**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| U.T.*<br>c/o National Immigrant Justice Center<br>224 S. Michigan Ave., Suite 600<br>Chicago, IL 60604;<br><br>E.R.*<br>c/o National Immigrant Justice Center<br>224 S. Michigan Ave., Suite 600<br>Chicago, IL 60604;<br><br>H.R.* and her minor son, J.R.* (by and through his mother),<br>c/o National Immigrant Justice Center<br>224 S. Michigan Ave., Suite 600<br>Chicago, IL 60604;<br><br>M.H.* and her minor daughter, H.D.* (by and through her mother),<br>c/o National Immigrant Justice Center<br>224 S. Michigan Ave., Suite 600<br>Chicago, IL 60604;<br><br>Tahirih Justice Center<br>6402 Arlington Blvd., Suite 300<br>Falls Church, VA 22042;<br><br>Las Americas Immigrant Advocacy Center<br>1500 East Yandell Drive<br>El Paso, TX 79902;<br><br>*Plaintiffs,*<br><br>v.<br><br>WILLIAM BARR, Attorney General of the United States, in his official capacity,<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530;<br><br>U.S. DEPARTMENT OF JUSTICE,<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530; | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case: 1:20−cv−00116
Assigned To : Sullivan, Emmet G.
Assign. Date : 1/15/2020
Description: TRO/Prelim. Injunct. (D−DECK)

JAMES MCHENRY, Director of the Executive )
Office for Immigration Review, in his official )
capacity, )
5107 Leesburg Pike )
Falls Church, VA 22041; )
 )
EXECUTIVE OFFICE OF IMMIGRATION )
REVIEW, )
5107 Leesburg Pike )
Falls Church, VA 22041; )
 )
CHAD F. WOLF, Acting Secretary of the )
Department of Homeland Security, in his official )
capacity, )
245 Murray Lane, SW )
Washington, DC 20528; )
 )
U.S. DEPARTMENT OF HOMELAND SECURITY, )
245 Murray Lane, SW )
Washington, DC 20528; )
 )
KENNETH T. CUCCINELLI, Acting Director of )
U.S. Citizenship and Immigration Services, in his )
official capacity, )
245 Murray Lane, SW )
Washington, DC 20528; )
 )
U.S. CITIZENSHIP AND IMMIGRATION )
SERVICES, )
20 Massachusetts Ave NW, )
Washington, DC 20529; )
 )
MARK MORGAN, Acting Commissioner of U.S. )
Customs and Border Protection, in his official )
capacity, )
1300 Pennsylvania Ave, NW )
Washington, DC 20229; )
 )
U.S. CUSTOMS AND BORDER PROTECTION, )
1300 Pennsylvania Ave, NW )
Washington, DC 20229; )
 )
MATTHEW ALBENCE, Acting Director of )
Immigration and Customs Enforcement, in his )
official capacity, )
500 12th Street, SW )

Washington, DC 20536;                          )
                                               )
U.S. IMMIGRATION AND CUSTOMS                   )
ENFORCEMENT,                                   )
500 12th Street, SW                            )
Washington, DC 20536;                          )
                                               )
                                               )
                        *Defendants.*          )
                                               )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

(Violation of Refugee Act, Immigration and Nationality Act, Administrative Procedure Act,
Foreign Affairs Reform and Restructuring Act of 1998, and Suspension Clause)

* Plaintiffs proceeding under a pseudonym are indicated with an asterisk.

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

JURISDICTION AND VENUE ........................................................................ 6

PARTIES ........................................................................................................... 6

BACKGROUND ............................................................................................... 13

I.      Federal Law Provides Several Forms of Protection for Individuals Fleeing Persecution and Torture ........................................................................ 13

        Asylum ......................................................................................................... 13

        Withholding of Removal and Protection Under the Convention Against Torture ........... 14

II.     Given the Importance of Preventing *Refoulement*, Congress and Agencies Created Numerous Procedural Safeguards in Removal Proceedings ........................ 16

III.    The Safe Third Country Provision, 8 U.S.C. § 1158(a)(2)(A), Sets Out a Narrow Exception to the Right to Apply for Asylum ................................ 18

        The Safe Third Country Agreement with Canada ................................................. 19

        Recent Agreements With Northern Triangle Countries ......................................... 20

IV.     The Interim Final Rule Creates a Procedural Framework That Is Inconsistent With the Safeguards Required in Removal Proceedings ................... 21

        The Rule Makes Onerous New Changes to Regular Removal Proceedings ................... 21

        The Rule Creates New Expedited Removal Procedures that Lack the Safeguards of the Statutory Credible Fear Interview Process ......................................... 22

        USCIS Guidance Concerning the Guatemala ACA Further Increases the Burden on Asylum Seekers ................................................................................ 24

V.      The Government Is Removing Asylum Seekers to Guatemala, and Is Poised to Begin Removals to Honduras, Without the Required Determinations that Their Asylum Systems Provide Access to Full and Fair Procedures. ............... 26

VI.     The Current ACA Countries—Guatemala, Honduras, and El Salvador—Are Extremely Dangerous and Unfit for Asylum Seekers ................................... 27

        Guatemala Is Not Safe for Asylum Seekers and Lacks a Full and Fair Asylum System ......................................................................................... 28

        El Salvador and Honduras Are Also Not Safe for Asylum Seekers and Lack Functioning Asylum Systems ........................................................................ 31

        It Is Dangerous to Shuffle Asylum Seekers Between Northern Triangle Countries ......... 33

VII.    The ACA Rule Is Inconsistent with International Law Regarding Safe Third Country Agreements ........................................................................ 33

VIII.   The Guatemala ACA Program Is Rapidly Expanding .................................... 35

IX.     Guatemala Has Proven Totally Unprepared to Receive Asylum Seekers Under Its ACA ................................................................................... 37

**X.   The ACA Rule and USCIS Guidance Cause Serious, Irreparable Harms to Plaintiffs.** ...................................................................................................... **39**

**CLAIMS FOR RELIEF** ......................................................................................... **42**

**PRAYER FOR RELIEF** ......................................................................................... **48**

## INTRODUCTION

1.      The United States has a longstanding commitment to protect people fleeing

persecution.  Congress has guaranteed that noncitizens who arrive or are physically present in the

United States may apply for asylum, subject to three narrow exceptions.  One of those exceptions

is that noncitizens may be denied the opportunity to apply for asylum in the United States and

instead be removed to seek protection elsewhere pursuant to a "safe third country" agreement.

That exception only applies if strict statutory requirements are met, including that the asylum

seeker would have a full and fair opportunity to seek asylum in the "safe third country" and

would not face persecution or torture there.

2.      For years, our only safe third country agreement was with Canada, a safe nation

with a robust asylum system.  Then, last summer, the United States signed three new "asylum

cooperative agreements" ("ACAs") with Guatemala, Honduras, and El Salvador—extremely

dangerous, refugee-producing countries with asylum systems that are skeletal at best.

3.      On November 19, 2019, the government issued an Interim Final Rule titled

"Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the

Immigration and Nationality Act" (the "Rule").  The Rule establishes procedures for the removal

of asylum seekers to Guatemala, Honduras, and El Salvador, and to any other countries with

which the United States signs future ACAs.  The Rule's aim is to permit the "distribution of

hundreds of thousands of asylum claims" to other countries.  84 Fed. Reg. at 63,994.

4.      On November 20, the government issued written guidance implementing its ACA

with Guatemala and began removing non-Guatemalan asylum seekers there.

5.      This lawsuit challenges the Rule, as well as agency guidance implementing the

Guatemala ACA (the "USCIS Guidance"), which unlawfully slam our nation's doors on people

fleeing horrific violence and other forms of persecution by denying them the right to apply for

asylum in the United States and shipping them to dangerous countries where there is virtually no

chance they will find refuge.  Indeed, the Rule has already put the Individual Plaintiffs in this

case, and others like them, in harm's way by removing them to Guatemala and forcing them to

decide between remaining there, where they fear for their lives, and returning to the countries

from which they fled persecution.

      6.     The Rule and the USCIS Guidance allow for the removal of vulnerable asylum

seekers to a *different* dangerous country from that which they fled, even one where they have

never set foot.  For example, under the Rule and Guatemala ACA, the United States could deport

an Afghan or Mexican asylum seeker to Guatemala.  Moreover, the Rule and the USCIS

Guidance provide for their removal without adequate measures to ensure that they will be safe

and have access to asylum or other protection from persecution.

      7.     The nations that have signed ACAs so far—Guatemala, El Salvador, and

Honduras—are impoverished, unstable, and among the most dangerous places in the world.

Known collectively as Central America's Northern Triangle, they have extremely high murder

rates, rampant gender-based violence, and virtually no ability to receive asylum seekers.  Indeed,

all three countries *generate* large numbers of refugees due to epidemic levels of violence and

instability typically seen in war zones.  In 2017 and 2018, the Northern Triangle countries were

three of the top four countries of origin for individuals *granted* asylum in the United States.

      8.     The government's willingness to sign ACAs with these countries illustrates that

its true goal is not to promote burden sharing while ensuring the safety of refugees.  Rather, the

Rule and ACAs simply turn away asylum seekers and pass the buck to other countries, regardless

of what happens to the individuals.  As one asylum officer said, "This agreement [with Guatemala] feels like a pretext to get rid of as many asylum claims as possible."[1]

9.      Because of the Rule, vulnerable asylum seekers are shut out of the United States and left to seek protection in countries with barely functioning asylum systems that cannot adequately protect them.  And if the receiving country rejects an individual's claim, that individual likely cannot get another chance at asylum in the United States.  The result is a deadly game of musical chairs that leaves many desperate asylum seekers without a safe haven, in violation of U.S. and international law.

10.      The only escape valve from this trap is for an asylum seeker to demonstrate that they are more likely than not to face persecution or torture in *every one* of the possible receiving countries that the government designates.  Yet under the Rule, an asylum seeker will only get the opportunity to demonstrate this likelihood of harm if they volunteer, without ever being asked, that they are afraid of being sent to one or more of those countries.  And even if an asylum seeker does affirmatively express such a fear, they must then demonstrate their likelihood of persecution or torture during a rushed interview almost immediately after a harrowing journey to the United States; without time to prepare, research, or compile documentation; without talking to a lawyer or being represented by one during the interview; and without review of the decision by an immigration judge.

11.      Moreover, although called a "threshold screening interview," 84 Fed. Reg. at 64,008, the Rule applies the more-likely-than-not standard, which is higher than even the ultimate burden to win asylum and is otherwise reserved for decisions on claims for

---

[1] Hamed Aleaziz, *Asylum Officers Were Told of Killings and Violence in Guatemala. They Were Ordered to Send People There Anyway.*, BuzzFeed News (Nov. 21, 2019), https://tinyurl.com/Buzzfeed-GuatemalaGuidance.

"withholding of removal"—a more limited form of protection against persecution—made after a full evidentiary removal hearing before an immigration judge with the rights to counsel, to present and cross-examine witnesses, and to both administrative and judicial review. The Rule's bare bones procedures, by contrast, are woefully inadequate to ensure that those who risk persecution, torture, or death in receiving countries will not be erroneously removed to danger there.

12.     The Rule and USCIS Guidance cast aside our asylum laws, which reflect Congress's carefully considered balance between effectuating our broad, historic commitment to protecting refugees fleeing persecution and torture—a commitment with origins in the 1951 United Nations Convention Relating to the Status of Refugees—and ensuring fairness and efficiency in the asylum process. First, it violates the Immigration and Nationality Act's ("INA") safe third country provision, 8 U.S.C. § 1158(a)(2)(A), which requires an individualized likelihood-of-persecution determination in *every* case prior to removal to a third country. Second, the Rule violates the withholding of removal statute, 8 U.S.C. § 1231(b)(3), and the Foreign Affairs Reform and Restructuring Act of 1998, which bar the removal of individuals to countries where their lives or freedom would be threatened on account of a protected ground or where they would be tortured, and their implementing regulations. And third, the Rule violates the expedited removal statute, 8 U.S.C. § 1225(b), by denying access to a credible fear interview, and by depriving asylum seekers of numerous procedural safeguards that Congress created as prerequisites to the imposition of an expedited removal order in their cases.

13.     Additionally, the Rule and USCIS Guidance violate § 1158(a)(2)(A)'s requirement that any receiving nation must be equipped to provide asylum seekers "access to full and fair procedures for determining [their] claim[s] to asylum." The Rule prohibits case-by-case

consideration of this requirement and instead calls for a categorical designation that a country meets this standard with respect to all asylum seekers *before* ACA removals to that country begin. But ACA removals to Guatemala are well underway and are set to begin to Honduras, and no such designations for those countries have been issued publicly. In the absence of any lawful categorical designation, the lack of individualized consideration of this statutory requirement violates the statute. And to the extent that some secret, categorical designations have been made, they have failed to account for the dire security situations and failing asylum systems in the receiving countries, as required by statute. At the very least, any designation that fails to adequately consider these highly relevant factors would be arbitrary and capricious in violation of the Administrative Procedure Act ("APA"). With the government refusing to even address these essential statutory requirements, there are no limits on where it might send asylum seekers. Indeed, the government is already using the Rule to remove gay men—like the lead Plaintiff in this case—to Guatemala, a country that persecutes LGBT persons, as the U.S. State Department has recognized.

14.     The Rule is also arbitrary and capricious in violation of the APA because it inexplicably fails to include even the most basic safeguards to ensure that individuals are not returned to countries where they face persecution, and departs without acknowledgment or explanation from the procedures otherwise used by the government to protect against removal to persecution or torture.

15.     In addition, the agencies issued the Rule without prior notice and opportunity for public comment, and effective immediately, in violation of the APA's procedural requirements.

16.     Finally, the Rule subjects individuals to expedited removal to third countries

without the constitutionally required level of federal court review of an expedited removal order,

and so violates the Suspension Clause.

17.     In short, the Rule recklessly subverts our legal framework for *accepting* refugees

into a machinery for casting them off into circumstances as perilous as those they fled.

## JURISDICTION AND VENUE

18.     This case arises under the APA, 5 U.S.C. § 701, *et seq.*; the INA, 8 U.S.C. § 1101,

*et seq.*, and its implementing regulations; the Foreign Affairs Reform and Restructuring Act of

1998, Pub. L. No. 10-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified

as Note to 8 U.S.C. § 1231); and the United States Constitution.  This Court has subject matter

jurisdiction under 28 U.S.C. § 1331 and under 8 U.S.C. § 1252(e)(3).

19.     Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of

the United States and officers of the United States acting in their official capacity and reside in

this District, and a substantial part of the events or omissions giving rise to the claim occurred in

this District.  Venue is further appropriate under 8 U.S.C. § 1252(e)(3)(A).

## PARTIES

20.     The Individual Plaintiffs are noncitizens who came to the United States to seek

asylum and were unlawfully removed to Guatemala pursuant to the Rule, the USCIS Guidance,

and the Guatemala ACA.[2]  The Organizational Plaintiffs are organizations that serve asylum

seekers.

21.     Plaintiff U.T. is a gay man from El Salvador.  When U.T. was a young child, a

male relative sexually abused him.  As he grew up, he struggled to come to terms with his sexual

---

[2] The Individual Plaintiffs are seeking leave to proceed under their initials in this case, and have
filed a separate motion under seal as to that issue, with declarations setting forth the details

orientation due to his family's and his country's homophobic views.  U.T. moved within El Salvador looking for a place where he could be open about his sexual orientation, but he never found a place where he was safe.  He fled El Salvador after an MS-13 gang member solicited him for sex and threatened him.  When U.T. finally came out to his parents, they disowned him; his mother said she would rather be dead than have a gay son.  Now, U.T. fears that he will be attacked or killed for his sexual orientation if he tries to live openly as a gay man in El Salvador.

22.     U.T. travelled through Guatemala en route to the United States and, while there, was subjected to homophobic slurs on the street.  When he entered the United States, border officials told him that because of the Guatemala ACA, he would be removed to Guatemala. When U.T. told the officer that he did not want to go to Guatemala because it is not safe for gay people there, the officer said he would have an interview to explain.  In that interview, which lasted less than an hour, U.T. tried to explain his fear of removal to Guatemala.  Not long after this interview, U.T. was removed to Guatemala, where he was given 72 hours to decide whether to pursue asylum in Guatemala.  U.T. decided to apply for asylum in Guatemala, but because that country is also unsafe for gay people, Guatemalan officials advised him to go to Mexico, where they said he could apply for asylum.  U.T. is in Mexico for now, but he remains uncertain how or where to find safety.

23.     Plaintiff E.R. fled his native Honduras after members of the MS-13 gang repeatedly attacked him and threatened his life.  Gang members came to E.R.'s workplace and told him that he could either sell drugs for the gang, become the gang's mechanic, or pay an extortion payment.  When he explained that he was not the owner of the business and he had no

---

provided here.  They are referred to in this complaint using their initials, but their true names have been provided in conjunction with the motion to proceed under pseudonym.

ability to decide to pay, the gang members attacked him. The first time, they hit him over the head with a bat. On another occasion, they stabbed him multiple times with a broken bottle. Each of these incidents caused significant injury and required hospitalization. E.R. knew that he could not go to the local police to report these problems because the police in his community work with the gang, and reporting them would only make things worse.

24.     E.R. fled Honduras and was detained when he entered the United States. Border officials told him that because of the Guatemala ACA, he would be removed to Guatemala. E.R., however, said that he was afraid of going to Guatemala. E.R. knew that the MS-13 could locate him there. He also insisted that he had evidence to support his claim for asylum, but officials told him that he did not need to present that evidence and instead asked him only about Guatemala. E.R. was removed to Guatemala in December 2019, about 10 days after he entered. Once in Guatemala, E.R. was given 72 hours to decide whether to apply for asylum in Guatemala. E.R. did not believe that he would be safe in Guatemala because the MS-13 can reach him there. He also felt pressure to leave the shelter where he stayed temporarily and did not have any support in Guatemala to help protect him. He is now in hiding in Honduras temporarily, but believes he is not safe there either. E.R. remains uncertain how or where to find safety.

25.     Plaintiff H.R. is a Salvadoran woman who was forced to flee her country after the MS-13 gang killed two of her siblings and began threatening her teenage daughter. H.R. and her family reported her siblings' murders to the police. After the police failed to investigate the murders, H.R. and her family began seeking answers on their own. The gang threatened H.R. and her family with death and told them to stop investigating. H.R. and her children attempted to relocate within El Salvador, but they did not feel safe. H.R. fled El Salvador with her two

children after the MS-13 attempted to force her teenage daughter into a relationship with a gang member.

26.     H.R. and her children traveled through Guatemala, where they stood out as migrants. Police demanded their documents, and extorted money from them upon learning that they were migrants. Feeling unsafe in Guatemala, they continued on to Mexico. H.R. became separated from her teenage daughter in Mexico, and her daughter is now in a migrant shelter for children in the United States. H.R. and her son J.R. crossed the border into the United States on December 24, 2019. An asylum officer interviewed H.R. and told her that because of the ACA, she would be removed to Guatemala or El Salvador. H.R. explained her fear of return to El Salvador and Guatemala and attempted to present evidence to the officer, but she and her son were removed to Guatemala on January 6, 2020. After being removed to Guatemala, H.R. was given 72 hours to decide whether to apply for asylum in Guatemala. H.R. had no resources or ability to protect herself and her child in Guatemala, and she was anxious to get documents from El Salvador to secure her daughter's release from detention in the United States. So, she returned to El Salvador temporarily, where she fears for her and her son's lives. H.R. remains uncertain how or where she and her child can find safety.

27.     Plaintiff J.R. is the minor son of Plaintiff H.R. He traveled to the United States with H.R., intending to seek asylum with her, and he was removed to Guatemala with H.R.

28.     Plaintiff M.H. is a woman from Honduras who fled to the United States with her minor daughter, H.D. Both M.H.'s common-law husband and her sister-in-law worked in the transportation business in Honduras and were forced to pay extortions to local gangs in order to work. They were murdered one year apart from one another. In May 2019, M.H. was threatened by a man who owned and operated taxis in the same city where her husband and sister-in-law

worked and who had detailed information about her, her daughter, and the murders of her husband and sister-in-law.  In November 2019, when M.H. paid a brief visit to Guatemala, she received an alarming text message from an unknown person letting her know that the person knew she was away from her home but was nevertheless close by.  Fearing for her and her daughter's safety, M.H. and H.D. fled to the United States.

29.     M.H. and her daughter entered the United States in December 2019, presented themselves to immigration officials, and requested asylum.  Officials told M.H. that because of a new policy, she and her daughter would be removed to Guatemala.  M.H. explained that she had been threatened while in Guatemala, and she asked for an opportunity to obtain a lawyer and present evidence that she had brought with her.  Officials refused to allow her time to obtain a lawyer, denied her an opportunity to present evidence in connection with her claims, and removed her to Guatemala.  There, M.R. learned that she had 72 hours to decide whether to stay in Guatemala and apply for asylum or return to Honduras.  Feeling that she had no means to remain safe or support herself in Guatemala, M.H. and her daughter returned temporarily to Honduras.  M.H. remains uncertain how or where she and her daughter can find safety.

30.     Plaintiff H.D. is the minor child of Plaintiff M.H.  She traveled to the United States with her mother, intending to seek asylum with her.  Both were removed from the United States to Guatemala under the ACA.

31.     Plaintiff Las Americas Immigrant Advocacy Center ("Las Americas") is a nonprofit legal services organization based in El Paso, Texas, dedicated to serving the legal needs of low-income immigrants, including asylum seekers.  An essential part of Las Americas' mission is to provide immigration counseling and legal services to asylum seekers who are detained by the federal government in the El Paso area and subjected to expedited removal.  This

work includes assisting asylum seekers to prepare for their credible fear interviews with asylum officers, representing them during those credible fear interviews, and representing them throughout the process of obtaining immigration judge review of negative credible fear determinations.  Las Americas also represents detained asylum seekers in other settings, such as in connection with bond and parole requests, and in regular removal proceedings in immigration court.

32.     Plaintiff Tahirih Justice Center ("Tahirih") is a nonprofit and non-partisan organization that provides free legal immigration services to survivors of gender-based violence. Tahirih's mission is to provide free holistic services to immigrant women and girls fleeing violence such as rape, domestic violence, female genital mutilation/cutting, forced marriage, and human trafficking, and who seek legal immigration status under U.S. law.  Tahirih offers legal representation and social services for individuals who seek protection, including asylum, in their immigration proceedings.  Tahirih operates from five offices across the country, which are located in Falls Church, Virginia; Baltimore, Maryland; Atlanta, Georgia; Houston, Texas; and San Bruno, California.

33.     Defendant William Barr is the Attorney General of the United States.  He is sued in his official capacity.  In that capacity, he issued the Rule challenged in this suit.  The Attorney General is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and is empowered to grant asylum or other relief.

34.     Defendant U.S. Department of Justice ("DOJ") is a cabinet-level department of the United States federal government.

35.     Defendant James McHenry is the Director of the Executive Office for Immigration Review ("EOIR").  He is sued in his official capacity.

36.     Defendant EOIR is the sub-agency of DOJ that, through its immigration judges, conducts removal proceedings and provides limited review of negative credible fear determinations.

37.     Defendant Chad F. Wolf is the Acting Secretary of Homeland Security. He is sued in his official capacity. In that capacity, he issued the Rule challenged in this suit. He directs each of the component agencies within the Department of Homeland Security. In his official capacity, Defendant Wolf is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, and is empowered to grant asylum and other immigration benefits.

38.     Defendant U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the United States federal government. Its components include U.S. Citizenship and Immigration Services ("USCIS"), Customs and Border Protection ("CBP"), and Immigration and Customs Enforcement ("ICE").

39.     Defendant Kenneth T. Cuccinelli is the Acting Director of USCIS. He is sued in his official capacity.

40.     Defendant USCIS is the sub-agency of DHS that, through its asylum officers, conducts interviews of individuals who apply for asylum. USCIS issued guidance on implementing the U.S.-Guatemala ACA. Pursuant to the Rule and USCIS Guidance, USCIS asylum officers conduct "threshold screening interviews" to determine whether noncitizens can be removed to a receiving country.

41.     Defendant Mark A. Morgan is the Acting Commissioner of CBP. He is sued in his official capacity.

42.     Defendant CBP is the sub-agency of DHS that is responsible for the initial processing and detention of noncitizens who are apprehended near the U.S. border or who

present themselves at ports of entry.  CBP makes the initial determination whether an individual

in expedited removal is "amenable" to removal pursuant to an ACA and refers the individual to

USCIS for a "threshold screening interview."

43.     Defendant Matthew T. Albence is the Acting Director of ICE.  He is sued in his

official capacity.

44.     Defendant ICE is the sub-agency of DHS that is responsible for carrying out

removal orders and overseeing immigration detention.

## BACKGROUND

**I.      Federal Law Provides Several Forms of Protection for Individuals Fleeing Persecution and Torture.**

45.     Federal law provides three primary forms of protection for individuals fleeing

persecution and torture: asylum under 8 U.S.C. § 1158; withholding of removal under 8 U.S.C.

§ 1231(b)(3); and protection under the Convention Against Torture ("CAT"), *see* 8 C.F.R.

§ 1208.16-18.

**<u>Asylum</u>**

46.     Asylum affords protection to individuals who have a "well-founded fear of

persecution" on account of one or more of five protected grounds: race, religion, nationality,

political opinion, or membership in a particular social group.  8 U.S.C. § 1101(a)(42)(A).  A

"well-founded fear of persecution" is defined as a ten percent chance of persecution.  *INS v.*

*Cardoza-Fonseca*, 480 U.S. 421, 430, 440 (1987).  Past persecution gives rise to a presumption

of a well-founded fear and thus of asylum eligibility.

47.     Subject to several narrow exceptions, including the safe third country exception at

issue here, "[a]ny alien who is physically present in the United States or who arrives in the

United States . . . , irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, [8 U.S.C. §] 1225(b)." 8 U.S.C. § 1158(a)(1).

48.     There are three principal ways to seek asylum.  First, a noncitizen not in removal proceedings may file an "affirmative" application to USCIS, and complete an interview with an asylum officer.  8 C.F.R. §§ 208.2(a), 208.9.  Second, a noncitizen in regular removal proceedings, 8 U.S.C. § 1229a, may submit a "defensive" asylum application to the immigration judge as a form of relief from removal, 8 C.F.R. § 208.2(b).  Third, a noncitizen who has been placed in "expedited removal"—a truncated removal process that may be applied to certain noncitizens who arrive at the border or enter without inspection, 8 U.S.C. § 1225(b)(1)—may also raise an asylum claim.  The noncitizen may do so by expressing fear of removal and undergoing a "credible fear" interview with an asylum officer to screen for asylum eligibility. By statute, the asylum officer must apply a low threshold screening standard, not the ultimate asylum standard.  Any noncitizen who satisfies that low bar must be referred to regular removal proceedings, where they can apply for asylum.

**Withholding of Removal and Protection Under the Convention Against Torture**

49.     Like asylum, withholding of removal protects individuals facing persecution on account of a protected ground.  The withholding provision, 8 U.S.C. § 1231(b)(3), bars the government from "remov[ing] an alien to a country if . . . the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."  Whereas winning asylum requires showing a ten percent chance of persecution, being granted withholding requires showing that persecution is more likely than not—a much higher bar.  *INS v. Stevic*, 467 U.S. 407, 429-30 (1984).  The withholding statute bars removal to *any* country as to which this showing is made, not just an

individual's home country.  Just as with asylum, a showing of past persecution creates presumptive eligibility for relief.

50.     A noncitizen in regular removal proceedings—even one who is ineligible for asylum—may apply for withholding of removal before an immigration judge.

51.     A noncitizen who expresses a fear of removal during expedited removal is screened for withholding eligibility by an asylum officer who applies a low threshold screening standard.

52.     Immigration regulations implementing the Convention Against Torture ("CAT") likewise prohibit the removal of a noncitizen to any country where "it is more likely than not that he or she would be tortured."  8 C.F.R. § 208.16(c)(2).

53.     The withholding of removal statute and the CAT regulations also implement international treaty obligations not to send noncitizens to countries where they face persecution or torture, known as *non-refoulement* obligations.  The Supreme Court has held, *see Stevic*, 467 U.S. at 421, 426 n.20, that the withholding statute addresses the requirement in Article 33 of the 1951 Refugee Convention that no signatory "expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."  The CAT regulations address the requirement in Article 3 of the CAT that "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture."

54.     These prohibitions on *refoulement* encompass both direct *refoulement*—sending asylum seekers directly to countries where they face persecution or torture—and indirect

*refoulement*—sending asylum seekers to countries that then send them onward to persecution or torture.

55.     An asylum officer cannot decide claims for withholding of removal and CAT protection.  Only an immigration judge can make these ultimate determinations of whether a noncitizen's removal to a given country is prohibited by our *non-refoulement* obligations under the Refugee Convention and the CAT.  8 C.F.R. § 1208.16(a), (c)(4).

## II.     Given the Importance of Preventing *Refoulement*, Congress and Agencies Created Numerous Procedural Safeguards in Removal Proceedings.

56.     The Rule challenged here denies noncitizens subject to an ACA the opportunity to apply for asylum, withholding of removal, and CAT protection.  As explained further below, it does so by creating new procedures that apply to individuals in expedited removal proceedings, where it imposes an extra-statutory process outside of the mandated credible fear interview framework, and to individuals in regular removal proceedings.  Those procedures depart drastically from the safeguards that Congress and federal agencies have long required to ensure that bona fide asylum seekers are not removed to persecution or torture.

57.     Generally, noncitizens subjected to expedited removal are ordered removed by an immigration officer "without further hearing or review."  8 U.S.C. § 1225(b)(1)(A)(i).  But Congress crafted an exception for individuals who express fear of removal.

58.     To determine if that exception applies, immigration officers must affirmatively ask noncitizens whether they have "any fear or concern about being returned to [their] home country or being removed from the United States."  Form I-867AB; 8 C.F.R. § 235.3(b)(2)(i) (requiring immigration officers to use Form I-867AB).  A noncitizen who expresses such a fear is entitled to a "credible fear" interview.  8 U.S.C. § 1225(b)(1)(B).

16

59.    At the credible fear interview, the asylum officer must affirmatively "elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture."  8 C.F.R. § 208.30(d).

60.    Because the credible fear interview is a threshold screening device, noncitizens need not satisfy the ultimate standards for asylum, withholding of removal, or CAT protection. Instead, they need only show a "significant possibility" that they could establish eligibility in a full removal hearing.  *See* 8 U.S.C. § 1225(b)(1)(B)(v); 8 C.F.R. § 208.30 (e)(2)-(3).  Because asylum requires a showing of a one in ten chance of persecution, it follows that a "significant possibility" of eligibility for asylum is just a fraction of that.  The standard is also met by demonstrating past persecution.

61.    The reason for applying a lower standard at this threshold screening stage is straightforward.  Asylum, withholding, and CAT claims are highly fact-specific and take significant time, resources, and expertise to develop, and often require expert testimony and extensive evidence about country conditions.  They also often involve complex legal questions. But credible fear interviews occur while individuals are detained, within days of their arrival, and often when they are still traumatized from the dangers they fled and their journeys to the United States.  It is impossible to present fully developed protection claims in this context.  Thus, Congress created a low threshold at the credible fear stage to ensure that potentially valid protection claims could be developed properly before an immigration judge, so that bona fide asylum seekers would not be summarily removed.

62.    If the asylum officer finds a "significant possibility" that the individual "could establish eligibility for asylum," the individual is placed in regular removal proceedings, where

17

they will have the opportunity to develop a full record supporting their protection claims before an immigration judge.

63.     In addition to expedited removal, there are two other statutory summary removal processes to which certain noncitizens may be subjected: administrative removal of non-permanent residents convicted of aggravated felonies, and reinstatement of removal of certain previously removed noncitizens who return to the United States without authorization.  8 U.S.C. §§ 1228(b), 1231(a)(5).  Although noncitizens subject to these proceedings are not permitted to apply for asylum, if they express a fear of persecution or torture, they are screened for potential entitlement to withholding of removal and CAT protection.  As in credible fear interviews, the ultimate standard for entitlement to withholding of removal and CAT protection—more likely than not—is *not* applied in these screenings.  The threshold screening standard for these summary removal processes is called "reasonable fear," which can be satisfied either by demonstrating past persecution or by meeting the lower standard for a grant of asylum, which is a ten percent chance of future persecution or torture.  Reasonable fear interviews provide similar basic procedural safeguards to credible fear interviews, including the right to consult with and be represented by counsel and immigration judge review.  *See* 8 C.F.R. §§ 208.31(c), (g).  A noncitizen who passes this screening can present their withholding and CAT claims before an immigration judge.

64.     In regular removal proceedings, noncitizens have the right to counsel, to present evidence, to cross-examine witnesses, and to administrative and judicial review.

**III.   The Safe Third Country Provision, 8 U.S.C. § 1158(a)(2)(A), Sets Out a Narrow Exception to the Right to Apply for Asylum.**

65.     Congress created the safe third country provision at 8 U.S.C. § 1158(a)(2)(A) as one of three narrow exceptions to the right to seek asylum.  (The two other exceptions affect

individuals who fail to apply within one year of their arrival, 8 U.S.C. § 1158(a)(2)(B), and those

who had a previous application denied, *id.* § 1158(a)(2)(C), and are not at issue in this case).

Under the safe third country provision, an individual may not apply for asylum "if the Attorney

General determines that the alien may be removed, pursuant to a bilateral or multilateral

agreement, to a country (other than the country of the alien's nationality or, in the case of an

alien having no nationality, the country of the alien's last habitual residence) in which the alien's

life or freedom would not be threatened on account of race, religion, nationality, membership in

a particular social group, or political opinion, and where the alien would have access to a full and

fair procedure for determining a claim to asylum or equivalent temporary protection, unless the

Attorney General finds that it is in the public interest for the alien to receive asylum in the United

States."

66.     The safe third country provision may not be applied to unaccompanied children.

8 U.S.C. § 1158(a)(2)(E).

**The Safe Third Country Agreement with Canada**

67.     Congress enacted the safe third country provision in 1996 in light of negotiations

initiated by Canada, which had long sought such an agreement with the United States.

68.     Canada is a global leader in refugee protection.  In 2001, the year before our safe

third country agreement with Canada was signed, it processed more than 44,000 asylum

applications.[3]  Between 2000 and 2019, Canada processed more than 28,000 applications per

year on average.[4]

---

[3] Statistics Canada, Just the Facts: Asylum Claimants (May 17, 2019),
https://www150.statcan.gc.ca/n1/pub/89-28-0001/2018001/article/00013-eng.htm.
[4] *Id.*; Government of Canada, Asylum Claims by Year – 2019 (last modified Dec. 18, 2019),
https://tinyurl.com/CanadaAsylumClaims2000-2019.

69.     Canada re-initiated negotiations on a safe third country agreement in 2001.  That process included public meetings with U.S. government officials and the Office of the U.N. High Commissioner for Refugees ("UNHCR"), publication of the draft agreement, and a hearing on the issue before the House Immigration Subcommittee.

70.     During the negotiations, the State Department looked to the European Union's Dublin Regulation governing the transfer of asylum seekers, which revealed "how tremendously complex, and potentially problematic, it is to implement these types of arrangements for bona fide refugees."[5]

71.     The United States signed the safe third country agreement with Canada on December 5, 2002.  Subject to several exceptions—including a generous family unification exception—that agreement provides that an asylum seeker who arrives at a land port of entry on the U.S.-Canada border may be removed to the other country to apply for asylum.  The agreement entered into force on December 29, 2004, one month after the United States issued procedural regulations adopted pursuant to regular notice-and-comment procedures.

**Recent Agreements With Northern Triangle Countries**

72.     For more than sixteen years after signing the agreement with Canada, the United States did not enter into any other safe third country agreement.  However, between June and September 2019, the U.S. government signed three new "asylum cooperative agreements" ("ACAs") with Guatemala, El Salvador, and Honduras.

73.     The context of these ACAs contrasts sharply with the U.S.-Canada safe third country agreement.  Unlike Canada, which is a stable democracy that accepts large numbers of

---

[5] *U.S. & Canada Safe Third Country Agreement: Hearing Before the H. Subcomm. on Immigr., Border Security, and Claims*, 107th Cong. 17 (Oct. 16, 2002) (statement of Deputy Assistant Secretary of State Kelly Ryan).

asylum seekers and has low levels of violence, Guatemala, El Salvador, and Honduras have epidemic levels of violence and *produce* large numbers of asylum seekers fleeing to the United States and other countries, as discussed below.

## IV.   The Interim Final Rule Creates a Procedural Framework That Is Inconsistent With the Safeguards Required in Removal Proceedings.

74.     On November 19, 2019, Defendant Attorney General Barr and Defendant Acting Secretary of Homeland Security Wolf promulgated the Rule, "Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act." 84 Fed. Reg. 63,994.  The Rule creates a procedural framework for removals under the Guatemala, Honduras, and El Salvador agreements and any future ACAs by instituting new procedures that apply to individuals in regular and expedited removal proceedings.

75.     Defendants issued the Rule without following the APA requirements of notice and comment rulemaking followed by a 30-day implementation period.  *See* 5 U.S.C. § 553(b)(B), (d).  Instead, they asserted the good cause and foreign affairs exceptions to these requirements.  *See* 5 U.S.C. § 553(a)(1), (b)(B), (d)(3).

**The Rule Makes Onerous New Changes to Regular Removal Proceedings**

76.     The Rule amends DOJ regulations governing *regular* removal proceedings by authorizing immigration judges to order asylum seekers removed to ACA countries before hearing the merits of their asylum, withholding, and CAT claims as to their home countries.  As to any ACA countries to which removal is proposed, the immigration judge would have to determine whether it is more likely than not that the applicant would be persecuted or tortured there.  Thus, to avoid being ordered removed, an applicant would have to present evidence and satisfy the more-likely-than-not standard as to *every* possible ACA country.

77.     By requiring noncitizens to demonstrate eligibility for withholding of removal or

CAT protection as to *every* ACA-signatory country to which the government argues they can be

removed, *before* they have a chance present their asylum claims on the merits, the Rule imposes

severe new substantive and practical burdens on asylum seekers and the attorneys and legal

services organizations who represent them.

78.     Additionally, while the safe third country provision confers on immigration

judges in regular removal proceedings the authority to apply a broad "public interest" exception

in cases where that provision could otherwise bar asylum, *see* 8 U.S.C. § 1158(a)(2)(A), the Rule

constrains that power, and asserts that immigration judges may apply that exception only with

the permission of DHS attorneys.

**The Rule Creates New Expedited Removal Procedures that Lack the Safeguards of the
Statutory Credible Fear Interview Process**

79.     For individuals in *expedited* removal, the Rule strips away essential procedural

safeguards that Congress created to protect asylum seekers from *refoulement* to countries where

they may be persecuted or tortured.  If the government deems an asylum seeker in expedited

removal proceedings potentially removable under an ACA, the asylum seeker is diverted away

from the normal credible fear process into a new process created by the Rule.  Instead of

receiving a credible fear interview, the Rule provides that the asylum seeker "shall be provided

written notice that if he or she fears removal to the prospective receiving country because of the

likelihood of persecution on account of a protected ground or torture in that country . . . the alien

should affirmatively state to the officer such a fear of removal." 84 Fed. Reg. at 64,009.  The

Rule does not explain when such notice will be provided, who shall provide it, whether it must

be in the noncitizen's language, or how notice is to be given if the noncitizen is illiterate.  Unlike

in the credible fear regulations, there is no requirement under the Rule that the officer affirmatively ask noncitizens whether they fear harm in the receiving country.

80.     If the noncitizen does not affirmatively state a fear of removal to an ACA country, no assessment of whether they are at risk of persecution or torture in that country ever happens. If the noncitizen does express such a fear, an asylum officer will assess their risk of persecution or torture in the ACA country in what the Rule calls a "threshold screening interview."  84 Fed. Reg. at 64,008-64,009.

81.     In that interview, the Rule provides that the officer will "determine whether it is more likely than not that the alien would be persecuted on account of a protected ground or tortured in that country," 84 Fed. Reg. at 64,009—which is the *ultimate* standard for receiving withholding or CAT relief in a full removal hearing before an immigration judge, not the lower screening standard used in credible fear or reasonable fear interviews.  Only if the noncitizen meets that ultimate standard as to every ACA country to which they are susceptible to removal, *see id.*, will the noncitizen then receive a normal credible fear interview regarding their fear of removal to their home country.

82.     Thus, a noncitizen subject to an ACA will receive a credible fear interview—and have the chance of developing and presenting her asylum claims to an immigration judge—only if they *both* affirmatively express a fear of removal to the ACA country and manage to satisfy the *ultimate* standard for withholding of removal or CAT relief by showing that they are more likely than not to be persecuted or tortured in the ACA country.

83.     Unlike in credible fear interviews, moreover, the noncitizen subjected to an ACA interview must make this much greater evidentiary showing without any opportunity to consult with or be represented by counsel.

23

84.     The absence of an opportunity to consult with or be represented by counsel also contrasts sharply with expedited removal pursuant to the U.S.-Canada Safe Third Country Agreement. Regulations implementing that agreement—which applies only to individuals who present at a port of entry along the northern border—permit consultation with and representation by counsel in connection with the screening interviews in which asylum officers determine whether to apply that agreement. 8 C.F.R. § 208.30(d)(4); 65 Fed. Reg. 76,121, 76,129 (Dec. 6, 2000) (final rule).

85.     If, after the ACA interview, the asylum officer determines that the noncitizen does not meet the more-likely-than-not standard, the noncitizen cannot apply for asylum, withholding of removal, or CAT protection in the United States, and is subject to immediate removal to the ACA country once a supervisory asylum officer signs off on the decision.

86.     The asylum officer's determination that a noncitizen is barred from applying for asylum and may be removed to a third country under an ACA is final. The Rule forbids an immigration judge from reviewing that determination. Thus, the asylum officer renders a conclusive determination that the noncitizen's removal complies with the withholding and CAT statutes.

87.     The only way for a noncitizen subject to an ACA to avoid removal to the ACA country is to abandon their asylum claim and accept a removal order to their *home* country— which, of course, is the country from which they are seeking asylum in the first place.

**USCIS Guidance Concerning the Guatemala ACA Further Increases the Burden on Asylum Seekers**

88.     On November 19, 2019, the same day the Rule was published in the Federal Register, USCIS distributed written guidance for asylum officers on conducting interviews concerning the Guatemala ACA. That USCIS Guidance provided the background and legal

framework for the agreement and its implementation and an explanation of the threshold

screening process, exceptions to the agreement, how to elicit evidence to support an exception,

the process for reviewing an asylum officer's decision about the applicability of an ACA, and

what happens after the interview with an asylum officer.

89.     The USCIS Guidance sets forth details about the procedures Defendants apply to

remove non-Guatemalan asylum seekers to Guatemala under the ACA.

90.     First, CBP officers processing individuals at the border make the initial

determination as to whether a noncitizen falls under an ACA.  To be removed under the

Guatemala ACA, the noncitizen initially had to be a national of Honduras or El Salvador and

must not have been convicted of a felony in the United States or any crime in Guatemala.  (The

list of amenable nationalities can be modified; Defendants have publicly stated that no

nationalities are exempt.  *See infra* ¶ 136.).

91.     CBP then gives the noncitizen a "Tear Sheet" stating, inter alia, that they could be

removed to Guatemala, that they will be referred to an asylum officer over the phone or in person

to determine whether they meet an exception to the Guatemala ACA, and that they "may express

a fear of removal to Guatemala or a fear of persecution or torture in Guatemala."

92.     Additionally, the USCIS Guidance provides that in ACA interviews—unlike in

withholding of removal adjudications in regular removal proceedings, or in threshold evaluations

of potential withholding eligibility in credible fear and reasonable fear interviews—

demonstrating past persecution in Guatemala does *not* create a presumption of future

persecution.  Instead, such a showing will just count as "strong evidence" of the likelihood of

future persecution.  The asylum officer *cannot* determine that a noncitizen is more likely than not

to face persecution based solely on past persecution.

93.     Along with the USCIS Guidance, asylum officers have been provided training

materials that describe pervasive violence committed with impunity in Guatemala.[6]

94.     On January 10, 2020, Defendants announced that they had finalized the

implementing agreement for the ACA with Honduras.  The details of that agreement and any

guidance to asylum officers regarding application of the ACA with Honduras have not yet been

made public.

## V.     The Government Is Removing Asylum Seekers to Guatemala, and Is Poised to Begin Removals to Honduras, Without the Required Determinations that Their Asylum Systems Provide Access to Full and Fair Procedures.

95.     The safe third country statute prohibits the government from removing an asylum

seeker to a third country without first determining that the country will provide the asylum

seeker with a full and fair procedure for seeking asylum.  8 U.S.C. § 1158(a)(2)(A).

96.     Neither the Rule nor the USCIS Guidance permits asylum officers to consider this

statutory requirement on a case-by-case basis.

97.     Instead, the Rule states: "Prior to implementation of an ACA, the Attorney

General and the Secretary of Homeland Security . . . will evaluate and make a categorical

determination whether a country to which aliens would be removed under such an agreement

provides 'access to a full and fair procedure for determining a claim to asylum or equivalent

temporary protection.'"  84 Fed. Reg. at 63,997 (quoting 8 U.S.C. § 1158(a)(2)(A)).

98.     However, the government has not publicly issued any such categorical

designation concerning Guatemala or any other country.

---

[6] Hamed Aleaziz, *A Controversial Plan To Deport Mexican Asylum-Seekers To Guatemala Has Been Paused*, BuzzFeed News (Jan. 8, 2020), https://www.buzzfeednews.com/article/hamedaleaziz/mexican-asylum-seekers-guatemala-plan-paused.

99.     If the government has made, but not disclosed, a categorical decision that Guatemala provides access to "full and fair" asylum procedures, that designation did not and cannot have adequately considered the security situation in Guatemala, the impact of that insecurity on refugees' ability to remain and seek protection in Guatemala, or the actual functioning of Guatemala's brand new, very limited, and failing asylum system.

100.    The administration has never adequately evaluated Guatemala's capacity, in terms of infrastructure or personnel, to accept and process asylum seekers before beginning to remove asylum seekers there.[7]

101.    The government also has not issued any categorical "full and fair" designation concerning Honduras or El Salvador, despite its announcement that it plans to begin removals to Honduras under that ACA imminently.

## VI.    The Current ACA Countries—Guatemala, Honduras, and El Salvador—Are Extremely Dangerous and Unfit for Asylum Seekers.

102.    El Salvador, Guatemala, and Honduras are experiencing epidemic levels of violence comparable to those typically seen in war zones.

103.    Violence against women, children, and members of the LGBT community by armed criminal groups has escalated dramatically in the Northern Triangle countries, and those governments have been unable or unwilling to provide effective protection.

104.    Consequently, large numbers of asylum seekers are fleeing life-threatening situations in El Salvador, Guatemala, and Honduras,[8] and thousands have been granted asylum in

---

[7] Nicole Narea, *Trump's Agreements in Central America Are Dismantling the Asylum System as We Know It*, Vox (Nov. 20, 2019), https://www.vox.com/2019/9/26/20870768/trump-agreement-honduras-guatemala-el-salvador-explained.

[8] *See, e.g.*, Dep't of Homeland Sec'y, Office of Immigration Statistics, Annual Flow Report, Refugees and Asylees: 2017 7-8, Mar. 2019, https://www.dhs.gov/sites/default/files/publications/Refugees_Asylees_2017.pdf.

the United States.  Between fiscal years 2015 and 2017, the United States granted asylum to

19,649 people from El Salvador, Guatemala, and Honduras.[9]

### Guatemala Is Not Safe for Asylum Seekers and Lacks a Full and Fair Asylum System

 105. For most asylum seekers, seeking protection in Guatemala is not an option.  The

country lacks a full and fair asylum processing system, and is often even more dangerous for

migrants than it is for Guatemalans, who have fled the country in large numbers.

 106. Guatemala had the twenty-sixth-highest homicide rate in the world in 2017, and

the seventh-highest for females.[10]  The U.S. State Department warns that "[v]iolent crime, such

as armed robbery and murder, is common."[11]  "Gang activity, such as extortion, violent street

crime, and narcotics trafficking, is widespread," and Guatemalan police often "lack the resources

to respond effectively to serious criminal incidents."[12]  Accordingly, the State Department

advises Americans to "[e]xercise increased caution in Guatemala due to crime," and to

"reconsider travel" to six of Guatemala's twenty-two departments where approximately 40% of

Guatemala's population lives, including where Guatemala City is located, due to high levels of

murder and other violent crime.[13]

 107. The State Department's Overseas Security Advisory Council reports that

"Guatemala remains among the most dangerous countries in the world" and has an "alarmingly

high murder rate" that "appears driven by narco-trafficking activity, gang-related violence, a

---

[9] *Id.*, Tbl. 7.
[10] U.N. Office on Drugs and Crime, Int'l Homicide Statistics Database, https://tinyurl.com/UNHomicideDatabase.
[11] U.S. State Dep't, Guatemala Travel Advisory, Feb. 28, 2019, https://tinyurl.com/GuatemalaTravelAdvisory.
[12] *Id.*
[13] *Id.*

heavily armed population, and police/judicial system unable to hold many criminals accountable."[14]

108.    Some of Guatemala's most serious human rights issues identified by the U.S. State Department in 2018 were "widespread corruption; trafficking in persons; crimes involving violence or threats thereof targeting lesbian, gay, bisexual, transgender, and intersex (LGBTI) persons, persons with disabilities, and members of other minority groups; and use of forced or compulsory or child labor."[15]   The high incidence of rape and other forms of physical and sexual violence against women is a serious problem.[16]

109.    Guatemala's gangs "include former members of the military, intelligence agencies and active members of the police," who are "often complicit" in organized crime.[17]   "Corruption and inadequate investigations ma[ke] prosecution difficult," and "officials frequently engage[] in corrupt practices with impunity."[18]   Guatemalan "[p]olice ha[ve] minimal training or capacity to investigate sexual crimes or assist survivors of such crimes, and the government [does] not enforce the law [criminalizing rape] effectively."[19]   LGBT persons face unchecked "societal discrimination . . . in access to education, health care, employment, and housing," violent attacks including acts of so-called "corrective rape," and frequent abuse by police.[20]

---

[14] U.S. State Dep't, Overseas Security Advisory Council, Guatemala 2019 Crime & Safety Report, Feb. 28, 2019, https://tinyurl.com/OSACGuatemala.
[15] U.S. State Dep't, Guatemala 2018 Human Rights Report 1, https://www.state.gov/wp-content/uploads/2019/03/GUATEMALA-2018.pdf.
[16] Id. at 16-17.
[17] InSight Crime, Guatemala Profile (Nov. 29, 2017), https://www.insightcrime.org/guatemala-organized-crime-news/guatemala/.
[18] U.S. State Dep't, Guatemala 2018 Human Rights Report 1, 14, https://www.state.gov/wp-content/uploads/2019/03/GUATEMALA-2018.pdf.
[19] Id. at 16.
[20] Id. at 21-22.

110.    Guatemala is also very poor, hindering its ability to support and provide a full and

fair process to asylum seekers and making it difficult for asylum seekers to survive there during

the pendency of their proceedings and beyond.  Its per capita gross domestic product was an

estimated $8,200 in 2017, "roughly half the average for Latin America and the Caribbean."[21]

More than half of the population is below the national poverty line, and 23% live in extreme

poverty.  Nearly half of Guatemala's children under age five are chronically malnourished, one

of the highest malnutrition rates in the world.

111.    Guatemala's asylum system is also brand new and barely functioning.  Its new

migration code was approved in 2016 and the implementing regulations pertaining to asylum

were issued in early 2019.  Before the official creation of this new system, Guatemala accepted

just 370 asylum seekers in 15 years, including individual family members.

112.    Last year, the U.S. State Department found that while Guatemalan "laws provide

for the granting of asylum or refugee status, and the government has established a system for

providing protection to refugees," UNHCR has "reported that identification and referral

mechanisms for potential asylum seekers were inadequate."[22]  "Both migration and police

authorities lacked adequate training concerning the rules for establishing refugee status."[23]

113.    According to UNHCR, only 466 people applied for refugee status in Guatemala

between January 2018 and July 2019.[24]  Even with this small number of applications, more than

ninety percent had not yet been decided by August 2019.[25]

---

[21] CIA World Factbook, Guatemala (Dec. 4, 2019), https://www.cia.gov/library/publications/the-world-factbook/geos/gt.html.
[22] U.S. State Dep't, Guatemala 2018 Human Rights Report 13, https://www.state.gov/wp-content/uploads/2019/03/GUATEMALA-2018.pdf.
[23] *Id.*
[24] David C. Adams, *Guatemala's "Embryonic" Asylum System Lacks Capacity to Serve as Safe U.S. Partner, Experts Say*, Univision News (Aug. 2, 2019), https://tinyurl.com/tb55o7t.
[25] *Id.*

114.    There are very few officials working on the asylum process in Guatemala, and staff usually are not familiar with the rights of refugees and asylum seekers.  There are significant limits on where asylum seekers can submit applications and attend interviews, and there are frequent check-in requirements.  Asylum applicants are also not permitted to be represented by attorneys during their interviews.  The system lacks adequate infrastructure, and does not have capacity to provide competent translation or interpretation services for non-Spanish speaking asylum seekers.  Moreover, Guatemala has failed to implement a system for asylum applicants to access basic social services such as shelter and education.

115.    UNHCR has warned that Guatemala does not have the capacity to significantly expand its asylum program.

116.    On June 18, 2019, less than six weeks before the signing of the Guatemala ACA, Guatemala's foreign minister acknowledged that Guatemala does not have adequate resources to receive asylum seekers.[26]

**El Salvador and Honduras Are Also Not Safe for Asylum Seekers and Lack Functioning Asylum Systems**

117.    The other impoverished countries with which the United States has signed ACAs are even more violent than Guatemala.  El Salvador had the highest homicide rate in the world in 2017, and Honduras had the fifth highest.[27]  Both countries suffer from epidemic levels of gang violence, rape and other violence against women and LGBT individuals, attacks on members of

---

[26] Sofia Menchu, *Guatemala Says It Has Not Pledged to Accept U.S.-Bound Asylum Seekers*, Reuters (June 18, 2019), https://tinyurl.com/tzca5v5.
[27] U.N. Office on Drugs and Crime, Int'l Homicide Statistics Database, https://tinyurl.com/UNHomicideDatabase.

ethnic minorities, ineffective policing, and entrenched corruption at all levels of government and law enforcement.[28]

118.    Neither El Salvador nor Honduras has a functioning asylum system capable of processing an influx of asylum applicants removed from the United States.  On December 15, 2019, three months *after* the signing of the U.S.-El Salvador ACA, El Salvador's president admitted that his country does not "have asylum capacities" and is not safe enough to properly serve as a safe third country.[29]

119.    Between 2008 and mid-2019, Honduras's immigration agency received fewer than 300 asylum applications and recognized only 50 people as refugees.[30]  The country received just nine asylum applications in 2016.[31]  That year, a U.N. monitor reported that Honduran "immigration and asylum policies and practices fail to live up to international standards required for those fleeing violence or persecution."[32]  In 2017, UNHCR reported that the nation had yet to "develop[] [or] implement[] . . . guidelines for the identification of persons with protection needs in order to guarantee effective access to asylum procedures."[33]

---

[28] *See, e.g.*, U.S. State Dep't, El Salvador 2018 Human Rights Report 1, 16, Mar. 2019, https://www.state.gov/wp-content/uploads/2019/03/EL-SALVADOR-2018.pdf; U.S. State Dep't, Honduras 2018 Human Rights Report 1, 14, Mar. 2019, https://www.state.gov/wp-content/uploads/2019/03/HONDURAS-2018.pdf.

[29] Sharyn Alfoni, *"Our Whole Economy is in Shatters": El Salvador's President Nayib Bukele on the Problems His Country is Facing*, CBS News (Dec. 15, 2019), https://tinyurl.com/ElSalvadorProblems.

[30] Yael Schacher, Senior U.S. Advocate, Refugees International, *Letter to USCIS Asylum Div. Chief Andrew Davidson & EOIR Ass't Dir. Lauren Alder Reid Re: Request for Comments* (Dec. 23, 2019), https://tinyurl.com/LetterToUSCISRequestComments.

[31] Global Detention Project, *Honduras Immigration Detention: Quick Facts* https://www.globaldetentionproject.org/countries/americas/honduras.

[32] U.N. Human Rights Council, *Report of the Special Rapporteur on the Human Rights of Internally Displaced Persons on his Mission to Honduras*, Apr. 2016, https://tinyurl.com/UNHCR-Honduras.

[33] UNHCR, Honduras Factsheet 2, Mar. 2017, https://tinyurl.com/UNHCRHondurasFactsheet.

**It Is Dangerous to Shuffle Asylum Seekers Between Northern Triangle Countries**

120.    In addition to the profound dangers and institutional deficiencies that make each Northern Triangle country unsuitable to serve as a safe third country for asylum seekers, there are grave risks in removing asylum seekers from one of these countries to another.

121.    Much of the epidemic violence that has caused individuals to flee El Salvador, Guatemala, and Honduras is carried out by gangs, such as the MS-13 and Mara 18, that are transnational and have tens of thousands of members throughout the Northern Triangle.[34]

122.    Additionally, El Salvador, Guatemala, and Honduras—along with Nicaragua—form the "Central America-4 Free Mobility Agreement," a regional free movement accord that permits unchecked land travel between the four countries, without visas or passports.  This freedom of movement between the Northern Triangle countries—which have a combined area smaller than Michigan—makes it easy for a gang or other motivated persecutor to pursue a victim anywhere within the region.  As such, there is little practical difference between removing an asylum seeker from any one of these countries to another, rather than back to her home country.

**VII.    The ACA Rule Is Inconsistent with International Law Regarding Safe Third Country Agreements.**

123.    The Rule suggests that the United States' efforts to formulate ACAs with other countries are consistent with the practice of other countries regarding burden sharing for refugee protection and with the views of UNHCR.  This is incorrect.

---

[34] ICE, Combating Gangs, Dec. 11, 2019, https://www.ice.gov/features/gangs.

124.    Consistent with its prior guidance, UNHCR publicly stated that the Rule constitutes "an approach at variance with international law that could result in the transfer of highly vulnerable individuals to countries where they may face life-threatening dangers."[35]

125.    UNHCR guidance on safe-third-country-type transfer agreements affirms that the "primary responsibility to provide protection rests with the State where asylum is sought."[36] UNHCR also advises that such agreements are not permissible as a means for a country to "divest itself of responsibility" for asylum seekers.[37] Asylum should not be refused "solely on the ground that it could be sought from another State," and an asylum seeker should not be required "to seek asylum in a country with which he has not established any relevant links."[38]

126.    Before removing an asylum seeker to a third country, UNHCR advises that it is incumbent on the sending country "individually to assess whether the third state will: (re)admit the person, grant the person access to a fair and efficient procedure for determination of refugee status and other international protection needs, permit the person to remain while a determination is made, and accord the person standards of treatment commensurate with the 1951 Convention and international human rights standards, including—but not limited to—protection from *refoulement*."[39]

---

[35] UNCHR, Statement on New U.S. Asylum Policy, Nov. 19, 2019, https://www.unhcr.org/en-us/news/press/2019/11/5dd426824/ statement-on-new-us-asylum-policy.html.

[36] UNHCR, Guidance Note on Bilateral and/or Multilateral Transfer Arrangements of Asylum-Seekers ¶ 1, May 2013, https://www.refworld.org/pdfid/51af82794.pdf; *accord* UNHCR, Legal Considerations Regarding Access to Protection and a Connection Between the Refugee and the Third Country in the Context of Return or Transfer to Safe Third Countries ¶ 2, Apr. 2018, https://www.refworld.org/pdfid/5acb33ad4.pdf.

[37] UNHCR, Guidance Note on Bilateral and/or Multilateral Transfer Arrangements of Asylum-Seekers ¶ 6, May 2013, https://www.refworld.org/pdfid/51af82794.pdf.

[38] UNHCR, Note on Asylum ¶ 11, Aug. 30, 1979, https://tinyurl.com/UNHCRNoteOnAsylum1979.

[39] UNHCR, Legal Considerations Regarding Access to Protection and a Connection Between the Refugee and the Third Country in the Context of Return or Transfer to Safe Third Countries ¶ 4, Apr. 2018, https://www.refworld.org/pdfid/5acb33ad4.pdf.

127.    For a transferring state to determine whether such requisite "standards are available" in a proposed safe third country, the transferring state must assess not just the receiving state's "international legal obligations," but also "its domestic laws and the actual practice of implementation" to ensure that the state's "actual practice indicat[es] consistent compliance with its international legal obligations."[40]

128.    In addition to meeting baseline *non-refoulement* obligations, the receiving country must be able to provide "effective protection," which includes the requirement that "there is no real risk to the life of the person in the third State," whether or not on account of a protected ground.[41]

129.    UNHCR has also made clear that "[t]he burden of proof does not lie with the asylum-seeker (to establish that the third country is unsafe), but rather with the country which wishes to remove the asylum-seeker from its territory (to establish that the third country is safe)."[42]

130.    The European Union has recognized similar requirements for transfers under its Dublin Regulation.[43]

## VIII.   The Guatemala ACA Program Is Rapidly Expanding.

131.    On November 20, 2019, Defendants began imposing ACA procedures on asylum seekers apprehended and placed in expedited removal in the El Paso Border Patrol Sector, which

---

[40] *Id.* ¶ 10.
[41] UNHCR, Summary Conclusions on the Concept of "Effective Protection" in the Context of Secondary Movements of Refugees and Asylum-Seekers, Feb. 2003, https://www.refworld.org/docid/3fe9981e4.html.
[42] UNHCR, Observations on the European Commission's Proposal for a Council Directive on Minimum Standards on Procedures for Granting and Withdrawing Refugee Status ¶ 36, July 2001, https://www.refworld.org/docid/3c0e3f374.html.
[43] *M.S.S. v. Belgium & Greece*, 2011-I Eur. Ct. H.R. 255; Joined Cases C-411/10 & C-493/10, *N.S. v. Sec'y of State for the Home Dep't*, 2011 E.C.R. I-13905.

spans west Texas and all of New Mexico.  Initially, Defendants applied the new ACA procedures only to adult male Honduran and Salvadoran asylum seekers.  However, Defendants have quickly expanded the geographic scope of the Guatemala ACA's application and the types of individuals subject to it.  The program is now being carried out across at least two sectors, and men, women, and children, including families, are being removed.

133. On November 21, Defendants removed a non-Guatemalan asylum seeker to Guatemala.  That individual, a young Honduran man, later stated that he had to sign a piece of paper that he did not understand, and was not informed that he was being removed to Guatemala until he was being taken to the plane that would deport him.[44]

133. Between November 21 and December 20, Defendants removed approximately 40 Honduran and Salvadoran asylum seekers to Guatemala.  This group included single men, young women, and families.

134. During that same period, approximately 20 more asylum seekers were pressured into withdrawing their asylum applications and accepting removal to their countries of origin when confronted with the threat of deportation to Guatemala.

135. On or around December 9, Defendants expanded the program's geographic reach and began applying the Guatemala ACA to Honduran and Salvadoran asylum seekers in the Rio Grande Valley in southern Texas.

136. On December 19, Defendant Cucinelli stated that "all populations" of asylum seekers are being considered for removal to Guatemala, "including Mexican nationals." Mexico's Ministry of Foreign Affairs estimates that if Mexican asylum seekers are subjected to

---

[44] Sofia Menchu, *Honduran Migrant Sent Back Under New U.S. Deal Resigned to Fate for Now*, Reuters (Nov. 22, 2019), https://tinyurl.com/HonduranMigrant.

the ACA, approximately 900 could be removed to Guatemala within a month.[45]  Other U.S.

officials stated that the government is also specifically considering removing Ecuadorian asylum

seekers to Guatemala, as well as asylum seekers from the non-Spanish-speaking countries of

Brazil and Haiti.[46]

137.    In the early days of January 2020, while much of the Guatemalan government and

civil society was closed, Defendants increased removals.  As of January 13, 2020, approximately

140 individuals had been removed to Guatemala under the Rule.[47]

138.    Removals to Honduras appear to be imminent.  On January 10, Defendants

announced that they were prepared to move forward with implementation of the Honduras ACA.

## IX.    Guatemala Has Proven Totally Unprepared to Receive Asylum Seekers Under Its ACA.

139.    When ACA removals to Guatemala began on November 21, the Guatemalan

government had not yet developed any coherent plan to ensure that asylum seekers deported

under the agreement would be able to access asylum procedures.

140.    On November 18, a briefing prepared for Defendant Wolf stated: "There is

uncertainty as to who will provide orientation services for migrants as well as who will provide

shelter, food, transportation, and other care."

141.    At present, those removed to Guatemala are being provided short-term

accommodations by nonprofit shelters in Guatemala City—one of the most dangerous places in

the country—which are not designed to accommodate this population.  The Guatemalan

---

[45] Julio-Cesar Chavez & Lizbeth Diaz, *"Into the Lion's Den": Mexican Asylum Seekers Fear Deportation to Guatemala*, Reuters (Jan. 7, 2020), https://tinyurl.com/tlbca4n.

[46] Michelle Hackman & Juan Montes, *Guatemala Is Set to Finalize Deal with U.S. to Accept Mexican Asylum Seekers*, Wall St. J. (Dec. 20, 2019), https://www.wsj.com/articles/guatemala-is-set-to-finalize-deal-with-u-s-to-accept-mexican-asylum-seekers-11576872424.

[47] Kevin Sieff, *The U.S. Is Putting Asylum Seekers on Planes to Guatemala – Often Without Telling Them They're Going There* (Jan. 13, 2020), https://tinyurl.com/tzptctx.

government has not put in place a plan for long-term housing of asylum seekers and officials have publicly stated that the government is not devoting any government resources to receiving asylum seekers.

142.    Upon their arrival in Guatemala, asylum seekers removed under the ACA are granted preliminary authorization to stay in the country for just 72 hours.

143.    Within those 72 hours, ACA deportees must decide whether to return to their home countries or remain in Guatemala and attempt to apply for asylum there.  However, many individuals have not received adequate information or instructions about the process of applying for asylum in Guatemala to allow them to make an informed decision just days after their disorienting deportation to an unexpected country.

144.    And asylum seekers removed to Guatemala face significant pressure to return to their countries of origin.  They frequently lack stable shelter and resources in Guatemala and face well-known dangers similar to those they fled in their home countries.  In fact, one woman removed to Guatemala reported that she came upon a crime scene with a dead body just blocks from the migrant shelter where she was staying temporarily. They also must assess the unlikely prospects for protection from either Guatemala's untested asylum system or its notoriously corrupt, ineffectual police.

145.    The United States has also provided substantial funds to support efforts in Guatemala to offer ACA deportees transportation back to their home countries.  This offer of free transportation intensifies the pressure that these individuals already face to return to their countries of origin.

146.   This indirect *refoulement* of asylum seekers is reportedly just the "result the Trump administration intended."[48]

## X.   The ACA Rule and USCIS Guidance Cause Serious, Irreparable Harms to Plaintiffs.

147.   Absent declaratory and injunctive relief, Plaintiffs will be severely and irreparably harmed by the Rule and USCIS Guidance.  The Individual Plaintiffs will be severely limited in their ability to access protection from persecution and torture, as they have been prevented from applying for asylum or any other form of protection in the United States and removed to a country where they face grave dangers and serious barriers to obtaining protection.  They cannot live safely either in Guatemala or in their home countries.

148.   Plaintiff Las Americas is a nonprofit legal services organization dedicated to serving low-income immigrants, including asylum seekers.  A core component of Las Americas' mission is to provide immigration counseling and legal services to asylum seekers detained by DHS in the El Paso area and subjected to expedited removal proceedings.  Las Americas' goal in that work is to ensure that as many asylum seekers as possible have a fair chance of passing their credible fear screenings so that they will have the opportunity to present their asylum claims on the merits in full removal proceedings.  Normally, Las Americas is able to fulfill this part of its mission by counseling and/or representing detained asylum seekers in preparation for credible fear interviews, representing individuals during those interviews, and, when necessary, seeking immigration judge review of negative credible fear determinations.  By removing asylum seekers without any credible fear interview and without any opportunity to consult with or be represented by counsel, the Rule and USCIS Guidance frustrate Las Americas' mission of providing legal

---

[48] Jason Hopkins, *Trump's Latest Asylum Deal is Working Just as the Administration Intended*, Daily Caller (Dec. 13, 2019), https://dailycaller.com/2019/12/13/all-asylum-seekers-returning-to-home-country/.

services to detained asylum seekers subjected to expedited removal proceedings.  By preventing detained asylum seekers from making it through the credible fear process, these ACA policies also negatively impact Las Americas' ability to represent individuals in connection with parole and bond requests, and in full removal proceedings.

149.    The Rule and USCIS Guidance also require Las Americas to expend significant resources to attempt to address the frustration of their mission.  Additionally, these policies jeopardize funding streams contingent on the organization's work representing individuals during the credible fear process.

150.    Plaintiff Tahirih Justice Center is a nonprofit and non-partisan organization that provides free legal immigration services, including asylum services, to survivors of gender-based violence.  Tahirih's mission is to provide free holistic services to immigrant women and girls fleeing violence such as rape, domestic violence, female genital mutilation/cutting, forced marriage, and human trafficking, and who seek legal immigration status under U.S. law.  Tahirih offers legal representation and social services for individuals who seek protection, including asylum, in their immigration proceedings.

151.    Asylum accounts for approximately 40% of Tahirih's immigration services. Tahirih's asylum clients come from all over the globe, and under the terms of the Rule, the vast majority of those clients would be categorically ineligible for asylum, withholding of removal, and CAT relief in the United States.  Even as currently applied to nationals of El Salvador and Honduras, the Rule will severely compromise Tahirih's asylum work.  In 2018, 21.4% of Tahirih's clients were from Honduras and 18.6% were from El Salvador.  Another 8.4% of Tahirih's asylum clients came from Guatemala in 2018.  These individuals would be subject to removal to Honduras or El Salvador once the agreements with those countries are operational.

152.    The Rule and USCIS Guidance frustrate Tahirih's mission of providing legal services to protect women and girls fleeing violence.  For example, the Rule prevents Tahirih's primary client-base from ever having the chance to apply for asylum or other forms of protection.  The Rule's more-likely-than-not standard is so high, and the procedures established by the Rule so bare bones and inadequate, that very few gender-based violence survivors will pass the "screening" interview.  Most gender-based violence survivors from Honduras and El Salvador thus will be removed before Tahirih ever has the chance to represent or otherwise serve them in their immigration proceedings.

153.    The provisions of the Rule concerning regular removal proceedings will also frustrate Tahirih's mission and force it to divert additional staff time and other resources.  In particular, Tahirih will have to significantly increase the resources it expends on each asylum client, because clients will have to be prepared to prove before an immigration judge that they are more likely than not to be persecuted or tortured in every country with which the United States has signed an ACA.  Satisfying that more-likely-than-not standard is a resource-intensive process, because staff attorneys must gather detailed expert evidence and testimony about country conditions.  Prior to the Rule, Tahirih generally had to prepare clients only to meet the lower asylum standard and only as to their country of origin.  Attempting to satisfy the more-likely-than-not standard as to any number of different countries will be incredibly burdensome in terms of staff time and organizational resources, and will limit the number of clients Tahirih is able to serve.

154.    The Rule will also affect Tahirih's funding.  Tahirih receives certain funding that can be used to provide immigration services only in specified geographic locations within the United States.  Because the Rule prevents Tahirih's client base from entering the country to seek

asylum or other forms of protection, Tahirih will be unable to use existing funding to provide the asylum services it has previously provided under such geographically-limited grants.

155.   The Rule's immediate promulgation denied Tahirih and Las Americas the opportunity to comment on the Rule before it into effect, and denied them the ability to prepare for its serious and harmful impacts.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Violation of the Safe Third Country Statute, 8 U.S.C. § 1158(a)(2)(A),
and the APA, 5 U.S.C. § 706(2)(A))**

156.   The INA's safe third country provision forbids the government from removing an individual to a third country pursuant to a bilateral or multilateral agreement unless it first "determines that . . . the alien's life or freedom would not be threatened on account of" a protected ground.  8 U.S.C. § 1158(a)(2)(A).  It thus requires that the government make a likelihood-of-persecution determination in every case prior to removing an individual under a § 1158(a)(2)(A) agreement.

157.   In expedited removal proceedings, the Rule and USCIS Guidance do not require such a determination in every case.  Instead, they require a likelihood-of-persecution assessment only if the individual affirmatively informs an asylum officer that they have a fear of removal to the relevant third country.

158.   Section 1158(a)(2)(A) also requires that before the government may remove an asylum seeker to a "safe third country" pursuant to a bilateral agreement, it must first determine that the third country would provide the asylum seeker "access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection."

159.     The Rule and USCIS Guidance provide for the expedited removal of asylum

seekers without any case-by-case determination that the receiving country will provide those

asylum seekers with access to full and fair asylum procedures.  The Rule states that a designation

will be made addressing this requirement on a categorical basis, but no such categorical

designation has been issued as to any of the current ACA countries.  Nor has any such

designation, or the basis for it, been communicated to Plaintiffs or to the public.  To the extent

any such designation has been made, it does not account for whether those countries are, in

reality, capable of providing full and fair access to protection, as required by the statute.

160.     The safe third country provision also confers on immigration judges the authority

to apply the provision's public interest exception in regular removal proceedings.  The Rule

erroneously provides that immigration judges lack this independent authority and may instead

only apply that exception with the permission of DHS counsel.

161.     For these reasons and others, the Rule and USCIS Guidance therefore violate 8

U.S.C. § 1158(a)(2)(A).

162.     As a result, the Rule and USCIS Guidance are contrary to law.  *See* 5 U.S.C.

§ 706(2)(A).

### SECOND CLAIM FOR RELIEF
**(Violation of the Withholding of Removal Statute, 8 U.S.C. § 1231(b)(3), and Implementing Regulations; the Foreign Affairs Reform and Restructuring Act of 1998, § 2242, 112 Stat. 2681-822, 105th Cong. 2d Sess. (1998), and Implementing Regulations; and the APA, 5 U.S.C. § 706(2)(A))**

163.     The INA's withholding of removal provision, 8 U.S.C. § 1231(b)(3), bars removal

of an individual to a country where it is more likely than not that they would face persecution.

164.    Section 2242(a) of the Foreign Affairs Reform and Restructuring Act of 1998

("FARRA") bars removal of an individual to a country where it is more likely than not that they

would be subjected to torture.  *See also* 8 C.F.R. §§ 208.16(c)(2), 1208.16(c)(2).

165.    Longstanding regulations implement these statutory provisions and the obligation

not to send an individual to persecution or torture.  For instance, only an immigration judge can

determine whether an individual faces such a risk of persecution or torture and is entitled to

withholding of removal or CAT protection after full removal proceedings in immigration court.

8 C.F.R. § 208.16(a), (c)(4); *id.* § 1208.16(a), (c)(4).  And past persecution creates a rebuttable

presumption of eligibility for withholding of removal.  *See* 8 C.F.R. §§ 208.16(b)(1)(i),

1208.16(b)(1)(i).

166.    The Rule and USCIS Guidance are inconsistent with, and seek to bypass, these

and other statutory and regulatory provisions.  Among other things, for individuals in expedited

removal, they require asylum officers, not immigration judges, to make the ultimate withholding

determination, i.e., whether an individual is more likely than not to be persecuted in a third

country, and deny the opportunity for immigration judge review.  They also provide that, in

determining whether an individual is more likely than not to be persecuted in the receiving

country, past persecution shall not establish a presumption of future persecution.

167.    Because the Rule and USCIS Guidance abandon the safeguards set out in

statutory provisions and regulations designed to ensure the critical protection against

*nonrefoulement*, the Rule and USCIS Guidance violate 8 U.S.C. § 1231(b)(3), the FARRA, and

their implementing regulations.

168.    As a result, the Rule and USCIS Guidance are contrary to law.  *See* 5 U.S.C.

§ 706(2)(A).

**THIRD CLAIM FOR RELIEF**
**(Violation of the Credible Fear Statute, 8 U.S.C. § 1225(b)(1), and Implementing Regulations)**

169.    Under the INA, if a noncitizen placed in expedited removal proceedings indicates to an immigration officer either a fear of persecution or an intention to apply for asylum, the noncitizen must be referred to an asylum officer for a credible fear interview, after which the asylum officer must determine whether the noncitizen has a credible fear of persecution.  8 U.S.C. § 1225(b)(1)(A)(ii), (B).  "'[C]redible fear of persecution' means that there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum." *Id.* § 1225(b)(1)(B)(v).

170.    A noncitizen "who is eligible for such interview may consult with a person or persons of the alien's choosing prior to the interview or any review thereof," 8 U.S.C. § 1225(b)(1)(B)(iv), and that "person . . . may be present at the interview and may be permitted . . . to present a statement at the end of the interview," 8 C.F.R. § 208.30(d)(4).  Following the credible fear interview, "if the officer determines that an alien does not have a credible fear of persecution," the noncitizen is entitled to "request . . . prompt review by an immigration judge of [that] determination."  8 U.S.C. § 1225(b)(1)(B)(iii)(I), (III).

171.    This credible fear interview process, with its attendant safeguards, is the only mechanism in expedited removal proceedings by which the government may remove an individual who has expressed a fear of persecution or intention to apply for asylum.  Only removal proceedings "specified in" the INA may supplant regular removal proceeding before an immigration judge.  8 U.S.C. § 1229a(a)(3).

45

172.   While the safe third country provision creates a bar that may be applied to asylum seekers, if applied in expedited removal, it must be done through the statutory credible fear interview process, with its attendant procedural safeguards.  Nothing in the safe third country provision purports to create an alternate expedited removal mechanism.

173.   Because the Rule and USCIS Guidance provide for the expedited removal of asylum seekers without application of the low credible fear standard, right to consultation and representation by counsel, immigration judge review, and the other required safeguards, it violates 8 U.S.C. § 1225(b)(1).

174.   As a result, the Rule and USCIS Guidance are contrary to law.  *See* 5 U.S.C. § 706(2)(A).

## FOURTH CLAIM FOR RELIEF
### (Violation of the APA, Arbitrary and Capricious – Failure to Acknowledge Departures)

175.   An agency violates the APA where it fails to acknowledge, or cannot show "good reasons" for, departing from prior policy.  Several of the procedures set out in the Rule and USCIS Guidance are unacknowledged or unjustified departures from prior agency policies regarding screening for claims of protection from removal because of the risk of persecution or torture.  Several are also unjustified departures from the procedures set out in the regulations implementing the U.S.-Canada Safe Third Country Agreement.

176.   The Rule and USCIS Guidance are arbitrary and capricious.  *See* 5 U.S.C. § 706(2)(A).

## FIFTH CLAIM FOR RELIEF
### (Violation of the APA, Arbitrary and Capricious)

177.   The APA requires reasoned and reasonable policy-making.

178.   Defendants have adopted procedures so ill-suited to achieving their *non-refoulement* obligation as to render the Rule and USCIS Guidance arbitrary and capricious.

179.   To the extent they have made such non-public categorical designations, Defendants' designations of Guatemala, Honduras, and El Salvador as providing asylum seekers access to full and fair procedures for determining protection claims are also arbitrary and capricious.  *See* 5 U.S.C. § 706(2)(A).

180.   Among other reasons, any such designations are arbitrary and capricious because Defendants failed to articulate reasoned explanations for their decisions; considered factors that Congress did not intend to be considered; entirely failed to consider important aspects of the problem; and offered explanations that run counter to the evidence before the agencies.

**SIXTH CLAIM FOR RELIEF**
**(Violation of the APA, Notice And Comment, 30-Day Grace Period)**

181.   The APA requires notice and opportunity for comment prior to the promulgation of regulations.  5 U.S.C. §§ 553(b), (c).  Defendants failed to provide notice and an opportunity to comment prior to the Rule's effective date.

182.   The APA requires that a regulation be published "no less than 30 days before its effective date."  5 U.S.C. § 553(d).  Defendants failed to comply with this requirement.

183.   Defendants have not articulated reasons sufficient to show good cause why these requirements are inapplicable, nor is the foreign affairs exception applicable.

**SEVENTH CLAIM FOR RELIEF**
**(Violation of the Suspension Clause, Art. 1, § 9, cl. 2, of the U.S. Constitution)**

184.   Article 1, § 9, cl. 2 of the United States Constitution provides that the "Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."

185.    The Rule subjects individuals to expedited removal to third countries without the constitutionally required level of federal court review of an expedited removal order.

186.    Depriving individuals of the right to seek judicial review of an expedited removal order violates the Suspension Clause.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for the following relief:

a.  A declaration pursuant to 28 U.S.C. § 2201 that the Rule and USCIS Guidance are contrary to law, arbitrary and capricious, and/or unconstitutional;

b.  Vacatur of the Rule and USCIS Guidance;

c.  An injunction prohibiting Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from implementing or enforcing the Rule and USCIS Guidance;

d.  An order vacating the removal orders issued to each of the Individual Plaintiffs;

e.  For any Individual Plaintiffs who have been removed prior to the Court's Order, an order paroling those Individual Plaintiffs into the United States for the duration of their removal proceedings so that they may apply for asylum, withholding of removal, and/or CAT protection in the United States;

f.  An order awarding Plaintiffs costs of suit, and reasonable attorneys' fees and expenses pursuant to any applicable law;

g.  Such other and further relief as the Court deems equitable, just, and proper.

Dated: January 15, 2020

Respectfully submitted,

*Keren Zwick* (D.D.C. Bar. No. IL0055)

Katrina Eiland*
Julie Veroff*
Morgan Russell*
Adrienne Harrold*
American Civil Liberties Union Foundation
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
(415) 343-0770

Keren Zwick (D.D.C. Bar. No. IL0055)
Gianna Borroto*
Ruben Loyo*
Mark Fleming*
Charles G. Roth*
National Immigrant Justice Center
224 S. Michigan Avenue, Suite 600
Chicago, IL 60604
(312) 660-1370

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
of the District of Columbia
915 15th Street, NW, 2nd floor
Washington, D.C. 20005
(202) 457-0800

Omar Jadwat*
Lee Gelernt*
American Civil Liberties Union Foundation,
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2600

Blaine Bookey*
Annie Daher*
Sayoni Maitra*
Karen Musalo*
Center for Gender & Refugee Studies
200 McAllister St.
San Francisco, CA 94102
(415) 565-4877

Hardy Vieux (Bar No. 474762)
Patricia Stottlemyer (Bar No. 888252536)
Human Rights First
805 15th Street, N.W., Suite 900
Washington, D.C. 20005
(202) 547-5692
Facsimile: (202) 553-5999

*Attorneys for Plaintiffs*
*Motion for pro bono admission forthcoming*