**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| U.T., *et al.*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) |
| | ) |
| WILLIAM BARR, *et al.*, | ) |
| | ) No. 1:20-cv-00116 (EGS) |
| *Defendants*. | ) |
| | ) |
| | ) |
| | ) |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT AND PERMANENT INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 3

   I.  Asylum, Withholding of Removal, and the Convention Against Torture ............................. 3

     A.  Asylum ...................................................................................................................... 3

     B.  *Non-refoulement* Obligations: Withholding of Removal and CAT Protection. .................. 4

   II.  Regular and Expedited Removal Proceedings. ...................................................................... 5

   III.  The Safe Third Country Provision ...................................................................................... 7

   IV.  Northern Triangle Agreements and the Interim Final Rule. .................................................. 8

     A.  Guatemala, Honduras, and El Salvador "Asylum Cooperative Agreements." .................. 8

     B.  Interim Final Rule and USCIS Guidance. ......................................................................... 9

     C.  USCIS Guidance ............................................................................................................. 11

     D.  The Categorical Designations and Guatemala ACA Implementation ............................. 12

   V.  Guatemala, Honduras, and El Salvador Are Unsafe for Asylum Seekers and Lack
Functioning Asylum Systems. ................................................................................................ 12

LEGAL STANDARD ........................................................................................................... 13

JURISDICTION ................................................................................................................... 13

ARGUMENT ........................................................................................................................ 15

   I.  The Rule, Guidance, and Designations are Unlawful. .......................................................... 15

     A.  The Rule and Guidance Violate the INA. ......................................................................... 15

       1.  The Rule Violates the Credible Fear Statute ................................................................. 16

i

2.  The Rule and Guidance Violate the Safe Third Country Provision............................... 17

3.  The Rule and Guidance Violate the Withholding and CAT Statutes.............................21

B.  The Expedited Removal Procedures in the Rule and Guidance Are Arbitrary and
Capricious Under the APA.............................................................................................. 21

1.  Failure to Explain Departures from Prior Practices........................................................ 22

2.  The Agencies Failed to Consider the Grave Risks of Stripping Away Safeguards
Designed to Prevent *Refoulement*. .................................................................................. 26

C.  The Lack of Any Judicial Review of Expedited Removal Orders Issued Under the Rule
Violates the Suspension Clause....................................................................................... 28

D.  The Guatemala Designations Are Unlawful. .................................................................. 29

1.  The Designations Violate the Safe Third Country Provision. ........................................ 31

2.  The Agencies' Categorical Designations Are Arbitrary and Capricious........................ 35

E. The Government Unlawfully Bypassed Notice-and-Comment Procedures. ...................... 36

1.  The Foreign Affairs Exception Does Not Apply. ........................................................... 37

2.  The Good Cause Exception Does Not Apply. ................................................................. 38

II.  A Permanent Injunction Is Necessary to Prevent Ongoing Irreparable Harm..................... 40

A.  Plaintiffs Are Suffering Irreparable Harm...................................................................... 40

B. The Balance of Equities and Public Interest Favor Preserving the Status Quo. ................ 45

CONCLUSION................................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**

*Ali v. Ashroft*,
   394 F.3d 780 (9th Cir. 2005) ................................................................. 24

*Alvarez Lagos v. Barr*,
   927 F.3d 236 (4th Cir. 2019) ........................................................... 25, 26

*Am. Ass'n of Exps. & Imps. v. United States*,
   751 F.2d 1239 (Fed. Cir. 1985) ............................................................ 37

*Am. Council of the Blind v. Mnuchin*,
   878 F.3d 360 (D.C. Cir. 2017) .............................................................. 30

*Am. Wild Horse Pres. Campaign v. Perdue*,
   873 F.3d 914 (D.C. Cir. 2017) .............................................................. 26

*Boumediene v. Bush*,
   553 U.S. 723 (2008) ............................................................................. 28

*Broudy v. Mather*,
   460 F.3d 106 (D.C. Cir. 2006) .............................................................. 29

*Butte Cty. v. Hogen*,
   613 F.3d 190 (D.C. Cir. 2010) .............................................................. 36

*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) ................................................................ 40

*Chen v. Dep't of Justice*,
   471 F.3d 315 (2d Cir. 2006) ................................................................. 33

*City of N.Y. v. Permanent Mission of India to the U.N.*,
   618 F.3d 172 (2d Cir. 2010) ................................................................. 37

*Clark v. Martinez*, 543 U.S. 371 (2005) .............................................. 19, 20

*Comcast Cable Commc'ns, LLC v. FCC*,
   717 F.3d 982 (D.C. Cir. 2013) .............................................................. 30

*Ctr. for Auto Safety v. Fed. Highway Admin.*,
   956 F.2d 309 (D.C. Cir. 1992) .............................................................. 23

*D&F Afonso Realty Tr. v. Garvey*,
　216 F.3d 1191 (D.C. Cir. 2000) ........................................................................ 35, 36

*Devitri v. Cronen*,
　289 F. Supp. 3d 287 (D. Mass. 2018) ...................................................................... 43

*E. Bay Sanctuary Coalition v. Trump*,
　932 F.3d 742 (9th Cir. 2018) .......................................................................... 39, 40

*E. Bay Sanctuary Covenant v. Barr*,
　934 F.3d 1026 (9th Cir. 2019) ............................................................................... 39

*E. Bay Sanctuary Covenant v. Trump*,
　--- F.3d ----, 2020 WL 962336 (9th Cir. Feb. 28, 2020) ...................... 14, 37, 38, 39

*E. Bay Sanctuary Covenant v. Trump*,
　349 F. Supp. 3d 838, 865 (N.D. Cal. 2018) ............................................................ 45

*El Rio Health Ctr. v. HHS*,
　396 F.3d 1265 (D.C. Cir. 2005) .............................................................................. 36

*FAA v. Cooper*,
　566 U.S. 284 (2012) ................................................................................................ 30

*FCC v. Fox Television Stations, Inc.*,
　556 U.S. 502 (2009) .......................................................................................... 22, 24

*Fox v. Clinton*,
　684 F.3d 67 (D.C. Cir. 2012) .................................................................................. 36

*Gerber v. Norton*,
　294 F.3d 173 (D.C. Cir. 2002) .......................................................................... 18, 35

*Gresham v. Azar*,
　No. 19-5094, --- F.3d ----, 2020 WL 741278 (D.C. Cir. Feb. 14, 2020) ...... 27, 35, 36

*Havens Realty Corp. v. Coleman*,
　455 U.S. 363 (1982) ................................................................................................ 14

*Heckler v. Campbell*,
　461 U.S. 458 (1983) ................................................................................................ 19

*Heikkila v. Barber*,
　345 U.S. 229 (1953) ................................................................................................ 28

*Innovation Law Lab v. Wolf*, --- F.3d ----,
  2020 WL 964402 (9th Cir. Feb. 28, 2020) ............................................................ 21

*INS v. Aguirre-Aguirre*,
  526 U.S. 415 (1999) ......................................................................................... 4, 5

*INS v. Cardoza-Fonseca*,
  480 U.S. 421 (1987) ............................................................................... 3, 26, 30

*INS v. St. Cyr*,
  533 U.S. 289 (2001) ..................................................................................... 28, 29

*INS v. Stevic*,
  467 U.S. 407 (1984) ......................................................................................... 4, 5

*International Brotherhood of Teamsters v. Peña*,
  17 F.3d 1478 (D.C. Cir. 1994) ....................................................................... 37, 38

*Libbie Rehab. Ctr., Inc. v. Shalala*,
  26 F. Supp. 2d 128 (D.D.C. 1998) ....................................................................... 45

*M.S.S. v. Belgium & Greece*,
  2011-I Eur. Ct. H.R. 255 .................................................................................... 31

*Make the Road N.Y. v. McAleenan*,
  405 F. Supp. 3d 1 (D.D.C. 2019) ........................................................................... 6

*Matter of B-R-*,
  26 I&N Dec. 119 (BIA 2013) ............................................................................... 30

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,
  138 S. Ct. 883 (2018) ......................................................................................... 30

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ............................................................................. 26, 35, 36

*Mozilla Corp. v. FCC*,
  940 F.3d 1 (D.C. Cir. 2019) ........................................................................... 27, 35

*N. Mariana Islands v. United States*,
  686 F. Supp. 2d 7 (D.D.C. 2009) ......................................................................... 45

*N.S. v. Sec'y of State for the Home Dep't*,
  2011 E.C.R. I-13905 ........................................................................................... 31

*Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n,*
   921 F.3d 1102 (D.C. Cir. 2019) ........................................................................... 26, 27

*Nishimura Ekiu v. United States,*
   142 U.S. 651 (1892) ..................................................................................................... 28

*Nken v. Holder,*
   556 U.S. 418 (2009) ..................................................................................................... 45

*Ntangsi v. Gonzales,*
   475 F.3d 1007 (8th Cir. 2007) ................................................................................. 19

*Nunez v. Boldin,*
   537 F. Supp. 578 (S.D. Tex. 1982) ......................................................................... 43

*Orantes-Hernandez v. Meese,*
   685 F. Supp. 1488 (C.D. Cal. 1988) ....................................................................... 43

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agriculture,*
   797 F.3d 1087 (D.C. Cir. 2015) ............................................................................... 14

*R.I.L.-R. v. Johnson,*
   80 F. Supp. 3d 164 (D.D.C. 2015) ........................................................................... 45

*\*Nat'l Lime Ass'n v. EPA,*
   233 F.3d 625 (D.C. Cir. 2000) ................................................................................. 32

*Sierra Club v. U.S. Dep't of Agric.,*
   841 F. Supp. 2d 349 (D.D.C. 2012) ......................................................................... 13

*\*Sorenson Commc'ns Inc. v. FCC,*
   755 F.3d 702 (D.C. Cir. 2014) ............................................................... 35, 36, 38, 39

*Spirit of Sage Council v. Norton,*
   294 F. Supp. 2d 67 (D.D.C. 2003) ........................................................................... 13

*Tennessee Gas Pipeline Co. v. F.E.R.C.,*
   969 F.2d 1141 (D.C. Cir. 1992) ............................................................................... 39

*\*Thuraissigiam v. Dep't of Homeland Sec.,*
   917 F.3d 1097 (9th Cir.) ..................................................................................... 28, 29

*Troy Corp. v. Browner,*
   120 F.3d 277 (D.C. Cir. 1997) ................................................................................. 13

*United States v. Mead Corp.*,
   533 U.S. 218 (2001) ................................................................. 36

*Wisc. Gas Co. v. F.E.R.C.*,
   758 F.2d 669 (D.C. Cir. 1985) ................................................. 40

*Yassini v. Crosland*,
   618 F.2d 1356 (9th Cir. 1980) ................................................. 37

*Zamora v. INS*,
   534 F.2d 1055 (2d Cir. 1976) ................................................. 33

*Zhang v. Gonzales*,
   426 F.3d 540 (2d Cir. 2005) ............................................. 25, 26

*Zhang v. Holder*,
   585 F.3d 715 (2d Cir. 2009) ..................................................... 7

**Statutes**

8 U.S.C. § 1101(a)(42)(A) ............................................................ 3

8 U.S.C. § 1101(a)(47)(B) ............................................................ 5

8 U.S.C. § 1103(a)(1) .................................................................. 20

8 U.S.C. § 1103(g)(1) .................................................................. 20

8 U.S.C. § 1129(c)(5) .................................................................... 5

8 U.S.C. § 1158(a)(1) .................................................................... 4

8 U.S.C. § 1158(a)(2) .................................................................... 4

*8 U.S.C. § 1158(a)(2)(A) .................................................... passim

8 U.S.C. § 1158(b)(1)(A) ............................................................. 3

8.U.S.C. § 1158(c)(2)(C) ............................................................ 19

*8 U.S.C. § 1225(b)(1) ............................................................... 16

8 U.S.C. § 1225(b)(1)(A)(i) .......................................................... 6

8 U.S.C. § 1225(b)(1)(A)(ii) .............................................. 6, 16, 17

8 U.S.C. § 1225(b)(1)(B) .............................................................. 6

8 U.S.C. § 1225(b)(1)(B)(ii) ................................................................. 6, 7, 16

8 U.S.C. § 1225(b)(1)(B)(iii)(I)……………………………………………………..7

8 U.S.C. § 1225(b)(1)(B)(iii)(III) .............................................................. 7, 16

8 U.S.C. § 1225(b)(1)(B)(iv) ................................................................... 7, 16

8 U.S.C. § 1225(b)(1)(B)(v) ............................................................... 6, 16, 22

*8 U.S.C. § 1229a(a)(3) ......................................................................... 5, 16

8 U.S.C. § 1229a(b)(4) ............................................................................. 5

*8 U.S.C. § 1231(b)(3) .......................................................................... 4, 5

8 U.S.C. § 1231(b)(3)(A) ....................................................................... 5, 19

8 U.S.C. § 1252(a)(1) .............................................................................. 5

8 U.S.C. § 1252(e)(2) ............................................................................. 29

8 U.S.C. § 1252(e)(3) ............................................................................. 14

8 U.S.C. § 1252(e)(3)(B) ......................................................................... 14

Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242(b), 112
    Stat. 2681, 2681-82 ........................................................................... 5

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208
    Div. C, 110 Stat. 3009-546 (Sept. 30, 1996) ............................................... 6

**Constitutional Provisions**

*U.S. Const. art. 1, § 9, cl. 2 .................................................................. 28

**Regulations**

8 C.F.R. § 208.13(b)(1) ........................................................................... 3

8 C.F.R. § 208.16(a) .............................................................................. 24

8 C.F.R. § 208.16(b) ............................................................................... 5

8 C.F.R. § 208.16(b)(1)(i) ....................................................................... 4, 24

8 C.F.R. § 208.16(c) ............................................................................................... 5

8 C.F.R. § 208.16(c)(2) ......................................................................................... 5

8 C.F.R. § 208.16(c)(4) ....................................................................................... 24

8 C.F.R. § 208.24(f) ............................................................................................ 19

8 C.F.R. § 208.30(d) ............................................................................... 7, 16, 22

8 C.F.R. § 208.30(d)(4) ........................................................................... 7, 16, 25

8 C.F.R. § 208.30(e)(3) ....................................................................................... 22

8 C.F.R. § 208.30(e)(6) ....................................................................................... 25

8 C.F.R. § 208.30(e)(6)(iii) ........................................................................... 11, 26

8 C.F.R. § 208.30(e)(6)(iii)(B) ........................................................................... 25

8 C.F.R. § 208.30(e)(6)(iii)(C) ........................................................................... 25

8 C.F.R. § 208.30(f) .............................................................................................. 7

8 C.F.R. § 208.30(g) ........................................................................................... 25

8 C.F.R. § 208.31(c) ........................................................................................... 22

8 C.F.R. § 208.31(c)(4) ....................................................................................... 25

8 C.F.R. § 208.31(e) ........................................................................................... 22

8 C.F.R. § 208.31(g) ........................................................................................... 25

8 C.F.R. § 235.3(b)(2)(i) ....................................................................................... 6

8 C.F.R. § 1208.16(a) .................................................................................... 5, 24

8 C.F.R. § 1208.16(c)(4) ....................................................................................... 5

8 C.F.R. § 1208.16(b)(1)(i) ................................................................................. 24

65 Fed. Reg. 76,121 (Dec. 6, 2000) ............................................................ 7, 16, 25

69 Fed. Reg. 10,620 (Mar. 8, 2004) ................................................................... 38

69 Fed. Reg. 10,627 (Mar. 8, 2004) ............................................................ 26, 38

84 Fed. Reg. 63,994 (Nov. 19, 2019) ............................................................ passim

84 Fed. Reg. 8478 (Feb. 19, 1999) ............................................................ 22

**Legislative History**

142 Cong. Rec. S11491-02 (daily ed. Sept. 27, 1996) ...................................... 6

H.R. 391, 115th Cong. § 12 (2017) ............................................................ 20

H.R. 1153, 114th Cong. § 12 (2015) ............................................................ 20

H.R. Rep. No. 104-469, pt. 1 (1996) .......................................... 6, 8, 17, 27

*U.S. & Canada Safe Third Country Agreement: Hearing Before the H. Subcomm. On Immigration*, 107th Cong. (Oct. 16, 2002) .................................................. 8

**Other Authorities**

1951 Convention Relating to the Status of Refugees, art. 33, July 28, 1951, 189 U.N.T.S. 150 ... 4

United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, art. 3, Dec. 10, 1985, 1465 U.N.T.S. 85 ........................................... 4

## INTRODUCTION

Plaintiffs challenge new immigration policies that unlawfully deny asylum seekers protection in the United States and allow for their summary removal to a *different* extremely dangerous country than those they fled, without consideration of their asylum claims. These policies purport to implement a provision of the asylum statute that Congress carefully crafted to permit such removals only to a "*safe* third country"—a term of art in international refugee law that requires a transferring country to ensure that the receiving country will in fact provide a safe haven. Congress incorporated these requirements into the safe third country provision to facilitate a limited transfer arrangement with Canada, a nation renowned for welcoming refugees. The government has now hijacked that provision to deport people fleeing violence to adjacent refugee-*producing* countries that are far from safe. Its explicit goal is to offload "hundreds of thousands" of asylum seekers, and its barebones procedures guarantee that many will be harmed.

Last summer, the government signed agreements with Guatemala, Honduras, and El Salvador. No doubt aware that they cannot plausibly be deemed safe third country agreements, the government calls them "asylum cooperative agreements" ("ACAs"). Guatemala, Honduras, and El Salvador form Central America's Northern Triangle, an area smaller than Michigan with a free-movement pact that allows persecutors to pursue victims across the region. These countries suffer from some the world's highest homicide rates, as well as epidemic levels of gender-based, anti-LGBT, and gang violence. All three have also been among the top five origin countries of individuals *granted* asylum in the United States since 2015. None of them have functioning asylum systems that can operate at any kind of meaningful capacity.

Since November, the government has removed more than 700 Honduran and Salvadoran asylum seekers—men, women, and children—to Guatemala. Six of those people are the

Individual Plaintiffs, who fled beatings, death threats, and other serious harms in their home countries.  The government intends to also use the procedures challenged here to send asylum seekers to Honduras and El Salvador.  Instead of protecting asylum seekers, it will merely shuffle them among countries presenting the very same dangers they fled.  These actions disregard the safeguards Congress built into U.S. laws to protect asylum seekers and the solemn treaty obligations those laws are intended to uphold.

When Congress added the safe third country provision, it also provided for the expedited removal of certain individuals.  In doing so, it built in a bedrock safeguard to ensure that asylum seekers are not removed to persecution or torture: the credible fear interview process.  The credible fear procedure defines the absolute minimum that Congress found necessary to comply with our international obligations, and is all that stands between many asylum seekers and being cast away to horrific violence.

The joint Interim Final Rule ("Rule") issued by the Department of Justice ("DOJ") and the Department of Homeland Security ("DHS") falls far below that minimum.  It deports people to danger using an extra-statutory mechanism that unlawfully circumvents the expedited removal statute's critical protections.  It also illegally violates the substantive protections of the safe third country provision itself and statutes codifying the United States' *non-refoulement* obligations.  In addition, the Rule fails the arbitrary and capricious test for reasoned decisionmaking, and it was unlawfully issued without the required notice and comment procedures.  Plaintiffs therefore ask the Court to vacate and permanently enjoin the Rule and the related agency guidance.

The Court should also vacate and enjoin the categorical designations (the "Designations") made by DHS and DOJ that Guatemala is a "safe third country."  The Designations assert in conclusory fashion that Guatemala offers safety and meaningful access to asylum.  They do so

without considering the factors required by law or grappling with key evidence in the administrative record that Guatemala is "among the most dangerous countries in the world" and could not even handle the small number of asylum applications it previously received. Like the Rule, these Designations are arbitrary and capricious and violate the safe third country provision.

Plaintiffs request that the Court order Defendants to parole the Individual Plaintiffs back into the United States, vacate their removal orders, and provide them with credible fear proceedings in accordance with the law or place them in regular removal proceedings.

## BACKGROUND

### I.      Asylum, Withholding of Removal, and the Convention Against Torture.

It is a fundamental commitment of the United States to protect refugees fleeing harm. This commitment is reflected in statutory law, including the provisions offering asylum, 8 U.S.C. § 1158; withholding of removal, 8 U.S.C. § 1231(b)(3); and in regulations implementing the Convention Against Torture ("CAT"), 8 C.F.R. §§ 208.16-18.

#### A. Asylum.

Asylum protects individuals who reach the United States and have a "well-founded fear of persecution" on account of a protected ground: race, religion, nationality, political opinion, or membership in a particular social group. 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A). A "well-founded fear of persecution" requires a mere ten percent chance of suffering serious harm. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430, 440 (1987). Past persecution gives rise to a presumption of a well-founded fear, and thus eligibility for asylum. 8 C.F.R. § 208.13(b)(1).

The asylum laws brought the United States into compliance with its international obligations under the 1951 U.N. Refugee Convention and its 1967 Protocol. *Cardoza-Fonseca*, 480 U.S. at 437-38. Generally, "[a]ny alien who is physically present in the United States or

who arrives in the United States . . . , irrespective of such alien's status, may apply for asylum."

8 U.S.C. § 1158(a)(1).  But asylum is subject to several limits, including a one-year filing

deadline and eligibility bars for individuals with certain criminal convictions.  *See id.*

§ 1158(a)(2), (b)(2).

### B. *Non-refoulement* Obligations: Withholding of Removal and CAT Protection.

Withholding of removal ("withholding") and CAT protection implement the United

States' "*non-refoulement*" obligations under international law not to send any person to a country

where that person would face persecution or torture.  *See* 1951 Convention Relating to the Status

of Refugees, art. 33, July 28, 1951, 189 U.N.T.S. 150;[1] United Nations Convention Against

Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, art. 3, Dec. 10,

1985, 1465 U.N.T.S. 85.  These protections may thus be available even to those denied asylum.

Both obligations encompass direct *refoulement*—sending individuals directly to countries where

they face persecution or torture—as well as indirect *refoulement*—sending them to countries

where they are sent onward to persecution or torture.  *See, e.g.*, DHSFF104, 364, 816-17, 832.[2]

The Supreme Court has held that the withholding statute addresses the Refugee

Convention's prohibition of *refoulement*.  *INS v. Stevic*, 467 U.S. 407, 426 n.20 (1984).

Withholding bars the government from removing a person to any country where his or her "life

or freedom would be threatened" on account of any of the same five protected grounds as

asylum.  8 U.S.C. § 1231(b)(3).  And as with asylum, past persecution generates a presumption

---

[1] The United States is not a party to the 1951 Convention, but is a party to its 1967 Protocol, which incorporates, inter alia, Article 33.  *INS v. Aguirre-Aguirre*, 526 U.S. 415, 427 (1999).

[2] The government provided plaintiffs with five separate administrative records.  This brief refers to those records using the abbreviations in the government's pagination.  "DOJIFR" and "DHSIFR" refer to the respective DOJ and DHS records concerning the Rule itself.  "USCIS" refers to the record concerning the Guidance documents.  "DOJFF" and "DHSFF" refer to the agencies' respective categorical Designations concerning Guatemala.

of future persecution for withholding eligibility.  8 C.F.R. § 208.16(b)(1)(i).  But withholding imposes a higher standard of proof: individuals must show that it is *more likely than not* that they will be persecuted.  *Stevic*, 467 U.S. at 429-30.  The CAT statute and regulations address the CAT's *non-refoulement* requirement by prohibiting the removal of a person to any country where "it is more likely than not that he or she would be tortured."  8 C.F.R. § 208.16(c)(2); Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242(b), 112 Stat. 2681, 2681-82.

Only an immigration judge ("IJ")—not an asylum officer—can make the ultimate decision of whether these obligations prohibit an individual's removal to a given country.  *Id.* § 1208.16(a), (c)(4).  If a person establishes withholding or CAT eligibility, the IJ *must* grant protection.  8 U.S.C. § 1231(b)(3); *Aguirre-Aguirre*, 526 U.S. at 420.  Both forms of protection prohibit removal not just to the person's home country, but to any proposed country of removal as to which the required showing is made.  8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 208.16(b)-(c).

## II.     Regular and Expedited Removal Proceedings.

Removal proceedings before an IJ under 8 U.S.C. § 1229a are the default mechanism for determining whether individuals may be removed under the Immigration and Nationality Act ("INA").  8 U.S.C. § 1229a(a)(3).  In removal proceedings, an individual is entitled to a full hearing before an IJ, with time to gather and present evidence and the right to be represented by counsel and cross-examine witnesses.  *Id.* § 1229a(b)(4).  And if the IJ denies asylum, withholding, or CAT relief, the individual can appeal to the Board of Immigration Appeals and then to the relevant federal court of appeals.  *Id.* §§ 1101(a)(47)(B), 1129(c)(5), 1252(a)(1).

The primary alternative removal procedure specified in the INA is expedited removal proceedings under 8 U.S.C. § 1225(b)(1).  Congress created expedited removal in 1996.  *See*

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208 Div. C, 110 Stat. 3009-546 (Sept. 30, 1996).  Expedited removal currently applies to certain individuals arriving at ports of entry or who recently entered the country without inspection and are apprehended near the border.  *See Make the Road N.Y. v. McAleenan*, 405 F. Supp. 3d 1 (D.D.C. 2019), *appeal pending*, No. 19-5298 (D.C. Cir., filed Oct. 31, 2019).

Congress crafted protections in these proceedings to avoid erroneously deporting asylum seekers to danger.  DHS must ask all persons in expedited removal if they fear being removed. *See* 8 C.F.R. § 235.3(b)(2)(i); DHSIFR752, 835.  Only those who do not express fear can be removed "without further hearing or review."  *See* 8 U.S.C. § 1225(b)(1)(A)(i).  Those who express fear "shall" receive an interview with an asylum officer, *id.* § 1225(b)(1)(A)(ii), to determine if they have a "credible fear of persecution," *id.* § 1225(b)(1)(B)(ii).  They cannot be removed without first receiving this credible fear interview.  *Id.* § 1225(b)(1)(B).

Congress also did not require individuals to establish their ultimate entitlement to protection during the credible fear interview.  *Id.* § 1225(b)(1)(B)(ii), (v).  Instead, they need only show "a significant possibility" of later meeting the ultimate standard for relief in a full removal hearing.  *Id.* § 1225(b)(1)(B)(v).  Because asylum requires a showing of a one in ten chance of persecution, a "significant possibility" of asylum eligibility is just a fraction of that. Congress designed this "low screening standard," 142 Cong. Rec. S11491-02 (daily ed. Sept. 27, 1996) (statement of Sen. Hatch, a principal sponsor), such that "there should be no danger that an alien with a genuine asylum claim" would be summarily removed to persecution.  H.R. Rep. No. 104-469, pt. 1, at 158 (1996); *see also* 62 Fed. Reg. 10,312, 10,320 (Mar. 6, 1997) (acknowledging that "[t]he credible fear standard sets forth a low threshold of proof of potential entitlement to asylum").  The low standard recognizes that the credible fear interview usually

occurs within days of an often-traumatized asylum seeker's arrival.  The person has "ordinarily

been detained since his or her arrival in the United States and is therefore likely to be more

unprepared, more vulnerable, and more wary of government officials."  *Zhang v. Holder*, 585

F.3d 715, 724 (2d Cir. 2009).   Individuals who satisfy the credible fear screening threshold are

placed in regular removal proceedings before an IJ.  8 U.S.C. § 1225(b)(1)(B)(ii); § 8 C.F.R.

208.30(f).

The credible fear process has other important protections.  For example, the interviews

are "nonadversarial" and asylum officers must affirmatively "elicit all relevant and useful

information" bearing on the individual's eligibility for relief.  8 C.F.R. § 208.30(d).  Individuals

also have the right to consult with counsel and have counsel present at the interview.  8 U.S.C.

§ 1225(b)(1)(B)(iv); 8 C.F.R. § 208.30(d)(4); 65 Fed. Reg. 76,121, 76,129 (Dec. 6, 2000).

Following the interview, "if the officer determines that an alien does not have a credible fear of

persecution," the individual is entitled to "prompt review by an immigration judge of [that]

determination."  8 U.S.C. § 1225(b)(1)(B)(iii)(I), (III).

## III.    The Safe Third Country Provision.

The safe third country provision states that a person may be denied the right to apply for

asylum if "the alien may be removed, pursuant to a bilateral or multilateral agreement, to a

country," other than the person's country of origin, where (1) "the alien's life or freedom would

not be threatened on account of [a protected ground]"; and (2) "the alien would have access to a

full and fair procedure for determining a claim to asylum or equivalent temporary protection";

unless (3) "the Attorney General finds that it is in the public interest for the alien to receive

asylum in the United States."  8 U.S.C. § 1158(a)(2)(A).  Congress enacted the safe third country

provision in 1996 in reponse to Canada's longstanding desire to negotiate such an agreement.[3]
As with the credible fear safeguards in the same 1996 legislation, Congress sought to "ensur[e]
that no alien will be returned to persecution."  H.R. Rep. No. 104-469, pt. 1, at 175 (1996).

Following the enactment of the safe third country provision, and after extensive
negotiations, the United States entered into an agreement with Canada, a safe, stable nation with
a world-renowned asylum system.  *See* Declaration of Alondra Martinez ("Martinez Decl."), Ex.
1 (United States-Canada Safe Third Country Agreement, Dec. 5, 2002 ("Canada Agreement")).
The Canada Agreement is narrow.  It prevents asylum seekers from accessing the U.S. asylum
system at ports of entry on the Canadian border (unless they have family members in the United
States), by allowing DHS to transfer them back to Canada to seek asylum.  *Id.*, art. 4.  It works in
the opposite direction as well.  *Id.*  The agreement also provided that the United Nations High
Commissioner for Refugees ("UNHCR") would monitor its implementation.  *Id.*, art. 8(3).

DHS and DOJ began applying the Canada Agreement after issuing regulations through
notice-and-comment procedures.  DHSFF714-23 (final rules); DHSFF907-14 (proposed rules).
That rulemaking "specifically recognize[d] that Canada offers a generous system of refugee
protection, and has a tradition of assisting refugees and displaced persons abroad."  DHSFF714.

## IV.    Northern Triangle Agreements and the Interim Final Rule.

### A.  Guatemala, Honduras, and El Salvador "Asylum Cooperative Agreements."

After more than 16 years with no additional safe third country agreements, last summer
the government signed "asylum cooperative agreements" ("ACAs") with Guatemala, Honduras,
and El Salvador, DOJIFR79-95.  Only the Guatemala ACA has been put into effect.  Unlike the

---

[3] *U.S. & Canada Safe Third Country Agreement: Hearing Before the H. Subcomm. on
Immigration*, 107th Cong., at 16 (Oct. 16, 2002) ("2002 Cong. Hearing") (statement of Kelly
Ryan, Deputy Assistant Secretary of State), *available at* https://tinyurl.com/tvhm55y.

Canada Agreement, it is not reciprocal, applies to individuals whether or not they arrive at ports of entry, has no exceptions for family reunification, and does not provide for UNHCR review of its implementation.  *Id.* at 92-94.

Most critically, Guatemala, like Honduras and El Salvador, lacks a functioning asylum system and is a dangerous and impoverished country that cannot provide safety to its own citizens, much less asylum seekers from elsewhere.  Indeed, the three countries *produce* the majority of refugees seeking safety in the U.S.  *Id.* at 54-60; DHSIFR803; DHSFF682, 1233.

### B.  Interim Final Rule and USCIS Guidance.

On November 19, 2019, without notice and comment, DHS and DOJ jointly issued the Interim Final Rule (the "Rule") that creates a procedural framework for removals under the three new ACAs and any future agreements.  84 Fed. Reg. 63,994 (Nov. 19, 2019); USCIS387-402. The Rule, which went into effect immediately, denies individuals subject to an ACA the opportunity to apply for asylum, withholding, and CAT protection in the United States.  *Id.* at 64,000.  Its stated purpose is to "distribut[e] hundreds of thousands of asylum claims" to other countries.  *Id.* at 63,994.

The Rule applies to asylum seekers in regular and expedited removal proceedings.  *Id.* at 63,998.  For regular removal, the Rule amends the regulations to authorize IJs to order individuals removed to any applicable ACA country before hearing their claim for asylum, withholding, and CAT protection as to their home country.  *Id.* at 64,010-11.  If the individual fears harm in the proposed ACA country of removal (e.g., Guatemala), the Rule provides that the IJ should determine whether it is more likely than not that the person would be persecuted or tortured in that country.  *Id.*  That is, individuals must prove entitlement to withholding or CAT protection as to Guatemala just to have the chance to apply for asylum in the United States.  *Id.*

Moreover, once other ACAs are effective, individuals will have to satisfy the more-likely-than-not standard as to *every* possible ACA country. *Id.* Although the safe third country provision grants IJs authority to apply a broad "public interest" exception, *see* 8 U.S.C. § 1158(a)(2)(A), the Rule asserts that IJs may do so only with the permission of DHS. 84 Fed. Reg. at 64,010-11.

For expedited removal proceedings, the Rule entirely bypasses the credible fear process. Under the Rule, asylum seekers subjected to expedited removal who express fear of removal to their home countries do not automatically get the credible fear interview Congress guaranteed them. *Id.* at 64,008-09. Instead, they receive only written notice that they may be removed to a third country. *Id.* at 64,009. The Rule does not require asylum officers to ask asylum seekers whether they fear removal to the ACA receiving country. *Id.* at 63,998. If an individual does not affirmatively express such a fear, they are summarily removed there with no assessment of whether they are at risk of persecution or torture. *Id.*

Even those who do express fear of removal to the the ACA country do not get a credible fear interview. Rather, asylum officers assess their risk of persecution or torture in the ACA country in what the Rule calls "threshold screening interviews." *Id.* at 64,008. But these are not "screenings" at all. Instead, individuals must meet the *ultimate* withholding or CAT standard: that they are more likely than not to be persecuted or tortured in the ACA country. *Id.* at 64,009. This is far higher than even the one-in-ten chance of persecution required for an ultimate grant of asylum. They must meet this high burden for *every* ACA country to which they might be removed, and the Rule forbids them from being represented by counsel as they attempt to do so. *Id.* at 64,003, 64,009. Only those who make this showing get credible fear interviews. And the

asylum officer's determination that an individual is barred from asylum and may be removed to a

third country under an ACA is final—the Rule prohibits IJ review.  *Id.* at 64,004.[4]

### C.  USCIS Guidance.

On November 19, 2019 and January 4, 2020, USCIS issued written guidance (the

"Guidance") to asylum officers regarding the Guatemala ACA.  USCIS278-312, 348-80; *see also*

*id.* at 313-19.  The Guidance states that Customs and Border Protection ("CBP") makes the

initial determination of whether individuals who express fear of removal to their home countries

fall under an ACA.  *Id.* at 283, 353.  Under the Guidance, the Guatemala ACA currently can be

applied to a national of Honduras or El Salvador who has not been convicted of a felony in the

United States or any crime in Guatemala, but the amenable nationalities are subject to change at

any time.  *Id.* at 287; *see also id.* at 380-81.  CBP is to give those selected for ACA removal

"Tear Sheets" stating that they may be removed to Guatemala and will be referred to an asylum

officer for an interview.  *Id.* at 283-85, 353-55, 374; *see also id.* at 1 (tear sheet).

The Guidance reiterates that an "[i]ndividual is <u>not entitled</u> to a consultant"—i.e., to

counsel—in an ACA interview.  *Id.* at 282, 352.  It specifically instructs asylum officers "not to

actively probe or question whether an asylum seeker has a fear of removal to Guatemala."  *Id.* at

363, 374.  The Guidance also provides that, for "threshold screening interviews," showing past

persecution in Guatemala does *not* create a presumption of future persecution there, but is

instead only "strong evidence" of the likelihood of future persecution.  *Id.* at 295, 366.

---

[4] The Canada Agreement regulations also bypass the credible fear process, and do not provide
for any individualized *non-refoulement* assessment.  Instead, the screening only concerns
exceptions to that agreement, such as that for family unity.  8 C.F.R. § 208.30(e)(6)(iii).  Those
procedures are not at issue here and, of course, Canada does not present the type of dangers
presented by the current ACA countries.

### D.  The Categorical Designations and Guatemala ACA Implementation.

On October 16 and November 7, 2019, DHS and DOJ, respectively, issued categorical designations that Guatemala meets the safe third country provision's requirements (the "Designations").  DHSFF1282-83; DOJFF6-7.  The government began removing adult Honduran and Salvadoran asylum seekers to Guatemala on November 21, 2019.  DOJFF112; USCIS287, 331-33.  On December 10, the program expanded to include parents with children, USCIS375, and is currently operational in at least two Border Patrol sectors.

## V.    Guatemala, Honduras, and El Salvador Are Unsafe for Asylum Seekers and Lack Functioning Asylum Systems.

According to the agencies' own administrative record, "[a] surging tide of violence sweeping" the Northern Triangle in recent years "has forced thousands of women, men, and children to leave their homes every month," fleeing "murder, extortion, and rape."  DHSFF682.  The three countries "have among the world's highest murder rates."  DHSIFR738.  The State Department specifically warned that "Guatemala remains among the most dangerous countries in the world," with a "high murder rate . . . driven by narco-trafficking activity, gang-related violence, a heavily armed population, and police/judicial system unable to hold many criminals accountable."  DHSFF1233.  Women in all three countries "face a startling degree of violence that has a devastating impact on their daily lives," with "increasing violence from criminal armed groups [often] occur[ing] alongside repeated physical and sexual violence at home."  *Id.* at 682.  Unchecked anti-LGBT violence is also widespread.  USCIS21-25; DHSFF616, 695.

Materials DHS provided to asylum officers explain that Honduran and Salvadoran migrants transiting Guatemala suffer "abuses and mistreatment by [police]" and "extortion, theft, and assault by migrat[ion] authorities."  USCIS11; *see also* DHSFF112, 548, 683.  Moreover, the

12

three countries are parties to a free-movement pact that allows the region's gangs and other persecutors to easily pursue their victims across borders.  USCIS19, 26; DHSFF1255, 1260.

The record also reflects that none of the three countries has a functioning asylum system. Guatemala's system has only seven dedicated employees, and just three or four who interview applicants.  DHSFF1231, 1253.  It can process just 100 to 150 claims per year and already has a backlog of over 400 cases.  DHSFF1231.  The relevant Honduran agency has only twelve employees, just three of whom adjudicate claims.  DHSFF1254.  El Salvador's asylum agency has no budget and no staff.  *Id.*

## LEGAL STANDARD

"[W]hen ruling on cross-motions for summary judgment, the court may grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law on material facts that are not genuinely disputed."  *Spirit of Sage Council v. Norton*, 294 F. Supp. 2d 67, 81 (D.D.C. 2003), *vacated in part as moot*, 411 F.3d 225 (D.C. Cir. 2005).  In APA cases, the Court "review[s] the administrative record directly to determine whether the agency has complied with the APA."  *Id.* (cleaned up) (quoting *Troy Corp. v. Browner*, 120 F.3d 277, 281 (D.C. Cir. 1997).

To obtain a permanent injunction, a plaintiff must show (1) irreparable injury; (2) remedies available at law are inadequate; (3) the balance of hardships favor the plaintiff; and (4) "that the public interest would not be disserved by a permanent injunction."  *Sierra Club v. U.S. Dep't of Agric.*, 841 F. Supp. 2d 349, 356 (D.D.C. 2012) (citation omitted).

## JURISDICTION

The Court has federal question jurisdiction under 28 U.S.C. § 1331 and also has jurisdiction under 8 U.S.C. § 1252(e)(3).  Section 1252(e)(3) confers jurisdiction on this Court to determine whether a "regulation issued to implement [the expedited removal statute, 8 U.S.C.

§ 1225(b)]" is unconstitutional, "[in]consistent with the applicable provisions of this subchapter," or "otherwise in violation of law."  8 U.S.C. § 1252(e)(3).  The policies challenged here purport to implement expedited removal.  Plaintiffs brought their challenge within sixty days of the implementation of those policies.  *See id.* § 1252(e)(3)(B).

Plaintiffs have standing.  The Individual Plaintiffs, six adults and children, sought asylum in the United States after fleeing Honduras and El Salvador, where they suffered threats, beatings, and other grave harms.  *See* SUF ¶¶ 126-36.[5]  They were all removed to Guatemala under the Rule, Guidance, and Designations.  *See id.*

The Organizational Plaintiffs are legal service organizations that represent asylum seekers.  The policies harm the Organizational Plaintiffs' interests and they must divert their resources to counteract that harm.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982); *People for the Ethical Treatment of Animals v. U.S. Dep't of Agriculture*, 797 F.3d 1087, 1094 (D.C. Cir. 2015); *E. Bay Sanctuary Covenant v. Trump* ("*EBSC v. Trump II*"), --- F.3d ----, 2020 WL 962336, at *9-10 (9th Cir. Feb. 28, 2020).

Las Americas Immigrant Advocacy Center ("Las Americas") serves asylum seekers in the El Paso area, including many Salvadorans and Hondurans.  SUF ¶ 155-56.  Las Americas normally devotes 35 percent of its work to representing asylum seekers in expedited removal.  SUF ¶ 156.  The Rule impedes Las Americas' ability to serve these individuals by precluding them from credible fear interviews and preventing representation by counsel at ACA "threshold screening interviews."  *Id.* ¶ 160.  Application of the Rule and Designations in regular removal proceedings will multiply the resources needed to represent clients in those proceedings, due to the need to present withholding and CAT claims as to Guatemala, forcing it to divert resources in

---

[5] Citations to facts that are not part of the administrative record are to the Statement of Undisputed Facts ("SUF") with relevant paragraph references.

response.  *Id.* ¶ 163.  Defendants' policies also jeopardize Las Americas' funding tied to representing individuals in credible fear interviews and in regular removal proceedings—which those removed under the Rule never reach.  *Id.* ¶ 164.

Plaintiff Tahirih Justice Center ("Tahirih") represents asylum seekers in removal proceedings.  SUF ¶ 143.  Roughly 40 percent of Tahirih's clients come from Honduras and El Salvador.  Defendants' policies will prevent Tahirih from serving asylum seekers from those countries who are removed under the Rule in expedited removal before they can have their claims assessed.  *Id.* ¶¶ 148-50.  Those who are not summarily removed face heavier burdens in regular removal proceedings, which will strain Tahirih's resources.  *Id.* ¶ 151.  As with Las Americas, Defendants' policies also threaten Tahirih's per-case funding.  *Id.* ¶ 152.  Moreover, although Tahirh submitted comments on the Rule after it issued, the agencies' failure to follow notice and comment procedures deprived Tahirih of the opportunity to do so before the Rule took effect.  *Id.*

## **ARGUMENT**

### I.      **The Rule, Guidance, and Designations are Unlawful.**

#### **A.  The Rule and Guidance Violate the INA.**

Congress wove critical procedural protections into the INA at every turn, to ensure that asylum seekers are not erroneously removed to persecution or torture.  The Rule bypasses three sets of essential guardrails: the detailed credible fear procedures Congress mandated for *all* asylum seekers placed in expedited removal; the multiple layers of substantive protections inscribed in the safe third country provision itself; and the ultimate backstops against *refoulement* codified in the withholding and CAT statutes.  The Rule replaces them with an extra-statutory scheme that places asylum seekers at an unacceptably high risk of removal to danger.

### 1.  The Rule Violates the Credible Fear Statute.

First, the Rule contravenes the INA's requirement that asylum seekers in expedited removal can be removed only through the credible fear process.  Only procedures "specified in" the INA itself may supplant regular removal proceedings.  8 U.S.C. § 1229a(a)(3) ("Unless otherwise specified *in this chapter*, a proceeding" before an IJ "shall be the sole and exclusive procedure for determining" inadmissibility and removability) (emphasis added).  Expedited removal under 8 U.S.C. § 1225(b)(1) is such an exception—and that statute's credible fear procedures *must* be complied with when an asylum seeker is in expedited removal proceedings.

By statute, if a noncitizen in expedited removal proceedings indicates "either an intention to apply for asylum . . . or a fear of persecution," an officer "*shall* refer the alien for an interview by an asylum officer under [8 U.S.C. § 1225(b)(1)] subparagraph (B)."  8 U.S.C. § 1225(b)(1)(A)(ii) (emphasis added).  The only interview under § 1225(b)(1)(B) is that to determine whether a noncitizen "has a credible fear of persecution."  *Id.* § 1225(b)(1)(B)(ii).

The credible fear provisions mandate application of the low "significant possibility . . . [of] eligibility" standard, 8 U.S.C. § 1225(b)(1)(B)(v), and guarantee rights to consultation, *id.* § 1225(b)(1)(B)(iv), and IJ review, *id.* § 1225(b)(1)(B)(iii)(III).  The regulations confirm these rights and require asylum officers "to *elicit* all relevant and useful information" in determining whether an asylum seeker can demonstrate credible fear.  8 C.F.R. § 208.30(d), (d)(4) (emphasis added); *see* 65 Fed. Reg. at 76,129.  Asylum seekers are entitled to "prompt review by an immigration judge" of adverse credible fear determinations.  8 U.S.C. § 1225(b)(1)(B)(iii)(III).

The INA admits of no exception to these requirements.  If the government applies the safe third country provision in expedited removal, it must follow credible fear procedures.

Yet the Rule diverts asylum seekers from the credible fear process into an extra-statutory "threshold screening interview."  84 Fed. Reg. at 64,008.  Asylum seekers routed into this misleadingly-named "screening" are generally removed without ever receiving credible fear interviews: these individuals receive credible fear interviews only if they affirmatively express fear of removal to every applicable ACA country—and then also demonstrate that they are *more likely than not* to be persecuted or tortured in each of them.  *Id.* at 63,998, 64,009.[6]  Only if they meet this heavy burden will the asylum officer "proceed to a credible fear interview."  *Id.* at 64,009.  The Rule's "threshold screening interview" procedure thus conflicts with the credible fear statute, which dictates that DHS "*shall* refer" every asylum seeker in expedited removal proceedings for a credible fear interview applying the low credible fear screening standard, not the ultimate standard for obtaining protection.  8 U.S.C. § 1225(b)(1)(A)(ii) (emphasis added). The Rule also unlawfully dispenses with other critical procedural protections set out in § 1225(b)(1) and its implementing regulations, such as representation by counsel and IJ review. Defendants cannot forgo these requirements just by changing the label on their interview procedures.  Accordingly, the Rule violates the INA.

## 2.   The Rule and Guidance Violate the Safe Third Country Provision.

In crafting the carefully-qualified limitations on asylum access in 8 U.S.C. § 1158(a)(2), which includes the "safe third country" provision, Congress sought to "ensur[e] that no alien will be returned to persecution."  H.R. Rep. No. 104-469, pt. 1, at 175 (1996).  The statute therefore permits third-country removal only if the receiving country is "safe" and has a "full and fair" asylum process, and the asylum seeker would not face persecution or torture on account of a

---

[6] Each ACA excludes unaccompanied children and individuals who arrive in the United States with valid visas or do not need visas to enter.  *See* DOJIFR81, 87-88, 93.  However, these groups are already not subject to expedited removal proceedings.  *See* 8 U.S.C. §§ 1225(b)(1), 1182(a)(6)(C), (a)(7), 1232(a)(5)(D); *see also id.* § 1158(a)(2)(E).

protected ground in the receiving country.  8 U.S.C. § 1158(a)(2)(A).  Congress also provided a

discretionary exception for cases where "it is in the public interest" for the individual to receive

asylum here.  *Id.*  The statute thus contains three essential requirements that apply whether an

individual is in regular or expedited removal proceedings: the government must (1) assess an

asylum seeker's risk of persecution in the third country every case, with the government bearing

the burden of proof; (2) find the individual will have full and fair access to asylum in a safe

receiving country; and (3) even if the first two requirements are met, assess whether the public

interest should permit the individual to apply for asylum in the United States.  *See id.*

Defendants' policies conflict with all three requirements.

First, the Rule and Guidance contravene the statute by failing to ensure that *all*

individuals will be free from persecution upon removal and, instead, assessing that danger only

when "the alien affirmatively states a fear of removal to [the third] country."  84 Fed. Reg. at

63,998; *accord* USCIS363, 374 ("[T]he [asylum officer] should not actively probe or question

whether the individual has a fear of removal to Guatemala.").  This means that asylum seekers

who do not affirmatively inform the asylum officer of a fear are subject to removal without *any*

determination concerning risk of persecution.  *See* 84 Fed. Reg. at 64,002.  The Rule and

Guidance therefore compel removals that the statute expressly forbids.  "When a statute requires

an agency to make a finding as a prerequisite to action," acting without making that finding

"violate[s] the statute."  *Gerber v. Norton*, 294 F.3d 173, 185-86 (D.C. Cir. 2002).

The Rule further contravenes this first statutory requirement by erroneously placing the

burden of proof on the asylum seeker "to demonstrate it is more likely than not that he or she

would be subject to persecution . . . or to torture in [the receiving] country."  84 Fed. Reg. at

63,998.  The Rule reasons that this burden of proof applies because the safe third country

provision "mirrors the standard for protection contained in the INA's withholding-of-removal

provision." *Id.* at 63,999. That is incorrect. The withholding statute requires applicants to prove

that their "life or freedom *would* be threatened." 8 U.S.C. § 1231(b)(3)(A) (emphasis added).

Conversely, the safe third country provision requires *the agency* to assure that "the alien's life or

freedom would *not* be threatened." *Id.* § 1158(a)(2)(A) (emphasis added). This language

actually tracks the text of 8 U.S.C. § 1158(c)(2)(C), which permits *termination* of asylum status

when "the Attorney General determines," inter alia, that an asylee "may be removed . . . to a

[third] country . . . in which the alien's life or freedom would *not* be threatened." *Id.*

§ 1158(c)(2)(C) (emphasis added). Whereas the applicant bears the burden to secure

withholding, the government bears the burden to terminate asylum. 8 C.F.R. § 208.24(f);

*Ntangsi v. Gonzales*, 475 F.3d 1007, 1012 (8th Cir. 2007). The Rule impermissibly "give[s] the

same statutory text different meanings" in sections 1158(a)(2)(A) and 1158(c)(2)(C). *See Clark

v. Martinez*, 543 U.S. 371, 386 (2005).

   Second, the Rule and Guidance fail to provide any opportunity for an individual to

contest whether *she* would have access to full and fair asylum procedures in the receiving

country—regardless of whether others might. *See* 8 U.S.C. § 1158(a)(2)(A) (requiring

determination of whether "*the alien* would have access to a full and fair procedure") (emphasis

added). While an "agency may rely on its rulemaking authority to determine issues that do not

require case-by-case consideration," it equally must permit individualized consideration of issues

that require it. *Heckler v. Campbell*, 461 U.S. 458, 467 (1983). The overall safety of another

country and the functioning of its asylum system may well be the "type of general factual issue

[that] may be resolved . . . fairly through rulemaking." *See id.* at 468. But some individuals may

be unsafe or otherwise lack effective access to protection due to their particular circumstances,

such as their sexual orientation.  *See, e.g.*, SUF ¶¶ 126, 142.  The statute requires the agencies to permit individuals to raise such concerns, and to address them when raised.  Because neither the Rule nor the Guidance permit such individualized consideration of barriers to accessing asylum, they violate the statute.

Third, the Rule violates the plain text of the safe third country provision by barring IJs in regular removal proceedings from applying the public interest exception, and instead "reserv[ing]" that discretion solely to DHS attorneys.  *See* 84 Fed. Reg. at 64,010-11.  The agencies acknowledge that IJs, exercising authority delegated by the Attorney General, can adjudicate other elements of a safe third country determination in regular removal proceedings. *See id.*  Nothing in the safe third country provision's text or structure offers any basis for the agencies' assertion that it somehow "reserves to [DHS]" authority to apply the exception.  *Id.* at 64,010.  To do so would again "give the same statutory text different meanings," *Clark*, 543 U.S. at 386, by reading "the Attorney General" in two conflicting ways in the same sentence: first ("if the Attorney General determines") as authorizing both DOJ IJs *and* DHS asylum officers to assess risk of persecution and torture; but then ("unless the Attorney General finds that it is in the public interest") as applying only to DHS.  *See* 8 U.S.C. § 1158(a)(2)(A); *see also id.* § 1103(a)(1) (charging DHS with administering and enforcing the INA "*except* insofar as [the statute] relate[s] to the powers, functions, and duties conferred upon the . . . Attorney General") (emphasis added); *id.* § 1103(g)(1) (confirming Attorney General's continuing "authorities and functions" over matters previously adjudicated in immigration court).  Repeated legislative efforts to amend the statute to *actually* reserve to DHS the authority to apply the exception confirms that it does not now do so.  *See* H.R. 1153, 114th Cong. § 12 (2015); H.R. 391, 115th Cong. § 12 (2017).

### 3.  The Rule and Guidance Violate the Withholding and CAT Statutes.

Even if not already bound to follow the credible fear procedures and the requirements of safe third country provision itself, the agencies would still be required, at a minimum, to comply with the withholding and CAT statutes.  These statutes codify "general anti-refoulement provision[s]" that "are not limited to instances in which an alien has had a full removal hearing," *see Innovation Law Lab v. Wolf*, --- F.3d ----, 2020 WL 964402, at *14 (9th Cir. Feb. 28, 2020), and thus provide the minimum requirements for ACA removals as well.

The Rule and Guidance contravene these statutes by failing to provide sufficient protection against *refoulement*.  Most significantly, the Rule permits asylum seekers to be removed to an ACA country without asylum officers ever asking individuals whether they fear removal to that country.  84 Fed. Reg. at 63,998; USCIS363, 374.  However, requiring "aliens, unprompted and untutored in the law of refoulement, [to] volunteer that they fear" removal to a third country fails to "satisf[y] our anti-refoulement obligations."  *Innovation Law*, 2020 WL 964402, at *15.  Moreover, the Rule applies the ultimate more-likely-than-not standard of proof for withholding and CAT, rather than a true screening standard, and yet bypasses the critical safeguards required whenever that ultimate standard is applied.  *See infra* at 21-26.  These threadbare procedures fail to provide sufficient protection against *refoulement*.

### B.  The Expedited Removal Procedures in the Rule and Guidance Are Arbitrary and Capricious Under the APA.

The expedited removal procedures in the Rule and Guidance are also arbitrary and capricious under the APA, for two reasons.  First, the agencies failed to acknowledge or explain their numerous departures from the safeguards deemed essential in all prior interview procedures assessing whether individuals may face persecution or torture.  Second, the agencies failed to

consider the obvious danger that stripping away those safeguards will result in erroneous removals, in violation of the United States' *non-refoulement* obligations.

### 1. Failure to Explain Departures from Prior Practices.

The agencies failed to acknowledge or explain the elimination of six key safeguards intended to ensure compliance with *non-refoulement* obligations.  "[T]he requirement that an agency provide reasoned explanation for its action . . . demand[s] that it display awareness that it *is* changing position."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  An agency cannot "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."  *Id.*  The Rule and Guidance repeatedly violate these prohibitions.

(i) Failure to Ask About Fear of Removal.  In credible fear interviews, asylum officers must "elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture."  8 C.F.R. § 208.30(d).  The Rule eliminates this mandate and instead provides that, if the noncitizen "does not affirmatively state a fear of persecution or torture" in the third country, the interview ends and the individual is "subject to removal."  84 Fed. Reg. at 64,002.  The agencies do not explain this change.

(ii) Failure to Apply a True Screening Standard.  Normally, asylum seekers in expedited removal proceedings need only demonstrate a "significant possibility" that they could win protection to proceed to a full hearing before an IJ.  8 U.S.C. § 1225(b)(1)(B)(v); 8 C.F.R. § 208.30(e)(3); *see also* 8 C.F.R. § 208.31(c), (e); 84 Fed. Reg. 8478, 8485 (Feb. 19, 1999).  Never before have the agencies required individuals seeking protection from removal to satisfy the ultimate withholding or CAT standards in summary asylum officer interviews.  This fundamental change is unexplained.

The agencies invoke the more-likely-than-not standard because that is what "applies in the withholding-of-removal context." 84 Fed. Reg. at 63,999. But they do not explain why they adopted the *ultimate* standard IJs apply in adjudicating withholding and CAT claims in regular removal proceedings, with a full hearing and judicial review, rather than a low screening standard, as in *every other* expedited removal context.

The agencies irrationally attempt to distinguish the withholding and CAT assessments made pursuant to the Rule on the basis that they involve removals to third countries, rather than to asylum seekers' home countries. 84 Fed. Reg. at 64,001. The agencies suggest that applying the ultimate standard is justified because asylum seekers will "not necessarily have preexisting ties or any preexisting reason to fear persecution or torture" in an ACA country. *Id.* at 64,001-02. But this is a non sequitur: for those who do have reason to fear harm, the withholding and CAT analyses are just as complex. And the Rule only affords fear assessments to those who "*affirmatively state*[] a fear of removal to the [ACA] country." *Id.* at 64,002 (emphasis added). Moreover, the agency's own record shows that many Honduran and Salvadoran asylum seekers do have reasons to fear harm in Guatemala. *See, e.g.*, USCIS19 (collecting evidence of "gang members moving among the Northern Triangle countries"); *id.* at 22 ("Central American migrants [in Guatemala suffer] abuses and mistreatment by [police]" and "extortion, theft, and assault by migrat[ion] authorities"); *id.* at 26 ("LGBTI asylum-seekers from Honduras [and] El Salvador" do not request asylum in Guatemala due to "the high levels of violence and discrimination against LGBTI people" there). *See also Ctr. for Auto Safety v. Fed. Highway Admin.*, 956 F.2d 309, 314 (D.C. Cir. 1992) (agency action resting on unsupported premise is arbitrary and capricious).

(iii) Asylum Officer Adjudication of the Ultimate Merits of Fear Claims.  Relatedly, the agencies do not explain how to square the Rule's requirement that asylum officers decide the ultimate merits of withholding and CAT claims with longstanding regulations forbidding just that.  Withholding regulations state that "[a]n asylum officer *shall not decide* whether . . . the removal of an alien to a country where the alien's life or freedom would be threatened must be withheld."  8 C.F.R. § 208.16(a) (emphasis added).   The CAT regulations similarly provide that an "*immigration judge* . . . shall" determine CAT eligibility.  8 C.F.R. § 208.16(c)(4) (emphasis added).  These requirements are critical because withholding and CAT protection are the final backstops against *refoulement*, where the consequences of error are matters of life and death.

The agencies may not "simply disregard rules that are still on the books." *Fox Television*, 556 U.S. at 515.  Yet, the agencies never even acknowledge these conflicting regulations, much less explain why they should be disregarded here.

(iv) Eliminating the Presumption Established by Past Persecution.  In the withholding context—which the agencies describe as mirroring the safe third country provision—a showing of past persecution creates a rebuttable presumption of future persecution.  *See* 8 C.F.R. §§ 208.16(b)(1)(i).  Yet the Guidance directs that past persecution in Guatemala does not establish a presumption of future persecution there.  USCIS295, 366.  Here too, there is no explanation for this departure, which makes it far more difficult for even asylum seekers from other countries who *have* been harmed in Guatemala to meet the heightened "screening" burden.

(v) Prohibition of Counsel.  Next, the agencies fail to acknowledge or explain their departure from existing interview procedures affording access to counsel.  In a credible fear interview, the asylum seeker may consult with counsel, and counsel may attend the interview.  8

C.F.R. § 208.30(d)(4); 65 Fed. Reg. at 76,129; *see also* 8 C.F.R. § 208.31(c)(4).  The Rule and

Guidance eliminate these rights to counsel.  *See* 84 Fed. Reg. at 64,003; USCIS282, 374.

Instead of acknowledging this departure from other fear screenings, the Rule cites the

regulations concerning the Canada Agreement—which permit consultation with counsel—as the

relevant baseline.  The agencies say that such consultation is unnecessary here because the ACAs

"incorporate fewer and less complex exceptions" than the Canada Agreement's family unity

exemptions.  84 Fed. Reg. at 64,003 & n.11; *see also* 8 C.F.R. § 208.30(e)(6)(iii)(B)-(C).  But

that explanation is based on a false premise.  The Rule's fear screening—not included in the

Canada procedures—is unquestionably more complex than whether an asylum seeker's uncle is a

U.S. lawful permanent resident.  *See, e.g.*, *Alvarez Lagos v. Barr*, 927 F.3d 236, 255 & n.4 (4th

Cir. 2019) (describing "both the 'future likely mistreatment' and 'acquiescence' prongs of the

CAT inquiry" as "fact-intensive"); *Zhang v. Gonzales*, 426 F.3d 540, 548 (2d Cir. 2005)

(assessing persecutor's motive is "a complex and contextual factual inquiry").[7]

(vi) Elimination of IJ Review.  Finally, in all other summary removal contexts designed

to comply with *non-refoulement* obligations, asylum officers' negative fear screening

determinations are subject to IJ review.  8 C.F.R. § 208.30(g) (credible fear screenings); *id.*

§ 208.31(g) (reasonable fear screenings).  The Rule prohibits such review without

acknowledgment or explanation.  84 Fed. Reg. at 64,003-04.

Instead, the agencies again point to the Canada regulations and irrationally attempt to

distinguish DOJ's conclusion in that context that IJ review *would be* required here.  *Id.* at 64,004.

DOJ reasoned that IJ review was unnecessary for the Canada procedures because asylum officers

---

[7] The Canada regulations also provide a right to counsel during the screening interview itself.  8 C.F.R. § 208.30(d)(4), (e)(6).

would not be evaluating "the merits of . . . asylum claims" or other issues "call[ing] for the kind

of expert judgment exercised by immigration judges in conducting credible fear reviews."  69

Fed. Reg. 10,627, 10,630 (Mar. 8, 2004).[8]  Under the present Rule, by contrast, "an asylum

officer *does* need to determine whether the alien would more likely than not be persecuted or

tortured."  84 Fed. Reg. at 64,004 (emphasis added).  The agencies then claim that assessing the

motives behind past persecution "in the asylum seeker's home country" is "complex," but that

"evaluating whether an asylum seeker would face [future] persecution or torture in a [third]

country . . . is more straightforward."  *Id.*  They provide no explanation for this conclusory and

baseless assertion.  *See, e.g.*, *Alvarez Lagos*, 927 F.3d at 255 & n.4 (noting fact-intensive nature

of CAT determinations); *Zhang*, 426 F.3d at 548.

### 2.  The Agencies Failed to Consider the Grave Risks of Stripping Away Safeguards Designed to Prevent *Refoulement*.

The agencies also "entirely failed to consider an important aspect of the problem," *Motor*

*Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983),

because they did not "adequately analyze the . . . consequences" of their actions on asylum

seekers, *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017).  To

make a reasoned decision that passes muster under the APA, the agency must "analyze the

impact" of policy change on affected individuals.  *Nat'l Lifeline Ass'n v. Fed. Commc'ns*

*Comm'n*, 921 F.3d 1102, 1105-06 (D.C. Cir. 2019).  Removing asylum seekers is "replete with

danger."  *Cardoza-Fonseca*, 480 U.S. at 449.  Consequently, one of Congress's explicit goals in

---

[8] As noted above, the Canada screening procedure contains no individualized *non-refoulement* assessment, and only concerns exceptions to that agreement, such as that for family unity.  8 C.F.R. § 208.30(e)(6)(iii).

crafting the safe third country provision was to "ensur[e] that no alien will be returned to persecution."  H.R. Rep. No. 104-469, pt. 1, at 175 (1996).

The agencies were therefore "required to grapple with the lapse in legal safeguards that [their] reversal of policy triggered."  *Mozilla Corp. v. FCC*, 940 F.3d 1, 67 (D.C. Cir. 2019); *Gresham v. Azar*, No. 19-5094, --- F.3d ----, 2020 WL 741278, at *6-7 (D.C. Cir. Feb. 14, 2020) (finding that "[f]ailure to consider whether [a] project will result in [Medicaid] coverage loss is arbitrary and capricious," as coverage is a "principal objective of Medicaid"); *Nat'l Lifeline Ass'n*, 921 F.3d at 1111 (holding arbitrary and capricious agency rule that "fail[ed] to consider the impact of the change on the [policy's] 'primary purpose' or otherwise explain how it is compatible with that purpose").  But the Rule does not address the obvious risks of *refoulement* in a process stripped of the safeguards used in other summary removal contexts, or weigh those risks against the Rule's supposed benefits.  *See* 84 Fed. Reg. at 64,001-04.

This failure is made more egregious by the extreme dangers and threadbare asylum systems in the current ACA countries.  The agencies' own record shows that the three countries have among the world's highest murder rates; are especially dangerous for women, children, LGBT individuals, and migrants; and lack asylum systems operating at any meaningful capacity.  DHSFF107, 437, 683, 1231, 1253-54.  All this evidence was in front of the agencies well before they issued the Rule.  But they did not grapple with any of it in enacting a Rule intended to serve as the procedural framework for "hundreds of thousands" of eventual removals to these countries—and potentially others just as dangerous and unprepared.  *See* 84 Fed. Reg. at 63,995; *see also* DHSFF598 ("Latin America and the Caribbean" is "one of the world's most violent regions").  The Rule is therefore arbitrary and capricious.

**C. The Lack of Any Judicial Review of Expedited Removal Orders Issued Under the Rule Violates the Suspension Clause.**

 "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."  U.S. Const. art. 1, § 9, cl. 2. Removal is a restraint on liberty that triggers habeas corpus.  *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892) ("An alien immigrant, prevented from landing . . . , and thereby restrained of his liberty, is doubtless entitled to a writ of *habeas corpus* to ascertain whether the restraint is lawful.").  "Because of [the Suspension] Clause, some 'judicial intervention in deportation cases' is *unquestionably* 'required by the Constitution.'"  *INS v. St. Cyr*, 533 U.S. 289, 300 (2001) (emphasis added) (quoting *Heikkila v. Barber*, 345 U.S. 229, 235 (1953)).

Cases from the "finality era" between 1891 and 1952—during which Congress enacted a series of statutes eliminating all judicial review of deportation—demonstrate that the Suspension Clause guarantees judicial review of the legality of removal orders.  *Thuraissigiam v. DHS*, 917 F.3d 1097, 1109 & n.11, 1113-15 (9th Cir.), *cert. granted*, 140 S. Ct. 427 (2019).  These provisions prevented judicial intervention "except insofar as it was required by the Constitution." *Heikkila*, 345 U.S. at 234-35.  But during this period, courts continued to exercise habeas review over removal orders.  *Id.* (collecting cases).  While the finality provisions eliminated judicial review of *factual* determinations, the Supreme Court nonetheless reviewed *legal* challenges in habeas.  *See Nishimura Ekiu*, 142 U.S. at 660.

More recently, the Supreme Court has twice reaffirmed that the Suspension Clause requires review of legal claims.  *St. Cyr*, 533 U.S. at 301-02 ("at the absolute minimum, the Suspension Clause protects the writ 'as it existed in 1789,'" including review of "erroneous application or interpretation of statutes"); *Boumediene v. Bush*, 553 U.S. 723, 779 (2008) (a

person must have "a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law") (quoting *St. Cyr*, 533 U.S. at 302).

The Rule does not permit judicial review of legal challenges to expedited removal orders to ACA countries.  Individuals who do not affirmatively express fear or fail to meet the ultimate withholding or CAT standard are removed without further review.  84 Fed. Reg. at 64,009. Under the government's interpretation of the INA, individuals may not seek judicial review of whether an expedited removal order is lawful.  *Thuraissigiam*, 917 F.3d at 1103-04, 1119 (discussing 8 U.S.C. § 1252(e)(2)).  Critically, individuals cannot even obtain judicial review of whether DHS complied with the Rule's procedures.  This violates the Suspension Clause.

### D.  The Guatemala Designations Are Unlawful.

Apart from the procedural mechanisms set forth in the Rule and Guidance, both DOJ and DHS issued categorical designations concluding that Guatemala meets the statutory requirements to be a safe third country.  DOJFF6-7; DHSFF1282-83.  Those designations violate the safe third country provision and run afoul of the APA's demand for reasoned decisionmaking.

The government may remove an asylum seeker to a third country only after "determin[ing] that . . . the alien would have *access* to a full and fair procedure for determining a claim to asylum or equivalent temporary protection."  8 U.S.C. § 1158(a)(2)(A) (emphasis added).  Courts invariably interpret constitutional or statutory provisions concerning "access" to procedures or services to require meaningful and effective access.  *E.g.*, *Broudy v. Mather*, 460 F.3d 106, 117 (D.C. Cir. 2006) (the "right of [access to the courts] not only protects the ability to get into court, but also ensures that such access be adequate, effective, and meaningful") (internal quotations omitted); *Am. Council of the Blind v. Mnuchin*, 878 F.3d 360, 363 (D.C. Cir.

2017) (Rehabilitation Act provision addressing access to federal benefits demands "meaningful access").

Congress's concerns with "access to a full and fair [asylum] procedure" and (in the section heading) "safe[ty]" establish two critical requirements for assessing any potential safe third country.  *See Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 893 (2018) (section headings give "cues as to what Congress intended") (internal quotation mark omitted); *see also Matter of B-R-*, 26 I. & N. Dec. 119, 122 (BIA 2013) (explaining that "safe third country provision[] . . . limit[s] an alien's ability to claim asylum in the United States when other *safe* options are available") (emphasis added).  First, the country must have a functioning system that affords individuals meaningful and effective access to protection *in practice*.  Second, refugees must be able to safely remain in the country while applying for asylum and after receiving it.

Indeed, the phrase "safe third country" is a term of art in international refugee law that predates the provision's enactment.  *See* Martinez Decl., Ex. 2 (UNHCR, Position on Readmission Agreements, "Protection Elsewhere," and Asylum Policy, Aug. 1, 1994 ("UNHCR, Protection Elsewhere")).[9]  "When a statute uses a term of art from a specific field of law, [courts] presume that Congress adopted 'the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken.'"  *Comcast Cable Commc'ns, LLC v. FCC*, 717 F.3d 982, 989 (D.C. Cir. 2013) (Kavanaugh, J., concurring) (quoting *FAA v. Cooper*, 566 U.S. 284, 292 (2012)).

When the safe third country provision was enacted—as now—international refugee law required any country considering transferring asylum seekers to a "safe third country" to take

---

[9] UNHCR "provides significant guidance in construing the [Refugee] Protocol, to which Congress sought to conform."  *Cardoza-Fonseca*, 480 U.S. at 439 n.22.

"all feasible steps . . . to make certain that protection will *actually* be provided" in the receiving

state.  UNHCR, Protection Elsewhere (emphasis added); *see also* Canada Agreement, pmbl.

(acknowledging that parties "must ensure *in practice*" that asylum seekers are identified and

indirect refoulment is avoided) (emphasis added).[10]  UNHCR has consistently interpreted the

safe third country concept to require the sending country to assess the receiving country's

"*actual practice* of implementation" of its asylum laws, and ensure that its "*actual practice*"

complies with international law obligations.  DHSFF822-23 (emphases added).  Signing relevant

treaties and adopting procedures on paper is not enough.  *Id.* at 822-23, 883, 1262-63; *see also*

84 Fed. Reg. at 64,000 & n.10 (citing these UNHCR guidance documents as setting forth

"international refugee law principles").[11]  UNHCR likewise instructs that "real risk to the life of

the person in the third State" is a "critical factor" in assessing whether a refugee will be able to

receive "effective protection" and "enjoy asylum."  DHSFF883, 1263.

### 1.  The Designations Violate the Safe Third Country Provision.

The Designations do not consider the *actual* operation of Guatemala's asylum system or

the dangers that asylum seekers face there.  That failure violates the INA.  *See Nat'l Lime Ass'n*

---

[10] While negotiating the Canada Agreement, the State Department "consulted with UNHCR" because UNHCR "advise[s] the U.S. Government . . . in a supervisory capacity."  2002 Cong. Hearing, *supra* note 4, at 58 (testimony of Kelly Ryan, Deputy Assistant Secretary of State).

[11] The agencies also assert that their actions align with the European Union's transfer framework. 84 Fed. Reg. at 64,000.  But consistent with UNHCR's guidance, the EU framework requires assessment of the actual functioning of the receiving country's asylum system.  The one European case in the administrative record notes that asylum seekers' "transfer to Greece was precluded by systemic flaws in [Greece's] asylum procedure."  DHSFF869.  Greece was held unable to satisfy its *non-refoulement* obligations "in practice."  *See* Joined Cases C-411/10 & C-493/10, *N.S. v. Sec'y of State for the Home Dep't*, 2011 E.C.R. I-13905, at ¶ 86-87; *accord M.S.S. v. Belgium & Greece*, 2011-I Eur. Ct. H.R. 255, at ¶ 300.

*v. EPA*, 233 F.3d 625, 634-35 (D.C. Cir. 2000) (agency violated statute "by failing to consider" issues "the [statute] requires [it] to consider").

The statute requires the agencies to consider the actual operation of the receiving country's protection system.  But here, the agencies' designations address *only* Guatemala's formal law and nowhere consider its asylum system's actual operations or capacity.  *See* DOJFF6-7; DHSFF1282-83.  Yet the record contains extensive evidence of that system's deficiencies, including a State Department "Assessment of the Guatemalan Asylum System," which describes serious structural defects.[12]  DHSFF1227-34.  The Guatemalan agency that first reviews asylum applications has only seven employees, just three or four of whom interview applicants.  *Id.* at 1231, 1253.  That agency makes a recommendation to an interagency commission that meets irregularly, has no dedicated asylum staff, lacks training on asylum law, and renders "gut decisions."  *Id.* at 1229, 1231.  The commission then forwards *its* recommendation to a second interagency body consisting of high-ranking officials—newly created in March 2019—which likewise meets infrequently and has no dedicated asylum staff.  *Id.* at 1229-30.  Theoretically, this last body issues final decisions, but it did not resolve a single claim in its first five months.  *Id.* at 1166; *see also id.* at 1231.

The agencies' own record establishes that, "[h]istorically, Guatemala has had capacity to process about 100-150 [asylum] cases per year."  *Id.* at 1231.  The State Department reported that under the cumbersome three-part process now in place, Guatemala will be unable to increase that number.  *Id.*  And the system already had a backlog of 400 cases in June 2019, a month before the ACA was signed.  *Id.*.  Yet the agencies signed off on a plan to send many more asylum seekers

---

[12] The State Department assessment also calls into question the facial sufficiency of Guatemala's asylum laws, explaining that UNHCR warned that "[Guatemala's] Migration Code . . . may not be fully compatible with the principles of non-refoulement."  DHSFF1232.

to Guatemala—and have now sent more than 700—without assessing the system's capacity or the potential impact of drastically increasing application volume.

The agencies also entirely failed to consider or address whether Guatemala is safe *in reality*, as required by statute, despite ample record evidence that asylum seekers face grave risks there. The State Department has long been recognized as "[t]he obvious source of information on general conditions in [a] foreign country." *Chen v. Dep't of Justice*, 471 F.3d 315, 341 (2d Cir. 2006) (quoting *Zamora v. INS*, 534 F.2d 1055, 1062 (2d Cir. 1976) (Friendly, J.)). In its assessment of Guatemala's viability as a safe third country, the State Department reported:

> Guatemala remains among the most dangerous countries in the world[] . . . . Guatemala's high murder rate appears driven by narco-trafficking activity, gang-related violence, a heavily armed population, and police/judicial system unable to hold many criminals accountable. . . . . Gang members usually punish non-compliant victims with violent assault or murder, and their family members are also victimized as punishment.

DHSFF1233.[13]

Other information in the agencies' own record is similarly alarming, particularly with respect to dangers facing migrants, women, children, racial minorities, and LGBT people. Migrants in Guatemala are "victims, at the hands of organized crime groups, gangs (maras) and even some police officers, immigration officers and other civil servants, of crimes including kidnapping, extortion, robbery, forced recruitment, sexual abuse, [and] physical violence." *Id.* at 107; *accord id.* (noting "extortion carried out by officers of the National Civil Police during immigration controls and proceedings"); *id.* at 548 ("migrants are victims of many abuses, such

---

[13] Notably, the administrative record does not contain any of the State Department's annual reports on human rights conditions in Guatemala (or Honduras or El Salvador), which extensively catalogue other violence and abuses. Although those reports are recognized as "'usually the best available source[s] of information' on country conditions," *Chen*, 471 F.3d at 341 (quoting *Zamora*, 534 F.2d at 1062), the agencies apparently did not consult them.

as extortion, robbery and even disappearances"); *id.* at 683 (migrants "report being victims of successive forms of extortion and violence, including sexual and gender-based violence . . . at the hands of different actors, including government authorities").

Women in Guatemala "face a startling degree of violence that has a devastating impact on their daily lives." *Id.* at 682. Similarly, "violence against LGBTI persons is a structural issue." *Id.* at 616; *see also id.* at 695 (noting "violence suffered by [LGBTI] persons"); *id.* at 437 (expressing concern about violence against, inter alia, "women, children, indigenous peoples, afrodescendants, [and] LGBTI persons").

Guatemala's "homicide rate . . . continues to be one of the highest in . . . one of the world's most violent regions," *id.* at 598, and the impunity rate for homicide exceeds 98 percent, *id.* at 462. Moreover, persecutors such as the Northern Triangle's pervasive transnational gangs pursue targets freely across the region. *Id.* at 1255, 1260; USCIS19, 26. And as the agencies are aware, in recent years, Guatemala has consistently been among the top countries of origin for individuals *granted* asylum in the United States. DOJIFR665.

Instead of grappling with any of this extensive contrary evidence, both agencies concluded that asylum seekers can "safely remain" in Guatemala while their claims are adjudicated, apparently because a provision of the country's immigration code purports to "guarantee[] that all migrants are not subject to 'any form of violence[.]'" DOJFF7; *accord* DHSFF1283.[14] But a mere legal prohibition of violence cannot satisfy the statutory requirement to consider whether asylum seekers can, *in reality*, safely remain in the country and enjoy protection. The agencies' complete failure to engage with evidence bearing on the critical

---

[14] Notably, the Designations entirely fail to address whether asylum seekers can remain safely in Guatemala and "enjoy protection" should they be *granted* asylum. *See* DHSFF1263 (refugees must "be able to enjoy asylum" in the receiving country).

question of safety—to say nothing of the particular dangers facing women, children, racial

minorities, and LGBT persons—violates the safe third country statute.  *See Gerber*, 294 F.3d at

185 ("conclusory recitation" cannot "satisfy a statutory requirement" to consider certain factors).

### 2.   The Agencies' Categorical Designations Are Arbitrary and Capricious.

The Designations also violate the APA for three reasons.  First, "agencies need to address

'important aspect[s] of the problem.'"  *Gresham*, 2020 WL 741278, at *6 (quoting *State Farm*,

463 U.S. at 43); *see D&F Afonso Realty Tr. v. Garvey*, 216 F.3d 1191, 1195 (D.C. Cir. 2000)

("we must strike down agency action if the agency failed to consider relevant factors"); *Mozilla*

*Corp.*, 940 F.3d at 67 (agency "required to grapple with the lapse in legal safeguards" triggered

by policy).  Under the safe third country provision, the actual functioning of Guatemala's asylum

system and the ability of asylum seekers to safely remain there in practice are, at minimum,

"relevant factors" and "important aspect[s] of the problem" the agencies must address.  *State*

*Farm*, 463 U.S. at 43.[15]   Because the agencies "left these serious concerns unaddressed," their

designations were arbitrary and capricious.  *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 710

(D.C. Cir. 2014).

Second, the agencies failed to adequately explain their decisions.  "[A]n agency 'must

examine the relevant data and articulate a satisfactory explanation for its action including a

rational connection between the facts found and the choice made.'"  *Sorenson Commc'ns Inc.*,

---

[15] Even the agencies' own record recognizes this.  *See* DHSFF822 (whether a state can serve as a safe third country "cannot be answered without looking at the state's international legal obligations, its domestic laws *and [its] actual practice* of implementation") (emphasis added); *id.* at 883 (whether there is a "risk to the life of the person in the third State" is a "critical factor[]" in assessing whether a potential safe third country can provide effective protection); *id.* at 1262-63 ("review of the actual practice of the State and its compliance with [international refugee] instruments is an essential part of this assessment"); *id.* at 1263 (refugees must "be able to enjoy asylum" in the receiving country, and "[t]he obligation to ensure that conditions in the receiving State meet these requirements in practice rests with the transferring State").

755 F.3d at 707 (quoting *State Farm*, 463 U.S. at 43); *see D&F Alfonso Realty Tr.*, 216 F.3d at

1194-95 (explaining that agency must "adequately explain its result").  The Designations fail this

test.  They state in conclusory fashion that Guatemala's asylum system is "robust" and

"sufficient," and that asylum applicants have "a meaningful opportunity" to apply, and can

"safely remain in Guatemala."  DHSFF1282-83; DOJFF6.  But the agencies never explain *how*

they reached those conclusions; the designations merely catalog the paper rights and procedures

set forth in Guatemala's asylum laws and regulations.  DHSFF1282-83; DOJFF6-7.  That is not

reasoned decisionmaking.  *See Gresham*, 2020 WL 741278, at *7 (dismissing concerns about

important problem "in a conclusory manner is not a hallmark of reasoned decisionmaking"); *see*

*also Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) ("no deference" owed to agency action

based on "purported expertise" where agency's explanation for action "lacks any coherence").

Third, an agency cannot simply "ignore evidence" in the record "contradicting its

position."  *Butte Cty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).  Rather, the agency must

"adequately . . . address relevant evidence before it."  *El Rio Health Ctr. v. HHS*, 396 F.3d 1265,

1278 (D.C. Cir. 2005).  The agencies violated this core principle, as the Designations fail to even

acknowledge the existence of substantial record evidence undermining their conclusions about

Guatemala, *see supra* at 32-33—let alone explain why the Designations are nonetheless justified.

**E. The Government Unlawfully Bypassed Notice-and-Comment Procedures.**

The government violated the APA by fundamentally changing asylum procedures

without allowing prior notice and comment.  The public comment period is designed to "foster

the fairness and deliberation that should underlie a pronouncement of such force."  *United States*

*v. Mead Corp.*, 533 U.S. 218, 230 (2001) (quotation marks omitted).  The Rule asserts that none

was required under the APA's foreign affairs and good cause exceptions.  Neither applies.

### 1.   The Foreign Affairs Exception Does Not Apply.

"'[I]mmigration matters typically implicate foreign affairs' at least to some extent." *City of N.Y. v. Permanent Mission of India to the U.N.*, 618 F.3d 172, 202 (2d Cir. 2010) (quoting *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980)).  Courts thus narrowly cabin the foreign affairs exception's application to immigration rules, so the exception does not "'becom[e] distended'" and "eliminate[] public participation in this entire area of administrative law." *Id.*[16]  In the immigration context, agencies must show that notice-and-comment procedures would "provoke definitely undesirable international consequences." *Id.*; *accord EBSC v. Trump II*, 2020 WL 962336, at *20; *Am. Ass'n of Exps. & Imps. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985).  The government failed to carry this burden.

First, the government claims that bypassing notice and comment was appropriate because the Rule "puts into effect" the Northern Triangle ACAs. 84 Fed. Reg. 64,005.  But the Rule does not "put[] into effect" any ACA.  It is a regulatory vessel that sets out procedures to govern *all* removals made pursuant to the safe third country provision—including *future* agreements— except the Canada Agreement. 84 Fed. Reg. at 63,996, 64,004.  The Rule was issued months ago, and yet the Honduras and El Salvador ACAs have not been "put[] into effect."

The agencies' reliance on *International Brotherhood of Teamsters v. Peña*, 17 F.3d 1478, 1486 (D.C. Cir. 1994), is thus misplaced.  *See* 84 Fed. Reg. at 64,005.  There, the United States and Mexico agreed to implement a requirement regarding commercial drivers' licenses by a certain deadline, and the agency promulgated a rule implementing that specific accord.  *Int'l*

---

[16] The Rule's reliance on *Permanent Mission*, 84 Fed. Reg. 64,005, is misplaced.  In rejecting a notice-and-comment challenge, the Second Circuit explicitly distinguished that case from the immigration context, where "[t]he dangers of an expansive reading of the foreign affairs exception . . . are manifest." *Permanent Mission*, 618 F.3d at 202.

*Bhd. Of Teamsters v. Pena*, 17 F.3d at 1480-81.  That rule "did no more than implement an agreement between the United States and Mexico."  *Id.* at 1486.  Here, the Rule does not implement any agreement; it creates generic procedures to govern *all* future ACA removals.

Second, the government's speculation that following notice-and-comment procedures "*could* impact" hypothetical future negotiations because hypothetical future partners "*may* be more hesitant to negotiate" without the Rule, 84 Fed. Reg. 64,005 (emphases added), is insufficient to demonstrate "definitely undesirable international consequences."  *EBSC v. Trump II*, 2020 WL 962336, at *20-21.  The United States successfully negotiated ACAs with Guatemala, Honduras, and El Salvador without any regulations even proposed, much less in place.  Any "connection between [future] negotiations . . . and the immediate implementation of the Rule is . . . 'not apparent'" in the record.  *Id.* at *21.[17]

The government unsuccessfully attempts to sidestep the closest analogue—the regulations governing removals under the Canada Agreement—by claiming that it cannot afford to wait the two years that elapsed between the signing of that agreement in December 2002 and the issuance of the final rules in November 2004.  84 Fed. Reg. at 64,005.  But only a fraction of that delay was due to notice and comment, which began with the issuance of proposed rules in March 2004.  69 Fed. Reg. 10,620 (Mar. 8, 2004); 69 Fed. Reg. at 10,627.  The agencies identified no reason they could not complete notice and comment more quickly here.

### 2.  The Good Cause Exception Does Not Apply.

Good cause is a "meticulous and demanding" standard, on which agencies receive no deference.  *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706 (D.C. Cir. 2014).  It is "limited

---

[17] The government also asserts a need to quickly address a "crisis" at the southern border as meeting the foreign affairs exception.  *See* 84 Fed. Reg. 64,005.  This Court should reject that contention for the same reasons it should refuse to find good cause, as addressed below.

to emergency situations," and must be "narrowly construed and only reluctantly countenanced." *Tenn. Gas Pipeline Co. v. FERC*, 969 F.2d 1141, 1144 (D.C. Cir. 1992).

The Rule falls far short of this demanding standard.  Courts have repeatedly rejected this administration's "speculative" assertions that providing for public comment would prompt a "'surge' across the southern border."  *E. Bay Sanctuary Coalition v. Trump* ("*EBSC v. Trump I*"), 932 F.3d 742, 776 (9th Cir. 2018); *see also EBSC v. Trump II*, 2020 WL 962336, at *20; *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1028 (9th Cir. 2019).  The Rule, standing alone, "does not change eligibility for asylum" for any particular person; "that change is not effected until the Rule is combined with" other Executive action—here, the necessary categorical designations and ACA-specific agency guidance.  *See EBSC v. Trump I*, 932 F.3d at 777.

Moreover, the government's claims lack record support.  *See Sorensen Commc'ns Inc.*, 755 F.3d at 707 (agency must "provide evidence of [the purported] exigency"); *Tenn. Gas Pipeline Co.*, 969 F.2d at 1145 (agency "provided little factual basis" for prediction construction companies would accelerate activities in advance of rule's implementation).  The Rule cites an October 2018 newspaper article that contains a single, unverified assertion that smugglers told migrants when DHS halted a *different* policy of separating families at the border and encouraged them to migrate before the policy's reinstatement.  *See* 84 Fed. Reg. at 64,006.  The article contains no evidence that *any* migrants altered their plans in response to this "sales pitch."  *See* DOJIFR899.  The Rule points to another article to suggest that Central Americans rushed to enter the United States between President Trump's election and inauguration.  84 Fed. Reg. at 64,007.[18]  But CBP's own data shows that the number of apprehensions at the southern border

---

[18] The Rule incorrectly states that this article attributes the claim to "Central American officials." 84 Fed. Reg. at 64,007.  While the article does not say that, it does attribute the rise in "migration from Central America" to "gang-related violence."  DOJIFR738.

*declined* in those months.  SUF ¶ 167.  A third article states only that unnamed U.S. officials "suspect" that Mexico's issuance of humanitarian visas "may have influenced" some Hondurans to migrate there.  DHSIFR821.  "Absent additional evidence," the agencies' proffered inference "is too difficult to credit."  *See EBSC v. Trump I*, 932 F.3d at 777.

That difficulty is underscored by the government's own actions.  If the government actually feared that "the announc[ing] that [it] ha[d] arranged for other countries" to receive asylum seekers would cause a surge at the border, *see* 84 Fed. Reg. at 64,006, the President would not have held a press conference to announce the Guatemala ACA, four months before it was put to use.  SUF ¶ 169.  DHS even posted its own "fact sheet" discussing all three agreements—in English and Spanish—weeks before it commenced ACA removals.  USCIS2-3; SUF ¶ 170.  Notably, each month between the announcement of the first ACA and the Rule's issuance, the number of apprehensions at and between ports of entry again declined.  SUF ¶ 168.

Finally, the agencies' citations to past interim final rules, 84 Fed. Reg. at 64,007, "have no relevance," since "good cause is determined on a 'case-by-case' basis."  *California v. Azar*, 911 F.3d 558, 575-76 (9th Cir. 2018).

## II.     A Permanent Injunction Is Necessary to Prevent Ongoing Irreparable Harm.

### A.     Plaintiffs Are Suffering Irreparable Harm.

Individual Plaintiffs were denied the opportunity to apply for asylum, withholding, and CAT protection and removed to Guatemala pursuant to the Rule, Guidance, and Designations.  They suffer from ongoing harm that is "both certain and great," *Wisc. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985), and will continue to suffer harm absent a permanent injunction.

Individual Plaintiffs fled brutal attacks, death threats, and the murder of family members.  U.T., a gay man, suffered childhood sexual abuse and marginalization because of his sexuality,

and fears for his life in El Salvador because he refused a gang leader who solicited him for sex. SUF ¶ 126.  In Honduras, MS-13 gang members hit E.R. in the head with a bat, badly cut him , and threatened to kill him and his family.  *Id.* ¶ 128.  M.H. and H.D., mothers from Honduras and El Salvador respectively, fled with their children after gangs murdered their relatives and threatened their lives.  *Id.* ¶¶ 130, 134.  When they sought protection in the United States, Individual Plaintiffs were instead removed to a country where they again feared for their lives. *Id.* ¶¶ 127, 129, 132, 135.  Unable to find protection, they are now in hiding.  *Id.*

Guatemala is not safe for the Individual Plaintiffs or other asylum seekers.  *See generally* SUF ¶¶ 103-21 (addressing dangerous conditions in Guatemala); *Id.* ¶¶ 126-36 (addressing harm to Individual Plaintiffs).  It is a refugee-*producing* country with extremely high rates of violence, *id.* ¶ 121—particularly against women, children, and LGBTI persons, *id.* ¶¶ 109-14.  As of December 2016, 12,554 Guatemalans were recognized as refugees globally, 11,328 of whom had been granted asylum in the United States.  *Id.* ¶ 103 (citing UNHCR, *Eligibility Guidelines for Assessing the International Protection Needs of Asylum-Seekers from Guatemala* 46 (Jan. 2018) ("UNHCR Protection Guidelines")); *see also* DOJIFR665 (listing Guatemala among the top four countries of origin for individuals granted asylum between 2015 and 2017); SUF ¶ 121.  Many Guatemalans receive asylum after suffering, for example, unchecked gang violence or homophobic attacks.  UNHCR Protection Guidelines at 38-55; *see* SUF ¶¶ 109, 114-15 (violence against LGBT people); 106, 110 (gang violence); 86, 108 (describing impunity for crimes).

Asylum seekers from other countries face particular dangers in Guatemala due to their status as migrants, including extortion, kidnapping, and physical and sexual violence by Guatemalan authorities and organized crime groups that operate with impunity.  DHSFF107, 360, 548, 683; SUF ¶¶ 85, 116-19.  In addition, Individual Plaintiffs and other Northern Triangle

asylum seekers are in danger in Guatemala because the countries are part of a free movement

zone that allows persecutors to reach victims throughout a region smaller than Michigan. *See*

USCIS19, 26; DHSFF1255, 1260; SUF ¶ 120; *see also* SUF ¶ 99 (explaining that migrant shelter

director has received death threats from persecutors targeting shelter residents).

Indeed, Plaintiffs and other asylum seekers have already faced violence, abuse, and

discrimination in Guatemala.  U.T. endured homophobic slurs while transiting Guatemala after

fleeing El Salvador.  SUF ¶ 127.  When he was removed to Guatemala and asked officials about

asylum, they advised him to go to Mexico because Guatemala is not safe for gay men.  *Id.*; *see*

*also id.* ¶¶ 114-16 (addressing anti-LGBT violence).  While Plaintiffs H.R. and J.R. were en

route to the United States, Guatemalan police singled them out as migrants, and extorted and

threatened them.  *Id.* ¶ 131; *see id.* ¶ 118 (addressing extortion of migrants).  Shortly after being

removed to Guatemala under the Rule, a gay client of Plaintiff Las Americas narrowly escaped a

homophobic assault.  *Id.* ¶ 142.  A Honduran teen transiting Guatemala with her one-year old

child was tracked and kidnapped by the same gang that targeted them in Honduras.  *Id.* ¶¶ 139-

40.  These examples bear out UNHCR's warning that the Rule "could result in the transfer of

highly vulnerable individuals to countries where they may face life-threatening dangers."  *Id.*

¶ 102 (also stating that the Rule is "at variance with international law").

Additionally, Individual Plaintiffs cannot effectively access or enjoy asylum in

Guatemala because Guatemala's asylum system barely functions.  *See id.* (UNHCR describing

Guatemala's asylum system as "nascent"); *see also id.* ¶¶ 44, 47, 49, 53-56, 63-65 (overview of

the system).  It is a cumbersome, inefficient process involving multiple interagency bodies.  *See*

*id.* ¶¶ 45-52.  Between January 2018 and August 2019, Guatemala's migration office received

466 asylum applications; at the end of that period, 423 were still pending.  *Id.* ¶ 97.  As of

September 30, Guatemala's asylum office still had just seven employees, and four or fewer of them adjudicated asylum claims.  *Id.*; *see also* DHSFF1253, 1231.  It is projected to take at least three years to clear the current backlog.  DHSFF1231.

To make matters worse, Guatemala has given Individual Plaintiffs and other asylum seekers just 72 hours to decide whether to apply for asylum or leave the country.  SUF ¶¶ 92, 127, 129, 132, 135.  They must make this choice after receiving confusing, inadequate information about the asylum process.  *Id.* ¶ 101.  U.T. was sent on to Mexico.  *Id.* ¶ 12.  Without safety or connections in Guatemala, E.R., H.R., J.R., M.H., and H.D. had to return to the countries they recently fled, where they fear for their lives.  *Id.* ¶¶ 129, 132, 135.  Indeed, very few of the hundreds removed to Guatemala under the Rule have been able to pursue asylum there.  *Id.* ¶ 95.  Like Individual Plaintiffs, most have instead been forced to return to their home countries or seek safety elsewhere.  *Id.*

Depriving Individual Plaintiffs of the opportunity to apply for protection in the United States and removing them to a country where they face persecution, torture, and other dangers—including indirect *refoulement*—constitutes irreparable harm.  *See, e.g.*, DHSFF1232 (noting UNHCR concern that Guatemalan law is not fully compatible with *non-refoulement* principle); *Devitri v. Cronen,* 289 F. Supp. 3d 287, 296-97 (D. Mass. 2018) (significant risk of persecution if removed is irreparable harm); *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488, 1504-05 (C.D. Cal. 1988) (removal to violent country without opportunity to apply for asylum and withholding is irreparable harm); *Nunez v. Boldin*, 537 F. Supp. 578, 586-87 (S.D. Tex. 1982) ("Deportation to a country where one's life would be threatened obviously would result in irreparable injury.").

The Rule has also caused and will cause Organizational Plaintiffs Tahirih and Las Americas irreparable harm.  Both organizations share a mission of providing legal services to

asylum seekers.  To continue serving individuals who may be subject to the Rule, they have

diverted substantial resources to more burdensome and costly forms of advocacy, including

sending staff to Mexico.  SUF ¶¶ 153-54, 161.  Such trips are now necessary for them to

continue serving asylum seekers subject to the Rule.  *Id.* ¶¶ 153-54, 161.

The Rule also impedes Las Americas' ability to serve asylum seekers in expedited

removal by denying them credible fear interviews and not providing for access to counsel,

making it extremely burdensome for Las Americas' to assist them.  *Id.* ¶¶ 160-61.

Additionally, because both organizations serve asylum-seeking clients in regular removal

proceedings through dedicated sources of funding, the Rule threatens them financially.  *Id.*

¶¶ 151, 164.  Approximately 40 percent of Tahirih's asylum clients in 2018 came from El

Salvador and Honduras and, thus, a substantial portion of their client population is at risk of

being processed under the Rule's expedited removal procedures.  *Id.* ¶ 148.  Similarly, a large

portion of the individuals Las Americas typically serves in regular removal proceedings are now

subject to the Rule.  *Id.* ¶ 156.  If these individuals are summarily removed, Tahirih and Las

Americas will lose the opportunity to represent them in their removal proceedings and may lose

funding for their asylum-related work.  *Id.* ¶¶ 151, 164.

For asylum seekers subject to the Rule who do reach regular removal proceedings, the

organizations will be forced to revamp representation strategies in a resource-intensive way.  The

organizations will have to demonstrate that their clients face a likelihood of persecution or

torture in *every* operative ACA country before the merits of their asylum claims can even be

heard.  *Id.* ¶¶ 151, 163; *see id.* ¶¶ 9-13.  The additional costs associated with developing these

cases (like procuring expert evidence) limits the overall number of clients the organizations can

serve, further harming them.  *Id.* ¶ 151.  Tahirih also suffers harm from the lost opportunity to

comment on the Rule.  *Id.* ¶ 152.  The loss of that opportunity, combined with the frustration of

Plaintiffs' missions, diversion of resources, and lack of remedy, constitutes irreparable harm.  *E.*

*Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 865 (N.D. Cal. 2018).

**B.      The Balance of Equities and Public Interest Favor Preserving the Status Quo.**

The remaining factors also favor injunctive relief.  While the Supreme Court has

recognized a public interest in the prompt removal of "an alien *lawfully* deemed removable,"

*Nken v. Holder*, 556 U.S. 418, 436 (2009) (emphasis added), "[t]he Government 'cannot suffer

harm from an injunction that merely ends an unlawful practice,'" *R.I.L.-R. v. Johnson*, 80 F.

Supp. 3d 164, 191 (D.D.C. 2015).  Rather, allowing removals to go forward under the Rule,

Guidance, and Designations would "permit[] and prolong[] a continuing violation of United

States law."  *Nken*, 556 U.S. at 436 (quotation marks omitted).

In contrast, if these policies remain in effect, hundreds—and, soon, thousands—more

asylum seekers will be unable to pursue protection, and will instead be removed to Guatemala or

another country where they face persecution and other serious harm.  *See Libbie Rehab. Ctr., Inc.*

*v. Shalala*, 26 F. Supp. 2d 128, 132 (D.D.C. 1998) (considering harm to third parties under

public interest prong).  "[T]here is a public interest in preventing aliens from being wrongfully

removed . . . to countries where they are likely to face substantial harm."  *Nken*, 556 U.S. at 436

Finally, "[t]he public interest is served when . . . agencies comply with their obligations

under the APA."  *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009).

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment should be granted.

Dated: February 28, 2020                          Respectfully submitted,

Keren Zwick (D.D.C. Bar. No. IL0055)          */s/ Katrina Eiland*
Gianna Borroto**                              Katrina Eiland
Ruben Loyo                                    Julie Veroff
Mark Fleming**                                Morgan Russell*
Charles G. Roth**                             Adrienne Harrold
National Immigrant Justice Center             American Civil Liberties Union Foundation
224 S. Michigan Avenue, Suite 600             Immigrants' Rights Project
Chicago, IL 60604                             39 Drumm Street
(312) 660-1370                                San Francisco, CA 94111
                                              (415) 343-0770

Arthur B. Spitzer (D.C. Bar No. 235960)       Omar Jadwat*
Scott Michelman (D.C. Bar No. 1006945)        Lee Gelernt*
American Civil Liberties Union Foundation     American Civil Liberties Union Foundation,
of the District of Columbia                   Immigrants' Rights Project
915 15th Street, NW, 2nd floor                125 Broad Street, 18th Floor
Washington, D.C. 20005                        New York, NY 10004
(202) 457-0800                                (212) 549-2660

Blaine Bookey*                                Hardy Vieux (D.C. Bar No. 474762)
Annie Daher*                                  Patricia Stottlemyer (D.C. Bar No. 888252536)
Sayoni Maitra*                                Human Rights First
Karen Musalo*                                 805 15th Street, N.W., Suite 900
Center for Gender & Refugee Studies           Washington, D.C. 20005
200 McAllister St.                            (202) 547-5692
San Francisco, CA 94102
(415) 565-4877


                                              *Attorneys for Plaintiffs*
                                              *\* Admitted Pro Hac Vice*
                                              *\*\*Admitted Pro Bono*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 28, 2020, I electronically filed the foregoing document

with the Clerk of the Court for the United States District Court for the District of Columbia by

using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be

accomplished by the CM/ECF system.

By: <u>*/s/ Katrina Eiland*</u>
KATRINA EILAND
