## DECLARATION OF LISA FRYDMAN

I, Lisa Frydman, make the following declaration based on my personal knowledge and declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge.

1.      I am Vice President for Regional Policy and Initiatives at Kids in Need of Defense ("KIND"), a nonprofit advocacy and legal services organization based in the United States. I submit this declaration in support of Plaintiffs' legal challenge to the U.S. government's policies providing for the removal of non-Guatemalan asylum seekers to Guatemala pursuant to the Asylum Cooperative Agreement ("ACA") between the United States and Guatemala. If called as a witness, I could and would testify as follows.

2.      As set forth in this declaration, I believe asylum seekers sent to Guatemala, as well as Honduras and/or El Salvador (collectively "the Northern Triangle countries"), pursuant to the ACAs with those countries would face extremely dangerous conditions as well as significant difficulties in accessing asylum protection, resources, and services to satisfy their basic needs while doing so. In Section I, I outline my professional experience and expert qualifications. In Section II, I describe the dangers that would await asylum seekers in the Northern Triangle countries. In Section III, focusing mainly on Guatemala, I describe the lack of capacity in the Northern Triangle countries' asylum systems and their inability to provide for their own citizens' welfare, let alone that of asylum seekers. In Section IV, I describe an error in guidance on the implementation of the Guatemala ACA pursuant to which the U.S. government may unlawfully send unaccompanied children to Guatemala under the ACA.

## I.      Relevant Professional Experience

3.      I am an attorney and have been, since 2017, Vice President for Regional Policy and Initiatives ("Regional Team") at KIND. From 2015-2017 I served as KIND's Director for Regional Policy and Initiatives. In my work at KIND, I supervise KIND's Regional Team and regularly visit the Northern Triangle countries and Mexico (referred to collectively herein as "the Region") to carry out the organization's work described here.

4.      KIND's Regional Team offers direct programming with children and adolescents in the Northern Triangle countries. The Regional Team, through civil society partner organizations, provides reintegration support services for unaccompanied and separated children repatriating to Guatemala and Honduras, as well as sexual and gender-based violence prevention programming for children in certain high migration communities in Guatemala and Honduras. Through its Reintegration Program and other Regional programming and visits, KIND's Regional Team communicated with approximately 550 Central American children in 2019. From 2015-2017, the Regional Team provided support services to children in Honduras and El Salvador with pending cases for refugee resettlement in the United States under an in-country refugee processing and parole effort known as the Central American Minors ("CAM") Program. In 2018 the Regional Team, through civil society partners, conducted a project in the Region to empower adolescent refugees and migrants, as well as internally displaced adolescents from El

Salvador, Guatemala, and Honduras, to tell their stories related to immigration and internal displacement.

5.      In addition to direct programming, the Regional Team engages in research and fact finding related to the root causes of child migration from Central America and develops recommendations on how to resolve the problems forcing children to leave their homes. I co-authored a report published in 2019 on violence against children and youth in Honduras.[1] In 2017, I coauthored two reports published by KIND that focused on sexual and gender-based violence and child migration.[2] These reports were based on extensive interviews with unaccompanied children from the Northern Triangle countries, government agencies, and civil society organizations. KIND's Regional Team regularly collects information regarding country conditions and the root causes of migration and uses this information to inform our plans for work in the Region, to update KIND's Legal Services Team about developing trends in the region that may impact claims for immigration relief, and to inform advocacy.

6.      The team, myself included, travels to the Region regularly to conduct fact finding, as well as to participate in training and capacity building sessions for government and civil society organizations; regional conferences on child migration attended by civil society experts, international organizations involved in migration and refugee protection, and governments of the region; and regional advocacy networks and forums. Since December 2018, the Regional Team has traveled to Mexico fourteen times to engage in fact finding and to participate in human rights monitoring along the northern and southern borders of Mexico, to provide training, and to meet with government agencies and civil society organizations with expertise in children's rights, migrants' rights, and refugee protection. The team traveled to Northern Triangle countries eight times in 2019.

7.      Since the United States began implementation of the ACA in Guatemala, I have been in regular communication with civil society organizations that serve migrants and refugees—including by providing short term shelter—in Guatemala and Honduras, as well as some government contacts, particularly in Guatemala. These discussions have concerned the individuals being sent to Guatemala to seek asylum there, and their conditions on arrival in Guatemala, as well as in Honduras—for those who did not remain in Guatemala to pursue asylum following return.

8.      The statements in this declaration are based on information obtained from: (1) conversations with civil society organizations in the Region; (2) interviews with government agencies in the Region; (3) participation in fact finding trips and/or supervision of Regional Team staff participating in fact finding trips; (4) conversations with unaccompanied children in Tijuana, Mexico, Juarez, Mexico, Mexico City, and Tapachula, Mexico; (5) conversations with

---

[1] Rachel Dotson and Lisa Frydman, KIND, *Everyday Life is Fear: Violence Against Children and Youth in Honduras* (2019), *available at* https://supportkind.org/resources/everyday-life-is-fear/.

[2] Rachel Dotson and Lisa Frydman, KIND, *Neither Security nor Justice: Sexual and Gender-based Violence and Gang Violence in El Salvador, Honduras, and Guatemala* (2017), *available at* https://supportkind.org/wp-content/uploads/2017/05/Neither-Security-nor- Justice_SGBV-Gang-Report-FINAL.pdf; Rachel Dotson and Lisa Frydman, KIND and CDH Fray Matías, *Childhood Cut Short: Sexual and Gender-based Violence Against Central American Migrant and Refugee Children* (June 2017), *available at* https://supportkind.org/wp-content/uploads/2017/06/Childhood-Cut-Short-KIND-SGBV- Report_June2017.pdf.

repatriated unaccompanied children and/or their parents; (6) conversations with children who had pending claims in the CAM program, including current cases with pending Requests for Review;[3] (7) extensive tracking of news articles from the Region and extensive research into country conditions throughout the Region; (8) calls for help from unaccompanied children and/or their family members during migration, or from civil society organizations providing support to unaccompanied children; and (9) communications sent to me from individuals who have been sent to Guatemala pursuant to the ACA, as well as with civil society organizations assisting them. While my experience in the Region has principally focused on children and youth, my research and communications have also provided me insight into issues relating to adults and families.

## II.   Asylum Seekers Face Significant Danger in the Northern Triangle Countries

9.      Under the ACAs, the United States is sending and/or proposes sending asylum seekers to three of the most dangerous countries in the world. Guatemala, Honduras, and El Salvador all rank among the top ten most dangerous countries by homicide rates globally.[4] Accordingly, these countries send significant numbers of asylum seekers with *bona fide* claims to the United States each year. In 2017, the United States granted asylum to 8,473 individuals from these countries.[5] The only country accounting for more grants of asylum that year than Guatemala, Honduras, and El Salvador was China, which only accounted for 5,548 asylum grants, despite having a population more than 42 times larger than these three countries combined.[6]

10.      Violence, in combination with impunity and a failure of protection, causes children and adults to flee their homes in the Northern Triangle countries and seek safety in the United States. Unaccompanied children from these countries seek to escape violence inflicted by criminal gangs or other organized crime, for example by drug cartels; sexual and gender-based violence, including violence and extreme discrimination based on sexual orientation and/or gender identity; and domestic abuse. These same forms of violence also plague adults in these countries, and adults similarly lack protection. Women and girls, and lesbian, gay, bisexual, transgender, and intersex ("LGBTI") individuals, face very high levels of sexual and gender-based violence. Women and children are also frequently trafficked from rural to urban areas and across borders or to border areas, where they are often sexually exploited or subject to exploitative labor. Femicide, or the gender-motivated killing of women and girls, is also pervasive in these countries.[7]

---

[3] *See* Rachel Dotson and Lisa Frydman, KIND and CDH Fray Matías, *Childhood Cut Short*, *supra* note 2.
[4] According to the United Nations Office on Drugs and Crime (UNODC), in 2017, El Salvador ranked first in the world by homicide rate, followed by Honduras (third) and Guatemala (ninth). UNODC, *Global Study on Homicide* (2019), *available at* https://dataunodc.un.org/GSH_app.
[5] Dep't of Homeland Security, Office of Immigration Statistics, *Annual Flow Report, Refugees and Asylees: 2017* (Mar. 2019), at 9, *available at* https://www.dhs.gov/sites/default/files/publications/Refugees_Asylees_2017.pdf.
[6] According to the World Bank, China's population in 2017 was 1,386,000,000, while the combined population of the Northern Triangle countries was 32,732,071. *See* World Bank Microdata Data Catalog, *available at* https://data.worldbank.org/indicator/SP.POP.TOTL?end=2017&locations=CN-HN-GT-SV&start=2017&view=bar (last visited Jan. 15, 2020).
[7] The UNODC has reported that, as of 2017, El Salvador and Honduras had the first and third highest female homicide rates in the world. *See* UNODC, *Global Study on Homicide* (2019), *supra* note 4. Guatemala is similarly

11.     Sexual violence perpetrated by gangs is one of the most common forms of violence that women and girls face. Gangs now dominate much of the urban areas of the Northern Triangle countries, and their control has increasingly spread to rural areas as well, where international drug cartels also, increasingly, operate. The most recent U.S. State Department Travel Advisory for Guatemala illustrates this point, issuing a level 3 travel advisory for the departments of Guatemala, Escuintla, Chiquimula, Quetzaltenango, Izabal, and Petén.[8] The departments of San Marcos and Huehuetenango have also experienced significant growth of organized crime in recent years. Where these criminal groups dominate, women and girls are in constant danger of being targeted for sexual violence, as they use rape and the threat of rape as a tactic of control in the areas where they operate. Women and girls are also frequently targeted for forced sexual relationships with organized crime members, and those who resist these advances face violence or even death.

12.     Gangs also forcibly recruit children and young adults (males as well as, increasingly, females) and, once invited to join, those who resist face threats, torture, and ultimately death. These same consequences also face individuals who fail to comply with violent extortion demands from these groups, which have become very common in recent years. When victims attempt to escape by relocating within their countries, gangs often track them down and ruthlessly punish them.

13.     Children and adults targeted by gangs and cartels, LGBTI individuals, and those targeted for other sexual and gender-based violence cannot rely on the governments of the Northern Triangle countries to protect them. As a result, these forms of violence—which pervade the Northern Triangle countries—are highly underreported, and even those crimes that do get reported rarely result in justice. In the vast majority of cases the perpetrator is never punished. Over 90% of homicide cases in the Northern Triangle countries end in impunity, and in cases involving sexual and gender-based violence the impunity rate is even higher—at 95%. Law enforcement officers sometimes target LGBTI individuals precisely when they come in to report violence.

14.     Closely related to impunity are the significant problems of corruption and repression, which are well-documented in all the Northern Triangle countries. In one notable example, the former Guatemalan president, Jimmy Morales, recently expelled the International Commission against Impunity in Guatemala ("CICIG"), an entity created by agreement with the United Nations to prosecute corruption. In its final report, CICIG described the Guatemalan government as a "mafia coalition," noting that corruption in that country could not be solved without "a profound restricting of the state."[9] In October 2019, the brother of Honduran president Juan Orlando Hernández was convicted on charges of drug trafficking, in a trial in

---

dangerous for women. *See* Mimi Yagoub, *Why Does Latin America Have the World's Highest Female Murder Rates*, InSight Crime (Feb. 11, 2016), *available at* https://www.insightcrime.org/news/analysis/why-does-latin-america-have-the-world-s-highest-female-murder-rates/ (reporting Guatemala ranked third in the world by female murder rate).

[8] U.S. Dep't of State, *Guatemala Travel Advisory*,
https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/guatemala-travel-advisory.html (last visited Jan. 15, 2020).

[9] *Guatemala in grip of 'mafia coalition', says UN body in scathing corruption report*, The Guardian (Aug. 8, 2019), *available at* https://www.theguardian.com/world/2019/aug/28/guatemala-corruption-mafia-coalition-jimmy-morales.

which multiple witnesses testified that President Hernández himself was aware of the activity, but accepted bribes and political support in exchange for turning a blind eye.[10] In January 2020 President Hernández shut down the mandate for the Mission to Support the Fight Against Corruption and Impunity in Honduras (MACCIH), the anti-graft body backed by the Organization for American States.

15.     I am aware of numerous cases involving domestic violence or sexual violence perpetrated by a male involved in organized crime in which the perpetrator was able to "buy off" law enforcement, as well as examples of police officers and judges being bought off. I have spoken with numerous women who fled abusive domestic partners in the Northern Triangle countries whose partners had either money or family connections that protected them from prosecution.

16.     Severely repressive measures by state security forces, including military police, army, and other security forces in the Northern Triangle countries have frequently targeted adolescent boys and young men from neighborhoods under control of organized crime. Extrajudicial killings of youth by security forces in the Northern Triangle have been well-documented, but other measures including mass arrests or threats against the young males of a particular neighborhood also erode public trust in law enforcement or security forces in these countries.

17.     Individuals fleeing violence and threats of violence in the Northern Triangle countries also face a risk that those threatening or targeting them in their home countries could locate them in another Northern Triangle country and even in Mexico. Experts on organized crime in the Region have repeatedly told us that gangs and cartels have region-wide reach and can locate individuals throughout the area, including across borders. Thus, fleeing a cartel or gang in El Salvador means one remains unsafe in Guatemala and Honduras, and vice versa. Furthermore, given the small geographic area encompassing Central America and relative freedom of movement throughout the Region, even individuals without international networks (e.g., family members) are also able to locate their targets across the borders between the Northern Triangle countries.

18.     Asylum seekers sent to Northern Triangle countries would likely be even more vulnerable to these types of violence, and less able to obtain protection, than the citizens of these countries.[11] As discussed in the next section, in search of work and resources, asylum seekers will likely settle in marginalized urban areas, the most dangerous parts of these already extremely dangerous countries. Asylum seekers' accents (and, if applicable, inability to speak Spanish) would also mark them as outsiders, putting them at heightened risk of harm and extortion by criminal groups. Lacking even a basic familiarity with these places, let alone family or other social ties, asylum seekers would not be able to take the types of measures that locals rely upon to decrease their risk of harm, e.g., by avoiding certain gang territories or especially dangerous public transportation routes.

---

[10] *Honduran President's Brother is Found Guilty of Drug Trafficking*, N.Y. Times (Oct. 18, 2019), *available at* https://www.nytimes.com/2019/10/18/world/americas/honduras-president-brother-drug-trafficking.html.

[11] The U.S. Department of State has noted that, in the case of Honduras, "[t]ransiting migrants were vulnerable to abuse by criminal organizations." U.S. Dep't of State, *Human Rights Report: Honduras* (2018), *available at* https://www.state.gov/wp-content/uploads/2019/03/HONDURAS-2018.pdf.

19.    The aforementioned problems of sexual and gender-based violence, violence against children, forced gang recruitment and extortion, gang and cartel violence, violence against LGBTI individuals, and human trafficking exist throughout the Northern Triangle countries, as do staggering rates of impunity. Thus, it is extremely unlikely that the governments of the Northern Triangle countries would provide protection to asylum seekers where they have been unable to protect their own citizens.

20.    Asylum seekers in Guatemala, Honduras, and El Salvador face even greater risk of danger, with less access to protection, than do citizens of those countries. Given the history of racism and discrimination against Indigenous Peoples in Guatemala, as well as against Afro-Descendant people in Guatemala, it is likely that Afro-Caribbean Hondurans or migrants from African countries would face discrimination should they be sent back to Guatemala. Guatemala is also experiencing a backlash against migrants from other Northern Triangle countries. For example, the director of a major hospital recently announced that the hospital would deny treatment to individuals from other countries in response to reports of suspected gang members from El Salvador "flooding" the country. Certain mayors along the migration route through Guatemala have also warned their constituents that migrants are dangerous, and that they should refrain from sheltering them. The fact that these individuals are less able to obtain protection makes them especially ripe targets for exploitation and violence in the first place.

21.    Given these facts, I was not surprised to learn that, as of February 25, 2020, only a very small fraction  of the more than 700 individuals who have been sent to Guatemala under the ACA have requested asylum. I recently received communication from Honduran asylum seekers sent to Guatemala who were too frightened to stay there and intended to return to Honduras. While they were deeply afraid of returning to Honduras, they felt they were in even greater danger in Guatemala given their lack of social or familial networks and support there.

### III.  The Northern Triangle Countries Are Unable to Process the Asylum Claims of, or Provide Basic Resources and Services to, Asylum Seekers Sent There Under the ACA

22.    The Northern Triangle countries are also not equipped to process the asylum claims of individuals sent there under the ACAs. Their asylum protection systems have only very limited capacity. Further, the insecurity in these countries and lack of governmental protection available, described above, combined with their inability to provide for asylum seekers' basic needs, described below, would make it extremely difficult—if not impossible—for asylum seekers to safely and humanely remain in these countries while seeking protection. Focusing especially on Guatemala, I explain these dynamics below.

### A.  The Asylum System in Guatemala

23.    Guatemala, like the other Northern Triangle countries,[12] has never received large numbers of asylum applicants, and it has struggled to process even the few asylum applications that it has received in recent years. According to the United Nations High Commissioner for Refugees ("UNHCR"), Guatemala received approximately 150 applications per year between

---

[12] See further discussion of these countries' asylum systems and capacity *infra.*

2015 and 2017.[13] It only adjudicated an average of 7 cases per year from 2002 through 2014, and 92 per year from 2015 to 2017.[14] As of 2018, only 390 recognized refugees and 254 asylum seekers with pending claims resided in the country.[15] Guatemala's migration office reportedly received 466 asylum applications between January 2018 and August 2019 but, as of August 2019, 423 cases still awaited decision.[16] Government officials also stated in July 2019 that the country had not resolved a single case in two years and that there were only four individuals who analyze asylum claims in the entire country.[17] Immigration-focused organizations in Guatemala have similarly reported that, between March 2018 and May 2019, Guatemala decided zero asylum cases and that the country only had three officers to interview asylum seekers.

24.     Guatemala's current asylum system is also brand new. In May 2017, Guatemala's new migration code went into effect, which restructured the adjudication of asylum claims. The law requires implementing regulations that were only issued in April 2019. Despite recent reforms, Guatemala's asylum system lacks important procedural safeguards that in practical effect interfere with individuals' ability to find protection. For example, the law provides that asylum seekers may initiate a claim by notifying an immigration or law enforcement official. However, for example, in non-ACA cases, Guatemalan immigration officials have informed some potential asylum seekers in the airport that claims for asylum can only be lodged at the border—contrary to Guatemalan law. High levels of corruption and impunity and law enforcement's involvement in violence against Guatemalan citizens (discussed above), as well as the fact that these officials lack asylum-specific training, make this difficult to do in practice. Although the Guatemalan migration code does not prohibit representation by an attorney in asylum claims, it does not require representation or explicitly recognize the right to representation. In practice, the agency that conducts asylum interviews does not allow for legal representation during the asylum interview or in the asylum process. Rather, the agency takes the position that asylum cases are personal matters, and because they are administrative rather than judicial attorneys cannot be present. Further, asylum seekers are provided very limited time to gather evidence to support their applications or obtain necessary information to assist them in presenting their claims before their interviews on their asylum claims.

25.     I understand that, as of February 25, 2020, the United States has sent more than 700 people to Guatemala under the ACA. These individuals are arriving extremely confused. Many have reported not understanding that they were being sent to Guatemala until they arrived there. Some believed they were being transferred between detention centers in the United States, while others thought they were being sent to Guatemala to await resolution of their U.S. asylum claims. These individuals were shocked to learn that their only path to protection was to pursue asylum in Guatemala.

---

[13] ACNUR [UNHCR], *Sistema Nacional de Protección de Refugiados en Guatemala, Segunda edición* [National System of Refugee Protection in Guatemala, Second edition] (2018), at 3, *available at* https://www.acnur.org/5b3e64214.pdf.

[14] *Id.* at 6.

[15] UNHCR, *Global Trends: Forced Displacement in 2018*, at 66, *available at* https://www.unhcr.org/5d08d7ee7.pdf.

[16] David C. Adams, *Guatemala's "embryonic" asylum system lacks capacity to serve as safe U.S. partner, experts say*, Univision (Aug. 2, 2019), *available at* https://www.univision.com/univision-news/immigration/guatemalas-embryonic-asylum-system-lacks-capacity-to-serve-as-safe-u-s-partner-experts-say.

[17] Emily Green, *Why Guatemala's President Inked an Impossible Asylum Deal with Trump*, Vice News (Jul. 29, 2019), *available at* https://www.vice.com/en_us/article/zmpjyx/why-guatemalas-president-inked-an-impossible-asylum-deal-with-trump.

26.     These individuals also are not receiving adequate information regarding the Guatemalan asylum process. A Honduran man who was sent to Guatemala under the ACA reported that he was never advised that he had a right to seek asylum there or told how to do so, for example. Individuals sent to Guatemala are also being asked to make a decision incredibly quickly—reportedly within minutes though officially within three days—regarding whether they want to return to their country of origin or seek asylum in Guatemala. Officials have provided no context, such as the steps for applying for asylum, or the showing required to succeed on an asylum claim, to assist them in making their decision.

27.     Significant delays exist in the Guatemalan asylum system.  Guatemalan law requires the government to decide all immigration cases, asylum claims included, within 90 days. In reality, decisions take much longer, in some cases up to one year or longer. Some asylum seekers face delays in getting an interview scheduled. After the asylum interview is complete CONARE, the National Commission on Refugees, makes a recommendation on the case, which goes to the National Migration Authority (AMN based on its Spanish title) for review. The AMN is comprised of the vice president of Guatemala and four ministers who only meet two times per year for regular meetings, significantly delaying the asylum process.

28.     I am not aware of any plans for changes to budget, staffing, or other resources to be devoted to asylum claim adjudication in relation to the implementation of the Guatemala ACA. Accordingly, I would expect the types of problems identified above to continue. .

## B.  Services to Support Asylum Seekers in Guatemala

29.     In addition to significant difficulties in navigating the asylum system in Guatemala, asylum seekers sent there under the ACA will likely struggle to satisfy their basic needs while awaiting the adjudication of their claims. While UNHCR is providing up to two months of financial support to asylum seekers, this will not suffice because, although Guatemalan law provides that asylum applications should be resolved within 90 days, delays of up to a year are not uncommon. As discussed above, Guatemala has proven incapable of protecting its own citizens from the significant dangers that exist there, and asylum seekers would be even more at risk and less likely to obtain protection than the general population. Guatemala also lacks the resources to provide for the health and well-being of its own citizens, let alone those of asylum seekers the United States sends there.

30.     Guatemala is an extremely poor country. Sixty percent of its citizens (and eighty percent of indigenous Guatemalans) live in poverty, and almost twenty-four percent in extreme poverty.[18] Almost two thirds of the Guatemalan population lives on less than $2 per day.[19] Much of the Guatemalan population, and almost half of all children, suffer from chronic malnutrition.[20] Guatemalan children suffer from some of the highest stunting rates in the world.[21] Children in Guatemala only receive an average of 6.4 years of schooling, and Guatemalans accordingly

---

[18] Inter-American Commission on Human Rights (IACHR), *Situation of Human Rights in Guatemala* (2017), at 28, https://www.oas.org/en/iachr/reports/pdfs/Guatemala2017-en.pdf.
[19] World Food Programme, *Guatemala*, https://www.wfp.org/countries/guatemala (last visited Jan. 15, 2020).
[20] IACHR, *Situation of Human Rights in Guatemala* (2017), at 28-29 (noting Guatemala is the country with the highest rates of chronic malnutrition in Latin America and that it has some of the highest rates in the world).
[21] World Food Programme, *Guatemala*, https://www.wfp.org/countries/guatemala (last visited Jan. 15, 2020).

suffer from high rates of illiteracy.[22] Millions of Guatemalans lack access to clean drinking water, and fifty percent lack "decent, adequate, and healthy housing."[23]

31.     Guatemala lacks a universal health coverage system and its hospitals have faced shortages of basic medicine and equipment.[24] The hospitals and health centers that do exist are overwhelmed. Construction of a new hospital in San Pedro Necta, Huehuetenango, for example, has been stalled for eleven years, while the existing hospital is forced to admit patients into beds in hallways. Many hospitals require up-front payment, and medicine and medical care outside of Guatemala City is limited.[25] I have worked with individuals in Guatemala who have struggled to pay for clinic visits and medicine and who have been unable to receive care in a timely manner because of shortages of doctors. It is common practice to require patients to purchase and provide their own medications and medical supplies (including medicines, syringes, durable medical equipment, etc.) prior to their medical appointments. Even if families can afford to purchase medicine, it is not always available. In rural areas, there is often no medical care available and, if such care exists, its quality can be questionable. Mental health and other psychosocial services are also extremely limited in Guatemala, and there have been disturbing reports regarding degrading and abusive treatment of individuals with mental illness.[26] Guatemalan children returning from the United States have not been provided government-funded educational or mental health services, housing support, or other psychosocial services— I have even worked with children who were unable to obtain needed psychotropic medication.

32.     Given the rates of poverty in Guatemala, and the fact that its government lacks sufficient resources to provide these types of basic resources and services for its own citizens, I do not believe it will provide them for migrants. Nor have I heard of any plans for the government to begin offering resources such as food assistance, medical care, or mental health services to asylum seekers specifically. The recent backlash and discrimination against migrants, including the denial of services to migrants by a major hospital in the country, discussed in paragraph 20, raises concern that asylum seekers will be denied the few resources that do exist.

33.     Asylum seekers sent to Guatemala will also struggle to find shelter. The Guatemalan government has no shelter and provides no housing support or allowance for asylum seekers or migrants, and I am not aware of any plans to begin doing so.

34.     Churches and other civil society organizations run some shelters for migrants in Guatemala, but these shelters are not capable of meeting the needs of asylum seekers sent to Guatemala under the ACA. The shelters provided by these private groups are short-term and

---

[22] IACHR, *Situation of Human Rights in Guatemala* (2017), at 30-31.

[23] *Id.* at 31-32.

[24] *Id.* at 33; U.S. Dep't of State, *Travel Advisory: Guatemala*, *available at* https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Guatemala.html (last visited Jan. 15, 2020).

[25] U.S. Dep't of State, *Travel Advisory: Guatemala*, https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Guatemala.html (last visited Jan. 15, 2020).

[26] A United States-based disability rights group described Guatemala's Federico Mora Hospital as "the most dangerous facility [their] investigators have witnessed anywhere in the Americas[,]" and reported that "any person with or without a disability detained in this hospital faces immediate risk to his or her life, health and personal integrity, as well as risk of inhuman and degrading treatment or torture[.]" Chris Rogers, *Inside the 'world's most dangerous' hospital*, BBC News (Dec. 5, 2014), *available at* https://www.bbc.com/news/magazine-30293880.

capacity is extremely limited. For example, *Casa del Migrante* [Migrant House] has space for only 60 migrants in the shelter and is unable to keep families together in the shelter. Fathers get separated from their children/the family. *Casa del Migrante* was totally overwhelmed by the few thousand people who transited the country in migrant caravans in October 2018 and has been overwhelmed by additional caravans that have come through. These shelters also lack security forces and have publicly available addresses, putting asylum seekers who stay there at risk. The shelters cannot ensure the safety of victims in situations involving crime by gangs or other criminal groups, and in some cases shelters explicitly ban victims of abuse by gang members. The vulnerability of migrants in civil society shelters was recently highlighted by reports that the director of *Casa del Migrante*, Father Mauro Verzeletti, has been receiving death threats, and has been warned that his work, and that of *Casa del Migrante*, would be shut down.

35.     In search of work, housing, and other resources and services, asylum seekers will likely gravitate toward marginalized urban areas. Language may further push asylum seekers toward these places—for example, in large swaths of Guatemala, individuals speak indigenous languages and a monolingual Spanish speaker (or speaker of another language) may have trouble communicating with the local population there. In these areas, asylum seekers will be especially vulnerable to the dangers that have caused Guatemalans to flee in record numbers. Asylum-seekers looking for work in Guatemala will be face significant obstacles. For example, although Guatemalan law permits asylum seekers and refugees to work, a government issued identification card is required to seek employment. Significant delays in receiving these cards make it difficult for asylum seekers and refugees to obtain legitimate employment. If asylum seekers can find work, it will almost certainly be in the informal sector[27] in jobs such as domestic work or selling products on the street. Salaries in the informal sector tend to be significantly lower than formal employment, working conditions tend to be extremely poor, and employees may be at higher risk for discrimination and exploitation.

36.     Discrimination will also put certain categories of asylum seekers—including LGBTI individuals, women and girls, and asylum seekers from certain countries and ethnic backgrounds—at even greater risk for exploitation and mistreatment.[28] In addition, confronted with limited prospects for employment, and even those who do find stable work will, like many Guatemalans, have serious difficulties in meeting their basic needs. The Guatemalan National Statistics Institute (INE) calculates that as of October 2019, it would cost at a minimum $467 (U.S. dollars) a month to feed a family of four, while the minimum cost of living for the family, including housing, education, health and transportation costs, is $1,079. This compares to an average national income of only $275 a month, well below the minimum wage, which in 2020 will range from about $368 to $400, depending on the type of employment. As such, as of 2014, 48.8% of Guatemalans lived in poverty, on less than $5.50 per person per day, and 8.7% lived in extreme poverty, on less than $1.90 a day. While the unemployment rate in Guatemala is low, at 2% nationwide in 2018 (up to 4% in Guatemala City), only 60% of the working age population is economically active, and of those, 70% are engaged in informal work. Asylum-seekers and refugees looking for work in Guatemala are therefore likely to be confronted with limited

---

[27] As of 2017, 85 percent of the labor force in Guatemala was informally employed. IACHR, *Situation of Human Rights in Guatemala* (2017), at 33. Individuals need the government issued identification card in order to open a bank account, and they need a bank account to get a job in the formal sector. Thus, the delay in receiving an identification for practical purposes makes it impossible to get a job in the formal sector.

[28] *See* discussion above at paragraph 20.

prospects for employment, and even those who do find stable work will, like many Guatemalans, have serious difficulties in meeting their basic needs.[29] Considering all of these factors, I believe it is very unlikely that asylum seekers will be able to earn enough money to cover the costs of housing, food, and other basic necessities. For all of the foregoing reasons, asylum seekers are unlikely to maintain their safety and well-being while pursuing their claims in Guatemala.

### C.  Asylum Systems and Resources in Honduras and El Salvador

37.     The asylum systems in Honduras and El Salvador are similarly unprepared to receive an increase in asylum seekers under those countries' ACAs with the United States.

38.     While Honduras has laws that allow for the granting of asylum, in practice, it has no meaningful asylum-processing system. According to UNHCR, from 2002 through 2013, Honduras received a total of 27 asylum applications.[30] The most applications Honduras ever received in one year between 2002 through 2017 was in 2014, when it received just 20 applications.[31] As of 2018, only 27 recognized refugees and 57 asylum seekers with pending cases resided in Honduras.[32] As for El Salvador, from 2002 through 2016, it never received more than 65 asylum applications per year, and most years the numbers of applications were much lower.[33] In 2017, it received a total of 93 asylum applications.[34] As of 2018, only 48 refugees and 18 asylum seekers with pending cases resided in El Salvador.[35] It was also recently reported that, according to a government source, El Salvador's Commission for the Determination of Refugee Status (*Comisión para la Determinación de la Condición de Personas Refugiadas*, known by the Spanish acronym CODER) had just one officer working directly on asylum claims in the entire country.[36] Given these facts, I cannot see how these countries would be equipped to handle an increase in claims should asylum seekers be sent there under the ACAs.

39.     As in the case of Guatemala, asylum seekers sent to these countries would find themselves in extremely dangerous conditions, as outlined above, and lacking access to critical

---

[29] *See See* Urías Gamarro, *Sube baja o se mantiene? Nada concreto para el salario mínimo del 2020*, Prensa Libre (Sept. 13, 2019), *available at* https://www.prensalibre.com/economia/sube-baja-o-se-mantiene-nada-concreto-para-el-salario-minimo-del-2020/; Rosa María Bolaños, César Pérez Marroquín, and Urias Gamarro, *¿Refleja el salario mínimo el costo de la canasta básica? Hay posturas polémicas al respecto,* Prensa Libre (Dec. 31, 2019), *available at* https://www.prensalibre.com/economia/refleja-el-salario-minimo-el-costo-de-la-canasta-basica-hay-posturas-polemicas-al-respecto; Urías Gamaro, *La canasta basico subio en octubre y coto a los guatemaltecos Q119.73 por dia*, Prensa Libre (Nov. 7, 2019), *available at* https://www.prensalibre.com/economia/la-canasta-basica-subio-en-octubre-y-costo-a-los-guatemaltecos-q119-73-por-dia/; World Bank, *Poverty and Equity Brief, Latin America & the Caribbean, Guatemala* (Oct. 2019), *available at* https://databank.worldbank.org/data/download/poverty/33EF03BB-9722-4AE2-ABC7-AA2972D68AFE/Global_POVEQ_GTM.pdf; *Instituto Nacional de Estadística Guatemala* (INE), https://www.ine.gob.gt/ine/ (last visited Jan. 15, 2020).

[30] ACNUR [UNHCR], *Sistema Nacional de Protección de Refugiados en Guatemala, Segunda edición* [National System of Refugee Protection in Guatemala, Second edition] (2018), at 3.

[31] *Id.*

[32] UNHCR, *Global Trends: Forced Displacement in 2018*, at 66.

[33] ACNUR [UNHCR], *Sistema Nacional de Protección de Refugiados en Guatemala, Segunda edición* [National System of Refugee Protection in Guatemala, Second edition] (2018), at 3.

[34] *Id.*

[35] UNHCR, *Global Trends: Forced Displacement in 2018*, at 65.

[36] Nelson Rauda Zablah, *El Salvador Signs Agreement To Accept Asylum Seekers the US Won't Protect*, El Faro (Oct. 8, 2019), https://elfaro.net/en/201909/el_salvador/23667/El-Salvador-Signs-Agreement-to-Accept-Asylum-Seekers-the-US-Won%E2%80%99t-Protect.htm.

resources and services while awaiting the adjudication of their claims. In Honduras, poverty afflicts sixty percent of the population and causes chronic food insecurity, especially among indigenous Hondurans, women, girls, children under five, and individuals with disabilities and HIV/AIDS.[37] In El Salvador, where the economy runs on the U.S. dollar, making goods and services comparatively expensive, poverty affects thirty-five percent of the population and fourteen percent of children under the age of five suffer from chronic malnutrition.[38]

40.     Insecurity in these countries is acute, impacting individuals' safety as well as their ability to access already scarce medical care and education. Teachers and school directors in El Progreso and Tegucigalpa, Honduras have shared with me that they have had to buy food with their own salaries for students who come to school hungry, because the schools lack resources and materials to teach, but also to feed, students. Public bus companies traveling to El Progreso, Honduras recently shut down due to gang extortion, leaving hundreds of students with no means of transportation to get to school. (Honduras also limits enrollment in schools to certain times of year, so asylum-seeking children may face delays in being able to enroll in school.) Children in Guatemala, El Salvador, and Honduras who live in gang dominated areas and are able to enroll in school often face violence and extortion on their way to and from school, especially if they are forced to cross boundaries between gang territories to arrive at school. Children are even vulnerable to gang violence within some schools. I spoke with a public school teacher in Honduras who described having gang members enter the school and forcibly remove students, who were later found dead.

41.     Asylum applicants in these countries will also face similar challenges with respect to finding shelter and employment as asylum seekers in Guatemala. As in Guatemala, Honduras and El Salvador do not provide government-funded shelters for asylum seekers. Employment will also prove difficult to obtain, especially in Honduras where I have witnessed long lines of people waiting for hours to drop off applications for a single job opening. Individuals living in territories dominated by gangs in these countries will likely face employment discrimination by employers who do not want to risk hiring an applicant who may possibly be associated with a gang. Taking all of this into account, I fear that asylum seekers sent to Honduras and El Salvador would lack a meaningful opportunity to pursue asylum claims in these countries.

## IV.   The U.S. Government's Erroneous ACA Screening Guidance May Result in Unaccompanied Children Being Illegally Sent to the Northern Triangle Countries

42.     Congress has recognized that unaccompanied children are an especially vulnerable population and have extended extra procedural protections in U.S. immigration law to ensure they have safety from persecution, human trafficking, and *refoulement* (return to the country where they were persecuted). In 2008, Congress unanimously passed the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA"), which created critical protective measures reflecting Congress' recognition of the difficulties children might face in understanding their rights or the legal procedures governing their cases without a government funded attorney to assist them while in CBP custody.[39]   For example, the TVPRA

---

[37] World Food Programme, *Honduras*, https://www.wfp.org/countries/honduras (last visited Jan. 15, 2020).

[38] World Food Programme, *El Salvador*, https://www.wfp.org/countries/el-salvador (last visited Jan. 15, 2020).

[39] Pub. L. 110-457, 122 Stat. 5044, *codified in part at* 8 U.S.C. §§ 1158, 1232.

ensures that children will not be subjected to expedited removal by directing their placement in full immigration proceedings under Section 240 of the INA.[40] These provisions recognize the difficulty of ascertaining the full scope of a child's situation and needs in an expedited manner at the border and through a cursory interview by a CBP officer. As such, children are afforded the ability to tell their story and have their case heard before a trained adjudicator—an immigration judge—rather than having to make their case before a CBP agent shortly after apprehension.

43.    The TVPRA also unambiguously exempts unaccompanied children from the Safe Third Country Bar to asylum[41] in recognition that children traveling alone would have no one to explain complex international agreements governing immigration and international protection and the risks of foreclosing access to protection under such circumstances. The Safe Third Country Bar thus cites the definition of "unaccompanied alien child," set out in the Homeland Security Act of 2002 (HSA), which encompasses *both* (a) a child for whom "there is no parent or legal guardian in the United States" and (b) a child for whom "no parent or legal guardian in the United States is available to provide care and physical custody."[42] In that vein, the regulation implementing the Guatemala ACA similarly exempts unaccompanied children, as defined under the HSA, from the ACA.[43]

44.    The unpublished "US-Guatemala Asylum Cooperative Agreement (ACA) Threshold Screening: Guidance for Asylum Officers and Asylum Office Staff," published by Reuters in November 2019, contains a very concerning error in its definition of a unaccompanied children for purposes of the ACA.[44] While the guidance properly states that unaccompanied children are not subject to the ACA, it incorrectly cites to the definition of unaccompanied children in 8 C.F.R. § 208.30[(e)](6)(iii)(D)[45]—the definition of an unaccompanied child for purposes of screening for exceptions to the Canada Safe Third Country Agreement—rather than the correct, HSA, definition, as cited in the Safe Third Country Bar text and the ACA implementing regulation.[46] The unaccompanied child definition in the Canada Safe Third Country Agreement exceptions (8 C.F.R. § 208.30(e)(6)(iii)(D)) defines as unaccompanied those children who "do not have a parent or legal guardian in either Canada or the United States." It excludes those children for whom "no parent or legal guardian in the United States is available to provide care and physical custody," which is part of the HSA definition.[47] While this regulatory definition of an unaccompanied child is narrower than the HSA definition, the Canada Safe

---

[40] 8 U.S.C. § 1232(a)(5)(D).

[41] 8 U.S.C. § 1158(a)(2)(E).

[42] *See* 8 U.S.C. § 1158(a)(2)(E) (providing that the safe third country bar "shall not apply to an unaccompanied alien child (as defined in section 279(g) of Title 6)[]"); *see also* 6 U.S.C. § 279(g)(2)(C))

[43] 84 Fed. Reg. 63994 ("Unaccompanied alien children, as defined by 6 U.S.C. 279(g), are categorically exempted from the ACA bar.").

[44] Unpublished guidance from U.S. Citizenship and Immigration Services, *US-Guatemala Asylum Cooperation Agreement (ACA) Threshold Screening: Guidance for Asylum Officers and Asylum Office Staff*, Dep't of Homeland Security (Nov. 19, 2019), https://fingfx.thomsonreuters.com/gfx/mkt/12/8962/8874/ACA%20Guatemala.pdf; Ted Hesson, *Trump administration prepares to send asylum seekers to Guatemala*, Reuters (Nov. 20, 2019), *available at* https://www.reuters.com/article/us-usa-immigration-guatemala-asylum/trump-administration-prepares-to-send-asylum-seekers-to-guatemala-idUSKBN1XU2SI.

[45] The regulation cited is 8 CFR 208.30(6)(iii)(D); however, such citation does not exist. I assume the guidance was intending to cite 8 CFR 208.30(e)(6)(iii)(D), which exempts unaccompanied children from return under the Canada Safe Third Country Agreement.

[46] *See* 8 U.S.C. § 1158(a)(2)(E).

[47] *Compare* 8 C.F.R. § 208.30(e)(6)(iii)(D) *with* 6 U.S.C. § 279(g)(2)(C).

Third Country Agreement actually exempts a wider range of children from its application, including both unaccompanied children, as well as children who have close family members, including parents and legal guardians, in Canada or the United States.[48]  Thus, this erroneous citation for the definition of an unaccompanied child in the USCIS guidance could result in *bona fide* unaccompanied children being sent to Guatemala in contravention of the Safe Third Country Bar and the TVPRA, the regulation implementing the ACA with Guatemala, as well as international principles on child welfare and the best interests of the child.

45.    It has been suggested that the USCIS citation to 8 C.F.R. § 208.30(e)(6)(iii)(D) for the unaccompanied child definition was simply a mistake. However, House Judiciary Committee Chairman Jerrold Nadler and Subcommittee on Immigration and Citizenship Chair Zoe Lofgren brought this error to the Department of Homeland Security's attention in a letter dated December 17, 2019 and yet, to date, the agency has not released revised guidance or otherwise responded to acknowledge and/or correct the error.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed: February 25, 2020        _____

                                   Lisa Frydman

---

[48] *See* 8 C.F.R. §§ 208.30(e)(6)(iii)(B), (C).

**Lisa Frydman**

1382 Hearst Avenue • Berkeley, CA 94702 • (510) 846-2265 • lisafrydman@gmail.com

## EDUCATION

University of California, Berkeley School of Law, Juris Doctor, 2002
Order of the Coif, Co-Founder of Youth and Education Law Society, International Human Rights Law Clinic

University of Maryland, College Park, Bachelor of Arts, History, 1996
magna cum laude

## EXPERIENCE

**Kids in Need of Defense (KIND)**, Washington, D.C.
**Vice President, Regional Policy and Initiatives**, February 2017-Present
Develop and oversee implementation of KIND's international programs, working with governments, international and intergovernmental organizations, civil society organizations, and private sector pro bono partners in Central America and Mexico. Lead high level strategy development of KIND's international work. Manage opening of offices and launch of KIND programming in Mexico. Lead and participate in fact finding missions to Central America and to Mexico's northern and southern borders focused on children's rights.  Author, edit, and supervise publications.

**Kids in Need of Defense (KIND)**, Washington, D.C.
**Director of Regional Policy and Initiatives**, April 2015-January 2017
Direct and develop KIND's programs that advance regional (Central America, Mexico, U.S.) protection of migrant children, including sexual and gender based violence program, in-country refugee processing program, reintegration program, and regional advocacy work. Supervise major research projects. Develop regionally-based solutions to serve the needs and protect the rights of children on the move. Advocate for policy and practice changes at regional and national levels to advance migrant children's rights. Lead and participate in fact finding missions to Central America focused on children's rights. Lead and engage in national and regional civil society coalitions. Supervise regional team staff.  Develop proposals for and supervise execution and deliverables of regional grants. Author, edit, and supervise publications.

**Center for Gender & Refugee Studies (CGRS)**, U.C., Hastings College of Law, San Francisco, CA
**Associate Director and Managing Attorney**, January 2013-March 2015, **Managing Attorney** December 2008-December 2012, **Staff Attorney** July 2007 – December 2008
**Management:** Coordinate staff and intern hiring. Supervise attorneys, student interns, and office manager. Manage case tracking and monitoring program. Co-supervised overhaul and modernization of website and case database. Cultivate and maintain relationships with law firms. Co-coordinate two-year regional migration project working with organizations in Central America, Mexico, and the United States. Work closely with development director to plan CGRS events and to maintain and increase revenue through prospecting, meetings with prospective and current funders, and reviewing draft LOIs and proposals. Develop and supervise plan to become IOLTA funded California support center. Work closely with executive director to design projects, develop organizational policies, make decisions about organizational growth and priorities, expand advisory board, and respond to staffing needs.
**Substantive Legal:** Coordinate policy work, including developing and implementing policy strategies, drafting and commenting on legislation, and advocating to congressional offices and federal administrative agencies. Author advocacy reports. Direct technical assistance program by mentoring pro bono attorneys with children's, gender, and LGBT asylum cases, reviewing and commenting on legal documents, and developing practice advisories and other litigation support materials. Train attorneys and other service providers on advanced topics in refugee law and the immigration system for children. Advise domestic and international organizations on children's refugee and immigration

**Lisa Frydman**

1382 Hearst Avenue • Berkeley, CA 94702 • (510) 846-2265 • lisafrydman@gmail.com

law and cases. Inform CGRS attorneys of significant legal developments. Shape litigation strategy for cases in which CGRS serves as amicus curiae or co-counsel and draft or review briefs and motions for Board of Immigration Appeals (BIA) and federal court submission. Produce articles regarding developments in gender and children's asylum claims. Respond to media inquiries.

**Legal Services for Children**, San Francisco, CA
**Staff Attorney and Immigration Project Director**, October 2004-June 2007
Represented children in immigration, education, dependency, and guardianship proceedings throughout the San Francisco Bay Area. Coordinated the Detained Immigrant Children's Project. Conducted training workshops for attorneys, judges, and social service providers on multiple legal issues related to immigrant youth. Supervised immigration project paralegal and law student interns, and mentored pro bono attorneys. Served as consultant to attorneys across country with child immigration cases. Participated in national legislative advocacy working group to advance immigration law for children, emphasis on Comprehensive Immigration Reform. Co-coordinated national administrative advocacy working group aimed at improving conditions, treatment, and handling of immigrant children's cases by EOIR, DHS, ORR, USCIS, and CBP.

**Florida Immigrant Advocacy Center,** Miami, Florida
**Equal Justice Works Fellow and Children's Attorney**, September 2002-September 2004
Represented unaccompanied immigrant children in a range of immigration matters, including deportation defense, Special Immigrant Juvenile Status, requests for parole, asylum and withholding of removal, and other forms of relief. Advocated for children's release from detention and for their medical, social, and emotional needs. Trained and mentored pro bono attorneys. Produced judicial bench memorandum for juvenile and family court judges on Special Immigrant Juvenile Status. Advocated to relevant administrative agencies for improved treatment of unaccompanied immigrant children nationwide. Worked with members of congress to advance legislation and assist individual youth. Mobilized immigrant communities through education and outreach. Educated the public on unaccompanied immigrant children through presentations, trainings, and the media.

## SELECT PUBLICATIONS

- *Everyday Life is Fear: Violence Against Children and Youth in Honduras*, Co-Author (October 2019).
- *Blocked from Safety: Unaccompanied Children Along the U.S.-Mexico Border* (April 2019).
- *Childhood Cut Short, Sexual and Gender-based Violence Against Central American Migrant and Refugee Children*, Co-Author (June 2017).
- *Human Rights, Children, and Migration in Central and North America: Causes, Policies, Practices, and Challenges*, Contributing Author and Co-Editor, *Forthcoming* (winter 2015).
- *A Treacherous Journey, Child Migrants Navigating the U.S. Immigration System*, Co-Author (February 2014).
- *Beacon of Hope or Failure of Protection?: U.S. Treatment of Asylum Claims Based on Persecution by Organized Gangs*, Immigration Briefings (October 2012).
- *Recent Developments in Domestic-Violence-Based Asylum Claims*, 2009 EMERGING ISSUES 4075, LexisNexis (August 2009).

## SELECT PRESENTATIONS

- *Recent Policies Limiting Access to the U.S. Asylum System*, International Association of Defense Council, February 2020
- *U.S. Law and Processing of Unaccompanied Immigrant Children Seeking Protection*, Mexican Child Protection Authorities and Mexican Child Welfare Agency, May 2019
- *Using Research on Sexual and Gender-Based Violence Against Children in Central America to Support Legal Claims for Asylum*, Hogan & Lovells LLP, June 2017

**Lisa Frydman**

1382 Hearst Avenue • Berkeley, CA 94702 • (510) 846-2265 • lisafrydman@gmail.com

- *Central American Refugee Resettlement and Access to Protection for Children*, U.C. Hastings College of Law, January 2016
- *Overview of Immigration System for Unaccompanied Children and Role of Physicians Working with Immigrant Children*, Training for Pediatric and Family Medicine Residents and Medical Students, University of California, San Francisco, October 2014.
- *Conditions for Children in "Northern Triangle" Countries and Legal Bases for Central American Children's Asylum Claims*, Training for San Francisco Asylum Officers, June 2014.
- *Representing Child Migrants In Family and Immigration Law*, (presented asylum section), Practicing Law Institute Webinar, June 2014.
- *Immigration Relief for Survivors of Domestic Violence,* Practicing Law Institute, May 2014.
- *Legal Relevance of Psychologists' Opinions in the Immigration Context*, California Psychological Association, webinar, February 2014.
- *Standards and Best Practices When Working with Child Clients Seeking Asylum*, One Justice Webinar, February 2012.
- *A Holistic Approach to Serving Undocumented Youth Clients*, American Bar Association, Midyear Conference, August 2007.
- *Special Immigrant Juvenile Status*, California Probate Judges' Annual Conference, March 2005