# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

U.T., *et al.*,                                               :

                      *Plaintiffs*,          :

                          Case No. 1:20-cv-00116 (EGS)

                   v.                          :

William Barr, Attorney General of the United       :
States, in his official capacity, *et al.*,

                              :

                    *Defendants*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

## BRIEF OF REFUGEES INTERNATIONAL
## <u>AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS</u>

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Local Rule 7(o) and Federal Rules of Appellate Procedure Rule 26.1, amicus, a non-governmental organization that advocates for lifesaving assistance and protection for displaced people in parts of the world impacted by conflict, persecution, and forced migration, states that it has no parent corporation, and, because it has issued no stock, no publicly held corporation owns 10% or more of amicus's stock.

# TABLE OF CONTENTS

IDENTITY AND INTEREST OF AMICUS CURIAE....................................................1

SUMMARY OF ARGUMENT ........................................................................1

ARGUMENT .................................................................................3

I.      THIS COURT SHOULD DECLARE THE RULE AND USCIS GUIDANCE AS
        CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS.................................3

        A.      The ACA with Guatemala violates INA's safe third country, expedited
                removal and withholding of removal provisions. .....................................4

                1.      The ACA violates INA's safe third country provision by sending
                        refugees to a country that does not have a fully functional asylum
                        system. ...............................................................................4

                2.      The ACA violates the non-*refoulement* principle mandated by
                        international and U.S. law......................................................8

        B.      The designation by the Department of Homeland Security to subject
                individuals to the ACA is arbitrary, capricious, and contrary to
                immigration law. ........................................................13

II.     THE STORIES OF OTHER ASYLUM SEEKERS ILLUSTRATE THAT THE
        PLaintiffs' CIRCUMSTANCES ARE NOT UNIQUE. .....................................17

CONCLUSION.................................................................................20

CERTIFICATE OF COMPLIANCE ..............................................................21

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Grace v. Whitaker*,
344 F. Supp. 3d 96 (D.D.C. 2018), *stay pending appeal denied*, No. 18-1853,
2091 WL 329572 (D.D.C. Jan. 25, 2019), *appeal filed*, No. 19-5013 (D.C. Cir.
Jan. 30, 2019) ...........................................................................................................13, 14

## STATUTES

8 U.S.C. § 1158(a)(2)(A) ...................................................................................................4, 18

8 U.S.C. § 1225(b)(1)(A)(ii) ...............................................................................................8, 13

8 U.S.C. § 1225(b)(1)(B)(iii)(I) ..........................................................................................9

8 U.S.C. § 1225(b)(1)(B)(iii)(III) .......................................................................................9

## TREATIES

Convention Relating to the Status of Refugees art. 33, July 28, 1951, 19 U.S.T. 6223
(1968), 189 U.N.T.S. 137 ...........................................................................................9

## REGULATIONS

8 C.F.R. § 208.30(d) ...........................................................................................................13

8 C.F.R. § 1208.31(c) ..........................................................................................................8

Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the
Immigration and Nationality Act, 84 Fed. Reg. 63,994 (Nov. 19, 2019) ....................1, 14

## OTHER AUTHORITIES

*¿Quién es?*, Procurador de los Derechos Humanos, https://www.pdh.org.gt/quien-es/ (last
visited Mar. 3, 2020) ....................................................................................................10

@camiloreports, Twitter (Feb. 19, 2020, 10:13 AM),
https://twitter.com/camiloreports/status/1230148427725574144/photo/1 .................12, 19

@camiloreports, TWITTER (Mar. 3, 2020, 7:40 PM),
https://twitter.com/camiloreports/status/1235002188444946432 .......................................11

@ReynaldoLeanos, Twitter (Feb. 25, 2020, 8:42 PM),
https://twitter.com/ReynaldoLeanos/status/1232481043657084930/photo/1 .............12, 19

American Immigration Council, *A Primer on Expedited Removal*, July 2019,
https://www.americanimmigrationcouncil.org/research/primer-expedited-removal...........9

American Immigration Council, *Removal Without Recourse: The Growth of Summary
Deportations from the United States*, Apr. 2014,
https://www.americanimmigrationcouncil.org/research/removal-without-
recoursegrowth-summary-deportations-united-states..........................................8

"Canada-U.S. Safe Third Country Agreement," Government of Canada (June 23, 2016),
https://www.canada.ca/en/immigration-refugees-
citizenship/corporate/mandate/policies-operational-instructions-
agreements/agreements/safe-third-country-agreement.html................................8

Comisión Española de Ayuda al Refugiado, *An overview of the Canadian asylum system*
(Apr. 2019), https://www.cear.es/wp-content/uploads/2019/04/CANADA-
REPORT_-CEAR.pdf.............................................................................7

"Guideline issued by the Chairperson pursuant to paragraph 159(1)(h) of the *Immigration
and Refugee Protection Act*," Immigration and Refugee Board of Canada (Dec.
15, 2012), https://irb-cisr.gc.ca/en/legal-policy/policies/Pages/GuideDir08.aspx..............7

"Intentional homicides (per 100,000 people) – Canada," The World Bank,
https://data.worldbank.org/indicator/VC.IHR.PSRC.P5?locations=CA (last visited Mar. 5,
2020) .........................................................................................7

"Intentional homicides (per 100,000 people) – Guatemala," The World Bank,
https://data.worldbank.org/indicator/VC.IHR.PSRC.P5?locations=GT (last visited
Mar. 5, 2020).................................................................................7

International Organization for Migration (IOM), "Migration Governance Snapshot:
Republic of Guatemala," (Aug. 2018),
https://migrationdataportal.org/sites/default/files/2018-
11/MGI%20Guatemala%20EN.pdf..........................................................5

"Joint Statement Between the U.S. Government and the Government of Honduras" Dept.
of Homeland Security (Sept. 13, 2019)
https://www.dhs.gov/news/2019/09/13/joint-statement-between-us-government-
and-government-honduras .................................................................18

Migration Code, Decree No. 44-2016, at 12 (Oct. 18, 2016),
https://www.acnur.org/fileadmin/Documentos/BDL/2017/10978.pdf. ............................6

Sofia Menchu, *Guatemala y México acuerdan frenar caravanas migratorias a EEUU:
Giammattei,* Reuters, Jan. 15, 2020, https://lta.reuters.com/articulo/guatemala-
inmigracion-idLTAKBN1ZE1TG-OUSLT .....................................................5

UNHCR/ACNUR, La Agencia de la ONU para los Refugiados, *ACNUR en Guatemala*
(Mar. 2019), https://www.acnur.org/5cacfd7a4.pdf ..........................................4

UNHCR/ACNUR, La Agencia de la ONU para los Refugiados, *Guatemala abre la puerta a un nuevo comienzo*, https://www.acnur.org/guatemala-abre-la-puerta-a-un-nuevo-comienzo.html (last visited Mar. 1, 2020)...........................................................5

UNHCR UN Refugee Agency, *Monitoring Report: Canada-United States Safe Third Country Agreement* (June 2006), https://www.unhcr.org/en-us/protection/operations/455b2cca4/unhcr-monitoring-report-canada-united-states-safe-third-country-agreement.html .........................................................8

U.S. Citizenship & Immigration Services, US-Guatemala Asylum Cooperation Agreement (ACA) Threshold Screening: Guidance for Asylum Officers and Asylum Office Staff, (Nov. 19, 2019), *link embedded in* Ted Hesson, Mica Rosenberg & Kristina Cooke, *Trump administration prepares to send asylum seekers to Guatemala,* Reuters (Nov. 20, 2019), https://www.reuters.com/article/us-usa-immigration-guatemala-asylum/trump-administration-prepares-to-send-asylum-seekers-to-guatemala-idUSKBN1XU2SI...15, 16

U.N. High Commissioner for Refugees, "UNHCR Note on the Principle of Non-Refoulement," Refworld (Nov. 1997), https://www.refworld.org/docid/438c6d972.html .........................................................10

## IDENTITY AND INTEREST OF AMICUS CURIAE

Amicus curiae Refugees International is a non-governmental organization that advocates for lifesaving assistance and protection for displaced people in parts of the world impacted by conflict, persecution, and forced migration.  Refugees International does not accept government or United Nations funding, enabling it to speak freely about policies that are working well and where global action falls short, and ensuring that its advocacy is impartial and independent.  It supports the building of asylum capacity and access to protection for displaced people in countries around the world, including the United States.  Every year, Refugees International advocates travel to some of the world's most severe displacement crises, examining the conditions facing refugees and internally displaced people, and assessing the responses to those needs by governments, non-governmental organizations, and local and international aid organizations.  Amicus has a strong interest in the proper application of federal laws to ensure that the rights of asylum seekers in the United States are protected as Congress intended and as our international obligations require.[1]

## SUMMARY OF ARGUMENT

Refugees International agrees with Plaintiffs that the interim final rule published as Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act, 84 Fed. Reg. 63994 (Nov. 19, 2019) (to be codified at 8 C.F.R. pt. 208) (the Rule), is contrary to law, arbitrary and capricious, and unconstitutional.  Refugees International views the Asylum Cooperation Agreements (ACAs) not, as the Rule suggests, as an

---

[1]   No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting this brief; and no person—other than the amicus curiae submitting this brief, their members, and their counsel—contributed money that was intended to fund preparing or submitting this brief.

attempt to "share the burden" of protection between countries, but as an effort by the United States to shift the responsibility of protection to countries less able to bear it.  Indeed, supplementary information accompanying the Rule makes clear that a principal motivation for the ACAs is to "reduce the flow" of asylum seekers to the United States as quickly as possible.

Two Refugees International investigators, Yael Schacher[2], Ph.D. and Rachel Schmidtke[3], traveled to Guatemala from February 1, 2020, to February 8, 2020, on a fact-finding mission to understand how Guatemala was implementing the ACA.  The stories collected by Refugees International in its investigation show that implementation of the ACA with Guatemala has already led to the return of asylum seekers to their home countries of Honduras and El Salvador without adequate screening or providing asylum seekers knowledge of their rights to protection. Just some of those stories are included here, and it is Refugees International's hope that these stories will help illustrate the dangers of this Rule.

Refugees International's first-hand observations and interviews show that asylum seekers arriving at the U.S. border are not channeled through the credible fear screening procedure to which they are entitled under immigration law.  And once these asylum seekers arrive in

---

[2]   Yael Schacher is a Senior U.S. Advocate at Refugees International, where she focuses on U.S. asylum, U.S. refugee admissions, temporary protected status, and humanitarian visas. Prior to joining Refugees International, Yael spent a decade researching the relationship between immigration and refugee policy.  Yael has an M.A. in History and a Ph.D. in American Studies from Harvard University and a B.A. in literature from Columbia University.

[3]   Rachel Schmidtke is the Advocate for Latin America at Refugees International.  Previously, she was the program associate at the Mexico Institute of the Woodrow Wilson International Center for Scholars where she played a key role in the development of the Mexico Institute's migration portfolio and produced policy work on Mexico, Central America, and U.S. migration, asylum, and refugee policies.  A Returned Peace Corps Peru Volunteer, Rachel received her M.A. in International Development Policy from Duke University, focusing on migration, Latin American foreign policy, and gender.

Guatemala, the process does not improve as Guatemala fails to provide a full and fair procedure for determining a claim to asylum or equivalent temporary protection, which makes the returning of asylum seekers to Guatemala a violation of the Immigration and Nationality Act (INA). Moreover, ACA transferees (*i.e.*, asylum seekers sent by the United States to Guatemala pursuant to the ACA) are given a "choice" of leaving Guatemala or applying for asylum. But given the insufficiencies of Guatemala's asylum system, the "choice" of ACA transferees to leave Guatemala rather than apply for asylum there is not "voluntary" and leads to their *refoulement*, violating both federal law and international treaties to which the United States is bound.

Consistent with its goal of advocating for effective policies involving displaced people, Refugees International urges this Court to declare the Rule unlawful and enjoin its continued execution.

## ARGUMENT

### I.      THIS COURT SHOULD DECLARE THE RULE AND USCIS GUIDANCE AS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS.

Refugees International agrees with Plaintiffs that the Rule should be enjoined and declared unconstitutional. This brief does not repeat the clear and cogent arguments made by Plaintiffs on this point. Rather, Refugees International submits this brief to report on the on-the-ground investigation by its advocates of the implementation of the ACA in Guatemala. The findings of Refugees International, detailed below, support Plaintiffs' position.

The investigation revealed violations of the rights of asylum seekers by the Department of Homeland Security (DHS) at the U.S. border; structural deficiencies with the asylum system in Guatemala that make "access to a full and fair opportunity to seek asylum" in Guatemala impossible; and serious risk that asylum seekers transferred under the ACA will face severe

harm, including persecution and *refoulement*.  The ACA with Guatemala violates the INA's safe

third country provision and various federal and international laws meant to protect asylum

seekers and refugees from *refoulement*.  Moreover, the Rule is being implemented in a manner

that is arbitrary and capricious.

A.    **The ACA with Guatemala violates INA's safe third country, expedited removal and withholding of removal provisions.**

      1.    **The ACA violates INA's safe third country provision by sending refugees to a country that does not have a fully functional asylum system.**

Under the safe third country provision, 8 U.S.C. § 1158(a)(2)(A), the Attorney General

can remove a foreign national otherwise eligible for asylum to a signatory country "in which the

[refugee]'s life or freedom would not be threatened on account of race, religion, nationality,

membership in a particular social group, or political opinion, and where the [refugee] would have

access to a full and fair procedure for determining a claim to asylum or equivalent temporary

protection."  *Id.*  Guatemala's asylum system falls far short of providing a full and fair procedure

for determining a claim to asylum or equivalent temporary protection.

Guatemala did not traditionally accept asylum seekers and only started receiving asylum

claims within the past few years.  But within the last couple of years, Guatemala has received a

significant increase in asylum applications that it simply does not have the structural and

technical capacity to handle.  Between January and November 2018 alone, Guatemala received

262 asylum-seekers, representing a 75% increase in the number of people seeking asylum in

Guatemala, compared to 2017.[4]  Though Guatemalan asylum claims should be resolved by law

---

[4]    UNHCR/ACNUR, La Agencia de la ONU para los Refugiados ("ACNUR"), *ACNUR en Guatemala* at 2 (Mar. 2019), https://www.acnur.org/5cacfd7a4.pdf.  *See* Plaintiffs' Appendix Pursuant to LCvR 7(n), at DHSFF0681, ECF No. 39 at 718 ("In 2015, Guatemala registered

within thirty days, Refugees International was told by representatives of the United Nations High Commissioner for Refugees (UNHCR) in Guatemala that the process takes much longer, sometimes years.

Moreover, asylum seekers consistently struggle to find work in Guatemala.  In 2016, the new Migration Code for Guatemala stated that the National Registry of Persons (RENAP) would issue the same ID card for asylum seekers and temporary residents alike, so that employers would recognize the asylum card as a valid form for employment.  As an initial matter, the process of applying for the new ID card—with fees to RENAP, the Migration Directorate, notaries, and other personnel—is often cost-prohibitive for many asylum seekers.  But to make matters worse, Refugees International was informed that RENAP has not been issuing the new IDs for refugees, as required by law.  Without the new ID card, refugees have found that employers will not accept otherwise legal paperwork noting their status as asylees.[5]

In some reported cases, Guatemalan authorities have even discouraged people from applying for asylum in the country.[6]  The National Commission for Refugees (CONARE), the

---

161 asylum claims and as of October 2016 a total of 133 asylum claims had been registered—which represents a 21 per cent increase in comparison with the same period in the previous year.").

[5]  *See* UNHCR/ACNUR, La Agencia de la ONU para los Refugiados ("ACNUR"); *Guatemala abre la puerta a un nuevo comienzo*, https://www.acnur.org/guatemala-abre-la-puerta-a-un-nuevo-comienzo.html (last visited Mar. 1, 2020) ("The biggest problem [refugees] face is the lack of recognition of the refugee card as a valid document that allows them to work freely in the country, earn a salary or establish a business or own business."); *see also* International Organization for Migration (IOM), "Migration Governance Snapshot: Republic of Guatemala," (Aug. 2018), https://migrationdataportal.org/sites/default/files/2018-11/MGI%20Guatemala%20EN.pdf.

[6]  *See* Sofia Menchu, *Guatemala y México acuerdan frenar caravanas migratorias a EEUU: Giammattei,* Reuters, Jan. 15, 2020, https://lta.reuters.com/articulo/guatemala-inmigracion-idLTAKBN1ZE1TG-OUSLT (noting that the President of Guatemala recently said that

Guatemalan agency that assesses asylum applications, does not have an office with staff devoted to asylum full-time and does not meet regularly.  CONARE's recommendations to grant asylum must also be approved by the National Immigration Authority, which includes several ministries, the Director of Immigration, and the Vice President (personally, not a designee).[7]  Based on data provided to amicus by UNHCR, as of January 29, 2020, of the several hundred asylum claims filed in Guatemala over the last two years, only twenty-six have been resolved and the backlog is growing.[8]  Although UNHCR is working to strengthen the capacity of the Guatemalan asylum system, it cannot change the Guatemalan legal and institutional framework that is bottlenecking asylum claims.[9]

These demonstrated failures of the Guatemalan asylum system contrast starkly with the asylum system in Canada, with which the United States has signed a Safe Third Country Agreement.  First and foremost, the foundational pillars of Canada's asylum system are extremely robust, with hundreds of specially trained officers and an Immigration and Refugee Board (IRB) to make determinations and hear appeals.  The IRB has procedures in place to

---

Guatemalan authorities would be "extremely demanding" and would turn away anyone without proper documentation—including unaccompanied minors).

[7]  Migration Code, Decree No. 44-2016, at 12 (Oct. 18, 2016), https://www.acnur.org/fileadmin/Documentos/BDL/2017/10978.pdf (mandating that the roles assigned were nondelegable).

[8]  *See also* Plaintiffs' Appendix Pursuant to LCvR 7(n), at DHSFF1257, ECF No. 39, at 883 (stating "there is a 450 case backlog because there was an 8-month period where no cases were adjudicated while the agency changed over").

[9]  *See also id.*, at DHSFF0683-84, ECF No. 39, at 720-21 (discussing the new *Migration Code*, a law approved by the Guatemalan Congress and promulgated by its President, which revokes existing asylum legislation, leaving the risk that if a new legal framework is not immediately enacted and approved, all asylum claims filed after the new *Migration Code* comes into force would not be processed for lack of a valid asylum mechanism).

protect people with special vulnerabilities—*i.e.*, torture victims, LGBTI people or women at risk—by, among other things, ensuring they are identified early, designating them special representatives who will protect their interests and guide them through the process, and altering procedures to avoid re-traumatizing them.[10]  Moreover, Canada's federal and provincial governments also minimize the chance of fees being a hurdle for asylum seekers, by subsidizing some legal services and accommodations for asylum seekers and funding asylum seekers' access to healthcare.  Asylum seekers can also apply for work permits as soon as they have submitted their asylum applications and can gain access to public employment programs funded by regional governments.[11]  It is also far safer for asylum seekers in Canada than it is in Guatemala, with less violence and fewer homicides.[12]

Second, the U.S.-Canada agreement protects key rights of asylum seekers in ways the U.S.-Guatemala agreement does not.  For example, the U.S.-Canada agreement applies to a much narrower group of people than ACA does, limiting asylum seekers that the United States can transfer to Canada, namely those who arrive at ports of entry from Canada, and provides an

---

[10]  *See* "Guideline issued by the Chairperson pursuant to paragraph 159(1)(h) of the *Immigration and Refugee Protection Act*," Immigration and Refugee Board of Canada (Dec. 15, 2012), https://irb-cisr.gc.ca/en/legal-policy/policies/Pages/GuideDir08.aspx.

[11]  *See* Comisión Española de Ayuda al Refugiado, *An overview of the Canadian asylum system* (Apr. 2019), https://www.cear.es/wp-content/uploads/2019/04/CANADA-REPORT_-CEAR.pdf.

[12]  Data collected for 2017 shows Canada with an average of 1.8 homicide per 100,000 people, compared to Guatemala's 26.1 homicides.  "Intentional homicides (per 100,000 people) – Canada," The World Bank, https://data.worldbank.org/indicator/VC.IHR.PSRC.P5?locations=CA (last visited Mar. 5, 2020); *c.f.* "Intentional homicides (per 100,000 people) – Guatemala," The World Bank, https://data.worldbank.org/indicator/VC.IHR.PSRC.P5?locations=GT (last visited Mar. 5, 2020).

exception for asylum seekers with close family members in the United States.[13]  Moreover, the

U.S.-Canada agreement also includes a provision inviting the UNHCR to monitor its

implementation to ensure its consistency with international refugee law.[14]  The ACA with

Guatemala fails to adopt any such oversight or assistance.

> ## 2.    The ACA violates the non-*refoulement* principle mandated by international and U.S. law.

"Expedited removal" refers to the legal authority given to Customs and Border Patrol

(CBP) officers to order the deportation of some non-U.S. citizens without any of the due-process

protections granted to most other people—such as the right to an attorney and to a hearing before

a judge.[15]  By law, expedited removal may not be applied to certain individuals—including

refugees, asylees, or asylum seekers.  *See* 8 U.S.C. § 1225(b)(1)(A)(ii).  Asylum seekers must

instead be referred to an asylum officer for an interview to determine if they have a "credible

fear" of persecution, and if an individual has been previously deported, an asylum officer

determines if the person has a "reasonable fear" of persecution—a higher standard than "credible

fear."  8 C.F.R. § 1208.31(c).  If the asylum officer fails to find that the person has a credible or

reasonable fear of return, that person is ordered removed.  8 U.S.C. § 1225(b)(1)(B)(iii)(I).

---

[13]   "Canada-U.S. Safe Third Country Agreement," Government of Canada (June 23, 2016), https://www.canada.ca/en/immigration-refugees-citizenship/corporate/mandate/policies-operational-instructions-agreements/agreements/safe-third-country-agreement.html.

[14]   UNHCR UN Refugee Agency, *Monitoring Report: Canada-United States "Safe Third Country Agreement"* (June 2006), https://www.unhcr.org/en-us/protection/operations/455b2cca4/unhcr-monitoring-report-canada-united-states-safe-third-country-agreement.html.

[15]   *See* American Immigration Council, *Removal Without Recourse: The Growth of Summary Deportations from the United States*, Apr. 2014, https://www.americanimmigrationcouncil.org/research/removal-without-recoursegrowth-summary-deportations-united-states.

Before deportation, the individual may challenge the asylum officer's adverse finding by requesting a hearing before an immigration judge, who must review the case "to the maximum extent practicable within 24 hours, but in no case later than 7 days."  8 U.S.C. § 1225(b)(1)(B)(iii)(III).  The judge's review is limited solely to assessing whether the individual's fear is credible or reasonable.[16]

These procedural safeguards have been put into place to help avoid *refoulement*.  First introduced by the 1951 United Nations (UN) Convention Relating to the Status of Refugees (the Refugee Convention or the Convention), and eventually signed and ratified by the United States in 1968, the non-*refoulement* principle provides: "No Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership in a particular social group or political opinion."[17]

Refugees International's investigation revealed that, in violation of this principle, asylum seekers transferred from the United States to Guatemala under the ACA are indirectly *refouled*.[18] They are thrust into a Kafkaesque situation in which they are not provided with adequate time, information, or resources to apply for asylum in Guatemala.  They are given a take-it-or-leave-it

---

[16]  *See* American Immigration Council., *A Primer on Expedited Removal*, July 2019, https://www.americanimmigrationcouncil.org/research/primer-expedited-removal.

[17]  Convention Relating to the Status of Refugees, art. 33, July 28, 1951, 19 U.S.T. 6223 (1968), 189 U.N.T.S. 137. This Convention, which entered into force on April 23, 1954, has 146 state parties, among which is the United States, which acceded to the treaty on October 15, 1968.  The Convention entered into force with respect to the United States on November 1, 1968.

[18]  The ACA also leads to direct refoulement as described in some of the stories collected by Refugees International.  *See, e.g.*, "G.C.F." and "Y&E" Stories, *infra* § II.

offer with a 72-hour expiration date, and without any assistance, the asylum seekers are forced to

"choose" their fate.  By denying asylum seekers a meaningful opportunity to apply for asylum,

Guatemala forces many asylum seekers to leave.  Although portrayed as voluntary, the refugees'

decisions are anything but.  Thus, by transferring the asylum seekers to Guatemala the United

States is causing the refugees' *refoulement*.[19]

When asylum seekers transferred to Guatemala under the ACA arrive at the airport in

Guatemala City, Guatemalan immigration officials register them and tell them they can return to

their home countries or remain in Guatemala for 72 hours.[20]  The Guatemalan government

provides nothing else—not even food or medical attention—to ACA transferees, including

young children.  This is despite the fact that most returnees are exhausted and disoriented, having

been flown out of Texas to an unknown place in the middle of the night and having waited on the

tarmac for an hour or more before getting off the plane.  Many of the adults are still shackled at

the wrist, waist, and ankles.  The Guatemalan Human Rights Ombudsman,[21] an official

appointed to investigate individuals' complaints against misadministration by public authorities

---

[19]   *See generally*, U.N. High Commissioner for Refugees, "UNHCR Note on the Principle of
Non-Refoulement," REFWORLD (Nov. 1997),
https://www.refworld.org/docid/438c6d972.html.

[20]   *See also* Plaintiffs' Appendix Pursuant to LCvR 7(n), at DHSFF0682, ECF No. 39, at 719
("[T]he absence of mechanisms to register survivors of violence as displaced persons in
Guatemala, coupled with limited alternatives to find protection and relocation in other areas
of the country, leave survivors of violence perpetrated by organized criminal groups with few
options but to seek international protection elsewhere.").

[21]   Under the 1985 Guatemalan Constitution, the Office of the Human Rights Ombudsman is an
independent body appointed by the Congress to ensure compliance with human rights
obligations under the Constitution and international conventions and treaties ratified by
Guatemala.  For more information, *see ¿Quién es?*, PROCURADOR DE LOS DERECHOS
HUMANOS, https://www.pdh.org.gt/quien-es/ (last visited Mar. 3, 2020).

and the only monitor at the Guatemalan airport, told Refugees International that registration

(which lasts 2-3 minutes for each individual) does not include any reference to applying for

asylum in Guatemala.

ACA transferees are next bussed to Refugio de la Niñez, a privately run humanitarian

protection organization, and Casa del Migrante, a shelter run by the Catholic Church.  Both

organizations have broad mandates to serve migrant populations in Guatemala City and have had

to divert much of their limited resources to serving the almost eight hundred ACA transferees.[22]

They can provide only initial counseling and food and shelter to the transferees upon arrival.

At Refugio de la Niñez, Refugees International observed an orientation session for

sixteen Hondurans transferred to Guatemala pursuant to the ACA.  All but two of them were

parents with children.  All of them were under the false impression that they could apply for

asylum in the United States from Guatemala.  They each had little information about how to

apply for asylum, how long it would take, where they would stay, and how they would support

themselves during the process.  There is no government shelter or legal aid for those who decide

to apply for asylum in Guatemala and, as noted, private organizations shoulder the responsibility

for humanitarian and legal support.

Despite this, the ACA is rapidly expanding.  On one of the days Refugees International

was in Guatemala City—February 5—the United States transferred sixty-two people: twenty-two

women, thirty-one children and nine men.  Seven of the eighteen people Refugees International

---

[22]   Although the United States is failing to track the number of people who are being transferred
to Guatemala under the ACA, the Guatemalan Immigration Ministry (GIM) releases weekly
reports to journalists that provide that information.  *See* @camiloreports, TWITTER (Mar. 3,
2020, 7:40 PM), https://twitter.com/camiloreports/status/1235002188444946432.

spoke to at Casa del Migrante had children with them who were two-years-old or younger. According to weekly statistics Refugees International received from the Instituto de Guatemalteco de Migracion, seventy-five percent of transferees currently under the ACA are women and children.[23]

The director of the Refugio de la Niñez told Refugees International that especially since mid-January increasing numbers are vulnerable and in need of international protection that Guatemala cannot provide. The physical and mental health of the transferees is of paramount concern. Several parents Refugees International interviewed at Casa del Migrante reported that their children were suffering from the diarrhea, rashes, and colds that they contracted while in custody at the U.S. border. As such, most were eager to leave the shelter as quickly as possible. At Case del Migrante, Refugees International spoke to one mother who fled El Salvador with her two children because of the brutal neglect they had suffered at the hands of her partner and her own mother. As she told Refugees International this, her six-year-old daughter clung to her leg in dazed silence and was non-responsive to smiles and questions. One young man told Refugees International that he would return to Honduras and go into hiding rather than remain at the shelter, which brought back traumatic memories of being "caged" at the U.S. border.

Given the insufficiencies of Guatemala's asylum system, the "choice" of ACA transferees to leave Guatemala rather than apply for asylum there is not "voluntary" and leads to their *refoulement*. Both UNHCR and the Human Rights Ombudsman told Refugees International that the short, three-day period given to ACA transferees to make this choice is

---

[23] *See, e.g.,* @camiloreports, TWITTER (Feb. 19, 2020, 10:13 AM), https://twitter.com/camiloreports/status/1230148427725574144/photo/1; @ReynaldoLeanos, TWITTER (Feb. 25, 2020, 8:42 PM), https://twitter.com/ReynaldoLeanos/status/1232481043657084930/photo/1, [hereinafter, collectively, GIM Weekly Reports].

insufficient and coercive and leads to their *refoulement*.  Only one person out of the eighteen people subject to the ACA interviewed by Refugees International at Casa del Migrante was applying for asylum in Guatemala.  Several said that they had no one in Guatemala to stay with or help them, so they would return to El Salvador and Honduras despite their fear of persecution there.  Essentially, the Rule makes the ACA a form of indirect *refoulement* as it leads to the rapid return of asylum seekers to their home countries with a short stop in Guatemala, without any screening of their fear of persecution claims either at the U.S. border or in Guatemala (*i.e.*, deportation with a layover).

**B.    The designation by the Department of Homeland Security to subject individuals to the ACA is arbitrary, capricious, and contrary to immigration law.**

The interviews conducted by Refugees International indicate that the ACA with Guatemala is being implemented in a way that violates the applicable immigration law.  Under the expedited removal process, "[i]f an alien 'indicates either an intention to apply for asylum . . . or a fear of persecution,' the alien must be referred for an interview with a U.S. Citizenship and Immigration Services ('USCIS') asylum officer."  *Grace v. Whitaker*, 344 F. Supp. 3d 96, 107 (D.D.C. 2018) (second alteration in original) (quoting 8 U.S.C. § 1225(b)(1)(A)(ii)), *stay pending appeal denied*, No. 18-1853, 2019 WL 329572 (D.D.C. Jan. 25, 2019), *appeal filed*, No. 19-5013 (D.C. Jan. 30, 2019).  In conducting the interview, "the asylum officer is required to 'elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture'" and "must 'conduct the interview in a nonadversarial manner.'"  *Id.* (quoting 8 C.F.R. § 208.30(d)).

In *Grace*, this Court enjoined the U.S. government from deporting asylum seekers "without first providing credible fear determinations consistent with the immigration laws," and found that allowing the government to make credible fear determinations "without taking into

13

account the independent characteristics presented in each case . . . is arbitrary, capricious, and contrary to immigration law." *Id.* at 105, 133. Under the new Rule, the Immigration Officers will no longer be required to elicit the necessary information to determine if a credible fear of persecution or torture exists, and if the asylum-seeker "does not affirmatively state a fear of persecution or torture" as to all of the ACA countries, then he or she will not receive a credible fear interview and will be subject to removal. 84 Fed. Reg. at 64,002. Refugees International's interviews indicate that asylum seekers are not being provided with credible fear interviews in contravention of immigration law.

All of the individuals interviewed by Refugees International were detained for between seven and twenty days in the United States, well in excess of the normal 72-hour detainment period, by Customs and Border Patrol in El Paso, McAllen, or Donna, Texas before their transfer to Guatemala. All of the people interviewed by Refugees International described receiving inedible food, having limited access to showers, and being subjected to poor and degrading treatment while in custody. In denying a request for a blanket for a sick child, a U.S. immigration officer told a detained mother that "if he gave her a blanket, he would have to give them to everyone."

While detained, all of the interviewees were denied the opportunity to talk with an attorney and allowed only to make one or two brief non-private phone calls. Each of the interviewees expressed a fear of returning to El Salvador or Honduras, but were not given a credible fear interview or an opportunity to seek asylum in the United States. One woman showed Refugees International photographic evidence of brutal beatings and copies of a court order to support her claim of fear of return to El Salvador, evidence she said U.S. officials at the border refused to let her present. Instead, each person was given a phone interview during which

they were asked for basic biographical information, but little about their motive for migrating

and nothing about their fear of return to their home countries.  Two transferees told Refugees

International that interpretation during the interview was inadequate.

All of the transferees that Refugees International interviewed who had been held at

McAllen and Donna received only three documents—a Notice and Order of Expedited Removal

(Form I-860), a Notice to Alien Ordered Removed/Departure Verification (Form I-296), and a

US-Guatemala Asylum Cooperation Agreement Threshold Screening Assessment Notice.  The

threshold screening notice stated only that "you were interviewed by a DHS asylum officer" who

determined "you are subject to removal to Guatemala under the U.S.-Guatemala Asylum

Cooperative Agreement for consideration of your asylum or other protection claims."[24]  Without

access to a lawyer or written translation to explain this,[25] it is not surprising that all of the people

interviewed by Refugees International were under the impression that they could apply for

asylum in the United States from Guatemala.  Several refused to sign their notice and departure

verification form, hoping this would mean they would not be barred from the United States for a

period of five years as indicated on the form.  One man from Honduras, who fled the country

---

[24]  U.S. Citizenship & Immigration Services, US-Guatemala Asylum Cooperation Agreement (ACA) Threshold Screening: Guidance for Asylum Officers and Asylum Office Staff, (Nov. 19, 2019), *link embedded in* Ted Hesson, Mica Rosenberg & Kristina Cooke, *Trump administration prepares to send asylum seekers to Guatemala,* Reuters (Nov. 20, 2019), https://www.reuters.com/article/us-usa-immigration-guatemala-asylum/trump-administration-prepares-to-send-asylum-seekers-to-guatemala-idUSKBN1XU2SI ("AO must create a summary of material facts as stated by the individual and at the end of the interview the AO must review the summary with the alien and give him or her an opportunity to correct errors.").

[25]  Although the asylum division is instructed to provide interpreters for asylum seekers, they are often not provided any translation of the English instructions and documentation.  *See id.* ("Asylum Division will provide interpreter as needed.").

with his wife and infant daughter after his father was murdered and he began receiving death threats, told Refugees International that a Customs and Border Patrol officer signed the form for him after he refused.  When given this form, several transferees said that they asked U.S. officials where they were being sent and the officials said they did not know, leading several transferees to be unaware that they were being flown to Guatemala until they arrived there.

Under the Guidance provided to interviewing officers, the asylum seeker is supposed to receive a Tear Sheet explaining that "[a]liens may express a fear of removal to Guatemala or a fear of persecution or torture in Guatemala."[26]  Despite this, none of the people interviewed by Refugees International indicated that they were advised that they could express fear of removal to Guatemala during their interview.  Indeed, only one person Refugees International spoke to, a pregnant Salvadoran woman, was given a second phone interview after she told the asylum officer that she did not want to be sent to Guatemala because she feared she would be detained there, since she had been detained in Mexico on her way to the U.S. border; but, she said, the second interview was almost identical to the first and she was found subject to removal under the ACA (despite telling U.S. officials that she was pregnant).  This woman, like several others to whom Refugees International spoke, explained that she felt she had no other option but to return to her home country and go into hiding, despite being afraid of returning to the country where her family members were murdered, raped, or threatened.  She, like several others to whom Refugees International spoke, was separated from siblings at the U.S. border and has immediate relatives (spouses, parents, or children) living in the United States.

One Honduran transferee told Refugees International that a U.S. border official told him that he would be released from detention in the United States sooner if he accepted transfer to

---

[26] *Id.* at 7.

Guatemala under the ACA rather than deportation to Honduras.  Refugees International spoke to several transferees (including two whose stories are recounted more fully below) who have immediate relatives living in the United States and who are pursuing asylum cases based upon the ***same fears*** as the transferees to Guatemala, which highlights the arbitrary manner in which this Rule is being implemented.

## II.    THE STORIES OF OTHER ASYLUM SEEKERS ILLUSTRATE THAT THE PLAINTIFFS' CIRCUMSTANCES ARE NOT UNIQUE.

In Refugees International's experience, many individuals who are transferred to Guatemala by the United States are scared, resourceless, and without viable legal recourse. Some of the stories collected by Refugees International are relayed below.

***"G.C.F."***[27]***—Honduran Police Officer Fleeing Gang Threats Sent Back to Northern Triangle Despite Immediate Family in the United States:*** Refugees International interviewed G.C.F., a former policeman from Honduras.  G.C.F. told Refugees International that officials at the U.S. border did not return to him documents he brought proving he was a witness in a case against gang members who would kill him if he returned home.  G.C.F.'s wife and child, who fled to the United States when G.C.F. began participating in the trial in Honduras, were already applying for asylum in the United States based upon the threats directed against him.  G.C.F. told Refugees International that he complained to officials at the border about poor interpretation during his interview with an asylum officer.  G.C.F. said an officer told him he had fifteen days to talk with another official about his case, but then he was rapidly transferred to Guatemala. Despite his family already being in the United States and his role in combatting gangs in

---

[27]   Pseudonyms are used to protect the confidentiality of individuals.  Documentation of the facts of the case examples are on file with Refugees International.

Honduras, G.C.F. was not considered by DHS for a "public interest exception" to the ACA.[28]

He fears remaining in Guatemala, where he is sure that gang members can find him, and he

remains uncertain as to how or where he can find safety.

**"F.G.O."**—*Young Honduran Man Fleeing Gang Violence Sent Back to Northern Triangle without Clear Explanation of Rights and Recourse*: Refugees International

interviewed a nineteen-year-old Honduran named F.G.O. whose mother abandoned the family

when he was four and whose father fled to the United States, leaving him, his sister and his

brother in the care of their grandmother, who is now ill and infirm.  A gang leader kidnapped his

sister and kept her as "his woman" until she managed to escape and flee to the United States.  In

response, the gang tried to recruit his brother and mutilated his legs with a machete.  Next, the

gang members came after F.G.O., blaming him for the sister's escape and robbing him.  F.G.O.

sought help from his employer to no avail; the gang leader found him and severely beat him,

prompting him to flee to the United States.  F.G.O. told Refugees International that he felt

panicked and spent much of his time crying at the crowded shelter, where he could not sleep or

eat knowing that he had only three days to figure out what to do—fearing persecution in

Honduras, knowing no one in Guatemala, and having his entire family in the United States

seeking asylum for the same reasons that he needed to.  He was still recovering from a rash he

developed while detained at the U.S. border, which a U.S. official attributed to his "having an

allergy to washing himself."  F.G.O. was desperate for help from a psychologist and a lawyer,

---

[28] Under 8 U.S.C. § 1158(a)(2)(A), an exemption to the ACA is if the Attorney General finds it in the public interest for the alien to receive asylum in the United States.  The U.S. government has prioritized working with the Honduran government to combat gangs.  *See* "Joint Statement Between the U.S. Government and the Government of Honduras" Dept. of Homeland Security (Sept. 13, 2019) https://www.dhs.gov/news/2019/09/13/joint-statement-between-us-government-and-government-honduras.

but neither were available to provide him services beyond initial consultations in Guatemala.  He could not understand why the lawyer his father found for him in the United States could not help him apply for asylum there.

**"Y and E"—*Honduran Woman and Her Two-Year-Old Daughter Sent to Guatemala Feels Returning and Hiding Is Only Option Left*:** Y fled Honduras with her two-year-old daughter after her husband was murdered.  She showed Refugees International his death certificate.  When Y asked for asylum at the U.S. border, an official told her that the United States "wasn't giving asylum anymore."  Instead, she was interviewed and told she would be sent to Guatemala.  When Refugees International spoke with her, Y was at a loss for how she could live if she applied for asylum in Guatemala.  She had no family or friends in Guatemala and felt unsafe since receiving a threatening video message from the same people who murdered her husband.  Even if she found a job to support herself while waiting in Guatemala, she would not be able to work because she would have to look after E.  Y told Refugees International that she did not know what to do, but planned to take a bus to Honduras and go into hiding.

These stories demonstrate the deficiencies of the asylum system as fashioned by the Rule. The individuals described above all expressed fear of persecution and may have qualified for asylum in the United States, but were forced to forgo their internationally and federally protected right to seek asylum in the United States because of the unlawful and unconstitutional execution of the ACA with Guatemala and the implementation of the Rule.  The number of people impacted like those described above is substantial and on the rise.[29]  The current Administration has indicated an intention to continue expanding its use of ACAs with other countries in similar situations to Guatemala.

---

[29]   *See* GIM Weekly Reports, *supra* note 22.

## CONCLUSION

For the foregoing reasons, this Court should declare the Rule and USCIS guidance as

unlawful and enjoin Defendants from implementing or enforcing the Rule against refugees in the

United States.

Dated: March 6, 2020                              Respectfully submitted,


                                                  By: /s/ *David E. Carney*
                                                  David E. Carney (D.C. Bar No. 472219)
                                                  1440 New York Avenue, NW
                                                  Washington, D.C. 20005
                                                  Phone: (202) 371-7246
                                                  David.Carney@probonolaw.com

                                                  Lea Haber Kuck
                                                  (*pro hac vice pending*)
                                                  One Manhattan West
                                                  New York, New York 10001
                                                  Phone: (212) 735-2978
                                                  Lea.Kuck@probonolaw.com

**CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to court order, Local Rule 7(o)(4) and Federal Rules of

Appellate Procedure Rule 32, that the foregoing Brief of Amicus Curiae is proportionally spaced,

has typeface of 12 points, and is 20 pages long and 5,979 words long.  This page and word count

does not include the Corporate Disclosure Statement, the Table of Contents, the Table of

Authorities, the Signature Block, this Certificate of Compliance, or any Certificate of Service.

_/s/   David E. Carney_
David E. Carney

Dated: March 6, 2020