**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| U.T., *et al.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | Case No. 1:20-cv-00116 (EGS) |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM BARR, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**BRIEF OF *AMICUS CURIAE* COUNCIL 119 IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION**

Muhammad U. Faridi*
Jordan M. Engelhardt*
Elizabeth Riordan Hurley*
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Tel: (212) 336-2000
Fax: (212) 336-2222

*Pro hac vice* application pending

Joy Odom (D.C. Bar No. 1015241)
SELENDY & GAY PLLC
1290 Avenue of the Americas
New York, New York 10104
Tel: (212) 390-9000
Fax:(212) 390-9399

*Attorneys for Amicus Curiae
Council National Citizenship and
Immigration Services Council 119*

# TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE* .................................................................................1

SUMMARY OF ARGUMENT ......................................................................................2

ARGUMENT ...............................................................................................................4

I.      THE ACA RULE BETRAYS AMERICA'S LONGSTANDING TRADITION
        OF PROVIDING SAFE HAVEN TO PEOPLE FLEEING PERSECUTION ...................4

        A.      America Has Historically Been a Global Leader in Providing Protection to
                the Persecuted ....................................................................................4

        B.      The World is Experiencing Another Wave of Displacement .................................9

        C.      The ACA Rule is the Most Extreme Measure in the Assault on the American
                Commitment of Providing Safe Haven to the Persecuted .....................................10

II.     THE ACA RULE VIOLATES AMERICAN ASYLUM LAW AND INTERNATIONAL
        TREATY OBLIGATIONS ................................................................................12

        A.      The ACA Rule Sends Asylum Seekers to Dangerous Countries in Violation
                of Statutory Requirements and Treaty Obligations ..............................................12

        B.      The Procedures Implementing the ACA Rule Do Not Safeguard Against
                Expulsion of Refugees to Where They Will Be Persecuted ....................................17

        C.      The ACA Rule Is Not Based on Neutral or Rational Principles, But Is Arbitrary
                and Capricious ....................................................................................21

III.    THE ACA RULE COMPELS ASYLUM OFFICERS TO VIOLATE THEIR OATH
        TO UPHOLD OUR NATION'S ASYLUM LAWS ...................................................24

CONCLUSION.............................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Baptist Churches v. Thornburgh*, 760 F. Supp. 796
    (N.D. Cal. 1991)....................................................................................................8

*Baltimore Gas & Elec. Co.* v. *Natural Res. Defense Council, Inc.*,
    462 U.S. 87 (1983)..........................................................................................21, 23

*Colemenar v. I.N.S.*,
    210 F.3d 967 (9th Cir. 2000) ............................................................................18

*Dep't of Commerce v. N.Y.*,
    588 U.S. ___, 139 S. Ct. 2551 (2019) ..............................................................21

*F.C.C. v. Fox Tel. Stations, Inc.*,
    556 U.S. 502 (2009)..........................................................................................21

*I.N.S. v. Aguirre-Aguirre*,
    526 U.S. 415 (1999) ..........................................................................................12

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ......................................................................................21, 24

**Statutes**

5 U.S.C § 706(2)(A) ....................................................................................................21, 24

8 U.S.C. § 1158(a)(1)-(2) ..................................................................................................12

8 U.S.C. § 1158(a)(2)(A) ......................................................................................13, 22, 24

8 U.S.C. § 1225(b)(1) .......................................................................................................25

8 U.S.C. § 1225(b)(1)(B) ....................................................................................................9

8 U.S.C. § 1225(b)(1)(B)(iii) ..............................................................................................8

8 U.S.C. §§ 1229a(b)(4)(A)-(B) ........................................................................................18

8 U.S.C. § 1231(b)(3) .....................................................................................................9, 12

8 U.S.C. § 1231(b)(3)(A) ....................................................................................................8

8 U.S.C. § 1362...................................................................................................................18

Displaced Persons Act of 1948, ch. 647, Pub. L. No. 80-774, 62 Stat. 1009 ................................6

Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 ................................................................8

Refugee-Escapee Act of 1957, Pub. L. No. 85-316, 71 Stat. 639 ................................................6

Refugee Relief Act of 1953, Pub. L. No. 83-203, 67 Stat. 400 ....................................................6

**Regulations**

8 C.F.R. § 208.1(b) ......................................................................................................................8

8 C.F.R. § 208.13(b)(1) ..............................................................................................................20

8 C.F.R. § 208.30 ....................................................................................................................8, 19

8 C.F.R. § 208.31 ....................................................................................................................9, 19

8 C.F.R. § 235.3 ............................................................................................................................9

8 C.F.R. § 235.3(b)(4)(i) ............................................................................................................19

8 C.F.R. § 238.1 ............................................................................................................................9

8 C.F.R. § 241.8 ............................................................................................................................9

8 C.F.R. § 1240.3 ........................................................................................................................18

84 Fed. Reg. 33,829-45 (Jul. 16, 2019) (codified at 28 C.F.R. Pt. 208)....................................11

84 Fed. Reg. 63,994-64,011 .................................................................................................. *passim*

**Treaties**

U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading
    Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100-20 ..............................7, 12

U.N. Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T.
    6259, 189 U.N.T.S. 137. ...............................................................................................7, 13, 20

U.N. Protocol Relating to the Status of Refugees, Jan. 31, 1967, 606 U.N.T.S. 267 ..............7, 12

**Other Authorities**

Adolf Eduard Zucker, *The Forty-Eighters: Political Refugees of the German
    Revolution of 1848* (1967) ..............................................................................................5

American Jewish Joint Distribution Committee, Minutes of the Meeting of the
    Executive Committee (Jun. 5, 1939)................................................................................5

Bryan L. McDonald, *Food Power: The Rise and Fall of the Postwar American Food System* (2017) ...........................................................................6

Carl J. Bon Tempo, *Americans at the Gate: The United States and Refugees During the Cold War* (2008).............................................................6

David C. Adams, *Guatemala's 'embryonic' asylum system lacks capacity to serve as safe U.S. Partner, experts say*, Univision.com, Aug. 2, 2019..........................................16

David W. Haines, *Safe Haven? A History of Refugees in America* (2010) .....................................9

Deborah Amos, *2018 Was Year of Drastic Cuts to U.S. Refugee Admissions*, NPR.org, Dec. 27, 2018. .........................................................................11

Dep't of Homeland Sec., Press Release, Migrant Protection Protocols (Jan. 24, 2019) .....................................................................................11

Emma Lazarus, *The New Colossus*, Nov. 2, 1883 ..................................................2, 10

Examining the Syrian Humanitarian Crisis From the Ground (Part II) Before the Subcomm. on the Middle East and North Africa of the House Comm. on Foreign Affairs, 114th Cong. 114-115 (2017) ..........................................10

Exec. Order, "Executive Order Protecting the Nation From Foreign Terrorist Entry Into the United States" (Mar. 6, 2017) ............................................10

Gil Loescher & John A. Scanlan, *Calculated Kindness: Refugees and America's Half-Open Door 1945-Present* 4-6 (1986) ...................................................6

Gregg A. Beyer, *Reforming Affirmative Asylum Processing in the United States: Challenges and Opportunities*, 9 Am. U. Int'l L. Rev. & Pol'y 43 (1994) ..............................8

Homeland Sec. Advisory Counsel, *CBP Families and Children Care Panel Final Report*, Nov. 14, 2019.......................................................15, 23, 24

Human Rights First, *Is Guatemala Safe for Refugees and Asylum Seekers?*, Jul. 1, 2019................................................................................15, 16

Human Rights First, *Report: Orders From Above: Massive Human Rights Abuses Under Trump Administration Return to Mexico Policy*, Oct. 2019........................................11

Jeremy Dupertuis Bangs, *Strangers and Pilgrims, Travellers and Sojourners: Leiden and the Foundations of Plymouth Plantation* (2009)......................................4

Joan Fitzpatrick, *The International Dimension of U.S. Refugee Law*, 15 Berkeley J. Int'l L. 1 (1997)......................................................................7

Jonathan Blitzer, *How the U.S. Asylum System is Keeping Migrants at Risk in Mexico*, The New Yorker, Oct. 1, 2019..............................................11

Kevin Sieff, *The U.S. is Putting Asylum Seekers on Planes to Guatemala — Often Without Telling Them Where They're Going*, Wash. Post, Jan. 14, 2020 ..............................16

Kids in Need of Defense, *Neither Security Nor Justice: Sexual and Gender-Based Violence and Gang Violence in El Salvador, Honduras, and Guatemala*, May 2017...................................................................................................................................14

Kids in Need of Defense, *Asylum Cooperative Agreements Fact Sheet*, Nov. 2019...................23

International Crisis Group, *Mexico's Southern Border: Security, Violence and Migration in the Trump Era*, May 9, 2018 ...............................................................22

Maggie Black, *The Children and the Nations: The Story of Unicef* (1986) ...................................6

María-Teresa Gil-Bazo, *The Safe Third Country Concept in International Agreements on Refugee Protection* ...........................................................................13

Michael D. Shear and Zolan Kanno-Youngs, *U.S. Cuts Refugee Program Again, Placing Cap at 18,000 People*, N.Y. Times, Sep. 27, 2019 ...................................................11

Patrick J. McDonnell and Molly O'Toole, *Mexico Balks at U.S. Plan to Send Mexican Asylum Seekers to Guatemala*, L.A. Times, Jan. 7, 2020 ........................................17

Philip A. Holman, *Refugee Resettlement in the United States, in Refugees in America in the 1990s: A Reference Handbook* 3 (David W. Haines ed., 1996)...............4, 5, 6

Richard Breitman & Alan M. Kraut, *American Refugee Policy and European Jewry, 1933-1945* (1988) ............................................................................................5

Sonia Perez, *President-elect says Guatemala can't do migrant deal with US*, Associated Press, Aug. 14, 2019...................................................................................15, 22

Steven Greenhouse, *U.S. Moves to Halt Abuses in Political Asylum Program*, N.Y. Times, Dec. 3, 1994 ...................................................................................................8

Timothy J. Meagher, *The Columbia Guide to Irish American History* 77 (2005)........................5

Tom K. Wong, *The Politics of Immigration: Partisanship, Demographic Change, and American National Identity* 52-53 (2017)............................................................................8

UNHCR, *Eligibility Guidelines for Assessing the International Protection Needs of Asylum Seekers from Guatemala*, Jan. 2018.......................................................................14

UNHCR, *Global Trends: Forced Displacement in 2018* (Jun. 20, 2019) ..........................9, 10, 13

UNHCR, *Women on the Run: First-Hand Accounts of Refugees Fleeing El Salvador, Guatemala, Honduras, and Mexico*, Oct. 2015.............................................. *passim*

U.S. Dep't of State, El Salvador 2018 Human Rights Report ..........................................14, 22, 23

U.S. Dep't of State, Guatemala 2018 Human Rights Report.................................................. *passim*

U.S. Dep't of State, Honduras 2018 Human Rights Report ................................................14, 22, 23

U.S. Dep't of State Overseas Sec. Advisory Council, Guatemala 2019 Crime & Safety Report, Feb. 28, 2019 ..................................................................................15, 22, 23

USCIS, *Refugee Timeline*, https://www.uscis.gov/history-and-genealogy/our-history/refugee-timeline ....................................................................................6, 8

USCIS, Guidance for Implenting Section 235(b)(2)(c) of the Immigration and Nationality Act and the Migrant Protection Protocols, Jan. 28, 2019 ...................................17

USCIS PM-602-0162: Guidance for Processing Reasonable Fear, Credibly Fear, Asylum, and Refugee Claims in Accordance with *Matter of A-B-*, July 11, 2018.........................................................................................................................18

William A. Spray, et al., *Fleeing the Famine, North America and Irish Refugees* (Margaret M. Mulrooney ed., 2003) ......................................................................5

William Bradford, *Of Plymouth Plantation* (Harold Paget ed. 2006) .............................................4

## INTEREST OF *AMICUS CURIAE*[1]

The National Citizenship and Immigration Services Council 119 is a labor organization that represents over 14,000 bargaining unit employees of U.S. Citizenship and Immigration Services ("USCIS"), a component of the Department of Homeland Security ("DHS").  Council 119's constituents include approximately 700 asylum and refugee officers who are tasked with implementing the joint interim final rule promulgated by DHS and the Department of Justice (the "DOJ") in November 2019, entitled "Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act," 84 Fed. Reg. 63,994-64,011 (the "ACA Rule"), which is the subject of this litigation.

In July–September 2019, DHS entered into bilateral Asylum Cooperative Agreements ("ACAs") with Guatemala, Honduras, and El Salvador, purportedly "in an effort to share the distribution of hundreds of thousands of asylum claims" being made at our southern border.  84 Fed. Reg. at 63,994.  These agreements, in conjunction with the ACA Rule, effectively bar most migrants seeking to enter the United States through the southern border from obtaining asylum relief in the United States and provide for their removal to one of the ACA countries.  DOJ and DHS promulgated the ACA Rule to provide procedures for removals of asylum seekers under the existing ACAs and any other ACAs that may be entered with other countries in the future.  The Trump Administration has begun permanently removing non-Guatemalans seeking to enter the United States through the southern border to Guatemala, and removals to Honduras and El Salvador are imminent.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(e), *amicus curiae* certifies that this brief was not written in whole or in part by counsel for any party, and no person or entity other than *amicus curiae* and its counsel has made a monetary contribution to the preparation and submission of this brief.  The parties have consented to the filing of this *amicus* brief.  *See* Fed. R. App. 29(a)(2).

*Amicus curiae* has a special interest in this case for at least two reasons.  First, as administrators of our country's asylum laws, Council 119's members have first-hand experience as to whether the ACA Rule is consistent with those laws and international treaty obligations governing the treatment of refugees.  Second, Council 119's members are the ones forced to carry out the ACA Rule, personally rendering many asylum seekers entering the country through our southern border ineligible to apply for asylum relief and processing them instead for removal to Guatemala (or another ACA country) without ever considering the merits of their underlying claims.  In this way, the ACA Rule compels Council 119's members to follow departmental directives that conflict with their oath to uphold the laws of the United States.

This brief relies solely upon publicly available information, including that in Plaintiffs' Appendix, and does not rely on any information that is confidential, law enforcement-sensitive, or classified.  It represents only the views of Council 119 on behalf of the bargaining unit, and it does not represent the views of USCIS or USCIS employees in their official capacities.

## SUMMARY OF ARGUMENT

The provision of safe haven to persecuted people is etched into our nation's identity. That commitment is perhaps best reflected in the sonnet enshrined at the pedestal of the colossal sculpture sitting in New York Harbor that has welcomed many generations of Americans: "*Give me your tired, your poor, / Your huddled masses yearning to breathe free, / The wretched refuse of your teeming shore. / Send these, the homeless, tempest-tost to me, / I lift my lamp beside the golden door!*"  Four hundred years ago with the arrival of the Pilgrims—America's first refugees—the promise of safety and an opportunity to build a permanent life without persecution remains a part of our nation's moral fabric.  This promise has been reinforced by our nation's laws, which, over the course of several decades, have established a standardized and agile system for identifying, vetting, and resettling refugees.  That system endured for decades across multiple

administrations, ensuring that refugees would not be returned to territories where they would be persecuted or tortured.

But the Trump Administration has turned the asylum system on its head.  The most extreme in a recent series of draconian changes to the American asylum process, the ACA Rule dismantles our carefully crafted system of vetting asylum claims, and with it, America's position as a global leader in refugee assistance.  Under the ACA Rule, asylum officers have no choice but to render the overwhelming majority of asylum seekers referred for ACA screening eligible for removal to the Northern Triangle countries of Guatemala, Honduras, or El Salvador, so long as the removal country is not the country of their origin.  That is so despite the irrefutable fact— even acknowledged by our own State Department—that asylum seekers fleeing persecution in their home country will face similar if not more significant dangers in the country where they will be removed.  Utterly indifferent to the safety of asylum seekers, this Kafkaesque process stands in flagrant violation of our domestic law and international treaty obligations.

Under our asylum law and treaty obligations, our nation can require an asylum seeker to pursue her asylum claim in a third country, but only if that country is a "safe third country" where the asylum seeker's safety and freedom will not be threatened on account of a protected status and where she will have access to full and fair asylum procedures.  Guatemala, El Salvador, and Honduras are not "safe third countries" by any rational measure.  These countries have a well-documented record of depriving vulnerable populations of safety and basic rights and of lacking meaningful systems for fairly adjudicating asylum claims.  The ACA Rule blatantly ignores these realities.

Council 119's members are steadfast in their commitment to serving our country by continuing its proud tradition as a refuge for the persecuted while ensuring the safety and

security of American citizens.  The ACA Rule betrays this tradition and forces Council 119's

members to take actions that violate their oath to uphold our nation's laws.  Accordingly, for the

reasons set forth herein and in the Plaintiffs' submission, *amicus curiae* urge the Court to grant

Plaintiffs' motion for summary judgment and permanent injunction.

## ARGUMENT

### I.    THE ACA RULE BETRAYS AMERICA'S LONGSTANDING TRADITION OF PROVIDING SAFE HAVEN TO PEOPLE FLEEING PERSECUTION

#### A.    America Has Historically Been a Global Leader in Providing Protection to the Persecuted

The story of refugees in America is older than that of America itself, with the country's

roots sprouting from the footsteps of Pilgrims onto a Massachusetts shore in November 1620.[2]

Fleeing religious persecution in their native England and exiled to Holland, the Pilgrims

journeyed across the Atlantic to make their permanent home in what would become the United

States.[3]  Their arrival etched into the nation's identity the promise that it would serve as a safe

haven for the persecuted.

The mid-19th century brought millions more refugees to America's doorstep.[4]  Between

1847 and 1851, an estimated two million Irish fled starvation and disease wrought by the Great

Famine, with 840,000 passing through the port of New York and many more arriving by way of

---

[2] *See* William Bradford, *Of Plymouth Plantation* (Harold Paget ed. 2006).

[3] Jeremy Dupertuis Bangs, Strangers and Pilgrims, Travellers and Sojourners: Leiden and the Foundations of Plymouth Plantation, vii, 7, 605, 614, 630 (2009).

[4] While U.S. policy during the 19th century did not draw a distinction between immigrants and refugees, historians have characterized groups whose emigration during this period was motivated by persecution, oppression, or natural disaster as refugees.  *See* Philip A. Holman, *Refugee Resettlement in the United States, in Refugees in America in the 1990s: A Reference Handbook*  3, 5 (David W. Haines ed., 1996).

Canada.[5]  During the same period, German political refugees fleeing reactionary reprisals in the wake of the 1848 Revolution came to America seeking freedom of thought and expression.[6]

Our nation's treatment of refugees, however, is not unblemished, as demonstrated by American policy toward Jewish refugees during World War II.[7]  Although the United States accepted approximately 250,000 refugees fleeing Nazi persecution prior to the country's entry into World War II, it refused to accept more as Nazi Germany increased its atrocities.[8]  American indifference to refugees fleeing German aggression is perhaps best reflected in the United States' denial of entry in 1939 to the *St. Louis*, an ocean liner carrying 907 German-Jewish refugees stranded off the coast of Miami.[9]  The ship returned to Europe where many of its occupants met their fate—254 would die in the Holocaust.[10]

In many ways, our nation's refugee policy since World War II has sought to rectify our wartime humanitarian failures.  Immediately after the war, the United States played a leading role in the formation and funding of international aid organizations such as the United Nations International Children's Emergency Fund and the World Food Programme, both of which

---

[5] Timothy J. Meagher, *The Columbia Guide to Irish American History* 77 (2005).  *See generally* William A. Spray, et al., *Fleeing the Famine, North America and Irish Refugees*, 1845-1851 (Margaret M. Mulrooney ed., 2003).  Many historians refer to these Irish migrants as refugees because their plight had roots in British colonial repression and conditions of serfdom.  *See*, *e.g.*, Meagher, at 66-71 (discussing various historians' assignment of culpability for the famine's devastation to British colonial rule).

[6] *See generally* Adolf Eduard Zucker, The Forty-Eighters: Political Refugees of the German Revolution of 1848 (1967).

[7] Richard Breitman & Alan M. Kraut, American Refugee Policy and European Jewry, 1933-1945, 1-10 (1988).

[8] Holman, *supra* note 4, at 5 (citing Congressional Research Service 1991:556).

[9] The American Jewish Joint Distribution Committee, Minutes of the Meeting of the Executive Committee (June 5, 1939), *available at* https://archives.jdc.org/wp-content/uploads/2018/06/stlouis_minutesjune-5-1939.pdf.

[10] *Id.*

provide support for refugees and displaced persons.[11]  In response to reports that Jewish

survivors of the Holocaust were kept in poor conditions in Allied-occupied Germany, President

Truman directed the issuance of 40,000 visas to resettle the survivors in the United States.[12]

Congress also took action by enacting the Displaced Persons Act of 1948, which allowed for the

admission of 415,000 displaced persons by the end of 1952.[13]

American compassion toward refugees following World War II was not limited to

Holocaust survivors.  In 1953, Congress enacted the Refugee Relief Act, which, along with its

amendments, authorized the admission of 214,000 refugees, including escapees from

Communist-dominated countries.[14]  The Refugee-Escapee Act that followed in 1957 allowed for

the resettlement of "refugee-escapees," persons fleeing persecution in Communist or Middle

Eastern countries.[15]  In the next three decades, the United States welcomed refugees escaping

violence, conflict, persecution, or natural disaster, at times in waves of hundreds of thousands,

from the Azores,[16] Cuba, Southeast Asia, Eastern Europe, the Soviet Union, and Afghanistan.[17]

The United States also began to undertake international treaty obligations related to

resettlement of refugees who set foot on American soil.  In 1968, the United States ratified the

---

[11] *See* Maggie Black, The Children and the Nations: The Story of Unicef, 25-35 (1986); Bryan L. McDonald, *Food Power: The Rise and Fall of the Postwar American Food System* 143 (2017).

[12] *See* Gil Loescher & John A. Scanlan, *Calculated Kindness: Refugees and America's Half-Open Door 1945-Present* 4-6 (1986).

[13] Displaced Persons Act of 1948, ch. 647, Pub. L. No. 80-774, 62 Stat. 1009; Holman, *supra* note 4, at 5.

[14] Refugee Relief Act of 1953, Pub. L. No. 83-203, 67 Stat. 400; Holman, *supra* note 4, at 5.

[15] Refugee-Escapee Act of 1957, Pub. L. No. 85-316, 71 Stat. 639; Holman, *supra* note 4, at 6.

[16] Carl J. Bon Tempo, *Americans at the Gate: The United States and Refugees During the Cold War* 107-15 (2008).

[17] *See* USCIS, *Refugee Timeline*, https://www.uscis.gov/history-and-genealogy /our-history/refugee-timeline.

1967 Protocol Relating to the Status of Refugees, a treaty drafted by the U.N. High

Commissioner for Refugees ("UNHCR").[18]   Through the 1967 Protocol, the United States

became bound by the substantive provisions of an earlier treaty, the 1951 Convention Related to

the Status of Refugees ("1951 Convention"),[19] agreeing that it would not: (i) discriminate against

refugees on the basis of race, religion, or nationality; (ii) penalize refugees for their illegal entry

or stay in the country; or (iii) engage in "refoulement"—to "expel or return ('refouler') a refugee

in any manner whatsoever to the frontiers of territories where his life or freedom would be

threatened on account of race, religion, nationality, membership of a particular social group or

political opinion."[20]   The United States reaffirmed its commitment to non-refoulement with its

ratification in 1994 of the U.N. Convention Against Torture and Other Cruel, Inhuman, or

Degrading Treatment or Punishment (the "CAT").[21]   Article 3(1) of the CAT provides:  "No

State Party shall expel, return ('refouler') or extradite a person to another State where there are

substantial grounds for believing that he would be in danger of being subjected to torture."[22]

Embracing its role as a global leader in refugee assistance, the United States has

effectuated these international commitments by developing a sophisticated system for vetting

claims for asylum.  Beginning in 1972, the Immigration and Naturalization Service (the "INS")

used existing procedures, such as parole, stays of deportation, and adjustment of status, to allow

---

[18] U.N. Protocol Relating to the Status of Refugees, Jan. 31, 1967, 606 U.N.T.S. 267.

[19] Joan Fitzpatrick, *The International Dimension of U.S. Refugee Law*, 15 Berkeley J. Int'l L. 1, 1 n.1 (1997).

[20] *Id*. at 2.

[21] *See* U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, at 20 (1988).

[22] *Id.*

foreign nationals who feared persecution in their homeland to remain in the country.[23]   The

Refugee Act of 1980 created the first statutory basis for asylum in the United States[24] and

codified the 1951 Convention's principle of non-refoulement.[25]   Then, in 1990, the INS

established an Asylum Corps, comprised of professional asylum officers trained in international

law and having access to information on international human rights.[26]  This specialized training

allows asylum officers to more accurately and efficiently assess asylum claims.  Recognizing the

value of this approach, Congress authorized funding to double the number of asylum officers in

1994.[27]  The asylum program was further modified in 1995 and 1996 to allow asylum officers to

process expedited removal of persons who cannot demonstrate a credible fear of persecution.

*See* 8 U.S.C. § 1225(b)(1)(B)(iii).

Since the creation of USCIS in 2003, the responsibility for maintaining an asylum system

in accordance with international and domestic law has rested with USCIS's Asylum Division,

which reviews claims of three categories of asylum-seekers: (1) those not in removal

proceedings who affirmatively apply for asylum, referred to as the "affirmative" asylum process;

(2) those subject to expedited removal who indicate an intention to apply for asylum or a fear of

return to their home country; and (3) those who have already been ordered removed but express a

---

[23] *See* USCIS, *Refugee Timeline*, https://www.uscis.gov/history-and-genealogy/our-history/refugee-timeline.

[24] The Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102; Tom K. Wong, *The Politics of Immigration: Partisanship, Demographic Change, and American National Identity* 52-53 (2017).

[25] *Compare* U.N. Convention Relating to the Status of Refugees art. 33(1), 189 U.N.T.S. 137, *with* 8 U.S.C. § 1231(b)(3)(A).

[26] Gregg A. Beyer, *Reforming Affirmative Asylum Processing in the United States: Challenges and Opportunities*, 9 Am. U. Int'l L. Rev. & Pol'y 43 (1994); *see also* 8 C.F.R. § 208.1(b); *Am. Baptist Churches v. Thornburgh*, 760 F. Supp. 796 (N.D. Cal. 1991).

[27] Steven Greenhouse, *U.S. Moves to Halt Abuses in Political Asylum Program*, N.Y. Times, Dec. 3, 1994, p. 8.

fear of return to their home country.  In the first instance, the Division is tasked with adjudicating "affirmative" asylum applications.  In the second instance, the Division determines whether the individual has a "credible fear" of persecution or torture.  *See* 8 U.S.C. § 1225(b)(1)(B); *see also* 8 C.F.R. §§ 208.30, 235.3.  If the Division so determines, the individual may apply for asylum or withholding of removal as a defense to removal in a formal removal proceeding before an immigration judge.  In the third instance, the Division must determine whether an individual who has already been ordered removed but expresses a fear of return to the removal country has a "reasonable fear" of persecution or torture in that country.  *See* 8 C.F.R. §§ 238.1, 241.8, 208.31. If the Division determines as such, the individual is referred to an immigration judge for withholding-only proceedings, in which the individual may seek withholding of removal under INA § 241(b)(3) (codified as 8 U.S.C. § 1231(b)(3)), or withholding of removal under regulations implementing CAT obligations.  This agile process strikes an appropriate balance between offering protection to qualified asylum seekers, enforcing applicable laws, and addressing national security concerns by working to mitigate fraud and abuse.

American leadership in refugee assistance and the effectiveness of our processes for dealing with displaced people are perhaps best reflected in the sheer number of refugees—nearly 5 million representing well over 70 nationalities[28]—successfully absorbed into the United States since World War II.  Forging new lives out of turmoil and trauma, refugees have contributed much to the fabric of American life and are integral to our success as a nation of immigrants.

B.     **The World is Experiencing Another Wave of Displacement**

Today, the world is in the throes of a migration crisis that is unprecedented in its scale.[29]

---

[28] David W. Haines, *Safe Haven? A History of Refugees in America* 4 (2010).

[29] *See* UNHCR, *Global Trends: Forced Displacement in 2018* [hereinafter "*Global Trends*"] at 4

In 2018, there were 70.8 million individuals forcibly displaced from their homes.[30]  This

displacement spans the globe, from the Middle East to Africa to Asia to Central America—a

region that has a legacy of violence and fragile institutions resulting in part from the civil wars of

the 1980s.[31]  Now, perhaps more than ever, America needs to continue its longstanding tradition

of offering protection, freedom, and opportunity to the vulnerable and persecuted.[32]

### C.     The ACA Rule is the Most Extreme Measure in the Assault on the American Commitment of Providing Safe Haven to the Persecuted

Despite the pressing need to afford protection to refugees fleeing violence and

persecution, America's refugee resettlement and asylum systems are under siege.  The Trump

Administration has implemented a barrage of measures whose impact and intent are to dismantle

the pillars of our defining role as a refuge for the world's persecuted, its "huddled masses

yearning to breathe free."[33]  After temporarily suspending the U.S. Refugee Admissions Program

altogether at the start of 2017,[34] the Administration has increasingly slashed the number of

refugees who can be resettled in the country each year—from 50,000 in Fiscal Year 2017 (a

decrease of more than 50% from 2016) to 45,000 in Fiscal Year 2018, 30,000 in Fiscal Year

---

(June 20, 2019), *available at* https://www.unhcr.org/globaltrends2018/.

[30] *Id.* at 2.

[31] *Id*. at 2-3, 7.

[32] *See* Examining the Syrian Humanitarian Crisis From the Ground (Part II) Before the Subcomm. on the Middle East and North Africa of the House Comm. on Foreign Affairs, 114th Cong. 114-115 (2017) (written testimony of Leon Rodriguez, Director, U.S. Citizenship and Immigration Servs., Dep't of Homeland Security), http://docs.house.gov/meetings/.

[33] Emma Lazarus, *The New Colossus*, Nov. 2, 1883.

[34] *See* Executive Order Protecting the Nation From Foreign Terrorist Entry Into the United States (Mar. 6, 2017) (discussing E.O. 13769 of Jan. 27, 2017), *available at* https://www. whitehouse.gov/presidential-actions/executive-order-protecting-nation-foreign-terrorist-entry-united-states-2/.

2019, and 18,000 in Fiscal Year 2020[35]—and has actually admitted far fewer.[36]  At our southern border, America's asylum system has fared no better.  In 2019, the Administration promulgated and implemented what it euphemistically referred to as the "Migrant Protection Protocols" ("MPP"),[37] which require asylum seekers to remain in Mexico pending adjudication of their asylum application, often under life-threatening conditions and without access to legal and supportive services.[38]  The same year, the Administration implemented the "Third Country Transit Bar," a rule categorically denying asylum to almost anyone crossing into the United States through the southern border without first having applied for and been denied asylum in any country through which they transited.[39]

The ACA Rule is the most extreme of these measures to date.  It has turned the American asylum system on its head: Rather than have their asylum claims heard, refugees from the Northern Triangle countries are permanently removed to other Northern Triangle countries— which are themselves some of the most dangerous countries on earth and are the source of large numbers of refugees.  As a result, a carefully crafted asylum system has been upended, its aims nightmarishly subverted from protection to punishment for seeking to cross our southern border.

---

[35] Michael D. Shear and Zolan Kanno-Youngs, *U.S. Cuts Refugee Program Again, Placing Cap at 18,000 People*, N.Y. Times, Sep. 27, 2019 at A16.

[36] For example, "[j]ust 22,491 refugees were resettled in the U.S. in fiscal year 2018, roughly half the 45,000 cap."  Deborah Amos, *2018 Was Year of Drastic Cuts to U.S. Refugee Admissions*, NPR, *available at* https://www.npr.org, Dec. 27, 2018.

[37] Dep't of Homeland Sec., Press Release, Migrant Protection Protocols (Jan. 24, 2019), *available at* https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols.

[38] The risks faced by migrants under MPP have been well documented.  *See*, *e.g.*, Human Rights First, *Report: Orders From Above: Massive Human Rights Abuses Under Trump Administration Return to Mexico Policy*, Oct. 2019; Jonathan Blitzer, *How the U.S. Asylum System is Keeping Migrants at Risk in Mexico*, The New Yorker, Oct. 1, 2019.

[39] Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829-45 (Jul. 16, 2019) (codified at 28 C.F.R. Pt. 208).

Where it once sought to identify and welcome those with meritorious claims of persecution under international law, it now erects barriers indiscriminately and without regard for the safety of the most vulnerable of people.

## II.  THE ACA RULE VIOLATES AMERICAN ASYLUM LAW AND INTERNATIONAL TREATY OBLIGATIONS

The non-refoulement requirement of the 1967 Protocol and the CAT is a bedrock principle of international law governing asylum that is also codified in our domestic law.  *See* 8 U.S.C. § 1231(b)(3); *see also I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 427 (1999).  Indeed, United States law expressly prohibits the Attorney General from removing a migrant to a country if the "the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1231(b)(3).  The ACA Rule violates this non-refoulement obligation because, under the rule, individuals whose lives and freedoms would be threatened on the basis of a protected characteristic in Guatemala, or who would be in danger of being subjected to torture in Guatemala, will nonetheless be expelled to Guatemala without an opportunity to apply for asylum in the United States.  The ACA Rule thus places *amicus curiae*'s members at risk of participating in the widespread violation of international and domestic law—something they did not sign up to do when they decided to become asylum and refugee officers.

### A.  The ACA Rule Sends Asylum Seekers to Dangerous Countries in Violation of Statutory Requirements and Treaty Obligations

Congress has expressly decreed that migrants who arrive at the United States border have the right to apply for asylum in the country subject to narrow exceptions.  *See* 8 U.S.C. §§ 1158(a)(1)-(2).  The exception relevant here—the "safe third country" exception—stems from the Preamble to the 1951 Convention, which acknowledges that "the grant of asylum may place unduly heavy burdens on certain countries, and that a satisfactory solution . . . cannot therefore

be achieved without international co-operation."[40]   The exception is designed to address "the phenomenon of refugees and asylum seekers 'who move in an irregular manner from countries *in which they have already found protection*, in order to seek asylum or permanent resettlement elsewhere.'"[41]   Through this exception, Congress carefully balanced the need to afford asylum to persecuted people against the need to share that burden with other countries that are willing and able to provide similar protection.[42]   Congress did so by decreeing that, for the "safe third country" bar to apply, the Attorney General must "determine[] that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country . . . *in which the alien's life or freedom would not be threatened* on account of [a protected class], *and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection* . . . ."  8 U.S.C. § 1158(a)(2)(A) (emphasis added).

Contrary to that Congressional mandate, the ACA Rule sends asylum seekers to countries in which their lives and freedom are directly threatened.  Guatemala, Honduras, and El Salvador are simply not safe for most asylum seekers.  In fact, these countries are among the most dangerous in the world, routinely leading in the rate of intentional homicides and generating significant numbers of refugees themselves.[43]   Reports abound of transnational gangs

---

[40] U.N. Convention Relating to the Status of Refugees, Preamble, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 137.

[41] María-Teresa Gil-Bazo, *The Safe Third Country Concept in International Agreements on Refugee Protection*, 33/1, Netherlands Quarterly of Human Rights 42, at 47 (2015) (emphasis added) (quoting the Executive Committee of the UNHCR's Conclusion No. 58(XL)).

[42] *See id.*

[43] *See* Pls.' App. (ECF No. 39) at DHSFF107, 437, 462, 548, 598, 616, 682-83, 695, 1233, 1255, 1260; USCIS19, 26.  El Salvador and Guatemala were the first and second most common nationality of origin for asylum applicants during 2018, with Honduras following at fourth. *Global Trends*, *supra* note 29, at 40; *see also* 84 Fed. Reg. at 63,995 ("Asylum claims by aliens from El Salvador, Guatemala, and Honduras account for over half of the pending asylum

perpetrating systemic and extreme violence against men, women, and children on the basis of perceived associations (for example, as rival gang members based upon refusal to join a gang);[44] of women and girls abused, trafficked, raped, or killed specifically on the basis of their sex;[45] and of LGBTI and indigenous individuals subjected to violence and discrimination restricting access to basic necessities.[46]  In these countries, law enforcement has proven unable or unwilling to curtail the violence such that criminal actors operate with impunity.[47]

The danger that Honduran and Salvadoran asylum-seekers face upon removal to Guatemala is functionally identical to, and perhaps even greater, than that which drove them from their home countries—they may face persecution not only on the same basis as they would if returned home, but are additionally vulnerable as migrants in Guatemala.[48]  As our own

claims."); Kids in Need of Defense ("KIND"), *Neither Security Nor Justice: Sexual and Gender-Based Violence and Gang Violence in El Salvador, Honduras, and Guatemala*, *available at* https://supportkind.org/wp-content/uploads/2017/05/Neither-Security-nor-Justice_SGBV-Gang-Report-FINAL.pdf, May 2017 [hereinafter "*KIND Report*"], at 3 (noting the countries' "staggering homicide rates," including "some of the highest rates of femicide, or the gender-motivated killing of women and girls, in the world").

[44] *See* UNHCR, *Eligibility Guidelines for Assessing the International Protection Needs of Asylum Seekers from Guatemala*, Jan. 2018 [hereinafter "UNHCR Guidelines"] at 39-44; UNHCR, *Women on the Run: First-Hand Accounts of Refugees Fleeing El Salvador, Guatemala, Honduras, and Mexico*, Oct. 2015 [hereinafter "*Women on the Run*"] at 19-23; ECF No. 39 at DHSFF1233.

[45] *Women on the Run*, *supra* note 44, at 4-6; *UNHCR Guidelines*, *supra* note 44, at 46-48; *KIND Report*, *supra* note 43, at 3; ECF No. 39 at DHSFF682.

[46] *KIND Report*, *supra* note 43, at 4; *Women on the Run*, *supra* note 44, at 36- 37; U.S. Dep't of State, Guatemala 2018 Human Rights Report at 20-22 [hereinafter "*2018 Guatemala Report*"]; ECF No. 39 at DHSFF437, 616, 695.

[47] *See, e.g.*, *Women on the Run*, *supra* note 44, at 23, 24; *2018 Guatemala Report*, *supra* note 46 at 1; U.S. Dep't of State, El Salvador 2018 Human Rights Report [hereinafter "*2018 El Salvador Report*"] at 1, 16, 20; U.S. Dep't of State, Honduras 2018 Human Rights Report [hereinafter "*2018 Honduras Report*"] at 1; KIND Report, *supra* note 43, at 4, 7-9; ECF No. 39 at DHSFF462 (impunity rate for homicide in Guatemala exceeds 98%).

[48] Human Rights First, *Is Guatemala Safe for Refugees and Asylum Seekers?*, Jul. 1, 2019

14

government has acknowledged, violent crime pervades every corner of the country,[49] often targeting women, LGBTI persons, persons with disabilities, members of indigenous communities, and other minorities, and impunity is widespread.[50]  Migrants in Guatemala have been the targeted victims of robbery, rape, and other violent assaults, and "[w]omen and children from other countries are exploited for sex trafficking."[51]  Guatemala's own president, Alejandro Giammattei, declared as president-elect that he "do[es] not think Guatemala fulfills the requirements to be a safe third country" and that it does not "have the capacity" to deal with migrants.[52]  Even DHS acknowledged it has no idea what will happen to asylum seekers removed to Guatemala under the ACA, noting uncertainty as to who will provide shelter, food, transportation, and other care.[53]

The same will be true of Guatemalans sent to El Salvador, Salvadorans sent to Honduras, and so on.  To reshuffle Central Americans within the Northern Triangle in the face of known dangers endemic to the region for particular groups evinces a callous disregard for the well-being

*available at* https://www.humanrightsfirst.org/resource/guatemala-safe-refugees-and-asylum-seekers [hereinafter "*HRF: Is Guatemala Safe?*"]; ECF No. 39 at USCIS11; DHSFF112, 548, 683.

[49] U.S. Dep't of State Overseas Sec. Advisory Council, *Guatemala 2019 Crime & Safety Report*, Feb. 28, 2019 [hereinafter "*OSAC Guatemala 2019 Report*"] at 1 ("Even the most upscale residential and commercial areas [in] Guatemala . . . experience violent crimes in broad daylight."); ECF No. 39 at, *e.g.*, DHSFF1233.

[50] *2018 Guatemala Report*, *supra* note 46 at 1, 16, 19-22; *HRF: Is Guatemala Safe?*, *supra* note 48; ECF No. 39 at DHSFF437, 616, 682, 695.

[51] *Women on the Run*, *supra* note 44, at 43; *HRF: Is Guatemala Safe?*, *supra* note 48 ("Guatemalan police, military, and elected officials have been placed under investigation for paying [migrant] children for sex acts, facilitating child sex trafficking, or protecting venues where trafficking occurs"); ECF No. 39 at DHSFF548, 683.

[52] Sonia Perez, *President-elect says Guatemala can't do migrant deal with US*, Associated Press, Aug. 14, 2019.

[53] Homeland Sec. Advisory Counsel, *CBP Families and Children Care Panel Final Report* [hereinafter "*CBP Families and Children Report*"] (Nov. 14, 2019) at 9-10.

of asylum seekers in gross violation of our domestic law and post-war treaty obligations.

Compounding these immediate dangers, Guatemala lacks any functioning system for processing asylum applications, such that it does not afford migrants access to a full and fair asylum procedure. According to the U.S. Department of State, migration and police authorities in Guatemala lack adequate training regarding the rules for establishing refugee status, and the identification and referral mechanisms for potential asylum seekers are inadequate.[54] This lack of training only exacerbates the threshold problem of inadequate staffing more generally. In 2018, only 262 people applied for refugee status in Guatemala, with only three staff members interviewing asylum applicants.[55] As one former State Department official noted, Guatemala's asylum system is "embryonic."[56]

The pervasive dangers facing asylum seekers and inadequacies of the asylum system in Guatemala have resulted in migrants abandoning their claims altogether in that country. Indeed, "[o]f the 143 Hondurans and Salvadorans sent to Guatemala [as of January 14, 2020], only five ha[d] applied for asylum, according to the country's migration agency."[57] With no other option, many of these refugees resign to their fate and return to the dangerous countries from which they originally fled.[58] As a result, the ACA Rule leads to refoulement of asylum seekers not only to

---

[54] *2018 Guatemala Report*, *supra* note 46, at 13.

[55] *HRF: Is Guatemala Safe?, supra* note 48.

[56] David C. Adams, *Guatemala's 'embryonic' asylum system lacks capacity to serve as safe U.S. Partner, experts say*, Univision.com, Aug. 2, 2019.

[57] Kevin Sieff, *The U.S. is Putting Asylum Seekers on Planes to Guatemala — Often Without Telling Them Where They're Going*, Wash. Post: The Americas (Jan. 14, 2020), https://www.washingtonpost.com/world/the_americas/the-us-is-putting-asylum-seekers-on-planes-to-guatemala--often-without-telling-them-where-theyre-going/2020/01/13/0f89a93a-3576-11ea-a1ff-c48c1d59a4a1_story.html.

[58] Patrick J. McDonnell and Molly O'Toole, *Mexico Balks at U.S. Plan to Send Mexican Asylum Seekers to Guatemala*, L.A. Times, Jan. 7, 2020, *available at* https://www.latimes.com/world-

strange third countries but also back to their home countries where their lives may be at risk.

**B.      The Procedures Implementing the ACA Rule Do Not Safeguard Against Expulsion of Refugees to Where They Will Be Persecuted**

The procedures implemented by USCIS pursuant to the ACA Rule are not designed to and cannot safeguard against violation of our nation's non-refoulement obligation. *First,* under the ACA Rule, immigration officers do not ask asylum seekers being considered for removal to Guatemala whether they fear persecution or torture in that country. Rather, the migrant is provided a notice in the form of a "tear sheet" stating that if the applicant fears removal to that country due to the likelihood of torture or persecution on the basis of a protected ground, the applicant should affirmatively state such fear. *See* 84 Fed. Reg. at 64,009; USCIS283-85, 353-55, 374. For those individuals who do not understand the notice or simply do not express a fear of removal to Guatemala for any number of reasons, the ACA Rule all but guarantees violation of the United States' non-refoulement obligations given the inherent dangers that migrants in Guatemala face.

*Second*, even where an asylum seeker affirmatively expresses a fear of removal to Guatemala on the basis of a protected ground, the resulting screening interview before an asylum officer is still likely to result in refoulement due to the unreasonably high evidentiary standard that will govern it.[59] Unlike in "credible fear" or "reasonable fear" interviews—summary proceedings that require an asylum applicant to demonstrate only a "***significant possibility***" of

---

nation/story/2020-01-07/mexico-balks-on-u-s-plan-to-send-mexican-asylum-seekers-to-guatemala.

[59] *See* USCIS, Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols, at 3-4, Jan. 28, 2019, *available at* https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2019/2019-01-28-Guidance-for-Implementing-Section-35-b-2-C-INA.pdf.

persecution or a "**_well-founded fear_**" of persecution, respectively[60]—a screening interview under the ACA Rule requires an applicant to establish that it is "**_more likely than not_**" that she will face persecution or torture in Guatemala.  *See* 84 Fed. Reg. at 64,009.

The stringent "more likely than not" standard required by the ACA Rule has traditionally been reserved for use in full-scale removal proceedings administered by immigration judges. And for good reason.  In those proceedings, applicants are afforded substantial protections, such as a full hearing, notice of rights, access to counsel, time to prepare, and the rights to administrative and judicial review—protections that are not available in assessments conducted under the ACA Rule.  *See* 8 U.S.C. §§ 1229a(b)(4)(A)-(B), 1362; 8 C.F.R. § 1240.3; *see also Colemenar v. I.N.S.*, 210 F.3d 967, 971 (9th Cir. 2000).  Indeed, under the ACA Rule, the asylum officer's assessment can be performed over the phone and the asylum seeker is not permitted access to counsel during the interview.  *See* 84 Fed. Reg. at 64,003, 64,009; ECF No. 39 at USCIS282.  The lack of counsel is especially problematic because, at the time of the interviews, many asylum seekers do not fully understand the dangers they may face in Guatemala since they were only passersby in that country *en route* to the United States or may have never even been to Guatemala.  Nor is the asylum officer's determination reviewable by an immigration judge.  *See* 84 Fed. Reg. at 64,008-09.

Moreover, the ACA Rule fails to provide even the basic procedural protections available to asylum applicants subject to "credible fear" and "reasonable fear" interviews governed by less stringent evidentiary burdens.  Upon referral to a "credible fear" interview, asylum seekers are provided Form M-444, titled "Information about Credible Fear Interview," which describes the

---

[60] *See* USCIS PM-602-0162: Guidance for Processing Reasonable Fear, Credibly Fear, Asylum, and Refugee Claims in Accordance with *Matter of A-B-*, July 11, 2018.

18

purpose of the interview and informs the applicant of:  (i) the right to consult with other persons (including counsel); (ii) the right to request review of the asylum officer's determination by an immigration judge; (iii) the consequences of a failure to establish "credible fear"; and (iv) the right to rest 48 hours prior to the interview.  8 C.F.R. § 235.3(b)(4)(i).  Before a "credible fear" assessment can proceed, the asylum officer is required to confirm that the asylum seeker has received Form M-444 and to verify that the asylum seeker understands the "credible fear" determination process.  8 C.F.R. § 208.30.  Individuals referred for a "reasonable fear" interview are afforded similar protections.  8 C.F.R. § 208.31.  These protections are designed to ensure that the United States does not violate its non-refoulement obligation.  But the ACA Rule affords none of these safeguards, while, at the same time, requiring the application of a higher standard.

The standards of proof differ across stages for a reason.  The standard is lower in the "credible fear" and "reasonable fear" interviews conducted before asylum officers because those interviews are *preliminary* assessments that efficiently dispose of facially unsupportable claims for relief under asylum law, the withholding procedures, or the CAT.  Asylum seekers who show "credible" or "reasonable" fear in these interviews are then given the chance to make their case to an immigration judge in a full evidentiary hearing where the "more likely than not" standard is applied and asylum seekers are provided additional safeguards.  Screening interviews of the type conducted under the ACA Rule or in the "credible fear" and "reasonable fear" contexts are not appropriate fora for applying the "more likely than not" standard because these interviews do not allow asylum seekers a full and fair opportunity to adequately present a case regarding their risk of persecution, nor do they provide asylum officers an adequate basis on which to make a reliable and accurate determination of an individual's risk of persecution in a given country.  As asylum officers who conduct credible fear and reasonable fear interviews daily, Council 119's

19

members know that the ACA Rule's combination of a high evidentiary standard with inadequate procedures all but ensures violation of the non-refoulement obligation.

Significantly, other countries that are parties to the 1951 Convention have rejected a "more likely than not" or "probability" standard in the context of refugee status determinations. Rather, the less stringent "well-founded fear" standard reflects the international community's recognition that trauma suffered by many refugees affects their ability to tell their stories and present documentary proof in support of their claims.[61]

Perhaps most alarming, the ACA Rule alters how asylum officers may view evidence of past persecution for purposes of meeting the stringent "more likely than not" standard in the withholding context, such that even migrants who were ***actually persecuted*** in an ACA country in the past will be sent there.  That is, under USCIS guidance for implementing the ACA Rule, asylum officers cannot make a finding that future persecution in Guatemala is "more likely than not" based solely on evidence of ***past*** persecution there.[62]  Thus, even if an asylum seeker (1) affirmatively states a fear of persecution in Guatemala and (2) presents evidence of having been persecuted in Guatemala, an asylum officer ***still*** cannot determine based solely on that evidence that the migrant is more likely than not to be persecuted in Guatemala in the future. These insurmountable evidentiary hurdles create a Kafkaesque process that ensures our country will return vulnerable people to a place where they will be persecuted based on a protected characteristic or tortured.

---

[61] *Women on the Run*, *supra* note 44, at 34.

[62] ECF No. 39 at USCIS295, 366.  By contrast, under existing regulations, evidence of past persecution in one's home country creates a *presumption* of persecution.  8 C.F.R. § 208.13(b)(1).

**C.      The ACA Rule Is Not Based on Neutral or Rational Principles, But Is Arbitrary and Capricious**

Congress passed the Administrative Procedure Act ("APA") to ensure that agency action is constrained by law and reason.  *F.C.C. v. Fox Tel. Stations, Inc.*, 556 U.S. 502, 536-37 (2009) (Kennedy, J., concurring).  Under the APA, agency action is subject to judicial review, and "[i]f an agency takes action not based on neutral and rational principles, the APA grants federal courts power to set aside the agency's action as 'arbitrary' or 'capricious.'"  *Id.* (quoting 5 U.S.C. § 706(2)(A)).  Under the "arbitrary and capricious" standard of review, agency action must be "within the bounds of reasoned decisionmaking."  *Baltimore Gas & Elec. Co.* v. *Natural Res. Defense Council, Inc.*, 462 U.S. 87, 105-06 (1983); *see also Dep't of Commerce v. N.Y.*, 588 U.S. ___, 139 S. Ct. 2551, 2569 (2019) (same).  Thus, courts should consider whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation and internal quotation marks omitted); *Dep't of Commerce*, 139 S. Ct. at 2569 (same).  A rule should be struck down if the agency "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

The ACA Rule is wholly detached from the reality of conditions in the ACA signatory countries.  The relevant inquiry under applicable law is whether ACA signatory countries are "safe third countries" for asylum seekers.  They indisputably are not.  In the ACA Rule itself, the promulgating agencies acknowledge that migrants fleeing these countries—Guatemala, El Salvador, and Honduras—"account for over half of the pending asylum cases" in the United States.  84 Fed. Reg. at 63,995.  The State Department's 2018 report on human rights conditions

in Guatemala cites pervasive violence targeting women, minority and indigenous groups, disabled persons, and LGBTI individuals, among others,[63] while its Overseas Security Advisory Council ("OSAC") states that Guatemala "remains among the most dangerous countries in the world."[64]   As discussed above, the systemic violence causing Guatemalans to flee their own country affects Honduran and Salvadoran asylum-seekers re-routed to Guatemala equally, if not even more acutely.[65]   An influx of migrants to Guatemala (or to Honduras or El Salvador for that matter) will only increase existing dangers, as in Mexico, where communities have responded to an influx of migrants with xenophobia and discrimination.[66]   Indeed, OSAC reports that tensions between migrants and police in Guatemala have led to clashes resulting in death and injury.[67]   As Guatemala's own President declared shortly before taking office: "If we do not have the capacity for our own people, just imagine other people."[68]

As discussed above, for an ACA signatory to be a "safe third country" under the asylum statute, it also must "provide[] aliens removed there pursuant to the agreement 'access to a full and fair procedure'" for determining their asylum claims.  84 Fed. Reg. at 63,996 (quoting 8 U.S.C. § 1158(a)(2)(A)).  Again, the evidence plainly shows that Guatemala and the other Northern Triangle countries do not and cannot meet this requirement.  The State Department

---

[63] *2018 Guatemala Report*, *supra* note 46, at 1-2, 16-22.  El Salvador and Honduras do not fare better by the Government's own analysis.  *See, e.g.*, *2018 El Salvador Report*, *supra* note 48, at 1, 16-20; *2018 Honduras Report*, *supra* note 48, at 1, 11, 17-21.

[64] *OSAC Guatemala 2019 Report*, *supra* note 49, at 1.

[65] *See supra* § II.A and accompanying notes.

[66] Int'l Crisis Group, *Mexico's Southern Border: Security, Violence and Migration in the Trump Era*, May 9, 2018, *available at* https://www.crisisgroup.org/latin-america-caribbean/mexico/66-mexicos-southern-border-security-violence-and-migration-trump-era.

[67] *OSAC Guatemala 2019 Report*, *supra* note 49, at 9.

[68] Perez, *supra* note 52.

reports that asylum procedures in Guatemala are "inadequate."[69]  And DHS itself admitted as recently as November 2019 that, without "significant assistance from the U.S.," Guatemala's asylum processing system cannot "handle and appropriately adjudicate asylum claims."[70]  The same is true of the asylum systems in Honduras and El Salvador.[71]

In the face of this uncontroverted evidence, the agencies' scant explanation for concluding that Guatemala and the other Northern Triangle countries somehow qualify as "safe" third countries for asylum seekers under the INA defies "reasoned decisionmaking."  *Baltimore Gas & Elec.*, 462 U.S. at 105.  All the ACA Rule says regarding threats to life and freedom facing migrants in ACA countries is that "the country of removal under an ACA is not the country originally prompting the asylum seeker's claim," speculating that this lack of "substantial connections" in an ACA country will make the migrant relatively safer there.  84 Fed. Reg. 64,004.  But this assumption is contradicted by the evidence compiled by the United States government itself, which shows that the violence endemic to the region is fueled by gangs and narco-traffickers with transnational reach.[72]

As to the availability of asylum procedures, the ACA Rule states that "these third countries of removal would have pre-committed, per binding agreements with the United States,

---

[69] *2018 Guatemala Report*, *supra* note 46, at 13.

[70] *CBP Families and Children Report*, *supra* note 53, at 9-10.

[71] *See 2018 Honduras Report*, *supra* note 47, at 14-15 (reporting "significant delays in processing"); KIND, *Asylum Cooperative Agreements Fact Sheet*, Nov. 2019, *available at* https://supportkind.org/wp-content/uploads/2019/11/ACAs-and-N.-Triangle-Factsheet-FINAL.pdf (reporting that El Salvador has only one asylum officer).

[72] *See 2018 Honduras Report*, *supra* note 47, at 1 (noting "[o]rganized criminal elements, including local and transnational gangs and narcotics traffickers"); *2018 El Salvador Report*, *supra* note 48, at 1 (same); *OSAC Guatemala 2019 Report*, *supra* note 49, at 2 ("the presence of organized criminal gangs Barrio 18 (18th Street) and Mara Salvatrucha (MS13) . . . contribute[s] to the violent crime"); *see also Women on the Run*, *supra* note 44, at Forward (reporting violence against women perpetrated by "heavily-armed, transnational criminal groups").

to provide access to a 'full and fair procedure' for the alien to acquire 'asylum or equivalent temporary protection.'"  84 Fed. Reg. 64,001-02 (quoting 8 U.S.C. § 1158(a)(2)(A)).  And in separate memoranda, DOJ and DHS determined categorically that Guatemala's asylum procedures are "full and fair," based on formal declarations in Guatemala's written migration law.  *See* DOJFF6-7; DHSFF1282-83.  But practically speaking, such paper pronouncements do not translate into a system that provides the required protections in practice.  DHS in fact admits that Guatemala cannot provide full and fair procedures without significant U.S. assistance,[73] and the ACA Rule is devoid of any proposal for actually providing such assistance to Guatemala or any other ACA country.

The ACA Rule presents a stark example of government agencies completely abandoning the neutral and rational analysis required by the APA in favor of implementing the political agenda of the executive that is devoid of any rationality.  DOJ and DHS's feeble attempt at justifying the ACA Rule "runs counter to the evidence before the agency," and "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  Thus, the ACA Rule should be struck down as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C § 706(2)(A).

## III.  THE ACA RULE COMPELS ASYLUM OFFICERS TO VIOLATE THEIR OATH TO UPHOLD OUR NATION'S ASYLUM LAWS

Asylum officers are dedicated public servants who carry out specialized functions within the asylum system, governed by statute and international law.  But the ACA Rule forces asylum officers to implement radical procedures that violate the very laws they took an oath to uphold.

---

[73] *CBP Families and Children Report*, *supra* note 53, at 9-10; *see also* DHSFF1227-34, 1253-54.

Under the INA, otherwise-removable migrants who indicate fear of persecution ***must*** be referred for a credible fear interview—a process governed by an appropriate evidentiary standard, with procedural safeguards, access to counsel, and the right of appeal.  *See* 8 U.S.C. § 1225(b)(1). The ACA Rule requires asylum officers to violate this statutory requirement by putting migrants who have affirmatively indicated fear of persecution through so-called "screening interviews" governed by a draconian standard without access to counsel or the right of appeal—a procedure designed to all but assure the migrant's removal to a dangerous country and an unknown fate. The ACA Rule thus reflects a dramatic departure from longstanding refugee screening processes and a stark re-interpretation of the asylum officer's role.

When the members of Council 119 enlisted to become asylum officers, they took a solemn oath to uphold the Constitution and the laws of the United States.  They have been specifically charged with furthering our nation's tradition and commitment of offering protection to the vulnerable and persecuted.  They did not sign up to carry out policies that defy our nation's asylum laws and treaty obligations and erode the moral fabric of our nation.

## CONCLUSION

Asylum officers are duty bound to protect vulnerable asylum seekers from persecution or torture.  However, under the ACA Rule, they face a conflict between the directives of their departmental leaders to follow the rule and adherence to our nation's legal and moral commitment to not return refugees to territories where they will face persecution.  Asylum officers should not be forced to honor departmental directives that are fundamentally contrary to the moral fabric of our nation and our international and domestic legal obligations.  For the foregoing reasons, *amicus curiae* respectfully urge the Court to grant Plaintiffs' motion for summary judgment and a permanent injunction.

Dated: March 6, 2020                                  Respectfully submitted,


                                                     _/s/ Joy Odom_
Muhammad U. Faridi*                                  Joy Odom (D.C. Bar No. )
Jordan M. Engelhardt*                                SELENDY & GAY PLLC
Elizabeth Riordan Hurley*                            1290 Avenue of the Americas
PATTERSON BELKNAP WEBB & TYLER LLP                   New York, New York 10104
1133 Avenue of the Americas                          Tel: (212) 390-9000
New York, New York 10036                             Fax: (212) 390-9399
Tel: (212) 336-2000
Fax: (212) 336-2222


*Pro hac vice* application pending                   *Attorneys for Amicus Curiae*
                                                     *Council National Citizenship and*
                                                     *Immigration Services Council 119*

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2020, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system.  Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: */s/ Joy Odom*
Joy Odom

27