**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **U.T., et al.,** | **Case: 1:20-cv-00116 (EGS)** |
| Plaintiffs, | |
| v. | |
| **WILLIAM BARR, Attorney General of the United States, in his official capacity, et al.,** | |
| Defendants. | |

**AMICUS CURIAE BRIEF OF THE STATES OF CALIFORNIA, CONNECTICUT, DELAWARE, HAWAII, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, OREGON, RHODE ISLAND, VERMONT, WASHINGTON, AND THE DISTRICT OF COLUMBIA IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION**

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
SUSAN E. SLAGER
Supervising Deputy Attorney General
MARISSA MALOUFF
JAMES F. ZAHRADKA II
R. ERANDI ZAMORA-GRAZIANO (Cal. SBN 281929)
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone:  (916) 210-7298
  Fax:  (916) 327-2319
  E-mail:  Erandi.Zamora@doj.ca.gov
  *Attorneys for Amicus Curie State of California*

KARL A. RACINE
Attorney General for the District of Columbia
KATHLEEN KONOPKA
Deputy Attorney General
NICOLE HILL
JAMES GRAHAM LAKE (DC Bar No. 1028853)
Assistant Attorneys General
  441 4th Street, N.W., Suite 600 South
  Washington, D.C. 20001
  Telephone: (202) 807-0369
  Fax: (202) 741-0575
  E-mail: Graham.Lake@dc.gov
  *Attorneys for Amicus Curiae District of Columbia*

*(Additional counsel listed on signature page)*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND STATES' INTERESTS........................................................................ 1

ARGUMENT ........................................................................................................................... 3

    I.      The Rule Harms Asylum Seekers ...................................................................... 3

          A.    Guatemala, El Salvador, and Honduras Lack Full and Fair Asylum
                Systems ..................................................................................................... 4

          B.    The Northern Triangle Is Among the Most Dangerous Regions in
                the World ................................................................................................... 7

    II.     The Rule Harms the States.................................................................................. 11

          A.    The Rule Will Result in Decreased Economic Contributions to the
                States ........................................................................................................ 11

          B.    The Rule Makes It More Difficult for States to Enforce Their Own
                Laws ......................................................................................................... 15

          C.    The Rule Harms the States' Interest in Family Unity............................. 16

          D.    The Rule Harms State-Funded Legal Service Programs ......................... 18

          E.    Promulgation of the Rule Without Notice and Comment Harms the
                States ........................................................................................................ 19

                1.    The Foreign Affairs Exception Does Not Apply ......................... 21

                2.    The Good Cause Exception Does Not Apply .............................. 23

CONCLUSION........................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page**

CASES

*Alaska v. U.S. Dep't of Transp.*
  868 F.2d 441 (D.C. Cir. 1989) ................................................................................15

*Batterton v. Marshall*
  648 F.2d 694 (D.C. Cir. 1980) ................................................................................20

*City of N.Y. v. Permanent Mission of India to United Nations*
  618 F.3d 172 (2d Cir. 2010) .............................................................................21, 22

*E. Bay Sanctuary Covenant v. Barr*
  385 F. Supp. 3d 922 (N.D. Cal. 2019) ....................................................................24

*E. Bay Sanctuary Covenant v. Barr*
  934 F.3d 1026 (9th Cir. 2019) ................................................................................24

*E. Bay Sanctuary Covenant v. Trump*
  354 F. Supp. 3d 1095 (N.D. Cal. 2018) ..................................................................24

*E. Bay Sanctuary Covenant v. Trump*
  932 F.3d 742 (9th Cir. 2018) ............................................................................20, 22

*Int'l Bhd. of Teamsters v. Pena*
  17 F.3d 1478 (D.C. Cir. 1994) ................................................................................22

*Jean v. Nelson*
  711 F.2d 1455 (11th Cir. 1983) ..............................................................................22

*Mendoza v. Perez*
  754 F.3d 1002 (D.C. Cir. 2014) ..............................................................................20

*Moore v. City of E. Cleveland*
  431 U.S. 494 (1977) ................................................................................................16

*N.J. Dep't of Envtl. Prot. v. U.S. E.P.A.*
  626 F.2d 1038 (D.C. Cir. 1980) ........................................................................20, 21

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*
  434 U.S. 1345 (1977) ..............................................................................................15

*Nken v. Holder*
  556 U.S. 418 (2009) ..................................................................................................3

**TABLE OF AUTHORITIES**

(continued)

**Page**

*Rivera v. NIBCO, Inc.*
364 F.3d 1057, 1065 (9th Cir. 2004) ....................................................................16

*Sorenson Commc'ns Inc. v. Fed. Commc'n Comm'n*
755 F.3d 702 (D.C. Cir. 2014) ......................................................................23, 25

*Texas v. United States*
809 F.3d 134 (5th Cir. 2015) ...........................................................................21

*United States v. Mead Corp.*
533 U.S. 218, 230 (2001) ...............................................................................20

*United States v. Picciotto*
875 F.2d 345 (D.C. Cir. 1989) ...........................................................................21

*United States v. Ross*
848 F.3d 1129 (D.C. Cir. 2017) .........................................................................20

*United States v. Valverde*
628 F.3d 1159 (9th Cir. 2010) ...........................................................................20

*Util. Solid Waste Activities Grp. v. U.S. E.P.A.*
236 F.3d 749 (D.C. Cir. 2001) ...........................................................................23

*Yassini v. Crosland*
618 F.2d 1356 (9th Cir. 1980) ......................................................................21, 22

*Zhang v. Slattery*
55 F.3d 732 (2d Cir. 1995)............................................................................21, 22

**LEGISLATIVE MATERIALS**

H.B. 5050, 80th Or. Legis. Assemb., 2019 Reg. Sess. (Or. 2019) ................................................19

H.R. Rep. No. 79-1980 (1946).........................................................................................22

S. Rep. No. 79-752 (1945) ............................................................................................22

S. Rep. No. 96-256 (1979) ........................................................................................3, 14

Wash. Laws of 2018, ch. 299, § 127(65) (amending Laws of 2017, 3d Spec. Sess.,
ch. 1, § 128) (Mar. 27, 2018) ...................................................................................18

Wash. Laws of 2019, ch. 415, § 129(21) (May 21, 2019) ...........................................................18

**TABLE OF AUTHORITIES**

(continued)

Page

REGULATORY MATERIALS

Agreement Between the Government of the United States of America and the
    Government of the Republic of Guatemala on Cooperation Regarding the
    Examination of Protection Claims, 84 Fed. Reg. 64,095 (Nov. 20, 2019) ...............................1

Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (July 16,
    2019) ........................................................................................................................24

Implementation of the Agreement Between the Government of the United States
    of America and the Government of Canada Regarding Asylum Claims Made
    in Transit and at Land Border Ports-of-Entry, 69 Fed. Reg. 69,480, 69,482
    (Nov. 29, 2004) ........................................................................................................2

Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under
    the Immigration and Nationality Act, 84 Fed. Reg. 63,994
    (Nov. 19, 2019) ................................................................................................... *passim*

STATUTES

5 U.S.C.
    § 553..................................................................................................................21
    § 553(a)(1) .........................................................................................................21
    § 553(b)(B).................................................................................................21, 23
    § 553(c) ..............................................................................................................20
    § 553(d) ..............................................................................................................20
    § 553(d)(3) .........................................................................................................23

8 U.S.C.
    § 1101(a)(42) .....................................................................................................21

Cal. Bus. & Prof. Code
    § 17200...............................................................................................................15

Cal. Gov. Code
    §§ 12900-12996 .................................................................................................15

Cal. Lab. Code
    §§ 200-1200 .......................................................................................................15

# TABLE OF AUTHORITIES
(continued)

**Page**

D.C. Code
    § 2-220.01 ....................................................................................................15
    § 32-531.01 ..................................................................................................15
    § 32-1001 .....................................................................................................15
    § 32-1301 .....................................................................................................15
    § 32-1331.01 ................................................................................................15

**FEDERAL REGULATIONS**

8. C.F.R.
    § 208.30(d)(4) ...............................................................................................2

**OTHER AUTHORITIES**

Am. Immigr. Council, *Immigrants in the United States* (Oct. 4, 2017)......................................12

Am. Immigr. Council, *Immigrants in California* (2017) .............................................................12

Bureau of Democracy, Hum. Rts. & Lab., U.S. Dep't of State, *El Salvador 2018 Human Rights Report* (Mar. 2019) ...............................................6, 8, 9, 10

Bureau of Democracy, Hum. Rts. & Lab., U.S. Dep't of State, *Guatemala 2017 Human Rights Report* (updated July 23, 2018).........................................8

Bureau of Democracy, Hum. Rts. & Lab., U.S. Dep't of State, *Guatemala 2018 Human Rights Report* (Mar. 2019) ......................................4, 9, 10, 11

Bureau of Democracy, Hum. Rts. & Lab., U.S. Dep't of State, *Honduras 2018 Human Rights Report* (Mar. 2019) ......................................8, 9, 10, 11

Cal. Dep't of Soc. Servs., *Immigration Services Program Update* (Mar. 2019)..........................18

Colleen K. Vesely, Ph.D., et al, *Immigrant Families Across the Life Course: Policy Impacts on Physical & Mental Health* (July 2019) ......................................17

Daniel Costa, *California Leads the Way*, Econ. Policy Inst. (Mar. 22, 2018)..............................16

D.C. Off. of the Mayor, Press Release, *Mayor Bowser Announces $2.5 Million Available for FY 2020 Immigrant Justice Legal Services Grant Program* (July 12, 2019) .....................................................................................................19

Douglas D. Heckathorn, et al., *Unregulated Work in Chicago: The Breakdown of Workplace Protections in the Low-Wage Labor Market,* Center for Urban Economic Development, University of Illinois at Chicago (2010) .........................................16

**TABLE OF AUTHORITIES**
(continued)

**Page**

Gretchen Frazee, *U.S. Claims Reducing Refugee Numbers Helps with the Asylum Backlog.  Will It?*, PBS News Hour (Oct. 2, 2019) ....................................................4

*Guatemalan Seeking Asylum Sues U.S. to Reunite with Family*, The Associated Press (Jan. 6, 2020) ...............................................................17

Hippolyte d'Albis et al., *Macroeconomic Evidence Suggests that Asylum Seekers Are Not a "Burden" for Western European Countries*, Science Advances (Jun. 20, 2018) .................................................................12

*Honduran Immigration Detention: Quick Facts,* Global Detention Project ...................................7

Human Rights Watch, *"At Least Let Them Work" The Denial of Work Authorization & Assistance for Asylum Seekers in the U.S.* (Nov. 12, 2013) ........................16

Human Rights Watch, *Deported to Danger* (Feb. 5, 2020) ...........................................7

Inst. on Taxation & Econ. Policy, *Undocumented Immigrants' State & Local Tax Contributions* (Mar. 2017) ...................................................14

Hum. Rts. First, *Is Guatemala Safe for Refugees and Asylum Seekers?* (July 1, 2019) ...................................................................4

Kids in Need of Defense (KIND), *Sexual and Gender Based Violence & Migration Fact Sheet* (Apr. 2018) ...........................................10

Ministerio de Relaciones Exteriores de El Salvador, *Gobierno de El Salvador Entrega Nacionalidades por Naturalización en el Día Mundial de los Refugiados* (June 20, 2016) ...........................................6

Molly Hennessy-Fiske, *The New Family Separation: Migrant Parents Stranded on Border Send Kids*, L.A. Times (Nov. 27, 2019) ...............................17

Molly Hennessy-Fiske, *Why & How Are Asylum Seekers Entering the U.S.?*, L.A. Times (Nov. 22, 2018) ...................................................17

N.J. Off. of Mgmt. & Budget*, The Governor's FY2020 Budget: Detailed Budget 419* (Mar. 2019) ...........................................................19

N.Y. Div. of Budget*, Governor Cuomo Announces Highlights of the FY 2019 State Budget* (Mar. 30, 2018) ...........................................18

Nadwa Mossaad, Off. of Immigr. Statistics, Dep't of Homeland Sec., *Annual Flow Report: Refugees and Asylees: 2017* (Mar. 2019) .................................. *passim*

**TABLE OF AUTHORITIES**
(continued)

Nelson Rauda Zablah, *El Salvador Signs Agreement to Accept Asylum Seekers the US Won't Protect*, El Faro (Sept. 21, 2019) ..............................................................6

New Am. Econ., *Immigrants & the Economy in New Jersey* ......................................13

New. Am. Econ., *New Americans in Chicago* ...........................................................13

New Am. Econ., *The Contributions of New Americans in Illinois* (Aug. 2016) ..........13

New Am. Econ., *The Contributions of New Americans in New Jersey* (Aug. 2016) ....13

New Am. Econ., *The Contributions of New Americans in Washington, D.C.* (Aug. 2016) ..............................................................................................................13

Organización Trans Reinas de la Noche, *Human Rights Violations against Transgender Women in Guatemala* (Feb. 2018)....................................................10

Overseas Sec. Advisory Council, U.S. Dep't of State, *Guatemala 2019 Crime & Safety Report* (Feb. 28, 2019) ...........................................................................8

Philip Bump, *Most Migration to the U.S. Costs Money. There's a Reason Asylum Doesn't.*, Wash. Post (Apr. 30, 2019) .................................................................18

Seung Min Kim, et al., *Trump Says He Has Agreement with Guatemala to Help Stem Flow of Migrants at the Border*, Wash. Post (July 26, 2019) .........................5

Sharyn Alfonsi, *"Our Whole Economy Is In Shatters": El Salvador's President Nayib Bukele on the Problems Facing His Country*, 60 Minutes (Dec. 15, 2019) .................................................................................................................5

Sofia Menchu, *Guatemalan Court Halts 'Safe Third Country' Designation for Asylum Seekers*, Reuters (July 19, 2019) ............................................................23

U.N. High Comm'r for Refugees (UNHCR), *Solicitud de la Condición de Refugiado,* ........................................................................................................5

UNHCR, *Submission by the United Nations High Commissioner for Refugees for the Office of the High Commissioner for Human Rights' Compilation Report: Universal Periodic Review: Guatemala* (Mar. 2017) ............................................5

UNHCR, *Eligibility Guidelines for Assessing the International Protection Needs of Asylum-Seekers from El Salvador* (Mar. 2016) ............................................8, 10

UNHCR, *Honduras Factsheet* (Mar. 2017) .............................................................7

**TABLE OF AUTHORITIES**
(continued)

**Page**

UNHCR, *Statement on New U.S. Asylum Policy* (Nov. 19, 2019) .................................................9

UNHCR, *The MIRPS: A Regional Integrative Response to Forced Displacement*
(Dec. 20, 2018) ........................................................................................................................8

UNHCR, *Women on the Run: First-Hand Accounts of Refugees Fleeing El
Salvador, Guatemala, Honduras, and Mexico* (Oct. 2015) .................................................8, 9

U.N. Hum. Rts. Off. High Comm'r (UNHRC), *Report of the Special Rapporteur
on the Human Rights of Internally Displaced Persons on His Mission to
Honduras* (Apr. 5, 2016)........................................................................................................7

UNHRC, *Committee on the Rights of the Child examines report of Guatemala*
(Jan. 17, 2018)........................................................................................................................9

U.S. Citizenship & Immigr. Servs. (USCIS), *US-Guatemala Asylum Cooperation
Agreement (ACA) Threshold Screening, Guidance for Asylum Officers and
Asylum Office Staff* (Nov. 19, 2019) ......................................................................................2

U.S. Dep't of Justice, Exec. Off. for Immigr. Review, *Statistics Yearbook FY2018* .....................2

Yeganeh Torbati, *U.S. Denied Tens of Thousands More Visas in 2018 Due to
Travel Ban: Data*, Reuters (Feb. 29, 2019) ...........................................................................18

Zolan Kanno-Youngs, *Mexican Asylum Seekers Could Now Be Deported to
Guatemala*, N.Y. Times (Jan. 6, 2020).....................................................................................5

## INTRODUCTION AND STATES' INTERESTS

The states of California, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, Washington, and the District of Columbia (Amici States or States) respectfully submit this brief as amici curiae in support of Plaintiffs' Motion for Summary Judgment and Permanent Injunction.  The rule at issue in this litigation effectively bars humanitarian relief—including asylum, withholding of removal, and relief under the Convention Against Torture (CAT)—for immigrants subject to Asylum Cooperative Agreements (ACAs) between the United States and Guatemala, El Salvador, and Honduras (Northern Triangle countries).[1] *See* Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act, 84 Fed. Reg. 63,994 (Nov. 19, 2019) (to be codified at 8 C.F.R. Parts 1003, 1208, and 1240) (Rule).

The Rule harms thousands of already vulnerable individuals.  Subject to extremely limited exceptions, the Rule requires that asylum seekers apprehended at the United States border or seeking admission at a port of entry undergo a complicated "threshold screening" and meet a high evidentiary standard, which they will most likely fail, before proceeding to a credible fear interview to determine if they can seek asylum in the United States.  *Id.* at 63,998, 64,002.  During this process, asylum seekers are denied the right to counsel and the benefit of a "consultation" period during which they could obtain guidance from a person of their choosing

---

[1] The Rule specifically lists these three countries, but will also apply to future ACAs between the United States and other countries.  84 Fed. Reg. 63,994.  Currently, Defendants have only published the ACA with Guatemala; thus, it is the only ACA in effect.  *See* Agreement Between the Government of the United States of America and the Government of the Republic of Guatemala on Cooperation Regarding the Examination of Protection Claims, 84 Fed. Reg. 64,095 (Nov. 20, 2019) (Guatemala ACA).

and prepare for the threshold screening.[2]  84 Fed. Reg. at 64,003.  If asylum seekers do not pass

the threshold screening—a likely outcome—they are categorically barred from asylum,

withholding of removal, and protection under CAT in the United States and are then removed to

an ACA country to pursue their humanitarian relief there.  *Id.* at 63,995, 64,000.  Because the

ACA countries of Guatemala, El Salvador, and Honduras are not equipped to handle

humanitarian claims and, in these countries, asylum seekers will be subjected to dangerous

conditions, the Rule will result in grave harm to asylum seekers.

The Amici States have a strong interest in ensuring that humanitarian relief remains

available to those in need of protection.  The States are home to thousands of asylees.  In 2018,

approximately 10,197 individuals in removal proceedings were granted asylum by immigration

courts (defensive asylum) in the States[3]; and the States constitute five of the top ten states of

residence for individuals who applied for and were granted asylum by USCIS (affirmative

asylum), with more than 55% of them residing in California and New York.[4]  Denying eligible

asylum seekers a meaningful opportunity to seek humanitarian protection deprives the States and

---

[2] Asylum seekers subject to the safe third country agreement between the U.S. and Canada are
afforded a consultation period.  *See* Implementation of the Agreement Between the Government
of the United States of America and the Government of Canada Regarding Asylum Claims Made
in Transit and at Land Border Ports-of-Entry, 69 Fed. Reg. 69,480, 69,482 (Nov. 29, 2004).
Moreover, the right to counsel is afforded to individuals during credible fear interviews in
expedited removal.  8 C.F.R. § 208.30(d)(4).  This right is denied in the Rule and related
guidance.  U.S. Citizenship & Immigr. Servs. (USCIS), *US-Guatemala Asylum Cooperation
Agreement (ACA) Threshold Screening, Guidance for Asylum Officers and Asylum Office Staff* 5
(Nov. 19, 2019) (hereinafter *USCIS – Guatemala ACA Guidance*),
https://tinyurl.com/USCISacaguidance (stating that asylum seekers are "not entitled to a
consultant.").

[3] U.S. Dep't of Justice, Exec. Off. for Immigr. Review, *Statistics Yearbook FY2018* 28,
https://tinyurl.com/EOIRyearbook.

[4] Nadwa Mossaad, Off. of Immigr. Statistics, Dep't of Homeland Sec., *Annual Flow Report:
Refugees and Asylees: 2017* 9, 11 tbl. 13 (Mar. 2019), https://tinyurl.com/MossaadStats.

their communities of asylees' significant economic and community contributions.  The Rule also

incentivizes those in the most desperate situations to enter the United States between ports of

entry and will predictably lead them to join the underground economy, making it more difficult

for the States to enforce their labor and civil rights laws.  Further, the Rule harms the States'

interest in family unity and harms State-funded legal services nonprofits by frustrating their

mission and requiring them to divert resources.  Lastly, the States have been harmed because

they have been denied the opportunity to participate in the rulemaking process before the Rule

went into effect.

## ARGUMENT

Giving asylum seekers a safe haven from persecution is a fundamental value of the

United States, and one to which the Amici States are strongly committed.  The purpose of the

Refugee Act of 1980, which established the present humanitarian protection system, was to

codify "one of the oldest themes in America's history—welcoming homeless refugees to our

shores."  S. Rep. No. 96-256, at 1 (1979).  In barring humanitarian protection for thousands of

eligible individuals, the Rule departs from this core principle and is inimical to the interest of the

States and the public in ensuring that those in need of protection are not sent into the hands of

their persecutors.  *Nken v. Holder*, 556 U.S. 418, 436 (2009) ("[T]here is a public interest in

preventing [immigrants] from being wrongfully removed, particularly to countries where they

are likely to face substantial harm.").

## I.    THE RULE HARMS ASYLUM SEEKERS

The Rule threatens to send asylum seekers to countries that are unable to protect them

because those countries lack full and fair asylum systems and suffer from some of the worst

violence in the world.  Indeed, due to this violence and other serious threats to individuals' basic

safety and security, the ACA countries themselves see thousands of their nationals flee to seek

asylum abroad every year.  84 Fed. Reg. at 63,995 ("Asylum claims by [immigrants] from El Salvador, Guatemala, and Honduras account for over half of the pending asylum cases [in the U.S.].").

A.   **Guatemala, El Salvador, and Honduras Lack Full and Fair Asylum Systems**

The asylum systems in Guatemala, El Salvador, and Honduras are not equipped to provide humanitarian protections to the thousands of asylum seekers who potentially will be sent there under the Rule.

Guatemala is not prepared to provide basic humanitarian services to meet the needs of the asylum seekers sent there under the Rule or to process their applications.  It was only recently that Guatemala even implemented a law defining the term "refugee," codifying the rights of those seeking protection, and implementing a refugee application process.[5]  As an added challenge, Guatemala's staffing is grossly inadequate, with only twelve officials to work on asylum cases and three staff members to interview asylum applicants.[6]  By comparison, in recent years, the United States has employed an average of 500 to 550 asylum officers.[7]  In 2018, Guatemala did not grant a single asylum application, in part because the country is still creating

---

[5] Bureau of Democracy, Hum. Rts. & Lab., U.S. Dep't of State, *Guatemala 2018 Human Rights Report* 12 (Mar. 2019) (hereinafter *State Dep't – Guatemala 2018*), https://tinyurl.com/State-Dept-Guatemala2018.

[6] *Is Guatemala Safe for Refugees and Asylum Seekers?*, Hum. Rts. First (July 1, 2019), https://tinyurl.com/HumanRightsFirstGuatemala.

[7] Gretchen Frazee, *U.S. Claims Reducing Refugee Numbers Helps with the Asylum Backlog.  Will It?*, PBS News Hour (Oct. 2, 2019), https://tinyurl.com/PBS-AsylumBacklog.

review mechanisms.[8]  The country will simply be unable to handle the potentially tens of thousands of asylum seekers it will likely receive because of the Rule.[9]

Guatemala's lack of resources for humanitarian relief is further made evident by the fact that the Guatemalan government provides "no national reception mechanisms or transit centres for persons in need of international protection."[10]  Instead, it relies almost exclusively on civil society organizations, whose resources are already overstretched, to provide humanitarian assistance and information on asylum procedures to asylum seekers.[11]

Similarly, due to a lack of government resources, asylum seekers in El Salvador face insurmountable challenges to obtain relief.  In fact, the president of El Salvador recently acknowledged that the country is not prepared to take in asylum seekers.[12]  Asylum claims in El

---

[8] Seung Min Kim, et al., *Trump Says He Has Agreement with Guatemala to Help Stem Flow of Migrants at the Border*, Wash. Post (July 26, 2019), https://tinyurl.com/ThirdCountry.

[9] Defendants have indicated that asylum seekers from El Salvador, Honduras, and Mexico will be sent to Guatemala.  *See USCIS – Guatemala ACA Guidance, supra* note 2, at 10; Zolan Kanno-Youngs, *Mexican Asylum Seekers Could Now Be Deported to Guatemala*, N.Y. Times (Jan. 6, 2020), https://tinyurl.com/Mexicans-GuatemalaACA.  Between 2015 and 2017, asylum seekers from these three countries filed 81,734 affirmative applications in the U.S., not including applications filed by individuals in removal proceedings.  Mossaad, *Annual Flow Report, supra* note 4, at 7.

[10] U.N. High Comm'r for Refugees (UNHCR), *Submission by the United Nations High Commissioner for Refugees For the Office of the High Commissioner for Human Rights' Compilation Report: Universal Periodic Review: Guatemala* 4 (Mar. 2017), https://tinyurl.com/UNHCRGuatemala.

[11] *Id*.

[12] Sharyn Alfonsi, *"Our Whole Economy Is In Shatters": El Salvador's President Nayib Bukele on the Problems Facing His Country*, 60 Minutes (Dec. 15, 2019), https://tinyurl.com/60minutes-Bukele-Interview (acknowledging that El Salvador's "economy is in . . . shatters.  Nothing works. . . . We don't have asylum capacities, but we can build them. . . . We don't have it now").

Salvador are processed by a commission, which, according to a Salvadoran newspaper, has only one officer working directly on asylum claims.[13]

Further, asylum seekers in El Salvador face unrealistic deadlines. Upon arrival into the country, individuals have only five business days to apply for asylum, and denial determinations must be appealed within three business days.[14]

Given this abbreviated window and understaffing, it is unsurprising that the number of asylum claims granted in El Salvador is exceedingly low. In 2016, El Salvador's Foreign Ministry stated that only 49 asylum claims had been granted in El Salvador "in recent years."[15] The U.S. State Department found that between January and July 2018, a mere four asylum applications had been filed in El Salvador—and as of March 2019 three had been denied, and one remained pending.[16] The lack of infrastructure to process asylum claims and the aggressive deadlines to which asylum applicants are subjected make humanitarian relief in El Salvador unrealistic to obtain.

Honduras also lacks an adequate system to provide relief. A 2016 United Nations Human Rights Council (UNHRC) report found that Honduran "immigration and asylum policies

---

[13] Nelson Rauda Zablah, *El Salvador Signs Agreement to Accept Asylum Seekers the US Won't Protect*, El Faro (Sept. 21, 2019), https://tinyurl.com/tm6d9bs.

[14] UNHCR, *Solicitud de la Condición de Refugiado,* https://tinyurl.com/unhcrHelpElSalvador (last visited Feb. 28, 2020). Applicants who file after the initial five-day period bear the burden of furnishing a justification for the delay, and Foreign Ministry officials can reject these justifications. *Id.*

[15] Ministerio de Relaciones Exteriores de El Salvador, *Gobierno de El Salvador Entrega Nacionalidades por Naturalización en el Día Mundial de los Refugiados* (June 20, 2016), https://tinyurl.com/Ministerio-de-Relaciones-Exter.

[16] Bureau of Democracy, Hum. Rts. & Lab., U.S. Dep't of State, *El Salvador 2018 Human Rights Report* 13 (Mar. 2019) (hereinafter *State Dep't – El Salvador 2018*), https://tinyurl.com/y4s7umwu.

and practices fail to live up to international standards required for those fleeing violence or persecution."[17]  In 2016, Honduras processed only nine applications for asylum,[18] and, as recently as 2017, its international protection system still required strengthening, training, and support from international agencies to "guarantee effective access to asylum procedures."[19]

The lack of infrastructure to process asylum claims in these countries will effectively result in the denial of valid claims for many individuals in need of protection.

### B.    The Northern Triangle Is Among the Most Dangerous Regions in the World

Eligible asylum seekers will face dangerous conditions in their futile attempts to seek protection in the ACA countries.[20]  Guatemala, El Salvador, and Honduras—collectively known as the Northern Triangle—are among the most dangerous countries in the world.  In large parts of the Northern Triangle, the governments are simply unable to protect their own residents from rampant violence, causing tens of thousands to flee to the United States.  Indeed, between 2015 and 2017, Guatemala, El Salvador, and Honduras ranked in the top four countries of nationality for individuals granted asylum in the United States—with a total of 19,649 individuals from these three countries receiving asylum.[21]  According to the United Nations, between 2010 and 2017, homicide rates in these three countries were between nine and thirteen times higher than

---

[17] UNHRC, *Report of the Special Rapporteur on the Human Rights of Internally Displaced Persons on His Mission to Honduras* 18 (Apr. 5, 2016), https://tinyurl.com/snz59o3.

[18] *Honduran Immigration Detention: Quick Facts,* Global Detention Project, https://tinyurl.com/sogefjq (last visited Feb. 28, 2020).

[19] UNHCR, *Honduras Factsheet* 2 (Mar. 2017) https://tinyurl.com/UNHCR-HondurasFacts.

[20] For example, a recent report by a human rights organization documented that in the last seven years, at least 138 Salvadorans had been killed after being removed from the United States. Human Rights Watch, *Deported to Danger* (Feb. 5, 2020) https://tinyurl.com/HRW-Feb2020.

[21] Mossaad, *Annual Flow Report, supra* note 4, at 9 tbl. 7.

the world average, and the death tolls were comparable to those of countries at war.[22]   The

Northern Triangle countries have experienced a surge in activity by criminal organizations

whose reach often transcends national boundaries with their members carrying out criminal

activity in neighboring countries.[23]

　　　　Guatemala, which according to the U.S. Department of State has an "alarmingly high

murder rate,"[24] suffers from widespread corruption (particularly in the police and judicial

sectors), trafficking in persons, and extortion.[25]   In Honduras and El Salvador, there have been

reports of unlawful killings by government agents.[26]   In all three countries, these crimes are

committed with impunity.[27]   In light of these conditions, UNHCR has expressed "serious

concerns" with the Rule, stating that it is "at variance with international law [and] could result in

---

[22] UNHCR, *The MIRPS: A Regional Integrative Response to Forced Displacement* (Dec. 20, 2018) 3 (citing United Nations 2018: Executive Committee (Feb. 2018), Briefing paper, Violence in the North of Central America (internal document)); UNHCR, *Women on the Run: First-Hand Accounts of Refugees Fleeing El Salvador, Guatemala, Honduras, and Mexico* 2 (Oct. 2015) (hereinafter *Women on the Run*), https://tinyurl.com/UNHCR-Women ("According to data from the UN Office on Drugs and Crime, Honduras ranks first, El Salvador fifth, and Guatemala sixth for rates of homicide globally.").

[23] *See Women on the Run*, *supra* note 22, at 2; *see also* UNHCR, *Eligibility Guidelines for Assessing the International Protection Needs of Asylum-Seekers from El Salvador* 16 (Mar. 2016) (hereinafter *UNHCR – Eligibility Guidelines for El Salvador Asylum Seekers*), https://www.refworld.org/docid/56e706e94.html.

[24] Overseas Sec. Advisory Council, U.S. Dep't of State, *Guatemala 2019 Crime & Safety Report* (Feb. 28, 2019), https://tinyurl.com/OSAC-Guatemala.

[25] Bureau of Democracy, Hum. Rts. & Lab., U.S. Dep't of State, *Guatemala 2017 Human Rights Report* 1 (updated July 23, 2018) (hereinafter *State Dep't – Guatemala 2017*), https://www.state.gov/wp-content/uploads/2019/01/Guatemala.pdf.

[26] *State Dep't – El Salvador 2018*, *supra* note 16, at 2, 14; Bureau of Democracy, Hum. Rts. & Lab., U.S. Dep't of State, *Honduras 2018 Human Rights Report* 1-2 (Mar. 2019) (hereinafter *State Dep't – Honduras 2018*), https://tinyurl.com/DOS-Honduras2018.

[27] *State Dep't – Guatemala 2017*, *supra* note 25, at 1, 6, 10, 14*; State Dep't – El Salvador 2018*, *supra* note 16, at 2, 14; *State Dep't – Honduras 2018*, *supra* note 26, at 1.

the transfer of highly vulnerable individuals to countries where they may face life-threatening dangers."[28]

These conditions are particularly dangerous for some especially vulnerable groups, including women, children, and Lesbian, Gay, Bisexual, Transgender, and Questioning (LGBTQ) asylum seekers.  Murders of women are prevalent in the three Northern Triangle countries.  El Salvador ranks first globally on rates of female homicide, with Guatemala ranking third, and Honduras seventh.[29]

Conditions for children in these countries are also grim.  In Guatemala, children are targets of recruitment by criminal gangs,[30] and child sexual exploitation and sex tourism are significant problems.[31]  Honduras, also a destination for child sex tourism, suffers from endemic child abuse, including the commercial sexual exploitation of children.[32]  Remarkably, the country does not even have a statutory rape law.[33]  In El Salvador, children suffer widespread abuse, including sexual abuse.[34]  Due to the upsurge in gang violence since the early 2010's, El Salvador has the highest rate of homicide among children and adolescents in the world, with

---

[28] UNHCR, *Statement on New U.S. Asylum Policy* (Nov. 19, 2019), https://tinyurl.com/UNHCR-ACAStatement.

[29] *Women on the Run*, *supra* note 22, at 2.

[30] United Nations Hum. Rts. Off. High Comm'r, *Committee on the Rights of the Child examines report of Guatemala* (Jan. 17, 2018), https://tinyurl.com/UNHR-Guatemala-Children.

[31] *State Dep't – Guatemala 2018*, *supra* note 5, at 18.

[32] *State Dep't – Honduras 2018*, *supra* note 26, at 18-19.

[33] *Id.*

[34] *State Dep't – El Salvador 2018*, *supra* note 16, at 17-18.

homicide ranking as the leading cause of death among adolescent boys.[35]  In all three Northern

Triangle countries, girls are frequently kidnapped and victimized by repeated gang rape.[36]

LGBTQ migrants in particular face dangers in the Northern Triangle, as homophobic and

transphobic violence is widespread in these countries.  In El Salvador, nongovernmental

organizations report violence and discrimination against LGBTQ people by public officials and

police forces.[37]  LGBTQ persons reported that, when attempting to make allegations of violence

committed against them, they were harassed by the Salvadoran national police and attorney

general, including by being subjected to strip searches.[38]  In Honduras, LGBTQ individuals are

subject to threats and violence.[39]  In Guatemala, almost one third of transwomen identified police

officers as their main persecutors, and LGBTQ women experience forced pregnancies through

what is known as "corrective rape."[40]

In addition to these harrowing types of violence, discrimination in aspects of civil society

is also common despite nominal prohibitions.  In El Salvador and Honduras, discrimination

based on gender identity or sexual orientation is legally prohibited, but abuses continue.[41]

Transgender women in Honduras are particularly vulnerable to employment and education

---

[35] *UNHCR – Eligibility Guidelines for El Salvador Asylum Seekers*, *supra* note 23, at 35.

[36] Kids in Need of Defense (KIND), *Sexual and Gender Based Violence & Migration Fact Sheet* 2 (Apr. 2018), https://tinyurl.com/KIND-SGBV.

[37] *State Dep't – El Salvador 2018*, *supra* note 16, at 20.

[38] *Id*.

[39] *State Dep't – Honduras 2018*, *supra* note 26, at 1.

[40] Organización Trans Reinas de la Noche, *Human Rights Violations against Transgender Women in Guatemala* 7 (Feb. 2018), https://tinyurl.com/OTRN-LGBT; *State Dep't – Guatemala 2018*, *supra* note 5, at 22.

[41] *State Dep't – El Salvador 2018*, *supra* note 16, at 20; *State Dep't – Honduras 2018*, *supra* note 26, at 20, 21.

discrimination.[42]  Notably, in Guatemala, legal protections against LGBTQ discrimination are

nonexistent.[43]

Given the dangerous conditions in the Northern Triangle, sending eligible asylum seekers

to seek asylum there will expose them to significant harm and likely result in further persecution.

## II.   THE RULE HARMS THE STATES

The Amici States are home to thousands of asylees.[44]  In effectively barring most eligible

asylum seekers from the United States and removing them to third countries, the Rule harms the

States by (1) depriving them of the asylees' economic contributions, (2) driving eligible asylum

seekers into the underground economy and thereby hindering the States' ability to enforce their

labor and civil rights laws, (3) harming the State's interest in family unity, and (4) forcing state-

funded legal services nonprofits to divert resources.  Further, by implementing the Rule without

the required notice and comment, Defendants have deprived the States of the opportunity to

participate in the rulemaking process regarding policies that affect their economies and the

welfare of their communities.

### A.   The Rule Will Result in Decreased Economic Contributions to the States

Amici States and their constituents fundamentally benefit when our society lives up to its

historic commitment to provide a safe haven to persecuted individuals.  Experience has shown

that the benefits associated with immigration, including the asylum process, are reciprocal; not

only do immigrants benefit from the opportunities associated with living in the United States, but

the States and country as a whole benefit from immigrants.  Detractors of our nation's

---

[42] *State Dep't – Honduras 2018*, *supra* note 26, at 21.

[43] *State Dep't – Guatemala 2018*, *supra* note 5, at 21.

[44] Mossaad, *supra* note 4, at tbl. 13 (listing California, New York, New Jersey, Illinois, and Washington among the top recipients of individuals granted affirmative asylum).

immigration and asylum laws have argued that immigrants—and asylum seekers in particular—drain our nation's resources.   Nothing could be further from the truth, as the Amici States know from experience.[45]

Immigrants enhance the nation's prosperity by contributing to the state and national economies.  Nearly one in six workers is an immigrant.[46]  Nationally, asylees who were granted affirmative asylum applications have a median age much lower than the U.S. native-born population, which means a majority of them are working age and thus contribute to the economic output of states and the country as a whole.[47]  The following are some examples of immigrants' significant contributions to the States:

- California: In great part due to the 6.6 million immigrants who form a major part of California's workforce, the state has become the fifth-largest economy in the world.[48] Immigrants fill over two-thirds of the jobs in California's agricultural and related sectors, almost half in manufacturing, 43% in construction, and 41% in computer and sciences.[49] In 2014, immigrant-led households in California paid over $26 billion in state and local taxes and exercised almost $240 billion in spending power, and in 2015, immigrant

[45] For an empirical analysis of this point in a different context, see Hippolyte d'Albis et al., *Macroeconomic Evidence Suggests that Asylum Seekers Are Not a "Burden" for Western European Countries*, Science Advances (Jun. 20, 2018), https://tinyurl.com/y269tm7e.

[46] Am. Immigr. Council, *Immigrants in the United States* 2 (Oct. 4, 2017), https://tinyurl.com/y3h72n23.

[47] *See* Mossaad, *Annual Flow Report, supra* note 4, at 8 (finding that 58 percent of those granted affirmative asylum in 2017 were between the ages of 18 and 44).

[48] Am. Immigr. Council, *Immigrants in California* 2 (2017), https://tinyurl.com/CAP-Immigrants-in-CA.

[49] *Id*. at 3-4.

business owners accounted for over 38% of all Californian entrepreneurs and generated

almost $22 billion in business income.[50]

- District of Columbia: Immigrants help power the District of Columbia's economy.  In

  2014, immigrant-owned businesses generated $121.9 million in income and employed

  41,672 people in the District.[51]  That same year, immigrants in the District earned $4

  billion and paid $336.9 million in local taxes.[52]

- Illinois: Immigrant-owned businesses generated $2.6 billion in business income in

  Illinois in 2014.[53]  In 2016, immigrants in Chicago alone contributed $1.6 billion in taxes

  to the state's economy and helped create or preserve 25,664 local manufacturing jobs.[54]

- New Jersey: In New Jersey, immigrants make up over 22% of the population, and

  approximately 28% of the workforce, and immigrant-owned businesses employ nearly

  390,000 people.[55]  In 2018, immigrants in New Jersey contributed over $29 billion in

  federal, state and local taxes.[56]

The States are therefore harmed by government actions, such as the Rule, that wrongfully

deny asylum applicants a meaningful opportunity to establish their eligibility for asylum and

---

[50] *Id*.

[51] New Am. Econ., *The Contributions of New Americans in Washington, D.C.* 2 (Aug. 2016), https://tinyurl.com/immigrantsDC.

[52] *Id.* at 5.

[53] New Am. Econ., *The Contributions of New Americans in Illinois* 2 (Aug. 2016), https://tinyurl.com/IL-Immigration-Economy.

[54] New. Am. Econ., *New Americans in Chicago* 1, 4 (last visited Mar. 2, 2020), https://tinyurl.com/NAE-Chigago.

[55] New Am. Econ., *Immigrants & the Econ. in New Jersey* (last visited Mar. 2, 2020), https://tinyurl.com/NewAmNJ; New Am. Econ., *The Contributions of New Americans in New Jeresy*, (Aug. 2016), https://tinyurl.com/rr45p42.

[56] New Am. Econ., *The Contributions of New Americans in New Jersey*, *surpa* note 55.

thereby present significant hurdles to their integration into the States' workforces.  *See* S. Rep. No. 96-256, at 9 (1979) (noting that asylees' clear legal status was meant to remedy the fact that previous "practice ha[d] often left the refugee in uncertainty as to his own situation and ha[d] sometimes made it more difficult for him to secure employment and enjoy . . . other rights").

Moreover, by imposing virtually insurmountable barriers to humanitarian relief, the Rule will discourage many who would be eligible for asylum in the United States from applying for asylum affirmatively.  Indeed, by presenting themselves at a port of entry seeking asylum, eligible asylum seekers risk being sent to the Northern Triangle, where they will likely suffer further persecution.  Faced with this possibility and fearing severe consequences if they are forced to return to the countries from which they escaped, many eligible asylum seekers in desperate situations will decide to enter the United States between ports of entry despite the risks to their safety and the resulting lack of legal status.

By pushing eligible asylum seekers into the shadows, the Rule will deprive these individuals of a work permit and a path to legal status.  This will have a number of negative effects on both the asylum seekers and the States.  For example, the States will lose tax revenue they would otherwise receive.  With lawful status and/or work permits, asylum seekers would pay millions more in taxes.[57]  For example, in Massachusetts, undocumented immigrants pay almost $185 million in state and local taxes every year, an amount that would increase to over $240 million if they had legal status and work authorization.[58]  Similarly, undocumented immigrants in New Mexico would have paid in excess of $8 million more in taxes in 2017 if they

---

[57] Inst. on Taxation & Econ. Policy, *Undocumented Immigrants' State & Local Tax Contributions* 2, 4 (Mar. 2017), https://tinyurl.com/ITEP-UndocTaxes.

[58] *Id* at 3.

had legal status.[59]  By preventing eligible asylees from receiving protection in the United States, the Rule will therefore deprive the States of their significant economic contributions.

## B.   The Rule Makes It More Difficult for States to Enforce Their Own Laws

The Rule hinders the States' ability to enforce their labor and civil rights laws by likely leading eligible asylum seekers to look for work in the underground economy.  As described above, many asylum seekers will likely make the harrowing decision to enter the United States without inspection and live in the shadows.  Without a work permit, these individuals will predictably turn to the underground economy, where it is more difficult for the States to enforce workplace protection laws intended to protect all residents.

The States have a fundamental interest in enforcing their own laws, *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989), and when a rulemaking impinges on that ability, the States suffer an injury.  *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers).  Through labor and civil rights laws, the States protect their residents from wage theft, exploitation, and discrimination at work.  *See generally, e.g.*, Cal. Gov. Code §§ 12900-12996; Cal. Bus. & Prof. Code § 17200 *et seq.*; Cal. Lab. Code §§ 200-1200; D.C. Code §§ 32-1301, *et seq.* (Wage Payment and Collection Law); D.C. Code §§ 32-1001, *et seq.* (Minimum Wage Revision Act);  D.C. Code §§ 32-531.01, *et seq.* (Sick and Safe Leave Act); D.C. Code §§ 32-1331.01, *et seq.* (Workplace Fraud Act), and D.C. Code §§ 2-220.01, *et seq.* (Living Wage Act).

These laws, for the most part, protect all residents without respect to immigration status, but effective enforcement relies on employees' ability and willingness to report violations. Despite the significant labor and civil rights abuses that befall unauthorized workers, fear of

---

[59] *Id.*

reprisal and deportation often inhibits unauthorized workers from reporting such violations.[60]
This fear of retaliation has been recognized by courts as a common and problematic occurrence
that undermines labor and civil rights protections.  In *Rivera v. NIBCO, Inc.*, for example, the
Ninth Circuit explained that the possibility of retaliatory actions results in "most undocumented
workers [being] reluctant to report abusive or discriminatory employment practices."  364 F.3d
1057, 1065 (9th Cir. 2004).  By discouraging eligible asylum seekers from affirmatively seeking
humanitarian relief and instead likely causing them to turn to the underground economy, the
Rule will make them more susceptible to workplace abuse and inhibit the States' ability to
enforce their civil rights and labor laws for all residents.

### C.    The Rule Harms the States' Interest in Family Unity

The Rule also harms the States' interest in family unity and will cause harm to
communities within the States.  The States value family unity, which provides crucial social
support that strengthens the neighborhood, communities, and civic society writ large.  *See, e.g.*,
*Moore v. City of E. Cleveland*, 431 U.S. 494, 503-04 (1977) ("It is through the family that we
inculcate and pass down many of our most cherished values, moral and cultural.")  Many
residents of the States have relatives in other countries who are escaping persecution and seeking

---

[60] *See* Human Rights Watch, *"At Least Let Them Work" The Denial of Work Authorization & Assistance for Asylum Seekers in the U.S.* (Nov. 12, 2013), https://tinyurl.com/yx9vp5wf; Daniel Costa, *California Leads the Way*, Econ. Policy Inst. (Mar. 22, 2018), https://tinyurl.com/CostaEPI.  *See also* Douglas D. Heckathorn, et al., *Unregulated Work in Chicago: The Breakdown of Workplace Protections In the Low-Wage Labor Market,* Center for Urban Economic Development, U. of Ill. at Chicago, 18 (2010) (finding that a significant percentage of immigrant workers who reported workplace injuries to their employer were immediately fired or threatened with deportation).

humanitarian protection in the United States.[61]  For example, a California father awaits being reunited with his two young children and their mother who fled gang threats in Honduras.[62]  Similarly, an asylum seeker now residing in Massachusetts seeks to reunite with her partner and young son, after the family escaped violence in Guatemala but became separated before reaching the United States.[63]  The Rule undermines the States' core interest in family unity because eligible asylum seekers, many with relatives in the States, will be barred from humanitarian protection in the United States and instead be sent to countries where they will suffer additional persecution.  As a result, residents of the States will be denied the opportunity to reunite with family members who are eligible asylum seekers.

Because families provide stability and support for their members and essential care and nurturing of children, this permanent separation will cause grave harm to residents of the States with family members eligible for asylum.  Family separation can result in negative health outcomes including toxic stress, which can delay brain development and cause cognitive impairment; irregular sleep patterns, which can lower academic achievement among children; and symptoms of post-traumatic stress disorder.[64]  Spousal separation can also cause fear,

---

[61] *See, e.g.*, Molly Hennessy-Fiske, *Why & How Are Asylum Seekers Entering the U.S.?*, L.A. Times (Nov. 22, 2018), https://tinyurl.com/Hennessy-Fiske (asylum seekers have relatives across the country, from Los Angeles to Miami, New York and Washington).

[62] Molly Hennessy-Fiske, *The New Family Separation: Migrant Parents Stranded on Border Send Kids*, L.A. Times (Nov. 27, 2019), https://tinyurl.com/KidsSentAlone.

[63] *Guatemalan Seeking Asylum Sues U.S. to Reunite with Family*, The Associated Press (Jan. 6, 2020), https://tinyurl.com/AP-MassWomanSues.

[64] Colleen K. Vesely, Ph.D., et al., *Immigrant Families Across the Life Course: Policy Impacts on Physical & Mental Health* (July 2019), https://tinyurl.com/NCFRpolicybrief.

anxiety, and depression.[65]  Ultimately, these harms to the States' residents will also harm the States' neighborhoods and communities.

### D.      The Rule Harms State-Funded Legal Service Programs

Legal counsel is essential in immigration matters and can be the difference between winning and losing a request for humanitarian protection.[66]  Recognizing the importance of proper legal guidance and the crucial role it plays in family reunification, several of the States fund nonprofit organizations to provide legal assistance in immigration-related matters.  For example, since FY 2015-16, California has allocated $152 million to nonprofit legal service organizations for this purpose.[67]  Similarly, Washington allocated a combined $4 million in fiscal years 2019-2021 to legal service organizations serving asylum seekers and other migrant populations.[68]  Among other programs, New York funds the Liberty Defense Project, a state-led, public-private legal defense fund designed to ensure that immigrants have access to legal counsel.[69]  The District of Columbia allocated $2.5 million for FY 2020 to programs that provide

---

[65] *See, e.g.,* Yeganeh Torbati, *U.S. Denied Tens of Thousands More Visas in 2018 Due to Travel Ban: Data*, Reuters (Feb. 29, 2019), https://tinyurl.com/TorbatiReuters (describing a U.S. citizen's plight to obtain a visa for his wife, and that their separation was causing them both to "break down psychologically").

[66] Philip Bump, *Most Migration to the U.S. Costs Money. There's a Reason Asylum Doesn't.*, Wash. Post (Apr. 30, 2019), https://tinyurl.com/BumpWashPost ("In 2017, 90 percent of those without legal representation were denied asylum in immigration court while only 54 percent of those with legal representation were [denied].").

[67] Cal. Dep't of Soc. Servs., *Immigration Services Program Update* 1 (Mar. 2019).

[68] *See* Wash. Laws of 2018, ch. 299, § 127(65) (amending Laws of 2017, 3d Spec. Sess., ch. 1, § 128) (Mar. 27, 2018), https://tinyurl.com/WashLaws; Wash. Laws of 2019, ch. 415, § 129(21) (May 21, 2019), https://tinyurl.com/WashLaws2019.

[69] *See* N.Y. Div. of Budget, *Governor Cuomo Announces Highlights of the FY 2019 State Budget* (Mar. 30, 2018), https://tinyurl.com/NYBudget2019.

legal services to its immigrant population, including asylum seekers.[70]  New Jersey also allocated $2.1 million in state funds in FY 2019 and 2020 for legal assistance to individuals in removal proceedings.[71]  And an Oregon law passed in 2019 provides $2 million to a legal services organization for immigration defense.[72]

The mission and sustainability of immigrant legal service programs funded by the States are imperiled by the Rule.  *See, e.g.*, Complaint ¶¶ 150-154, ECF Doc. 3 (Jan. 15, 2020).  The Rule undermines humanitarian protection, imposing a new complex screening mechanism and a higher evidentiary standard.  *See id. ¶¶* 10-11.  To respond to these new and complicated requirements, legal service providers in the States will be required to divert considerable resources to re-strategize their approach to client representation and to re-allocate staff time and resources to counsel asylum seekers prior to their arrival at a U.S. port of entry.  *See, e.g.*, *id.* ¶ 153.  As a result, the number of cases these providers can undertake will decrease, and their operational costs will increase.  *Id.*  The Rule will therefore make it more expensive for the States to support the current level of services to immigrant communities.

### E.  Promulgation of the Rule Without Notice and Comment Harms the States

The foregoing harms to the States are compounded by Defendants' issuing of the Rule without affording notice and an opportunity to comment prior to the date of implementation.  *See* 84 Fed. Reg. at 63,994 (making the rule effective on November 19, 2019, the date of

---

[70] D.C. Off. of the Mayor, Press Release, *Mayor Bowser Announces $2.5 Million Available for FY 2020 Immigrant Justice Legal Services Grant Program* (July 12, 2019), https://tinyurl.com/DC-Grant.

[71] *See* N.J. Off. of Mgmt. & Budget, *The Governor's FY2020 Budget: Detailed Budget* 419 (Mar. 2019), https://tinyurl.com/NJ2020Budget.

[72] H.B. 5050, 80th Or. Legis. Assemb., 2019 Reg. Sess. (Or. 2019), https://tinyurl.com/Or-HB5050.

publication).  In so doing, Defendants disregarded the bedrock requirement under the

Administrative Procedure Act (APA) that agencies are to provide interested parties with notice

and an opportunity to comment on a rule at least 30 days before it takes effect.  5 U.S.C. §

553(c), (d).

The APA's notice and comment requirements serve the "essential purpose" of fostering

"public participation and fairness to affected parties," *Batterton v. Marshall*, 648 F.2d 694, 703

(D.C. Cir. 1980), and ensuring that "the agency has all pertinent information before it when

making a decision."  *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014) (internal citation

and quotation marks omitted); *accord, E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 775

(9th Cir. 2018) (explaining that the APA's "procedures are 'designed to assure due deliberation'

of agency regulations and 'foster the fairness and deliberation that should underlie a

pronouncement of such force'" (quoting *United States v. Mead Corp.*, 533 U.S. 218, 230

(2001))).  As such, it is "antithetical to the structure and purpose of the APA for an agency to

implement a rule first, then seek comment later."  *United States v. Valverde*, 628 F.3d 1159,

1164 (9th Cir. 2010) (internal citation and quotation marks omitted); *see also United States v.

Ross*, 848 F.3d 1129, 1133 (D.C. Cir. 2017) (joining the Ninth Circuit in invalidating the interim

rule at issue in *Valverde*, 628 F.3d 1159).

Notice and comment is especially important where, as here, states are among the affected

parties.  As the D.C. Circuit has recognized, "where federalism concerns are implicated, the

usefulness and desirability of the APA's notice-and-comment provision may be magnified."  *N.J.

Dep't of Envtl. Prot. v. U.S. E.P.A.*, 626 F.2d 1038, 1047 (D.C. Cir. 1980) (footnote omitted).

Indeed, one manifestation of this principle is that States receive "special solicitude" in

establishing their standing to bring an APA suit.  *Texas v. United States*, 809 F.3d 134, 151-52

(5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016) (per curiam).

It is noteworthy that the Department of Homeland Security engaged in a fulsome notice

and comment process when, in 2004, it promulgated regulations implementing the asylum

cooperation agreement with Canada.  *See* 69 Fed. Reg. at 69,480 (issuing final rule eight months

after issuing proposed rule).  *Cf. United States v. Picciotto*, 875 F.2d 345, 348 (D.C. Cir. 1989)

(considering, in applying § 553, the fact that the agency treated "a similar[] . . . regulation . . . as

a substantive rule requiring notice and comment").  Now, however, Defendants contend that the

Rule—which, like its 2004 predecessor, concerns safe third country agreements—is exempt from

the APA's notice and comment requirements because the Rule, in their view, falls within the

"foreign affairs" exception under § 553(a)(1) and because they assert "good cause" to forgo such

procedures under § 553(b)(B) and (d)(3).  Neither ground has merit.

### 1.    The Foreign Affairs Exception Does Not Apply

Exceptions to notice and comment are to "be narrowly construed and only reluctantly

countenanced."  *N.J. Dep't of Envtl. Prot.*, 626 F.2d at 1045; *Zhang v. Slattery*, 55 F.3d 732, 744

(2d Cir. 1995), *superseded on other grounds by statute*, 8 U.S.C. § 1101(a)(42).  Where, as here,

a proposed rule involves immigration, the "dangers of an expansive reading of the foreign affairs

exception . . . are manifest."  *City of N.Y. v. Permanent Mission of India to United Nations*, 618

F.3d 172, 202 (2d Cir. 2010).  Because immigration matters may implicate foreign affairs to

some extent, *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980), "it would be

problematic if incidental foreign affairs effects eliminated public participation in this entire area

of administrative law."  *City of N.Y.*, 618 F.3d at 202.  For this reason, courts have "regularly

limited the exception in [the immigration] context to prevent the exception from 'becom[ing]

distended.'"  *Id.* (quoting *Zhang*, 55 F.3d at 744).  This approach "accords with Congress's

admonition in the legislative history of the APA not to interpret the phrase 'foreign affairs

function' . . . loosely . . . to mean any function extending beyond the borders of the United

States." *Id.* (quoting S. Rep. No. 79–752, at 13 (1945), and citing H.R. Rep. No. 79-1980, at 23

(1946)) (ellipsis in original); *see also Jean v. Nelson*, 711 F.2d 1455, 1477 (11th Cir. 1983)

(explaining that the "legislative history . . . indicates the exception should be construed

narrowly").

In the immigration context, in other words, the foreign affairs exception is inapplicable

unless an agency demonstrates that complying with notice and comment requirements would

"provoke definitely undesirable international consequences." *Yassini*, 618 F.2d at 1360 n.4;

*Zhang*, 55 F.3d at 744; *City of N.Y.*, 618 F.3d at 202; *E. Bay Sanctuary Covenant*, 932 F.3d at

775-76.  Acknowledging that "[s]ome courts" apply this test, Defendants assert, in conclusory

fashion, that they nonetheless meet this standard because "a delayed effective date for this rule

*could* have far-reaching consequences for the strength of the negotiating position of the United

States in relation to potential signatories of future [ACAs]."  84 Fed. Reg. at 64,006 (emphasis

added).  This purported harm is speculative, unsupported by the record, and contradicted by

subsequent events.  The Rule does not explain, nor cite anything to substantiate, its assertion that

even a short administrative comment period would disrupt current negotiations.  And, to the

contrary, more than three months have now passed since Defendants issued the Rule—a period

that would have been sufficient to engage in appropriate notice and comment rulemaking—and

no additional international agreements have been published.[73]

---

[73] Defendants' reliance on *Int'l Bhd. of Teamsters v. Pena*, 17 F.3d 1478 (D.C. Cir. 1994), is
unavailing.  *See* 84 Fed. Reg. at 64,005.  Unlike in *Pena*, which did not concern an immigration
rulemaking, the Rule here does not involve merely the ministerial adoption of substantive rules
already required by an international agreement.  *See* 17 F.3d at 1486.  Moreover, nothing in the
agreements with Guatemala, Honduras, and El Salvador require the United States to act by a

### 2.    The Good Cause Exception Does Not Apply

The "good cause" exception cannot be applied to excuse notice and comment here.  *See* 5

U.S.C. § 553(b)(B) (stating three bases for "good cause": where notice and comment would be

"impracticable, unnecessary, or contrary to the public interest"); *see also id.* § 553(d)(3).  Circuit

precedent makes clear that this exception is to be "narrowly construed," *Util. Solid Waste*

*Activities Grp. v. U.S. E.P.A.*, 236 F.3d 749, 754 (D.C. Cir. 2001), and that the "good-cause

inquiry is meticulous and demanding." *Sorenson Commc'ns Inc. v. Fed. Commc'n Comm'n*, 755

F.3d 702, 706 (D.C. Cir. 2014).

Defendants broadly contend that "[d]elaying implementation of this rule until the

conclusion of notice-and-comment procedures . . . would be impracticable and contrary to the

public interest."  84 Fed. Reg. at 64,006.  But they offer no support for the contention that notice

and comment would be "impracticable," and history contradicts any such notion.[74]  Instead,

Defendants focus exclusively on their contention that such procedures would be "contrary to the

public interest," arguing that notice and comment would have resulted in a "dramatic increase in

the numbers of [immigrants] who enter or attempt to enter the United States to file asylum

applications before the effective date."  *See id.*

---

specific date that necessitate Defendants bypassing ordinary administrative procedures.  To the
contrary, the agreements contemplate "gradual" implementation and permit the United States to
suspend implementation of the agreement for six months simply by giving written notice.  *See* 84
Fed. Reg. at 64,099 (publication of the Guatemala Agreement).  In any event, significant
questions concerning the legality of the ACA in Guatemala and the fact that the Northern
Triangle countries lacked the capacity to adjudicate high volumes of cases undermine any
purported interest Defendants had in making the Rule immediately effective.  *See supra* Part
I(A); *see also* Sofia Menchu, *Guatemalan Court Halts 'Safe Third Country' Designation for
Asylum Seekers*, Reuters (July 19, 2019), https://tinyurl.com/qnpnr9h.

[74] That the 2004 regulation regarding Canada went through notice and comment demonstrates
that such procedures are quite plainly not "impracticable" in this context. *See* 69 Fed. Reg. at
69,480.

The factual basis offered by Defendants in support of their "good cause" theory is deficient on its face.  Defendants cite several rules previously issued without notice and comment.  Tellingly, while two of these rules were temporarily enjoined at various times, Defendants do *not* assert that those injunctions gave rise to any sort of surge in asylum applications.  *See id.* at 64,007.  For example, Defendants issued a rule without notice and comment, which with limited exceptions, bars asylum to any applicant who transited through a third country en route to the United States and did not apply for protection there.  *See* Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829, 33,840–41 (July 16, 2019).  This rule was enjoined nationally for 25 days, and within the Ninth Circuit for an additional 24 days.  *E. Bay Sanctuary Covenant v. Barr*, 385 F. Supp. 3d 922, 951 (N.D. Cal. 2019); *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1028 (9th Cir. 2019) (upholding the preliminary injunction in the Ninth Circuit), *stayed pending appeal*, 140 S. Ct. 3 (2019).  Nonetheless, Defendants do not allege that there was a surge in asylum application during this time.  84 Fed. Reg. at 64,007.

Defendants' additional reasoning is insufficient.  Defendants repeatedly cite a district court order concerning a November 2018 asylum rule, which relied on an October 2018 article, to conclude that one could infer that smugglers might communicate about the impending rule to potential asylum seekers and cause a surge in immigration during the notice and comment period. 84 Fed. Reg. at 64,006 (citing *E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1095, 1115 (N.D. Cal. 2018)).  But Defendants omit that the very same court enjoined the subsequent July 2019 asylum rule and *rejected* the same article, finding that "a single, progressively more stale article cannot excuse notice-and-comment for every immigration-related regulation ad infinitum."  *Barr*, 385 F. Supp. 3d at 950.  Defendants' conjecture about a

potential surge and their invocation of past uses of the exception do not satisfy the requisite

"meticulous and demanding" good-cause inquiry.  *Sorenson Commc'ns*, 755 F.3d at 706.

As sovereigns responsible for the health, safety, and welfare of millions of people within

their respective borders, the Amici States have unique interests and perspectives to contribute on

issues of national importance and widespread impact, like those raised by the Rule.  Defendants

were obligated to promulgate the Rule through ordinary notice and comment, and their failure to

do so deprived the States of an opportunity to provide important input and insight into the deeply

problematic aspects of the Rule that affected both the States directly, *see supra* at Part II(A)-(D),

and their residents, *see supra* at Part I.

## CONCLUSION

Plaintiffs' Motion for Summary Judgment and Permanent Injunction should be granted.

Dated:  March 6, 2020

Respectfully submitted,

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
SUSAN E. SLAGER
Supervising Deputy Attorney General
MARISSA MALOUFF
JAMES F. ZAHRADKA II

_s/ Erandi Zamora-Graziano_
R. ERANDI ZAMORA-GRAZIANO
(Cal. SBN 281929)*
Deputy Attorneys General
_Attorneys for Amicus Curie State of California_
_*Filing pursuant to LCvR 83.2(f)_

KARL A. RACINE
Attorney General for the District of Columbia
KATHLEEN KONOPKA
Deputy Attorney General
NICOLE HILL

_s/ James Graham Lake_
JAMES GRAHAM LAKE (DC Bar No. 1028853)
Assistant Attorneys General
_Attorneys for Amicus Curiae District of_
_Columbia_

WILLIAM TONG
_Attorney General_
_State of Connecticut_
55 Elm Street
Hartford, CT 06106

KATHLEEN JENNINGS
_Attorney General_
_State of Delaware_
820 North French Street
Wilmington, DE 19801

CLARE E. CONNORS
_Attorney General_
_State of Hawaii_
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
_Attorney General_
_State of Illinois_
100 W. Randolph Street, 12th Fl.
Chicago, IL 60601

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME  04333-0006

MAURA HEALEY
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

KEITH ELLISON
*Attorney General*
*State of Minnesota*
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

GURBIR S. GREWAL
*Attorney General*
*State of New Jersey*
25 Market Street, Box 080
Trenton, NJ 08625

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 S. Main Street
Providence, RI 02903

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

BRIAN E. FROSH
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

HECTOR BALDERAS
*Attorney General*
*State of New Mexico*
P.O. Drawer 1508
Santa Fe, NM 87504

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street N.E.
Salem, OR 97301

THOMAS J. DONOVAN, JR.
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609