JOSEPH H. HUNT
*Assistant Attorney General*
SCOTT G. STEWART
*Deputy Assistant Attorney General*
WILLIAM C. PEACHEY
*Director*
EREZ REUVENI
*Assistant Director*
BRIAN WARD
*Senior Litigation Counsel*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-9121
Email: brian.c.ward@usdoj.gov

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| U.T., *et al.*,          ) | Civil Action No. 1:20-cv-00116-EGS |
|          ) | |
|       Plaintiffs,     ) | |
|          ) | |
| v.          ) | |
|          ) | |
| William Barr, *et al.*,     ) | |
|          ) | |
|       Defendants.    ) | |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND PERMANENT INJUNCTION AND IN SUPPORT OF
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................1

LEGAL AND PROCEDURAL BACKGROUND........................................................................7

ARGUMENT .............................................................................................................................16

I.   The claims are non-justiciable ..........................................................................................16

    A.   The Court lacks subject-matter jurisdiction................................................................16

    B.   Plaintiffs lack Article III standing and are not within the
        zone of interests .........................................................................................................26

II.   The government is entitled to summary judgment on all claims .......................................33

    A.   The Rule and guidance do not violate statutes governing removal to a third
        country, expedited removal, or withholding of removal (Claims I - III) ....................33

    B.   The Rule and guidance are not arbitrary and capricious (Claim IV). .........................45

    C.   The full-and-fair determinations are lawful (Claim V)...............................................50

    D.   The Rule was lawfully issued without notice and comment (Claims VI) ...................55

    E.   The Rule may not be challenged on Suspension Clause grounds and
        in any event is consistent with the Clause (Claim VII)..............................................59

III.   Any relief that the Court grants must be sharply limited...................................................61

CONCLUSION...........................................................................................................................65

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*AILA v. Reno*,
  18 F. Supp. 2d 38 (D.D.C. 1998) ..................................................................................... passim

*Adams v. Vance*,
  570 F.2d 950 (D.C. Cir. 1978) ................................................................................................ 63

*Am. Ass'n for Homecare v. Leavitt*,
  No. 08-cv-0992, 2008 WL 2580217 (D.D.C. June 30, 2008)............................................ 29, 64

*Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*,
  751 F.2d 1239 (Fed. Cir. 1985)........................................................................................... 54, 55

*Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*,
  659 F.3d 13 (D.C. Cir. 2011) ............................................................................................... 27, 38

*Am. Soc'y of Cataract & Refractive Surgery v. Thompson*,
  279 F.3d 447 (7th Cir. 2002) ...................................................................................................... 21

*American Fed'n of Labor v. Donovan*,
  757 F.2d 330 (D.C. Cir. 1985)..................................................................................................... 41

*American Immigration Lawyers Ass'n v. Reno*,
  199 F.3d 1352 (D.C. Cir. 2000) ....................................................................................... passim

*Arpaio v. Obama*,
  797 F.3d 11 (D.C. Cir. 2015) ....................................................................................................... 27

*Bains v. Schiltgen*,
  No. C 97-2573 SI, 1998 WL 204977 (N.D. Cal. Apr. 21, 1998)............................................ 25

*Barr v. East Bay Sanctuary Covenant*,
  140 S. Ct. 3 (2019)......................................................................................................................... 32

*Block v. Cmty. Nutrition Inst.*,
  467 U.S. 340 (1984)....................................................................................................................... 30

*Bourdon v. DHS*,
  940 F.3d 537 (11th Cir. 2019) ..................................................................................................... 21

*Bowles v. Russell*,
  551 U.S. 205 (2007)....................................................................................................................... 61

*Bremer v. Johnson*,
  834 F.3d 925 (8th Cir. 2016) ........................................................................... 21

*Broadgate Inc. v. USCIS*,
  730 F. Supp. 2d 240 (D.D.C. 2010) ....................................................... 35, 37, 38, 39

*CAIR v. Trump*,
  No. 1:19-CV-02117-TJK, 2019 WL 3436501 (D.D.C. July 24, 2019) ................... 64

*Chicago & S. Air Lines, Inc. v. Waterman SS Corp.*,
  333 U.S. 103 (1948) ........................................................................................ 55

*Children's Hosp. Ass'n of Texas v. Azar*,
  300 F. Supp. 3d 190 (D.D.C. 2018) ................................................................. 63

*Cisneros v. Alpine Ridge Group*,
  508 U.S. 10, (1993) ........................................................................................ 24

*City of Los Angeles v. Barr*,
  929 F.3d 1163 (9th Cir. July 12, 2019) ............................................................ 46

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ........................................................................................ 31

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ........................................................................................ 28

*Clark v. Martinez*,
  543 U.S. 371 (2005) ........................................................................................ 42

*Clarke v. Secs. Indus. Ass'n*,
  479 U.S. 388 (1987) ........................................................................................ 29

Congress Mandates. *Castro v. DHS*,
  835 F.3d 422 (3d Cir. 2016) ............................................................................ 59

*Cronin v. U.S. Dep't of Agric.*,
  919 F.2d 439 (7th Cir. 1990) ............................................................................ 63

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ........................................................................................ 26

*Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019) .................................................................................... 53

*EarthLink, Inc. v. FCC*,
  462 F.3d 1 (D.C. Cir. 2006) ............................................................ 45, 54

*East Bay Sanctuary Covenant v. Trump*,
  354 F. Supp. 3d 1094 (N.D. Cal. 2018) ...................................................... 57

*East Bay Sanctuary Covenant v. Trump*,
  909 F.3d 1219 (9th Cir. 2018) ........................................... 5, 30, 56, 64

*F.C.C. v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ............................................................................ 46

*Fair Empl. Council of Greater Washington, Inc. v. BMC Marketing*,
  28 F.3d 1268 (D.C. Cir. 1994) ............................................................ 28

*Fed'n for Am. Immigration Reform, Inc. (FAIR) v. Reno*,
  93 F.3d 897 (D.C. Cir. 1996) .............................................................. 30

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ............................................................ 28

*Garcia v. Thomas*,
  683 F.3d 952 (9th Cir. 2012) .............................................................. 51

*Gebhardt v. Nielsen*,
  879 F.3d 980 (9th Cir. 2018) .............................................................. 21

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) ................................................................... 26, 60

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
  527 U.S. 308 (1999) ............................................................................ 60

*Haitian Refugee Ctr. v. Gracey*,
  809 F.2d 794 (D.C. Cir. 1987) ............................................................ 26

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ............................................................................ 26

*Hawaii Helicopter Operators Ass'n v. FAA*,
  51 F.3d 212 (9th Cir. 1995) ................................................................ 57

*Heckler v. Campbell*,
  461 U.S. 458 (1983) ..................................................................... 42, 43

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ................................................................................................. 58

*Immigrant Rights Project v. USCIS*,
    325 F.R.D. 671 (W.D. Wash. 2016) ................................................................... 30

*Innovation Law Lab v. McAleenan*,
    924 F.3d 503 (9th Cir. 2019) .............................................................................. 63

*Innovation Law Lab v. Wolf*,
    No. 19-15716, 2020 WL 964402 (9th Cir. Feb. 28, 2020) ................................. 45

*INS v. Cardoza-Fonseca*,
    480 U.S. 421 (1987) .............................................................................. 8, 33, 52

*INS v. Legalization Assistance Project of L.A. Cty.*,
    510 U.S. 1301 (1993) .......................................................................................... 30

*INS v. St. Cyr*,
    533 U.S. 289 (2001) ............................................................................................ 59

*J.E.F.M. v. Lynch*,
    837 F.3d 1026 (9th Cir. 2016) ...................................................................... 24, 25

*Jifry v. F.A.A.*,
    370 F.3d 1174 (D.C. Cir. 2004) ......................................................................... 57

*Jimenez-Mora v. Ashcroft*,
    86 F. App'x 527 (3d Cir. 2004) .................................................................... 20, 21

*Kucana v. Holder*,
    558 U.S. 233 (2010) ............................................................................................ 23

*L.M.-M. v. Cuccinelli*,
    No. 19-2676, 2020 WL 985376 (D.D.C. Mar. 1, 2020) ............................ 6, 7, 62, 64

*Landon v. Plasencia*,
    459 U.S. 21 (1982) ........................................................................................ 59, 63

*Lee v. USCIS*,
    592 F.3d 612 (4th Cir. 2010) .............................................................................. 21

*Liberty Maritime Corp. v. United States*,
    928 F.2d 413 (D.C. Cir. 1991) ........................................................................... 24

*Linda R.S. v. Richard D.*,
  410 U.S. 614 (1973) ......................................................................................... 26

*Lindeen v. SEC*,
  825 F.3d 646 (D.C. Cir. 2016) ................................................................... 46, 54

*Lopez v. Davis*,
  531 U.S. 230 (2001) ............................................................................... 4, 13, 43

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................................... 25, 26

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) ......................................................................................... 60

*Matter of N-M-A-*,
  22 I. & N. Dec 312 (BIA 1998) ...................................................................... 48

*Mejia v. Sessions*,
  866 F.3d 573 (4th Cir. 2017) ..................................................................... 8, 32

*Mendoza v. Perez*,
  754 F.3d 1002 (D.C. Cir. 2014) ...................................................................... 31

*Mobil Oil Corp. v. Dep't of Energy*,
  728 F.2d 1477 (TECA 1983) ........................................................................... 57

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ................................................................................... 60, 62

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
  463 U.S. 29 (1983) ..................................................................................... 45, 53

*Mountain States Legal Found. v. Glickman*,
  92 F.3d 1228 (D.C. Cir. 1996) ....................................................................... 29

*Munaf v. Geren*,
  553 U.S. 674 (2008) ................................................................................... 51, 59

*Nat'l Taxpayers Union, Inc. v. United States*,
  68 F.3d 1428 (D.C. Cir. 1995) ....................................................................... 28

*Nat'l Treasury Emps. Union v. United States*,
  101 F.3d 1423 (D.C. Cir. 1996) ..................................................................... 27

*O.A. v. Trump*,
    404 F. Supp. 3d 109 (D.D.C. 2019) ....................................................................... 62

*O'Shea v. Littleton*,
    414 U.S. 488 (1974) ............................................................................................... 31

*P.L. v. U.S. Immigration and Customs Enforcement*,
    No. 1:19-CV-01336, 2019 WL 2568648 (S.D.N.Y. June 21, 2019) ....................... 24

*Patchak v. Zinke*,
    138 S. Ct. 897 (2018) ....................................................................................... 16, 17

*PETA v. United States Dep't of Agric.*,
    797 F.3d 1087 (D.C. Cir. 2015) ............................................................................ 27

*Poursina v. USCIS*,
    936 F.3d 868 (9th Cir. 2019) ................................................................................. 23

*Rajah v. Mukasey*,
    544 F.3d 427 (2d Cir. 2008) .................................................................................. 56

*Raoof v. Sullivan*,
    315 F. Supp. 3d 34 (2018) ..................................................................................... 55

*Saavedra Bruno v. Albright*,
    197 F.3d 1153 (D.C. Cir. 1999) ............................................................................ 25

*Sessions v. Morales-Santana*,
    137 S. Ct. 1678 (2017) .......................................................................................... 26

*Sorenson Commc'ns Inc. v. F.C.C.*,
    755 F.3d 702 (D.C. Cir. 2014) .............................................................................. 57

*Spencer Enters., Inc. v. United States*,
    345 F.3d 683 (2003) .............................................................................................. 23

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ..................................................................................... 25, 26

*Struniak v. Lynch*,
    159 F.Supp.3d 643 (E.D. Va. 2016) ..................................................................... 21

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ......................................................................................... 29, 60

*Sure-Tan, Inc. v. NLRB,*
    467 U.S. 883 (1984) ........................................................................... 27

*Tchitchui v. Holder,*
    657 F.3d 132 (2d Cir. 2011) .............................................................. 63

*Trump v. Hawaii,*
    138 S. Ct. 2392 ............................................................................ 60, 61

*United States ex rel. Knauff v. Shaughnessy,*
    338 U.S. 537 (1950) ........................................................................... 59

*Villa-Anguiano v. Holder,*
    727 F.3d 873, 878 (9th Cir. 2013) ..................................................... 35

*Virginia Soc'y for Human Life v. FEC,*
    263 F.3d 379 (4th Cir. 2001) ............................................................. 61

*Warth v. Seldin,*
    422 U.S. 490 (1975) ........................................................................... 26

*Weaver v. U.S. Info. Agency,*
    87 F.3d 1429 (D.C. Cir. 1996) .......................................................... 42

*Yassini v. Crosland,*
    618 F.2d 1356 (9th Cir. 1980) ...................................................... 54, 55

*Zhu v. Gonzales,*
    411 F.3d 292 (D.C. Cir. 2005) .......................................................... 23

## Statutes

5 U.S.C. § 553 ........................................................................... passim

5 U.S.C. § 702 ................................................................................ 29

5 U.S.C. § 706(2)(A) .......................................................... 3, 14, 15, 61

8 U.S.C. 1225(a)(3) .......................................................................... 36

8 U.S.C. § 1101(a)(42) ....................................................................... 6

8 U.S.C. § 1103(g)(2) ...................................................................... 44

8 U.S.C. § 1153(a)(2)(A) ................................................................. 53

8 U.S.C. § 1158 ....................................................................... passim

8 U.S.C. § 1159 ............................................................................................................... 8

8 U.S.C. § 1225 ...................................................................................................... passim

8 U.S.C. § 1229a ............................................................................................................. 3

8 U.S.C. § 1231(b) ................................................................................................. passim

8 U.S.C. § 1252 ...................................................................................................... passim

8 U.S.C. § 1329 ............................................................................................................. 25

28 U.S.C. § 1331 ..................................................................................................... 16, 24

28 U.S.C. § 2342 ........................................................................................................... 62

42 U.S.C. § 423(a)(2)(A) ............................................................................................. 42

## Regulations

8 C.F.R. § 208.16(a) ..................................................................................................... 48

8 C.F.R. § 208.16(b) ..................................................................................................... 40

8 C.F.R. § 208.24(f) ...................................................................................................... 41

8 C.F.R. § 208.30(d) ..................................................................................................... 47

8 C.F.R. § 1208.16 ........................................................................................................ 44

8 C.F.R. § 1208.16(c) ..................................................................................................... 8

## Other Authorities

*Multiple Chancellors: Reforming the National Injunction*,
   131 HARV. L. REV. 417 (2017) ............................................................................... 61

# INTRODUCTION

This case arises from efforts by two legal services organizations and six individual Plaintiffs to halt on a nationwide basis the implementation of a critical bilateral agreement entered into by the United States and Guatemala to address sharing the burdens of unconstrained mass migration in the region that has caused a humanitarian crisis at our southern border.

The United States has experienced an astonishing surge of migration, with hundreds of thousands of aliens travelling from and through Central America to our shared border with Mexico, often to raise ultimately meritless protection claims that overwhelm our immigration system. To combat this overwhelming and ongoing crush on the immigration system, the United States has engaged in ongoing diplomatic discussions with the governments of Guatemala, El Salvador, Honduras, and other countries on how to best share the burdens posed by this mass migration while preserving eligible individuals' access to protection. On July 26, 2019, after sustained negotiations, the United States signed an asylum-cooperative agreement (ACA) with Guatemala facilitating the transfer of certain arriving aliens seeking asylum to Guatemala for processing of their protection claims. Transfer of aliens to a third country is authorized by statute if the government determines that Guatemala can provide "a full and fair procedure for determining a claim to asylum or equivalent temporary protection." 8 U.S.C. § 1158(a)(2)(A). The Departments of Justice and Homeland Security made those determinations and issued an interim final rule implementing ACAs, *see* Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act, 84 Fed. Reg. 63,994 (Nov. 19, 2019), and agency guidance implementing the Rule, *see* USCIS278-300.

Together, the agreement, the Rule, and the guidance address the urgent, ongoing crisis at the border and in the nation's immigration courts caused by the "significant increase" in the past

1

decade in the "number of aliens encountered at or near its borders, particularly the southern land border with Mexico." 84 Fed. Reg. at 63,995. Many of these aliens raise asylum claims that are ultimately found not to be have merit, contributing to a backlog of nearly one million cases in immigration courts, including nearly half a million pending asylum claims, delaying consideration of genuine claims for asylum. *Id.* at 63,995-96. Processing these aliens and their claims has also consumed a tremendous amount of resources of the Department of Homeland Security (DHS). *Id.* The Rule seeks to relieve some of this burden by implementing a statutorily authorized mechanism for "shar[ing] the distribution of hundreds of thousands of asylum claims" and "provid[ing] asylum seekers with access to only one" country's systems for hearing asylum and protection claims, while also ensuring that aliens are not sent to countries where they are likely to face persecution or torture. 84 Fed. Reg. at 63,994-95, 64,009. The Rule thus allows aliens to pursue their claims for asylum or protection from removal and aids ongoing negotiations with regional partners on deterring and sharing the burdens of mass migration to the United States. *Id*. at 64,005-06.

Despite the Executive Branch's clear authority and sound policy aims, Plaintiffs ask this Court to issue a nationwide permanent injunction halting the government's implementation of its agreement with Guatemala and other future such agreements. This Court should deny Plaintiffs' extraordinary request.

Plaintiffs' claims are not justiciable. To begin, the Court lacks subject-matter jurisdiction over their claims. The statute Plaintiffs invoke, 8 U.S.C. § 1252(e)(3), Compl. ¶ 18; Mot. 13-14, authorizes "judicial review" only of "determinations under section 1225(b)" (the expedited-removal statute) "and its implementation," including "regulations" and "written polic[ies]" "to implement [§ 1225(b)]." But the challenged Rule and guidance implement provisions of the asylum statute, 8 U.S.C. § 1158(a)(2)(A), authorizing the Attorney General to determine who may

apply for asylum in the United States, and do not implement § 1225(b). Plaintiffs also may not challenge in this Court the application of the Rule by immigration judges in full removal proceedings under 8 U.S.C. § 1229a, because such claims may be raised in only the courts of appeals. *See* 8 U.S.C. § 1252(a)(5), (b)(9). And Plaintiffs' challenges to the Departments' determinations implementing 8 U.S.C. § 1158(a)(2)(A) are in any event foreclosed because Congress was clear: "No court shall have jurisdiction to review any determination" under § 1158(a)(2)(A), *id.* § 1158(a)(3), or any discretionary decision undergirding such a determination, *see id.* § 1252(a)(2)(B)(ii).

Plaintiffs also lack standing. The organizational Plaintiffs lack standing because they are advocacy groups who claim injury based on the need to adapt to a new policy and speculation about its effect on their funding. That view of injury defies Article III—it would confer standing whenever the law changes. Plaintiffs' predictions about their funding streams are also far too speculative to support standing. Their asserted injuries also fall outside the zone of interests of the immigration laws—which provide a cause of action, if at all, only for individual affected *aliens*. Plaintiff organizations have no cognizable role to play in the immigration review scheme, and cannot circumvent it by rushing to federal court before aliens directly affected by the Rule do so. The individual Plaintiffs also lack standing because each was categorically ineligible for asylum for reasons unrelated to the Rule and guidance, and therefore has no legally protected interest or injury sufficient to support Article III standing. They also lack standing to seek prospective relief because they fail to demonstrate that they are likely to be subject to the Rule again in the future.

Plaintiffs' claims also fail on the merits. *First*, Plaintiffs contend that the Rule and guidance violate the Administrative Procedure Act (APA), *see* 5 U.S.C. § 706(2)(A), because they are inconsistent with the credible-fear procedures in the expedited-removal statute, 8 U.S.C.

§ 1225(b)(1). Compl. ¶¶ 169-74; Mot. 16-17. The credible-fear procedures provide an avenue for an alien subject to expedited removal to nonetheless apply for asylum in certain circumstances. Plaintiffs argue that the Rule and guidance are contrary to law because they do not provide the same procedures. But there is no statutory requirement that aliens subject to a bar to applying for asylum under § 1158(a)(2)(A) must have access to the same procedures that are available to aliens who can potentially pursue asylum claims.

*Second*, Plaintiffs contend that the Rule and guidance violate the APA because they are inconsistent with the statute governing removal to a third country based on an ACA, 8 U.S.C. § 1158(a)(2)(A). Compl. ¶¶ 156-62; Mot. 17-20. Section 1158(a)(2)(A) categorically bars an alien from seeking asylum in this country if the Departments determine that the alien may be removed under a bilateral agreement to a country where his "life or freedom would not be threatened on account of" a protected ground and where he would have "access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection." Section 1158 squarely authorizes the Departments to issue the Rule here, and the Rule is consistent with each of these provisions. The Rule ensures that any alien who raises a fear of removal to a third country can do so as part of an individual screening interview. In addition, before implementing the ACA with Guatemala, the Departments made determinations, following careful review of information from governmental and non-governmental sources, that Guatemala provides access to full-and-fair procedures for asylum and other protection claims. Contrary to Plaintiffs' contention, there is no requirement that the Departments make the latter determination anew in each individual case. *See Lopez v. Davis*, 531 U.S. 230, 243-44 (2001).

*Third*, Plaintiffs argue that the Rule violates the APA because it is inconsistent with 8 U.S.C. § 1231(b)(3), which governs claims for withholding of removal raised in full removal

proceedings because the Rule does not apply the same procedures as § 1231(b)(3). Compl. ¶¶ 163-68; Mot. 21. But Plaintiffs offer no support for the contention that the procedures that apply when an alien seeks protection from removal to his home country under § 1231(b)(3) must be applied when an alien is being removed to a *third* country under § 1158(a)(2)(A). The Rule is consistent with the requirements of § 1158(a)(2)(A) and, in any event, a separate provision, 8 U.S.C. § 1231(h), provides that § 1231 creates no legally enforceable rights.

*Fourth*, Plaintiffs argue that the Rule is arbitrary and capricious in violation of the APA because it departs from "prior policy" and fails to consider important aspects of the problem, and that the determinations that Guatemala has full-and-fair procedures are unlawful. Compl. ¶¶ 175-80; Mot. 21-36. But the Rule and guidance implement a new bilateral agreement with Guatemala and do not alter or depart from any existing policy. Moreover, the Departments explained their reasons for adopting each aspect of the Rule that Plaintiffs challenge; the Departments explained the basis for the full-and-fair determinations, the Rule, and the guidance; and each is supported by a robust administrative record. *See* DOJIFR001-1075; DHSIFR001-875; DOJFF001-144; DHSFF001-1283; USCIS001-402. Plaintiffs' policy disagreements with the Executive's considered policy judgments are no basis to second-guess the conclusions of the agency heads.

*Fifth*, Plaintiffs maintain that the Departments unlawfully bypassed the APA's notice-and-comment procedures under 5 U.S.C. § 553. Compl. ¶¶ 181-83; Mot. 36-40. But those procedures are not required where, as here, agencies are implementing a measure linked intimately to foreign affairs—ongoing negotiations between the United States and other countries to address the current mass-migration crisis. *See* 5 U.S.C. § 553(a)(1); 84 Fed. Reg. at 64,005. Awaiting notice and comment would have "[h]inder[ed]" the Executive's "ability to implement a new policy in response to a current foreign affairs crisis"—precisely the "undesirable international consequence

that warrants invocation of the foreign affairs exception." *East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1252 (9th Cir. 2018); *see* 84 Fed. Reg. at 64,005-06. Nor is a notice-and-comment period required where it would harm important national interests and "the agency for good cause finds" that it would be "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B), (d)(3). Where it would "jeopardize the lives and welfare of aliens who could surge to the border to enter the United States before the rule limiting asylum applications took effect," making the crisis on the southern border worse, 84 Fed. Reg. 64, 006-07, good cause is satisfied.

*Sixth*, Plaintiffs argue that the Rule violates the Suspension Clause because it does not provide for individual judicial review of an alien's removal order to Guatemala. Compl. ¶¶ 184-86; Mot. 28-29. But it is the relevant statute, 8 U.S.C. § 1252(e)(2), not the Rule, which forecloses judicial review, and that statute has been operative since 1998. Plaintiffs are well outside the 60-day jurisdictional time limit in 8 U.S.C. § 1252(e)(3)(B) for challenges to the statute, which the D.C. Circuit upheld in all respects nearly twenty years ago. *See American Immigration Lawyers Ass'n v. Reno* (*AILA*), 199 F.3d 1352, 1364 (D.C. Cir. 2000). Regardless, no Plaintiff is subject to detention or purports to raise a habeas claim, so Plaintiffs cannot invoke the Suspension Clause to demand more procedures concerning their removal than Congress provided.

Finally, if this Court grants any relief to Plaintiffs, that relief must be sharply limited. Halting the implementation of the United States' agreement with Guatemala would have serious negative foreign-relations implications, and the statute governing this Court's jurisdiction over challenges to expedited removal, 8 U.S.C. § 1252(e)(3), authorizes only the entry of declaratory, not injunctive, relief. *See L.M.-M. v. Cuccinelli*, No. 19-2676, 2020 WL 985376, at *24 (D.D.C. Mar. 1, 2020) (Moss, J.).

The Court should grant summary judgment to the government and dismiss this case.

## LEGAL AND PROCEDURAL BACKGROUND

Legal Background. Congress has empowered the Attorney General and the Secretary of Homeland Security to decide who may be granted asylum in the United States. 8 U.S.C. §§ 1158, 1225(b)(1). Although certain aliens generally may "apply for asylum" under § 1158(a)(1), asylum relief is always discretionary, [1] and importantly, the statute sets out a range of exceptions, creating various categories of aliens who are ineligible to apply. *Id.* § 1158(a)(2). Section 1158(a), titled "Authority to apply for asylum," provides that: "Any alien who is physically present in the United States or who arrives in the United States," "irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, [8 U.S.C. §] 1225(b)," which governs expedited removal of aliens. *Id.* § 1158(a)(1).

Section 1158(a)(2), titled "Exceptions," articulates three bars to applying for asylum, including the "safe third country" bar. *Id*. § 1158(a)(2)(A). Under that bar, an alien may not apply for asylum if the Attorney General[2] determines: (1) "that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion," and (2) that "the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent

---

[1] A grant of asylum is entirely discretionary. Asylum "*may* [be] grant[ed] to an alien who has applied," *id.* § 1158(b)(1)(A) (emphasis added), if the alien is not subject to a bar to applying for asylum, is not subject to an eligibility bar, and satisfies certain requirements, *id.* § 1158(a)(2), (b)(1)(B), (b)(2).

[2] Following the Homeland Security Act of 2002, Pub. L. No. 107-296, §§ 402, 441, 116 Stat. 2135 (Nov. 25, 2002), the Attorney General and the Secretary of Homeland Security now share authority over immigration functions and references to "Attorney General" in the INA are understood to also encompass DHS, depending on the circumstances.

temporary protection." *Id.* § 1158(a)(2)(A). If the Attorney General makes these determinations and does not "find[] that it is in the public interest for the alien to receive asylum in the United States," *id.*, then the alien is barred from applying for asylum in this country. The determinations under § 1158(a)(2) are not subject to review. *See id.* § 1158(a)(3) ("No court shall have jurisdiction to review any determination of the Attorney General under paragraph (2)").

The INA and regulations also provide for two forms of protection from removal: withholding of removal, which generally precludes removal of an alien who is subject to a removal order if he demonstrates that his "life or freedom would be threatened" based on a protected ground in the country of removal, 8 U.S.C. § 1231(b)(3)(A); and protection under the Convention Against Torture (CAT), if the alien faces a clear probability of torture in the designated country of removal, 8 C.F.R. § 1208.16(c). Both forms of protection are country-specific and only relate to the particular country to which the United States is trying to remove an alien. *See Mejia v. Sessions*, 866 F.3d 573, 579 (4th Cir. 2017). Withholding and CAT do not prevent the United States from removing an alien to a third country and do not provide an alien with any right to live in the United States, any status, or any avenue to obtain status. *See* 8 U.S.C. § 1159 (conditions for adjustment of status); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 429 n.6 (1987).

Asylum-Cooperative Agreements. On July 26, 2019, the United States signed a bilateral agreement covered by § 1158(a)(2)(A), "Agreement on Cooperation Regarding the Examination of Protection Claims, with the government of Guatemala." DOJFF99-105. The agreement provides that Guatemala will consider the protection claims of covered individuals who are transferred from the United States to Guatemala. DOJFF103. The ACA does not apply to citizens or nationals of Guatemala, unaccompanied minors, or persons with U.S. visas or no visa restrictions, but otherwise covers individuals of any nationality seeking protection under international agreements

governing refugees, including the 1951 Convention Relating to the Status of Refugees, the 1967 Protocol Relating to the Status of Refugees, and the Convention Against Torture. DOJFF101-103; *see also* DHSFF698; 84 Fed. Reg. 64,095.

As part of the ACA, Guatemala agreed that, "[t]o ensure that protection applications transferred to Guatemala by the United States have access to a system to determine protection, Guatemala will not return or expel applications for protection in Guatemala, unless the application is abandoned by the applicant or is formally rejected through an administrative decision." DOJFF103. Both governments agreed to put "procedures in place to ensure that the transfer from the United States to Guatemala of the persons covered by [the ACA] are compatible with their respective obligations, domestic and international laws, and migration policies." DOJFF104. The United States also agreed "to cooperate to strengthen the institutional capacities of Guatemala," and that the governments of the two countries would reevaluate the agreement at regular intervals to identify and correct any deficiencies with the agreement or its implementation. *Id.*

Full-and-Fair Determinations. On October 16, 2019, the Acting Secretary of DHS issued a memorandum detailing his determination that Guatemala's refugee protection laws satisfy the "access to a full and fair procedure" requirements of § 1158(a)(2)(A). DHSFF1282. The Acting Secretary reached this decision "after a careful review of the available information found in the Guatemalan Migration Code, their implementing regulations, an active dialogue between our two states, information provided by the Department of State, information provided by the United Nations High Commissioner for Refugees (UNHCR), and information from other sources." *Id.* The Acting Secretary noted that, although not necessarily required to determine that a country provides access to full-and-fair procedures, Guatemala "appears to satisfy" all UNHCR guidelines

for the minimal guarantees that UNHCR advises State Parties to implement in their refugee-status determinations. DHSFF1282.

In a memorandum dated November 7, 2019, the Attorney General also determined that Guatemala's refugee protection laws satisfy the "Access to a Full and Fair Procedure" requirements of § 1158(a)(2)(A). DOJFF6-7. He reached this conclusion "[a]fter careful consideration," "based upon the Guatemalan Migration Code, its implementing regulations, and information provided by the Departments of State and Homeland Security following consultations between the United States and Guatemala." DOJFF6.

The Attorney General determined that Guatemala provides "access to a full and fair procedure" because "it has in place a sufficient protection system with accompanying procedures and laws," and an "applicant for protection in Guatemala has a meaningful opportunity to make a protection claim, receive a hearing and adjudication regarding that claim, and safely remain in Guatemala until his or her protection claim is resolved." DOJFF6. Guatemala also has a process "that comports with basic notions of procedural fairness," as both its legal provisions and the representations made by Guatemalan officials to the United States State Department and DHS indicate that "Guatemala has a competent immigration authority with clear procedures for addressing initial asylum applications, including referral of claims to an adjudicative body." *Id*. This includes giving applicants "oral guidance" during the initial stages of the proceedings "on how to present a claim" and "on rights protections, and privileges," notice of decisions, "the right to appeal an adverse decision," and the right to "remain in Guatemala during any appellate process." *Id*. Guatemala "has also adopted laws barring *refoulement* of refugees that are consistent with the *non-refoulement* obligations" of the 1951 Convention and the 1967 Protocol. *Id.*

Joint Rule Implementing ACAs. On November 19, 2019, the Attorney General and Acting Secretary of Homeland Security issued a joint interim final rule (the "Rule") that applies to all ACAs with countries other than Canada (which is already covered by an earlier rule specifically implementing the U.S.-Canada ACA). *See* 84 Fed. Reg. 63,994. The Rule provides for "a threshold screening" process to determine "which country will consider the alien's claim," and "provide asylum seekers with access to only one of the ACA signatory countries' protection systems," "in an effort to share the distribution of hundreds of thousands of asylum claims." *Id.*

Consistent with § 1158(a)(2)(A), the Rule is designed to alleviate the burden on the overtaxed U.S. asylum system from "adjudicating asylum claims" resulting from "[h]undreds of thousands of migrants [who] have reached the United States in recent years and have claimed a fear of persecution or torture." 84 Fed. Reg. at 63,994. Many of these migrants ultimately do not "establish legal qualification for such relief" or even "apply[ ] for protection after being released into the United States, which has contributed to a backlog of 987,198 cases before the Executive Office for Immigration Review (including 474,327 asylum cases), each taking an average of 816 days to complete." *Id.* at 63,995. In the last decade, "the United States has experienced a significant increase in the number of aliens encountered at or near its borders with Mexico," and "[t]his increase has been accompanied by a sharp increase in the number and percentage of aliens requesting asylum or claiming a fear of persecution or torture when apprehended or encountered by DHS." *Id.* During this time period, "the percentage of aliens referred for credible fear interviews within ER proceedings jumped from approximately 5 percent to above 40 percent." *Id.* This has "consume[d] a tremendous amount of resources within the Departments of Justice and Homeland Security." *Id.*

The Rule provides that when an immigration officer in an expedited-removal proceeding determines "that an alien ... appears to be subject to the terms of an [ACA]," "prior to any determination concerning whether the alien has a credible fear of persecution or torture, the asylum officer shall conduct a threshold screening interview to determine whether the alien is ineligible to apply for asylum in the United States and is subject to removal to" a country with which the United States has signed an ACA. 84 Fed. Reg. at 64,008. "The asylum officer shall advise the alien of the applicable agreement's exceptions and question the alien as to applicability of any of these exceptions to the alien's case." *Id*. at 64,009. The Rule provides that aliens may not be removed to an ACA country if they establish, consistent with § 1158(a)(2)(A) and the CAT regulations, that it is more likely than not that they will be persecuted or tortured in the receiving country, and the alien must "be provided written notice that if he or she fears removal to the prospective receiving country because of the likelihood of persecution on account of a protected ground or torture in that country and wants the officer to determine whether it is more likely than not that the alien would be persecuted on account of a protected ground or tortured in that country, the alien should affirmatively state to the officer such a fear of removal." *Id*. If the asylum officer, with concurrence from a supervisory asylum officer, determines that the alien does not fall into an exception to the ACA and has not demonstrated that it is more likely than not that he would be persecuted on account of a protected ground or tortured in the ACA country, then "the alien is ineligible to apply for asylum in the United States," "shall be advised that he [ ] will be removed to the receiving country," and "shall be informed that, in the receiving country, [he] will have an opportunity to pursue the [ ] claim for asylum or equivalent temporary protection." *Id*. Alternatively, for aliens "whom DHS has chosen to place in removal proceedings under [INA § 240],"—*i.e.* full, non-expedited removal proceedings in immigration court—the Rule gives

immigration judges the authority to make these determinations, including determining "whether an alien is ineligible to apply for asylum and should be removed to a third country pursuant to" an ACA under § 1158(a)(2)(A). 84 Fed. Reg. 64,010.

The Departments issued this Rule as an interim final rule that is effective immediately under the APA's exception to the notice-and-comment requirements for rules involving a "foreign affairs function" and the "good cause" exception that applies where these requirements are "impracticable, unnecessary, or contrary to the public interest." *Id*. at 64,004-08.

USCIS Guidance. On November 19, 2019, USCIS issued written guidance to asylum officers implementing the Rule. USCIS278-300; *see also id* 33-49, 348-380. The guidance provides that a U.S. Customs and Border Protection (CBP) officer or agent will make an initial determination as to whether an alien is amenable to an ACA and will give the individual a "tear sheet" providing information about the threshold screening under the Rule. USCIS283, USCIS001 (tear sheet). The tear sheet explains, among other things, that the individual will be referred to an asylum officer for an interview and an assessment of whether they fall under any exception to the ACA. USCIS001, 284; *see also id.* at 287-90 (setting out the exceptions). It also notifies the alien that, if he does not fit an exception to the ACA, that he may be removed to Guatemala where he may apply for asylum or other protection. USCIS001, 284.

The tear sheet also notifies the alien that he may express a fear of removal to Guatemala, and that, if he does, he will be afforded "appropriate process." USCIS001. It states: "If you have such a fear, please inform the immigration officer who provided you this form or any other immigration officer, or please ask to speak to a supervisor," and that "[o]ver the next day, you may consult with a person or persons of your choosing prior to the interview by phone." USCIS001. At the interview, the asylum officer "must confirm that the individual received the Tear Sheet and

understood its contents," and "provide an interpreter as needed." USCIS314, 352. If an individual affirmatively expresses a fear of removal to Guatemala, the asylum officer will determine whether he is more likely than not to be persecuted or tortured in Guatemala. USCIS285. If the asylum officer "determines the individual is unable to participate effectively in the interview because of illness, fatigue, or other impediments the officer may reschedule the interview. USCIS314, 352. The officer must create a summary of the material facts stated by the alien at the interview, review the summary with the alien, and give him an opportunity to correct any errors. *Id.* Following the interview, the asylum officer's determination must be reviewed by a supervisor, and the alien can be removed under an ACA only if the supervisor concurs with the asylum officer's findings. USCIS291.

    This Lawsuit. On January 15, 2020, two organizations that provide legal services to asylum seekers and six individual Plaintiffs filed this suit seeking declaratory and injunctive relief. Compl. ¶¶ 20-32, Prayer for Relief. Plaintiffs allege that the Rule and guidance deny covered aliens "the right to apply for asylum in the United States," subvert the "legal framework for *accepting* refugees," *id.* ¶¶ 5, 17, and "severely limit[ ] their ability to access protection from persecution" by "prevent[ing them] from applying for asylum" in the United States, *id.* ¶ 147. Each individual Plaintiff has already been issued an expedited-removal order and been removed to Guatemala under the Rule and ACA. *Id.* ¶ 20.

    The organizational Plaintiffs Las Americas and Tahirih Justice Center allege that the Rule and guidance "frustrate" their "mission of providing legal services" to asylum seekers by preventing aliens from "making it through the credible fear process," and removing them before these organizations have a chance to represent them, potentially affecting particular funding sources, *id.* ¶¶ 148-49, 152, 154, and prevent aliens from reaching "full removal proceedings," or

14

require investment of more resources when they do," *id*. ¶¶ 148, 153. The organizations also allege harm from the lack of "opportunity to comment on the Rule." *Id*. ¶¶ 154-55.

Plaintiffs bring six APA claims and one constitutional claim. *First*, they claim that the rule conflicts with the statute governing ACAs, 8 U.S.C. § 1158(a)(2)(A), and so is contrary to law. Compl. ¶¶ 156-62; *see* 5 U.S.C. § 706(2)(A). *Second*, Plaintiffs claim that the rule is inconsistent with 8 U.S.C. § 1231(b)(3), and its implementing regulations, which govern claims for withholding of removal raised in full removal proceedings, and so is contrary to law. Compl. ¶¶ 163-68; *see* 5 U.S.C. § 706(2)(A). *Third*, Plaintiffs allege that the rule is inconsistent with 8 U.S.C. § 1225(b)(1), the provision authorizing expedited-removal procedures, and its implementing regulations, and so is contrary to law. Compl. ¶¶ 169-74; *see* 5 U.S.C. § 706(2)(A). *Fourth*, Plaintiffs assert that the rule unlawfully departs from "prior policy," and is therefore "arbitrary and capricious." Compl. ¶¶ 175-76; *see* 5 U.S.C. § 706(2)(A). *Fifth*, they allege that the government's finding that Guatemala provides access to "full and fair procedures" for asylum or related claims is unreasonable, and therefore arbitrary and capricious. Compl. ¶¶ 177-80; *see* 5 U.S.C. § 553(b), (c), (d). *Sixth*, Plaintiffs claim the rule violates the APA because it was issued without notice and an opportunity to comment and was published less than 30 days before its effective date. Compl. ¶¶ 181-83; *see* 5 U.S.C. § 553(b), (c), (d). *Seventh*, they allege that the rule violates the Constitution's Suspension Clause, U.S. Const. art. I, § 9, cl. 2, because the relevant statute bars "judicial review" of individual orders of "expedited removal." Compl. ¶¶ 184-86.

Plaintiffs seek a declaration that the Rule and guidance are unlawful, vacatur of the Rule and guidance, a universal permanent injunction preventing implementation of the Rule and guidance (effectively enjoining implementation of any future ACA), and an order vacating the

removal orders of each individual named Plaintiff and paroling these six Plaintiffs into the United States to allow them to apply for asylum. *Id.*, Prayer for Relief.

Plaintiffs filed their summary-judgment motion on February 28, 2020.

## ARGUMENT

The Court should deny Plaintiffs' motion for summary judgment and grant summary judgment in favor of the government. This Court lacks subject-matter jurisdiction; Plaintiffs lack standing and the organizational Plaintiffs are not within the INA's zone of interests; all of Plaintiffs' claims lack merit; and—even if their claims had merit—their requested injunctive relief is foreclosed by the relevant statutory provisions and, in any event, far too broad.

## I.   The claims are non-justiciable.

### A.   The Court lacks subject-matter jurisdiction.

Plaintiffs contend that this "Court has subject matter jurisdiction under 28 U.S.C. § 1331 and under 8 U.S.C. § 1252(e)(3)." Compl. ¶ 18; *see also* Mot. 13-14. This is incorrect.

As explained below, various provisions of the INA bar jurisdiction over Plaintiffs' claims. Section 1252(e)(3), the only possible basis for jurisdiction here, is strictly limited to particular types of challenges to regulations and policies that *implement* the expedited-removal statute, which the Rule and guidance do not do. Plaintiffs argue that "[t]he policies challenged here purport to implement expedited removal," Mot. 14, but there is no basis for this assertion and Plaintiffs cite nothing to support it. To the contrary, the Rule and guidance implement the Attorney General's authority under § 1158(a)(2)(A). Because Plaintiffs lack jurisdiction under § 1252(e)(3), and other provisions of § 1252 bar any other challenges to expedited removal "[n]otwithstanding" any other provision of law," § 1252(a)(2)(A), (B), this Court also lacks jurisdiction over Plaintiffs' claims

under 28 U.S.C. § 1331. *See Patchak v. Zinke*, 138 S. Ct. 897, 905 (2018) (phrase "notwithstanding any other provision of law" in jurisdictional provision encompasses § 1331).

8 U.S.C. § 1252(e)(3). Section 1252(e)(3) does not provide jurisdiction to review any of Plaintiffs' challenges to the Rule, the guidance, or the full-and-fair determinations. Section 1252(e)(3), titled "Challenges to the validity of the system," provides for review only of regulations and written policies that establish the structure and procedures for the expedited-removal system. Moreover, while § 1252(e)(3) authorizes "[j]udicial review of determinations under section 1225(b)" and "its implementation," Congress authorized review only of certain types of actions under § 1252(e)(3). Congress directed that review of any determination under § 1225(b) and its implementation of § 1225(b) "shall be limited to determinations of" whether "[§ 1225(b)], or any regulation issued to implement such section, is constitutional," and whether "a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law." *Id.* § 1252(e)(3)(A)(ii). This section permits review of the validity of § 1225(b)(1) itself and regulations and policies that flesh out its structure and procedure. *See AILA*, 199 F.3d at 1364 (affirming district court's rejection of challenges to initial adoption of procedural framework for the expedited-removal process).

The Rule and guidance do not "implement" § 1225(b) or the expedited-removal process; they implement provisions of § 1158(a), the asylum statute. That latter statute generally provides "[a]uthority to apply for asylum" for certain aliens, who "may apply for asylum" in various ways "in accordance with this section or, where applicable, section 1225(b)." 8 U.S.C. § 1158(a)(1). But the following subsection provides "Exceptions" and authorizes the Attorney General to determine certain categories of aliens for whom the authorization to seek asylum in § 1158(a)(1) does not

apply, including aliens determined to fall under the "[s]afe third country" exception in § 1158(a)(2)(A). It is this exception that the Rule and guidance implement, and neither says anything about the implementation or operations of the expedited-removal statute, § 1225(b). The expedited-removal statute, § 1225(b)(1)(A), provides that arriving aliens and certain other aliens are subject to expedited removal if they are determined to be inadmissible under § 1182(a)(6)(C) or § 1182(a)(7). 8 U.S.C. § 1225(b)(1)(A). These aliens are ordered "removed from the United States without further hearing or review unless" the alien can "apply for asylum under section 1158 of this title" and expresses an intent to do so. 8 U.S.C. § 1225(b)(1)(A)(ii). The Rule and guidance just define the universe of aliens who may "apply for asylum under section 1158," and, as relevant here, the threshold screening contemplated by the Rule and guidance do nothing more than identify which aliens fall within that universe.

The Rule and guidance do not change how the expedited-removal statute operates. Under the expedited-removal statute, an alien who may apply for asylum and expresses an intent to do so goes through the process provided for asylum claims raised in expedited-removal proceedings, which begins under § 1225(b)(1)(A)(ii) with an immigration officer referring the alien to an asylum officer for the credible-fear interview provided for by § 1225(b)(1)(B). After evaluating whether the alien "has a credible fear of persecution," the asylum officer determines whether the alien should be held for "*further* consideration of the application for asylum." 8 U.S.C. § 1225(b)(1)(B)(ii) (emphasis added). Alternatively, aliens who are barred from applying for asylum or who do not express a fear of persecution or intent to apply for asylum as permitted by § 1158, are removed without further hearing or review under § 1225(b)(1)(A)(i), and do not reach the start of the expedited-removal asylum process in § 1225(b)(1)(A)(ii). This was true before the Rule, and remains true today. The Rule and guidance, which address only threshold

determinations of whether an alien falls under the safe-third-country exception codified in § 1158(a)(2)(A), are thus not an "implementation" of § 1225(b). Neither the Rule nor the guidance gives any effect to § 1225(b) or changes how it operates, and neither fulfills any specific obligation of the expedited-removal provisions in § 1225(b)(1). *See* Webster's Third International Dictionary (1987) (defining "implement" as "to give practical effect to and ensure of actual fulfillment by concrete measures").

Plaintiffs' challenges are thus not "[c]hallenges to the validity of the [expedited-removal] system" or to a regulation or policy that implements § 1225(b), and so § 1252(e)(3) provides no jurisdiction for their claims. 8 U.S.C. § 1252(e)(3); *see also* H.R. Rep. 104-828 (Sept. 24, 1996) (conference report), at 220 ("Section [1252](e)(3) provides for limited judicial review of the validity of *procedures* under section [1225](b)(1)." (emphasis added)). Nor were the Rule and guidance "issued by or under the authority of the Attorney General to implement [§ 1225(b)]." *Id*. § 1252(e)(3)(A)(ii). They were issued under § 1158 and the Attorney General's general authority under § 1103(g)(2) to "establish such regulations," "issue such instructions," and "perform such other acts" as he determines are necessary for carrying out the provisions of the INA. *See also id.* § 1103(a)(3) (providing similar authority to the Secretary of DHS); 84 Fed. Reg. at 63,997 (citing these provisions as the "DOJ and DHS authority to promulgate this Rule"). If Congress had sought to permit review under § 1252(e)(3) of any decision, rule, or guidance implementing other INA provisions that are incidental to credible-fear proceedings, it would have listed as subject to review decisions concerning *all* substantive provisions of the INA, rather than just decisions, rules, and guidance issued "to implement" § 1225(b) itself. It did not do so. *See id*. § 1252(e)(3)(A)(i) & (ii).

The organizational Plaintiffs' attempts to invoke jurisdiction under § 1252(e)(3) fail for all of the above reasons and others, as well. Only an individual who is subject to expedited-removal

procedures at the time a suit is initiated may invoke § 1252(e)(3). Again, § 1252(e)(3) authorizes review of the "implementation" of certain expedited-removal procedures only if Plaintiffs are in fact subject to "determinations under section 1225(b) of this title." This is further demonstrated by the fact that § 1252(e)(3) appears in a section titled "[j]udicial review of *orders* under section 1225(b)(1)." (Emphasis added). Section 1252(e)(3) thus grants jurisdiction only if there is a reviewable "determination[]" or "order[]" "under section 1225(b)." 8 U.S.C. § 1252(e)(3)(A). As organizations, these Plaintiffs have not, and could not, be subject to any determination under § 1225(b), and they lack standing to raise the claims of others who *are* subject to such orders. *See AILA*, 199 F.3d at 1360 ("Congress meant to allow litigation challenging the new [expedited-removal] system by, *and only by*, aliens against whom the new procedures had been applied." (emphasis added)).

 <u>8 U.S.C. § 1158(a)(3).</u> Plaintiffs' claims are also foreclosed by 8 U.S.C. § 1158(a)(3). The Department heads promulgated the Rule under § 1158(a)(2)(A). That provision authorizes the Departments to "determine[ ]" of "find[]" three things at issue here: (1) whether "the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country ... in which the alien's life or freedom would not be threatened" on a protected ground; (2) whether "the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection" in that country; and, (3) whether "it is in the public interest for the alien to receive asylum in the United States." 8 U.S.C. § 1158(a)(2)(A). Congress provided that "[n]o court shall have jurisdiction to review *any* determination of the Attorney General [or the Secretary] under [§ 1158(a)(2)(A)]." *Id*. § 1158(a)(3) (emphasis added). The phrase "any determination" in § 1158(a)(3) refers to each thing the government "determines" under § 1158(a)(2)(A), and bars review of Plaintiffs' challenges to these determinations, including the determination that

Guatemala has "a full and fair procedure for determining" asylum and other protection claims, or that an alien removed to Guatemala will not face persecution there. Mot. 29-31

In § 1158(a)(3), Congress barred review of any determination under § 1158(a)(2)(A), including any challenge to the process of making these determinations. *See Jimenez-Mora v. Ashcroft*, 86 F. App'x 527, 530 (3d Cir. 2004) (§ 1158(a)(3) bars review of "challenges to the process of deciding" or reaching the ultimate determination). Congress's use of "determines" coupled with the judicial-review bar at § 1158(a)(3) shows that Congress meant to shield from review not just a final "determination," but the "method for reaching that final decision." *Bourdon v. DHS*, 940 F.3d 537, 542 (11th Cir. 2019). Congress's decision in § 1158(a)(3) to limit "jurisdiction to review any determination of the Attorney General [or the Secretary] under" § 1158(a)(2)(A) would have no effect if parties could challenge the ultimate determination by challenging the Departments' decisions on how to best reach that determination. *See Jimenez-Mora*, 86 F. App'x at 530 (rejecting argument that claim "merely involves a collateral attack on the *procedures* used in making a determination," because otherwise "it is hard to imagine a case that would *not* fall outside the jurisdictional bar of § 1158(a)(3)"). The judicial-review bar in § 1158(a)(3) thus precludes any challenge to the *procedures* or *process* by which the agencies choose to implement their unreviewable authority under § 1158(a)(2)(A). *See, e.g.*, *Bourdon*, 940 F.3d at 542 (collecting cases); *Gebhardt v. Nielsen*, 879 F.3d 980, 987 (9th Cir. 2018); *Bremer v. Johnson*, 834 F.3d 925, 930 (8th Cir. 2016); *Lee v. USCIS*, 592 F.3d 612, 620 (4th Cir. 2010); *Am. Soc'y of Cataract & Refractive Surgery v. Thompson*, 279 F.3d 447, 452 (7th Cir. 2002); *cf. Struniak v. Lynch*, 159 F.Supp.3d 643, 654 (E.D. Va. 2016) (holding that provision precluding "jurisdiction to review [] the ultimate decision" also bars review of "the steps that are a necessary and ancillary part of reaching the ultimate decision").

This limit on jurisdiction extends to each of Plaintiffs' claims that challenge the way in which the Rule and guidance make the determinations contemplated by § 1158(a)(2)(A). Compl. ¶¶ 156-80 (Claims I-V). Plaintiffs claim that the Rule and guidance provide an inadequate process for determining that an alien's life or freedom will not be threatened in the destination country, that he will have "access to a full and fair procedure," and that it is not in the public interest for him to seek asylum in the United States, Compl. ¶¶ 156-60, 63-67, 69-72; Mot. 15-21 (Claims I-III); that the manner in which these determinations are made under the Rule and guidance "depart[s] from prior agency policies" for making these determinations and failed to consider important aspects of the problem, Compl. ¶ 175; Mot. 21-27 (Claim IV); and, that the determination process is "ill-suited to achieving" the aims of that statute, Compl. ¶ 178-80 (Claim V); Mot. 35-36. Each of these claims purports to challenge both the result and the *process*—including the standard applied and the burden of proof—by which the Departments "determine" under § 1158(a)(2)(A) whether "alien's life or freedom would not be threatened" on a protected ground in a third country or whether that country has a "full and fair procedure for determining a claim to asylum or equivalent temporary protection."

Section 1158(a)(2)(A) thus grants the agencies unreviewable authority to determine that an alien is subject to its provisions and to determine that the alien is categorically barred from applying for asylum "unless the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States." Section 1158(a)(2)(A) does not refer narrowly to "an application," or contain any other provisions implying that broader procedural decisions about how to adjudicate whether an alien falls under the safe-third-country provision in § 1158(a)(2)(A) are outside the scope of the agency's discretion or the scope of the bar to judicial review in § 1158(a)(3). Section 1158(a)(3) thus forecloses jurisdiction over Plaintiffs' first five claims.

8 U.S.C. § 1252(a)(2)(B)(ii). Section 1252(a)(2)(B)(ii) also limits jurisdiction to review the agencies' discretionary determinations under § 1158(a)(2)(A), and their chosen means of implementing it through the Rule and the guidance. In § 1252(a)(2)(B)(ii), Congress stated that "[n]otwithstanding any other provision of law (statutory or nonstatutory), . . . no court shall have jurisdiction to review" "any ... decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title." 8 U.S.C. § 1252(a)(2)(B)(ii). Such decisions must be "specified under [8 U.S.C. §§ 1151–1378] to be in the discretion" of the Secretary. *Kucana v. Holder*, 558 U.S. 233, 239 (2010). But the fact that a specific provision does not use the word "discretion" does not mean § 1252(a)(2)(B)(ii) does not apply. *See Zhu v. Gonzales*, 411 F.3d 292, 295 (D.C. Cir. 2005) (citing § 1158(a) as an example of how "a decision may be 'specified ... to be in the discretion of the Attorney General' even if the grant of authority to make that decision does not use the word 'discretion'"). Rather, § 1252(a)(2)(B)(ii) applies if the judgment to be rendered is, by statute, "entirely within [the] judgment or conscience" of the Secretary. *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 690 (2003). The statute simply must "vest[] the government with authority to make a discretionary decision." *Poursina v. USCIS*, 936 F.3d 868, 871 (9th Cir. 2019).

Section 1158(a)(2)(A) does just that. The statute gives the Attorney General the authority to "determine[ ] that the alien may be removed pursuant to a bilateral or multilateral agreement," that "the alien's life or freedom would not be threatened" on account of a protected ground, and that "the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection." 8 U.S.C. § 1158(a)(2)(A). This grant of authority does not provide any statutory standard to apply—it calls for the exercise of "expertise and judgment

unfettered by any statutory standard whatsoever." *Zhu*, 411 F.3d at 295. Section 1158(a)(3) categorically bars review of the exercise of that expertise and judgment, and the decision to apply § 1158(a)(2)(A) to a specific alien, through the Rule or otherwise, is thus "'entirely discretionary'" and covered by § 1252(a)(2)(B)(ii). *See Poursina*, 936 F.3d at 872.

In addition, Congress's use of the prefatory "[n]otwithstanding any other provision of law" in § 1252(a)(2)(B)(ii) "clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18, (1993). The unambiguous text provides a clear statement that such discretionary decisions not be subject to judicial review, and "supersede[s] all other laws." *Liberty Maritime Corp. v. United States*, 928 F.2d 413, 416 (D.C. Cir. 1991) ("clearer statement of law" than a "'notwithstanding clause'" "is difficult to imagine"). Section 1252(a)(2)(B)(ii) squarely removes from federal courts *any* jurisdiction—including federal-question jurisdiction under 28 U.S.C. § 1331—to review discretionary determinations such as those contemplated by § 1158(a)(2)(A), and bars Plaintiffs' claims I through V challenging these determinations.

<u>8 U.S.C. § 1252(b)(9)</u>. Plaintiffs also purport to challenge the application of the Rule to aliens in regular removal proceedings before immigration judges. Compl. ¶¶ 76-78, 148, 153, 160. But even if Plaintiffs were individuals who were in such proceedings—which they are not, so they lack standing to raise these claims—the INA strips district courts of jurisdiction to review any "questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States." 8 U.S.C. § 1252(b)(9). Such review "shall be available only through judicial review of a final order under this section" and no district court "shall have jurisdiction ... to review such an order or such questions of law or fact." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016).

Section 1252(b)(9) limits review of all claims challenging procedures applied in full removal proceedings to an appeal brought by an individual alien in the court of appeals *after* his removal proceedings are over. *Id.* at 1032. This provision thus bars claims raised by organizations challenging the rules that apply to third-party aliens in removal proceedings, *see P.L. v. U.S. Immigration and Customs Enforcement*, No. 1:19-CV-01336, 2019 WL 2568648, at *3 (S.D.N.Y. June 21, 2019), including "policies-and-practices challenges," *J.E.F.M.*, 837 F.3d at 1032, arising from any "action taken or proceeding brought to remove an alien from the United States," 8 U.S.C. § 1252(b)(9), whether or not the challenge is to an actual final order of removal or whether there even is a final order at all. *See J.E.F.M.*, 837 F.3d at 1032. Accordingly, to the extent Plaintiffs raise any claims challenging the application of the Rule to aliens in full removal proceedings, those claims are barred by § 1252(b)(9).

Congress similarly made clear that no party other than the United States could litigate challenges to removal in the district courts by withdrawing jurisdiction for such causes of action that had previously existed. Until Congress amended the INA to include the claim-channeling provisions of § 1252, a separate provision, 8 U.S.C. § 1329, provided an affirmative basis for jurisdiction in federal district courts for suits filed by any alien or organization challenging implementation of the immigration laws. *See, e.g.*, *Bains v. Schiltgen*, No. C 97-2573 SI, 1998 WL 204977, at *3 (N.D. Cal. Apr. 21, 1998) (describing statute's prior version). But Congress amended § 1329 in 1996, "making clear that district court jurisdiction founded on the immigration statute is confined to actions brought by the government." *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1162 (D.C. Cir. 1999). This provision makes clear that organizational plaintiffs like those here have no cause of action under the INA to raise challenges related to removal proceedings.

### B.        Plaintiffs lack Article III standing and are not within the zone of interests.

Plaintiffs have not suffered any cognizable injury sufficient to establish Article III standing.

To satisfy the "'irreducible constitutional minimum' of standing" under Article III, a party must

demonstrate that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged

conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 560 (1992)). "Foremost among these requirements is injury in fact—a plaintiff's

pleading and proof that he has suffered the 'invasion of a legally protected interest' that is 'concrete

and particularized.'" *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Lujan*, 504 U.S. at

560). Plaintiffs must separately establish standing and jurisdiction for each claim they raise and

each form of relief they seek. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006).

Organizational Standing. Organizations cannot establish standing by alleging injuries of

third parties. *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689 (2017). Where, as here, an

organization sues on its own behalf, it must establish standing in the same manner as an individual.

*See Warth v. Seldin*, 422 U.S. 490, 511 (1975). A party "lacks standing to contest the policies of

the prosecuting authority when [it] is neither prosecuted nor threatened with prosecution." *Linda*

*R.S. v. Richard D.*, 410 U.S. 614, 619 (1973); *see also Haitian Refugee Ctr. v. Gracey*, 809 F.2d

794, 804-07 (D.C. Cir. 1987) (applying principle to immigration context); *AILA*, 199 F.3d at 1364

(rejecting organizational standing "to raise claims, whether statutory or constitutional, on behalf

of aliens," noting "judicial presumption against suits seeking relief for a large and diffuse group

of individuals, none of whom are party to the lawsuit").

The organizational Plaintiffs seek to establish standing under *Havens Realty Corp.*

*v. Coleman*, 455 U.S. 363 (1982), which held that organizations can establish standing in certain

limited circumstances based on interference with their missions. Compl. ¶¶ 148-55; Mot. 14. But, notably, *Havens* arose under a private right of action under the Fair Housing Act, and Congress's aim to allow private enforcement of statutory prohibitions against discriminatory housing practices drove the Court's standing analysis in that case. 455 U.S. at 373-74. This is a far different context from the INA, where Congress has made plain its interest in limiting all review to claims from individual aliens who are directly affected. *See* 8 U.S.C. § 1252(a)(5), (b)(9), (e). The INA confers no "legally cognizable interests," *Spokeo*, 136 S. Ct. at 1549, on advocacy organizations, and such organizations have "no judicially cognizable interest" related to "enforcement of the immigration laws," *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984). An organization similarly cannot show an invasion of a legally protected interest based solely on the fact that a change in law may affect future clients and, in turn, Plaintiffs' decisions about how to allocate resources. *See Arpaio v. Obama*, 797 F.3d 11, 15 (D.C. Cir. 2015) (rejecting standing from alleged injuries from "[p]rojected increases ... in the county's policing burden and jail population").

Even if *Havens* applied, it would not be satisfied here. The D.C. Circuit has interpreted *Havens* to impose a two-part test for determining "whether an organization's injury is concrete and demonstrable or merely a setback to its abstract social interests." *PETA v. United States Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015). First the Court asks "whether the defendant's allegedly unlawful activities injured the plaintiff's interest in promoting its mission." *Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011). "If the answer is yes, [it] then ask[s] whether the plaintiff used its resources to counteract that injury." *Id*. Here, the organizational Plaintiffs do not satisfy these requirements.

To satisfy the first element, the government's conduct must "directly conflict with the organization's mission." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C.

Cir. 1996). Standing exists only when "the action challenged ... [is] at loggerheads with the stated mission of the plaintiff." *Id.* at 1429; *see also PETA*, 797 F.3d at 1095; *cf. PETA*, 797 F.3d at 1100-01 (Millett, J., dubitante) (criticizing expansive readings of *Havens* and noting that the case involved "direct, concrete, and immediate injury" to the organization's services based on a "specific legal right"). Plaintiffs state that their missions involve "providing legal services to" asylum seekers and individuals fleeing violence, Compl. ¶¶ 148, 152, but even under the Rule, large numbers of aliens will continue to be placed in full removal proceedings or go through the credible-fear process, and nothing in the Rule prevents the organizations from continuing to represent large numbers of asylum-seeking clients.

For similar reasons, Plaintiffs also fail to show that they have diverted resources in a manner that confers standing. Plaintiffs do not allege that the Rule will decrease their overall client base or result in a shortage of asylum seekers in need of legal services. They have put forth no evidence is support of their allegations that the Rule threatens their funding, Compl. ¶¶ 149, 154, even from "per-case funding" sources, Mot. 15. Both organizations also allege that they will have to expend resources "to represent clients in regular removal proceedings" to help clients who are ineligible for asylum apply for other forms of protection. Mot. 14-15. But D.C. Circuit "precedent makes clear that an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015); *see also Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization."); *cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (no standing where plaintiffs' costly measures to avoid government

surveillance they believed reasonably likely were "self-inflicted"). Even in the fair-housing context, an organization alleging standing under *Havens* must establish that it would have suffered some other injury if it had not diverted resources to counteracting the problem, because otherwise the diversion of resources is a purely self-inflicted injury that cannot support standing. *See Fair Empl. Council of Greater Washington, Inc. v. BMC Marketing*, 28 F.3d 1268, 1276-77 (D.C. Cir. 1994).

Finally, both organizations allege harm based on the lack of "opportunity to comment on the Rule before it [went] into effect." Compl. ¶ 155; *see also* Mot. 15. But "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *cf. Am. Ass'n for Homecare v. Leavitt*, No. 08-cv-0992, 2008 WL 2580217, at *5 (D.D.C. June 30, 2008) ("procedural violation alone without showing another actual injury" insufficient). In any event, this injury would only supply Article III standing for one claim.

Zone of Interests. The organizational Plaintiffs' claims are also outside the zone of interests of the statutes that they invoke. The APA does not "allow suit by every person suffering injury in fact." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395 (1987). It provides a cause of action only to one "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. To be "aggrieved," "the interest sought to be protected" must "be arguably within the zone of interests to be protected or regulated by the statute ... in question." *Clarke*, 479 U.S. at 396 (modifications omitted). "[O]n any given claim the injury that supplies constitutional standing must be the same as the injury within the requisite 'zone of interests.'" *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996). The organizational Plaintiffs do not argue that they are in the zone of interests, and invoke no such interest here.

Nothing in the INA or its asylum provisions even arguably suggests that it protects the interests of nonprofit organizations "providing legal services to detained asylum seekers." Compl. ¶ 148; *id.* ¶ 152. The asylum provisions neither regulate the organizational Plaintiffs' conduct nor create any benefits for which these organizations themselves might be eligible. And courts have routinely concluded that immigration statutes are directed at aliens, not the organizations advocating for them. When confronted with a similar challenge brought by "organizations that provide legal help to immigrants," Justice O'Connor concluded that the Immigration Reform and Control Act "was clearly meant to protect the interests of undocumented aliens, not the interests of [such] organizations," and the fact that a "regulation may affect the way an organization allocates its resources ... does not give standing to an entity which is not within the zone of interests the statute meant to protect." *INS v. Legalization Assistance Project of L.A. Cty.*, 510 U.S. 1301, 1305 (1993) (O'Connor, J., in chambers). The D.C. Circuit and other courts have thus held that immigrant advocacy organizations are outside the immigration statutes' zone of interests. *See, e.g.*, *Fed'n for Am. Immigration Reform, Inc. (FAIR) v. Reno*, 93 F.3d 897, 900-04 (D.C. Cir. 1996).[3] That reasoning fully applies here. Plaintiffs are not applying for asylum; they seek to help others do so. Nothing in "the relevant provisions [can] be fairly read to implicate [Plaintiffs'] interest in the efficient use of resources." *Nw. Immigrant Rights Project v. USCIS*, 325 F.R.D. 671, 688 (W.D. Wash. 2016). Because Plaintiffs are simply bystanders to the statutory scheme, the (alleged) effects on their resources are outside the statutory zone of interests.[4]

---

[3] While the Ninth Circuit recently held otherwise in *East Bay*, 909 F.3d at 1243-44, it did not consider *FAIR*, 93 F.3d at 903, which held that persons were outside the zone of interests of the INA provisions that they challenged even though they were within the zone of interests of another statutory provision. Regardless, *East Bay* conflicts with controlling D.C. Circuit authority.

[4] The INA itself confirms that such organizations are not within the zone of interests. An alien's challenge to an asylum determination must occur in individual removal proceedings, and others

The procedural nature of some of the organizational Plaintiffs' claims makes no difference. A plaintiff asserting a violation of the APA's notice-and-comment requirements must still show a concrete Article III injury that comes within the zone of interests protected by the underlying substantive statute upon which their claims are based—here, the INA. *See Mendoza v. Perez*, 754 F.3d 1002, 1016 (D.C. Cir. 2014). Plaintiffs have not done so.

Standing of the Individual Plaintiffs. The individual Plaintiffs similarly lack standing for any of their claims challenging the Rule, the guidance, or the full-and-fair determinations.

*First*, Plaintiffs lack standing to request any prospective injunctive relief related to the Rule, the guidance, or the full-and-fair determinations. A plaintiff seeking *prospective* relief must show more than Article III standing to challenge *past* injuries; he must demonstrate a "real and immediate threat that the injury will be repeated." *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 (1983). Plaintiffs have proffered no allegations that they are likely to be subject to the Rule at some point in the future, and even if they had, such allegations would be speculative. Plaintiffs cannot seek prospective relief absent a showing either of "continuing, present adverse effects" or "a sufficient likelihood that [they] will again be wronged in a similar way." *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974); *Lyons*, 461 U.S. at 111. Plaintiffs thus lack standing to seek prospective injunctive relief on their APA claims challenging the Rule and guidance (Claims I-VI).

*Second*, none of the individual Plaintiffs has standing to raise challenges to limitations on applying for asylum in the United States because none of them was eligible for asylum even if the Rule did not exist. Each individual Plaintiff transited through a third country in the second half of

---

may not bring suit on their behalf. 8 U.S.C. § 1252(a); *see Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984). And as to any change to expedited removal, should Plaintiffs' claims be construed as challenging such changes, 8 U.S.C. § 1252(e)(3) creates the exclusive review scheme for such challenges and precludes organizational challenges.

2019 on their way to the United States, and none of them sought asylum or other protection in those countries before arriving to the United States. *See* ECF No. 1, Ex. 1 at ¶¶ 19-25; Ex. 2 at ¶¶ 5, 18, 20; Ex. 3 at ¶¶ 26-28, 30; Ex. 4 at ¶¶ 16-18. All the individual Plaintiffs were thus barred from receiving asylum in the United States under an Interim Final Rule titled "Asylum Eligibility and Procedural Modifications." 84 Fed. Reg. 33,829. Under that rule, which was issued in July 2019, "an alien who enters or attempts to enter the United States across the southern border after failing to apply for protection in a third country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States is ineligible for asylum." 84 Fed. Reg. at 33,830. Accordingly, even if the ACA Rule had not prevented Plaintiffs from applying for asylum, none of them would have been eligible to receive asylum here anyway. *See Barr v. East Bay Sanctuary Covenant*, 140 S. Ct. 3 (2019). Plaintiffs thus cannot claim any injury caused by the ACA, the Rule, or the guidance based on the theory they were prevented from obtaining asylum in the United States and so they lack standing.

It does not matter that aliens who are ineligible for asylum based on the third-country transit rule might, if in removal proceedings before an immigration judge, still seek withholding of removal or CAT protection. 84 Fed. Reg. at 33,837-38. These protections apply only with respect to a particular country to which an immigration judge orders an alien removed, generally the alien's home country. Plaintiffs were removed to a third country, rather than their home countries or other countries to which DHS otherwise would have sought to remove them in full removal proceedings. *See* 8 U.S.C. § 1231(b)(1)(A). Plaintiffs cannot claim any injury based on not having an opportunity to apply for protection from removal to a country to which the government did not ultimately send them. *See, e.g.*, *Mejia*, 866 F.3d at 579. In other words, even if a Plaintiff had been in full removal proceedings and an immigration judge ordered him removed to, for example, El

Salvador, a grant of withholding to El Salvador would limit only his removal to that country and not limit his removal to Guatemala or any other country. Such a grant would have no effect whatsoever if the government is not seeking to remove him to El Salvador, and would provide no benefit to the alien otherwise because a grant of protection does not provide an alien with any right to live in or any avenue to obtain any status in the United States, *see Cardoza-Fonseca*, 480 U.S. at 429 n.6, so a lost opportunity to apply for these protections had no effect, and caused no injury that can confer standing.[5]

## II.     The government is entitled to summary judgment on all claims.

### A.  The Rule and guidance do not violate statutes governing removal to a third country, expedited removal, or for withholding of removal (Claims I - III).

The Rule, the guidance, and the government's full-and-fair determinations are fully consistent with other provisions of the INA. Section 1158(a)(2)(A) bars an alien from applying for asylum in this country if two threshold conditions are met: "the Attorney General determines that" "the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion," and determines that "the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection." 8 U.S.C. § 1158(a)(2)(A). The only exception to such a determination for covered aliens is if the "the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States." *Id.*

---

[5] Moreover, in certain circumstances, even an alien who was granted asylum may nonetheless be removed to a third country  pursuant to a bilateral agreement. *See* 8 U.S.C. § 1158(c)(2)(C).

The Rule satisfies each of the requirements of § 1158(a)(2)(A). *First*, on July 26, 2019, the United States and Guatemala signed a bilateral agreement governing removal from the United States to Guatemala. DOJFF99-105. Consistent with § 1158(a)(2)(A), the ACA exempts any alien for whom Guatemala is "the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence." DOJFF99-105. Plaintiffs do not challenge the validity of this ACA. *Second*, through the Rule, the Attorney General and the Acting Secretary of Homeland Security have established a procedure to ensure that an "alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion," if removed to Guatemala. 8 U.S.C. § 1158(a)(2)(A); *see* 84 Fed. Reg. at 64,009. The Rule establishes a process for assessing and determining in each individual case whether an alien has a fear of persecution on account of a protected ground and provides for an interview and a procedure that requires concurrence of a supervisory official. *See* 84 Fed. Reg. at 64,009. *Third*, the Attorney General and the Acting Secretary both determined that Guatemala provides "access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection." 8 U.S.C. § 1158(a)(2)(A); *see* DHSFF1282; DOJFF6-7. They reached this categorical determination after careful review of the Guatemalan Migration Code and its implementing regulations, discussion between officials from both countries, and information provided by the United Nations High Commissioner for Refugees (UNHCR) and information from the State Department and other sources. DOJFF6; DHSFF1282. The statute requires nothing more. *AILA v. Reno*, 18 F. Supp. 2d 38, 55-56 (D.D.C. 1998), *aff'd*, 199 F.3d 1352 (D.C. Cir. 2000) (cannot "impose upon the Attorney General any obligation to afford more procedures than the governing statute explicitly requires or that she has chosen to afford in her discretion.").

Plaintiffs also challenge USCIS's guidance addressing the Rule, but this guidance merely implements the Rule and the U.S.-Guatemala ACA, and Plaintiffs do not make any particular arguments related to the guidance that are separate from the Rule for their first three claims. *See generally* Mot. 15-21. Consistent with statute and the Rule, the guidance sets out how to determine whether an alien is covered by an ACA and whether the alien's life or freedom would be threatened on account of a protected ground in the relevant third country. USCIS349-72. This guidance simply tracks the language of the Rule, which itself is consistent with § 1158(a)(2)(A). Nothing more is required. In any event, the guidance is not subject to APA review. *See Broadgate Inc. v. USCIS*, 730 F. Supp. 2d 240, 243 (D.D.C. 2010) ("interpretive rules and general policy statements" are not reviewable under the APA).

Plaintiffs' primary argument is that the Rule and guidance are inconsistent with INA provisions barring aliens from applying for asylum if they may be removed to a third country, *see* 8 U.S.C. § 1158(a)(2)(A), the credible-fear provisions in the expedited-removal statute, *see* 8 U.S.C. § 1225(b), and the withholding and CAT statutes, *see* 8 U.S.C. § 1231(b), and are thus contrary to law under the APA. Mot. 15-21. Each claim fails.

8 U.S.C. § 1225(b). Plaintiffs contend that the Rule violates statutory provisions governing credible-fear interviews under § 1225(b)(1)(B) for asylum seekers in expedited-removal proceedings and argue that there is a "requirement that asylum seekers in expedited removal can be removed only through the credible fear process." Mot. 16. This is incorrect. It a is well-established principle rooted in prosecutorial discretion that DHS has discretion to choose whether to place an alien in "expedited removal or other forms of removal." *Villa-Anguiano v. Holder*, 727 F.3d 873, 878 (9th Cir. 2013). There is no statutory requirement that an alien who is categorically ineligible to even *apply for* asylum must nevertheless go through expedited-removal procedures

that provide an alien *applying for* asylum with a credible-fear interview. Section 1225(b)(1) requires only that an alien be referred for a credible-fear interview if he indicates an "intention to apply for asylum under section 1158 of this title or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(ii). But 8 U.S.C. § 1158(a)(2), titled "Exceptions," excludes certain aliens from the opportunity to apply for asylum, including those aliens subject to § 1158(a)(2)(A)'s safe-third-country provision, and creates a categorical bar to asylum applications for these aliens.

An alien who is categorically barred from applying for asylum because of § 1158(a)(2)(A)—as an alien subject to the ACA is—cannot indicate a cognizable "intention to apply for asylum," and so is not entitled to referral to a credible-fear interview. Indeed, as already explained, § 1158(a)(2) authorizes the Departments to set up a separate process preceding the credible-fear process or regular removal proceedings for "determin[ing] that the alien may be removed" to a particular country with which there is an ACA and "in which the alien's life or freedom would not be threatened," 8 U.S.C. § 1158(a)(1)(A). Once that determination is made, the alien is categorically barred from applying for asylum, and so, contrary to Plaintiffs' assertion, *see* Mot. 16, the Rule is consistent with § 1225(b)(1) because an alien who is subject to § 1158(a)(2)(A) cannot indicate a possible "intention to apply for asylum under [§ 1158]," 8 U.S.C. § 1225(b)(1)(A)(i), and is barred from certain portions of the expedited-removal procedures that apply to asylum applicants under § 1225(b)(1)(A)(ii), including credible-fear interviews under § 1225(b)(1)(B). *See also* 8 U.S.C. 1225(b)(1)(A)(ii) (heading) (governing "[c]laims for asylum").

The screening process provided for by the Rule is thus consistent with § 1225(b) and the preceding section, § 1225(a), which provides that "all aliens ... who are applicants for admission ... shall be inspected by immigration officers." 8 U.S.C. 1225(a)(3). Aliens who cannot establish

"clearly and beyond a doubt" that they are "entitled to be admitted" are generally placed, as a matter of discretion, in expedited removal or removal proceedings under § 1229a. For an alien in procedures under § 1225, if the alien indicates an intention to apply for asylum, they are referred to an asylum officer for a "credible fear" interview. 8 U.S.C. § 1225(b)(1)(A)(ii). But again, an alien subject to § 1158(a)(2)(A) cannot cognizably assert "an intention to apply for asylum under section 1158," 8 U.S.C. § 1225(b)(1)(A)(i), and so is not entitled to the process for determining whether he has a credible fear. The statute defines an alien as having a "credible fear" if "the alien could establish eligibility for asylum under section 1158 of this title." *Id.* § 1225(b)(1)(B)(v). An alien subject to an ACA cannot establish such eligibility and, consistent with § 1158(a)(2)(A) and § 1225(a), the Rule thus reasonably provides for a "threshold screening to determine whether an alien is barred from applying for asylum" "[d]irectly upon an initial inadmissibility or deportability determination." 84 Fed. Reg. at 63,998.

Indeed, the rule implementing the ACA with Canada similarly provides for a threshold screening process that does not involve the alien completing the credible-fear process. *See* 69 Fed. Reg. at 69,480 (setting up a "threshold screening process" for "prescreening of asylum and related claims" to "determine ... whether aliens should be returned to Canada for consideration of their protection claims"). As noted in that rule, "a careful reading of the Act makes clear that credible fear interviews are not required for aliens subject to [an ACA]" under "8 U.S.C. 1158(a)(1)." *Id.* Importantly, the provision governing "Asylum interviews" as part of the credible-fear process in § 1225(b)(1)(B)(ii) states that, when an alien successfully completes the credible-fear interview process, "the alien shall be detained for *further consideration* of the application for asylum." (emphasis added). "Clearly, then, the credible fear interview process constitutes the initiation of

37

the asylum application process described in [§ 1158(a)(1)]" and is part of that application process. 69 Fed. Reg. at 69,481.

There is accordingly no conflict between the Rule and § 1225(b)(1), because § 1158(a)(2)(A) allows the Departments to determine that certain aliens may not access the asylum-application process in the first place, and therefore for aliens subject to § 1158(a)(2)(A) no credible-fear interview process is required.

8 U.S.C. § 1158(a)(2)(A). Plaintiffs next make several arguments that the Rule and guidance violate the safe-third-country provision in § 1158(a)(2)(A), Mot. 17-20, but each of their arguments lacks merit.

*First*, they argue that "the Rule and Guidance contravene the statute by failing to ensure that *all* individuals will be free from persecution upon removal and, instead, assessing that danger only when 'the alien affirmatively states a fear of removal to [the third] country.'" *Id*. at 18. Plaintiffs argue that the Rule and guidance "compel[ ] removals that the statute expressly forbids." *Id*. Plaintiffs are incorrect. Under the Rule and guidance, an asylum officer must "advise the alien of the [ACA's] exceptions and question the alien as to applicability of any of these exceptions," and provide the alien with "written notice that if he or she fears removal to the prospective receiving country because of a likelihood of persecution on account of a protected ground or torture in that country," that "the alien should affirmatively state to the officer such a fear of removal." 84 Fed. Reg. at 64,009; USCIS354. Prior to the interview with an asylum officer, the alien is provided with a written "tear sheet" that informs him that he "is potentially amenable to removal to Guatemala for consideration of [his] asylum or other protection claim(s)," that he "will be referred for an interview with a U.S. asylum officer, so a determination can be made whether [he] meet[s] any exceptions to the [ACA]," and that, "[o]ver the next day, [he] may consult with a person or

persons of [his] choosing prior to the interview by phone." USCIS001. The tear sheet lays out the ACA's exceptions and further explains that if he does not "meet an exception to the" ACA, he "may be removed to Guatemala" where he can apply for "asylum or equivalent temporary protection." *Id*.

The tear sheet also informs the alien that he "may express a fear of being removed to Guatemala or a fear of persecution or torture in Guatemala," and that if he "express[es] a fear of removal to Guatemala, [he] will be afforded the appropriate process." USCIS001. The tear sheet tells the alien: "If you have such a fear, please inform the immigration officer who provided you this form or any other immigration officer, or please ask to speak to a supervisor." *Id*. In addition, the asylum officer "must confirm that the individual received the Tear Sheet and understood its contents," and "provide an interpreter as needed." USCIS314, 352. Moreover, if the asylum officer "determines the individual is unable to participate effectively in the interview because of illness, fatigue, or other impediments" then the officer "may reschedule the interview." USCIS314, 352.

The Rule and guidance thus provide that any alien "potentially be subject to an ACA will be advised that he or she may be removed to" Guatemala, 84 Fed. Reg. at 64,000, and encouraged to "please inform the immigration officer who provided" the form or "any other immigration officer," or to "please ask to speak to a supervisor," if they have any fear of being sent to Guatemala, USCIS001. Any alien with a fear of removal to Guatemala has an opportunity and every incentive to raise it,[6] and if they do, the officer interviewing the alien to determine whether the ACA applies will also "interview the alien to determine whether it is more likely than not that the alien would be persecuted on account of a protected ground or tortured in the third country."

---

[6] Various INA provisions governing protection claims similarly require aliens to affirmatively express a fear of removal to trigger screening. *See, e.g.*, 8 C.F.R. §§ 238.1, 241.8(e).

84 Fed. Reg. at 64,000. The officer "must create a summary of material facts as stated by the individual," "must review the summary with the alien and give him or her an opportunity to correct errors," USCIS352, 355, and if the officer finds that an alien has not met this standard, a supervisory asylum officer must review and concur with the determination before a decision is made to remove the alien, 84 Fed. Reg. at 64,009. The Rule and guidance thus do not conflict with the § 1158(a)(2)(A)'s requirement to determine that an "alien's life or freedom would not be threatened" in Guatemala on account of a protected ground.

*Second*, Plaintiffs argue that the Rule and guidance are contrary to § 1158(a)(2)(A), by "erroneously placing the burden of proof on the asylum seeker." Mot. 18-19. But where, as here, the statute does not set a precise standard, *see* 8 U.S.C. § 1158(a)(2)(A); 84 Fed. Reg. at 63,999, government choices implementing the statute, including on the appropriate standard to apply, are entitled to deference. *See AILA*, 18 F. Supp. 2d 38 at 53 ("an agency is entitled to the highest degree of deference where Congress has delegated to the agency the authority 'to promulgate standards or classifications.'" (quoting *American Fed'n of Labor v. Donovan,* 757 F.2d 330, 341 (D.C. Cir. 1985)). Plaintiffs' sole response is that the government should bear the burden because the government bears the burden of proof as a matter of regulation in proceedings to *terminate* asylum once it has been granted. Mot. 19. Plaintiffs note that the language in § 1158(c)(2), which governs termination of asylum, is similar to the language in § 1158(a)(2)(A), and so, in their view, placing the burden on the alien under § 1158(a)(2)(A) impermissibly gives the same statutory text different meanings. Mot. 19. This is incorrect for multiple reasons.

The regulation Plaintiffs cite, 8 C.F.R. § 208.24(f) applies exclusively in a very different context: removal proceedings in immigration court under § 1229a that are reopened to reassess an asylum claim that an immigration judge previously granted. Plaintiffs cite the regulation rather

than the statute because the statute, § 1158(c)(2), says nothing about who bears the burden of proof to terminate asylum, and the fact that the agency choice to implement a *different* statute in a *different* context another way says nothing about what the statute itself requires. Also, while the statutory provision on termination of asylum says nothing about who should bear the burden of proof, the provision on obtaining asylum does. *See* 8 U.S.C. § 1158(b)(1)(B)(i). It says that "[t]he burden of proof is on the applicant to establish that the applicant is a refugee," by showing among other things that he fears persecution on account of his "race, religion, nationality, membership in a particular social group, or political opinion." *Id*. Thus, when the statute sets out a burden it places it on the applicant, and there is nothing inconsistent about similarly placing the burden on an alien who falls under an ACA under the Rule.

Even if the statute did set a burden for termination of asylum and placed that burden on the government, there would be nothing inconsistent about placing the burden on an applicant to obtain relief or protection and placing the burden on the government when it tries to terminate the relief or protection—which presupposes that the alien has already been granted a benefit. There is no bar to giving different statutory text with different purposes different meanings based on its context in the overall statutory scheme. The language Plaintiffs cite from *Clark* that judges cannot "give the same statutory texts different meanings in different cases," rejects giving the text of the "*same* [statutory] provision" different meanings when applied to different individuals. *Clark v. Martinez*, 543 U.S. 371, 380, 386 (2005). It says nothing about giving different statutory provisions or sub-provisions with similar language different interpretations where they serve different purposes. *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1437 (D.C. Cir. 1996) (noting that "[i]dentical words may have different meanings" depending on "the subject-matter to which the words refer" or

"based on a difference in context" even when addressing "two subsections of the same [ ] provision").

Moreover, for withholding claims, "[t]he burden of proof is on the applicant" to "establish that his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 208.16(b), (c)(2). Section 1158(a)(2)(A) "do[es] not specify the precise procedural mechanism by which the Attorney General and Secretary must determine that an alien's life or freedom will not be threatened on account of a protected ground in the third country," 84 Fed. Reg. at 63,999, but § 1158(a)(2)(A) uses the same language as the withholding statute. *Compare* 8 U.S.C. § 1158(a)(2)(A) (limiting removal to country "if the Attorney General determines that ... the alien's life or freedom would [ ] be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion") *with id*. § 1231(b)(3) (limiting removal to country "if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion"); *see also* 84 Fed. Reg. at 63,999 (noting that standard in the Rule "mirrors the standard for protection contained in the INA's withholding-of-removal provision").

*Third*, Plaintiffs argue that the Rule and guidance "fail to provide any opportunity for an individual to contest whether she would have access to full and fair asylum procedures in the receiving country." Mot. 19-20. But there is no requirement in the statute that each alien have an individualized opportunity to challenge the determination that Guatemala is "a country ... where the alien would have access to a full and fair procedure for determining" asylum claims. 8 U.S.C. § 1158(a)(2)(A). As to their argument that individualized determinations are required absent

rulemaking, Mot. 19, nothing in the statute requires the agency either to make the full-and-fair determination through rulemaking or to re-assess whether Guatemala provides full-and-fair procedures in every individual threshold determination. Plaintiffs' reliance on *Heckler v. Campbell*, 461 U.S. 458 (1983)—*see* Mot. 19—is misplaced, as that case dealt with disability determinations under a provision of the Social Security Act that explicitly required a disability determination related to the "individual" based on whether "his physical or mental impairment" limits his ability to work "considering his age, education, and work experience." 42 U.S.C. § 423(a)(2)(A). Section 1158(a)(2)(A) lists no individualized factors that must be considered in making the full-and-fair determination, and, in any event, *Heckler* stands for the proposition that an agency may resolve some general factual issues by regulation even where a statute requires determinations related to a particular individual and not, as Plaintiffs assert, that any determination required by a statute must be made on a case-by-case basis. *See Heckler*, 461 U.S. at 467.

Section 1158(a)(2)(A) requires only a determination that Guatemala has a full-and-fair procedure for determining asylum and protection claims, and settled principles of administrative law dictate that the agencies may make this determination categorically. *See Lopez v. Davis*, 531 U.S. 230, 243-44 (2001). Plaintiffs have no basis to demand procedures beyond what is required by the statute. *See AILA*, 18 F. Supp. 2d 38 at 56. Moreover, Plaintiffs argue that an individualized determination is necessary because "some individuals may be unsafe" due to "their particular circumstances, such as their sexual orientation," Mot. 20, but that concern relates to whether an alien's life or freedom would be threatened in Guatemala, a concern for which the Rule *does* provide individualized consideration. *See* 84 Fed. Reg. at 64,000.

*Fourth*, Plaintiffs argue that "the Rule violates the plain text of the safe third country provision by barring IJs in regular removal proceedings from applying the public interest

exception, and instead 'reserv[ing]' that discretion solely to DHS attorneys." Mot. 20. As advocacy organizations and individuals who were not placed in removal proceedings before an immigration judge, Plaintiffs cannot raise this claim for the reasons noted above (Plaintiffs lack standing to raise such a claim and there is no jurisdiction to raise such a claim in district court anyway).[7] In any event, they err in arguing that immigration judges must apply this exception because immigration judges exercise other authority delegated by the Attorney General. The Rule was issued jointly by DOJ and DHS, who jointly share authority over immigration, and the agencies determined that DHS should exercise this authority. Even if, as Plaintiffs argue, § 1158(a)(2)(A) specifically grants authority to make these "public interest" determinations to the Attorney General, the INA grants the Attorney General broad authority to "delegate such authority" in whatever way he "determines to be necessary for carrying out this section" or any other provision of the INA. 8 U.S.C. § 1103(g)(2); *see also id.* § 1103(a)(3) (providing similar authority to the Secretary). And, again, § 1158(a)(3) places such determinations beyond review. Finally, the decision that DHS should make the public-interest determinations predates this Rule, and was adopted by regulation at the time of the U.S.-Canada ACA. 8 C.F.R. § 208.30(e)(6)(iii)(F).

8 U.S.C. § 1231(b)(3). Plaintiffs next argue that the "rule and guidance violate the withholding and CAT statutes," which, they argue, codify the government's general *non-refoulement* obligations and are not limited to where "an alien has had a full removal hearing." Mot. 21. But by their plan terms, the statutory and regulatory provisions governing withholding and CAT protections do relate to an alien in full removal proceedings whom an immigration judge

---

[7] Plaintiffs further lack standing to raise this claim because none of them were in removal proceedings before an immigration judge and so no Plaintiff had any opportunity to have this exception considered in removal proceedings by DHS *or* by an immigration judge, and so no Plaintiff can claim any injury from this aspect of the Rule.

has found removable and who will, absent protection, be returned to his home country. *See* 8 U.S.C. § 1231(b)(3); 8 C.F.R. § 1208.16. These provisions have no direct application here, and Plaintiffs provide no basis for their argument that the same exact procedures must be applied when aliens will be removed to a third country. In any event, to the extent Plaintiffs challenge the standard of proof and argue that the government must take the same approach as under the withholding statute, as noted above, the Rule does apply the burden of proof in the same way as the withholding statute. Plaintiffs' only other argument on this point is that the procedures are insufficient if they require aliens to "volunteer that they fear" removal to a third country "unprompted." Mot. 21 (quoting *Innovation Law Lab v. Wolf*, No. 19-15716, 2020 WL 964402, at *15 (9th Cir. Feb. 28, 2020)). But as explained, the tear sheet provided to any alien who is potentially covered by an ACA prompts the alien to raise any fear he might have of being removed to the third country. USCIS001.

Regardless, Plaintiffs cannot rely on § 1231 as a basis for any APA challenge to implementation of § 1158(a)(2)(A) because § 1231 provides that "Nothing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person." 8 U.S.C. § 1231(h).

**B.  The Rule and guidance are not arbitrary and capricious (Claim IV).**

Plaintiffs next argue that the Rule and guidance are arbitrary and capricious because they fail to "acknowledge or explain" departures from previous procedures and fail "to consider an important aspect of the problem." Mot. 21-27. There is no merit to these arguments.

To begin, arbitrary-and-capricious review is "limited," *EarthLink, Inc. v. FCC*, 462 F.3d 1, 9 (D.C. Cir. 2006), and courts may not substitute their "judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). "An

agency's predictive judgments about areas that are within the agency's field of discretion and expertise are entitled to *particularly deferential* review" and "need not rest on pure factual determinations." *EarthLink, Inc.*, 462 F.3d at 12 (quotations omitted). The agency need only articulate "a rational connection between the facts found and the choice made." *Motor Vehicle*, 463 U.S. at 43. In cases like this one, involving an express grant of authority to prescribe rules and standards, the agency's "judgment [is owed] more than mere deference or weight," and courts give the agency interpretation "controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." *Lindeen v. SEC*, 825 F.3d 646, 656 (D.C. Cir. 2016); *see City of Los Angeles v. Barr*, 929 F.3d 1163, 1177 (9th Cir. July 12, 2019) (in such circumstances "agency's promulgations are entitled to more than mere deference or weight; rather, they are entitled to legislative effect").

The Rule here was promulgated based on a range of undisputed findings related to the crisis on the southern border, including that "[h]undreds of thousands of migrants have reached the United States in recent years and have claimed a fear of persecution or torture," many of whom ultimately do not "establish legal qualification for such relief" or even "apply[ ] for protection after being released into the United States." 84 Fed. Reg. at 63,994-95; *see, e.g.* DOJIFR38-40, 54-78, 479-80, 613-15, 627, 636-740, 746-838, 890-925, 1018, 1054-1075; DHSIFR01-4, 809-30, 837-51. "This increase has been accompanied by a sharp increase in the number and percentage of aliens requesting asylum or claiming a fear of persecution or torture when apprehended or encountered by DHS," and "the percentage of aliens referred for credible fear interviews within ER proceedings jumped from approximately 5 percent to above 40 percent." 84 Fed. Reg. at 63,994-95. This has "contributed to a backlog of ... 474,327 asylum cases," placing tremendous burdens on the government agencies tasked with processing these aliens and "adjudicating asylum

claims." *Id.* The Rule implements ACAs that the Executive Branch has negotiated to help share this burden with other nations and was developed to support ongoing negotiations with these countries and others. *Id*. at 63,995. The Departments adequately identified and explained the basis and reasons for this new Rule. *Cf. F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009) ("it suffices that the new policy is permissible under the statute [and] that there are good reasons for it").

In support of their argument that the Rule and guidance are arbitrary and capricious, Plaintiffs contend only that the "agencies failed to acknowledge or explain the elimination of six key safeguards intended to ensure compliance with *non-refoulement* obligations." Mot. 22. But each of their six arguments reduces to the same false premise: that the policies are arbitrary and capricious if they do not parrot credible-fear interviews or procedures available in full removal proceedings under § 1229a, even if these procedures are not mentioned in § 1158(a)(2)(A).

*First*, Plaintiffs argue that the Rule departs from regulations that provide asylum officers conducting credible-fear interviews should elicit relevant information from aliens during the interview. Mot. 22 (citing 8 C.F.R. § 208.30(d)). This is incorrect. The government has not changed any aspect of credible-fear interviews through this Rule. It is a new policy implementing new ACAs and, in any case, the most analogous prior rule governing the U.S.-Canada ACA similarly did not adopt all credible-fear procedures. 69 Fed. Reg. at 69,481; DOJIFR98-108; DHSIFR657-68. As explained, there is no requirement that credible-fear procedures apply to threshold determinations under § 1158(a)(2)(A). Moreover, Plaintiffs' argument improperly conflates the procedures that apply *in* a credible-fear interview for eliciting information with the process that applies prior to any such interview or screening if the alien does raise a fear. The rule

explains why the agencies chose the approach they adopted, and that is all that is even arguably required under the APA.

*Second*, Plaintiffs argue that the Rule fails to apply a "true" screening test because it does not apply a "significant possibility" test. Mot. 22-23. But there is no requirement to apply a "significant possibility" standard or any other aspect of the credible-fear standard to an initial-screening interview under § 1158(a)(2)(A). Again there is no change from prior position—as there was no prior position—and this Rule provides *more* screening than was made available under the rule implementing the U.S-Canada ACA. As Plaintiffs acknowledge, that earlier rule "contains no individualized *non-refoulement* assessment" whatsoever. Mot. 26, n.8. Moreover, unlike with withholding claims, "the third country to which an alien would be removed under an ACA is a country to which an alien does not necessarily have preexisting ties or any preexisting reason to fear persecution or torture," and the country will "have pre-committed, per [a] binding [ACA] agreement[ ] with the United States" to "provide the alien procedures for requesting safe haven." 84 Fed. Reg. at 64,001-02. Plaintiffs argue that a lesser standard should apply, but the agency adequately explained the choice it made, and no binding source of law compels a higher standard.

*Third*, Plaintiffs argue that the Rule departs from regulations that say that an immigration judge will decide withholding and CAT claims. Mot. 24 (citing 8 C.F.R. § 208.16(a), (c)(4)). But as with Plaintiffs' other arguments, here again, there is no prior rule applicable to the ACA process under § 1158(a)(2)(A) from which the Rule is a departure. The regulations that Plaintiffs cite apply exclusively in immigration court where, of course, the immigration judge is the one to decide claims. These regulations say nothing about the process required under § 1158(a)(2)(A) for aliens barred from applying for asylum, whether under § 1225(b) or under § 1229a, where an alien can have their asylum and protection claims decided in immigration court. Plaintiffs provide no

argument for why such rules should apply in the very different ACA context, and the agency explained the rationale for its approach, which is all that is required.

*Fourth*, Plaintiffs argue that the guidance improperly "[e]liminat[es]" the general presumption that past persecution creates a presumption of future persecution. Mot. 24; *see also Matter of N-M-A-*, 22 I. & N. Dec 312 (BIA 1998). But the Rule does not "eliminate" anything, because the presumption never applied in this context in the first place. Moreover, the agency had good reason to take a different approach here because the Rule applies only to removal to a third country where the alien will generally not have particular ties, not to his home country, and where he will be removed under a bilateral agreement in which Guatemala agrees to ensure that he has access to procedures for ensuring he can seek safe haven there. Further, although not applying an across-the-board presumption, the guidance still reasonably treats past persecution as "strong evidence of likelihood of future persecution on the basis of the same claim." USCIS366.

*Fifth*, Plaintiffs argue that the Rule does not provide the same access to counsel and opportunity for consultation that is provided in credible-fear interviews. Mot. 24-25. This argument is similarly based on the false premise that the screening under § 1158(a)(2)(A) must follow the separate credible-fear process under § 1225(b). In any case, an alien subject to the Rule has an opportunity for consultation in advance of the interview, *see* USCIS001, similar to the Canada ACA rule. 69 Fed. Reg. at 69,481-82. Plaintiffs argue that the Rule is a departure from the regulations implementing the Canada ACA, which "permit consultation with counsel" during the interview, Mot. 25, but the agencies adequately explained that consultation in the Canada rule was based on that ACA's complex exceptions, and the exceptions in the Guatemala ACA are "fewer and less complex," creating less need for consultation. 84 Fed. Reg. at 64,003; *see* DOJIFR98-108; DHSIFR657-68. Plaintiffs argue that the Guatemala "Rule's fear screening" is "complex,"

ACA, Mot. 25, but that argument misses the mark, as the fear screening simply requires the alien to describe his own personal experiences. Moreover, Plaintiffs cannot rely on the procedures under the Canada rule to argue a "departure" from prior practice because, as they acknowledge, the Canada rule did not provide for any fear screening. Mot. 25 & n.8.

*Finally*, Plaintiffs contend that the Rule departs from prior procedures in other summary removal contexts that permit review by an immigration judge, Mot. 25, but this argument is again based on different statutory provisions that have never been applied in the ACA context and so there is no departure from prior practice. Moreover, the Rule implements § 1158 and the particular goals of that section—goals that are not necessarily implicated by other removal procedures—to create streamlined procedures that reduce the burden on our immigration system and encourage our foreign partners to bear a greater share of the burden of resolving regional migration issues. 84 Fed. Reg. 63,994-95; *see, e.g.* DOJIFR79-133, 627, 985, 1019, 1042, 1074; DHSIFR201-15, 645-68, 677-81, 837-75. Plaintiffs also argue that the agencies failed to consider an important aspect of the problem by failing to "address the obvious risks of *refoulement* in a process stripped of the safeguards used in other summary removal contexts." Mot. 26-27. But the Rule not only considered these risks, 84 Fed. Reg. 63,999, it also created specific procedures to allow aliens to raise a fear-of-persecution or torture claim with respect to the third country. In this way, it is consistent with the requirements of § 1158, and provides greater *refoulement* protections than the rule implementing the U.S.-Canada ACA. As this Court held in *AILA*, which the D.C. Circuit affirmed in full on this point: "Plaintiffs cannot impose upon the Attorney General any obligation to afford more procedures than the governing statute explicitly requires or that she has chosen to afford in her discretion." *AILA*, 18 F. Supp. 2d at 55-56, *aff'd*, 199 F.3d 1352 (D.C. Cir. 2000).

### C.  The full-and-fair determinations are lawful (Claim V).

Plaintiffs also argue that the Departments' determinations under § 1158 that Guatemala has a "full and fair procedure for determining a claim to asylum or equivalent temporary protection" are unlawful because they "violate the safe third country provision and run afoul of the APA's demand for reasoned decisionmaking." Mot. 29. Plaintiffs cannot succeed on this claim. To begin, § 1158(a)(3) bars review of "any determination" under § 1158(a)(2)(A), including the "full and fair procedure" determination. As explained above, this bar on judicial review extends to the process by which the agencies make determinations and evinces congressional intent to insulate the decision-making process from review. In such circumstances, the rule of non-inquiry applies and courts are limited to evaluating whether the agencies made the determination identified in the statute. If, as here, they did, then "the court's inquiry shall have reached its end"—courts may not inquire into the substance of the Executive's foreign-affairs determinations. *Trinidad y Garcia v. Thomas*, 683 F.3d 952, 956-57 (9th Cir. 2012) (en banc). Though often applied in the extradition context, the Supreme Court has made clear that the rule of non-inquiry is not limited to that context. *Munaf v. Geren*, 553 U.S. 674, 700-01 (2008) (dismissing habeas petition alleging "transfer to Iraqi custody is likely to result in torture" because "it is for the political branches, not the judiciary, to assess practices in foreign countries"); *cf. Narenji v. Civiletti*, 617 F.2d 745, 748 (D.C. Cir. 1979) (noting limited role of judiciary in relation to immigration matters tied to foreign relations).

In addition, § 1158(a)(2)(A) requires only that the Departments determine that aliens would "have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection" in Guatemala. The agencies did precisely this when they determined that Guatemala "has in place a sufficient protection system with accompanying procedures and laws," and an "applicant for protection in Guatemala has a meaningful opportunity to make a protection claim,

receive a hearing and adjudication regarding that claim, and safely remain in Guatemala until his or her protection claim is resolved." DOJFF6. In addition, they found that Guatemala has a process "that comports with basic notions of procedural fairness," as both Guatemalan legal provisions and representations made by Guatemalan officials to the United States Departments of State and Homeland Security indicate that "Guatemala has a competent immigration authority with clear procedures for addressing initial asylum applications, including referral of claims to an adjudicative body." *Id.* This includes giving applicants "oral guidance" during the initial stages of the proceedings "on how to present a claim," and "information on rights protections, and privileges"; providing notice of decisions and "the right to appeal an adverse decision" and to "remain in Guatemala during any appellate process"; and "laws barring *refoulement* of refugees that are consistent with the *non-refoulement* obligations" of the 1951 Convention and the 1967 Protocol. DOJFF6-7. The Attorney General thus made the determination required by the statute, which requires nothing more. *See AILA*, 18 F. Supp. 2d 38 at 56.

Plaintiffs argue that the phrase "safe third country" is a term of art in refugee law for which "UNHCR 'provides significant guidance.'" Mot. 30 n.22 (quoting *Cardoza-Fonseca*, 480 U.S. at 439 n.22). But as the Supreme Court explained, U.N. guidance does not have "the force of law or in any way bind[ ]" agencies. *Id*. What matters is the language Congress enacted in the relevant statute, *id.* at 432, and nothing in § 1158(a)(2)(A) requires the "full and fair" determination conform to UNHCR guidance. In any case, as noted in the full-and-fair determinations, the Departments considered UNHCR guidance on determining refugee status and concluded that Guatemala "appears to satisfy" that guidance. DHSFF1282. The Acting Secretary therefore found that his determination was consistent with "another official's view" of "safe third country considerations." *Id.*; *see also id.* at 144, 677, 680, 790-823, 881, 915; DOJFF143.

Plaintiffs argue that the "statute requires the agencies to consider the *actual* operation of Guatemala's asylum system," and that the agency determinations improperly address "*only* Guatemala's formal law and nowhere consider its asylum system's actual operations." Mot. 31-32. But there is no such requirement in the statute, and in any event, Plaintiffs are incorrect. The designations were based in part on Guatemala's formal legal provisions. *See* DOJFF1-8, 25-86; DHSFF21-89, 114-43. But they were also based on "careful consideration" of Guatemala's "implementing regulations, and information provided by the Departments of State and Homeland Security following consultations between the United States and Guatemala." DOJFF6; *see also id*. 1-5, 7-24, 87-142; DHSFF90-101, 698. The process included "an active dialogue between our two states"—DHSFF1282;   *see* DHSFF1076-1244,   1259-61   (documenting   extensive   inter-governmental communications)—and considerations of "information provided by the Department of State, information provided by the United Nations High Commissioner for Refugees (UNHCR), and information from other sources," DHSFF1282; *see also e.g.,* DHSFF102-13, 144-697, 790-859, 881-84, 915-22.

Plaintiffs next contend that Guatemala's historical capacity to process refugees is insufficient and that the agencies failed to consider this. Mot. 32. But here again, there is no specific requirement in the statute to consider capacity, and in any case, the agencies *did* consider capacity. Over a five-month period, senior DHS officials, including the Acting Secretary, "visited Guatemala multiple times and hosted bilateral discussions with Guatemalan officials to examine that country's capacity for processing asylum and other refugee protection claims," and DHS and the State Department "verif[ied] the nature and capacity of Guatemala's procedures." DOJFF2; *see also* DOJFF20-24, DHS1255-53 ("Guatemalan Immigration Law and Current Capacity"). As part of the ACA, Guatemala also specifically agreed "[t]o ensure that protection applications

transferred to Guatemala by the United States have access to a system to determine protection." DOJFF103-04. And the United States agreed to invest in Guatemala's capacity to process asylum claims by "cooperat[ing] to strengthen the institutional capacities of Guatemala," DOJFF104, and at the time of the full-and-fair determinations, DHS already had a "robust footprint of personnel" in Guatemala to assist with and "assure successful implementation of" the ACA through "planning, support, technical expertise, and logistical assistance," DOJFF02.

Plaintiffs next argue that the "agencies also entirely failed to consider whether Guatemala is safe *in reality*, as required by statute." Mot. 33; *id*. 34-5. But § 1158(a)(2)(A) does not state that the Departments must make a safety determination, and Plaintiffs cite nothing in the statute in support of their assertion. The statute does require a determination that the ACA country is a country "in which the alien's life or freedom would not be threatened." 8 U.S.C. § 1153(a)(2)(A). But that determination is not part of the full-and-fair determination, and the Departments addressed this requirement through the Rule, which creates an individualized process for assessing whether a particular asylum seeker will face persecution in Guatemala.

Plaintiffs' remaining arguments that the designations are arbitrary and capricious, Mot. 35-36, restate their earlier arguments and fail for the same reasons. These arguments all reduce to a disagreement with the agencies' unreviewable determinations. But a disagreement with how the agency viewed the record does not make the determinations arbitrary and capricious where, as here, the agency addressed everything required by the statute, evaluated all relevant evidence, and explained why and how it reached the determinations. This Court may not "second-guess[ ] the" Attorney General's and Secretary's "weighing of risks and benefits." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2571 (2019). The agencies' determinations, like the Rule, are supported by reasonable justifications rooted in the government's "expertise and experience," *Earthlink, Inc.*,

462 F.3d at 12, and even if these determinations were subject to review, they would easily meet the deferential standard of review under the APA, *Lindeen*, 825 F.3d at 656.

### D.  The Rule was lawfully issued without notice and comment (Claims VI).

Plaintiffs contend that the Rule was unlawfully issued without notice and an opportunity for comment. Mot. 36-40. But the APA provides exceptions to the notice-and-comment requirements when either the rule "involve[s] ... [a] foreign affairs function of the United States," *id.* § 553(a)(1), or "the agency for good cause finds ... that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B), (d)(3). The Rule here fits within both exceptions and is consistent with similar interim rules affecting the border.

Foreign Affairs. The foreign-affairs exception covers agency actions "linked intimately with the Government's overall political agenda concerning relations with another country." *Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985). "A rule of law that would inhibit the flexibility of the political branches [in matters of foreign affairs] should be adopted with only the greatest caution." *Yassini v. Crosland*, 618 F.2d 1356, 1361 (9th Cir. 1980).

The Departments properly invoked this exception. The Rule involves "U.S. relations with Mexico and the Northern Triangle countries," and is critical to negotiations with these countries on how to "address the enormous flow of aliens through these countries to the southern border," where they "strain resources and contribute to a national security and humanitarian crisis." 84 Fed. Reg. at 64,005. *See* DOJIFR79-95, 109-133, 627, 839-48, 890-93, 985, 1074-75; DHSIFR681, 737, 809-30, 837-75. The Rule thus directly implicates U.S. foreign-policy and national-security interests. The Departments found that the Rule "will facilitate ongoing diplomatic negotiations

with foreign countries regarding migration issues, including measures to control the flow of aliens into the United States," and "will remove obstacles to successfully negotiating ACAs with other countries." 84 Fed. Reg. at 64,005. United States officials "remain in negotiations with other nations to enter into additional ACAs," and "[d]elaying the implementation of the rule due to notice-and-comment rulemaking could impact the ability of the United States to negotiate." *Id*. Delays in implementing the Rule "create[ ] uncertainty about the regulatory framework that the United States will have in place to carry out such agreements," and "[p]otential signatories to such agreements may be more hesitant to negotiate" or "rely on a commitment by the United States to meet the terms of negotiated agreements if the regulatory framework to carry out such agreements is uncertain and not yet in place." *Id*.

The Rule is thus "linked intimately with the Government's overall political agenda concerning relations with another country"—here, the multiple other countries with which the United States is engaged in ongoing negotiations to address the crisis on the southern border. *See Am. Ass'n of Exporters*, 751 F.2d at 1249; *see Raoof v. Sullivan*, 315 F. Supp. 3d 34, 43-44 (2018). The Rule is thus a "[d]ecision[ ] involving the relationships between the United States and its alien visitors" that "implicate[s] our relations with foreign powers" and "implement[s] the President's foreign policy." *Yassini*, 618 F.2d at 1361. Courts may not second-guess the Executive's assessment of potential foreign-policy consequences or inhibit the flexibility of the political branches to take actions they deem necessary in matters of foreign affairs. *Id.*; *Chicago & S. Air Lines, Inc. v. Waterman SS Corp.*, 333 U.S. 103, 111 (1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial ... They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility.").

Plaintiffs argue that the foreign-affairs exception can be invoked only after a showing by the agencies that notice-and-comment procedures would provoke undesirable international consequences. Mot. 37. The statute requires no such showing. The exception applies when a rule "involve[s]" a "foreign affairs function of the United States"—without regard to harm. 5 U.S.C. § 553(a)(1); *see Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008) (there is "no requirement" that agency state a finding of undesirable international consequences, particularly "when the consequences are seemingly as evident" as they are here). Indeed, "[h]indering" the Executive's "ability to implement a new policy in response to a current foreign affairs crisis is the type of definitely undesirable international consequence that warrants invocation of the foreign affairs exception." *East Bay*, 909 F.3d at 1252. Even if such a showing were required, the Rule notes that notice-and-comment procedures would "provoke definitively undesirable international consequences," because a "delayed effective date for this rule could have far-reaching consequences for the strength of the negotiating position of the United States in relation to potential signatories of future ACAs." 84 Fed. Reg. at 64,006.

Plaintiffs argue that the Rule does not put into effect any ACA, emphasizing that "[t]he Rule was issued months ago, and yet the Honduras and El Salvador ACAs have not been 'put[ ] into effect.'" Mot. 37. But ongoing planning on the implementation of agreements with foreign nations that have already been signed does not undermine the application of the foreign-affairs exception, where, as noted above, delays in finalizing the Rule could undermine ongoing negotiations with additional countries and undermine our bargaining position by establishing that the United States was not serious about implementing the agreements. Plaintiffs also argue that the exception should not apply because the Rule does not put into effect a particular ACA, but rather creates "procedures to govern *all* future ACA removals." Mot. 37-38. But Plaintiffs cite no

support for the argument that the foreign-affairs exception cannot apply simply because a rule implements *multiple* agreements, present and future, with foreign countries. Finally, Plaintiffs note that the rule implementing the ACA with Canada went through the notice-and-comment process, but the agencies' discretionary choice to follow these procedures one time does not bind them to take the same approach every time. Moreover, as Plaintiffs acknowledge, the earlier rule took several years to finalize, including approximately eight months between the proposed and final rules. Mot. 38. The agencies are not required to presume that the process would be any more swift now than it was in 2004, and Plaintiffs offer no reason to believe it would be. Mot. 38.

Good Cause. The good-cause exception applies when "the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare." *Mobil Oil Corp. v. Dep't of Energy*, 728 F.2d 1477, 1492 (TECA 1983). In evaluating the good-cause exception, courts "defer to an agency's factual findings and expert judgments therefrom, unless such findings and judgments are arbitrary and capricious." *Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 706 n.3 (D.C. Cir. 2014). Significant public-safety harms provide good cause to make rule changes without pre-promulgation notice and comment. *Hawaii Helicopter Operators Ass'n v. FAA,* 51 F.3d 212, 214 (9th Cir. 1995); *see Jifry v. F.A.A.*, 370 F.3d 1174, 1179-80 (D.C. Cir. 2004) (relying on *Hawaii Helicopter*).

Consistent with these principles, the Departments recognized that providing notice of changes in asylum procedures could cause migrants to rush to the southern border, as "[w]ould-be asylum applicants have a strong incentive to intensify their efforts to rapidly reach the U.S. border when the United States announces a regulatory change that will impact asylum applicants." 84 Fed. Reg. at 64,006; *see East Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1115 (N.D. Cal. 2018), *aff'd* 950 F.3d 1242. "Recent events have shown that knowledge of this kind of

impending change is highly likely to cause a dramatic increase in the numbers of aliens who enter

or attempt to enter the United States to file asylum applications before the effective date of the

change," and would even "create a perceived urgency for aliens to enter the United States illegally

or apply for admission without proper documentation before the ACAs take effect." 84 Fed. Reg.

at 64,006. As "courts have recognized, smugglers encourage migrants to enter the United States

based on changes in U.S. immigration policy." *Id*.

Plaintiffs argue that the Rule offers only speculative assertions and that the government's

claims lack record support. Mot. 39. But the Rule sets out a long list of prior examples of past

policy changes that caused surges to the southern border, and these findings are supported by ample

evidence in the records. *See* 84 Fed. Reg. at 64,007 (collecting examples); DOJIFR154, 436, 547,

593, 597, 613, 616, 628, 738; DHSIFR692, 737-49, 755-801, 809. Plaintiffs alternatively argue

that the application of the good-cause exception to similar policy changes in the past is irrelevant

because good cause must be determined on a case-by-case basis, Mot. 40, but the government

obviously cannot provide evidence of the harms that would have occurred if the government had

given advance notice that it planned to implement a new rule related to asylum applications.

Instead, the agencies identified evidence that similar changes in the law in the past had caused an

increased surge at the border and reasonably determined that this Rule would have a similar impact,

worsening the crisis at the southern border and the potential risk of harm. Courts are ill-equipped

to second-guess the Executive Branch's predictive judgments in this context. *See Holder v.

Humanitarian Law Project*, 561 U.S. 1, 34-35 (2010) ("The Government, when seeking to prevent

imminent harms in the context of international affairs and national security, is not required to

conclusively link all the pieces in the puzzle before we grant weight to its empirical conclusion.").

### E.  The Rule may not be challenged on Suspension Clause grounds and in any event is consistent with the Clause (Claim VII).

Plaintiffs contend that the Rule violates the Suspension Clause because that clause "guarantees judicial review of the legality of removal orders" yet the Rule "does not permit judicial review" of "removal orders to ACA countries." Mot. 28-29. There is no merit to this argument.

First, it is not the Rule, but the relevant statute, § 1252(e)—which has been operative since 1998—that limits judicial review of expedited-removal orders. Section 1252 prohibits judicial review of individual orders of expedited removal other than on three limited grounds, none of which is applicable here. *See* 8 U.S.C. § 1252(a)(2)(A), (e)(2). And § 1252(e)(3) is the sole provision authorizing suits challenging expedited-removal procedures. Challenges to the expedited-removal process and review procedures, including challenges to whether the procedures provided are constitutional, *see* 8 U.S.C. § 1252(e)(3)(A)(i), "must be filed no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure ... is first implemented." *Id*. § 1252(e)(3)(B). Plaintiffs are well outside the 60-day jurisdictional limit for challenging the statute, which, in any event, the D.C. Circuit upheld in all respects 20 years ago. *See AILA*, 199 F.3d at 1364.

Second, there is no freestanding cause of action premised on the Suspension Clause that Plaintiffs may invoke outside the context of a challenge to ongoing *detention*. *See Munaf*, 553 U.S. at 693; *INS v. St. Cyr*, 533 U.S. 289, 301 (2001). The Clause is implicated only in the habeas context, and so the individual Plaintiffs, who are not detained and do not raise detention challenges, and the organizational Plaintiffs, who certainly are not detained, cannot raise Suspension Clause claims. Moreover, an alien seeking initial admission to the United States "has no constitutional rights regarding his application," *Landon v. Plasencia*, 459 U.S. 21, 32 (1982), so "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned,"

*United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950). Plaintiffs are entitled only to the procedures that Congress and the agencies provide, including judicial review procedures, *AILA*, 18 F. Supp. 2d at 56, and applicants for admission cannot invoke the Suspension Clause to demand additional procedures beyond the judicial-review procedures Congress Mandates. *Castro v. DHS*, 835 F.3d 422, 448–49 (3d Cir. 2016). Here, Plaintiffs do not identify any statute mandating judicial review of the challenged aspects of their removal orders.

### III.     Any relief that the Court grants must be sharply limited.

Even if Plaintiffs were entitled to summary judgment on any of their claims, the Court should not issue nationwide injunctive relief, and must limit any relief to the parties before the Court. At most, relief should be limited to vacatur of the Rule with prospective effect, and should not include injunctive or retrospective relief.

*First*, Article III forecloses the injunctive relief Plaintiffs seek. Under Article III, "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018) (citation omitted). Allowing a party to challenge regulations "apart from any concrete application that threatens imminent harm to [their] interests" would "fly in the face of Article III's injury-in-fact requirement." *Summers*, 555 U.S. at 494. That rule is especially important here, where plaintiffs do "not represent a class, so they [can] not seek to enjoin [an agency regulation] on the ground that it might cause harm to other parties." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 163 (2010).

*Second*, injunctions that go beyond a plaintiff's own injuries exceed the power of a court sitting in equity, which must limit injunctions to "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). It is well established that the scope of a court's statutory authority to enter

injunctive relief is circumscribed by the type of relief that was "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999). But the tradition of equity inherited from English law was premised on "providing equitable relief only to parties" because the fundamental role of a court was to "adjudicate the rights of 'individual[s].'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2427-28 (Thomas, J., concurring) (quoting The Federalist No. 78, at 466 (Alexander Hamilton) (Clinton Rossiter ed., 1961)). As a result, "a plaintiff could not sue to vindicate the private rights of someone else." *Id*. at 2428.

*Third*, the APA does not authorize universal injunctive relief. *Cf. Trump*, 138 S. Ct. at 2425 (Thomas, J. concurring) ("No statute expressly grants district courts the power to issue universal injunctions."). The APA provides only that a court may "hold unlawful and set aside agency action." 5 U.S.C. § 706(2). Nothing in § 706(2)'s text specifies whether the Rule, if found invalid, should be set aside on its *face* or *as applied* to the individual Plaintiffs. In the absence of a clear statement in the APA that it displaces traditional rules of equity, the court should adopt the narrower reading of the "set aside" language. *See Virginia Soc'y for Human Life v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001) ("Nothing in the language of the APA, however, requires us to exercise such far-reaching power."). The absence of nationwide injunctions prior to Congress' enactment of the APA in 1946 (and for over fifteen years thereafter) further suggests that the APA was not originally understood to authorize such broad relief. *See* Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 HARV. L. REV. 417, 438 & n.121 (2017); *see also* H.R. Rep. No. 1980, 79th Cong., 2d Sess. 42 (1946) (referring to possibility of suits for declaratory relief to "determine the validity or application of a rule or order").

*Fourth*, even assuming the APA could be read to provide for universal relief, § 702 provides that "[n]othing herein (1) affects other limitations on judicial review ... or (2) confers

authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." Congress can curtail the jurisdiction and equitable authority of lower federal courts, *see Bowles v. Russell*, 551 U.S. 205, 211 (2007), and has done so here by enacting the following INA provisions that prohibit universal injunctive relief. Section 1252(e)(1)(A) provides that "no court may [ ] enter declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) ... except as specifically authorized in a subsequent paragraph of this subsection." The sole remedy authorized under § 1252(e)(3) is a "determination[]" on the merits of challenges to § 1225(b) and aspects of its implementation. The word "determination" does not ordinarily connote injunctive relief, as opposed to declaratory relief. [8] Section 1252(e)(1)(B) also prohibits "certify[ing] a class," indicating that Congress did not "intend[] to permit actions" seeking relief "on behalf of a still wider group of aliens," with "no class representative" and where "plaintiffs are unconstrained by the requirements of [Rule] 23." *AILA*, 199 F.3d at 1364. Universal injunctive relief produces the same result Congress foreclosed, benefitting aliens "none of whom are parties to the lawsuit." *Id.*

Accordingly, even if the Court sets aside the Rule and guidance, the Court should deny injunctive relief. *See L.M.-M. v. Cuccinelli*, No. 19-2676, 2020 WL 985376, at *24 (D.D.C. Mar. 1, 2020) (Moss, J.) (observing that § 1252(e)(3) "contemplates that courts may issue declaratory judgments relating to the 'implementation of' the expedited removal provisions," and rejecting request for injunctive relief). "An injunction is a drastic and extraordinary remedy, which should not be granted" where "a less drastic remedy" can redress the Plaintiffs' injury. *Monsanto Co.*, 561 U.S. at 165. The Supreme Court has cautioned that a district court vacating an agency action under

---

[8] Had Congress intended otherwise it could have used language to that effect. *See, e.g.*, 28 U.S.C. § 2342 (empowering court "to enjoin ... the validity of" agency orders).

the APA should not issue an injunction unless doing so would "have [a] meaningful practical effect independent of [the policy's] vacatur," *id.* at 165, a showing that Plaintiffs cannot make where they do "not represent a class," *id.* at 163. *Cf. O.A. v. Trump*, 404 F. Supp. 3d 109, 153-54 (D.D.C. 2019) (concluding, even in a class-action case not involving some of the jurisdictional provisions at issue in this case, that vacatur was sufficient).

Even if injunctive relief were appropriate, Plaintiffs have not shown that the nationwide set-aside relief they seek is warranted. Plaintiffs raise arguments related to the factors for a *preliminary* injunction, including irreparable harm and the balance of the equities, but these factors are not relevant here. When a request for injunctive relief is raised in a motion for summary judgment, it "moots the Court's consideration of the preliminary injunctive factors because the Court will enter judgment on the merits." *Children's Hosp. Ass'n of Texas v. Azar*, 300 F. Supp. 3d 190, 202 (D.D.C. 2018); *see also Cronin v. U.S. Dep't of Agric.*, 919 F.2d 439, 445 (7th Cir. 1990) ("considerations of irreparable harm are out the window" when combined with "a full hearing" plaintiff's claims).

In any event, Plaintiffs' allegations of harm are insufficient here, where the Executive Branch has identified a crisis and an urgent need for our regional partners to cooperate to address it, and has taken targeted action to address the "national security and humanitarian crisis," 84 Fed. Reg. at 64,005 & n.12, while ensuring that seeking asylum in the United States remains available to aliens who have no other option, *Tchitchui v. Holder*, 657 F.3d 132, 137 (2d Cir. 2011) ("core regulatory purpose of asylum ... is not to provide [aliens] with a broader choice of safe homelands, but rather, to protect refugees with nowhere else to turn"). None of Plaintiffs' alleged injuries outweigh the harm that would be caused by "injunctive relief [that] deeply intrudes into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), and

undermines the "efficient administration of the immigration laws at the border," *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019). It is always in the public interest to protect the borders and enforce its immigration laws. *See Landon v. Plasencia*, 459 U.S. 21, 34 (1982).

In addition, Plaintiffs' allegations of harm in their home countries, Mot. 40-41, are irrelevant because they were not removed to their home countries. And their allegations related to parties not before this Court—*e.g.*, "other asylum seekers," Mot. 41-42—are similarly inapposite. *See East Bay*, 909 F.3d at 1240. The individual Plaintiffs' allegations about the Guatemalan asylum system cannot overcome the unreviewable determinations by the Attorney General and DHS that Guatemala has full-and-fair procedures for hearing protection claims that both governments have agreed to further invest in and strengthen. DOJFF104. Their allegations about the capacity of that system and the likelihood of aliens being sent from Guatemala to an additional country, Mot. 41-43, are similarly undermined by the Departments' findings and future commitments. As to the organizational Plaintiffs, even assuming they could challenge the Rule, the diversion-of-resources injuries they allege, Mot. 43-45, are not the type of injury "that can warrant [nationwide] relief." *CAIR v. Trump*, No. 1:19-CV-02117-TJK, 2019 WL 3436501, at *2 (D.D.C. July 24, 2019). As to the loss of an opportunity to comment, Mot. 44-45, this is also insufficient because Plaintiffs' allegations of injury "cannot stand on procedural violation alone." *Am. Ass'n for Homecare v. Leavitt*, 2008 WL 2580217, *5 (D.D.C. June 30, 2008).

For these reasons, the Court should deny Plaintiffs request for a permanent injunction. At most, Plaintiffs may be entitled to prospective declaratory relief on any claims for which they have demonstrated an entitlement to summary judgment. *See L.M.-M.*, 2020 WL 985376, at *24.

## CONCLUSION

For these reasons, the Court should grant summary judgment to Defendants on all claims.

65

Dated: March 25, 2020           Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

SCOTT G. STEWART
Deputy Assistant Attorney General

WILLIAM C. PEACHEY
Director

EREZ REUVENI
Assistant Director

By: /s/ *Brian C. Ward*
    BRIAN C. WARD
    Senior Litigation Counsel
    U.S. Department of Justice, Civil Division
    Office of Immigration Litigation
    District Court Section
    P.O. Box 868, Ben Franklin Station
    Washington, DC 20044
    Tel: (202) 616-9121
    Email: brian.c.ward@usdoj.gov

    *Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 25, 2020, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of for the District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: */s/ Brian C. Ward*
     BRIAN C. WARD
     Senior Litigation Counsel
     United States Department of Justice