**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| U.T., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 1:20-cv-00116 |
| ) | |
| William Barr, *et al*. ) | |
| ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**DEFENDANTS' APPENDIX UNDER LOCAL CIVIL RULE 7(n)(1)**

Defendants submit the following excerpts of the administrative records that are cited in Defendants' Memorandum of Law in Support of Defendants' Cross-Motion for Summary Judgment, ECF No. 82. *See* LCvr 7(n)(1); Minute Order (Feb. 25, 2020) (permitting the parties to submit separate appendices).

**DOCUMENT**                                                                                              **PAGE**

**Department of Justice – Record for Interim Final Rule**

1. Executive Office for Immigration Review, Pending Statistics (Oct. 11, 2019) . . . . DOJIFR38

2. Executive Office for Immigration Review, Adjudication Statistics:
   Pending Cases (Oct. 7, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DOJIFR39

3. Executive Office for Immigration Review,
   Immigration Judge (IJ) Hiring (October 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . .DOJIFR40

4. United States Citizenship & Immigration Services, Credible Fear
   and Reasonable Fear Statistics and Nationality Report:
   Fiscal Year 2018, 4th Quarter, July 1- Sept. 30, 2018 (Nov. 16, 2018) . . . . . . . . . .DOJIFR54

5. United States Citizenship & Immigration Services, Credible Fear
   Workload Report Summary: January 2019 (Feb. 22, 2019) . . . . . . . . . . . . . . . . . . .DOJIFR58

6.  Executive Office for Immigration Review, Adjudication Statistics:
    Total Asylum Applications (Oct. 23, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DOJIFR62

7.  Executive Office for Immigration Review, Adjudication Statistics:
    Affirmative Asylum Applications (Oct. 23, 2019) . . . . . . . . . . . . . . . . . . . . . . . . DOJIFR63

8.  Executive Office for Immigration Review, Adjudication Statistics:
    Defensive Asylum Applications (Oct. 23, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . DOJIFR64

9.  Executive Office for Immigration Review, Immigration Judges (IJs)
    Serving (October 17, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .DOJIFR65

10. United States Citizenship & Immigration Services, Credible Fear Workload
    Report Summary: FY09–FY13. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DOJIFR66

11. Executive Office for Immigration Review, Adjudication Statistics:
    Asylum Decision & Filing Rates in Cases Originating
    with a Credible Fear Claim (Oct. 23, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DOJIFR73

12. Executive Office for Immigration Review, Adjudication Statistics:
    Asylum Decision Rates (Oct. 23, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DOJIFR77

13. Executive Office for Immigration Review, Adjudication Statistics:
    "Family Unit" Data for Select Courts (Oct. 28, 2019). . . . . . . . . . . . . . . . . . . . . .DOJIFR78

14. Agreement between the United States and El Salvador for Cooperation
    in the Examination of Protection Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .DOJIFR79

15. Agreement between the United States and Honduras for Cooperation
    in the Examination of Protection Claims (Sept. 25, 2019) . . . . . . . . . . . . . . . . . . . DOJIFR85

16. Agreement between the United States and Guatemala on Cooperating
    Regarding the Examination of Protection Claims (July 26, 2019) . . . . . . . . . . . . . DOJIFR91

17. Department of Homeland Security, Memorandum from Acting Secretary
    Kevin McAleenan, Whether Guatemala's Refugee Protection Laws
    and Procedures Satisfy the "Access to Full and Fair Procedure" Requirements
    of Section 208(a)(2)(A) of the INA, 8 U.S.C. § 1158(a)(2)(A) (Oct. 16, 2019) . . . .DOJIFR96

18. Implementation of the Agreement between the Government of
    the United States of America and the Government of Canada
    Regarding Asylum Claims Made in Transit and at Land Border
    Ports-of-Entry (final rule), 69 FR 69479 (Nov. 29, 2004) . . . . . . . . . . . . . . . . . . . DOJIFR98

19. Asylum Claims Made by Aliens Arriving from Canada at Land Border
    Ports-of-Entry, 69 FR 69490 (Final Rule) (Nov. 29, 2004) . . . . . . . . . . . . . . . . . DOJIFR109

20. Implementation of the Agreement between the Government of
the United States of America and the Government of Canada
Regarding Asylum Claims Made in Transit and at Land Border
Ports-of-Entry, 69 FR 10620 (Proposed Rule) (March 8, 2004) . . . . . . . . . . . . . . .DOJIFR119

21. Asylum Claims Made by Aliens Arriving from Canada at Land Border
Ports-of-Entry, 69 FR 10627 (Proposed Rule) (March 8, 2004) . . . . . . . . . . . . . .DOJIFR127

22. Visas: Documentation of Nonimmigrants under the Immigration and
Nationality Act, as Amended, 81 FR 5906 (Feb. 4, 2016) . . . . . . . . . . . . . . . . . . DOJIFR154

23. Application for a Stay Pending Appeal, *Barr v. East Bay Sanctuary
Covenant* (Aug. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .DOJIFR436

24. Customs and Border Protection, Southwest Border Migration FY2019
(Oct. 23, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DOJIFR479

25. Designating Aliens for Expedited Removal, 69 FR 48877 (Aug. 11, 2004) . . . . . DOJIFR547

26. Eliminating Exception To Expedited Removal Authority for Cuban
Nationals Encountered in the United States or Arriving by Sea,
82 FR 4902 (Jan. 17, 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DOJIFR593

27. Eliminating Exception to Expedited Removal Authority for Cuban Nationals
Arriving by Air, 82 FR 4769 (Jan. 17, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . DOJIFR597

28. Gustavo Palencia & Sofia Menchu, Central Americans Surge North,
Hoping To Reach U.S. Before Trump Inauguration, Reuters (Nov. 24, 2016) . . . DOJIFR613

29. Department of Homeland Security, Defensive Asylum Cases and Most
Current Outcomes by Filing Date Fiscal Year (Oct. 29, 2019). . . . . . . . . . . . . . . DOJIFR615

30. President William Jefferson Clinton, Statement on Signing the
Omnibus Appropriations Act, 1997 (Sept. 30, 1996) . . . . . . . . . . . . . . . . . . . . . . DOJIFR616

31. Department of Homeland Security, Secretary Nielsen Meets with Mexican
Officials on Border Emergency, Travels to Honduras to Meet with Northern
Triangle Governments to Address Crisis at Source (March 26, 2019) . . . . . . . . . .DOJIFR627

32. Suspending the 30-Day and Annual Interview Requirements
From the Special Registration Process for Certain Nonimmigrants,
68 FR 67578 (Dec. 2, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DOJIFR628

33. Executive Office for Immigration Review, Statistics Yearbook FY2017 . . . . . . .DOJIFR636

34. Executive Office for Immigration Review, Statistics Yearbook FY2018 . . . . . . .DOJIFR681

35. Executive Office for Immigration Review, Asylum Applications Before and After Effective Date of IIRIRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DOJIFR725

36. Robbie Whelan, "Central Americans Surge at Border Before Trump Takes Over," *Wall Street Journal* (Dec. 23, 2016). . . . . . . . . . . . . . . . . . . . . . . . . DOJIFR738

37. Department of Homeland Security, Border Security Metrics Report (May 1, 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DOJIFR746

38. U.S. Customs and Border Protection, Enforcement Actions Southwest Border Total: Apprehensions and Inadmissible Aliens by Country of Citizenship (FY17–FY19 TD May) . . . . . . . . . . . . . . . . . . . . . . . . .DOJIFR814

39. United States Citizenship & Immigration Services, Credible Fear & Reasonable Fear Workload: FY06–FY13 Q1 (May 16, 2013). . . . . . . . . . . . . . DOJIFR815

40. Department of Homeland Security, Southwest Border Encounters of Non-Mexican Aliens by Month and Year FY2013–FY2019Q2. . . . . . . . . . . . . DOJIFR816

41. U.S. Customs & Border Protection, Southwest Border Enforcement Actions: March Official Reporting (Apr. 1, 2019) . . . . . . . . . . . . . . . . . . . . . . . DOJIFR818

42. U.S. Customs & Border Protection, Southwest Border Total Apprehensions & Inadmissible Aliens FY19 April–September Planning Profile (Apr. 10, 2019). . . DOJIFR820

43. Department of Homeland Security, OTM Caravan Breakdown in Mexico (Apr. 22, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .DOJIFR829

44. U.S. Customs & Border Protection, Southwest Border Apprehensions by Sector: Fiscal Year 2019 (July 10, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . .DOJIFR830

45. U.S.-Mexico Joint Declaration (June 7, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . DOJIFR839

46. Proposed Interdiction of Haitian Flag Vessels, 5 Op. O.L.C. 242, 244-45 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DOJIFR841

47. Statement by Secretary Johnson on Southwest Border Security, Oct. 17, 2016. . . DOJIFR890

48. Juan Montes, *Migrant Caravan Crosses Mexico's Southern Border*, Wall St. J. (Oct. 19, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .DOJIFR894

49. Nick Miroff & Carolyn Van Houten, *The Border Is Tougher To Cross than Ever. But There's Still One Way into America*, Wash. Post. (Oct. 24, 2018) . . . . . . . . .DOJIFR898

50. Delphine Schrank, *Mexico Offers Plan To Keep U.S.-bound Immigrants in Mexico*, Reuters (Oct. 26, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .DOJIFR910

51. Christopher Sherman, *'We're Heading North!' Migrants Nix Offer to Stay in Mexico*, Associated Press (Oct. 27, 2018). . . . . . . . . . . . . . . . . . . . . . . . DOJIFR912

4

52. Remarks by President Trump on the Illegal Immigration Crisis
    and Border Security, Nov. 1, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DOJIFR915

53. Implementation of the Agreement Between the Government of the
    United States of America and the Government of Canada Regarding
    Asylum Claims Made in Transit and at Land Border Ports-of-Entry,
    69 FR 10620 (Mar. 8, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DOJIFR985

54. Executive Office for Immigration Review, Adjudication Statistics:
    New Cases and Total Completions: FY1983–FY2019 Q2 (Oct. 7, 2019) . . . . . . DOJIFR1018

55. Louise Radnofsky, *Trump Says Guatemala Is Set To Help Stem
    Migrant Flow*, WSJ (Jun 18, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DOJIFR1019

56. Memorandum from President Donald J. Trump to the Attorney General and
    Secretary of Homeland Security, Additional Measures to Enhance Border
    Security and Restore Integrity to Our Immigration System (Apr. 29, 2019) . . . . DOJIFR1042

57. Dara Lind, The Border Is in Crisis. Here's How It Got This Bad,
    Vox (June 5, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .DOJIFR1054

58. Executive Office for Immigration Review, Credible Fear & Asylum Process:
    FY2008–FY2019 Q2 (Apr. 23, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DOJIFR1072

59. U.S. Citizenship and Immigration Services,
    Credible Fear Process at the FRCs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .DOJIFR1073

60. The White House, Our Nation's Weak Asylum Laws Are
    Encouraging an Overwhelming Increase in Illegal Immigration,
    Fact Sheet (Nov.1, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .DOJIFR1074

**Department of Homeland Security – Record for Interim Final Rule**

1.  U.S. Customs and Border Protection, Southwest Border
    Migration FY 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DHSIFR001

2.  Department of Homeland Security, Office of Immigration Statistics,
    Analysis of Department of Justice Executive Office of Immigration
    Review Case Info and Proceeding Datasets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DHSIFR003

3.  Executive Office for Immigration Review, Adjudication Statistics
    FY 2008 to FY 2019 (Third Quarter) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DHSIFR004

4.  Implementation of the Agreement Between the Government of the
    United States of America and the Government of Canada Regarding
    Asylum Claims Made in Transit and at Land Border Ports-of-Entry,
    69 Fed. Reg. 10620 (Mar. 8, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DHSIFR201

5.  Asylum Claims Made by Aliens Arriving from Canada at Land
    Border Ports-of-Entry, 69 Fed. Reg. 10627 (Mar. 8, 2004)..............................DHSIFR209

6.  United Nations High Commissioner for Refugees, Legal Considerations
    Regarding Access to Protection and a Connection between the Refugee
    and the Third Country in the Context of Return or Transfer to Safe
    Third Countries ...................................................................................................DHSIFR645

7.  United Nations High Commissioner for Refugees, Summary
    Conclusions on the Concept of "Effective Protection" in the Context
    of Secondary Movements of Refugees and Asylum-Seekers ..........................DHSIFR650

8.  United Nations High Commissioner for Refugees, Guidance Note on
    Bilateral and/or Multilateral Transfer Arrangements of Asylum-Seekers........DHSIFR654

9.  Implementation of the Agreement Between the Government of the
    United States of America and the Government of Canada Regarding
    Asylum Claims Made in Transit and at Land Border Ports-of-Entry,
    69 Fed. Reg. 69480 (Nov. 29, 2004)...............................................................DHSIFR657

10. Presidential Memorandum on Additional Measures to Enhance Border
    Security and Restore Integrity to Our Immigration System (Apr. 29, 2019) ... DHSIFR677

11. Department of Homeland Security, Secretary Nielsen Meets with
    Mexican Officials on Border Emergency, Travels to Honduras to
    Meet with Northern Triangle Governments to Address Crisis at
    Source (Mar. 26, 2019) ....................................................................................DHSIFR681

12. Suspending the 30-Day and Annual Interview Requirements From
    the Special Registration Process for Certain Nonimmigrants,
    68 Fed. Reg. 67578 (Dec. 2, 2003)..................................................................DHSIFR692

13. Gustavo Palencia, *Central Americans surge north, hoping to reach
    U.S. before Trump inauguration*, Reuters (Nov. 24 2016) ..............................DHSIFR737

14. Eliminating Exception To Expedited Removal Authority for Cuban
    Nationals Encountered in the United States or Arriving by Sea,
    82 Fed. Reg. 4902 (Jan. 17, 2017). ..................................................................DHSIFR743

15. Eliminating Exception to Expedited Removal Authority for Cuban
    Nationals Arriving by Air, 82 Fed. Reg. 4769 (Jan. 17, 2017).........................DHSIFR747

16. *Barr v. East Bay Sanctuary Covenant*, No. 19A230, Application
    for a Stay Pending Appeal (Aug. 26, 2019)......................................................DHSIFR755

6

17. Statement on Signing the Omnibus Consolidated Appropriations Act, 1997 (Sept. 30, 1996) ........................................................................... DHSIFR798

18. Robbie Whelan, *Central Americans Surge at Border Before Trump Takes Over; Migrants from violence-plagued El Salvador, Honduras, and Guatemala push north in anticipation of new administration's tougher border measures*, Wall Street Journal (Online) (Dec. 23, 2016)......... DHSIFR809

19. Dara Lind, *The border is in crisis. Here's how it got this bad*, Vox (Jun. 5, 2019) ............................................................................ DHSIFR813

20. Declaring a National Emergency Concerning the Southern Border of the United States, 84 Fed. Reg. 4949 (Feb. 20, 2019).................................. DHSIFR837

21. Fact Sheet, Our Nation's Weak Asylum Laws are Encouraging an Overwhelming Increase in Illegal Immigration (Nov. 1, 2018) ...................... DHSIFR839

22. Remarks by President Trump on the Illegal Immigration Crisis and Border Security (Nov. 1, 2018)......................................................... DHSIFR841

23. Agreement Between the Government of the United States of America and the Government of the Republic of Guatemala on Cooperation Regarding the Examination of Protection Claims ........................................... DHSIFR852

24. Department of Homeland Security, Decision Document (Nov. 4, 2019)......... DHSIFR857

25. Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act, 84 Fed. Reg. 63994 (November 19, 2019) ...................................... DHSIFR858

## Department of Justice – Full-and-Fair-Determination Record

1. Department of Justice, Memorandum from Gene Hamilton, Counselor to the Attorney General, INA Section 208(a)(2)(A) Agreement with Guatemala (Nov. 6, 2019) ..................................... DOJFF0001

2. Memorandum from the Attorney General, Whether Guatemala's Refugee Protection Laws and Procedures Satisfy the "Access to a Full and Fair Procedure" Requirements of Section 208(a)(2)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a)(2)(A) (Nov. 7, 2019) ..... DOJFF0006

3. Written Representation of the Guatemalan Protection System from the Government of Guatemala Transmitted to the U.S. Government Through Ambassador to the Rep. of Guatemala Luis E. Arreaga (Oct. 8, 2019)........... DOJFF0009

4. Memorandum for Kevin K. McAleenan, Acting Secretary, DHS, from
   Bernardo Pillot, Acting DHS Regional Attaché for Central America,
   Implementation of Asylum Cooperative Agreement with the
   Government of Guatemala, with an Attached Timeline of DHS
   Engagement with Government of Guatemala re: Asylum Agreement,
   Asylum Processes and Procedures (Oct. 30, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . DOJFF0020

5. Migration Code, Congressional Decree, No. 44-2016 (2016) (Guat.) . . . . . . . . . . . DOJFF0025

6. National Immigration Authority, Regulations on the Procedure for the
   Protection, Determination, and Recognition of Refugee Status in the
   State of Guatemala, Order No. 2-2019 (2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DOJFF0087

7. Agreement Between the Government of the United States of America and
   the Government of the Republic of Guatemala Concerning Cooperation
   Regarding Examination of Protection Claims (July 26, 2019) . . . . . . . . . . . . . . . . DOJFF0099

8. Annexes to Agreement Between Government of the United States of America
   and the Government of the Republic of Guatemala Concerning Cooperation
   Regarding the Examination of Protection Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . DOJFF0107

9. Determination Memorandum from Kevin K. McAleenan, Acting Secretary,
   DHS, Whether Guatemala's Refugee Protection Laws and Procedures
   Satisfy the "Access to a Full and Fair Procedure" Requirements of
10. Section 208(a)(2)(A) of the Immigration and Nationality Act,
    8 U.S.C. § 1158(a)(2)(A) (Oct. 16, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DOJFF0143

## Department of Homeland Security – Full-and-Fair-Determination Record

1. Acuerdo De Autoridad Migratoria Nacional No. 2-2019 . . . . . . . . . . . . . . . . . . . . . . . . DHSFF0021

2. Migration Code (Decree 44-2016 of the Congress of the Republic of
   Guatemala) (October 16, 2016) (Unofficial English Translation) . . . . . . . . . . . . . . . DHSFF0029

3. National Immigration Authority Order No. 2-2019 – Regulations on the
   Procedure For the Protection, Determination, and Recognition of Refugee
   Status In the State of Guatemala (Unofficial English Translation) . . . . . . . . . . . . . . DHSFF0090

4. UN Committee on the Protection of the Rights of All Migrant Workers
   and Members of Their Families (CMW), Concluding Observations on
   the Second Periodic Report of Guatemala (May 2, 2019) . . . . . . . . . . . . . . . . . . . . . DHSFF0102

5. Convention On The Creation Of The Single Central American Visa For
   The Free Movement Of Foreigners Among The Republics Of El Salvador,
   Guatemala, Honduras And Nicaragua (Unofficial English Translation) . . . . . . . . . . DHSFF0114

6.  Congreso De La República De Guatemala, Decreto Número 44-2016,
    El Congreso De La República De Guatemala (October 18, 2016) ..................... DHSFF0126

7.  UNHCR, Handbook on Procedures and Criteria for Determining
    Refugee Status under the 1951 Convention and the 1967 Protocol relating
    to the Status of Refugees (January 1992 ed.) ....................................................... DHSFF0144

8.  International Organization for Migration (IOM), Migration Governance
    Snapshot: Republic of Guatemala (August 2018) ............................................... DHSFF0205

9.  MIRPS (Comprehensive Regional Protection and Solutions Framework) .......... DHSFF0215

10. Inter-American Commission on Human Rights (IACHR), Situation of
    Human Rights in Guatemala (December 31, 2017) ............................................. DHSFF0426

11. UNHCR Fact Sheet Guatemala (April 2019) ...................................................... DHSFF0677

12. UN High Commissioner for Refugees (UNHCR), Submission by the
    United Nations High Commissioner for Refugees for the Office of the High
    Commissioner for Human Rights' Compilation Report - Universal
    Periodic Review: 3rd Cycle, 28th Session Guatemala ......................................... DHSFF0680

13. Agreement Between the Government of the United States of America
    and the Government of the Republic of Guatemala on Cooperation
    Regarding the Examination of Protection Claims, 84 Fed. Reg. 64095
    (November 20, 2019) .......................................................................................... DHSFF0698

14. UNHCR, Advisory Opinion on the Extraterritorial Application of
    Non-Refoulement Obligations under the 1951 Convention relating to
    the Status of Refugees and its 1967 Protocol (January 26, 2007) ...................... DHSFF0790

15. UNHCR, Note on the Principle of Non-Refoulement (November 1997) ........... DHSFF0809

16. UNHCR, Legal Considerations Regarding Access to Protection and
    a Connection Between the Refugee and the Third Country in the Context
    of Return or Transfer to Safe Third Countries (April 2018) ............................... DHSFF0819

17. Directive 2013/32/EU of the European Parliament and of the Council
    of 26 June 2013 on Common Procedures for Granting and Withdrawing
    International Protection (Recast) (June 29, 2013) ............................................... DHSFF0824

18. UNHCR, Summary Conclusions on the Concept of "Effective Protection"
    in the Context of Secondary Movements of Refugees and
    Asylum-Seekers (February 2003) ...................................................................... DHSFF0881

19. UNHCR Statement on Safe Country Concepts and the Right to an
    Effective Remedy in Admissibility Procedures (September 2019) ..................... DHSFF0915

20. Diplomatic Note from the U.S. Department of State to the Ministry
    of Foreign Affairs (July 26, 2019) ..................................................................... DHSFF1076

21. Questions Regarding Access to Full and Fair Procedures (Diplomatic Note)..... DHSFF1078

22. Follow Up Questions (Communications between the U.S. Government
    and the Government of Guatemala) ..................................................................... DHSFF1082

23. September 16, 2019 Full and Fair Q&A Read Out/Summary
    (Communications between the U.S. Government and the Government of
    Guatemala) ........................................................................................................... DHSFF1090

24. Memorandum, Devimin 220-2019 ....................................................................... DHSFF1094

25. Understanding of Facts (Communications between the U.S. Government
    and the Government of Guatemala) ..................................................................... DHSFF1119

26. Memorandum re Transfer of Questions Regarding Access To Just And Complete
    Processes In Support Of The Cooperation Agreement Concerning The Review Of
    Protection Requests Between The Government Of Guatemala And The
    Government Of The United States Of America, Devimin 220-2019
    (July 26, 2019) (Official English translation) ..................................................... DHSFF1140

27. Questions for Post about Guatemala's Asylum System (Communications
    between the U.S. Government and the Government of Guatemala).................... DHSFF1165

28. Email re RE: Question: Guatemala Asylum (July 25, 2019).............................. DHSFF1166

29. Communications between the U.S. Government and the Government
    of Guatemala ....................................................................................................... DHSFF1203

30. AMEmbassy Guatemala, 19 Guatemala 536, 19 State 61360
    re Assessment of the Guatemalan Asylum System (June 12, 2019)................... DHSFF1227

31. Official English translation (LS No. 2020-0109472)
    of Devimin 290-2019 (October 8, 2019) ............................................................ DHSFF1235

32. Email re Assessment of the Guatemalan Asylum System (June 12, 2019)…....... DHSFF1245

33. Email re Fwd: Asylum staffing in NCA countries (October 4, 2019)…............. DHSFF1253

34. Guatemalan Immigration Law and Current Capacity ......................................... DHSFF1255

35. Meeting with Guatemala Instituto de Migracion (May 30, 2019) ...................... DHSFF1259

36. Email re RE: MFA Response to ACA Understanding of Facts
(October 11, 2019) ...................................................................................... DHSFF1261

37. Memorandum from the Secretary re: Whether Guatemala's Refugee Protection
Laws and Procedures Satisfy the "Access to a Full and Fair Procedure"
Requirements of Section 208(a)(2)(A) of the Immigration and Nationality
Act, 8 U.S.C. § 1158(a)(2)(A) (October 16, 2019) ............................................. DHSFF1282

## USCIS – Guidance Record

1. Department of Homeland Security, Possible Removal to Guatemala in
Accordance with the U.S.-Guatemala Asylum Cooperation Agreement,
Initial Processing Information (Oct. 17, 2019) ..................................................... USCIS001

2. U.S. Citizenship and Immigration Services, Safe Third Country
Threshold Screening Lesson Plan (May 9, 2013) ................................................ USCIS033

3. U.S. Citizenship and Immigration Services, Guatemala ACA
Training (Nov. 19, 2019) ................................................................................ USCIS278

4. U.S. Citizenship and Immigration Services, Email RE:  FOR
INTERNAL USE ONLY--Implementation of the Guatemala ACA
UPDATED (Nov. 21, 2019) .............................................................................. USCIS313

5. U.S. Citizenship and Immigration Services, Guatemala ACA Training
(Jan. 4, 2020).............................................................................................. USCIS348

6. U.S. Citizenship and Immigration Services, ACA – Guatemala
Guidance and Procedures (Jan. 4, 2020)........................................................... USCIS373

7. U.S. Citizenship and Immigration Services, ACA Global Case
Management System Instructions (Jan. 4, 2020)................................................. USCIS378

**Executive Office for Immigration Review (EOIR)**
**Planning, Analysis, and Statistics Division (PASD)**
Pending Statistics

Data is current as of  October 11, 2019.

| Pending Statistics | Pending |
|---|---:|
| Pending: | 987,198 |
| Pending with an asylum application: | 474,327 |
| Guatemala | 82,198 |
| Honduras | 63,246 |
| El Salvador | 91,926 |
| Asylum Median Processing Time (in days) | 816 |

*I-862 & I-863 Initial Case Completions.

DOJIFR00038

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW ADJUDICATION STATISTICS

## Pending Cases[1]



| FY | Pending Cases at End of Fiscal Year |
|---|---|
| 2008 | 186,099 |
| 2009 | 223,768 |
| 2010 | 262,738 |
| 2011 | 298,203 |
| 2012 | 327,607 |
| 2013 | 356,262 |
| 2014 | 430,083 |
| 2015 | 460,013 |
| 2016 | 521,417 |
| 2017 | 655,929 |
| 2018 | 795,566 |
| 2019 | 987,274 |

Data Generated: October 7, 2019
[1] Pending cases equals removal, deportation, exclusion, asylum-only, and withholding only.

DOJIFR00039

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW ADJUDICATION STATISTICS

## Immigration Judge (IJ) Hiring



| FY | Total IJs Hired | Total IJs on Board |
|------|------|------|
| 2010 | 17 | 245 |
| 2011 | 39 | 273 |
| 2012 | 4 | 267 |
| 2013 | 8 | 262 |
| 2014 | 0 | 249 |
| 2015 | 20 | 254 |
| 2016 | 56 | 289 |
| 2017 | 64 | 338 |
| 2018 | 81 | 395 |
| 2019 | 92 | 442 |

Data Generated: October 2019

DOJIFR00040

## Credible Fear Workload Report Summary
### FY 2018 Total Caseload

| | Totals | Oct-17 | Nov-17 | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 | Aug-18 | Sep-18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 99,035 | 7,296 | 7,307 | 7,462 | 8,121 | 6,621 | 8,266 | 8,500 | 9,968 | 9,742 | 6,565 | 10,220 | 8,957 |
| Interviews Conducted | 85,018 | 5,339 | 6,365 | 6,265 | 6,926 | 5,699 | 7,280 | 7,142 | 8,877 | 8,941 | 6,065 | 8,066 | 8,053 |
| All Decisions | 97,728 | 6,359 | 7,494 | 7,164 | 8,108 | 8,640 | 7,869 | 10,067 | 10,080 | 10,860 | 7,155 | 8,755 | 9,157 |
| Fear Established (Y) | 84,077 | 4,797 | 5,781 | 4,347 | | 5,134 | 6,175 | 6,779 | 8,079 | 7,472 | 5,246 | 6,639 | 7,230 |
| Fear Not Established (N) | 9,659 | 531 | 591 | 715 | 676 | 767 | 975 | 719 | 821 | 1,314 | 945 | 1,082 | 829 |
| Closings | 13,392 | 1,031 | 1,122 | 889 | 1,222 | 1,070 | 1,526 | | 1,167 | 1,294 | 964 | 1,034 | 1,098 |

## Credible Fear Workload Report by Month Total Caseload

### OCT. 2017 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 7,296 | 859 | 46 | 10 | 152 | 5,390 | 244 | 59 | 199 | 13 | 59 | 265 |
| Interviews Conducted | 5,339 | 625 | 40 | 2 | 89 | 3,943 | 199 | 41 | 149 | 16 | 42 | 193 |
| All Decisions | 6,359 | 811 | 68 | 2 | 108 | 4,675 | 203 | 50 | 172 | 16 | 49 | 205 |
| Fear Established (Y) | 4,797 | 502 | 37 | 2 | 61 | 3,594 | 192 | 30 | 127 | 14 | 35 | 189 |
| Fear Not Established (N) | 531 | 124 | 4 | 0 | 24 | 328 | | 7 | 22 | 2 | 7 | 6 |
| Closings | 1,031 | 185 | 27 | 0 | 19 | 743 | 4 | | 23 | 0 | 7 | 14 |

### NOV. 2017 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 7,307 | 538 | 167 | 44 | 153 | 5,590 | 352 | 71 | 122 | 3 | 65 | 202 |
| Interviews Conducted | 6,365 | 625 | 46 | 0 | 136 | 4,972 | 322 | 21 | 147 | 1 | 20 | 202 |
| All Decisions | 7,494 | 660 | 75 | 1 | 163 | 5,809 | 346 | 25 | 160 | 2 | 22 | 231 |
| Fear Established (Y) | 5,781 | 411 | 36 | 1 | 124 | 4,749 | 310 | 21 | 127 | 1 | 19 | 196 |
| Fear Not Established (N) | 591 | 94 | 11 | 0 | 13 | 425 | 20 | | 19 | | 2 | 6 |
| Closings | 1,122 | 155 | 28 | 0 | 19 | 839 | 24 | 4 | 14 | | 2 | 29 |

### DEC. 2017 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 7,462 | 698 | 375 | 28 | 125 | 5,135 | 364 | 201 | 191 | 39 | 44 | 262 |
| Interviews Conducted | 6,265 | 488 | 402 | 18 | 131 | 4,412 | 271 | 121 | 181 | 0 | 47 | 219 |
| All Decisions | 7,164 | 632 | 434 | 18 | 152 | 5,043 | 288 | 106 | 196 | 0 | 41 | 235 |
| Fear Established (Y) | 4,347 | 502 | 307 | 2 | 108 | 4,011 | 260 | 84 | 159 | 0 | 40 | 213 |
| Fear Not Established (N) | 715 | 123 | 37 | 1 | 23 | 411 | 24 | 12 | 25 | 0 | 6 | 18 |
| Closings | 889 | 149 | 30 | 0 | 21 | 621 | 18 | 10 | 12 | 0 | 13 | 15 |

### JAN. 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 8,121 | 883 | 400 | 15 | 108 | 5,675 | 432 | 82 | 203 | 14 | 127 | 191 |
| Interviews Conducted | 6,926 | 725 | 283 | 1 | 77 | 5,046 | 373 | 33 | 162 | | 61 | 164 |
| All Decisions | 8,108 | 922 | 357 | 3 | 94 | 5,840 | 406 | 42 | 194 | 1 | 69 | 180 |
| Fear Established (Y) | | 559 | 199 | 2 | 67 | 4,556 | 337 | 29 | 146 | 1 | 55 | 158 |
| Fear Not Established (N) | 715 | 175 | 21 | 0 | 9 | 443 | 37 | 4 | 14 | 0 | 6 | 6 |
| Closings | 1,222 | 188 | 74 | 2 | 18 | 841 | 32 | 9 | 34 | 0 | 8 | 16 |

### FEB. 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 6,621 | 653 | 217 | 5 | 120 | 4,878 | 255 | 77 | 153 | 14 | 47 | 184 |
| Interviews Conducted | 5,699 | 566 | 167 | 7 | 96 | 4,061 | 270 | 121 | 140 | 68 | 63 | 140 |
| All Decisions | 8,640 | 757 | 149 | 8 | 106 | 4,926 | 304 | 142 | 156 | 78 | 99 | 155 |
| Fear Established (Y) | 5,134 | 514 | 114 | 6 | 72 | 4,375 | 455 | 104 | 116 | 67 | 76 | 122 |
| Fear Not Established (N) | 676 | 157 | 20 | 0 | 23 | 411 | 24 | 11 | | 5 | 16 | 8 |
| Closings | 1,070 | 151 | 15 | 2 | 35 | 740 | 21 | 23 | 27 | 33 | 6 | 32 |

### MARCH 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 8,266 | 787 | 389 | 7 | 82 | 5,959 | 270 | 82 | 153 | | 151 | 383 |
| Interviews Conducted | 7,280 | 609 | 363 | 7 | 57 | 5,531 | 166 | 26 | 157 | 0 | 107 | 257 |
| All Decisions | 7,869 | 683 | 386 | 8 | 126 | 6,615 | 205 | 40 | 180 | 0 | 100 | 297 |
| Fear Established (Y) | 6,175 | 435 | 301 | 8 | 48 | 4,894 | 141 | 17 | 140 | 0 | 81 | 241 |
| Fear Not Established (N) | 767 | 124 | 47 | 0 | 17 | 533 | 19 | | 14 | 0 | 5 | 8 |
| Closings | 1,526 | 124 | 38 | 0 | 47 | 1,198 | 46 | 9 | 26 | 0 | 14 | 32 |

### APRIL 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 8,500 | 812 | 224 | 16 | 138 | 6,092 | 474 | 77 | 153 | 14 | 213 | 287 |
| Interviews Conducted | 7,142 | 753 | 207 | 9 | 93 | 4,857 | 482 | 44 | 149 | 1 | 217 | 330 |
| All Decisions | 10,067 | 905 | 246 | 9 | 97 | 5,249 | 551 | 52 | 174 | 1 | 249 | 336 |
| Fear Established (Y) | 6,779 | 558 | 187 | 7 | 69 | 4,209 | 453 | 39 | 160 | 0 | 216 | 277 |
| Fear Not Established (N) | 719 | 157 | 20 | 0 | 6 | 445 | 36 | 6 | 12 | 1 | 20 | 40 |
| Closings | 975 | 157 | 27 | 2 | 18 | 606 | 64 | 12 | 9 | 0 | 30 | 27 |

### MAY 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 9,968 | 1,106 | 337 | 45 | 103 | 7,025 | 270 | 82 | 184 | 4 | 140 | 303 |
| Interviews Conducted | 8,877 | 924 | 263 | 27 | 91 | 6,452 | 556 | 59 | 156 | 0 | 109 | 240 |
| All Decisions | 10,080 | 1,107 | 309 | 35 | 119 | 7,279 | 570 | 71 | 170 | 0 | 127 | 280 |
| Fear Established (Y) | 8,079 | 730 | 212 | 28 | 78 | 6,040 | 484 | 51 | 137 | 0 | 97 | 242 |
| Fear Not Established (N) | 821 | 210 | 49 | 6 | 20 | 754 | 43 | 12 | 23 | 0 | 16 | 27 |
| Closings | 1,167 | 210 | 49 | 6 | 20 | 754 | 43 | 12 | 30 | | | |

### JUNE 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 9,742 | 939 | 402 | 72 | 78 | 6,547 | 532 | 73 | 203 | 13 | 419 | 467 |
| Interviews Conducted | 8,941 | 878 | 420 | 54 | 40 | 6,126 | 521 | 43 | 189 | 2 | 351 | 317 |
| All Decisions | 10,860 | 1,034 | 488 | 55 | 37 | 6,988 | 566 | 59 | 225 | 1 | 368 | 259 |
| Fear Established (Y) | 7,472 | 668 | 316 | 49 | 26 | 5,224 | 479 | 34 | 178 | 1 | 281 | 216 |
| Fear Not Established (N) | 1,314 | 176 | 76 | 4 | 3 | 913 | 66 | 5 | 29 | 0 | 30 | 11 |
| Closings | 1,294 | 190 | 96 | | 2 | 851 | 21 | 20 | 18 | 0 | 57 | 31 |

### JULY 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 6,565 | 1,126 | 432 | 44 | 117 | 3,686 | 394 | 77 | 81 | 0 | 354 | 245 |
| Interviews Conducted | 6,065 | 840 | 242 | 31 | 105 | 3,680 | 375 | 59 | 91 | 0 | 333 | 316 |
| All Decisions | 7,155 | 950 | 287 | 37 | 136 | 4,384 | 403 | 72 | 107 | 0 | 395 | 384 |
| Fear Established (Y) | 5,246 | 640 | 163 | 27 | 83 | 3,231 | 343 | 39 | 77 | 0 | 297 | 346 |
| Fear Not Established (N) | 945 | 145 | 46 | 6 | 28 | 616 | 32 | 14 | 14 | 0 | 37 | 11 |
| Closings | 964 | 165 | 78 | 5 | 28 | 537 | 28 | 19 | 16 | | 61 | 27 |

### AUGUST 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 10,220 | 1,492 | 127 | 42 | 230 | 6,986 | 637 | 74 | 156 | 15 | 277 | 194 |
| Interviews Conducted | 8,066 | 1,167 | 167 | 33 | 174 | 5,405 | 488 | 63 | 118 | 0 | 277 | 174 |
| All Decisions | 8,755 | 1,249 | 235 | 34 | 223 | 5,766 | 503 | 72 | 131 | 6 | 316 | 226 |
| Fear Established (Y) | 6,639 | 932 | 179 | 29 | 135 | 4,339 | 422 | 64 | 82 | 0 | 260 | 197 |
| Fear Not Established (N) | 1,082 | 177 | 25 | 4 | 31 | 717 | 33 | 3 | 21 | 1 | 38 | 2 |
| Closings | 1,034 | 138 | 31 | 1 | 43 | 710 | 33 | 5 | 28 | 0 | 14 | 10 |

### SEPTEMBER 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 8,957 | 1,243 | 457 | 45 | 136 | 6,054 | 461 | 94 | 111 | 0 | 122 | 234 |
| Interviews Conducted | 8,053 | 987 | 410 | 0 | 65 | 5,577 | 476 | 52 | 116 | 0 | 154 | 150 |
| All Decisions | 9,157 | 1,246 | 470 | 8 | 99 | 6,375 | 497 | 41 | 114 | 0 | 153 | 154 |
| Fear Established (Y) | 7,230 | 916 | 377 | 5 | 62 | 5,054 | 425 | 21 | 105 | 0 | 128 | 137 |
| Fear Not Established (N) | 829 | 142 | 29 | 0 | 21 | 563 | 42 | 6 | 6 | 0 | 9 | 2 |
| Closings | 1,098 | 188 | 64 | 3 | 19 | 758 | 30 | 2 | 3 | 0 | 14 | 10 |



The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.



U.S. Citizenship and Immigration Services

DOJ.FIR00054

## Reasonable Fear Workload Report Summary
### FY 2018 Total Caseload

| | Totals | Oct-17 | Nov-17 | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 | Aug-18 | Sep-18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 11,101 | 862 | 856 | 855 | 922 | 775 | 888 | 915 | 1,041 | 979 | 969 | 1,125 | 914 |
| Interviews Conducted | 7,212 | 579 | 528 | 528 | 491 | 480 | 642 | 598 | 737 | 746 | 546 | 751 | 586 |
| All Decisions | 10,964 | 896 | 839 | 837 | 786 | 785 | 952 | 910 | 1,066 | 1,065 | 883 | 1,079 | 866 |
| Fear Established (Y) | 3,161 | 273 | 229 | 221 | 235 | 244 | 313 | 276 | 322 | 308 | 212 | 287 | 241 |
| Fear Not Established (N) | 3,826 | 306 | 283 | 306 | 258 | 249 | 313 | 304 | 373 | 393 | 311 | 435 | 295 |
| Closings | 3,977 | 317 | 317 | 310 | 293 | 292 | 326 | 330 | 371 | 364 | 360 | 357 | 330 |

### Reasonable Fear Workload Report Monthly Caseload by Office

**OCT. 2017 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 862 | 142 | 121 | 0 | 48 | 277 | 50 | 46 | 18 | 0 | 107 | 57 |
| Interviews Conducted | 579 | 72 | 42 | 0 | 43 | 193 | 37 | 15 | 8 | 0 | | 40 |
| All Decisions | 896 | 135 | 107 | 0 | 52 | 274 | 46 | 44 | 15 | 0 | | 58 |
| Fear Established (Y) | 273 | 31 | 15 | 0 | 13 | 70 | 24 | 20 | 5 | 0 | 18 | 30 |
| Fear Not Established (N) | 306 | 42 | 26 | 0 | 25 | 121 | 13 | 8 | 19 | 0 | 8 | 10 |
| Closings | 317 | 62 | 66 | 0 | 9 | 83 | 7 | 7 | 4 | 0 | 16 | 18 |

**NOV. 2017 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 856 | 133 | 99 | 17 | 47 | 370 | 33 | 36 | 22 | 3 | 38 | 57 |
| Interviews Conducted | 528 | 83 | 55 | 1 | 37 | 224 | 25 | 12 | 27 | 1 | 27 | 40 |
| All Decisions | 839 | 147 | 121 | 1 | 37 | 335 | 25 | 19 | 30 | 1 | 39 | 58 |
| Fear Established (Y) | 229 | 40 | 23 | 1 | 15 | 138 | 13 | 8 | 14 | 0 | 18 | 30 |
| Fear Not Established (N) | 283 | 67 | 31 | 0 | 22 | 124 | 8 | 4 | 4 | 0 | 16 | 10 |
| Closings | 327 | 67 | 67 | 0 | 16 | 124 | 8 | 4 | 4 | 0 | 16 | 18 |

**DEC. 2017 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 855 | 150 | 90 | 10 | 54 | 315 | 54 | 44 | 21 | 1 | 36 | 80 |
| Interviews Conducted | 528 | 97 | 51 | 13 | 38 | 168 | 28 | 21 | 21 | 0 | 16 | 44 |
| All Decisions | 837 | 155 | 101 | 6 | 50 | 339 | 38 | 25 | 34 | 1 | 29 | 59 |
| Fear Established (Y) | 221 | 40 | 20 | 1 | 11 | 63 | 10 | 14 | 7 | 0 | 8 | 36 |
| Fear Not Established (N) | 306 | 59 | 31 | 4 | 23 | 146 | 13 | 7 | 12 | 1 | 9 | 8 |
| Closings | 310 | 56 | 50 | 1 | 16 | 130 | 8 | 7 | 4 | 0 | 18 | 14 |

**JAN. 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 922 | 161 | 106 | 14 | 66 | 326 | 33 | 28 | 50 | 3 | 36 | 81 |
| Interviews Conducted | 491 | 98 | 55 | 6 | 45 | 190 | 25 | 19 | 32 | 0 | 11 | 44 |
| All Decisions | 786 | 164 | 80 | 8 | 54 | 302 | 30 | 24 | 36 | 0 | 29 | 59 |
| Fear Established (Y) | 235 | 49 | 12 | 2 | 13 | 74 | 7 | 11 | 23 | 0 | 8 | 36 |
| Fear Not Established (N) | 258 | 49 | 14 | 4 | 31 | 118 | 12 | 9 | 9 | 0 | 3 | 9 |
| Closings | 293 | 66 | 54 | 2 | 35 | 124 | 11 | 8 | 4 | 0 | 18 | 14 |

**FEB. 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 775 | 102 | 102 | 10 | 44 | 315 | 54 | 40 | 21 | 1 | 32 | 54 |
| Interviews Conducted | 480 | 83 | 50 | 13 | 38 | 168 | 28 | 13 | 21 | 0 | 16 | 44 |
| All Decisions | 785 | 141 | 100 | 13 | 52 | 294 | 38 | 19 | 32 | 3 | 41 | 52 |
| Fear Established (Y) | 244 | 52 | 19 | 5 | 16 | 69 | 13 | 7 | 10 | 2 | 19 | 24 |
| Fear Not Established (N) | 249 | 45 | 23 | 8 | 19 | 109 | 15 | 7 | 7 | 1 | 5 | 20 |
| Closings | 292 | 44 | 58 | 1 | 7 | 135 | 11 | 14 | 7 | 1 | 17 | 20 |

**MARCH 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 888 | 140 | 117 | 8 | 56 | 337 | 62 | 37 | 50 | 3 | 41 | 74 |
| Interviews Conducted | 642 | 90 | 54 | 2 | 34 | 276 | 69 | 15 | 21 | 19 | 23 | 39 |
| All Decisions | 952 | 123 | 115 | 2 | 53 | 409 | 76 | 30 | 27 | 27 | 33 | 56 |
| Fear Established (Y) | 313 | 42 | 28 | 0 | 19 | 122 | 33 | 4 | 17 | 15 | 13 | 25 |
| Fear Not Established (N) | 313 | 42 | 21 | 2 | 19 | 156 | 28 | 12 | 1 | 4 | 6 | 13 |
| Closings | 326 | 66 | 66 | 0 | 20 | 131 | 11 | 10 | 1 | 1 | 14 | 20 |

**APRIL 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 915 | 167 | 95 | 11 | 44 | 410 | 43 | 32 | 19 | 1 | 32 | 54 |
| Interviews Conducted | 598 | 126 | 53 | 8 | 32 | 242 | 44 | 13 | 17 | 8 | 25 | 30 |
| All Decisions | 910 | 172 | 93 | 13 | 59 | 377 | 62 | 36 | 27 | 8 | 51 | 57 |
| Fear Established (Y) | 276 | 58 | 16 | 3 | 16 | 145 | 14 | 11 | 10 | 8 | 14 | 25 |
| Fear Not Established (N) | 304 | 53 | 31 | 3 | 20 | 145 | 15 | 11 | 5 | 0 | 19 | 14 |
| Closings | 330 | 61 | 46 | 1 | 7 | 135 | 11 | 14 | 3 | 0 | 41 | 18 |

**MAY 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 1,041 | 142 | 126 | 12 | 51 | 468 | 47 | 28 | 30 | 9 | 41 | 87 |
| Interviews Conducted | 737 | 145 | 83 | 6 | 35 | 306 | 40 | 22 | 25 | 9 | 23 | 52 |
| All Decisions | 1,066 | 222 | 147 | 9 | 47 | 418 | 69 | 35 | 26 | 6 | 39 | 64 |
| Fear Established (Y) | 322 | 67 | 24 | 1 | 17 | 122 | 33 | 14 | 10 | 0 | 12 | 22 |
| Fear Not Established (N) | 373 | 67 | 38 | 1 | 17 | 173 | 16 | 20 | 10 | 0 | 10 | 20 |
| Closings | 371 | 76 | 85 | 0 | 17 | 130 | 12 | 10 | 2 | 0 | 17 | 21 |

**JUNE 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 979 | 156 | 120 | 12 | 67 | 356 | 55 | 24 | 39 | 0 | 67 | 66 |
| Interviews Conducted | 746 | 143 | 65 | 8 | 42 | 272 | 44 | 23 | 36 | 0 | 51 | 17 |
| All Decisions | 1,065 | 165 | 120 | 5 | 57 | 422 | 62 | 36 | 25 | 0 | 91 | 45 |
| Fear Established (Y) | 308 | 46 | 40 | 3 | 16 | 124 | 14 | 11 | 11 | 0 | 31 | 10 |
| Fear Not Established (N) | 393 | 53 | 31 | 2 | 20 | 145 | 15 | 12 | 11 | 0 | 19 | 10 |
| Closings | 364 | 55 | 64 | 1 | 7 | 135 | 11 | 14 | 3 | 0 | 41 | 25 |

**JULY 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 969 | 186 | 153 | 18 | 50 | 346 | 47 | 28 | 30 | 9 | 67 | 66 |
| Interviews Conducted | 546 | 89 | 63 | 6 | 39 | 241 | 19 | 14 | 27 | 0 | 23 | 17 |
| All Decisions | 883 | 158 | 110 | 10 | 49 | 362 | 30 | 23 | 35 | 0 | 61 | 45 |
| Fear Established (Y) | 212 | 40 | 23 | 4 | 6 | 84 | 12 | 4 | 14 | 0 | 20 | 10 |
| Fear Not Established (N) | 311 | 40 | 38 | 4 | 29 | 143 | 8 | 14 | 14 | 0 | 11 | 10 |
| Closings | 360 | 78 | 49 | 1 | 14 | 135 | 10 | 8 | 9 | 0 | 30 | 25 |

**AUGUST 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 1,125 | 187 | 101 | 12 | 48 | 534 | 57 | 22 | 39 | 0 | 101 | 66 |
| Interviews Conducted | 751 | 126 | 84 | 12 | 31 | 329 | 44 | 15 | 36 | 0 | 40 | 34 |
| All Decisions | 1,079 | 185 | 152 | 15 | 48 | 473 | 44 | 18 | 53 | 0 | 63 | 57 |
| Fear Established (Y) | 287 | 45 | 28 | 5 | 17 | 120 | 17 | 4 | 15 | 0 | 26 | 19 |
| Fear Not Established (N) | 435 | 64 | 44 | 7 | 25 | 220 | 19 | 12 | 21 | 0 | 13 | 10 |
| Closings | 357 | 76 | 82 | 0 | 15 | 133 | 8 | 2 | 2 | 0 | 24 | 15 |

**SEPTEMBER 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 914 | 149 | 132 | 18 | 56 | 372 | 33 | 24 | 36 | 4 | 45 | 49 |
| Interviews Conducted | 586 | 112 | 59 | 6 | 25 | 284 | 27 | 12 | 27 | 0 | 25 | 14 |
| All Decisions | 866 | 170 | 102 | 10 | 43 | 362 | 32 | 21 | 24 | 0 | 48 | 25 |
| Fear Established (Y) | 241 | 48 | 14 | 1 | 7 | 119 | 12 | 4 | 11 | 0 | 19 | 6 |
| Fear Not Established (N) | 295 | 43 | 26 | 5 | 14 | 172 | 14 | 8 | 18 | 0 | 11 | 5 |
| Closings | 330 | 79 | 62 | 4 | 22 | 100 | 9 | 2 | 9 | 0 | 27 | 13 |

The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.



U.S. Citizenship and Immigration Services

DOJJFR00055

# Monthly Credible and Reasonable Fear Nationality Reports

| Credible Fear Nationality Report October 2017 (FY 2018) | | | Reasonable Fear Nationality Report October 2017 (FY 2018) | |
|---|---|---|---|---|
| **Nationality** | **Receipts** | | **Nationality** | **Receipts** |
| 1 GUATEMALA | 2,126 | | 1 MEXICO | 313 |
| 2 HONDURAS | 1,399 | | 2 HONDURAS | 164 |
| 3 EL SALVADOR | 1,127 | | 3 GUATEMALA | 160 |
| 4 MEXICO | 701 | | 4 EL SALVADOR | 149 |
| 5 INDIA | 599 | | 5 UNKNOWN | 24 |

| Credible Fear Nationality Report November 2017 (FY 2018) | | | Reasonable Fear Nationality Report November 2017 (FY 2018) | |
|---|---|---|---|---|
| **Nationality** | **Receipts** | | **Nationality** | **Receipts** |
| 1 GUATEMALA | 2,144 | | 1 MEXICO | 302 |
| 2 HONDURAS | 1,509 | | 2 HONDURAS | 209 |
| 3 EL SALVADOR | 1,222 | | 3 GUATEMALA | 161 |
| 4 INDIA | 551 | | 4 EL SALVADOR | 134 |
| 5 MEXICO | 533 | | 5 BRAZIL | 14 |

| Credible Fear Nationality Report December 2017 (FY 2018) | | | Reasonable Fear Nationality Report December 2017 (FY 2018) | |
|---|---|---|---|---|
| **Nationality** | **Receipts** | | **Nationality** | **Receipts** |
| 1 GUATEMALA | 2,247 | | 1 MEXICO | 292 |
| 2 HONDURAS | 1,576 | | 2 GUATEMALA | 200 |
| 3 EL SALVADOR | 1,153 | | 3 HONDURAS | 178 |
| 4 INDIA | 689 | | 4 EL SALVADOR | 124 |
| 5 MEXICO | 467 | | 5 BRAZIL | 16 |

| Credible Fear Nationality Report January 2018 (FY 2018) | | | Reasonable Fear Nationality Report January 2018 (FY 2018) | |
|---|---|---|---|---|
| **Nationality** | **Receipts** | | **Nationality** | **Receipts** |
| 1 GUATEMALA | 2,365 | | 1 MEXICO | 286 |
| 2 HONDURAS | 1,948 | | 2 HONDURAS | 244 |
| 3 EL SALVADOR | 1,059 | | 3 GUATEMALA | 194 |
| 4 INDIA | 728 | | 4 EL SALVADOR | 146 |
| 5 MEXICO | 630 | | 5 BRAZIL | 14 |

| Credible Fear Nationality Report February 2018 (FY 2018) | | | Reasonable Fear Nationality Report February 2018 (FY 2018) | |
|---|---|---|---|---|
| **Nationality** | **Receipts** | | **Nationality** | **Receipts** |
| 1 GUATEMALA | 1,981 | | 1 MEXICO | 285 |
| 2 HONDURAS | 1,648 | | 2 HONDURAS | 175 |
| 3 EL SALVADOR | 755 | | 3 GUATEMALA | 146 |
| 4 MEXICO | 649 | | 4 EL SALVADOR | 103 |
| 5 CUBA | 325 | | 5 DOMINICAN REPUBLIC | 5 |

| Credible Fear Nationality Report March 2018 (FY 2018) | | | Reasonable Fear Nationality Report March 2018 (FY 2018) | |
|---|---|---|---|---|
| **Nationality** | **Receipts** | | **Nationality** | **Receipts** |
| 1 GUATEMALA | 2,044 | | 1 MEXICO | 330 |
| 2 HONDURAS | 1,115 | | 2 HONDURAS | 212 |
| 3 EL SALVADOR | 705 | | 3 GUATEMALA | 175 |
| 4 MEXICO | 868 | | 4 EL SALVADOR | 132 |
| 5 CUBA | 181 | | 5 BRAZIL | 12 |

**U.S. Citizenship and Immigration Services**

The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.

DOJIFR00056

| Credible Fear Nationality Report<br>April 2018 (FY 2018) | | | Reasonable Fear Nationality Report<br>April 2018 (FY 2018) | |
|---|---|---|---|---|
| **Nationality** | **Receipts** | | **Nationality** | **Receipts** |
| 1 HONDURAS | 2,531 | | 1 MEXICO | 283 |
| 2 GUATEMALA | 1,878 | | 2 HONDURAS | 231 |
| 3 EL SALVADOR | 972 | | 3 GUATEMALA | 178 |
| 4 MEXICO | 613 | | 4 EL SALVADOR | 140 |
| 5 CUBA | 546 | | 5 BRAZIL | 12 |

| Credible Fear Nationality Report<br>May 2018 (FY 2018) | | | Reasonable Fear Nationality Report<br>May 2018 (FY 2018) | |
|---|---|---|---|---|
| **Nationality** | **Receipts** | | **Nationality** | **Receipts** |
| 1 HONDURAS | 2,952 | | 1 MEXICO | 317 |
| 2 GUATEMALA | 2,406 | | 2 HONDURAS | 242 |
| 3 EL SALVADOR | 1,245 | | 3 GUATEMALA | 218 |
| 4 INDIA | 686 | | 4 EL SALVADOR | 166 |
| 5 MEXICO | 654 | | 5 BRAZIL | 11 |

| Credible Fear Nationality Report<br>June 2018 (FY 2018) | | | Reasonable Fear Nationality Report<br>June 2018 (FY 2018) | |
|---|---|---|---|---|
| **Nationality** | **Receipts** | | **Nationality** | **Receipts** |
| 1 HONDURAS | 3,169 | | 1 MEXICO | 307 |
| 2 GUATEMALA | 2,348 | | 2 HONDURAS | 269 |
| 3 EL SALVADOR | 1,416 | | 3 GUATEMALA | 198 |
| 4 INDIA | 691 | | 4 EL SALVADOR | 156 |
| 5 CUBA | 621 | | 5 BRAZIL | 14 |

| Credible Fear Nationality Report<br>July 2018 (FY 2018) | | | Reasonable Fear Nationality Report<br>July 2018 (FY 2018) | |
|---|---|---|---|---|
| **Nationality** | **Receipts** | | **Nationality** | **Receipts** |
| 1 HONDURAS | 1,617 | | 1 MEXICO | 328 |
| 2 GUATEMALA | 1,427 | | 2 HONDURAS | 215 |
| 3 EL SALVADOR | 959 | | 3 GUATEMALA | 203 |
| 4 INDIA | 677 | | 4 EL SALVADOR | 151 |
| 5 CUBA | 480 | | 5 BRAZIL | 19 |

| Credible Fear Nationality Report<br>August 2018 (FY 2018) | | | Reasonable Fear Nationality Report<br>August 2018 (FY 2018) | |
|---|---|---|---|---|
| **Nationality** | **Receipts** | | **Nationality** | **Receipts** |
| 1 HONDURAS | 2,636 | | 1 MEXICO | 322 |
| 2 GUATEMALA | 2,035 | | 2 HONDURAS | 311 |
| 3 INDIA | 1,343 | | 3 GUATEMALA | 261 |
| 4 EL SALVADOR | 1,342 | | 4 EL SALVADOR | 144 |
| 5 CUBA | 772 | | 5 NICARAGUA | 31 |

| Credible Fear Nationality Report<br>September 2018 (FY 2018) | | | Reasonable Fear Nationality Report<br>September 2018 (FY 2018) | |
|---|---|---|---|---|
| **Nationality** | **Receipts** | | **Nationality** | **Receipts** |
| 1 HONDURAS | 2,541 | | 1 MEXICO | 281 |
| 2 GUATEMALA | 1,728 | | 2 HONDURAS | 268 |
| 3 EL SALVADOR | 1,284 | | 3 GUATEMALA | 173 |
| 4 INDIA | 870 | | 4 EL SALVADOR | 119 |
| 5 NICARAGUA | 604 | | 5 NICARAGUA | 24 |

U.S. Citizenship and Immigration Services

The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.

DOJIFR00057

**Credible Fear Workload Report Summary**
**FY2019 Total Caseload**

| | Totals | Oct-18 | Nov-18 | Dec-18 | Jan-19 | Feb-19 | Mar-19 | Apr-19 | May-19 | Jun-19 | Jul-19 | Aug-19 | Sep-19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 35,310 | 9,446 | 7,918 | 8,070 | 9,876 | | | | | | | | |
| Interviews Conducted | 28,847 | 7,773 | 7,487 | 6,933 | 6,654 | | | | | | | | |
| All Decisions | 32,188 | 8,593 | 7,848 | 8,405 | 7,342 | | | | | | | | |
| Fear Established (Y) | 25,060 | 6,902 | 6,000 | 6,460 | 5,698 | | | | | | | | |
| Fear Not Established (N) | 3,403 | 721 | 1,028 | 881 | 773 | | | | | | | | |
| Closings | 3,725 | 970 | 820 | 1,064 | 871 | | | | | | | | |

**October 2018 (FY 2019)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 9,446 | 1,140 | 385 | 18 | 133 | 6,509 | 601 | 138 | 131 | - | 138 | 253 |
| Interviews Conducted | 7,773 | 1,192 | 273 | 15 | 113 | 5,110 | 498 | 111 | 122 | - | 120 | 219 |
| All Decisions | 8,593 | 1,178 | 259 | 25 | 158 | 5,822 | 508 | 149 | 139 | - | 151 | 204 |
| Fear Established (Y) | 6,902 | 842 | 188 | 20 | 108 | 4,782 | 435 | 104 | 120 | - | 124 | 179 |
| Fear Not Established (N) | 721 | 145 | 22 | 3 | 34 | 400 | 56 | 22 | 13 | - | 17 | 9 |
| Closings | 970 | 191 | 49 | 2 | 16 | 640 | 17 | 23 | 6 | - | 10 | 16 |

**November 2018 (FY 2019)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 7,918 | 909 | 279 | 23 | 191 | 5,486 | 476 | 127 | 81 | - | 122 | 224 |
| Interviews Conducted | 7,487 | 934 | 198 | 20 | 168 | 5,266 | 412 | 108 | 84 | - | 101 | 196 |
| All Decisions | 7,848 | 1,109 | 231 | 22 | 151 | 5,376 | 436 | 124 | 77 | - | 101 | 221 |
| Fear Established (Y) | 6,000 | 803 | 178 | 20 | 120 | 4,108 | 352 | 84 | 67 | - | 84 | 184 |
| Fear Not Established (N) | 1,028 | 152 | 18 | - | 14 | 742 | 49 | 24 | 9 | - | 4 | 16 |
| Closings | 820 | 154 | 35 | 2 | 17 | 526 | 35 | 16 | 1 | - | 13 | 21 |

**December 2018 (FY 2019)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 8,070 | 1,212 | 277 | 13 | 189 | 5,363 | 433 | 215 | 61 | 9 | 133 | 165 |
| Interviews Conducted | 6,933 | 840 | 246 | 4 | 151 | 4,858 | 411 | 150 | 41 | - | 109 | 123 |
| All Decisions | 8,405 | 1,000 | 319 | 7 | 210 | 5,928 | 448 | 180 | 49 | - | 122 | 142 |
| Fear Established (Y) | 6,460 | 685 | 230 | 3 | 142 | 4,670 | 362 | 121 | 41 | - | 94 | 112 |
| Fear Not Established (N) | 881 | 152 | 30 | 1 | 31 | 556 | 53 | 26 | 3 | - | 14 | 15 |
| Closings | 1,064 | 163 | 59 | 3 | 37 | 702 | 33 | 33 | 5 | - | 14 | 15 |

**January 2019 (FY 2019)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 9,876 | 1,434 | 466 | 14 | 164 | 6,591 | 498 | 154 | 68 | 81 | 152 | 254 |
| Interviews Conducted | 6,654 | 796 | 258 | 5 | 144 | 4,524 | 350 | 147 | 69 | 33 | 122 | 206 |
| All Decisions | 7,342 | 939 | 286 | 5 | 156 | 4,914 | 405 | 164 | 78 | 36 | 125 | 234 |
| Fear Established (Y) | 5,698 | 637 | 172 | 5 | 101 | 3,984 | 298 | 118 | 60 | 31 | 98 | 194 |
| Fear Not Established (N) | 773 | 159 | 49 | - | 36 | 426 | 46 | 28 | 10 | 2 | 8 | 9 |
| Closings | 871 | 143 | 65 | - | 19 | 504 | 61 | 18 | 8 | 3 | 19 | 31 |

**February 2018 (FY 2019)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | | | | | | | | | | | | |
| Interviews Conducted | | | | | | | | | | | | |
| All Decisions | | | | | | | | | | | | |
| Fear Established (Y) | | | | | | | | | | | | |
| Fear Not Established (N) | | | | | | | | | | | | |
| Closings | | | | | | | | | | | | |

**March 2018 (FY 2019)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | | | | | | | | | | | | |
| Interviews Conducted | | | | | | | | | | | | |
| All Decisions | | | | | | | | | | | | |
| Fear Established (Y) | | | | | | | | | | | | |
| Fear Not Established (N) | | | | | | | | | | | | |
| Closings | | | | | | | | | | | | |



U.S. Citizenship and Immigration Services

The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.

DOJIFR00058

| April 2019 (FY 2019) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
| Case Receipts |  |  |  |  |  |  |  |  |  |  |  |  |
| Interviews Conducted |  |  |  |  |  |  |  |  |  |  |  |  |
| **All Decisions** |  |  |  |  |  |  |  |  |  |  |  |  |
| Fear Established (Y) |  |  |  |  |  |  |  |  |  |  |  |  |
| Fear Not Established (N) |  |  |  |  |  |  |  |  |  |  |  |  |
| Closings |  |  |  |  |  |  |  |  |  |  |  |  |

| May 2019 (FY 2019) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
| Case Receipts |  |  |  |  |  |  |  |  |  |  |  |  |
| Interviews Conducted |  |  |  |  |  |  |  |  |  |  |  |  |
| **All Decisions** |  |  |  |  |  |  |  |  |  |  |  |  |
| Fear Established (Y) |  |  |  |  |  |  |  |  |  |  |  |  |
| Fear Not Established (N) |  |  |  |  |  |  |  |  |  |  |  |  |
| Closings |  |  |  |  |  |  |  |  |  |  |  |  |

| June 2019 (FY 2019) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
| Case Receipts |  |  |  |  |  |  |  |  |  |  |  |  |
| Interviews Conducted |  |  |  |  |  |  |  |  |  |  |  |  |
| **All Decisions** |  |  |  |  |  |  |  |  |  |  |  |  |
| Fear Established (Y) |  |  |  |  |  |  |  |  |  |  |  |  |
| Fear Not Established (N) |  |  |  |  |  |  |  |  |  |  |  |  |
| Closings |  |  |  |  |  |  |  |  |  |  |  |  |

| July 2019 (FY 2019) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
| Case Receipts |  |  |  |  |  |  |  |  |  |  |  |  |
| Interviews Conducted |  |  |  |  |  |  |  |  |  |  |  |  |
| **All Decisions** |  |  |  |  |  |  |  |  |  |  |  |  |
| Fear Established (Y) |  |  |  |  |  |  |  |  |  |  |  |  |
| Fear Not Established (N) |  |  |  |  |  |  |  |  |  |  |  |  |
| Closings |  |  |  |  |  |  |  |  |  |  |  |  |

| August 2019 (FY 2019) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
| Case Receipts |  |  |  |  |  |  |  |  |  |  |  |  |
| Interviews Conducted |  |  |  |  |  |  |  |  |  |  |  |  |
| **All Decisions** |  |  |  |  |  |  |  |  |  |  |  |  |
| Fear Established (Y) |  |  |  |  |  |  |  |  |  |  |  |  |
| Fear Not Established (N) |  |  |  |  |  |  |  |  |  |  |  |  |
| Closings |  |  |  |  |  |  |  |  |  |  |  |  |

| September 2019 (FY 2019) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
| Case Receipts |  |  |  |  |  |  |  |  |  |  |  |  |
| Interviews Conducted |  |  |  |  |  |  |  |  |  |  |  |  |
| **All Decisions** |  |  |  |  |  |  |  |  |  |  |  |  |
| Fear Established (Y) |  |  |  |  |  |  |  |  |  |  |  |  |
| Fear Not Established (N) |  |  |  |  |  |  |  |  |  |  |  |  |
| Closings |  |  |  |  |  |  |  |  |  |  |  |  |

U.S. Citizenship and Immigration Services

The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.

**Monthly Credible Fear Top 5 Nationalities Received**
**Fiscal Year 2019**

| Monthly Credible Fear Nationality Report | |
|---|---|
| **October-18** | |
| Nationality | Receipts |
| 1 HONDURAS | 2,507 |
| 2 GUATEMALA | 1,936 |
| 3 EL SALVADOR | 1,337 |
| 4 INDIA | 852 |
| 5 CUBA | 786 |

| Monthly Credible Fear Nationality Report | |
|---|---|
| **November-18** | |
| Nationality | Receipts |
| 1 HONDURAS | 1,857 |
| 2 GUATEMALA | 1,482 |
| 3 EL SALVADOR | 997 |
| 4 CUBA | 870 |
| 5 INDIA | 713 |

| Monthly Credible Fear Nationality Report | |
|---|---|
| **December-18** | |
| Nationality | Receipts |
| 1 HONDURAS | 1,853 |
| 2 GUATEMALA | 1,695 |
| 3 CUBA | 1,091 |
| 4 EL SALVADOR | 939 |
| 5 INDIA | 645 |

| Monthly Credible Fear Nationality Report | |
|---|---|
| **January-19** | |
| Nationality | Receipts |
| 1 HONDURAS | 3,327 |
| 2 GUATEMALA | 1,747 |
| 3 EL SALVADOR | 1,145 |
| 4 CUBA | 1,005 |
| 5 INDIA | 508 |

| Monthly Credible Fear Nationality Report | |
|---|---|
| **February-19** | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

| Monthly Credible Fear Nationality Report | |
|---|---|
| **March-19** | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

| Monthly Credible Fear Nationality Report | |
|---|---|
| **April-19** | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

| Monthly Credible Fear Nationality Report | |
|---|---|
| **May-19** | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

| Monthly Credible Fear Nationality Report | |
|---|---|
| **June-19** | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

| Monthly Credible Fear Nationality Report | |
|---|---|
| **July-19** | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

| Monthly Credible Fear Nationality Report | |
|---|---|
| **August-19** | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

| Monthly Credible Fear Nationality Report | |
|---|---|
| **September-19** | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

**U.S. Citizenship and Immigration Services**

The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.

Credible Fear Processing Times
FY 2019 through January 2019

| FY2019 - All Credible Fear cases | Totals | % | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUNE | JUL | AUG | SEP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Decisions Served (Any Period) | 28,495 | | 7,633 | 7,031 | 7,351 | 6,480 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Completions (Closings + Served) | 32,219 | | 8,603 | 7,851 | 8,414 | 7,351 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10 Days or Less | 16,775 | 52.1% | 4,934 | 3,237 | 4,700 | 3,904 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Over 10 Days | 15,444 | 47.9% | 3,669 | 4,614 | 3,714 | 3,447 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Percent Timely Completed | 52.1% | | 57.4% | 41.2% | 55.9% | 53.1% | | | | | | | | |



U.S. Citizenship
and Immigration
Services

The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.

DOJIFR00061

# Executive Office for Immigration Review Adjudication Statistics

## Total Asylum Applications[1]



| Fiscal Year | Filed | Granted | Total Receipts : Total Grants Ratio |
|---|---|---|---|
| 2008 | 42,836 | 8,778 | 4.87:1 |
| 2009 | 35,812 | 8,384 | 4.27:1 |
| 2010 | 32,888 | 8,234 | 3.99:1 |
| 2011 | 41,462 | 9,866 | 4.2:1 |
| 2012 | 44,578 | 10,461 | 4.26:1 |
| 2013 | 43,463 | 9,692 | 4.48:1 |
| 2014 | 47,561 | 8,559 | 5.55:1 |
| 2015 | 63,657 | 8,108 | 7.85:1 |
| 2016 | 82,523 | 8,684 | 9.5:1 |
| 2017 | 144,725 | 10,539 | 13.73:1 |
| 2018 | 163,454 | 13,172 | 12.4:1 |
| 2019 | 208,942 | 18,809 | 11.1:1 |

Data Generated: October 23, 2019
[1] Total (affirmative and defensive) asylum applications filed and total asylum applications granted (initial case completions) in removal, deportation, exclusion, and asylum-only proceedings.

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW ADJUDICATION STATISTICS

## Affirmative Asylum Applications[1]



| Fiscal Year | Filed | Granted | Affirmative Receipts : Affirmative Grants Ratio |
|---|---|---|---|
| 2008 | 29,672 | 6,017 | 4.93:1 |
| 2009 | 23,636 | 6,075 | 3.89:1 |
| 2010 | 20,144 | 6,052 | 3.32:1 |
| 2011 | 23,464 | 7,121 | 3.29:1 |
| 2012 | 24,636 | 7,634 | 3.22:1 |
| 2013 | 19,963 | 7,103 | 2.81:1 |
| 2014 | 16,249 | 5,816 | 2.79:1 |
| 2015 | 17,276 | 4,745 | 3.64:1 |
| 2016 | 12,706 | 3,835 | 3.31:1 |
| 2017 | 22,103 | 3,585 | 6.16:1 |
| 2018 | 48,922 | 4,069 | 12.02:1 |
| 2019 | 61,453 | 5,372 | 11.43:1 |

Data Generated: October 23, 2019
[1] Affirmative asylum applications filed and affirmative asylum applications granted (initial case completions) in removal, deportation, exclusion, and asylum-only proceedings.

DOJIFR00063

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW ADJUDICATION STATISTICS

## Defensive Asylum Applications[1]



| Fiscal Year | Filed | Granted | Defensive Receipts : Defensive Grants Ratio |
|:---:|:---:|:---:|:---:|
| 2008 | 13,164 | 2,761 | 4.76:1 |
| 2009 | 12,176 | 2,309 | 5.27:1 |
| 2010 | 12,744 | 2,182 | 5.84:1 |
| 2011 | 17,998 | 2,745 | 6.55:1 |
| 2012 | 19,942 | 2,827 | 7.05:1 |
| 2013 | 23,500 | 2,589 | 9.07:1 |
| 2014 | 31,312 | 2,743 | 11.41:1 |
| 2015 | 46,381 | 3,363 | 13.79:1 |
| 2016 | 69,817 | 4,849 | 14.39:1 |
| 2017 | 122,622 | 6,954 | 17.63:1 |
| 2018 | 114,532 | 9,103 | 12.58:1 |
| 2019 | 147,489 | 13,437 | 10.97:1 |

Data Generated: October 23, 2019
[1] Defensive asylum applications filed and defensive asylum applications granted (initial case completions) in removal, deportation, exclusion, and asylum-only proceedings.

DOJIFR00064

**Executive Office for Immigration Review (EOIR)**

**Immigration Judges (IJs) Serving**

Data is current as of  October 17, 2019.


441 Immigration Judges

DOJIFR00065

## Credible Fear Workload Report
## Summary - FY 09-13

| FY2009 - All Credible Fear cases | Totals | % | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUNE | JUL | AUG | SEP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Completions (Closings + Served) | 5,523 | | 507 | 349 | 579 | 407 | 584 | 521 | 485 | 346 | 422 | 486 | 429 | 408 |
| 14 Days or Less | 5,173 | 93.66% | 456 | 295 | 536 | 385 | 542 | 509 | 473 | 330 | 358 | 472 | 421 | 396 |
| Over 14 Days | 350 | 6.34% | 51 | 54 | 43 | 22 | 42 | 12 | 12 | 16 | 64 | 14 | 8 | 12 |
| Percent Timely Completed | 93.66% | | 89.9% | 84.5% | 92.6% | 94.6% | 92.8% | 97.7% | 97.5% | 95.4% | 84.8% | 97.1% | 98.1% | 97.06% |

| FY2010 - All Credible Fear cases | Totals | % | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUNE | JUL | AUG | SEP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Decisions Served (Any Period) | 7,848 | | 402 | 422 | 571 | 476 | 517 | 612 | 694 | 770 | 875 | 704 | 875 | 930 |
| Total Completions (Closings + Served) | 8,926 | 96.98% | 468 | 459 | 653 | 528 | 595 | 683 | 781 | 872 | 1047 | 797 | 1001 | 1042 |
| 14 Days or Less | 8,656 | 96.98% | 436 | 431 | 630 | 506 | 587 | 661 | 765 | 858 | 1011 | 756 | 993 | 1022 |
| Over 14 Days | 270 | 3.02% | 32 | 28 | 23 | 22 | 8 | 22 | 16 | 14 | 36 | 41 | 8 | 20 |
| Percent Timely Completed | 96.98% | | 93.2% | 93.9% | 96.5% | 95.8% | 98.7% | 96.8% | 98.0% | 98.4% | 96.6% | 94.9% | 99.2% | 98.08% |

| FY2011 - All Credible Fear cases | Totals | % | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUNE | JUL | AUG | SEP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Decisions Served (Any Period) | 10,667 | | 1038 | 933 | 779 | 846 | 636 | 967 | 911 | 924 | 944 | 788 | 1092 | 809 |
| Total Completions (Closings + Served) | 11,716 | 98.58% | 1133 | 1006 | 870 | 892 | 695 | 1047 | 1004 | 1032 | 1047 | 883 | 1196 | 911 |
| 14 Days or Less | 11,550 | 98.58% | 1117 | 983 | 853 | 891 | 683 | 1039 | 994 | 1024 | 1037 | 862 | 1165 | 902 |
| Over 14 Days | 166 | 1.42% | 16 | 23 | 17 | 1 | 12 | 8 | 10 | 8 | 10 | 21 | 31 | 9 |
| Percent Timely Completed | 98.58% | | 98.6% | 97.7% | 98.0% | 99.9% | 98.3% | 99.2% | 99.0% | 99.2% | 99.0% | 97.6% | 97.4% | 99.0% |

| FY2012 - All Credible Fear cases | Totals | % | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUNE | JUL | AUG | SEP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Decisions Served (Any Period) | 12,056 | | 667 | 664 | 700 | 473 | 609 | 981 | 674 | 974 | 1211 | 1597 | 2018 | 1488 |
| Total Completions (Closings + Served) | 13,607 | 96.70% | 755 | 763 | 794 | 580 | 681 | 1100 | 787 | 1110 | 1366 | 1804 | 2211 | 1656 |
| 14 Days or Less | 13,158 | 96.70% | 743 | 752 | 792 | 564 | 645 | 1083 | 771 | 1068 | 1331 | 1757 | 2119 | 1533 |
| Over 14 Days | 449 | 3.30% | 12 | 11 | 2 | 16 | 36 | 17 | 16 | 42 | 35 | 47 | 92 | 123 |
| Percent Timely Completed | 96.70% | | 98.4% | 98.6% | 99.7% | 97.2% | 94.7% | 98.5% | 98.0% | 96.2% | 97.4% | 97.4% | 95.8% | 92.6% |

| FY2013 - All Credible Fear cases | Totals | % | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUNE | JUL | AUG | SEP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Decisions Served (Any Period) | 33,283 | | 1596 | 1242 | 1603 | 1795 | 1921 | 2139 | 3124 | 3336 | 3776 | 4867 | 4167 | 3717 |
| Total Completions (Closings + Served) | 36,454 | 85.91% | 1789 | 1415 | 1749 | 2107 | 2140 | 2413 | 3458 | 3648 | 4056 | 5172 | 4492 | 4015 |
| 14 Days or Less | 31,318 | 85.91% | 1702 | 988 | 704 | 1220 | 1688 | 2252 | 3243 | 2999 | 3483 | 4828 | 4290 | 3921 |
| Over 14 Days | 5,136 | 14.09% | 87 | 427 | 1045 | 887 | 452 | 161 | 215 | 649 | 573 | 344 | 202 | 94 |
| Percent Timely Completed | 85.91% | | 95.1% | 69.8% | 40.3% | 57.9% | 78.9% | 93.3% | 93.8% | 82.2% | 85.9% | 93.3% | 95.5% | 97.7% |

| FY2014 - All Credible Fear cases | Totals | % | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUNE | JUL | AUG | SEP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Decisions Served (Any Period) | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Completions (Closings + Served) | 0 | #DIV/0! | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 14 Days or Less | 0 | #DIV/0! | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Over 14 Days | 0 | #DIV/0! | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Percent Timely Completed | #DIV/0! | | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! |

Source: APCVKWKLCF

DOJ/FR00066

## Credible Fear Workload Report Summary
### FY 2013 Total Caseload

| | Totals | Oct-12 | Nov-12 | Dec-12 | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 36,005 | 1,673 | 1,876 | 1,803 | 1,791 | 2,049 | 2,662 | 3,748 | 3,317 | 4,513 | 4,566 | 4,079 | 4,079 |
| Interviews Conducted | 33,010 | 1,616 | 1,242 | 1,609 | 2,113 | 1,819 | 2,280 | 3,525 | 3,446 | 4,064 | 4,311 | 3,829 | 3,766 |
| All Decisions | 36,174 | 1,772 | 1,355 | 1,733 | 2,291 | 1,925 | 2,499 | 3,794 | 3,732 | 4,307 | 4,617 | 4,110 | 4,039 |
| Fear Established (Y) | 30,393 | 1,379 | 1,042 | 1,422 | 1,793 | 1,535 | 2,017 | 3,214 | 3,226 | 3,772 | 4,054 | 3,534 | 3,405 |
| Fear Not Established (N) | 2,587 | 199 | 140 | 163 | 186 | 168 | 205 | 244 | 193 | 253 | 253 | 248 | 335 |
| Closings | 3,194 | 194 | 173 | 148 | 312 | 222 | 277 | 336 | 313 | 282 | 310 | 328 | 299 |

## Credible Fear Workload Report by Month Total Caseload

### OCT. 2012 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 1,673 | 61 | 3 | 1,422 | 70 | 18 | 86 | 0 | 13 |
| Interviews Conducted | 1,616 | 29 | 3 | 1,369 | 117 | 16 | 71 | 0 | 11 |
| All Decisions | 1,772 | 33 | 4 | 1,383 | 248 | 20 | 71 | 0 | 13 |
| Fear Established (Y) | 1,379 | 21 | 3 | 1,124 | 147 | 9 | 64 | 0 | 11 |
| Fear Not Established (N) | 199 | 8 | 0 | 147 | 30 | 6 | 7 | 0 | 1 |
| Closings | 194 | 3 | 0 | 112 | 71 | 5 | 3 | 0 | 0 |

### NOV. 2012 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 1,876 | 45 | 11 | 1,517 | 207 | 20 | 63 | 0 | 13 |
| Interviews Conducted | 1,242 | 60 | 0 | 918 | 163 | 26 | 62 | 0 | 12 |
| All Decisions | 1,355 | 70 | 3 | 968 | 218 | 18 | 66 | 0 | 12 |
| Fear Established (Y) | 1,042 | 50 | 3 | 768 | 149 | 13 | 47 | 0 | 12 |
| Fear Not Established (N) | 140 | 8 | 0 | 104 | 14 | 4 | 10 | 0 | 0 |
| Closings | 173 | 12 | 0 | 96 | 55 | 1 | 9 | 0 | 0 |

### DEC. 2012 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 1,803 | 18 | 7 | 1,162 | 432 | 27 | 83 | 0 | 73 |
| Interviews Conducted | 1,609 | 18 | 10 | 1,107 | 322 | 19 | 84 | 0 | 47 |
| All Decisions | 1,733 | 22 | 11 | 1,162 | 359 | 26 | 85 | 1 | 67 |
| Fear Established (Y) | 1,422 | 16 | 4 | 981 | 285 | 16 | 75 | 1 | 44 |
| Fear Not Established (N) | 163 | 3 | 1 | 104 | 37 | 8 | 7 | 0 | 3 |
| Closings | 148 | 3 | 2 | 97 | 37 | 3 | 2 | 0 | 4 |

### JAN. 2013 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 1,791 | 35 | 4 | 1,317 | 263 | 39 | 112 | 0 | 21 |
| Interviews Conducted | 2,113 | 60 | 0 | 1,766 | 156 | 48 | 95 | 0 | 23 |
| All Decisions | 2,291 | 39 | 6 | 1,861 | 217 | 43 | 104 | 0 | 21 |
| Fear Established (Y) | 1,793 | 15 | 5 | 1,500 | 149 | 25 | 84 | 0 | 15 |
| Fear Not Established (N) | 186 | 3 | 1 | 156 | 4 | 12 | 9 | 0 | 1 |
| Closings | 312 | 21 | 3 | 205 | 64 | 6 | 11 | 0 | 2 |

### FEB. 2013 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 2,049 | 11 | 26 | 1,376 | 467 | 66 | 82 | 0 | 21 |
| Interviews Conducted | 1,819 | 8 | 22 | 1,243 | 407 | 58 | 54 | 0 | 27 |
| All Decisions | 1,925 | 16 | 19 | 1,287 | 463 | 57 | 59 | 0 | 24 |
| Fear Established (Y) | 1,535 | 7 | 14 | 1,025 | 387 | 38 | 43 | 0 | 21 |
| Fear Not Established (N) | 163 | 1 | 2 | 120 | 17 | 15 | 8 | 0 | 0 |
| Closings | 222 | 8 | 1 | 142 | 59 | 4 | 8 | 0 | 0 |

### MARCH 2013 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 2,662 | 135 | 49 | 1,654 | 585 | 67 | 118 | 0 | 54 |
| Interviews Conducted | 2,280 | 121 | 40 | 1,373 | 533 | 71 | 94 | 0 | 48 |
| All Decisions | 2,499 | 116 | 48 | 1,469 | 625 | 72 | 119 | 0 | 50 |
| Fear Established (Y) | 2,017 | 98 | 32 | 1,205 | 492 | 51 | 95 | 0 | 44 |
| Fear Not Established (N) | 205 | 12 | 6 | 120 | 44 | 6 | 4 | 0 | 10 |
| Closings | 277 | 12 | 12 | 132 | 89 | 9 | 20 | 0 | 3 |

### APRIL 2013 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 3,748 | 112 | 43 | 2,097 | 946 | 245 | 209 | 0 | 96 |
| Interviews Conducted | 3,525 | 56 | 54 | 2,091 | 913 | 184 | 148 | 0 | 79 |
| All Decisions | 3,794 | 86 | 63 | 2,234 | 972 | 200 | 153 | 0 | 86 |
| Fear Established (Y) | 3,214 | 53 | 53 | 1,949 | 854 | 97 | 140 | 0 | 68 |
| Fear Not Established (N) | 244 | 7 | 8 | 86 | 49 | 14 | 13 | 0 | 1 |
| Closings | 336 | 29 | 2 | 199 | 69 | 14 | 13 | 0 | 10 |

### MAY 2013 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 3,317 | 241 | 50 | 1,652 | 830 | 74 | 367 | 0 | 103 |
| Interviews Conducted | 3,446 | 237 | 52 | 1,793 | 798 | 108 | 384 | 0 | 74 |
| All Decisions | 3,732 | 261 | 52 | 1,964 | 866 | 107 | 400 | 0 | 82 |
| Fear Established (Y) | 3,226 | 225 | 45 | 1,643 | 786 | 76 | 379 | 0 | 72 |
| Fear Not Established (N) | 193 | 8 | 6 | 127 | 26 | 5 | 21 | 0 | 0 |
| Closings | 313 | 28 | 1 | 194 | 54 | 5 | 21 | 0 | 10 |

### JUNE 2013 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 4,513 | 153 | 43 | 2,378 | 1,181 | 384 | 422 | 0 | 211 |
| Interviews Conducted | 4,064 | 138 | 33 | 2,047 | 1,147 | 134 | 416 | 0 | 56 |
| All Decisions | 4,307 | 180 | 27 | 2,174 | 1,092 | 142 | 321 | 0 | 237 |
| Fear Established (Y) | 3,772 | 136 | 20 | 1,852 | 1,092 | 123 | 321 | 0 | 228 |
| Fear Not Established (N) | 253 | 4 | 6 | 182 | 45 | 14 | 1 | 0 | 1 |
| Closings | 282 | 40 | 1 | 140 | 75 | 5 | 13 | 0 | 8 |

### JULY 2013 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 4,566 | 57 | 30 | 2,626 | 1,240 | 68 | 267 | 0 | 211 |
| Interviews Conducted | 4,311 | 54 | 29 | 2,415 | 1,192 | 87 | 263 | 0 | 211 |
| All Decisions | 4,617 | 68 | 29 | 2,611 | 1,262 | 105 | 263 | 0 | 216 |
| Fear Established (Y) | 4,054 | 54 | 26 | 2,227 | 1,139 | 81 | 261 | 0 | 211 |
| Fear Not Established (N) | 253 | 2 | 2 | 175 | 54 | 14 | 2 | 0 | 4 |
| Closings | 310 | 12 | 1 | 209 | 69 | 9 | 10 | 0 | 0 |

### AUGUST 2013 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 4,079 | 154 | 18 | 1,908 | 912 | 128 | 422 | 0 | 148 |
| Interviews Conducted | 3,829 | 106 | 33 | 1,902 | 874 | 126 | 385 | 0 | 141 |
| All Decisions | 4,110 | 180 | 27 | 2,174 | 948 | 135 | 224 | 0 | 153 |
| Fear Established (Y) | 3,534 | 124 | 20 | 1,734 | 805 | 73 | 354 | 0 | 56 |
| Fear Not Established (N) | 248 | 4 | 6 | 182 | 45 | 8 | 3 | 0 | 8 |
| Closings | 328 | 29 | 0 | 159 | 73 | 6 | 19 | 0 | 12 |

### SEPTEMBER 2013 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 4,079 | 201 | 17 | 2,216 | 888 | 192 | 312 | 0 | 148 |
| Interviews Conducted | 3,766 | 110 | 10 | 1,970 | 820 | 183 | 342 | 0 | 141 |
| All Decisions | 4,039 | 224 | 18 | 2,129 | 884 | 188 | 338 | 0 | 153 |
| Fear Established (Y) | 3,405 | 183 | 10 | 1,749 | 749 | 162 | 322 | 0 | 133 |
| Fear Not Established (N) | 335 | 2 | 10 | 222 | 67 | 10 | 22 | 0 | 8 |
| Closings | 299 | 29 | 6 | 159 | 68 | 6 | 19 | 0 | 12 |

DOJ-FR0067

## Credible Fear Workload Report Summary
### FY 2013 Inland Caseload

| | Totals | Oct-12 | Nov-12 | Dec-12 | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 27,327 | 1,510 | 1,563 | 1,377 | 1,444 | 1,592 | 1,970 | 2,576 | 2,664 | 3,406 | 3,402 | 2,749 | 3,074 |
| Interviews Conducted | 25,669 | 1,350 | 950 | 1,317 | 1,826 | 1,393 | 1,647 | 2,497 | 2,784 | 3,004 | 3,210 | 2,832 | 2,859 |
| **All Decisions** | 27,568 | 1,471 | 1,018 | 1,398 | 1,949 | 1,475 | 1,830 | 2,655 | 3,030 | 3,218 | 3,448 | 3,024 | 3,082 |
| Fear Established (Y) | 23,252 | 1,150 | 805 | 1,165 | 1,566 | 1,167 | 1,479 | 2,316 | 2,606 | 2,778 | 3,004 | 2,627 | 2,589 |
| Fear Not Established (N) | 1,948 | 168 | 96 | 131 | 148 | 131 | 153 | 117 | 159 | 240 | 208 | 183 | 256 |
| Closings | 2,368 | 153 | 117 | 102 | 235 | 102 | 179 | 222 | 265 | 240 | 236 | 214 | 207 |

### Credible Fear Workload Report by Month Inland Caseload

#### OCT. 2012 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZSF |
|---|---|---|---|---|---|---|---|---|
| Case Receipts | 1,510 | 11 | 0 | 1291 | 159 | 0 | 49 | 0 |
| Interviews Conducted | 1,350 | 8 | 0 | 1212 | 98 | 0 | 31 | 1 |
| **All Decisions** | 1,471 | 10 | 0 | 1280 | 150 | 0 | 30 | 1 |
| Fear Established (Y) | 1,150 | 7 | 0 | 1043 | 74 | 0 | 25 | 1 |
| Fear Not Established (N) | 168 | 1 | 0 | 136 | 24 | 0 | 5 | 0 |
| Closings | 153 | 0 | 0 | 101 | 52 | 0 | 0 | 0 |

#### NOV. 2012 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZSF |
|---|---|---|---|---|---|---|---|---|
| Case Receipts | 1,563 | 3 | 0 | 1381 | 123 | 0 | 55 | 1 |
| Interviews Conducted | 950 | 5 | 0 | 798 | 92 | 0 | 54 | 1 |
| **All Decisions** | 1,018 | 3 | 0 | 827 | 129 | 0 | 58 | 1 |
| Fear Established (Y) | 805 | 3 | 0 | 677 | 83 | 0 | 41 | 1 |
| Fear Not Established (N) | 96 | 0 | 0 | 77 | 9 | 0 | 10 | 0 |
| Closings | 117 | 0 | 0 | 73 | 37 | 0 | 7 | 0 |

#### DEC. 2012 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZSF |
|---|---|---|---|---|---|---|---|---|
| Case Receipts | 1,377 | 6 | 0 | 1062 | 232 | 0 | 72 | 5 |
| Interviews Conducted | 1,317 | 8 | 0 | 1029 | 206 | 0 | 73 | 1 |
| **All Decisions** | 1,398 | 4 | 0 | 1084 | 232 | 0 | 73 | 5 |
| Fear Established (Y) | 1,165 | 3 | 0 | 915 | 176 | 0 | 66 | 5 |
| Fear Not Established (N) | 131 | 1 | 0 | 94 | 31 | 0 | 5 | 0 |
| Closings | 102 | 0 | 0 | 75 | 25 | 0 | 2 | 0 |

#### JAN. 2013 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZSF |
|---|---|---|---|---|---|---|---|---|
| Case Receipts | 1,444 | 4 | 0 | 1133 | 148 | 0 | 98 | 1 |
| Interviews Conducted | 1,826 | 4 | 0 | 1654 | 82 | 2 | 79 | 5 |
| **All Decisions** | 1,949 | 6 | 0 | 1723 | 130 | 2 | 87 | 1 |
| Fear Established (Y) | 1,566 | 4 | 0 | 1409 | 78 | 2 | 72 | 1 |
| Fear Not Established (N) | 148 | 0 | 0 | 139 | 4 | 0 | 5 | 0 |
| Closings | 235 | 2 | 0 | 175 | 48 | 0 | 10 | 0 |

#### FEB. 2013 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZSF |
|---|---|---|---|---|---|---|---|---|
| Case Receipts | 1,592 | 0 | 0 | 1271 | 247 | 0 | 73 | 5 |
| Interviews Conducted | 1,393 | 0 | 0 | 1131 | 212 | 0 | 48 | 1 |
| **All Decisions** | 1,475 | 0 | 0 | 1164 | 257 | 0 | 53 | 1 |
| Fear Established (Y) | 1,167 | 0 | 0 | 934 | 194 | 0 | 38 | 1 |
| Fear Not Established (N) | 131 | 0 | 0 | 109 | 13 | 0 | 7 | 0 |
| Closings | 102 | 0 | 0 | 121 | 50 | 0 | 8 | 0 |

#### MARCH 2013 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZSF |
|---|---|---|---|---|---|---|---|---|
| Case Receipts | 1,970 | 3 | 0 | 1522 | 342 | 0 | 99 | 2 |
| Interviews Conducted | 1,647 | 3 | 2 | 1288 | 278 | 1 | 73 | 2 |
| **All Decisions** | 1,830 | 5 | 2 | 1373 | 351 | 1 | 96 | 2 |
| Fear Established (Y) | 1,479 | 3 | 2 | 1146 | 249 | 1 | 76 | 2 |
| Fear Not Established (N) | 153 | 2 | 0 | 118 | 31 | 0 | 4 | 0 |
| Closings | 198 | 2 | 0 | 109 | 71 | 0 | 16 | 0 |

#### APRIL 2013 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZSF |
|---|---|---|---|---|---|---|---|---|
| Case Receipts | 2,576 | 22 | 0 | 1698 | 470 | 8 | 164 | 3 |
| Interviews Conducted | 2,497 | 15 | 0 | 1895 | 441 | 3 | 139 | 4 |
| **All Decisions** | 2,655 | 21 | 0 | 2004 | 481 | 3 | 142 | 4 |
| Fear Established (Y) | 2,316 | 13 | 0 | 1759 | 406 | 2 | 132 | 4 |
| Fear Not Established (N) | 117 | 1 | 0 | 81 | 34 | 1 | 0 | 0 |
| Closings | 222 | 0 | 0 | 164 | 41 | 0 | 10 | 2 |

#### MAY 2013 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZSF |
|---|---|---|---|---|---|---|---|---|
| Case Receipts | 2,664 | 178 | 0 | 1589 | 464 | 41 | 392 | 0 |
| Interviews Conducted | 2,784 | 172 | 7 | 1714 | 455 | 42 | 348 | 46 |
| **All Decisions** | 3,030 | 192 | 7 | 1875 | 507 | 41 | 360 | 48 |
| Fear Established (Y) | 2,606 | 164 | 7 | 1570 | 443 | 34 | 342 | 46 |
| Fear Not Established (N) | 159 | 5 | 0 | 126 | 21 | 0 | 7 | 0 |
| Closings | 265 | 23 | 0 | 179 | 43 | 0 | 18 | 2 |

#### JUNE 2013 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZSF |
|---|---|---|---|---|---|---|---|---|
| Case Receipts | 3,406 | 136 | 14 | 2130 | 543 | 106 | 336 | 129 |
| Interviews Conducted | 3,004 | 123 | 25 | 1826 | 520 | 102 | 299 | 109 |
| **All Decisions** | 3,218 | 155 | 19 | 1939 | 581 | 107 | 307 | 110 |
| Fear Established (Y) | 2,778 | 121 | 13 | 1659 | 489 | 95 | 293 | 108 |
| Fear Not Established (N) | 200 | 4 | 6 | 152 | 28 | 9 | 1 | 0 |
| Closings | 240 | 30 | 0 | 128 | 64 | 3 | 13 | 2 |

#### JULY 2013 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZSF |
|---|---|---|---|---|---|---|---|---|
| Case Receipts | 3,402 | 44 | 10 | 2315 | 621 | 42 | 204 | 166 |
| Interviews Conducted | 3,210 | 47 | 7 | 2212 | 581 | 56 | 208 | 99 |
| **All Decisions** | 3,448 | 56 | 9 | 2385 | 624 | 69 | 208 | 96 |
| Fear Established (Y) | 3,004 | 47 | 8 | 2041 | 547 | 59 | 206 | 96 |
| Fear Not Established (N) | 208 | 2 | 1 | 164 | 33 | 6 | 2 | 0 |
| Closings | 236 | 7 | 0 | 180 | 44 | 4 | 0 | 1 |

#### AUGUST 2013 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZSF |
|---|---|---|---|---|---|---|---|---|
| Case Receipts | 2,749 | 120 | 8 | 1696 | 438 | 108 | 336 | 43 |
| Interviews Conducted | 2,832 | 76 | 8 | 1725 | 423 | 104 | 314 | 182 |
| **All Decisions** | 3,024 | 99 | 9 | 1831 | 462 | 109 | 314 | 200 |
| Fear Established (Y) | 2,627 | 74 | 6 | 1572 | 399 | 95 | 305 | 168 |
| Fear Not Established (N) | 183 | 2 | 9 | 143 | 26 | 3 | 2 | 4 |
| Closings | 214 | 23 | 0 | 116 | 37 | 3 | 7 | 28 |

#### SEPTEMBER 2013 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZSF |
|---|---|---|---|---|---|---|---|---|
| Case Receipts | 3,074 | 153 | 71 | 1825 | 545 | 158 | 274 | 48 |
| Interviews Conducted | 2,859 | 154 | 67 | 1637 | 498 | 151 | 305 | 47 |
| **All Decisions** | 3,082 | 175 | 70 | 1759 | 541 | 153 | 302 | 52 |
| Fear Established (Y) | 2,589 | 153 | 58 | 1451 | 453 | 139 | 290 | 45 |
| Fear Not Established (N) | 256 | 2 | 9 | 185 | 43 | 11 | 4 | 2 |
| Closings | 207 | 20 | 3 | 123 | 45 | 13 | 3 | 5 |

DOJ/FR00068

**Credible Fear Workload Report Summary**
**FY 2013 Port of Entry (POE) Caseload**

| | Totals | Oct-12 | Nov-12 | Dec-12 | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 8,703 | 363 | 313 | 426 | 347 | 457 | 692 | 1,172 | 653 | 1,107 | 1,160 | 1,009 | 1,004 |
| Interviews Conducted | 7,838 | 266 | 292 | 292 | 287 | 426 | 633 | 1,028 | 662 | 1,060 | 1,099 | 997 | 896 |
| All Decisions | 8,061 | 301 | 301 | 335 | 342 | 450 | 659 | 1,086 | 702 | 1,089 | 1,086 | 986 | 986 |
| Fear Established (Y) | 7,138 | 229 | 237 | 257 | 227 | 368 | 538 | 888 | 620 | 994 | 1,048 | 907 | 815 |
| Fear Not Established (N) | 639 | 31 | 44 | 32 | 38 | 39 | 53 | 127 | 52 | 45 | 79 | 65 | 34 |
| Closings | 824 | 41 | 56 | 46 | 77 | 43 | 79 | 114 | 48 | 42 | 72 | 114 | 92 |

**Credible Fear Workload Report by Month Port of Entry (POE) Caseload**

**OCT. 2012 (FY 2013)**

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 363 | 50 | 21 | 131 | 89 | 18 | 37 | 0 | 17 |
| Interviews Conducted | 266 | 21 | 3 | 97 | 79 | 16 | 40 | 0 | 10 |
| All Decisions | 301 | 23 | 4 | 103 | 98 | 20 | 41 | 0 | 12 |
| Fear Established (Y) | 229 | 14 | 3 | 81 | 73 | 9 | 39 | 0 | 10 |
| Fear Not Established (N) | 31 | 5 | 0 | 11 | 6 | 6 | 2 | 0 | 1 |
| Closings | 41 | 3 | 1 | 11 | 19 | 5 | 0 | 0 | 2 |

**NOV. 2012 (FY 2013)**

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 313 | 42 | 11 | 136 | 84 | 20 | 8 | 0 | 12 |
| Interviews Conducted | 292 | 55 | 7 | 120 | 71 | 20 | 8 | 0 | 11 |
| All Decisions | 337 | 67 | 3 | 141 | 89 | 18 | 8 | 0 | 11 |
| Fear Established (Y) | 237 | 47 | 3 | 91 | 66 | 13 | 6 | 0 | 11 |
| Fear Not Established (N) | 44 | 8 | 0 | 27 | 5 | 4 | 0 | 0 | 0 |
| Closings | 56 | 12 | 0 | 23 | 18 | 1 | 2 | 0 | 0 |

**DEC. 2012 (FY 2013)**

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 426 | 12 | 7 | 100 | 200 | 27 | 11 | 1 | 68 |
| Interviews Conducted | 292 | 15 | 10 | 78 | 116 | 19 | 11 | 1 | 42 |
| All Decisions | 335 | 18 | 7 | 98 | 127 | 26 | 12 | 1 | 46 |
| Fear Established (Y) | 257 | 14 | 6 | 66 | 109 | 16 | 9 | 1 | 39 |
| Fear Not Established (N) | 32 | 2 | 1 | 10 | 6 | 8 | 2 | 0 | 3 |
| Closings | 46 | 3 | 2 | 22 | 12 | 2 | 1 | 0 | 4 |

**JAN. 2013 (FY 2013)**

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 347 | 31 | 4 | 124 | 115 | 38 | 14 | 0 | 21 |
| Interviews Conducted | 287 | 7 | 2 | 112 | 74 | 46 | 16 | 0 | 18 |
| All Decisions | 342 | 33 | 6 | 138 | 87 | 41 | 17 | 0 | 20 |
| Fear Established (Y) | 227 | 31 | 5 | 91 | 70 | 16 | 12 | 0 | 14 |
| Fear Not Established (N) | 38 | 3 | 0 | 17 | 0 | 1 | 4 | 0 | 0 |
| Closings | 77 | 19 | 1 | 30 | 16 | 6 | 1 | 0 | 4 |

**FEB. 2013 (FY 2013)**

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 457 | 11 | 26 | 105 | 220 | 66 | 9 | 0 | 20 |
| Interviews Conducted | 426 | 8 | 22 | 112 | 195 | 58 | 6 | 0 | 46 |
| All Decisions | 450 | 16 | 19 | 123 | 206 | 57 | 6 | 0 | 23 |
| Fear Established (Y) | 368 | 7 | 14 | 91 | 193 | 38 | 5 | 0 | 20 |
| Fear Not Established (N) | 39 | 1 | 4 | 11 | 4 | 15 | 1 | 0 | 3 |
| Closings | 43 | 8 | 1 | 21 | 9 | 4 | 0 | 0 | 0 |

**MARCH 2013 (FY 2013)**

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 692 | 46 | 14 | 133 | 132 | 24 | 19 | 0 | 52 |
| Interviews Conducted | 633 | 65 | 45 | 185 | 255 | 70 | 21 | 0 | 46 |
| All Decisions | 659 | 43 | 47 | 194 | 255 | 71 | 23 | 0 | 48 |
| Fear Established (Y) | 538 | 29 | 96 | 96 | 343 | 66 | 50 | 0 | 35 |
| Fear Not Established (N) | 52 | 6 | 1 | 13 | 7 | 12 | 0 | 0 | 3 |
| Closings | 79 | 10 | 2 | 23 | 18 | 6 | 1 | 0 | 9 |

**APRIL 2013 (FY 2013)**

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 1,172 | 30 | 54 | 188 | 476 | 237 | 45 | 0 | 147 |
| Interviews Conducted | 1,028 | 41 | 54 | 196 | 472 | 181 | 29 | 0 | 128 |
| All Decisions | 1,139 | 65 | 63 | 230 | 491 | 197 | 11 | 0 | 127 |
| Fear Established (Y) | 898 | 37 | 53 | 190 | 448 | 95 | 8 | 0 | 120 |
| Fear Not Established (N) | 127 | 6 | 8 | 5 | 15 | 89 | 3 | 0 | 0 |
| Closings | 114 | 22 | 2 | 35 | 28 | 13 | 3 | 0 | 6 |

**MAY 2013 (FY 2013)**

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 653 | 43 | 18 | 163 | 346 | 66 | 40 | 0 | 65 |
| Interviews Conducted | 662 | 65 | 45 | 79 | 343 | 66 | 36 | 0 | 28 |
| All Decisions | 702 | 69 | 45 | 89 | 359 | 66 | 40 | 0 | 34 |
| Fear Established (Y) | 620 | 61 | 38 | 73 | 343 | 42 | 37 | 0 | 26 |
| Fear Not Established (N) | 34 | 3 | 6 | 1 | 5 | 19 | 0 | 0 | 0 |
| Closings | 48 | 5 | 3 | 15 | 11 | 5 | 3 | 0 | 8 |

**JUNE 2013 (FY 2013)**

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 1,107 | 17 | 8 | 212 | 474 | 20 | 86 | 5 | 168 |
| Interviews Conducted | 1,060 | 15 | 8 | 177 | 451 | 32 | 98 | 6 | 203 |
| All Decisions | 1,089 | 25 | 8 | 235 | 486 | 35 | 28 | 0 | 216 |
| Fear Established (Y) | 994 | 15 | 7 | 193 | 406 | 22 | 85 | 6 | 186 |
| Fear Not Established (N) | 45 | 10 | 0 | 30 | 17 | 2 | 6 | 0 | 2 |
| Closings | 42 | 10 | 1 | 12 | 11 | 2 | 1 | 0 | 28 |

**JULY 2013 (FY 2013)**

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 1,160 | 13 | 20 | 211 | 619 | 26 | 63 | 63 | 145 |
| Interviews Conducted | 1,099 | 19 | 20 | 203 | 611 | 31 | 55 | 58 | 115 |
| All Decisions | 1,165 | 12 | 20 | 226 | 638 | 36 | 55 | 59 | 119 |
| Fear Established (Y) | 1,048 | 7 | 18 | 186 | 592 | 22 | 53 | 53 | 115 |
| Fear Not Established (N) | 45 | 3 | 1 | 11 | 5 | 1 | 0 | 3 | 1 |
| Closings | 72 | 5 | 1 | 29 | 25 | 6 | 0 | 0 | 3 |

**AUGUST 2013 (FY 2013)**

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 1,009 | 34 | 10 | 212 | 474 | 20 | 86 | 4 | 100 |
| Interviews Conducted | 997 | 30 | 10 | 177 | 451 | 32 | 98 | 4 | 94 |
| All Decisions | 1,086 | 36 | 9 | 235 | 486 | 35 | 91 | 9 | 101 |
| Fear Established (Y) | 907 | 30 | 9 | 162 | 406 | 22 | 85 | 5 | 88 |
| Fear Not Established (N) | 65 | 6 | 0 | 30 | 17 | 2 | 6 | 0 | 6 |
| Closings | 114 | 10 | 1 | 43 | 33 | 2 | 1 | 0 | 7 |

**SEPTEMBER 2013 (FY 2013)**

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 1,004 | 48 | 10 | 391 | 343 | 34 | 38 | 4 | 100 |
| Interviews Conducted | 896 | 45 | 10 | 333 | 322 | 32 | 37 | 5 | 94 |
| All Decisions | 986 | 49 | 9 | 370 | 343 | 36 | 36 | 5 | 101 |
| Fear Established (Y) | 815 | 30 | 9 | 298 | 296 | 23 | 36 | 3 | 88 |
| Fear Not Established (N) | 79 | 8 | 0 | 37 | 24 | 8 | 3 | 0 | 6 |
| Closings | 92 | 19 | 3 | 35 | 23 | 4 | 1 | 0 | 7 |

DOJ-FR00069

## Reasonable Fear Workload Report Summary
### FY 2013 Total Caseload

| | Totals | Oct-12 | Nov-12 | Dec-12 | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 7733 | 556 | 491 | 418 | 528 | 528 | 582 | 555 | 546 | 587 | 950 | 948 | 794 |
| Interviews Conducted | 4373 | 315 | 209 | 161 | 314 | 292 | 332 | 406 | 343 | 335 | 432 | 636 | 598 |
| All Decisions | 2339 | 442 | 435 | 252 | 605 | 370 | 509 | 605 | 343 | 687 | 705 | 867 | 1006 |
| Fear Established (Y) | 2324 | 106 | 100 | 93 | 58 | 97 | 132 | 213 | 206 | 171 | 236 | 360 | 406 |
| Fear Not Established (N) | 1651 | 85 | 93 | 97 | 144 | 142 | 130 | 142 | 146 | 137 | 145 | 181 | 201 |
| Closings | 3424 | 251 | 242 | 180 | 319 | 256 | 247 | 250 | 251 | 279 | 324 | 426 | 399 |

## Reasonable Fear Workload Report Monthly Caseload by Office

### OCT. 2012 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 556 | 72 | 31 | 239 | 62 | 14 | 79 | 0 | 59 |
| Interviews Conducted | 315 | 10 | 9 | 239 | 19 | 8 | 20 | 0 | 21 |
| All Decisions | 442 | 50 | 23 | 252 | 44 | 16 | 36 | 0 | 21 |
| Fear Established (Y) | 106 | 6 | 5 | 61 | 5 | 6 | 12 | 0 | 11 |
| Fear Not Established (N) | 85 | 3 | 3 | 58 | 5 | 5 | 3 | 0 | 8 |
| Closings | 251 | 41 | 15 | 133 | 34 | 7 | 19 | 0 | 2 |

### NOV. 2012 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 491 | 57 | 18 | 221 | 89 | 29 | 29 | 0 | 48 |
| Interviews Conducted | 209 | 6 | 7 | 126 | 34 | 5 | 13 | 0 | 18 |
| All Decisions | 435 | 47 | 15 | 239 | 72 | 16 | 26 | 0 | 20 |
| Fear Established (Y) | 100 | 2 | 3 | 53 | 22 | 4 | 8 | 0 | 8 |
| Fear Not Established (N) | 93 | 1 | 3 | 52 | 20 | 0 | 5 | 0 | 12 |
| Closings | 242 | 44 | 9 | 134 | 30 | 12 | 13 | 0 | 0 |

### DEC. 2012 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 418 | 46 | 38 | 225 | 25 | 19 | 27 | 0 | 38 |
| Interviews Conducted | 161 | 15 | 9 | 73 | 19 | 8 | 23 | 0 | 14 |
| All Decisions | 370 | 41 | 20 | 221 | 29 | 16 | 30 | 0 | 13 |
| Fear Established (Y) | 93 | 5 | 0 | 61 | 6 | 5 | 15 | 0 | 1 |
| Fear Not Established (N) | 97 | 4 | 7 | 50 | 20 | 3 | 5 | 0 | 8 |
| Closings | 180 | 32 | 13 | 110 | 3 | 10 | 9 | 0 | 3 |

### JAN. 2013 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 568 | 58 | 23 | 320 | 45 | 27 | 57 | 0 | 38 |
| Interviews Conducted | 314 | 25 | 15 | 176 | 37 | 14 | 34 | 0 | 13 |
| All Decisions | 605 | 61 | 28 | 301 | 70 | 32 | 48 | 0 | 65 |
| Fear Established (Y) | 142 | 7 | 4 | 77 | 18 | 9 | 23 | 0 | 4 |
| Fear Not Established (N) | 144 | 11 | 14 | 81 | 22 | 6 | 4 | 0 | 6 |
| Closings | 319 | 43 | 10 | 143 | 30 | 17 | 21 | 0 | 55 |

### FEB. 2013 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 528 | 65 | 34 | 246 | 53 | 37 | 40 | 0 | 53 |
| Interviews Conducted | 292 | 16 | 24 | 114 | 43 | 13 | 38 | 0 | 44 |
| All Decisions | 565 | 55 | 31 | 270 | 74 | 25 | 45 | 0 | 65 |
| Fear Established (Y) | 159 | 11 | 6 | 69 | 27 | 5 | 25 | 0 | 16 |
| Fear Not Established (N) | 150 | 5 | 16 | 60 | 27 | 5 | 10 | 0 | 27 |
| Closings | 256 | 39 | 9 | 141 | 20 | 15 | 10 | 0 | 22 |

### MARCH 2013 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 582 | 35 | 38 | 311 | 58 | 19 | 42 | 0 | 79 |
| Interviews Conducted | 332 | 27 | 14 | 155 | 79 | 6 | 16 | 0 | 35 |
| All Decisions | 509 | 72 | 18 | 211 | 93 | 40 | 38 | 0 | 37 |
| Fear Established (Y) | 132 | 13 | 1 | 42 | 11 | 5 | 11 | 0 | 6 |
| Fear Not Established (N) | 130 | 15 | 4 | 64 | 26 | 2 | 1 | 0 | 18 |
| Closings | 247 | 44 | 13 | 93 | 25 | 33 | 26 | 0 | 13 |

### APRIL 2013 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 555 | 76 | 35 | 262 | 74 | 28 | 53 | 2 | 27 |
| Interviews Conducted | 406 | 43 | 24 | 217 | 68 | 13 | 13 | 1 | 27 |
| All Decisions | 605 | 66 | 28 | 321 | 95 | 14 | 33 | 0 | 48 |
| Fear Established (Y) | 213 | 24 | 9 | 101 | 55 | 8 | 14 | 2 | 11 |
| Fear Not Established (N) | 142 | 8 | 9 | 82 | 23 | 2 | 1 | 0 | 17 |
| Closings | 250 | 34 | 19 | 138 | 17 | 7 | 18 | 0 | 20 |

### MAY 2013 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 546 | 84 | 28 | 170 | 156 | 21 | 63 | 0 | 24 |
| Interviews Conducted | 343 | 45 | 17 | 159 | 63 | 16 | 27 | 0 | 16 |
| All Decisions | 603 | 64 | 26 | 309 | 97 | 25 | 41 | 0 | 41 |
| Fear Established (Y) | 206 | 20 | 4 | 91 | 42 | 11 | 23 | 0 | 15 |
| Fear Not Established (N) | 146 | 12 | 5 | 94 | 19 | 5 | 3 | 0 | 8 |
| Closings | 251 | 32 | 17 | 124 | 36 | 9 | 15 | 0 | 18 |

### JUNE 2013 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 797 | 79 | 50 | 314 | 90 | 102 | 143 | 2 | 17 |
| Interviews Conducted | 335 | 22 | 38 | 156 | 47 | 8 | 59 | 2 | 3 |
| All Decisions | 587 | 71 | 56 | 243 | 71 | 26 | 104 | 1 | 15 |
| Fear Established (Y) | 171 | 16 | 11 | 62 | 24 | 8 | 46 | 1 | 3 |
| Fear Not Established (N) | 137 | 11 | 26 | 84 | 6 | 10 | 0 | 0 | 0 |
| Closings | 279 | 44 | 19 | 97 | 42 | 18 | 48 | 0 | 11 |

### JULY 2013 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 950 | 66 | 52 | 490 | 116 | 24 | 74 | 3 | 125 |
| Interviews Conducted | 432 | 46 | 21 | 125 | 88 | 45 | 77 | 3 | 27 |
| All Decisions | 705 | 98 | 43 | 204 | 106 | 70 | 105 | 3 | 76 |
| Fear Established (Y) | 236 | 36 | 8 | 32 | 56 | 25 | 60 | 3 | 16 |
| Fear Not Established (N) | 145 | 10 | 5 | 58 | 25 | 18 | 10 | 0 | 9 |
| Closings | 324 | 52 | 20 | 114 | 25 | 27 | 35 | 0 | 51 |

### AUGUST 2013 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 948 | 118 | 50 | 317 | 193 | 32 | 108 | 0 | 130 |
| Interviews Conducted | 636 | 160 | 30 | 179 | 202 | 61 | 31 | 0 | 87 |
| All Decisions | 967 | 127 | 57 | 288 | 238 | 73 | 49 | 0 | 135 |
| Fear Established (Y) | 360 | 39 | 11 | 48 | 138 | 34 | 52 | 0 | 52 |
| Fear Not Established (N) | 181 | 14 | 14 | 61 | 52 | 11 | 9 | 0 | 20 |
| Closings | 426 | 74 | 32 | 159 | 48 | 28 | 22 | 0 | 63 |

### SEPTEMBER 2013 (FY 2013)

| | Totals | ZAR | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZSF |
|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 794 | 89 | 37 | 295 | 140 | 51 | 85 | 0 | 97 |
| Interviews Conducted | 598 | 44 | 18 | 144 | 52 | 57 | 57 | 0 | 126 |
| All Decisions | 1006 | 107 | 28 | 267 | 259 | 74 | 97 | 0 | 174 |
| Fear Established (Y) | 406 | 36 | 4 | 77 | 119 | 40 | 55 | 0 | 75 |
| Fear Not Established (N) | 201 | 14 | 11 | 65 | 44 | 14 | 7 | 0 | 46 |
| Closings | 399 | 57 | 13 | 125 | 96 | 20 | 35 | 0 | 53 |

DCUFR00070

# Monthly Credible and Reasonable Fear Nationality Reports
## Top Five Countries

### Credible Fear Nationality Report — Oct. 2012 (FY 2013)

| | Nationality | Receipts |
|---|---|---|
| 1 | EL SALVADOR | 586 |
| 2 | HONDURAS | 435 |
| 3 | GUATEMALA | 308 |
| 4 | MEXICO | 153 |
| 5 | ECUADOR | 90 |

### Reasonable Fear Nationality Report — Oct. 2012 (FY 2013)

| | Nationality | Receipts |
|---|---|---|
| 1 | MEXICO | 229 |
| 2 | HONDURAS | 111 |
| 3 | EL SALVADOR | 100 |
| 4 | GUATEMALA | 71 |
| 5 | JAMAICA | 11 |

### Credible Fear Nationality Report — Nov. 2012 (FY 2013)

| | Nationality | Receipts |
|---|---|---|
| 1 | EL SALVADOR | 532 |
| 2 | HONDURAS | 431 |
| 3 | GUATEMALA | 318 |
| 4 | MEXICO | 156 |
| 5 | ECUADOR | 109 |

### Reasonable Fear Nationality Report — Nov. 2012 (FY 2013)

| | Nationality | Receipts |
|---|---|---|
| 1 | MEXICO | 186 |
| 2 | EL SALVADOR | 97 |
| 3 | HONDURAS | 95 |
| 4 | GUATEMALA | 85 |
| 5 | ECUADOR | 7 |

### Credible Fear Nationality Report — Dec. 2012 (FY 2013)

| | Nationality | Receipts |
|---|---|---|
| 1 | EL SALVADOR | 503 |
| 2 | HONDURAS | 341 |
| 3 | GUATEMALA | 314 |
| 4 | MEXICO | 149 |
| 5 | ECUADOR | 139 |

### Reasonable Fear Nationality Report — Dec. 2012 (FY 2013)

| | Nationality | Receipts |
|---|---|---|
| 1 | MEXICO | 181 |
| 2 | HONDURAS | 85 |
| 3 | EL SALVADOR | 71 |
| 4 | GUATEMALA | 47 |
| 5 | COLOMBIA | 6 |

### Credible Fear Nationality Report — Jan. 2013 (FY 2013)

| | Nationality | Receipts |
|---|---|---|
| 1 | EL SALVADOR | 424 |
| 2 | HONDURAS | 374 |
| 3 | GUATEMALA | 340 |
| 4 | ECUADOR | 146 |
| 5 | MEXICO | 139 |

### Reasonable Fear Nationality Report — Jan. 2013 (FY 2013)

| | Nationality | Receipts |
|---|---|---|
| 1 | MEXICO | 218 |
| 2 | HONDURAS | 119 |
| 3 | EL SALVADOR | 96 |
| 4 | GUATEMALA | 82 |
| 5 | JAMAICA | 10 |

### Credible Fear Nationality Report — Feb. 2013 (FY 2013)

| | Nationality | Receipts |
|---|---|---|
| 1 | EL SALVADOR | 587 |
| 2 | GUATEMALA | 405 |
| 3 | HONDURAS | 347 |
| 4 | ECUADOR | 135 |
| 5 | MEXICO | 131 |

### Reasonable Fear Nationality Report — Feb. 2013 (FY 2013)

| | Nationality | Receipts |
|---|---|---|
| 1 | MEXICO | 199 |
| 2 | HONDURAS | 106 |
| 3 | EL SALVADOR | 93 |
| 4 | GUATEMALA | 86 |
| 5 | ECUADOR | 9 |

### Credible Fear Nationality Report — March 2013 (FY 2013)

| | Nationality | Receipts |
|---|---|---|
| 1 | EL SALVADOR | 749 |
| 2 | HONDURAS | 598 |
| 3 | GUATEMALA | 507 |
| 4 | INDIA | 174 |
| 5 | MEXICO | 163 |

### Reasonable Fear Nationality Report — March 2013 (FY 2013)

| | Nationality | Receipts |
|---|---|---|
| 1 | MEXICO | 199 |
| 2 | HONDURAS | 142 |
| 3 | EL SALVADOR | 125 |
| 4 | GUATEMALA | 84 |
| 5 | BRAZIL | 6 |

DOJIFR00071

### Credible Fear Nationality Report
### April 2013 (FY 2013)

| | Nationality | Receipts |
|---|---|---|
| 1 | EL SALVADOR | 947 |
| 2 | HONDURAS | 780 |
| 3 | GUATEMALA | 679 |
| 4 | INDIA | 337 |
| 5 | ECUADOR | 246 |

### Reasonable Fear Nationality Report
### April 2013 (FY 2013)

| | Nationality | Receipts |
|---|---|---|
| 1 | MEXICO | 176 |
| 2 | HONDURAS | 124 |
| 3 | EL SALVADOR | 110 |
| 4 | GUATEMALA | 86 |
| 5 | ECUADOR | 13 |

### Credible Fear Nationality Report
### May 2013 (FY 2013)

| | Nationality | Receipts |
|---|---|---|
| 1 | EL SALVADOR | 1000 |
| 2 | HONDURAS | 700 |
| 3 | GUATEMALA | 592 |
| 4 | INDIA | 359 |
| 5 | ECUADOR | 239 |

### Reasonable Fear Nationality Report
### May 2013 (FY 2013)

| | Nationality | Receipts |
|---|---|---|
| 1 | MEXICO | 158 |
| 2 | HONDURAS | 135 |
| 3 | GUATEMALA | 106 |
| 4 | EL SALVADOR | 104 |
| 5 | ECUADOR | 12 |

### Credible Fear Nationality Report
### June 2013 (FY 2013)

| | Nationality | Receipts |
|---|---|---|
| 1 | EL SALVADOR | 1419 |
| 2 | HONDURAS | 815 |
| 3 | INDIA | 741 |
| 4 | GUATEMALA | 606 |
| 5 | ECUADOR | 234 |

### Reasonable Fear Nationality Report
### June 2013 (FY 2013)

| | Nationality | Receipts |
|---|---|---|
| 1 | MEXICO | 233 |
| 2 | EL SALVADOR | 200 |
| 3 | HONDURAS | 178 |
| 4 | GUATEMALA | 120 |
| 5 | NICARAGUA | 10 |

### Credible Fear Nationality Report
### July 2013 (FY 2013)

| | Nationality | Receipts |
|---|---|---|
| 1 | EL SALVADOR | 1416 |
| 2 | HONDURAS | 818 |
| 3 | GUATEMALA | 621 |
| 4 | INDIA | 587 |
| 5 | MEXICO | 290 |

### Reasonable Fear Nationality Report
### July 2013 (FY 2013)

| | Nationality | Receipts |
|---|---|---|
| 1 | MEXICO | 310 |
| 2 | HONDURAS | 218 |
| 3 | EL SALVADOR | 186 |
| 4 | GUATEMALA | 160 |
| 5 | ECUADOR | 13 |

### Credible Fear Nationality Report
### August 2013 (FY 2013)

| | Nationality | Receipts |
|---|---|---|
| 1 | EL SALVADOR | 1244 |
| 2 | HONDURAS | 597 |
| 3 | MEXICO | 477 |
| 4 | GUATEMALA | 433 |
| 5 | ECUADOR | 219 |

### Reasonable Fear Nationality Report
### August 2013 (FY 2013)

| | Nationality | Receipts |
|---|---|---|
| 1 | MEXICO | 278 |
| 2 | EL SALVADOR | 243 |
| 3 | HONDURAS | 191 |
| 4 | GUATEMALA | 157 |
| 5 | ECUADOR | 22 |

### Credible Fear Nationality Report
### September 2013 (FY 2013)

| | Nationality | Receipts |
|---|---|---|
| 1 | EL SALVADOR | 1502 |
| 2 | HONDURAS | 599 |
| 3 | GUATEMALA | 462 |
| 4 | MEXICO | 458 |
| 5 | INDIA | 229 |

### Reasonable Fear Nationality Report
### September 2013 (FY 2013)

| | Nationality | Receipts |
|---|---|---|
| 1 | MEXICO | 282 |
| 2 | EL SALVADOR | 192 |
| 3 | HONDURAS | 133 |
| 4 | GUATEMALA | 131 |
| 5 | ECUADOR | 12 |

DOJIFR00072

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW ADJUDICATION STATISTICS

## Asylum Decision and Filing Rates in Cases Originating with a Credible Fear Claim[1]



| FY | Grants | Grant Rate | Denials | Denial Rate | Other[2] | Other Rate | Admin Closure[3] | Admin Closure Rate | No Asylum Application Filed | Percentage of No Asylum Application Filed | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2008 | 1,002 | 31.68% | 810 | 25.61% | 284 | 8.98% | 63 | 1.99% | 1,004 | 31.74% | 3,163 |
| 2009 | 990 | 34.00% | 644 | 22.12% | 257 | 8.83% | 53 | 1.82% | 968 | 33.24% | 2,912 |
| 2010 | 997 | 37.95% | 494 | 18.80% | 219 | 8.34% | 89 | 3.39% | 828 | 31.52% | 2,627 |
| 2011 | 1,390 | 28.78% | 798 | 16.53% | 337 | 6.98% | 67 | 1.39% | 2,237 | 46.32% | 4,829 |
| 2012 | 1,498 | 23.39% | 932 | 14.55% | 477 | 7.45% | 176 | 2.75% | 3,322 | 51.87% | 6,405 |
| 2013 | 1,394 | 16.44% | 1,442 | 17.01% | 599 | 7.07% | 233 | 2.75% | 4,810 | 56.74% | 8,478 |
| 2014 | 1,686 | 12.81% | 2,675 | 20.33% | 1,261 | 9.58% | 403 | 3.06% | 7,133 | 54.21% | 13,158 |
| 2015 | 1,947 | 13.71% | 2,761 | 19.45% | 1,338 | 9.42% | 2,041 | 14.38% | 6,110 | 43.04% | 14,197 |
| 2016 | 2,463 | 11.99% | 3,737 | 18.20% | 1,729 | 8.42% | 3,683 | 17.93% | 8,924 | 43.46% | 20,536 |
| 2017 | 3,961 | 13.89% | 7,313 | 25.65% | 2,622 | 9.20% | 1,914 | 6.71% | 12,705 | 44.56% | 28,515 |
| 2018 | 5,577 | 16.39% | 9,999 | 29.38% | 4,747 | 13.95% | 339 | 1.00% | 13,369 | 39.28% | 34,031 |
| 2019 | 8,457 | 15.25% | 17,621 | 31.77% | 6,203 | 11.18% | 17 | 0.03% | 23,161 | 41.76% | 55,459 |

Data Generated: October 23, 2019

[1] Asylum decisions subsequent to a credible fear book-in at Department of Homeland Security in completed removal, deportation, exclusion proceedings (initial case completions only) or in proceedings that have been administratively closed.
[2] Asylum Others have a decision of abandonment, not adjudicated, other, or withdrawn.
[3] Administrative Closure decisions that have not been placed back on the docket (redocketing occurs following an immigration judge's grant of a party's motion to recalendar).

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## ADJUDICATION STATISTICS

### Asylum Decision and Filing Rates in Cases Originating with a Credible Fear Claim[1] and Nationality of El Salvador



| FY | Grants | Grant Rate | Denials | Denial Rate | Other[2] | Other Rate | Admin Closure[3] | Admin Closure Rate | No Asylum Application Filed | Percentage of No Asylum Application Filed | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2008 | 4 | 1.71% | 19 | 8.12% | 11 | 4.70% | 3 | 1.28% | 197 | 84.19% | 234 |
| 2009 | 4 | 1.49% | 56 | 20.90% | 21 | 7.84% | 2 | 0.75% | 185 | 69.03% | 268 |
| 2010 | 22 | 8.24% | 59 | 22.10% | 18 | 6.74% | 0 | 0.00% | 168 | 62.92% | 267 |
| 2011 | 30 | 3.87% | 115 | 14.82% | 49 | 6.31% | 0 | 0.00% | 582 | 75.00% | 776 |
| 2012 | 52 | 4.48% | 145 | 12.48% | 80 | 6.88% | 10 | 0.86% | 875 | 75.30% | 1,162 |
| 2013 | 78 | 3.66% | 314 | 14.71% | 125 | 5.86% | 54 | 2.53% | 1,563 | 73.24% | 2,134 |
| 2014 | 112 | 2.95% | 669 | 17.63% | 392 | 10.33% | 113 | 2.98% | 2,509 | 66.11% | 3,795 |
| 2015 | 161 | 4.43% | 564 | 15.51% | 370 | 10.18% | 634 | 17.44% | 1,907 | 52.45% | 3,636 |
| 2016 | 279 | 5.16% | 813 | 15.03% | 512 | 9.47% | 1,140 | 21.08% | 2,664 | 49.26% | 5,408 |
| 2017 | 671 | 9.40% | 1,839 | 25.75% | 672 | 9.41% | 622 | 8.71% | 3,338 | 46.74% | 7,142 |
| 2018 | 938 | 11.34% | 2,923 | 35.35% | 1,431 | 17.31% | 103 | 1.25% | 2,874 | 34.76% | 8,269 |
| 2019 | 1,189 | 10.30% | 5,042 | 43.66% | 1,496 | 12.95% | 6 | 0.05% | 3,816 | 33.04% | 11,549 |

Data Generated: October 23, 2019
[1] Asylum decisions subsequent to a credible fear book-in at Department of Homeland Security in completed removal, deportation, exclusion proceedings (initial case completions only) or in proceedings that have been administratively closed.
[2] Asylum Others have a decision of abandonment, not adjudicated, other, or withdrawn.
[3] Administrative Closure decisions that have not been placed back on the docket (redocketing occurs following an immigration judge's grant of a party's motion to recalendar).

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW ADJUDICATION STATISTICS

## Asylum Decision and Filing Rates in Cases Originating with a Credible Fear Claim[1] and Nationality of Guatemala



| FY | Grants | Grant Rate | Denials | Denial Rate | Other[2] | Other Rate | Admin Closure[3] | Admin Closure Rate | No Asylum Application Filed | Percentage of No Asylum Application Filed | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2008 | 5 | 3.14% | 37 | 23.27% | 18 | 11.32% | 0 | 0.00% | 99 | 62.26% | 159 |
| 2009 | 8 | 4.79% | 41 | 24.55% | 12 | 7.19% | 2 | 1.20% | 104 | 62.28% | 167 |
| 2010 | 11 | 8.21% | 37 | 27.61% | 18 | 13.43% | 0 | 0.00% | 68 | 50.75% | 134 |
| 2011 | 22 | 7.24% | 41 | 13.49% | 17 | 5.59% | 5 | 1.64% | 219 | 72.04% | 304 |
| 2012 | 50 | 8.73% | 66 | 11.52% | 27 | 4.71% | 11 | 1.92% | 419 | 73.12% | 573 |
| 2013 | 44 | 4.26% | 135 | 13.06% | 71 | 6.87% | 32 | 3.09% | 752 | 72.73% | 1,034 |
| 2014 | 97 | 5.53% | 294 | 16.76% | 141 | 8.04% | 59 | 3.36% | 1,163 | 66.31% | 1,754 |
| 2015 | 119 | 6.23% | 262 | 13.72% | 190 | 9.95% | 391 | 20.47% | 948 | 49.63% | 1,910 |
| 2016 | 191 | 6.42% | 396 | 13.31% | 255 | 8.57% | 608 | 20.43% | 1,526 | 51.28% | 2,976 |
| 2017 | 326 | 8.13% | 761 | 18.97% | 360 | 8.97% | 243 | 6.06% | 2,322 | 57.88% | 4,012 |
| 2018 | 403 | 7.50% | 1,293 | 24.06% | 730 | 13.58% | 43 | 0.80% | 2,905 | 54.06% | 5,374 |
| 2019 | 637 | 6.21% | 2,803 | 27.32% | 980 | 9.55% | 2 | 0.02% | 5,837 | 56.90% | 10,259 |

Data Generated: October 23, 2019
[1] Asylum decisions subsequent to a credible fear book-in at Department of Homeland Security in completed removal, deportation, exclusion proceedings (initial case completions only) or in proceedings that have been administratively closed.
[2] Asylum Others have a decision of abandonment, not adjudicated, other, or withdrawn.
[3] Administrative Closure decisions that have not been placed back on the docket (redocketing occurs following an immigration judge's grant of a party's motion to recalendar).

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## ADJUDICATION STATISTICS

### Asylum Decision and Filing Rates in Cases Originating with a Credible Fear Claim[1] and Nationality of Honduras



| FY | Grants | Grant Rate | Denials | Denial Rate | Other[2] | Other Rate | Admin Closure[3] | Admin Closure Rate | No Asylum Application Filed | Percentage of No Asylum Application Filed | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2008 | 14 | 5.79% | 25 | 10.33% | 15 | 6.20% | 2 | 0.83% | 186 | 76.86% | 242 |
| 2009 | 7 | 2.54% | 36 | 13.04% | 11 | 3.99% | 2 | 0.72% | 220 | 79.71% | 276 |
| 2010 | 22 | 10.19% | 39 | 18.06% | 24 | 11.11% | 3 | 1.39% | 128 | 59.26% | 216 |
| 2011 | 24 | 5.53% | 62 | 14.29% | 31 | 7.14% | 1 | 0.23% | 316 | 72.81% | 434 |
| 2012 | 31 | 4.20% | 79 | 10.70% | 56 | 7.59% | 5 | 0.68% | 567 | 76.83% | 738 |
| 2013 | 41 | 2.78% | 227 | 15.37% | 116 | 7.85% | 17 | 1.15% | 1,076 | 72.85% | 1,477 |
| 2014 | 91 | 3.74% | 522 | 21.48% | 262 | 10.78% | 36 | 1.48% | 1,519 | 62.51% | 2,430 |
| 2015 | 135 | 6.72% | 383 | 19.06% | 220 | 10.95% | 209 | 10.40% | 1,062 | 52.86% | 2,009 |
| 2016 | 194 | 5.42% | 522 | 14.59% | 259 | 7.24% | 453 | 12.66% | 2,150 | 60.09% | 3,578 |
| 2017 | 417 | 7.12% | 1,263 | 21.57% | 489 | 8.35% | 219 | 3.74% | 3,468 | 59.22% | 5,856 |
| 2018 | 524 | 7.36% | 2,018 | 28.36% | 914 | 12.85% | 55 | 0.77% | 3,604 | 50.65% | 7,115 |
| 2019 | 584 | 4.45% | 3,923 | 29.90% | 1,329 | 10.13% | 5 | 0.04% | 7,280 | 55.48% | 13,121 |

Data Generated: October 23, 2019
[1] Asylum decisions subsequent to a credible fear book-in at Department of Homeland Security in completed removal, deportation, exclusion proceedings (initial case completions only) or in proceedings that have been administratively closed.
[2] Asylum Others have a decision of abandonment, not adjudicated, other, or withdrawn.
[3] Administrative Closure decisions that have not been placed back on the docket (redocketing occurs following an immigration judge's grant of a party's motion to recalendar).

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## ADJUDICATION STATISTICS

### Asylum Decision Rates[1]



| FY | Grants | Grant Rate | Denials | Denial Rate | Other[2] | Other Rate | Admin Closure[3] | Admin Closure Rate | Total |
|---|---|---|---|---|---|---|---|---|---|
| 2008 | 8,781 | 23.71% | 11,559 | 31.21% | 14,350 | 38.75% | 2,343 | 6.33% | 37,033 |
| 2009 | 8,385 | 24.04% | 9,858 | 28.26% | 14,416 | 41.33% | 2,221 | 6.37% | 34,880 |
| 2010 | 8,234 | 25.36% | 8,355 | 25.73% | 12,548 | 38.65% | 3,332 | 10.26% | 32,469 |
| 2011 | 9,866 | 31.23% | 9,354 | 29.61% | 10,938 | 34.62% | 1,435 | 4.54% | 31,593 |
| 2012 | 10,462 | 30.47% | 8,523 | 24.83% | 10,471 | 30.50% | 4,875 | 14.20% | 34,331 |
| 2013 | 9,692 | 24.77% | 8,880 | 22.70% | 10,684 | 27.31% | 9,867 | 25.22% | 39,123 |
| 2014 | 8,562 | 22.64% | 9,292 | 24.57% | 10,416 | 27.55% | 9,544 | 25.24% | 37,814 |
| 2015 | 8,113 | 18.69% | 8,847 | 20.38% | 11,017 | 25.38% | 15,423 | 35.54% | 43,400 |
| 2016 | 8,685 | 15.81% | 11,735 | 21.36% | 12,886 | 23.46% | 21,632 | 39.38% | 54,938 |
| 2017 | 10,540 | 19.58% | 17,632 | 32.76% | 14,750 | 27.41% | 10,897 | 20.25% | 53,819 |
| 2018 | 13,173 | 20.51% | 26,596 | 41.41% | 22,355 | 34.81% | 2,099 | 3.27% | 64,223 |
| 2019 | 18,813 | 20.25% | 45,352 | 48.82% | 28,606 | 30.79% | 134 | 0.14% | 92,905 |

Data Generated: October 23, 2019
[1] Asylum decisions on affirmative and defensive applications issues in completed removal, deportation, exclusion, and asylum only proceedings or in proceedings that have been administratively closed. Initial case completions only.
[2] Asylum Others have a decision of abandonment, not adjudicated, other, or withdrawn.
[3] Administrative closure decisions for cases that have not been placed back on the docket. Redocketing occurs following an immigration judge's grant of a party's motion to recalendar.

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## ADJUDICATION STATISTICS

### "Family Unit" Data for Select Courts[1]

| Court | Initial Receipts | Initial Case Completions | Initial Case Completion Decisions | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Removal | In Absentia Removal | Relief | Termination | Voluntary Departure | Other |
| ATLANTA | 9,270 | 4,228 | 4,065 | 3,508 | 0 | 9 | 154 | 0 |
| BALTIMORE | 2,211 | 972 | 858 | 577 | 76 | 5 | 33 | 0 |
| CHICAGO | 7,305 | 3,337 | 2,328 | 1,191 | 75 | 848 | 86 | 0 |
| DENVER | 3,768 | 1,596 | 1,523 | 1,322 | 6 | 8 | 59 | 0 |
| HOUSTON | 19,842 | 7,139 | 6,888 | 5,427 | 43 | 18 | 190 | 0 |
| LOS ANGELES | 13,787 | 3,410 | 3,248 | 2,443 | 57 | 28 | 77 | 0 |
| MIAMI | 12,242 | 5,144 | 4,865 | 4,078 | 43 | 92 | 144 | 0 |
| NEW ORLEANS | 7,541 | 2,609 | 2,532 | 2,418 | 8 | 5 | 64 | 0 |
| NEW YORK CITY | 8,752 | 3,323 | 3,157 | 2,584 | 86 | 17 | 62 | 1 |
| SAN FRANCISCO | 10,725 | 1,854 | 1,390 | 861 | 310 | 122 | 32 | 0 |
| TOTAL | 95,443 | 33,612 | 30,854 | 24,409 | 704 | 1,152 | 901 | 1 |

Data Generated: October 28, 2019
Data for period from September 24, 2018 through October 25, 2019
[1] The term "family unit" is an apprehension classification used by the Department of Homeland Security (DHS), and EOIR does not generally differentiate "family unit" cases from other cases unless they are identified as such by DHS. Accordingly, the "family unit" cases represented in the chart do not include all cases of "family units" currently in immigration proceedings nationwide.

DOJIFR00078

**AGREEMENT**

**BETWEEN**

**THE GOVERNMENT OF THE UNITED STATES OF AMERICA**

**AND**

**THE GOVERNMENT OF THE REPUBLIC OF EL SALVADOR**

**FOR COOPERATION IN THE EXAMINATION OF PROTECTION CLAIMS**

THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE REPUBLIC OF EL SALVADOR (hereinafter referred to individually as "Party," or collectively as "the Parties"),

CONSIDERING that El Salvador is a party to the 1951 Convention relating to the Status of Refugees, done at Geneva, July 28, 1951 (the "1951 Convention") and the Protocol relating to the Status of Refugees, done at New York, January 31, 1967 (the "1967 Protocol"), and the United States is party to the 1967 Protocol, and reaffirming the Parties' obligations to provide protection for eligible refugees who are physically present in their respective territories in accordance with their respective obligations under those instruments, subject to the Parties' respective reservations, understandings, and declarations;

ACKNOWLEDGING in particular the obligations of the Parties in honoring the principle of non-refoulement as set forth in the 1951 Convention and the 1967 Protocol, as well as the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, done at New York, December 10, 1984 (the "Convention Against Torture"), subject to the Parties' respective reservations, understandings, and declarations and reaffirming their respective obligations to promote and protect human rights and fundamental freedoms consistent with their respective international obligations;

RECOGNIZING and respecting the obligations of each Party under its domestic laws, policies, instructions, and agreements;

EMPHASIZING that the United States and El Salvador offer systems of refugee protection that are consistent with their respective obligations under the 1951 Convention or the 1967 Protocol, and committed to the notion that cooperation and burden-sharing with respect to refugee status claimants can be enhanced;

DOJIFR00079

DESIRING to uphold asylum or equivalent temporary protection as a critical instrument of the international protection of refugees, while simultaneously desiring to prevent fraud in the asylum process, which undermines its legitimate purpose, and resolved to strengthen the integrity of that institution and the public support on which it depends; and

AWARE that such sharing of responsibility must ensure in practice that persons in need of international protection are identified and that breaches of the fundamental principle of non-refoulement are avoided, and therefore determined to safeguard for each refugee status claimant eligible to pursue a refugee status claim who comes within their jurisdiction, access to a full and fair refugee status determination procedure;

AGREE as follows:

## ARTICLE 1

For the purposes of this Agreement:

1. "Protection Claim" means a request from a person to the government of a Party for protection consistent with their respective obligations under the 1951 Convention or the 1967 Protocol, or the Convention Against Torture, in accordance with the Parties' respective laws and policies implementing those obligations, or any other equivalent temporary protection available under El Salvadornian migration law.

2. "Protection Claimant" means any person who makes a Protection Claim in the territory of one of the Parties.

3. "Protection Determination System" means the sum of laws and administrative and judicial practices employed by each Party's national government for the purpose of adjudicating Protection Claims.  In the case of El Salvador, it means any applicable laws, regulations, decrees, or resolutions.

4. "Unaccompanied Minor" means a Protection Claimant who has not yet reached his or her eighteenth birthday and does not have a parent or legal guardian present and available to provide care and custody in the country where the Unaccompanied Minor is encountered, either in the United States or El Salvador.

## ARTICLE 2

This Agreement does not apply to Protection Claimants who are citizens or nationals of El Salvador; or who, not having a country of nationality, are habitual residents of El Salvador.

## ARTICLE 3

1. In order to ensure that Protection Claimants have access to a Protection Determination System, El Salvador shall not return or remove a Protection Claimant referred by the United States under the terms of Article 4 to another country until an administratively final adjudication of the person's Protection Claim has been made.

2. El Salvador shall not remove a Protection Claimant transferred to El Salvador under the terms of this Agreement pursuant to any other agreement or regulatory designation. El Salvador shall have a procedure to resolve, consistent with its domestic law and international obligations, potential abandonment of claims by individuals transferred under this agreement.

3. During the transfer process as determined in the implementation plan, individuals subject to this agreement will be the responsibility of the United States until the transfer process is complete.

## ARTICLE 4

1. Responsibility for determining the Protection Claim shall rest with the United States, where the United States determines that the person:

    a. Is an Unaccompanied Minor; or

    b. Arrived in the territory of the United States:

        i. With a validly issued visa or other valid admission document, other than for transit, issued by the United States; or
        ii. Not being required to obtain a visa by the United States.

2. El Salvador shall not be required to accept the transfer of a Protection Claimant until a final determination with respect to paragraph 1 is made by the United States.

3. Subject to paragraphs 1 and 2 of this article, El Salvador shall examine, in accordance with its Protection Determination System, to determine the Protection Claim of any person who makes such claims after arriving at a port of entry, or crossing a border between ports of entry of the United States on or after the effective date of this Agreement.

4. The United States shall apply this Agreement with respect to Unaccompanied Minors consistent with its national law.

5. El Salvador shall not dispute any decision of the United States that an individual qualifies for an exception under Articles 4 and 5 of this Agreement.

6. The Parties will have procedures in place to ensure that transfers of Protection Claimants to El Salvador are consistent with the Parties respective obligations and national laws.

## ARTICLE 5

Notwithstanding any provision of this Agreement, either Party may at its own discretion examine any Protection Claim made to that Party where it determines that it is in its public interest to do so.

## ARTICLE 6

The Parties may:

1. Exchange such information as may be necessary for the effective implementation of this Agreement subject to national laws and regulations. That information shall not be disclosed by the Party of the receiving country except in accordance with its national laws and regulations. The Parties shall seek to ensure that information is not exchanged or disclosed in such a way as to place Protection Claimants or their families at risk in their countries of origin.

2. Exchange on a regular basis information on the laws, regulations, and practices relating to their respective Protection Determination Systems.

## ARTICLE 7

1. The Parties shall develop standard operating procedures to assist with the implementation of this Agreement.  These procedures shall include provisions for notification, to El Salvador, in advance of the transfer of any Protection Claimant pursuant to this Agreement. The United States shall work with El Salvador to identify appropriate individuals to be transferred pursuant to this agreement.

2. Those procedures shall include mechanisms for resolving differences respecting the interpretation and implementation of the terms of this Agreement.  Issues that cannot be resolved through these mechanisms shall be settled through diplomatic channels.

3. The United States intends to cooperate with El Salvador in order to strengthen El Salvador's institutional capacities.

4. The Parties agree to review this Agreement and its implementation.  The first review shall take place not later than 3 months from the date of entry into force of this Agreement and shall be jointly conducted by representatives of each Party. The Parties may invite other appropriate organizations with expertise, as agreed upon by the Parties, to participate in this initial review.  The Parties may cooperate with such organizations in the monitoring of this Agreement, provided that those organizations agree to provide such consultation services.

5. Within 7 days of the entry into force of this agreement, the Parties intend to complete an initial implementation plan that seeks to address, among other things:  (a) procedures necessary to effectuate the transfer of individuals under this agreement; (b) the volume or number of individuals to be transferred; and (c) institutional capacity requirements.   Until the initial implementation plan is completed, the parties do not plan to operationalize this agreement.

## ARTICLE 8

Both Parties shall, upon request, endeavor to assist each other in the resettlement of individuals determined to require protection in appropriate circumstances.

## ARTICLE 9

1. This Agreement shall enter into force upon exchange of notes by both Parties indicating that each has completed the necessary domestic legal procedures for bringing the Agreement into force.

2. Either Party may terminate this Agreement upon six months' written notice to the other Party.

3. Either Party may, immediately upon written notice to the other Party, suspend for an initial period of up to three months' application of this Agreement.  Such suspension may be renewed for additional periods of up to three months upon written notice to the other Party.  Either Party may, with the written agreement of the other Party, suspend any part of this Agreement.

4. The Parties may agree on any modification of or addition to this Agreement in writing. When so agreed, and approved in accordance with the applicable legal procedures of each Party, a modification or addition shall constitute an integral part of this Agreement.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective governments, have signed this Agreement.

DONE at_____, this__ day of_____2019, in duplicate in the English and Spanish languages, each text being equally authentic.


FOR THE GOVERNMENT OF THE           FOR THE GOVERNMENT OF THE
UNITED STATES OF AMERICA:            REPUBLIC OF EL SALVADOR:




Kevin K. McAleenan                  Alexandra Hill Tinoco
Acting Secretary                    Minister
U.S. Department of Homeland Security  Ministry of Foreign Relations

AGREEMENT

BETWEEN

THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND

THE GOVERNMENT OF THE REPUBLIC OF HONDURAS

FOR COOPERATION IN THE EXAMINATION OF PROTECTION
CLAIMS

THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE
GOVERNMENT OF THE REPUBLIC OF HONDURAS (hereinafter referred to
individually as "Party," or collectively as "the Parties"),

CONSIDERING that Honduras is a party to the principal international human rights
instruments and in particular to the 1951 Convention relating to the Status of
Refugees, done at Geneva, July 28, 1951 (the "1951 Convention") and the Protocol
relating to the Status of Refugees, done at New York, January 31, 1967 (the "1967
Protocol"), that the United States is a party to the 1967 Protocol, and other relevant
international instruments to which Honduras is a party, and reaffirming the Parties'
obligations to provide protection for eligible refugees who are physically present in
their respective territories in accordance with their respective obligations under those
instruments, subject to the Parties' respective reservations, understandings, and
declarations;

ACKNOWLEDGING in particular the obligations of the Parties in honoring the
principle of non-refoulement as set forth in the 1951 Convention and the 1967
Protocol, as well as the Convention Against Torture and Other Cruel, Inhuman or
Degrading Treatment or Punishment, done at New York, December 10, 1984 (the
"Convention Against Torture"), subject to the Parties' respective reservations,
understandings, and declarations and reaffirming their respective obligations to
promote and protect human rights and fundamental freedoms consistent with their
respective international obligations;

RECOGNIZING and respecting the obligations of each Party under its domestic laws,
policies, instructions, and agreements;

DOJIFR00085

EMPHASIZING that the United States and Honduras offer systems of refugee protection that are consistent with their respective obligations under the 1951 Convention or the 1967 Protocol, and committed to the notion that cooperation and burden-sharing with respect to refugee status claimants can be enhanced;

DESIRING to uphold asylum or equivalent temporary protection as a critical instrument of the international protection of refugees, while simultaneously desiring to prevent fraud in the protection system, which undermines its legitimate purpose, and resolved to strengthen the integrity of that institution and the public support on which it depends;

CONVINCED that agreements among states may enhance the international protection of refugees by promoting the orderly handling of asylum applications by the responsible party and the principle of burden-sharing; and

AWARE that such sharing of responsibility must ensure in practice that persons in need of international protection are identified and that breaches of the fundamental principle of non- refoulement are avoided, and therefore determined to safeguard for each protection claimant eligible to pursue a protection claim who comes within their jurisdiction, access to a full and fair protection determination procedure;

AGREE as follows:

## ARTICLE 1

For the purposes of this Agreement:

1. "Protection Claim" means a request from a person to the government of a Party for protection consistent with their respective obligations under the 1951 Convention or the 1967 Protocol, or the Convention Against Torture, in accordance with the Parties' respective laws and policies implementing those obligations, or any other equivalent temporary protection available under Honduran migration law.

2. "Protection Claimant" means any person who makes a Protection Claim in the territory of one of the Parties with respect to each Party's obligations.

3. "Protection Determination System" means the sum of laws and administrative and judicial practices employed by each Party's national government for the purpose of adjudicating Protection Claims.

4. Unaccompanied Minor" means a Protection Claimant who has not yet reached his or her eighteenth birthday and does not have a parent or legal guardian present and available to provide care and custody in the country where the Unaccompanied Minor is encountered, either in the United States or Honduras.

## ARTICLE 2

This Agreement does not apply to Protection Claimants who are citizens or nationals of Honduras; or who, not having a country of nationality, are habitual residents of Honduras.

## ARTICLE 3

1. In order to ensure that Protection Claimants have access to a Protection Determination System, Honduras shall not return or remove a Protection Claimant referred by the United States to another country until an administratively final adjudication of the person's Protection Claim has been made. Honduras shall have a procedure to resolve, consistent with its domestic law and international obligations, potential abandonment of claims by individuals transferred under this Agreement.

2. Honduras shall not be required to accept the transfer of a Protection Claimant until a final determination with respect to Article 4, paragraph 1 is made by the United States.

3. With the exemption of the persons described in paragraphs 1 and 2 of Article 4, Honduras shall examine, in accordance with its Protection Determination System, to determine the Protection Claim of any person who makes such claims after arriving at a port of entry, or crossing a border between ports of entry of the United States on or after the effective date of this Agreement. The Parties shall respect each other's decision as relates to Protection Determinations made under their respective national laws.

4. The United States shall apply this Agreement with respect to Unaccompanied Minors consistent with its national law.

5. During the transfer process as determined in the Implementation Plan, individuals subject to this Agreement will be the responsibility of the United States until the transfer process is complete.

## ARTICLE 4

1. Responsibility for determining the Protection Claim shall rest with the United States, where the United States determines that the person:

   a.  Is an Unaccompanied Minor; or

   b.  Arrived in the territory of the United States:

       i.  With a validly issued visa or other valid admission document, other than for transit, issued by the United States; or

      ii.  Not being required to obtain a visa by the United States.

2. Honduras shall not dispute any decision of the United States that an individual qualifies for an exception under Articles 4 and 5 of this Agreement.

3. The Parties will have procedures in place to ensure that transfers of Protection Claimants to Honduras are consistent with the Party's respective obligations and national laws.

## ARTICLE 5

Notwithstanding any provision of this Agreement, either Party may, at its own discretion, examine any Protection Claim made to that Party where it determines that it is in its public interest to do so.

## ARTICLE 6

The Parties may:

1. Exchange such information as may be necessary for the effective implementation of this Agreement subject to national laws and regulations. That information shall not be disclosed by the Party of the receiving country except in accordance with its national laws and regulations. The Parties shall seek to ensure that information is not exchanged or disclosed in such a way as to place Protection Claimants or their families' life, security, and integrity at risk in their countries of origin.

2. Exchange on a regular basis information on the laws, regulations, and practices relating to their respective Protection Determination System.

## ARTICLE 7

1. The Parties shall develop standard operating procedures to assist with the implementation of this Agreement. These procedures shall include provisions for notification, to Honduras, in advance of the transfer of any Protection Claimant pursuant to this Agreement. In the Implementation Plan, the Parties shall work to identify appropriate individuals to be transferred pursuant to this Agreement.

2. In case of conflict or controversy derived from the application of this Agreement, the Parties are committed to resolving such matters through dialog or diplomatic channels.

3. The United States intends to cooperate with Honduras in order to strengthen the Republic of Honduras's institutional capacities.

4. The Parties agree to review this Agreement and its implementation. The first review shall take place not later than 3 months from the date of entry into force of this Agreement and shall be jointly conducted by representatives of each Party. The Parties may invite other appropriate organizations with expertise, as agreed upon by the Parties, to participate in this initial review. The Parties may cooperate with such organizations in the monitoring of this Agreement, provided that those organizations agree to provide such consultation services.

5. The Parties intend to complete an Initial Joint Implementation Plan that seeks to address, among other things: (a) procedures necessary to effectuate the transfer of individuals under this Agreement; (b) the volume or number of individuals to be transferred; and (c) institutional capacity requirements.

## ARTICLE 8

1. This Agreement shall enter into force upon exchange of notes by both Parties indicating that each has completed the necessary domestic legal procedures for bringing the Agreement into force and the Initial Joint Implementation plan has been established.. This Agreement shall automatically renew after each one-year period for an additional year, subject to notification within 30 days of expiration by either Party of its intention not to renew.

2. Either Party may terminate this Agreement upon six months' written notice to the other Party.

3. Either Party may, immediately upon written notice to the other Party, suspend for an initial period of up to three months' application of this Agreement. Such suspension may be renewed for additional periods of up to three months upon written notice to the other Party. Either Party may, with the written agreement of the other Party, suspend any part of this Agreement.

4. The Parties may agree on any modification of or addition to this Agreement in writing. When so agreed, and approved in accordance with the applicable legal procedures of each Party, a modification or addition shall constitute an integral part of this Agreement.

5. Nothing in this Agreement shall be constructed in such a way as to obligate the Parties to disburse or obligate funds. The implementation of this Agreement shall be subject to the availability of funds and technical capacities of each Party.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective governments, have signed this Agreement.

DONE at New York, New York, this 25 day of September 2019, in duplicate in the English and Spanish languages, each text being equally authentic.

FOR THE GOVERNMENT OF THE
UNITED STATES OF AMERICA:

FOR THE GOVERNMENT OF THE
REPUBLIC OF HONDURAS:

Kevin K. McAleenan
Acting Secretary
U.S. Department of Homeland Security

Lisandro Rosales Banegas
Minister
Ministry of Foreign Relations

# AGREEMENT
## BETWEEN
## THE GOVERNMENT OF THE UNITED STATES OF AMERICA
## AND
## THE GOVERNMENT OF THE REPUBLIC OF GUATEMALA
## ON COOPERATION REGARDING THE EXAMINATION OF PROTECTION CLAIMS

THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE REPUBLIC OF GUATEMALA, hereinafter referred to individually as "Party" or collectively "the Parties".

CONSIDERING that Guatemala regulates its relations with other countries in accordance with international principles, rules and practices, with the purpose of contributing to the maintenance of peace and freedom, the respect and defense of human rights, and the strengthening of democratic processes and international institutions that guarantee the mutual and equitable benefit among the states. On the other hand, Guatemala will maintain relations of friendship, solidarity and cooperation with those states whose economic, social and cultural development is analogous to that of Guatemala, such as the right of people to migrate and their need for protection.

WHEREAS Guatemala currently incorporates a dynamic immigration law into its domestic legislation, which requires Guatemala to recognize the right of every person to emigrate or immigrate, thereby allowing any migrant to enter, remain, transit, leave and return to its territory in accordance with its domestic laws. Likewise, in situations not provided for by domestic legislation, the norm that most favors the migrant must be applied. As such, temporary shelter and care should be given to those who wish to enter Guatemala legally. For the above reasons it is necessary to promote cooperation agreements with other states that uphold the same values outlined in Guatemala's migration policy, which is regulated by the National Migration Authority.

CONSIDERING that Guatemala is a party to the 1951 Convention relating to the Status of Refugees, done at Geneva on July 28, 1951 (the "1951 Convention") and the Protocol Relating to the Status of Refugees, done at New York on January 31, 1967 (the "1967 Protocol"), to which the United States of America is a party and reaffirming the obligation of the Parties to provide protection to refugees who meet the requirements and who are physically in their respective territories, in accordance with their obligations under those instruments and subject to the respective laws, treaties, and declarations of the Parties.

RECOGNIZING, in particular, the obligation of the Parties to comply with the principle of non-refoulement, as outlined in the 1951 Convention and the 1967 Protocol, as well as the Convention against Torture and Other Treatment or Cruel, Inhuman or Degrading Penalties, signed in New York on December 10, 1984 (the "Convention against Torture"), subject to the Parties respective reservations, understandings, and declarations and reaffirming their respective obligations to promote and protect human rights and fundamental freedoms consistent with their international obligations;

RECOGNIZING and respecting the obligations of each Party in accordance with its domestic laws

and policies, and international agreements and arrangements;

UNDERSCORING that the United States and Guatemala offer refugee protection systems that are consistent with their obligations under the 1951 Convention and/or the 1967 Protocols;

DETERMINED to maintain the status of refuge or equivalent temporary protection, as an essential measure of the protection of refugees or asylees, and at the same time wishing to prevent fraud in the refugee or asylum application process --an action that undermines its legitimate purpose-- and determined to strengthen the integrity of the official process for requesting asylum or refugee status as well as public support for said processes;

AWARE that the distribution of responsibility for requests for protection must guarantee in practice, that people in need of protection be identified and that violations of the basic principle of non-refoulement be avoided; and, therefore, committed to safeguarding for each applicant the status of refuge or asylum that meets the required conditions, access to a full and fair procedure for the determination of their claim;

AGREE to the following:

## ARTICLE 1

For the purposes of this Agreement:

1. "Request for Protection" refers to the request of a person of any nationality, to the government of one of the Parties to receive protection in accordance with their respective institutional obligations derived from the 1951 Convention, the 1967 Protocol or the Convention against Torture, and in accordance with the respective laws and policies of the Parties, enforcing compliance with said international obligations; as well as to receive any other type of equivalent temporary protection available under the migration law of the receiving party.

2. "Protection Applicant" refers to any person who submits a request for protection in the territory of one of the Parties.

3. "System to Determine Protection" refers to the set of policies, laws, administrative and judicial practices that the Government of each Party uses to make a decision on requests for protection.

4. "Unaccompanied Minor" refers to an applicant for protection who has not reached the age of eighteen (18) and whose parent or legal guardian is not present or available to provide care and physical custody in the United States, or in Guatemala, where the unaccompanied minor is located.

5. In the case of Guatemala immigration, law and migration policy refers to the rights of persons to enter, remain, transit and leave its territory in accordance with its domestic laws

and international agreements and arrangements, and immigration stay means the authorized period of time according to the immigration status granted to individuals.

## ARTICLE 2

This Agreement does not apply to applicants for protection who are citizens or nationals of Guatemala; or stateless individuals habitually residing in Guatemala.

## ARTICLE 3

1. To ensure that protection applicants transferred to Guatemala by the United States have access to a system to determine protection, Guatemala will not return or expel applicants for protection in Guatemala, unless the application is abandoned by the applicant or is formally rejected through an administrative decision.

2. During the transfer process, the persons subject to this Agreement will be the responsibility of the United States until the transfer process is completed.

## ARTICLE 4

1. The responsibility for determining and concluding requests for protection within its territory shall rest with the United States, when the United States establishes that that person:

   a. is an unaccompanied minor; or

   b. has arrived in the territory of the United States:

      i. with a validly-issued visa or other valid admission document, other than a transit visa, issued by the United States; or

      ii. without the United States requiring him to obtain a visa.

2. Notwithstanding paragraph 1 of this article, Guatemala will evaluate the request for protection on an individual basis, in accordance with what is established and authorized by the competent authority on immigration matters in its migration policies and laws and in its territory, of persons who meet the appropriate requirements under this Agreement and who arrive in the United States at a port of entry or between ports of entry, on or after the effective date of this Agreement.  Guatemala will evaluate the request for protection, in keeping with the Initial Implementation Plan and the standard operating procedures referenced in Article 7.1 and 7.5.

3. The Parties shall apply this Agreement with respect to unaccompanied minors, in accordance with their respective domestic laws.

4. The Parties shall have procedures in place to ensure that the transfers from the United States to Guatemala of the persons covered by this Agreement are compatible with their respective obligations, domestic and international laws, and migration policies.]

5. The United States shall make the final decision that an individual qualifies for an exception under Articles 4 and 5 of this Agreement.

## ARTICLE 5

Notwithstanding any provision of this Agreement, any Party may, at its discretion, examine any request for protection that has been submitted to that Party when it decides that it is in the public interest to do so.

## ARTICLE 6

The Parties may:

1. Exchange information when necessary for the effective implementation of this Agreement, subject to national laws and regulations. Such information will not be disclosed by the recipient country except in accordance with its national laws and regulations.

2. The Parties may regularly exchange information regarding laws, regulations, and practices related to their respective systems to determine migration protection.

## ARTICLE 7

1. The Parties shall develop standard operating procedures to assist in the implementation of this Agreement. These procedures shall incorporate provisions to notify Guatemala in advance of the transfer of any person pursuant to this Agreement. The United States will collaborate with Guatemala to identify the appropriate individuals to be transferred to Guatemala's territory.

2. The operating procedures shall incorporate mechanisms to resolve disputes that respect the interpretation and implementation of the terms of this Agreement. Unforeseen cases that cannot be resolved through these mechanisms will be resolved through diplomatic channels.

3. The United States plans to cooperate to strengthen the institutional capacities of Guatemala.

4. The Parties agree to regularly evaluate this Agreement and its implementation to correct any deficiencies found. The evaluations will be carried out jointly by the Parties, the first within a maximum period of three (3) months from the date of entry into operation of the Agreement with following evaluations occurring by the same terms. The Parties may invite, by mutual agreement, other relevant organizations with specialized knowledge on the subject, to participate in the initial evaluation and/or cooperate for the implementation of this Agreement.

5. The Parties intend to complete an initial implementation plan, which will contain gradual steps, and address, among other things:  (a) procedures necessary to effectuate the transfer of individuals under this agreement; (b) the volume or number of individuals to be transferred; and (c) institutional capacity requirements.   The Parties plan to operationalize this Agreement upon the completion of a phased implementation plan.

### ARTICLE 8

1. This Agreement shall enter into force by means of an exchange of notes between the Parties indicating that each party has complied with the necessary domestic legal procedures for the Agreement to enter into force. For the term of two (2) years, renewable before its expiration with the exchange of diplomatic notes.

2. Any Party may terminate this Agreement by giving written notice to the other Party three (3) months in advance.

3. Any Party may, immediately after notifying the other Party in writing, suspend for an initial period of up to three (3) months the implementation of this Agreement. This suspension may be extended for additional periods of up to three (3) months, by means of written notification to the other Party. Any Party may, with the written consent of the other, suspend any part of this Agreement.

4. The Parties may in writing, by mutual agreement, make any modification or addition to this Agreement. These shall enter into force in accordance with the relevant legal procedures of each Party and the amendment or addition shall constitute an integral part of this Agreement.

5. Nothing in this Agreement shall be construed in such a way as to oblige the Parties to disburse or obligate funds.

IN FAITH WHEREOF, the undersigned, duly authorized by their respective governments, sign this Agreement.

SIGNED on the 26 day of July of the year 2019 in the English and Spanish languages, with both texts being authentic.

FOR THE GOVERNMENT OF THE UNITED STATES OF AMERICA:
Kevin K. McAleenan
Acting Secretary of Homeland Security

FOR THE GOVERNMENT OF THE REPUBLIC OF GUATEMALA:
Enrique A. Degenhart Asturias
Minister of Government

*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528



**Homeland Security**

MEMORANDUM FROM THE SECRETARY

SUBJECT:     Whether Guatemala's Refugee Protection Laws and Procedures Satisfy the "Access to a Full and Fair Procedure" Requirements of Section 208(a)(2)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a)(2)(A).

After careful consideration, I find that Guatemala's refugee protection laws and procedures satisfy the requirements of Immigration and Nationality Act ("INA" or "the Act"), Section 208(a)(2)(A).  This decision was made after a careful review of the available information found in the Guatemalan Migration Code, their implementing regulations, an active dialogue between our two States, information provided by the Department of State, information provided by the United Nations High Commissioner for Refugees (UNHCR), and information from other sources.

As the Department of Homeland Security has long recognized, the perfect harmonization of a foreign country's asylum laws and procedures to the laws and procedures in the United States "is not a prerequisite to entering into responsibility-sharing arrangements."[1]

Guatemala has satisfied the INA Section 208(a)(2)(A) requirement because it has in place a sufficient protection system with accompanying procedures and laws.  Applicants for protection in Guatemala have a meaningful opportunity to make a protection claim, receive a hearing and adjudication regarding that claim, and safely remain in Guatemala until their protection claim is resolved.

Additionally, the phrase "full and fair procedure" presumes that the third country have in place a process that comports with basic notions of procedural fairness.  The Guatemalan system meets these basic requirements.  In Guatemala, an interpreter is available for the applicant during the interview, oral guidance is given to the applicant at the initial stages of the proceedings on how to present a claim along with information on rights, protections, and privileges, and an appeal process is provided.  The applicant may also remain in Guatemala during the appeals process. Guatemalan law has adopted and maintains laws against *refoulement* of refugees that are in accord with its *non-refoulement* obligations described in Article 33 of the 1951 Convention Relating to the Status of Refugees 1951 and the 1967 Protocol Relating to the Status of Refugees, at a minimum.

---

[1] 69 Fed. Reg. 10,620-01, 10,620 (Mar. 8, 2004).

**Subject**: Whether Guatemala's Refugee Protection Laws and Procedures Satisfy the "Access to a Full and Fair Procedure" Requirements of Section 208(a)(2)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a)(2)(A).
Page 2

Additionally, non-binding UNHCR guidance provides another official's view in the context of safe third country considerations. The UNHCR Handbook is not definitive, but it indicates that a variety of procedures may be appropriate.[2]

I need not conclude that all of these UNHCR Handbook guidelines must be met for a country to provide "full and fair" procedures. Notwithstanding this, the Guatemalan system appears to satisfy each of them based on the available information. For example, it appears Guatemala has a competent immigration authority that has clear instruction for addressing initial asylum applicants, including referral to an adjudicative body. As for Guatemala's compliance with its *non-refoulement* obligations, Article 46 of the Migration Code generally establishes what those *non-refoulement* duties and obligations are, and they appear to meet or exceed the standards of Article 33 of the 1951 Refugee Convention and the 1967 Protocol. For example, Guatemalan law requires that, should asylum or refugee status be denied, an applicant will not be return to "his or her country when there is a credible reason to fear serious dangers to his or her life, physical integrity, and freedom."[3] Guatemalan Migration Code Article 12 also guarantees all migrants are not to be subject to "any form of violence," including torture, cruel, or degrading treatment. Guatemalan law further provides that asylum applicants will receive guidance during their application process, and it has a robust protection system in place under its laws, including the availability of psychologist during the refugee interview.[4] It also appears that a refugee applicant and refugee status grantee in Guatemala are informed of this decision and issued certifying documentation. Guatemala provides applicants the right to appeal an adverse decision on protection applications, which they must do within 10 days of notification of the decision. Applicants are also allowed to stay in Guatemalan during the pendency an appeal.

Therefore, and based on the information provided, I find that the Guatemalan refugee protection system satisfies the "access to a full and fair procedure" requirements of INA § 208(a)(2)(A).

Kevin K. McAleenan
Acting Secretary of Homeland Security

OCT 1 6 2019
Date

---

[2] *See* UNHCR, Handbook on Procedures and Criteria for Determining Refugee Status ("UNHCR Handbook") ¶ 189 (Jan. 1992 ed.). Notably, the UNHCR Handbook's most recent reissuance was in February 2019. However, the substance between the 2019 version of the UNHCR Handbook and the 1992 UNHCR Handbook remains unchanged.

[3] Migration Code, Congressional Decree, No. 44–2016, art. 46 (2016) (Guat.).

[4] *See* Regulations on the Procedure for the Protection, Determination, and Recognition of Refugee States in the State of Guatemala, Order No. 2-2019, at art. 17 (2019); *see also* Migration Code art. 180.



Monday,
November 29, 2004

Part III

# Department of Homeland Security

8 CFR Parts 208, 212, and 235
Implementation of the Agreement
Between the Government of the United
States of America and the Government of
Canada Regarding Asylum Claims Made
in Transit and at Land Border Ports-of-
Entry; Final Rule

# Department of Justice

8 CFR Part 1003 et seq.
Asylum Claims Made by Aliens Arriving
From Canada at Land Border Ports-of-
Entry; Final Rule

# DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 208, 212, and 235**

[CIS No. 2255–03]

**RIN 1615–AA91**

## Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry

**AGENCY:** Department of Homeland Security.

**ACTION:** Final rule.

**SUMMARY:** This rule codifies specific terms of an agreement between the United States and Canada that permits the respective governments to manage which government decides certain aliens' requests for protection from persecution or torture pursuant to domestic implementation of international treaty obligations. This rule establishes U.S. Citizenship and Immigration Services ("USCIS") asylum officers' authority to make threshold determinations concerning applicability of this agreement in the expedited removal context. In addition, this rule codifies the existing definitions of "credible fear of persecution" and "credible fear of torture" without altering those definitions.

**DATES:** This final rule is effective December 29, 2004.

**FOR FURTHER INFORMATION CONTACT:** Joanna Ruppel, Deputy Director, Asylum Division, Office of Refugee, Asylum, and International Operations, U.S. Citizenship and Immigration Services, 20 Massachusetts Avenue, NW, Washington, DC 20536; Telephone (202) 272–1663.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Background
II. Validity of the Threshold Screening Process
III. Detention Issues
IV. Procedural Safeguards Under the Threshold Screening Interview Process: Arrivals from Canada
  • Screening Process Guarantees
  • Post-Interview Process
V. Adjudicating Exceptions to the Agreement
  • Family-Based Exceptions
  • Unaccompanied Minor Exception
  • Public Interest Exception
  • Valid Visa Exception
  • Other Exceptions
VI. Procedures for Asylum Seekers Going to and Being Returned from Canada
  • Process for Asylum Seekers Bound for Canada
  • Process for Asylum Seekers Returned from Canada
  • Cost of Processing Returned Asylum Seekers
VII. Monitoring Plans
VIII. Agreement Terms Unrelated to Processing Asylum Seekers Coming to the United States from Canada
  • Resettlement under the Agreement
  • Terminating the Agreement
IX. Miscellaneous
  • Resolving U.S.-Canadian Differences in Interpreting the Agreement
  • Defining 'land border port-of-entry'
  • Aliens "directed back" from Canada
  • Indirect *refoulement*
X. Conforming Amendment to Part 235 of Title 8 of the Code of Federal Regulations

## I. Background

On March 8, 2004, the Secretary of Homeland Security and the Attorney General promulgated proposed rules to implement terms of the "Agreement Between the Government of the United States of America and the Government of Canada for Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries' ("Safe Third Country Agreement" or "Agreement"), which, consistent with section 208(a)(2)(A) of the Immigration and Nationality Act ("Act") (8 U.S.C. 1158(a)(2)(A)), provide for the return of certain asylum seekers to the "country of last presence." 69 FR 10620, 69 FR 10627. The Agreement is available both on the USCIS Web site, *http://www.uscis.gov*, and the Web site for the U.S. Embassy in Canada, *http://www.usembassycanada.gov/content/can_usa/safethirdfinal_agreement.pdf*.

The proposed rules outlined how the Department of Homeland Security (DHS) and the Department of Justice (DOJ) proposed to address the asylum, withholding of removal, and Convention Against Torture claims ("protection claims") of aliens seeking to enter the U.S. at U.S.-Canada land border ports-of-entry, or in transit through the U.S. during removal by the Canadian government, in accordance with the Safe Third Country Agreement. The Agreement allocates responsibility between the United States and Canada whereby one country or the other (but not both) will assume responsibility for processing the claims of certain asylum seekers who are traveling from Canada into the United States or from the United States into Canada. The Agreement provides for a threshold determination to be made concerning which country will consider the merits of an alien's protection claim, enhancing the two nations' ability to manage, in an orderly fashion, asylum claims brought by persons crossing our common border. As discussed in the **SUPPLEMENTARY INFORMATION** section in the preamble to those proposed rules, the Agreement allocates resources and provides for prescreening of asylum and related claims in certain instances during the expedited removal process, where the asylum officer would determine whether any of the Agreement's exceptions apply or whether aliens should be returned to Canada for consideration of their protection claims. The limited number of aliens arriving from Canada at land border ports-of-entry or in transit during removal by the Canadian government who are placed in removal proceedings under section 240 of the Act (8 U.S.C. 1229a) (instead of being processed through expedited removal procedures) would have the Agreement applied to them in the first instance by immigration judges of the Executive Office for Immigration Review ("EOIR"), as outlined in the DOJ proposed rule at 69 FR 10627 *et seq.* In response to the DHS proposed rule, DHS received 7 sets of comments from non-governmental organizations ("NGOs") and the Office of the United Nations High Commissioner for Refugees ("UNHCR"). While incorporating several of the comments, this final rule implements the basic approach discussed in the March 8 rule proposed by DHS.

The following discussion of the comments received by DHS corresponds generally to the variety of issues raised by commenters and is arranged into the following categories: Validity of the threshold screening process identified in the proposed rule; issues related to detention of asylum seekers; procedural safeguards under the threshold screening process; adjudication of the Agreement's several exceptions to its general rule of returning certain asylum seekers to Canada; procedures for asylum seekers bound for and returned from Canada; monitoring of the Agreement's implementation and impact; and Agreement terms unrelated to processing asylum seekers coming to the United States from Canada. Within each category, the discussion summarizes the relevant comments and offers the Department's responses, including an explanation of any changes made to the rule. Following the discussion of the comments is an explanation of one minor conforming regulatory amendment included in the final rule to ensure that existing regulations governing the expedited removal process are consistent with the threshold screening interview mechanism adopted in DHS' final rule. Many commenters took issue with the Agreement itself, challenging its wisdom on policy grounds. This

Supplementary Information to the final rule, while endeavoring to address each comment as fully as possible, does not engage in a policy debate about the Agreement itself.

## II. Validity of the Threshold Screening Process

One commenter indicated that creating a special process to assess the applicability of the Agreement and its exceptions would result in increased inefficiency and bureaucracy. The Department disagrees and, to the contrary, believes that the threshold screening process is the most efficient mechanism for implementing the Agreement. It will not create additional bureaucracy. The threshold screening process adopts existing processes from the credible fear process, will be a streamlined determination, and can be transitioned seamlessly to the credible fear process if an exception to the Agreement is found.

Other commenters argued that the new threshold screening process is legally insufficient, if not contrary to existing laws, because it does not occur as part of the credible fear determination and does not provide for independent administrative review of negative decisions by immigration judges. These commenters have concluded that the proposed process does not, therefore, comport with statutory expedited removal provisions. Specifically, the commenters identify sections 235(b)(1)(A)(ii) and 235(b)(1)(B) of the Act (8 U.S.C. 1225(b)(1)(A)(ii), 1225(b)(1)(B)), which provide that asylum officers shall interview arriving aliens who are inadmissible under section 212(a)(6)(C) or 212(a)(7) of the Act (8 U.S.C. 1182(a)(6)(C), 1182(a)(7)) and who indicate either an intention to apply for asylum or a fear of persecution in order to determine whether such aliens have a "credible fear of persecution," and further provide that negative credible fear determinations may be reviewed by immigration judges. Similarly, arriving aliens who express a fear of torture are subject to these same procedures as a matter of regulation. 8 CFR 208.30(e).

While the Department agrees that these provisions generally do call for the administration of credible fear interviews to those aliens in expedited removal processing who express an intent to apply for asylum or a fear of persecution or torture, a careful reading of the Act makes clear that credible fear interviews are not required for aliens subject to the Safe Third Country Agreement. Under section 208(a)(1) of the Act (8 U.S.C. 1158(a)(1)), any alien physically present in or arriving in the

United States may apply for asylum in accordance with that section, or where applicable, section 235(b) of the Act (8 U.S.C. 1225(b)). The following paragraph, section 208(a)(2)(A) of the Act (8 U.S.C. 1158(a)(2)(A)), however, creates an exception to this generally permissive asylum filing standard, revealing Congress' intent that an alien may not apply for asylum in accordance with section 235(b) (8 U.S.C. 1225(b)) if the alien "may be removed, pursuant to a bilateral or multilateral agreement, to a country * * * in which the alien's life or freedom would not be threatened. * * * Section 235(b)(1)(B)(ii) of the Act (8 U.S.C. 1225(b)(1)(B)(ii)) states that, when an alien successfully completes the credible fear interview process, "the alien shall be detained for *further consideration* of the application for asylum." (emphasis added). Clearly, then, the credible fear interview process constitutes the initiation of the asylum application process described in section 208(a)(1) or the Act (8 U.S.C. 1158(a)(1)). For this reason, and in light of section 208(d)(5)(B)'s (8 U.S.C. 1158(d)(5)(B)) authorization to promulgate regulations that impose "conditions or limitations on the consideration of an application for asylum," as long as they are "not inconsistent with this Act," the Department finds the threshold screening interview process described in the proposed rule to be in accord with the Act.

A closely related comment raised by some commenters is the request that the rule include an independent review or appeals process for asylum officer findings that an alien does not meet one of the Agreement's exceptions and is, accordingly, ineligible to pursue an asylum application via the credible fear interview process. The Department believes that, given the narrow legal and factual issues present in the threshold screening process, review of an asylum officer's threshold determination by a supervisory asylum officer will adequately serve to ensure that proper decisions are made on this limited issue. In light of the comments received, the requirement that a supervisory asylum officer must concur in the asylum officer's finding that the alien is subject to return to Canada under the Agreement has been expressly added to the final rule at 8 CFR 208.30(e)(6)(i).

## III. Detention Issues

Several commenters addressed the issue of detention. For instance, some commenters suggested adding to the rule the statement that asylum seekers subject to the Agreement generally should not be detained. Another

commenter advocated a mechanism for the Department to refer individuals entering the United States or being returned by Canada under the Agreement to NGOs in the United States, to facilitate alternatives to detention. Commenters also expressed concern about the detention of returnees from Canada. One commenter would have the rule prohibit detention of this group under any circumstances, while another suggested that the Department only detain returnees under exceptional circumstances, and, if detention is necessary, to avoid detention in local and county jails. The Agreement does not amend the detention authority under sections 236, 236A and 241 of the Act (8 U.S.C. 1226, 1226a, 1231) or require that DHS alter its current detention policies or practices. No amendments to the detention regulations were proposed in the proposed rule, and any changes in these regulations would require a new proposed rule. After reviewing the comments, DHS is not convinced that there is any reason to amend the detention provisions of the regulations because of the implementation of the Agreement or this rule. The comments do not articulate any legitimate basis for treating aliens without lawful immigration status in the United States who are returned under the Agreement differently from other asylum seekers in the United States without lawful immigration status.

## IV. Procedural Safeguards Under the Threshold Screening Interview Process: Arrivals From Canada

*Screening Process Guarantees*

Several commenters were concerned that the rule does not specify that individuals arriving from Canada would receive the same procedural safeguards in the threshold screening interview process that are provided to arriving aliens who receive credible fear interviews. In particular, the Department was urged to incorporate, in the final rule, the following such safeguards: Option to consult with a person of the alien's choosing; sufficient time to contact a consultant, relative, or relevant advocates, at no expense to the U.S. government; sufficient time to prepare for the eligibility interview; an assurance that the interview would not occur sooner than 48 hours after the asylum seeker's arrival at a detention facility, unless the individual waives this preparation period; the ability to request that the threshold screening interview be postponed, which the Department should grant if there are good reasons to do so; use of an

interpreter; explanation of and guidance on the interview procedure; and the issuance of a reasoned written decision.

The Department has clarified, in the final rule, that the same safeguards accorded to aliens who are eligible for a credible fear determination will be accorded to aliens who receive threshold screening interviews. However, the suggestion that the threshold screening interview be postponed upon an alien's request has no parallel in the sections of 8 CFR 208.30 outlining the credible fear process. Also, this suggestion would compromise the principle underlying the Agreement that aliens be returned promptly to the country of last presence; therefore, it will not be incorporated into the final rule. In appropriate cases, the Department may exercise its discretion to delay the threshold screening process where the delay is justified.

One commenter recommended that the final rule include a statement requiring the Department to accommodate reasonable requests for assistance in securing evidence in support of an asylum seeker's claim arising from the asylum seeker's detention. For example, an asylum seeker may need access to a telephone or fax machine to secure evidence establishing relationships, a family member's legal status, or the asylum seeker's age. The Department currently provides access to telephones to detained asylum seekers who are subject to expedited removal. If additional assistance is needed, such as access to a fax machine, an asylum officer may be able to facilitate such access. However, the Department does not believe it is necessary to incorporate this suggestion into the final rule, because it is operational in nature and instead will be incorporated into field guidance upon implementation of the rule.

*Post-Interview Process*

One commenter suggested that the rule should clarify that return to Canada under the Agreement would not render a person inadmissible to the United States on that basis. While the Agreement does not address matters of inadmissibility, the Department may only remove aliens from the United States using a mechanism provided by Congress. Generally, for aliens arriving in the United States without valid documents required for admission, expedited removal under section 235(b) of the Act (8 U.S.C. 1225(b)) is the removal mechanism provided by Congress. A removal order under section 235(b) of the Act would, as a matter of law, constitute a temporary

inadmissibility ground under section 212(a)(9)(A)(i) of the Act (8 U.S.C. 1182(a)(9)(A)(i)). Waivers and exceptions to this inadmissibility ground do exist and will be considered by the Department on a case-by-case basis, consistent with existing regulations and operational directives. Similarly, discretion exists on the part of Customs and Border Protection ("CBP") officers to allow aliens to withdraw their applications for admission (so that they would face no admissibility bar to a subsequent admission to the United States) and this discretion will continue to be used on a case-by-case basis.

Another commenter recommended that either the final rule or operating procedures should include a mechanism for reconsideration by the Department of its decision to remove an asylum seeker to Canada following a decision that he or she does not qualify for one of the Agreement's exceptions if new evidence subsequently becomes available. The Department plans to continue working with its Canadian counterparts to establish common procedures to resolve matters like these at the local level through operational guidance.

## V. Adjudicating Exceptions to the Agreement

A substantial number of the comments to the proposed rule concerned the interpretation and adjudication of Agreement exceptions for asylum seekers arriving at land border ports-of-entry. These comments corresponded roughly to the specific exceptions themselves, and can be addressed with reference to the following categories: family unity; unaccompanied minors; public interest; validly issued visas; and other exceptions. Many of the concerns evident from these comments were raised initially at meetings with NGOs, including a public meeting in August 2002, before the Agreement was signed. The Department carefully considered several of the issues outlined in these comments at that time and incorporated many suggestions into the text of the Agreement.

*Family-Based Exceptions*

Many commenters believe that the rule should define "family member" broadly and in a more culturally sensitive manner that reflects the reality of the refugee experience. For example, one commenter recommended considering "de facto" family members as eligible anchor relatives within this exception, or, in the alternative, as part of the public interest exception. The definition of "family member" was the

subject of prolonged discussion while negotiating the Agreement. The United States delegation advocated and succeeded in achieving a definition much broader than the class of family members recognized for other purposes under United States and Canadian immigration law. During negotiations, both Canada and the United States took into account the reality that different cultures define "family member" differently. Given the specificity of the Agreement's enumerated relationships in its "family member" definition, the Department will not now, in effect, unilaterally amend the Agreement's definition by means of this rule to include additional individuals. The Department's position is that using the regulatory process to create new definitions at this stage would serve to undermine the compromise represented by this carefully negotiated, bilateral agreement.

Other commenters suggested including "cousins" as part of the "family member" definition in the rule. As explained above, the Agreement's list of who may qualify as an anchor "family member" is not subject to amendment by the rule. For the same reason, the Department will not include, as suggested in a separate comment, "other close relatives" to the list of family members.

Several commenters recommended that the rule specifically include a "common-law partners" exception, as it is included in the Canadian regulations' definition of "family member." Canada has included common-law partners in the definition of "family member" in the Canadian regulations implementing the Agreement because this relationship has often been recognized as a matter of Canadian law. Article 1 of the Agreement provides that each Party will apply the Agreement's family member exceptions in a manner that is consistent with its national law. While valid foreign marriages, including common law marriages, are generally given effect under U.S. immigration law, *see Matter of H-*, 9 I&N Dec. 640, 641 (BIA 1962); *but see* section 101(a)(35) of the Act (8 U.S.C. 1101(a)(35)), U.S. federal law precludes use of the terms "marriage" or "spouse" to refer to same-sex partnerships. *See* Defense of Marriage Act, Public Law 104–199, section 3, 110 Stat. 2419 (1996) (providing that, for purposes of federal law, "'marriage' means only a legal union between one man and one woman as husband and wife, and * * * 'spouse' refers only to a person of the opposite sex who is a husband or a wife."). Because the Department cannot promulgate regulations that are contrary

to law, the Department did not adopt the commenters' suggestion to add a "common-law partner" interpretation of the term "spouse," as used in the Agreement's family member exceptions.

A few commenters believe that the rule should eliminate the Agreement's age and immigration status limits on anchor relatives, reasoning that the limits result in separating families when children cannot serve as anchors for their parents. Both countries have expressed their concern for reuniting separated families. To that end, both intend to work with the UNHCR and NGOs to monitor the Agreement's effect, addressing this potential problem operationally rather than by regulation. A key reason that age limits were included in the Agreement's family unity exceptions was that neither government wanted to trigger an increase in the smuggling and trafficking of minors, sent ahead by family members for the purpose of serving as anchors in either country. Further, the requirement that anchor relatives hold lawful, non-visitor immigration status derives from the negotiated Agreement terms, *see* art. 4, para. 2(a), which will not be modified through the rule-making process.

*Unaccompanied Minor Exception*

Some commenters felt that the rule should expand the Agreement's definition of "unaccompanied minor" to include a minor who is "separated from both parents and is not being cared for by an adult who by law has the responsibility to do so." The Department declines to incorporate this change to the Agreement's definition into the final rule. The Agreement's definition of "unaccompanied minor," as explained in the **SUPPLEMENTARY INFORMATION** accompanying the proposed rule, differs from the definition customarily used for purposes of U.S. immigration processing. As previously explained, the definitions in the Agreement were carefully negotiated with the Canadian government and the Department will not use the rule-making process to alter unilaterally the clear definitions in the Agreement. However, by applying DHS'' customary operational definition to unaccompanied minors seeking asylum so that they are generally referred for a hearing by an immigration judge in proceedings under section 240 of the Act (8 U.S.C. 1229a), the Department is providing them ample process to explain whether they meet one of the Agreement's exceptions and to present their protection claims.

The same commenters also recommended that the rule should shift the burden of proof concerning the location of an unaccompanied minor's parents from the unaccompanied minor to the government, requiring the government to demonstrate that the unaccompanied minor is in the care of his or her parents or is following to join them. While the Department understands the need to proceed with heightened restraint and sensitivity in the cases of unaccompanied minors, there is concern that this recommendation could adversely affect the unaccompanied minor by resulting in fact-finding delays before a final determination. The child likely will have more information than DHS as to the location of his or her parents and therefore it is more appropriate for the child to bear the burden of proof in establishing the parents' locations. Moreover, aliens in removal proceedings—regardless of age— generally bear the burden of proving their admissibility to the United States, 8 U.S.C. 1129(c)(2), and, similarly, applicants for asylum, withholding of removal, and protection under the Convention Against Torture, bear the burden of proof to establish eligibility, even in cases where the applicant is a child. The commenters did not provide sound rationales for shifting the burden of proof for purposes of establishing that an exception to the Agreement applies.

These commenters also suggested that the rule include a mechanism for determining a child's relationship to an accompanying adult or to individuals present in the United States or Canada, including an interview with a child welfare specialist, if the child arrives at the border with an individual who is not his or her legal guardian. The mechanism, they suggest, should include procedures to identify potential family members and determine their suitability to serve as the child's guardian. The Department agrees that this is an area requiring further consideration; however, the issues surrounding identification of individuals accompanying alien children and verification of relationships between adults and children are broader than the scope of this rule and are not unique to those children subject to this rule. These issues may be raised at all borders, and all ports-of-entry, even in the case of aliens with lawful status here. Therefore, these issues would be more appropriately addressed systemically, as a coordinated effort among the Department's various agencies to create a uniform approach, rather than within this rule. Consequently, the Department declines to incorporate the process

proposed by commenters within the rule.

Many commenters, as previously stated, urged the Department to consider "separated children," who are not with either parent or with an adult responsible for their care, as part of the discretionary public interest exception under Article 6 of the Agreement. The Department is sensitive to the unique issues facing unaccompanied minors and will proceed carefully in cases where an unaccompanied minor arriving in the United States appears to be a "separated child." The Department will consider, on a case-by-case basis, whether such a child might meet the Agreement's public interest exception.

*Public Interest Exception*

Many of the commenters recommended that the rule should state that "humanitarian concern is a public interest." The Department believes that the Agreement's public interest exception is best administered through operational guidance and on an individualized, case-by-case basis, but does acknowledge that "humanitarian concern" is certainly an important consideration to factor in to a public interest assessment.

Some commenters suggested that the rule include a non-exhaustive list of categories that would merit consideration under the public interest exception. Three of the suggested categories—common-law spouses, de facto family members, and separated children with parents or legal guardians in the U.S. who are ineligible to serve as anchors—were addressed above in the discussion replying to comments about the proposed rule's sections concerning the "family member" and "unaccompanied minor" exceptions.

Other categories suggested by commenters for consideration under the public interest exception include:

a. Cases where effective protection cannot be guaranteed in Canada because of that country's asylum laws; and, similarly, cases where U.S. law and practice are not consistent with Canadian law and practice;

b. Cases in which the anchor relatives are under age 18 and have pending asylum applications;

c. Cases of survivors of torture; and

d. Cases of individuals with physical and psychological health needs.

Issues of minor anchor relatives, past torture, and health needs are some of the factors that may be considered under the Agreement's public interest exception, along with all other relevant circumstances, on a case-by-case basis. The intent behind this provision of the Agreement was to allow each

DOJIFR00102

government to make case-by-case determinations with broad discretion. Had the parties' intent been to include the broad categories of individuals listed above, the categories would have been spelled out in the Agreement in the same manner as the other exceptions.

For reasons stated in the Supplementary Information to the proposed rule, the Department does not consider differences in Canadian and U.S. protection laws germane to decisions made under the Agreement. The commenters urged, with respect to this suggestion, that the rule include a mechanism for the UNHCR and NGOs to help the Department analyze Canadian law and practice, including approval rates by nationality and basis for approval, to ensure that the Department exercises discretion in cases where there are discrepancies with U.S. law. The Department will not apply the public interest exception in a manner that would undermine the Agreement's allocation of responsibility for adjudication of protection claims. Also, as explained in the Supplementary Information to the proposed rule, differences in our protection systems were contemplated by the United States and Canada during negotiations. In either country, asylum seekers will have their protection claims fully and fairly considered.

Other commenters suggested specific procedures in the rule concerning the exercise of discretion, in the public interest, to allow an individual to pursue a protection claim in the United States. One commenter explaining who specifically may exercise this discretion, and the other called for a clear procedure between EOIR and DHS to ensure that the Department properly considers cases pending before EOIR for the public interest exception. In response to these suggestions, the final rule has been amended at 8 CFR 208.30(e)(6)(iii)(F) to specify that the Director of USCIS, or the Director's designee, will be responsible for DHS determinations made under the Agreement's public interest exception. Any party wishing to present a case for consideration under this exception should provide relevant case information to the Director's office or that of his or her designee.

*Valid Visa Exception*

One commenter noted that the rule should define "validly issued visa" so as not to link the validity of its issue to the asylum seeker's presumed subjective intentions. For example, U.S. immigration authorities have determined in some instances that valid

tourist or business visas were obtained by "fraud" because of the visa holder's true intent to seek asylum. For the limited purposes of applying this exception to the Agreement, USCIS will construe the term "validly issued" to refer to visas that are genuine (*i.e.*, not counterfeit) and were issued to the alien by the U.S. government.

*Other Exceptions*

One commenter forwarded comments made in response to a review of an earlier draft of the Agreement in 2002, in which it recommended that, to avoid the separation of families and minimize social and economic costs for states, the Agreement add a transit exception. Additionally, the commenter suggested a "community support contact" exception, which could include friends or colleagues willing to submit statements about their willingness to support the asylum seeker during the process. A transit exception would effectively invalidate the Agreement, as the Agreement's stated purpose is quite clearly to return asylum seekers to the "country of last presence." With respect to the "community support contact" exception, the Department reiterates that the exceptions to the Agreement were determined through careful negotiations with the Canadian government, and that to create additional exceptions through rule-making would serve to undermine the process. Therefore, the Department declines to adopt this recommendation.

## VI. Procedures for Asylum Seekers Going to and Being Returned From Canada

*Process for Asylum Seekers Bound for Canada*

Several commenters recommended that the rule include a mechanism whereby the Department could refer Canada-bound asylum seekers to NGOs in the United States for assistance in locating relatives and providing advice regarding eligibility before arriving at a land border port-of-entry. The commenters do not explain how the Department would identify these asylum seekers and implement this recommendation. While the Department appreciates the participation of NGOs in the process to date and will continue to seek their assistance to educate populations likely to be affected by the Agreement, it will not adopt this recommendation, because it would be administratively impracticable to implement and could unnecessarily delay travel for thousands of individuals crossing from the United States to Canada. U.S. officials generally do not

stop and address individuals leaving the United States to go to Canada. Even if immigration officials were to stop individuals traveling from the United States into Canada, it is unclear how they would identify those whom they intend to seek asylum in Canada—certainly a minimal portion of individuals crossing the border each day—in order to refer them to an NGO.

*Process for Asylum Seekers Returned From Canada*

Several commenters expressed a desire to have the rule clarify the process affecting those asylum seekers who are determined to be ineligible by Canada and returned to the United States—the group anticipated to constitute the majority of asylum seekers affected by the Agreement. One non-governmental organization recommended that the rule guarantee that these individuals be exempt from the expedited removal process.

The Department declines to codify the process affecting those returned to the United States under the Agreement, because existing regulations already govern how they will be treated by DHS. For purposes of U.S. immigration law, these returnees will be in the same position they would be in had they not left the United States. As the Department stated in the Supplementary Information to the proposed rule, individuals returned from Canada to the United States, with the rare exception noted below, will not be subject to expedited removal because they will not meet the definition of "arriving alien." Depending on the individual's immigration status in the United States, he or she may be subject to removal proceedings under section 240 of the Act (8 U.S.C. 1229a). However, it is not possible, practical or advisable for the Department to codify such a guarantee in this rule. There may be a rare circumstance in which the expedited removal provisions of the Act would apply. For example, someone initially paroled into the United States may attempt to enter Canada and then be returned to the United States after his or her parole period here expired. Such a person, as an individual whose parole period has expired, may be subject to expedited removal. 8 U.S.C. 1182(d)(5)(A), 1225(a)(1)–(b)(1)(A)(i); 8 CFR 1.1(q).

Many commenters suggested that the rule include a mechanism to enable Canada, in the event that it decides that the Agreement exceptions are inapplicable to an individual alien, to address any possible errors in its decision or consider new information offered by the alien that he or she

qualifies for an exception and is eligible to present a protection claim in Canada. DHS regulations do not govern Canadian authorities. It would be inappropriate for DHS regulations to outline a mechanism for the Canadian authorities to correct errors or address new information. Nonetheless, the Canadian and United States governments have agreed to consult with each other on these matters and to address them operationally.

One commenter also stressed that, in this context, the Department should release detainees or provide transport to the nearest land border port-of-entry if Canada agrees to reconsider a claim and requires the asylum seeker's presence at the border. Release of detainees will be determined on a case-by-case basis, depending on the facts of the case and applicability of immigration laws. Should an individual be released, the logistics for how that person will get to the border is best determined on a case-by-case basis and through operational, as opposed to regulatory, guidance.

*Cost of Processing Returned Asylum Seekers*

The majority of the commenters disagreed with the proposed rule's assessment of the costs that will result from the rule's implementation, as outlined in the proposed rule's determination made under Executive Order 12866. They allege that certain tangible costs—including increases in adjudications, detention, Border Patrol deployment, and criminality—were not adequately addressed. They argue that, among the intangible costs of this Agreement that were ignored by the proposed rule, are the increased risks to life and safety of those seeking to enter either country outside land border ports-of-entry, and the potential for the Agreement to attract more smugglers and traffickers, which would make this land border more dangerous.

The costs identified in discussing Executive Order 12866 were the costs associated with implementation of the provisions proposed in the rule, not the costs associated with the Agreement itself. The proposed and final rules are focused solely on asylum seekers seeking to enter the United States who may be returned to Canada pursuant to the Agreement, not those who are returned from Canada pursuant to the Agreement or who seek to cross the border illegally. As such, those costs were properly not considered in addressing Executive Order 12866. However, the United States Government carefully considered all of the potential costs identified by the commenters before it entered into the Agreement and

determined that the benefits of the Agreement outweigh its costs.

**VII. Monitoring Plans**

Nearly all of the commenters recommended that the rule explicitly refer to the UNHCR's monitoring role, as specified in Article 8 of the Agreement. They added that the rule should specify exactly what type of information the UNHCR will receive, such as numbers of applicants, their ages, their countries of origin, and the disposition of their eligibility and credibility determinations. They also recommended that the rule establish a timetable for the reports, preferably quarterly or whenever a special situation warrants one. In addition, the commenters recommended that the rule authorize the UNHCR to monitor eligibility and credibility determinations and to intercede in cases in which it believes erroneous decisions were made. The same commenters also felt that the rule should allow NGOs to operate as the UNHCR's implementing partners to monitor the Agreement.

The Department has not incorporated these recommendations into this rule, but plans to take them into consideration when finalizing its arrangements with Canada and the UNHCR concerning monitoring of the Agreement. The Department also would welcome the assistance and input of NGOs. It is fully the intent of the Department to abide by the Agreement, which, at Article 8, provides that ''The Parties shall cooperate with UNHCR in the monitoring of this Agreement and seek input from non-governmental organizations.'' The Department values the longstanding consultative, cooperative relationship the UNHCR has had with the U.S. government, which includes monitoring the United States' application of the Convention Relating to the Status of Refugees, Jul. 28, 1951, 189 U.N.T.S. 150 (''Refugee Convention''). For example, the UNHCR recently monitored and analyzed the expedited removal process and made several useful recommendations for the Department. However, the Department considers it inappropriate to codify the nature of this relationship, or the relationship between the Department and the NGO community, in these rules. Details of monitoring plans often change and develop over time, as unforeseen events arise, and those involved in the monitoring plan identify methods, consistent with evolving events, to better gather and analyze data. As such, it is more appropriate to include details of such plans in formal action plans and memoranda. One comment suggested that the rule include a monitoring plan

concerning smuggling and trafficking developments. As stated earlier, the Department is aware of the potential for increased smuggling and trafficking after the Agreement is implemented and intends to monitor these developments. The Department does not believe, however, that it is appropriate to codify such a monitoring plan in regulations for the same reasons noted above.

**VIII. Agreement Terms Unrelated to Processing Asylum Seekers Coming to the United States From Canada**

*Resettlement Under the Agreement*

Most commenters wanted the rule to include details concerning the implementation of the resettlement side agreement addressed in Article 9 of the Agreement. Another commenter recommended that the Department of State introduce its own proposed rule to implement the resettlement agreement.

This comment concerns an issue separate and distinct from that of returning asylum seekers to the country of last presence. The scope of this rule will remain limited to implementing the Agreement's terms as they concern two limited categories of asylum seekers: Those seeking entry to the United States at a land border port-of-entry on the Canadian border and those who seek protection while being removed from Canada and transiting through the United States.

*Terminating the Agreement*

One commenter suggested that the rule include criteria to determine whether the Agreement should be cancelled because of negative impacts, particularly any increase in smuggling or trafficking. Another made a similar, though less specific suggestion, that the rule should include procedures for revising or terminating the Agreement, should that prove necessary. One commenter added that the Department of State should propose its own separate rule concerning the procedures for suspending or terminating the Agreement, including adequate or appropriate termination grounds.

With respect to termination procedures, Article 10 of the Agreement between the United States and Canada specifically provides that termination may occur with six months' written notice from either party, and that three months' written notice would result in suspension. It would be inappropriate for the U.S. Government to negotiate an Agreement with Canada and then unilaterally adopt specific criteria that would result in the Agreement's termination. The efficacy and ongoing commitment to an international

**69486** **Federal Register** / Vol. 69, No. 228 / Monday, November 29, 2004 / Rules and Regulations

agreement is a matter of foreign policy of the United States, the proper subject of diplomacy, and inappropriate for regulation under the Administrative Procedure Act (5 U.S.C. 551–59, 701–06, 1305, 3105, 3344, 5372, 7521).

**IX. Miscellaneous**

*Resolving U.S.-Canadian Differences in Interpreting the Agreement*

Most commenters agreed that the rule should provide a detailed mechanism to resolve differences between Canada and the United States regarding the interpretation and implementation of the Agreement. In accordance with the second paragraph of Article 8 of the Agreement, which provides that standard operating procedures "shall include mechanisms for resolving differences respecting the interpretation and implementation of the terms of this Agreement," the Department intends to cooperate with its Canadian colleagues to address and resolve differences in the same spirit in which the Agreement was negotiated. As reflected in the Agreement itself, resolution of such differences is more appropriately addressed through operating procedures than through the promulgation of regulations.

*Defining "Land Border Port-of-Entry"*

Over half of the commenters suggested that this rule provide a definition of "land border port-of-entry," as that term is used in the Agreement. Prior regulatory attempts to define "port-of-entry" have done so in reference to geographical locations where federal officers have authority to perform their official functions. For example, in the customs regulations at 19 CFR 101.1, this term simply "refer[s] to any place designated by Executive Order of the President, by order of the Secretary of Treasury, or by Act of Congress, at which a Customs officer is authorized to * * * enforce the various provisions of the Customs and navigation laws." Pursuant to this approach of port-of-entry designation, these regulations enumerate specific ports-of-entry that have been designated as "Customs port of entry." 19 CFR 101.3(b)(1). Existing immigration regulations take a similar approach, defining "ports-of-entry" with an exhaustive list of locations, broken down into three "classes." 8 CFR 100.4(c)(2). These definitional approaches reveal the difficulty of providing one uniform definition of "port-of-entry." Indeed, beyond the fact of CBP officers' presence, "ports-of-entry" can vary in nearly every way imaginable. For instance, some ports-of-

entry may sit on federally owned property, while others may be located on private or municipally owned property. Similarly, some land ports-of-entry border waterways or bridges, while others are located on busy highways or railroad tracks, while still others are situated in remote, rural areas. Given the impracticability of a one-size-fits-all definitional approach to "land border ports-of-entry," the Department will rely on the current definitions of 8 CFR 100.4(c)(2) and 19 CFR 101.3(b)(1) in implementing the Agreement. Thus, where an alien arrives at a "port-of-entry," as designated in one of these regulatory provisions, which is located at the shared U.S.-Canada border, the alien will be subject to the Agreement. Aliens apprehended in the immediate vicinity of such ports-of-entry attempting to avoid inspection will, where reasonable, be regarded as having "arrive[d] at a land border port of entry" and, consequently, be subject to the Agreement. Finally, the Department intends to work closely with the Canadian government to provide operational guidance concerning the Agreement's applicability in marginal cases.

*Aliens "Directed Back" From Canada*

Two commenters raised the issue of aliens "directed back" by the Canadian government pending an interview by Canadian immigration officials. These commenters explained that, while Canadian authorities generally interview an alien who requests protection at the time he or she seeks to enter Canada from the United States, Canadian authorities have had occasion to direct such aliens back to the U.S. for future interview appointments in Canada during periods of increased attempted migration that outstrip Canadian processing resources. According to these commenters, such an increase is possible during the period immediately preceding Agreement implementation. The commenters have therefore requested that the Department work to accommodate such aliens' attempts to enter Canada for a consideration of their protection claims. The Department will not adopt this suggestion. As discussed in the Supplementary Information to the proposed rule and, again, earlier in the Supplementary Information to this final rule, aliens who unsuccessfully attempt to enter Canada do not alter their immigration status by the attempted entry. Thus, if an alien who is present in the U.S. without having been inspected and admitted (or paroled) by an immigration officer unsuccessfully attempts to enter Canada, then he or she

remains an unlawfully present alien subject to removal from the United States under sections 212(a)(6)(A)(i) and 240(a) of the Act (8 U.S.C. 1182(a)(6)(A)(i), 1229a(a)), just as if an immigration officer had apprehended the alien before he or she sought to enter Canada. An alien's appointment with Canadian immigration officials, while relevant to the Department's prosecutorial discretion concerning any decision to place the alien in removal proceedings, does not confer legal status upon an unlawfully present alien.

*Indirect Refoulment*

One commenter argued that returning aliens to Canada under the Agreement would constitute "indirect" refoulment, and would therefore violate U.S. obligations under the Refugee Convention and the Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T.S. 6223 ("Refugee Protocol"). The Department disagrees. Article 33 of the Refugee Convention obligates the U.S., through its accession to the Refugee Protocol, not to "expel or return ('refouler') a refugee in any manner whatsoever to the *frontiers of territories where his life or freedom would be threatened* on account of his race, religion, nationality, membership of a particular social group or political opinion." (emphasis supplied). Absent some claim that an alien's life or freedom would be threatened in Canada, which the commenter did not suggest, the return of the alien to Canada for a full and fair consideration of his or her protection claims is consistent with U.S. obligations.

**X. Conforming Amendment to 8 CFR Part 235**

In preparing this final rule, the Department determined that 8 CFR 235.3(b)(4) must also be amended to reflect the proposed rule's use of a threshold screening interview mechanism preceding the initiation of credible fear interviews for those aliens in expedited removal proceedings who are subject to the Safe Third Country Agreement. This existing regulatory provision explicitly makes reference to a CBP officer's referral of protection claims for a "credible fear" determination under 8 CFR 208.30. As aliens subject to expedited removal who are covered by the Agreement must first pass a threshold screening interview to determine whether their protection claims may be considered in the U.S., 8 CFR 235.3(b)(4) has been revised to refer more generally to 8 CFR 208.30 without reference to the credible fear process. This amendment ensures that the expedited removal regulations conform

to the threshold screening interview process explained in the proposed rule.

## Regulatory Flexibility Act

DHS has reviewed this rule in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)) and by approving it, DHS certifies that this rule will not have a significant economic impact on a substantial number of small entities. This rule, which relates to asylum claims, applies to individual aliens only. As such, a substantial number of small entities, as that term is defined in 5 U.S.C. 601(6), will not be affected by the rule.

## Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one-year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

## Small Business Regulatory Enforcement Fairness Act of 1996

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

## Executive Order 12866

The Department of Homeland Security has determined that this rule is a "significant regulatory action" under Executive Order 12866, section 3(f), Regulatory Planning and Review, and, accordingly, this rule has been submitted to the Office of Management and Budget for review. In particular, the Department has assessed both the costs and benefits of this rule as required by Executive Order 12866, section 1(b)(6) and has made a reasoned determination that the benefits of this rule justify its costs.

The rule implements a bilateral agreement that allocates responsibility between the United States and Canada for processing claims of certain asylum seekers by codifying the process by which individuals seeking entry into the United States, or being removed by Canada in transit through the United States, may be returned to Canada pursuant to the Agreement. The rule applies to individuals who are subject to expedited removal and, under existing regulations, would receive a credible fear interview by an asylum officer. This rule simply provides a preliminary screening by asylum officers to determine whether the alien is even eligible to seek protection in the United States, in which case the asylum officer will then proceed to make the credible fear determination under existing rules. Based on statistical evidence, it is anticipated that approximately 200 aliens may seek to enter the United States from Canada at a land border port-of-entry and be placed into expedited removal proceedings. A significant number of these aliens will be found exempt from the Agreement and eligible to seek protection in the United States after the threshold screening interview proposed in this rule. It is difficult to predict how many aliens will be returned to Canada under the Agreement, but the costs incurred in detaining and transporting them are not likely to be substantial. Therefore, the "tangible" costs of this rulemaking to the U.S. Government are minimal. Applicants who are found to be subject to the Agreement will be returned to Canada to seek protection, saving the U.S. Government the cost of adjudicating their asylum claims and, in some cases, the cost of detention throughout the asylum process.

The cost to asylum seekers who, under the rule, will be returned to Canada are the costs of pursuing an asylum claim in Canada, as opposed to the United States. There is no fee to apply for asylum in Canada and, under Canadian law, asylum seekers are provided social benefits that they are not eligible for in the United States, including access to medical coverage, adult public education, and public benefits. Therefore, the tangible costs of seeking asylum in Canada are no greater than they are in the United States. The "intangible" costs to asylum seekers who would be returned to Canada under the proposed rule are the costs of potential separation from support networks they may be seeking to join in the United States. However, the Agreement contains broad exceptions based on principles of family unity that would generally allow those with family connections in the United States to seek asylum in the United States under existing regulations governing the credible fear process.

The Executive Order 12866 cost analysis captures the costs which apply to those instances where an alien requests protection from the United States government under one of two scenarios: when arriving at a port-of-entry on the United States-Canada land border; or, when transiting through the United States as part of the Canadian government's effort to remove the alien to a third country. In either scenario, the rule provides asylum officers with authority to make basic, threshold screening determinations about how the Agreement applies to the alien. Although additional costs may be incurred as part of the Safe Third Country Agreement between the United States and Canada, the costs discussed in the Executive Order 12866 are limited to those costs arising under the two scenarios outlined in the rule and not the cost impact of the overall Agreement between the two countries.

The Agreement provides for a threshold determination to be made concerning which country will assume responsibility for processing claims of asylum seekers. This rule only clarifies the threshold screening determination for a United States asylum officer when determining whether an alien should be returned to Canada. It is unclear how many individuals will seek asylum in the United States from Canada. Similarly, the Agreement permits Canada to return to the United States certain asylum seekers attempting to enter Canada from the United States at a land border port-of-entry. The Department does not know how many asylum seekers Canada will return to the United States. As discussed in the proposed rule and above, individuals returned from Canada to the United States will be in the same position as they would be in had they not sought entry in Canada. This analysis is beyond the purview of the rule. However, the Department will continue to monitor the costs associated with handling asylum seekers at land border ports-of-entry.

The Department recognizes that there have been pre-existing periodic costs associated with the departure of aliens from the United States to Canada for purposes of seeking asylum, particularly during the period in which the National Security Entry-Exit Registration System (NSEERS) was operating. These costs arose when, during a period of increased attempted migration to Canada from the United States, the Government of Canada decided not to admit asylum seekers until they could be scheduled for interview appointments. The Department recognizes that many of these costs were directly borne by aliens, State and local agencies, and nonprofit organizations. While costs similar to those incurred in the past may be borne by aliens attempting to enter Canada before the

DOJIFR00106

Agreement becomes effective, they are not affected by the terms of this rule. However, the Department will continue to monitor the costs associated with handling asylum seekers at land border ports-of-entry.

The rule benefits the United States because it enhances the ability of the United States and Canada to manage, in an orderly fashion, asylum claims brought by persons crossing our common border. By implementing the Agreement, the rule furthers U.S. and Canadian goals, as outlined in the 30-Point Action Plan under the Smart Border Declaration signed by Secretary Ridge and former Canadian Deputy Foreign Minister John Manley, to ensure a secure flow of people between the two countries while preserving asylum seekers' access to a full and fair asylum process in a manner consistent with U.S. law and international obligations.

**Executive Order 13132**

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

**Executive Order 12988 Civil Justice Reform**

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

**Paperwork Reduction Act**

The regulations at 8 CFR 208.30 require that an asylum officer conduct a threshold screening interview to determine whether an alien is ineligible to apply for asylum pursuant to section 208(a)(2)(A) of the Act (8 U.S.C. 1158(a)(2)(A)). The threshold screening interview is considered an information collection under the Paperwork Reduction Act (PRA) of 1995. On March 8, 2004, the Department of Homeland Security, published a proposed rule in the **Federal Register** to provide USCIS asylum officers' with authority to make threshold determinations concerning applicability of the Agreement Between the Government of the United States of America and the Government of Canada regarding asylum claims made in transit and at land border ports-of-entry. In the Supplementary Information in the proposed rule under the heading "Paperwork Reduction Act" the USCIS

published a 60 day notice encouraging the public to submit comments specifically to the information collection requirements contained in 8 CFR 208.30. The USCIS did not receive any comments on the information collection requirements. Accordingly, the USCIS has submitted an information collection package to OMB in accordance with the PRA and OMB has approved this information collection.

**Family Assessment Statement**

The Department has reviewed this rule and determined that it may affect family well-being as that term is defined in section 654 of the Treasury General Appropriations Act, 1999, Public Law 105—277, Div. A. Accordingly, the Department has assessed this action in accordance with the criteria specified by section 654(c)(1). In this rule, an alien arriving at a land border port-of-entry with Canada may qualify for an exception to the Safe Third Country Agreement, which otherwise requires individuals to seek protection in the country of last presence (Canada), by establishing a relationship to a family member in the United States ("anchor relative") who has lawful status in the United States, other than a visitor, or is 18 years of age or older and has an asylum application pending. This rule incorporates the Agreement's definition of "family member," which may be a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew. The "family member" definition was intended to be broad in scope to promote family unity. This rule thereby strengthens the stability of the family by providing a mechanism to reunite separated family members in the United States.

In some cases, the rule will have a negative effect resulting in the separation of family members. The Agreement's exceptions, as expressed in the rule, require an anchor relative to have either lawful status in the United States, other than visitor, or else to be 18 years of age or older and have a pending asylum application. Family members who do not meet one of these conditions, therefore, would be separated under the rule. However, this rule's definition of "family member," which derives from the exceptions to the Agreement, is more generous than other family-based immigration laws, which require the anchor relative to have more permanent status in the United States (such as that of citizen, lawful permanent resident, asylee or refugee) and which have a more restricted list of the type of family relationships that can be used to

sponsor someone for immigration to the United States (although, unlike those laws, this Agreement provides only an opportunity to apply for protection and does not directly confer an affirmative immigration benefit). Under this rule, family members will be able to reunite even if the anchor relative's status is less than permanent in the United States. Further, on a case-by-case basis, the Agreement's "public interest" exception can be used to minimize this cost.

**List of Subjects**

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 212*

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

*8 CFR Part 235*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

**Amendments to the Regulations**

■ Accordingly, chapter I of title 8 of the Code of Federal Regulations is amended as follows:

**PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1158, 1226, 1252, 1282; 8 CFR part 2.

■ 2. Section 208.4 is amended by adding a new paragraph (a)(6) to read as follows:

**§ 208.4   Filing the application.**

\*       \*       \*       \*       \*

(a) \*   \*   \*

(6) *Safe Third Country Agreement.* Asylum officers have authority to apply section 208(a)(2)(A) of the Act, relating to the determination that the alien may be removed to a safe country pursuant to a bilateral or multilateral agreement, only as provided in 8 CFR 208.30(e). For provisions relating to the authority of immigration judges with respect to section 208(a)(2)(A), *see* 8 CFR 1240.11(g).

\*       \*       \*       \*       \*

■ 3. Section 208.30 is amended by:
    a. Redesignating paragraph (e)(4) as (e)(7);

DOJIFR00107

b. Redesignating paragraph (e)(2) as paragraph (e)(4), and by revising newly redesignated paragraph (e)(4);

c. Redesignating paragraph (e)(3) as parargaph(e)(5) and by revising newly redesignated paragraph (e)(5);

d. Adding new paragraphs (e)(2), (e)(3), and (e)(6);

e. Revising paragraph (g)(2)(i), and by f. Removing paragraphs (g)(2)(iii) and (g)(2)(iv).

The additions and revisions read as follows:

§ 208.30   Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.

*    *    *    *    *

(e) * * *

(2) An alien will be found to have a credible fear of persecution if there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, the alien can establish eligibility for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act.

(3) An alien will be found to have a credible fear of torture if the alien shows that there is a significant possibility that he or she is eligible for withholding of removal or deferral of removal under the Convention Against Torture, pursuant to 8 CFR 208.16 or 208.17.

(4) In determining whether the alien has a credible fear of persecution, as defined in section 235(b)(1)(B)(v) of the Act, or a credible fear of torture, the asylum officer shall consider whether the alien's case presents novel or unique issues that merit consideration in a full hearing before an immigration judge.

(5) Except as provided in paragraph (e)(6) of this section, if an alien is able to establish a credible fear of persecution or torture but appears to be subject to one or more of the mandatory bars to applying for, or being granted, asylum contained in section 208(a)(2) and 208(b)(2) of the Act, or to withholding of removal contained in section 241(b)(3)(B) of the Act, the Department of Homeland Security shall nonetheless place the alien in proceedings under section 240 of the Act for full consideration of the alien's claim, if the alien is not a stowaway. If the alien is a stowaway, the Department shall place the alien in proceedings for consideration of the alien's claim pursuant to 8 CFR 208.2(c)(3).

(6) Prior to any determination concerning whether an alien arriving in the United States at a U.S.-Canada land border port-of-entry or in transit through the U.S. during removal by Canada has a credible fear of persecution or torture, the asylum officer shall conduct a threshold screening interview to determine whether such an alien is ineligible to apply for asylum pursuant to section 208(a)(2)(A) of the Act and subject to removal to Canada by operation of the Agreement Between the Government of the United States and the Government of Canada For Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries (''Agreement''). In conducting this threshold screening interview, the asylum officer shall apply all relevant interview procedures outlined in paragraph (d) of this section, provided, however, that paragraph (d)(2) of this section shall not apply to aliens described in this paragraph. The asylum officer shall advise the alien of the Agreement's exceptions and question the alien as to applicability of any of these exceptions to the alien's case.

(i) If the asylum officer, with concurrence from a supervisory asylum officer, determines that an alien does not qualify for an exception under the Agreement during this threshold screening interview, the alien is ineligible to apply for asylum in the United States. After the asylum officer's documented finding is reviewed by a supervisory asylum officer, the alien shall be advised that he or she will be removed to Canada in order to pursue his or her claims relating to a fear of persecution or torture under Canadian law. Aliens found ineligible to apply for asylum under this paragraph shall be removed to Canada.

(ii) If the alien establishes by a preponderance of the evidence that he or she qualifies for an exception under the terms of the Agreement, the asylum officer shall make a written notation of the basis of the exception, and then proceed immediately to a determination concerning whether the alien has a credible fear of persecution or torture under paragraph (d) of this section.

(iii) An alien qualifies for an exception to the Agreement if the alien is not being removed from Canada in transit through the United States and

(A) Is a citizen of Canada or, not having a country of nationality, is a habitual resident of Canada;

(B) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who has been granted asylum, refugee, or other lawful status in the United States, provided, however, that this exception shall not apply to an alien whose relative maintains only nonimmigrant visitor status, as defined in section 101(a)(15)(B) of the Act, or whose relative maintains only visitor status based on admission to the United States pursuant to the Visa Waiver Program;

(C) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who is at least 18 years of age and has an asylum application pending before U.S. Citizenship and Immigration Services, the Executive Office for Immigration Review, or on appeal in federal court in the United States;

(D) Is unmarried, under 18 years of age, and does not have a parent or legal guardian in either Canada or the United States;

(E) Arrived in the United States with a validly issued visa or other valid admission document, other than for transit, issued by the United States to the alien, or, being required to hold a visa to enter Canada, was not required to obtain a visa to enter the United States; or

(F) The Director of USCIS, or the Director's designee, determines, in the exercise of unreviewable discretion, that it is in the public interest to allow the alien to pursue a claim for asylum, withholding of removal, or protection under the Convention Against Torture, in the United States.

(iv) As used in 8 CFR 208.30(e)(6)(iii)(B), (C) and (D) only, ''legal guardian'' means a person currently vested with legal custody of such an alien or vested with legal authority to act on the alien's behalf, provided that such an alien is both unmarried and less than 18 years of age, and provided further that any dispute with respect to whether an individual is a legal guardian will be resolved on the basis of U.S. law.

*    *    *    *    *

(g) * * *

(2) * * *

(i) Immigration judges will review negative credible fear findings as provided in 8 CFR 1208.30(g)(2).

*    *    *    *    *

PART 212—DOCUMENTARY REQUIREMENTS; NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

■ 4. The authority citation for part 212 continues to read as follows:

Authority: 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1187, 1223, 1225, 1226, 1227.

■ 5. Section 212.5 is amended by adding a new paragraph (e)(2)(iii) to read as follows:

**§ 212.5   Parole of aliens into the United States.**

\* \* \* \* \*

(e) \* \* \*

(2) \* \* \*

(iii) Any alien granted parole into the United States so that he or she may transit through the United States in the course of removal from Canada shall have his or her parole status terminated upon notice, as specified in 8 CFR 212.5(e)(2)(i), if he or she makes known to an immigration officer of the United States a fear of persecution or an intention to apply for asylum. Upon termination of parole, any such alien shall be regarded as an arriving alien, and processed accordingly by the Department of Homeland Security.

\* \* \* \* \*

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

■ 6. The authority citation for part 235 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, published January 2, 2004), 1201, 1224, 1225, 1226, 1228, 1365a note, 1379, 1731–32.7.

■ 7. Section 235.3 is amended by revising the first sentence of paragraph (b)(4) to read as follows:

**§ 235.3   Inadmissible aliens and expedited removal.**

\* \* \* \* \*

(b) \* \* \*

(4) \* \* \* If an alien subject to the expedited removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country, the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer in accordance with 8 CFR 208.30. \* \* \*

\* \* \* \* \*

Dated: November 19, 2004.

**Tom Ridge,**

*Secretary of Homeland Security.*

[FR Doc. 04–26239 Filed 11–26–04; 8:45 am]

**BILLING CODE 4410–10–P**

## DEPARTMENT OF JUSTICE

**8 CFR Parts 1003, 1208, 1212, 1235, and 1240**

[EOIR No. 142F; AG Order No. 2740–2004]

RIN 1125–AA46

## Asylum Claims Made by Aliens Arriving From Canada at Land Border Ports-of-Entry

**AGENCY:** Executive Office for Immigration Review, Justice.

**ACTION:** Final rule.

**SUMMARY:** This rule adopts without substantial change the proposed rule to implement the December 5, 2002, Agreement Between the Government of the United States and the Government of Canada For Cooperation in the Examination of Refugee Status Claims from Nationals of Third Counties ("bilateral agreement with Canada" or "Agreement"). The Agreement bars certain aliens who are arriving from Canada, or in transit during removal from Canada, from applying for asylum and related protections in the United States. In the context of expedited removal proceedings, the Department of Homeland Security ("DHS") will conduct a threshold screening interview to determine whether the Agreement applies to an alien. The DHS final rule is published elsewhere in this **Federal Register**. The role of the Executive Office of Immigration Review ("EOIR") is limited to an evaluation of how the Agreement applies to aliens whom DHS has chosen to place in removal proceedings.

**DATES:** This rule is effective December 29, 2004.

**FOR FURTHER INFORMATION CONTACT:** Mary Beth Keller, General Counsel, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2600, Falls Church, Virginia 22041, telephone (703) 305–0470.

**SUPPLEMENTARY INFORMATION:**

### Introduction

On March 8, 2004, the Department of Justice ("Department") and DHS promulgated proposed rules implementing the Agreement. *See* 69 FR 10627 (March 8, 2004). This final rule adopts the Department's proposed rule without significant change. The proposed rule described procedures implementing the Agreement in removal proceedings under section 240 of the Immigration and Nationality Act ("Act").

The Agreement covers certain aliens who are arriving at U.S.-Canada land border ports-of-entry or arriving in

transit through the U.S. during removal by the Canadian government and who express a fear of persecution or torture. Subject to several specific exceptions, the Agreement provides for the United States to return such arriving aliens to Canada, the country of last presence, to seek protection under Canadian law, rather than applying in the United States for the protective claims of asylum, withholding of removal, or protection under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("Convention Against Torture" or "CAT"). Therefore, aliens covered by the Agreement will be allowed to seek asylum and related protections in one country or the other, but not in both.

The Agreement specifically recognizes that Canada offers a generous system of refugee protection, and has a tradition of assisting refugees and displaced persons abroad. The Agreement also ensures that asylum seekers returned to Canada will have access to a full and fair procedure for determining their protection claims before they can be removed to a third country.

As implemented in the United States, the Agreement will operate as follows. First, a United States Citizenship and Immigration Services ("USCIS") asylum officer will conduct a threshold screening interview in the context of expedited removal proceedings. The DHS final rule, published elsewhere in this edition of the **Federal Register,** and the DHS proposed rule, published at 69 FR 10620 (March 8, 2004), address this process in more detail. To summarize, the asylum officer will conduct a threshold screening interview to determine whether an arriving alien who is subject to the Agreement meets any of its exceptions, or whether the alien should be returned to Canada for consideration of his or her protection claims in that country.

If the asylum officer determines that the alien qualifies for an exception to the Agreement, the asylum officer will then proceed immediately to a consideration of whether the alien has a credible fear of persecution or torture if returned to his or her country. The existing credible fear process of section 235(b) of the Act will apply to those aliens, including the potential for review by an immigration judge.

On the other hand, if the asylum officer determines that an arriving alien does not meet an exception to the Agreement and should be returned to Canada for consideration of his or her asylum or other protection claims under Canadian law, the asylum officer's

§ 212.5   Parole of aliens into the United States.

\* \* \* \* \*

(e) \* \* \*

(2) \* \* \*

(iii) Any alien granted parole into the United States so that he or she may transit through the United States in the course of removal from Canada shall have his or her parole status terminated upon notice, as specified in 8 CFR 212.5(e)(2)(i), if he or she makes known to an immigration officer of the United States a fear of persecution or an intention to apply for asylum. Upon termination of parole, any such alien shall be regarded as an arriving alien, and processed accordingly by the Department of Homeland Security.

\* \* \* \* \*

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

■ 6. The authority citation for part 235 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, published January 2, 2004), 1201, 1224, 1225, 1226, 1228, 1365a note, 1379, 1731–32.7.

■ 7. Section 235.3 is amended by revising the first sentence of paragraph (b)(4) to read as follows:

§ 235.3   Inadmissible aliens and expedited removal.

\* \* \* \* \*

(b) \* \* \*

(4) \* \* \* If an alien subject to the expedited removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country, the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer in accordance with 8 CFR 208.30. \* \* \*

\* \* \* \* \*

Dated: November 19, 2004.

**Tom Ridge,**

*Secretary of Homeland Security.*

[FR Doc. 04–26239 Filed 11–26–04; 8:45 am]

**BILLING CODE 4410–10–P**

## DEPARTMENT OF JUSTICE

**8 CFR Parts 1003, 1208, 1212, 1235, and 1240**

**[EOIR No. 142F; AG Order No. 2740–2004]**

**RIN 1125–AA46**

## Asylum Claims Made by Aliens Arriving From Canada at Land Border Ports-of-Entry

**AGENCY:** Executive Office for Immigration Review, Justice.

**ACTION:** Final rule.

**SUMMARY:** This rule adopts without substantial change the proposed rule to implement the December 5, 2002, Agreement Between the Government of the United States and the Government of Canada For Cooperation in the Examination of Refugee Status Claims from Nationals of Third Counties ("bilateral agreement with Canada" or "Agreement"). The Agreement bars certain aliens who are arriving from Canada, or in transit during removal from Canada, from applying for asylum and related protections in the United States. In the context of expedited removal proceedings, the Department of Homeland Security ("DHS") will conduct a threshold screening interview to determine whether the Agreement applies to an alien. The DHS final rule is published elsewhere in this **Federal Register**. The role of the Executive Office of Immigration Review ("EOIR") is limited to an evaluation of how the Agreement applies to aliens whom DHS has chosen to place in removal proceedings.

**DATES:** This rule is effective December 29, 2004.

**FOR FURTHER INFORMATION CONTACT:** Mary Beth Keller, General Counsel, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2600, Falls Church, Virginia 22041, telephone (703) 305–0470.

**SUPPLEMENTARY INFORMATION:**

### Introduction

On March 8, 2004, the Department of Justice ("Department") and DHS promulgated proposed rules implementing the Agreement. *See* 69 FR 10627 (March 8, 2004). This final rule adopts the Department's proposed rule without significant change. The proposed rule described procedures implementing the Agreement in removal proceedings under section 240 of the Immigration and Nationality Act ("Act").

The Agreement covers certain aliens who are arriving at U.S.-Canada land border ports-of-entry or arriving in transit through the U.S. during removal by the Canadian government and who express a fear of persecution or torture. Subject to several specific exceptions, the Agreement provides for the United States to return such arriving aliens to Canada, the country of last presence, to seek protection under Canadian law, rather than applying in the United States for the protective claims of asylum, withholding of removal, or protection under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("Convention Against Torture" or "CAT"). Therefore, aliens covered by the Agreement will be allowed to seek asylum and related protections in one country or the other, but not in both.

The Agreement specifically recognizes that Canada offers a generous system of refugee protection, and has a tradition of assisting refugees and displaced persons abroad. The Agreement also ensures that asylum seekers returned to Canada will have access to a full and fair procedure for determining their protection claims before they can be removed to a third country.

As implemented in the United States, the Agreement will operate as follows. First, a United States Citizenship and Immigration Services ("USCIS") asylum officer will conduct a threshold screening interview in the context of expedited removal proceedings. The DHS final rule, published elsewhere in this edition of the **Federal Register,** and the DHS proposed rule, published at 69 FR 10620 (March 8, 2004), address this process in more detail. To summarize, the asylum officer will conduct a threshold screening interview to determine whether an arriving alien who is subject to the Agreement meets any of its exceptions, or whether the alien should be returned to Canada for consideration of his or her protection claims in that country.

If the asylum officer determines that the alien qualifies for an exception to the Agreement, the asylum officer will then proceed immediately to a consideration of whether the alien has a credible fear of persecution or torture if returned to his or her country. The existing credible fear process of section 235(b) of the Act will apply to those aliens, including the potential for review by an immigration judge.

On the other hand, if the asylum officer determines that an arriving alien does not meet an exception to the Agreement and should be returned to Canada for consideration of his or her asylum or other protection claims under Canadian law, the asylum officer's

decision will not be reviewed by an immigration judge. These aliens are not eligible to apply for asylum via the credible fear process, by operation of the Agreement and section 208(a)(2)(A) of the Act.

Finally, this rule recognizes that DHS may choose, in certain cases, to place an arriving alien into removal proceedings under section 240 of the Act, rather than expedited removal under section 235 of the Act. The immigration judges will apply the terms of the Agreement with respect to the alien. In that case, if the immigration judge determines that the Agreement is applicable and orders the alien removed, the alien will be returned to Canada to seek protection under Canadian law. This rule also provides that aliens whom DHS places in removal proceedings and who are ineligible to apply for protection by operation of the Agreement may, nevertheless, apply for any other form of relief from removal for which they may be eligible. *See* 8 CFR 1240.11(g)(4).

**Public Comments**

The public was provided a 60-day comment period that ended on May 7, 2004. The Department received comments from the United Nations High Commissioner for Refugees, three non-governmental organizations, and an interested individual. The comments covered a broad range of issues, and included arguments for both expanding the rule, and for making it more restrictive. The comments also included some general opposition to the Agreement itself.[1] The DHS final rule published elsewhere in this edition of the **Federal Register** addresses public comments received in response to the DHS proposed rule.

Several commenters asserted that there should be a provision permitting independent review of an asylum officer's negative threshold determination, or that the evaluation should be conducted as part of the credible fear determination, which would include review by an immigration judge. In contrast, one commenter took the position that positive threshold determinations should be automatically reviewed by an immigration judge, but there should be no review of negative determinations. Other comments related to the procedures to be applied when the Agreement is applied in removal proceeding under section 240 of the Act.

Several commenters were concerned about precluding aliens covered by the Agreement from applying for withholding of removal and protection under the Convention Against Torture. The commenters also raised issues related to the administration of the Agreement's exceptions, procedures for asylum seekers returned to the United States under the Agreement, requests for reconsideration of decisions made by the Canadian government to return asylum seekers to the United States, the inadmissibility of aliens subsequent to removal to Canada, and the possibility of accepting motions to reopen or reconsider filed by asylum seekers after they are returned to Canada.

These and other comments about the proposed rule are summarized by subject matter and responded to below. After careful review and consideration of all comments, the Department will retain the structure of the proposed rule without modification except for a few minor technical changes and corrections.

*A. The Threshold Screening Interview*

As outlined in the DHS proposed rule and summarized above, the Agreement will be implemented by DHS in expedited removal proceedings by means of a ''threshold screening interview.'' During this interview, an asylum officer will question aliens who are subject to the Agreement to determine whether they meet one of the Agreement's exceptions. *See* 8 CFR 208.30(e)(6). Aliens in expedited removal proceedings who do not meet one of the exceptions will be returned to Canada without initiation of the credible fear process or involvement of the Department's immigration judges. Several commenters asserted that the asylum officer's decision in the threshold screening interview should be subject to independent review by an immigration judge. The Department declines to adopt this suggestion.

In the supplementary information to the Department's proposed rule, the Department explained that, compared to the myriad of issues that can arise in a credible fear interview, the matters in a threshold screening interview are narrow in scope. *See* 69 FR at 10630. The commenters contest this characterization, and assert that many complicated issues could arise. Specifically, the commenters gave examples of age determination of ''unaccompanied minors,'' and of whether an asylum seeker has a qualifying relative under the relevant Agreement exceptions.

The Department remains confident that asylum officers will be able to adequately address the issues that could arise during the threshold screening interview, and that further review by an immigration judge is unnecessary, regardless of whether the ultimate determination is positive or negative. Asylum officers are trained personnel who must regularly make factual and legal determinations. Additionally, the DHS final rule has been amended to require that a supervisory asylum officer must concur in any negative threshold determination by an asylum officer. These requirements ensure a comprehensive review at the screening level, and one which comports with due process.

Relatedly, several commenters asserted that any determination under the Agreement should be part of the credible fear interview process, and that the proposed screening process would controvert the existing statutory and regulatory scheme governing the credible fear process. The commenters argue that an assessment under the Agreement is really a question of eligibility for asylum and related relief, and, under current 8 CFR 208.30(e), once credible fear is established, any question of eligibility for relief must occur in removal proceedings.

The Department has concluded that the threshold screening interview is not inconsistent with the Immigration and Nationality Act. *See* 8 U.S.C. 1158(d)(5)(B). The threshold factual determinations under the Agreement— *e.g.*, whether the alien is under the age of 18 or has a qualifying relative in the United States—relate only to the applicability of the terms of the Agreement, which is expressly authorized by section 208(a)(2)(A) of the Act, not to a determination whether the alien has suffered past persecution or faces future persecution or torture if returned to his or her country. In short, the purpose of the determinations under the Agreement is not to evaluate the merits of the alien's claims for asylum or other protections, but instead relate to which forum will consider the merits of those claims. There is no requirement under the Agreement that an immigration judge review a decision that an alien is ineligible to apply for asylum in the United States. An asylum officer's determination that the alien should be returned to Canada under the Agreement means that the alien will then pursue his or her protection claims in Canada under Canadian law rather than in the United States, pursuant to section 208(a)(2)(A). Although the current version of the regulations referenced by commenters does not permit asylum officers to apply the asylum bars during the credible fear

---

[1] The Department notes that the public was provided an opportunity to express their views about the proposed Agreement during a meeting at the former Immigration and Naturalization Service. *See* 67 FR 46212 (July 12, 2002). The Agreement is now final.

**69492** **Federal Register**/Vol. 69, No. 228/Monday, November 29, 2004/Rules and Regulations

process, the threshold screening process created in the DHS rules is separate and distinct from the credible fear process. Further, with respect to this concern about the inconsistency between the "threshold screening interview" and existing regulatory provisions, the Department and DHS rules, after notice to the public and opportunity for comment, are amending these existing regulations under authorized rulemaking procedures.

The Department also notes that, under the DHS rule, once an alien satisfies any of the exceptions under the Agreement, an asylum officer will then make a credible fear determination relating to the alien's protection claims. *See* 8 CFR 208.30(e)(6) and 235.3(b)(4). As with any other credible fear determination, the alien will be able to seek a review of any adverse decision by an immigration judge.

The commenters also refer to section 235(b)(1)(A)(ii) of the Act, which states that immigration officers shall refer an arriving alien for a credible fear interview before an asylum officer if that alien indicates an intention to apply for asylum or expresses a fear of persecution. The Act generally requires that an arriving alien be given a credible fear interview if the alien expresses either an intention to apply for asylum under section 208 of the Act or a fear of persecution. In particular, section 208(a)(1) of the Act recognizes the right of an arriving alien to present a claim for asylum, specifically by means of the credible fear process under section 235(b) of the Act. However, section 208(a)(2)(A) of the Act provides that the right to apply for asylum as stated in section 208(a)(1) of the Act shall not apply in the case of an alien who can be removed to a safe third country pursuant to a bilateral or multilateral agreement. That is, aliens who can be removed to a safe third country under this process do not have a right to apply for asylum in the United States. Since, as noted in section 208(a)(1) of the Act, the credible fear process is the means by which arriving aliens present their claim for asylum, this necessarily means that aliens who can be removed to a safe third country do not have a statutory right to a credible fear review. Accordingly, an arriving alien who is subject to the bilateral Agreement with Canada, and does not qualify for an exception to that Agreement, would not have the right to present a claim for asylum through the credible fear process, including immigration judge review. Rather, in accord with the Act, the alien would be returned to Canada so that Canadian officials can consider

the merits of his or her protection claims under Canadian law.

Finally, as the Department discussed in the supplementary information to the proposed rule, permitting immigration judge review of an asylum officer's determination to return the alien to Canada under the Agreement would likely result in prolonging the detention of arriving aliens who otherwise could be returned promptly to Canada to pursue their asylum claims there. *See* 69 FR at 10630.

For the foregoing reasons, the Department believes that the threshold screening interview to determine if an arriving alien should be returned to Canada should remain separate from the credible fear process, which relates to the merits of an alien's claims of past or future persecution. The Department acknowledges the legal sufficiency of the threshold screening interview approach specified in the DHS rule and declines to adopt the commenters' suggested changes to this approach.

*B. Consideration of the Agreement in Removal Proceedings*

One commenter sought clarification as to whether certain provisions normally applicable in removal proceedings would apply to arriving aliens whom DHS has chosen to place in removal proceedings. The Department notes that individuals placed in removal proceedings pursuant to section 240 of the Act who are subject to the terms of the Agreement will be subject to the usual statutory and regulatory provisions applicable in removal proceedings before an immigration judge.

The commenter specifically requested the issuance of regulatory or field guidance for the immigration judges to make clear that a reasonable request for a continuance to obtain evidence for Agreement-related issues should be granted. The Department declines to take this action. The regulations governing removal proceedings provide that the immigration judge has the discretion to deny a request for a continuance, or to grant one when "good cause" is shown. *See* 8 CFR 1003.29. This rule would apply to any removal proceeding where the applicability of the Agreement is at issue. The parties therefore have an established procedure by which to make a request for a continuance, and the immigration judge will adjudicate such requests on a case-by-case basis.

One commenter questioned whether individuals placed in removal proceedings will be permitted to appeal the findings of an immigration judge under the Agreement to the Board of

Immigration Appeals ("Board"). The Board has jurisdiction to review appeals from all decisions of immigration judges in removal proceedings. *See* 8 CFR 1003.1(b)(3) and 1240.15. This would include a decision of an immigration judge concerning the applicability of the Agreement.

*C. Withholding of Removal and Convention Against Torture Claims*

Several commenters challenged the provision of the proposed rule that states that aliens who are ineligible to apply for asylum in the United States under the Agreement are also precluded from applying for withholding of removal or protection under the Convention Against Torture. The commenters assert that section 208(a)(2)(A) of the Act only provides for safe third country agreements as a bar to asylum, and does not extend to withholding of removal or protection under CAT.

As the Department pointed out in the supplementary information to the proposed rule, there is nothing in section 241(b)(3)(A) of the Act, or in Article 3 of CAT, and their respective implementing regulations, which prevents the United States from removing an alien to a safe third country so that the alien can pursue his or her protection claims in that country. *See* 69 FR at 10631. In this discussion, we explained that the specific terms of the Agreement are consistent with the United States' obligation not to return an individual to a country where the person would face persecution or torture. *See id.*

The Department agrees that withholding of removal under section 241(b)(3)(A) of the Act, and withholding or deferral of removal under CAT, are mandatory forms of relief for aliens who establish that they are entitled to such relief. However, it is essential to keep in mind that, in order to be entitled to such relief, an alien must demonstrate that it is more likely than not that he or she would be persecuted, or tortured, in the particular removal country. That is, withholding or deferral of removal relates only to the country as to which the alien has established a likelihood of persecution or torture—the alien may nonetheless be returned, consistent with CAT and section 241(b)(1) and (b)(2) of the Act, to other countries where he or she would not face a likelihood of persecution or torture.

In the context of aliens covered by the Agreement, the United States and Canada have acknowledged that Canada is a safe third country where aliens will have resort to its asylum system, and where they will have access to a full and

fair procedure for determining their claims for protection against persecution or torture if returned to any country in which they fear such harm. Canada is a safe third country, and, in the absence of a showing that an alien would face the likelihood of persecution or torture in Canada, the United States clearly would not be in violation of its international obligations (as those obligations are codified in the Act and its implementing regulations) by returning such an alien to Canada.[2] Thus this rule is fully consistent with the legal requirements under section 241(b)(3) of the Act and CAT.

The commenters also assert that Canada's mere accession to CAT is an insufficient basis to exclude aliens from seeking CAT relief, arguing that the Department and DHS rules somehow set a precedent for a "safe country of origin" list that is a step beyond the safe third country concept. They argue that adjudication of refugee claims should not be precluded based upon a blanket determination that a country is "safe." In support of their argument, the commenters state that aliens presently seek CAT protection from countries that are signatories to CAT, mentioning those countries by name.

The Department is not persuaded by this line of argument, because the provisions of this rule only apply with respect to a safe third country agreement that satisfies all of the requirements of section 208(a)(2)(A) of the Act. At present the only such Agreement is between the United States and Canada. The Agreement was created in recognition of that country's relationship with the United States, and other specific factors. These include Canada's generous refugee system, tradition of assisting refugees and displaced persons, and agreement to provide each refugee status claimant access to a full and fair refugee status determination procedure as a means to guarantee the protections of the 1951 Convention Relating to the Status of Refugees, the 1967 Protocol Relating to the Status of Refugees, and the Convention Against Torture.

Additionally, one commenter argued that returning an alien to Canada under the Agreement would constitute

"indirect" refoulement in violation the United States' international obligation to protect refugees. The commenter argues that returning the asylum seeker to Canada may indirectly constitute refoulement if Canadian authorities subsequently send the alien back to the place of feared persecution. This rule, however, only deals with returning an individual to Canada pursuant to the terms of the Agreement, where the alien will have a full opportunity to pursue their claims for protection. As previously stated, returning an alien to a safe third country is fully consistent with the United States' obligations not to return an individual to a country where the person would face persecution or torture.

*D. Exceptions to the Agreement*

One commenter expressed several specific concerns about the exceptions provided for by the Agreement, and these suggestions will be addressed in turn. The Department initially points out that the exceptions to the Agreement are found in the DHS final rule at 8 CFR 208.30(e)(6)(iii), and are incorporated by reference into this final rule at 8 CFR 1240.11(g)(3). The DHS rule provides a detailed discussion of the exceptions.

1. Family Unity Provisions

The commenter recommended that under the family unity provisions, the term "spouse" should be interpreted to include a common-law spouse. DHS has not expanded the definition of spouse; similarly, the Department will not undertake this action. The Department does point out that the Act and case law have addressed the definition of "spouse" under the immigration law. *See, e.g.*, section 101(a)(35) of the Act; *Matter of H-,* 9 I&N Dec. 640 (BIA 1962) (recognizing the general rule that the validity of a marriage is determined by the law of the place where it is contracted or celebrated). The parties are free to present any proper arguments regarding the interpretation of the term "spouse" before the immigration judge in the course of removal proceedings.

The commenter also recommended that "de facto" relatives be considered eligible "anchor" relatives if the individual serves or has served as the alien's primary source of emotional or material support, regardless of their relationship to the alien. As explained in the supplementary information to the DHS final rule, the definition of "family member" was the subject of much negotiation in the context of the Agreement, and DHS has declined to further expand the definition in its final rule. The Department accordingly declines to make this change.

On the other hand, one commenter stated that the family unity exceptions in the Agreement are too broad, and that they should include a provision requiring family members to assume full financial responsibility for any alien falling under an exception. The commenter also expressed other objections to the exceptions, arguing for example that minors should not be treated any differently than adults. The Department declines to narrow or limit any exceptions to the Agreement, just as the Department has declined to expand upon them.

2. Valid Visa Exception

One commenter expressed concern about the exception for asylum seekers who arrive in the United States pursuant to a validly issued United States visa or other valid admission document. The commenter effectively noted that DHS may consider such documents, even if genuine, to support a charge of fraud in violation of section 212(a)(6)(C) of the Act if they were procured by applicants whose true intentions were to enter the United States to apply for asylum. The commenter sought clarification as to whether such United States visas would be considered "validly issued" under the exception to the Agreement. The DHS has not amended its rule in this area; however, the supplementary information to the DHS final rule states that for the limited purposes of applying the exception to the Agreement, USCIS will issue and apply operational guidance interpreting the term "validly issued" without regard to the asylum seeker's subjective intent. If an alien is placed into removal proceedings under section 240 of the Act, the parties may raise any issues concerning the interpretation of this exception before the immigration judge in the course of removal proceedings. The Department notes that the factual basis for a possible finding of inadmissibility under section 212(a)(6)(C) of the Act will be scrutinized, because such a finding may permanently bar an alien from admission. *See Matter of Y-G-,* 20 I&N Dec. 794 (BIA 1994).

3. Public Interest Exception

One commenter raised several issues concerning the application of the public interest exception for aliens in removal proceedings. For example, the commenter recommended that minors who have a parent or legal guardian in the United States and do not meet any of the specific exceptions to the Agreement should be considered under the public interest exception. The DHS rule provides that an asylum officer may

---

[2] The commenters do not appear to be challenging the designation of Canada as a safe third country. We note that Article 2 of the Agreement provides that the Agreement does not apply to refugee claimants who are citizens of Canada or the United States or to aliens who, not having a country of nationality, are habitual residents of Canada or the United States. If an alien has any additional arguments about why return to Canada is not appropriate under the Agreement, they could be raised with DHS in the context of the public interest exception.

decide in the public interest to allow an alien covered by the Agreement to pursue a claim for asylum or other protection even though the alien does not meet a specific exception to the Agreement. If the alien is in removal proceedings, DHS may file a written notice of its decision before the immigration judge. *See* 8 CFR 240.11(g)(3). The Attorney General has decided that the decision to invoke this authority will be left solely within the discretion of DHS and will not be within the discretion of the immigration judges to review or adjudicate in the first instance. The Department therefore declines to expand or amend the public interest definition as has been suggested by the commenter. We note that the supplementary information to the DHS rule concluded that the public interest exception is best administered through operational guidance and on a case-by-case basis. In addition, DHS has stated in the preamble to its rule that it will be sensitive to the unique issues facing minors and will proceed carefully in those cases.

The commenter also recommended that the proposed rule establish a procedure between the Department and DHS to ensure that DHS fully considers the application of the public interest exception in those cases being adjudicated before an immigration judge. The Department declines to accept the commenter's recommendation. This rule provides that an immigration judge may consider asylum issues regarding an alien who otherwise would be barred by the Agreement if DHS notifies the immigration judge that it has invoked the public interest exception. If an issue arises in removal proceedings related to the public interest exception, and it is within the jurisdiction of the immigration judge to address, the parties may raise the matter during the proceedings under the existing rules.

*E. Procedures for Asylum Seekers Returned to the United States*

One commenter sought an explanation as to how asylum seekers returned to the United States from Canada under the Agreement will be received and processed. The commenter understood that these returnees, without lawful status in the United States, will be processed as if apprehended in the interior of the United States and thus will be placed in removal proceedings, rather than being treated as arriving aliens subject to expedited removal.

The manner in which asylum seekers returned to the United States from Canada under the Agreement will be received and processed is within the province of DHS. *See, e.g., Matter of Bahta,* 22 I&N Dec. 1381, 1391 (BIA 2000) (addressing the former Immigration and Naturalization Service's fundamental authority to exercise procedural discretion on whether to commence removal proceedings). The supplementary information to the DHS final rule provides a discussion of how these asylum seekers will be received and processed.

The commenter recommended that, if DHS decides to detain an asylum seeker returned under the Agreement, immigration judges should either order the release of the individual or set a low bond if the person does not pose a danger to the community and his or her identity has been established.

The Department declines to adopt special rules in this situation. In general, an alien whom DHS has chosen to place in removal proceedings before an immigration judge will be subject to the established procedures governing custody and bond determinations. *See* 8 CFR 236.1, 1003.19, and 1236.1(d). Those procedures do not apply, however, with respect to arriving aliens whom DHS has placed in expedited removal under section 235 of the Act. *See also* 8 CFR 235.3(c) (arriving aliens remain subject to detention as arriving aliens even if they are placed into removal proceedings under section 240 of the Act, but may be paroled by DHS). An arriving alien's custody status is not subject to review by an immigration judge. *See* 8 CFR 1003.19(h)(2)(i)(B); *Matter of Oseiwusu,* 22 I&N Dec. 19 (BIA 1998).

The commenter further expressed concern about a possible surge of asylum seekers to the United States-Canadian ports-of-entry before the implementation of the Agreement, which would result in the Canadian authorities being overwhelmed with requests and having to "direct back" aliens to the United States with re-scheduled Canadian interviews. This has reportedly happened in the past, and one consequence was that asylum seekers were detained in the United States and unable to return to Canada for their interviews. The commenter recommended that, with respect to asylum seekers placed in removal proceedings "as a result of a Canadian direct-back, and absent any serious security concerns," immigration judges either release these individuals on their own recognizance or set a low bond so that they can return to Canada to attend their scheduled hearings. The commenter also recommended that the removal proceedings of such individuals be administratively closed

while they pursue their refugee claims in Canada.

The Department declines to accept the commenter's recommendations. Because the Agreement does not contemplate that special consideration be given to such aliens, DHS will in the first instance decide how to deal with these individuals in the exercise of its enforcement discretion. If the aliens are placed into removal proceedings before an immigration judge, they will have recourse to existing procedures, including procedures for custody and bond redeterminations, and requests for administrative closure. For a more complete discussion of how these aliens may be processed should this situation arise, *see* the **SUPPLEMENTARY INFORMATION** section in the DHS final rule published elsewhere in this **Federal Register**.

*F. Reconsideration by Canada for Asylum Seekers Returned to the United States*

One commenter has encouraged Canada to establish a mechanism to reconsider cases, based on new evidence or changed circumstances, after a person has been returned to the United States under the Agreement. The commenter seeks an explanation as to how the Department would assist Canadian authorities if such a reconsideration was sought. The commenter specifically recommends that, in the event Canadian authorities seek the alien's presence at the United States-Canadian border to reconsider a claim, the immigration judge should order the release or appropriately lower the bond of that alien, and administratively close the alien's case if he or she is admitted into Canada to pursue a refugee claim.

The Agreement does not address the issue of reconsideration of claims after they are adjudicated by either country. The Department will not speculate about what future developments in this area might occur. If Canadian officials do seek to reconsider the case of an alien who is in removal proceedings, the initial determination on how to respond would be made by DHS, not by the immigration judge. The parties to the proceedings may present their positions concerning the alien's detention in the course of any custody review properly before the immigration judge. Further, any request for administrative closure of a removal proceeding should be addressed on a case-by-case basis. *See generally Matter of Gutierrez,* 21 I&N Dec. 479, 480 (BIA 1996) (administrative closure is used to temporarily remove a case from the docket, and is not permitted if opposed by either party).

The Department therefore declines to accept the commenter's recommendation.

## G. Inadmissibility of Aliens Removed to Canada Under the Agreement

One commenter recommended that an alien who is returned to Canada under the Agreement should not subsequently be found inadmissible to the United States under section 212(a)(9)(A)(i) of the Act (providing that any alien who has been ordered removed under section 235(b)(1) of the Act, or at the end of removal proceedings under section 240 of the Act initiated upon the alien's arrival, is inadmissible for 5 years after the date of such removal).

The Department notes that the applicability of the Agreement does not change the fact that an alien has been ordered removed in the context of expedited removal proceedings or removal proceedings under section 240 of the Act. The Department finds no reason why section 212(a)(9)(A) of the Act, or any related provisions concerning aliens removed from the United States, would not apply in the case of an alien subject to the Agreement who is subject to expedited removal or is ordered removed to Canada by an immigration judge. As for other arriving aliens who have been ordered removed, the alien may seek DHS' consent to reapply for admission, pursuant to section 212(a)(9)(A)(iii) of the Act.

## H. Requests for Reconsideration for Asylum Seekers Returned to Canada

One commenter recommended that the immigration judge and the Board permit requests by the individual asylum seeker, or the Canadian government, to reconsider a decision that an alien did not qualify for an exception to the Agreement, even after an alien has been removed to Canada.

The Department declines to accept the commenter's recommendation. The rules governing motions for reopening and reconsideration do not provide authority for third parties, such as the Canadian government, to file motions in proceedings before the immigration judge or the Board. *See* 8 CFR 1003.2(a) and 1003.23(b). In addition, the regulations provide that a motion to reopen or reconsider shall not be made by or on behalf of a person who is the subject of removal, deportation, or exclusion proceedings subsequent to his or her departure from the United States. *See* 8 CFR 1003.2(d) and 1003.23(b). The Department declines to make any amendments to these existing regulations.

The commenter requested that, at a minimum, individuals returned to Canada be permitted to resubmit asylum claims at the border, assuming they are not detained. With respect to an alien who already has been returned to Canada under the Agreement in order to seek protection under Canadian law, allowing such an alien to return once again to the United States and resubmit his or her asylum claims after being denied relief in Canada would undermine a general premise of the Agreement, which is that a covered alien is able to seek protection in one country or the other, but not both. If such an alien later returns to a U.S.-Canada land border port-of-entry seeking protection, he or she would remain subject to the Agreement and be removed to Canada again unless he or she was able to establish an exception to the Agreement.

## I. Miscellaneous Issues

The Department also received several miscellaneous comments from one commenter who asserted that the United States has too many illegal immigrants (which drives up various costs), that battered women should stay in their own countries and work to change laws there, and that this rule is a "major rule" that will costs taxpayers millions of dollars.

In response, it is the Department's long-standing position that America is a welcoming country to persons who come here lawfully—whether they come here as immigrants or non-immigrants (including as refugees from human rights abuses)—and that lawful immigration benefits this country. However, the Department and other agencies of the United States government vigorously enforce American immigration laws against illegal immigration. The Department disagrees that this rule is a "major rule" under the Small Business Regulatory Enforcement Fairness Act or that it is "economically significant" within the meaning of Executive Order 12866. This rule simply implements a statutorily-authorized agreement between the United States and Canada that allocates responsibility between the United States and Canada for processing claims of certain asylum seekers.

Finally, the Department has added one minor conforming amendment at 8 CFR 1235.3(b)(4) to accommodate DHS' use of the threshold screening process in applying the Agreement. For more details concerning the DHS amendment to 8 CFR 235.3(b)(4), see the DHS final rule also appearing in this **Federal Register**. This rule makes a conforming amendment to 8 CFR 1235.3(b)(4) to

cross-reference the provisions of the DHS rule rather than restating them. The Department is also correcting a typographical error to the part heading of 8 CFR 1235.

## Regulatory Flexibility Act

The Attorney General, in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)), has reviewed this regulation and, by approving it, certifies that this rule will not have a significant economic impact on a substantial number of small entities. This rule affects individual aliens, as it relates to claims of asylum. It does not affect small entities, as that term is defined in 5 U.S.C. 601(6).

## Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

## Small Business Regulatory Enforcement Fairness Act of 1996

This rule is not a major rule as defined by section 251 of the Small Business Regulatory Enforcement Act of 1996 (5 U.S.C. 804). This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

## Executive Order 12866

The Attorney General has determined that this rule is a "significant regulatory action" under Executive Order 12866, section 3(f), Regulatory Planning and Review, and, accordingly, this rule has been submitted to the Office of Management and Budget for review. In particular, the Department has assessed both the costs and benefits of this rule as required by Executive Order 12866, section 1(b)(6), and has made a reasoned determination that the benefits of this regulation justify its costs.

The rule would implement a bilateral Agreement that allocates responsibility between the United States and Canada for processing claims of certain asylum-seekers, enhancing the two nations' ability to manage, in an orderly fashion,

asylum claims brought by persons crossing our common border. The rule applies to certain individuals in removal proceedings who apply for asylum. This rule simply adds another factor for immigration judges to consider in removal proceedings. Therefore, the "tangible" costs of this rulemaking to the U.S. Government are minimal. Applicants who are found to be subject to the bilateral Agreement with Canada will be returned to Canada to seek asylum, saving the U.S. Government the cost of adjudicating their asylum claims.

The cost to asylum-seekers who, under the rule, will be returned to Canada are the costs of pursuing an asylum claim in Canada, as opposed to the United States. There is no fee to apply for asylum in Canada and, under Canadian law, asylum-seekers are provided social benefits for which they are not eligible in the United States. Therefore, the tangible costs of seeking asylum in Canada are no greater than they are in the United States. The "intangible" costs to asylum-seekers who would be returned to Canada under the rule are the costs of potential separation from support networks they may be seeking to join in the United States. However, the Agreement contains broad exceptions based on principles of family unity that would allow many of those with family connections in the United States to seek asylum in the United States under existing regulations.

**Executive Order 13132**

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

**Executive Order 12988 Civil Justice Reform**

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

**Paperwork Reduction Act**

The provisions of the Paperwork Reduction Act of 1995, Public Law 104–13, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320, do not apply to this final rule because there are no new or revised recordkeeping or reporting requirements.

**Family Assessment Statement**

The Attorney General has reviewed this regulation and assessed this action in accordance with the criteria specified by section 654(c)(1) of the Treasury General Appropriations Act, 1999, Public Law 105–277, Div. A. The Attorney General has determined that it will not affect family well-being as that term is defined in section 654.

The separate final rule published by the Department of Homeland Security explains that an alien arriving at U.S.-Canada land border port-of-entry may qualify for an exception to the bilateral Agreement with Canada, which otherwise requires individuals to seek protection in the country of last presence (Canada), by establishing a relationship to a family member in the United States who has lawful status in the United States, other than a visitor, or is 18 years of age or older and has an asylum application pending. The DHS proposed rule addresses issues relating to family well-being in connection with that rule.

This rule provides that the immigration judges will apply the definition of "family member" used in the Agreement and DHS rule, in those cases where DHS has chosen to place an alien who is subject to the Agreement into removal proceedings under section 240 of the Act. However, that is expected to occur only very rarely. In any other case, where DHS does not choose to place an arriving alien into removal proceedings under section 240 of the Act, this rule has no effect on family well-being, because the immigration judges will not be involved. DHS determinations made under the Agreement will not be reviewed by the Department of Justice.

**List of Subjects**

*8 CFR Part 1003*

Administrative practice and procedure, Aliens, Immigration, Legal Services, Organization and function (Government agencies).

*8 CFR Part 1208*

Administrative practice and procedure, Aliens, Immigration, and Reporting and recordkeeping requirements.

*8 CFR Part 1212*

Administrative practice and procedure, Aliens, Immigration, Passports and visas, and Reporting and recordkeeping requirements.

*8 CFR Part 1235*

Administrative practice and procedure, Aliens, Immigration, and Reporting and recordkeeping requirements.

*8 CFR Part 1240*

Administrative practice and procedure and Aliens.

■ Accordingly, chapter V of title 8 of the Code of Federal Regulations is amended as follows:

**PART 1003—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**

■ 1. The authority citation for part 1003 continues to read as follows:

**Authority:** 5 U.S.C. 301; 8 U.S.C. 1101 note, 1103, 1252 note, 1252b, 1324b, 1362; 28 U.S.C. 509, 510, 1746; sec. 2, Reorg. Plan No. 2 of 1950, 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub. L. 105–100, 111 Stat. 2196–200; sections 1506 and 1510 of Pub. L. 106–386; 114 Stat. 1527–29, 1531–32; section 1505 of Pub. L. 106–554, 114 Stat. 2763A–326 to –328.

■ 2. Section 1003.42 is amended by adding new paragraph (h) to read as follows:

**§ 1003.42   Review of credible fear determinations.**

\*       \*       \*       \*       \*

(h) *Safe third country agreement.* (1) *Arriving alien.* An immigration judge has no jurisdiction to review a determination by an asylum officer that an arriving alien is not eligible to apply for asylum pursuant to a bilateral or multilateral agreement (the Agreement) under section 208(a)(2)(A) of the Act and should be returned to a safe third country to pursue his or her claims for asylum or other protection under the laws of that country. See 8 CFR 208.30(e)(6). However, in any case where an asylum officer has found that an arriving alien qualifies for an exception to the Agreement, an immigration judge does have jurisdiction to review a negative credible fear finding made thereafter by the asylum officer as provided in this section.

(2) *Aliens in transit.* An immigration judge has no jurisdiction to review any determination by DHS that an alien being removed from Canada in transit through the United States should be returned to Canada to pursue asylum claims under Canadian law, under the terms of a safe third country agreement with Canada.

\*       \*       \*       \*       \*

*Federal Register* / Vol. 69, No. 228 / Monday, November 29, 2004 / Rules and Regulations   **69497**

## PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 3. The authority citation for part 1208 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1158, 1226, 1252, 1282.

■ 4. Section 1208.4 is amended by adding new paragraph (a)(6) to read as follows:

### § 1208.4   Filing the application.

\* \* \* \* \*

(a) \* \* \*

(6) *Safe third country agreement.* Immigration judges have authority to consider issues under section 208(a)(2)(A) of the Act, relating to the determination of whether an alien is ineligible to apply for asylum and should be removed to a safe third country pursuant to a bilateral or multilateral agreement, only with respect to aliens whom DHS has chosen to place in removal proceedings under section 240 of the Act, as provided in 8 CFR 1240.11(g). For DHS regulations relating to determinations by asylum officers on this subject, see 8 CFR 208.30(e)(6).

\* \* \* \* \*

■ 5. Section 1208.30 is amended by:

■ a. Revising paragraphs (a) and (e); and by

■ b. Removing and reserving paragraphs (c), (d), (f), and (g)(1).

The revisions read as follows:

### § 1208.30   Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.

(a) *Jurisdiction.* The provisions of this subpart apply to aliens subject to sections 235(a)(2) and 235(b)(1) of the Act. Pursuant to section 235(b)(1)(B), asylum officers have exclusive jurisdiction to make credible fear determinations, and the immigration judges have exclusive jurisdiction to review such determinations.

\* \* \* \* \*

(e) *Determination.* For the standards and procedures for asylum officers in conducting credible fear interviews and in making positive and negative credible fear determinations, see 8 CFR 208.30. The immigration judges will review such determinations as provided in paragraph (g)(2) of this section and 8 CFR 1003.42.

\* \* \* \* \*

## PART 1212—DOCUMENTARY REQUIREMENTS; NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

■ 6. The authority citation for part 1212 is revised to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103.

■ 7. Section 1212.5 is revised to read as follows:

### § 1212.5   Parole of aliens into the United States.

Procedures and standards for the granting of parole by the Department of Homeland Security can be found at 8 CFR 212.5.

## PART 1235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

■ 8. The authority citation for part 1235 is revised to read as follows:

**Authority:** 8 U.S.C. 1101 and note; 1103; 1183; 1201; 1224; 1225; 1226; 1228.

■ 9. The heading for part 1235 is revised to read as above.

■ 10. Section 1235.3 is amended by revising paragraph (b)(4) introductory text and paragraph (b)(4)(i) to read as follows:

### § 1235.3   Inadmissible aliens and expedited removal.

\* \* \* \* \*

(4) *Claim of asylum or fear of persecution or torture.* (i) The DHS regulations at 8 CFR 235.3(b)(4) provide for referring an alien to an asylum officer if the alien indicates an intention to apply for asylum or expresses a fear of persecution or torture or a fear of return to his or her country.

\* \* \* \* \*

## PART 1240—PROCEEDINGS TO DETERMINE REMOVABILITY OF ALIENS IN THE UNITED STATES

■ 11. The authority citation for part 1240 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1182, 1186a, 1224, 1225, 1226, 1227, 1251, 1252 note, 1252a, 1252b, 1362; secs. 202 and 203, Pub. L. 105–100, 111 Stat. 2160, 2193; sec. 902, Pub. L. 105–277, 112 Stat. 2681; sec. 1101, Pub. L. 107–269, 116 Stat. 2135.

■ 12. Section 1240.11 is amended by adding a new paragraph (g), to read as follows:

### § 1240.11   Ancillary matters, applications.

\* \* \* \* \*

(g) *Safe third country agreement.* (1) The immigration judge has authority to apply section 208(a)(2)(A) of the Act, relating to a determination that an alien may be removed to a safe third country pursuant to a bilateral or multilateral agreement (Agreement), in the case of an alien who is subject to the terms of the Agreement and is placed in proceedings pursuant to section 240 of the Act. In an appropriate case, the immigration judge shall determine whether under the Agreement the alien should be returned to the safe third country, or whether the alien should be permitted to pursue asylum or other protection claims in the United States.

(2) An alien described in paragraph (g)(1) of this section is ineligible to apply for asylum, pursuant to section 208(a)(2)(A) of the Act, unless the immigration judge determines, by preponderance of the evidence, that:

(i) The Agreement does not apply to the alien or does not preclude the alien from applying for asylum in the United States; or

(ii) The alien qualifies for an exception to the Agreement as set forth in paragraph (g)(3) of this section.

(3) The immigration judge shall apply the applicable regulations in deciding whether the alien qualifies for any exception under the Agreement that would permit the United States to exercise authority over the alien's asylum claim. The exceptions under the Agreement are codified at 8 CFR 208.30(e)(6)(iii). The immigration judge shall not review, consider, or decide any issues pertaining to any discretionary determination on whether the alien should be permitted to pursue an asylum claim in the United States notwithstanding the general terms of the Agreement, as such discretionary public interest determinations are reserved to DHS. However, an alien in removal proceedings who is otherwise ineligible to apply for asylum under the Agreement may apply for asylum if DHS files a written notice in the proceedings before the immigration judge that it has decided in the public interest to allow the alien to pursue claims for asylum or withholding of removal in the United States.

(4) An alien who is found to be ineligible to apply for asylum under section 208(a)(2)(A) of the Act is ineligible to apply for withholding of removal pursuant to section 241(b)(3) of the Act and the Convention against Torture. However, the alien may apply for any other relief from removal for which the alien may be eligible. If an alien who is subject to section 208(a)(2)(A) of the Act is ordered removed, the alien shall be ordered removed to the safe third country in which the alien will be able to pursue his or her claims for asylum or

protection against persecution or torture under the laws of that country.

Dated: November 22, 2004.

**John Ashcroft,**

*Attorney General.*

[FR Doc. 04–26238 Filed 11–26–04; 8:45 am]

**BILLING CODE 4410–30–P**

DOJIFR00118

10620

# Proposed Rules

Federal Register

Vol. 69, No. 45

Monday, March 8, 2004

This section of the FEDERAL REGISTER contains notices to the public of the proposed issuance of rules and regulations. The purpose of these notices is to give interested persons an opportunity to participate in the rule making prior to the adoption of the final rules.

## DEPARTMENT OF HOMELAND SECURITY

### 8 CFR Parts 208 and 212

[CIS No. 2255–03]

RIN 1615–AA91

### Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry

**AGENCY:** Department of Homeland Security.

**ACTION:** Proposed rule.

**SUMMARY:** On March 1, 2003, the Immigration and Naturalization Service transferred from the Department of Justice to the Department of Homeland Security (DHS), pursuant to the Homeland Security Act of 2002 (Public Law 107–296). The responsibility for administering the asylum program was transferred to U.S. Citizenship and Immigration Services ("USCIS") within DHS. The terms of a recently signed agreement between the United States and Canada bar certain categories of aliens arriving from Canada at land border ports-of-entry and in transit from Canada from applying for protection in the United States. This proposed rule would establish USCIS asylum officers' authority to make threshold determinations concerning applicability of the Agreement in the expedited removal context.

**DATES:** Written comments must be submitted on or before May 7, 2004.

**ADDRESSES:** Please submit written comments to the Director, Regulations and Forms Services Division, Department of Homeland Security, 425 I Street, NW, Room 4034, Washington, DC 20536. To ensure proper handling please reference CIS No. 2255–03 on your correspondence. You may also submit comments electronically to USCIS at *rfs.regs@dhs.gov.* When submitting comments electronically, you must include CIS No. 2255–03 in

the subject box. Comments are available for public inspection at the above address by calling (202) 514–3048 to arrange for an appointment.

**FOR FURTHER INFORMATION CONTACT:** Joanna Ruppel, Deputy Director, Asylum Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Ave., NW., Third Floor, Washington, DC 20536, telephone number (202) 305–2663.

**SUPPLEMENTARY INFORMATION:**

## What Legal Authority Permits USCIS To Use a Safe Third Country Agreement as a Bar To Applying for Asylum?

Section 208(a)(1) of the Immigration and Nationality Act ("Act") permits any alien who is physically present in or who arrives at the United States to apply for asylum. However, section 208(a)(2)(A) of the Act specifically states that paragraph (1) shall not apply where, "pursuant to a bilateral or multilateral agreement, the alien may be removed to a country where the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General [now deemed to be the Secretary of Homeland Security under the Homeland Security Act] finds that it is in the public interest for the alien to receive asylum in the United States."

On December 5th, 2002, the governments of the United States and Canada signed the Agreement Between the Government of the United States and the Government of Canada For Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries ("Safe Third Country Agreement" or "Agreement"). The Agreement will take effect when the United States has promulgated implementing regulations and Canada has completed its own domestic procedures necessary to bring the Agreement into force. This Agreement will be implemented by USCIS asylum officer determinations.

The Agreement allocates responsibility between the United States and Canada whereby one country or the other (but not both) will assume responsibility for processing the claims

of certain asylum seekers who are traveling from Canada into the United States or from the United States into Canada. The Agreement provides for a threshold determination to be made concerning which country will consider the merits of an alien's protection claim, enhancing the two nations' ability to manage, in an orderly fashion, asylum claims brought by persons crossing our common border. This Safe Third Country Agreement between the United States and Canada currently constitutes the only agreement, for purposes of section 208(a)(2)(A) of the Act, that would bar an individual in or arriving at the United States from applying for asylum.

During the bilateral negotiations that have resulted in the Safe Third Country Agreement, the delegations of both countries acknowledged certain differences in their respective asylum systems. However, harmonization of asylum laws and procedures is not a prerequisite to entering into responsibility-sharing arrangements. The salient factor is whether the countries sharing responsibility for refugee protection have laws and mechanisms in place that adhere to their international obligations to protect refugees. The Executive Committee for the Office of the United Nations High Commissioner for Refugees (UNHCR) has concluded, "Overall it is UNHCR's position that, while in principle each State Party to the 1951 Convention and 1967 Protocol has a responsibility to examine refugee claims made to it, "burden-sharing" arrangements allowing for readmission and determination of status elsewhere are reasonable, provided they always ensure protection of refugees and solutions to their problems." Background Note on the Safe Country Concept and Refugee Status (EC/SCP/68), July 26, 1991. While the asylum systems in Canada and the U.S. are not identical, both country's asylum systems meet and exceed international standards and obligations under the 1951 Convention relating to the Status of Refugees (1951 Refugee Convention) and the 1967 Protocol relating to the Status of Refugees (1967 Protocol), and the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (Convention Against Torture).

## What Are the Terms of the Safe Third Country Agreement Between the United States and Canada?

The Agreement permits the United States to remove to Canada certain asylum seekers attempting to enter the United States from Canada at a land border port-of-entry and aliens who are being removed from Canada in transit through the United States. Similarly, it permits Canada to return to the United States certain asylum seekers attempting to enter Canada from the United States at a land border port-of-entry and certain aliens being removed from the United States through Canada. In either case, the Agreement provides (with certain exceptions) that the alien be returned to the "country of last presence" for consideration of his or her protection claims, including asylum, withholding of removal, and protection under the Convention Against Torture, under the laws of that country.

For aliens arriving at a land border port-of-entry, the Agreement provides for a number of exceptions. These exceptions are based upon the principles underlying the U.S. position while negotiating the Agreement: (1) To the extent practicable, the Agreement should not act to separate families; (2) the Agreement must guarantee that persons subject to it would have their protection claims adjudicated in one of the two countries; and (3) it would be applied only in circumstances where it is indisputable that the alien arrived directly from the other country. These principles have been achieved by including a robust family unity exception that allows asylum seekers to join certain family members residing in the United States or Canada while they pursue their protection claims; by clearly stipulating that the alien must have his or her claim adjudicated in either Canada or the United States; and by limiting the application of the Agreement to situations where it is clear that the alien arrived directly from the other country; *e.g.*, at land border ports-of-entry or in-transit while being removed from Canada.

The Agreement's family unity exceptions are particularly generous. The range of family members who may qualify as "anchor" relatives due to their presence in the United States is far broader than those recognized under other provisions of immigration law. The list of eligible family members includes spouses, sons, daughters, parents, legal guardians, siblings, grandparents, grandchildren, aunts, uncles, nieces, and nephews. For purposes of the Agreement, a "legal guardian" will be construed as someone who is currently vested with legal custody of the asylum seeker or with the authority to act on behalf of the asylum seeker, provided that the asylum seeker is both unmarried and less than 18 years of age. USCIS will provide field guidance to asylum officers to standardize the approach used in construing other family member relationships relevant to the Agreement but not defined in the Act. Finally, these family members may qualify as anchor relatives even if they themselves do not possess permanent immigration status in the U.S. Aliens in valid immigrant or nonimmigrant status may qualify as anchor relatives, with the exception of aliens who maintain only nonimmigrant visitor status under section 101(a)(15)(B) of the Act or based on admission under the Visa Waiver Program, who are precluded from serving as anchor relatives by the language of the Agreement.

More specifically, an alien who arrives at a land border port-of-entry is exempt from return under the Agreement if the alien:

(1) Is a citizen of Canada or, not having a country of nationality, is a habitual resident of Canada;

(2) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who has been granted asylum, refugee, or other lawful status in the United States, except visitor status;

(3) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who is at least 18 years of age and has an asylum application pending in the United States;

(4) Is unmarried, under 18 years of age, and does not have a parent or legal guardian in either Canada or the United States;

(5) Is applying for admission at a United States land border port-of-entry with a validly issued visa or other valid admission document, other than for transit, issued by the United States, or, being required to hold a visa to enter Canada, was not required to obtain a visa to enter the United States; or

(6) Has been permitted, as an unreviewable exercise of discretion by DHS, to pursue a protection claim in the United States because it was determined that it is in the public interest to do so.

The specific terms of the Safe Third Country Agreement are available on the USCIS Web site at *http://www.uscis.gov.*

## How Does This Rule Propose To Implement the Safe Third Country Agreement?

The rule proposes to revise § 208.4 and add a new § 208.30(e)(6) to permit asylum officers to conduct a "threshold screening interview" in order to determine whether an alien is ineligible to apply for asylum under section 208(a)(2)(A) of the Act by operation of the Safe Third Country Agreement. New § 208.30(e)(6)(iii) would codify the exceptions to the Agreement. Under this rule, in any case where an asylum officer determines that the alien qualifies for an exception to the Agreement with Canada, the asylum officer will proceed immediately to a determination as to whether or not the alien has a credible fear of persecution or torture, as provided under existing law.

In § 208.30(e)(6)(i), this proposed rule also makes clear that, when an asylum officer determines that an alien is ineligible to pursue his or her protection claims in the United States based on the applicability of the Safe Third Country Agreement, the alien will be removed to Canada, the country of the alien's last presence, in order to pursue his or her claims there.

The rule also proposes to incorporate the existing definitions of "credible fear of persecution" and "credible fear of torture" in the new §§ 208.30(e)(2) and (e)(3). The definition of credible fear of persecution, derived from section 235(b)(1)(B)(v) of the Act and existing policy that incorporates consideration of eligibility for withholding of removal, is "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, the alien can establish eligibility for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act." The proposed rule incorporates the existing definition of credible fear of torture provided in the supplementary information to the interim rule implementing the United States' obligations under the Convention Against Torture published in the **Federal Register** at 64 FR 8484 on February 19, 1999. Under current procedures, as provided in the supplementary information to the interim rule, an alien is found to have a credible fear of torture if the alien shows that there is a significant possibility that he or she is eligible for withholding of removal or deferral of removal under the Convention Against Torture. The rule does not propose to

alter current procedures related to these existing definitions.

Finally, this rule proposes to remove the provisions of 8 CFR 208.30(g)(2) relating to the conduct of credible fear review by immigration judges. In view of the transfer of the responsibilities of the former INS to DHS on March 1, 2003, the Attorney General published a rule creating a new chapter V in 8 CFR, beginning with part 1001 and containing the regulations pertaining to the functions of the Executive Office for Immigration Review (EOIR), which remains under the authority of Attorney General. The Attorney General's rule was published in the **Federal Register** at 68 FR 9824 on February 28, 2003. Accordingly, this rule revises § 208.30(g)(2) to remove the previous provisions and to substitute a new cross-reference to the current EOIR regulations which are now codified at 8 CFR 1208.30(g)(2).

## Why Is USCIS Proposing To Amend the Regulations Governing Credible Fear Determinations?

The Safe Third Country Agreement between the United States and Canada bars certain aliens from pursuing protection claims in the United States if they are either arriving from Canada at land border ports-of-entry or are being removed from Canada in transit through the United States. Instead, those aliens will be returned to Canada to have their protection claims adjudicated by Canada. In general, the Agreement will be applied to such aliens who are subject to expedited removal provisions under section 235(b) of the Act, which provides a specific removal mechanism for aliens who are inadmissible under sections 212(a)(6)(C) (fraud or willful misrepresentation) or 212(a)(7) (failure to have proper documents) of the Act. However, in light of the Safe Third Country Agreement's purpose in allowing asylum seekers access to only one of the signatory countries' protection systems, this rule proposes a modified approach to the expedited removal process in the form of a threshold asylum officer screening as to which country (Canada or the United States) will consider an alien's protection claims. Only after this threshold issue has been resolved in favor of allowing the alien to pursue an asylum claim in the United States will an asylum officer make a determination as to whether or not the alien has a credible fear of persecution or torture.

Under section 235(b), aliens subject to expedited removal who seek asylum in the United States or otherwise express a fear of persecution or torture are referred to an asylum officer. During a

"credible fear interview," the asylum officer inquires as to the nature and basis of the alien's claims relating to past persecution and fear of future persecution or torture. The asylum officer then determines whether or not there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claims and other facts known to the officer, that the alien could establish eligibility for protection under U.S. law. In the event that the asylum officer determines that the alien has not established a credible fear of persecution or torture, the alien may request review of that determination by an immigration judge.

For aliens who are subject to the Agreement, however, the threshold question is whether the alien should be returned to Canada for Canadian authorities to consider the merits of the alien's claims, or whether the alien will instead be allowed to pursue his or her protection claims in the United States. Accordingly, this rule provides for a threshold screening interview by an asylum officer to determine whether an alien subject to the Agreement will be permitted to remain in the U.S. to pursue his or her protection claims, based on the alien's qualification for one of the Agreement's exceptions. It is only after this threshold screening interview (*i.e.*, only after the asylum officer has decided that the alien is not going to be removed to Canada for an adjudication of the alien's claims) that the asylum officer would proceed to promptly consider the alien's claims for protection under United States law through the credible fear determination process. The asylum officer's notes regarding the threshold issues raised by the Agreement would then be included in the asylum officer's written record of the credible fear determination. In those instances where an asylum officer determines, after review by a supervisory asylum officer, that the alien has not provided reason to believe, by a preponderance of the evidence, that he or she qualifies for any of the Agreement's exceptions, then the asylum officer will advise the alien that he or she is being returned to Canada based on the terms of the Agreement so that the alien will be able to pursue his or her claims for asylum or protection under Canadian law.

Given the narrowness of the factual issues relevant to the threshold screening determination that the Agreement and/or its exceptions are applicable to an alien, which can readily be considered and adjudicated by asylum officers, this rule does not provide for referral to immigration

judges for further review of these threshold screening determinations. The narrow factual issues concerning the Agreement's applicability and exceptions (such as the presence of family members in the U.S. or the possession of validly issued visas) do not relate to whether an alien has a fear of persecution or torture, and can adequately be resolved by asylum officers. Thus, under this proposed rule, when an asylum officer makes and a supervisor reviews this threshold determination, there would be no further administrative review of that decision. Elsewhere in the **Federal Register**, the Department of Justice is publishing a proposed rule to specify the authority of the immigration judges with respect to issues arising under the Agreement.

This method for implementing the Safe Third Country Agreement, which bars certain aliens from applying for asylum in the United States, is within the authority of the Secretary of DHS, under section 208(a)(2)(A) of the Act and under section 208(d)(5)(B) of the Act, which provides authority to impose regulatory conditions or limitations on the consideration of an application for asylum not inconsistent with the Act. Section 208(a)(2)(A) of the Act makes an alien ineligible to apply for asylum in the United States if, pursuant to a bilateral agreement, the Secretary concludes that the alien "would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection" in a safe third country. An alien who is covered by section 208(a)(2)(A) is thus not eligible to apply for asylum regardless of the statutory means by which he is ordered removed from the United States. By this rule, the Secretary is proposing, in a manner consistent with the Act, to delegate to asylum officers the authority to make the threshold determination whether an alien is ineligible to apply for asylum by operation of the Agreement with Canada.

USCIS thus proposes to amend the regulations governing the credible fear determination in order to implement the threshold screening process described above for aliens subject to the Safe Third Country Agreement, prior to a credible fear determination. However, this rule preserves unchanged the existing credible fear process itself, including the availability of a credible fear review by an immigration judge, in every case where the asylum officer determines that an alien subject to the Agreement does satisfy any of the threshold jurisdictional exceptions, including a discretionary decision by

DOJIFR00121

DHS to allow the alien to pursue an asylum claim as a matter in the public interest. If the asylum officer determines the alien is not barred by the Agreement from pursuing his or her protection claims in the U.S., the asylum officer will then proceed immediately to a credible fear determination on the merits of the alien's claims, and, if necessary, an immigration judge will conduct a review of this determination on the merits, as provided under existing law and regulations.

## How Does This Rule or the Safe Third Country Agreement Affect Unaccompanied Minors?

In order to understand how this rule affects unaccompanied minors, it is important to understand that the definition of an "unaccompanied minor" customarily used in determining appropriate immigration processes is different than the definition used in the Agreement for determining whether an exception to the Agreement applies. While "unaccompanied minor" has not been formally defined in the Act or in regulations, for immigration processing purposes, an individual who is under age 18 and is not accompanied by an adult relative or guardian is considered an "unaccompanied minor." This definition differs from the Agreement's language. Article 1(f) of the Agreement defines "unaccompanied minor" as "an unmarried refugee status claimant who has not yet reached his or her eighteenth birthday and does not have a parent or legal guardian in either Canada or the United States." This rule does not propose replacing the customary definition of "unaccompanied minor" with the Agreement's definition for purposes of determining immigration issues unrelated to the Agreement. However, in applying the Agreement, this difference in definitions will result in finding that some individuals under age 18 who are not accompanied by an adult relative or legal guardian when they arrive at a land border port-of-entry will not qualify for the unaccompanied minor exception in the Agreement, because they have a parent or legal guardian in the United States or Canada.

Since August of 1997, the Immigration and Naturalization Service's policy, now DHS's policy, has been to place unaccompanied minors into expedited removal proceedings only under limited circumstances. Under existing policy, an unaccompanied minor would be placed into expedited removal proceedings only if he or she (1) in the presence of a DHS immigration officer, engaged in a crime that would qualify as an aggravated felony if committed by an adult; (2) has been convicted or adjudicated delinquent of an aggravated felony in the United States or any other country, and a U.S. Customs and Border Protection (CBP) officer has confirmation of that order; or (3) has been formally removed, excluded, or deported previously from the United States. Existing guidelines permit granting a waiver, deferring the inspection, permitting a withdrawal of the application for admission, or using other discretionary means to process unaccompanied minors who seek admission to the United States, where appropriate. This rule does not propose to change that existing policy. The Safe Third Country Agreement will be applied in the expedited removal proceedings of unaccompanied minors only when such other processing of an unaccompanied minor seeking admission at a land border port-of-entry is not appropriate. When an unaccompanied minor arrives from Canada at a land border port-of-entry and seeks protection, he or she still will be processed according to existing guidelines, which often results in placing the minor into removal proceedings under section 240 of the Act. Where the minor is placed into removal proceedings under section 240 of the Act, the Agreement, including its definition of "unaccompanied minor," will be applied by the immigration judge, as provided in the Department of Justice proposed rule published in the **Federal Register**.

## What Type of Evidence Will Satisfy USCIS When Determining Whether an Individual Meets One of the Exceptions in the Agreement?

As specified in the proposed rule at § 208.30(e)(6)(ii) and pursuant to a Statement of Principles concerning the implementation of the Agreement, the alien bears the burden of proof to establish by a preponderance of the evidence that an exception applies, such that the alien falls outside the scope of the Agreement. Asylum officers will use all available evidence, including the individual's testimony, affidavits and other documentation, as well as available records and databases, to determine whether an exception to the Agreement applies in each individual's case. Credible testimony alone may be sufficient to establish that an exception applies, if there is a satisfactory explanation of why corroborative documentation is not reasonably available. DHS recognizes that computer systems and DHS records will not be sufficient to verify family relationships in all circumstances and that asylum seekers fleeing persecution often will not have documents establishing family relationships with them at the time they seek to enter the United States. Asylum officers receive extensive training in evaluating credibility of testimony when there is little or no documentation in support of that testimony. Asylum officers will document their findings that the Agreement or its exceptions are applicable to an alien, and in the case of any alien who qualifies for one of the Agreement's exceptions, will immediately proceed to make a credible fear determination, as described in sections 235(b)(1)(B)(ii) and (iii) of the Act.

## How Does the Safe Third Country Agreement Address the Possibility That Individuals Will Be Removed Without Having Their Protection Claims Heard?

An individual referred by either Canada or the United States to the other country under the terms of Article 4 cannot be removed to a third country until an adjudication of the individual's protection claims has been made. The Agreement also provides, in Article 3, that an individual returned to the country of last presence shall not be removed to another country pursuant to any other Safe Third Country Agreement or regulation.

## How Does the Safe Third Country Agreement Affect People Who Are Being Removed From Canada or the United States and Then Seek Protection While Transiting Through the Other Country?

Pursuant to Article 5(a) of the Agreement, if an alien is being removed from Canada through the United States and expresses a fear of persecution or torture, the alien will be returned to Canada for Canada to adjudicate his or her protection claims, in accordance with Canada's protection system. Generally, individuals being removed by Canada through the United States are pre-inspected in Canada and escorted by Canadian immigration officials to their onward destination. Individuals who make a protection claim during pre-inspection will not be allowed to transit through the United States. Individuals being removed by Canada in transit through the United States are considered arriving aliens in parole status, as described in section 212(d)(5) of the Act. If such an individual asserts a fear of persecution or torture to a U.S. immigration officer, while in transit through the United States, the individual's parole status will be terminated pursuant to § 212.5(e)(2)(i), and he or she generally will be placed in expedited removal proceedings, though there may be some rare instances

in which the individual will be placed in removal proceedings under section 240 of the Act. Transit aliens placed in expedited removal proceedings under this provision will be subject to the same asylum officer threshold screening process as aliens arriving at U.S.-Canada land border ports-of-entry. For those rare instances in which such a transit alien is placed in removal proceedings pursuant to section 240 of the Act, the Agreement will be applied by the immigration judge as provided in the Department of Justice proposed rule, published in the **Federal Register**.

The effect of the Agreement on an asylum seeker being removed from the United States through Canada depends on whether the United States already has considered any asylum, withholding, or Torture Convention claim(s). If the United States has considered but denied the alien's protection claims, the person will be permitted onward movement, in accordance with Article 5(c) of the Agreement. If the United States has not already adjudicated the alien's protection claims, the person will be returned to the United States for such an adjudication.

## How Does the Agreement Affect Individuals Who Seek Withholding of Removal or Protection Under the Convention Against Torture?

Article 33 of the 1951 Refugee Convention, as supplemented by the 1967 Refugee Protocol, requires that signatory states not return persons to any country where their lives or freedom would be threatened on account of their race, religion, nationality, political opinion, or membership in a particular social group. The U.S. is a signatory to the 1967 Protocol, and Canada is a signatory to both the 1951 Refugee Convention and the 1967 Protocol. The U.S. implements its obligations under the 1967 Protocol in section 241(b)(3) of the Act, which, as implemented, prohibits DHS from removing aliens to any country where it is more likely than not that their lives or freedom would be threatened on account of the grounds enumerated above. Nevertheless, DHS is not prevented from removing aliens to countries where their lives or freedom would not be threatened.

Article 3 of the Convention Against Torture prohibits the return of persons to any country where there are substantial grounds for believing that they would be subject to torture. Like the United States, Canada is a signatory to the Convention Against Torture. The United States implements this obligation by granting withholding of

removal or deferral of removal to a country where it is more likely than not that the applicant would be subject to torture.

Article 3 of the Agreement provides that ''the Parties shall not return or remove a refugee status claimant referred by either Party under the terms of [the Agreement] to another country until an adjudication of the person's refugee status claim has been made.'' In Article 1, the Agreement defines a refugee status claim to include a request for protection under the 1951 Refugee Convention, 1967 Protocol, or Convention Against Torture. Returning any alien to Canada pursuant to the terms of the Agreement for a consideration of the alien's protection claims, in the absence of any grounds for believing that the alien would be persecuted or tortured in Canada, is consistent with the United States' international protection obligations.

## Does CBP Plan To Place Aliens Returned to the United States From Canada Under the Safe Third Country Agreement Into Expedited Removal Proceedings?

No. For an alien to be subject to the expedited removal provisions, the alien must first meet the definition of arriving alien. The Board of Immigration Appeals has held that an alien who goes abroad but is returned to the United States after having been formally denied admission by the foreign country is not an applicant for admission, since, in contemplation of law, the alien did not leave the United States. Matter of T, 6 I&N Dec. 638 (1955). Those who entered the United States legally or illegally and are later denied admission by Canada are not arriving aliens and therefore not subject to expedited removal. Depending on their status, they may or may not be subject to removal proceedings before an immigration judge, pursuant to section 240 of the Act, or removal pursuant to sections 241(a)(5) (reinstatement of a prior order) or 238(b) (administrative removal based on aggravated felony conviction) of the Act. For example, this return to the United States would not qualify as an ''arrival'' for purposes of determining whether an applicant has filed for asylum within one year of the date of his or her last arrival in the United States, as required under section 208(a)(2)(B) of the Act.

## How Does This Proposed Rule Affect Individuals Who Enter the United States Through Canada and Who Then Apply for Asylum?

The proposed rule does not affect any individuals who apply for asylum after

entering the United States from Canada. The proposed rule is limited only to those individuals who are placed in expedited removal or removal proceedings upon arrival at U.S.-Canada land border ports-of-entry and to those who are aliens in transit through the United States subsequent to removal from Canada. Individuals who previously entered the United States, having come from Canada, and later apply for asylum affirmatively with USCIS or defensively in removal proceedings before an immigration judge are not arriving aliens and so will not be barred from applying for asylum by operation of the Agreement.

### Regulatory Flexibility Act

DHS has reviewed this regulation in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)) and by approving it, DHS preliminarily certifies that this rule will not have a significant economic impact on a substantial number of small entities. This rule affects individual aliens, as it relates to claims of asylum. It does not affect small entities, as that term is defined in 5 U.S.C. 601(6).

### Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one-year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

### Small Business Regulatory Enforcement Fairness Act of 1996

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

### Executive Order 12866

The Department of Homeland Security has determined that this rule is a ''significant regulatory action'' under Executive Order 12866, section 3(f), Regulatory Planning and Review, and, accordingly, this rule has been submitted to the Office of Management and Budget for review. In particular, the

**Federal Register** / Vol. 69, No. 45 / Monday, March 8, 2004 / Proposed Rules **10625**

Department has assessed both the costs and benefits of this rule as required by Executive Order 12866, section 1(b)(6) and has made a reasoned determination that the benefits of this regulation justify its costs.

The proposed rule would implement a bilateral agreement that allocates responsibility between the United States and Canada for processing claims of certain asylum seekers. The rule applies to individuals who are subject to expedited removal and, under existing regulations, would receive a credible fear interview by an asylum officer. This rule simply adds a preliminary screening by asylum officers to determine whether the alien is even eligible to seek protection in the United States, in which case the asylum officer will then proceed to make the credible fear determination under existing rules. Based on statistical evidence, it is anticipated that approximately 200 aliens may seek to enter the United States from Canada at a land border port-of-entry and be placed into expedited removal proceedings. A significant number of these aliens will be found exempt from the Agreement and eligible to seek protection in the United States after the threshold screening interview proposed in this rule. It is difficult to predict how many aliens will be returned to the U.S.-Canadian border under the Agreement, but the costs incurred in detaining and transporting them are not likely to be substantial. Therefore, the "tangible" costs of this rulemaking to the U.S. Government are minimal. Applicants who are found to be subject to the Safe Third Country Agreement will be returned to Canada to seek protection, saving the U.S. Government the cost of adjudicating their asylum claims and, in some cases, the cost of detention throughout the asylum process.

The cost to asylum seekers who, under the proposed rule, will be returned to Canada are the costs of pursuing an asylum claim in Canada, as opposed to the United States. There is no fee to apply for asylum in Canada and, under Canadian law, asylum seekers are provided social benefits that they are not eligible for in the United States, including access to medical coverage, adult public education, and public benefits. Therefore, the tangible costs of seeking asylum in Canada are no greater than they are in the United States. However, because there may be other tangible costs to asylum seekers attempting to enter the United States from Canada at a land border port-of-entry (*e.g.*, transportation costs to the U.S. border), public comment is invited for further consideration of what such

additional costs may include. The "intangible" costs to asylum seekers who would be returned to Canada under the proposed rule are the costs of potential separation from support networks they may be seeking to join in the United States. However, the Agreement contains broad exceptions based on principles of family unity that would generally allow those with family connections in the United States to seek asylum in the United States under existing regulations governing the credible fear process.

The proposed rule benefits the United States because it enhances the ability of the U.S. and Canada to manage, in an orderly fashion, asylum claims brought by persons crossing our common border. By implementing the Agreement, the proposed rule furthers U.S. and Canadian goals, as outlined in the 30-Point Action Plan under the Smart Border Declaration signed by Secretary Ridge and former Canadian Deputy Foreign Minister John Manley, to ensure a secure flow of people between the two countries while preserving asylum seekers' access to a full and fair asylum process in a manner consistent with U.S. law and international obligations. Further, the Agreement and proposed rule save the U.S. the time and expense of adjudicating protection claims brought by asylum seekers who have already had a full and fair opportunity to present their claims in Canada.

**Executive Order 13132**

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

**Executive Order 12988 Civil Justice Reform**

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

**Paperwork Reduction Act**

The regulations at 8 CFR 208.30 require that an asylum officer conduct a threshold screening interview to determine whether an alien is ineligible to apply for asylum pursuant to section 208(a)(2)(A) of the Act. The threshold screening interview is considered an information collection requirement subject to review by OMB under the

Paperwork Reduction Act of 1995. Written comments are encouraged and will be accepted until May 7, 2004. When submitting comments on the information collection, your comments should address one or more of the following four points.

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of the information on those who are to respond, including through the use of any and all appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.*, permitting electronic submission of responses.

*Overview of This Information Collection*

(1) *Type of information collection:* New.

(2) *Title of Form/Collection:* Credible fear threshold screening interview.

(3) *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* No form number, U.S. Citizenship and Immigration Services.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Individuals. The information collection is necessary in order for the CIS to make a determination whether an alien is eligible to apply for asylum pursuant to section 208(a)(2)(A) of the Act.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* 200 respondents at 30 minutes per response.

(6) *An estimate of the total of public burden (in hours) associated with the collection:* Approximately 100 burden hours.

All comments and suggestions or questions regarding additional information should be directed to the Department of Homeland Security, U.S. Citizenship and Immigration Services, Regulations and Forms Services Division, 425 I Street, NW., Room 4034, Washington, DC 20536; Attention: Richard A. Sloan, Director, 202–514–3291.

**Family Assessment Statement**

DHS has reviewed this regulation and determined that it may affect family well-being as that term is defined in section 654 of the Treasury General Appropriations Act, 1999, Public Law 105–277, Div. A. Accordingly, DHS has assessed this action in accordance with the criteria specified by section 654(c)(1). In this proposed rule, an alien arriving at a land border port-of-entry with Canada may qualify for an exception to the Safe Third Country Agreement, which otherwise requires individuals to seek protection in the country of last presence (Canada), by establishing a relationship to a family member in the United States who has lawful status in the United States, other than a visitor, or is 18 years of age or older and has an asylum application pending. This proposed rule incorporates the Agreement's definition of "family member," which may be a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew. The "family member" definition was intended to be broad in scope, to promote family unity. This proposed rule thereby strengthens the stability of the family by providing a mechanism to reunite separated family members in the United States.

In some cases the proposed rule will have a negative effect resulting in the separation of family members. The Agreement's exceptions, as expressed in the proposed rule, require the family member to have either lawful status in the United States, other than visitor, or else to be 18 years of age or older and have a pending asylum application. Family members who do not meet one of these conditions, therefore, would be separated under the proposed rule. However, this proposed rule's definition of "family member" and the exceptions to the Agreement are more generous than other family-based immigration laws, which require the anchor family member to have more permanent status in the United States (such as citizen, lawful permanent resident, asylee or refugee) and which have a more restricted list of the type of family relationships that can be used to sponsor someone for immigration to the United States (although, unlike those laws, this Agreement provides only an opportunity to apply for protection and does not directly confer an affirmative immigration benefit). Under this rule, family members will be able to reunite even if the anchor relative's status is less than permanent in the United States.

**List of Subjects**

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 212*

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

**Proposed Amendments to the Regulations**

Accordingly, chapter I of title 8 of the Code of Federal Regulations is proposed to be amended as follows:

**PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1158, 1226, 1252, 1282; 8 CFR part 2.

2. Section 208.4 is amended by adding a new paragraph (a)(6) to read as follows:

**§ 208.4   Filing the application.**

\*      \*      \*      \*      \*

(a) \* \* \*

(6) *Safe Third Country Agreement.* Asylum officers have authority to apply section 208(a)(2)(A) of the Act, relating to the determination that the alien may be removed to a safe country pursuant to a bilateral or multilateral agreement, only as provided in § 208.30(e). For provisions relating to the authority of immigration judges with respect to section 208(a)(2)(A), see 8 CFR 1240.11(g).

\*      \*      \*      \*      \*

3. Section 208.30 is amended by:
a. Redesignating paragraph (e)(4) as (e)(7);
b. Redesignating paragraphs (e)(2) and (e)(3) as (e)(4) and (e)(5) respectively;
c. Revising newly designated paragraphs (e)(4) and (e)(5);
d. Adding new paragraphs (e)(2), (e)(3), and (e)(6);
e. Revising paragraph (g)(2)(i), and by
f. Removing paragraphs (g)(2)(iii) and (g)(2)(iv).

The additions and revisions read as follows:

**§ 208.30   Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.**

\*      \*      \*      \*      \*

(e) \* \* \*

(2) An alien will be found to have a credible fear of persecution if there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, the alien can establish eligibility for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act.

(3) An alien will be found to have a credible fear of torture if the alien shows that there is a significant possibility that he or she is eligible for withholding of removal or deferral of removal under the Convention Against Torture, pursuant to §§ 208.16 or 208.17.

(4) In determining whether the alien has a credible fear of persecution, as defined in section 235(b)(1)(B)(v) of the Act, or a credible fear of torture, the asylum officer shall consider whether the alien's case presents novel or unique issues that merit consideration in a full hearing before an immigration judge.

(5) Except as provided in paragraph (e)(6) of this section, if an alien is able to establish a credible fear of persecution or torture but appears to be subject to one or more of the mandatory bars to applying for, or being granted, asylum contained in section 208(a)(2) and 208(b)(2) of the Act, or to withholding of removal contained in section 241(b)(3)(B) of the Act, the Department of Homeland Security shall nonetheless place the alien in proceedings under section 240 of the Act for full consideration of the alien's claim, if the alien is not a stowaway. If the alien is a stowaway, the Department shall place the alien in proceedings for consideration of the alien's claim pursuant to § 208.2(c)(3).

(6) Prior to any determination concerning whether an alien arriving in the United States at a U.S.-Canada land border port-of-entry or in transit through the U.S. during removal by Canada has a credible fear of persecution or torture, the asylum officer shall conduct a threshold screening interview to determine whether such an alien is ineligible to apply for asylum pursuant to section 208(a)(2)(A) of the Act and subject to removal to Canada under the Agreement Between the Government of the United States and the Government of Canada For Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries ("Agreement"). In conducting this threshold screening interview, the asylum officer shall advise the alien of the Agreement's exceptions and question the alien as to applicability of any of these exceptions to the alien's case.

(i) If the asylum officer determines that an alien does not qualify for an

exception under the Agreement during this threshold screening interview, the alien is ineligible to apply for asylum in the United States. After review of this finding by a supervisory asylum officer, the alien shall be advised that he or she will be removed to Canada in order to pursue his or her claims relating to a fear of persecution or torture under Canadian law. Aliens found ineligible to apply for asylum under this paragraph shall be removed to Canada.

(ii) If the alien establishes by a preponderance of the evidence that he or she qualifies for an exception under the terms of the Agreement, the asylum officer shall make a written notation of the basis of the exception, and then proceed immediately to a determination concerning whether an alien has a credible fear of persecution or torture.

(iii) An alien qualifies for an exception to the Agreement if the alien is not being removed from Canada in transit through the United States and:

(A) Is a citizen of Canada or, not having a country of nationality, is a habitual resident of Canada;

(B) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who has been granted asylum, refugee, or other lawful status in the United States, provided, however, that this exception shall not apply to an alien whose relative maintains only nonimmigrant visitor status, as defined in section 101(a)(15)(B) of the Act, or whose relative maintains only visitor status based on admission to the U.S. pursuant to the Visa Waiver Program;

(C) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who is at least 18 years of age and has an asylum application pending before U.S. of Citizenship and Immigration Services, the Executive Office for Immigration Review, or on appeal in federal court in the United States;

(D) Is unmarried, under 18 years of age, and does not have a parent or legal guardian in either Canada or the United States;

(E) Arrived in the United States with a validly issued visa or other valid admission document, other than for transit, issued by the United States, or, being required to hold a visa to enter Canada, was not required to obtain a visa to enter the United States; or

(F) The Department of Homeland Security determines, in the exercise of unreviewable discretion, that it is in the public interest to allow the alien to pursue a claim for asylum, withholding of removal, or protection under the

Convention Against Torture, in the United States.

(iv) As used in § 208.30(e)(6)(iii)(B), (C) and (D) only, ''legal guardian'' means a person currently vested with legal custody of such an alien or vested with legal authority to act on the alien's behalf, provided that such an alien is both unmarried and less than 18 years of age, and provided further that any dispute with respect to whether an individual is a legal guardian will be resolved on the basis of U.S. law.

*     *     *     *     *

(g) * * *

(2) * * *

(i) Immigration judges will review negative credible fear findings as provided in 8 CFR 1208.30(g)(2).

*     *     *     *     *

## PART 212—DOCUMENTARY REQUIREMENTS; NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

4. The authority citation for part 212 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1187, 1225, 1226, 1227, 1228; 8 CFR part 2.

5. Section 212.5 is amended by adding new paragraph (e)(2)(iii) to read as follows:

### § 212.5   Parole of aliens into the United States.

*     *     *     *     *

(e) * * *

(2) * * *

(iii) Any alien granted parole into the United States so that he or she may transit through the United States in the course of removal from Canada shall have his or her parole status terminated upon notice, as specified in § 212.5(e)(2)(i), if he or she makes known to an immigration officer of the United States a fear of persecution or an intention to apply for asylum. Upon termination of parole, any such alien shall be regarded as an applicant for admission, and processed accordingly by the Department of Homeland Security.

*     *     *     *     *

Dated: January 26, 2004.

**Tom Ridge,**

*Secretary of Homeland Security.*

[FR Doc. 04–5077 Filed 3–5–04; 8:45 am]

**BILLING CODE 4410–10–P**

## DEPARTMENT OF JUSTICE

**8 CFR Parts 1003, 1208, 1212, and 1240**

**[EOIR No. 142P; AG Order No. 2709–2004]**

**RIN 1125–AA46**

### Asylum Claims Made by Aliens Arriving from Canada at Land Border Ports-of-Entry

**AGENCY:** Executive Office for Immigration Review, Justice.

**ACTION:** Proposed rule.

**SUMMARY:** The recent Safe Third Country agreement between the United States and Canada provides new procedures for dealing with certain categories of aliens crossing at land border ports-of-entry between the United States and Canada, or in transit from Canada or the United States, and who express a fear of persecution or torture if returned to the country of their nationality or habitual residence. The Agreement recognizes that the United States and Canada are safe third countries, each of which offers full procedures for nationals of other countries to seek asylum or other protection. Accordingly, subject to several specific exceptions, the Agreement provides for the United States to return such arriving aliens to Canada, the country of last presence, to seek protection under Canadian law, rather than applying for asylum in the United States. Subject to the stated exceptions, such aliens attempting to travel from Canada to the United States, or vice versa, will be allowed to seek asylum or other protection in one country or the other, but not in both.

Elsewhere in this issue of the **Federal Register**, the Department of Homeland Security (DHS) is publishing a proposed rule that would, among other things, give asylum officers the authority to apply the Agreement with respect to arriving aliens. This proposed rule provides that the immigration judges will not review the threshold factual determinations by asylum officers that an alien does not satisfy any of the exceptions under the Agreement. However, for any alien who the asylum officer determines is not barred by the Agreement, the existing credible fear process under section 235(b) of the Immigration and Nationality Act (Act) remains unchanged, including the right to seek review by an immigration judge. Finally, this rule provides authority for an immigration judge to apply the Agreement with respect to aliens whom DHS has chosen to place in removal proceedings under section 240 of the Act.

exception under the Agreement during this threshold screening interview, the alien is ineligible to apply for asylum in the United States. After review of this finding by a supervisory asylum officer, the alien shall be advised that he or she will be removed to Canada in order to pursue his or her claims relating to a fear of persecution or torture under Canadian law. Aliens found ineligible to apply for asylum under this paragraph shall be removed to Canada.

(ii) If the alien establishes by a preponderance of the evidence that he or she qualifies for an exception under the terms of the Agreement, the asylum officer shall make a written notation of the basis of the exception, and then proceed immediately to a determination concerning whether an alien has a credible fear of persecution or torture.

(iii) An alien qualifies for an exception to the Agreement if the alien is not being removed from Canada in transit through the United States and:

(A) Is a citizen of Canada or, not having a country of nationality, is a habitual resident of Canada;

(B) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who has been granted asylum, refugee, or other lawful status in the United States, provided, however, that this exception shall not apply to an alien whose relative maintains only nonimmigrant visitor status, as defined in section 101(a)(15)(B) of the Act, or whose relative maintains only visitor status based on admission to the U.S. pursuant to the Visa Waiver Program;

(C) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who is at least 18 years of age and has an asylum application pending before U.S. of Citizenship and Immigration Services, the Executive Office for Immigration Review, or on appeal in federal court in the United States;

(D) Is unmarried, under 18 years of age, and does not have a parent or legal guardian in either Canada or the United States;

(E) Arrived in the United States with a validly issued visa or other valid admission document, other than for transit, issued by the United States, or, being required to hold a visa to enter Canada, was not required to obtain a visa to enter the United States; or

(F) The Department of Homeland Security determines, in the exercise of unreviewable discretion, that it is in the public interest to allow the alien to pursue a claim for asylum, withholding of removal, or protection under the

Convention Against Torture, in the United States.

(iv) As used in § 208.30(e)(6)(iii)(B), (C) and (D) only, ''legal guardian'' means a person currently vested with legal custody of such an alien or vested with legal authority to act on the alien's behalf, provided that such an alien is both unmarried and less than 18 years of age, and provided further that any dispute with respect to whether an individual is a legal guardian will be resolved on the basis of U.S. law.

*    *    *    *    *

(g) * * *

(2) * * *

(i) Immigration judges will review negative credible fear findings as provided in 8 CFR 1208.30(g)(2).

*    *    *    *    *

## PART 212—DOCUMENTARY REQUIREMENTS; NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

4. The authority citation for part 212 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1187, 1225, 1226, 1227, 1228; 8 CFR part 2.

5. Section 212.5 is amended by adding new paragraph (e)(2)(iii) to read as follows:

### § 212.5   Parole of aliens into the United States.

*    *    *    *    *

(e) * * *

(2) * * *

(iii) Any alien granted parole into the United States so that he or she may transit through the United States in the course of removal from Canada shall have his or her parole status terminated upon notice, as specified in § 212.5(e)(2)(i), if he or she makes known to an immigration officer of the United States a fear of persecution or an intention to apply for asylum. Upon termination of parole, any such alien shall be regarded as an applicant for admission, and processed accordingly by the Department of Homeland Security.

*    *    *    *    *

Dated: January 26, 2004.

**Tom Ridge,**

*Secretary of Homeland Security.*

[FR Doc. 04–5077 Filed 3–5–04; 8:45 am]

**BILLING CODE 4410–10–P**

## DEPARTMENT OF JUSTICE

**8 CFR Parts 1003, 1208, 1212, and 1240**

**[EOIR No. 142P; AG Order No. 2709–2004]**

**RIN 1125–AA46**

### Asylum Claims Made by Aliens Arriving from Canada at Land Border Ports-of-Entry

**AGENCY:** Executive Office for Immigration Review, Justice.

**ACTION:** Proposed rule.

**SUMMARY:** The recent Safe Third Country agreement between the United States and Canada provides new procedures for dealing with certain categories of aliens crossing at land border ports-of-entry between the United States and Canada, or in transit from Canada or the United States, and who express a fear of persecution or torture if returned to the country of their nationality or habitual residence. The Agreement recognizes that the United States and Canada are safe third countries, each of which offers full procedures for nationals of other countries to seek asylum or other protection. Accordingly, subject to several specific exceptions, the Agreement provides for the United States to return such arriving aliens to Canada, the country of last presence, to seek protection under Canadian law, rather than applying for asylum in the United States. Subject to the stated exceptions, such aliens attempting to travel from Canada to the United States, or vice versa, will be allowed to seek asylum or other protection in one country or the other, but not in both.

Elsewhere in this issue of the **Federal Register**, the Department of Homeland Security (DHS) is publishing a proposed rule that would, among other things, give asylum officers the authority to apply the Agreement with respect to arriving aliens. This proposed rule provides that the immigration judges will not review the threshold factual determinations by asylum officers that an alien does not satisfy any of the exceptions under the Agreement. However, for any alien who the asylum officer determines is not barred by the Agreement, the existing credible fear process under section 235(b) of the Immigration and Nationality Act (Act) remains unchanged, including the right to seek review by an immigration judge. Finally, this rule provides authority for an immigration judge to apply the Agreement with respect to aliens whom DHS has chosen to place in removal proceedings under section 240 of the Act.

**DATES:** Written comments must be submitted on or before May 7, 2004.

**FOR FURTHER INFORMATION CONTACT:** Chuck Adkins-Blanch, General Counsel, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2600, Falls Church, Virginia 22041, telephone (703) 305–0470.

**ADDRESSES:** Please submit written comments to Chuck Adkins-Blanch, General Counsel, Executive Office for Immigration Review, Office of the General Counsel, 5107 Leesburg Pike, Suite 2600, Falls Church, Virginia, 22041. To ensure proper handling, please reference RIN No. 1125–AA46 on your correspondence. The public may also submit comments electronically to the EOIR at *eoir.regs@usdoj.gov*. When submitting comments electronically, you must include RIN No.1125–AA46 in the subject box.

**SUPPLEMENTARY INFORMATION:** On December 5, 2002, the governments of the United States and Canada signed the Agreement Between the Government of the United States and the Government of Canada For Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries (''bilateral Agreement with Canada'' or ''Agreement''). The Agreement will not take effect until the United States has promulgated implementing regulations and Canada has completed its own necessary domestic procedures to bring the Agreement into force. The supplementary information in the proposed rule of the Department of Homeland Security published elsewhere in this issue of the **Federal Register** explains in greater detail the goals of the Agreement and the reasons for including its particular terms and exceptions, and persons commenting on this rule should keep in mind the discussion of these issues in the DHS proposed rule.

**Terms of the Agreement**

This Agreement permits the United States to return to Canada, the country of last presence, certain aliens seeking protection who attempt to enter the United States from Canada at a land border port-of-entry, or are being removed from Canada in transit through the United States. Such aliens are not eligible to apply for asylum, withholding of removal, or protection under the Convention Against Torture in the United States, unless one of the exceptions stated in the Agreement applies. Under the Agreement, those aliens who are returned to Canada will have their protection claims adjudicated by Canadian authorities under Canadian law. Similarly, the Agreement permits

Canada to return to the United States certain aliens seeking protection attempting to enter Canada from the United States at land border ports-of-entry, and certain aliens being removed from the United States in transit through Canada. In either case, the Agreement ensures that the asylum seekers will have access to a full and fair procedure for determining their asylum or other protection claims, either by the United States or by Canada, before the alien can be returned to the country of his or her nationality or habitual residence.

The Agreement applies to aliens arriving from Canada who are inadmissible under section 212(a)(6)(C) (fraud or willful misrepresentation) or section 212(a)(7) (failure to present proper documents) of the Immigration and Nationality Act (Act), 8 U.S.C. 1182(a)(6)(C), (7). In general, all arriving aliens who are inadmissible on either of those grounds are subject to expedited removal pursuant to section 235(b) of the Act. Under 8 CFR 235.3(b)(4), aliens subject to expedited removal who seek asylum in the United States or otherwise express a fear of persecution or torture are referred to an asylum officer employed by U.S. Citizenship and Immigration Services, a component of DHS, for a credible fear determination in accordance with 8 CFR 208.30.

As stated last year when the Agreement was being negotiated, ''Such an arrangement would limit the access of asylum seekers, under appropriate circumstances, to the system of only one of the two countries.'' 67 FR 46213 (July 12, 2002). Thus, the Agreement provides a threshold basis for returning certain arriving aliens to Canada to pursue their protection claims under Canadian law, but also provides several specific exceptions in which arriving aliens would be permitted to remain in the United States in order to pursue protection under United States law.

In particular, the Agreement provides important exceptions based on concerns for family unity, allowing an arriving alien to remain in the United States to pursue protection claims if the alien has a qualifying family member living in the United States and that family member either has been granted lawful status in the United States (other than visitor), or the family member is over the age of 18 and has filed a pending application for asylum. The range of family members who may qualify as ''anchor'' relatives due to their presence in the United States is far broader than those recognized under other provisions of immigration law. It includes spouses, sons, daughters, parents, legal guardians, siblings, grandparents, grandchildren, aunts, uncles, nieces,

and nephews. There is a separate exception for minors who do not have a parent in either the United States or Canada, though the definition of ''unaccompanied minor'' under the Agreement is also different than that used in other contexts under the immigration laws.

The Agreement also has exceptions for an arriving alien who is a citizen of Canada (or a habitual resident of Canada not having a country of nationality), as well as for aliens who presented a valid visa or other travel document (other than for transiting the United States) or were exempt from the requirement to present a passport.

Finally, the Agreement recognizes that the United States Government may conclude, in its discretion, that it is in the public interest to allow an arriving alien to remain in the United States to pursue protection even though the alien does not meet any of the specific exceptions under the Agreement. This latter discretionary determination is reserved to DHS alone and is not within the province of the immigration judges to review or grant.

The DHS proposed rule on this subject provides a more complete discussion of the Agreement, and the exceptions under the Agreement that would be codified at 8 CFR 208.30. The specific terms of the bilateral Agreement with Canada can be found on the DHS Web site at *http://www.uscis.gov*.

*Legal Authority Permitting the Use of a Bilateral Agreement as a Bar to Applying for Asylum*

Section 208(a)(1) of the Act permits any alien who is physically present in or who arrives at the United States to apply for asylum, and specifically recognizes the right of arriving aliens to present claims for asylum through the credible fear review process under section 235(b) of the Act. However, section 208(a)(2)(A) of the Act states that the right to apply for asylum under paragraph (1) shall not apply where, ''pursuant to a bilateral or multilateral agreement, the alien may be removed to a country where the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General [or the Secretary of Homeland Security] finds that it is in the public interest for the alien to receive asylum in the United States.''

The bilateral Agreement with Canada allocates responsibility between the

United States and Canada for processing claims of certain asylum-seekers, enhancing the two nations' ability to manage, in an orderly fashion, asylum claims brought by persons crossing our common border. At present, it is the only agreement, for purposes of section 208(a)(2)(A) of the Act, that would bar an arriving alien from applying for asylum in the United States.

**Implementation of the Agreement**

The DHS rule published elsewhere in this issue of the **Federal Register** proposes to revise the DHS rules in 8 CFR chapter I, parts 208 and 212 to implement the provisions of the Agreement. This rule proposes revisions to the regulations of the Department of Justice relating to the role of immigration judges in implementing the Agreement.

Until February 28, 2003, the regulations governing the immigration judges and the Board of Immigration Appeals (BIA) were also in 8 CFR chapter I because the former Immigration and Naturalization Service (INS) and the Executive Office for Immigration Review (EOIR) were both part of the Department of Justice under the authority of the Attorney General. On March 1, 2003, however, the functions of the former INS were transferred from the Department of Justice to DHS pursuant to the Homeland Security Act (HSA), Public Law 107–296, 116 Stat, 2135, 2178 (2002). That law also provided that EOIR (including the administrative adjudications conducted by the immigration judges and the BIA) remains in the Department of Justice under the authority of the Attorney General. Accordingly, on February 28, 2003, the Attorney General published a technical rule that reorganized title 8 of the Code of Federal Regulations to reflect the transfer of the functions of the former INS to DHS while creating a separate set of regulations pertaining to EOIR. *See* Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 FR 9824 (Feb. 28, 2003). This technical rule created a new chapter V in 8 CFR and transferred or duplicated certain parts and sections from chapter I to the new chapter V and made other amendments. The regulations governing proceedings before EOIR are now contained in 8 CFR chapter V, beginning with part 1001. The DHS regulations pertaining to the Act remain in 8 CFR chapter I.

In its rule, DHS proposes to implement the Agreement by revising 8 CFR 208.4 and 208.30 to permit asylum officers to conduct a threshold screening to determine whether or not an alien

qualifies for an exception under the Agreement that would allow the alien to pursue an asylum or protection claim in the United States. The exceptions are listed in 8 CFR 208.30(e)(6)(iii) of the DHS proposed rule. If the arriving alien does not qualify for an exception under the Agreement, there would be no need for a credible fear determination on the merits of the alien's asylum claims and, accordingly, no right to seek review of the merits of the asylum claims by an immigration judge, as discussed below. The alien would be returned to Canada to pursue an asylum or protection claim under Canadian law. If the arriving alien does qualify for an exception to the Agreement, the asylum officer would proceed promptly to consider the merits of the alien's claims for protection under United States law through the regular credible fear process. Finally, DHS adopts definitions of "credible fear of persecution" and "credible fear of torture" in the 8 CFR 208.30(e).

This proposed rule is a companion to the DHS rule. Because the immigration judges and the BIA have independent authority over asylum and withholding claims made by aliens in removal proceedings, the Attorney General duplicated all of the provisions of 8 CFR part 208 as a new part in 8 CFR chapter V, part 1208. While DHS is making changes to its regulations in part 208 governing the asylum officers, the Attorney General in this rule is proposing to make changes to parts 1003 and 1208, relating to review of negative credible fear determinations by immigration judges, and part 1240, relating to the application of the Agreement to aliens in removal proceedings.

This rule takes account of the proposed changes being made by DHS in 8 CFR part 208, but does not propose to duplicate in part 1208 the full text of all of those changes. Many of the changes that DHS is proposing to make to 8 CFR 208.30 pertain only to the actions of the asylum officers, and do not directly affect the authority of the immigration judges and the BIA. Thus, in many instances, this rule will remove existing language from 8 CFR part 1208.30 and simply insert cross-references to the provisions of the DHS regulations in part 208.30 rather than reprinting them in full. In addition, because the provisions in 8 CFR 212.5 relating to the granting of parole pertain to actions by the Department of Homeland Security, and do not directly affect the authority of the immigration judges and the BIA, this rule does not attempt to track the changes that DHS is proposing to make to 8 CFR 212.5. Instead, this rule proposes to remove the

entire text of the parallel provision in 8 CFR 1212.5 and merely insert a cross-reference to the DHS regulations in 8 CFR 212.5.

**Threshold Screening of an Alien's Eligibility Under the Agreement**

Under section 235(b)(1)(B)(iii)(III) of the Act, an arriving alien who has received a negative credible fear determination by an asylum officer may request a prompt review by an immigration judge. The purpose of this review by an immigration judge is to allay concerns that an arriving alien might be returned to the country of his or her nationality or habitual residence to face persecution or torture, without having had an adequate opportunity to present his or her claims to U.S. immigration officials. The current regulations governing review of credible fear determinations by immigration judges are codified in 8 CFR 1003.42 and 1208.30(g)(2). In the credible fear review process, the alien is able to present any information relating to the likelihood of persecution or torture if the alien were removed to the country of his or her nationality or habitual residence.

For aliens who are subject to the Agreement, however, the threshold question is whether the alien should be returned to Canada for Canadian authorities to consider the merits of that alien's claims, or whether the alien will be allowed to pursue protection in the United States. Because the threshold nature of the issues under the Agreement is quite different from the issues relating to the merits of an alien's claimed fear of persecution or torture if returned to his or her country of nationality, this proposed rule, like the DHS rule, does not provide for an immigration judge to review an asylum officer's threshold determination under the Agreement that the alien should be returned to Canada for a determination of his or her asylum claims under Canadian law.

In the credible fear process, asylum officers consider the merits of the claimed fear of persecution or torture in making a credible fear determination. If the asylum officer makes a negative credible fear determination, the alien has the right to have an immigration judge review the merits of that determination. In contrast, in the case of an arriving alien from Canada who is subject to the Agreement and does not meet any of the exceptions, the merits of the alien's claims would not even arise in any proceedings before an immigration judge, and there would be no occasion for an immigration judge to consider or determine whether or not

the alien in fact has a credible fear of facing persecution or torture if returned to the country of his or her nationality or habitual residence. Such issues are irrelevant to a review of the specific exceptions under the Agreement (since the public interest exception under the Agreement is for DHS alone to consider, not an immigration judge). Unless the alien is under the age of 18 and unaccompanied, the principal issue for DHS to consider under the Agreement as a practical matter in deciding if the alien meets one of the exceptions will be whether the alien has a qualifying family member living in the United States (i.e., a qualifying family member who is either in lawful immigration status in the United states, other than as a visitor, or has a pending asylum application).

Given the narrowness of the factual issues, the Department believes that the applicability of the Agreement can readily be considered and adjudicated by asylum officers. None of the threshold factual determinations under the Agreement has any relationship to the merits of an arriving alien's asylum claims, and none calls for the kind of expert judgment exercised by immigration judges in conducting credible fear reviews concerning the merits of an arriving alien's asylum claims. In addition, because the law requires that arriving aliens be detained, providing for reviews by immigration judges of these threshold issues under the Agreement through a credible fear review would likely result in prolonging the detention of such aliens, since the law provides that such a credible fear review can occur as late as 7 days after the asylum officer's determination. For these reasons, this rule provides that an immigration judge will not have jurisdiction to review an asylum officer's threshold determination under the Agreement that an alien is to be returned to Canada in order to pursue an adjudication of his or her asylum claims under Canadian law.

### Removal Proceedings

New § 1240.11(g) provides rules pertaining to an arriving alien who is subject to the Agreement but DHS, in its discretion, decides to place the alien into removal proceedings under section 240 of the Act, rather than into expedited removal. Thus, if the immigration judge determines that the alien was placed into removal proceedings in connection with his or her arrival at a United States port-of-entry on the United States/ Canadian land border, the alien would not be eligible to apply for asylum pursuant to section 208(a)(2)(A) of the Act unless an exception to the

Agreement is applicable. DHS might decide, in its discretion, to place an arriving alien into regular removal proceedings, for example, in order to lodge additional charges of inadmissibility against the alien, or, as suggested in the supplementary information in the DHS draft rule, because the alien is a minor. However, if DHS is seeking removal of the alien upon his or her arrival from Canada at a United States land border, it does not make any legal difference under the Agreement and under section 208(a)(2)(A) of the Act whether DHS has decided to use expedited removal procedures under section 235 of the Act or regular removal proceedings under section 240 of the Act.

Under this rule, an alien in regular removal proceedings who is subject to the Agreement would not be able to pursue an application for asylum, withholding of removal, or protection under the Convention Against Torture before the immigration judge, unless the alien satisfies the burden of proof to establish by a preponderance of the evidence that he or she qualifies for an exception to the Agreement, other than the public interest exception. (As previously noted, the decision to invoke the public interest exception is solely within the discretion of DHS. If DHS determines that it is in the public interest to allow a covered alien to pursue a claim for asylum or withholding of removal in removal proceedings, then DHS will file a written notice of its decision before the immigration judge, as provided in new 8 CFR 1240.11(g)(3).) If the alien does not establish an exception, he/she will be returned to Canada (the country of the alien's last presence) in order to pursue his or her protection claims there under Canadian law. As provided in the Agreement, the United States cannot remove an arriving alien who is covered by the Agreement to any country other than Canada in order to have recourse to protection under Canadian law.

This rule does not affect any other individuals applying for asylum in removal proceedings who are not subject to the Agreement. In particular, under the terms of the Agreement, an alien who is charged with grounds of deportability after being found in the United States will not be subject to the limitations of the Agreement, even if the alien had previously entered the United States from Canada, or any alien who arrived in the United States by air or water, or who entered the United States illegally at any point between the established land border port-of-entry.

As suggested in the supplementary information in the DHS proposed rule, DHS may exercise its discretion to place certain minors into removal proceedings under section 240 of the Act, rather than in expedited removal, when they arrive at a port-of-entry at the United States/ Canadian land border. The Agreement uses a different definition of the term "unaccompanied minor" than is used in other contexts under the immigration laws. An unmarried arriving alien under the age of 18 who does not have a parent either in the United States or Canada will be exempt from the Agreement as an "unaccompanied minor," and will be permitted to pursue claims for asylum, withholding of removal, and protection under the Convention Against Torture before the immigration judge. However, a minor arriving from Canada who does have a parent either in the United States or in Canada will not be eligible for the exception as an unaccompanied minor under the terms of the Agreement (whether or not the alien may be considered an unaccompanied minor for other purposes under the immigration laws). Unless such an alien is able to satisfy one of the other exceptions under the Agreement—such as having a qualifying family member in the United States who either has been granted lawful status or has a pending asylum application—then the minor would not be eligible to apply for asylum, withholding of removal, or protection under the Convention Against Torture before the immigration judge. The immigration judge would consider applications for any other forms of relief for which the alien might be eligible and, if the alien is ultimately ordered removed, he or she would be returned to Canada in order to pursue claims for asylum or refugee protection under Canadian law.

For example, if a 15-year-old asylum-seeker arrives at a United States/Canada land-border port-of-entry without other family members, DHS may choose to place the alien in removal proceedings according to its own policies. In the course of the removal proceedings, the immigration judge will first determine whether the minor has a parent or legal guardian in the United States or Canada, in order to determine whether the "unaccompanied minor" exception to the Agreement applies. If the minor does have a parent or legal guardian in the United States or Canada, the immigration judge will determine whether any of the other exceptions to the Agreement apply. For example, if the alien's parent is living in the United States, the minor would not be an "unaccompanied minor" under the

Agreement, but the parent may be a qualifying relative if the parent either has been granted lawful status in the United States other than as a visitor or has a pending asylum application, as provided in other exceptions to the Agreement.

An alien who is found to be ineligible to apply for asylum pursuant to section 208(a)(2)(A) of the Act and the bilateral Agreement with Canada will be removed to Canada to have all of his or her claims for protection adjudicated by Canadian authorities under Canadian law. Accordingly, this rule adds § 1240.11(g)(4) to provide that an alien in removal proceedings who is subject to the Agreement is ineligible to apply for withholding of removal under section 241(b)(3) of the Act and the Convention Against Torture if it is determined that he or she is ineligible to apply for asylum based on the Agreement.

Section 241(b)(3)(A) of the Act prohibits removal of an alien to a country where the alien's life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion. Similarly, Article 3 of the Convention Against Torture prohibits the return of an individual to another country where there are substantial grounds for believing that he or she would be subject to torture. These provisions, however, do not prevent the United States from removing an individual to any safe third country in which the person would not face the threat of persecution or torture.

Like the United States, Canada is a signatory to the 1967 Protocol Relating to the Status of Refugees ("Protocol") [1] and the Convention against Torture. Article 3 of the bilateral Agreement with Canada provides that "the Parties shall not return or remove a refugee status claimant referred by either Party under the terms of [the Agreement] to another country until an adjudication of the person's refugee status claim has been made." In Article 1, the Agreement defines a refugee status claim to include a request for protection consistent with the Protocol and the Convention Against Torture. Therefore, returning an individual to Canada pursuant to the terms of the Agreement is consistent with United States' obligations not to return an individual to a country where

the person would face persecution or torture.

*Individuals Being Removed from Canada Who Seek Protection While in Transit Through the United States*

Pursuant to the Agreement, if a person is being removed from Canada in transit through the United States and expresses a fear of persecution or torture or an intention to apply for asylum, the person will be returned to Canada for Canadian authorities to determine the refugee status claim, in accordance with Canadian law. The inspection of an alien who falls into this category is explained in the supplementary information in the DHS proposed rule. Generally, an individual being removed from Canada in transit through the United States will be placed in expedited removal proceedings, though there may be some rare instances in which the individual will be placed in removal proceedings under section 240 of the Act. The DHS rule provides that such individuals will receive the same threshold screening by an asylum officer as an alien who seeks entry to the United States at a land border port-of-entry between Canada and the United States. However, the exceptions for unaccompanied minors, qualifying family members, and valid travel documents do not apply to an alien being removed from Canada in transit through the United States. Because the Agreement provides no exceptions to the obligation to return such alien to Canada, except for the public interest exception, and the public interest exception itself would not be within the authority of an immigration judge to consider in any event, there is essentially nothing for an immigration judge to review in this context and no purpose to be served by providing for such review. For those rare instances in which an alien being removed in transit through the United States is placed in removal proceedings pursuant to section 240 of the Act, the immigration judge will not consider any claims of asylum, withholding of removal, or protection under the Convention Against Torture (unless DHS files a written notice in the proceedings that it has decided it is in the public interest to allow the alien to pursue those claims in the United States), and after completion of the proceedings, if the alien is ordered removed, the alien will be returned to Canada. On the other hand, if DHS files a written notice in the proceedings that it is in the public interest to allow the alien to pursue protection claims in the United States, then the alien will pursue his or her claim for protection in the removal proceedings, and, if ordered

removed, will be ordered removed to an appropriate country of removal.

**Regulatory Flexibility Act**

The Attorney General, in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)), has reviewed this regulation and, by approving it, certifies that this rule will not have a significant economic impact on a substantial number of small entities. This rule affects individual aliens, as it relates to claims of asylum. It does not affect small entities, as that term is defined in 5 U.S.C. 601(6).

**Unfunded Mandates Reform Act of 1995**

This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

**Small Business Regulatory Enforcement Fairness Act of 1996**

This rule is not a major rule as defined by section 251 of the Small Business Regulatory Enforcement Act of 1996 (5 U.S.C. 804). This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

**Executive Order 12866**

The Attorney General has determined that this rule is a "significant regulatory action" under Executive Order 12866, section 3(f), Regulatory Planning and Review, and, accordingly, this rule has been submitted to the Office of Management and Budget for review. In particular, the Department has assessed both the costs and benefits of this rule as required by Executive Order 12866, section 1(b)(6) and has made a reasoned determination that the benefits of this regulation justify its costs.

The proposed rule would implement a bilateral agreement that allocates responsibility between the United States and Canada for processing claims of certain asylum-seekers, enhancing the two nations' ability to manage, in an orderly fashion, asylum claims brought by persons crossing our common border. The rule applies to certain individuals

---

[1] Section 241(b)(3) of the Act is based on Article 33 of the Protocol. *See INS* v *Stevic,* 467 U.S. 407, 421 (1984) ("Section 203(e) of the Refugee Act of 1980 amended the language of § 243(h) [currently § 241(b)(3) of the Act] basically conforming it to the language of Article 33 of the United Nations Protocol.")

in removal proceedings who apply for asylum. This rule simply adds another factor for immigration judges to consider in removal proceedings. Therefore, the "tangible" costs of this rulemaking to the U.S. Government are minimal. Applicants who are found to be subject to the bilateral Agreement with Canada will be returned to Canada to seek asylum, saving the U.S. Government the cost of adjudicating their asylum claims.

The cost to asylum-seekers who, under the proposed rule, will be returned to Canada are the costs of pursuing an asylum claim in Canada, as opposed to the United States. There is no fee to apply for asylum in Canada and, under Canadian law, asylum-seekers are provided social benefits that they are not eligible for in the United States. Therefore, the tangible costs of seeking asylum in Canada are no greater than they are in the United States. The "intangible" costs to asylum-seekers who would be returned to Canada under the proposed rule are the costs of potential separation from support networks they may be seeking to join in the United States. However, the Agreement contains broad exceptions based on principles of family unity that would generally allow those with family connections in the United States to seek asylum in the United States under existing regulations.

**Executive Order 13132**

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

**Executive Order 12988 Civil Justice Reform**

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

**Paperwork Reduction Act**

The provisions of the Paperwork Reduction Act of 1995, Public Law 104–13, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320, do not apply to this proposed rule because there are no new or revised recordkeeping or reporting requirements.

**Family Assessment Statement**

The Attorney General has reviewed this regulation and assessed this action in accordance with the criteria specified by section 654(c)(1) of the Treasury General Appropriations Act, 1999, Public Law 105–277, Div. A. The Attorney General has determined that it will not affect family well-being as that term is defined in section 654.

The separate proposed rule published by the Department of Homeland Security explains that an alien arriving at a land border port-of-entry with Canada may qualify for an exception to the bilateral Agreement with Canada, which otherwise requires individuals to seek protection in the country of last presence (Canada), by establishing a relationship to a family member in the United States who has lawful status in the United States, other than a visitor, or is 18 years of age or older and has an asylum application pending. The DHS proposed rule addresses issues relating to family well-being in connection with that rule.

This proposed rule provides that the immigration judges will apply the same administrative guidelines of "family member" in the DHS proposed rule, in those cases where DHS has chosen to place an alien who is subject to the Agreement into removal proceedings under section 240 of the Act. However, that is expected to occur only very rarely. In any other case, where DHS does not choose to place an arriving alien into removal proceedings under section 240 of the Act, this rule has no effect on family well-being, because the immigration judges will not be involved.

**List of Subjects**

*8 CFR Part 1003*

Administrative practice and procedure, Aliens, Immigration, Legal services, Organization and function (Government agencies).

*8 CFR Part 1208*

Administrative practice and procedure, Aliens, Immigration, and Reporting and recordkeeping requirements.

*8 CFR Part 1212*

Administrative practice and procedure, Aliens, Immigration, Passports and visas and Reporting and recordkeeping requirements.

*8 CFR Part 1240*

Administrative practice and procedure and Aliens.

Accordingly, chapter V of title 8 of the Code of Federal Regulations is proposed to be amended as follows:

**PART 1003—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**

1. The authority citation for part 1003 continues to read as follows:

**Authority:** 5 U.S.C. 301; 8 U.S.C. 1101 note, 1103, 1252 note, 1252b, 1324b, 1362; 28 U.S.C. 509, 510, 1746; sec. 2, Reorg. Plan No. 2 of 1950, 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub. L. 105–100, 111 Stat. 2196–200; sections 1506 and 1510 of Pub. L. 106–386; 114 Stat. 1527–29, 1531–32; section 1505 of Pub. L. 106–554, 114 Stat. 2763A–326 to –328.

2. Section 1003.42 is amended by adding new paragraph (h) to read as follows:

**§ 1003.42   Review of credible fear determinations.**

*       *       *       *       *

(h) Safe third country agreement—(1) Arriving alien. An immigration judge shall have no jurisdiction to review a determination by an asylum officer that an arriving alien is not eligible to apply for asylum pursuant to a bilateral or multilateral agreement (the agreement) under section 208(a)(2)(A) of the Act and should be returned to a safe third country to pursue his or her asylum claims under the laws of that country. See 8 CFR 208.30(e)(6).

(2) Aliens in transit. An immigration judge has no jurisdiction to review any determination by DHS that an alien being removed from Canada in transit through the United States should be returned to Canada to pursue asylum claims under Canadian law, under the terms of a safe third country agreement with Canada.

*       *       *       *       *

**PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

3. The authority citation for part 1208 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1158, 1226, 1252, 1282.

4. Section 1208.4 is amended by adding new paragraph (a)(6) to read as follows:

**§ 1208.4   Filing the application.**

*       *       *       *       *

(a) * * *

(6) Safe third country agreement. Immigration judges have authority to consider issues under section 208(a)(2)(A) of the Act, relating to the determination of whether an alien is ineligible to apply for asylum and should be removed to a safe third

country pursuant to a bilateral or multilateral agreement, only with respect to aliens whom DHS has chosen to place in removal proceedings under section 240 of the Act, as provided in 8 CFR 1240.11(g). For DHS regulations relating to determinations by asylum officers on this subject, see 8 CFR 208.30(e)(6).

* * * * *

5. Section 1208.30 is amended by:

a. Revising paragraphs (a) and (e); and by

b. Removing and reserving paragraphs (c), (d), (f) and (g)(1).

The revisions read as follows:

### § 1208.30   Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.

(a) Jurisdiction. The provisions of this subpart apply to aliens subject to sections 235(a)(2) and 235(b)(1) of the Act. Pursuant to section 235(b)(1)(B), asylum officers have exclusive jurisdiction to make credible fear determinations, and the immigration judges have exclusive jurisdiction to review such determinations.

* * * * *

(e) Determination. For the standards and procedures for asylum officers in conducting credible fear interviews and in making positive and negative credible fear determinations, see 8 CFR 208.30(b), (c), (d), (e), (f), and (g)(1). The immigration judges will review such determinations as provided in paragraph (g)(2) of this section and 8 CFR 1003.42.

* * * * *

## PART 1212—DOCUMENTARY REQUIREMENTS; NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

6. The authority citation for part 1212 is revised to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103.

7. Section 1212.5 is revised to read as follows:

### § 1212.5   Parole of aliens into the United States.

Procedures and standards for the granting of parole by the Department of Homeland Security can be found at 8 CFR 212.5.

## PART 1240—PROCEEDINGS TO DETERMINE REMOVABILITY OF ALIENS IN THE UNITED STATES

8. The authority citation for part 1240 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1182, 1186a, 1224, 1225, 1226, 1227, 1251, 1252 note,

1252a, 1252b, 1362; secs. 202 and 203, Pub. L. 105–100, 111 Stat. 2160, 2193; sec. 902, Pub. L. 105–277, 112 Stat. 2681; sec. 1101, Pub. L. 107–269, 116 Stat. 2135.

9. Section 1240.11 is amended by adding a new paragraph (g), to read as follows:

### § 1240.11   Ancillary matters, applications.

* * * * *

(g) Safe third country agreement. (1) The immigration judge has authority to apply section 208(a)(2)(A) of the Act, relating to a determination that an alien may be removed to a safe third country pursuant to a bilateral or multilateral agreement, in the case of an alien who is subject to the terms of the agreement and is placed in proceedings pursuant to section 240 of the Act without being processed under section 235 of the Act. In an appropriate case, the immigration judge shall determine whether under the Agreement the alien should be returned to the safe third country, or whether the alien should be permitted to pursue asylum or other protection claims in the United States.

(2) An alien described in paragraph (g)(1) of this section is ineligible to apply for asylum, pursuant to section 208(a)(2)(A) of the Act, unless the immigration judge determines, by preponderance of the evidence, that:

(i) The agreement does not apply to the alien or does not preclude the alien from applying for asylum in the United States; or

(ii) The alien qualifies for an exception to the agreement as set forth in paragraph (g)(3) of this section.

(3) The immigration judge shall apply the applicable regulations in deciding whether the alien qualifies for any exception under the agreement that would permit the United States to exercise authority over the alien's asylum claim. The exceptions under the agreement are codified at 8 CFR 208.30(e)(6)(iii). The immigration judge shall not review, consider, or decide any issues pertaining to any discretionary determination on whether the alien should be permitted to pursue an asylum claim in the United States notwithstanding the general terms of the agreement, as such discretionary public interest determinations are reserved to the Department of Homeland Security. However, an alien in removal proceedings who is otherwise ineligible to apply for asylum under the agreement may apply for asylum if the Department of Homeland Security files a written notice in the proceedings before the immigration judge that it has decided in the public interest to allow the alien to pursue claims for asylum or

withholding of removal in the United States.

(4) An alien who is found to be ineligible to apply for asylum under section 208(a)(2)(A) of the Act is ineligible to apply for withholding of removal pursuant to section 241(b)(3) of the Act and the Convention against Torture. However, the alien may apply for any other relief from removal for which the alien may be eligible. If an alien who is subject to section 208(a)(2)(A) of the Act is ordered removed, the alien shall be ordered removed to the safe third country in which the alien will be able to pursue his or her claims for asylum or protection under the laws of that country.

Dated: March 1, 2004.

**John Ashcroft,**

*Attorney General.*

[FR Doc. 04–5065 Filed 3–5–04; 8:45 am]

**BILLING CODE 4410–30–P**

## DEPARTMENT OF AGRICULTURE

### Animal and Plant Health Inspection Service

#### 9 CFR Parts 93, 94, and 95

[Docket No. 03–080–2]

RIN 0579–AB73

### Bovine Spongiform Encephalopathy; Minimal Risk Regions and Importation of Commodities

**AGENCY:** Animal and Plant Health Inspection Service, USDA.

**ACTION:** Proposed rule; reopening of comment period.

---

**SUMMARY:** We are reopening the comment period for our proposed rule that would amend the regulations regarding the importation of animals and animal products to recognize, and add Canada to, a category of regions that present a minimal risk of introducing bovine spongiform encephalopathy into the United States via live ruminants and ruminant products. The proposed rule also set out conditions under which we would allow the importation of certain live ruminants and ruminant products and byproducts from such regions. This action will allow interested persons additional time to prepare and submit comments.

**DATES:** We will consider all comments that we receive on or before April 7, 2004.

**ADDRESSES:** You may submit comments by any of the following methods:

## PART 71—DESIGNATION OF CLASS A, B, C, D, AND E AIRSPACE AREAS; AIR TRAFFIC SERVICE ROUTES; AND REPORTING POINTS

■ 1. The authority citation for part 71 continues to read as follows:

**Authority:** 49 U.S.C. 106(f), 106(g); 40103, 40113, 40120; E.O. 10854, 24 FR 9565, 3 CFR, 1959–1963 Comp., p. 389.

### § 71.1 [Amended]

■ 2. The incorporation by reference in 14 CFR 71.1 of FAA Order 7400.9Z, Airspace Designations and Reporting Points, dated August 6, 2015, effective September 15, 2015, is amended as follows:

*Paragraph 6002   Class E Airspace designated as surface areas.*

\*    \*    \*    \*    \*

**AGL SD E2   Rapid City, SD (Amended)**

Rapid City Regional Airport, SD
  (Lat. 44°02′43″ N., long. 103°03′27″ W.)
Ellsworth AFB, SD
  (Lat. 44°08′42″ N., long. 103°06′13″ W.)
Rapid City VORTAC
  (Lat. 43°58′34″ N., long. 103°00′44″ W.)

Within a 4.4-mile radius of the Rapid City Regional Airport, excluding the portion north of a line between the intersection of the Rapid City Regional Airport 4.4-mile radius and the Ellsworth AFB 4.7-mile radius, and that airspace extending upward from the surface within 2.6 miles each side of the Rapid City VORTAC 155°/335°. radials extending from the 4.4-mile radius of the Rapid City Regional Airport to 7 miles southeast of the VORTAC, excluding that airspace within the Rapid City, Class D airspace area.

\*    \*    \*    \*    \*

*Paragraph 6004   Class E Airspace Areas Designated as an Extension to a Class D or Class E Surface Area.*

\*    \*    \*    \*    \*

**AGL SD E4   Rapid City, SD (Amended)**

Rapid City Regional Airport, SD
  (Lat. 44°02′43″ N., long. 103°03′27″ W.)
Rapid City VORTAC
  (Lat. 43°58′34″ N., long. 103°00′44″ W.)

That airspace extending upward from the surface within 2.6 miles each side of the Rapid City VORTAC 155°/335° radials extending from the 4.4-mile radius of the Rapid City Regional Airport to 7 miles southeast of the VORTAC, excluding that airspace within the Rapid City, Class D airspace area.

Issued in Fort Worth, Texas, on January 27, 2016.

**Robert W. Beck,**

*Manager, Operations Support Group, ATO Central Service Center.*

[FR Doc. 2016–02037 Filed 2–3–16; 8:45 am]

**BILLING CODE 4910–13–P**

## DEPARTMENT OF STATE

**22 CFR Part 41**

**[Public Notice: 9428]**

**RIN 1400–AD17**

### Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended

**AGENCY:** Department of State.

**ACTION:** Interim final rule.

**SUMMARY:** As a result of this rule, a passport and a visa will be required of a British, French, or Netherlands national, or of a national of Antigua, Barbados, Grenada, Jamaica, or Trinidad and Tobago, who has residence in British, French, or Netherlands territory located in the adjacent islands of the Caribbean area, or has residence in Antigua, Barbados, Grenada, Jamaica, or Trinidad and Tobago, if the alien is proceeding to the United States as an agricultural worker. In light of past experience, and to promote consistency of treatment across H–2A agricultural workers, prudent border management requires these temporary workers to obtain a visa along with most other H–2A agricultural workers.

The previous rule allowing temporary workers from these countries to enter the United States without a visa presented a vulnerability. Temporary workers from these countries now require H–2A visas to enter the United States.

**DATES:** This rule is effective February 19, 2016. *Comment period:* The Department will accept comments until April 4, 2016.

**ADDRESSES:**

• Interested parties may submit comments at any time by any of the following methods:

• *Mail:* U.S. Department of State, Visa Services, Legislation and Regulations Division, 600 19th Street NW., Room 12–526B, Washington, DC 20006 ATTN: Paul-Anthony L. Magadia.

• If you have access to the Internet you may submit comments by going to *http://www.regulations.gov/#!home* and searching for Public Notice number XXXX.

**FOR FURTHER INFORMATION CONTACT:**
Paul-Anthony L. Magadia, U.S. Department of State, Visa Services, Legislation and Regulations Division, Washington, DC 20006, (202) 485–7641, Email: *magadiapl@state.gov*.

**SUPPLEMENTARY INFORMATION:**

## Why is the Department promulgating this rule?

The Department of State (the Department) is amending the previous rule to alleviate fraud and security concerns that have developed subsequent to that rule's publication. The previous rule, 22 CFR 41.2(e)(1), allowed nationals of certain Caribbean countries, as well as nationals of certain other countries who have residence in such countries' territories in the Caribbean, to enter the United States as temporary agricultural workers without visas. The amended rule requires that temporary workers from these countries obtain H–2A visas to enter the United States.

## What is the current rule?

Currently, British, French, and Netherlands nationals and nationals of Antigua, Barbados, Grenada, Jamaica, and Trinidad and Tobago, who have their residence in British, French, or Netherlands territory located in the adjacent islands of the Caribbean area or in Antigua, Barbados, Grenada, Jamaica, or Trinidad and Tobago, are not required to obtain visas before traveling to the United States as H–2A agricultural workers.

## What will prospective H–2A agricultural workers be required to do?

The amended rule requires these prospective H–2A agricultural workers to obtain a visa prior to traveling to the United States. Any spouses or children of these workers also will have to obtain a visa. To obtain a visa, these nonimmigrant aliens will have to be in possession of a valid passport, submit a visa application to and appear for an interview at a U.S. embassy or consulate, and undergo the Department's visa screening process.

## Will the amended rule ensure that prospective H–2A agricultural workers are properly screened prior to their arrival in the United States?

Requiring these prospective H–2A agricultural workers to obtain visas will ensure that they are sufficiently screened prior to arrival in the United States. This will lessen the possibility that persons who pose security risks to the United States and other potential immigration violators may improperly gain admission to the United States. At the same time, requiring that these applicants appear before consular officers will provide greater opportunities to prescreen for potential employment fraud and will promote compliance with Department of Homeland Security (DHS) and Department of Labor (DOL) H–2A rules.

## How will the amended rule further the national security interests of the United States?

The Department, in conjunction with DHS, has determined that the visa exemption provided a loophole that could potentially be exploited by terrorists and other persons seeking to engage in unlawful activities in the United States and threatens the security interests of the United States. This visa exemption is outdated in the post-9/11 environment and inconsistent with the visa requirement for other H–2A agricultural workers from other countries. The Department and DHS have determined that eliminating this visa exemption furthers the national security interests of the United States.

## How will the amended rule affect the Department's visa issuance process?

The application of the general visa requirement to the class of Caribbean agricultural workers described above will ensure that these applicants for admission, like other H–2A agricultural workers, are properly screened through the Department's visa issuance process prior to arrival in the United States. This will lessen the possibility that persons who pose security risks to the United States and other potential immigration violators may improperly gain admission to the United States.

Moreover, extending the visa requirement to these Caribbean H–2A agricultural workers will better ensure that such workers are protected from certain employment and recruitment-based abuses. It also will ensure that agricultural workers have been informed, and are aware of, their rights and responsibilities before departing from their home countries to engage in H–2A agricultural work.

## What other changes is the Department making in this rule?

Redesignated paragraph (e)(2)(iv) is being amended to reflect that The Royal Virgin Islands Police Department has been renamed the Royal Virgin Islands Police Force.

## Will DHS be publishing a parallel amendment?

DHS is publishing a parallel amendment to 8 CFR 212.1(b).

*Regulatory Findings*

## Administrative Procedure Act

The publication of this rule as an interim final rule, with provisions for post-promulgation public comments, is based on the good cause exception found in section 553 of the Administrative Procedure Act (APA) (5

U.S.C. 553(b)(B)). There is reasonable concern that publication of the rule as a proposed rule, which would permit continuation of the current visa exemption, could lead to an increase in applications for admission in bad faith by persons who would otherwise have been denied visas and are seeking to avoid the visa requirement and consular screening process during the period between the publication of a proposed and a final rule. Accordingly, the Department finds that it is impracticable and contrary to the public interest to publish this rule with prior notice and comment period. Under the good cause exception, this rule is exempt from the notice and comment and delayed effective date requirements of the APA.

In addition, the Department is of the opinion that eliminating the visa exemption and requiring a visa for Caribbean H–2A agricultural workers, and the spouses or children accompanying or following these workers, is a foreign affairs function of the U.S. government. As this rule implements this function, the Department is of the opinion that, pursuant to 5 U.S.C. 553(a)(1), this rule is exempt from the requirements of 5 U.S.C. 553, including the notice and comment and 30-day delayed effective date requirements. The Department is nevertheless providing the opportunity for the public to provide comments for 60 days.

## Regulatory Flexibility Act/Executive Order 13272: Small Business

Because this interim final rule is exempt from notice and comment rulemaking under 5 U.S.C. 553, it is exempt from the regulatory flexibility analysis requirements set forth at sections 603 and 604 of the Regulatory Flexibility Act (5 U.S.C. 603 and 604). Nonetheless, consistent with section 605(b) of the Regulatory Flexibility Act (5 U.S.C. 605(b)), the Department certifies that this rule will not have a significant economic impact on a substantial number of small entities. This rulemaking regulates individual aliens who seek consideration for nonimmigrant visas and does not affect any small entities, as defined in 5 U.S.C. 601(6).

## The Unfunded Mandates Reform Act of 1995

Section 202 of the Unfunded Mandates Reform Act of 1995, Public Law 104–4, 109 Stat. 48, 2 U.S.C. 1532, generally requires agencies to prepare a statement before proposing any rule that may result in an annual expenditure of $100 million or more by state, local, or tribal governments, or by the private

sector. This rule will not result in any such expenditure, nor will it significantly or uniquely affect small governments.

## The Small Business Regulatory Enforcement Fairness Act of 1996

This rule is not a major rule as defined by 5 U.S.C. 804, for purposes of congressional review of agency rulemaking under the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121.

## Executive Order 12866: Regulatory Review

The costs of this rulemaking are discussed in the companion DHS rule, RIN 1651–AB09, included elsewhere in this edition of the **Federal Register**. That discussion is incorporated by reference herein. The Department has reviewed the costs and benefits of this rule to ensure its consistency with the regulatory philosophy and principles set forth in Executive Order 12866 and has determined that the benefits of this interim final rule justify its costs.

## Executive Order 13563

The Department has considered this rule in light of Executive Order 13563, dated January 18, 2011, and affirms that this regulation is consistent with the guidance therein.

## Executive Orders 12372 and 13132: Federalism

This regulation will not have substantial direct effects on the states, on the relationship between the national government and the states, or the distribution of power and responsibilities among the various levels of government; nor will the rule have federalism implications warranting the application of Executive Orders 12372 and 13132.

## Executive Order 13175 Consultation and Coordination With Indian Tribal Governments

The Department has determined that this rulemaking will not have tribal implications, will not impose substantial direct compliance costs on Indian tribal governments, and will not pre-empt tribal law. Accordingly, the requirements of Executive Order 13175 do not apply to this rulemaking.

## Executive Order 12988: Civil Justice Reform

The Department has reviewed this interim final rule in light of Executive Order 12988 to eliminate ambiguity, minimize litigation, establish clear legal standards, and reduce burden.

## Paperwork Reduction Act

This rule does not impose any new information collections subject to the Paperwork Reduction Act, 44 U.S.C., Chapter 35. The Department anticipates between 100 and 4,100 additional nonimmigrant visa applicants per year as a result of this rulemaking. The current burden for this information collection (OMB Control No. 1405–0182) is 13,875,345 hours, with 11,100,276 respondents. The burden per response is 75 minutes. The top estimate for the number of additional respondents would add approximately 5,000 hours to a burden that is almost 14 million hours. Therefore, the addition of these respondents does not significantly increase the burden associated with this information collection.

## List of Subjects in 22 CFR Part 41

Aliens, Foreign officials, Immigration, Nonimmigrants, Passports and visas.

For the reasons stated in the preamble, the Department of State is amending 22 CFR part 41 to read as follows:

## PART 41—[AMENDED]

■ 1. The authority citation for part 41 is revised to read as follows:

**Authority:** 22 U.S.C. 2651a; 8 U.S.C. 1104; Pub. L. 105–277, 112 Stat. 2681–795 through 2681–801; 8 U.S.C. 1185 note (section 7209 of Pub. L. 108–458, as amended by section 546 of Pub. L. 109–295).

■ 2. Amend § 41.2 as follows:

■ a. Remove paragraph (e).

■ b. Redesignate paragraphs (f) through (m) as paragraphs (e) through (l).

■ c. Revise redesignated paragraph (e)(2)(iv).

The revisions read as follows:

### § 41.2 Exemption or waiver by Secretary of State and Secretary of Homeland Security of passport and/or visa requirements for certain categories of nonimmigrants.

\* \* \* \* \*

(e) \* \* \*

(2) \* \* \*

(iv) Presents a current certificate issued by the Royal Virgin Islands Police Force indicating that he or she has no criminal record.

\* \* \* \* \*

Dated: January 22, 2016.

**David T. Donahue,**

*Acting Assistant Secretary for Consular Affairs, Department of State.*

[FR Doc. 2016–02191 Filed 2–3–16; 8:45 am]

**BILLING CODE 4710–06–P**

## DEPARTMENT OF THE TREASURY

**Internal Revenue Service**

**26 CFR Part 1**

**[TD 9748]**

**RIN 1545–BM57**

## Allocation of Creditable Foreign Taxes

**AGENCY:** Internal Revenue Service (IRS), Treasury.

**ACTION:** Final and temporary regulations.

**SUMMARY:** This document contains temporary regulations that provide guidance relating to the allocation by a partnership of creditable foreign tax expenditures. These temporary regulations are necessary to improve the operation of an existing safe harbor rule that is used for determining whether allocations of creditable foreign tax expenditures are deemed to be in accordance with the partners' interests in the partnership. The text of these temporary regulations also serves as the text of the proposed regulations set forth in the notice of proposed rulemaking (REG–100861–15) published in the Proposed Rules section in this issue of the **Federal Register**. These regulations affect partnerships that pay or accrue foreign income taxes, and their partners.

**DATES:** *Effective Date:* These regulations are effective on February 4, 2016.

*Applicability Dates:* For dates of applicability, see §§ 1.704–1T(b)(1)(ii)(*b*)(*1*) and (b)(1)(ii)(*b*)(*3*)(*B*).

**FOR FURTHER INFORMATION CONTACT:** Suzanne M. Walsh, (202) 317–4908 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

## Background and Explanation of Provisions

Allocations of creditable foreign tax expenditures ("CFTEs") do not have substantial economic effect, and accordingly a CFTE must be allocated in accordance with the partners' interests in the partnership. *See* § 1.704–1(b)(4)(viii). Section 1.704–1(b)(4)(viii) provides a safe harbor under which CFTE allocations are deemed to be in accordance with the partners' interests in the partnership. In general, the purpose of the safe harbor is to match allocations of CFTEs with the income to which the CFTEs relate.

In order to apply the safe harbor, a partnership must (1) determine the partnership's "CFTE categories," (2) determine the partnership's net income in each CFTE category, and (3) allocate the partnership's CFTEs to each category. Section 1.704–

1(b)(4)(viii)(*c*)(*2*) requires a partnership to assign its income to activities and provides for the grouping of a partnership's activities into one or more CFTE categories based generally on whether net income from the activities is allocated to partners in the same sharing ratios. Section 1.704–1(b)(4)(viii)(*c*)(*3*) provides rules for determining the partnership's net income (for U.S. federal income tax purposes) in a CFTE category, including rules for allocating and apportioning expenses, losses, and other deductions to gross income. Section 1.704–1(b)(4)(viii)(*d*) assigns CFTEs to the CFTE category that includes the related income under the principles of § 1.904–6, with certain modifications. In order to satisfy the safe harbor, partnership allocations of CFTEs in a CFTE category must be in proportion to the allocations of the partnership's net income in the CFTE category.

### I. Effect of Section 743(b) Adjustments

Section 1.704–1(b)(4)(viii)(*c*)(*3*)(*i*) of the current final regulations provides that a partnership determines its net income in a CFTE category by taking into account all partnership items attributable to the relevant activity or group of activities, including items of gross income, gain, loss, deduction, and expense, and items allocated pursuant to section 704(c). The current final regulations do not state whether an adjustment under section 743(b) is taken into account in computing the partnership's net income in a CFTE category.

In the case of a transfer of a partnership interest that results in an adjustment under section 743(b) (because the partnership has a section 754 election in effect, or because there is a substantial built-in loss (as defined in section 743(d)) in the partnership), the partnership must adjust the basis of partnership property with respect to the transferee partner only (a section 743(b) adjustment). No adjustment is made to the common basis of partnership property, and the section 743(b) adjustment has no effect on the partnership's computation of any item under section 703. § 1.743–1(j)(1).

The Treasury Department and the IRS believe that a transferee partner's section 743(b) adjustment with respect to its interest in a partnership should not be taken into account in computing such partnership's net income in a CFTE category because the basis adjustment is unique to the transferee partner and because the basis adjustment ordinarily would not be taken into account by a foreign jurisdiction in computing its foreign

IN THE SUPREME COURT OF THE UNITED STATES

—————————————

No. 19A-————

WILLIAM P. BARR, ATTORNEY GENERAL OF THE UNITED STATES,
ET AL., APPLICANTS

v.

EAST BAY SANCTUARY COVENANT, ET AL.

—————————————

APPLICATION FOR A STAY PENDING APPEAL
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT AND PENDING
FURTHER PROCEEDINGS IN THIS COURT

—————————————

NOEL J. FRANCISCO
Solicitor General
  Counsel of Record
Department of Justice
Washington, D.C. 20530-0001
SupremeCtBriefs@usdoj.gov
(202) 514-2217

PARTIES TO THE PROCEEDING

The applicants (defendants-appellants below) are Matthew T. Albence, in his official capacity as Acting Director of Immigration and Customs Enforcement; William P. Barr, in his official capacity as Attorney General of the United States; Kenneth T. Cuccinelli, in his official capacity as Acting Director of U.S. Citizenship and Immigration Services; Executive Office for Immigration Review; Immigration and Customs Enforcement; Kevin K. McAleenan, in his official capacity as Acting Secretary of the U.S. Department of Homeland Security; James McHenry, in his official capacity as Director of the Executive Office for Immigration Review; John P. Sanders, in his official capacity as Acting Commissioner of U.S. Customs and Border Protection; U.S. Citizenship and Immigration Services; U.S. Customs and Border Protection; U.S. Department of Justice; and U.S. Department of Homeland Security.

The respondents (plaintiffs-appellees below) are East Bay Sanctuary Covenant, Al Otro Lado, Innovation Law Lab, and Central American Resource Center in Los Angeles.

DOJIFR00437

II

RELATED PROCEEDINGS

United States District Court (N.D. Cal.):

> East Bay Sanctuary Covenant v. Barr, No. 19-cv-4073
>
> (July 24, 2019)

United States Court of Appeals (9th Cir.):

> East Bay Sanctuary Covenant v. Barr, No. 19-16487
>
> (Aug. 16, 2019)

IN THE SUPREME COURT OF THE UNITED STATES

————————————

No. 19A-_____

WILLIAM P. BARR, ATTORNEY GENERAL OF THE UNITED STATES,
ET AL., APPLICANTS

v.

EAST BAY SANCTUARY COVENANT, ET AL.

————————————

APPLICATION FOR A STAY PENDING APPEAL
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT AND PENDING
FURTHER PROCEEDINGS IN THIS COURT

————————————

Pursuant to Rule 23 of the Rules of this Court and the All Writs Act, 28 U.S.C. 1651, the Solicitor General, on behalf of applicants William P. Barr, Attorney General of the United States, et al., respectfully applies for a stay of the injunction issued by the United States District Court for the Northern District of California, pending consideration and disposition of the government's appeal from that injunction to the United States Court of Appeals for the Ninth Circuit and, if necessary, pending the filing and disposition of a petition for a writ of certiorari and any further proceedings in this Court.

The United States has experienced an unprecedented surge in the number of aliens who enter the country unlawfully across the southern border and, if apprehended, claim asylum and remain in the country while their claims are adjudicated, with little

2

prospect of obtaining that discretionary relief. The Departments of Justice and Homeland Security have express statutory authority to establish "additional limitations and conditions, consistent with [the asylum statute], under which an alien shall be ineligible for asylum." 8 U.S.C. 1158(b)(2)(C). Exercising that authority, the Departments issued an interim final rule denying asylum to certain aliens who seek asylum in the United States without having sought protection in a third country through which they traveled and where such protection was available. The rule thus screens out asylum seekers who declined to request protection at the first opportunity.

The rule serves important public purposes. Most importantly, it alleviates a crushing burden on the U.S. asylum system by prioritizing asylum seekers who most need asylum in the United States. The rule also screens out asylum claims that are less likely to be meritorious by denying asylum to aliens who refused to seek protection in third countries en route to the southern border. In turn, the rule deters aliens without a genuine need for asylum from making the arduous and potentially dangerous journey from Central America to the United States. The risks of that journey and human smuggling threaten harm to many aliens, including children. The Departments therefore adopted a rule that encourages asylum-seekers to present their claims in the first safe country in which they arrive. That

rule, which is similar to a requirement in effect in the European Union, complements restrictions that Congress already imposed upon other asylum seekers who have elsewhere to turn.

Respondents -- four organizations that serve aliens -- sued to enjoin the rule. No respondent is actually subject to the rule. Yet the district court granted their request and issued a universal injunction barring enforcement of the rule as to any persons anywhere in the United States -- even though another district court entertaining a challenge to the rule had previously sided with the government. App., _infra_, 19a-63a. The government appealed to the Ninth Circuit and sought a stay of the injunction pending appeal. The court of appeals denied the stay insofar as the injunction operates within the Ninth Circuit, but granted the stay insofar as the injunction operates outside the Ninth Circuit. _Id._ at 1a-9a. The court stated that the district court retained jurisdiction to further develop the record and to re-extend the injunction beyond the Ninth Circuit.

The injunction now in effect is deeply flawed and should be stayed pending appeal and pending any further proceedings in this Court. All of the relevant factors support a stay.

_First_, if the Ninth Circuit upholds the injunction, there is a reasonable probability that this Court will grant certiorari. The injunction prohibits the Executive Branch from implementing an interim final rule adopted to address an ongoing

DOJIFR00441

4

crisis at the southern border, with significant implications for ongoing diplomatic negotiations and foreign relations.

Second, there is more than a fair prospect that the Court will vacate the injunction.   As an initial matter, the injunction was entered at the behest of organizations that do not even have a judicially cognizable interest in its application to individual aliens.   Moreover, the Ninth Circuit denied a full stay solely on the ground that the Departments likely should not have issued the rule as an interim final rule, without advance notice and comment.   The Administrative Procedure Act (APA), however, allows an agency to issue a rule without notice-and-comment procedures if the rule involves a "foreign affairs function of the United States."   5 U.S.C. 553(a)(1).   The rule at hand plainly involves a foreign affairs function of the United States:   It requires aliens seeking asylum in the United States to take certain steps in foreign countries, in order to protect the integrity of the U.S.-Mexico border and to facilitate ongoing diplomatic negotiations. Separately, the APA allows an agency to issue a rule without notice and comment for good cause.   The Departments explained that delaying effectiveness of the rule may prompt an additional surge of asylum seekers, further burdening an already overwhelmed asylum system and further undermining the United States' position in ongoing diplomatic negotiations.

5

The district court (though not the Ninth Circuit) also concluded that that the rule exceeds the Departments' statutory authority and that the rule is arbitrary and capricious. Those conclusions are also erroneous. Consistent with its conferral of broad discretion to grant or deny asylum, the asylum statute expressly authorizes the Departments to adopt new categorical bars to asylum, and the bar adopted here is consistent with the asylum statute's other provisions. And the Departments amply explained the reasoning underlying the adoption of the bar.

Third, the balance of equities favors a stay. The injunction impairs the security of our border, perpetuates a crushing burden on our asylum system, and impedes ongoing diplomatic negotiations. At the same time, respondent organizations have no cognizable interest in the grant or denial of asylum to individual aliens, much less equities that could outweigh the interests served by the rule. As for the aliens the rule covers, it denies them a purely discretionary benefit, and it allows them to seek other forms of protection, including withholding of removal in the United States and refugee protection in safe third countries. The vast majority of those aliens' claims would be unlikely to succeed in the end, but processing those claims severely strains our asylum system.

At a minimum, the injunction is vastly overbroad. The injunction's circuit-wide sweep -- preventing the rule's

application to all aliens in the Ninth Circuit -- violates the well-settled rule that injunctive relief must be limited to redressing a plaintiff's own injuries, and unduly interferes with the Executive's authority to establish immigration policy. The Court should, at the very least, stay the injunction to the extent that it goes beyond remedying the alleged injury to any specific aliens respondents identify as actual clients in the United States subject to the rule.

STATEMENT

1.   Asylum is a form of discretionary relief under the Immigration and Nationality Act (INA), 8 U.S.C. 1101 et seq. See 8 U.S.C. 1158.   As a general matter, asylum protects an alien from removal, creates a path to lawful permanent residence and U.S. citizenship, enables the alien to receive authorization to work, and enables the alien's family members to seek lawful immigration status derivatively.   See 8 U.S.C. 1158-1159.

In order to obtain asylum, an alien generally must clear three hurdles.  First, the alien must show that he qualifies as a "refugee" -- i.e., that he is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of [a protected belief or trait]."  8 U.S.C. 1101(42) and 1158(b)(1)(A).  Second, the alien must show that he is not subject to an exception or mandatory bar that precludes the alien from applying for asylum or the government

DOJIFR00444

7

from granting it.  8 U.S.C. 1158(a)(2) and (b)(2).  Third, the alien must demonstrate that he merits a favorable exercise of the discretion to grant asylum.  See 8 U.S.C. 1158(b)(1)(A).

The INA denies asylum to certain aliens -- for example, aliens who have themselves engaged in persecution and certain aliens who have committed serious crimes.  See 8 U.S.C. 1158(b)(2)(A).  The INA also provides that an alien may not even apply for asylum if he may be removed to a safe third country pursuant to an international agreement, see 8 U.S.C. 1158(a)(2)(A), and that the government may not grant asylum to an alien who has been firmly resettled in another country before arriving in the United States, see 8 U.S.C. 1158(b)(2)(A)(vi).

Consistent with its vesting of broad discretion in the Executive in determining whether to grant asylum, the INA provides that the Attorney General and Secretary of Homeland Security "may by regulation establish additional limitations and conditions, consistent with [Section 1158], under which an alien shall be ineligible for asylum."  8 U.S.C. 1158(b)(2)(C); see 6 U.S.C. 552(d); 8 U.S.C. 1103(a)(1).  Previous Attorneys General and Secretaries have invoked that authority to establish bars beyond those required by the statute itself.  See, e.g., Asylum Procedures, 65 Fed. Reg. 76,121, 76,126 (Dec. 6, 2000) (denying asylum to applicants who can safely relocate within their home countries); Aliens Subject to a Bar on Entry Under Certain

8

Presidential Proclamations, 83 Fed. Reg. 55,934 (Nov. 9, 2018)
(denying asylum to applicants subject to certain presidential
proclamations).

2.   a.   On July 16, 2019, the Departments of Justice and
Homeland Security jointly issued an interim final rule that
establishes an additional bar to the discretionary grant of
asylum.  See Asylum Eligibility and Procedural Modifications, 84
Fed. Reg. 33,829.  In general, that bar applies to any alien who
(1) arrives in the United States across the southern land
border, (2) has transited through a third country en route from
his home country to the United States, and (3) has failed to
apply for protection from persecution or torture that was
available in at least one third country through which the alien
transited.  Id. at 33,835, 33,843.

The bar, however, is limited in multiple respects.  First,
it does not apply where "[t]he only countries through which the
alien transited" are not parties to certain international
treaties (making refugee protection unavailable there).  84 Fed.
Reg. at 33,843.  Second, the bar does not apply where the alien
applied for protection from persecution or torture in a third
country, but "received a final judgment denying the alien
protection in such country."  Ibid.  Third, the rule makes an
exception to the bar for certain victims of human trafficking.
Ibid.  Fourth, the bar is prospective; it applies only to aliens

9

who enter, attempt to enter, or arrive in the United States on or after the date of the rule's adoption.  Ibid.  Finally, the bar covers only asylum; it does not affect eligibility for withholding or deferral of removal.  Id. at 33,830.

b.  In adopting the rule, the Departments explained the policy judgment underlying the third-country transit bar.  At the outset, the Departments explained that "[t]he United States has experienced an overwhelming surge in the number of non-Mexican aliens crossing the southern border and seeking asylum." 84 Fed. Reg. at 33,840.  For example, the proportion of aliens subject to expedited removal who had been referred for a credible-fear interview (a step in the process of seeking asylum for certain aliens) had "jumped from approximately 5 percent" a decade ago "to above 40 percent" now.  Id. at 33,830-33,831. And "[i]mmigration courts received over 162,000 asylum [claims] in FY 2018, a 270 percent increase from five years earlier." Id. at 33,838.  The Departments pointed out, however, that "[o]nly a small minority of these individuals * * * are ultimately granted asylum."  Id. at 33,831.

The Departments explained that this surge in border crossings and (usually meritless) asylum claims has placed an "extraordinary" "strain on the nation's immigration system."  84 Fed. Reg. at 33,831.  The "large influx" has "consume[d] an inordinate amount of resources" of the Department of Homeland

DOJIFR00447

10

Security, which must "surveil, apprehend, screen, and process the aliens who enter the country," "detain many aliens pending further proceedings," and "represent the United States in immigration court proceedings." <u>Ibid.</u>  The surge has also "consume[d] substantial resources" at the Department of Justice, whose immigration judges adjudicate asylum claims and whose officials prosecute aliens who violate federal criminal law. <u>Ibid.</u>  For example, the Department of Justice now has "[m]ore than 436,000" pending cases that "include an asylum application."  <u>Ibid.</u>  The strain "extends to the judicial system," which must handle requests to review denials of asylum claims, and which "can take years" to reach "[f]inal disposition of asylum claims, even those that lack merit." <u>Ibid.</u>

Against that backdrop, the Departments explained that the third-country transit bar serves several purposes.  First, it helps "alleviate the strain on the U.S. immigration system" by "prioritizing" the applicants "who need [asylum] most" and "de-prioritizing" other applicants.  84 Fed. Reg. at 33,831, 33,839-33,840.  Applicants who cannot apply for asylum in third countries while en route to the United States -- or whose applications third countries have rejected -- have "nowhere else to turn," "have no other option," and "have no alternative to U.S.-based asylum relief."  <u>Id.</u> at 33,831, 33,834 (citation omitted).  In contrast, applicants covered by the bar <u>do</u> "have

11

[an] alternative country where they can escape persecution or torture."  Id. at 33,840.  Put simply, the rule "speed[s] relief" to applicants who most need asylum here, and at the same time "mitigates the strain on the country's immigration system" by denying relief to others.  Id. at 33,831, 33,839-33,840.

Second, the third-country transit bar helps screen out (and, ultimately, deter) "meritless asylum claims" by "restricting the claims of aliens who, while ostensibly fleeing persecution, chose not to seek protection at the earliest possible opportunity."  84 Fed. Reg. at 33,831, 33,839.  "An alien's decision not to apply for protection at the first available opportunity, and instead wait for the most preferred destination of the United States, raises questions about the validity and urgency of the alien's claim."  Id. at 33,839.  It is "reasonable to question" whether such aliens "genuinely fear persecution or torture, or are simply economic migrants."  Ibid. The Departments determined that it was "justified" to address that issue through "a new categorical asylum bar" -- rather than through consideration of the failure to apply for asylum in a third country as "just one of many factors" when adjudicating an individual claim -- in light of "the increased numbers  * * * of asylum claims in recent years."  Id. at 33,839 n.8.

Third, the third-country transit bar helps protect children from the dangers of migration to the United States by

DOJIFR00449

12

encouraging aliens to seek asylum at the first opportunity.  The
journey from Central America to the United States is "long and
arduous," and it "brings with it a great risk of harm" to
children.  84 Fed. Reg. at 33,838.  That risk "could be relieved
if individuals were to more readily avail themselves of legal
protection from persecution in a third country closer to the
child's country of origin."  Ibid.

Fourth, the bar "seeks to curtail the humanitarian crisis
created by human smugglers bringing men, women, and children
across the southern border."  84 Fed. Reg. at 33,840.  The bar
accomplishes that objective "[b]y reducing a central incentive
for aliens without a genuine need for asylum to cross the border
-- the hope of a lengthy asylum process that will enable them to
remain in the United States for years despite their statutory
ineligibility for relief."  Ibid.

Finally, the rule "will facilitate ongoing diplomatic
negotiations with Mexico and the Northern Triangle Countries
[i.e., Guatemala, Honduras, and El Salvador]" regarding
proposals for "reduc[ing] the flow" of aliens from those
countries to the United States and for "encourag[ing] aliens to
seek protection at the safest and earliest point of transit
possible."  84 Fed. Reg. at 33,840, 33,842.  The rule puts the
United States in a "better [negotiating] position" by improving
the United States' ability to curtail the flow of aliens across

DOJIFR00450

13

the southern border.  Id. at 33,831.  In addition, by channeling
asylum claims to countries the aliens first enter, the rule
encourages foreign countries to "partner" with the United States
and to shoulder their share of the burdens of mass migration.
Id. at 33,842 (citation omitted).  Indeed, the administrative
record before the Departments showed that, in the past, the
United States has successfully relied on its immigration
initiatives when negotiating agreements with foreign countries.
For example, earlier this year, the United States relied on
another immigration measure, the Migration Protection Protocols,
when negotiating an agreement under which "Mexico will take
unprecedented steps to increase enforcement to curb irregular
migration" and "to dismantle human smuggling and trafficking
organizations."  A.R. 24; see A.R. 45-50, 138-139, 231-232, 533-
557, 635-637, 676, 698.  In short, the rule "will strengthen the
ability of the United States to address the crisis at the
southern border and therefore facilitate the likelihood of
success in future negotiations."  84 Fed. Reg. at 33,842.

   The Departments also observed that the rule "is in keeping
with the efforts of other liberal democracies to prevent forum-
shopping by directing asylum-seekers to present their claims in
the first safe country in which they arrive."  84 Fed. Reg. at
33,840.  For example, under a regulation of the European Union,
an applicant for asylum must ordinarily present his application

14

to the state of first safe entry, and may be transferred back to
that state if he fails to do so.  Ibid.  The United Nations High
Commissioner for Refugees has praised that protocol for its
"commendable efforts to share and allocate the burden of review
of refugee and asylum claims."  Ibid. (citation omitted).

c.    The Departments promulgated the rule as an interim
final rule, without advance notice and comment.  They invoked
the exception to notice-and-comment procedures for rules that
involve a "foreign affairs function of the United States."
5 U.S.C. 553(a)(1).  They noted that "[t]he flow of aliens
across the southern border, unlawfully or without appropriate
travel documents, directly implicates the foreign policy and
national security interests of the United States."  84 Fed. Reg.
at 33,841.  And they explained that ongoing negotiations "would
be disrupted" by an additional surge of migrants in response to
a proposed rule.  Id. at 33,842.

The Departments also invoked the good-cause exception to
notice-and-comment procedures, under which an agency may forgo
notice and comment "when the agency for good cause finds  * * *
that notice and public procedure thereon are impracticable,
unnecessary, or contrary to the public interest."  5 U.S.C.
553(b)(3)(B).  They explained that "immediate implementation of
[the] rule is essential to avoid a surge of aliens who would
have strong incentives to seek to cross the border" while the

15

notice-and-comment process remains ongoing.  84 Fed. Reg. at 33,841.  They observed that "smugglers encourage migrants to enter the United States based on changes in U.S. immigration policy," and that, "[i]f this rule were published for notice and comment before becoming effective, 'smugglers might * * * communicate the Rule's potentially relevant change in U.S. immigration policy, albeit in non-technical terms.'"  <u>Ibid.</u> (citation omitted).  The resulting "additional surge of aliens," they concluded, "would be destabilizing to the region, as well as to the U.S. immigration system."  <u>Ibid.</u>

3.  Respondents, four organizations that provide services to aliens, challenged the rule in the Northern District of California.  The district court entered a preliminary injunction against enforcement of the rule.  App., <u>infra</u>, 19a-63a.  First, the court concluded that respondents have raised "serious questions" regarding the government's invocation of foreign-affairs and good-cause exceptions to notice-and-comment procedures.  <u>Id.</u> at 48a.  Second, the court concluded that the rule likely conflicted with the express statutory bars to asylum for aliens "who may be removed to a 'safe third country'" and aliens who are "firmly resettled in another country prior to arriving in the United States."  <u>Id.</u> at 19a-20a.  Finally, the court concluded that the rule was likely arbitrary and capricious because the government had neither shown that asylum

DOJIFR00453

16

was "sufficiently available" in third countries nor explained why "the failure to seek asylum in a third country is so damning standing alone that the government can reasonably disregard any alternative reasons why an applicant may have failed to seek asylum in that country." Id. at 51a.

The district court ordered the entry of "a nationwide injunction," App., infra, 63a -- even though, a few hours earlier, another district court entertaining a challenge to the rule had sided with the government and had refused to award any preliminary relief (nationwide or otherwise) against the rule, see Capital Area Immigrants' Rights Coalition v. Trump, No. 19-2117, 2019 WL 3436501 (D.D.C. July 24, 2019) (CAIR). The government filed a notice of appeal and moved for a stay of the injunction pending appeal, but the district court denied the government's motion. App., infra, 14a-18a.

4.   The government renewed its motion for a stay pending appeal in the Ninth Circuit. See App., infra, 1a-13a. A motions panel denied the motion for a stay "insofar as the injunction applies within the Ninth Circuit," reasoning that the government had not shown a likelihood of success on the merits with respect to its invocation of the good-cause and foreign-affairs exceptions to notice-and-comment procedures. Id. at 3a; see id. at 2a-3a. The Ninth Circuit stated that the good-cause exception "'should be interpreted narrowly'" and that the

DOJIFR00454

17

foreign-affairs exception "requires showing that ordinary public noticing would 'provoke definitely undesirable international consequences.'" Ibid. (citation omitted). In light of that conclusion, the Ninth Circuit expressly declined to reach the district court's alternative determinations that the rule exceeded the government's statutory authority and that the rule was arbitrary and capricious. See id. at 3a n.3.

A majority of the motions panel, however, granted the motion for a stay "insofar as the injunction applies outside the Ninth Circuit." App., infra, 3a. It explained that "the nationwide scope of the injunction is not supported by the record," that the district court "failed to undertake the analysis necessary before granting such broad relief," and that the district court "failed to discuss whether a nationwide injunction is necessary to remedy [respondents'] alleged harm." Id. at 3a-5a & n.4. But the panel stated that, "[w]hile this appeal proceeds, the district court retains jurisdiction to further develop the record in support of a preliminary injunction extending beyond the Ninth Circuit." Id. at 8a-9a.

Judge Tashima concurred in part and dissented in part. He would have denied the motion for a stay in its entirety and allowed the district court's injunction to remain in effect even outside the Ninth Circuit. See App., infra, 10a-13a.

18

5.   After the Ninth Circuit's ruling, respondents filed a "Motion to Consider Supplemental Evidence and Restore the Nationwide Scope of the Injunction" in the district court.   D. Ct. Doc. 57 (Aug. 19, 2019).   The district court ordered further briefing on "the issuance of a nationwide injunction" and set the matter for a hearing on September 5, 2019.   D. Ct. Doc. 59, at 1 (Aug. 19, 2019).

ARGUMENT

Under Rule 23 of the Rules of this Court and the All Writs Act, 28 U.S.C. 1651, a single Justice or the Court may stay a district-court order pending appeal to a court of appeals.   See, e.g., Trump v. International Refugee Assistance Project, 137 S. Ct. 2080 (2017) (per curiam) (IRAP); see also San Diegans for the Mt. Soledad Nat'l War Mem'l v. Paulson, 548 U.S. 1301, 1302 (2006) (Kennedy, J., in chambers) (stay factors).   Here, all of the relevant factors strongly favor a stay.   First, this Court would likely grant certiorari if the court of appeals affirms a nationwide (or even circuitwide) injunction against the rule. Second, respondents have no judicially cognizable interest in challenging the rule in the first place, and in any event the rule is a procedurally and substantively lawful exercise of the Departments' express statutory authority to place additional limitations on asylum.   Third, there is direct and irreparable injury to the interests of the government and the public but not

DOJIFR00456

19

respondents.   At a minimum, the injunction sweeps too broadly and should be stayed to the extent it goes beyond remedying injuries to specific aliens that respondents identify as actual clients in the United States subject to the rule.

1.   A stay is warranted because, if the Ninth Circuit affirms the injunction, at least "four Justices" would likely "'vote to grant certiorari.'"   San Diegans, 548 U.S. at 1302 (Kennedy, J., in chambers) (citation omitted).   The rule enjoined by the district court serves important national purposes.   The rule seeks to protect "the integrity of our borders" and to "alleviate" an "extraordinary," "extreme," and "unsustainable" "strain on the nation's immigration system."   84 Fed. Reg. at 33,831, 33,838, 33,840.   It also seeks to ameliorate a "humanitarian crisis" by discouraging aliens from making long and dangerous journeys to the United States and by discouraging human smuggling.   Id. at 33,831.   Moreover, the rule is part of a coordinated and ongoing diplomatic effort regarding the recent surge in migration from the Northern Triangle countries.   The rule explains that the third-country transit bar "will facilitate ongoing diplomatic negotiations." Id. at 33,840.   Whether the rule is lawful is thus a question of exceptional importance -- especially in light of the "dramatic increase" in illegal entries and the "sharp increase" in corresponding asylum claims in recent years.   See id. at 33,830.

DOJIFR00457

20

Under these circumstances, this Court's review of a court of appeals decision affirming the injunction would plainly be warranted.   Indeed, this Court often grants certiorari to address interference with executive policies that address "national security," Department of the Navy v. Egan, 484 U.S. 518, 520 (1988), or with "federal power" over "the law of immigration and alien status," Arizona v. United States, 567 U.S. 387, 394 (2012).   The district court's injunction causes both types of interference.

2.   A stay is also warranted because, if the Ninth Circuit affirms the injunction and this Court grants review, there is at least a "fair prospect" that this Court will vacate the injunction.   Lucas, 486 U.S. at 1304 (Kennedy, J., in chambers). At a minimum the Court would likely narrow the injunction because respondents have no basis for obtaining global relief -- or even relief that extends throughout the Ninth Circuit.

a.   Respondent organizations' claims fail at the outset for procedural reasons. See D. Ct. Doc. 28 at 7 (July 19, 2019) (raising this argument but acknowledging contrary circuit precedent).   First, Article III requires the party invoking federal jurisdiction to establish standing -- which means, among other requirements, that the party must show that it has suffered an "invasion of a legally protected interest" that is "concrete and particularized."   Gill v. Whitford, 138 S. Ct.

DOJIFR00458

21

1916, 1929 (2018) (citation omitted).  A party generally "lacks a judicially cognizable interest in the prosecution or nonprosecution of another," Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973), or in the "enforcement of the immigration laws" against another, Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 897 (1984).  Respondent organizations thus lack a cognizable interest in the grant or denial of asylum to third parties. Second, a party ordinarily may bring a challenge under the APA only if the interest asserted is "arguably within the zone of interests to be protected or regulated by the statute" at issue. Clarke v. Sec. Indus. Ass'n, 479 U.S. 388. 396 (1987). Respondent organizations' interests in doing "business" with asylum-seekers, App., infra, 12a, falls outside the zone of interests protected by the asylum statute.

b.  The Ninth Circuit refused to grant a full stay of the injunction on the sole ground that the government had failed to justify its promulgation of the rule as an interim final rule. App., infra, 2a-3a & n.3.  That conclusion was incorrect.

First, the APA makes an exception to notice-and-comment procedures for rules that involve a "foreign affairs function of the United States." 5 U.S.C. 553(a)(1).  That exception applies here because the rule is "linked intimately with the Government's overall political agenda concerning relations with another country."  American Ass'n of Exps. & Imps. v. United

22

States, 751 F.2d 1239, 1249 (Fed. Cir. 1985). The rule addresses "[t]he flow of aliens across the southern border," a matter that "directly implicates the foreign policy and national security interests of the United States." 84 Fed. Reg. at 33,841. In addition, the Departments explained that the rule "will facilitate ongoing diplomatic negotiations with foreign countries regarding migration issues, including measures to control the flow of aliens into the United States." Id. at 33,842. By channeling asylum claims to foreign countries, the rule encourages those countries to shoulder their share of the burdens imposed by mass migration. The rule also gives the United States immediate leverage in ongoing negotiations regarding border security and the sharing of migration burdens. A.R. 537–538, 635–637.

Conversely, "negotiations would be disrupted if notice-and-comment procedures preceded the effective date of this rule." 84 Fed. Reg. at 33,842. An additional surge of asylum seekers in response to a proposed rule would "provok[e] a disturbance in domestic politics in Mexico and the Northern Triangle countries" and would "erod[e] the sovereign authority of the United States to pursue the negotiating strategy it deems to be most appropriate as it engages its foreign partners." Ibid. Moreover, "the longer that the effective date of the interim rule is delayed, the greater the number of people who will pass

DOJIFR00460

through third countries where they may have otherwise received refuge and reach the U.S. border." Ibid.

That analysis was well supported by the record, which shows that the United States has in the past successfully relied on its immigration initiatives when negotiating agreements with foreign countries. For example, earlier this year, the United States relied on another immigration initiative, the Migration Protection Protocols, when negotiating an agreement under which "Mexico will take unprecedented steps to increase enforcement to curb irregular migration" and "to dismantle human smuggling and trafficking organizations." A.R. 24; see A.R. 45-50, 138-139, 231-232, 533-557, 635-637, 676, 698.

The courts below asserted that the government had failed to demonstrate that notice-and-comment procedures would "provoke definitely undesirable international consequences." App., infra, 2a-3a (citation omitted); see id. at 20a. The statute, however, requires no such showing. Under its plain terms, the government need only show that the rule involves a "foreign affairs function of the United States," 5 U.S.C. 553(a); it need not further demonstrate to a court's satisfaction that notice and comment would cause undesirable international consequences. In any event, the government did identify such consequences when it explained that a delay in the implementation of the rule would frustrate ongoing negotiations and allow an additional

surge of asylum seekers before the rule takes effect. The courts below had no basis for second-guessing the Executive's assessment of those foreign-policy consequences. See Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 111 (1948) ("[T]he Judiciary has neither aptitude, facilities nor responsibility" for "decisions as to foreign policy.").

Second, the APA also allows an agency to issue an interim final rule for "good cause." 5 U.S.C. 553(b)(3)(B). Good cause exists when "the very announcement" of the rule could "be expected to precipitate activity by affected parties that would harm the public welfare." Mobil Oil Corp. v. DOE, 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983), cert. denied, 467 U.S. 1255 (1984). Here, the Departments explained that advance notice and comment could cause aliens to "surge to the border to enter the United States before the rule took effect." 84 Fed. Reg. at 33,841. The Departments' "experience has been that when public announcements are made regarding changes in our immigration laws and procedures, there are dramatic increases in the numbers of aliens who enter or attempt to enter the United States." Ibid.

The record bears out the Departments' concern. Southwestern-border family-unit apprehensions are up 469% from the same time in 2018, A.R. 223, and there has been a surge of nearly four times the number of non-Mexican-national

apprehensions from May 2018 to May 2019 (121,151 in May 2019
compared to 32,477 in May 2018).    A.R. 119.    Numerous news
articles connect that surge to changes in immigration policy.
See A.R. 438-439 (describing how smugglers persuaded migrants to
cross the border after family separation was halted by telling
them to "hurry up before they might start doing so again"); A.R.
452-454 (indicating that migrants refused offers to stay in
Mexico because their goal is to enter the United States); A.R.
663-665, 683 (indicating that Mexico faced a migrant surge when
it changed its policies).

The district court questioned whether potential asylum
seekers would be aware of a proposed rule change or would change
their behavior in response.    App., _infra_, 48a.    But "[t]he
Government, when seeking to prevent imminent harms in the
context of international affairs and national security, is not
required to conclusively link all the pieces in the puzzle
before [the Court] grant[s] weight to its empirical
conclusions."    _Holder_ v. _Humanitarian Law Project_, 561 U.S. 1,
35 (2010).    And here, the Departments are plainly in the best
position to make such predictive judgments, and their judgments
were eminently reasonable (and consistent with past practice).
The district court therefore erred in second-guessing them.

c.    The district court (but not the Ninth Circuit) also
determined that the rule is likely inconsistent with the asylum

26

statute, 8 U.S.C. 1158.  The asylum statute makes it clear that asylum is always a matter of executive "discretion" and never a matter of "entitlement."  INS v. Cardoza-Fonseca, 480 U.S. 421, 428 n.6 (1987); see 8 U.S.C. 1158(b)(1)(A) (providing that asylum "may [be] grant[ed]" to an eligible alien).  The asylum statute also makes it clear that the Executive may exercise its discretion through categorical rules, not just through case-by-case adjudication.  It provides that the Executive may establish categorical "limitations and conditions" on asylum eligibility, beyond those already set out in the statute, so long as they are "consistent with [Section 1158]."  8 U.S.C. 1158(b)(2)(C).  The district court determined that the third-country transit bar was inconsistent with two statutory provisions:  the safe-third-country provision, 8 U.S.C. 1158(a)(2)(A), and the firm-resettlement bar, 8 U.S.C. 1158(b)(2)(A)(vi).  App., infra, 39a-45a.  The district court's analysis was mistaken.  The provisions on which the district court relied merely establish minimum statutory requirements for the discretionary grant of asylum; they do not foreclose the Executive from imposing additional, more stringent requirements for that benefit.

The safe-third-country provision prohibits an alien from even applying for asylum if the alien "may be removed, pursuant to a bilateral or multilateral agreement," to a safe third country "where the alien would have access to a full and fair

DOJIFR00464

27

procedure for determining a claim to asylum or equivalent temporary protection." 8 U.S.C. 1158(a)(2)(A). That provision, by its terms, denies the right to apply for asylum to a particular category of aliens. It does not grant asylum to aliens who fall outside that category, but rather leaves that decision to the discretion of the Executive. It is therefore consistent with the Executive's imposition of an additional restriction upon the grant of asylum.

The firm-resettlement bar prohibits granting asylum to an alien who "was firmly resettled in another country prior to arriving in the United States." 8 U.S.C. 1158(b)(2)(A)(vi). That provision, again, merely prohibits the Executive from granting asylum to a particular category of aliens. It does not require the Executive to grant asylum to aliens outside that category. It, too, is consistent with the imposition of an additional restriction upon the grant of asylum.

In reaching the contrary conclusion, the district court gave the safe-third-country provision and firm-resettlement bar a kind of field-preemptive effect. Under the district court's approach, those provisions effectively set out the exclusive requirements relating to an asylum seeker's efforts to obtain relief in a third country, and they prevent the Executive Branch from imposing additional requirements addressing that subject. That reading of the statute is incorrect. The asylum statute

DOJIFR00465

28

expressly authorizes the Executive to "establish additional limitations and conditions" "by regulation." 8 U.S.C. 1158(b)(2)(C). Thus, the enumerated statutory bars plainly do not occupy the field, and the Executive enjoys broad discretion to supplement those bars with additional limitations. Indeed, this Court rejected a similar approach to the INA in Trump v. Hawaii, 138 S. Ct. 2392 (2018). There, the Court determined that the INA's express provisions regarding the entry of aliens "did not implicitly foreclose the Executive from imposing tighter restrictions" -- even when the Executive's restrictions addressed a subject that is "similar" to one that Congress "already touch[ed] on in the INA." Id. at 2411-2412. So also here, the INA's enumerated asylum bars do not foreclose the Executive from imposing tighter bars -- even if those tighter bars address subjects that are similar to those that Congress already touched on in the asylum statute.

Notably, this case differs from Trump v. East Bay Sanctuary Covenant, No. 18A615, where this Court declined to stay an injunction prohibiting enforcement of a different bar to asylum. There, the relevant statutory provision authorized aliens to apply for asylum "whether or not [they arrive] at a designated port of arrival," 8 U.S.C. 1158(a)(1), and the relevant rule prohibited the grant of asylum to aliens who enter the country unlawfully, see 83 Fed. Reg. 55,934. In this case, by contrast,

DOJIFR00466

nothing in the asylum statute specifically grants the aliens subject to the third-country transit bar the right to apply for asylum -- much less the right to receive it.

d.  Finally, the district court (but not the Ninth Circuit) concluded that the rule was likely arbitrary and capricious.  App., _infra_, 50a-58a.  That, too, was incorrect.

As explained earlier, the Attorney General and Secretary explained that the rule serves multiple policy objectives. First, it helps "alleviate the strain on the U.S. immigration system" by "prioritizing" the applicants who have "nowhere else to turn" and thus "need [asylum] most," while "de-prioritizing" other applicants.  84 Fed. Reg. at 33,831, 33,834, 33,839-33,840 (citation omitted).  Second, the rule helps screen out "meritless asylum claims" by "restricting the claims of aliens who, while ostensibly fleeing persecution, chose not to seek protection at the earliest possible opportunity."  _Id._ at 33,831, 33,839.  Third, the rule helps protect children by reducing the incentive for families leaving Central America to make the "long and arduous" journey through Mexico to the United States.  _Id._ at 33,838.  Fourth, the rule helps "curtail the humanitarian crisis created by human smugglers" by "reducing a central incentive for aliens without a genuine need for asylum to cross the border -- the hope of a lengthy asylum process that will enable them to remain in the United States for years

DOJIFR00467

despite their statutory ineligibility for relief." <u>Id.</u> at 33,840. Finally, the rule "will facilitate ongoing diplomatic negotiations with Mexico and the Northern Triangle Countries" regarding the flow of aliens. <u>Ibid.</u>

The district court did not question the soundness of most of that reasoning. Indeed, the district court itself recognized that "the Rule's intent is to incentivize putative refugees to seek relief at the first opportunity," and that "[t]he agency's explanation as to how this exhaustion requirement serves its stated aims is adequate." App., <u>infra</u>, 58a. That should have been the end of the arbitrary-and-capricious inquiry.

The district court nevertheless concluded that the rule is arbitrary and capricious because the agencies had failed to explain why "the failure to seek asylum in a third country is so damning standing alone that the government can reasonably disregard any alternative reasons why an applicant may have failed to seek asylum in that country." App., <u>infra</u>, 51a. In the rule, the Departments did not take the position that it is impossible for an applicant to have alternative reasons for failing to seek asylum at the first opportunity, rather that such a decision "<u>raises questions</u> about the validity and urgency of the agency's claim and <u>may mean</u> that the claim is <u>less likely</u> to be successful." 84 Fed. Reg. at 33,839 (emphasis added). The Departments decided to address that failure by adopting a

DOJIFR00468

"categorical asylum bar," not by treating that failure as "just one of many factors" to be considered in the course of adjudicating the alien's asylum claim.  <u>Id.</u> at 33,839 n.8.

The Departments also explained why they chose a categorical bar.  First, the third-country transit bar rests on more than a desire to screen out meritless asylum claims.  The bar promotes other objectives, such as "prioritizing" the applicants "who need [asylum] most," 84 Fed. Reg. at 33,831, 33,839-33,840, and "reduc[ing] a central incentive for aliens without a genuine need for asylum to cross the border -- the hope of a lengthy asylum process that will enable them to remain in the United States for years despite their statutory ineligibility for relief," <u>id.</u> at 33,840.  Only a categorical rule would fully serve those purposes.  Second, even with respect to screening out meritless claims, the Departments explained that it was appropriate to adopt a bright-line rule rather than a multifactor standard in light of "the increased numbers" of asylum claims.  <u>Id.</u> at 33,839 n.8.  That was a permissible choice, particularly because the asylum statute explicitly invites the use of bright-line rules by authorizing the adoption of categorical bars to asylum.  See 8 U.S.C. 1158(b)(2)(C); see also <u>Fong Hook Mak</u> v. <u>INS</u>, 435 F.2d 728, 730 (2d Cir. 1970) (Friendly, J.) ("The administrator also exercises the discretion accorded him when * * * he determines certain conduct to be so

inimical to the statutory scheme that all persons who have engaged in it shall be ineligible for favorable consideration, regardless of other factors.").

To be sure, the Departments' selection of a categorical rule means that some otherwise meritorious asylum claims will be channeled to other countries.  But the Departments reasonably determined that the benefits of alleviating the strain on the U.S. asylum system and of speeding asylum to those who most need it outweighed the costs of a categorical rule.  And the Departments' policy choice to channel some meritorious asylum claims to other countries was particularly reasonable here, given that the asylum statute's purpose is not "to grant asylum to everyone who wishes to  * * *  mov[e] to the United States," Singh v. INS, 134 F.3d 962, 967 (9th Cir. 1998); the United States' asylum system currently faces a crushing burden; and the U.N. High Commissioner for Refugees has endorsed "efforts to share and allocate the burden of review of refugee and asylum claims" among multiple countries, 84 Fed. Reg. at 33,840.  "By second-guessing the [Departments'] weighing of risks and benefits," the Ninth Circuit improperly "substitute[d] [its] judgment for that of the agenc[ies]."  Department of Commerce v. New York, 139 S. Ct. 2551, 2571 (2019).

The district court also concluded that the rule is flawed because there was no basis for concluding that "asylum in Mexico

DOJIFR00470

33

is a feasible alternative to relief in the United States."
App., _infra_, 51a (citation omitted).  That conclusion, too, is
incorrect.  First, the rule makes clear that the third-country
transit bar is inapplicable where "[t]he only countries through
which the alien transited" are not parties to certain
international treaties and thus do not have any obligation under
those treaties to provide protection from persecution and
torture.  84 Fed. Reg. at 33,843.  Second, the rule's rationales
do not depend on the particular details of the refugee-
protection system in Mexico or other third countries.
Regardless of the ease or difficulty of obtaining protection in
those countries, the very fact that an alien has not even _tried_
to obtain protection there suggests that the alien's claim lacks
urgency and merit.  Third, in all events, as even the district
court's review shows, Mexico has a robust refugee-protection
system, which it is improving in conjunction with international
partners.  See App., _infra_, at 53a-55a (citing A.R. 306, 534,
639).  The Departments weighed the totality of the evidence and
determined that it established sufficient capacity in Mexico to
address the claims of transiting aliens.  84 Fed. Reg. at
33,839-33,840.  The district court erred in second-guessing that
determination:  "it is for the political branches, not the
Judiciary, to assess practices in foreign countries and to
determine national policy in light of those assessments."  _Munaf_

v. Geren, 553 U.S. 674, 700-701 (2008). The district court's decision is particularly improper because it "pass[es] judgment on" Mexico's legal system "and undermine[s]" our "Government's ability to speak with one voice in this area." Id. at 702-703.

Last, the district court concluded that the rule is flawed because it does not "create an exception for unaccompanied minors." App., infra, 57a. But no statute requires such an exception. When unaccompanied minors are to be treated differently than adults for purposes of asylum, the INA says so. E.g., 8 U.S.C. 1158(b)(3)(C). And the Departments did consider the specific issues posed by unaccompanied minors, 84 Fed. Reg. at 33,839 n.7 -- as even the district court recognized, App., infra, 57a-58a. The Departments simply determined that no exception was warranted. Indeed, they observed that Congress "did not exempt" unaccompanied minors from various other "bars to asylum eligibility." 84 Fed. Reg. at 33,839 n.7. The Departments' choice was not arbitrary and capricious.

3. The balance of harms also favors a stay because the injunction causes direct, irreparable injury to the government and the public. First, the injunction frustrates the "public interest in effective measures to prevent the entry of illegal aliens" at the Nation's borders. United States v. Cortez, 449 U.S. 411, 421 n.4 (1981). The United States has experienced an "overwhelming surge" of unlawful crossings at the Nation's

DOJIFR00472

southern border.   84 Fed. Reg. at 33,840.   The injunction undermines a coordinated effort by the Executive to curtail that surge.   Second, the injunction frustrates the government's strong interest in a well-functioning asylum system. "Immigration courts received over 162,000 asylum [claims] in FY 2018, a 270 percent increase from five years earlier," and the current burden is "extreme" and "unsustainable." Id. at 33,831, 33,838.   Third, the injunction undermines "sensitive and weighty interests of * * * foreign affairs," Humanitarian Law Project, 561 U.S. at 33-34, by preventing the full implementation of a rule that is designed to "facilitate ongoing diplomatic negotiations," 84 Fed. Reg. at 33,840.

The district court asserted that the rule harms aliens by denying them asylum and by "deliver[ing] [them] into the hands of their persecutors." App., infra, 60a (citation omitted). That assertion is incorrect.   In the first place, asylum is a discretionary benefit, and it ordinarily makes little sense to describe the denial of a purely discretionary benefit as an irreparable harm.   That is especially so when "[o]nly a small minority" of asylum claims are meritorious to begin with.   84 Fed. Reg. at 33,831.   In addition, the rule does not "deliver aliens into the hands of their persecutors," App., infra, 60a, because aliens covered by the rule (1) retain the ability to apply for asylum in third countries, (2) remain eligible for

asylum in the United States if the third country denies protection, and (3) "remain eligible" for other forms of protection besides asylum, such as "withholding of removal" and "deferral of removal."  84 Fed. Reg. at 33,831, 33,843.

The district court also concluded that respondent organizations faced irreparable harm through a "diversion of resources" (respondents must now spend time and money addressing the effects of the rule) and a "loss of funding" (fewer clients might pay respondents fees for assistance with their asylum applications).  App., _infra_, 59a.  Even crediting those assertions and assuming that they are proper factors in the equitable balance, the administrative inconveniences that the district court identified plainly do not outweigh the harm that would be imposed by "injunctive relief [that] deeply intrudes into the core concerns of the executive branch."  _Adams_ v. _Vance_, 570 F.2d 950, 954 (D.C. Cir. 1978).

4.  At a minimum, a stay should be granted because the universal injunction entered at the behest of respondents is vastly overbroad (and remains overbroad even after the Ninth Circuit's partial stay).  See _IRAP_, 137 S. Ct. at 2088.

a.  As a general rule, courts lack the authority to enter universal injunctions that preclude enforcement of a law or rule against all persons, rather than against only the plaintiffs.  First, under Article III of the Constitution, "[a] plaintiff's

37

remedy must be tailored to redress the plaintiff's particular injury." Gill, 138 S. Ct. at 1934. Because "standing is not dispensed in gross," "a plaintiff must demonstrate standing separately for each form of relief sought." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352-353 (2006) (citations omitted). A plaintiff may have standing to challenge the application of the rule to the plaintiff himself, but ordinarily lacks standing to challenge its application to unrelated third parties.

Bedrock rules of equity independently require that injunctions be no broader than "necessary to provide complete relief to the plaintiffs." Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 765 (1994) (citation omitted). That principle applies with even greater force to a preliminary injunction, which is an equitable tool designed merely to preserve the status quo during litigation. University of Tex. v. Camenisch, 451 U.S. 390, 395 (1981). Moreover, the equitable jurisdiction of federal courts is grounded in historical practice, yet universal injunctions are a modern invention. See Hawaii, 138 S. Ct. at 2425-2429 (Thomas, J., concurring).

Finally, universal injunctions create practical problems for the federal courts and federal litigants. They "take a toll on the federal court system -- preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the

DOJIFR00475

courts and for the Executive Branch." Hawaii, 138 S. Ct. at 2425 (Thomas, J., concurring).   They also allow courts and parties to circumvent Federal Rule of Civil Procedure 23, which sets out the prerequisites for certifying a class and for granting relief to such a class.  And they create an inequitable "one-way ratchet" under which a loss by the government precludes enforcement of the challenged rule everywhere, but a victory by the government does not preclude other plaintiffs from "run[ning] off to the 93 other districts for more bites at the apple."  City of Chicago v. Sessions, 888 F.3d 272, 298 (7th Cir. 2018) (Manion, J., concurring in the judgment in part and dissenting in part), reh'g en banc granted (No. 17-2991) (June 4, 2018), reh'g en banc vacated as moot (No. 17-2991) (Aug. 10, 2018).  This case illustrates that problem:  The district court here ordered the entry of "a nationwide injunction," App., infra, 63a, even though another federal district court entertaining a similar challenge had sided with the government and had refused to award any preliminary relief at all, see CAIR v. Trump, No. 19-2117, 2019 WL 3436501 (D.D.C. July 24, 2019).

Under the principles just discussed, an injunction could be granted, at most, to cover specific aliens that respondents identify as actual clients in the United States who are otherwise subject to the rule.  An injunction could not properly

extend to all aliens throughout the Nation, or even all aliens in the Ninth Circuit.

b.   The Ninth Circuit recognized that "[a]n injunction must be 'narrowly tailored to remedy the specific harm shown.'" App., _infra_, 4a (citation omitted).   And it observed that "nationwide injunctions have detrimental consequences."   _Id._ at 5a (citation omitted).   In light of those principles, the Ninth Circuit correctly determined that the district court's "nationwide injunction" was not "justified."   _Ibid._

The Ninth Circuit did not, however, follow its own reasoning to its logical conclusion -- _i.e._, that respondent organizations may receive, at most, an injunction that is tailored to their own clients.   The court instead stayed the injunction "outside the Ninth Circuit," but allowed the injunction to remain in effect "within the Ninth Circuit." App., _infra_, at 3a, 6a.   "Such a solution has no basis in traditional equity.   On the one hand, equity confined itself to controlling the defendant's behavior vis-à-vis the plaintiff. On the other hand, to protect the plaintiff, equity was willing to enjoin acts outside [the court's] territorial jurisdiction. Equity acts in personam.   Geographical lines are simply not the stopping point."   Samuel L. Bray, _Multiple Chancellors: Reforming the National Injunction_, 131 Harv. L. Rev. 417, 422 n.19 (2017).   Respondents thus have no basis for obtaining an

DOJIFR00477

40

injunction with respect to aliens who are not their clients -- regardless of whether those aliens are located in the Ninth Circuit or in some other circuit.

The Ninth Circuit also stated that "the district court retains jurisdiction to further develop the record in support of a preliminary injunction extending beyond the Ninth Circuit." App., _infra_, 8a-9a. Regardless of the factual record, however, the district court had no authority, as a matter of law, to issue an injunction that went beyond remedying the alleged harms to the plaintiffs in this case.  And any broadening of the injunction would only increase the harm to the government.

CONCLUSION

The injunction should be stayed pending appeal and, if the Ninth Circuit affirms the injunction, pending the filing and disposition of a petition for a writ of certiorari and any further proceedings in this Court.  At a minimum, the injunction should be stayed as to all persons other than specific aliens that respondents identify as actual clients in the United States subject to the rule.

Respectfully submitted.

NOEL J. FRANCISCO
<u>Solicitor General</u>

AUGUST 2019

DOJIFR00478

Official website of the Department of Homeland Security (https://www.facebook.com/CBPgov/)    (https://instagram.com/customsborder/)    (https://www.flickr.com/photos/cbpphotos/)    (https://twitter.com/cbp)    (https://www.linkedin.com/company/2997?trk=tyah)    (https://www.youtube.com/user/customsborderprotect)

**U.S. Customs and Border Protection (/)**

(/)

# Southwest Border Migration FY 2019



**U.S. Border Patrol Southwest Border Apprehensions FY 2019**

| USBP | Demographic | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Southwest Border | Unaccompanied Alien Child | 4,963 | 5,258 | 4,752 | 5,105 | 6,817 | 8,956 | 8,882 | 11,475 | 7,373 | 5,563 | 3,729 | | **72,873** |
| | Family Units* | 23,115 | 25,164 | 27,507 | 24,188 | 36,530 | 53,206 | 58,715 | 84,490 | 57,353 | 42,546 | 25,057 | | **457,871** |
| | Single Adult | 22,931 | 21,433 | 18,489 | 18,686 | 23,533 | 30,671 | 31,677 | 36,894 | 30,178 | 23,873 | 21,907 | | **280,272** |
| Southwest Border Total Apprehensions | | **51,009** | **51,855** | **50,748** | **47,979** | **66,880** | **92,833** | **99,274** | **132,859** | **94,904** | **71,982** | **50,693** | | **811,016** |

*Family Unit represents the number of individuals (either a child under 18 years old, parent, or legal guardian) apprehended with a family member by the U.S. Border Patrol.

In August, 50,693 people were apprehended between ports of entry on the Southwest Border, compared with 71,982 in the month of July and 94,904 in June. In FY18, a total of 396,579 individuals were apprehended between ports of entry on our Southwest Border.

For breakdown by Sector, visit USBP Southwest Border Apprehensions by Sector (/newsroom/stats/sw-border-migration/usbp-sw-border-apprehensions)

## Office of Field Operations Southwest Border Inadmissibles FY 2019

| Field Operations | Demographic | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | |

DOJIFR00479

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 142 of 1770

| Field Operations | Demographic | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Southwest Border | Unaccompanied Alien Child | 454 | 405 | 351 | 410 | 426 | 424 | 385 | 386 | 306 | 292 | 396 | | **4,235** |
| | Family Units* | 4,178 | 4,989 | 4,390 | 4,223 | 4,210 | 4,215 | 3,637 | 4,139 | 3,627 | 4,364 | 5,993 | | **47,965** |
| | Single Adults | 5,058 | 5,148 | 5,221 | 5,629 | 4,950 | 6,169 | 6,075 | 6,801 | 5,457 | 5,328 | 6,838 | | **62,674** |
| | Accompanied Minor Child** | 86 | 70 | 81 | 70 | 76 | 91 | 92 | 70 | 68 | 89 | 86 | | **879** |
| Southwest Border Total Inadmissibles | | **9,776** | **10,612** | **10,043** | **10,332** | **9,662** | **10,899** | **10,189** | **11,396** | **9,458** | **10,073** | **13,313** | | **115,753** |

*Family Unit represents the number of individuals (either a child under 18 years old, parent, or legal guardian) deemed inadmissible with a family member by the Office of Field Operations.

**Accompanied Minor Child represents a child accompanied by a parent or legal guardian and the parent or legal guardian is either a U.S. Citizen, Lawful Permanent Resident, or admissible alien, and the child is determined to be inadmissible.

In August, 13,313 people presenting themselves at ports of entry on the Southwest Border were deemed inadmissible, compared with 10,073 in the month of July and 9,458 in June. In FY18, 124,511 people presenting themselves at ports of entry on the Southwest Border were deemed inadmissible.

OFO inadmissibility metrics include: individuals encountered at ports of entry who are seeking lawful admission into the United States but are determined to be inadmissible, individuals presenting themselves to seek humanitarian protection under our laws, and individuals who withdraw an application for admission and return to their countries of origin within a short timeframe.

For breakdown by Field Office, visit Southwest Border Inadmissibles by Field Office (/newsroom/stats/sw-border-migration/ofo-sw-border-inadmissibles).

**Last modified:** October 23, 2019

Share This Page.

DOJIFR00480

(OMB) for review and clearance under the Paperwork Reduction Act of 1995.

**DATES:** Fax written comments on the collection of information by September 10, 2004.

**ADDRESSES:** OMB is still experiencing significant delays in the regular mail, including first class and express mail, and messenger deliveries are not being accepted. To ensure that comments on the information collection are received, OMB recommends that written comments be faxed to the Office of Information and Regulatory Affairs, OMB, Attn: Fumie Yokota, Desk Officer for FDA, FAX: 202–395–6974.

**FOR FURTHER INFORMATION CONTACT:** Karen L. Nelson, Office of Management Programs (HFA–250), Food and Drug Administration, 5600 Fishers Lane, Rockville, MD 20857, 301–827–1482.

**SUPPLEMENTARY INFORMATION:** In compliance with 44 U.S.C. 3507, FDA has submitted the following proposed collection of information to OMB for review and clearance.

**Draft Guidance for Industry on Pharmacogenomic Data Submissions (OMB Control Numbers 0910–0014, 0910–0001, and 0910–0338)—Extension**

The guidance provides recommendations to sponsors submitting or holding investigational new drugs (INDs), new drug applications (NDAs), or biologic liscensing applications (BLAs) on what pharmacogenomic data should be submitted to the agency during the drug development process. Sponsors holding and applicants submitting INDs, NDAs, or BLAs are subject to FDA requirements in parts 312, 314, and 601 (21 CFR 312, 314, and 601) for submitting to the agency data relevant to drug safety and efficacy (§§ 312.22, 312.23, 312.31, 312.33, 314.50, 314.81, 601.2, and 601.12).

*Description of Respondents*: Sponsors submitting or holding INDs, NDAs, or BLAs for human drugs and biologics.

*Burden Estimate*: The guidance interprets FDA regulations for IND, NDA, or BLA submissions, clarifying when the regulations require pharmacogenomics data to be submitted and when the submission of such data is voluntary. The pharmacogenomic data submissions described in the guidance that are required to be submitted to an IND, NDA, BLA, or annual report are covered by the information collection requirements under parts 312, 314, and 601 and are approved by OMB under control numbers 0910–0014 (part 312—INDs; approved until January 1, 2006); 0910–0001 (part 314—NDAs and annual reports; approved until March 31, 2005); and 0910–0338 (approved until August 31, 2005).

The guidance distinguishes between pharmacogenomic tests that may be considered valid biomarkers appropriate for regulatory decisionmaking, and other, less well developed exploratory tests. The submission of exploratory pharmacogenomic data is not required under the regulations, although the agency encourages the voluntary submission of such data.

The guidance describes the voluntary genomic data submission (VGDS) that can be used for such a voluntary submission. The guidance does not recommend a specific format for the VGDS, except that such a voluntary submission be designated as a VGDS. The data submitted in a VGDS and the level of detail should be sufficient for FDA to be able to interpret the information and independently analyze the data, verify results, and explore possible genotype-phenotype correlations across studies. FDA does not want the VGDS to be overly burdensome and time-consuming for the sponsor.

FDA has estimated the burden of preparing a voluntary submission described in the guidance that should be designated as a VGDS. Based on FDA's familiarity with sponsors' interest in submitting pharmacogenomic data during the drug development process, FDA estimates that approximately 20 sponsors will submit approximately 80 VGDSs and that, on average, each VGDS will take approximately 10 hours to prepare and submit to FDA.

In the **Federal Register** of November 4, 2003 (68 FR 62461), FDA published a 60-day notice requesting public comment on the information collection provisions. No comments were received on the information collection estimates.

TABLE 1.—ESTIMATED ANNUAL REPORTING BURDEN[1]

| | Number of Respondents | Number of Responses per Respondent | Total Annual Responses | Hours per Response | Total Hours |
|---|---|---|---|---|---|
| Voluntary genomic data submissions | 20 | 4 | 80 | 10 | 800 |

[1] There are no capital costs or operating and maintenance costs associated with this collection.

Dated: August 5, 2004.

**Jeffrey Shuren,**
*Assistant Commissioner for Policy.*
[FR Doc. 04–18360 Filed 8–6–04; 12:04 pm]
**BILLING CODE 4160–01–S**

**DEPARTMENT OF HOMELAND SECURITY**

**Bureau of Customs and Border Protection**

**Designating Aliens For Expedited Removal**

**AGENCY:** Bureau of Customs and Border Protection, DHS.

**ACTION:** Notice.

**SUMMARY:** This notice authorizes the Department of Homeland Security to place in expedited removal proceedings any or all members of the following class of aliens: Aliens determined to be inadmissible under sections 212(a)(6)(C) or (7) of the Immigration and Nationality Act who were present in the U.S. without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, who are encountered by an immigration officer within 100 air miles of the U.S. international land border, and who have not established to the satisfaction of an immigration officer that they have been physically present in the U.S. continuously for the fourteen-day (14-day) period immediately prior to the date of encounter. DHS believes that exercising its statutory authority to place these individuals in expedited removal proceedings will enhance national security and public safety by facilitating prompt immigration determinations, enabling DHS to deal more effectively with the large volume of persons seeking illegal entry, and ensure removal from the country of those not granted relief, while at the same time protecting the rights of the individuals affected.

**DATES:** This notice is effective on August 11, 2004.

**ADDRESSES:** Please submit written comments to: Regulations Branch, Office of Regulations and Rulings, Bureau of Customs and Border Protection, 1300 Pennsylvania Avenue, NW., Washington, DC 20229. *See* SUPPLEMENTARY INFORMATION section for more details on submission of comments.

**FOR FURTHER INFORMATION CONTACT:** Dana E. Graydon, Acting Associate Chief, Office of Border Patrol, U.S. Customs and Border Protection, 1300 Pennsylvania Ave., NW., Suite 6.5–E, Washington, DC 20229, *dana.graydon@dhs.gov,* 202–344–3153.

**SUPPLEMENTARY INFORMATION:** Please submit written comments, original and two copies, to the address listed above on or before either October 12, 2004. Submitted comments may be inspected at the Office of Regulations and Rulings, Bureau of Customs and Border Protection, 799 9th Street, NW., Washington, DC, during regular business hours. Arrangements to inspect submitted comments should be made in advance by calling Mr. Joseph Clark at (202) 572–8768.

Section 302 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Public Law 104–208, Div. C, 110 Stat. 3009–546, amended section 235(b) of the Immigration and Nationality Act ("Act"), 8 U.S.C. 1225(b), to authorize the Attorney General (now the Secretary of Homeland Security as designated under the Homeland Security Act of 2002) to remove, without a hearing before an immigration judge, aliens arriving in the U.S. who are inadmissible under sections 212(a)(6)(C) or 212(a)(7) of the Act, 8 U.S.C. 1182(a)(6)(C) and 1182(a)(7). Under section 235(b)(1) of the Act, 8 U.S.C. 1225(b)(1), expedited removal proceedings may be applied to two categories of aliens. First, section 235(b)(1)(A)(i) of the Act, 8 U.S.C. 1225(b)(1)(A)(i), permits expedited removal proceedings for aliens who are "arriving in the United States." "Arriving aliens" are defined by regulation to mean "an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international waters and brought into the United States by any means whether or not to a designated port-of-entry." (8 CFR 1.1(q)). Cuban citizens who arrive at U.S. ports-of-entry by aircraft are exempted from this first category of aliens subject to expedited removal under section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F). Second, section 235(b)(1)(A)(iii) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii), permits the Attorney General (now the Secretary of Homeland Security), in his or her sole and unreviewable discretion, to designate certain other aliens to whom the expedited removal provisions may be applied. Section 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii), authorizes the Secretary to apply (by designation) expedited removal proceedings to aliens who arrive in, attempt to enter, or have entered the U.S. without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, and who have not established to the satisfaction of the immigration officer that they have been physically present in the U.S. continuously for the two-year period immediately prior to the date of determination of inadmissibility.

By statute, an alien present in the U.S. who has not been admitted shall be deemed for purposes of the Act to be an applicant for admission. 8 U.S.C. 1225(a), section 235(a)(1) of the Act. Once alienage has been established, an alien applicant for admission has the burden of establishing that he or she is clearly and beyond doubt entitled to be admitted and is not inadmissible under section 212 of this Act. Aliens who have not been admitted or paroled and who are subject to expedited removal under this designation have the burden of proof to show affirmatively that they are not inadmissible and have maintained the required continuous physical presence in the U.S. Any absence from the U.S. shall serve to break the period of continuous physical presence. 8 CFR 235.3(b)(1)(ii).

Pursuant to 8 CFR 235.3(b)(1)(ii) (62 FR 10312, 10355, March 6, 1997), the Attorney General provided that her designation authority would be exercised by the Commissioner of the former Immigration and Naturalization Service (INS). Pursuant to sections 102(a), 441, 1512(d) and 1517 of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2310, 6 U.S.C. 112, 251, 552(d), 557, and 8 CFR 2.1, the authority of the Attorney General and the Commissioner of the INS in accordance with 8 U.S.C. 235(b)(1)(A)(iii) and 8 CFR 235.3(b)(1)(ii), respectively, was transferred to the Secretary of Homeland Security, and references to the Attorney General or the Commissioner in the statute and regulations are deemed to refer to the Secretary.

DHS has a pressing need to improve the security and safety of the nation's land borders, and expanding expedited removal between ports of entry will provide DHS officers with a valuable tool to meet that objective. Presently DHS officers cannot apply expedited removal procedures to the nearly 1 million aliens who are apprehended each year in close proximity to the borders after illegal entry. It is not logistically possible for DHS to initiate formal removal proceedings against all such aliens. This is primarily a problem along the southern border, and thus the majority of such aliens are Mexican nationals, who are "voluntarily" returned to Mexico without any formal removal order. Based upon anecdotal evidence, many of those who are returned to Mexico seek to reenter the U.S. illegally, often within 24 hours of being voluntarily returned (it is not uncommon for DHS officers to apprehend the same individual many times over a span of several months). On the southern land border with Mexico, those aliens who are apprehended who are not Mexican nationals cannot be returned to Mexico. Currently, non-Mexican nationals who are inadmissible may be voluntarily returned to their country of citizenship or nationality via aircraft, or placed in formal removal proceedings under section 240 of the Act. Because DHS lacks the resources to detain all third-country nationals (aliens who are neither nationals of Mexico nor Canada) who have been apprehended after illegally crossing into the U.S. from both the northern and southern land borders, many of these aliens are released in the U.S. each year with a notice to appear for removal proceedings. Many of these aliens subsequently fail to appear for their removal proceedings, and then disappear in the U.S.

Without limiting its ability to exercise its discretion in the event of a national emergency, other unforeseen events, or a change in circumstances, DHS plans under this designation as a matter of prosecutorial discretion to apply expedited removal only to (1) third-country nationals and (2) to Mexican and Canadian nationals with histories of criminal or immigration violations, such as smugglers or aliens who have made numerous illegal entries. We recognize that certain aliens, including unaccompanied minors, members of the Class Action Settlement in *American Baptist Churches* v. *Thornburgh,* 760 F. Supp. 796 (N.D. Cal. 1991) (which settled the claims of a class of Salvadorans and Guatemalans regarding handling of asylum claims), and aliens who may be eligible for cancellation of removal under section 240A of the Act,

DOJIFR00548

for example, may possess equities that weigh against the use of expedited removal proceedings. Accordingly, in appropriate circumstances and as an exercise of prosecutorial discretion, officers will be able to permit certain aliens described in this notice to return voluntarily, withdraw their application for admission, or to be placed into regular removal proceedings under section 240 of the Act in lieu of expedited removal proceedings.

In the interests of focusing enforcement resources upon unlawful entries that have a close spatial and temporal nexus to the border, this notice does not implement the full nationwide expedited removal authority available to DHS pursuant to section 235 of the Act, 8 U.S.C. 1225. Nor does this notice limit DHS from implementing the full nationwide enforcement authority of the statute through publication of a subsequent **Federal Register** notice. The statute provides DHS with the authority to apply expedited removal to aliens who cannot establish that they have maintained a physical presence in the U.S. continuously for the two-year period immediately prior to the date of determination of inadmissibility. The statute also does not limit geographically the application of expedited removal. At this time, DHS has elected to assert and implement only that portion of the authority granted by the statute that bears close temporal and spatial proximity to illegal entries at or near the border. Accordingly, this notice applies only to aliens encountered within 14 days of entry without inspection and within 100 air miles of any U.S. international land border.

It is anticipated under this designation that expedited removal will be employed against those aliens who are apprehended immediately proximate to the land border and have negligible ties or equities in the U.S. Nevertheless, this designation extends to a 100-mile operational range because many aliens will arrive in vehicles that speedily depart the border area, and because other recent arrivals will find their way to near-border locales seeking transportation to other locations within the interior of the U.S. The 100-mile range already has been established by regulation as a reasonable distance from the external boundary of the U.S. for the purpose of preventing the illegal entry of aliens into the U.S. *See* section 287(a)(3) of the Act; 8 CFR 287.1(a)(2) and (c).

The use of expedited removal orders, which prohibit reentry for a period of 5 years, will deter unlawful entry, and make it possible to pursue future

criminal prosecution against those aliens who continue to enter the U.S. in violation of law. It will also accelerate the processing of inadmissible aliens because it generally does not require an appearance before an immigration judge, except in certain circumstances. Deterring future entries and accelerating removals will enhance DHS's ability to oversee the border, and to focus its resources on threats to public safety and to national security. DHS also believes that the use of expedited removal will likely interfere with human trafficking and alien smuggling operations, which are growing in sophistication, and which induce aliens from all over the world to cross the country's borders. Alien smuggling organizations have been responsible for numerous violent crimes, including homicide, hostage-taking, and crimes involving sexual exploitation. DHS expects that the expansion of expedited removal under this notice will ultimately reduce the number of aliens who risk injury or death attempting to enter the U.S. through difficult mountainous and desert terrain, as well as decrease property crimes in border areas.

All aliens placed into expedited removal as a result of this designation will have the same rights to a credible fear screening by an asylum officer, and the right to review of an adverse credible fear determination by an immigration judge, that are provided to arriving aliens who are currently placed into expedited removal after being denied admission at a port of entry. Any alien who falls within this designation, who is placed in expedited removal proceedings, and who indicates an intention to apply for asylum or who asserts a fear of persecution or torture will be interviewed by an asylum officer who will determine whether the alien has a credible fear as defined in section 235(b)(1)(B)(v) of the Act, 8 U.S.C. 1225(b)(1)(B)(v). If that standard is met, the alien will be referred to an immigration judge for a removal proceeding under section 240 of the Act, sections 235(b)(1)(A)(ii) and (B) of the Act, 8 U.S.C. 1225(b)(1)(A)(ii) and (B); 8 CFR 235.3(b)(4). The Forms I–867A and I–867B currently used by officers who process aliens under the expedited removal program provide to all aliens in expedited removal proceedings information concerning the credible fear interview, in accordance with the statutory requirement at section 235(b)(1)(B)(iv) of the Act, 8 U.S.C. 1225(b)(1)(B)(iv). The forms require that the officer inquire whether the alien has any reason to fear harm if returned to his or her country. Officers authorized

to administer the expedited removal program will be trained to be alert for any verbal or non-verbal indications that the alien may be afraid to return to his or her homeland.

Similarly, all aliens placed into expedited removal as a result of this designation, who claim lawful permanent resident, refugee, asylee status, or U.S. citizenship will receive the same procedures, including the right to review of any adverse expedited removal order by an immigration judge, that are provided to arriving aliens making similar status claims who are currently placed in expedited removal at ports of entry under 8 CFR 235.3(b). DHS, with limited exceptions, plans to detain aliens who are placed in expedited removal under this designation. Section 235(b)(1)(B)(iii)(IV) of the Act, 8 U.S.C. 1225(b)(1)(B)(iii)(IV), and 8 CFR 235.3(b)(2)(iii) direct that any alien who is placed in expedited removal proceedings shall be detained pending a final determination of credible fear and, if found not to have such a fear, such alien shall be detained until removed. Parole of such alien under 8 CFR 235.3(b)(2)(iii) may be permitted only when the Secretary determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective. Section 235(b)(1)(B)(ii) of the Act, 8 U.S.C. 1225(b)(1)(B)(ii), directs that if a credible fear has been established, the alien shall be detained for further consideration of the protection claim or claims. Under Department of Justice regulations, immigration judge review of custody determinations is permitted only for bond and custody determinations pursuant to section 236 of the Act, 8 U.S.C. 1226, 8 CFR 1236, and 8 CFR 1003.19(a). Aliens subject to expedited removal procedures under section 235 of the Act (including those aliens who are referred after a positive credible fear determination to an immigration judge for proceedings under section 240 of the Act) are not eligible for bond, and therefore are not eligible for a bond redetermination before an immigration judge. Parole of aliens determined to have a credible fear may be considered in accordance with section 212(d)(5) of the Act, 8 U.S.C. 1182(d)(5), and 8 CFR 212.5.

The expedited removal authority implemented in this Notice will not be employed against Cuban citizens because removals to Cuba cannot presently be assured and for other U.S. policy reasons.

The Department has determined that good cause exists under the

Administrative Procedure Act (APA), 5 U.S.C. 553(b)(3)(B) and (d)(3), to exempt this notice from the notice and comment requirements under the APA. Delaying the implementation of this notice to allow public notice and comment would be impracticable, unnecessary and contrary to the public interest.

Congress explicitly authorized the Secretary of Homeland Security to designate categories of aliens to whom expedited removal proceedings may be applied, and made clear that "[s]uch designation shall be in the sole and unreviewable discretion of the Secretary and may be modified at any time." Section 235(b)(1)(A)(iii)(I) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii)(I). The large volume of illegal entries, and attempted illegal entries, and the attendant risks to national security presented by these illegal entries, necessitates that DHS expand the expedited removal program as provided in this designation. DHS is confident that the experience gained through implementation of the expedited removal program at ports of entry will enable DHS to expand the program in a manner that is both effective and humane.

There is an urgent need to enhance DHS's ability to improve the safety and security of the nation's land borders, as well as the need to deter foreign nationals from undertaking dangerous border crossings, and thereby prevent the needless deaths and crimes associated with human trafficking and alien smuggling operations. The expansion of expedited removal will increase the deterrence of illegal entries by ensuring that apprehension quickly leads to removal. This is especially critical because of the environmental dangers faced by aliens illegally entering the U.S. across desert or mountainous areas. In the Arizona desert alone, since the initiation of the Arizona Border Control Initiative (ABC) in March of 2004, the Border Patrol has rescued hundreds of aliens in distress and has unfortunately discovered over 40 aliens who have died in the attempt to enter the U.S.

This designation is necessary to remove quickly from the U.S. aliens who are encountered shortly after illegally entering the U.S. across the land borders. The ability to detain aliens while admissibility and identity is determined and protection claims are adjudicated, as well as to quickly remove aliens without protection claims or claims to lawful status, is a necessity for national security and public safety. As a critical element of a number of DHS initiatives to enhance security along the border, the expansion of expedited removal will increase

national security, diminish the number of illegal entries, and impair the ability of smuggling organizations to operate. Accordingly, for the foregoing reasons, the Department has determined that public notice and comment prior to promulgation of this notice would be impracticable, unnecessary and contrary to the public interest as those terms are used under the APA.

Although the Department believes for the foregoing reasons that pre-promulgation notice and comment procedures are not statutorily mandated in this case, DHS is interested in receiving comments from the public on all aspects of the expedited removal program, but especially on the effectiveness of the program, problems envisioned by the commenters, and suggestions on how to address those problems. DHS believes that by maintaining a dialogue with interested parties, DHS can ensure that the program is even more effective in combating and deterring illegal entry, while at the same time protecting the rights of the individuals affected.

The expansion of expedited removal under this notice will also support the Arizona Border Control Initiative (ABC), a program designed to secure and protect the Arizona border. Working with other Federal, State, local and tribal entities, DHS has placed significant personnel and technical assets on the border to decrease the deaths of illegal immigrants in the desert; and to lower the rate of violent crime related to illegal border traffic in Southern Arizona. The ABC began operations in March 2004. For the reasons stated above, the ABC's success will rely in part upon the ability of DHS officers to place inadmissible aliens apprehended shortly after illegal entry into expedited removal.

Every year, illegal aliens from many different countries continue to enter the U.S. illegally across the nation's land borders. It is critical for public safety and national security that these aliens are not released into the U.S. without adequate verification of their identities and backgrounds.

**Notice of Designation of Aliens Subject to Expedited Removal Proceedings**

Pursuant to section 235(b)(1)(A)(iii) of the Immigration and Nationality Act ("Act") and 8 CFR 235.3(b)(1)(ii), I order as follows:

(1) Except as provided in paragraph (5), the Department of Homeland Security, through its component bureaus, may place in expedited removal proceedings any or all members of the following class of aliens: Aliens who are inadmissible under sections

212(a)(6)(C) or (7) of the Act, who are physically present in the U.S. without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, who are encountered by an immigration officer within 100 air miles of any U.S. international land border, and who have not established to the satisfaction of an immigration officer that they have been physically present in the U.S. continuously for the 14-day period immediately prior to the date of encounter. Each alien subject to this notice bears the affirmative burden to show to the satisfaction of an immigration officer that the alien has been present in the U.S. continuously for the relevant 14-day period. This notice does not apply to aliens who arrive at U.S. ports-of-entry, as these aliens are already subject to expedited removal. This notice will be given effect only with respect to apprehensions made within the CBP Border Patrol sectors of (Laredo, McAllen, Del Rio, Marfa, El Paso, Tucson, Yuma, El Centro, San Diego, Blaine, Spokane, Havre, Grand Forks, Detroit, Buffalo, Swanton, and Houlton).

(2) Any alien who falls within this designation who indicates an intention to apply for asylum or who asserts a fear of persecution or torture will be interviewed by an asylum officer to determine whether the alien has a credible fear as defined in section 235(b)(1)(B)(v) of the Act, 8 U.S.C. 1225(b)(1)(B)(v). If that standard is met, the alien will be referred to an immigration judge for proceedings under section 240 of the Act, 8 U.S.C. 1229a.

(3) Any alien who is placed in expedited removal proceedings under this designation who claims lawful permanent resident, refugee, asylee status, or U.S. citizenship will be processed in accordance with the procedures provided in 8 CFR 235.3(b) and 8 CFR 1235.3(b).

(4) Any alien who is placed in expedited removal proceedings under this designation will be detained pursuant to section 235(b) of the Act, 8 U.S.C. 1225(b), with certain exceptions, until removed. However, aliens determined to have a credible fear may be considered by DHS for parole in accordance with section 212(d)(5) of the Act and 8 CFR 212.5. Aliens detained pursuant to the expedited removal provisions under section 235 of the Act (including those aliens who are referred after a positive credible fear determination to an immigration judge for proceedings under section 240 of the Act) are not eligible for bond, and therefore are not eligible for a bond

DOJIFR00550

redetermination before an immigration judge.

(5) This notice applies to aliens described in paragraph (1) who are encountered within the U.S. beginning August 11, 2004.

(6) The expedited removal proceedings contemplated by this notice will not be initiated against Cuban citizens or nationals.

Dated: August 3, 2004.

**Tom Ridge,**

*Secretary of Homeland Security.*

[FR Doc. 04–18469 Filed 8–10–04; 8:45 am]

**BILLING CODE 4820–02–P**

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–4903–N–63]**

### Notice of Proposed Information Collection: Comment Request; Contract and Subcontract Activity

**AGENCY:** Office of the Chief Information Officer, HUD.

**ACTION:** Notice.

---

**SUMMARY:** The proposed information collection requirement described below will be submitted to the Office of Management and Budget (OMB) for review, as required by the Paperwork Reduction Act. The Department is soliciting public comments on the subject proposal.

This is a request for approval of a revision to the currently approved information collection, which enables HUD to monitor and evaluate Minority Business Enterprise (MBE) activities against the total program activity and the designated MBE goals. Reports are submitted annually to Congress. This information collection combines two previously approved collections, OMB control numbers 2577–0088 and 2502–0355. OMB control number 2535–pending will now be used for this collection.

**DATES:** *Comments due:* October 12, 2004.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Comments should refer to the proposal by name and/or OMB Control Number and should be sent to: Wayne Eddins, Reports Management Officer, AYO, Department of Housing and Urban Development, 451 Seventh Street, SW., Washington, DC 20410; e-mail *Wayne_Eddins@HUD.gov*; telephone (202) 708–2374. This is not a toll-free number. Copies of available documents may be obtained from Mr. Eddins and at HUD's Web site at *http:/*

*/www5.hud.gov:63001/po/i/icbts/collectionsearch.cfm.*

**FOR FURTHER INFORMATION CONTACT:** Lillian Deitzer, Information Technology Specialist, AYO, Department of Housing and Urban Development, 451 Seventh Street, SW., Washington, DC 20410; e-mail *Lillian_L_Deitzer@HUD.gov*; telephone (202) 708–2374. This is not a toll-free number.

**SUPPLEMENTARY INFORMATION:** The Department will submit the proposed information collection to OMB for review, as required by the Paperwork Reduction Act of 1995 (44 U.S.C. Chapter 35, as amended).

This Notice is soliciting comments from members of the public and affecting agencies concerning the proposed collection of information to: (1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility; (2) Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information; (3) Enhance the quality, utility, and clarity of the information to be collected; and (4) Minimize the burden of the collection of information on those who are to respond; including through the use of appropriate automated collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

This Notice also lists the following information:

*Title of Proposal:* Contract and Subcontract Activity.

*OMB Control Number, if applicable:* 2535–pending.

*Description of the need for the information and proposed use:* Information will enable HUD to monitor and evaluate Minority Business Enterprise (MBE) activities against the total program activity and the designated MBE goals. Reports are submitted annually to Congress. This information collection combines two previously approved collections, OMB control numbers 2577–0088 and 2502–0355. OMB control number 2535–pending will now be used for this collection.

*Agency form numbers, if applicable:* HUD 2516.

*Estimation of the total number of hours needed to prepare the information collection including number of respondents, frequency of response, and hours of response:* An estimation of the total numbers of hours needed to prepare the information collection is 5,000, number of respondents is 5,000,

frequency of response is "annually," and the hours per response is 1 hour.

*Status of the proposed information collection:* Revision of a currently approved collection.

**Authority:** Section 3506 of the Paperwork Reduction Act of 1995, 44 U.S.C. Chapter 35, as amended.

Dated: August 4, 2004.

**Wayne Eddins,**

*Departmental Reports Management Officer, Office of the Chief Information Officer.*

[FR Doc. 04–18301 Filed 8–10–04; 8:45 am]

**BILLING CODE 4210–72–P**

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–4907–N–26]**

### Notice of Proposed Information Collection: Comment Request; Automated Clearing House (ACH) Program Application—Title I Insurance Charge Payments System

**AGENCY:** Office of the Assistant Secretary for Housing—Federal Housing Commissioner, HUD.

**ACTION:** Notice.

---

**SUMMARY:** The proposed information collection requirement described below will be submitted to the Office of Management and Budget (OMB) for review, as required by the Paperwork Reduction Act. The Department is soliciting public comments on the subject proposal.

**DATES:** *Comments Due Date:* October 12, 2004.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Comments should refer to the proposal by name and/or OMB Control Number and should be sent to: Wayne Eddins, Reports Management Officer, Department of Housing and Urban Development, 451 7th Street, SW., L'Enfant Plaza Building, Room 8001, Washington, DC 20410 or *Wayne Eddins@hud.gov.*

**FOR FURTHER INFORMATION CONTACT:** Lester J. West, Director, Financial Operations Center, Department of Housing and Urban Development, 52 Corporate Circle, Albany, NY 12203, telephone (518) 464–4200 x4206 (this is not a toll free number) for copies of the proposed forms and other available information.

**SUPPLEMENTARY INFORMATION:** The Department is submitting the proposed information collection to OMB for review, as required by the Paperwork Reduction Act of 1995 (44 U.S.C. Chapter 35, as amended).

# DEPARTMENT OF HOMELAND SECURITY

[Docket No. DHS–2016–0089]

## National Infrastructure Advisory Council

**AGENCY:** National Protection and Programs Directorate, DHS.

**ACTION:** Committee management; notice of an Open Federal Advisory Committee meeting.

**SUMMARY:** The National Infrastructure Advisory Council (NIAC) will meet Thursday, February 16, 2017, at 1331 F Street NW., Suite 1000, Washington, DC 20004. This meeting will be open to the public.

**DATES:** The NIAC will meet on February 16, 2017. The meeting will be held from 1:30 p.m.–4:30 p.m. EST. The meeting may close early if the committee has completed its business. For additional information, please consult the NIAC Web site, *www.dhs.gov/NIAC*, or contact the NIAC Secretariat by phone at (703) 235–2888 or by email at *NIAC@hq.dhs.gov.*

**ADDRESSES:** 1331 F Street NW., Suite 1000, Washington, DC 20004. Members of the public will register at the registration table prior to entering the meeting room. For information on facilities or services for individuals with disabilities, or to request special assistance at the meeting, contact the person listed under **FOR FURTHER INFORMATION CONTACT** below as soon as possible.

To facilitate public participation, we are inviting public comment on the issues to be considered by the Council as listed in the "Summary" section below. Comments must be submitted in writing no later than 12:00 p.m. on February 13, 2017, in order to be considered by the Council in its meeting. The comments must be identified by "DHS–2016–0089," and may be submitted by any *one* of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting written comments.

• *Email: NIAC@hq.dhs.gov.* Include the docket number (DHS–2016–0089) in the subject line of the message.

• *Fax:* (703)235–9707.

• *Mail:* Ginger Norris, National Protection and Programs Directorate, Department of Homeland Security, 245 Murray Lane SW., Mail Stop 0612, Washington, DC 20598–0607.

*Instructions:* All written submissions received must include the words "Department of Homeland Security" and the docket number for this action. Written comments received will be posted without alteration at *www.regulations.gov,* including any personal information provided.

*Docket:* For access to the docket or to read background documents or comments received by the NIAC, go to *www.regulations.gov.* Enter "NIAC" in the search line and the Web site will list all relevant documents for your review.

Members of the public will have an opportunity to provide oral comments on the topics on the meeting agenda below, and on any previous studies issued by the NIAC. We request that comments be limited to the issues and studies listed in the meeting agenda and previous NIAC studies. All previous NIAC studies can be located at *www.dhs.gov/NIAC.* Public comments may be submitted in writing or presented in person for the Council to consider. Comments received by Ginger Norris on or after 1:00 p.m. on February 16, 2017 will still be accepted and reviewed by the Members, but not necessarily at the time of the meeting. In-person presentations will be limited to three minutes per speaker, with no more than 15 minutes for all speakers. Parties interested in making in-person comments should register on the Public Comment Registration list available at the entrance to the meeting location prior to the beginning of the meeting.

**FOR FURTHER INFORMATION CONTACT:** Ginger Norris, Department of Homeland Security, National Protection and Programs Directorate, Office of Infrastructure Protection, NIAC, Designated Federal Officer, 245 Murray Lane SW., Mail Stop 0607, Washington, DC 20598–0607, telephone 202–441–5885.

**SUPPLEMENTARY INFORMATION:** Notice of this meeting is given under the Federal Advisory Committee Act, 5 U.S.C. appendix. The NIAC shall provide the President, through the Secretary of Homeland Security, with advice on the security and resilience of the Nation's critical infrastructure sectors. The NIAC will meet to discuss issues relevant to critical infrastructure security and resilience, as directed by the President.

The meeting will commence at 1:00 p.m. EST. At this meeting, the Council will discuss its newest tasking and receive briefings. All presentations will be posted prior to the meeting on the Council's public Web page— *www.dhs.gov/NIAC.*

## Public Meeting Agenda

I. Opening of Meeting
II. Roll Call of Members
III. Opening Remarks and Introductions
IV. Approval of SEP 2016 Meeting Minutes
V. Presentations on Future Focus Study
VI. Public Comment
VII. Discussion of New NIAC Business
VIII. Closing Remarks
IX. Adjournment

Dated: January 4, 2017.

**Ginger Norris,**
*Designated Federal Officer for the NIAC.*
[FR Doc. 2017–00789 Filed 1–13–17; 8:45 am]
**BILLING CODE 9110–9–P**

# DEPARTMENT OF HOMELAND SECURITY

## Office of the Secretary

[DHS Docket No. DHS–2017–0004]

## Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea

**AGENCY:** Office of the Secretary, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** This notice concerns the authority of the Department of Homeland Security (DHS or the Department) to place certain designated categories of aliens in expedited removal proceedings. On November 13, 2002, the former Immigration and Naturalization Service (INS) of the Department of Justice issued a notice designating certain aliens who arrive by sea, either by boat or other means, as eligible for placement in expedited removal proceedings, with an exception for Cuban citizens or nationals (hereinafter "Cuban nationals"). On August 11, 2004, DHS issued a notice designating certain aliens in the United States as eligible for placement in expedited removal proceedings, also with an exception for Cuban nationals. In light of recent changes in the relationship between the United States and Cuba, the Department has determined that the exceptions for Cuban nationals, contained in the designations of November 13, 2002 and August 11, 2004, are no longer warranted and are thus hereby eliminated. The rest of the November 13, 2002 and August 11, 2004 designations, including any implementing policies, are unaffected by this notice and remain unchanged.

**DATE:** This notice is effective on January 13, 2017. Interested persons are invited to submit written comments on this notice on or before March 20, 2017.

**ADDRESSES:** You may submit comments, identified by DHS Docket Number DHS–2017–0004, by any one of the following methods:

• *Federal e-Rulemaking Portal* *www.regulations.gov.* Follow the Web site instructions for submitting comments.

• *Mail or Hand Delivery/Courier:* Please submit all written comments (including and CD–ROM submissions) to Amanda Baran, Principal Director for Immigration Policy, DHS, 245 Murray Lane SW., Mail Stop 0445, Washington, DC 20528.

Please submit your comments by only one method. Comments received by means other than those listed above or received after the comment period has closed will not be reviewed. All comments received will be posted without change on *http:// www.regulations.gov.* The *http:// www.regulations.gov* Web site is the Federal e-rulemaking portal and comments posted there are available and accessible to the public. Commenters should not include personal information such as Social Security Numbers, personal addresses, telephone numbers, and email addresses in their comments as such information will become viewable by the public on the *http://www.regulations.gov* Web site. It is the commenter's responsibility to safeguard his or her information. Comments submitted through *http:// www.regulations.gov* will not include the commenter's email address unless the commenter chooses to include that information as part of his or her comment.

Postal delivery in Washington, DC, may be delayed due to security concerns. Therefore, DHS encourages the public to submit comments through the *http://www.regulations.gov* Web site.

*Docket:* For access to the docket to read background documents or comments received, go to the Federal eRulemaking portal at *http:// www.regulations.gov.* If you need assistance to review the comments, please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section below.

**FOR FURTHER INFORMATION CONTACT:** Amanda Baran, Principal Director for Immigration Policy, 202–282–8805, *Amanda.baran@hq.dhs.gov.*

**SUPPLEMENTARY INFORMATION:** Section 302 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Public Law 104–208, Div. C, 110 Stat. 3009–546, amended section 235(b) of the Immigration and Nationality Act ("Act"), 8 U.S.C. 1225(b), to authorize the Attorney General (now the Secretary of Homeland Security as designated under the Homeland Security Act of 2002) to remove, without a hearing before an immigration judge, aliens arriving in the United States and certain other applicants for admission who are inadmissible under sections 212(a)(6)(C) or 212(a)(7) of the Act, 8 U.S.C. 1182(a)(6)(C) and 1182(a)(7), for lack of valid documents necessary for admission or entry or for procuring or seeking to procure a visa, other immigration-related documentation, admission to the United States, or other immigration benefit by fraud or willful misrepresentation of a material fact.

Expedited removal proceedings under section 235(b) of the Act, 8 U.S.C. 1225(b), may be applied to two categories of aliens. First, expedited removal proceedings may be used for aliens who are "arriving in the United States." Section 235(b)(1)(A)(i) of the Act, 8 U.S.C. 1225(b)(1)(A)(i). Second, the Secretary, in his or her sole and unreviewable discretion, may designate certain other aliens to whom the expedited removal provisions may be applied. Section 235(b)(1)(A)(iii) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii); *see* 8 CFR 235.3(b)(1)(ii). Specifically, with limited exception, the Act authorizes the Secretary to apply (by designation) expedited removal proceedings to all or any subset of aliens who (1) have not been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, and (2) have not established to the satisfaction of the immigration officer that they have been physically present in the United States continuously for the two-year period immediately prior to the date of determination of inadmissibility. Section 235(b)(1)(A)(iii)(I)–(II), 8 U.S.C. 1225(b)(1)(A)(iii)(I)–(II). The Secretary may modify such designations at any time. *Id.*

On November 13, 2002, the former INS issued a **Federal Register** notice announcing that it was exercising its authority under section 235(b)(1)(A)(iii) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii), to designate additional aliens who may be placed in expedited removal proceedings. 67 FR 68924. Specifically, that notice designated the following class of aliens who may be placed in expedited removal proceedings: "all aliens who arrive in the United States by sea, either by boat or other means, who are not admitted or paroled, and who have not been physically present in the United States continuously for the two-year period prior to a determination of inadmissibility." *Id.* The INS noted at the time that "[p]lacing these individuals in expedited removal proceedings and maintaining detention for the duration of all immigration proceedings, with limited exceptions, will ensure prompt immigration determinations and ensure removal from the country of those not granted relief in those cases, while at the same time protecting the rights of the individuals affected." *Id.* The INS also stated that "exercising its authority to detain this class of aliens . . . will assist in deterring surges in illegal migration by sea, including potential mass migration, and preventing loss of life." *Id.* The INS further noted that preventing illegal migration by sea also protects national security, as "[a] surge in illegal migration by sea threatens [that] security by diverting valuable United States Coast Guard and other resources from counter-terrorism and homeland security responsibilities." *Id.*

The November 13, 2002 notice, however, contained an exception for Cuban nationals who are otherwise described in the designated class, stating that expedited removal proceedings would not be initiated against such Cuban nationals who arrive by sea. *Id.* The INS based this exception on "longstanding U.S. policy to treat Cubans differently from other aliens," citing the Cuban Adjustment Act, Public Law 89–732 (1966) (8 U.S.C. 1255 note), as an example of such treatment. *Id.* The notice also cited section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F), which at the time statutorily exempted Cuban nationals who arrived by aircraft at a U.S. port of entry from being placed into expedited removal proceedings because of the lack of diplomatic relations between the United States and Cuba. That section expressly provides that expedited removal "shall not apply to an alien who is a native or citizen of a country in the Western Hemisphere with whose government the United States does not have full diplomatic relations and who arrives by aircraft at a port of entry." Section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F).

On August 11, 2004, DHS issued a similar **Federal Register** notice announcing that it was exercising its authority under section 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii), to designate an additional class of aliens to be placed in expedited removal proceedings. 69 FR 48877. That notice authorized the Department to place in expedited removal proceedings any or all members of the following class of aliens: "Aliens determined to be inadmissible under sections 212(a)(6)(C) or (7) of the Immigration and Nationality Act who are present in the U.S. without having been admitted or paroled following inspection by an immigration officer at a designated port of entry, who are encountered by an immigration officer within 100 air miles

of the U.S. international land border, and who have not established to the satisfaction of an immigration officer that they have been physically present in the U.S. continuously for the fourteen-day (14-day) period immediately prior to the date of encounter.'' *Id.* DHS noted at the time that ''exercising its statutory authority to place these individuals in expedited removal proceedings will enhance national security and public safety by facilitating prompt immigration determinations, enabling DHS to deal more effectively with the large volume of persons seeking illegal entry, and ensure removal from the country of those not granted relief, while at the same time protecting the rights of the individuals affected.'' *Id.*

Like the November 13, 2002 notice, the August 11, 2004 notice contained an exception for Cuban nationals who are otherwise described in the designated class and stated that expedited removal proceedings would not be initiated against such nationals encountered in the United States. *Id.* The notice similarly based this exception on that fact that ''removals to Cuba [could not] presently be assured and for other U.S. policy reasons,'' *id.,* citing section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F), as well.

Since those notices were issued, significant changes in the relationship between the United States and Cuba have occurred. In December 2014, President Obama announced a historic opening between the United States and Cuba, as well as an approach for reestablishing diplomatic relations and adjusting regulations to facilitate greater travel, commerce, people-to-people ties, and the free flow of information to, from, and within Cuba. On July 20, 2015, the United States and Cuba formally reestablished full diplomatic relations and opened embassies in each other's countries. In the time following the reestablishment of full diplomatic relations, the United States and Cuba have taken concrete steps towards enhancing security, building bridges between our peoples, and promoting economic prosperity for citizens of both countries. And recent migration discussions have yielded important changes that will dramatically affect travel and migration between our two countries. Among other things, Cuba has agreed to accept and facilitate the repatriation of its nationals who are ordered removed from the United States. This arrangement and other changes remain the focus of ongoing diplomatic discussions between the two countries.

DHS also has recently seen a significant increase in attempts by Cuban nationals to illegally enter the United States. Many of those Cuban nationals have taken a dangerous journey through Central America and Mexico; others have taken to the high seas in the dangerous attempt to cross the Straits of Florida. DHS believes this increase in attempted migration has been driven in part by the perception that there is a limited window before the United States will eliminate favorable immigration policies for Cuban nationals.

The application of the expedited removal authorities to Cuban nationals must reflect these new realities. First, the Department notes that the statutory provision categorically barring the use of expedited removal for certain aliens who arrive by aircraft at a U.S. port of entry no longer applies to Cuban nationals, as the United States and Cuba have reestablished full diplomatic relations. *See* section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F). In fact, DHS and DOJ are promulgating rules in this issue of the **Federal Register**, amending 8 CFR 235.3(b)(1)(i) and 1235.3(b)(1)(i) to strike the regulatory exception for Cuban nationals arriving by aircraft at a U.S. port of entry. Second, the improved relationship between the United States and Cuba, along with Cuba's agreement to accept the repatriation of its nationals, has eroded certain U.S. policy justifications for the exception. Finally, a categorical exception severely impairs the Government's ability to remove unauthorized aliens encountered within the United States. For these reasons, DHS has determined, in consultation with the Department of State, that a categorical exception from expedited removal for Cuban nationals is no longer in the interests of the United States.

Accordingly, this notice eliminates the categorical exceptions for Cuban nationals, with respect to both the November 13, 2002 and August 11, 2004 notices, on a prospective basis, beginning on January 13, 2017, *see* 8 CFR 235.3(b)(1)(ii) (designation may be effective as early as the date of issuance). As a result, Cuban nationals encountered on or after January 13, 2017 are included in the classes of aliens subject to expedited removal as designated in the November 13, 2002 and August 11, 2004 notices. DHS is not changing any other aspects of those designations and, apart from the modification described above, will continue exercising its expedited removal authority as indicated in the November 13, 2002 and August 11, 2004 notices.

As it did for the November 13, 2002 and August 11, 2004 notices, and consistent with implementing regulations at 8 CFR 235.3(b)(1)(ii), the Department has determined that good cause exists to exempt this notice from the notice-and-comment and 30-day delayed effective date requirements under the Administrative Procedure Act (APA). *See* 5 U.S.C. 553(b)(3)(B) and (d)(3). Delaying the implementation of this notice to allow public notice and comment would be impracticable and contrary to the public interest. Congress explicitly authorized the Secretary to designate categories of aliens to whom expedited removal proceedings may be applied, and made clear that ''[s]uch designation shall be in the sole and unreviewable discretion of the Secretary and may be modified at any time.'' Section 235(b)(1)(A)(iii)(I) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii)(I).

Moreover, as with the August 11, 2004 notice, the designation in this notice is necessary to remove quickly from the United States aliens who are encountered shortly after illegally entering across U.S. land borders. The ability to detain such aliens while admissibility and identity are determined and protection claims are adjudicated, as well as to quickly remove those without protection claims or claims to lawful status, is a necessity for national security and public safety.

DHS has determined that pre-promulgation notice and comment would undermine these interests, while endangering human life and having a potential destabilizing effect in the region. Among other things, such opportunity for notice and comment could result in a surge in migration of Cuban nationals seeking to travel to and enter the United States prior to the effectuation of the changes announced in this notice. Such a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. *See Matter of D–J–,* I. & N. Dec. 572, 579 (A.G. 2003). A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations. Additionally, a surge in migration over land or sea could result in significant loss of human life. For the foregoing reasons, the Department has determined that public notice and comment prior to promulgation of this notice would be impracticable and contrary to the public interest.

In addition, the change implemented by this notice is part of a major foreign policy initiative announced by the President, and is central to ongoing

diplomatic discussions between the United States and Cuba with respect to travel and migration between the two countries. DHS, in consultation with the Department of State, has determined that eliminating the exception from expedited removal proceedings for Cuban nationals involves a foreign affairs function of the United States, 5 U.S.C. 553(a)(1), and that this notice is exempt from APA procedural requirements on that basis.

Finally, and for the same reasons described above, DHS finds that delay caused by publication would adversely affect the interests of the United States and the effective enforcement of the immigration laws, and therefore invokes 8 CFR 235.3(b)(1)(ii) to make this designation effective immediately upon placement on public inspection.

Although advance notice and comment procedures are not in the interests of the United States with respect to this notice, DHS is interested in receiving comments from the public on the elimination of the categorical exception for Cuban nationals. DHS believes that by maintaining a dialogue with interested parties, DHS may be better positioned to ensure that the program is even more effective in combating and deterring illegal entry, while at the same time protecting the rights of the individuals affected.

**Notice of Designation of Aliens Subject to Expedited Removal Proceedings**

Pursuant to section 235(b)(1)(A)(iii) of the Immigration and Nationality Act (8 U.S.C. 1225(b)(1)(A)(iii)) and 8 CFR 235.3(b)(1)(ii), I order as follows:

(1) With respect to the above-referenced Designation of November 13, 2002, 67 FR 68924, I hereby rescind the provision at numbered paragraph (5), specifying that "[e]xpedited removal proceedings will not be initiated against Cuban citizens or nationals who arrive by sea," and other language of the Designation referencing or relating to that exception for Cuban citizens or nationals.

(2) With respect to the above-referenced Designation of August 11, 2004, 69 FR 48877, I hereby rescind the provision at numbered paragraph (6), specifying that "[t]he expedited removal proceedings contemplated by this notice will not be initiated against Cuban citizens or nationals," and other language of the Designation referencing or relating to that exception for Cuban citizens or nationals.

Signed: at Washington, DC this 11th of January, 2017.

**Jeh Charles Johnson,**

*Secretary of Homeland Security.*

[FR Doc. 2017–00914 Filed 1–13–17; 8:45 am]

**BILLING CODE P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2593–16; DHS Docket No. USCIS–2015–USCIS–2013–0006]**

**RIN 1615–ZB62**

**Extension of the Designation of Somalia for Temporary Protected Status**

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** The Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the designation of Somalia for Temporary Protected Status (TPS) for a period of 18 months, effective March 18, 2017 through September 17, 2018. This extension allows eligible Somali nationals (and aliens having no nationality who last habitually resided in Somalia) to retain TPS through September 17, 2018, so long as they otherwise continue to meet the eligibility requirements for TPS. The Secretary has determined that an extension is warranted because conditions in Somalia supporting its designation for TPS continue to be met. Through this Notice, DHS also sets forth procedures necessary for nationals of Somalia (or aliens having no nationality who last habitually resided in Somalia) to re-register for TPS and to apply for renewal of their Employment Authorization Documents (EAD) with U.S. Citizenship and Immigration Services (USCIS).

**DATES:** The 18-month extension of the TPS designation of Somalia is effective as of March 18, 2017, and will remain in effect through September 17, 2018. The 60-day re-registration period runs from January 17, 2017 through March 20, 2017. Note: It is important for re-registrants to timely re-register during this 60-day period and not to wait until their EADs expire.

**FOR FURTHER INFORMATION CONTACT:**

• For further information on TPS, including guidance on the application process and additional information on eligibility, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps*. You can find specific information about the extension of Somalia's designation for TPS by selecting "Somalia" from the menu on the left side of the TPS Web page.

• You can also contact Guillermo Roman-Riefkohl, TPS Program Manager, Waivers and Temporary Services Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529–2060; or by phone at 202–272–1533 (this is not a toll-free number).

**Note:** The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquires.

• Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS Web site at *http://www.uscis.gov*, or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). Service is available in English and Spanish.

• Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

BIA—Board of Immigration Appeals
DHS—Department of Homeland Security
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Government—U.S. Government
IJ—Immigration Judge
INA—Immigration and Nationality Act
OSC—U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services

**What is Temporary Protected Status (TPS)?**

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA), or to eligible aliens without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and obtain EADs, so long as they continue to meet the requirements of TPS.

# Rules and Regulations

Federal Register

Vol. 82, No. 10

Tuesday, January 17, 2017

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents. Prices of new books are listed in the first FEDERAL REGISTER issue of each week.

## DEPARTMENT OF HOMELAND SECURITY

### Office of the Secretary

**8 CFR Part 235**

**[DHS Docket No. DHS–2017–0003]**

**RIN 1601–AA81**

### Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air

**AGENCY:** Office of the Secretary, Department of Homeland Security.

**ACTION:** Final rule; request for comments.

**SUMMARY:** This final rule revises Department of Homeland Security (DHS) regulations to eliminate the categorical exception from expedited removal proceedings for Cuban nationals who arrive in the United States at a port of entry by aircraft. As a result of these changes, Cuban nationals who arrive in the United States at a port of entry by aircraft will be subject to expedited removal proceedings commensurate with nationals of other countries.

**DATES:** This final rule is effective January 13, 2017. Interested persons are invited to submit written comments on this final rule on or before March 20, 2017.

**ADDRESSES:** You may submit comments, identified by Regulatory Information Number (RIN) 1601–AA81 and DHS Docket Number DHS–2017–0003, by any one of the following methods:

• *Federal e-Rulemaking Portal www.regulations.gov.* Follow the Web site instructions for submitting comments.

• *Mail or Hand Delivery/Courier:* Please submit all written comments (including and CD–ROM submissions) to Amanda Baran, Principal Director for Immigration Policy, DHS, 245 Murray Lane SW., Mail Stop 0445, Washington, DC 20528.

Please submit your comments by only one method. Comments received by means other than those listed above or received after the comment period has closed will not be reviewed. All comments received will be posted without change on *http://www.regulations.gov.* The *http://www.regulations.gov* Web site is the Federal e-rulemaking portal and comments posted there are available and accessible to the public. Commenters should not include personal information such as Social Security Numbers, personal addresses, telephone numbers, and email addresses in their comments as such information will become viewable by the public on the *http://www.regulations.gov* Web site. It is the commenter's responsibility to safeguard his or her information. Comments submitted through *http://www.regulations.gov* will not include the commenter's email address unless the commenter chooses to include that information as part of his or her comment.

Postal delivery in Washington, DC, may be delayed due to security concerns. Therefore, DHS encourages the public to submit comments through the *http://www.regulations.gov* Web site.

*Docket:* For access to the docket to read background documents or comments received, go to the Federal eRulemaking portal at *http://www.regulations.gov.* If you need assistance to review the comments, please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section below.

**FOR FURTHER INFORMATION CONTACT:** Amanda Baran, Principal Director for Immigration Policy, 202–282–8805, *Amanda.baran@hq.dhs.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Background

Section 302 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Public Law 104–208, Div. C, 110 Stat. 3009–546, amended section 235(b) of the Immigration and Nationality Act ("Act"), 8 U.S.C. 1225(b), to authorize what are known as "expedited removal proceedings." Specifically, section 235(b) was amended to authorize the Attorney General (now the Secretary of Homeland Security [1]) to remove, without a hearing before an immigration judge, aliens arriving in the United States who are inadmissible under sections 212(a)(6)(C) or 212(a)(7) of the Act, 8 U.S.C. 1182(a)(6)(C) and 1182(a)(7), for lack of valid documents necessary for admission or entry or for procuring or seeking to procure a visa, other immigration-related documentation, admission to the United States, or other immigration benefit by fraud or willful misrepresentation of a material fact.

Expedited removal proceedings under section 235(b) of the Act, 8 U.S.C. 1225(b), may be applied to two categories of aliens. First, expedited removal proceedings may be used for aliens who are "arriving in the United States." Section 235(b)(1)(A)(i) of the Act, 8 U.S.C. 1225(b)(1)(A)(i). Second, the Secretary, in his or her sole and unreviewable discretion, may designate certain other aliens to whom the expedited removal provisions may be applied. Section 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii); *see* 8 CFR 235.3(b)(1)(ii).

When it created the expedited removal process, Congress also created a limited exception for certain aliens who arrived at a U.S. port of entry by aircraft. Under section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F), expedited removal "shall not apply to an alien who is a native or citizen of a country in the Western Hemisphere with whose government the United States does not have full diplomatic relations and who arrives by aircraft at a port of entry." For many years, this exception applied to Cuban nationals due to the lack of full diplomatic relations between the United States and Cuba. DHS regulations implementing section 235(b)(1) of the Act, 8 U.S.C. 1225(b)(1), this expressly stated that the expedited removal provisions apply to "[a]rriving aliens, as defined in 8 CFR 1.2, except for citizens of Cuba arriving at a United States port-of-entry by aircraft." 8 CFR 235.3(b)(1)(i); *see also* 8

---

[1] Under section 1517 of title XV of the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions that were transferred from the Attorney General or other Department of Justice (DOJ) official to DHS by the HSA "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (2003) (codifying HSA, tit. XV, sec. 1517); 6 U.S.C. 542 note; 8 U.S.C. 1551 note.

CFR 1235.3(b)(1)(i) (parallel Department of Justice (DOJ) regulations stating that the expedited removal provisions apply to "[a]rriving aliens, as defined in [8 CFR 1001.1(q)], except for citizens of Cuba arriving at a United States port-of-entry by aircraft").[2]

Since that regulation was promulgated, significant changes in the relationship between the United States and Cuba have occurred. In December 2014, President Obama announced a historic opening between the United States and Cuba, as well as an approach for reestablishing diplomatic relations and adjusting regulations to facilitate greater travel, commerce, people-to-people ties, and the free flow of information to, from, and within Cuba. On July 20, 2015, the United States and Cuba formally reestablished full diplomatic relations and opened embassies in each other's countries. In the time following the reestablishment of full diplomatic relations, the United States and Cuba have taken concrete steps towards enhancing security, building bridges between our peoples, and promoting economic prosperity for citizens of both countries. And recent migration discussions have yielded important changes that will dramatically affect travel and migration between our two countries. Among other things, Cuba has agreed to accept and facilitate the repatriation of its nationals who are ordered removed from the United States. This arrangement and other changes remain the focus of ongoing diplomatic discussions between the two countries. DHS, in consultation with the Department of State, has determined that the limitation at section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F) no longer applies with respect to Cuba.

Moreover, DHS has recently seen a significant increase in attempts by Cuban nationals to illegally enter the United States. Many of those Cuban nationals have taken a dangerous journey through Central America and Mexico; others have taken to the high seas in the dangerous attempt to cross the Straits of Florida. DHS believes this increase in attempted migration has been driven in part by the perception that there is a limited window before the United States will eliminate favorable immigration policies for Cuban nationals.

The application of the expedited removal authorities to Cuban nationals must reflect these new realities. Accordingly, DHS is eliminating provisions in its regulations that categorically exempt Cuban nationals who arrive at a U.S. port of entry by aircraft from expedited removal proceedings under 8 CFR 235.3. Importantly, the statutory provision categorically barring the use of expedited removal for certain aliens who arrive by air no longer applies to Cuban nationals, as the United States and Cuba have reestablished full diplomatic relations. Moreover, previous U.S. policy justifications for exempting Cuban nationals from expedited removal—including Cuba's general refusal to accept the repatriation of its nationals—are no longer valid in many respects. Finally, a categorical exception severely impairs the Government's ability to remove unauthorized aliens encountered within the United States. For these reasons, DHS, in consultation with the Department of State, has determined that a categorical exception from expedited removal for Cuban nationals is no longer in the interests of the United States. Accordingly, as a result of this final rule, Cuban nationals will be subject to expedited removal proceedings under section 235(b) of the INA and 8 CFR 235.3 like nationals of other countries. For the same reasons, DHS is also publishing a notice in this issue of the **Federal Register** to remove the parallel exceptions for expedited removal of Cuban nationals who arrive by sea or who are encountered by an immigration officer within 100 air miles of the U.S. border.

## II. Statutory and Regulatory Requirements

### A. Administrative Procedure Act

The promulgation of this rule as a final rule, with provisions for post-promulgation public comments, is based on the good cause exception found in section 553 of the Administrative Procedure Act (APA) (5 U.S.C. 553(b)(B)). Delaying the implementation of the change announced in this rule to allow pre-promulgation notice and comment would be impracticable and contrary to the public interest. Congress explicitly authorized the Secretary of Homeland Security to designate categories of aliens to whom expedited removal proceedings may be applied, and made clear that "[s]uch designation shall be in the sole and unreviewable discretion of the Secretary and may be modified at any time." Section 235(b)(1)(A)(iii)(I) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii)(I). And this rule is necessary to remove quickly from the United States certain Cuban nationals who arrive by air at U.S. ports of entry. The ability to detain such aliens while admissibility and identity are determined and protection claims are adjudicated, as well as to quickly remove those without protection claims or claims to lawful status, is a necessity for national security and public safety.

Pre-promulgation notice and comment would undermine these interests, while endangering human life and having a potential destabilizing effect in the region. Specifically, DHS is concerned that publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule. Such a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations. Additionally, a surge could result in significant loss of human life. Accordingly, DHS finds that it would be impracticable and contrary to the public interest to accept pre-promulgation comments on this rule. For the same reasons, DHS also finds good cause to issue this rule without a 30-day delayed effective date requirement of the APA, *see* 5 U.S.C. 553(d).[3]

In addition, the change implemented by this rule is part of a major foreign policy initiative announced by the President, and is central to ongoing diplomatic discussions between the United States and Cuba with respect to travel and migration between the two countries. DHS, in consultation with the Department of State, has determined that eliminating the exception from expedited removal proceedings for Cuban nationals involves a foreign affairs function of the United States, 5 U.S.C. 553(a)(1), and is also exempt from the notice and comment and 30-day delayed effective date requirements of the APA on that basis. DHS is

---

[2] DOJ initially promulgated 8 CFR 235.3(b)(1)(i) as an exercise of the functions of the former Immigration and Naturalization Service (INS) and the Executive Office for Immigration Review. *See* 62 FR 10312 (Mar. 6, 1997). Following enactment of the HSA, 8 CFR 235.3(b)(1)(i) was transferred to DHS, and effectively duplicated in parallel DOJ regulations at 8 CFR 1235.3(b)(1)(i). *See* 68 FR 10349 (Mar. 5, 2003). DOJ is revising its parallel regulation by separate rulemaking in this issue of the **Federal Register**.

[3] In addition, in light of the lack of pre-publication notice and comment and a delayed effective date for the related notice that DHS has published in this issue of the **Federal Register**, a delay in the effective date of this regulation would be incongruous and unnecessary.

nevertheless providing the opportunity for the public to comment.

### B. Executive Orders 13563 and 12866

Executive Orders 13563 and 12866 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility.

The Office of Management and Budget has not designated this rule as a significant regulatory action under section 3(f) of Executive Order 12866. Accordingly, the Office of Management and Budget has not reviewed this rule.

### C. Regulatory Flexibility Act

The Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*), as amended by the Small Business Regulatory Enforcement and Fairness Act of 1996, requires an agency to prepare a regulatory flexibility analysis that describes the effect of a proposed rule on small entities when the agency is required to publish a general notice of proposed rulemaking. A small entity may be a small business (defined as any independently owned and operated business not dominant in its field that qualifies as a small business per the Small Business Act); a small not-for-profit organization; or a small governmental jurisdiction (locality with fewer than 50,000 people). Because this final rule is exempt from notice-and-comment rulemaking requirements under 5 U.S.C. 553, a regulatory flexibility analysis is not required.

### Regulatory Amendments

**List of Subjects in 8 CFR Part 235**

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

**Authority and Issuance**

For the reasons stated in the preamble, part 235 of title 8 of the Code of Federal Regulations is amended as set forth below:

**8 CFR CHAPTER I**

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

■ 1. The authority citation for part 235 continues to read:

**Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, 69 FR 241, 3 CFR, 2004 Comp., p. 278), 1201, 1224, 1225, 1226, 1228, 1365a note, 1365b, 1379, 1731–32; Title VII of Public Law 110–229; 8 U.S.C. 1185 note (section 7209 of Pub. L. 108–458); Pub. L. 112–54.

■ 2. Revise § 235.3(b)(1)(i) to read as follows:

**§ 235.3  Inadmissible aliens and expedited removal.**

*    *    *    *    *

(b) * * *

(1) * * *

(i) Arriving aliens, as defined in 8 CFR 1.2;

*    *    *    *    *

Signed at Washington, DC, this 11th of January 2017.

**Jeh Charles Johnson,**

*Secretary of Homeland Security.*

[FR Doc. 2017–00915 Filed 1–13–17; 8:45 am]

**BILLING CODE P**

---

## DEPARTMENT OF JUSTICE

### Executive Office for Immigration Review

**8 CFR Part 1235**

**[AG Order No. 3817–2017; EOIR Docket No. 401]**

**RIN 1125–AA80**

### Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air

**AGENCY:** Executive Office for Immigration Review, Department of Justice.

**ACTION:** Final rule; request for comments.

---

**SUMMARY:** This final rule revises Executive Office for Immigration Review (EOIR) regulations to eliminate the categorical exception from expedited removal proceedings for Cuban nationals who arrive in the United States at a port of entry by aircraft. This final rule conforms with a parallel Department of Homeland Security (DHS) regulation. As a result of these changes, Cuban nationals who arrive in the United States at a port of entry by aircraft will be subject to expedited removal proceedings commensurate with nationals of other countries.

**DATES:** This final rule is effective January 13, 2017. Interested persons are invited to submit written comments on this final rule on or before March 20, 2017. Comments received by mail will be considered timely if they are

postmarked on or before that date. The electronic Federal Docket Management System (FDMS) will accept comments until midnight Eastern Time at the end of that day.

**ADDRESSES:** Please submit written comments to Jean King, General Counsel, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2600, Falls Church, Virginia 22041. To ensure proper handling, please reference RIN No. 1125–AA80 or EOIR Docket No. 401 on your correspondence. You may submit comments electronically or view an electronic version of this proposed rule at *www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Jean King, General Counsel, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2600, Falls Church, Virginia 22041; telephone (703) 605–1744 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

### I. Public Participation

Interested persons are invited to participate in this rulemaking by submitting written data, views, or arguments on all aspects of this rule. EOIR also invites comments that relate to the economic, environmental, or federalism effects that might result from this rule. To provide the most assistance to EOIR, comments should explain the reason for any recommended change, and should include data, information, or authority that supports such recommended change.

All comments submitted for this rulemaking should include the agency name and RIN 1125–AA80 or EOIR Docket No. 401. Please note that all comments received are considered part of the public record and will be made available for public inspection at *www.regulations.gov.*, including personally identifiable information (such as a person's name, address, or any other data that might personally identify that individual) voluntarily submitted by the commenter.

If you want to submit personally identifiable information as part of your comment, but do not want it to be posted online, you must include the phrase "PERSONALLY IDENTIFIABLE INFORMATION" in the first paragraph of your comment and identify what information you want redacted.

If you want to submit confidential business information as part of your comment, but do not want it to be posted online, you must include the phrase "CONFIDENTIAL BUSINESS INFORMATION" in the first paragraph of your comment. You also must prominently identify confidential

# Central Americans surge north, hoping to reach U.S. before Trump inauguration

REUTERS

By Gustavo Palencia and Sofia Menchu
Reuters Nov 24, 2016, 6:00 PM

EGUCIGALPA/GUATEMALA CITY (Reuters) - Central American countries warned on Thursday that large numbers of migrants have fled their poor, violent homes since Donald Trump's surprise election win, hoping to reach the United States before he takes office next year.

Trump won the Nov. 8 vote by taking a hard line on immigration, threatening to deport millions of people living illegally in the United States and to erect a wall along the Mexican border.

Trump's tough campaign rhetoric sent tremors through the slums of Central America and the close-knit migrant communities in U.S. cities, with many choosing to fast-forward their plans and migrate north before Trump takes office on Jan. 20.

During fiscal year 2016, the United States detained nearly 410,000 people along the southwest border with Mexico, up about a quarter from the previous year. The vast majority hail from Guatemala, El Salvador and Honduras.

Since Trump's victory, the number of people flocking north has surged, Central American officials say, contributing to a growing logjam along the southern U.S. border.

"We're worried because we're seeing a rise in the flow of migrants leaving the country, who have been urged to leave by coyotes telling them that they have to reach the United States before Trump takes office," Maria Andrea Matamoros, Honduras' deputy foreign minister, told Reuters, referring to people smugglers.

Carlos Raul Morales, Guatemala's foreign minister, told Reuters people were also leaving Guatemala en masse before Trump becomes president.

"The coyotes are leaving people in debt, and taking their property as payment for the journey," he said in an interview.

Last week, U.S. Customs and Border Protection opened a temporary holding facility for up to 500 people near the Texan border with Mexico, in what it said was a response to a marked uptick in illegal border crossings.

U.S. Department of Homeland Security Secretary Jeh Johnson said earlier this month immigration detention facilities were holding about 10,000 more individuals than usual, after a spike in October of migrants including unaccompanied children, families and asylum seekers.

GANG VIOLENCE

Unemployed and sick of the lack of opportunities and endemic gang violence that blight his poor neighborhood in the town of San Marcos, south of San Salvador, Carlos Garcia, 25, said he was looking to enter the United States before Trump assumes power.

"There's one thing I'm very clear about," he said. "I want to get out of here."

Guatemalan Fares Revolorio, 27, arrived in the northwestern Mexican border city of Tijuana on Wednesday after a grueling 4,200-kilometer (2,610-mile), week-long trek by bus. She was waiting to cross into the United States, where she hoped to apply for asylum.

Accompanied by her three children and her husband, she said she left Guatemala as it had become too dangerous. Her husband's brother was killed two months ago, and local gangs, known as "maras," had assaulted her son.

"They tell us the new president doesn't like illegal immigrants, but we have to take the chance," she said, as she struggled to hold back tears. "Nobody wants to die in a horrible way, and we can't be in Guatemala any longer. My children are growing up in fear."

During the campaign, Trump set out plans to impound billions of dollars of remittances so Mexico ends up paying for his proposed wall on the southern U.S. border. It remains unclear if he will stick to the proposal.

Humberto Roque Villanueva, Mexico's deputy interior minister for migration, told Reuters the day after the U.S. election that Mexico stands ready to lobby the U.S. Congress and use all legal means against Trump's plan for blocking remittances.

Victoria Cordova, who was deported from the United States in 2014, said Trump's victory had sown fear in her poor hillside slum in the capital Tegucigalpa.

"People are very worried because many of them have family over there in the United States, and they live off the remittances they send," she said.

The foreign ministers of Mexico, El Salvador, Honduras and Guatemala met on Monday to formulate a strategy to protect their migrants in the United States, in a show of regional solidarity.

At the meeting in Guatemala City, the foreign ministers asked Mexico for help to create a migrant protection network, liaise for coordination with U.S. authorities, and to meet regularly for regional talks.

(Additional reporting by Lizbeth Diaz in Tijuana, Nelson Renteria in San Salvador and Gabriel Stargardter in Mexico City; Writing by Gabriel Stargardter; Editing by Frank Jack Daniel)

Defensive Asylum Cases and Most Current Outcomes by Filing Date Fiscal Year

|  | Defensive cases filed | Relief | Removal | Voluntary Departure | Proceeding Completion | In Proceedings |
|---|---|---|---|---|---|---|
| 2000 | 5,299 | 1,465 | 2,537 | 164 | 1,131 | 2 |
| 2001 | 6,795 | 1,879 | 3,514 | 257 | 1,142 | 3 |
| 2002 | 8,265 | 1,847 | 4,931 | 382 | 1,105 | - |
| 2003 | 8,566 | 1,801 | 4,811 | 764 | 1,188 | 2 |
| 2004 | 8,659 | 1,788 | 4,842 | 1,174 | 849 | 6 |
| 2005 | 11,173 | 3,887 | 6,152 | 903 | 226 | 5 |
| 2006 | 13,870 | 5,517 | 7,031 | 1,019 | 296 | 7 |
| 2007 | 12,984 | 4,543 | 6,539 | 1,392 | 498 | 12 |
| 2008 | 12,247 | 4,792 | 5,488 | 1,173 | 756 | 38 |
| 2009 | 11,685 | 4,735 | 4,736 | 1,101 | 1,040 | 73 |
| 2010 | 12,168 | 4,984 | 4,528 | 1,113 | 1,340 | 203 |
| 2011 | 16,459 | 5,756 | 6,188 | 1,338 | 2,562 | 615 |
| 2012 | 18,252 | 5,389 | 6,534 | 1,336 | 3,479 | 1,514 |
| 2013 | 21,263 | 5,137 | 7,451 | 1,233 | 4,541 | 2,901 |
| 2014 | 27,996 | 6,035 | 9,873 | 1,303 | 5,538 | 5,247 |
| 2015 | 42,554 | 9,201 | 15,568 | 1,326 | 5,144 | 11,315 |
| 2016 | 67,178 | 10,962 | 23,385 | 1,647 | 3,967 | 27,217 |
| 2017 | 119,737 | 10,411 | 31,600 | 2,637 | 1,746 | 73,343 |
| 2018 | 121,671 | 6,758 | 19,137 | 2,432 | 335 | 93,009 |

Source: Department of Homeland Security (DHS) Office of Immigration Statistics (OIS) analysis of Department of Justice (DOJ) Executive Office of Immigration Review (EOIR) Case Info and Proceedings datasets.

Note: Data are based on DOJ EOIR data as of March 31, 2019.

Table prepared by DHS OIS Deputy Assistant Secretary Marc Rosenblum with support from OIS Director of Data Processing Hongwei Zhang on October 29, 2019.

DOJIFR00615

I am pleased that the Congress dropped a provision that would have made funding for the nuclear waste management program contingent upon congressional passage of a subsequent authorization bill. This language could have led to the immediate suspension of ongoing work at the Yucca Mountain site.

I am also pleased that the Congress provided $45 million to the International Nuclear Safety program, which assists nations of the former Soviet Union and Eastern Europe in improving the safety of Soviet-designed nuclear reactors.

I am disappointed that the Act cuts $93 million from my request for solar and renewable energy research programs. Investments in the development of advanced renewable energy technologies, which have a large potential export market, will create new jobs and reduce pollution, thereby addressing climate change and protecting human health and the environment. I am also concerned by the cuts in funding for DOE departmental administration and program direction in civilian research and defense programs that may jeopardize the Department's ability to perform its missions and maintain its financial management responsibilities.

I am disappointed that the Act includes over $210 million in unrequested funds for Corps' construction, studies, and operation and maintenance programs. The Congress should have used these funds to restore reductions it made to other priority DOE and Corps programs, such as the Corps' wetlands regulatory program.

**William J. Clinton**

The White House,
September 30, 1996.

NOTE: H.R. 3816, approved September 30, was assigned Public No. 104–206. This statement was released by the Office of the Press Secretary on October 1.

## Statement on Signing Legislation Waiving Certain Enrollment Requirements
*September 30, 1996*

Today I have signed into law House Joint Resolution 197, which waives the printing requirements of sections 106 and 107 of Title 1 of the United States Code with respect to any appropriations measure of the 104th Congress that is presented to me after the enactment of H.J. Res. 197. I have done so to avoid any confusion as to my ability to act on any form of legislation presented to me after certification by the Committee on House Oversight of the House of Representatives that the form is a true enrollment.

In signing this joint resolution, I express no view as to whether it is necessary to waive the provisions of Title 1 before I exercise my prerogatives under Article I, section 7 of the Constitution where the Congress has presented to me any form of bill or resolution it considers to be a true enrollment.

**William J. Clinton**

The White House,
September 30, 1996.

NOTE: H.J. Res. 197, approved September 30, was assigned Public Law No. 104–207. This statement was released by the Office of the Press Secretary on October 1.

## Statement on Signing the Omnibus Consolidated Appropriations Act, 1997
*September 30, 1996*

I have signed into law H.R. 3610, the fiscal year 1997 omnibus appropriations and immigration reform bill.

This bill is good for America, and I am pleased that my Administration could fashion it with the Congress on a bipartisan basis. It moves us further down the road toward our goal of a balanced budget while protecting, not violating, the values we share as Americans—opportunity, responsibility, and community.

Specifically, the legislation restores needed funds for education and training, the environment, science and technology, and law enforcement; fully funds my anti-drug and counter-terrorism initiatives; extends the Brady Bill so that those who commit domestic violence cannot buy handguns; provides needed resources to respond to fires in the western part of the Nation and to the devastation brought by Hurricanes Fran and

Hortense; and includes landmark immigration reform legislation that cracks down on illegal immigration without punishing legal immigrants.

The bill restores substantial sums for education and training, furthering my agenda of life-long education to help Americans acquire the skills they need to get good jobs in the new global economy.

It provides the funds through which Head Start can serve an additional 50,000 disadvantaged young children; fulfills my request for the Goals 2000 education reform program, enabling States to more quickly raise their academic standards and implement innovative reform; increases funding for the Safe and Drug-Free Schools program, helping States reduce violence and drug abuse in schools; provides most of my request for the Technology Literacy Challenge Fund to help States leverage technology funds; fulfills my request for Title 1, education for the disadvantaged; and provides the funds to enable well over a half-million young people to participate in the Summer Jobs program.

For college students, I am pleased that the bill fulfills my request for the largest Pell Grant college scholarship awards in history and expands the number of middle- and low-income students who receive aid by 126,000—to 3.8 million. I am also pleased that the bill fully funds my Direct Lending program, enabling more students to take advantage of cheaper and more efficient loans.

For the environment, the bill provides funds to support the Environmental Protection Agency's early implementation of two major new environmental laws that I signed this summer—the Safe Drinking Water Act, and the Pesticide and Food Safety Law. In addition, the bill provides additional funds for energy conservation and to help finish the cleanup of Boston Harbor and help prevent beach closures.

At the same time, the bill does not contain any of the riders that would have affected management of the Tongass National Forest in Alaska, national Native American tribal rights, the Interior Department's management of subsistence fishing in Alaska, long-term management of the Elwha Dam in Washington State, and the issuance of emergency-efficiency standards for appliances. I am, however, disappointed the Congress did not adopt my proposal to repeal the 1995 salvage timber rider and restore the application of environmental laws to salvage logging on Federal lands.

For research and technology, the bill promotes economic growth by continuing needed Federal support for advanced technology. It restores funding for the Commerce Department's Advanced Technology Program, providing resources for new grants to support innovative technology companies across the Nation.

It also provides a sizeable increase for the National Institutes of Health, which will enable NIH to expand its critical research into new ways to treat breast cancer, AIDS, and other diseases. I am also pleased that the bill provides nearly $1 billion for Ryan White AIDS treatment grants, including funds to help States purchase a new class of AIDS drugs called "protease inhibitors" and other life-extending medications. And the Congress also fully funded my request for the Department of Housing and Urban Development's program that provides housing assistance for people with AIDS.

For law enforcement, the bill provides $1.4 billion to ensure that my program to put 100,000 more police on the streets of America's communities by the year 2000 proceeds on schedule; with this bill, we will have provided funding for 64,000 of the 100,000 that I called for at the start of my Administration. The bill also increases funds for Justice Department law enforcement programs, for the FBI's crime-fighting efforts, and for new Federal prisons. As I had urged, the bill also extends the Brady Bill to ensure that those who commit domestic violence cannot purchase guns. Finally, I am pleased that the Congress provided a modest increase for the Legal Services Corporation, which ensures that those who lack the means still have access to our legal system.

I am also pleased that the bill provides a $1.4 billion increase in funding for anti-drug programs. It doubles funding for Drug Courts, increases funds for drug interdiction efforts by the Defense, Transportation, and Treasury Departments, and provides the resources to expand the Drug Enforcement Administration's domestic efforts along the

DOJIFR00617

Southwest border and elsewhere. The bill also includes strong language about drug testing that my Administration had proposed, requiring that localities have drug-testing programs in place for their prisoners and parolees in order to qualify for State and local prison grants. And it includes funding for the drug testing of Federal, State, and local arrestees.

For counterterrorism, the bill funds my request for over $1.1 billion to fight terrorism and to improve aviation security and safety. It enables the Justice and Treasury Departments to better investigate and prosecute terrorist acts, and it provides funds to implement the recommendations of Vice President Gore's Commission on Aviation Safety and Security and the Federal Aviation Administration's recent 90-day safety review. These funds will enable us to hire 300 more aviation security personnel, deploy new explosive detection teams, and buy high-technology bomb detection equipment to screen luggage. The bill also gives my Administration the authority to study the use of taggants in black and smokeless powder; taggant technology holds the promise of allowing the detection and identification of explosives material.

I hereby designate as an emergency requirement, as the Congress has already done, the $122.6 million in fiscal 1996 funds and the $230.68 million in fiscal 1997 funds for the Defense Department for antiterrorism, counterterrorism, and security enhancement programs in this Act, pursuant to section 251(b)(2)(D)(I) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

This bill also funds the Nation's defense program for another year; it fully funds my defense antiterrorism and counter-narcotics efforts as well as the Cooperative Threat Reduction program, and at my insistence it provides a substantial amount of the funding for my dual-use technology program. But it also provides about $9 billion more than I proposed for defense, including a substantial amount for weapons that are not even in the Defense Department's future plans and were not requested by the service chiefs. This bill is part of a plan by the majority in the Congress that adds funds for investments now

and reduces them in the future. I continue to believe that my long-range plan is more rational. It provides sufficient funds now while increasing them at the turn of the century when new technologies will become available.

I am pleased that the Congress has provided the minimum acceptable levels for certain key international affairs programs, such as the U.S. contribution to the International Development Association and the Korean Peninsula Energy Development Organization and for international peacekeeping operations and arrears. I also commend the Congress for providing at least a modest increase in funding international family planning programs and for dropping misguided Mexico City restrictions, and for funding bilateral economic assistance without rescinding prior-year appropriations. In addition, the Congress has facilitated the Middle East peace process by authorizing U.S. participation in the Middle East Development Bank. Nevertheless, I must note that the overall funding level for international affairs programs is well below what we need to assure that we can achieve our foreign policy objectives.

This bill, however, does more than fund major portions of the Government for the next fiscal year. It also includes landmark immigration reform legislation that builds on our progress of the last 3 years. It strengthens the rule of law by cracking down on illegal immigration at the border, in the workplace, and in the criminal justice system—without punishing those living in the United States legally.

Specifically, the bill requires the sponsors of legal immigrants to take added responsibility for their well-being. And it does not include the so-called Gallegly amendment, which I strongly opposed and which would have allowed States to refuse to educate the children of illegal immigrants. At my insistence the bill does not include the proposed onerous provisions against legal immigrants, which would have gone beyond the welfare reform law.

I am pleased that the Congress provided 7 additional months of food assistance for needy immigrants, including benefits for many elderly and children. This step will pro-

vide some help to individuals and States in preparing for the dramatic restriction of access to benefits that legal immigrants will face under the welfare reform bill.

I am, however, extremely concerned about a provision in this bill that could lead to the Federal Government waiving the Endangered Species Act and the National Environmental Policy Act in order to expeditiously construct physical barriers and roads on the U.S. border. I know the Attorney General shares my commitment to those important environmental laws and will make every effort, in consultation with environmental agencies, to implement the immigration law in compliance with those environmental laws. I am also concerned about a provision that imposes a new "intent requirement" in unfair immigration-related employment cases that could place hardships on some U.S. citizens and permanent residents. I have asked the Attorney General to take steps to alleviate any potential discrimination that this provision causes against U.S. citizens and authorized workers—particularly Hispanics and Asian-Americans who, by their appearance or accent, may appear to be foreign. Finally, I will seek to correct provisions in this bill that are inconsistent with international principles of refugee protection, including the imposition of rigid deadlines for asylum applications.

The bill also makes important changes in the Nation's banking laws. It assures the continued soundness of the bank and thrift deposit insurance system, and it includes significant regulatory relief for financial institutions. At my insistence, the bill does not erode the protection of consumers and communities.

I commend Senators Baucus and Bingaman for raising the awareness of the issue of the proper accounting of highway trust fund receipts. In next year's reauthorization of the Intermodal Surface Transportation and Efficiency Act, my Administration will rely on a baseline that treats all States fairly and equitably.

The bill includes a Government-wide program to enable agencies to offer buyouts, through December 31, 1997, of up to $25,000 to employees eligible for early or regular retirement. Many of these workers

stay on for years after they can retire, so buyouts will serve as an incentive for them to leave. Buyouts are an important tool to help Federal managers downsize their agencies as we continue to move toward a balanced budget—without relying solely on reductions-in-force (RIFs).

I am disappointed that one of my priorities—a ban on physician "gag rules"—was not included. Several States have passed similar legislation to ensure that doctors have the freedom to inform their patients of the full range of medical treatment options, and I am disappointed that the Congress was not able to reach agreement on this measure.

Nevertheless, this bill is good for America. As I have said, it moves us down the path toward a balanced budget while protecting our values. It provides the needed resources to fight domestic and international terrorism. And it cracks down on illegal immigration while protecting legal immigrants.

I am pleased to sign it.

**William J. Clinton**

The White House,
September 30, 1996.

NOTE: H.R. 3610, approved September 30, was assigned Public Law No. 104–208. This statement was released by the Office of the Press Secretary on October 1.

## Message to the Senate Transmitting the Inter-American Convention on Serving Criminal Sentences Abroad
### *September 30, 1996*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Inter-American Convention on Serving Criminal Sentences Abroad, drawn up by the Committee on Juridical and Political Affairs within the Permanent Council of the Organization of American States (OAS) and composed of representatives of the Member States. The Convention was adopted and opened for signature at the twenty-third regular session of the General Assembly meeting in Managua, Nicaragua, on June 9, 1993, and signed on behalf of the United States at the OAS Headquarters in



U.S. Department of
Homeland Security

## Secretary Nielsen Meets with Mexican Officials on Border Emergency, Travels to Honduras to Meet with Northern Triangle Governments to Address Crisis at Source

Release Date: March 26, 2019

Secretary of Homeland Security Kirstjen M. Nielsen met with senior officials from the Government of Mexico Tuesday, March 26 to discuss border security and immigration, and she will travel to Honduras to participate in multilateral meetings with regional partners to discuss the common cause America shares with the countries of Central America in confronting migration flows and promoting security and prosperity. There she plans to sign a first-of-its-kind regional accord meant to address the migration crisis.

The Secretary traveled to Miami, Florida on Tuesday for a bilateral meeting with Mexican Secretary of the Interior Olga Sanchez Cordero and senior Mexican government officials. They discussed ways the U.S. and Mexico can work together to address irregular migration and the record levels of illegal entries at the U.S. Southern Border, where last month DHS apprehended more than 75,000 individuals—a 12-year high. They also discussed combating human trafficking and smuggling, security cooperation, and U.S. plans to bolster the Migrant Protection Protocols (http://links.govdelivery.com/dl/track?type=click&

enid=ZWFzPTEmbXNpZD0mYXVkPTombWFpbGluZ2lkPTIwMTkwMzI2LjE2NjUxMDUxJm1lc3NhZ2VpZD1NREItUEJOVS1CVUwtMjAxOTAzMjYuMTY2NTEwNTEmZGF0YWJhc2VpZD0xMDAxJnNlcmlhbD0xNzAxMDIzNiZlbWFpbGlkPWJlbm5ldHQuY2ludG9uQGFzc29jaWF0ZXMu&100&&&https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols) (MPP), a DHS initiative to return migrants to Mexico and provide humanitarian protections while they await U.S. immigration processing.

On Wednesday, March 27 the Secretary will be in Tegucigalpa, Honduras to participate in a multilateral meeting at the Ministry of Security with Northern Triangle officials representing the governments of Guatemala, Honduras, and El Salvador. The meeting will mark the continuation of a multi-year diplomatic process aimed at stemming the flood of irregular migration at the source, and ultimately help confront the ongoing humanitarian and security emergency at the U.S. Southern Border. The meetings will be led by Honduran President Juan Orlando Hernández.

The Secretary and Northern Triangle security ministers have been working toward the development of a first-of-its-kind Memorandum of Cooperation—or "regional compact"—between the U.S. and the countries of the Northern Triangle. Reflecting improved cooperation between the countries, the accord focuses on stemming the migration crisis at its source, including preventing the formation of new migrant caravans that set out to reach the United States.

A final compact would cover four distinct areas of collaboration:

- Combating Human Trafficking and Migrant Smuggling
- Countering Organized Crime and Gangs
- Expanding Information and Intelligence Sharing
- Strengthening Border Security

Following Secretary Nielsen's call for the formation of a "compact" last summer, in February she and Northern Triangle security ministers announced the signing of a joint statement declaring a commitment (http://links.govdelivery.com/dl/track?type=click&

enid=ZWFzPTEmbXNpZD0mYXVkPTombWFpbGluZ2lkPTIwMTkwMzI2LjE2NjUxMDUxJm1lc3NhZ2VpZD1NREItUEJOVS1CVUwtMjAxOTAzMjYuMTY2NTEwNTEmZGF0YWJhc2VpZD0xMDAxJnNlcmlhbD0xNzAxMDIzNiZlbWFpbGlkPWJlbm5ldHQuY2ludG9uQGFzc29jaWF0ZXMu&101&&&https://www.dhs.gov/news/2019/02/21/secretary-nielsen-announces-historic-steps-northern-triangle-security-ministers) to reach a final deal to improve information sharing, law enforcement cooperation, and public messaging to address the ongoing crisis.

Earlier on Wednesday, Nielsen will participate in bilateral meetings with the Honduran President Juan Orlando Hernández and First Lady Ana Garcia Carias at the Ministry of Security in Tegucigalpa.

###

Topics: International Engagement (/topics/international) , Secretary of Homeland Security (/topics/secretary-homeland-security)

Keywords: Immigration (/keywords/immigration) , International Partnership (/keywords/international-partnerships)

Last Published Date: March 26, 2019

DOJIFR00627



**Tuesday,**
**December 2, 2003**

**Part IV**

# Department of Homeland Security

**8 CFR Part 264**
**Suspending the 30-Day and Annual**
**Interview Requirements From the Special**
**Registration Process for Certain**
**Nonimmigrants; Interim Rule**

DOJIFR00628

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Part 264**

**[ICE No. 2301–3]**

**RIN 1653–AA29**

**Suspending the 30-Day and Annual Interview Requirements From the Special Registration Process for Certain Nonimmigrants**

**AGENCY:** U.S. Immigration and Customs Enforcement, Department of Homeland Security.

**ACTION:** Interim rule with request for comments.

**SUMMARY:** This rule amends Department of Homeland Security (DHS) regulations for the registration and monitoring of certain nonimmigrant aliens. This rule amends existing regulations by suspending the 30-day and annual re-registration requirements for aliens who are subject to the National Security Entry-Exit Registration System (NSEERS) Registration. Instead of requiring all aliens subject to NSEERS to appear for 30-day and/or annual re-registration interviews, the DHS will utilize a more tailored system in which it will notify individual aliens of future registration requirements. This rule also eliminates the requirement for those nonimmigrant aliens subject to special registration who are also enrolled in the Student and Exchange Visitor Information System (SEVIS) to separately notify DHS of changes in educational institutions and addresses. Additionally, this rule clarifies how nonimmigrant aliens may apply for relief from special registration requirements and clarifies that certain alien crewmen are not subject to the departure requirements. Finally, certain conforming amendments have been made to the existing regulations to reflect the fact that the former Immigration and Naturalization Service (Service) has been abolished and its functions transferred from the Department of Justice to DHS under the Homeland Security Act of 2002 (HSA), Public Law 107–296.

**DATES:** *Effective date:* This interim rule is effective December 2, 2003.

*Comment date:* Written comments must be submitted on or before February 2, 2004.

**ADDRESSES:** Please submit written comments to the Director, Regulations and Forms Services Division, U.S. Citizenship and Immigration Services, DHS, 425 I Street, NW., Room 4034, Washington, DC 20536. To ensure proper handling, please reference ICE

No. 2301–03 on your correspondence. Comments may also be submitted electronically to DHS at *rfs.regs@dhs.gov.* Comments submitted electronically must include the ICE No. 2301–03 in the subject box. Comments are available for public inspection at the above address by calling (202) 514–3048 to arrange for an appointment.

**FOR FURTHER INFORMATION CONTACT:** Robert Schoch, U.S. Immigration and Customs Enforcement, DHS, 425 I Street, NW., Room 1000, Washington, DC 20536, telephone (202) 353–3173.

**SUPPLEMENTARY INFORMATION:**

### Background

*How Does Registration of Aliens Work Under the Existing Statutory and Regulatory Provisions?*

Section 262(a) of the Immigration and Nationality Act (Act) provides that all aliens who have not previously been registered and fingerprinted pursuant to section 221(b) of the Act have a duty to apply for registration and to be fingerprinted if they remain in the United States for 30 days or longer. Under the existing regulations at 8 CFR 264.1(a), DHS registers nonimmigrants using Form I–94 (Arrival-Departure Record). Section 263(a) of the Act also authorizes the Secretary of DHS to prescribe special regulations and forms for the registration of special groups of aliens in the United States. As authorized by section 262(c) of the Act, the existing regulations at 8 CFR 264.1(e) contain general provisions waiving the fingerprinting requirement for many nonimmigrants. Accordingly, at the present time, most nonimmigrant aliens are admitted to the United States without being either fingerprinted or photographed.

Section 214 of the Act authorizes the Attorney General (now deemed to be the Secretary of DHS under the HSA) to prescribe conditions for the admission of nonimmigrant aliens. Section 215 of the Act provides for departure control from the United States. In addition, section 265 of the Act requires that all aliens who remain in the United States who are required to be registered under the Act must notify the Secretary of DHS of each change of address within ten days from the date of such change and furnish with such notice additional information as the Secretary of DHS may prescribe.

Prior to the enactment of the HSA and the transfer of the functions of the former Service from the Department of Justice to DHS, the Service exercised the previously described registration authority to require that certain classes of aliens be specially registered while in

the United States. Pursuant to section 263(a) of the Act, as well as the general registration authority under section 262 of the Act, the former Service promulgated 8 CFR 264.1(f), which required that certain nonimmigrant aliens be registered, fingerprinted, and photographed by the Service at the port of entry (POE) at the time the nonimmigrant aliens apply for admission. *See* 67 FR 52584 (Aug. 12, 2002). Registration at the POEs shall be known as "POE registration" for the purpose of this discussion. Additionally, pursuant to section 265 of the Act, 8 CFR 264.1(f) directed that certain nonimmigrant aliens designated by the Attorney General who were already in the United States appear before the Service for special registration. *Id.* Registration of aliens already present in the United States shall be known as "call-in registration" for the purpose of this discussion.

*How Does This Rule Change the Current Special Registration Requirements?*

Currently, 8 CFR 264.1(f)(3) provides that aliens specially registered at a POE must appear before DHS 30 days after their admission into the United States for a continuing registration interview. This rule suspends this automatic 30-day continuing registration requirement.

As currently written, 8 CFR 264.1(f)(5) requires that all aliens who were subject to special registration appear for an annual re-registration interview. This rule also suspends the annual re-registration requirement.

The suspension of the 30-day and annual re-registration requirement applies to all aliens previously registered under the NSEERS program, whether call-in or POE registration, as well as any aliens registered subsequent to the effective date of this rule. In place of these previous requirements that all nonimmigrant aliens subject to NSEERS registration appear for additional 30-yday and annual interviews, this rule will allow DHS, as a matter of discretion, to notify nonimmigrant aliens subject to NSEERS registration to appear for one or more additional continuing registration interviews in those particular cases where it may be necessary to determine whether the alien is complying with the conditions of his or her nonimmigrant visa status and admission.

This rule also provides that when an alien who is monitored under SEVIS notifies DHS of a change of address or educational institution through SEVIS, it also constitutes a notification for the purposes of NSEERS registration. It also clarifies that certain alien crewmen, described at section 101(a)(15)(D) of the

DOJIFR00629

Act, and are subject to special registration, are exempted from the departure control requirements of 8 CFR section 264.1(f) (8).

Finally, this rule reflects that the Service was abolished, and DHS now performs its functions. Thus, throughout 8 CFR 264.1(f), this rule substitutes the Secretary of Homeland Security for the Attorney General, and replaces references to the Service with references to DHS.

This rule does not eliminate or in any way limit the authority of the Secretary of DHS under section 263 of the Act, for certain types of aliens, and section 265 of the Act, for any class or group of aliens, through notice, to require such aliens to appear for special registration in the future if circumstances so require. Additionally, this rule does not limit or alter any other special registration requirement under section 263 of the Act.

*What Other Changes Are Made by This Rule?*

This rule also clarifies how nonimmigrant aliens subject to NSEERS registration may apply for relief from registration departure requirements. Aliens subject to NSEERS registration are required to register their departure before an immigration officer at a designated port of departure and depart from that port on the same day. Aliens previously could contact the Service district director to obtain relief from these departure requirements. However, the abolition of the former Service and the distribution of its functions to various agencies within DHS, such as U.S. Citizenship and Immigration Services (CIS) and U.S. Customs and Border Protection (CBP), have created uncertainties for aliens as to how to seek such relief. For nonimmigrant aliens who have been NSEERS registered, this regulation clarifies how the alien may seek a waiver from the departure registration requirements.

First, under the revisions set out in this rule, a nonimmigrant alien subject to the departure registration requirements based upon NSEERS registration may seek relief from these requirements before his or her departure from an official designated by DHS or from the CBP field office director for the port from which the alien intends to depart. The alien seeking such relief must establish to the satisfaction of the field office director or designated official that exigent or unusual circumstances exist, and that the alien warrants a favorable exercise of discretion.

Additionally, for an alien who has been registered and who makes frequent trips to the United States, based upon a showing of good cause, exigent or unusual circumstances, the CBP field office director over the port to which the alien most frequently arrives in the United States may exempt the alien from future POE registrations. The field office director or his designee will make the determination that the frequency of arrival warrants relief from the registration requirements on a case-by-case basis. In making this determination, the field office director or his designee will consider the mode of travel, business and economic concerns, purpose of travel, or other factors as determined by the director. In seeking such relief, the alien bears the burden of establishing he or she warrants a favorable exercise of discretion. If granted, relief from POE registrations also shall include relief from NSEERS registration departure control requirements.

An alien alternatively may seek an exemption from the NSEERS registration requirements from the Department of State by such forms and methods as the Department of State may prescribe.

There are no specific forms to request relief from the NSEERS requirements from DHS; an individual seeking relief should direct a letter to the appropriate CBP field office director. In such a letter, the alien should provide a detailed description of the type of relief sought, their full name, date-of-birth, Fingerprint Identification Number (which is reflected on the Form I–94), a 1″ x 1″ passport style photograph, the alien's A-number, if one has been assigned, and any documents that support the relief request. Information regarding the relief provisions will be provided to aliens upon completion of registration. Copies of these materials, known as the "walk-away" materials, are also available on the Web site *www.ice.gov*, in the special registration section.

This rule further clarifies to aliens applying for relief that, until an application for relief from the NSEERS registration requirements is granted, the alien is required to comply with the registration requirements.

The decision of any DHS officer or official to grant or deny relief from the NSEERS registration provisions is done as an exercise of discretion, and as such is final and cannot be appealed.

A DHS officer authorized to grant relief also may terminate such relief by providing notice to the alien.

*Why Is This Rule Necessary?*

The former Service, and now DHS (as of March 1, 2003), have evaluated the utility of the 30-day and annual interviews under the current requirements for national security and immigration enforcement purposes. Additionally, DHS is under a congressional mandate set forth in various amendments to the Act to create a comprehensive entry-exit system. In carrying out this mandate through the establishment of the US–VISIT Program, DHS has reviewed the use of the special registration program for both POE and call-in registrations. After considering these factors, DHS has determined it is appropriate to suspend the continuing registration requirements set out in 8 CFR 264.1(f), that automatically required aliens subject to NSEERS registration to report for 30-day and/or annual re-registration interviews. Special registration of aliens at POEs has, consistent with the program's intent, provided important law enforcement benefits, which have included the identification of a number of alien terrorists and criminals. This rule is not amending the procedures for NSEERS registration at the POE's. In addition to US–VISIT, which will soon become operational, DHS has other systems available that can help ensure that those aliens who are already subject to NSEERS registration remain in compliance with the terms of their visa and admission. For example, Congress mandated that DHS develop a student monitoring system. See Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Public Law 104–208, section 641; "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism" (USA Patriot Act), Public Law 107–56, section 416. This system, SEVIS, is now fully operational. Schools now must report directly to DHS when a student or exchange visitor alien changes schools, fails to appear for classes or otherwise fails to maintain his or her student status following admission into the United States.

Thus, DHS is now in a position to suspend the mandatory re-registration interview requirements for those aliens who are already subject to NSEERS registration, which will reduce the burden on those required to register under the current regulations, as well as to DHS. Instead, DHS will be able to schedule re-registration interviews on a more targeted and effective basis, only in those particular cases where it may be appropriate for additional scrutiny to ensure that an alien remains in compliance with the terms of his or her nonimmigrant visa and admission.

*Who Is Affected by This Rule?*

Aliens who have been subject to NSEERS registration, whether as a result of being registered at a POE upon arrival, or as a result of being called in to register by **Federal Register** notice, are affected by the rule, because it reduces their current reporting requirements by eliminating the mandatory 30-day and annual re-registration interviews. Additionally, aliens who hereafter enter the United States and are NSEERS registered at a POE are affected by this rule. Affected aliens have been or will be given a Form I–94 documenting their registration, which will reflect their Fingerprint Identification Number (FIN). DHS uses the FIN recorded on the Form I–94 to identify the records of an alien subject to special registration. Based upon the number of aliens who have previously registered, DHS estimates that over the 6 month time span from December 2003 through May 2004, approximately 82,532 aliens will benefit from this change and will not have to report for either a 30-day or annual re-interview during that period.

*How Does This Rule Affect Registration at POEs?*

This rule does not affect the procedures for the NSEERS registration of aliens, including fingerprinting, photographing, and provision of information, at POEs. As is obligatory under current regulations, nonimmigrant aliens subject to POE registration will still be required, utilizing the information collection system in place, to provide routine and readily available information as a condition of admission. This includes such information as is necessary to identify the alien in the United States. Lists of information that may be required during NSEERS registration have previously been issued. See, *e.g.*, 67 FR 40581, 40582.

Registration at POEs continues to allow DHS to determine if an alien's fingerprints match those of known terrorists or criminals, and to detain for removal or refuse admission of the alien if such an identity match is established.

*How Will DHS Provide Notice to Individual Aliens That They Must Appear for an Additional Registration Interview?*

In place of the automatic re-registration requirements set out in the original NSEERS registration provisions, this rule substitutes a more tailored approach to re-registration. The determination of whether an alien will be subject to additional registration

requirements will be made on a case-by-case basis. The admission of any nonimmigrant alien subject to NSEERS registration is subject to the requirement that, under this rule, he or she may be required to appear for future continuing re-registration interviews at the discretion of DHS. At the time of admission, DHS will advise all nonimmigrant aliens subject to special registration that they may be required to appear for additional registration interviews upon notice. DHS will separately notify those aliens selected to appear before DHS to comply with the additional re-registration requirements, which for a small number of aliens may be more frequent than the 30-day and annual re-registration requirements set out in the prior rule. However, only aliens who are notified of the re-registration requirements will have to appear before DHS for such requirement, and the majority of individuals registered will see a reduction in the burden of additional registration as a result of this rule. Notification under these regulations may be given to the alien in a manner reasonably calculated to reach the alien, which shall include, but is not limited to, notice by publication in the **Federal Register**, a letter sent via standard U.S. postal mail to the last address provided by the alien to DHS using regular mail, an e-mail to the address the alien provided to DHS during a previous NSEERS registration interview, or in-person delivery. The nonimmigrant alien must appear at the designated U.S. Immigration and Customs Enforcement office location, and on the specified date and time, unless otherwise specified in the notice. DHS will provide the alien at least ten days, measured from the date DHS publishes or sends notice to the alien, to comply with the re-registration obligation.

Notice to an alien of registration or re-registration requirements may be issued by the ICE Assistant Secretary, his designee, or any other such individual designated by the Secretary of DHS.

*How Does This Rule Affect an Alien's Obligation To Notify DHS of a Change of Address or Employment?*

This rule reiterates, for this distinct group of nonimmigrant aliens who are subject to NSEERS registration, and who remain in the United States for more than thirty days, the requirement that the nonimmigrant alien notify DHS of any change of address, employment and/or educational institution within 10 days of such change. Affected aliens may notify DHS by mail, or such other means as the Secretary of DHS may designate, of a change of address. The

required form, the AR–11 for Special Registration, is available at DHS offices and on the DHS Internet Web site at *http://www.uscis.gov*, in the special registration section.

However, this rule discontinues the requirement that student aliens monitored under SEVIS who are subject to special registration separately notify DHS of a change in their educational institution or address, if such information is provided to DHS through SEVIS. This rule provides that when an alien reports a change of address or educational institution to DHS through SEVIS, that action fulfills his or her special registration requirement to notify DHS of changes in address. However, student aliens who are monitored under SEVIS who are subject to special registration will still be required under 8 CFR 264.1(f)(5) to notify DHS of any change of employment which is currently not captured in the SEVIS system.

*How Does This Rule Affect Departure Control Requirements?*

This rule does not change the general requirement that a nonimmigrant alien subject to NSEERS registration, either POE registration or a prior or future call-in registration, also report his or her actual departure from the United States. Cessation of departure controls is inconsistent with the congressional mandate requiring that DHS establish a comprehensive entry-exit monitoring system. As DHS develops the larger system mandated by Congress, to be called US–VISIT, it will integrate the NSEERS registration currently in use. This requirement of departure registration means that the alien must appear at a designated Port of Departure before a departure control officer, *i.e.*, a CBP inspector, on the day he or she departs the United States to close his or her registration and also depart from that port. This departure requirement will ensure that all NSEERS registrations are properly closed.

If the departure control requirements do not continue, registration records for the nonimmigrant aliens subject to NSEERS registration would be left open without explanation. This could result in serious difficulties, including the possibility of future inadmissibility, for already registered aliens who depart and attempt to return to the United States.

The most recent **Federal Register** notice listing Ports of Departure can be found at 68 FR 8967. This rule does not alter or amend that list.

This rule does clarify that certain alien crewmen described at 101(a) (15) (D) of the Act who are subject to special registration requirements are exempt

DOJIFR00631

from the departure registration requirements of 8 CFR 264(f) (8).

*Does This Rule Change Any of the Penalties for Failing To Comply With the Special Registration Provisions?*

No. This rule does not change any of the penalties for failing to comply with the special registration provisions. Moreover, this rule does not excuse any prior failure to comply with special registration provisions.

Under section 214(a) of the Act, as amended by the HSA, the admission of all nonimmigrant aliens to the United States "shall be for such time and under such conditions as the [Secretary of DHS] may by regulations prescribe." The Secretary of DHS may impose conditions on admission that are rationally related to the maintenance of nonimmigrant status. See, *e.g., Narenji* v. *Civiletti,* 617 F.2d 745, 747 (D.C. Cir. 1980)(upholding regulation requiring Iranians on student visas to report and "provide information as to residence and maintenance of nonimmigrant status" or be subject to deportation proceedings). The regulations that currently implement section 214 of the Act provide in part that one condition of a nonimmigrant's continued stay in the country "is the full and truthful disclosure of all information requested" by DHS. 8 CFR 214.1(f).

The NSEERS registration requirements previously imposed upon aliens, either through POE registration or call-in registration, were intended in part to ensure that nonimmigrant aliens are complying with their nonimmigrant status (*e.g.,* by continuing to be students or employees, as contemplated at the time of the issuance of their visas or admission). Additionally, 8 CFR 214.1(f) was amended to reflect that a nonimmigrant alien's willful failure to comply with the special registration provisions constitutes a failure to maintain the relevant nonimmigrant status, and would render the alien removable under section 237(a)(1)(C)(i) of the Act.

Although this rule amends the regulations to eliminate the existing automatic 30-day and annual re-registration interview requirements, aliens who willfully failed to comply with prior registration requirements, including aliens who failed before December 2, 2003 to appear for a required initial call-in registration, a 30-day re-registration interview, or an annual re-registration interview, remain subject to the penalties outlined above and in previous **Federal Register** notices. Additionally, aliens who willfully fail to comply with any future call-in notice or additional registration

requirement imposed pursuant to this rule would be removable under section 237(a)(1)(C)(i) of the Act.

*What Is the Effect of an Alien's Failure To Comply With the Departure Reporting Requirements Upon the Alien's Subsequent Application for Admission?*

An alien who is subject to the special registration requirements who has failed, without good cause, to report his or her departure with DHS is presumed inadmissible to the United States. The presumption of inadmissibility arises if there was no good cause for the alien's failure to report to DHS at the time of his or her departure from the United States. However, an alien may overcome the presumption of inadmissibility by establishing to the Secretary of State and the Secretary of DHS that he or she does not seek to enter the United States to engage solely, principally, or incidentally in any unlawful activity.

An alien who fails to report his or her departure may, at the time he or she applies for a new nonimmigrant visa abroad, attempt to establish that there was good cause for the failure to report and, in the event that no good cause is found, that he or she is not inadmissible under 212(a)(3)(A)(ii) of the Act. If the consular officer, in adjudicating the new visa application, finds good cause existed for the alien's failure to register departure or that the alien is not inadmissible under section 212(a)(3)(A)(ii) of the Act, the inspecting officer at the POE, while not bound by the DOS determination, will consider this finding as a significantly favorable factor in determining whether the alien is inadmissible due to his or her prior failure to register at the time of departure from the United States.

**Good Cause Exception**

Immediate implementation of this interim rule with provision for post-promulgation public comments is based upon the good cause exception found at 5 U.S.C. 553(b)(B). Pursuant to 5 U.S.C. 553(b)(B), prior notice and opportunity for comment is not necessary where it is "impracticable, unnecessary, or contrary to the public interest." DHS estimates that without this regulation approximately 82,532 aliens would be subject to 30-day or annual re-registration interviews between December 2003 and May 2004. Therefore DHS believes there is an urgent need for the immediate implementation of this rule suspending the automatic interview requirements to avoid unnecessarily burdening the public impacted by this rule.

**Initial Regulatory Flexibility Act Determination**

The Regulatory Flexibility Act of 1980, as amended (RFA) was enacted by Congress to ensure that small entities (small businesses, not-for-profit organizations, and small governmental jurisdictions) are not unnecessarily or disproportionately burdened by Federal regulations. The RFA requires agencies to review rules to determine if they have "a significant economic impact on a substantial number of small entities." DHS has determined that this interim final rule will not have a significant economic impact on a substantial number of small entities.

This rule will not affect small entities as defined at 5 U.S.C. 605(b) and will relieve cost burdens on individuals.

In accordance with the Regulatory Flexibility Act, 5 U.S.C. 605(b), I have reviewed this rule and by approving it, I certify that this rule will not have a significant economic impact on a substantial number of small entities.

**Executive Order 12866**

Executive Order 12866, "Regulatory Planning and Review," requires a determination whether a regulatory action is "significant" and therefore subject to review by the Office of Management and Budget (OMB) and to E.O. 12866's requirements.

This rule is considered by DHS to be a significant regulatory action under Executive Order 12866, section 3(f), Regulatory Planning and Review. However, it does not have an impact on the economy of $100 million or more and, therefore, is not economically significant. Accordingly, this regulation has been submitted to the Office of Management and Budget (OMB) for review.

DHS has assessed both the costs and benefits of this rule as required by Executive Order 12866. First, this rule significantly reduces costs to the public by reducing the burden of re-registration and continuing registration requirements for aliens present in the United States. Without this regulation, in between December 2003 and May 2004, an estimated 82,532 aliens would be subject to re-registration under prior regulations. Assuming that each interview will last 45 minutes, and each alien will have to prepare approximately 30 minutes for the interview, DHS anticipates that between December 2003 and May 2004, the burden reduction on the public to be a total of over 103,000 hours.

DHS also will experience a burden reduction, based upon the reduced costs related to information collection and

processing. Based upon the number of estimated registrations between December 2003 and May 2004 and assuming that each registration lasts approximately 45 minutes, under this regulation DHS estimates it will be able to reallocate almost 62,000 work hours. DHS is able to shift personnel who would have conducted these re-registration interviews to other law enforcement functions. These resources also can be better utilized to craft a targeted registration process that meets the national security needs of the country.

The costs to DHS of not amending the regulations would be significant. Because the initial call-in registrations by the former Service occurred over a brief period of months, the number of aliens appearing for re-registration in a brief period of time will be significant. DHS would be forced to reallocate personnel resources from other law-enforcement functions in order to timely register aliens.

## Executive Order 13132

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a Federalism summary impact statement.

## Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by state, local and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions are deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

## Small Business Regulatory Enforcement Fairness Act of 1996

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

## Executive Order 12988: Civil Justice Reform

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

## Paperwork Reduction Act of 1995

The regulations at 8 CFR 264.1(f)(7) allows an alien who has been registered under the provisions of 8 CFR 264.1(f) and who has not yet departed from the United States, to seek relief from the departure control requirement contained in 8 CFR 264.1(f)(8) for that admission. In order to seek relief the alien must apply to the U.S. Customs and Border Protection field office director for the port from which the alien intends to depart. In making an application for relief, the alien must establish that exigent or unusual circumstances exist and that the alien warrants a favorable exercise of discretion. This request for relief is considered an information collection requirement under the Paperwork Reduction Act (PRA).

The Department of Homeland Security (DHS) and the U.S. Immigration and Customs Enforcement (ICE) has submitted an emergency information collection request (ICR) utilizing emergency review procedures, to the Office of Management and Budget (OMB) for review and clearance in accordance with section 1320.13(a)(1)(ii) and (a)(2)(iii) of the Paperwork Reduction Act of 1995. The DHS has determined that it cannot reasonably comply with the normal clearance procedures under this part because normal clearance procedures are reasonably likely to prevent or disrupt the collection of information. Therefore, immediate OMB approval has been requested. If granted, the emergency approval is only valid for 180 days. ALL comments and/or questions pertaining to this pending request for emergency approval must be directed to OMB, Office of Information and Regulatory Affairs, Attention: Department of Homeland Security Desk Officer, 725—17th Street, NW., Suite 10235, Washington, DC 20503.

During the first 60 days of this same period, a regular review of this information collection is also being undertaken. During the regular review period, the DHS requests written comments and suggestions from the public and affected agencies concerning this information collection. Comments are encouraged and will be accepted until February 2, 2004. During 60-day regular review, all comments and suggestions, or questions regarding additional information, to include obtaining a copy of the information collection instrument with instructions, should be directed to Mr. Richard A. Sloan, 202–514–3291, Director, Regulations and Forms Services Division, Department of Homeland Security, Room 4034, 425 I Street, NW., Washington, DC 20536. Written comments and suggestions from the public and affected agencies concerning the proposed collection of information should address one or more of the following four points:

(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agencies estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.*, permitting electronic submission of responses. Overview of this information collection:

(1) *Type of Information Collection:* New information collection.

(2) *Title of the Form/Collection:* Exemption from NSEERS Registration Requirements.

(3) *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* No Agency Form Number. File No. OMB–40. U.S. Immigration and Customs Enforcement.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals and Households. This information collection allows an alien to seek an exemption from the NSEERS registration requirements by submitting a letter to the Department of Homeland Security containing specific information.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* 5,800 responses at 30 minutes (.5 hours) per response.

(6) *An estimate of the total public burden (in hours) associated with the collection:* 2,900 annual burden hours.

If additional information is required contact: Mr. Steve Cooper, PRA

Clearance Officer, Department of Homeland Security, Office of Chief Information Officer, Regional Office Building 3, 7th and D Streets, SW., Suite 4636–26, Washington, DC 20202.

Under the Paperwork Reduction Act of 1995, Public Law 104–13, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any reporting requirements inherent in a rule. This rule suspends the 30-day and annual re-registration requirements for aliens who are subject to NSEERS registration. The OMB information collection number under NSEERS is 1115–0254. It is estimated that approximately 82,000 aliens will no longer be subject to the 30-day or annual re-registration interviews once this rule is implemented. Accordingly, ICE has submitted the required Paperwork Reduction Change Worksheet (OMB–83C) to OMB reflecting the reduction in burden hours for NSEERS.

## List of Subjects in 8 CFR Part 264

Reporting and recordkeeping requirements.

■ Accordingly, part 264 of chapter I of title 8 of the Code of Federal Regulations is amended as follows:

## PART 264—REGISTRATION AND FINGERPRINTING OF ALIENS IN THE UNITED STATES

■ 1. The authority citation for Part 264 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1201, 1303– 1305; 8 CFR part 2.

■ 2. Section 264.1(f) is revised to read as follows:

### § 264.1   Registration and fingerprinting.

\* \* \* \* \*

*(f) Registration, fingerprinting, and photographing of certain nonimmigrant aliens.*

(1) Registration requirement for certain nonimmigrants. Notwithstanding the provisions in paragraph (e) of this section, nonimmigrant aliens identified in paragraph (f)(2) of this section are subject to special registration, fingerprinting, and photographing requirements upon arrival in the United States. This requirement shall not apply to those nonimmigrant aliens applying for admission to the United States under sections 101(a)(15)(A) (8 U.S.C. 1101(a)(15)(A)) or 101(a)(15)(G) (8 U.S.C. 1101(a)(15)(G)) of the Act. In addition, this requirement shall not apply to those classes of nonimmigrant aliens to whom the Secretary of Homeland Security and the Secretary of State jointly determine it shall not

apply, or to any individual nonimmigrant alien to whom the Secretary of Homeland Security or the Secretary of State determines it shall not apply. Completion of special registration pursuant to this paragraph (f) is a condition of admission under section 214 of the Act (8 U.S.C. 1184) if the inspecting officer determines that the alien is subject to registration under this paragraph (f) (hereinafter ''nonimmigrant alien subject to special registration'').

(2) Identification of aliens subject to registration at ports-of-entry. Nonimmigrant aliens in the following categories are subject to the requirements of paragraph (f)(3) of this section:

(i) Nonimmigrant aliens who are nationals or citizens of a country or territory designated by the Secretary of Homeland Security, in consultation with the Secretary of State, by a notice in the **Federal Register**;

(ii) Nonimmigrant aliens whom a consular officer or an inspecting officer has reason to believe are nationals or citizens of a country or territory designated by the Secretary of Homeland Security, in consultation with the Secretary of State, by a notice in the **Federal Register**; or

(iii) Nonimmigrant aliens who meet pre-existing criteria, or whom a consular officer or the inspecting officer has reason to believe meet pre-existing criteria, determined by the Secretary of Homeland Security or the Secretary of State to indicate that such aliens' presence in the United States warrants monitoring in the national security interests, as defined in section 219 of the Act (8 U.S.C. 1189), or law enforcement interests of the United States.

(3) *Obligations regarding registration.* (i) Any nonimmigrant alien who is included in paragraph (f)(2) of this section, and who applies for admission to the United States, shall be specially registered by providing information required by the Department of Homeland Security, shall be fingerprinted, and shall be photographed, by Department of Homeland Security, at the port-of-entry at such time the nonimmigrant alien applies for admission to the United States. The Department of Homeland Security shall advise the nonimmigrant alien subject to special registration that the nonimmigrant alien may, upon ten days notice, and at the Department of Homeland Security's discretion, be required to appear at a U.S. Immigration and Customs Enforcement office in person to verify information by providing additional information or

documentation confirming compliance with the conditions of his or her visa status and admission. The Department of Homeland Security will determine on a case-by-case basis which aliens must appear in person to verify information. The nonimmigrant alien subject to special registration must appear at the designated office location, and on the specified date and time, unless otherwise specified in the notice.

(ii) At the time of verification of information for registration pursuant to paragraph (f)(3)(i) of this section, the nonimmigrant alien subject to special registration shall provide the Department of Homeland Security with proof of compliance with the conditions of his or her nonimmigrant visa status and admission, including, but not limited to, proof of residence, employment, or registration and matriculation at an approved school or educational institution. The nonimmigrant alien subject to special registration shall provide any additional information required by the Department of Homeland Security.

(4) *Registration of aliens present in the United States.* (i) The Secretary of Homeland Security, by publication of a notice in the **Federal Register**, also may impose such special registration, fingerprinting, and photographing requirements upon nonimmigrant aliens who are nationals, citizens, or residents of specified countries or territories (or a designated subset of such nationals, citizens, or residents) who have already been admitted to the United States or who are otherwise in the United States. A notice under this paragraph (f)(4) shall explain the procedures for appearing in person and providing the information required by the Department of Homeland Security, providing fingerprints, photographs, or submitting supplemental information or documentation.

(ii) Any nonimmigrant alien who is currently subject to special registration as a result of the publication of any previous **Federal Register** notice may, while he or she remains in the United States, upon 10 days notice and at the Department of Homeland Security's discretion, be required to appear at a Department of Homeland Security Office in person to provide additional information or documentation confirming compliance with his or her visa and admission. The Department of Homeland Security will determine on a case-by-case basis which aliens must appear in person to verify information. The nonimmigrant alien subject to special registration must appear at the designated office location, and on the

specified date and time, unless otherwise specified in the notice.

(5) *Obligation to provide updated information.* In addition to any additional re-registrations that may be required pursuant to paragraphs (f)(3) and (f)(4) of this section, any nonimmigrant alien subject to special registration under this paragraph (f) who remains in the United States for 30 days or more shall notify the Department of Homeland Security by mail or other such means as determined by the Secretary of Homeland Security, using a notification form designated by the Department of Homeland Security, of any change of address, change of residence, change of employment, or change of educational institution within 10 days of such change. Notice to the Department of Homeland Security of a change of address, change of residence or change of educational institution made within 10 days of such a change through the Student and Exchange Visitor Information System (SEVIS) shall constitute notice under this paragraph.

(6) [Reserved]

(7) *Relief from registration requirements.* A nonimmigrant alien subject to special registration may apply for relief from the registration requirements as follows:

(i) *Relief from departure controls set out in 264.1(f) (8).* An alien who has been registered under the provisions of this section (f) and has not yet departed the United States may seek relief from the departure control requirement contained in paragraph (f)(8) for that admission by applying to the U.S. Customs and Border Protection field office director for the port from which the alien intends to depart. In making an application for relief, the alien must establish that exigent or unusual circumstances exist and that the alien warrants a favorable exercise of discretion.

(ii) *Frequent travelers.* An alien who previously has been registered and who would otherwise be subject to registration at a port of entry under the provisions of paragraphs (f)(2) and (3) of this section may seek relief from the registration requirements from the Secretary of Homeland Security after his initial registration if the alien makes frequent trips to the United States. An alien seeking relief under this paragraph from the Secretary of Homeland Security may apply to the U.S. Customs

and Border Protection field office director for the port to which the alien most frequently arrives in the United States. The field office director or his designee will make the determination that the frequency of arrival warrants relief from the registration requirements on a case-by-case basis, and will consider in this analysis the mode of travel, business and economic concerns, purpose of travel, or other factors as determined by the director. In making an application for relief, the alien must establish that good cause or exigent or unusual circumstances exist and that the alien warrants a favorable exercise of discretion.

(iii) *Exemption from registration.* At a Department of State consular office abroad, an alien may seek exemption from these regulations from the Department of State by such methods as it may prescribe.

(iv) *For all applications for relief.* Any decision of a Department of Homeland Security officer or official to grant or deny relief under this paragraph (f)(7) is final and not appealable. Absent receipt of a decision exempting or relieving the nonimmigrant alien from these requirements, he or she shall comply with the special registration requirements contained in this section.

(v) *Termination of relief.* Relief granted under paragraphs (f)(7)(i) or (ii) of this section may be terminated by notice to the alien by any field office director or other Department of Homeland Security officer or official authorized to grant such relief.

(8) *Departure requirements.* (i) General requirements When a nonimmigrant alien subject to special registration departs from the United States (other than nonimmigrant crewmen as defined under section 101(a)(15)(D) of the Act) he or she shall report to an inspecting officer of the Department of Homeland Security at any'port-of-entry unless the Department of Homeland Security has, by publication of a notice in the **Federal Register**, specified that nonimmigrant aliens subject to special registration may not depart from specific ports. This paragraph (f)(8) applies only to those nonimmigrant aliens who have been registered under paragraph (f)(3) of this section, or who have been required to register pursuant to paragraph (f)(4) of this section, and who have not been granted relief from the departure requirements under paragraph (f)(7).

(ii) *Presumption of inadmissibility.* Any nonimmigrant alien subject to special registration who fails, without good cause, to be examined by an inspecting officer at the time of his or her departure and to have his or her departure recorded by the inspecting officer shall thereafter be presumed to be inadmissible under, but not limited to, section 212(a)(3)(A)(ii) of the Act (8 U.S.C. 1182(a)(3)(A)(ii)), as an alien whom the Secretary of Homeland Security has reasonable grounds to believe, based on the alien's past failure to conform with the requirements for special registration, seeks to enter the United States to engage in unlawful activity.

(iii) *Overcoming inadmissibility.* An alien may overcome the presumption of inadmissibility set out in paragraph (f)(8)(ii) by making a showing that he or she satisfies conditions set by the Secretary of Homeland Security and the Secretary of State. If a consular officer, in adjudicating a new visa application by an alien that previously failed to register his or her departure from the United States, finds good cause existed for the alien's failure to register departure or that the alien is not inadmissible under section 212(a)(3)(A)(ii) of the Act, the inspecting officer at the port-of-entry, while not bound by the consular officer's decision, will consider this finding as a significantly favorable factor in determining whether the alien is admissible.

(9) *Completion of registration.* Registration under this paragraph (f) is not deemed to be complete unless all of the information required by the Department of Homeland Security and all requested documents are provided in a timely manner. Any additional re-registration that may be required and each change of material fact is a registration that is required under sections 262 and 263 of the Act (8 U.S.C. 1302, 1303). Each change of address required under this paragraph (f) is a change of address required under section 265 of the Act (8 U.S.C. 1305).

\*     \*     \*     \*     \*

Dated: November 27, 2003.

**Tom Ridge,**

*Secretary of Homeland Security.*

[FR Doc. 03–30120 Filed 12–1–03; 8:45 am]

**BILLING CODE 4410–10–P**



**U.S. Department of Justice**
**Executive Office for Immigration Review**

# Statistics Yearbook
## Fiscal Year 2017

Prepared by the Planning, Analysis, & Statistics Division

**Contact Information**
Office of Policy
Communications and Legislative Affairs Division
5107 Leesburg Pike, Suite 1902
Falls Church, VA 22041
(703) 305-0289
(703) 605-0365 (fax)

**Disclaimer**
The Statistics Yearbook has been prepared as a public service by the Executive Office for Immigration Review and is strictly informational in nature. In no way should any information in the Statistics Yearbook, in whole or in part, be regarded as legal advice or authority, or be understood in any way to enlarge upon, or otherwise modify or interpret, any existing legal authority, including, but not limited to, the Immigration and Nationality Act and Title 8 of the Code of Federal Regulations.

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

# TABLE OF CONTENTS

A Note on Format ........................................................................................................... 4

The Executive Office for Immigration Review ............................................................... 5

Statistics Yearbook Key Definitions ............................................................................... 7

Immigration Courts ......................................................................................................... 8
  Pending Caseload ......................................................................................................... 8
  Total I-862 Matters Received and Completed ............................................................ 10
  Cases Received and Completed by Type .................................................................... 13
  I-862 Case Completions by Decision ......................................................................... 14
  I-862 ICCs by Country of Nationality ....................................................................... 17
  I-862 ICCs by Language ............................................................................................. 18
  I-862 ICCs for Detained Cases ................................................................................... 19
  I-862 Institutional Hearing Program Cases Received and Completed ....................... 21
  I-862 ICCs with Applications for Relief .................................................................... 22
  Asylum Cases Received and Completed ..................................................................... 24
  Asylum Cases Completed by Decision ....................................................................... 26
  Asylum Grants by Country of Nationality .................................................................. 29
  Convention Against Torture ........................................................................................ 30
  I-862 Applications for Relief other than Asylum ....................................................... 32
  I-862 *In Absentia* Orders ........................................................................................... 33
  Immigration Judge Hiring ........................................................................................... 35

Board of Immigration Appeals ....................................................................................... 36
  Total Cases Received and Completed ......................................................................... 36
  Cases Received and Completed by Type ..................................................................... 37
  Appeals from IJ Decisions Completed by Country of Nationality ............................. 38
  Appeals from IJ Decisions (I-862) Completed by Representation Status ................... 39
  Case Appeals from IJ Decision (I-862 ICCs) Completed for Detained Cases ........... 40
  IJ Decisions (I-862 ICCs) Appealed ........................................................................... 41

Office of the Chief Administrative Hearing Officer ....................................................... 42
  Total Cases Received and Completed ......................................................................... 42

Freedom of Information Act (FOIA) ............................................................................... 44
  FOIA Receipts ............................................................................................................. 44

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

## LISTING OF TABLES

Table 1. Immigration Courts Pending Cases ........................................................................................ 9
Table 2. Total I-862 Immigration Court Matters Received by Court .................................................. 11
Table 3. Total I-862 Immigration Court Matters Completed by Court and Type ............................... 12
Table 4. Immigration Court Cases Received by Case Type ................................................................ 13
Table 5. Immigration Court Initial and Subsequent Case Completions by Case Type ...................... 13
Table 6. Credible Fear (CF) and Reasonable Fear (RF) Review ICCs by Decision .......................... 15
Table 7. FY 2017 I-862 Changes of Venue and Transfers ................................................................. 16
Table 8. I-862 ICCs by Top 25 Countries of Nationality .................................................................. 17
Table 9. I-862 ICCs by Top 25 Languages ........................................................................................ 18
Table 10. FY 2017 I-862 Detained ICCs ........................................................................................... 20
Table 11. I-862 IHP ICCs by Decision .............................................................................................. 21
Table 12. FY 2017 I-862 ICCs with Applications for Relief ............................................................. 23
Table 13. Asylum ICCs by Court for FY 2017 .................................................................................. 25
Table 14. Asylum Decision Rate by Immigration Court .................................................................... 28
Table 15. Asylum Grants by Top 25 Countries of Nationality .......................................................... 29
Table 16. Convention Against Torture Cases by Decision ................................................................. 30
Table 17. Convention Against Torture Completions by Court ........................................................... 31
Table 18. I-862 Cases Grants of Relief .............................................................................................. 32
Table 19. I-862 *In Absentia* Orders and ICCs by Respondent Type ................................................ 34
Table 20. BIA Receipts and Completions by Type ............................................................................ 37
Table 21. BIA Appeals from ICCs by Top 25 Countries of Nationality ........................................... 38
Table 22. BIA Detained Completions ................................................................................................ 40

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 174 of 1770

U.S. DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

# LISTING OF FIGURES

Figure 1. OCIJ Pending Caseload................................................................8
Figure 2. BIA Pending Caseload ...............................................................8
Figure 3. Total I-862 Immigration Court Matters .....................................10
Figure 4. I-862 Immigration Court Matters Received by Type ...................10
Figure 5. I-862 Immigration Court Matters Completed by Type ................10
Figure 6. I-862 Case Completions ............................................................14
Figure 7. I-862 ICCs by Decision .............................................................14
Figure 8. I-862 Subsequent Case Completions by Decision .....................14
Figure 9. Administrative Closures .............................................................15
Figure 10. Total I-862 Changes of Venue and Transfers ...........................15
Figure 11. I-862 ICCs by Nationality .......................................................17
Figure 12. I-862 ICCs by Language ..........................................................18
Figure 13. I-862 ICCs by Detention Status ...............................................19
Figure 14. I-862 Standard Detained ICCs .................................................19
Figure 15. I-862 IHP Receipts and ICCs ..................................................21
Figure 16. I-862 ICCs by Application Filling Status .................................22
Figure 17. Asylum Receipts ......................................................................24
Figure 18. Asylum Receipts and ICCs ......................................................24
Figure 19. Asylum ICCs by Decision ........................................................26
Figure 20. Affirmative and Defensive Asylum ICCs by Decision ...............26
Figure 21. Administrative Closures of Asylum Cases.................................27
Figure 22. Asylum and Withholding of Removal ICCs by Decision ...........27
Figure 23. Withholding of Removal ICCs by Decision ..............................27
Figure 24. Asylum Grants by Country of Nationality ................................29
Figure 25. I-862 *In Absentia* Rates ...........................................................33
Figure 26. Immigration Judge Hiring ........................................................35
Figure 27. Total BIA Cases Received and Completed .................................36
Figure 28. BIA Receipts and Completions by Case Type ...........................37
Figure 29. Completed Appeals from IJ Decisions by Nationality................38
Figure 30. Completed Appeals from IJ Decisions (I-862 Cases) by Representation Status .................39
Figure 31. Complete Case Appeals from I-862 ICCs by Detention Status ...........................40
Figure 32. I-862 ICCs Appealed to BIA ....................................................41
Figure 33. OCAHO Receipts and Completions...........................................43
Figure 34. OCAHO Receipts and Completions by Type .............................43
Figure 35. FOIA Receipts ..........................................................................44

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

## A NOTE ON FORMAT

Since publication of the Executive Office for Immigration Review (EOIR) fiscal year (FY) 2016 Statistics Yearbook, EOIR has reassessed the format of its annual yearbook, leading to some delay in the release of the FY 2017 Statistics Yearbook. For the FY 2017 Yearbook, EOIR has improved the graphics and the layout to make the data easier to understand. It has also endeavored to improve the precision of reported statistics and their utility for operations and public interest. Further, EOIR's ongoing public release of data reports, many of which have already reported FY 2017 data contained in the Yearbook, and the periodic public release of EOIR's overall Case Data file, which contains almost all data from FY 2017 that is otherwise presented in the Yearbook, potentially render the release of an annual yearbook obsolete. Nevertheless, EOIR anticipates releasing the FY 2018 Statistics Yearbook on a much more expeditious timetable, though its primary commitment will continue to be updates to its online data.

Please refer any questions on these improvements to EOIR's Office of Policy, Communications and Legislative Affairs Division.

## THE EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

EOIR is responsible for adjudicating immigration cases. On behalf of the Attorney General, EOIR interprets and administers federal immigration laws and regulations through immigration court cases, appellate reviews, and administrative hearings in certain types of immigration-related cases. EOIR consists of three adjudicatory bodies: The Office of the Chief Immigration Judge (OCIJ), the Board of Immigration Appeals (BIA), and the Office of the Chief Administrative Hearing Officer (OCAHO).

OCIJ provides overall program direction and establishes priorities for 338 immigration judges (IJ) located in 61 immigration courts throughout the nation. The BIA hears appeals from certain decisions rendered by IJs and by district directors of Department of Homeland Security (DHS) in a wide variety of cases. OCAHO conducts hearings in civil penalty cases arising from the unlawful employment of aliens, unfair immigration-related employment practices, and civil document fraud.

Although this Statistics Yearbook addresses each of EOIR's three adjudicatory bodies, most of the data presented comes from immigration court cases. Most immigration court cases involve removal proceedings. A removal proceeding has two parts. First, an immigration judge assesses whether an alien is removable as charged under the applicable law. If an immigration judge determines that the alien is not removable, then the immigration judge will terminate proceedings.[1] If the immigration judge sustains the charge or charges of removability, proceedings continue. A finding of removability by itself never guarantees that an alien will be ordered removed or that the alien will actually be removed. Rather, if the alien is found removable, the judge must also make a second determination as to whether the alien is eligible for any relief or protection that would allow the alien to remain in the United States. Examples of such relief or protection include asylum, withholding of removal, protection under the Convention Against Torture, adjustment of status, cancellation of removal for lawful permanent residents, cancellation of removal for certain non-permanent residents, and certain waivers provided by the Immigration and Nationality Act.[2]

The removal proceeding begins when the DHS (either U.S. Immigration and Customs Enforcement (ICE), U.S. Citizenship and Immigration Services (USCIS), or U.S. Customs and Border Protection (CBP)) serves an individual with a charging document, called a Notice to Appear (NTA), and files it with an immigration court.

Aliens in removal proceedings, called respondents, have a right to legal representation at no expense to the government. EOIR also provides a list of *pro bono* legal service providers to any respondent who appears in removal proceedings without representation.

---

[1] Although applicable regulations distinguish between the dismissal of proceedings and the termination of proceedings, EOIR classifies both of them as "terminations" for statistical purposes because the outcomes are substantively identical.

[2] Although relief (*e.g.* asylum) and protection (*e.g.* withholding of removal) are legally distinct outcomes, EOIR classifies both of them as "relief" for statistical purposes because the outcomes are similar in that for both, an alien is generally allowed to remain in the United States. Additionally, voluntary departure is a form of relief from removal, but it carries an alternate order of removal if the departure is not timely effectuated. Consequently, EOIR classifies it as a separate outcome for statistical purposes and does not count it as either relief or an order of removal.

DOJIFR00641

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

During the removal proceeding, the immigration court schedules an initial hearing, referred to as a master calendar hearing, before an immigration judge.  At this hearing, the immigration judge informs the respondent of his or her rights and addresses representation. The judge may also take pleadings, determine removability, and ascertain apparent eligibility for any relief or protection provided for by law. If a judge finds an alien removable and the alien wishes to apply for relief or protection from removal, the judge will schedule an individual merits hearing on the alien's application where both parties (the respondent and DHS) may present arguments and evidence regarding that application.  If the immigration judge finds the alien eligible for relief or protection from removal, the judge will then grant the application.

If an immigration judge finds an alien is removable and ineligible for any relief or protection from removal, the judge will order the alien removed.  ICE is then responsible for any subsequent detention and removal activities. The issuance of a removal order does not guarantee the actual physical removal of an alien from the United States.

Within 30 days of the immigration judge's decision in a removal case, either party or both parties may appeal the decision to the BIA. If the BIA decision is adverse to the alien, the alien may file a petition for review of that decision with the appropriate federal circuit court of appeals within 30 days.

In certain circumstances, a party to a removal case may also file a motion with the immigration court to reconsider or reopen the case after an immigration judge or the BIA has rendered a decision.

In certain circumstances, for aliens detained by DHS or aliens recently released from custody by DHS, an immigration judge may consider requests to redetermine the conditions of custody or to ameliorate the conditions of release. Any alien may make such a request, and an immigration judge will preside over a hearing on the request, commonly called a "bond hearing." Whether an immigration judge grants the request ultimately depends on the facts and applicable law of each case.  Either party or both parties may appeal the immigration judge's bond decision to the BIA.

DOJIFR00642

# STATISTICS YEARBOOK KEY DEFINITIONS

The following definitions are applicable to the FY 2017 Yearbook. Please note that prior Yearbooks may have utilized different definitions and that some terms may have different usages or definitions outside the Yearbook context.

**Immigration court matters** include cases, bond redeterminations, and motions to reopen, reconsider, and recalendar.

**Immigration court cases** include twelve case types, divided into four categories. I-862 case types include removal, deportation, and exclusion cases. I-863 case types include asylum-only, withholding-only, credible fear review, reasonable fear review, and claimed status review cases. Other case types include rescission, non-removal Nicaraguan Adjustment and Central American Relief Act (NACARA), departure control, and continued detention review cases.

**Immigration court receipts** is the total number of charging documents, bond redeterminations, and motions to reopen, reconsider, and recalendar received within the reporting period.

**Immigration court matter completions** is the total number of immigration judge decisions on cases and bond redeterminations, plus the total number of denied motions to reopen, reconsider, and recalendar.

**Initial case completion (ICC)** is the first dispositive decision rendered by an immigration judge. For instance, an I-862 removal case is completed by an order of removal, relief, voluntary departure, termination, or other. An order granting a continuance, changing venue, or administratively closing a case is not a dispositive decision and, thus, does not constitute a case completion.

**Subsequent case completion** refers to any dispositive decision by an immigration judge after an ICC.

DOJIFR00643

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

# IMMIGRATION COURTS

## PENDING CASELOAD

**Figure 1.** The number of pending immigration court cases has grown by 84 percent since the end of FY 2013, and by 26 percent since the end of FY 2016.



**Figure 2.** The BIA's pending caseload decreased 32 percent from FY 2013 to FY 2017.



DOJIFR00644

## Table 1. Immigration Courts Pending Cases

| Immigration Court | Pending Cases as of 9/30/2017 |
|---|---|
| Adelanto | 1,258 |
| Arlington | 38,966 |
| Atlanta | 19,159 |
| Aurora | 417 |
| Baltimore | 29,516 |
| Batavia | 317 |
| Bloomington | 6,210 |
| Boston | 22,505 |
| Buffalo | 1,466 |
| Charlotte | 12,981 |
| Chicago | 29,197 |
| Cleveland | 7,835 |
| Dallas | 16,940 |
| Denver | 10,660 |
| Detroit | 4,385 |
| El Paso | 4,879 |
| El Paso SPC | 440 |
| Elizabeth | 672 |
| Eloy | 1,096 |
| Fishkill | 119 |
| Florence | 589 |
| Harlingen | 2,498 |
| Hartford | 4,019 |
| Honolulu | 628 |
| Houston | 48,872 |
| Houston SPC | 1,219 |
| Imperial | 3,444 |
| Kansas City | 6,353 |
| Krome | 722 |
| Las Vegas | 3,652 |
| LaSalle | 318 |
| Los Angeles (N) | 61,885 |
| Los Angeles (D) | 526 |
| Louisville | 4,631 |
| Memphis | 10,858 |
| Miami | 32,486 |
| New Orleans | 8,483 |
| New York City | 84,090 |
| Newark | 33,532 |
| Oakdale | 268 |
| Omaha | 8,653 |
| Orlando | 10,410 |
| Otay Mesa | 808 |
| Otero | 196 |
| Pearsall | 765 |
| Philadelphia | 9,729 |
| Phoenix | 7,287 |
| Port Isabel | 527 |
| Portland | 4,215 |
| Saipan | 98 |
| Salt Lake City | 2,612 |
| San Antonio | 27,484 |
| San Diego | 4,530 |
| San Francisco | 47,878 |
| San Juan | 219 |
| Seattle | 8,789 |
| Stewart | 807 |
| Tacoma | 980 |
| Tucson | 723 |
| Ulster | 156 |
| Varick | 662 |
| York | 448 |
| **Total** | **656,067** |

DOJIFR00645

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

## TOTAL I-862 MATTERS RECEIVED AND COMPLETED

**Figure 3.** The number of I-862 matters the immigration courts received increased by 28 percent between FY 2016 and FY 2017. The number of I-862 matters the immigration courts completed increased by 17 percent from FY 2016 to FY 2017.

**Figure 3. Total I-862 Immigration Court Matters**

| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Receipts | 271,726 | 307,017 | 274,920 | 316,343 | 405,947 |
| Completions | 217,123 | 203,325 | 204,909 | 207,230 | 243,128 |

**Figure 4.** New NTAs constitute the bulk of the courts' work.

**Figure 4. I-862 Immigration Court Matters Received by Type**

| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| New NTAs | 193,690 | 226,670 | 189,676 | 224,963 | 291,258 |
| Bonds | 57,673 | 60,476 | 60,067 | 63,421 | 78,483 |
| Motions | 20,363 | 19,871 | 25,177 | 27,959 | 36,206 |
| Total | 271,726 | 307,017 | 274,920 | 316,343 | 405,947 |

**Figure 5.** The majority of matters completed are I-862 ICCs.

**Figure 5. I-862 Immigration Court Matters Completed by Type**



| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Initial Case Completions | 137,329 | 124,649 | 127,452 | 128,201 | 149,581 |
| Subsequent Case Completions | 17,511 | 14,448 | 13,650 | 12,433 | 10,164 |
| Bonds | 57,531 | 59,852 | 59,543 | 62,197 | 77,278 |
| Motions (Not Granted) | 4,752 | 4,376 | 4,264 | 4,399 | 6,105 |
| Total | 217,123 | 203,325 | 204,909 | 207,230 | 243,128 |

DOJIFR00646

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

## Table 2. Total I-862 Immigration Court Matters Received by Court

| Immigration Court | FY 2016 Total Matters | FY 2017 | | | | Rate of Change: Total Matters |
|---|---|---|---|---|---|---|
| | | Total Matters | New NTAs | Bonds | Motions | |
| Adelanto | 7,664 | 8,486 | 3,681 | 4,754 | 51 | 11% |
| Arlington | 13,547 | 15,488 | 12,317 | 1,492 | 1,679 | 14% |
| Atlanta | 8,524 | 11,714 | 8,625 | 2,064 | 1,025 | 37% |
| Aurora | 3,044 | 3,848 | 2,016 | 1,776 | 56 | 26% |
| Baltimore | 8,825 | 14,583 | 12,880 | 750 | 953 | 65% |
| Batavia | 2,981 | 2,491 | 1,226 | 1,239 | 26 | -16% |
| Bloomington | 3,192 | 4,748 | 2,740 | 1,369 | 639 | 49% |
| Boston | 7,791 | 11,042 | 8,396 | 1,499 | 1,147 | 42% |
| Buffalo | 534 | 782 | 588 | 0 | 194 | 46% |
| Charlotte | 5,880 | 9,449 | 8,416 | 479 | 554 | 61% |
| Chicago | 9,787 | 11,509 | 7,718 | 2,700 | 1,091 | 18% |
| Cleveland | 3,006 | 4,112 | 2,859 | 806 | 447 | 37% |
| Dallas | 11,501 | 13,236 | 11,393 | 1,183 | 660 | 15% |
| Denver | 1,824 | 2,714 | 2,053 | 241 | 420 | 49% |
| Detroit | 2,697 | 3,753 | 2,210 | 1,197 | 346 | 39% |
| El Paso | 1,091 | 1,741 | 1,422 | 38 | 281 | 60% |
| El Paso SPC | 3,950 | 3,462 | 2,171 | 1,248 | 43 | -12% |
| Elizabeth | 5,442 | 4,931 | 2,336 | 2,551 | 44 | -9% |
| Eloy | 7,154 | 8,040 | 3,582 | 4,383 | 75 | 12% |
| Fishkill | 170 | 169 | 157 | 0 | 12 | -1% |
| Florence | 5,300 | 3,991 | 2,486 | 1,448 | 57 | -25% |
| Harlingen | 3,554 | 3,429 | 2,448 | 0 | 981 | -4% |
| Hartford | 1,586 | 2,648 | 2,202 | 244 | 202 | 67% |
| Honolulu | 413 | 591 | 422 | 122 | 47 | 43% |
| Houston | 13,116 | 14,224 | 12,994 | 3 | 1,227 | 8% |
| Houston SPC | 10,454 | 14,363 | 8,859 | 5,279 | 225 | 37% |
| Imperial | 3,869 | 4,311 | 2,340 | 1,882 | 89 | 11% |
| Kansas City | 3,337 | 5,254 | 3,538 | 1,329 | 387 | 57% |
| Krome | 6,750 | 8,507 | 4,349 | 4,032 | 126 | 26% |
| Las Vegas | 3,179 | 4,447 | 2,817 | 1,166 | 464 | 40% |
| LaSalle | 4,979 | 5,998 | 3,071 | 2,902 | 25 | 20% |
| Los Angeles (N) | 16,209 | 26,188 | 21,300 | 14 | 4,874 | 62% |
| Los Angeles (D) | 4,786 | 4,697 | 1,939 | 2,721 | 37 | -2% |
| Louisville | 1,325 | 1,860 | 1,572 | 7 | 281 | 40% |
| Memphis | 5,143 | 6,430 | 5,278 | 41 | 1,111 | 25% |
| Miami | 11,921 | 16,575 | 13,918 | 53 | 2,604 | 39% |
| New Orleans | 3,866 | 5,180 | 4,616 | 0 | 564 | 34% |
| New York City | 18,445 | 27,131 | 23,895 | 5 | 3,231 | 47% |
| Newark | 5,163 | 8,708 | 7,872 | 2 | 834 | 69% |
| Oakdale | 4,206 | 4,782 | 2,405 | 2,329 | 48 | 14% |
| Omaha | 2,993 | 4,504 | 3,283 | 745 | 476 | 50% |
| Orlando | 5,271 | 8,241 | 6,012 | 1,100 | 1,129 | 56% |
| Otay Mesa | 3,284 | 4,938 | 2,145 | 2,751 | 42 | 50% |
| Otero | 350 | 1,904 | 1,179 | 715 | 10 | 444% |
| Pearsall | 6,658 | 8,168 | 5,366 | 2,764 | 38 | 23% |
| Philadelphia | 3,036 | 4,013 | 3,493 | 2 | 518 | 32% |
| Phoenix | 2,721 | 3,335 | 2,378 | 3 | 954 | 23% |
| Port Isabel | 3,895 | 4,062 | 2,605 | 1,394 | 63 | 4% |
| Portland | 1,558 | 1,357 | 1,108 | 13 | 236 | 11% |
| Saipan | 21 | 115 | 111 | 1 | 3 | 448% |
| Salt Lake City | 2,004 | 1,258 | 887 | 110 | 261 | -56% |
| San Antonio | 6,146 | 7,999 | 5,062 | 1,613 | 1,324 | 30% |
| San Diego | 2,752 | 2,842 | 2,125 | 9 | 708 | 3% |
| San Francisco | 17,127 | 20,328 | 15,162 | 3,171 | 1,995 | 19% |
| San Juan | 251 | 336 | 135 | 17 | 184 | 34% |
| Seattle | 2,687 | 2,757 | 2,164 | 0 | 593 | 3% |
| Stewart | 4,295 | 7,769 | 5,021 | 2,669 | 79 | 81% |
| Tacoma | 6,556 | 6,648 | 3,185 | 3,418 | 45 | 1% |
| Tucson | 680 | 608 | 489 | 0 | 119 | -11% |
| Ulster | 300 | 241 | 222 | 0 | 19 | -20% |
| Varick | 3,133 | 3,253 | 1,451 | 1,721 | 81 | 4% |
| York | 4,420 | 5,659 | 2,568 | 2,919 | 172 | 28% |
| **Total** | **316,343** | **405,947** | **291,258** | **78,483** | **36,206** | **22%** |

| Key |
|---|
| 25%+ **growth** in Total Matters Received |
| 25%+ **decrease** in Total Matters Received |

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

### Table 3. Total I-862 Immigration Court Matters Completed by Court and Type

| Immigration Court | FY 2016 Total Matters | FY 2017 Total Matters | Initial Case Completions | Subsequent Case Completions | Bonds | Motions Not Granted | Rate of Change: Total Matters |
|---|---|---|---|---|---|---|---|
| Adelanto | 5,227 | 6,636 | 1,873 | 70 | 4,677 | 16 | 27% |
| Arlington | 6,877 | 6,509 | 4,628 | 313 | 1,404 | 164 | -5% |
| Atlanta | 7,185 | 7,473 | 4,873 | 213 | 2,015 | 372 | 4% |
| Aurora | 2,108 | 2,856 | 1,013 | 30 | 1,794 | 19 | 35% |
| Baltimore | 4,645 | 4,264 | 3,066 | 292 | 757 | 149 | -8% |
| Batavia | 1,903 | 1,837 | 562 | 25 | 1,244 | 6 | -3% |
| Bloomington | 2,059 | 2,795 | 1,358 | 84 | 1,235 | 118 | 36% |
| Boston | 4,579 | 4,851 | 2,882 | 384 | 1,520 | 65 | 6% |
| Buffalo | 710 | 601 | 497 | 65 | 0 | 39 | -15% |
| Charlotte | 4,652 | 4,505 | 3,731 | 203 | 479 | 92 | -3% |
| Chicago | 5,705 | 7,879 | 4,688 | 378 | 2,699 | 114 | 38% |
| Cleveland | 2,005 | 2,439 | 1,522 | 104 | 776 | 37 | 22% |
| Dallas | 8,659 | 8,148 | 6,574 | 250 | 1,140 | 184 | -6% |
| Denver | 735 | 1,781 | 1,336 | 151 | 229 | 65 | 142% |
| Detroit | 2,097 | 2,959 | 1,629 | 92 | 1,138 | 100 | 41% |
| El Paso | 938 | 1,421 | 1,214 | 60 | 38 | 109 | 51% |
| El Paso SPC | 2,793 | 2,677 | 1,421 | 30 | 1,203 | 23 | -4% |
| Elizabeth | 3,780 | 4,043 | 1,441 | 54 | 2,527 | 21 | 7% |
| Eloy | 5,332 | 6,685 | 2,174 | 48 | 4,436 | 27 | 25% |
| Fishkill | 125 | 163 | 150 | 6 | 0 | 7 | 30% |
| Florence | 3,126 | 2,362 | 924 | 21 | 1,394 | 23 | -24% |
| Harlingen | 2,338 | 2,535 | 1,794 | 206 | 0 | 535 | 8% |
| Hartford | 1,214 | 1,263 | 898 | 91 | 240 | 34 | 4% |
| Honolulu | 521 | 634 | 485 | 33 | 113 | 3 | 22% |
| Houston | 6,137 | 7,302 | 6,776 | 355 | 3 | 168 | 19% |
| Houston SPC | 6,037 | 9,564 | 4,513 | 55 | 4,947 | 49 | 58% |
| Imperial | 2,369 | 2,434 | 519 | 25 | 1,873 | 17 | 3% |
| Kansas City | 2,156 | 3,238 | 1,796 | 109 | 1,282 | 51 | 50% |
| Krome | 5,083 | 7,062 | 3,002 | 86 | 3,899 | 75 | 39% |
| Las Vegas | 2,646 | 3,766 | 2,338 | 216 | 1,147 | 65 | 42% |
| LaSalle | 3,935 | 5,016 | 2,111 | 30 | 2,860 | 15 | 27% |
| Los Angeles (N) | 11,641 | 11,807 | 9,761 | 1,312 | 14 | 720 | 1% |
| Los Angeles (D) | 3,866 | 4,265 | 1,372 | 63 | 2,815 | 15 | 10% |
| Louisville | 816 | 845 | 751 | 33 | 6 | 55 | 4% |
| Memphis | 2,990 | 3,636 | 3,267 | 153 | 42 | 174 | 22% |
| Miami | 5,833 | 7,950 | 6,814 | 695 | 51 | 390 | 36% |
| New Orleans | 2,124 | 2,698 | 2,496 | 121 | 0 | 81 | 27% |
| New York City | 14,662 | 12,887 | 11,445 | 1,059 | 1 | 382 | -12% |
| Newark | 3,179 | 3,176 | 2,801 | 253 | 9 | 113 | 0% |
| Oakdale | 2,907 | 3,850 | 1,460 | 21 | 2,334 | 35 | 32% |
| Omaha | 1,611 | 2,625 | 1,697 | 122 | 765 | 41 | 63% |
| Orlando | 3,105 | 5,333 | 3,780 | 359 | 1,056 | 138 | 72% |
| Otay Mesa | 2,094 | 3,587 | 764 | 31 | 2,772 | 20 | 71% |
| Otero | 238 | 1,804 | 1,116 | 5 | 679 | 4 | 658% |
| Pearsall | 3,533 | 4,137 | 1,420 | 17 | 2,685 | 15 | 17% |
| Philadelphia | 1,659 | 1,871 | 1,653 | 155 | 2 | 61 | 13% |
| Phoenix | 1,797 | 2,320 | 2,093 | 159 | 3 | 65 | 29% |
| Port Isabel | 2,450 | 2,599 | 1,160 | 36 | 1,367 | 36 | 6% |
| Portland | 785 | 614 | 530 | 63 | 13 | 8 | -22% |
| Saipan | 21 | 25 | 18 | 4 | 1 | 2 | 19% |
| Salt Lake City | 1,714 | 1,286 | 991 | 89 | 148 | 58 | -25% |
| San Antonio | 2,904 | 5,226 | 3,157 | 262 | 1,481 | 326 | 80% |
| San Diego | 1,306 | 1,708 | 1,432 | 115 | 6 | 155 | 31% |
| San Francisco | 10,357 | 10,115 | 6,267 | 392 | 3,268 | 188 | -2% |
| San Juan | 193 | 158 | 105 | 24 | 17 | 12 | -18% |
| Seattle | 2,115 | 1,806 | 1,540 | 167 | 0 | 99 | -15% |
| Stewart | 3,799 | 6,979 | 4,153 | 86 | 2,694 | 46 | 84% |
| Tacoma | 5,053 | 5,866 | 2,278 | 39 | 3,530 | 19 | 16% |
| Tucson | 679 | 729 | 672 | 43 | 0 | 14 | 7% |
| Ulster | 204 | 218 | 199 | 9 | 0 | 10 | 7% |
| Varick | 2,468 | 2,560 | 892 | 53 | 1,598 | 17 | 4% |
| York | 3,451 | 4,750 | 1,709 | 145 | 2,852 | 44 | 38% |
| **Total** | **207,230** | **243,128** | **149,581** | **10,164** | **77,278** | **6,105** | **17%** |

**Key**

25%+ **growth** in Total Matters Completed

25%+ **decrease** in Total Matters Completed

U.S. DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

## CASES RECEIVED AND COMPLETED BY TYPE

### Table 4. Immigration Court Cases Received by Case Type

| Type of Case | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 |
|---|---|---|---|---|---|
| Removal | 193,689 | 226,669 | 189,674 | 224,962 | 291,258 |
| Credible Fear | 1,770 | 6,507 | 6,644 | 7,464 | 6,532 |
| Withholding Only | 2,328 | 3,145 | 3,061 | 3,261 | 3,388 |
| Reasonable Fear | 1,156 | 1,778 | 2,608 | 2,521 | 2,476 |
| Asylum Only | 393 | 294 | 255 | 227 | 399 |
| Rescission | 46 | 31 | 45 | 27 | 37 |
| Claimed Status | 31 | 22 | 21 | 11 | 6 |
| Continued Detention Review | 0 | 3 | 2 | 1 | 0 |
| Deportation | 1 | 1 | 2 | 1 | 0 |
| NACARA | 2 | 4 | 1 | 0 | 0 |
| **Total** | **199,416** | **238,454** | **202,313** | **238,475** | **304,096** |

### Table 5. Immigration Court Initial and Subsequent Case Completions by Case Type

| Type of Case | FY 2013 | | FY 2014 | | FY 2015 | | FY 2016 | | FY 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Initial | Subsequent | Initial | Subsequent | Initial | Subsequent | Initial | Subsequent | Initial | Subsequent |
| Deportation | 601 | 1,592 | 472 | 1,157 | 452 | 1,100 | 477 | 1,082 | 381 | 818 |
| Exclusion | 48 | 154 | 35 | 103 | 19 | 103 | 35 | 83 | 22 | 62 |
| Removal | 136,680 | 15,765 | 124,142 | 13,188 | 126,981 | 12,447 | 127,689 | 11,268 | 149,178 | 9,284 |
| Credible Fear | 1,726 | 0 | 6,353 | 0 | 6,624 | 2 | 7,492 | 0 | 6,533 | 0 |
| Reasonable Fear | 1,135 | 0 | 1,707 | 0 | 2,559 | 0 | 2,536 | 2 | 2,437 | 0 |
| Claimed Status | 28 | 2 | 22 | 0 | 19 | 0 | 14 | 1 | 4 | 1 |
| Asylum Only | 307 | 72 | 296 | 75 | 230 | 49 | 200 | 51 | 261 | 64 |
| Rescission | 35 | 5 | 28 | 3 | 26 | 5 | 28 | 2 | 33 | 1 |
| Continued Detention Review | 2 | 0 | 2 | 0 | 3 | 0 | 2 | 0 | 0 | 0 |
| NACARA | 2 | 5 | 1 | 1 | 2 | 0 | 1 | 1 | 3 | 2 |
| Withholding Only | 1,300 | 64 | 2,553 | 107 | 2,209 | 127 | 2,501 | 132 | 2,865 | 163 |
| **Total** | **141,864** | **17,659** | **135,611** | **14,634** | **139,124** | **13,833** | **140,975** | **12,622** | **161,717** | **10,395** |

13

DOJIFR00649

U.S. DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

## I-862 CASE COMPLETIONS BY DECISION

**Figure 6.** I-862 ICCs increased 17 percent from FY 2016 to FY 2017.



Figure 6. I-862 Case Completions

|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Subsequent Case Completion | 17,511 | 14,448 | 13,650 | 12,433 | 10,164 |
| Initial Case Completion | 137,329 | 124,649 | 127,452 | 128,201 | 149,581 |
| Total | 154,840 | 139,097 | 141,102 | 140,634 | 159,745 |

**Figure 7.** All I-862 case outcomes except termination increased in FY 2017.



Figure 7. I-862 ICCs by Decision

|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Other | 499 | 366 | 436 | 481 | 514 |
| Removal | 75,384 | 72,715 | 75,727 | 75,092 | 97,457 |
| Voluntary Departure | 17,902 | 13,666 | 9,911 | 9,055 | 13,603 |
| Relief | 24,456 | 20,297 | 17,614 | 17,248 | 19,456 |
| Termination | 19,088 | 17,605 | 23,764 | 26,325 | 18,551 |
| Total | 137,329 | 124,649 | 127,452 | 128,201 | 149,581 |

**Figure 8.** For I-862 cases, subsequent case completions have decreased by about seven percent between FY 2013 and FY 2017.



Figure 8. I-862 Subsequent Case Completions by Decision

|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Removal | 6,781 | 5,824 | 6,049 | 4,626 | 3,988 |
| Termination | 5,381 | 4,625 | 4,699 | 5,006 | 3,286 |
| Relief | 3,905 | 2,897 | 2,204 | 2,129 | 2,166 |
| Voluntary Departure | 1,192 | 836 | 507 | 459 | 540 |
| Other | 252 | 266 | 191 | 213 | 184 |
| Total | 17,511 | 14,448 | 13,650 | 12,433 | 10,164 |

DOJIFR00650

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

**Figure 9.** Administrative closures decreased by about 40 percent from FY 2016 to FY 2017.

### Figure 9. Administrative Closures

| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Administrative Closure | 32,545 | 34,422 | 46,214 | 53,736 | 32,394 |

**Figure 10.** For I-862 cases, changes of venue have increased 35 percent since FY 2013 and transfers have increased 23 percent in the same period.

### Figure 10. Total I-862 Changes of Venue and Transfers



| | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 |
|---|---|---|---|---|---|
| Changes of Venue | 50,909 | 64,520 | 50,303 | 56,239 | 68,949 |
| Transfers | 37,826 | 40,895 | 37,662 | 41,868 | 46,584 |
| Total | 88,735 | 105,415 | 87,965 | 98,107 | 115,533 |

### Table 6. Credible Fear (CF) and Reasonable Fear (RF) Review ICCs by Decision

| Disposition | FY 13 | | FY 14 | | FY 15 | | FY 16 | | FY 17 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | CF | RF | CF | RF | CF | RF | CF | RF | CF | RF |
| Affirmed DHS Decision | 1,503 | 977 | 5,232 | 1,439 | 5,219 | 2,053 | 5,333 | 1,915 | 4,851 | 1,811 |
| Vacated DHS Decision | 206 | 131 | 1,055 | 230 | 1,347 | 451 | 2,088 | 571 | 1,647 | 588 |
| Other | 18 | 30 | 67 | 43 | 65 | 64 | 74 | 57 | 38 | 45 |
| **Total** | **1,727** | **1,138** | **6,354** | **1,712** | **6,631** | **2,568** | **7,495** | **2,543** | **6,536** | **2,444** |

### Table 7. FY 2017 I-862 Changes of Venue and Transfers

| Immigration Court | Changes of Venue | Transfers | Total |
|---|---|---|---|
| Adelanto | 2,327 | 30 | 2,357 |
| Arlington | 2,154 | 2,053 | 4,207 |
| Atlanta | 2,543 | 2,961 | 5,504 |
| Aurora | 1,080 | 18 | 1,098 |
| Baltimore | 915 | 31 | 946 |
| Batavia | 394 | 442 | 836 |
| Bloomington | 216 | 668 | 884 |
| Boston | 432 | 981 | 1,413 |
| Buffalo | 516 | 110 | 626 |
| Charlotte | 660 | 37 | 697 |
| Chicago | 1,845 | 2,042 | 3,887 |
| Cleveland | 324 | 507 | 831 |
| Dallas | 593 | 2,068 | 2,661 |
| Denver | 697 | 170 | 867 |
| Detroit | 303 | 627 | 930 |
| El Paso | 1,648 | 243 | 1,891 |
| El Paso SPC | 20 | 1,188 | 1,208 |
| Elizabeth | 24 | 1,406 | 1,430 |
| Eloy | 1,933 | 1 | 1,934 |
| Fishkill | 28 | 25 | 53 |
| Florence | 1,887 | 11 | 1,898 |
| Harlingen | 3,675 | 232 | 3,907 |
| Hartford | 227 | 208 | 435 |
| Honolulu | 24 | 50 | 74 |
| Houston | 7,335 | 2,706 | 10,041 |
| Houston SPC | 210 | 5,556 | 5,766 |
| Imperial | 1,949 | 2,146 | 4,095 |
| Kansas City | 602 | 797 | 1,399 |
| Krome | 1,765 | 509 | 2,274 |
| Las Vegas | 486 | 669 | 1,155 |
| LaSalle | 1,219 | 186 | 1,405 |
| Los Angeles (N) | 3,598 | 317 | 3,915 |
| Los Angeles (D) | 148 | 1,367 | 1,515 |
| Louisville | 197 | 210 | 407 |
| Memphis | 559 | 831 | 1,390 |
| Miami | 1,839 | 23 | 1,862 |
| New Orleans | 1,496 | 10 | 1,506 |
| New York City | 3,061 | 232 | 3,293 |
| Newark | 1,868 | 765 | 2,633 |
| Oakdale | 826 | 454 | 1,280 |
| Omaha | 250 | 657 | 907 |
| Orlando | 781 | 464 | 1,245 |
| Otay Mesa | 281 | 1,274 | 1,555 |
| Otero | 6 | 407 | 413 |
| Pearsall | 444 | 3,775 | 4,219 |
| Philadelphia | 626 | 294 | 920 |
| Phoenix | 1,443 | 21 | 1,464 |
| Port Isabel | 36 | 1,242 | 1,278 |
| Portland | 265 | 60 | 325 |
| Saipan | 0 | 0 | 0 |
| Salt Lake City | 331 | 211 | 542 |
| San Antonio | 5,723 | 1,757 | 7,480 |
| San Diego | 1,635 | 279 | 1,914 |
| San Francisco | 1,436 | 2,375 | 3,811 |
| San Juan | 57 | 9 | 66 |
| Seattle | 376 | 3 | 379 |
| Stewart | 926 | 0 | 926 |
| Tacoma | 1,249 | 1 | 1,250 |
| Tucson | 181 | 2 | 183 |
| Ulster | 64 | 32 | 96 |
| Varick | 123 | 505 | 628 |
| York | 1,093 | 329 | 1,422 |
| **Total** | **68,949** | **46,584** | **115,533** |

DOJIFR00652

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

## I-862 ICCS BY COUNTRY OF NATIONALITY

EOIR IJs hear cases from many different nationalities each year.

**Figure 11.** About 75 percent of I-862 ICCs in FY 2017 were cases of nationals from Mexico, Guatemala, Honduras, or El Salvador.

**Table 8.** In the last five years, Mexico, Guatemala, Honduras, El Salvador, China, Ecuador, Dominican Republic, Cuba, and India were nine of the top ten countries of nationality.

### Figure 11. I-862 ICCs by Nationality



| | Initial Case Completions |
|---|---|
| Mexico | 47,309 |
| Guatemala | 25,016 |
| Honduras | 20,834 |
| El Salvador | 19,633 |
| Other | 36,789 |

### Table 8. I-862 ICCs by Top 25 Countries of Nationality

| Rank | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 |
|---|---|---|---|---|---|
| 1 | Mexico | Mexico | Mexico | Mexico | Mexico |
| 2 | Guatemala | Guatemala | Honduras | Guatemala | Guatemala |
| 3 | El Salvador | Honduras | Guatemala | Honduras | Honduras |
| 4 | Honduras | El Salvador | El Salvador | El Salvador | El Salvador |
| 5 | China | China | China | China | China |
| 6 | Cuba | Cuba | Ecuador | Ecuador | Haiti |
| 7 | Dominican Republic | Dominican Republic | Dominican Republic | Dominican Republic | Ecuador |
| 8 | Jamaica | Ecuador | India | Cuba | Dominican Republic |
| 9 | Ecuador | India | Cuba | India | Cuba |
| 10 | India | Jamaica | Jamaica | Jamaica | India |
| 11 | Colombia | Colombia | Haiti | Colombia | Brazil |
| 12 | Philippines | Haiti | Colombia | Haiti | Jamaica |
| 13 | Haiti | Philippines | Peru | Brazil | Colombia |
| 14 | Brazil | Peru | Philippines | Somalia | Nicaragua |
| 15 | Peru | Nicaragua | Nicaragua | Nicaragua | Romania |
| 16 | Nicaragua | Brazil | Brazil | Peru | Peru |
| 17 | Nigeria | Nepal | Somalia | Ghana | Philippines |
| 18 | Russia | Nigeria | Nigeria | Philippines | Nepal |
| 19 | Nepal | Ethiopia | Ethiopia | Nigeria | Pakistan |
| 20 | Pakistan | Russia | Nepal | Pakistan | Ghana |
| 21 | Ethiopia | Egypt | Bangladesh | Nepal | Nigeria |
| 22 | Kenya | Pakistan | Pakistan | Bangladesh | Eritrea |
| 23 | Canada | Vietnam | Ghana | Canada | Venezuela |
| 24 | Vietnam | Kenya | Vietnam | Romania | Canada |
| 25 | Egypt | Canada | Canada | Egypt | Cameroon |

U.S. DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

## I-862 ICCs by Language

In parallel to the many nationalities that come before IJs, there are similarly hundreds of languages in which hearings are conducted. EOIR provides interpretation services for all aliens in proceedings as appropriate.

**Figure 12.** About 85 percent of I-862 ICCs in FY 2017 were cases of Spanish- or English-speaking aliens.

**Table 9.** In the last five years, seven of the top ten languages were Spanish, English, Mandarin, Creole, Punjabi, Arabic, or Russian.

**Figure 12. I-862 ICCs by Language**



| | Initial Case Completions |
|---|---|
| ■ Spanish | 111,321 |
| ■ English | 16,383 |
| ■ Mandarin | 4,486 |
| □ Other | 17,391 |

**Table 9. I-862 ICCs by Top 25 Languages**

| Rank | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 |
|---|---|---|---|---|---|
| 1 | Spanish | Spanish | Spanish | Spanish | Spanish |
| 2 | English | English | English | English | English |
| 3 | Mandarin | Mandarin | Mandarin | Mandarin | Mandarin |
| 4 | Unknown Language | Unknown Language | Unknown Language | Unknown Language | Creole |
| 5 | Russian | Russian | Arabic | Arabic | Unknown Language |
| 6 | Arabic | Arabic | Russian | Punjabi | Punjabi |
| 7 | Punjabi | Punjabi | Punjabi | Russian | Portuguese |
| 8 | Creole | Creole | Creole | Portuguese | Arabic |
| 9 | Portuguese | French | Somali | Mam | Russian |
| 10 | French | Portuguese | French | Creole | Mam |
| 11 | Korean | Korean | Portuguese | Somali | French |
| 12 | Foo Chow | Nepali | Quiche | Quiche | Quiche |
| 13 | Nepali | Somali | Nepali | French | Nepali |
| 14 | Amharic | Foo Chow | Bengali | Nepali | Tigrigna - Eritrean |
| 15 | Tagalog | Amharic | Mam | Foo Chow | Romanian-Moldovan |
| 16 | Romanian-Moldovan | Vietnamese | Foo chow | Bengali | Konjobal |
| 17 | Vietnamese | Gujarati | Korean | Amharic | Somali |
| 18 | Gujarati | Quiche | Amharic | Korean | Bengali |
| 19 | Tigrigna - Eritrean | Mam | Vietnamese | Tigrigna - Eritrean | Urdu |
| 20 | Urdu | Tagalog | Tigrigna - Eritrean | Konjobal | Foo Chow |
| 21 | Indonesian | Urdu | Gujarati | Romanian-Moldovan | Korean |
| 22 | Armenian | Albanian | Albanian | Urdu | Albanian |
| 23 | Somali | Armenian | Konjobal | Albanian | Amharic |
| 24 | Albanian | Indonesian | Tagalog | Vietnamese | Vietnamese |
| 25 | Tamil | Tigrigna - Eritrean | Urdu | Armenian | Gujarati |

U.S. DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

## I-862 ICCs FOR DETAINED CASES

Detention locations include DHS Service Processing Centers (SPC), DHS contract detention facilities, state and local government jails, and Bureau of Prisons institutions. For the purpose of Figure 13, Institutional Hearing Program (IHP) cases are considered detained cases as are cases of unaccompanied alien children (UAC) in the custody of the Department of Health and Human Services.

**Figure 13.** Detained I-862 ICCs increased 36 percent from FY 2016 to FY 2017.



**Figure 13. I-862 ICCs by Detention Status**

|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Initial Case Completions for Detained Aliens | 58,813 | 51,145 | 40,358 | 39,912 | 54,098 |
| Initial Case Completions for All Aliens | 137,329 | 124,649 | 127,452 | 128,201 | 149,581 |
| Percent Detained | 43% | 41% | 32% | 31% | 36% |

**Figure 14.** The number of standard detained completions – aliens at least 18 years of age that are not at an IHP location, are not UAC or in HHS custody, and are not considered to have competency concerns or to be subject to the *Franco* litigation – have increased 39 percent from FY 2016 to FY 2017.



**Figure 14. I-862 Standard Detained ICCs**

|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Completions | 49,121 | 42,605 | 32,104 | 30,749 | 42,881 |

DOJIFR00655

U.S. DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

## Table 10. FY 2017 I-862 Detained ICCs

| Immigration Court | Completions |
|---|---|
| Adelanto | 1,848 |
| Arlington | 1,132 |
| Atlanta | 2,072 |
| Aurora | 1,001 |
| Baltimore | 423 |
| Batavia | 539 |
| Bloomington | 735 |
| Boston | 804 |
| Buffalo | 0 |
| Charlotte | 8 |
| Chicago | 1,734 |
| Cleveland | 547 |
| Dallas | 3,095 |
| Denver | 91 |
| Detroit | 905 |
| El Paso | 113 |
| El Paso SPC | 1,421 |
| Elizabeth | 1,439 |
| Eloy | 2,152 |
| Fishkill | 150 |
| Florence | 921 |
| Harlingen | 62 |
| Hartford | 228 |
| Honolulu | 145 |
| Houston | 46 |
| Houston SPC | 4,513 |
| Imperial | 338 |
| Kansas City | 687 |
| Krome | 2,966 |
| Las Vegas | 1,036 |
| LaSalle | 2,106 |
| Los Angeles (N) | 58 |
| Los Angeles (D) | 1,368 |
| Louisville | 0 |
| Memphis | 26 |
| Miami | 198 |
| New Orleans | 5 |
| New York City | 6 |
| Newark | 2 |
| Oakdale | 1,459 |
| Omaha | 695 |
| Orlando | 729 |
| Otay Mesa | 750 |
| Otero | 1,115 |
| Pearsall | 1,419 |
| Philadelphia | 11 |
| Phoenix | 69 |
| Port Isabel | 1,158 |
| Portland | 5 |
| Saipan | 3 |
| Salt Lake City | 179 |
| San Antonio | 464 |
| San Diego | 29 |
| San Francisco | 1,491 |
| San Juan | 26 |
| Seattle | 0 |
| Stewart | 4,143 |
| Tacoma | 2,276 |
| Tucson | 379 |
| Ulster | 199 |
| Varick | 876 |
| York | 1,703 |
| **Total** | **54,098** |

**U.S. Department of Justice**
Executive Office for
Immigration Review

## I-862 Institutional Hearing Program Cases Received and Completed

IHP is a cooperative effort between EOIR, DHS, and various federal, state, and municipal corrections agencies. IJs and court staff either travel to IHP facilities to conduct IHP hearings, or the IJs conduct the hearings by video teleconferencing.

**Figure 15.** New IHP case receipts declined in FY 2017.

**Figure 15. I-862 IHP Receipts and ICCs**



| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ New NTAs | 4,048 | 3,916 | 2,914 | 3,568 | 2,581 |
| ■ Initial Case Completions | 3,385 | 3,191 | 2,714 | 2,973 | 2,463 |

### Table 11. I-862 IHP ICCs by Decision

| Disposition | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Removal | 3,277 | 3,075 | 2,573 | 2,726 | 2,333 |
| Voluntary Departure | 2 | 3 | 7 | 28 | 10 |
| Termination | 80 | 86 | 91 | 94 | 53 |
| Relief | 23 | 27 | 39 | 117 | 63 |
| Other | 3 | 0 | 4 | 8 | 4 |
| **Total Completions** | **3,385** | **3,191** | **2,714** | **2,973** | **2,463** |

DOJIFR00657

## I-862 ICCs WITH APPLICATIONS FOR RELIEF

**Figure 16.** The percent of completed I-862 cases with applications for relief has been roughly constant over the past five years.

**Figure 16. I-862 ICCs by Application Filling Status**



| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| With Applications | 50,834 | 44,974 | 40,789 | 45,094 | 56,035 |
| Without Applications | 86,495 | 79,675 | 86,663 | 83,107 | 93,546 |
| Total | 137,329 | 124,649 | 127,452 | 128,201 | 149,581 |

U.S. DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

## Table 12. FY 2017 I-862 ICCs with Applications for Relief

| Immigration Court | Initial Case Completions | Number of Completions with Applications | Percent with Applications |
|---|---|---|---|
| Adelanto | 1,873 | 837 | 45% |
| Arlington | 4,628 | 1,644 | 36% |
| Atlanta | 4,873 | 1,050 | 22% |
| Aurora | 1,013 | 320 | 32% |
| Baltimore | 3,066 | 981 | 32% |
| Batavia | 562 | 178 | 32% |
| Bloomington | 1,358 | 490 | 36% |
| Boston | 2,882 | 1,496 | 52% |
| Buffalo | 497 | 208 | 42% |
| Charlotte | 3,731 | 675 | 18% |
| Chicago | 4,688 | 1,530 | 33% |
| Cleveland | 1,522 | 535 | 35% |
| Dallas | 6,574 | 1,243 | 19% |
| Denver | 1,336 | 491 | 37% |
| Detroit | 1,629 | 664 | 41% |
| El Paso | 1,214 | 287 | 24% |
| El Paso SPC | 1,421 | 208 | 15% |
| Elizabeth | 1,441 | 698 | 48% |
| Eloy | 2,174 | 526 | 24% |
| Fishkill | 150 | 32 | 21% |
| Florence | 924 | 224 | 24% |
| Harlingen | 1,794 | 540 | 30% |
| Hartford | 898 | 394 | 44% |
| Honolulu | 485 | 315 | 65% |
| Houston | 6,776 | 2,735 | 40% |
| Houston SPC | 4,513 | 991 | 22% |
| Imperial | 519 | 190 | 37% |
| Kansas City | 1,796 | 529 | 29% |
| Krome | 3,002 | 1,283 | 43% |
| Las Vegas | 2,338 | 1,054 | 45% |
| LaSalle | 2,111 | 346 | 16% |
| Los Angeles (N) | 9,761 | 4,663 | 48% |
| Los Angeles (D) | 1,372 | 511 | 37% |
| Louisville | 751 | 48 | 6% |
| Memphis | 3,267 | 1,069 | 33% |
| Miami | 6,814 | 2,531 | 37% |
| New Orleans | 2,496 | 337 | 14% |
| New York City | 11,445 | 7,622 | 67% |
| Newark | 2,801 | 1,064 | 38% |
| Oakdale | 1,460 | 265 | 18% |
| Omaha | 1,697 | 640 | 38% |
| Orlando | 3,780 | 1,815 | 48% |
| Otay Mesa | 764 | 281 | 37% |
| Otero | 1,116 | 298 | 27% |
| Pearsall | 1,420 | 436 | 31% |
| Philadelphia | 1,653 | 680 | 41% |
| Phoenix | 2,093 | 1,040 | 50% |
| Port Isabel | 1,160 | 602 | 52% |
| Portland | 530 | 347 | 65% |
| Saipan | 18 | 2 | 11% |
| Salt Lake City | 991 | 477 | 48% |
| San Antonio | 3,157 | 890 | 28% |
| San Diego | 1,432 | 451 | 31% |
| San Francisco | 6,267 | 3,199 | 51% |
| San Juan | 105 | 42 | 40% |
| Seattle | 1,540 | 970 | 63% |
| Stewart | 4,153 | 710 | 17% |
| Tacoma | 2,278 | 959 | 42% |
| Tucson | 672 | 233 | 35% |
| Ulster | 199 | 66 | 33% |
| Varick | 892 | 457 | 51% |
| York | 1,709 | 636 | 37% |
| **Total** | **149,581** | **56,035** | **37%** |

| Key |
|---|
| >50% of completions had applications |
| <15% of completions had applications |

DOJ Executive Office for Immigration Review (EOIR)

DOJIFR00659

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

## ASYLUM CASES RECEIVED AND COMPLETED

There are two types of asylum processes – defensive and affirmative. The defensive asylum process applies to aliens who appear before EOIR and who request asylum before an IJ. The affirmative asylum process applies to aliens who initially file an asylum application with USCIS and, subsequently, have that application referred by USCIS to EOIR.

**Figure 17.** Defensive asylum receipts have increased significantly (423 percent) from FY 2013 to FY 2017. In the same period, affirmative asylum receipts have increased 12 percent.



**Figure 17. Asylum Receipts**

|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Affirmative | 19,931 | 16,267 | 17,339 | 12,753 | 22,252 |
| Defensive | 23,101 | 30,876 | 45,884 | 68,980 | 120,709 |
| Total | 43,032 | 47,143 | 63,223 | 81,733 | 142,961 |

**Figure 18.** Asylum receipts increased 232 percent from FY 2013 to FY 2017; completions increased by 51 percent over the same period.



**Figure 18. Asylum Receipts and ICCs**

|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Receipts | 43,032 | 47,143 | 63,223 | 81,733 | 142,961 |
| Completions | 28,623 | 27,788 | 27,699 | 33,116 | 43,137 |

DOJIFR00660

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

## Table 13. Asylum ICCs by Court for FY 2017

| Immigration Court | Completions |
|---|---|
| Adelanto | 738 |
| Arlington | 1,377 |
| Atlanta | 756 |
| Aurora | 225 |
| Baltimore | 831 |
| Batavia | 145 |
| Bloomington | 354 |
| Boston | 861 |
| Buffalo | 71 |
| Charlotte | 464 |
| Chicago | 955 |
| Cleveland | 409 |
| Dallas | 793 |
| Denver | 329 |
| Detroit | 365 |
| El Paso | 91 |
| El Paso SPC | 150 |
| Elizabeth | 531 |
| Eloy | 354 |
| Fishkill | 5 |
| Florence | 170 |
| Harlingen | 364 |
| Hartford | 316 |
| Honolulu | 289 |
| Houston | 2,493 |
| Houston SPC | 546 |
| Imperial | 143 |
| Kansas City | 352 |
| Krome | 1,011 |
| Las Vegas | 726 |
| LaSalle | 202 |
| Los Angeles (N) | 3,697 |
| Los Angeles (D) | 424 |
| Louisville | 31 |
| Memphis | 749 |
| Miami | 1,740 |
| New Orleans | 231 |
| New York City | 7,108 |
| Newark | 759 |
| Oakdale | 178 |
| Omaha | 434 |
| Orlando | 1,451 |
| Otay Mesa | 232 |
| Otero | 277 |
| Pearsall | 336 |
| Philadelphia | 500 |
| Phoenix | 603 |
| Port Isabel | 477 |
| Portland | 304 |
| Saipan | 0 |
| Salt Lake City | 286 |
| San Antonio | 808 |
| San Diego | 382 |
| San Francisco | 2,643 |
| San Juan | 10 |
| Seattle | 887 |
| Stewart | 541 |
| Tacoma | 776 |
| Tucson | 156 |
| Ulster | 13 |
| Varick | 235 |
| York | 453 |
| **Total** | **43,137** |

DOJIFR00661

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

## ASYLUM CASES COMPLETED BY DECISION

An asylum application also generally serves as an application for withholding of removal under section 241(b)(3) of the Immigration and Nationality Act (INA). As such, EOIR reports on these two forms of relief from removal contemporaneously. Grant rates are calculated as percentages of all completed cases of the given type.

**Figure 19.** In the past five years, asylum grants have increased by about nine percent.

### Figure 19. Asylum ICCs by Decision

|       | FY 13  | FY 14 | FY 15  | FY 16  | FY 17  |
|-------|--------|-------|--------|--------|--------|
| Grants | 9,753  | 8,638 | 8,170  | 8,730  | 10,654 |
| Denials | 8,665 | 9,152 | 8,752  | 11,695 | 17,677 |
| Other  | 10,193 | 9,996 | 10,775 | 12,690 | 14,805 |

**Figure 20.** The defensive grant rate is consistently lower than that of affirmative asylum applications. Similarly, the defensive denial rate is significantly higher than the affirmative asylum denial rate.

### Figure 20. Affirmative and Defensive Asylum ICCs by Decision



Legend: Affirmative Grants, Defensive Grants, Affirmative Denials, Defensive Denials, Affirmative Other Closures, Defensive Other Closures

DOJIFR00662

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

**Figure 21.** Administrative closures of asylum cases decreased by about 48 percent from FY 2016 to FY 2017.

### Figure 21. Administrative Closures of Asylum Cases



|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ Total | 7,568 | 7,335 | 12,215 | 18,630 | 9,626 |

**Figure 22.** The grant rate for either asylum or withholding of removal has decreased about 30 percent in the last five years.

### Figure 22. Asylum and Withholding of Removal ICCs by Decision



|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ Asylum Grants | 9,753 | 8,638 | 8,170 | 8,730 | 10,654 |
| ■ Withholding of Removal Grants | 1,624 | 1,436 | 1,138 | 1,049 | 1,265 |
| Denials of Asylum and/or Withholding of Removal | 7,298 | 7,925 | 7,713 | 10,728 | 16,197 |

**Figure 23.** The withholding of removal grant rate has decreased about 48 percent from FY 2013 to FY 2017.

### Figure 23. Withholding of Removal ICCs by Decision



|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ Grants | 1,624 | 1,436 | 1,138 | 1,049 | 1,265 |
| ■ Denials | 9,237 | 9,529 | 8,950 | 12,013 | 17,684 |
| Others | 12,810 | 11,677 | 11,818 | 13,369 | 17,040 |

DOJIFR00663

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

## Table 14. Asylum Decision Rate by Immigration Court

| Immigration Court | Grants | | Denials | | Other Closures | | Administrative Closure | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Number | Rate | Number | Rate | Number | Rate | Number | Rate | |
| Adelanto | 98 | 13% | 498 | 67% | 142 | 19% | 0 | 0% | 738 |
| Arlington | 424 | 22% | 411 | 21% | 542 | 28% | 557 | 29% | 1,934 |
| Atlanta | 23 | 3% | 481 | 59% | 252 | 31% | 55 | 7% | 811 |
| Aurora | 29 | 13% | 147 | 65% | 49 | 22% | 1 | 0% | 226 |
| Baltimore | 355 | 36% | 221 | 22% | 255 | 26% | 166 | 17% | 997 |
| Batavia | 30 | 21% | 83 | 57% | 32 | 22% | 1 | 1% | 146 |
| Bloomington | 53 | 13% | 184 | 46% | 117 | 29% | 50 | 12% | 404 |
| Boston | 332 | 30% | 194 | 18% | 335 | 31% | 235 | 21% | 1,096 |
| Buffalo | 17 | 18% | 30 | 31% | 24 | 25% | 25 | 26% | 96 |
| Charlotte | 32 | 7% | 289 | 59% | 143 | 29% | 22 | 5% | 486 |
| Chicago | 336 | 29% | 294 | 26% | 325 | 28% | 192 | 17% | 1,147 |
| Cleveland | 39 | 7% | 175 | 33% | 195 | 37% | 114 | 22% | 523 |
| Dallas | 74 | 9% | 511 | 62% | 208 | 25% | 34 | 4% | 827 |
| Denver | 97 | 20% | 95 | 20% | 137 | 28% | 157 | 32% | 486 |
| Detroit | 46 | 11% | 184 | 43% | 135 | 32% | 58 | 14% | 423 |
| El Paso | 3 | 2% | 43 | 25% | 45 | 26% | 80 | 47% | 171 |
| El Paso SPC | 4 | 3% | 88 | 59% | 58 | 39% | 0 | 0% | 150 |
| Elizabeth | 199 | 37% | 238 | 45% | 94 | 18% | 0 | 0% | 531 |
| Eloy | 8 | 2% | 186 | 53% | 160 | 45% | 0 | 0% | 354 |
| Fishkill | 0 | 0% | 4 | 80% | 1 | 20% | 0 | 0% | 5 |
| Florence | 4 | 2% | 77 | 45% | 89 | 52% | 0 | 0% | 170 |
| Harlingen | 7 | 2% | 52 | 14% | 305 | 82% | 6 | 2% | 370 |
| Hartford | 96 | 24% | 110 | 28% | 110 | 28% | 84 | 21% | 400 |
| Honolulu | 214 | 73% | 53 | 18% | 22 | 8% | 3 | 1% | 292 |
| Houston | 205 | 8% | 1,736 | 68% | 552 | 22% | 43 | 2% | 2,536 |
| Houston SPC | 39 | 7% | 350 | 64% | 157 | 29% | 1 | 0% | 547 |
| Imperial | 24 | 16% | 79 | 54% | 40 | 27% | 4 | 3% | 147 |
| Kansas City | 59 | 13% | 176 | 39% | 117 | 26% | 105 | 23% | 457 |
| Krome | 55 | 5% | 553 | 55% | 403 | 40% | 2 | 0% | 1,013 |
| Las Vegas | 39 | 4% | 462 | 48% | 225 | 24% | 228 | 24% | 954 |
| LaSalle | 7 | 3% | 147 | 72% | 48 | 24% | 1 | 0% | 203 |
| Los Angeles (N) | 379 | 6% | 1,082 | 18% | 2,236 | 38% | 2,244 | 38% | 5,941 |
| Los Angeles (D) | 34 | 8% | 303 | 71% | 87 | 21% | 0 | 0% | 424 |
| Louisville | 0 | 0% | 4 | 7% | 27 | 47% | 27 | 47% | 58 |
| Memphis | 133 | 16% | 465 | 54% | 151 | 18% | 109 | 13% | 858 |
| Miami | 269 | 13% | 923 | 45% | 548 | 27% | 311 | 15% | 2,051 |
| New Orleans | 24 | 7% | 112 | 30% | 95 | 26% | 137 | 37% | 368 |
| New York City | 3,915 | 41% | 1,000 | 10% | 2,193 | 23% | 2,541 | 26% | 9,649 |
| Newark | 174 | 18% | 98 | 10% | 487 | 51% | 191 | 20% | 950 |
| Oakdale | 22 | 12% | 117 | 66% | 39 | 22% | 0 | 0% | 178 |
| Omaha | 34 | 6% | 187 | 35% | 213 | 40% | 95 | 18% | 529 |
| Orlando | 186 | 11% | 846 | 52% | 419 | 26% | 190 | 12% | 1,641 |
| Otay Mesa | 44 | 19% | 143 | 61% | 45 | 19% | 2 | 1% | 234 |
| Otero | 39 | 14% | 193 | 70% | 45 | 16% | 0 | 0% | 277 |
| Pearsall | 70 | 21% | 211 | 63% | 55 | 16% | 0 | 0% | 336 |
| Philadelphia | 178 | 29% | 129 | 21% | 193 | 32% | 104 | 17% | 604 |
| Phoenix | 71 | 7% | 42 | 4% | 490 | 50% | 370 | 38% | 973 |
| Port Isabel | 39 | 8% | 371 | 78% | 67 | 14% | 0 | 0% | 477 |
| Portland | 100 | 28% | 113 | 31% | 91 | 25% | 57 | 16% | 361 |
| Saipan | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 |
| Salt Lake City | 39 | 12% | 155 | 46% | 91 | 27% | 50 | 15% | 335 |
| San Antonio | 126 | 14% | 468 | 52% | 214 | 24% | 87 | 10% | 895 |
| San Diego | 62 | 13% | 183 | 40% | 137 | 30% | 78 | 17% | 460 |
| San Francisco | 1,300 | 39% | 437 | 13% | 906 | 27% | 670 | 20% | 3,313 |
| San Juan | 5 | 45% | 2 | 18% | 3 | 27% | 1 | 9% | 11 |
| Seattle | 201 | 20% | 496 | 49% | 190 | 19% | 121 | 12% | 1,008 |
| Stewart | 13 | 2% | 441 | 81% | 87 | 16% | 2 | 0% | 543 |
| Tacoma | 130 | 17% | 461 | 59% | 185 | 24% | 1 | 0% | 777 |
| Tucson | 17 | 10% | 120 | 71% | 19 | 11% | 12 | 7% | 168 |
| Ulster | 0 | 0% | 6 | 43% | 7 | 50% | 1 | 7% | 14 |
| Varick | 33 | 14% | 124 | 53% | 78 | 33% | 0 | 0% | 235 |
| York | 69 | 15% | 294 | 65% | 90 | 20% | 1 | 0% | 454 |
| **Total** | **10,654** | **20%** | **17,677** | **34%** | **14,805** | **28%** | **9,626** | **18%** | **52,762** |

U.S. DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

## ASYLUM GRANTS BY COUNTRY OF NATIONALITY

**Figure 24.** In FY 2017, the top four nationalities accounted for 57 percent of asylum grants. China alone accounted for 26 percent of all asylum grants.

**Table 15.** For each of the five years, six of the top 10 countries from which aliens were granted asylum were China, El Salvador, Guatemala, India, Nepal, and Ethiopia.

**Figure 24. Asylum Grants by Country of Nationality**



| | Asylum Grants |
|---|---|
| ■ China | 2,794 |
| ■ El Salvador | 1,355 |
| ■ Honduras | 955 |
| ■ Guatemala | 951 |
| ■ Other | 4,599 |

### Table 15. Asylum Grants by Top 25 Countries of Nationality

| Rank | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 |
|---|---|---|---|---|---|
| 1 | China | China | China | China | China |
| 2 | Nepal | India | Guatemala | El Salvador | El Salvador |
| 3 | Ethiopia | Ethiopia | Honduras | Guatemala | Honduras |
| 4 | India | Nepal | India | Honduras | Guatemala |
| 5 | Egypt | Egypt | El Salvador | Mexico | Mexico |
| 6 | Soviet Union | El Salvador | Nepal | India | India |
| 7 | Eritrea | Guatemala | Ethiopia | Nepal | Nepal |
| 8 | Russia | Eritrea | Mexico | Ethiopia | Eritrea |
| 9 | El Salvador | Soviet Union | Somalia | Somalia | Cameroon |
| 10 | Guatemala | Honduras | Soviet Union | Eritrea | Ethiopia |
| 11 | Mexico | Somalia | Egypt | Egypt | Syria |
| 12 | Cameroon | Russia | Eritrea | Soviet Union | Egypt |
| 13 | Pakistan | Cameroon | Russia | Cameroon | Bangladesh |
| 14 | Sri Lanka | Mexico | Syria | Bangladesh | Soviet Union |
| 15 | Guinea | Pakistan | Bangladesh | Albania | Albania |
| 16 | Honduras | Venezuela | Cameroon | Russia | Pakistan |
| 17 | Somalia | Iraq | Nigeria | Syria | Haiti |
| 18 | Mali | Gambia | Albania | Burkina Faso | Somalia |
| 19 | Moldavia (Moldova) | Sri Lanka | Haiti | Pakistan | Guinea |
| 20 | Venezuela | Moldavia (Moldova) | Colombia | Nigeria | Ecuador |
| 21 | Indonesia | Colombia | Gambia | Ghana | Burkina Faso |
| 22 | Colombia | Syria | Pakistan | Iran | Ghana |
| 23 | Gambia | Albania | Iraq | Kirghizia (Kyrgyzstan) | Ukraine |
| 24 | Bangladesh | Burkina Faso | Burkina Faso | Guinea | Nigeria |
| 25 | Burkina Faso | Nigeria | Kirghizia (Kyrgyzstan) | Ukraine | Venezuela |

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

## CONVENTION AGAINST TORTURE

In 1999, the Department of Justice implemented regulations regarding the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Convention Against Torture or CAT). There are two forms of protection under the Convention Against Torture, withholding of removal and deferral of removal.

### Table 16. Convention Against Torture Cases by Decision

| Granted | | | Denied | Other | Withdrawn | Abandoned | Not Adjudicated | Total |
|---|---|---|---|---|---|---|---|---|
| Withholding | Deferral | Total | | | | | | |
| 760 | 175 | 935 | 17,061 | 25,249 | 6,455 | 2,044 | 14 | 51,758 |

30

## Table 17. Convention Against Torture Completions by Court

| Immigration Court | Completions |
|---|---|
| Adelanto | 1,588 |
| Arlington | 2,269 |
| Atlanta | 883 |
| Aurora | 352 |
| Baltimore | 821 |
| Batavia | 203 |
| Bloomington | 405 |
| Boston | 733 |
| Buffalo | 163 |
| Charlotte | 579 |
| Chicago | 969 |
| Cleveland | 503 |
| Dallas | 825 |
| Denver | 460 |
| Detroit | 614 |
| El Paso | 200 |
| El Paso SPC | 198 |
| Elizabeth | 717 |
| Eloy | 806 |
| Fishkill | 33 |
| Florence | 517 |
| Harlingen | 311 |
| Hartford | 378 |
| Honolulu | 190 |
| Houston | 2,094 |
| Houston SPC | 856 |
| Imperial | 758 |
| Kansas City | 467 |
| Krome | 1,145 |
| Las Vegas | 973 |
| LaSalle | 247 |
| Los Angeles (N) | 3,699 |
| Los Angeles (D) | 665 |
| Louisville | 84 |
| Memphis | 786 |
| Miami | 2,219 |
| New Orleans | 354 |
| New York City | 5,915 |
| Newark | 791 |
| Oakdale | 215 |
| Omaha | 245 |
| Orlando | 1,863 |
| Otay Mesa | 846 |
| Otero | 321 |
| Pearsall | 539 |
| Philadelphia | 582 |
| Phoenix | 393 |
| Port Isabel | 603 |
| Portland | 426 |
| Saipan | 5 |
| Salt Lake City | 352 |
| San Antonio | 1,213 |
| San Diego | 645 |
| San Francisco | 3,541 |
| San Juan | 9 |
| Seattle | 1,002 |
| Stewart | 639 |
| Tacoma | 1,100 |
| Tucson | 116 |
| Ulster | 77 |
| Varick | 589 |
| York | 667 |
| **Total** | **51,758** |

DOJIFR00667

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

## I-862 APPLICATIONS FOR RELIEF OTHER THAN ASYLUM

In addition to asylum, there is a variety of types of relief from removal available to aliens in immigration proceedings. These include, but are not limited to, different forms of cancellation of removal, adjustment of status, and different types of waivers.

### Table 18. I-862 Cases Grants of Relief

| Fiscal Year | Relief Granted to Lawful Permanent Residents (LPR) | | Relief Granted to Non-LPR | | | | |
|---|---|---|---|---|---|---|---|
| | Relief Granted Under Section 212(c) | Cancellation of Removal | Not Subject to Annual Cap of 4,000 Grants | | | Subject to Annual Cap of 4,000 Grants | |
| | | | Adjustment of Status to LPR | Suspension of Deportation | Cancellation of Removal | Suspension of Deportation | Cancellation of Removal |
| FY 13 | 667 | 3,874 | 5,033 | 71 | 325 | 0 | 4,031 |
| FY 14 | 551 | 3,220 | 3,281 | 69 | 275 | 2 | 3,847 |
| FY 15 | 439 | 2,592 | 2,198 | 53 | 279 | 2 | 3,827 |
| FY 16 | 385 | 2,239 | 1,854 | 31 | 247 | 1 | 3,735 |
| FY 17 | 401 | 2,202 | 1,860 | 54 | 304 | 0 | 3,716 |

DOJIFR00668

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

## I-862 *IN ABSENTIA* ORDERS

When an alien fails to appear for a hearing, the IJ may conduct a hearing in the alien's absence (*in absentia*). The *in absentia* rate refers to the proportion of all IJ decisions at the ICC where the removal order is issued *in absentia*.

**Figure 25.** From FY 2016 to FY 2017, the overall I-862 *in absentia* rate increased by about eight percent. In the same period, the never detained *in absentia* rate increased 18 percent. The released rate increased 13 percent.

### Figure 25. I-862 *In Absentia* Rates



### Table 19. I-862 *In Absentia* Orders and ICCs by Respondent Type

| FY | Decision Subset | All Cases | Never Detained Cases | Released Cases | UAC Cases | Asylum Cases |
|---|---|---|---|---|---|---|
| FY 13 | In Absentia Orders | 18,747 | 10,394 | 8,278 | 836 | 1,742 |
| | Initial Case Completion | 136,761 | 51,152 | 26,798 | 2,565 | 28,459 |
| FY 14 | In Absentia Orders | 23,440 | 13,676 | 9,662 | 1,882 | 1,748 |
| | Initial Case Completion | 124,238 | 46,874 | 26,223 | 3,576 | 27,584 |
| FY 15 | In Absentia Orders | 35,166 | 24,646 | 10,464 | 6,481 | 1,847 |
| | Initial Case Completion | 127,350 | 59,550 | 27,442 | 13,435 | 27,644 |
| FY 16 | In Absentia Orders | 32,755 | 23,437 | 9,254 | 6,191 | 3,017 |
| | Initial Case Completion | 128,145 | 62,852 | 25,380 | 15,095 | 33,082 |
| FY 17 | In Absentia Orders | 41,384 | 30,010 | 11,292 | 6,759 | 4,776 |
| | Initial Case Completion | 149,436 | 67,966 | 27,376 | 13,872 | 43,013 |

DOJIFR00670

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

## IMMIGRATION JUDGE HIRING

To better manage its caseload, EOIR focused on increased hiring of immigration judges in FY 2017.

**Figure 26.** The number of IJs on board increased 17 percent in FY 2017.

**Figure 26. Immigration Judge Hiring**



| | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 |
|---|---|---|---|---|---|---|---|---|
| ▬ Total IJs Hired | 17 | 39 | 4 | 8 | 0 | 20 | 56 | 64 |
| ― Total IJs on Board | 245 | 273 | 267 | 262 | 249 | 254 | 289 | 338 |

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 207 of 1770

U.S. DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

## BOARD OF IMMIGRATION APPEALS

### TOTAL CASES RECEIVED AND COMPLETED

The majority of cases BIA reviews arise from decisions IJs make in removal, deportation, or exclusion cases. A full list of case types heard by BIA originating from OCIJ is below. For purposes of this Statistics Yearbook, these types of cases are collectively referred to as appeals from IJ decisions.

- Case appeals from the decisions of IJs in removal, deportation, and exclusion cases at the court level;
- Appeals filed from the decisions of IJs on motions to reopen;
- Motions to reopen and/or reconsider filed in cases already decided by the BIA;
- Appeals pertaining to bond, parole, or detention;
- Interlocutory appeals; and
- Cases (or appeals) remanded from the Federal Court.

The BIA also has jurisdiction to review appeals arising from certain decisions that DHS officials render. These types of appeals are listed below. For purposes of this Statistics Yearbook, appeals from these DHS decisions are referred to as DHS decision appeals.

- Family-based visa petitions adjudicated by DHS district directors or regional service center directors;
- Waivers of inadmissibility for non-immigrants under INA § 212(d)(3)(A)(ii); and
- Fines and penalties imposed upon carriers for violations of immigration laws.

**Figure 27.** In FY 2017 completions decreased slightly while receipts increased slightly.

**Figure 27. Total BIA Cases Received and Completed**



| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ Receipts | 34,808 | 29,750 | 29,346 | 30,221 | 33,503 |
| ■ Completions | 36,688 | 30,822 | 34,243 | 33,241 | 31,820 |

DOJIFR00672

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 208 of 1770

U.S. DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

## CASES RECEIVED AND COMPLETED BY TYPE

BIA has jurisdiction over appeals from IJ decisions and certain DHS decisions. The majority of appeals from IJ decisions are from case appeals, and the majority of appeals from DHS decisions are from visa petitions.

**Figure 31.** Appeals from IJ decisions make up most of the BIA's work. Completions of appeals from IJ decisions increased about three percent in FY 2017. Completions from DHS decisions decreased by about 32 percent.

### Figure 28. BIA Receipts and Completions by Case Type



| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Receipts: Appeals from DHS Decisions | 5,598 | 4,385 | 6,480 | 5,639 | 3,958 |
| Receipts: Appeals from IJ Decisions | 29,210 | 25,365 | 22,866 | 24,582 | 29,545 |
| Receipts: Total Appeals | 34,808 | 29,750 | 29,346 | 30,221 | 33,503 |
| Completions: Appeals from DHS Decisions | 5,411 | 3,293 | 6,641 | 6,767 | 4,586 |
| Completions: Appeals from IJ Decisions | 31,277 | 27,529 | 27,602 | 26,474 | 27,234 |
| Completions: Total Appeals | 36,688 | 30,822 | 34,243 | 33,241 | 31,820 |

### Table 20. BIA Receipts and Completions by Type

| Appeal Type | FY 2013 | | FY 2014 | | FY 2015 | | FY 2016 | | FY 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Receipts | Comp. | Receipts | Comp. | Receipts | Comp. | Receipts | Comp. | Receipts | Comp. |
| **Total Appeals from IJ Decisions** | **29,210** | **31,277** | **25,365** | **27,529** | **22,866** | **27,602** | **24,582** | **26,474** | **29,545** | **27,234** |
| *Case Appeal* | 16,495 | 17,933 | 13,557 | 15,775 | 11,475 | 15,474 | 12,737 | 14,563 | 17,106 | 15,966 |
| *Appeal of IJ Motion to Reopen* | 1,639 | 1,839 | 1,516 | 1,691 | 1,454 | 1,659 | 1,453 | 1,631 | 1,785 | 1,960 |
| *Motion to Reopen/Reconsider-BIA* | 7,692 | 8,603 | 6,691 | 6,394 | 5,908 | 6,427 | 5,639 | 5,586 | 5,898 | 5,000 |
| *Bond Appeal* | 1,816 | 1,700 | 2,091 | 1,990 | 2,253 | 2,220 | 3,002 | 2,805 | 3,621 | 3,124 |
| *Bond MTR* | 28 | 24 | 32 | 35 | 52 | 47 | 57 | 45 | 33 | 43 |
| *Interlocutory Appeal* | 209 | 194 | 163 | 169 | 240 | 216 | 352 | 287 | 433 | 404 |
| *Federal Court Remand* | 1,331 | 984 | 1,314 | 1,474 | 1,484 | 1,559 | 1,341 | 1,556 | 669 | 737 |
| *Continued Detention Review* | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 |
| *Zero Bond Appeal* | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Appeals from DHS Decisions** | **5,598** | **5,411** | **4,385** | **3,293** | **6,480** | **6,641** | **5,639** | **6,767** | **3,958** | **4,586** |
| *Decisions on Visa Petitions* | 5,539 | 5,348 | 4,333 | 3,266 | 6,435 | 6,573 | 5,612 | 6,734 | 3,911 | 4,550 |
| *212(d)(3)(A) Waiver Decisions* | 55 | 60 | 49 | 25 | 45 | 65 | 26 | 33 | 45 | 33 |
| *Decisions on Fines and Penalties* | 4 | 3 | 3 | 2 | 0 | 3 | 1 | 0 | 2 | 3 |
| **Grand Total** | **34,808** | **36,688** | **29,750** | **30,822** | **29,346** | **34,243** | **30,221** | **33,241** | **33,503** | **31,820** |

Case 1:20-cv-00116-EGS    Document 85    Filed 03/27/20    Page 209 of 1770

U.S. DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

## APPEALS FROM IJ DECISIONS COMPLETED BY COUNTRY OF NATIONALITY

BIA hears appeals from IJ decisions involving hundreds of nationalities. Appeals from IJ decisions arise primarily in cases of aliens from Mexico and Central America.

**Figure 29.** Over half of completed appeals from IJ decisions involve an alien from one of three countries.

**Table 21.** For the past five years, nine countries ranked among the top ten: Mexico, El Salvador, Guatemala, Honduras, China, India, Haiti, Jamaica, and Dominican Republic.

**Figure 29. Completed Appeals from IJ Decisions by Nationality**



| | Completions |
|---|---|
| Mexico | 7,737 |
| El Salvador | 3,958 |
| Guatemala | 2,857 |
| Honduras | 2,584 |
| Other | 10,098 |

### Table 21. BIA Appeals from ICCs by Top 25 Countries of Nationality

| Rank | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 |
|---|---|---|---|---|---|
| 1 | Mexico | Mexico | Mexico | Mexico | Mexico |
| 2 | China | China | El Salvador | El Salvador | El Salvador |
| 3 | El Salvador | El Salvador | China | China | Guatemala |
| 4 | Guatemala | Guatemala | Guatemala | Guatemala | Honduras |
| 5 | Honduras | Honduras | Honduras | Honduras | China |
| 6 | India | India | India | India | India |
| 7 | Colombia | Jamaica | Haiti | Haiti | Haiti |
| 8 | Jamaica | Colombia | Jamaica | Jamaica | Jamaica |
| 9 | Indonesia | Haiti | Colombia | Dominican Republic | Dominican Republic |
| 10 | Dominican Republic | Dominican Republic | Dominican Republic | Colombia | Ecuador |
| 11 | Haiti | Brazil | Brazil | Bangladesh | Colombia |
| 12 | Brazil | Indonesia | Nigeria | Ecuador | Bangladesh |
| 13 | Pakistan | Nigeria | Ecuador | Brazil | Brazil |
| 14 | Nigeria | Peru | Philippines | Nigeria | Nigeria |
| 15 | Venezuela | Pakistan | Peru | Philippines | Ghana |
| 16 | Philippines | Ecuador | Indonesia | Peru | Philippines |
| 17 | Ecuador | Philippines | Nicaragua | Indonesia | Pakistan |
| 18 | Peru | Kenya | Bangladesh | Armenia | Somalia |
| 19 | Kenya | Venezuela | Pakistan | Nicaragua | Peru |
| 20 | Nicaragua | Nicaragua | Nepal | Ghana | Nicaragua |
| 21 | Armenia | Ghana | Kenya | Nepal | Venezuela |
| 22 | Nepal | Russia | Armenia | Pakistan | Kenya |
| 23 | Albania | Nepal | Venezuela | Venezuela | Cameroon |
| 24 | Russia | Albania | Russia | Kenya | Cuba |
| 25 | Ghana | Armenia | Ghana | Albania | Nepal |

DOJIFR00674

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

## APPEALS FROM IJ DECISIONS (I-862) COMPLETED BY REPRESENTATION STATUS

**Figure 30.** Representation rate for appeals has remained roughly constant across the past five years, reaching a high of 80 percent of completed appeals from IJ decisions represented in FY 2017.



**Figure 30. Completed Appeals from IJ Decisions (I-862 Cases) by Representation Status**

|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Represented | 24,742 | 20,804 | 21,130 | 20,935 | 21,810 |
| Unrepresented | 6,535 | 6,725 | 6,472 | 5,539 | 5,424 |
| Total | 31,277 | 27,529 | 27,602 | 26,474 | 27,234 |
| % Represented | 79% | 76% | 77% | 79% | 80% |

DOJIFR00675

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 211 of 1770

U.S. DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

## CASE APPEALS FROM IJ DECISION (I-862 ICCs) COMPLETED FOR DETAINED CASES

BIA handles detained cases (including aliens in IHP) as priority cases. For the purposes of Figure 31, figures for detained cases include IHP cases and cases of unaccompanied alien children in the custody of the Department of Health and Human Services.

**Figure 31.** The percent of completed case appeals from ICCs in I-862 detained cases has stayed approximately constant over the past five years, within a five-percentage point spread.

**Figure 31. Complete Case Appeals from I-862 ICCs by Detention Status**



| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ Detained Case Appeal Decisions | 4,589 | 4,796 | 4,398 | 3,577 | 4,243 |
| ■ Total Case Appeal Decisions | 17,933 | 15,775 | 15,474 | 14,563 | 15,966 |
| Percent Detained | 26% | 30% | 28% | 25% | 27% |

**Table 22.** The percent of total detained IHP completions has been consistently between six and seven percent for the past five years.

**Table 22. BIA Detained Completions**

| Fiscal Year | Total Detained Completions | IHP Completions | Percent IHP Completions |
|---|---|---|---|
| FY 13 | 4,589 | 302 | 7% |
| FY 14 | 4,796 | 273 | 6% |
| FY 15 | 4,398 | 280 | 6% |
| FY 16 | 3,577 | 265 | 7% |
| FY 17 | 4,243 | 293 | 7% |

DOJIFR00676

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

## IJ DECISIONS (I-862 ICCS) APPEALED

**Figure 32.** The percentage of ICCs being appealed has fluctuated between nine and 12 percent across the past five fiscal years.

**Figure 32. I-862 ICCs Appealed to BIA**



|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ IJ Decisions | 137,329 | 124,649 | 127,452 | 128,201 | 149,581 |
| ■ Case Appeals Received | 16,495 | 13,557 | 11,475 | 12,737 | 17,106 |
| Percent Appealed | 12% | 11% | 9% | 10% | 11% |

DOJIFR00677

# OFFICE OF THE CHIEF ADMINISTRATIVE HEARING OFFICER

## TOTAL CASES RECEIVED AND COMPLETED

OCAHO is headed by the Chief Administrative Hearing Officer, who is responsible for the general supervision of administrative law judges (ALJs), management of OCAHO and review of ALJ decisions relating to illegal hiring, employment eligibility verification violations and document fraud. OCAHO's ALJs hear cases and adjudicate issues arising under provisions of the INA relating to:

- Knowingly hiring, recruiting or referring for a fee unauthorized aliens, or the continued employment of unauthorized aliens, failure to comply with employment eligibility verification requirements, and/or requiring indemnity bonds from employees in violation of section 274A of the INA (employer sanctions provisions);
- Unfair immigration-related employment practices in violation of section 274B of the INA (anti-discrimination provisions); and
- Immigration-related document fraud in violation of section 274C of the INA (document fraud provisions).

Employer sanctions and document fraud complaints are brought by the U.S. Department of Homeland Security. Anti-discrimination complaints may be brought by the U.S. Department of Justice's Immigrant and Employee Rights Section or private litigants. All final agency decisions may be appealed to the appropriate federal circuit court of appeals.

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

**Figure 33.**
Completions continued to outpace receipts in FY 2017. Note that completions may have been for cases received in a prior fiscal year.

### Figure 33. OCAHO Receipts and Completions



|  | FY 16 | FY 17 |
|---|---|---|
| Receipts | 84 | 74 |
| Completions | 119 | 75 |

**Figure 34.** The bulk of OCAHO's workload is 274A and 274B complaints.

### Figure 34. OCAHO Receipts and Completions by Type

|  | 274A and 274B Complaints | Subpoenas | Requests for Review | Attorney's Fees |
|---|---|---|---|---|
| FY 15 Receipts | 58 | 22 | 5 | 1 |
| FY 15 Completions | 77 | 22 | 5 | 0 |
| FY 16 Receipts | 37 | 21 | 2 | 0 |
| FY 16 Completions | 56 | 21 | 2 | 1 |
| FY 17 Receipts | 58 | 45 | 0 | 0 |
| FY 17 Completions | 62 | 45 | 0 | 0 |

DOJIFR00679

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 215 of 1770

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2017

# FREEDOM OF INFORMATION ACT (FOIA)

## FOIA RECEIPTS

**Figure 35.** Since FY 2013, the number of FOIA requests received by EOIR has increased by about 73 percent.



**Figure 35. FOIA Receipts**

| | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 |
|---|---|---|---|---|---|
| Receipts | 25,336 | 26,614 | 31,513 | 35,500 | 43,859 |



**U.S. Department of Justice**
**Executive Office for Immigration Review**

# Statistics Yearbook
## Fiscal Year 2018

Prepared by the Planning, Analysis, & Statistics Division

**Contact Information**
Office of Policy
Communications and Legislative Affairs Division
5107 Leesburg Pike, Suite 1902
Falls Church, VA 22041
(703) 305-0289
(703) 605-0365 (fax)

**Disclaimer**
The Statistics Yearbook has been prepared as a public service by the Executive Office for Immigration Review and is strictly informational in nature. In no way should any information in the Statistics Yearbook, in whole or in part, be regarded as legal advice or authority, or be understood in any way to enlarge upon, or otherwise modify or interpret, any existing legal authority, including, but not limited to, the Immigration and Nationality Act and Title 8 of the Code of Federal Regulations.

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

## TABLE OF CONTENTS

The Executive Office for Immigration Review ............................................................... 4
Statistics Yearbook Key Definitions................................................................................ 6
Immigration Courts.......................................................................................................... 7
  Pending Caseload ......................................................................................................... 7
  I-862 and I-863 New NTA's and Total Completions ................................................... 7
  Total I-862 Matters Received and Completed .............................................................. 9
  Cases Received and Completed by Type .................................................................... 12
  I-862 Case Completions by Decision ........................................................................ 13
  I-862 ICCs by Country of Nationality ....................................................................... 17
  I-862 ICCs by Language ............................................................................................ 18
  I-862 ICCs for Detained Cases .................................................................................. 19
  I-862 Institutional Hearing Program Cases Received and Completed ........................ 21
  I-862 ICCs with Applications for Relief .................................................................... 22
  I-862 Asylum Cases Received and ICCs .................................................................... 24
  I-862 Asylum ICCs by Decision ............................................................................... 26
  I-862 ICC Asylum Grants by Country of Nationality ................................................ 29
  Convention Against Torture ...................................................................................... 30
  I-862 Applications for Relief other than Asylum ....................................................... 32
  I-862 *In Absentia* Orders ........................................................................................... 33
  Immigration Judge Hiring .......................................................................................... 34
Board of Immigration Appeals ...................................................................................... 35
  Total Cases Received and Completed ........................................................................ 35
  Cases Received and Completed by Type .................................................................... 36
  Appeals from IJ Decisions Completed by Country of Nationality.............................. 37
  Appeals from IJ Decisions (I-862) Completed by Representation Status .................... 38
  Case Appeals from IJ Decision (I-862 ICCs) Completed for Detained Cases ............. 39
  IJ Decisions (I-862 ICCs) Appealed .......................................................................... 40
Office of the Chief Administrative Hearing Officer ..................................................... 41
  Total Cases Received and Completed ........................................................................ 41
Freedom of Information Act (FOIA) ............................................................................. 43
  FOIA Receipts .......................................................................................................... 43

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

## LISTING OF TABLES

Table 1. Immigration Courts Pending Cases ................................................................. 8
Table 2. Total I-862 Immigration Court Matters Received by Court ............................ 10
Table 3. Total I-862 Immigration Court Matters Completed by Court and Type .......... 11
Table 4. Immigration Court Cases Received by Case Type ......................................... 12
Table 5. Immigration Court Initial and Subsequent Case Completions by Case Type .......... 12
Table 6. Credible Fear (CF) and Reasonable Fear (RF) Review ICCs by Decision .......... 15
Table 7. I-862 Changes of Venue and Transfers ........................................................ 16
Table 8. I-862 ICCs by Top 25 Countries of Nationality ............................................ 17
Table 9. I-862 ICCs by Top 25 Languages .................................................................. 18
Table 10. I-862 Detained ICCs ................................................................................... 20
Table 11. I-862 IHP ICCs by Decision ........................................................................ 21
Table 12. I-862 ICCs with Applications for Relief ...................................................... 23
Table 13. Asylum I-862 ICCs by Court for FY 2018 ................................................... 25
Table 14. I-862 ICC Asylum Decision Rate by Immigration Court .............................. 28
Table 15. Asylum I-862 ICC Grants by Top 25 Countries of Nationality ..................... 29
Table 16. Convention Against Torture Cases by Decision ........................................... 30
Table 17. Convention Against Torture Completions by Court ...................................... 31
Table 18. I-862 Cases Grants of Relief ...................................................................... 32
Table 19. I-862 *In Absentia* Orders and ICCs by Respondent Type ........................... 33
Table 20. BIA Receipts and Completions by Type ...................................................... 36
Table 21. BIA Appeals from ICCs by Top 25 Countries of Nationality ........................ 37
Table 22. BIA Detained Completions .......................................................................... 39

DOJIFR00683

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 219 of 1770

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

## LISTING OF FIGURES

Figure 1. OCIJ Pending Caseload.................................................................................................. 7
Figure 2. New NTA's and Total Completions.............................................................................. 7
Figure 3. Total I-862 Immigration Court Matters ....................................................................... 9
Figure 4. I-862 Immigration Court Matters Received by Type .................................................... 9
Figure 5. I-862 Immigration Court Matters Completed by Type ................................................. 9
Figure 6. I-862 Case Completions ............................................................................................. 13
Figure 7. I-862 ICCs by Decision ............................................................................................. 13
Figure 8. I-862 Subsequent Case Completions by Decision ...................................................... 13
Figure 9. Administrative Closures ............................................................................................. 14
Figure 10. Inactive Pending End of Fiscal Year Totals ............................................................. 14
Figure 11. Total I-862 Changes of Venue and Transfers ........................................................... 15
Figure 12. I-862 ICCs by Nationality ....................................................................................... 17
Figure 13. I-862 ICCs by Language .......................................................................................... 18
Figure 14. I-862 ICCs by Detention Status ............................................................................... 19
Figure 15. I-862 Standard Detained ICCs ................................................................................. 19
Figure 16. I-862 IHP Receipts and ICCs ................................................................................... 21
Figure 17. I-862 ICCs by Application Filling Status ................................................................. 22
Figure 18. Asylum I-862 Receipts ............................................................................................ 24
Figure 19. Asylum I-862 Receipts and ICCs ............................................................................ 24
Figure 20. Asylum I-862 ICCs by Decision .............................................................................. 26
Figure 21. Affirmative and Defensive Asylum I-862 ICCs by Decision ................................... 26
Figure 22. Asylum I-862 Administrative Closures, Including Those with a Subsequent Granted Motion to Recalendar .................................................................................................................... 27
Figure 23. I-862 Asylum and I-862 Withholding of Removal ICCs by Decision ...................... 27
Figure 24. I-862 Withholding of Removal ICCs by Decision .................................................... 27
Figure 25. Asylum I-862 ICC Grants by Country of Nationality .............................................. 29
Figure 26. Immigration Judge Hiring ........................................................................................ 34
Figure 27. Total BIA Cases Received and Completed ............................................................... 35
Figure 28. BIA Receipts and Completions by Case Type .......................................................... 36
Figure 29. Completed Appeals from IJ Decisions by Nationality .............................................. 37
Figure 30. Completed Appeals from IJ Decisions (I-862 Cases) by Representation Status ........ 38
Figure 31. Complete Case Appeals from I-862 ICCs by Detention Status ................................. 39
Figure 32. I-862 ICCs Appealed to BIA ................................................................................... 40
Figure 33. OCAHO Receipts by Type........................................................................................ 42
Figure 34. OCAHO Completions by Type ................................................................................. 42
Figure 35. FOIA Receipts .......................................................................................................... 43

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

## THE EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

EOIR is responsible for adjudicating immigration cases. On behalf of the Attorney General, EOIR interprets and administers federal immigration laws and regulations through immigration court cases, appellate reviews, and administrative hearings in certain types of immigration-related cases. EOIR consists of three adjudicatory bodies: The Office of the Chief Immigration Judge (OCIJ), the Board of Immigration Appeals (BIA), and the Office of the Chief Administrative Hearing Officer (OCAHO).

OCIJ provides overall program direction and establishes priorities for over 400 immigration judges (IJ) located in 63 immigration courts and two immigration adjudication centers throughout the nation. The BIA hears appeals from certain decisions rendered by IJs and by district directors of Department of Homeland Security (DHS) in a wide variety of cases. OCAHO conducts hearings in civil penalty cases arising from the unlawful employment of aliens, unfair immigration-related employment practices, and civil document fraud.

Although this Statistics Yearbook addresses each of EOIR's three adjudicatory bodies, most of the data presented comes from immigration court cases. Most immigration court cases involve removal proceedings. A removal proceeding has two parts. First, an immigration judge assesses whether an alien is removable as charged under the applicable law. If an immigration judge determines that the alien is not removable, then the immigration judge will terminate proceedings.[1] If the immigration judge sustains the charge or charges of removability, proceedings continue. A finding of removability by itself never guarantees that an alien will be ordered removed or that the alien will actually be removed. Rather, if the alien is found removable, the judge must also make a second determination as to whether the alien is eligible for any relief or protection that would allow the alien to remain in the United States. Examples of such relief or protection include asylum, withholding of removal, protection under the Convention Against Torture, adjustment of status, cancellation of removal for lawful permanent residents, cancellation of removal for certain non-permanent residents, and certain waivers provided by the Immigration and Nationality Act.[2]

The removal proceeding begins when the DHS (either U.S. Immigration and Customs Enforcement (ICE), U.S. Citizenship and Immigration Services (USCIS), or U.S. Customs and Border Protection (CBP)) serves an individual with a charging document, called a Notice to Appear (NTA), and files it with an immigration court.

Aliens in removal proceedings, called respondents, have a right to legal representation at no expense to the government. EOIR also provides a list of *pro bono* legal service providers to any respondent who appears in removal proceedings without representation.

During the removal proceeding, the immigration court schedules an initial hearing, referred to as a master calendar hearing, before an immigration judge. At this hearing, the immigration judge informs the

---

[1] Although applicable regulations distinguish between the dismissal of proceedings and the termination of proceedings, EOIR classifies both of them as "terminations" for statistical purposes because the outcomes are substantively identical.

[2] Voluntary departure is a form of relief from removal, but it carries an alternate order of removal if the departure is not timely effectuated. Consequently, EOIR classifies it as a separate outcome for statistical purposes and does not count it as either relief or an order of removal.

DOJIFR00685

respondent of his or her rights and addresses representation. The judge may also take pleadings, determine removability, and ascertain apparent eligibility for any relief or protection provided for by law. If a judge finds an alien removable and the alien wishes to apply for relief or protection from removal, the judge will schedule an individual merits hearing on the alien's application where both parties (the respondent and DHS) may present arguments and evidence regarding that application. If the immigration judge finds the alien eligible for relief or protection from removal, the judge will then grant the application.

If an immigration judge finds an alien is removable and ineligible for any relief or protection from removal, the judge will order the alien removed. ICE is then responsible for any subsequent detention and removal activities. The issuance of a removal order does not guarantee the actual physical removal of an alien from the United States.

Within 30 days of the immigration judge's decision in a removal case, either party or both parties may appeal the decision to the BIA. If the BIA decision is adverse to the alien, the alien may file a petition for review of that decision with the appropriate federal circuit court of appeals within 30 days.

In certain circumstances, a party to a removal case may also file a motion with the immigration court to reconsider or reopen the case after an immigration judge or the BIA has rendered a decision.

In certain circumstances, for aliens detained by DHS or aliens recently released from custody by DHS, an immigration judge may consider requests to redetermine the conditions of custody or to ameliorate the conditions of release. Any alien may make such a request, and an immigration judge will preside over a hearing on the request, commonly called a "bond hearing." Whether an immigration judge grants the request ultimately depends on the facts and applicable law of each case. Either party or both parties may appeal the immigration judge's bond decision to the BIA.

DOJIFR00686



**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

# STATISTICS YEARBOOK KEY DEFINITIONS

The following definitions are applicable to the FY 2018 Yearbook. Please note that prior Yearbooks may have used different definitions and that some terms may have different usages or definitions outside the Yearbook context.

**Immigration court matters** include cases, bond redeterminations, and motions to reopen, reconsider, and recalendar.

**Immigration court cases** include twelve case types, divided into four categories. I-862 case types include removal, deportation, and exclusion cases. I-863 case types include asylum-only and withholding-only cases.  Review case types include credible fear review, reasonable fear review, and claimed status review cases. Other case types include rescission, non-removal Nicaraguan Adjustment and Central American Relief Act (NACARA), departure control, and continued detention review cases.

**Immigration court receipts** is the total number of charging documents, bond redeterminations, and motions to reopen, reconsider, and recalendar received within the reporting period.

**Immigration court matter completions** is the total number of immigration judge decisions on cases and bond redeterminations, plus the total number of denied motions to reopen, reconsider, and recalendar.

**Initial case completion (ICC)** is the first dispositive decision rendered by an immigration judge. For instance, an I-862 removal case is completed by an order of removal, relief, voluntary departure, termination, or other. An order granting a continuance, changing venue, or administratively closing a case is not a dispositive decision and, thus, does not constitute a case completion.

**Subsequent case completion** refers to any dispositive decision by an immigration judge after an ICC.

DOJIFR00687

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

# IMMIGRATION COURTS

## PENDING CASELOAD

**Figure 1.** The number of pending immigration court cases has grown by 84 percent since the end of FY 2014, and by 20 percent since the end of FY 2017.



**Figure 1. OCIJ Pending Caseload**

| | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 |
|---|---|---|---|---|---|
| Pending | 430,078 | 460,034 | 521,439 | 656,369 | 789,258 |

## I-862 AND I-863 NEW NTA'S AND TOTAL COMPLETIONS



**Figure 2. New NTA's and Total Completions**

| | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 |
|---|---|---|---|---|---|
| New NTA's | 230,108 | 192,991 | 228,452 | 295,214 | 308,304 |
| Total Completions | 142,124 | 143,717 | 143,506 | 163,159 | 195,571 |

DOJ Executive Office for Immigration Review (EOIR)

DOJIFR00688

**U.S. Department of Justice**
Executive Office for
Immigration Review

## Table 1. Immigration Courts Pending Cases

| Immigration Court | Pending Cases as of 9/30/2018 |
|---|---|
| Adelanto | 1,197 |
| Arlington | 44,053 |
| Atlanta | 25,078 |
| Aurora | 534 |
| Baltimore | 34,595 |
| Batavia | 398 |
| Bloomington | 8,160 |
| Boston | 28,021 |
| Buffalo | 2,005 |
| Charlotte | 16,365 |
| Chicago | 29,697 |
| Cleveland | 10,122 |
| Dallas | 25,703 |
| Denver | 12,116 |
| Detroit | 5,304 |
| El Paso | 4,479 |
| El Paso SPC | 383 |
| Elizabeth | 753 |
| Eloy | 856 |
| Fishkill | 76 |
| Florence | 419 |
| Harlingen | 4,453 |
| Hartford | 5,404 |
| Honolulu | 458 |
| Houston | 52,361 |
| Houston SPC | 1,802 |
| Imperial | 3,957 |
| Kansas City | 8,479 |
| Krome | 802 |
| Las Vegas | 4,466 |
| LaSalle | 443 |
| Los Angeles (N) | 74,819 |
| Los Angeles (D) | 368 |
| Louisville | 5,132 |
| Memphis | 13,697 |
| Miami | 38,458 |
| New Orleans | 10,872 |
| New York City | 102,214 |
| Newark | 42,431 |
| Oakdale | 591 |
| Omaha | 10,801 |
| Orlando | 16,440 |
| Otay Mesa | 578 |
| Otero | 600 |
| Pearsall | 793 |
| Philadelphia | 14,619 |
| Phoenix | 8,625 |
| Port Isabel | 824 |
| Portland | 5,565 |
| Saipan | 156 |
| Salt Lake City | 2,727 |
| San Antonio | 27,089 |
| San Diego | 4,883 |
| San Francisco | 59,237 |
| San Juan | 294 |
| Seattle | 10,629 |
| Stewart | 690 |
| Tacoma | 952 |
| Tucson | 796 |
| Ulster | 98 |
| Varick | 839 |
| York | 502 |
| **Total** | **789,258** |

DOJIFR00689

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

## TOTAL I-862 MATTERS RECEIVED AND COMPLETED

**Figure 3.** The number of I-862 matters the immigration courts received increased by seven percent between FY 2017 and FY 2018. The number of I-862 matters the immigration courts completed increased by 20 percent from FY 2017 to FY 2018.

**Figure 3. Total I-862 Immigration Court Matters**

|  | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 |
|---|---|---|---|---|---|
| Receipts | 307,024 | 274,914 | 316,332 | 406,092 | 434,158 |
| Completions | 203,338 | 204,928 | 207,239 | 243,276 | 291,370 |

**Figure 4.** New NTAs constitute the bulk of the courts' work.

**Figure 4. I-862 Immigration Court Matters Received by Type**



|  | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 |
|---|---|---|---|---|---|
| New NTAs | 226,673 | 189,673 | 224,959 | 291,430 | 304,342 |
| Bonds | 60,476 | 60,066 | 63,411 | 78,454 | 91,291 |
| Motions | 19,875 | 25,175 | 27,962 | 36,208 | 38,525 |
| Total | 307,024 | 274,914 | 316,332 | 406,092 | 434,158 |

**Figure 5.** The majority of matters completed are I-862 ICCs.

**Figure 5. I-862 Immigration Court Matters Completed by Type**



|  | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 |
|---|---|---|---|---|---|
| Initial Case Completions | 128,464 | 131,431 | 130,554 | 150,757 | 182,421 |
| Subsequent Case Completions | 10,629 | 9,670 | 10,070 | 9,049 | 9,656 |
| Bonds | 59,869 | 59,563 | 62,218 | 77,387 | 91,056 |
| Motions (Not Granted) | 4,376 | 4,264 | 4,397 | 6,083 | 8,233 |
| Total | 203,338 | 204,928 | 207,239 | 243,276 | 291,366 |

DOJIFR00690

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

### Table 2. Total I-862 Immigration Court Matters Received by Court

| Immigration Court | FY 2017 Total Matters | FY 2018 | | | | Rate of Change: Total Matters |
|---|---|---|---|---|---|---|
| | | Total Matters | New NTAs | Bonds | Motions | |
| Adelanto | 8,488 | 11,324 | 5,240 | 6,019 | 65 | 33% |
| Arlington | 15,543 | 10,833 | 7,828 | 1,477 | 1,528 | -30% |
| Atlanta | 11,710 | 13,479 | 9,789 | 2,837 | 853 | 15% |
| Aurora | 3,850 | 5,327 | 2,593 | 2,669 | 65 | 38% |
| Baltimore | 14,580 | 8,958 | 7,285 | 890 | 783 | -39% |
| Batavia | 2,492 | 2,702 | 1,216 | 1,449 | 37 | 8% |
| Bloomington | 4,742 | 4,938 | 2,957 | 1,407 | 574 | 4% |
| Boston | 11,047 | 9,678 | 6,843 | 1,275 | 1,560 | -12% |
| Buffalo | 782 | 1,105 | 722 | 0 | 383 | 41% |
| Charlotte | 9,453 | 7,700 | 6,981 | 184 | 535 | -19% |
| Chicago | 11,508 | 13,897 | 9,480 | 3,314 | 1,103 | 21% |
| Cleveland | 5,077 | 5,953 | 3,796 | 1,774 | 383 | 17% |
| Dallas | 13,343 | 16,908 | 14,024 | 2,375 | 509 | 27% |
| Denver | 2,713 | 3,015 | 2,454 | 83 | 478 | 11% |
| Detroit | 3,753 | 4,936 | 2,579 | 2,011 | 346 | 32% |
| El Paso | 1,742 | 1,840 | 1,464 | 4 | 372 | 6% |
| El Paso SPC | 3,464 | 2,937 | 1,813 | 1,078 | 46 | -15% |
| Elizabeth | 4,931 | 5,432 | 2,306 | 3,060 | 66 | 10% |
| Eloy | 8,040 | 9,277 | 4,443 | 4,695 | 139 | 15% |
| Fishkill | 169 | 81 | 64 | 0 | 17 | -52% |
| Florence | 3,989 | 4,285 | 2,090 | 2,137 | 58 | 7% |
| Harlingen | 3,429 | 6,308 | 5,177 | 2 | 1,129 | 84% |
| Hartford | 2,648 | 2,274 | 1,934 | 165 | 175 | -14% |
| Honolulu | 591 | 583 | 420 | 108 | 55 | -1% |
| Houston | 14,231 | 14,398 | 12,597 | 10 | 1,791 | 1% |
| Houston SPC | 14,363 | 14,922 | 8,024 | 6,657 | 241 | 4% |
| Imperial | 4,311 | 3,776 | 1,880 | 1,795 | 101 | -12% |
| Kansas City | 4,290 | 5,798 | 3,947 | 1,059 | 792 | 35% |
| Krome | 8,504 | 11,242 | 5,545 | 5,531 | 166 | 32% |
| Las Vegas | 4,445 | 5,080 | 3,121 | 1,582 | 377 | 14% |
| LaSalle | 5,998 | 6,266 | 3,139 | 3,098 | 29 | 4% |
| Los Angeles (N) | 26,185 | 22,687 | 18,674 | 6 | 4,007 | -13% |
| Los Angeles (D) | 4,678 | 5,994 | 2,582 | 3,356 | 56 | 28% |
| Louisville | 1,860 | 1,249 | 1,017 | 0 | 232 | -33% |
| Memphis | 6,429 | 5,425 | 4,631 | 7 | 787 | -16% |
| Miami | 16,576 | 13,886 | 10,962 | 4 | 2,920 | -16% |
| New Orleans | 5,183 | 5,402 | 4,856 | 0 | 546 | 4% |
| New York City | 27,137 | 30,448 | 25,887 | 108 | 4,453 | 12% |
| Newark | 8,707 | 11,690 | 10,603 | 0 | 1,087 | 34% |
| Oakdale | 4,782 | 6,850 | 3,235 | 3,538 | 77 | 43% |
| Omaha | 4,505 | 4,983 | 3,260 | 1,308 | 415 | 11% |
| Orlando | 8,243 | 9,571 | 7,622 | 761 | 1,188 | 16% |
| Otay Mesa | 4,938 | 4,150 | 1,911 | 2,186 | 53 | -16% |
| Otero | 1,904 | 3,706 | 2,522 | 1,167 | 17 | 95% |
| Pearsall | 8,168 | 9,312 | 6,298 | 2,941 | 73 | 14% |
| Philadelphia | 4,010 | 6,104 | 5,493 | 16 | 595 | 52% |
| Phoenix | 3,335 | 4,904 | 3,424 | 1 | 1,479 | 47% |
| Port Isabel | 4,062 | 5,751 | 4,088 | 1,594 | 69 | 42% |
| Portland | 1,356 | 2,181 | 1,928 | 76 | 177 | 61% |
| Saipan | 115 | 94 | 91 | 0 | 3 | -18% |
| Salt Lake City | 1,259 | 1,531 | 1,218 | 34 | 279 | 22% |
| San Antonio | 7,994 | 8,134 | 5,904 | 367 | 1,863 | 2% |
| San Diego | 2,841 | 2,801 | 2,213 | 0 | 588 | -1% |
| San Francisco | 20,325 | 20,963 | 16,766 | 2,600 | 1,597 | 3% |
| San Juan | 336 | 302 | 128 | 18 | 156 | -10% |
| Seattle | 2,757 | 2,777 | 2,329 | 3 | 445 | 1% |
| Stewart | 7,767 | 8,559 | 5,597 | 2,879 | 83 | 10% |
| Tacoma | 6,649 | 8,244 | 4,228 | 3,928 | 88 | 24% |
| Tucson | 608 | 705 | 563 | 0 | 142 | 16% |
| Ulster | 241 | 205 | 184 | 2 | 19 | -15% |
| Varick | 3,257 | 4,191 | 1,672 | 2,397 | 122 | 29% |
| York | 5,659 | 6,107 | 2,705 | 3,249 | 153 | 8% |
| **Total** | **406,092** | **434,158** | **304,342** | **91,291** | **38,525** | **7%** |

**Key**

25%+ **growth** in Total Matters Received

25%+ **decrease** in Total Matters Received

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

### Table 3. Total I-862 Immigration Court Matters Completed by Court and Type

| Immigration Court | FY 2017 Total Matters | FY 2018 | | | | | Rate of Change: Total Matters |
|---|---|---|---|---|---|---|---|
| | | Total Matters | Initial Case Completions | Subsequent Case Completions | Bonds | Motions Not Granted | |
| Adelanto | 6,637 | 8,503 | 2,125 | 78 | 6,275 | 25 | 28% |
| Arlington | 6,512 | 6,742 | 4,795 | 313 | 1,434 | 200 | 4% |
| Atlanta | 7,478 | 9,008 | 5,662 | 200 | 2,743 | 403 | 20% |
| Aurora | 2,860 | 4,055 | 1,371 | 37 | 2,618 | 29 | 42% |
| Baltimore | 4,278 | 5,382 | 3,952 | 316 | 858 | 256 | 26% |
| Batavia | 1,850 | 2,047 | 648 | 29 | 1,349 | 21 | 11% |
| Bloomington | 2,793 | 3,383 | 1,754 | 123 | 1,417 | 89 | 21% |
| Boston | 4,861 | 5,096 | 3,387 | 308 | 1,260 | 141 | 5% |
| Buffalo | 601 | 701 | 619 | 45 | 0 | 37 | 17% |
| Charlotte | 4,510 | 5,353 | 4,847 | 198 | 186 | 122 | 19% |
| Chicago | 7,880 | 9,476 | 5,730 | 354 | 3,241 | 151 | 20% |
| Cleveland | 3,064 | 3,959 | 2,040 | 101 | 1,736 | 82 | 29% |
| Dallas | 8,154 | 8,974 | 6,360 | 178 | 2,272 | 164 | 10% |
| Denver | 1,780 | 2,230 | 1,910 | 155 | 91 | 74 | 25% |
| Detroit | 2,959 | 4,187 | 1,954 | 168 | 1,976 | 89 | 42% |
| El Paso | 1,422 | 1,710 | 1,537 | 58 | 4 | 111 | 20% |
| El Paso SPC | 2,696 | 2,120 | 1,016 | 16 | 1,055 | 33 | -21% |
| Elizabeth | 4,044 | 4,317 | 1,301 | 44 | 2,952 | 20 | 7% |
| Eloy | 6,685 | 7,549 | 2,663 | 65 | 4,764 | 57 | 13% |
| Fishkill | 163 | 116 | 99 | 10 | 0 | 7 | -29% |
| Florence | 2,366 | 2,961 | 887 | 16 | 2,032 | 26 | 25% |
| Harlingen | 2,537 | 2,117 | 1,289 | 140 | 1 | 687 | -17% |
| Hartford | 1,265 | 1,258 | 982 | 69 | 164 | 43 | -1% |
| Honolulu | 634 | 823 | 681 | 15 | 117 | 10 | 30% |
| Houston | 7,307 | 11,001 | 9,988 | 511 | 7 | 495 | 51% |
| Houston SPC | 9,569 | 11,858 | 5,017 | 87 | 6,698 | 56 | 24% |
| Imperial | 2,434 | 2,438 | 573 | 27 | 1,785 | 53 | 0% |
| Kansas City | 2,617 | 3,760 | 2,489 | 112 | 1,069 | 90 | 44% |
| Krome | 7,071 | 9,756 | 4,046 | 107 | 5,513 | 90 | 38% |
| Las Vegas | 3,769 | 4,305 | 2,499 | 162 | 1,553 | 91 | 14% |
| LaSalle | 5,016 | 5,638 | 2,538 | 32 | 3,056 | 12 | 12% |
| Los Angeles (N) | 11,804 | 11,630 | 9,970 | 940 | 9 | 711 | -1% |
| Los Angeles (D) | 4,275 | 5,322 | 1,743 | 81 | 3,474 | 24 | 24% |
| Louisville | 845 | 1,333 | 1,228 | 51 | 0 | 54 | 58% |
| Memphis | 3,635 | 3,912 | 3,613 | 110 | 6 | 183 | 8% |
| Miami | 7,954 | 10,309 | 9,023 | 589 | 3 | 694 | 30% |
| New Orleans | 2,698 | 3,488 | 3,290 | 129 | 0 | 69 | 29% |
| New York City | 12,882 | 17,477 | 15,725 | 1,010 | 78 | 664 | 36% |
| Newark | 3,174 | 4,278 | 3,702 | 297 | 0 | 279 | 35% |
| Oakdale | 3,850 | 5,660 | 2,077 | 35 | 3,501 | 47 | 47% |
| Omaha | 2,625 | 3,096 | 1,615 | 102 | 1,306 | 73 | 18% |
| Orlando | 5,337 | 5,052 | 3,853 | 233 | 763 | 203 | -5% |
| Otay Mesa | 3,587 | 3,439 | 1,078 | 36 | 2,304 | 21 | -4% |
| Otero | 1,810 | 2,844 | 1,695 | 16 | 1,125 | 8 | 57% |
| Pearsall | 4,137 | 4,876 | 1,806 | 26 | 3,021 | 23 | 18% |
| Philadelphia | 1,871 | 2,326 | 2,139 | 118 | 11 | 58 | 24% |
| Phoenix | 2,320 | 3,246 | 2,964 | 163 | 1 | 118 | 40% |
| Port Isabel | 2,599 | 3,311 | 1,653 | 49 | 1,556 | 53 | 27% |
| Portland | 613 | 986 | 853 | 49 | 76 | 8 | 61% |
| Saipan | 25 | 36 | 35 | 0 | 0 | 1 | 44% |
| Salt Lake City | 1,287 | 1,789 | 1,602 | 90 | 35 | 62 | 39% |
| San Antonio | 5,229 | 5,550 | 4,376 | 276 | 450 | 448 | 6% |
| San Diego | 1,707 | 2,372 | 2,045 | 180 | 0 | 147 | 39% |
| San Francisco | 10,121 | 12,108 | 8,813 | 524 | 2,604 | 167 | 20% |
| San Juan | 158 | 174 | 113 | 17 | 18 | 26 | 10% |
| Seattle | 1,806 | 1,929 | 1,709 | 124 | 3 | 93 | 7% |
| Stewart | 6,979 | 7,736 | 4,737 | 87 | 2,856 | 56 | 11% |
| Tacoma | 5,872 | 6,674 | 2,564 | 43 | 4,018 | 49 | 14% |
| Tucson | 729 | 754 | 696 | 41 | 0 | 17 | 3% |
| Ulster | 218 | 205 | 187 | 8 | 2 | 8 | -6% |
| Varick | 2,567 | 3,530 | 1,086 | 74 | 2,325 | 45 | 38% |
| York | 4,750 | 5,101 | 1,672 | 84 | 3,285 | 60 | 7% |
| **Total** | **243,276** | **291,366** | **182,421** | **9,656** | **91,056** | **8,233** | **20%** |

**Key**

25%+ **growth** in Total Matters Completed

25%+ **decrease** in Total Matters Completed

**U.S. DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR**
**IMMIGRATION REVIEW**

STATISTICS YEARBOOK
FY 2018

## CASES RECEIVED AND COMPLETED BY TYPE

### Table 4. Immigration Court Cases Received by Case Type

| Type of Case | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 |
|---|---|---|---|---|---|
| Removal | 226,672 | 189,671 | 224,958 | 291,430 | 304,339 |
| Credible Fear | 6,506 | 6,644 | 7,464 | 6,534 | 6,664 |
| Withholding Only | 3,139 | 3,063 | 3,266 | 3,395 | 3,236 |
| Reasonable Fear | 1,778 | 2,608 | 2,519 | 2,471 | 2,744 |
| Asylum Only | 296 | 255 | 227 | 389 | 726 |
| Rescission | 31 | 45 | 27 | 37 | 38 |
| Claimed Status | 22 | 21 | 11 | 6 | 5 |
| Deportation | 1 | 2 | 1 | 0 | 2 |
| NACARA | 4 | 1 | 0 | 0 | 1 |
| Exclusion | 0 | 0 | 0 | 0 | 1 |
| Continued Detention Review | 3 | 2 | 1 | 0 | 0 |
| **Total** | **238,452** | **202,312** | **238,474** | **304,262** | **317,756** |

### Table 5. Immigration Court Initial and Subsequent Case Completions by Case Type

| Type of Case | FY 2014 | | FY 2015 | | FY 2016 | | FY 2017 | | FY 2018 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Initial | Subsequent | Initial | Subsequent | Initial | Subsequent | Initial | Subsequent | Initial | Subsequent |
| Deportation | 455 | 1,175 | 431 | 1,122 | 461 | 1,098 | 364 | 836 | 390 | 614 |
| Exclusion | 33 | 105 | 19 | 103 | 35 | 83 | 20 | 64 | 21 | 68 |
| Removal | 127,976 | 9,349 | 130,981 | 8,445 | 130,058 | 8,889 | 150,373 | 8,149 | 182,010 | 8,974 |
| Credible Fear | 6,353 | 0 | 6,624 | 2 | 7,492 | 0 | 6,534 | 0 | 6,668 | 0 |
| Reasonable Fear | 1,707 | 0 | 2,559 | 0 | 2,536 | 2 | 2,438 | 0 | 2,769 | 1 |
| Claimed Status | 22 | 0 | 19 | 0 | 15 | 0 | 4 | 1 | 8 | 0 |
| Asylum Only | 313 | 58 | 246 | 34 | 214 | 36 | 273 | 52 | 371 | 32 |
| Rescission | 30 | 1 | 28 | 0 | 28 | 2 | 33 | 1 | 26 | 1 |
| Continued Detention Review | 2 | 0 | 3 | 0 | 2 | 0 | 0 | 0 | 0 | 0 |
| NACARA | 1 | 1 | 2 | 0 | 1 | 1 | 3 | 2 | 0 | 0 |
| Withholding Only | 2,587 | 73 | 2,230 | 106 | 2,539 | 93 | 2,900 | 127 | 2,950 | 141 |
| **Total** | **139,479** | **10,762** | **143,142** | **9,815** | **143,381** | **10,204** | **162,942** | **9,232** | **195,213** | **9,831** |

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

## I-862 CASE COMPLETIONS BY DECISION

**Figure 6.** I-862 ICCs increased 21 percent from FY 2017 to FY 2018.

**Figure 6. I-862 Case Completions**



| | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 |
|---|---|---|---|---|---|
| Initial Case Completion | 128,464 | 131,431 | 130,554 | 150,757 | 182,421 |
| Subsequent Case Completion | 10,629 | 9,670 | 10,070 | 9,049 | 9,656 |
| Total | 139,093 | 141,101 | 140,624 | 159,806 | 192,077 |

**Figure 7.** All I-862 case outcomes except "other" increased in FY 2018.

**Figure 7. I-862 ICCs by Decision**



| | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 |
|---|---|---|---|---|---|
| Removal | 76,061 | 79,444 | 77,193 | 98,451 | 116,508 |
| Relief | 20,477 | 17,648 | 17,282 | 19,488 | 23,710 |
| Voluntary Departure | 13,862 | 10,023 | 9,130 | 13,652 | 22,189 |
| Termination | 17,691 | 23,874 | 26,465 | 18,653 | 19,530 |
| Other | 373 | 442 | 484 | 513 | 484 |
| Total | 128,464 | 131,431 | 130,554 | 150,757 | 182,421 |

**Figure 8.** For I-862 cases, subsequent case completions have decreased by about nine percent between FY 2014 and FY 2018.

**Figure 8. I-862 Subsequent Case Completions by Decision**



| | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 |
|---|---|---|---|---|---|
| Removal | 2,480 | 2,329 | 2,526 | 3,012 | 3,777 |
| Relief | 2,718 | 2,172 | 2,092 | 2,159 | 2,418 |
| Voluntary Departure | 640 | 395 | 385 | 493 | 709 |
| Termination | 4,532 | 4,590 | 4,861 | 3,204 | 2,501 |
| Other | 259 | 184 | 206 | 181 | 251 |
| Total | 10,629 | 9,670 | 10,070 | 9,049 | 9,656 |

DOJIFR00694

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

**Figure 9.** Administrative closures decreased by about 67 percent from FY 2017 to FY 2018.

### Figure 9. Administrative Closures



| | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 |
|---|---|---|---|---|---|
| Administratively Closed Cases | 34,437 | 46,227 | 53,750 | 32,408 | 10,539 |
| Motions to Recalendar Granted | 6,249 | 10,602 | 13,343 | 17,648 | 18,784 |

**Figure 10.** The rate of increase of the inactive pending caseload has slowed in the past two fiscal years. From FY 2017 to FY 2018, the inactive pending caseload only increased by three percent.

### Figure 10. Inactive Pending End of Fiscal Year Totals

| | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 |
|---|---|---|---|---|---|
| Inactive Pending | 204,003 | 235,327 | 275,583 | 299,537 | 309,016 |

DOJIFR00695

**U.S. Department of Justice**
Executive Office for
Immigration Review

Statistics Yearbook
FY 2018

**Figure 11.** For I-862 cases, changes of venue have increased 10 percent since FY 2014 and transfers have increased 35 percent in the same period.

**Figure 11. Total I-862 Changes of Venue and Transfers**



| | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 |
|---|---|---|---|---|---|
| Changes of Venue | 64,519 | 50,303 | 56,240 | 68,948 | 71,125 |
| Transfers | 40,899 | 37,673 | 41,889 | 46,635 | 55,041 |
| Total | 105,418 | 87,976 | 98,129 | 115,583 | 126,166 |

**Table 6. Credible Fear (CF) and Reasonable Fear (RF) Review ICCs by Decision**

| Disposition | FY 2014 | | FY 2015 | | FY 2016 | | FY 2017 | | FY 2018 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | CF | RF | CF | RF | CF | RF | CF | RF | CF | RF |
| Affirmed DHS Decision | 5,232 | 1,439 | 5,219 | 2,053 | 5,333 | 1,915 | 4,852 | 1,812 | 5,206 | 2,193 |
| Vacated DHS Decision | 1,055 | 230 | 1,347 | 451 | 2,088 | 571 | 1,647 | 588 | 1,386 | 508 |
| Other | 67 | 43 | 65 | 64 | 73 | 57 | 38 | 45 | 78 | 71 |
| **Total** | **6,354** | **1,712** | **6,631** | **2,568** | **7,494** | **2,543** | **6,537** | **2,445** | **6,670** | **2,772** |

### Table 7. I-862 Changes of Venue and Transfers

| Immigration Court | Changes of Venue | Transfers | Total |
|---|---|---|---|
| Adelanto | 3,341 | 306 | 3,647 |
| Arlington | 1,755 | 1,924 | 3,679 |
| Atlanta | 1,271 | 3,581 | 4,852 |
| Aurora | 1,327 | 11 | 1,338 |
| Baltimore | 1,193 | 1,736 | 2,929 |
| Batavia | 120 | 523 | 643 |
| Bloomington | 226 | 1,444 | 1,670 |
| Boston | 443 | 1,085 | 1,528 |
| Buffalo | 519 | 64 | 583 |
| Charlotte | 769 | 36 | 805 |
| Chicago | 2,134 | 7,453 | 9,587 |
| Cleveland | 544 | 1,220 | 1,764 |
| Dallas | 626 | 2,814 | 3,440 |
| Denver | 453 | 57 | 510 |
| Detroit | 347 | 1,039 | 1,386 |
| El Paso | 1,866 | 172 | 2,038 |
| El Paso SPC | 19 | 1,014 | 1,033 |
| Elizabeth | 61 | 1,411 | 1,472 |
| Eloy | 2,398 | 2 | 2,400 |
| Fishkill | 27 | 17 | 44 |
| Florence | 1,551 | 14 | 1,565 |
| Harlingen | 3,878 | 262 | 4,140 |
| Hartford | 212 | 95 | 307 |
| Honolulu | 64 | 52 | 116 |
| Houston | 3,456 | 3,359 | 6,815 |
| Houston SPC | 1,611 | 2,593 | 4,204 |
| Imperial | 932 | 1,536 | 2,468 |
| Kansas City | 408 | 611 | 1,019 |
| Krome | 1,800 | 484 | 2,284 |
| Las Vegas | 335 | 1,221 | 1,556 |
| LaSalle | 802 | 50 | 852 |
| Los Angeles (N) | 3,791 | 160 | 3,951 |
| Los Angeles (D) | 1,276 | 185 | 1,461 |
| Louisville | 291 | 220 | 511 |
| Memphis | 525 | 777 | 1,302 |
| Miami | 1,484 | 19 | 1,503 |
| New Orleans | 1,046 | 13 | 1,059 |
| New York City | 3,392 | 474 | 3,866 |
| Newark | 1,814 | 313 | 2,127 |
| Oakdale | 774 | 460 | 1,234 |
| Omaha | 277 | 806 | 1,083 |
| Orlando | 674 | 396 | 1,070 |
| Otay Mesa | 1,287 | 23 | 1,310 |
| Otero | 5 | 662 | 667 |
| Pearsall | 216 | 4,799 | 5,015 |
| Philadelphia | 968 | 1,388 | 2,356 |
| Phoenix | 1,671 | 66 | 1,737 |
| Port Isabel | 710 | 1,661 | 2,371 |
| Portland | 351 | 34 | 385 |
| Saipan | 1 | 0 | 1 |
| Salt Lake City | 178 | 239 | 417 |
| San Antonio | 7,829 | 3,008 | 10,837 |
| San Diego | 890 | 220 | 1,110 |
| San Francisco | 1,928 | 1,712 | 3,640 |
| San Juan | 58 | 9 | 67 |
| Seattle | 376 | 14 | 390 |
| Stewart | 1,283 | 46 | 1,329 |
| Tacoma | 1,877 | 1 | 1,878 |
| Tucson | 229 | 8 | 237 |
| Ulster | 60 | 25 | 85 |
| Varick | 156 | 879 | 1,035 |
| York | 1,220 | 238 | 1,458 |
| **Total** | **71,125** | **55,041** | **126,166** |

DOJIFR00697

## I-862 ICCS BY COUNTRY OF NATIONALITY

EOIR IJs hear cases from many different nationalities each year.

**Figure 12.** About 75 percent of I-862 ICCs in FY 2018 were cases of nationals from Mexico, Guatemala, Honduras, or El Salvador.

**Table 8.** In the last five years, Mexico, Guatemala, Honduras, El Salvador, China, India, Ecuador, and Cuba, were eight of the top ten countries of nationality.

**Figure 12. I-862 ICCs by Nationality**



Initial Case Completions

| | |
|---|---|
| ■ Mexico | 58,800 |
| ■ Guatemala | 31,286 |
| ■ Honduras | 24,622 |
| ■ El Salvador | 22,712 |
| ■ Other | 45,001 |

### Table 8. I-862 ICCs by Top 25 Countries of Nationality

| Rank | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 |
|---|---|---|---|---|---|
| 1 | Mexico | Mexico | Mexico | Mexico | Mexico |
| 2 | Guatemala | Honduras | Guatemala | Guatemala | Guatemala |
| 3 | Honduras | Guatemala | Honduras | Honduras | Honduras |
| 4 | El Salvador | El Salvador | El Salvador | El Salvador | El Salvador |
| 5 | China | China | China | China | China |
| 6 | Cuba | Ecuador | Ecuador | Haiti | Haiti |
| 7 | Dominican Republic | Dominican Republic | Dominican Republic | Ecuador | India |
| 8 | Ecuador | India | Cuba | Dominican Republic | Ecuador |
| 9 | India | Cuba | India | Cuba | Cuba |
| 10 | Jamaica | Jamaica | Jamaica | India | Brazil |
| 11 | Colombia | Haiti | Colombia | Brazil | Dominican Republic |
| 12 | Haiti | Colombia | Haiti | Jamaica | Jamaica |
| 13 | Philippines | Peru | Brazil | Colombia | Colombia |
| 14 | Peru | Philippines | Somalia | Nicaragua | Nicaragua |
| 15 | Nicaragua | Nicaragua | Nicaragua | Romania | Romania |
| 16 | Brazil | Brazil | Peru | Peru | Peru |
| 17 | Nigeria | Somalia | Ghana | Nepal | Nepal |
| 18 | Nepal | Nigeria | Philippines | Philippines | Venezuela |
| 19 | Ethiopia | Ethiopia | Nigeria | Pakistan | Nigeria |
| 20 | Russia | Nepal | Pakistan | Ghana | Bangladesh |
| 21 | Egypt | Bangladesh | Nepal | Nigeria | Pakistan |
| 22 | Pakistan | Pakistan | Bangladesh | Eritrea | Eritrea |
| 23 | Vietnam | Ghana | Canada | Canada | Philippines |
| 24 | Kenya | Vietnam | Romania | Venezuela | Cameroon |
| 25 | Canada | Canada | Egypt | Cameroon | Russia |

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 234 of 1770

U.S. DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

## I-862 ICCs BY LANGUAGE

In parallel to the many nationalities that come before IJs, there are similarly hundreds of languages in which hearings are conducted. EOIR provides interpretation services for all aliens in proceedings as appropriate.

**Figure 13.** About 84 percent of I-862 ICCs in FY 2018 were cases of Spanish- or English-speaking aliens.

**Table 9.** In the last five years, six of the top ten languages were Spanish, English, Mandarin, Punjabi, Arabic, or Russian.

### Figure 13. I-862 ICCs by Language



| | Initial Case Completions |
|---|---|
| ■ Spanish | 134,611 |
| ■ English | 19,498 |
| ■ Mandarin | 5,413 |
| ■ Other | 22,899 |

### Table 9. I-862 ICCs by Top 25 Languages

| Rank | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 |
|---|---|---|---|---|---|
| 1 | Spanish | Spanish | Spanish | Spanish | Spanish |
| 2 | English | English | English | English | English |
| 3 | Mandarin | Mandarin | Mandarin | Mandarin | Mandarin |
| 4 | Unknown Language | Unknown Language | Unknown Language | Creole | Creole |
| 5 | Russian | Arabic | Arabic | Unknown Language | Unknown Language |
| 6 | Arabic | Russian | Punjabi | Punjabi | Punjabi |
| 7 | Punjabi | Punjabi | Russian | Portuguese | Portuguese |
| 8 | Creole | Creole | Portuguese | Arabic | Arabic |
| 9 | French | Somali | Mam | Russian | Mam |
| 10 | Portuguese | French | Somali | Mam | Russian |
| 11 | Korean | Portuguese | Creole | French | Quiche |
| 12 | Nepali | Quiche | Quiche | Quiche | Nepali |
| 13 | Somali | Nepali | French | Nepali | French |
| 14 | Foo Chow | Mam | Nepali | Tigrigna - Eritrean | Konjobal |
| 15 | Amharic | Bengali | Foo Chow | Romanian-Moldovan | Tigrigna - Eritrean |
| 16 | Vietnamese | Foo Chow | Bengali | Konjobal | Bengali |
| 17 | Gujarati | Korean | Amharic | Somali | Romanian-Moldovan |
| 18 | Quiche | Amharic | Korean | Bengali | Urdu |
| 19 | Mam | Vietnamese | Tigrigna - Eritrean | Urdu | Albanian |
| 20 | Tagalog | Tigrigna - Eritrean | Konjobal | Foo Chow | Foo Chow |
| 21 | Urdu | Gujarati | Romanian-Moldovan | Korean | Konjobal, Western (Akateko) |
| 22 | Albanian | Albanian | Urdu | Albanian | Gujarati |
| 23 | Armenian | Konjobal | Albanian | Amharic | Hindi |
| 24 | Indonesian | Tagalog | Vietnamese | Vietnamese | Somali |
| 25 | Tigrigna - Eritrean | Urdu | Armenian | Gujarati | Vietnamese |

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

## I-862 ICCs FOR DETAINED CASES

Detention locations include DHS Service Processing Centers (SPC), DHS contract detention facilities, state and local government jails, and Bureau of Prisons institutions. For the purpose of Figure 13, Institutional Hearing Program (IHP) cases are considered detained cases as are cases of unaccompanied alien children (UAC) in the custody of the Department of Health and Human Services.

**Figure 14.** Detained I-862 ICCs increased 15 percent from FY 2017 to FY 2018.



**Figure 14. I-862 ICCs by Detention Status**

|  | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 |
|---|---|---|---|---|---|
| Initial Case Completions for Detained Aliens | 51,450 | 40,627 | 40,115 | 54,273 | 62,676 |
| Initial Case Completions for All Aliens | 128,464 | 131,431 | 130,554 | 150,757 | 182,421 |
| Percent Detained | 40% | 31% | 31% | 36% | 34% |

**Figure 15.** The number of standard detained completions – aliens at least 18 years of age that are not at an IHP location, are not UAC or in HHS custody, and are not considered to have competency concerns or to be subject to the *Franco* litigation – have increased 17 percent from FY 2017 to FY 2018.



**Figure 15. I-862 Standard Detained ICCs**

|  | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 |
|---|---|---|---|---|---|
| Completions | 44,864 | 34,106 | 32,622 | 45,569 | 53,303 |

19

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 236 of 1770

U.S. DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

## Table 10. I-862 Detained ICCs

| Immigration Court | Completions |
|---|---|
| Adelanto | 2,082 |
| Arlington | 1,009 |
| Atlanta | 2,383 |
| Aurora | 1,345 |
| Baltimore | 464 |
| Batavia | 621 |
| Bloomington | 996 |
| Boston | 951 |
| Buffalo | 0 |
| Charlotte | 1 |
| Chicago | 1,717 |
| Cleveland | 950 |
| Dallas | 3,857 |
| Denver | 100 |
| Detroit | 1,093 |
| El Paso | 107 |
| El Paso SPC | 1,014 |
| Elizabeth | 1,293 |
| Eloy | 2,652 |
| Fishkill | 99 |
| Florence | 881 |
| Harlingen | 19 |
| Hartford | 181 |
| Honolulu | 137 |
| Houston | 21 |
| Houston SPC | 5,012 |
| Imperial | 439 |
| Kansas City | 723 |
| Krome | 4,012 |
| Las Vegas | 1,131 |
| LaSalle | 2,535 |
| Los Angeles (N) | 17 |
| Los Angeles (D) | 1,712 |
| Louisville | 0 |
| Memphis | 0 |
| Miami | 98 |
| New Orleans | 0 |
| New York City | 42 |
| Newark | 3 |
| Oakdale | 2,076 |
| Omaha | 800 |
| Orlando | 731 |
| Otay Mesa | 1,052 |
| Otero | 1,692 |
| Pearsall | 1,806 |
| Philadelphia | 12 |
| Phoenix | 43 |
| Port Isabel | 1,645 |
| Portland | 1 |
| Saipan | 5 |
| Salt Lake City | 160 |
| San Antonio | 717 |
| San Diego | 42 |
| San Francisco | 1,691 |
| San Juan | 12 |
| Seattle | 9 |
| Stewart | 4,704 |
| Tacoma | 2,557 |
| Tucson | 298 |
| Ulster | 187 |
| Varick | 1,070 |
| York | 1,669 |
| **Total** | **62,676** |

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

## I-862 INSTITUTIONAL HEARING PROGRAM CASES RECEIVED AND COMPLETED

IHP is a cooperative effort between EOIR, DHS, and various federal, state, and municipal corrections agencies. IJs and court staff either travel to IHP facilities to conduct IHP hearings, or the IJs conduct the hearings by video teleconferencing.

**Figure 16.** New IHP case receipts increased slightly over FY 2017 levels.

**Figure 16. I-862 IHP Receipts and ICCs**



| | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 |
|---|---|---|---|---|---|
| New NTAs | 3,916 | 2,914 | 3,568 | 2,581 | 2,790 |
| Initial Case Completions | 3,217 | 2,737 | 2,991 | 2,471 | 2,450 |

### Table 11. I-862 IHP ICCs by Decision

| Disposition | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 |
|---|---|---|---|---|---|
| Removal | 3,100 | 2,591 | 2,743 | 2,340 | 2,315 |
| Termination | 86 | 95 | 95 | 54 | 100 |
| Relief | 28 | 40 | 117 | 63 | 22 |
| Voluntary Departure | 3 | 7 | 28 | 10 | 12 |
| Other | 0 | 4 | 8 | 4 | 1 |
| **Total Completions** | **3,217** | **2,737** | **2,991** | **2,471** | **2,450** |

DOJIFR00702

**U.S. Department of Justice**
Executive Office for
Immigration Review

## I-862 ICCs with Applications for Relief

**Figure 17.** The percent of completed I-862 cases with applications for relief increased about 19 percent since FY 2017.



**Figure 17. I-862 ICCs by Application Filing Status**

|  | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 |
|---|---|---|---|---|---|
| With Applications | 44,805 | 40,638 | 44,917 | 55,729 | 80,278 |
| Without Applications | 83,659 | 90,793 | 85,637 | 95,028 | 102,143 |
| Total | 128,464 | 131,431 | 130,554 | 150,757 | 182,421 |

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

## Table 12. I-862 ICCs with Applications for Relief

| Immigration Court | Initial Case Completions | Number of Completions with Applications | Percent with Applications |
|---|---|---|---|
| Adelanto | 2,125 | 990 | 47% |
| Arlington | 4,795 | 2,322 | 48% |
| Atlanta | 5,662 | 1,681 | 30% |
| Aurora | 1,371 | 424 | 31% |
| Baltimore | 3,952 | 1,997 | 51% |
| Batavia | 648 | 219 | 34% |
| Bloomington | 1,754 | 553 | 32% |
| Boston | 3,387 | 1,789 | 53% |
| Buffalo | 619 | 297 | 48% |
| Charlotte | 4,847 | 1,167 | 24% |
| Chicago | 5,730 | 1,989 | 35% |
| Cleveland | 2,040 | 737 | 36% |
| Dallas | 6,360 | 1,428 | 22% |
| Denver | 1,910 | 886 | 46% |
| Detroit | 1,954 | 673 | 34% |
| El Paso | 1,537 | 437 | 28% |
| El Paso SPC | 1,016 | 294 | 29% |
| Elizabeth | 1,301 | 530 | 41% |
| Eloy | 2,663 | 949 | 36% |
| Fishkill | 99 | 28 | 28% |
| Florence | 887 | 264 | 30% |
| Harlingen | 1,289 | 459 | 36% |
| Hartford | 982 | 516 | 53% |
| Honolulu | 681 | 511 | 75% |
| Houston | 9,988 | 4,916 | 49% |
| Houston SPC | 5,017 | 1,159 | 23% |
| Imperial | 573 | 297 | 52% |
| Kansas City | 2,489 | 919 | 37% |
| Krome | 4,046 | 1,293 | 32% |
| Las Vegas | 2,499 | 1,191 | 48% |
| LaSalle | 2,538 | 377 | 15% |
| Los Angeles (N) | 9,970 | 5,792 | 58% |
| Los Angeles (D) | 1,743 | 814 | 47% |
| Louisville | 1,228 | 388 | 32% |
| Memphis | 3,613 | 1,521 | 42% |
| Miami | 9,023 | 4,998 | 55% |
| New Orleans | 3,290 | 983 | 30% |
| New York City | 15,725 | 11,866 | 75% |
| Newark | 3,702 | 1,461 | 39% |
| Oakdale | 2,077 | 349 | 17% |
| Omaha | 1,615 | 673 | 42% |
| Orlando | 3,853 | 1,604 | 42% |
| Otay Mesa | 1,078 | 528 | 49% |
| Otero | 1,695 | 330 | 19% |
| Pearsall | 1,806 | 563 | 31% |
| Philadelphia | 2,139 | 1,008 | 47% |
| Phoenix | 2,964 | 1,569 | 53% |
| Port Isabel | 1,653 | 765 | 46% |
| Portland | 853 | 544 | 64% |
| Saipan | 35 | 16 | 46% |
| Salt Lake City | 1,602 | 1,001 | 62% |
| San Antonio | 4,376 | 1,765 | 40% |
| San Diego | 2,045 | 1,075 | 53% |
| San Francisco | 8,813 | 5,413 | 61% |
| San Juan | 113 | 33 | 29% |
| Seattle | 1,709 | 1,041 | 61% |
| Stewart | 4,737 | 471 | 10% |
| Tacoma | 2,564 | 1,033 | 40% |
| Tucson | 696 | 341 | 49% |
| Ulster | 187 | 61 | 33% |
| Varick | 1,086 | 535 | 49% |
| York | 1,672 | 445 | 27% |
| **Total** | **182,421** | **80,278** | **44%** |

| Key |
|---|
| >50% of completions had applications |
| <15% of completions had applications |

DOJIFR00704

**U.S. Department of Justice**
Executive Office for
Immigration Review

## I-862 Asylum Cases Received and ICCs

There are two types of asylum processes – defensive and affirmative. The defensive asylum process applies to aliens who appear before EOIR and who request asylum before an IJ. The affirmative asylum process applies to aliens who initially file an asylum application with USCIS and, subsequently, have that application referred by USCIS to EOIR.

**Figure 18.** Defensive asylum receipts have increased significantly (258 percent) from FY 2014 to FY 2018. In the same period, affirmative asylum receipts have increased 202 percent.



**Figure 18. Asylum I-862 Receipts**

| | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 |
|---|---|---|---|---|---|
| Affirmative | 16,251 | 17,292 | 12,721 | 22,156 | 49,004 |
| Defensive | 30,886 | 45,895 | 69,009 | 120,815 | 110,469 |
| Total | 47,137 | 63,187 | 81,730 | 142,971 | 159,473 |

**Figure 19.** Asylum receipts increased 238 percent from FY 2014 to FY 2018; completions increased by 125 percent over the same period.



**Figure 19. Asylum I-862 Receipts and ICCs**

| | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 |
|---|---|---|---|---|---|
| Receipts | 47,137 | 63,187 | 81,730 | 142,971 | 159,473 |
| Completions | 27,667 | 27,590 | 32,981 | 42,907 | 62,382 |

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 241 of 1770

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

## Table 13. Asylum I-862 ICCs by Court for FY 2018

| Immigration Court | Completions |
|---|---|
| Adelanto | 826 |
| Arlington | 2,089 |
| Atlanta | 963 |
| Aurora | 302 |
| Baltimore | 1,904 |
| Batavia | 167 |
| Bloomington | 346 |
| Boston | 1,215 |
| Buffalo | 174 |
| Charlotte | 961 |
| Chicago | 1,192 |
| Cleveland | 551 |
| Dallas | 773 |
| Denver | 531 |
| Detroit | 407 |
| El Paso | 191 |
| El Paso SPC | 263 |
| Elizabeth | 340 |
| Eloy | 604 |
| Fishkill | 5 |
| Florence | 201 |
| Harlingen | 218 |
| Hartford | 420 |
| Honolulu | 486 |
| Houston | 4,148 |
| Houston SPC | 602 |
| Imperial | 265 |
| Kansas City | 755 |
| Krome | 846 |
| Las Vegas | 817 |
| LaSalle | 195 |
| Los Angeles (N) | 4,698 |
| Los Angeles (D) | 647 |
| Louisville | 242 |
| Memphis | 1,100 |
| Miami | 4,281 |
| New Orleans | 755 |
| New York City | 11,029 |
| Newark | 1,058 |
| Oakdale | 223 |
| Omaha | 472 |
| Orlando | 1,370 |
| Otay Mesa | 432 |
| Otero | 260 |
| Pearsall | 391 |
| Philadelphia | 800 |
| Phoenix | 767 |
| Port Isabel | 543 |
| Portland | 466 |
| Saipan | 12 |
| Salt Lake City | 751 |
| San Antonio | 1,384 |
| San Diego | 905 |
| San Francisco | 4,213 |
| San Juan | 6 |
| Seattle | 944 |
| Stewart | 226 |
| Tacoma | 823 |
| Tucson | 204 |
| Ulster | 6 |
| Varick | 320 |
| York | 297 |
| **Total** | **62,382** |

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

## I-862 ASYLUM ICCS BY DECISION

An asylum application also generally serves as an application for withholding of removal under section 241(b)(3) of the Immigration and Nationality Act (INA). As such, EOIR reports on these two forms of relief and protection from removal contemporaneously.

**Figure 20.** In the past five years, asylum grants have increased by about 53 percent. In the same period, denials increased 193 percent.

**Figure 20. Asylum I-862 ICCs by Decision**

|  | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 |
|---|---|---|---|---|---|
| Grants | 8,637 | 8,168 | 8,728 | 10,663 | 13,248 |
| Denials | 9,121 | 8,727 | 11,676 | 17,641 | 26,689 |
| Other | 9,909 | 10,695 | 12,577 | 14,603 | 22,445 |

**Figure 21.** The defensive grant rate is consistently lower than that of affirmative asylum applications.



**Figure 21. Affirmative and Defensive Asylum I-862 ICCs by Decision**

■ Affirmative Grants    ■ Defensive Grants
■ Affirmative Denials    ■ Defensive Denials
■ Affirmative Other Closures    ■ Defensive Other Closures

DOJIFR00707

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

**Figure 22.**
Administrative closures of asylum cases decreased by about 81 percent from FY 2017 to FY 2018.



**Figure 22. Asylum I-862 Administrative Closures, Including Those with a Subsequent Granted Motion to Recalendar**

|  | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 |
|---|---|---|---|---|---|
| Asylum Administrative Closures | 9,595 | 15,489 | 21,764 | 10,982 | 2,109 |

**Figure 23.** The grant rate for either asylum or withholding of removal has decreased about 33 percent in the last five years.



**Figure 23. I-862 Asylum and I-862 Withholding of Removal ICCs by Decision**

|  | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 |
|---|---|---|---|---|---|
| Asylum Grants | 8,637 | 8,168 | 8,728 | 10,663 | 13,248 |
| Withholding of Removal Grants | 1,464 | 1,153 | 1,056 | 1,274 | 1,746 |
| Denials of Asylum and/or Withholding of Removal | 7,905 | 7,693 | 10,711 | 16,167 | 24,730 |
| Grant Rate | 56% | 55% | 48% | 42% | 38% |

**Figure 24.** The withholding of removal grant rate has decreased about 38 percent from FY 2014 to FY 2018.



**Figure 24. I-862 Withholding of Removal ICCs by Decision**

|  | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 |
|---|---|---|---|---|---|
| Grants | 1,464 | 1,153 | 1,056 | 1,274 | 1,746 |
| Denials | 9,639 | 9,055 | 12,094 | 17,738 | 26,906 |
| Others | 11,978 | 12,063 | 13,593 | 17,143 | 25,989 |

DOJIFR00708

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

## Table 14. I-862 ICC Asylum Decision Rate by Immigration Court

| Immigration Court | Grants | | Denials | | Other Closures | | Administrative Closure | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Number | Rate | Number | Rate | Number | Rate | Number | Rate | |
| Adelanto | 140 | 17% | 531 | 64% | 155 | 19% | 1 | 0% | 827 |
| Arlington | 665 | 31% | 679 | 32% | 745 | 35% | 39 | 2% | 2,128 |
| Atlanta | 22 | 2% | 629 | 65% | 312 | 32% | 9 | 1% | 972 |
| Aurora | 40 | 13% | 192 | 62% | 70 | 23% | 7 | 2% | 309 |
| Baltimore | 737 | 38% | 617 | 32% | 550 | 28% | 53 | 3% | 1,957 |
| Batavia | 18 | 11% | 90 | 54% | 59 | 35% | 1 | 1% | 168 |
| Bloomington | 39 | 11% | 163 | 45% | 144 | 40% | 13 | 4% | 359 |
| Boston | 352 | 26% | 296 | 22% | 567 | 42% | 142 | 10% | 1,357 |
| Buffalo | 34 | 19% | 94 | 53% | 46 | 26% | 3 | 2% | 177 |
| Charlotte | 32 | 3% | 700 | 71% | 229 | 23% | 26 | 3% | 987 |
| Chicago | 410 | 33% | 399 | 32% | 383 | 31% | 60 | 5% | 1,252 |
| Cleveland | 60 | 11% | 266 | 47% | 225 | 40% | 13 | 2% | 564 |
| Dallas | 73 | 9% | 428 | 55% | 272 | 35% | 11 | 1% | 784 |
| Denver | 106 | 19% | 237 | 43% | 188 | 34% | 18 | 3% | 549 |
| Detroit | 37 | 9% | 200 | 49% | 170 | 41% | 4 | 1% | 411 |
| El Paso | 4 | 2% | 71 | 37% | 116 | 60% | 3 | 2% | 194 |
| El Paso SPC | 41 | 16% | 176 | 67% | 46 | 17% | 1 | 0% | 264 |
| Elizabeth | 83 | 24% | 164 | 48% | 93 | 27% | 3 | 1% | 343 |
| Eloy | 12 | 2% | 361 | 59% | 231 | 38% | 3 | 0% | 607 |
| Fishkill | 0 | 0% | 3 | 60% | 2 | 40% | 0 | 0% | 5 |
| Florence | 9 | 4% | 118 | 58% | 74 | 37% | 1 | 0% | 202 |
| Harlingen | 5 | 2% | 94 | 42% | 119 | 53% | 7 | 3% | 225 |
| Hartford | 92 | 21% | 197 | 46% | 131 | 31% | 8 | 2% | 428 |
| Honolulu | 295 | 60% | 158 | 32% | 33 | 7% | 9 | 2% | 495 |
| Houston | 243 | 6% | 2,757 | 65% | 1,148 | 27% | 126 | 3% | 4,274 |
| Houston SPC | 19 | 3% | 364 | 59% | 219 | 36% | 13 | 2% | 615 |
| Imperial | 77 | 29% | 152 | 57% | 36 | 14% | 0 | 0% | 265 |
| Kansas City | 81 | 11% | 407 | 53% | 267 | 35% | 8 | 1% | 763 |
| Krome | 20 | 2% | 386 | 46% | 440 | 52% | 1 | 0% | 847 |
| Las Vegas | 32 | 3% | 514 | 56% | 271 | 30% | 99 | 11% | 916 |
| LaSalle | 4 | 2% | 100 | 51% | 91 | 47% | 0 | 0% | 195 |
| Los Angeles (N) | 555 | 11% | 1,383 | 28% | 2,760 | 56% | 192 | 4% | 4,890 |
| Los Angeles (D) | 80 | 12% | 421 | 65% | 146 | 23% | 0 | 0% | 647 |
| Louisville | 23 | 9% | 151 | 61% | 68 | 28% | 5 | 2% | 247 |
| Memphis | 101 | 9% | 700 | 63% | 299 | 27% | 7 | 1% | 1,107 |
| Miami | 404 | 9% | 2,775 | 63% | 1,102 | 25% | 144 | 3% | 4,425 |
| New Orleans | 81 | 10% | 514 | 66% | 160 | 21% | 25 | 3% | 780 |
| New York City | 4,894 | 43% | 2,384 | 21% | 3,751 | 33% | 316 | 3% | 11,345 |
| Newark | 151 | 13% | 143 | 13% | 764 | 68% | 70 | 6% | 1,128 |
| Oakdale | 21 | 9% | 131 | 59% | 71 | 32% | 0 | 0% | 223 |
| Omaha | 18 | 4% | 229 | 46% | 225 | 46% | 21 | 4% | 493 |
| Orlando | 104 | 7% | 813 | 57% | 453 | 32% | 54 | 4% | 1,424 |
| Otay Mesa | 67 | 15% | 293 | 68% | 72 | 17% | 1 | 0% | 433 |
| Otero | 7 | 3% | 185 | 71% | 68 | 26% | 0 | 0% | 260 |
| Pearsall | 79 | 20% | 234 | 60% | 78 | 20% | 2 | 1% | 393 |
| Philadelphia | 222 | 27% | 218 | 26% | 360 | 44% | 24 | 3% | 824 |
| Phoenix | 91 | 12% | 117 | 15% | 559 | 71% | 17 | 2% | 784 |
| Port Isabel | 38 | 7% | 421 | 78% | 84 | 15% | 0 | 0% | 543 |
| Portland | 108 | 21% | 170 | 33% | 188 | 37% | 44 | 9% | 510 |
| Saipan | 0 | 0% | 11 | 0% | 1 | 0% | 0 | 0% | 12 |
| Salt Lake City | 99 | 13% | 431 | 56% | 221 | 29% | 16 | 2% | 767 |
| San Antonio | 184 | 13% | 504 | 35% | 696 | 49% | 43 | 3% | 1,427 |
| San Diego | 81 | 8% | 606 | 64% | 218 | 23% | 48 | 5% | 953 |
| San Francisco | 1,514 | 33% | 729 | 16% | 1,970 | 43% | 342 | 8% | 4,555 |
| San Juan | 0 | 0% | 0 | 0% | 6 | 100% | 0 | 0% | 6 |
| Seattle | 266 | 27% | 470 | 48% | 208 | 21% | 36 | 4% | 980 |
| Stewart | 16 | 7% | 156 | 69% | 54 | 24% | 1 | 0% | 227 |
| Tacoma | 175 | 21% | 470 | 57% | 178 | 22% | 3 | 0% | 826 |
| Tucson | 23 | 11% | 146 | 71% | 35 | 17% | 2 | 1% | 206 |
| Ulster | 0 | 0% | 3 | 43% | 3 | 43% | 1 | 14% | 7 |
| Varick | 20 | 6% | 172 | 53% | 128 | 39% | 6 | 2% | 326 |
| York | 44 | 14% | 166 | 55% | 87 | 29% | 7 | 2% | 304 |
| **Total** | **13,248** | **21%** | **26,689** | **41%** | **22,445** | **35%** | **2,109** | **3%** | **64,491** |

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

## I-862 ICC ASYLUM GRANTS BY COUNTRY OF NATIONALITY

**Figure 25.** In FY 2018, the top four nationalities accounted for 53 percent of asylum grants. China alone accounted for 23 percent of all asylum grants.

**Table 15.** For each of the five years, six of the top 10 countries from which aliens were granted asylum were China, El Salvador, Honduras, Guatemala, India, and Nepal.

**Figure 25. Asylum I-862 ICC Grants by Country of Nationality**



|  | Asylum Grants |
|---|---|
| China | 3,061 |
| El Salvador | 1,786 |
| Honduras | 1,188 |
| Guatemala | 1,021 |
| Other | 6,192 |

### Table 15. Asylum I-862 ICC Grants by Top 25 Countries of Nationality

| Rank | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 |
|---|---|---|---|---|---|
| 1 | China | China | China | China | China |
| 2 | India | Guatemala | El Salvador | El Salvador | El Salvador |
| 3 | Ethiopia | Honduras | Guatemala | Honduras | Honduras |
| 4 | Nepal | El Salvador | Honduras | Guatemala | Guatemala |
| 5 | Egypt | India | Mexico | Mexico | India |
| 6 | El Salvador | Nepal | India | India | Mexico |
| 7 | Guatemala | Ethiopia | Nepal | Nepal | Nepal |
| 8 | Eritrea | Mexico | Ethiopia | Eritrea | Cameroon |
| 9 | Soviet Union | Somalia | Somalia | Cameroon | Bangladesh |
| 10 | Honduras | Soviet Union | Eritrea | Ethiopia | Eritrea |
| 11 | Somalia | Egypt | Egypt | Syria | Albania |
| 12 | Russia | Eritrea | Soviet Union | Egypt | Egypt |
| 13 | Cameroon | Syria | Cameroon | Bangladesh | Cuba |
| 14 | Mexico | Russia | Bangladesh | Soviet Union | Syria |
| 15 | Pakistan | Cameroon | Albania | Albania | Pakistan |
| 16 | Venezuela | Bangladesh | Russia | Pakistan | Ethiopia |
| 17 | Iraq | Nigeria | Syria | Haiti | Venezuela |
| 18 | Gambia | Albania | Pakistan | Somalia | Ecuador |
| 19 | Sri Lanka | Haiti | Burkina Faso | Guinea | Russia |
| 20 | Moldavia (Moldova) | Colombia | Nigeria | Burkina Faso | Soviet Union |
| 21 | Colombia | Pakistan | Ghana | Ecuador | Ukraine |
| 22 | Syria | Gambia | Iran | Ghana | Guinea |
| 23 | Albania | Iraq | Kirghizia (Kyrgzstan) | Nigeria | Iraq |
| 24 | Burkina Faso | Burkina Faso | Guinea | Ukraine | Kirghizia (Kyrgzstan) |
| 25 | Nigeria | Kirghizia (Kyrgzstan) | Ukraine | Venezuela | Burkina Faso |

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 246 of 1770

U.S. DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

## CONVENTION AGAINST TORTURE

In 1999, the Department of Justice implemented regulations regarding the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Convention Against Torture or CAT). There are two forms of protection under the Convention Against Torture, withholding of removal and deferral of removal.

**Table 16. Convention Against Torture I-862 Initial and Subsequent Case Completions by Decision**

| Granted | | | Denied | Other | Withdrawn | Abandoned | Not Adjudicated | Total |
|---|---|---|---|---|---|---|---|---|
| Withholding | Deferral | Total | | | | | | |
| 1,157 | 177 | 1,334 | 25,964 | 25,802 | 9,816 | 3,414 | 3,288 | 69,618 |

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

## Table 17. Convention Against Torture I-862 Initial and Subsequent Case Completions by Court

| Immigration Court | Completions |
|---|---|
| Adelanto | 1,225 |
| Arlington | 2,288 |
| Atlanta | 1,123 |
| Aurora | 465 |
| Baltimore | 1,926 |
| Batavia | 256 |
| Bloomington | 491 |
| Boston | 915 |
| Buffalo | 245 |
| Charlotte | 1,019 |
| Chicago | 3,626 |
| Cleveland | 596 |
| Dallas | 957 |
| Denver | 532 |
| Detroit | 644 |
| El Paso | 473 |
| El Paso SPC | 317 |
| Elizabeth | 498 |
| Eloy | 907 |
| Fishkill | 38 |
| Florence | 543 |
| Harlingen | 251 |
| Hartford | 424 |
| Honolulu | 436 |
| Houston | 3,491 |
| Houston SPC | 910 |
| Imperial | 1,027 |
| Kansas City | 757 |
| Krome | 890 |
| Las Vegas | 1,059 |
| LaSalle | 242 |
| Los Angeles (N) | 4,128 |
| Los Angeles (D) | 872 |
| Louisville | 291 |
| Memphis | 1,166 |
| Miami | 4,492 |
| New Orleans | 802 |
| New York City | 8,143 |
| Newark | 1,036 |
| Oakdale | 293 |
| Omaha | 335 |
| Orlando | 1,585 |
| Otay Mesa | 1,278 |
| Otero | 274 |
| Pearsall | 530 |
| Philadelphia | 1,316 |
| Phoenix | 550 |
| Port Isabel | 725 |
| Portland | 553 |
| Saipan | 16 |
| Salt Lake City | 660 |
| San Antonio | 1,886 |
| San Diego | 1,055 |
| San Francisco | 5,279 |
| San Juan | 16 |
| Seattle | 1,040 |
| Stewart | 274 |
| Tacoma | 1,132 |
| Tucson | 146 |
| Ulster | 72 |
| Varick | 621 |
| York | 481 |
| **Total** | **69,618** |

DOJIFR00712

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

## I-862 APPLICATIONS FOR RELIEF OTHER THAN ASYLUM

In addition to asylum, there is a variety of types of relief from removal available to aliens in immigration proceedings. These include, but are not limited to, different forms of cancellation of removal, adjustment of status, and different types of waivers.

### Table 18. I-862 Cases Grants of Relief

| Fiscal Year | Relief Granted to Lawful Permanent Residents (LPR) | | Relief Granted to Non-LPR | | | | |
|---|---|---|---|---|---|---|---|
| | Relief Granted Under Section 212(c) | Cancellation of Removal | Not Subject to Annual Cap of 4,000 Grants | | | Subject to Annual Cap of 4,000 Grants | |
| | | | Adjustment of Status to LPR | Suspension of Deportation | Cancellation of Removal | Suspension of Deportation | Cancellation of Removal |
| FY 14 | 551 | 3,220 | 3,281 | 69 | 275 | 2 | 3,847 |
| FY 15 | 439 | 2,592 | 2,198 | 53 | 279 | 2 | 3,826 |
| FY 16 | 385 | 2,239 | 1,854 | 31 | 246 | 1 | 3,730 |
| FY 17 | 401 | 2,202 | 1,861 | 54 | 304 | 0 | 3,719 |
| FY 18 | 368 | 2,152 | 3,088 | 37 | 187 | 0 | 3,752 |

DOJIFR00713

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

## I-862 *IN ABSENTIA* ORDERS

When an alien fails to appear for a hearing, the IJ may conduct a hearing in the alien's absence (*in absentia*). The *in absentia* rate refers to the proportion of all IJ decisions at the ICC where the removal order is issued *in absentia*.

### Table 19. I-862 *In Absentia* Orders and ICCs by Respondent Type

| FY | Decision Subset | All Cases | Never Detained Cases | Released Cases | UAC Cases | Asylum Cases |
|---|---|---|---|---|---|---|
| FY 14 | In Absentia Orders | 26,234 | 15,409 | 10,709 | 2,153 | 1,700 |
| | Initial Case Completion | 128,464 | 49,483 | 27,531 | 3,969 | 27,669 |
| FY 15 | In Absentia Orders | 38,432 | 26,954 | 11,409 | 7,255 | 1,797 |
| | Initial Case Completion | 131,431 | 62,245 | 28,559 | 14,387 | 27,592 |
| FY 16 | In Absentia Orders | 34,557 | 24,644 | 9,838 | 6,499 | 2,934 |
| | Initial Case Completion | 130,554 | 64,340 | 26,098 | 15,543 | 32,982 |
| FY 17 | In Absentia Orders | 42,205 | 30,518 | 11,601 | 6,875 | 4,594 |
| | Initial Case Completion | 150,757 | 68,740 | 27,745 | 14,123 | 42,908 |
| FY 18 | In Absentia Orders | 46,480 | 34,133 | 12,268 | 6,782 | 7,135 |
| | Initial Case Completion | 182,421 | 83,568 | 36,180 | 13,572 | 62,383 |

DOJIFR00714

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

## IMMIGRATION JUDGE HIRING

To better manage its caseload, EOIR focused on increased hiring of immigration judges in FY 2017 and FY 2018.

**Figure 26.** The number of IJs on board increased 17 percent from FY 2017 to FY 2018.



**Figure 26. Immigration Judge Hiring**

| | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 |
|---|---|---|---|---|---|---|---|---|---|
| Total IJs Hired | 17 | 39 | 4 | 8 | 0 | 20 | 56 | 64 | 81 |
| Total IJs on Board | 245 | 273 | 267 | 262 | 249 | 254 | 289 | 338 | 395 |

DOJIFR00715

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 251 of 1770

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

# BOARD OF IMMIGRATION APPEALS

## TOTAL CASES RECEIVED AND COMPLETED

The majority of cases BIA reviews arise from decisions IJs make in removal, deportation, or exclusion cases. A full list of case types heard by BIA originating from OCIJ is below. For purposes of this Statistics Yearbook, these types of cases are collectively referred to as appeals from IJ decisions.

- Case appeals from the decisions of IJs in removal, deportation, and exclusion cases at the court level;
- Appeals filed from the decisions of IJs on motions to reopen;
- Motions to reopen and/or reconsider filed in cases already decided by the BIA;
- Appeals pertaining to bond, parole, or detention;
- Interlocutory appeals; and
- Cases (or appeals) remanded from the Federal Court.

The BIA also has jurisdiction to review appeals arising from certain decisions that DHS officials render. These types of appeals are listed below. For purposes of this Statistics Yearbook, appeals from these DHS decisions are referred to as DHS decision appeals.

- Family-based visa petitions adjudicated by DHS district directors or regional service center directors;
- Waivers of inadmissibility for non-immigrants under INA § 212(d)(3)(A)(ii); and
- Fines and penalties imposed upon carriers for violations of immigration laws.

**Figure 27.** In FY 2018 completions decreased slightly while receipts increased by about 48 percent.



**Figure 27. Total BIA Cases Received and Completed**

|             | FY 14  | FY 15  | FY 16  | FY 17  | FY 18  |
|-------------|--------|--------|--------|--------|--------|
| Receipts    | 29,750 | 29,347 | 30,224 | 33,556 | 49,522 |
| Completions | 30,821 | 34,240 | 33,241 | 31,820 | 29,788 |

DOJIFR00716

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 252 of 1770

U.S. DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

## CASES RECEIVED AND COMPLETED BY TYPE

BIA has jurisdiction over appeals from IJ decisions and certain DHS decisions. The majority of appeals from IJ decisions are from case appeals, and the majority of appeals from DHS decisions are from visa petitions.

**Figure 28.** Appeals from IJ decisions make up most of the BIA's work. Completions of appeals from IJ decisions were roughly constant from FY 2017 to FY 2018. Completions from DHS decisions decreased by about 51 percent.

### Figure 28. BIA Receipts and Completions by Case Type



| | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 |
|---|---|---|---|---|---|
| ■ Receipts: Appeals from DHS Decisions | 4,382 | 6,480 | 5,638 | 3,957 | 2,075 |
| ■ Receipts: Appeals from IJ Decisions | 17,329 | 15,423 | 17,548 | 23,001 | 39,028 |
| ■ Receipts: Board Cases | 8,039 | 7,444 | 7,038 | 6,598 | 8,419 |
| Receipts: Total Appeals | 29,750 | 29,347 | 30,224 | 33,556 | 49,522 |
| ■ Completions: Appeals from DHS Decisions | 3,292 | 6,638 | 6,767 | 4,586 | 2,251 |
| ■ Completions: Appeals from IJ Decisions | 19,626 | 19,569 | 19,287 | 21,454 | 20,986 |
| ■ Completions: Board Cases | 7,903 | 8,033 | 7,187 | 5,780 | 6,551 |
| Completions: Total Appeals | 30,821 | 34,240 | 33,241 | 31,820 | 29,788 |

### Table 20. BIA Receipts and Completions by Type

| Appeal Type | FY 2014 | | FY 2015 | | FY 2016 | | FY 2017 | | FY 2018 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Receipts | Comp. | Receipts | Comp. | Receipts | Comp. | Receipts | Comp. | Receipts | Comp. |
| **Total Appeals from IJ Decisions** | 17,329 | 19,626 | 15,423 | 19,569 | 17,548 | 19,287 | 23,001 | 21,454 | 39,028 | 20,986 |
| *Case Appeal* | 13,558 | 15,775 | 11,475 | 15,474 | 12,738 | 14,563 | 17,136 | 15,966 | 31,902 | 14,464 |
| *Appeal of IJ Motion to Reopen* | 1,516 | 1,691 | 1,455 | 1,659 | 1,453 | 1,631 | 1,789 | 1,960 | 2,604 | 1,793 |
| *Bond Appeal* | 2,091 | 1,990 | 2,253 | 2,220 | 3,003 | 2,805 | 3,624 | 3,124 | 3,576 | 3,951 |
| *Interlocutory Appeal* | 163 | 169 | 240 | 216 | 353 | 287 | 452 | 404 | 946 | 778 |
| *Continued Detention Review* | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 |
| *Zero Bond Appeal* | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Appeals from DHS Decisions** | 4,382 | 3,292 | 6,480 | 6,638 | 5,638 | 6,767 | 3,957 | 4,586 | 2,075 | 2,251 |
| *Decisions on Visa Petitions* | 4,333 | 3,267 | 6,435 | 6,573 | 5,612 | 6,734 | 3,912 | 4,553 | 1,988 | 2,169 |
| *212(d)(3)(A) Waiver Decisions* | 49 | 25 | 45 | 65 | 26 | 33 | 45 | 33 | 87 | 82 |
| *Decisions on Fines and Penalties* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Board Cases** | 8,039 | 7,903 | 7,444 | 8,033 | 7,038 | 7,187 | 6,598 | 5,780 | 8,419 | 6,551 |
| *Motion to Reopen/Reconsider-BIA* | 6,693 | 6,394 | 5,908 | 6,427 | 5,641 | 5,586 | 5,897 | 5,000 | 7,659 | 5,823 |
| *Bond MTR* | 32 | 35 | 52 | 47 | 57 | 45 | 33 | 43 | 65 | 52 |
| *Federal Court Remand* | 1,314 | 1,474 | 1,484 | 1,559 | 1,340 | 1,556 | 668 | 737 | 695 | 676 |
| **Grand Total** | 29,750 | 30,821 | 29,347 | 34,240 | 30,224 | 33,241 | 33,556 | 31,820 | 49,522 | 29,788 |

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

## APPEALS COMPLETED BY COUNTRY OF NATIONALITY

BIA hears appeals involving hundreds of nationalities. Appeals arise primarily in cases of aliens from Mexico and Central America.

**Figure 29.** Over half of completed appeals involve an alien from one of three countries.

**Table 21.** For the past five years, nine countries ranked among the top ten: Mexico, El Salvador, Guatemala, Honduras, China, Haiti, India, Jamaica, and Dominican Republic.

**Figure 29. Completed Appeals (excluding DHS Decisions) by Nationality**



| | Completions |
|---|---|
| Mexico | 7,405 |
| El Salvador | 4,047 |
| Guatemala | 3,125 |
| Honduras | 2,838 |
| Other | 10,122 |

### Table 21. BIA Appeals from ICCs by Top 25 Countries of Nationality

| Rank | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 |
|---|---|---|---|---|---|
| 1 | Mexico | Mexico | Mexico | Mexico | Mexico |
| 2 | China | El Salvador | El Salvador | El Salvador | El Salvador |
| 3 | El Salvador | China | China | Guatemala | Guatemala |
| 4 | Guatemala | Guatemala | Guatemala | Honduras | Honduras |
| 5 | Honduras | Honduras | Honduras | China | China |
| 6 | India | India | India | India | Haiti |
| 7 | Jamaica | Haiti | Haiti | Haiti | India |
| 8 | Colombia | Jamaica | Jamaica | Jamaica | Jamaica |
| 9 | Haiti | Colombia | Dominican Republic | Dominican Republic | Dominican Republic |
| 10 | Dominican Republic | Dominican Republic | Colombia | Ecuador | Ecuador |
| 11 | Brazil | Brazil | Bangladesh | Colombia | Brazil |
| 12 | Indonesia | Nigeria | Ecuador | Bangladesh | Iraq |
| 13 | Nigeria | Ecuador | Brazil | Brazil | Colombia |
| 14 | Peru | Philippines | Nigeria | Nigeria | Nigeria |
| 15 | Pakistan | Peru | Philippines | Ghana | Somalia |
| 16 | Ecuador | Indonesia | Peru | Philippines | Pakistan |
| 17 | Philippines | Nicaragua | Indonesia | Pakistan | Bangladesh |
| 18 | Kenya | Bangladesh | Armenia | Peru | Nicaragua |
| 19 | Venezuela | Pakistan | Nicaragua | Somalia | Peru |
| 20 | Nicaragua | Nepal | Ghana | Nicaragua | Indonesia |
| 21 | Ghana | Kenya | Nepal | Venezuela | Venezuela |
| 22 | Russia | Armenia | Pakistan | Kenya | Ghana |
| 23 | Nepal | Venezuela | Venezuela | Cameroon | Cameroon |
| 24 | Albania | Russia | Kenya | Cuba | Cuba |
| 25 | Armenia | Ghana | Albania | Nepal | Guinea |

DOJIFR00718

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

## APPEALS COMPLETED BY REPRESENTATION STATUS

**Figure 30.** Representation rate for appeals has remained roughly constant across the past five years, reaching a high of 80 percent of completed appeals represented in FY 2017.

**Figure 30. Completed Appeals (excluding DHS Decisions) by Representation Status**



| | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 |
|---|---|---|---|---|---|
| ■ Represented | 20,802 | 21,129 | 20,944 | 21,808 | 21,672 |
| ■ Unrepresented | 6,727 | 6,473 | 5,530 | 5,426 | 5,865 |
| Total | 27,529 | 27,602 | 26,474 | 27,234 | 27,537 |
| % Represented | 76% | 77% | 79% | 80% | 79% |

DOJIFR00719

Case 1:20-cv-00116-EGS    Document 85    Filed 03/27/20    Page 255 of 1770

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

## CASE APPEALS COMPLETED FOR DETAINED CASES

BIA handles detained cases (including aliens in IHP) as priority cases. For the purposes of Figure 31, figures for detained cases include IHP cases and cases of unaccompanied alien children in the custody of the Department of Health and Human Services.

**Figure 31.** The percent of completed case appeals that were detained increased about 39 percent form FY 2017 to FY 2018.

**Figure 31. Complete Case Appeals by Detention Status**



|  | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 |
|---|---|---|---|---|---|
| Detained Case Appeal Decisions | 4,796 | 4,398 | 3,577 | 4,243 | 5,336 |
| Total Case Appeal Decisions | 15,775 | 15,474 | 14,563 | 15,966 | 14,464 |
| Percent Detained | 30% | 28% | 25% | 27% | 37% |

**Table 22.** The percent of total detained IHP completions has been consistently between four and seven percent for the past five years.

**Table 22. BIA Detained Completions**

| Fiscal Year | Total Detained Completions | IHP Completions | Percent IHP Completions |
|---|---|---|---|
| FY 14 | 4,796 | 272 | 6% |
| FY 15 | 4,398 | 280 | 6% |
| FY 16 | 3,577 | 266 | 7% |
| FY 17 | 4,243 | 288 | 7% |
| FY 18 | 5,336 | 222 | 4% |

**U.S. Department of Justice**
Executive Office for
Immigration Review

## IJ Decisions (I-862 ICCs) Appealed



**Figure 32. I-862 ICCs Appealed to BIA**

| | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 |
|---|---|---|---|---|---|
| IJ Decisions | 128,464 | 131,431 | 130,554 | 150,757 | 182,421 |
| Case Appeals Received | 13,558 | 11,475 | 12,738 | 17,136 | 31,902 |
| Percent Appealed | 11% | 9% | 10% | 11% | 17% |

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

# OFFICE OF THE CHIEF ADMINISTRATIVE HEARING OFFICER

## TOTAL CASES RECEIVED AND COMPLETED

OCAHO is headed by the Chief Administrative Hearing Officer, who is responsible for the general supervision of administrative law judges (ALJs), management of OCAHO and review of ALJ decisions relating to illegal hiring, employment eligibility verification violations and document fraud. OCAHO's ALJs hear cases and adjudicate issues arising under provisions of the INA relating to:

- Knowingly hiring, recruiting or referring for a fee unauthorized aliens, or the continued employment of unauthorized aliens, failure to comply with employment eligibility verification requirements, and/or requiring indemnity bonds from employees in violation of section 274A of the INA (employer sanctions provisions);
- Unfair immigration-related employment practices in violation of section 274B of the INA (anti-discrimination provisions); and
- Immigration-related document fraud in violation of section 274C of the INA (document fraud provisions).

Employer sanctions and document fraud complaints are brought by the U.S. Department of Homeland Security. Anti-discrimination complaints may be brought by the U.S. Department of Justice's Immigrant and Employee Rights Section or private litigants. All final agency decisions may be appealed to the appropriate federal circuit court of appeals.

DOJIFR00722

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

**Figure 33.** The bulk of OCHAO receipts are 274A and 274B complaints. Note that OCAHO began monitoring remand receipts in FY 2018; there may have been remand receipts in prior years.



**Figure 33. OCAHO Receipts by Type**

|  | 274A Complaints | 274B Complaints | Subpoenas | Requests for Review | Attorney's Fees | Remands | Total |
|---|---|---|---|---|---|---|---|
| FY 15 | 41 | 17 | 22 | 5 | 1 | 0 | 86 |
| FY 16 | 29 | 8 | 21 | 2 | 0 | 0 | 60 |
| FY 17 | 12 | 46 | 45 | 0 | 0 | 0 | 103 |
| FY 18 | 47 | 18 | 20 | 0 | 0 | 1 | 86 |

**Figure 34.** The bulk of OCAHO's completions are 274A and 274B complaints. Note that completions may have been for cases received in prior years. Further, OCAHO began monitoring remand completions in FY 2018; there may have been remand completions in prior years.

**Figure 34. OCAHO Completions by Type**

|  | 274A Complaints | 274B Complaints | Subpoenas | Requests for Review | Attorney's Fees | Remands | Total |
|---|---|---|---|---|---|---|---|
| FY 15 | 57 | 20 | 22 | 5 | 0 | 0 | 104 |
| FY 16 | 37 | 19 | 21 | 2 | 1 | 0 | 80 |
| FY 17 | 26 | 36 | 45 | 0 | 0 | 0 | 107 |
| FY 18 | 32 | 27 | 20 | 0 | 0 | 1 | 80 |

42

DOJIFR00723

**U.S. DEPARTMENT OF JUSTICE**
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

STATISTICS YEARBOOK
FY 2018

# FREEDOM OF INFORMATION ACT (FOIA)

## FOIA RECEIPTS

**Figure 35.** Since FY 2013, the number of FOIA requests received by EOIR has increased by about 107 percent.



**Figure 35. FOIA Receipts**

| | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 |
|---|---|---|---|---|---|---|
| ■ Receipts | 25,336 | 26,614 | 31,513 | 35,500 | 43,859 | 52,432 |

DOJIFR00724

**Executive Office for Immigration Review**

**Asylum Applications Before and After Effective Date of IIRIRA**

**Weekly asylum applications, March 28, 1994 through September 10, 2001**



DOJIFR00725

**Executive Office for Immigration Review**
**Planning, Analysis, and Statistics Division**

**PASD #19-227**
**Initial Asylum Receipts by Week**
**Date Range: April 1, 1994 to March 31, 1997 (Asylum Receipt Date)**
**Date of Data Run: April 4, 2019**

**Initial Asylum Receipts by Week**

| Week | TOTAL |
|---|---|
| Week Of March 28, 1994 (April 1, 1994 is Friday of this week) | 71 |
| Week Of April 4, 1994 | 334 |
| Week Of April 11, 1994 | 493 |
| Week Of April 18, 1994 | 427 |
| Week Of April 25, 1994 | 449 |
| Week Of May 2, 1994 | 449 |
| Week Of May 9, 1994 | 458 |
| Week Of May 16, 1994 | 447 |
| Week Of May 23, 1994 | 422 |
| Week Of May 30, 1994 | 259 |
| Week Of June 6, 1994 | 437 |
| Week Of June 13, 1994 | 394 |
| Week Of June 20, 1994 | 321 |
| Week Of June 27, 1994 | 418 |
| Week Of July 4, 1994 | 359 |
| Week Of July 11, 1994 | 392 |
| Week Of July 18, 1994 | 398 |
| Week Of July 25, 1994 | 469 |
| Week Of August 1, 1994 | 295 |
| Week Of August 8, 1994 | 381 |
| Week Of August 15, 1994 | 411 |
| Week Of August 22, 1994 | 403 |
| Week Of August 29, 1994 | 396 |
| Week Of September 5, 1994 | 314 |
| Week Of September 12, 1994 | 411 |
| Week Of September 19, 1994 | 433 |
| Week Of September 26, 1994 | 480 |
| Week Of October 3, 1994 | 432 |
| Week Of October 10, 1994 | 406 |
| Week Of October 17, 1994 | 448 |
| Week Of October 24, 1994 | 421 |
| Week Of October 31, 1994 | 451 |
| Week Of November 7, 1994 | 361 |

**Executive Office for Immigration Review**
**Planning, Analysis, and Statistics Division**

**PASD #19-227**
**Initial Asylum Receipts by Week**
**Date Range: April 1, 1994 to March 31, 1997 (Asylum Receipt Date)**
**Date of Data Run: April 4, 2019**

| | |
|---|---|
| Week Of November 14, 1994 | 509 |
| Week Of November 21, 1994 | 319 |
| Week Of November 28, 1994 | 497 |
| Week Of December 5, 1994 | 300 |
| Week Of December 12, 1994 | 413 |
| Week Of December 19, 1994 | 380 |
| Week Of December 26, 1994 | 293 |
| Week Of January 2, 1995 | 357 |
| Week Of January 9, 1995 | 315 |
| Week Of January 16, 1995 | 338 |
| Week Of January 23, 1995 | 374 |
| Week Of January 30, 1995 | 484 |
| Week Of February 6, 1995 | 389 |
| Week Of February 13, 1995 | 860 |
| Week Of February 20, 1995 | 587 |
| Week Of February 27, 1995 | 813 |
| Week Of March 6, 1995 | 1,622 |
| Week Of March 13, 1995 | 806 |
| Week Of March 20, 1995 | 1,145 |
| Week Of March 27, 1995 | 1,174 |
| Week Of April 3, 1995 | 1,399 |
| Week Of April 10, 1995 | 1,320 |
| Week Of April 17, 1995 | 1,338 |
| Week Of April 24, 1995 | 1,787 |
| Week Of May 1, 1995 | 1,584 |
| Week Of May 8, 1995 | 1,226 |
| Week Of May 15, 1995 | 1,736 |
| Week Of May 22, 1995 | 1,824 |
| Week Of May 29, 1995 | 1,141 |
| Week Of June 5, 1995 | 1,529 |
| Week Of June 12, 1995 | 1,369 |
| Week Of June 19, 1995 | 1,815 |
| Week Of June 26, 1995 | 1,720 |
| Week Of July 3, 1995 | 1,089 |
| Week Of July 10, 1995 | 1,598 |
| Week Of July 17, 1995 | 1,737 |
| Week Of July 24, 1995 | 1,794 |

**Executive Office for Immigration Review**

**Planning, Analysis, and Statistics Division**

**PASD #19-227**

**Initial Asylum Receipts by Week**

**Date Range: April 1, 1994 to March 31, 1997 (Asylum Receipt Date)**

**Date of Data Run: April 4, 2019**

| | |
|---|---|
| Week Of July 31, 1995 | 1,284 |
| Week Of August 7, 1995 | 1,110 |
| Week Of August 14, 1995 | 1,347 |
| Week Of August 21, 1995 | 1,864 |
| Week Of August 28, 1995 | 1,368 |
| Week Of September 4, 1995 | 1,799 |
| Week Of September 11, 1995 | 2,282 |
| Week Of September 18, 1995 | 1,695 |
| Week Of September 25, 1995 | 1,660 |
| Week Of October 2, 1995 | 1,625 |
| Week Of October 9, 1995 | 1,399 |
| Week Of October 16, 1995 | 1,381 |
| Week Of October 23, 1995 | 1,378 |
| Week Of October 30, 1995 | 1,334 |
| Week Of November 6, 1995 | 1,120 |
| Week Of November 13, 1995 | 582 |
| Week Of November 20, 1995 | 975 |
| Week Of November 27, 1995 | 3,191 |
| Week Of December 4, 1995 | 1,347 |
| Week Of December 11, 1995 | 1,695 |
| Week Of December 18, 1995 | 1,307 |
| Week Of December 25, 1995 | 1,376 |
| Week Of January 1, 1996 | 995 |
| Week Of January 8, 1996 | 808 |
| Week Of January 15, 1996 | 655 |
| Week Of January 22, 1996 | 1,379 |
| Week Of January 29, 1996 | 1,222 |
| Week Of February 5, 1996 | 1,761 |
| Week Of February 12, 1996 | 1,624 |
| Week Of February 19, 1996 | 999 |
| Week Of February 26, 1996 | 1,658 |
| Week Of March 4, 1996 | 2,873 |
| Week Of March 11, 1996 | 1,843 |
| Week Of March 18, 1996 | 3,314 |
| Week Of March 25, 1996 | 1,650 |
| Week Of April 1, 1996 | 1,799 |
| Week Of April 8, 1996 | 1,552 |

DOJIFR00728

**Executive Office for Immigration Review**

**Planning, Analysis, and Statistics Division**

**PASD #19-227**

**Initial Asylum Receipts by Week**

**Date Range: April 1, 1994 to March 31, 1997 (Asylum Receipt Date)**

**Date of Data Run: April 4, 2019**

| | |
|---|---|
| Week Of April 15, 1996 | 1,379 |
| Week Of April 22, 1996 | 1,628 |
| Week Of April 29, 1996 | 1,669 |
| Week Of May 6, 1996 | 2,176 |
| Week Of May 13, 1996 | 1,160 |
| Week Of May 20, 1996 | 1,840 |
| Week Of May 27, 1996 | 1,626 |
| Week Of June 3, 1996 | 1,423 |
| Week Of June 10, 1996 | 2,133 |
| Week Of June 17, 1996 | 1,938 |
| Week Of June 24, 1996 | 2,425 |
| Week Of July 1, 1996 | 1,187 |
| Week Of July 8, 1996 | 1,860 |
| Week Of July 15, 1996 | 1,774 |
| Week Of July 22, 1996 | 1,524 |
| Week Of July 29, 1996 | 1,348 |
| Week Of August 5, 1996 | 1,629 |
| Week Of August 12, 1996 | 1,856 |
| Week Of August 19, 1996 | 1,260 |
| Week Of August 26, 1996 | 1,211 |
| Week Of September 2, 1996 | 815 |
| Week Of September 9, 1996 | 1,240 |
| Week Of September 16, 1996 | 1,919 |
| Week Of September 23, 1996 | 1,801 |
| Week Of September 30, 1996 | 1,695 |
| Week Of October 7, 1996 | 1,923 |
| Week Of October 14, 1996 | 1,427 |
| Week Of October 21, 1996 | 1,541 |
| Week Of October 28, 1996 | 1,687 |
| Week Of November 4, 1996 | 1,580 |
| Week Of November 11, 1996 | 1,221 |
| Week Of November 18, 1996 | 2,853 |
| Week Of November 25, 1996 | 1,052 |
| Week Of December 2, 1996 | 881 |
| Week Of December 9, 1996 | 1,815 |
| Week Of December 16, 1996 | 1,367 |
| Week Of December 23, 1996 | 704 |

**Executive Office for Immigration Review**
**Planning, Analysis, and Statistics Division**

**PASD #19-227**
**Initial Asylum Receipts by Week**
**Date Range: April 1, 1994 to March 31, 1997 (Asylum Receipt Date)**
**Date of Data Run: April 4, 2019**

| | |
|---|---|
| Week Of December 30, 1996 | 1,238 |
| Week Of January 6, 1997 | 1,394 |
| Week Of January 13, 1997 | 1,324 |
| Week Of January 20, 1997 | 1,265 |
| Week Of January 27, 1997 | 2,390 |
| Week Of February 3, 1997 | 2,224 |
| Week Of February 10, 1997 | 2,370 |
| Week Of February 17, 1997 | 1,339 |
| Week Of February 24, 1997 | 2,126 |
| Week Of March 3, 1997 | 1,829 |
| Week Of March 10, 1997 | 1,495 |
| Week Of March 17, 1997 | 2,162 |
| Week Of March 24, 1997 | 4,448 |
| Week Of March 31, 1997 | 1,099 |
| **TOTAL** | **193,542** |

**Executive Office for Immigration Review**

**Planning, Analysis, and Statistics Division**

**PASD #19-227**

**Initial Asylum Receipts by Week**

**Date Range: April 1, 1997 to September 11, 2001 (Asylum Receipt Date)**

**Date of Data Run: April 4, 2019**

**Initial Asylum Receipts by Week**

| Week | TOTAL |
|---|---|
| Week Of March 31, 1997 (April 1, 1997 is Tuesday of this week) | 145 |
| Week Of April 7, 1997 | 209 |
| Week Of April 14, 1997 | 484 |
| Week Of April 21, 1997 | 819 |
| Week Of April 28, 1997 | 925 |
| Week Of May 5, 1997 | 1,130 |
| Week Of May 12, 1997 | 1,249 |
| Week Of May 19, 1997 | 1,548 |
| Week Of May 26, 1997 | 778 |
| Week Of June 2, 1997 | 1,900 |
| Week Of June 9, 1997 | 1,387 |
| Week Of June 16, 1997 | 1,477 |
| Week Of June 23, 1997 | 1,222 |
| Week Of June 30, 1997 | 1,515 |
| Week Of July 7, 1997 | 1,945 |
| Week Of July 14, 1997 | 1,034 |
| Week Of July 21, 1997 | 1,344 |
| Week Of July 28, 1997 | 1,330 |
| Week Of August 4, 1997 | 1,052 |
| Week Of August 11, 1997 | 674 |
| Week Of August 18, 1997 | 1,440 |
| Week Of August 25, 1997 | 2,006 |
| Week Of September 1, 1997 | 965 |
| Week Of September 8, 1997 | 2,045 |
| Week Of September 15, 1997 | 2,293 |
| Week Of September 22, 1997 | 2,466 |
| Week Of September 29, 1997 | 1,408 |
| Week Of October 6, 1997 | 1,155 |
| Week Of October 13, 1997 | 1,170 |
| Week Of October 20, 1997 | 1,495 |
| Week Of October 27, 1997 | 1,366 |
| Week Of November 3, 1997 | 1,335 |
| Week Of November 10, 1997 | 1,247 |

**Executive Office for Immigration Review**
**Planning, Analysis, and Statistics Division**

**PASD #19-227**
**Initial Asylum Receipts by Week**
**Date Range: April 1, 1997 to September 11, 2001 (Asylum Receipt Date)**
**Date of Data Run: April 4, 2019**

| | |
|---|---|
| Week Of November 17, 1997 | 1,530 |
| Week Of November 24, 1997 | 1,296 |
| Week Of December 1, 1997 | 1,545 |
| Week Of December 8, 1997 | 1,449 |
| Week Of December 15, 1997 | 1,207 |
| Week Of December 22, 1997 | 618 |
| Week Of December 29, 1997 | 787 |
| Week Of January 5, 1998 | 1,211 |
| Week Of January 12, 1998 | 1,765 |
| Week Of January 19, 1998 | 1,222 |
| Week Of January 26, 1998 | 1,488 |
| Week Of February 2, 1998 | 1,408 |
| Week Of February 9, 1998 | 1,490 |
| Week Of February 16, 1998 | 1,183 |
| Week Of February 23, 1998 | 1,397 |
| Week Of March 2, 1998 | 1,294 |
| Week Of March 9, 1998 | 1,221 |
| Week Of March 16, 1998 | 1,091 |
| Week Of March 23, 1998 | 1,296 |
| Week Of March 30, 1998 | 1,349 |
| Week Of April 6, 1998 | 1,030 |
| Week Of April 13, 1998 | 1,221 |
| Week Of April 20, 1998 | 1,436 |
| Week Of April 27, 1998 | 1,134 |
| Week Of May 4, 1998 | 1,480 |
| Week Of May 11, 1998 | 1,365 |
| Week Of May 18, 1998 | 1,789 |
| Week Of May 25, 1998 | 1,120 |
| Week Of June 1, 1998 | 1,456 |
| Week Of June 8, 1998 | 1,118 |
| Week Of June 15, 1998 | 1,061 |
| Week Of June 22, 1998 | 976 |
| Week Of June 29, 1998 | 930 |
| Week Of July 6, 1998 | 997 |
| Week Of July 13, 1998 | 1,209 |
| Week Of July 20, 1998 | 1,278 |
| Week Of July 27, 1998 | 1,165 |

**Executive Office for Immigration Review**
**Planning, Analysis, and Statistics Division**

**PASD #19-227**
**Initial Asylum Receipts by Week**
**Date Range: April 1, 1997 to September 11, 2001 (Asylum Receipt Date)**
**Date of Data Run: April 4, 2019**

| | |
|---|---|
| Week Of August 3, 1998 | 1,552 |
| Week Of August 10, 1998 | 1,316 |
| Week Of August 17, 1998 | 1,139 |
| Week Of August 24, 1998 | 1,377 |
| Week Of August 31, 1998 | 1,139 |
| Week Of September 7, 1998 | 1,230 |
| Week Of September 14, 1998 | 1,137 |
| Week Of September 21, 1998 | 1,120 |
| Week Of September 28, 1998 | 1,364 |
| Week Of October 5, 1998 | 1,098 |
| Week Of October 12, 1998 | 1,012 |
| Week Of October 19, 1998 | 1,323 |
| Week Of October 26, 1998 | 981 |
| Week Of November 2, 1998 | 1,455 |
| Week Of November 9, 1998 | 1,037 |
| Week Of November 16, 1998 | 935 |
| Week Of November 23, 1998 | 702 |
| Week Of November 30, 1998 | 1,145 |
| Week Of December 7, 1998 | 915 |
| Week Of December 14, 1998 | 927 |
| Week Of December 21, 1998 | 686 |
| Week Of December 28, 1998 | 719 |
| Week Of January 4, 1999 | 1,206 |
| Week Of January 11, 1999 | 1,004 |
| Week Of January 18, 1999 | 741 |
| Week Of January 25, 1999 | 1,243 |
| Week Of February 1, 1999 | 1,424 |
| Week Of February 8, 1999 | 1,158 |
| Week Of February 15, 1999 | 959 |
| Week Of February 22, 1999 | 922 |
| Week Of March 1, 1999 | 1,381 |
| Week Of March 8, 1999 | 930 |
| Week Of March 15, 1999 | 1,230 |
| Week Of March 22, 1999 | 631 |
| Week Of March 29, 1999 | 857 |
| Week Of April 5, 1999 | 1,007 |
| Week Of April 12, 1999 | 788 |

DOJIFR00733

**Executive Office for Immigration Review**
**Planning, Analysis, and Statistics Division**

**PASD #19-227**
**Initial Asylum Receipts by Week**
**Date Range: April 1, 1997 to September 11, 2001 (Asylum Receipt Date)**
**Date of Data Run: April 4, 2019**

| | |
|---|---|
| Week Of April 19, 1999 | 914 |
| Week Of April 26, 1999 | 754 |
| Week Of May 3, 1999 | 885 |
| Week Of May 10, 1999 | 700 |
| Week Of May 17, 1999 | 917 |
| Week Of May 24, 1999 | 792 |
| Week Of May 31, 1999 | 710 |
| Week Of June 7, 1999 | 1,196 |
| Week Of June 14, 1999 | 573 |
| Week Of June 21, 1999 | 676 |
| Week Of June 28, 1999 | 882 |
| Week Of July 5, 1999 | 546 |
| Week Of July 12, 1999 | 873 |
| Week Of July 19, 1999 | 811 |
| Week Of July 26, 1999 | 763 |
| Week Of August 2, 1999 | 753 |
| Week Of August 9, 1999 | 1,009 |
| Week Of August 16, 1999 | 817 |
| Week Of August 23, 1999 | 937 |
| Week Of August 30, 1999 | 935 |
| Week Of September 6, 1999 | 789 |
| Week Of September 13, 1999 | 626 |
| Week Of September 20, 1999 | 882 |
| Week Of September 27, 1999 | 778 |
| Week Of October 4, 1999 | 767 |
| Week Of October 11, 1999 | 533 |
| Week Of October 18, 1999 | 903 |
| Week Of October 25, 1999 | 942 |
| Week Of November 1, 1999 | 1,008 |
| Week Of November 8, 1999 | 778 |
| Week Of November 15, 1999 | 949 |
| Week Of November 22, 1999 | 456 |
| Week Of November 29, 1999 | 801 |
| Week Of December 6, 1999 | 896 |
| Week Of December 13, 1999 | 740 |
| Week Of December 20, 1999 | 537 |
| Week Of December 27, 1999 | 299 |

DOJIFR00734

**Executive Office for Immigration Review**

**Planning, Analysis, and Statistics Division**

<u>**PASD #19-227**</u>

<u>**Initial Asylum Receipts by Week**</u>

<u>**Date Range: April 1, 1997 to September 11, 2001 (Asylum Receipt Date)**</u>

<u>**Date of Data Run: April 4, 2019**</u>

| | |
|---|---|
| Week Of January 3, 2000 | 957 |
| Week Of January 10, 2000 | 612 |
| Week Of January 17, 2000 | 851 |
| Week Of January 24, 2000 | 840 |
| Week Of January 31, 2000 | 901 |
| Week Of February 7, 2000 | 786 |
| Week Of February 14, 2000 | 871 |
| Week Of February 21, 2000 | 668 |
| Week Of February 28, 2000 | 1,004 |
| Week Of March 6, 2000 | 958 |
| Week Of March 13, 2000 | 797 |
| Week Of March 20, 2000 | 1,050 |
| Week Of March 27, 2000 | 1,004 |
| Week Of April 3, 2000 | 842 |
| Week Of April 10, 2000 | 873 |
| Week Of April 17, 2000 | 901 |
| Week Of April 24, 2000 | 815 |
| Week Of May 1, 2000 | 1,105 |
| Week Of May 8, 2000 | 945 |
| Week Of May 15, 2000 | 816 |
| Week Of May 22, 2000 | 959 |
| Week Of May 29, 2000 | 652 |
| Week Of June 5, 2000 | 1,284 |
| Week Of June 12, 2000 | 1,022 |
| Week Of June 19, 2000 | 1,101 |
| Week Of June 26, 2000 | 475 |
| Week Of July 3, 2000 | 548 |
| Week Of July 10, 2000 | 997 |
| Week Of July 17, 2000 | 801 |
| Week Of July 24, 2000 | 889 |
| Week Of July 31, 2000 | 913 |
| Week Of August 7, 2000 | 905 |
| Week Of August 14, 2000 | 727 |
| Week Of August 21, 2000 | 942 |
| Week Of August 28, 2000 | 713 |
| Week Of September 4, 2000 | 714 |
| Week Of September 11, 2000 | 894 |

DOJIFR00735

**Executive Office for Immigration Review**
**Planning, Analysis, and Statistics Division**

**PASD #19-227**
**Initial Asylum Receipts by Week**
**Date Range: April 1, 1997 to September 11, 2001 (Asylum Receipt Date)**
**Date of Data Run: April 4, 2019**

| | |
|---|---|
| Week Of September 18, 2000 | 1,373 |
| Week Of September 25, 2000 | 986 |
| Week Of October 2, 2000 | 1,087 |
| Week Of October 9, 2000 | 844 |
| Week Of October 16, 2000 | 1,076 |
| Week Of October 23, 2000 | 949 |
| Week Of October 30, 2000 | 1,006 |
| Week Of November 6, 2000 | 712 |
| Week Of November 13, 2000 | 1,098 |
| Week Of November 20, 2000 | 741 |
| Week Of November 27, 2000 | 892 |
| Week Of December 4, 2000 | 1,022 |
| Week Of December 11, 2000 | 832 |
| Week Of December 18, 2000 | 774 |
| Week Of December 25, 2000 | 745 |
| Week Of January 1, 2001 | 658 |
| Week Of January 8, 2001 | 766 |
| Week Of January 15, 2001 | 817 |
| Week Of January 22, 2001 | 927 |
| Week Of January 29, 2001 | 902 |
| Week Of February 5, 2001 | 1,040 |
| Week Of February 12, 2001 | 1,117 |
| Week Of February 19, 2001 | 798 |
| Week Of February 26, 2001 | 973 |
| Week Of March 5, 2001 | 996 |
| Week Of March 12, 2001 | 1,135 |
| Week Of March 19, 2001 | 1,166 |
| Week Of March 26, 2001 | 1,055 |
| Week Of April 2, 2001 | 1,079 |
| Week Of April 9, 2001 | 1,116 |
| Week Of April 16, 2001 | 1,088 |
| Week Of April 23, 2001 | 1,284 |
| Week Of April 30, 2001 | 1,398 |
| Week Of May 7, 2001 | 1,232 |
| Week Of May 14, 2001 | 1,018 |
| Week Of May 21, 2001 | 1,087 |
| Week Of May 28, 2001 | 932 |

**Executive Office for Immigration Review**
**Planning, Analysis, and Statistics Division**

**PASD #19-227**
**Initial Asylum Receipts by Week**
**Date Range: April 1, 1997 to September 11, 2001 (Asylum Receipt Date)**
**Date of Data Run: April 4, 2019**

| | |
|---|---|
| Week Of June 4, 2001 | 1,564 |
| Week Of June 11, 2001 | 1,348 |
| Week Of June 18, 2001 | 1,128 |
| Week Of June 25, 2001 | 1,062 |
| Week Of July 2, 2001 | 855 |
| Week Of July 9, 2001 | 979 |
| Week Of July 16, 2001 | 1,288 |
| Week Of July 23, 2001 | 1,102 |
| Week Of July 30, 2001 | 1,473 |
| Week Of August 6, 2001 | 1,324 |
| Week Of August 13, 2001 | 1,570 |
| Week Of August 20, 2001 | 1,369 |
| Week Of August 27, 2001 | 1,096 |
| Week Of September 3, 2001 | 1,068 |
| Week Of September 10, 2001 | 231 |
| **TOTAL** | **244,397** |

## *Central Americans Surge at Border Before Trump Takes Over;  Migrants from violence-plagued El Salvador, Honduras and Guatemala push north in anticipation of new administration's tougher border measures*

The Wall Street Journal Online

December 23, 2016

Copyright 2016 Factiva ®, from Dow Jones
All Rights Reserved



Copyright 2016 Dow Jones & Company, Inc. All Rights Reserved.

THE WALL STREET JOURNAL.

**Section:** WORLD

**Length:** 983 words

**Byline:** By *Robbie Whelan*

## Body

GRANJENO, Texas-Central Americans are crossing illegally into the U.S. at the fastest rate in years, many of them hoping to sneak in before Donald Trump's presidential inauguration and the heightened border-security measures he has promised.

The U.S. Border Patrol apprehended 47,214 migrants along the southwest U.S. border in November, an increase of 44% compared with November 2015. It was the Border Patrol's busiest month since June of 2014, when illegal entries from Central America were cresting.

Over the past six months, Border Patrol agents have caught nearly 240,000 migrants, an average of more than 1,300 a day-30% more than the same period a year earlier.

"Right now we're trending toward 2014 numbers, which was our high-water mark," said José Villareal, chief of operations for the Border Patrol's Rio Grande Valley sector and a 31-year veteran of the agency.

While  the number of illegal migrants from Mexico to the U.S. has steadily declined in the past decade, migration from Central America has risen, mostly because of gang-related violence. Honduras, El Salvador and Guatemala have  among the world's highest murder rates .

"It's a humanitarian crisis, a drug crisis, a security crisis. We're going to have to deal with that issue immediately," said a member of Mr. Trump's transition team.

While  most migrants are fleeing poverty and violence at home, the wild-card factor in recent months has been Mr. Trump's ultimately successful presidential campaign, which  focused heavily on deporting millions of illegal immigrants , curbing migration and building a wall to seal off the Mexican border.

DOJIFR00738

Central Americans Surge at Border Before Trump Takes Over;  Migrants from violence-plagued El Salvador, Honduras and Guatemala push north in anticipation of new....

"Some migrants have talked about how President Trump is going to seal off the border," said Mr. Villareal. "There's definitely a percentage of folks who believed that they can beat the clock" by reaching the U.S. before the new president takes office.

So they can charge more, smugglers often spread rumors to make it seem more urgent for migrants to get to the U.S., said Maureen Meyer, senior associate with the Washington Office on Latin America, a human-rights nonprofit organization. In 2014, for example, smugglers promulgated stories throughout Central America that the U.S. was doling out "permisos"-or permission slips-for migrants to cross.

"For a lot of people,  they're running from crime or extortion and threats of violence, so it might be a now-or-never mind-set," Ms. Meyer said. "But a lot of them seem to be aware Trump and the possibility of a wall or other changes that would affect them."

Alex Pérez, age 18, left his home in rural Honduras in early September, at one point stowing away in the back of a lime truck in an attempt to reach Texas and eventually meet up with a friend in Los Angeles.

He hasn't made it. Since early this month, Mr. Pérez has been living in a transit shelter run by an evangelical Christian group in the Mexican border city of Reynosa. Without money to pay smugglers to cross the Rio Grande in a raft, he is trying to figure out how to reach the U.S. and wonders if time is running short.

"With the new U.S. president that is coming, a lot of people are going to come. They say this is the only month we have to get across," he said in an interview at the shelter.

After crossing the river, many migrants end up on an overgrown slice of floodplain known as Rincón Corner in Granjeno, just outside of McAllen, Texas. Out of roughly 315 miles of border in the Rio Grande Valley sector, only 54 miles have a border fence, making the area especially porous. The sector, which encompasses 34,000 square miles of U.S. territory from the Gulf of Mexico to McAllen, accounts for more than half of all migrant apprehensions each year.

The surge is straining Border Patrol resources. Just before Thanksgiving, the Department of Homeland Security deployed 150 additional Border Patrol agents from other sectors to work here on monthlong shifts. Two weeks ago, the border agency set up a 500-bed tent facility in Donna, Texas, to handle detainees, a job usually handled by Immigration and Customs Enforcement, another federal agency.

The Border Patrol says it has tightened security measures, including beefing up the number of agents and increasing the collection of biometric data, to discourage migrants from making repeated tries at the border. None of it has deterred thousands seeking to escape the threat of violence in their home countries.

Last week, José Maltez Castro, a 34-year-old motorcycle salesman from Usulután, El Salvador, successfully crossed the Rio Grande in a raft with his 3-year-old son and 5-year-old daughter, only to be immediately caught, along with 26 other Salvadoran migrants, by the Border Patrol.

Mr. Maltez said he fled El Salvador after local gang members repeatedly threatened to kidnap an older daughter and force her into the sex trade, adding he intended to send for her and his wife once he got to the U.S. So far, he said, he had spent $1,500 and 24 days in transit to the U.S.-Mexico border.

"My neighbors told me that once you get to America, the government supports you," Mr. Maltez said. "I was very afraid that we wouldn't be able to cross because of what happened with the election."

On a recent cloudy Friday afternoon, U.S. Border Patrol agent Isaac Villegas crouched in the underbrush on the bank of the Rio Grande, waiting for an inflatable raft piloted by a smuggler and filled with eight migrants to enter the water.

Then he jumped out shouting, forcing the raft to turn back toward the Mexican bank of the river and causing the smuggler, in a panic, to tumble into the waist-deep water.

Central Americans Surge at Border Before Trump Takes Over;  Migrants from violence-plagued El Salvador, Honduras and Guatemala push north in anticipation of new....

"He'll probably try again at a different landing further down the river," Mr. Villegas said. But nonetheless, he added, "I want to disrupt this mind-set the smugglers have that they can just cross this river whenever they please."

Dudley Althaus contributed to this article.

Write to **_Robbie_ _Whelan_** at  _robbie.whelan_@wsj.com

## Notes

PUBLISHER: Dow Jones & Company, Inc.

**Load-Date:** May 16, 2018

DOJIFR00740



# Department of Homeland Security Border Security Metrics Report

*May 1, 2018*



DOJIFR00746

# Message from Homeland Security

May 1, 2018

The "Department of Homeland Security Border Security Metrics Report" is submitted pursuant to the Fiscal Year (FY) 2017 National Defense Authorization Act (NDAA), which directs that "Not later than 180 days after the date of the enactment of this section, the Secretary (of Homeland Security) shall develop metrics, informed by situational awareness, to measure the effectiveness of security between ports of entry, at ports of entry, in the maritime environment and to measure the effectiveness of the aviation assets and operations of Air and Marine Operations of U.S. Customs and Border Protection."  The Act further directs the Secretary to annually assess, report, and implement the specified metrics.

The outcome-based performance measures called for by the Act are the most comprehensive, rigorous set of border security metrics required of the Department of Homeland Security (DHS) to date.  Through previous efforts, DHS has established processes and procedures to collect and analyze essential data to meet most, but not all, of the Act's requirements.  This initial report identifies which measures are still unavailable; DHS commits to continuing efforts to produce all the measures required by the Act no later than submission of the next annual report.

DHS considers this report to be the beginning of a consequential dialogue with Congress and the American public wherein defensible data create the foundation for discussions of border security policies and strategies.  This initial report focuses on providing data and information on DHS methodological approaches.  In accordance with the Act, future annual reports will include trend analysis of the measures being reported.

Thank you for your continuing support and commitment to strengthening the operating effectiveness of DHS.

Pursuant to congressional requirements, this notification is being provided to the following Members of Congress:

> The Honorable Ron Johnson
> Chairman, Senate Committee on Homeland Security and Governmental Affairs
>
> The Honorable Claire McCaskill
> Ranking Member, Senate Committee on Homeland Security and Governmental Affairs
>
> The Honorable Michael McCaul
> Chairman, House Committee on Homeland Security
>
> The Honorable Bennie Thompson
> Ranking Member, House Committee on Homeland Security

Inquiries relating to this report may be directed to the DHS Office of Legislative Affairs at (202) 447-5890.

DOJIFR00747

Sincerely,


James W. McCament
Deputy Under Secretary
Office of Strategy, Policy, and Plans

DOJIFR00748



# DHS Border Security Metrics Report

# Table of Contents

I.      Legislative Language ................................................................................................5

II.     Introduction ...............................................................................................................6

III.    SEC. 1092 BORDER SECURITY METRICS ...........................................................9

§ 1092 (b) METRICS FOR SECURING THE BORDER BETWEEN PORTS OF ENTRY .........................9

§ 1092 (c) METRICS FOR SECURING THE BORDER AT PORTS OF ENTRY...................................33

§ 1092 (d) METRICS FOR SECURING THE MARITIME BORDER ....................................................44

§ 1092 (e) AIR AND MARINE SECURITY METRICS IN THE LAND DOMAIN................................51

§ 1092 (g)(3)(D) Other Appropriate Information ...................................................................56

IV.     Conclusion ...............................................................................................................62

Appendix A – Repeated Trials Model Methodology..............................................................63

Appendix B – Drugs Seizures – All Ports of Entry ...............................................................66

DOJIFR00749

# I.    Legislative Language

Section 1092 of the FY 2017 National Defense Authorization Act (NDAA), signed into law December 23, 2016, directs the Secretary of Homeland Security to provide annually to the Committee on Homeland Security of the House of Representatives and the Committee on Homeland Security and Governmental Affairs of the Senate specific "Metrics for Securing the Border Between Ports of Entry," "Metrics for Securing the Border At Ports of Entry," "Metrics for Securing the Maritime Border," and "Air and Marine Security Metrics in the Land Domain." The NDAA further directs that the Secretary "in accordance with applicable privacy laws, make data related to apprehensions, inadmissible aliens, drug seizures, and other enforcement actions available to the public, law enforcement communities, and academic research communities."

DOJIFR00750

# II.   Introduction

As President Donald Trump indicated in Executive Order 13767 "Border Security and Immigration Enforcement Improvements" (January 25, 2017), border security is critically important to the national security of the United States. The Department's ability to measure its border-security inputs, activities, outputs, and outcomes is essential to the effective and efficient management of the Department, including management of the new activities and investments directed by the President's Executive Orders on border security and immigration enforcement.

Comprehensive and rigorous performance management data provide DHS leadership with the foundation to support responsible evidence-based decision-making for resource allocation and investments and for operational and mission management. Further, DHS implementation of this approach provides a pair of unifying border security goals under the Department's mission to secure and manage U.S. borders. As summarized in the DHS Quadrennial Homeland Security Review (QHSR), the Department's first two goals under the border security mission area are to "Secure U.S. Air, Land, and Sea Borders and Approaches" by preventing illegal entry and to "Safeguard and Expedite Lawful Travel and Trade" by safeguarding key nodes, conveyances, and pathways, and by managing the risk of people and goods in transit. Ultimately, the border security metrics described in this report are designed to assess the ability of the Department's border security policies and investments to achieve these outcomes.

For analytic purposes, the metrics included in this report may be divided into four categories:

- Inputs: Resources acquired or expended to secure the border. Examples of border security inputs include the number of U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) officers and U.S. Border Patrol (USBP) agents deployed, miles of fencing and other border infrastructure, and numbers of aircraft committed to the border security mission.
- Activities: Specific actions taken to secure the border. Examples of border security activities include illegal border crossers apprehended, travelers admitted or denied admission at ports of entry (POE), and pounds of narcotics seized.
- Outputs: Immediate results of enforcement activities as they relate to the border security goals. Examples of border security outputs include the rate at which intending unlawful border crossers are apprehended or interdicted, and the accuracy of screening results for travelers and goods at POEs.
- Outcomes: The ultimate impacts of border security policies. As defined by the QHSR, the most important border security outcomes are the numbers of illegal migrants and quantities of illegal goods entering the United States (Goal 2.1), and the ease with which lawful travelers and goods pass through POEs (Goal 2.2).

In general, border security *inputs* and *activities* are directly observable and can be measured with a high degree of reliability. Policymakers have direct control over resource allocation, and data on inputs are available in budget and acquisitions documents. Operational agencies also track enforcement activities as part of their case management process. In short, the Department knows exactly how many agents it deploys, how many miles of fence it erects, how many aliens it apprehends, and how many travelers it admits. Input and activity measures tend to provide insight into the level and type of enforcement effort undertaken—what the Department is

DOJIFR00751

doing—that are useful for workload management and tactical decision-making; but in and of themselves these metrics typically provide limited insight into the state of border security.

*Outcome* and *output* measures often provide more insight than inputs and activities when it comes to evaluating border security and may be powerful tools for policy and program evaluation. Yet many output and outcome metrics are difficult to measure directly because illegal border crossers actively seek to evade detection, and some flows are undetected and therefore can never be measured directly. This challenge is nearly universal when measuring illegal activities, which is why law enforcement agencies typically rely on crime *reports* as indicators of *total* criminal activities, for example. Measuring border security outputs and outcomes is also difficult because of the diversity and complexity of the enforcement mission along the United States' 6,000 miles of land borders, 95,471 miles of coastline, and 350 POEs. Moreover, enforcement outcomes only partially depend on border security policies, since immigration flows also reflect numerous factors outside enforcement agencies' control, including the broader set of U.S. immigration policies and numerous economic, demographic, and other structural factors.

Historically, DHS and the legacy Immigration and Naturalization Service addressed these measurement challenges by relying on alien apprehensions (an activity metric) as a proxy measure of illegal immigration between POEs (an outcome metric). More recently, CBP and DHS have initiated a number of new estimation strategies to better model unknown flows. These efforts have focused primarily on border security between POEs in the land domain (NDAA § 1092(b)), a domain that has been identified by Congress and the last several Administrations as a top enforcement priority. Some of this research remains a work in progress as DHS is not yet able to validate certain modeling assumptions or to quantify the uncertainty around its new estimation techniques. In addition, many of the metrics in this report remain limited to the southwest border. The Department's future work on border metrics will continue to refine these new indicators of border security between POEs and expand data collection and methodologies to the northern border, while also developing additional indicators of border security, including those identified as incomplete in this report.

Pursuant to the NDAA, this report covers a mix of input, activity, output, and outcome metrics between POEs, at POEs, in the maritime domain, and with respect to air and marine security in the land domain. While most of these measures involve data the Department has tracked for many years, some remain under development or fall outside the scope of the Department's existing measurement methodologies. This report includes the following information for each border security metric:

- Definition of the metric and brief description of how the metric contributes to the Department's understanding of border security;
- Discussion of the Department's current methodology for producing the metric and related methodological limitations; and
- Available data, including historical data where possible, and brief discussion of implications for the current state of border security.

The following sections of this report provide this information for each metric directed by the NDAA. In addition to the specific metrics identified in sections §1092(b) – (e), this report

DOJIFR00752

includes supplemental measures that inform the Department's assessment of the state of border security between POEs, as directed by NDAA § 1092(g)(3)(D).

DOJIFR00753

# III.  SEC. 1092 BORDER SECURITY METRICS

## § 1092(b) Metrics for Securing the Border between Ports of Entry

### § 1092(b)(1)(A)(i) Attempted Unlawful Border Crosser Apprehension Rate

**Definition**

In general, the attempted unlawful border crosser apprehension rate is defined as the proportion of attempted border crossers that is apprehended by USBP:

$$Apprehension\ Rate = \frac{Apprehensions}{Unlawful\ Entry\ Attempts}$$

While USBP has reliable administrative data on apprehensions, the Department does not have an exact count of unlawful entry attempts since an unknown number of illegal border crossers evade detection.  As a result of this so-called "denominator problem," the Department must estimate the apprehension rate.  Current methodologies allow DHS to produce two apprehension rate estimates:

*Model-based Apprehension Rate* ($AR_{Model\text{-}based}$) – Based on statistical modeling, the estimated share of all attempted unlawful border crossers between land POEs that is apprehended.

*Observational Apprehension Rate* ($AR_{Observational}$) – Based on direct (unlawful border crossers observed by USBP) and indirect (residual evidence of a border crosser, i.e. footprints) observations of attempted unlawful border crossers, the estimated share of observed attempted unlawful border crossers that is apprehended.

The apprehension rate is an *output measure* that describes the difficulty of illegally crossing the border successfully.

A conceptual limitation of apprehension rate data is that they include information about border *apprehensions*, but exclude information about *turn backs* (see section 1092 (b)(1)(A)(iv) for definition), which are a key element of USBP's enforcement strategy, with underlying operational implications.  In this sense, measures of the apprehension rate understate USBP's overall enforcement success rate.  On the other hand, some analysts consider information about turn backs difficult to interpret since an unknown share of turn backs make additional entry attempts.

DOJIFR00754

**Methodology and Limitations**

*Model-based Apprehension Rate*

The Model-based Apprehension Rate is based on the repeated trials model (RTM) methodology. As explained in detail in Appendix A, the RTM methodology yields an estimated partial apprehension rate (PAR) for southwest border crossers, which focuses on a relatively small share of attempted unlawful border crossers. Following the calculation of the PAR, the AR$_{Model\text{-}based}$ methodology consists of four additional steps.

First, all attempted unlawful border crossers are divided into two groups, which are labeled "impactable" and "non-impactable" by traditional DHS enforcement policies. Impactable border crossers include adults without children who are not asylum seekers and (prior to 2017) are not from Cuba. Aliens in this group are described as impactable because they are generally subject to the full range of DHS and Department of Justice (DOJ) enforcement consequences, and therefore potentially impacted by existing border enforcement. Non-impactable border crossers include unaccompanied minors, family units, individuals who request asylum, and (prior to 2017) Cubans. Aliens in this group are described as non-impactable because, historically, they have usually been released into the United States with a Notice to Appear in immigration court for legal proceedings on a future date, rather than being subject to immediate DHS enforcement consequences. These aliens are assumed generally to be "non-impactable" by traditional DHS enforcement activities at the border because even if they are apprehended they are typically unlikely to be immediately removed or returned.[1]

Second, the AR$_{Model\text{-}based}$ methodology assumes an apprehension rate for each of these two groups: 1) all attempted unlawful border crossers in the impactable population are assumed to be apprehended at the partial apprehension rate generated by the RTM methodology; and 2) all unlawful border crossers in the non-impactable population are assumed to intentionally present themselves to a USBP agent or OFO officer and therefore to have a 100 percent apprehension rate. Notably, these assumptions do not reflect the actual behavior of all border crossers, as noted below, but they serve to construct a probability model.

Third, the Partial Apprehension Rate is used to calculate the total number of impactable aliens making illegal entry attempts. The methodology assumes (in the previous step) that all impactable aliens are apprehended at the PAR rate generated by the RTM methodology:

$$PAR = \frac{Apprehensions_{Impactable}}{Attempts_{Impactable}}$$

---

[1] Cubans were considered "non-impactable" between 1995 and January 2017 because they were routinely granted parole into the United States if they reached U.S. soil, under the wet-foot/dry-foot policy. The Obama Administration terminated the special parole component of the wet-foot/dry-foot policy in January 2017.

DOJIFR00755

Mathematically, this equation can be re-arranged to define the total number of impactable aliens making an illegal entry attempt as follows:

$$Attempts_{Impactable} = \frac{Apprehensions_{Impactable}}{PAR}$$

Since non-impactable aliens are assumed to have a 100% apprehension rate, the number of entry attempts of non-impactable aliens is equal to the number of their apprehensions.

Finally, the Total Apprehension Rate is calculated as a weighted average of the total numbers of impactable and non-impactable aliens attempting unlawful entry times their respective apprehension rates:

$$AR_{Model-based} = \frac{(Attempts_{Impactable} * PAR) + (Attempts_{Non-impactable} * 100\%)}{(Attempts_{Impactable} + Attempts_{Non-impactable})}$$

The current AR_Model-based methodology makes a number of assumptions that cannot be fully validated.  First, the AR_Model-based methodology builds on the RTM's partial apprehension rate, and so incorporates all of the RTM modeling assumptions and associated limitations discussed in Appendix A.  In addition, the current AR_Model-based methodology also assumes:  that the entire cohort of border crossers can be divided into impactable and non-impactable groups, that the entire impactable group is apprehended at the same rate as RTM aliens included in the PAR analysis, and that the entire non-impactable group is apprehended 100 percent of the time.  Each of these additional assumptions introduces potential biases into the estimated apprehension rate.

The Department has not precisely quantified the impact of these assumptions on the AR_Model-based estimates.  For these reasons, DHS considers the AR_Model-based methodology to be a work in progress.  DHS is working to refine the AR_Model-based methodology to address these limitations and to more precisely describe their impact on the AR_Model-based estimate.  The estimated apprehension rates reported here may be updated in the future as the Department continues to refine the model-based estimation methodology.

*Observational Apprehension Rate*

The Observational Apprehension Rate is calculated as the ratio of USBP apprehensions to the sum of apprehensions and observed (directly or indirectly) got aways:

$$AR_{Observational} = \frac{Apprehensions}{Apprehensions + Got\ Aways}$$

"Got aways" are defined as subjects at the southwest border who, after making an illegal entry, are not turned back or apprehended, and are no longer being actively pursued by USBP agents.

Since 2014, USBP has implemented a standard, southwest border-wide methodology for determining when to report a subject as a got away.  Some subjects are observed directly as evading apprehension or turning back; others are acknowledged as got aways or turn backs after

DOJIFR00756

agents follow evidence that indicate entries have occurred such as foot sign (i.e. tracks), sensor activations, interviews with apprehended subjects, camera views, and communication between and among stations and sectors.  The scope of these data includes all areas of the southwest land border at or below the northernmost law enforcement posture (typically a USBP checkpoint) within a given area of responsibility, and those individuals apprehended less than 30 days after entering the United States.

In an effort to maintain reliable best practices, command staff at all southern border stations ensure all agents are aware of and utilize proper definitions for apprehensions, got aways and turn backs at their respective stations.  They also ensure the necessary communication takes place between and among sectors and stations to minimize double-counting when subjects cross more than one station's area of responsibility. In addition to station-level safeguards, designated USBP Headquarters components validate data integrity by utilizing various data quality reports.

The primary limitation to $AR_{Observational}$ is that the denominator excludes an unknown number of unobserved got aways.  Over the past several years, DHS has invested millions of dollars in technology that has facilitated the ability to see and detect more at the border.  Improvements in situational awareness give DHS an ever-increasing, real-time ability to understand how much illegal activity agents are encountering at the immediate border and their ability to respond.  As a result, despite the fact that overall border entries are substantially lower today than in any previous fiscal year, agents are currently interdicting slightly *lower* percentages of the total known flow.  This observation reflects USBP's increased domain awareness—i.e., that through technological advances, the agency has improved its awareness of illegal entry attempts (known got aways)—rather than experienced a drop in enforcement effectiveness.  Increasing situational awareness narrows the gap between the known and unknown flow, and puts DHS in a position to build ever better observational estimates of border security.  The Department will continue to refine these observational estimates and is currently working on a methodology to estimate their statistical reliability.

An additional methodological limitation is that the estimated count of got aways aggregates potentially subjective observations from thousands of individual agents.  USBP has taken a number of steps to establish reliable turn back and got away methodologies, as discussed above.

**Available Data and Discussion**

Table 1 provides the estimated model-based apprehensions rate for FY 2003 – FY 2016 and the estimated observational apprehension rate for FYs 2006-2016, the years for which these data are available.

DOJIFR00757

Table 1:  Model-Based and Observational Apprehension Rates, FY 2000 – FY 2016

| Fiscal Year | Model-based Apprehension Rate | Observational Apprehension Rate |
|---|---|---|
| 2003 | 34.1 | NA |
| 2004 | 37.0 | NA |
| 2005 | 39.1 | NA |
| 2006 | 39.2 | 63.5 |
| 2007 | 40.2 | 64.1 |
| 2008 | 44.6 | 67.7 |
| 2009 | 47.2 | 70.7 |
| 2010 | 46.6 | 74.4 |
| 2011 | 46.1 | 79.4 |
| 2012 | 48.0 | 77.5 |
| 2013 | 51.0 | 70.8 |
| 2014 | 65.5 | 74.8 |
| 2015 | 63.5 | 76.7 |
| 2016 | 64.8 | 79.4 |

Since FY 2003, the model-based apprehension rate has climbed from less than 35 percent to nearly 65 percent in FY 2016.  These increases reflect a higher apprehension rate for "impactable" border crossers as well as an increase in the share of border crossers who are "non-impactable" and therefore assumed to be apprehended 100 percent of the time.

The observational apprehension rate has also shown improvements since FY 2006.  Despite its limitations, the upward trend in $AR_{Observational}$ is noteworthy because it independently reinforces the upward trend observed in the model-based estimate.  Moreover, with increasing situational awareness along the border during this period, it is likely that CBP detects an increasing share of total got aways over time.  As a result, the upward trend in $AR_{Observational}$ likely under-estimates the actual increase in the total share of attempted border crossers that is apprehended.

## § 1092(b)(1)(A)(ii) Detected unlawful entries

**Definition**

*Detected unlawful entries* – The total number of attempted unlawful border crossers between land POEs who are directly or indirectly observed or detected by USBP.

Detected unlawful entries is an *outcome measure* that describes the numbers of migrants detected crossing or attempting to cross the border unlawfully.  Detected unlawful entries is not a comprehensive outcome measure since it excludes undetected unlawful entries, as discussed below.  The ratio of detected to undetected unlawful entries, also discussed below, is an *output measure* that describes the Department's ability to detect unlawful entries.

13

**Methodology and Limitations**

The number of detected unlawful entries is calculated as the sum of turn backs, got aways, and apprehensions.  Turn backs are defined as subjects who, after making an illegal entry into the United States, return to the country from which they entered, not resulting in an apprehension or got away.  Got aways are defined as subjects who, after making an illegal entry, are not turned back or apprehended, and are no longer being actively pursued by USBP agents.  Apprehensions are defined as removable aliens arrested by USBP.

Turn backs and got aways are observational estimates; USBP records total and by-sector estimates of turn backs and got aways based on direct and indirect observations as described above.  Apprehensions are calculated based on nationwide DHS administrative data and are not limited to the southwest border; USBP apprehension data are considered a reliable count of apprehensions.

The primary limitation to detected unlawful entries is that this metric incorporates turn back and got away estimates that aggregate potentially subjective observations from thousands of individual agents.  USBP has taken a number of steps to address this problem by establishing consistent and reliable turn back and got away methodologies, as discussed above.

**Available Data and Discussion**

Figure 1 depicts available data on estimated detected unlawful entries for FY 2006 – FY 2016, the years for which data are available.  As the figure indicates, estimated detected unlawful entries (the sum of apprehensions, turn backs, and got aways) fell from 2.0 million to 624 thousand during this period, a 69 percent decrease.

Figure 1:  Estimated Detected Unlawful Entries Nationwide Between POEs, FY 2006 – FY 2016



DOJIFR00759

# § 1092(b)(1)(A)(iii) Estimated undetected unlawful entries

**Definition**

*Undetected unlawful entries* – An estimate of the number of attempted unlawful border crossers between land POEs who are not directly or indirectly observed or detected by USBP.  By assumption, undetected unlawful entries evade apprehension and enter the United States unlawfully.

Undetected unlawful entries is an *outcome measure* that describe the numbers of migrants who completely evade detection and successfully enter the United States unlawfully.  Undetected unlawful entries is not a comprehensive outcome measure since it excludes detected unlawful entries, discussed above.  The ratio of detected to total unlawful entries (i.e., the probability of detection) is an *output measure* that describes the Department's ability to detect unlawful entries, as discussed below. At present, this methodology only exists for the southwest land border between ports of entry. Research is underway on methods to produce this estimate for the northern border.

**Methodology and Limitations**

Currently, the Department's best available methodology for estimating undetected unlawful entries builds on the repeated trials model (RTM) methodology to produce a model-based estimate of total successful unlawful entries.  The estimated number of undetected unlawful entries is calculated as the difference between the model-based estimate of total successful unlawful entries and the estimated number of got aways (i.e., *detected* successful unlawful entries):

$$Undetected\ Unlawful\ Entries \\ = Total\ Successful\ Unlawful\ Entries - Detected\ Got\ Aways$$

As explained in detail in Appendix A, the RTM methodology yields an estimated partial apprehension rate (PAR) for southwest border crossers.  Following the calculation of the PAR, the methodology for estimating total successful unlawful entries consists of three additional steps.

First, as in the calculation of the model-based apprehension rate discussed above, all attempted unlawful border crossers are divided into "impactable" and "non-impactable" groups.  Second, the PAR is used to estimate the odds of successful entry for aliens within the impactable population group.[2]  Third, the number of successful unlawful entries is estimated based on the odds of successful entry among this group times the apprehension count among impactable aliens.  Because non-impactable aliens are assumed to be apprehended 100 percent of the time, only impactable aliens contribute to the estimated count of total successful unlawful entries:

---

[2] Mathematically, $odds\ of\ successful\ entry = \left(\frac{1-PAR}{PAR}\right)$.

DOJIFR00760

$$Total\ Successful\ Unlawful\ Entries$$
$$= Odds\ of\ Successful\ Entry * Apprehensions\ of\ Impactable\ Aliens$$

The estimated number of undetected unlawful entries is derived from the observational estimate of detected unlawful entries, with limitations discussed above, and the model-based estimate of total successful unlawful entries, which in turn is derived from the RTM methodology and the model-based apprehension rate, with additional limitations discussed above.  DHS is working to refine both the observational and model-based methodologies and to more precisely describe the impact of these limitations on estimates of total and undetected unlawful entries.

**Available Data and Discussion**

Figure 2 depicts available data on estimated undetected unlawful entries for FY 2006 – FY 2016, the years for which data are available. As the figure indicates, estimated undetected unlawful entries fell from approximately 851,000 to nearly 62,000 during this period, a 93 percent decrease.

Figure 2:  Estimated Southwest Border Undetected Unlawful Entries, FY 2006 – FY 2016



# § 1092(b)(1)(A)(iv) Turn backs

**Definition**

*Turn backs* –An estimate of the number of subjects who, after making an illegal entry into the United States, return to the country from which they entered, not resulting in an apprehension or got away.

Turn backs are an *activity measure* that USBP uses for tactical decision-making.

16

Turn backs also contribute to several other border security metrics, including Detected Unlawful Entries, discussed above, and the Unlawful Border Crossing Effectiveness Rate, discussed below.

**Methodology and Limitations**

Turn backs are a nationwide observational estimate; USBP records total and by-sector estimates of turn backs based on direct and indirect observations as described above.

The primary limitation to detected turn backs is that the estimate aggregates potentially subjective observations from thousands of individual agents.  USBP has taken a number of steps to address this problem by establishing consistent and reliable turn back and got away methodologies, as discussed above.  In addition, some unlawful border crossers may enter the United States to drop off drug loads or to act as decoys to lure agents away from a certain area and then return to Mexico, and therefore may be misidentified as turn backs.[3]

**Available Data and Discussion**

Table 2:  Southwest Border Turn Backs between POEs, FY 2007 – FY 2016

| FY2007 | FY2008 | FY2009 | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| 254,490 | 204,176 | 178,566 | 150,005 | 121,007 | 121,079 | 156,581 | 147,025 | 105,670 | 108,601 |

The number of turn backs has decreased by more than 57 percent since FY 2007. This decrease is consistent with numerous other between-POE metrics than suggest a decrease in flow over the past 10 years.

# § 1092(b)(1)(A)(v) Got aways

**Definition**

*Got aways* – An estimate of the number of subjects who, after making an illegal entry, are not turned back or apprehended, and are no longer being actively pursued by USBP agents.

*Total Successful Unlawful Entries* – An estimate of the total number of subjects who cross the border unlawfully and who enter the United States without being apprehended.

**Methodology and Limitations**

*Got Aways*

---

[3] U.S. Government Accountability Office, "Border Patrol: Goals and Measures Not Yet in Place to Inform Border Security Status and Resource Needs," GAO-13-330T, February 26, 2013, p. 15.

DOJIFR00762

Got aways are an observational estimate; USBP records total and by-sector estimates of got aways based on direct and indirect observations as described above.  While got aways are recorded by USBP at all borders, got aways in this section refer to the southwest border between-ports of entry only.

The primary methodological limitation of got aways is that the estimate aggregates potentially subjective observations from thousands of individual agents.  USBP has taken a number of steps to address this problem by establishing consistent and reliable turn back and got away methodologies, as discussed above.

Conceptually, the got aways metric is limited to *observed* (directly or indirectly) flows; it is not a comprehensive measure of successful unlawful entries.  USBP's recent work to increase situational awareness, including through the use of Geospatial Intelligence, gives the Department growing confidence in its got away count.  As situational awareness continues to improve, observed got aways will become an increasingly comprehensive measure of successful unlawful entries.  USBP and DHS are working to refine USBP's observational methodology and to more precisely describe the gap between observed and unobserved got aways.

*Total Successful Unlawful Entries*

The current methodology for estimating total successful unlawful entries is based on the repeated trials model (RTM) methodology.  As explained in detail in Appendix A, the RTM methodology yields an estimated partial apprehension rate (PAR) for southwest border crossings, which focuses on a relatively small share of attempted unlawful border crossers.  Following the calculation of the PAR, the methodology for estimating total successful unlawful entries consists of three additional steps, as described above:  attempted border crossers are divided into impactable and non-impactable groups; the PAR is used to estimate the odds of successful entry; and the number of successful unlawful entries is estimated based on the odds of successful entry among this group times the number of apprehensions of impactable aliens.

The RTM methodology to estimate the PAR confronts a number of methodological limitations, as discussed in Appendix A.  Each of the additional assumptions involved in using the PAR to estimate total successful unlawful entries introduces additional methodological limitations and potential biases.  DHS is working to refine the model-based methodology and to more precisely describe the impact of these limitations on estimates of total successful unlawful entries.

**Available Data and Discussion**

Figure 3 depicts southwest border between-ports of entry detected got aways for FY 2006 – FY 2016 and estimated total successful unlawful entries for FY 2000 – FY 2016, the years for which data are available.  As the figure illustrates, estimated total successful unlawful entries declined from 1.8 million to 168,000 between FY 2000 and FY 2016, a 91 percent decrease.  Estimated got aways declined from 615,000 to 106,000 between FY 2006 and FY 2016, an 83 percent decrease.

DOJIFR00763

Figure 3:  Southwest Border Got Aways and Estimated Total Successful Unlawful Entries
between POEs, FY 2000 – FY 2016



Notably, the model-based estimate of total successful unlawful entries declined at a faster rate
than observed got aways, with the model based estimate falling 89 percent between FY 2006 and
FY 2016 (the period for which both data series are available), versus an 83 percent decrease for
detected got aways during this period.  Relatedly, the two series have substantially converged
over this time period, with observed got aways accounting for 42 percent of total estimated
successful unlawful entries in FY 2006 versus 63 percent in FY 2016.  These facts suggest that
USBP detects an increasingly comprehensive share of all attempted unlawful border crossers.


## § 1092(b)(1)(B) A measurement of situational awareness achieved in each U.S. Border Patrol sector

**Definition**

*Situational awareness* – Knowledge and understanding of current unlawful cross-border activity.

Situational awareness is an output measure that describes the Department's awareness of
unlawful cross-border activity.

**Methodology and Limitations**

DHS is in the process of developing a defensible, analytically sound measure for situational
awareness for each USBP sector that meets the intent of the NDAA § 1092(b)(1)(B).  DHS
anticipates this measure will be reported in the annual report due to Congress in November 2020.
In the interim, a number of the Department's existing metrics are informed by the Department's

DOJIFR00764

awareness of migrants and other threats in the near border regions (CBP has operational jurisdiction within 100 miles of U.S. borders) and in the approaches [*See* § 1092(b)(1)(A)(ii to v) and § 1092(b)(1)(D)].

## § 1092(b)(1)(C) Unlawful Border Crossing Effectiveness Rate

**Definition**

*Unlawful Border Crossing Effectiveness Rate* – The estimated percentage of all attempted unlawful border crossers that is interdicted by USBP, where interdictions include apprehensions and turn backs.

The Unlawful Border Crossing Effectiveness Rate is an *output measure* that describes how difficult it is for unlawful border crossers to enter the United States without being interdicted.

**Methodology and Limitations**

The Unlawful Border Crossing Effectiveness Rate is calculated by dividing the number of apprehensions and turn backs between land POEs by the sum of the number of apprehensions, turn backs, and total estimated successful unlawful entries:

$$Effectiveness\ Rate = \frac{Apprehensions + Turn\ backs}{Apprehensions + Turn\ backs + Successful\ unlawful\ entries}$$

The NDAA calls for an effectiveness rate that incorporates USBP's observational estimate of turn backs and DHS's current model-based estimate of total estimated successful unlawful entries. This measure would confront all of the methodological challenges associated with each of its component parts, as discussed above.

The Unlawful Border Crossing Effectiveness Rate is conceptually similar to USBP's Interdiction Effectiveness Rate (IER), which USBP reports in its Annual Performance Report pursuant to the Government Performance and Results Modernization Act (GPRMA) of 2010. The Unlawful Border Crossing Effectiveness Rate differs from the IER in that the former includes total estimated successful unlawful entries in its denominator and IER includes known got aways.

The Unlawful Border Crossing Effectiveness Rate is also conceptually similar to the estimated apprehension rate, with the difference being that the Effectiveness Rate includes data on turn backs and apprehensions while the apprehension rate focuses exclusively on apprehensions. An advantage to examining the effectiveness rate, rather than the apprehension rate, is that effectiveness rate more completely captures USBP's actual enforcement practices, which include efforts to turn back border crossers, in addition to efforts to apprehend them. On the other hand, some analysts consider the effectiveness rate (along with IER) to be an ambiguous indicator of enforcement success since an unknown share of turn backs make additional entry attempts.

DOJIFR00765

Despite its shortcomings as an analytic tool, to date, only the IER is available for analysis at the sector level.  While a southwest border-wide estimate has been developed, sector-level estimates of unlawful entries and attempts have not yet been produced and validated by DHS.  These estimates are projected to be available for the 2019 report.

**Available Data and Discussion**

Table 3:  Interdiction Effectiveness Rate by Southwest Border Sector, FY 2014 – FY 2016

|  | Big Bend, TX | Del Rio, TX | EL Centro, CA | EL Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ |
|---|---|---|---|---|---|---|---|---|---|
| **FY2014** | 72% | 76% | 85% | 92% | 74% | 80% | 89% | 75% | 91% |
| **FY2015** | 77% | 73% | 83% | 90% | 74% | 82% | 88% | 80% | 95% |
| **FY2016** | 70% | 79% | 81% | 89% | 78% | 83% | 89% | 82% | 96% |

IER often vary from year to year and by sector.  One point of note for FY 2016 is the 96 percent IER for Yuma, AZ, which often scores the highest rating.  Del Rio reported the largest increase in all sectors, climbing six percentage points in FY 2016 to 79 percent.  Big Bend reported the largest loss in FY 2016, decreasing by seven percentage points to 70 percent.  Due to the small number of attempted and successful entries along the Northern Border, a Northern Border IER has not been developed.

# § 1092(b)(1)(D) Probability of Detection Rate

**Definition**

*Estimated probability of detection* - The estimated probability that DHS detects attempted unlawful border crossers between land POEs.

The estimated probability of detection is an *output measure* that describes the ability of attempted unlawful border crossers to enter without being detected. Because successful unlawful entry estimate is available only for the southwest border between-ports of entry, data in this section refer exclusively to this region.

**Methodology and Limitations**

The estimated probability of detection is defined as the ratio of detected unlawful entries to estimated total unlawful entries:

$$Probability\ of\ Detection = \frac{Detected\ Unlawful\ Entries}{Estimated\ Total\ Unlawful\ Entries}$$

DOJIFR00766

As described above, the number of detected unlawful entries is calculated as the sum of turn backs, got aways, and apprehensions, a mix of observational estimates and administrative data. The primary limitation to detected unlawful entries is that this metric incorporates turn back and got away estimates that aggregate potentially subjective observations from thousands of individual agents. USBP has taken a number of steps to address this problem by establishing consistent and reliable turn back and got away methodologies, as discussed above.

Estimated total unlawful entries is calculated as the sum of turn backs, apprehensions, and the model-based estimate of total successful unlawful entries. As described above, the methodology for estimating total successful unlawful entries begins with the RTM methodology's partial apprehension rate, discussed in detail in Appendix A. Following the calculation of the PAR, the methodology for estimating total successful unlawful entries consists of three additional steps: attempted border crossers are divided into impactable and non-impactable groups; the PAR is used to estimate the odds of successful entry; and the number of successful unlawful entries is estimated based on the odds of successful entry among this group times the apprehension count among impactable aliens.

The RTM methodology to estimate the PAR confronts a number of methodological limitations, as discussed in Appendix A. Each of the additional assumptions involved in using the PAR to estimate total successful unlawful entries introduces additional methodological limitations and potential biases. DHS is working to refine the model-based methodology and to more precisely describe the impact of these limitations on estimates of total successful unlawful entries in future State of the Border reports.

**Available Data and Discussion**

Figure 4 depicts the estimated probability of detection for FY 2006 – FY 2016, the years for which data are available. As the figure indicates, the estimated probability increased from 70 percent in FY 2006 (when an estimated 2.0 million unlawful border crossers were detected out of an estimated 2.9 million total unlawful border crossers) to 91 percent in FY 2016 (611,000 detected out of 673,000 total estimated unlawful border crossers).

Figure 4: Southwest Border Between-Ports of Entry Estimated Probability of Detection, FY 2006 – FY 2016



DOJIFR00767

# § 1092(b)(1)(E) Apprehensions in Each U.S Border Patrol Sector

**Definition**

*Apprehension* - The arrest of a removable alien by DHS USBP.

Apprehensions are *activity measures* that provide information used for program planning and operational purposes, among other uses.  Historically, the Department has also used apprehensions as a proxy indicator of illegal entries, an outcome measure.

For many years, DHS and the legacy Immigration and Naturalization Service also used apprehensions as a proxy indicator of successful unlawful border crossings, i.e., an *outcome measure*.  Over the long-term and across multiple locations, apprehensions are a problematic indicator of enforcement outcomes since the relationship between apprehensions and successful unlawful entries depends on the apprehension rate, which changes over time and may also differ by location.  But in the short-term and in a fixed geographic area, DHS continues to view changes in apprehensions as a useful outcome indicator because short term changes in apprehensions are more likely to be driven by changes in the number of unlawful border crossing attempts than by changes in the apprehension rate.

**Methodology and Limitations**

Apprehensions are recorded in administrative record systems with a unique identifier created for each apprehension.  USBP's count of apprehensions is considered reliable.

Apprehensions displayed below are event counts, meaning each apprehension of the same alien in a fiscal year is counted separately.  These data do not represent a count of unique aliens apprehended.

**Available Data and Discussion**

Table 4: Southwest Border Apprehension by USBP sector, FY 2007 – FY 2016

| Sector | FY2007 | FY2008 | FY2009 | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|---|---|---|---|---|
| Big Bend, TX | 5,536 | 5,391 | 6,360 | 5,288 | 4,036 | 3,964 | 3,684 | 4,096 | 5,031 | 6,366 |
| Del Rio, TX | 22,920 | 20,761 | 17,082 | 14,694 | 16,144 | 21,720 | 23,510 | 24,255 | 19,013 | 23,078 |
| EL Centro, CA | 55,883 | 40,961 | 33,521 | 32,562 | 30,191 | 23,916 | 16,306 | 14,511 | 12,820 | 19,448 |
| EL Paso, TX | 75,464 | 30,312 | 14,999 | 12,251 | 10,345 | 9,678 | 11,154 | 12,339 | 14,495 | 25,634 |
| Laredo, TX | 56,714 | 43,668 | 40,569 | 35,287 | 36,053 | 44,872 | 50,749 | 44,049 | 35,888 | 36,562 |
| Rio Grande | 73,430 | 75,473 | 60,989 | 59,766 | 59,243 | 97,762 | 154,453 | 256,393 | 147,257 | 186,830 |

23

DOJIFR00768

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Valley, TX | | | | | | | | | |
| San Diego, CA | 152,460 | 162,390 | 118,721 | 68,565 | 42,447 | 28,461 | 27,496 | 29,911 | 26,290 | 31,891 |
| Tucson, AZ | 378,239 | 317,696 | 241,673 | 212,202 | 123,285 | 120,000 | 120,939 | 87,915 | 63,397 | 64,891 |
| Yuma, AZ | 37,992 | 8,363 | 6,951 | 7,116 | 5,833 | 6,500 | 6,106 | 5,902 | 7,142 | 14,170 |
| **Total** | **858,638** | **705,015** | **540,865** | **447,731** | **327,577** | **356,873** | **414,397** | **479,371** | **331,333** | **408,870** |

Apprehension numbers often vary considerably from year to year and by sector.  Since FY 2013, the Rio Grande Valley (RGV) sector has displaced the Tucson sector as the leader in apprehensions, with over 120,000 more apprehensions than the next leading sector in FY 2016.  Apprehensions were up across the board in FY 2016, with each sector reporting increases.  The largest numeric increase was seen in RGV with almost 40,000 more apprehensions in FY 2016 than in FY 2015; however, the largest percent increase was seen in Yuma, where the apprehension count roughly doubled.  Tucson and San Diego, historically major sectors for apprehensions, continue to report considerably lower numbers than earlier years shown in the chart, with Tucson reporting 64,891 apprehensions in FY 2016, as compared to 378,239 in FY 2007.

## § 1092(b)(1)(F) Apprehensions of Unaccompanied Alien Children

**Definition**

*Unaccompanied alien child (UAC)* - one who has no lawful immigration status in the United States; has not attained 18 years of age, and with respect to whom; 1) there is no parent or legal guardian in the United States; or 2) no parent or legal guardian in the United States is available to provide care and physical custody [6 U.S.C. § 279(g)(2)].

UAC apprehensions are an *activity measure* that provide information used for program planning and operational purposes, among other uses.  Historically, the Department has also used apprehensions as a proxy indicator of illegal entries, an outcome measure.

**Methodology and Limitations**

Apprehensions are recorded in administrative record systems with a unique identifier created for each apprehension.  Since 2008, USBP systems have included a flag for children who are found to meet the legal definition of a UAC.  USBP's count of apprehensions is considered reliable, but some outside analysts have raised questions about agents' ability to reliably distinguish among older children and young adults (e.g., to distinguish between 17 and 18 year-olds) and to confirm whether children are traveling alone or in family groups.[4]

---

[4] OIG-10-12 Department of Homeland Security Office of Inspector General.  *Age Determination Practices for Unaccompanied Alien Children in ICE Custody*.  November 2009

DOJIFR00769

USBP began collecting data on UACs in FY 2008; data are unavailable for earlier years.

**Data and Discussion**

Tables 5a – 5d provide counts of UAC apprehensions by citizenship and by USBP sector for FY 2008 through FY 2016, the years for which data are available.

Table 5a:  Total Southwest Border Apprehensions of UACs, FY 2008 – FY 2016

| Sector | FY2008 | FY2009 | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|---|---|---|---|
| Big Bend, TX | 84 | 147 | 197 | 189 | 168 | 125 | 256 | 839 | 951 |
| Del Rio, TX | 834 | 1,085 | 1,014 | 1,113 | 1,618 | 2,135 | 3,268 | 2,285 | 2,689 |
| EL Centro, CA | 337 | 673 | 448 | 457 | 498 | 434 | 662 | 668 | 1,379 |
| EL Paso, TX | 1,139 | 889 | 1,011 | 697 | 659 | 744 | 1,029 | 1,662 | 3,885 |
| Laredo, TX | 799 | 1,901 | 1,570 | 1,608 | 2,658 | 3,795 | 3,800 | 2,459 | 2,953 |
| Rio Grande Valley, TX | 2,523 | 3,835 | 4,977 | 5,236 | 10,759 | 21,553 | 49,959 | 23,864 | 36,714 |
| San Diego, CA | 888 | 3,028 | 980 | 549 | 524 | 656 | 954 | 1,084 | 1,553 |
| Tucson, AZ | 1,271 | 7,606 | 7,998 | 5,878 | 7,239 | 9,070 | 8,262 | 6,019 | 6,302 |
| Yuma, AZ | 47 | 276 | 216 | 222 | 280 | 247 | 351 | 1,090 | 3,266 |
| **Total** | **7,922** | **19,440** | **18,411** | **15,949** | **24,403** | **38,759** | **68,541** | **39,970** | **59,692** |

Table 5b:  Southwest Border Apprehensions of UACs from Mexico, FY 2008 – FY 2016

| Sector | FY2008 | FY2009 | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|---|---|---|---|
| Big Bend, TX | 59 | 127 | 180 | 183 | 137 | 104 | 102 | 73 | 118 |
| Del Rio, TX | 396 | 851 | 772 | 801 | 911 | 1,082 | 821 | 798 | 867 |
| EL Centro, CA | 306 | 631 | 404 | 427 | 418 | 328 | 278 | 397 | 610 |
| EL Paso, TX | 1,067 | 841 | 947 | 663 | 616 | 654 | 698 | 823 | 1,149 |
| Laredo, TX | 118 | 1,308 | 886 | 1,022 | 1,369 | 1,652 | 1,354 | 1,299 | 1,515 |
| Rio Grande Valley, TX | 365 | 2,401 | 2,787 | 3,009 | 4,361 | 6,366 | 7,081 | 3,243 | 3,389 |
| San Diego, CA | 879 | 2,990 | 950 | 523 | 480 | 598 | 740 | 823 | 851 |
| Tucson, AZ | 79 | 6,582 | 6,485 | 4,893 | 5,405 | 6,241 | 4,394 | 3,412 | 3,293 |
| Yuma, AZ | 33 | 258 | 204 | 192 | 246 | 194 | 166 | 144 | 134 |
| **Total** | **3,302** | **15,989** | **13,615** | **11,713** | **13,943** | **17,219** | **15,634** | **11,012** | **11,926** |

Table 5c:  Southwest Border Apprehensions of UACs from Northern Triangle Countries, FY 2008 – FY 2016

| Sector | FY2008 | FY2009 | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|---|---|---|---|
| Big Bend, TX | 23 | 19 | 16 | 6 | 29 | 18 | 151 | 760 | 824 |
| Del Rio, TX | 423 | 229 | 238 | 307 | 701 | 1,044 | 2,422 | 1,479 | 1,806 |
| EL Centro, CA | 28 | 42 | 42 | 29 | 70 | 104 | 379 | 269 | 641 |
| EL Paso, TX | 65 | 46 | 58 | 32 | 40 | 80 | 290 | 824 | 2,685 |
| Laredo, TX | 627 | 523 | 598 | 528 | 1,228 | 2,028 | 2,329 | 1,113 | 1,382 |
| Rio Grande Valley, TX | 2,051 | 1,389 | 2,057 | 2,030 | 6,229 | 14,696 | 42,020 | 20,260 | 32,935 |

25

| San Diego, CA | 9 | 37 | 28 | 25 | 44 | 48 | 209 | 255 | 625 |
| Tucson, AZ | 1,091 | 938 | 1,326 | 927 | 1,753 | 2,731 | 3,727 | 2,497 | 2,904 |
| Yuma, AZ | 14 | 15 | 8 | 28 | 34 | 36 | 178 | 930 | 3,091 |
| **Total** | **4,331** | **3,238** | **4,371** | **3,912** | **10,128** | **20,785** | **51,705** | **28,387** | **46,893** |

Note:  Northern Triangle Countries refers to El Salvador, Guatemala, and Honduras.

Table 5d:  Southwest Border Apprehensions of UACs from All Other Countries, FY 2008 – FY 2016

| Sector | FY2008 | FY2009 | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|---|---|---|---|
| Big Bend, TX | 2 | 1 | 1 | 0 | 2 | 3 | 3 | 6 | 9 |
| Del Rio, TX | 15 | 5 | 4 | 5 | 6 | 9 | 25 | 8 | 16 |
| EL Centro, CA | 3 | 0 | 2 | 1 | 10 | 2 | 5 | 2 | 128 |
| EL Paso, TX | 7 | 2 | 6 | 2 | 5 | 10 | 41 | 15 | 51 |
| Laredo, TX | 54 | 70 | 86 | 58 | 61 | 115 | 117 | 47 | 56 |
| Rio Grande Valley, TX | 107 | 45 | 133 | 199 | 169 | 491 | 858 | 361 | 390 |
| San Diego, CA | 0 | 1 | 2 | 1 | 0 | 10 | 5 | 6 | 77 |
| Tucson, AZ | 101 | 86 | 187 | 58 | 82 | 98 | 141 | 110 | 105 |
| Yuma, AZ | 0 | 3 | 4 | 2 | 0 | 17 | 7 | 16 | 41 |
| **Total** | **289** | **213** | **425** | **326** | **335** | **755** | **1,202** | **571** | **873** |

After averaging 15,000 per year from FY 2008 – FY 2011, UAC apprehensions increased an average of more than 60 percent per year in FY 2012 – FY 2014, peaking at 68,541 in FY 2014. UAC numbers returned to their FY 2013 level in FY 2015, but then climbed to 59,692 in FY 2016.  More than half of all UACs were reported in RGV (36,714), most of whom were from the Northern Triangle countries of Honduras, Guatemala, and El Salvador (32,935).

# § 1092(b)(1)(G) Apprehensions of Family Units

**Definition**

*Family unit* - the number of individuals apprehended with a family member by the USBP.  For example, a mother and child apprehended together are counted as two family units.

Family unit apprehensions (FMUA) are *activity measures* that provide information used for program planning and operational purposes, among other uses.  Historically, the Department has also used apprehensions as a proxy indicator of illegal entries, an outcome measure.

**Methodology and Limitations**

Apprehensions are recorded in administrative record systems with a unique identifier created for each apprehension.  USBP's count of apprehensions is considered reliable, but agents may not always be able to reliably identify family units.

DOJIFR00771

USBP began collecting data on family units in FY 2012; data on family unit apprehensions are unavailable for earlier years.

## Data and Discussion

Table 6a:   Total Southwest Border Apprehensions of FMUAs, FY 2015 – FY 2016

|  | Big Bend, TX | Del Rio, TX | EL Centro, CA | EL Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ | **Total** |
|---|---|---|---|---|---|---|---|---|---|---|
| FY2012 | 76 | 349 | 1,127 | 265 | 1,825 | 2,625 | 1,373 | 3,254 | 222 | **11,116** |
| FY2013 | 102 | 711 | 365 | 298 | 1,688 | 7,265 | 1,576 | 2,630 | 220 | **14,855** |
| FY2014 | 176 | 4,950 | 630 | 562 | 3,591 | 52,326 | 1,723 | 3,812 | 675 | **68,445** |
| FY2015 | 807 | 2,141 | 675 | 1,220 | 1,372 | 27,409 | 1,550 | 2,930 | 1,734 | **39,838** |
| FY2016 | 1,051 | 3,549 | 1,593 | 5,664 | 1,640 | 52,006 | 2,863 | 3,139 | 6,169 | **77,674** |

Table 6b:   Southwest Border Apprehensions of FMUAs from Mexico, FY 2015 – FY 2016

|  | Big Bend, TX | Del Rio, TX | EL Centro, CA | EL Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ | **Total** |
|---|---|---|---|---|---|---|---|---|---|---|
| **FY2012** | 56 | 218 | 699 | 241 | 1,623 | 1,555 | 1,325 | 2,940 | 194 | **8,851** |
| **FY2013** | 90 | 177 | 294 | 267 | 1,116 | 1,690 | 1,343 | 2,216 | 163 | **7,356** |
| **FY2014** | 61 | 141 | 260 | 213 | 779 | 1,832 | 1,213 | 1,057 | 83 | **5,639** |
| **FY2015** | 40 | 174 | 196 | 188 | 713 | 1,326 | 854 | 696 | 89 | **4,276** |
| **FY2016** | 38 | 229 | 163 | 224 | 518 | 1,392 | 346 | 487 | 84 | **3,481** |

Table 6c:   Southwest Border Apprehensions of FMUAs from Northern Triangle Countries, FY 2015 – FY 2016

|  | Big Bend, TX | Del Rio, TX | EL Centro, CA | EL Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ | **Total** |
|---|---|---|---|---|---|---|---|---|---|---|
| **FY2012** | 10 | 120 | 12 | 19 | 175 | 989 | 31 | 130 | 3 | **1,489** |
| **FY2013** | 8 | 522 | 40 | 23 | 522 | 5,354 | 39 | 254 | 19 | **6,781** |
| **FY2014** | 100 | 4,753 | 337 | 291 | 2,767 | 49,790 | 351 | 2,553 | 392 | **61,334** |
| **FY2015** | 764 | 1929 | 470 | 1,002 | 602 | 25,296 | 617 | 2,127 | 1,556 | **34,363** |
| **FY2016** | 1,005 | 3,233 | 1,380 | 4,634 | 827 | 49,919 | 1,615 | 2,496 | 5,298 | **70,407** |

Note:  Northern Triangle Countries refers to El Salvador, Guatemala, and Honduras.

DOJIFR00772

Table 6d:  Southwest Border Apprehensions of FMUAs from All Other Countries, FY 2015 – FY 2016

|  | Big Bend, TX | Del Rio, TX | EL Centro, CA | EL Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ | **Total** |
|---|---|---|---|---|---|---|---|---|---|---|
| **FY2012** | 10 | 11 | 416 | 5 | 27 | 81 | 17 | 184 | 25 | **776** |
| **FY2013** | 4 | 12 | 31 | 8 | 50 | 221 | 194 | 160 | 38 | **718** |
| **FY2014** | 15 | 56 | 33 | 58 | 45 | 704 | 159 | 202 | 200 | **1,472** |
| **FY2015** | 3 | 38 | 9 | 30 | 57 | 787 | 79 | 107 | 89 | **1,199** |
| **FY2016** | 8 | 87 | 50 | 806 | 295 | 695 | 902 | 156 | 787 | **3,786** |

From 2015 to 2016, FMUA numbers increased considerably across all sectors.  Similar to the UAC trend observed in these two years, total FMUAs nearly doubled in 2016, and more than doubled in some sectors.  Yuma reported only 1,734 FMUAs in 2015 but 6,169 in 2016; El Paso saw a similar trend.  Like the UACs, most FMUAs (70,407 of 77,674) were from Northern Triangle countries.  In fact, despite the overall increase in FMUAs, the total count of FMUAs from Mexico decreased by 19 percent in 2016.

## § 1092(b)(1)(H) Between the Ports Illicit Drugs Seizure Rate

**Definition**

*Between the Ports Illicit Drug Seizure Rate* – For each type of illicit drug seized by USBP between POEs, the ratio of the amount of illicit drugs seized in any fiscal year relative to the average amount seized in the immediately preceding five FYs.

The Illicit Drug Seizure Rate is an *activity measure*, which compares trends in activity data over time.

**Methodology and Limitations**

Between-the-ports drug seizure data are obtained from USBP administrative records.  These data are considered reliable.

Pursuant to the definition of the Illicit Drug Seizure Rate directed by NDAA § 1092 (b)(1)(H), the drug seizure rate describes the ratio of each year's seizures relative to illicit drugs seizures in the preceding five years; the measure does not describe the rate at which illicit drugs are seized.

**Available Data and Discussion**

Table 7:  Illicit Drugs Seized Relative to Preceding Five Years ("Illicit Drug Seizure Rate") between POEs, FY 2012 – FY 2016

DOJIFR00773

| Drug Type | | **FY2012** | **FY2013** | **FY2014** | **FY2015** | **FY2016** |
|---|---|---|---|---|---|---|
| Marijuana | Rate | 101% | 100% | 83% | 81% | 72% |
| | Lbs seized | 2,299,864 | 2,430,123 | 1,922,545 | 1,538,307 | 1,294,052 |
| Cocaine | Rate | 117% | 53% | 57% | 206% | 71% |
| | Lbs seized | 12,161 | 4,596 | 4,554 | 11,220 | 5,473 |
| Heroin | Rate | 151% | 142% | 142% | 141% | 129% |
| | Oz seized | 6,873 | 9,212 | 9,691 | 8,282 | 9,062 |
| Methamphetamines | Rate | 228% | 160% | 149% | 215% | 168% |
| | Lbs seized | 3,715 | 3,580 | 3,930 | 6,443 | 8,224 |

Drug seizure trends varied in FY 2016 by type of illicit drug. Marijuana and cocaine both saw declines in FY 2016 as compared to the previous five years (72 percent and 71 percent of the previous five year average, respectively).  This is a continuous trend for marijuana seizures, which have been on the decline since FY 2014.  Cocaine seizures had been declining until FY 2015, in which year a resurgence in seizures was observed.  Heroin and methamphetamines seizures continue to increase, as they have in each year at least since FY 2012.

# § 1092(b)(1)(I) Estimates of the Impact of the Consequence Delivery System on Recidivism

**Definition**

*Consequence Delivery System (CDS)* – a process implemented by USBP to uniquely evaluate each apprehended subject and to identify the most effective and efficient consequences to deliver to impede and deter further illegal activity.

*Recidivist Rate* – The share of subjects apprehended by USBP who are apprehended more than once in the same fiscal year.

The annual recidivist rate is an *output measure* that offers insight into what share of deportees are deterred from making additional unlawful entry attempts, though not accounting for unknown attempts/entries.  USBP use the annual recidivist rate as one of its 15 metrics of the effectiveness of enforcement consequences under the CDS.

**Methodology and Limitations**

Since 2007, USBP has collected biometric data (including fingerprints and digital photographs) from most unlawful border crossers it apprehends.  These data are used to identify subjects apprehended more than once in a given fiscal year.  USBP data on re-apprehensions in the same fiscal year is considered reliable.  The annual recidivist rate is defined as the number of unique subjects apprehended multiple times in a fiscal year divided by the total number of unique subjects in the fiscal year:

DOJIFR00774

$$Annual\ Recidivist\ Rate = \frac{Number\ of\ Unique\ Subjects\ Apprehended\ Multiple\ Times}{Total\ Number\ of\ Unique\ Subjects}$$

The annual recidivism rate is a valid indicator of the probability that deportees make subsequent attempts at re-apprehensions in that a drop in the annual recidivism rate very likely reflects a drop in unlawful re-entry attempts.  The measure has the further advantages that USBP can calculate annual recidivism based strictly on its own apprehension data and that it can reliably be calculated at the end of each fiscal year.  These features make the annual recidivism rate a useful measure for USBP performance management.

Nonetheless, as the U.S. Government Accountability Office (GAO) has argued, if the goal is to accurately describe the share of deportees who make additional unlawful entry attempts, the current measure of recidivism could be strengthened in at least two ways:  1) count re-apprehensions based on the date on which a subject is removed or returned, rather than that the date of apprehension; 2) count re-apprehensions that occur within a fixed period of time defined by the subject's repatriation date, rather than by the fiscal year.[5]  When based on a one year window, these refinements yield a more expansive definition of the recidivism rate that DHS refers to as the "Total One-Year Recidivism Rate"; future versions of this report will include estimates of the impact of CDS on both the annual recidivism rate and a longer-term recidivism rate.

**Available Data and Discussion**

Table 8: CDS Recidivism Rate Change by Sector

| Southwest Border Sector | Year CDS Implemented | Average Annual Recidivism Rate in 3 Prior Years[1] | Average Annual Recidivism Rate in 3 Subsequent Years[2] |
|---|---|---|---|
| San Diego | FY 2012 | 38% | 31% |
| El Centro | FY 2012 | 42% | 36% |
| Yuma | FY 2012 | 18% | 16% |
| Tucson | FY 2012 | 26% | 20% |
| El Paso | FY 2012 | 10% | 10% |
| Big Bend | FY 2012 | 11% | 7% |
| Del Rio | FY 2012 | 8% | 6% |
| Laredo | FY 2012 | 14% | 12% |
| Rio Grande Valley | FY 2012 | 15% | 12% |

[1]Refers to the 3 years prior to CDS being implemented in that sector
[2]Refers to the 3 years after CDS was implemented in that sector

With the exception of the El Paso sector, where rates remained unchanged, the annual recidivism rates dropped across the board following the implementation of CDS.  While changes in

---

[5] U.S. Government Accountability Office, "Border Patrol: Actions Needed to Improve Oversight of Post-Apprehension Consequences," GAO-17-66, January 2017, pp. 13-17.

DOJIFR00775

recidivism should not be interpreted solely as a function of CDS given that border enforcement is a complex, dynamic system, some sectors showed noticeable improvements in recidivism rates, such as the Tucson and El Centro sectors which saw six percent drops after CDS, and San Diego which saw a seven percent drop. Other sectors, which already had the lowest recidivism rates, saw smaller improvements. Recidivism data are not available to calculate the impact of CDS at the Northern Border due to the small number of attempted illegal entries along the Northern Border.

## § 1092(b)(1)(J) Examination of Each Consequence under the CDS

**Definition**

*Consequence* – An administrative, programmatic, or criminal justice process imposed on a subject following the subject's apprehension. CDS is designed to identify, for any given subject, the ideal consequences to deliver to impede and deter further illegal activity.

**Methodology and Limitations**

USBP's current methodology for assessing the CDS involves analyzing the effectiveness and efficiency of each enforcement consequence. One of the key effectiveness metrics is the annual recidivism rate, which is calculated separately for each enforcement consequence.

Under the CDS, USBP specifically targets aliens with more extensive records of unlawful border crossing behavior for consequences that are designed to have a greater deterrent impact. For example, the Target Enforcement Initiative utilizes partnerships with the U.S. Department of Justice to prioritize and prosecute individuals with six or more apprehensions. As a result, differences in recidivism rates by enforcement consequence may reflect differences in the propensity of the targeted population to make further re-entry attempts, in addition to the possible impact of each consequence on recidivism.

An additional limitation of currently-available data is that they are based on apprehension data for a given fiscal year, not repatriation data. Depending on the consequence and the timing of the apprehension, some individuals may not be repatriated to their country of origin during the fiscal year of their apprehension, and therefore may not have an opportunity to attempt re-entry. DHS and CBP are working to refine their analysis of CDS and will seek to address these limitations in the FY 2018 version of this report.

**Available Data and Discussion**

Table 9: Annual Recidivism Rate by Consequence, FY 2012 – FY 2016

31

DOJIFR00776

| Consequence | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|
| Voluntary Return | 27.06% | 28.61% | 30.50% | 27.03% | 24.55% |
| Warrant of Arrest/ Notice to Appear | 3.83% | 1.44% | 0.60% | 0.89% | 0.41% |
| Expedited Removal | 16.44% | 16.66% | 17.54% | 18.08% | 15.46% |
| Reinstatement of Removal | 15.88% | 16.42% | 15.80% | 15.41% | 16.62% |
| Alien Transfer Exit Program | 23.82% | 25.48% | 28.63% | 27.17% | 28.80% |
| Criminal Consequence Program | 10.30% | 9.26% | 8.24% | 6.67% | 8.36% |
| Standard Prosecution | 9.09% | 10.17% | 9.18% | 8.79% | 8.16% |
| Operation Against Smugglers Initiative on Safety and Security | 10.24% | 18.04% | 18.25% | 22.97% | 30.93% |

While these data should be interpreted with caution for the reasons identified above, some trends are noteworthy. For example, the more punitive consequence programs such as CCP and standard prosecution generally showed lower recidivism rates (8.36 percent, 8.16 percent) than less punitive programs like voluntary return (24.55 percent) or expedited removal (15.46 percent). At the same time, recidivism rates are notably high among individuals in the Operation Against Smugglers Initiative on Safety and Security (OASISS) consequence group; this finding likely reflects the fact that the population selected for OASISS—suspected smugglers—routinely make multiple crossing attempts.

DOJIFR00777

# § 1092(c) Metrics for Securing the Border at Ports of Entry

## § 1092(c)(1)(A)(i) Total Inadmissible Travelers at Ports of Entry

**Definition**

*Inadmissible Alien* – An alien seeking admission at a POE who does not meet the criteria in the INA for admission.

*Known Inadmissible Aliens* – Aliens seeking admission at a POE who are found by OFO to be inadmissible.

*Total Attempted Inadmissible Aliens* – The estimated number of inadmissible aliens who attempt to enter the United States.  Total attempted inadmissible aliens include known inadmissible aliens and successful unlawful entries at POEs.

Inadmissible aliens and known inadmissible aliens are *activity measures* that describes OFO officer workload.  Known inadmissible aliens may also be used as a proxy indicator of total attempted inadmissible aliens, which is an *outcome measure*.

**Methodology and Limitations**

Known inadmissible aliens are recorded in OFO administrative records with a unique identifier created for each inadmissibility determination.  OFO's count of known inadmissible aliens is considered reliable.

The Department does not currently have a methodology in place to estimate the number of attempted inadmissible aliens.  DHS and CBP are working to establish a methodology to produce such an estimate in time to be included in the 2018 State of the Border Report.

**Available Data and Discussion**

Table 10: Known Inadmissible Aliens at Ports of Entry, FY 2007 - FY2016

| FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 |
|---------|---------|---------|---------|---------|---------|---------|---------|---------|---------|
| 203,310 | 224,770 | 225,149 | 231,306 | 216,355 | 197,362 | 205,920 | 224,927 | 254,637 | 292,614 |

From the recent low in FY 2012, the number of aliens identified as inadmissible at POEs has continue to climb. In FY 2016, 292,614 aliens were deemed inadmissible at POEs, the highest number this decade. The FY 2016 count represents an increase of 48 percent over the 197,362 inadmissible aliens in FY 2012.

## § 1092(c)(1)(A)(ii) Refusal and Interdiction Rates at Ports of Entry

DOJIFR00778

**Definition**

*Refusal Rate* – The share of all passengers seeking admission at a port of entry that is found inadmissible.  Refusal Rate is an *activity measure* that describes OFO officer workload.

*Port of Entry Interdiction Rate* – The share of attempted inadmissible aliens that is found inadmissible.  POE Interdiction Rate is an *output measure* that describes the difficulty of entering the United States unlawfully through a port of entry.

**Methodology and Limitations**

The refusal rate is calculated by dividing known inadmissible aliens (i.e., aliens found inadmissible by OFO officers at POEs) by the total number of passengers seeking admission at ports of entry:

$$Refusal\ Rate = \frac{Inadmissibility\ Determinations}{Arivals\ at\ POEs}$$

Data on inadmissibility determinations and total passengers is obtained from OFO administrative records; these data are considered reliable.

The Department does not have a methodology in place to calculate total attempted inadmissible aliens, and therefore currently cannot calculate a POE interdiction rate.

**Available Data and Discussion**

Table 11: Inadmissible Aliens and Refusal Rate at Ports of Entry FY 2007 - FY2016

|          | Passengers  | Inadmissible | Refusal Rate |
|----------|-------------|--------------|--------------|
| **FY 2007** | 407,677,568 | 203,310 | 0.05% |
| **FY 2008** | 401,481,071 | 224,770 | 0.06% |
| **FY 2009** | 361,191,781 | 225,149 | 0.06% |
| **FY 2010** | 352,980,607 | 231,306 | 0.07% |
| **FY 2011** | 340,364,884 | 216,355 | 0.06% |
| **FY 2012** | 351,551,007 | 197,362 | 0.06% |
| **FY 2013** | 362,333,988 | 205,920 | 0.06% |
| **FY 2014** | 374,974,750 | 224,927 | 0.06% |
| **FY 2015** | 383,200,225 | 254,637 | 0.07% |
| **FY 2016** | 390,592,745 | 292,614 | 0.07% |

Since 2012, the number of passengers at POEs has increased 11 percent (from 352 to 391 million), while the number of known inadmissible passengers has increased 48 percent (from 197,000 to 293,000), resulting in a 33 percent increase in the refusal rate (from under 0.06

34

percent to over 0.07 percent).  This increase may indicate that inadmissible aliens represent an increasingly large share of passengers, that OFO is better able to detect inadmissible aliens, or both.  With an FY 2016 refusal rate of .0749 percent, however, the number of known inadmissible aliens is still a very small share of passengers coming through POEs.

## § 1092(c)(1)(A)(iii) Unlawful Entries at Ports of Entry

**Definition**

*Successful Unlawful Entries* - The estimated number of inadmissible aliens who unlawfully enter the United States through POEs.

Successful unlawful entries is an *outcome measure*.

**Methodology and Limitations**

The Department does not currently have a methodology to reliably estimate the number of successful unlawful entries through POEs.  DHS and CBP are working to establish a methodology to produce such an estimate in time to be included in the 2018 State of the Border Report.

## § 1092(c)(1)(B) Illicit Drugs Seized at Ports of Entry

**Definition**

*Drug Seizures* – Seizures of illicit drugs by CBP officers at POEs.

Drug Seizures are an *activity measure*.  Drug seizures may also be interpreted as a proxy indicator of illicit drug inflows through POEs, an *outcome measure*.

**Methodology and Limitations**

Drugs seizure data are obtained from OFO administrative records, measured in kilograms.  These data are considered reliable.

**Available Data and Discussion**

Drug seizures at POEs is contained in Appendix B.  A total of 367,612.58 kilos of illicit drugs were seized at POEs in FY 2016, which represents a nine percent decline from a total of 400,719.44 kilos in FY 2015, but is still higher than the previous five-year average of 352,399.84 kilos.

DOJIFR00780

# § 1092(c)(1)(C) Port of Entry Illicit Drug Seizure Rate

**Definition**

*Port of Entry Illicit Drug Seizure Rate* – For each type of illicit drug seized by OFO at POEs, the ratio of the amount of illicit drugs seized in any fiscal year to the average of the amount seized in the immediately preceding five fiscal years.

**Methodology and Limitations**

At-ports-of-entry drug seizure data are obtained from OFO administrative records.  These data are considered reliable.

Pursuant to the definition of the illicit drug seizure rate directed by NDAA § 1092(c)(1)(C), the drug seizure rate describes recent seizure trends (i.e., current year compared to five previous years); the measure does not describe the rate at which illicit drugs are seized.

The Drug Seizure Rate is an *activity measure*, which compares trends in activity data over time. Drug seizures may also be interpreted as a proxy indicator of illicit drug inflows through POEs, an *outcome measure*.

**Available Data and Discussion**

Table 12: Port of Entry Illicit Drug Seizure Rate, FY 2012 – FY 2016

| Drug Type | | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|---|
| Marijuana | Rate | 88% | 81% | 77% | 118% | 102% |
| | Kg seized | 219,344 | 195,270 | 180,686 | 250,637 | 219,960 |
| Cocaine | Rate | 73% | 82% | 71% | 87% | 103% |
| | Kg seized | 7,294 | 7,413 | 6,234 | 7,190 | 8,209 |
| Heroin | Rate | 209% | 208% | 168% | 174% | 106% |
| | Kg seized | 1,125 | 1,475 | 1,556 | 1,984 | 1,483 |
| Methamphetamines | Rate | 233% | 263% | 200% | 200% | 203% |
| | Kg seized | 4,888 | 7,503 | 8,285 | 10,861 | 14,279 |

Unlike recent trends in drug seizures between POEs, marijuana and cocaine seizures at POEs held fairly constant in FY 2016 as compared to the previous five-year average (two percent and three percent increase respectively).  Notably, however, seizures of marijuana and cocaine have fallen in recent years, and the volume of seizures in FY 2016 were still relatively low by recent historical standards.  Heroin and methamphetamines, however, continued their increases into FY 2016, with heroin increasing six percent over a constantly growing five year average and methamphetamines more than doubling its previous five year average each of the past five years.

# § 1092(c)(1)(D) Major Infractions at Ports of Entry

**Definition**

DOJIFR00781

*Major Infractions* – OFO considers major infractions to include all arrests, including arrests related to terrorism, drugs, criminal alien [including zero tolerance (ZT) arrests], currency, merchandise, agriculture products, National Crime Information Center (NCIC) hits, and Terrorist Screening Database (TSDB) hits, among others.

*Known Major Infractions* – The number of major infractions interdicted by OFO.

*Undetected Major Infractions* – The estimated number of major infractions not interdicted by OFO.

Known Major Infractions are an *activity measure*.  Undetected major infractions are an *outcome measure*.

**Methodology and Limitations**

These data are recorded in OFO administrative records and are considered reliable.

The Department does not currently have a methodology to estimate the number of undetected major infractions.

**Available Data and Discussion**

Table 13:  Known Major Infractions at Ports of Entry, FY 2007 – FY 2016

|          | Passengers   | Major Infractions | Infraction Rate |
|----------|--------------|-------------------|-----------------|
| **FY 2007** | 407,677,568 | 90,718  | 0.02% |
| **FY 2008** | 401,481,071 | 96,330  | 0.02% |
| **FY 2009** | 361,191,781 | 108,941 | 0.03% |
| **FY 2010** | 352,980,607 | 112,446 | 0.03% |
| **FY 2011** | 340,364,884 | 120,491 | 0.04% |
| **FY 2012** | 351,551,007 | 111,185 | 0.03% |
| **FY 2013** | 362,333,988 | 112,471 | 0.03% |
| **FY 2014** | 374,974,750 | 106,354 | 0.03% |
| **FY 2015** | 383,200,225 | 112,562 | 0.03% |
| **FY 2016** | 390,592,745 | 113,665 | 0.03% |

OFO officers interdicted 113,665 passengers based on major infractions at ports of entry in FY 2016.  The number of major infractions was almost unchanged from FY 2015, and similar to the number each year since FY 2010.  With the number of passengers increasing slightly over this period, the infraction rate fell slightly from 0.04 percent in FY 2011 to 0.03 percent in FY 2016.  Over the last 10 years (i.e., since FY 2007), both the number of total seizures and the infraction rate both showed modest increases.

DOJIFR00782

## § 1092(c)(1)(E) Cocaine Seizure Effectiveness Rate

**Definition**

*Cocaine seizure effectiveness rate* – In consultation with the Office of National Drug Control Policy (ONDCP), the amount of cocaine seized by OFO at land POEs compared to the total estimated flow of cocaine through land POEs.

Cocaine seizures is an *activity measure*.  Seizures may also be used as a proxy indicator of total attempts to import cocaine, an *outcome measure*.  Seizure effectiveness rate (i.e., cocaine seized as compared to the total estimate cocaine flow) is an *output measure*.

**Methodology and Limitations**

Seizure data is obtained from OFO administrative records and is considered reliable.  Estimates of the total cocaine flow are provided by ONDCP.  The U.S. Government does not have an estimate of the share of the total cocaine flow that passes through land POEs, but the U.S. Drug Enforcement Agency's National Drug Threat Assessment states that the southwest border remains the key entry point for the majority of the cocaine entering the Unites States.

**Available Data and Discussion**

Table 14:  Estimates of Cocaine Seizure at Land Ports of Entry FY 2012 – FY 2016

|  | **FY2012** | **FY2013** | **FY2014** | **FY2015** | **FY2016** |
|---|---|---|---|---|---|
| Estimated Flow | 479 | 475 | 479 | 684 | 1,142 |
| Seizures | 45,260.18 | 39,074.63 | 41,311.88 | 38,145.00 | 52,900.67 |
| Seizure Effectiveness Rate | 4.2% | 3.7% | 3.9% | 2.5% | 2.1% |

Notes:  Estimated flow is measure in metric tons. Cocaine seizure estimates reported in pounds. Estimated cocaine flows are based on the IACM mid-point estimate for 2012-2014 and based on confirmed and substantiated CCDB estimate for 2015-2016.

## § 1092(c)(1)(F)(i) Average Wait Times and Traffic Volume

**Definition**

*Average Wait Time* – Average minute wait time for vehicles to pass through a land POE.

*Private Vehicle Volume* – The number of private vehicles passing through a land POE per year.

*Commercial Vehicle Volume* – The number of commercial vehicles passing through a land POE per year.

DOJIFR00783

Average wait time is an *output measure* describing the ease of crossing the border.  Vehicle volume is an *activity measure*.

**Methodology and Limitations**

OFO calculates average wait times for each POE by a variety of methods, some automated using Radio Frequency Identification and others manually using either surveying or line of sight determinations.  For manual wait time determinations, OFO officers record average minute wait times in the Border Wait Time tool, for automated wait times the time is recorded automatically every 30 minutes.  Wait time data is not available for all POEs, particularly small northern border POEs with negligible wait times.  OFO leadership directed POEs to provide wait times in March 2014.  The policy is currently under review and new guidance will be issued in the near future to account for the improvements in automation and recording.

OFO records counts of Personally Owned Vehicles (POV) as administrative data in its Operations Management Report (OMR); these data are considered reliable.

**Available Data and Discussion**

Data on Average Wait Times, and counts of private and commercial vehicles for each land POE for which data are available are contained in Appendix C. Appendix C contains law enforcement sensitive information and has been redacted from this public report.


# § 1092(c)(1)(F)(ii) Infrastructure Capacity Utilization Rate

**Definition**

*Infrastructure Capacity Utilization Rate* – Average number of vehicles processed per booth, per hour at each land POE.

The Infrastructure Capacity Utilization Rate is an *output measure* that describes OFO's ability to process traffic relative to the physical and staffing capacity.

**Methodology and Limitations**

Data are obtained from OFO administrative records.  The data comes from CBP systems with booth hours and throughput as calculated fields.  The hours serve as a proxy measure for the number of CBP officer hours spent processing and are measured on a one-for-one basis.  Throughput is then calculated by summing all vehicles that passed through a site in a year and then dividing it by total booth hours.

**Available Data and Discussion**

Infrastructure capacity utilization rate data is contained in Appendix D. Appendix D contains law enforcement sensitive information and has been redacted from this public report.

DOJIFR00784

Each OFO land POE is unique in terms of staffing authorizations and physical layouts.  Land POEs may be physically constrained by the available space around them and so unable to expand to yield greater capacity.  Land POEs in the United States are also impacted by the adjoining Canadian and Mexican land POE management decisions on staffing and physical layouts.  Both the OFO Mission Support Facilities Division and the CBP Office of Facilities and Asset Management are working on establishing methods to determine resourcing decisions for land POEs.

Infrastructure capacity utilization rate varies by location and year.  In general, the southern border reports higher utilization rates because of higher flows through the POEs.  The overall utilization rate increased in FY 2016 over the previous year, due to a combination of increased efficiency and increased traffic demand for a fixed number of processing lanes.  CBP processed an average of 47.4 vehicles per lane, per hour in FY 2016 (34.6 on the northern border; 54.4 on the southern border).

Table 15:  Average infrastructure capacity utilization rate FY 2012 – FY 2016

| Border | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 |
|---|---|---|---|---|---|
| Northern Border | 36.2 | 38.2 | 39 | 35.7 | 34.6 |
| Southern Border | 47.7 | 46.8 | 49.1 | 53 | 54.4 |
| Total | 43.1 | 43.5 | 45.3 | 46.6 | 47.4 |

## § 1092(c)(1)(F)(iii) Secondary Examination Rate

**Definition**

*Secondary Examination Rate* – Percentage of passengers subject to secondary inspection at each land POE.

Secondary Examination Rate is an *activity measure* that describes OFO workload and practices.

**Methodology and Limitations**

Data are obtained from OFO administrative records. Secondary examination rate is determined by the recorded number of passengers sent for secondary inspection versus the total number of recorded passengers.

**Available Data and Discussion**

Frequency of secondary inspections data is contained in Appendix E. Appendix E contains law enforcement sensitive information and has been redacted from this public report.

DOJIFR00785

Secondary inspection rates vary considerably among the various POEs.  Among the northern border POEs, the rate of secondary inspection declined from 8.52 percent in FY 2012 to 7.30 percent in FY 2016.  The southern border Secondary Inspection Rate remained stable over the past four years, with 11.88 percent of passengers receiving secondary inspection in FY 2016.  This number is down from the prior three year average from FY 2010 to FY 2012, when closer to 15 percent of passengers received secondary inspection.  The highest secondary inspection rates were northern border POEs such as St. John (32.30 percent) and Vanceboro (29.83 percent).  Certain smaller land POEs have high secondary examination rates due to low volume of traffic that allow officers increased time to thoroughly examine a larger share of passengers.

# § 1092(c)(1)(F)(iv) Secondary Examinations Effectiveness Rate

This measure is under review.  OFO does not presently measure the effectiveness of secondary examinations at the enterprise level.

# § 1092(c)(1)(G)(i) Number of Potentially "High-Risk" Cargo Containers

**Definition**

*Potentially High-Risk Cargo Containers* – Shipping containers carrying cargo shipments identified as potentially high-risk using National Targeting Center (NTC) security criteria.

Potentially High-Risk Cargo Containers is an *activity measure* that describes OFO workload.

**Methodology and Limitations**

All international cargo shipments coming to the United States via the sea, land, and air modes of transportation are screened by the NTC using the Automated Targeting System (ATS) to identify those shipments that may be considered potentially high-risk according to NTC security criteria.  Any cargo container carrying a shipment identified as potentially high-risk is identified for immediate review and assessed or scanned prior to lading at a Container Security Initiative (CSI) member foreign port of origin or at arrival at a U.S. POE.  Assessing, resolving, and when required, scanning and physically inspecting cargo found to be potentially high-risk ensures the safety of the public and minimizes the impact to the trade through the effective use of risk-focused targeting.

The NTC periodically refines, improves, and revises the security criteria applied by the Automated Targeting System, which in turn improves the focus of the risk assessment applied and somewhat reduces the overall number of cargo shipments identified as potentially high-risk.  This process of continual review and refinement in the security criteria applied and ATS methodology has led to significant reductions in the total number of cargo containers identified as potentially high-risk year-to-year, even though the total amount of cargo arriving at U.S. POEs has increased over the same time period.

DOJIFR00786

**Available Date and Discussion**

Table 16:  Potentially High-Risk Cargo Containers at Seaports, FY 2013 – FY 2016

| FY2013 | FY2014 | FY2015 | FY2016 |
|--------|--------|--------|--------|
| 89,598 | 74,509 | 72,974 | 71,815 |

The number of potentially high-risk cargo containers declined in 2016 for the third year in a row. Overall, the number of potentially high-risk containers fell from 89,598 in FY 2013 to 71,815 in FY 2016, a 20 percent decrease.


# § 1092(c)(1)(G)(ii) Ratio of Potentially High-Risk Cargo Containers Scanned Relative to High-Risk Containers Entering in Previous Fiscal Year

**Definition**

*Ratio of Potentially High-Risk Containers Scanned* – The ratio of potentially high-risk containers scanned relative to the number of potentially high-risk containers entering in the previous fiscal year.

*Percentage of Potentially High-Risk Containers Scanned* – The percentage of potentially high-risk containers scanned relative to the total number of potentially high-risk containers entering in the same fiscal year.

The ratio of potentially high-risk containers scanned is an *activity measure*, which compares trends in activity data over time. Ratio of High Risk Containers may also be interpreted as a proxy indicator of high risk containers successfully be scanned and entering through ports of entry, an *outcome measure*.

The percentage of potentially high-risk containers scanned is an *output measure*, which describes CBP's ability to scan containers identified as being potentially high-risk.

**Methodology and Limitations**

Inspection data are obtained from OFO administrative records.  These data include potentially high-risk cargo containers reviewed, assessed, or scanned.  These three methods of inspection are not currently distinguishable with available data sources.

The ratio compares potentially high-risk containers in one year to the number entering in the previous year and should not be confused with the percentage of potentially high-risk containers scanned relative to the number entering in the current year.

42

A container is considered "high-risk" if even one shipment within it is designated high-risk.  One container may have multiple high-risk shipments within it which could cause the same container to be reviewed or scanned multiple times.

**Available Data and Discussion**

The ratio of potentially high-risk containers reviewed, assessed, or scanned relative to previous years' entries along with the percentage scanned in the current year are contained in Appendix F. Appendix F contains law enforcement sensitive information and has been redacted from this public report.

With respect to the percentage scanned, nearly all sea POEs reported 100 percent scanning of high-risk cargo containers in FY 2016 or indicated that no high-risk containers passed through the POE.  The few POEs that reported lower than a 100 percent scanning rate reported at least a 99 percent rate.


## § 1092(c)(1)(G)(iii) Potentially High-Risk Cargo Containers Scanned Upon Arrival at a U.S. POE

This measure is under review and will be provided in the FY 2018 report.


## § 1092(c)(1)(G)(iv) Potentially High-Risk Cargo Containers Scanned Before Arrival at a U.S. POE

This measure is under review and will be provided in the FY 2018 report.

DOJIFR00788

# § 1092(d) Metrics for Securing the Maritime Border

## § 1092(d)(1)(A) Situational Awareness in the Maritime Environment

**Definition**

The NDAA calls for DHS to develop a measure for situational awareness based on "knowledge and understanding of current unlawful cross-border activity, including the following:  (A) Threats and trends concerning illicit trafficking and unlawful crossings; (B) The ability to forecast future shifts in such threats and trends; (C) The ability to evaluate such threats and trends at a level sufficient to create actionable plans; and (D) The operational capability to conduct persistent and integrated surveillance of the international borders of the United States."

Situational awareness is an *output measure*.

**Methodology and Limitations**

DHS is in the multi-year process of developing a defensible, analytically sound measure for situational awareness in the maritime domain that meets the intent of the NDAA.

In the interim, the Department reports on the following operational activities contributing to maritime domain situational awareness:
- CBP Aircraft Hours Flown for Situational Awareness or Interdiction Support
- USCG Aircraft Hours Flown for Situational Awareness or Interdiction Support
- USCG Cutter Hours Contributing to Situational Awareness or Interdiction
- CBP Boat Hours Contributing to Situational Awareness or Interdiction
- USCG Boat Hours Contributing to Situational Awareness or Interdiction
- CBP Tethered Aerostat Radar System (TARS) Radar Operating Hours
- Number of Vessel Manifests Screened by Coastwatch

**Available Data and Discussion**

Table 17a:  CBP Aircraft Flight Hours Within/Outside Transit Zone, FY 2016

|  | **FY2016** |
| --- | --- |
| Inside Transit Zone - CBP | 6,420 |
| Outside Transit Zone – CBP | 13,188 |

Table 17b:  USCG Aircraft Flight Hours Within/Outside Transit Zone, FY 2012 – FY 2016

|  | **FY2012** | **FY2013** | **FY2014** | **FY2015** | **FY2016** |
| --- | --- | --- | --- | --- | --- |
| Inside Transit Zone – USCG | 5,082 | 4,599 | 4,567 | 5,426 | 4,110 |
| Outside Transit Zone – USCG | 14,721 | 14,258 | 13,896 | 14,003 | 13,736 |

44

USCG reported a decrease in the number of flight hours both inside and outside the transit zone in FY 2016.  Between FY 2012 and FY 2015, an average of 4,919 hours were flown inside the transit zone, while only 4,110 were flown in FY 2016 – the lowest recorded flight hours in the last five years.  Similarly, 13,736 hours were flown outside the transit zone in FY 2016, as compared to the FY 2012-2015 average of 14,220.  This FY 2016 total was also the lowest number of hours flown outside the transit zone in the last five years.

Table 18:  USCG Cutter underway hours within/outside transit zone FY 2012 – FY 2016

|  | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|
| Inside Transit Zone | 37,866 | 25,388 | 14,456 | 16,964 | 28,205 |
| Outside Transit Zone | 127,671 | 117,114 | 117,093 | 112,773 | 78,462 |

Table 19a:  USCG Boat underway hours within/outside transit zone FY 2012 – FY 2016

|  | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|
| Inside Transit Zone | 0 | 2,031 | 0 | 0 | 0 |
| Outside Transit Zone | 46,326 | 37,640 | 30,726 | 32,701 | 28,525 |

Table 19b:  CBP Boat underway hours within/outside transit zone FY 2016

|  | FY2016 |
|---|---|
| Inside Transit Zone | 0 |
| Outside Transit Zone | 40,241 |

Note:  CBP maritime hours include Air and Marine Operations vessel underway hours.

Table 20:  Total operational hours for TARS radars FY 2012 – FY 2016

|  | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|
| Cudjoe Key, FL | 5,752 | 6,289 | 6,165 | 6,306 | 4,886 |
| Lajas, PR | 0[1] | 0[1] | 1,230[1] | 5,049 | 4,559 |

[1] TARS site at Lajas, Puerto Rico crashed in 2011; CBP re-established operations in May 2014.
Source:  CBP administrative records

CBP's Air and Marine Operations (AMO) uses TARS to provide long-range detection of low-altitude aircraft at the radar's maximum range.  The elevated sensor mitigates curvature of the earth and terrain masking limitations.  The number of TARS operational hours declined for both locations in FY 2016.  Cudjoe Key saw a 1,420 hour decrease in hours (23 percent decrease from FY 2015).  Lajas reported a 490 hour decrease (10 percent decrease from FY 2015).  FY 2016 saw an increase in severe tropical weather throughout the storm season because of a La Niña effect, which impacted operations.  In addition to the weather, AMO switched out the aerostat envelope of the TARS in Cudjoe Key over March and April 2017.

Table 21:  Vessel Manifests Screened by Coastwatch for National Security Concerns Prior to Arrival at U.S. POE, FY 2012 – FY 2016

| FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|
| 118,098 | 126,112 | 124,661 | 122,133 | 117,736 |

DOJIFR00790

# § 1092(d)(1)(B) Known Maritime Migrant Flow Rate

**Definition**

*Known Maritime Flow* - Total maritime migrant flow interdicted, identified directly or indirectly but not interdicted, or otherwise believed to have unlawfully entered the United States

Known Maritime Flow is an *outcome measure*.

**Methodology and Limitations**

Migrant flow data are obtained from USCG and CBP administrative records.  The USCG maintains a robust accounting of USCG, international partner, and domestic partner interdictions and sightings of undocumented maritime migrants.  The USCG relies upon its partners to report their interdictions to the USCG for compilation in the database.  At times, undocumented maritime migrants are counted by both USCG and CBP (or other partners) when interdicted as agencies often cooperate during these operations.  In certain limited cases undocumented maritime migrant interdictions by partners are not reported to the USCG, and these cases are not accounted for in the figures below.  Additionally, while partners report cases to the USCG when undocumented maritime migrants are apprehended on shore or evidence is found of their arrival on shore, some migrants arrive without being apprehended and leave no evidence.  These cases are never reported and are also excluded from the known maritime migrant flow figures below.

Table 22:  Migrants interdicted in the maritime domain by DHS Component FY 2007 – FY 2016

|         | USCG  | CBP   | DHS and Partners |
|---------|-------|-------|------------------|
| **FY 2007** | 5,981 | NA    | NA    |
| **FY 2008** | 4,565 | NA    | NA    |
| **FY 2009** | 3,682 | NA    | NA    |
| **FY 2010** | 2,121 | NA    | NA    |
| **FY 2011** | 2,458 | NA    | NA    |
| **FY 2012** | 2,732 | NA    | NA    |
| **FY 2013** | 2,093 | NA    | NA    |
| **FY 2014** | 3,587 | NA    | 7,752 |
| **FY 2015** | 3,825 | NA    | 6,028 |
| **FY 2016** | 6,326 | 2,683 | 8,167 |

Note:  Some interdictions may be counted by both USCG and CBP as some migrant interdictions involve assets from both agencies.  Interdictions by DHS and partners may include international partners.

Table 23:  Known maritime migrant flow, FY 2007 – FY 2016

| FY2007 | FY2008 | FY2009 | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| 14,682 | 10,879 | 9,850  | 4,443  | 4,566  | 5,298  | 7,631  | 10,631 | 8,057  | 10,319 |

DOJIFR00791

# § 1092(d)(1)(C) Illicit Drug Removal Rate

**Terms**

*Illicit Drugs Removal Rate* –The ratio of illicit drugs removed by DHS maritime security in any fiscal year, including drugs abandoned at sea, relative to the average amount removed or abandoned in the immediately preceding five fiscal years.

The Illicit Drug Removal Rate is an *activity measure*, which compares trends in activity data over time.

**Methodology and Limitations**

Drug removals are obtained from USCG and CBP administrative records; these data are considered reliable.

Pursuant to the definition of the Illicit Drug Removal Rate directed by NDAA § 1092 (d)(1)(C), the Drug Removal Rate describes recent trends in drugs removed or abandoned at sea (i.e., current year compared to five previous years); the measure does not describe the rate at which illicit drugs are removed.

Non-commercial maritime drug removals includes those seized by the USCG, CBP, other law enforcement agencies, and international partners, as well as those disrupted or abandoned by drug trafficking organizations.

**Available Data and Discussion**

Table 24:  Ratio of Drugs Removed or Abandoned at Sea Relative to Previous Five Fiscal Years ("Illicit Drug Removal Rate"), FY 2012 – FY 2016

| Drug Type | | **FY2012** | **FY2013** | **FY2014** | **FY2015** | **FY2016** |
|---|---|---|---|---|---|---|
| Marijuana | Rate | 337% | 137% | 154% | 100% | 61% |
| | Quantity Removed | 124,585 | 81,008 | 108,535 | 78,262 | 52,613 |
| Methamphetamine | Rate | 0% | 150% | 265% | 36% | 4332% |
| | Quantity Removed | 0 | 17.4 | 32.1 | 4.8 | 599.5 |
| Heroin | Rate | 762% | 0% | 0% | 676% | 327% |
| | Quantity Removed | 24 | 0 | 0 | 52.4 | 44 |

Note:  Marijuana measured in pounds, amphetamines and heroin measured in kilograms.
Data only includes removals by USCG.

47

DOJIFR00792

# § 1092(d)(1)(D) Cocaine Removal Effectiveness Rate

**Definition**

*Cocaine Removal Effectiveness Rate* – In consultation with ONDCP, the amount of cocaine removed by DHS inside and outside the maritime transit zone compared to total estimated flow of cocaine through the maritime domain.

Cocaine Removals is an *activity measure*.  Removals may also be used as a proxy indicator of total attempts to import cocaine, an *outcome measure*.  Cocaine Removal Effectiveness rate (i.e., cocaine seized as compared to the total estimate cocaine flow) is an *output measure*.

**Methodology and Limitations**

Drug removal data are obtained from ONDCP, JIATF-S, CBP, and USCG administrative records through the Consolidated Counter Drug Database (CCDB), and are considered reliable.  Flow quantities are the best estimates available based on intelligence reporting and case data. Additionally, while other government estimates for production in major cocaine producing countries in South America and consumption of cocaine within America do not align with the estimated non-commercial maritime flow figures inside the transit zone derived from the CCDB, this metric was derived based upon the non-commercial maritime flow estimates.

For the purposes of this metric, based upon where the data was gathered, the transit zone is defined by the Joint Interagency Task Force South area of responsibility.  Non-commercial maritime drug removals include those seized by USCG, CBP, other law enforcement agencies, and international partners, as well as those disrupted by anti-drug trafficking operations.  The cocaine removal rate is based on estimates of noncommercial maritime cocaine flow from the CCDB. Outside the transit zone data is not considered as robust with regard to intelligence on flow. As a result, the interdiction rate for cocaine outside the transit zone is not considered reliable.

**Available Data and Discussion**

Table 25:  Cocaine Removed by DHS Relative to the Total Estimated Flow in the Maritime Transit Zone, FY 2012 – FY 2016

| Location | | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 |
|---|---|---|---|---|---|---|
| Inside Transit Zone | Rate | 23% | 12% | 17% | 21% | 17% |
| | Quantity Removed | 186.4 | 155.4 | 178.8 | 277.2 | 482.7 |
| | Estimated Flow | 799.5 | 1260.4 | 1042.2 | 1308.8 | 2852.6 |
| Outside Transit Zone | Rate | 49% | 19% | 50% | 73% | 28% |
| | Quantity Removed | 21.3 | 15.1 | 13.2 | 39 | 17.7 |
| | Estimated Flow | 43.8 | 81.5 | 26.2 | 53.2 | 62.3 |

Note: Removal and estimated flow quantities measured in metric tons.

Figure 5:  Flow and Removal of Cocaine in the Maritime Transit Zone, FY 2012 – FY 2016

48

DOJIFR00793



The flow of cocaine is estimated to have risen in 2016 to over 2,800 metric tons, based on the decrease in aerial eradication of cocaine crops in Colombia and improved intelligence reporting throughout the Transit Zone.

## § 1092(d)(1)(E) DHS Maritime Threat Response Rate

**Definition**

*DHS Maritime Threat Response Rate* – The ability of DHS maritime security components to respond to and resolve known maritime threats, whether inside or outside a transit zone, by placing assets on-scene, relative to the total number of known threats.

**Methodology and Limitations**

Currently, this data only exists associated with cocaine response activity.  Further, DHS data is part of a larger set of interagency data and may not be able to be separated from the larger interagency data set, which is currently assessed and reconciled on a cycle and process outside of DHS that does not support submission at this time.  DHS, in cooperation with interagency partners, intends to explore options to collect response data for non-cocaine response events, as well as options to provide the response rate measures data to meet the intent of the Act and hopes to provide an update in the November 2018 report.

## § 1092(d)(1)(F) Intergovernmental Maritime Threat Response Rate

**Definition**

DOJIFR00794

*Intergovernmental Maritime Threat Response Rate* – The ability of DHS maritime security components or other U.S. Government entities to respond to and resolve known maritime threats, whether inside or outside a transit zone, by placing assets on-scene, relative to the total number of known threats.

**Methodology and Limitations**

Currently, this data only exists associated with cocaine response activity.  Further, DHS data is part of a larger set of interagency data and may not be able to be separated from the larger interagency data set, which is currently assessed and reconciled on a cycle and process outside of DHS that doesn't support submission at this time.  DHS, in cooperation with interagency partners, intends to explore options to collect response data for non-cocaine response events, as well as options to provide the response rate measures data to meet the intent of the Act and hopes to provide an update in the November 2018 report.

DOJIFR00795

# § 1092(e) Air and Marine Security Metrics in the Land Domain

## § 1092(e)(1)(A) Flight Hour Effectiveness Rate

**Definition**

Flight Hour Effectiveness Rate in the Land Domain – Number of flight hours flown by DHS Air and Marine Operations in the Land Domain as a percentage of AMO's unconstrained and unfunded flight hour requirements.

Flight Hour Effectiveness Rate is an *output measure*.

**Methodology and Limitations**

This Flight Hour Effectiveness Rate is determined by dividing the total hours flown by the number of flight hours determined during the annual collection process. The flight hour requirements for the subsequent fiscal year are collected by AMO operating locations based on unconstrained requirements collected from USBP, ICE and other partner agencies as well as internal AMO requirements. In FY 2016, AMO collected the following unconstrained flight hour requirements from these partner agencies in the Land Domain: USBP – 209,448 hours; ICE – 54,580 hours; OFO - 6,820 hours; and 24,377 hours for all other enforcement and non-enforcement Land Domain missions (U.S. Secret Service event security, local Law Enforcement coordination, training, maintenance, etc.).  In 2016, AMO's unconstrained flight hour requirement in the Land Domain totaled 295,225 hours.  However, after incorporating the approved funding for FY 2016, the total funded flight hours in the Land Domain was reduced to 79,774 programmed hours.

**Available Data and Discussion**

AMO completed 27 percent of the unconstrained flight hour requirement during FY 2016, with 79,872 hours flown against the unconstrained 295,225 hours.  Data from previous years are not available for analysis.

## § 1092(e)(1)(B) Funded Flight Hour Effectiveness Rate

**Definition**

*Funded Flight Hour Effectiveness Rate* – Number of flight hours flown by Air and Marine Operations as a percentage of the number of flight hours funded by Congress.

Funded Flight Hour Effectiveness Rate is an *output measure*.

**Methodology and Limitations**

DOJIFR00796

Flight hour data are obtained from AMO administrative records.  This rate is determined by dividing the total hours flown by the number of flight hours funded by Congress.

**Available Data and Discussion**

AMO's Flight Hour Effectiveness Rate was 100 percent in FY 2016, with 79,872 hours flown against 79,774 funded hours.  Data from previous years are not available for analysis.

## § 1092(e)(1)(C) AMO Readiness Rate

**Definition**

*AMO Readiness Rate* - The percentage of mission requests that AMO was able to fulfill, excluding those requests that could not be fulfilled due to reasons beyond AMO's control.

AMO Readiness Rate is an *activity measure*.

**Methodology and Limitations**

Missions data are obtained from AMO administrative records.  The rate is determined by dividing the missions flown by the total number of mission requests (number of missions flown plus the number of missions cancelled due to causes within AMO control, such as maintenance, personnel, and asset availability).

Table 26:  AMO Missions Cancelled and Readiness Rate FY 2016

|  | FY2016 |
|---|---|
| Total Non-Cancelled Missions | 31,635 |
| Missions cancelled - asset availability | 4,978 |
| Missions cancelled - crew availability | 1,738 |
| Total cancelled missions within AMO control | 6,716 |
| Readiness rate due to causes within AMO control | 82% |

AMO's readiness rate was 82 percent in FY 2016, with 6,716 out of 38,351  planned missions cancelled due to causes within AMO control.  Data from previous years are not available for analysis.

## § 1092(e)(1)(D) AMO Weather-Related Cancelation Rate

**Definition**

*AMO Weather-Related Cancelation Rate* - The number of missions cancelled by AMO due to weather as a percentage of total planned AMO missions.

DOJIFR00797

AMO Weather-related cancelation rate is an *activity measure*.

**Methodology and Limitations**

Mission data are obtained from AMO administrative records.  The Weather-Related Cancelation Rate is calculated by dividing the number of missions cancelled due to weather by the total number of missions requested by AMO's partner agencies.

**Available Data and Discussion**

Table 27:  AMO Weather-Related Cancelation Rate, FY 2016

| | |
|---|---|
| Total Missions Requested by Partner Agencies | 42,761 |
| Missions Cancelled – Weather | 3,083 |
| Cancellation Rate due to Weather | 7% |

Data from previous years are not available for analysis.


# § 1092(e)(1)(E) AMO Individuals Detected

**Definition**

*AMO Individuals Detected* – Number of individuals detected by CBP AMO through the use of unmanned aerial systems and manned aircraft.

AMO Individuals Detected is an *activity measure*.

**Methodology and Limitations**

Data are obtained from AMO administrative records.  The Department's currently available data on detections by unmanned aircraft are limited to the number of VADER detections, and current data on detections from manned aircraft are limited to detections leading to apprehensions and arrests.

These data exclude certain detections because AMO does not presently track data from all sensors on unmanned and manned aircraft.  For this reason, the Department considers the current AMO Individuals Detected measure to be a work in progress, and expects to provide more comprehensive data on AMO detections as part of the FY 2019 State of the Border Report.

**Available Data and Discussion**

Table 28:  Individuals Detected by AMO by Aircraft Type

| Aircraft Type | FY2016 |
|---|---|
| Manned | 54,879 |
| Unmanned | 7,908 |

DOJIFR00798

Data from previous years are not available for analysis.

# § 1092(e)(1)(F) AMO Apprehensions Assisted

**Definition**

*AMO Apprehensions Assisted* – USBP apprehensions assisted by AMO through the use of unmanned aerial systems and manned aircraft.

AMO Apprehensions Assisted is an *activity measure*.

**Methodology and Limitations**

Data are obtained from AMO administrative records.  The metric consists of apprehensions and arrests that are attributed to manned and unmanned aircraft operations.  These data are based on Aircraft Enforcement Hours (non-maritime), therefore excluding DHC-8, P-3, and MEA aircraft operations occurring in the maritime domain

**Available Data and Discussion**

Table 29:  Apprehensions Assisted by AMO by Aircraft Type and Flight Hours

| Aircraft Type | FY2016 | |
| --- | --- | --- |
| | Enforcement Flight Hours | Apprehensions |
| Manned | 64,639 | 50,646 |
| Unmanned | 4,857 | 1,729 |

Data from previous years are not available for analysis.

# § 1092(e)(1)(G) Illicit Drug Seizures Assisted by AMO

**Definition**

*Illicit Drug Seizures Assisted by AMO* - The number and quantity of illicit drug seizures assisted by AMO through the use of unmanned aerial systems and manned aircraft.

Illegal Drug Seizures Assisted is an *activity measure*.

**Methodology and Limitations**

DOJIFR00799

Drug seizure data are obtained from AMO administrative records.  The metric consists of the total number of events and quantity in pounds of drug seizures using manned and unmanned systems.  A "drug event" is defined as a single law enforcement action resulting in a drug seizure(s).  This is based on Aircraft Enforcement Hours (non-maritime), therefore excluding DHC-8, P-3, and MEA aircraft operations occurring in the maritime domain.

**Available Data and Discussion**

Table 30:  Illicit Drug Seizures and Drug Events by AMO by Aircraft Type and Flight Hours

| | FY2016 | | |
|---|---|---|---|
| Aircraft Type | Enforcement Flight Hours | Drug Events | Drug Seizures (lbs) |
| Manned | 64,639 | 3,834 | 651,759 |
| Unmanned | 4,857 | 78 | 30,033 |

Data from previous years are not available for analysis.


# § 1092(e)(1)(H) AMO Actionable Intelligence

**Definition**

*AMO Actionable Intelligence* - The number of times that actionable intelligence related to border security was obtained through the use of unmanned aerial systems and manned aircraft.

This measure is under review and will be provided in the FY 2019 State of the Border report.

DOJIFR00800

# § 1092(g)(3)(D) Other Appropriate Information

Pursuant to NDAA § 1092(g)(3)(D), this section provides three additional metrics of border security between ports of entry:  1) selected characteristics of USBP apprehensions; 2) the estimated at-the-border deterrence rate; and 3) estimated border crossing costs.

## Selected Characteristics of Recent USBP Apprehensions

**Definition**

Historically, the overwhelming majority of individuals apprehended between POEs along the southwest border have been Mexican adults, and very few of them have sought asylum or other forms of humanitarian relief from removal.  The profile of USBP apprehensions has changed in important ways in recent years, as growing shares of individuals apprehended are:  a) from countries other than Mexico (primarily the Northern Triangle of Central America countries of El Salvador, Guatemala, and Honduras), b) UACs or children and adults traveling together as FMUAs, and/or c) seeking asylum by claiming credible or reasonable fear of being returned to their countries of citizenship when potentially subject to expedited removal.

These shifting characteristics have an important impact on border security and USBP border enforcement because existing enforcement policies were largely designed with the more traditional alien profile in mind. For example, many consequences under CBP's Consequence Delivery Program such as the Alien Transfer Exit Program and the Mexican Interior Repatriation Program are only applicable to Mexican nationals.  And UACs, FMUAs, and aliens making successful credible/reasonable fear claims are generally not subject to expedited removal and have been considered "not impactable" by traditional USBP enforcement efforts because upon apprehension they have typically been released into the United States with a Notice to Appear in immigration court on a future date.  More generally, the drivers of migration from countries other than Mexico and for aliens who may seek humanitarian relief from removal may be different from those that motivated earlier generations of unlawful border crossers, potentially causing U.S. policymakers to rethink their policy response.

To monitor these changing dynamics, the Department tracks two main sets of characteristics:

*Apprehensions by Citizenship* – The share of aliens apprehended by USBP from Mexico, El Salvador, Guatemala, Honduras, and all other countries.

*Apprehensions by Potential Humanitarian Equities* – The share of aliens apprehended by USBP who are unaccompanied children, are apprehended as part of a family unit, and/or who make successful credible or reasonable fear claims.

Apprehensions is an *activity measure*.

DOJIFR00801

**Methodology and Limitations**

Apprehensions are recorded in administrative record systems with a unique identifier created for each apprehension.  Apprehensions by citizenship, by UAC status, and by family unit status are generally considered reliable, though agents may not always be able to identify UACs or family units.

**Available Data and Discussion**

Table 31:  USBP Southwest Border Apprehensions by Citizenship, FY 2008 – FY 2016

| Country | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|
| Mexico | 653,035 | 495,582 | 396,819 | 280,580 | 262,341 | 265,409 | 226,771 | 186,017 | 190,760 |
| El Salvador | 12,133 | 11,181 | 13,123 | 10,368 | 21,903 | 36,957 | 66,419 | 43,392 | 71,848 |
| Guatemala | 15,143 | 14,125 | 16,831 | 17,582 | 34,453 | 54,143 | 80,473 | 56,691 | 74,601 |
| Honduras | 18,110 | 13,344 | 12,231 | 11,270 | 30,349 | 46,448 | 90,968 | 33,445 | 52,952 |
| All Other | 6,584 | 6,633 | 8,727 | 7,777 | 7,827 | 11,440 | 14,740 | 11,788 | 18,709 |
| **Total** | **705,005** | **540,865** | **447,731** | **327,577** | **356,873** | **414,397** | **479,371** | **331,333** | **408,870** |

In recent years, apprehensions have started to shift from consisting overwhelmingly of Mexican nationals to an equal share of Mexican nationals and border crossers from other areas, mostly Northern Triangle countries.  In 2014 and 2016, southwest border apprehensions peaked, most noticeably for Northern Triangle countries.  In 2016, only 46 percent of southwest border apprehensions were Mexican nationals while 48 percent were from Northern Triangle countries.  Apprehensions of border crossers from all other countries also rose considerably in 2016, increasing by more than 50 percent.

Table 32:  USBP Southwest Border Apprehensions by Potential Humanitarian Claim, FY 2008 – FY 2016

|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|
| FMUA | NA | NA | NA | NA | 11,116 | 14,855 | 68,445 | 39,838 | 77,674 |
| UAC | 7,922 | 19,440 | 18,411 | 15,949 | 24,403 | 38,759 | 68,541 | 39,970 | 59,692 |
| Credible/ Reasonable Fear Claim | 7,454 | 8,627 | 12,499 | 13,994 | 22,087 | 44,380 | 57,936 | 47,117 | 87,585 |
| **Total Apprehensions** | **705,005** | **540,865** | **447,731** | **327,577** | **356,873** | **414,397** | **479,371** | **331,333** | **408,870** |

Note: Table rows are not mutually exclusive categories; some individuals are counted as FMUA and credible/reasonable fear.

Consistent with the surge of apprehensions seen in 2016, the number of family unit apprehensions and UAC apprehensions rose in 2016, with family unit numbers roughly doubling from 2015 and UAC apprehensions increasing 49 percent.  Credible fear claims also rose substantially in 2016, with an 86 percent increase over the previous year. All three of these "non-impactable" flows have increased dramatically over the past decade.  As compared to 2008, credible fear/reasonable fear claims have increased eleven-fold, while UAC numbers have

DOJIFR00802

increased seven-fold; and FMUA apprehensions have increased seven-fold since 2012 (the first year for which data are available).

## At-the-Border Deterrence

**Definition**

*Deterrence* - the estimated share of migrants who, following a failed unlawful entry attempt, are deterred from making a subsequent reentry and decide instead to return home or otherwise remain in Mexico.

The deterrence rate is an *output measure* associated with the difficulty of crossing the border unlawfully because it reflects decisions by people who have already decided to migrate illegally to abandon their effort.

**Methodology and Limitations**

As with the apprehension or interdiction rate, deterrence cannot be observed directly.

DHS currently estimates deterrence based on migrant surveys; the Department believes surveys or interviews are one of the only ways to directly measure deportees' intentions to make a further illegal entry attempt.  The most important survey data on deterrence comes from the Colegio de la Frontera Norte International Border Survey (EMIF), which interviews deportees immediately at repatriation facilities upon their return to Mexico and asks them about their intentions to return to the United States within the next 7-90 days.  In work for DHS, the Institute for Defense Analyses (IDA) Corporation used a combination of EMIF and CBP data to build an econometric model of 90-day deterrence for all USBP apprehensions since 2000.[6]

In addition to the standard concerns about the validity of survey samples and survey instruments, questions about deterrence are especially hard to measure accurately given the ever-evolving enforcement environment.  A further limitation is that the EMIF data is restricted to Mexican northern border deportees, and cannot be assumed to apply to migrants from other regions/countries because they face different trade-offs and geographic barriers when considering a re-entry attempt.

**Available Data and Discussion**

Figure 6:  At the Border Deterrence for Mexican Border Deportees, FY 1993 – FY 2016

---

[6] John W. Bailey et al., "Assessing Southern Border Security," Institute for Defense Analyses, IDA Paper NS P-5304, May 2016.

DOJIFR00803



The data describe relatively limited deterrence levels prior to 2007 (20-40 percent in the seven-day survey and 10-30 percent in the 90-day model), and substantial growth in the deterrence rate since that time.  Estimated seven-day deterrence rates have exceeded 75 percent every year since 2012, and estimated 90-day deterrence rates hovered around 60 percent in 2014 through 2016.

## Border Crossing Costs

**Definition**

*Percent hiring smuggler* – the share of migrants who hire a smuggler.

*Border crossing costs* - the average fees that smugglers charge.

Smuggling usage and average smuggling fees are *output measures* associated with the difficulty of crossing the border unlawfully.  Migrants will only tolerate higher fees to the extent that smugglers provide an essential and successful service.  Smugglers also compete to attract customers by offering their services at the lowest profitable rate, so higher fees indicate rising costs to smugglers.  Rising smuggling fees also reflect an increased risk to smugglers of a criminal conviction; smugglers pass this risk along to customers in the form of higher fees.

**Methodology and Limitations**

The only available data on smuggling fees come from migrant surveys and USBP custodial interviews.  These data may be subject to response bias if migrants are reluctant to admit to hiring a smuggler, but such bias should be broadly consistent over time, so changes in survey/interview data should reflect changes in the difficulty of crossing the border.

DOJIFR00804

**Available Data and Discussion**

One finding across multiple surveys is that smuggler usage rates have increased steadily over the last five decades.  Previous research by the Office of Immigration Statistics found that smuggler usage rates climbed from 40-50 percent during the 1970s, to 59 percent in the late 1970s and early 1980s, 70-80 percent in the 1980s to 1990s, 80 to 93 percent in the 1990s to 2000s, and 95 percent for first-time crossers surveyed in 2006.  Similarly, according to USBP interviews, relatively few illegal border crossers hired a smuggler prior to 2001, but usage rates climbed to 80-95 percent among apprehended border crossers in 2015.

Figure 7:  Border Crossing Cost Estimates, FY 1999 – FY 2015



Source:  U.S. Border Patrol apprehension records, El Colegio de la Frontera Norte Encuestas sobre Migracion en las Fronteras Norte y Sur de Mexico (EMIF).

Survey results also indicate steady increases in fees paid to migrant smugglers.  Averaging across the available sources depicted in Figure X, smuggling fees increased by five percent per year during the 1980s, 12 percent per year during the 1990s, and nine percent per year during the decade ending in 2015.

Custodial interviews conducted by USBP have found that smuggling fees are often paid in stages.  Initial fees required to approach staging locations along the border were often lower than $100 prior to the late 2000s, and an additional $1,000-$3,000 in fees were charged upon delivery to the final destination.  More recently, smuggling fees for Mexicans and Central Americans reportedly have been as high as $1,200 for the initial staging payment and up to $8,000 at the final destination.  Custodial interviews also find evidence of an increase in alternative forms of payment in exchange for passage, including migrants being required to participate in smuggling controlled substances or other illicit items across the border or to work off debts upon arrival in

DOJIFR00805

the United States, as well as reports of harsh negotiations concerning payment plans with family members.

DOJIFR00806

# IV.  Conclusion

DHS recognizes that its ability to accurately measure its border security outcomes, outputs, activities, and inputs is essential to the effective and efficient management of the Department. The metrics contained in this report will be the baseline that DHS uses to measure its progress towards meeting the goals contained in the Executive Order on *Border Security and Immigration Enforcement Improvement*. As such, the Department will continue to refine these metrics through internal and external engagement and collaboration, including with Congress. DHS looks forward to updating Congress on this progress through periodic briefings and formally with the submission of future State of the Border Reports.

DOJIFR00807

# Appendix A – Repeated Trials Model Methodology

The Department's current model-based estimates of the Apprehension Rate, of the total number of successful unlawful entries, and of related measures such as undetected unlawful entries build on research conducted for DHS by the Institute for Defense Analyses (IDA) based on long-standing social science research on the Repeated Trials Methodology (RTM).[7]  The Department views some of IDA's assumptions as problematic and is still working to validate and refine the modeling methodology.  For this reason, while this report includes metrics based on IDA's model-based approach, DHS views the model itself as a work in progress, and future reports will update resulting metrics as the Department continues to improve its own modeling ability.

The primary building block for the model-based Apprehension Rate and total estimated successful unlawful entries is an estimated apprehension rate for a particular subset of border crossers that DHS refers to as a partial apprehension rate (PAR).  The approach focuses on illegal border crossers who are apprehended and deported to the Mexican border and who make a subsequent re-entry attempt.  The logic of the PAR is to use USBP biometric data to assess what share of migrants who make repeated entry attempts is subsequently re-apprehended.

The PAR methodology consists of three main steps (see Figure 2).  First, the model identifies a subset of illegal border crossers who are candidates to attempt re-entry, the so-called RTM population.  Under IDA's methodology, this group excludes all non-Mexicans, those deported to the Mexican interior or remotely through the Alien Transfer and Exit Program, aliens who have ever requested asylum, those facing criminal charges, and children under 18 years old.

---

[7] For a full discussion of IDA's model-based estimate, see John W. Bailey et al., "Assessing Southern Border Security," Institute for Defense Analyses, IDA Paper NS P-5304, May 2016.  Also see Thomas J. Espenshade, "Using INS Border Apprehension Data to Measure the Flow of Undocumented Migrants Crossing the U.S.-Mexico Frontier," *International Migration Review* (1995): 545-565; Joseph Chang, "CBP Apprehensions at the Border," Homeland Security Studies and Analysis Institute, 2006.

DOJIFR00808

Figure 1:  Partial Apprehension Rate Methodology



Source:  DHS Office of Immigration Statistics adaptation of Bailey et al. 2016.

The second step in calculating the PAR is to distinguish between deportees who give up and return home or otherwise remain in Mexico versus those who attempt to re-enter the United States.  IDA estimates this share based on an analysis of a survey of recent deportees conducted by the College of the Northern Border, the so-called EMIF survey.

Third, by definition, RTM assumes deportees who are not deterred following an apprehension always make a subsequent reentry attempt.  Thus, by observing in DHS administrative records how many migrants from the RTM population are re-apprehended, the model infers the number that successfully re-enters.  The ratio of re-apprehensions to successful re-entries is used to estimate the partial apprehension rate.

The PAR model confronts important limitations at each point in the modeling process.  The most notable and challenging to overcome is the assumption of the RTM that subjects who are not deterred will always attempt re-entry until successful.  One problem with this assumption is the lack of reliable data on who is deterred.  IDA relies primarily on the EMIF survey to estimate the deterrence rate.  And while the EMIF is widely recognized as one of the best migrant surveys available, its results are still dependent on the characteristics of the sample, the quality of the survey instrument, and the honesty of the respondents.  More fundamentally, the EMIF survey asks recent deportees about their *intentions* to re-enter the United States, and it therefore does not take account of shifting border enforcement efforts, potential changes in behavior by individuals who have been exposed to consequence programs, or other deterrent factors along the border.  The structure of the RTM model means that any resulting undercount in the estimate of the deterred population results in a downward bias in the PAR.

Second, the RTM population represents a shrinking share of southwest border apprehensions.  Mexican adults quickly deported to the nearest border accounted for about 95 percent of apprehensions when the RTM methodology was developed in the 1990s.  But changes in the composition of border flows (i.e., rising numbers of Central Americans and asylum seekers);

DOJIFR00809

changes in CBPs enforcement strategy to emphasize criminal charges, lateral repatriation, and other enforcement consequences; and IDA's restrictive modeling choices mean that as few as 20 percent of U.S. Border Patrol (USBP) apprehensions in recent years are used to estimate the PAR.  In addition, because the RTM sample excludes aliens who are more likely to surrender to USBP (i.e., aliens with a higher apprehension rate), the PAR is biased downwards as an indicator of the overall apprehension rate; this bias may be substantial given the number of aliens excluded from the RTM sample.

Third, IDA makes somewhat restrictive assumptions about which re-apprehensions to include in the final stage of the PAR calculation.  In particular, IDA excludes apprehensions occurring at check points and other remote locations and those occurring more than four days after an illegal entry.  Given USBP's defense-in-depth strategy, which places resources at and behind the border, these assumptions result in a slight further downward bias in the PAR.

Despite these limitations, the Department views the RTM methodology as a promising approach to estimating an apprehension rate that takes great advantage of USBP's collection of biometric data since 2000.  DHS is currently working to relax certain aspects of IDA's modeling assumptions and to more fully describe the impact of each assumption on the PAR and on related model-based metrics reported above.

DOJIFR00810

# Appendix B – Drugs Seizures – All Ports of Entry

## OFO Drug Seizures at Ports of Entry FY 2007 to FY 2016

| DRUG | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|
| Grand Total | 372,493.60 | 433,037.02 | 680,417.93 | 395,390.47 | 371,813.83 |
| COCA PRODUCTS, TEA BAGS OR LIQUOR | | | | | 953.62 |
| COCAINE | 35,635.13 | 18,246.01 | 27,946.47 | 28,063.88 | 23,517.88 |
| CRYSTAL METHAMPHETAMINES | 235.15 | 186.25 | 360.6 | 544.2 | 875.61 |
| DIHYDROCODEINONE (HYDROCODONE) | | | 70.92 | 26.37 | 8.46 |
| ECSTASY | 771.36 | 700.28 | 500.83 | 527.71 | 264.92 |
| EPHEDRINE | 888.58 | 7,901.41 | 8,762.73 | 7,738.18 | 4,475.71 |
| FENETHYLLINE-(CAPTAGON-AMPHETAMINE) | | | | | |
| GAMMA HYDROXY BUTYRATE | 39.28 | 48.34 | 26.16 | 79.86 | 24.28 |
| HASH,LIQUID (HASH OIL) | 0.06 | 0.1 | 0.08 | 0.26 | 0.04 |
| HASHISH | 128.94 | 105.3 | 276.83 | 143.11 | 104.83 |
| HEROIN | 932.08 | 845.46 | 827.61 | 1,316.57 | 1,594.24 |
| KETAMINE | 11.86 | 100.77 | 40.85 | 66.84 | 112.47 |
| KHAT (CATHA EDULIS) | 41,216.88 | 54,815.24 | 116,691.90 | 95,988.98 | 70,061.23 |
| LSD | 0.16 | 0.85 | 4.58 | 0.78 | 10.09 |
| MARIJUANA | 280,387.77 | 261,611.58 | 312,264.86 | 246,546.43 | 253,771.78 |
| MARIJUANA PLANTS | | | | | 13.15 |
| MDPV-(METHYLENEDIOXYPYROVALERONE) | | | | | |
| MEPHEDRONE | | | | 0.5 | |
| METHAMPHETAMINE | 1,164.53 | 1,155.95 | 1,970.25 | 2,900.33 | 3,824.11 |
| METHYLONE | | | | | 1.3 |
| METHYLPHENIDATE (RITALIN) | 39.95 | 46.74 | 38.95 | 23.79 | 28.11 |
| MORPHINE | 7.4 | 8.15 | 1.08 | 22.86 | 6.2 |
| N-BENZYLPIPERAZINE (BZP TABLETS) | 0.02 | 9.36 | 182.79 | 15.24 | 12.9 |
| NEXUS/2 CB | 0 | | 0.16 | 0 | 0.11 |
| OPIUM | 529.5 | 318.74 | 662.55 | 825.52 | 667.96 |
| OTHER DRUGS, PRESCRIPTIONS, CHEMICALS | 2,257.77 | 5,814.91 | 5,878.10 | 7,125.77 | 5,452.89 |
| OXYCODONE (OXYCONTIN) | 1.59 | 2.8 | 4.86 | 5.21 | 6.07 |
| PARAMETHOXYAMPHETAMINE | 0.03 | | | 0.01 | 0 |
| PRECURSOR CHEMICALS EXCEPT EPHEDRINE | 7,521.86 | 80,705.40 | 203,508.22 | 230.2 | 4,760.66 |
| PSILOCYN OR PSILOCYBIN MUSHROOMS | 24.58 | 25.81 | 4.81 | 4.71 | 3.74 |
| ROHYPNOL | 0.24 | 0.18 | 0.05 | 0.53 | 0.21 |
| STEROIDS | 698.88 | 386.16 | 389.02 | 3,117.40 | 331.81 |

DOJIFR00811

| DRUG | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 |
|---|---|---|---|---|---|
| SYNTHETIC CANNABINOIDS - ALL TYPES | | | | 72.1 | 929.35 |
| YABA | | 1.25 | 2.67 | 3.14 | 0.08 |
| **Grand Total** | 344,129.80 | 336,121.66 | 309,214.45 | 400,719.44 | 367,612.58 |
| COCA PRODUCTS, TEA BAGS OR LIQUOR | 270.63 | 112.31 | 335.66 | 370.24 | 210.93 |
| COCAINE | 20,529.67 | 17,723.96 | 18,738.75 | 17,302.28 | 23,949.98 |
| CRYSTAL METHAMPHETAMINES | 1,377.53 | 1,522.53 | 1,742.36 | 1,625.40 | 2,084.99 |
| DIHYDROCODEINONE (HYDROCODONE) | 1.79 | 4.29 | 11.24 | 2.98 | 14.45 |
| ECSTASY | 49.56 | 104.26 | 111.04 | 103.97 | 704.61 |
| EPHEDRINE | 2,350.28 | 5.1 | 28.57 | 42.1 | 13.5 |
| FENETHYLLINE-(CAPTAGON-AMPHETAMINE) | | | | | 1.22 |
| FENTANYL | | | | | 208.25 |
| GAMMA HYDROXY BUTYRATE | 218.16 | 33.09 | 73.31 | 48.68 | 483.76 |
| HASH,LIQUID (HASH OIL) | 0.18 | 0.13 | 13.98 | 0.77 | 0.45 |
| HASHISH | 60.96 | 58.1 | 117.11 | 82.43 | 75.24 |
| HEROIN | 1,714.41 | 1,809.90 | 1,957.01 | 2,508.16 | 1,915.58 |
| KETAMINE | 81.31 | 88.58 | 77.78 | 43.69 | 150.59 |
| KHAT (CATHA EDULIS) | 47,972.07 | 84,023.03 | 67,478.21 | 66,953.87 | 70,087.11 |
| LSD | 17.82 | 3 | 7.02 | 3.57 | 2.41 |
| MARIJUANA | 237,053.80 | 213,186.12 | 198,650.99 | 273,423.14 | 233,774.29 |
| MARIJUANA PLANTS | 0.03 | 7.97 | 0.66 | 0.25 | 1.64 |
| MDPV-(METHYLENEDIOXYPYROVALERONE) | 29.22 | 335.14 | 225.68 | 234.05 | 41.75 |
| MEPHEDRONE | 12.4 | 11.82 | 9.11 | 5.72 | 2.66 |
| METHAMPHETAMINE | 5,032.37 | 7,884.50 | 8,796.53 | 11,529.10 | 15,018.32 |
| METHYLONE | 74.63 | 322.27 | 829.42 | 315.68 | 41.98 |
| METHYLPHENIDATE (RITALIN) | 36.63 | 20.03 | 15.14 | 13.69 | 12.3 |
| MORPHINE | 13.1 | 31.36 | 213.71 | 19.29 | 520.21 |
| N-BENZYLPIPERAZINE (BZP TABLETS) | 73.71 | 87.78 | 1.61 | 1.16 | 0.1 |
| NEXUS/2 CB | 0.06 | 0.09 | 0.11 | 1.26 | 0.06 |
| OPIUM | 1,150.49 | 1,289.80 | 1,637.34 | 652.98 | 905.89 |
| OTHER DRUGS, PRESCRIPTIONS, CHEMICALS | 5,719.66 | 4,135.02 | 5,117.21 | 22,330.66 | 12,987.55 |
| OXYCODONE (OXYCONTIN) | 13.72 | 13.17 | 11.14 | 6.46 | 20.65 |
| PARAMETHOXYAMPHETAMINE | 0.15 | | | | |
| PRECURSOR CHEMICALS EXCEPT EPHEDRINE | 18,778.76 | 739.27 | 748.2 | 1,293.69 | 3,377.95 |
| PSILOCYN OR PSILOCYBIN MUSHROOMS | 17.98 | 23.38 | 24.11 | 16.18 | 45.78 |
| ROHYPNOL | 0.23 | 0.74 | 0.04 | 0 | 0.08 |

DOJIFR00812

| STEROIDS | 476.53 | 470.05 | 554.53 | 581.16 | 613.24 |
| SYNTHETIC CANNABINOIDS - ALL TYPES | 1,001.97 | 2,074.37 | 1,686.67 | 1,206.82 | 550.79 |
| YABA | | 0.47 | 0.18 | | 2.53 |

Note: Tea bags included in this table are those used to carry coca products.

68

DOJIFR00813

**U.S. Customs and Border Protection Enforcement Actions – Southwest Border**
**Total –Apprehensions and Inadmissible Aliens by Country of Citizenship**
**FY17 - 19TD through May**

| Other Than Mexico Enforcement Actions – CBP Total | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEPT | Total | FYTD (MAY) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY19 | 41,235 | 45,479 | 46,846 | 41,736 | 58,640 | 81,414 | 87,945 | 121,151 | | | | | 524,446 | 524,446 |
| FY18 | 17,332 | 21,656 | 24,435 | 17,730 | 17,582 | 25,810 | 28,188 | 32,477 | 27,092 | 24,735 | 28,889 | 32,577 | 298,503 | 185,210 |
| FY17 | 43,052 | 43,207 | 42,729 | 26,269 | 11,226 | 5,718 | 4,682 | 7,108 | 8,631 | 11,323 | 14,627 | 14,839 | 233,411 | 183,991 |

U.S. Customs and
Border Protection

**CBP STAT**
Statistical Tracking and Analysis Team



DOJIFR00815

| Credible Fear Cases | FY-06 | FY-07 | FY-08 | FY-09 | FY-10 | FY-11 | FY-12 | FY-13 Q1 |
|---|---|---|---|---|---|---|---|---|
| Referrals from CBP or ICE | 5,338 | 5,252 | 4,995 | 5,369 | 8,959 | 11,217 | 13,880 | 5,552 |
| Completed | 5,241 | 5,286 | 4,828 | 5,222 | 8,777 | 11,529 | 13,579 | 4,860 |
| CF Found | 3,320 | 3,182 | 3,097 | 3,411 | 6,293 | 9,423 | 10,838 | 3,843 |
| CF Not Found | 584 | 1,062 | 816 | 1,004 | 1,404 | 1,054 | 1,187 | 502 |
| Closed | 1,337 | 1,042 | 915 | 807 | 1,080 | 1,052 | 1,554 | 515 |
| Of cases decided on the merits, % where CF was found | 85.04% | 74.98% | 79.15% | 77.26% | 81.76% | 89.94% | 90.13% | 87.64% |
| Of all referred cases, % where CF was found | 63.35% | 60.20% | 64.15% | 65.32% | 71.70% | 81.73% | 79.81% | 70.07% |

| Reasonable Fear Cases | FY-06 | FY-07 | FY-08 | FY-09 | FY-10 | FY-11 | FY-12 | FY-13 Q1 |
|---|---|---|---|---|---|---|---|---|
| Referrals | 325 | 550 | 700 | 1,109 | 2,060 | 3,233 | 5,070 | 1,465 |
| Completed | 292 | 504 | 619 | 971 | 1,293 | 2,756 | 4,692 | 1,247 |
| RF Found | 55 | 122 | 135 | 163 | 202 | 603 | 938 | 299 |
| RF Not Found | 57 | 128 | 172 | 165 | 206 | 270 | 960 | 275 |
| Closed | 180 | 254 | 312 | 643 | 885 | 1,883 | 2,794 | 673 |
| Of cases decided on the merits, % where RF was found | 49.11% | 48.80% | 43.97% | 49.70% | 49.51% | 69.07% | 49.42% | 52.09% |
| Of all referred cases, % where RF was found | 18.84% | 24.21% | 21.81% | 16.79% | 15.62% | 21.88% | 19.99% | 23.98% |

**Table 1. Southwest Border Encounters of non-Mexican Aliens by Month and Year (FY 2013 to FY 2019Q2)**

| Month | Apprehensions | Inadmissibles | Total Encounters |
|---|---|---|---|
| OCTOBER 2012 | 8,533 | 1,597 | 10,130 |
| NOVEMBER 2012 | 8,719 | 1,582 | 10,301 |
| DECEMBER 2012 | 7,731 | 1,903 | 9,634 |
| JANUARY 2013 | 6,950 | 1,818 | 8,768 |
| FEBRUARY 2013 | 10,848 | 1,855 | 12,703 |
| MARCH 2013 | 15,328 | 2,117 | 17,445 |
| APRIL 2013 | 16,825 | 1,915 | 18,740 |
| MAY 2013 | 16,994 | 2,277 | 19,271 |
| JUNE 2013 | 13,950 | 2,134 | 16,084 |
| JULY 2013 | 14,507 | 2,066 | 16,573 |
| AUGUST 2013 | 14,709 | 2,029 | 16,738 |
| SEPTEMBER 2013 | 13,894 | 2,050 | 15,944 |
| OCTOBER 2013 | 14,978 | 2,154 | 17,132 |
| NOVEMBER 2013 | 14,391 | 2,360 | 16,751 |
| DECEMBER 2013 | 14,985 | 2,557 | 17,542 |
| JANUARY 2014 | 12,113 | 1,886 | 13,999 |
| FEBRUARY 2014 | 16,895 | 2,031 | 18,926 |
| MARCH 2014 | 24,501 | 2,654 | 27,155 |
| APRIL 2014 | 26,782 | 2,818 | 29,600 |
| MAY 2014 | 38,078 | 3,640 | 41,718 |
| JUNE 2014 | 40,244 | 3,927 | 44,171 |
| JULY 2014 | 24,322 | 3,014 | 27,336 |
| AUGUST 2014 | 15,037 | 2,832 | 17,869 |
| SEPTEMBER 2014 | 10,274 | 2,579 | 12,853 |
| OCTOBER 2014 | 10,153 | 2,783 | 12,936 |
| NOVEMBER 2014 | 10,078 | 2,987 | 13,065 |
| DECEMBER 2014 | 11,260 | 3,877 | 15,137 |
| JANUARY 2015 | 7,591 | 3,334 | 10,925 |
| FEBRUARY 2015 | 8,570 | 2,824 | 11,394 |
| MARCH 2015 | 10,566 | 3,669 | 14,235 |
| APRIL 2015 | 12,245 | 3,315 | 15,560 |
| MAY 2015 | 14,685 | 3,726 | 18,411 |
| JUNE 2015 | 14,444 | 3,968 | 18,412 |
| JULY 2015 | 14,791 | 4,610 | 19,401 |
| AUGUST 2015 | 15,656 | 6,177 | 21,833 |
| SEPTEMBER 2015 | 15,277 | 5,303 | 20,580 |
| OCTOBER 2015 | 16,801 | 7,309 | 24,110 |
| NOVEMBER 2015 | 18,425 | 7,484 | 25,909 |
| DECEMBER 2015 | 23,418 | 5,940 | 29,358 |
| JANUARY 2016 | 10,601 | 4,706 | 15,307 |
| FEBRUARY 2016 | 10,672 | 7,025 | 17,697 |
| MARCH 2016 | 13,854 | 6,927 | 20,781 |
| APRIL 2016 | 17,940 | 4,741 | 22,681 |
| MAY 2016 | 21,329 | 9,114 | 30,443 |
| JUNE 2016 | 18,796 | 5,498 | 24,294 |
| JULY 2016 | 20,296 | 7,180 | 27,476 |
| AUGUST 2016 | 22,572 | 8,640 | 31,212 |
| SEPTEMBER 2016 | 23,406 | 10,883 | 34,289 |
| OCTOBER 2016 | 28,061 | 15,075 | 43,136 |
| NOVEMBER 2016 | 31,904 | 11,457 | 43,361 |
| DECEMBER 2016 | 31,994 | 10,807 | 42,801 |
| JANUARY 2017 | 20,154 | 6,259 | 26,413 |
| FEBRUARY 2017 | 9,632 | 1,647 | 11,279 |
| MARCH 2017 | 4,773 | 1,040 | 5,813 |
| APRIL 2017 | 3,687 | 1,038 | 4,725 |
| MAY 2017 | 5,569 | 1,638 | 7,207 |
| JUNE 2017 | 7,190 | 1,590 | 8,780 |
| JULY 2017 | 9,349 | 2,068 | 11,417 |
| AUGUST 2017 | 11,915 | 2,800 | 14,715 |
| SEPTEMBER 2017 | 11,750 | 3,179 | 14,929 |
| OCTOBER 2017 | 13,435 | 4,059 | 17,494 |
| NOVEMBER 2017 | 17,363 | 4,406 | 21,769 |
| DECEMBER 2017 | 18,739 | 5,822 | 24,561 |
| JANUARY 2018 | 13,752 | 4,037 | 17,789 |
| FEBRUARY 2018 | 13,551 | 4,162 | 17,713 |
| MARCH 2018 | 19,721 | 6,130 | 25,851 |
| APRIL 2018 | 21,873 | 6,370 | 28,243 |
| MAY 2018 | 26,805 | 5,737 | 32,542 |
| JUNE 2018 | 23,282 | 3,895 | 27,177 |
| JULY 2018 | 21,360 | 3,524 | 24,884 |
| AUGUST 2018 | 25,375 | 3,631 | 29,006 |
| SEPTEMBER 2018 | 29,066 | 3,640 | 32,706 |
| OCTOBER 2018 | 37,128 | 5,675 | 42,803 |



OTM Apprehensions at SW Border, FY2013 - FY2019Q2



OTM Encounters at SW Border, FY2013-FY2019Q2

DOJIFR00816

| | | | |
|---|---|---|---|
| NOVEMBER 2018 | 40,706 | 5,833 | 46,539 |
| DECEMBER 2018 | 42,045 | 5,236 | 47,281 |
| JANUARY 2019 | 36,878 | 5456 | 42,334 |
| FEBRUARY 2019 | 54,008 | 5027 | 59,035 |
| MARCH 2019 | 75,851 | 5570 | 81,421 |

DOJIFR00817

UNCLASSIFIED//FOR OFFICIAL USE ONLY

April 1, 2019

**Southwest Border Enforcement Actions: March Official Reporting**

**Key Observations:**

- March total enforcement actions increased 35% compared to February.  This rate of increase is consistent with previous years for March.
    - Overall, March is 35% higher (103,493) than February (76,535) - last FY, March was 37% higher and from FY12 – FY16 it averaged 28% higher.
    - CBP total enforcement actions this March are 132% higher than the last 7 year March average and 516% higher than March of FY17.
        - UAC increased 30% in March compared to February, last March increased 40%.
        - FMUA increased 41% in March compared to February, last March increased 48%.
- The last time that this March's level was observed (overall) was March FY08 (89,770) and April FY08 (91,566).
    - April of FY08 was the last time USBP apprehensions exceeded 70,000.
- Guatemala remains the highest country of origin/citizenship.
    - Guatemalan total enforcement actions increased 40%.
    - Honduran total enforcement actions increased 30%.
    - El Salvador total enforcement actions increased **68%**.
    - Mexico increased 25%.
- In March, UAC and FMUA are 64% of total CBP Enforcement Actions; FMUA alone are 55%.
    - FYTD, UAC and FMUA are 60% of total CBP Enforcement Actions; FMUA alone are 51%.
- In March, OTM enforcement actions are 75% of the total; 70% Northern Triangle.
    - FYTD, OTM enforcement actions are 71% of the total; 66% Northern Triangle.
- For FY19TD, CBP is on track to exceed 1 million apprehensions and inadmissible aliens along the southwest border – a level not seen since FY06.

**USBP**

- USBP Apprehensions through March (361,087) exceed fiscal year totals for FY17, FY15, FY12, and FY11.  4 of the last 10 years.
- USBP FMUA [alone] this March are **42%** higher than USBP Total Apprehensions last March.
- At the end of March (FY mid-point):
    - USBP will have apprehended 91% of the volume of all of last fiscal year in six months' time.
    - FMUA this FY are **77%** higher than all of last FY for USBP FMUA.
- USBP total apprehensions increased 38% in March compared to February.  This is the second consecutive month with 38% growth.
- OTM apprehensions account for 82% of March apprehensions.
    - Northern Triangle countries are 76% of total apprehensions.
- For the last month, peak apprehensions have occurred on 3 of the last 4 Tuesdays (5 of last 6).
    - Tuesday appears to be the most common peak day for UAC and FMUA apprehensions.
    - For the last 9 weeks, single adults have peaked on Tuesday, Wednesday or Thursday 3 times each.
- As a percent of total apprehensions, increases are observed in the El Paso Sector. In October, El Paso apprehensions were 14% of the total.  In March, they account for 24% of apprehensions.
    - Conversely, in October RGV apprehensions were 41% of the total – in March, they are 36%.



U.S. Customs and
Border Protection

CBP STAT
Statistical Tracking and Analysis Team

UNCLASSIFIED//FOR OFFICIAL USE ONLY

DOJIFR00818

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**OFO**

- Inadmissible apprehensions this FY are tracking just below last FY (61,247 vs 63,845).  March is 13% higher than February.
- Inadmissible UAC decreased 1%.
- FMUA at the ports of entry remained nearly the same (4,194) as January and February.
- Single adults at the ports are 25% higher than February.



U.S. Customs and
Border Protection

CBP STAT
Statistical Tracking and Analysis Team

UNCLASSIFIED//FOR OFFICIAL USE ONLY

DOJIFR00819

**PREDECISIONAL // DELIBERATIVE DOCUMENT**

## FY19 Planning Profile based on data through April 10, 2019



U.S. Customs and Border Protection - Southwest Border
Total Apprehensions and Inadmissible Aliens
FY19 April - September Planning Profile

Based on data through April 22, April is projected to be 108,537 – right in the middle of the earlier model.

*April is based on April data through the 10th.*

Projection 1: April through September are based on the average rate of change occurring during FYs 15/16. Projected total: 1,227,299

Projection 2: April through September is based on the monthly rate of change observed FY18. Projected total: 1,028,638

**PREDECISIONAL // DELIBERATIVE DOCUMENT**



**CBP STAT**
Statistical Tracking and Analysis Team



U.S. Customs and
Border Protection

PREDECISIONAL // DELIBERATIVE DOCUMENT



U.S. Customs and Border Protection - Southwest Border
Total Unaccompanied Alien Children Apprehensions and Inadmissible Aliens
FY19 April - September Planning Profile

Based on data through April 22, April is projected to be 9,325 – just below the lower bound of the earlier model.

*April is based on April data through the 10th.*

Projection 1: April through September are based on the average rate of change occurring during FYs 15/16.  Projected total: 112,460

Projection 2: April through September is based on the monthly rate of change observed FY18.  Projected total: 91,987

PREDECISIONAL // DELIBERATIVE DOCUMENT



CBP STAT
Statistical Tracking and Analysis Team



U.S. Customs and
Border Protection



PREDECISIONAL // DELIBERATIVE DOCUMENT

U.S. Customs and Border Protection - Southwest Border
Total Individuals in a Family Unit Apprehensions and Inadmissible Aliens
FY19 April - September Planning Profile

Based on data through April 22, April is projected to be 62,059 – right in the middle of the earlier model.

*April is based on April data through the 10th.*

Projection 1: April through September are based on the average rate of change occurring during FYs 15/16.  Projected total: 738,671

Projection 2: April through September is based on the monthly rate of change observed FY18.  Projected total: 578,259

PREDECISIONAL // DELIBERATIVE DOCUMENT



U.S. Customs and
Border Protection



CBP STAT
Statistical Tracking and Analysis Team

PREDECISIONAL // DELIBERATIVE DOCUMENT



U.S. Customs and Border Protection - Southwest Border
Total Single Adult Apprehensions and Inadmissible Aliens
FY19 April - September Planning Profile

*April is based on April data through the 10th.*

Projection 1: April through September are based on the average rate of change occurring during FYs 15/16.  Projected total: 375,684

Projection 2: April through September is based on the monthly rate of change observed FY18.  Projected total:  357,908

Based on data through April 22, April is projected to be 37,154 – higher than the earlier model.

PREDECISIONAL // DELIBERATIVE DOCUMENT



U.S. Customs and
Border Protection

**CBP STAT**
Statistical Tracking and Analysis Team





**PREDECISIONAL // DELIBERATIVE DOCUMENT**

U.S. Customs and Border Protection - Southwest Border
Total Child Apprehensions and Inadmissible Aliens
FY19 April - September Planning Profile

No interim update is available for this slide.

**PREDECISIONAL // DELIBERATIVE DOCUMENT**

*April is based on April data through the 10th.*

Projection 1: April through September are based on the average rate of change occurring during FYs 15/16.  Projected total: 486,779

Projection 2: April through September is based on the monthly rate of change observed FY18.  Projected total: 438,545



U.S. Customs and
Border Protection

**CBP STAT**
Statistical Tracking and Analysis Team

**PREDECISIONAL // DELIBERATIVE DOCUMENT**



U.S. Border Patrol - Southwest Border
Total Apprehensions
FY19 April - September Planning Profile

Based on data through April 22, April is projected to be 98,633 – toward the lower bound of the earlier model.

*April is based on April data through the 10th.*

Projection 1: April through September are based on the average rate of change occurring during FYs 15/16.  Projected total: 1,056,983

Projection 2: April through September is based on the monthly rate of change observed FY18.  Projected total: 909,365

**PREDECISIONAL // DELIBERATIVE DOCUMENT**



CBP STAT
Statistical Tracking and Analysis Team



U.S. Customs and
Border Protection

PREDECISIONAL // DELIBERATIVE DOCUMENT



U.S. Border Patrol - Southwest Border
Unaccompanied Alien Children Apprehensions
FY19 April - September Planning Profile

Legend:
- FY19 Actual
- Projection 1 (15/16)
- Projection 2 (18)
- Average

Based on data through April 22, April is projected to be 8,909 – lower than the earlier model and March totals.

*April is based on April data through the 10th.*

Projection 1: April through September are based on the average rate of change occurring during FYs 15/16.  Projected total: 105,175

Projection 2: April through September is based on the monthly rate of change observed FY18.  Projected total: 91,820

PREDECISIONAL // DELIBERATIVE DOCUMENT



U.S. Customs and Border Protection

**CBP STAT**
Statistical Tracking and Analysis Team

PREDECISIONAL // DELIBERATIVE DOCUMENT



**U.S. Border Patrol - Southwest Border**
**Individuals in a Family Unit Apprehensions**
**FY19 April - September Planning Profile**

Legend:
- FY19 Actual
- Projection 1 (15/16)
- Projection 2 (18)
- Average

Data values: 23,116 (OCT), 25,164 (NOV), 27,507 (DEC), 24,189 (JAN), 36,531 (FEB), 53,077 (MAR)

Projection 1 (15/16): 57,854 (APR), 63,162, 77,689, 78,466, 88,666, 105,513, 107,623

Projection 2 (18): 56,130 (APR), 56,697, 55,007, 75,910, 99,442

Average (APR): 57,854

Based on data through April 22, April is projected to be 58,639 – in range of the earlier model toward lower bound.

*April is based on April data through the 10th.*

Projection 1: April through September are based on the average rate of change occurring during FYs 15/16.  Projected total: 674,171

Projection 2: April through September is based on the monthly rate of change observed FY18.  Projected total: 554,093

PREDECISIONAL // DELIBERATIVE DOCUMENT



U.S. Customs and
Border Protection

**CBP STAT**
Statistical Tracking and Analysis Team

PREDECISIONAL // DELIBERATIVE DOCUMENT



U.S. Border Patrol - Southwest Border
Single Adult Apprehensions
FY19 April - September Planning Profile

Based on data through April 22, April is projected to be 31,085 – in the middle of the earlier model.

*April is based on April data through the 10th.*

Projection 1: April through September are based on the average rate of change occurring during FYs 15/16.  Projected total: 307,990

Projection 2: April through September is based on the monthly rate of change observed FY18.  Projected total: 293,804

PREDECISIONAL // DELIBERATIVE DOCUMENT



U.S. Customs and
Border Protection

CBP STAT
Statistical Tracking and Analysis Team

# OTM CARAVAN
# BREAKDOWN IN MEXICO

April 22. 2019

**16,560 OTMs** *"GOM Reporting*



Migrants traveling from Arriaga, Chiapas to Ixtepec, Oaxaca

| | |
|---|---|
| CALIFORNIA: Tijuana 344/Mexicali 609 | 753 |
| ...RA: Hermosillo | 5 |
| ...AHUA: Ciudad Juarez | 4,740 |
| ...UILA: Acuña 179/Piedras Negras 194 | 373 |
| ...O LEON: Monterrey 345/Guadalupe 60 | 405 |
| ...ULIPAS: Reynosa 627/Matamoros 216 | 627 |
| ...Ca: Migrants arriving from Arriaga #s in next report | |
| | **6,903** |

**CHIAPAS**

| | |
|---|---|
| REGIONAL: Traveling to Arriaga 430/Tonala 110/Arriaga approx.500 -with partial on board train to Ixtepec, Oaxaca from there, they will travel by train to Medias Aguas Ver. | |
| TAPACHULA: Siglo XXI 2,229/Mesoamericana 1,309/OTMS | |
| Haiti-Congo-Cameroon in town 383/Cubans in town 750 | |
| SUCHIATE: Recino Fiscal | |
| MAPASTEPEC: # Varies 284 (a 400, reporting low numb... | |
| PIJIJIAPAN: left over from current INM/PF Ops | |
| MX/OTI BORDER: TVHR 650/COMAR 156 | |
| **TOTAL** | |

# U.S. Border Patrol Southwest Border Apprehensions by Sector Fiscal Year 2019

https://www.cbp.gov/newsroom/stats/sw-border-migration/usbp-sw-border-apprehensions

## Southwest Border Unaccompanied Alien Children (0-17 yr old) Apprehensions

Comparisons below reflect Fiscal Year To Date 2019 compared to Fiscal Year To Date 2018.

| Unaccompanied Alien Children Apprehensions by Sector | | | |
|---|---|---|---|
| Sector | FY18TD JUN | FY19TD JUN | % Change FY18TD JUN to FY19TD JUN |
| Big Bend | 850 | 581 | -32% |
| Del Rio | 998 | 2,701 | 171% |
| El Centro | 1,921 | 2,286 | 19% |
| El Paso | 3,978 | 14,593 | 267% |
| Laredo | 2,137 | 2,058 | -4% |
| Rio Grande | 17,392 | 27,837 | 60% |
| San Diego | 1,692 | 2,861 | 69% |
| Tucson | 3,983 | 4,055 | 2% |
| Yuma | 4,421 | 6,652 | 50% |
| **USBP Southwest Border Total** | **37,372** | **63,624** | **70%** |

DOJIFR00830

## Southwest Border Family Unit* Apprehensions

Comparisons below reflect Fiscal Year To Date 2019 compared to Fiscal Year To Date 2018.

| Family Unit* Apprehensions by Sector | | | |
|---|---|---|---|
| Sector | FY18TD JUN | FY19TD  JUN | % Change FY18TD JUN to FY19TD JUN |
| Big Bend | 566 | 1,754 | 210% |
| Del Rio | 1,829 | 22,423 | 1,126% |
| El Centro | 1,976 | 7,464 | 278% |
| El Paso | 6,326 | 117,612 | 1,759% |
| Laredo | 411 | 778 | 89% |
| Rio Grande | 42,188 | 165,950 | 293% |
| San Diego | 2,392 | 14,996 | 527% |
| Tucson | 3,164 | 11,614 | 267% |
| Yuma | 9,689 | 47,717 | 392% |
| **USBP Southwest Border Total** | **68,541** | **390,308** | **469%** |

**\*Note:** Family Unit represents the number of individuals (either a child under 18 years old, parent or legal guardian) apprehended with a family member by the U.S. Border Patrol.

# Southwest Border Single Adult Apprehensions

Comparisons below reflect Fiscal Year To Date 2019 compared to Fiscal Year To Date 2018.

| Single Adult Apprehensions by Sector | | | |
|---|---|---|---|
| **Sector** | **FY18TD JUN** | **FY19TD JUN** | **% Change FY18TD JUN to FY19TD JUN** |
| Big Bend | 5,043 | 4,792 | -5% |
| Del Rio | 8,772 | 15,583 | 78% |
| El Centro | 17,033 | 18,500 | 9% |
| El Paso | 10,412 | 23,595 | 127% |
| Laredo | 21,953 | 27,192 | 24% |
| Rio Grande | 54,958 | 72,649 | 32% |
| San Diego | 24,972 | 29,981 | 24% |
| Tucson | 33,121 | 34,715 | 5% |
| Yuma | 4,793 | 7,436 | 55% |
| **USBP Southwest Border Total** | **180,357** | **234,443** | **30%** |

# Southwest Border Unaccompanied Alien Children Apprehensions by Country

Numbers below reflect Fiscal Years 2014 - 2018 and 2019 TD.

| Unaccompanied Alien Children Apprehensions by Country | | | | | | |
|---|---|---|---|---|---|---|
| **Country** | **FY14** | **FY15** | **FY16** | **FY17** | **FY18** | **FY19TD JUN** |
| El Salvador | 16,404 | 9,389 | 17,512 | 9,143 | 4,949 | **9,810** |
| Guatemala | 17,057 | 13,589 | 18,913 | 14,827 | 22,327 | **27,168** |
| Honduras | 18,244 | 5,409 | 10,468 | 7,784 | 10,913 | **16,892** |
| Mexico | 15,634 | 11,012 | 11,926 | 8,877 | 10,136 | **7,843** |

DOJIFR00832

## Southwest Border Family Unit* Apprehensions by Country

Numbers below reflect Fiscal Years 2016 - 2018 and 2019 TD

| Family Units* Apprehensions by Country | | | |
|---|---|---|---|
| Country | FY16 | FY17 | FY18 | FY19TD JUN |
| El Salvador | 27,114 | 24,122 | 13,669 | 44,198 |
| Guatemala | 23,067 | 24,657 | 50,401 | 167,104 |
| Honduras | 20,226 | 22,366 | 39,439 | 152,019 |
| Mexico | 3,481 | 2,271 | 2,261 | 3,209 |

**\*Note:** Family Unit represents the number of individuals (either a child under 18 years old, parent or legal guardian) apprehended with a family member by the U.S. Border Patrol.

## Southwest Border Single Adult Apprehensions by Country

Numbers below reflect Fiscal Years 2016 - 2018 and 2019 TD

| Single Adult Apprehensions by Country | | | |
|---|---|---|---|
| Country | FY16 | FY17 | FY18 | FY19TD JUN |
| El Salvador | 27,222 | 16,495 | 12,751 | 16,491 |
| Guatemala | 32,621 | 26,387 | 42,994 | 41,366 |
| Honduras | 22,258 | 17,110 | 26,161 | 36,128 |
| Mexico | 175,353 | 116,790 | 139,860 | 113,123 |

DOJIFR00833

## Southwest Border Family Unit Subject, Unaccompanied Alien Children, and Single Adult Apprehensions Fiscal Year 2019 - By Month

FMUA:  Family Unit Apprehensions
UAC:    Unaccompanied Alien Children
SA:       Single Adult

**FY19 October**

| Sector | FMUA FY 2019 OCT | UAC FY 2019 OCT | SA FY 2019 OCT | TOTAL FY 2019 OCT |
|---|---|---|---|---|
| Big Bend | 17 | 37 | 501 | 555 |
| Del Rio | 548 | 145 | 1,309 | 2,002 |
| El Centro | 782 | 256 | 2,205 | 3,243 |
| El Paso | 5,180 | 830 | 1,325 | 7,335 |
| Laredo | 121 | 265 | 3,063 | 3,449 |
| Rio Grande | 11,525 | 2,307 | 6,923 | 20,755 |
| San Diego | 1,156 | 227 | 2,844 | 4,227 |
| Tucson | 1,163 | 469 | 4,196 | 5,828 |
| Yuma | 2,623 | 429 | 561 | 3,613 |
| **Southwest Border Total** | **23,115** | **4,965** | **22,927** | **51,007** |

**FY19 November**

| Sector | FMUA FY 2019 NOV | UAC FY 2019 NOV | SA FY 2019 NOV | TOTAL FY 2019 NOV |
|---|---|---|---|---|
| Big Bend | 31 | 36 | 381 | 448 |
| Del Rio | 831 | 146 | 1,111 | 2,088 |
| El Centro | 914 | 273 | 2,002 | 3,189 |
| El Paso | 6,435 | 1,038 | 1,395 | 8,868 |
| Laredo | 49 | 181 | 2,439 | 2,669 |
| Rio Grande | 11,487 | 2,310 | 6,916 | 20,713 |
| San Diego | 1,495 | 310 | 2,771 | 4,576 |
| Tucson | 754 | 465 | 3,842 | 5,061 |
| Yuma | 3,168 | 500 | 575 | 4,243 |
| **Southwest Border Total** | **25,164** | **5,259** | **21,433** | **51,855** |

**FY19 December**

| Sector | FMUA FY 2019 DEC | UAC FY 2019 DEC | SA FY 2019 DEC | TOTAL FY 2019 DEC |
|---|---|---|---|---|
| Big Bend | 122 | 74 | 425 | 621 |
| Del Rio | 919 | 155 | 949 | 2,023 |
| El Centro | 1,012 | 211 | 1,493 | 2,716 |
| El Paso | 7,336 | 970 | 1,144 | 9,450 |
| Laredo | 74 | 148 | 1,837 | 2,059 |
| Rio Grande | 10,630 | 1,881 | 5,861 | 18,372 |
| San Diego | 2,413 | 356 | 3,046 | 5,815 |
| Tucson | 1,310 | 408 | 3,193 | 4,911 |
| Yuma | 3,691 | 550 | 539 | 4,780 |
| **Southwest Border Total** | **27,507** | **4,753** | **18,487** | **50,747** |

**FY19 January**

| Sector | FMUA FY 2019 JAN | UAC FY 2019 JAN | SA FY 2019 JAN | TOTAL FY 2019 JAN |
|---|---|---|---|---|
| Big Bend | 91 | 59 | 438 | 588 |
| Del Rio | 1,009 | 192 | 1,323 | 2,524 |
| El Centro | 808 | 236 | 1,417 | 2,461 |
| El Paso | 6,838 | 1,013 | 1,287 | 9,138 |
| Laredo | 73 | 191 | 2,368 | 2,632 |
| Rio Grande | 9,942 | 2,183 | 5,586 | 17,711 |
| San Diego | 1,118 | 283 | 2,723 | 4,124 |
| Tucson | 670 | 357 | 3,069 | 4,096 |
| Yuma | 3,640 | 593 | 473 | 4,706 |
| **Southwest Border Total** | **24,189** | **5,107** | **18,684** | **47,980** |

**FY19 February**

| Sector | FMUA FY 2019 FEB | UAC FY 2019 FEB | SA FY 2019 FEB | TOTAL FY 2019 FEB |
|---|---|---|---|---|
| Big Bend | 186 | 61 | 598 | 845 |
| Del Rio | 2,262 | 239 | 1,512 | 4,013 |
| El Centro | 1,189 | 336 | 1,794 | 3,319 |
| El Paso | 10,892 | 1,522 | 1,759 | 14,173 |
| Laredo | 61 | 249 | 2,812 | 3,122 |
| Rio Grande | 14,430 | 2,910 | 8,026 | 25,366 |
| San Diego | 2,036 | 383 | 3,029 | 5,448 |
| Tucson | 1,024 | 438 | 3,449 | 4,911 |
| Yuma | 4,451 | 679 | 557 | 5,687 |
| **Southwest Border Total** | **36,531** | **6,817** | **23,536** | **66,884** |

DOJIFR00836

**FY19 March**

| Sector | FMUA FY 2019 MAR | UAC FY 2019 MAR | SA FY 2019 MAR | TOTAL FY 2019 MAR |
|---|---|---|---|---|
| Big Bend | 197 | 80 | 665 | 942 |
| Del Rio | 2,831 | 435 | 2,297 | 5,563 |
| El Centro | 1,139 | 299 | 2,125 | 3,563 |
| El Paso | 16,966 | 2,188 | 3,071 | 22,225 |
| Laredo | 106 | 300 | 3,787 | 4,193 |
| Rio Grande | 20,943 | 3,714 | 9,106 | 33,763 |
| San Diego | 2,504 | 429 | 3,947 | 6,880 |
| Tucson | 1,824 | 600 | 4,833 | 7,257 |
| Yuma | 6,696 | 918 | 835 | 8,449 |
| **Southwest Border Total** | **53,206** | **8,963** | **30,666** | **92,835** |

**FY19 April**

| Sector | FMUA FY 2019 APR | UAC FY 2019 APR | SA FY 2019 APR | TOTAL FY 2019 APR |
|---|---|---|---|---|
| Big Bend | 224 | 61 | 657 | 942 |
| Del Rio | 3,440 | 395 | 2,014 | 5,849 |
| El Centro | 741 | 256 | 2,390 | 3,387 |
| El Paso | 20,642 | 2,465 | 3,980 | 27,087 |
| Laredo | 101 | 259 | 3,612 | 3,972 |
| Rio Grande | 22,895 | 3,759 | 10,074 | 36,728 |
| San Diego | 2,106 | 366 | 3,726 | 6,198 |
| Tucson | 1,533 | 396 | 3,992 | 5,921 |
| Yuma | 7,034 | 936 | 1,236 | 9,206 |
| **Southwest Border Total** | **58,716** | **8,893** | **31,681** | **99,290** |

**FY19 May**

| Sector | FMUA<br>FY 2019 MAY | UAC<br>FY 2019 MAY | SA<br>FY 2019 MAY | TOTAL<br>FY 2019 MAY |
|---|---|---|---|---|
| Big Bend | 732 | 117 | 710 | 1,559 |
| Del Rio | 5,272 | 569 | 2,721 | 8,562 |
| El Centro | 576 | 243 | 2,666 | 3,485 |
| El Paso | 29,815 | 3,256 | 5,575 | 38,646 |
| Laredo | 110 | 266 | 3,736 | 4,112 |
| Rio Grande | 33,933 | 4,870 | 11,028 | 49,831 |
| San Diego | 1,366 | 308 | 4,212 | 5,886 |
| Tucson | 1,773 | 510 | 4,592 | 6.875 |
| Yuma | 10,914 | 1,350 | 1,660 | 13,924 |
| **Southwest Border Total** | **84,491** | **11,489** | **36,900** | **132,880** |

**FY19 June**

| Sector | FMUA<br>FY 2019 JUN | UAC<br>FY 2019 JUN | SA<br>FY 2019 JUN | TOTAL<br>FY 2019 JUN |
|---|---|---|---|---|
| Big Bend | 154 | 56 | 417 | 627 |
| Del Rio | 5,311 | 425 | 2,347 | 8,083 |
| El Centro | 303 | 176 | 2,408 | 2,887 |
| El Paso | 13,508 | 1,311 | 4,059 | 18,878 |
| Laredo | 83 | 199 | 3,538 | 3,820 |
| Rio Grande | 30,165 | 3,903 | 9,129 | 43,197 |
| San Diego | 802 | 199 | 3,683 | 4,684 |
| Tucson | 1,563 | 412 | 3,549 | 5,524 |
| Yuma | 5,500 | 697 | 1,000 | 7,197 |
| **Southwest Border Total** | **57,389** | **7,378** | **30,130** | **94,897** |

Last modified: July 10, 2019

*U.S. DEPARTMENT OF STATE*

*Office of the Spokesperson*

For Immediate Release

*MEDIA NOTE*

June 7, 2019

# U.S.-Mexico Joint Declaration

The United States and Mexico met this week to address the shared challenges of irregular migration, to include the entry of migrants into the United States in violation of U.S. law.  Given the dramatic increase in migrants moving from Central America through Mexico to the United States, both countries recognize the vital importance of rapidly resolving the humanitarian emergency and security situation.  The Governments of the United States and Mexico will work together to immediately implement a durable solution.

As a result of these discussions, the United States and Mexico commit to:

**Mexican Enforcement Surge**

Mexico will take unprecedented steps to increase enforcement to curb irregular migration, to include the deployment of its National Guard throughout Mexico, giving priority to its southern border.  Mexico is also taking decisive action to dismantle human smuggling and trafficking organizations as well as their illicit financial and transportation networks.  Additionally, the United States and Mexico commit to strengthen bilateral cooperation, including information sharing and coordinated actions to better protect and secure our common border.

**Migrant Protection Protocols**

The United States will immediately expand the implementation of the existing Migrant Protection Protocols across its entire Southern Border.  This means that those crossing the U.S.

Southern Border to seek asylum will be rapidly returned to Mexico where they may await the adjudication of their asylum claims.

In response, Mexico will authorize the entrance of all of those individuals for humanitarian reasons, in compliance with its international obligations, while they await the adjudication of their asylum claims.  Mexico will also offer jobs, healthcare and education according to its principles.

The United States commits to work to accelerate the adjudication of asylum claims and to conclude removal proceedings as expeditiously as possible.

**Further Actions**

Both parties also agree that, in the event the measures adopted do not have the expected results, they will take further actions.  Therefore, the United States and Mexico will continue their discussions on the terms of additional understandings to address irregular migrant flows and asylum issues, to be completed and announced within 90 days, if necessary.

**Ongoing Regional Strategy**

The United States and Mexico reiterate their previous statement of December 18, 2018, that both countries recognize the strong links between promoting development and economic growth in southern Mexico and the success of promoting prosperity, good governance and security in Central America.  The United States and Mexico welcome the Comprehensive Development Plan launched by the Government of Mexico in concert with the Governments of El Salvador, Guatemala and Honduras to promote these goals.  The United States and Mexico will lead in working with regional and international partners to build a more prosperous and secure Central America to address the underlying causes of migration, so that citizens of the region can build better lives for themselves and their families at home.

# Proposed Interdiction of Haitian Flag Vessels

Proposed executive agreement between the government of Haiti and the United States, by which the U.S. Coast Guard is to stop and board Haitian flag vessels on the high seas in order to prevent Haitians from entering the United States illegally, is authorized both by the U.S. immigration laws, and by the President's inherent constitutional power to protect the Nation and to conduct foreign relations.

Authority for provision in proposed agreement with Haiti, by which the Coast Guard will detain Haitians emigrating in violation of Haitian law and return them to Haiti, derives from the President's statutory power to guard the borders against illegal entry of aliens, and from his inherent constitutional power in the field of foreign relations.

August 11, 1981

## MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This responds to your inquiry concerning the implementation of the proposed interdiction of Haitian flag vessels. As presently formulated, the government of Haiti and the United States will enter into an agreement (the Agreement) permitting the United States Coast Guard to stop Haitian flag vessels, board them and ascertain whether any of the Haitians aboard have left Haiti in violation of its travel laws and whether they intend to travel to the United States in violation of U.S. immigration laws. Individuals who are determined to have left Haiti illegally will be returned to Haiti pursuant to the President's authority in the field of foreign relations in order to assist Haiti in the enforcement of its emigration laws. Those who have left Haiti, whether legally or illegally, in an attempt to enter the United States illegally will be returned to Haiti pursuant to the President's authority under 8 U.S.C. §§ 1182(f) and 1185(a)(1) to enforce U.S. immigration laws, to protect our sovereignty, and as an exercise of his power in the field of foreign relations.[1]

The Coast Guard plans to intercept the Haitian vessels in the Windward Passage, on the high seas but relatively close to Haiti.[2] At that

---

[1] We note that the Agreement does not cover United States vessels either while they are in Haitian waters or while they are on the high seas. Therefore, the Agreement does not contemplate the return of the Haitians on board such vessels to Haiti.

[2] Placing the Coast Guard vessels closer to the United States is apparently not possible because of the increased difficulties and costs of detecting and interdicting vessels from Haiti once they have traveled far from Haiti and the practical problems of caring for the Haitians during the 4-day voyage back to Haiti.

DOJIFR00841

point, Haitians will be headed toward either the United States or the Bahamas. Although experience suggests that two-thirds of the vessels are headed toward the United States, it is probable that, as the interdiction continues, an ever-increasing number will claim they are going to the Bahamas. Unless the Haitians admit they are coming to the United States, establishing their intended destination may become more difficult.

1. *Effect of the Immigration and Nationality Act (INA)*. The interdiction will not be affected by the provisions of the INA. Aliens are entitled to exclusion proceedings only when they arrive "by water or by air at any port within the United States." 8 U.S.C. § 1221(a). They are entitled to deportation proceedings only if they are "within the United States." 8 U.S.C. § 1251. Asylum claims may only be filed by those "physically present in the United States or at a land border or port of entry." The Refugee Act of 1980, Pub. L. No. 96–212, § 201(b), 94 Stat. 105 (to be codified at 8 U.S.C. § 1158(a)). Since the interdiction will be taking place on the high seas, which is not part of the United States, 8 U.S.C. § 1101(a)(38), none of these provisions will apply.

2. *Coast Guard Authority to Enforce United States Laws*. The Coast Guard is authorized to stop ships upon the high seas in order to detect violations of American laws. 14 U.S.C. § 89(a).[3] The interdiction at seas of a foreign flag vessel requires the permission of the flag state, which the contemplated Agreement expressly grants.[4] The authority for returning the Haitians who are attempting to enter the United States illegally may be found in both statutory authority and implied constitutional authority under Article II. The two statutes are 8 U.S.C. §§ 1182(f) and 1185(a)(1). The first, 8 U.S.C. § 1182(f), states:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may

---

[3] This section states:

The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas . . . for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken; or, if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized.

[4] The continuing jurisdiction of a country over vessels flying its flag on the high seas is a basic principle of international law. 1 L Oppenheim, International Law § 264 (8th ed. 1955) This principle has been codified in the Convention on the High Seas, Apr. 29, 1958, art. 6, 13 U.S.T. 2313, T.I.A.S No. 5200. Ships flying no flag may also be stopped to determine if they are stateless

DOJIFR00842

by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.[5]

The second, 8 U.S.C. § 1185(a)(1), provides:

> (a) Until otherwise ordered by the President or Congress, it shall be unlawful—
>
> > (1) for any alien to . . . attempt to . . . enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe . . .

Under § 1182(f), the President would make a finding that the entry of all Haitians without proper documentation is detrimental to the interests of the United States and issue a proclamation suspending their entry. It could be argued that the entry of illegal aliens, Haitians or otherwise, is already "suspended" since it is already illegal for them to come, and that the section is directed against those who are otherwise eligible. The section, however, is not limited by its terms to documented aliens, and the legislative history is silent on this point. Since the section delegates to the President the authority to exclude entirely certain classes of aliens, we believe that a return of the Haitians can be based on the Coast Guard's power to enforce federal laws. 14 U.S.C. § 89(a). Likewise, § 1185(a)(1) makes it unlawful for any alien to enter the country unless in compliance with the rules and limitations set by the President. All of the undocumented Haitians who are attempting to enter the country are therefore doing so in violation of this section. *See also* 8 U.S.C. § 1103 (Attorney General's duty to control and guard the borders); *Ex parte Siebold,* 100 U.S. 371, 396 (1879).[6]

Implied constitutional power is less clear. Where Congress has acted, the regulation of immigration is an area in which Congress exercises plenary power. *Kleindienst* v. *Mandel,* 408 U.S. 753, 766 (1972) (power to exclude aliens prevails over First Amendment interests of citizens). There has been recognition, however, that the sovereignty of the Nation, which is the basis of our ability to exclude all aliens, is lodged in both political branches of the government. *See Ekiu* v. *United States,* 142 U.S. 651, 659 (1892). An explicit discussion is found in *United States ex rel. Knauff* v. *Shaughnessy,* 338 U.S. 537 (1950). Rejecting a claim that it should review regulations which excluded a German war bride, the Court stated:

---

[5] Neither this Office nor the Immigration and Naturalization Service (INS) is aware of any time when the power granted by this section, added in 1952, has been used

[6] Given the desperate physical condition of many of the Haitians found on the high seas, the Coast Guard may, in particular situations, also be acting pursuant to its duty to render aid to distressed persons and vessels. 14 U.S.C. §§ 2, 88.

DOJIFR00843

Petitioner contends that the 1941 Act and the regulations thereunder are void to the extent that they contain unconstitutional delegations of legislative power. But there is no question of inappropriate delegation of legislative power involved here. The exclusion of aliens is a fundamental act of sovereignty. The right to do so stems not alone from legislative power but is *inherent in the executive power* to control the foreign affairs of the nation. *United States* v. *Curtiss-Wright Export Corp.,* 299 U.S. 304; *Fong Yue Ting* v. *United States,* 149 U.S. 698, 713. When Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an inherent executive power.

*Id.* at 542 (citations omitted, emphasis added). *See also Savelis* v. *Vlachos,* 137 F. Supp. 389, 395 (E.D. Va. 1955) *aff'd,* 248 F.2d 729 (4th Cir. 1957) (dictum).

The President, in the exercise of this inherent authority, would be acting to protect the United States from massive illegal immigration. His power to protect the Nation or American citizens or property that are threatened, even where there is no express statute for him to execute, was recognized in *In re Neagle,* 135 U.S. 1, 63–67 (1890). *See also In re Debs,* 158 U.S. 564, 581 (1895); *United States ex rel. Martinez-Angosto* v. *Mason,* 344 F.2d 673, 688 (2d Cir. 1965) (Friendly, J. concurring); 50 U.S.C. § 1541 (War Powers Resolution).[7] A recent Supreme Court decision points out that, in the absence of legislation, it was a common perception that the President could control the issuance of passports to citizens, citing the foreign relations power. *Haig* v. *Agee,* 453 U.S. 281, 292–94 (1981).

The President may also act to return the boats with the flag state's permission as an exercise of his power in the field of foreign relations, a field in which "with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation." *United States* v. *Curtiss-Wright Export Corp.,* 299 U.S. 304, 319 (1936). *See also Narenji* v. *Civiletti,* 617 F.2d 745, 747–48 (D.C. Cir. 1979), *cert denied,* 446 U.S. 957 (1980) (regulation of Iranian students); *Chicago & Southern Air Lines, Inc.* v. *Waterman S.S. Corp.,* 333 U.S. 103 (1948) (regulation of foreign airlines). The President's power is strongest where he has well recognized constitutional powers (foreign affairs) to which Congress has added statutory delegation (8 U.S.C. §§ 1182 (f), 1185).

---

[7] This Office has relied upon such inherent authority in an opinion, stating that the President could act to prevent airplane hijackings by placing marshals on board, even in the absence of express authority to take such preventive measures Memorandum for the Director, United States Marshals Service, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel, 2–3 (Sept 30, 1970).

245

DOJIFR00844

3. *Coast Guard Authority to Enforce Haitian Law Pursuant to an Agreement Entered into by the Executive.* The Coast Guard has submitted a draft Agreement that would permit the Coast Guard to board Haitian vessels in order to determine whether any alien is committing an offense against Haitian emigration laws. The issue which arises is whether the Executive can enter into an agreement under which the United States agrees to detain Haitians who are emigrating in violation of Haitian law in order to return them to Haiti. The President's authority to enter into executive agreements with foreign nations may be exercised either under congressional authorization or the President's inherent authority.[8] The President's power to enter into such agreements on his own authority can arise from "that control of foreign relations which the Constitution vests in the President as a part of the Executive function," 39 Op. Att'y Gen. 484, 486 (1940).[9] The limits on presidential power to enter into these agreements are not settled and have aroused controversy from the earliest days of our Republic.[10]

We believe that authority to enter into the Agreement is provided by two sources—the power delegated by Congress to the President, through the Attorney General, to guard the borders, 8 U.S.C. § 1103(a), and the President's authority in the field of foreign relations. The arrest of Haitian citizens as an aid to Haiti's enforcement of its emigration laws will enable the President to curtail the flow of Haitians in the furtherance of his "power and duty to control and guard the boundaries and the borders of the United States against the illegal entry of aliens." *Id.* The breadth of the President's authority in the field of foreign relations is extremely broad, as illustrated by the numerous executive agreements that have been negotiated and upheld by the courts.[11] *See United States* v. *Pink,* 315 U.S. 203 (1942) (Litvinov Agreement); *United States* v. *Belmont,* 301 U.S. 324 (1937) (same); *Tucker* v. *Alexandroff,* 183 U.S. 424, 435 (1902) (Mexican/United States agreement to permit both countries to cross the border in pursuit of marauding Indians);[12] *Dole* v. *Carter,* 444 F. Supp. 1065, 1068–69 (D. Kansas), *motion denied,* 569 F.2d 1109 (10th Cir. 1977) (return of the Crown of St. Stephen).

An agreement to aid the enforcement of the laws of another country is not without precedent. In 1891, the United States and Great Britain entered into an executive agreement prohibiting for one year the killing of seals in the Bering Sea. *Modus Vivendi Respecting the Fur-Seal Fisheries in Behring Sea,* 1 W. Malloy, Treaties, Conventions, International

---

[8] E. Corwin, The President's Control of Foreign Relations 116–17 (1917) (Corwin).

[9] Agreements executed by various Presidents for the settlement of claims of United States citizens against foreign governments are examples. *See Dames & Moore* v. *Regan,* 453 U.S. 654 (1981).

[10] E. Corwin, The President, 216–233 (3d ed. 1948) (debate between Hamilton and Madison over the constitutionality of Washington's Proclamation of Neutrality); L. Henkin, Foreign Affairs and the Constitution 177 (1972) (Henkin).

[11] Henkin, *supra,* at 179.

[12] 1 W. Malloy, Treaties, Conventions, International Acts, Protocols, and Agreements 1144 (1910) (Malloy).

246

DOJIFR00845

Acts, Protocols, and Agreements, 743 (1910) (Malloy). This agreement permitted the seizure of offending vessels and persons if "outside the ordinary territorial limits of the United States," by the naval authorities of either country. *Id.,* Art. III. "They shall be handed over as soon as practicable to the authorities of the nation to which they respectively belong. . . ." *Id.* As there was no statutory authority for this agreement, the President acted pursuant to his inherent authority in the field of foreign affairs.

Between 1905 and 1911, Presidents Roosevelt and Taft entered into a series of executive agreements that permitted the United States to operate the customs administration of both Santo Domingo (now the Dominican Republic) and Liberia.[13]

> [This first agreement] provided, in brief, for (1) a receiver of 'the revenues of all the customs houses,' to be designated by the President of the United States and satisfactory to the Dominican President; (2) the deposit in a New York bank for the benefit of creditors of all receipts above 45 percent, which was to be turned over to the Dominican Republic for the expenses of government administration and the necessary expenses of collection; and (3) the eventual distribution of the funds in the payment of Dominican debts.

W. McClure, International Executive Agreements 94 (1941). A customs administration in Haiti was established by treaty in 1915 but an elaborate series of executive agreements were signed "both extending and terminating various phases of American intervention and assistance in the financial, medical and military affairs of Haiti."[14]

Many authorities have noted that a President's exercise of his authority in this area is "a problem of practical statemanship rather than of Constitutional Law." E. Corwin, The President's Control of Foreign Relations 120–21 (1917).[15] The Supreme Court has upheld a variety of executive agreements based upon a number of theories and it is difficult to delineate with certainty the limits of the President's authority when he enters into such agreements based solely on his inherent executive authority. *But see Reid* v. *Covert,* 354 U.S. 1, 16–19 (1957) (agreement cannot deny civilian his right to a trial by jury). Because this Agree-

---

[13] 1 W. Malloy, *supra,* at 418. *See also* McDougal & Lans, *Treaties and Congressional-Executive or Presidential Agreements,* 54 Yale L.J. 181, 279 (1945); N. Small, Some Presidential Interpretations of the Presidency, 78–79 (1970) The arrangement was based on a fear that these countries' debts would be used by European countries as a grounds for military intervention.

[14] McDougal, *supra,* 54 Yale L.J. at 279. The final one was signed in 1934

[15] Commitment of financial resources overseas "depend[s] directly and immediately on appropriations from Congress. . . . While the issue of Presidential power to make executive agreements or commitments has no legal solution, political forces have mitigated its theoretical rigors. The President has to get along with Congress and with the Senate in particular, and he will not lightly risk antagonizing it by disregarding what it believes are its constitutional prerogatives." Henkin, *supra,* at 183–84. *See also* K. Holloway, Modern Trends in Treaty Law 216–17 (1967), McClure, *supra,* at 330; Restatement (Second) of the Foreign Relations Law of the United States § 121 (1965)

DOJIFR00846

ment will be based both on delegated and inherent authority, we believe that it is constitutional.

4. *Obligations Under the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, United Nations, Protocol, 19 U.S.T. 6223,* T.I.A.S. No. 6577. Article 33 (19 U.S.T. 6276) of the Protocol, to which the United States is a party, provides that "No Contracting State shall . . . return (*"refouler"*) a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Individuals who claim that they will be persecuted for one of these reasons must be given an opportunity to substantiate their claims. The Protocol does not, however, mandate any particular kind of procedure. We have reviewed the plan outlined in the draft prepared by INS and believe that it comports with the Protocol.

5. *Effect of the Foreign Assistance Act of 1961, 22 U.S.C. § 2151–2151d (Supp. III 1979).* We know of no provision of the Act that would prohibit the interdiction, since no foreign aid funds are being used.

6. *Formal Implementation of the Interdiction.* There are three formal steps still to be taken before the interdiction can begin. The first is clearance of the Agreement by the Department of State. The second is the signing of the Agreement by the United States and the government of Haiti.[16] The third is the issuance of a proclamation by the President pursuant to 8 U.S.C § 1182(f). The proclamation would contain a finding that the entry of Haitian nationals who do not possess proper documentation for entry into the United States is detrimental to the interests of the United States. The proclamation would then suspend the entry of all such Haitian nationals. If a decision is made not to rely upon 8 U.S.C. § 1182(f), no proclamation is necessary. However, the validity of the President's action will certainly be strengthened by relying on both statutory provisions which provide support for the contemplated action.

The Coast Guard is presently under the authority of the Department of Transportation. 14 U.S.C. § 1. The Attorney General is in charge of enforcing the immigration laws. 8 U.S.C. § 1103. The Coast Guard will be enforcing both the immigration laws and the laws of Haiti pursuant to the Agreement. While a memorandum of understanding signed by the Coast Guard, INS, and the Department of State would facilitate operations, 14 U.S.C. § 141, a presidential order to the Secretary of Transportation to have the Coast Guard act to enforce both parts of the Agreement will avoid any question about the Coast Guard's authority to act.

---

[16] The Agreement should be transmitted to Congress within 60 days. 1 U.S.C. § 112b(a) (Supp. III 1979).

DOJIFR00847

7. *Coast Guard's Authority to Operate in Haitian Waters:* Under the Agreement Haiti will grant the Coast Guard permission to enter its waters to return Haitian nationals. The Coast Guard's authority to enter the waters will be pursuant to the Agreement.[17] By permitting the Coast Guard to enter its waters, Haiti is granting free passage to our ships and crews. Sovereign nations often grant permission for the passage of foreign forces. *Tucker* v. *Alexandroff,* 183 U.S. 424, 435 (1902); *Schooner Exchange* v. *McFaddon,* 11 U.S. 116, 139–40 (1812); 2 J. Moore, A Digest of International Law § 213 (1906). We suggest a modification to the Agreement to make it clear that Haiti will not exercise jurisdiction over the Coast Guard ships or her crews while they are in Haitian waters. *Schooner Exchange,* 11 U.S. at 140, 143.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[17] It will not be pursuant to 14 U.S.C. § 89(a) because the waters of Haiti are not within the jurisdiction of the United States. *United States* v. *Conroy,* 589 F.2d 1258, 1265 (5th Cir. 1979) Section 89(a), however, does not limit the authority of the Coast Guard to act pursuant to another provision of law—in this case, the Agreement. 14 U.S.C. § 89(c).

DOJIFR00848

# Statement by Secretary Johnson on Southwest Border Security

Release Date:
October 17, 2016
For Immediate Release
DHS Press Office
Contact: 202-282-8010

In Fiscal Year 2016, total apprehensions by the Border Patrol on our southwest border, between ports of entry, numbered 408,870.  This represents an increase over FY15, but was lower than FY14 and FY13, and a fraction of the number of apprehensions routinely observed from the 1980s through 2008.  Apprehensions are an indicator of total attempts to cross the border illegally.  Meanwhile, the demographics of illegal migration on our southern border has changed significantly over the last 15 years – far fewer Mexicans and single adults are attempting to cross the border without authorization, but more families and unaccompanied children are fleeing poverty and violence in Central America.  In 2014, Central Americans apprehended on the southern border outnumbered Mexicans for the first time.  In 2016, it happened again.

| *Southwest Border Apprehensions - FY13-FY16* | | | | |
|---|---|---|---|---|
| **Category** | **FY13** | **FY14** | **FY15** | **FY16** |
| Unaccompanied children | 38,759 | 68,541 | 39,970 | 59,692 |
| Family members | 14,855 | 68,445 | 39,838 | 77,674 |
| Individuals | 360,783 | 342,385 | 251,525 | 271,504 |
| **Total** | **414,397** | **479,371** | **331,333** | **408,870** |

Unaccompanied children and families have presented new challenges in our immigration system.  I have traveled to the southwest border 17 times over the last 34 months as Secretary and have seen this personally.  We are determined to treat migrants in a humane manner.  At the same time, we must enforce our immigration laws consistent

DOJIFR00890

with our enforcement priorities.  This has included, and will continue to include, providing individuals with an opportunity to assert claims for asylum and other forms of humanitarian relief.

At the same time, we are providing a safe, alternative paths to our country for individuals in need of humanitarian protection.  Earlier this year, the Government of Costa Rica announced its agreement to enter into a protection transfer arrangement with the U.N. High Commissioner for Refugees and the International Organization for Migration to help address the Central American migration challenge. We're also establishing an in-country referral program in countries of origin including Honduras, El Salvador, and Guatemala.  This program enables vulnerable residents in the region to be considered for refugee protection in the United States after being screened and interviewed by DHS officers. We have also announced an expansion of the categories of individuals eligible for participation in our Central American Minors program when accompanied by a qualified child.  We promote and encourage use of these programs.

Border security alone cannot overcome the powerful push factors of poverty and violence that exist in Central America. Walls alone cannot prevent illegal migration.  Ultimately, the solution is long-term investment in Central America to address the underlying push factors in the region. We continue to work closely with our federal partners and the governments in the region, and are pleased with the $750 million Congress approved in FY 2016 for support and aid to Central America. We urge Congress to provide additional resources in FY 2017.

But, there is more to do for border security.  I urge the next Administration and the next Congress to continue to make smart investments in border security technology, equipment and other resources.  This is what our experts on the border -- those on the front lines every day, charged with the responsibility of protecting our borders – tell me each time I ask them.

At all times throughout President Obama's administration, we have endeavored to enforce the immigration laws in a fair and humane way, consistent with the immigration system we have.   But, the reality is the system is broken, and badly need of comprehensive immigration reform that only Congress can provide.  For one thing, we must reckon with the millions of undocumented immigrants who live in the shadows in this country, who've been here for years,  and who should be given the opportunity to

come forward and get right with the law.  It is my profound hope that the next Congress will finally address this and other issues, and enact comprehensive immigration reform.

Other points:

- The new immigration enforcement priorities President Obama and I announced in November 2014, which focus on serious convicted criminals and those apprehended at the border, are being implemented effectively by our immigration enforcement personnel.  Our priorities are reflected in actual results.  Today, over 99% of those in immigration detention fit within one of our enforcement priorities; and around 85% are within the top priority for removal.  In 2009, just 35% of those deported by ICE were convicted criminals; today that percentage is about 60%.  Enforcement actions that began early this year, focused on families and unaccompanied children now over 18 that were apprehended at the border.

- Earlier this week, I paid my sixth visit to Mexico as Secretary of Homeland Security.   On this visit I met with President Peña Nieto, my counterpart the Secretary of Government Miguel Osorio Chong, Secretary of Foreign Affairs Claudia Ruiz Massieu, Secretary of Finance Jose Antonio Meade, and Attorney General Arely Gomez Gonzalez.  Our working relationship is strong, and we've committed to do even more for our mutual border security interests.  Additionally, we've resolved to create a standing U.S.-Mexican working group, staffed largely with career officials, to ensure a permanent dialogue on security issues that will sustain itself past the Obama and Peña Nieto Administrations.

- In recent months we've seen an influx of Haitian nationals on our southern border, principally at certain land ports of entry.  On September 22, I announced we would resume removals of Haitian nationals in accordance with our existing enforcement priorities.  In light of Hurricane Matthew, which struck Haiti on October 4, removal flights to Haiti have been suspended temporarily.  Working with the Government of Haiti, DHS intends to resume removal flights as soon as possible.  DHS and the Department of State are working with the Government of Haiti and other key partners to ensure that removals occur in as humane and minimally disruptive a manner as possible.  The policy change I announced on September 22 remains in effect. Haitians attempting to enter the United States without authorization will continue to be placed into immigration detention.

- With our interagency partners, DHS continues to aggressively target and dismantle the transnational criminal organizations that smuggle and exploit migrants. One

recent example is "Operation ALL IN."  This operation resulted in the apprehension of 100 individuals now facing federal prosecution at either the federal, state, or local level. Those arrested as part of Operation ALL IN include smugglers, as well as gang members and sex offenders.

DOJIFR00893

## Migrant Caravan Crosses Mexico's Southern Border;  Nation's police hold at bay in a standoff the group fleeing violence-prone Central America for the U.S.

The Wall Street Journal Online

October 19, 2018

Copyright 2018 Factiva  , from Dow Jones
All Rights Reserved



Copyright 2018 Dow Jones & Company, Inc. All Rights Reserved.

## THE WALL STREET JOURNAL.

**Section:** WORLD

**Length:** 1413 words

**Byline:** By Juan Montes

# Body

TECUN UMAN, Guatemala-A caravan of several thousand Honduran migrants on their way to the U.S. breached Mexico's southern border with Guatemala on Friday, but were held at bay by hundreds of Mexican police in a tense standoff, deepening a regional migration crisis.

The rush at the border came after Mexican officials said they would grant asylum to the caravan of about 3,000 migrants fleeing violence-prone Central America. But the Mexicans said they would let in only 100 to 200 migrants a day, because they couldn't process asylum claims more quickly.

Despite the offer, the majority of Hondurans grew restive at the prospect of waiting for days or weeks following days of walking from their hometowns to Mexico. Hundreds of migrants, mostly young men, began pulling down a fence on the Guatemalan side of the border and soon overwhelmed the handful of Guatemalan police.

One of the migrants addressed the crowd from a house in this Guatemalan border town. "If they don't let us cross now, we'll cross by the river," he said.

Migrants then rushed across the bridge that separates the two countries and tried to overwhelm some 500 federal police manning a thin fence. At one point, some in the crowd threw bottles and stones at the police, who responded with several volleys of what appeared to be tear gas. A helicopter roamed in the skies.

Some migrants carried babies in their arms, others pushed baby carriages, and nearly everyone carried their belongings in backpacks and handbags. Only a few women with children were allowed to enter Mexico.

After it became clear the Mexican police wouldn't let the majority of the crowd through, dozens of young men began climbing the fence on the bridge and throwing themselves into the shallow river, tying several makeshift rafts together in an attempt to cross illegally to the Mexican side.

DOJIFR00894

Migrant Caravan Crosses Mexico's Southern Border;  Nation's police hold at bay in a standoff the group fleeing violence-prone Central America for the U.S.

Mexico's Interior Minister Alfonso Navarrete claimed that caravan leaders "put pregnant women and children at the front of the group." He said several Mexican police were injured as they contained crowds from crossing into Mexican territory.

The caravan has  drawn the ire of President Trump . Mr. Trump has featured the caravan and the broader immigration issue  in political rallies  around the U.S. on behalf of Republican candidates in November's midterm elections.

Most of the migrants plan to go to the U.S. and ask for asylum or try to cross the border illegally. Mr. Trump has vowed they will be sent back.

Mr. Trump has long claimed the U.S. is hobbled by lax immigration laws, including a so-called catch-and-release policy, in which immigrants requesting asylum are released into the community while they await a hearing to determine their status.

The president said that, at his request, Mexico was trying to help control the flow of immigrants from neighboring countries, but that he was prepared  to use U.S. military force if necessary .

Adding to pressure on Mexico to prevent the migrants from reaching the U.S. border, U.S. Secretary of State Mike Pompeo met with Mexican authorities in Mexico City on Friday. The migrant caravan was at the top of the agenda.

"We're prepared to do all that we can to support the decisions that Mexico makes about how they're going to address this very serious and important issue to their country," Mr. Pompeo told reporters after meeting with President Enrique Pe a Nieto.

Mexican officials had hoped the offer of asylum would break up the large caravan and persuade many migrants to stay in Mexico rather than cross the country and try to enter the U.S. illegally.

"Mexico is in a bind," said Michael Shifter, president of the Inter-American Dialogue, a Washington-based think tank. "Mexico is saying it's doing this for its own interest, and that's true, but the U.S. is also putting a lot of pressure, and Mexico has to also maintain its relationship with the U.S."

Earlier in the day, Mexico's ambassador to Guatemala, Luis Manuel L pez Moreno, met with migrants in the central square of this town. He told the exhausted travelers that they would be allowed to enter in an orderly manner.

"The border is not closed. We are open to receive them with order and according to the law," Mr. L pez Moreno said in an interview.

Some of the migrants received the news with cheers. "Thank God! Thank God! We thank Mexico for its generosity and solidarity," said Karissa Romero, a 31-year-old woman who joined the caravan on Sunday in Honduras with two of her children.

Mexico has a long record of defending the rights of its own migrants in the U.S. Images of the Honduran migrants being pushed back by Mexican police were sharply criticized by some in Mexico.

Mexico's interior minister, Mr. Navarrete, said Mexico will continue with efforts to convince the leaders of the group to assist with the orderly entry of migrants into Mexico and respect the country's laws, he told Mexican television.

"There is no possibility that we'll act in a coercive way, hurting a vulnerable group," he added.

The caravan began last week in Honduras and quickly grew in size. At the beginning, it was a group of 200 people who agreed on social media to travel together to ensure their safety through some of the world's most violent countries. But it soon grew quickly. Residents and migrants say they joined the caravan because they didn't have to pay thousands of dollars for a "coyote" smuggler to get them in the U.S.

DOJIFR00895

Migrant Caravan Crosses Mexico's Southern Border;  Nation's police hold at bay in a standoff the group fleeing violence-prone Central America for the U.S.

"We just want to seek a better future. In Honduras, you work to survive and that's not a worthy life," said Dania L pez, 30, a divorced woman who arrived with her three children. She said she earned just $62 a week. "The journey is really difficult. My son told me this morning: Mom, let's pay a taxi," she added in tears while hugging her five-year old son, Ariel.

Mexico's effort to offer asylum marks a departure from its handling of previous caravans, when migrants were sometimes given transit visas allowing them to pass through Mexico on their way to the U.S.

Aurora Vega, spokeswoman for Mexico's government migration agency, said migrants would have to stay at a government-run shelter for the first 10 days of their stay while Mexican officials review their applications and ensure there are no criminals or terrorists among them. Mexico's asylum agency will then decide whether to approve the requests of those who pass that first screening. The asylum application process typically takes close to 45 working days.

"They are not free to roam the country when they first arrive, and if someone is caught doing so, they will be deported," she said. That means the caravan is unlikely to regroup anytime soon, she said.

During that time, migrants can choose whether to stay at a government-run shelter or go to one run by charity groups, Ms. Vega said. If they leave town during that period, the asylum request is canceled and applicants will be subject to deportation.

Asylum seekers in the U.S. also face a lengthy and complicated legal process. For those who pass an initial interview, the so-called credible fear bar, will have to prove to an immigration judge that they are likely to face persecution in their home country because of their membership in a particular social group and their government is either unwilling or unable to protect them.

Many asylum seekers from Central America have said they are fleeing gangs, domestic violence and other crime. Earlier this year, Attorney General  Jeff Sessions issued a ruling  that said domestic violence and threats from gangs are generally not grounds for winning asylum in the U.S. He said such threats were "private violence."

Nonetheless, those who do pass the credible fear bar and are released from immigration jails will face a yearslong wait for their case to be decided. More than 764,000 cases are currently pending in  federal immigration courts .

While immigrants wait, they can apply for a work permit to be allowed to legally work while their case is being decided.

Courtney McBride, Alicia Caldwell and Vivian Salama contributed to this article.

Write to Juan Montes at  juan.montes@wsj.com

Related Articles

*  Trump Threatens to Cut Off Aid to Honduras Over Immigration Caravan

*  Immigrant Children Are Staying Longer in Custody

*  Inside the Texas Tent City Housing More Than 1,000 Migrant Teens

*  As Migration From Guatemala Surges, U.S. Officials Seek Answers  (Oct. 13)

*  Nafta Rewrite Won't Boost U.S. Growth, Economists Say

*  In Brazil, Big Plans and No Money  (Oct. 3)

*  Latin America Is the Murder Capital of the World  (Sept. 20)

Migrant Caravan Crosses Mexico's Southern Border;  Nation's police hold at bay in a standoff the group fleeing violence-prone Central America for the U.S.

## Notes

PUBLISHER: Dow Jones & Company, Inc.

## Classification

**Language:** ENGLISH

**Publication-Type:** Web Publication

**Journal Code:** WSJO

**Subject:** IMMIGRATION (89%); TERRITORIAL & NATIONAL BORDERS (89%); POLITICAL ASYLUM (89%); MIGRATION ISSUES (78%); SPECIAL INVESTIGATIVE FORCES (77%); POLICE FORCES (77%); IMMIGRATION LAW (76%); ELECTIONS (71%); INFANTS & TODDLERS (69%); CAMPAIGNS & ELECTIONS (66%); WOMEN'S HEALTH (66%); PREGNANCY & CHILDBIRTH (64%); WOUNDS & INJURIES (64%); GOVERNMENT ADVISORS & MINISTERS (61%); MIDTERM ELECTIONS (60%); POLITICAL CANDIDATES (60%); gimm Human Migration; gpir Politics/International Relations; gvexe Executive Branch; gcat Political/General News; gpol Domestic Politics; gvbod Government Bodies; PROVIDER TERMS: OLAM

**Person:** DONALD TRUMP (76%)

**Geographic:** MEXICO (99%); GUATEMALA (94%); UNITED STATES (94%); HONDURAS (92%); CENTRAL AMERICA (79%); usa United States; mex Mexico; guat Guatemala; camz Central America; lamz Latin America; namz North America; devgcoz Emerging Market Countries; dvpcoz Developing Economies

IP Codes: G/EXE, N/GEN, N/PLT, R/CME, R/GT, R/LTM, R/MX, R/NME, R/US

IP Descriptors: WSJ, WSJ.com, WSJ.com Site Search, WSJAsia, WSJEurope, WSJ Japanese, Online, WSJ-PRO-WSJ.com, CARAVAN, HONDURAN CARAVAN, HONDURAN MIGRANTS, ILLEGAL IMMIGRATION, LIBERTY AND REFOUNDATION PARTY, MEXICO BORDER, MIDTERM ELECTIONS, POMPEO MEETING, SAN PEDRO SULA, SB1254624005803536404330458454416340215566144, L pez, Dania, Navarrete, Alfonso, Pe a Nieto, Enrique, Pompeo, Mike, SYND, CODES_REVIEWED, Latin America News

**Load-Date:** October 29, 2018

---

End of Document

The border is tougher to cross than ever. But there's still one way into America. - The Washington Post                    11/29/18, 8:22 AM

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 387 of 1770

The Washington Post

# The border is tougher to cross than ever. But there's still one way into America.

By Nick Miroff and
Carolyn Van Houten
October 24

*[This story has been optimized for offline reading on our apps. For a richer experience, you can find the full version of this story here. An Internet connection is required.]*

HIDALGO COUNTY, Tex. — Crouched low in the brush along the riverbank, Border Patrol agent Robert Rodriguez watched the Mexican side of the Rio Grande, waiting. A norteño ballad drifted from a radio somewhere on a nearby farm, and two pigs cooled themselves at the water's edge, wading to their bellies. For a moment, one of the border's busiest places for illegal crossings looked placid.

Then a raft appeared.

Within seconds it was in the water, a teenage guide steering the current while his boss, an older man, stood watch on the bank. In less than a minute, the teenager delivered a woman and a boy to the U.S. side and they climbed out, shoes sinking in the wet silt.

Rodriguez stepped onto the path to stop them, but the woman and the boy did not run. They wanted to be captured. This is how it works now.

The era of mass migration by Mexican laborers streaming into California and the deserts of Arizona is over. Billions spent on fencing, sensors, agents and drones have hardened the border and made it tougher than ever to sneak into the United States. The migrants coming today are increasingly Central Americans seeking asylum or some form of humanitarian protection, bearing stories of torture, gang recruitment, abusive spouses, extortionists and crooked police.

They know the quickest path to a better life in the United States is now an administrative one — not through mountains or canyons but through the front gates of the country's immigration

DOJIFR00898

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 388 of 1770

bureaucracy.

Last year, U.S. immigration courts received nearly 120,000 asylum claims from migrants facing deportation, a fourfold increase from 2014. Those filings have pushed the number of pending cases before U.S. immigration courts to more than 750,000, collapsing the system and upending President Trump's sweeping promises to lock down the border.

The extraordinary surge of asylum seekers is testing the limits of whom, exactly, the United States is willing to protect, challenging the stone-carved ideal of America as the place that welcomes the tired and poor, "yearning to breathe free."

It has also presented Trump with one of the most vexing policy challenges of his presidency, and virtually every measure taken so far has made the problem worse.

Trump this spring deployed a nuclear option — separating parents from their children — in an attempt to stop families from coming. It backfired. The controversy generated by the policy and its abrupt rollback six weeks later handed smuggling guides across Central America a potent sales pitch. They now tell potential customers the Americans do not jail parents who bring children — and to hurry up before they might start doing so again.

Families asking for mercy constitute a greater-than-ever portion of those taken into custody. More than half of all arrests along the Mexican border last month were migrant family members or unaccompanied minors, up from 13 percent in 2013.

This spring, Trump fixated on a caravan of asylum seekers traveling through Mexico, about 300 of whom eventually crossed into the United States. Now, a much larger procession of as many as 7,000 Central Americans is trekking north toward the border, despite threats from the president to stop them with U.S. troops and sever aid to their countries.

There is a sinking feeling, among Department of Homeland Security officials, that more caravans are yet to come and that they will only get larger.

Families are coming in caravans and on their own because it works. Only 1.4 percent of migrant family members from Guatemala, Honduras and El Salvador who crossed the border illegally in

DOJIFR00899

2017 have been deported to their home countries, according to DHS officials.

The United States has neither the detention space nor the legal authority to hold children long enough to process their parents' claims, so families are typically released from custody to await court hearings that could be months, even years, into the future.

Trump has long derisively referred to this as "catch and release" and used it as an attack line against Democrats. But in the months since ending family separation, Trump has now made it his de facto policy.

The administration has drafted plans to add thousands of detention beds in an attempt to hold parents with children longer. DHS officials have also proposed new rules that would allow the government to withdraw from a 1997 federal court agreement limiting the amount of time children can be held in immigration jails to 20 days.

But in the meantime, so many families are coming through high-volume corridors such as the Rio Grande Valley that Rodriguez and other agents have come to describe them as "non-impactables," because they say there is nothing they can do to stop them.

As Rodriguez radioed another agent to pick up the woman and the boy, she handed him her Honduran identification card. Cecilia Ulloa was 25. Darwin, her son, was 13. The math took a moment to sink in, and Ulloa appeared to recognize a familiar look of confusion.

"My stepfather," she said. "It started when I was 10."

After a decade in prison for rape, her stepfather was free now, stalking them, blaming her for ruining his life, Ulloa said. "He's going to kill us."

Police in Honduras had told her there was nothing they could do, she said, so she and her son left for the United States. They wanted asylum.

Chances were they would be denied. But it could take months, or longer, for the U.S. immigration system to determine whether Ulloa and her son deserve protection. They would probably not be sent back to Honduras anytime soon.

The border is tougher to cross than ever. But there's still one way into America. - The Washington Post

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 390 of 1770

11/29/18, 8:22 AM

**Credible fear**

Some migrants' stories of gang threats and police indifference have a rehearsed quality, suggesting they are concocted. The smuggling guides who charge $10,000 or more for the trip provide transportation and meals, but also coaching, including the key words migrants should say to convince U.S. asylum officers that their fears meet credibility standards.

But there are many with no need to make things up. The countries they are running from have some of the highest murder rates in the world. Their criminal justice systems barely function. Some have been victimized already.

Lisa Brodyaga, an immigration lawyer in South Texas who has worked with Central American migrants since the late 1970s, said adult asylum seekers who appear before immigration judges "are almost all being deported."

"I think judges felt freer to follow their gut under Obama than they do now," she said.

Migrants have adapted just as quickly. As asylum officers and immigration judges reject more claims, the number of single adults who arrive claiming fear of persecution is dropping. The fastest-growing portion comprises parents coming with children, preventing their long-term detention and significantly reducing the likelihood they will be deported.

Last month, border agents arrested 16,658 individuals who arrived as members of "family units," an all-time high, up from 9,247 in July.

Migrant advocates have documented cases of rejected asylum applicants being killed after they were sent back. But a full picture is difficult to obtain because U.S. government statistics do not track what happens to deportees once they leave the United States.

DHS officials point to improving public-safety statistics from Central America as evidence that the asylum trend is not driven by worsening violence.

Those fleeing lawlessness and crime are also lured north by job opportunities and the desire to reunite with parents, siblings and other relatives already living here. The United States offers not only safety but also a chance at a dramatically better life.

DOJIFR00901

The border is tougher to cross than ever. But there's still one way into America: Ask for asylum - The Washington Post 11/29/18, 8:22 AM

Case 1:20-cv-00116-EGS Document 85 Filed 03/27/20 Page 391 of 1770

And with the U.S. unemployment rate at a 50-year low and employers across the Midwest desperate for labor, the Trump-era economy is undermining the Trump-era immigration agenda.

"Migrants from Central America seek asylum in the U.S. to escape gangs, violence and lack of opportunity," said Doris Meissner, who is policy director at the Migration Policy Institute and ran the U.S. immigration system under President Bill Clinton. "This mixture of humanitarian and economic migration is happening in other parts of the world, too."

"However, only some of those in peril are actually eligible for asylum," said Meissner, co-author of the new report "The U.S. Asylum System in Crisis." "Granting them protection but keeping asylum systems from being overwhelmed or misused requires broad solutions, including attacking the reasons people flee."

For people like Ulloa and her son, here's how it works.

Those who cross the border and turn themselves in are interviewed by a U.S. asylum officer to determine whether they have a "credible fear" of facing persecution back home. The Supreme Court has ruled that an asylum-seeker's fear is considered "well-founded" if there is a 10 percent chance they will face persecution, and those who potentially qualify are referred to an immigration judge.

Between Oct. 1, 2017 — the start of the 2018 fiscal year — and June 30, the period for which the most recent statistics are available, the government received more than 73,000 credible-fear claims, up from 5,000 during all of 2009. Of those 73,000 who were interviewed, 76 percent were found to have a credible fear of return.

The finding does not mean that a judge will eventually grant asylum. Justice Department statistics show that fewer than 10 percent of Central American applicants are awarded asylum, but the process of applying offers a shield from deportation and a toehold, however tenuous, in the United States.

Trump officials view this as a too-permissive approach to asylum claims that amounts to a mile-wide loophole in the American immigration system. U.S. generosity is being exploited by smugglers and cheats, they say, and the dysfunction encourages more to make a dangerous journey.

Under Trump, asylum denial rates have reached their highest levels in more than a decade. But

DOJIFR00902

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 392 of 1770

nearly half of those rulings are issued in absentia, because the applicant does not appear in court.

That is the breach Trump officials see: If asylum seekers think their case is likely to be denied, they can drop out of the court system and disappear, remaining in the United States illegally. The latest Justice Department figures show U.S. courts issued more than 40,000 removal orders in absentia during the government's 2017 fiscal year, nearly twice as many as in 2014.

"Saying a few simple words — claiming a fear of return — has transformed a straightforward arrest for illegal entry and immediate return too often into a prolonged legal process, where an alien may be released from custody into the United States and possibly never show up for an immigration hearing," Attorney General Jeff Sessions said in a September speech to a group of 44 newly hired immigration judges that he said was the largest class in history.

"Our system was not designed to handle thousands of new asylum claims every month from individuals who illegally flood across the border," he said. "But that is what has been happening, and it has overwhelmed the system."

### 'Private' violence

In the absence of a physical wall, the Trump administration is laying down new legal barriers to the asylum process. The U.S. immigration court system is a branch of the Justice Department, not the judiciary, and the attorney general effectively functions as a one-man Supreme Court. In June, Sessions issued a sweeping ruling that overturned the case of a Guatemalan domestic-violence victim who had demonstrated that police failed to protect her from spousal abuse and rape.

Sessions's ruling said asylum laws are meant to shelter those facing persecution for political or religious beliefs, or their membership in a well-defined social group, not those fleeing what he called "private" forms of violence.

"The mere fact that a country may have problems effectively policing certain crimes — such as domestic violence or gang violence — or that certain populations are more likely to be victims of crime, cannot itself establish an asylum claim," Sessions wrote.

Under Sessions, the Justice Department has attempted to reduce the court backlog by adding dozens

DOJIFR00903

The border is tougher to cross then ever. But there's still one way into America. - The Washington Post

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 393 of 1770

11/29/18, 8:22 AM

of immigration judges and imposing quotas that compel them to process more cases. It has taken steps to prioritize the claims of the most recent arrivals, as a way to discourage asylum seekers from taking advantage of the court backlog. And it has instructed judges and asylum officers to take a more adversarial approach to migrants' claims.

U.S. asylum laws were shaped in the aftermath of World War II, when the United States and other Western nations developed international treaties based on the principle of "non-refoulement" — that those fleeing persecution should not be sent back to places where they are likely to killed or persecuted.

Applicants who reached U.S. soil could prove eligibility for asylum on the basis of past persecution or a fear of future abuse on the basis of their "race, religion, nationality, membership in a particular social group or political opinion."

In practice, historians and immigration scholars say, political considerations have often superseded humanitarian ones. During the Cold War, refugees fleeing communist and left-wing governments in Vietnam, Cuba and Nicaragua were welcomed in large numbers, while those escaping U.S.-friendly military dictatorships in El Salvador and Guatemala were denied.

"The United States has never solely pursued asylum on the basis of humanitarian principles," said Roberto Suro, a migration expert at the University of Southern California and former director of the Pew Hispanic Center. "American approaches have always been ad hoc and driven largely by foreign policy concerns and domestic policy concerns."

Sessions has directed judges and asylum officers to adhere to a narrower definition of "membership in a social group" — the category had been used in recent years to grant protection to victims of domestic violence.

"An alien may suffer threats and violence in a foreign country for any number of reasons relating to her social, economic, family or other personal circumstances," Sessions wrote. "Yet the asylum statute does not provide redress for all misfortune."

The president demonstrated even less patience this spring, when a large group of asylum-seeking Central American families formed a caravan to travel northward. Trump took their journey as a

personal affront.

"We cannot allow all of these people to invade our Country," he wrote on Twitter. "When somebody comes in, we must immediately, with no Judges or Court Cases, bring them back from where they came."

More than 400 caravan members eventually crossed, according to DHS statistics. Among them was Carlos Aldana, who now lives with his partner and young daughters outside Seattle, waiting to see a judge. The monitoring device strapped to his leg has been on so long he barely notices it anymore.

"We go to the park. We go to church and the grocery store," Aldana said. "It's beautiful here."

His family's asylum claim epitomizes the intertwined push-and-pull factors that bring Central Americans to the United States — and that make it unlikely he, his partner and their two daughters will be allowed to stay.

The family had a small farm near the Caribbean coast, on land purchased with money sent home by a brother working in the United States. When traces of gold were found on the property, Aldana said, he and his siblings invested in mining equipment and began digging.

Then a local crime boss found out about their discovery. He showed up at the property with a carload of men, offering to "go into business together," Aldana said. Aldana's family declined, and the man returned and said he had heard others were planning to kill them. He offered protection. Again, Aldana and his siblings refused.

The threats worsened. Then one of Aldana's brothers was killed. Aldana said his family was too scared to go to the police. "They work for him," he said of the gangster.

The family fled to another part of Honduras and attempted to start over, but a year later the man found them and the threats resumed, Aldana said.

This time Aldana and his family fled to southern Mexico. They were arrested by Mexican authorities and sent back to Honduras. They tried to start over again.

Worried that he was putting the whole family in danger, another of Aldana's brothers bid farewell

DOJIFR00905

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 395 of 1770

and left. His body was found a few months later, tortured and mutilated. Aldana reported the crime to police, but they made no arrests, he said.

Aldana fled with his family to Mexico a second time, then found out about the caravan. Like others who joined, they saw it as a safe, affordable way to reach the border.

Along the journey, the caravan's legal advisers warned Aldana he would probably not qualify for asylum because he had been deported from the United States once before, in 2008, when he attempted to come illegally at age 19.

But he crossed anyway, and like so many Central Americans, his urge to flee is hard to separate from the desire for a better life in the United States.

"I feel safe here. I just want to be able to stay, so my girls don't have to grow up in a place like that," he said of Honduras. "I don't ever want to go back."

**'The most horrifying stories'**

Asylum seekers who make their claims at official border crossings — not on the banks of the Rio Grande — are not breaking the law. But U.S. agents have to let them cross the bridge first.

On a recent morning in South Texas, immigration lawyer Jennifer Harbury walked across the river into Mexico under a blazing sun, waiting for a nun to pick her up. They drove to a Reynosa migrant shelter in a bullet-scarred neighborhood full of cartel lookouts and stash houses used by smugglers to stage illegal crossings.

Harbury is an irritant to U.S. border officials as well as the cartels. She provides free legal advice and assistance to asylum seekers, so the nuns who run the shelter call her often to see whether she can help migrant families desperate for legal advice. Harbury's pro bono work takes profits away from traffickers, because they charge a "tax" of several hundred dollars to those who cross illegally along the river. They earn nothing from the migrants Harbury escorts to the official border crossing.

Harbury is one of the activists who also help asylum seekers stranded in the no man's land on the pedestrian bridge over the river. In recent months, U.S. officers have been turning migrants away,

DOJIFR00906

The border is tougher to cross than ever. But there's one way into America: Ask for asylum. - The Washington Post

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 396 of 1770

11/29/18, 8:22 AM

telling them to come back later. Harbury and others have criticized the practice as unlawful, but DHS officials say that port officers have multiple responsibilities and that busy border crossings have capacity limits.

It was Harbury who provided ProPublica with the surreptitious audio recording of a child screaming for her mother that dealt a severe blow to the family-separation policy. She has absorbed the stories of thousands of asylum seekers over the decades and increasingly views her job with the urgency of an emergency responder. She intends to help as many asylum seekers enter the United States as possible, because she believes she is saving their lives.

"These people have the most horrifying stories I have ever heard," she said. "I don't think people have better claims than those running from the cartels."

The shelter in Reynosa was crowded with newly deported Mexicans, many still carrying their belongings in plastic bags provided by the U.S. government. Immigration and Customs Enforcement had dropped off 85 deportees the previous night, and several complained harshly of bad food and abysmal conditions in U.S. detention.

The nuns had asked Harbury to help a young mother stranded for more than a week, Maria Magdalena Gonzalez, 21, and her son, Emiliano, 3. A gangster in Gonzalez's home state of Guerrero was threatening to kill her for rejecting his advances, she said. But when she and her son tried to approach the U.S. border crossing a few days earlier to seek asylum, they had been turned away.

With more and more Central Americans showing up at the port of entry, U.S. officers had set up an impromptu checkpoint over the middle of the Rio Grande, blocking them from setting foot on the U.S. side to start the asylum process.

Those who fail to cross are put at risk, because cartel lookouts ply the Mexican side of the bridge, watching for Central Americans who have been turned away. The migrants are prime targets for kidnapping because criminal groups assume they have relatives living in the United States with enough money to pay a ransom.

Harbury was there to make sure Gonzalez and her son weren't rejected again.

DOJIFR00907

A nun drove them to the bridge over the river, and Harbury walked alongside them until a Mexican immigration official stood in the way. He had been looking for asylum seekers from Central America, but Gonzalez and her son were Mexican, so there was nothing he could do to detain them.

He told Harbury the U.S. agents had not been letting asylum seekers through, or were making others wait three or four days to be allowed to approach the American side.

Harbury, Gonzalez and the boy continued walking until three American officers blocked them halfway across the bridge. "We want asylum," Gonzalez said softly, more a question than a demand. An agent told her to stand aside and wait.

Harbury asked how long, and the officers said it could be several hours, perhaps days. She sat down on the pavement with Gonzalez and the boy. "We'll wait," she said.

The officers appeared to notice a reporter taking notes and called a supervisor. He arrived and waved everyone through.

Gonzalez reached the inspection booth and pushed her paperwork forward. Harbury gave her a hug and an invitation to dinner. Then the officers directed Gonzalez and her son to an adjacent waiting room.

"They made it," Harbury said.

She waved goodbye through the glass. The room wasn't full, not even close. There were more than 60 chairs in the waiting area, and all but two were empty.

DOJIFR00908

The border is tougher to cross than ever. But there's one easy way into America. - The Washington Post

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 398 of 1770

11/29/18, 8:22 AM



**Nick Miroff**

Nick Miroff covers immigration enforcement, drug trafficking and the Department of Homeland Security on The Washington Post's National Security desk. He was a Post foreign correspondent in Latin America from 2010 to 2017, and has been a staff writer since 2006.  Follow 🐦



**Carolyn Van Houten**

Carolyn Van Houten is a staff photojournalist at the Washington Post. Previously, she worked at the San Antonio Express-News and held internships at National Geographic, The Tampa Bay Times, and The Chicago Tribune, among others. She studied journalism at the University of North Carolina at Chapel Hill.  Follow 🐦



The Washington Post

# Thank you.

Your subscription supports journalism that matters.

DOJIFR00909

World News October 26, 2018 / 2:33 PM

# Mexico offers plan to keep U.S.-bound migrants in Mexico

Delphine Schrank

PIJIJIAPAN, Mexico (Reuters) - Mexico on Friday offered temporary identification papers and jobs to migrants who register for asylum in the country, stepping up efforts to halt the advance of a U.S.-bound Central American caravan that has angered Washington.

U.S. President Donald Trump has threatened to close the U.S.-Mexico border and cut aid to Central America to try to stop the caravan of several thousand people. U.S. officials have said that up to 1,000 troops may be sent to the U.S. southern border to prevent the migrants from crossing.

Making reference to the caravan, Mexican President Enrique Pena Nieto said that migrants wishing to obtain temporary identification documents, jobs or education for their children could do so by registering for asylum in southern Mexico.

"This plan is only for those who comply with Mexican laws, and it's a first step towards a permanent solution for those who are granted refugee status in Mexico," Pena Nieto said in a pre-recorded address broadcast on Friday afternoon.

To qualify for the scheme he called "Estas en Tu Casa" ('Make Yourself at Home') migrants had to be in the southern states of Chiapas and Oaxaca, Pena Nieto said.

Temporary work in the states would be extended so as also to benefit Mexicans, said Pena Nieto, who leaves office on Nov. 30.

The caravan, which is moving through Chiapas on the border of Guatemala, has enabled Trump to campaign hard on illegal immigration ahead of midterm congressional elections on Nov. 6, in which Republicans are battling to keep control of Congress.

Mexican officials have said those migrants who do not qualify for refugee status are liable to be deported.

Mexico's government has said that more than 1,700 people in the convoy have registered for asylum, while others have returned home. Estimates on the size of the group vary.

Alden Rivera, the Honduran ambassador to Mexico, told Mexican radio on Friday that the caravan could reach Mexico City by next Friday. He put an "official" headcount at 3,500, estimating that at least two-thirds of them were Hondurans.

The caravan set off in Honduras nearly two weeks ago, and has picked up other Central Americans en route.

Alexander Fernandez, a Honduran traveling in the caravan, said people began leaving the town of Pijijiapan at about 3 a.m. to head for Arriaga, a town in the west of Chiapas.

A banner hanging over a bridge on the migrants' path read: "Your hearts are brave, don't give up."

Tens of thousands of Central Americans set off for the United States every year, looking to escape violence and poverty. Hondurans, Guatemalans and Salvadorans make up the bulk of illegal immigrants apprehended at the U.S. border.

On Thursday night, thousands of people took refuge under small tents or teepees made from garbage bags in Pijijiapan's town square. Many people rushed to a nearby river in the afternoon to wash off the sweat of travel and extreme heat.

A White House official said on Thursday that "a wide range of administrative, legal and legislative options" were being considered regarding the migrants.

Additional reporting by Veronica Gomez in Mexico City; Editing by Dave Graham and Tom Brown

Our Standards:The Thomson Reuters Trust Principles.

# 'We're heading north!' Migrants nix offer to stay in Mexico

By CHRISTOPHER SHERMAN   October 27, 2018

ARRIAGA, Mexico (AP) — Hundreds of Mexican federal officers carrying plastic shields blocked a Central American caravan from advancing toward the United States on Saturday, after a group of several thousand migrants turned down the chance to apply for refugee status and obtain a Mexican offer of benefits.

Mexican President Enrique Pena Nieto has announced what he called the "You are at home" plan, offering shelter, medical attention, schooling and jobs to Central Americans in Chiapas and Oaxaca states if migrants apply, calling it a first step toward permanent refugee status. Authorities said more than 1,700 had already applied for refugee status.

But a standoff unfolded as federal police officers blocked the highway, saying there was an operation underway to stop the caravan. Thousands of migrants waited to advance, vowing to continue their long trek toward the U.S. border.

At a meeting brokered by Mexico's National Human Rights Commission, police said they would reopen the highway and only wanted an opportunity for federal authorities to explain the proposal to migrants who had rejected it the previous evening. Migrants countered that the middle of a highway was no place to negotiate and said they wanted to at least arrive safely to Mexico City to discuss the topic with authorities and Mexican lawmakers.

They agreed to relay information back to their respective sides and said they would reconvene.

Orbelina Orellana, a migrant from San Pedro Sula, Honduras, said she and her husband left three children behind and had decided to continue north one way or another.

"Our destiny is to get to the border," Orellana said.

She was suspicious of the government's proposal and said that some Hondurans who had applied for legal status had already been sent back. Her claims could not be verified, but migrants' representatives in the talks asked the Mexican government to provide a list of anyone who had been forced to return.

The standoff comes after one of the caravan's longest days of walking and hanging from passing trucks on a 60-mile (100 kilometer) journey to the city of Arriaga.

The bulk of the migrants were boisterous Friday evening in their refusal to accept anything less than safe passage to the U.S. border.

DOJIFR00912

"Thank you!" they yelled as they voted to reject the offer in a show of hands. They then added: "No, we're heading north!"

Sitting at the edge of the edge of the town square, 58-year-old Oscar Sosa of San Pedro Sula, Honduras concurred.

"Our goal is not to remain in Mexico," Sosa said. "Our goal is to make it to the (U.S). We want passage, that's all."

Still 1,000 miles (1,600 kilometers) from the nearest U.S. border crossing at McAllen, Texas, the journey could be twice as long if the group of some 4,000 migrants heads for the Tijuana-San Diego frontier, as another caravan did earlier this year. Only about 200 in that group made it to the border.

While such migrant caravans have taken place regularly over the years, passing largely unnoticed, they have received widespread attention this year after fierce opposition from U.S. President Donald Trump.

On Friday, the Pentagon approved a request for additional troops at the southern border, likely to total several hundred, to help the U.S. Border Patrol as Trump seeks to transform concerns about immigration and the caravan into electoral gains in the Nov. 6 midterms.

Defense Secretary Jim Mattis signed off on the request for help from the Department of Homeland Security and authorized the military staff to work out details such as the size, composition and estimated cost of the deployments, according to a U.S. official who spoke on condition of anonymity to discuss planning that has not yet been publicly announced.

Stoking fears about the caravan and illegal immigration to rally his Republican base, the president insinuated that gang members and "Middle Easterners" are mixed in with the group, though he later acknowledged there was no proof of that.

At a church in Arriaga that opened its grounds to women and children Friday, Ana Griselda Hernandez, 44, of Mapala, Honduras, said she and two friends traveling with children had decided to pay for a bus ride from Pijijiapan, because the 4-year-old and 5-year-old would have never covered the 60-mile distance.

"It's difficult because they walk very slowly," she said. She pointed out scabbed-over blisters on her feet, a testament to the fact they had walked or hitched rides since leaving their country.

The caravan is now trying to strike out for Tapanatepec, about 29 miles (46 kilometers) away.

Up until now, Mexico's government has allowed the migrants to make their way on foot, but has not provided them with food, shelter or bathrooms, reserving any aid for those who turn themselves in.

Police have also been ejecting paid migrant passengers off buses, enforcing an obscure road insurance regulation to make it tougher for them to travel that way.

On Friday, authorities were cracking down on smaller groups trying to catch up with the main caravan, detaining about 300 Hondurans and Guatemalans who crossed the Mexico border illegally, said an official with the national immigration authority.

Migrants, who enter Mexico illegally every day, usually ride in smugglers' trucks or buses, or walk at night to avoid detection. The fact that the group of about 300 stragglers was walking in broad daylight suggests they were adopting the tactics of the main caravan, which is large enough to be out in the open without fear of mass detention.

However, it now appears such smaller groups will be picked off by immigration authorities, keeping them from swelling the caravan's ranks.

On Friday evening, Irineo Mujica, whose organization People without Borders is supporting the caravan, accused Mexican immigration agents of harassment and urged migrants to travel closely together.

"They are terrorizing us," he said.

Associated Press writers Mark Stevenson and Peter Orsi in Mexico City contributed to this report.

# Remarks by President Trump on the Illegal Immigration Crisis and Border Security

Issued on: November 1, 2018

Roosevelt Room

4:19 P.M. EDT

THE PRESIDENT: Well, thank you very much, everyone. Appreciate it. And good afternoon. I would like to provide an update to the American people regarding the crisis on our southern border — and crisis it is.

Illegal immigration affects the lives of all Americans. Illegal immigration hurts American workers; burdens American taxpayers; and undermines public safety; and places enormous strain on local schools, hospitals, and communities in general, taking precious resources away from the poorest Americans who need them most. Illegal immigration costs our country billions and billions of dollars each year.

America is a welcoming country. And under my leadership, it's a welcoming country. We lead the world in humanitarian protection and assistance, by far. There's nobody even close. We have the largest and most expansive immigration programs anywhere on the planet.

We've issued 40 million green cards since 1970, which means the permanent residency and a path to citizenship for many, many people. But we will not allow our generosity to be abused by those who would break our laws, defy our rules, violate our borders, break into our country illegally. We won't allow it.

Mass, uncontrolled immigration is especially unfair to the many wonderful, law-abiding immigrants already living here who followed the rules and waited their turn. Some have been waiting for many years. Some have been waiting for a long time. They've done everything perfectly. And they're going to come in. At some point, they're going to come in. In many cases, very soon. We need them to come in, because we have companies coming into our country; they need workers. But they have to come in on a merit basis, and they will come in on a merit basis.

The communities are often left to bear the cost and the influx of people that come in illegally. We can't allow that.

There's a limit to how many people a nation can responsibly absorb into their societies. Every day, above and beyond our existing lawful admission programs, roughly 1,500 to 2,000 people try crossing our borders illegally. We do a very good job considering the laws are so bad. They're not archaic; they're incompetent. It's not that they're old; they're just bad. And we can't get any Democrat votes to change them. It's only the Republicans that are — in unison, they

want to change them. They want to make strong borders, want to get rid of any crime because of the borders, of which there's a lot.

And we've done a great job with the laws that we have. We're moving in tremendous numbers of people to get out the MS-13 gangs and others gangs that illegally come into our country. And we're getting them out by the thousands.

But this is a perilous situation, and it threatens to become even more hazardous as our economy gets better and better. A lot of the cause of this problem is the fact that we right now have the hottest economy anywhere in the world. It's doing better than any economy in the world. Jobs, unemployment — you look at any number.

Right now, we have more workers than any time in the history of our country. We have more people working, which is a tremendous statement. More people working than at any time in the history of our country. And people want to come in, and in some cases, they want to take advantage of that, and that's okay. And we want them to come in, but they have to come in through merit. They have to come in legally.

At this very moment, large, well-organized caravans of migrants are marching towards our southern border. Some people call it an "invasion." It's like an invasion. They have violently overrun the Mexican border. You saw that two days ago. These are tough people, in many cases. A lot of young men, strong men. And a lot of men that maybe we don't want in our country. But again, we'll find that out through the legal process.

But they've overrun the Mexican police, and they've overrun and hurt badly Mexican soldiers. So this isn't an innocent group of people. It's a large number of people that are tough. They've injured, they've attacked, and the Mexican police and military has actually suffered. And I appreciate what Mexico is trying to do.

So let me begin by stating that these illegal caravans will not be allowed into the United States, and they should turn back now, because they're wasting their time. They should apply to come into our country. We want them to come into our country very much. We need people to help us, with all of these companies that are coming in. We've never had anything like this. We have car companies coming in. We have Foxconn — so involved with the manufacturing of Apple products — coming in in Wisconsin. We have a lot of companies coming in, but they have to apply, and they have to be wonderful people that are going to love our country and work hard.

And we've already dispatched, for the border, the United States military. And they will do the job. They are setting up right now, and they're preparing. We hope nothing happens. But if it does, we are totally prepared. Greatest military anywhere in the world, and it's going to be, and is now, in great shape. No longer depleted like it was when I took over as the President of the United States.

The government of Mexico has generously offered asylum, jobs, education, and medical care for people within the caravan, but many members of the caravan have refused these offers, which demonstrate that these migrants are not legitimate asylum-seekers. They're not looking for

protection. Because if they were, they'd be able to get it from Mexico. Mexico has agreed to take them in and encouraged them to stay. But they don't want to stay; they want to come into the United States. So this is no longer safety, and asylum is about safety.

Asylum is not a program for those living in poverty. There are billions of people in the world living at the poverty level. The United States cannot possibly absorb them all. Asylum is a very special protection intended only for those fleeing government persecution based on race, religion, and other protected status.

These caravans and illegal migrants are drawn to our country by Democrat-backed laws and left-wing judicial rulings. We're getting rulings that are so ridiculous, so bad. They're writing the laws. Can't do that. Collectively known as — as an example, catch-and-release. It's a disgrace that we have to put up with it.

These policies lead to the release of illegal aliens into our communities after they've been apprehended. But we're not releasing anymore. Big change, as of a couple of days ago. We're going to no longer release. We're going to catch; we're not going to release. They're going to stay with us until the deportation hearing or the asylum hearing takes place. So we're not releasing them into the community.

We have millions of people that, over the years, have been released into the community. They never show up for the trials. They never come back. They're never seen again. And those people, they know who they are. And we know a lot of where they are, who they are. And those people will be deported, directly deported.

The biggest loophole drawing illegal aliens to our borders is the use of fraudulent or meritless asylum claims to gain entry into our great country. An alien simply crosses the border illegally, finds a Border Patrol agent, and using well-coached language — by lawyers and others that stand there trying to get fees or whatever they can get — they're given a phrase to read. They never heard of the phrase before. They don't believe in the phrase. But they're given a little legal statement to read, and they read it. And now, all of a sudden, they're supposed to qualify. But that's not the reason they're here.

This merely asserts the need for asylum, and then often released into the United States, and they await a lengthy court process. The court process will takes years sometimes for them to attend. Well, we're not releasing them into our country any longer. They'll wait for long periods of time. We're putting up massive cities of tents. The military is helping us incredibly well.

I want to thank the Army Corps of Engineers. They've been so efficient, so good, so talented. And we have thousands of tents. We have a lot of tents; we have a lot of everything. We're going to hold them right there. We're not letting them into our country. And then they never show up — almost. It's like a level of 3 percent. They never show up for the trial. So by the time their trial comes, they're gone. Nobody knows where they are. But we know where a lot of them are, and they're going to be deported.

There are now nearly 700,000 aliens inside the United States awaiting adjudication of their claims. Most of these people we have no idea how they got there, why they got there. And the number is actually going to be a much larger number as we look at all of the data. So if you look at just at a minimal number, it's the size of Vermont, or bigger. And the overall number could be 10 million people; it could be 12 million people; it could be 20 million people. The record keeping from past administrations has not exactly been very good.

As human smugglers and traffickers have learned how the game is played and how to game the system, we have witnessed a staggering 1,700 [percent] increase in asylum claims since the year 2010. They understand the law better than the lawyers understand the law. You have a lot of professionalism there. You have a lot of professionalism involved with setting up the caravans. You take a look at the way that's happening. Even the countries — you look at Honduras and El Salvador, and you look at what's happening at the different levels and different countries, and what's happening on the streets. There's a lot of professionalism taking place, and there seems to be a lot of money passing. And then, all of a sudden, out of the blue, these big caravans are formed and they start marching up. They got a long way to go.

On average, once released, an asylum case takes three and half years to complete. Think of it. Somebody walks into our country, reads a statement given by a lawyer, and we have a three-and-a-half-year court case for one person, whereas other people tell them, "Out. Get out. Just get out." Other countries — "Get out. We have a border. Get out."

We go through years and years of litigation because of the Democrats and the incompetent, very, very stupid laws that we have. They're the laughingstock all over the world, including the people that are marching up. They understand. But the difference is, we're not allowing them in, and we're not releasing, and we're not doing any of the things that were done for so many years that really are terrible for our country.

The overwhelming majority of claims are rejected by the courts, but by that time, the alien has usually long since disappeared into our country. So they never get to see the judge. They never get to have a ruling. They don't care because they're in the country and nobody knows where they are.

All told, there are approximately 1 million aliens who have received final orders of removal. They've actually got final orders of removal. You don't have to go to court anymore. The courts have already issued the orders of removal, and we've gotten a lot of them. But who remain at large in our country. So we've moving them out.

This endemic abuse of the asylum system makes a mockery of our immigration system, displacing legitimate asylum-seekers — and there are legitimate asylum-seekers — while rewarding those who abuse or defraud our system, which is almost everybody. Everybody is abusing it and just doing things to our system which were unthinkable, I'm sure even by the Democrats who were largely responsible for getting it done.

These individuals disrespect the foundations of American government by voluntarily choosing to break the law as their first act on American soil.

Furthermore, contained within this giant flow of illegal migration to our southwest border is the movement of illicit and deadly narcotics. It's in the southwest, most of it comes in. Nearly 100 percent of heroin in the United States enters through the southern border– think of that: 100 percent, almost, of heroin comes in through the southern border, along with roughly 90 percent of cocaine, and the majority of meth, and a substantial portion of the ultra-lethal fentanyl killing our youth. Fentanyl is killing our youth.

These drugs destroy the lives and kill much more than 70,000 Americans every single year. And the number goes up. It goes up and up and up, because we are so foolish with our laws that we allow this to happen. A death toll equivalent of the size of an entire American city every year. The current influx, if not halted, threatens to overwhelm our immigration system and our communities, and poses unacceptable dangers to the entire nation. We have to have our borders. Can't let drugs come in. Not just — it's not just people. It's people; it's drugs. It's human traffickers.

Human trafficking is now at the highest level in the world that it's ever been. And that's because of the Internet. Think of it — human trafficking. You think back 200 years, 500 years. Human trafficking — where they steal children; in many cases, women, unfortunately. They steal women. The human traffickers, the lowest scum on Earth. The lowest scum on Earth. And it's at a level that it's never been. Worldwide — never been at a level like this.

If these caravans are allowed into our country, only bigger and more emboldened caravans will follow. And you see that's what's happening now. We have one that's coming up, and it's being somewhat dissipated, as they march. But then other people are joining it. And then it gets bigger. And now, if you look back at Honduras, and if you look at El Salvador, other ones are solving and they're forming. They're forming. You have new ones that are forming. And we call it "caravan number two" is unbelievably rough people. Very, very hard for the military to stop it. Our military will have no problem. But very, very hard. Mexico is having a very, very hard time with it.

Once they arrive, the Democrat Party's vision is to offer them free healthcare, free welfare, free education, and the right to vote. You and the hardworking taxpayers of our country will be asked to pick up the entire tab. And that's what's happening — medical and, in many cases, they've got some big medical problems before they get here.

No nation can allow itself to be overwhelmed by uncontrolled masses of people rushing their border. That's what's happening. They are rushing our border. They are coming up. And even before you get to the caravan, just on a daily basis, people coming in. And it's a very bad thing for our country. It's sad in many ways, but it's a very bad thing for our country. And again, costs us billions and billions and billions of dollars a year.

And I will therefore take every lawful action at my disposal to address this crisis. And that's what we're doing. The United States military, great people.

My administration is finalizing a plan to end the rampant abuse of our asylum system — it's abused — to halt the dangerous influx, and to establish control over America's sovereign

borders. We got borders. And once that control is set and standardized, and made very strong — including the building of the wall, which we've already started. $1.6 billion spent last year; $1.6 billion this year. We have another $1.6 [billion] that will be coming, but we want to build it at one time. All it does is turn people in a different direction if you don't. We want to build it at one time.

Under this plan, the illegal aliens will no longer get a free pass into our country by lodging meritless claims in seeking asylum. Instead, migrants seeking asylum will have to present themselves lawfully at a port of entry. So they're going to have to lawfully present themselves at a port of entry. Those who choose to break our laws and enter illegally will no longer be able to use meritless claims to gain automatic admission into our country. We will hold them — for a long time, if necessary.

The only long-term solution to the crisis, and the only way to ensure the endurance of our nation as a sovereign country, is for Congress to overcome open borders obstruction. That's exactly what it is: It's open border obstruction. No votes. You can come up with the greatest border plan, the greatest immigration plan. You won't get one vote from a Democrat. They have terrible policy. In many cases, they're terrible politicians. But the one thing I give them great credit for: They vote as a bloc. They stick together.

And we will end catch-and-release. We're not releasing any longer. We also must finish the job that we started by being strong at the border. When we're strong at the border, people will turn away and they won't bother. You will see, in a year from now, or in certainly a period of time from now, despite our very good economy, which some of them come for that — I can't blame them for that; you have to do it legally — but you will see that the numbers of people trying to get in will be greatly reduced.

But that can only happen if we're strong at the border. And the southern border is a big problem, and it's a tremendous problem for drugs pouring in and destroying our youth, and, really, destroying the fabric of our country. There's never been a drug problem like we have today. And as I said, much of it comes from the southern border.

So in the meantime, I will fulfill my sacred obligation to protect our country and defend the United States of America. And this is a defense of our country. We have no choice. We have no choice. We will defend our borders, we will defend our country.

Thank you very much.

Q Mr. President, what happens to the children then? If you're ending catch-and-release, what happens to those children? Do they stay in these tent cities? Or what happens?

THE PRESIDENT: We're working on a system where they stay together. But I will say that, by doing that, tremendous numbers — you know, under the Obama plan, you could separate children. They never did anything about that. Nobody talks about that. But under President Obama, they separated children from the parents. We actually put it so that that didn't happen.

But what happens when you do that is you get tremendous numbers of people coming. It's almost like an incentive to — when they hear they're not going to be separated, they come many, many times over. But President Obama separated the children, the parents. And nobody complained. When we continued the exact same law, this country went crazy.

So we are going to continue and try to continue what we're doing. But it is a tremendous incentive for people to try. But it's going to be very, very hard for people to come into our country. So we think we'll be able to do that.

Q With the military, do you envision them firing upon any of these people?

THE PRESIDENT: I hope not.

Q Could you see the military (inaudible)?

THE PRESIDENT: I hope not. It's the military — I hope — I hope there won't be that. But I will tell you this: Anybody throwing stones, rocks — like they did to Mexico and the Mexican military, Mexican police, where they badly hurt police and soldiers of Mexico — we will consider that a firearm. Because there's not much difference, where you get hit in the face with a rock — which, as you know, it was very violent a few days ago — very, very violent — that break-in. It was a break-in of a country. They broke into Mexico.

And you look at what's happening in Guatemala, just to mention Guatemala, along with El Salvador and Honduras. It's disgraceful that those countries aren't able to stop this. Because they should be able to stop it before it starts.

And the United States pays them a fortune, and we're looking at not doing that anymore. Because why should we be doing that when they do nothing for us?

Jeff. Jeff, go ahead.

Q Mr. President, how is this plan going to be legal, considering the current law?

THE PRESIDENT: Oh, this is totally legal. No. This is legal. We are stopping people at the border. This is an invasion, and nobody is even questioning that.

Q But in terms of your plans to change asylum, are you going to do this via executive order?

THE PRESIDENT: No, no, you don't have to — you don't have to release. You have — you can hold. The problem is, to hold people, you need massive facilities. It's the most ridiculous thing I've ever heard. Another country says, "Sorry, you can't come in." With us, we take their name, take their phone number, take their everything, and say, "Good luck." Only because we don't have the facilities to hold people. But we're building the facilities now. We're building massive numbers of tents, and we will hold them in tents. But you don't have to release them. They released them only because they didn't have the facilities to hold them.

Q Mr. President, is there like an executive order that you're going to be releasing today?

THE PRESIDENT: Oh, we will be doing an executive order sometime next week, yes.

Q (Inaudible) executive order dealing with ending catch-and-release and asylum?

THE PRESIDENT: It's going to end — it's going to be talking about everything. It'll be quite comprehensive. Many of the things we've talked about today.

Q Mr. President, so you're — so just to clarify, you are speaking of, in the tents, these family units that would arrive (inaudible) the children?

THE PRESIDENT: Well, we have other facilities also. But what's happened is we are holding so many facilities — so many people that our facilities are being overrun. They're being overrun. And we are putting up temporary facilities. Eventually, people won't be coming here anymore when they realize they can't get through.

Q So they will hold the children in those tents with their parents?

THE PRESIDENT: We will be holding the family and the children together. Remember this: President Obama separated children from families. And all I did was take the same law, and then I softened the law. But by softening the law, many people come up that would not have come up if there was separation.

Q Mr. President, what do you say to the critics who think this is a political thing before the midterms?

THE PRESIDENT: There's nothing political about a caravan of thousands of people, and now others forming, pouring up into our country. We have no idea who they are. All we know is they're pretty tough people when they can blast through the Mexican military and Mexican police. They're pretty tough people. Even Mexico said, "Wow, these are tough people." I don't want them in our country. And women don't want them in our country. Women want security. Men don't want them in our country. But the women do not want them. Women want security. You look at what the women are looking for. They want to have security. They don't want to have these people in our country. And they're not going to be in our country. It's a very big thing.

Yes.

Q Mr. President, when you talk about finalizing a plan to end asylum, is this a plan that would be included in that executive order?

THE PRESIDENT: Oh, no, people are going to have a chance to go for asylum. But if you look at the records, not very many people are allowed to stay once they go to court. But what happens is they'd go into — they were using asylum — first of all, they were told what to say by lawyers

and others. "Read this statement." You read the statement, and now you're seeking asylum. The whole thing is ridiculous. And we won't put up with it any longer.

Q President Trump, U.S. law and international law says that people who have valid claims have a right to seek asylum.

THE PRESIDENT: That's right.

Q So why would — why would they be —

THE PRESIDENT: Well, they're going to go to court. They're going to go to court, as crazy as it sounds. They're going to go —

Q But the law say that they don't — they're not —

THE PRESIDENT: Excuse me. Excuse me. Ready? They're going to go to court, and a judge is going to determine. But usually, when they go to court, they're deported. It just seems that most of the people are deported once they go. The problem is they never end up going to court, because when they come in, they're told to come back in a year, for a court case, and they disappear into the United States never to be seen again.

But we're going to be —

Q But the current laws doesn't say about holding people in tent cities.

THE PRESIDENT: And they're given deportation notices. We will be deporting those people.

Q Mr. President, you're saying rocks are — rock-throwing, like happened in Mexico, will be considered —

THE PRESIDENT: We will consider that the maximum that we can consider that, because they're throwing rocks viciously and violently. You saw that three days ago. Really hurting the military. We're not going to put up with that. If they want to throw rocks at our military, our military fights back. We're going to consider — and I told them, consider it a rifle. When they throw rocks like they did at the Mexico military and police, I say, consider it a rifle.

Jeff?

Q A separate topic, sir. Did you offer Heather Nauert the job of U.N. Ambassador?

THE PRESIDENT: Well, she's under very serious consideration. She's excellent. She's been with us a long time. She's been a supporter for a long time. And she's really excellent. So she's under very serious — we'll probably make a decision next week. We have a lot of people that want the job, and there are a lot of really great people. But we'll be talking about that next week sometime.

Q Did you see Oprah Winfrey's comments today?

THE PRESIDENT: I didn't. What did she say?

Q She was campaigning in Georgia at the same time that Vice President Pence was.

THE PRESIDENT: At the same time as who?

Q Excuse me, at the same time Vice President Pence was, encouraging people to vote and —

THE PRESIDENT: Well, that's okay. I mean, I was on Oprah's last week — the last week of her show. Oprah liked me very much. I've always liked Oprah. You know, Oprah is good. But the woman that she's supporting is not qualified to be the governor of Georgia, by any stretch of the imagination.

And I'll be in Georgia the next few days — the next few days — and we have a tremendous — around Macon — we have a tremendous crowd already. Nobody has a crowd like we have because people want to see a great governor of Georgia. And I think Brian is going to be a great governor of Georgia. I think he'll be a fantastic governor. He's totally qualified.

She is not qualified to be the governor of Georgia. She's not qualified. And Georgia is a great state —

Q Why is she not qualified?

THE PRESIDENT: — it's a great, great state. Take a — take a look. Take a look at her past. Take a look at her history. Take a look at what she wants to do and what she has in mind for the state. That state will be in big, big trouble very quickly. And the people of Georgia don't want that.

Question?

Q Mr. President, really quickly, just on election integrity? Can you say for a fact that our elections are secure next week? What can you tell us?

THE PRESIDENT: Yeah, yeah. I just met with — I just met with the FBI, with Chris; and the Justice Department; and with Secretary Nielsen. And they've spent a lot of time and effort and some money on making sure that everything with respect to the election coming up in five days is going to be perfect and safe. There will be hopefully no meddling, no tampering, no nothing. And we spent a lot —

Now President Obama had the chance to do that in September before '16, but he chose not to do that because he thought Hillary Clinton was going to win. And while everybody agrees it didn't affect the vote at all, nevertheless he could have done things that probably would have made it a little more obvious, a little clearer. But he was told by the FBI in September before the election

DOJIFR00924

in '16 about potential meddling or potential Russian meddling, and he did nothing about it. He didn't do that because he thought that Hillary Clinton would win.

All right, one more.

Q Are you optimistic that you can still get the continuing resolution through December 7th for Homeland Security funded, even if the Democrats take the House?

THE PRESIDENT: I think if — I think we're going to do very well in the election, I must tell you. If you look at the races, if you look at the Senate, which is very important, obviously. I'm leaving today; I'll be in Missouri. And I'll be touching down at a number of places over the next five days. But I think we're doing very well in the Senate, and I think we're doing very well in the House.

The only problem is, with the House, there's so many people. I'd like to stop for every one of them, but there's so many people. But I think we're doing very well in the House. I think people want to see strong borders. I think they want to see security. They want to see good healthcare. They want to see the things that we're providing. They don't want to have their taxes increased. We're decreasing their taxes.

We just announced yesterday, you probably heard — Kevin Brady put it out — a reduction of tax. We're going for a reduction of middle-income tax or 10 percent. The Democrats want to, I mean, double up your taxes. In some cases, you'll have to pay three times what you're paying right now in order to get bad healthcare.

And so what we're doing is something that I think the people want, and I think we're going to do very well in the election, even though history says that whoever President it — whoever the President may be, it trends the other way. It certainly does seem that way.

But nobody has ever been President that has the greatest economy in the history of our country. This is the greatest economy in the history of our country. These are the greatest unemployment and employment numbers in the history of our country. Nobody has ever had that to campaign with. So I do.

Thank you all very much. I appreciate it. Thank you.

END

4:51 P.M. EDT

10620

# Proposed Rules

Federal Register

Vol. 69, No. 45

Monday, March 8, 2004

This section of the FEDERAL REGISTER contains notices to the public of the proposed issuance of rules and regulations. The purpose of these notices is to give interested persons an opportunity to participate in the rule making prior to the adoption of the final rules.

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 208 and 212**

**[CIS No. 2255–03]**

**RIN 1615–AA91**

**Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry**

**AGENCY:** Department of Homeland Security.

**ACTION:** Proposed rule.

**SUMMARY:** On March 1, 2003, the Immigration and Naturalization Service transferred from the Department of Justice to the Department of Homeland Security (DHS), pursuant to the Homeland Security Act of 2002 (Public Law 107–296). The responsibility for administering the asylum program was transferred to U.S. Citizenship and Immigration Services ("USCIS") within DHS. The terms of a recently signed agreement between the United States and Canada bar certain categories of aliens arriving from Canada at land border ports-of-entry and in transit from Canada from applying for protection in the United States. This proposed rule would establish USCIS asylum officers' authority to make threshold determinations concerning applicability of the Agreement in the expedited removal context.

**DATES:** Written comments must be submitted on or before May 7, 2004.

**ADDRESSES:** Please submit written comments to the Director, Regulations and Forms Services Division, Department of Homeland Security, 425 I Street, NW, Room 4034, Washington, DC 20536. To ensure proper handling please reference CIS No. 2255–03 on your correspondence. You may also submit comments electronically to USCIS at *rfs.regs@dhs.gov*. When submitting comments electronically, you must include CIS No. 2255–03 in

the subject box. Comments are available for public inspection at the above address by calling (202) 514–3048 to arrange for an appointment.

**FOR FURTHER INFORMATION CONTACT:** Joanna Ruppel, Deputy Director, Asylum Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Ave., NW., Third Floor, Washington, DC 20536, telephone number (202) 305–2663.

**SUPPLEMENTARY INFORMATION:**

## What Legal Authority Permits USCIS To Use a Safe Third Country Agreement as a Bar To Applying for Asylum?

Section 208(a)(1) of the Immigration and Nationality Act ("Act") permits any alien who is physically present in or who arrives in the United States to apply for asylum. However, section 208(a)(2)(A) of the Act specifically states that paragraph (1) shall not apply where, "pursuant to a bilateral or multilateral agreement, the alien may be removed to a country where the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General [now deemed to be the Secretary of Homeland Security under the Homeland Security Act] finds that it is in the public interest for the alien to receive asylum in the United States."

On December 5th, 2002, the governments of the United States and Canada signed the Agreement Between the Government of the United States and the Government of Canada For Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries ("Safe Third Country Agreement" or "Agreement"). The Agreement will take effect when the United States has promulgated implementing regulations and Canada has completed its own domestic procedures necessary to bring the Agreement into force. This Agreement will be implemented by USCIS asylum officer determinations.

The Agreement allocates responsibility between the United States and Canada whereby one country or the other (but not both) will assume responsibility for processing the claims

of certain asylum seekers who are traveling from Canada into the United States or from the United States into Canada. The Agreement provides for a threshold determination to be made concerning which country will consider the merits of an alien's protection claim, enhancing the two nations' ability to manage, in an orderly fashion, asylum claims brought by persons crossing our common border. This Safe Third Country Agreement between the United States and Canada currently constitutes the only agreement, for purposes of section 208(a)(2)(A) of the Act, that would bar an individual in or arriving at the United States from applying for asylum.

During the bilateral negotiations that have resulted in the Safe Third Country Agreement, the delegations of both countries acknowledged certain differences in their respective asylum systems. However, harmonization of asylum laws and procedures is not a prerequisite to entering into responsibility-sharing arrangements. The salient factor is whether the countries sharing responsibility for refugee protection have laws and mechanisms in place that adhere to their international obligations to protect refugees. The Executive Committee for the Office of the United Nations High Commissioner for Refugees (UNHCR) has concluded, "Overall it is UNHCR's position that, while in principle each State Party to the 1951 Convention and 1967 Protocol has a responsibility to examine refugee claims made to it, "burden-sharing" arrangements allowing for readmission and determination of status elsewhere are reasonable, provided they always ensure protection of refugees and solutions to their problems." Background Note on the Safe Country Concept and Refugee Status (EC/SCP/68), July 26, 1991. While the asylum systems in Canada and the U.S. are not identical, both country's asylum systems meet and exceed international standards and obligations under the 1951 Convention relating to the Status of Refugees (1951 Refugee Convention) and the 1967 Protocol relating to the Status of Refugees (1967 Protocol), and the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (Convention Against Torture).

DOJIFR00985

## What Are the Terms of the Safe Third Country Agreement Between the United States and Canada?

The Agreement permits the United States to remove to Canada certain asylum seekers attempting to enter the United States from Canada at a land border port-of-entry and aliens who are being removed from the United States in transit through the United States. Similarly, it permits Canada to return to the United States certain asylum seekers attempting to enter Canada from the United States at a land border port-of-entry and certain aliens being removed from the United States through Canada. In either case, the Agreement provides (with certain exceptions) that the alien be returned to the "country of last presence" for consideration of his or her protection claims, including asylum, withholding of removal, and protection under the Convention Against Torture, under the laws of that country.

For aliens arriving at a land border port-of-entry, the Agreement provides for a number of exceptions. These exceptions are based upon the principles underlying the U.S. position while negotiating the Agreement: (1) To the extent practicable, the Agreement should not act to separate families; (2) the Agreement must guarantee that persons subject to it would have their protection claims adjudicated in one of the two countries; and (3) it would be applied only in circumstances where it is indispensable that the alien arrived directly from the other country. These principles have been achieved by including a robust family unity exception that allows asylum seekers to join certain family members residing in the United States or Canada while they pursue their protection claims; by clearly stipulating that the alien must have his or her claim adjudicated in either Canada or the United States; and by limiting the application of the Agreement to situations where it is clear that the alien arrived directly from the other country; e.g., at land border ports-of-entry or in-transit while being removed from Canada.

The Agreement's family unity exceptions are particularly generous. The range of family members who may qualify as "anchor" relatives due to their presence in the United States is far broader than those recognized under other provisions of immigration law. The list of eligible family members includes spouses, sons, daughters, parents, legal guardians, siblings, grandparents, grandchildren, aunts, uncles, nieces, and nephews. For purposes of the Agreement, a "legal guardian" will be construed as someone who is currently vested with legal custody of the asylum seeker or with the authority to act on behalf of the asylum seeker, provided that the asylum seeker is both unmarried and less than 18 years of age. USCIS will provide field guidance to asylum officers to standardize the approach used in construing other family member relationships relevant to the Agreement but not defined in the Act. Finally, these family members may qualify as anchor relatives even if they themselves do not possess permanent immigration status in the U.S. Aliens in valid immigrant or nonimmigrant status may qualify as anchor relatives, with the exception of aliens who maintain only nonimmigrant visitor status under section 101(a)(15)(B) of the Act or based on admission under the Visa Waiver Program, who are precluded from serving as anchor relatives by the language of the Agreement.

More specifically, an alien who arrives at a land border port-of-entry is exempt from return under the Agreement if the alien:

(1) Is a citizen of Canada or, not having a country of nationality, is a habitual resident of Canada;

(2) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who has been granted asylum, refugee, or other lawful status in the United States, except visitor status;

(3) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who is at least 18 years of age and has an asylum application pending in the United States;

(4) Is unmarried, under 18 years of age, and does not have a parent or legal guardian in either Canada or the United States;

(5) Is applying for admission at a United States land border port-of-entry with a validly issued visa or other valid admission document, other than for transit, issued by the United States, or, being required to hold a visa to enter Canada, was not required to obtain a visa to enter the United States; or

(6) Has been permitted, as an unreviewable exercise of discretion by DHS, to pursue a protection claim in the United States because it was determined that it is in the public interest to do so.

The specific terms of the Safe Third Country Agreement are available on the USCIS Web site at *http://www.uscis.gov*.

## How Does This Rule Propose To Implement the Safe Third Country Agreement?

The rule proposes to revise § 208.4 and add a new § 208.30(e)(6) to permit asylum officers to conduct a "threshold screening interview" in order to determine whether an alien is ineligible to apply for asylum under section 208(a)(2)(A) of the Act by operation of the Safe Third Country Agreement. New § 208.30(e)(6)(iii) would codify the exceptions to the Agreement. Under this rule, in any case where an asylum officer determines that the alien qualifies for an exception to the Agreement with Canada, the asylum officer will proceed immediately to a determination as to whether or not the alien has a credible fear of persecution or torture, as provided under existing law.

In § 208.30(e)(6)(i), this proposed rule also makes clear that, when an asylum officer determines that an alien is ineligible to pursue his or her protection claims in the United States based on the applicability of the Safe Third Country Agreement, the alien will be removed to Canada, the country of the alien's last presence, in order to pursue his or her claims there.

The rule also proposes to incorporate the existing definitions of "credible fear of persecution" and "credible fear of torture" in the new §§ 208.30(e)(2) and (e)(3). The definition of credible fear of persecution, derived from section 235(b)(1)(B)(v) of the Act and existing policy that incorporates consideration of eligibility for withholding of removal, is "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, the alien can establish eligibility for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act." The proposed rule incorporates the existing definition of credible fear of torture provided in the supplementary information to the interim rule implementing the United States' obligations under the Convention Against Torture published in the **Federal Register** at 64 FR 8484 on February 19, 1999. Under current procedures, as provided in the supplementary information to the interim rule, an alien is found to have a credible fear of torture if the alien shows that there is a significant possibility that he or she is eligible for withholding of removal or deferral of removal under the Convention Against Torture. The rule does not propose to

**10622** **Federal Register**/Vol. 69, No. 45/Monday, March 8, 2004/Proposed Rules

alter current procedures related to these existing definitions.

Finally, this rule proposes to remove the provisions of 8 CFR 208.30(g)(2) relating to the conduct of credible fear review by immigration judges. In view of the transfer of the responsibilities of the former INS to DHS on March 1, 2003, the Attorney General published a rule creating a new chapter V in 8 CFR, beginning with part 1001 and containing the regulations pertaining to the functions of the Executive Office for Immigration Review (EOIR), which remains under the authority of Attorney General. The Attorney General's rule was published in the **Federal Register** at 68 FR 9824 on February 28, 2003. Accordingly, this rule revises § 208.30(g)(2) to remove the previous provisions and to substitute a new cross-reference to the current EOIR regulations which are now codified at 8 CFR 1208.30(g)(2).

## Why Is USCIS Proposing To Amend the Regulations Governing Credible Fear Determinations?

The Safe Third Country Agreement between the United States and Canada bars certain aliens from pursuing protection claims in the United States if they are either arriving from Canada at land border ports-of-entry or are being removed from Canada in transit through the United States. Instead, those aliens will be returned to Canada to have their protection claims adjudicated by Canada. In general, the Agreement will be applied to such aliens who are subject to expedited removal provisions under section 235(b) of the Act, which provides a specific removal mechanism for aliens who are inadmissible under sections 212(a)(6)(C) (fraud or willful misrepresentation) or 212(a)(7) (failure to have proper documents) of the Act. However, in light of the Safe Third Country Agreement's purpose in allowing asylum seekers access to only one of the signatory countries' protection systems, this rule proposes a modified approach to the expedited removal process in the form of a threshold asylum officer screening as to which country (Canada or the United States) will consider an alien's protection claims. Only after this threshold issue has been resolved in favor of allowing the alien to pursue an asylum claim in the United States will an asylum officer make a determination as to whether or not the alien has a credible fear of persecution or torture.

Under section 235(b), aliens subject to expedited removal who seek asylum in the United States or otherwise express a fear of persecution or torture are referred to an asylum officer. During a

"credible fear interview," the asylum officer inquires as to the nature and basis of the alien's claims relating to past persecution and fear of future persecution or torture. The asylum officer then determines whether or not there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claims and other facts known to the officer, that the alien could establish eligibility for protection under U.S. law. In the event that the asylum officer determines that the alien has not established a credible fear of persecution or torture, the alien may request review of that determination by an immigration judge.

For aliens who are subject to the Agreement, however, the threshold question is whether the alien should be returned to Canada for Canadian authorities to consider the merits of the alien's claims, or whether the alien will instead be allowed to pursue his or her protection claims in the United States. Accordingly, this rule provides for a threshold screening interview by an asylum officer to determine whether an alien subject to the Agreement will be permitted to remain in the U.S. to pursue his or her protection claims, based on the alien's qualification for one of the Agreement's exceptions. It is only after this threshold screening interview (i.e., only after the asylum officer has decided that the alien is not going to be removed to Canada for an adjudication of the alien's claims) that the asylum officer would proceed to promptly consider the alien's claims for protection under United States law through the credible fear determination process. The asylum officer's notes regarding the threshold issues raised by the Agreement would then be included in the asylum officer's written record of the credible fear determination. In those instances where an asylum officer determines, after review by a supervisory asylum officer, that the alien has not provided reason to believe, by a preponderance of the evidence, that he or she qualifies for any of the Agreement's exceptions, then the asylum officer will advise the alien that he or she is being returned to Canada based on the terms of the Agreement so that the alien will be able to pursue his or her claims for asylum or protection under Canadian law.

Given the narrowness of the factual issues relevant to the threshold screening determination that the Agreement and/or its exceptions are applicable to an alien, which can readily be considered and adjudicated by asylum officers, this rule does not provide for referral to immigration

judges for further review of these threshold screening determinations. The narrow factual issues concerning the Agreement's applicability and exceptions (such as the presence of family members in the U.S. or the possession of validly issued visas) do not relate to whether an alien has a fear of persecution or torture, and can adequately be resolved by asylum officers. Thus, under this proposed rule, when an asylum officer makes and a supervisor reviews this threshold determination, there would be no further administrative review of that decision. Elsewhere in the **Federal Register**, the Department of Justice is publishing a proposed rule to specify the authority of the immigration judges with respect to issues arising under the Agreement.

This method for implementing the Safe Third Country Agreement, which bars certain aliens from applying for asylum in the United States, is within the authority of the Secretary of DHS, under section 208(a)(2)(A) of the Act and under section 208(d)(5)(B) of the Act, which provides authority to impose regulatory conditions or limitations on the consideration of an application for asylum not inconsistent with the Act. Section 208(a)(2)(A) of the Act makes an alien ineligible to apply for asylum in the United States if, pursuant to a bilateral agreement, the Secretary concludes that the alien "would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection" in a safe third country. An alien who is covered by section 208(a)(2)(A) is thus not eligible to apply for asylum regardless of the statutory means by which he is ordered removed from the United States. By this rule, the Secretary is proposing, in a manner consistent with the Act, to delegate to asylum officers the authority to make the threshold determination whether an alien is ineligible to apply for asylum by operation of the Agreement with Canada.

USCIS thus proposes to amend the regulations governing the credible fear determination in order to implement the threshold screening process described above for aliens subject to the Safe Third Country Agreement, prior to a credible fear determination. However, this rule preserves unchanged the existing credible fear process itself, including the availability of a credible fear review by an immigration judge, in every case where the asylum officer determines that an alien subject to the Agreement does satisfy any of the threshold jurisdictional exceptions, including a discretionary decision by

DHS to allow the alien to pursue an asylum claim as a matter in the public interest. If the asylum officer determines the alien is not barred by the Agreement from pursuing his or her protection claims in the U.S., the asylum officer will then proceed immediately to a credible fear determination on the merits of the alien's claims, and, if necessary, an immigration judge will conduct a review of this determination on the merits, as provided under existing law and regulations.

## How Does This Rule or the Safe Third Country Agreement Affect Unaccompanied Minors?

In order to understand how this rule affects unaccompanied minors, it is important to understand that the definition of an "unaccompanied minor" customarily used in determining appropriate immigration processes is different than the definition used in the Agreement for determining whether an exception to the Agreement applies. While "unaccompanied minor" has not been formally defined in the Act or in regulations, for immigration processing purposes, an individual who is under age 18 and is not accompanied by an adult relative or guardian is considered an "unaccompanied minor." This definition differs from the Agreement's language. Article 1(f) of the Agreement defines "unaccompanied minor" as "an unmarried refugee status claimant who has not yet reached his or her eighteenth birthday and does not have a parent or legal guardian in either Canada or the United States." This rule does not propose replacing the customary definition of "unaccompanied minor" with the Agreement's definition for purposes of determining immigration issues unrelated to the Agreement. However, in applying the Agreement, this difference in definitions will result in finding that some individuals under age 18 who are not accompanied by an adult relative or legal guardian when they arrive at a land border port-of-entry will not qualify for the unaccompanied minor exception in the Agreement, because they have a parent or legal guardian in the United States or Canada.

Since August of 1997, the Immigration and Naturalization Service's policy, now DHS's policy, has been to place unaccompanied minors into expedited removal proceedings only under limited circumstances. Under existing policy, an unaccompanied minor would be placed into expedited removal proceedings only if he or she (1) in the presence of a DHS immigration officer, engaged in a crime that would qualify as an aggravated felony if committed by an

adult; (2) has been convicted or adjudicated delinquent of an aggravated felony in the United States or any other country, and a U.S. Customs and Border Protection (CBP) officer has confirmation of that order; or (3) has been formally removed, excluded, or deported previously from the United States. Existing guidelines permit granting a waiver, deferring the inspection, permitting a withdrawal of the application for admission, or using other discretionary means to process unaccompanied minors who seek admission to the United States, where appropriate. This rule does not propose to change that existing policy. The Safe Third Country Agreement will be applied in the expedited removal proceedings of unaccompanied minors only when such other processing of an unaccompanied minor seeking admission at a land border port-of-entry is not appropriate. When an unaccompanied minor arrives from Canada at a land border port-of-entry and seeks protection, he or she still will be processed according to existing guidelines, which often results in placing the minor into removal proceedings under section 240 of the Act. Where the minor is placed into removal proceedings under section 240 of the Act, the Agreement, including its definition of "unaccompanied minor," will be applied by the immigration judge, as provided in the Department of Justice proposed rule published in the **Federal Register**.

## What Type of Evidence Will Satisfy USCIS When Determining Whether an Individual Meets One of the Exceptions in the Agreement?

As specified in the proposed rule at § 208.30(e)(6)(ii) and pursuant to a Statement of Principles concerning the implementation of the Agreement, the alien bears the burden of proof to establish by a preponderance of the evidence that an exception applies, such that the alien falls outside the scope of the Agreement. Asylum officers will use all available evidence, including the individual's testimony, affidavits and other documentation, as well as available records and databases, to determine whether an exception to the Agreement applies in each individual's case. Credible testimony alone may be sufficient to establish that an exception applies, if there is a satisfactory explanation of why corroborative documentation is not reasonably available. DHS recognizes that computer systems and DHS records will not be sufficient to verify family relationships in all circumstances and that asylum seekers fleeing persecution often will

not have documents establishing family relationships with them at the time they seek to enter the United States. Asylum officers receive extensive training in evaluating credibility of testimony when there is little or no documentation in support of that testimony. Asylum officers will document their findings that the Agreement or its exceptions are applicable to an alien, and in the case of any alien who qualifies for one of the Agreement's exceptions, will immediately proceed to make a credible fear determination, as described in sections 235(b)(1)(B)(ii) and (iii) of the Act.

## How Does the Safe Third Country Agreement Address the Possibility That Individuals Will Be Removed Without Having Their Protection Claims Heard?

An individual referred by either Canada or the United States to the other country under the terms of Article 4 cannot be removed to a third country until an adjudication of the individual's protection claims has been made. The Agreement also provides, in Article 3, that an individual returned to the country of last presence shall not be removed to another country pursuant to any other Safe Third Country Agreement or regulation.

## How Does the Safe Third Country Agreement Affect People Who Are Being Removed From Canada or the United States and Then Seek Protection While Transiting Through the Other Country?

Pursuant to Article 5(a) of the Agreement, if an alien is being removed from Canada through the United States and expresses a fear of persecution or torture, the alien will be returned to Canada for Canada to adjudicate his or her protection claims, in accordance with Canada's protection system. Generally, individuals being removed by Canada through the United States are pre-inspected in Canada and escorted by Canadian immigration officials to their onward destination. Individuals who make a protection claim during pre-inspection will not be allowed to transit through the United States. Individuals being removed by Canada in transit through the United States are considered arriving aliens in parole status, as described in section 212(d)(5) of the Act. If such an individual asserts a fear of persecution or torture to a U.S. immigration officer, while in transit through the United States, the individual's parole status will be terminated pursuant to § 212.5(e)(2)(i), and he or she generally will be placed in expedited removal proceedings, though there may be some rare instances

in which the individual will be placed in removal proceedings under section 240 of the Act. Transit aliens placed in expedited removal proceedings under this provision will be subject to the same asylum officer threshold screening process as aliens arriving at U.S.-Canada land border ports-of-entry. For those rare instances in which such a transit alien is placed in removal proceedings pursuant to section 240 of the Act, the Agreement will be applied by the immigration judge as provided in the Department of Justice proposed rule, published in the **Federal Register**.

The effect of the Agreement on an asylum seeker being removed from the United States through Canada depends on whether the United States already has considered any asylum, withholding, or Torture Convention claim(s). If the United States has considered but denied the alien's protection claims, the person will be permitted onward movement, in accordance with Article 5(c) of the Agreement. If the United States has not already adjudicated the alien's protection claims, the person will be returned to the United States for such an adjudication.

**How Does the Agreement Affect Individuals Who Seek Withholding of Removal or Protection Under the Convention Against Torture?**

Article 33 of the 1951 Refugee Convention, as supplemented by the 1967 Refugee Protocol, requires that signatory states not return persons to any country where their lives or freedom would be threatened on account of their race, religion, nationality, political opinion, or membership in a particular social group. The U.S. is a signatory to the 1967 Protocol, and Canada is a signatory to both the 1951 Refugee Convention and the 1967 Protocol. The U.S. implements its obligations under the 1967 Protocol in section 241(b)(3) of the Act, which, as implemented, prohibits DHS from removing aliens to any country where it is more likely than not that their lives or freedom would be threatened on account of the grounds enumerated above. Nevertheless, DHS is not prevented from removing aliens to countries where their lives or freedom would not be threatened.

Article 3 of the Convention Against Torture prohibits the return of persons to any country where there are substantial grounds for believing that they would be subject to torture. Like the United States, Canada is a signatory to the Convention Against Torture. The United States implements this obligation by granting withholding of removal or deferral of removal to a country where it is more likely than not that the applicant would be subject to torture.

Article 3 of the Agreement provides that "the Parties shall not return or remove a refugee status claimant referred by either Party under the terms of [the Agreement] to another country until an adjudication of the person's refugee status claim has been made." In Article 1, the Agreement defines a refugee status claim to include a request for protection under the 1951 Refugee Convention, 1967 Protocol, or Convention Against Torture. Returning any alien to Canada pursuant to the terms of the Agreement for a consideration of the alien's protection claims, in the absence of any grounds for believing that the alien would be persecuted or tortured in Canada, is consistent with the United States' international protection obligations.

**Does CBP Plan To Place Aliens Returned to the United States From Canada Under the Safe Third Country Agreement Into Expedited Removal Proceedings?**

No. For an alien to be subject to the expedited removal provisions, the alien must first meet the definition of arriving alien. The Board of Immigration Appeals has held that an alien who goes abroad but is returned to the United States after having been formally denied admission by the foreign country is not an applicant for admission, since, in contemplation of law, the alien did not leave the United States. Matter of T, 6 I&N Dec. 638 (1955). Those who entered the United States legally or illegally and are later denied admission by Canada are not arriving aliens and therefore not subject to expedited removal. Depending on their status, they may or may not be subject to removal proceedings before an immigration judge, pursuant to section 240 of the Act, or removal pursuant to sections 241(a)(5) (reinstatement of a prior order) or 238(b) (administrative removal based on aggravated felony conviction) of the Act. For example, this return to the United States would not qualify as an "arrival" for purposes of determining whether an applicant has filed for asylum within one year of the date of his or her last arrival in the United States, as required under section 208(a)(2)(B) of the Act.

**How Does This Proposed Rule Affect Individuals Who Enter the United States Through Canada and Who Then Apply for Asylum?**

The proposed rule does not affect any individuals who apply for asylum after entering the United States from Canada. The proposed rule is limited only to those individuals who are placed in expedited removal or removal proceedings upon arrival at U.S.-Canada land border ports-of-entry and to those who are aliens in transit through the United States subsequent to removal from Canada. Individuals who previously entered the United States, having come from Canada, and later apply for asylum affirmatively with USCIS or defensively in removal proceedings before an immigration judge are not arriving aliens and so will not be barred from applying for asylum by operation of the Agreement.

**Regulatory Flexibility Act**

DHS has reviewed this regulation in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)) and by approving it, DHS preliminarily certifies that this rule will not have a significant economic impact on a substantial number of small entities. This rule affects individual aliens, as it relates to claims of asylum. It does not affect small entities, as that term is defined in 5 U.S.C. 601(6).

**Unfunded Mandates Reform Act of 1995**

This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one-year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

**Small Business Regulatory Enforcement Fairness Act of 1996**

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

**Executive Order 12866**

The Department of Homeland Security has determined that this rule is a "significant regulatory action" under Executive Order 12866, section 3(f), Regulatory Planning and Review, and, accordingly, this rule has been submitted to the Office of Management and Budget for review. In particular, the

Department has assessed both the costs and benefits of this rule as required by Executive Order 12866, section 1(b)(6) and has made a reasoned determination that the benefits of this regulation justify its costs.

The proposed rule would implement a bilateral agreement that allocates responsibility between the United States and Canada for processing claims of certain asylum seekers. The rule applies to individuals who are subject to expedited removal and, under existing regulations, would receive a credible fear interview by an asylum officer. This rule simply adds a preliminary screening by asylum officers to determine whether the alien is even eligible to seek protection in the United States, in which case the asylum officer will then proceed to make the credible fear determination under existing rules. Based on statistical evidence, it is anticipated that approximately 200 aliens may seek to enter the United States from Canada at a land border port-of-entry and be placed into expedited removal proceedings. A significant number of these aliens will be found exempt from the Agreement and eligible to seek protection in the United States after the threshold screening interview proposed in this rule. It is difficult to predict how many aliens will be returned to the U.S.-Canadian border under the Agreement, but the costs incurred in detaining and transporting them are not likely to be substantial. Therefore, the "tangible" costs of this rulemaking to the U.S. Government are minimal. Applicants who are found to be subject to the Safe Third Country Agreement will be returned to Canada to seek protection, saving the U.S. Government the cost of adjudicating their asylum claims and, in some cases, the cost of detention throughout the asylum process.

The cost to asylum seekers who, under the proposed rule, will be returned to Canada are the costs of pursuing an asylum claim in Canada, as opposed to the United States. There is no fee to apply for asylum in Canada and, under Canadian law, asylum seekers are provided social benefits that they are not eligible for in the United States, including access to medical coverage, adult public education, and public benefits. Therefore, the tangible costs of seeking asylum in Canada are no greater than they are in the United States. However, because there may be other tangible costs to asylum seekers attempting to enter the United States from Canada at a land border port-of-entry (*e.g.*, transportation costs to the U.S. border), public comment is invited for further consideration of what such

additional costs may include. The "intangible" costs to asylum seekers who would be returned to Canada under the proposed rule are the costs of potential separation from support networks they may be seeking to join in the United States. However, the Agreement contains broad exceptions based on principles of family unity that would generally allow those with family connections in the United States to seek asylum in the United States under existing regulations governing the credible process.

The proposed rule benefits the United States because it enhances the ability of the U.S. and Canada to manage, in an orderly fashion, asylum claims brought by persons crossing our common border. By implementing the Agreement, the proposed rule furthers U.S. and Canadian goals, as outlined in the 30-Point Action Plan under the Smart Border Declaration signed by Secretary Ridge and former Canadian Deputy Foreign Minister John Manley, to ensure a secure flow of people between the two countries while preserving asylum seekers' access to a full and fair asylum process in a manner consistent with U.S. law and international obligations. Further, the Agreement and proposed rule save the U.S. the time and expense of adjudicating protection claims brought by asylum seekers who have already had a full and fair opportunity to present their claims in Canada.

## Executive Order 13132

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

## Executive Order 12988 Civil Justice Reform

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

## Paperwork Reduction Act

The regulations at 8 CFR 208.30 require that an asylum officer conduct a threshold screening interview to determine whether an alien is ineligible to apply for asylum pursuant to section 208(a)(2)(A) of the Act. The threshold screening interview is considered an information collection requirement subject to review by OMB under the

Paperwork Reduction Act of 1995. Written comments are encouraged and will be accepted until May 7, 2004. When submitting comments on the information collection, your comments should address one or more of the following four points.

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of the information on those who are to respond, including through the use of any and all appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.*, permitting electronic submission of responses.

*Overview of This Information Collection*

(1) *Type of information collection:* New.

(2) *Title of Form/Collection:* Credible fear threshold screening interview.

(3) *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* No form number, U.S. Citizenship and Immigration Services.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Individuals. The information collection is necessary in order for the CIS to make a determination whether an alien is eligible to apply for asylum pursuant to section 208(a)(2)(A) of the Act.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* 200 respondents at 30 minutes per response.

(6) *An estimate of the total of public burden (in hours) associated with the collection:* Approximately 100 burden hours.

All comments and suggestions or questions regarding additional information should be directed to the Department of Homeland Security, U.S. Citizenship and Immigration Services, Regulations and Forms Services Division, 425 I Street, NW., Room 4034, Washington, DC 20536; Attention: Richard A. Sloan, Director, 202–514–3291.

DOJIFR00990

## Family Assessment Statement

DHS has reviewed this regulation and determined that it may affect family well-being as that term is defined in section 654 of the Treasury General Appropriations Act, 1999, Public Law 105–277, Div. A. Accordingly, DHS has assessed this action in accordance with the criteria specified by section 654(c)(1). In this proposed rule, an alien arriving at a land border port-of-entry with Canada may qualify for an exception to the Safe Third Country Agreement, which otherwise requires individuals to seek protection in the country of last presence (Canada), by establishing a relationship to a family member in the United States who has lawful status in the United States, other than a visitor, or is 18 years of age or older and has an asylum application pending. This proposed rule incorporates the Agreement's definition of "family member," which may be a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew. The "family member" definition was intended to be broad in scope, to promote family unity. This proposed rule thereby strengthens the stability of the family by providing a mechanism to reunite separated family members in the United States.

In some cases the proposed rule will have a negative effect resulting in the separation of family members. The Agreement's exceptions, as expressed in the proposed rule, require the family member to have either lawful status in the United States, other than visitor, or else to be 18 years of age or older and have a pending asylum application. Family members who do not meet one of these conditions, therefore, would be separated under the proposed rule. However, this proposed rule's definition of "family member" and the exceptions to the Agreement are more generous than other family-based immigration laws, which require the anchor family member to have more permanent status in the United States (such as citizen, lawful permanent resident, asylee or refugee) and which have a more restricted list of the type of family relationships that can be used to sponsor someone for immigration to the United States (although, unlike those laws, this Agreement provides only an opportunity to apply for protection and does not directly confer an affirmative immigration benefit). Under this rule, family members will be able to reunite even if the anchor relative's status is less than permanent in the United States.

## List of Subjects

### 8 CFR Part 208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

### 8 CFR Part 212

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

## Proposed Amendments to the Regulations

Accordingly, chapter I of title 8 of the Code of Federal Regulations is proposed to be amended as follows:

## PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1158, 1226, 1252, 1282; 8 CFR part 2.

2. Section 208.4 is amended by adding a new paragraph (a)(6) to read as follows:

### § 208.4   Filing the application.

\*     \*     \*     \*     \*

(a) \* \* \*

(6) *Safe Third Country Agreement.* Asylum officers have authority to apply section 208(a)(2)(A) of the Act, relating to the determination that the alien may be removed to a safe country pursuant to a bilateral or multilateral agreement, only as provided in § 208.30(e). For provisions relating to the authority of immigration judges with respect to section 208(a)(2)(A), see 8 CFR 1240.11(g).

\*     \*     \*     \*     \*

3. Section 208.30 is amended by:
a. Redesignating paragraph (e)(4) as (e)(7);

b. Redesignating paragraphs (e)(2) and (e)(3) as (e)(4) and (e)(5) respectively;
c. Revising newly designated paragraphs (e)(4) and (e)(5);
d. Adding new paragraphs (e)(2), (e)(3), and (e)(6);
e. Revising paragraph (g)(2)(i), and by
f. Removing paragraphs (g)(2)(iii) and (g)(2)(iv).

The additions and revisions read as follows:

### § 208.30   Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.

\*     \*     \*     \*     \*

(e) \* \* \*

(2) An alien will be found to have a credible fear of persecution if there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, the alien can establish eligibility for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act.

(3) An alien will be found to have a credible fear of torture if the alien shows that there is a significant possibility that he or she is eligible for withholding of removal or deferral of removal under the Convention Against Torture, pursuant to §§ 208.16 or 208.17.

(4) In determining whether the alien has a credible fear of persecution, as defined in section 235(b)(1)(B)(v) of the Act, or a credible fear of torture, the asylum officer shall consider whether the alien's case presents novel or unique issues that merit consideration in a full hearing before an immigration judge.

(5) Except as provided in paragraph (e)(6) of this section, if an alien is able to establish a credible fear of persecution or torture but appears to be subject to one or more of the mandatory bars to applying for, or being granted, asylum contained in section 208(a)(2) and 208(b)(2) of the Act, or to withholding of removal contained in section 241(b)(3)(B) of the Act, the Department of Homeland Security shall nonetheless place the alien in proceedings under section 240 of the Act for full consideration of the alien's claim, if the alien is not a stowaway. If the alien is a stowaway, the Department shall place the alien in proceedings for consideration of the alien's claim pursuant to § 208.2(c)(3).

(6) Prior to any determination concerning whether an alien arriving in the United States at a U.S.-Canada land border port-of-entry or in transit through the U.S. during removal by Canada has a credible fear of persecution or torture, the asylum officer shall conduct a threshold screening interview to determine whether such an alien is ineligible to apply for asylum pursuant to section 208(a)(2)(A) of the Act and subject to removal to Canada under the Agreement Between the Government of the United States and the Government of Canada For Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries ("Agreement"). In conducting this threshold screening interview, the asylum officer shall advise the alien of the Agreement's exceptions and question the alien as to applicability of any of these exceptions to the alien's case.

(i) If the asylum officer determines that an alien does not qualify for an

DOJIFR00991

exception under the Agreement during this threshold screening interview, the alien is ineligible to apply for asylum in the United States. After review of this finding by a supervisory asylum officer, the alien shall be advised that he or she will be removed to Canada in order to pursue his or her claims relating to a fear of persecution or torture under Canadian law. Aliens found ineligible to apply for asylum under this paragraph shall be removed to Canada.

(ii) If the alien establishes by a preponderance of the evidence that he or she qualifies for an exception under the terms of the Agreement, the asylum officer shall make a written notation of the basis of the exception, and then proceed immediately to a determination concerning whether an alien has a credible fear of persecution or torture.

(iii) An alien qualifies for an exception to the Agreement if the alien is not being removed from Canada in transit through the United States and:

(A) Is a citizen of Canada or, not having a country of nationality, is a habitual resident of Canada;

(B) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who has been granted asylum, refugee, or other lawful status in the United States, provided, however, that this exception shall not apply to an alien whose relative maintains only nonimmigrant visitor status, as defined in section 101(a)(15)(B) of the Act, or whose relative maintains only visitor status based on admission to the U.S. pursuant to the Visa Waiver Program;

(C) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who is at least 18 years of age and has an asylum application pending before U.S. of Citizenship and Immigration Services, the Executive Office for Immigration Review, or on appeal in federal court in the United States;

(D) Is unmarried, under 18 years of age, and does not have a parent or legal guardian in either Canada or the United States;

(E) Arrived in the United States with a validly issued visa or other valid admission document, other than for transit, issued by the United States, or, being required to hold a visa to enter Canada, was not required to obtain a visa to enter the United States; or

(F) The Department of Homeland Security determines, in the exercise of unreviewable discretion, that it is in the public interest to allow the alien to pursue a claim for asylum, withholding of removal, or protection under the Convention Against Torture, in the United States.

(iv) As used in § 208.30(e)(6)(iii)(B), (C) and (D) only, "legal guardian" means a person currently vested with legal custody of such an alien or vested with legal authority to act on the alien's behalf, provided that such an alien is both unmarried and less than 18 years of age, and provided further that any dispute with respect to whether an individual is a legal guardian will be resolved on the basis of U.S. law.

*    *    *    *    *

(g) * * *

(2) * * *

(i) Immigration judges will review negative credible fear findings as provided in 8 CFR 1208.30(g)(2).

*    *    *    *    *

## PART 212—DOCUMENTARY REQUIREMENTS; NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

4. The authority citation for part 212 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1187, 1225, 1226, 1227, 1228; 8 CFR part 2.

5. Section 212.5 is amended by adding new paragraph (e)(2)(iii) to read as follows:

### § 212.5   Parole of aliens into the United States.

*    *    *    *    *

(e) * * *

(2) * * *

(iii) Any alien granted parole into the United States so that he or she may transit through the United States in the course of removal from Canada shall have his or her parole status terminated upon notice, as specified in § 212.5(e)(2)(i), if he or she makes known to an immigration officer of the United States a fear of persecution or an intention to apply for asylum. Upon termination of parole, any such alien shall be regarded as an applicant for admission, and processed accordingly by the Department of Homeland Security.

*    *    *    *    *

Dated: January 26, 2004.

**Tom Ridge,**

*Secretary of Homeland Security.*

[FR Doc. 04–5077 Filed 3–5–04; 8:45 am]

**BILLING CODE 4410–10–P**

## DEPARTMENT OF JUSTICE

**8 CFR Parts 1003, 1208, 1212, and 1240**

**[EOIR No. 142P; AG Order No. 2709–2004]**

**RIN 1125–AA46**

## Asylum Claims Made by Aliens Arriving from Canada at Land Border Ports-of-Entry

**AGENCY:** Executive Office for Immigration Review, Justice.

**ACTION:** Proposed rule.

**SUMMARY:** The recent Safe Third Country agreement between the United States and Canada provides new procedures for dealing with certain categories of aliens crossing at land border ports-of-entry between the United States and Canada, or in transit from Canada or the United States, and who express a fear of persecution or torture if returned to the country of their nationality or habitual residence. The Agreement recognizes that the United States and Canada are safe third countries, each of which offers full procedures for nationals of other countries to seek asylum or other protection. Accordingly, subject to several specific exceptions, the Agreement provides for the United States to return such arriving aliens to Canada, the country of last presence, to seek protection under Canadian law, rather than applying for asylum in the United States. Subject to the stated exceptions, such aliens attempting to travel from Canada to the United States, or vice versa, will be allowed to seek asylum or other protection in one country or the other, but not in both.

Elsewhere in this issue of the **Federal Register**, the Department of Homeland Security (DHS) is publishing a proposed rule that would, among other things, give asylum officers the authority to apply the Agreement with respect to arriving aliens. This proposed rule provides that the immigration judges will not review the threshold factual determinations by asylum officers that an alien does not satisfy any of the exceptions under the Agreement. However, for any alien who the asylum officer determines is not barred by the Agreement, the existing credible fear process under section 235(b) of the Immigration and Nationality Act (Act) remains unchanged, including the right to seek review by an immigration judge. Finally, this rule provides authority for an immigration judge to apply the Agreement with respect to aliens whom DHS has chosen to place in removal proceedings under section 240 of the Act.

DOJIFR00992

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW ADJUDICATION STATISTICS

## New Cases and Total Completions



| Fiscal Year | Initial Receipts[1] | Average Initial Receipts per Month | Total Completions[2] | Average Total Completions per Month |
|---|---|---|---|---|
| 2008 | 225,871 | 18,823 | 230,595 | 19,216 |
| 2009 | 255,036 | 21,253 | 232,675 | 19,390 |
| 2010 | 247,186 | 20,599 | 223,349 | 18,612 |
| 2011 | 238,159 | 19,847 | 220,016 | 18,335 |
| 2012 | 212,936 | 17,745 | 186,758 | 15,563 |
| 2013 | 196,627 | 16,386 | 156,571 | 13,048 |
| 2014 | 230,150 | 19,179 | 142,118 | 11,843 |
| 2015 | 193,001 | 16,083 | 143,720 | 11,977 |
| 2016 | 228,457 | 19,038 | 143,509 | 11,959 |
| 2017 | 295,222 | 24,602 | 163,176 | 13,598 |
| 2018 | 315,290 | 26,274 | 195,696 | 16,308 |
| 2019 | 443,729 | 36,977 | 275,552 | 22,963 |

Data Generated: October 7, 2019
[1] Initial receipts equals removal, deportation, exclusions, asylum-only, and withholding only cases.
[2] Total completions equals initial case completions plus subsequent case completions.

DOJIFR01018

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/trump-says-guatemala-is-set-to-help-stem-migrant-flow-11560833062

LATIN AMERICA

# Trump Says Guatemala Is Set to Help Stem Migrant Flow

President also says U.S. will increase deportation efforts



People look through a section of the U.S.-Mexico border barrier on the beach in Tijuana, Mexico, on June 9. On Monday, President Trump said Guatemala was ready to sign a 'Safe-Third Agreement' to accept asylum seekers and prevent them from coming to the U.S. **PHOTO:** CESAR RODRIGUEZ/BLOOMBERG NEWS

*By Louise Radnofsky*

June 18, 2019 12:44 am ET

WASHINGTON—President Trump praised Mexico's efforts to intercept Central American asylum seekers and said that Guatemala was getting ready to sign an agreement that would make it a final refuge for people fleeing poverty and violence in the region.

In a pair of tweets Monday night, Mr. Trump said that Guatemala was preparing to sign a "Safe-Third Agreement," in an apparent reference to a legal designation that would require Central American migrants that cross into Guatemala to claim asylum there, blocking those migrants from lodging claims elsewhere.

Officials from Guatemala's Foreign Ministry didn't immediately respond to requests for comment, and the White House declined to immediately provide further details.

Mr. Trump also said Monday night that U.S. Immigration and Customs Enforcement would increase its efforts to remove people in the U.S. without authorization.

DOJIFR01019

"Next week ICE will begin the process of removing the millions of illegal aliens who have illicitly found their way into the United States. They will be removed as fast as they come in," wrote Mr. Trump.

An administration official said there were more than one million immigrants who were subject to final deportation orders but the orders hadn't yet been enforced. The administration official said late Monday that enforcing the orders would be a top priority for ICE.

Many of the families who have been traveling through Mexico to the U.S. border have been coming from Guatemala as well as Honduras and El Salvador. Many say they are fleeing a combination of endemic poverty, violence and corruption in the region.

The issue of "safe third country" status remains a major point of contention between the U.S. and Mexico, even as the two countries have reached a deal to attempt to stem a flow of Central American adults and children that U.S. authorities say have brought the southwest border to a breaking point by arriving each day in the thousands.

Mexico had long resisted U.S. requests that it accept the safe third country status, insisting that it lacked the resources to uphold such a commitment—but as part of its agreement with the U.S., Mexico pledged last week that it would take steps to declare itself a safe third country if its other efforts failed to reduce migrant numbers.

Mexico has said that its ability to uphold its asylum commitments would depend on whether Guatemala and other Central American countries would also agree to grant asylum to migrants.

Mr. Trump's tweets on Monday night suggested that the regional framework that Mexico has been pressing for could be advancing.

"Mexico, using their strong immigration laws, is doing a very good job of stopping people long before they get to our Southern Border," wrote Mr. Trump. "Guatemala is getting ready to sign a Safe-Third Agreement."

But migrant rights groups have raised significant concerns over Guatemala's ability to provide shelter and assistance to asylum seekers crossing into the country from Honduras and El

Salvador. Charities and civic groups currently provide most of the funding and resources for such assistance right now.

U.S. officials say the American immigration system is ill-equipped to receive Central American families seeking asylum, from the moment they turn themselves in to the court adjudication of their claims. which can take years amid heavy backlogs.

**Write to** Louise Radnofsky at louise.radnofsky@wsj.com

*Appeared in the June 18, 2019, print edition as 'Trump Says Guatemala Is Set to Stem Flow.'*

Copyright © 2019 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

DOJIFR01021

PRESIDENTIAL MEMORANDA

# Presidential Memorandum on Additional Measures to Enhance Border Security and Restore Integrity to Our Immigration System

Issued on: April 29, 2019

MEMORANDUM FOR THE ATTORNEY GENERAL
THE SECRETARY OF HOMELAND SECURITY

SUBJECT:     Additional Measures to Enhance Border Security
and Restore Integrity to Our Immigration System

By the authority vested in me as President by the Constitution and the laws of the United States of America, and to ensure the safety and territorial integrity of the United States as well as to ensure that the Nation's immigration laws are faithfully executed, it is hereby ordered as follows:

Section 1.  Purpose.  As noted in Proclamations 9822 and 9842 of November 9, 2018, and February 7, 2019, respectively, our immigration and asylum system is in crisis as a consequence of the mass migration of aliens across our southern border.  In Proclamation 9844 of February 15, 2019, I declared a national emergency to address the security and humanitarian crisis at that border.  That emergency continues to grow increasingly severe.  In March, more than 100,000 inadmissible aliens were encountered seeking entry into the United States.  Many aliens travel in large caravans or other large organized groups, and many travel with children.  The extensive resources required to process and care for these individuals pulls U.S. Customs and Border Protection personnel away from securing our Nation's borders.  Additionally, illicit organizations benefit financially by smuggling illegal aliens into the United States and encouraging abuse of our asylum procedures.  This strategic exploitation of our Nation's humanitarian programs undermines our Nation's security and sovereignty.  The purpose of this memorandum is to strengthen asylum procedures to safeguard our system against rampant abuse of our asylum process.

Sec. 2.  Policy.  It is the policy of the executive branch to manage our humanitarian immigration programs in a safe, orderly manner that provides access to relief or protection from removal from the United States for aliens who qualify, and that promptly denies benefits to and facilitates the removal of those who do not.

Sec. 3.  Further Steps to Enhance the Integrity and Efficiency of the Existing Asylum System.  Within 90 days of the date of this memorandum, the Attorney General and the Secretary of Homeland Security, as applicable, shall take all appropriate actions to:

(a)  propose regulations to ensure that aliens who receive positive fear determinations pursuant to section 235(b)(1) of the Immigration and Nationality Act (INA) (8 U.S.C. 1225(b)(1)) or section 2242 of the Foreign Affairs Reform and Restructuring Act of 1998 (8 U.S.C. 1231 note) are placed in proceedings conducted under 8 CFR 208.2(c)(1) and 1208.2(c)(1) or, if not eligible for asylum, are placed in proceedings conducted under 8 CFR 208.2(c)(2) and 1208.2(c)(2);

(b)  propose regulations to ensure that, absent exceptional circumstances, all asylum applications adjudicated in immigration court proceedings receive final administrative adjudication, not including administrative appeal, within 180 days of filing, in accordance with section 208(d)(5)(A)(iii) of the INA (8 U.S.C. 1158(d)(5)(A)(iii));

(c)  propose regulations setting a fee for an asylum application not to exceed the costs of adjudicating the application, as authorized by section 208(d)(3) of the INA (8 U.S.C. 1158(d)(3)) and other applicable statutes, and setting a fee for an initial application for employment authorization for the period an asylum claim is pending; and

(d)  propose regulations under section 208(d)(2) of the INA (8 U.S.C. 1158(d)(2)) and other applicable statutes to bar aliens who have entered or attempted to enter the United States unlawfully from receiving employment authorization before any applicable application for relief or protection from removal has been granted, and to ensure immediate revocation of employment authorization for aliens who are denied asylum or become subject to a final order of removal.

Sec. 4.  Allocation of Immigration Officers.  The Secretary of Homeland Security shall reprioritize the assignment of immigration officers and any other employees of the Department as the Secretary deems necessary and appropriate to improve the integrity of adjudications of credible and reasonable fear claims, to strengthen the enforcement of the immigration laws, and to ensure compliance with the law by those aliens who have final orders of removal.

Sec. 5.  General Provisions.  (a)  Nothing in this memorandum shall be construed to impair or otherwise affect:

(i)   the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This memorandum shall be implemented in a manner consistent with applicable law and subject to the availability of appropriations.

(c)  This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.


DONALD J. TRUMP



A Guatemalan woman and her three daughters at the border fence after crossing into El Paso, Texas, from Ciudad Juarez, Mexico.  |  David Peinado/NurPhoto via Getty Images

# The border is in crisis. Here's how it got this bad.

There really is something unprecedented — and deadly — happening at the US-Mexico border right now. But the threat is to migrants themselves.

By Dara Lind  |  dara@vox.com  |  Updated Jun 5, 2019, 1:47pm EDT

President Trump's constant temper tantrums about the US-Mexico border have become the background noise of his administration. Even as he reaches for more and more drastic threats to try to "stop" the flow of unauthorized migrants into the US — like the threat of a 5 percent tariff on all goods coming into the US from Mexico — it seems that the public (including fellow Republican politicians) have an ever harder time taking him seriously.

But as Trump has raged, something genuinely unprecedented has started happening at the border.

DOJIFR01054

Case 1:20-cv-00116-EGS    Document 85    Filed 03/27/20    Page 430 of 1770

The past several months have seen a huge spike in unauthorized migration, especially of families, into the US.

The government's capacity to handle an influx of large groups of children and families was already under serious strain at the end of 2018. By March, politicians of both parties were recognizing it as a humanitarian crisis. And the numbers of people coming just keep rising — with 132,887 migrants apprehended by Border Patrol after crossing the US-Mexico border (committing the misdemeanor of illegal entry) in May 2019.

This isn't a manufactured crisis, or a politically engineered one, as some Democrats and progressives have argued. If it were, it would be easier to solve.

What's happening at the border is the result of a regional crisis in which — if **current rates continue** — close to 1 percent of the entire population of Guatemala and Honduras will attempt to immigrate to the US this year. The Mexican government, meanwhile, is vacillating between humanitarian rhetoric and militarized crackdowns, US border officials are openly begging for help, and Trump himself is throwing the mother of all temper tantrums.

Trump's threats will likely cause massive collateral damage throughout North America and aren't even likely to stop people from arriving at the US-Mexico border, his stated goal. But that doesn't mean there isn't a problem here, or even a crisis. It just means it's not one that's going to be solved anytime soon.

## 1) Is there an unprecedented surge of unauthorized migration into the US?

Yes — or at least, probably. But of a specific kind.

Three things are simultaneously true:

- The total number of people coming into the US without papers is still lower than it was for most of the 20th century, and substantially lower than its turn-of-the-century peak.

- The total number of people coming into the US without papers is now higher than it's been since early 2007, before the Great Recession.

DOJIFR01055

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 431 of 1770

- The number of people coming into the US without papers who can't simply be detained and deported — children, families, and asylum seekers — is almost certainly unprecedented.

(https:/
url=http
3A%
2F%
2Fwww
2F2019
2F4%
2F11%
2F1829
2Fbord
immigra
illegal-
asylum
central-
america(https://(http://v
mexicou=httpsurl=http
trump% 3A%    3A%
3Futm_ 2F%    2F%
3Dsoci2Fww2Fwww
26utm_2F2019.2F2019
3Dtwitt2F4%    2F4%
3A%  2F11%2F11%
20Bord2F1829.2F1829
20Patro2Fbord2Fbord
20apprimmigrammigra
2C%  illegal- illegal-
20Octoasylumasylum
202011central-central-
presenamericamerica

DOJIFR01056

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 432 of 1770

By this point, it's not just that there are more children and families coming than have in recent years. There is substantial evidence that the raw number of children and families entering the US is higher than it's ever been.

We don't have apples-to-apples data. Right now, DHS separately counts "unaccompanied alien children" who come without their parents, and migrants who come in "family units" of one or more parents with one or more children. Before 2011, though, it combined juveniles who came with parents and juveniles who came without them — and simply counted parents traveling with their children as adults.

We do know, however, that very few of all migrants apprehended were juveniles in the early 2000s compared to today — so even during peak unauthorized migration, rarely more than 100,000 juveniles a year were crossing. And the majority of those were coming without their parents. So if the statistics had been kept in the same way in the early 2000s that they are now, they almost certainly wouldn't have shown more than 150,000 unaccompanied children and family units coming into the US even during peak years.

So far in fiscal year 2019, with four months to go, nearly 390,000 children and parents have been apprehended. Nearly 96,000 unaccompanied children and family members were apprehended in the month of May alone.

## 2) Why can't all border crossers simply be deported?

The US border enforcement system is built to apprehend people who are trying to sneak into the US, and return them to their home country as quickly as possible.

For most of US history, apprehended migrants were just informally returned to Mexico. In the mid-2000s, the US started formally deporting apprehended migrants instead — using "expedited removal," which allowed people who got caught entering the US to get deported without going before an immigration judge. Typically, a migrant would be apprehended by Border Patrol officials,

DOJIFR01057

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 433 of 1770

transferred to Immigration and Customs Enforcement (ICE) custody within 72 hours, and deported once a deportation order could be signed.

But there are extra legal protections built into US law and policy for asylum seekers — who can't simply be deported — and for vulnerable groups, including children and families, who can't simply be detained.

Asylum seekers — whether they have presented themselves at a port of entry to ask for asylum (breaking no US law) or crossed into the US between ports of entry (committing the misdemeanor of illegal entry) and evoked their right to asylum after being apprehended by a Border Patrol officer — can't be deported until they've been screened by an asylum officer to see if they have a "credible fear" of persecution. Unaccompanied children from non-Mexican countries have to be transferred to the care of the Department of Health and Human Services within 72 hours and are guaranteed immigration court hearings. Families, under a 2015 court ruling, can't be detained indefinitely; generally, the government has to release them after about 20 days.

In all three cases, the "detain, then deport" system doesn't work. The system is overloaded with people it wasn't designed to handle.

## 3) Why are people coming to the United States to begin with?

The simplest answer is probably the truest: because things are bad enough for them in their home countries of Guatemala, Honduras, and El Salvador that they've decided to risk the journey to the US, and whatever treatment awaits them here, for a chance in America.



DOJIFR01058



A group of Hondurans sleep as they wait to board a bus that will take them out of Honduras in April 2019. Unless stopped by Mexican authorities — which is plausible — many will likely head to the United States, as previous "caravans" of Honduran migrants have. | Orlando Sierra/AFP/Getty Images

US law slices migrants into categories. People seeking to migrate for economic reasons or to reunite with family might have a way to migrate to the US legally, but they're not allowed legal status if they arrive without papers. People fleeing persecution have the right once on US soil to apply for asylum, whether they have papers or not.

The Trump administration claims that very few of the people coming to the US now are genuine asylum seekers, pointing to the fairly low rate of success of asylum claims in immigration court (10 to 15 percent for Northern Triangle countries) as evidence that these aren't "real" asylees, or even to claim that most of them are outright frauds.

In practice, though, it's often hard to determine a single reason that a given migrant is leaving — much less a group of hundreds of them, or a monthly flow of tens of thousands. The same people facing dire poverty can also be persecuted by their governments for their political views; someone might decide to leave because their crops are failing, but decide *when* to leave based on a threat to their lives.

The most pressing problem in Honduras and El Salvador continues to be violence, specifically gang violence. (El Salvador has reduced its homicide rate substantially, and migration to the US has declined sharply since last summer.) Victimization by gangs isn't as solid a basis for an asylum claim as victimization

DOJIFR01059

by the government, and the Trump administration is trying to make it even harder to claim asylum due to gang violence.

Guatemala, which has seen the biggest increase in migration to the US in the current surge, is generally more beset by crushing poverty than gang violence. (Domestic violence is endemic in all three countries.) Poverty, no matter how dire, isn't grounds to seek asylum. But it's hard to disentangle the poverty of the Guatemalan highlands from concerns about the government's treatment of indigenous peoples, or the poor situation of the region's farmers from oppression of community and environmental activists challenging the government's land use policies.

Many of these migrants are choosing to come to the US rather than staying in Mexico because the US offers them a better opportunity to make money and support their families, in addition to being substantially safer, and US law allows asylum claims from migrants who pass through Mexico. (Asylum seekers who try to enter the US from Canada have to stay in Canada.) Many asylum seekers also have relatives in the US already. That doesn't mean they don't also have valid asylum claims.

Further complicating all of this, migrants themselves don't necessarily know what asylum is or why they might or might not qualify for it. Some migrants I've spoken to believed you could get asylum simply by having a relative in the US — or that if you had no family in the US, you couldn't get asylum. (Neither is the case.) People traveling in the "caravan" last fall often told reporters they were coming to the US to work.

To the US government (and immigration hawks), both of these are indicators that these aren't "real" asylum seekers. To advocates and immigration lawyers, they're evidence that people move between countries for complex reasons, and that some who might qualify for asylum might not even know it without help from a lawyer.

## 4) Why are more people coming now?

DOJIFR01060

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 436 of 1770

Trump's first few months in office set records for how few people were caught trying to enter the US from Mexico, something he continued to brag about even as apprehension levels began to rise again in summer and fall 2017. (The claim made by Trump critics that unauthorized migration is at "historic lows" is based on the fact that yearly apprehension rates are still low in comparison to the pre-recession era, but apprehensions have been rising pretty much every month since April 2017.) And building on a trend that had become noticeable since the border crisis of summer 2014, the people who were coming were unaccompanied children and, increasingly, families.

By September 2018, DHS officials were raising alarms about the number of children and families coming into the US, and warning that the system was overwhelmed. Apprehensions continued to climb through the fall. Then in February, they skyrocketed.



Large groups, like this group of 100, have become increasingly common at the US/Mexico border — contributing to the rapid spike in apprehensions of migrants in the past few months.  | David Peinado/NurPhoto via Getty Images

DOJIFR01061

The rapid increase from the beginning of 2019 to now still isn't fully understood. It appears to stem from a shift in smuggling tactics and capacity. (While human smuggling is illegal, it's used by asylum seekers who feel they have no other choice as well as people migrating for economic reasons.)

The rise of "express route" buses that can take hundreds of migrants at a time through Mexico in five or six days appears to be a factor. Many migrants who might have felt the chance of arriving in the US wasn't worth the risks of a grueling and dangerous journey on foot through Mexico may be changing their calculus now that the risk is lower. Similarly, anecdotal reports indicate that smugglers are offering discounts for migrants who bring their children.

The other factor is Mexico. The government of Andrés Manuel López Obrador (who took office in December) has tried to marry rhetoric about a new humanitarian approach to migration with a desire to stay on the Trump administration's good side. In December, Mexico made it much easier for Central American migrants seeking to travel to the US to get temporary "humanitarian visas" that allowed them 90 days of legal status in Mexico.

The Mexican government wasn't prepared for how many Central Americans would seek the visas, and shut down the program rapidly. But American officials suspect the humanitarian visas made it much easier for Central Americans already in Mexico to come to the US, and may have influenced more to come.

## 5) Is the US system stretched to the "breaking point"?

It is apparent that the needs of migrants in custody have overwhelmed DHS capacity.

The department is redirecting resources from other things to the border, much like it would in a natural disaster. Customs and Border Protection has detailed a few hundred port officers to help Border Patrol agents care for families and children — slowing down the processing of people and vehicles at ports of entry accordingly, and causing hours-long lines across some international bridges. The department has called for volunteers from other agencies to help.

DOJIFR01062

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 438 of 1770

But they're still swamped. On a call in June, one Customs and Border Protection official said, "when we have 4,000 people in custody, we consider that high. When we have 6,000, we consider it a crisis. Right now, we have 19,000 people in custody. It's just off the charts."

In May, DHS's **inspector general office found** that as many as 900 people were being held in a Border Patrol facility built for 125 people. One cell, with a listed maximum capacity of 12 people, held 76.

In March, CBP agents in El Paso kept some families in a temporary holding pen under a bridge, with some families claiming they were kept there for several days. The holding pen was shut down at the end of March, after pictures of it attracted widespread shock and outrage, but CBP agents encouraged reporters to get pictures of it — pointing to it as an example of what they were forced to do because they had no other choice.

It's difficult to determine whether that's true, because it's really about counterfactuals — what else the Trump administration could have done in the past to prepare for this, or what other things it could be doing now. (A world in which Trump spent as much time and money on processing centers for migrant families as he spent on a wall would look very different.)

CBP has warned for months that it isn't able to house and process the current population coming into the US, and that it has nowhere to put people between when they turn themselves in to Border Patrol agents and when they are released.

The deaths of several children in Border Patrol custody have highlighted the lack of appropriate care in Border Patrol facilities. Congress included funds in its February appropriations bill to help Border Patrol provide food and shelter for migrant families in El Paso, but there are far more families and children coming now than the February bill anticipated.

Releasing asylum seekers from custody isn't as easy as letting them out. Unlike immigrants who are arrested by ICE while living in the United States, many

DOJIFR01063

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 439 of 1770

newly arrived asylum seekers aren't familiar with the US, often speak neither English nor Spanish, and may not have appropriate clothing or funds for bus fare. They are usually released with instructions to check in with an ICE agent at a field office that could be states away. There are nonprofit organizations that can help acclimate families and get them to their destination, but that too requires advance notification and effort. When the government simply dumps people outside bus stations, they end up lost, cold, and confused.

## 6) Have the Trump administration's actions contributed to the crisis?

Trump and DHS officials say that "legitimate" asylum seekers ought to have no reason to enter illegally, and even attempted to ban people who crossed between ports of entry from seeking asylum. (The ban was quickly struck down in court). But since last summer, the administration has restricted asylum seekers trying to present themselves at ports of entry, allowing in only a fraction each day of the people who are waiting — a policy called "metering" or "queue management."



DOJIFR01064

This Honduran woman and her children wait in one of the shelters in Tijuana for migrants trying to cross into the United States. Hundreds of migrants are waiting to be allowed to present themselves legally to claim asylum at the port of entry at San Ysidro. Under the Trump administration's "metering" policy, the wait has sometimes taken months.  | Mario Tama/Getty Images

Metering varies from port to port (see **this article** to read about the policy in depth), but at the most popular ports of entry, it's forced migrants to wait weeks or months before they can step onto US soil and exercise their right to claim asylum. Faced with such a wait — sometimes in dangerous Mexican border towns — it's logical that a migrant might choose to cross illegally to present their asylum claim instead.

As the number of people caught coming into the US between ports of entry illegally has spiked, the number of "inadmissible" migrants, who come to a port of entry and are found not to have valid legal status, has stayed flat. Many Trump critics point to metering as the root of the discrepancy — and accuse Trump of manufacturing a crisis by forcing people to cross illegally, then panicking when they do.

It's clear that at least some migrants are crossing illegally only because they can't cross legally, but it's extremely likely that the number of illegal entries would be climbing even without the metering policy.

There have always been many fewer asylum seekers coming to ports of entry than crossing between them. That's especially true in the Rio Grande Valley, which has been the epicenter of child and family migration for the past decade.

Where migrants cross into the US isn't usually their choice to make; it's the choice of the smuggler facilitating their arrival. The emergence of new drop-off points for large groups of migrants like Antelope Wells, New Mexico, and Lukeville, Arizona, isn't the result of democratic decision-making by migrants — those locations are the endpoints of smuggling routes. And they're between, not at, ports of entry.

DOJIFR01065

### 7) Is Trump right that Mexico and the Northern Triangle countries aren't doing anything to stop migrants from reaching the US?

No.



Mexican soldiers help string wire across the border fence in Juarez — part of the Mexican government's broader cooperation with the Trump administration in deterring and interdicting migrants.  | David Peinado/NurPhoto via Getty Images

Trump appears to be mad that Northern Triangle countries aren't doing more to stop their citizens from leaving, which is not a thing that governments are supposed to do under general human rights principles, and also, more to the point, not a thing that governments can do without a massive investment of time, personnel, and infrastructure. Trump is asking governments that can't even guarantee the safety and well-being of their citizens to monitor those citizens' whereabouts perfectly.

DOJIFR01066

Guatemala, Honduras, and El Salvador have cooperated with the US on security measures; a new "compact" allowing joint policing operations between the four countries was signed by then-Homeland Security Secretary Kirstjen Nielsen and her Central American counterparts in April — shortly before Nielsen was fired.

The Mexican situation is more complicated. The Mexican government's brief expansion of humanitarian visas in December really did make it easier for Central Americans to enter and move through Mexico to the US, so it would make sense for the Trump administration to be mad at them over that.

But the Mexican government reversed its visa policy as soon as it became clear how many migrants were coming in. And since then, it's been extremely cooperative — even deferential — with the US.

Metering only works because of Mexican officials stopping asylum seekers before they can set foot on US soil. Under the "Migrant Protection Protocols," Mexican officials have allowed the US to force nearly 9,000 Central Americans to return to Mexico and wait for their asylum cases to be resolved.

In January, as a large caravan of migrants prepared to cross into a US port in Texas, a group of Mexican law enforcement officials surrounded them and detained them at an empty factory, letting out only a few a day to seek asylum; when unrest broke out at the factory, the asylum seekers were dispersed on buses to towns farther from the border.

On a couple of occasions, Mexican officials have even **deployed the military** to the isthmus connecting Mexico and Guatemala to "contain" migrants.

Trump administration officials not named Donald Trump generally acknowledge Mexico's cooperation, even if they say they'd like Mexico to do more. Trump himself, however, appears to be unshakable in the belief he's held since 2015: that the government of Mexico is at fault for anyone arriving in the US without papers.

DOJIFR01067

Case 1:20-cv-00116-EGS    Document 85    Filed 03/27/20    Page 443 of 1770

## 8) Will cutting off aid to the Northern Triangle countries help?

Almost certainly not.

It's not exactly clear what the parameters of the State Department's Saturday announcement that it was cutting off aid actually are — in particular, there seems to be confusion about whether it applies to contracts that have already been signed. But because the State Department (reportedly under pressure from the Office of Management and Budget, under Trump's acting Chief of Staff Mick Mulvaney) had been slow-walking aid from 2018, not to mention 2019, that's still hundreds of millions of dollars potentially lost.

Aid is traditionally seen as an important way to curb emigration, under the logic that people will be less likely to leave their countries if they're safer and more able to make a living there. (In practice, improving someone's financial situation can in the short term make them more likely to migrate, but security aid that reduces violence in a country has been shown to decrease emigration.)

Even Trump administration officials have endorsed this point of view — from former Homeland security secretary and Chief of Staff John Kelly, who bragged that the Trump administration was doing more than previous administrations to help the region, to CBP Commissioner Kevin McAleenan — now acting secretary of DHS — who responded to a previous Trump threat to cut off aid by **telling CBS** that the US needed to invest in Central America.



DOJIFR01068



A father waits with his daughter to board a bus that will take them out of Honduras to Guatemala — and from there to Mexico and (possibly) the United States. According to some estimates, the number of Hondurans and Guatemalans apprehended at the US/Mexico border this year will reach almost 1 percent of those countries' populations.  | Orlando Sierra/AFP/Getty Images

If the aid cutoff includes security aid, that would likely be immediately counterproductive, because it would make it much harder for the US to conduct anti-smuggling and anti-trafficking operations in the region — and much harder for the governments of the Northern Triangle countries to do that themselves.

The aid cutoff also threatens to damage the US-Mexico relationship. The López Obrador government has maintained a rhetorical commitment to a "Marshall Plan"-style investment in Central America — and the US's rhetorical agreement that such development was necessary helped justify Mexico's cooperation on immigration crackdowns. With the aid cutoff, the Trump administration is sending the message that it doesn't actually agree with Mexico's vision for the region — just as it ramps up pressure on Mexico to do more to target Central American migrants as a way to help Trump.

## 9) What are other solutions?

The answer to this question depends on what you see as the problem. Immigration hawks see it as too many people coming into the US without papers whose asylum claims won't ultimately prevail; immigration doves see the problem as the conditions in Central America that migrants are fleeing, and the conditions in which they're held while in the US.

There are plenty of ideas in the former category. The problem is that the ideas are not getting the support they would need to actually happen.

DOJIFR01069

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 445 of 1770

The US would like to get Mexico to sign a "safe third country" agreement that would allow the US to deny asylum to Central Americans, but Mexico has no interest in that. The Trump administration wants to get Congress to deport Central American children without hearings and override the court settlement that prevents long-term family detention, but House Democrats aren't biting. The White House wants to change the intentionally generous "credible fear" standard in asylum screening interviews so that fewer people are allowed to stay and apply for asylum (increasing the risk that legitimate asylum claimants will get returned to danger), but the legal concerns about that are so intense that it might have to purge generally like-minded officials from the Department of Homeland Security to carry out the plan.

In the latter category, it's easy to point to things that the administration should *stop* doing, like keeping families outdoors in cage-like holding pens. A humanitarian agenda could also include more case management outside of detention, to increase the odds that families show up to hearings, or even broader access to counsel in immigration proceedings (which isn't guaranteed under current law).

But it's not clear how much money the administration would need to invest in order to take proper care of the families coming in now, or how quickly that could be done — and it's not clear how many more families are going to come in the coming months.

The old consensus that the US needed to help address the "root causes" of migration, by investing in the Northern Triangle countries and making it more appealing for people to stay, was never supposed to be an immediate solution to anything. Of course, Trump's view of migration makes it less likely that anyone will be able to *start* work on long-term solutions that might bear fruit down the road. It is almost certainly, in the meantime, going to get worse before it gets better.

DOJIFR01070

EXPLAINERS

**The House just passed a $15 minimum wage. It would be the first increase in a decade.**

EXPLAINERS

**Trump's racist tirades against "the Squad," explained**

EXPLAINERS

**The controversy over whether the media should call Trump's racist tweets "racist," explained**

View all stories in Explainers

DOJIFR01071

## Credible Fear and Asylum Process:
## Fiscal Year (FY) 2008 – FY 2019 Quarter 2

### Out of 100 aliens who were to claim a credible fear...[1]

**CREDIBLE FEAR INTERVIEW**
United States Citizenship and Immigration Services (USCIS) would **refer 81 credible fear claimants to EOIR**
*(81% of claims referred to EOIR)[2]*

**OPTION FOR EOIR TO REVIEW A NEGATIVE FEAR FINDING**
**7 cases are closed[3]**

**3 credible fear claimants would not request review by an immigration judge (IJ)** — — — — — → *Alien Is Removed*

**9 credible fear claimants would request review** by an IJ

**CREDIBLE FEAR REVIEW (CFR)[4]**
IJs would **find credible fear for 2 credible fear claimants**
*(IJs find credible fear in 21% of CFRs)*

**REMOVAL PROCEEDINGS**
EOIR would **receive and complete 83 I-862 cases[5]** originating from credible fear claims

### ... only 14 out of 100 would be granted asylum.



**ASYLUM APPLICATION**
**44 credible fear claimants would file for asylum**
*(Of completed I-862 cases originating from a credible fear claim made to USCIS, 53 percent of aliens filed for asylum)*

**ASYLUM DECISION**
**IJs would grant asylum to only 14 credible fear claimants** and **would not grant asylum to 30 credible fear claimants**
*(Of completed I-862 cases originating from a credible fear claim made to USCIS, IJs grant asylum 17 percent of the time)*

*Never Referred to EOIR*

*Referred, but Never Filed Asylum (24 ordered removed in absentia)*

*Referred & Filed, but Not Granted (4 ordered removed in absentia)*

*Referred, Filed, & Granted Asylum*

EOIR Data Generated: April 23, 2019
[1] Percentages used in assessing this population may change as more cases are completed over time and because some cases may be reopened.
[2] Based on USCIS data (generated April 26, 2019). Includes claims referred to EOIR in which USCIS did not make a credible fear finding because it could not obtain an interpreter.
[3] Closed cases include those in which a claim is dissolved or withdrawn or an alien is found to be ineligible for the credible fear process.
[4] If USCIS finds that an alien has not established a credible fear, the alien may request review of that finding by an IJ. If the IJ finds that an alien has established a credible fear, then the alien (unless the alien is a stowaway) is placed in removal proceedings.
[5] Includes completed removal, exclusion, and deportation case types.

# USCIS Credible Fear (CF) Process at the FRCs



**USCIS Receives ICE Referral of Fear Claim**

→ (0-1 Days later) **Data Entry into USCIS System – USCIS Support Staff**

→ (3-5 Days Later) **USCIS Officer Orients Adult on CF Process – Serves G-56 CF Interview Notice**

→ (0-1 Days Later) **USCIS Asylum Officer (AO) conducts CF interview**

→ (0-1 Days Later) **USCIS AO Issues CF Decision**

→ (0-1 Days Later) **Supervisory AO Conducts Reviews**

→ (0-1 Days Later) **CF Decision Documents Prepared for Service**

→ **Service of CF Decision**

**Relevant Statutory/Regulatory Provisions and Policies**

**[Under USCIS Receives ICE Referral of Fear Claim]**

- **INA §235(b)(1)(B)(iv); 8 CFR § 235.3(b)(4)** CBP/ICE officer required to provide alien information about the CF process
- USCIS accepts jurisdiction on receipt of all properly completed Forms I-860, I-867 Parts A and B, and M-444.

**[Under Data Entry / Orients Adult]**

- **INA § 235(b)(1)(B)(iv); 8 CFR § 208.30(d)(4).** Allows aliens to consult with person(s) of their choosing prior to the interview, but shall be at no expense to government and not unreasonably delay the process.
- **8 CFR § 235.3(b)(4)(ii).** Requires alien be given time to contact and consult with consultant.
- **8 CFR § 208.30(d)(2).** Requires AO orient the alien to verify that alien received M-444 and determine that alien has an understanding of the CF process using the M-444. **[M-444 written disclosure of process is provided for by reg.]**
- **M-444.** Informs aliens that they can request female officer/interpreter, or male officer/interpreter.
- **M-444 and 1997 policy** (outlined in Supplementary Information section of ER/CF Interim Rule, 62 FR 44 – 10312, 10320 (March 6, 1997)). Alien given 48 hours from arrival at detention facility to rest and conduct such consultation prior to interview, unless 48 hours is waived.
- **Local FRC policy** (since March 2015). In order to limit the previously large number of reschedule requests at the FRCs, CF interviews are scheduled for 72 hours after orientation instead of 48 hours.
- **M-444 and noted in Supplementary Information section of ER/CF Interim Rule, 62 FR 44, 10320.** Aliens should have access to a phone while in detention to contact consultants.

**[Under USCIS Asylum Officer (AO) conducts CF interview]**

- **8 CFR § 208.30(d).** CF interview must be conducted separate and apart from general public.
- **8 CFR § 208.30(d)(5).** Requires AO to arrange for the assistance of an interpreter for the CF interview, if necessary.
- **8 CFR § 208.30(d)(1).** If AO conducting CF interview determines that alien is unable to participate effectively in interview because of illness/fatigue/other impediments, officer may reschedule interview.
- **M-444.** Allows alien to request for additional time to contact a consultant.
- **8 CFR § 208.30(d)(4).** Allows the alien to have a consultant present at the interview.

**[Under Supervisory AO Conducts Reviews]**

- **8 CFR § 208.30(e)(7).** AO's CF determination is not final until it is reviewed by a supervisory asylum officer (SAO).
- **8 CFR § 208.30(f).** Issue a Form I-862 (NTA) to each family member who is found positive for CF.
- **8 § CFR 208.30(g)(1).** Issue a Form I-869 Record of Negative Credible Fear Finding and Request for Review by Immigration Judge for each family member who is found negative for CF. Must ask each individual if they wish to have Immigration judge review of the negative determination; no response or refusal to respond will be viewed as a request for review.
- **8 § CFR 208.30(g)(2)(iii).** For negative CF determinations, Asylum Offices are required to provide EOIR copies of the Form I-863, Notice of Referral to Immigration Judge, the AO interview notes, summary of the material facts, and other materials upon which the determination was based.

DOJIFR01073

FACT SHEETS

# Our Nation's Weak Asylum Laws are Encouraging an Overwhelming Increase In Illegal Immigration

## IMMIGRATION

Issued on: November 1, 2018

"We will not rest until our border is secure, our citizens are safe, and we finally end the immigration crisis once and for all."

*President Donald J. Trump*

**MISUSED ASYLUM LAWS: Flaws in our asylum system allow illegal aliens with meritless claims to cross our borders and remain here for years.**

- Our Nation's asylum laws have allowed illegal aliens with meritless claims to easily enter and stay in the United States while awaiting legal proceedings.
- Asylum seekers at the border only have to meet the low bar for establishing a "credible fear" of returning under which they must show a "possibility" to qualify for asylum.
  - Aliens who claim a credible fear of returning do not have to provide any verification or corroboration of their claims in order to receive a positive determination and be released into the interior of the United States.
- As a result, illegal aliens with meritless cases that are released from detention are able to remain in our communities for years, while their cases are litigated in immigration courts.

**AN OVERWHELMING SURGE: Our country faces a growing and overwhelming surge of illegal aliens seeking to take advantage of our weak asylum laws.**

- Today, approximately one in 10 illegal aliens arriving at our southern border claims a credible fear of return, up from one out of every 100 prior to 2013.
  - Since 2010, these claims have spiked by 1,700 percent.

DOJIFR01074

- o This staggering increase has contributed to a backlog of hundreds of thousands of cases in our immigration courts.
- This surge is only growing, with reports showing that asylum requests at the southern border have recently increased from 1,500 per week to approximately 2,000 per week.
- U.S. Citizenship and Immigration Services (USCIS) processed approximately 100,000 credible fear claims this last fiscal year (FY), surpassing the 94,000 record set in FY 2016.
  - o In FY 2018, USCIS received approximately 106,000 new asylum requests from those admitted legally, compared to only 25,500 in 2008.
  - o Immigration courts received approximately 160,000 asylum requests in FY 2018, compared to only 42,000 in FY 2008.

**A DRIVING FACTOR IN ILLEGAL IMMIGRATION: The standards that apply to the credible fear process is a major driver of our Nation's immigration crisis.**

- While there has been an enormous spike in credible fear-initiated claims, relatively few asylum claims have ultimately been found to be meritorious.
- Approximately 80 percent of aliens arriving from Guatemala, Honduras, and El Salvador passed initial credible fear screenings, but only 15 percent of those were granted asylum.
- There has been a major increase in the number of illegal alien family units arriving at our border and family units now make up a significant percentage of credible fear claims.
  - o The number of family units apprehended by U.S. Customs and Border Protection has increased 620 percent during the past five years.
  - o Family units make up about 40 percent of all credible fear-initiated asylum claims.
  - o As a result of loopholes, nearly all asylum seekers in family units are permitted by the Department of Homeland Security to remain in the United States, pending their asylum hearing.



Official website of the Department of Homeland Security (https://www.facebook.com/CBP.gov/)     (https://instagram.com/customsborder/)     (https://www.flickr.com/photos/cbpphotos/)     (https://twitter.com/cbp)

(https://www.linkedin.com/company/2997?trk=tyah)     (https://www.youtube.com/user/customsborderprotect)

U.S. Customs and
Border Protection
(/)

(/)

# Southwest Border Migration FY 2019



CBP Southwest Border Total Apprehensions / Inadmissibles

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY19 | 60,785 | 62,467 | 60,791 | 58,311 | 76,542 | 103,732 | 109,463 | 144,255 | 104,362 | 82,055 | 64,006 | | 521,090 |
| FY18 | 34,871 | 39,051 | 40,519 | 35,905 | 36,751 | 50,347 | 51,862 | 43,180 | 40,149 | 46,719 | 50,568 | 50,560 | 521,090 |
| FY17 | 66,842 | 63,218 | 58,379 | 42,359 | 23,557 | 16,794 | 15,798 | 19,966 | 21,673 | 25,069 | 30,582 | 31,280 | 415,517 |
| FY16 | 45,516 | 45,755 | 48,742 | 33,657 | 38,311 | 46,118 | 48,511 | 55,386 | 45,671 | 46,909 | 46,909 | 51,893 | 553,378 |
| FY15 | 35,903 | 33,032 | 34,243 | 30,180 | 32,550 | 39,162 | 38,296 | 40,683 | 38,619 | 38,611 | 42,415 | 41,165 | 444,859 |
| FY14 | 41,828 | 38,685 | 36,695 | 35,181 | 42,399 | 57,405 | 59,119 | 68,804 | 66,541 | 48,819 | 39,758 | 34,003 | 569,237 |

**U.S. Border Patrol Southwest Border Apprehensions FY 2019**

| USBP | Demographic | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Southwest Border | Unaccompanied Alien Child | 4,963 | 5,258 | 4,752 | 5,105 | 6,817 | 8,956 | 8,882 | 11,475 | 7,373 | 5,563 | 3,729 | | **72,873** |
| | Family Units* | 23,115 | 25,164 | 27,507 | 24,188 | 36,530 | 53,206 | 58,715 | 84,490 | 57,353 | 42,546 | 25,057 | | **457,871** |
| | Single Adult | 22,931 | 21,433 | 18,489 | 18,686 | 23,533 | 30,671 | 31,677 | 36,894 | 30,178 | 23,873 | 21,907 | | **280,272** |
| Southwest Border Total Apprehensions | | **51,009** | **51,855** | **50,748** | **47,979** | **66,880** | **92,833** | **99,274** | **132,859** | **94,904** | **71,982** | **50,693** | | **811,016** |

*Family Unit represents the number of individuals (either a child under 18 years old, parent, or legal guardian) apprehended with a family member by the U.S. Border Patrol.

In August, 50,693 people were apprehended between ports of entry on the Southwest Border, compared with 71,982 in the month of July and 94,904 in June. In FY18, a total of 396,579 individuals were apprehended between ports of entry on our Southwest Border.

For breakdown by Sector, visit USBP Southwest Border Apprehensions by Sector (/newsroom/stats/sw-border-migration/usbp-sw-border-apprehensions)

## Office of Field Operations Southwest Border Inadmissibles FY 2019

| Field Operations | Demographic | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | |

DHSIFR001

| Field Operations | Demographic | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Southwest Border | Unaccompanied Alien Child | 454 | 405 | 351 | 410 | 426 | 424 | 385 | 386 | 306 | 292 | 396 | | **4,235** |
| | Family Units* | 4,178 | 4,989 | 4,390 | 4,223 | 4,210 | 4,215 | 3,637 | 4,139 | 3,627 | 4,364 | 5,993 | | **47,965** |
| | Single Adults | 5,058 | 5,148 | 5,221 | 5,629 | 4,950 | 6,169 | 6,075 | 6,801 | 5,457 | 5,328 | 6,838 | | **62,674** |
| | Accompanied Minor Child** | 86 | 70 | 81 | 70 | 76 | 91 | 92 | 70 | 68 | 89 | 86 | | **879** |
| Southwest Border Total Inadmissibles | | **9,776** | **10,612** | **10,043** | **10,332** | **9,662** | **10,899** | **10,189** | **11,396** | **9,458** | **10,073** | **13,313** | | **115,753** |

*Family Unit represents the number of individuals (either a child under 18 years old, parent, or legal guardian) deemed inadmissible with a family member by the Office of Field Operations.

**Accompanied Minor Child represents a child accompanied by a parent or legal guardian and the parent or legal guardian is either a U.S. Citizen, Lawful Permanent Resident, or admissible alien, and the child is determined to be inadmissible.

In August, 13,313 people presenting themselves at ports of entry on the Southwest Border were deemed inadmissible, compared with 10,073 in the month of July and 9,458 in June. In FY18, 124,511 people presenting themselves at ports of entry on the Southwest Border were deemed inadmissible.

OFO inadmissibility metrics include: individuals encountered at ports of entry who are seeking lawful admission into the United States but are determined to be inadmissible, individuals presenting themselves to seek humanitarian protection under our laws, and individuals who withdraw an application for admission and return to their countries of origin within a short timeframe.

For breakdown by Field Office, visit Southwest Border Inadmissibles by Field Office (/newsroom/stats/sw-border-migration/ofo-sw-border-inadmissibles).

**Last modified:** October 23, 2019

✈ Share This Page.

EOIR Defensive Asylum Cases and Most Current Outcomes by Filing Date Fiscal Year

| | Defensive cases filed | Relief | Removal | Voluntary Departure | Proceeding Completion | In Proceedings |
|---|---|---|---|---|---|---|
| 2000 | 5,299 | 1,465 | 2,537 | 164 | 1,131 | 2 |
| 2001 | 6,795 | 1,879 | 3,514 | 257 | 1,142 | 3 |
| 2002 | 8,265 | 1,847 | 4,931 | 382 | 1,105 | - |
| 2003 | 8,566 | 1,801 | 4,811 | 764 | 1,188 | 2 |
| 2004 | 8,659 | 1,788 | 4,842 | 1,174 | 849 | 6 |
| 2005 | 11,173 | 3,887 | 6,152 | 903 | 226 | 5 |
| 2006 | 13,870 | 5,517 | 7,031 | 1,019 | 296 | 7 |
| 2007 | 12,984 | 4,543 | 6,539 | 1,392 | 498 | 12 |
| 2008 | 12,247 | 4,792 | 5,488 | 1,173 | 756 | 38 |
| 2009 | 11,685 | 4,735 | 4,736 | 1,101 | 1,040 | 73 |
| 2010 | 12,168 | 4,984 | 4,528 | 1,113 | 1,340 | 203 |
| 2011 | 16,459 | 5,756 | 6,188 | 1,338 | 2,562 | 615 |
| 2012 | 18,252 | 5,389 | 6,534 | 1,336 | 3,479 | 1,514 |
| 2013 | 21,263 | 5,137 | 7,451 | 1,233 | 4,541 | 2,901 |
| 2014 | 27,996 | 6,035 | 9,873 | 1,303 | 5,538 | 5,247 |
| 2015 | 42,554 | 9,201 | 15,568 | 1,326 | 5,144 | 11,315 |
| 2016 | 67,178 | 10,962 | 23,385 | 1,647 | 3,967 | 27,217 |
| 2017 | 119,737 | 10,411 | 31,600 | 2,637 | 1,746 | 73,343 |
| 2018 | 121,671 | 6,758 | 19,137 | 2,432 | 335 | 93,009 |

Source: Department of Homeland Security (DHS) Office of Immigration Statistics (OIS) analysis of Department of Justice (DOJ) Executive Office of Immigration Review (EOIR) Case Info and Proceedings datasets.

Note: Data are based on DOJ EOIR data as of March 31, 2019.

Table prepared by DHS OIS Deputy Assistant Secretary Marc Rosenblum with support from OIS Director of Data Processing Hongwei Zhang on October 29, 2019.

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## ADJUDICATION STATISTICS

### Asylum Decision Rates[1]



| FY | Grants | Grant Rate | Denials | Denial Rate | Other[2] | Other Rate | Admin Closure[3] | Admin Closure Rate | Total |
|---|---|---|---|---|---|---|---|---|---|
| 2008 | 8,781 | 23.71% | 11,559 | 31.21% | 14,350 | 38.75% | 2,341 | 6.32% | 37,031 |
| 2009 | 8,385 | 24.04% | 9,857 | 28.26% | 14,416 | 41.33% | 2,222 | 6.37% | 34,880 |
| 2010 | 8,234 | 25.36% | 8,354 | 25.73% | 12,549 | 38.65% | 3,332 | 10.26% | 32,469 |
| 2011 | 9,866 | 31.23% | 9,354 | 29.61% | 10,935 | 34.62% | 1,435 | 4.54% | 31,590 |
| 2012 | 10,461 | 30.47% | 8,523 | 24.83% | 10,470 | 30.50% | 4,875 | 14.20% | 34,329 |
| 2013 | 9,690 | 24.77% | 8,880 | 22.70% | 10,682 | 27.31% | 9,866 | 25.22% | 39,118 |
| 2014 | 8,562 | 22.64% | 9,292 | 24.57% | 10,416 | 27.55% | 9,543 | 25.24% | 37,813 |
| 2015 | 8,113 | 18.69% | 8,847 | 20.38% | 11,018 | 25.39% | 15,425 | 35.54% | 43,403 |
| 2016 | 8,685 | 15.81% | 11,737 | 21.36% | 12,886 | 23.46% | 21,628 | 39.37% | 54,936 |
| 2017 | 10,539 | 19.58% | 17,632 | 32.76% | 14,751 | 27.41% | 10,893 | 20.24% | 53,815 |
| 2018 | 13,172 | 20.51% | 26,598 | 41.42% | 22,348 | 34.80% | 2,098 | 3.27% | 64,216 |
| 2019 (Third Quarter[4]) | 12,942 | 20.64% | 30,504 | 48.66% | 19,171 | 30.58% | 73 | 0.12% | 62,690 |

Data Generated: July 24, 2019
[1] Asylum decisions on affirmative and defensive applications issues in completed removal, deportation, exclusion, and asylum only proceedings or in proceedings that have been administratively closed. Initial case completions only.
[2] Asylum Others have a decision of abandonment, not adjudicated, other, or withdrawn.
[3] Administrative closure decisions for cases that have not been placed back on the docket. Redocketing occurs following an immigration judge's grant of a party's motion to recalendar.
[4] FY 2019 Third Quarter through June 30, 2019.

DHSIFR004

# Proposed Rules

**Federal Register**

Vol. 69, No. 45

Monday, March 8, 2004

This section of the FEDERAL REGISTER contains notices to the public of the proposed issuance of rules and regulations. The purpose of these notices is to give interested persons an opportunity to participate in the rule making prior to the adoption of the final rules.

---

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 208 and 212**

[CIS No. 2255–03]

**RIN 1615–AA91**

**Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry**

**AGENCY:** Department of Homeland Security.

**ACTION:** Proposed rule.

**SUMMARY:** On March 1, 2003, the Immigration and Naturalization Service transferred from the Department of Justice to the Department of Homeland Security (DHS), pursuant to the Homeland Security Act of 2002 (Public Law 107–296). The responsibility for administering the asylum program was transferred to U.S. Citizenship and Immigration Services ("USCIS") within DHS. The terms of a recently signed agreement between the United States and Canada bar certain categories of aliens arriving from Canada at land border ports-of-entry and in transit from Canada from applying for protection in the United States. This proposed rule would establish USCIS asylum officers' authority to make threshold determinations concerning applicability of the Agreement in the expedited removal context.

**DATES:** Written comments must be submitted on or before May 7, 2004.

**ADDRESSES:** Please submit written comments to the Director, Regulations and Forms Services Division, Department of Homeland Security, 425 I Street, NW, Room 4034, Washington, DC 20536. To ensure proper handling please reference CIS No. 2255–03 on your correspondence. You may also submit comments electronically to USCIS at *rfs.regs@dhs.gov.* When submitting comments electronically, you must include CIS No. 2255–03 in the subject box. Comments are available for public inspection at the above address by calling (202) 514–3048 to arrange for an appointment.

**FOR FURTHER INFORMATION CONTACT:** Joanna Ruppel, Deputy Director, Asylum Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Ave., NW., Third Floor, Washington, DC 20536, telephone number (202) 305–2663.

**SUPPLEMENTARY INFORMATION:**

## What Legal Authority Permits USCIS To Use a Safe Third Country Agreement as a Bar To Applying for Asylum?

Section 208(a)(1) of the Immigration and Nationality Act ("Act") permits any alien who is physically present in or who arrives at the United States to apply for asylum. However, section 208(a)(2)(A) of the Act specifically states that paragraph (1) shall not apply where, "pursuant to a bilateral or multilateral agreement, the alien may be removed to a country where the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General [now deemed to be the Secretary of Homeland Security under the Homeland Security Act] finds that it is in the public interest for the alien to receive asylum in the United States."

On December 5th, 2002, the governments of the United States and Canada signed the Agreement Between the Government of the United States and the Government of Canada For Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries ("Safe Third Country Agreement" or "Agreement"). The Agreement will take effect when the United States has promulgated implementing regulations and Canada has completed its own domestic procedures necessary to bring the Agreement into force. This Agreement will be implemented by USCIS asylum officer determinations.

The Agreement allocates responsibility between the United States and Canada whereby one country or the other (but not both) will assume responsibility for processing the claims of certain asylum seekers who are traveling from Canada into the United States or from the United States into Canada. The Agreement provides for a threshold determination to be made concerning which country will consider the merits of an alien's protection claim, enhancing the two nations' ability to manage, in an orderly fashion, asylum claims brought by persons crossing our common border. This Safe Third Country Agreement between the United States and Canada currently constitutes the only agreement, for purposes of section 208(a)(2)(A) of the Act, that would bar an individual in or arriving at the United States from applying for asylum.

During the bilateral negotiations that have resulted in the Safe Third Country Agreement, the delegations of both countries acknowledged certain differences in their respective asylum systems. However, harmonization of asylum laws and procedures is not a prerequisite to entering into responsibility-sharing arrangements. The salient factor is whether the countries sharing responsibility for refugee protection have laws and mechanisms in place that adhere to their international obligations to protect refugees. The Executive Committee for the Office of the United Nations High Commissioner for Refugees (UNHCR) has concluded, "Overall it is UNHCR's position that, while in principle each State Party to the 1951 Convention and 1967 Protocol has a responsibility to examine refugee claims made to it, "burden-sharing" arrangements allowing for readmission and determination of status elsewhere are reasonable, provided they always ensure protection of refugees and solutions to their problems." Background Note on the Safe Country Concept and Refugee Status (EC/SCP/68), July 26, 1991. While the asylum systems in Canada and the U.S. are not identical, both country's asylum systems meet and exceed international standards and obligations under the 1951 Convention relating to the Status of Refugees (1951 Refugee Convention) and the 1967 Protocol relating to the Status of Refugees (1967 Protocol), and the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (Convention Against Torture).

## What Are the Terms of the Safe Third Country Agreement Between the United States and Canada?

The Agreement permits the United States to remove to Canada certain asylum seekers attempting to enter the United States from Canada at a land border port-of-entry and aliens who are being removed from the United States in transit through the United States. Similarly, it permits Canada to return to the United States certain asylum seekers attempting to enter Canada from the United States at a land border port-of-entry and certain aliens being removed from the United States through Canada. In either case, the Agreement provides (with certain exceptions) that the alien be returned to the "country of last presence" for consideration of his or her protection claims, including asylum, withholding of removal, and protection under the Convention Against Torture, under the laws of that country.

For aliens arriving at a land border port-of-entry, the Agreement provides for a number of exceptions. These exceptions are based upon the principles underlying the U.S. position while negotiating the Agreement: (1) To the extent practicable, the Agreement should not act to separate families; (2) the Agreement must guarantee that persons subject to it would have their protection claims adjudicated in one of the two countries; and (3) it would be applied only in circumstances where it is indisputable that the alien arrived directly from the other country. These principles have been achieved by including a robust family unity exception that allows asylum seekers to join certain family members residing in the United States or Canada while they pursue their protection claims; by clearly stipulating that the alien must have his or her claim adjudicated in either Canada or the United States; and by limiting the application of the Agreement to situations where it is clear that the alien arrived directly from the other country; *e.g.*, at land border ports-of-entry or in-transit while being removed from Canada.

The Agreement's family unity exceptions are particularly generous. The range of family members who may qualify as "anchor" relatives due to their presence in the United States is far broader than those recognized under other provisions of immigration law. The list of eligible family members includes spouses, sons, daughters, parents, legal guardians, siblings, grandparents, grandchildren, aunts, uncles, nieces, and nephews. For purposes of the Agreement, a "legal guardian" will be construed as someone who is currently vested with legal custody of the asylum seeker or with the authority to act on behalf of the asylum seeker, provided that the asylum seeker is both unmarried and less than 18 years of age. USCIS will provide field guidance to asylum officers to standardize the approach used in construing other family member relationships relevant to the Agreement but not defined in the Act. Finally, these family members may qualify as anchor relatives even if they themselves do not possess permanent immigration status in the U.S. Aliens in valid immigrant or nonimmigrant status may qualify as anchor relatives, with the exception of aliens who maintain only nonimmigrant visitor status under section 101(a)(15)(B) of the Act or based on admission under the Visa Waiver Program, who are precluded from serving as anchor relatives by the language of the Agreement.

More specifically, an alien who arrives at a land border port-of-entry is exempt from return under the Agreement if the alien:

(1) Is a citizen of Canada or, not having a country of nationality, is a habitual resident of Canada;

(2) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who has been granted asylum, refugee, or other lawful status in the United States, except visitor status;

(3) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who is at least 18 years of age and has an asylum application pending in the United States;

(4) Is unmarried, under 18 years of age, and does not have a parent or legal guardian in either Canada or the United States;

(5) Is applying for admission at a United States land border port-of-entry with a validly issued visa or other valid admission document, other than for transit, issued by the United States, or, being required to hold a visa to enter Canada, was not required to obtain a visa to enter the United States; or

(6) Has been permitted, as an unreviewable exercise of discretion by DHS, to pursue a protection claim in the United States because it was determined that it is in the public interest to do so.

The specific terms of the Safe Third Country Agreement are available on the USCIS Web site at *http://www.uscis.gov.*

## How Does This Rule Propose To Implement the Safe Third Country Agreement?

The rule proposes to revise § 208.4 and add a new § 208.30(e)(6) to permit asylum officers to conduct a "threshold screening interview" in order to determine whether an alien is ineligible to apply for asylum under section 208(a)(2)(A) of the Act by operation of the Safe Third Country Agreement. New § 208.30(e)(6)(iii) would codify the exceptions to the Agreement. Under this rule, in any case where an asylum officer determines that the alien qualifies for an exception to the Agreement with Canada, the asylum officer will proceed immediately to a determination as to whether or not the alien has a credible fear of persecution or torture, as provided under existing law.

In § 208.30(e)(6)(i), this proposed rule also makes clear that, when an asylum officer determines that an alien is ineligible to pursue his or her protection claims in the United States based on the applicability of the Safe Third Country Agreement, the alien will be removed to Canada, the country of the alien's last presence, in order to pursue his or her claims there.

The rule also proposes to incorporate the existing definitions of "credible fear of persecution" and "credible fear of torture" in the new §§ 208.30(e)(2) and (e)(3). The definition of credible fear of persecution, derived from section 235(b)(1)(B)(v) of the Act and existing policy that incorporates consideration of eligibility for withholding of removal, is "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien can establish eligibility for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act." The proposed rule incorporates the existing definition of credible fear of torture provided in the supplementary information to the interim rule implementing the United States' obligations under the Convention Against Torture published in the **Federal Register** at 64 FR 8484 on February 19, 1999. Under current procedures, as provided in the supplementary information to the interim rule, an alien is found to have a credible fear of torture if the alien shows that there is a significant possibility that he or she is eligible for withholding of removal or deferral of removal under the Convention Against Torture. The rule does not propose to

DHSIFR202

alter current procedures related to these existing definitions.

Finally, this rule proposes to remove the provisions of 8 CFR 208.30(g)(2) relating to the conduct of credible fear review by immigration judges. In view of the transfer of the responsibilities of the former INS to DHS on March 1, 2003, the Attorney General published a rule creating a new chapter V in 8 CFR, beginning with part 1001 and containing the regulations pertaining to the functions of the Executive Office for Immigration Review (EOIR), which remains under the authority of Attorney General. The Attorney General's rule was published in the **Federal Register** at 68 FR 9824 on February 28, 2003. Accordingly, this rule revises § 208.30(g)(2) to remove the previous provisions and to substitute a new cross-reference to the current EOIR regulations which are now codified at 8 CFR 1208.30(g)(2).

**Why Is USCIS Proposing To Amend the Regulations Governing Credible Fear Determinations?**

The Safe Third Country Agreement between the United States and Canada bars certain aliens from pursuing protection claims in the United States if they are either arriving from Canada at land border ports-of-entry or are being removed from Canada in transit through the United States. Instead, those aliens will be returned to Canada to have their protection claims adjudicated by Canada. In general, the Agreement will be applied to such aliens who are subject to expedited removal provisions under section 235(b) of the Act, which provides a specific removal mechanism for aliens who are inadmissible under sections 212(a)(6)(C) (fraud or willful misrepresentation) or 212(a)(7) (failure to have proper documents) of the Act. However, in light of the Safe Third Country Agreement's purpose in allowing asylum seekers access to only one of the signatory countries' protection systems, this rule proposes a modified approach to the expedited removal process in the form of a threshold asylum officer screening as to which country (Canada or the United States) will consider an alien's protection claims. Only after this threshold issue has been resolved in favor of allowing the alien to pursue an asylum claim in the United States will an asylum officer make a determination as to whether or not the alien has a credible fear of persecution or torture.

Under section 235(b), aliens subject to expedited removal who seek asylum in the United States or otherwise express a fear of persecution or torture are referred to an asylum officer. During a

"credible fear interview," the asylum officer inquires as to the nature and basis of the alien's claims relating to past persecution and fear of future persecution or torture. The asylum officer then determines whether or not there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claims and other facts known to the officer, that the alien could establish eligibility for protection under U.S. law. In the event that the asylum officer determines that the alien has not established a credible fear of persecution or torture, the alien may request review of that determination by an immigration judge.

For aliens who are subject to the Agreement, however, the threshold question is whether the alien should be returned to Canada for Canadian authorities to consider the merits of the alien's claims, or whether the alien will instead be allowed to pursue his or her protection claims in the United States. Accordingly, this rule provides for a threshold screening interview by an asylum officer to determine whether an alien subject to the Agreement will be permitted to remain in the U.S. to pursue his or her protection claims, based on the alien's qualification for one of the Agreement's exceptions. It is only after this threshold screening interview (*i.e.*, only after the asylum officer has decided that the alien is not going to be removed to Canada for an adjudication of the alien's claims) that the asylum officer would proceed to promptly consider the alien's claims for protection under United States law through the credible fear determination process. The asylum officer's notes regarding the threshold issues raised by the Agreement would then be included in the asylum officer's written record of the credible fear determination. In those instances where an asylum officer determines, after review by a supervisory asylum officer, that the alien has not provided reason to believe, by a preponderance of the evidence, that he or she qualifies for any of the Agreement's exceptions, then the asylum officer will advise the alien that he or she is being returned to Canada based on the terms of the Agreement so that the alien will be able to pursue his or her claims for asylum or protection under Canadian law.

Given the narrowness of the factual issues relevant to the threshold screening determination that the Agreement and/or its exceptions are applicable to an alien, which can readily be considered and adjudicated by asylum officers, this rule does not provide for referral to immigration

judges for further review of these threshold screening determinations. The narrow factual issues concerning the Agreement's applicability and exceptions (such as the presence of family members in the U.S. or the possession of validly issued visas) do not relate to whether an alien has a fear of persecution or torture, and can adequately be resolved by asylum officers. Thus, under this proposed rule, when an asylum officer makes and a supervisor reviews this threshold determination, there would be no further administrative review of that decision. Elsewhere in the **Federal Register**, the Department of Justice is publishing a proposed rule to specify the authority of the immigration judges with respect to issues arising under the Agreement.

This method for implementing the Safe Third Country Agreement, which bars certain aliens from applying for asylum in the United States, is within the authority of the Secretary of DHS, under section 208(a)(2)(A) of the Act and under section 208(d)(5)(B) of the Act, which provides authority to impose regulatory conditions or limitations on the consideration of an application for asylum not inconsistent with the Act. Section 208(a)(2)(A) of the Act makes an alien ineligible to apply for asylum in the United States if, pursuant to a bilateral agreement, the Secretary concludes that the alien "would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection" in a safe third country. An alien who is covered by section 208(a)(2)(A) is thus not eligible to apply for asylum regardless of the statutory means by which he is ordered removed from the United States. By this rule, the Secretary is proposing, in a manner consistent with the Act, to delegate to asylum officers the authority to make the threshold determination whether an alien is ineligible to apply for asylum by operation of the Agreement with Canada.

USCIS thus proposes to amend the regulations governing the credible fear determination in order to implement the threshold screening process described above for aliens subject to the Safe Third Country Agreement, prior to a credible fear determination. However, this rule preserves unchanged the existing credible fear process itself, including the availability of a credible fear review by an immigration judge, in every case where the asylum officer determines that an alien subject to the Agreement does satisfy any of the threshold jurisdictional exceptions, including a discretionary decision by

DHS to allow the alien to pursue an asylum claim as a matter in the public interest. If the asylum officer determines the alien is not barred by the Agreement from pursuing his or her protection claims in the U.S., the asylum officer will then proceed immediately to a credible fear determination on the merits of the alien's claims, and, if necessary, an immigration judge will conduct a review of this determination on the merits, as provided under existing law and regulations.

**How Does This Rule or the Safe Third Country Agreement Affect Unaccompanied Minors?**

In order to understand how this rule affects unaccompanied minors, it is important to understand that the definition of an ''unaccompanied minor'' customarily used in determining appropriate immigration processes is different than the definition used in the Agreement for determining whether an exception to the Agreement applies. While ''unaccompanied minor'' has not been formally defined in the Act or in regulations, for immigration processing purposes, an individual who is under age 18 and is not accompanied by an adult relative or guardian is considered an ''unaccompanied minor.'' This definition differs from the Agreement's language. Article 1(f) of the Agreement defines ''unaccompanied minor'' as ''an unmarried refugee status claimant who has not yet reached his or her eighteenth birthday and does not have a parent or legal guardian in either Canada or the United States.'' This rule does not propose replacing the customary definition of ''unaccompanied minor'' with the Agreement's definition for purposes of determining immigration issues unrelated to the Agreement. However, in applying the Agreement, this difference in definitions will result in finding that some individuals under age 18 who are not accompanied by an adult relative or legal guardian when they arrive at a land border port-of-entry will not qualify for the unaccompanied minor exception in the Agreement, because they have a parent or legal guardian in the United States or Canada.

Since August of 1997, the Immigration and Naturalization Service's policy, now DHS's policy, has been to place unaccompanied minors into expedited removal proceedings only under limited circumstances. Under existing policy, an unaccompanied minor would be placed into expedited removal proceedings only if he or she (1) in the presence of a DHS immigration officer, engaged in a crime that would qualify as an aggravated felony if committed by an adult; (2) has been convicted or adjudicated delinquent of an aggravated felony in the United States or any other country, and a U.S. Customs and Border Protection (CBP) officer has confirmation of that order; or (3) has been formally removed, excluded, or deported previously from the United States. Existing guidelines permit granting a waiver, deferring the inspection, permitting a withdrawal of the application for admission, or using other discretionary means to process unaccompanied minors who seek admission to the United States, where appropriate. This rule does not propose to change that existing policy. The Safe Third Country Agreement will be applied in the expedited removal proceedings of unaccompanied minors only when such other processing of an unaccompanied minor seeking admission at a land border port-of-entry is not appropriate. When an unaccompanied minor arrives from Canada at a land border port-of-entry and seeks protection, he or she still will be processed according to existing guidelines, which often results in placing the minor into removal proceedings under section 240 of the Act. Where the minor is placed into removal proceedings under section 240 of the Act, the Agreement, including its definition of ''unaccompanied minor,'' will be applied by the immigration judge, as provided in the Department of Justice proposed rule published in the **Federal Register**.

**What Type of Evidence Will Satisfy USCIS When Determining Whether an Individual Meets One of the Exceptions in the Agreement?**

As specified in the proposed rule at § 208.30(e)(6)(ii) and pursuant to a Statement of Principles concerning the implementation of the Agreement, the alien bears the burden of proof to establish by a preponderance of the evidence that an exception applies, such that the alien falls outside the scope of the Agreement. Asylum officers will use all available evidence, including the individual's testimony, affidavits and other documentation, as well as available records and databases, to determine whether an exception to the Agreement applies in each individual's case. Credible testimony alone may be sufficient to establish that an exception applies, if there is a satisfactory explanation of why corroborative documentation is not reasonably available. DHS recognizes that computer systems and DHS records will not be sufficient to verify family relationships in all circumstances and that asylum seekers fleeing persecution often will not have documents establishing family relationships with them at the time they seek to enter the United States. Asylum officers receive extensive training in evaluating credibility of testimony when there is little or no documentation in support of that testimony. Asylum officers will document their findings that the Agreement or its exceptions are applicable to an alien, and in the case of any alien who qualifies for one of the Agreement's exceptions, will immediately proceed to make a credible fear determination, as described in sections 235(b)(1)(B)(ii) and (iii) of the Act.

**How Does the Safe Third Country Agreement Address the Possibility That Individuals Will Be Removed Without Having Their Protection Claims Heard?**

An individual referred by either Canada or the United States to the other country under the terms of Article 4 cannot be removed to a third country until an adjudication of the individual's protection claims has been made. The Agreement also provides, in Article 3, that an individual returned to the country of last presence shall not be removed to another country pursuant to any other Safe Third Country Agreement or regulation.

**How Does the Safe Third Country Agreement Affect People Who Are Being Removed From Canada or the United States and Then Seek Protection While Transiting Through the Other Country?**

Pursuant to Article 5(a) of the Agreement, if an alien is being removed from Canada through the United States and expresses a fear of persecution or torture, the alien will be returned to Canada for Canada to adjudicate his or her protection claims, in accordance with Canada's protection system. Generally, individuals being removed by Canada through the United States are pre-inspected in Canada and escorted by Canadian immigration officials to their onward destination. Individuals who make a protection claim during pre-inspection will not be allowed to transit through the United States. Individuals being removed by Canada in transit through the United States are considered arriving aliens in parole status, as described in section 212(d)(5) of the Act. If such an individual asserts a fear of persecution or torture to a U.S. immigration officer, while in transit through the United States, the individual's parole status will be terminated pursuant to § 212.5(e)(2)(i), and he or she generally will be placed in expedited removal proceedings, though there may be some rare instances

in which the individual will be placed in removal proceedings under section 240 of the Act. Transit aliens placed in expedited removal proceedings under this provision will be subject to the same asylum officer threshold screening process as aliens arriving at U.S.-Canada land border ports-of-entry. For those rare instances in which such a transit alien is placed in removal proceedings pursuant to section 240 of the Act, the Agreement will be applied by the immigration judge as provided in the Department of Justice proposed rule, published in the **Federal Register**.

The effect of the Agreement on an asylum seeker being removed from the United States through Canada depends on whether the United States already has considered any asylum, withholding, or Torture Convention claim(s). If the United States has considered but denied the alien's protection claims, the person will be permitted onward movement, in accordance with Article 5(c) of the Agreement. If the United States has not already adjudicated the alien's protection claims, the person will be returned to the United States for such an adjudication.

### How Does the Agreement Affect Individuals Who Seek Withholding of Removal or Protection Under the Convention Against Torture?

Article 33 of the 1951 Refugee Convention, as supplemented by the 1967 Refugee Protocol, requires that signatory states not return persons to any country where their lives or freedom would be threatened on account of their race, religion, nationality, political opinion, or membership in a particular social group. The U.S. is a signatory to the 1967 Protocol, and Canada is a signatory to both the 1951 Refugee Convention and the 1967 Protocol. The U.S. implements its obligations under the 1967 Protocol in section 241(b)(3) of the Act, which, as implemented, prohibits DHS from removing aliens to any country where it is more likely than not that their lives or freedom would be threatened on account of the grounds enumerated above. Nevertheless, DHS is not prevented from removing aliens to countries where their lives or freedom would not be threatened.

Article 3 of the Convention Against Torture prohibits the return of persons to any country where there are substantial grounds for believing that they would be subject to torture. Like the United States, Canada is a signatory to the Convention Against Torture. The United States implements this obligation by granting withholding of

removal or deferral of removal to a country where it is more likely than not that the applicant would be subject to torture.

Article 3 of the Agreement provides that ''the Parties shall not return or remove a refugee status claimant referred by either Party under the terms of [the Agreement] to another country until an adjudication of the person's refugee status claim has been made.'' In Article 1, the Agreement defines a refugee status claim to include a request for protection under the 1951 Refugee Convention, 1967 Protocol, or Convention Against Torture. Returning any alien to Canada pursuant to the terms of the Agreement for a consideration of the alien's protection claims, in the absence of any grounds for believing that the alien would be persecuted or tortured in Canada, is consistent with the United States' international protection obligations.

### Does CBP Plan To Place Aliens Returned to the United States From Canada Under the Safe Third Country Agreement Into Expedited Removal Proceedings?

No. For an alien to be subject to the expedited removal provisions, the alien must first meet the definition of arriving alien. The Board of Immigration Appeals has held that an alien who goes abroad but is returned to the United States after having been formally denied admission by the foreign country is not an applicant for admission, since, in contemplation of law, the alien did not leave the United States. Matter of T, 6 I&N Dec. 638 (1955). Those who entered the United States legally or illegally and are later denied admission by Canada are not arriving aliens and therefore not subject to expedited removal. Depending on their status, they may or may not be subject to removal proceedings before an immigration judge, pursuant to section 240 of the Act, or removal pursuant to sections 241(a)(5) (reinstatement of a prior order) or 238(b) (administrative removal based on aggravated felony conviction) of the Act. For example, this return to the United States would not qualify as an ''arrival'' for purposes of determining whether an applicant has filed for asylum within one year of the date of his or her last arrival in the United States, as required under section 208(a)(2)(B) of the Act.

### How Does This Proposed Rule Affect Individuals Who Enter the United States Through Canada and Who Then Apply for Asylum?

The proposed rule does not affect any individuals who apply for asylum after

entering the United States from Canada. The proposed rule is limited only to those individuals who are placed in expedited removal or removal proceedings upon arrival at U.S.-Canada land border ports-of-entry and to those who are aliens in transit through the United States subsequent to removal from Canada. Individuals who previously entered the United States, having come from Canada, and later apply for asylum affirmatively with USCIS or defensively in removal proceedings before an immigration judge are not arriving aliens and so will not be barred from applying for asylum by operation of the Agreement.

### Regulatory Flexibility Act

DHS has reviewed this regulation in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)) and by approving it, DHS preliminarily certifies that this rule will not have a significant economic impact on a substantial number of small entities. This rule affects individual aliens, as it relates to claims of asylum. It does not affect small entities, as that term is defined in 5 U.S.C. 601(6).

### Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one-year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

### Small Business Regulatory Enforcement Fairness Act of 1996

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

### Executive Order 12866

The Department of Homeland Security has determined that this rule is a ''significant regulatory action'' under Executive Order 12866, section 3(f), Regulatory Planning and Review, and, accordingly, this rule has been submitted to the Office of Management and Budget for review. In particular, the

Department has assessed both the costs and benefits of this rule as required by Executive Order 12866, section 1(b)(6) and has made a reasoned determination that the benefits of this regulation justify its costs.

The proposed rule would implement a bilateral agreement that allocates responsibility between the United States and Canada for processing claims of certain asylum seekers. The rule applies to individuals who are subject to expedited removal and, under existing regulations, would receive a credible fear interview by an asylum officer. This rule simply adds a preliminary screening by asylum officers to determine whether the alien is even eligible to seek protection in the United States, in which case the asylum officer will then proceed to make the credible fear determination under existing rules. Based on statistical evidence, it is anticipated that approximately 200 aliens may seek to enter the United States from Canada at a land border port-of-entry and be placed into expedited removal proceedings. A significant number of these aliens will be found exempt from the Agreement and eligible to seek protection in the United States after the threshold screening interview proposed in this rule. It is difficult to predict how many aliens will be returned to the U.S.-Canadian border under the Agreement, but the costs incurred in detaining and transporting them are not likely to be substantial. Therefore, the "tangible" costs of this rulemaking to the U.S. Government are minimal. Applicants who are found to be subject to the Safe Third Country Agreement will be returned to Canada to seek protection, saving the U.S. Government the cost of adjudicating their asylum claims and, in some cases, the cost of detention throughout the asylum process.

The cost to asylum seekers who, under the proposed rule, will be returned to Canada are the costs of pursuing an asylum claim in Canada, as opposed to the United States. There is no fee to apply for asylum in Canada and, under Canadian law, asylum seekers are provided social benefits that they are not eligible for in the United States, including access to medical coverage, adult public education, and public benefits. Therefore, the tangible costs of seeking asylum in Canada are no greater than they are in the United States. However, because there may be other tangible costs to asylum seekers attempting to enter the United States from Canada at a land border port-of-entry (*e.g.*, transportation costs to the U.S. border), public comment is invited for further consideration of what such

additional costs may include. The "intangible" costs to asylum seekers who would be returned to Canada under the proposed rule are the costs of potential separation from support networks they may be seeking to join in the United States. However, the Agreement contains broad exceptions based on principles of family unity that would generally allow those with family connections in the United States to seek asylum in the United States under existing regulations governing the credible fear process.

The proposed rule benefits the United States because it enhances the ability of the U.S. and Canada to manage, in an orderly fashion, asylum claims brought by persons crossing our common border. By implementing the Agreement, the proposed rule furthers U.S. and Canadian goals, as outlined in the 30-Point Action Plan under the Smart Border Declaration signed by Secretary Ridge and former Canadian Deputy Foreign Minister John Manley, to ensure a secure flow of people between the two countries while preserving asylum seekers' access to a full and fair asylum process in a manner consistent with U.S. law and international obligations. Further, the Agreement and proposed rule save the U.S. the time and expense of adjudicating protection claims brought by asylum seekers who have already had a full and fair opportunity to present their claims in Canada.

**Executive Order 13132**

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

**Executive Order 12988 Civil Justice Reform**

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

**Paperwork Reduction Act**

The regulations at 8 CFR 208.30 require that an asylum officer conduct a threshold screening interview to determine whether an alien is ineligible to apply for asylum pursuant to section 208(a)(2)(A) of the Act. The threshold screening interview is considered an information collection requirement subject to review by OMB under the

Paperwork Reduction Act of 1995. Written comments are encouraged and will be accepted until May 7, 2004. When submitting comments on the information collection, your comments should address one or more of the following four points.

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of the information on those who are to respond, including through the use of any and all appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.*, permitting electronic submission of responses.

*Overview of This Information Collection*

(1) *Type of information collection:* New.

(2) *Title of Form/Collection:* Credible fear threshold screening interview.

(3) *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* No form number, U.S. Citizenship and Immigration Services.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Individuals. The information collection is necessary in order for the CIS to make a determination whether an alien is eligible to apply for asylum pursuant to section 208(a)(2)(A) of the Act.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* 200 respondents at 30 minutes per response.

(6) *An estimate of the total of public burden (in hours) associated with the collection:* Approximately 100 burden hours.

All comments and suggestions or questions regarding additional information should be directed to the Department of Homeland Security, U.S. Citizenship and Immigration Services, Regulations and Forms Services Division, 425 I Street, NW., Room 4034, Washington, DC 20536; Attention: Richard A. Sloan, Director, 202–514–3291.

**Family Assessment Statement**

DHS has reviewed this regulation and determined that it may affect family well-being as that term is defined in section 654 of the Treasury General Appropriations Act, 1999, Public Law 105–277, Div. A. Accordingly, DHS has assessed this action in accordance with the criteria specified by section 654(c)(1). In this proposed rule, an alien arriving at a land border port-of-entry with Canada may qualify for an exception to the Safe Third Country Agreement, which otherwise requires individuals to seek protection in the country of last presence (Canada), by establishing a relationship to a family member in the United States who has lawful status in the United States, other than a visitor, or is 18 years of age or older and has an asylum application pending. This proposed rule incorporates the Agreement's definition of "family member," which may be a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew. The "family member" definition was intended to be broad in scope, to promote family unity. This proposed rule thereby strengthens the stability of the family by providing a mechanism to reunite separated family members in the United States.

In some cases the proposed rule will have a negative effect resulting in the separation of family members. The Agreement's exceptions, as expressed in the proposed rule, require the family member to have either lawful status in the United States, other than visitor, or else to be 18 years of age or older and have a pending asylum application. Family members who do not meet one of these conditions, therefore, would be separated under the proposed rule. However, this proposed rule's definition of "family member" and the exceptions to the Agreement are more generous than other family-based immigration laws, which require the anchor family member to have more permanent status in the United States (such as citizen, lawful permanent resident, asylee or refugee) and which have a more restricted list of the type of family relationships that can be used to sponsor someone for immigration to the United States (although, unlike those laws, this Agreement provides only an opportunity to apply for protection and does not directly confer an affirmative immigration benefit). Under this rule, family members will be able to reunite even if the anchor relative's status is less than permanent in the United States.

**List of Subjects**

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 212*

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

**Proposed Amendments to the Regulations**

Accordingly, chapter I of title 8 of the Code of Federal Regulations is proposed to be amended as follows:

**PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1158, 1226, 1252, 1282; 8 CFR part 2.

2. Section 208.4 is amended by adding a new paragraph (a)(6) to read as follows:

**§ 208.4   Filing the application.**

\*   \*   \*   \*   \*

(a) \* \* \*

(6) *Safe Third Country Agreement.* Asylum officers have authority to apply section 208(a)(2)(A) of the Act, relating to the determination that the alien may be removed to a safe country pursuant to a bilateral or multilateral agreement, only as provided in § 208.30(e). For provisions relating to the authority of immigration judges with respect to section 208(a)(2)(A), see 8 CFR 1240.11(g).

\*   \*   \*   \*   \*

3. Section 208.30 is amended by:
a. Redesignating paragraph (e)(4) as (e)(7);
b. Redesignating paragraphs (e)(2) and (e)(3) as (e)(4) and (e)(5) respectively;
c. Revising newly designated paragraphs (e)(4) and (e)(5);
d. Adding new paragraphs (e)(2), (e)(3), and (e)(6);
e. Revising paragraph (g)(2)(i), and by
f. Removing paragraphs (g)(2)(iii) and (g)(2)(iv).
The additions and revisions read as follows:

**§ 208.30   Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.**

\*   \*   \*   \*   \*

(e) \* \* \*

(2) An alien will be found to have a credible fear of persecution if there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, the alien can establish eligibility for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act.

(3) An alien will be found to have a credible fear of torture if the alien shows that there is a significant possibility that he or she is eligible for withholding of removal or deferral of removal under the Convention Against Torture, pursuant to §§ 208.16 or 208.17.

(4) In determining whether the alien has a credible fear of persecution, as defined in section 235(b)(1)(B)(v) of the Act, or a credible fear of torture, the asylum officer shall consider whether the alien's case presents novel or unique issues that merit consideration in a full hearing before an immigration judge.

(5) Except as provided in paragraph (e)(6) of this section, if an alien is able to establish a credible fear of persecution or torture but appears to be subject to one or more of the mandatory bars to applying for, or being granted, asylum contained in section 208(a)(2) and 208(b)(2) of the Act, or to withholding of removal contained in section 241(b)(3)(B) of the Act, the Department of Homeland Security shall nonetheless place the alien in proceedings under section 240 of the Act for full consideration of the alien's claim, if the alien is not a stowaway. If the alien is a stowaway, the Department shall place the alien in proceedings for consideration of the alien's claim pursuant to § 208.2(c)(3).

(6) Prior to any determination concerning whether an alien arriving in the United States at a U.S.-Canada land border port-of-entry or in transit through the U.S. during removal by Canada has a credible fear of persecution or torture, the asylum officer shall conduct a threshold screening interview to determine whether such an alien is ineligible to apply for asylum pursuant to section 208(a)(2)(A) of the Act and subject to removal to Canada under the Agreement Between the Government of the United States and the Government of Canada For Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries ("Agreement"). In conducting this threshold screening interview, the asylum officer shall advise the alien of the Agreement's exceptions and question the alien as to applicability of any of these exceptions to the alien's case.

(i) If the asylum officer determines that an alien does not qualify for an

exception under the Agreement during this threshold screening interview, the alien is ineligible to apply for asylum in the United States. After review of this finding by a supervisory asylum officer, the alien shall be advised that he or she will be removed to Canada in order to pursue his or her claims relating to a fear of persecution or torture under Canadian law. Aliens found ineligible to apply for asylum under this paragraph shall be removed to Canada.

(ii) If the alien establishes by a preponderance of the evidence that he or she qualifies for an exception under the terms of the Agreement, the asylum officer shall make a written notation of the basis of the exception, and then proceed immediately to a determination concerning whether an alien has a credible fear of persecution or torture.

(iii) An alien qualifies for an exception to the Agreement if the alien is not being removed from Canada in transit through the United States and:

(A) Is a citizen of Canada or, not having a country of nationality, is a habitual resident of Canada;

(B) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who has been granted asylum, refugee, or other lawful status in the United States, provided, however, that this exception shall not apply to an alien whose relative maintains only nonimmigrant visitor status, as defined in section 101(a)(15)(B) of the Act, or whose relative maintains only visitor status based on admission to the U.S. pursuant to the Visa Waiver Program;

(C) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who is at least 18 years of age and has an asylum application pending before U.S. of Citizenship and Immigration Services, the Executive Office for Immigration Review, or on appeal in federal court in the United States;

(D) Is unmarried, under 18 years of age, and does not have a parent or legal guardian in either Canada or the United States;

(E) Arrived in the United States with a validly issued visa or other valid admission document, other than for transit, issued by the United States, or, being required to hold a visa to enter Canada, was not required to obtain a visa to enter the United States; or

(F) The Department of Homeland Security determines, in the exercise of unreviewable discretion, that it is in the public interest to allow the alien to pursue a claim for asylum, withholding of removal, or protection under the Convention Against Torture, in the United States.

(iv) As used in § 208.30(e)(6)(iii)(B), (C) and (D) only, ''legal guardian'' means a person currently vested with legal custody of such an alien or vested with legal authority to act on the alien's behalf, provided that such an alien is both unmarried and less than 18 years of age, and provided further that any dispute with respect to whether an individual is a legal guardian will be resolved on the basis of U.S. law.

*    *    *    *    *

(g) * * *

(2) * * *

(i) Immigration judges will review negative credible fear findings as provided in 8 CFR 1208.30(g)(2).

*    *    *    *    *

## PART 212—DOCUMENTARY REQUIREMENTS; NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

4. The authority citation for part 212 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1187, 1225, 1226, 1227, 1228; 8 CFR part 2.

5. Section 212.5 is amended by adding new paragraph (e)(2)(iii) to read as follows:

### § 212.5   Parole of aliens into the United States.

*    *    *    *    *

(e) * * *

(2) * * *

(iii) Any alien granted parole into the United States so that he or she may transit through the United States in the course of removal from Canada shall have his or her parole status terminated upon notice, as specified in § 212.5(e)(2)(i), if he or she makes known to an immigration officer of the United States a fear of persecution or an intention to apply for asylum. Upon termination of parole, any such alien shall be regarded as an applicant for admission, and processed accordingly by the Department of Homeland Security.

*    *    *    *    *

Dated: January 26, 2004.

**Tom Ridge,**

*Secretary of Homeland Security.*

[FR Doc. 04–5077 Filed 3–5–04; 8:45 am]

**BILLING CODE 4410–10–P**

## DEPARTMENT OF JUSTICE

**8 CFR Parts 1003, 1208, 1212, and 1240**

**[EOIR No. 142P; AG Order No. 2709–2004]**

**RIN 1125–AA46**

### Asylum Claims Made by Aliens Arriving from Canada at Land Border Ports-of-Entry

**AGENCY:** Executive Office for Immigration Review, Justice.

**ACTION:** Proposed rule.

---

**SUMMARY:** The recent Safe Third Country agreement between the United States and Canada provides new procedures for dealing with certain categories of aliens crossing at land border ports-of-entry between the United States and Canada, or in transit from Canada or the United States, and who express a fear of persecution or torture if returned to the country of their nationality or habitual residence. The Agreement recognizes that the United States and Canada are safe third countries, each of which offers full procedures for nationals of other countries to seek asylum or other protection. Accordingly, subject to several specific exceptions, the Agreement provides for the United States to return such arriving aliens to Canada, the country of last presence, to seek protection under Canadian law, rather than applying for asylum in the United States. Subject to the stated exceptions, such aliens attempting to travel from Canada to the United States, or vice versa, will be allowed to seek asylum or other protection in one country or the other, but not in both.

Elsewhere in this issue of the **Federal Register**, the Department of Homeland Security (DHS) is publishing a proposed rule that would, among other things, give asylum officers the authority to apply the Agreement with respect to arriving aliens. This proposed rule provides that the immigration judges will not review the threshold factual determinations by asylum officers that an alien does not satisfy any of the exceptions under the Agreement. However, for any alien who the asylum officer determines is not barred by the Agreement, the existing credible fear process under section 235(b) of the Immigration and Nationality Act (Act) remains unchanged, including the right to seek review by an immigration judge. Finally, this rule provides authority for an immigration judge to apply the Agreement with respect to aliens whom DHS has chosen to place in removal proceedings under section 240 of the Act.

exception under the Agreement during this threshold screening interview, the alien is ineligible to apply for asylum in the United States. After review of this finding by a supervisory asylum officer, the alien shall be advised that he or she will be removed to Canada in order to pursue his or her claims relating to a fear of persecution or torture under Canadian law. Aliens found ineligible to apply for asylum under this paragraph shall be removed to Canada.

(ii) If the alien establishes by a preponderance of the evidence that he or she qualifies for an exception under the terms of the Agreement, the asylum officer shall make a written notation of the basis of the exception, and then proceed immediately to a determination concerning whether an alien has a credible fear of persecution or torture.

(iii) An alien qualifies for an exception to the Agreement if the alien is not being removed from Canada in transit through the United States and:

(A) Is a citizen of Canada or, not having a country of nationality, is a habitual resident of Canada;

(B) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who has been granted asylum, refugee, or other lawful status in the United States, provided, however, that this exception shall not apply to an alien whose relative maintains only nonimmigrant visitor status, as defined in section 101(a)(15)(B) of the Act, or whose relative maintains only visitor status based on admission to the U.S. pursuant to the Visa Waiver Program;

(C) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who is at least 18 years of age and has an asylum application pending before U.S. of Citizenship and Immigration Services, the Executive Office for Immigration Review, or on appeal in federal court in the United States;

(D) Is unmarried, under 18 years of age, and does not have a parent or legal guardian in either Canada or the United States;

(E) Arrived in the United States with a validly issued visa or other valid admission document, other than for transit, issued by the United States, or, being required to hold a visa to enter Canada, was not required to obtain a visa to enter the United States; or

(F) The Department of Homeland Security determines, in the exercise of unreviewable discretion, that it is in the public interest to allow the alien to pursue a claim for asylum, withholding of removal, or protection under the Convention Against Torture, in the United States.

(iv) As used in § 208.30(e)(6)(iii)(B), (C) and (D) only, ''legal guardian'' means a person currently vested with legal custody of such an alien or vested with legal authority to act on the alien's behalf, provided that such an alien is both unmarried and less than 18 years of age, and provided further that any dispute with respect to whether an individual is a legal guardian will be resolved on the basis of U.S. law.

\*      \*      \*      \*      \*

(g) \* \* \*

(2) \* \* \*

(i) Immigration judges will review negative credible fear findings as provided in 8 CFR 1208.30(g)(2).

\*      \*      \*      \*      \*

## PART 212—DOCUMENTARY REQUIREMENTS; NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

4. The authority citation for part 212 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1187, 1225, 1226, 1227, 1228; 8 CFR part 2.

5. Section 212.5 is amended by adding new paragraph (e)(2)(iii) to read as follows:

### § 212.5  Parole of aliens into the United States.

\*      \*      \*      \*      \*

(e) \* \* \*

(2) \* \* \*

(iii) Any alien granted parole into the United States so that he or she may transit through the United States in the course of removal from Canada shall have his or her parole status terminated upon notice, as specified in § 212.5(e)(2)(i), if he or she makes known to an immigration officer of the United States a fear of persecution or an intention to apply for asylum. Upon termination of parole, any such alien shall be regarded as an applicant for admission, and processed accordingly by the Department of Homeland Security.

\*      \*      \*      \*      \*

Dated: January 26, 2004.

**Tom Ridge,**

*Secretary of Homeland Security.*

[FR Doc. 04–5077 Filed 3–5–04; 8:45 am]

**BILLING CODE 4410–10–P**

## DEPARTMENT OF JUSTICE

**8 CFR Parts 1003, 1208, 1212, and 1240**

**[EOIR No. 142P; AG Order No. 2709–2004]**

**RIN 1125–AA46**

### Asylum Claims Made by Aliens Arriving from Canada at Land Border Ports-of-Entry

**AGENCY:** Executive Office for Immigration Review, Justice.

**ACTION:** Proposed rule.

**SUMMARY:** The recent Safe Third Country agreement between the United States and Canada provides new procedures for dealing with certain categories of aliens crossing at land border ports-of-entry between the United States and Canada, or in transit from Canada or the United States, and who express a fear of persecution or torture if returned to the country of their nationality or habitual residence. The Agreement recognizes that the United States and Canada are safe third countries, each of which offers full procedures for nationals of other countries to seek asylum or other protection. Accordingly, subject to several specific exceptions, the Agreement provides for the United States to return such arriving aliens to Canada, the country of last presence, to seek protection under Canadian law, rather than applying for asylum in the United States. Subject to the stated exceptions, such aliens attempting to travel from Canada to the United States, or vice versa, will be allowed to seek asylum or other protection in one country or the other, but not in both.

Elsewhere in this issue of the **Federal Register**, the Department of Homeland Security (DHS) is publishing a proposed rule that would, among other things, give asylum officers the authority to apply the Agreement with respect to arriving aliens. This proposed rule provides that the immigration judges will not review the threshold factual determinations by asylum officers that an alien does not satisfy any of the exceptions under the Agreement. However, for any alien who the asylum officer determines is not barred by the Agreement, the existing credible fear process under section 235(b) of the Immigration and Nationality Act (Act) remains unchanged, including the right to seek review by an immigration judge. Finally, this rule provides authority for an immigration judge to apply the Agreement with respect to aliens whom DHS has chosen to place in removal proceedings under section 240 of the Act.

**DATES:** Written comments must be submitted on or before May 7, 2004.

**FOR FURTHER INFORMATION CONTACT:** Chuck Adkins-Blanch, General Counsel, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2600, Falls Church, Virginia 22041, telephone (703) 305–0470.

**ADDRESSES:** Please submit written comments to Chuck Adkins-Blanch, General Counsel, Executive Office for Immigration Review, Office of the General Counsel, 5107 Leesburg Pike, Suite 2600, Falls Church, Virginia, 22041. To ensure proper handling, please reference RIN No. 1125–AA46 on your correspondence. The public may also submit comments electronically to the EOIR at *eoir.regs@usdoj.gov*. When submitting comments electronically, you must include RIN No.1125–AA46 in the subject box.

**SUPPLEMENTARY INFORMATION:** On December 5, 2002, the governments of the United States and Canada signed the Agreement Between the Government of the United States and the Government of Canada For Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries ("bilateral Agreement with Canada" or "Agreement"). The Agreement will not take effect until the United States has promulgated implementing regulations and Canada has completed its own necessary domestic procedures to bring the Agreement into force. The supplementary information in the proposed rule of the Department of Homeland Security published elsewhere in this issue of the **Federal Register** explains in greater detail the goals of the Agreement and the reasons for including its particular terms and exceptions, and persons commenting on this rule should keep in mind the discussion of these issues in the DHS proposed rule.

**Terms of the Agreement**

This Agreement permits the United States to return to Canada, the country of last presence, certain aliens seeking protection who attempt to enter the United States from Canada at a land border port-of-entry, or are being removed from Canada in transit through the United States. Such aliens are not eligible to apply for asylum, withholding of removal, or protection under the Convention Against Torture in the United States, unless one of the exceptions stated in the Agreement applies. Under the Agreement, those aliens who are returned to Canada will have their protection claims adjudicated by Canadian authorities under Canadian law. Similarly, the Agreement permits

Canada to return to the United States certain aliens seeking protection attempting to enter Canada from the United States at land border ports-of-entry, and certain aliens being removed from the United States in transit through Canada. In either case, the Agreement ensures that the asylum seekers will have access to a full and fair procedure for determining their asylum or other protection claims, either by the United States or by Canada, before the alien can be returned to the country of his or her nationality or habitual residence.

The Agreement applies to aliens arriving from Canada who are inadmissible under section 212(a)(6)(C) (fraud or willful misrepresentation) or section 212(a)(7) (failure to present proper documents) of the Immigration and Nationality Act (Act), 8 U.S.C. 1182(a)(6)(C), (7). In general, all arriving aliens who are inadmissible on either of those grounds are subject to expedited removal pursuant to section 235(b) of the Act. Under 8 CFR 235.3(b)(4), aliens subject to expedited removal who seek asylum in the United States or otherwise express a fear of persecution or torture are referred to an asylum officer employed by U.S. Citizenship and Immigration Services, a component of DHS, for a credible fear determination in accordance with 8 CFR 208.30.

As stated last year when the Agreement was being negotiated, "Such an arrangement would limit the access of asylum seekers, under appropriate circumstances, to the system of only one of the two countries." 67 FR 46213 (July 12, 2002). Thus, the Agreement provides a threshold basis for returning certain arriving aliens to Canada to pursue their protection claims under Canadian law, but also provides several specific exceptions in which arriving aliens would be permitted to remain in the United States in order to pursue protection under United States law.

In particular, the Agreement provides important exceptions based on concerns for family unity, allowing an arriving alien to remain in the United States to pursue protection claims if the alien has a qualifying family member living in the United States and that family member either has been granted lawful status in the United States (other than visitor), or the family member is over the age of 18 and has filed a pending application for asylum. The range of family members who may qualify as "anchor" relatives due to their presence in the United States is far broader than those recognized under other provisions of immigration law. It includes spouses, sons, daughters, parents, legal guardians, siblings, grandparents, grandchildren, aunts, uncles, nieces,

and nephews. There is a separate exception for minors who do not have a parent in either the United States or Canada, though the definition of "unaccompanied minor" under the Agreement is also different than that used in other contexts under the immigration laws.

The Agreement also has exceptions for an arriving alien who is a citizen of Canada (or a habitual resident of Canada not having a country of nationality), as well as for aliens who presented a valid visa or other travel document (other than for transiting the United States) or were exempt from the requirement to present a passport.

Finally, the Agreement recognizes that the United States Government may conclude, in its discretion, that it is in the public interest to allow an arriving alien to remain in the United States to pursue protection even though the alien does not meet any of the specific exceptions under the Agreement. This latter discretionary determination is reserved to DHS alone and is not within the province of the immigration judges to review or grant.

The DHS proposed rule on this subject provides a more complete discussion of the Agreement, and the exceptions under the Agreement that would be codified at 8 CFR 208.30. The specific terms of the bilateral Agreement with Canada can be found on the DHS Web site at *http://www.uscis.gov*.

*Legal Authority Permitting the Use of a Bilateral Agreement as a Bar to Applying for Asylum*

Section 208(a)(1) of the Act permits any alien who is physically present in or who arrives at the United States to apply for asylum, and specifically recognizes the right of arriving aliens to present claims for asylum through the credible fear review process under section 235(b) of the Act. However, section 208(a)(2)(A) of the Act states that the right to apply for asylum under paragraph (1) shall not apply where, "pursuant to a bilateral or multilateral agreement, the alien may be removed to a country where the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General [or the Secretary of Homeland Security] finds that it is in the public interest for the alien to receive asylum in the United States."

The bilateral Agreement with Canada allocates responsibility between the

United States and Canada for processing claims of certain asylum-seekers, enhancing the two nations' ability to manage, in an orderly fashion, asylum claims brought by persons crossing our common border. At present, it is the only agreement, for purposes of section 208(a)(2)(A) of the Act, that would bar an arriving alien from applying for asylum in the United States.

**Implementation of the Agreement**

The DHS rule published elsewhere in this issue of the **Federal Register** proposes to revise the DHS rules in 8 CFR chapter I, parts 208 and 212 to implement the provisions of the Agreement. This rule proposes revisions to the regulations of the Department of Justice relating to the role of immigration judges in implementing the Agreement.

Until February 28, 2003, the regulations governing the immigration judges and the Board of Immigration Appeals (BIA) were also in 8 CFR chapter I because the former Immigration and Naturalization Service (INS) and the Executive Office for Immigration Review (EOIR) were both part of the Department of Justice under the authority of the Attorney General. On March 1, 2003, however, the functions of the former INS were transferred from the Department of Justice to DHS pursuant to the Homeland Security Act (HSA), Public Law 107–296, 116 Stat, 2135, 2178 (2002). That law also provided that EOIR (including the administrative adjudications conducted by the immigration judges and the BIA) remains in the Department of Justice under the authority of the Attorney General. Accordingly, on February 28, 2003, the Attorney General published a technical rule that reorganized title 8 of the Code of Federal Regulations to reflect the transfer of the functions of the former INS to DHS while creating a separate set of regulations pertaining to EOIR. *See* Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 FR 9824 (Feb. 28, 2003). This technical rule created a new chapter V in 8 CFR and transferred or duplicated certain parts and sections from chapter I to the new chapter V and made other amendments. The regulations governing proceedings before EOIR are now contained in 8 CFR chapter V, beginning with part 1001. The DHS regulations pertaining to the Act remain in 8 CFR chapter I.

In its rule, DHS proposes to implement the Agreement by revising 8 CFR 208.4 and 208.30 to permit asylum officers to conduct a threshold screening to determine whether or not an alien

qualifies for an exception under the Agreement that would allow the alien to pursue an asylum or protection claim in the United States. The exceptions are listed in 8 CFR 208.30(e)(6)(iii) of the DHS proposed rule. If the arriving alien does not qualify for an exception under the Agreement, there would be no need for a credible fear determination on the merits of the alien's asylum claims and, accordingly, no right to seek review of the merits of the asylum claims by an immigration judge, as discussed below. The alien would be returned to Canada to pursue an asylum or protection claim under Canadian law. If the arriving alien does qualify for an exception to the Agreement, the asylum officer would proceed promptly to consider the merits of the alien's claims for protection under United States law through the regular credible fear process. Finally, DHS adopts definitions of ''credible fear of persecution'' and ''credible fear of torture'' in the 8 CFR 208.30(e).

This proposed rule is a companion to the DHS rule. Because the immigration judges and the BIA have independent authority over asylum and withholding claims made by aliens in removal proceedings, the Attorney General duplicated all of the provisions of 8 CFR part 208 as a new part in 8 CFR chapter V, part 1208. While DHS is making changes to its regulations in part 208 governing the asylum officers, the Attorney General in this rule is proposing to make changes to parts 1003 and 1208, relating to review of negative credible fear determinations by immigration judges, and part 1240, relating to the application of the Agreement to aliens in removal proceedings.

This rule takes account of the proposed changes being made by DHS in 8 CFR part 208, but does not propose to duplicate in part 1208 the full text of all of those changes. Many of the changes that DHS is proposing to make to 8 CFR 208.30 pertain only to the actions of the asylum officers, and do not directly affect the authority of the immigration judges and the BIA. Thus, in many instances, this rule will remove existing language from 8 CFR part 1208.30 and simply insert cross-references to the provisions of the DHS regulations in part 208.30 rather than reprinting them in full. In addition, because the provisions in 8 CFR 212.5 relating to the granting of parole pertain to actions by the Department of Homeland Security, and do not directly affect the authority of the immigration judges and the BIA, this rule does not attempt to track the changes that DHS is proposing to make to 8 CFR 212.5. Instead, this rule proposes to remove the

entire text of the parallel provision in 8 CFR 1212.5 and merely insert a cross-reference to the DHS regulations in 8 CFR 212.5.

**Threshold Screening of an Alien's Eligibility Under the Agreement**

Under section 235(b)(1)(B)(iii)(III) of the Act, an arriving alien who has received a negative credible fear determination by an asylum officer may request a prompt review by an immigration judge. The purpose of this review by an immigration judge is to allay concerns that an arriving alien might be returned to the country of his or her nationality or habitual residence to face persecution or torture, without having had an adequate opportunity to present his or her claims to U.S. immigration officials. The current regulations governing review of credible fear determinations by immigration judges are codified in 8 CFR 1003.42 and 1208.30(g)(2). In the credible fear review process, the alien is able to present any information relating to the likelihood of persecution or torture if the alien were removed to the country of his or her nationality or habitual residence.

For aliens who are subject to the Agreement, however, the threshold question is whether the alien should be returned to Canada for Canadian authorities to consider the merits of that alien's claims, or whether the alien will be allowed to pursue protection in the United States. Because the threshold nature of the issues under the Agreement is quite different from the issues relating to the merits of an alien's claimed fear of persecution or torture if returned to his or her country of nationality, this proposed rule, like the DHS rule, does not provide for an immigration judge to review an asylum officer's threshold determination under the Agreement that the alien should be returned to Canada for a determination of his or her asylum claims under Canadian law.

In the credible fear process, asylum officers consider the merits of the claimed fear of persecution or torture in making a credible fear determination. If the asylum officer makes a negative credible fear determination, the alien has the right to have an immigration judge review the merits of that determination. In contrast, in the case of an arriving alien from Canada who is subject to the Agreement and does not meet any of the exceptions, the merits of the alien's claims would not even arise in any proceedings before an immigration judge, and there would be no occasion for an immigration judge to consider or determine whether or not

the alien in fact has a credible fear of facing persecution or torture if returned to the country of his or her nationality or habitual residence. Such issues are irrelevant to a review of the specific exceptions under the Agreement (since the public interest exception under the Agreement is for DHS alone to consider, not an immigration judge). Unless the alien is under the age of 18 and unaccompanied, the principal issue for DHS to consider under the Agreement as a practical matter in deciding if the alien meets one of the exceptions will be whether the alien has a qualifying family member living in the United States (*i.e.*, a qualifying family member who is either in lawful immigration status in the United states, other than as a visitor, or has a pending asylum application).

Given the narrowness of the factual issues, the Department believes that the applicability of the Agreement can readily be considered and adjudicated by asylum officers. None of the threshold factual determinations under the Agreement has any relationship to the merits of an arriving alien's asylum claims, and none calls for the kind of expert judgment exercised by immigration judges in conducting credible fear reviews concerning the merits of an arriving alien's asylum claims. In addition, because the law requires that arriving aliens be detained, providing for reviews by immigration judges of these threshold issues under the Agreement through a credible fear review would likely result in prolonging the detention of such aliens, since the law provides that such a credible fear review can occur as late as 7 days after the asylum officer's determination. For these reasons, this rule provides that an immigration judge will not have jurisdiction to review an asylum officer's threshold determination under the Agreement that an alien is to be returned to Canada in order to pursue an adjudication of his or her asylum claims under Canadian law.

### Removal Proceedings

New § 1240.11(g) provides rules pertaining to an arriving alien who is subject to the Agreement but DHS, in its discretion, decides to place the alien into removal proceedings under section 240 of the Act, rather than in expedited removal. Thus, if the immigration judge determines that the alien was placed into removal proceedings in connection with his or her arrival at a United States port-of-entry on the United States/Canadian land border, the alien would not be eligible to apply for asylum pursuant to section 208(a)(2)(A) of the Act unless an exception to the

Agreement is applicable. DHS might decide, in its discretion, to place an arriving alien into regular removal proceedings, for example, in order to lodge additional charges of inadmissibility against the alien, or, as suggested in the supplementary information in the DHS draft rule, because the alien is a minor. However, if DHS is seeking removal of the alien upon his or her arrival from Canada at a United States land border, it does not make any legal difference under the Agreement and under section 208(a)(2)(A) of the Act whether DHS has decided to use expedited removal procedures under section 235 of the Act or regular removal proceedings under section 240 of the Act.

Under this rule, an alien in regular removal proceedings who is subject to the Agreement would not be able to pursue an application for asylum, withholding of removal, or protection under the Convention Against Torture before the immigration judge, unless the alien satisfies the burden of proof to establish by a preponderance of the evidence that he or she qualifies for an exception to the Agreement, other than the public interest exception. (As previously noted, the decision to invoke the public interest exception is solely within the discretion of DHS. If DHS determines that it is in the public interest to allow a covered alien to pursue a claim for asylum or withholding of removal in removal proceedings, then DHS will file a written notice of its decision before the immigration judge, as provided in new 8 CFR 1240.11(g)(3).) If the alien does not establish an exception, he/she will be returned to Canada (the country of the alien's last presence) in order to pursue his or her protection claims there under Canadian law. As provided in the Agreement, the United States cannot remove an arriving alien who is covered by the Agreement to any country other than Canada in order to have recourse to protection under Canadian law.

This rule does not affect any other individuals applying for asylum in removal proceedings who are not subject to the Agreement. In particular, under the terms of the Agreement, an alien who is charged with grounds of deportability after being found in the United States will not be subject to the limitations of the Agreement, even if the alien had previously entered the United States from Canada, or any alien who arrived in the United States by air or water, or who entered the United States illegally at any point between the established land border port-of-entry.

As suggested in the supplementary information in the DHS proposed rule, DHS may exercise its discretion to place certain minors into removal proceedings under section 240 of the Act, rather than in expedited removal, when they arrive at a port-of-entry at the United States/Canadian land border. The Agreement uses a different definition of the term ''unaccompanied minor'' than is used in other contexts under the immigration laws. An unmarried arriving alien under the age of 18 who does not have a parent either in the United States or Canada will be exempt from the Agreement as an ''unaccompanied minor,'' and will be permitted to pursue claims for asylum, withholding of removal, and protection under the Convention Against Torture before the immigration judge. However, a minor arriving from Canada who does have a parent either in the United States or in Canada will not be eligible for the exception as an unaccompanied minor under the terms of the Agreement (whether or not the alien may be considered an unaccompanied minor for other purposes under the immigration laws). Unless such an alien is able to satisfy one of the other exceptions under the Agreement—such as having a qualifying family member in the United States who either has been granted lawful status or has a pending asylum application—then the minor would not be eligible to apply for asylum, withholding of removal, or protection under the Convention Against Torture before the immigration judge. The immigration judge would consider applications for any other forms of relief for which the alien might be eligible and, if the alien is ultimately ordered removed, he or she would be returned to Canada in order to pursue claims for asylum or refugee protection under Canadian law.

For example, if a 15-year-old asylum-seeker arrives at a United States/Canada land-border port-of-entry without other family members, DHS may choose to place the alien in removal proceedings according to its own policies. In the course of the removal proceedings, the immigration judge will first determine whether the minor has a parent or legal guardian in the United States or Canada, in order to determine whether the ''unaccompanied minor'' exception to the Agreement applies. If the minor does have a parent or legal guardian in the United States or Canada, the immigration judge will determine whether any of the other exceptions to the Agreement apply. For example, if the alien's parent is living in the United States, the minor would not be an ''unaccompanied minor'' under the

Agreement, but the parent may be a qualifying relative if the parent either has been granted lawful status in the United States other than as a visitor or has a pending asylum application, as provided in other exceptions to the Agreement.

An alien who is found to be ineligible to apply for asylum pursuant to section 208(a)(2)(A) of the Act and the bilateral Agreement with Canada will be removed to Canada to have all of his or her claims for protection adjudicated by Canadian authorities under Canadian law. Accordingly, this rule adds § 1240.11(g)(4) to provide that an alien in removal proceedings who is subject to the Agreement is ineligible to apply for withholding of removal under section 241(b)(3) of the Act and the Convention Against Torture if it is determined that he or she is ineligible to apply for asylum based on the Agreement.

Section 241(b)(3)(A) of the Act prohibits removal of an alien to a country where the alien's life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion. Similarly, Article 3 of the Convention Against Torture prohibits the return of an individual to another country where there are substantial grounds for believing that he or she would be subject to torture. These provisions, however, do not prevent the United States from removing an individual to any safe third country in which the person would not face the threat of persecution or torture.

Like the United States, Canada is a signatory to the 1967 Protocol Relating to the Status of Refugees ("Protocol") [1] and the Convention against Torture. Article 3 of the bilateral Agreement with Canada provides that "the Parties shall not return or remove a refugee status claimant referred by either Party under the terms of [the Agreement] to another country until an adjudication of the person's refugee status claim has been made." In Article 1, the Agreement defines a refugee status claim to include a request for protection consistent with the Protocol and the Convention Against Torture. Therefore, returning an individual to Canada pursuant to the terms of the Agreement is consistent with United States' obligations not to return an individual to a country where

the person would face persecution or torture.

*Individuals Being Removed from Canada Who Seek Protection While in Transit Through the United States*

Pursuant to the Agreement, if a person is being removed from Canada in transit through the United States and expresses a fear of persecution or torture or an intention to apply for asylum, the person will be returned to Canada for Canadian authorities to determine the refugee status claim, in accordance with Canadian law. The inspection of an alien who falls into this category is explained in the supplementary information in the DHS proposed rule. Generally, an individual being removed from Canada in transit through the United States will be placed in expedited removal proceedings, though there may be some rare instances in which the individual will be placed in removal proceedings under section 240 of the Act. The DHS rule provides that such individuals will receive the same threshold screening by an asylum officer as an alien who seeks entry to the United States at a land border port-of-entry between Canada and the United States. However, the exceptions for unaccompanied minors, qualifying family members, and valid travel documents do not apply to an alien being removed from Canada in transit through the United States. Because the Agreement provides no exceptions to the obligation to return such alien to Canada, except for the public interest exception, and the public interest exception itself would not be within the authority of an immigration judge to consider in any event, there is essentially nothing for an immigration judge to review in this context and no purpose to be served by providing for such review. For those rare instances in which an alien being removed in transit through the United States is placed in removal proceedings pursuant to section 240 of the Act, the immigration judge will not consider any claims of asylum, withholding of removal, or protection under the Convention Against Torture (unless DHS files a written notice in the proceedings that it has decided it is in the public interest to allow the alien to pursue those claims in the United States), and after completion of the proceedings, if the alien is ordered removed, the alien will be returned to Canada. On the other hand, if DHS files a written notice in the proceedings that it is in the public interest to allow the alien to pursue protection claims in the United States, then the alien will pursue his or her claim for protection in the removal proceedings, and, if ordered

removed, will be ordered removed to an appropriate country of removal.

**Regulatory Flexibility Act**

The Attorney General, in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)), has reviewed this regulation and, by approving it, certifies that this rule will not have a significant economic impact on a substantial number of small entities. This rule affects individual aliens, as it relates to claims of asylum. It does not affect small entities, as that term is defined in 5 U.S.C. 601(6).

**Unfunded Mandates Reform Act of 1995**

This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

**Small Business Regulatory Enforcement Fairness Act of 1996**

This rule is not a major rule as defined by section 251 of the Small Business Regulatory Enforcement Act of 1996 (5 U.S.C. 804). This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

**Executive Order 12866**

The Attorney General has determined that this rule is a "significant regulatory action" under Executive Order 12866, section 3(f), Regulatory Planning and Review, and, accordingly, this rule has been submitted to the Office of Management and Budget for review. In particular, the Department has assessed both the costs and benefits of this rule as required by Executive Order 12866, section 1(b)(6) and has made a reasoned determination that the benefits of this regulation justify its costs.

The proposed rule would implement a bilateral agreement that allocates responsibility between the United States and Canada for processing claims of certain asylum-seekers, enhancing the two nations' ability to manage, in an orderly fashion, asylum claims brought by persons crossing our common border. The rule applies to certain individuals

---

[1] Section 241(b)(3) of the Act is based on Article 33 of the Protocol. *See INS* v *Stevic*, 467 U.S. 407, 421 (1984) ("Section 203(e) of the Refugee Act of 1980 amended the language of § 243(h) [currently § 241(b)(3) of the Act] basically conforming it to the language of Article 33 of the United Nations Protocol.")

in removal proceedings who apply for asylum. This rule simply adds another factor for immigration judges to consider in removal proceedings. Therefore, the "tangible" costs of this rulemaking to the U.S. Government are minimal. Applicants who are found to be subject to the bilateral Agreement with Canada will be returned to Canada to seek asylum, saving the U.S. Government the cost of adjudicating their asylum claims.

The cost to asylum-seekers who, under the proposed rule, will be returned to Canada are the costs of pursuing an asylum claim in Canada, as opposed to the United States. There is no fee to apply for asylum in Canada and, under Canadian law, asylum-seekers are provided social benefits that they are not eligible for in the United States. Therefore, the tangible costs of seeking asylum in Canada are no greater than they are in the United States. The "intangible" costs to asylum-seekers who would be returned to Canada under the proposed rule are the costs of potential separation from support networks they may be seeking to join in the United States. However, the Agreement contains broad exceptions based on principles of family unity that would generally allow those with family connections in the United States to seek asylum in the United States under existing regulations.

**Executive Order 13132**

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

**Executive Order 12988 Civil Justice Reform**

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

**Paperwork Reduction Act**

The provisions of the Paperwork Reduction Act of 1995, Public Law 104–13, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320, do not apply to this proposed rule because there are no new or revised recordkeeping or reporting requirements.

**Family Assessment Statement**

The Attorney General has reviewed this regulation and assessed this action in accordance with the criteria specified by section 654(c)(1) of the Treasury General Appropriations Act, 1999, Public Law 105–277, Div. A. The Attorney General has determined that it will not affect family well-being as that term is defined in section 654.

The separate proposed rule published by the Department of Homeland Security explains that an alien arriving at a land border port-of-entry with Canada may qualify for an exception to the bilateral Agreement with Canada, which otherwise requires individuals to seek protection in the country of last presence (Canada), by establishing a relationship to a family member in the United States who has lawful status in the United States, other than a visitor, or is 18 years of age or older and has an asylum application pending. The DHS proposed rule addresses issues relating to family well-being in connection with that rule.

This proposed rule provides that the immigration judges will apply the same administrative guidelines of "family member" in the DHS proposed rule, in those cases where DHS has chosen to place an alien who is subject to the Agreement into removal proceedings under section 240 of the Act. However, that is expected to occur only very rarely. In any other case, where DHS does not choose to place an arriving alien into removal proceedings under section 240 of the Act, this rule has no effect on family well-being, because the immigration judges will not be involved.

**List of Subjects**

*8 CFR Part 1003*

Administrative practice and procedure, Aliens, Immigration, Legal services, Organization and function (Government agencies).

*8 CFR Part 1208*

Administrative practice and procedure, Aliens, Immigration, and Reporting and recordkeeping requirements.

*8 CFR Part 1212*

Administrative practice and procedure, Aliens, Immigration, Passports and visas and Reporting and recordkeeping requirements.

*8 CFR Part 1240*

Administrative practice and procedure and Aliens.

Accordingly, chapter V of title 8 of the Code of Federal Regulations is proposed to be amended as follows:

**PART 1003—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**

1. The authority citation for part 1003 continues to read as follows:

**Authority:** 5 U.S.C. 301; 8 U.S.C. 1101 note, 1103, 1252 note, 1252b, 1324b, 1362; 28 U.S.C. 509, 510, 1746; sec. 2, Reorg. Plan No. 2 of 1950, 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub. L. 105–100, 111 Stat. 2196–200; sections 1506 and 1510 of Pub. L. 106–386; 114 Stat. 1527–29, 1531–32; section 1505 of Pub. L. 106–554, 114 Stat. 2763A–326 to –328.

2. Section 1003.42 is amended by adding new paragraph (h) to read as follows:

**§ 1003.42   Review of credible fear determinations.**

\*   \*   \*   \*   \*

(h) Safe third country agreement—(1) Arriving alien. An immigration judge shall have no jurisdiction to review a determination by an asylum officer that an arriving alien is not eligible to apply for asylum pursuant to a bilateral or multilateral agreement (the agreement) under section 208(a)(2)(A) of the Act and should be returned to a safe third country to pursue his or her asylum claims under the laws of that country. See 8 CFR 208.30(e)(6).

(2) Aliens in transit. An immigration judge has no jurisdiction to review any determination by DHS that an alien being removed from Canada in transit through the United States should be returned to Canada to pursue asylum claims under Canadian law, under the terms of a safe third country agreement with Canada.

\*   \*   \*   \*   \*

**PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

3. The authority citation for part 1208 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1158, 1226, 1252, 1282.

4. Section 1208.4 is amended by adding new paragraph (a)(6) to read as follows:

**§ 1208.4   Filing the application.**

\*   \*   \*   \*   \*

(a) \* \* \*

(6) Safe third country agreement. Immigration judges have authority to consider issues under section 208(a)(2)(A) of the Act, relating to the determination of whether an alien is ineligible to apply for asylum and should be removed to a safe third

country pursuant to a bilateral or multilateral agreement, only with respect to aliens whom DHS has chosen to place in removal proceedings under section 240 of the Act, as provided in 8 CFR 1240.11(g). For DHS regulations relating to determinations by asylum officers on this subject, see 8 CFR 208.30(e)(6).

\* \* \* \* \*

5. Section 1208.30 is amended by:

a. Revising paragraphs (a) and (e); and by

b. Removing and reserving paragraphs (c), (d), (f) and (g)(1).

The revisions read as follows:

### § 1208.30  Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.

(a) Jurisdiction. The provisions of this subpart apply to aliens subject to sections 235(a)(2) and 235(b)(1) of the Act. Pursuant to section 235(b)(1)(B), asylum officers have exclusive jurisdiction to make credible fear determinations, and the immigration judges have exclusive jurisdiction to review such determinations.

\* \* \* \* \*

(e) Determination. For the standards and procedures for asylum officers in conducting credible fear interviews and in making positive and negative credible fear determinations, see 8 CFR 208.30(b), (c), (d), (e), (f), and (g)(1). The immigration judges will review such determinations as provided in paragraph (g)(2) of this section and 8 CFR 1003.42.

\* \* \* \* \*

## PART 1212—DOCUMENTARY REQUIREMENTS; NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

6. The authority citation for part 1212 is revised to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103.

7. Section 1212.5 is revised to read as follows:

### § 1212.5  Parole of aliens into the United States.

Procedures and standards for the granting of parole by the Department of Homeland Security can be found at 8 CFR 212.5.

## PART 1240—PROCEEDINGS TO DETERMINE REMOVABILITY OF ALIENS IN THE UNITED STATES

8. The authority citation for part 1240 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1182, 1186a, 1224, 1225, 1226, 1227, 1251, 1252 note,

1252a, 1252b, 1362; secs. 202 and 203, Pub. L. 105–100, 111 Stat. 2160, 2193; sec. 902, Pub. L. 105–277, 112 Stat. 2681; sec. 1101, Pub. L. 107–269, 116 Stat. 2135.

9. Section 1240.11 is amended by adding a new paragraph (g), to read as follows:

### § 1240.11  Ancillary matters, applications.

\* \* \* \* \*

(g) Safe third country agreement. (1) The immigration judge has authority to apply section 208(a)(2)(A) of the Act, relating to a determination that an alien may be removed to a safe third country pursuant to a bilateral or multilateral agreement, in the case of an alien who is subject to the terms of the agreement and is placed in proceedings pursuant to section 240 of the Act without being processed under section 235 of the Act. In an appropriate case, the immigration judge shall determine whether under the Agreement the alien should be returned to the safe third country, or whether the alien should be permitted to pursue asylum or other protection claims in the United States.

(2) An alien described in paragraph (g)(1) of this section is ineligible to apply for asylum, pursuant to section 208(a)(2)(A) of the Act, unless the immigration judge determines, by preponderance of the evidence, that:

(i) The agreement does not apply to the alien or does not preclude the alien from applying for asylum in the United States; or

(ii) The alien qualifies for an exception to the agreement as set forth in paragraph (g)(3) of this section.

(3) The immigration judge shall apply the applicable regulations in deciding whether the alien qualifies for any exception under the agreement that would permit the United States to exercise authority over the alien's asylum claim. The exceptions under the agreement are codified at 8 CFR 208.30(e)(6)(iii). The immigration judge shall not review, consider, or decide any issues pertaining to any discretionary determination on whether the alien should be permitted to pursue an asylum claim in the United States notwithstanding the general terms of the agreement, as such discretionary public interest determinations are reserved to the Department of Homeland Security. However, an alien in removal proceedings who is otherwise ineligible to apply for asylum under the agreement may apply for asylum if the Department of Homeland Security files a written notice in the proceedings before the immigration judge that it has decided in the public interest to allow the alien to pursue claims for asylum or

withholding of removal in the United States.

(4) An alien who is found to be ineligible to apply for asylum under section 208(a)(2)(A) of the Act is ineligible to apply for withholding of removal pursuant to section 241(b)(3) of the Act and the Convention against Torture. However, the alien may apply for any other relief from removal for which the alien may be eligible. If an alien who is subject to section 208(a)(2)(A) of the Act is ordered removed, the alien shall be ordered removed to the safe third country in which the alien will be able to pursue his or her claims for asylum or protection under the laws of that country.

Dated: March 1, 2004.

**John Ashcroft,**
*Attorney General.*

[FR Doc. 04–5065 Filed 3–5–04; 8:45 am]

**BILLING CODE 4410–30–P**

## DEPARTMENT OF AGRICULTURE

## Animal and Plant Health Inspection Service

## 9 CFR Parts 93, 94, and 95

**[Docket No. 03–080–2]**

**RIN 0579–AB73**

## Bovine Spongiform Encephalopathy; Minimal Risk Regions and Importation of Commodities

**AGENCY:** Animal and Plant Health Inspection Service, USDA.

**ACTION:** Proposed rule; reopening of comment period.

**SUMMARY:** We are reopening the comment period for our proposed rule that would amend the regulations regarding the importation of animals and animal products to recognize, and add Canada to, a category of regions that present a minimal risk of introducing bovine spongiform encephalopathy into the United States via live ruminants and ruminant products. The proposed rule also set out conditions under which we would allow the importation of certain live ruminants and ruminant products and byproducts from such regions. This action will allow interested persons additional time to prepare and submit comments.

**DATES:** We will consider all comments that we receive on or before April 7, 2004.

**ADDRESSES:** You may submit comments by any of the following methods:



**Legal Considerations regarding access to protection and a connection between the refugee and the third country in the context of return or transfer to safe third countries**

**Introduction**

1.　　This paper aims to summarise UNHCR's position, reflecting international law and practice, on access to protection and rights in the context of transfer to 'first countries of asylum' and 'safe third countries'. It examines in particular the relevance of a connection between the refugee and the third country in the application of such concepts and the issue of access to and level of protection that needs to be guaranteed by the third country. The evolution of UNHCR's position and the documents in which it has been expressed are set out in the references.

2.　　In line with general state practice and international law, ensuring refugee protection and access to human rights for individual refugees is the responsibility of the state where the refugees are, or which otherwise has jurisdiction over them. This reflects the primary responsibility for protection of the state in which a person arrives and seeks international protection. At the same time, refugees do not have an unfettered right to choose their 'asylum country'.[1] Their intentions, however, ought to be taken into account.[2] Refugees may be returned or transferred to a state where they had found, could have found or, pursuant to a formal agreement, can find international protection. The 1951 Convention relating to the Status of Refugees and its 1967 Protocol do not prohibit such return or transfer. According to relevant conclusions of UNHCR's Executive Committee, where refugees and asylum-seekers move in an irregular manner from a country where they have already found protection, they may be returned to that country.[3] Furthermore, according to relevant conclusions of UNHCR's Executive Committee, where it appears that a person, before requesting asylum, already has a connection or close links with another state, s/he may if it appears fair and reasonable be called upon first to request asylum from that state.[4]

**General considerations on applying the first country of asylum and safe third country concepts**

3.　　The 'first country of asylum' concept is generally applied in cases where a person has already, in a previous state, found international protection that continues to be accessible and effective for the individual concerned. Application of the concept requires an individual assessment of whether the refugee will be readmitted to the 'first country of asylum', granted lawful stay[5] there, and be accorded standards of treatment commensurate with the 1951 Convention and its 1967 Protocol and international human rights standards, including – but not limited to – protection from *refoulement*.[6]

[1] UNHCR, *Guidance Note on bilateral and/or multilateral transfer arrangements of asylum-seekers*, May 2013, para. 3(i), http://www.refworld.org/docid/51af82794.html. UNHCR, *Summary Conclusions on the Concept of "Effective Protection" in the Context of Secondary Movements of Refugees and Asylum-Seekers (Lisbon Expert Roundtable, 9-10 December 2002)*, February 2003, para. 11, http://www.refworld.org/docid/3fe9981e4.html.
[2] *Ibid*. EXCOM Conclusion No. 15 (XXX) 1979, para. (h) (iii).
[3] EXCOM Conclusion No. 58 (XL) 1989, para. (f).
[4] EXCOM Conclusion No. 15 (XXX) 1979, para. (h) (iv).
[5] 'Lawful stay' means a permitted, regularized stay of some duration integral to the refugees' enjoyment of rights and necessary if a state is to implement its obligations under the 1951 Convention, see UNHCR, *"Lawfully Staying" - A Note on Interpretation*, 3 May 1988, paras. 11, 21 and 23, http://www.refworld.org/docid/42ad93304.html.
[6] EXCOM Conclusion No. 58 (XL) 1989, para. (f) and EXCOM Conclusion No. 85 (XLIX) 1998, para. (aa). UNHCR, *Summary Conclusions on the Concept of "Effective Protection" in the Context of Secondary Movements of Refugees and Asylum-Seekers (Lisbon Expert Roundtable, 9-10 December 2002)*, February 2003, para. 15, http://www.refworld.org/docid/3fe9981e4.html. UNHCR, *Global Consultations on International Protection/Third Track: Asylum Processes (Fair and Efficient Asylum Procedures)*, 31 May 2001, EC/GC/01/12, paras. 10 and 11, http://www.refworld.org/docid/3b36f2fca.html. UNHCR, *UNHCR Policy on Refugee Protection and Solutions in Urban*

1

4.     The 'safe third country concept' has been applied in cases where a person could have or can find protection in a third state either in relation to a specific individual case or pursuant to a formal bi- or multilateral agreement between states on the transfer of asylum-seekers.[7] Prior to transfer, it is important, keeping with relevant international law standards, individually to assess whether the third state will:

- (re)admit the person,
- grant the person access to a fair and efficient procedure for determination of refugee status and other international protection needs,
- permit the person to remain while a determination is made, and
- accord the person standards of treatment commensurate with the 1951 Convention and international human rights standards, including – but not limited to – protection from *refoulement*.[8]
- Where she or he is determined to be a refugee, s/he should be recognized as such and be granted lawful stay.[9]

5.     In some circumstances, transfers or relocation of refugees or asylum-seekers under a bilateral or multilateral arrangement has been carried out in the absence of an individual assessment. This would require both the existence and availability of certain objective standards of protection in the third state, as well as firm undertakings by that country that those returned will have access to protection, assistance and solutions in line with the guarantees set out above in paragraph 4. Pre-transfer individual assessments, however, are nonetheless necessary for vulnerable groups, including unaccompanied and separated children, with the best interests of the child being given primary consideration.[10]

**Connection with the third country**

6.     According to relevant conclusions of UNHCR's Executive Committee, regard should be had to the concept that asylum should not be refused solely on the ground that it could be sought from another state. Where, however, it appears that a person, before requesting asylum, already has a connection or close links with another state, s/he may if it appears fair and reasonable be called upon first to request asylum from

---

*Areas*, September 2009, paras. 153 and 154, http://www.refworld.org/docid/4ab8e7f72.html. UNHCR, *Guidance Note on bilateral and/or multilateral transfer arrangements of asylum-seekers*, May 2013, para. 3(vi), http://www.refworld.org/docid/51af82794.html. UNHCR, *Considerations on the "Safe Third Country" Concept*, July 1996, http://www.refworld.org/docid/3ae6b3268.html.

[7] UNHCR, *Guidance Note on bilateral and/or multilateral transfer arrangements of asylum-seekers*, May 2013, para. 2, http://www.refworld.org/docid/51af82794.html.

[8] EXCOM Conclusion No. 85 (XLIX) 1998, para. (aa). UNHCR, *Summary Conclusions on the Concept of "Effective Protection" in the Context of Secondary Movements of Refugees and Asylum-Seekers (Lisbon Expert Roundtable, 9-10 December 2002)*, February 2003, para. 15, http://www.refworld.org/docid/3fe9981e4.html. UNHCR, *Global Consultations on International Protection/Third Track: Asylum Processes (Fair and Efficient Asylum Procedures)*, 31 May 2001, EC/GC/01/12, paras. 14 and 15, http://www.refworld.org/docid/3b36f2fca.html. UNHCR, *UNHCR Policy on Refugee Protection and Solutions in Urban Areas*, September 2009, paras. 153 and 154, http://www.refworld.org/docid/4ab8e7f72.html. UNHCR, *Guidance Note on bilateral and/or multilateral transfer arrangements of asylum-seekers*, May 2013, para. 3(vi), http://www.refworld.org/docid/51af82794.html. UNHCR, *Considerations on the "Safe Third Country" Concept*, July 1996, http://www.refworld.org/docid/3ae6b3268.html.

[9] UNHCR, *Summary Conclusions on the Concept of "Effective Protection" in the Context of Secondary Movements of Refugees and Asylum-Seekers (Lisbon Expert Roundtable, 9-10 December 2002)*, February 2003, para. 15, http://www.refworld.org/docid/3fe9981e4.html. UNHCR, *Guidance Note on bilateral and/or multilateral transfer arrangements of asylum-seekers*, May 2013, para. 3(vi), http://www.refworld.org/docid/51af82794.html.

[10] See, e.g. Article 3 of the Convention on the Rights of the Child (2 September 1990) 1577 UNTS 3; UNHCR, *UNHCR Guidelines on Determining the Best Interests of the Child*, May 2008, http://www.refworld.org/docid/48480c342.html; and UN Committee on the Rights of the Child (CRC), *General comment No. 6 (2005): Treatment of Unaccompanied and Separated Children Outside their Country of Origin*, 1 September 2005, CRC/GC/2005/6, http://www.refworld.org/docid/42dd174b4.html.

DHSIFR646

that state.[11] Requiring a connection between the refugee or asylum-seeker and the third state is not mandatory under international law. The person may well be returned to a country through which s/he may have passed *en route*,[12] or the person may be transferred to a country to which s/he has never been but that has agreed, by way of a formal arrangement, to be responsible.[13] In follow up to relevant conclusions of UNHCR's Executive Committee, UNHCR though has consistently been advocating for a meaningful link or connection to exist that would make it reasonable and sustainable for a person to seek asylum in another state.[14] Taking into account the duration and nature of any sojourn, and connections based on family or other close ties[15] increases the viability of the return or transfer from the viewpoint of both the individual and the state. As such, it reduces the risk of irregular onward movement, prevents the creation of 'orbit' situations [16] and advances international cooperation and responsibility sharing. In this context, transfers to third countries should be aimed at enhancing burden- and responsibility-sharing and international/regional cooperation, and not be burden shifting. Transfers to third countries need to contribute to the enhancement of the overall protection space in the transferring state, the receiving state and/or the region as a whole.[17]

**Access to and level of protection in the third country**

7.     As a precondition to return or transfer of an asylum-seeker or refugee to another country, it is crucial to establish that s/he has access in that country to standards of treatment commensurate with the 1951 Convention, its 1967 Protocol and international human rights standards.[18] While protection from *refoulement* is at the centre of refugee protection principles, the standards of treatment to which refugees and asylum-seekers have a right under the 1951 Convention, its 1967 Protocol and international human rights law go beyond protection from *refoulement*.[19]

---

[11] EXCOM Conclusion No. 15 (XXX) 1979, para. (h) (iv).

[12] UNHCR, *Global Consultations on International Protection/Third Track: Asylum Processes (Fair and Efficient Asylum Procedures)*, 31 May 2001, EC/GC/01/12, paras. 12 and 16, http://www.refworld.org/docid/3b36f2fca.html.

[13] UNHCR, *Guidance Note on bilateral and/or multilateral transfer arrangements of asylum-seekers*, May 2013, para. 2, http://www.refworld.org/docid/51af82794.html.

[14] UNHCR, *Considerations on the "Safe Third Country" Concept*, July 1996, http://www.refworld.org/docid/3ae6b3268.html. UNHCR, *Global Consultations on International Protection/Third Track: Asylum Processes (Fair and Efficient Asylum Procedures)*, 31 May 2001, EC/GC/01/12, para. 16 (final sentence), http://www.refworld.org/docid/3b36f2fca.html. UNHCR, *Summary Conclusions on the Concept of "Effective Protection" in the Context of Secondary Movements of Refugees and Asylum-Seekers (Lisbon Expert Roundtable, 9-10 December 2002)*, February 2003, para. 12, http://www.refworld.org/docid/3fe9981e4.html.

[15] UNHCR has identified such ties as including family relations; previously acquired rights in the state such as previous residence or long-term visits, and linguistic, cultural or other similar ties. See, for example: UNHCR, *Considerations on the "Safe Third Country" Concept*, July 1996, http://www.refworld.org/docid/3ae6b3268.html; UNHCR, *Improving Asylum Procedures: Comparative Analysis and Recommendations for Law and Practice - Detailed Research on Key Asylum Procedures Directive Provisions*, March 2010, p. 311, http://www.refworld.org/docid/4c63e52d2.html.

[16] EXCOM Conclusion No. 71 (XLIV) 1993, para. (k).

[17] UNHCR, *Guidance Note on bilateral and/or multilateral transfer arrangements of asylum-seekers*, May 2013, para. 3(iv), http://www.refworld.org/docid/51af82794.html.

[18] EXCOM Conclusion No. 87 (L) 1999, para. (l), According to which, asylum-seekers and refugees must be treatment in accordance with the highest possible standards of protection.

[19] EXCOM Conclusion No. 85 (XLIX) 1998, para. (aa), stressing that asylum-seekers who are returned to a third country will be treated in accordance with accepted international standards, will be protected from *refoulement*, and will be able to seek and enjoy asylum. UN General Assembly, *Note on International Protection*, 7 July 1999, A/AC.96/914, para. 19, http://www.refworld.org/docid/3ae68d98b.html, considering that no asylum-seeker should be returned to a third country for determination of the claim without sufficient guarantees, in each individual case: that the person will be readmitted to that country; will enjoy there effective protection against *refoulement*; will have the possibility to seek and enjoy asylum; and will be treated in accordance with accepted international standards. UNHCR, *Global Consultations on International Protection/Third Track: Asylum Processes (Fair and Efficient Asylum Procedures)*, 31 May 2001, EC/GC/01/12, para. 11, http://www.refworld.org/docid/3b36f2fca.html, indicating that securing "effective protection" requires the full and durable enjoyment of rights. UN High Commissioner for Refugees (UNHCR), *Guidance Note on bilateral and/or multilateral transfer arrangements of asylum-seekers*, May 2013, para. 3(vi), http://www.refworld.org/docid/51af82794.html. UNHCR, *The Concept of 'Protection Elsewhere'*, 7 IJRL 123 (1995), p. 125, in which UNHCR 'welcomes the fact that the definition of 'safe' now includes not only protection from *refoulement* but also the absence of 'other violations of fundamental human rights', in response to a Note submitted by the government of the United Kingdom to the Inter-Governmental Consultations on 'Sending Asylum Seekers to Safe Third Countries'.

3

8.      Refugees who have been so recognized and found protection in a third state need to have the opportunity to re-avail themselves of the protection previously afforded to them as refugees. Upon return, they need to be granted lawful stay in the country and as such entitled to the corresponding rights of the 1951 Convention, i.e. all rights applicable to refugees generally, including protection from *refoulement* and access to the legal right to pursue gainful employment in accordance with Articles 17, 18 and 19 of the 1951 Convention in order to enable the progressive achievement of self-reliance.[20]

9.      When it has not yet been determined by the third state whether the person seeking protection is a refugee or otherwise in need of international protection, upon return or transfer to the third country the person needs to be granted access to a fair and efficient asylum procedure and be authorized to remain in the country, until and unless a final negative determination of the asylum-seeker's claim to refugee protection is rendered. During this time the asylum-seeker is lawfully in the state.[21] Protective obligations under the 1951 Convention applicable to refugees generally, including protection from *refoulement*, to refugees present in the territory, and to refugees 'lawfully in' are relevant. This includes the requirement for the third state to provide asylum-seekers access to means of subsistence sufficient to maintain an adequate standard of living[22] and to undertake steps to enable the progressive achievement of self-reliance.[23] As such, although the enjoyment of the right to self-employment under Article 18 of the 1951 Convention may be delayed for a limited period of time, it cannot be denied over the long-term because of government delays in the asylum procedures.[24] Once it is determined the person is a refugee, s/he should be granted lawful stay and have access to the corresponding rights of the 1951 Convention as mentioned above in paragraph 8.

10.      Whether standards of treatment commensurate with the 1951 Convention, its 1967 Protocol and international human rights standards are available cannot be answered without looking at the state's international legal obligations, its domestic laws and the actual practice of implementation.[25] To ensure access to protection is effective and enduring, being a state party to the 1951 Convention and/or its 1967 Protocol and basic human rights instruments without any limitations is a critical indicator.[26] Access

---

[20] UNHCR, *Summary Conclusions on the Concept of "Effective Protection" in the Context of Secondary Movements of Refugees and Asylum-Seekers (Lisbon Expert Roundtable, 9-10 December 2002)*, February 2003, para. 15(g), http://www.refworld.org/docid/3fe9981e4.html.
[21] UNHCR, *Guidelines on the Applicable Criteria and Standards relating to the Detention of Asylum-Seekers and Alternatives to Detention*, 2012, para. 13, http://www.refworld.org/docid/503489533b8.html. UNHCR, *"Lawfully Staying" - A Note on Interpretation*, 3 May 1988, http://www.refworld.org/docid/42ad93304.html.
[22] Article 11, International Covenant on Economic, Social and Cultural Rights.
[23] UNHCR, *Improving Asylum Procedures: Comparative Analysis and Recommendations for Law and Practice - Detailed Research on Key Asylum Procedures Directive Provisions*, March 2010, p. 283, http://www.refworld.org/docid/4c63e52d2.html.
[24] (UNHCR), *Expert opinion of UNHCR on issues of the right to work for refugees and asylum-seekers in the case of [South African Somali Association vs Limpopo Department of Economic Development, Environment and Tourism] in the North Gauteng High Court, Pretoria, South Africa*, 14 March 2013, 12/HCR/RSA/ADM/594, http://www.refworld.org/docid/5215d0734.html.
[25] UNHCR, *Global Consultations on International Protection/Third Track: Asylum Processes (Fair and Efficient Asylum Procedures)*, 31 May 2001, EC/GC/01/12, para. 14, http://www.refworld.org/docid/3b36f2fca.html. UNHCR, *Improving Asylum Procedures: Comparative Analysis and Recommendations for Law and Practice - Detailed Research on Key Asylum Procedures Directive Provisions*, March 2010, p. 283, http://www.refworld.org/docid/4c63e52d2.html. UNHCR, *Summary Conclusions on the Concept of "Effective Protection" in the Context of Secondary Movements of Refugees and Asylum-Seekers (Lisbon Expert Roundtable, 9-10 December 2002)*, February 2003, para. 15 (e), http://www.refworld.org/docid/3fe9981e4.html. UNHCR, *Guidance Note on bilateral and/or multilateral transfer arrangements of asylum-seekers*, May 2013, para. 3(iii) and 3(viii), http://www.refworld.org/docid/51af82794.html. UNHCR, *Considerations on the "Safe Third Country" Concept*, July 1996, http://www.refworld.org/docid/3ae6b3268.html.
[26] UNHCR, *Summary Conclusions on the Concept of "Effective Protection" in the Context of Secondary Movements of Refugees and Asylum-Seekers (Lisbon Expert Roundtable, 9-10 December 2002)*, February 2003, para. 15(e), http://www.refworld.org/docid/3fe9981e4.html. It should be noted that the conclusion considers accession to and

DHSIFR648

to human rights standards and standards of treatment commensurate with the 1951 Convention and its 1967 Protocol may only be effectively and durably guaranteed when the state is obliged to provide such access under international treaty law, has adopted national laws to implement the relevant treaties and can rely on actual practice indicating consistent compliance by the state with its international legal obligations.

**UNHCR**
**April 2018**

---

compliance with the 1951 Convention and/or its 1967 Protocol to be essential, unless the destination country can demonstrate it has developed a practice akin to the 1951 Convention and/or its 1967 Protocol.

5



Lisbon Expert Roundtable
9 and 10 December 2002

organised by the United Nations High Commissioner for Refugees
and the Migration Policy Institute
hosted by the Luso-American Foundation for Development

**Summary Conclusions on the Concept of "Effective Protection" in the Context of Secondary Movements of Refugees and Asylum-Seekers**

1. The December 2002 Lisbon expert roundtable reviewed the concept of "effective protection" in the context of secondary movements of asylum-seekers and refugees. The question of what constitutes effective protection in a third country usually arises in the implementation of what is commonly referred to as the concept of first country of asylum, "safety elsewhere" or the "safe" third country concept. The discussion was based on a background paper by Prof. Dr Stephen Legomsky, Washington University in St. Louis, United States, entitled "Returning Asylum-Seekers to Third Countries: The Requirements of Effective Protection". Participants included 30 experts from 18 countries, drawn from governments, NGOs, academia, the judiciary and the legal profession.

2. The roundtable is in direct follow-up of the "Agenda for Protection" (A/AC.96/965/Add.1 of 26 June 2002), which defines as one of its six goals "protecting refugees within broader migration movements". One of the activities foreseen to work towards this goal is: "Bearing in mind ExCom Conclusion No. 58 (XL) of 1989 on the Problem of Refugees and Asylum-Seekers Who Move in an Irregular Manner from a Country in which They had already Found Protection, UNHCR, in co-operation with relevant partners, to analyse the reasons for such movements, and propose strategies to address them in specific situations, predicated on a more precisely articulated understanding of what constitutes effective protection in countries of first asylum, and taking into account international solidarity and burden-sharing."

3. The objective of this roundtable was to identify the principles, grounded in law, around which policy parameters could be built to address issues concerning the secondary movement of asylum-seekers and refugees and which would have a practical value for decision- and policy-makers. The principles should be practical and holistic, that is, they should take account of physical, material and legal safety considerations.

4. The following Summary Conclusions do not represent the individual views of each participant or necessarily of UNHCR, but reflect broadly the understandings emerging from the discussion.

**Overall context**

5. The rationale behind examining "effective protection" in the context of the return of asylum-seekers and refugees to third countries is fourfold:
- to enhance international co-operation to share the burdens and responsibilities of admitting and hosting refugees;
- to strengthen protection capacities in host countries;
- to foster international solidarity and support for generating solutions;
- to address issues related to "irregular movement", including people smuggling, people trafficking, multiple applications and "orbit" cases.

DHSIFR650

6. The causes of secondary movements are manifold and include lack of durable solutions; limited capacity to host refugees and provide effective protection for protracted periods of time; as well as lack of access to legal migration opportunities. It was recommended that such causes required further careful study in relation to specific situations to provide a clearer understanding on which to build comprehensive strategies to reduce such movements.

7. Return to a third country of asylum is only one element in an interrelated comprehensive framework, aimed at reducing (the need for) secondary movement. Other elements of such an integrated framework were identified as including: addressing root causes of forced displacement; strengthening protection capacities in host countries; enabling access to durable solutions, including local integration and enhanced resettlement; concluding responsibility-sharing agreements; opening up more channels for regular entry in the context of resettlement, labour migration and, importantly, family reunification; as well as criminal law enforcement measures.

8. Operationalising international solidarity and international co-operation to share the burdens and responsibilities of hosting refugees is crucial to effecting the return of asylum-seekers and refugees to third countries under certain circumstances. Hosting large numbers of refugees is a major contribution by developing countries, which should be properly recognised when considering the removal of persons who could have sought protection there.

**Framework considerations**

9. While the 1951 Convention relating to the Status of Refugees and its 1967 Protocol constitute the core framework, other sources of rights and obligations in international law may be relevant for informing the appreciation of whether or not it is permissible to return an asylum-seeker or refugee to a third country. It is important not to exclude any source of law (treaty obligations, customary international obligations, interpretative guidance such as Executive Committee Conclusions) and to appreciate the specific circumstances of a case. An assessment of effective protection requires an individualised case-by-case examination.

10. From the point of view of identifying the elements of effective protection in the context of return to third countries, the distinction between the so-called "safe" third country and the country of first asylum concepts is not relevant.[1] The distinction is, however, relevant when it comes to an appreciation of the links between an asylum-seeker or refugee and the destination country, in which the person is now applying for asylum, or the third country, as well as for procedural issues in destination countries. In addition, readmission obligations are clearer in respect of countries that have already provided effective protection to an individual.

11. There is no obligation under international law for a person to seek international protection at the first effective opportunity. On the other hand, asylum-seekers and refugees do not have an unfettered right to choose the country that will determine their asylum claim in substance and provide asylum. Their intentions, however, ought to be taken into account.[2]

12. States could craft bi- or multilateral arrangements, consistent with international refugee and human rights law standards, according to which asylum-seekers would be encouraged and enabled to seek international protection at the first available opportunity. This could be done by agreeing to mechanisms and criteria to allocate responsibilities for the determination of asylum applications and the provision of effective protection. Such arrangements should take account of meaningful links, such as family connections and other close ties, between an asylum-seeker and a particular country. They should also include procedural safeguards, including for example, a notification to the receiving country that an asylum application has not been examined on its

---

[1] See, UNHCR, "Asylum Processes (Fair and Efficient Asylum Procedures)", EC/GC/01/12, 31 May 2001, paragraphs 10–18.
[2] Executive Committee Conclusion No. 15 (XXX) 1979, Refugees without an Asylum Country, paragraph (h) (iii).

DHSIFR651

merits. The effectiveness of such arrangements needs careful assessment and regular review both in terms of their operational efficiency and their resource implications.

13. Besides considerations of burden-sharing with countries hosting large numbers of refugees, several participants questioned the appropriateness, from a protection perspective, of returns outside the context of countries with equivalent asylum systems. In this regard, the wide disparity and poor levels of protection in many countries were noted.

14. Family and other links between a person seeking asylum and the destination country or the third State are important and should be given weight. The protection of the family as the natural and fundamental group unit of society is a widely recognised principle of human rights.

**Critical factors for the appreciation of "effective protection" in the context of return to third States**

15. The following elements, while not exhaustive, are critical factors for the appreciation of "effective protection" in the context of return to third countries:

a) The person has no well-founded fear of persecution in the third State on any of the 1951 Convention grounds.

b) There will be respect for fundamental human rights in the third State in accordance with applicable international standards, including but not limited to the following:

- ◆ there is no real risk that the person would be subjected to torture or to cruel, inhuman or degrading treatment or punishment in the third State;

- ◆ there is no real risk to the life of the person in the third State;

- ◆ there is no real risk that the person would be deprived of his or her liberty in the third State without due process.

c) There is no real risk that the person would be sent by the third State to another State in which he or she would not receive effective protection or would be at risk of being sent from there on to any other State where such protection would not be available.

d) While respecting data protection principles during the notification process, the third State has explicitly agreed to readmit the person as an asylum-seeker or, as the case may be, a refugee.

e) While accession to international refugee instruments and basic human rights instruments is a critical indicator, the actual practice of States and their compliance with these instruments is key to the assessment of the effectiveness of protection. Where the return of an asylum-seeker to a third State is involved, accession to and compliance with the 1951 Convention and/or 1967 Protocol are essential, unless the destination country can demonstrate that the third State has developed a practice akin to the 1951 Convention and/or its 1967 Protocol.

f) The third State grants the person access to fair and efficient procedures for the determination of refugee status, which includes – as the basis of recognition of refugee status – grounds that would be recognised in the destination country. In cases, however, where the third State provides prima facie recognition of refugee status, the examination must establish that the person can avail him- or herself of such recognition and the ensuing protection.

g) The person has access to means of subsistence sufficient to maintain an adequate standard of living. Following recognition as a refugee, steps are undertaken by the third State to

enable the progressive achievement of self-reliance, pending the realisation of durable solutions.

h)   The third State takes account of any special vulnerabilities of the person concerned and maintains the privacy interests of the person and his or her family.

i)   If the person is recognised as a refugee, effective protection will remain available until a durable solution can be found.


Department of International Protection
Office of the United Nations High Commissioner for Refugees (UNHCR)
February 2003

DHSIFR653



**UNHCR**
United Nations High Commissioner for Refugees
Haut Commissariat des Nations Unies pour les réfugiés

**Guidance Note on**
**bilateral and/or multilateral transfer arrangements of asylum-seekers**

1. It is UNHCR's position that asylum-seekers and refugees should ordinarily be processed in the territory of the State where they arrive, or which otherwise has jurisdiction over them. This is also in line with general State practice.[1] The primary responsibility to provide protection rests with the State where asylum is sought.

2. Nonetheless, there are an increasing number of initiatives in various regions involving the transfer[2] of asylum-seekers from one country to another for the purpose of processing their asylum claims. Such arrangements have typically involved the transfer of asylum-seekers either: (a) to the State where they first sought (or could have sought) asylum; or (b) to other countries with which the asylum-seeker has no previous links. They have also involved both bilateral and/or multilateral (regional) arrangements.

3. The legality and/or appropriateness of any such arrangement need to be assessed on a case-by-case basis, subject to its particular modalities and legal provisions. However, this assessment is to be guided by the following principles:

   i) There is no obligation for asylum-seekers to seek asylum at the first effective opportunity, yet at the same time there is no unfettered right to choose one's country of asylum. The intentions of an asylum-seeker, however, ought to be taken into account to the extent possible.[3]

   ii) It is generally recognized that a State has jurisdiction, and consequently is bound by relevant international and regional refugee and human rights law obligations, if it has *de jure* and/or effective *de facto* control over a territory <u>or</u> over persons.[4] This includes situations where a State exercises jurisdiction outside its territory.[5]

   iii) In principle, States involved in bilateral or multilateral transfer arrangements should be parties to the 1951 Convention relating to the Status of Refugees (1951 Convention) and/or its 1967 Protocol,[6] or otherwise party to relevant refugee and human rights instruments. Yet while being party to international and regional refugee and human rights instruments is an important indicator as to whether the receiving State meets the criteria outlined in this Guidance Note, review of the actual practice of

---

[1] UN High Commissioner for Refugees, *Protection Policy Paper: Maritime interception operations and the processing of international protection claims: legal standards and policy considerations with respect to extraterritorial processing*, November 2010, available at: http://www.unhcr.org/refworld/docid/4cd12d3a2.html.

[2] The term 'transfer' is used in this Guidance Note to refer to the range of methods and processes by which asylum-seekers are moved from one country to another under special bilateral and/or multilateral State arrangements. It excludes return to one's country of origin. This Guidance Note does not address other legal processes relating to the deportation, expulsion or extradition of asylum-seekers and/or refugees carried out on an individual basis.

[3] UN High Commissioner for Refugees, *Summary Conclusions on the Concept of "Effective Protection" in the Context of Secondary Movements of Refugees and Asylum-Seekers (Lisbon Expert Roundtable, 9-10 December 2002)*, February 2003, available at: http://www.unhcr.org/refworld/docid/3fe9981e4.html, para. 11; UNHCR Executive Committee Conclusion No. 15 (XXX) (Refugees without an Asylum Country) (1979), paras. (h)(iii) and (h)(iv).

[4] UN High Commissioner for Refugees, *Protection Policy Paper: Maritime interception operations and the processing of international protection claims: legal standards and policy considerations with respect to extraterritorial processing*, November 2010, available at: http://www.unhcr.org/refworld/docid/4cd12d3a2.html, paras. 9-10.

[5] *Hirsi Jamaa and Others v. Italy*, Application no. 27765/09, Council of Europe: European Court of Human Rights, 23 February 2012, available at: http://www.unhcr.org/refworld/docid/4f4507942.html; UN High Commissioner for Refugees, *Protection Policy Paper: Maritime interception operations and the processing of international protection claims: legal standards and policy considerations with respect to extraterritorial processing*, November 2010, available at: http://www.unhcr.org/refworld/docid/4cd12d3a2.html.

[6] 1951 Convention relating to the Status of Refugees, 189 U.N.T.S. 137, entry into force 22 April 1954; 1967 Protocol Relating to the Status of Refugee, 606 U.N.T.S. 267, entry into force 4 October 1967.

the State and its compliance with these instruments is an essential part of this assessment.[7]

iv)  Arrangements should be aimed at enhancing burden- and responsibility-sharing and international/regional cooperation, and not be burden shifting.[8] Such arrangements should ideally contribute to the enhancement of the overall protection space in the transferring State, the receiving State and/or the region as a whole.[9]

v)   An arrangement between States for the transfer of asylum-seekers is best governed by a legally binding instrument, challengeable and enforceable in a court of law by the affected asylum-seekers. The arrangement would need to clearly stipulate the rights and obligations of each State and the rights and duties of asylum-seekers.

vi)  The transfer arrangement needs to guarantee that each asylum-seeker:

- will be individually assessed as to the appropriateness of the transfer, subject to procedural safeguards, prior to transfer.[10] Pre-transfer assessments are particularly important for vulnerable groups, including unaccompanied and separated children. The best interest of the child must be a primary consideration;[11]
- will be admitted to the proposed receiving State;
- will be protected against *refoulement*;
- will have access to fair and efficient procedures for the determination of refugee status and/or other forms of international protection;[12]
- will be treated in accordance with accepted international standards (for example, appropriate reception arrangements; access to health, education and basic services; safeguards against arbitrary detention; persons with specific needs are identified and assisted); and
- if recognized as being in need of international protection, will be able to enjoy asylum and/or access a durable solution.[13]

vii) Where these guarantees cannot be agreed to or met, then transfer would not be appropriate.

---

[7] UN High Commissioner for Refugees, *Summary Conclusions on the Concept of "Effective Protection" in the Context of Secondary Movements of Refugees and Asylum-Seekers (Lisbon Expert Roundtable, 9-10 December 2002)*, February 2003, available at: http://www.unhcr.org/refworld/docid/3fe9981e4.html, para. 15(e). See also, e.g., *Hirsi Jamaa and Others v. Italy*, Application no. 27765/09, Council of Europe: European Court of Human Rights, 23 February 2012, available at: http://www.unhcr.org/refworld/docid/4f4507942.html; and *M.S.S. v. Belgium and Greece*, Application no. 30696/09, Council of Europe: European Court of Human Rights, 21 January 2011, available at: http://www.unhcr.org/refworld/docid/4d39bc7f2.

[8] UN High Commissioner for Refugees, *Expert Meeting on International Cooperation to Share Burdens and Responsibilities*, 28 June 2011, available at: http://www.unhcr.org/refworld/docid/4e9fed232.html, para. 8.

[9] UN High Commissioner for Refugees, *Protection Policy Paper: Maritime interception operations and the processing of international protection claims: legal standards and policy considerations with respect to extraterritorial processing*, November 2010, available at: http://www.unhcr.org/refworld/docid/4cd12d3a2.html, para. 48.

[10] See, e.g., UN High Commissioner for Refugees, *Global Consultations on International Protection/Third Track: Asylum Processes (Fair and Efficient Asylum Procedures)*, 31 May 2001, EC/GC/01/12, available at: http://www.unhcr.org/refworld/docid/3b36f2fca.html, para. 13.

[11] See, e.g., Article 3, Convention on the Rights of the Child, 1577 U.N.T.S 3, entry into force 2 September 1990; UN High Commissioner for Refugees, *UNHCR Guidelines on Determining the Best Interests of the Child*, May 2008, available at: http://www.unhcr.org/refworld/docid/48480c342.html. See also, e.g., UN Committee on the Rights of the Child (CRC), *CRC General Comment No. 6 (2005): Treatment of Unaccompanied and Separated Children Outside their Country of Origin*, 1 September 2005, CRC/GC/2005/6, available at: http://www.refworld.org/docid/42dd174b4.html.

[12] ExCom Conclusion No. 8 (XXVIII) (Determination of Refugee Status) (1977); UN High Commissioner for Refugees, *Global Consultations on International Protection/Third Track: Asylum Processes (Fair and Efficient Asylum Procedures)*, 31 May 2001, EC/GC/01/12, available at: http://www.unhcr.org/refworld/docid/3b36f2fca.html.

[13] See further, e.g., ExCom Conclusion No. 85 (XLIX) (Conclusion on International Protection) (1998), para. (aa); ExCom Conclusion No. 58 (XL) (Problem of Refugees and Asylum-Seekers who move in an irregular manner from a country in which they had already found protection) (1989), para. (f); UN High Commissioner for Refugees, *Summary Conclusions on the Concept of "Effective Protection" in the Context of Secondary Movements of Refugees and Asylum-Seekers (Lisbon Expert Roundtable, 9-10 December 2002)*, February 2003, available at: http://www.unhcr.org/refworld/docid/3fe9981e4.html.

DHSIFR655

viii) The obligation to ensure that conditions in the receiving State meet these requirements in practice rests with the transferring State, prior to entering into such arrangements. As indicated above, it is not enough to merely assume that an asylum-seeker would be treated in conformity with these standards – either because the receiving State is a party to the 1951 Convention or other refugee or human rights instruments, or on the basis of an ongoing arrangement or past practice.[14] Regular monitoring and/or review by the transferring State of the transfers and the conditions in the receiving State would also be required to ensure they continue to meet international standards.[15]

4.  In terms of State responsibility post-transfer, at a minimum, and regardless of the arrangement, the transferring State remains, inter alia, subject to the obligation of *non-refoulement*.[16] In addition, the transferring State may retain responsibility for other obligations arising under international and/or regional refugee and human rights law. This would be the case, for example, where the reception and/or processing of asylum-seekers in the receiving State is effectively under the control or direction of the transferring State.

5.  The receiving State, in exercising territorial jurisdiction, will likewise be subject to applicable refugee and human rights law obligations. It cannot use the transfer arrangement as an excuse to limit its responsibilities for persons on its territory.

6.  In summary, transfer arrangements of asylum-seekers for asylum processing need to take into account and ensure that: applicable refugee and human rights law standards are met, as outlined at paragraph (3); refugee status and/or other processing for international protection needs takes place fairly and efficiently; access to asylum and/or durable solutions are provided within a reasonable time; and/or the arrangement improves asylum space in the receiving State, the transferring State and/or the region as a whole. Such arrangements would not be appropriate where they represent an attempt, in whole or part, by a 1951 Convention State party to divest itself of responsibility; or they are used as an excuse to deny or limit jurisdiction and responsibility under international refugee and human rights law.

**Division of International Protection**
**May 2013**

---

[14] UN High Commissioner for Refugees, *Global Consultations on International Protection/Third Track: Asylum Processes (Fair and Efficient Asylum Procedures)*, 31 May 2001, EC/GC/01/12, available at: http://www.unhcr.org/refworld/docid/3b36f2fca.html, para. 14; UN High Commissioner for Refugees, *Summary Conclusions on the Concept of "Effective Protection" in the Context of Secondary Movements of Refugees and Asylum-Seekers (Lisbon Expert Roundtable, 9-10 December 2002)*, February 2003, available at: http://www.unhcr.org/refworld/docid/3fe9981e4.html, para. 15(e); *M.S.S. v. Belgium and Greece*, Application no. 30696/09, Council of Europe: European Court of Human Rights, 21 January 2011, available at: http://www.unhcr.org/refworld/docid/4d39bc7f2, para. 359.
[15] *M.S.S. v. Belgium and Greece*, Application no. 30696/09, Council of Europe: European Court of Human Rights, 21 January 2011, available at: http://www.unhcr.org/refworld/docid/4d39bc7f2.
[16] See generally, UN High Commissioner for Refugees, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol*, 26 January 2007, available at: http://www.unhcr.org/refworld/docid/45f17a1a4.html; UN High Commissioner for Refugees, *Protection Policy Paper: Maritime interception operations and the processing of international protection claims: legal standards and policy considerations with respect to extraterritorial processing*, November 2010, available at: http://www.unhcr.org/refworld/docid/4ed12d3a2.html.

DHSIFR656





Monday,
November 29, 2004

Part III

Department of
Homeland Security

8 CFR Parts 208, 212, and 235
Implementation of the Agreement
Between the Government of the United
States of America and the Government of
Canada Regarding Asylum Claims Made
in Transit and at Land Border Ports-of-
Entry; Final Rule

Department of
Justice

8 CFR Part 1003 et seq.
Asylum Claims Made by Aliens Arriving
From Canada at Land Border Ports-of-
Entry; Final Rule

DHSIFR657

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 208, 212, and 235**

**[CIS No. 2255–03]**

**RIN 1615–AA91**

## Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry

**AGENCY:** Department of Homeland Security.

**ACTION:** Final rule.

**SUMMARY:** This rule codifies specific terms of an agreement between the United States and Canada that permits the respective governments to manage which government decides certain aliens' requests for protection from persecution or torture pursuant to domestic implementation of international treaty obligations. This rule establishes U.S. Citizenship and Immigration Services ("USCIS") asylum officers' authority to make threshold determinations concerning applicability of this agreement in the expedited removal context. In addition, this rule codifies the existing definitions of "credible fear of persecution" and "credible fear of torture" without altering those definitions.

**DATES:** This final rule is effective December 29, 2004.

**FOR FURTHER INFORMATION CONTACT:** Joanna Ruppel, Deputy Director, Asylum Division, Office of Refugee, Asylum, and International Operations, U.S. Citizenship and Immigration Services, 20 Massachusetts Avenue, NW, Washington, DC 20536; Telephone (202) 272–1663.

**SUPPLEMENTARY INFORMATION:**

### Table of Contents

I. Background
II. Validity of the Threshold Screening Process
III. Detention Issues
IV. Procedural Safeguards Under the Threshold Screening Interview Process: Arrivals from Canada
 • Screening Process Guarantees
 • Post-Interview Process
V. Adjudicating Exceptions to the Agreement
 • Family-Based Exceptions
 • Unaccompanied Minor Exception
 • Public Interest Exception
 • Valid Visa Exception
 • Other Exceptions
VI. Procedures for Asylum Seekers Going to and Being Returned from Canada
 • Process for Asylum Seekers Bound for Canada
 • Process for Asylum Seekers Returned from Canada
 • Cost of Processing Returned Asylum Seekers
VII. Monitoring Plans
VIII. Agreement Terms Unrelated to Processing Asylum Seekers Coming to the United States from Canada
 • Resettlement under the Agreement
 • Terminating the Agreement
IX. Miscellaneous
 • Resolving U.S.-Canadian Differences in Interpreting the Agreement
 • Defining 'land border port-of-entry'
 • Aliens "directed back" from Canada
 • Indirect *refoulement*
X. Conforming Amendment to Part 235 of Title 8 of the Code of Federal Regulations

## I. Background

On March 8, 2004, the Secretary of Homeland Security and the Attorney General promulgated proposed rules to implement terms of the "Agreement Between the Government of the United States of America and the Government of Canada for Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries' ("Safe Third Country Agreement" or "Agreement"), which, consistent with section 208(a)(2)(A) of the Immigration and Nationality Act ("Act") (8 U.S.C. 1158(a)(2)(A)), provide for the return of certain asylum seekers to the "country of last presence." 69 FR 10620, 69 FR 10627. The Agreement is available both on the USCIS Web site, *http://www.uscis.gov*, and the Web site for the U.S. Embassy in Canada, *http://www.usembassycanada.gov/content/can_usa/safethirdfinal_agreement.pdf*.

The proposed rules outlined how the Department of Homeland Security (DHS) and the Department of Justice (DOJ) proposed to address the asylum, withholding of removal, and Convention Against Torture claims ("protection claims") of aliens seeking to enter the U.S. at U.S.-Canada land border ports-of-entry, or in transit through the U.S. during removal by the Canadian government, in accordance with the Safe Third Country Agreement. The Agreement allocates responsibility between the United States and Canada whereby one country or the other (but not both) will assume responsibility for processing the claims of certain asylum seekers who are traveling from Canada into the United States or from the United States into Canada. The Agreement provides for a threshold determination to be made concerning which country will consider the merits of an alien's protection claim, enhancing the two nations' ability to manage, in an orderly fashion, asylum claims brought by persons crossing our common border. As discussed in the **SUPPLEMENTARY INFORMATION** section in the preamble to those proposed rules, the Agreement allocates resources and provides for prescreening of asylum and related claims in certain instances during the expedited removal process, where the asylum officer would determine whether any of the Agreement's exceptions apply or whether aliens should be returned to Canada for consideration of their protection claims. The limited number of aliens arriving from Canada at land border ports-of-entry or in transit during removal by the Canadian government who are placed in removal proceedings under section 240 of the Act (8 U.S.C. 1229a) (instead of being processed through expedited removal procedures) would have the Agreement applied to them in the first instance by immigration judges of the Executive Office for Immigration Review ("EOIR"), as outlined in the DOJ proposed rule at 69 FR 10627 *et seq.* In response to the DHS proposed rule, DHS received 7 sets of comments from non-governmental organizations ("NGOs") and the Office of the United Nations High Commissioner for Refugees ("UNHCR"). While incorporating several of the comments, this final rule implements the basic approach discussed in the March 8 rule proposed by DHS.

The following discussion of the comments received by DHS corresponds generally to the variety of issues raised by commenters and is arranged into the following categories: Validity of the threshold screening process identified in the proposed rule; issues related to detention of asylum seekers; procedural safeguards under the threshold screening process; adjudication of the Agreement's several exceptions to its general rule of returning certain asylum seekers to Canada; procedures for asylum seekers bound for and returned from Canada; monitoring of the Agreement's implementation and impact; and Agreement terms unrelated to processing asylum seekers coming to the United States from Canada. Within each category, the discussion summarizes the relevant comments and offers the Department's responses, including an explanation of any changes made to the rule. Following the discussion of the comments is an explanation of one minor conforming regulatory amendment included in the final rule to ensure that existing regulations governing the expedited removal process are consistent with the threshold screening interview mechanism adopted in DHS' final rule. Many commenters took issue with the Agreement itself, challenging its wisdom on policy grounds. This

Supplementary Information to the final rule, while endeavoring to address each comment as fully as possible, does not engage in a policy debate about the Agreement itself.

## II. Validity of the Threshold Screening Process

One commenter indicated that creating a special process to assess the applicability of the Agreement and its exceptions would result in increased inefficiency and bureaucracy. The Department disagrees and, to the contrary, believes that the threshold screening process is the most efficient mechanism for implementing the Agreement. It will not create additional bureaucracy. The threshold screening process adopts existing processes from the credible fear process, will be a streamlined determination, and can be transitioned seamlessly to the credible fear process if an exception to the Agreement is found.

Other commenters argued that the new threshold screening process is legally insufficient, if not contrary to existing laws, because it does not occur as part of the credible fear determination and does not provide for independent administrative review of negative decisions by immigration judges. These commenters have concluded that the proposed process does not, therefore, comport with statutory expedited removal provisions. Specifically, the commenters identify sections 235(b)(1)(A)(ii) and 235(b)(1)(B) of the Act (8 U.S.C. 1225(b)(1)(A)(ii), 1225(b)(1)(B)), which provide that asylum officers shall interview arriving aliens who are inadmissible under section 212(a)(6)(C) or 212(a)(7) of the Act (8 U.S.C. 1182(a)(6)(C), 1182(a)(7)) and who indicate either an intention to apply for asylum or a fear of persecution in order to determine whether such aliens have a ''credible fear of persecution,'' and further provide that negative credible fear determinations may be reviewed by immigration judges. Similarly, arriving aliens who express a fear of torture are subject to these same procedures as a matter of regulation. 8 CFR 208.30(e).

While the Department agrees that these provisions generally do call for the administration of credible fear interviews to those aliens in expedited removal processing who express an intent to apply for asylum or a fear of persecution or torture, a careful reading of the Act makes clear that credible fear interviews are not required for aliens subject to the Safe Third Country Agreement. Under section 208(a)(1) of the Act (8 U.S.C. 1158(a)(1)), any alien physically present in or arriving in the United States may apply for asylum in accordance with that section, or where applicable, section 235(b) of the Act (8 U.S.C. 1225(b)). The following paragraph, section 208(a)(2)(A) of the Act (8 U.S.C. 1158(a)(2)(A)), however, creates an exception to this generally permissive asylum filing standard, revealing Congress' intent that an alien may not apply for asylum in accordance with section 235(b) (8 U.S.C. 1225(b)) if the alien ''may be removed, pursuant to a bilateral or multilateral agreement, to a country * * * in which the alien's life or freedom would not be threatened. * * * Section 235(b)(1)(B)(ii) of the Act (8 U.S.C. 1225(b)(1)(B)(ii)) states that, when an alien successfully completes the credible fear interview process, ''the alien shall be detained for *further consideration* of the application for asylum.'' (emphasis added). Clearly, then, the credible fear interview process constitutes the initiation of the asylum application process described in section 208(a)(1) or the Act (8 U.S.C. 1158(a)(1)). For this reason, and in light of section 208(d)(5)(B)'s (8 U.S.C. 1158(d)(5)(B)) authorization to promulgate regulations that impose ''conditions or limitations on the consideration of an application for asylum,'' as long as they are ''not inconsistent with this Act,'' the Department finds the threshold screening interview process described in the proposed rule to be in accord with the Act.

A closely related comment raised by some commenters is the request that the rule include an independent review or appeals process for asylum officer findings that an alien does not meet one of the Agreement's exceptions and is, accordingly, ineligible to pursue an asylum application via the credible fear interview process. The Department believes that, given the narrow legal and factual issues present in the threshold screening process, review of an asylum officer's threshold determination by a supervisory asylum officer will adequately serve to ensure that proper decisions are made on this limited issue. In light of the comments received, the requirement that a supervisory asylum officer must concur in the asylum officer's finding that the alien is subject to return to Canada under the Agreement has been expressly added to the final rule at 8 CFR 208.30(e)(6)(i).

## III. Detention Issues

Several commenters addressed the issue of detention. For instance, some commenters suggested adding to the rule the statement that asylum seekers subject to the Agreement generally should not be detained. Another commenter advocated a mechanism for the Department to refer individuals entering the United States or being returned by Canada under the Agreement to NGOs in the United States, to facilitate alternatives to detention. Commenters also expressed concern about the detention of returnees from Canada. One commenter would have the rule prohibit detention of this group under any circumstances, while another suggested that the Department only detain returnees under exceptional circumstances, and, if detention is necessary, to avoid detention in local and county jails. The Agreement does not amend the detention authority under sections 236, 236A and 241 of the Act (8 U.S.C. 1226, 1226a, 1231) or require that DHS alter its current detention policies or practices. No amendments to the detention regulations were proposed in the proposed rule, and any changes in these regulations would require a new proposed rule. After reviewing the comments, DHS is not convinced that there is any reason to amend the detention provisions of the regulations because of the implementation of the Agreement or this rule. The comments do not articulate any legitimate basis for treating aliens without lawful immigration status in the United States who are returned under the Agreement differently from other asylum seekers in the United States without lawful immigration status.

## IV. Procedural Safeguards Under the Threshold Screening Interview Process: Arrivals From Canada

*Screening Process Guarantees*

Several commenters were concerned that the rule does not specify that individuals arriving from Canada would receive the same procedural safeguards in the threshold screening interview process that are provided to arriving aliens who receive credible fear interviews. In particular, the Department was urged to incorporate, in the final rule, the following such safeguards: Option to consult with a person of the alien's choosing; sufficient time to contact a consultant, relative, or relevant advocates, at no expense to the U.S. government; sufficient time to prepare for the eligibility interview; an assurance that the interview would not occur sooner than 48 hours after the asylum seeker's arrival at a detention facility, unless the individual waives this preparation period; the ability to request that the threshold screening interview be postponed, which the Department should grant if there are good reasons to do so; use of an

interpreter; explanation of and guidance on the interview procedure; and the issuance of a reasoned written decision.

The Department has clarified, in the final rule, that the same safeguards accorded to aliens who are eligible for a credible fear determination will be accorded to aliens who receive threshold screening interviews. However, the suggestion that the threshold screening interview be postponed upon an alien's request has no parallel in the sections of 8 CFR 208.30 outlining the credible fear process. Also, this suggestion would compromise the principle underlying the Agreement that aliens be returned promptly to the country of last presence; therefore, it will not be incorporated into the final rule. In appropriate cases, the Department may exercise its discretion to delay the threshold screening process where the delay is justified.

One commenter recommended that the final rule include a statement requiring the Department to accommodate reasonable requests for assistance in securing evidence in support of an asylum seeker's claim arising from the asylum seeker's detention. For example, an asylum seeker may need access to a telephone or fax machine to secure evidence establishing relationships, a family member's legal status, or the asylum seeker's age. The Department currently provides access to telephones to detained asylum seekers who are subject to expedited removal. If additional assistance is needed, such as access to a fax machine, an asylum officer may be able to facilitate such access. However, the Department does not believe it is necessary to incorporate this suggestion into the final rule, because it is operational in nature and instead will be incorporated into field guidance upon implementation of the rule.

*Post-Interview Process*

One commenter suggested that the rule should clarify that return to Canada under the Agreement would not render a person inadmissible to the United States on that basis. While the Agreement does not address matters of inadmissibility, the Department may only remove aliens from the United States using a mechanism provided by Congress. Generally, for aliens arriving in the United States without valid documents required for admission, expedited removal under section 235(b) of the Act (8 U.S.C. 1225(b)) is the removal mechanism provided by Congress. A removal order under section 235(b) of the Act would, as a matter of law, constitute a temporary

inadmissibility ground under section 212(a)(9)(A)(i) of the Act (8 U.S.C. 1182(a)(9)(A)(i)). Waivers and exceptions to this inadmissibility ground do exist and will be considered by the Department on a case-by-case basis, consistent with existing regulations and operational directives. Similarly, discretion exists on the part of Customs and Border Protection ("CBP") officers to allow aliens to withdraw their applications for admission (so that they would face no admissibility bar to a subsequent admission to the United States) and this discretion will continue to be used on a case-by-case basis.

Another commenter recommended that either the final rule or operating procedures should include a mechanism for reconsideration by the Department of its decision to remove an asylum seeker to Canada following a decision that he or she does not qualify for one of the Agreement's exceptions if new evidence subsequently becomes available. The Department plans to continue working with its Canadian counterparts to establish common procedures to resolve matters like these at the local level through operational guidance.

**V. Adjudicating Exceptions to the Agreement**

A substantial number of the comments to the proposed rule concerned the interpretation and adjudication of Agreement exceptions for asylum seekers arriving at land border ports-of-entry. These comments corresponded roughly to the specific exceptions themselves, and can be addressed with reference to the following categories: family unity; unaccompanied minors; public interest; validly issued visas; and other exceptions. Many of the concerns evident from these comments were raised initially at meetings with NGOs, including a public meeting in August 2002, before the Agreement was signed. The Department carefully considered several of the issues outlined in these comments at that time and incorporated many suggestions into the text of the Agreement.

*Family-Based Exceptions*

Many commenters believe that the rule should define "family member" broadly and in a more culturally sensitive manner that reflects the reality of the refugee experience. For example, one commenter recommended considering "de facto" family members as eligible anchor relatives within this exception, or, in the alternative, as part of the public interest exception. The definition of "family member" was the

subject of prolonged discussion while negotiating the Agreement. The United States delegation advocated and succeeded in achieving a definition much broader than the class of family members recognized for other purposes under United States and Canadian immigration law. During negotiations, both Canada and the United States took into account the reality that different cultures define "family member" differently. Given the specificity of the Agreement's enumerated relationships in its "family member" definition, the Department will not now, in effect, unilaterally amend the Agreement's definition by means of this rule to include additional individuals. The Department's position is that using the regulatory process to create new definitions at this stage would serve to undermine the compromise represented by this carefully negotiated, bilateral agreement.

Other commenters suggested including "cousins" as part of the "family member" definition in the rule. As explained above, the Agreement's list of who may qualify as an anchor "family member" is not subject to amendment by the rule. For the same reason, the Department will not include, as suggested in a separate comment, "other close relatives" to the list of family members.

Several commenters recommended that the rule specifically include a "common-law partners" exception, as it is included in the Canadian regulations' definition of "family member." Canada has included common-law partners in the definition of "family member" in the Canadian regulations implementing the Agreement because this relationship has often been recognized as a matter of Canadian law. Article 1 of the Agreement provides that each Party will apply the Agreement's family member exceptions in a manner that is consistent with its national law. While valid foreign marriages, including common law marriages, are generally given effect under U.S. immigration law, *see Matter of H-*, 9 I&N Dec. 640, 641 (BIA 1962); *but see* section 101(a)(35) of the Act (8 U.S.C. 1101(a)(35)), U.S. federal law precludes use of the terms "marriage" or "spouse" to refer to same-sex partnerships. *See* Defense of Marriage Act, Public Law 104–199, section 3, 110 Stat. 2419 (1996) (providing that, for purposes of federal law, "'marriage' means only a legal union between one man and one woman as husband and wife, and * * * 'spouse' refers only to a person of the opposite sex who is a husband or a wife."). Because the Department cannot promulgate regulations that are contrary

to law, the Department did not adopt the commenters' suggestion to add a "common-law partner" interpretation of the term "spouse," as used in the Agreement's family member exceptions.

A few commenters believe that the rule should eliminate the Agreement's age and immigration status limits on anchor relatives, reasoning that the limits result in separating families when children cannot serve as anchors for their parents. Both countries have expressed their concern for reuniting separated families. To that end, both intend to work with the UNHCR and NGOs to monitor the Agreement's effect, addressing this potential problem operationally rather than by regulation. A key reason that age limits were included in the Agreement's family unity exceptions was that neither government wanted to trigger an increase in the smuggling and trafficking of minors, sent ahead by family members for the purpose of serving as anchors in either country. Further, the requirement that anchor relatives hold lawful, non-visitor immigration status derives from the negotiated Agreement terms, *see* art. 4, para. 2(a), which will not be modified through the rule-making process.

*Unaccompanied Minor Exception*

Some commenters felt that the rule should expand the Agreement's definition of "unaccompanied minor" to include a minor who is "separated from both parents and is not being cared for by an adult who by law has the responsibility to do so." The Department declines to incorporate this change to the Agreement's definition into the final rule. The Agreement's definition of "unaccompanied minor," as explained in the SUPPLEMENTARY INFORMATION accompanying the proposed rule, differs from the definition customarily used for purposes of U.S. immigration processing. As previously explained, the definitions in the Agreement were carefully negotiated with the Canadian government and the Department will not use the rule-making process to alter unilaterally the clear definitions in the Agreement. However, by applying DHS" customary operational definition to unaccompanied minors seeking asylum so that they are generally referred for a hearing by an immigration judge in proceedings under section 240 of the Act (8 U.S.C. 1229a), the Department is providing them ample process to explain whether they meet one of the Agreement's exceptions and to present their protection claims.

The same commenters also recommended that the rule should shift the burden of proof concerning the location of an unaccompanied minor's parents from the unaccompanied minor to the government, requiring the government to demonstrate that the unaccompanied minor is in the care of his or her parents or is following to join them. While the Department understands the need to proceed with heightened restraint and sensitivity in the cases of unaccompanied minors, there is concern that this recommendation could adversely affect the unaccompanied minor by resulting in fact-finding delays before a final determination. The child likely will have more information than DHS as to the location of his or her parents and therefore it is more appropriate for the child to bear the burden of proof in establishing the parents' locations. Moreover, aliens in removal proceedings—regardless of age— generally bear the burden of proving their admissibility to the United States, 8 U.S.C. 1129a(c)(2), and, similarly, applicants for asylum, withholding of removal, and protection under the Convention Against Torture, bear the burden of proof to establish eligibility, even in cases where the applicant is a child. The commenters did not provide sound rationales for shifting the burden of proof for purposes of establishing that an exception to the Agreement applies.

These commenters also suggested that the rule include a mechanism for determining a child's relationship to an accompanying adult or to individuals present in the United States or Canada, including an interview with a child welfare specialist, if the child arrives at the border with an individual who is not his or her legal guardian. The mechanism, they suggest, should include procedures to identify potential family members and determine their suitability to serve as the child's guardian. The Department agrees that this is an area requiring further consideration; however, the issues surrounding identification of individuals accompanying alien children and verification of relationships between adults and children are broader than the scope of this rule and are not unique to those children subject to this rule. These issues may be raised at all borders, and all ports-of-entry, even in the case of aliens with lawful status here. Therefore, these issues would be more appropriately addressed systemically, as a coordinated effort among the Department's various agencies to create a uniform approach, rather than within this rule. Consequently, the Department declines to incorporate the process

proposed by commenters within the rule.

Many commenters, as previously stated, urged the Department to consider "separated children," who are not with either parent or with an adult responsible for their care, as part of the discretionary public interest exception under Article 6 of the Agreement. The Department is sensitive to the unique issues facing unaccompanied minors and will proceed carefully in cases where an unaccompanied minor arriving in the United States appears to be a "separated child." The Department will consider, on a case-by-case basis, whether such a child might meet the Agreement's public interest exception.

*Public Interest Exception*

Many of the commenters recommended that the rule should state that "humanitarian concern is a public interest." The Department believes that the Agreement's public interest exception is best administered through operational guidance and on an individualized, case-by-case basis, but does acknowledge that "humanitarian concern" is certainly an important consideration to factor in to a public interest assessment.

Some commenters suggested that the rule include a non-exhaustive list of categories that would merit consideration under the public interest exception. Three of the suggested categories—common-law spouses, de facto family members, and separated children with parents or legal guardians in the U.S. who are ineligible to serve as anchors—were addressed above in the discussion replying to comments about the proposed rule's sections concerning the "family member" and "unaccompanied minor" exceptions.

Other categories suggested by commenters for consideration under the public interest exception include:

a. Cases where effective protection cannot be guaranteed in Canada because of that country's asylum laws; and, similarly, cases where U.S. law and practice are not consistent with Canadian law and practice;

b. Cases in which the anchor relatives are under age 18 and have pending asylum applications;

c. Cases of survivors of torture; and

d. Cases of individuals with physical and psychological health needs.

Issues of minor anchor relatives, past torture, and health needs are some of the factors that may be considered under the Agreement's public interest exception, along with all other relevant circumstances, on a case-by-case basis. The intent behind this provision of the Agreement was to allow each

government to make case-by-case determinations with broad discretion. Had the parties' intent been to include the broad categories of individuals listed above, the categories would have been spelled out in the Agreement in the same manner as the other exceptions.

For reasons stated in the Supplementary Information to the proposed rule, the Department does not consider differences in Canadian and U.S. protection laws germane to decisions made under the Agreement. The commenters urged, with respect to this suggestion, that the rule include a mechanism for the UNHCR and NGOs to help the Department analyze Canadian law and practice, including approval rates by nationality and basis for approval, to ensure that the Department exercises discretion in cases where there are discrepancies with U.S. law. The Department will not apply the public interest exception in a manner that would undermine the Agreement's allocation of responsibility for adjudication of protection claims. Also, as explained in the Supplementary Information to the proposed rule, differences in our protection systems were contemplated by the United States and Canada during negotiations. In either country, asylum seekers will have their protection claims fully and fairly considered.

Other commenters suggested specific procedures in the rule concerning the exercise of discretion, in the public interest, to allow an individual to pursue a protection claim in the United States. One commenter explaining who specifically may exercise this discretion, and the other called for a clear procedure between EOIR and DHS to ensure that the Department properly considers cases pending before EOIR for the public interest exception. In response to these suggestions, the final rule has been amended at 8 CFR 208.30(e)(6)(iii)(F) to specify that the Director of USCIS, or the Director's designee, will be responsible for DHS determinations made under the Agreement's public interest exception. Any party wishing to present a case for consideration under this exception should provide relevant case information to the Director's office or that of his or her designee.

*Valid Visa Exception*

One commenter noted that the rule should define "validly issued visa" so as not to link the validity of its issue to the asylum seeker's presumed subjective intentions. For example, U.S. immigration authorities have determined in some instances that valid tourist or business visas were obtained by "fraud" because of the visa holder's true intent to seek asylum. For the limited purposes of applying this exception to the Agreement, USCIS will construe the term "validly issued" to refer to visas that are genuine (*i.e.*, not counterfeit) and were issued to the alien by the U.S. government.

*Other Exceptions*

One commenter forwarded comments made in response to a review of an earlier draft of the Agreement in 2002, in which it recommended that, to avoid the separation of families and minimize social and economic costs for states, the Agreement add a transit exception. Additionally, the commenter suggested a "community support contact" exception, which could include friends or colleagues willing to submit statements about their willingness to support the asylum seeker during the process. A transit exception would effectively invalidate the Agreement, as the Agreement's stated purpose is quite clearly to return asylum seekers to the "country of last presence." With respect to the "community support contact" exception, the Department reiterates that the exceptions to the Agreement were determined through careful negotiations with the Canadian government, and that to create additional exceptions through rule-making would serve to undermine the process. Therefore, the Department declines to adopt this recommendation.

**VI. Procedures for Asylum Seekers Going to and Being Returned From Canada**

*Process for Asylum Seekers Bound for Canada*

Several commenters recommended that the rule include a mechanism whereby the Department could refer Canada-bound asylum seekers to NGOs in the United States for assistance in locating relatives and providing advice regarding eligibility before arriving at a land border port-of-entry. The commenters do not explain how the Department would identify these asylum seekers and implement this recommendation. While the Department appreciates the participation of NGOs in the process to date and will continue to seek their assistance to educate populations likely to be affected by the Agreement, it will not adopt this recommendation, because it would be administratively impracticable to implement and could unnecessarily delay travel for thousands of individuals crossing from the United States to Canada. U.S. officials generally do not stop and address individuals leaving the United States to go to Canada. Even if immigration officials were to stop individuals traveling from the United States into Canada, it is unclear how they would identify those who intend to seek asylum in Canada—certainly a minimal portion of individuals crossing the border each day—in order to refer them to an NGO.

*Process for Asylum Seekers Returned From Canada*

Several commenters expressed a desire to have the rule clarify the process affecting those asylum seekers who are determined to be ineligible by Canada and returned to the United States—the group anticipated to constitute the majority of asylum seekers affected by the Agreement. One non-governmental organization recommended that the rule guarantee that these individuals be exempt from the expedited removal process.

The Department declines to codify the process affecting those returned to the United States under the Agreement, because existing regulations already govern how they will be treated by DHS. For purposes of U.S. immigration law, these returnees will be in the same position they would be in had they not left the United States. As the Department stated in the Supplementary Information to the proposed rule, individuals returned from Canada to the United States, with the rare exception noted below, will not be subject to expedited removal because they will not meet the definition of "arriving alien." Depending on the individual's immigration status in the United States, he or she may be subject to removal proceedings under section 240 of the Act (8 U.S.C. 1229a). However, it is not possible, practical or advisable for the Department to codify such a guarantee in this rule. There may be a rare circumstance in which the expedited removal provisions of the Act would apply. For example, someone initially paroled into the United States may attempt to enter Canada and then be returned to the United States after his or her parole period here expired. Such a person, as an individual whose parole period has expired, may be subject to expedited removal. 8 U.S.C. 1182(d)(5)(A), 1225(a)(1)–(b)(1)(A)(i); 8 CFR 1.1(q).

Many commenters suggested that the rule include a mechanism to enable Canada, in the event that it decides that the Agreement exceptions are inapplicable to an individual alien, to address any possible errors in its decision or consider new information offered by the alien that he or she

qualifies for an exception and is eligible to present a protection claim in Canada. DHS regulations do not govern Canadian authorities. It would be inappropriate for DHS regulations to outline a mechanism for the Canadian authorities to correct errors or address new information. Nonetheless, the Canadian and United States governments have agreed to consult with each other on these matters and to address them operationally.

One commenter also stressed that, in this context, the Department should release detainees or provide transport to the nearest land border port-of-entry if Canada agrees to reconsider a claim and requires the asylum seeker's presence at the border. Release of detainees will be determined on a case-by-case basis, depending on the facts of the case and applicability of immigration laws. Should an individual be released, the logistics for how that person will get to the border is best determined on a case-by-case basis and through operational, as opposed to regulatory, guidance.

*Cost of Processing Returned Asylum Seekers*

The majority of the commenters disagreed with the proposed rule's assessment of the costs that will result from the rule's implementation, as outlined in the proposed rule's determination made under Executive Order 12866. They allege that certain tangible costs—including increases in adjudications, detention, Border Patrol deployment, and criminality—were not adequately addressed. They argue that, among the intangible costs of this Agreement that were ignored by the proposed rule, are the increased risks to life and safety of those seeking to enter either country outside land border ports-of-entry, and the potential for the Agreement to attract more smugglers and traffickers, which would make this land border more dangerous.

The costs identified in discussing Executive Order 12866 were the costs associated with implementation of the provisions proposed in the rule, not the costs associated with the Agreement itself. The proposed and final rules are focused solely on asylum seekers seeking to enter the United States who may be returned to Canada pursuant to the Agreement, not those who are returned from Canada pursuant to the Agreement or who seek to cross the border illegally. As such, those costs were properly not considered in addressing Executive Order 12866. However, the United States Government carefully considered all of the potential costs identified by the commenters before it entered into the Agreement and

determined that the benefits of the Agreement outweigh its costs.

VII. Monitoring Plans

Nearly all of the commenters recommended that the rule explicitly refer to the UNHCR's monitoring role, as specified in Article 8 of the Agreement. They added that the rule should specify exactly what type of information the UNHCR will receive, such as numbers of applicants, their ages, their countries of origin, and the disposition of their eligibility and credibility determinations. They also recommended that the rule establish a timetable for the reports, preferably quarterly or whenever a special situation warrants one. In addition, the commenters recommended that the rule authorize the UNHCR to monitor eligibility and credibility determinations and to intercede in cases in which it believes erroneous decisions were made. The same commenters also felt that the rule should allow NGOs to operate as the UNHCR's implementing partners to monitor the Agreement.

The Department has not incorporated these recommendations into this rule, but plans to take them into consideration when finalizing its arrangements with Canada and the UNHCR concerning monitoring of the Agreement. The Department also would welcome the assistance and input of NGOs. It is fully the intent of the Department to abide by the Agreement, which, at Article 8, provides that "The Parties shall cooperate with UNHCR in the monitoring of this Agreement and seek input from non-governmental organizations." The Department values the longstanding consultative, cooperative relationship the UNHCR has had with the U.S. government, which includes monitoring the United States' application of the Convention Relating to the Status of Refugees, Jul. 28, 1951, 189 U.N.T.S. 150 ("Refugee Convention"). For example, the UNHCR recently monitored and analyzed the expedited removal process and made several useful recommendations for the Department. However, the Department considers it inappropriate to codify the nature of this relationship, or the relationship between the Department and the NGO community, in these rules. Details of monitoring plans often change and develop over time, as unforeseen events arise, and those involved in the monitoring plan identify methods, consistent with evolving events, to better gather and analyze data. As such, it is more appropriate to include details of such plans in formal action plans and memoranda. One comment suggested that the rule include a monitoring plan

concerning smuggling and trafficking developments. As stated earlier, the Department is aware of the potential for increased smuggling and trafficking after the Agreement is implemented and intends to monitor these developments. The Department does not believe, however, that it is appropriate to codify such a monitoring plan in regulations for the same reasons noted above.

VIII. Agreement Terms Unrelated to Processing Asylum Seekers Coming to the United States From Canada

*Resettlement Under the Agreement*

Most commenters wanted the rule to include details concerning the implementation of the resettlement side agreement addressed in Article 9 of the Agreement. Another commenter recommended that the Department of State introduce its own proposed rule to implement the resettlement agreement.

This comment concerns an issue separate and distinct from that of returning asylum seekers to the country of last presence. The scope of this rule will remain limited to implementing the Agreement's terms as they concern two limited categories of asylum seekers: Those seeking entry to the United States at a land border port-of-entry on the Canadian border and those who seek protection while being removed from Canada and transiting through the United States.

*Terminating the Agreement*

One commenter suggested that the rule include criteria to determine whether the Agreement should be cancelled because of negative impacts, particularly any increase in smuggling or trafficking. Another made a similar, though less specific suggestion, that the rule should include procedures for revising or terminating the Agreement, should that prove necessary. One commenter added that the Department of State should propose its own separate rule concerning the procedures for suspending or terminating the Agreement, including adequate or appropriate termination grounds.

With respect to termination procedures, Article 10 of the Agreement between the United States and Canada specifically provides that termination may occur with six months' written notice from either party, and that three months' written notice would result in suspension. It would be inappropriate for the U.S. Government to negotiate an Agreement with Canada and then unilaterally adopt specific criteria that would result in the Agreement's termination. The efficacy and ongoing commitment to an international

agreement is a matter of foreign policy of the United States, the proper subject of diplomacy, and inappropriate for regulation under the Administrative Procedure Act (5 U.S.C. 551–59, 701–06, 1305, 3105, 3344, 5372, 7521).

### IX. Miscellaneous

*Resolving U.S.-Canadian Differences in Interpreting the Agreement*

Most commenters agreed that the rule should provide a detailed mechanism to resolve differences between Canada and the United States regarding the interpretation and implementation of the Agreement. In accordance with the second paragraph of Article 8 of the Agreement, which provides that standard operating procedures ''shall include mechanisms for resolving differences respecting the interpretation and implementation of the terms of this Agreement,'' the Department intends to cooperate with its Canadian colleagues to address and resolve differences in the same spirit in which the Agreement was negotiated. As reflected in the Agreement itself, resolution of such differences is more appropriately addressed through operating procedures than through the promulgation of regulations.

*Defining ''Land Border Port-of-Entry''*

Over half of the commenters suggested that this rule provide a definition of ''land border port-of-entry,'' as that term is used in the Agreement. Prior regulatory attempts to define ''port-of-entry'' have done so in reference to geographical locations where federal officers have authority to perform their official functions. For example, in the customs regulations at 19 CFR 101.1, this term simply ''refer[s] to any place designated by Executive Order of the President, by order of the Secretary of Treasury, or by Act of Congress, at which a Customs officer is authorized to * * * enforce the various provisions of the Customs and navigation laws.'' Pursuant to this approach of port-of-entry designation, these regulations enumerate specific ports-of-entry that have been designated as ''Customs port of entry.'' 19 CFR 101.3(b)(1). Existing immigration regulations take a similar approach, defining ''ports-of-entry'' with an exhaustive list of locations, broken down into three ''classes.'' 8 CFR 100.4(c)(2). These definitional approaches reveal the difficulty of providing one uniform definition of ''port-of-entry.'' Indeed, beyond the fact of CBP officers' presence, ''ports-of-entry'' can vary in nearly every way imaginable. For instance, some ports-of-

entry may sit on federally owned property, while others may be located on private or municipally owned property. Similarly, some land ports-of-entry border waterways or bridges, while others are located on busy highways or railroad tracks, while still others are situated in remote, rural areas. Given the impracticability of a one-size-fits-all definitional approach to ''land border ports-of-entry,'' the Department will rely on the current definitions of 8 CFR 100.4(c)(2) and 19 CFR 101.3(b)(1) in implementing the Agreement. Thus, where an alien arrives at a ''port-of-entry,'' as designated in one of these regulatory provisions, which is located at the shared U.S.-Canada border, the alien will be subject to the Agreement. Aliens apprehended in the immediate vicinity of such ports-of-entry attempting to avoid inspection will, where reasonable, be regarded as having ''arrive[d] at a land border port of entry'' and, consequently, be subject to the Agreement. Finally, the Department intends to work closely with the Canadian government to provide operational guidance concerning the Agreement's applicability in marginal cases.

*Aliens ''Directed Back'' From Canada*

Two commenters raised the issue of aliens ''directed back'' by the Canadian government pending an interview by Canadian immigration officials. These commenters explained that, while Canadian authorities generally interview an alien who requests protection at the time he or she seeks to enter Canada from the United States, Canadian authorities have had occasion to direct such aliens back to the U.S. for future interview appointments in Canada during periods of increased attempted migration that outstrip Canadian processing resources. According to these commenters, such an increase is possible during the period immediately preceding Agreement implementation. The commenters have therefore requested that the Department work to accommodate such aliens' attempts to enter Canada for a consideration of their protection claims. The Department will not adopt this suggestion. As discussed in the Supplementary Information to the proposed rule and, again, earlier in the Supplementary Information to this final rule, aliens who unsuccessfully attempt to enter Canada do not alter their immigration status by the attempted entry. Thus, if an alien who is present in the U.S. without having been inspected and admitted (or paroled) by an immigration officer unsuccessfully attempts to enter Canada, then he or she

remains an unlawfully present alien subject to removal from the United States under sections 212(a)(6)(A)(i) and 240(a) of the Act (8 U.S.C. 1182(a)(6)(A)(i), 1229a(a)), just as if an immigration officer had apprehended the alien before he or she sought to enter Canada. An alien's appointment with Canadian immigration officials, while relevant to the Department's prosecutorial discretion concerning any decision to place the alien in removal proceedings, does not confer legal status upon an unlawfully present alien.

*Indirect Refoulment*

One commenter argued that returning aliens to Canada under the Agreement would constitute ''indirect'' refoulment, and would therefore violate U.S. obligations under the Refugee Convention and the Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T.S. 6223 (''Refugee Protocol''). The Department disagrees. Article 33 of the Refugee Convention obligates the U.S., through its accession to the Refugee Protocol, not to ''expel or return ('refouler') a refugee in any manner whatsoever to the *frontiers of territories where his life or freedom would be threatened* on account of his race, religion, nationality, membership of a particular social group or political opinion.'' (emphasis supplied). Absent some claim that an alien's life or freedom would be threatened in Canada, which the commenter did not suggest, the return of the alien to Canada for a full and fair consideration of his or her protection claims is consistent with U.S. obligations.

### X. Conforming Amendment to 8 CFR Part 235

In preparing this final rule, the Department determined that 8 CFR 235.3(b)(4) must also be amended to reflect the proposed rule's use of a threshold screening interview mechanism preceding the initiation of credible fear interviews for those aliens in expedited removal proceedings who are subject to the Safe Third Country Agreement. This existing regulatory provision explicitly makes reference to a CBP officer's referral of protection claims for a ''credible fear'' determination under 8 CFR 208.30. As aliens subject to expedited removal who are covered by the Agreement must first pass a threshold screening interview to determine whether their protection claims may be considered in the U.S., 8 CFR 235.3(b)(4) has been revised to refer more generally to 8 CFR 208.30 without reference to the credible fear process. This amendment ensures that the expedited removal regulations conform

to the threshold screening interview process explained in the proposed rule.

## Regulatory Flexibility Act

DHS has reviewed this rule in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)) and by approving it, DHS certifies that this rule will not have a significant economic impact on a substantial number of small entities. This rule, which relates to asylum claims, applies to individual aliens only. As such, a substantial number of small entities, as that term is defined in 5 U.S.C. 601(6), will not be affected by the rule.

## Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one-year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

## Small Business Regulatory Enforcement Fairness Act of 1996

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

## Executive Order 12866

The Department of Homeland Security has determined that this rule is a "significant regulatory action" under Executive Order 12866, section 3(f), Regulatory Planning and Review, and, accordingly, this rule has been submitted to the Office of Management and Budget for review. In particular, the Department has assessed both the costs and benefits of this rule as required by Executive Order 12866, section 1(b)(6) and has made a reasoned determination that the benefits of this rule justify its costs.

The rule implements a bilateral agreement that allocates responsibility between the United States and Canada for processing claims of certain asylum seekers by codifying the process by which individuals seeking entry into the United States, or being removed from Canada in transit through the United States, may be returned to Canada pursuant to the Agreement. The rule applies to individuals who are subject to expedited removal and, under existing regulations, would receive a credible fear interview by an asylum officer. This rule simply provides a preliminary screening by asylum officers to determine whether the alien is even eligible to seek protection in the United States, in which case the asylum officer will then proceed to make the credible fear determination under existing rules. Based on statistical evidence, it is anticipated that approximately 200 aliens may seek to enter the United States from Canada at a land border port-of-entry and be placed into expedited removal proceedings. A significant number of these aliens will be found exempt from the Agreement and eligible to seek protection in the United States after the threshold screening interview proposed in this rule. It is difficult to predict how many aliens will be returned to Canada under the Agreement, but the costs incurred in detaining and transporting them are not likely to be substantial. Therefore, the "tangible" costs of this rulemaking to the U.S. Government are minimal. Applicants who are found to be subject to the Agreement will be returned to Canada to seek protection, saving the U.S. Government the cost of adjudicating their asylum claims and, in some cases, the cost of detention throughout the asylum process.

The cost to asylum seekers who, under the rule, will be returned to Canada are the costs of pursuing an asylum claim in Canada, as opposed to the United States. There is no fee to apply for asylum in Canada and, under Canadian law, asylum seekers are provided social benefits that they are not eligible for in the United States, including access to medical coverage, adult public education, and public benefits. Therefore, the tangible costs of seeking asylum in Canada are no greater than they are in the United States. The "intangible" costs to asylum seekers who would be returned to Canada under the proposed rule are the costs of potential separation from support networks they may be seeking to join in the United States. However, the Agreement contains broad exceptions based on principles of family unity that would generally allow those with family connections in the United States to seek asylum in the United States under existing regulations governing the credible fear process.

The Executive Order 12866 cost analysis captures the costs which apply to those instances where an alien requests protection from the United States government under one of two scenarios: when arriving at a port-of-entry on the United States-Canada land border; or, when transiting through the United States as part of the Canadian government's effort to remove the alien to a third country. In either scenario, the rule provides asylum officers with authority to make basic, threshold screening determinations about how the Agreement applies to the alien. Although additional costs may be incurred as part of the Safe Third Country Agreement between the United States and Canada, the costs discussed in the Executive Order 12866 are limited to those costs arising under the two scenarios outlined in the rule and not the cost impact of the overall Agreement between the two countries.

The Agreement provides for a threshold determination to be made concerning which country will assume responsibility for processing claims of asylum seekers. This rule only clarifies the threshold screening determination for a United States asylum officer when determining whether an alien should be returned to Canada. It is unclear how many individuals will seek asylum in the United States from Canada. Similarly, the Agreement permits Canada to return to the United States certain asylum seekers attempting to enter Canada from the United States at a land border port-of-entry. The Department does not know how many asylum seekers Canada will return to the United States. As discussed in the proposed rule and above, individuals returned from Canada to the United States will be in the same position as they would be in had they not sought entry in Canada. This analysis is beyond the purview of the rule. However, the Department will continue to monitor the costs associated with handling asylum seekers at land border ports-of-entry.

The Department recognizes that there have been pre-existing periodic costs associated with the departure of aliens from the United States to Canada for purposes of seeking asylum, particularly during the period in which the National Security Entry-Exit Registration System (NSEERS) was operating. These costs arose when, during a period of increased attempted migration to Canada from the United States, the Government of Canada decided not to admit asylum seekers until they could be scheduled for interview appointments. The Department recognizes that many of these costs were directly borne by aliens, State and local agencies, and nonprofit organizations. While costs similar to those incurred in the past may be borne by aliens attempting to enter Canada before the

Agreement becomes effective, they are not affected by the terms of this rule. However, the Department will continue to monitor the costs associated with handling asylum seekers at land border ports-of-entry.

The rule benefits the United States because it enhances the ability of the United States and Canada to manage, in an orderly fashion, asylum claims brought by persons crossing our common border. By implementing the Agreement, the rule furthers U.S. and Canadian goals, as outlined in the 30-Point Action Plan under the Smart Border Declaration signed by Secretary Ridge and former Canadian Deputy Foreign Minister John Manley, to ensure a secure flow of people between the two countries while preserving asylum seekers' access to a full and fair asylum process in a manner consistent with U.S. law and international obligations.

### Executive Order 13132

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### Executive Order 12988 Civil Justice Reform

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

### Paperwork Reduction Act

The regulations at 8 CFR 208.30 require that an asylum officer conduct a threshold screening interview to determine whether an alien is ineligible to apply for asylum pursuant to section 208(a)(2)(A) of the Act (8 U.S.C. 1158(a)(2)(A)). The threshold screening interview is considered an information collection under the Paperwork Reduction Act (PRA) of 1995. On March 8, 2004, the Department of Homeland Security, published a proposed rule in the **Federal Register** to provide USCIS asylum officers' with authority to make threshold determinations concerning applicability of the Agreement between the Government of the United States of America and the Government of Canada regarding asylum claims made in transit and at land border ports-of-entry. In the Supplementary Information in the proposed rule under the heading "Paperwork Reduction Act" the USCIS

published a 60 day notice encouraging the public to submit comments specifically to the information collection requirements contained in 8 CFR 208.30. The USCIS did not receive any comments on the information collection requirements. Accordingly, the USCIS has submitted an information collection package to OMB in accordance with the PRA and OMB has approved this information collection.

### Family Assessment Statement

The Department has reviewed this rule and determined that it may affect family well-being as that term is defined in section 654 of the Treasury General Appropriations Act, 1999, Public Law 105–277, Div. A. Accordingly, the Department has assessed this action in accordance with the criteria specified by section 654(c)(1). In this rule, an alien arriving at a land border port-of-entry with Canada may qualify for an exception to the Safe Third Country Agreement, which otherwise requires individuals to seek protection in the country of last presence (Canada), by establishing a relationship to a family member in the United States ("anchor relative") who has lawful status in the United States, other than a visitor, or is 18 years of age or older and has an asylum application pending. This rule incorporates the Agreement's definition of "family member," which may be a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew. The "family member" definition was intended to be broad in scope to promote family unity. This rule thereby strengthens the stability of the family by providing a mechanism to reunite separated family members in the United States.

In some cases, the rule will have a negative effect resulting in the separation of family members. The Agreement's exceptions, as expressed in the rule, require an anchor relative to have either lawful status in the United States, other than visitor, or else to be 18 years of age or older and have a pending asylum application. Family members who do not meet one of these conditions, therefore, would be separated under the rule. However, this rule's definition of "family member," which derives from the exceptions to the Agreement, is more generous than other family-based immigration laws, which require the anchor relative to have more permanent status in the United States (such as that of citizen, lawful permanent resident, asylee or refugee) and which have a more restricted list of the type of family relationships that can be used to

sponsor someone for immigration to the United States (although, unlike those laws, this Agreement provides only an opportunity to apply for protection and does not directly confer an affirmative immigration benefit). Under this rule, family members will be able to reunite even if the anchor relative's status is less than permanent in the United States. Further, on a case-by-case basis, the Agreement's "public interest" exception can be used to minimize this cost.

### List of Subjects

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 212*

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

*8 CFR Part 235*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

### Amendments to the Regulations

■ Accordingly, chapter I of title 8 of the Code of Federal Regulations is amended as follows:

### PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1158, 1226, 1252, 1282; 8 CFR part 2.

■ 2. Section 208.4 is amended by adding a new paragraph (a)(6) to read as follows:

**§ 208.4   Filing the application.**

\*    \*    \*    \*    \*

(a) \* \* \*

(6) *Safe Third Country Agreement.* Asylum officers have authority to apply section 208(a)(2)(A) of the Act, relating to the determination that the alien may be removed to a safe country pursuant to a bilateral or multilateral agreement, only as provided in 8 CFR 208.30(e). For provisions relating to the authority of immigration judges with respect to section 208(a)(2)(A), *see* 8 CFR 1240.11(g).

\*    \*    \*    \*    \*

■ 3. Section 208.30 is amended by:
  a. Redesignating paragraph (e)(4) as (e)(7);

b. Redesignating paragraph (e)(2) as paragraph (e)(4), and by revising newly redesignated paragraph (e)(4);

c. Redesignating paragraph (e)(3) as parargaph(e)(5) by and by revising newly redesignated paragraph (e)(5);

d. Adding new paragraphs (e)(2), (e)(3), and (e)(6);

e. Revising paragraph (g)(2)(i), and by

f. Removing paragraphs (g)(2)(iii) and (g)(2)(iv).

The additions and revisions read as follows:

§ 208.30   Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.

\*   \*   \*   \*   \*

(e) \* \* \*

(2) An alien will be found to have a credible fear of persecution if there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, the alien can establish eligibility for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act.

(3) An alien will be found to have a credible fear of torture if the alien shows that there is a significant possibility that he or she is eligible for withholding of removal or deferral of removal under the Convention Against Torture, pursuant to 8 CFR 208.16 or 208.17.

(4) In determining whether the alien has a credible fear of persecution, as defined in section 235(b)(1)(B)(v) of the Act, or a credible fear of torture, the asylum officer shall consider whether the alien's case presents novel or unique issues that merit consideration in a full hearing before an immigration judge.

(5) Except as provided in paragraph (e)(6) of this section, if an alien is able to establish a credible fear of persecution or torture but appears to be subject to one or more of the mandatory bars to applying for, or being granted, asylum contained in section 208(a)(2) and 208(b)(2) of the Act, or to withholding of removal contained in section 241(b)(3)(B) of the Act, the Department of Homeland Security shall nonetheless place the alien in proceedings under section 240 of the Act for full consideration of the alien's claim, if the alien is not a stowaway. If the alien is a stowaway, the Department shall place the alien in proceedings for consideration of the alien's claim pursuant to 8 CFR 208.2(c)(3).

(6) Prior to any determination concerning whether an alien arriving in the United States at a U.S.-Canada land border port-of-entry or in transit through

the U.S. during removal by Canada has a credible fear of persecution or torture, the asylum officer shall conduct a threshold screening interview to determine whether such an alien is ineligible to apply for asylum pursuant to section 208(a)(2)(A) of the Act and subject to removal to Canada by operation of the Agreement Between the Government of the United States and the Government of Canada For Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries ("Agreement"). In conducting this threshold screening interview, the asylum officer shall apply all relevant interview procedures outlined in paragraph (d) of this section, provided, however, that paragraph (d)(2) of this section shall not apply to aliens described in this paragraph. The asylum officer shall advise the alien of the Agreement's exceptions and question the alien as to applicability of any of these exceptions to the alien's case.

(i) If the asylum officer, with concurrence from a supervisory asylum officer, determines that an alien does not qualify for an exception under the Agreement during this threshold screening interview, the alien is ineligible to apply for asylum in the United States. After the asylum officer's documented finding is reviewed by a supervisory asylum officer, the alien shall be advised that he or she will be removed to Canada in order to pursue his or her claims relating to a fear of persecution or torture under Canadian law. Aliens found ineligible to apply for asylum under this paragraph shall be removed to Canada.

(ii) If the alien establishes by a preponderance of the evidence that he or she qualifies for an exception under the terms of the Agreement, the asylum officer shall make a written notation of the basis of the exception, and then proceed immediately to a determination concerning whether the alien has a credible fear of persecution or torture under paragraph (d) of this section.

(iii) An alien qualifies for an exception to the Agreement if the alien is not being removed from Canada in transit through the United States and

(A) Is a citizen of Canada or, not having a country of nationality, is a habitual resident of Canada;

(B) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who has been granted asylum, refugee, or other lawful status in the United States, provided, however, that this exception shall not apply to an alien whose relative maintains only nonimmigrant visitor status, as defined in section

101(a)(15)(B) of the Act, or whose relative maintains only visitor status based on admission to the United States pursuant to the Visa Waiver Program;

(C) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who is at least 18 years of age and has an asylum application pending before U.S. Citizenship and Immigration Services, the Executive Office for Immigration Review, or on appeal in federal court in the United States;

(D) Is unmarried, under 18 years of age, and does not have a parent or legal guardian in either Canada or the United States;

(E) Arrived in the United States with a validly issued visa or other valid admission document, other than for transit, issued by the United States to the alien, or, being required to hold a visa to enter Canada, was not required to obtain a visa to enter the United States; or

(F) The Director of USCIS, or the Director's designee, determines, in the exercise of unreviewable discretion, that it is in the public interest to allow the alien to pursue a claim for asylum, withholding of removal, or protection under the Convention Against Torture, in the United States.

(iv) As used in 8 CFR 208.30(e)(6)(iii)(B), (C) and (D) only, "legal guardian" means a person currently vested with legal custody of such an alien or vested with legal authority to act on the alien's behalf, provided that such an alien is both unmarried and less than 18 years of age, and provided further that any dispute with respect to whether an individual is a legal guardian will be resolved on the basis of U.S. law.

\*   \*   \*   \*   \*

(g) \* \* \*

(2) \* \* \*

(i) Immigration judges will review negative credible fear findings as provided in 8 CFR 1208.30(g)(2).

\*   \*   \*   \*   \*

PART 212—DOCUMENTARY REQUIREMENTS; NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

■ 4. The authority citation for part 212 continues to read as follows:

Authority: 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1187, 1223, 1225, 1226, 1227.

■ 5. Section 212.5 is amended by adding a new paragraph (e)(2)(iii) to read as follows:

**§ 212.5   Parole of aliens into the United States.**

\*    \*    \*    \*    \*

(e) \* \* \*

(2) \* \* \*

(iii) Any alien granted parole into the United States so that he or she may transit through the United States in the course of removal from Canada shall have his or her parole status terminated upon notice, as specified in 8 CFR 212.5(e)(2)(i), if he or she makes known to an immigration officer of the United States a fear of persecution or an intention to apply for asylum. Upon termination of parole, any such alien shall be regarded as an arriving alien, and processed accordingly by the Department of Homeland Security.

\*    \*    \*    \*    \*

**PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION**

■ 6. The authority citation for part 235 continues to read as follows:

Authority: 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, published January 2, 2004), 1201, 1224, 1225, 1226, 1228, 1365a note, 1379, 1731–32.7.

■ 7. Section 235.3 is amended by revising the first sentence of paragraph (b)(4) to read as follows:

**§ 235.3   Inadmissible aliens and expedited removal.**

\*    \*    \*    \*    \*

(b) \* \* \*

(4) \* \* \* If an alien subject to the expedited removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country, the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer in accordance with 8 CFR 208.30. \* \* \*

\*    \*    \*    \*    \*

Dated: November 19, 2004.

Tom Ridge,

*Secretary of Homeland Security.*

[FR Doc. 04–26239 Filed 11–26–04; 8:45 am]

BILLING CODE 4410–10–P

**DEPARTMENT OF JUSTICE**

**8 CFR Parts 1003, 1208, 1212, 1235, and 1240**

[EOIR No. 142F; AG Order No. 2740–2004]

RIN 1125–AA46

**Asylum Claims Made by Aliens Arriving From Canada at Land Border Ports-of-Entry**

**AGENCY:** Executive Office for Immigration Review, Justice.

**ACTION:** Final rule.

**SUMMARY:** This rule adopts without substantial change the proposed rule to implement the December 5, 2002, Agreement Between the Government of the United States and the Government of Canada For Cooperation in the Examination of Refugee Status Claims from Nationals of Third Counties ("bilateral Agreement with Canada" or "Agreement"). The Agreement bars certain aliens who are arriving from Canada, or in transit during removal from Canada, from applying for asylum and related protections in the United States. In the context of expedited removal proceedings, the Department of Homeland Security ("DHS") will conduct a threshold screening interview to determine whether the Agreement applies to an alien. The DHS final rule is published elsewhere in this **Federal Register**. The role of the Executive Office of Immigration Review ("EOIR") is limited to an evaluation of how the Agreement applies to aliens whom DHS has chosen to place in removal proceedings.

**DATES:** This rule is effective December 29, 2004.

**FOR FURTHER INFORMATION CONTACT:** Mary Beth Keller, General Counsel, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2600, Falls Church, Virginia 22041, telephone (703) 305–0470.

**SUPPLEMENTARY INFORMATION:**

**Introduction**

On March 8, 2004, the Department of Justice ("Department") and DHS promulgated proposed rules implementing the Agreement. *See* 69 FR 10627 (March 8, 2004). This final rule adopts the Department's proposed rule without significant change. The proposed rule described procedures implementing the Agreement in removal proceedings under section 240 of the Immigration and Nationality Act ("Act").

The Agreement covers certain aliens who are arriving at U.S.-Canada land border ports-of-entry or arriving in transit through the U.S. during removal by the Canadian government and who express a fear of persecution or torture. Subject to several specific exceptions, the Agreement provides for the United States to return such arriving aliens to Canada, the country of last presence, to seek protection under Canadian law, rather than applying in the United States for the protective claims of asylum, withholding of removal, or protection under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("Convention Against Torture" or "CAT"). Therefore, aliens covered by the Agreement will be allowed to seek asylum and related protections in one country or the other, but not in both.

The Agreement specifically recognizes that Canada offers a generous system of refugee protection, and has a tradition of assisting refugees and displaced persons abroad. The Agreement also ensures that asylum seekers returned to Canada will have access to a full and fair procedure for determining their protection claims before they can be removed to a third country.

As implemented in the United States, the Agreement will operate as follows. First, a United States Citizenship and Immigration Services ("USCIS") asylum officer will conduct a threshold screening interview in the context of expedited removal proceedings. The DHS final rule, published elsewhere in this edition of the **Federal Register**, and the DHS proposed rule, published at 69 FR 10620 (March 8, 2004), address this process in more detail. To summarize, the asylum officer will conduct a threshold screening interview to determine whether an arriving alien who is subject to the Agreement meets any of its exceptions, or whether the alien should be returned to Canada for consideration of his or her protection claims in that country.

If the asylum officer determines that the alien qualifies for an exception to the Agreement, the asylum officer will then proceed immediately to a consideration of whether the alien has a credible fear of persecution or torture if returned to his or her country. The existing credible fear process of section 235(b) of the Act will apply to those aliens, including the potential for review by an immigration judge.

On the other hand, if the asylum officer determines that an arriving alien does not meet an exception to the Agreement and should be returned to Canada for consideration of his or her asylum or other protection claims under Canadian law, the asylum officer's



**PRESIDENTIAL MEMORANDA**

# Presidential Memorandum on Additional Measures to Enhance Border Security and Restore Integrity to Our Immigration System

**— IMMIGRATION**

Issued on: **April 29, 2019**

★ ★ ★

MEMORANDUM FOR THE ATTORNEY GENERAL
THE SECRETARY OF HOMELAND SECURITY

SUBJECT:     Additional Measures to Enhance Border Security
and Restore Integrity to Our Immigration System

By the authority vested in me as President by the Constitution and the laws of the
United States of America, and to ensure the safety and territorial integrity of the
United States as well as to ensure that the Nation's immigration laws are faithfully
executed, it is hereby ordered as follows:

Section 1.  Purpose.  As noted in Proclamations 9822 and 9842 of November 9,
2018, and February 7, 2019, respectively, our immigration and asylum system is in
crisis as a consequence of the mass migration of aliens across our southern border.
 In Proclamation 9844 of February 15, 2019, I declared a national emergency to
address the security and humanitarian crisis at that border.  That emergency
continues to grow increasingly severe.  In March, more than 100,000 inadmissible

DHSIFR677

aliens were encountered seeking entry into the United States.  Many aliens travel in large caravans or other large organized groups, and many travel with children.  The extensive resources required to process and care for these individuals pulls U.S. Customs and Border Protection personnel away from securing our Nation's borders.  Additionally, illicit organizations benefit financially by smuggling illegal aliens into the United States and encouraging abuse of our asylum procedures.  This strategic exploitation of our Nation's humanitarian programs undermines our Nation's security and sovereignty.  The purpose of this memorandum is to strengthen asylum procedures to safeguard our system against rampant abuse of our asylum process.

Sec. 2.  Policy.  It is the policy of the executive branch to manage our humanitarian immigration programs in a safe, orderly manner that provides access to relief or protection from removal from the United States for aliens who qualify, and that promptly denies benefits to and facilitates the removal of those who do not.

Sec. 3.  Further Steps to Enhance the Integrity and Efficiency of the Existing Asylum System.  Within 90 days of the date of this memorandum, the Attorney General and the Secretary of Homeland Security, as applicable, shall take all appropriate actions to:

(a)  propose regulations to ensure that aliens who receive positive fear determinations pursuant to section 235(b)(1) of the Immigration and Nationality Act (INA) (8 U.S.C. 1225(b)(1)) or section 2242 of the Foreign Affairs Reform and Restructuring Act of 1998 (8 U.S.C. 1231 note) are placed in proceedings conducted under 8 CFR 208.2(c)(1) and 1208.2(c)(1) or, if not eligible for asylum, are placed in proceedings conducted under 8 CFR 208.2(c)(2) and 1208.2(c)(2);

(b)  propose regulations to ensure that, absent exceptional circumstances, all asylum applications adjudicated in immigration court proceedings receive final administrative adjudication, not including administrative appeal, within 180 days of

DHSIFR678

filing, in accordance with section 208(d)(5)(A)(iii) of the INA (8 U.S.C. 1158(d)(5)(A)(iii));

(c)  propose regulations setting a fee for an asylum application not to exceed the costs of adjudicating the application, as authorized by section 208(d)(3) of the INA (8 U.S.C. 1158(d)(3)) and other applicable statutes, and setting a fee for an initial application for employment authorization for the period an asylum claim is pending; and

(d)  propose regulations under section 208(d)(2) of the INA (8 U.S.C. 1158(d)(2)) and other applicable statutes to bar aliens who have entered or attempted to enter the United States unlawfully from receiving employment authorization before any applicable application for relief or protection from removal has been granted, and to ensure immediate revocation of employment authorization for aliens who are denied asylum or become subject to a final order of removal.

Sec. 4.  Allocation of Immigration Officers.  The Secretary of Homeland Security shall reprioritize the assignment of immigration officers and any other employees of the Department as the Secretary deems necessary and appropriate to improve the integrity of adjudications of credible and reasonable fear claims, to strengthen the enforcement of the immigration laws, and to ensure compliance with the law by those aliens who have final orders of removal.

Sec. 5.  General Provisions.  (a)  Nothing in this memorandum shall be construed to impair or otherwise affect:

(i)   the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

DHSIFR679

(b)  This memorandum shall be implemented in a manner consistent with applicable law and subject to the availability of appropriations.

(c)  This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

DHSIFR680



U.S. Department of
Homeland Security

# Secretary Nielsen Meets with Mexican Officials on Border Emergency, Travels to Honduras to Meet with Northern Triangle Governments to Address Crisis at Source

Release Date: March 26, 2019

Secretary of Homeland Security Kirstjen M. Nielsen met with senior officials from the Government of Mexico Tuesday, March 26 to discuss border security and immigration, and she will travel to Honduras to participate in multilateral meetings with regional partners to discuss the common cause America shares with the countries of Central America in confronting migration flows and promoting security and prosperity. There she plans to sign a first-of-its-kind regional accord meant to address the migration crisis.

The Secretary traveled to Miami, Florida on Tuesday for a bilateral meeting with Mexican Secretary of the Interior Olga Sanchez Cordero and senior Mexican government officials. They discussed ways the U.S. and Mexico can work together to address irregular migration and the record levels of illegal entries at the U.S. Southern Border, where last month DHS apprehended more than 75,000 individuals—a 12-year high. They also discussed combating human trafficking and smuggling, security cooperation, and U.S. plans to bolster the Migrant Protection Protocols (http://links.govdelivery.com/#/track?type=click& enid=ZWFzPTEmbXNpZD0mYWQ2D0mbWFpbGluZ2lkPTIwMTkwMzI2LjM1NjkxMXQxMjEmbWVzc2FnZWlkPU1EU1QLQUQ0.jklQQ9jdQ0jMThLTtwMTtwMUaMjQ1LjM1NjkxMXQ1mZGFBYkUhc2dpZ0x5a0x5a0x5nH8HQ9cOQtODDmMy2blMfpgGfkrfWLpKfihfZXeuYmFyc0bsc50aaHAuZ2Qiui.mdvd2100&&https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols) (MPP), a DHS initiative to return migrants to Mexico and provide humanitarian protections while they await U.S. immigration processing.

On Wednesday, March 27 the Secretary will be in Tegucigalpa, Honduras to participate in a multilateral meeting at the Ministry of Security with Northern Triangle officials representing the governments of Guatemala, Honduras, and El Salvador. The meeting will mark the continuation of a multi-year diplomatic process aimed at stemming the flood of irregular migration at the source, and ultimately help confront the ongoing humanitarian and security emergency at the U.S. Southern Border. The meetings will be led by Honduran President Juan Orlando Hernández.

The Secretary and Northern Triangle security ministers have been working toward the development of a first-of-its-kind Memorandum of Cooperation—or "regional compact"—between the U.S. and the countries of the Northern Triangle. Reflecting improved cooperation between the countries, the accord focuses on stemming the migration crisis at its source, including preventing the formation of new migrant caravans that set out to reach the United States.

A final compact would cover four distinct areas of collaboration:

- Combating Human Trafficking and Migrant Smuggling
- Countering Organized Crime and Gangs
- Expanding Information and Intelligence Sharing
- Strengthening Border Security

Following Secretary Nielsen's call for the formation of a "compact" last summer, in February she and Northern Triangle security ministers announced the signing of a joint statement declaring a commitment (http://links.govdelivery.com/#/track?type=click& enid=ZWFzPTEmbXNpZD0mYWQ2D0mbWFpbGluZ2lkPTIwMTkwMzI2LjM1NjkxMXQxMjEmbWVzc2FnZWlkPU1EU1QLQUQ0.jklQQ9jdQ0jMThLTtwMTtwMUaMjQ1LjM1NjkxMXQ1mZGFBYkUhc2dp0x5a0x5a0x5nH8HQ9cOQtODDmMy2blMfpgGfkrfWLpKfihfZXeuYmFyc0bsc50aaHAuZ2Qiui.mdvd2101&&https://www.dhs.gov/news/2019/02/21/secretary-nielsen-announces-historic-steps-northern-triangle-security-ministers) to reach a final deal to improve information sharing, law enforcement cooperation, and public messaging to address the ongoing crisis.

Earlier on Wednesday, Nielsen will participate in bilateral meetings with the Honduran President Juan Orlando Hernández and First Lady Ana García Carías at the Ministry of Security in Tegucigalpa.

###

Topics: International Engagement (/topics/international) , Secretary of Homeland Security (/topics/secretary-homeland-security)

Keywords: Immigration (/keywords/immigration) , International Partnership (/keywords/international-partnerships)

Last Published Date: March 26, 2019

DHSIFR681





**Tuesday,**

**December 2, 2003**

**Part IV**

# Department of Homeland Security

**8 CFR Part 264**

**Suspending the 30-Day and Annual Interview Requirements From the Special Registration Process for Certain Nonimmigrants; Interim Rule**

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Part 264**

**[ICE No. 2301–3]**

**RIN 1653–AA29**

## Suspending the 30-Day and Annual Interview Requirements From the Special Registration Process for Certain Nonimmigrants

**AGENCY:** U.S. Immigration and Customs Enforcement, Department of Homeland Security.

**ACTION:** Interim rule with request for comments.

**SUMMARY:** This rule amends Department of Homeland Security (DHS) regulations for the registration and monitoring of certain nonimmigrant aliens. This rule amends existing regulations by suspending the 30-day and annual re-registration requirements for aliens who are subject to the National Security Entry-Exit Registration System (NSEERS) Registration. Instead of requiring all aliens subject to NSEERS to appear for 30-day and/or annual re-registration interviews, the DHS will utilize a more tailored system in which it will notify individual aliens of future registration requirements. This rule also eliminates the requirement for those nonimmigrant aliens subject to special registration who are also enrolled in the Student and Exchange Visitor Information System (SEVIS) to separately notify DHS of changes in educational institutions and addresses. Additionally, this rule clarifies how nonimmigrant aliens may apply for relief from special registration requirements and clarifies that certain alien crewmen are not subject to the departure requirements. Finally, certain conforming amendments have been made to the existing regulations to reflect the fact that the former Immigration and Naturalization Service (Service) has been abolished and its functions transferred from the Department of Justice to DHS under the Homeland Security Act of 2002 (HSA), Public Law 107–296.

**DATES:** *Effective date:* This interim rule is effective December 2, 2003.

*Comment date:* Written comments must be submitted on or before February 2, 2004.

**ADDRESSES:** Please submit written comments to the Director, Regulations and Forms Services Division, U.S. Citizenship and Immigration Services, DHS, 425 I Street, NW., Room 4034, Washington, DC 20536. To ensure proper handling, please reference ICE

No. 2301–03 on your correspondence. Comments may also be submitted electronically to DHS at *rfs.regs@dhs.gov.* Comments submitted electronically must include the ICE No. 2301–03 in the subject box. Comments are available for public inspection at the above address by calling (202) 514–3048 to arrange for an appointment.

**FOR FURTHER INFORMATION CONTACT:** Robert Schoch, U.S. Immigration and Customs Enforcement, DHS, 425 I Street, NW., Room 1000, Washington, DC 20536, telephone (202) 353–3173.

**SUPPLEMENTARY INFORMATION:**

### Background

*How Does Registration of Aliens Work Under the Existing Statutory and Regulatory Provisions?*

Section 262(a) of the Immigration and Nationality Act (Act) provides that all aliens who have not previously been registered and fingerprinted pursuant to section 221(b) of the Act have a duty to apply for registration and to be fingerprinted if they remain in the United States for 30 days or longer. Under the existing regulations at 8 CFR 264.1(a), DHS registers nonimmigrants using Form I–94 (Arrival-Departure Record). Section 263(a) of the Act also authorizes the Secretary of DHS to prescribe special regulations and forms for the registration of special groups of aliens in the United States. As authorized by section 262(c) of the Act, the existing regulations at 8 CFR 264.1(e) contain general provisions waiving the fingerprinting requirement for many nonimmigrants. Accordingly, at the present time, most nonimmigrant aliens are admitted to the United States without being either fingerprinted or photographed.

Section 214 of the Act authorizes the Attorney General (now deemed to be the Secretary of DHS under the HSA) to prescribe conditions for the admission of nonimmigrant aliens. Section 215 of the Act provides for departure control from the United States. In addition, section 265 of the Act requires that all aliens who remain in the United States who are required to be registered under the Act must notify the Secretary of DHS of each change of address within ten days from the date of such change and furnish with such notice additional information as the Secretary of DHS may prescribe.

Prior to the enactment of the HSA and the transfer of the functions of the former Service from the Department of Justice to DHS, the Service exercised the previously described registration authority to require that certain classes of aliens are specially registered while in

the United States. Pursuant to section 263(a) of the Act, as well as the general registration authority under section 262 of the Act, the former Service promulgated 8 CFR 264.1(f), which required that certain nonimmigrant aliens be registered, fingerprinted, and photographed by the Service at the port of entry (POE) at the time the nonimmigrant aliens apply for admission. *See* 67 FR 52584 (Aug. 12, 2002). Registration at the POEs shall be known as "POE registration" for the purpose of this discussion. Additionally, pursuant to section 265 of the Act, 8 CFR 264.1(f) directed that certain nonimmigrant aliens designated by the Attorney General who were already in the United States appear before the Service for special registration. *Id.* Registration of aliens already present in the United States shall be known as "call-in registration" for the purpose of this discussion.

*How Does This Rule Change the Current Special Registration Requirements?*

Currently, 8 CFR 264.1(f)(3) provides that aliens specially registered at a POE must appear before DHS 30 days after their admission into the United States for a continuing registration interview. This rule suspends this automatic 30-day continuing registration requirement.

As currently written, 8 CFR 264.1(f)(5) requires that all aliens who were subject to special registration appear for an annual re-registration interview. This rule also suspends the annual re-registration requirement.

The suspension of the 30-day and annual re-registration requirement applies to all aliens previously registered under the NSEERS program, whether call-in or POE registration, as well as any aliens registered subsequent to the effective date of this rule. In place of these previous requirements that all nonimmigrant aliens subject to NSEERS registration appear for additional 30-yday and annual interviews, this rule will allow DHS, as a matter of discretion, to notify nonimmigrant aliens subject to NSEERS registration to appear for one or more additional continuing registration interviews in those particular cases where it may be necessary to determine whether the alien is complying with the conditions of his or her nonimmigrant visa status and admission.

This rule also provides that when an alien who is monitored under SEVIS notifies DHS of a change of address or educational institution through SEVIS, it also constitutes a notification for the purposes of NSEERS registration. It also clarifies that certain alien crewmen, described at section 101(a)(15)(D) of the

Act, and are subject to special registration, are exempted from the departure control requirements of 8 CFR section 264.1(f) (8).

Finally, this rule reflects that the Service was abolished, and DHS now performs its functions. Thus, throughout 8 CFR 264.1(f), this rule substitutes the Secretary of Homeland Security for the Attorney General, and replaces references to the Service with references to DHS.

This rule does not eliminate or in any way limit the authority of the Secretary of DHS under section 263 of the Act, for certain types of aliens, and section 265 of the Act, for any class or group of aliens, through notice, to require such aliens to appear for special registration in the future if circumstances so require. Additionally, this rule does not limit or alter any other special registration requirement under section 263 of the Act.

*What Other Changes Are Made by This Rule?*

This rule also clarifies how nonimmigrant aliens subject to NSEERS registration may apply for relief from registration departure requirements. Aliens subject to NSEERS registration are required to register their departure before an immigration officer at a designated port of departure and depart from that port on the same day. Aliens previously could contact the Service district director to obtain relief from these departure requirements. However, the abolition of the former Service and the distribution of its functions to various agencies within DHS, such as U.S. Citizenship and Immigration Services (CIS) and U.S. Customs and Border Protection (CBP), have created uncertainties for aliens as to how to seek such relief. For nonimmigrant aliens who have been NSEERS registered, this regulation clarifies how the alien may seek a waiver from the departure registration requirements.

First, under the revisions set out in this rule, a nonimmigrant alien subject to the departure registration requirements based upon NSEERS registration may seek relief from these requirements before his or her departure from an official designated by DHS or from the CBP field office director for the port from which the alien intends to depart. The alien seeking such relief must establish to the satisfaction of the field office director or designated official that exigent or unusual circumstances exist, and that the alien warrants a favorable exercise of discretion.

Additionally, for an alien who has been registered and who makes frequent trips to the United States, based upon a showing of good cause, exigent or unusual circumstances, the CBP field office director over the port to which the alien most frequently arrives in the United States may exempt the alien from future POE registrations. The field office director or his designee will make the determination that the frequency of arrival warrants relief from the registration requirements on a case-by-case basis. In making this determination, the field office director or his designee will consider the mode of travel, business and economic concerns, purpose of travel, or other factors as determined by the director. In seeking such relief, the alien bears the burden of establishing he or she warrants a favorable exercise of discretion. If granted, relief from POE registrations also shall include relief from NSEERS registration departure control requirements.

An alien alternatively may seek an exemption from the NSEERS registration requirements from the Department of State by such forms and methods as the Department of State may prescribe.

There are no specific forms to request relief from the NSEERS requirements from DHS; an individual seeking relief should direct a letter to the appropriate CBP field office director. In such a letter, the alien should provide a detailed description of the type of relief sought, their full name, date-of-birth, Fingerprint Identification Number (which is reflected on the Form I–94), a 1″ x 1″ passport style photograph, the alien's A-number, if one has been assigned, and any documents that support the relief request. Information regarding the relief provisions will be provided to aliens upon completion of registration. Copies of these materials, known as the ''walk-away'' materials, are also available on the Web site *www.ice.gov*, in the special registration section.

This rule further clarifies to aliens applying for relief that, until an application for relief from the NSEERS registration requirements is granted, the alien is required to comply with the registration requirements.

The decision of any DHS officer or official to grant or deny relief from the NSEERS registration provisions is done as an exercise of discretion, and as such is final and cannot be appealed.

A DHS officer authorized to grant relief also may terminate such relief by providing notice to the alien.

*Why Is This Rule Necessary?*

The former Service, and now DHS (as of March 1, 2003), have evaluated the utility of the 30-day and annual interviews under the current requirements for national security and immigration enforcement purposes. Additionally, DHS is under a congressional mandate set forth in various amendments to the Act to create a comprehensive entry-exit system. In carrying out this mandate through the establishment of the US–VISIT Program, DHS has reviewed the use of the special registration program for both POE and call-in registrations. After considering these factors, DHS has determined it is appropriate to suspend the continuing registration requirements set out in 8 CFR 264.1(f), that automatically required aliens subject to NSEERS registration to report for 30-day and/or annual re-registration interviews. Special registration of aliens at POEs has, consistent with the program's intent, provided important law enforcement benefits, which have included the identification of a number of alien terrorists and criminals. This rule is not amending the procedures for NSEERS registration at the POE's. In addition to US–VISIT, which will soon become operational, DHS has other systems available that can help ensure that those aliens who are already subject to NSEERS registration remain in compliance with the terms of their visa and admission. For example, Congress mandated that DHS develop a student monitoring system. See Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Public Law 104–208, section 641; ''Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism'' (USA Patriot Act), Public Law 107–56, section 416. This system, SEVIS, is now fully operational. Schools now must report directly to DHS when a student or exchange visitor alien changes schools, fails to appear for classes or otherwise fails to maintain his or her student status following admission into the United States.

Thus, DHS is now in a position to suspend the mandatory re-registration interview requirements for those aliens who are already subject to NSEERS registration, which will reduce the burden on those required to register under the current regulations, as well as to DHS. Instead, DHS will be able to schedule re-registration interviews on a more targeted and effective basis, only in those particular cases where it may be appropriate for additional scrutiny to ensure that an alien remains in compliance with the terms of his or her nonimmigrant visa and admission.

*Who Is Affected by This Rule?*

Aliens who have been subject to NSEERS registration, whether as a result of being registered at a POE upon arrival, or as a result of being called in to register by **Federal Register** notice, are affected by the rule, because it reduces their current reporting requirements by eliminating the mandatory 30-day and annual re-registration interviews. Additionally, aliens who hereafter enter the United States and are NSEERS registered at a POE are affected by this rule. Affected aliens have been or will be given a Form I–94 documenting their registration, which will reflect their Fingerprint Identification Number (FIN). DHS uses the FIN recorded on the Form I–94 to identify the records of an alien subject to special registration. Based upon the number of aliens who have previously registered, DHS estimates that over the 6 month time span from December 2003 through May 2004, approximately 82,532 aliens will benefit from this change and will not have to report for either a 30-day or annual re-interview during that period.

*How Does This Rule Affect Registration at POEs?*

This rule does not affect the procedures for the NSEERS registration of aliens, including fingerprinting, photographing, and provision of information, at POEs. As is obligatory under current regulations, nonimmigrant aliens subject to POE registration will still be required, utilizing the information collection system in place, to provide routine and readily available information as a condition of admission. This includes such information as is necessary to identify the alien in the United States. Lists of information that may be required during NSEERS registration have previously been issued. See, *e.g.*, 67 FR 40581, 40582.

Registration at POEs continues to allow DHS to determine if an alien's fingerprints match those of known terrorists or criminals, and to detain for removal or refuse admission of the alien if such an identity match is established.

*How Will DHS Provide Notice to Individual Aliens That They Must Appear for an Additional Registration Interview?*

In place of the automatic re-registration requirements set out in the original NSEERS registration provisions, this rule substitutes a more tailored approach to re-registration. The determination of whether an alien will be subject to additional registration

requirements will be made on a case-by-case basis. The admission of any nonimmigrant alien subject to NSEERS registration is subject to the requirement that, under this rule, he or she may be required to appear for future continuing re-registration interviews at the discretion of DHS. At the time of admission, DHS will advise all nonimmigrant aliens subject to special registration that they may be required to appear for additional registration interviews upon notice. DHS will separately notify those aliens selected to appear before DHS to comply with the additional re-registration requirements, which for a small number of aliens may be more frequent than the 30-day and annual re-registration requirements set out in the prior rule. However, only aliens who are notified of the re-registration requirements will have to appear before DHS for such requirement, and the majority of individuals registered will see a reduction in the burden of additional registration as a result of this rule. Notification under these regulations may be given to the alien in a manner reasonably calculated to reach the alien, which shall include, but is not limited to, notice by publication in the **Federal Register**, a letter sent via standard U.S. postal mail to the last address provided by the alien to DHS using regular mail, an e-mail to the address the alien provided to DHS during a previous NSEERS registration interview, or in-person delivery. The nonimmigrant alien must appear at the designated U.S. Immigration and Customs Enforcement office location, and on the specified date and time, unless otherwise specified in the notice. DHS will provide the alien at least ten days, measured from the date DHS publishes or sends notice to the alien, to comply with the re-registration obligation.

Notice to an alien of registration or re-registration requirements may be issued by the ICE Assistant Secretary, his designee, or any other such individual designated by the Secretary of DHS.

*How Does This Rule Affect an Alien's Obligation To Notify DHS of a Change of Address or Employment?*

This rule reiterates, for this distinct group of nonimmigrant aliens who are subject to NSEERS registration, and who remain in the United States for more than thirty days, the requirement that the nonimmigrant alien notify DHS of any change of address, employment and/or educational institution within 10 days of such change. Affected aliens may notify DHS by mail, or such other means as the Secretary of DHS may designate, of a change of address. The

required form, the AR–11 for Special Registration, is available at DHS offices and on the DHS Internet Web site at *http://www.uscis.gov*, in the special registration section.

However, this rule discontinues the requirement that student aliens monitored under SEVIS who are subject to special registration separately notify DHS of a change in their educational institution or address, if such information is provided to DHS through SEVIS. This rule provides that when an alien reports a change of address or educational institution to DHS through SEVIS, that action fulfills his or her special registration requirement to notify DHS of changes in address. However, student aliens who are monitored under SEVIS who are subject to special registration will still be required under 8 CFR 264.1(f)(5) to notify DHS of any change of employment which is currently not captured in the SEVIS system.

*How Does This Rule Affect Departure Control Requirements?*

This rule does not change the general requirement that a nonimmigrant alien subject to NSEERS registration, either POE registration or a prior or future call-in registration, also report his or her actual departure from the United States. Cessation of departure controls is inconsistent with the congressional mandate requiring that DHS establish a comprehensive entry-exit monitoring system. As DHS develops the larger system mandated by Congress, to be called US–VISIT, it will integrate the NSEERS registration currently in use. This requirement of departure registration means that the alien must appear at a designated Port of Departure before a departure control officer, *i.e.*, a CBP inspector, on the day he or she departs the United States to close his or her registration and also depart from that port. This departure requirement will ensure that all NSEERS registrations are properly closed.

If the departure control requirements do not continue, registration records for the nonimmigrant aliens subject to NSEERS registration would be left open without explanation. This could result in serious difficulties, including the possibility of future inadmissibility, for already registered aliens who depart and attempt to return to the United States.

The most recent **Federal Register** notice listing Ports of Departure can be found at 68 FR 8967. This rule does not alter or amend that list.

This rule does clarify that certain alien crewmen described at 101(a) (15) (D) of the Act who are subject to special registration requirements are exempt

from the departure registration requirements of 8 CFR 264(f) (8).

*Does This Rule Change Any of the Penalties for Failing To Comply With the Special Registration Provisions?*

No. This rule does not change any of the penalties for failing to comply with the special registration provisions. Moreover, this rule does not excuse any prior failure to comply with special registration provisions.

Under section 214(a) of the Act, as amended by the HSA, the admission of all nonimmigrant aliens to the United States "shall be for such time and under such conditions as the [Secretary of DHS] may by regulations prescribe." The Secretary of DHS may impose conditions on admission that are rationally related to the maintenance of nonimmigrant status. See, *e.g.*, *Narenji* v. *Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1980)(upholding regulation requiring Iranians on student visas to report and "provide information as to residence and maintenance of nonimmigrant status" or be subject to deportation proceedings). The regulations that currently implement section 214 of the Act provide in part that one condition of a nonimmigrant's continued stay in the country "is the full and truthful disclosure of all information requested" by DHS. 8 CFR 214.1(f).

The NSEERS registration requirements previously imposed upon aliens, either through POE registration or call-in registration, were intended in part to ensure that nonimmigrant aliens are complying with their nonimmigrant status (*e.g.*, by continuing to be students or employees, as contemplated at the time of the issuance of their visas or admission). Additionally, 8 CFR 214.1(f) was amended to reflect that a nonimmigrant alien's willful failure to comply with the special registration provisions constitutes a failure to maintain the relevant nonimmigrant status, and would render the alien removable under section 237(a)(1)(C)(i) of the Act.

Although this rule amends the regulations to eliminate the existing automatic 30-day and annual re-registration interview requirements, aliens who willfully failed to comply with prior registration requirements, including aliens who failed before December 2, 2003 to appear for a required initial call-in registration, a 30-day re-registration interview, or an annual re-registration interview, remain subject to the penalties outlined above and in previous **Federal Register** notices. Additionally, aliens who willfully fail to comply with any future call-in notice or additional registration

requirement imposed pursuant to this rule would be removable under section 237(a)(1)(C)(i) of the Act.

*What Is the Effect of an Alien's Failure To Comply With the Departure Reporting Requirements Upon the Alien's Subsequent Application for Admission?*

An alien who is subject to the special registration requirements who has failed, without good cause, to report his or her departure with DHS is presumed inadmissible to the United States. The presumption of inadmissibility arises if there was no good cause for the alien's failure to report to DHS at the time of his or her departure from the United States. However, an alien may overcome the presumption of inadmissibility by establishing to the Secretary of State and the Secretary of DHS that he or she does not seek to enter the United States to engage solely, principally, or incidentally in any unlawful activity.

An alien who fails to report his or her departure may, at the time he or she applies for a new nonimmigrant visa abroad, attempt to establish that there was good cause for the failure to report and, in the event that no good cause is found, that he or she is not inadmissible under 212(a)(3)(A)(ii) of the Act. If the consular officer, in adjudicating the new visa application, finds good cause existed for the alien's failure to register departure or that the alien is not inadmissible under section 212(a)(3)(A)(ii) of the Act, the inspecting officer at the POE, while not bound by the DOS determination, will consider this finding as a significantly favorable factor in determining whether the alien is inadmissible due to his or her prior failure to register at the time of departure from the United States.

**Good Cause Exception**

Immediate implementation of this interim rule with provision for post-promulgation public comments is based upon the good cause exception found at 5 U.S.C. 553(b)(B). Pursuant to 5 U.S.C. 553(b)(B), prior notice and opportunity for comment is not necessary where it is "impracticable, unnecessary, or contrary to the public interest." DHS estimates that without this regulation approximately 82,532 aliens would be subject to 30-day or annual re-registration interviews between December 2003 and May 2004. Therefore DHS believes there is an urgent need for the immediate implementation of this rule suspending the automatic interview requirements to avoid unnecessarily burdening the public impacted by this rule.

**Initial Regulatory Flexibility Act Determination**

The regulatory Flexibility Act of 1980, as amended (RFA) was enacted by Congress to ensure that small entities (small businesses, not-for-profit organizations, and small governmental jurisdictions) are not unnecessarily or disproportionately burdened by Federal regulations. The RFA requires agencies to review rules to determine if they have "a significant economic impact on a substantial number of small entities." DHS has determined that this interim final rule will not have a significant economic impact on a substantial number of small entities.

This rule will not affect small entities as defined at 5 U.S.C. 605(b) and will relieve cost burdens on individuals.

In accordance with the Regulatory Flexibility Act, 5 U.S.C. 605(b), I have reviewed this rule and by approving it, I certify that this rule will not have a significant economic impact on a substantial number of small entities.

**Executive Order 12866**

Executive Order 12866, "Regulatory Planning and Review," requires a determination whether a regulatory action is "significant" and therefore subject to review by the Office of Management and Budget (OMB) and to E.O. 12866's requirements.

This rule is considered by DHS to be a significant regulatory action under Executive Order 12866, section 3(f), Regulatory Planning and Review. However, it does not have an impact on the economy of $100 million or more and, therefore, is not economically significant. Accordingly, this regulation has been submitted to the Office of Management and Budget (OMB) for review.

DHS has assessed both the costs and benefits of this rule as required by Executive Order 12866. First, this rule significantly reduces costs to the public by reducing the burden of re-registration and continuing registration requirements for aliens present in the United States. Without this regulation, in between December 2003 and May 2004, an estimated 82,532 aliens would be subject to re-registration under prior regulations. Assuming that each interview will last 45 minutes, and each alien will have to prepare approximately 30 minutes for the interview, DHS anticipates that between December 2003 and May 2004, the burden reduction on the public to be a total of over 103,000 hours.

DHS also will experience a burden reduction, based upon the reduced costs related to information collection and

processing. Based upon the number of estimated registrations between December 2003 and May 2004 and assuming that each registration lasts approximately 45 minutes, under this regulation DHS estimates it will be able to reallocate almost 62,000 work hours. DHS is able to shift personnel who would have conducted these re-registration interviews to other law enforcement functions. These resources also can be better utilized to craft a targeted registration process that meets the national security needs of the country.

The costs to DHS of not amending the regulations would be significant. Because the initial call-in registrations by the former Service occurred over a brief period of months, the number of aliens appearing for re-registration in a brief period of time will be significant. DHS would be forced to reallocate personnel resources from other law-enforcement functions in order to timely register aliens.

## Executive Order 13132

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a Federalism summary impact statement.

## Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by state, local and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions are deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

## Small Business Regulatory Enforcement Fairness Act of 1996

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

## Executive Order 12988: Civil Justice Reform

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

## Paperwork Reduction Act of 1995

The regulations at 8 CFR 264.1(f)(7) allows an alien who has been registered under the provisions of 8 CFR 264.1(f) and who has not yet departed from the United States, to seek relief from the departure control requirement contained in 8 CFR 264.1(f)(8) for that admission. In order to seek relief the alien must apply to the U.S. Customs and Border Protection field office director for the port from which the alien intends to depart. In making an application for relief, the alien must establish that exigent or unusual circumstances exist and that the alien warrants a favorable exercise of discretion. This request for relief is considered an information collection requirement under the Paperwork Reduction Act (PRA).

The Department of Homeland Security (DHS) and the U.S. Immigration and Customs Enforcement (ICE) has submitted an emergency information collection request (ICR) utilizing emergency review procedures, to the Office of Management and Budget (OMB) for review and clearance in accordance with section 1320.13(a)(1)(ii) and (a)(2)(iii) of the Paperwork Reduction Act of 1995. The DHS has determined that it cannot reasonably comply with the normal clearance procedures under this part because normal clearance procedures are reasonably likely to prevent or disrupt the collection of information. Therefore, immediate OMB approval has been requested. If granted, the emergency approval is only valid for 180 days. ALL comments and/or questions pertaining to this pending request for emergency approval must be directed to OMB, Office of Information and Regulatory Affairs, Attention: Department of Homeland Security Desk Officer, 725—17th Street, NW., Suite 10235, Washington, DC 20503.

During the first 60 days of this same period, a regular review of this information collection is also being undertaken. During the regular review period, the DHS requests written comments and suggestions from the public and affected agencies concerning this information collection. Comments are encouraged and will be accepted until February 2, 2004. During 60-day regular review, all comments and suggestions, or questions regarding additional information, to include obtaining a copy of the information collection instrument with instructions, should be directed to Mr. Richard A. Sloan, 202–514–3291, Director, Regulations and Forms Services Division, Department of Homeland Security, Room 4034, 425 I Street, NW., Washington, DC 20536. Written comments and suggestions from the public and affected agencies concerning the proposed collection of information should address one or more of the following four points:

(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agencies estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.*, permitting electronic submission of responses. Overview of this information collection:

(1) *Type of Information Collection:* New information collection.

(2) *Title of the Form/Collection:* Exemption from NSEERS Registration Requirements.

(3) *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* No Agency Form Number. File No. OMB–40. U.S. Immigration and Customs Enforcement.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals and Households. This information collection allows an alien to seek an exemption from the NSEERS registration requirements by submitting a letter to the Department of Homeland Security containing specific information.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* 5,800 responses at 30 minutes (.5 hours) per response.

(6) *An estimate of the total public burden (in hours) associated with the collection:* 2,900 annual burden hours.

If additional information is required contact: Mr. Steve Cooper, PRA

Clearance Officer, Department of Homeland Security, Office of Chief Information Officer, Regional Office Building 3, 7th and D Streets, SW., Suite 4636–26, Washington, DC 20202.

Under the Paperwork Reduction Act of 1995, Public Law 104–13, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any reporting requirements inherent in a rule. This rule suspends the 30-day and annual re-registration requirements for aliens who are subject to NSEERS registration. The OMB information collection number under NSEERS is 1115–0254. It is estimated that approximately 82,000 aliens will no longer be subject to the 30-day or annual re-registration interviews once this rule is implemented. Accordingly, ICE has submitted the required Paperwork Reduction Change Worksheet (OMB–83C) to OMB reflecting the reduction in burden hours for NSEERS.

## List of Subjects in 8 CFR Part 264

Reporting and recordkeeping requirements.

■ Accordingly, part 264 of chapter I of title 8 of the Code of Federal Regulations is amended as follows:

## PART 264—REGISTRATION AND FINGERPRINTING OF ALIENS IN THE UNITED STATES

■ 1. The authority citation for Part 264 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1201, 1303—1305; 8 CFR part 2.

■ 2. Section 264.1(f) is revised to read as follows:

### § 264.1   Registration and fingerprinting.

\* \* \* \* \*

*(f) Registration, fingerprinting, and photographing of certain nonimmigrant aliens.*

(1) Registration requirement for certain nonimmigrants. Notwithstanding the provisions in paragraph (e) of this section, nonimmigrant aliens identified in paragraph (f)(2) of this section are subject to special registration, fingerprinting, and photographing requirements upon arrival in the United States. This requirement shall not apply to those nonimmigrant aliens applying for admission to the United States under sections 101(a)(15)(A) (8 U.S.C. 1101(a)(15)(A)) or 101(a)(15)(G) (8 U.S.C. 1101(a)(15)(G)) of the Act. In addition, this requirement shall not apply to those classes of nonimmigrant aliens to whom the Secretary of Homeland Security and the Secretary of State jointly determine it shall not apply, or to any individual nonimmigrant alien to whom the Secretary of Homeland Security or the Secretary of State determines it shall not apply. Completion of special registration pursuant to this paragraph (f) is a condition of admission under section 214 of the Act (8 U.S.C. 1184) if the inspecting officer determines that the alien is subject to registration under this paragraph (f) (hereinafter ''nonimmigrant alien subject to special registration'').

(2) Identification of aliens subject to registration at ports-of-entry. Nonimmigrant aliens in the following categories are subject to the requirements of paragraph (f)(3) of this section:

(i) Nonimmigrant aliens who are nationals or citizens of a country or territory designated by the Secretary of Homeland Security, in consultation with the Secretary of State, by a notice in the **Federal Register**;

(ii) Nonimmigrant aliens whom a consular officer or an inspecting officer has reason to believe are nationals or citizens of a country or territory designated by the Secretary of Homeland Security, in consultation with the Secretary of State, by a notice in the **Federal Register**; or

(iii) Nonimmigrant aliens who meet pre-existing criteria, or whom a consular officer or the inspecting officer has reason to believe meet pre-existing criteria, determined by the Secretary of Homeland Security or the Secretary of State to indicate that such aliens' presence in the United States warrants monitoring in the national security interests, as defined in section 219 of the Act (8 U.S.C. 1189), or law enforcement interests of the United States.

(3) *Obligations regarding registration.* (i) Any nonimmigrant alien who is included in paragraph (f)(2) of this section, and who applies for admission to the United States, shall be specially registered by providing information required by the Department of Homeland Security, shall be fingerprinted, and shall be photographed, by Department of Homeland Security, at the port-of-entry at such time the nonimmigrant alien applies for admission to the United States. The Department of Homeland Security shall advise the nonimmigrant alien subject to special registration that the nonimmigrant alien may, upon ten days notice, and at the Department of Homeland Security's discretion, be required to appear at a U.S. Immigration and Customs Enforcement office in person to verify information by providing additional information or documentation confirming compliance with the conditions of his or her visa status and admission. The Department of Homeland Security will determine on a case-by-case basis which aliens must appear in person to verify information. The nonimmigrant alien subject to special registration must appear at the designated office location, and on the specified date and time, unless otherwise specified in the notice.

(ii) At the time of verification of information for registration pursuant to paragraph (f)(3)(i) of this section, the nonimmigrant alien subject to special registration shall provide the Department of Homeland Security with proof of compliance with the conditions of his or her nonimmigrant visa status and admission, including, but not limited to, proof of residence, employment, or registration and matriculation at an approved school or educational institution. The nonimmigrant alien subject to special registration shall provide any additional information required by the Department of Homeland Security.

(4) *Registration of aliens present in the United States.* (i) The Secretary of Homeland Security, by publication of a notice in the **Federal Register**, also may impose such special registration, fingerprinting, and photographing requirements upon nonimmigrant aliens who are nationals, citizens, or residents of specified countries or territories (or a designated subset of such nationals, citizens, or residents) who have already been admitted to the United States or who are otherwise in the United States. A notice under this paragraph (f)(4) shall explain the procedures for appearing in person and providing the information required by the Department of Homeland Security, providing fingerprints, photographs, or submitting supplemental information or documentation.

(ii) Any nonimmigrant alien who is currently subject to special registration as a result of the publication of any previous **Federal Register** notice may, while he or she remains in the United States, upon 10 days notice and at the Department of Homeland Security's discretion, be required to appear at a Department of Homeland Security Office in person to provide additional information or documentation confirming compliance with his or her visa and admission. The Department of Homeland Security will determine on a case-by-case basis which aliens must appear in person to verify information. The nonimmigrant alien subject to special registration must appear at the designated office location, and on the

specified date and time, unless otherwise specified in the notice.

(5) *Obligation to provide updated information.* In addition to any additional re-registrations that may be required pursuant to paragraphs (f)(3) and (f)(4) of this section, any nonimmigrant alien subject to special registration under this paragraph (f) who remains in the United States for 30 days or more shall notify the Department of Homeland Security by mail or other such means as determined by the Secretary of Homeland Security, using a notification form designated by the Department of Homeland Security, of any change of address, change of residence, change of employment, or change of educational institution within 10 days of such change. Notice to the Department of Homeland Security of a change of address, change of residence or change of educational institution made within 10 days of such a change through the Student and Exchange Visitor Information System (SEVIS) shall constitute notice under this paragraph.

(6) [Reserved]

(7) *Relief from registration requirements.* A nonimmigrant alien subject to special registration may apply for relief from the registration requirements as follows:

(i) *Relief from departure controls set out in 264.1(f) (8).* An alien who has been registered under the provisions of this section (f) and has not yet departed the United States may seek relief from the departure control requirement contained in paragraph (f)(8) for that admission by applying to the U.S. Customs and Border Protection field office director for the port from which the alien intends to depart. In making an application for relief, the alien must establish that exigent or unusual circumstances exist and that the alien warrants a favorable exercise of discretion.

(ii) *Frequent travelers.* An alien who previously has been registered and who would otherwise be subject to registration at a port of entry under the provisions of paragraphs (f)(2) and (3) of this section may seek relief from the registration requirements from the Secretary of Homeland Security after his initial registration if the alien makes frequent trips to the United States. An alien seeking relief under this paragraph from the Secretary of Homeland Security may apply to the U.S. Customs and Border Protection field office director for the port to which the alien most frequently arrives in the United States. The field office director or his designee will make the determination that the frequency of arrival warrants relief from the registration requirements on a case-by-case basis, and will consider in this analysis the mode of travel, business and economic concerns, purpose of travel, or other factors as determined by the director. In making an application for relief, the alien must establish that good cause or exigent or unusual circumstances exist and that the alien warrants a favorable exercise of discretion.

(iii) *Exemption from registration.* At a Department of State consular office abroad, an alien may seek exemption from these regulations from the Department of State by such methods as it may prescribe.

(iv) *For all applications for relief.* Any decision of a Department of Homeland Security officer or official to grant or deny relief under this paragraph (f)(7) is final and not appealable. Absent receipt of a decision exempting or relieving the nonimmigrant alien from these requirements, he or she shall comply with the special registration requirements contained in this section.

(v) *Termination of relief.* Relief granted under paragraphs (f)(7)(i) or (ii) of this section may be terminated by notice to the alien by any field office director or other Department of Homeland Security officer or official authorized to grant such relief.

(8) *Departure requirements.* (i) General requirements When a nonimmigrant alien subject to special registration departs from the United States (other than nonimmigrant crewmen as defined under section 101(a)(15)(D) of the Act) he or she shall report to an inspecting officer of the Department of Homeland Security at any port of entry unless the Department of Homeland Security has, by publication of a notice in the **Federal Register**, specified that nonimmigrant aliens subject to special registration may not depart from specific ports. This paragraph (f)(8) applies only to those nonimmigrant aliens who have been registered under paragraph (f)(3) of this section, or who have been required to register pursuant to paragraph (f)(4) of this section, and who have not been granted relief from the departure requirements under paragraph (f)(7).

(ii) *Presumption of inadmissibility.* Any nonimmigrant alien subject to special registration who fails, without good cause, to be examined by an inspecting officer at the time of his or her departure and to have his or her departure recorded by the inspecting officer shall thereafter be presumed to be inadmissible under, but not limited to, section 212(a)(3)(A)(ii) of the Act (8 U.S.C. 1182(a)(3)(A)(ii)), as an alien whom the Secretary of Homeland Security has reasonable grounds to believe, based on the alien's past failure to conform with the requirements for special registration, seeks to enter the United States to engage in unlawful activity.

(iii) *Overcoming inadmissibility.* An alien may overcome the presumption of inadmissibility set out in paragraph (f)(8)(ii) by making a showing that he or she satisfies conditions set by the Secretary of Homeland Security and the Secretary of State. If a consular officer, in adjudicating a new visa application by an alien that previously failed to register his or her departure from the United States, finds good cause existed for the alien's failure to register departure or that the alien is not inadmissible under section 212(a)(3)(A)(ii) of the Act, the inspecting officer at the port-of-entry, while not bound by the consular officer's decision, will consider this finding as a significantly favorable factor in determining whether the alien is admissible.

(9) *Completion of registration.* Registration under this paragraph (f) is not deemed to be complete unless all of the information required by the Department of Homeland Security and all requested documents are provided in a timely manner. Any additional re-registration that may be required and each change of material fact is a registration that is required under sections 262 and 263 of the Act (8 U.S.C. 1302, 1303). Each change of address required under this paragraph (f) is a change of address required under section 265 of the Act (8 U.S.C. 1305).

\*     \*     \*     \*     \*

Dated: November 27, 2003.

**Tom Ridge,**

*Secretary of Homeland Security.*

[FR Doc. 03–30120 Filed 12–1–03; 8:45 am]

**BILLING CODE 4410–10–P**



Discover Thomson Reuters                Directory of sites    Login    Contact    Support

**REUTERS** Business    Markets    World    Politics    TV    More

WORLD NEWS    NOVEMBER 24, 2016 / 6:01 PM / 3 YEARS AGO

# Central Americans surge north, hoping to reach U.S. before Trump inauguration

Gustavo Palencia, Sofia Menchu                5 MIN READ    

TEGUCIGALPA/GUATEMALA CITY (Reuters) - Central American countries warned on Thursday that large numbers of migrants have fled their poor, violent homes since Donald Trump's surprise election win, hoping to reach the United States before he takes office next year.

DHSIFR737

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 508 of 1770

Immigrants from Central America and Mexican citizens, who are fleeing
from violence and poverty, queue to cross into the U.S. to apply for
asylum at the new border crossing of El Chaparral in Tijuana, Mexico,
November 24, 2016. REUTERS/Jorge Duenes

Trump won the Nov. 8 vote by taking a hard line on immigration,
threatening to deport millions of people living illegally in the United
States and to erect a wall along the Mexican border.

Trump's tough campaign rhetoric sent tremors through the slums of
Central America and the close-knit migrant communities in U.S.
cities, with many choosing to fast-forward their plans and migrate
north before Trump takes office on Jan. 20.

During fiscal year 2016, the United States detained nearly 410,000
people along the southwest border with Mexico, up about a quarter
from the previous year. The vast majority hail from Guatemala, El
Salvador and Honduras.

Since Trump's victory, the number of people flocking north has
surged, Central American officials say, contributing to a growing
logjam along the southern U.S. border.

"We're worried because we're seeing a rise in the flow of migrants
leaving the country, who have been urged to leave by coyotes telling

DHSIFR738

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 509 of 1770

them that they have to reach the United States before Trump takes office," Maria Andrea Matamoros, Honduras' deputy foreign minister, told Reuters, referring to people smugglers.

Carlos Raul Morales, Guatemala's foreign minister, told Reuters people were also leaving Guatemala en masse before Trump becomes president.

"The coyotes are leaving people in debt, and taking their property as payment for the journey," he said in an interview.

Last week, U.S. Customs and Border Protection opened a temporary holding facility for up to 500 people near the Texan border with Mexico, in what it said was a response to a marked uptick in illegal border crossings.

U.S. Department of Homeland Security Secretary Jeh Johnson said earlier this month immigration detention facilities were holding about 10,000 more individuals than usual, after a spike in October of migrants including unaccompanied children, families and asylum seekers.

## GANG VIOLENCE

DHSIFR739

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 510 of 1770

Unemployed and sick of the lack of opportunities and endemic gang violence that blight his poor neighborhood in the town of San Marcos, south of San Salvador, Carlos Garcia, 25, said he was looking to enter the United States before Trump assumes power.

"There's one thing I'm very clear about," he said. "I want to get out of here."

Guatemalan Fares Revolorio, 27, arrived in the northwestern Mexican border city of Tijuana on Wednesday after a grueling 4,200-kilometer (2,610-mile), week-long trek by bus. She was waiting to cross into the United States, where she hoped to apply for asylum.

Accompanied by her three children and her husband, she said she left Guatemala as it had become too dangerous. Her husband's brother was killed two months ago, and local gangs, known as "maras," had assaulted her son.

"They tell us the new president doesn't like illegal immigrants, but we have to take the chance," she said, as she struggled to hold back tears. "Nobody wants to die in a horrible way, and we can't be in Guatemala any longer. My children are growing up in fear."

During the campaign, Trump set out plans to impound billions of dollars of remittances so Mexico ends up paying for his proposed wall

DHSIFR740

Case 1:20-cv-00116-EGS    Document 85    Filed 03/27/20    Page 511 of 1770

on the southern U.S. border. It remains unclear if he will stick to the proposal.

Humberto Roque Villanueva, Mexico's deputy interior minister for migration, told Reuters the day after the U.S. election that Mexico stands ready to lobby the U.S. Congress and use all legal means against Trump's plan for blocking remittances.

Victoria Cordova, who was deported from the United States in 2014, said Trump's victory had sown fear in her poor hillside slum in the capital Tegucigalpa.

"People are very worried because many of them have family over there in the United States, and they live off the remittances they send," she said.

Slideshow (3 Images)

The foreign ministers of Mexico, El Salvador, Honduras and Guatemala met on Monday to formulate a strategy to protect their migrants in the United States, in a show of regional solidarity.

At the meeting in Guatemala City, the foreign ministers asked Mexico for help to create a migrant protection network, liaise for coordination with U.S. authorities, and to meet regularly for regional talks.

DHSIFR741

Additional reporting by Lizbeth Diaz in Tijuana, Nelson Renteria in San Salvador and Gabriel Stargardter in Mexico City; Writing by Gabriel Stargardter; Editing by Frank Jack Daniel

*Our Standards:*    *The Thomson Reuters Trust Principles.*

Apps    Newsletters    Advertise with Us    Advertising Guidelines    Cookies
Terms of Use    Privacy



All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

© 2019 Reuters. All Rights Reserved.

DHSIFR742

## DEPARTMENT OF HOMELAND SECURITY

[Docket No. DHS–2016–0089]

### National Infrastructure Advisory Council

**AGENCY:** National Protection and Programs Directorate, DHS.

**ACTION:** Committee management; notice of an Open Federal Advisory Committee meeting.

**SUMMARY:** The National Infrastructure Advisory Council (NIAC) will meet Thursday, February 16, 2017, at 1331 F Street NW., Suite 1000, Washington, DC 20004. This meeting will be open to the public.

**DATES:** The NIAC will meet on February 16, 2017. The meeting will be held from 1:30 p.m.–4:30 p.m. EST. The meeting may close early if the committee has completed its business. For additional information, please consult the NIAC Web site, *www.dhs.gov/NIAC*, or contact the NIAC Secretariat by phone at (703) 235–2888 or by email at *NIAC@hq.dhs.gov*.

**ADDRESSES:** 1331 F Street NW., Suite 1000, Washington, DC 20004. Members of the public will register at the registration table prior to entering the meeting room. For information on facilities or services for individuals with disabilities, or to request special assistance at the meeting, contact the person listed under **FOR FURTHER INFORMATION CONTACT** below as soon as possible.

To facilitate public participation, we are inviting public comment on the issues to be considered by the Council as listed in the "Summary" section below. Comments must be submitted in writing no later than 12:00 p.m. on February 13, 2017, in order to be considered by the Council in its meeting. The comments must be identified by "DHS–2016–0089," and may be submitted by any *one* of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting written comments.

• *Email: NIAC@hq.dhs.gov.* Include the docket number (DHS–2016–0089) in the subject line of the message.

• *Fax:* (703)235–9707.

• *Mail:* Ginger Norris, National Protection and Programs Directorate, Department of Homeland Security, 245 Murray Lane SW., Mail Stop 0612, Washington, DC 20598–0607.

*Instructions:* All written submissions received must include the words "Department of Homeland Security" and the docket number for this action. Written comments received will be posted without alteration at *www.regulations.gov,* including any personal information provided.

*Docket:* For access to the docket or to read background documents or comments received by the NIAC, go to *www.regulations.gov.* Enter "NIAC" in the search line and the Web site will list all relevant documents for your review.

Members of the public will have an opportunity to provide oral comments on the topics on the meeting agenda below, and on any previous studies issued by the NIAC. We request that comments be limited to the issues and studies listed in the meeting agenda and previous NIAC studies. All previous NIAC studies can be located at *www.dhs.gov/NIAC.* Public comments may be submitted in writing or presented in person for the Council to consider. Comments received by Ginger Norris on or after 1:00 p.m. on February 16, 2017 will still be accepted and reviewed by the Members, but not necessarily at the time of the meeting. In-person presentations will be limited to three minutes per speaker, with no more than 15 minutes for all speakers. Parties interested in making in-person comments should register on the Public Comment Registration list available at the entrance to the meeting location prior to the beginning of the meeting.

**FOR FURTHER INFORMATION CONTACT:** Ginger Norris, Department of Homeland Security, National Protection and Programs Directorate, Office of Infrastructure Protection, NIAC, Designated Federal Officer, 245 Murray Lane SW., Mail Stop 0607, Washington, DC 20598–0607, telephone 202–441–5885.

**SUPPLEMENTARY INFORMATION:** Notice of this meeting is given under the Federal Advisory Committee Act, 5 U.S.C. appendix. The NIAC shall provide the President, through the Secretary of Homeland Security, with advice on the security and resilience of the Nation's critical infrastructure sectors. The NIAC will meet to discuss issues relevant to critical infrastructure security and resilience, as directed by the President.

The meeting will commence at 1:00 p.m. EST. At this meeting, the Council will discuss its newest tasking and receive briefings. All presentations will be posted prior to the meeting on the Council's public Web page—*www.dhs.gov/NIAC.*

### Public Meeting Agenda

I. Opening of Meeting
II. Roll Call of Members
III. Opening Remarks and Introductions
IV. Approval of SEP 2016 Meeting Minutes
V. Presentations on Future Focus Study
VI. Public Comment
VII. Discussion of New NIAC Business
VIII. Closing Remarks
IX. Adjournment

Dated: January 4, 2017.

**Ginger Norris,**
*Designated Federal Officer for the NIAC.*
[FR Doc. 2017–00789 Filed 1–13–17; 8:45 am]
**BILLING CODE 9110–9–P**

## DEPARTMENT OF HOMELAND SECURITY

### Office of the Secretary

[DHS Docket No. DHS–2017–0004]

### Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea

**AGENCY:** Office of the Secretary, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** This notice concerns the authority of the Department of Homeland Security (DHS or the Department) to place certain designated categories of aliens in expedited removal proceedings. On November 13, 2002, the former Immigration and Naturalization Service (INS) of the Department of Justice issued a notice designating certain aliens who arrive by sea, either by boat or other means, as eligible for placement in expedited removal proceedings, with an exception for Cuban citizens or nationals (hereinafter "Cuban nationals"). On August 11, 2004, DHS issued a notice designating certain aliens in the United States as eligible for placement in expedited removal proceedings, also with an exception for Cuban nationals. In light of recent changes in the relationship between the United States and Cuba, the Department has determined that the exceptions for Cuban nationals, contained in the designations of November 13, 2002 and August 11, 2004, are no longer warranted and are thus hereby eliminated. The rest of the November 13, 2002 and August 11, 2004 designations, including any implementing policies, are unaffected by this notice and remain unchanged.

**DATE:** This notice is effective on January 13, 2017. Interested persons are invited to submit written comments on this notice on or before March 20, 2017.

**ADDRESSES:** You may submit comments, identified by DHS Docket Number DHS–2017–0004, by any one of the following methods:

• *Federal e-Rulemaking Portal* *www.regulations.gov.* Follow the Web site instructions for submitting comments.

• *Mail or Hand Delivery/Courier:* Please submit all written comments (including and CD–ROM submissions) to Amanda Baran, Principal Director for Immigration Policy, DHS, 245 Murray Lane SW., Mail Stop 0445, Washington, DC 20528.

Please submit your comments by only one method. Comments received by means other than those listed above or received after the comment period has closed will not be reviewed. All comments received will be posted without change on *http:// www.regulations.gov.* The *http:// www.regulations.gov* Web site is the Federal e-rulemaking portal and comments posted there are available and accessible to the public. Commenters should not include personal information such as Social Security Numbers, personal addresses, telephone numbers, and email addresses in their comments as such information will become viewable by the public on the *http://www.regulations.gov* Web site. It is the commenter's responsibility to safeguard his or her information. Comments submitted through *http:// www.regulations.gov* will not include the commenter's email address unless the commenter chooses to include that information as part of his or her comment.

Postal delivery in Washington, DC, may be delayed due to security concerns. Therefore, DHS encourages the public to submit comments through the *http://www.regulations.gov* Web site.

*Docket:* For access to the docket to read background documents or comments received, go to the Federal eRulemaking portal at *http:// www.regulations.gov.* If you need assistance to review the comments, please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section below.

**FOR FURTHER INFORMATION CONTACT:** Amanda Baran, Principal Director for Immigration Policy, 202–282–8805, *Amanda.baran@hq.dhs.gov.*

**SUPPLEMENTARY INFORMATION:** Section 302 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Public Law 104–208, Div. C, 110 Stat. 3009–546, amended section 235(b) of the Immigration and Nationality Act ("Act"), 8 U.S.C. 1225(b), to authorize the Attorney General (now the Secretary of Homeland Security as designated under the Homeland Security Act of 2002) to

remove, without a hearing before an immigration judge, aliens arriving in the United States and certain other applicants for admission who are inadmissible under sections 212(a)(6)(C) or 212(a)(7) of the Act, 8 U.S.C. 1182(a)(6)(C) and 1182(a)(7), for lack of valid documents necessary for admission or entry or for procuring or seeking to procure a visa, other immigration-related documentation, admission to the United States, or other immigration benefit by fraud or willful misrepresentation of a material fact.

Expedited removal proceedings under section 235(b) of the Act, 8 U.S.C. 1225(b), may be applied to two categories of aliens. First, expedited removal proceedings may be used for aliens who are "arriving in the United States." Section 235(b)(1)(A)(i) of the Act, 8 U.S.C. 1225(b)(1)(A)(i). Second, the Secretary, in his or her sole and unreviewable discretion, may designate certain other aliens to whom the expedited removal provisions may be applied. Section 235(b)(1)(A)(iii) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii); *see* 8 CFR 235.3(b)(1)(ii). Specifically, with limited exception, the Act authorizes the Secretary to apply (by designation) expedited removal proceedings to all or any subset of aliens who (1) have not been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, and (2) have not established to the satisfaction of the immigration officer that they have been physically present in the United States continuously for the two-year period immediately prior to the date of determination of inadmissibility. Section 235(b)(1)(A)(iii)(I)–(II), 8 U.S.C. 1225(b)(1)(A)(iii)(I)–(II). The Secretary may modify such designations at any time. *Id.*

On November 13, 2002, the former INS issued a **Federal Register** notice announcing that it was exercising its authority under section 235(b)(1)(A)(iii) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii), to designate additional aliens who may be placed in expedited removal proceedings. 67 FR 68924. Specifically, that notice designated the following class of aliens who may be placed in expedited removal proceedings: "all aliens who arrive in the United States by sea, either by boat or other means, who are not admitted or paroled, and who have not been physically present in the United States continuously for the two-year period prior to a determination of inadmissibility." *Id.* The INS noted at the time that "[p]lacing these individuals in expedited removal proceedings and maintaining detention for the duration of all immigration proceedings, with limited exceptions,

will ensure prompt immigration determinations and ensure removal from the country of those not granted relief in those cases, while at the same time protecting the rights of the individuals affected." *Id.* The INS also stated that "exercising its authority to detain this class of aliens . . . will assist in deterring surges in illegal migration by sea, including potential mass migration, and preventing loss of life." *Id.* The INS further noted that preventing illegal migration by sea also protects national security, as "[a] surge in illegal migration by sea threatens [that] security by diverting valuable United States Sea Coast Guard and other resources from counter-terrorism and homeland security responsibilities." *Id.*

The November 13, 2002 notice, however, contained an exception for Cuban nationals who are otherwise described in the designated class, stating that expedited removal proceedings would not be initiated against such Cuban nationals who arrive by sea. *Id.* The INS based this exception on "longstanding U.S. policy to treat Cubans differently from other aliens," citing the Cuban Adjustment Act, Public Law 89–732 (1966) (8 U.S.C. 1255 note), as an example of such treatment. *Id.* The notice also cited section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F), which at the time statutorily exempted Cuban nationals who arrived by aircraft at a U.S. port of entry from being placed into expedited removal proceedings because of the lack of diplomatic relations between the United States and Cuba. That section expressly provides that expedited removal "shall not apply to an alien who is a native or citizen of a country in the Western Hemisphere with whose government the United States does not have full diplomatic relations and who arrives by aircraft at a port of entry." Section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F).

On August 11, 2004, DHS issued a similar **Federal Register** notice announcing that it was exercising its authority under section 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii), to designate an additional class of aliens to be placed in expedited removal proceedings. 69 FR 48877. That notice authorized the Department to place in expedited removal proceedings any or all members of the following class of aliens: "Aliens determined to be inadmissible under sections 212(a)(6)(C) or (7) of the Immigration and Nationality Act who are present in the U.S. without having been admitted or paroled following inspection by an immigration officer at a designated port of entry, who are encountered by an immigration officer within 100 air miles

of the U.S. international land border, and who have not established to the satisfaction of an immigration officer that they have been physically present in the U.S. continuously for the fourteen-day (14-day) period immediately prior to the date of encounter.'' *Id.* DHS noted at the time that ''exercising its statutory authority to place these individuals in expedited removal proceedings will enhance national security and public safety by facilitating prompt immigration determinations, enabling DHS to deal more effectively with the large volume of persons seeking illegal entry, and ensure removal from the country of those not granted relief, while at the same time protecting the rights of the individuals affected.'' *Id.*

Like the November 13, 2002 notice, the August 11, 2004 notice contained an exception for Cuban nationals who are otherwise described in the designated class and stated that expedited removal proceedings would not be initiated against such nationals encountered in the United States. *Id.* The notice similarly based this exception on that fact that ''removals to Cuba [could not] presently be assured and for other U.S. policy reasons,'' *id.,* citing section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F), as well.

Since those notices were issued, significant changes in the relationship between the United States and Cuba have occurred. In December 2014, President Obama announced a historic opening between the United States and Cuba, as well as an approach for reestablishing diplomatic relations and adjusting regulations to facilitate greater travel, commerce, people-to-people ties, and the free flow of information to, from, and within Cuba. On July 20, 2015, the United States and Cuba formally reestablished full diplomatic relations and opened embassies in each other's countries. In the time following the reestablishment of full diplomatic relations, the United States and Cuba have taken concrete steps towards enhancing security, building bridges between our peoples, and promoting economic prosperity for citizens of both countries. And recent migration discussions have yielded important changes that will dramatically affect travel and migration between our two countries. Among other things, Cuba has agreed to accept and facilitate the repatriation of its nationals who are ordered removed from the United States. This arrangement and other changes remain the focus of ongoing diplomatic discussions between the two countries.

DHS also has recently seen a significant increase in attempts by Cuban nationals to illegally enter the United States. Many of those Cuban nationals have taken a dangerous journey through Central America and Mexico; others have taken to the high seas in the dangerous attempt to cross the Straits of Florida. DHS believes this increase in attempted migration has been driven in part by the perception that there is a limited window before the United States will eliminate favorable immigration policies for Cuban nationals.

The application of the expedited removal authorities to Cuban nationals must reflect these new realities. First, the Department notes that the statutory provision categorically barring the use of expedited removal for certain aliens who arrive by aircraft at a U.S. port of entry no longer applies to Cuban nationals, as the United States and Cuba have reestablished full diplomatic relations. *See* section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F). In fact, DHS and DOJ are promulgating rules in this issue of the **Federal Register**, amending 8 CFR 235.3(b)(1)(i) and 1235.3(b)(1)(i) to strike the regulatory exception for Cuban nationals arriving by aircraft at a U.S. port of entry. Second, the improved relationship between the United States and Cuba, along with Cuba's agreement to accept the repatriation of its nationals, has eroded certain U.S. policy justifications for the exception. Finally, a categorical exception severely impairs the Government's ability to remove unauthorized aliens encountered within the United States. For these reasons, DHS has determined, in consultation with the Department of State, that a categorical exception from expedited removal for Cuban nationals is no longer in the interests of the United States.

Accordingly, this notice eliminates the categorical exceptions for Cuban nationals, with respect to both the November 13, 2002 and August 11, 2004 notices, on a prospective basis, beginning on January 13, 2017, *see* 8 CFR 235.3(b)(1)(ii) (designation may be effective as early as the date of issuance). As a result, Cuban nationals encountered on or after January 13, 2017 are included in the classes of aliens subject to expedited removal as designated in the November 13, 2002 and August 11, 2004 notices. DHS is not changing any other aspects of those designations and, apart from the modification described above, will continue exercising its expedited removal authority as indicated in the November 13, 2002 and August 11, 2004 notices.

As it did for the November 13, 2002 and August 11, 2004 notices, and consistent with implementing regulations at 8 CFR 235.3(b)(1)(ii), the Department has determined that good cause exists to exempt this notice from the notice-and-comment and 30-day delayed effective date requirements under the Administrative Procedure Act (APA). *See* 5 U.S.C. 553(b)(3)(B) and (d)(3). Delaying the implementation of this notice to allow public notice and comment would be impracticable and contrary to the public interest. Congress explicitly authorized the Secretary to designate categories of aliens to whom expedited removal proceedings may be applied, and made clear that ''[s]uch designation shall be in the sole and unreviewable discretion of the Secretary and may be modified at any time.'' Section 235(b)(1)(A)(iii)(I) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii)(I).

Moreover, as with the August 11, 2004 notice, the designation in this notice is necessary to remove quickly from the United States aliens who are encountered shortly after illegally entering across U.S. land borders. The ability to detain such aliens while admissibility and identity are determined and protection claims are adjudicated, as well as to quickly remove those without protection claims or claims to lawful status, is a necessity for national security and public safety.

DHS has determined that pre-promulgation notice and comment would undermine these interests, while endangering human life and having a potential destabilizing effect in the region. Among other things, such opportunity for notice and comment could result in a surge in migration of Cuban nationals seeking to travel to and enter the United States prior to the effectuation of the changes announced in this notice. Such a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. *See Matter of D–J–*, I. & N. Dec. 572, 579 (A.G. 2003). A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations. Additionally, a surge in migration over land or sea could result in significant loss of human life. For the foregoing reasons, the Department has determined that public notice and comment prior to promulgation of this notice would be impracticable and contrary to the public interest.

In addition, the change implemented by this notice is part of a major foreign policy initiative announced by the President, and is central to ongoing

diplomatic discussions between the United States and Cuba with respect to travel and migration between the two countries. DHS, in consultation with the Department of State, has determined that eliminating the exception from expedited removal proceedings for Cuban nationals involves a foreign affairs function of the United States, 5 U.S.C. 553(a)(1), and that this notice is exempt from APA procedural requirements on that basis.

Finally, and for the same reasons described above, DHS finds that delay caused by publication would adversely affect the interests of the United States and the effective enforcement of the immigration laws, and therefore invokes 8 CFR 235.3(b)(1)(ii) to make this designation effective immediately upon placement on public inspection.

Although advance notice and comment procedures are not in the interests of the United States with respect to this notice, DHS is interested in receiving comments from the public on the elimination of the categorical exception for Cuban nationals. DHS believes that by maintaining a dialogue with interested parties, DHS may be better positioned to insure that the program is even more effective in combating and deterring illegal entry, while at the same time protecting the rights of the individuals affected.

**Notice of Designation of Aliens Subject to Expedited Removal Proceedings**

Pursuant to section 235(b)(1)(A)(iii) of the Immigration and Nationality Act (8 U.S.C. 1225(b)(1)(A)(iii)) and 8 CFR 235.3(b)(1)(ii), I order as follows:

(1) With respect to the above-referenced Designation of November 13, 2002, 67 FR 68924, I hereby rescind the provision at numbered paragraph (5), specifying that "[e]xpedited removal proceedings will not be initiated against Cuban citizens or nationals who arrive by sea," and other language of the Designation referencing or relating to that exception for Cuban citizens or nationals.

(2) With respect to the above-referenced Designation of August 11, 2004, 69 FR 48877, I hereby rescind the provision at numbered paragraph (6), specifying that "[t]he expedited removal proceedings contemplated by this notice will not be initiated against Cuban citizens or nationals," and other language of the Designation referencing or relating to that exception for Cuban citizens or nationals.

Signed: at Washington, DC this 11th of January, 2017.

**Jeh Charles Johnson,**

*Secretary of Homeland Security.*

[FR Doc. 2017–00914 Filed 1–13–17; 8:45 am]

**BILLING CODE P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2593–16; DHS Docket No. USCIS–2015–USCIS–2013–0006]**

**RIN 1615–ZB62**

**Extension of the Designation of Somalia for Temporary Protected Status**

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** The Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the designation of Somalia for Temporary Protected Status (TPS) for a period of 18 months, effective March 18, 2017 through September 17, 2018. This extension allows eligible Somali nationals (and aliens having no nationality who last habitually resided in Somalia) to retain TPS through September 17, 2018, so long as they otherwise continue to meet the eligibility requirements for TPS. The Secretary has determined that an extension is warranted because conditions in Somalia supporting its designation for TPS continue to be met. Through this Notice, DHS also sets forth procedures necessary for nationals of Somalia (or aliens having no nationality who last habitually resided in Somalia) to re-register for TPS and to apply for renewal of their Employment Authorization Documents (EAD) with U.S. Citizenship and Immigration Services (USCIS).

**DATES:** The 18-month extension of the TPS designation of Somalia is effective as of March 18, 2017, and will remain in effect through September 17, 2018. The 60-day re-registration period runs from January 17, 2017 through March 20, 2017. Note: It is important for re-registrants to timely re-register during this 60-day period and not to wait until their EADs expire.

**FOR FURTHER INFORMATION CONTACT:**

• For further information on TPS, including guidance on the application process and additional information on eligibility, please visit the USCIS TPS

Web page at *http://www.uscis.gov/tps.* You can find specific information about the extension of Somalia's designation for TPS by selecting "Somalia" from the menu on the left side of the TPS Web page.

• You can also contact Guillermo Roman-Riefkohl, TPS Program Manager, Waivers and Temporary Services Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529–2060; or by phone at 202–272–1533 (this is not a toll-free number).

**Note:** The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquires.

• Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS Web site at *http:// www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). Service is available in English and Spanish.

• Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

BIA—Board of Immigration Appeals
DHS—Department of Homeland Security
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Government—U.S. Government
IJ—Immigration Judge
INA—Immigration and Nationality Act
OSC—U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services

**What is Temporary Protected Status (TPS)?**

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA), or to eligible aliens without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and obtain EADs, so long as they continue to meet the requirements of TPS.



# Rules and Regulations

Federal Register

Vol. 82, No. 10

Tuesday, January 17, 2017

---

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents. Prices of new books are listed in the first FEDERAL REGISTER issue of each week.

---

## DEPARTMENT OF HOMELAND SECURITY

### Office of the Secretary

**8 CFR Part 235**

**[DHS Docket No. DHS–2017–0003]**

**RIN 1601–AA81**

### Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air

**AGENCY:** Office of the Secretary, Department of Homeland Security.

**ACTION:** Final rule; request for comments.

**SUMMARY:** This final rule revises Department of Homeland Security (DHS) regulations to eliminate the categorical exception from expedited removal proceedings for Cuban nationals who arrive in the United States at a port of entry by aircraft. As a result of these changes, Cuban nationals who arrive in the United States at a port of entry by aircraft will be subject to expedited removal proceedings commensurate with nationals of other countries.

**DATES:** This final rule is effective January 13, 2017. Interested persons are invited to submit written comments on this final rule on or before March 20, 2017.

**ADDRESSES:** You may submit comments, identified by Regulatory Information Number (RIN) 1601–AA81 and DHS Docket Number DHS–2017–0003, by any one of the following methods:

• *Federal e-Rulemaking Portal* www.regulations.gov. Follow the Web site instructions for submitting comments.

• *Mail or Hand Delivery/Courier:* Please submit all written comments (including and CD–ROM submissions) to Amanda Baran, Principal Director for Immigration Policy, DHS, 245 Murray Lane SW., Mail Stop 0445, Washington, DC 20528.

Please submit your comments by only one method. Comments received by means other than those listed above or received after the comment period has closed will not be reviewed. All comments received will be posted without change on *http://www.regulations.gov*. The *http://www.regulations.gov* Web site is the Federal e-rulemaking portal and comments posted there are available and accessible to the public. Commenters should not include personal information such as Social Security Numbers, personal addresses, telephone numbers, and email addresses in their comments as such information will become viewable by the public on the *http://www.regulations.gov* Web site. It is the commenter's responsibility to safeguard his or her information. Comments submitted through *http://www.regulations.gov* will not include the commenter's email address unless the commenter chooses to include that information as part of his or her comment.

Postal delivery in Washington, DC, may be delayed due to security concerns. Therefore, DHS encourages the public to submit comments through the *http://www.regulations.gov* Web site.

*Docket:* For access to the docket to read background documents or comments received, go to the Federal eRulemaking portal at *http://www.regulations.gov*. If you need assistance to review the comments, please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section below.

**FOR FURTHER INFORMATION CONTACT:** Amanda Baran, Principal Director for Immigration Policy, 202–282–8805, *Amanda.baran@hq.dhs.gov*.

**SUPPLEMENTARY INFORMATION:**

## I. Background

Section 302 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Public Law 104–208, Div. C, 110 Stat. 3009–546, amended section 235(b) of the Immigration and Nationality Act ("Act"), 8 U.S.C. 1225(b), to authorize what are known as "expedited removal proceedings." Specifically, section 235(b) was amended to authorize the Attorney General (now the Secretary of Homeland Security [1]) to remove, without a hearing before an immigration judge, aliens arriving in the United States who are inadmissible under sections 212(a)(6)(C) or 212(a)(7) of the Act, 8 U.S.C. 1182(a)(6)(C) and 1182(a)(7), for lack of valid documents necessary for admission or entry or for procuring or seeking to procure a visa, other immigration-related documentation, admission to the United States, or other immigration benefit by fraud or willful misrepresentation of a material fact.

Expedited removal proceedings under section 235(b) of the Act, 8 U.S.C. 1225(b), may be applied to two categories of aliens. First, expedited removal proceedings may be used for aliens who are "arriving in the United States." Section 235(b)(1)(A)(i) of the Act, 8 U.S.C. 1225(b)(1)(A)(i). Second, the Secretary, in his or her sole and unreviewable discretion, may designate certain other aliens to whom the expedited removal provisions may be applied. Section 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii); *see* 8 CFR 235.3(b)(1)(ii).

When it created the expedited removal process, Congress also created a limited exception for certain aliens who arrived at a U.S. port of entry by aircraft. Under section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F), expedited removal "shall not apply to an alien who is a native or citizen of a country in the Western Hemisphere with whose government the United States does not have full diplomatic relations and who arrives by aircraft at a port of entry." For many years, this exception applied to Cuban nationals due to the lack of full diplomatic relations between the United States and Cuba. DHS regulations implementing section 235(b)(1) of the Act, 8 U.S.C. 1225(b)(1), thus expressly stated that the expedited removal provisions apply to "[a]rriving aliens, as defined in 8 CFR 1.2, except for citizens of Cuba arriving at a United States port-of-entry by aircraft." 8 CFR 235.3(b)(1)(i); *see also* 8

---

[1] Under section 1517 of title XV of the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions that were transferred from the Attorney General or other Department of Justice (DOJ) official to DHS by the HSA "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (2003) (codifying HSA, tit. XV, sec. 1517); 6 U.S.C. 542 note; 8 U.S.C. 1551 note.

CFR 1235.3(b)(1)(i) (parallel Department of Justice (DOJ) regulations stating that the expedited removal provisions apply to "[a]rriving aliens, as defined in [8 CFR 1001.1(q)], except for citizens of Cuba arriving at a United States port-of-entry by aircraft").[2]

Since that regulation was promulgated, significant changes in the relationship between the United States and Cuba have occurred. In December 2014, President Obama announced a historic opening between the United States and Cuba, as well as an approach for reestablishing diplomatic relations and adjusting regulations to facilitate greater travel, commerce, people-to-people ties, and the free flow of information to, from, and within Cuba. On July 20, 2015, the United States and Cuba formally reestablished full diplomatic relations and opened embassies in each other's countries. In the time following the reestablishment of full diplomatic relations, the United States and Cuba have taken concrete steps towards enhancing security, building bridges between our peoples, and promoting economic prosperity for citizens of both countries. And recent migration discussions have yielded important changes that will dramatically affect travel and migration between our two countries. Among other things, Cuba has agreed to accept and facilitate the repatriation of its nationals who are ordered removed from the United States. This arrangement and other changes remain the focus of ongoing diplomatic discussions between the two countries. DHS, in consultation with the Department of State, has determined that the limitation at section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F) no longer applies with respect to Cuba.

Moreover, DHS has recently seen a significant increase in attempts by Cuban nationals to illegally enter the United States. Many of those Cuban nationals have taken a dangerous journey through Central America and Mexico; others have taken to the high seas in the dangerous attempt to cross the Straits of Florida. DHS believes this increase in attempted migration has been driven in part by the perception that there is a limited window before the United States will eliminate favorable immigration policies for Cuban nationals.

The application of the expedited removal authorities to Cuban nationals must reflect these new realities. Accordingly, DHS is eliminating provisions in its regulations that categorically exempt Cuban nationals who arrive at a U.S. port of entry by aircraft from expedited removal proceedings under 8 CFR 235.3. Importantly, the statutory provision categorically barring the use of expedited removal for certain aliens who arrive by air no longer applies to Cuban nationals, as the United States and Cuba have reestablished full diplomatic relations. Moreover, previous U.S. policy justifications for exempting Cuban nationals from expedited removal—including Cuba's general refusal to accept the repatriation of its nationals—are no longer valid in many respects. Finally, a categorical exception severely impairs the Government's ability to remove unauthorized aliens encountered within the United States. For these reasons, DHS, in consultation with the Department of State, has determined that a categorical exception from expedited removal for Cuban nationals is no longer in the interests of the United States. Accordingly, as a result of this final rule, Cuban nationals will be subject to expedited removal proceedings under section 235(b) of the INA and 8 CFR 235.3 like nationals of other countries. For the same reasons, DHS is also publishing a notice in this issue of the **Federal Register** to remove the parallel exceptions for expedited removal of Cuban nationals who arrive by sea or who are encountered by an immigration officer within 100 air miles of the U.S. border.

## II. Statutory and Regulatory Requirements

### A. Administrative Procedure Act

The promulgation of this rule as a final rule, with provisions for post-promulgation public comments, is based on the good cause exception found in section 553 of the Administrative Procedure Act (APA) (5 U.S.C. 553(b)(B)). Delaying the implementation of the change announced in this rule to allow pre-promulgation notice and comment would be impracticable and contrary to the public interest. Congress explicitly authorized the Secretary of Homeland Security to designate categories of aliens to whom expedited removal proceedings may be applied, and made clear that "[s]uch designation shall be in the sole and unreviewable discretion of the Secretary and may be modified at any time." Section 235(b)(1)(A)(iii)(I) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii)(I). And this rule is necessary to remove quickly from the United States certain Cuban nationals who arrive by air at U.S. ports of entry. The ability to detain such aliens while admissibility and identity are determined and protection claims are adjudicated, as well as to quickly remove those without protection claims or claims to lawful status, is a necessity for national security and public safety.

Pre-promulgation notice and comment would undermine these interests, while endangering human life and having a potential destabilizing effect in the region. Specifically, DHS is concerned that publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule. Such a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations. Additionally, a surge could result in significant loss of human life. Accordingly, DHS finds that it would be impracticable and contrary to the public interest to accept pre-promulgation comments on this rule. For the same reasons, DHS also finds good cause to issue this rule without a 30-day delayed effective date requirement of the APA, *see* 5 U.S.C. 553(d).[3]

In addition, the change implemented by this rule is part of a major foreign policy initiative announced by the President, and is central to ongoing diplomatic discussions between the United States and Cuba with respect to travel and migration between the two countries. DHS, in consultation with the Department of State, has determined that eliminating the exception from expedited removal proceedings for Cuban nationals involves a foreign affairs function of the United States, 5 U.S.C. 553(a)(1), and is also exempt from the notice and comment and 30-day delayed effective date requirements of the APA on that basis. DHS is

---

[2] DOJ initially promulgated 8 CFR 235.3(b)(1)(i) as an exercise of the functions of the former Immigration and Naturalization Service (INS) and the Executive Office for Immigration Review. *See* 62 FR 10312 (Mar. 6, 1997). Following enactment of the HSA, 8 CFR 235.3(b)(1)(i) was transferred to DHS, and effectively duplicated in parallel DOJ regulations at 8 CFR 1235.3(b)(1)(i). *See* 68 FR 10349 (Mar. 5, 2003). DOJ is revising its parallel regulation by separate rulemaking in this issue of the **Federal Register**.

[3] In addition, in light of the lack of pre-publication notice and comment and a delayed effective date for the related notice that DHS has published in this issue of the **Federal Register**, a delay in the effective date of this regulation would be incongruous and unnecessary.

nevertheless providing the opportunity for the public to comment.

### B. Executive Orders 13563 and 12866

Executive Orders 13563 and 12866 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility.

The Office of Management and Budget has not designated this rule as a significant regulatory action under section 3(f) of Executive Order 12866. Accordingly, the Office of Management and Budget has not reviewed this rule.

### C. Regulatory Flexibility Act

The Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*), as amended by the Small Business Regulatory Enforcement and Fairness Act of 1996, requires an agency to prepare a regulatory flexibility analysis that describes the effect of a proposed rule on small entities when the agency is required to publish a general notice of proposed rulemaking. A small entity may be a small business (defined as any independently owned and operated business not dominant in its field that qualifies as a small business per the Small Business Act); a small not-for-profit organization; or a small governmental jurisdiction (locality with fewer than 50,000 people). Because this final rule is exempt from notice-and-comment rulemaking requirements under 5 U.S.C. 553, a regulatory flexibility analysis is not required.

### Regulatory Amendments

**List of Subjects for 8 CFR Part 235**

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

### Authority and Issuance

For the reasons stated in the preamble, part 235 of title 8 of the Code of Federal Regulations is amended as set forth below:

**8 CFR CHAPTER I**

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

■ 1. The authority citation for part 235 continues to read:

**Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, 69 FR 241, 3 CFR, 2004 Comp., p. 278), 1201, 1224, 1225, 1226, 1228, 1365a note, 1365b, 1379, 1731–32; Title VII of Public Law 110–229; 8 U.S.C. 1185 note (section 7209 of Pub. L. 108–458); Pub. L. 112–54.

■ 2. Revise § 235.3(b)(1)(i) to read as follows:

### § 235.3  Inadmissible aliens and expedited removal.

\*    \*    \*    \*    \*

(b) \* \* \*

(1) \* \* \*

(i) Arriving aliens, as defined in 8 CFR 1.2;

\*    \*    \*    \*    \*

Signed at Washington, DC, this 11th of January 2017.

**Jeh Charles Johnson,**

*Secretary of Homeland Security.*

[FR Doc. 2017–00915 Filed 1–13–17; 8:45 am]

**BILLING CODE P**

---

## DEPARTMENT OF JUSTICE

### Executive Office for Immigration Review

**8 CFR Part 1235**

[AG Order No. 3817–2017; EOIR Docket No. 401]

**RIN 1125–AA80**

### Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air

**AGENCY:** Executive Office for Immigration Review, Department of Justice.

**ACTION:** Final rule; request for comments.

**SUMMARY:** This final rule revises Executive Office for Immigration Review (EOIR) regulations to eliminate the categorical exception from expedited removal proceedings for Cuban nationals who arrive in the United States at a port of entry by aircraft. This final rule conforms with a parallel Department of Homeland Security (DHS) regulation. As a result of these changes, Cuban nationals who arrive in the United States at a port of entry by aircraft will be subject to expedited removal proceedings commensurate with nationals of other countries.

**DATES:** This final rule is effective January 13, 2017. Interested persons are invited to submit written comments on this final rule on or before March 20, 2017. Comments received by mail will be considered timely if they are

postmarked on or before that date. The electronic Federal Docket Management System (FDMS) will accept comments until midnight Eastern Time at the end of that day.

**ADDRESSES:** Please submit written comments to Jean King, General Counsel, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2600, Falls Church, Virginia 22041. To ensure proper handling, please reference RIN No. 1125–AA80 or EOIR Docket No. 401 on your correspondence. You may submit comments electronically or view an electronic version of this proposed rule at *www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Jean King, General Counsel, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2600, Falls Church, Virginia 22041; telephone (703) 605–1744 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

### I. Public Participation

Interested persons are invited to participate in this rulemaking by submitting written data, views, or arguments on all aspects of this rule. EOIR also invites comments that relate to the economic, environmental, or federalism effects that might result from this rule. To provide the most assistance to EOIR, comments should explain the reason for any recommended change, and should include data, information, or authority that supports such recommended change.

All comments submitted for this rulemaking should include the agency name and RIN 1125–AA80 or EOIR Docket No. 401. Please note that all comments received are considered part of the public record and will be made available for public inspection at *www.regulations.gov.*, including personally identifiable information (such as a person's name, address, or any other data that might personally identify that individual) voluntarily submitted by the commenter.

If you want to submit personally identifiable information as part of your comment, but do not want it to be posted online, you must include the phrase "PERSONALLY IDENTIFIABLE INFORMATION" in the first paragraph of your comment and identify what information you want redacted.

If you want to submit confidential business information as part of your comment, but do not want it to be posted online, you must include the phrase "CONFIDENTIAL BUSINESS INFORMATION" in the first paragraph of your comment. You also must prominently identify confidential

IN THE SUPREME COURT OF THE UNITED STATES

————————————————

No. 19A-_____

WILLIAM P. BARR, ATTORNEY GENERAL OF THE UNITED STATES,
ET AL., APPLICANTS

v.

EAST BAY SANCTUARY COVENANT, ET AL.

————————————————

APPLICATION FOR A STAY PENDING APPEAL
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT AND PENDING
FURTHER PROCEEDINGS IN THIS COURT

————————————————

NOEL J. FRANCISCO
  Solicitor General
    Counsel of Record
  Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217

DHSIFR755

PARTIES TO THE PROCEEDING

The applicants (defendants-appellants below) are Matthew T. Albence, in his official capacity as Acting Director of Immigration and Customs Enforcement; William P. Barr, in his official capacity as Attorney General of the United States; Kenneth T. Cuccinelli, in his official capacity as Acting Director of U.S. Citizenship and Immigration Services; Executive Office for Immigration Review; Immigration and Customs Enforcement; Kevin K. McAleenan, in his official capacity as Acting Secretary of the U.S. Department of Homeland Security; James McHenry, in his official capacity as Director of the Executive Office for Immigration Review; John P. Sanders, in his official capacity as Acting Commissioner of U.S. Customs and Border Protection; U.S. Citizenship and Immigration Services; U.S. Customs and Border Protection; U.S. Department of Justice; and U.S. Department of Homeland Security.

The respondents (plaintiffs-appellees below) are East Bay Sanctuary Covenant, Al Otro Lado, Innovation Law Lab, and Central American Resource Center in Los Angeles.

(I)

DHSIFR756

II

RELATED PROCEEDINGS

United States District Court (N.D. Cal.):

    <u>East Bay Sanctuary Covenant</u> v. <u>Barr</u>, No. 19-cv-4073

    (July 24, 2019)

United States Court of Appeals (9th Cir.):

    <u>East Bay Sanctuary Covenant</u> v. <u>Barr</u>, No. 19-16487

    (Aug. 16, 2019)

DHSIFR757

IN THE SUPREME COURT OF THE UNITED STATES

————————————

No. 19A-———————

WILLIAM P. BARR, ATTORNEY GENERAL OF THE UNITED STATES,
ET AL., APPLICANTS

v.

EAST BAY SANCTUARY COVENANT, ET AL.

————————————

APPLICATION FOR A STAY PENDING APPEAL
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT AND PENDING
FURTHER PROCEEDINGS IN THIS COURT

————————————

Pursuant to Rule 23 of the Rules of this Court and the All Writs Act, 28 U.S.C. 1651, the Solicitor General, on behalf of applicants William P. Barr, Attorney General of the United States, et al., respectfully applies for a stay of the injunction issued by the United States District Court for the Northern District of California, pending consideration and disposition of the government's appeal from that injunction to the United States Court of Appeals for the Ninth Circuit and, if necessary, pending the filing and disposition of a petition for a writ of certiorari and any further proceedings in this Court.

The United States has experienced an unprecedented surge in the number of aliens who enter the country unlawfully across the southern border and, if apprehended, claim asylum and remain in the country while their claims are adjudicated, with little

DHSIFR758

prospect of obtaining that discretionary relief. The Departments of Justice and Homeland Security have express statutory authority to establish "additional limitations and conditions, consistent with [the asylum statute], under which an alien shall be ineligible for asylum." 8 U.S.C. 1158(b)(2)(C). Exercising that authority, the Departments issued an interim final rule denying asylum to certain aliens who seek asylum in the United States without having sought protection in a third country through which they traveled and where such protection was available. The rule thus screens out asylum seekers who declined to request protection at the first opportunity.

The rule serves important public purposes. Most importantly, it alleviates a crushing burden on the U.S. asylum system by prioritizing asylum seekers who most need asylum in the United States. The rule also screens out asylum claims that are less likely to be meritorious by denying asylum to aliens who refused to seek protection in third countries en route to the southern border. In turn, the rule deters aliens without a genuine need for asylum from making the arduous and potentially dangerous journey from Central America to the United States. The risks of that journey and human smuggling threaten harm to many aliens, including children. The Departments therefore adopted a rule that encourages asylum-seekers to present their claims in the first safe country in which they arrive. That

rule, which is similar to a requirement in effect in the European Union, complements restrictions that Congress already imposed upon other asylum seekers who have elsewhere to turn.

Respondents -- four organizations that serve aliens -- sued to enjoin the rule. No respondent is actually subject to the rule. Yet the district court granted their request and issued a universal injunction barring enforcement of the rule as to any persons anywhere in the United States -- even though another district court entertaining a challenge to the rule had previously sided with the government. App., infra, 19a-63a. The government appealed to the Ninth Circuit and sought a stay of the injunction pending appeal. The court of appeals denied the stay insofar as the injunction operates within the Ninth Circuit, but granted the stay insofar as the injunction operates outside the Ninth Circuit. Id. at 1a-9a. The court stated that the district court retained jurisdiction to further develop the record and to re-extend the injunction beyond the Ninth Circuit.

The injunction now in effect is deeply flawed and should be stayed pending appeal and pending any further proceedings in this Court. All of the relevant factors support a stay.

First, if the Ninth Circuit upholds the injunction, there is a reasonable probability that this Court will grant certiorari. The injunction prohibits the Executive Branch from implementing an interim final rule adopted to address an ongoing

DHSIFR760

4

crisis at the southern border, with significant implications for ongoing diplomatic negotiations and foreign relations.

Second, there is more than a fair prospect that the Court will vacate the injunction. As an initial matter, the injunction was entered at the behest of organizations that do not even have a judicially cognizable interest in its application to individual aliens. Moreover, the Ninth Circuit denied a full stay solely on the ground that the Departments likely should not have issued the rule as an interim final rule, without advance notice and comment. The Administrative Procedure Act (APA), however, allows an agency to issue a rule without notice-and-comment procedures if the rule involves a "foreign affairs function of the United States." 5 U.S.C. 553(a)(1). The rule at hand plainly involves a foreign affairs function of the United States: It requires aliens seeking asylum in the United States to take certain steps in foreign countries, in order to protect the integrity of the U.S.-Mexico border and to facilitate ongoing diplomatic negotiations. Separately, the APA allows an agency to issue a rule without notice and comment for good cause. The Departments explained that delaying effectiveness of the rule may prompt an additional surge of asylum seekers, further burdening an already overwhelmed asylum system and further undermining the United States' position in ongoing diplomatic negotiations.

5

The district court (though not the Ninth Circuit) also concluded that that the rule exceeds the Departments' statutory authority and that the rule is arbitrary and capricious. Those conclusions are also erroneous. Consistent with its conferral of broad discretion to grant or deny asylum, the asylum statute expressly authorizes the Departments to adopt new categorical bars to asylum, and the bar adopted here is consistent with the asylum statute's other provisions. And the Departments amply explained the reasoning underlying the adoption of the bar.

Third, the balance of equities favors a stay. The injunction impairs the security of our border, perpetuates a crushing burden on our asylum system, and impedes ongoing diplomatic negotiations. At the same time, respondent organizations have no cognizable interest in the grant or denial of asylum to individual aliens, much less equities that could outweigh the interests served by the rule. As for the aliens the rule covers, it denies them a purely discretionary benefit, and it allows them to seek other forms of protection, including withholding of removal in the United States and refugee protection in safe third countries. The vast majority of those aliens' claims would be unlikely to succeed in the end, but processing those claims severely strains our asylum system.

At a minimum, the injunction is vastly overbroad. The injunction's circuit-wide sweep -- preventing the rule's

6

application to all aliens in the Ninth Circuit -- violates the well-settled rule that injunctive relief must be limited to redressing a plaintiff's own injuries, and unduly interferes with the Executive's authority to establish immigration policy. The Court should, at the very least, stay the injunction to the extent that it goes beyond remedying the alleged injury to any specific aliens respondents identify as actual clients in the United States subject to the rule.

STATEMENT

1.  Asylum is a form of discretionary relief under the Immigration and Nationality Act (INA), 8 U.S.C. 1101 et seq. See 8 U.S.C. 1158.  As a general matter, asylum protects an alien from removal, creates a path to lawful permanent residence and U.S. citizenship, enables the alien to receive authorization to work, and enables the alien's family members to seek lawful immigration status derivatively.  See 8 U.S.C. 1158-1159.

In order to obtain asylum, an alien generally must clear three hurdles.  First, the alien must show that he qualifies as a "refugee" -- i.e., that he is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of [a protected belief or trait]."  8 U.S.C. 1101(42) and 1158(b)(1)(A).  Second, the alien must show that he is not subject to an exception or mandatory bar that precludes the alien from applying for asylum or the government

from granting it.   8 U.S.C. 1158(a)(2) and (b)(2).   Third, the
alien must demonstrate that he merits a favorable exercise of
the discretion to grant asylum.  See 8 U.S.C. 1158(b)(1)(A).

The INA denies asylum to certain aliens -- for example,
aliens who have themselves engaged in persecution and certain
aliens who have committed serious crimes.   See 8 U.S.C.
1158(b)(2)(A).   The INA also provides that an alien may not even
apply for asylum if he may be removed to a safe third country
pursuant to an international agreement, see 8 U.S.C.
1158(a)(2)(A), and that the government may not grant asylum to
an alien who has been firmly resettled in another country before
arriving in the United States, see 8 U.S.C. 1158(b)(2)(A)(vi).

Consistent with its vesting of broad discretion in the
Executive in determining whether to grant asylum, the INA
provides that the Attorney General and Secretary of Homeland
Security "may by regulation establish additional limitations and
conditions, consistent with [Section 1158], under which an alien
shall be ineligible for asylum."  8 U.S.C. 1158(b)(2)(C); see 6
U.S.C. 552(d); 8 U.S.C. 1103(a)(1).   Previous Attorneys General
and Secretaries have invoked that authority to establish bars
beyond those required by the statute itself.  See, e.g., Asylum
Procedures, 65 Fed. Reg. 76,121, 76,126 (Dec. 6, 2000) (denying
asylum to applicants who can safely relocate within their home
countries); Aliens Subject to a Bar on Entry Under Certain

8

Presidential Proclamations, 83 Fed. Reg. 55,934 (Nov. 9, 2018)
(denying asylum to applicants subject to certain presidential
proclamations).

2.   a.   On July 16, 2019, the Departments of Justice and
Homeland Security jointly issued an interim final rule that
establishes an additional bar to the discretionary grant of
asylum.   See Asylum Eligibility and Procedural Modifications, 84
Fed. Reg. 33,829.   In general, that bar applies to any alien who
(1) arrives in the United States across the southern land
border, (2) has transited through a third country en route from
his home country to the United States, and (3) has failed to
apply for protection from persecution or torture that was
available in at least one third country through which the alien
transited.   Id. at 33,835, 33,843.

The bar, however, is limited in multiple respects.   First,
it does not apply where "[t]he only countries through which the
alien transited" are not parties to certain international
treaties (making refugee protection unavailable there).   84 Fed.
Reg. at 33,843.   Second, the bar does not apply where the alien
applied for protection from persecution or torture in a third
country, but "received a final judgment denying the alien
protection in such country."   Ibid.   Third, the rule makes an
exception to the bar for certain victims of human trafficking.
Ibid.   Fourth, the bar is prospective; it applies only to aliens

9

who enter, attempt to enter, or arrive in the United States on or after the date of the rule's adoption. <u>Ibid.</u> Finally, the bar covers only asylum; it does not affect eligibility for withholding or deferral of removal. <u>Id.</u> at 33,830.

b.  In adopting the rule, the Departments explained the policy judgment underlying the third-country transit bar.  At the outset, the Departments explained that "[t]he United States has experienced an overwhelming surge in the number of non-Mexican aliens crossing the southern border and seeking asylum." 84 Fed. Reg. at 33,840.  For example, the proportion of aliens subject to expedited removal who had been referred for a credible-fear interview (a step in the process of seeking asylum for certain aliens) had "jumped from approximately 5 percent" a decade ago "to above 40 percent" now.  <u>Id.</u> at 33,830-33,831. And "[i]mmigration courts received over 162,000 asylum [claims] in FY 2018, a 270 percent increase from five years earlier." <u>Id.</u> at 33,838.  The Departments pointed out, however, that "[o]nly a small minority of these individuals * * * are ultimately granted asylum." <u>Id.</u> at 33,831.

The Departments explained that this surge in border crossings and (usually meritless) asylum claims has placed an "extraordinary" "strain on the nation's immigration system." 84 Fed. Reg. at 33,831.  The "large influx" has "consume[d] an inordinate amount of resources" of the Department of Homeland

10

Security, which must "surveil, apprehend, screen, and process the aliens who enter the country," "detain many aliens pending further proceedings," and "represent the United States in immigration court proceedings." Ibid.  The surge has also "consume[d] substantial resources" at the Department of Justice, whose immigration judges adjudicate asylum claims and whose officials prosecute aliens who violate federal criminal law. Ibid.  For example, the Department of Justice now has "[m]ore than 436,000" pending cases that "include an asylum application."  Ibid.  The strain "extends to the judicial system," which must handle requests to review denials of asylum claims, and which "can take years" to reach "[f]inal disposition of asylum claims, even those that lack merit."  Ibid.

Against that backdrop, the Departments explained that the third-country transit bar serves several purposes.  First, it helps "alleviate the strain on the U.S. immigration system" by "prioritizing" the applicants "who need [asylum] most" and "de-prioritizing" other applicants.  84 Fed. Reg. at 33,831, 33,839-33,840.  Applicants who cannot apply for asylum in third countries while en route to the United States -- or whose applications third countries have rejected -- have "nowhere else to turn," "have no other option," and "have no alternative to U.S.-based asylum relief."  Id. at 33,831, 33,834 (citation omitted).  In contrast, applicants covered by the bar do "have

11

[an] alternative country where they can escape persecution or torture." Id. at 33,840. Put simply, the rule "speed[s] relief" to applicants who most need asylum here, and at the same time "mitigates the strain on the country's immigration system" by denying relief to others. Id. at 33,831, 33,839-33,840.

Second, the third-country transit bar helps screen out (and, ultimately, deter) "meritless asylum claims" by "restricting the claims of aliens who, while ostensibly fleeing persecution, chose not to seek protection at the earliest possible opportunity." 84 Fed. Reg. at 33,831, 33,839. "An alien's decision not to apply for protection at the first available opportunity, and instead wait for the most preferred destination of the United States, raises questions about the validity and urgency of the alien's claim." Id. at 33,839. It is "reasonable to question" whether such aliens "genuinely fear persecution or torture, or are simply economic migrants." Ibid. The Departments determined that it was "justified" to address that issue through "a new categorical asylum bar" -- rather than through consideration of the failure to apply for asylum in a third country as "just one of many factors" when adjudicating an individual claim -- in light of "the increased numbers * * * of asylum claims in recent years." Id. at 33,839 n.8.

Third, the third-country transit bar helps protect children from the dangers of migration to the United States by

12

encouraging aliens to seek asylum at the first opportunity.  The journey from Central America to the United States is "long and arduous," and it "brings with it a great risk of harm" to children.  84 Fed. Reg. at 33,838.  That risk "could be relieved if individuals were to more readily avail themselves of legal protection from persecution in a third country closer to the child's country of origin."  Ibid.

Fourth, the bar "seeks to curtail the humanitarian crisis created by human smugglers bringing men, women, and children across the southern border."  84 Fed. Reg. at 33,840.  The bar accomplishes that objective "[b]y reducing a central incentive for aliens without a genuine need for asylum to cross the border -- the hope of a lengthy asylum process that will enable them to remain in the United States for years despite their statutory ineligibility for relief."  Ibid.

Finally, the rule "will facilitate ongoing diplomatic negotiations with Mexico and the Northern Triangle Countries [i.e., Guatemala, Honduras, and El Salvador]" regarding proposals for "reduc[ing] the flow" of aliens from those countries to the United States and for "encourag[ing] aliens to seek protection at the safest and earliest point of transit possible."  84 Fed. Reg. at 33,840, 33,842.  The rule puts the United States in a "better [negotiating] position" by improving the United States' ability to curtail the flow of aliens across

the southern border.  Id. at 33,831.  In addition, by channeling asylum claims to countries the aliens first enter, the rule encourages foreign countries to "partner" with the United States and to shoulder their share of the burdens of mass migration. Id. at 33,842 (citation omitted).  Indeed, the administrative record before the Departments showed that, in the past, the United States has successfully relied on its immigration initiatives when negotiating agreements with foreign countries. For example, earlier this year, the United States relied on another immigration measure, the Migration Protection Protocols, when negotiating an agreement under which "Mexico will take unprecedented steps to increase enforcement to curb irregular migration" and "to dismantle human smuggling and trafficking organizations."  A.R. 24; see A.R. 45-50, 138-139, 231-232, 533-557, 635-637, 676, 698.  In short, the rule "will strengthen the ability of the United States to address the crisis at the southern border and therefore facilitate the likelihood of success in future negotiations."  84 Fed. Reg. at 33,842.

The Departments also observed that the rule "is in keeping with the efforts of other liberal democracies to prevent forum-shopping by directing asylum-seekers to present their claims in the first safe country in which they arrive."  84 Fed. Reg. at 33,840.  For example, under a regulation of the European Union, an applicant for asylum must ordinarily present his application

14

to the state of first safe entry, and may be transferred back to
that state if he fails to do so.  Ibid.  The United Nations High
Commissioner for Refugees has praised that protocol for its
"commendable efforts to share and allocate the burden of review
of refugee and asylum claims."  Ibid. (citation omitted).

c.   The Departments promulgated the rule as an interim
final rule, without advance notice and comment.  They invoked
the exception to notice-and-comment procedures for rules that
involve a "foreign affairs function of the United States."
5 U.S.C. 553(a)(1).  They noted that "[t]he flow of aliens
across the southern border, unlawfully or without appropriate
travel documents, directly implicates the foreign policy and
national security interests of the United States."  84 Fed. Reg.
at 33,841.  And they explained that ongoing negotiations "would
be disrupted" by an additional surge of migrants in response to
a proposed rule.  Id. at 33,842.

The Departments also invoked the good-cause exception to
notice-and-comment procedures, under which an agency may forgo
notice and comment "when the agency for good cause finds  * * *
that notice and public procedure thereon are impracticable,
unnecessary, or contrary to the public interest."  5 U.S.C.
553(b)(3)(B).  They explained that "immediate implementation of
[the] rule is essential to avoid a surge of aliens who would
have strong incentives to seek to cross the border" while the

notice-and-comment process remains ongoing. 84 Fed. Reg. at 33,841. They observed that "smugglers encourage migrants to enter the United States based on changes in U.S. immigration policy," and that, "[i]f this rule were published for notice and comment before becoming effective, 'smugglers might * * * communicate the Rule's potentially relevant change in U.S. immigration policy, albeit in non-technical terms.'" Ibid. (citation omitted). The resulting "additional surge of aliens," they concluded, "would be destabilizing to the region, as well as to the U.S. immigration system." Ibid.

3. Respondents, four organizations that provide services to aliens, challenged the rule in the Northern District of California. The district court entered a preliminary injunction against enforcement of the rule. App., infra, 19a-63a. First, the court concluded that respondents have raised "serious questions" regarding the government's invocation of foreign-affairs and good-cause exceptions to notice-and-comment procedures. Id. at 48a. Second, the court concluded that the rule likely conflicted with the express statutory bars to asylum for aliens "who may be removed to a 'safe third country'" and aliens who are "firmly resettled in another country prior to arriving in the United States." Id. at 19a-20a. Finally, the court concluded that the rule was likely arbitrary and capricious because the government had neither shown that asylum

DHSIFR772

16

was "sufficiently available" in third countries nor explained why "the failure to seek asylum in a third country is so damning standing alone that the government can reasonably disregard any alternative reasons why an applicant may have failed to seek asylum in that country." Id. at 51a.

The district court ordered the entry of "a nationwide injunction," App., infra, 63a -- even though, a few hours earlier, another district court entertaining a challenge to the rule had sided with the government and had refused to award any preliminary relief (nationwide or otherwise) against the rule, see Capital Area Immigrants' Rights Coalition v. Trump, No. 19-2117, 2019 WL 3436501 (D.D.C. July 24, 2019) (CAIR). The government filed a notice of appeal and moved for a stay of the injunction pending appeal, but the district court denied the government's motion. App., infra, 14a-18a.

4. The government renewed its motion for a stay pending appeal in the Ninth Circuit. See App., infra, 1a-13a. A motions panel denied the motion for a stay "insofar as the injunction applies within the Ninth Circuit," reasoning that the government had not shown a likelihood of success on the merits with respect to its invocation of the good-cause and foreign-affairs exceptions to notice-and-comment procedures. Id. at 3a; see id. at 2a-3a. The Ninth Circuit stated that the good-cause exception "'should be interpreted narrowly'" and that the

foreign-affairs exception "requires showing that ordinary public noticing would 'provoke definitely undesirable international consequences.'" Ibid. (citation omitted). In light of that conclusion, the Ninth Circuit expressly declined to reach the district court's alternative determinations that the rule exceeded the government's statutory authority and that the rule was arbitrary and capricious. See id. at 3a n.3.

A majority of the motions panel, however, granted the motion for a stay "insofar as the injunction applies outside the Ninth Circuit." App., infra, 3a. It explained that "the nationwide scope of the injunction is not supported by the record," that the district court "failed to undertake the analysis necessary before granting such broad relief," and that the district court "failed to discuss whether a nationwide injunction is necessary to remedy [respondents'] alleged harm." Id. at 3a-5a & n.4. But the panel stated that, "[w]hile this appeal proceeds, the district court retains jurisdiction to further develop the record in support of a preliminary injunction extending beyond the Ninth Circuit." Id. at 8a-9a.

Judge Tashima concurred in part and dissented in part. He would have denied the motion for a stay in its entirety and allowed the district court's injunction to remain in effect even outside the Ninth Circuit. See App., infra, 10a-13a.

18

5.    After the Ninth Circuit's ruling, respondents filed a "Motion to Consider Supplemental Evidence and Restore the Nationwide Scope of the Injunction" in the district court.  D. Ct. Doc. 57 (Aug. 19, 2019).  The district court ordered further briefing on "the issuance of a nationwide injunction" and set the matter for a hearing on September 5, 2019.  D. Ct. Doc. 59, at 1 (Aug. 19, 2019).

### ARGUMENT

Under Rule 23 of the Rules of this Court and the All Writs Act, 28 U.S.C. 1651, a single Justice or the Court may stay a district-court order pending appeal to a court of appeals.  See, e.g., Trump v. International Refugee Assistance Project, 137 S. Ct. 2080 (2017) (per curiam) (IRAP); see also San Diegans for the Mt. Soledad Nat'l War Mem'l v. Paulson, 548 U.S. 1301, 1302 (2006) (Kennedy, J., in chambers) (stay factors).  Here, all of the relevant factors strongly favor a stay.  First, this Court would likely grant certiorari if the court of appeals affirms a nationwide (or even circuitwide) injunction against the rule. Second, respondents have no judicially cognizable interest in challenging the rule in the first place, and in any event the rule is a procedurally and substantively lawful exercise of the Departments' express statutory authority to place additional limitations on asylum.  Third, there is direct and irreparable injury to the interests of the government and the public but not

19

respondents.  At a minimum, the injunction sweeps too broadly and should be stayed to the extent it goes beyond remedying injuries to specific aliens that respondents identify as actual clients in the United States subject to the rule.

1.  A stay is warranted because, if the Ninth Circuit affirms the injunction, at least "four Justices" would likely "'vote to grant certiorari.'"  San Diegans, 548 U.S. at 1302 (Kennedy, J., in chambers) (citation omitted).  The rule enjoined by the district court serves important national purposes.  The rule seeks to protect "the integrity of our borders" and to "alleviate" an "extraordinary," "extreme," and "unsustainable" "strain on the nation's immigration system."  84 Fed. Reg. at 33,831, 33,838, 33,840.  It also seeks to ameliorate a "humanitarian crisis" by discouraging aliens from making long and dangerous journeys to the United States and by discouraging human smuggling.  Id. at 33,831.  Moreover, the rule is part of a coordinated and ongoing diplomatic effort regarding the recent surge in migration from the Northern Triangle countries.  The rule explains that the third-country transit bar "will facilitate ongoing diplomatic negotiations." Id. at 33,840.  Whether the rule is lawful is thus a question of exceptional importance -- especially in light of the "dramatic increase" in illegal entries and the "sharp increase" in corresponding asylum claims in recent years.  See id. at 33,830.

20

Under these circumstances, this Court's review of a court of appeals decision affirming the injunction would plainly be warranted.   Indeed, this Court often grants certiorari to address interference with executive policies that address "national security," Department of the Navy v. Egan, 484 U.S. 518, 520 (1988), or with "federal power" over "the law of immigration and alien status," Arizona v. United States, 567 U.S. 387, 394 (2012).   The district court's injunction causes both types of interference.

2.   A stay is also warranted because, if the Ninth Circuit affirms the injunction and this Court grants review, there is at least a "fair prospect" that this Court will vacate the injunction.   Lucas, 486 U.S. at 1304 (Kennedy, J., in chambers). At a minimum the Court would likely narrow the injunction because respondents have no basis for obtaining global relief -- or even relief that extends throughout the Ninth Circuit.

a.   Respondent organizations' claims fail at the outset for procedural reasons. See D. Ct. Doc. 28 at 7 (July 19, 2019) (raising this argument but acknowledging contrary circuit precedent).   First, Article III requires the party invoking federal jurisdiction to establish standing -- which means, among other requirements, that the party must show that it has suffered an "invasion of a legally protected interest" that is "concrete and particularized." Gill v. Whitford, 138 S. Ct.

DHSIFR777

1916, 1929 (2018) (citation omitted).  A party generally "lacks a judicially cognizable interest in the prosecution or nonprosecution of another," Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973), or in the "enforcement of the immigration laws" against another, Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 897 (1984).  Respondent organizations thus lack a cognizable interest in the grant or denial of asylum to third parties. Second, a party ordinarily may bring a challenge under the APA only if the interest asserted is "arguably within the zone of interests to be protected or regulated by the statute" at issue. Clarke v. Sec. Indus. Ass'n, 479 U.S. 388. 396 (1987). Respondent organizations' interests in doing "business" with asylum-seekers, App., infra, 12a, falls outside the zone of interests protected by the asylum statute.

b.   The Ninth Circuit refused to grant a full stay of the injunction on the sole ground that the government had failed to justify its promulgation of the rule as an interim final rule. App., infra, 2a-3a & n.3.  That conclusion was incorrect.

First, the APA makes an exception to notice-and-comment procedures for rules that involve a "foreign affairs function of the United States." 5 U.S.C. 553(a)(1).  That exception applies here because the rule is "linked intimately with the Government's overall political agenda concerning relations with another country."  American Ass'n of Exps. & Imps. v. United

22

States, 751 F.2d 1239, 1249 (Fed. Cir. 1985). The rule addresses "[t]he flow of aliens across the southern border," a matter that "directly implicates the foreign policy and national security interests of the United States." 84 Fed. Reg. at 33,841. In addition, the Departments explained that the rule "will facilitate ongoing diplomatic negotiations with foreign countries regarding migration issues, including measures to control the flow of aliens into the United States." Id. at 33,842. By channeling asylum claims to foreign countries, the rule encourages those countries to shoulder their share of the burdens imposed by mass migration. The rule also gives the United States immediate leverage in ongoing negotiations regarding border security and the sharing of migration burdens. A.R. 537–538, 635–637.

Conversely, "negotiations would be disrupted if notice-and-comment procedures preceded the effective date of this rule." 84 Fed. Reg. at 33,842. An additional surge of asylum seekers in response to a proposed rule would "provok[e] a disturbance in domestic politics in Mexico and the Northern Triangle countries" and would "erod[e] the sovereign authority of the United States to pursue the negotiating strategy it deems to be most appropriate as it engages its foreign partners." Ibid. Moreover, "the longer that the effective date of the interim rule is delayed, the greater the number of people who will pass

through third countries where they may have otherwise received refuge and reach the U.S. border." Ibid.

That analysis was well supported by the record, which shows that the United States has in the past successfully relied on its immigration initiatives when negotiating agreements with foreign countries. For example, earlier this year, the United States relied on another immigration initiative, the Migration Protection Protocols, when negotiating an agreement under which "Mexico will take unprecedented steps to increase enforcement to curb irregular migration" and "to dismantle human smuggling and trafficking organizations." A.R. 24; see A.R. 45-50, 138-139, 231-232, 533-557, 635-637, 676, 698.

The courts below asserted that the government had failed to demonstrate that notice-and-comment procedures would "provoke definitely undesirable international consequences." App., infra, 2a-3a (citation omitted); see id. at 20a. The statute, however, requires no such showing. Under its plain terms, the government need only show that the rule involves a "foreign affairs function of the United States," 5 U.S.C. 553(a); it need not further demonstrate to a court's satisfaction that notice and comment would cause undesirable international consequences. In any event, the government did identify such consequences when it explained that a delay in the implementation of the rule would frustrate ongoing negotiations and allow an additional

24

surge of asylum seekers before the rule takes effect. The courts below had no basis for second-guessing the Executive's assessment of those foreign-policy consequences. See Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 111 (1948) ("[T]he Judiciary has neither aptitude, facilities nor responsibility" for "decisions as to foreign policy.").

Second, the APA also allows an agency to issue an interim final rule for "good cause." 5 U.S.C. 553(b)(3)(B). Good cause exists when "the very announcement" of the rule could "be expected to precipitate activity by affected parties that would harm the public welfare." Mobil Oil Corp. v. DOE, 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983), cert. denied, 467 U.S. 1255 (1984). Here, the Departments explained that advance notice and comment could cause aliens to "surge to the border to enter the United States before the rule took effect." 84 Fed. Reg. at 33,841. The Departments' "experience has been that when public announcements are made regarding changes in our immigration laws and procedures, there are dramatic increases in the numbers of aliens who enter or attempt to enter the United States." Ibid.

The record bears out the Departments' concern. Southwestern-border family-unit apprehensions are up 469% from the same time in 2018, A.R. 223, and there has been a surge of nearly four times the number of non-Mexican-national

apprehensions from May 2018 to May 2019 (121,151 in May 2019 compared to 32,477 in May 2018). A.R. 119. Numerous news articles connect that surge to changes in immigration policy. See A.R. 438-439 (describing how smugglers persuaded migrants to cross the border after family separation was halted by telling them to "hurry up before they might start doing so again"); A.R. 452-454 (indicating that migrants refused offers to stay in Mexico because their goal is to enter the United States); A.R. 663-665, 683 (indicating that Mexico faced a migrant surge when it changed its policies).

The district court questioned whether potential asylum seekers would be aware of a proposed rule change or would change their behavior in response. App., _infra_, 48a. But "[t]he Government, when seeking to prevent imminent harms in the context of international affairs and national security, is not required to conclusively link all the pieces in the puzzle before [the Court] grant[s] weight to its empirical conclusions." _Holder_ v. _Humanitarian Law Project_, 561 U.S. 1, 35 (2010). And here, the Departments are plainly in the best position to make such predictive judgments, and their judgments were eminently reasonable (and consistent with past practice). The district court therefore erred in second-guessing them.

c. The district court (but not the Ninth Circuit) also determined that the rule is likely inconsistent with the asylum

statute, 8 U.S.C. 1158.  The asylum statute makes it clear that asylum is always a matter of executive "discretion" and never a matter of "entitlement."  INS v. Cardoza-Fonseca, 480 U.S. 421, 428 n.6 (1987); see 8 U.S.C. 1158(b)(1)(A) (providing that asylum "may [be] grant[ed]" to an eligible alien).  The asylum statute also makes it clear that the Executive may exercise its discretion through categorical rules, not just through case-by-case adjudication.  It provides that the Executive may establish categorical "limitations and conditions" on asylum eligibility, beyond those already set out in the statute, so long as they are "consistent with [Section 1158]."  8 U.S.C. 1158(b)(2)(C).  The district court determined that the third-country transit bar was inconsistent with two statutory provisions:  the safe-third-country provision, 8 U.S.C. 1158(a)(2)(A), and the firm-resettlement bar, 8 U.S.C. 1158(b)(2)(A)(vi).  App., infra, 39a-45a.  The district court's analysis was mistaken.  The provisions on which the district court relied merely establish minimum statutory requirements for the discretionary grant of asylum; they do not foreclose the Executive from imposing additional, more stringent requirements for that benefit.

The safe-third-country provision prohibits an alien from even applying for asylum if the alien "may be removed, pursuant to a bilateral or multilateral agreement," to a safe third country "where the alien would have access to a full and fair

procedure for determining a claim to asylum or equivalent temporary protection." 8 U.S.C. 1158(a)(2)(A). That provision, by its terms, <u>denies</u> the right to apply for asylum to a particular category of aliens. It does not <u>grant</u> asylum to aliens who fall outside that category, but rather leaves that decision to the discretion of the Executive. It is therefore consistent with the Executive's imposition of an additional restriction upon the grant of asylum.

The firm-resettlement bar prohibits granting asylum to an alien who "was firmly resettled in another country prior to arriving in the United States." 8 U.S.C. 1158(b)(2)(A)(vi). That provision, again, merely <u>prohibits</u> the Executive from granting asylum to a particular category of aliens. It does not <u>require</u> the Executive to grant asylum to aliens outside that category. It, too, is consistent with the imposition of an additional restriction upon the grant of asylum.

In reaching the contrary conclusion, the district court gave the safe-third-country provision and firm-resettlement bar a kind of field-preemptive effect. Under the district court's approach, those provisions effectively set out the exclusive requirements relating to an asylum seeker's efforts to obtain relief in a third country, and they prevent the Executive Branch from imposing additional requirements addressing that subject. That reading of the statute is incorrect. The asylum statute

28

expressly authorizes the Executive to "establish additional limitations and conditions" "by regulation." 8 U.S.C. 1158(b)(2)(C). Thus, the enumerated statutory bars plainly do not occupy the field, and the Executive enjoys broad discretion to supplement those bars with additional limitations. Indeed, this Court rejected a similar approach to the INA in Trump v. Hawaii, 138 S. Ct. 2392 (2018). There, the Court determined that the INA's express provisions regarding the entry of aliens "did not implicitly foreclose the Executive from imposing tighter restrictions" -- even when the Executive's restrictions addressed a subject that is "similar" to one that Congress "already touch[ed] on in the INA." Id. at 2411-2412. So also here, the INA's enumerated asylum bars do not foreclose the Executive from imposing tighter bars -- even if those tighter bars address subjects that are similar to those that Congress already touched on in the asylum statute.

Notably, this case differs from Trump v. East Bay Sanctuary Covenant, No. 18A615, where this Court declined to stay an injunction prohibiting enforcement of a different bar to asylum. There, the relevant statutory provision authorized aliens to apply for asylum "whether or not [they arrive] at a designated port of arrival," 8 U.S.C. 1158(a)(1), and the relevant rule prohibited the grant of asylum to aliens who enter the country unlawfully, see 83 Fed. Reg. 55,934. In this case, by contrast,

nothing in the asylum statute specifically grants the aliens subject to the third-country transit bar the right to apply for asylum -- much less the right to receive it.

d.   Finally, the district court (but not the Ninth Circuit) concluded that the rule was likely arbitrary and capricious.  App., _infra_, 50a-58a.  That, too, was incorrect.

As explained earlier, the Attorney General and Secretary explained that the rule serves multiple policy objectives. First, it helps "alleviate the strain on the U.S. immigration system" by "prioritizing" the applicants who have "nowhere else to turn" and thus "need [asylum] most," while "de-prioritizing" other applicants.  84 Fed. Reg. at 33,831, 33,834, 33,839-33,840 (citation omitted).  Second, the rule helps screen out "meritless asylum claims" by "restricting the claims of aliens who, while ostensibly fleeing persecution, chose not to seek protection at the earliest possible opportunity."  _Id._ at 33,831, 33,839.  Third, the rule helps protect children by reducing the incentive for families leaving Central America to make the "long and arduous" journey through Mexico to the United States.  _Id._ at 33,838.  Fourth, the rule helps "curtail the humanitarian crisis created by human smugglers" by "reducing a central incentive for aliens without a genuine need for asylum to cross the border -- the hope of a lengthy asylum process that will enable them to remain in the United States for years

DHSIFR786

despite their statutory ineligibility for relief." <u>Id.</u> at 33,840. Finally, the rule "will facilitate ongoing diplomatic negotiations with Mexico and the Northern Triangle Countries" regarding the flow of aliens. <u>Ibid.</u>

The district court did not question the soundness of most of that reasoning. Indeed, the district court itself recognized that "the Rule's intent is to incentivize putative refugees to seek relief at the first opportunity," and that "[t]he agency's explanation as to how this exhaustion requirement serves its stated aims is adequate." App., <u>infra</u>, 58a. That should have been the end of the arbitrary-and-capricious inquiry.

The district court nevertheless concluded that the rule is arbitrary and capricious because the agencies had failed to explain why "the failure to seek asylum in a third country is so damning standing alone that the government can reasonably disregard any alternative reasons why an applicant may have failed to seek asylum in that country." App., <u>infra</u>, 51a. In the rule, the Departments did not take the position that it is impossible for an applicant to have alternative reasons for failing to seek asylum at the first opportunity, rather that such a decision "<u>raises questions</u> about the validity and urgency of the agency's claim and <u>may mean</u> that the claim is <u>less likely</u> to be successful." 84 Fed. Reg. at 33,839 (emphasis added). The Departments decided to address that failure by adopting a

"categorical asylum bar," not by treating that failure as "just one of many factors" to be considered in the course of adjudicating the alien's asylum claim.  Id. at 33,839 n.8.

The Departments also explained why they chose a categorical bar.  First, the third-country transit bar rests on more than a desire to screen out meritless asylum claims.  The bar promotes other objectives, such as "prioritizing" the applicants "who need [asylum] most," 84 Fed. Reg. at 33,831, 33,839-33,840, and "reduc[ing] a central incentive for aliens without a genuine need for asylum to cross the border -- the hope of a lengthy asylum process that will enable them to remain in the United States for years despite their statutory ineligibility for relief," id. at 33,840.  Only a categorical rule would fully serve those purposes.  Second, even with respect to screening out meritless claims, the Departments explained that it was appropriate to adopt a bright-line rule rather than a multifactor standard in light of "the increased numbers" of asylum claims.  Id. at 33,839 n.8.  That was a permissible choice, particularly because the asylum statute explicitly invites the use of bright-line rules by authorizing the adoption of categorical bars to asylum.  See 8 U.S.C. 1158(b)(2)(C); see also Fong Hook Mak v. INS, 435 F.2d 728, 730 (2d Cir. 1970) (Friendly, J.) ("The administrator also exercises the discretion accorded him when * * * he determines certain conduct to be so

32

inimical to the statutory scheme that all persons who have engaged in it shall be ineligible for favorable consideration, regardless of other factors.").

To be sure, the Departments' selection of a categorical rule means that some otherwise meritorious asylum claims will be channeled to other countries. But the Departments reasonably determined that the benefits of alleviating the strain on the U.S. asylum system and of speeding asylum to those who most need it outweighed the costs of a categorical rule. And the Departments' policy choice to channel some meritorious asylum claims to other countries was particularly reasonable here, given that the asylum statute's purpose is not "to grant asylum to everyone who wishes to * * * mov[e] to the United States," Singh v. INS, 134 F.3d 962, 967 (9th Cir. 1998); the United States' asylum system currently faces a crushing burden; and the U.N. High Commissioner for Refugees has endorsed "efforts to share and allocate the burden of review of refugee and asylum claims" among multiple countries, 84 Fed. Reg. at 33,840. "By second-guessing the [Departments'] weighing of risks and benefits," the Ninth Circuit improperly "substitute[d] [its] judgment for that of the agenc[ies]." Department of Commerce v. New York, 139 S. Ct. 2551, 2571 (2019).

The district court also concluded that the rule is flawed because there was no basis for concluding that "asylum in Mexico

is a feasible alternative to relief in the United States."
App., _infra_, 51a (citation omitted).  That conclusion, too, is
incorrect.  First, the rule makes clear that the third-country
transit bar is inapplicable where "[t]he only countries through
which the alien transited" are not parties to certain
international treaties and thus do not have any obligation under
those treaties to provide protection from persecution and
torture.  84 Fed. Reg. at 33,843.  Second, the rule's rationales
do not depend on the particular details of the refugee-
protection system in Mexico or other third countries.
Regardless of the ease or difficulty of obtaining protection in
those countries, the very fact that an alien has not even _tried_
to obtain protection there suggests that the alien's claim lacks
urgency and merit.  Third, in all events, as even the district
court's review shows, Mexico has a robust refugee-protection
system, which it is improving in conjunction with international
partners.  See App., _infra_, at 53a-55a (citing A.R. 306, 534,
639).  The Departments weighed the totality of the evidence and
determined that it established sufficient capacity in Mexico to
address the claims of transiting aliens.  84 Fed. Reg. at
33,839-33,840.  The district court erred in second-guessing that
determination:  "it is for the political branches, not the
Judiciary, to assess practices in foreign countries and to
determine national policy in light of those assessments."  _Munaf_

34

v. Geren, 553 U.S. 674, 700-701 (2008).  The district court's decision is particularly improper because it "pass[es] judgment on" Mexico's legal system "and undermine[s]" our "Government's ability to speak with one voice in this area."  Id. at 702-703.

Last, the district court concluded that the rule is flawed because it does not "create an exception for unaccompanied minors."  App., infra, 57a.  But no statute requires such an exception.  When unaccompanied minors are to be treated differently than adults for purposes of asylum, the INA says so.  E.g., 8 U.S.C. 1158(b)(3)(C).  And the Departments did consider the specific issues posed by unaccompanied minors, 84 Fed. Reg. at 33,839 n.7 -- as even the district court recognized, App., infra, 57a-58a.  The Departments simply determined that no exception was warranted.  Indeed, they observed that Congress "did not exempt" unaccompanied minors from various other "bars to asylum eligibility."  84 Fed. Reg. at 33,839 n.7.  The Departments' choice was not arbitrary and capricious.

3.  The balance of harms also favors a stay because the injunction causes direct, irreparable injury to the government and the public.  First, the injunction frustrates the "public interest in effective measures to prevent the entry of illegal aliens" at the Nation's borders.  United States v. Cortez, 449 U.S. 411, 421 n.4 (1981).  The United States has experienced an "overwhelming surge" of unlawful crossings at the Nation's

southern border.   84 Fed. Reg. at 33,840.   The injunction undermines a coordinated effort by the Executive to curtail that surge.   Second, the injunction frustrates the government's strong interest in a well-functioning asylum system. "Immigration courts received over 162,000 asylum [claims] in FY 2018, a 270 percent increase from five years earlier," and the current burden is "extreme" and "unsustainable." Id. at 33,831, 33,838.   Third, the injunction undermines "sensitive and weighty interests of * * * foreign affairs," Humanitarian Law Project, 561 U.S. at 33-34, by preventing the full implementation of a rule that is designed to "facilitate ongoing diplomatic negotiations," 84 Fed. Reg. at 33,840.

The district court asserted that the rule harms aliens by denying them asylum and by "deliver[ing] [them] into the hands of their persecutors."   App., infra, 60a (citation omitted). That assertion is incorrect.   In the first place, asylum is a discretionary benefit, and it ordinarily makes little sense to describe the denial of a purely discretionary benefit as an irreparable harm.   That is especially so when "[o]nly a small minority" of asylum claims are meritorious to begin with.   84 Fed. Reg. at 33,831.   In addition, the rule does not "deliver aliens into the hands of their persecutors," App., infra, 60a, because aliens covered by the rule (1) retain the ability to apply for asylum in third countries, (2) remain eligible for

asylum in the United States if the third country denies protection, and (3) "remain eligible" for other forms of protection besides asylum, such as "withholding of removal" and "deferral of removal." 84 Fed. Reg. at 33,831, 33,843.

The district court also concluded that respondent organizations faced irreparable harm through a "diversion of resources" (respondents must now spend time and money addressing the effects of the rule) and a "loss of funding" (fewer clients might pay respondents fees for assistance with their asylum applications). App., _infra_, 59a. Even crediting those assertions and assuming that they are proper factors in the equitable balance, the administrative inconveniences that the district court identified plainly do not outweigh the harm that would be imposed by "injunctive relief [that] deeply intrudes into the core concerns of the executive branch." _Adams_ v. _Vance_, 570 F.2d 950, 954 (D.C. Cir. 1978).

4.  At a minimum, a stay should be granted because the universal injunction entered at the behest of respondents is vastly overbroad (and remains overbroad even after the Ninth Circuit's partial stay). See _IRAP_, 137 S. Ct. at 2088.

a.  As a general rule, courts lack the authority to enter universal injunctions that preclude enforcement of a law or rule against all persons, rather than against only the plaintiffs. First, under Article III of the Constitution, "[a] plaintiff's

remedy must be tailored to redress the plaintiff's particular injury." Gill, 138 S. Ct. at 1934.  Because "standing is not dispensed in gross," "a plaintiff must demonstrate standing separately for each form of relief sought." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352-353 (2006) (citations omitted). A plaintiff may have standing to challenge the application of the rule to the plaintiff himself, but ordinarily lacks standing to challenge its application to unrelated third parties.

Bedrock rules of equity independently require that injunctions be no broader than "necessary to provide complete relief to the plaintiffs." Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 765 (1994) (citation omitted).  That principle applies with even greater force to a preliminary injunction, which is an equitable tool designed merely to preserve the status quo during litigation. University of Tex. v. Camenisch, 451 U.S. 390, 395 (1981).  Moreover, the equitable jurisdiction of federal courts is grounded in historical practice, yet universal injunctions are a modern invention.  See Hawaii, 138 S. Ct. at 2425-2429 (Thomas, J., concurring).

Finally, universal injunctions create practical problems for the federal courts and federal litigants.  They "take a toll on the federal court system -- preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the

courts and for the Executive Branch." Hawaii, 138 S. Ct. at 2425 (Thomas, J., concurring). They also allow courts and parties to circumvent Federal Rule of Civil Procedure 23, which sets out the prerequisites for certifying a class and for granting relief to such a class. And they create an inequitable "one-way ratchet" under which a loss by the government precludes enforcement of the challenged rule everywhere, but a victory by the government does not preclude other plaintiffs from "run[ning] off to the 93 other districts for more bites at the apple." City of Chicago v. Sessions, 888 F.3d 272, 298 (7th Cir. 2018) (Manion, J., concurring in the judgment in part and dissenting in part), reh'g en banc granted (No. 17-2991) (June 4, 2018), reh'g en banc vacated as moot (No. 17-2991) (Aug. 10, 2018). This case illustrates that problem: The district court here ordered the entry of "a nationwide injunction," App., infra, 63a, even though another federal district court entertaining a similar challenge had sided with the government and had refused to award any preliminary relief at all, see CAIR v. Trump, No. 19-2117, 2019 WL 3436501 (D.D.C. July 24, 2019).

Under the principles just discussed, an injunction could be granted, at most, to cover specific aliens that respondents identify as actual clients in the United States who are otherwise subject to the rule. An injunction could not properly

extend to all aliens throughout the Nation, or even all aliens in the Ninth Circuit.

b.   The Ninth Circuit recognized that "[a]n injunction must be 'narrowly tailored to remedy the specific harm shown.'" App., _infra_, 4a (citation omitted).  And it observed that "nationwide injunctions have detrimental consequences."  _Id._ at 5a (citation omitted).  In light of those principles, the Ninth Circuit correctly determined that the district court's "nationwide injunction" was not "justified."  _Ibid._

The Ninth Circuit did not, however, follow its own reasoning to its logical conclusion -- _i.e._, that respondent organizations may receive, at most, an injunction that is tailored to their own clients.  The court instead stayed the injunction "outside the Ninth Circuit," but allowed the injunction to remain in effect "within the Ninth Circuit." App., _infra_, at 3a, 6a.  "Such a solution has no basis in traditional equity.  On the one hand, equity confined itself to controlling the defendant's behavior vis-à-vis the plaintiff. On the other hand, to protect the plaintiff, equity was willing to enjoin acts outside [the court's] territorial jurisdiction. Equity acts in personam.  Geographical lines are simply not the stopping point."  Samuel L. Bray, _Multiple Chancellors: Reforming the National Injunction_, 131 Harv. L. Rev. 417, 422 n.19 (2017).  Respondents thus have no basis for obtaining an

injunction with respect to aliens who are not their clients --
regardless of whether those aliens are located in the Ninth
Circuit or in some other circuit.

The Ninth Circuit also stated that "the district court
retains jurisdiction to further develop the record in support of
a preliminary injunction extending beyond the Ninth Circuit."
App., _infra_, 8a-9a.  Regardless of the factual record, however,
the district court had no authority, as a matter of law, to
issue an injunction that went beyond remedying the alleged harms
to the plaintiffs in this case.   And any broadening of the
injunction would only increase the harm to the government.

                          CONCLUSION

The injunction should be stayed pending appeal and, if the
Ninth Circuit affirms the injunction, pending the filing and
disposition of a petition for a writ of certiorari and any
further proceedings in this Court.  At a minimum, the injunction
should be stayed as to all persons other than specific aliens
that respondents identify as actual clients in the United States
subject to the rule.

Respectfully submitted.


                          NOEL J. FRANCISCO
                          Solicitor General


AUGUST 2019


DHSIFR797

I am pleased that the Congress dropped a provision that would have made funding for the nuclear waste management program contingent upon congressional passage of a subsequent authorization bill. This language could have led to the immediate suspension of ongoing work at the Yucca Mountain site.

I am also pleased that the Congress provided $45 million to the International Nuclear Safety program, which assists nations of the former Soviet Union and Eastern Europe in improving the safety of Soviet-designed nuclear reactors.

I am disappointed that the Act cuts $93 million from my request for solar and renewable energy research programs. Investments in the development of advanced renewable energy technologies, which have a large potential export market, will create new jobs and reduce pollution, thereby addressing climate change and protecting human health and the environment. I am also concerned by the cuts in funding for DOE departmental administration and program direction in civilian research and defense programs that may jeopardize the Department's ability to perform its missions and maintain its financial management responsibilities.

I am disappointed that the Act includes over $210 million in unrequested funds for Corps' construction, studies, and operation and maintenance programs. The Congress should have used these funds to restore reductions it made to other priority DOE and Corps programs, such as the Corps' wetlands regulatory program.

William J. Clinton

The White House,
September 30, 1996.

NOTE: H.R. 3816, approved September 30, was assigned Public No. 104–206. This statement was released by the Office of the Press Secretary on October 1.

## Statement on Signing Legislation Waiving Certain Enrollment Requirements
September 30, 1996

Today I have signed into law House Joint Resolution 197, which waives the printing requirements of sections 106 and 107 of Title 1 of the United States Code with respect to any appropriations measure of the 104th Congress that is presented to me after the enactment of H.J. Res. 197. I have done so to avoid any confusion as to my ability to act on any form of legislation presented to me after certification by the Committee on House Oversight of the House of Representatives that the form is a true enrollment.

In signing this joint resolution, I express no view as to whether it is necessary to waive the provisions of Title 1 before I exercise my prerogatives under Article I, section 7 of the Constitution where the Congress has presented to me any form of bill or resolution it considers to be a true enrollment.

William J. Clinton

The White House,
September 30, 1996.

NOTE: H.J. Res. 197, approved September 30, was assigned Public Law No. 104–207. This statement was released by the Office of the Press Secretary on October 1.

## Statement on Signing the Omnibus Consolidated Appropriations Act, 1997
September 30, 1996

I have signed into law H.R. 3610, the fiscal year 1997 omnibus appropriations and immigration reform bill.

This bill is good for America, and I am pleased that my Administration could fashion it with the Congress on a bipartisan basis. It moves us further down the road toward our goal of a balanced budget while protecting, not violating, the values we share as Americans—opportunity, responsibility, and community.

Specifically, the legislation restores needed funds for education and training, the environment, science and technology, and law enforcement; fully funds my anti-drug and counter-terrorism initiatives; extends the Brady Bill so that those who commit domestic violence cannot buy handguns; provides needed resources to respond to fires in the western part of the Nation and to the devastation brought by Hurricanes Fran and

Hortense; and includes landmark immigration reform legislation that cracks down on illegal immigration without punishing legal immigrants.

The bill restores substantial sums for education and training, furthering my agenda of life-long education to help Americans acquire the skills they need to get good jobs in the new global economy.

It provides the funds through which Head Start can serve an additional 50,000 disadvantaged young children; fulfills my request for the Goals 2000 education reform program, enabling States to more quickly raise their academic standards and implement innovative reform; increases funding for the Safe and Drug-Free Schools program, helping States reduce violence and drug abuse in schools; provides most of my request for the Technology Literacy Challenge Fund to help States leverage technology funds; fulfills my request for Title 1, education for the disadvantaged; and provides the funds to enable well over a half-million young people to participate in the Summer Jobs program.

For college students, I am pleased that the bill fulfills my request for the largest Pell Grant college scholarship awards in history and expands the number of middle- and low-income students who receive aid by 126,000—to 3.8 million. I am also pleased that the bill fully funds my Direct Lending program, enabling more students to take advantage of cheaper and more efficient loans.

For the environment, the bill provides funds to support the Environmental Protection Agency's early implementation of two major new environmental laws that I signed this summer—the Safe Drinking Water Act, and the Pesticide and Food Safety Law. In addition, the bill provides additional funds for energy conservation and to help finish the cleanup of Boston Harbor and help prevent beach closures.

At the same time, the bill does not contain any of the riders that would have affected management of the Tongass National Forest in Alaska, national Native American tribal rights, the Interior Department's management of subsistence fishing in Alaska, long-term management of the Elwha Dam in Washington State, and the issuance of emergency-efficiency standards for appliances. I am, however, disappointed the Congress did not adopt my proposal to repeal the 1995 salvage timber rider and restore the application of environmental laws to salvage logging on Federal lands.

For research and technology, the bill promotes economic growth by continuing needed Federal support for advanced technology. It restores funding for the Commerce Department's Advanced Technology Program, providing resources for new grants to support innovative technology companies across the Nation.

It also provides a sizeable increase for the National Institutes of Health, which will enable NIH to expand its critical research into new ways to treat breast cancer, AIDS, and other diseases. I am also pleased that the bill provides nearly $1 billion for Ryan White AIDS treatment grants, including funds to help States purchase a new class of AIDS drugs called "protease inhibitors" and other life-extending medications. And the Congress also fully funded my request for the Department of Housing and Urban Development's program that provides housing assistance for people with AIDS.

For law enforcement, the bill provides $1.4 billion to ensure that my program to put 100,000 more police on the streets of America's communities by the year 2000 proceeds on schedule; with this bill, we will have provided funding for 64,000 of the 100,000 that I called for at the start of my Administration. The bill also increases funds for Justice Department law enforcement programs, for the FBI's crime-fighting efforts, and for new Federal prisons. As I had urged, the bill also extends the Brady Bill to ensure that those who commit domestic violence cannot purchase guns. Finally, I am pleased that the Congress provided a modest increase for the Legal Services Corporation, which ensures that those who lack the means still have access to our legal system.

I am also pleased that the bill provides a $1.4 billion increase in funding for anti-drug programs. It doubles funding for Drug Courts, increases funds for drug interdiction efforts by the Defense, Transportation, and Treasury Departments, and provides the resources to expand the Drug Enforcement Administration's domestic efforts along the

Southwest border and elsewhere. The bill also includes strong language about drug testing that my Administration had proposed, requiring that localities have drug-testing programs in place for their prisoners and parolees in order to qualify for State and local prison grants. And it includes funding for the drug testing of Federal, State, and local arrestees.

For counterterrorism, the bill funds my request for over $1.1 billion to fight terrorism and to improve aviation security and safety. It enables the Justice and Treasury Departments to better investigate and prosecute terrorist acts, and it provides funds to implement the recommendations of Vice President Gore's Commission on Aviation Safety and Security and the Federal Aviation Administration's recent 90-day safety review. These funds will enable us to hire 300 more aviation security personnel, deploy new explosive detection teams, and buy high-technology bomb detection equipment to screen luggage. The bill also gives my Administration the authority to study the use of taggants in black and smokeless powder; taggant technology holds the promise of allowing the detection and identification of explosives material.

I hereby designate as an emergency requirement, as the Congress has already done, the $122.6 million in fiscal 1996 funds and the $230.68 million in fiscal 1997 funds for the Defense Department for antiterrorism, counterterrorism, and security enhancement programs in this Act, pursuant to section 251(b)(2)(D)(I) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

This bill also funds the Nation's defense program for another year; it fully funds my defense antiterrorism and counter-narcotics efforts as well as the Cooperative Threat Reduction program, and at my insistence it provides a substantial amount of the funding for my dual-use technology program. But it also provides about $9 billion more than I proposed for defense, including a substantial amount for weapons that are not even in the Defense Department's future plans and were not requested by the service chiefs. This bill is part of a plan by the majority in the Congress that adds funds for investments now

and reduces them in the future. I continue to believe that my long-range plan is more rational. It provides sufficient funds now while increasing them at the turn of the century when new technologies will become available.

I am pleased that the Congress has provided the minimum acceptable levels for certain key international affairs programs, such as the U.S. contribution to the International Development Association and the Korean Peninsula Energy Development Organization and for international peacekeeping operations and arrears. I also commend the Congress for providing at least a modest increase in funding international family planning programs and for dropping misguided Mexico City restrictions, and for funding bilateral economic assistance without rescinding prior-year appropriations. In addition, the Congress has facilitated the Middle East peace process by authorizing U.S. participation in the Middle East Development Bank. Nevertheless, I must note that the overall funding level for international affairs programs is well below what we need to assure that we can achieve our foreign policy objectives.

This bill, however, does more than fund major portions of the Government for the next fiscal year. It also includes landmark immigration reform legislation that builds on our progress of the last 3 years. It strengthens the rule of law by cracking down on illegal immigration at the border, in the workplace, and in the criminal justice system—without punishing those living in the United States legally.

Specifically, the bill requires the sponsors of legal immigrants to take added responsibility for their well-being. And it does not include the so-called Gallegly amendment, which I strongly opposed and which would have allowed States to refuse to educate the children of illegal immigrants. At my insistence the bill does not include the proposed onerous provisions against legal immigrants, which would have gone beyond the welfare reform law.

I am pleased that the Congress provided 7 additional months of food assistance for needy immigrants, including benefits for many elderly and children. This step will pro-

vide some help to individuals and States in preparing for the dramatic restriction of access to benefits that legal immigrants will face under the welfare reform bill.

I am, however, extremely concerned about a provision in this bill that could lead to the Federal Government waiving the Endangered Species Act and the National Environmental Policy Act in order to expeditiously construct physical barriers and roads on the U.S. border. I know the Attorney General shares my commitment to those important environmental laws and will make every effort, in consultation with environmental agencies, to implement the immigration law in compliance with those environmental laws. I am also concerned about a provision that imposes a new "intent requirement" in unfair immigration-related employment cases that could place hardships on some U.S. citizens and permanent residents. I have asked the Attorney General to take steps to alleviate any potential discrimination that this provision causes against U.S. citizens and authorized workers—particularly Hispanics and Asian-Americans who, by their appearance or accent, may appear to be foreign. Finally, I will seek to correct provisions in this bill that are inconsistent with international principles of refugee protection, including the imposition of rigid deadlines for asylum applications.

The bill also makes important changes in the Nation's banking laws. It assures the continued soundness of the bank and thrift deposit insurance system, and it includes significant regulatory relief for financial institutions. At my insistence, the bill does not erode the protection of consumers and communities.

I commend Senators Baucus and Bingaman for raising the awareness of the issue of the proper accounting of highway trust fund receipts. In next year's reauthorization of the Intermodal Surface Transportation and Efficiency Act, my Administration will rely on a baseline that treats all States fairly and equitably.

The bill includes a Government-wide program to enable agencies to offer buyouts, through December 31, 1997, of up to $25,000 to employees eligible for early or regular retirement. Many of these workers stay on for years after they can retire, so buyouts will serve as an incentive for them to leave. Buyouts are an important tool to help Federal managers downsize their agencies as we continue to move toward a balanced budget—without relying solely on reductions-in-force (RIFs).

I am disappointed that one of my priorities—a ban on physician "gag rules"—was not included. Several States have passed similar legislation to ensure that doctors have the freedom to inform their patients of the full range of medical treatment options, and I am disappointed that the Congress was not able to reach agreement on this measure.

Nevertheless, this bill is good for America. As I have said, it moves us down the path toward a balanced budget while protecting our values. It provides the needed resources to fight domestic and international terrorism. And it cracks down on illegal immigration while protecting legal immigrants.

I am pleased to sign it.

WILLIAM J. CLINTON

The White House,
September 30, 1996.

NOTE: H.R. 3610, approved September 30, was assigned Public Law No. 104–208. This statement was released by the Office of the Press Secretary on October 1.

## Message to the Senate Transmitting the Inter-American Convention on Serving Criminal Sentences Abroad
September 30, 1996

To the Senate of the United States:

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Inter-American Convention on Serving Criminal Sentences Abroad, drawn up by the Committee on Juridical and Political Affairs within the Permanent Council of the Organization of American States (OAS) and composed of representatives of the Member States. The Convention was adopted and opened for signature at the twenty-third regular session of the General Assembly meeting in Managua, Nicaragua, on June 9, 1993, and signed on behalf of the United States at the OAS Headquarters in

# Central Americans Surge at Border Before Trump Takes Over; Migrants from violence-plagued El Salvador, Honduras and Guatemala push north in anticipation of new administration's tougher border measures

Whelan, Robbie . Wall Street Journal (Online) ; New York, N.Y. [New York, N.Y]23 Dec 2016: n/a.

🔗 ProQuest document link

## FULL TEXT

GRANJENO, Texas--Central Americans are crossing illegally into the U.S. at the fastest rate in years, many of them hoping to sneak in before Donald Trump's presidential inauguration and the heightened border-security measures he has promised.

The U.S. Border Patrol apprehended 47,214 migrants along the southwest U.S. border in November, an increase of 44% compared with November 2015. It was the Border Patrol's busiest month since June of 2014, when illegal entries from Central America were cresting.

Over the past six months, Border Patrol agents have caught nearly 240,000 migrants, an average of more than 1,300 a day--30% more than the same period a year earlier.

"Right now we're trending toward 2014 numbers, which was our high-water mark," said José Villareal, chief of operations for the Border Patrol's Rio Grande Valley sector and a 31-year veteran of the agency.

While the number of illegal migrants from Mexico to the U.S. has steadily declined in the past decade, migration from Central America has risen, mostly because of gang-related violence. Honduras, El Salvador and Guatemala have among the world's highest murder rates .

"It's a humanitarian crisis, a drug crisis, a security crisis. We're going to have to deal with that issue immediately," said a member of Mr. Trump's transition team.

While most migrants are fleeing poverty and violence at home, the wild-card factor in recent months has been Mr. Trump's ultimately successful presidential campaign, which focused heavily on deporting millions of illegal immigrants , curbing migration and building a wall to seal off the Mexican border.

"Some migrants have talked about how President Trump is going to seal off the border," said Mr. Villareal. "There's definitely a percentage of folks who believed that they can beat the clock" by reaching the U.S. before the new president takes office.

So they can charge more, smugglers often spread rumors to make it seem more urgent for migrants to get to the


PDF GENERATED BY SEARCH.PROQUEST.COM

U.S., said Maureen Meyer, senior associate with the Washington Office on Latin America, a human-rights nonprofit organization. In 2014, for example, smugglers promulgated stories throughout Central America that the U.S. was doling out "permisos"--or permission slips--for migrants to cross.

"For a lot of people, they're running from crime or extortion and threats of violence, so it might be a now-or-never mind-set," Ms. Meyer said. "But a lot of them seem to be aware Trump and the possibility of a wall or other changes that would affect them."

Alex Pérez, age 18, left his home in rural Honduras in early September, at one point stowing away in the back of a lime truck in an attempt to reach Texas and eventually meet up with a friend in Los Angeles.

He hasn't made it. Since early this month, Mr. Pérez has been living in a transit shelter run by an evangelical Christian group in the Mexican border city of Reynosa. Without money to pay smugglers to cross the Rio Grande in a raft, he is trying to figure out how to reach the U.S. and wonders if time is running short.

"With the new U.S. president that is coming, a lot of people are going to come. They say this is the only month we have to get across," he said in an interview at the shelter.

After crossing the river, many migrants end up on an overgrown slice of floodplain known as Rincón Corner in Granjeno, just outside of McAllen, Texas. Out of roughly 315 miles of border in the Rio Grande Valley sector, only 54 miles have a border fence, making the area especially porous. The sector, which encompasses 34,000 square miles of U.S. territory from the Gulf of Mexico to McAllen, accounts for more than half of all migrant apprehensions each year.

The surge is straining Border Patrol resources. Just before Thanksgiving, the Department of Homeland Security deployed 150 additional Border Patrol agents from other sectors to work here on monthlong shifts. Two weeks ago, the border agency set up a 500-bed tent facility in Donna, Texas, to handle detainees, a job usually handled by Immigration and Customs Enforcement, another federal agency.

The Border Patrol says it has tightened security measures, including beefing up the number of agents and increasing the collection of biometric data, to discourage migrants from making repeated tries at the border. None of it has deterred thousands seeking to escape the threat of violence in their home countries.

Last week, José Maltez Castro, a 34-year-old motorcycle salesman from Usulután, El Salvador, successfully crossed the Rio Grande in a raft with his 3-year-old son and 5-year-old daughter, only to be immediately caught, along with 26 other Salvadoran migrants, by the Border Patrol.

Mr. Maltez said he fled El Salvador after local gang members repeatedly threatened to kidnap an older daughter and force her into the sex trade, adding he intended to send for her and his wife once he got to the U.S. So far, he said, he had spent $1,500 and 24 days in transit to the U.S.-Mexico border.

"My neighbors told me that once you get to America, the government supports you," Mr. Maltez said. "I was very afraid that we wouldn't be able to cross because of what happened with the election."

On a recent cloudy Friday afternoon, U.S. Border Patrol agent Isaac Villegas crouched in the underbrush on the bank of the Rio Grande, waiting for an inflatable raft piloted by a smuggler and filled with eight migrants to enter the water.



Then he jumped out shouting, forcing the raft to turn back toward the Mexican bank of the river and causing the smuggler, in a panic, to tumble into the waist-deep water.

"He'll probably try again at a different landing further down the river," Mr. Villegas said. But nonetheless, he added, "I want to disrupt this mind-set the smugglers have that they can just cross this river whenever they please."

Dudley Althaus contributed to this article.

Write to Robbie Whelan at robbie.whelan@wsj.com

Credit: By Robbie Whelan

## DETAILS

| | |
|---|---|
| People: | Trump, Donald J |
| Publication title: | Wall Street Journal (Online); New York, N.Y. |
| Pages: | n/a |
| Publication year: | 2016 |
| Publication date: | Dec 23, 2016 |
| Section: | World |
| Publisher: | Dow Jones &Company Inc |
| Place of publication: | New York, N.Y. |
| Country of publication: | United States, New York, N.Y. |
| Publication subject: | Business And Economics |
| Source type: | Newspapers |
| Language of publication: | English |
| Document type: | News |
| ProQuest document ID: | 1851637107 |
| Document URL: | https://search.proquest.com/docview/1851637107?accountid=31567 |
| Copyright: | (c) 2016 Dow Jones &Company, Inc. Reproduced with permission of copyright owner. Further reproduction or distribution is prohibited without permission. |



| Last updated: | 2018-11-30 |
| --- | --- |
| Database: | US Newsstream |

## LINKS

Check for full text via 360 Link

Database copyright © 2019 ProQuest LLC. All rights reserved.

Terms and Conditions    Contact ProQuest





A Guatemalan woman and her three daughters at the border fence after crossing into El Paso, Texas, from Ciudad Juarez, Mexico. | David Peinado/NurPhoto via Getty Images

# The border is in crisis. Here's how it got this bad.

There really is something unprecedented — and deadly — happening at the US-Mexico border right now. But the threat is to migrants themselves.

By Dara Lind | dara@vox.com | Updated Jun 5, 2019, 1:47pm EDT

President Trump's constant temper tantrums about the US-Mexico border have become the background noise of his administration. Even as he reaches for more and more drastic threats to try to "stop" the flow of unauthorized migrants into the US — like the threat of a 5 percent tariff on all goods coming into the US from Mexico — it seems that the public (including fellow Republican politicians) have an ever harder time taking him seriously.

But as Trump has raged, something genuinely unprecedented has started happening at the border.

DHS 675
AR675

The past several months have seen a huge spike in unauthorized migration, especially of families, into the US.

The government's capacity to handle an influx of large groups of children and families was already under serious strain at the end of 2018. By March, politicians of both parties were recognizing it as a humanitarian crisis. And the numbers of people coming just keep rising — with 132,887 migrants apprehended by Border Patrol after crossing the US-Mexico border (committing the misdemeanor of illegal entry) in May 2019.

This isn't a manufactured crisis, or a politically engineered one, as some Democrats and progressives have argued. If it were, it would be easier to solve.

What's happening at the border is the result of a regional crisis in which — if **current rates continue** — close to 1 percent of the entire population of Guatemala and Honduras will attempt to immigrate to the US this year. The Mexican government, meanwhile, is vacillating between humanitarian rhetoric and militarized crackdowns, US border officials are openly begging for help, and Trump himself is throwing the mother of all temper tantrums.

Trump's threats will likely cause massive collateral damage throughout North America and aren't even likely to stop people from arriving at the US-Mexico border, his stated goal. But that doesn't mean there isn't a problem here, or even a crisis. It just means it's not one that's going to be solved anytime soon.

## 1) Is there an unprecedented surge of unauthorized migration into the US?

Yes — or at least, probably. But of a specific kind.

Three things are simultaneously true:

- The total number of people coming into the US without papers is still lower than it was for most of the 20th century, and substantially lower than its turn-of-the-century peak.

- The total number of people coming into the US without papers is now higher than it's been since early 2007, before the Great Recession.

DHS000316
AR0676

- The number of people coming into the US without papers who can't simply be detained and deported — children, families, and asylum seekers — is almost certainly unprecedented.

(https:/
url=http
3A%
2F%
2Fwww
2F2019
2F4%
2F11%
2F1829
2Fbord
immigra
illegal-
asylum
central-
america(https://(http://v
mexicou=httpsurl=http
trump% 3A%   3A%
3Futm_  2F%   2F%
3Dsoci2Fwww2Fwww
26utm_2F20192F2019
3Dtwitt 2F4%  2F4%
3A%  2F11%2F11%
20Bord2F18292F1829
20Patr2Fbord2Fbord
20apprimmigrimmigra
2C%  illegal- illegal-
20Octoasylumasylum
202011central-central-
presentamericamerica

By this point, it's not just that there are more children and families coming than have in recent years. There is substantial evidence that the raw number of children and families entering the US is higher than it's ever been.

We don't have apples-to-apples data. Right now, DHS separately counts "unaccompanied alien children" who come without their parents, and migrants who come in "family units" of one or more parents with one or more children. Before 2011, though, it combined juveniles who came with parents and juveniles who came without them — and simply counted parents traveling with their children as adults.

We do know, however, that very few of all migrants apprehended were juveniles in the early 2000s compared to today — so even during peak unauthorized migration, rarely more than 100,000 juveniles a year were crossing. And the majority of those were coming without their parents. So if the statistics had been kept in the same way in the early 2000s that they are now, they almost certainly wouldn't have shown more than 150,000 unaccompanied children and family units coming into the US even during peak years.

So far in fiscal year 2019, with four months to go, nearly 390,000 children and parents have been apprehended. Nearly 96,000 unaccompanied children and family members were apprehended in the month of May alone.

## 2) Why can't all border crossers simply be deported?

The US border enforcement system is built to apprehend people who are trying to sneak into the US, and return them to their home country as quickly as possible.

For most of US history, apprehended migrants were just informally returned to Mexico. In the mid-2000s, the US started formally deporting apprehended migrants instead — using "expedited removal," which allowed people who got caught entering the US to get deported without going before an immigration judge. Typically, a migrant would be apprehended by Border Patrol officials,

DHS AR0678

transferred to Immigration and Customs Enforcement (ICE) custody within 72
hours, and deported once a deportation order could be signed.

But there are extra legal protections built into US law and policy for asylum
seekers — who can't simply be deported — and for vulnerable groups, including
children and families, who can't simply be detained.

Asylum seekers — whether they have presented themselves at a port of entry to
ask for asylum (breaking no US law) or crossed into the US between ports of
entry (committing the misdemeanor of illegal entry) and evoked their right to
asylum after being apprehended by a Border Patrol officer — can't be deported
until they've been screened by an asylum officer to see if they have a "credible
fear" of persecution. Unaccompanied children from non-Mexican countries have
to be transferred to the care of the Department of Health and Human Services
within 72 hours and are guaranteed immigration court hearings. Families, under
a 2015 court ruling, can't be detained indefinitely; generally, the government has
to release them after about 20 days.

In all three cases, the "detain, then deport" system doesn't work. The system is
overloaded with people it wasn't designed to handle.

## 3) Why are people coming to the United States to begin with?

The simplest answer is probably the truest: because things are bad enough for
them in their home countries of Guatemala, Honduras, and El Salvador that
they've decided to risk the journey to the US, and whatever treatment awaits
them here, for a chance in America.



Border: The migration crisis and the Trump administration's response, explained - Vox    Page 6 of 18

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 576 of 1770
Case 1:19-cv-04019-SPF   Document 258   Filed 07/19/19   Page 762 of 779



A group of Hondurans sleep as they wait to board a bus that will take them out of Honduras in April 2019. Unless stopped by Mexican authorities — which is plausible — many will likely head to the United States, as previous "caravans" of Honduran migrants have. | Orlando Sierra/AFP/Getty Images

US law slices migrants into categories. People seeking to migrate for economic reasons or to reunite with family might have a way to migrate to the US legally, but they're not allowed legal status if they arrive without papers. People fleeing persecution have the right once on US soil to apply for asylum, whether they have papers or not.

The Trump administration claims that very few of the people coming to the US now are genuine asylum seekers, pointing to the fairly low rate of success of asylum claims in immigration court (10 to 15 percent for Northern Triangle countries) as evidence that these aren't "real" asylees, or even to claim that most of them are outright frauds.

In practice, though, it's often hard to determine a single reason that a given migrant is leaving — much less a group of hundreds of them, or a monthly flow of tens of thousands. The same people facing dire poverty can also be persecuted by their governments for their political views; someone might decide to leave because their crops are failing, but decide *when* to leave based on a threat to their lives.

The most pressing problem in Honduras and El Salvador continues to be violence, specifically gang violence. (El Salvador has reduced its homicide rate substantially, and migration to the US has declined sharply since last summer.) Victimization by gangs isn't as solid a basis for an asylum claim as victimization

DHS-000
AR000

by the government, and the Trump administration is trying to make it even harder to claim asylum due to gang violence.

Guatemala, which has seen the biggest increase in migration to the US in the current surge, is generally more beset by crushing poverty than gang violence. (Domestic violence is endemic in all three countries.) Poverty, no matter how dire, isn't grounds to seek asylum. But it's hard to disentangle the poverty of the Guatemalan highlands from concerns about the government's treatment of indigenous peoples, or the poor situation of the region's farmers from oppression of community and environmental activists challenging the government's land use policies.

Many of these migrants are choosing to come to the US rather than staying in Mexico because the US offers them a better opportunity to make money and support their families, in addition to being substantially safer, and US law allows asylum claims from migrants who pass through Mexico. (Asylum seekers who try to enter the US from Canada have to stay in Canada.) Many asylum seekers also have relatives in the US already. That doesn't mean they don't also have valid asylum claims.

Further complicating all of this, migrants themselves don't necessarily know what asylum is or why they might or might not qualify for it. Some migrants I've spoken to believed you could get asylum simply by having a relative in the US — or that if you had no family in the US, you couldn't get asylum. (Neither is the case.) People traveling in the "caravan" last fall often told reporters they were coming to the US to work.

To the US government (and immigration hawks), both of these are indicators that these aren't "real" asylum seekers. To advocates and immigration lawyers, they're evidence that people move between countries for complex reasons, and that some who might qualify for asylum might not even know it without help from a lawyer.

## 4) Why are more people coming now?

Trump's first few months in office set records for how few people were caught trying to enter the US from Mexico, something he continued to brag about even as apprehension levels began to rise again in summer and fall 2017. (The claim made by Trump critics that unauthorized migration is at "historic lows" is based on the fact that yearly apprehension rates are still low in comparison to the pre-recession era, but apprehensions have been rising pretty much every month since April 2017.) And building on a trend that had become noticeable since the border crisis of summer 2014, the people who were coming were unaccompanied children and, increasingly, families.

By September 2018, DHS officials were raising alarms about the number of children and families coming into the US, and warning that the system was overwhelmed. Apprehensions continued to climb through the fall. Then in February, they skyrocketed.



Large groups, like this group of 100, have become increasingly common at the US/Mexico border — contributing to the rapid spike in apprehensions of migrants in the past few months.  | David Peinado/NurPhoto via Getty Images

The rapid increase from the beginning of 2019 to now still isn't fully understood. It appears to stem from a shift in smuggling tactics and capacity. (While human smuggling is illegal, it's used by asylum seekers who feel they have no other choice as well as people migrating for economic reasons.)

The rise of "express route" buses that can take hundreds of migrants at a time through Mexico in five or six days appears to be a factor. Many migrants who might have felt the chance of arriving in the US wasn't worth the risks of a grueling and dangerous journey on foot through Mexico may be changing their calculus now that the risk is lower. Similarly, anecdotal reports indicate that smugglers are offering discounts for migrants who bring their children.

The other factor is Mexico. The government of Andrés Manuel López Obrador (who took office in December) has tried to marry rhetoric about a new humanitarian approach to migration with a desire to stay on the Trump administration's good side. In December, Mexico made it much easier for Central American migrants seeking to travel to the US to get temporary "humanitarian visas" that allowed them 90 days of legal status in Mexico.

The Mexican government wasn't prepared for how many Central Americans would seek the visas, and shut down the program rapidly. But American officials suspect the humanitarian visas made it much easier for Central Americans already in Mexico to come to the US, and may have influenced more to come.

## 5) Is the US system stretched to the "breaking point"?

It is apparent that the needs of migrants in custody have overwhelmed DHS capacity.

The department is redirecting resources from other things to the border, much like it would in a natural disaster. Customs and Border Protection has detailed a few hundred port officers to help Border Patrol agents care for families and children — slowing down the processing of people and vehicles at ports of entry accordingly, and causing hours-long lines across some international bridges. The department has called for volunteers from other agencies to help.

DHS-0683
AR663

But they're still swamped. On a call in June, one Customs and Border Protection official said, "when we have 4,000 people in custody, we consider that high. When we have 6,000, we consider it a crisis. Right now, we have 19,000 people in custody. It's just off the charts."

In May, DHS's **inspector general office found** that as many as 900 people were being held in a Border Patrol facility built for 125 people. One cell, with a listed maximum capacity of 12 people, held 76.

In March, CBP agents in El Paso kept some families in a temporary holding pen under a bridge, with some families claiming they were kept there for several days. The holding pen was shut down at the end of March, after pictures of it attracted widespread shock and outrage, but CBP agents encouraged reporters to get pictures of it — pointing to it as an example of what they were forced to do because they had no other choice.

It's difficult to determine whether that's true, because it's really about counterfactuals — what else the Trump administration could have done in the past to prepare for this, or what other things it could be doing now. (A world in which Trump spent as much time and money on processing centers for migrant families as he spent on a wall would look very different.)

CBP has warned for months that it isn't able to house and process the current population coming into the US, and that it has nowhere to put people between when they turn themselves in to Border Patrol agents and when they are released.

The deaths of several children in Border Patrol custody have highlighted the lack of appropriate care in Border Patrol facilities. Congress included funds in its February appropriations bill to help Border Patrol provide food and shelter for migrant families in El Paso, but there are far more families and children coming now than the February bill anticipated.

Releasing asylum seekers from custody isn't as easy as letting them out. Unlike immigrants who are arrested by ICE while living in the United States, many

DHS684
AR684

Border: The migration crisis and the Trump administration's response, explained - Vox     Page 11 of 18

Case 1:20-cv-00116-ESS   Document 85   Filed 03/27/20   Page 581 of 1770
Case 1:19-cv-04019-SJF   Document 258   Filed 08/17/19   Page 14 of 179

newly arrived asylum seekers aren't familiar with the US, often speak neither English nor Spanish, and may not have appropriate clothing or funds for bus fare. They are usually released with instructions to check in with an ICE agent at a field office that could be states away. There are nonprofit organizations that can help acclimate families and get them to their destination, but that too requires advance notification and effort. When the government simply dumps people outside bus stations, they end up lost, cold, and confused.

## 6) Have the Trump administration's actions contributed to the crisis?

Trump and DHS officials say that "legitimate" asylum seekers ought to have no reason to enter illegally, and even attempted to ban people who crossed between ports of entry from seeking asylum. (The ban was quickly struck down in court). But since last summer, the administration has restricted asylum seekers trying to present themselves at ports of entry, allowing in only a fraction each day of the people who are waiting — a policy called "metering" or "queue management."



This Honduran woman and her children wait in one of the shelters in Tijuana for migrants trying to cross into the United States. Hundreds of migrants are waiting to be allowed to present themselves legally to claim asylum at the port of entry at San Ysidro. Under the Trump administration's "metering" policy, the wait has sometimes taken months.  | Mario Tama/Getty Images

Metering varies from port to port (see **this article** to read about the policy in depth), but at the most popular ports of entry, it's forced migrants to wait weeks or months before they can step onto US soil and exercise their right to claim asylum. Faced with such a wait — sometimes in dangerous Mexican border towns — it's logical that a migrant might choose to cross illegally to present their asylum claim instead.

As the number of people caught coming into the US between ports of entry illegally has spiked, the number of "inadmissible" migrants, who come to a port of entry and are found not to have valid legal status, has stayed flat. Many Trump critics point to metering as the root of the discrepancy — and accuse Trump of manufacturing a crisis by forcing people to cross illegally, then panicking when they do.

It's clear that at least some migrants are crossing illegally only because they can't cross legally, but it's extremely likely that the number of illegal entries would be climbing even without the metering policy.

There have always been many fewer asylum seekers coming to ports of entry than crossing between them. That's especially true in the Rio Grande Valley, which has been the epicenter of child and family migration for the past decade.

Where migrants cross into the US isn't usually their choice to make; it's the choice of the smuggler facilitating their arrival. The emergence of new drop-off points for large groups of migrants like Antelope Wells, New Mexico, and Lukeville, Arizona, isn't the result of democratic decision-making by migrants — those locations are the endpoints of smuggling routes. And they're between, not at, ports of entry.

### 7) Is Trump right that Mexico and the Northern Triangle countries aren't doing anything to stop migrants from reaching the US?

No.



Mexican soldiers help string wire across the border fence in Juarez — part of the Mexican government's broader cooperation with the Trump administration in deterring and interdicting migrants. | David Peinado/NurPhoto via Getty Images

Trump appears to be mad that Northern Triangle countries aren't doing more to stop their citizens from leaving, which is not a thing that governments are supposed to do under general human rights principles, and also, more to the point, not a thing that governments can do without a massive investment of time, personnel, and infrastructure. Trump is asking governments that can't even guarantee the safety and well-being of their citizens to monitor those citizens' whereabouts perfectly.

DHS-AR667

Guatemala, Honduras, and El Salvador have cooperated with the US on security measures; a new "compact" allowing joint policing operations between the four countries was signed by then-Homeland Security Secretary Kirstjen Nielsen and her Central American counterparts in April — shortly before Nielsen was fired.

The Mexican situation is more complicated. The Mexican government's brief expansion of humanitarian visas in December really did make it easier for Central Americans to enter and move through Mexico to the US, so it would make sense for the Trump administration to be mad at them over that.

But the Mexican government reversed its visa policy as soon as it became clear how many migrants were coming in. And since then, it's been extremely cooperative — even deferential — with the US.

Metering only works because of Mexican officials stopping asylum seekers before they can set foot on US soil. Under the "Migrant Protection Protocols," Mexican officials have allowed the US to force nearly 9,000 Central Americans to return to Mexico and wait for their asylum cases to be resolved.

In January, as a large caravan of migrants prepared to cross into a US port in Texas, a group of Mexican law enforcement officials surrounded them and detained them at an empty factory, letting out only a few a day to seek asylum; when unrest broke out at the factory, the asylum seekers were dispersed on buses to towns farther from the border.

On a couple of occasions, Mexican officials have even **deployed the military** to the isthmus connecting Mexico and Guatemala to "contain" migrants.

Trump administration officials not named Donald Trump generally acknowledge Mexico's cooperation, even if they say they'd like Mexico to do more. Trump himself, however, appears to be unshakable in the belief he's held since 2015: that the government of Mexico is at fault for anyone arriving in the US without papers.

Border: The migration crisis and the Trump administration's response, explained - Vox    Page 15 of 18

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 585 of 1770
Case 1:29-cv-04015-JSR   Document 25-8   Filed 08/27/19   Page 15 of 179

## 8) Will cutting off aid to the Northern Triangle countries help?

Almost certainly not.

It's not exactly clear what the parameters of the State Department's Saturday announcement that it was cutting off aid actually are — in particular, there seems to be confusion about whether it applies to contracts that have already been signed. But because the State Department (reportedly under pressure from the Office of Management and Budget, under Trump's acting Chief of Staff Mick Mulvaney) had been slow-walking aid from 2018, not to mention 2019, that's still hundreds of millions of dollars potentially lost.

Aid is traditionally seen as an important way to curb emigration, under the logic that people will be less likely to leave their countries if they're safer and more able to make a living there. (In practice, improving someone's financial situation can in the short term make them more likely to migrate, but security aid that reduces violence in a country has been shown to decrease emigration.)

Even Trump administration officials have endorsed this point of view — from former Homeland security secretary and Chief of Staff John Kelly, who bragged that the Trump administration was doing more than previous administrations to help the region, to CBP Commissioner Kevin McAleenan — now acting secretary of DHS — who responded to a previous Trump threat to cut off aid by **telling CBS** that the US needed to invest in Central America.



DHS-AR689

Border: The migration crisis and the Trump administration's response, explained - Vox    Page 16 of 18

Case 1:20-cv-00116-EGS  Document 85  Filed 08/27/20  Page 586 of 1770
Case 1:19-cv-04019-SSS  Document 258  Filed 08/15/19  Page 192 of 179



A father waits with his daughter to board a bus that will take them out of Honduras to Guatemala — and from there to Mexico and (possibly) the United States. According to some estimates, the number of Hondurans and Guatemalans apprehended at the US/Mexico border this year will reach almost 1 percent of those countries' populations. | Orlando Sierra/AFP/Getty Images

If the aid cutoff includes security aid, that would likely be immediately counterproductive, because it would make it much harder for the US to conduct anti-smuggling and anti-trafficking operations in the region — and much harder for the governments of the Northern Triangle countries to do that themselves.

The aid cutoff also threatens to damage the US-Mexico relationship. The López Obrador government has maintained a rhetorical commitment to a "Marshall Plan"-style investment in Central America — and the US's rhetorical agreement that such development was necessary helped justify Mexico's cooperation on immigration crackdowns. With the aid cutoff, the Trump administration is sending the message that it doesn't actually agree with Mexico's vision for the region — just as it ramps up pressure on Mexico to do more to target Central American migrants as a way to help Trump.

## 9) What are other solutions?

The answer to this question depends on what you see as the problem. Immigration hawks see it as too many people coming into the US without papers whose asylum claims won't ultimately prevail; immigration doves see the problem as the conditions in Central America that migrants are fleeing, and the conditions in which they're held while in the US.

There are plenty of ideas in the former category. The problem is that the ideas are not getting the support they would need to actually happen.

DHS-ICE
AR690

The US would like to get Mexico to sign a "safe third country" agreement that would allow the US to deny asylum to Central Americans, but Mexico has no interest in that. The Trump administration wants to get Congress to deport Central American children without hearings and override the court settlement that prevents long-term family detention, but House Democrats aren't biting. The White House wants to change the intentionally generous "credible fear" standard in asylum screening interviews so that fewer people are allowed to stay and apply for asylum (increasing the risk that legitimate asylum claimants will get returned to danger), but the legal concerns about that are so intense that it might have to purge generally like-minded officials from the Department of Homeland Security to carry out the plan.

In the latter category, it's easy to point to things that the administration should *stop* doing, like keeping families outdoors in cage-like holding pens. A humanitarian agenda could also include more case management outside of detention, to increase the odds that families show up to hearings, or even broader access to counsel in immigration proceedings (which isn't guaranteed under current law).

But it's not clear how much money the administration would need to invest in order to take proper care of the families coming in now, or how quickly that could be done — and it's not clear how many more families are going to come in the coming months.

The old consensus that the US needed to help address the "root causes" of migration, by investing in the Northern Triangle countries and making it more appealing for people to stay, was never supposed to be an immediate solution to anything. Of course, Trump's view of migration makes it less likely that anyone will be able to *start* work on long-term solutions that might bear fruit down the road. It is almost certainly, in the meantime, going to get worse before it gets better.

DHS-0001
AR0021

Border: The migration crisis and the Trump administration's response, explained - Vox    Page 18 of 18
Case 1:20-cv-00116-EGS   Document 85   Filed 08/27/20   Page 588 of 1770
Case 1:19-cv-04073-SF   Document 258   Filed 08/19/19   Page 19 of 179

EXPLAINERS

**The House just passed a $15 minimum wage. It would be the first increase in a decade.**

EXPLAINERS

**Trump's racist tirades against "the Squad," explained**

EXPLAINERS

**The controversy over whether the media should call Trump's racist tweets "racist," explained**

View all stories in Explainers



Federal Register

Vol. 84, No. 34

Wednesday, February 20, 2019

# Presidential Documents

Title 3—

The President

Proclamation 9844 of February 15, 2019

## Declaring a National Emergency Concerning the Southern Border of the United States

**By the President of the United States of America**

**A Proclamation**

The current situation at the southern border presents a border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency. The southern border is a major entry point for criminals, gang members, and illicit narcotics. The problem of large-scale unlawful migration through the southern border is long-standing, and despite the executive branch's exercise of existing statutory authorities, the situation has worsened in certain respects in recent years. In particular, recent years have seen sharp increases in the number of family units entering and seeking entry to the United States and an inability to provide detention space for many of these aliens while their removal proceedings are pending. If not detained, such aliens are often released into the country and are often difficult to remove from the United States because they fail to appear for hearings, do not comply with orders of removal, or are otherwise difficult to locate. In response to the directive in my April 4, 2018, memorandum and subsequent requests for support by the Secretary of Homeland Security, the Department of Defense has provided support and resources to the Department of Homeland Security at the southern border. Because of the gravity of the current emergency situation, it is necessary for the Armed Forces to provide additional support to address the crisis.

NOW, THEREFORE, I, DONALD J. TRUMP, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 201 and 301 of the National Emergencies Act (50 U.S.C. 1601 *et seq.*), hereby declare that a national emergency exists at the southern border of the United States, and that section 12302 of title 10, United States Code, is invoked and made available, according to its terms, to the Secretaries of the military departments concerned, subject to the direction of the Secretary of Defense in the case of the Secretaries of the Army, Navy, and Air Force. To provide additional authority to the Department of Defense to support the Federal Government's response to the emergency at the southern border, I hereby declare that this emergency requires use of the Armed Forces and, in accordance with section 301 of the National Emergencies Act (50 U.S.C. 1631), that the construction authority provided in section 2808 of title 10, United States Code, is invoked and made available, according to its terms, to the Secretary of Defense and, at the discretion of the Secretary of Defense, to the Secretaries of the military departments. I hereby direct as follows:

**Section 1**. The Secretary of Defense, or the Secretary of each relevant military department, as appropriate and consistent with applicable law, shall order as many units or members of the Ready Reserve to active duty as the Secretary concerned, in the Secretary's discretion, determines to be appropriate to assist and support the activities of the Secretary of Homeland Security at the southern border.

**Sec. 2**. The Secretary of Defense, the Secretary of the Interior, the Secretary of Homeland Security, and, subject to the discretion of the Secretary of Defense, the Secretaries of the military departments, shall take all appropriate

actions, consistent with applicable law, to use or support the use of the authorities herein invoked, including, if necessary, the transfer and acceptance of jurisdiction over border lands.

**Sec. 3**. This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this fifteenth day of February, in the year of our Lord two thousand nineteen, and of the Independence of the United States of America the two hundred and forty-third.

[FR Doc. 2019–03011
Filed 2–19–19; 8:45 am]
Billing code 3295–F9–P

DHSIFR838

## FACT SHEETS

# Our Nation's Weak Asylum Laws are Encouraging an Overwhelming Increase In Illegal Immigration

## IMMIGRATION

Issued on: November 1, 2018

**"We will not rest until our border is secure, our citizens are safe, and we finally end the immigration crisis once and for all."**

*President Donald J. Trump*

**MISUSED ASYLUM LAWS: Flaws in our asylum system allow illegal aliens with meritless claims to cross our borders and remain here for years.**

- Our Nation's asylum laws have allowed illegal aliens with meritless claims to easily enter and stay in the United States while awaiting legal proceedings.
- Asylum seekers at the border only have to meet the low bar for establishing a "credible fear" of returning under which they must show a "possibility" to qualify for asylum.
  - Aliens who claim a credible fear of returning do not have to provide any verification or corroboration of their claims in order to receive a positive determination and be released into the interior of the United States.
- As a result, illegal aliens with meritless cases that are released from detention are able to remain in our communities for years, while their cases are litigated in immigration courts.

**AN OVERWHELMING SURGE: Our country faces a growing and overwhelming surge of illegal aliens seeking to take advantage of our weak asylum laws.**

- Today, approximately one in 10 illegal aliens arriving at our southern border claims a credible fear of return, up from one out of every 100 prior to 2013.
  - Since 2010, these claims have spiked by 1,700 percent.

- o This staggering increase has contributed to a backlog of hundreds of thousands of cases in our immigration courts.
- This surge is only growing, with reports showing that asylum requests at the southern border have recently increased from 1,500 per week to approximately 2,000 per week.
- U.S. Citizenship and Immigration Services (USCIS) processed approximately 100,000 credible fear claims this last fiscal year (FY), surpassing the 94,000 record set in FY 2016.
  - o In FY 2018, USCIS received approximately 106,000 new asylum requests from those admitted legally, compared to only 25,500 in 2008.
  - o Immigration courts received approximately 160,000 asylum requests in FY 2018, compared to only 42,000 in FY 2008.

**A DRIVING FACTOR IN ILLEGAL IMMIGRATION: The standards that apply to the credible fear process is a major driver of our Nation's immigration crisis.**

- While there has been an enormous spike in credible fear-initiated claims, relatively few asylum claims have ultimately been found to be meritorious.
- Approximately 80 percent of aliens arriving from Guatemala, Honduras, and El Salvador passed initial credible fear screenings, but only 15 percent of those were granted asylum.
- There has been a major increase in the number of illegal alien family units arriving at our border and family units now make up a significant percentage of credible fear claims.
  - o The number of family units apprehended by U.S. Customs and Border Protection has increased 620 percent during the past five years.
  - o Family units make up about 40 percent of all credible fear-initiated asylum claims.
  - o As a result of loopholes, nearly all asylum seekers in family units are permitted by the Department of Homeland Security to remain in the United States, pending their asylum hearing.

# Remarks by President Trump on the Illegal Immigration Crisis and Border Security

Issued on: November 1, 2018

Roosevelt Room

4:19 P.M. EDT

THE PRESIDENT: Well, thank you very much, everyone. Appreciate it. And good afternoon. I would like to provide an update to the American people regarding the crisis on our southern border — and crisis it is.

Illegal immigration affects the lives of all Americans. Illegal immigration hurts American workers; burdens American taxpayers; and undermines public safety; and places enormous strain on local schools, hospitals, and communities in general, taking precious resources away from the poorest Americans who need them most. Illegal immigration costs our country billions and billions of dollars each year.

America is a welcoming country. And under my leadership, it's a welcoming country. We lead the world in humanitarian protection and assistance, by far. There's nobody even close. We have the largest and most expansive immigration programs anywhere on the planet.

We've issued 40 million green cards since 1970, which means the permanent residency and a path to citizenship for many, many people. But we will not allow our generosity to be abused by those who would break our laws, defy our rules, violate our borders, break into our country illegally. We won't allow it.

Mass, uncontrolled immigration is especially unfair to the many wonderful, law-abiding immigrants already living here who followed the rules and waited their turn. Some have been waiting for many years. Some have been waiting for a long time. They've done everything perfectly. And they're going to come in. At some point, they're going to come in. In many cases, very soon. We need them to come in, because we have companies coming into our country; they need workers. But they have to come in on a merit basis, and they will come in on a merit basis.

The communities are often left to bear the cost and the influx of people that come in illegally. We can't allow that.

There's a limit to how many people a nation can responsibly absorb into their societies. Every day, above and beyond our existing lawful admission programs, roughly 1,500 to 2,000 people try crossing our borders illegally. We do a very good job considering the laws are so bad. They're not archaic; they're incompetent. It's not that they're old; they're just bad. And we can't get any Democrat votes to change them. It's only the Republicans that are — in unison, they

want to change them. They want to make strong borders, want to get rid of any crime because of the borders, of which there's a lot.

And we've done a great job with the laws that we have. We're moving in tremendous numbers of people to get out the MS-13 gangs and others gangs that illegally come into our country. And we're getting them out by the thousands.

But this is a perilous situation, and it threatens to become even more hazardous as our economy gets better and better. A lot of the cause of this problem is the fact that we right now have the hottest economy anywhere in the world. It's doing better than any economy in the world. Jobs, unemployment — you look at any number.

Right now, we have more workers than any time in the history of our country. We have more people working, which is a tremendous statement. More people working than at any time in the history of our country. And people want to come in, and in some cases, they want to take advantage of that, and that's okay. And we want them to come in, but they have to come in through merit. They have to come in legally.

At this very moment, large, well-organized caravans of migrants are marching towards our southern border. Some people call it an "invasion." It's like an invasion. They have violently overrun the Mexican border. You saw that two days ago. These are tough people, in many cases. A lot of young men, strong men. And a lot of men that maybe we don't want in our country. But again, we'll find that out through the legal process.

But they've overrun the Mexican police, and they've overrun and hurt badly Mexican soldiers. So this isn't an innocent group of people. It's a large number of people that are tough. They've injured, they've attacked, and the Mexican police and military has actually suffered. And I appreciate what Mexico is trying to do.

So let me begin by stating that these illegal caravans will not be allowed into the United States, and they should turn back now, because they're wasting their time. They should apply to come into our country. We want them to come into our country very much. We need people to help us, with all of these companies that are coming in. We've never had anything like this. We have car companies coming in. We have Foxconn — so involved with the manufacturing of Apple products — coming in in Wisconsin. We have a lot of companies coming in, but they have to apply, and they have to be wonderful people that are going to love our country and work hard.

And we've already dispatched, for the border, the United States military. And they will do the job. They are setting up right now, and they're preparing. We hope nothing happens. But if it does, we are totally prepared. Greatest military anywhere in the world, and it's going to be, and is now, in great shape. No longer depleted like it was when I took over as the President of the United States.

The government of Mexico has generously offered asylum, jobs, education, and medical care for people within the caravan, but many members of the caravan have refused these offers, which demonstrate that these migrants are not legitimate asylum-seekers. They're not looking for

protection. Because if they were, they'd be able to get it from Mexico. Mexico has agreed to take them in and encouraged them to stay. But they don't want to stay; they want to come into the United States. So this is no longer safety, and asylum is about safety.

Asylum is not a program for those living in poverty. There are billions of people in the world living at the poverty level. The United States cannot possibly absorb them all. Asylum is a very special protection intended only for those fleeing government persecution based on race, religion, and other protected status.

These caravans and illegal migrants are drawn to our country by Democrat-backed laws and left-wing judicial rulings. We're getting rulings that are so ridiculous, so bad. They're writing the laws. Can't do that. Collectively known as — as an example, catch-and-release. It's a disgrace that we have to put up with it.

These policies lead to the release of illegal aliens into our communities after they've been apprehended. But we're not releasing anymore. Big change, as of a couple of days ago. We're going to no longer release. We're going to catch; we're not going to release. They're going to stay with us until the deportation hearing or the asylum hearing takes place. So we're not releasing them into the community.

We have millions of people that, over the years, have been released into the community. They never show up for the trials. They never come back. They're never seen again. And those people, they know who they are. And we know a lot of where they are, who they are. And those people will be deported, directly deported.

The biggest loophole drawing illegal aliens to our borders is the use of fraudulent or meritless asylum claims to gain entry into our great country. An alien simply crosses the border illegally, finds a Border Patrol agent, and using well-coached language — by lawyers and others that stand there trying to get fees or whatever they can get — they're given a phrase to read. They never heard of the phrase before. They don't believe in the phrase. But they're given a little legal statement to read, and they read it. And now, all of a sudden, they're supposed to qualify. But that's not the reason they're here.

This merely asserts the need for asylum, and then often released into the United States, and they await a lengthy court process. The court process will takes years sometimes for them to attend. Well, we're not releasing them into our country any longer. They'll wait for long periods of time. We're putting up massive cities of tents. The military is helping us incredibly well.

I want to thank the Army Corps of Engineers. They've been so efficient, so good, so talented. And we have thousands of tents. We have a lot of tents; we have a lot of everything. We're going to hold them right there. We're not letting them into our country. And then they never show up — almost. It's like a level of 3 percent. They never show up for the trial. So by the time their trial comes, they're gone. Nobody knows where they are. But we know where a lot of them are, and they're going to be deported.

There are now nearly 700,000 aliens inside the United States awaiting adjudication of their claims. Most of these people we have no idea how they got there, why they got there. And the number is actually going to be a much larger number as we look at all of the data. So if you look at just at a minimal number, it's the size of Vermont, or bigger. And the overall number could be 10 million people; it could be 12 million people; it could be 20 million people. The record keeping from past administrations has not exactly been very good.

As human smugglers and traffickers have learned how the game is played and how to game the system, we have witnessed a staggering 1,700 [percent] increase in asylum claims since the year 2010. They understand the law better than the lawyers understand the law. You have a lot of professionalism there. You have a lot of professionalism involved with setting up the caravans. You take a look at the way that's happening. Even the countries — you look at Honduras and El Salvador, and you look at what's happening at the different levels and different countries, and what's happening on the streets. There's a lot of professionalism taking place, and there seems to be a lot of money passing. And then, all of a sudden, out of the blue, these big caravans are formed and they start marching up. They got a long way to go.

On average, once released, an asylum case takes three and half years to complete. Think of it. Somebody walks into our country, reads a statement given by a lawyer, and we have a three-and-a-half-year court case for one person, whereas other people tell them, "Out. Get out. Just get out." Other countries — "Get out. We have a border. Get out."

We go through years and years of litigation because of the Democrats and the incompetent, very, very stupid laws that we have. They're the laughingstock all over the world, including the people that are marching up. They understand. But the difference is, we're not allowing them in, and we're not releasing, and we're not doing any of the things that were done for so many years that really are terrible for our country.

The overwhelming majority of claims are rejected by the courts, but by that time, the alien has usually long since disappeared into our country. So they never get to see the judge. They never get to have a ruling. They don't care because they're in the country and nobody knows where they are.

All told, there are approximately 1 million aliens who have received final orders of removal. They've actually got final orders of removal. You don't have to go to court anymore. The courts have already issued the orders of removal, and we've gotten a lot of them. But who remain at large in our country. So we've moving them out.

This endemic abuse of the asylum system makes a mockery of our immigration system, displacing legitimate asylum-seekers — and there are legitimate asylum-seekers — while rewarding those who abuse or defraud our system, which is almost everybody. Everybody is abusing it and just doing things to our system which were unthinkable, I'm sure even by the Democrats who were largely responsible for getting it done.

These individuals disrespect the foundations of American government by voluntarily choosing to break the law as their first act on American soil.

Furthermore, contained within this giant flow of illegal migration to our southwest border is the movement of illicit and deadly narcotics. It's in the southwest, most of it comes in. Nearly 100 percent of heroin in the United States enters through the southern border– think of that: 100 percent, almost, of heroin comes in through the southern border, along with roughly 90 percent of cocaine, and the majority of meth, and a substantial portion of the ultra-lethal fentanyl killing our youth. Fentanyl is killing our youth.

These drugs destroy the lives and kill much more than 70,000 Americans every single year. And the number goes up. It goes up and up and up, because we are so foolish with our laws that we allow this to happen. A death toll equivalent of the size of an entire American city every year. The current influx, if not halted, threatens to overwhelm our immigration system and our communities, and poses unacceptable dangers to the entire nation. We have to have our borders. Can't let drugs come in. Not just — it's not just people. It's people; it's drugs. It's human traffickers.

Human trafficking is now at the highest level in the world that it's ever been. And that's because of the Internet. Think of it — human trafficking. You think back 200 years, 500 years. Human trafficking — where they steal children; in many cases, women, unfortunately. They steal women. The human traffickers, the lowest scum on Earth. The lowest scum on Earth. And it's at a level that it's never been. Worldwide — never been at a level like this.

If these caravans are allowed into our country, only bigger and more emboldened caravans will follow. And you see that's what's happening now. We have one that's coming up, and it's being somewhat dissipated, as they march. But then other people are joining it. And then it gets bigger. And now, if you look back at Honduras, and if you look at El Salvador, other ones are solving and they're forming. They're forming. You have new ones that are forming. And we call it "caravan number two" is unbelievably rough people. Very, very hard for the military to stop it. Our military will have no problem. But very, very hard. Mexico is having a very, very hard time with it.

Once they arrive, the Democrat Party's vision is to offer them free healthcare, free welfare, free education, and even the right to vote. You and the hardworking taxpayers of our country will be asked to pick up the entire tab. And that's what's happening — medical and, in many cases, they've got some big medical problems before they get here.

No nation can allow itself to be overwhelmed by uncontrolled masses of people rushing their border. That's what's happening. They are rushing our border. They are coming up. And even before you get to the caravan, just on a daily basis, people coming in. And it's a very bad thing for our country. It's sad in many ways, but it's a very bad thing for our country. And again, costs us billions and billions and billions of dollars a year.

And I will therefore take every lawful action at my disposal to address this crisis. And that's what we're doing. The United States military, great people.

My administration is finalizing a plan to end the rampant abuse of our asylum system — it's abused — to halt the dangerous influx, and to establish control over America's sovereign

borders. We got borders. And once that control is set and standardized, and made very strong — including the building of the wall, which we've already started. $1.6 billion spent last year; $1.6 billion this year. We have another $1.6 [billion] that will be coming, but we want to build it at one time. All it does is turn people in a different direction if you don't. We want to build it at one time.

Under this plan, the illegal aliens will no longer get a free pass into our country by lodging meritless claims in seeking asylum. Instead, migrants seeking asylum will have to present themselves lawfully at a port of entry. So they're going to have to lawfully present themselves at a port of entry. Those who choose to break our laws and enter illegally will no longer be able to use meritless claims to gain automatic admission into our country. We will hold them — for a long time, if necessary.

The only long-term solution to the crisis, and the only way to ensure the endurance of our nation as a sovereign country, is for Congress to overcome open borders obstruction. That's exactly what it is: It's open border obstruction. No votes. You can come up with the greatest border plan, the greatest immigration plan. You won't get one vote from a Democrat. They have terrible policy. In many cases, they're terrible politicians. But the one thing I give them great credit for: They vote as a bloc. They stick together.

And we will end catch-and-release. We're not releasing any longer. We also must finish the job that we started by being strong at the border. When we're strong at the border, people will turn away and they won't bother. You will see, in a year from now, or in certainly a period of time from now, despite our very good economy, which some of them come for that — I can't blame them for that; you have to do it legally — but you will see that the numbers of people trying to get in will be greatly reduced.

But that can only happen if we're strong at the border. And the southern border is a big problem, and it's a tremendous problem for drugs pouring in and destroying our youth, and, really, destroying the fabric of our country. There's never been a drug problem like we have today. And as I said, much of it comes from the southern border.

So in the meantime, I will fulfill my sacred obligation to protect our country and defend the United States of America. And this is a defense of our country. We have no choice. We have no choice. We will defend our borders, we will defend our country.

Thank you very much.

Q Mr. President, what happens to the children then? If you're ending catch-and-release, what happens to those children? Do they stay in these tent cities? Or what happens?

THE PRESIDENT: We're working on a system where they stay together. But I will say that, by doing that, tremendous numbers — you know, under the Obama plan, you could separate children. They never did anything about that. Nobody talks about that. But under President Obama, they separated children from the parents. We actually put it so that that didn't happen.

But what happens when you do that is you get tremendous numbers of people coming. It's almost like an incentive to — when they hear they're not going to be separated, they come many, many times over. But President Obama separated the children, the parents. And nobody complained. When we continued the exact same law, this country went crazy.

So we are going to continue and try to continue what we're doing. But it is a tremendous incentive for people to try. But it's going to be very, very hard for people to come into our country. So we think we'll be able to do that.

Q With the military, do you envision them firing upon any of these people?

THE PRESIDENT: I hope not.

Q Could you see the military (inaudible)?

THE PRESIDENT: I hope not. It's the military — I hope — I hope there won't be that. But I will tell you this: Anybody throwing stones, rocks — like they did to Mexico and the Mexican military, Mexican police, where they badly hurt police and soldiers of Mexico — we will consider that a firearm. Because there's not much difference, where you get hit in the face with a rock — which, as you know, it was very violent a few days ago — very, very violent — that break-in. It was a break-in of a country. They broke into Mexico.

And you look at what's happening in Guatemala, just to mention Guatemala, along with El Salvador and Honduras. It's disgraceful that those countries aren't able to stop this. Because they should be able to stop it before it starts.

And the United States pays them a fortune, and we're looking at not doing that anymore. Because why should we be doing that when they do nothing for us?

Jeff. Jeff, go ahead.

Q Mr. President, how is this plan going to be legal, considering the current law?

THE PRESIDENT: Oh, this is totally legal. No. This is legal. We are stopping people at the border. This is an invasion, and nobody is even questioning that.

Q But in terms of your plans to change asylum, are you going to do this via executive order?

THE PRESIDENT: No, no, you don't have to — you don't have to release. You have — you can hold. The problem is, to hold people, you need massive facilities. It's the most ridiculous thing I've ever heard. Another country says, "Sorry, you can't come in." With us, we take their name, take their phone number, take their everything, and say, "Good luck." Only because we don't have the facilities to hold people. But we're building the facilities now. We're building massive numbers of tents, and we will hold them in tents. But you don't have to release them. They released them only because they didn't have the facilities to hold them.

Q Mr. President, is there like an executive order that you're going to be releasing today?

THE PRESIDENT: Oh, we will be doing an executive order sometime next week, yes.

Q (Inaudible) executive order dealing with ending catch-and-release and asylum?

THE PRESIDENT: It's going to end — it's going to be talking about everything. It'll be quite comprehensive. Many of the things we've talked about today.

Q Mr. President, so you're — so just to clarify, you are speaking of, in the tents, these family units that would arrive (inaudible) the children?

THE PRESIDENT: Well, we have other facilities also. But what's happened is we are holding so many facilities — so many people that our facilities are being overrun. They're being overrun. And we are putting up temporary facilities. Eventually, people won't be coming here anymore when they realize they can't get through.

Q So they will hold the children in those tents with their parents?

THE PRESIDENT: We will be holding the family and the children together. Remember this: President Obama separated children from families. And all I did was take the same law, and then I softened the law. But by softening the law, many people come up that would not have come up if there was separation.

Q Mr. President, what do you say to the critics who think this is a political thing before the midterms?

THE PRESIDENT: There's nothing political about a caravan of thousands of people, and now others forming, pouring up into our country. We have no idea who they are. All we know is they're pretty tough people when they can blast through the Mexican military and Mexican police. They're pretty tough people. Even Mexico said, "Wow, these are tough people." I don't want them in our country. And women don't want them in our country. Women want security. Men don't want them in our country. But the women do not want them. Women want security. You look at what the women are looking for. They want to have security. They don't want to have these people in our country. And they're not going to be in our country. It's a very big thing.

Yes.

Q Mr. President, when you talk about finalizing a plan to end asylum, is this a plan that would be included in that executive order?

THE PRESIDENT: Oh, no, people are going to have a chance to go for asylum. But if you look at the records, not very many people are allowed to stay once they go to court. But what happens is they'd go into — they were using asylum — first of all, they were told what to say by lawyers

and others. "Read this statement." You read the statement, and now you're seeking asylum. The whole thing is ridiculous. And we won't put up with it any longer.

Q President Trump, U.S. law and international law says that people who have valid claims have a right to seek asylum.

THE PRESIDENT: That's right.

Q So why would — why would they be —

THE PRESIDENT: Well, they're going to go to court. They're going to go to court, as crazy as it sounds. They're going to go —

Q But the law say that they don't — they're not —

THE PRESIDENT: Excuse me. Excuse me. Ready? They're going to go to court, and a judge is going to determine. But usually, when they go to court, they're deported. It just seems that most of the people are deported once they go. The problem is they never end up going to court, because when they come in, they're told to come back in a year, for a court case, and they disappear into the United States never to be seen again.

But we're going to be —

Q But the current laws doesn't say about holding people in tent cities.

THE PRESIDENT: And they're given deportation notices. We will be deporting those people.

Q Mr. President, you're saying rocks are — rock-throwing, like happened in Mexico, will be considered —

THE PRESIDENT: We will consider that the maximum that we can consider that, because they're throwing rocks viciously and violently. You saw that three days ago. Really hurting the military. We're not going to put up with that. If they want to throw rocks at our military, our military fights back. We're going to consider — and I told them, consider it a rifle. When they throw rocks like they did at the Mexico military and police, I say, consider it a rifle.

Jeff?

Q A separate topic, sir. Did you offer Heather Nauert the job of U.N. Ambassador?

THE PRESIDENT: Well, she's under very serious consideration. She's excellent. She's been with us a long time. She's been a supporter for a long time. And she's really excellent. So she's under very serious — we'll probably make a decision next week. We have a lot of people that want the job, and there are a lot of really great people. But we'll be talking about that next week sometime.

Q Did you see Oprah Winfrey's comments today?

THE PRESIDENT: I didn't. What did she say?

Q She was campaigning in Georgia at the same time that Vice President Pence was.

THE PRESIDENT: At the same time as who?

Q Excuse me, at the same time Vice President Pence was, encouraging people to vote and —

THE PRESIDENT: Well, that's okay. I mean, I was on Oprah's last week — the last week of her show. Oprah liked me very much. I've always liked Oprah. You know, Oprah is good. But the woman that she's supporting is not qualified to be the governor of Georgia, by any stretch of the imagination.

And I'll be in Georgia the next few days — the next few days — and we have a tremendous — around Macon — we have a tremendous crowd already. Nobody has a crowd like we have because people want to see a great governor of Georgia. And I think Brian is going to be a great governor of Georgia. I think he'll be a fantastic governor. He's totally qualified.

She is not qualified to be the governor of Georgia. She's not qualified. And Georgia is a great state —

Q Why is she not qualified?

THE PRESIDENT: — it's a great, great state. Take a — take a look. Take a look at her past. Take a look at her history. Take a look at what she wants to do and what she has in mind for the state. That state will be in big, big trouble very quickly. And the people of Georgia don't want that.

Question?

Q Mr. President, really quickly, just on election integrity? Can you say for a fact that our elections are secure next week? What can you tell us?

THE PRESIDENT: Yeah, yeah. I just met with — I just met with the FBI, with Chris; and the Justice Department; and with Secretary Nielsen. And they've spent a lot of time and effort and some money on making sure that everything with respect to the election coming up in five days is going to be perfect and safe. There will be hopefully no meddling, no tampering, no nothing. And we spent a lot —

Now President Obama had the chance to do that in September before '16, but he chose not to do that because he thought Hillary Clinton was going to win. And while everybody agrees it didn't affect the vote at all, nevertheless he could have done things that probably would have made it a little more obvious, a little clearer. But he was told by the FBI in September before the election

in '16 about potential meddling or potential Russian meddling, and he did nothing about it. He didn't do that because he thought that Hillary Clinton would win.

All right, one more.

Q Are you optimistic that you can still get the continuing resolution through December 7th for Homeland Security funded, even if the Democrats take the House?

THE PRESIDENT: I think if — I think we're going to do very well in the election, I must tell you. If you look at the races, if you look at the Senate, which is very important, obviously. I'm leaving today; I'll be in Missouri. And I'll be touching down at a number of places over the next five days. But I think we're doing very well in the Senate, and I think we're doing very well in the House.

The only problem is, with the House, there's so many people. I'd like to stop for every one of them, but there's so many people. But I think we're doing very well in the House. I think people want to see strong borders. I think they want to see security. They want to see good healthcare. They want to see the things that we're providing. They don't want to have their taxes increased. We're decreasing their taxes.

We just announced yesterday, you probably heard — Kevin Brady put it out — a reduction of tax. We're going for a reduction of middle-income tax or 10 percent. The Democrats want to, I mean, double up your taxes. In some cases, you'll have to pay three times what you're paying right now in order to get bad healthcare.

And so what we're doing is something that I think the people want, and I think we're going to do very well in the election, even though history says that whoever President it — whoever the President may be, it trends the other way. It certainly does seem that way.

But nobody has ever been President that has the greatest economy in the history of our country. This is the greatest economy in the history of our country. These are the greatest unemployment and employment numbers in the history of our country. Nobody has ever had that to campaign with. So I do.

Thank you all very much. I appreciate it. Thank you.

END

4:51 P.M. EDT

# AGREEMENT
## BETWEEN
## THE GOVERNMENT OF THE UNITED STATES OF AMERICA
## AND
## THE GOVERNMENT OF THE REPUBLIC OF GUATEMALA
## ON COOPERATION REGARDING THE EXAMINATION OF PROTECTION CLAIMS

THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE REPUBLIC OF GUATEMALA, hereinafter referred to individually as "Party" or collectively "the Parties".

CONSIDERING that Guatemala regulates its relations with other countries in accordance with international principles, rules and practices, with the purpose of contributing to the maintenance of peace and freedom, the respect and defense of human rights, and the strengthening of democratic processes and international institutions that guarantee the mutual and equitable benefit among the states. On the other hand, Guatemala will maintain relations of friendship, solidarity and cooperation with those states whose economic, social and cultural development is analogous to that of Guatemala, such as the right of people to migrate and their need for protection.

WHEREAS Guatemala currently incorporates a dynamic immigration law into its domestic legislation, which requires Guatemala to recognize the right of every person to emigrate or immigrate, thereby allowing any migrant to enter, remain, transit, leave and return to its territory in accordance with its domestic laws. Likewise, in situations not provided for by domestic legislation, the norm that most favors the migrant must be applied. As such, temporary shelter and care should be given to those who wish to enter Guatemala legally. For the above reasons it is necessary to promote cooperation agreements with other states that uphold the same values outlined in Guatemala's migration policy, which is regulated by the National Migration Authority.

CONSIDERING that Guatemala is a party to the 1951 Convention relating to the Status of Refugees, done at Geneva on July 28, 1951 (the "1951 Convention") and the Protocol Relating to the Status of Refugees, done at New York on January 31, 1967 (the "1967 Protocol"), to which the United States of America is a party and reaffirming the obligation of the Parties to provide protection to refugees who meet the requirements and who are physically in their respective territories, in accordance with their obligations under those instruments and subject to the respective laws, treaties, and declarations of the Parties.

RECOGNIZING, in particular, the obligation of the Parties to comply with the principle of non-refoulement, as outlined in the 1951 Convention and the 1967 Protocol, as well as the Convention against Torture and Other Treatment or Cruel, Inhuman or Degrading Penalties, signed in New York on December 10, 1984 (the "Convention against Torture"), subject to the Parties respective reservations, understandings, and declarations and reaffirming their respective obligations to promote and protect human rights and fundamental freedoms consistent with their international obligations;

RECOGNIZING and respecting the obligations of each Party in accordance with its domestic laws

and policies, and international agreements and arrangements;

UNDERSCORING that the United States and Guatemala offer refugee protection systems that are consistent with their obligations under the 1951 Convention and/or the 1967 Protocols;

DETERMINED to maintain the status of refuge or equivalent temporary protection, as an essential measure of the protection of refugees or asylees, and at the same time wishing to prevent fraud in the refugee or asylum application process –an action that undermines its legitimate purpose– and determined to strengthen the integrity of the official process for requesting asylum or refugee status as well as public support for said processes;

AWARE that the distribution of responsibility for requests for protection must guarantee in practice, that people in need of protection be identified and that violations of the basic principle of non-refoulement be avoided; and, therefore, committed to safeguarding for each applicant the status of refuge or asylum that meets the required conditions, access to a full and fair procedure for the determination of their claim;

AGREE to the following:

## ARTICLE 1

For the purposes of this Agreement:

1. "Request for Protection" refers to the request of a person of any nationality, to the government of one of the Parties to receive protection in accordance with their respective institutional obligations derived from the 1951 Convention, the 1967 Protocol or the Convention against Torture, and in accordance with the respective laws and policies of the Parties, enforcing compliance with said international obligations; as well as to receive any other type of equivalent temporary protection available under the migration law of the receiving party.

2. "Protection Applicant" refers to any person who submits a request for protection in the territory of one of the Parties.

3. "System to Determine Protection" refers to the set of policies, laws, administrative and judicial practices that the Government of each Party uses to make a decision on requests for protection.

4. "Unaccompanied Minor" refers to an applicant for protection who has not reached the age of eighteen (18) and whose parent or legal guardian is not present or available to provide care and physical custody in the United States, or in Guatemala, where the unaccompanied minor is located.

5. In the case of Guatemala immigration, law and migration policy refers to the rights of persons to enter, remain, transit and leave its territory in accordance with its domestic laws

and international agreements and arrangements, and immigration stay means the authorized period of time according to the immigration status granted to individuals.

## ARTICLE 2

This Agreement does not apply to applicants for protection who are citizens or nationals of Guatemala; or stateless individuals habitually residing in Guatemala.

## ARTICLE 3

1.  To ensure that protection applicants transferred to Guatemala by the United States have access to a system to determine protection, Guatemala will not return or expel applicants for protection in Guatemala, unless the application is abandoned by the applicant or is formally rejected through an administrative decision.

2.  During the transfer process, the persons subject to this Agreement will be the responsibility of the United States until the transfer process is completed.

## ARTICLE 4

1.  The responsibility for determining and concluding requests for protection within its territory shall rest with the United States, when the United States establishes that that person:

    a. is an unaccompanied minor; or

    b. has arrived in the territory of the United States:

        i. with a validly-issued visa or other valid admission document, other than a transit visa, issued by the United States; or

        ii. without the United States requiring him to obtain a visa.

2.  Notwithstanding paragraph 1 of this article, Guatemala will evaluate the request for protection on an individual basis, in accordance with what is established and authorized by the competent authority on immigration matters in its migration policies and laws and in its territory, of persons who meet the appropriate requirements under this Agreement and who arrive in the United States at a port of entry or between ports of entry, on or after the effective date of this Agreement. Guatemala will evaluate the request for protection, in keeping with the Initial Implementation Plan and the standard operating procedures referenced in Article 7.1 and 7.5.

3.  The Parties shall apply this Agreement with respect to unaccompanied minors, in accordance with their respective domestic laws.

4.  The Parties shall have procedures in place to ensure that the transfers from the United States to Guatemala of the persons covered by this Agreement are compatible with their respective obligations, domestic and international laws, and migration policies.]

5.  The United States shall make the final decision that an individual qualifies for an exception under Articles 4 and 5 of this Agreement.

## ARTICLE 5

Notwithstanding any provision of this Agreement, any Party may, at its discretion, examine any request for protection that has been submitted to that Party when it decides that it is in the public interest to do so.

## ARTICLE 6

The Parties may:

1.  Exchange information when necessary for the effective implementation of this Agreement, subject to national laws and regulations. Such information will not be disclosed by the recipient country except in accordance with its national laws and regulations.

2.  The Parties may regularly exchange information regarding laws, regulations, and practices related to their respective systems to determine migration protection.

## ARTICLE 7

1.  The Parties shall develop standard operating procedures to assist in the implementation of this Agreement. These procedures shall incorporate provisions to notify Guatemala in advance of the transfer of any person pursuant to this Agreement. The United States will collaborate with Guatemala to identify the appropriate individuals to be transferred to Guatemala's territory.

2.  The operating procedures shall incorporate mechanisms to resolve disputes that respect the interpretation and implementation of the terms of this Agreement. Unforeseen cases that cannot be resolved through these mechanisms will be resolved through diplomatic channels.

3.  The United States plans to cooperate to strengthen the institutional capacities of Guatemala.

4.  The Parties agree to regularly evaluate this Agreement and its implementation to correct any deficiencies found. The evaluations will be carried out jointly by the Parties, the first within a maximum period of three (3) months from the date of entry into operation of the Agreement with following evaluations occurring by the same terms. The Parties may invite, by mutual agreement, other relevant organizations with specialized knowledge on the subject, to participate in the initial evaluation and/or cooperate for the implementation of this Agreement.

5. The Parties intend to complete an initial implementation plan, which will contain gradual steps, and address, among other things:  (a) procedures necessary to effectuate the transfer of individuals under this agreement; (b) the volume or number of individuals to be transferred; and (c) institutional capacity requirements.   The Parties plan to operationalize this Agreement upon the completion of a phased implementation plan.

## ARTICLE 8

1. This Agreement shall enter into force by means of an exchange of notes between the Parties indicating that each party has complied with the necessary domestic legal procedures for the Agreement to enter into force. For the term of two (2) years, renewable before its expiration with the exchange of diplomatic notes.

2. Any Party may terminate this Agreement by giving written notice to the other Party three (3) months in advance.

3. Any Party may, immediately after notifying the other Party in writing, suspend for an initial period of up to three (3) months the implementation of this Agreement. This suspension may be extended for additional periods of up to three (3) months, by means of written notification to the other Party. Any Party may, with the written consent of the other, suspend any part of this Agreement.

4. The Parties may in writing, by mutual agreement, make any modification or addition to this Agreement. These shall enter into force in accordance with the relevant legal procedures of each Party and the amendment or addition shall constitute an integral part of this Agreement.

5. Nothing in this Agreement shall be construed in such a way as to oblige the Parties to disburse or obligate funds.

IN FAITH WHEREOF, the undersigned, duly authorized by their respective governments, sign this Agreement.

SIGNED on the 26 day of July of the year 2019 in the English and Spanish languages, with both texts being authentic.

| FOR THE GOVERNMENT OF THE UNITED STATES OF AMERICA: | FOR THE GOVERNMENT OF THE REPUBLIC OF GUATEMALA: |
|---|---|
| Kevin K. McAleenan | Enrique A. Degenhart Asturias |
| Acting Secretary of Homeland Security | Minister of Government |

DHSIFR856

Decision Document

Joint DHS-DOJ Interim Final Rule: *Implementing Bilateral and Multilateral Cooperation Agreements for Asylum Under the Immigration and Nationality Act*

_____   Approve submission of the final rule to the *Federal Register* for publication.

_____   Disapprove submission to the *Federal Register*.

_____   Modify per further instructions.

_____   Needs discussion.

_____   Date
**NOV 1 4 2019**

DHSIFR857

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**8 CFR Part 208**

[USCIS Docket No. USCIS–2019–0021]

RIN 1615–AC49

**DEPARTMENT OF JUSTICE**

**Executive Office for Immigration Review**

**8 CFR Parts 1003, 1208, and 1240**

[EOIR Docket No. 19–0021; A.G. Order No. 4581–2019]

RIN 1125–AA98

**Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act**

**AGENCY:** Executive Office for Immigration Review, Department of Justice; U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Interim final rule; request for comment.

**SUMMARY:** The Department of Justice ("DOJ") and the Department of Homeland Security ("DHS") (collectively, "the Departments") are adopting an interim final rule ("IFR" or "rule") to modify existing regulations to provide for the implementation of Asylum Cooperative Agreements ("ACAs") that the United States enters into pursuant to section 208(a)(2)(A) of the Immigration and Nationality Act ("INA" or "Act"). Because the underlying purpose of section 208(a)(2)(A) is to provide asylum seekers with access to only one of the ACA signatory countries' protection systems, this rule adopts a modified approach to the expedited removal ("ER") and section 240 processes in the form of a threshold screening as to which country will consider the alien's claim. This rule will apply to all ACAs in force between the United States and countries other than Canada, including bilateral ACAs recently entered into with El Salvador, Guatemala, and Honduras in an effort to share the distribution of hundreds of thousands of asylum claims. The rule will apply only prospectively to aliens who arrive at a U.S. port of entry, or enter or attempt to enter the United States between ports of entry, on or after the effective date of the rule.

**DATES:**
*Effective date:* This rule is effective November 19, 2019.

*Submission of public comments:* Comments must be submitted on or before December 19, 2019.

**ADDRESSES:** You may submit comments, identified by Docket Numbers USCIS–2019–0021 and EOIR Docket No. 19–0021, through the *Federal eRulemaking Portal: http://www.regulations.gov.* If you cannot submit your material by using *https://www.regulations.gov,* contact the person in the **FOR FURTHER INFORMATION CONTACT** section of this document for alternate instructions.

**FOR FURTHER INFORMATION CONTACT:**
*USCIS:* Andrew Davidson, Chief, Asylum Division, Refugee Asylum and International Operations, U.S. Citizenship & Immigration Services, 20 Massachusetts Avenue NW, Suite 1100, Washington, DC 20529–2140; Telephone (202) 272–8377 (not a toll-free call).

*EOIR:* Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041; Telephone (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

**I. Public Participation**

Interested persons are invited to participate in this rulemaking by submitting written data, views, or arguments on all aspects of this rule. The Departments also invite comments that relate to the potential economic or federalism effects that might result from this rule. To provide the most assistance to the Departments, comments should reference a specific portion of the rule; explain the reason for any recommended change; and include data, information, or authority that supports the recommended change. Comments received will be considered and addressed in the process of drafting the final rule.

All comments submitted for this rulemaking should include the agency names and Docket Numbers USCIS–2019–0021 and EOIR Docket No. 19–0021. Please note that all comments received are considered part of the public record and made available for public inspection at *https://www.regulations.gov.* Such information includes personally identifiable information (such as a person's name, address, or any other data that might personally identify that individual) that the commenter voluntarily submits.

**II. Executive Summary**

The Departments are adopting an interim final rule to modify existing

regulations to provide for the implementation of agreements that the United States enters into pursuant to section 208(a)(2)(A) of the INA. 8 U.S.C. 1158(a)(2)(A). Such agreements—referred to by the Departments as Asylum Cooperative Agreements and alternatively described as safe third country agreements in existing regulations—are formed between the United States and foreign countries where aliens removed to those countries would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection.[1] In certain circumstances, an ACA, in conjunction with section 208(a)(2)(A), bars an alien subject to the agreement from applying for asylum in the United States and provides for the removal of the alien, pursuant to the agreement, to a country that will provide access to a full and fair procedure for determining the alien's protection claim. Removal pursuant to these agreements will be ordered within ER proceedings or, in certain instances, within INA section 240 removal proceedings. But because the underlying purpose of section 208(a)(2)(A) is to provide asylum seekers with access to only one of the ACA signatory countries' protection systems, this rule adopts a modified approach to the ER and section 240 processes in the form of a threshold screening as to which country will consider the alien's claim. This rule will apply to all ACAs between the United States and countries other than Canada. In 2002, the United States and Canada entered into a bilateral ACA, titled the "Agreement Between the Government of the United States and the Government of Canada for Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries," which the Departments implemented by regulation in 2004.

Although various recent regulatory reforms have reduced the burdens associated with adjudicating asylum claims (and others hold out promise to do so should injunctions on their implementation be lifted), the U.S. asylum system remains overtaxed. Hundreds of thousands of migrants have reached the United States in recent years and have claimed a fear of persecution[2] or torture. They often do

---

[1] For ease of reference, this rule refers to an asylum claim in the third country as alternatively encompassing "equivalent temporary protection" consistent with INA section 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A).

[2] "Fear of persecution" as used in this document describes persecution "on account of race, religion, nationality, membership in a particular social

not ultimately establish legal qualification for such relief or even actually applying for protection after being released into the United States, which has contributed to a backlog of 987,198 cases before the Executive Office for Immigration Review (including 474,327 asylum cases), each taking an average of 816 days to complete. Asylum claims by aliens from El Salvador, Guatemala, and Honduras account for over half of the pending asylum cases.

To help alleviate those burdens and promote regional migration cooperation, the United States recently signed bilateral ACAs with El Salvador, Guatemala, and Honduras in an effort to share the distribution of asylum claims.[3] Pending the Department of State's publication of the ACAs in the United States Treaties and Other International Agreements series in accordance with 1 U.S.C. 112a, the agreements will be published in a document in the **Federal Register**. This rule will establish the authority of DHS asylum officers to make threshold determinations as to whether aliens are ineligible to apply for asylum under those three ACAs, and any future ones, in the course of ER proceedings under section 235(b)(1) of the Act, 8 U.S.C. 1225(b)(1), once the agreements enter into force. As a practical matter, this rule will also establish the authority of immigration judges ("IJs") to make such determinations in the context of removal proceedings under INA section 240, 8 U.S.C. 1229a. To the extent that an alien in ER proceedings is rendered ineligible to apply for asylum by more than one ACA, the immigration officer will assess which agreement is most appropriately applicable to the alien. Immigration officers may exercise discretion in making such determinations as authorized by the Secretary of Homeland Security ("Secretary") via field guidance. To the extent that an alien in section 240 proceedings is rendered ineligible to apply for asylum by more than one ACA, the immigration judge shall enter alternate orders of removal to each country that is a signatory to an applicable ACA. DHS immigration officers may exercise discretion when selecting from among the alternate orders, again, as authorized by the Secretary via field guidance. The rule will apply only prospectively to aliens who arrive at a U.S. port of entry, or enter or attempt to enter the United States between ports of entry, on or after the effective date of the rule.

## III. Purpose of This Interim Final Rule

Asylum is a discretionary immigration benefit that generally can be sought by eligible aliens who are physically present or arriving in the United States. *See* INA 208(a)(1), 8 U.S.C. 1158(a)(1). Throughout the past decade, the United States has experienced a significant increase in the number of aliens encountered at or near its borders, particularly the southern land border with Mexico, as described by the Departments' recent joint rule requiring certain aliens seeking to apply for asylum to have first applied for equivalent protection in at least one country through which they transited en route to the United States, *see* Asylum Eligibility and Procedural Modifications, 84 FR 33829, 33830 (July 16, 2019). This increase has been accompanied by a sharp increase in the number and percentage of aliens requesting asylum or claiming a fear of persecution or torture when apprehended or encountered by DHS. As noted by the third-country-transit rule, for example, over the past decade the percentage of aliens referred for credible fear interviews within ER proceedings jumped from approximately 5 percent to above 40 percent. *Id.* at 33830–31. The number of asylum cases filed with DOJ also rose sharply, more than tripling between 2013 and 2018. *Id.* at 33831. During that same period, the filing of affirmative asylum applications rose from 44,453 in 2013 to 106,147 in 2018.

This increase reflects high rises in both defensive asylum claims (*i.e.,* asylum claims raised after removal proceedings have begun) and affirmative asylum claims (*i.e.,* asylum claims raised apart from or before removal proceedings have begun). In Fiscal Year ("FY") 2018, 110,136 individuals in ER proceedings raised claims of persecution or torture and were referred for credible fear interviews (99,035 individuals) or reasonable fear interviews (11,101 individuals). These individuals, combined with individuals who filed for asylum while in INA section 240 removal proceedings, resulted in 114,532 defensive asylum applications filed with DOJ in FY2018. Additionally, in FY2018, 48,922 affirmative asylum applications were also referred to DOJ. By contrast, in FY2013, 43,768 individuals in ER proceedings raised claims of persecution or torture and were referred for credible fear interviews (36,035 individuals) or reasonable fear interviews (7,733 individuals). These individuals, combined with individuals who filed for asylum while in section 240 removal proceedings, resulted in 23,500 defensive asylum applications filed with DOJ in FY2013. Additionally, in FY2013, 19,963 affirmative asylum applications were also referred to DOJ.

This has led to a backlog that, as of October 11, 2019, included more than 476,000 asylum cases before DOJ's Executive Office for Immigration Review ("EOIR"). The backlog of affirmative asylum applications pending with USCIS sits at 340,810, as of the end of FY2019. Historically, only a small minority of the individuals claiming a fear of return on the basis of persecution or torture were ultimately granted asylum or had even applied for it. Indeed, over the years, many aliens who initially claimed a fear of return upon entry or arrival abandoned those claims altogether.

Immigration detention centers have often been pushed to capacity, making even temporary detention for arriving aliens difficult to sustain. Or aliens have been released into the interior of the country, after which they often fail to appear for their removal proceedings, or unlawfully abscond after receiving removal orders, becoming fugitives. To help ease some of the burden on the immigration detention system and to reduce the numbers of aliens illegally entering the country, the Administration has worked with Mexico to permit people attempting to enter the United States from Mexico on land to remain in Mexico while awaiting their removal proceedings, pursuant to section 235(b)(2)(C) of the INA, 8 U.S.C. 1225(b)(2)(C).

Arresting the significant number of aliens who illegally enter the United States or arrive at ports of entry without the necessary documents to enter the United States legally, and processing and adjudicating their fear of return claims for ER, and processing and adjudicating their asylum claims in removal proceedings under INA section 240, consumes a tremendous amount of resources within the Departments of Justice and Homeland Security. After surveilling and arresting aliens, DHS must devote significant resources towards detaining many aliens pending further proceedings, process (and in the context of ER) adjudicate their claims (which are subject to potentially multiple layers of review), and represent the United States during removal proceedings before EOIR.

The large number of aliens seeking relief in the United States also consumes substantial DOJ resources. Within DOJ, IJs adjudicate aliens' asylum claims in INA section 240

---

group, or political opinion." INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A).

[3] None of these agreements have yet entered into force.

proceedings, prosecutors and law enforcement officials must prosecute and maintain custody of aliens who violate Federal criminal law, and DOJ attorneys represent the United States in civil cases involving immigration and detention issues. Despite DOJ deploying 80% more immigration judges than in 2010, and completing nearly double the number of asylum cases in FY2018 as in FY2010, more than 476,000 asylum cases remain pending before the immigration courts. Further, immigration courts have an additional caseload that stems from cases that are not related to asylum. This significantly increased backlog is due in part to the sharp increase in the numbers of filed asylum applications. Between 2010 and 2018, there was a nearly nine-fold increase in defensive asylum cases and the number of affirmative asylum cases referred to EOIR more than doubled.

The large majority of fear of persecution or torture claims raised by those arrested at the southern border either have not led to actual claims for asylum or have been ultimately determined to be without legal merit. For example, in FY2018, 34,031 individuals who had received credible fear interviews before asylum officers were referred to DOJ for asylum hearings. Approximately 39%, or 13,369, of these individuals failed to file an asylum application, and thus abandoned their claims. Only 5,577 individuals were granted asylum, a number equal to 16.4% of all individuals referred to DOJ after credible fear interviews, or 27% of individuals who were referred to DOJ following a credible fear interview and filed an asylum application. The success rate declines when one looks at all asylum applications adjudicated by DOJ. In FY2018, 64,223 asylum applications were adjudicated by DOJ's immigration judges. Only 13,173, or 20.5%, were granted. The strain on the U.S. immigration system, and the wait times for aliens seeking to process legitimate claims through the U.S. asylum system, is extreme. This delay extends to the immigration court system, where cases involving related immigration and detention issues have caused significant docket backlogs.

In section 208(a)(2)(A) of the INA, 8 U.S.C. 1158(a)(2)(A), Congress provided a mechanism to help ease this strain on the immigration system by authorizing the Executive Branch to enter into agreements with other countries to distribute the burdens associated with adjudicating claims for asylum or equivalent temporary protection. Specifically, section 208(a)(2)(A) authorizes the Executive Branch to bar

an alien from applying for asylum in the United States where, pursuant to a bilateral or multilateral agreement, the alien may be removed to a third country (*i.e.,* a country other than the alien's country of nationality or last habitual residence, *see* INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A)), that affords the alien access to a full and fair procedure for determining claims for asylum or equivalent temporary protection. Consistent with the President's extensive foreign affairs authority, *see, e.g., Zivotofsky* v. *Kerry*, 135 S. Ct. 2076, 2084–94 (2015); *United States* v. *Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936) (emphasizing the President's extensive role representing U.S. interests in relations with foreign nations), section 208(a)(2)(A), by its terms, provides substantial flexibility to the Executive Branch in negotiating and implementing ACAs. *Accord* INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B) (authorizing the Attorney General and Secretary to "provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with this chapter"); *see also Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579, 635 (Jackson, J., concurring) ("When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate."); *id.* at 637 (observing that an exercise of federal affairs power "pursuant to an Act of congress would be supported by the strongest of presumptions and the widest latitude of judicial interpretation").

In contrast to statutory and regulatory bars providing that certain aliens are ineligible to *receive* asylum, *see, e.g.,* INA 208(b)(2)(A), (C), 8 U.S.C. 1158(b)(2)(A), (C), the ACA bar relates to whether an alien may even *apply* for asylum. Unlike the restrictions on asylum eligibility, application of the ACA bar does not involve an evaluation of whether an alien would ultimately receive asylum relief if able to apply, or even whether the alien has made a preliminary showing of a significant possibility that the alien would be eligible for asylum. Rather, section 208(a)(2)(A) bars an alien from applying for asylum in the United States when the following four requirements are satisfied: (i) The United States has entered into a requisite "bilateral or multilateral agreement"; (ii) at least one of the signatory countries to the agreement is a "third country" with respect to the alien; (iii) "the alien's life or freedom would not be threatened" in

that third country "on account of race, religion, nationality, membership in a particular social group, or political opinion"; and (iv) that third country provides aliens removed there pursuant to the agreement "access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection." [4] Even if all of these elements are satisfied, the Secretary nonetheless may determine in his discretion "that it is in the public interest for the alien to receive asylum in the United States." INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A).

This interim rule will amend DHS and DOJ regulations implementing section 208(a)(2)(A) to effectuate ACAs other than the agreement already formed with Canada in 2002 and implemented by regulation in 2004. *See* Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR 69480 ((Nov. 29, 2004) (DHS) Asylum Claims Made by Aliens Arriving from Canada at Land Border Ports-of-Entry, 69 FR 69490 (Nov. 29, 2004) (DOJ).

In particular, this rule will broaden the procedures (implemented in ER and INA section 240 proceedings) for determining whether an alien is subject to an ACA or within one of its exceptions to account for ACAs other than the U.S.-Canada Agreement. Additionally, this rule will establish a screening mechanism to evaluate whether an alien who would otherwise be removable to a third country under an ACA other than the U.S.-Canada Agreement can establish that it is more likely than not that he or she would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion, or would be tortured in that third country. This rule consequently will provide a general mechanism for implementation of all existing and future ACAs not previously implemented.[5] In sum, this

---

[4] Unaccompanied alien children, as defined by 6 U.S.C. 279(g), are categorically exempted from the ACA bar. *See* INA 208(a)(2)(E), 8 U.S.C. 1158(a)(2)(E).

[5] This interim rule leaves in place the regulatory structure specific to the U.S.-Canada Agreement so as to avoid disruption to long-standing processes and expectations concerning implementation of that agreement. This rule will allow for implementation of ACAs that have a broader scope of applicability than the U.S.-Canada Agreement and, consequently, provides for a more robust threshold screening mechanism for evaluating whether an alien is properly removed subject to an ACA other than the U.S.-Canada Agreement, which is narrowly directed to third country nationals seeking to enter the United States at a U.S.-Canada land border port of entry.

rule implements a screening mechanism to determine: (i) Whether an alien falls within the terms of a bilateral or multilateral ACA formed under section 208(a)(2)(A), other than the previously implemented U.S.-Canada Agreement, (ii) whether an alien within an ACA's plain terms nonetheless falls under one of the agreement's exceptions, and (iii) whether an alien within an ACA's scope but not subject to an exception nonetheless demonstrates that it is more likely than not that the alien's life or freedom would be threatened or the alien would be tortured in the third country.

ACAs entered pursuant to section 208(a)(2)(A) will be published in the **Federal Register**. Prior to implementation of an ACA, the Attorney General and the Secretary of Homeland Security ("Secretary") will evaluate and make a categorical determination whether a country to which aliens would be removed under such an agreement provides "access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection." INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A). Section 208(a)(2)(A) of the INA also requires a determination that an alien's life and freedom would not be threatened on account of a protected ground in a third country with which the United States has entered into an ACA. This rule effectuates such a determination via individualized threshold screening that provides an opportunity for an alien to establish fear of persecution in the third country to which he would be removed pursuant to an ACA.

The INA's ACA provision provides authority to pursue significant policy interests by entering into bilateral or multilateral agreements allowing for burden-sharing between the United States and other countries with respect to refugee-protection claims.

Consistent with this compelling policy aim, this interim rule is intended to aid the United States in its negotiations with foreign nations on migration issues. Specifically, the rule will aid the United States as it seeks to develop a regional framework with other countries to more equitably distribute the burden of processing the protection claims of the hundreds of thousands of irregular migrants who now seek to enter the United States every year and claim a fear of return. Addressing the eligibility for asylum of aliens who enter or attempt to enter the United States will better position the United States as it engages in ongoing diplomatic negotiations with Mexico and the Northern Triangle countries (El Salvador, Guatemala, and Honduras) regarding migration issues in general, and related measures employed to curtail the irregular flow of aliens into the United States.

## IV. Background and Legal Basis for Regulatory Changes

### A. DOJ and DHS Authority To Promulgate This Rule

The Attorney General and the Secretary publish this joint IFR pursuant to their respective authorities concerning asylum determinations. The Homeland Security Act of 2002 ("HSA"), Public Law 107–296, 116 Stat. 2135, as amended, created DHS and transferred to it many functions related to the execution of Federal immigration law. The Secretary was charged "with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens," INA 103(a)(1), 8 U.S.C. 1103(a)(1), and granted the power to take all actions "necessary for carrying out" his authority under the immigration laws, INA 103(a)(3), 8 U.S.C. 1103(a)(3).

The HSA thus transferred to DHS some authority to adjudicate asylum applications, including the authority to conduct "credible fear" interviews in the context of ER. INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B); *see also* HSA 451(b), 116 Stat. at 2196 (providing for the transfer of adjudication of asylum and refugee applications from the Commissioner of Immigration and Naturalization to the Director of the Bureau of Citizenship and Immigration Services). That authority has been delegated within DHS to USCIS. *See* 8 CFR 208.2(a), 208.30.

In addition, under the HSA, the Attorney General retained authority over individual immigration adjudications (including certain adjudications related to asylum applications) conducted within EOIR. *See* HSA 1101(a), 6 U.S.C. 521; INA 103(g), 8 U.S.C. 1103(g). IJs within DOJ continue to adjudicate all asylum applications made by aliens during the removal process, and they also review asylum applications referred by USCIS to the immigration court. *See* INA 101(b)(4), 240(a)(1), 8 U.S.C. 1101(b)(4), 1229a(a)(1); 8 CFR 1208.2(b), 1240.1(a). Additionally, the INA provides that "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." INA 103(a)(1), 8 U.S.C. 1103(a)(1).

This rule specifically concerns implementation of section 208(a)(2)(A) of the INA, 8 U.S.C. 1158(a)(2)(A), which generally provides that an alien may not apply for asylum if the Attorney General and the Secretary determine that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Secretary finds that it is in the public interest for the alien to receive asylum in the United States.

By operation of the HSA, the reference to "Attorney General" is understood to also encompass the Secretary, depending on whether the alien is in immigration proceedings before DHS or DOJ. Thus, determinations as to whether an alien's asylum application is barred by INA section 208(a)(2)(A), in conjunction with an ACA, fall within the scope of both DHS and DOJ authority, as each department bears responsibility for adjudicating asylum applications. In addition, section 208(d)(5)(B) of the INA authorizes the Secretary and the Attorney General to "provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with this chapter." 8 U.S.C. 1158(d)(5)(B); *see* Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR 10620, 10622 (Mar. 8, 2004) (DHS) (proposed rule) (relying in part on INA 208(d)(5)(B) to establish threshold screening for applicability of INA 208(a)(2)(A) in relation to the U.S.-Canada Agreement). This broad division of functions and authorities informs the background of this interim rule.

### B. Adjudication of Asylum Applications and the Section 208(a)(2)(A) Bar

Asylum is a form of discretionary relief under section 208 of the INA, 8 U.S.C. 1158. Under that provision, aliens applying for asylum must establish (i) that they meet the definition of a "refugee" set forth at INA 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A); (ii) that they are not subject to a bar to either applying for asylum or receiving asylum; and (iii) that they merit a favorable exercise of discretion. INA 208(a)–(b), 8 U.S.C. 1158(a)–(b).

### 1. Removal Under ER and INA Section 240 Proceedings

When aliens indicate an intention to apply for asylum, or express a fear of persecution or torture, or a fear of removal to their country in the context of ER proceedings, they are evaluated in ER proceedings by immigration officers through a credible fear interview designed to determine whether there is a significant possibility that the alien would be eligible for asylum, statutory withholding of removal, or protection under the regulations issued pursuant to legislation implementing the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), December 10, 1984, 1465 U.N.T.S. 84, S. Treaty Doc. No. 100–20 (1988). INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B), 8 CFR 208.30, 235.3(b)(4). Section 235(a)(3) of the INA provides that "[a]ll aliens . . . who are applicants for admission . . . shall be inspected by immigration officers." 8 U.S.C. 1225(a)(3). As part of initial inspections, immigration officers must assess whether an alien is inadmissible. Aliens who cannot establish "clearly and beyond a doubt" that they are "entitled to be admitted" will be examined for removal, as a matter of discretion, under the jurisdictional framework of either ER (if they are eligible)[6] or section 240 removal proceedings (or, in certain circumstances, other removal proceedings). *See* INA 235(b)(2)(A), 8 U.S.C. 1225(b)(2)(A) ("Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section [240]."); INA 235(b)(2)(B), 8 U.S.C. 1225(b)(2)(B) (providing that crewmen, stowaways, and aliens subject to ER need not receive section 240 hearings).

In the ER process, if a DHS immigration officer determines that an alien is inadmissible on one of two specified grounds, and meets certain other criteria, the alien generally must be "removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [section 208] or

a fear of persecution." INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i). If, however, such an alien "indicates either an intention to apply for asylum . . . or a fear of persecution" (or, by regulation, a fear of torture), the alien must instead be referred "for an interview by an asylum officer." INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii); *see also* 8 CFR 235.3(b)(4).

Generally, in that interview, the asylum officer determines whether the alien has "a credible fear of persecution or torture"—that is, whether there is a "significant possibility" that the alien could succeed on the merits of his or her claims for asylum, statutory withholding of removal, or protection under the CAT regulations. 8 CFR 208.30(d), (e)(2)–(3). If the officer makes a positive credible fear determination, the officer must refer the alien "for full consideration of [the alien's claim(s) for relief or protection] in proceedings under section 240 of the Act." *Id.* 208.30(f). If the asylum officer makes a negative determination, and a supervisory officer concurs, the asylum officer "shall order the alien removed," subject to review by an IJ at the request of the alien of the negative credible fear determination. *Id.* 208.30(g)(1)(i)–(ii).

Similarly, in section 240 removal proceedings, an IJ first determines whether the alien is inadmissible or deportable. *See* INA 240(c)(2)–(3), 8 U.S.C. 1229a(c)(2)–(3); 8 CFR 1240.8(a)–(c). If the IJ determines that the alien is inadmissible or deportable, the alien then bears the burden to demonstrate that he or she should receive any form of relief or protection from removal— *e.g.*, asylum. *See* INA 240(c)(4), 8 U.S.C. 1229a(c)(4); 8 CFR 1240.8(d). If the alien does so, the IJ grants the alien's application for relief or protection; if not, the IJ orders the alien removed, subject to potential review by the Board of Immigration Appeals ("BIA") and a federal court of appeals. *See* INA 240(c)(1), (5), 8 U.S.C. 1229a(c)(1), (5); INA 242, 8 U.S.C. 1252; 8 CFR 1003.1(b)(3), 1240.1(a)(1).

### 2. Removals to Third Countries Consistent With the ACA Provision of INA Section 208(a)(2)(A)

Directly upon an initial inadmissibility or deportability determination within either an ER proceeding or a section 240 proceeding, *see, e.g.*, INA 235(b)(1)(A)(ii), 240(c)(2)– (3), 8 U.S.C. 1225(b)(1)(A)(ii), 1229a(c)(2)–(3), section 208(a)(2)(A) authorizes an asylum officer or IJ to conduct a threshold screening to determine whether an alien is barred from applying for asylum in the United

States pursuant to an ACA, 8 U.S.C. 1158(a)(2)(A). This rule will provide a mechanism for the operation of these threshold screenings. Under this rule, an asylum officer or IJ will determine whether an alien is subject to an ACA, and, if so, in those instances in which the alien affirmatively states a fear of removal to a country that is a signatory to the agreement, whether the alien can affirmatively establish it is more likely than not that the alien would be persecuted or tortured in that country. If the alien is subject to the ACA but fails to demonstrate it is more likely than not that he or she would be subject to persecution on account of a protected ground or to torture in that country, the ER or section 240 proceeding would be completed without an adjudication of any claims relating to a fear of persecution or torture in the alien's home country.

Under this rule, however, an alien may voluntarily abandon his or her asylum claim prior to removal pursuant to an ACA, choosing instead to accept a removal order without pursuing any application for asylum. *Cf.* Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR 8 at 69482 (DHS) (noting that immigration officers can use their discretion to permit aliens subject to removal under ACAs to withdraw their applications for admission so that they do not face an admissibility bar to a subsequent admission to the United States). Further, application of an ACA remains within the discretion of the screening officer and DHS, which may conclude nonetheless that "it is in the public interest for the alien to receive asylum in the United States."[7] INA 208(a)(2)(A), 1158(a)(2)(A); *see* Asylum Claims Made by Aliens Arriving from Canada at Land Border Ports-of-Entry, 69 FR 10627, 10628 (DOJ) (proposed rule) (recognizing that "the United States Government may conclude, in its discretion, that it is in the public interest to allow an arriving alien to remain in the United States to pursue

---

[6] *See* INA 235(b)(1)(A), 8 U.S.C. 1225(b)(1)(A) (authorizing screening by immigration officers to determine whether aliens are eligible for ER because they are inadmissible for engaging in fraud or willful misrepresentation related to a visa, other documentation, or admission, or for falsely claiming U.S. citizenship, INA 212(a)(6)(C), 8 U.S.C. 1182(a)(6)(C), or not possessing valid entry documents, INA 212(a)(7), 8 U.S.C. 1182(a)(7)).

[7] As in the case of the U.S.-Canada Agreement, if there are unique considerations that the individual would like DHS to consider with respect to the "public interest" exception to application of an ACA, the individual should timely bring them to the officer's attention. *Cf.* Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR at 69483 (DHS) (noting that the Agreement's public interest exception is "best administered through operational guidance and on an individualized, case-by-case basis").

protection'' even if the alien is subject to an ACA and that this "discretionary determination is reserved to DHS").

Section 208(a)(1) generally establishes that "[a]ny alien who is physically present in . . . or who arrives in the United States . . . may apply for asylum." 8 U.S.C. 1158(a)(1). But section 208(a)(2) places limitations on those applications. Most of the section 208(a)(2) application limitations are procedural, such as the stipulation that asylum applications must generally be filed within one year of arrival in the United States. INA 208(a)(2)(B), 8 U.S.C. 1158(a)(2)(B). But section 208(a)(2)(A) provides a more substantive limitation—establishing that, in certain circumstances, an alien covered by an ACA is prohibited from applying for asylum in the United States.

Specifically, an alien's asylum application is barred if the following four conditions are satisfied: (i) The United States has entered "a bilateral or multilateral agreement" under which certain aliens may be removed—that is, an ACA; (ii) the alien is subject to the ACA, and one of the signatory countries is a "third country" with respect to the alien; (iii) "the alien's life or freedom would not be threatened" in that third country "on account of race, religion, nationality, membership in a particular social group, or political opinion"; and (iv) that third country will provide the alien with "access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection." INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A). The INA provides that "[n]o court shall have jurisdiction" to review any determination of the Attorney General or Secretary made under any of the provisions within section 208(a)(2). INA 208(a)(3), 8 U.S.C. 1158(a)(3).

3. Protection Screening With Respect to Removal to the Third Country

Where section 208(a)(2)(A) applies, it bars an alien from applying for asylum in the United States and authorizes the removal of the alien to a third country that will provide procedures for asylum or equivalent temporary protection in the place of the United States. This rule, however, provides that if an alien states a fear of persecution or torture in, or removal to, the third country, an asylum officer will determine whether "the alien's life or freedom would . . . be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion." INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A). The terms of section 208(a)(2)(A) do not specify the precise procedural mechanism by which the Attorney

General and Secretary must determine that an alien's life or freedom will not be threatened on account of a protected ground in the third country. As the relevant text of section 208(a)(2)(A) ("the alien's life or freedom not be threatened [in the third country] on account of race, religion, nationality, membership in a particular social group, or political opinion") mirrors the standard for protection contained in the INA's withholding-of-removal provision, INA 241(b)(3)(A), 8 U.S.C. 1231(b)(3)(A), this regulation adopts the burden of proof that applies in the withholding-of-removal context. And the withholding-of-removal provision has long been construed to call for a determination as to whether the alien can show that it is "more likely than not" that he or she would be persecuted on account of a protected ground in the country of removal. See INS v. Cardoza-Fonseca, 480 U.S. 421, 423 (1987); INS v. Stevic, 467 U.S. 407, 429–30 (1984); see also 8 CFR 1208.16(b)(2). Accordingly, under the threshold screening implemented by this rule, an alien will not be removed to a third country under INA section 208(a)(2)(A) if the alien establishes that it is more likely than not that the alien would be persecuted on account of a protected ground in that country.

The United States has undertaken certain *non-refoulement* (non-return) obligations under the 1967 Protocol relating to the Status of Refugees ("1967 Protocol"), which incorporates Articles 2–34 of the 1951 Convention relating to the Status of Refugees ("1951 Convention").[8] Article 33 of the 1951 Refugee Convention, as understood in U.S. law, generally precludes state parties from removing individuals to any country where their lives or freedom would be threatened on account of their race, religion,

nationality, political opinion, or membership in a particular social group. Consistent with these obligations, Congress has precluded removal of an alien to a third country under section 208(a)(2)(A) if "the alien's life or freedom would . . . be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. 1158(a)(2)(A).

The United States has also undertaken certain *non-refoulement* obligations under CAT, which are effectuated by DHS and DOJ regulations that prohibit the removal of an alien to a country where he or she would more likely than not be tortured. See 8 CFR 208.16(c), 1208.16(c).[9] Removing an alien to a third country pursuant to an ACA for consideration of the alien's protection claim in that country is consistent with U.S. obligations under CAT, in the absence of grounds for believing that the alien would be persecuted on account of a protected ground or tortured in the third country. See Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR at 10624 (DHS) (proposed rule) (explaining the interaction between CAT obligations and the application of the U.S.-Canada Agreement).

Congress enacted section 208(a)(2)(A) as a mechanism for countries to burden-share the responsibility for providing protection to refugees. Such agreements allocate responsibility between the United States and the third country with which it has formed an ACA whereby one country or the other (but not both) will bear responsibility for processing the asylum and other protection claims of refugees subject to the terms of the ACA. See id. at 10620 (explaining the legal authority for applying cooperative agreements rather than permitting applications for asylum or other relief in the United States); see also Asylum Claims Made by Aliens Arriving from Canada at Land Border Ports-of-Entry, 69 FR at 10628 (DOJ) (proposed rule) (providing that aliens subject to the U.S.-Canada Agreement are "not eligible to apply for asylum, withholding of removal, or protection under [CAT] in the United States"). The salient factor for the formulation and application of a section 208(a)(2)(A) agreement is whether the country sharing responsibility with the United States for refugee protection has laws and

---

[8] The United States is a party to the 1967 Protocol, but not the 1951 Convention. *Stevic*, 467 U.S. at 416 & n.9. The Protocol is not self-executing in the United States. *See Khan* v. *Holder*, 584 F.3d 773, 783 (9th Cir. 2009). But the United States has implemented Article 34 of the 1951 Convention—which provides that party states "shall as far as possible facilitate the assimilation and naturalization of refugees"—through the INA's asylum provision, section 208. *See Cardoza-Fonseca*, 480 U.S. at 441 (internal quotation marks omitted). As the Supreme Court has recognized, Article 34 is "precatory" and "does not require [an] implementing authority actually to grant asylum to all" persons determined to be refugees. *Id.* Thus, Congress's decision to bar certain classes of aliens from applying for asylum does not contravene Article 34. *See Garcia* v. *Sessions*, 856 F.3d 27, 42 (1st Cir. 2017) (Article 34 does not "preclude[ ] a contracting State from imposing a limitation on the eligibility of an alien to seek asylum"); *see also R–S–C–* v. *Sessions*, 869 F.3d 1176, 1188 (10th Cir. 2017) (similar); *Cazun* v. *U.S. Att'y Gen.*, 856 F.3d 249, 257 & n.16 (3d Cir. 2017) (similar).

[9] CAT is also not self-executing in the United States. *See Auguste* v. *Ridge*, 395 F.3d 123, 132 (3d Cir. 2005).

mechanisms in place that adhere to international treaty obligations to protect refugees. *See* Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims made in Transit and at Land Border Ports-of-Entry, 69 FR at 10620 (DHS) (proposed rule).

Accordingly, this interim rule provides that an alien who will potentially be subject to an ACA will be advised that he or she may be removed to a third country pursuant to a bilateral or multilateral agreement. If the alien affirmatively states a fear of removal to or persecution or torture in that third country, a DHS asylum officer will interview the alien to determine whether it is more likely than not that the alien would be persecuted on account of a protected ground or tortured in the third country. *See* 8 CFR 208.30. DOJ immigration judges will apply a similar procedure to determine whether a removal pursuant to an ACA cannot proceed because the individual has established that it is more likely than not that he or she would be persecuted on account of a protected ground or tortured in the third country. *See id.* 1240.11.

4. Additional Consequences of the Applicability of Section 208(a)(2)(A) to an Alien's Asylum Application

If an asylum officer or IJ determines that an alien is barred from applying for asylum under section 208(a)(2)(A), then the alien is also barred from applying for withholding of removal under section 241(b)(3)(A) of the INA, 8 U.S.C. 1231(b)(3)(A), and protection under the regulations implementing CAT. The purpose of section 208(a)(2)(A)—and an agreement between the United States and another country formed thereunder—is to vest "one country or the other (but not both) [with the] responsibility for processing" an alien's claims related to fear of persecution or torture in the alien's home country. Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR at 10620 (DHS) (proposed rule). That purpose would be defeated if, even when section 208(a)(2)(A) and an ACA made another country responsible for adjudicating an alien's asylum claim, the United States remained responsible for adjudicating his or her claims for withholding of removal and CAT protection. Moreover, even if the United States granted an alien's claims to withholding of removal or CAT protection, thereby eliminating

the possibility of removal to the alien's home country, "[n]othing . . . [would] prevent the [United States] from removing [the] alien to a third country"—including a country that is a signatory to an applicable ACA. 8 CFR 208.16(f), 1208.16(f). Because the alien could be removed to a third country pursuant to an ACA regardless of the eventual outcome of his or her withholding-of-removal or CAT protection claims, Congress cannot have intended to require DHS and DOJ to adjudicate those claims before effectuating such removal. *See* Asylum Claims Made by Aliens Arriving from Canada at Land Border Ports-of-Entry, 69 FR at 69492–93 (DOJ) (for similar reasons, concluding that, if the U.S.-Canada Agreement bars an alien from applying for asylum in the United States, the alien is also barred from applying for withholding of removal and CAT protection).

*C. Consistency With International Practice*

The INA's ACA provision embodies the policy aim of entering into bilateral or multilateral agreements to promote burden-sharing between the United States and other countries with respect to refugee protection. The U.S. efforts to formulate ACAs with foreign countries is in keeping with the efforts of other liberal democracies to formulate cooperative arrangements in which multiple countries agree to share the review of refugee claims for protection.

For example, in 1990, European countries adopted the Dublin Regulation in response to an asylum crisis as refugees and economic migrants fled communism at the end of the Cold War; it came into force in 1997. *See* Convention Determining the State Responsible for Examining Applications for Asylum Lodged in One of the Member States of the European Communities, 1997 O.J. (C 254). The United Nations High Commissioner for Refugees ("UNHCR") praised the Dublin Regulation's "commendable efforts to share and allocate the burden of review of refugee and asylum claims." UNHCR Position on Conventions Recently Concluded in Europe (Dublin and Schengen Conventions), 3 Eur. Series 2, 385 (1991). Now in its third iteration, the Dublin III Regulation sets asylum criteria and protocol for the European Union ("EU"). It instructs that asylum claims "shall be examined by a single Member State." Regulation (EU) No. 604/2013 of the European Parliament and of the Council of 26 June 2013, Establishing the Criteria and Mechanisms for Determining the Member State Responsible for

Examining an Application for International Protection Lodged in One of the Member States by a Third-Country National or a Stateless Person (Recast), 2013 O.J. (L 180) 31, 37.

UNHCR likewise generally has accepted the safe third country concept as consonant with international refugee law principles. UNHCR, *Legal Considerations Regarding Access to Protection and a Connection Between the Refugee and the Third Country in the Context of Return or Transfer to Safe Third Countries* (Apr. 2018), *available at http://www.refworld.org/pdfid/ 5acb33ad4.pdf.* According to UNHCR, "refugees do not have an unfettered right to choose their 'asylum country.'" *Id.* at 1 & n.1 (citing UNHCR, *Guidance Note on bilateral and/or multilateral transfer arrangements of asylum-seekers,* May 2013, para. 3(i), *http:// www.refworld.org/docid/ 51af82794.html;* UNHCR, *Summary Conclusions on the Concept of "Effective Protection" in the Context of Secondary Movements of Refugees and Asylum-Seekers (Lisbon Expert Roundtable, 9–10 December 2002),* Feb. 2003, para. 11, *http://www.refworld.org/ docid/3fe9981e4.html*). Instead, "[r]efugees may be returned or transferred to a state where they had found, could have found or, pursuant to a formal agreement, can find international protection. The 1951 Convention relating to the Status of Refugees and its 1967 Protocol do not prohibit such return or transfer."[10] *Id.* at 1.

*D. The U.S-Canada Agreement and Its Implementing Regulations*

Section 208(a)(2)(A) itself does not mandate a particular set of procedures for determining whether the section's requirements are satisfied—and thus whether an alien is barred from applying for asylum. The ample regulatory flexibility that section 208(a)(2)(A) affords the Departments has been utilized in the regulations implementing the U.S.-Canada Agreement.

In those regulations, the Attorney General and Secretary made an across-the-board determination that all aliens removed to Canada pursuant to the U.S.-Canada Agreement would have "access to a full and fair procedure" for adjudicating their asylum claims within the meaning of INA section 208(a)(2)(A). In reaching that across-the-board finding, the Departments clarified that

---

[10] Formal advisory opinions of UNHCR are not binding on the United States, but they have been recognized as useful aids in interpreting the 1951 Convention and 1967 Protocol. *See, e.g., INS v. Aguirre-Aguirre,* 526 U.S. 415, 427–28 (1999).

"harmonization of asylum laws and procedures is not a prerequisite to entering into responsibility-sharing arrangements" under INA section 208(a)(2)(A). Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR at 10620 (DHS) (proposed rule). Rather, "[t]he salient factor is whether the countries sharing responsibility for refugee protection have laws and mechanisms in place that adhere to their international obligations to protect refugees." *Id.*

In contrast to the categorical finding on the full-and-fair-procedure requirement in the 2004 rule, the implementing regulations for the U.S.-Canada Agreement call for individualized determinations as to whether an alien falls within the terms of the Agreement, and, if so, whether the alien qualifies for one of the Agreement's exceptions. Specifically, with respect to ER, the regulations provide that, when an alien seeks to apply for asylum, the asylum officer must first determine whether the alien falls within one of the classes generally subject to the Agreement—that is, "whether [the] alien arriv[ed] in the United States at a U.S.-Canada land border port-of-entry or in transit through the U.S. during removal by Canada." Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR at 69489 (DHS) (codified at 8 CFR 208.30(e)(6)). If so, the asylum officer must then determine whether "the alien [can] establish[] by a preponderance of the evidence that he or she qualifies for an exception under the terms of the Agreement"—including the exception applicable where certain DHS officials have determined that it is in the public interest for the alien to have his asylum claim heard in the United States. *Id.* (codified at 8 CFR 208.30(e)(6)(iii), (iii)(F)).

If the asylum officer determines that the alien is not subject to the Agreement, or meets an exception, the asylum officer proceeds to conduct a credible fear interview. *Id.* (codified at 8 CFR 208.30(e)(6)(ii)). But if the asylum officer determines that the alien is subject to the Agreement, and does not meet an exception, the asylum officer submits his or her findings to a "supervisory asylum officer." *Id.* (codified at 8 CFR 208.30(e)(6)(i)). If that supervisory officer concurs, the alien is barred from applying for asylum in the

United States. And if the alien is so barred, he or she can be removed to Canada without any further administrative review by an IJ or the BIA. Asylum Claims Made by Aliens Arriving From Canada at Land Border Ports-of-Entry, 69 FR at 69496 (DOJ) (codified at 8 CFR 1003.42(h)).

The regulations governing INA section 240 proceedings are similar. They require an IJ—after determining that an alien is inadmissible or deportable, but before assessing the merits of the alien's claims for asylum, withholding of removal, or protection under the regulations implementing CAT—to determine whether the U.S.-Canada Agreement "appl[ies] to the alien" and whether "[t]he alien qualifies for an exception to the Agreement." *Id.* at 69497 (codified at 8 CFR 1240.11(g)(2)(i)–(ii)). If the Agreement does not apply, or the alien meets an exception, the IJ assesses the alien's claims for relief as usual. *Id.* (codified at 8 CFR 1240.11(g)(1)). But if the Agreement applies, and the alien does not meet an exception, the IJ does not assess the merits of any potential statutory withholding-of-removal or CAT claim and instead may order the alien removed, with the proviso that the alien may apply for any other relief from removal for which the alien may be eligible. *Id.* (codified at 8 CFR 1240.11(g)(4)).

## V. Detailed Discussion of Regulatory Changes

### A. Summary of the New and Amended Regulatory Provisions and Their Import

Despite the existence of regulations effectuating the U.S.-Canada Agreement within the ER and INA section 240 frameworks, this rule is necessary because several of the current implementing regulations are specific to the U.S.-Canada Agreement, *see* Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR at 69480 (DHS) (proposed rule); *id.* at 69480 (DHS), and Canada is specially situated in a number of ways including its shared border with the United States. In addition, this rule provides for individualized screening of claims by aliens that they will face persecution or torture in the third country to which they would be removed pursuant to an ACA other than the U.S.-Canada Agreement.

The scope of the U.S.-Canada Agreement, and, consequently, the U.S.-Canada Agreement regulations, is limited to aliens arriving at ports of

entry along the U.S. border with Canada. In contrast, this generalized rule for the implementation of all ACAs (with countries other than Canada) will cover ACAs to the full extent permitted by section 208(a)(2)(A), which contains no limitation to only those aliens who have transited through the relevant third country or who arrive at ports of entry. To accommodate for the expanded applicability of the ACAs implemented under this current rule beyond the narrower class of aliens subject to the U.S.-Canada Agreement after traveling through Canada, this rule expands the threshold screening of aliens potentially subject to ACAs other than the U.S.-Canada Agreement. The rule gives aliens subject to an ACA an opportunity, during threshold screening, to establish that it would be "more likely than not" that the alien's life or freedom would be threatened in the third country on account of a protected ground or that the alien would be tortured in the third country. If DHS officers or IJs determine that an alien establishes such a fear by a preponderance of the evidence, the alien will not be removed to the third country pursuant to the ACA formed with that particular country. *Cf.* INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A) (eliminating the opportunity to apply for asylum in the United States "if the Attorney General [or Secretary] determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion," among other required determinations described elsewhere in this rule).

In contrast to many of the countries listed as potential countries of removal in section 241(b) of the INA, the third country to which an alien would be removed under an ACA is a country to which an alien does not necessarily have preexisting ties or any preexisting reason to fear persecution or torture. *Compare* INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A), *with* INA 241(b)(1)–(2), 8 U.S.C. 1231(b)(1)–(2). Moreover, unlike the countries to which aliens typically would be removed under section 241(b) of the INA, these third countries of removal would have pre-committed, per binding agreements with the United States, to provide access to a "full and fair procedure" for the alien to acquire "asylum or equivalent temporary

protection,'' INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A). Aliens subject to an ACA thus would have an avenue for protection in the third country of removal not necessarily available in an INA section 241(b) country of removal—a country that may not have entered a binding agreement to provide the alien procedures for requesting safe haven and that may have originally prompted the alien's flight and application for asylum.

This rule retains the existing regulations implementing the U.S.-Canada Agreement, while also crafting a new regulatory framework under which other ACAs will be implemented. Even though the regulatory framework for implementation of the new ACAs will differ in some significant respects from the earlier 2004 regulations, in part for the reasons described above, this rule also replicates several key aspects of implementation of the U.S.-Canada Agreement. First, as with the regulatory scheme for the U.S.-Canada Agreement, prior to implementation of an ACA subject to this rule, the Departments will make a generalized determination as to whether the third country grants asylum seekers ''access to a full and fair procedure'' within the meaning of INA 208(a)(2)(A). This finding is required by the text of section 208(a)(2)(A), and the Departments will make the ''full and fair'' third country determination separate and apart from the regulatory provisions provided for here, to address this threshold statutory element that must be satisfied before any section 208(a)(2)(A) bilateral or multilateral agreement is effectuated. Second, under this rule, there will be an individualized screening process within the preexisting ER and INA section 240 frameworks to evaluate whether an alien falls within the terms of an agreement and, if so, whether the alien nonetheless meets one of its exceptions. The statute also provides an exception to the terms of an ACA in the event that the Secretary determines in the Secretary's discretion that ''it is in the public interest for the alien to receive asylum in the United States.'' INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A). As under the U.S.-Canada Agreement, the public interest exception is to be applied on a case-by-case basis, as a matter of discretion, to permit certain individuals to pursue applications for asylum or withholding of removal in the United States, where the Secretary or his immigration officers ''find[] that it is in the public interest for the alien to receive asylum in the United States.'' *See* INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A); *cf.* 8 CFR 208.30(e)(6)(iii)(F). Application of the exception is ''solely within the discretion of DHS.'' Asylum Claims Made by Aliens Arriving from Canada at Land Border Ports-of-Entry, 69 FR at 10628, 10630 (DOJ) (proposed rule); *see also* INA 208(a)(3), 8 U.S.C. 1158(a)(3) (''No court shall have jurisdiction to review any determination of the Attorney General [or Secretary] under paragraph (2).'').

As with the regulations implementing the U.S.-Canada Agreement, this rule will implement the statutory requirements into its threshold screening mechanism for evaluating which aliens are barred from applying for asylum under an ACA. The applicability of any additional limitations on the categories of aliens subject to the terms of a particular ACA will also be assessed during the initial screening. If an ACA is determined to be applicable to an alien applying for asylum, and the alien does not demonstrate that his life or freedom will more likely than not be threatened in the third country, the immigration officer may proceed to order removal without consideration of asylum, withholding-of-removal, or CAT claims, analogous to the U.S.-Canada Agreement removal arrangements. *See* Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR at 69481 (DHS) (''[A] careful reading of the Act makes clear that credible fear interviews are not required for aliens subject to [ACAs].'').

The U.S.-Canada Agreement applies only to aliens who had arrived in the United States to seek asylum after traveling through Canada. However, the terms of section 208(a)(2)(A) do not limit the applicability of ACAs to aliens who have traveled through the third country in transit to the United States. Consequently, in contrast to the U.S.-Canada provisions, this rule provides that the screening procedures for ACAs with countries other than Canada (which, with one possible exception, would not be contiguous to the United States) will afford aliens an opportunity to establish that it is more likely than not that they would be persecuted or tortured if removed to the applicable third country. It provides an additional screening component enabling asylum officers and IJs to assess whether an alien who affirmatively states a fear of removal to the signatory country under an applicable ACA would more likely than not be persecuted or tortured in such country.

## B. New 8 CFR 208.30(e)(7)

The regulations at 8 CFR 208.30 govern interviews, conducted by DHS asylum officers, of stowaways and aliens subject to ER. *See* 8 CFR 208.30(a). New paragraph (e)(7) requires an asylum officer, in an appropriate case, to make several threshold screening determinations before assessing the merits of an alien's claims for asylum, withholding of removal, or CAT protection. First, the asylum officer must determine whether the alien is subject to one or more ACAs. Second, if so, the officer must determine whether the alien meets any exception to the applicable agreement(s)—including the public-interest exception, which, under section 208(a)(2)(A), all ACAs must contain. If the alien is not subject to any ACA, or the alien meets an exception to each applicable agreement, the asylum officer will assess the merits of the alien's claims for relief as usual—that is, assess whether the alien has a credible fear of persecution or torture under existing paragraphs (e)(2) and (3). But if the alien is subject to an ACA, and does not meet any exception, the asylum officer will inform the alien that he or she is potentially subject to removal to the third country signatory to the relevant ACA, and that the third country, rather than the United States, will provide access to a full and fair procedure for adjudication of the alien's claims.

After identifying the third country or countries to which the alien may be removed, if the alien does not affirmatively state a fear of persecution or torture in, or removal to, the country or countries, the asylum officer will refer the determination—*i.e.,* that the alien is barred from applying for asylum, withholding of removal, and CAT protection in the United States, and subject to removal to the third country or countries—to a supervisory officer for review. If the supervisory asylum officer disagrees, that officer will remand the case to the asylum officer for a credible fear interview.

If, on the other hand, the alien affirmatively states a fear of persecution or torture in, or removal to, the third country or countries, the asylum officer will then determine whether the alien can establish, by a preponderance of the evidence, that, if the alien were removed to the third country or countries, it is more likely than not that he or she would be persecuted on account of a protected ground or tortured. If the officer determines the alien has met that burden, given that the alien has already been placed into ER proceedings, the officer will assess the

merits of the alien's claims for relief and protection as usual—*i.e.,* conduct a normal credible fear interview. But if the officer determines the alien has not met that burden, the officer will refer the determination to a supervisory asylum officer for review.

The threshold screening determinations under the U.S.-Canada Agreement regulatory procedures similarly incorporate a preponderance-of-the-evidence standard. *See* 8 CFR 208.30(e)(6)(ii). As under the U.S.-Canada screening procedures, in making the threshold determinations discussed above, asylum officers "will use all available evidence, including the individual's testimony, affidavits and other documentation, as well as available records and databases." Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR at 10623 (DHS) (proposed rule); *see also id.* at 69482 (DHS) ("The Department has clarified, in the final rule, that the same safeguards accorded to aliens who are eligible for a credible fear determination will be accorded to aliens who receive threshold screening interviews."). In the asylum officer's discretion, "[c]redible testimony alone may be sufficient" to meet the alien's burden "if there is a satisfactory explanation of why corroborative documentation is not reasonably available." Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR at 10623 (DHS) (proposed rule). Asylum officers have received "extensive training in evaluating credibility of testimony when there is little or no documentation in support of that testimony," *id.,* and will apply that training to the threshold determination of whether an alien falls within the terms of an ACA or an exception and whether the alien has established a clear probability of persecution or torture in the third country.

In contrast to the final rule implementing the U.S.-Canada Agreement that provided an alien with a minimal consultation period prior to the threshold screening interview to determine the applicability of the Agreement, this rule does not mandate such a period. *See* Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR at

69482 (DHS) (providing a minimal consultation period but emphasizing that the consultation period would not permit the postponement of the threshold screening interview process so as not to "compromise the principle underlying the Agreement that aliens be returned promptly to the country of last presence"). Rather, this rule expands the threshold screening process itself to allow for an alien to demonstrate that he or she is "more likely than not" to be subject to persecution on account of a protected ground or torture in the receiving country under the ACA.

The bilateral ACAs that the United States has issued as of the effective date of this rule include agreements with El Salvador, Guatemala, and Honduras and incorporate fewer and less complex exceptions than the U.S.-Canada Agreement, eliminating the need for a consultation period analogous to the consultation period permitted by the U.S.-Canada Agreement.[11] Further, this rule's expansion of the underlying threshold screening procedures to provide an opportunity for aliens to establish "more likely than not" persecution or torture in the receiving country provides additional process beyond that which is available under the regulations implementing the U.S.-Canada Agreement.

Although section 208(a)(2)(A) is silent with respect to which party bears the burden of showing the applicability (or inapplicability) of the bar and the appropriate standard of proof for such a showing, section 208(b)(1) indicates that the ultimate burden of proof in establishing asylum eligibility is on the applicant. *See* INA 208(b)(1)(A)–(B), 8 U.S.C. 1158(b)(1)(A)–(B) (authorizing a grant of asylum to an alien who meets the burden of establishing that he or she is a refugee). Moreover, the section 208(a)(2)(A) language regarding protection against harm from the third country of removal is parallel to the section 241(b)(3) language establishing withholding-of-removal protection with respect to the typical potential countries of removal specified by INA sections 241(b)(1) and (2). When evaluating

whether an alien is entitled to withholding of removal under INA 241(b)(3) or evaluating a claim for protection under the regulations implementing CAT, an IJ addresses whether an alien has established the relevant fear by a preponderance of the evidence. *See* 8 CFR 1208.16(b)–(c). It is therefore reasonable to require an alien to show, by a preponderance of the evidence, that he or she meets an exception to an otherwise applicable ACA, and that he or she would face harm in the third country. *See* Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR at 69483 (DHS) (reasoning that, because "applicants for asylum, withholding of removal, and protection under [CAT] bear the burden of proof," it is reasonable for aliens to bear "the burden of proof for purposes of establishing that an exception to the [U.S.-Canada] Agreement applies").

*C. Amended 8 CFR 1003.42(h)(1)–(2) and New 8 CFR 1003.42(h)(3)–(4)*

This rule will amend 8 CFR 1003.42(h) to reflect the implementation of ACAs other than the U.S.-Canada Agreement. In particular, the rule will make technical amendments to 8 CFR 1003.42(h)(1) and (2) to clarify that those paragraphs apply to only the preexisting U.S.-Canada Agreement. The rule creates new 8 CFR 1003.42(h)(3) and (4) to reflect the distinction that the threshold officer screening in the non-Canada ACAs includes an opportunity for the alien to establish that it is more likely than not that he or she would be persecuted on account of a protected ground or tortured. Under the new paragraph (h)(3), an IJ is prohibited from reviewing an officer's determination that section 208(a)(2)(A) bars an alien from applying for asylum. But an IJ acquires jurisdiction to review a negative credible fear finding in any case where an alien either establishes that he or she qualifies for an ACA exception, *or* establishes more-likely-than-not harm in the relevant third country, thus prohibiting the application of the ACA to that alien. (In such a case, the asylum officer would apply typical credible fear screening to the alien, giving an IJ jurisdiction to review a negative finding by that officer.) The new (h)(4) clarifies that an alien subject to removal under an ACA is ineligible to apply for withholding-of-removal and CAT relief in the United States, along with asylum, as explained in the detailed legal background section of the rule.

---

[11] Applicability of the exceptions at issue in the non-Canada ACAs generally can be evaluated through records checks and by asking straightforward biographic questions. Conversely, the exceptions to the U.S.-Canada Agreement required more detailed information from the alien, such as whether certain family members of the applicant are present in the United States, the immigration status of those family members, and whether the family members have pending asylum applications. *See* 8 CFR 208.30(e)(6)(iii)(A)–(F). Should the U.S. enter into additional ACAs in the future having exceptions that mirror the complexity of those contained in the U.S.-Canada Agreement, DHS could choose to establish consultation periods as needed.

This IFR preserves the general review framework currently underlying 8 CFR 1003.42(h)(1), which provides that an IJ lacks jurisdiction to review an asylum officer's determination that the U.S.-Canada Agreement bars an alien from applying for asylum in the United States and makes them removable to Canada for adjudication of his or her claim for asylum or equivalent protection. In proposing a framework for implementing the U.S.-Canada Agreement, DOJ noted that, in a given case, the asylum officer would be making an individualized determination only as to whether the Agreement (or any of its exceptions) applied to the alien. Asylum Claims Made by Aliens Arriving from Canada at Land Border Ports-of-Entry, 69 FR at 10630 (DOJ) (proposed rule). Given the "narrowness of the factual issues" underlying such a determination, DOJ determined that review by an IJ was unnecessary. *Id.*

DOJ suggested the analysis might be different if an asylum officer were evaluating "the merits of an . . . alien's asylum claims." *Id.* And under this IFR, an asylum officer does need to determine whether the alien would more likely than not be persecuted or tortured in the third country to which he or she would be removed under an ACA. But when evaluating an asylum claim on the merits, an asylum officer or IJ is often forced to make a complex assessment as to whether wrongs done to the asylum seeker (or those similarly situated) in the asylum seeker's home country were motivated by animus against a protected group or some other factor. In contrast, evaluating whether an asylum seeker would face persecution or torture in a country to which he has no substantial connections is more straightforward. The third country with which the United States has formed an ACA is, by definition, not an alien's country of nationality or last habitual residence. *See* INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A) (authorizing ACA removal only to countries other than that of the alien's nationality or last habitual residence, if the alien has no nationality). And, thus, the country of removal under an ACA is not the country originally prompting the asylum seeker's claim, unlike the potential countries of removal under section 241(b)(1)–(2) to which section 241(b)(3) withholding of removal claims are directed, *see* 8 U.S.C. 1231(b)(1)–(2) (providing, *e.g.,* for an alien to be removed to the country in which he or she boarded a vessel or aircraft to reach the United States or the country in which he or she is a citizen or was born or has a residence). Because the ACA

country of removal did not prompt the alien's claim, the process for determining simply whether to send the alien to a third country for that consideration is reasonably more minimalistic than the requisite procedures for deciding asylum and withholding of removal claims on the merits.

Finally, Congress chose not to mandate IJ review of decisions as to whether an alien is subject to an ACA. Yet, in the same legislation creating section 208(a)(2)(A), Congress created the ER process. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Public Law 104–208, sec. 302 and 604, 110 Stat. 3009–546, –579, –690. And in that process, Congress expressly mandated IJ review (at the request of the alien) of a negative credible fear determination by an asylum officer. *Compare* INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A) *with* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). That difference strongly suggests that Congress did not intend to require IJ review of decisions by asylum officers as to whether aliens are barred from applying for asylum under section 208(a)(2)(A).

Therefore, it is unnecessary—and indeed would be inconsistent with the INA removal statutory scheme—to mandate IJ review of a determination that section 208(a)(2)(A) bars an alien from applying for asylum. In section 208(a)(2)(A), Congress authorized the Executive Branch to operate within the President's foreign affairs authority to enter international agreements more evenly distributing the load of providing access to potential asylum for international refugees and asylees. By its terms, section 208(a)(2)(A) preserves flexibility for the Executive Branch in entering such agreements. The provision imposes two clear requirements, limiting such international agreements only to countries that provide access to full and fair protection procedures and are places in which an alien's life or freedom would not be harmed on account of a protected ground. Beyond those specifications, the Executive Branch's utilization of its statutory authority under section 208(a)(2)(A) is subject to no express procedural stipulations.

In any event, this rule preserves unchanged the existing credible fear process itself, including the statutorily required availability of review by an IJ. So, if an asylum officer determines that an alien subject to the terms of an ACA bar would more likely than not be persecuted or tortured in the third country or, for any reason, that the ACA does not prohibit the alien's U.S.

asylum application, the officer will then proceed immediately to a credible fear determination. If necessary, as required by statute and preexisting regulations, an IJ will conduct a review of this determination.

### D. Amended 8 CFR 1240.11(g) and New 8 CFR 1240.11(h)

This rule will amend 8 CFR 1240.11(g) to reflect that the section will now apply only to the U.S.-Canada Agreement. The rule will also create a new 8 CFR 1240.11(h) to provide for the implementation of all other existing and future ACAs within the context of section 240 proceedings. Similar to the threshold determinations that asylum officers must make in ER proceedings, as described above, this new regulatory section will require IJs to determine whether an alien falls within an exception to an otherwise applicable ACA, and will authorize IJs to provide an alien subject to the terms of an ACA an opportunity to establish that it is more likely than not that the alien would be persecuted on account of a protected ground or tortured in the applicable third country.

## VI. Regulatory Requirements

### A. Administrative Procedure Act

The Departments' decision to promulgate the regulations implementing the U.S.-Canada Agreement through formal notice-and-comment rulemaking does not obligate the Departments to do so here. *See, e.g., Hoctor* v. *U.S. Dep't of Agric.,* 82 F.3d 165, 171–72 (7th Cir. 1996) (observing that courts should "attach no weight" to an agency's varied approaches to the use of notice-and-comment rulemaking involving similar rules and that "there is nothing in the [Administrative Procedure Act ("APA")] to forbid an agency to use the notice and comment procedure in cases in which it is not *required* to do so"); *Indep. Living Res.* v. *Or. Arena Corp.,* 982 F. Supp. 698, 744 n.62 (D. Or. 1997) ("There are many reasons why an agency may voluntarily elect to utilize notice and comment rulemaking . . . ."). For the reasons that follow, the Departments are issuing this rule as an interim final rule pursuant to the APA's exemption from notice-and-comment requirements for rules involving "foreign affairs function[s]" and the "good cause" exception for rules with respect to which "notice and public procedure" is "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. 553(a)(1), (b)(B).

1. Foreign Affairs Exemption

The Departments may forgo notice-and-comment procedures and a delay in the effective date of this rule because the rule involves a "foreign affairs function of the United States," and thus is exempt from the procedural requirements of 5 U.S.C. 553. *See id.* 553(a)(1). This rule puts into effect ACAs already negotiated with El Salvador, Guatemala, and Honduras, and will remove obstacles to successfully negotiating ACAs with other countries. This rule is thus similar to others that courts have determined are within the scope of the foreign affairs exemption and is likewise exempt from notice-and-comment rulemaking requirements and the required delay in the effective date. *See, e.g., Int'l Bhd. of Teamsters* v. *Peña,* 17 F.3d 1478, 1486 (D.C. Cir. 1994) (holding that a Federal Highway Administration rule "implement[ing] an agreement between the United States and Mexico" was necessary for the United States to avoid "reneging on [its] international obligations" and thus was appropriately promulgated under the foreign affairs exemption of the APA); *City of New York* v. *Permanent Mission of India to United Nations,* 618 F.3d 172, 201 (2d Cir. 2010) (quoting the description of the purpose of the foreign affairs exemption in H.R. Rep. No. 79–1980, at 23 (1946)).

This rule will facilitate ongoing diplomatic negotiations with foreign countries regarding migration issues, including measures to control the flow of aliens into the United States. *See City of New York,* 618 F.3d at 201 (finding that rules related to diplomacy with specific other countries fall within the scope of the foreign affairs exemption). Those ongoing discussions relate to proposals for increased efforts by third countries to help reduce the flow of illegal aliens north to the United States and to join the United States in shouldering the load of providing asylum procedures, and possible relief or protection, to the migrants from around the world flocking to U.S. borders. *See Yassini* v. *Crosland,* 618 F.2d 1356, 1361 (9th Cir. 1980) (per curiam) (because an immigration directive "was implementing the President's foreign policy," the action "fell within the foreign affairs function and good cause exceptions to the notice and comment requirements of the APA").

In the latter half of 2019, U.S. officials entered into agreements with El Salvador, Guatemala, and Honduras pursuant to INA 208(a)(2)(A). U.S. officials remain in negotiations with other nations to enter into additional ACAs. Delaying the implementation of the rule due to notice-and-comment rulemaking could impact the ability of the United States to negotiate by creating uncertainty about the regulatory framework that the United States will have in place to carry out such agreements. *See East Bay I,* 909 F.3d at 1252–53 (suggesting that reliance on the exemption is justified where the Government "explain[s] how immediate publication of the Rule, instead of *announcement* of a proposed rule followed by a thirty-day period of notice and comment" is necessary in light of the Government's foreign affairs efforts). Potential signatories to such agreements may be more hesitant to negotiate with the United States and to rely on a commitment by the United States to meet the terms of negotiated agreements if the regulatory framework to carry out such agreements is uncertain and not yet in place.

The terms of some of the current ACAs have been contingent on the signing countries exchanging diplomatic notes certifying that each country has put in place the legal framework necessary to effectuate and operationalize the agreement. The United States will have a stronger negotiating position in entering additional agreements if a domestic regulatory framework is already in effect during the negotiations. The circumstances of the U.S.-Canada Agreement underscore this reality, as a period of nearly two years passed between the formation of the agreement and its effectuation through the promulgation of final rules. That delay was not as problematic in the context of U.S.-Canada relations, as comparatively few aliens are subject to the U.S.-Canada Agreement. In contrast, a far greater number of aliens arriving at the southern border will be affected by the non-Canada ACAs currently under development. To bring the numbers of U.S. asylum applicants to a more manageable level, and to have a strong negotiating position with other potential third countries, the United States needs the flexibility to effectuate the current ACAs much more rapidly than the two-year time period that transpired between the signing and execution of the U.S.-Canada Agreement. Further, countries that sign ACAs with the United States may be deterred from sustaining their commitments to the agreements if the United States materially delays its operationalization after representing to those countries that their entry into these agreements is an urgent U.S. priority. *Cf. E. Bay Sanctuary Covenant* v. *Trump,* 932 F.3d 742, 776 (9th Cir. 2018) ("*East Bay I*") ("Hindering the President's ability to implement a new policy in response to a current foreign affairs crisis is the type of 'definitely undesirable international consequence' that warrants invocation of the foreign affairs exception.").

Similarly, a delayed effective date for the rule may weaken the facility of the United States to pursue the negotiating strategy it deems to be most appropriate as it engages its foreign partners. *See, e.g., Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp.* v. *United States,* 751 F.2d 1239, 1249 (Fed. Cir. 1985) (the foreign affairs exemption facilitates "more cautious and sensitive consideration of those matters which so affect relations with other Governments that . . . public rule-making provisions would provoke definitely undesirable international consequences" (internal quotation marks omitted)). In addition, addressing this crisis will be more effective and less disruptive to long-term U.S. relations with Mexico [12] and the Northern Triangle countries the sooner that this interim final rule is in place, as it will help address the enormous flow of aliens through these countries to the southern border, where aliens seeking ultimately meritless asylum claims continue to strain resources and contribute to a national security and humanitarian crisis. *Cf. id.* ("The timing of an announcement of new consultations or quotas may be linked intimately with the Government's overall political agenda concerning relations with another country."). Further, the efficient implementation of this interim rule will improve the ability of the United States to negotiate successfully with these and potentially other countries. *See Rajah* v. *Mukasey,* 544 F.3d 427, 438 (2d Cir. 2008) (finding that the notice-and-comment process can be "slow and cumbersome," which can negatively affect efforts to secure U.S. national interests, thereby justifying application of the foreign affairs exemption).

This rule supports the President's foreign policy with respect to Mexico, the Northern Triangle countries, and other potential partner countries in this area and thus is exempt from the notice-and-comment and delayed-effective-

---

[12] The United States and Mexico have been engaged in ongoing discussions regarding both regional and bilateral approaches to asylum. *See, e.g., Secretary Nielsen Meets with Mexican Officials on Border Emergency, Travels to Honduras to Meet with Northern Triangle Governments to Address Crisis at Source* (Mar. 26, 2019), *available at http://www.dhs.gov/news/2019/03/26/secretary-nielsen-meets-mexican-officials-border-emergency-travels-honduras-meet.*

date requirements in 5 U.S.C. 553. *See Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp.,* 751 F.2d at 1249; *Yassini,* 618 F.2d at 1361.

Invoking the APA's foreign affairs exemption is also consistent with past rulemakings. In 2016, for example, in response to diplomatic developments between the United States and Cuba, DHS changed its regulations concerning flights to and from the island via an immediately effective interim final rule. Flights to and From Cuba, 81 FR 14948, 14952 (Mar. 21, 2016). In a similar vein, DHS, in consultation with the Department of State, recently provided notice that it was eliminating an exception to expedited removal for certain Cuban nationals. The document explained that the change in policy was consistent with the foreign affairs exemption for rules subject to notice-and-comment requirements because the change was central to ongoing negotiations between the two countries. Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902, 4904–05 (Jan. 17, 2017).

Some courts have layered onto the foreign affairs exemption a requirement that the agency show not merely that the rule implicates foreign affairs, but also that the use of notice-and-comment procedures would "provoke definitely undesirable international consequences." *See, e.g., East Bay I,* 932 F.3d at 775–76 (internal quotation marks omitted). As explained above, even this constraint on application of the APA foreign affairs exemption is satisfied here, as a delayed effective date for this rule could have far-reaching consequences for the strength of the negotiating position of the United States in relation to potential signatories of future ACAs.

2. Good Cause Exception

Alternatively, the Departments may forgo notice-and-comment rulemaking and a delayed effective date while this rulemaking is published in the **Federal Register** for public comment, because the APA provides an exception from those requirements when an agency "for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. 553(b)(B); *see* 5 U.S.C. 553(d)(3). This exception relieves agencies of notice-and-comment requirements in urgent situations, or in circumstances where "the delay created by the notice and comment requirements would result in serious damage to important interests." *Woods Psychiatric Inst.* v. *United States,* 20 Cl. Ct. 324, 333 (1990), *aff'd,* 925 F.2d 1454 (Fed. Cir. 1991); *see also Nat'l Fed'n of Fed. Emps.* v. *Devine,* 671 F.2d 607, 611–12 (D.C. Cir. 1982); *United States* v. *Dean,* 604 F.3d 1275, 1279 (11th Cir. 2010). On multiple occasions, agencies have relied on this exception to promulgate immigration-related interim rules.[13]

The Departments have concluded that the good cause exceptions in 5 U.S.C. 553(b)(B) and (d)(3) apply to this rule. Delaying implementation of this rule until the conclusion of notice-and-comment procedures and the 30-day delayed effective date would be impracticable and contrary to the public interest. In rejecting challenges to the prior use of interim rules, courts have cited evidence that pre-publication of a significant change in asylum procedures will cause migrants to rush to U.S. borders. *See East Bay I,* 354 F. Supp. 3d 1094, 1115 (N.D. Cal. 2018) (concluding that the Government was "likely to prevail on its claim regarding the good cause exception" in the context of a November 2018 interim rule barring asylum eligibility for aliens who, in violation of a Presidential proclamation, enter between ports of entry); *cf. Barr* v. *East Bay Sanctuary Covenant,* ("*East Bay II*"), No. 19A230, 588 U.S. ____ (Sept. 11, 2019) (granting, without explanation, a stay on appeal from a circuit court order that had concluded, in part, that the Government had inadequately justified reliance on the good cause and foreign affairs APA exemptions in promulgating an IFR). Would-be asylum applicants have a strong incentive to intensify their efforts to rapidly reach the U.S. border when the United States announces a regulatory change that will impact asylum applications. *See, e.g., Mobil Oil Corp.* v. *Dep't of Energy,* 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) (concluding that good cause exists when "the very announcement" of a rule could "be expected to precipitate activity by affected parties that would harm the public welfare"); *see also id.* (collecting cases).

Here, the announcement that the United States has arranged for other countries to consider certain protection applications, in lieu of any ability to apply for protection within the United States itself, would create a perceived urgency for aliens to enter the United States illegally and apply for admission without proper documentation before the ACAs take effect. The implementation of ACAs would require significant numbers of aliens to file applications for protection in third countries rather than the United States. Recent events have shown that knowledge of this kind of impending change is highly likely to cause a dramatic increase in the numbers of aliens who enter or attempt to enter the United States to file asylum applications before the effective date of the change. For example, over a one-year period from 2018 to 2019, southwestern-border family-unit apprehensions rose 469 percent. *See* Application for a Stay Pending Appeal at 24, *Barr* v. *East Bay Sanctuary Covenant,* No. 19A230 (U.S. Aug. 26, 2019) ("Stay Application, *East Bay II*") (citing Administrative Record at 233, *East Bay Sanctuary Covenant* v. *Barr,* No. 19–cv–04073–JST (N.D. Cal. 2019) ("A.R., *East Bay II*"). And numerous news articles connect such recent surges to changes in immigration policy. *See* Stay Application, *East Bay II,* at 25 (citing A.R., *East Bay II,* at 438–39 (describing how smugglers persuaded migrants to cross the border after family separation was halted by telling the migrants to "hurry up before they might start doing so again"); *id.* at 452–54 (indicating that migrants refused offers to stay in Mexico because their goal is to enter the United States); *id.* at 663–665, 683 (indicating that Mexico faced a migrant surge when it changed its policies)).

Further, as courts have recognized, smugglers encourage migrants to enter the United States based on changes in U.S. immigration policy, and, in fact, "the number of asylum seekers entering as families has risen" in a way that "suggests a link to knowledge of those policies." *East Bay,* 354 F. Supp. 3d at 1115. If this rule were published for notice and comment before becoming effective, "smugglers might similarly communicate th[is] Rule's potentially relevant change in U.S. immigration policy," *id.,* and the risk of a surge in migrants hoping to enter the country before the rule becomes effective supports a finding of good cause under 5 U.S.C. 553.

---

[13] *See, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (interim rule citing good cause to immediately require a passport and visa from certain H2–A Caribbean agricultural workers to avoid "an increase in applications for admission in bad faith by persons who would otherwise have been denied visas and are seeking to avoid the visa requirement and consular screening process during the period between the publication of a proposed and a final rule"); Suspending the 30-Day and Annual Interview Requirements From the Special Registration Process for Certain Nonimmigrants, 68 FR 67578, 67581 (Dec. 2, 2003) (interim rule claiming the good cause exception for suspending certain automatic registration requirements for nonimmigrants because "without [the] regulation approximately 82,532 aliens would be subject to 30-day or annual re-registration interviews" over a six-month period).

Past experience shows that individuals inside and outside of the United States change their behavior in anticipation of changes to U.S. immigration laws. For example, Central American officials reported that after President Donald Trump's victory in the November 2016 election, Central Americans began "crossing illegally into the U.S. at the fastest rate in years, many of them hoping to sneak in before Donald Trump's presidential inauguration and the heightened border-security measures he has promised." Robbie Whelan, *Central Americans Surge at Border Before Trump Takes Over*, Wall Street Journal (Dec. 23, 2016), *http://www.wsj.com/articles/central-americans-surge-at-border-before-trump-takes-over-1482489047*. Honduras's deputy foreign minister attested, "We're worried because we're seeing a rise in the flow of migrants leaving the country, who have been urged to leave by coyotes telling them that they have to reach the United States before Trump takes office." Gustavo Palencia & Sofia Menchu, *Central Americans Surge North, Hoping To Reach U.S. Before Trump Inauguration*, Reuters (Nov. 24, 2016), *http://www.reuters.com/article/us-usa-trump-immigration-centralamerica/central-americans-surge-north-hoping-to-reach-u-s-before-trump-inauguration-idUSKBN13J2A7* (internal quotation marks omitted). Guatemala's foreign minister similarly stated that people were "leaving Guatemala en masse before Trump becomes president." *Id.*

The enactment of the Illegal Immigration Reform and Immigration Responsibility Act ("IIRIRA"), Public Law 104–208, div. C, 110 Stat. 3009–546 (1996), similarly prompted immigrants to change their behavior and seek to take advantage of the pre-IIRIRA rules. IIRIRA made several changes to asylum law. For example, it added three categorical bars to asylum: (1) Aliens who can be removed to a safe third country pursuant to bilateral or multilateral agreement; (2) aliens who failed to apply for asylum within one year of arriving in the United States; and (3) aliens who have previously applied for asylum and had the application denied. INA 208(a)(2)(A)–(C), 8 U.S.C. 1158(a)(2)(A)–(C). IIRIRA also provided that aggravated felonies, defined in INA 101(a)(43), 8 U.S.C. 1101(a)(43), would be considered "particularly serious crime[s]" that render an alien ineligible for asylum. INA 208(b)(2)(B)(i), 8 U.S.C. 1158(b)(2)(B)(i). IIRIRA was signed into law on September 30, 1996, *see* President William Jefferson Clinton, Statement on Signing H.R. 3610, the

Omnibus Appropriations Act, 1997 (Sept. 30, 1996), but did not take effect until April 1, 1997. Data shows a large spike in asylum applications filed just before IIRIRA went into effect and a large dip the week it went into effect. *See* Initial Asylum Receipts by Week, April 1, 1994, to March 31, 1997, PASD #19–227, Planning, Analysis, and Statistics Division, EOIR (recording 52 successive weeks with fewer than 3,000 total "[i]nitial [a]sylum [r]eceipts," spiking to an intake of 4,448 new asylum cases the week of Monday, March 24, 1997, and then dipping back down to just 1,099 new cases the week of March 31, 1997). This suggests that some asylum seekers that would have otherwise applied in April may have instead applied in March to avoid IIRIRA's new rules on asylum.

In addition to the factual basis for reliance on the good cause exception here, in light of these numerous examples in which announcements of U.S. immigration policy changes immediately impacted migrant behavior, application of the exception here comports with repeated agency practice. For example, in January 2017, DHS concluded that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "[p]re-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region." Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017). DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule." *Id.* DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations." *Id.* DHS concluded that "a surge could result in significant loss of human life." *Id.*

Reliance on the good cause exception in effecting immediate changes in immigration policy is not a new practice. In 2004, for example, DHS relied on the exception to immediately expand ER to further national security

and deter dangerous migrant travel. *See, e.g.,* Designating Aliens For Expedited Removal, 69 FR 48877 (Aug. 11, 2004); *see also, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR at 5907 (finding the good cause exception applicable because of similar concerns).

DOJ and DHS raised similar concerns and drew similar conclusions in the July 2019 joint interim final rule that limited asylum eligibility for aliens who had transited to the United States through a third country without applying for available asylum relief. Asylum Eligibility and Procedural Modifications, 84 FR 33829, 33840–41 (July 16, 2019); *see also, e.g.,* Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 FR 55934, 55950–51 (Nov. 9, 2018) (also relying on the good cause exception). As noted above, the Supreme Court granted (without explanation) a stay of a lower court decision that had ruled against use of an IFR to promulgate the third-country-transit requirement.

These same concerns apply to this rule to an even greater extent. Pre-promulgation notice and comment, or a delay in the effective date, would jeopardize the lives and welfare of aliens who could surge to the border to enter the United States before the rule limiting asylum applications took effect. *See East Bay I*, 354 F. Supp. 3d at 1115 (citing a newspaper article suggesting that such a rush to the border occurred due to knowledge of a pending regulatory change in immigration law). Furthermore, an additional surge of aliens seeking to enter via the southern border prior to the effective date of this rule would be destabilizing to the region, as well as to the U.S. immigration system. In recent years, there has been a massive increase in the number of aliens who assert a fear of persecution. This massive increase is overwhelming the U.S. immigration system as a result of a variety of factors, including the extraordinary proportion of aliens who are initially found to have a credible fear and therefore are referred to full removal proceedings in immigration court; a lack of detention space; and the resulting high rate of release into the interior of the United States of aliens with a positive credible fear determination, many of whom then abscond without pursuing their asylum claims to a final conclusion and become difficult to locate and remove. Recent initiatives to track family-unit cases in 10 cities and from Sept. 24, 2018, through October 25, 2019, revealed that 79 percent of removal orders were

issued in absentia—*i.e.*, were issued to an alien who had absconded. A large additional influx of aliens who intend to enter illegally or to apply for admission without proper documentation would exacerbate this crisis. This concern is particularly acute in the current climate in which illegal immigration flows fluctuate significantly in response to news events. Therefore, this interim final rule is a practical and necessary means to address the time-sensitive influx of aliens and avoid creating an even larger short-term influx.

*B. Regulatory Flexibility Act*

The Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.*, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, requires an agency to prepare and make available to the public a regulatory flexibility analysis that describes the effect of the rule on small entities (*i.e.*, small businesses, small organizations, and small governmental jurisdictions). A regulatory flexibility analysis is not required when a rule is exempt from notice-and-comment rulemaking.

*C. Unfunded Mandates Reform Act of 1995*

This interim final rule will not result in the expenditure by state, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

*D. Congressional Review Act*

This interim final rule is not a major rule as defined by section 804 of the Congressional Review Act. 5 U.S.C. 804. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

*E. Executive Order 12866, Executive Order 13563, and Executive Order 13771 (Regulatory Planning and Review)*

This rule is not subject to Executive Order 12866 as it is implicates a foreign affairs function of the United States relating to ongoing discussions with implications for a set of specified international relationships. As this is not a regulatory action under Executive Order 12866, it is not subject to Executive Order 13771.

*F. Executive Order 13132 (Federalism)*

This rule will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*G. Executive Order 12988 (Civil Justice Reform)*

This rule meets the applicable standards set forth in section 3(a) and 3(b)(2) of Executive Order 12988.

*H. Paperwork Reduction Act*

This rule does not propose new, or revisions to existing, "collection[s] of information" as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320.

**List of Subjects**

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 1003*

Administrative practice and procedure, Aliens, Immigration, Legal Services, Organization and functions (Government agencies).

*8 CFR Part 1208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 1240*

Administrative practice and procure, Aliens.

**Regulatory Amendments**

**DEPARTMENT OF HOMELAND SECURITY**

Accordingly, for the reasons set forth in the preamble, the Secretary of Homeland Security amends 8 CFR part 208 as follows:

**PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title of Public Law 110–229, 8 CFR part 2.

■ 2. Section 208.4 is amended by revising paragraph (a)(6) to read as follows:

**§ 208.4    Filing the application.**

\*    \*    \*    \*    \*

(a) \* \* \* Asylum

(6) Asylum Cooperative Agreements. Immigration officers have authority to apply section 208(a)(2)(A) of the Act, relating to the determination that the alien may be removed to a third country pursuant to a bilateral or multilateral agreement, as provided in § 208.30(e). For provisions relating to the authority of immigration judges with respect to section 208(a)(2)(A), see 8 CFR 1240.11(g) and (h).

\*    \*    \*    \*    \*

■ 3. Section 208.30 is amended by revising paragraph (e)(7) and adding paragraph (e)(8) to read as follows:

**§ 208.30    Credible fear determinations involving stowaways and applicants for admission who are found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act, whose entry is limited or suspended under section 212(f) or 215(a)(1) of the Act, or who failed to apply for protection from persecution in a third country where potential relief is available while en route to the United States.**

\*    \*    \*    \*    \*

(e) \* \* \*

(7) When an immigration officer has made an initial determination that an alien, other than an alien described in paragraph (e)(6) of this section and regardless of whether the alien is arriving at a port of entry, appears to be subject to the terms of an agreement authorized by section 208(a)(2)(A) of the Act, and seeks the alien's removal consistent with this provision, prior to any determination concerning whether the alien has a credible fear of persecution or torture, the asylum officer shall conduct a threshold screening interview to determine whether the alien is ineligible to apply for asylum in the United States and is subject to removal to a country ("receiving country") that is a signatory to the applicable agreement authorized by section 208(a)(2)(A) of the Act, other than the U.S.-Canada Agreement effectuated in 2004. In conducting this threshold screening interview, the asylum officer shall apply all relevant

interview procedures outlined in paragraph (d) of this section, except that paragraphs (d)(2) and (4) of this section shall not apply to aliens described in this paragraph (e)(7). The asylum officer shall advise the alien of the applicable agreement's exceptions and question the alien as to applicability of any of these exceptions to the alien's case. The alien shall be provided written notice that if he or she fears removal to the prospective receiving country because of the likelihood of persecution on account of a protected ground or torture in that country and wants the officer to determine whether it is more likely than not that the alien would be persecuted on account of a protected ground or tortured in that country, the alien should affirmatively state to the officer such a fear of removal. If the alien affirmatively states such a fear, the asylum officer will determine whether the individual has demonstrated that it is more likely than not that he or she would be persecuted on account of a protected ground or tortured in that country.

(i)(A) If the asylum officer, with concurrence from a supervisory asylum officer, determines during the threshold screening interview that an alien does not qualify for an exception under the applicable agreement, and, if applicable, that the alien has not demonstrated that it is more likely than not that he or she would be persecuted on account of a protected ground or tortured in the receiving country, the alien is ineligible to apply for asylum in the United States. Subject to paragraph (e)(7)(i)(B) of this section, after the asylum officer's documented finding is reviewed by a supervisory asylum officer, the alien shall be advised that he or she will be removed to the receiving country, as appropriate under the applicable agreement, in order to pursue his or her claims relating to a fear of persecution or torture under the law of the receiving country. Prior to removal to a receiving country under an agreement authorized by section 208(a)(2)(A), the alien shall be informed that, in the receiving country, the alien will have an opportunity to pursue the alien's claim for asylum or equivalent temporary protection.

(B) Aliens found ineligible to apply for asylum under this paragraph (e)(7) shall be removed to the receiving country, depending on the applicable agreement, unless the alien voluntarily withdraws his or her request for asylum.

(ii) If the alien establishes by a preponderance of the evidence that he or she qualifies for an exception under the terms of the applicable agreement, or would more likely than not be

persecuted on account of a protected ground delineated in section 208(a)(2)(A) of the Act or tortured in the receiving country, the asylum officer shall make a written notation to that effect, and may then proceed to determine whether any other agreement is applicable to the alien under the procedures set forth in this paragraph (e)(7). If the alien establishes by a preponderance of the evidence that he or she qualifies for an exception under the terms of each of the applicable agreements, or would more likely than not be persecuted on account of a protected ground or tortured in each of the prospective receiving countries, the asylum officer shall make a written notation to that effect, and then proceed immediately to a determination concerning whether the alien has a credible fear of persecution or torture under paragraph (d) of this section.

(iii) An exception to an applicable agreement is defined under the terms of the agreement itself. Each agreement, including any exceptions, will be announced in a **Federal Register** document. If the asylum officer determines that an alien is within one of the classes covered by a section 208(a)(2)(A) agreement, the officer shall next determine whether the alien meets any of the applicable agreement's exceptions. Regardless of whether the text of the applicable agreement provides for the following exceptions, all such agreements, by operation of section 208(a)(2)(A) of the Act, and as applicable to the United States, are deemed to contain the following provisions:

(A) No alien may be removed, pursuant to an agreement authorized by section 208(a)(2)(A), to the alien's country of nationality, or, if the alien has no nationality, to the alien's country of last habitual residence; and

(B) No alien may be removed, pursuant to an agreement authorized by section 208(a)(2)(A), where the Director of USCIS, or the Director's designee, determines, in the exercise of unreviewable discretion, that it is in the public interest for the alien to receive asylum in the United States, and that the alien therefore may apply for asylum, withholding of removal, or protection under the Convention Against Torture, in the United States.

(iv) If the asylum officer determines the alien meets an exception under the applicable agreement, or would more likely than not be persecuted on account of a protected ground or tortured in the prospective receiving country, the officer may consider whether the alien is subject to another agreement and its exceptions or would more likely than

not be persecuted on account of a protected ground or tortured in another receiving country. If another section 208(a)(2)(A) agreement may not be applied to the alien, the officer should immediately proceed to a credible fear interview.

(8) An asylum officer's determination shall not become final until reviewed by a supervisory asylum officer.

\*     \*     \*     \*     \*

**Department of Justice**

Accordingly, for the reasons set forth in the preamble, the Attorney General amends 8 CFR parts 1003, 1208, and 1240 as follows:

## PART 1003—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

■ 4. The authority citation for part 1003 continues to read as follows:

**Authority:** 5 U.S.C. 301; 6 U.S.C 521; 8 U.S.C. 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231, 1254a, 1255, 1324d, 1330, 1361, 1362; 28 U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub. L. 105–100, 111 Stat. 2196–200; sections 1506 and 1510 of Pub. L. 106–386, 114 Stat. 1527–29, 1531–32; section 1505 of Pub. L. 106–554, 114 Stat. 2763A–326 to –328.

■ 5. Section 1003.42 is amended by revising paragraph (h) to read as follows:

### § 1003.42   Review of credible fear determination.

\*     \*     \*     \*     \*

(h) *Asylum cooperative agreement—* (1) *Arriving alien.* An asylum judge has no jurisdiction to review a determination by an immigration officer that an arriving alien is not eligible to apply for asylum pursuant to the 2002 U.S.-Canada Agreement formed under section 208(a)(2)(A) of the Act and should be returned to Canada to pursue his or her claims for asylum or other protection under the laws of Canada. *See* 8 CFR 208.30(e)(6). However, in any case where an asylum officer has found that an arriving alien qualifies for an exception to that Agreement, an immigration judge does have jurisdiction to review a negative credible fear finding made thereafter by the asylum officer as provided in this section.

(2) *Aliens in transit.* An immigration judge has no jurisdiction to review any determination by DHS that an alien being removed from Canada in transit through the United States should be returned to Canada to pursue asylum claims under Canadian law, under the terms of the 2002 U.S.-Canada Agreement.

**64010**    **Federal Register** / Vol. 84, No. 223 / Tuesday, November 19, 2019 / Rules and Regulations

(3) *Applicants for admission.* An immigration judge has no jurisdiction to review a determination by an asylum officer that an alien is not eligible to apply for asylum pursuant to a bilateral or multilateral agreement with a third country under section 208(a)(2)(A) of the Act and should be removed to the third country to pursue his or her claims for asylum or other protection under the laws of that country. *See* 8 CFR 208.30(e)(7). However, if the asylum officer has determined that the alien may not or should not be removed to a third country under section 208(a)(2)(A) of the Act and subsequently makes a negative credible fear determination, an immigration judge has jurisdiction to review the negative credible fear finding as provided in this section.

(4) *Aliens in transit through the United States from countries other than Canada.* An immigration judge has no jurisdiction to review any determination by DHS that an alien being removed from a receiving country in transit through the United States should be returned to pursue asylum claims under the receiving country's law, under the terms of the applicable cooperative agreement. *See* 8 CFR 208.30(e)(7).

## PART 1208—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

■ 6. The authority citation for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title of Public Law 110–229, 8 CFR part 2.

■ 7. Section 1208.4 is amended by revising paragraph (a)(6) to read as follows:

### § 1208.4  Filing the application.

\*    \*    \*    \*    \*

(a) \* \* \*

(6) *Asylum cooperative agreements.* Immigration judges have authority to consider issues under section 208(a)(2)(A) of the Act, relating to the determination of whether an alien is ineligible to apply for asylum and should be removed to a third country pursuant to a bilateral or multilateral agreement, only with respect to aliens whom DHS has chosen to place in removal proceedings under section 240 of the Act, as provided in 8 CFR 1240.11(g) and (h). For DHS regulations relating to determinations by immigration officers on this subject, see 8 CFR 208.30(e)(6) and (7).

\*    \*    \*    \*    \*

## PART 1240—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

■ 8. The authority citation for part 1240 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1158, 1182, 1186a, 1186b, 1225, 1226, 1227, 1228, 1229a, 1229b, 1229c, 1252 note, 1361, 1362; secs. 202 and 203, Pub. L. 105–100 (111 Stat. 2160, 2193); sec. 902, Pub. L. 105–277 (112 Stat. 2681).

■ 9. Section 1240.11 is amended by revising the paragraph (g) subject heading and paragraphs (g)(1) and (4) and adding paragraph (h) to read as follows:

### § 1240.11  Ancillary matters, applications.

\*    \*    \*    \*    \*

(g) *U.S.-Canada safe third country agreement.* (1) The immigration judge has authority to apply section 208(a)(2)(A) of the Act, relating to a determination that an alien may be removed to Canada pursuant to the 2002 Agreement Between the Government of the United States of America and the Government of Canada For Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries ("Agreement"), in the case of an alien who is subject to the terms of the Agreement and is placed in proceedings pursuant to section 240 of the Act. In an appropriate case, the immigration judge shall determine whether under that Agreement the alien should be returned to Canada, or whether the alien should be permitted to pursue asylum or other protection claims in the United States.

\*    \*    \*    \*    \*

(4) An alien who is found to be ineligible to apply for asylum under section 208(a)(2)(A) of the Act is ineligible to apply for withholding of removal pursuant to section 241(b)(3) of the Act and the Convention against Torture. However, the alien may apply for any other relief from removal for which the alien may be eligible. If an alien who is subject to the Agreement and section 208(a)(2)(A) of the Act is ordered removed, the alien shall be ordered removed to Canada, in which the alien will be able to pursue his or her claims for asylum or protection against persecution or torture under the laws of Canada.

(h) *Other asylum cooperative agreements.* (1) The immigration judge has authority to apply section 208(a)(2)(A) of the Act, relating to a determination that an alien may be removed to a third country pursuant to a bilateral or multilateral agreement— other than the 2002 U.S.-Canada Agreement—in the case of an alien who is subject to the terms of the relevant

agreement and is placed in proceedings pursuant to section 240 of the Act. In an appropriate case, the immigration judge shall determine whether under the relevant agreement the alien should be removed to the third country, or whether the alien should be permitted to pursue asylum or other protection claims in the United States. If more than one agreement applies to the alien and the alien is ordered removed, the immigration judge shall enter alternate orders of removal to each relevant country.

(2) An alien described in paragraph (h)(1) of this section is ineligible to apply for asylum pursuant to section 208(a)(2)(A) of the Act, or for withholding of removal or CAT protection in the United States, unless the immigration judge determines, by a preponderance of the evidence, that:

(i) The relevant agreement does not apply to the alien or does not preclude the alien from applying for asylum in the United States;

(ii) The alien qualifies for an exception to the relevant agreement as set forth in paragraph (h)(3) of this section and the **Federal Register** document specifying the exceptions particular to the relevant agreement; or

(iii) The alien has demonstrated that it is more likely than not that he or she would be persecuted on account of a protected ground or tortured in the third country.

(3) The immigration judge shall apply the applicable regulations in deciding whether an alien described in paragraph (h)(1) of this section qualifies for an exception under the relevant agreement that would permit the United States to exercise authority over the alien's asylum claim. The exceptions for agreements with countries other than Canada are further explained by the applicable published **Federal Register** document setting out each Agreement and its exceptions. The immigration judge shall not review, consider, or decide any issues pertaining to any discretionary determination on whether an alien described in paragraph (h)(1) of this section should be allowed to pursue an application for asylum in the United States notwithstanding the general terms of an agreement, as section 208(a)(2)(A) of the Act reserves to the Secretary or his delegates the determination whether it is in the public interest for the alien to receive asylum in the United States. However, an alien in removal proceedings who is otherwise ineligible to apply for asylum under an agreement may apply for asylum if DHS files a written notice in the proceedings before the immigration judge that DHS has decided in the

public interest that the alien may pursue an application for asylum or withholding of removal in the United States.

(4) If the immigration judge determines that an alien described in paragraph (h)(1) of this section is subject to the terms of agreements formed pursuant to section 208(a)(2)(A) of the Act, and that the alien has failed to demonstrate that it is more likely than not that the alien would be persecuted on account of a protected ground or tortured in those third countries, then the alien is ineligible to apply for withholding of removal pursuant to section 241(b)(3) of the Act and the Convention Against Torture notwithstanding any other provision in this chapter. However, the alien may apply for any other relief from removal for which the alien may be eligible. If an alien who is subject to section 208(a)(2)(A) of the Act is ordered removed, the alien shall be ordered removed to the relevant third country in which the alien will be able to pursue his or her claims for asylum or protection against persecution or torture under the laws of that country.

Approved:

Dated: November 14, 2019.

**Chad F. Wolf,**

*Acting Secretary of Homeland Security.*

Approved:

Dated: November 14, 2019.

**William P. Barr,**

*Attorney General.*

[FR Doc. 2019–25137 Filed 11–18–19; 8:45 am]

**BILLING CODE 9111–97–P; 4410–30–P**



**U.S. Department of Justice**

Office of the Attorney General

*Washington D.C. 20530*

November 6, 2019

MEMORANDUM FOR THE ATTORNEY GENERAL

THROUGH:          THE DEPUTY ATTORNEY GENERAL        *11-6-2019*

FROM:             Gene Hamilton
                  Counselor to the Attorney General

SUBJECT:          INA Section 208(a)(2)(A) Agreement with Guatemala

PURPOSE:          To obtain the Attorney General's approval of the proposed Attorney
                  General memorandum.

TIMETABLE:        As soon as possible.

Section 208(a)(2)(A) of the Immigration and Nationality Act ("INA") provides that an alien who could otherwise apply for asylum in the United States "may be removed, pursuant to a bilateral or multilateral agreement, to a country . . . in which the alien's life or freedom would not be threatened on account of [a protected ground], and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection."  8 U.S.C. § 1158(a)(2)(A).  The statute contemplates the formation of "[s]afe third country" agreements—otherwise referred to as asylum cooperative agreements ("ACAs")—that enable the United States to remove prospective asylum applicants to other countries that are qualified to adjudicate asylum claims.  *See, e.g.*, Agreement for Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries, U.S.-Canada, Dec. 5, 2002, T.I.A.S. 04-1229 (INA section 208(a)(2)(A) agreement with Canada).

The United States signed an ACA with the Republic of Guatemala on July 26, 2019. (Attachment E).  Before the agreement enters into force, you and the Acting Secretary of the Department of Homeland Security ("DHS") must determine that Guatemala provides aliens with "access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection."  8 U.S.C. § 1158(a)(2)(A).  The Acting Secretary of Homeland Security recently determined that Guatemala satisfies this standard.  *See* Determination Memorandum from the Secretary, *Whether Guatemala's Refugee Protection Laws and Procedures Satisfy the "Access to a Full and Fair Procedure" Requirements of Section 208(a)(2)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a)(2)(A)* (Oct. 16, 2019) (Attachment G).

Although there is an argument that the Acting Secretary's determination presents sufficient authority under the INA, the transfer of authorities under the Homeland Security Act is not always perfectly clear, and therefore, to avoid any uncertainty, I recommend that you make that determination as well.  Moreover, the INA expressly provides that "determination[s] and

1

Subject:  Asylum Cooperative Agreement with Guatemala

ruling[s] by the Attorney General with respect to all questions of law shall be controlling." INA § 103(a)(1), 8 U.S.C. § 1103(a)(1).  Because section 208(a)(2)(A) of the INA provides that such an alien may be removed "if the Attorney General determines" that the applicable conditions precedent are met, including the legal requirement that a third country's procedures are "full and fair," 8 U.S.C. § 1158(a)(2)(A), a parallel determination by you provides an additional textual foundation for removal of aliens to Guatemala pursuant to the U.S.-Guatemala ACA.

I recommend that you sign the enclosed Attorney General memorandum to make the determination.  To return aliens to Guatemala for consideration of their asylum claims under the ACA, you and the Acting Secretary must also determine that an alien's life and freedom would not be threatened in Guatemala on account of a protected ground.  Prior to implementing the U.S.-Guatemala ACA, we intend to promulgate joint regulations with DHS to provide for individualized screening of aliens subject to removal under the ACA that includes an evaluation of whether an alien's life or freedom is more likely than not to be threatened on account of a protected ground in Guatemala.  This threshold screening will satisfy the second INA section 208(a)(2)(A) requirement that you and the Acting Secretary determine that Guatemala is an adequately safe forum for removal of an alien for consideration of the alien's claim for asylum or equivalent relief.

The recommended determination regarding Guatemala's legal procedures is based on factual information concerning the Guatemalan asylum system that has been assembled by the U.S. Department of State ("DOS") and DHS based upon a review of Guatemalan law and consultations with Guatemalan officials.  (Attachments A, C, and D.)  DHS also provided a detailed description of the departments' efforts to investigate and verify the adequacy of Guatemala's procedures for providing asylum or equivalent temporary protection.  *See* Memorandum for Kevin K. McAleenan, Acting Secretary, DHS, from Bernardo Pillot, Acting DHS Regional Attaché for Central America, *Re: Implementation of Asylum Cooperative Agreement with the Government of Guatemala*, with an attached *Timeline of DHS Engagement with Government of Guatemala re: Asylum Agreement, Asylum Processes and Procedures* (Oct. 30, 2019) (Attachment B).  Over a five-month period, Acting Secretary McAleenan and other senior DHS officials visited Guatemala multiple times and hosted bilateral discussions with Guatemalan officials to examine that country's capacity for processing asylum and other refugee protection claims.  *Id.* (Timeline.)  As part of those efforts, Acting Secretary McAleenan received a comprehensive briefing on Guatemalan procedures and witnessed refugee processing in Guatemala City.  *Id.* (Timeline.)  DHS and DOS also engaged in videoconferences and written exchanges with Guatemalan officials to verify the nature and capacity of Guatemala's procedures.  *Id.* (Timeline.)  Based on those efforts, Bernardo Pillot, the Acting DHS Regional Attaché for Central America, has assessed that "the Guatemalan Government is prepared, ready[,] willing and able to receive transfers under this agreement as soon as possible." *Id.* (Memorandum.)  According to Mr. Pillot, "DHS has a robust footprint of personnel supporting operations (over 45 personnel) in Guatemala both on a permanent and temporary basis to assure successful implementation of this agreement and other key DHS priorities." *Id.* (Memorandum.)  In addition, Mr. Pillot confirmed that DHS intends to "continue to provide planning, support, technical expertise, and logistical assistance to Guatemalan immigration and law enforcement authorities to implement the agreement in a phased manner." *Id.* (Memorandum.)

The Office of Legal Counsel has advised that a country satisfies the "access to a full and fair procedure" standard if it has a generally available process for applicants seeking asylum or

Subject: Asylum Cooperative Agreement with Guatemala

equivalent relief that comports with basic notions of procedural fairness. The INA's "full and fair" standard does not require a country to have in place procedures for refugee relief that are equivalent, or identical, to U.S. asylum procedures. *See* Notice of Proposed Rulemaking, *Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry*, 69 Fed. Reg. 10,620, 10,620 (Mar. 8, 2004) (Department of Homeland Security) (noting that the perfect harmonization of a foreign country's asylum laws and procedures with the laws and procedures of the United States "is not a prerequisite to entering into responsibility-sharing arrangements"). Nor is there any express requirement that the third country's decision-making body or appellate process involve judicial officers, or that applicants have the assistance of counsel. These conclusions are based on the statutory context of the section 208(a)(2)(A) "access to a full and fair procedure" requirement, relevant international sources of law, and analogous domestic legal frameworks.

The United Nations High Commissioner for Refugees also provides relevant guidance in connection with its Handbook on Procedures and Criteria for Determining Refugee Status and Guidelines on International Protection Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees ("UNHCR Handbook"). While the terms of the handbook are not binding under United States law, the handbook suggests that a refugee relief system will comport with basic notions of fairness if it includes a clear set of procedures for consideration of claims; the provision of necessary procedural guidance to applicants; the availability of necessary facilities and interpreter services for applicants; the issuance of documentation to applicants recognized as refugees; an opportunity to appeal a negative determination; the ability to remain in the country during consideration of the application's claims; and a commitment to *non-refoulement* principles. *See* UNHCR Handbook ¶¶ 189, 191–92. United States law does not require the adoption of the standards in the UNHCR Handbook. But countries that provide asylum and refugee relief in general conformity with those standards would likely satisfy the requirement of "access to a full and fair procedure" under INA section 208(a)(2)(A).

The information gathered by DOS and DHS on Guatemalan asylum and refugee procedures, as presented to this Department, supports the determination that Guatemala satisfies the "access to a full and fair procedure" standard. Guatemalan law makes asylum (or equivalent "refugee status") available to aliens based on a broad range of protected grounds and codifies Guatemala's *non-refoulement* obligations under the 1951 Convention Relating to the Status of Refugees. *See, e.g.*, Regulations on the Procedure for the Protection, Determination, and Recognition of Refugee Status in the State of Guatemala, Order No. 2-2019, preamble & art. 4 (2019) ("Regulations on Refugee Status") (Attachment D); *see also* Migration Code, Congressional Decree, No. 44–2016, art. 46 (2016) (Guat.) (Attachment C). Applicants for asylum receive guidance on the application process; complete an interview; acquire the right to appeal an adverse asylum ruling by the adjudicative authority; and have permission to remain in the country pending the completion of this process. *See* Regulations on Refugee Status at art. 17; *see also* Migration Code at arts. 43, 48, 84, & 177–87.

According to DOS and DHS, Guatemalan officials have been unclear about the availability of interpreter services to aliens applying for asylum in Guatemala and about whether aliens convicted of serious crimes would receive the same protection against *non-refoulement* that they would enjoy under U.S. law. Guatemala is a signatory to international agreements protecting against removal to a country where the individual would be subject to torture, and its

Subject: Asylum Cooperative Agreement with Guatemala

domestic laws suggest a general prohibition on such removal. *See* ACA at 1–2; Migration Code at arts. 12, 46; Regulations on Refugee Status (preamble). Even so, the U.S.-Guatemala ACA implementation plan excludes aliens convicted of serious crimes from return to Guatemala, making the extent of Guatemala's protection against the removal of such aliens inapplicable to the legal determination regarding the U.S.-Guatemala ACA. *See Initial Implementation Plan and Annexes*, Agreement Between the Government of the United States of America and the Government of the Republic of Guatemala Concerning Cooperation Regarding the Examination of Protection Claims (Draft), at 7 (Oct. 9, 2019) ("Initial Implementation Plan") (Attachment F).

In addition, we understand from DHS that the current implementation plan is for the U.S.-Guatemala agreement to encompass only nationals from Honduras and El Salvador, thereby ensuring that any limits on Guatemala's interpreter services are likely to be adequate for the intended scope of the population likely to be removed. *See Initial Implementation Plan* at 3–4; *Written Representation of the Guatemalan Protection System from the Government of Guatemala Transmitted to the U.S. Government Through Ambassador to the Rep. of Guatemala Luis E. Arreaga*, Part D.7–8 (Oct. 8, 2019) (Attachment A). Guatemala's provisions for the consideration of asylum and other refugee protection for aliens subject to the U.S.-Guatemala ACA thus at a minimum satisfy, and in certain aspects exceed, commonly understood notions of procedural fairness as set forth, for example, in sources such as the UNHCR Handbook addressing international refugee legal protections.

On October 16, 2019, the Acting Secretary determined that Guatemala provides aliens with "access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection." *See* Acting Secretary McAleenan Determination Memorandum (Attachment G). I believe this conclusion is sound, and so I recommend that you make the same determination by signing the attached proposed Attorney General memorandum. In support of that determination, I have enclosed the following: the translated memorandum describing the procedures available under Guatemalan law for acquiring asylum and refugee protection as understood by DOS, DHS, and Guatemalan officials (Attachment A); the DHS description of its communications with Guatemala regarding Guatemala's asylum and other refugee-relief procedures (Attachment B); relevant provisions of Guatemalan legal codes (Attachments C and D); the signed U.S.-Guatemala ACA (Attachment E); the initial implementation plan for carrying out the U.S.-Guatemala ACA (Attachment F); and AS McAleenan's memorandum determining that Guatemala satisfies the "access to a full and fair procedure" standard (Attachment G).

RECOMMENDATION: I recommend you sign the attached proposed Attorney General memorandum.

APPROVE: _WPBarr_   DATE: _11/7/19_   Concurring Component:

OLC: _SE 11-6-19_

DISAPPROVE: _____   DATE: _____

OTHER: _____

4

Subject:  Asylum Cooperative Agreement with Guatemala

| | |
|---|---|
| Attachment A | *Written Representation of the Guatemalan Protection System from the Government of Guatemala Transmitted to the U.S. Government Through Ambassador to the Rep. of Guatemala Luis E. Arreaga* (Oct. 8, 2019) |
| Attachment B | Memorandum for Kevin K. McAleenan, Acting Secretary, DHS, from Bernardo Pillot, Acting DHS Regional Attaché for Central America, *Re: Implementation of Asylum Cooperative Agreement with the Government of Guatemala*, with an attached *Timeline of DHS Engagement with Government of Guatemala re: Asylum Agreement, Asylum Processes and Procedures* (Oct. 30, 2019) |
| Attachment C | Migration Code, Congressional Decree, No. 44-2016 (2016) (Guat.) |
| Attachment D | Regulations on the Procedure for the Protection, Determination, and Recognition of Refugee Status in the State of Guatemala, Order No. 2-2019 (2019) |
| Attachment E | U.S.-Guatemala Asylum Cooperative Agreement (July 26, 2019) |
| Attachment F | *Initial Implementation Plan and Annexes*, Agreement Between the Government of the United States of America and the Government of the Republic of Guatemala Concerning Cooperation Regarding the Examination of Protection Claims (Draft) (Oct. 9, 2019) |
| Attachment G | Determination Memorandum from Acting Secretary McAleenan, *Whether Guatemala's Refugee Protection Laws and Procedures Satisfy the "Access to a Full and Fair Procedure" Requirements of Section 208(a)(2)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a)(2)(A)* (Oct. 16, 2019) |

DOJFF0005



# Office of the Attorney General
## Washington, D. C. 20530

November 7, 2019

MEMORANDUM FROM THE ATTORNEY GENERAL

SUBJECT:  Whether Guatemala's Refugee Protection Laws and Procedures Satisfy the "Access to a Full and Fair Procedure" Requirements of Section 208(a)(2)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a)(2)(A)

After careful consideration, I find that Guatemala's refugee protection laws and procedures satisfy the requirements of section 208(a)(2)(A) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1158(a)(2)(A). I make this decision based upon the Guatemalan Migration Code, its implementing regulations, and information provided by the Departments of State and Homeland Security following consultations between the United States and Guatemala.

Pursuant to a bilateral or multilateral agreement, section 208(a)(2)(A) of the INA authorizes the removal of an alien to a country that will provide the alien with "access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection" rather than allowing the alien to pursue such a claim in the United States. As the Department of Homeland Security has recognized, the perfect harmonization of a foreign country's asylum laws and procedures with the laws and procedures of the United States "is not a prerequisite to entering into responsibility-sharing arrangements."[1] Guatemala has satisfied the INA section 208(a)(2)(A) "access to a full and fair procedure" requirement because it has in place a sufficient protection system with accompanying procedures and laws. An applicant for protection in Guatemala has a meaningful opportunity to make a protection claim, receive a hearing and adjudication regarding that claim, and safely remain in Guatemala until his or her protection claim is resolved.

The phrase "access to a full and fair procedure" presumes that the third country has in place a process that comports with basic notions of procedural fairness. The Guatemalan system meets these basic requirements. For example, Guatemalan legal provisions and representations made by Guatemalan officials in exchanges with the U.S. State Department and the Department of Homeland Security indicate that Guatemala has a competent immigration authority with clear procedures for addressing initial asylum applications, including referral of claims to an adjudicative body. At the initial stages of the proceedings, the applicant receives oral guidance on how to present a claim along with information on rights, protections, and privileges. Asylum

---

[1] Notice of Proposed Rulemaking, *Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry*, 69 Fed. Reg. 10,620, 10,620 (Mar. 8, 2004) (Department of Homeland Security).

Subject:    Whether Guatemala's Refugee Protection Laws and Procedures Satisfy the "Access to a Full and Fair Procedure" Requirements of Section 208(a)(2)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a)(2)(A)

and refugee-status grantees in Guatemala receive notice of the decisions granting them relief along with the ability to acquire identification facilitating access to health services, education, and employment.  Guatemala also provides notice of the denial of protection applications and gives applicants the right to appeal an adverse decision within ten days of receiving the notification of denial.  Applicants may remain in Guatemala during any appellate process.[2]

Guatemala has also adopted laws barring *refoulement* of refugees that are consistent with the *non-refoulement* obligations described in Article 33 of the 1951 Convention Relating to the Status of Refugees and the 1967 Protocol Relating to the Status of Refugees.  Article 46 of Guatemala's Migration Code generally establishes the substance of Guatemala's *non-refoulement* duties and commitments, and those commitments appear to meet or exceed the standards of Article 33 of the 1951 Refugee Convention and the 1967 Protocol.  For example, Guatemalan law requires that, should asylum or refugee status be denied, an applicant will not be returned to "his or her country when there is a credible reason to fear serious danger to his or her life, physical integrity, and freedom."[3]  Guatemalan Migration Code Article 12 also guarantees that all migrants are not to be subject to "any form of violence," including torture or cruel or degrading treatment.

Therefore, I find that the Guatemalan refugee protection system satisfies the "access to a full and fair procedure" requirement of INA section 208(a)(2)(A).

_11/7/19_
Date

_William P. Barr_
William P. Barr
Attorney General

---

[2] *See* Regulations on the Procedure for the Protection, Determination, and Recognition of Refugee Status in the State of Guatemala, Order No. 2-2019, art. 17 (2019); *see also* Migration Code, Congressional Decree, No. 44–2016, arts. 43, 48, 84, & 177–87 (2016) (Guat.).

[3] Migration Code at art. 46.

2

[Type here]



U.S. Department of State
Office of Language Services
Translating Division

LS No. 2020-0109472
Spanish/English
ALK/GPG

**Translation**

**Ministry of Foreign Relations**
**Republic of Guatemala, Central America**

DEVIMIN-290-2019

 The Ministry of Foreign Relations of the Republic of Guatemala presents its compliments to the

Embassy of the United States of America and transmits herewith a presentation to provide an

understanding of how the refugee system works in Guatemala.

 The attached presentation provides information, which was approved and forwarded by the

Ministry of Government, on the correct operation of the refugee system in Guatemala. At the same time,

this Ministry would like to take this opportunity to reiterate the fact that in Guatemala refugee status and

asylum are two different forms of protection.

 [Complimentary close]

    Guatemala, October 8, 2019

    [Signature]

    [Ministry stamp]

Embassy of the United States of America,
 Guatemala City.

*[Not a USG classification:] Confidential*
*Attorney-Client Communication /Attorney Work Product*
*Deliberative and Predecisional*
*For Official Use Only*

The United States and Guatemala, pursuant to the AGREEMENT BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE REPUBLIC OF GUATEMALA REGARDING THE EXAMINATION OF PROTECTION APPLICATIONS ("the Agreement"), intend to offer applicants for protection systems of protection consistent with the obligations provided for under, respectively, the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees. As a result, the two countries maintain that any foreign national who is subject to the Agreement would have access to a full and fair procedure in the investigation of a protection application under applicable legislation.

In view of the foregoing, the Government of the United States of America has initiated a dialogue with the Government of Guatemala, which is currently in progress, regarding the latter's system of protection. This dialogue has resulted in establishment of the following information:

A. *Non-Refoulement*
1. Guatemala is a signatory to the United Nations Convention Against Torture (CAT); however, the Guatemalan Migration Code contains no direct reference to any prohibition on the return, expulsion, or deportation of individuals when there are substantial grounds to believe that a given individual would be at risk of being tortured. This situation is covered under Article 71 of the Code. Article 3 of the Rules of Procedure for Protection, Determination, and Recognition of Refugee Status in Guatemala [*Reglamento del procedimiento para la protección, determinación y reconocimiento del estatuto de refugiado en el Estado de Guatemala*] also makes reference to non-refoulement for those individuals eligible for refugee status. It provides that:

> "The provisions set forth in these Rules shall be interpreted and applied in accordance with the principles of non-discrimination, confidentiality, and family reunification, and on a humanitarian and apolitical basis, consistent with the rights and obligations applicable to refugees under the Constitution of the Republic of Guatemala and international agreements to which Guatemala is party."

2. Because there are currently no specific cases in which protection is being sought on the grounds of torture and because no provision is made in this regard in the Migration Code, refugee status shall apply to torture cases.

3. Guatemala shall apply only those protection application restrictions that are contained in conventions and domestic laws.

4. At present, no migration policies, beyond those already established under Guatemalan law, are used as grounds to deny an applicant's protection (asylum, refugee status, or protection from torture) application.

5. Guatemala does not grant protection measures to refugee status applicants in any of the following circumstances: (a) The individual has committed a crime against peace, a war crime,

*[Not a USG classification:] Confidential*
*Attorney-Client Communication /Attorney Work Product*
*Deliberative and Predecisional*
*For Official Use Only*

or a crime against humanity, as defined in the international instruments drafted for the adoption of provisions on such crimes; (b) The individual committed a particularly serious crime in a place other than the country of refuge before being admitted to that country as a refugee or before the time that his/her application was submitted for the purpose of evading justice in another country; (c) The individual is guilty of acts contrary to the purposes and principles of the United Nations  as embodied in treaties and international agreements.

6.  Acts of racial discrimination, torture, forced disappearance, acts against persons with disabilities, and acts contrary to the rights of women, children, migrants, minorities, and indigenous people, as contained in the Universal Declaration of Human Rights, are those "acts and purposes" that are considered, under the 1951 Convention and Article 47 of the Migration Code, to be so contrary to the purposes and principles of the United Nations that they warrant denial of refugee status.

7.  Guatemala is currently a signatory to the Convention Against Torture and to the 1951 Convention relating to Refugee Status and its 1967 Protocol.

8.  UNHCR involvement with respect to non-refoulement is of an advisory nature with regard to the Guatemalan State.

9.  Those protection applicants who enter Guatemala as irregular entrants shall face administrative fines and be subject to expulsion or deportation but shall not face criminal penalties.

10. Guatemala has a National Office for the Prevention of Torture, the function of which is to make recommendations, as applicable, to State entities when a person is the object of cruel and inhuman or degrading treatment.

*B.  Protection Application Processing Capacity*

1.  Two hundred sixty-two protection applications were submitted to the Guatemalan Migration Institute in 2018, and two hundred eighty-four have been submitted so far in 2019.

2.  Guatemala's protection application capacity information [*sic*—inclusion of the word "*información*" here may be a typographical error] improved after the rules for the determination and granting of refugee status [*reglamento para la determinación otorgamiento del estatuto de refugiado*], adopted in March 2019, took effect.

3.  The processing of protection applications has been taking an average of one to two years from the time the applicant submits his/her protection application to the time a decision on the application is made, but since the above-mentioned rules took effect, this process has become faster.

4.  Thirty-two refugee status applications were abandoned in 2018.

*[Not a USG classification:] Confidential*
*Attorney-Client Communication /Attorney Work Product*
*Deliberative and Predecisional*
*For Official Use Only*

C. *Protection available under Guatemalan law*

1. In applications alleging torture, Guatemala recognizes persecution perpetrated abroad by both State and non-State actors.

2. The difference between asylum applications and refugee status applications is basically that asylum protection requires political persecution and is processed in a Guatemalan consulate or embassy abroad whereas refugee status protection requires other grounds and is processed inside Guatemala.

3. Additional information on the administrative procedures regarding protection measures is given below:

| | WHO MAKES DETERMINATION | DESCRIPTION | LAW GOVERNING THIS |
|---|---|---|---|
| **REFUGEE** | National Migration Authority | 1. An application for refugee status may be made in person, either orally or in writing, at the Reception Center; <br><br> 2. The application shall be immediately forwarded, in writing, to the support personnel of the National Commission for Refugees (CONARE) [*Comisión Nacional para Refugiados*]; <br><br> 3. The individual shall appear at the Office of International Migration Affairs (ORMI), where he/she shall confirm his/her initial application. This shall then constitute an official application and he/she will receive, through CONARE, a 30-day residence permit, as established in the rules for protection and determination of refugee status [*Reglamento para la* | Migration Code |

*[Not a USG classification:] Confidential*
*Attorney-Client Communication /Attorney Work Product*
*Deliberative and Predecisional*
*For Official Use Only*

| | | | |
|---|---|---|---|
| | | *Protección y Determinación del Estatuto de Refugiado*]. | |
| | | 4. A date and time for a personal interview is established. If the applicant fails to appear, the application may be declared abandoned. | |
| | | 5. If the applicant appears for the interview, he or she shall append documents corroborating the well-founded fear, or proving any other situation that warrants the grant of refugee status, to the application. | |
| | | 6. Once the investigation process conducted by CONARE support personnel is completed, the results are sent to the CONARE expert committee so that it can issue the appropriate Expert Opinion. | |
| | | 7. Once the CONARE expert committee issues its Expert Opinion, the applicant's refugee status file is sent to the National Migration Authority. | |

*[Not a USG classification:] Confidential*
*Attorney-Client Communication /Attorney Work Product*
*Deliberative and Predecisional*
*For Official Use Only*

| | | | |
|---|---|---|---|
| | | 8. The National Migration Authority issues a decision on the grant or denial of refugee status in Guatemalan territory. | |
| | | 9. The applicant is notified of the decision issued by the competent authority granting or denying the application. | |
| | | 10. In the event of denial of status, the party concerned may file a petition for reconsideration in accordance with law. | |
| | | 11. Notice of the petition for reconsideration shall be served on the National Migration Authority, which rules on such petitions. | |
| **ASYLUM** | Ministry of Foreign Relations | The Bilateral Relations Directorate is responsible for processing asylum applications, and the Minister of Foreign Relations is the official responsible for issuing a decision on such applications.<br><br>Political asylum is requested outside Guatemalan territory, and refugee status is requested inside Guatemalan territory. | Government Order No. 415-2003 |

SBU - DELIBERATIVE PROCESS

*[Not a USG classification:] Confidential*
*Attorney-Client Communication /Attorney Work Product*
*Deliberative and Predecisional*
*For Official Use Only*

4. Guatemala receives protection applications both orally and in writing as established in Article 17 of the  Rules of Procedure for Protection, Determination, and Recognition of Refugee Status in Guatemala [*Reglamento del Procedimiento para la Protección, Determinación y Reconocimiento del Estatuto de Refugiado en el Estado de Guatemala*].

### D.  Reception/Determination Process

This section develops and expands on the reception procedure, which is a component of the procedure for the grant of refugee status described above in C(3) of this document.

1. All applications for refugee status shall be delivered in person, either orally or in writing, to a migration checkpoint, to the Unit for the Protection of the Fundamental Rights and Care of Migrants [*Subdirección de Atención y Protección de Derechos*], or to the Institute's Reception Center. This process shall be carried out as follows:

(A) At the Migration Control Unit [*Subdirección de Control Migratorio*] located at one of the Institute's checkpoints, the agent shall take receipt of the spoken or written initial application and shall immediately forward that application, in writing, to CONARE support personnel, or;

(B) At the Institute's Unit for the Protection of the Fundamental Rights and Care of Migrants, receipt of the initial application shall be taken orally or in writing and shall be forwarded in writing to CONARE support personnel;

(C) [Receipt of the application shall be taken] at the Reception Center upon entry into Guatemala.

2. After receiving the protection application, CONARE support personnel shall take the following actions:

a. Provide guidance to the refugee status applicant so that he/she can obtain information about procedures;

b. Take receipt of the official application. The applicant shall fill out the form provided by CONARE, which must be sequentially numbered. On that form the applicant shall explain the grounds for the application and why he/she left his/her country of origin. The applicant may append to the application any personal identification documents that he/she has brought with him/her, as well as any other proof he/she deems pertinent as grounds for his/her application;

c. Notify the Unit for the Protection of the Fundamental Rights and Care of Migrants [*Subdirección de Atención y Protección de Derechos*] about the applicant's temporary residence status;

*[Not a USG classification:] Confidential*
*Attorney-Client Communication /Attorney Work Product*
*Deliberative and Predecisional*
*For Official Use Only*

d.  Notify the Migration Unit [*Subdirección de Migración*] if the applicant has children or adolescents, for purposes of providing temporary residence.

e.  Establish a date and time for the interview, which must take place within a period not to exceed 15 days from the date of the receipt of the official application.

3.  In Guatemala, each protection applicant receives spoken guidance once he or she submits an application. Spoken guidance covers the procedures to be followed by the applicant, what steps to take, available protections, information relating to the fact that the applicant is being given a 30-day permit, and what he/she may not do while in Guatemala. The applicant also receives a summary of the appeals (petition for reconsideration) process during this initial stage. This guidance is given to all protection applicants.

4.  The guidance is offered in Spanish or in a language the applicant understands and in accordance with migration policy.

5.  In the initial stage of the proceedings, the applicant is advised, orally, of his/her right to contact a UNHCR representative.

6.  On the date and at the time established for the interview, a specific area shall be made available for interviewing applicants in order to determine whether each applicant meets the requirements for obtaining refugee status. This area shall be properly equipped with audio- and video-recorders to document the interview. In addition, a psychologist shall be present at each interview to draft a psychological report based on the interview. If necessary, a translator or interpreter shall be present and shall sign the document issued as a result of the interview.

7.  While conducting the interview, the interviewer shall comply with the following regulatory requirements:

a.  Applicants shall be interviewed one by one by CONARE support personnel, who shall use a specialized, comprehensive, and individualized approach;

b.  Unaccompanied children and adolescents or children and adolescents who have been separated from their families shall be served in specialized areas by qualified personnel who shall attend to their specific protection needs in accordance with current Guatemalan law, and the interviewer shall work with the Office of the Attorney General of Guatemala [*oficina de la Procuraduría General de la Nación*] to ensure specialized attention to this category of migrants. (This provision does not apply to persons processed under the terms of the Agreement.);

c.  The interview shall be conducted in Spanish. If the applicant or refugee does not speak Spanish, he/she shall be assisted by a translator or interpreter;

*[Not a USG classification:] Confidential*
*Attorney-Client Communication /Attorney Work Product*
*Deliberative and Predecisional*
*For Official Use Only*

    d.  With respect to family groups, each family member shall be interviewed individually within a period not to exceed 30 days.

8.  As indicated earlier, protection application interviews are generally conducted in Spanish, but Guatemala shall provide translators or interpreters for any language; under the Agreement and migration policies, however, this is not necessary.

9.  As indicated earlier, children are interviewed separately and apart from their family unit (if they are part of a more extended family unit). If a child is unaccompanied, he/she shall also be interviewed separately. Guatemala has a special "child-friendly" interview area. (Under the Agreement, this provision does not apply to unaccompanied children.)

10.  Once an official refugee status application is received, CONARE support personnel shall open an investigation into the case, using appropriate methods to bring that investigation to completion.

11.  The right to a defense is guaranteed under Article 12 of the Guatemalan Constitution and this right applies to protection application interviews.

12.  If the applicant fails to present an identification document or if such a document cannot be obtained through the services of the embassy of the applicant's country, Guatemalan agents shall interview the applicant to verify his/her identity to their satisfaction for the purpose of detecting and preventing fraud.

13.  The interview process for those persons subject to the Agreement shall be the same as the process for other protection applicants, except that potential fraud can be more efficiently minimized for those individuals processed under the Agreement.

14.  Applicants shall not be required to leave Guatemala while any appeal relating to their protection application(s) is pending.

15.  The derivative beneficiaries of approved protection applications are parents, siblings, spouses, and sons and daughters.

*E.  Scope of Protection*

1.  When protection applicants in Guatemala start their paperwork, they are provided with a special identification document to use for identifying themselves to the authorities. This document also identifies them as persons entitled to remain legally in Guatemalan territory. Later, when refugee status is granted, they are provided with an identification document to use for activities of daily life, such as education or work activities.

2.  In accordance with Article 101(b) of the Migration Code, protection applicants are permitted to: (1) work, (2) move freely within Guatemala; and (3) obtain travel authorizations (for example, a

*[Not a USG classification:] Confidential*
*Attorney-Client Communication /Attorney Work Product*
*Deliberative and Predecisional*
*For Official Use Only*

refugee travel document) to leave and return to the country. These authorizing documents are valid until a final decision is made. The rights described above can take effect as soon as the identification document is issued after the second interview.





**U.S. Department of Homeland Security**
Washington, DC 20528

| | |
|---|---|
| MEMORANDUM FOR: | Kevin K. McAleenan<br>Acting Secretary |
| FROM: | Bernardo Pillot *B. Pillot*<br>DHS Regional Attaché for Central America (Acting) |
| SUBJECT: | Implementation of Asylum Cooperative Agreement with the<br>Government of Guatemala |

**Purpose:**  This memorandum is to inform you that DHS assesses the Government of Guatemala is ready, willing and able to implement the asylum cooperative agreement with the Government of Guatemala.  Implementation of this agreement will protect American citizens and the security of the Homeland by stemming the flow of illegal immigrants traveling toward our borders.

**Background:**  DHS has worked closely with the Guatemalan Ministry of Security, Ministry of Foreign Affairs, and Guatemalan migration, asylum and law enforcement authorities in a capacity-building role to prepare for the implementation of the Asylum Cooperative Agreement which will sharply reduce the flow of immigrants transiting from the Northern Triangle with the intent to illegally enter the United States.  Given this extensive working relationship and cooperation with the Government of Guatemala, DHS assesses the Guatemalan Government is prepared, ready willing and able to receive transfers under this agreement as soon as possible.

DHS has a robust footprint of personnel supporting operations (over 45 personnel) in Guatemala both on a permanent and temporary basis to assure successful implementation of this agreement and other key DHS priorities. These personnel are from various DHS operational components including Immigration and Customs Enforcement, U.S. Citizenship and Immigration Service, and U.S. Customs and Border Protection.

DHS intends to proceed with implementation of the agreement and continue to provide planning, support, technical expertise, and logistical assistance to Guatemalan immigration and law enforcement authorities to implement the agreement in a phased manner.

For its part, the Government of Guatemala has indicated that it is ready, willing, able and prepared to implement the agreement and will commit all necessary personnel.  Guatemala will also further support implementation of this agreement by expanding cooperation with international organizations, like UNHR and IOM, who recently received $47 million dollars in U.S. foreign assistance funding to increase asylum capacity in Guatemala.

Given DHS' close working relationship with the relevant authorities of the Government of Guatemala and the extensive interaction between DHS personnel on the ground and Guatemalan authorities over the last five months on this issue, DHS assess that the Government of Guatemala is ready, willing, and able to implement this agreement as soon as possible.

**Timeline of DHS Engagement with Government of Guatemala re: Asylum Agreement, Asylum Processes and Procedures**

<u>June</u>

June 7 – DHS begins analyzing the Guatemalan immigration code.

June 12-13 – Senior USG Delegation with Executive Leadership from DHS and DOS have discussions in Guatemala with the Guatemalan Ministry of Security and the Ministry of Foreign Affairs and begin negotiating the asylum cooperation agreement.  Attorneys from DHS and DOS engaged with the Guatemalans on current immigration policies/processes and current asylum processes in Guatemala.

June 18-21 – Senior USG Delegation from DHS and DOS return to Guatemala City for on-going discussions on asylum cooperative agreement and asylum processes and procedures.

June 25-26 – Acting Secretary McAleenan travels to Guatemala along with DOS/WHA leadership for various meetings including with UNHCR Executive Leadership and the International Organization of Migration.  During this time, the Acting Secretary receives comprehensive briefings from the organizations on current asylum processing and capacity in Guatemala, and witnesses a refugee processing interview from USCIS in Guatemala City.

<u>July</u>

July 8 – DHS and DOS host a VTC with the attorneys from the Guatemalan Government to discuss the asylum agreement text, asylum processes/procedures and implementation of the agreement. DHS shares a draft implementation plan with Guatemala.

July 9 – DHS and DOS host a seven hour VTC with the Guatemalan Government for further discussions on asylum agreement text, asylum processes/procedures, and implementation of the agreement.

July 10 - DHS and DOS host a seven hour VTC with the Guatemalan Government for further discussions on asylum agreement text, asylum processes/procedures, and implementation of the agreement.

July 12 – DHS, with input from DOS, develops a list of questions about Guatemala's asylum processes and procedures, and sends the questions to the Government of Guatemala.

July 15 – The Guatemalan Minister of Security comes to Washington, DC for meetings at DHS to discuss details of the implementation plan of the ACA.  During this time, the Minister also attends meetings at the EEOB attended by Senior WH Leadership, DHS Acting Secretary McAleenan, and DOS Leadership to discuss the asylum agreement and implementation.

July 18 – DHS and DOS meet with UNHCR in Washington DC to discuss capacity building for the Guatemala asylum system.

July 22 – DHS and DOS meet with UNHCR in Washington DC to further discus Guatemala's asylum system and capacity building

July 23 – DHS and DOS host a meeting in Washington, DC with the Guatemalan Ministry of Security to discuss asylum processes and implementation of the asylum cooperative agreement.

July 25 – Guatemalan government provides the first round of responses to the questions sent by DHS.

July 26 – Acting Secretary McAleenan and the Guatemalan Minister of Security sign the Asylum Cooperative Agreement in the Oval Office.

July 27 - Guatemala responds to a series of questions on Guatemala asylum program via diplomatic note.

July 29 – Acting Secretary McAleenan hosts a call with various Guatemalan government officials regarding implementation of the asylum agreement

July 31 – Acting Secretary McAleenan travels to Guatemala City for further discussions with the Guatemalan Government on implementation of the agreement.  While in Guatemala City, the Acting Secretary also engages with other key stakeholders, including UNHCR.

**August**

August 13 – USG sends follow up questions on the Guatemala asylum system to Guatemala.

August 14 – Acting Secretary McAleenan hosts the Guatemalan Minister of Security to discuss asylum processes and implementation of the agreement.  During this meeting, DHS shares a second round of additional clarifying questions on Guatemala's asylum processes and procedures.

**September**

September 11 – DOS leadership confirms that the Government of Guatemala received the follow-up questions from DHS and that Guatemala will provide answers by the following week.

September 13 – DOS and DHS meet with UNHCR in Washington, DC to discuss regional cooperation and asylum agreements, including with Guatemala.

September 16 – DHS hosts a teleconference with the Guatemalan Minister of Security and Government of Guatemala immigration attorneys to further discuss asylum processes and procedures.

**October**

October 3 – Based on the numerous discussions with various Guatemalan officials and lawyers, DHS drafts an "understandings" document outlining the asylum processes and procedures in Guatemala.  DHS requests that U.S. Ambassador to Guatemala transmit the "understandings" document to the Government of Guatemala to verify the facts and assertions contained in the document.

October 9 – The Government of Guatemala provides via an official diplomatic note its response and edits to the "understandings" document.

October 11 – Government of Guatemala provides clarifying edits to the "understandings" document and clarifies that, any foreign individual inside Guatemalan territory who claims persecution on account of political opinion, is entitled to apply for refugee status.

October 29 – DOS leadership, U.S. Embassy Guatemala leadership, and DHS representatives in Guatemala met with the Government of Guatemala and International Organizations to discuss implementation of the ACA

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

## MIGRATION CODE

### VOLUME I
### General Rights

### Part I
### The right to migrate and the rights of migrants

### Chapter I
### Rights

**Article 1. Right to migrate.** The State of Guatemala recognizes each person's right to emigrate or immigrate, whereby migrants may enter, remain in, transit through, leave, and return to Guatemalan territory, pursuant to national legislation.

**Article 2. Access to government agencies.** The State guarantees the right of all persons in Guatemalan national territory to enjoy equal access to public safety, health, education, employment, housing, and other services necessary for the fulfillment of their lives, pursuant to the Political Constitution of the Republic, the present Code, and other applicable standards.

Foreign citizens may access government agencies in order to carry out their activities and assert their legal rights. No government official may deny anyone assistance and service due to the fact that they are not Guatemalan citizens.

**Article 3. Right to Guatemalan nationality.** The right of foreign citizens to obtain Guatemalan nationality is recognized, pursuant to the Nationality Law in force.

**Article 4. Right to family.** The State of Guatemala recognizes the right of foreign citizens to settle in Guatemala with their families, either with the intention of starting a new family or reunifying family members within national territory, pursuant to the Political Constitution of the Republic, this Code, and other applicable standards.

**Article 5. Right to property and investment.** Any foreign citizen, with the exception of limitations set by the Political Constitution of the Republic and other laws, has the right to obtain property within national territory, and to invest in lawful businesses, companies, and entities, pursuant to national legislation.

**Article 6. Right to work.** Any foreign citizen has the right to work, in line with the provisions of this Code, national legislation in force, and international law.

**Article 7. Right to education.** Any foreign citizen has the right to education under the national and higher education systems, pursuant to the provisions of this Code and specific legislative provisions with regard to education.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

**Article 8. Rights of the individual.** Rights and guarantees granted by Guatemalan laws and international conventions and treaties ratified by Guatemala are to be considered incorporated, even if they do not expressly appear in this Code.

**Article 9. Non-discrimination.** Migrants shall enjoy equal treatment, and may not be discriminated against for reasons of sex, sexual orientation, race, color, language, religion or creed, political or other opinions, ethnic or social origin, nationality, age, economic situation, wealth, marital status, birth, or any other personal characteristic.

**Chapter II**
**Rights and special conditions**

**Article 10. Right to protection by the State.** The State of Guatemala is required to protect the personal integrity, life, and liberty of all Guatemalan and foreign citizens in national territory, without discrimination of any type.

State institutions may not demand identification documents or any other requirements in exchange for providing a foreign citizen with required protection. In all cases, necessary and available means shall be used in order to provide him or her with immediate care.

Persons have the right to freely decide where to settle within national territory.

**Article 11. Rights of migrant children or adolescents who are unaccompanied or separated from their families.** Migrant children and adolescents of other nationalities who are unaccompanied or separated from their families, pregnant girls or adolescents, girls or adolescents with their own children, and married couples who are minors with or without their own children have the right to receive services from specialized and differentiated outpatient programs or inpatient programs at specially designed shelters provided or authorized by the State to this end, pursuant to the specific principles identified in this Code.

The relevant authorities shall consider a differentiated response for the protection of refugee children, particularly those who are unaccompanied or have been separated from their parents or guardians, in order to appropriately meet their specific protection and service needs. In no case may children or adolescents who are unaccompanied or separated from their families be denied entry at the border.

Children and adolescents may not be deported, as this does not serve their best interest.

Specific due diligence and procedures shall be carried out in line with this Code and its regulations.

"Children or adolescents who are unaccompanied or separated from their families" shall be defined as children or adolescents who are not under the care and protection of their father,

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

mother, or an adult who according to law or custom is their usual caregiver, even when these children are accompanied by other persons.

**Article 12. Protection from violence, torture, and cruel, inhumane, or degrading treatment.** The State guarantees migrants' dignity and rights within national territory, and ensures that they are not subjected to any form of violence, torture, or cruel, inhumane, or degrading treatment.

Migrants who report being victims of violence, sexual or labor violence, torture, or cruel, inhumane, or degrading treatment at the hands of one or more persons, for profit or not, shall receive immediate services in line with measures to safeguard their integrity, health, and lives.

**Article 13. Maternity and sexual health.** Female migrants with or without identification documents to remain in Guatemala, have the right to access public sexual and reproductive health services on equal footing with Guatemalan citizens. This is to include gynecological services, maternity care for the time frame necessary to preserve their lives and that of their newborns, as well as family planning services.

All female migrants and their children have equal rights with Guatemalan citizens to receive immunization vaccinations against the main infectious diseases found in the community, as well as ordinary disease, in line with national health policies.

**Article 14. Elderly persons.** All elderly migrants in vulnerable situations in national territory have the right to care and shelter, as well as special services as necessary due to their age.

**Article 15. Family.** Migrants and their families have the right to remain together at all times. If, for administrative reasons and on a strictly exceptional basis they must be separated, that separation period shall only last as long as required to complete the administrative step, and family members shall be informed of where the individual is, what administrative steps must take place, and the authority requiring the temporary separation. Children and adolescents may be separated from their families in strictly exceptional circumstances, and only when that separation serves their best interest.

Family members have the right to file a writ of habeas corpus with the competent authority, and their access to this right shall always be facilitated.

Government officials who fail to comply with the provisions of this article shall be subject to penalties in line with Guatemalan criminal legislation.

**Article 16. Right to shelter and temporary care.** The Guatemalan Migration Institute has the exclusive authority to authorize entities providing migrants with temporary shelter and services. These entities must comply with regulatory provisions regarding their location and operations.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

Guatemalan citizens who have returned from other countries may request that Guatemalan authorities provide them with temporary shelter and services, in order to provide them with a place to spend the night for 48 hours, and return to their place of origin. Authorities shall ensure that living conditions at these centers are acceptable and appropriate.

**Article 17. Right to information and documentation.** All foreign citizens or returning Guatemalan citizen have the right to receive necessary information regarding their situation, administrative steps to take place, and anything regarding their status or person.

Authorities may not confiscate, withhold, destroy, change, alter, hide, or pretend to lose migrants' identification, travel, or personal documents. Altering or including any false information on foreign migrants' or returning Guatemalan citizens' personal identification or travel documents is also prohibited.

**Article 18. Slavery or servitude.** No migrant in national territory may be subjected to conditions of slavery, servitude, or forced labor.

**Article 19. Right to communication and family contact.** Migrants in specialized shelters, housing centers, and temporary care centers authorized by the Guatemalan Migration Institute may request, based on available resources, support communicating abroad in order to speak with family members and consular assistance.

In the case of children and adolescents who are unaccompanied and/or separated from their families, communication shall be encouraged whenever necessary, in order to serve the children's best interest. Minors may also communicate with their consular authorities at any time. Exceptions include cases of asylum applicants or those requesting any other type of international protection system.

**Article 20. Right to be returned to one's country of origin or home country.** Migrants have the right to ask Guatemalan authorities to return them to their countries of origin or provenance. To that end, when migrants cannot bear the costs of their return, they must speak with their consular authorities, or with their country of origin provenance in order to arrange the best mechanism for their return. Guatemalan authorities shall verify that travel to these countries has been completed successfully.

## Chapter III
## Rights of migrant workers and their families

**Article 21. Recognition.** The State of Guatemala guarantees that all migrant workers' rights and the rights of their families are recognized in the Political Constitution of the Republic, national legislation, and international law duly recognized in Guatemala.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

**Article 22. Indubio Pro Operario.** As is the case with Guatemalan citizens, any interpretation or scope of the legal, regulatory, or contractual provisions regarding migrant workers shall be that which is most favorable to workers.

Stipulations involving the relinquishment, reduction, misrepresentation, or limitation of rights recognized by national or international legislation and any public or private provision are null and void, and may not be used to compel migrant workers.

**Article 23. Minimum social rights.** The following are minimum social rights which underpin labor legislation specific to migrant workers and the operations of State administrative entities and courts:
   a) The right to freely select one's work and enjoy satisfactory economic conditions guaranteeing the worker and his or her family a dignified existence.
   b) Equal pay, to be no less than the minimum wage in force, and in legal currency; employees may reach an agreement with employers to be paid in the current legal currency of another country.
   c) The unseizability of one's salary in cases determined by the national labor law in force; this also applies to personal work equipment or tools.
   d) Respect for workdays, vacation time, leave, compensation, and other rights recognized by national labor legislation.
   e) Overtime payment pursuant to national legislation in force or in line with an agreement reached between the employee and employer.
   f) Female workers' right to special maternity protections.
   g) Children and adolescents may not be employed, except as provided as an exception pursuant to national and international law.
   h) Payment of economic benefits for one's family in case of death, in line with the provisions for each case, pursuant to national legislation and internal regulations at the worker's place of employment.

**Article 24. Social security.** Migrant workers and their beneficiary families have the right to services and benefits from the Guatemalan Social Security Institute [IGSS]. To receive these benefits, they must be registered and pay contributions in line with IGSS standards.

The IGSS must issue administrative provisions to register migrant workers and their beneficiaries.

**Article 25. Pensions.** Migrant workers who work for Guatemalan state agencies, including independent or decentralized agencies, have the right to make contributions pursuant to the specific pension law.

Migrant workers who have fulfilled the law's requirements have the right to receive a pension in line with their service and contributions.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

**Article 26. Categories of migrant workers.** For the purposes of implementing this Code, a "migrant worker" is defined as any foreign citizen who carries out remunerated activities in Guatemalan territory. These workers are classified in the following categories:

a) **Cross-border and itinerant workers:** A cross-border worker is a person who resides in the territory of a neighboring State and returns home at the conclusion of his or her workday, or at least once per week; itinerant workers carry out the same activity and transit between Guatemala and Belize, until the Territorial, Insular, and Maritime Differendum is resolved by the International Court of Justice.

b) **Temporary workers:** Persons whose activities depend on the season, or due to the nature of their work, are only carried out for a specific period during the year.

c) **Consultant, advisor, or specialized technician:** A person who carries out his or her activities for a period of no more than 365 days, and whose services are required by a specific contractor, as a consultant, advisor, or specialized technician, and who is not required to request permanent residence.

d) **Self-employed worker:** Any worker who carries out industrial or commercial activities independently or with his or her family members, and who is authorized to carry out remunerated activities within national territory.

The Guatemalan Migration Institute may suggest expanding these categories and proposing regulations and conditions, as circumstances require.

**Article 27. Family members and companions.** Blood relatives, as defined by law, who depend on the migrant worker, may settle in Guatemala for the duration of the migrant worker's labor activities. This also applies to the migrant worker's spouse or cohabitant. In all cases, corresponding authorizations shall be provided, and managed in line with this Code and national legislation.

Family members or companions accompanying a migrant worker may carry out labor activities, and to that end, obtain a migrant worker category classification. They may also carry out educational activities in the national education system, and access the Guatemalan health system.

**Article 28. Information with one's country's representatives.** For no reason may migrant workers or their family members or companions be denied or prevented from communicating with their country's consular or diplomatic representatives. In case of death, accident, or any other situation requiring communication with one's country, immediate communication shall one's respective consular or diplomatic representative shall be facilitated.

**Article 29. Cultural and religious identity.** Diplomatic representations in Guatemala may promote their countries' own cultural and religious activities among their fellow nationals working in Guatemala. This right shall be exercised within the framework of Guatemala's laws, and with respect for the cultures, languages, religions, beliefs, and customs of persons who live in national territory.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

**Article 30. Entry and exit.** During their stay in Guatemala, migrant workers and their families or companions may enter and leave the country so long as is necessary, in line with standards set forth by this Code and its regulation.

**Article 31. Assets and properties.** Migrant workers or their family members or companions who acquire assets or properties in Guatemala shall be the owners of that property, even when they no longer carry out remunerated activities in the country. They may avail themselves of their property in line with their interests and national legislation in force.

When a migrant worker is arrested or convicted of a crime or offense, he or she does not lose rights to his or her legally and legitimately acquired assets or property, unless, pursuant to Guatemalan legislation, the property is found to be subject to forfeiture or seizure.

**Article 32. Transfer of assets and funds.** Once they have concluded their period of stay in Guatemala, migrant workers and their families have the right to take their securities or assets of their legal and legitimately required property, and to transfer money in line with authorized bank procedures.

They may also bring their assets into the country and transfer money from accounts in other countries into duly accredited accounts in the Guatemalan banking system.

Limitations to this right are with regard to health, legal proceedings preventing the exit of assets or money, or forfeiture proceedings.

No government official may encumber or limit this right, for any reason outside of what has previously been established by legislative and administrative provisions, or court order.

**Article 33. Requests to exercise one's right to vote.** Diplomatic offices in Guatemala representing countries in which citizens may exercise their right to vote from abroad, may request, through the Ministry of Foreign Relations, that Government authorities provide assistance from the Guatemalan Migration Institute, as well as any support necessary to obtain a list of persons of their nationality residing in Guatemala.

**Article 34. Right to cooperatives.** Migrant workers or their family members or companions may be members of cooperatives. To this effect, cooperatives shall have their own standards to establish methods and levels of participation.

**Article 35. Taxes.** Migrant workers are subject to paying taxes, levies, arbitration, and fines established in general and specific national legislation. They must also comply with administrative requirements, as set by the Tax Administration Superintendence for each case.

Tax breaks, exemptions, or any other benefit shall be in line with administrative or legislative provisions, which may be issued for each case and at any time.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

**Article 36. Resignations or dismissals.** Employers of migrant workers holding valid authorization in Guatemala shall inform the Guatemalan Migration Institute whenever foreign employees are dismissed or have resigned, and the migrant worker may be required to pay for his or her services, pursuant to Guatemalan labor law.

**Article 37. Labor justice.** All migrant workers have the right to access administrative authorities and labor courts in Guatemala, and to file cases in line with national laws in force.

**Chapter IV**
**Rights of victims of trafficking in persons**

**Article 38. Rights.** Migrants who are the victims of trafficking in persons have the following rights, in addition to the regulations in Article 11 of the Law Against Sexual Violence, Exploitation, and Trafficking in Persons [*Ley Contra la Violencia Sexual, Explotación y Trata de Personas*], Decree Number 9-2009 of the Congress of the Republic:

   a) Access to available resources. In cases involving children and adolescents, proceedings shall recognize victims' special needs, which include being able to complete their full development process.
   b) To not be subjected to confrontation with accused perpetrators.
   c) That protection measures from applicable laws do not entail imprisonment.
   d) To testify, in special conditions providing protection and care.

**Article 39. Protection and shelter hostels.** Protection and shelter hostels and specialized programs providing comprehensive care for adult migrants who are victims of sexual violence, exploitation, and trafficking in persons, are under the Secretariat for Sexual Violence, Exploitation, and Trafficking, and support services are provided by the Ministry of Public Health and Social Assistance, Ministry of Labor and Social Security, as well as the Ministry of Social Development, in line with their mandates. Services shall be managed in coordination with the Division of Migrant Services and Protection of Fundamental Rights, along with other State agencies, in line with current policies and legislation.

Children and adolescents who are victims of sexual violence, exploitation, and trafficking in persons, including Guatemalan children or migrants of other nationalities, shall enjoy specialized and differentiated care through programs under the Office of the Presidential Secretariat for Social Welfare as the governing body providing essential services and special protection to children and adolescents whose rights have been threatened or violated. The Secretariat shall coordinate its activities through the National Council for Services and Protection of which it is a part, as well as other State institutions, and provide services through its department headquarters.

State institutions identified in this article shall set standards for various care services and programs provided at protection and shelter hostels.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

**Article 40. Immigration controls.** Pursuant to Article 14 of the Law Against Sexual Violence, Exploitation, and Trafficking in Persons [*Ley Contra la Violencia Sexual, Explotación y Trata de Personas*], Decree number 9-2009 of the Congress of the Republic, the Guatemalan Migration Institute, the Ministry of the Interior, and the Public Ministry shall issue protocols and joint provisions regarding steps to take in each circumstance.

All provisions issued shall comply with respect for human rights. Additionally, victims shall be informed about the protection and service system, and if the victim is a child or adolescent, the Solicitor General's Office shall be informed in order to begin the protection process.

**Article 41. Repatriation of migrant victims.** Migrant victims of trafficking in persons shall be repatriated pursuant to Articles 16, 17, and 18 of the Law Against Sexual Violence, Exploitation, and Trafficking in Persons, Decree number 9-2009 of the Congress of the Republic.

Within those proceedings, the right of the victims to not be repatriated due to violence or fear of violence shall be considered, without prejudice to applications for asylum, refugee status, or residency for humanitarian reasons, or any reason regulated in this Code or in line with international practice.

When a person is in the national territory of his or her blood relatives as defined by law, or has a credible fear that returning to his or her country of origin will present a serious risk to his or her life or personal integrity, non-repatriation shall be considered.

**Article 42. Protocols.** Interinstitutional protocols regulated in section b. of Article 19 of the Law Against Sexual Violence, Exploitation, and Trafficking in Persons, Decree number 9-2009 of the Congress of the Republic, as well as those of institutions described in the same text of the aforementioned article, shall include the Guatemalan Migration Institute.

## Chapter V
### Right to recognition of refugee status, political asylum, and humanitarian assistance

**Article 43. Refugee.** Foreign citizens may request that the State of Guatemala grant them refugee status upon entry into Guatemala at an official immigration checkpoint.

The process for obtaining refugee status shall be laid out in the respective regulation, pursuant to legislation in force and international instruments to which Guatemala is a party.

**Article 44. Asylum.** Guatemala may grant asylum at the discretion of the State of Guatemala, in line with the Political Constitution of the Republic of Guatemala.

**Article 45. Refugee.** For a person with refugee status, recognizing that status involves certain rights and duties as established in the Political Constitution of the Republic, international instruments, and other Guatemalan laws, submitted to the jurisdiction and competence of the State of Guatemala.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

The procedure for requesting, obtaining, or denying refugee status shall be established in regulations, in line with legislation in force and international standards.

**Article 46. Non-refoulement.** If an individual is denied refugee status or asylum, he or she may not be returned to his or her country when there is a credible reason to fear serious danger to his or her life, physical integrity, and freedom. Prior to refoulement, the State of Guatemala shall ensure that the Office of the United Nations High Commissioner on Refugees (UNHCR) has been informed of the person's situation.

**Article 47. Denial of refugee status.** Refugee status may not be granted to a person:

1. Who has committed a crime against peace, war crimes, or a crime against humanity, as defined by international instruments drafted to adopt provisions with respect to those crimes;
2. Who has committed a particularly serious crime outside of his or her country of refuge, prior to being admitted as a refugee, or when the claim has been made in order to evade justice in another country;
3. Who is guilty of acts contrary to the purposes and principles of the United Nations set out in international treaties and conventions.

**Article 48. Temporary resident status for children, adolescents, and adults recognized as having refugee status or political asylum.** Children, adolescents, and men and women recognized as having political refugee status or political asylum under the scope of territorial asylum, shall immediately be granted temporary residence and receive appropriate documentation, which may be used prior to the issuance of a final decision, in order to access their basic rights, such as freedom of movement, access to health services, education, legal information and guidance, access to justice, among other fundamental rights established by national legislation and international law.

**Article 49. Special protection for migrants fleeing sexual violence.** When the reasons for requesting refugee status or asylum are serious suffering from sexual violence or the threat of such violence, migrants, whether children, adolescents, or adults, shall be protected, and special, appropriate protection measures shall be adopted in accordance with the migrant's situation, in order to provide comprehensive services, particularly healthcare.

**Article 50. Penalty.** Failure to produce identification and travel documents, or failure to comply with administrative requirements for entering, remaining in, or transiting through Guatemala do not justify the imposition of a criminal penalty. However, the person in question is required to pay for any administrative costs incurred, pursuant to regulations, and he or she shall be returned to his or her country of origin.

**Article 51. Equality.** Applicants for refugee status, political asylum, and asylum under the scope of territorial asylum who have entered Guatemalan territory legally shall enjoy all of the rights and obligations set out in Guatemalan legislation, particularly the Political Constitution of the

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

Republic and this Code, as well as those recognized and guaranteed by international treaties and conventions ratified by the State of Guatemala.

**Article 52. Confidentiality.** The presence of applicants for recognition of refugee status, refugees, applicants for political asylum, or political asylum recipients in Guatemalan territory, as well as the respective documents and applications to recognize their condition or status shall be managed with respect the principle of confidentiality, in order to protect their lives, integrity, and freedom.

**Article 53. Identity.** While awaiting resolution of their cases, applicants for recognition of refugee status or political asylum under the scope of territorial asylum shall have the right to a special identification document, in order to access education and health services, and the document shall be considered valid for the purpose of obtaining remunerated employment, in line with legislation in force.

Refugees and political asylum recipients shall also be granted a special identification document.

**Article 54. Humanitarian assistance.** The State of Guatemala may facilitate the ability of legally established national and international entities providing humanitarian assistance to carry out their activities within Guatemalan territory. Migrants shall have the right to access these assistance entities for humanitarian reasons.

**Article 55. Unified registry of humanitarian assistance entities.** The State of Guatemala, through its immigration authorities, shall register entities providing humanitarian assistance for migrants.

Mandated international bodies may carry out activities providing care and protection to migrants.

**Part II**
**Immigration Law**

**Chapter I**
**General provisions**

**Article 56. Immigration law.** Guatemalan immigration law regulates the freedom of persons to enter, remain in, transit through, and exit national territory, in line with the fundamental rights of persons recognized in the Political Constitution of the Republic, national legislation, and international instruments.

**Article 57. Purpose.** The purpose of immigration law is to guarantee the right to migrate, through the provisions issued in this Code and its regulations, as well as any administrative or regulatory provisions issued by the Guatemalan Migration Institute.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

**Article 58. Interpretation.** Immigration standards are to be interpreted in favor of the rights of migrants.

**Article 59. Limitations.** The right to migrate shall only be limited in cases described by this Code and its regulations, or based on provisions regarding health, security, or public order, personal safety, or via a court order or ruling.

**Article 60. Principles.** The Guatemalan Migration Institute is guided by the following principles: legality, integrity, honesty, non-discrimination, due diligence, protection of persons, family reunification, confidentiality, professionalization, and due process.

## Chapter II
### Obligations and prohibitions for migrants

**Article 61. Obligations of Guatemalan citizens.** In order for Guatemalan citizens to travel abroad, they must meet the following requirements:

   a) Hold a valid Guatemalan passport or identification document, in line with requirements of the destination country and Guatemala's own requirements for that State.
   b) In the case of children and adolescents, in order to travel alone or in the company of a third country, they must carry authorization in writing from both parents, or whomever has parental authority, custody, or guardianship of them. Failure to comply with this requirement may lead to denial of exit from Guatemala. Should one or both parents be located abroad, that authorization in writing may be presented to the Guatemalan consulate accredited abroad.
   c) Depending on the country of destination, travelers must comply with immigration authorities' requirements in order to enter and remain in that national territory.
   d) Comply with tax declarations and payments imposed by the Tax Administration Superintendence on any assets they wish to bring into or out of the country.

No government authority may deny Guatemalan citizens their right to enter national territory.

**Article 62. Obligations.** Foreign citizens in Guatemala are required to respect the Political Constitution of the Republic of Guatemala, laws in force in Guatemala, and various worldviews and cultural and religious identities living together in national territory, as is consistent with a multiethnic, multilingual, and multicultural country.

**Article 63. Mandatory compliance.** Compliance with the provisions of Decree number 10-2015 of the Congress of the Republic of Guatemala is mandatory.

**Article 64. General rules.** Failure to comply with foreign citizens' obligations in Guatemala shall lead to administrative responsibility, and potentially being asked to leave the country

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

immediately, or, when justified, removal. However, when foreign citizens have committed a crime, authorities shall proceed in line with criminal legislation in force.

Criteria for the denial of entry, suspension of residence, and rejection of applications for entry are governed by the regulations of this Code.

Immigration inspection checkpoints at maritime ports, airports, and land borders shall have the space necessary in order to disseminate information on obligations contained in this Code and general prohibitions contained in national legislation with regard to immigration. Companies transporting persons and international cargo, whether by sea, land or air, shall be provided with immigration forms to be distributed among passengers traveling to Guatemala.

## Chapter III
## Entry of foreign citizens into Guatemala

**Article 65. Regular entry of foreign citizens into national territory.** Foreign citizens wishing to enter Guatemala via air, land, or sea shall comply with requirements for their nationality, as established in the respective regulation.

Exceptions are made for persons who enter Guatemala legally for humanitarian reasons or in need of international protection, as is the case for persons applying for recognition of refugee status or political asylum under the scope of territorial asylum.

Persons who present themselves at immigration inspection checkpoints at maritime ports, airports, and land borders without required official documents may be denied entry into national territory.

**Article 66. Hindrances to entry.** In addition to the administrative provisions issued by the Guatemalan Migration Institute, the following are hindrances to entering the country:
   a) In the interest of public order and security.
   b) Being designated as having committed a crime contained in the Rome Statute of the International Criminal Court.
   c) Being criminally prosecuted for ordinary crimes against life, liberty, and property.
   d) Being subject to an international arrest warrant.

**Article 67. Entry of Central American citizens.** Central American citizens may enter Guatemala as tourists upon presentation of their original national identification document or valid passport, on the basis of the principle of reciprocity, for a period of up to 90 days, renewable one time only.
Guatemala may enter into rules and agreements issued jointly among Central American nations in order to facilitate their citizens' entry and exit within the region.

**Article 68. Entry of persons for humanitarian reasons.** Foreign citizens may enter Guatemala for the following humanitarian reasons:

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

a) Due to natural disaster in neighboring countries, which force persons or groups of persons to save their lives.
b) Due to medical emergencies or to save persons' lives, on aircraft or maritime vessels.
c) Due to armed conflict, pursuant to international law.
d) Following a cooperation request from another State or bodies created by International Law to bring equipment, vessels, or persons working in medicine, aid, or emergency services.
e) To repatriate the remains of family members who have died in Guatemala.

The stay of these persons or vessels shall be governed by the provisions of this Code and its regulations.

**Article 69. Entry at the request of competent authorities.** Foreign citizens required to testify as witnesses, victims, or expert witnesses in proceedings in the Guatemalan justice system, and those required by legal or executive authorities to make personal representations, may obtain a special entry permit.

The corresponding form shall be defined in the regulations.

**Article 70. Temporary entry due to transport.** For the purpose of maritime, air, or land transport, entry may be authorized for staff and crew members of legal entities, or individual persons carrying lawful cargo within the framework of normal trade.

Such authorizations may be expedited by the immigration inspection checkpoint chief officer, in coordination with the Port Captaincy, National Civil Aviation Administration, or Transport Department, so long as the corresponding requirements are fulfilled and the authorized fee established by corresponding regulation has been paid. The authorization is valid for a period of 48 hours in cases of air or land entry, and 72 hours in cases of maritime vessels.

When a legal entity or individual person works transporting persons or goods and requires permanent authorization, that person or entity shall be subject to civil and trade law as well as the provisions of this Code.

**Article 71. Unforeseeable circumstances.** When a person appears at Guatemalan Migration Institute facilities or its head office and requests official entry into Guatemala without fulfilling the regulations of this Code or other legal provisions, the Institute shall send that person to previously authorized institutions in order to provide him or her with temporary shelter. The employee or government official shall follow the following criteria:

a) If the person indicates that he or she is being persecuted in his or her country of origin, the victim of threats of violence, or the victim of violence, an application for refugee status or territorial political asylum, or entry for humanitarian purposes shall be required, and the person shall be provided with shelter and temporary services.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

**b)** If the person is a child or adolescent, he or she shall be cared for in line with legal provisions in force and the provisions of this Code.

**c)** Female migrants who indicate they are the victims of sexual violence or are being persecuted to that end, or are victims of domestic violence shall be provided with healthcare services, in line with the stipulations of specific laws. The right to not be returned to one's country of origin or provenance shall prevail, given the serious threat of becoming a victim of sexual violence in any form.

**d)** Should a family unit appear, in line with the provisions of this Code, the Deputy Director of Migrant Services and Protection of Fundamental Rights shall provide care and follow-up on cases involving family reunification and protection and care for children and adolescents, in line with the minors' best interest, or in line with the principles governing the specific case.

**Chapter IV**
**The stay of foreign citizens and their regular immigration status**

**Article 72. Stay.** Foreign citizens may remain in Guatemala for as long as is authorized, pursuant to their regular or extraordinary immigration status granted based on the provisions of this Code.

Persons with extraordinary immigration status may remain in Guatemala, pursuant to this Code.

**Article 73. Regular immigration status.** Regular immigration status is an immigration category granted to foreign citizens due to their entry and stay in national territory, in line with the following classifications:

**a)** Tourist or traveler.
**b)** Temporary resident.
**c)** Permanent resident.

**Article 74. Tourists or travelers.** Tourists or travelers are foreign citizens who have legally entered Guatemala for legal purposes, without intentions of obtaining temporary or permanent residence, for a period of no more than 90 days, which may be renewed once.

Persons with technical, professional, scientific, cultural, athletic, or religious vocations whose skills are required by public or private institutions may stay in Guatemala and conduct remunerated consulting or advisory activities for a period of no more than 80 days.

**Article 75. Temporary residents.** Temporary residence is granted to persons to whom the Guatemalan Migration Institute has extended a document recognizing them as temporary residents, as defined below:

**a) Migrant workers:** Foreign citizens who have been authorized to remain in Guatemala in order to conduct a legal, remunerated activity, under the dependence

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

and direction of an employer. Migrant workers may request temporary residence for a period of one to five years.

b) **Students:** Foreign citizens authorized to live in Guatemala for the purpose of studying at any educational level. Temporary residence is authorized for students for the period of their educational cycle or the duration of their corresponding university courses, pursuant to the regulations established by this Code.

c) **Athletes and artists:** Foreign citizens hired by legal entities or individual persons, and who provide their specialized services as athletes or artists, may be granted temporary resident status for the period of their specific contract, or for up to a maximum period of five years, in line with applicable national legislation in force.

d) **Investors:** Foreign citizens who invest in Guatemala shall be granted residence for a period of no more than five years.

e) **Intellectuals, researchers, and scientists:** Persons dedicated to scientific, research, and academic activities who have been hired by entities to carry out work based on their knowledge and skills shall be granted temporary resident status for a period of no more than five years.

f) **Clergy and religious leaders:** Foreign religious leaders and clergy belonging to a religious entity that has formally been recognized by the State may obtain temporary residence for a period of no more than five years.

The description of requirements to fulfill in order to recognize temporary resident status are established in the regulations of this Code.

**Article 76. General rules on temporary resident status.** Persons wishing to obtain temporary resident status may begin the process at Guatemalan consular missions, or, if they are legally in Guatemala, at the Guatemalan Migration Institute.

All time periods set out in the article above may be extended on consideration of the Guatemalan Migration Institute. Status may be revoked at the request of the interested party, or for administrative offenses involving revocation of that status.

Temporary resident status does not deprive holders of that status of their right to enter and leave Guatemala without restrictions, other than those set by this Code and others defined in national legislation in force.

**Article 77. Special rules for temporary resident status for studies.** The children of persons who have requested temporary resident status in any of the categories described in this Code may acquire student status at any level of the national education system, with a declaration from their mother or father, a letter of acceptance from an educational center where they are enrolled, and indication of the course levels they will complete, in line with the provisions of the corresponding educational center.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

While awaiting status, children and adolescents may attend the corresponding educational center with a document issued by the Guatemalan Migration Institute indicating that their immigration status is pending.

Foreign citizens requesting that status for higher education studies, and who have completed their secondary education in Guatemala, must request an extension of their resident status. Foreign citizens who require student resident status for the first time for university level studies shall provide an original acceptance letter from the university and proof of enrollment in the higher education institution.

**Article 78. Permanent residents.** Permanent residents are persons who, in addition to fulfilling other legal requirements, wish to establish residence in Guatemala, in line with requirements established in the corresponding regulation, and are within the following criteria:

   a) Temporary residence in Guatemala for a period equal to or greater than five years.
   b) Having been married to or in a declared common-law relationship with a Guatemalan citizen for over one year.
   c) Citizens of another nationality, who are close relatives as defined by law of a Guatemalan citizen.
   d) Those born in another Central American country who have been temporary residents of Guatemala for a period of one year.
   e) Investors or pensioners who have been authorized to reside in Guatemala and have permanent, legal income originating abroad.

   As a special rule for permanent resident status for investors or pensioners, it is understood that all benefits and exonerations governed by the specific regulation for these cases shall be applicable to persons of Guatemalan origin who have naturalized in other countries and return with pensions from foreign governments or private entities.

**Article 79. Administrative provisions.** The Guatemalan Migration Institute shall issue corresponding regulation regarding procedures, forms, and fees to be completed and paid in order to grant, revoke, and extend immigration status, along with other effects required for regular immigration status.

**Article 80. Registries.** The Guatemalan Migration Institute shall maintain an updated registry of persons to whom it has granted temporary and permanent resident status, and may issue statements and certifications to interested parties.

The database of persons with regular permanent immigration status shall be shared with the National Registry of Persons in order to issue identification documents extended to resident foreign citizens. Procedures to carry out those steps, coordination between both institutions, and other issues related to procedure and defining requirements shall be contained in the specific regulation to be issued to that effect.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

## Chapter V
## Extraordinary immigration status

**Article 81. Extraordinary permanent status.** Unlike regular immigration statuses identified in this Code, extraordinary permanent circumstances allowing a foreign citizen into Guatemalan territory are recognized as follows:

- **a)** Provisional permanent status.
- **b)** Special service permanent status.
- **c)** Permanent status for humanitarian reasons.

**Article 82. Provisional permanent status.** Provisional permanent status is the stay of one or more foreign residents in Guatemalan territory, and is granted in the following cases:

- **a)** Via court order in order for a person to appear in court as a witness, expert witness, or victim, limited to the time strictly necessary to do so.
- **b)** At the request of Guatemalan authorities for steps requiring the person's physical presence, for the time strictly necessary to complete those steps.
- **c)** Via application for refugee status, for a period of 30 days, which may be renewed.

**Article 83. Categories of special service permanent status.** This status may be granted to foreign citizens who have been the victims of torture, trafficking in persons, sexual violence, women in special circumstances, children who are unaccompanied or separated from their families, elderly persons, persons suffering from psychological disorders, and others.

When refugee status is granted, the Guatemalan Migration Institute and National Registry of Persons shall issue the provisions for obtaining an identification document, pursuant to Articles 53 and 104 of this Code.

**Article 84. Temporary residence for applicants for refugee status.** Temporary resident status shall be granted to children and adolescents who have applied for refugee status in line with Article 48 of this Code.
The Guatemalan Migration Institute and National Registry of Persons shall issue the provisions for obtaining an identification document, in line with Article 104 of this Code.

**Article 85. Permanent status for humanitarian reasons.** When foreign citizens enter Guatemala for reasons outlined in Article 68 of this Code, they shall be granted permanent status for humanitarian reasons, when those reasons are proven.

Persons must be identified via special cards which they must carry at all times, and which shall contain personal identification information, information on whether they have entered with their family members or any blood relatives, the reasons why status has been granted, and the signature and seal of the Subdirector of Migrant Services and Protection of Fundamental Rights and the General Director of the Guatemalan Migration Institute.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

The Subdirector of Migrant Services and Protection of Fundamental Rights shall create a single, updated registry with information on all persons who have been granted this status.

**Article 86. International bodies.** When permanent status has been granted for humanitarian reasons, the General Director may request that bodies of the United Nations and the International Committee of the Red Cross provide their collaboration, support, and strengthening measures with regard to experience in humanitarian assistance.

**Chapter VI**
**Special immigration status**

**Article 87. Special status.** Special status shall be granted to persons who, due to their activities or situation, do not fall into any of the regular or extraordinary status definitions.

Special status shall be defined as follows:

a) Cross-border and itinerant workers.
b) Workers in line with section b) or Article 13 of the Labor Code. In these cases, the Ministry of Labor and Welfare shall communicate the corresponding information.
c) Diplomatic, consular, and international organization staff governed by the provisions of corresponding international conventions to which Guatemala is a party.
d) Special guests of State Bodies and their dependencies, or of autonomous and decentralized bodies, which shall communicate the steps that shall be taken for the delegations accompanying their guests.
e) Artistic, cultural, religious, athletic, or educational groups traveling together under the responsibility of a specific person.

The Division of Immigration Control shall be responsible for categorizing and granting that status in the case of persons who do not fall into any regular or extraordinary category. Exceptions shall be made for officials listed in section c), as they are to be handled exclusively by the Ministry of Foreign Relations.

**Chapter VII**
**Exit of foreign citizens from Guatemala**

**Article 88. Regular exit of foreign citizens from Guatemala.** Exit from Guatemala shall be conducted via official immigration inspection checkpoints in the country, in compliance with the corresponding documentation, requirements, and security formalities indicated for each situation.

Exit may be denied to foreign citizens who fail to comply with the requirements indicated, or when there is reason for denying the person exit.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

**Article 89. Immigration impediments to exiting the country.** The following persons may not exit the country:

a) Children and adolescents who are unaccompanied and do not possess required official documentation to travel alone or in the company of persons who are not legally authorized.

b) Persons who have requested refugee status, political asylum, or permanent status for humanitarian reasons and who have not given the notice or justification required by the Guatemalan Migration Institute.

c) Persons who are not permitted to leave the country due to a court order.

The Guatemalan Migration Institute shall issue the provisions necessary regarding official documents to be presented, as well as with regard to coordination with taxation bodies, maritime port administrators, airports, and other bodies required for effective compliance and control of standards regarding impediments to exiting the country.

**Chapter VII**
**Identification and travel documents**

**Section I**
**Identification documents**

**Article 90. Travel documents.** Travel documents for migrants or Guatemalan travelers are issued by the Guatemalan Migration Institute, in order for persons to travel pursuant to their internationally-recognized immigration status.

Migrants' or travelers' travel documents also include those issued by immigration authorities in other countries, in order for their nationals to be allowed to enter, stay in, and exit Guatemala, pursuant to national immigration laws in force.

For both Guatemalan and foreign citizens, the use of other identification documents as travel documents is recognized when there are bilateral or multilateral agreements with the respective countries validating the use of other documents.

The only exception to the use of a passport shall be when there is a bilateral or multilateral agreement or convention allowing the entry into another country's territory using another identification document.

A passport is the identification document issued for Guatemalan citizens abroad, and it shall be issued exclusively by the Guatemalan Migration Institute.

**Article 91. Obtaining a passport.** Passports are issued by the Guatemalan Migration Institute, and may be obtained at locations established for this purpose.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

Guatemalan citizens abroad may obtain a passport from Guatemalan diplomatic or consular offices.

The Guatemalan Migration Institute shall transfer 25% of net income collected by consular missions for the issuance of passports abroad to the Ministry of Foreign Relations; those funds shall be used exclusively for strengthening and expanding the consular network for the purpose of protecting and serving Guatemalan migrants abroad.

Considering the best interest of children and adolescents, in order to obtain a Guatemalan passport, minors must have authorization from the person representing them, in line with the Civil Code. Should one or both parents be abroad, authorization may be given via Guatemala's respective consular officials. Should one or both parents be in Guatemala while the minor child is abroad, authorization may be given at the Ministry of Foreign Relations.

**Article 92. Types of passports.** Passports are classified as:

a) **Regular:** Those issued to persons of Guatemalan nationality with no restrictions other than those laid out in this Code and national legislation.
b) **Official:** Those issued to State officials who travel abroad on official missions.
c) **Diplomatic:** Passports issued to the President of the Republic, the Vice President of the Republic, Members of Congress of the Republic and Supreme Court Judges. Diplomatic officials serving abroad, and career diplomatic officials in service at the Ministry of Foreign Relations headquarters, holding the rank of Minister, Vice Minister, or head of some Ministry Bureau divisions.

**Article 93. Special Travel Document.** A Special Travel Document shall be issued to persons whose refugee status has been recognized by the State of Guatemala, in line with the provisions of this Code and international conventions ratified by Guatemala. The Special Travel Document shall indicate that the holder is not a Guatemalan national, but that due to the special conditions of his or her status, he or she has been granted a temporary identification document in order to enter and leave the country one time, when there is a fully justified reason.

The Special Travel Document shall include the following statement:

"This Special Travel Document was issued by the State of Guatemala to the person whose identification information is contained herein. However, the bearer has been warned that this document does not guarantee his or her entry into the territory of another State, which has the faculties to deny him or her entry, transit, and residence, pursuant to its own laws and immigration provisions."

**Article 94. Passport features and validity.** Passport features shall be in line with agreements made at the regional level by Heads of State and Government of countries in the Central American Integration System (SICA).

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

Passport covers shall indicate the type of passport and name of the Republic of Guatemala. Regular passports shall be valid for five to 10 years, and may be issued for shorter time periods, when stated expressly by this Code or governing regulation.

Diplomatic and official passports shall be valid for time periods in line with the period of government in which the passport was issued, or until the official has completed his or her public duties. State institutions requesting official or diplomatic passports shall inform the Guatemalan Migration Institute within a period of no more than 30 days when the official has concluded his or her duties.

Regulation of this code shall define other passport features, such as special conditions to facilitate obtaining renewals or changes, the Division of International Identification and Travel Documents shall issue rules regarding passport security and authenticity, in line with continuing advancements and recommendations from the International Civil Aviation Organization.

**Article 95. Invalidity and voidability.** Passports are invalid when they are not issued by the Guatemalan Migration Institute, do not comply with features defined in this Code or its regulation, and when they have false visas from other countries.

Passports may be voided when they are declared void via corresponding report for theft, robbery, loss, damage, or other reasons. A passport is void when information required by this Code and its regulation is altered, or when information on the person it identifies or its forms have been altered, or when the passport has expired due to having completed its period of validity.

**Article 96. Reports.** When a passport has been lost, stolen, or robbed, its holder must provide a proof of report issued by the corresponding authority, in order to obtain a new passport. When passports have been damaged or destroyed, a letter signed by the holder and presentation of the original document is sufficient.

The procedure below shall be governed by the corresponding regulation.

Guatemalan citizens shall file a report with competent authorities in the countries where they are, if conditions allow. In all cases, consular offices shall issue a travel document valid for a 90-day period.

**Article 97. Verification for protective purposes.** When a travel document is requested outside the country for an unaccompanied child or adolescent, the Guatemalan consular official shall verify via communication with the Solicitor General's Office that the minor has not been reported disappeared, kidnapped, or missing. Issuance of this document shall proceed in line with Article 91 of this Code.

Consular offices shall act in accordance with the best interests of the minor.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

**Article 98. Special rights to diplomatic passports.** Diplomatic officials in service abroad and career diplomatic officials at the Ministry of Foreign Relations headquarters with the rank of Minister, Vice Minister, or the heads of some Bureau divisions at the Ministry, their spouses, and minor children shall have rights to diplomatic passports.

**Article 99. Right to identification documents outside of Guatemala.** Guatemalan citizens in other countries whose passports have expired, been damaged, robbed, stolen, or lost have the right to request a new passport at corresponding consular offices.

**Article 100. Identification of temporary and permanent residents.** Persons who have obtained temporary or permanent resident status shall identify themselves with the personal identification document issued to them by the National Registry of Persons, pursuant to the specific regulations issued by that Registry.

For the purposes of the personal identification document, temporary residents shall be considered as foreign residents, in application of section b) of Article 55 of Decree number 90-2005 of the Congress of the Republic, National Registry of Persons Act.

**Article 101. Identification of extraordinary immigration status.** In the case of persons with provisional resident status, a passport shall serve as an identification document.

In the case of persons holding special care resident status, the following shall apply:

a) The bearer of a passport from his or her country of origin shall use that passport as a valid form of identification until it has expired; then, he or she shall temporarily be authorized for the National Registry of Persons.
b) In the case of persons applying for recognition of refugee status, the special document shall be authorized by the National Registry of Persons, in line with the Guatemalan Migration Institute. This shall be considered valid for the purpose of obtaining work and exercising one's right to education and health care while awaiting a final decision.
c) Persons with resident status for humanitarian reasons shall use the corresponding card as defined by this Code.

**Article 102. Identification of persons with special immigration status.** As a general rule, the existence of a passport shall apply. In the case of border workers, a regular cross-border visitor card shall be issued, which shall note the bearer's activity and, if applicable, the name of the legal entity or individual person employing him or her, or the commercial or public name of where he or she generally conducts business.

**Section II**
**Travel documents**

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

**Article 103. Travel documents.** Travel documents include those extended to Guatemalan citizens by the Guatemalan Migration Institute to allow persons to obtain corresponding authorizations, as well as register entries, residence, and exits in other countries.

Travel documents also include those extended by immigration authorities from other countries, allowing nationals of that country to register authorization, entry, residence, and exit in Guatemalan territory.

**Article 104. Travel documents for asylum recipients or refugees, refuge, or for humanitarian reasons.** Persons recognized as refugees or asylum recipients who do not have travel documents may request that the Guatemalan Migration Institute issue a special travel document, consistent with a document described with the features listed in the article in this Code referring to Special Travel Documents.

That Special Travel Document shall be valid for one single entry and exit.

**Article 105. Visas.** Visas issued by Guatemala to foreign citizens authorize that person to enter, transit through, remain in, and exit Guatemala for the time indicated on the document itself. The time period may be changed due to changes in the bearer's immigration status, in line with the status categories identified in this Code.

National immigration authorities may issue periodic information regarding which nationalities require a visa in order to enter Guatemalan territory.

Procedures for obtaining a Guatemalan visa, as well as its form, duration, and other requirements shall be governed by the specific regulation regarding visas.

## Chapter IX
## Immigration Regularization Plans

**Article 106. Regularization plans.** Plans for regularization are those through which the State of Guatemala allows foreign citizens irregularly present in Guatemalan territory to obtain regular immigration status, according to the regulations in this Code.

**Article 107. Foreigners irregularly present.** A foreign citizen irregularly present is defined as a person who entered or lives in national territory in good faith and peacefully, but who does not have any of the regular immigration statuses defined by this Code.

**Article 108. Issuance of regularization plans.** The Executive Body, at the request of the National Immigration Authority, shall, via Governmental Agreement, issue the terms of regularization plans, to include objectives, a period of operation, and specific procedures to follow.

The Guatemalan Migration Institute shall always be the governing body responsible for carrying out such plans. Specific procedures must be within the general rules issued by this Code.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

**Article 109. Requesting regularization plans.** Only the National Immigration Authority may request that the Executive Body issue such plans, along with a corresponding technical study recognized by the Guatemalan Migration Institute.

**Article 110. Beneficiaries.** Regularization plans may also be issued in the following circumstances:

a) There is a high number of Guatemalans requesting to regain their citizenship.
b) The presumption, based on relevant data and statistics, of a high number of persons from other countries from Central America present in Guatemala.
c) A high number of children of Guatemalan citizens born abroad who wish to obtain documentation as Guatemalan nationals.

**Article 111. Features.** Regularization plans are temporary, with specific time frames, and are to be used for the regularization of persons who have entered the country during a specific time period, and therefore, are extraordinary procedures which shall be adjusted for each situation and condition, in line with the general rules of this Code. In the case of Guatemalans, regularization plans shall be permanent and their procedures shall be governed by regulation.

Procedures may be taxed via the corresponding Governmental Agreement, be free of charge, fines may be reduced, and aimed at connecting persons with a direct relationship with the State of Guatemala as residents, in the framework of their fundamental rights.

**VOLUME II**
**Immigration System and Policies**

**Part I**
**Guatemalan Immigration System**

**Chapter I**
**Guatemalan Immigration System and Immigration Policy**

**Article 112. Guatemalan Immigration System.** The Guatemalan Immigration System has been created as a body of state institutions which serve migrants and ensure appropriate and effective regulation of Guatemalan and foreign citizens' entry into and exit from Guatemala, and foreign citizens' transit and stay in Guatemala, in a framework of respect for, protection of, and safeguarding human rights, and contributing to national development and protection of Guatemala's inhabitants.

The Guatemalan Immigration System shall act with due diligence at all times, observing the following principles:

a) **Professionalism:** Officials or employees shall conduct their duties professionally.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

b) **Timeliness:** Officials or employees shall proactively seek to conduct all of their duties within reasonable time frames.

c) **Independence and impartiality:** All acts, resolutions, and decisions made or issued by Guatemalan Immigration System officials and employees shall be based on law, in line with legality and human rights.

d) **Transparency:** Immigration activities shall guarantee access to public information under the parameters established by national legislation.

**Article 113.  Composition.** The Guatemalan Immigration System shall be comprised of:

a) The National Immigration Authority.

b) The Guatemalan Migration Institute

c) National Migrant Services Council of Guatemala.

The entities that comprise the Guatemalan Immigration System shall meet at least once per year, or as needed, in order to share information, best practices, or any other matter related to migrants.

**Article 114. Immigration Policy.** Immigration Policy is a set of standards, institutions, procedures, programs, plans, budgets, and actions by the State of Guatemala in order to serve persons' right to migrate.

The Immigration Policy shall be issued by the National Immigration Authority, and implemented by the Guatemalan Migration Institute, jointly with its divisions. The Policy shall also coordinate policy actions with other State institutions, based on their mandates and competencies.

The institutions mentioned in this Code and in Guatemalan national legislation, and which have a direct link with the implementation of immigration policy shall, as part of their operations, handle issues required the policy and national legislation.

**Article 115. Immigration Policy Principles.** The Immigration Policy is designed and comprised of the following principles:

a) Respect for human rights.

b) Guarantee the right to migrate, the rights of migrants, and immigration law as distinct but complementary categories.

c) Exclusive competence over matter of the Guatemalan Migration Institute.

d) Integrating Guatemala's immigration commitments undertaken with the International Community.

e) The security of migrants during origin, transit, destination, and return.

f) The preservation of national territory.

**Chapter II**
**National Immigration Authority**

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

**Article 116. National Immigration Authority.** The National Immigration Authority is created and responsible for drafting, creating, and supervising Immigration Policy and security in the area of migration.

**Article 117. Integration.** The National Immigration Authority is comprised of the Vice President of the Republic, the Minister of Foreign Relations, the Minister of Social Development, the Minister of Labor and Welfare, the Minister of the Interior, the Director of the Guatemalan Migration Institute, and the Executive Secretary of the National Migrant Services Council of Guatemala.

The Vice President of the Republic is responsible for managing the National Immigration Authority. The Director of the Guatemalan Migration Institute shall act as Technical Secretary of the National Immigration Authority, which shall have a voice but no voting power at sessions, and the operation of which shall be governed by specific regulation.

The National Immigration Authority shall meet at least once every three months, in regular sessions, and in special sessions as necessary.

**Article 118. Functions.** The functions of the National Immigration Authority are:

1) Issue Immigration Policy.
2) Supervise policy compliance.
3) Amend policy in line with requirements of the President of the Republic, members of the Authority, Congress of the Republic, or any other Government body which justifies the change.
4) Request approval by the President of the Republic, in the Council of Ministers, for immigration regularization plans described in this Code.
5) Approve the Guatemalan Migration Institute draft budget.
6) Approve regulations issued by the Guatemalan Migration Institute.
7) Request technical reports from the Guatemalan Migration Institute.
8) Request Immigration Policy execution and implementation reports.
9) Approve the annual and strategic plan of the Guatemalan Migration Institute.
10) Promote the signature and ratification of international conventions, treaties, and agreements.
11) Request technical, statistical, and academic studies, or any study considered necessary in order to appropriately address the needs of persons exercising their right to migrate.
12) Delegate special committees to its members, in line with their duties.
13) Request state entities provide reports considered necessary in order to guarantee the right to migrate.
14) All functions indicated in this Code and national legislation.

**Article 119. International policy leadership.** In matters related to foreign or international immigration policy, the National Immigration Authority shall act in coordination with the

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

Ministry of Foreign Relations and in line with international policy as defined by the President of the Republic.

## Chapter III
## Guatemalan Migration Institute

**Article 120. Creation and decentralization.** The Guatemalan Migration Institute is created as a decentralized agency of the Executive Body.

The Guatemalan Migration Institute has exclusive authority for the implementation of Immigration Policy, the direct and indirect management of state provisions aimed at managing the right to migrate, execution of the approved budget to this effect, and other provisions considered within Guatemala's national legislation.

In order to comply with its mandate and implement its activities, the Guatemalan Migration Institute has authority throughout national territory, with sufficient capacity to administer its financial, technical, human, and administrative resources, as well as fulfill its rights and obligations.

**Article 121. Mission.** The mission of the Guatemalan Migration Institute is to ensure respect for the human right to migrate, guaranteed via appropriate administration of immigration law, and providing timely services and protection for foreign or national migrants, as required. The Institute shall also act as a decentralized body providing public immigration services, focusing its activities on respect for human rights.

**Article 122. Functions.** In addition to the functions governing regulations in this Code and national legislation, the Guatemalan Migration Institute is also responsible for the following:

a)  Ensure migrants' rights.
b)  Establish administrative offices as necessary in order to provide services to migrants in Guatemalan territory and abroad.
c)  Implement Immigration Policy issued by the National Immigration Authority.
d)  Integrate the National Immigration Authority via the General Director.
e)  Conduct technical, statistical, and any other reports in order to continually update administrative provisions, as well as whenever required by the National Immigration Authority or the President of the Republic.
f)  Coordinate specific activities for the service, assistance, and protection of migrants with State Secretariats and Ministries, and provide Immigration Policy results and target compliance follow-up.
g)  Coordinate the administration of migrant services with State Secretariats and Ministries.
h)  Integrate specific divisions created to provide services in special situations.
i)  Propose the creation of temporary high-level committees to the National Immigration Authority in order to address specific situations.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

j) Propose that the National Immigration Authority request the issuance of regularization plans, in line with the provisions of this Code.

k) Provide divisions in order to provide service, assistance, and protection of migrants requesting asylum, refuge, and humanitarian assistance.

l) Direct and monitor implementation of provisions regarding the entry of foreign citizens into national territory, as well as their stay and exit.

m) Direct and monitor implementation of the provisions for regular, extraordinary, and special immigration status, in line with this Code, Immigration Policy, international practices, and national legislation.

n) Direct, monitor, and administer the issuance and granting of international identification and travel documents, in line with this Code and other administrative provisions issued to this end.

o) Implement and guarantee respect for administrative procedures regulated by this Code.

p) Guarantee respect for labor rights and promote the professionalization of the Guatemalan Migration Institute's human resources.

q) Exclusively manage, and be responsible for databases described in this Code, though said databases are the property of the State of Guatemala.

**Article 123. Financial resources.** The Guatemalan Migration Institute shall rely on the financial resources allocated to it in the General Budget of Income and Expenditures of the State, along with those resources from the following sources:

a) Fines imposed for infractions pursuant to regulations in this Code;

b) The amount charged for travel documents requested in Guatemalan territory and abroad, which are issued and authorized by the Guatemalan Migration Institute;

c) The amount charged for Guatemalan visas for persons from States where a visa is required;

d) The amount charged for obtaining, extending, or changing various immigration categories and statuses;

e) Income from regularization plan fees;

f) Income from charges for foreign citizens exiting Guatemalan territory. The provisions and corresponding amount shall be governed by regulation;

g) Contributions from public and private entities; and

h) Any other income obtained via any lawful charges.

Financial resources from sources listed above are exclusive to the Guatemalan Migration Institute, and therefore, shall be exclusively earmarked for staff professional development, infrastructure, equipment, maintenance, operational costs, and migrant services.

**Section I**
**General Director**

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

**Article 124. General Director.** The Guatemalan Migration Institute is managed by a General Director, who shall manage the Institute with total independence of judgement, and entirely under his or her responsibility, pursuant to national legislation, without prejudice to directives and guidelines set by the National Immigration Authority for the effective implementation of national immigration policy.

The General Director is responsible for any claim of damages due to acts or omissions incurred during his or her mandate.

The General Director may sign conventions on immigration matters with national and international entities, as well as with similar immigration and security institutions abroad, in order to share and consult information.

**Article 125. Selection.** The President of the Republic is responsible for nominating a person to act as Director of the Guatemalan Migration Institute, in line with the qualities expressed in this Code, who shall be nominated for a five-year period which may be extended.

If the Director position becomes vacant, the new nominee shall begin a new five-year mandate, which may be extended.

**Article 126. General Director qualities.** The qualities required for the General Director of the Guatemalan Migration Institute are the same as required for any State Minister.

**Article 127. Prohibitions on being General Director.** Individuals fulfilling the following criteria may not be nominated as General Director of the Guatemalan Migration Institute:
   a) Being the provider, provider representative, director, or trusted employee of a service or goods provider contracted by the State in any of its agencies.
   b) Being a member of the clergy or a religious leader.
   c) Having a pending criminal case for any of the crimes laid out in national legislation.
   d) Having been convicted for crimes against public administration, life, liberty, sexual integrity, or personal integrity. Having been found to have violated or threatened to violate the human rights of children and adolescents.

**Article 128. Suspension of duties.** The General Director shall be suspended from duty when, due to duly justified temporary situations, he or she requests permission from the National Immigration Authority, for a specific period of time.

**Article 129. Removal from office.** The General Director may be removed from office by the President of the Republic, at the request of the National Immigration Authority, if he or she incurs the following factors:

   1. Committing acts that are fraudulent, illegal, or clearly contrary to the functions or interests of the Guatemalan Migration Institute or the State in General.
   2. Being convicted by a final judgement of having committed intentional crimes.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

3. Speaking in favor of a political party or presenting one's self as a candidate for a popularly elected post.

**Article 130. Replacement.** The Deputy Director shall replace the General Director of the Guatemalan Migration Institute in the following cases:

1. Temporary absence or illness;
2. Suspension from duty;
3. Having been declared by a competent authority of being physically or mentally unfit for duty;
4. Removal;
5. Resignation;
6. Death; and
7. Abandonment.

In cases c) through g), the Deputy Director shall temporarily replace the General Director until a new Director has been named.

**Article 131. General duties.** The general duties of the General Director, in addition to those listed in other legal instruments, are as follows:

1. At all times, seek to ensure free access to all persons' right to migrate, and impose no greater limits than those established by national legislation, as well as by treaties and conventions in the areas of human rights, rights of refugees, humanitarian law, and international criminal law, which have been approved and ratified by Guatemala.
2. Manage the Guatemalan Migration Institute, pursuant to national immigration policy, this Code, and national legislation.
3. Implement the National Immigration Policy and establish administrative provisions for this purpose.
4. Legally represent the Guatemalan Migration Institute.
5. Submit the Guatemalan Migration Institute strategic and annual plan and annual draft budget for consideration and approval of the Immigration Authority.
6. Issue general and specific regulation for approval by the National Immigration Authority.
7. Acquire goods and services for the Guatemalan Migration Institute.
8. Sign contracts for the purpose of fulfilling the aims of the Guatemalan Migration Institute.
9. Sign agreements, MOUs, and conventions with civil cooperation, national, or international institutions.
10. Nominate and remove deputy directors of immigration.
11. Integrate the National Immigration Authority.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

**Article 132. Specific duties.** In addition to those laid out in other legal instruments, the following are specific duties of the General Director:

1. Issue internal human resources policy and its administration via the corresponding internal entity, including the professional immigration career path.
2. Approve programs, projects, and plans for each division and administrative units of the Guatemalan Migration Institute.
3. Supervise execution of the budget and approve internal adjustments, in line with corresponding plans, projects, and programs.
4. Issue general and specific orders regarding service and exercise of duty.
5. Integrate the National Institute for Statistics in provisions regarding collecting statistics.
6. With the Deputy Director, coordinate bodies for administrative procedures governed by this Code and regulations.

**Article 133. Representation.** Legal representation carried out by the General Director may be delegated expressly, in order to act on behalf of the General Director in corresponding administrative or legal processes, in carrying out the functions attributed to the Guatemalan Migration Institute by this Code, its regulations, and national legislation.

**Section II**
**Deputy Director**

**Article 134. Deputy Director.** Anyone nominated as Deputy Director must hold the same qualities established by this Code for the General Director. The Deputy Director shall be named by the General Director.

**Article 135. Duties of the Deputy Director.** The Deputy Director shall replace the General Director in situations described in Article 130 of this Code. He or she shall exercise the duties assigned to him or her by the internal regulations and provisions of the Guatemalan Migration Institute, in addition to the following:

a) Manage and coordinate the drafting, design, implementation, and evaluation of modernization and institutional strengthening projects aimed at improving efficiency and efficacy, which shall be submitted to the General Director for approval.
b) Act as the central coordinator with immigration division directors with regard to administrative procedures governed by this Code and its regulations.
c) Represent the Guatemalan Migration Institute before national authorities or international entities when requested by the General Director.
d) Manage the immigration professionalization studies unit, in line with the provisions issued by the General Director and in coordination with the corresponding internal units.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

    e) Integrate the Service and Protection Council and implement the provisions adopted by that Council, in coordination with immigration divisions and in line with the General Director.

    f) Other duties as assigned by the General Director of the Guatemalan Migration Institute.

## Chapter IV
## Divisions

**Article 136. Divisions.** The Divisions shall be structured and organized based on efficiency and efficacy criteria, in line with the competencies, duties, and attributes assigned by this Code and internal regulation of the Guatemalan Migration Institute.

The duties assigned to the divisions may be delegated to units established by the Guatemalan Migration Institute in regions or departments of the Republic for the purpose of carrying out its work.

**Article 137. Division authority and hierarchy.** The divisions shall be managed by a Division Director, who is the highest authority within each division.

He or she is responsible for compliance with the duties and attributes assigned to the respective divisions, pursuant to this Code, regulations, and provisions issued by the General Director and national legislation.

**Article 138. Nominations.** The division directors are nominated by the General Director, in line with the qualities and requirements established by regulation.

However, nominees shall be professional university graduates, active members of professional associations, at least 30 years of age, with greater merit given to candidates with government career experience in immigration.

**Article 139. Division organic structure.** The Guatemalan Migration Institute is headed by the General Director, a position which may be carried out by the Deputy Director, in line with the provisions of this Code. However, the following organic division structure is in place in order to ensure efficient and effective operations of the attributes assigned to the Institute:

    **a) Substantive and Operational Structure**

    a) Division of Migrant Services and Protection of Fundamental Rights.
    b) Alien Division.
    c) Immigration Control Division.
    d) Division of Personal Identification and Travel Documents.
    e) Immigration Policy Division.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

### b) Technical Support Structure

**a)** Planning Division.
**b)** Legal Affairs Division.
**c)** Professional Responsibility Division.
**d)** International Immigration Relations Division.
**e)** User Services Division.

### c) Administrative Structure

a) Financial Affairs Division.
b) Human Resources and Staff Professionalization Division.
c) Administrative and Logistical Support Division.
d) Technological, Communications, and IT Resources Division.

**Article 140. Definition of administrative and operational structures.** The administrative and operational structure of the Guatemalan Migration Institute is comprised of five divisions, which are defined as follows:

**a) Division of Migrant Services and Protection of Fundamental Rights.** This division is responsible for the following:

  a.1    Taking necessary steps to serve and protect migrants by the State of Guatemala, particularly unaccompanied children and adolescents, families, and pregnant female migrants.

  a.2.    Assist applicants for recognition of refugee status, refugees, applicants for political asylum under territorial or diplomatic asylum, political asylum recipients under territorial or diplomatic asylum, and those holding extraordinary immigration status governed by this Code.

  a.3.    Support procedures for providing temporary care and shelter, family communication and contact, and requests by foreign citizens to be returned to their country of origin or provenance.

  a.4.    Provide, regulate, and authorize the operations, features, and conditions of dignity, security, trustworthiness, and supervision of special homes for protection, shelter, and care for foreign migrants, as well as returned Guatemalan citizens.

**b) Alien Division:** This division is responsible for issuing, registering, and monitoring visas and residence permits, after verifying the veracity and validity of information

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

and documents required in line with the categories defined in this Code and regulation provisions. The Alien Division is also responsible for the following:

b.1.   During the process of evaluating, analyzing, and approving visa and residence applications and renewals, collecting biographical and biometric information on applicants, to be verified using public security databases.

In the case of visa applications from persons in whose country Guatemala does not have consular representation, biographical and biometric information shall be verified upon the person's appearance at an immigration checkpoint in Guatemala.

Requirements for obtaining visas and residence are laid out in the regulations of this Code.

b.2.   Inform foreign residents in Guatemala of the expiration of residence permits granted, as well as managing any changes to the foreigners' registry.

b.3.   Propose immigration regularization plans to the General Director as needed.

The Alien Division shall have an immigration verification field unit. Staff at this unit shall be periodically evaluated via reliability testing.

c)  **Immigration Control Division:** This division is responsible for controlling and registering the entry and exit of foreign citizens and nationals in Guatemalan territory, pursuant to the provisions of this Code and national legislation in force, via national border checkpoints in air, land, and maritime routes. For foreign citizens, this involves ensuring compliance with legal provisions with regard to their entry, exit, stay, and activities in Guatemala, with the exception of border checkpoints between countries with which Guatemala has signed or subscribed to free movement treaties or conventions. Through its verification field unit, this division is responsible for verifying the immigration situation of persons who hold immigration status in line with the categories set out in this Code and its regulation, throughout Guatemalan territory.

Immigration control at entry and exit border checkpoints shall collect biographical and biometric information on checkpoint users, with the exception of land border checkpoints, which are governed by free movement conventions.

The Immigration Control Division shall also have a verification field unit, to ensure that all individual persons or legal entities providing transportation services submit Advanced Passenger Information data (API). The field unit is also responsible for verifying information contained in APIs. Transporters which fail to submit this

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

information shall be subject to any corresponding penalties, which are governed by the regulation of this Code.

Field unit staff shall be evaluated periodically, through reliability tests, and in their duties continuously assist the National Civil Police agency responsible for citizens' security in ports, airports, and air, land, and maritime border checkpoints.

d) **Division of Personal Identification and Travel Documents:** This division is responsible for establishing the processes and systems necessary to safely, efficiently, diligently, and consistently issue identification and travel documents for Guatemalan and foreign citizens, as stipulated in this Code, as well as persons holding extraordinary and special immigration status.

d) **Immigration Policy Division:** Increasing migration and the challenges it presents require generating and systematizing statistics in order to measure migration flows originating in, with destination to, transiting through, and returning to Guatemalan territory.
In line with its attributes, the Immigration Policy Division of the Guatemalan Migration Institute shall produce information, with collaboration from institutions it considers pertinent, with regard to migration flow trends, scope, and features, based on administrative registries generated at various entry points, immigration checkpoints, Guatemalan Migration Institute offices, or any other relevant source.

The Division shall also drive ongoing immigration surveys at borders, in order to contribute to creating immigration policies with greater social awareness of the migration phenomenon.

The General Director of the Institute and each of its division directors shall jointly be responsible for the integrity and safeguard of the respective databases.

**Article 141. Technical support structure.** The technical support structure is comprised of five divisions, which are defined as follows:
   a) **Planning Division:** This division is responsible for coordinating the planning, programming, and evaluation process for annual and strategic plans, in order to ensure implementation of the national immigration policy and allocated budget.

   b) **Legal Affairs Division:** This division is responsible for knowing decisions in cases involving applications for asylum, refugee status, and extraordinary immigration status, and making suggestions to the General Director regarding those decisions. This division shall also provide ongoing support to the entire organic structure of the Guatemalan Migration Institute.

   c) **Professional Responsibility Division:** This division is responsible for due diligence upon receiving complaints against employees and officials, investigating them, and

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

determining whether disciplinary administrative procedures need to be opened. Should it be determined that crimes have been committed, the division shall inform the General Director in order to file a report with the Public Ministry.

d) **International Immigration Relations Division:** This division is responsible for coordinating with the Guatemalan National Migrant Services Council in advising other divisions on immigration-related matters in international relations, in order to serve the rights of Guatemalan citizens abroad.

e) **User Services Division:** This division is responsible for monitoring and registering all applications filed with the Guatemalan Migration Institute and its divisions, with the aim of centralizing the system for receiving applications, documentation, and notification of resolutions. This division shall receive, collect, manage, classify, and distribute applications and forms accordingly. It is also responsible for providing users with information, legal requirements, processing times, and anything else related with immigration procedures. The User Services Division shall also institute the public information access office pursuant to national legislation.

**Article 142. Administrative structure.** The administrative structure is comprised of four divisions, identified as follows:

a) **Financial Affairs Division:** This division is responsible for managing financial resources, in line with the principles of transparency, efficiency, effectiveness, and optimal administration, as well as budgetary and accounting operations. It is responsible for coordinating budget execution and annual planning supervision with the Planning Division.

b) **Human Resources and Staff Professionalization Division:** This division is responsible for executing human resources policy, pursuant to the guidelines of the General Director, and managing human resources at the Guatemalan Migration Institute, in line with the objectives of achieving full enjoyment of labor rights, staff integration, and professional development through a career aimed at service in institutional development.

c) **Administrative and Logistics Support Division:** This division is responsible for providing the General Director, Deputy Director, divisions, departments, units, immigration centers, and any other institutional entities with support in order to ensure they have the equipment, goods, supplies, and services they need, as well as coordinating logistics processes in order for them to comply with their mandates.

d) **Technological, Communications, and IT Resources Division:** This division is responsible for managing all matters related to databases, networks, IT equipment, telecommunications, and IT systems necessary for the appropriate, modern, and optimal operation of the Guatemalan Migration Institute's automated systems and components.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

The databases shall be uniform and standardized in order for internal consultations to be shared with national security institutions, with the exception of sensitive information as established by law.

**Article 143. Extension, creation, modification, and merging.** The General Director may extend, create, modify, or merge the number of divisions, based on the needs of the Institute, however, the extension, creation, modification, and merging of these structures must be justified and authorized by the National Immigration Authority.

Regulation of such shall not require amendments to this Code, but rather shall be carried out via specific regulations to be issued.

**Article 144. Internal Audit Division.** The Internal Audit Division is responsible for carrying out objective and systematic studies of financial, administrative, technical, and operational operations of all agencies of the Guatemalan Migration Institute, with the aim of evaluating procedures, internal controls, and registries, as well as to endure compliance with laws, regulations, standards, and manuals governing the Institute, and suggest measures for preventive and corrective steps in order to optimize the use of resources.

**Chapter V**
**Advisory Bodies of the Institute General Directorate**

**Article 145. Advisory bodies.** The Guatemalan Migration Institute has advisory bodies named as departments, which are:
   **a)** Social Communication;
   **b)** Immigration Policies and Studies; and
   **c)** Statistics and Archives.

**Article 146. Naming and department authority.** The departments are to be managed by leadership named by the General Directorate, to be the maximum authority within each department.

**Article 147. Function.** The heads of the advisory bodies have the special task of advising the General Director, the Deputy Directory, and organic structures defined by this Code.

They shall be structured and organized in the interest of efficiency and effectiveness, in line with their competencies, functions, and attributes assigned by internal regulation of the Guatemalan Migration Institute.

**Article 148. Extension.** The General Director may extend the number of departments based on the Institute's needs, however, the creation of such a structure must be justified, and shall be authorized by the National Immigration Authority.

**UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION**

Legal regulation of such a structure does not require amending this Code, but shall be carried out via specific regulation to be issued.

## Chapter VI
## Immigration career path

**Article 149. Immigration career path.** A career in immigration is a profession recognized by the State, to include the processes of selection, education, training, professionalization, evaluation, promotion, suspension, and dismissal, through which immigration administration ensures its staff is duly qualified, with a dedication to service and ethical performance of their duties.

For the purposes of creating and strengthening an immigration career path and profession, the Guatemalan Migration Institute shall promote the creation of university studies programs in immigration at Guatemalan universities, or institutions in general.

All new or promoted staff at the Guatemalan Migration Institute shall be subject to periodic reliability tests governed by the regulations in this Code, prior to beginning employment or their contract.

**Article 150. Manual.** Staff shall abide by a manual classifying positions and salaries, which shall lay out conditions for promotions, transfers, and dismissal, considering qualifications on merit and ongoing performance evaluations.

Additionally, the manual shall contain, at a minimum, the denomination, specializations, functions, responsibilities, and requirements of each position, its hierarchy, and corresponding salary.

**Article 151. Opposition.** An opposition system shall be established for promotions and nominations to positions, to be regulated as appropriate and developed in the specific manual.

**Article 152. Management.** The Deputy Director shall be responsible for approving and managing implementation of the professional career path plans presented by the Professionalization Studies Unit for immigration staff. The unit shall be ascribed to the Human Resources and Staff Professionalization Division.

## Chapter VII
## Inter-institutional relations

**Article 153. Relations with human rights bodies.** In the interest of effective compliance with its mandates, the Guatemalan Migration Institute may, at any time, enter into inter-institutional cooperation agreements, conventions, mechanisms, and projects with the Human Rights Ombudsman and the National Office for the Prevention of Torture and Other Cruel, Inhumane, and Degrading Treatment.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

**Article 154. Relations with the Migrants Commission of the Congress of the Republic.** The Guatemalan Migration Institute shall establish a relationship of close cooperation with the Migrants Commission of the Congress of the Republic, in order to maintain ongoing dialogue regarding the needs of migrants and necessary legislative measures.

During the second half of January of each year, the Guatemalan Migration Institute must also present an annual report on its work, in writing, to the Migrants Commission of the Congress of the Republic.

**Article 155. Relationships with international bodies.** The Guatemalan Migration Institute may develop relations of cooperation, assistance, and ongoing work with its counterparts.

At no time may the Guatemalan Migration Institute act as a representative of the State of Guatemala before international bodies in the area of international policy, and shall turn to the competent authorities to this end.

**Article 156. Relationships with other civil society entities.** The Guatemalan Migration Institute may develop relations of cooperation, assistance, and ongoing work with civil society entities, and may enter into agreements or conventions.

In no case may the Institute agree to the transfer of funds from the Guatemalan Migration Institute to nonprofit, for-profit, business, or commercial civil society organizations.

The functions of the Guatemalan Migration Institute may not be delegated.

**Article 157. Relations with other State agencies.** The Guatemalan Migration Institute shall maintain close relations with other decentralized or autonomous State agencies, with regard to their competencies, functions, and legal prerogatives.

**Chapter VIII**
**Guatemalan Migration Institute and the National Migrant Services Council of Guatemala**

**Article 158. Complementarity.** The Guatemalan Migration Institute shall maintain complementary relations with the National Migrant Services Council of Guatemala. Complementarity shall be understood as cooperation and integration of activities aimed at servicing and protecting Guatemalan citizens' human rights and individual guarantees abroad.

**Article 159. Mutual strengthening.** With the aim of not duplicating budgets and government activities, both institutions shall jointly review their strategic and annual plans, respect their specific functions, determine cooperation activities, and establishing areas where they must mutually strengthen each other.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

**Article 160. Joint activities.** In addition to cooperation activities defined as a result of mutual strengthening and within national legislation, both institutions shall cooperate with the Ministry of Foreign Relations in:

1. Providing necessary assistance to Guatemalan citizens abroad in order to obtain official immigration and personal identification, or documents that legally must be managed by consulates.
2. Maintaining ongoing dialogue with authorities in foreign countries regarding the conditions, treatment, care, and health of Guatemalan citizens in immigration centers or during deportation or return processes.
3. Coordinate with shelters in order to provide shelter and temporary protection to Guatemalans requesting assistance returning to Guatemala.
4. Manage Guatemalan citizens' requests for assistance returning to Guatemala.

**Chapter IX**
**Service and Protection Council**

**Article 161. Service and Protection Council.** The Service and Protection Council is created as an entity of the National Immigration Authority, and responsible for the following activities:

1. Managing prevention and information campaigns on the risks of migration and the rights of migrants.
2. Creating awareness programs in the educational sector in order to address the issue of migration, particularly among children and adolescents.
3. Promoting reporting on human rights violations.
4. Creating health awareness campaigns for deportees or returnees.
5. Serving the families of migrants presumed disappeared during migration, and creating contact mechanisms with foreign authorities.
6. Carrying out any activities necessary to prevent migration risks, service for deportees or returnees, search relief, and family member identification.

The Director of the Guatemalan Migration Institute, via the Service and Protection Council, and in coordination with the National Migrant Service Council of Guatemala, may build links to coordinate and manage with associations of returnees and migrants, both abroad and in Guatemala, and coordinating mechanisms on harnessing and investing remittances. Other activities include promoting and participating in private initiatives, communities, local cooperatives, and nonprofit civil associations, for the purpose of creating employability and productivity programs for returnees, family members, and migrant communities. The Director may always urge these activities to prioritize communities, municipalities, and departments with higher rates of underdevelopment and migration.

**Article 162. Composition.** The Service and Protection Council shall be comprised of the following institutions:

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

1. The General Director of the Guatemalan Migration Institute, who presides the Council.
2. The Executive Secretary of the National Migrant Service Council of Guatemala.
3. A Vice Minister of the Ministry of Education.
4. A Vice Minister from the Ministry of Public Health and Social Services.
5. A Vice Minister of the Ministry of Labor and Social Welfare.
6. A Vice Minister of the Ministry of the Interior.
7. A Vice Minister of the Ministry of Foreign Relations.
8. A Vice Minister of the Ministry of Economy.
9. A Vice Minister of the Ministry of Social Development.
10. A Representative delegated by the Solicitor General of the Nation.
11. The Director of the Division of Protection and Fostering of Childhood and Adolescence, under the Presidential Secretariat for Social Welfare.
12. The Representative delegated by the Human Rights Ombudsman.

In order to comply with its mandate, the Service and Protection Council may invite state entities or international bodies it deems relevant based on their specialties to regular or special meetings, in order to identify plans or specific programs.

**Article 163. Integration.** During the first six months of this Code's entry into force, the Service and Protection Council shall meet in order to establish a working agenda allowing it to have, within a year, meeting as often as necessary, a definition of procedures to follow for cases described in the activities with which it has been tasked by this Code.

A definition of those proceedings shall be presented to the National Immigration Authority for validation and integration in the National Immigration Policy.

**Article 164. Regular and special sessions.** Once it has determined its procedures to be followed, the Service and Protection Council shall hold regular meetings once every six months, and special meetings as often as necessary.

**Article 165. Distribution of responsibilities.** The General Director shall be responsible for coordinating and implementing the procedures, with the support of state institutions comprising the Council, in order to establish responsibilities as part of that definition, in line with the exclusive scope of each institution.

**Chapter X**
**Security at immigration checkpoints**

**Article 166. Security.** Security at immigration checkpoints shall always be aimed at ensuring the protection of persons and their rights.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

When the National Civil Police must intervene, they shall always seek to have a minimal impact on individual persons, and establish mechanisms for the proportional and necessary use of force and weapons, in line with special procedures.

The Director of the Guatemalan Migration Institute shall encourage the Ministry of the Interior to ensure that the National Civil Police includes special training on serving the human rights of migrants in its curriculum, along with components of international human rights and humanitarian law. It shall also encourage the designation of National Civil Police officers and agents for security at immigration centers and checkpoints, who display the highest human qualities, and engage in continuing education on provisions aimed at guaranteeing the provisions of Article 167 of this Code.

**Article 167. Coordination.** The Guatemalan Migration Institute shall coordinate immigration checkpoint security activities with the Ministry of the Interior. These activities shall be aimed at:

   a) Ensuring the security of persons at immigration checkpoints, so that they are not victims of acts of violence against their integrity or property.
   b) Establishing mechanisms for detaining persons who attempt to leave the country and are subject to an arrest warrant.
   c) Establishing mechanisms for arresting persons in flagrante.
   d) Competencies in cases of a disruption of public order at immigration checkpoints.
   e) Any activity necessary to safeguard the security of persons.

**Article 168. Detention.** The National Civil Police is the authority authorized to detain persons. In such cases, the immigration checkpoint employee or officer shall immediately alert the National Civil Police in order for this procedure to be conducted according to protocol.

Detained persons may not be deprived of their liberty inside immigration checkpoints.

**Part II**
**Procedures**

**Chapter I**
**Procedures for the protection of unaccompanied children and adolescents and those separated from their families**

**Article 169. Unaccompanied child migrants and those who have been separated from their families.** Unaccompanied child migrants and those separated from their families are defined as children and adolescents who are separated from their mother, father, or both parents, or from other relatives, and are not under the care of an adult who, by law or custom, assumes that responsibility.

**Article 170. Principles.** The procedure for serving and protecting unaccompanied children and adolescents is governed by the following principles:

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

a) **The child's best interest.** Decisions shall guarantee strict compliance with this principle. Authorities are required to determine the best interest of the child or adolescent, which requires a clear and substantial assessment of the migrant child's identity, particularly his or her nationality, parents, and ethnic, cultural, and linguistic background, as well as any vulnerabilities and special protection needs. In cases in which it is impossible to establish whether the child is a minor or his or her age, or there is reasonable doubt as to his or her age or the veracity of his or her documents, he or she shall be presumed to be a minor.

b) **Non-discrimination.** Unaccompanied children and adolescents or those who have been separated from their families shall not be discriminated against for being unaccompanied or separated from their families, refugee status, or status as an applicant for refugee status or political asylum, or immigration status, nationality, belonging to an ethnic group, or sexual status. This principle includes differentiated treatment based on protection needs, such as those associated with age, sexual diversity, and gender.

c) **Family unit and the right to family reunification.** Authorities shall take all measures to ensure that unaccompanied children or adolescents or those who have been separated from their families are reunited with their mother or father, both parents, guardian, or whomever has custody of them, either in the receiving country, or country of origin or provenance, except when the best interest of the child requires prolonging that separation. In line with this principle, authorities shall favor not separating siblings or relatives.

d) **Communication and preservation of personal relationships and direct contact between children and parents.** Children and adolescents have a right to know the whereabouts of their relatives, particularly their mother, father, and siblings. This principle includes the right to locating one's mother, father, or family members and facilitating communication with them, whether in the country of origin or receiving country.

e) **Non-violence and dignified treatment.** The dignity of child and adolescent migrants shall be protected, particularly in the case of unaccompanied minors, and the authorities shall ensure that they are not subjected to conditions contrary to their personal integrity, such as torture, cruel, inhumane, or degrading treatment.

f) **Protection and security.** No administrative decision or decision by the authorities may put the security of children or adolescents at risk. To this end, authorities shall seek to protect minors using the various mechanisms considered appropriate, while coordinating with authorities in other States to ensure the dignified and safe repatriation of child and adolescent migrants. Places provided for minors' care and shelter shall be pleasant, safe, and friendly environments.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

g) **Legality and due process.** Any decision taken on the status of children and adolescents, particularly those who are unaccompanied and separated, shall be done so with full respect for the right to defense and due process.

h) **Confidentiality of registries and protection of one's private life.** Authorities shall seek to not endanger sensitive information or information on the identity of children or adolescents, or their families. Dissemination of this information is restricted, except when sharing it is in the best interest of the child in order to find his or her family members or seek family reunification. Authorities shall maintain the confidentiality of unaccompanied children and adolescents, as well as that of their families. They shall ensure that the information collected and exchanged in order to protect the minor is not used for other purposes.

i) **Specialization of officers and staff responsible for immigration management, protection, repatriation, transfer, and family and social reunification of unaccompanied child migrants.** Professionals responsible for these procedures and serving children and adolescents shall have specialized training in the human rights of children and adolescents, allowing them to provide multidisciplinary service in the areas of psychology, social work, health, and legal matters.

j) **Principle of non-return when there is a risk to personal integrity.** No child or adolescent shall be transferred to another country if there is a risk that he or she may suffer serious human rights violations, particularly violations of the right to life, liberty, and physical integrity.

k) **Right to life, survival, and development.** Children and adolescents, particularly those who are unaccompanied or separated, shall be protected from violence and exploitation.

l) **Right to freely express one's opinion.** The desires and opinion of unaccompanied or separated children and adolescents shall be duly noted and taken into consideration. Following informed expression of such desires and opinions, they shall be provided with al information on their rights, existing services, means of communication, procedures to request refugee status or asylum, the location of their families, and the situation in their country of origin. With regard to guardianship, custody, housing, and legal representation, the opinions of the child or adolescent shall also be taken into account. The information mentioned above shall be provided in a fashion pursuant to the minor's maturity level and ability to understand. Given that participation depends on reliable communication, interpretation shall be provided in all phases of the procedure.

**Article 171. Child Protection Officers Unit.** The Guatemalan Migration Institute, via the Division of Migrant Services and Protection of Fundamental Rights, shall create a specialized unit for serving and protecting child migrants, which shall bring together teams of multidisciplinary

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

professionals in serving, assisting, protecting, and managing the rights of children and adolescents. Professionals from this unit shall be known as child protection officers.

The specialized child migrant service and protection unit shall work in close coordination with the Office of the Solicitor General of the Nation within the scope of its competence, as well as in agencies comprising the National Child and Adolescent Protective Services System.

**Article 172. Support and assistance at consulates.** Child protection officers working in Guatemalan territory may be commissioned to provide support and assistance at consulates when consulates make such a request.

At all times, they shall interact and coordinate in order to effectively protect Guatemalan children and adolescents abroad.

**Article 173. Unaccompanied and separated children and adolescents in Guatemala, outside the country of their nationality.** Pursuant to the provisions of this Code, foreign citizen children and adolescents who are unaccompanied or separated from their families have the right to service by specialized staff. The authorities shall plan on adopting special protection measures, adapted to reflect the situation of vulnerability in which the minor may find him or herself.

Generally speaking, unaccompanied children and adolescents, or those separated from their families, shall not be deprived of their liberty.
During the immigration process, the Office of the Presidential Secretariat for Social Welfare shall implement child or adolescent protection programs, with a priority on:

   a) Housing with a relative in Guatemala, regardless of his or her immigration status, who is able to ensure the minor's care;
   b) Temporary family placement; and
   c) Other open-ended housing options, aimed at protecting children and families; these measures may be adopted in line with the administrative procedure to be carried out in the respective regulations. Exceptionally, and for a briefly as possible, the minor may be housed in a residential shelter.

Through an initial evaluation, should the Office of the Presidential Secretariat for Social Welfare identify foreign child or adolescent migrants likely to be recognized as refugees or receive asylum, any other international protective measure, or family reunification, the Office shall immediately inform the Guatemalan Migration Institute's Division of Migrant Services and Protection of Fundamental Rights in order to take steps toward adopting special protection.

The Division of Migrant Services and Protection of Fundamental Rights, through the specialized unit for child migrant protection and service, can and shall follow the following procedure:

   a) Immediately inform the General Director of the case in order to grant temporary status, so as to protect the minor's fundamental rights and ensure that he or she is

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

not returned to his or her country of origin until his or her situation can be determined.

b) Take steps to identify and inform the minor of his or her rights, insuring that this is done so in his or her language, and in line with his or her age and maturity.

c) Communicate with the Solicitor General's Office with regard to cases requiring special protection measures for children and adolescents who will begin the procedure, pursuant to its regulations.

d) Maintain close contact with the Office of the Presidential Secretariat for Social Welfare and the Ministry of Foreign Relations through its consular network.

Throughout the procedure, contact or communication with family members shall be ensured, in line with the best interests of the child. If the child or adolescent requests assistance returning to his or her country of origin, the authorities shall ensure this does not run the risk of jeopardizing the minor's fundamental rights. In the case of family reunification, the Guatemalan Migration Institute shall ensure that the child or adolescent and his or her family have an immigration status facilitating immigration regularization in Guatemala.

Such situations and steps taken may be communicated to the Office of the United Nations High Commissioner for Refugees or other international bodies with a mandate aimed at service and protection.

**Article 174. Unaccompanied Guatemalan child and adolescent migrants.** It is in national interest to serve and protect the fundamental rights of Guatemalan child and adolescent migrants who are unaccompanied in foreign countries.

Consulates are the authorities responsible for taking necessary steps to serve and protect the fundamental rights of Guatemalan children and adolescents abroad.

Consuls may request support from child protection officers or the representative of the National Migrant Services Council of Guatemala.

Institutions comprising the Service and Protection Council shall design and manage databases on foreign child and adolescent migrants or unaccompanied nationals, whose data shall be reserved and used solely for the purpose of drafting immigration policies focused on protecting rights.

**Article 175. Receiving children or adolescents.** The Service and Protection Council, in defining its respective procedures, shall observe the following guidelines for receiving children or adolescents who have been repatriated, returned, or deported to Guatemala:

a) The Guatemalan Migration Institute's Division of Migrant Services and Protection of Fundamental Rights is responsible for receiving children and adolescents.

b) Institutions comprising the Service and Protection Council shall gradually participate in the process of receiving the minor.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

   c) At all times, a representative of the Office of the Solicitor General shall be present in order to monitor the family reunification process or judicial proceedings.

   d) The child or adolescent received shall be sent immediately to temporary care and shelter.

   e) A spokesperson from the Guatemalan Migration Institute may provide information and give details on the return of children or adolescents, but at no time may they be shown to the media during the reception of the minor, and the names and identities of the minors in question may not be shared.

   f) The media may be informed after a time period during which it has been determined that such a mechanism may help locate family members.

   g) Family reunification shall proceed once it has been determined that the minor's family, guardian, or custodian present no threats or human rights violations to the child.

   h) The social services process shall establish a support program for social insertion, to provide follow-up on education, technical education, and professional insertion, in line with national legislation and other specific situations. The goal of these follow-up programs is to ensure that family reunification is permanent.

With the information shared by consuls or psychosocial support teams, the Guatemalan authorities shall ensure that special protection measures are adopted, and adapted to the situation of vulnerability in which the unaccompanied child or adolescent may find him or herself. For this purpose, the authorities may promote programs aimed at protecting children and families, as well as social protection programs, which it shall coordinate with other State and civil society institutions. During the investigation in the interest of family reunification, the child or adolescent may be placed in temporary housing, for as briefly as possible.

**Article 176. Legal protection process.** In line with the best interest of the child, if a threat or violation of the rights of the child or adolescent impedes family reunification, the Solicitor General shall initiate a legal protection process within the child and adolescent justice system.

**Chapter II**
**Procedure for the protection and determination of Refugee Status in the State of Guatemala**

**Article 177. Competent authority.** The National Immigration Authority shall be the competent authority to resolve all applications for refugee status.

The National Immigration Authority shall create the National Refugees Commission, to be comprised of a technical representative of the Ministries of Foreign Relations, Labor and Social Welfare, the Interior, and the Guatemalan Migration Institute.

The National Refugees Commission shall act as an advisory body, and its main functions shall be studying the foundation of refugee status applications, issuing recommendations, opinions, and suggestions.

**UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION**

The Office of the United Nations High Commissioner for Refugees or its representative, in line with its mandate and functions, may participate as an advisor as part of the Commission.

**Article 178. Application.** The application for refugee status may be submitted in writing or verbally to the Guatemalan Migration Institute, or in Guatemala's immigration border checkpoints, in line with the provisions in the regulation of this Code.

**Article 179. Special application.** Foreign citizens legally present in Guatemalan territory may also apply for recognition of refugee status at the Guatemalan Migration Institute, when motivating causes subsequently occur in their country of origin.

**Article 180. Legal representation and interpreter.** The right of applicants for refugee status to be provided with legal assistance and an interpreter or translator at all phases of the procedure for determining whether refugee status shall be recognized.

**Article 181. Confidentiality.** The confidentiality of the application, documentation, and personal information of persons applying for recognition of refugee status shall be recognized, in order to avoid any risk of life, integrity, liberty, or any other rights of the applicant.

**Article 182. Resources.** Applicants for recognition of refugee status may file an appeal with the National Immigration Authority of any negative decisions on their application, within 10 days of notification of that decision. In such cases, the National Immigration Authority shall issue a permanent decision within no more than five days.

**Article 183. Final refusal.** Upon issuing a final decision rejecting an application for recognition of refugee status, the Office of the United Nations High Commissioner for Refugees may, if it considers it in line with its mandate, request that the applicant be granted a reasonable period of time in Guatemalan territory in order to obtain admission in another country.

In all such cases, the time period shall be agreed upon by the National Immigration Authority, and communicated to the Office of the United Nations High Commissioner for Refugees and the Guatemalan Migration Institute.

**Article 184. Cessation of refugee status.** The National Immigration Authority shall declare the cessation of refugee status if the person in question is found to be in any of the following situations:

- a) He or she voluntarily renounces his or her refugee status;
- b) If he or she has voluntarily turned to the protection of the country of his or her nationality;
- c) If, having lost his or her nationality, he or she voluntarily recovers it;
- d) If he or she has acquired a new nationality or new refugee status and has protection from the country his or her new nationality or new refugee status;

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

e) If he or she has voluntarily moved back to the country which he or she had abandoned, or outside of which he or she had remained due to fear of persecution; and

f) If the circumstances on which the decision to recognize refugee status was based have ended, he or she cannot continue to refuse to turn to the protection of the country of his or her nationality.

In the case of f) of this article, the National Refugees Commission, prior to issuing its decision, shall schedule a hearing for the interested party to take place in 10 days' time, in order for him or her to exercise his or her right to defense in evaluating the preponderance of arguments in favor of continuing to receive international protection as a refugee. With or without a response, the Commission shall resolve whether or not to issue a cessation of refugee status, and this decision shall be considered final. The State shall have the burden of proof to demonstrate that there is a valid cause for cessation of refugee status.

The National Immigration Authority shall have the faculty to resolve situations or cases not outlined in this article, with regard to cessation of refugee status.

**Article 185. Residency option.** A person in line d) of Article 78 of this Code may apply for permanent residence, pursuant to the provisions established to that effect.

Obtaining temporary or permanent residence, or international protection to which a person may be subject shall not be grounds for losing refugee status.

**Article 186. Streamlining procedures.** In very special circumstances, such as children or adolescents who are victims of sexual violence, among others, the National Refugees Commission may take administrative steps in order to streamline the process for issuing a resolution granting refugee status.

**Article 187. Regulation.** Corresponding regulation governing procedures regarding refugee status shall be issued.

**Chapter III**
**General criteria for regularization procedures for foreign citizens**

**Article 188. General procedures.** The regularization process shall begin with the submission of an application to the Guatemalan Migration Institute, with the exception of the provisions in Articles 181 and 182 of this Code, in line with requirements, and including documents established in each case.

**Article 189. Time periods.** The regularization procedure shall conclude within 90 days following the submission of an application.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

If procedures are already in place, the Guatemalan Migration Institute shall set a time limit of 30 days in order to rectify the applications, within the 90 regular-day period. This step may be extended by 30 days.

**Article 190. Appeals.** Applicants may file an appeal of decisions issued in this matter, as outlined in Article 182 of this Code.

**Article 191. Regulation.** When a regularization plan is issued pursuant to the provisions of this code, specific regulation shall be issued, in line with the special provisions governing each specific case for which the plan has been issued.

## Chapter IV
## Migrant offenses and penalties

**Article 192. Penalization.** The Guatemalan Migration Institute has the power to impose penalties pursuant to the regulations of this chapter and exclusively within its scope of competence.

**Article 193. Offenses.** The following shall be considered as administrative offenses that may be committed by foreign citizens:

a) Failure to present one's international travel identification document to the Guatemalan authorities. The principle of non-penalization shall be observed with regard to applicants for recognition of refugee status or political asylum who are not carrying personal identification documents.
b) Remaining in Guatemala for longer than authorized, without a pending extension application.
c) Failure to inform the authorities of changes to one's address or domicile, as appropriate.
d) In the case of temporary residents, failure to present a certificate of tax solvency to the Guatemalan Migration Institute.
e) Being caught conducting commercial activities without proper authorization, pursuant to national legislation.
f) Entering Guatemala via unauthorized checkpoints or locations, or having no proof of legal entry.

**Article 194. Penalties.** The offenses listed are subject to the following financial penalties:

a) For failure to present one's international identification and travel document, a fine of 200 quetzals.
b) For remaining in Guatemala longer than authorized, without a pending application for extension, a fine of 15 quetzals per day.
c) For failure to present a certificate of tax solvency, a fine of 2,000 quetzals.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

   d)  For being found to have conducted commercial activities without proper authorization, a fine of 5,000 quetzals and cease and desist order.

All fines may be paid in United States dollars, using the current valid exchange rate on the day of payment, as calculated by the Bank of Guatemala.

**Article 195. Penalty of immediate removal from Guatemala.** Should foreign citizens fail to comply with the obligations identified in this Code, in addition to financial penalties, they may be required to leave Guatemala within a period of no more than 10 days.

This administrative penalty shall be imposed by the Guatemalan Migration Institute, via its competent body.

**Article 196. Appeals.** Persons subject to penalty shall have the right to appeal the decision pursuant to Article 182 of this Code.

**Article 197. Independent procedure.** Administrative penalties here are distinct from the administrative penalties imposed by the Tax Administration Superintendence.

Administrative penalties are also distinct from criminal penalties imposed for crimes committed, and resulting from a criminal proceeding established in Guatemalan legislation, by the corresponding authorities.

## Chapter V
### Procedure for serving families reported disappeared due to migration

**Article 198. Report of disappearance.** Any family members or individuals in general who do not know the whereabouts or destination of a person who is known to have migrated to another country, either regularly or irregularly, has the right to report this person as missing.

**Article 199. Institutional service.** The missing person's report shall be filed with the Guatemalan Migration Institute, which shall share it with the Service and Protection Council, in order for appropriate steps to be taken, in line with the procedures that the Council has determined for this purpose.

**Article 200. Search mechanism.** The Service and Protection Council shall establish a procedure to facilitate contact and information exchange with the authorities in countries where it is presumed that the person may be, either in transit or as the country of destination.

This procedure shall be established in order to obtain information on deceased persons who have been buried unidentified in those countries, persons deprived of liberty, and persons who may be at healthcare centers, hospitals, morgues, or other places in transit or receiving countries, for the purpose of providing migrants with care and shelter. This function shall be coordinated via Guatemala's consular missions.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

Guatemala's consular mission shall request the support of local authorities in the countries where the disappearance of Guatemalan citizens was reported, in order to begin search mechanisms in order to locate the Guatemalan citizen who was reported missing.  The mission shall request information on places where criminal entities dedicated to sexual exploitation and trafficking in persons are known to operate, in order to investigate the possibility of finding Guatemalan citizens who have been victims of those or related crimes.

**Article 201. Facilitating transfers.** Should a person reported as missing be found, the Service and Protection Council may support a blood relative, preferably the mother, father, or sibling, in order to visit the country where the person reported missing has been located.

In these cases, authorities shall provide the logistic, legal, and social work support necessary for the situation that the family member will encounter, in coordination with other agencies.

**Article 202. Repatriation of remains.** The Ministry of Foreign Relations is responsible for ensuring appropriate repatriation of persons who, after being reported disappeared or missing, were found deceased in the territory of another State.

**Article 203. Foreign migrants assumed to be disappeared in Guatemalan territory.** The Service and Protection Council shall coordinate with the Public Ministry, National Civil Police, Penitentiary System, National Institute of Forensic Sciences, and the Ministry of Public Health and Social Services with regard to public hospitals and cemetery management, in order to avail them with the mechanisms to search for, identify, and locate foreign citizens reported as missing in Guatemalan territory.

These institutions shall have a database allowing for real time information exchange in line with international standards for the identification of persons reported missing.

In the case of unidentified deceased persons, the National Institute of Forensic Science and the Ministry of Public Health and Social Assistance shall coordinate the adaptation of unified registries in order to have precise information on the location where the person has been buried at various cemeteries, as well as ante mortem and post mortem information obtained during the forensic process.

**Article 204. Prohibition of cremation.** The authorities have prohibited authorization of cremation of the bodies of foreign migrants in order for them to be repatriated to their country of origin.

Guatemalan authorities have prohibited authorization of cremation of the bodies of Guatemalan citizens who died abroad prior to their repatriation to Guatemala.

**Article 205. Constitutional relief and habeas corpus.** Any person, whether a Guatemalan citizen or not, may file for constitutional relief or a writ of habeas corpus on behalf of foreign migrants, in order to restore the migrant's rights or cease violations of those rights, in order for

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

the migrant to be presented by the authorities, should he or she be in their facilities or under their guard, shelter, care, or custody.

**Article 206. Facilitating search mechanisms.** The Service and Protection Council may promote free access to State agencies at various State authorities for the family members of foreign migrants who have been reported missing in Guatemalan territory.

Additionally, access to sources of information shall be managed on a case by case basis.

**Article 207. Search for unaccompanied child or adolescent migrants reported missing.** The Service and Protection Council shall support the Solicitor General in the national and international search for, location, and safeguard of unaccompanied child or adolescent migrants, or those who have been separated from their families and have gone missing.

The Alba-Keneth Alert System Law [Ley del Sistema de Alerta Alba-Keneth] shall apply as appropriate.

**Part III**
**Means of transport**

**Chapter I**
**Criteria and general regulation**

**Article 208. Supervision.** Upon entry and exit, all means of international transport, whether via air, sea, or land, shall be scrutinized for immigration control of passengers, crew members, or staff. The Guatemalan Migration Institute shall determine where this verification takes place. The entry of passengers, crew members, or staff shall be contingent on compliance with documentation as established in Guatemalan legislation.

**Article 209. Service and protection.** Employees of the Guatemalan Migration Institute shall determine whether or not they need to provide service and protection to persons requiring medical attention or any other emergency service during the immigration verification process.

**Article 210. Private cooperation.** Private entities or private transportation companies, whether maritime, air, or land, shall cooperate with the immigration control procedure, ensuring that their passengers' and crew members' documentation are in compliance. Corresponding provisions shall be issued to that effect.

**Article 211. Prohibition.** Aircraft, vessels, and land vehicles may not leave Guatemala before their passengers, crew members, and staff have undergone an immigration control procedure.

Failure to comply with this standard shall lead to the penalty of a fine equivalent to ten thousand United States dollars (US$10,000.00).

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

**Article 212. Joint responsibility.** The owner, captain, commander, supervisor, or officer of any international means of transport, and companies, entities or agencies, representative, operators, or co-signing parties of international means of transport are jointly responsible for the transfer, care, and custody of passengers, crew members, and staff, until their admission into Guatemala, pursuant to the conditions set forth by this Code, its regulation, and other immigration-related provisions.

**Article 213. Obligations.** In addition to the corresponding transfer, companies, entities or agencies, representatives, operators, or co-signing parties of international means of transport shall all jointly bear any financial penalties resulting from the competent authorities rejecting passengers or crew members who do not fulfill entry and stay requirements established by this Code and its regulations. This includes any expenses incurred when foreign citizens must remain in Guatemala solely for the time necessary for denial of entry into Guatemala.

Failure to comply with this provision shall be subject to the penalty of a fine equivalent to ten thousand United States dollars (US$10,000.00).

**Article 214. Immigration checkpoint.** Within border, port, and airport facilities, immigration checkpoints shall be installed for the purpose of conducting immigration verification.

**Article 215. Transportation employees.** The Guatemalan Migration Institute shall govern the obligations and other provisions to be fulfilled with regard to documentation and immigration verifications for international transportation employees.

## Chapter II
## Authorizations

**Article 216. Manifests.** The port captain, General Direction of Civil Aviation, and General Direction of Transportation may not authorize the entry or exit of vessels, ships, aircraft, and land vehicles into Guatemalan territory if they do not comply with the shipping provisions with regard to passenger, staff, and crew manifests.

**Article 217. Passengers in transit.** Passengers in transit are considered tourists or travelers.

## Volume III
## Final, transitory, and repealed provisions

## Part I
## Final provisions

**Article 218. Guatemalan migrant workers and recruiters.** Guatemalan migrant workers may access temporary worker programs abroad, either individually or through legal recruitment entities, which have been previously authorized and duly registered by the Ministry of Labor and Social Welfare of Guatemala, with collaboration from the Ministry of Foreign Relations.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

To this end, in addition to the provisions of Article 34 of the Labor Code, recruitment agencies or individual recruiters shall specify in the respective forms approved by the Ministry of Labor and Social welfare, which public or private entities require services abroad, as well as the class, category, and type of work to be completed.

**Article 219. Assistance and services for Guatemalan migrant workers.** The Ministry of Labor and Social Welfare shall create a system for coordinating with the Ministry of Foreign Relations in order to provide Guatemalan migrant workers abroad with assistance and services.

The Ministry of Foreign Relations shall promote diplomatic relations with the receiving country in order to verify the respect of labor rights and the conditions of the specific contracts.

## Chapter II
## Transition and labor rights

**Article 220. Non-impingement on labor rights.** The transition process from the General Direction of Migration under the Ministry of the Interior, to the Guatemalan Migration Institute as a decentralized agency with exclusive competence, shall not affect existing labor contracts to the workers' detriment.

The Ministry of Labor and Social Welfare, via its corresponding agency, shall be responsible for ensuring that workers' rights are not mischaracterized, reduced, or violated during the transition process.

**Article 221. Unions.** The unions of the General Direction of Migration shall not be undermined in their capacities as legal persons during the transition process to the Guatemalan Migration Institute.

**Article 222. Collective agreement.** The Collective Labor Agreement signed between the General Direction of Migration Workers' Union and the General Direction of Migration remains in force in light of the creation of the Guatemalan Migration Institute.

**Article 223. Career path.** All public employees of the General Direction of Migration shall join the professional career development system during the transition process, with a view of consolidating the administrative management of the Guatemalan Migration Institute's functions.

Any labor proceedings between the General Direction of Migration and any public employee or officer in progress before the legal authorities shall continue their processes.

**Article 224. Full enjoyment of rights.** The rights to leave, vacation, prenatal and maternity leave, work days, remuneration, and other labor rights remain in force and shall continue as normal.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

**Article 225. Pensioners.** Employees of the Guatemalan Migration Institute may continue contributing to the Guatemalan civil pension system, in line with the voluntary incorporation procedure established in the specific law.

### Chapter III
### Transitory provisions

**Article 226. Beginning activities.** The Guatemalan Migration Institute, created by this Code, shall begin its operations from the moment the President of the Republic names a General Director, in line with the provisions of this Code.

Upon beginning its operations, all competencies, rights, attributes, functions, representations, and delegations governed by laws, regulations, and other regulatory instruments in favor of or under the responsibility of the General Direction of Migration, shall be exercised by the Guatemalan Migration Institute, as shall all rights and obligations contained in national or international conventions, contracts, or other legal instruments.

Real estate and moveable property, equipment, and furniture, as well as other assets and liabilities of the General Direction of Migration shall be transferred to the institutional equity of the Guatemalan Migration Institute.

**Article 227. Following creation of the National Immigration Authority and naming of the Director of the Guatemalan Migration Institute.** The National Immigration Authority shall be formed within 60 days of the entry into force of this Code, in order to begin issuing regulations and the transition plan, to be issued within a period of six to 12 months.

The President of the Republic shall name the Director of the Guatemalan Migration Institute, once the transition plan presented by the National Immigration Authority has been approved.

The person acting as General Director of Immigration shall remain in his or her post until the transition plan has been presented and approved.

**Article 228. Gradual transition.** Once the transition plan presented by the National Immigration Authority to the President of the Republic has been approved, the President shall name the Director of the Guatemalan Migration Institute, in order for him or her to begin jointly implementing that plan with the National Immigration Authority, a representative from the Ministry of the Interior, and a Vice Minister from the Ministry of Public Finance, within a maximum period of two years.

During this process, the Ministry of the Interior shall abandon the functions it carried out, until the Guatemalan Migration Institute remains as a decentralized agency with exclusive competence.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

**Article 229. Support from the Comptroller General's Office.** As part of its duties, the Comptroller General's Office shall support the transition process in order to ensure an effective transfer and management of public funds administrated by the former General Direction of Migration.

**Article 230. Files.** All files shall be technically transferred, in line with the archiving rules provided by the Central American Archives.

Prior to the transfer, standards shall be issued on assessing files, in order to:

1.    Determine which documents shall be transferred to Central American Archives due to its historic or cultural value.

2.    Determine which documents shall be kept at the Department of Statistics and Archives due to their administrative value and information on persons.

3.    Determine which documents shall be sent to national libraries, the Ministry of Education, or Universidad de San Carlos de Guatemala due to their academic value.

4.    Determine the procedure for preserving, handling, and storing any information that will remain in the corresponding migration archive.

5.    Establish a sequence for document review, issuing assessments, and digitalizing documents.

6.    Determining what material may be recycled.

It shall also be determined what technical aspects are necessary in order to correctly manage the information and later make it available to the public, pursuant to the Law on Access to Public Information [Ley de Accesso a la Información Pública].

**Article 231. Budget.** The Ministry of the Interior shall transfer funds allocated to the General Direction of Migration to the Guatemalan Migration Institute. Additionally, the General State Income and Expenditure Budget shall include an initial allocation in order to cover initial costs for establishment, organization, and operations.

The same General State Income and Expenditure Budget shall include specific line items for state institutions providing protection to returned Guatemalan migrants or foreign citizens requiring specialized protection based on violations of their rights.

**Article 232. Transfer of property.** All physical assets, furniture, and real estate of the General Direction of Migration which are necessary for operations shall be transferred to the Guatemalan Migration Institute. That transfer shall take place pursuant to the provisions of the

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

State Procurement Law [Ley de Contrataciones del Estado] and other applicable provisions. The Ministry of Public Finance shall grant its approval for this transfer.

**Article 233. Immigration checkpoints.** Immigration checkpoints established prior to the entry into force of this Code shall continue normal operations in line with their established functions.

**Article 234. Sole regularization plan.** 180 days following the entry into force of this Code, a time period of 180 days shall be granted for foreign migrants irregularly present in Guatemala to apply for immigration regularization.

**Article 235. Regularization of residents.** Documents granting persons temporary or permanent resident status shall remain in force. The General Director of the Institute shall convene the beginning of changes to status or in order to update status pursuant to the regulations of this Code.

**Article 236. Validity of applications, procedures, and documentation.** All applications, procedures, and documentation existing prior to the entry into force of this Code shall be resolved pursuant to Decree number 95-98 of the Congress of the Republic.

**Article 237. Strengthening the consular protection network.** In order to strengthen the network of consular protection and services for Guatemalan citizens abroad, the Ministry of Foreign Relations shall increase the number of consular representations, within a period of no more than five years, in cities abroad where a large number of Guatemalan migrants reside.

In order to fulfill the provisions of this article, the Ministry of Public Finance shall create the budget line items necessary within the State Income and Expenditure Budget each year, in order to allocate the necessary funds.

**Article 238. Regulation.** The general regulation and other regulations in this Code shall be approved during the first year following the creation of the National Immigration Authority.

**Chapter IV**
**Amendments and repeals to National Legislation**

**Article 239.** The first paragraph shall be amended, and lines j) and k) of Article 36 of the Executive Agency Law [Ley del Organismo Ejecutivo], Decree number 114-97 of the Congress of the Republic shall be repealed, to read as follows:

> **"Article 36. Ministry of the Interior.** The Ministry of the Interior shall be responsible for drafting policies, complying, and enforcing the legal framework regarding maintaining public order, the security of persons and their property, guaranteeing of their rights, implementing court orders and legal resolutions, and endorsing the nominations of State Ministers, including whoever replaces him or her; to this end, the Ministry shall be responsible for the following functions:"

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

**Article 240.** Article 8 of Decree number 46-2007 of the Congress of the Republic, Law on the National Migrant Service Council of Guatemala [Ley del Consejo Nacional de Atención al Migrante de Guatemala] shall be amended, adding line g) with the following text:

> "g) a representative delegated by the General Director of the Guatemalan Migration Institute."

**Article 241.** The following from decree number 95-98 of the Congress of the Republic, Law on Migration [Ley de Migración] shall be repealed:

> **a)** Part I, Sole Chapter, and Articles 1 and 2.
> **b)** Part II, Chapters I and II, and Articles 3 to 11.
> **c)** Part III, Chapters I, II, III, IV, Sections One and Two and Chapter V and Articles 12 to 45.
> **d)** Part IV, Sole Chapter, and articles 46 to 48.
> **e)** Part V, Chapters I and II, Sections One through Four, and Articles 49 to 69.
> **f)** Part VI, Chapters I to III and Articles 70 to 86.
> **g)** Part VII, Chapters I to III and Articles 87 to 96.
> **h)** Part VIII, Sole Chapter, Articles 97 and 98.
> **i)** Part IX, Articles 99 to 102.
> **j)** Part X, Chapter II and Articles 109 to 115.
> **k)** Part XI and Article 116.
> **l)** Part XII, Articles 117 to 120.

**Article 242.** Governmental Agreement 383-2001, Regulation for the Protection and Determination of Refugee Status in the territory of the State of Guatemala [Reglamento para la Protección y Determinación del Estatuto de Refugiado en el territorio del Estado de Guatemala] is repealed.

**Article 243.** All legal and regulatory provisions in national legislation referring to the matters governed by this Code are repealed. Additionally, provisions in other regulatory bodies attributing functions or duties to the General Direction of Migration are hereby repealed, and understood to fall under the purview of the Guatemalan Migration Institute.

**Article 244.** Headings of the articles of this Code do not represent an official interpretation.

**Article 245. Special validity.** As the transition to the Guatemalan Migration Institute is completed, the provisions of numeral 2 of Article 61 and the last paragraph of Article 91 of this Code shall be functions under the aegis of the General Direction of Migration, entering into force on the day of its publication in the Official Legal Journal.

**Article 246. Validity.** This Decree was approved by a favorable vote by at least two-thirds of the total number of representatives in the Congress of the Republic, and shall enter into force 60

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

days following its publication in the Official Legal Journal, with the exception of this article, which shall enter into force as of the day of its publication.

**TO BE SUBMITTED TO THE EXECUTIVE BRANCH FOR ITS RATIFICATION, ENACTMENT, AND PUBLICATION.**

**ISSUED AT THE PALACE OF THE LEGISLATIVE BRANCH, IN GUATEMALA CITY, THE TWENTIETH OF SEPTEMBER TWO-THOUSAND AND SIXTEEN.**

[signature]
**MARIO TARACENA DIAZ-SOL**
**PRESIDENT**

[stamp]: Congress of the Republic
of Guatemala

[signature]
**LUIS ALBERTO CONTRERAS COLINDRES**
**SECRETARY**

[signature]
**OSCAR STUARDO CHINCHILLA GUZMAN**
**SECRETARY**

# NATIONAL IMMIGRATION AUTHORITY
## -AMN-
## ORDER No. 2-2019 OF THE NATIONAL IMMIGRATION AUTHORITY:

### WHEREAS:

The Constitution of the Republic of Guatemala establishes the general principle that, in the area of human rights, treaties and conventions accepted and ratified by Guatemala take precedence over domestic law.

### WHEREAS:

The State of Guatemala is a party to the Convention relating to the Status of Refugees adopted in Geneva on July 28, 1951 and the Protocol relating to the Status of Refugees signed in New York on January 31, 1967; the American Convention on Human Rights of 1969; the Convention on the Rights of the Child of 1989; the Convention on the Elimination of All Forms of Discrimination against Women of 1979; the Inter-American Convention on the Prevention, Punishment and Eradication of Violence against Women (Convention of Belém do Pará), and the Cartagena Declaration of 1984.

### WHEREAS:

Article 8 of the Immigration Code, Decree No. 44-2016 of the Congress of the Republic of Guatemala, establishes that although the Code does not include rights and guarantees granted by international conventions and treaties ratified by Guatemala, they are considered to be incorporated therein. Therefore, regulations on the procedure for the protection, determination, and recognition of refugee status must recognize and harmonize with the content of the aforementioned international instruments.

### THEREFORE:

In the exercise of the functions conferred by Articles 43, 118(f), and 187 of the Immigration Code, Decree Number 44-2016 of the Congress of the Republic of Guatemala,

### IT ORDERS:

The adoption of the following:

**REGULATIONS ON THE PROCEDURE FOR THE PROTECTION, DETERMINATION, AND RECOGNITION OF REFUGEE STATUS IN THE STATE OF GUATEMALA**

**TITLE I**

**SOLE CHAPTER**

**GENERAL PROVISIONS**

**Article 1. Purpose.** The purpose of these regulations is to define the Procedure for the Protection, Determination, and Recognition of Refugee Status in the State of Guatemala established in Article 43 of the Immigration Code.

**Article 2. Acronyms and definitions.** For the purpose of effective compliance with these Regulations, the following definitions will apply:

a. **AMN:** National Immigration Authority [*Autoridad Migratoria Nacional*];

b. **CONARE:** National Refugee Commission [*Comisión Nacional para Refugiados*];

c. **Institute:** Guatemalan Migration Institute [*Instituto Guatemalteco de Migración*];

d. **UNHCR:** United Nations High Commissioner for Refugees;

e. **Grounds:** The facts and events that give rise to the well-founded fear of persecution, which must constitute violations of fundamental human rights;

f. **Extension of Refugee Status:** Concept whereby the spouse and family members of an applicant for refugee status or a recognized refugee, to the degrees of kinship permitted by law, may be extended the right to apply for refugee status or be recognized as a refugee;

g. **Family reunification:** Principle whereby an unaccompanied or separated child or adolescent is to be reunited with his or her mother or father, or with both parents, or with a guardian or custodian;

h. **Cessation of refugee status:** Condition that arises when the refugee loses the international protection granted by the State of Guatemala due to his or her circumstances;

i. **Well-founded fear:** Those reasons and events that gave rise to persecution and which, because of their nature, repetition, or the cumulative actions of a third party, endanger or could endanger a person's life, safety, or freedom;

j. **Refugee status:** Extraordinary immigration status of a foreign national who, under the circumstances established in the Immigration Code, is recognized as a refugee by the National Immigration Authority;

k. **Applicant for refugee status:** A foreign national who formally applies to the National Immigration Authority for recognition of refugee status.

l.   **Country of origin:** The country of nationality or habitual residence of the applicant for recognition of refugee status.

**Article 3. Principles of Interpretation and Application.** The provisions of these Regulations will be interpreted and applied in accordance with the humanitarian and apolitical principles of nondiscrimination, confidentiality, and family reunification, in keeping with the rights and obligations established in the Constitution of the Republic of Guatemala applicable to refugees and the international arrangements to which the State of Guatemala is a party.

**Article 4. Refugee Profile.** The following persons may apply for refugee status:

a.   Any person who, owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is in the country and is unable, or owing to such fear, is unwilling to avail himself or herself of the protection of the country of his or her nationality;

b.   Persons who have fled their country because their lives, safety, or freedom have been threatened by generalized violence, foreign aggression, internal conflicts, massive violation of human rights or other circumstances which have seriously disturbed public order;

c.   Persons who suffer persecution through sexual violence or other forms of persecution based on gender or sexual orientation resulting from violations of human rights contained in international agreements to which the State of Guatemala is a party.

**Article 5. Exclusion.** Refugee status may not be granted to persons who fall within the grounds set forth in Article 47 of the Immigration Code.

The grounds for exclusion are individualized and do not affect family members. When the principal applicant is excluded from refugee status, he or she cannot invoke extension or family reunification.

**Article 6. Special Personal Identification Document.** Applicants for refugee status will be entitled to a Special Personal Identification Document, which will be issued by the competent authority. Persons recognized by the State of Guatemala as refugees will also have this document in accordance with the provisions of the Immigration Code.

**Article 7. Special Travel Document.** Persons with refugee status have the right to leave and return to the territory of Guatemala with a Special Travel Document issued for this purpose, in order to travel to any country except the country where the reasons for the application for refugee status arose; for this, they must have a Special Travel Document issued by the Division of Personal Identification and Travel Documents of the Institute. Refugees must request the proper authorization, and are advised that if they leave the country without it, they will lose their refugee status.

Each Special Travel Document will be valid for one departure and one entry.

**Article 8. Right to Work.** Under Articles 6, 48, 53, 84, and 101 of the Immigration Code, applicants for refugee status and persons granted refugee status are entitled to work in the country, with the proper authorization of the Ministry of Labor and Social Welfare.

**Article 9. Right to Education.** Under Articles 48, 53, 84, and 101 of the Immigration Code, applicants for refugee status are entitled to enroll in education programs and curricula at all levels, upon presentation of their Special Personal Identification Document, subject to compliance with the requirements established by the competent institutions.

**Article 10. Protection of Children and Adolescents.** Unaccompanied or separated migrant children and adolescents will enjoy, *inter alia*, the rights set forth in Article 11 of the Immigration Code.

In addition, they will not be turned away at the border, deported, or repatriated prior to an assessment of their international protection needs.

## TITLE II

### CHAPTER I

### THE NATIONAL IMMIGRATION AUTHORITY AND

### THE NATIONAL REFUGEE COMMISSION

**Article 11. Competent Authority.** Under Article 177 of the Immigration Code, the AMN will be competent to adjudicate all refugee status applications and declare the cessation of refugee status pursuant to Article 184 of the Immigration Code.

**Article 12. The Commission.** The National Refugee Commission, hereinafter referred to as CONARE, is created as an advisory body to the AMN, and is composed of a technical representative, incumbent, and alternate delegate from the Ministry of Foreign Relations, Ministry of Labor and Social Welfare, Ministry of the Interior, and the Guatemalan Migration Institute. The individuals who comprise CONARE must be public servants.

In order to implement the refugee status procedure, CONARE will establish the guidelines to be followed by support staff.

**Article 13. Support Staff.** The Institute will designate support staff to receive refugee status applications, conduct interviews, and manage files during the refugee status recognition process, so that CONARE can perform its functions.

These staff members will report to the Institute and must have the necessary technical and professional capacity to handle and follow up on refugee status applications.

**Article 14. Functions of the National Refugee Commission.** In addition to the functions regulated in the Immigration Code, CONARE will exercise the following functions:

a. Verify that applicants comply with the provisions of Articles 4 and 27 of these Regulations, as well as with the elements and grounds established in the national legislation and international arrangements to which Guatemala is a party, relating to the recognition and protection of refugees;

b. Report refugee status applications to the Institute's Division of Migrant Services and Protection of Fundamental Rights and to the Institute's Alien Affairs Division in the case of children and adolescents, for the appropriate purposes;

c. Notify the Institute's Alien Affairs Division of persons who have been granted refugee status, for the appropriate purposes;

d. Issue recommendations, opinions, and suggestions to the AMN regarding the grounds and arguments for refugee status applications and extension requests;

e. Issue recommendations, opinions, and suggestions to the AMN regarding the cessation of refugee status;

f. Adjudicate the cessation of refugee status in cases governed by Article 184(f) of the Immigration Code;

g. Notify the AMN of any case files that have not been acted upon for more than six months by the applicant, in order for the appropriate action to be taken;

h. Forward refugee status application files to the AMN, through the Technical Secretariat, for its information and the respective adjudication;

i. Safeguard files relating to refugee status;

j. Issue the appropriate records regarding refugee status;

k. Perform all functions as required by law or at the request of the National Immigration Authority.

**Article 15. Advice.** CONARE may request the collaboration, training, and advice of UNHCR.

**Article 16. Sessions.** CONARE will hold regular sessions twice a month and extraordinary sessions when necessary.

CONARE will meet at the headquarters of the Institute or at a place determined by the AMN.

CONARE will define, through the appropriate instrument, the terms of its official notice of meetings, quorum, sessions, and other matters related to its operation and powers.

## CHAPTER II

## PROCEDURE FOR THE RECOGNITION OF REFUGEE STATUS

**Article 17. Procedure.** Applications for refugee status may be made in person, in writing or orally, at an immigration checkpoint or at the Institute's Division of Migrant Services and Protection of Fundamental Rights. The procedure will be carried out as follows:

**1. Application.** The application may be made:

- Before the Migration Control Division at the Institute's immigration checkpoints, where an agent will receive the initial request orally or in writing, forwarding it immediately in writing to CONARE support staff, or;

- Before the Institute's Division of Migrant Services and Protection of Fundamental Rights, where the initial request will be received orally or in writing and immediately forwarded in writing to CONARE support staff.

Upon receipt of the application, CONARE support staff will:

a)   Provide guidance for the applicant to obtain information on the regulatory procedure for acquiring refugee status.

b)   Receive the formal application, for which the applicant must complete the consecutively numbered form provided by CONARE. The applicant must state the reasons for the application and the departure from his or her country of origin. The applicant may attach any personal identification document(s) that he or she may possess and any other evidence deemed relevant in support of the application.

c)   Notify the Division of Migrant Services and Protection of Fundamental Rights of temporary stay status.

d)   Notify the Alien Affairs Division of refugee status applications for children and adolescents, for the granting of temporary residence.

e)   Set a date and time for the interview, which will be not more than 15 days from the filing of the formal application form.

If the applicant fails to appear for the personal interview on the date specified, and the 30 days of temporary stay status have elapsed, the competent divisions will be notified for the appropriate purposes.

**2.    Personal Interview:**

On the day and time set for the interview, there will be a specific area in which to interview applicants for the determination of refugee status. This area will be properly equipped with video and audio devices to document the proceedings conducted. Each interview must also be attended by a psychologist, who will issue a psychological report based on the interview conducted. If necessary, the parties will be assisted by a translator or interpreter, who will sign the document produced as a result of the interview. The interview will be conducted in keeping with the following requirements:

2.1.   Applicants must be served individually by CONARE support staff who will provide a specialized, comprehensive, and differentiated approach.

2.2.   Unaccompanied or separated children and adolescents will be cared for in special areas by trained personnel, meeting their specific protection needs in accordance with current national legislation with support from the Office of the Solicitor General in order to provide them with special attention.

2.3.   The interview will be conducted in Spanish; if the refugee applicant does not speak Spanish, the assistance of a translator or interpreter will be provided.

In the case of family groups, these interviews will be conducted on an individual basis, and will take place within a period of not more than 30 days.

**3.   Investigation of the case and issuance of recommendation, opinion, or suggestion:**

Upon receipt of the formal application for refugee status, CONARE support staff will begin the investigation of the case, using the appropriate means to complete the file.

Once the investigation of the case has concluded, CONARE will take cognizance of and examine the file at the earliest possible session, so that CONARE may subsequently, and within a period of not more than 30 days, recommend, advise, or suggest to the AMN that it consider granting or denying refugee status.

**4.   Decision of the National Immigration Authority and notice thereof:**

Upon receipt of the file containing CONARE's recommendations, opinions, and suggestions pursuant to Article 177 of the Immigration Code, the AMN will proceed to adjudicate the application, granting or denying refugee status.

If the decision is favorable, CONARE will provide notice to the applicant. The refugee must continue with the respective legal procedures before the Institute.

**Article 18. Denial and Motion for Reconsideration**. Once the applicant for refugee status has received proper notice from CONARE of the decision to deny refugee status, the applicant may file a motion for reconsideration.

Said motion must be filed with the AMN at the headquarters of its Technical Secretariat within 10 days, counting from the day following the date of notice, and will be adjudicated within a period of not more than 5 days.

Prior to adjudicating the case, the AMN may take any action it deems necessary to revoke, amend, or uphold the decision on appeal.

Once the decision denying the application for refugee status becomes final, the applicant must regularize his or her immigration status in the country, without prejudice to the application of Article 195 of the Immigration Code.

**Article 19. Withdrawal of Application.** Applicants may withdraw their applications if they consider that it is not in their personal interest to continue with the proceeding. This must be stated in writing to the support staff, who will communicate it to CONARE.

The AMN will issue a decision approving the withdrawal and subsequent closure of the case file. The applicant for refugee status will be notified of this decision and informed that he or she must regularize his or her immigration status or leave the country, as appropriate.

**Article 20. Closure of File without Action.** CONARE will inform the AMN of the abandonment of those files in which refugee status applicants have taken no action for more than six months. The AMN will then declare the applications abandoned and order the closure of the files.

## CHAPTER III

## PROCEDURE FOR THE CESSATION OF REFUGEE STATUS

**Article 21. Cessation of refugee status.** It is incumbent upon the AMN to declare the cessation of refugee status when the refugee falls within the circumstances set forth in subparagraphs (a), (b), (c), (d), (e), and the final paragraph of Article 184 of the Immigration Code, and those established in the 1951 Refugee Convention adopted in Geneva on July 28, 1951.

**Article 22. General procedure for the cessation of refugee status.** When any of the grounds provided in the preceding article arise, CONARE will proceed as follows:

a) **Knowledge of the situation leading to cessation of refugee status:** When CONARE becomes aware of any of the situations mentioned in Article 184(a), (b), (c), (d), (e) and the final paragraph thereof, it will examine the case and *ex officio* issue a detailed report to the AMN with the respective opinion, recommendation, or suggestion.

b) **Decision on cessation of refugee status:** Upon receipt of CONARE's detailed report, the AMN will issue a decision declaring the cessation of refugee status if it deems it appropriate.

c) **Notice of decision:** Should the AMN issue a decision declaring the cessation of refugee status, notice of that decision must be provided by CONARE to the person whose refugee status has ceased. This notice must be served personally by the means determined by the competent authority, guaranteeing the principle of confidentiality and informing the person of the effects of the decision and steps to be taken.

**Article 23. Procedure for the cessation of refugee status under Article 184(f) of the Immigration Code.** Once CONARE is aware that the circumstances under which a foreign national was recognized as a refugee by the State of Guatemala have ceased to exist, that person may no longer refuse to avail himself of the protection of the country of his or her citizenship. Accordingly, CONARE is responsible for adjudicating the cessation in accordance with the following procedure:

a) **Hearing and notice:** When CONARE becomes aware of the above circumstances, it will examine the case, gathering *ex officio* all the evidence it deems pertinent. It will then inform the interested party, serving notice of a hearing within ten days of the day following the date of notice, so that the interested party may exercise his or her right to a defense in the assessment of the reasons that warrant continued international protection as a refugee.

b) **Decision on cessation of refugee status:** Once the deadline for the hearing granted to the interested party has expired, with or without a reply, CONARE will decide whether cessation of refugee status is appropriate. This determination will be deemed a final decision, notice of which will be served on the interested party by CONARE support staff, who will also inform him or her of the effects of the cessation.

**Article 24. Effects of cessation of refugee status.** When CONARE declares the cessation of refugee status, CONARE will immediately notify the Institute that it may grant a reasonable period of time for the person whose refugee status has ceased to regularize his or her immigration status within a period of not more than 30 days or leave the country, as appropriate, at which time the provisions of the regulations in force will apply.

Jafeth Ernesto Cabrera Franco
**Vice President of the Republic of Guatemala**
**Director, National Immigration Authority**

Enrique Antonio Degenhart Asturias
**Minister of the Interior**
**Member, National Immigration Authority**

Francisco Abraham Sandoval García
**Deputy Minister for Labor Administration**
**Bureau Chief**

Sandra Erica Jovel Polanco
**Minister of Foreign Relations**
**Member, National Immigration Authority**

Carlos Velásquez Monge
**Minister of Social Development**
**Member, National Immigration Authority**

Carlos Rolando Narez Noriega
**Executive Secretary**
**National Migrant Services Council of**
**Guatemala**
**Member, National Immigration Authority**

Carlos Emilio Morales Cancino
**Director of the Guatemalan Migration Institute**
**Technical Secretary of the National Immigration Authority**

## CHAPTER IV

## SPECIAL PROVISIONS

**Article 25. Identification of children and adolescents for refugee status recognition.** Should the Presidential Secretariat for Social Welfare identify foreign migrant children and adolescents through an initial assessment and determine that they are eligible for international protection measures, it will inform the Division of Migrant Services and Protection of Fundamental Rights so that proceedings may continue before CONARE.

**Article 26. Procedure for requesting extension of refugee status recognition.** Persons recognized as refugees by the State of Guatemala will have the right to request the extension of recognition. This request will be presented to the support personnel, who will conduct the respective procedure, and CONARE will subsequently transfer the file in order to make recommendations, opinions, or suggestions to the AMN as appropriate. The procedure for a declaration of extension is as follows:

a)   **Formal request.** Upon receipt of the initial request for extension, CONARE will provide a form to be completed by the applicant in his or her capacity as a refugee in the State of Guatemala. The applicant's refugee status will be evidenced by the original Special Personal Identification Document and a photocopy thereof.

b)   **Interviews.** Once CONARE support staff conducts the interview in accordance with Article 17(2) of these Regulations and verifies the applicant's profile, it will notify CONARE so that CONARE may issue the recommendation, opinion, or suggestion to the AMN, as appropriate.

c)   **Decision.** The AMN will issue a decision granting or denying the request for extension.

Persons recognized under the status procedure governed by this article will have the same rights as the primary refugee.

**Article 27. Obligations of the refugee status applicant and the refugee.**

Applicants for refugee status and refugees have duties toward the host country which, in particular, include the obligation to abide by its laws and regulations, as well as measures taken to maintain public order.

**Article 28. Notices.** Any notice, summons, or subpoena addressed to the AMN must be served through its Technical Secretariat.

**Article 29. Unforeseen cases.** Cases not provided for in these regulations will be adjudicated by the AMN taking into account suggestions, opinions, or recommendations made by CONARE.


## TITLE III
## SOLE CHAPTER
## TRANSITIONAL PROVISIONS

**Article 30. Validity of applications, procedures, and administrative formalities.** All applications, procedures, and administrative formalities existing prior to the entry into force of the Immigration Code will be adjudicated within the temporal scope of validity of the law, as established in the Judiciary Act and Article 236 of the Immigration Code.

**Transitional Article 31.** All applications filed after the entry into force of the Immigration Code will be adjudicated by the AMN in accordance with the procedure set forth in these Regulations.

**Transitional Article 32.** Files containing applications submitted prior to the entry into force of the Immigration Code that have been finally adjudicated will be turned over by the National Refugee Commission established by Government Order 383-2001 to CONARE as provided in the Immigration Code for closure and safekeeping.

**Transitional Article 33.** During the transition process and while the Institute is being established administratively, the National Migration Bureau will continue to handle matters concerning refugee status through the Office of International Migration Affairs.

**Article 34. Operation.** These regulations will enter into force thirty days after their publication in the Official Gazette [*Diario de Centro América*].

Done in Guatemala City, on March fourth, two thousand nineteen.

# DRAFT

**AGREEMENT BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE REPUBLIC OF GUATEMALA CONCERNING COOPERATION REGARDING THE EXAMINATION OF PROTECTION CLAIMS**

## INITIAL IMPLEMENTATION PLAN

## AND ANNEXES

DOJFF0100

# AGREEMENT
## BETWEEN
## THE GOVERNMENT OF THE UNITED STATES OF AMERICA
## AND
## THE GOVERNMENT OF THE REPUBLIC OF GUATEMALA
## ON COOPERATION REGARDING THE EXAMINATION OF PROTECTION CLAIMS

THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE REPUBLIC OF GUATEMALA, hereinafter referred to individually as "Party" or collectively "the Parties".

CONSIDERING that Guatemala regulates its relations with other countries in accordance with international principles, rules and practices, with the purpose of contributing to the maintenance of peace and freedom, the respect and defense of human rights, and the strengthening of democratic processes and international institutions that guarantee the mutual and equitable benefit among the states. On the other hand, Guatemala will maintain relations of friendship, solidarity and cooperation with those states whose economic, social and cultural development is analogous to that of Guatemala, such as the right of people to migrate and their need for protection.

WHEREAS Guatemala currently incorporates a dynamic immigration law into its domestic legislation, which requires Guatemala to recognize the right of every person to emigrate or immigrate, thereby allowing any migrant to enter, remain, transit, leave and return to its territory in accordance with its domestic laws. Likewise, in situations not provided for by domestic legislation, the norm that most favors the migrant must be applied. As such, temporary shelter and care should be given to those who wish to enter Guatemala legally. For the above reasons it is necessary to promote cooperation agreements with other states that uphold the same values outlined in Guatemala's migration policy, which is regulated by the National Migration Authority.

CONSIDERING that Guatemala is a party to the 1951 Convention relating to the Status of Refugees, done at Geneva on July 28, 1951 (the "1951 Convention") and the Protocol Relating to the Status of Refugees, done at New York on January 31, 1967 (the "1967 Protocol"), to which the United States of America is a party and reaffirming the obligation of the Parties to provide protection to refugees who meet the requirements and who are physically in their respective territories, in accordance with their obligations under those instruments and subject to the respective laws, treaties, and declarations of the Parties.

RECOGNIZING, in particular, the obligation of the Parties to comply with the principle of non-refoulement, as outlined in the 1951 Convention and the 1967 Protocol, as well as the Convention against Torture and Other Treatment or Cruel, Inhuman or Degrading Penalties, signed in New York on December 10, 1984 (the "Convention against Torture"), subject to the Parties respective reservations, understandings, and declarations and reaffirming their respective obligations to promote and protect human rights and fundamental freedoms consistent with their international obligations;

RECOGNIZING and respecting the obligations of each Party in accordance with its domestic laws

and policies, and international agreements and arrangements;

UNDERSCORING that the United States and Guatemala offer refugee protection systems that are consistent with their obligations under the 1951 Convention and/or the 1967 Protocols;

DETERMINED to maintain the status of refuge or equivalent temporary protection, as an essential measure of the protection of refugees or asylees, and at the same time wishing to prevent fraud in the refugee or asylum application process --an action that undermines its legitimate purpose– and determined to strengthen the integrity of the official process for requesting asylum or refugee status as well as public support for said processes;

AWARE that the distribution of responsibility for requests for protection must guarantee in practice, that people in need of protection be identified and that violations of the basic principle of non-refoulement be avoided; and, therefore, committed to safeguarding for each applicant the status of refuge or asylum that meets the required conditions, access to a full and fair procedure for the determination of their claim;

AGREE to the following:

## ARTICLE 1

For the purposes of this Agreement:

1. "Request for Protection" refers to the request of a person of any nationality, to the government of one of the Parties to receive protection in accordance with their respective institutional obligations derived from the 1951 Convention, the 1967 Protocol or the Convention against Torture, and in accordance with the respective laws and policies of the Parties, enforcing compliance with said international obligations; as well as to receive any other type of equivalent temporary protection available under the migration law of the receiving party.

2. "Protection Applicant" refers to any person who submits a request for protection in the territory of one of the Parties.

3. "System to Determine Protection" refers to the set of policies, laws, administrative and judicial practices that the Government of each Party uses to make a decision on requests for protection.

4. "Unaccompanied Minor" refers to an applicant for protection who has not reached the age of eighteen (18) and whose parent or legal guardian is not present or available to provide care and physical custody in the United States, or in Guatemala, where the unaccompanied minor is located.

5. In the case of Guatemala immigration, law and migration policy refers to the rights of persons to enter, remain, transit and leave its territory in accordance with its domestic laws

and international agreements and arrangements, and immigration stay means the authorized period of time according to the immigration status granted to individuals.

## ARTICLE 2

This Agreement does not apply to applicants for protection who are citizens or nationals of Guatemala; or stateless individuals habitually residing in Guatemala.

## ARTICLE 3

1. To ensure that protection applicants transferred to Guatemala by the United States have access to a system to determine protection, Guatemala will not return or expel applicants for protection in Guatemala, unless the application is abandoned by the applicant or is formally rejected through an administrative decision.

2. During the transfer process, the persons subject to this Agreement will be the responsibility of the United States until the transfer process is completed.

## ARTICLE 4

1. The responsibility for determining and concluding requests for protection within its territory shall rest with the United States, when the United States establishes that that person:

   a. is an unaccompanied minor; or

   b. has arrived in the territory of the United States:

   > i. with a validly-issued visa or other valid admission document, other than a transit visa, issued by the United States; or

   > ii. without the United States requiring him to obtain a visa.

2. Notwithstanding paragraph 1 of this article, Guatemala will evaluate the request for protection on an individual basis, in accordance with what is established and authorized by the competent authority on immigration matters in its migration policies and laws and in its territory, of persons who meet the appropriate requirements under this Agreement and who arrive in the United States at a port of entry or between ports of entry, on or after the effective date of this Agreement. Guatemala will evaluate the request for protection, in keeping with the Initial Implementation Plan and the standard operating procedures referenced in Article 7.1 and 7.5.

3. The Parties shall apply this Agreement with respect to unaccompanied minors, in accordance with their respective domestic laws.

4. The Parties shall have procedures in place to ensure that the transfers from the United States to Guatemala of the persons covered by this Agreement are compatible with their respective obligations, domestic and international laws, and migration policies.]

5. The United States shall make the final decision that an individual qualifies for an exception under Articles 4 and 5 of this Agreement.

## ARTICLE 5

Notwithstanding any provision of this Agreement, any Party may, at its discretion, examine any request for protection that has been submitted to that Party when it decides that it is in the public interest to do so.

## ARTICLE 6

The Parties may:

1. Exchange information when necessary for the effective implementation of this Agreement, subject to national laws and regulations. Such information will not be disclosed by the recipient country except in accordance with its national laws and regulations.

2. The Parties may regularly exchange information regarding laws, regulations, and practices related to their respective systems to determine migration protection.

## ARTICLE 7

1. The Parties shall develop standard operating procedures to assist in the implementation of this Agreement. These procedures shall incorporate provisions to notify Guatemala in advance of the transfer of any person pursuant to this Agreement. The United States will collaborate with Guatemala to identify the appropriate individuals to be transferred to Guatemala's territory.

2. The operating procedures shall incorporate mechanisms to resolve disputes that respect the interpretation and implementation of the terms of this Agreement. Unforeseen cases that cannot be resolved through these mechanisms will be resolved through diplomatic channels.

3. The United States plans to cooperate to strengthen the institutional capacities of Guatemala.

4. The Parties agree to regularly evaluate this Agreement and its implementation to correct any deficiencies found. The evaluations will be carried out jointly by the Parties, the first within a maximum period of three (3) months from the date of entry into operation of the Agreement with following evaluations occurring by the same terms. The Parties may invite, by mutual agreement, other relevant organizations with specialized knowledge on the subject, to participate in the initial evaluation and/or cooperate for the implementation of this Agreement.

5. The Parties intend to complete an initial implementation plan, which will contain gradual steps, and address, among other things: (a) procedures necessary to effectuate the transfer of individuals under this agreement; (b) the volume or number of individuals to be transferred; and (c) institutional capacity requirements.   The Parties plan to operationalize this Agreement upon the completion of a phased implementation plan.

## ARTICLE 8

1. This Agreement shall enter into force by means of an exchange of notes between the Parties indicating that each party has complied with the necessary domestic legal procedures for the Agreement to enter into force. For the term of two (2) years, renewable before its expiration with the exchange of diplomatic notes.

2. Any Party may terminate this Agreement by giving written notice to the other Party three (3) months in advance.

3. Any Party may, immediately after notifying the other Party in writing, suspend for an initial period of up to three (3) months the implementation of this Agreement. This suspension may be extended for additional periods of up to three (3) months, by means of written notification to the other Party. Any Party may, with the written consent of the other, suspend any part of this Agreement.

4. The Parties may in writing, by mutual agreement, make any modification or addition to this Agreement. These shall enter into force in accordance with the relevant legal procedures of each Party and the amendment or addition shall constitute an integral part of this Agreement.

5. Nothing in this Agreement shall be construed in such a way as to oblige the Parties to disburse or obligate funds.

IN FAITH WHEREOF, the undersigned, duly authorized by their respective governments, sign this Agreement.

SIGNED on the 26 day of  July  of the year 2019 in the English and Spanish languages, with both texts being authentic.


FOR THE GOVERNMENT OF THE UNITED STATES OF AMERICA:
Kevin K. McAleenan
Acting Secretary of Homeland Security

FOR THE GOVERNMENT OF THE REPUBLIC OF GUATEMALA:
Enrique A. Degenhart Asturias
Minister of Government

# DRAFT

## ANNEX 1

**INITIAL IMPLEMENTATION PLAN**

**PHASED INITIAL IMPLEMENTATION PLAN**

## ANNEX 1

# DRAFT
### INITIAL IMPLEMENTATION PLAN

### PHASED INITIAL IMPLEMENTATION PLAN

In accordance with the provisions of Article 3 of the Initial Implementation Plan, of the present Annex 1, the number of people to be transferred per week and by air, as well as at arrival ports must be established on the timeline.

a. **Determination of Arrival Port (runway).** In the initial implementation plan the arrival of people transferred from the United States of America to Guatemala will be made at the Aurora International Airport located in Guatemala City which has the capacity to support the landing and takeoff of McDonnell Douglas MD-83 (twin-engine jet) (MD83) airplanes and similar aircrafts.



b. At the start of the gradual implementation of the Initial Implementation Plan, the Returned Reception Center located in the Guatemalan Air Force facilities of the La Aurora International Airport will be used for the reception of transferred persons. In

# DRAFT

this first phase or stage, *only men over 18 years of age will be received from the Republic of Honduras and El Salvador, according to the following table:*

| GENERAL TIMELINE FOR THE TRANSFER OF INDIVIDUALS UNDER THE IMPLEMENTATION PLAN | | | |
|---|---|---|---|
| WEEK | ACTIVITY | INDIVIDUALS PER WEEK | TOTAL NUMBER OF PEOPLE PER MONTH |
| 1 | RECEPTION OF | 405 | |
| 2 | PEOPLE | 405 | |
| 3 | TRANSFERRED | 405 | 1,620 |
| | ON FIVE FLIGHTS PER | | |
| 4 | WEEK | 405 | |
| 5 | RECEPTION OF | 405 | |
| 6 | PEOPLE | 405 | |
| 7 | TRANSFERRED | 405 | 1,620 |
| | ON FIVE FLIGHTS PER | | |
| 8 | WEEK | 405 | |
| 9 | RECEPTION OF | 405 | |
| 10 | PEOPLE | 405 | |
| 11 | TRANSFERRED | 405 | 1,620 |
| | ON FIVE FLIGHTS PER | | |
| 12 | WEEK | 405 | |
| | TOTAL NUMBER OF PEOPLE RECEIVED | 4,860 | 4,860 |

**First Periodic Evaluation of the Initial Implementation Plan:** In accordance with Article 6 of the Initial Implementation Plan, the parties plan to carry out the first periodic evaluation of compliance with the execution of the Initial Implementation Plan, in order to determine the necessary conditions, and by mutual agreement, the effective fulfillment of its phased implementation.

# DRAFT

## ANNEX 2

**NECESSARY CONDITIONS FOR THE APPLICATION OF THE INITIAL
IMPLEMENTATION PLAN**

## ANNEX 2

**NECESSARY CONDITIONS FOR THE APPLICATION OF THE INITIAL
IMPLEMENTATION PLAN**

# DRAFT

Within the content of the Agreement between the Government of the United States of America and the Government of the Republic of Guatemala on Cooperation regarding the Examination of Protection and Claims and its Initial Implementation Plan, it was established that this annex would be established in detail the necessary conditions for the phased application of the Agreement, which are presented below:

### I.   OF TRANSFERRED PERSONS

1. Persons eligible for transfer to Guatemala must meet the eligibility criteria established in Article 2 of the Initial Implementation Plan. This criteria is detailed below:

   a. Be over 18 years of age, subject to the provisions.

   b. Persons of all nationalities may be transferred in accordance with the specific migration policies issued by Guatemala's National Migration Authority pursuant to the Agreement between the Government of the United States of America and the Government of the Republic of Guatemala on Cooperation regarding the Examination of Protection and Claims.

   c. Be medically cleared to travel using the same rules and procedures applied by the Government of the United States of America, in its deportation proceedings. The conditions of the transfer are:

      1. The health status of people is determined by a medical specialist from the United States of America.

      2. People who have active infectious diseases are not eligible for transfer.

# DRAFT

3.  People who have recently had major surgery are not eligible for transfer.

4.  People who have recently had serious injuries are not eligible for transfer.

d.  Persons with special needs are not eligible for transfer from the United States of America until the institutional capacities of Guatemala are developed and available.

e.  Persons who have been convicted of crimes considered to be serious crimes in the United States of America or convicted of crimes in the Republic of Guatemala are not eligible for transfer.

f.  People who have red notifications in Interpol are not eligible for transfer, unless those notifications have been generated at the request of Interpol in Guatemala.

As for subparagraph b), it should be considered that, the policy issued by the National Migration Authority, establishes that in the case of this Cooperative Agreement, in solidarity with foreign migrants from the Central American region, the population subject to transfer from the United States of America to Guatemala will be, of Honduran and Salvadoran nationalities. Given this, the profile of transferred persons must be as follows:

- Men and women of Honduran and Salvadoran nationality over 18 years of age.

2.  As previously stated, persons who are transferred to Guatemala, upon entering the national territory may voluntarily request the following from the Guatemalan Migration Institute:

A. Refugee Status.

B. Voluntary return to their country of origin.

# DRAFT

C. Neither a request for Voluntary Return nor for Refugee Status.

The Reception Centers of the Guatemalan Migration Institute will have staff who will be responsible for providing care and advice to transferred persons and managing their requests in the following ways:

A.  Persons who requested Refugee Status.

 1.  Persons requesting Refugee Status may voluntarily request care and shelter at the Center for Shelter and Temporary Migration Care (CACTMI), which may be granted for up to 48 hours, in which case they will be transported by buses provided by the corresponding authority from the UNHCR-run Center for Shelter and Temporary Migration Care (CACTMI).

 2.  In accordance with the provisions of Article 17 of the Regulations for the Procedure for  Protection, Determination and Recognition of the Status of Refugees in the State of Guatemala, individuals must complete an initial application form for Refugee Status, which will be provided by representatives from the Guatemalan Migration Institute. These applications will be provided with guidance to continue their process in the administrative offices of the Guatemalan Migration Institute, *and which is outlined in Annex 3.*

B.  People request voluntary return:

 1.  Persons transferred from the United States of America to Guatemala who request Voluntary Return, will be interviewed by a representative of the Immigration Control Branch. At the end of the interview, if the person requests voluntary return, a transport will be assigned for their return to their country of origin. These transfers will be conducted with transportation provided by the IOM.

# DRAFT

2. Persons who are not assigned transportation for return to their country of origin due to lack of availability, will be give permission to remain in Guatemala while they await their return. This period is not to exceed 48 hours This procedure will be detailed in *Annex 3*.

C. Persons who did not request Refugee Status nor Voluntary Return:

1. Persons who have not requested voluntary return and have not applied for Refugee Status will be granted a period of 48 hours of permanency in the country.

## II.    INFRASTRUCTURE

1. **Reception Centers:** During the initial implementation process for the reception of migrants transferred from the United States of America to Guatemala, the Return Center located at the Guatemalan Air Force facilities at the La Aurora International Airport will be used.

   These facilities have the capacity to receive, on average, flights of 135 people. Though the dignified and safe reception process varies in length, on average it takes about 1.5 to 2 hours to carry out in accordance with security and human rights requirements.

2. **Temporary Shelter and Migration Care Center (CACTMI):** The centers will begin to operate following the signing and implementation of the Letter of Understanding between the Directorate-General of Migration and UNHCR. For this reason, the conditions for shelter and temporary migratory care will not be detailed

# DRAFT

in this phase. This will remain under the administration of UNHCR, coordination and direction of the Directorate-General of Migration.

3. **Administrative Centers for Refugee Status Request:** To properly process the requests for Refugee Status of transferred persons, applicants must apply at the Office of International Migratory Affairs-ORMI-, located in the offices occupied by Migration, zone 4 of Guatemala City.

4. **Transportation:** Includes the ground transportation system for transferred people from the United States of America to Guatemala, who make a request for voluntary return to their country of origin, which will be provided by IOM.

5. **Security:** Security must be provided that includes internal security of the facilities, perimeter security and security of the movement of people. (National Civil Police Agreement).

6. **Human Resources:** Includes the training needs of the staff, and must have the technical and specialized capacity for the care of the transferred persons. UNHCR will provide training to the administrative staff of the operational division of the Immigration Control Branch, the Office of International Migration Relations, the Shelter and Temporary Care Administrative Center, and the Reception Center.

# DRAFT

## ANNEX 3

## PROTOCOLS

DRAFT

# DRAFT

## RECEPTION PROTOCOLS FOR TRANSFERRED PERSONS UNDER THE INITIAL IMPLEMENTATION PLAN.

| # | Entity Responsible or Activity | Description of Activity |
|---|---|---|
| | START | Start of the process. |
| 1 | INFORMATION IS SENT BY THE UNITED STATES | Information must be sent in advance prior to the transfer of individuals from the United States of America to Guatemala. This information must be in an XLM or a similar format and must contain the following information: date and time of arrival in the country with 48 hour's prior notice; number of the individual's personal identity document; type of identity document (e.g. passport, identity card, other personal identity document or exit permit, as appropriate); document's expiration date; names and surnames; gender; nationality; date and place of birth; ICAO-compliant fingerprints (for the State party that applies); an ICAO-compliant photograph (for the State party that applies); other information requested by the receiving State through the competent authority; information on the individual's health state (i.e. the individual's medical record). |
| 2 | IMMIGRATION CONTROL BRANCH | Once the Republic of Guatemala's Migration Institute receives the information, a pre-check will be conducted along with a review of national and international alerts for each of the people to be transferred. |

# DRAFT

| # | Entity Responsible or Activity | Description of Activity |
|---|---|---|
| 3 | MIGRATION CONTROL SENDS TRANSFER AUTHORIZATION | The proper authorities are notified of the United States' intention to transfer a group of people. The U.S. would indicate if the respective authorization is for all of the individuals or only for those remaining in the territory. |
| 4 | RECEPTION STAGE | This stage includes providing:<br>1. Documentation;<br>2. Information to the transferred person(s);<br>3. Migration Control Registry; and<br>4. Establishing whether people request shelter or voluntary return.<br><br>1. |
| 5 | DOCUMEN -TATION | The United States of America must physically deliver to the staff of the Guatemalan Migration Institute the following documentation:<br>• Flight Manifesto;<br>• Passport, identity document or other international travel document; and<br>• Health certificate when warranted. |
| 6 | INFORMATION IS PROVIDED TO TRANSFERRED INDIVIDUALS | Information to be provided to the transferred individuals;<br>- Welcome package; and<br>- General information on the protections that can be requested in Guatemala. |

DOJFF0119

# DRAFT

| # | Entity Responsible or Activity | Description of Activity |
|---|---|---|
| 7 | INTERVIEWS ARE CONDUCTED AND STATISTICAL REPORTS ARE PRODUCED | Migration Control Registry<br><br>All transferred individuals must register with Immigration Control. |
| 8 | MIGRATION STATUS IS DETERMINED | If the transferred person requests protection, the procedure will be established in the Protection Request Protocols. |
| 9 | END | If the transferred person requests a voluntary return, the procedure will be established in the Voluntary Return Request Protocol. |

DOJFF0120

# DRAFT

**RECEPTION PROTOCOL OF TRANSFERRED PERSONS UNDER THE INITIAL IMPLEMENTATION PLAN.**

## A. GENERAL OBJECTIVE:

The purpose of this protocol is to establish the steps regarding the reception of the people who are transferred in accordance with the Initial Implementation Plan of the Agreement between the Government of the United States of America and the Government of the Republic of Guatemala regarding the Examination of Protection and Claims.

## B. PROCEDURE:

The procedure to follow will be the following stages:

### a) Pre-Reception Stage:

1) Prior to the transfer of persons from the United States of America, advance information must be submitted in an XLM format file or another to be agreed, containing the following fields:

- Day and time of arrival in the country with 48 hours notice.
- Number of the document that individualizes the person
- Personal identification document (passport, identity card, personal identity document or except conduit as appropriate)
- Effective date of the document
- Names and surnames
- Sex
- Nationality
- Date and place of birth

# DRAFT

- Fingerprints in accordance with ICAO standards (for the State party that applies)
- Photograph with ICAO format (for the State party that applies)
- Other information requested by the receiving State through the competent authority.
- Information on the state of physical health (medical record)

2) Once the Republic of Guatemala's receives the information, the Guatemalan Migration Institute will pre-check and review national and international alerts of each of the persons to be transferred.

3) The authorities of the United States of America are notified that they are going to transfer the persons, indicating in the respective authorization if it is for all persons or only for some.

b) **Reception Stage**:

This stage is comprised of the following steps:

1) Documentation:
   Which shall be surrendered physically by U.S. authorities to the personnel of the Guatemalan Migration Institute.
   - Flight manifest
   - Passaport, identity documento or other international travel document;
   - Health certificate (as appropriate)

2) Information for transferred persons;
   Welcome packet
   General Information about protection rights that can be requested in Guatemala.

# DRAFT

3) Migration Control Registry

All transferred persons must properly register with the immigration control authority.

4) If the transferred person requests protection, the procedure shall be outlined in the Protocol for Protection Requests.

5) If the transferred person requests an assisted voluntary return, the procedure shall be established in the Protocol for Assisted Return Requests.

# DRAFT

REFUGE APPLICATION PROTOCOL FOR TRANSFERED PERSONS

| # | Entity Responsible | Description of Activity |
|---|---|---|
| | START | Start of the process. |
| 1 | MIGRATION CONTROL | The request for refugee status can be done in-person, in writing, or orally at the Reception Center. |
| 2 | ORMI | Said request shall immediately be transferred in writing to the CONARE support staff. |

DOJFF0124

# DRAFT

| # | Entity Responsible | Description of Activity |
|---|---|---|
| 3 | ORMI | The individual must report to the Office of International Migration Relations (ORMI) and certify their initial application, which will be constituted as a formal request and which will be granted through CONARE, which will also grant the individual a 30-day residency permit, as outlined in the Rules of Procedure on the Determination of Protection and Refugee Status. |
| 4 | ORMI | The time and date is set for the personal interview.<br><br>If the applicant fails to show up, the case will be considered as abandoned. |
| 5 | ORMI/ CONARE | Once CONARE support staff have concluded its investigation, the case will be transferred to so that a Technical Opinion can be issued. |
| 6 | CONARE | Once CONARE issues a Technical Opinion, the applicant's file will be forwarded to the National Migration Authority. |

DOJFF0125

# DRAFT

| # | Entity Responsible | Description of Activity |
|---|---|---|
| 7 | NATIONAL MIGRATION AUTHORITY (AMN) | The National Migration Authority will issue a Resolution, either granting or denying the request for protection in Guatemala. |
| 8 | NATIONAL MIGRATION | (The AMN will) notify the applicant of the resolution issued by the competent authority, either granting or denying the applicant's request for protection. |
| 9 | AMN TECHNICAL SECRETARIAT | In case the request for protection is denied, **the applicant may submit an appeal, in accordance with the provisions outlined in the law.** |
| 10 | NATIONAL MIGRATION AUTHORITY/CONARE | The National Migration Authority will review the appeal, issue a ruling, and forward its decision to CONARE so that it can notify the applicant. |
| 11 | END | End of the process. |

# DRAFT

**PROTECTION REQUEST PROTOCOL FOR TRANSFERRED PERSONS**

### A. OVERALL OBJETIVE:

The purpose of this protocol is to establish the procedure for the recognition of the requested protection. The procedure established in the regulation will be used for the recognition of the Refugee Status regulated by the National Migration Authority Agreement.

### B. PROCEDURE:

1. The request for Refugee Status may be made personally in writing or verbally at the Reception Center;

2. This request will be immediately transferred in writing to CONARE support staff;

3. The person must appear before the offices occupied by the Office of International Migration Relations (ORMI) in which his initial request will be ratified, which will be constituted as a formal request. The residence permit will be grated through CONARE for 30 days as indicated in the Regulation of the Procedure for the Protection, Determination of the Refugee Status.

4. Day and time is set for the personal interview, but if the applicant is not present, the application will be found to be abandoned.

5. If present at the interview, the applicant must bring documents that support the well-founded fear or other situation that merits the grant of refuge.

6. Once the investigation process has been concluded by CONARE support staff, the file will be transferred to that Commission, to issue the corresponding Technical Opinion.

# DRAFT

7.  With the Technical Opinion issued by CONARE, the file of the refugee applicant is submitted to the National Migration Authority.

8.  The National Migration Authority issues a resolution granting or denying the Refugee Status in the territory of Guatemala.

9.  Notify the applicant of the resolution issued by the competent authority granting or denying it.

10. In case of refusal of the Status, **the interested party may present the appeal for replacement in accordance with the provisions of the law.**

11. The recourse will be known by the National Migration Authority who resolves it.

# DRAFT

## TRANSFER PROTOCOL FOR PERSONS REQUESTING VOLUNTARY RETURN

| # | Entity Responsible | Description of Activity |
|---|---|---|
| | START | Start of the process. |
| 1 | MIGRATION CONTROL | The applicant presents him/herself to the migration representative, and requests an assisted voluntary return. |
| 2 | MIGRATION CONTROL | The Migration Delegate lets the applicant know if it is his/her desire to grant the applicant's request for an assisted voluntary (self) return. |
| 3 | MIGRATION CONTROL/IOM | Once the voluntary return request has been accepted, the immigration representative refers the person to the transportation option provided by IOM, whom will coordinate the departure time of the buses based on the applicant's nationality. |

DOJFF0129

# DRAFT

| # | Entity Responsible | Description of Activity |
|---|---|---|
| 4 | MIGRATION CONTROL/IOM | At the moment of transfering the person requesting voluntary return, the (migration) representative will include him/her in the final list of people to transfer by country of origin. |
| 5 | MIGRATI ON CONTRO | The list of people is to be transferred to the migration representative who will accompany the individuals to be returned and who is tasked with coordinating the accompaniment and security of the group by the national civil police. |
| 6 | MIGRATION CONTROL/IOM | Upon arriving at the border or point of return (depending on the country of origin of the transferred persons), a copy of the list is given to the migration representative so that he/she may register the "exits" and coordinate delivery to the immigration authority of the destination country. |
| 7 | END | Proceed to interview all deportees, to corroborate their identification information, including: age and nationality data. Interviews generate: the final list; with the most important data, proceeding to extrapolate the statistics of the given population. |

DOJFF0130

# DRAFT

**TRANSFER PROTOCOL OF APPLICANTS REQUESTING VOLUNTARY RETURN**

## A. OVERALL OBJECTIVE

The purpose of this protocol is to establish the steps to be followed regarding the transfer of persons who request voluntary return to the country of origin and who were transferred in accordance with the Initial Implementation Plan of the Agreement between the Government of the United States of America and the Government of the Republic of Guatemala regarding the Examination of Protection and Claims.

## B. PROCEDURE:

The procedure is established in accordance with the following steps:

1. The applicant appears before the immigration representative to whom he requests the voluntary return.

2. The Migration representative informs the applicant of his desire to access your voluntary return for that reason.

3. Once the request for voluntary return has been accepted the representative refers the person to the transport granted by IOM who will coordinate the departure time of the buses according to the applicant's nationality.

4. The representative at the time of transferring the person requesting the voluntary return should be included in the list of people to be transferred according to their country of origin.

5. The list of people to be transferred should be sent to the representative who will accompany the people to return and coordinate security with the national civil police.

# DRAFT

6.  Upon arrival at the border of return according to the country of origin of the persons transferred, a copy of the list is given to the migrant representative for the registration of the departure from the national territory and delivery to the immigration authority of the country of destination.

PROYECTO BORRADOR

# DRAFT

| # | Entity Responsible | Description of Activity |
|---|---|---|
| | START | Start of the process. |
| 1 | MIGRATION CONTROL BRANCH | The individual presents him/herself to the migration representative. |
| 2 | MIGRATION CONTROL BRANCH | Migration representative conducts an interview with the transferred individual. If during the process, said individual states that he/she does not wish to request either protection nor voluntary return, then he/she must complete a statement stating that both protection and a voluntary return were offered to him/her but were both rejected. |
| 3 | MIGRATION CONTROL BRANCH | Migration status is granted, giving the individual 48 hours to leave the country. |

# DRAFT

| # | Entity Responsible | Description of Activity |
|---|---|---|
| 4 | MIGRATION CONTROL BRANCH → | The transferred individual leaves the reception center on their own. In case, the allotted deadline is exceeded, the individual can be sanctioned with abandonment or deportation. |
| | END | End of the process. |

DOJFF0134

# DRAFT

**RECEPTION PROTOCOL OF TRANSFERRED PEOPLE WHO DO NOT REQUEST PROTECTION NOR VOLUNTARY RETURN.**

**A. OVERALL OBJETIVE:**

The purpose of this protocol is to establish the steps to be followed regarding the reception of the people who are transferred in accordance with the Initial Implementation Plan of the Agreement between the Government of the United States of America and the Government of the Republic of Guatemala regarding the Examination of Protection Claims and do not request protection nor voluntary return.

**B. PROCEDURE:**

    a.   The person appears before the immigration representatives.

    b.   Represenative conducts an interview and during this one the transferred person states that he does not request protection or voluntary return

    c.   Immigration status is granted by granting you stay for 48 hours to leave the country.

    d.   Transferred person leaves by their own means.

# DRAFT

**LIST OF INITIAL IMPLEMENTATION PLAN NEEDS**

Attached is a list of needs established by the Agreement between the Government of the United States of America and the Government of the Republic of Guatemala regarding the Examination of Protection Claims, in Article 7 numeral 5 subsection c).

| MIGRATION | | |
|-----------|-----------|-----------|
| GUATEMALAN AIR FORCE ROOM | | |
| NUMBER OF FLIGHTS | NECESSARY PERSONNEL | NECESSARY EQUIPMENT |
| | 15 AUXILIARIES SCM | 16 COMPUTERS (INCLUDING READER AND WEB CAMERA) |
| | | 16 DESKS |
| | | 16 CHAIRS |
| | | 1 PRINTER |
| | | 1 PHOTOCOPIER |
| | | 1 DOCUMENT SCANNER |
| | | 16 MICROPHONES |
| | | VARIOUS CLEANING MATERIALS |
| | | 16 COMPUTERS (INCLUDING READER AND WEB CAMERA) |
| | | 16 DESKS |
| | | 16 CHAIRS |
| | | 1 PRINTER |
| | | 1 PHOTOCOPIER |
| | 1 IT STAFF | 1 DOCUMENT SCANNER |

# DRAFT

|  |  |  |
|---|---|---|
|  |  | 16 MICROPHONES |
|  |  | VARIOUS CLEANING MATERIALS |
|  |  | 16 COMPUTERS |
|  |  | (INCLUDING READER AND WEB CAMERA) |
|  |  | 16 DESKS |
|  |  | 16 CHAIRS |
|  |  | 1 PRINTER |
|  |  | 1 PHOTOCOPIER |
|  |  | 1 DOCUMENT SCANNER |
|  | 3 MAINTENANCE STAFF | 16 MICROPHONES |
|  |  | VARIOUS CLEANING MATERIALS |
|  |  | 16 COMPUTERS |
|  |  | (INCLUDING READER AND WEB CAMERA) |
|  |  | 16 DESKS |
|  |  | 16 CHAIRS |
|  |  | 1 PRINTER |
|  |  | 1 PHOTOCOPIER |
|  |  | 1 DOCUMENT SCANNER |
|  |  | 16 MICROPHONES |
|  |  | VARIOUS CLEANING MATERIALS |
|  |  | 16 COMPUTERS |
|  |  | (INCLUDING READER AND WEB CAMERA) |
|  |  | 16 DESKS |
|  |  | 16 CHAIRS |
|  |  | 1 PRINTER |
|  |  | 1 PHOTOCOPIER |
|  |  | 1 DOCUMENT SCANNER |
|  |  | 16 MICROPHONES |
|  |  | VARIOUS CLEANING MATERIALS |

# DRAFT

| | | |
|---|---|---|
| | | 16 COMPUTERS (INCLUDING READER AND WEB CAMERA) |
| | | 16 DESKS |
| | | 16 CHAIRS |
| | | 1 PRINTER |
| | | 1 PHOTOCOPIER |
| | | 1 DOCUMENT SCANNER |
| | | 16 MICROPHONES |
| | | VARIOUS CLEANING MATERIALS |
| | | 16 COMPUTERS (INCLUDING READER AND WEB CAMERA) |
| | | 16 DESKS |
| | | 16 CHAIRS |
| | | 1 PRINTER |
| | | 1 PHOTOCOPIER |
| | | 1 DOCUMENT SCANNER |
| | | 16 MICROPHONES |
| | | VARIOUS CLEANING MATERIALS |
| | | 16 COMPUTERS (INCLUDING READER AND WEB CAMERA) |
| | | 16 DESKS |
| | | 16 CHAIRS |
| | | 1 PRINTER |
| | | 1 PHOTOCOPIER |
| | | 1 DOCUMENT SCANNER |
| | | 16 MICROPHONES |
| | | VARIOUS CLEANING MATERIALS |
| | | 16 COMPUTERS (INCLUDING READER AND WEB CAMERA) |

PROYECTO BORRADOR

# DRAFT

| | | |
|---|---|---|
| | | 16 DESKS |
| | | 16 CHAIRS |
| | | 1 PRINTER |
| | | 1 PHOTOCOPIER |
| | | 1 DOCUMENT SCANNER |
| | | 16 MICROPHONES |
| | | VARIOUS CLEANING MATERIALS |
| | | 16 COMPUTERS |
| | | (INCLUDING READER AND WEB CAMERA) |
| | | 16 DESKS |
| | | 16 CHAIRS |
| | | 1 PRINTER |
| | | 1 PHOTOCOPIER |
| | | 1 DOCUMENT SCANNER |
| | | 16 MICROPHONES |
| | | VARIOUS CLEANING MATERIALS |

| MIGRATION CONARE/ORMI | | | |
|---|---|---|---|
| **LOCATION** | **NECESSARY PERSONNEL** | **NECESSARY EQUIPMENT** | **TOTALS** |
| **CONARE** | 8 LAWYERS<br>5 TECHNICAL WORKING GROUP PERSONNEL | 2 COMPLETE COMPUTER EQUIPMENT<br>5 WEB CAMERAS | 17<br><br>5 |

# DRAFT

| | | | |
|---|---|---|---|
| | | 5 LAPTOPS | 10 |
| | | 26 DESKS | 26 |
| | | 7 CHAIRS | 26 |
| | | 1 RETROPROJECTOR | 2 |
| | | 1 TABLET | |
| **ORMI** | 10 RESEARCHERS | 15 COMPUTERS | |
| | 5 RECEPTION | 5 LAPTOP | |
| | 4 PSYCHOLOGISTS | 1 RETROPROJECTOR | |
| | 2 SOCIAL WORKERS | 1 PRINTER | |
| | | 1 PHOTOCOPIER | 1 |
| | | 1 OASIS | 1 |
| | | 1 REFRIGERATOR | 1 |
| | | 1 MICROWAVE OVEN | 1 |
| | | 19 CHAIRS | |
| | | 1 DOCUMENT SCANNER | 1 |

| **MIGRATION**<br><br>**MIGRATION CONTROL** | | | |
|---|---|---|---|
| **LOCATION** | **NECESSARY PERSONNEL** | **NECESSARY EQUIPMENT** | **TOTALS** |
| **OPERATIONS DIVISION** | 4 PILOTS<br><br>8 AUXILARIES | 4 PICK UPS | 16 |

# DRAFT





Secretary
**U.S. Department of Homeland Security**
Washington, DC 20528

**Homeland Security**

## MEMORANDUM FROM THE SECRETARY

SUBJECT:   Whether Guatemala's Refugee Protection Laws and Procedures Satisfy the "Access to a Full and Fair Procedure" Requirements of Section 208(a)(2)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a)(2)(A).

After careful consideration, I find that Guatemala's refugee protection laws and procedures satisfy the requirements of Immigration and Nationality Act ("INA" or "the Act"), Section 208(a)(2)(A). This decision was made after a careful review of the available information found in the Guatemalan Migration Code, their implementing regulations, an active dialogue between our two States, information provided by the Department of State, information provided by the United Nations High Commissioner for Refugees (UNHCR), and information from other sources.

As the Department of Homeland Security has long recognized, the perfect harmonization of a foreign country's asylum laws and procedures to the laws and procedures in the United States "is not a prerequisite to entering into responsibility-sharing arrangements."[1]

Guatemala has satisfied the INA Section 208(a)(2)(A) requirement because it has in place a sufficient protection system with accompanying procedures and laws. Applicants for protection in Guatemala have a meaningful opportunity to make a protection claim, receive a hearing and adjudication regarding that claim, and safely remain in Guatemala until their protection claim is resolved.

Additionally, the phrase "full and fair procedure" presumes that the third country have in place a process that comports with basic notions of procedural fairness. The Guatemalan system meets these basic requirements. In Guatemala, an interpreter is available for the applicant during the interview, oral guidance is given to the applicant at the initial stages of the proceedings on how to present a claim along with information on rights, protections, and privileges, and an appeal process is provided. The applicant may also remain in Guatemala during the appeals process. Guatemalan law has adopted and maintains laws against *refoulement* of refugees that are in accord with its *non-refoulement* obligations described in Article 33 of the 1951 Convention Relating to the Status of Refugees 1951 and the 1967 Protocol Relating to the Status of Refugees, at a minimum.

---

[1] 69 Fed. Reg. 10,620-01, 10,620 (Mar. 8, 2004).

**Subject**:  Whether Guatemala's Refugee Protection Laws and Procedures Satisfy the "Access to a Full and Fair Procedure" Requirements of Section 208(a)(2)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a)(2)(A).
Page 2

Additionally, non-binding UNHCR guidance provides another official's view in the context of safe third country considerations.  The UNHCR Handbook is not definitive, but it indicates that a variety of procedures may be appropriate.[2]

I need not conclude that all of these UNHCR Handbook guidelines must be met for a country to provide "full and fair" procedures.  Notwithstanding this, the Guatemalan system appears to satisfy each of them based on the available information.  For example, it appears Guatemala has a competent immigration authority that has clear instruction for addressing initial asylum applicants, including referral to an adjudicative body.  As for Guatemala's compliance with its *non-refoulement* obligations, Article 46 of the Migration Code generally establishes what those *non-refoulement* duties and obligations are, and they appear to meet or exceed the standards of Article 33 of the 1951 Refugee Convention and the 1967 Protocol.  For example, Guatemalan law requires that, should asylum or refugee status be denied, an applicant will not be return to "his or her country when there is a credible reason to fear serious dangers to his or her life, physical integrity, and freedom."[3]  Guatemalan Migration Code Article 12 also guarantees all migrants are not to be subject to "any form of violence," including torture, cruel, or degrading treatment.  Guatemalan law further provides that asylum applicants will receive guidance during their application process, and it has a robust protection system in place under its laws, including the availability of psychologist during the refugee interview.[4]  It also appears that a refugee applicant and refugee status grantee in Guatemala are informed of this decision and issued certifying documentation.  Guatemala provides applicants the right to appeal an adverse decision on protection applications, which they must do within 10 days of notification of the decision.  Applicants are also allowed to stay in Guatemalan during the pendency an appeal.

Therefore, and based on the information provided, I find that the Guatemalan refugee protection system satisfies the "access to a full and fair procedure" requirements of INA § 208(a)(2)(A).


Kevin K. McAleenan
Acting Secretary of Homeland Security

OCT 1 6 2019
Date

---

[2] *See* UNHCR, Handbook on Procedures and Criteria for Determining Refugee Status ("UNHCR Handbook") ¶ 189 (Jan. 1992 ed.).  Notably, the UNHCR Handbook's most recent reissuance was in February 2019.  However, the substance between the 2019 version of the UNHCR Handbook and the 1992 UNHCR Handbook remains unchanged.

[3] Migration Code, Congressional Decree, No. 44–2016, art. 46 (2016) (Guat.).

[4] *See* Regulations on the Procedure for the Protection, Determination, and Recognition of Refugee States in the State of Guatemala, Order No. 2-2019, at art. 17 (2019); *see also* Migration Code art. 180.



# AUTORIDAD MIGRATORIA NACIONAL
## -AMN-

### ACUERDO DE AUTORIDAD MIGRATORIA NACIONAL No. 2-2019:

#### CONSIDERANDO:

Que la Constitución Política de la República de Guatemala, establece el principio general que, en materia de Derechos Humanos, los tratados y convenciones aceptados y ratificados por Guatemala, tienen preeminencia sobre el derecho interno.

#### CONSIDERANDO:

Que el Estado de Guatemala es parte de la Convención sobre el Estatuto de los Refugiados adoptada en Ginebra, el 28 de julio de 1951 y el Protocolo sobre el Estatuto de los Refugiados suscrito en Nueva York el 31 de enero de 1967, de la Convención Americana sobre los Derechos Humanos de 1969, de la Convención sobre los Derechos del Niño de 1989, de la Convención sobre la eliminación de todas las formas de discriminación contra la mujer de 1979, de la Convención Interamericana para prevenir, sancionar y erradicar la violencia contra la mujer, Convención Belem Do Pará y la Declaración de Cartagena de 1984.

#### CONSIDERANDO:

Que el **Artículo 8** del Código de Migración Decreto Número 44-2016 del Congreso de la República de Guatemala, establece que aunque en el mencionado cuerpo legal no figuren derechos y garantías que otorgan convenios y tratados internacionales ratificados por Guatemala, se consideran incorporados. Lo cual hace necesario que la reglamentación del procedimiento para la protección, determinación y reconocimiento del Estatuto de Refugiado, reconozca y armonice con lo regulado en los citados instrumentos internacionales.

#### POR TANTO:

En el ejercicio de la función que le confieren los Artículos 43, 118 inciso f) y 187 del Código de Migración, Decreto Número 44-2016 del Congreso de la República de Guatemala.

#### ACUERDA:

Aprobar el siguiente:

DHSFF0021

REGLAMENTO DEL PROCEDIMIENTO PARA LA PROTECCIÓN, DETERMINACIÓN Y

RECONOCIMIENTO DEL ESTATUTO DE REFUGIADO

EN EL ESTADO DE GUATEMALA

TÍTULO I

CAPÍTULO ÚNICO

DISPOSICIONES GENERALES

**Artículo 1. Objeto.** El presente reglamento tiene por objeto regular el Procedimiento para la Protección, Determinación y Reconocimiento del Estatuto de Refugiado en el Estado de Guatemala, establecido en el Artículo 43 del Código de Migración.

**Artículo 2. Acrónimos y definiciones.** Para el efectivo cumplimiento del presente Reglamento se entenderá lo siguiente:

a. **AMN:** Autoridad Migratoria Nacional;

b. **CONARE:** Comisión Nacional para Refugiados;

c. **Instituto:** Instituto Guatemalteco de Migración;

d. **ACNUR:** Alto Comisionado de las Naciones Unidas para los Refugiados;

e. **Fundamentación:** Son los hechos y actos que den origen al fundado temor de persecución, que deberán constituir violaciones a derechos fundamentales de las personas;

f. **Extensión del Estatuto de Refugiado:** Figura por medio de la cual, al cónyuge y a los familiares de la persona solicitante o reconocida bajo el Estatuto de Refugiado, dentro de los grados de ley podrán hacer extensivo su derecho como solicitante o refugiado reconocido;

g. **Reunificación familiar:** Principio por medio del cual se debe procurar que la niña, niño o adolescente no acompañado o separado de su familia se reúna con su madre o padre, o con ambos padres, tutor o quien ejerce la guarda y custodia;

h. **Cesación del Estatuto de Refugiado:** Causal que surge, cuando por las situaciones en las que se encuentra la persona refugiada pierde la protección internacional otorgada por el Estado de Guatemala;

i. **Fundado temor:** Aquellos motivos y hechos que dieron lugar a una persecución, y que, por su naturaleza, carácter reiterado, o bien, por una acumulación de acciones por parte de un tercero, ponen o podrían poner en riesgo la vida, la seguridad o la libertad de una persona;

j. **Estatuto de Refugiado:** Estatus extraordinario migratorio de la persona extranjera que, encontrándose en los supuestos establecidos en el Código de Migración, es reconocida como Refugiada, por la Autoridad Migratoria Nacional;

k. **Solicitante del Estatuto de Refugiado:** La persona extranjera que solicita formalmente a la Autoridad Migratoria Nacional el reconocimiento del Estatuto de Refugiado;

l. **País de origen:** El país de nacionalidad o de residencia habitual del solicitante del reconocimiento del Estatuto de Refugiado.

**Artículo 3. Principios de Interpretación y Aplicación.** La interpretación y la aplicación de las disposiciones establecidas en el presente Reglamento, se efectuarán en concordancia con los principios de No Discriminación, Confidencialidad, Reunificación familiar, de carácter Humanitario y Apolítico, en cumplimiento con los derechos y obligaciones establecidos en la Constitución Política de la República de Guatemala, aplicables a los refugiados y los arreglos internacionales de los que el Estado de Guatemala sea parte.

**Artículo 4. Del perfil del Refugiado.** Puede optar a solicitar el reconocimiento de Estatuto de Refugiado:

a. Toda persona que, debido a fundados temores de ser perseguida por motivos de raza, religión, nacionalidad, pertenencia a determinado grupo social u opiniones políticas, se encuentre en el país y no pueda, o a causa de dichos temores, no quiera acogerse a la protección del país de su nacionalidad.

b. Quien huye de su país porque su vida, seguridad o libertad ha sido amenazada por la violencia generalizada, la agresión extranjera, los conflictos internos, la violación masiva de los derechos humanos u otras circunstancias que hayan perturbado gravemente el orden público;

DHSFF0022

c.  Quien sufra de persecución a través de violencia sexual u otras formas de persecución de género o por orientación sexual que resulte de violaciones de derechos humanos contenidos en arreglos internacionales de los cuales el Estado de Guatemala sea parte.

**Artículo 5. Exclusión.** No podrá reconocerse el Estatuto de Refugiado a las personas que se encuentren dentro de las causales establecidas en el artículo 47 del Código de Migración.

Los enunciados de exclusión son personalísimos y no afectan a los miembros de la familia. Cuando el solicitante principal se le excluya del Estatuto de Refugiado no podrá invocar la extensión o la Reunificación Familiar.

**Artículo 6. Documento Personal de Identidad Especial.** El solicitante del Estatuto de Refugiado tendrá derecho al Documento Personal de Identidad Especial, el cual será extendido por la autoridad competente. Asimismo, las personas reconocidas por el Estado de Guatemala como refugiadas contarán con dicho documento de conformidad con lo que establece el Código de Migración.

**Artículo 7. Documento Especial de Viaje.** Las personas amparadas bajo el Estatuto de Refugiado tienen derecho a salir y retornar al territorio de Guatemala con el Documento Especial de Viaje que se emita para el efecto; para viajar a cualquier país exceptuando al país en el que se dieron los motivos para la solicitud del Estatuto de Refugiado, para ello deberá contar con el Documento Especial de Viaje emitido por la Subdirección de Documentos de Identidad Personal y de Viaje del Instituto. Las personas refugiadas deberán solicitar la debida autorización, bajo apercibimiento que, de salir del país sin la misma, perderá su condición de refugiado.

Cada Documento Especial de Viaje será válido para una salida y una entrada.

**Artículo 8. Derecho al Trabajo.** De conformidad con los Artículos 6, 48, 53, 84 y 101 del Código de Migración, los solicitantes del Estatuto de Refugiado y los reconocidos bajo el Estatuto de Refugiado, tienen derecho al trabajo en el país, con la debida autorización del Ministerio de Trabajo y Previsión Social.

**Artículo 9. Derecho a la Educación.** De conformidad con lo establecido en los Artículos 48, 53, 84 y 101 del Código de Migración, los solicitantes del Estatuto de Refugiado tienen derecho de incorporarse a los programas y planes de educación, de todos los niveles, mediante la presentación del Documento Personal de Identidad Especial, previo cumplimiento de los requisitos prestablecidos por las Instituciones competentes.

**Artículo 10. Protección a la Niñez y Adolescencia.** Las niñas, niños y adolescentes migrantes no acompañados o separados de su familia gozarán, entre otros, de los derechos establecidos en el Artículo 11 del Código de Migración.

Además, no deberán rechazarse en frontera, deportarse o repatriarse antes de una evaluación de sus necesidades de protección internacional.

## TÍTULO II

## CAPÍTULO I

## DE LA AUTORIDAD MIGRATORIA NACIONAL Y LA COMISIÓN NACIONAL PARA REFUGIADOS

**Artículo 11. Autoridad competente.** De conformidad con lo establecido en el Artículo 177 del Código de Migración, la AMN será la competente de resolver todas las solicitudes del Estatuto de Refugiado y declarar la cesación del Estatuto de Refugiado de conformidad con lo establecido en el Artículo 184 del Código de Migración.

**Artículo 12. De la Comisión.** Se crea la Comisión Nacional para Refugiados, como ente asesor de la AMN, que en adelante se le denominará CONARE, la cual está conformada por un representante técnico, titular y suplente del Ministerio de Relaciones Exteriores, Ministerio de Trabajo y Previsión Social, Ministerio de Gobernación e Instituto Guatemalteco de Migración. Las personas que conformen la CONARE, deberán tener la calidad de servidores públicos.

Para operativizar el procedimiento del Estatuto de Refugiado, la CONARE establecerá los lineamientos a seguir por parte del personal de apoyo.

**Artículo 13. Personal de Apoyo.** El Instituto designará personal de apoyo a efecto de recibir las solicitudes del Estatuto de Refugiado, realizar entrevistas, así como diligenciar los expedientes durante el proceso de reconocimiento del Estatuto de Refugiado para que la CONARE pueda realizar sus funciones.

Dicho personal dependerá del Instituto y deberá contar con la capacidad técnica y profesional necesaria para el abordaje y seguimiento de las solicitudes del Estatuto de Refugiado.

DHSFF0023

**Artículo 14. Funciones de la Comisión Nacional para Refugiados.** Además de las funciones reguladas en el Código de Migración, la CONARE ejercerá las siguientes funciones:

a. Verificar que los solicitantes cumplan con lo regulado en el Artículo 4 y 27 del presente Reglamento, así como con los elementos y motivos establecidos en la legislación nacional y arreglos internacionales de los que Guatemala sea parte, relacionados con el reconocimiento y protección de los refugiados;

b. Notificar sobre las solicitudes del Estatuto de Refugiado a la Subdirección de Atención y Protección de Derechos Fundamentales de los Migrantes del Instituto y a la Subdirección de Extranjería del Instituto en el caso de niñas, niños y adolescentes, para lo correspondiente;

c. Notificar a la Subdirección de Extranjería del Instituto sobre las personas que han sido reconocidas bajo el Estatuto de Refugiado, para lo correspondiente;

d. Emitir recomendaciones, opiniones y sugerencias a la AMN, respecto a la fundamentación y argumentación de las solicitudes del Estatuto de Refugiado y en las solicitudes de extensión;

e. Emitir recomendaciones, opiniones y sugerencias a la AMN, respecto a la cesación del Estatuto de Refugiado;

f. Resolver sobre la cesación del Estatuto de Refugiado en el caso regulado en la literal f) del Artículo 184 del Código de Migración;

g. Hacer del conocimiento de la AMN sobre los expedientes que se dejaron de accionar por más de seis meses por parte del solicitante para lo procedente;

h. Remitir a la AMN, a través de la Secretaría Técnica, los expedientes de las Solicitudes de Estatuto de Refugiado para su conocimiento y resolución correspondiente;

i. Resguardar los expedientes relativos al Estatuto de Refugiado;

j. Emitir las constancias correspondientes respecto al Estatuto de Refugiado;

k. Realizar todas aquellas funciones que le correspondan de conformidad con la ley o a solicitud de la Autoridad Migratoria Nacional.

**Artículo 15. Asesoría.** La CONARE, podrá requerir la colaboración, capacitación y asesoría de ACNUR.

**Artículo 16. Sesiones.** La CONARE realizará sus sesiones ordinarias dos veces al mes y de forma extraordinaria cuando sea necesario.

La CONARE se reunirá en la sede del Instituto o en el lugar que decida la AMN.

La CONARE definirá a través del instrumento correspondiente lo relativo a convocatorias, quórum, sesiones y otros relacionados a su funcionamiento y atribuciones.

## CAPÍTULO II

## DEL PROCEDIMIENTO PARA EL RECONOCIMIENTO DEL ESTATUTO DE REFUGIADO

**Artículo 17. Procedimiento.** La solicitud del Estatuto de Refugiado, se podrá formular personalmente por escrito o verbalmente ante el puesto de Control Migratorio o ante la Subdirección de Atención y Protección de Derechos Fundamentales de los Migrantes del Instituto, el procedimiento se realizará de la siguiente manera:

1. **De la Solicitud.** La solicitud se podrá realizar:

a) Ante la Subdirección de Control Migratorio en los puestos de Control Migratorio del Instituto, el delegado recibirá la solicitud inicial de forma verbal o por escrito, trasladándola inmediatamente de forma escrita al personal de apoyo de la CONARE; ó;

• Ante la Subdirección de Atención y Protección de Derechos Fundamentales de los Migrantes del Instituto, se recibirá la solicitud inicial de forma verbal o escrita, trasladándola de forma escrita e inmediatamente al personal de apoyo de la CONARE.

Luego de recibida la solicitud, el personal de apoyo de la CONARE realizará lo siguiente:

a) Orientar al solicitante del Estatuto de Refugiado para que obtenga la información sobre el procedimiento Reglamentario para la obtención del Estatuto en mención.

b) Proceder a recibir la solicitud formal, deberá completar el formulario que la CONARE pondrá a su disposición, el cual deberá contener numeración correlativa, en el que el solicitante deberá exponer los motivos de la solicitud y la salida de su país de origen. El solicitante podrá acompañar a su solicitud el o los documentos de identificación personal que porte y demás medios de prueba que considere pertinentes para sustentar su solicitud.

DHSFF0024

c) Notificar a la Subdirección de Atención y Protección de Derechos Fundamentales de los Migrantes el estatus de permanencia provisional.

d) Notificar a la Subdirección de Extranjería sobre las solicitudes del Estatuto de Refugiado de niñas, niños y adolescentes, para el otorgamiento de la Residencia Temporal.

e) Fijar día y hora para la entrevista, la cual no podrá exceder de 15 días, contados a partir de presentado el formulario de solicitud formal.

Si el solicitante no se presentare a la entrevista personal en la fecha indicada, y transcurridos los treinta días de estatus de permanencia provisional, se notificará a las Subdirecciones competentes para los efectos correspondientes.

**2. Entrevista personal:**

El día y hora señalado para la entrevista, se dispondrá de un área específica para la realización de la entrevista a los solicitantes para la determinación del Estatuto de Refugiado, área debidamente equipada con video y audio para documentar las actuaciones que ahí se realicen. Asimismo, en cada entrevista deberá estar presente un Psicólogo, quien emitirá un informe psicológico como resultado de la entrevista realizada, y si fuere necesario también con la intervención de un traductor o intérprete, quien firmará el documento resultante de la entrevista realizada. En el desarrollo de la entrevista se deberá cumplir con los siguientes aspectos:

2.1. Los solicitantes deberán ser atendidos individualmente por el personal de apoyo de la CONARE quien brindará un abordaje especializado, integral y diferenciado.

2.2. Las niñas, niños y adolescentes no acompañados o separados de sus familias, serán atendidos en áreas especiales por personal capacitado, atendiendo a sus necesidades específicas de protección de conformidad con la legislación nacional vigente con el acompañamiento de la Procuraduría General de la Nación a efecto de brindarles atención especial.

2.3. La entrevista deberá realizarse en idioma español, en caso el solicitante de refugio no lo hable, se le proporcionará la asistencia de un traductor o intérprete.

En el caso de grupos familiares dichas entrevistas se harán de forma individualizada, las cuales se efectuarán dentro de un plazo que no podrá exceder de treinta días.

**3. Investigación del caso y emisión de recomendación, opinión o sugerencia:**

El personal de apoyo de la CONARE al momento de recibir la solicitud formal del Estatuto de Refugiado iniciará con la investigación del caso, utilizando los medios adecuados para que sea completado el expediente.

Al haber concluido la investigación del caso, la CONARE conocerá y analizará el expediente en la sesión más inmediata, para que posteriormente y en un plazo que no exceda de 30 días, la CONARE recomiende, opine o sugiera a la AMN para efecto de que considere otorgar o denegar el Estatuto de Refugiado.

**4. Resolución de la Autoridad Migratoria Nacional y su notificación:**

Recibido el expediente con las recomendaciones, opiniones y sugerencias de la CONARE de conformidad con el Artículo 177 del Código de Migración, la AMN procederá a resolver la solicitud del Estatuto de Refugiado, otorgando o denegando el mismo.

En caso la resolución sea favorable, deberá ser notificada al solicitante por la CONARE. La persona Refugiada deberá continuar con el trámite que en derecho corresponda ante el Instituto.

**Artículo 18. Denegación y Recurso de Reposición.** Al ser debidamente notificado, el solicitante del Estatuto de Refugiado por parte de la CONARE, de la resolución que deniega el otorgamiento del Estatuto de Refugiado, el interesado podrá interponer recurso de Reposición.

Dicho recurso deberá interponerse ante la AMN en la sede de su Secretaría Técnica, dentro del plazo de 10 días, contados a partir del día siguiente al de la notificación, y resolverse en un plazo no mayor a 5 días en que el expediente se encuentre en estado de resolver.

La AMN previo a resolver podrá realizar las diligencias que considere necesarias para la revocación, modificación o confirmación de la resolución objeto del recurso.

Al quedar firme la resolución que deniega la solicitud del Estatuto de Refugiado, la persona deberá regularizar su situación migratoria en el territorio nacional, sin perjuicio de aplicar el artículo 195 del Código de Migración.

DHSFF0025

**Artículo 19. Desistimiento de solicitud.** El solicitante podrá desistir de su solicitud si considera que no conviene a sus intereses personales continuar con el procedimiento, lo cual deberá manifestar por escrito ante el personal de apoyo, el que lo comunicará a la CONARE.

La AMN emitirá resolución aprobando el desistimiento y posterior archivo del expediente, lo cual deberá ser notificado al solicitante del Estatuto de Refugiado, informándole que deberá regularizar su situación migratoria o abandonar el país, según sea el caso.

**Artículo 20. Archivo del Expediente sin acción.** La CONARE pondrá en conocimiento a la AMN, el abandono de aquellos expedientes, en que los solicitantes del Estatuto de Refugiado han dejado de accionar por más de seis meses. La AMN procederá a declarar el abandono de las solicitudes y ordenará el archivo de los expedientes.

## CAPÍTULO III

## DEL PROCEDIMIENTO PARA LA CESACIÓN DEL ESTATUTO DE REFUGIADO

**Artículo 21. Cesación del Estatuto de Refugiado.** La declaración de cesación del Estatuto de Refugiado corresponde a la AMN, cuando la persona refugiada se encuentre dentro de las situaciones enumeradas en las literales a), b), c), d), e) y último párrafo del Artículo 184 del Código de Migración y los establecidos en la Convención sobre el Estatuto de Refugiado de 1951 adoptada en Ginebra el 28 de julio de 1951.

**Artículo 22. Procedimiento general para la cesación del Estatuto de Refugiado.** Al presentarse alguna de las causales previstas en el artículo que antecede, la CONARE deberá realizar el siguiente procedimiento:

a) **Conocimiento de la situación que conlleva la cesación del Estatuto de Refugiado:** Al ser del conocimiento de la CONARE alguna de las situaciones mencionadas en el Artículo 184 literales a), b), c), d), e) y último párrafo, ésta procederá a realizar el análisis del caso, de oficio emitirá informe circunstanciado a la AMN con la respectiva opinión, recomendación o sugerencia.

b) **Resolución de cesación del Estatuto de Refugiado:** La AMN al recibir el informe circunstanciado de la CONARE emitirá la resolución por medio de la cual declarará la cesación del Estatuto de Refugiado si lo estima conveniente.

c) **Notificación de la resolución:** En caso la AMN emita resolución por medio de la cual deberá declarar la cesación del Estatuto de Refugiado, la misma deberá ser notificada por la CONARE a la persona que se le haya declarado la cesación del Estatuto de Refugiado. Dicha notificación se deberá realizar personalmente por los medios que determine la autoridad competente, garantizando el Principio de Confidencialidad, informándole los efectos de dicha resolución y el procedimiento a seguir.

**Artículo 23. Procedimiento para la cesación del Estatuto de Refugiado según Artículo 184 literal f) del Código de Migración.** Al ser del conocimiento de la CONARE que han desaparecido las circunstancias en virtud de las cuales, una persona extranjera fue reconocida como refugiada por el Estado de Guatemala, dicha persona no podrá continuar negándose a acogerse a la protección del país de su nacionalidad. Para el efecto le corresponde a la CONARE resolver sobre la cesación, de conformidad con el siguiente procedimiento:

a) **Audiencia y notificación:** Al ser del conocimiento de la CONARE lo indicado en el párrafo anterior, ésta procederá a realizar el análisis del caso , reuniendo de oficio toda la prueba que considere pertinente, luego le informará al interesado a quien le correrá audiencia por el plazo de diez días contados a partir del día siguiente de su notificación, para que ejerza su derecho a la defensa en la evaluación sobre la prevalencia de los motivos que ameritan continuar acogiéndose a la protección internacional como refugiado.

b) **Resolución de cesación del Estatuto de Refugiado:** Al transcurrir el plazo de la audiencia concedida al interesado, con su contestación o sin ella, la CONARE resolverá sobre la procedencia o no de la cesación del Estatuto de Refugiado, la cual será considerada una resolución definitiva, misma que será debidamente notificada por parte del personal de apoyo de la CONARE al interesado, informándole también los efectos de la cesación.

**Artículo 24. Efectos de la cesación del Estatuto de Refugiado.** Al declararse la cesación del Estatuto de Refugiado por parte de la CONARE, ésta notificará inmediatamente al Instituto que podrá conceder un plazo razonable a la persona que se le haya cesado su condición de persona refugiada, quien podrá regularizar su situación migratoria en un plazo que no exceda de 30 días o abandonar el país según sea el caso, momento a partir del cual se aplicará lo dispuesto en la normativa vigente.

DHS EF0026



Jafeth Ernesto Cabrera Franco
Vicepresidente de la República de Guatemala
Director Autoridad Migratoria Nacional

Enrique Antonio Degenhart Asturias
Ministro de Gobernación
Miembro Autoridad Migratoria Nacional

Francisco Abraham Sandoval García
Viceministro de Administración de Trabajo
Encargado de Despacho

Sandra Erica Jovel Polanco
Ministra de Relaciones Exteriores
Miembro Autoridad Migratoria Nacional

Carlos Velásquez Monge
Ministro de Desarrollo Social
Miembro Autoridad Migratoria Nacional

Carlos Rolando Narez Noriega
Secretario Ejecutivo
Consejo Nacional de Atención
al Migrante de Guatemala
Miembro Autoridad Migratoria Nacional

Carlos Emilio Morales Cancino
Director del Instituto Guatemalteco de Migración
Secretario Técnico de la Autoridad Migratoria Nacional

DHS-F00

## CAPÍTULO IV

## DISPOSICIONES ESPECIALES

**Artículo 25. Identificación de niñas, niños y adolescentes susceptibles de reconocimiento del Estatuto de Refugiado.** En el caso que la Secretaría de Bienestar Social de la Presidencia identifique, mediante evaluación inicial a niñas, niños y adolescentes migrantes extranjeros y determine que son susceptibles de medidas de protección internacional, lo deberá comunicar a la Subdirección de Atención y Protección de los Derechos Fundamentales de los Migrantes para que se continúe con el procedimiento ante la CONARE.

**Artículo 26. Procedimiento para solicitar extensión del reconocimiento de Estatuto de Refugiado.** Las personas refugiadas reconocidas por el Estado de Guatemala, tendrán derecho a solicitar la extensión del reconocimiento, dicha solicitud se presentará ante el personal de apoyo, la que deberá realizar el procedimiento respectivo y posteriormente trasladar a la CONARE el expediente a efecto de recomendar, opinar o sugerir a la **AMN** lo correspondiente. El procedimiento para que se declare la extensión es el siguiente:

a) **Solicitud formal.** Una vez recibida la solicitud inicial de extensión la CONARE proporcionará un formulario para que sea completado por el solicitante en su calidad de refugiado en el Estado de Guatemala, lo cual acreditará con el original y fotocopia del Documento Personal de Identidad Especial.

b) **Entrevistas.** Una vez el personal de apoyo de la CONARE realice la entrevista de conformidad con el numeral 2. del Artículo 17 del presente Reglamento y verifique el perfil del solicitante, lo comunicará a la CONARE para que esta emita la recomendación, opinión o sugerencia según corresponda a la AMN.

c) **Resolución.** La AMN emitirá resolución otorgando o denegando la solicitud de extensión.

Las personas reconocidas mediante el procedimiento de estatuto regulado en el presente artículo tendrán los mismos derechos que la persona titular como refugiado.

**Artículo 27. De las obligaciones del solicitante del Estatuto de Refugiado y del Refugiado.** Los solicitantes del Estatuto de Refugiado y el Refugiado tienen, respecto del país donde se encuentran, deberes que, en especial, entrañan la obligación de acatar sus leyes y reglamentos, así como medidas adoptadas para el mantenimiento del orden público.

**Artículo 28. Notificaciones.** Cualquier notificación, emplazamiento o citación dirigida a la AMN se deberá realizar por conducto de su Secretaría Técnica.

**Artículo 29. Casos no previstos.** Los casos no previstos en el presente reglamento serán resueltos por la AMN en atención a las sugerencias, opiniones o recomendaciones formuladas por la CONARE.

## TÍTULO III

## CAPÍTULO ÚNICO

## DISPOSICIONES TRANSITORIAS

**Artículo 30. Vigencia de las solicitudes, procedimientos y trámites.** Todas las solicitudes, procedimientos y trámites existentes antes de la entrada en vigencia del Código de Migración, serán resueltos conforme al ámbito temporal de validez de la ley de acuerdo con lo establecido en la Ley del Organismo Judicial y el artículo 236 del Código de Migración.

**Artículo 31. Transitorio.** Todas las solicitudes presentadas a partir de la entrada en vigencia del Código de Migración, serán resueltas por la AMN de conformidad con el procedimiento establecido en el presente Reglamento.

**Artículo 32. Transitorio.** Los expedientes resueltos en definitiva de las solicitudes presentadas previamente a la vigencia del Código de Migración, deberán ser entregados por la Comisión Nacional para Refugiados establecida en el Acuerdo Gubernativo 383-2001 a la CONARE dispuesta en el Código de Migración, para su archivo y resguardo.

**Artículo 33. Transitorio.** Durante el proceso de transición y mientras se constituye administrativamente el Instituto, la ejecución operativa del Estatuto de Refugiado continuará realizándola la Dirección General de Migración a través de la Oficina de Relaciones Migratorias Internacionales.

**Artículo 34. Vigencia.** El presente reglamento empieza a regir treinta días después de su publicación en el Diario de Centro América.

Dado en la ciudad de Guatemala, el cuatro de marzo de dos mil diecinueve.

DHSFF0028

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

## MIGRATION CODE

### VOLUME I
### General Rights

### Part I
### The right to migrate and the rights of migrants

### Chapter I
### Rights

**Article 1. Right to migrate.** The State of Guatemala recognizes each person's right to emigrate or immigrate, whereby migrants may enter, remain in, transit through, leave, and return to Guatemalan territory, pursuant to national legislation.

**Article 2. Access to government agencies.** The State guarantees the right of all persons in Guatemalan national territory to enjoy equal access to public safety, health, education, employment, housing, and other services necessary for the fulfillment of their lives, pursuant to the Political Constitution of the Republic, the present Code, and other applicable standards.

Foreign citizens may access government agencies in order to carry out their activities and assert their legal rights. No government official may deny anyone assistance and service due to the fact that they are not Guatemalan citizens.

**Article 3. Right to Guatemalan nationality.** The right of foreign citizens to obtain Guatemalan nationality is recognized, pursuant to the Nationality Law in force.

**Article 4. Right to family.** The State of Guatemala recognizes the right of foreign citizens to settle in Guatemala with their families, either with the intention of starting a new family or reunifying family members within national territory, pursuant to the Political Constitution of the Republic, this Code, and other applicable standards.

**Article 5. Right to property and investment.** Any foreign citizen, with the exception of limitations set by the Political Constitution of the Republic and other laws, has the right to obtain property within national territory, and to invest in lawful businesses, companies, and entities, pursuant to national legislation.

**Article 6. Right to work.** Any foreign citizen has the right to work, in line with the provisions of this Code, national legislation in force, and international law.

**Article 7. Right to education.** Any foreign citizen has the right to education under the national and higher education systems, pursuant to the provisions of this Code and specific legislative provisions with regard to education.

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

**Article 8. Rights of the individual.** Rights and guarantees granted by Guatemalan laws and international conventions and treaties ratified by Guatemala are to be considered incorporated, even if they do not expressly appear in this Code.

**Article 9. Non-discrimination.**  Migrants shall enjoy equal treatment, and may not be discriminated against for reasons of sex, sexual orientation, race, color, language, religion or creed, political or other opinions, ethnic or social origin, nationality, age, economic situation, wealth, marital status, birth, or any other personal characteristic.

## Chapter II
## Rights and special conditions

**Article 10. Right to protection by the State.** The State of Guatemala is required to protect the personal integrity, life, and liberty of all Guatemalan and foreign citizens in national territory, without discrimination of any type.

State institutions may not demand identification documents or any other requirements in exchange for providing a foreign citizen with required protection. In all cases, necessary and available means shall be used in order to provide him or her with immediate care.

Persons have the right to freely decide where to settle within national territory.

**Article 11. Rights of migrant children or adolescents who are unaccompanied or separated from their families.** Migrant children and adolescents of other nationalities who are unaccompanied or separated from their families, pregnant girls or adolescents, girls or adolescents with their own children, and married couples who are minors with or without their own children have the right to receive services from specialized and differentiated outpatient programs or inpatient programs at specially designed shelters provided or authorized by the State to this end, pursuant to the specific principles identified in this Code.

The relevant authorities shall consider a differentiated response for the protection of refugee children, particularly those who are unaccompanied or have been separated from their parents or guardians, in order to appropriately meet their specific protection and service needs. In no case may children or adolescents who are unaccompanied or separated from their families be denied entry at the border.

Children and adolescents may not be deported, as this does not serve their best interest.

Specific due diligence and procedures shall be carried out in line with this Code and its regulations.

"Children or adolescents who are unaccompanied or separated from their families" shall be defined as children or adolescents who are not under the care and protection of their father,

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

mother, or an adult who according to law or custom is their usual caregiver, even when these children are accompanied by other persons.

**Article 12. Protection from violence, torture, and cruel, inhumane, or degrading treatment.** The State guarantees migrants' dignity and rights within national territory, and ensures that they are not subjected to any form of violence, torture, or cruel, inhumane, or degrading treatment.

Migrants who report being victims of violence, sexual or labor violence, torture, or cruel, inhumane, or degrading treatment at the hands of one or more persons, for profit or not, shall receive immediate services in line with measures to safeguard their integrity, health, and lives.

**Article 13. Maternity and sexual health.** Female migrants with or without identification documents to remain in Guatemala, have the right to access public sexual and reproductive health services on equal footing with Guatemalan citizens. This is to include gynecological services, maternity care for the time frame necessary to preserve their lives and that of their newborns, as well as family planning services.

All female migrants and their children have equal rights with Guatemalan citizens to receive immunization vaccinations against the main infectious diseases found in the community, as well as ordinary disease, in line with national health policies.

**Article 14. Elderly persons.** All elderly migrants in vulnerable situations in national territory have the right to care and shelter, as well as special services as necessary due to their age.

**Article 15. Family.** Migrants and their families have the right to remain together at all times. If, for administrative reasons and on a strictly exceptional basis they must be separated, that separation period shall only last as long as required to complete the administrative step, and family members shall be informed of where the individual is, what administrative steps must take place, and the authority requiring the temporary separation. Children and adolescents may be separated from their families in strictly exceptional circumstances, and only when that separation serves their best interest.

Family members have the right to file a writ of habeas corpus with the competent authority, and their access to this right shall always be facilitated.

Government officials who fail to comply with the provisions of this article shall be subject to penalties in line with Guatemalan criminal legislation.

**Article 16. Right to shelter and temporary care.** The Guatemalan Migration Institute has the exclusive authority to authorize entities providing migrants with temporary shelter and services. These entities must comply with regulatory provisions regarding their location and operations.

DHSFF0031

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

Guatemalan citizens who have returned from other countries may request that Guatemalan authorities provide them with temporary shelter and services, in order to provide them with a place to spend the night for 48 hours, and return to their place of origin. Authorities shall ensure that living conditions at these centers are acceptable and appropriate.

**Article 17. Right to information and documentation.** All foreign citizens or returning Guatemalan citizen have the right to receive necessary information regarding their situation, administrative steps to take place, and anything regarding their status or person.

Authorities may not confiscate, withhold, destroy, change, alter, hide, or pretend to lose migrants' identification, travel, or personal documents. Altering or including any false information on foreign migrants' or returning Guatemalan citizens' personal identification or travel documents is also prohibited.

**Article 18. Slavery or servitude.** No migrant in national territory may be subjected to conditions of slavery, servitude, or forced labor.

**Article 19. Right to communication and family contact.** Migrants in specialized shelters, housing centers, and temporary care centers authorized by the Guatemalan Migration Institute may request, based on available resources, support communicating abroad in order to speak with family members and consular assistance.

In the case of children and adolescents who are unaccompanied and/or separated from their families, communication shall be encouraged whenever necessary, in order to serve the children's best interest. Minors may also communicate with their consular authorities at any time. Exceptions include cases of asylum applicants or those requesting any other type of international protection system.

**Article 20. Right to be returned to one's country of origin or home country.** Migrants have the right to ask Guatemalan authorities to return them to their countries of origin or provenance. To that end, when migrants cannot bear the costs of their return, they must speak with their consular authorities, or with their country of origin provenance in order to arrange the best mechanism for their return. Guatemalan authorities shall verify that travel to these countries has been completed successfully.

**Chapter III**
**Rights of migrant workers and their families**

**Article 21. Recognition.** The State of Guatemala guarantees that all migrant workers' rights and the rights of their families are recognized in the Political Constitution of the Republic, national legislation, and international law duly recognized in Guatemala.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

**Article 22. Indubio Pro Operario.** As is the case with Guatemalan citizens, any interpretation or scope of the legal, regulatory, or contractual provisions regarding migrant workers shall be that which is most favorable to workers.

Stipulations involving the relinquishment, reduction, misrepresentation, or limitation of rights recognized by national or international legislation and any public or private provision are null and void, and may not be used to compel migrant workers.

**Article 23. Minimum social rights.** The following are minimum social rights which underpin labor legislation specific to migrant workers and the operations of State administrative entities and courts:

a) The right to freely select one's work and enjoy satisfactory economic conditions guaranteeing the worker and his or her family a dignified existence.

b) Equal pay, to be no less than the minimum wage in force, and in legal currency; employees may reach an agreement with employers to be paid in the current legal currency of another country.

c) The unseizability of one's salary in cases determined by the national labor law in force; this also applies to personal work equipment or tools.

d) Respect for workdays, vacation time, leave, compensation, and other rights recognized by national labor legislation.

e) Overtime payment pursuant to national legislation in force or in line with an agreement reached between the employee and employer.

f) Female workers' right to special maternity protections.

g) Children and adolescents may not be employed, except as provided as an exception pursuant to national and international law.

h) Payment of economic benefits for one's family in case of death, in line with the provisions for each case, pursuant to national legislation and internal regulations at the worker's place of employment.

**Article 24. Social security.** Migrant workers and their beneficiary families have the right to services and benefits from the Guatemalan Social Security Institute [IGSS]. To receive these benefits, they must be registered and pay contributions in line with IGSS standards.

The IGSS must issue administrative provisions to register migrant workers and their beneficiaries.

**Article 25. Pensions.** Migrant workers who work for Guatemalan state agencies, including independent or decentralized agencies, have the right to make contributions pursuant to the specific pension law.

Migrant workers who have fulfilled the law's requirements have the right to receive a pension in line with their service and contributions.

DHSFF0033

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

**Article 26. Categories of migrant workers.** For the purposes of implementing this Code, a "migrant worker" is defined as any foreign citizen who carries out remunerated activities in Guatemalan territory. These workers are classified in the following categories:

a) **Cross-border and itinerant workers:** A cross-border worker is a person who resides in the territory of a neighboring State and returns home at the conclusion of his or her workday, or at least once per week; itinerant workers carry out the same activity and transit between Guatemala and Belize, until the Territorial, Insular, and Maritime Differendum is resolved by the International Court of Justice.

b) **Temporary workers:** Persons whose activities depend on the season, or due to the nature of their work, are only carried out for a specific period during the year.

c) **Consultant, advisor, or specialized technician:** A person who carries out his or her activities for a period of no more than 365 days, and whose services are required by a specific contractor, as a consultant, advisor, or specialized technician, and who is not required to request permanent residence.

d) **Self-employed worker:** Any worker who carries out industrial or commercial activities independently or with his or her family members, and who is authorized to carry out remunerated activities within national territory.

The Guatemalan Migration Institute may suggest expanding these categories and proposing regulations and conditions, as circumstances require.

**Article 27. Family members and companions.** Blood relatives, as defined by law, who depend on the migrant worker, may settle in Guatemala for the duration of the migrant worker's labor activities. This also applies to the migrant worker's spouse or cohabitant. In all cases, corresponding authorizations shall be provided, and managed in line with this Code and national legislation.

Family members or companions accompanying a migrant worker may carry out labor activities, and to that end, obtain a migrant worker category classification. They may also carry out educational activities in the national education system, and access the Guatemalan health system.

**Article 28. Information with one's country's representatives.** For no reason may migrant workers or their family members or companions be denied or prevented from communicating with their country's consular or diplomatic representatives. In case of death, accident, or any other situation requiring communication with one's country, immediate communication shall one's respective consular or diplomatic representative shall be facilitated.

**Article 29. Cultural and religious identity.** Diplomatic representations in Guatemala may promote their countries' own cultural and religious activities among their fellow nationals working in Guatemala. This right shall be exercised within the framework of Guatemala's laws, and with respect for the cultures, languages, religions, beliefs, and customs of persons who live in national territory.

DHSFF0034

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

**Article 30. Entry and exit.** During their stay in Guatemala, migrant workers and their families or companions may enter and leave the country so long as is necessary, in line with standards set forth by this Code and its regulation.

**Article 31. Assets and properties.** Migrant workers or their family members or companions who acquire assets or properties in Guatemala shall be the owners of that property, even when they no longer carry out remunerated activities in the country. They may avail themselves of their property in line with their interests and national legislation in force.

When a migrant worker is arrested or convicted of a crime or offense, he or she does not lose rights to his or her legally and legitimately acquired assets or property, unless, pursuant to Guatemalan legislation, the property is found to be subject to forfeiture or seizure.

**Article 32. Transfer of assets and funds.** Once they have concluded their period of stay in Guatemala, migrant workers and their families have the right to take their securities or assets of their legal and legitimately required property, and to transfer money in line with authorized bank procedures.

They may also bring their assets into the country and transfer money from accounts in other countries into duly accredited accounts in the Guatemalan banking system.

Limitations to this right are with regard to health, legal proceedings preventing the exit of assets or money, or forfeiture proceedings.

No government official may encumber or limit this right, for any reason outside of what has previously been established by legislative and administrative provisions, or court order.

**Article 33. Requests to exercise one's right to vote.** Diplomatic offices in Guatemala representing countries in which citizens may exercise their right to vote from abroad, may request, through the Ministry of Foreign Relations, that Government authorities provide assistance from the Guatemalan Migration Institute, as well as any support necessary to obtain a list of persons of their nationality residing in Guatemala.

**Article 34. Right to cooperatives.** Migrant workers or their family members or companions may be members of cooperatives. To this effect, cooperatives shall have their own standards to establish methods and levels of participation.

**Article 35. Taxes.** Migrant workers are subject to paying taxes, levies, arbitration, and fines established in general and specific national legislation.  They must also comply with administrative requirements, as set by the Tax Administration Superintendence for each case.

Tax breaks, exemptions, or any other benefit shall be in line with administrative or legislative provisions, which may be issued for each case and at any time.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

**Article 36. Resignations or dismissals.** Employers of migrant workers holding valid authorization in Guatemala shall inform the Guatemalan Migration Institute whenever foreign employees are dismissed or have resigned, and the migrant worker may be required to pay for his or her services, pursuant to Guatemalan labor law.

**Article 37. Labor justice.** All migrant workers have the right to access administrative authorities and labor courts in Guatemala, and to file cases in line with national laws in force.

**Chapter IV**
**Rights of victims of trafficking in persons**

**Article 38. Rights.** Migrants who are the victims of trafficking in persons have the following rights, in addition to the regulations in Article 11 of the Law Against Sexual Violence, Exploitation, and Trafficking in Persons [*Ley Contra la Violencia Sexual, Explotación y Trata de Personas*], Decree Number 9-2009 of the Congress of the Republic:

    **a)** Access to available resources. In cases involving children and adolescents, proceedings shall recognize victims' special needs, which include being able to complete their full development process.

    **b)** To not be subjected to confrontation with accused perpetrators.

    **c)** That protection measures from applicable laws do not entail imprisonment.

    **d)** To testify, in special conditions providing protection and care.

**Article 39. Protection and shelter hostels.** Protection and shelter hostels and specialized programs providing comprehensive care for adult migrants who are victims of sexual violence, exploitation, and trafficking in persons, are under the Secretariat for Sexual Violence, Exploitation, and Trafficking, and support services are provided by the Ministry of Public Health and Social Assistance, Ministry of Labor and Social Security, as well as the Ministry of Social Development, in line with their mandates. Services shall be managed in coordination with the Division of Migrant Services and Protection of Fundamental Rights, along with other State agencies, in line with current policies and legislation.

Children and adolescents who are victims of sexual violence, exploitation, and trafficking in persons, including Guatemalan children or migrants of other nationalities, shall enjoy specialized and differentiated care through programs under the Office of the Presidential Secretariat for Social Welfare as the governing body providing essential services and special protection to children and adolescents whose rights have been threatened or violated. The Secretariat shall coordinate its activities through the National Council for Services and Protection of which it is a part, as well as other State institutions, and provide services through its department headquarters.

State institutions identified in this article shall set standards for various care services and programs provided at protection and shelter hostels.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

**Article 40. Immigration controls.** Pursuant to Article 14 of the Law Against Sexual Violence, Exploitation, and Trafficking in Persons [*Ley Contra la Violencia Sexual, Explotación y Trata de Personas*], Decree number 9-2009 of the Congress of the Republic, the Guatemalan Migration Institute, the Ministry of the Interior, and the Public Ministry shall issue protocols and joint provisions regarding steps to take in each circumstance.

All provisions issued shall comply with respect for human rights. Additionally, victims shall be informed about the protection and service system, and if the victim is a child or adolescent, the Solicitor General's Office shall be informed in order to begin the protection process.

**Article 41. Repatriation of migrant victims.** Migrant victims of trafficking in persons shall be repatriated pursuant to Articles 16, 17, and 18 of the Law Against Sexual Violence, Exploitation, and Trafficking in Persons, Decree number 9-2009 of the Congress of the Republic.

Within those proceedings, the right of the victims to not be repatriated due to violence or fear of violence shall be considered, without prejudice to applications for asylum, refugee status, or residency for humanitarian reasons, or any reason regulated in this Code or in line with international practice.

When a person is in the national territory of his or her blood relatives as defined by law, or has a credible fear that returning to his or her country of origin will present a serious risk to his or her life or personal integrity, non-repatriation shall be considered.

**Article 42. Protocols.** Interinstitutional protocols regulated in section b. of Article 19 of the Law Against Sexual Violence, Exploitation, and Trafficking in Persons, Decree number 9-2009 of the Congress of the Republic, as well as those of institutions described in the same text of the aforementioned article, shall include the Guatemalan Migration Institute.

## Chapter V
### Right to recognition of refugee status, political asylum, and humanitarian assistance

**Article 43. Refugee.** Foreign citizens may request that the State of Guatemala grant them refugee status upon entry into Guatemala at an official immigration checkpoint.

The process for obtaining refugee status shall be laid out in the respective regulation, pursuant to legislation in force and international instruments to which Guatemala is a party.

**Article 44. Asylum.** Guatemala may grant asylum at the discretion of the State of Guatemala, in line with the Political Constitution of the Republic of Guatemala.

**Article 45. Refugee.** For a person with refugee status, recognizing that status involves certain rights and duties as established in the Political Constitution of the Republic, international instruments, and other Guatemalan laws, submitted to the jurisdiction and competence of the State of Guatemala.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

The procedure for requesting, obtaining, or denying refugee status shall be established in regulations, in line with legislation in force and international standards.

**Article 46. Non-refoulement.** If an individual is denied refugee status or asylum, he or she may not be returned to his or her country when there is a credible reason to fear serious danger to his or her life, physical integrity, and freedom. Prior to refoulement, the State of Guatemala shall ensure that the Office of the United Nations High Commissioner on Refugees (UNHCR) has been informed of the person's situation.

**Article 47. Denial of refugee status.** Refugee status may not be granted to a person:
1. Who has committed a crime against peace, war crimes, or a crime against humanity, as defined by international instruments drafted to adopt provisions with respect to those crimes;
2. Who has committed a particularly serious crime outside of his or her country of refuge, prior to being admitted as a refugee, or when the claim has been made in order to evade justice in another country;
3. Who is guilty of acts contrary to the purposes and principles of the United Nations set out in international treaties and conventions.

**Article 48. Temporary resident status for children, adolescents, and adults recognized as having refugee status or political asylum.** Children, adolescents, and men and women recognized as having political refugee status or political asylum under the scope of territorial asylum, shall immediately be granted temporary residence and receive appropriate documentation, which may be used prior to the issuance of a final decision, in order to access their basic rights, such as freedom of movement, access to health services, education, legal information and guidance, access to justice, among other fundamental rights established by national legislation and international law.

**Article 49. Special protection for migrants fleeing sexual violence.** When the reasons for requesting refugee status or asylum are serious suffering from sexual violence or the threat of such violence, migrants, whether children, adolescents, or adults, shall be protected, and special, appropriate protection measures shall be adopted in accordance with the migrant's situation, in order to provide comprehensive services, particularly healthcare.

**Article 50. Penalty.** Failure to produce identification and travel documents, or failure to comply with administrative requirements for entering, remaining in, or transiting through Guatemala do not justify the imposition of a criminal penalty. However, the person in question is required to pay for any administrative costs incurred, pursuant to regulations, and he or she shall be returned to his or her country of origin.

**Article 51. Equality.** Applicants for refugee status, political asylum, and asylum under the scope of territorial asylum who have entered Guatemalan territory legally shall enjoy all of the rights and obligations set out in Guatemalan legislation, particularly the Political Constitution of the

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

Republic and this Code, as well as those recognized and guaranteed by international treaties and conventions ratified by the State of Guatemala.

**Article 52. Confidentiality.** The presence of applicants for recognition of refugee status, refugees, applicants for political asylum, or political asylum recipients in Guatemalan territory, as well as the respective documents and applications to recognize their condition or status shall be managed with respect the principle of confidentiality, in order to protect their lives, integrity, and freedom.

**Article 53. Identity.** While awaiting resolution of their cases, applicants for recognition of refugee status or political asylum under the scope of territorial asylum shall have the right to a special identification document, in order to access education and health services, and the document shall be considered valid for the purpose of obtaining remunerated employment, in line with legislation in force.

Refugees and political asylum recipients shall also be granted a special identification document.

**Article 54. Humanitarian assistance.** The State of Guatemala may facilitate the ability of legally established national and international entities providing humanitarian assistance to carry out their activities within Guatemalan territory. Migrants shall have the right to access these assistance entities for humanitarian reasons.

**Article 55. Unified registry of humanitarian assistance entities.** The State of Guatemala, through its immigration authorities, shall register entities providing humanitarian assistance for migrants.

Mandated international bodies may carry out activities providing care and protection to migrants.

**Part II**
**Immigration Law**

**Chapter I**
**General provisions**

**Article 56. Immigration law.** Guatemalan immigration law regulates the freedom of persons to enter, remain in, transit through, and exit national territory, in line with the fundamental rights of persons recognized in the Political Constitution of the Republic, national legislation, and international instruments.

**Article 57. Purpose.** The purpose of immigration law is to guarantee the right to migrate, through the provisions issued in this Code and its regulations, as well as any administrative or regulatory provisions issued by the Guatemalan Migration Institute.

DHSFF0039

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

**Article 58. Interpretation.** Immigration standards are to be interpreted in favor of the rights of migrants.

**Article 59. Limitations.** The right to migrate shall only be limited in cases described by this Code and its regulations, or based on provisions regarding health, security, or public order, personal safety, or via a court order or ruling.

**Article 60. Principles.** The Guatemalan Migration Institute is guided by the following principles: legality, integrity, honesty, non-discrimination, due diligence, protection of persons, family reunification, confidentiality, professionalization, and due process.

## Chapter II
## Obligations and prohibitions for migrants

**Article 61. Obligations of Guatemalan citizens.** In order for Guatemalan citizens to travel abroad, they must meet the following requirements:

    **a)** Hold a valid Guatemalan passport or identification document, in line with requirements of the destination country and Guatemala's own requirements for that State.

    **b)** In the case of children and adolescents, in order to travel alone or in the company of a third country, they must carry authorization in writing from both parents, or whomever has parental authority, custody, or guardianship of them. Failure to comply with this requirement may lead to denial of exit from Guatemala. Should one or both parents be located abroad, that authorization in writing may be presented to the Guatemalan consulate accredited abroad.

    **c)** Depending on the country of destination, travelers must comply with immigration authorities' requirements in order to enter and remain in that national territory.

    **d)** Comply with tax declarations and payments imposed by the Tax Administration Superintendence on any assets they wish to bring into or out of the country.

No government authority may deny Guatemalan citizens their right to enter national territory.

**Article 62. Obligations.** Foreign citizens in Guatemala are required to respect the Political Constitution of the Republic of Guatemala, laws in force in Guatemala, and various worldviews and cultural and religious identities living together in national territory, as is consistent with a multiethnic, multilingual, and multicultural country.

**Article 63. Mandatory compliance.** Compliance with the provisions of Decree number 10-2015 of the Congress of the Republic of Guatemala is mandatory.

**Article 64. General rules.** Failure to comply with foreign citizens' obligations in Guatemala shall lead to administrative responsibility, and potentially being asked to leave the country

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

immediately, or, when justified, removal. However, when foreign citizens have committed a crime, authorities shall proceed in line with criminal legislation in force.

Criteria for the denial of entry, suspension of residence, and rejection of applications for entry are governed by the regulations of this Code.

Immigration inspection checkpoints at maritime ports, airports, and land borders shall have the space necessary in order to disseminate information on obligations contained in this Code and general prohibitions contained in national legislation with regard to immigration. Companies transporting persons and international cargo, whether by sea, land or air, shall be provided with immigration forms to be distributed among passengers traveling to Guatemala.

## Chapter III
### Entry of foreign citizens into Guatemala

**Article 65. Regular entry of foreign citizens into national territory.** Foreign citizens wishing to enter Guatemala via air, land, or sea shall comply with requirements for their nationality, as established in the respective regulation.

Exceptions are made for persons who enter Guatemala legally for humanitarian reasons or in need of international protection, as is the case for persons applying for recognition of refugee status or political asylum under the scope of territorial asylum.

Persons who present themselves at immigration inspection checkpoints at maritime ports, airports, and land borders without required official documents may be denied entry into national territory.

**Article 66. Hindrances to entry.** In addition to the administrative provisions issued by the Guatemalan Migration Institute, the following are hindrances to entering the country:
  a) In the interest of public order and security.
  b) Being designated as having committed a crime contained in the Rome Statute of the International Criminal Court.
  c) Being criminally prosecuted for ordinary crimes against life, liberty, and property.
  d) Being subject to an international arrest warrant.

**Article 67. Entry of Central American citizens.** Central American citizens may enter Guatemala as tourists upon presentation of their original national identification document or valid passport, on the basis of the principle of reciprocity, for a period of up to 90 days, renewable one time only.
Guatemala may enter into rules and agreements issued jointly among Central American nations in order to facilitate their citizens' entry and exit within the region.

**Article 68. Entry of persons for humanitarian reasons.** Foreign citizens may enter Guatemala for the following humanitarian reasons:

a) Due to natural disaster in neighboring countries, which force persons or groups of persons to save their lives.
b) Due to medical emergencies or to save persons' lives, on aircraft or maritime vessels.
c) Due to armed conflict, pursuant to international law.
d) Following a cooperation request from another State or bodies created by International Law to bring equipment, vessels, or persons working in medicine, aid, or emergency services.
e) To repatriate the remains of family members who have died in Guatemala.

The stay of these persons or vessels shall be governed by the provisions of this Code and its regulations.

**Article 69. Entry at the request of competent authorities.** Foreign citizens required to testify as witnesses, victims, or expert witnesses in proceedings in the Guatemalan justice system, and those required by legal or executive authorities to make personal representations, may obtain a special entry permit.

The corresponding form shall be defined in the regulations.

**Article 70. Temporary entry due to transport.** For the purpose of maritime, air, or land transport, entry may be authorized for staff and crew members of legal entities, or individual persons carrying lawful cargo within the framework of normal trade.

Such authorizations may be expedited by the immigration inspection checkpoint chief officer, in coordination with the Port Captaincy, National Civil Aviation Administration, or Transport Department, so long as the corresponding requirements are fulfilled and the authorized fee established by corresponding regulation has been paid. The authorization is valid for a period of 48 hours in cases of air or land entry, and 72 hours in cases of maritime vessels.

When a legal entity or individual person works transporting persons or goods and requires permanent authorization, that person or entity shall be subject to civil and trade law as well as the provisions of this Code.

**Article 71. Unforeseeable circumstances.** When a person appears at Guatemalan Migration Institute facilities or its head office and requests official entry into Guatemala without fulfilling the regulations of this Code or other legal provisions, the Institute shall send that person to previously authorized institutions in order to provide him or her with temporary shelter. The employee or government official shall follow the following criteria:

a) If the person indicates that he or she is being persecuted in his or her country of origin, the victim of threats of violence, or the victim of violence, an application for refugee status or territorial political asylum, or entry for humanitarian purposes shall be required, and the person shall be provided with shelter and temporary services.

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

**b)** If the person is a child or adolescent, he or she shall be cared for in line with legal provisions in force and the provisions of this Code.

**c)** Female migrants who indicate they are the victims of sexual violence or are being persecuted to that end, or are victims of domestic violence shall be provided with healthcare services, in line with the stipulations of specific laws. The right to not be returned to one's country of origin or provenance shall prevail, given the serious threat of becoming a victim of sexual violence in any form.

**d)** Should a family unit appear, in line with the provisions of this Code, the Deputy Director of Migrant Services and Protection of Fundamental Rights shall provide care and follow-up on cases involving family reunification and protection and care for children and adolescents, in line with the minors' best interest, or in line with the principles governing the specific case.

**Chapter IV**
**The stay of foreign citizens and their regular immigration status**

**Article 72. Stay.** Foreign citizens may remain in Guatemala for as long as is authorized, pursuant to their regular or extraordinary immigration status granted based on the provisions of this Code.

Persons with extraordinary immigration status may remain in Guatemala, pursuant to this Code.

**Article 73. Regular immigration status.** Regular immigration status is an immigration category granted to foreign citizens due to their entry and stay in national territory, in line with the following classifications:

**a)** Tourist or traveler.
**b)** Temporary resident.
**c)** Permanent resident.

**Article 74. Tourists or travelers.** Tourists or travelers are foreign citizens who have legally entered Guatemala for legal purposes, without intentions of obtaining temporary or permanent residence, for a period of no more than 90 days, which may be renewed once.

Persons with technical, professional, scientific, cultural, athletic, or religious vocations whose skills are required by public or private institutions may stay in Guatemala and conduct remunerated consulting or advisory activities for a period of no more than 80 days.

**Article 75. Temporary residents.** Temporary residence is granted to persons to whom the Guatemalan Migration Institute has extended a document recognizing them as temporary residents, as defined below:

**a) Migrant workers:** Foreign citizens who have been authorized to remain in Guatemala in order to conduct a legal, remunerated activity, under the dependence

DHSFF0043

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

and direction of an employer. Migrant workers may request temporary residence for a period of one to five years.

b) **Students:** Foreign citizens authorized to live in Guatemala for the purpose of studying at any educational level. Temporary residence is authorized for students for the period of their educational cycle or the duration of their corresponding university courses, pursuant to the regulations established by this Code.

c) **Athletes and artists:** Foreign citizens hired by legal entities or individual persons, and who provide their specialized services as athletes or artists, may be granted temporary resident status for the period of their specific contract, or for up to a maximum period of five years, in line with applicable national legislation in force.

d) **Investors:** Foreign citizens who invest in Guatemala shall be granted residence for a period of no more than five years.

e) **Intellectuals, researchers, and scientists:** Persons dedicated to scientific, research, and academic activities who have been hired by entities to carry out work based on their knowledge and skills shall be granted temporary resident status for a period of no more than five years.

f) **Clergy and religious leaders:** Foreign religious leaders and clergy belonging to a religious entity that has formally been recognized by the State may obtain temporary residence for a period of no more than five years.

The description of requirements to fulfill in order to recognize temporary resident status are established in the regulations of this Code.

**Article 76. General rules on temporary resident status.** Persons wishing to obtain temporary resident status may begin the process at Guatemalan consular missions, or, if they are legally in Guatemala, at the Guatemalan Migration Institute.

All time periods set out in the article above may be extended on consideration of the Guatemalan Migration Institute. Status may be revoked at the request of the interested party, or for administrative offenses involving revocation of that status.

Temporary resident status does not deprive holders of that status of their right to enter and leave Guatemala without restrictions, other than those set by this Code and others defined in national legislation in force.

**Article 77. Special rules for temporary resident status for studies.** The children of persons who have requested temporary resident status in any of the categories described in this Code may acquire student status at any level of the national education system, with a declaration from their mother or father, a letter of acceptance from an educational center where they are enrolled, and indication of the course levels they will complete, in line with the provisions of the corresponding educational center.

DHSFF0044

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

While awaiting status, children and adolescents may attend the corresponding educational center with a document issued by the Guatemalan Migration Institute indicating that their immigration status is pending.

Foreign citizens requesting that status for higher education studies, and who have completed their secondary education in Guatemala, must request an extension of their resident status. Foreign citizens who require student resident status for the first time for university level studies shall provide an original acceptance letter from the university and proof of enrollment in the higher education institution.

**Article 78. Permanent residents.** Permanent residents are persons who, in addition to fulfilling other legal requirements, wish to establish residence in Guatemala, in line with requirements established in the corresponding regulation, and are within the following criteria:

a) Temporary residence in Guatemala for a period equal to or greater than five years.
b) Having been married to or in a declared common-law relationship with a Guatemalan citizen for over one year.
c) Citizens of another nationality, who are close relatives as defined by law of a Guatemalan citizen.
d) Those born in another Central American country who have been temporary residents of Guatemala for a period of one year.
e) Investors or pensioners who have been authorized to reside in Guatemala and have permanent, legal income originating abroad.

   As a special rule for permanent resident status for investors or pensioners, it is understood that all benefits and exonerations governed by the specific regulation for these cases shall be applicable to persons of Guatemalan origin who have naturalized in other countries and return with pensions from foreign governments or private entities.

**Article 79. Administrative provisions.** The Guatemalan Migration Institute shall issue corresponding regulation regarding procedures, forms, and fees to be completed and paid in order to grant, revoke, and extend immigration status, along with other effects required for regular immigration status.

**Article 80. Registries.** The Guatemalan Migration Institute shall maintain an updated registry of persons to whom it has granted temporary and permanent resident status, and may issue statements and certifications to interested parties.

The database of persons with regular permanent immigration status shall be shared with the National Registry of Persons in order to issue identification documents extended to resident foreign citizens. Procedures to carry out those steps, coordination between both institutions, and other issues related to procedure and defining requirements shall be contained in the specific regulation to be issued to that effect.

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

## Chapter V
## Extraordinary immigration status

**Article 81. Extraordinary permanent status.** Unlike regular immigration statuses identified in this Code, extraordinary permanent circumstances allowing a foreign citizen into Guatemalan territory are recognized as follows:

**a)** Provisional permanent status.
**b)** Special service permanent status.
**c)** Permanent status for humanitarian reasons.

**Article 82. Provisional permanent status.** Provisional permanent status is the stay of one or more foreign residents in Guatemalan territory, and is granted in the following cases:

**a)** Via court order in order for a person to appear in court as a witness, expert witness, or victim, limited to the time strictly necessary to do so.
**b)** At the request of Guatemalan authorities for steps requiring the person's physical presence, for the time strictly necessary to complete those steps.
**c)** Via application for refugee status, for a period of 30 days, which may be renewed.

**Article 83. Categories of special service permanent status.** This status may be granted to foreign citizens who have been the victims of torture, trafficking in persons, sexual violence, women in special circumstances, children who are unaccompanied or separated from their families, elderly persons, persons suffering from psychological disorders, and others.

When refugee status is granted, the Guatemalan Migration Institute and National Registry of Persons shall issue the provisions for obtaining an identification document, pursuant to Articles 53 and 104 of this Code.

**Article 84. Temporary residence for applicants for refugee status.** Temporary resident status shall be granted to children and adolescents who have applied for refugee status in line with Article 48 of this Code.
The Guatemalan Migration Institute and National Registry of Persons shall issue the provisions for obtaining an identification document, in line with Article 104 of this Code.

**Article 85. Permanent status for humanitarian reasons.** When foreign citizens enter Guatemala for reasons outlined in Article 68 of this Code, they shall be granted permanent status for humanitarian reasons, when those reasons are proven.

Persons must be identified via special cards which they must carry at all times, and which shall contain personal identification information, information on whether they have entered with their family members or any blood relatives, the reasons why status has been granted, and the signature and seal of the Subdirector of Migrant Services and Protection of Fundamental Rights and the General Director of the Guatemalan Migration Institute.

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

The Subdirector of Migrant Services and Protection of Fundamental Rights shall create a single, updated registry with information on all persons who have been granted this status.

**Article 86. International bodies.** When permanent status has been granted for humanitarian reasons, the General Director may request that bodies of the United Nations and the International Committee of the Red Cross provide their collaboration, support, and strengthening measures with regard to experience in humanitarian assistance.

## Chapter VI
## Special immigration status

**Article 87. Special status.** Special status shall be granted to persons who, due to their activities or situation, do not fall into any of the regular or extraordinary status definitions.

Special status shall be defined as follows:

a) Cross-border and itinerant workers.
b) Workers in line with section b) or Article 13 of the Labor Code. In these cases, the Ministry of Labor and Welfare shall communicate the corresponding information.
c) Diplomatic, consular, and international organization staff governed by the provisions of corresponding international conventions to which Guatemala is a party.
d) Special guests of State Bodies and their dependencies, or of autonomous and decentralized bodies, which shall communicate the steps that shall be taken for the delegations accompanying their guests.
e) Artistic, cultural, religious, athletic, or educational groups traveling together under the responsibility of a specific person.

The Division of Immigration Control shall be responsible for categorizing and granting that status in the case of persons who do not fall into any regular or extraordinary category. Exceptions shall be made for officials listed in section c), as they are to be handled exclusively by the Ministry of Foreign Relations.

## Chapter VII
## Exit of foreign citizens from Guatemala

**Article 88. Regular exit of foreign citizens from Guatemala.** Exit from Guatemala shall be conducted via official immigration inspection checkpoints in the country, in compliance with the corresponding documentation, requirements, and security formalities indicated for each situation.

Exit may be denied to foreign citizens who fail to comply with the requirements indicated, or when there is reason for denying the person exit.

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

**Article 89. Immigration impediments to exiting the country.** The following persons may not exit the country:

**a)** Children and adolescents who are unaccompanied and do not possess required official documentation to travel alone or in the company of persons who are not legally authorized.

**b)** Persons who have requested refugee status, political asylum, or permanent status for humanitarian reasons and who have not given the notice or justification required by the Guatemalan Migration Institute.

**c)** Persons who are not permitted to leave the country due to a court order.

The Guatemalan Migration Institute shall issue the provisions necessary regarding official documents to be presented, as well as with regard to coordination with taxation bodies, maritime port administrators, airports, and other bodies required for effective compliance and control of standards regarding impediments to exiting the country.

**Chapter VII**
**Identification and travel documents**

**Section I**
**Identification documents**

**Article 90. Travel documents.** Travel documents for migrants or Guatemalan travelers are issued by the Guatemalan Migration Institute, in order for persons to travel pursuant to their internationally-recognized immigration status.

Migrants' or travelers' travel documents also include those issued by immigration authorities in other countries, in order for their nationals to be allowed to enter, stay in, and exit Guatemala, pursuant to national immigration laws in force.

For both Guatemalan and foreign citizens, the use of other identification documents as travel documents is recognized when there are bilateral or multilateral agreements with the respective countries validating the use of other documents.

The only exception to the use of a passport shall be when there is a bilateral or multilateral agreement or convention allowing the entry into another country's territory using another identification document.

A passport is the identification document issued for Guatemalan citizens abroad, and it shall be issued exclusively by the Guatemalan Migration Institute.

**Article 91. Obtaining a passport.** Passports are issued by the Guatemalan Migration Institute, and may be obtained at locations established for this purpose.

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

Guatemalan citizens abroad may obtain a passport from Guatemalan diplomatic or consular offices.

The Guatemalan Migration Institute shall transfer 25% of net income collected by consular missions for the issuance of passports abroad to the Ministry of Foreign Relations; those funds shall be used exclusively for strengthening and expanding the consular network for the purpose of protecting and serving Guatemalan migrants abroad.

Considering the best interest of children and adolescents, in order to obtain a Guatemalan passport, minors must have authorization from the person representing them, in line with the Civil Code. Should one or both parents be abroad, authorization may be given via Guatemala's respective consular officials. Should one or both parents be in Guatemala while the minor child is abroad, authorization may be given at the Ministry of Foreign Relations.

**Article 92. Types of passports.** Passports are classified as:

a) **Regular:** Those issued to persons of Guatemalan nationality with no restrictions other than those laid out in this Code and national legislation.
b) **Official:** Those issued to State officials who travel abroad on official missions.
c) **Diplomatic:** Passports issued to the President of the Republic, the Vice President of the Republic, Members of Congress of the Republic and Supreme Court Judges. Diplomatic officials serving abroad, and career diplomatic officials in service at the Ministry of Foreign Relations headquarters, holding the rank of Minister, Vice Minister, or head of some Ministry Bureau divisions.

**Article 93. Special Travel Document.** A Special Travel Document shall be issued to persons whose refugee status has been recognized by the State of Guatemala, in line with the provisions of this Code and international conventions ratified by Guatemala. The Special Travel Document shall indicate that the holder is not a Guatemalan national, but that due to the special conditions of his or her status, he or she has been granted a temporary identification document in order to enter and leave the country one time, when there is a fully justified reason.

The Special Travel Document shall include the following statement:

"This Special Travel Document was issued by the State of Guatemala to the person whose identification information is contained herein. However, the bearer has been warned that this document does not guarantee his or her entry into the territory of another State, which has the faculties to deny him or her entry, transit, and residence, pursuant to its own laws and immigration provisions."

**Article 94. Passport features and validity.** Passport features shall be in line with agreements made at the regional level by Heads of State and Government of countries in the Central American Integration System (SICA).

DHSFF0049

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

Passport covers shall indicate the type of passport and name of the Republic of Guatemala. Regular passports shall be valid for five to 10 years, and may be issued for shorter time periods, when stated expressly by this Code or governing regulation.

Diplomatic and official passports shall be valid for time periods in line with the period of government in which the passport was issued, or until the official has completed his or her public duties. State institutions requesting official or diplomatic passports shall inform the Guatemalan Migration Institute within a period of no more than 30 days when the official has concluded his or her duties.

Regulation of this code shall define other passport features, such as special conditions to facilitate obtaining renewals or changes, the Division of International Identification and Travel Documents shall issue rules regarding passport security and authenticity, in line with continuing advancements and recommendations from the International Civil Aviation Organization.

**Article 95. Invalidity and voidability.** Passports are invalid when they are not issued by the Guatemalan Migration Institute, do not comply with features defined in this Code or its regulation, and when they have false visas from other countries.

Passports may be voided when they are declared void via corresponding report for theft, robbery, loss, damage, or other reasons. A passport is void when information required by this Code and its regulation is altered, or when information on the person it identifies or its forms have been altered, or when the passport has expired due to having completed its period of validity.

**Article 96. Reports.** When a passport has been lost, stolen, or robbed, its holder must provide a proof of report issued by the corresponding authority, in order to obtain a new passport. When passports have been damaged or destroyed, a letter signed by the holder and presentation of the original document is sufficient.

The procedure below shall be governed by the corresponding regulation.

Guatemalan citizens shall file a report with competent authorities in the countries where they are, if conditions allow. In all cases, consular offices shall issue a travel document valid for a 90-day period.

**Article 97. Verification for protective purposes.** When a travel document is requested outside the country for an unaccompanied child or adolescent, the Guatemalan consular official shall verify via communication with the Solicitor General's Office that the minor has not been reported disappeared, kidnapped, or missing. Issuance of this document shall proceed in line with Article 91 of this Code.

Consular offices shall act in accordance with the best interests of the minor.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

**Article 98. Special rights to diplomatic passports.** Diplomatic officials in service abroad and career diplomatic officials at the Ministry of Foreign Relations headquarters with the rank of Minister, Vice Minister, or the heads of some Bureau divisions at the Ministry, their spouses, and minor children shall have rights to diplomatic passports.

**Article 99. Right to identification documents outside of Guatemala.** Guatemalan citizens in other countries whose passports have expired, been damaged, robbed, stolen, or lost have the right to request a new passport at corresponding consular offices.

**Article 100. Identification of temporary and permanent residents.** Persons who have obtained temporary or permanent resident status shall identify themselves with the personal identification document issued to them by the National Registry of Persons, pursuant to the specific regulations issued by that Registry.

For the purposes of the personal identification document, temporary residents shall be considered as foreign residents, in application of section b) of Article 55 of Decree number 90-2005 of the Congress of the Republic, National Registry of Persons Act.

**Article 101. Identification of extraordinary immigration status.** In the case of persons with provisional resident status, a passport shall serve as an identification document.

In the case of persons holding special care resident status, the following shall apply:

a) The bearer of a passport from his or her country of origin shall use that passport as a valid form of identification until it has expired; then, he or she shall temporarily be authorized for the National Registry of Persons.

b) In the case of persons applying for recognition of refugee status, the special document shall be authorized by the National Registry of Persons, in line with the Guatemalan Migration Institute. This shall be considered valid for the purpose of obtaining work and exercising one's right to education and health care while awaiting a final decision.

c) Persons with resident status for humanitarian reasons shall use the corresponding card as defined by this Code.

**Article 102. Identification of persons with special immigration status.** As a general rule, the existence of a passport shall apply. In the case of border workers, a regular cross-border visitor card shall be issued, which shall note the bearer's activity and, if applicable, the name of the legal entity or individual person employing him or her, or the commercial or public name of where he or she generally conducts business.

**Section II**
**Travel documents**

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

**Article 103. Travel documents.** Travel documents include those extended to Guatemalan citizens by the Guatemalan Migration Institute to allow persons to obtain corresponding authorizations, as well as register entries, residence, and exits in other countries.

Travel documents also include those extended by immigration authorities from other countries, allowing nationals of that country to register authorization, entry, residence, and exit in Guatemalan territory.

**Article 104. Travel documents for asylum recipients or refugees, refuge, or for humanitarian reasons.** Persons recognized as refugees or asylum recipients who do not have travel documents may request that the Guatemalan Migration Institute issue a special travel document, consistent with a document described with the features listed in the article in this Code referring to Special Travel Documents.

That Special Travel Document shall be valid for one single entry and exit.

**Article 105. Visas.** Visas issued by Guatemala to foreign citizens authorize that person to enter, transit through, remain in, and exit Guatemala for the time indicated on the document itself. The time period may be changed due to changes in the bearer's immigration status, in line with the status categories identified in this Code.

National immigration authorities may issue periodic information regarding which nationalities require a visa in order to enter Guatemalan territory.

Procedures for obtaining a Guatemalan visa, as well as its form, duration, and other requirements shall be governed by the specific regulation regarding visas.

### Chapter IX
### Immigration Regularization Plans

**Article 106. Regularization plans.** Plans for regularization are those through which the State of Guatemala allows foreign citizens irregularly present in Guatemalan territory to obtain regular immigration status, according to the regulations in this Code.

**Article 107. Foreigners irregularly present.** A foreign citizen irregularly present is defined as a person who entered or lives in national territory in good faith and peacefully, but who does not have any of the regular immigration statuses defined by this Code.

**Article 108. Issuance of regularization plans.** The Executive Body, at the request of the National Immigration Authority, shall, via Governmental Agreement, issue the terms of regularization plans, to include objectives, a period of operation, and specific procedures to follow.

The Guatemalan Migration Institute shall always be the governing body responsible for carrying out such plans. Specific procedures must be within the general rules issued by this Code.

DHSFF0052

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

**Article 109. Requesting regularization plans.** Only the National Immigration Authority may request that the Executive Body issue such plans, along with a corresponding technical study recognized by the Guatemalan Migration Institute.

**Article 110. Beneficiaries.** Regularization plans may also be issued in the following circumstances:

    **a)** There is a high number of Guatemalans requesting to regain their citizenship.
    **b)** The presumption, based on relevant data and statistics, of a high number of persons from other countries from Central America present in Guatemala.
    **c)** A high number of children of Guatemalan citizens born abroad who wish to obtain documentation as Guatemalan nationals.

**Article 111. Features.** Regularization plans are temporary, with specific time frames, and are to be used for the regularization of persons who have entered the country during a specific time period, and therefore, are extraordinary procedures which shall be adjusted for each situation and condition, in line with the general rules of this Code. In the case of Guatemalans, regularization plans shall be permanent and their procedures shall be governed by regulation.

Procedures may be taxed via the corresponding Governmental Agreement, be free of charge, fines may be reduced, and aimed at connecting persons with a direct relationship with the State of Guatemala as residents, in the framework of their fundamental rights.

**VOLUME II**
**Immigration System and Policies**


**Part I**
**Guatemalan Immigration System**


**Chapter I**
**Guatemalan Immigration System and Immigration Policy**

**Article 112. Guatemalan Immigration System.** The Guatemalan Immigration System has been created as a body of state institutions which serve migrants and ensure appropriate and effective regulation of Guatemalan and foreign citizens' entry into and exit from Guatemala, and foreign citizens' transit and stay in Guatemala, in a framework of respect for, protection of, and safeguarding human rights, and contributing to national development and protection of Guatemala's inhabitants.

The Guatemalan Immigration System shall act with due diligence at all times, observing the following principles:

    **a)** **Professionalism:** Officials or employees shall conduct their duties professionally.

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

    **b) Timeliness:** Officials or employees shall proactively seek to conduct all of their duties within reasonable time frames.

    **c) Independence and impartiality:** All acts, resolutions, and decisions made or issued by Guatemalan Immigration System officials and employees shall be based on law, in line with legality and human rights.

    **d) Transparency:** Immigration activities shall guarantee access to public information under the parameters established by national legislation.

**Article 113.  Composition.** The Guatemalan Immigration System shall be comprised of:

    **a)** The National Immigration Authority.
    **b)** The Guatemalan Migration Institute.
    **c)** National Migrant Services Council of Guatemala.

The entities that comprise the Guatemalan Immigration System shall meet at least once per year, or as needed, in order to share information, best practices, or any other matter related to migrants.

**Article 114. Immigration Policy.** Immigration Policy is a set of standards, institutions, procedures, programs, plans, budgets, and actions by the State of Guatemala in order to serve persons' right to migrate.

The Immigration Policy shall be issued by the National Immigration Authority, and implemented by the Guatemalan Migration Institute, jointly with its divisions. The Policy shall also coordinate policy actions with other State institutions, based on their mandates and competencies.

The institutions mentioned in this Code and in Guatemalan national legislation, and which have a direct link with the implementation of immigration policy shall, as part of their operations, handle issues required the policy and national legislation.

**Article 115. Immigration Policy Principles.** The Immigration Policy is designed and comprised of the following principles:

    **a)** Respect for human rights.
    **b)** Guarantee the right to migrate, the rights of migrants, and immigration law as distinct but complementary categories.
    **c)** Exclusive competence over matter of the Guatemalan Migration Institute.
    **d)** Integrating Guatemala's immigration commitments undertaken with the International Community.
    **e)** The security of migrants during origin, transit, destination, and return.
    **f)** The preservation of national territory.

**Chapter II**
**National Immigration Authority**

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

**Article 116. National Immigration Authority.** The National Immigration Authority is created and responsible for drafting, creating, and supervising Immigration Policy and security in the area of migration.

**Article 117. Integration.** The National Immigration Authority is comprised of the Vice President of the Republic, the Minister of Foreign Relations, the Minister of Social Development, the Minister of Labor and Welfare, the Minister of the Interior, the Director of the Guatemalan Migration Institute, and the Executive Secretary of the National Migrant Services Council of Guatemala.

The Vice President of the Republic is responsible for managing the National Immigration Authority. The Director of the Guatemalan Migration Institute shall act as Technical Secretary of the National Immigration Authority, which shall have a voice but no voting power at sessions, and the operation of which shall be governed by specific regulation.

The National Immigration Authority shall meet at least once every three months, in regular sessions, and in special sessions as necessary.

**Article 118. Functions.** The functions of the National Immigration Authority are:

1) Issue Immigration Policy.
2) Supervise policy compliance.
3) Amend policy in line with requirements of the President of the Republic, members of the Authority, Congress of the Republic, or any other Government body which justifies the change.
4) Request approval by the President of the Republic, in the Council of Ministers, for immigration regularization plans described in this Code.
5) Approve the Guatemalan Migration Institute draft budget.
6) Approve regulations issued by the Guatemalan Migration Institute.
7) Request technical reports from the Guatemalan Migration Institute.
8) Request Immigration Policy execution and implementation reports.
9) Approve the annual and strategic plan of the Guatemalan Migration Institute.
10) Promote the signature and ratification of international conventions, treaties, and agreements.
11) Request technical, statistical, and academic studies, or any study considered necessary in order to appropriately address the needs of persons exercising their right to migrate.
12) Delegate special committees to its members, in line with their duties.
13) Request state entities provide reports considered necessary in order to guarantee the right to migrate.
14) All functions indicated in this Code and national legislation.

**Article 119. International policy leadership.** In matters related to foreign or international immigration policy, the National Immigration Authority shall act in coordination with the

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

Ministry of Foreign Relations and in line with international policy as defined by the President of the Republic.

## Chapter III
## Guatemalan Migration Institute

**Article 120. Creation and decentralization.** The Guatemalan Migration Institute is created as a decentralized agency of the Executive Body.

The Guatemalan Migration Institute has exclusive authority for the implementation of Immigration Policy, the direct and indirect management of state provisions aimed at managing the right to migrate, execution of the approved budget to this effect, and other provisions considered within Guatemala's national legislation.

In order to comply with its mandate and implement its activities, the Guatemalan Migration Institute has authority throughout national territory, with sufficient capacity to administer its financial, technical, human, and administrative resources, as well as fulfill its rights and obligations.

**Article 121. Mission.** The mission of the Guatemalan Migration Institute is to ensure respect for the human right to migrate, guaranteed via appropriate administration of immigration law, and providing timely services and protection for foreign or national migrants, as required. The Institute shall also act as a decentralized body providing public immigration services, focusing its activities on respect for human rights.

**Article 122. Functions.** In addition to the functions governing regulations in this Code and national legislation, the Guatemalan Migration Institute is also responsible for the following:

a) Ensure migrants' rights.
b) Establish administrative offices as necessary in order to provide services to migrants in Guatemalan territory and abroad.
c) Implement Immigration Policy issued by the National Immigration Authority.
d) Integrate the National Immigration Authority via the General Director.
e) Conduct technical, statistical, and any other reports in order to continually update administrative provisions, as well as whenever required by the National Immigration Authority or the President of the Republic.
f) Coordinate specific activities for the service, assistance, and protection of migrants with State Secretariats and Ministries, and provide Immigration Policy results and target compliance follow-up.
g) Coordinate the administration of migrant services with State Secretariats and Ministries.
h) Integrate specific divisions created to provide services in special situations.
i) Propose the creation of temporary high-level committees to the National Immigration Authority in order to address specific situations.

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

**j)** Propose that the National Immigration Authority request the issuance of regularization plans, in line with the provisions of this Code.

**k)** Provide divisions in order to provide service, assistance, and protection of migrants requesting asylum, refuge, and humanitarian assistance.

**l)** Direct and monitor implementation of provisions regarding the entry of foreign citizens into national territory, as well as their stay and exit.

**m)** Direct and monitor implementation of the provisions for regular, extraordinary, and special immigration status, in line with this Code, Immigration Policy, international practices, and national legislation.

**n)** Direct, monitor, and administer the issuance and granting of international identification and travel documents, in line with this Code and other administrative provisions issued to this end.

**o)** Implement and guarantee respect for administrative procedures regulated by this Code.

**p)** Guarantee respect for labor rights and promote the professionalization of the Guatemalan Migration Institute's human resources.

**q)** Exclusively manage, and be responsible for databases described in this Code, though said databases are the property of the State of Guatemala.

**Article 123. Financial resources.** The Guatemalan Migration Institute shall rely on the financial resources allocated to it in the General Budget of Income and Expenditures of the State, along with those resources from the following sources:

**a)** Fines imposed for infractions pursuant to regulations in this Code;

**b)** The amount charged for travel documents requested in Guatemalan territory and abroad, which are issued and authorized by the Guatemalan Migration Institute;

**c)** The amount charged for Guatemalan visas for persons from States where a visa is required;

**d)** The amount charged for obtaining, extending, or changing various immigration categories and statuses;

**e)** Income from regularization plan fees;

**f)** Income from charges for foreign citizens exiting Guatemalan territory. The provisions and corresponding amount shall be governed by regulation;

**g)** Contributions from public and private entities; and

**h)** Any other income obtained via any lawful charges.

Financial resources from sources listed above are exclusive to the Guatemalan Migration Institute, and therefore, shall be exclusively earmarked for staff professional development, infrastructure, equipment, maintenance, operational costs, and migrant services.

**Section I**
**General Director**

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

**Article 124. General Director.** The Guatemalan Migration Institute is managed by a General Director, who shall manage the Institute with total independence of judgement, and entirely under his or her responsibility, pursuant to national legislation, without prejudice to directives and guidelines set by the National Immigration Authority for the effective implementation of national immigration policy.

The General Director is responsible for any claim of damages due to acts or omissions incurred during his or her mandate.

The General Director may sign conventions on immigration matters with national and international entities, as well as with similar immigration and security institutions abroad, in order to share and consult information.

**Article 125. Selection.** The President of the Republic is responsible for nominating a person to act as Director of the Guatemalan Migration Institute, in line with the qualities expressed in this Code, who shall be nominated for a five-year period which may be extended.

If the Director position becomes vacant, the new nominee shall begin a new five-year mandate, which may be extended.

**Article 126. General Director qualities.** The qualities required for the General Director of the Guatemalan Migration Institute are the same as required for any State Minister.

**Article 127. Prohibitions on being General Director.** Individuals fulfilling the following criteria may not be nominated as General Director of the Guatemalan Migration Institute:
   a) Being the provider, provider representative, director, or trusted employee of a service or goods provider contracted by the State in any of its agencies.
   b) Being a member of the clergy or a religious leader.
   c) Having a pending criminal case for any of the crimes laid out in national legislation.
   d) Having been convicted for crimes against public administration, life, liberty, sexual integrity, or personal integrity. Having been found to have violated or threatened to violate the human rights of children and adolescents.

**Article 128. Suspension of duties.** The General Director shall be suspended from duty when, due to duly justified temporary situations, he or she requests permission from the National Immigration Authority, for a specific period of time.

**Article 129. Removal from office.** The General Director may be removed from office by the President of the Republic, at the request of the National Immigration Authority, if he or she incurs the following factors:

   1. Committing acts that are fraudulent, illegal, or clearly contrary to the functions or interests of the Guatemalan Migration Institute or the State in General.
   2. Being convicted by a final judgement of having committed intentional crimes.

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

3. Speaking in favor of a political party or presenting one's self as a candidate for a popularly elected post.

**Article 130. Replacement.** The Deputy Director shall replace the General Director of the Guatemalan Migration Institute in the following cases:

1. Temporary absence or illness;
2. Suspension from duty;
3. Having been declared by a competent authority of being physically or mentally unfit for duty;
4. Removal;
5. Resignation;
6. Death; and
7. Abandonment.

In cases c) through g), the Deputy Director shall temporarily replace the General Director until a new Director has been named.

**Article 131. General duties.** The general duties of the General Director, in addition to those listed in other legal instruments, are as follows:

1. At all times, seek to ensure free access to all persons' right to migrate, and impose no greater limits than those established by national legislation, as well as by treaties and conventions in the areas of human rights, rights of refugees, humanitarian law, and international criminal law, which have been approved and ratified by Guatemala.
2. Manage the Guatemalan Migration Institute, pursuant to national immigration policy, this Code, and national legislation.
3. Implement the National Immigration Policy and establish administrative provisions for this purpose.
4. Legally represent the Guatemalan Migration Institute.
5. Submit the Guatemalan Migration Institute strategic and annual plan and annual draft budget for consideration and approval of the Immigration Authority.
6. Issue general and specific regulation for approval by the National Immigration Authority.
7. Acquire goods and services for the Guatemalan Migration Institute.
8. Sign contracts for the purpose of fulfilling the aims of the Guatemalan Migration Institute.
9. Sign agreements, MOUs, and conventions with civil cooperation, national, or international institutions.
10. Nominate and remove deputy directors of immigration.
11. Integrate the National Immigration Authority.

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

**Article 132. Specific duties.** In addition to those laid out in other legal instruments, the following are specific duties of the General Director:

1. Issue internal human resources policy and its administration via the corresponding internal entity, including the professional immigration career path.
2. Approve programs, projects, and plans for each division and administrative units of the Guatemalan Migration Institute.
3. Supervise execution of the budget and approve internal adjustments, in line with corresponding plans, projects, and programs.
4. Issue general and specific orders regarding service and exercise of duty.
5. Integrate the National Institute for Statistics in provisions regarding collecting statistics.
6. With the Deputy Director, coordinate bodies for administrative procedures governed by this Code and regulations.

**Article 133. Representation.** Legal representation carried out by the General Director may be delegated expressly, in order to act on behalf of the General Director in corresponding administrative or legal processes, in carrying out the functions attributed to the Guatemalan Migration Institute by this Code, its regulations, and national legislation.

**Section II**
**Deputy Director**

**Article 134. Deputy Director.** Anyone nominated as Deputy Director must hold the same qualities established by this Code for the General Director. The Deputy Director shall be named by the General Director.

**Article 135. Duties of the Deputy Director.** The Deputy Director shall replace the General Director in situations described in Article 130 of this Code. He or she shall exercise the duties assigned to him or her by the internal regulations and provisions of the Guatemalan Migration Institute, in addition to the following:

a) Manage and coordinate the drafting, design, implementation, and evaluation of modernization and institutional strengthening projects aimed at improving efficiency and efficacy, which shall be submitted to the General Director for approval.
b) Act as the central coordinator with immigration division directors with regard to administrative procedures governed by this Code and its regulations.
c) Represent the Guatemalan Migration Institute before national authorities or international entities when requested by the General Director.
d) Manage the immigration professionalization studies unit, in line with the provisions issued by the General Director and in coordination with the corresponding internal units.

DHSFF0060

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

e)  Integrate the Service and Protection Council and implement the provisions adopted by that Council, in coordination with immigration divisions and in line with the General Director.

f)  Other duties as assigned by the General Director of the Guatemalan Migration Institute.

## Chapter IV
## Divisions

**Article 136. Divisions.** The Divisions shall be structured and organized based on efficiency and efficacy criteria, in line with the competencies, duties, and attributes assigned by this Code and internal regulation of the Guatemalan Migration Institute.

The duties assigned to the divisions may be delegated to units established by the Guatemalan Migration Institute in regions or departments of the Republic for the purpose of carrying out its work.

**Article 137. Division authority and hierarchy.** The divisions shall be managed by a Division Director, who is the highest authority within each division.

He or she is responsible for compliance with the duties and attributes assigned to the respective divisions, pursuant to this Code, regulations, and provisions issued by the General Director and national legislation.

**Article 138. Nominations.** The division directors are nominated by the General Director, in line with the qualities and requirements established by regulation.

However, nominees shall be professional university graduates, active members of professional associations, at least 30 years of age, with greater merit given to candidates with government career experience in immigration.

**Article 139. Division organic structure.** The Guatemalan Migration Institute is headed by the General Director, a position which may be carried out by the Deputy Director, in line with the provisions of this Code. However, the following organic division structure is in place in order to ensure efficient and effective operations of the attributes assigned to the Institute:

**a)  Substantive and Operational Structure**

a)  Division of Migrant Services and Protection of Fundamental Rights.

b)  Alien Division.

c)  Immigration Control Division.

d)  Division of Personal Identification and Travel Documents.

e)  Immigration Policy Division.

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

    **b) Technical Support Structure**

**a)** Planning Division.
**b)** Legal Affairs Division.
**c)** Professional Responsibility Division.
**d)** International Immigration Relations Division.
**e)** User Services Division.

    **c) Administrative Structure**

a) Financial Affairs Division.
b) Human Resources and Staff Professionalization Division.
c) Administrative and Logistical Support Division.
d) Technological, Communications, and IT Resources Division.

**Article 140. Definition of administrative and operational structures.** The administrative and operational structure of the Guatemalan Migration Institute is comprised of five divisions, which are defined as follows:

  **a) Division of Migrant Services and Protection of Fundamental Rights.** This division is responsible for the following:

    a.1 Taking necessary steps to serve and protect migrants by the State of Guatemala, particularly unaccompanied children and adolescents, families, and pregnant female migrants.

    a.2. Assist applicants for recognition of refugee status, refugees, applicants for political asylum under territorial or diplomatic asylum, political asylum recipients under territorial or diplomatic asylum, and those holding extraordinary immigration status governed by this Code.

    a.3. Support procedures for providing temporary care and shelter, family communication and contact, and requests by foreign citizens to be returned to their country of origin or provenance.

    a.4. Provide, regulate, and authorize the operations, features, and conditions of dignity, security, trustworthiness, and supervision of special homes for protection, shelter, and care for foreign migrants, as well as returned Guatemalan citizens.

  **b) Alien Division:** This division is responsible for issuing, registering, and monitoring visas and residence permits, after verifying the veracity and validity of information

and documents required in line with the categories defined in this Code and regulation provisions. The Alien Division is also responsible for the following:

b.1.   During the process of evaluating, analyzing, and approving visa and residence applications and renewals, collecting biographical and biometric information on applicants, to be verified using public security databases.
In the case of visa applications from persons in whose country Guatemala does not have consular representation, biographical and biometric information shall be verified upon the person's appearance at an immigration checkpoint in Guatemala.
Requirements for obtaining visas and residence are laid out in the regulations of this Code.

b.2.   Inform foreign residents in Guatemala of the expiration of residence permits granted, as well as managing any changes to the foreigners' registry.

b.3.   Propose immigration regularization plans to the General Director as needed.

The Alien Division shall have an immigration verification field unit. Staff at this unit shall be periodically evaluated via reliability testing.

c)   **Immigration Control Division:** This division is responsible for controlling and registering the entry and exit of foreign citizens and nationals in Guatemalan territory, pursuant to the provisions of this Code and national legislation in force, via national border checkpoints in air, land, and maritime routes. For foreign citizens, this involves ensuring compliance with legal provisions with regard to their entry, exit, stay, and activities in Guatemala, with the exception of border checkpoints between countries with which Guatemala has signed or subscribed to free movement treaties or conventions. Through its verification field unit, this division is responsible for verifying the immigration situation of persons who hold immigration status in line with the categories set out in this Code and its regulation, throughout Guatemalan territory.

Immigration control at entry and exit border checkpoints shall collect biographical and biometric information on checkpoint users, with the exception of land border checkpoints, which are governed by free movement conventions.

The Immigration Control Division shall also have a verification field unit, to ensure that all individual persons or legal entities providing transportation services submit Advanced Passenger Information data (API). The field unit is also responsible for verifying information contained in APIs. Transporters which fail to submit this

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

information shall be subject to any corresponding penalties, which are governed by the regulation of this Code.

Field unit staff shall be evaluated periodically, through reliability tests, and in their duties continuously assist the National Civil Police agency responsible for citizens' security in ports, airports, and air, land, and maritime border checkpoints.

d) **Division of Personal Identification and Travel Documents:** This division is responsible for establishing the processes and systems necessary to safely, efficiently, diligently, and consistently issue identification and travel documents for Guatemalan and foreign citizens, as stipulated in this Code, as well as persons holding extraordinary and special immigration status.

d) **Immigration Policy Division:** Increasing migration and the challenges it presents require generating and systematizing statistics in order to measure migration flows originating in, with destination to, transiting through, and returning to Guatemalan territory.
In line with its attributes, the Immigration Policy Division of the Guatemalan Migration Institute shall produce information, with collaboration from institutions it considers pertinent, with regard to migration flow trends, scope, and features, based on administrative registries generated at various entry points, immigration checkpoints, Guatemalan Migration Institute offices, or any other relevant source.

The Division shall also drive ongoing immigration surveys at borders, in order to contribute to creating immigration policies with greater social awareness of the migration phenomenon.

The General Director of the Institute and each of its division directors shall jointly be responsible for the integrity and safeguard of the respective databases.

**Article 141. Technical support structure.** The technical support structure is comprised of five divisions, which are defined as follows:

a) **Planning Division:** This division is responsible for coordinating the planning, programming, and evaluation process for annual and strategic plans, in order to ensure implementation of the national immigration policy and allocated budget.

b) **Legal Affairs Division:** This division is responsible for knowing decisions in cases involving applications for asylum, refugee status, and extraordinary immigration status, and making suggestions to the General Director regarding those decisions. This division shall also provide ongoing support to the entire organic structure of the Guatemalan Migration Institute.

c) **Professional Responsibility Division:** This division is responsible for due diligence upon receiving complaints against employees and officials, investigating them, and

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

determining whether disciplinary administrative procedures need to be opened. Should it be determined that crimes have been committed, the division shall inform the General Director in order to file a report with the Public Ministry.

**d)   International Immigration Relations Division:** This division is responsible for coordinating with the Guatemalan National Migrant Services Council in advising other divisions on immigration-related matters in international relations, in order to serve the rights of Guatemalan citizens abroad.

**e)   User Services Division:** This division is responsible for monitoring and registering all applications filed with the Guatemalan Migration Institute and its divisions, with the aim of centralizing the system for receiving applications, documentation, and notification of resolutions. This division shall receive, collect, manage, classify, and distribute applications and forms accordingly. It is also responsible for providing users with information, legal requirements, processing times, and anything else related with immigration procedures. The User Services Division shall also institute the public information access office pursuant to national legislation.

**Article 142. Administrative structure.** The administrative structure is comprised of four divisions, identified as follows:

**a)   Financial Affairs Division:** This division is responsible for managing financial resources, in line with the principles of transparency, efficiency, effectiveness, and optimal administration, as well as budgetary and accounting operations. It is responsible for coordinating budget execution and annual planning supervision with the Planning Division.

**b)   Human Resources and Staff Professionalization Division:** This division is responsible for executing human resources policy, pursuant to the guidelines of the General Director, and managing human resources at the Guatemalan Migration Institute, in line with the objectives of achieving full enjoyment of labor rights, staff integration, and professional development through a career aimed at service in institutional development.

**c)   Administrative and Logistics Support Division:** This division is responsible for providing the General Director, Deputy Director, divisions, departments, units, immigration centers, and any other institutional entities with support in order to ensure they have the equipment, goods, supplies, and services they need, as well as coordinating logistics processes in order for them to comply with their mandates.

**d)   Technological, Communications, and IT Resources Division:** This division is responsible for managing all matters related to databases, networks, IT equipment, telecommunications, and IT systems necessary for the appropriate, modern, and optimal operation of the Guatemalan Migration Institute's automated systems and components.

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

The databases shall be uniform and standardized in order for internal consultations to be shared with national security institutions, with the exception of sensitive information as established by law.

**Article 143. Extension, creation, modification, and merging.** The General Director may extend, create, modify, or merge the number of divisions, based on the needs of the Institute, however, the extension, creation, modification, and merging of these structures must be justified and authorized by the National Immigration Authority.

Regulation of such shall not require amendments to this Code, but rather shall be carried out via specific regulations to be issued.

**Article 144. Internal Audit Division.** The Internal Audit Division is responsible for carrying out objective and systematic studies of financial, administrative, technical, and operational operations of all agencies of the Guatemalan Migration Institute, with the aim of evaluating procedures, internal controls, and registries, as well as to endure compliance with laws, regulations, standards, and manuals governing the Institute, and suggest measures for preventive and corrective steps in order to optimize the use of resources.

**Chapter V**
**Advisory Bodies of the Institute General Directorate**

**Article 145. Advisory bodies.** The Guatemalan Migration Institute has advisory bodies named as departments, which are:
- **a)** Social Communication;
- **b)** Immigration Policies and Studies; and
- **c)** Statistics and Archives.

**Article 146. Naming and department authority.** The departments are to be managed by leadership named by the General Directorate, to be the maximum authority within each department.

**Article 147. Function.** The heads of the advisory bodies have the special task of advising the General Director, the Deputy Directory, and organic structures defined by this Code.

They shall be structured and organized in the interest of efficiency and effectiveness, in line with their competencies, functions, and attributes assigned by internal regulation of the Guatemalan Migration Institute.

**Article 148. Extension.** The General Director may extend the number of departments based on the Institute's needs, however, the creation of such a structure must be justified, and shall be authorized by the National Immigration Authority.

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

Legal regulation of such a structure does not require amending this Code, but shall be carried out via specific regulation to be issued.

## Chapter VI
## Immigration career path

**Article 149. Immigration career path.** A career in immigration is a profession recognized by the State, to include the processes of selection, education, training, professionalization, evaluation, promotion, suspension, and dismissal, through which immigration administration ensures its staff is duly qualified, with a dedication to service and ethical performance of their duties.

For the purposes of creating and strengthening an immigration career path and profession, the Guatemalan Migration Institute shall promote the creation of university studies programs in immigration at Guatemalan universities, or institutions in general.

All new or promoted staff at the Guatemalan Migration Institute shall be subject to periodic reliability tests governed by the regulations in this Code, prior to beginning employment or their contract.

**Article 150. Manual.** Staff shall abide by a manual classifying positions and salaries, which shall lay out conditions for promotions, transfers, and dismissal, considering qualifications on merit and ongoing performance evaluations.

Additionally, the manual shall contain, at a minimum, the denomination, specializations, functions, responsibilities, and requirements of each position, its hierarchy, and corresponding salary.

**Article 151. Opposition.** An opposition system shall be established for promotions and nominations to positions, to be regulated as appropriate and developed in the specific manual.

**Article 152. Management.** The Deputy Director shall be responsible for approving and managing implementation of the professional career path plans presented by the Professionalization Studies Unit for immigration staff. The unit shall be ascribed to the Human Resources and Staff Professionalization Division.

## Chapter VII
## Inter-institutional relations

**Article 153. Relations with human rights bodies.** In the interest of effective compliance with its mandates, the Guatemalan Migration Institute may, at any time, enter into inter-institutional cooperation agreements, conventions, mechanisms, and projects with the Human Rights Ombudsman and the National Office for the Prevention of Torture and Other Cruel, Inhumane, and Degrading Treatment.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

**Article 154. Relations with the Migrants Commission of the Congress of the Republic.** The Guatemalan Migration Institute shall establish a relationship of close cooperation with the Migrants Commission of the Congress of the Republic, in order to maintain ongoing dialogue regarding the needs of migrants and necessary legislative measures.

During the second half of January of each year, the Guatemalan Migration Institute must also present an annual report on its work, in writing, to the Migrants Commission of the Congress of the Republic.

**Article 155. Relationships with international bodies.** The Guatemalan Migration Institute may develop relations of cooperation, assistance, and ongoing work with its counterparts.

At no time may the Guatemalan Migration Institute act as a representative of the State of Guatemala before international bodies in the area of international policy, and shall turn to the competent authorities to this end.

**Article 156. Relationships with other civil society entities.** The Guatemalan Migration Institute may develop relations of cooperation, assistance, and ongoing work with civil society entities, and may enter into agreements or conventions.

In no case may the Institute agree to the transfer of funds from the Guatemalan Migration Institute to nonprofit, for-profit, business, or commercial civil society organizations.

The functions of the Guatemalan Migration Institute may not be delegated.

**Article 157. Relations with other State agencies.** The Guatemalan Migration Institute shall maintain close relations with other decentralized or autonomous State agencies, with regard to their competencies, functions, and legal prerogatives.

**Chapter VIII**
**Guatemalan Migration Institute and the National Migrant Services Council of Guatemala**

**Article 158. Complementarity.** The Guatemalan Migration Institute shall maintain complementary relations with the National Migrant Services Council of Guatemala. Complementarity shall be understood as cooperation and integration of activities aimed at servicing and protecting Guatemalan citizens' human rights and individual guarantees abroad.

**Article 159. Mutual strengthening.** With the aim of not duplicating budgets and government activities, both institutions shall jointly review their strategic and annual plans, respect their specific functions, determine cooperation activities, and establishing areas where they must mutually strengthen each other.

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

**Article 160. Joint activities.** In addition to cooperation activities defined as a result of mutual strengthening and within national legislation, both institutions shall cooperate with the Ministry of Foreign Relations in:

1. Providing necessary assistance to Guatemalan citizens abroad in order to obtain official immigration and personal identification, or documents that legally must be managed by consulates.
2. Maintaining ongoing dialogue with authorities in foreign countries regarding the conditions, treatment, care, and health of Guatemalan citizens in immigration centers or during deportation or return processes.
3. Coordinate with shelters in order to provide shelter and temporary protection to Guatemalans requesting assistance returning to Guatemala.
4. Manage Guatemalan citizens' requests for assistance returning to Guatemala.

### Chapter IX
### Service and Protection Council

**Article 161. Service and Protection Council.** The Service and Protection Council is created as an entity of the National Immigration Authority, and responsible for the following activities:

1. Managing prevention and information campaigns on the risks of migration and the rights of migrants.
2. Creating awareness programs in the educational sector in order to address the issue of migration, particularly among children and adolescents.
3. Promoting reporting on human rights violations.
4. Creating health awareness campaigns for deportees or returnees.
5. Serving the families of migrants presumed disappeared during migration, and creating contact mechanisms with foreign authorities.
6. Carrying out any activities necessary to prevent migration risks, service for deportees or returnees, search relief, and family member identification.

The Director of the Guatemalan Migration Institute, via the Service and Protection Council, and in coordination with the National Migrant Service Council of Guatemala, may build links to coordinate and manage with associations of returnees and migrants, both abroad and in Guatemala, and coordinating mechanisms on harnessing and investing remittances. Other activities include promoting and participating in private initiatives, communities, local cooperatives, and nonprofit civil associations, for the purpose of creating employability and productivity programs for returnees, family members, and migrant communities. The Director may always urge these activities to prioritize communities, municipalities, and departments with higher rates of underdevelopment and migration.

**Article 162. Composition.** The Service and Protection Council shall be comprised of the following institutions:

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

1. The General Director of the Guatemalan Migration Institute, who presides the Council.
2. The Executive Secretary of the National Migrant Service Council of Guatemala.
3. A Vice Minister of the Ministry of Education.
4. A Vice Minister from the Ministry of Public Health and Social Services.
5. A Vice Minister of the Ministry of Labor and Social Welfare.
6. A Vice Minister of the Ministry of the Interior.
7. A Vice Minister of the Ministry of Foreign Relations.
8. A Vice Minister of the Ministry of Economy.
9. A Vice Minister of the Ministry of Social Development.
10. A Representative delegated by the Solicitor General of the Nation.
11. The Director of the Division of Protection and Fostering of Childhood and Adolescence, under the Presidential Secretariat for Social Welfare.
12. The Representative delegated by the Human Rights Ombudsman.

In order to comply with its mandate, the Service and Protection Council may invite state entities or international bodies it deems relevant based on their specialties to regular or special meetings, in order to identify plans or specific programs.

**Article 163. Integration.** During the first six months of this Code's entry into force, the Service and Protection Council shall meet in order to establish a working agenda allowing it to have, within a year, meeting as often as necessary, a definition of procedures to follow for cases described in the activities with which it has been tasked by this Code.

A definition of those proceedings shall be presented to the National Immigration Authority for validation and integration in the National Immigration Policy.

**Article 164. Regular and special sessions.** Once it has determined its procedures to be followed, the Service and Protection Council shall hold regular meetings once every six months, and special meetings as often as necessary.

**Article 165. Distribution of responsibilities.** The General Director shall be responsible for coordinating and implementing the procedures, with the support of state institutions comprising the Council, in order to establish responsibilities as part of that definition, in line with the exclusive scope of each institution.

## Chapter X
## Security at immigration checkpoints

**Article 166. Security.** Security at immigration checkpoints shall always be aimed at ensuring the protection of persons and their rights.

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

When the National Civil Police must intervene, they shall always seek to have a minimal impact on individual persons, and establish mechanisms for the proportional and necessary use of force and weapons, in line with special procedures.

The Director of the Guatemalan Migration Institute shall encourage the Ministry of the Interior to ensure that the National Civil Police includes special training on serving the human rights of migrants in its curriculum, along with components of international human rights and humanitarian law. It shall also encourage the designation of National Civil Police officers and agents for security at immigration centers and checkpoints, who display the highest human qualities, and engage in continuing education on provisions aimed at guaranteeing the provisions of Article 167 of this Code.

**Article 167. Coordination.** The Guatemalan Migration Institute shall coordinate immigration checkpoint security activities with the Ministry of the Interior. These activities shall be aimed at:

a) Ensuring the security of persons at immigration checkpoints, so that they are not victims of acts of violence against their integrity or property.
b) Establishing mechanisms for detaining persons who attempt to leave the country and are subject to an arrest warrant.
c) Establishing mechanisms for arresting persons in flagrante.
d) Competencies in cases of a disruption of public order at immigration checkpoints.
e) Any activity necessary to safeguard the security of persons.

**Article 168. Detention.** The National Civil Police is the authority authorized to detain persons. In such cases, the immigration checkpoint employee or officer shall immediately alert the National Civil Police in order for this procedure to be conducted according to protocol.

Detained persons may not be deprived of their liberty inside immigration checkpoints.

**Part II**
**Procedures**

**Chapter I**
**Procedures for the protection of unaccompanied children and adolescents and those separated from their families**

**Article 169. Unaccompanied child migrants and those who have been separated from their families.** Unaccompanied child migrants and those separated from their families are defined as children and adolescents who are separated from their mother, father, or both parents, or from other relatives, and are not under the care of an adult who, by law or custom, assumes that responsibility.

**Article 170. Principles.** The procedure for serving and protecting unaccompanied children and adolescents is governed by the following principles:

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

a) **The child's best interest.** Decisions shall guarantee strict compliance with this principle. Authorities are required to determine the best interest of the child or adolescent, which requires a clear and substantial assessment of the migrant child's identity, particularly his or her nationality, parents, and ethnic, cultural, and linguistic background, as well as any vulnerabilities and special protection needs. In cases in which it is impossible to establish whether the child is a minor or his or her age, or there is reasonable doubt as to his or her age or the veracity of his or her documents, he or she shall be presumed to be a minor.

b) **Non-discrimination.** Unaccompanied children and adolescents or those who have been separated from their families shall not be discriminated against for being unaccompanied or separated from their families, refugee status, or status as an applicant for refugee status or political asylum, or immigration status, nationality, belonging to an ethnic group, or sexual status. This principle includes differentiated treatment based on protection needs, such as those associated with age, sexual diversity, and gender.

c) **Family unit and the right to family reunification.** Authorities shall take all measures to ensure that unaccompanied children or adolescents or those who have been separated from their families are reunited with their mother or father, both parents, guardian, or whomever has custody of them, either in the receiving country, or country of origin or provenance, except when the best interest of the child requires prolonging that separation. In line with this principle, authorities shall favor not separating siblings or relatives.

d) **Communication and preservation of personal relationships and direct contact between children and parents.** Children and adolescents have a right to know the whereabouts of their relatives, particularly their mother, father, and siblings. This principle includes the right to locating one's mother, father, or family members and facilitating communication with them, whether in the country of origin or receiving country.

e) **Non-violence and dignified treatment.** The dignity of child and adolescent migrants shall be protected, particularly in the case of unaccompanied minors, and the authorities shall ensure that they are not subjected to conditions contrary to their personal integrity, such as torture, cruel, inhumane, or degrading treatment.

f) **Protection and security.** No administrative decision or decision by the authorities may put the security of children or adolescents at risk. To this end, authorities shall seek to protect minors using the various mechanisms considered appropriate, while coordinating with authorities in other States to ensure the dignified and safe repatriation of child and adolescent migrants. Places provided for minors' care and shelter shall be pleasant, safe, and friendly environments.

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

g) **Legality and due process.** Any decision taken on the status of children and adolescents, particularly those who are unaccompanied and separated, shall be done so with full respect for the right to defense and due process.

h) **Confidentiality of registries and protection of one's private life.** Authorities shall seek to not endanger sensitive information or information on the identity of children or adolescents, or their families. Dissemination of this information is restricted, except when sharing it is in the best interest of the child in order to find his or her family members or seek family reunification. Authorities shall maintain the confidentiality of unaccompanied children and adolescents, as well as that of their families. They shall ensure that the information collected and exchanged in order to protect the minor is not used for other purposes.

i) **Specialization of officers and staff responsible for immigration management, protection, repatriation, transfer, and family and social reunification of unaccompanied child migrants.** Professionals responsible for these procedures and serving children and adolescents shall have specialized training in the human rights of children and adolescents, allowing them to provide multidisciplinary service in the areas of psychology, social work, health, and legal matters.

j) **Principle of non-return when there is a risk to personal integrity.** No child or adolescent shall be transferred to another country if there is a risk that he or she may suffer serious human rights violations, particularly violations of the right to life, liberty, and physical integrity.

k) **Right to life, survival, and development.** Children and adolescents, particularly those who are unaccompanied or separated, shall be protected from violence and exploitation.

l) **Right to freely express one's opinion.** The desires and opinion of unaccompanied or separated children and adolescents shall be duly noted and taken into consideration. Following informed expression of such desires and opinions, they shall be provided with al information on their rights, existing services, means of communication, procedures to request refugee status or asylum, the location of their families, and the situation in their country of origin. With regard to guardianship, custody, housing, and legal representation, the opinions of the child or adolescent shall also be taken into account. The information mentioned above shall be provided in a fashion pursuant to the minor's maturity level and ability to understand. Given that participation depends on reliable communication, interpretation shall be provided in all phases of the procedure.

**Article 171. Child Protection Officers Unit.** The Guatemalan Migration Institute, via the Division of Migrant Services and Protection of Fundamental Rights, shall create a specialized unit for serving and protecting child migrants, which shall bring together teams of multidisciplinary

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

professionals in serving, assisting, protecting, and managing the rights of children and adolescents. Professionals from this unit shall be known as child protection officers.

The specialized child migrant service and protection unit shall work in close coordination with the Office of the Solicitor General of the Nation within the scope of its competence, as well as in agencies comprising the National Child and Adolescent Protective Services System.

**Article 172. Support and assistance at consulates.** Child protection officers working in Guatemalan territory may be commissioned to provide support and assistance at consulates when consulates make such a request.

At all times, they shall interact and coordinate in order to effectively protect Guatemalan children and adolescents abroad.

**Article 173. Unaccompanied and separated children and adolescents in Guatemala, outside the country of their nationality.** Pursuant to the provisions of this Code, foreign citizen children and adolescents who are unaccompanied or separated from their families have the right to service by specialized staff. The authorities shall plan on adopting special protection measures, adapted to reflect the situation of vulnerability in which the minor may find him or herself.

Generally speaking, unaccompanied children and adolescents, or those separated from their families, shall not be deprived of their liberty.
During the immigration process, the Office of the Presidential Secretariat for Social Welfare shall implement child or adolescent protection programs, with a priority on:

**a)** Housing with a relative in Guatemala, regardless of his or her immigration status, who is able to ensure the minor's care;
**b)** Temporary family placement; and
**c)** Other open-ended housing options, aimed at protecting children and families; these measures may be adopted in line with the administrative procedure to be carried out in the respective regulations. Exceptionally, and for a briefly as possible, the minor may be housed in a residential shelter.

Through an initial evaluation, should the Office of the Presidential Secretariat for Social Welfare identify foreign child or adolescent migrants likely to be recognized as refugees or receive asylum, any other international protective measure, or family reunification, the Office shall immediately inform the Guatemalan Migration Institute's Division of Migrant Services and Protection of Fundamental Rights in order to take steps toward adopting special protection.

The Division of Migrant Services and Protection of Fundamental Rights, through the specialized unit for child migrant protection and service, can and shall follow the following procedure:

**a)** Immediately inform the General Director of the case in order to grant temporary status, so as to protect the minor's fundamental rights and ensure that he or she is

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

not returned to his or her country of origin until his or her situation can be determined.

b) Take steps to identify and inform the minor of his or her rights, insuring that this is done so in his or her language, and in line with his or her age and maturity.

c) Communicate with the Solicitor General's Office with regard to cases requiring special protection measures for children and adolescents who will begin the procedure, pursuant to its regulations.

d) Maintain close contact with the Office of the Presidential Secretariat for Social Welfare and the Ministry of Foreign Relations through its consular network.

Throughout the procedure, contact or communication with family members shall be ensured, in line with the best interests of the child. If the child or adolescent requests assistance returning to his or her country of origin, the authorities shall ensure this does not run the risk of jeopardizing the minor's fundamental rights. In the case of family reunification, the Guatemalan Migration Institute shall ensure that the child or adolescent and his or her family have an immigration status facilitating immigration regularization in Guatemala.

Such situations and steps taken may be communicated to the Office of the United Nations High Commissioner for Refugees or other international bodies with a mandate aimed at service and protection.

**Article 174. Unaccompanied Guatemalan child and adolescent migrants.** It is in national interest to serve and protect the fundamental rights of Guatemalan child and adolescent migrants who are unaccompanied in foreign countries.

Consulates are the authorities responsible for taking necessary steps to serve and protect the fundamental rights of Guatemalan children and adolescents abroad.

Consuls may request support from child protection officers or the representative of the National Migrant Services Council of Guatemala.

Institutions comprising the Service and Protection Council shall design and manage databases on foreign child and adolescent migrants or unaccompanied nationals, whose data shall be reserved and used solely for the purpose of drafting immigration policies focused on protecting rights.

**Article 175. Receiving children or adolescents.** The Service and Protection Council, in defining its respective procedures, shall observe the following guidelines for receiving children or adolescents who have been repatriated, returned, or deported to Guatemala:

a) The Guatemalan Migration Institute's Division of Migrant Services and Protection of Fundamental Rights is responsible for receiving children and adolescents.

b) Institutions comprising the Service and Protection Council shall gradually participate in the process of receiving the minor.

DHSFF0075

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

c) At all times, a representative of the Office of the Solicitor General shall be present in order to monitor the family reunification process or judicial proceedings.

d) The child or adolescent received shall be sent immediately to temporary care and shelter.

e) A spokesperson from the Guatemalan Migration Institute may provide information and give details on the return of children or adolescents, but at no time may they be shown to the media during the reception of the minor, and the names and identities of the minors in question may not be shared.

f) The media may be informed after a time period during which it has been determined that such a mechanism may help locate family members.

g) Family reunification shall proceed once it has been determined that the minor's family, guardian, or custodian present no threats or human rights violations to the child.

h) The social services process shall establish a support program for social insertion, to provide follow-up on education, technical education, and professional insertion, in line with national legislation and other specific situations. The goal of these follow-up programs is to ensure that family reunification is permanent.

With the information shared by consuls or psychosocial support teams, the Guatemalan authorities shall ensure that special protection measures are adopted, and adapted to the situation of vulnerability in which the unaccompanied child or adolescent may find him or herself. For this purpose, the authorities may promote programs aimed at protecting children and families, as well as social protection programs, which it shall coordinate with other State and civil society institutions. During the investigation in the interest of family reunification, the child or adolescent may be placed in temporary housing, for as briefly as possible.

**Article 176. Legal protection process.** In line with the best interest of the child, if a threat or violation of the rights of the child or adolescent impedes family reunification, the Solicitor General shall initiate a legal protection process within the child and adolescent justice system.

### Chapter II
### Procedure for the protection and determination of Refugee Status in the State of Guatemala

**Article 177. Competent authority.** The National Immigration Authority shall be the competent authority to resolve all applications for refugee status.

The National Immigration Authority shall create the National Refugees Commission, to be comprised of a technical representative of the Ministries of Foreign Relations, Labor and Social Welfare, the Interior, and the Guatemalan Migration Institute.

The National Refugees Commission shall act as an advisory body, and its main functions shall be studying the foundation of refugee status applications, issuing recommendations, opinions, and suggestions.

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

The Office of the United Nations High Commissioner for Refugees or its representative, in line with its mandate and functions, may participate as an advisor as part of the Commission.

**Article 178. Application.** The application for refugee status may be submitted in writing or verbally to the Guatemalan Migration Institute, or in Guatemala's immigration border checkpoints, in line with the provisions in the regulation of this Code.

**Article 179. Special application.** Foreign citizens legally present in Guatemalan territory may also apply for recognition of refugee status at the Guatemalan Migration Institute, when motivating causes subsequently occur in their country of origin.

**Article 180. Legal representation and interpreter.** The right of applicants for refugee status to be provided with legal assistance and an interpreter or translator at all phases of the procedure for determining whether refugee status shall be recognized.

**Article 181. Confidentiality.** The confidentiality of the application, documentation, and personal information of persons applying for recognition of refugee status shall be recognized, in order to avoid any risk of life, integrity, liberty, or any other rights of the applicant.

**Article 182. Resources.** Applicants for recognition of refugee status may file an appeal with the National Immigration Authority of any negative decisions on their application, within 10 days of notification of that decision. In such cases, the National Immigration Authority shall issue a permanent decision within no more than five days.

**Article 183. Final refusal.** Upon issuing a final decision rejecting an application for recognition of refugee status, the Office of the United Nations High Commissioner for Refugees may, if it considers it in line with its mandate, request that the applicant be granted a reasonable period of time in Guatemalan territory in order to obtain admission in another country.

In all such cases, the time period shall be agreed upon by the National Immigration Authority, and communicated to the Office of the United Nations High Commissioner for Refugees and the Guatemalan Migration Institute.

**Article 184. Cessation of refugee status.** The National Immigration Authority shall declare the cessation of refugee status if the person in question is found to be in any of the following situations:

    a)  He or she voluntarily renounces his or her refugee status;
    b)  If he or she has voluntarily turned to the protection of the country of his or her nationality;
    c)  If, having lost his or her nationality, he or she voluntarily recovers it;
    d)  If he or she has acquired a new nationality or new refugee status and has protection from the country his or her new nationality or new refugee status;

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

**e)** If he or she has voluntarily moved back to the country which he or she had abandoned, or outside of which he or she had remained due to fear of persecution; and

**f)** If the circumstances on which the decision to recognize refugee status was based have ended, he or she cannot continue to refuse to turn to the protection of the country of his or her nationality.

In the case of f) of this article, the National Refugees Commission, prior to issuing its decision, shall schedule a hearing for the interested party to take place in 10 days' time, in order for him or her to exercise his or her right to defense in evaluating the preponderance of arguments in favor of continuing to receive international protection as a refugee. With or without a response, the Commission shall resolve whether or not to issue a cessation of refugee status, and this decision shall be considered final. The State shall have the burden of proof to demonstrate that there is a valid cause for cessation of refugee status.

The National Immigration Authority shall have the faculty to resolve situations or cases not outlined in this article, with regard to cessation of refugee status.

**Article 185. Residency option.** A person in line d) of Article 78 of this Code may apply for permanent residence, pursuant to the provisions established to that effect.

Obtaining temporary or permanent residence, or international protection to which a person may be subject shall not be grounds for losing refugee status.

**Article 186. Streamlining procedures.** In very special circumstances, such as children or adolescents who are victims of sexual violence, among others, the National Refugees Commission may take administrative steps in order to streamline the process for issuing a resolution granting refugee status.

**Article 187. Regulation.** Corresponding regulation governing procedures regarding refugee status shall be issued.

### Chapter III
### General criteria for regularization procedures for foreign citizens

**Article 188. General procedures.** The regularization process shall begin with the submission of an application to the Guatemalan Migration Institute, with the exception of the provisions in Articles 181 and 182 of this Code, in line with requirements, and including documents established in each case.

**Article 189. Time periods.** The regularization procedure shall conclude within 90 days following the submission of an application.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

If procedures are already in place, the Guatemalan Migration Institute shall set a time limit of 30 days in order to rectify the applications, within the 90 regular-day period. This step may be extended by 30 days.

**Article 190. Appeals.** Applicants may file an appeal of decisions issued in this matter, as outlined in Article 182 of this Code.

**Article 191. Regulation.** When a regularization plan is issued pursuant to the provisions of this code, specific regulation shall be issued, in line with the special provisions governing each specific case for which the plan has been issued.

## Chapter IV
## Migrant offenses and penalties

**Article 192. Penalization.** The Guatemalan Migration Institute has the power to impose penalties pursuant to the regulations of this chapter and exclusively within its scope of competence.

**Article 193. Offenses.** The following shall be considered as administrative offenses that may be committed by foreign citizens:

a) Failure to present one's international travel identification document to the Guatemalan authorities. The principle of non-penalization shall be observed with regard to applicants for recognition of refugee status or political asylum who are not carrying personal identification documents.
b) Remaining in Guatemala for longer than authorized, without a pending extension application.
c) Failure to inform the authorities of changes to one's address or domicile, as appropriate.
d) In the case of temporary residents, failure to present a certificate of tax solvency to the Guatemalan Migration Institute.
e) Being caught conducting commercial activities without proper authorization, pursuant to national legislation.
f) Entering Guatemala via unauthorized checkpoints or locations, or having no proof of legal entry.

**Article 194. Penalties.** The offenses listed are subject to the following financial penalties:

a) For failure to present one's international identification and travel document, a fine of 200 quetzals.
b) For remaining in Guatemala longer than authorized, without a pending application for extension, a fine of 15 quetzals per day.
c) For failure to present a certificate of tax solvency, a fine of 2,000 quetzals.

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

d)  For being found to have conducted commercial activities without proper authorization, a fine of 5,000 quetzals and cease and desist order.

All fines may be paid in United States dollars, using the current valid exchange rate on the day of payment, as calculated by the Bank of Guatemala.

**Article 195. Penalty of immediate removal from Guatemala.** Should foreign citizens fail to comply with the obligations identified in this Code, in addition to financial penalties, they may be required to leave Guatemala within a period of no more than 10 days.

This administrative penalty shall be imposed by the Guatemalan Migration Institute, via its competent body.

**Article 196. Appeals.** Persons subject to penalty shall have the right to appeal the decision pursuant to Article 182 of this Code.

**Article 197. Independent procedure.** Administrative penalties here are distinct from the administrative penalties imposed by the Tax Administration Superintendence.

Administrative penalties are also distinct from criminal penalties imposed for crimes committed, and resulting from a criminal proceeding established in Guatemalan legislation, by the corresponding authorities.

## Chapter V
### Procedure for serving families reported disappeared due to migration

**Article 198. Report of disappearance.** Any family members or individuals in general who do not know the whereabouts or destination of a person who is known to have migrated to another country, either regularly or irregularly, has the right to report this person as missing.

**Article 199. Institutional service.** The missing person's report shall be filed with the Guatemalan Migration Institute, which shall share it with the Service and Protection Council, in order for appropriate steps to be taken, in line with the procedures that the Council has determined for this purpose.

**Article 200. Search mechanism.** The Service and Protection Council shall establish a procedure to facilitate contact and information exchange with the authorities in countries where it is presumed that the person may be, either in transit or as the country of destination.

This procedure shall be established in order to obtain information on deceased persons who have been buried unidentified in those countries, persons deprived of liberty, and persons who may be at healthcare centers, hospitals, morgues, or other places in transit or receiving countries, for the purpose of providing migrants with care and shelter. This function shall be coordinated via Guatemala's consular missions.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

Guatemala's consular mission shall request the support of local authorities in the countries where the disappearance of Guatemalan citizens was reported, in order to begin search mechanisms in order to locate the Guatemalan citizen who was reported missing.  The mission shall request information on places where criminal entities dedicated to sexual exploitation and trafficking in persons are known to operate, in order to investigate the possibility of finding Guatemalan citizens who have been victims of those or related crimes.

**Article 201. Facilitating transfers.** Should a person reported as missing be found, the Service and Protection Council may support a blood relative, preferably the mother, father, or sibling, in order to visit the country where the person reported missing has been located.

In these cases, authorities shall provide the logistic, legal, and social work support necessary for the situation that the family member will encounter, in coordination with other agencies.

**Article 202. Repatriation of remains.** The Ministry of Foreign Relations is responsible for ensuring appropriate repatriation of persons who, after being reported disappeared or missing, were found deceased in the territory of another State.

 **Article 203. Foreign migrants assumed to be disappeared in Guatemalan territory.** The Service and Protection Council shall coordinate with the Public Ministry, National Civil Police, Penitentiary System, National Institute of Forensic Sciences, and the Ministry of Public Health and Social Services with regard to public hospitals and cemetery management, in order to avail them with the mechanisms to search for, identify, and locate foreign citizens reported as missing in Guatemalan territory.

These institutions shall have a database allowing for real time information exchange in line with international standards for the identification of persons reported missing.

In the case of unidentified deceased persons, the National Institute of Forensic Science and the Ministry of Public Health and Social Assistance shall coordinate the adaptation of unified registries in order to have precise information on the location where the person has been buried at various cemeteries, as well as ante mortem and post mortem information obtained during the forensic process.

**Article 204. Prohibition of cremation.** The authorities have prohibited authorization of cremation of the bodies of foreign migrants in order for them to be repatriated to their country of origin.

Guatemalan authorities have prohibited authorization of cremation of the bodies of Guatemalan citizens who died abroad prior to their repatriation to Guatemala.

**Article 205. Constitutional relief and habeas corpus.** Any person, whether a Guatemalan citizen or not, may file for constitutional relief or a writ of habeas corpus on behalf of foreign migrants, in order to restore the migrant's rights or cease violations of those rights, in order for

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

the migrant to be presented by the authorities, should he or she be in their facilities or under their guard, shelter, care, or custody.

**Article 206. Facilitating search mechanisms.** The Service and Protection Council may promote free access to State agencies at various State authorities for the family members of foreign migrants who have been reported missing in Guatemalan territory.

Additionally, access to sources of information shall be managed on a case by case basis.

**Article 207. Search for unaccompanied child or adolescent migrants reported missing.** The Service and Protection Council shall support the Solicitor General in the national and international search for, location, and safeguard of unaccompanied child or adolescent migrants, or those who have been separated from their families and have gone missing.

The Alba-Keneth Alert System Law [Ley del Sistema de Alerta Alba-Keneth] shall apply as appropriate.

**Part III**
**Means of transport**

**Chapter I**
**Criteria and general regulation**

**Article 208. Supervision.** Upon entry and exit, all means of international transport, whether via air, sea, or land, shall be scrutinized for immigration control of passengers, crew members, or staff. The Guatemalan Migration Institute shall determine where this verification takes place. The entry of passengers, crew members, or staff shall be contingent on compliance with documentation as established in Guatemalan legislation.

**Article 209. Service and protection.** Employees of the Guatemalan Migration Institute shall determine whether or not they need to provide service and protection to persons requiring medical attention or any other emergency service during the immigration verification process.

**Article 210. Private cooperation.** Private entities or private transportation companies, whether maritime, air, or land, shall cooperate with the immigration control procedure, ensuring that their passengers' and crew members' documentation are in compliance. Corresponding provisions shall be issued to that effect.

**Article 211. Prohibition.** Aircraft, vessels, and land vehicles may not leave Guatemala before their passengers, crew members, and staff have undergone an immigration control procedure.

Failure to comply with this standard shall lead to the penalty of a fine equivalent to ten thousand United States dollars (US$10,000.00).

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

**Article 212. Joint responsibility.** The owner, captain, commander, supervisor, or officer of any international means of transport, and companies, entities or agencies, representative, operators, or co-signing parties of international means of transport are jointly responsible for the transfer, care, and custody of passengers, crew members, and staff, until their admission into Guatemala, pursuant to the conditions set forth by this Code, its regulation, and other immigration-related provisions.

**Article 213. Obligations.** In addition to the corresponding transfer, companies, entities or agencies, representatives, operators, or co-signing parties of international means of transport shall all jointly bear any financial penalties resulting from the competent authorities rejecting passengers or crew members who do not fulfill entry and stay requirements established by this Code and its regulations. This includes any expenses incurred when foreign citizens must remain in Guatemala solely for the time necessary for denial of entry into Guatemala.

Failure to comply with this provision shall be subject to the penalty of a fine equivalent to ten thousand United States dollars (US$10,000.00).

**Article 214. Immigration checkpoint.** Within border, port, and airport facilities, immigration checkpoints shall be installed for the purpose of conducting immigration verification.

**Article 215. Transportation employees.** The Guatemalan Migration Institute shall govern the obligations and other provisions to be fulfilled with regard to documentation and immigration verifications for international transportation employees.

**Chapter II**
**Authorizations**

**Article 216. Manifests.** The port captain, General Direction of Civil Aviation, and General Direction of Transportation may not authorize the entry or exit of vessels, ships, aircraft, and land vehicles into Guatemalan territory if they do not comply with the shipping provisions with regard to passenger, staff, and crew manifests.

**Article 217. Passengers in transit.** Passengers in transit are considered tourists or travelers.

**Volume III**
**Final, transitory, and repealed provisions**

**Part I**
**Final provisions**

**Article 218. Guatemalan migrant workers and recruiters.** Guatemalan migrant workers may access temporary worker programs abroad, either individually or through legal recruitment entities, which have been previously authorized and duly registered by the Ministry of Labor and Social Welfare of Guatemala, with collaboration from the Ministry of Foreign Relations.

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

To this end, in addition to the provisions of Article 34 of the Labor Code, recruitment agencies or individual recruiters shall specify in the respective forms approved by the Ministry of Labor and Social welfare, which public or private entities require services abroad, as well as the class, category, and type of work to be completed.

**Article 219. Assistance and services for Guatemalan migrant workers.** The Ministry of Labor and Social Welfare shall create a system for coordinating with the Ministry of Foreign Relations in order to provide Guatemalan migrant workers abroad with assistance and services.

The Ministry of Foreign Relations shall promote diplomatic relations with the receiving country in order to verify the respect of labor rights and the conditions of the specific contracts.

**Chapter II**
**Transition and labor rights**

**Article 220. Non-impingement on labor rights.** The transition process from the General Direction of Migration under the Ministry of the Interior, to the Guatemalan Migration Institute as a decentralized agency with exclusive competence, shall not affect existing labor contracts to the workers' detriment.

The Ministry of Labor and Social Welfare, via its corresponding agency, shall be responsible for ensuring that workers' rights are not mischaracterized, reduced, or violated during the transition process.

**Article 221. Unions.** The unions of the General Direction of Migration shall not be undermined in their capacities as legal persons during the transition process to the Guatemalan Migration Institute.

**Article 222. Collective agreement.** The Collective Labor Agreement signed between the General Direction of Migration Workers' Union and the General Direction of Migration remains in force in light of the creation of the Guatemalan Migration Institute.

**Article 223. Career path.** All public employees of the General Direction of Migration shall join the professional career development system during the transition process, with a view of consolidating the administrative management of the Guatemalan Migration Institute's functions.

Any labor proceedings between the General Direction of Migration and any public employee or officer in progress before the legal authorities shall continue their processes.

**Article 224. Full enjoyment of rights.** The rights to leave, vacation, prenatal and maternity leave, work days, remuneration, and other labor rights remain in force and shall continue as normal.

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

**Article 225. Pensioners.** Employees of the Guatemalan Migration Institute may continue contributing to the Guatemalan civil pension system, in line with the voluntary incorporation procedure established in the specific law.

## Chapter III
## Transitory provisions

**Article 226. Beginning activities.** The Guatemalan Migration Institute, created by this Code, shall begin its operations from the moment the President of the Republic names a General Director, in line with the provisions of this Code.

Upon beginning its operations, all competencies, rights, attributes, functions, representations, and delegations governed by laws, regulations, and other regulatory instruments in favor of or under the responsibility of the General Direction of Migration, shall be exercised by the Guatemalan Migration Institute, as shall all rights and obligations contained in national or international conventions, contracts, or other legal instruments.

Real estate and moveable property, equipment, and furniture, as well as other assets and liabilities of the General Direction of Migration shall be transferred to the institutional equity of the Guatemalan Migration Institute.

**Article 227. Following creation of the National Immigration Authority and naming of the Director of the Guatemalan Migration Institute.** The National Immigration Authority shall be formed within 60 days of the entry into force of this Code, in order to begin issuing regulations and the transition plan, to be issued within a period of six to 12 months.

The President of the Republic shall name the Director of the Guatemalan Migration Institute, once the transition plan presented by the National Immigration Authority has been approved.

The person acting as General Director of Immigration shall remain in his or her post until the transition plan has been presented and approved.

**Article 228. Gradual transition.** Once the transition plan presented by the National Immigration Authority to the President of the Republic has been approved, the President shall name the Director of the Guatemalan Migration Institute, in order for him or her to begin jointly implementing that plan with the National Immigration Authority, a representative from the Ministry of the Interior, and a Vice Minister from the Ministry of Public Finance, within a maximum period of two years.

During this process, the Ministry of the Interior shall abandon the functions it carried out, until the Guatemalan Migration Institute remains as a decentralized agency with exclusive competence.

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

**Article 229. Support from the Comptroller General's Office.** As part of its duties, the Comptroller General's Office shall support the transition process in order to ensure an effective transfer and management of public funds administrated by the former General Direction of Migration.

**Article 230. Files.** All files shall be technically transferred, in line with the archiving rules provided by the Central American Archives.

Prior to the transfer, standards shall be issued on assessing files, in order to:

1.      Determine which documents shall be transferred to Central American Archives due to its historic or cultural value.

2.      Determine which documents shall be kept at the Department of Statistics and Archives due to their administrative value and information on persons.

3.      Determine which documents shall be sent to national libraries, the Ministry of Education, or Universidad de San Carlos de Guatemala due to their academic value.

4.      Determine the procedure for preserving, handling, and storing any information that will remain in the corresponding migration archive.

5.      Establish a sequence for document review, issuing assessments, and digitalizing documents.

6.      Determining what material may be recycled.

It shall also be determined what technical aspects are necessary in order to correctly manage the information and later make it available to the public, pursuant to the Law on Access to Public Information [Ley de Accesso a la Información Pública].

**Article 231. Budget.** The Ministry of the Interior shall transfer funds allocated to the General Direction of Migration to the Guatemalan Migration Institute. Additionally, the General State Income and Expenditure Budget shall include an initial allocation in order to cover initial costs for establishment, organization, and operations.

The same General State Income and Expenditure Budget shall include specific line items for state institutions providing protection to returned Guatemalan migrants or foreign citizens requiring specialized protection based on violations of their rights.

**Article 232. Transfer of property.** All physical assets, furniture, and real estate of the General Direction of Migration which are necessary for operations shall be transferred to the Guatemalan Migration Institute. That transfer shall take place pursuant to the provisions of the

UNREVIEWED TRANSLATION – NOT FOR DISTRIBUTION

State Procurement Law [Ley de Contrataciones del Estado] and other applicable provisions. The Ministry of Public Finance shall grant its approval for this transfer.

**Article 233. Immigration checkpoints.** Immigration checkpoints established prior to the entry into force of this Code shall continue normal operations in line with their established functions.

**Article 234. Sole regularization plan.** 180 days following the entry into force of this Code, a time period of 180 days shall be granted for foreign migrants irregularly present in Guatemala to apply for immigration regularization.

**Article 235. Regularization of residents.** Documents granting persons temporary or permanent resident status shall remain in force. The General Director of the Institute shall convene the beginning of changes to status or in order to update status pursuant to the regulations of this Code.

**Article 236. Validity of applications, procedures, and documentation.** All applications, procedures, and documentation existing prior to the entry into force of this Code shall be resolved pursuant to Decree number 95-98 of the Congress of the Republic.

**Article 237. Strengthening the consular protection network.** In order to strengthen the network of consular protection and services for Guatemalan citizens abroad, the Ministry of Foreign Relations shall increase the number of consular representations, within a period of no more than five years, in cities abroad where a large number of Guatemalan migrants reside.

In order to fulfill the provisions of this article, the Ministry of Public Finance shall create the budget line items necessary within the State Income and Expenditure Budget each year, in order to allocate the necessary funds.

**Article 238. Regulation.** The general regulation and other regulations in this Code shall be approved during the first year following the creation of the National Immigration Authority.

## Chapter IV
## Amendments and repeals to National Legislation

**Article 239.** The first paragraph shall be amended, and lines j) and k) of Article 36 of the Executive Agency Law [Ley del Organismo Ejecutivo], Decree number 114-97 of the Congress of the Republic shall be repealed, to read as follows:

"**Article 36. Ministry of the Interior.** The Ministry of the Interior shall be responsible for drafting policies, complying, and enforcing the legal framework regarding maintaining public order, the security of persons and their property, guaranteeing of their rights, implementing court orders and legal resolutions, and endorsing the nominations of State Ministers, including whoever replaces him or her; to this end, the Ministry shall be responsible for the following functions:"

DHSFF0087

**Article 240.** Article 8 of Decree number 46-2007 of the Congress of the Republic, Law on the National Migrant Service Council of Guatemala [Ley del Consejo Nacional de Atención al Migrante de Guatemala] shall be amended, adding line g) with the following text:

> "g) a representative delegated by the General Director of the Guatemalan Migration Institute."

**Article 241.** The following from decree number 95-98 of the Congress of the Republic, Law on Migration [Ley de Migración] shall be repealed:

> **a)** Part I, Sole Chapter, and Articles 1 and 2.
> **b)** Part II, Chapters I and II, and Articles 3 to 11.
> **c)** Part III, Chapters I, II, III, IV, Sections One and Two and Chapter V and Articles 12 to 45.
> **d)** Part IV, Sole Chapter, and articles 46 to 48.
> **e)** Part V, Chapters I and II, Sections One through Four, and Articles 49 to 69.
> **f)** Part VI, Chapters I to III and Articles 70 to 86.
> **g)** Part VII, Chapters I to III and Articles 87 to 96.
> **h)** Part VIII, Sole Chapter, Articles 97 and 98.
> **i)** Part IX, Articles 99 to 102.
> **j)** Part X, Chapter II and Articles 109 to 115.
> **k)** Part XI and Article 116.
> **l)** Part XII, Articles 117 to 120.

**Article 242.** Governmental Agreement 383-2001, Regulation for the Protection and Determination of Refugee Status in the territory of the State of Guatemala [Reglamento para la Protección y Determinación del Estatuto de Refugiado en el territorio del Estado de Guatemala] is repealed.

**Article 243.** All legal and regulatory provisions in national legislation referring to the matters governed by this Code are repealed. Additionally, provisions in other regulatory bodies attributing functions or duties to the General Direction of Migration are hereby repealed, and understood to fall under the purview of the Guatemalan Migration Institute.

**Article 244.** Headings of the articles of this Code do not represent an official interpretation.

**Article 245. Special validity.** As the transition to the Guatemalan Migration Institute is completed, the provisions of numeral 2 of Article 61 and the last paragraph of Article 91 of this Code shall be functions under the aegis of the General Direction of Migration, entering into force on the day of its publication in the Official Legal Journal.

**Article 246. Validity.** This Decree was approved by a favorable vote by at least two-thirds of the total number of representatives in the Congress of the Republic, and shall enter into force 60

UNREVIEWED TRANSLATION – ~~NOT FOR DISTRIBUTION~~

days following its publication in the Official Legal Journal, with the exception of this article, which shall enter into force as of the day of its publication.

**TO BE SUBMITTED TO THE EXECUTIVE BRANCH FOR ITS RATIFICATION, ENACTMENT, AND PUBLICATION.**

**ISSUED AT THE PALACE OF THE LEGISLATIVE BRANCH, IN GUATEMALA CITY, THE TWENTIETH OF SEPTEMBER TWO-THOUSAND AND SIXTEEN.**

[signature]
**MARIO TARACENA DIAZ-SOL**
**PRESIDENT**

[stamp]: Congress of the Republic of Guatemala

[signature]
**LUIS ALBERTO CONTRERAS COLINDRES**
**SECRETARY**

[signature]
**OSCAR STUARDO CHINCHILLA GUZMAN**
**SECRETARY**

**NATIONAL IMMIGRATION AUTHORITY**
**-AMN-**
**ORDER No. 2-2019 OF THE NATIONAL IMMIGRATION AUTHORITY:**


**WHEREAS:**

The Constitution of the Republic of Guatemala establishes the general principle that, in the area of human rights, treaties and conventions accepted and ratified by Guatemala take precedence over domestic law.

**WHEREAS:**

The State of Guatemala is a party to the Convention relating to the Status of Refugees adopted in Geneva on July 28, 1951 and the Protocol relating to the Status of Refugees signed in New York on January 31, 1967; the American Convention on Human Rights of 1969; the Convention on the Rights of the Child of 1989; the Convention on the Elimination of All Forms of Discrimination against Women of 1979; the Inter-American Convention on the Prevention, Punishment and Eradication of Violence against Women (Convention of Belém do Pará), and the Cartagena Declaration of 1984.

**WHEREAS:**

Article 8 of the Immigration Code, Decree No. 44-2016 of the Congress of the Republic of Guatemala, establishes that although the Code does not include rights and guarantees granted by international conventions and treaties ratified by Guatemala, they are considered to be incorporated therein. Therefore, regulations on the procedure for the protection, determination, and recognition of refugee status must recognize and harmonize with the content of the aforementioned international instruments.

**THEREFORE:**

In the exercise of the functions conferred by Articles 43, 118(f), and 187 of the Immigration Code, Decree Number 44-2016 of the Congress of the Republic of Guatemala,

**IT ORDERS:**

The adoption of the following:

DHSFF0090

**REGULATIONS ON THE PROCEDURE FOR THE PROTECTION, DETERMINATION, AND RECOGNITION OF REFUGEE STATUS IN THE STATE OF GUATEMALA**

**TITLE I**

**SOLE CHAPTER**

**GENERAL PROVISIONS**

**Article 1. Purpose.** The purpose of these regulations is to define the Procedure for the Protection, Determination, and Recognition of Refugee Status in the State of Guatemala established in Article 43 of the Immigration Code.

**Article 2. Acronyms and definitions.** For the purpose of effective compliance with these Regulations, the following definitions will apply:

a. **AMN:** National Immigration Authority [*Autoridad Migratoria Nacional*];

b. **CONARE:** National Refugee Commission [*Comisión Nacional para Refugiados*];

c. **Institute:** Guatemalan Migration Institute [*Instituto Guatemalteco de Migración*];

d. **UNHCR:** United Nations High Commissioner for Refugees;

e. **Grounds:** The facts and events that give rise to the well-founded fear of persecution, which must constitute violations of fundamental human rights;

f. **Extension of Refugee Status:** Concept whereby the spouse and family members of an applicant for refugee status or a recognized refugee, to the degrees of kinship permitted by law, may be extended the right to apply for refugee status or be recognized as a refugee;

g. **Family reunification:** Principle whereby an unaccompanied or separated child or adolescent is to be reunited with his or her mother or father, or with both parents, or with a guardian or custodian;

h. **Cessation of refugee status:** Condition that arises when the refugee loses the international protection granted by the State of Guatemala due to his or her circumstances;

i. **Well-founded fear:** Those reasons and events that gave rise to persecution and which, because of their nature, repetition, or the cumulative actions of a third party, endanger or could endanger a person's life, safety, or freedom;

j. **Refugee status:** Extraordinary immigration status of a foreign national who, under the circumstances established in the Immigration Code, is recognized as a refugee by the National Immigration Authority;

k. **Applicant for refugee status:** A foreign national who formally applies to the National Immigration Authority for recognition of refugee status.

l.   **Country of origin:** The country of nationality or habitual residence of the applicant for recognition of refugee status.

**Article 3. Principles of Interpretation and Application.** The provisions of these Regulations will be interpreted and applied in accordance with the humanitarian and apolitical principles of nondiscrimination, confidentiality, and family reunification, in keeping with the rights and obligations established in the Constitution of the Republic of Guatemala applicable to refugees and the international arrangements to which the State of Guatemala is a party.

**Article 4. Refugee Profile.** The following persons may apply for refugee status:

a.   Any person who, owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is in the country and is unable, or owing to such fear, is unwilling to avail himself or herself of the protection of the country of his or her nationality;

b.   Persons who have fled their country because their lives, safety, or freedom have been threatened by generalized violence, foreign aggression, internal conflicts, massive violation of human rights or other circumstances which have seriously disturbed public order;

c.   Persons who suffer persecution through sexual violence or other forms of persecution based on gender or sexual orientation resulting from violations of human rights contained in international agreements to which the State of Guatemala is a party.

**Article 5. Exclusion.** Refugee status may not be granted to persons who fall within the grounds set forth in Article 47 of the Immigration Code.

The grounds for exclusion are individualized and do not affect family members. When the principal applicant is excluded from refugee status, he or she cannot invoke extension or family reunification.

**Article 6. Special Personal Identification Document.** Applicants for refugee status will be entitled to a Special Personal Identification Document, which will be issued by the competent authority. Persons recognized by the State of Guatemala as refugees will also have this document in accordance with the provisions of the Immigration Code.

**Article 7. Special Travel Document.** Persons with refugee status have the right to leave and return to the territory of Guatemala with a Special Travel Document issued for this purpose, in order to travel to any country except the country where the reasons for the application for refugee status arose; for this, they must have a Special Travel Document issued by the Division of Personal Identification and Travel Documents of the Institute. Refugees must request the proper authorization, and are advised that if they leave the country without it, they will lose their refugee status.

Each Special Travel Document will be valid for one departure and one entry.

**Article 8. Right to Work.** Under Articles 6, 48, 53, 84, and 101 of the Immigration Code, applicants for refugee status and persons granted refugee status are entitled to work in the country, with the proper authorization of the Ministry of Labor and Social Welfare.

**Article 9. Right to Education.** Under Articles 48, 53, 84, and 101 of the Immigration Code, applicants for refugee status are entitled to enroll in education programs and curricula at all levels, upon presentation of their Special Personal Identification Document, subject to compliance with the requirements established by the competent institutions.

**Article 10. Protection of Children and Adolescents.** Unaccompanied or separated migrant children and adolescents will enjoy, *inter alia*, the rights set forth in Article 11 of the Immigration Code.

In addition, they will not be turned away at the border, deported, or repatriated prior to an assessment of their international protection needs.


## TITLE II

## CHAPTER I

## THE NATIONAL IMMIGRATION AUTHORITY AND

## THE NATIONAL REFUGEE COMMISSION

**Article 11. Competent Authority.** Under Article 177 of the Immigration Code, the AMN will be competent to adjudicate all refugee status applications and declare the cessation of refugee status pursuant to Article 184 of the Immigration Code.

**Article 12. The Commission.** The National Refugee Commission, hereinafter referred to as CONARE, is created as an advisory body to the AMN, and is composed of a technical representative, incumbent, and alternate delegate from the Ministry of Foreign Relations, Ministry of Labor and Social Welfare, Ministry of the Interior, and the Guatemalan Migration Institute. The individuals who comprise CONARE must be public servants.

In order to implement the refugee status procedure, CONARE will establish the guidelines to be followed by support staff.

**Article 13. Support Staff.** The Institute will designate support staff to receive refugee status applications, conduct interviews, and manage files during the refugee status recognition process, so that CONARE can perform its functions.

These staff members will report to the Institute and must have the necessary technical and professional capacity to handle and follow up on refugee status applications.

**Article 14. Functions of the National Refugee Commission.** In addition to the functions regulated in the Immigration Code, CONARE will exercise the following functions:

DHSFF0093

a.   Verify that applicants comply with the provisions of Articles 4 and 27 of these Regulations, as well as with the elements and grounds established in the national legislation and international arrangements to which Guatemala is a party, relating to the recognition and protection of refugees;

b.   Report refugee status applications to the Institute's Division of Migrant Services and Protection of Fundamental Rights and to the Institute's Alien Affairs Division in the case of children and adolescents, for the appropriate purposes;

c.   Notify the Institute's Alien Affairs Division of persons who have been granted refugee status, for the appropriate purposes;

d.   Issue recommendations, opinions, and suggestions to the AMN regarding the grounds and arguments for refugee status applications and extension requests;

e.   Issue recommendations, opinions, and suggestions to the AMN regarding the cessation of refugee status;

f.   Adjudicate the cessation of refugee status in cases governed by Article 184(f) of the Immigration Code;

g.   Notify the AMN of any case files that have not been acted upon for more than six months by the applicant, in order for the appropriate action to be taken;

h.   Forward refugee status application files to the AMN, through the Technical Secretariat, for its information and the respective adjudication;

i.   Safeguard files relating to refugee status;

j.   Issue the appropriate records regarding refugee status;

k.   Perform all functions as required by law or at the request of the National Immigration Authority.

**Article 15. Advice.** CONARE may request the collaboration, training, and advice of UNHCR.

**Article 16. Sessions.** CONARE will hold regular sessions twice a month and extraordinary sessions when necessary.

CONARE will meet at the headquarters of the Institute or at a place determined by the AMN.

CONARE will define, through the appropriate instrument, the terms of its official notice of meetings, quorum, sessions, and other matters related to its operation and powers.

## CHAPTER II

## PROCEDURE FOR THE RECOGNITION OF REFUGEE STATUS

**Article 17. Procedure.** Applications for refugee status may be made in person, in writing or orally, at an immigration checkpoint or at the Institute's Division of Migrant Services and Protection of Fundamental Rights. The procedure will be carried out as follows:

**1. Application.** The application may be made:

≠   Before the Migration Control Division at the Institute's immigration checkpoints, where an agent will receive the initial request orally or in writing, forwarding it immediately in writing to CONARE support staff, or;

≠   Before the Institute's Division of Migrant Services and Protection of Fundamental Rights, where the initial request will be received orally or in writing and immediately forwarded in writing to CONARE support staff.

Upon receipt of the application, CONARE support staff will:

a)   Provide guidance for the applicant to obtain information on the regulatory procedure for acquiring refugee status.

b)   Receive the formal application, for which the applicant must complete the consecutively numbered form provided by CONARE. The applicant must state the reasons for the application and the departure from his or her country of origin. The applicant may attach any personal identification document(s) that he or she may possess and any other evidence deemed relevant in support of the application.

c)   Notify the Division of Migrant Services and Protection of Fundamental Rights of temporary stay status.

d)   Notify the Alien Affairs Division of refugee status applications for children and adolescents, for the granting of temporary residence.

e)   Set a date and time for the interview, which will be not more than 15 days from the filing of the formal application form.

If the applicant fails to appear for the personal interview on the date specified, and the 30 days of temporary stay status have elapsed, the competent divisions will be notified for the appropriate purposes.

**2.    Personal Interview:**

On the day and time set for the interview, there will be a specific area in which to interview applicants for the determination of refugee status. This area will be properly equipped with video and audio devices to document the proceedings conducted. Each interview must also be attended by a psychologist, who will issue a psychological report based on the interview conducted. If necessary, the parties will be assisted by a translator or interpreter, who will sign the document produced as a result of the interview. The interview will be conducted in keeping with the following requirements:

2.1.   Applicants must be served individually by CONARE support staff who will provide a specialized, comprehensive, and differentiated approach.

2.2.   Unaccompanied or separated children and adolescents will be cared for in special areas by trained personnel, meeting their specific protection needs in accordance with current national legislation with support from the Office of the Solicitor General in order to provide them with special attention.

2.3.   The interview will be conducted in Spanish; if the refugee applicant does not speak Spanish, the assistance of a translator or interpreter will be provided.

In the case of family groups, these interviews will be conducted on an individual basis, and will take place within a period of not more than 30 days.

**3.     Investigation of the case and issuance of recommendation, opinion, or suggestion:**

Upon receipt of the formal application for refugee status, CONARE support staff will begin the investigation of the case, using the appropriate means to complete the file.

Once the investigation of the case has concluded, CONARE will take cognizance of and examine the file at the earliest possible session, so that CONARE may subsequently, and within a period of not more than 30 days, recommend, advise, or suggest to the AMN that it consider granting or denying refugee status.

**4.     Decision of the National Immigration Authority and notice thereof:**

Upon receipt of the file containing CONARE's recommendations, opinions, and suggestions pursuant to Article 177 of the Immigration Code, the AMN will proceed to adjudicate the application, granting or denying refugee status.

If the decision is favorable, CONARE will provide notice to the applicant. The refugee must continue with the respective legal procedures before the Institute.

**Article 18. Denial and Motion for Reconsideration**. Once the applicant for refugee status has received proper notice from CONARE of the decision to deny refugee status, the applicant may file a motion for reconsideration.

Said motion must be filed with the AMN at the headquarters of its Technical Secretariat within 10 days, counting from the day following the date of notice, and will be adjudicated within a period of not more than 5 days.

Prior to adjudicating the case, the AMN may take any action it deems necessary to revoke, amend, or uphold the decision on appeal.

Once the decision denying the application for refugee status becomes final, the applicant must regularize his or her immigration status in the country, without prejudice to the application of Article 195 of the Immigration Code.

**Article 19. Withdrawal of Application.** Applicants may withdraw their applications if they consider that it is not in their personal interest to continue with the proceeding. This must be stated in writing to the support staff, who will communicate it to CONARE.

The AMN will issue a decision approving the withdrawal and subsequent closure of the case file. The applicant for refugee status will be notified of this decision and informed that he or she must regularize his or her immigration status or leave the country, as appropriate.

**Article 20. Closure of File without Action.** CONARE will inform the AMN of the abandonment of those files in which refugee status applicants have taken no action for more than six months. The AMN will then declare the applications abandoned and order the closure of the files.

## CHAPTER III

### PROCEDURE FOR THE CESSATION OF REFUGEE STATUS

**Article 21. Cessation of refugee status.** It is incumbent upon the AMN to declare the cessation of refugee status when the refugee falls within the circumstances set forth in subparagraphs (a), (b), (c), (d), (e), and the final paragraph of Article 184 of the Immigration Code, and those established in the 1951 Refugee Convention adopted in Geneva on July 28, 1951.

**Article 22. General procedure for the cessation of refugee status.** When any of the grounds provided in the preceding article arise, CONARE will proceed as follows:

a) **Knowledge of the situation leading to cessation of refugee status:** When CONARE becomes aware of any of the situations mentioned in Article 184(a), (b), (c), (d), (e) and the final paragraph thereof, it will examine the case and *ex officio* issue a detailed report to the AMN with the respective opinion, recommendation, or suggestion.

b) **Decision on cessation of refugee status:** Upon receipt of CONARE's detailed report, the AMN will issue a decision declaring the cessation of refugee status if it deems it appropriate.

c) **Notice of decision:** Should the AMN issue a decision declaring the cessation of refugee status, notice of that decision must be provided by CONARE to the person whose refugee status has ceased. This notice must be served personally by the means determined by the competent authority, guaranteeing the principle of confidentiality and informing the person of the effects of the decision and steps to be taken.

**Article 23. Procedure for the cessation of refugee status under Article 184(f) of the Immigration Code.** Once CONARE is aware that the circumstances under which a foreign national was recognized as a refugee by the State of Guatemala have ceased to exist, that person may no longer refuse to avail himself of the protection of the country of his or her citizenship. Accordingly, CONARE is responsible for adjudicating the cessation in accordance with the following procedure:

a) **Hearing and notice:** When CONARE becomes aware of the above circumstances, it will examine the case, gathering *ex officio* all the evidence it deems pertinent. It will then inform the interested party, serving notice of a hearing within ten days of the day following the date of notice, so that the interested party may exercise his or her right to a defense in the assessment of the reasons that warrant continued international protection as a refugee.

b) **Decision on cessation of refugee status:** Once the deadline for the hearing granted to the interested party has expired, with or without a reply, CONARE will decide whether cessation of refugee status is appropriate. This determination will be deemed a final decision, notice of which will be served on the interested party by CONARE support staff, who will also inform him or her of the effects of the cessation.

**Article 24. Effects of cessation of refugee status.** When CONARE declares the cessation of refugee status, CONARE will immediately notify the Institute that it may grant a reasonable period of time for the person whose refugee status has ceased to regularize his or her immigration status within a period of not more than 30 days or leave the country, as appropriate, at which time the provisions of the regulations in force will apply.

Jafeth Ernesto Cabrera Franco
**Vice President of the Republic of Guatemala**
**Director, National Immigration Authority**

Enrique Antonio Degenhart Asturias
**Minister of the Interior**
**Member, National Immigration Authority**

Francisco Abraham Sandoval García
**Deputy Minister for Labor Administration**
**Bureau Chief**

Sandra Erica Jovel Polanco
**Minister of Foreign Relations**
**Member, National Immigration Authority**

Carlos Velásquez Monge
**Minister of Social Development**
**Member, National Immigration Authority**

Carlos Rolando Narez Noriega
**Executive Secretary**
**National Migrant Services Council of Guatemala**
**Member, National Immigration Authority**

Carlos Emilio Morales Cancino
**Director of the Guatemalan Migration Institute**
**Technical Secretary of the National Immigration Authority**

DHSFF0099

# CHAPTER IV

## SPECIAL PROVISIONS

**Article 25. Identification of children and adolescents for refugee status recognition.** Should the Presidential Secretariat for Social Welfare identify foreign migrant children and adolescents through an initial assessment and determine that they are eligible for international protection measures, it will inform the Division of Migrant Services and Protection of Fundamental Rights so that proceedings may continue before CONARE.

**Article 26. Procedure for requesting extension of refugee status recognition.** Persons recognized as refugees by the State of Guatemala will have the right to request the extension of recognition. This request will be presented to the support personnel, who will conduct the respective procedure, and CONARE will subsequently transfer the file in order to make recommendations, opinions, or suggestions to the AMN as appropriate. The procedure for a declaration of extension is as follows:

a) **Formal request.** Upon receipt of the initial request for extension, CONARE will provide a form to be completed by the applicant in his or her capacity as a refugee in the State of Guatemala. The applicant's refugee status will be evidenced by the original Special Personal Identification Document and a photocopy thereof.

b) **Interviews**. Once CONARE support staff conducts the interview in accordance with Article 17(2) of these Regulations and verifies the applicant's profile, it will notify CONARE so that CONARE may issue the recommendation, opinion, or suggestion to the AMN, as appropriate.

c) **Decision.** The AMN will issue a decision granting or denying the request for extension.

Persons recognized under the status procedure governed by this article will have the same rights as the primary refugee.

**Article 27. Obligations of the refugee status applicant and the refugee.**

Applicants for refugee status and refugees have duties toward the host country which, in particular, include the obligation to abide by its laws and regulations, as well as measures taken to maintain public order.

**Article 28. Notices.** Any notice, summons, or subpoena addressed to the AMN must be served through its Technical Secretariat.

**Article 29. Unforeseen cases.** Cases not provided for in these regulations will be adjudicated by the AMN taking into account suggestions, opinions, or recommendations made by CONARE.

## TITLE III
## SOLE CHAPTER
## TRANSITIONAL PROVISIONS

DHSFF0100

**Article 30. Validity of applications, procedures, and administrative formalities.** All applications, procedures, and administrative formalities existing prior to the entry into force of the Immigration Code will be adjudicated within the temporal scope of validity of the law, as established in the Judiciary Act and Article 236 of the Immigration Code.

**Transitional Article 31.** All applications filed after the entry into force of the Immigration Code will be adjudicated by the AMN in accordance with the procedure set forth in these Regulations.

**Transitional Article 32.** Files containing applications submitted prior to the entry into force of the Immigration Code that have been finally adjudicated will be turned over by the National Refugee Commission established by Government Order 383-2001 to CONARE as provided in the Immigration Code for closure and safekeeping.

**Transitional Article 33.** During the transition process and while the Institute is being established administratively, the National Migration Bureau will continue to handle matters concerning refugee status through the Office of International Migration Affairs.

**Article 34. Operation.** These regulations will enter into force thirty days after their publication in the Official Gazette [*Diario de Centro América*].

Done in Guatemala City, on March fourth, two thousand nineteen.

United Nations

**CMW**/C/GTM/CO/2



## International Convention on the Protection of the Rights of All Migrant Workers and Members of Their Families

Distr.: General
2 May 2019
English
Original: Spanish

**Committee on the Protection of the Rights of All Migrant Workers and Members of Their Families**

## Concluding observations on the second periodic report of Guatemala*

1.      The Committee considered the second periodic report of Guatemala (CMW/C/GTM/2) at its 413th and 414th meetings (CMW/C/SR.413 and CMW/C/SR.414), held on 2 and 3 April 2019. At its 429th meeting, held on 12 April 2019, it adopted the present concluding observations.

## A.    Introduction

2.      The Committee welcomes the submission of the State party's second periodic report, which was prepared in response to the list of issues prior to submission of the report (CMW/C/GTM/QPR/2), as well as the additional information provided during the dialogue by the high-level delegation, which was headed by the Chair of the Presidential Commission for the Coordination of Human Rights Policy, Jorge Luis Borrayo Reyes, and comprised representatives of the Ministry of Labour and Social Welfare, the Social Welfare Secretariat of the Office of the First Lady, the Social Welfare Secretariat, the Ministry of Foreign Affairs, the Ministry of the Interior, the Ministry of Health and Social Welfare, the Congressional Commission on Migrants, the National Council for Assistance to Guatemalan Migrants, the National Institute of Forensic Sciences, the Guatemalan Migration Institute, the Presidential Commission for the Coordination of Human Rights Policy, the Ministry of Economic Affairs, and the Permanent Mission of Guatemala to the United Nations Office at Geneva.

3.      The Committee appreciates the open and constructive dialogue held with the delegation. The Committee commends the State party for the timely submission of its report and for its high-quality content, which demonstrates the State party's interest in sharing the work it has done to implement the Convention.

4.      The Committee acknowledges that Guatemala, as a country of origin of migrant workers, has made progress in protecting the rights of its nationals working abroad. However, the Committee also notes that, as a country of origin, transit, destination and return, the State party is facing an unprecedented situation owing to mixed migratory movements, in particular mass migrations known as "migrant caravans", headed for the United States of America and Mexico, and that this makes it difficult for Guatemala to fulfil its obligation to protect the rights of migrant workers and members of their families under its jurisdiction.

5.      The Committee notes that a large part of the population in Guatemala suffers from adverse living conditions as a result of high rates of poverty, corruption, violence and crime, social exclusion of certain groups and underemployment, and natural disasters and climate change, in particular in areas of the so-called "dry corridor". These are also the structural

---

\*  Adopted by the Committee at its thirtieth session (1–12 April 2019).

Please recycle



DHSFF0102

causes that lead to forced migration. The Committee notes that the foregoing has a higher impact on the most vulnerable sectors of the population, such as indigenous peoples, peasant farmers and poor people. The Committee takes note of the State party's efforts to reverse this situation and uphold their people's right to migrate or not to be forced to migrate.

6.     The Committee notes that some countries where Guatemalan migrant workers are employed are not parties to the Convention, which may constitute an obstacle to the enjoyment by migrant workers of their rights under the Convention and that, in spite of this, Guatemala has continued to support its nationals in those countries.

## B.   Positive aspects

7.     The Committee welcomes the adoption of the following legislative measures:

(a)     Congressional Decree No. 10-2015, amendments to the Migration Act (Congressional Decree No. 95-98);

(b)     Elections and Political Parties Act, Congressional Decree No. 26-2016, establishing the right to vote for Guatemalans living abroad;

(c)     Congressional Decree No. 44-2016, on the adoption of the Migration Code;

(d)     Congressional Decree No. 19-2017, on the adoption of an amendment to the Constitution of the International Organization for Migration.

8.     The Committee also welcomes the following institutional and policy measures:

(a)     The adoption of the State Policy to Combat Trafficking in Persons and Provide Comprehensive Protection for Victims 2014–2024, of the Secretariat against Sexual Violence, Exploitation and Trafficking in Persons;

(b)     The adoption of the 2017–2032 National Decent Employment Policy of the Ministry of Labour and Social Welfare, of which the Migration for Development Programme is a part;

(c)     The adoption of the State Policy and Action Plan for the Comprehensive Protection of Children and Adolescents (2017–2032) of the Secretariat against Sexual Violence, Exploitation and Trafficking in Persons, which includes a component on unaccompanied migrant children and adolescents;

(d)     Adoption of the "Migrants Become Entrepreneurs" programme of the Ministry of Economic Affairs;

(e)     The restructuring of the Office of the Advocate for Children and Adolescents of the Attorney General's Office, which resulted in the creation of the Migrant Children and Adolescents and International Abduction Unit;

(f)     The establishment of the Commission for the Comprehensive Care of Migrant Children and Adolescents by Government Order No. 146-2014.

9.     The Committee also notes with satisfaction the invitations extended by the State party to the United Nations special procedures, including:

(a)     The Special Rapporteur on the sale and sexual exploitation of children, including child prostitution, child pornography and other child sexual abuse material, 2013 (A/HRC/22/54/Add.1);

(b)     The Special Rapporteur on the right of everyone to the enjoyment of the highest attainable standard of physical and mental health, 2011 (A/HRC/17/25/Add.3);

(c)     The Special Rapporteur on the rights of indigenous peoples, 2011 (A/HRC/18/35/Add.3).

10.     The Committee considers it positive that the State party voted in favour of the Global Compact for Safe, Orderly and Regular Migration, adopted by the General Assembly in its resolution 73/195, of 19 December 2018, and recommends that the State party work towards fully implementing the Convention.

DHSFI 0103

11.     The Committee wishes to highlight the establishment of and the activities carried out by a number of collegiate bodies, such as councils, working groups and committees, that have worked in a coordinated manner on programmes and projects devoted to migrants, and it acknowledges the State party's efforts to coordinate the activities of all its institutions to comply with its obligations under the Convention.

## C.     Principal subjects of concern and recommendations

### 1.     General measures of implementation (arts. 73 and 84)

#### Legislation and application

12.     The Committee notes with appreciation the various laws, policies, programmes and other initiatives introduced to protect the rights of migrant workers in the State party and of its citizens abroad, particularly since the adoption of the new Migration Code (Decree No. 44-2016), which entered into force on 1 May 2017. The Committee is, however, concerned at the lengthy implementation of the Code and its secondary legislation. The Committee also expresses its concern about the content of articles 46, 50 and 195 of the Code, with regard to various rights of the Convention and the principle of non-refoulement.

13.     **The Committee recommends that the State party put into practice supplementary regulations to effectively implement the Migration Code; such regulations should be in line with the Convention and the Committee's general comments. When all such regulations have been adopted, the Committee recommends that the State party follow up on their application so as to align with the Convention any provisions that might be inconsistent with it. It also invites the State party to provide, in its third periodic report, more information regarding the application of the Convention and of the Committee's general comments by domestic courts. The Committee recommends amending articles 46, 50 and 195 of the Code, so as to fully guarantee the right to non-refoulement, as well as the prohibition of denial of entry at the border or indirect refoulement, in accordance with paragraphs 50 and 51 of general comment No. 2 (2013) on the rights of migrant workers in an irregular situation and members of their families and article 22 of the Convention.**

#### Ratification of relevant instruments

14.     The Committee notes that the State party has ratified almost all the major human rights treaties, as well as a number of International Labour Organization (ILO) conventions. Nevertheless, the Committee notes that the State party has not yet ratified the International Convention for the Protection of All Persons from Enforced Disappearance, the Second Optional Protocol to the International Covenant on Civil and Political Rights, aiming at the abolition of the death penalty, the Optional Protocol to the International Covenant on Economic, Social and Cultural Rights, the Optional Protocol to the Convention on the Rights of Persons with Disabilities, the Optional Protocol to the Convention on the Rights of the Child on a communications procedure, the ILO Migrant Workers (Supplementary Provisions) Convention, 1975 (No. 143) and the ILO Domestic Workers Convention, 2011 (No. 189).

15.     **The Committee recommends that the State party consider ratifying or acceding to the above instruments as soon as possible.**

#### Comprehensive policy on migration

16.     The Committee notes the efforts made by the State party to address various migration-related issues. However, the Committee is concerned that the comprehensive policy on migration has not yet been implemented. While the Committee considers the restructuring of the State party's institutions as a positive step towards improving management of migration matters, it is nevertheless concerned about the time that this is taking and about the fact that the delay is having a weakening effect on institutions.

17.     **The Committee recommends that the State party give priority to institutional reform and allocate adequate resources towards implementing the comprehensive**

DHSFF0104   **3**

policy on migration, in line with the Convention and the Migration Code, swiftly and effectively in respect of all the entities involved. In addition, the Committee recommends that the State party emphasize the need to address gender-related issues and human rights approaches in all the institutions that deal with migration. The Committee also recommends that the finalized version of the policy on migration be widely disseminated among Guatemalans, so as to ensure its effective implementation, and that it involve civil society and clearly define the roles of each institution that deals with migration at the national, departmental and local levels, making sure that there is no overlap of functions and that security agencies do not take over functions of the Migration Institute. The Committee recommends that the State party take the necessary measures to ensure that the comprehensive policy on migration takes a human rights approach.

**Coordination**

18.     The Committee notes that, according to the Migration Code, the new Migration Institute will be the highest migration authority in the State party and will have broad powers to manage migration in the State party, while holding a fundamental role in the implementation of the Convention.

19.     **The Committee recommends that the State party:**

(a)     **Take the necessary measures to ensure that the Migration Institute is provided with the necessary human, technical and financial resources for it to be an efficient, transparent entity with a human rights perspective, and for it to hire highly qualified staff who have received human rights training, are dedicated to public service and are familiar with gender and child protection issues;**

(b)     **Adopt the necessary domestic legislation, once finalized, in connection with which the Committee highlights the importance for the new Migration Institute to move away from public-security-based approaches or the criminalization of migration, while preparing to manage individual migration, mass migration and contingencies, based on the lessons learned in recent months;**

(c)     **Ensure collaboration and cooperation among the institutions that deal with migration and optimize the work of entities such as the National Council for Assistance to Guatemalan Migrants by boosting support for their offices located in border areas.**

**Data collection**

20.     The Committee is concerned about the insufficient disaggregated statistics on migration flows into, out of and through the State party, in particular on migrant workers and members of their families in an irregular situation, as well as other migration issues, such as migrant workers in detention in the State party, migrant workers who are nationals of the State party and who are in detention in the State of destination, and the number of unaccompanied migrant children in the State party.

21.     **The Committee recommends that, in line with target 17.18 of the Sustainable Development Goals and following an approach based on human rights, gender equality and non-discrimination, the State party:**

(a)     **Strengthen the data collection system for all entities that provide services to migrant workers and members of their families;**

(b)     **Conduct a systematic assessment of the situation of migrant workers in a regular or irregular situation, and report thereon to the Committee in its next periodic report;**

(c)     **Verify the information on detained migrants and on unaccompanied migrant children and compare this information with that of neighbouring countries and destination countries (Mexico and the United States), in connection with which it also recommends that the State party take steps to ensure that measures will be taken for the immediate assistance and protection of those groups of migrant workers and members of their families.**

DHSFI 0105

**Training on and dissemination of the Convention**

22.    The Committee takes note of the measures adopted by various Government institutions to disseminate the Convention and to train some staff who are responsible for protecting migrant workers' rights. However, the Committee is concerned that there is still no continuous training on the Convention and that efforts to provide training on the Convention to all relevant stakeholders remain insufficient.

23.    **The Committee reiterates its previous recommendation (CMW/C/GTM/CO/1, para. 17) that the State party:**

(a)    **Improve and expand education and training programmes on the rights enshrined in the Convention and related domestic legislation, with a view to establishing them as ongoing programmes that adopt a gender perspective; such programmes should target all public institutions for awareness-raising purposes and should be compulsory for staff at institutions responsible for matters relating to migration, including law enforcement and border authorities, judges, prosecutors and local authorities;**

(b)    **Use effective mechanisms to evaluate the impact of such training, for instance, how many tribunals apply the Convention in cases involving migrants and how many centres for minors have taken action in follow-up to the recommendations of joint general comments Nos. 3 and 4 (2017) of the Committee on the Protection of the Rights of All Migrant Workers and Members of Their Families and Nos. 22 and 23 (2017) of the Committee on the Rights of the Child, on the human rights of children in the context of international migration in countries of origin, transit, destination and return;**

(c)    **To increase its cooperation with universities, civil society organizations and the media to disseminate information about the Convention and encourage migrant workers and members of their families to demand respect for their rights under the Convention.**

**Participation of civil society**

24.    The Committee notes that the Migration Code contains a provision on cooperation, assistance and joint activities involving civil society. However, the Committee has received information about a proposal for legal reform that could limit the autonomy and functionality of the work of civil society organizations, including those working for the rights of migrant workers.

25.    **The Committee encourages the State party to ensure the continued broad participation of Guatemalan migrants' organizations abroad, notably in Canada, the United States and Mexico, the human rights organizations of migrants in Guatemala and organizations and committees of family members of migrants from other countries in Central America. The Committee also recommends that any new standards be issued in compliance with the Convention without eroding acquired rights and without limiting the functionality of the work of civil society organizations that promote the rights of migrant workers and members of their families.**

**2.    General principles (arts. 7 and 83)**

**Non-discrimination**

26.    The Committee notes that the State party's constitutional and legislative framework includes provisions to combat discrimination and xenophobia and recognizes the equal rights and dignity of all individuals in the territory of the State party, whether or not they are nationals. However, the Committee is concerned about the following:

(a)    Discriminatory attitudes on the part of some public officials, the mistreatment of women and lesbian, gay, bisexual, transgender and intersex persons, as well as xenophobic responses in border areas of Guatemala;

(b)    The marginality and poverty faced by indigenous peoples and peasant-farmer communities in the State party, who, because of their situation, are frequently subjected to

evictions and displacement from their ancestral lands or the places where they have lived and worked for years, and many of whom have been forced to migrate to other countries.

27.    **The Committee recommends that the State party:**

(a)    **Further promote the hospitality and solidarity for which Guatemalans are well known and advocate, in migrant host communities, a culture of peace and dialogue, in other words, the peaceful resolution of conflicts and the appreciation of diversity, in order to meet the challenges of migration and the mass movement of persons;**

(b)    **Give local governments the support they need to manage migration in their districts without resorting to the use of law enforcement;**

(c)    **Adopt specific legislation classifying as a punishable act the various forms of discrimination, in accordance with article 7 of the Convention, and to amend national legislation where necessary to bring it into line with the Convention;**

(d)    **Focus on combating social stigmatization and sanction all forms of aggression and violence against migrants, with particular emphasis on protecting women, lesbian, gay, bisexual, transgender and intersex persons, and children victims of assault, and develop campaigns against machismo and homophobia and promote social inclusion and respect for diversity;**

(e)    **Take urgent measures to protect indigenous communities that are forced to migrate and grant them access to basic services, a good education and health care;**

(f)    **Introduce a special programme to provide migration guidance to indigenous communities, with their voluntary consent, so that they are familiar with their rights and obligations in their own language and are made aware of the support that their country can offer them as migrants outside Guatemala.**

3.    **Human rights of all migrant workers and members of their families (arts. 8–35)**

**Protection from violence, physical injury, threats and intimidation**

28.    The Committee notes with concern reports that Guatemalan migrant workers and/or members of their families travelling along the migratory route towards the north have been the victims, at the hands of organized crime groups, gangs (maras) and even some police officers, immigration officers and other civil servants, of crimes including kidnapping, extortion, robbery, forced recruitment, sexual abuse, physical violence and other forms of ill-treatment. The Committee is also concerned about the lack of information from the State party on the incidents in question and the lack of effective mechanisms for filing complaints, supporting victims and facilitating access to justice and other forms of reparation. The Committee notes with concern the information it has received on acts of extortion carried out by officers of the National Civil Police during immigration controls and proceedings, acts that have intensified with the detention of buses transporting migrant workers in border areas, such as San Marcos, Huehuetenango, El Quiché, Petén, Chiquimula and Jutiapa. It is also concerned about the vulnerability of the personal data of migrant workers and their families when they seek social services from institutions.

29.    **The Committee recommends that the State party:**

(a)    **Strengthen mechanisms for protecting migrants who fall victim to crimes or abuse committed by organized crime groups or authorities along the migratory route towards the north, particularly in Mexico, including the specific measures taken to ensure migrant workers' access to justice, such as facilitating the filing of complaints, due process, the protection of witnesses and comprehensive reparation of the rights concerned;**

(b)    **Sign partnership agreements involving the judicial authorities of Guatemala and Mexico;**

(c)    **Establish a protocol of cooperation on legal aid for victims and maintain an ongoing dialogue with the National Human Rights Commission of Mexico;**

DHSFI0107

(d)     **Take measures to ensure that the use of force in migration operations is governed by the principles of legality, absolute necessity and proportionality, and that it has a legitimate aim;**

(e)     **Take measures to investigate, prosecute and punish, administratively and criminally, cases involving extortion and other offences committed by officers of the National Civil Police against migrant workers;**

(f)     **Take measures to establish "firewalls" (protection of personal information and data) between migration control authorities and public institutions, such as the police and the authorities responsible for administering justice, health care and education, for all migrant workers and members of their families, regardless of their migration status.**

30.     The Committee takes note of the initiatives introduced to support families and the mechanisms created in respect of the search of missing or disappeared migrants, and recognizes the efforts made to that end by the State party, including in corpse identification, record-keeping, forensic analysis and the collaboration established with other States. The Committee expresses its concern about the activities of organized crime groups and the possible involvement of public officials in these disappearances through complicity or acquiescence.

31.     **The Committee recommends that the State party:**

(a)     **Make every effort to search for living migrants who are missing or have been disappeared;**

(b)     **Strengthen the flexible mechanism for contacting, searching for and notifying the family members of missing, deceased and/or murdered migrants through a single procedure that facilitates the reporting of cases, and for repatriating and returning their remains when necessary;**

(c)     **Uphold the rights of the families of disappeared migrant victims to justice and to the truth about the fate of their relatives and to comprehensive, appropriate and effective reparation.**

**Border management and migrants in transit**

32.     The Committee takes note of the State party's efforts to facilitate the transit of migrants through its territory and acknowledges that those who pass through its territory along the migratory route towards the north are not isolated or punished. The Committee is concerned at the slow response from the State party's authorities to the first "migrant caravan" in October 2018 and at the lack of a permanent strategy to deal with the mass movements that have continued since then. The Committee takes note of the memorandum of cooperation on border security signed on 27 March 2019 by Guatemala, the United States, El Salvador and Honduras. The Committee expresses its concern about the fact that the bilateral and multilateral agreements on border security and immigration control that have been signed with countries in the region may be contrary to the Convention and other instruments of international human rights law.

33.     **In line with the Recommended Principles and Guidelines on Human Rights at International Borders of the Office of the United Nations High Commissioner for Human Rights, the Committee recommends that the State party:**

(a)     **Respect the human rights of migrants along the entire migration route and at border crossings;**

(b)     **Ensure that border management includes the development and oversight of joint plans with neighbouring countries, especially Mexico, for the safe and orderly passage of migrant caravans;**

(c)     **Combat all forms of violence and enforce the principle of non-refoulement and the prohibition of arbitrary and collective expulsions of migrants;**

(d)     **Finalize and execute the strategy to deal with mass movements of people, with the participation of local governments, civil society, human rights defenders and consulates in the countries of origin of people who travel in migrant caravans;**

DHSFF0108

(e)     **Take the necessary measures to ensure that any bilateral and multilateral agreement on migration, as well as its implementation, is in conformity with the Convention, and in particular that such agreement does not involve the return, expulsion or deportation of migrant workers to their countries of origin or to third countries where their right to life or physical integrity may be violated, where the principle of non-refoulement is not respected or where torture and other cruel, inhuman or degrading treatment is not prohibited.**

**Labour exploitation and other forms of ill-treatment**

34.     The Committee takes note of the State party's efforts to prevent forced labour, in particular through inspections carried out by the Ministry of Labour and Social Welfare. However, it notes with concern allegations that migrant workers, especially those in an irregular situation working in the State party, are often subjected to labour exploitation, including forced labour.

35.     **Taking into account its general comment No. 2, the Committee recommends that the State party, in line with the Sustainable Development Goals (targets 8.7 and 16.2), increase labour inspections and prosecute, punish and sanction all persons or groups that exploit documented or undocumented migrant workers, including child migrant workers, or subject them to forced labour or abuse.**

36.     The Committee welcomes the provision of data on remittances from Guatemalan migrant workers abroad and notes the economic strategies that are being developed to protect migrant workers' resources and ensure the free flow of their household income. Nevertheless, it considers that there is no comprehensive approach to protecting the interests of migrants and seeking opportunities in the management of remittances.

37.     **Bearing in mind the vast number of remittances that Guatemala receives and the significant increase in that number in recent years, the Committee recommends establishing regulations on the transfer of resources to Guatemala and ensuring that rates are reasonable and conditions safe. It also recommends adopting a public policy to channel remittances towards improving people's quality of life, well-being and education, and towards productive enterprises, while ensuring that these resources do not fall into the hands of criminal organizations and their accomplices by means of extortion, blackmail or migrant smuggling/trafficking.**

**Due process, detention and equality before the courts**

38.     The Committee is concerned at migrants' lack of access to justice, limitations on the ability of migrants in transit to file complaints, the fear that migrants have of being arrested if they bring an action before the courts because they are in an irregular situation, and the justice authorities' lack of knowledge of migration regulations, the Convention and the manner in which it should be applied in the handling of cases in court.

39.     **The Committee recommends creating prosecutor's offices that specialize in crimes against migrants, and suggests establishing simplified processes for registering complaints and collecting testimonies from migrants so that investigations can be launched against criminal organizations that prey on migrants through various forms of extortion, exploitation and violation of their rights. It also recommends that justice be served regardless of whether a migrant has left the territory of Guatemala and that justice be demanded for Guatemalans abroad who have been victims of such crimes.**

**Deprivation of liberty and conditions of detention**

40.     The Committee is concerned at the lack of detailed statistical information on various matters that have been put to the State party previously, relating to the detention of migrants, including migrant workers in Guatemala, and at the information received regarding the administrative detention of migrants prior to expulsion, including in airports.

41.     **The Committee recommends phasing out all migration-related measures of deprivation of liberty and making any deprivation of liberty absolutely prohibited for children and adolescents. The Committee also recommends that the State party apply**

DHSFI0109

alternative measures for unaccompanied minors and that it place them in care centres run by personnel specializing in children, in line with joint general comments Nos. 3 and 4 (2017) of the Committee on the Protection of the Rights of All Migrant Workers and Members of Their Families and Nos. 22 and 23 (2017) of the Committee on the Rights of the Child.

**Consular assistance**

42.     The Committee takes note of the progress made by the State party in improving and expanding the consular services available to Guatemalan migrant workers and members of their families, including through its 41 embassies with consular sections, 32 consulates and 90 honorary consulates. The Committee also appreciates the use of mobile consulates to bring services closer to citizens and the cooperation with other States to grant access to consular assistance in missions in other countries where it is not possible to set up a Guatemalan office. However, it considers that there is a lack of civil society involvement.

43.     **The Committee recommends that the State party:**

(a)     **Continue building the capacity of its consulates and embassies to provide advisory services, legal assistance and protection to Guatemalan migrant workers and members of their families who live abroad, and implement the Protocol for Rights-Based Consular Assistance in the provision of all consular services;**

(b)     **Involve civil society organizations, associations, volunteer organizations and churches in the management and care of migrants in countries of both origin and destination in order to enjoy the support and solidarity of its own nationals.**

**4.     Promotion of sound, equitable, humane and lawful conditions in connection with international migration of workers and members of their families (arts. 64–71)**

**Children in situations of international migration**

44.     The Committee notes the steps taken by the State party to protect children and adolescents in the context of migration, and the provisions of the Migration Code in this respect. The Committee appreciates the efforts made to enable the family reunification of almost 6,000 Guatemalan migrant children with their parents in destination countries. The Committee welcomes the adoption of the 2015 Protocol for Psychosocial Support in the Reception of Unaccompanied Migrant Children and Adolescents, which is being updated, and of the 2017 Protocol for the Reception and Care of Migrant Children and Adolescents, which it recognizes as examples of good practice, although they have been implemented unevenly thus far. The Committee is concerned at the situation of children's rights in the State party, which leads them to migrate to other countries; the rise in the number of migrant workers and their children and of unaccompanied minors who are deprived of their liberty; and the lack of comprehensive measures to protect the rights of children in expulsion proceedings.

45.     **In line with joint general comments Nos. 3 and 4 (2017) of the Committee on the Protection of the Rights of All Migrant Workers and Members of Their Families and Nos. 22 and 23 (2017) of the Committee on the Rights of the Child, the Committee recommends that the State party:**

(a)     **Ensure that procedures involving unaccompanied children necessarily take account of the best interests of the child, with a view to adopting short- and long-term solutions, such as family reunification, integration in the host country, repatriation to the country of origin or resettlement in a third country;**

(b)     **Guarantee that no child or adolescent is repatriated without prior, justified and case-by-case verification that the measure is in his or her best interests and that his or her life will not be endangered;**

(c)     **Follow up on pending cases involving Guatemalan mothers and fathers deported from the United States and children and adolescents who travelled alone and are in the custody of the United States authorities.**

**International cooperation with countries of transit and destination**

46.     The Committee notes the existence of bilateral agreements with Mexico and Belize and the regional initiatives adopted with neighbouring countries or in the context of the Regional Conference on Migration. It also takes note of the Central American Border Control Agreement between El Salvador, Honduras, Nicaragua and Guatemala, and the labour migration programme drawn up with Canada. The Committee understands that the holistic vision of the Plan of the Alliance for Prosperity in the Northern Triangle between Guatemala, El Salvador and Honduras is to address the structural causes of migration and prevent irregular migration. However, it considers that implementation is inefficient and that the actions under some of these plans do not reach the most vulnerable population groups, who are forced to migrate. Furthermore, since these mechanisms were set up prior to the mass migrations, they are ill-suited to this new reality and to the needs of the groups involved.

47.     **The Committee recommends that the State party redouble its efforts to raise awareness of and implement the Central American Border Control Agreement, set up a mechanism to assess the impact of the Plan of the Alliance for Prosperity in the Northern Triangle, and consider adjusting or supplementing these initiatives in order to deal with the current migration situation and to address any inconsistencies with the Convention. The Committee also recommends that the State party continue to promote, at the bilateral and regional levels, initiatives and agreements aimed at safeguarding the rights and guarantees contained in the Convention in respect of migrant workers and members of their families, such as fair wages and access to social security, regardless of their migration status.**

**Private recruitment agencies**

48.     The Committee notes the steps being taken to regulate and monitor private recruitment agencies, including the efforts of the Ministry of Labour to adopt regulations on the registration, authorization and operation of recruiters, recruitment agencies and placement agencies of Guatemalan workers inside and outside Guatemala, the purpose of which is to grant authorization to and register agencies that recruit people for work abroad.

49.     **In accordance with the United Nations Guiding Principles on Business and Human Rights, the Committee recommends that the State party:**

(a)     **Strengthen the legal and regulatory framework applicable to private recruitment agencies;**

(b)     **Strengthen recruitment monitoring and inspections to prevent private recruitment agencies from charging fees for their services to migrant workers and from acting as intermediaries for abusive foreign recruiters;**

(c)     **Ensure that private recruitment agencies provide complete information to individuals seeking employment abroad and that they guarantee the effective enjoyment of all agreed employment benefits, in particular fair wages and decent working conditions;**

(d)     **Put in place an easily accessible complaints mechanism to enable migrants who consider that they have been affected by the actions of recruitment agencies to access justice and receive free legal aid, including when it is the family members of migrant workers who make the complaints.**

**Return and reintegration**

50.     The Committee takes notes of the work of the inter-institutional coordinating committee for the reception of migrants who have been forced to return to Guatemala and the various support programmes in place for returning migrants, including the "A Migrant's Trace" strategy, the "Stay" and "Migrants Become Entrepreneurs" programmes, and the "2 x 1" project, which provide for initiatives such as the decent reception of returning migrants, vocational training, labour-market integration and self-employment and entrepreneurship schemes. Nevertheless, the Committee is concerned at the scant information provided about the impact of these programmes on the effective reintegration of returning migrant workers.

DHSFI0111

51.    **The Committee recommends that the State party, in accordance with article 67 of the Convention and the Sustainable Development Goals (target 10.7), to intensify initiatives to support migrants – with a focus on gender and cultural relevance – in returning to their places of origin and to expand measures for the durable reintegration of deported persons or returned persons. It also recommends offering psychosocial assistance to those whose human rights have been violated during the processes of leaving, transit, migration or return.**

**Trafficking in persons**

52.    The Committee notes the adoption of the State Policy to Combat Trafficking in Persons and Provide Comprehensive Protection for Victims 2014–2024, of the Secretariat against Sexual Violence, Exploitation and Trafficking in Persons, and the new regulations establishing the Migration Code. The Committee is concerned at the lack of information on the scale of trafficking in persons in the State party, the lack of sufficient human, technical and financial resources to prevent such trafficking, the lack of training for officials responsible for the implementation of anti-trafficking legislation and the limited administration of justice for trafficking victims.

53.    **The Committee recommends that the State party step up its efforts to combat trafficking in persons, in line with the Sustainable Development Goals (target 5.2), and in particular that it:**

(a)    **Effectively implement the legislation and public policies to combat trafficking in persons and provide comprehensive protection for victims for the period 2014–2024, including by establishing clearly defined goals, regular evaluations, the collection of reliable statistics and the allocation of an adequate budget;**

(b)    **Improve the training of police officers and other law enforcement officials, border guards, judges, prosecutors, labour inspectors, teachers, health-care personnel and the State party's embassy and consular personnel in order to combat trafficking in persons;**

(c)    **Enhance international, regional and bilateral cooperation by concluding agreements with countries of origin, transit and destination on the prevention of trafficking in persons and the detection of organized crime networks, and cooperate with public prosecutor's offices to arrest, prosecute and punish criminals.**

5.    **Dissemination and follow-up**

**Dissemination**

54.    **The Committee requests the State party to ensure the timely dissemination of the present concluding observations, in the official languages of the State party, to the relevant State institutions, including to government ministries, the legislature, the judiciary and relevant local authorities, as well as to non-governmental organizations and other members of civil society. The State party is encouraged to make the system for follow-up to the Committee's recommendations a flexible tool, to be updated regularly and accessible to the public, alongside the system already set up by the State party.**

55.    **The Committee recommends addressing the implementation of the Convention, in particular the present observations and conclusions for the State party, together with civil society organizations and that they explore the proposals made by civil society with respect to specific migration problems in Guatemala given their deep understanding of the daily reality of migrants.**

**Technical assistance**

56.    **The Committee recommends that the State party avail itself of technical cooperation from the international community in order to follow up on the recommendations contained in the present concluding observations, in line with the 2030 Agenda for Sustainable Development.**

**Follow-up to concluding observations**

57.     **The Committee requests the State party to provide, within two years (that is, by 1 May 2021), written information on the implementation of the recommendations contained in paragraphs 25, 31, 33 and 45 above.**

**Next periodic report**

58.     **The Committee requests the State party to submit its third periodic report by 1 May 2024. The Committee encourages the State party to continue to follow the simplified reporting procedure in that regard. The Committee draws the State party's attention to its harmonized treaty-specific guidelines (HRI/GEN/2/Rev.6).**

———————

DHSFI0113

CONVENTION ON THE CREATION OF THE SINGLE CENTRAL AMERICAN VISA FOR THE FREE MOVEMENT OF FOREIGNERS

AMONG THE REPUBLICS OF

EL SALVADOR, GUATEMALA, HONDURAS AND NICARAGUA

The Governments of the Republics of El Salvador, Guatemala, Honduras and Nicaragua, hereinafter referred to as "the Parties"

Considering

That historically the Central American countries have expressed their will to harmonize legislation and regional migratory systems;

That multiple benefits have been achieved mainly for the nationals of the Parties, as a result of the execution of migratory measures that have facilitated the passage of persons among their respective territories;

That at the Extraordinary Summit of the Heads of State and of the Government of the Countries of Central American Integration System (SICA), gathered these in the Republic of Guatemala on February 26, 2004, agreed among other points, to celebrate the decision of the Presidents of El Salvador, Guatemala, Honduras and Nicaragua to approve the Plan of Central American Migratory Integration, which will ostensibly facilitate the free transit of persons;

That within the framework of that Summit, the Government Ministers of the Parties signed the document called Commission of Work for Freedom of Movement, in which they decided to take joint action in order to unify efforts in migration matters, to execute the free movement of persons in the territory of the Parties;

The following have been agreed:

Article I

Definitions

For the purposes of the present Convention, it is understood that:

a)  Interior migration delegations:  Officially-enabled migration for exercising control of passengers originating from and destined exclusively for the territories of the Parties.

b)  Peripheral migratory delegations: Officially-authorized immigration positions for exercising control of passengers with or destined from a third state.

c)  Third State:  Any State that is not one of the Parties.

d)  Foreigner: Any person who is a national of a third State.

e)  Immigration Control: The verification of requirements established in the national legislation of the Parties for the entry, permanent residency and departure of nationals and Foreigners, carried out in the migratory delegations.

DHSFF0114

f) Permanent Residency permit: Any autorization issued to a Foreigner by the Peripheral migration delegations, for their permanent residence and free movement in the territories of the Parties for a given period.

g) Single Central American Visa: The authorization that empowers a foreigner to apply for Peripheral immigration delegation their income and permanence in any of the territories of the Parties, extended in accordance with this Convention and the respective national legislation.

h) Freedom of movement: It is the facility that is granted to a citizen of a third party who have a visa to enter any of the territories of the countries Party, may mobilize the other countries part without additional visa requirements, always that it has not expired, subject to the agreed migratory procedures.

## Article II

### Object and Nature

The purpose of this Convention is to create the single Central American Visa and allow the free movement of foreigners in the territory of either Party.  For these purposes, the Parties agree to approve the classification in terms of extension and compulsory visa requirements and procedures for your obtenci6n and free movement.

## Article III

### Characteristics of the single Central American Visa

The single Central American Visa will have the characteristics and costs approved and authorized by the Parties.

## Article IV

### Classification

The Parties agree to approve the following classification for the purpose of extension and obligatory visa in three categories, according to the origin and nature of the document:

Category "A":  Exempt from visa.

Category "B":  Consular visa or without consultation.

Category "C":  Consulted visa.

The list of countries and others not recognized as international organizations that make up all the above mentioned, will be agreed and communicated by the corresponding diplomatic and consular missions.

The list that makes references to the different categories will be incorporated as Annex I.

## Article V

### Requirements

The Tequisitos for the obtaining of a visa by the foreigners carriers of a travel document in the Categories "B" and "C" shall be established in agreement with the Parts in a single form, which will be contemplated in a manual of procedures that will be revised periodically.

Article VI

Foreigners included in the category "A" may enter the territories of the breads by any of the migratory delegations peripheral and, mobilize freely in these, crossing through any of the inner migratory delegations.

Foreigners included in the category "B", including those who according to the special provisions of visa have been favored with.

Change in category of consulted visa "C" to visa consular or without Query "B "with a visa granted by any of the Parties may enter the territories of these by any of the peripheral migratory delegations,  and move within these territories, crossing by any of the delegations internal migratory, based on the approved list of visas.

Foreigners included in the category "C" with visa granted by any of the Parties, only may enter and move within the territory of the Party that bestowed the visa.

Article VII

Conditions of Ingress and permanence

Any alien who enters the territory of any of the Parties shall be authorized to his stay in accordance with the Manual of procedures.

It may prohibit entry or suspend the permanence of foreigners in the territories of the Parties, for reasons of public order, national interest or security of the state of each part and region;  It would also prohibit the ingress of persons who have been expelled and/or repatriated.

The single Central American Visa does not imply the temporary or permanent residence in the Territory of the Parties.  Consequently, foreigners wishing to enjoy a status other than income must comply with the requirements established by the legislation of each of the Parties.

Article VIII

Manual

The Parties agree that the technical and operational measures to comply with this Convention shall be regulated in two manuals, one for the Ministries of Govenment for the General Directorates of Migration and another for the Ministries of Foreign Affairs that includes the foreign service for the emission of visas, which will be elaborated by the respective Ministries.

The Consular Manual for the emission of visas and the list of classification for purposes of exempt and obligatory visas may be reviewed and amended to petition one of the Parties, in order to adapt it to the circumstances of the Central American region.

Article IX

Information Systems

The migration authorities of the Parties will develop UR: a strategy that allows the unification of technology and the exchange of information based on the basics of security and facilitation of the migration management, in line with the agreements that are within the framework of the Commission-Central American Directors of Migration (OCAM).

Article X

Safeguards

Nothing in this Convention shall be construed as a total waiver or part of the sovereignty on any land, insular, river, air and/or claim by any of the Parties, and does not go to the detriment of any right of such territory, nor would it constitute a precedent for the strengthening or weakening of the reclamation of any of them on any territory.

Article XI

Visa Suppression Agreements with third States

No party will subscribe to third State agreements relating to the simplification or suppression of visas that contradict the classification referred to in the Article IV of this Convention.

Article XII

Reservations

The present Convention does not allow reservations.

Article XIII

Final provisions

1. This Convention shall be approved and ratified by each Party in accordance with its constitutional rules, entering into force ten days after the date of the deposit of the second instrument of ratification and will have an indefinite duration.

2. This Convention and its instruments of ratification shall be deposited in the Secretary-General of the Central American Integration system (SG-SICA).

3. The Secretary-General of the Central American Integration System shall notify the Parties of the date of the deposit of the last instrument of ratification and the entry into force of the Convention.

4. This Convention may accede to any other Member State of the system of the Central American Integration System, and entered into force for those States ten days after the date of the deposit of their respective instrument or of accession.

5. This Convention may be amended, at the request of one of the Parties, and for its approval will be required from the consensus of all Parties.  The modifications to the present Convention shall be subject to ratification by each Party in accordance with the constitutional procedures, and enter into force ten days after the deposit of the last instrument of ratification.

6. Any party may, at any moment, denounce this Convention, by means of a notification, please write to the depositary via Diplomatica, who will communicate it to the other Parties.  Such denunciation shall take effect twelve months after the date of notification.

Subscribed in the city of Tegucigalpa, M.D.C., Republic of Honduras, the thirtieth day of June of the year Two Thousand Five, in five original exemplars.

//signed//

RICARDO MADURO, President of the Republic of Honduras

ELIAS ANTONIO SACA GONZALEZ, President of the Republic of El Salvador

ENRIQUE BOLANOS, President of the Republic of Nicaragua

JORGE BRIZ ABULARACH, Minister of Foreign Affairs of Guatemala

DHSFF0118

Annex I
Visa Homologation List Countries CA-4

| No. | Country | Ordinary Passport | Official Diplomatic Passport and Service | Observations |
|---|---|---|---|---|
| | | Classification Category "A" | | |
| 1 | Germany | (A) Exempt from Visa | (A) Exempt from Visa | |
| 2 | Andorra | (A) Exempt from Visa | (A) Exempt from Visa | |
| 3 | Antigua and Barbados | (A) Exempt from Visa | (A) Exempt from Visa | |
| 4 | Argentina | (A) Exempt from Visa | (A) Exempt from Visa | |
| 5 | Australia | (A) Exempt from Visa | (A) Exempt from Visa | |
| 6 | Austria | (A) Exempt from Visa | (A) Exempt from Visa | |
| 7 | Bahamas | (A) Exempt from Visa | (A) Exempt from Visa | |
| 8 | Bahrain | (A) Exempt from Visa | (A) Exempt from Visa | |
| 9 | Barbados | (A) Exempt from Visa | (A) Exempt from Visa | |
| 10 | Belgium | (A) Exempt from Visa | (A) Exempt from Visa | |
| 11 | Belize | (A) Exempt from Visa | (A) Exempt from Visa | |
| 12 | Brazil | (A) Exempt from Visa | (A) Exempt from Visa | |
| 13 | Brunei-Darussal | (A) Exempt from Visa | (A) Exempt from Visa | |
| 14 | Bulgaria | (A) Exempt from Visa | (A) Exempt from Visa | |
| 15 | Canada | (A) Exempt from Visa | (A) Exempt from Visa | |
| 16 | Chile | (A) Exempt from Visa | (A) Exempt from Visa | |
| 17 | Taiwan | (A) Exempt from Visa | (A) Exempt from Visa | |
| 18 | Cyprus | (A) Exempt from Visa | (A) Exempt from Visa | |
| 19 | Republic of South Korea | (A) Exempt from Visa | (A) Exempt from Visa | |
| 20 | Costa Rica | (A) Exempt from Visa | (A) Exempt from Visa | |
| 21 | Croatia | (A) Exempt from Visa | (A) Exempt from Visa | |
| 22 | Denmark | (A) Exempt from Visa | (A) Exempt from Visa | |
| 23 | El Salvador | (A) Exempt from Visa | (A) Exempt from Visa | |
| 24 | Slovakia | (A) Exempt from Visa | (A) Exempt from Visa | |
| 25 | Slovenia | (A) Exempt from Visa | (A) Exempt from Visa | |
| 26 | Spain | (A) Exempt from Visa | (A) Exempt from Visa | |
| 27 | USA | (A) Exempt from Visa | (A) Exempt from Visa | |
| 28 | Estonia | (A) Exempt from Visa | (A) Exempt from Visa | |
| 29 | Finland | (A) Exempt from Visa | (A) Exempt from Visa | |
| 30 | France | (A) Exempt from Visa | (A) Exempt from Visa | Those originating in the other French territories will be given visa-exempt treatment |
| 31 | Greece | (A) Exempt from Visa | (A) Exempt from Visa | |
| 32 | Guam | (A) Exempt from Visa | (A) Exempt from Visa | |
| 33 | Guatemala | (A) Exempt from Visa | (A) Exempt from Visa | |
| 34 | Honduras | (A) Exempt from Visa | (A) Exempt from Visa | |
| 35 | Hungary | (A) Exempt from Visa | (A) Exempt from Visa | |
| 36 | Ireland | (A) Exempt from Visa | (A) Exempt from Visa | |
| 37 | Iceland | (A) Exempt from Visa | (A) Exempt from Visa | |
| 38 | Marshall Islands | (A) Exempt from Visa | (A) Exempt from Visa | |
| 39 | Solomon Islands | (A) Exempt from Visa | (A) Exempt from Visa | |
| 40 | Israel | (A) Exempt from Visa | (A) Exempt from Visa | |
| 41 | Italy | (A) Exempt from Visa | (A) Exempt from Visa | |
| 42 | Japan | (A) Exempt from Visa | (A) Exempt from Visa | |
| 43 | Kuwait | (A) Exempt from Visa | (A) Exempt from Visa | |
| 44 | Latvia | (A) Exempt from Visa | (A) Exempt from Visa | |
| 45 | Liechtenstein | (A) Exempt from Visa | (A) Exempt from Visa | |
| 46 | Lithuania | (A) Exempt from Visa | (A) Exempt from Visa | |
| 47 | Luxemburg | (A) Exempt from Visa | (A) Exempt from Visa | |
| 48 | Macedonia | (A) Exempt from Visa | (A) Exempt from Visa | |

| 49 | Madagascar | (A) Exempt from Visa | (A) Exempt from Visa | |
| 50 | Malaysia | (A) Exempt from Visa | (A) Exempt from Visa | |
| 51 | Malta | (A) Exempt from Visa | (A) Exempt from Visa | |
| 52 | Mexico | (A) Exempt from Visa | (A) Exempt from Visa | |
| 53 | Monaco | (A) Exempt from Visa | (A) Exempt from Visa | |
| 54 | Nicaragua | (A) Exempt from Visa | (A) Exempt from Visa | |
| 55 | Norway | (A) Exempt from Visa | (A) Exempt from Visa | |
| 56 | New Zealand | (A) Exempt from Visa | (A) Exempt from Visa | |
| 57 | Panama | (A) Exempt from Visa | (A) Exempt from Visa | |
| 58 | Paraguay | (A) Exempt from Visa | (A) Exempt from Visa | |
| 59 | Poland | (A) Exempt from Visa | (A) Exempt from Visa | |
| 60 | Portugal | (A) Exempt from Visa | (A) Exempt from Visa | |
| 61 | Qatar | (A) Exempt from Visa | (A) Exempt from Visa | |
| 62 | The Netherlands | (A) Exempt from Visa | (A) Exempt from Visa | To the natives of Aruba and the Dutch Antilles will be given the same treatment. |
| 63 | The United Kingdom of Great Britain and Northern Ireland and the Administrative Regions | (A) Exempt from Visa | (A) Exempt from Visa | (*) British passport carriers, originating in Hong Kong, whose interior is read "British Nationality" will be given Visa treatment "A". In cases not indicating the above in the British passport that the bearer is some native of Hong Kong, it will be given consulted visa treatment "C". |
| 64 | Czech Republic | (A) Exempt from Visa | (A) Exempt from Visa | |
| 65 | Romania | (A) Exempt from Visa | (A) Exempt from Visa | |
| 66 | St Kitts and Nevis | (A) Exempt from Visa | (A) Exempt from Visa | |
| 67 | San Marino | (A) Exempt from Visa | (A) Exempt from Visa | |
| 68 | Saint Vincente and Granadina | (A) Exempt from Visa | (A) Exempt from Visa | |
| 69 | Saint Lucia | (A) Exempt from Visa | (A) Exempt from Visa | |
| 70 | The Holy See (Vatican City) | (A) Exempt from Visa | (A) Exempt from Visa | |
| 71 | Sao Tome and Principe | (A) Exempt from Visa | (A) Exempt from Visa | |
| 72 | Singapore | (A) Exempt from Visa | (A) Exempt from Visa | |
| 73 | South Africa | (A) Exempt from Visa | (A) Exempt from Visa | |
| 74 | Sweden | (A) Exempt from Visa | (A) Exempt from Visa | |
| 75 | Switzerland | (A) Exempt from Visa | (A) Exempt from Visa | |
| 76 | Trinidad and Tobago | (A) Exempt from Visa | (A) Exempt from Visa | |
| 77 | Turkey | (A) Exempt from Visa | (A) Exempt from Visa | |
| 78 | Tuvalu | (A) Exempt from Visa | (A) Exempt from Visa | |
| 79 | Uruguay | (A) Exempt from Visa | (A) Exempt from Visa | |
| 80 | Vanuatu | (A) Exempt from Visa | (A) Exempt from Visa | |
| 81 | Venezuela | (A) Exempt from Visa | (A) Exempt from Visa | |
| | International Organizations | Passport | | Observations |
| 82 | Organization of American States | (A) Exempt from Visa | | |
| 83 | United Nations | (A) Exempt from Visa | | |
| 84 | European Commission | (A) Exempt from Visa | | |

| | | Classification Category "B" | | |
|---|---|---|---|---|
| No. | Country | Ordinary Passport | Official Diplomatic and Service Passport | Observations |
| 1 | Saudi Arabia | (B) Consular or without consultation | (B) Consular or without consultation | |
| 2 | Azerbaijan | (B) Consular or without consultation | (B) Consular or without consultation | |
| 3 | Belorussia | (B) Consular or without consultation | (A) Exempt from Visa | |
| 4 | Benin | (B) Consular or without consultation | (B) Consular or without consultation | |
| 5 | Bhutan | (B) Consular or without consultation | (B) Consular or without consultation | |
| 6 | Bolivia | (B) Consular or without consultation | (A) Exempt from Visa | |
| 7 | Burkina Faso | (B) Consular or without consultation | (B) Consular or without consultation | |
| 8 | Burundi | (B) Consular or without consultation | (B) Consular or without consultation | |
| 9 | Capo Verdi | (B) Consular or without consultation | (B) Consular or without consultation | |
| 10 | Cambodia | (B) Consular or without consultation | (B) Consular or without consultation | |
| 11 | Cameroon | (B) Consular or without consultation | (B) Consular or without consultation | |
| 12 | Chad | (B) Consular or without consultation | (B) Consular or without consultation | |
| 13 | Colombia | (B) Consular or without consultation | (A) Exempt from Visa | * Until New Order Honduras Dara Trato Cateqoria "C " |
| 14 | Comoros | (B) Consular or without consultation | (B) Consular or without consultation | |
| 15 | Ivory Coast | (B) Consular or without consultation | (B) Consular or without consultation | |
| 16 | Djibouti | (B) Consular or without consultation | (B) Consular or without consultation | |
| 17 | Dominica | (B) Consular or without consultation | (B) Consular or without consultation | |
| 18 | Ecuador | (B) Consular or without consultation | | |
| 19 | Egypt | (B) Consular or without consultation | (B) Consular or without consultation | |
| 20 | United Arab Emirates | (B) Consular or without consultation | (B) Consular or without consultation | |
| 21 | Fiji | (B) Consular or without consultation | (B) Consular or without consultation | |
| 22 | Philippines | (B) Consular or without consultation | (A) Exempt from Visa | |
| 23 | Gabon | (B) Consular or without consultation | (B) Consular or without consultation | |
| 24 | Gambia | (B) Consular or without consultation | (B) Consular or without consultation | |
| 25 | Georgia | (B) Consular or without consultation | (B) Consular or without consultation | |
| 26 | Granada | (B) Consular or without consultation | (A) Exempt from Visa | |

DHSFF0121

| 27 | Guinea | (B) Consular or without consultation | (B) Consular or without consultation | |
| 28 | Guinea Bissau | (B) Consular or without consultation | (B) Consular or without consultation | |
| 29 | Guinea Ecuat. | (B) Consular or without consultation | (B) Consular or without consultation | |
| 30 | Guyana | (B) Consular or without consultation | (A) Exempt from Visa | |
| 31 | Jamaica | (B) Consular or without consultation | (A) Exempt from Visa | |
| 32 | Kazakhstan | (B) Consular or without consultation | (B) Consular or without consultation | |
| 33 | Kenya | (B) Consular or without consultation | (A) Exempt from Visa | |
| 34 | Kyrgyzstan | (B) Consular or without consultation | (B) Consular or without consultation | |
| 35 | Kiribati | (B) Consular or without consultation | (B) Consular or without consultation | |
| 36 | Leshoto | (B) Consular or without consultation | (B) Consular or without consultation | |
| 37 | Malawi | (B) Consular or without consultation | (B) Consular or without consultation | |
| 38 | Maldives | (B) Consular or without consultation | (B) Consular or without consultation | |
| 39 | Morocco | (B) Consular or without consultation | (A) Exempt from Visa | |
| 40 | Mauricio | (B) Consular or without consultation | (B) Consular or without consultation | |
| 41 | Mauritania | (B) Consular or without consultation | (B) Consular or without consultation | |
| 42 | Micronesia | (B) Consular or without consultation | (B) Consular or without consultation | |
| 43 | Moldova | (B) Consular or without consultation | (B) Consular or without consultation | |
| 44 | Myanmar | (B) Consular or without consultation | (B) Consular or without consultation | |
| 45 | Namibia | (B) Consular or without consultation | (B) Consular or without consultation | |
| 46 | Nauru | (B) Consular or without consultation | (B) Consular or without consultation | |
| 47 | Niger | (B) Consular or without consultation | (B) Consular or without consultation | |
| 48 | Palau | (B) Consular or without consultation | (B) Consular or without consultation | |
| 49 | Papa New Guinea | (B) Consular or without consultation | (B) Consular or without consultation | |
| 50 | Peru | (B) Consular or without consultation | (A) Exempt from Visa | |
| 51 | Central African Republic | (B) Consular or without consultation | (B) Consular or without consultation | |
| 52 | Dominican Republic | (B) Consular or without consultation | (A) Exempt from Visa | |
| 53 | Rwanda | (B) Consular or without consultation | (B) Consular or without consultation | |
| 54 | Russian Federation | (B) Consular or without consultation | (A) Exempt from Visa | |

| 55 | Samoa | (B) Consular or without consultation | (B) Consular or without consultation | |
| 56 | Senegal | (B) Consular or without consultation | (B) Consular or without consultation | |
| 57 | Serbia and Montenegro | (B) Consular or without consultation | (A) Exempt from Visa | |
| 58 | Seychelles | (B) Consular or without consultation | (B) Consular or without consultation | |
| 59 | Suriname | (B) Consular or without consultation | (B) Consular or without consultation | |
| 60 | Swaziland | (B) Consular or without consultation | (B) Consular or without consultation | |
| 61 | Thailand | (B) Consular or without consultation | (B) Consular or without consultation | |
| 62 | Tanzania | (B) Consular or without consultation | (B) Consular or without consultation | |
| 63 | Tajikistan | (B) Consular or without consultation | (B) Consular or without consultation | |
| 64 | Togo | (B) Consular or without consultation | (B) Consular or without consultation | |
| 65 | Tonga | (B) Consular or without consultation | (B) Consular or without consultation | |
| 66 | Tunisia | (B) Consular or without consultation | (B) Consular or without consultation | |
| 67 | Turkmenistan | (B) Consular or without consultation | (B) Consular or without consultation | |
| 68 | Ukraine | (B) Consular or without consultation | (A) Exempt from Visa | |
| 69 | Uganda | (B) Consular or without consultation | (B) Consular or without consultation | |
| 70 | Uzbekistan | (B) Consular or without consultation | (B) Consular or without consultation | |
| 71 | Zambia | (B) Consular or without consultation | (B) Consular or without consultation | |
| 72 | Zimbabwe | (B) Consular or without consultation | (B) Consular or without consultation | |

| | | Classification Category "C" | | |
|---|---|---|---|---|
| No. | Country | Ordinary Passport | Official Diplomatic Passport and Service | Observations |
| 1 | Afghanistan | (C) Consulted | (C) Consulted | |
| 2 | Albania | (C) Consulted | (C) Consulted | |
| 3 | Angola | (C) Consulted | (C) Consulted | |
| 4 | Algeria | (C) Consulted | (C) Consulted | |
| 5 | Armenia | (C) Consulted | (C) Consulted | |
| 6 | Eritrea | (C) Consulted | (C) Consulted | |
| 7 | Bangladesh | (C) Consulted | (C) Consulted | |
| 8 | Bosnia and Herzegovina | (C) Consulted | (C) Consulted | |
| 9 | Botswana | (C) Consulted | (C) Consulted | |
| 10 | Peoples Republic of China | (C) Consulted | (C) Consulted | British Passport carriers, originating in Hong Kong in whose interior is read "Nationality British citizen (British citizenship), will be given a visa-exempt treatment (A). In the case that the above is not indicated in the British passport that the bearer originates from Hong Kong (where it reads Overseas) will be given visa treatment consulted (C) |
| 11 | Congo | (C) Consulted | (C) Consulted | |
| 12 | Democratic Republic of Congo | (C) Consulted | (C) Consulted | |
| 13 | North Korea | (C) Consulted | (C) Consulted | |
| 14 | Cuba | (C) Consulted | (B) Consular or without consultation* | (*) Until new order, Guatemala and Nicaragua will continue giving visa-exempt treatment (A) |
| 15 | Ethiopia | (C) Consulted | (C) Consulted | |
| 16 | Ghana | (C) Consulted | (C) Consulted | |
| 17 | Haiti | (C) Consulted | (C) Consulted | |
| 18 | India | (C) Consulted | (C) Consulted | |
| 19 | Indonesia | (C) Consulted | (C) Consulted | |
| 20 | Iraq | (C) Consulted | (C) Consulted | |
| 21 | Iran | (C) Consulted | (C) Consulted | |
| 22 | Jordan | (C) Consulted | (C) Consulted | |
| 23 | Laos | (C) Consulted | (C) Consulted | |
| 24 | Lebanon | (C) Consulted | (C) Consulted | |
| 25 | Liberia | (C) Consulted | (C) Consulted | |
| 26 | Libya | (C) Consulted | (C) Consulted | |
| 27 | Mali | (C) Consulted | (C) Consulted | |
| 28 | Mongolia | (C) Consulted | (C) Consulted | |
| 29 | Mozambique | (C) Consulted | (C) Consulted | |
| 30 | Nepal | (C) Consulted | (C) Consulted | |
| 31 | Nigeria | (C) Consulted | (C) Consulted | |
| 32 | Oman | (C) Consulted | (C) Consulted | |
| 33 | Pakistan | (C) Consulted | (C) Consulted | |
| 34 | Sierra Leone | (C) Consulted | (C) Consulted | |
| 35 | Syria | (C) Consulted | (C) Consulted | |
| 36 | Somalia | (C) Consulted | (C) Consulted | |
| 37 | Sri Lanka | (C) Consulted | (C) Consulted | |

DHSFF0124

| | | | | |
|---|---|---|---|---|
| 38 | Sudan | (C) Consulted | (C) Consulted | |
| 39 | East Timor | (C) Consulted | (C) Consulted | |
| 40 | Vietnam | (C) Consulted | (C) Consulted | |
| 41 | Yemen | (C) Consulted | (C) Consulted | |
| | Entities or Authorities Not Recognized as a State | Passport or other Valid Travel Document | | Observations |
| 1 | Palestinian Authority, Passport carriers or other valid travel document issued by Palestinian Authority | (C) Consulted | (C) Consulted | |
| 2 | Democratic Arab Republic of Sahrawi | (C) Consulted | (C) Consulted | |

DHSFF0125

# Diario de Centro América

#### Fundado en 1880

ÓRGANO OFICIAL DE LA REPÚBLICA DE GUATEMALA, C. A.

MARTES 18 de OCTUBRE de 2016 No. 70 Tomo CCCV | Director General: Héctor Salvatierra | www.dca.gob.gt

## EN ESTA EDICIÓN ENCONTRARÁ:

### ORGANISMO LEGISLATIVO

**CONGRESO DE LA REPÚBLICA DE GUATEMALA**

DECRETO NÚMERO 44-2016
Página 1

### ORGANISMO EJECUTIVO

**MINISTERIO DE GOBERNACIÓN**

Acuérdase reconocer la personalidad jurídica y aprobar las bases constitutivas de la IGLESIA EVANGÉLICA APÓSTOLES Y PROFETAS MARANATHA.
Página 19

### PUBLICACIONES VARIAS

**MUNICIPALIDAD DE OCOS, DEPARTAMENTO DE SAN MARCOS**
Acuérdase CREAR EL CUERPO DE LA POLICÍA MUNICIPAL DEL MUNICIPIO DE OCOS, DEPARTAMENTO DE SAN MARCOS.
Página 19

**MUNICIPALIDAD DE USPANTAN, DEPARTAMENTO DE QUICHE**
Acuérdase dar su anuencia para la ejecución del proyecto: AMPLIACIÓN SISTEMA DE AGUA POTABLE AREA URBANA, USPANTAN, QUICHE.
Página 19

Acuérdase dar su anuencia para la ejecución del proyecto: MEJORAMIENTO CAMINO RURAL CASERIO BAXIL HACIA CRUCE LA CIENEGA, USPANTAN, QUICHE.
Página 20

**CORTE SUPREMA DE JUSTICIA**
ACUERDO NÚMERO 40-2016
Página 20

### ANUNCIOS VARIOS

| | |
|---|---|
| – Matrimonios | Página 22 |
| – Disolución de Sociedad | Página 22 |
| – Patentes de Invención | Página 22 |
| – Registro de Marcas | Página 22 |
| – Títulos Supletorios | Página 22 |
| – Edictos | Página 23 |
| – Remates | Página 26 |
| – Constituciones de Sociedad | Página 29 |
| – Modificaciones de Sociedad | Página 29 |
| – Convocatorias | Página 28, 30 |

## ORGANISMO LEGISLATIVO



## CONGRESO DE LA REPÚBLICA DE GUATEMALA

### DECRETO NÚMERO 44-2016

EL CONGRESO DE LA REPÚBLICA DE GUATEMALA

CONSIDERANDO:

Que el Estado de Guatemala reconoce y garantiza la libertad de toda persona de entrar, transitar y salir del territorio nacional y cambiar de domicilio o residencia sin más limitaciones que las que se establezcan en las leyes. Asimismo, que es su deber garantizarle a los habitantes de la República la vida, la libertad, la justicia, la seguridad, la paz y el desarrollo integral de la persona, razón por la cual el Estado se organiza para proteger a la persona y la familia siendo su fin supremo el bien común.

CONSIDERANDO:

Que el derecho internacional de los derechos humanos, así como el derecho internacional específico en materia de asilo, refugio y el humanitario disponen de un marco normativo de obligaciones y responsabilidades para los Estados en materia de atención, asistencia, seguridad y protección de las personas migrantes. Y que Guatemala siendo Estado Parte de este marco normativo internacional tiene la responsabilidad de incorporar de forma armónica las disposiciones especiales, con lo cual se debe desarrollar y adoptar medidas legislativas que garanticen el pleno goce de los derechos humanos de las personas.

CONSIDERANDO:

Que los instrumentos internacionales en materia de trabajadores migrantes, entre los cuales destaca la Convención Internacional Sobre la Protección de los Derechos de Todos los Trabajadores Migratorios y sus Familiares, ratificada por el Estado de Guatemala, requiere de ser armonizada mediante disposiciones legislativas a lo interno del Estado de forma que se garantice el acceso, goce y disfrute pleno del derecho a trabajar y el derecho laboral bajo la protección del Estado sin importar la nacionalidad de las personas.

CONSIDERANDO:

Que Guatemala es un país cuya situación social y económica ha generado un alto número de personas migrantes, asimismo, que por ubicación geográfica es un país de tránsito y destino de personas de distintas nacionalidades y que ambas situaciones requieren de adoptar modelos propios de gestión de la migración, así como de políticas nacionales orientadas a la atención, asistencia, seguridad y protección de las personas migrantes. De igual forma busca que la función migratoria nacional, que se desarrolla en el territorio nacional, coadyuven en el fortalecimiento de la seguridad pública, a través de procedimientos migratorios balanceados, entre el respeto DHSRF0126 humanos y acciones que fortalezcan la seguridad pública.

### CONSIDERANDO:

Que existe la necesidad de un sistema nacional de migraciones que dé plena vigencia al derecho a migrar como base y fundamento de la institucionalidad y el derecho migratorio en el marco del respeto a los derechos fundamentales de las personas. Y que el Estado de Guatemala requiere de una institucionalidad migratoria renovada, única, independiente con capacidad de formular y configurar la política migratoria del país, con lo cual su modelo de gestión incorpore una visión de servicio, mecanismos políticos de coordinación que permitan una respuesta y atención efectiva, así como principios de actuación que le permitan la adaptación a los entornos nacionales e internacionales.

### CONSIDERANDO:

Que debe mantenerse la unidad del marco jurídico que regula la migración, con lo cual se garantice la seguridad jurídica a las personas y se permita pleno acceso al conocimiento de las normas vigentes del país, a la vez que se incorporen los estándares internacionales de protección y asistencia de personas migrantes y sus familiares en el marco del tránsito, destino y retorno.

### POR TANTO:

En uso de las facultades que le otorga el artículo 171 literal a) de la Constitución Política de la República de Guatemala,

### DECRETA:

El siguiente:

### CÓDIGO DE MIGRACIÓN

Libro I
Derechos en General

Título I
Derecho a migrar y los derechos de las personas migrantes

Capítulo I
Derechos

**Artículo 1. Derecho a migrar.** El Estado de Guatemala reconoce el derecho de toda persona a emigrar o inmigrar, por lo cual el migrante puede entrar, permanecer, transitar, salir y retornar al territorio nacional conforme la legislación nacional.

**Artículo 2. Acceso a dependencias del Estado.** El Estado garantiza a toda persona que se encuentre en el territorio nacional, en plena igualdad de condiciones, acceder a los servicios públicos de seguridad, salud, educación, trabajo, vivienda y todos aquellos que sean necesarios para el desarrollo de sus vidas, de conformidad con lo establecido en la Constitución Política de la República, el presente Código y otras normas aplicables.

Los extranjeros podrán acceder a las dependencias del Estado para ejercer sus acciones y hacer valer sus derechos de conformidad con la ley. Ningún funcionario público puede negarles la asistencia y atención por el hecho de no ser guatemaltecos.

**Artículo 3. Derecho a la nacionalidad guatemalteca.** Se reconoce el derecho de las personas extranjeras a obtener la nacionalidad guatemalteca. Para ello deberá observar la Ley de Nacionalidad vigente.

**Artículo 4. Derecho a la familia.** Se reconoce el derecho de las personas extranjeras a establecerse en el país con sus familias, o bien con el ánimo de formarla o reunificarla dentro del territorio nacional, conforme a lo estipulado en la Constitución Política de la República, el presente Código y otras normas aplicables.

**Artículo 5. Derecho a la propiedad e inversión.** Cualquier persona extranjera, salvo las limitaciones establecidas en la Constitución Política de la República y otras leyes, tiene derecho a obtener propiedades en el territorio nacional, así como de invertir en las empresas, comercios o entidades lícitas, de conformidad con la legislación nacional.

**Artículo 6. Derecho al trabajo.** Toda persona extranjera tiene derecho al trabajo conforme lo establece este Código, la legislación nacional vigente y el derecho internacional.

**Artículo 7. Derecho a la educación.** Toda persona extranjera tiene derecho a la educación dentro del sistema educativo nacional y el sistema de educación superior, conforme las disposiciones de este Código y las disposiciones legislativas específicas en educación.

**Artículo 8. Derechos inherentes a la persona.** Los derechos y garantías que otorgan las leyes del país y los convenios y tratados internacionales ratificados por Guatemala, aunque no figuren de forma expresa en el presente Código, se consideran incorporados.

**Artículo 9. No discriminación.** Las personas migrantes deben ser tratadas igualitariamente y no podrán ser discriminadas por motivos de sexo, orientación sexual, raza, color, idioma, religión o convicción, opinión política o de otra índole, origen étnico o social, nacionalidad, edad, situación económica, patrimonio, estado civil, nacimiento o cualquier característica personal.

Capítulo II
Derechos y condiciones especiales

**Artículo 10. Derecho de protección del Estado.** El Estado de Guatemala, sin discriminación alguna, tiene la obligación de proteger la integridad personal, la vida y la libertad de toda persona nacional y extranjera que se encuentre en territorio nacional.

Las instituciones del Estado no deberán exigir documentos de identificación o cualquier otro requisito, para brindar la protección requerida por una persona extranjera. En todo caso, se deberán utilizar los medios necesarios y disponibles para darle una atención inmediata.

Las personas tienen el derecho de decidir libremente donde establecerse dentro del territorio nacional.

**Artículo 11. Derecho de los niños, niñas o adolescentes migrantes no acompañados o separados de sus familias.** Los niños, niñas y adolescentes migrantes de otras nacionalidades no acompañados o separados de sus familias, niñas y adolescentes embarazadas o con hijos, parejas casadas de menores de edad con o sin hijos que se encuentren en el territorio nacional tienen derecho a ser atendidos en programas especializados y diferenciados ambulatorios o abrigados en casas especiales que sean dispuestas o autorizadas por el Estado para el efecto, conforme los principios específicos que se definen en el presente Código.

Las autoridades competentes deben contemplar una respuesta diferenciada de protección hacia los niños y niñas o refugiados, en especial aquellos no acompañados o que han sido separados de sus padres o tutores, con el propósito de atender adecuadamente sus necesidades de protección y asistencia específicas. En ningún supuesto podrá rechazarse el ingreso en frontera a niños, niñas o adolescentes no acompañados o separados de su familia.

No se puede deportar a los niños, niñas o adolescentes de no ser en su interés superior.

Las diligencias y procedimientos específicos se realizarán de acuerdo al presente Código y su reglamento.

Se entiende por niños, niñas o adolescentes no acompañados o separados de su familia, aquellos que no se encuentran bajo el cuidado o protección de su padre, madre o de un adulto que de acuerdo a la ley o costumbre sea su cuidador habitual, aunque estén siendo acompañados por otras personas.

**Artículo 12. Protección contra violencia, torturas, tratos crueles, inhumanos o degradantes.** El Estado garantiza la dignidad y los derechos de las personas migrantes en territorio nacional, velando porque no sean sometidas a ninguna forma de violencia, ni a torturas, tratos crueles, inhumanos o degradantes.

Las personas migrantes que denuncien ser víctimas de violencia, violencia sexual o laboral, torturas, tratos crueles, inhumanos o degradantes, por una o por más personas, con fines de lucro o no, deberán ser inmediatamente atendidas conforme las medidas que pongan a salvo su integridad, salud y vida.

**Artículo 13. Maternidad y salud sexual.** La mujer migrante con o sin documento de identificación para estar en el país, tiene derecho en plena igualdad a los guatemaltecos, a acceder a servicios públicos de salud sexual y reproductiva, que incluyen servicios ginecológicos, de maternidad durante el tiempo necesario para preservar su vida y la del nonato, así como servicios de planificación familiar.

Toda madre migrante y su hijo o hija tienen derecho en plena igualdad a los guatemaltecos, a recibir la vacunación de inmunización contra las principales enfermedades infecciosas que tienen lugar en la comunidad, así como las ordinarias de acuerdo a la política nacional de salud.

**Artículo 14. Personas adultas mayores.** Todas las personas adultas mayores migrantes, en situación de vulnerabilidad, que se encuentren en el territorio nacional, tienen derecho a ser atendidas y abrigadas, así como a darles las atenciones especiales necesarias en razón de su edad.

**Artículo 15. Familia.** Las personas migrantes y sus familias tienen derecho a permanecer juntas en todo momento. Si por razones administrativas y de manera estrictamente excepcional, deben ser separadas, esto deberá ser únicamente por el tiempo que dure la gestión, debiendo informar a la familia el lugar donde se encontrará la gestión que debe realizarse y la autoridad que ha requerido y por la cual se le separará temporalmente. En el caso de niños, niñas o adolescentes, podrán ser separados de su familia, también de manera estrictamente excepcional y exclusivamente en razón de su interés superior.

Los miembros de la familia tienen derecho a presentar recursos de exhibición personal ante autoridad competente, por lo cual siempre se les deberá facilitar el acceso.

El funcionario que no cumpla con lo previsto en este artículo, será sancionado conforme la legislación penal del país.

**Artículo 16. Derecho al abrigo y cuidado temporal.** Es facultad exclusiva del Instituto Guatemalteco de Migración, autorizar a entidades que prestarán abrigo y cuidado temporal a migrantes, los cuales deberán cumplir con las disposiciones reglamentarias para su ubicación y funcionamiento.

Los guatemaltecos retornados de otros países podrán solicitar a la autoridad guatemalteca les dé albergue para abrigo y cuidado temporal, el cual tiene como fin brindar un lugar para pernoctar durante cuarenta y ocho horas y retornar a su lugar de origen. Las autoridades velarán que las condiciones de habitabilidad de los centros sean dignas y apropiadas.

**Artículo 17. Derecho a la información y documentación.** Toda persona extranjera o guatemalteca retornada tiene derecho a recibir la información necesaria sobre su situación, las gestiones que deben desarrollarse y toda aquella que tenga relación con su estatus o su persona.

Está prohibido a las autoridades confiscar, retener, destruir, cambiar, alterar, ocultar, hacer por perdidos los documentos de identidad, viaje o personales de las personas migrantes. Asimismo, se prohíbe alterar o de cualquier forma incorporar información falsa sobre los documentos personales de identificación o viaje de las personas migrantes extranjeras o guatemaltecas retornadas.

**Artículo 18. Esclavitud o servidumbre.** Ninguna persona que se encuentre en territorio nacional puede ser sometida a condiciones de esclavitud o servidumbre, ni a trabajos forzados.

**Artículo 19. Derecho a la comunicación y contacto familiar.** Las personas migrantes en casas especiales de abrigo, centros de abrigo y centros de cuidado temporal, autorizados por el Instituto Guatemalteco de Migración, pueden solicitar, conforme a las posibilidades disponibles, apoyo en comunicación al extranjero para el contacto familiar y auxilio consular.

En el caso de las niñas, niños y/o adolescentes no acompañados y/o separados se promoverá la comunicación las veces que sean necesarias, atendiendo a su interés superior. Asimismo, pueden comunicarse en cualquier momento con sus autoridades consulares. Se exceptúan los casos de los solicitantes de refugio o de cualquier otro sistema de protección internacional.

**Artículo 20. Derecho a ser retornado al país de origen o de procedencia.** Las personas migrantes tienen derecho a solicitar a las autoridades guatemaltecas ser retornadas a sus países de origen o procedencia. Para el efecto, cuando las personas migrantes no puedan asumir los costos de su retorno, se debe comunicar a las autoridades consulares de su país de origen, o al país de origen o de procedencia y se establecerá el mecanismo idóneo para su retorno. Las autoridades guatemaltecas verificarán el efectivo embarque a tales países.

### Capítulo III
### Derecho de los trabajadores migrantes y sus familias

**Artículo 21. Reconocimiento.** El Estado de Guatemala garantiza a toda persona trabajadora migrante y sus familias los derechos reconocidos en la Constitución Política de la República, la legislación nacional y el derecho internacional debidamente reconocido en nuestro país.

**Artículo 22. Indubio Pro Operario.** Toda interpretación o alcance de las disposiciones legales, reglamentarias o contractuales en materia de trabajadores migrantes, de igual forma que los guatemaltecos, se interpretará en el sentido más favorable para el trabajador.

Son nulas de pleno derecho y no obligan a las personas trabajadoras migrantes las estipulaciones que impliquen renuncias, disminución, tergiversación o limitación de los derechos reconocidos en la legislación nacional, internacional y en cualquier disposición de índole pública o privada.

**Artículo 23. Derechos sociales mínimos.** Son derechos sociales mínimos que fundamentan la legislación laboral específica para los trabajadores migrantes y la actuación de las entidades administrativas del Estado y de los tribunales:

a) La libertad en la elección de trabajo y las condiciones económicas satisfactorias que garanticen al trabajador y a su familia una existencia digna.

b) La remuneración equitativa, no menor al salario mínimo vigente y en moneda de curso legal; puede pactar con el patrono remuneración en moneda legal y vigente de otro país.

c) Inembargabilidad del salario en los casos que ha determinado el derecho laboral nacional vigente; de igual forma los equipos o implementos personales de trabajo.

d) El respeto a las jornadas de trabajo, vacaciones, licencias, indemnización y demás derechos reconocidos en la legislación nacional del trabajo.

e) El pago de prestaciones extraordinarias conforme la legislación nacional vigente o bien conforme lo pactado con el patrono.

f) El derecho de las mujeres trabajadoras migrantes a la protección especial para su condición de maternidad.

g) La prohibición de ocupar niños, niñas o adolescentes en trabajos, salvo lo establecido como excepción conforme el derecho nacional e internacional.

h) Otorgamiento de beneficios económicos para la familia cuando suceda la muerte, de acuerdo a lo establecido para cada caso conforme la legislación nacional e interna de la entidad en donde desempeñaba su trabajo.

**Artículo 24. Seguro social.** Las personas migrantes trabajadoras y sus familiares beneficiarios tienen derecho a obtener los servicios y beneficios del Instituto Guatemalteco de Seguridad Social. Para el efecto, deben ser inscritos y deben aportar las cuotas de forma correspondiente con las normas emitidas por el Instituto.

El Instituto Guatemalteco de Seguridad Social debe emitir las disposiciones administrativas para el registro de personas migrantes trabajadoras y los beneficiarios de estas.

**Artículo 25. Clases pasivas.** Las personas migrantes trabajadoras que desarrollen sus trabajos para las dependencias del Estado de Guatemala, incluyendo las autónomas o descentralizadas, tienen derecho a realizar aportaciones conforme la ley específica de clases pasivas.

Las personas migrantes trabajadoras que han cumplido con los requisitos de ley, tienen derecho a recibir las pensiones correspondientes por sus servicios y aportaciones.

**Artículo 26. Categorías de trabajador migratorio.** Para efectos de aplicación del presente Código, se entiende por trabajador migratorio toda persona extranjera que realice actividades remuneradas en territorio nacional y se clasifica dentro de, las siguientes categorías:

a) **Trabajadores transfronterizos e itinerantes:** El trabajador transfronterizo es aquella persona que reside en un Estado vecino al que regresa al final de su jornada diaria de trabajo, o por lo menos una vez a la semana; asimismo los trabajadores itinerantes son los que realizan la misma actividad y que transitan entre Guatemala y Belice, hasta que el Diferendo Territorial, Insular y Marítimo sea resuelto por la Corte Internacional de Justicia.

b) **Trabajadores de temporada:** Persona cuyas actividades dependen de las condiciones de la estación propia del año, o por la naturaleza del trabajo solo se realiza durante un tiempo determinado del año.

c) **Trabajador consultor, asesor o técnico especializado:** Persona que realiza sus actividades por un período no mayor a trescientos sesenta y cinco días y que sean requeridos por el contratante específicamente como consultor, asesor o técnico especializado y que no requieran de solicitar una residencia permanente.

d) **Trabajador por cuenta propia:** Todo trabajador que realiza actividades comerciales e industriales por su propia cuenta o con sus familias y que tiene autorización para realizar actividades remuneradas dentro del territorio nacional.

El Instituto Guatemalteco de Migración podrá sugerir la ampliación de las categorías y proponer la reglamentación de las condiciones cuando las circunstancias lo ameriten.

**Artículo 27. Familiares o acompañantes.** Los familiares consanguíneos, dentro de los grados de ley, que dependan del trabajador migrante pueden establecerse en el país durante el tiempo que duren las actividades laborales del trabajador migrante. Asimismo, el cónyuge o la persona conviviente del trabajador migrante. En todos los casos se extenderán las autorizaciones correspondientes y se gestionará conforme este Código y la legislación nacional.

Los familiares o acompañantes a cargo del trabajador migrante pueden desempeñar actividades de trabajo, obteniendo por tanto una categoría de trabajador migrante, así como actividades de educación en el sistema nacional de educación y en el sistema de salud.

**Artículo 28. Información con sus representantes de país.** Por ningún motivo puede prohibirse o negarse a los trabajadores migratorios y sus familias o acompañantes la comunicación con los representantes consulares o diplomáticos de sus países. En casos de muerte, accidente o cualquier situación que requiera de comunicación con su país, se facilitará la comunicación inmediata con el cónsul o representante diplomático respectivo.

**Artículo 29. Identidad cultural y religiosa.** Las representaciones diplomáticas con sede en Guatemala pueden promover entre sus connacionales trabajadores en el país, las actividades culturales y religiosas propias de sus países. Este derecho debe ejercerse dentro del marco del respeto a las leyes del país y de las culturas, idiomas, religiones, creencias y hábitos de las personas que habitan el territorio nacional.

**Artículo 30. Ingresos y egresos.** Los trabajadores migrantes y sus familias o acompañantes, durante su estadía como trabajadores pueden ingresar y egresar del país las veces que sean necesarias cumpliendo con las normas establecidas en el presente Código y su reglamento.

**Artículo 31. Bienes y propiedades.** Los trabajadores migratorios o sus familias o acompañantes que adquieran bienes o propiedades en el país serán propietarios de los mismos aún cuando ya no realicen actividades remuneradas en el país y pueden disponer de ellos conforme sus intereses y en el marco de la legislación nacional vigente.

Cuando un trabajador migratorio sea detenido o condenado por la comisión de delito o falta no pierde los derechos sobre sus bienes o propiedades adquiridas legal y legítimamente, salvo que conforme a nuestra legislación se encuentren sujetos a extinción de dominio o decomiso.

**Artículo 32. Transferencia de bienes y dineros.** Los trabajadores migratorios y sus familias, cuando hayan terminado el período de estancia en Guatemala, tienen derecho a llevarse con ellos los títulos o bienes de su propiedad legal y legítimamente adquiridos y a realizar las transferencias de dinero conforme los procedimientos bancarios autorizados.

De igual forma pueden ingresar al país sus bienes y transferir el dinero de cuentas de otros países para cuentas debidamente acreditadas en el sistema bancario guatemalteco.

Las limitaciones a este derecho son en relación a la salud, la existencia de procesos judiciales que impidan el egreso de dichos bienes o dineros o por procedimientos de extinción de dominio.

Ningún funcionario puede gravar o limitar este derecho por fuera de lo previamente se ha establecido por disposiciones legislativas, administrativas o por orden judicial.

**Artículo 33. Solicitudes para ejercicio de derecho de votación.** Las sedes diplomáticas acreditadas en Guatemala, cuyos países reconozcan el derecho de voto de sus connacionales fuera de su territorio, pueden solicitar mediante las autoridades de Gobierno, o por medio del Ministerio de Relaciones Exteriores, colaboración al Instituto Guatemalteco de Migración y el apoyo necesario para contar con el listado de personas residentes de su nacionalidad.

**Artículo 34. Derecho a cooperativas.** Los trabajadores migrantes o sus familiares o acompañantes podrán ser miembros de cooperativas. Al efecto, las cooperativas dispondrán de sus normas propias para establecer sus formas y niveles de participación.

**Artículo 35. Impuestos.** Los trabajadores migrantes están sujetos al pago de impuestos, tasas, arbitrios y multas establecidas de forma general y específica en la legislación nacional. Asimismo, deberán cumplir con los requisitos administrativos que establezca la Superintendencia de Administración Tributaria para cada caso.

Las exoneraciones, exenciones o cualquier otro beneficio tributario serán conforme a las disposiciones legislativas o administrativas que para cada caso y en momentos determinados puedan emitirse.

**Artículo 36. Renuncias o despidos.** Los empleadores de trabajadores migrantes con autorización vigente en el país deberán informar al Instituto Guatemalteco de Migración en los casos que sus empleados extranjeros sean despedidos o hayan renunciado, pudiendo

exigir el trabajador migrante el pago de sus prestaciones conforme al derecho laboral guatemalteco.

**Artículo 37. Justicia laboral.** Todos los trabajadores migrantes tienen el derecho de acceder a las autoridades administrativas y a los tribunales laborales del país y accionar conforme las leyes nacionales vigentes.

### Capítulo IV
### Derecho de las personas víctimas de trata

**Artículo 38. Derechos.** Son derechos de las personas migrantes víctimas de trata de personas, además de los regulados en el artículo 11 de la Ley Contra la Violencia Sexual, Explotación y Trata de Personas, Decreto Número 9-2009 del Congreso de la República, los siguientes:

a) Acceder a los recursos de asistencia disponibles. En el caso de niños, niñas y adolescentes, se garantizará que los procedimientos reconozcan sus necesidades especiales que impliquen la condición de ser un sujeto en pleno desarrollo de la personalidad.

b) A no ser sometidos a careos.

c) A que las medidas de protección de derechos aplicables no impliquen la privación de su libertad.

d) A prestar testimonio en condiciones especiales de protección y cuidado.

Los derechos enunciados en este artículo son integrales, irrenunciables e indivisibles.

**Artículo 39. Hogar de protección y abrigo.** Los hogares de protección y abrigo y los programas especializados en atención integral para personas migrantes víctimas adultas de violencia sexual, explotación y trata de personas, están a cargo de la Secretaría de Violencia Sexual, Explotación y Trata, y los servicios de asistencia están a cargo del Ministerio de Salud Pública y Asistencia Social, el Ministerio de Trabajo y Previsión Social, así como del Ministerio de Desarrollo Social, conforme sus competencias. Atenderán en coordinación con la Subdirección de Atención y Protección de Derechos Fundamentales de los Migrantes y las demás entidades del Estado, conforme las políticas y legislación vigente.

Las niñas, niños y adolescentes víctimas de violencia sexual, explotación y trata de personas, que incluya a niñez guatemalteca o migrantes de otras nacionalidades, gozarán de atención especializada y diferenciada a través de los programas, que estarán a cargo de la Secretaría de Bienestar Social de la Presidencia, como ente rector de los servicios esenciales de protección especial de la niñez y adolescencia amenazada o violada en sus derechos. Esta coordinará sus acciones a través del Consejo de Atención y Protección del cual forma parte, así como con otras instituciones del Estado y prestará sus servicios a través de sus sedes departamentales.

Las instituciones del Estado identificadas en este artículo deben establecer estándares para los distintos servicios y programas de atención en hogares de protección y abrigo.

**Artículo 40. Controles migratorios.** Para el efectivo control migratorio, de acuerdo a lo establecido en el artículo 14 de la Ley Contra la Violencia Sexual, Explotación y Trata de Personas, Decreto Número 9-2009 del Congreso de la República, el Instituto Guatemalteco de Migración, el Ministerio de Gobernación y el Ministerio Público deberán emitir los protocolos y disposiciones conjuntas sobre la actuación en cada circunstancia.

Todas las disposiciones que sean emitidas deben ser conforme al respeto de los derechos humanos. Asimismo se dispondrá el informar a la víctima sobre el sistema de protección y atención que se le puede brindar, y si fuere niño, niña o adolescente se le comunicará a la Procuraduría General de la Nación para el inicio del proceso de protección.

**Artículo 41. Repatriación de migrantes víctimas.** Las víctimas de trata de personas migrantes serán repatriadas conforme lo establecen los artículos 16, 17 y 18 de la Ley Contra la Violencia Sexual, Explotación y Trata de Personas, Decreto Número 9-2009 del Congreso de la República.

Dentro de los procedimientos previos, se debe considerar el derecho de las víctimas a no ser repatriadas por violencia o temor a la violencia, sin perjuicio de las solicitudes de asilo, refugio, permanencia por razones humanitarias o cualquiera de las reguladas en el presente Código o conforme la práctica internacional.

Se debe considerar la no repatriación de la persona por encontrarse en el territorio nacional su familia consanguínea dentro de los grados de ley o por temores fundados de que el retorno a su país de origen pone en grave riesgo su vida o su integridad personal.

**Artículo 42. Protocolos.** Los protocolos interinstitucionales regulados en la literal b, del artículo 19 de la Ley Contra la Violencia Sexual, Explotación y Trata de Personas, Decreto Número 9-2009 del Congreso de la República, además de las instituciones referidas en el mismo texto del artículo citado, se incluirá al Instituto Guatemalteco de Migración.

### Capítulo V
### Derechos al reconocimiento del estatuto de refugiado, asilo político y la asistencia humanitaria

**Artículo 43. Refugio.** Las personas extranjeras pueden solicitar refugio al Estado de Guatemala al momento de su ingreso al país en un puesto migratorio oficial.

El procedimiento para el reconocimiento del estatuto de refugiado será dispuesto en el reglamento respectivo, de conformidad con la legislación vigente y los instrumentos internacionales de los que Guatemala es parte.

**Artículo 44. Asilo.** Guatemala podrá otorgar asilo, siendo su otorgamiento de carácter discrecional por parte del Estado de Guatemala, de conformidad con la Constitución Política de la República de Guatemala.

**Artículo 45. Refugio.** El reconocimiento del estatuto de refugiado conlleva para la persona refugiada el ejercicio de los derechos y el cumplimiento de los deberes previstos en la Constitución Política de la República, instrumentos internacionales y demás leyes del país, quedando sometidos a la jurisdicción y competencia del Estado guatemalteco.

El procedimiento para solicitar, obtener o denegar el estatuto de refugiado será establecido en el reglamento de conformidad con la legislación vigente y los estándares internacionales.

**Artículo 46. No devolución.** Si se deniega el reconocimiento del estatuto de refugiado o asilado, la persona no podrá ser devuelta al país donde exista razón fundada de poner en grave peligro su vida, su integridad física y su libertad. El Estado de Guatemala, previo a la devolución, garantizará que la Oficina del Alto Comisionado de las Naciones Unidas para los Refugiados (ACNUR) ha sido puesta en conocimiento de la situación de la persona.

**Artículo 47. No otorgamiento del estatuto de refugiado.** No puede otorgarse el estatuto de refugiado a la persona:

a) Que ha cometido un delito contra la paz, un delito de guerra o un delito contra la humanidad, de los definidos en los instrumentos internacionales elaborados para adoptar disposiciones respecto de tales delitos;
b) Que ha cometido un delito particularmente grave fuera del país de refugio, antes de ser admitida en él como refugiada o cuando la solicitud ha sido presentada para sustraerse de la justicia de otro país;
c) Que sea culpable de actos contrarios a las finalidades y los principios de las Naciones Unidas, plasmados en los tratados y convenios internacionales.

**Artículo 48. Estatus de residente temporal a niños, niñas, adolescentes y adultos reconocidos con el estatuto de refugiado o asilado político.** Los niños, las niñas, las personas adolescentes, los hombres y mujeres reconocidos con el estatuto de refugiado, o asilado político bajo la figura del asilo territorial, serán puestos inmediatamente bajo el estatuto de residente temporal y recibirán la documentación adecuada, medida con la cual antes de la emisión de una resolución definitiva garantizará el acceso a derechos básicos de estas personas como la libertad de circulación, el acceso a los servicios de salud, educación, información y orientación legal, el acceso a la justicia, entre otros derechos fundamentales establecidos en la legislación nacional y el derecho internacional.

**Artículo 49. Protección especial a migrantes por violencia sexual.** Cuando las razones de solicitud de refugio o asilo sean el grave sufrimiento de violencia sexual o la amenaza de sufrir esta violencia, los migrantes que son niños, niñas, adolescentes y adultos, serán protegidos y se adoptarán medidas particulares de protección adecuadas a su situación, brindando la atención integral, especialmente en salud.

**Artículo 50. Sanción.** El no contar con documentos de identidad y de viaje, o no haber cumplido los requisitos administrativos de ingreso, estancia o tránsito dentro del país no justifica la imposición de sanción penal, pero está obligado a pagar los gastos administrativos ocasionados de conformidad con lo que establezca el reglamento y serán retornados al país de procedencia.

**Artículo 51. Igualdad.** El solicitante del reconocimiento del estatuto de refugiado, el solicitante de asilo político y el asilado político bajo la figura del asilo territorial que ha ingresado al territorio de forma regular, gozará de todos los derechos y obligaciones enunciados en la legislación guatemalteca, en especial de la Constitución Política de la República y de este Código, así como los reconocidos y garantizados en los tratados y convenios internacionales ratificados por el Estado de Guatemala.

**Artículo 52. Confidencialidad.** La presencia de las personas solicitantes del reconocimiento del estatuto de refugiado, refugiados, solicitantes de asilo político y asilados políticos en el territorio de la República así como los respectivos trámites y solicitudes para el reconocimiento de su condición o estatuto respetarán el principio de confidencialidad con el fin de proteger su vida, integridad y libertad.

**Artículo 53. Identidad.** Las personas solicitantes del reconocimiento del estatuto de refugiado o asilo político bajo la figura del asilo territorial, en tanto se resuelve su solicitud, tienen derecho a contar con documento personal de identidad especial con el fin de poder acceder a los servicios de educación y salud; asimismo el documento será considerado válido para obtener trabajo remunerado conforme la legislación vigente.

De igual forma las personas refugiadas y asiladas políticas contarán con documento personal de identidad especial.

**Artículo 54. Asistencia humanitaria.** El Estado de Guatemala puede facilitar a las entidades nacionales e internacionales que provean asistencia humanitaria, legalmente establecidas, todas las facilidades para que puedan desarrollar sus actividades dentro del territorio del país. Los migrantes tienen el derecho de solicitar a esas entidades asistencia por razones humanitarias.

**Artículo 55. Registro unificado de entidades de asistencia humanitaria.** El Estado de Guatemala, mediante sus autoridades migratorias, deberá registrar las entidades de asistencia humanitaria para personas migrantes.

Los organismos internacionales mandatados podrán ejercer actividades de protección y asistencia en favor de personas migrantes.

### Título II
### Derecho migratorio

### Capítulo I
### Disposiciones generales

**Artículo 56. Derecho migratorio.** El derecho migratorio guatemalteco regula la libertad de las personas de entrar, permanecer, transitar y salir del territorio nacional, de acuerdo con los derechos fundamentales de las personas plasmados en la Constitución Política de la República, la legislación nacional y los instrumentos internacionales.

**Artículo 57. Finalidad.** El derecho migratorio tiene como finalidad garantizar el derecho a migrar mediante las disposiciones que se emiten en el presente Código y sus reglamentos, así como todas aquellas reglamentarias o administrativas que sean emitidas por el Instituto Guatemalteco de Migración.

**Artículo 58. Interpretación.** Las normas migratorias se interpretan en favor de los derechos de las personas migrantes.

**Artículo 59. Limitación.** Se limita el derecho a migrar únicamente en los casos que dispongan el presente Código y sus reglamentos, de igual forma cuando medien disposiciones de salud, seguridad u orden público, seguridad de las personas y por orden o sentencia judicial.

**Artículo 60. Principios.** Son principios que rigen la actuación del Instituto Guatemalteco de Migración, la legalidad, integridad, probidad, no discriminación, debida diligencia, protección de la persona, reunificación familiar, confidencialidad, profesionalización y debido proceso.

### Capítulo II
### Obligaciones y prohibiciones de las personas migrantes

**Artículo 61. Obligaciones de las personas guatemaltecas.** Para que las personas guatemaltecas puedan viajar al extranjero, es necesario:

1. Tener pasaporte guatemalteco vigente o su documento de identidad de acuerdo a lo solicitado por el Estado destino y sus acuerdos de Guatemala para con ese Estado.

2. En el caso de niños, niñas y adolescentes, para viajar solos o en compañía de un tercero, deben portar la autorización escrita de ambos padres, o de quien ejerza la patria potestad, guarda y custodia o tutela. En el no cumplimiento de esta obligación autoriza a negar el egreso del país. En el caso de que uno de los padres o ambos, se encuentren en el extranjero, dicha autorización escrita podrá darse ante cónsul guatemalteco, acreditado en el exterior.

3. De acuerdo al país donde se dirija debe cumplir con los requisitos que las autoridades migratorias le requieran como obligatorios para poder ingresar y permanecer en sus territorios nacionales.

4. Cumplir con las declaraciones y pagos de impuestos que la Superintendencia de Administración Tributaria disponga sobre los bienes que se deseen ingresar o egresar del país.

Ninguna autoridad del país puede negar a las personas de nacionalidad guatemalteca su ingreso a territorio nacional.

**Artículo 62. Obligaciones.** Son obligaciones de las personas extranjeras en Guatemala, respetar la Constitución Política de la República de Guatemala, las leyes vigentes del país y las distintas cosmovisiones e identidades culturales y religiosas que conviven en el territorio nacional, en consonancia por ser un país multiétnico, plurilingüe y multicultural.

**Artículo 63. Observancia obligatoria.** Lo establecido en el Decreto Número 10-2015 del Congreso de la República de Guatemala es de observancia obligatoria.

**Artículo 64. Reglas generales.** El incumplimiento de las obligaciones de las personas extranjeras en Guatemala genera responsabilidad administrativa, y permite solicitar el abandono inmediato del país, o en caso justificado determinar su expulsión. Sin embargo, cuando hayan cometido delito, la autoridad procederá conforme las leyes penales vigentes.

Los criterios que deben aplicarse para prohibir el ingreso, la suspensión de permanencia y el rechazo de solicitudes de ingreso serán regulados en el reglamento del presente Código.

Los puestos migratorios en los puertos marítimos, aeropuertos y fronteras terrestres dispondrán de espacios en donde se difundan las obligaciones previstas en el presente Código y las prohibiciones generales contenidas en la legislación nacional aplicables al tema migratorio. Asimismo, se deberá dotar a las empresas de transporte de personas y de mercadería internacional, tanto marítimas, terrestres y aéreas, de boletas de control migratorio que deben ser repartidas entre los pasajeros que viajen con destino a Guatemala.

### Capítulo III
### Ingreso de personas extranjeras a Guatemala

**Artículo 65. Ingreso ordinario de personas extranjeras al territorio nacional.** Las personas extranjeras que deseen ingresar a Guatemala por vía área, terrestre o marítima deberán cumplir con los requisitos que para su nacionalidad se establezca en el reglamento respectivo.

Se exceptúan aquellas personas que ingresan legalmente al territorio de la República por razones humanitarias o en necesidad de protección internacional, como es el caso de los solicitantes del reconocimiento del estatuto de refugiado, de asilo político bajo la figura del asilo territorial.

Las personas que se presenten a los puestos migratorios de puertos marítimos, aeropuertos y fronteras terrestres sin los documentos oficiales requeridos les podrá ser negado el acceso al territorio nacional.

**Artículo 66. Impedimentos para el ingreso.** Además de las disposiciones administrativas que se dispongan por el Instituto Guatemalteco de Migración, son impedimentos para ingresar al país:

a) Por razones de orden y seguridad pública.

b) Ser señalado de la comisión de delitos contenidos en el Estatuto de Roma de la Corte Penal Internacional.

c) Ser perseguido penalmente por delitos de orden común contra la vida, la propiedad y la libertad.

d) Tener orden de captura internacional.

**Artículo 67. Ingreso de centroamericanos.** Los centroamericanos pueden ingresar al país como turistas portando su documento de identidad nacional en original, o bien su pasaporte vigente, atendiendo al principio de reciprocidad, hasta por noventa días de permanencia, prorrogable por una única vez.

Guatemala puede ser parte de las reglas y acuerdos que entre las naciones centroamericanas se emitan conjuntamente para facilitar el ingreso y egreso de sus ciudadanos en la región.

**Artículo 68. Ingreso de personas por razones humanitarias.** Las personas extranjeras podrán ingresar al país por las siguientes razones humanitarias:

a) Por catástrofe natural en los países vecinos, que obliga a las personas o grupo de personas a salvar sus vidas.

b) Por emergencias médicas o para poner a salvo la vida de las personas, las aeronaves o embarcaciones marítimas.

c) Por razones de conflictos armados, de acuerdo al derecho internacional.

d) Por solicitud de cooperación de otro Estado u órganos creados por el Derecho Internacional para ingresar equipo, naves o personas cuyo fin es médico, de auxilio o socorro.

e) Para repatriación de restos de familiares muertos en Guatemala.

La permanencia de estas personas o naves se regirán conforme lo establecido en el presente Código y su reglamento.

**Artículo 69. Ingresos a solicitud de autoridad competente.** Los extranjeros que sean requeridos para declarar como testigos, víctimas o como peritos dentro de procesos del sistema de justicia guatemalteco, y aquellos que sean requeridos por autoridad judicial o del ejecutivo para gestiones personales, pueden obtener permiso especial de ingreso.

El formulario correspondiente será el definido en el reglamento.

**Artículo 70. Ingresos temporales por razones de transporte.** Por razones de transporte marítimo, aéreo o terrestre, puede darse una autorización de ingreso al personal y tripulación de personas jurídicas o personas individuales cuya carga sea lícita y dentro del comercio normal de cosas.

Dichas autorizaciones pueden ser expedidas por el jefe del puesto de control migratorio en coordinación con la Capitanía Portuaria, la Dirección General de Aeronáutica Civil o la Dirección de Transportes, siempre que se observen los requisitos correspondientes y se pague la tarifa autorizada y establecida en el reglamento correspondiente. La autorización tiene una duración de cuarenta y ocho horas en caso aéreo o terrestre y de setenta y dos horas en caso de naves marítimas.

Cuando sea una persona jurídica o individual cuyo giro comercial sea el transporte de personas o cosas y requiera de permiso permanente deberá sujetarse al derecho civil y mercantil y a las disposiciones de este Código.

**Artículo 71. Situaciones no previstas.** Cuando en las instalaciones del Instituto Guatemalteco de Migración o sus sedes, se presente una persona solicitando el ingreso oficial a Guatemala sin estar previsto en las regulaciones del presente Código o en las demás disposiciones legales que se emitan, deberá ser enviada a las instituciones previamente autorizadas por el Instituto que presten abrigo temporal y el funcionario o empleado deberá observar los siguientes criterios:

a) Si la persona manifiesta estar siendo perseguida en su país de origen, ser víctima de amenazas de violencia o ser víctima de violencia, requerir solicitud del reconocimiento del estatuto de refugiado o asilo político territorial, ingreso por razón humanitaria, la persona tendrá disponible abrigo y cuidado temporal.

b) Si se trata de un niño, niña o persona adolescente deberán ser atendidos conforme las disposiciones legales vigentes y lo dispuesto en este Código.

c) Si son mujeres migrantes que declaran ser víctimas de violencia sexual o estar siendo perseguidas con esos fines, o víctimas de violencia intrafamiliar, se les otorgará asistencia en salud y se procederá de conformidad a lo estipulado en la ley específica. Prima el derecho a no ser retornada al país de origen o procedencia existiendo grave amenaza de ser víctima de violencia sexual en cualquiera de sus formas.

d) Si es una familia, se estará a lo dispuesto del presente Código y será el Subdirector de Atención y Protección de Derechos Fundamentales de los Migrantes quien debe brindar la atención y seguimiento al caso para la reunificación familiar, protección y asistencia de niños, niñas o adolescentes de conformidad con su interés superior, o conforme los principios que rigen la actuación según sea el caso.

### Capítulo IV
DHSFF0130

Permanencia de personas extranjeras y su estatus ordinario migratorio

**Artículo 72. Permanencia.** Las personas extranjeras pueden permanecer en el país en razón del tiempo autorizado de acuerdo al estatus ordinario o extraordinario que le sea otorgado por disposición de este Código.

Pueden permanecer en el país personas con estatus migratorio especial de acuerdo al presente Código.

**Artículo 73. Estatus ordinario migratorio.** El estatus ordinario migratorio es la categoría migratoria que se les otorga a las personas extranjeras en razón de su ingreso y permanencia en el territorio nacional de acuerdo a la siguiente clasificación:

a) Turista o viajero.

b) Residente temporal.

c) Residente permanente.

**Artículo 74. Turistas o viajeros.** Son turistas o viajeros las personas extranjeras que han ingresado de forma regular con fines lícitos, sin propósito de obtener una residencia temporal o permanente, cuyo plazo no podrá ser mayor de noventa días, prorrogable por una sola vez.

Las personas técnicas, profesionales, científicas, culturales, deportistas o religiosas, que por razones de sus conocimientos sean requeridas por instituciones públicas o privadas, para permanecer y desarrollar una actividad de consulta o asesoría remunerada por un período que no supera los ciento ochenta días.

**Artículo 75. Residentes temporales.** Cuentan con el estatus de residente temporal, las personas que el Instituto Guatemalteco de Migración les extienda un documento los reconoce como residentes temporales, identificados a continuación:

a) **Trabajadores migrantes:** Las personas extranjeras que han sido autorizadas a permanecer en el país para dedicarse al ejercicio de alguna actividad lícita, remunerada, bajo la dependencia y dirección de un patrono. Los trabajadores migrantes podrán solicitar residencia temporal por el plazo de uno a cinco años.

b) **Estudiantes:** Las personas extranjeras autorizadas para residir en el país por razones de estudio en cualquiera de los niveles educativos. Se les autorizará el estatus de residencia temporal de estudiante por el período correspondiente al ciclo educativo o la duración de los cursos universitarios correspondientes de acuerdo a lo regulado por este Código.

c) **Deportistas y artistas:** Las personas extranjeras contratadas por personas jurídicas o individuales que presten sus servicios especializados como deportistas o artistas, se les autorizará el estatus de residencia temporal de acuerdo al período de duración del contrato específico o hasta por un período máximo de cinco años, observando lo establecido en la legislación nacional vigente aplicable.

d) **Inversionistas:** Las personas extranjeras que realicen inversiones en el país, se les autorizará por un plazo no mayor de cinco años.

e) **Intelectuales, investigadores y científicos:** Las personas que se dedican a actividades científicas, de investigación y académicas que sean contratadas por entidades para la realización de trabajos propios de sus conocimientos, se les autorizará el estatus de residencia temporal por un plazo no mayor de cinco años.

f) **Ministros de culto o religiosos:** Los ministros de culto o religiosos extranjeros con pertenencia a una entidad religiosa reconocida oficialmente por el Estado, se les autorizará el estatus de residente temporal por un plazo no mayor de cinco años.

La descripción de los requisitos para el cumplimiento de reconocimiento del estatus de residente temporal, serán establecidos en el reglamento del presente Código.

**Artículo 76. Reglas generales del estatus de residente temporal.** Las personas que deseen obtener el estatus de residente temporal pueden iniciar el trámite ante las misiones consulares guatemaltecas o bien encontrándose en condiciones migratorias regulares en Guatemala ante el Instituto Guatemalteco de Migración.

Todos los plazos establecidos en el artículo anterior serán prorrogables a consideración del Instituto Guatemalteco de Migración. El estatus puede ser revocado por solicitud del interesado o bien por falta administrativa que implique la revocación de dicho estatus.

El estatus de residente temporal no priva a la persona de su derecho de egresar e ingresar al país limitadamente, teniendo como restricciones únicamente las que impone este Código y otras que sean definidas en la legislación vigente nacional.

El reglamento deberá emitir el procedimiento correspondiente para otorgar el estatus de residencia temporal.

**Artículo 77. Regla especial para el estatus de residente temporal de estudio.** Los hijos de las personas que han solicitado estatus de residente temporal en cualquiera de las categorías descritas en este Código, podrán adquirir los estatus de estudiante en cualquiera de los niveles del sistema de educación nacional con la declaración del padre o madre, carta de aceptación del centro educativo en donde serán inscritos y el señalamiento de los grados que cursará de acuerdo a lo previsto por el centro educativo correspondiente.

Mientras se obtiene el estatus, los niños, niñas y adolescentes podrán asistir al centro educativo correspondiente con documento expedido por el Instituto Guatemalteco de Migración que indica que su estatus migratorio se encuentra en trámite.

Las personas extranjeras que soliciten dicho estatus, para el nivel de estudios superiores y que han cursado sus estudios de diversificado en el país, deberán realizar una solicitud de prórroga. Las personas extranjeras que requieren el estatus por primera vez, para

estudios del nivel universitario, deberán acompañar la carta en original de aceptación de la universidad y la constancia de inscripción a la casa de estudios superiores.

**Artículo 78. Residentes permanentes.** Son residentes permanentes las personas que además de cumplir con los otros requisitos legales, desean adquirir domicilio en el país, los cuales serán establecidos en el reglamento correspondiente y que se encuentran dentro de los siguientes criterios:

a) Han sido residentes temporales por un período igual o mayor de cinco años.

b) Tener un año o más de haber contraído matrimonio o declarado la unión de hecho con persona guatemalteca.

c) Los familiares, dentro de los grados de ley, de persona guatemalteca que tienen otra nacionalidad.

d) Los nacidos en otros países de Centro América cuando han sido residentes temporales por un período de un año.

e) Los rentistas o pensionados, que son las personas que han sido autorizadas para residir en el país y que cuentan con ingresos permanentes lícitos provenientes del extranjero.

Se entiende, como regla especial para el estatus de residente permanente rentista o pensionado, todos los beneficios y exoneraciones que sean regulados en el reglamento específico para estos casos, serán aplicables a las personas guatemaltecas de origen que se hayan naturalizado en otros países y que regresen pensionados o jubilados por gobiernos o entidades privadas.

**Artículo 79. Disposiciones administrativas.** El Instituto Guatemalteco de Migración deberá emitir el reglamento correspondiente desarrollando los procedimientos, formas y tasas que deben ser cumplidas y pagadas para el otorgamiento, revocación, prórroga y demás efectos que los estatus ordinarios migratorios requieran.

**Artículo 80. Registros.** El Instituto Guatemalteco de Migración deberá mantener el registro actualizado de las personas a las que se les ha otorgado los estatus de residentes temporales y permanentes, podrá emitir constancias y certificaciones a las personas interesadas.

La base de datos del registro de personas con estatus ordinario migratorio permanente debe ser socializada con el Registro Nacional de las Personas para la emisión de documentos de identidad que se extienden a los extranjeros domiciliados. Los procedimientos para realizar dichas gestiones, la coordinación entre ambas instituciones y demás temas de procedimiento y definición de requisitos deberá ser contenido en el reglamento específico que para el efecto deba emitirse.

## Capítulo V
## Estatus extraordinario migratorio

**Artículo 81. Estatus extraordinario de permanencia.** Distinto de los estatus ordinarios migratorios que se definen en este Código, se reconocen circunstancias extraordinarias de permanencia que permiten a una persona extranjera estar en territorio nacional, siendo las siguientes:

a) Estatus de permanencia provisional.

b) Estatus de permanencia de atención especial.

c) Estatus de permanencia por razón humanitaria.

**Artículo 82. Estatus de permanencia provisional.** La permanencia provisional es la estadía de una persona o personas extranjeras en el territorio nacional y se otorga en los siguientes casos:

a) Por orden judicial para que pueda comparecer como testigo, perito o víctima, por el tiempo estrictamente necesario.

b) Por solicitud de autoridad guatemalteca para gestiones que requieren su presencia física, por el tiempo estrictamente necesario.

c) Por solicitud de refugio, por el plazo de treinta días prorrogables.

**Artículo 83. Categorías de estatus de permanencia de atención especial.** Pueden obtener este estatus las personas extranjeras que son víctimas de tortura, víctimas de trata, víctimas de violencia sexual, mujeres en circunstancias particulares, niños, niñas no acompañados o separados de sus familiares, personas mayores, personas perturbadas psicológicamente y otros.

El Instituto Guatemalteco de Migración y el Registro Nacional de las Personas en el caso que se les otorgue el estatuto de refugiado deberán emitir las disposiciones para la obtención del documento de identidad que dispone el artículo 53 y 104 del presente Código.

**Artículo 84. Residencia temporal para solicitantes de la condición de refugiado.** Se otorgará el estatus de residente temporal a los niños, niñas y adolescentes que han solicitado el estatus de refugiado de acuerdo al artículo 48 del presente Código.
El Instituto Guatemalteco de Migración y el Registro Nacional de las Personas deberán emitir las disposiciones para la obtención del documento de identidad que dispone el artículo 104 del presente Código.

**Artículo 85. Estatus de permanencia por razón humanitaria.** Cuando las personas extranjeras ingresan a Guatemala por las razones definidas en el artículo 68 del presente Código, se les otorgará el estatus de permanencia por razón humanitaria comprobada.

Al respecto, las personas deberán ser identificadas mediante boletas especiales que deben portar en todo momento y las cuales deben contener los datos de identificación

DHSFP0131

personal, si han ingresado acompañados de su familia o cualquier familiar consanguíneo, las razones que le otorgan el estatus, la firma y el sello del Subdirector para la Atención, Asistencia y Protección de Derechos Fundamentales de los Migrantes y el Director General del Instituto Guatemalteco de Migración.

El Subdirector de Atención y Protección de Derechos Fundamentales de los Migrantes llevará un registro único y actualizado con la información de todas las personas que se les ha otorgado este estatus.

**Artículo 86. Órganos internacionales.** En los casos de ser otorgado el estatus de permanencia por razón humanitaria, el Director General puede solicitar a los órganos de Naciones Unidas y al Comité Internacional de la Cruz Roja su colaboración, apoyo y fortalecimiento en relación a la experiencia en ayuda humanitaria.

### Capítulo VI
### Estatus migratorio especial

**Artículo 87. Estatus especial.** Obtienen el estatus especial aquellas personas que por su actividad o situación no se encuentran dentro de las definidas como ordinarias o extraordinarias.

Se les denominará con estatus especial a las siguientes:

a) Trabajadores transfronterizos e itinerantes.

b) Trabajadores conforme a la literal b) del artículo 13 del Código de Trabajo. En estos casos, el Ministerio de Trabajo y Previsión Social deberá comunicar lo correspondiente.

c) Los funcionarios diplomáticos, consulares o de organismos internacionales que se regirán por las disposiciones de los convenios internacionales correspondientes de los que Guatemala es parte.

d) Invitados especiales de los Organismos del Estado y sus dependencias o de los órganos autónomos y descentralizados quienes comunicarán de las gestiones que deban realizarse para las comitivas que acompañen a sus invitados.

e) Grupos artísticos, culturales, religiosos, deportivos o educativos que viajan juntos bajo la responsabilidad de una persona determinada.

La Subdirección de Control Migratorio será la encargada de calificar y otorgar dicho estatus en el caso de que las personas no encuadren en ninguna de las categorías ordinarias o extraordinarias. Se exceptúan los funcionarios indicados en la literal c), por ser estos sujetos de tratamiento exclusivo del Ministerio de Relaciones Exteriores.

### Capítulo VII
### Egreso de personas extranjeras de Guatemala

**Artículo 88. Egreso ordinario de personas extranjeras de Guatemala.** El egreso de Guatemala debe realizarse vía los puestos migratorios oficiales del país, cumpliendo con la documentación correspondiente, los requisitos y formalidades de seguridad que sean indicados para cada situación.

Se puede negar el egreso de personas extranjeras del país cuando no cumplen con los requisitos solicitados o bien cuando existan causas que requieren que a la persona le sea negado su egreso.

**Artículo 89. Impedimentos migratorios de egreso.** No pueden egresar del país:

a) Los niños, niñas y adolescentes no acompañados que no porten la documentación oficial requerida para poder realizar viajes solos o en compañía de personas que no están autorizadas legalmente.

b) Las personas que estando bajo solicitud del estatuto de refugiado, asilado político o estatus de permanencia por razón humanitaria no hubieren realizado los avisos y justificaciones que sean requeridos por el Instituto Guatemalteco de Migración.

c) Las personas que por orden judicial no se les tiene permitido salir del país.

El Instituto Guatemalteco de Migración emitirá las disposiciones necesarias sobre los documentos oficiales que deben ser portados, asimismo, sobre las coordinaciones con las entidades tributarias, administradoras de puertos marítimos, aeropuertos y demás que se requiera para el efectivo cumplimiento y control de las normas de impedimento de egreso del país.

### Capítulo VIII
### Documentos de identidad y de viaje

### Sección I
### Documentos de identidad

**Artículo 90. Documentos de viaje.** Los documentos de viaje del migrante o viajero guatemalteco, son los expedidos por el Instituto Guatemalteco de Migración, para que puedan migrar o viajar de acuerdo a los estatus migratorios reconocidos internacionalmente.

Son también documentos de viaje del migrante o viajero aquellos expedidos por las autoridades migratorias de otros países para que sus nacionales puedan ingresar, permanecer y egresar de Guatemala conforme el documento migratorio vigente en el país.

Se reconoce para las personas guatemaltecas como para personas extranjeras, el uso de otros documentos de identidad como documentos de viaje cuando existan acuerdos bilaterales o multilaterales con los países respectivos y que validen el uso de otros documentos.

La única excepción al uso del pasaporte será cuando exista acuerdo o convenio bilateral o multilateral de poder ingresar a territorio de otro país mediante otro documento de identidad.

El pasaporte es el documento de identidad de los guatemaltecos en el extranjero, y es expedido de forma exclusiva por el Instituto Guatemalteco de Migración.

**Artículo 91. Obtención del pasaporte.** El pasaporte es extendido por el Instituto Guatemalteco de Migración y su obtención por parte de las personas será en las sedes que para el efecto sean establecidas.

En caso de las personas guatemaltecas en el exterior el pasaporte podrán adquirirlo mediante las sedes diplomáticas o consulares del país.

El Instituto Guatemalteco de Migración deberá transferir el veinticinco por ciento de los ingresos netos recaudados por las misiones consulares por la expedición de pasaporte en el extranjero al Ministerio de Relaciones Exteriores; dichos fondos serán exclusivamente utilizados para el fortalecimiento y ampliación de la red de protección consular y atención al migrante guatemalteco en el extranjero.

Atendiendo al principio del interés superior del niño, niñas y adolescentes, para obtener pasaporte guatemalteco, los niños, niñas y adolescentes deberán contar con la autorización de la persona que ejerza la representación del menor de edad, de conformidad con el Código Civil. En el caso de que uno o ambos padres se encuentren en el extranjero, la autorización podrá darse ante el funcionario consular guatemalteco respectivo, asimismo si uno o ambos padres se encuentran en Guatemala y el menor de edad en el extranjero, la autorización se realizará ante el Ministerio de Relaciones Exteriores.

**Artículo 92. Clases de pasaportes.** Los pasaportes se clasifican en:

a) **Ordinarios:** Los expedidos a las personas de nacionalidad guatemalteca sin más restricciones que las previstas en este Código y la legislación nacional.

b) **Oficiales:** Los expedidos a funcionarios del Estado que viajan al exterior en misiones oficiales.

c) **Diplomáticos:** Los expedidos al Presidente de la República, el Vicepresidente de la República, a los Diputados al Congreso de la República y los Magistrados de la Corte Suprema de Justicia. Asimismo, a funcionarios diplomáticos que se encuentren en servicio efectivo en el exterior y a los funcionarios diplomáticos de carrera en servicio efectivo, en planta central del Ministerio de Relaciones Exteriores con rango de Ministro, Viceministro o titular de algunas de las Direcciones Generales del Ministerio.

**Artículo 93. Documento Especial de Viaje.** Será emitido a las personas refugiadas reconocidas por el Estado de Guatemala, de acuerdo a lo establecido en el presente Código y a los convenios internacionales ratificados por Guatemala. En el Documento Especial de Viaje se debe indicar que no son nacionales, pero que por las condiciones especiales de su estatus se les ha otorgado un documento de identidad temporal para que puedan egresar e ingresar al país por una sola vez, habiendo una causa plenamente justificada.

En el Documento Especial de Viaje debe incluirse la siguiente leyenda:

"Este Documento Especial de Viaje fue emitido por el Estado de Guatemala a la persona cuyos datos de identificación son consignados en el mismo. Sin embargo, se le advierte a la persona que el mismo no garantiza su ingreso al territorio de otro Estado, el cual está facultado para denegarle el ingreso, tránsito y permanencia, conforme sus leyes y disposiciones migratorias."

**Artículo 94. Características y vigencia de los pasaportes.** Las características de los pasaportes atenderán a lo acordado a nivel regional por los Jefes de Estado y de Gobierno de los países del Sistema de la Integración Centroamericana (SICA).

Siempre debe observarse en su carátula la clase de pasaporte que corresponde y el nombre de República de Guatemala. La vigencia de los pasaportes ordinarios será de cinco o diez años, y serán extendidos por tiempos menores, cuando expresamente el presente Código o su reglamento así lo regule.

Los pasaportes oficiales y diplomáticos tendrán vigencia en razón de la compatibilidad con el periodo de gobierno en que fue extendido o bien en razón de cesar en el cargo público al funcionario. Las instituciones del Estado que hayan solicitado pasaportes oficiales o diplomáticos, deberán informar al Instituto Guatemalteco de Migración en un periodo no mayor de treinta días del cese de los funcionarios en sus cargos.

El reglamento del presente Código deberá definir las demás características de los pasaportes, así como las condiciones especiales que faciliten la obtención de las renovaciones o reposiciones, la Subdirección de Documentos de Identidad Internacional y de Viaje debe emitir las reglas de seguridad y autenticidad de los mismos de acuerdo a los avances que permanentemente se realicen y a las recomendaciones de la Organización de Aviación Civil Internacional.

**Artículo 95. Nulidad y anulabilidad.** Los pasaportes son nulos cuando no son emitidos por el Instituto Guatemalteco de Migración, no cumplen con las características definidas en el presente Código o su reglamento y cuando se les ha incorporado visas falsas de otros países.

Son anulables cuando por hurto, robo, extravío, deterioro y otros, son declarados anulados mediante el procedimiento de denuncia o reporte correspondiente. Cuando es alterada la información que de acuerdo al presente Código y su reglamento es obligatorio que posea, se ha alterado la información de la persona guatemalteca, se ha alterado sus formas y cuando ha expirado por cumplirse su plazo de vigencia.

**Artículo 96. Denuncias y reportes.** Cuando un pasaporte se haya extraviado, robado o hurtado, la persona debe acompañar constancia de denuncia expedida por la autoridad que corresponda para la obtención del nuevo pasaporte.

Cuando el pasaporte se ha deteriorado o destruido, es suficiente con carta firmada por el titular del mismo y presentación del documento original.

El procedimiento a seguir será regulado en el reglamento correspondiente.

En el caso de guatemaltecos fuera del país, si las condiciones lo permiten debe acompañar denuncia presentada ante la autoridad competente del país en donde se encuentre. En todo caso, el cónsul deberá extenderle un documento de viaje con vigencia de noventa días

**Artículo 97. Verificación en razón de protección.** Cuando fuera del país sea solicitado el documento de viaje para un niño, niña o adolescente no acompañado, el cónsul guatemalteco verificará en comunicación con la Procuraduría General de la Nación que el niño, niña o adolescente no se encuentra reportado como desaparecido, secuestrado o extraviado. Para la emisión de este documento se atenderá a lo previsto en el artículo 91 del presente Código.

El interés superior de la niñez y adolescencia debe regir como criterio de protección ante la actuación consular

**Artículo 98. Derecho especial de pasaportes diplomáticos.** Tiene derecho al pasaporte diplomático además de los funcionarios diplomáticos que se encuentren en servicio efectivo en el exterior y de los funcionarios diplomáticos de carrera en servicio efectivo, en planta central del Ministerio de Relaciones Exteriores con rango de Ministro, Viceministro o titular de algunas de la Direcciones Generales del Ministerio, el cónyuge y los hijos menores de edad.

**Artículo 99. Derecho al documento de identidad fuera de Guatemala.** Los guatemaltecos que se encuentren en otro país y su pasaporte venciera, se deteriorara, fuera robado, hurtado o extraviado tienen derecho a solicitar un nuevo pasaporte ante las sedes consulares correspondientes

**Artículo 100. Identidad de los residentes temporales y permanentes.** Las personas que han obtenido el estatus de residentes temporales o permanentes, deberán identificarse con el Documento Personal de Identificación que les será extendido por el Registro Nacional de las Personas, de conformidad con las regulaciones específicas que sean emitidas por este Registro.

Para efectos del documento personal de identificación, a los residentes temporales se les considerará extranjeros domiciliados, aplicando la literal b) del artículo 55 del Decreto Número 90-2005 del Congreso de la República, Ley del Registro Nacional de las Personas.

**Artículo 101. Identidad de estatus extraordinario migratorio.** En el caso de las personas con estatus de permanencia provisional sus pasaportes serán el documento de identidad.

En el caso de las personas con estatus de permanencia de atención especial, serán los siguientes:

a) Si portaren pasaporte del país de origen se tomará este como válido hasta su expiración, posteriormente, será el autorizado temporalmente por el Registro Nacional de las Personas.

b) Si fueren personas solicitantes del reconocimiento del estatuto de refugiado el documento especial será el autorizado por el Instituto Guatemalteco de Migración, en acuerdo con el Instituto Guatemalteco de Migración. Es válido para que puedan acceder a la obtención de empleo y el ejercicio de sus derechos de educación y salud en cuanto se resuelve en definitiva

c) Las personas con estatus de permanencia por razón humanitaria mediante la boleta correspondiente definida en el presente Código.

**Artículo 102. Identidad de las personas con estatus migratorio especial.** Como regla general rige la existencia del pasaporte. Para el caso de los trabajadores fronterizos, se emitirá la tarjeta de visitante ordinario transfronterizo, en donde se hará constar la actividad a la que se dedica y si fuere el caso del nombre de la persona jurídica o individual para la cual desarrolla sus actividades, o bien el nombre comercial o público en donde normalmente se desempeña.

## Sección II
## Documentos de viaje

**Artículo 103. Documentos de viaje.** Son documentos de viaje los extendidos para guatemaltecos por el Instituto Guatemalteco de Migración y que permiten a las personas obtener las autorizaciones correspondientes, así como registrar los ingresos, permanencia y egresos de otros países

También son documentos de viaje los extendidos por autoridades migratorias de otros países y que le permiten a los nacionales de ese país registrar la autorización, ingreso, permanencia y egreso a territorio guatemalteco.

**Artículo 104. Documento de viaje para asilados o refugiados, refugio o por razones humanitarias.** Las personas reconocidas como refugiadas o asiladas que no cuentan con documentos de viaje, podrán solicitar al Instituto Guatemalteco de Migración la emisión de un documento especial de viaje, consistente en un documento bajo las características enunciadas en el artículo que se refiere al Documento Especial de Viaje del presente Código.

Este Documento Especial de Viaje tendrá validez para una sola entrada y una salida.

**Artículo 105. Visas.** Las visas extendidas por Guatemala a personas extranjeras autorizan a esta persona a poder ingresar, transitar, permanecer y egresar del país por el tiempo determinado en el propio documento. El tiempo puede ser cambiado en razón de cambiar su estatus migratorio de acuerdo a las categorías de estatus definidas en este Código.

La autoridad migratoria nacional debe emitir de forma periódica a que nacionalidades se les requerirá visa para ingresar a territorio nacional.

Los procedimientos para la obtención de visa guatemalteca, así como su forma, duración y demás requerimientos será regulado en el reglamento específico de visas.

## Capítulo IX
## Planes de regularización migratoria

**Artículo 106. Planes de regularización.** Los planes de regularización son aquellos mediante los cuales el Estado de Guatemala le permite a una persona extranjera que radica en territorio nacional en situación irregular, obtener un estatus migratorio ordinario, según lo regulado por el presente Código y sus reglamentos.

**Artículo 107. Extranjero en situación irregular.** Se considera a una persona extranjera en situación irregular cuando ingreso o habita en el territorio nacional, de buena fe y de forma pacífica, pero que no cuenta con ninguno de los estatus ordinarios migratorios definidos en el presente Código.

**Artículo 108. Emisión de los planes de regularización.** El Organismo Ejecutivo a solicitud de la Autoridad Migratoria Nacional debe mediante Acuerdo Gubernativo emitir la vigencia de los planes de regularización y desarrollar dentro del mismo los objetivos, el período de aplicación y el procedimiento específico a seguir

La autoridad rectora para el desarrollo de estos planes siempre debe ser el Instituto Guatemalteco de Migración y para el procedimiento específico se debe observar las reglas generales emitidas en este mismo Código.

**Artículo 109. Solicitud del plan de regularización.** Únicamente la Autoridad Migratoria Nacional puede solicitar al Organismo Ejecutivo la emisión de estos planes, acompañando el estudio técnico correspondiente que debe ser avalado por el Instituto Guatemalteco de Migración.

**Artículo 110. Beneficiarios.** Los planes de regularización también pueden ser emitidos en las siguientes circunstancias

a) Exista un alto número de solicitudes de guatemaltecos que soliciten la recuperación de la ciudadanía

b) La presunción basada en datos estadísticos relevantes de un alto número de personas de otros países de Centro América radicados en Guatemala.

c) Alto número de hijos e hijas de personas guatemaltecas nacidas en el extranjero que deseen obtener sus documentos como nacionales.

**Artículo 111. Características.** Los planes de regularización son temporales, con plazos definidos y aplican para la regularización de personas que han ingresado al país a partir de un año específico y hasta un año determinado, por lo tanto, son procedimientos extraordinarios que deben ser ajustados a cada situación y condición, observando las reglas generales del presente Código, para el caso de los guatemaltecos, los planes de regularización serán permanentes y su procedimiento se normará por reglamento

Los procedimientos pueden gravarse mediante el Acuerdo Gubernativo correspondiente, pueden ser trámites gratuitos, los pagos de multas pueden ser reducidos y orientados a vincular a las personas en una relación directa con el Estado como habitante en el marco de sus derechos fundamentales.

## Libro II
## Sistema y Políticas Migratorias

## Título I
## Sistema Migratorio Guatemalteco

## Capítulo I
## Sistema Migratorio Guatemalteco y Política Migratoria

**Artículo 112. Sistema Migratorio Guatemalteco.** Se crea el Sistema Migratorio Guatemalteco como el conjunto de instituciones estatales que velan por el migrante y la regulación apropiada y efectiva del ingreso y salida de guatemaltecos y extranjeros al territorio de Guatemala y el tránsito y la estancia de los extranjeros en el mismo, en un marco de respeto, protección y salvaguarda de los derechos humanos, de contribución al desarrollo nacional y protección de los habitantes.

El Sistema Migratorio Guatemalteco actuará con debida diligencia en todas sus actuaciones, observando los siguientes principios:

a) **Oficiosidad:** Los funcionarios o empleados actúan oficiosamente en el diligenciamiento de sus funciones.

b) **Oportunidad:** Los funcionarios o empleados en todas sus actividades actuaran en procura de plazos razonables y de forma propositiva

c) **Independencia e Imparcialidad:** Todos los actos, resoluciones y decisiones que los funcionarios y empleados del Sistema Migratorio Guatemalteco realicen, emitan o tomen siempre serán basadas en derecho, apegadas a legalidad y respeto a los derechos humanos.

d) **Transparencia:** La actuación migratoria ~~DHSEF0133~~ a la información pública bajo los parámetros establecidos por la legislación nacional.

**Artículo 113. Conformación.** El Sistema Migratorio Guatemalteco se conforma por:

a) La Autoridad Migratoria Nacional.

b) El Instituto Guatemalteco de Migración.

c) El Consejo Nacional de Atención al Migrante de Guatemala.

Las entidades que conforman el Sistema Migratorio Guatemalteco deberán reunirse, como mínimo, una vez al año o de acuerdo a las necesidades que puedan presentarse, para compartir información, buenas prácticas o cualquier asunto relacionado con los migrantes.

**Artículo 114. Política Migratoria.** La Política Migratoria es el conjunto de normas, instituciones, procedimientos, programas, planes, presupuestos y acciones que el Estado de Guatemala destina con exclusividad para atender el derecho a migrar de las personas.

La Política Migratoria será emitida por la Autoridad Migratoria Nacional y ejecutada por el Instituto Guatemalteco de Migración en conjunto con sus subdirecciones. Además coordinará con el resto de instituciones del Estado las acciones de política según su mandato y competencias.

Las instituciones que sean mencionadas en el presente Código y en la legislación nacional del país y que por lo tanto tengan una vinculación directa con la ejecución de la política migratoria, deben desarrollar dentro de sus funciones la de atender los asuntos para los cuales la política y la legislación nacional les requiera.

**Artículo 115. Principios de la Política Migratoria.** Los principios sobre los cuales debe ser diseñada y conformada la Política Migratoria son:

a) Respeto a los derechos humanos de las personas.

b) Garantía del derecho a migrar, los derechos de los migrantes y el derecho migratorio como categorías distintas pero complementarias.

c) Exclusiva competencia en materia del Instituto Guatemalteco de Migración

d) Integración de los compromisos migratorios adquiridos por Guatemala ante la Comunidad Internacional

e) La seguridad de las personas migrantes durante el origen, tránsito, destino y retorno.

f) La preservación del territorio nacional.

## Capítulo II
### Autoridad Migratoria Nacional

**Artículo 116. Autoridad Migratoria Nacional.** Se crea la Autoridad Migratoria Nacional, la cual tiene a su cargo la formulación, creación y supervisión de la Política Migratoria y de la seguridad en materia de migración.

**Artículo 117. Integración.** La Autoridad Migratoria Nacional está conformada por el Vicepresidente de la República, el Ministro de Relaciones Exteriores, el Ministro de Desarrollo Social, el Ministro de Trabajo y Previsión Social, el Ministro de Gobernación, el Director del Instituto Guatemalteco de Migración y el Secretario Ejecutivo del Consejo Nacional de Atención al Migrante de Guatemala.

El Vicepresidente de la República es quien tiene a su cargo la dirección de la Autoridad Migratoria Nacional. El Director del Instituto Guatemalteco de Migración fungirá como Secretario Técnico de la Autoridad Migratoria Nacional, el cual tendrá voz pero no voto en las sesiones que realicen, el funcionamiento será regulado por el reglamento específico.

La Autoridad Migratoria Nacional debe reunirse por lo menos una vez cada tres meses en sesiones ordinarias, y en sesiones extraordinarias cuando sea necesario.

**Artículo 118. Funciones.** Son funciones de la Autoridad Migratoria Nacional:

a) Emitir la Política Migratoria.

b) Supervisar el cumplimiento de la política.

c) Modificar la política de acuerdo a los requerimientos del Presidente de la República, de los propios integrantes de la Autoridad, del Congreso de la República o de cualquier otra instancia de Gobierno que justifique la modificación

d) Solicitar al Presidente de la República, en Consejo de Ministros, la aprobación de los planes de regularización migratoria a que hace referencia este Código.

e) Aprobar el proyecto de presupuesto del Instituto Guatemalteco de Migración

f) Aprobar los reglamentos emitidos por el Instituto Guatemalteco de Migración

g) Requerir informes técnicos al Instituto Guatemalteco de Migración.

h) Requerir los informes de ejecución e implementación de la Política Migratoria.

i) Aprobar el plan estratégico y anual del Instituto Guatemalteco de Migración.

j) Promover la firma y ratificación de convenios, tratados y acuerdos internacionales'

k) Solicitar estudios técnicos, estadísticos, académicos o los que se consideren necesarios para el abordaje adecuado de las necesidades de las personas en el ejercicio del derecho a migrar.

l) Delegar en algunos de sus integrantes, comisiones especiales, de acuerdo a sus funciones

m) Requerir a las entidades estatales los informes que considere necesarios para garantizar el derecho a migrar.

n) Todas aquellas que se señalen en este Código y en la legislación nacional

**Artículo 119. Rectoría política internacional.** En cuestiones relacionadas con la política migratoria exterior o internacional, la Autoridad Migratoria Nacional, debe actuar en coordinación con el Ministerio de Relaciones Exteriores y en concordancia con la política internacional definida por el Presidente de la República.

## Capítulo III
### Instituto Guatemalteco de Migración

**Artículo 120. Creación y descentralización.** Se crea el Instituto Guatemalteco de Migración como una dependencia descentralizada del Organismo Ejecutivo.

El Instituto Guatemalteco de Migración tiene competencia exclusiva para la ejecución de la Política Migratoria, la administración directa e indirecta de las disposiciones estatales orientadas a la gestión del derecho a migrar, la ejecución presupuestaria aprobada para el efecto y las demás disposiciones que sean consideradas dentro de la legislación nacional del país.

Para el cumplimiento de sus fines y la ejecución de sus funciones el Instituto Guatemalteco de Migración, tiene competencia en todo el territorio nacional, con capacidad suficiente para administrar sus recursos financieros, técnicos, humanos y administrativos, así como adquirir derechos y obligaciones.

**Artículo 121. Misión.** El Instituto Guatemalteco de Migración tiene como misión el velar por el respeto al derecho humano de migrar, garantizando mediante la administración adecuada del derecho migratorio y la asistencia y protección oportuna de aquellas personas migrantes extranjeras o nacionales que lo requieran. Asimismo, constituirse como un órgano descentralizado en la prestación de los servicios públicos migratorios, orientando su acción al respeto de los derechos humanos de las personas.

**Artículo 122. Funciones.** Son funciones del Instituto Guatemalteco de Migración, además de las que se regulan en el reglamento del presente Código y la legislación nacional, las siguientes:

a) Velar por los derechos de las personas migrantes.

b) Establecer las oficinas administrativas necesarias para la atención de las personas migrantes en el territorio nacional y en el extranjero.

c) Ejecutar la Política Migratoria emitida por la Autoridad Migratoria Nacional.

d) Integrar la Autoridad Migratoria Nacional mediante el Director General.

e) Realizar los informes técnicos, estadísticos y cualquier índole para cuando sea requerido por la Autoridad Migratoria Nacional o por el Presidente de la República.

f) Coordinar con las Secretarías y Ministerios de Estado las acciones específicas para la atención, asistencia y protección de las personas migrantes y dar seguimiento al cumplimiento de los resultados y metas de la Política Migratoria.

g) Coordinar con las Secretarías y Ministerios de Estado la administración del servicio migratorio.

h) Integrar las subdirecciones específicas creadas para la atención de situaciones especiales.

i) Proponer a la Autoridad Migratoria Nacional la creación de comisiones temporales de alto nivel para el abordaje de coyunturas específicas.

j) Proponer a la Autoridad Migratoria Nacional se solicite la emisión de planes de regularización, de acuerdo a lo establecido en el presente Código.

k) Disponer de subdirecciones para la atención, asistencia y protección de personas migrantes solicitantes de asilo, refugio y asistencia humanitaria

l) Dirigir y controlar la aplicación de las disposiciones para el ingreso de personas extranjeras al territorio nacional, así como su permanencia y egreso.

m) Dirigir y controlar la aplicación de las disposiciones para los estatus ordinarios, extraordinarios y especiales migratorios de acuerdo al presente Código, la Política Migratoria, las prácticas internacionales y la legislación nacional.

n) Dirigir, controlar y administrar la emisión y otorgamiento de los documentos de identidad internacional y de viaje, de conformidad con el presente Código y las demás disposiciones administrativas que se emitan para el efecto.

o) Aplicar y garantizar el respeto de los procedimientos administrativos regulados en el presente Código.

p) Garantizar el respeto a los derechos laborales y promover la profesionalización del recurso humano del Instituto Guatemalteco de Migración.

q) Administrar exclusivamente y bajo su responsabilidad las bases de datos que se especifican en el presente Código, sin embargo, dichas bases de datos son propiedad del Estado.

**Artículo 123. Recursos financieros.** El Instituto Guatemalteco de Migración contará con los recursos financieros que tenga asignados en el Presupuesto General de Ingresos y Egresos del Estado y los que provengan de las siguientes fuentes:

DHSFF01 34

1) Multas impuestas por faltas conforme a lo que regula el presente Código;

2) El cobro del valor de los documentos de viaje solicitados en territorio nacional y en el extranjero, y que sean expedidos y autorizados por el Instituto Guatemalteco de Migración;

3) El cobro por el otorgamiento de visa guatemalteca a persona originaria del Estado al que se le solicite visa;

4) El cobro del valor por la obtención, prórroga o cambio de las diferentes categorías y estatus migratorios;

5) Los ingresos provenientes de los cobros por trámite en planes de regularización;

6) Los ingresos provenientes del cobro de egresos del territorio nacional de los extranjeros. Las disposiciones y el monto correspondiente serán regulados en el reglamento;

7) Aportaciones de entidades públicas y privadas; y,

8) Cualquier otro ingreso que obtenga por cualquier título lícito.

Los recursos financieros provenientes de las fuentes enumeradas anteriormente tienen carácter de privativos a favor del Instituto Guatemalteco de Migración, por lo tanto, los mismos deberán ser destinados exclusivamente para la carrera profesional del personal, infraestructura, equipo, mantenimiento, gastos de operación y atención al migrante.

### Sección I
### Director General

**Artículo 124. Director General.** El Instituto Guatemalteco de Migración es dirigido por el Director General, el cual ejerce sus funciones con absoluta independencia de criterio y bajo su entera responsabilidad de conformidad con la legislación nacional, sin perjuicio de las directrices y lineamientos que se determinen por la Autoridad Migratoria Nacional para la efectiva ejecución de la política nacional migratoria.

El Director General es responsable de los daños y perjuicios que cause por los actos y omisiones en que incurra en el ejercicio de su cargo.

El Director General puede suscribir convenios en materia migratoria con los entes nacionales e internacionales que correspondan; así como instituciones similares y de seguridad extranjeras con la finalidad de compartir y consultar información.

**Artículo 125. Selección.** El Presidente de la República es responsable de nombrar a la persona que ocupará el puesto de Director General del Instituto Guatemalteco de Migración, de acuerdo a las calidades dispuestas en el presente Código, quién le dará nombramiento para un periodo de cinco años, prorrogables.

Si se produce la vacante definitiva del Director, la persona a nombrar inicia un nuevo periodo de cinco años, prorrogables.

**Artículo 126. Calidades para ser Director General.** Para el cargo de Director General del Instituto Guatemalteco de Migración se requieren las mismas calidades que para ser Ministro de Estado.

**Artículo 127. Prohibiciones para ser Director General.** No puede ser nombrado Director General del Instituto Guatemalteco de Migración, quien se encuentre dentro de las siguientes circunstancias:

a) Ser proveedor, representante del proveedor, director o empleado de confianza del proveedor de servicios o bienes contratados por el Estado en cualquiera de sus dependencias.

b) Ser ministro de culto o líder religioso.

c) Tener proceso penal pendiente por cualquier delito de los previstos en la legislación nacional.

d) Haber sido condenado por delitos contra la administración pública, la vida, la libertad, la indemnidad sexual o la integridad personal. Asimismo, haber sido declarado que violó o amenazó derechos humanos de la niñez y adolescencia.

**Artículo 128. Suspensión de funciones.** El Director General se suspende en sus funciones cuando por situaciones temporales, debidamente justificadas, solicita a la Autoridad Migratoria Nacional permiso por un tiempo determinado.

**Artículo 129. Remoción del cargo.** El Director General puede ser removido por el Presidente de la República a solicitud de la Autoridad Migratoria Nacional si incurre en las siguientes causales:

a) Cometer actos fraudulentos, ilegales o evidentemente opuestos a las funciones o intereses del Instituto Guatemalteco de Migración o al Estado en general.

b) Ser condenado en sentencia firme por la comisión de delitos dolosos.

c) Pronunciarse a favor de partido político o postularse como candidato para un cargo de elección popular.

**Artículo 130. Sustitución.** El Subdirector General sustituirá al Director General del Instituto Guatemalteco de Migración en los siguientes casos:

a) Ausencia temporal o enfermedad;

b) Suspensión de funciones;

c) Declaratoria por autoridad competente de incapacidad física o mental para el ejercicio del cargo;

d) Remoción;

e) Renuncia;

f) Fallecimiento; y,

g) Abandono.

Para los casos de las literales de la c) a la g) el Subdirector General sustituirá temporalmente al Director General en tanto se nombra al nuevo Director.

**Artículo 131. Funciones generales.** Son funciones generales del Director General, además de aquellas que sean dispuestas en otros instrumentos jurídicos, las siguientes:

1. Procurar en todo momento el libre acceso al derecho de migrar de toda persona y no imponer más límites que los establecidos en la legislación nacional, así como en los tratados y convenios aprobados y ratificados por Guatemala en materia de derechos humanos, derecho de refugiados, derecho humanitario y derecho penal internacional.

2. Dirigir el Instituto Guatemalteco de Migración de conformidad con la política nacional migratoria, este Código y la legislación nacional.

3. Ejecutar la Política Migratoria Nacional y establecer las disposiciones administrativas para el efecto.

4. Representar legalmente al Instituto Guatemalteco de Migración.

5. Someter a consideración y aprobación de la Autoridad Migratoria el plan estratégico y anual del Instituto Guatemalteco de Migración. De igual forma el proyecto de presupuesto anual.

6. Emitir el reglamento general y específico para aprobación de la Autoridad Migratoria Nacional.

7. Adquirir bienes y servicios para el Instituto Guatemalteco de Migración.

8. Firmar contratos para el cumplimiento de los fines del Instituto Guatemalteco de Migración.

9. Suscribir acuerdos, cartas de entendimiento y convenios con instituciones civiles de cooperación, nacionales o internacionales.

10. Nombrar y remover a los subdirectores de migración.

11. Integrar la Autoridad Migratoria Nacional.

**Artículo 132. Funciones específicas.** Son funciones específicas del Director General, además de aquellas que sean dispuestas en otros instrumentos jurídicos, las siguientes:

1. Emitir la política interna de recursos humanos y su administración mediante el ente interno correspondiente, incluyendo la carrera profesional de migración.

2. Aprobar los programas, proyectos y planes de cada subdirección y de las unidades administrativas del Instituto Guatemalteco de Migración.

3. Supervisar la ejecución presupuestaria y aprobar sus ajustes internos de acuerdo a los programas, proyectos y planes correspondientes.

4. Impartir las instrucciones convenientes al servicio y al ejercicio de las funciones, tanto de carácter general como relativas a sus asuntos específicos.

5. Integrar al Instituto Nacional de Estadística en las disposiciones de recopilación estadística.

6. Coordinar con el Subdirector General, las instancias de procedimientos administrativos regulados en este Código y los reglamentos.

**Artículo 133. Representación.** La representación legal que ejerce el Director General se puede delegar de forma expresa, para actuar en nombre del Director General en los procesos administrativos o judiciales correspondientes en que se ejercitan funciones atribuidas al Instituto Guatemalteco de Migración por este Código, sus reglamentos y la legislación nacional.

### Sección II
### Subdirector General

**Artículo 134. Subdirector General.** Para ser nombrado Subdirector General se debe reunir las mismas calidades establecidas en este Código para el Director General. El Subdirector General será nombrado por el Director General.

**Artículo 135. Funciones del Subdirector General.** El Subdirector General suple al Director General en los casos previstos en el artículo 130 de este Código. Tendrá las funciones que le sean asignadas por los reglamentos y disposiciones internas del Instituto Guatemalteco de Migración, además de las siguientes:

1. Dirigir y coordinar la elaboración, diseño, implementación y evaluación de proyectos de modernización y fortalecimiento que persigan eficiencia y eficacia, los cuales deberá someter a aprobación del Director General.

DHS-EP-0135

2. Ser el ente interno central de coordinación con los subdirectores de migración en cuanto a los procedimientos administrativos regulados en este Código y los reglamentos.

3. Representar al Instituto Guatemalteco de Migración ante las autoridades nacionales o ante estudios internacionales cuando se lo solicite el Director General.

4. Dirigir la unidad de estudios de profesionalización migratoria de acuerdo a las disposiciones emitidas por el Director General y en coordinación con las unidades internas correspondientes.

5. Integrar el Consejo de Atención y Protección y ejecutar en coordinación con las subdirecciones de migración y en acuerdo con el Director General las disposiciones que dentro del consejo sean tomadas.

6. Las demás funciones que le asigne el Director General del Instituto Guatemalteco de Migración.

### Capítulo IV
### Subdirecciones

**Artículo 136. Subdirecciones.** Las Subdirecciones se estructuran y organizan bajo los criterios de eficacia y eficiencia, conforme las competencias, funciones y atribuciones que se dispongan dentro del presente Código y los reglamentos internos del Instituto Guatemalteco de Migración.

Las funciones que sean competencia de las subdirecciones pueden delegarse en las unidades que el Instituto Guatemalteco de Migración establezca en las regiones o departamentos de la República para el cumplimiento de sus fines.

**Artículo 137. Autoridad y jerarquía de las subdirecciones.** Las subdirecciones serán dirigidas por un Subdirector, quien es la autoridad máxima a nivel jerárquico dentro de cada subdirección.

Tiene como responsabilidad el cumplimiento de las funciones y atribuciones asignadas a sus respectivas subdirecciones de conformidad con este Código, los reglamentos, las disposiciones emanadas del Director General y las demás provenientes de la legislación nacional.

**Artículo 138. Nombramientos.** Los subdirectores son nombrados por el Director General de acuerdo a las calidades y requisitos que se establezcan dentro del reglamento

Sin embargo, debe observar que las personas sean profesionales universitarios, colegiados activos, mayores de treinta años, dando mayor mérito a aquellos que cuenten con carrera dentro del ámbito migratorio estatal.

**Artículo 139. Estructura orgánica de las subdirecciones.** El Instituto Guatemalteco de Migración tiene como ente jerárquico superior al Director General, función que puede ser desarrollada por el Subdirector General de acuerdo a lo establecido en el presente Código. Sin embargo, para el funcionamiento eficiente y efectivo de las atribuciones se dispone de la siguiente estructura orgánica de las subdirecciones.

1. **Estructura Sustantiva y Operativa**

   a) Subdirección de Atención y Protección de Derechos Fundamentales de los Migrantes.
   b) Subdirección de Extranjería.
   c) Subdirección de Control Migratorio.
   d) Subdirección de Documentos de Identidad Personal y de Viaje.
   e) Subdirección de Política Migratoria.

2. **Estructura de Apoyo Técnico**

   a) Subdirección de Planificación.
   b) Subdirección de Asuntos Jurídicos.
   c) Subdirección de Responsabilidad Profesional.
   d) Subdirección de Relaciones Migratorias Internacionales.
   e) Subdirección de Atención al Usuario.

3. **Estructura Administrativa**

   a) Subdirección de Asuntos Financieros.
   b) Subdirección de Recursos Humanos y Profesionalización de Personal.
   c) Subdirección de Apoyo Administrativo y Logístico.
   d) Subdirección de Recursos Tecnológicos, Comunicaciones e Informática.

**Artículo 140. Definición de las estructuras administrativas y operativas.** La estructura administrativa y operativa del Instituto Guatemalteco de Migración es compuesta por cinco subdirecciones, las cuales se definen de la siguiente forma:

**a) Subdirección de Atención y Protección de Derechos Fundamentales de los Migrantes.** Tendrá las siguientes responsabilidades:

   a.1 Disponer de las acciones necesarias para la asistencia y protección de las personas migrantes por parte del Estado de Guatemala, en especial de los niños, niñas y adolescentes no acompañados, familias y mujeres migrantes embarazadas.

   a.2 Asistir a los solicitantes del reconocimiento del estatuto de refugiado, a los refugiados, solicitantes de asilo político bajo la figura del asilo territorial o diplomático y a los asilados políticos bajo la figura del asilo territorial o diplomático, y del estatus extraordinario migratorio regulado por este Código.

   a.3 Apoyar los procedimientos para el abrigo y cuidado temporal, comunicación y contacto familiar y solicitudes de extranjeros para ser retornados a su país de origen o procedencia.

   a.4 Disponer, regular y autorizar el funcionamiento, las características y condiciones de dignidad, seguridad, confiabilidad y supervisión de las casas especiales de protección, abrigo y cuidado de los migrantes extranjeros, así como de los nacionales retornados.

Las disposiciones internas o regulatorias serán normadas en el reglamento del presente Código.

**b) Subdirección de Extranjería:** Es la responsable de la emisión, registro y control de las visas y residencias, luego de verificar la veracidad y validez de la información y documentos requeridos de acuerdo a las categorías definidas en este Código y lo establecido en el reglamento. También tiene las siguientes responsabilidades:

   b.1 En el proceso de evaluación, análisis y aprobación de las solicitudes y renovaciones de visas y residencias, recogerá la información biográfica y biométrica de las personas que las solicitan, las cuales serán verificadas con las bases de datos de seguridad pública.
   Para el caso de las solicitudes de visa de las personas cuyo país en donde Guatemala no cuente con representación consular, la información biográfica y biométrica se verificará en el momento que la persona se presente en el puesto de control migratorio en Guatemala.
   Los requisitos para el otorgamiento de las visas y residencias se desarrollarán en el reglamento del presente Código.

   b.2 Notificar a los residentes extranjeros en Guatemala sobre el vencimiento de las residencias otorgadas, así como la gestión de las modificaciones al registro de extranjeros.

   b.3 Sugerir al Director General la necesidad de planes de regularización migratoria de extranjeros.

La Subdirección de Extranjería contará con una unidad de verificación migratoria de campo. El personal que labore en esta unidad deberá ser evaluado periódicamente a través de pruebas de confiabilidad.

**c) Subdirección de Control Migratorio:** Es la responsable de controlar y registrar el ingreso y egreso de nacionales y extranjeros del territorio nacional, conforme a las disposiciones del presente Código y la legislación nacional vigente, a través de los puestos fronterizos nacionales, en las vías aéreas, terrestres o marítimas. Para los extranjeros implica la vigilancia del cumplimiento de las disposiciones legales respecto a su ingreso, egreso, permanencia y actividades en el país. Con excepción de los puestos fronterizos entre países con los que se haya suscrito o se suscriba tratados o convenios de libre tránsito. Esta Subdirección, a través de

una unidad de verificación de campo, tiene la función de verificar en cualquier lugar del territorio nacional la situación migratoria de las personas que ostentan el estatus migratorio conforme a las categorías definidas en este Código y lo establecido en el reglamento.

El control migratorio fronterizo de entrada y salida recogerá la información biográfica y biométrica de los usuarios en los puntos fronterizos, con excepción de los puestos fronterizos terrestres, en los casos regulados por convenios de libre tránsito.

La Subdirección de Control Migratorio también contará con una unidad de verificación de campo que comprobará que todas las personas individuales o jurídicas, que presten servicios de transporte, entreguen la Información Anticipada Sobre los Pasajeros (APIS, por sus siglas en inglés), encargándose además de verificar dicha información. Al no presentar esta información, por parte de los transportistas, estarán sujetos a las sanciones correspondientes que se regularán en el reglamento de este Código.

El personal que labora en las unidades previstas en la presente literal, será evaluado periódicamente a través de pruebas de confiabilidad, y en el cumplimiento de sus funciones coadyuvará permanentemente con la dependencia de la Policía Nacional Civil responsable de la seguridad ciudadana en puestos, aeropuertos y puestos fronterizos aéreos, terrestres y marítimos.

**d) Subdirección de Documentos de Identidad Personal y de Viaje:** Es la responsable de establecer los procesos y sistemas necesarios para emitir en forma segura, eficiente, diligente y consistente los documentos de identidad y de viaje de guatemaltecos y extranjeros que estipula el presente Código, así como de las personas en estatus extraordinario y especial migratorio.

**e) Subdirección de Política Migratoria:** La creciente migración y su problemática, demanda la generación y sistematización de estadísticas que puedan dar cuenta de los flujos de migrantes de origen, destino, tránsito y retorno al territorio.
En correspondencia con sus atribuciones, la Subdirección de Política Migratoria del Instituto Guatemalteco de Migración deberá producir información contando con la colaboración de las instituciones que considere pertinentes, sobre las tendencias, magnitudes y características de los flujos migratorios, a partir de los registros administrativos generados en los diversos puntos de ingreso, estaciones migratorias, oficinas del Instituto Guatemalteco de Migración o cualquier otra que considere pertinente.

Asimismo, la Subdirección impulsará el levantamiento continuo de encuestas sobre migración en las fronteras, lo que contribuirá a generar las políticas en la materia para un mayor conocimiento social sobre el fenómeno migratorio.

DHSF0136

El Director General del Instituto y cada uno de los subdirectores, serán solidariamente responsables de la integridad y el resguardo de las bases de datos respectivas.

**Artículo 141. Definición de la estructura de apoyo técnico.** La estructura de apoyo técnico está integrada por cinco subdirecciones, las cuales se definen de la siguiente forma:

a) **Subdirección de Planificación:** Es la responsable de coordinar el proceso de planificación, programación y evaluación de los planes estratégicos,y anuales para lograr la ejecución de la política migratoria nacional y el presupuesto asignado.

b) **Subdirección de Asuntos Jurídicos:** Es la responsable de conocer y sugerir al Director General las decisiones en los casos de solicitudes de asilo, refugio y en aquellas de estatus extraordinario migratorio. De igual forma, debe dar acompañamiento permanente a toda la estructura orgánica del Instituto Guatemalteco de Migración.

c) **Subdirección de Responsabilidad Profesional:** Es la responsable de diligenciar la recepción de denuncias contra empleados y funcionarios, investigarlos y determinar la necesidad de apertura de procedimiento administrativo disciplinario. En caso de que se determine la existencia de delitos debe comunicar al Director General para la realización de la denuncia ante el Ministerio Público.

d) **Subdirección de Relaciones Migratorias Internacionales:** Es la responsable en coordinación con el Consejo Nacional de Atención al Migrante de Guatemala en asesorar en materia migratoria de relaciones internacionales, a las demás subdirecciones, para atender los derechos de las personas guatemaltecas en el exterior.

e) **Subdirección de Atención al Usuario:** Es la responsable de mantener el control y registro de todas las solicitudes presentadas ante el Instituto Guatemalteco de Migración y sus Subdirecciones con el objeto de centralizar el sistema de recepción de solicitudes, documentación y notificación de las resoluciones. Debe recibir, recopilar, administrar, clasificar y distribuir las solicitudes y expedientes correspondientemente. Asimismo, es la responsable de proporcionar la información, requisitos de ley, tiempos de gestión y todo lo relacionado con los trámites a las personas usuarias. Debe instituir la oficina de acceso a la información pública conforme la legislación nacional.

**Artículo 142. Definición de la estructura administrativa.** La estructura administrativa está integrada por cuatro subdirecciones las cuales se definen de la siguiente forma:

a) **Subdirección de Asuntos Financieros:** Es la responsable de la administración de los recursos financieros conforme los principios de transparencia, eficiencia efectividad y administración óptima, así como de las operaciones presupuestarias y contables. Tiene a su cargo la coordinación de la supervisión de la ejecución presupuestaria y la planificación anual con la Subdirección de Planificación.

b) **Subdirección de Recursos Humanos y Profesionalización de Personal:** Es la responsable de ejecutar la política de recursos humanos conforme los lineamientos del Director General y administrar el recurso humano del Instituto

Guatemalteco de Migración, conforme los objetivos de lograr el pleno goce de los derechos laborales, la integración del personal y el desarrollo profesional mediante una carrera cuyo objetivo sea el desarrollo institucional de servicio.

c) **Subdirección de Apoyo Administrativo y Logístico:** Es la responsable de brindar apoyo al Director General, Subdirector General, Subdirecciones, Departamentos, Unidades, Centros Migratorios y cualquier otra entidad institucional para que puedan contar con los equipos, bienes, suministros, servicios necesarios y coordinación de procesos de logística para cumplir con sus funciones.

d) **Subdirección de Recursos Tecnológicos, Comunicaciones e Informática:** Es la responsable de administrar todo lo relacionado con bases de datos, redes, equipos de cómputo, telecomunicaciones y sistemas informáticos necesarios para el adecuado, moderno y óptimo funcionamiento de los sistemas y componentes automatizados del Instituto Guatemalteco de Migración.

Las bases de datos deberán ser en formato uniforme y estandarizado para el uso de consultas internas que podrán ser compartidas con instituciones de seguridad nacional, con la excepción de la información sensible que establezca la ley.

**Artículo 143. Ampliación, creación, modificación y fusión.** El Director General puede ampliar, crear, modificar o fusionar el número de subdirecciones de conformidad con las necesidades del Instituto, sin embargo, la ampliación, creación, modificación y fusión de estas estructuras deberá estar justificada y será autorizada por la Autoridad Migratoria Nacional.

Para su regulación jurídica no será necesaria la reforma al presente Código, sino mediante el reglamento específico que debe emitirse.

**Artículo 144. Subdirección de Auditoría Interna.** La Subdirección de Auditoría Interna, es la responsable de efectuar exámenes objetivos y sistemáticos de las operaciones financieras, administrativas, técnicas y operacionales de todas las dependencias que integran el Instituto Guatemalteco de Migración, con el propósito de evaluar los procedimientos, controles internos y registros, así como velar por el cumplimiento de las leyes, reglamentos, normas y manuales que rigen al mismo, sugiriendo medidas tanto preventivas como correctivas a efecto de optimizar la utilización de los recursos

## Capítulo V
### Órganos asesores de la Dirección General del Instituto

**Artículo 145. Órganos asesores.** El Instituto Guatemalteco de Migración tiene los órganos asesores que serán denominados departamentos, siendo los siguientes:

a) Comunicación Social;

b) Estudios y Políticas Migratorias, y;

c) De Estadística y Archivos.

**Artículo 146. Nombramiento y autoridad de los departamentos.** Los departamentos serán dirigidos por jefaturas que serán nombrados por el Director General y son la autoridad máxima jerárquica dentro de cada departamento.

**Artículo 147. Función.** Los jefes de los órganos asesores tienen la función especial de asesorar al Director General, al Subdirector General y a las estructuras orgánicas definidas en el presente Código.

Se estructuran y organizan bajo los criterios de eficacia y eficiencia, conforme las competencias, funciones y atribuciones que se dispongan dentro de los reglamentos internos del Instituto Guatemalteco de Migración.

**Artículo 148. Ampliación.** El Director General puede ampliar el número de departamentos de conformidad con las necesidades del Instituto, sin embargo, la creación de esta estructura deberá estar justificada y será autorizada por la Autoridad Migratoria Nacional.

Para su regulación jurídica no será necesaria la reforma al presente Código, sino mediante el reglamento específico que debe emitirse.

## Capítulo VI
### Carrera migratoria

**Artículo 149. Carrera migratoria.** Se crea la carrera migratoria, la cual constituye una profesión reconocida por el Estado, que comprenderá el proceso de selección, formación, capacitación, profesionalización, evaluación, promoción, suspensión y remoción, a través del cual, la administración migratoria se garantiza un personal debidamente calificado, con vocación de servicio y ética en el desempeño de sus funciones.

El Instituto Guatemalteco de Migración para los efectos de la creación y fortalecimiento de la carrera migratoria y la profesión migratoria, promoverá la creación de la carrera universitaria migratoria con universidades del país o instituciones en general.

Todo personal de nuevo ingreso laboral o de ascenso al Instituto Guatemalteco de Migración se debe someter previo a fijar su relación laboral o contractual, a las pruebas de confiabilidad periódica que se regularán en el reglamento del presente Código.

**Artículo 150. Manual.** El personal está sujeto a un manual de clasificación de puestos y salarios, en donde debe desarrollarse las condiciones para los ascensos, traslados y remociones, considerando las calificaciones de mérito y evaluaciones permanentes del desempeño.

Este manual, además, debe contener como mínimo, la denominación, especializaciones, funciones, responsabilidades y los requisitos de cada puesto, su escala jerárquica y el salario correspondiente.

**Artículo 151. Oposición.** Se establece el sistema de oposición para los ascensos y nombramientos a puestos de trabajo, lo cual debe ser reglamentado correspondientemente y desarrollado en el manual específico.

**Artículo 152. Dirección.** El Subdirector General tiene a su cargo aprobar y dirigir la ejecución de los planes de la carrera profesional que sean presentados por la Unidad de Estudios de Profesionalización para el personal migratorio. La unidad estará adscrita a la Subdirección de Recursos Humanos y Profesionalización de Personal.

## Capítulo VII
### Relación interinstitucional

**Artículo 153. Relación con órganos de derechos humanos.** Para el efectivo cumplimiento de sus funciones, el Instituto Guatemalteco de Migración puede establecer en cualquier momento acuerdos, convenios, mecanismos y proyectos de cooperación interinstitucional con el Procurador de los Derechos Humanos y con la Oficina Nacional de Prevención de la Tortura y otros Tratos o Penas Crueles, Inhumanos o Degradantes.

**Artículo 154. Relación con la Comisión de Migrantes del Congreso de la República.** El Instituto Guatemalteco de Migración, debe establecer una estrecha relación de cooperación con la Comisión de Migrantes del Congreso de la República, a fin de mantener un permanente diálogo sobre las necesidades de la población migrante y las medidas legislativas necesarias.

Asimismo, el Instituto Guatemalteco de Migración debe obligatoriamente presentar informe anual de labores por escrito a la Comisión de Migrantes del Congreso de la República, en los últimos quince días del mes de enero de cada año.

**Artículo 155. Relación con instancias internacionales.** El Instituto Guatemalteco de Migración con sus homólogos puede desarrollar relaciones de cooperación, asistencia y trabajo conjunto.

En ningún momento puede el Instituto Guatemalteco de Migración actuar en representación del Estado ante instancias internacionales en materia de política internacional, para el efecto debe acudir a la autoridad competente.

**Artículo 156. Relación con entidades de la sociedad civil.** El Instituto Guatemalteco de Migración puede desarrollar relaciones de cooperación, asistencia y trabajo conjunto con entidades de la sociedad civil, pudiendo suscribir acuerdos o convenios.

En ningún caso puede acordar la transferencia de fondos del Instituto Guatemalteco de Migración a organizaciones civiles no lucrativas, lucrativas, empresariales o comerciales.

Las funciones del Instituto Guatemalteco de Migración son indelegables.

**Artículo 157. Relación con otras dependencias.** El Instituto Guatemalteco de Migración debe guardar estrecha relación con otras dependencias del Estado,

DHSTF0137

descentralizadas o autónomas, en relación a sus competencias, funciones y prerrogativas de ley.

### Capítulo VIII
### Instituto Guatemalteco de Migración y el Consejo Nacional de Atención al Migrante de Guatemala

**Artículo 158. Complementariedad.** El Instituto Guatemalteco de Migración mantendrá relaciones complementarias con el Consejo Nacional de Atención al Migrante de Guatemala. La complementariedad será entendida como la cooperación e integración de acciones tendientes a la atención y protección de los derechos humanos y garantías individuales de los guatemaltecos en el extranjero.

**Artículo 159. Fortalecimiento mutuo.** Con la finalidad de no duplicar presupuestos y acciones estatales, ambas instituciones deben revisar conjuntamente sus planes estratégicos y anuales, observando el respeto a sus funciones específicas, determinando las acciones de cooperación y estableciendo los aspectos en donde deben fortalecerse mutuamente.

**Artículo 160. Acciones conjuntas.** Además de las acciones de cooperación que sean definidas como resultado del fortalecimiento mutuo y dentro de la legislación nacional, ambas instituciones deberán cooperar con el Ministerio de Relaciones Exteriores en:

a) Asistencia necesaria a los guatemaltecos en el extranjero para la obtención de documentos oficiales de migración, de identidad personal o bien de aquellos que por disposición de las leyes del país deban ser gestionados mediante los consulados.

b) El diálogo permanente con autoridades de países extranjeros sobre las condiciones, trato, higiene y salud de guatemaltecos en centros de migración o bien durante la deportación o retorno.

c) Coordinar con albergues para el abrigo y protección temporal a guatemaltecos que solicitan auxilio para retornar al país.

d) Gestionar las solicitudes de auxilio de retorno de guatemaltecos al país.

### Capítulo IX
### Consejo de Atención y Protección

**Artículo 161. Consejo de Atención y Protección.** Se crea el Consejo de Atención y Protección como el ente de la Autoridad Migratoria Nacional responsable de las acciones siguientes:

a) Generar campañas de prevención e información sobre los riesgos de la migración y los derechos de las personas migrantes.

b) Generar programas de sensibilización al sector educativo para atender el tema de las migraciones, especialmente con niñas, niños y adolescentes.

c) Promover la denuncia de violaciones a derechos humanos.

d) Crear los programas de atención en salud a personas deportadas o retornadas.

e) Atender a las familias de personas migrantes consideradas desaparecidas durante la migración, generando mecanismos de contacto con autoridades extranjeras.

f) Desarrollar todas aquellas que sean necesarias para prevenir a las personas sobre los riesgos de la migración, la atención de las personas deportadas o retornadas y el alivio de las necesidades de búsqueda e identificación de las familias.

El Director del Instituto Guatemalteco de Migración, mediante el Consejo de Atención y Protección, en coordinación con el Consejo Nacional de Atención al Migrante de Guatemala, podrá crear enlaces de coordinación y gestionar con asociaciones de personas retornadas y asociaciones de migrantes en el extranjero y en Guatemala, la creación de mecanismos sobre el aprovechamiento de remesas y la inversión adecuada de las mismas. A su vez, la promoción y participación de la iniciativa privada, de comunidades, cooperativas locales y asociaciones civiles no lucrativas para la creación de programas de empleabilidad y de productividad de personas retornadas, familiares y de comunidades migrantes. Siempre podrá promover que estas actividades prioricen comunidades, municipios y departamentos con mayores índices de subdesarrollo y migración.

**Artículo 162. Conformación.** El Consejo de Atención y Protección estará conformado por las siguientes instituciones:

1. El Director General del Instituto Guatemalteco de Migración, quien lo preside.

2. El Secretario Ejecutivo del Consejo Nacional de Atención al Migrante de Guatemala.

3. Un Viceministro del Ministerio de Educación.

4. Un Viceministro del Ministerio de Salud Pública y Asistencia Social.

5. Un Viceministro del Ministerio de Trabajo y Previsión Social.

6. Un Viceministro del Ministerio de Gobernación.

7. Un Viceministro del Ministerio de Relaciones Exteriores.

8. Un Viceministro del Ministerio de Economía.

9. Un Viceministro del Ministerio de Desarrollo Social.

10. El Representante delegado por el Procurador General de la Nación.

11. El Subsecretario de la Subsecretaría de Protección y Acogimiento a la Niñez y Adolescencia, de la Secretaría de Bienestar Social de la Presidencia de la República.

12. El Representante delegado por la Procuraduría de los Derechos Humanos.

El Consejo de Atención y Protección, para el cumplimiento de sus fines puede invitar a las reuniones ordinarias y extraordinarias a las entidades estatales u organismos internacionales que considere oportunas, por razón de su especialidad, para la definición de planes o programas específicos.

**Artículo 163. Integración.** Durante los primeros seis meses de entrada en vigencia del presente Código, el Consejo de Atención y Protección debe sesionar a efecto de establecer una agenda de trabajo que le permita tener en un año, reuniéndose cuantas veces sea necesario, una definición de los procedimientos a seguir para los casos señalados dentro de las acciones que le han sido encomendadas por este Código.

Dicha definición de procedimientos debe ser presentada a la Autoridad Nacional Migratoria para su validación e integración dentro de la Política Nacional Migratoria.

**Artículo 164. Sesiones ordinarias y extraordinarias.** El Consejo de Atención y Protección debe reunirse, luego de la definición de los procedimientos, de forma ordinaria una vez cada semestre y de forma extraordinaria cuantas veces sea necesario.

**Artículo 165. Distribución de responsabilidades.** El Director General estará a cargo de la coordinación y ejecución de los procedimientos, con el apoyo de las instituciones estatales integrantes del Consejo, para el efecto dentro de la misma definición de procedimientos se establecerán responsabilidades de acuerdo a la materia exclusiva de cada institución.

### Capítulo X
### Seguridad en puestos migratorios

**Artículo 166. Seguridad.** La seguridad en puestos migratorios siempre debe ser orientada a la protección de la persona y sus derechos.

Cuando se requiera la intervención de la Policía Nacional Civil, siempre debe observarse la mínima afectación de la persona, estableciendo mecanismos de uso de la fuerza y de las armas de forma proporcional y necesaria, conforme los procedimientos especiales.

El Director del Instituto Guatemalteco de Migración debe promover ante el Ministerio de Gobernación, que la Policía Nacional Civil, cuente en su pensum de estudios con formación especial para la atención de los derechos de las personas migrantes, así como el conocimiento del derecho internacional de los derechos humanos y humanitarios. A su vez, promover que los agentes y oficiales de la Policía Nacional Civil que sean designados para la seguridad en centros y puestos migratorios cuenten con las más altas calidades humanas y se mantengan en constante formación sobre las disposiciones para garantizar el contenido del artículo 167 de este Código.

**Artículo 167. Coordinación.** El Instituto Guatemalteco de Migración debe coordinar con el Ministerio de Gobernación las acciones en materia de seguridad dentro de los puestos migratorios. Estas acciones estarán destinadas a:

1. Garantizar la seguridad de las personas dentro de los puestos migratorios, de tal forma que no sean víctimas de actos de violencia contra su integridad o sus bienes.

2. Establecer mecanismos para detener personas que intentan salir del país y que tienen previa orden judicial de detención.

3. Establecer los mecanismos para detención de personas en flagrancia.

4. La competencia en situaciones de alteración del orden dentro de los puestos migratorios.

5. Todos aquellos que sean necesarios para resguardar la seguridad de las personas.

**Artículo 168. Detención.** La Policía Nacional Civil es la autoridad facultada para detener a las personas, el funcionario o empleado del puesto migratorio debe informar inmediatamente o alertar a la Policía Nacional Civil para que esta proceda conforme su protocolo.

Las personas detenidas no pueden permanecer privadas de libertad dentro de los puestos migratorios.

### Título II
### Procedimientos

### Capítulo I
### Procedimiento para la protección de niños, niñas y adolescentes no acompañados y separados de sus familias

**Artículo 169. Niñez migrante no acompañada y separada de sus familias.** Se considera niñez migrante no acompañada y separada de sus familias a los niños, niñas y adolescentes que están separados de su mamá, papá o ambos, o de otros parientes y no están al cuidado de una persona mayor de edad que, por ley o costumbre asuma esa responsabilidad.

**Artículo 170. Principios.** El procedimiento para la atención y protección de los niños, niñas y adolescentes no acompañados se rige por DHSI-F0438

DHSI-F0438

1. **Interés superior del niño.** Las decisiones deben garantizar el cumplimiento estricto de este principio. Es necesario que la autoridad realice una determinación del interés superior del niño, niña o adolescente, lo cual exige una evaluación clara y a fondo de la identidad del niño, niña o adolescente migrante no acompañado o separado de su familia, en particular de su nacionalidad, crianza, antecedentes étnicos, culturales y lingüísticos y en efecto determine las vulnerabilidades y necesidades especiales de protección. En caso de imposibilidad de establecer la minoría de edad o exista duda razonable sobre su edad o de la veracidad de sus documentos se presumirá la minoría de edad.

2. **No discriminación.** Los niños, niñas y adolescentes no acompañados o separados de sus familias no deben ser discriminados por su situación de no acompañados o separados de su familia, por su estatuto de refugiados, solicitantes del estatuto de refugiado, asilado político o condición migratoria, su nacionalidad, su pertenencia a un grupo étnico o condición sexual. Este principio incluye la diferenciación fundada en la diversidad de necesidades de protección, como la asociada a la edad, la diversidad sexual y el género.

3. **Unidad familiar y derecho a la reunificación familiar.** Las autoridades deben procurar por todos los medios que el niño, niña o adolescente migrante no acompañado o separado de su familia se reúna con su mamá o papá, ambos padres, o tutor o quien ejerce la guarda y custodia, ya sea en el país receptor, el de origen o procedencia, salvo cuando el interés superior requiera prolongar la separación. Por este principio se favorece la no separación de hermanos o parientes.

4. **Comunicación y preservación de relaciones personales y contactos directos entre los niños y padres.** Los niños, niñas y adolescentes tienen derecho a conocer el paradero de sus parientes, en especial de la madre, padre y hermanos. Este principio incluye el derecho de localización de padre, madre o familiares y facilitar su comunicación, en el país de origen o en el país receptor.

5. **No violencia y trato digno.** Se debe proteger la dignidad de los niños, niñas y adolescentes migrantes, en especial de los no acompañados, velando porque no sean sometidos a condiciones contrarias a su integridad personal como las torturas, tratos crueles, inhumanos o degradantes.

6. **Protección y seguridad.** Ninguna decisión administrativa, así como ninguna disposición de la autoridad puede poner en riesgo la seguridad de los niños, niñas y adolescentes. Para el efecto, se debe procurar su protección en los mecanismos diversos que se consideren apropiados, así como la coordinación con autoridades de otros Estados para una repatriación digna y segura de la niñez y adolescencia migrante. Los lugares donde estén dispuestos para su cuidado y abrigo deben ser ambientes agradables, seguros y amistosos.

7. **Legalidad y debido proceso.** Toda decisión que se tome sobre el estatus de los niños, niñas y adolescentes, en especial los no acompañados y separados, debe ser en pleno respeto del derecho de defensa y debido proceso.

8. **Confidencialidad de los registros y protección de la vida privada.** Se debe procurar no poner en peligro la información sensible y la identidad del niño, niña o adolescente, ni la de su familia. Su difusión por medios está restringida, salvo cuando prevalezca el interés superior del niño, niña o adolescente para encontrar a sus familiares y procurar la reunificación familiar. Las autoridades deben proteger el carácter confidencial de la información de las niñas, niños, y adolescentes no acompañados y sus familias. Se garantizará que la información recabada e intercambiada con la finalidad de protección de la niñez no será utilizada para otros fines.

9. **Especialización del personal y funcionarios a cargo de la gestión migratoria, protección, repatriación, entrega y reunificación familiar y social de la niñez migrante no acompañada.** Los profesionales designados a estos procedimientos y a la atención de los niños, niñas y adolescentes deben contar con formación especializada en derechos humanos de la niñez y adolescencia, que permita brindar una atención multidisciplinaria en las ramas de la psicología, trabajo social, salud y legal.

10. **Principio de no devolución cuando está en riesgo la integridad personal.** No se trasladará a ningún niño, niña o adolescente a otro país si existiera un riesgo de sufrir graves violaciones de sus derechos humanos, en particular la violación del derecho a la vida, a la libertad y a la integridad física.

11. **Derecho a la vida, supervivencia y desarrollo.** Los niños, niñas y adolescentes, especialmente los separados o no acompañados deben ser protegidos contra la violencia y la explotación.

12. **Derecho a expresar su opinión de forma libre.** Los niños, niñas o adolescentes no acompañados o separados, se recabarán y tendrán debidamente en cuenta los deseos y las opiniones de estos. De cara a la expresión informada de tales deseos y opiniones, es imperativo que se les brinde toda la información de sus derechos, servicios existentes, en especial medios de comunicación, el procedimiento para solicitar la condición de refugiado o asilo, la localización de la familia y la situación en el país de origen. En lo que concierne a la tutela, custodia, alojamiento y representación legal, deben tenerse también en cuenta las opiniones del niño, niña o adolescente. La información antes mencionada se proporcionará en forma que sea acorde con la madurez y el nivel de comprensión. Dado que la participación está en función de una comunicación fiable, se proveerá en su caso interpretación en todas las fases del procedimiento.

**Artículo 171. Unidad de Oficiales de Protección de la Infancia.** El Instituto Guatemalteco de Migración mediante la Subdirección de Atención y Protección de Derechos Fundamentales de los Migrantes, debe crear la unidad especializada de atención y protección de la niñez migrante, que reunirá los equipos multidisciplinarios profesionales en atención, asistencia, protección y gestión de los derechos de los niños, niñas y adolescentes. A los profesionales de la Unidad se les denominará oficiales de protección de la infancia.

La unidad especializada de atención y protección de la niñez migrante, debe guardar estrecha coordinación con la Procuraduría General de la Nación en el ámbito de su competencia, así como con las instancias que conforman el Sistema Nacional de Protección de la Niñez y Adolescencia.

**Artículo 172. Apoyo y asistencia a cónsules.** Los oficiales de protección de la infancia actúan en el territorio nacional y pueden ser comisionados para brindar asistencia y apoyo a los cónsules cuando estos lo requieran.

En todo momento deben interactuar y coordinar para la protección efectiva de los niños, niñas o adolescentes guatemaltecos en el exterior.

**Artículo 173. Niñez y adolescencia migrante no acompañada y separada de su familia que se encuentra en Guatemala fuera de su país de nacionalidad.** De acuerdo a lo establecido en este Código, los niños, niñas y adolescentes migrantes extranjeros no acompañados o separados de su familia tienen derecho a ser atendidos por personal especializado. La autoridad debe prever la adopción de medidas particulares de protección, adecuadas a la situación de vulnerabilidad en que puedan encontrarse.

No deberá privarse de libertad; por regla general, a las niñas, niños y adolescentes no acompañados o separados de su familia.

La Secretaría de Bienestar Social de la Presidencia de la República durante el procedimiento migratorio implementará los programas de protección del niño, niña o adolescentes, priorizando:

a) Acogimiento con un pariente que se encuentre en el país, sin considerar su situación migratoria, que garantice su cuidado;

b) El acogimiento familiar temporal, y;

c) Otras formas de alojamiento de carácter abierto, orientadas a la protección de la niñez y la familia, estas medidas podrá adoptarlas conforme al procedimiento administrativo que se desarrollará en el reglamento respectivo. En forma excepcional, y por el menor tiempo posible, podrá ser alojado bajo la modalidad de abrigo residencial.

En el caso que la Secretaría de Bienestar Social de la Presidencia identifique, mediante una evaluación inicial; a niñas, niños y adolescentes migrantes extranjeros que sean susceptibles de reconocimiento de refugiado o de asilo, o de otra medida de protección internacional o reunificación familiar; lo comunicará inmediatamente a la Subdirección de Atención y Protección de Derechos Fundamentales de los Migrantes del Instituto Guatemalteco de Migración a fin de seguir los procedimientos para la adopción de medidas de protección especial.

La Subdirección de Atención y Protección de Derechos Fundamentales de los Migrantes, mediante la unidad especializada de atención y protección de la niñez migrante le compete y debe, para el efecto, seguir el siguiente procedimiento:

a) De forma inmediata comunicar al Director General el caso para el otorgamiento de estatus de residencia temporal, para garantizar la protección de sus derechos fundamentales y establecer la no devolución al país de origen hasta que no se determine su situación.

b) Realizar los procedimientos de identificación e información de sus derechos, garantizando que sean en su idioma y conforme a su madurez y edad.

c) Comunicar a la Procuraduría General de la Nación los casos donde se detecte la necesidad de medidas de protección especial a la niñez y adolescencia quién iniciará el procedimiento según su reglamentación.

d) Mantener estrecha relación con la Secretaría de Bienestar Social de la Presidencia y con el Ministerio de Relaciones Exteriores a través de su red consular.

En todo el procedimiento, debe garantizar el contacto o comunicación familiar de acuerdo al interés superior del niño. Asimismo, si el niño, niña o adolescente solicita auxilio para retornar a su país de origen, deberá observar que este no corra riesgos de ser menoscabado en sus derechos fundamentales. En el caso de reunificación familiar, el Instituto Guatemalteco de Migración velará para que el niño, niña o adolescente y su familia tengan un estatus migratorio que facilite su regularización migratoria en Guatemala.

De tal situación y de lo actuado podrá ser comunicado al Alto Comisionado de las Naciones Unidas para Refugiados u otros Organismos Internacionales cuyo mandato esté orientado a la asistencia o protección.

**Artículo 174. Niñez y adolescencia guatemalteca migrante no acompañada.** Es de interés nacional el atender y proteger los derechos fundamentales de los niños, niñas y adolescentes guatemaltecos migrantes no acompañados que se encuentren en países extranjeros.

Los consulados, son las autoridades responsables de ejercer las acciones necesarias para atender y proteger los derechos fundamentales de los niños, niñas y adolescentes guatemaltecos en el extranjero.

El cónsul puede solicitar el apoyo de oficiales de protección de la infancia o del representante del Consejo Nacional para la Atención del Migrante de Guatemala.

Las instituciones que conforman el Consejo de Atención y Protección deberán diseñar y administrar las bases de datos de niñas, niños y adolescentes migrantes extranjeros o nacionales no acompañados, cuyos datos serán reservados y únicamente podrán utilizarse para desarrollar políticas migratorias protectoras de la niñez.

**Artículo 175. Proceso de recepción del niño, niña o adolescente.** El Consejo de Atención y Protección en la definición de los procedimientos respectivos, debe observar

los siguientes lineamientos para la recepción de niños, niñas o adolescentes que son repatriados, retornados o deportados al país:

a) La recepción del niño, niña o adolescente está a cargo de la Subdirección de Atención y Protección de Derechos Fundamentales de los Migrantes del Instituto Guatemalteco de Migración.

b) En el proceso de recepción, las instituciones que conforman el Consejo de Atención y Protección participarán de forma gradual.

c) En todo momento estará presente el representante del Procurador General de la Nación, para el seguimiento al proceso de reunificación familiar o la judicialización de los casos.

d) El niño, niña o adolescente es recibido e inmediatamente puesto en abrigo y cuidado temporal.

e) Un portavoz del Instituto Guatemalteco de Migración puede informar y dar detalles sobre el retorno de los niños, niñas o adolescentes, pero en ningún momento serán exhibidos ante los medios de comunicación durante la recepción. Ni podrá darse a conocer el nombre o identidad.

f) Puede ser de conocimiento de los medios de comunicación luego de un período de tiempo en donde se ha determinado que dicho mecanismo puede ayudar a la localización de los familiares.

g) La reunificación familiar procede luego de determinar que no existen amenazas o violación de los derechos humanos del niño por parte de su familia, tutor, o responsable.

h) El proceso de atención social deberá establecer un programa de apoyo para la inserción social, que de seguimiento en educación, capacitación técnica, inserción laboral conforme la legislación nacional y demás situaciones específicas. El objetivo de los programas de seguimiento es garantizar una reunificación familiar permanente.

Con la información compartida por los cónsules o equipos psicosociales, la autoridad en Guatemala deberá prever la adopción de medidas particulares de protección adecuadas a la situación de vulnerabilidad en que puede encontrarse la niña, niño o adolescente migrante no acompañado, para el efecto la autoridad promoverá programas orientados a la protección de la niñez y la familia, así como programas de protección social, lo cual coordinará con otras instituciones del Estado y sociedad civil. Mientras se culmina la investigación que permita la reunificación familiar, el niño, niña o adolescente, por el menor tiempo posible, podrá ser alojado en forma temporal.

**Artículo 176. Proceso judicial de protección.** De conformidad con el interés superior del niño, si existe una amenaza o violación de derechos al niño, niña o adolescente que impide la reunificación familiar, el Procurador General de la Nación debe iniciar un proceso judicial de protección ante el sistema de justicia de niñez y adolescencia

### Capítulo II
### Procedimiento para la protección y determinación del Estatuto de Refugiado en el Estado de Guatemala

**Artículo 177. Autoridad competente.** La Autoridad Migratoria Nacional será la competente de resolver todas las solicitudes de estatuto de refugiados.

La Autoridad Migratoria Nacional creará la Comisión Nacional para Refugiados, la cual estará conformada por un representante técnico de los Ministerios de Relaciones Exteriores, de Trabajo y Previsión Social, de Gobernación y del Instituto Guatemalteco de Migración.

La Comisión Nacional para Refugiados, funge como el ente asesor y sus funciones principales serán las de examinar la fundamentación de las solicitudes del estatuto de refugiado, emitir recomendaciones, opiniones y sugerencias.

El Alto Comisionado de las Naciones Unidas para los Refugiados o su representante, de acuerdo a su mandato y sus funciones, podrá participar como asesor en dicha Comisión

**Artículo 178. Solicitud.** La solicitud para obtener el estatuto de refugiado, se podrá formular por escrito o verbalmente ante el Instituto Guatemalteco de Migración, o en los puestos de control migratorio fronterizo del país, de acuerdo a los procedimientos establecidos en el reglamento del presente Código.

**Artículo 179. Solicitud especial.** El extranjero que se encuentre legalmente en el territorio guatemalteco también podrá solicitar el reconocimiento del estatuto de refugiado ante el Instituto Guatemalteco de Migración, cuando sobrevengan causas que lo motiven en su país de origen.

**Artículo 180. Representación legal e intérprete.** Se reconoce el derecho de las personas solicitantes de contar con la debida asistencia letrada y el intérprete o traductor en todas las fases del procedimiento para la determinación de la condición de refugiado.

**Artículo 181. Confidencialidad.** Se garantiza la confidencialidad de la solicitud, el trámite e información personal de la persona solicitante de reconocimiento de estatuto de refugiado, para evitar cualquier riesgo a la vida, integridad, libertad, o cualquier otro derecho de la persona solicitante.

**Artículo 182. Recursos.** El solicitante del reconocimiento de estatuto de refugiado podrá interponer, dentro del plazo de diez días contados a partir del día siguiente al de la notificación de la resolución denegatoria, el recurso de reposición ante la Autoridad Migratoria Nacional, la que deberá resolver en un plazo no mayor de cinco días, quedando firme con esta resolución.

**Artículo 183. Denegación definitiva.** Al quedar firme la resolución que deniega la solicitud del reconocimiento de la condición de refugiado, la oficina del Alto Comisionado de las Naciones Unidas para los Refugiados, podrá solicitar si lo considera procedente de conformidad con su mandato, un plazo razonable de permanencia en el territorio nacional para el solicitante, en tanto obtiene su admisión en otro país.

El plazo de permanencia será acordado, en cada caso, por la Autoridad Migratoria Nacional y será comunicado a la Oficina del Alto Comisionado de las Naciones Unidas para los Refugiados (ACNUR) y al Instituto Guatemalteco de Migración.

**Artículo 184. Cesación del estatuto de refugiado.** La Autoridad Migratoria Nacional declarará la cesación del estatuto de refugiado, si la persona se encuentra en alguna de las situaciones siguientes:

a) Si renuncia voluntariamente a su condición del estatuto de refugiado;

b) Si se ha acogido de nuevo, voluntariamente, a la protección del país de su nacionalidad;

c) Si habiendo perdido su nacionalidad, la recobra voluntariamente;

d) Si ha adquirido una nueva nacionalidad o un nuevo estatuto de refugiado y cuenta con la protección del país de su nueva nacionalidad o del nuevo estatuto de refugiado;

e) Si voluntariamente se ha establecido de nuevo en el país que había abandonado o fuera del cual había permanecido por temor de ser perseguida, y.

f) Si por haber desaparecido las circunstancias en virtud de las cuales fue reconocida como refugiada, no puede continuar negándose a acogerse a la protección del país de su nacionalidad.

En el caso de la literal f. del presente artículo, la Comisión Nacional para Refugiados, previo a emitir la resolución, deberá correr audiencia por diez días al interesado, a fin de que pueda ejercer su derecho a la defensa en la evaluación sobre la prevalencia de los motivos que ameriten el continuar acogiéndose a la protección internacional como refugiados. Con su contestación o sin ella, la Comisión resolverá sobre la procedencia o no de la cesación del estatuto de refugiado, la cual será considerada una resolución definitiva. El Estado tendrá la carga de la prueba para demostrar que existe una causal de cesación válida del estatuto de refugiado.

La Autoridad Migratoria Nacional tendrá la facultad de resolver las situaciones o casos no previstos en el presente artículo, para la cesación del estatuto de refugiado.

**Artículo 185. Opción a la residencia.** La persona a la que se refiere la literal d) del artículo 78 de este Código, puede solicitar la residencia permanente de conformidad con lo establecido para el efecto

No se pierde la condición de refugiado por la obtención de la residencia temporal o permanente, ni la protección internacional a la que la persona pueda estar sujeta.

**Artículo 186. Agilización del procedimiento.** La Comisión Nacional para Refugiados atendiendo a circunstancias muy especiales, como las de niños, niñas, adolescentes, personas víctimas de violencia sexual, entre otras, puede tomar las medidas de orden administrativo tendientes a agilizar el procedimiento para la emisión de la resolución que otorgue el estatuto de refugiado.

**Artículo 187. Reglamentación.** Debe emitirse el reglamento correspondiente que regulará los procedimientos sobre el estatuto de refugiado.

### Capítulo III
### Criterios generales para los procedimientos de regularización de personas extranjeras

**Artículo 188. Procedimiento general.** El proceso de regularización dará inicio con la presentación de la solicitud ante el Instituto Guatemalteco de Migración, con excepción de lo dispuesto en los artículos 181 y 182 del presente Código, cumpliendo con los requisitos y adjuntando los documentos que se establezcan en cada caso.

**Artículo 189. Plazos.** El procedimiento de regularización debe contemplar una duración máxima de noventa días a partir de la presentación de la solicitud.

Si existieren previos, el Instituto Guatemalteco de Migración fijara un plazo de treinta días para la subsanación de los mismos en cualquier momento dentro de los noventa días ordinarios. La subsanación puede ser prorrogada por treinta días.

**Artículo 190. Recursos.** Contra las resoluciones emitidas en esta materia, el solicitante podrá interponer el recurso de reposición indicado en el artículo 182 del presente Código.

**Artículo 191. Reglamentación.** Cuando se emita el plan de regularización conforme lo dispuesto en este Código, se deberá emitir un reglamento específico que estará en concordancia con las disposiciones especiales que rigen para el caso concreto del cual se ha emitido dicho plan

### Capítulo IV
### Faltas y sanciones del migrante

**Artículo 192. Potestad sancionatoria.** El Instituto Guatemalteco de Migración, tiene potestad para imponer sanciones conforme lo regulado en el presente capítulo y en el ámbito exclusivo de su competencia.

**Artículo 193. Faltas.** Se consideran faltas administrativas que pueden ser cometidas por las personas extranjeras:

a) No presentar ante la autoridad guatemalteca su documento de identidad internacional de viaje. Debe observarse el principio de no sanción a los solicitantes

DHSFF0140

del reconocimiento del estatuto de refugiado o asilado político por no portar documento de identidad personal.

b) Permanecer en el país por más tiempo del que le ha sido autorizado sin tener pendiente resolución de ampliación.

c) No informar de los cambios de dirección de residencia o de domicilio cuando sea el caso.

d) En los casos de residente temporal no presentar la certificación de solvencia tributaria al Instituto Guatemalteco de Migración.

e) Ser sorprendido realizando actividades comerciales sin estar autorizado para el efecto conforme la legislación nacional.

f) Ingresar al país por puestos o lugares no autorizados o no tener prueba de que ingresó regularmente.

**Artículo 194. Sanciones.** A las faltas reguladas les son aplicables las siguientes sanciones pecuniarias:

1. Por no presentar su documento de identidad internacional y de viaje, multa de doscientos Quetzales.

2. Por permanecer más tiempo del que les ha sido autorizado, sin tener pendiente gestión de ampliación, multa de quince Quetzales por día de exceso de permanencia.

3. En los casos de no presentar la certificación de solvencia tributaria, multa de dos mil Quetzales.

4. El ser sorprendido en actividades comerciales sin estar autorizado, multa de cinco mil Quetzales y orden de cesación de actividades.

Todas las multas pueden ser canceladas en Dólares de los Estados Unidos de América, utilizando el cambio de referencia vigente al día de pago calculado por el Banco de Guatemala.

**Artículo 195.** Sanción de abandono inmediato del país. En los casos de incumplimiento de las obligaciones de personas extranjeras determinados en el presente Código, se puede imponer, además de las sanciones pecuniarias la orden de abandono del país en un plazo no mayor de diez días.

Esta sanción de tipo administrativa es impuesta por el Instituto Guatemalteco de Migración, mediante su órgano competente.

**Artículo 196. Recursos.** Las personas sancionadas tienen derecho a recurrir la decisión mediante el recurso de reposición indicado en el artículo 182 del presente Código.

**Artículo 197. Procedimiento independiente.** Las sanciones administrativas son distintas a las sanciones administrativas que impongan la Superintendencia de Administración Tributaria.

La sanción administrativa es distinta a la sanción penal, la cual será aplicable en los casos de comisión de delitos y como resultado del proceso penal establecido en la legislación del país por las autoridades correspondientes.

### Capítulo V
### Procedimiento para la atención de familias de personas reportadas como desaparecidas a causa de la migración

**Artículo 198. Reporte de desaparición.** Los familiares o cualquier persona que no tenga conocimiento sobre el paradero o destino de una persona, de la cual se conoce que migró hacia otro país de forma regular o irregular, tiene derecho a reportar a esta persona como desaparecida.

**Artículo 199. Atención institucional.** El reporte de desaparición se realizará ante el Instituto Guatemalteco de Migración quien lo hará de conocimiento del Consejo de Atención y Protección, para que se realicen las gestiones correspondientes conforme el procedimiento determinado para el efecto por el mismo Consejo.

**Artículo 200. Mecanismo de búsqueda.** El Consejo de Atención y Protección debe establecer un procedimiento que facilite el contacto e intercambio de información con las autoridades de los países en donde se presume la persona pudo encontrarse en razón de tránsito o bien de destino.

Este procedimiento debe establecerse para obtener información sobre personas fallecidas inhumadas como no identificadas en esos países, personas privadas de libertad y personas que puedan encontrarse en centros de salud, hospitalarios, forenses o en lugares que el Estado de tránsito o recepción disponga para el cuido y abrigo de personas migrantes. Esta función será coordinada a través de las misiones consulares de Guatemala.

La misión consular de Guatemala deberá solicitar apoyo a las autoridades locales del país en donde se reportó la desaparición de un connacional para que se inicien los mecanismos de búsqueda que traten de dar con el paradero del guatemalteco presuntamente desaparecido. Asimismo, deberá solicitar información de los lugares donde se tenga conocimiento que operan estructuras criminales dedicadas a la explotación sexual y trata de personas para que se investigue la posibilidad de que se encuentren guatemaltecos siendo víctimas de dichos delitos o de algún otro conexo.

**Artículo 201. Facilitación de traslados.** En caso de ser necesario por haberse encontrado a la persona reportada como desaparecida, el Consejo de Atención y Protección puede apoyar a un familiar consanguíneo de preferencia la mamá, papá o hermanos, para que visite el país en donde se encuentre la persona reportada como desaparecida.

En estos casos se debe disponer de los apoyos logísticos, legales y de trabajo social necesarios para la situación que deba enfrentar el familiar en coordinación con otras dependencias.

**Artículo 202. Repatriación de cadáveres.** Corresponde al Ministerio de Relaciones Exteriores garantizar la repatriación digna de personas que, habiendo sido reportadas como desaparecidas o no localizadas, fueran encontradas fallecidas en el territorio de otro Estado.

**Artículo 203. Migrantes extranjeros desaparecidos de forma presunta en el territorio guatemalteco.** El Consejo de Atención y Protección coordinará con el Ministerio Público, la Policía Nacional Civil, el Sistema Penitenciario, el Instituto Nacional de Ciencias Forenses y el Ministerio de Salud Pública y Asistencia Social, en lo que corresponde a hospitales públicos y la administración de cementerios, para que a través de sus funciones dispongan de mecanismos que permitan la búsqueda, identificación y localización de personas extranjeras reportadas como desaparecidas en el territorio nacional.

Entre estas instituciones debe existir una base de datos que permita el intercambio de información en tiempo real y bajo estándares internacionales adecuados a la identificación de personas reportadas como desaparecidas.

En el caso de personas fallecidas no identificadas, el Instituto Nacional de Ciencias Forenses y el Ministerio de Salud Pública y Asistencia Social, deben coordinar la adecuación de registros unificados que permitan tener la información exacta del lugar donde las personas han sido inhumadas en los distintos cementerios, así como la información ante mortem y post mortem que se haya obtenido del proceso forense correspondiente.

**Artículo 204. Prohibición de cremación.** Las autoridades tienen prohibido autorizar la cremación de los cuerpos de las personas migrantes extranjeras para su repatriación al país de origen.

Las autoridades guatemaltecas tienen prohibido autorizar la cremación de los cuerpos de los guatemaltecos fallecidos en el exterior previo a su repatriación al país.

**Artículo 205. Amparo y exhibición personal.** Cualquier persona, guatemalteca o no, puede presentar amparo o solicitar exhibición personal a favor de personas migrantes extranjeras para que se les restituya su derecho o cese una violación en su contra, para que sean exhibidas por las autoridades en caso de encontrarse en sus instalaciones o bajo su guarda, abrigo, cuido o custodia.

**Artículo 206. Facilitación de mecanismos de búsqueda.** El Consejo de Atención y Protección podrá promover ante las diversas autoridades del Estado, el libre acceso a las dependencias del Estado de los familiares de las personas migrantes extranjeras reportadas como desaparecidas en el territorio nacional.

Asimismo, el acceso a las fuentes de información y a ser tratados conforme su situación.

**Artículo 207. Búsqueda de niños, niñas y adolescentes migrantes no acompañados reportados como desaparecidos.** El Consejo de Atención y Protección apoyará al Procurador General de la Nación, para la búsqueda, localización y resguardo nacional e internacional de las niñas, niños y adolescentes migrantes no acompañados y separados de su familia que se encuentren desaparecidos.

Se aplicará la Ley del Sistema de Alerta Alba-Keneth en cuanto corresponde.

### Título III
### Medios de transporte

### Capítulo I
### Criterios y regulación general

**Artículo 208. Supervisión.** Al ingreso y egreso, todo medio de transporte, aéreo, marítimo o terrestre internacional estará sujeta a las supervisiones de control migratorio sobre sus pasajeros, sus tripulantes o su personal. El Instituto Guatemalteco de Migración determina en qué lugares se realiza la supervisión. El ingreso de pasajeros, tripulantes o personal está supeditado al cumplimiento de la documentación prevista en la legislación nacional.

**Artículo 209. Asistencia y protección.** Los empleados del Instituto Guatemalteco de Migración, determinarán la existencia de brindar asistencia y protección a personas que requieran atención médica o cualquier otro servicio de urgencia en los procedimientos de supervisión.

**Artículo 210. Colaboración privada.** Las entidades privadas o de transporte privado, ya sea marítimo, aéreo o terrestre deben colaborar en el control del cumplimiento de los documentos de los pasajeros y su personal. Para el efecto se emitirán las disposiciones correspondientes.

**Artículo 211. Prohibición.** No pueden abandonar el país las aeronaves, embarcaciones y vehículos terrestres sin que sus pasajeros, tripulantes y personal realicen el procedimiento de control migratorio.

Por el incumplimiento de esta normativa, se sancionará al infractor con una multa equivalente a diez mil Dólares de los Estados Unidos de América (US$10,000.00).

**Artículo 212. Responsabilidad solidaria.** El propietario, capitán, comandante, encargado o responsable de todo medio de transporte internacional, y las compañías, empresas o agencias propietarias, representantes, explotadoras o consignatarias de medios de transporte internacional, son responsables solidarios por el traslado, el cuidado y la custodia de pasajeros, los tripulantes y el personal que sean admitidos en el país, en las condiciones determinadas por el presente Código, reglamentos y demás disposiciones migratorias.

**Artículo 213. Obligación.** Además del traslado correspondiente, las compañías, empresas o agencias propietarias, representantes, explotadoras o consignatarias de medios de transporte internacional, indistintamente, deben sufragar toda obligación pecuniaria originada en razón del rechazo ordenado por autoridad competente, de los pasajeros o los tripulantes que no cumplan con los requisitos de ingreso y permanencia establecidos en el presente Código y sus reglamentos. Incluso de los gastos que deben cubrirse cuando estas personas extranjeras deben permanecer en el país, el tiempo estrictamente necesario para ejecutar el rechazo.

El incumplimiento de esta disposición será sancionado con multa equivalente a diez mil Dólares de los Estados Unidos de América (US$10,000.00).

**Artículo 214. Puesto migratorio.** Dentro de las instalaciones fronterizas, portuarias y aeroportuarias existirán puestos migratorios, por vía de los cuales se realizará la supervisión migratoria.

**Artículo 215. Trabajadores de los medios de transporte.** El Instituto Guatemalteco de Migración, regulará las obligaciones y demás disposiciones que deben cumplirse para la documentación y supervisión migratoria de los trabajadores de medios de transporte internacional.

### Capítulo II
### Autorizaciones

**Artículo 216. Listados.** La capitanía del puerto, la Dirección General de Aeronáutica Civil y la Dirección General de Transportes, no podrán autorizar el ingreso y egreso de buques, embarcaciones, aeronaves y vehículos terrestres al territorio nacional si no cumplen con las disposiciones de entrega de listados de pasajeros, personal y tripulantes.

**Artículo 217. Pasajeros en tránsito.** Los pasajeros en tránsito son considerados turistas o viajeros.

### Libro III
### Disposiciones finales, transitorias y derogatorias

### Título I
### Disposiciones Finales y Transitorias

### Capítulo I
### Disposiciones finales

**Artículo 218. Trabajadores guatemaltecos migrantes y reclutadores.** Los trabajadores guatemaltecos migrantes pueden acceder a programas de trabajadores temporales en el extranjero, de forma individual o por vía de entidades lícitas de reclutamiento de personas, previamente autorizadas y debidamente registradas por el Ministerio de Trabajo y Previsión Social de Guatemala con la colaboración del Ministerio de Relaciones Exteriores.

Para el efecto, además de lo dispuesto en el artículo 34 del Código de Trabajo, las empresas y personas reclutadoras deben especificar, en los formularios respectivos aprobados por el Ministerio de Trabajo y Previsión Social, las entidades públicas o privadas que requieren los servicios en el extranjero, así como la clase, categoría y tipo de trabajo que desarrollarán.

**Artículo 219. Auxilio y asistencia de trabajadores migrantes guatemaltecos.** El Ministerio de Trabajo y Previsión Social debe crear el sistema de coordinación con el Ministerio de Relaciones Exteriores, para el auxilio y asistencia de trabajadores migrantes guatemaltecos en el extranjero.

El Ministerio de Relaciones Exteriores, deberá promover relaciones diplomáticas con el país de acogida para que se permita la verificación del respeto a los derechos laborales y a lo establecido en los contratos específicos.

### Capítulo II
### Transición y derechos laborales

**Artículo 220. No afectación de derechos laborales.** El proceso de transición de la Dirección General de Migración dentro del Ministerio de Gobernación, al Instituto Guatemalteco de Migración como dependencia descentralizada con competencia exclusiva, no afecta los contratos de trabajo existentes en perjuicio de los trabajadores

El Ministerio de Trabajo y Previsión Social por medio de la dependencia correspondiente tiene a su cargo la supervisión de que no se tergiverse, disminuya o contraríe los derechos de los trabajadores en el proceso de transición.

**Artículo 221. Sindicatos.** Los sindicatos de la Dirección General de Migración no serán menoscabados en sus capacidades como persona jurídica, durante el proceso de transición al Instituto Guatemalteco de Migración.

**Artículo 222. Pacto colectivo.** El Pacto Colectivo de Trabajo celebrado entre el Sindicato de Trabajadores de la Dirección General de Migración y la Dirección General de Migración, permanece vigente ante la conformación del Instituto Guatemalteco de Migración.

**Artículo 223. Incorporación a carrera.** Todos los empleados públicos de la Dirección General de Migración deben ingresar al sistema de carrera profesional desde el proceso de transición y con miras a consolidar la gestión administrativa de las funciones del Instituto Guatemalteco de Migración.

Los procesos laborales que estén en proceso ante la autoridad judicial, entre la Dirección General de Migración y algún funcionario o empleado público, deberán continuar su proceso.

**Artículo 224. Plena vigencia de derechos.** Los derechos a licencias, vacaciones, descansos pre y post natal, jornadas de trabajo, remuneraciones y demás derechos de trabajo permanecen vigentes y deben seguir su curso normal.

**Artículo 225. Clases pasivas.** Los trabajadores del Instituto Guatemalteco de Migración pueden seguir aportando al régimen de pensiones civiles del Estado, cumpliendo con el procedimiento de incorporación voluntaria establecida en la ley específica.

### Capítulo III
### Disposiciones transitorias

**Artículo 226. Del inicio de las actividades.** El Instituto Guatemalteco de Migración, que se crea a través del presente Código, iniciará funciones al momento en que el Presidente de la República nombre al Director General, conforme las disposiciones del presente Código.

En el inicio de funciones, todas las competencias, derechos, atribuciones, funciones, representaciones y delegaciones, que estén reguladas en leyes, reglamentos y demás instrumentos normativos a favor o a cargo de la Dirección General de Migración, pasan a ser ejercidas por el Instituto Guatemalteco de Migración. De igual forma todos los derechos y obligaciones, que consten en convenios, contratos u otros instrumentos jurídicos, nacionales o internacionales.

Los bienes muebles e inmuebles, equipamiento, mobiliario, y demás activos y pasivos de la Dirección General de Migración pasan a formar parte del patrimonio institucional del Instituto Guatemalteco de Migración.

**Artículo 227. De la conformación de la Autoridad Migratoria Nacional y el nombramiento del Director del Instituto Guatemalteco de Migración.** La Autoridad Migratoria Nacional se deberá conformar sesenta días después de la entrada en vigencia del presente Código, para iniciar con la emisión de reglamentación y el plan de transición, los cuales deberán ser emitidos en un plazo de seis a doce meses.

El Presidente de la República deberá nombrar al Director del Instituto Guatemalteco de Migración, una vez apruebe el plan de transición presentado por la Autoridad Migratoria Nacional.

La persona que ocupa el puesto de Director General de Migración se mantendrá en el cargo hasta que sea presentado y aprobado el plan de transición.

**Artículo 228. Gradualidad de la transición.** Aprobado el plan de transición presentado por la Autoridad Migratoria Nacional al Presidente de la República, este nombrará al Director del Instituto Guatemalteco de Migración para que, en conjunto con la Autoridad Migratoria Nacional, un representante del Ministerio de Gobernación y un viceministro del Ministerio de Finanzas Públicas, inicien con la ejecución de este plan, en un período máximo de dos años.

Durante este proceso el Ministerio de Gobernación irá abandonando las funciones que desarrollaba hasta dejar al Instituto Guatemalteco de Migración como la dependencia descentralizada con competencia exclusiva.

**Artículo 229. Acompañamiento de la Contraloría General de Cuentas.** En el marco de sus funciones la Contraloría General de Cuentas deberá acompañar el proceso de transición para garantizar la efectividad en traslado y manejo de los fondos públicos administrados por la cesada dirección.

**Artículo 230. Archivos.** Todos los archivos deberán ser transferidos de forma técnica y conforme las reglas de archivística que para el efecto pueda disponer el Archivo General de Centro América.

Previa a la transferencia deben emitirse las normas de valoración de archivos, las cuales permitan:

a) Definir qué documentos deben ser transferidos al Archivo General de Centro América por su valor histórico o patrimonial.

b) Definir qué documentos deben ser conservados dentro del Departamento de Estadística y Archivo por su valor administrativo y de información de las personas.

c) Definir qué documentos deben ser enviados a las bibliotecas nacionales, del Ministerio de Educación o de la Universidad de San Carlos de Guatemala por su contenido académico.

d) Definir el procedimiento de conservación, tratamiento y resguardo de la información que permanecerá en el archivo correspondiente de migración.

e) Establecer la secuencia de revisión de documentos, la emisión de valoraciones y la digitalización de los mismos.

f) Definir qué material sea desechable mediante reciclaje.

Asimismo, se debe determinar todos los aspectos técnicos que sean necesarios para el correcto manejo de la información y su posterior puesta a disposición pública de acuerdo con la Ley de Acceso a la Información Pública.

**Artículo 231. Presupuesto.** El Ministerio de Gobernación debe trasladar los fondos que le fueron asignados para la Dirección General de Migración al Instituto Guatemalteco de Migración. Asimismo, en el Presupuesto General de Ingresos y Egresos del Estado, se debe dar una asignación inicial para dar cobertura a los gastos iniciales de instalación, organización y operaciones.

En el mismo Presupuesto General de Ingresos y Egresos del Estado, se deben crear partidas presupuestarias específicas a las Instituciones del Estado que prestan servicios de protección a las personas migrantes guatemaltecas retornadas o personas extranjeras que necesitan protección especializada de acuerdo a la vulneración de sus derechos.

**Artículo 232. Transferencia de bienes.** Se transfieren al Instituto Guatemalteco de Migración todos los bienes físicos, muebles e inmuebles de la Dirección General de Migración que sean necesarios para su funcionamiento. Dicha transferencia se hará de

DHSF0142

conformidad con lo que establece la Ley de Contrataciones del Estado y demás disposiciones aplicables. Debe contarse con la anuencia del Ministerio de Finanzas Públicas.

**Artículo 233. Puestos migratorios.** Los puestos migratorios debidamente establecidos en el momento de la entrada en vigencia del presente Código, se mantendrán funcionando de forma normal conforme sus funciones establecidas.

**Artículo 234. Plan único de regularización.** Ciento ochenta días luego de la entrada en vigencia de este Código, se otorga un plazo de ciento ochenta días para las personas migrantes extranjeras que se encuentren en situación irregular para que soliciten su regularización migratoria.

**Artículo 235. Regularización de residentes.** Los documentos que acreditan a las personas con estatus de residente temporal o permanente permanecen vigentes. El Director General del Instituto debe emitir la convocatoria para el inicio del cambio de nominación del estatus o bien para la actualización conforme las regulaciones de este Código.

**Artículo 236. Vigencias de solicitudes, procedimientos y trámites.** Todas las solicitudes, procedimientos y trámites existentes antes de la entrada en vigencia del presente Código, serán resueltos conforme el Decreto Número 95-98 del Congreso de la República.

**Artículo 237. Fortalecimiento de la red de protección consular.** Para el fortalecimiento de la red de protección consular y atención al guatemalteco en el extranjero, el Ministerio de Relaciones Exteriores deberá incrementar las sedes consulares, en un plazo no mayor de cinco años, en aquellas ciudades del extranjero en donde residan una cantidad considerable de migrantes guatemaltecos.

Para cumplir con lo establecido en el presente artículo, el Ministerio de Finanzas Públicas, creará las partidas presupuestarias necesarias dentro del Presupuesto de Ingresos y Egresos del Estado, anualmente, para la asignación de los fondos necesarios.

**Artículo 238. Reglamento.** El reglamento general y los demás reglamentos que se disponen en el presente Código, serán aprobados durante el primer año luego de la conformación de la Autoridad Migratoria Nacional.

**Capítulo IV**
**Reformas y derogación a la Legislación Nacional**

**Artículo 239.** Se reforma el primer párrafo y se derogan las literales j) y k) del artículo 36 de la Ley del Organismo Ejecutivo, Decreto Número 114-97 del Congreso de la República, el cual queda así:

"**Artículo 36. Ministerio de Gobernación.** Al Ministerio de Gobernación le corresponde formular las políticas, cumplir y hacer cumplir el régimen jurídico relativo al mantenimiento de la paz y el orden público, la seguridad de las personas

y de sus bienes, la garantía de sus derechos, la ejecución de las órdenes y resoluciones judiciales y refrendar los nombramientos de los Ministros de Estado, incluyendo el de quien lo suceda en el cargo; para ella tiene a su cargo las siguientes funciones:"

**Artículo 240.** Se reforma el artículo 8 del Decreto Número 46-2007 del Congreso de la República, Ley del Consejo Nacional de Atención al Migrante de Guatemala, adicionando la literal g) con el texto siguiente:

"g)    Un representante delegado por el Director General del Instituto Guatemalteco de Migración."

**Artículo 241.** Se deroga, del Decreto Número 95-98 del Congreso de la República, Ley de Migración, lo siguiente:

a)   El Título I, el Capítulo Único y los artículos 1 y 2.

b)   El Título II, los Capítulos I y II y los artículos del 3 al 11.

c)   El Título III, los Capítulos I, II, III, IV las Secciones Primera y Segunda y el Capítulo V y los artículos del 12 al 45.

d)   El Título IV, el Capítulo Único y los artículos del 46 al 48.

e)   El Título V, los Capítulos I y II Secciones de la Primera a la Cuarta y los artículos del 49 al 69.

f)   El Título VI, los Capítulos I al III y los artículos del 70 al 86.

g)   El Título VII, los Capítulos I al III y los artículos del 87 al 96.

h)   El Título VIII, el Capítulo Único y los artículos 97 y 98.

i)   El Título IX los artículos del 99 al 102.

j)   Del Título X el Capítulo II y los artículos del 109 al 115.

k)   El Título XI y el artículo 116.

l)   El Título XII los artículos del 117 al 120.

**Artículo 242.** Se deroga el Acuerdo Gubernativo 383-2001, Reglamento para la Protección y Determinación del Estatuto de Refugiado en el territorio del Estado de Guatemala.

**Artículo 243.** Quedan derogadas todas las disposiciones legales y reglamentarias que en la legislación nacional se refieran a las materias que norma este Código. Asimismo, las disposiciones contenidas en otros cuerpos normativos que le atribuyan funciones o

deberes a la Dirección General de Migración, se entenderán que serán realizadas por el Instituto Guatemalteco de Migración.

**Artículo 244.** Los epígrafes de los artículos del presente Código no tienen valor interpretativo.

**Artículo 245. Vigencia especial.** Lo normado en el numeral 2 del artículo 61, y el último párrafo del artículo 91 del presente Código, en tanto se completa la transición al Instituto Guatemalteco de Migración, serán funciones a cargo de la Dirección General de Migración, cuya vigencia empieza el mismo día de su publicación en el Diario Oficial.

**Artículo 246. Vigencia.** El presente Decreto fue aprobado con el voto favorable de más de las dos terceras partes del número total de diputados que integran el Congreso de la República y entrará en vigencia sesenta días después de su publicación en el Diario Oficial a excepción de este artículo el cual entra en vigencia el mismo día de la publicación.

REMÍTASE AL ORGANISMO EJECUTIVO PARA SU SANCIÓN, PROMULGACIÓN Y PUBLICACIÓN.

EMITIDO EN EL PALACIO DEL ORGANISMO LEGISLATIVO, EN LA CIUDAD DE GUATEMALA, EL VEINTE DE SEPTIEMBRE DE DOS MIL DIECISÉIS.



MARIO TARACENA DÍAZ-SOL
PRESIDENTE

LUIS ALBERTO CONTRERAS COLÍNDRES
SECRETARIO

OSCAR STUARDO CHINCHILLA GUZMÁN
SECRETARIO

PALACIO NACIONAL: Guatemala, doce de octubre del año dos mil dieciséis.

PUBLÍQUESE Y CÚMPLASE

MORALES CABRERA

Lic. Francisco Manuel Rivas Lara
Ministro de Gobernación

Carlos Adolfo Martínez Gularte
SECRETARIO GENERAL
DE LA PRESIDENCIA DE LA REPÚBLICA

DHSFF0143



# Handbook
# on Procedures and Criteria
# for Determining Refugee Status
# under the 1951 Convention
# and the 1967 Protocol
# relating to the Status of Refugees

**HCR/IP/4/Eng/REV.1**
**Reedited,**
**Geneva, January 1992,**
**UNHCR 1979**

## FOREWORD

I)      Refugee status, on the universal level, is governed by the 1951 Convention and the 1967 Protocol relating to the Status of Refugees. These two international legal instruments have been adopted within the framework of the United Nations. At the time of republishing this Handbook 110 states have become parties to the Convention or to the Protocol or to both instruments.

II)      These two international legal instruments are applicable to persons who are refugees as therein defined. The assessment as to who is a refugee, i.e. the determination of refugee status under the 1951 Convention and the 1967 Protocol, is incumbent upon the Contracting State in whose territory the refugee applies for recognition of refugee status.

III)      Both the 1951 Convention and the 1967 Protocol provide for co-operation between the Contracting States and the Office of the United Nations High Commissioner for Refugees. This co-operation extends to the determination of refugee status, according to arrangements made in various Contracting States.

IV)      The Executive Committee of the High Commissioner's Programme at its twenty-eighth session requested the Office of the High Commissioner "to consider the possibility of issuing – for the guidance of Governments – a handbook relating to procedures and criteria for determining refugee status". The first edition of the Handbook was issued by my Division in September 1979 in response to this request by the Executive Committee. Since then the Handbook has been regularly reprinted to meet the increasing demands of government officials, academics, and lawyers concerned with refugee problems. The present edition updates information concerning accessions to the international refugee instruments including details of declarations on the geographical applicability of the 1951 Convention and 1967 Protocol.

V)      The segment of this Handbook on the criteria for determining refugee status breaks down and explains the various components of the definition of refugee set out in the 1951 Convention and the 1967 Protocol. The explanations are based on the knowledge accumulated by the High Commissioner's Office over some 25 years, since the entry into force of the 1951 Convention on 21 April 1954. The practice of States is taken into account as are exchanges of views between the Office and the competent authorities of Contracting States, and the literature devoted to the subject over the last quarter of a century. As the Handbook has been conceived as a practical

guide and not as a treatise on refugee law, references to literature etc. have purposely been omitted.

VI)      With respect to procedures for the determination of refugee status, the writers of the Handbook have been guided chiefly by the principles defined in this respect by the Executive Committee itself. Use has naturally also been made of the knowledge available concerning the practice of States.

VII)      The Handbook is meant for the guidance of government officials concerned with the determination of refugee status in the various Contracting States. It is hoped that it will also be of interest and useful to all those concerned with refugee problems.

*Michel Moussalli*

*Director of International Protection*

*Office of the United Nations High Commissioner for Refugees*

## INTRODUCTION – International instruments defining the term "refugee"

### A. Early instruments (1921-1946)

1.      Early in the twentieth century, the refugee problem became the concern of the international community, which, for humanitarian reasons, began to assume responsibility for protecting and assisting refugees.

2.      The pattern of international action on behalf of refugees was established by the League of Nations and led to the adoption of a number of international agreements for their benefit. These instruments are referred to in Article 1 A (1) of the 1951 Convention relating to the Status of Refugees (see paragraph 32 below).

3.      The definitions in these instruments relate each category of refugees to their national origin, to the territory that they left and to the lack of diplomatic protection by their former home country. With this type of definition "by categories" interpretation was simple and caused no great difficulty in ascertaining who was a refugee.

4.      Although few persons covered by the terms of the early instruments are likely to request a formal determination of refugee status at the present time.. such cases could occasionally arise. They are dealt with below in Chapter II, A. Persons who meet the definitions of international instruments prior to the 1951 Convention are usually referred to as "statutory refugees".

### B. 1951 Convention relating to the Status of Refugees

5.      Soon after the Second World War, as the refugee problem had not been solved, the need was felt for a new international instrument to define the legal status of refugees. Instead of ad hoc agreements adopted in relation to specific refugee situations, there was a call for an instrument containing a general definition of who was to be considered a refugee. The Convention relating to the Status of Refugees was adopted by a Conference of Plenipotentiaries of the United Nations on 28 July 1951, and entered into force on 21 April 1954. In the following paragraphs it is referred to as "the 1951 Convention". (The text of the 1951 Convention will be found in Annex II.)

### C. Protocol relating to the Status of Refugees

6.      According to the general definition contained in the 1951 Convention, a refugee is a person who:

> "As a result of events occurring before 1 January 1951 and owing to well-founded fear of being persecuted ... is outside his country of nationality ..."

7.      The 1951 dateline originated in the wish of Governments, at the time the Convention was adopted, to limit their obligations to refugee situations that were known to exist at that time, or to those which might subsequently arise from events that had already occurred.[1]

8.      With the passage of time and the emergence of new refugee situations, the need was increasingly felt to make the provisions of the 1951 Convention applicable to such new refugees. As a result, a Protocol relating to the Status of Refugees was prepared. After consideration by the General Assembly of the United Nations, it was opened for accession on 31 January 1967 and entered into force on 4 October 1967.

9.      By accession to the 1967 Protocol, States undertake to apply the substantive provisions of the 1951 Convention to refugees as defined in the Convention, but without the 1951 dateline. Although related to the Convention in this way, the Protocol is an independent instrument, accession to which is not limited to States parties to the Convention.

---

[1] The 1951 Convention also provides for the possibility of introducing a geographic limitation (see paragraphs 108 to 110 below).

10.     In the following paragraphs, the 1967 Protocol relating to the Status of Refugees is referred to as "the 1967 Protocol". (The text of the Protocol will be found in Annex III.)

11.     At the time of writing, 78 States are parties to the 1951 Convention or to the 1967 Protocol or to both instruments. (A list of the States parties will be found in Annex IV.)

### D. Main provisions of the 1951 Convention and the 1967 Protocol

12.     The 1951 Convention and the 1967 Protocol contain three types of provisions:

(i)     Provisions giving the *basic definition* of who is (and who is not) a refugee and who, having been a refugee, has ceased to be one. The discussion and interpretation of these provisions constitute the main body of the present Handbook, intended for the guidance of those whose task it is to determine refugee status.

(ii)     Provisions that define the *legal status* of refugees and their rights and duties in their country of refuge. Although these provisions have no influence on the process of determination of refugee status, the authority entrusted with this process should be aware of them, for its decision may indeed have far-reaching effects for the individual or family concerned.

(iii)     Other provisions dealing with the *implementation* of the instruments from the administrative and diplomatic standpoint. Article 35 of the 1951 Convention and Article 11 of the 1967 Protocol contain an undertaking by Contracting States to co-operate with the Office of the United Nations High Commissioner for Refugees in the exercise of its functions and, in particular, to facilitate its duty of supervising the application of the provisions of these instruments.

### E. Statute of the Office of the United Nations High Commissioner for Refugees

13.     The instruments described above under A-C define the persons who are to be considered refugees and require the parties to accord a certain status to refugees in their respective territories.

14.     Pursuant to a decision of the General Assembly, the Office of the United Nations High Commissioner for Refugees ("UNHCR") was established as of 1 January 1951. The Statute of the Office is annexed to Resolution 428 (V), adopted by the General Assembly on 14 December 1950. According to the Statute, the High Commissioner is called upon – *inter alia* – to provide international protection, under the auspices of the United Nations, to refugees falling within the competence of his Office.

15.     The Statute contains definitions of those persons to whom the High Commissioner's competence extends, which are very close to, though not identical with, the definition contained in the 1951 Convention. By virtue of these definitions the High Commissioner is competent for refugees irrespective of any dateline[2] or geographic limitation.[3]

16.     Thus, a person who meets the criteria of the UNHCR Statute qualifies for the protection of the United Nations provided by the High Commissioner, regardless of whether or not he is in a country that is a party to the 1951 Convention or the 1967 Protocol or whether or not he has been recognized by his host country as a refugee under either of these instruments. Such refugees, being within the High Commissioner's mandate, are usually referred to as "mandate refugees".

17.     From the foregoing, it will be seen that a person can simultaneously be both a mandate refugee *and* a refugee under the 1951 Convention or the 1967 Protocol. He may, however, be in a country that is not bound by either of these instruments, or he may be excluded from recognition as a Convention refugee by the application of the dateline or the geographic

---

[2] See paragraphs 35 and 36 below.

[3] See paragraphs 108 and 110 below.

limitation. In such cases he would still qualify for protection by the High Commissioner under the terms of the Statute.

18.     The above mentioned Resolution 428 (V) and the Statute of the High Commissioner's Office call for co-operation between Governments and the High Commissioner's Office in dealing with refugee problems. The High Commissioner is designated as the authority charged with providing inter-national protection to refugees, and is required *inter alia* to promote the conclusion and ratification of international conventions for the protection of refugees, and to supervise their application.

19.     Such co-operation, combined with his supervisory function, forms the basis for the High Commissioner's fundamental interest in the process of determining refugee status under the 1951 Convention and the 1967 Protocol. The part played by the High Commissioner is reflected, to varying degrees, in the procedures for the determination of refugee status established by a number of Governments.

### F. Regional instruments relating to refugees

20.     In addition to the 1951 Convention and the 1967 Protocol, and the Statute of the Office of the United Nations High Commissioner for Refugees, there are a number of regional agreements, conventions and other instruments relating to refugees, particularly in Africa, the Americas and Europe. These regional instruments deal with such matters as the granting of asylum, travel documents and travel facilities, etc. Some also contain a definition of the term "refugee", or of persons entitled to asylum.

21.     In Latin America, the problem of diplomatic and territorial asylum is dealt with in a number of regional instruments including the Treaty on International Penal Law, (Montevideo, 1889); the Agreement on Extradition, (Caracas, 1911); the Convention on Asylum, (Havana, 1928); the Convention on Political Asylum, (Montevideo, 1933); the Convention on Diplomatic Asylum, (Caracas, 1954); and the Convention on Territorial Asylum, (Caracas, 1954).

22.     A more recent regional instrument is the Convention Governing the Specific Aspects of Refugee Problems in Africa, adopted by the Assembly of Heads of State and Government of the Organization of African Unity on 10 September 1969. This Convention contains a definition of the term "refugee", consisting of two parts: the first part is identical with the definition in the 1967 Protocol (i.e. the definition in the 1951 Convention without the dateline or geographic limitation). The second part applies the term "refugee" to:

"every person who, owing to external aggression, occupation, foreign domination or events seriously disturbing public order in either part or the whole of his country of origin or nationality, is compelled to leave his place of habitual residence in order to seek refuge in another place outside his country of origin or nationality".

23.     The present Handbook deals only with the determination of refugee status under the two international instruments of universal scope: the 1951 Convention and the 1967 Protocol.

### G. Asylum and the treatment of refugees

24.     The Handbook does not deal with questions closely related to the determination of refugee status e.g. the granting of asylum to refugees or the legal treatment of refugees after they have been recognized as such.

25.     Although there are references to asylum in the Final Act of the Conference of Plenipotentiaries as well as in the Preamble to the Convention, the granting of asylum is not dealt with in the 1951 Convention or the 1967 Protocol. The High Commissioner has always pleaded for a generous asylum policy in the spirit of the Universal Declaration of Human Rights and the Declaration on Territorial Asylum, adopted by the General Assembly of the United Nations on 10 December 1948 and on 14 December 1967 respectively.

26.     With respect to the treatment within the territory of States, this is regulated as regards refugees by the main provisions of the 1951 Convention and 1967 Protocol (see paragraph 12(ii) above). Furthermore, attention should be drawn to Recommendation E contained in the Final Act of the Conference of Plenipotentiaries which adopted the 1951 Convention:

> "The Conference
> Expresses the hope that the Convention relating to the Status of Refugees will have value as an example exceeding its contractual scope and that all nations will be guided by it in granting so far as possible to persons in their territory as refugees and who would not be covered by the terms of the Convention, the treatment for which it provides."

27.     This recommendation enables States to solve such problems as may arise with regard to persons who are not regarded as fully satisfying the criteria of the definition of the term "refugee".

DHSFF0149

**PART ONE – Criteria for the Determination of Refugee Status**

### *CHAPTER I – GENERAL PRINCIPLES*

28.        A person is a refugee within the meaning of the 1951 Convention as soon as he fulfils the criteria contained in the definition. This would necessarily occur prior to the time at which his refugee status is formally determined. Recognition of his refugee status does not therefore make him a refugee but declares him to be one. He does not become a refugee because of recognition, but is recognized because he is a refugee.

29.        Determination of refugee status is a process which takes place in two stages. Firstly, it is necessary to ascertain the relevant facts of the case. Secondly, the definitions in the 1951 Convention and the 1967 Protocol have to be applied to the facts thus ascertained.

30.        The provisions of the 1951 Convention defining who is a refugee consist of three parts, which have been termed respectively "inclusion", "cessation" and "exclusion" clauses.

31.        The inclusion clauses define the criteria that a person must satisfy in order to be a refugee. They form the positive basis upon which the determination of refugee status is made. The so-called cessation and exclusion clauses have a negative significance; the former indicate the conditions under which a refugee ceases to be a refugee and the latter enumerate the circumstances in which a person is excluded from the application of the 1951 Convention although meeting the positive criteria of the inclusion clauses.

### *CHAPTER II – INCLUSION CLAUSES*

## A.    Definitions

**(1) Statutory Refugees**

32.        Article 1 A (1) of the 1951 Convention deals with statutory refugees, i.e. persons considered to be refugees under the provisions of international instruments preceding the Convention. This provision states that:

> "For the purposes of the present Convention, the term 'refugee' shall apply to any person who:

> (1) Has been considered a refugee under the Arrangements of 12 May 1926 and 30 June 1928 or under the Conventions of 28 October 1933 and 10 February 1938, the Protocol of 14 September 1939 or the Constitution of the International Refugee Organization;

Decisions of non-eligibility taken by the International Refugee Organization during the period of its activities shall not prevent the status of refugees being accorded to persons who fulfil the conditions of paragraph 2 of this section."

33.        The above enumeration is given in order to provide a link with the past and to ensure the continuity of international protection of refugees who became the concern of the international community at various earlier periods. As already indicated (para. 4 above), these instruments have by now lost much of their significance, and a discussion of them here would be of little practical value. However, a person who has been considered a refugee under the terms of any of these instruments is automatically a refugee under the 1951 Convention. Thus, a holder of a so-called "Nansen Passport"[4] or a "Certificate of Eligibility" issued by the International Refugee Organization must be considered a refugee under the 1951 Convention unless one of the cessation clauses has become applicable to his case or he is excluded from the application of the Convention by one of the exclusion clauses. This also applies to a surviving child of a statutory refugee.

---

[4] "Nansen Passport": a certificate of identity for use as a travel document, issued to refugees under the provisions of prewar instruments.

**(2) General definition in the 1951 Convention**

34.      According to Article 1 A (2) of the 1951 Convention the term "refugee" shall apply to any person who:

"As a result of events occurring before 1 January 1951 and owing to well founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence as a result of such events, is unable or, owing to such fear, is unwilling to return to it."

This general definition is discussed in detail below.

# B.      Interpretation of terms

**(1) "Events occurring before 1 January 1951"**

35.      The origin of this 1951 dateline is explained in paragraph 7 of the Introduction. As a result of the 1967 Protocol this dateline has lost much of its practical significance. An interpretation of the word "events" is therefore of interest only in the small number of States parties to the 1951 Convention that are not also party to the 1967 Protocol.[5]

36.      The word "events" is not defined in the 1951 Convention, but was understood to mean "happenings of major importance involving territorial or profound political changes as well as systematic programmes of persecution which are after-effects of earlier changes".[6] The dateline refers to "events" as a result of which, and not to the date on which, a person becomes a refugee, not does it apply to the date on which he left his country. A refugee may have left his country before or after the datelines, provided that his fear of persecution is due to "events" that occurred before the dateline or to after-effects occurring at a later date as a result of such events.[7]

**(2) "well founded fear of being persecuted"**

**(a) General analysis**

37.      The phrase "well-founded fear of being persecuted" is the key phrase of the definition. It reflects the views of its authors as to the main elements of refugee character. It replaces the earlier method of defining refugees by categories (i.e. persons of a certain origin not enjoying the protection of their country) by the general concept of "fear" for a relevant motive. Since fear is subjective, the definition involves a subjective element in the person applying for recognition as a refugee. Determination of refugee status will therefore primarily require an evaluation of the applicant's statements rather than a judgement on the situation prevailing in his country of origin.

38.      To the element of fear – a state of mind and a subjective condition – is added the qualification "well-founded". This implies that it is not only the frame of mind of the person concerned that determines his refugee status, but that this frame of mind must be supported by an objective situation. The term "well-founded fear" therefore contains a subjective and an objective element, and in determining whether well-founded fear exists, both elements must be taken into consideration.

39.      It may be assumed that, unless he seeks adventure or just wishes to see the world, a person would not normally abandon his home and country without some compelling reason. There may be many reasons that are compelling and understandable, but only one motive has

---

[5] See Annex IV.

[6] UN Document E/1618 page 39.

[7] Loc. cit.

been singled out to denote a refugee. The expression "owing to well-founded fear of being persecuted" – for the reasons stated – by indicating a specific motive automatically makes all other reasons for escape irrelevant to the definition. It rules out such persons as victims of famine or natural disaster, unless they also have well-founded fear of persecution for one of the reasons stated. Such other motives may not, however, be altogether irrelevant to the process of determining refugee status, since all the circumstances need to be taken into account for a proper understanding of the applicant's case.

40.     An evaluation of the *subjective element* is inseparable from an assessment of the personality of the applicant, since psychological reactions of different individuals may not be the same in identical conditions. One person may have strong political or religious convictions, the disregard of which would make his life intolerable; another may have no such strong convictions. One person may make an impulsive decision to escape; another may carefully plan his departure.

41.     Due to the importance that the definition attaches to the subjective element, an assessment of credibility is indispensable where the case is not sufficiently clear from the facts on record. It will be necessary to take into account the personal and family background of the applicant, his membership of a particular racial, religious, national, social or political group, his own interpretation of his situation, and his personal experiences – in other words, everything that may serve to indicate that the predominant motive for his application is fear. Fear must be reasonable. Exaggerated fear, however, may be well-founded if, in all the circumstances of the case, such a state of mind can be regarded as justified.

42.     As regards the objective clement, it is necessary to evaluate the statements made by the applicant. The competent authorities that are called upon to determine refugee status are not required to pass judgement on conditions in the applicant's country of origin. The applicant's statements cannot, however, be considered in the abstract, and must be viewed in the context of the relevant background situation. A knowledge of conditions in the applicant's country of origin – while not a primary objective – is an important element in assessing the applicant's credibility. In general, the applicant's fear should be considered well-founded if he can establish, to a reasonable degree, that his continued stay in his country of origin has become intolerable to him for the reasons stated in the definition, or would for the same reasons be intolerable if he returned there.

43.     These considerations need not necessarily be based on the applicant's own personal experience. What, for example, happened to his friends and relatives and other members of the same racial or social group may well show that his fear that sooner or later he also will become a victim of persecution is well-founded. The laws of the country of origin, and particularly the manner in which they are applied, will be relevant. The situation of each person must, however, be assessed on its own merits. In the case of a well-known personality, the possibility of persecution may be greater than in the case of a person in obscurity. All these factors, e.g. a person's character, his background, his influence, his wealth or his outspokenness, may lead to the conclusion that his fear of persecution is "well-founded".

44.     While refugee status must normally be determined on an individual basis, situations have also arisen in which entire groups have been displaced under circumstances indicating that members of the group could be considered individually as refugees. In such situations the need to provide assistance is often extremely urgent and it may not be possible for purely practical reasons to carry out an individual determination of refugee status for each member of the group. Recourse has therefore been had to so-called "group determination" of refugee status, whereby each member of the group is regarded *prima facie* (i.e. in the absence of evidence to the contrary) as a refugee.

45.     Apart from the situations of the type referred to in the preceding paragraph, an applicant for refugee status must normally show good reason why he individually fears persecution. It may be assumed that a person has well-founded fear of being persecuted if he has already been the victim of persecution for one of the reasons enumerated in the 1951 Convention. However, the

word "fear" refers not only to persons who have actually been persecuted, but also to those who wish to avoid a situation entailing the risk of persecution.

46.     The expressions "fear of persecution" or even "persecution" are usually foreign to a refugee's normal vocabulary. A refugee will indeed only rarely invoke "fear of persecution" in these terms, though it will often be implicit in his story. Again, while a refugee may have very definite opinions for which he has had to suffer, he may not, for psychological reasons, be able to describe his experiences and situation in political terms.

47.     A typical test of the well-foundedness of fear will arise when an applicant is in possession of a valid national passport. It has sometimes been claimed that possession of a passport signifies that the issuing authorities do not intend to persecute the holder, for otherwise they would not have issued a passport to him. Though this may be true in some cases, many persons have used a legal exit from their country as the only means of escape without ever having revealed their political opinions, a knowledge of which might place them in a dangerous situation vis-à-vis the authorities.

48.     Possession of a passport cannot therefore always be considered as evidence of loyalty on the part of the holder, or as an indication of the absence of fear. A passport may even be issued to a person who is undesired in his country of origin, with the sole purpose of securing his departure, and there may also be cases where a passport has been obtained surreptitiously. In conclusion, therefore, the mere possession of a valid national passport is no bar to refugee status.

49.     If, on the other hand, an applicant, without good reason, insists on retaining a valid passport of a country of whose protection he is allegedly unwilling to avail himself, this may cast doubt on the validity of his claim to have "well-founded fear". Once recognized, a refugee should not normally retain his national passport.

50.     There may, however, be exceptional situations in which a person fulfilling the criteria of refugee status may retain his national passport-or be issued with a new one by the authorities of his country of origin under special arrangements. Particularly where such arrangements do not imply that the holder of the national passport is free to return to his country without prior permission, they may not be incompatible with refugee status.

**(b) Persecution**

51.     There is no universally accepted definition of "persecution", and various attempts to formulate such a definition have met with little success. From Article 33 of the 1951 Convention, it may be inferred that a threat to life or freedom on account of race, religion, nationality, political opinion or membership of a particular social group is always persecution. Other serious violations of human rights – for the same reasons – would also constitute persecution.

52.     Whether other prejudicial actions or threats would amount to persecution will depend on the circumstances of each case, including the subjective element to which reference has been made in the preceding para. graphs. The subjective character of fear of persecution requires an evaluation of the opinions and feelings of the person concerned. It is also in the light of such opinions and feelings that any actual or anticipated measures against him must necessarily be viewed. Due to variations in the psychological make-up of individuals and in the circumstances of each case, interpretations of what amounts to persecution are bound to vary.

53.     In addition, an applicant may have been subjected to various measures not in themselves amounting to persecution (e.g. discrimination in different forms), in some cases combined with other adverse factors (e.g. general atmosphere of insecurity in the country of origin). In such situations, the various elements involved may, if taken together, produce an effect on the mind of the applicant that can reasonably justify a claim to well-founded fear of persecution on "cumulative grounds". Needless to say, it is not possible to lay down a general rule as to what cumulative reasons can give rise to a valid claim to refugee status. This will necessarily depend on all the circumstances, including the particular geographical, historical and ethnological context.

**(c) Discrimination**

54.      Differences in the treatment of various groups do indeed exist to a greater or lesser extent in many societies. Persons who receive less favourable treatment as a result of such differences are not necessarily victims of persecution. It is only in certain circumstances that discrimination will amount to persecution. This would be so if measures of discrimination lead to consequences of a substantially prejudicial nature for the person concerned, e.g. serious restrictions on his right to earn his livelihood, his right to practise his religion, or his access to normally available educational facilities.

55.      Where measures of discrimination are, in themselves, not of a serious character, they may nevertheless give rise to a reasonable fear of persecution if they produce, in the mind of the person concerned, a feeling of apprehension and insecurity as regards his future existence. Whether or not such measures of discrimination in themselves amount to persecution must be determined in the light of all the circumstances. A claim to fear of persecution will of course be stronger where a person has been the victim of a number of discriminatory measures of this type and where there is thus a cumulative element involved.[8]

**(d) Punishment**

56.      Persecution must be distinguished from punishment for a common law offence. Persons fleeing from prosecution or punishment for such an offence are not normally refugees. It should be recalled that a refugee is a victim – or potential victim – of injustice, not a fugitive from justice.

57.      The above distinction may, however, occasionally be obscured. In the first place, a person guilty of a common law offence may be liable to excessive punishment, which may amount to persecution within the meaning of the definition. Moreover, penal prosecution for a reason mentioned in the definition (for example, in respect of "illegal" religious instruction given to a child) may in itself amount to persecution.

58.      Secondly, there may be cases in which a person, besides fearing prosecution or punishment for a common law crime, may also have "well founded fear of persecution". In such cases the person concerned is a refugee. It may, however, be necessary to consider whether the crime in question is not of such a serious character as to bring the applicant within the scope of one of the exclusion clauses.[9]

59.      In order to determine whether prosecution amounts to persecution, it will also be necessary to refer to the laws of the country concerned, for it is possible for a law not to be in conformity with accepted human rights standards. More often, however, it may not be the law but its application that is discriminatory. Prosecution for an offence against "public order", e.g. for distribution of pamphlets, could for example be a vehicle for the persecution of the individual on the grounds of the political content of the publication.

60.      In such cases, due to the obvious difficulty involved in evaluating the laws of another country, national authorities may frequently have to take decisions by using their own national legislation as a yardstick. Moreover, recourse may usefully be had to the principles set out in the various international instruments relating to human rights, in particular the International Covenants on Human Rights, which contain binding commitments for the States parties and are instruments to which many States parties to the 1951 Convention have acceded.

**(e) Consequences of unlawful departure or unauthorized stay outside country of origin**

61.      The legislation of certain States imposes severe penalties on nationals who depart from the country in an unlawful manner or remain abroad without authorization. Where there is reason

---

[8] See also paragraph 53.

[9] See paragraphs 144 to 156.

to believe that a person, due to his illegal departure or unauthorized stay abroad is liable to such severe penalties his recognition as a refugee will be justified if it can be shown that his motives for leaving or remaining outside the country are related to the reasons enumerated in Article 1 A (2) of the 1951 Convention (see paragraph 66 below).

**(f) Economic migrants distinguished from refugees**

62.　　A migrant is a person who, for reasons other than those contained in the definition, voluntarily leaves his country in order to take up residence elsewhere. He may be moved by the desire for change or adventure, or by family or other reasons of a personal nature. If he is moved exclusively by economic considerations, he is an economic migrant and not a refugee.

63.　　The distinction between an economic migrant and a refugee is, however, sometimes blurred in the same way as the distinction between economic and political measures in an applicant's country of origin is not always clear. Behind economic measures affecting a person's livelihood there may be racial, religious or political aims or intentions directed against a particular group. Where economic measures destroy the economic existence of a particular section of the population (e.g. withdrawal of trading rights from, or discriminatory or excessive taxation of, a specific ethnic or religious group), the victims may according to the circumstances become refugees on leaving the country.

64.　　Whether the same would apply to victims of general economic measures (i.e. those that are applied to the whole population without discrimination) would depend on the circumstances of the case. Objections to general economic measures are not by themselves good reasons for claiming refugee status. On the other hand, what appears at first sight to be primarily an economic motive for departure may in reality also involve a political element, and it may be the political opinions of the individual that expose him to serious consequences, rather than his objections to the economic measures themselves.

**(g) Agents of persecution**

65.　　Persecution is normally related to action by the authorities of a country. It may also emanate from sections of the population that do not respect the standards established by the laws of the country concerned. A case in point may be religious intolerance, amounting to persecution, in a country otherwise secular, but where sizeable fractions of the population do not respect the religious beliefs of their neighbours. Where serious discriminatory or other offensive acts are committed by the local populace, they can be considered as persecution if they are knowingly tolerated by the authorities, or if the authorities refuse, or prove unable, to offer effective protection.

**(3) "for reasons of race, religion, nationality, membership of a particular social group or political opinion"**

**(a) General analysis**

66.　　In order to be considered a refugee, a person must show well-founded fear of persecution for one of the reasons stated above. It is immaterial whether the persecution arises from any single one of these reasons or from a combination of two or more of them. Often the applicant himself may not be aware of the reasons for the persecution feared. It is not, however, his duty to analyze his case to such an extent as to identify the reasons in detail.

67.　　It is for the examiner, when investigating the facts of the case, to ascertain the reason or reasons for the persecution feared and to decide whether the definition in the 1951 Convention is met with in this respect. It is evident that the reasons for persecution under these various headings will frequently overlap. Usually there will be more than one clement combined in one person, e.g. a political opponent who belongs to a religious or national group, or both, and the combination of such reasons in his person may be relevant in evaluating his well-founded fear.

DHSFF0155

**(b) Race**

68.     Race, in the present connexion, has to be understood in its widest sense to include all kinds of ethnic groups that are referred to as "races" in common usage. Frequently it will also entail membership of a specific social group of common descent forming a minority within a larger population. Discrimination for reasons of race has found world-wide condemnation as one of the most striking violations of human rights. Racial discrimination, therefore, represents an important element in determining the existence of persecution.

69.     Discrimination on racial grounds will frequently amount to persecution in the sense of the 1951 Convention. This will be the case if, as a result of racial discrimination, a person's human dignity is affected to such an extent as to be incompatible with the most elementary and inalienable human rights, or where the disregard of racial barriers is subject to serious consequences.

70.     The mere fact of belonging to a certain racial group will normally not be enough to substantiate a claim to refugee status. There may, however, be situations where, due to particular circumstances affecting the group, such membership will in itself be sufficient ground to fear persecution.

**(c) Religion**

71.     The Universal Declaration of Human Rights and the Human Rights Covenant proclaim the right to freedom of thought, conscience and religion, which right includes the freedom of a person to change his religion and his freedom to manifest it in public or private, in teaching, practice, worship and observance.

72.     Persecution for "reasons of religion" may assume various forms, e.g. prohibition of membership of a religious community, of worship in private or in public, of religious instruction, or serious measures of discrimination imposed on persons because they practise their religion or belong to a particular religious community.

73.     Mere membership of a particular religious community will normally not be enough to substantiate a claim to refugee status. There may, however, be special circumstances where mere membership can be a sufficient ground.

**(d) Nationality**

74.     The term "nationality" in this context is not to be understood only as "citizenship". It refers also to membership of an ethnic or linguistic group and may occasionally overlap with the term "race". Persecution for reasons of nationality may consist of adverse attitudes and measures directed against a national (ethnic, linguistic) minority and in certain circumstances the fact of belonging to such a minority may in itself give rise to well-founded fear of persecution.

75.     The co-existence within the boundaries of a State of two or more national (ethnic, linguistic) groups may create situations of conflict and also situations of persecution or danger of persecution. It may not always be easy to distinguish between persecution for reasons of nationality and persecution for reasons of political opinion when a conflict between national groups is combined with political movements, particularly where a political movement is identified with a specific "nationality".

76.     Whereas in most cases persecution for reason of nationality is feared by persons belonging to a national minority, there have been many cases in various continents where a person belonging to a majority group may fear persecution by a dominant minority.

**(e) Membership of a particular social group**

77.     A "particular social group" normally comprises persons of similar background, habits or social status. A claim to fear of persecution under this heading may frequently overlap with a claim to fear of persecution on other grounds, i.e. race, religion or nationality.

78.     Membership of such a particular social group may be at the root of persecution because there is no confidence in the group's loyalty to the Government or because the political outlook, antecedents or economic activity of its members, or the very existence of the social group as such, is held to be an obstacle to the Government's policies.

79.     Mere membership of a particular social group will not normally be enough to substantiate a claim to refugee status. There may, however, be special circumstances where mere membership can be a sufficient ground to fear persecution.

**(f) Political opinion**

80.     Holding political opinions different from those of the Government is not in itself a ground for claiming refugee status, and an applicant must show that he has a fear of persecution for holding such opinions. This presupposes that the applicant holds opinions not tolerated by the authorities, which are critical of their policies or methods. It also presupposes that such opinions have come to the notice of the authorities or are attributed by them to the applicant. The political opinions of a teacher or writer may be more manifest than those of a person in a less exposed position. The relative importance or tenacity of the applicant's opinions – in so far as this can be established from all the circumstances of the case – will also be relevant.

81.     While the definition speaks of persecution "for reasons of political opinion" it may not always be possible to establish a causal link between the opinion expressed and the related measures suffered or feared by the applicant. Such measures have only rarely been based expressly on "opinion". More frequently, such measures take the form of sanctions for alleged criminal acts against the ruling power. It will, therefore, be necessary to establish the applicant's political opinion, which is at the root of his behaviour, and the fact that it has led or may lead to the persecution that he claims to fear.

82.     As indicated above, persecution "for reasons of political opinion" implies that an applicant holds an opinion that either has been expressed or has come to the attention of the authorities. There may, however, also be situations in which the applicant has not given any expression to his opinions. Due to the strength of his convictions, however, it may be reasonable to assume that his opinions will sooner or later find expression and that the applicant will, as a result, come into conflict with the authorities. Where this can reasonably be assumed, the applicant can be considered to have fear of persecution for reasons of political opinion.

83.     An applicant claiming fear of persecution because of political opinion need not show that the authorities of his country of origin knew of his opinions before he left the country. He may have concealed his political opinion and never have suffered any discrimination or persecution. However, the mere fact of refusing to avail himself of the protection of his Government, or a refusal to return, may disclose the applicant's true state of mind and give rise to fear of persecution. In such circumstances the test of well-founded fear would be based on an assessment of the consequences that an applicant having certain political dispositions would have to face if he returned. This applies particularly to the so-called refugee "sur place".[10]

84.     Where a person is subject to prosecution or punishment for a political offence, a distinction may have to be drawn according to whether the prosecution is for political *opinion* or for politically-motivated *acts*. If the prosecution pertains to a punishable act committed out of political motives, and if the anticipated punishment is in conformity with the general law of the country concerned, fear of such prosecution will not in itself make the applicant a refugee.

85.     Whether a political offender can also be considered a refugee will depend upon various other factors. Prosecution for an offence may, depending upon the circumstances, be a pretext for punishing the offender for his political opinions or the expression thereof. Again, there may be reason to believe that a political offender would be exposed to excessive or arbitrary punishment for the alleged offence. Such excessive or arbitrary punishment will amount to persecution.

---

[10] See paragraphs 94 to 96.

86.     In determining whether a political offender can be considered a refugee, regard should also be had to the following elements: personality of the applicant, his political opinion, the motive behind the act, the nature of the act committed, the nature of the prosecution and its motives; finally, also, the nature of the law on which the prosecution is based. These elements may go to show that the person concerned has a fear of persecution and not merely a fear of prosecution and punishment – within the law – for an act committed by him.

**(4) "is outside the country of his nationality"**

**(a) General analysis**

87.     In this context, "nationality" refers to "citizenship". The phrase "is outside the country of his nationality" relates to persons who have a nationality, as distinct from stateless persons. In the majority of cases, refugees retain the nationality of their country of origin.

88.     It is a general requirement for refugee status that an applicant who has a nationality be outside the country of his nationality. There are no exceptions to this rule. International protection cannot come into play as long as a person is within the territorial jurisdiction of his home country.[11]

89.     Where, therefore, an applicant alleges fear of persecution in relation to the country of his nationality, it should be established that he does in fact possess the nationality of that country. There may, however, be uncertainty as to whether a person has a nationality. He may not know himself, or he may wrongly claim to have a particular nationality or to be stateless. Where his nationality cannot be clearly established, his refugee status should be determined in a similar manner to that of a stateless person, i.e. instead of the country of his nationality, the country of his former habitual residence will have to be taken into account. (See paragraphs 101 to 105 below.)

90.     As mentioned above, an applicant's well-founded fear of persecution must be in relation to the country of his nationality. As long as he has no fear in relation to the country of his nationality, he can be expected to avail himself of that country's protection. He is not in need of international protection and is therefore not a refugee.

91.     The fear of being persecuted need not always extend to the *whole* territory of the refugee's country of nationality. Thus in ethnic clashes or in cases of grave disturbances involving civil war conditions, persecution of a specific ethnic or national group may occur in only one part of the country. In such situations, a person will not be excluded from refugee status merely because he could have sought refuge in another part of the same country, if under all the circumstances it would not have been reasonable to expect him to do so.

92.     The situation of persons having more than one nationality is dealt with in paragraphs 106 and 107 below.

93.     Nationality may be proved by the possession of a national passport. Possession of such a passport creates a *prima facie* presumption that the holder is a national of the country of issue, unless the passport itself states otherwise. A person holding a passport showing him to be a national of the issuing country, but who claims that he does not possess that country's nationality, must substantiate his claim, for example, by showing that the passport is a so-called "passport of convenience" (an apparently regular national passport that is sometimes issued by a national authority to non-nationals). However, a mere assertion by the holder that the passport

---

[11] In certain countries, particularly in Latin America, there is a custom of "diplomatic asylum", i.e. granting refuge to political fugitives in foreign embassies. While a person thus sheltered may be considered to be outside his country's jurisdiction, he is not outside its territory and cannot therefore be considered under the terms of the 1951 Convention. The former notion of the "extraterritoriality" of embassies has lately been replaced by the term "inviolability" used in the 1961 Vienna Convention on Diplomatic Relations.

was issued to him as a matter of convenience for travel purposes only is not sufficient to rebut the presumption of nationality. In certain cases, it might be possible to obtain information from the authority that issued the passport. If such information cannot be obtained, or cannot be obtained within reasonable time, the examiner will have to decide on the credibility of the applicant's assertion in weighing all other elements of his story.

### (b) Refugees "sur place"

94.     The requirement that a person must be outside his country to be a refugee does not mean that he must necessarily have left that country illegally, or even that he must have left it on account of well-founded fear. He may have decided to ask for recognition of his refugee status after having already been abroad for some time. A person who was not a refugee when he left his country, but who becomes a refugee at a later date, is called a refugee *"sur place"*.

95.     A person becomes a refugee *"sur place"* due to circumstances arising in his country of origin during his absence. Diplomats and other officials serving abroad, prisoners of war, students, migrant workers and others have applied for refugee status during their residence abroad and have been recognized as refugees.

96.     A person may become a refugee *"sur place"* as a result of his own actions, such as associating with refugees already recognized, or expressing his political views in his country of residence. Whether such actions are sufficient to justify a well-founded fear of persecution must be determined by a careful examination of the circumstances. Regard should be had in particular to whether such actions may have come to the notice of the authorities of the person's country of origin and how they are likely to be viewed by those authorities.

### (5) "and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country"

97.     Unlike the phrase dealt with under (6) below, the present phrase relates to persons who have a nationality. Whether unable or unwilling to avail himself of the protection of his Government, a refugee is always a person who does not enjoy such protection.

98.     Being *unable* to avail himself of such protection implies circumstances that are beyond the will of the person concerned. There may, for example, be a state of war, civil war or other grave disturbance, which prevents the country of nationality from extending protection or makes such protection ineffective. Protection by the country of nationality may also have been denied to the applicant. Such denial of protection may confirm or strengthen the applicant's fear of persecution, and may indeed be an element of persecution.

99.     What constitutes a refusal of protection must be determined according to the circumstances of the case. If it appears that the applicant has been denied services (e.g., refusal of a national passport or extension of its validity, or denial of admittance to the home territory) normally accorded to his co-nationals, this may constitute a refusal of protection within the definition.

100.     The term *unwilling* refers to refugees who refuse to accept the protection of the Government of the country of their nationality.[12] It is qualified by the phrase "owing to such fear". Where a person is willing to avail himself of the protection of his home country, such willingness would normally be incompatible with a claim that he is outside that country "owing to well-founded fear of persecution". Whenever the protection of the country of nationality is available, and there is no ground based on well-founded fear for refusing it, the person concerned is not in need of international protection and is not a refugee.

---

[12] UN Document E/1618, p. 39.

**(6) "or who, not having a nationality and being outside the country of his former habitual residence as a result of such events, is unable or, owing to such fear, is unwilling to return to it"**

101.     This phrase, which relates to stateless refugees, is parallel to the preceding phrase, which concerns refugees who have a nationality. In the case of stateless refugees, the "country of nationality" is replaced by "the country of his former habitual residence", and the expression "unwilling to avail himself of the protection..." is replaced by the words "unwilling to return to it". In the case of a stateless refugee, the question of "availment of protection" of the country of his former habitual residence does not, of course, arise. Moreover, once a stateless person has abandoned the country of his former habitual residence for the reasons indicated in the definition, he is usually unable to return.

102.     It will be noted that not all stateless persons are refugees. they must be outside the country of their former habitual residence for the reasons indicated in the definition. Where these reasons do not exist, the stateless person is not a refugee.

103.     Such reasons must be examined in relation to the country of "former habitual residence" in regard to which fear is alleged. This was defined by the drafters of the 1951 Convention as "the country in which he had resided and where he had suffered or fears he would suffer persecution if he returned".[13]

104.     A stateless person may have more than one country of former habitual residence, and he may have a fear of persecution in relation to more than one of them. The definition does not require that he satisfies the criteria in relation to all of them.

105.     Once a stateless person has been determined a refugee in relation to "the country of his former habitual residence", any further change of country of habitual residence will not affect his refugee status.

**(7) Dual or multiple nationality**

Article 1 A (2), paragraph 2, of the 1951 Convention:

> "In the case of a person who has more than one nationality, the term "the country of his nationality" shall mean each of the countries of which he is a national, and a person shall not be deemed to be lacking the protection of the country of his nationality if, without any valid reason based on well-founded fear, he has not availed himself of the protection of one of the countries of which he is a national."

106.     This clause, which is largely self-explanatory, is intended to exclude from refugee status all persons with dual or multiple nationality who can avail themselves of the protection of at least one of the countries of which they are nationals. Wherever available, national protection takes precedence over international protection.

107.     In examining the case of an applicant with dual or multiple nationality, it is necessary, however, to distinguish between the possession of a nationality in the legal sense and the availability of protection by the country concerned. There will be cases where the applicant has the nationality of a country in regard to which he alleges no fear, but such nationality may be deemed to be ineffective as it does not entail the protection normally granted to nationals. In such circumstances, the possession of the second nationality would not be inconsistent with refugee status. As a rule, there should have been a request for, and a refusal of, protection before it can be established that a given nationality is ineffective. If there is no explicit refusal of protection, absence of a reply within reasonable time may be considered a refusal.

---

[13] Loc. cit.

**(8) Geographical scope**

108.     At the time when the 1951 Convention was drafted, there was a desire by a number of States not to assume obligations the extent of which could not be foreseen. This desire led to the inclusion of the 1951 dateline, to which reference has already been made (paragraphs 35 and 36 above). In response to the wish of certain Governments, the 1951 Convention also gave to Contracting States the possibility of limiting their obligations under the Convention to persons who had become refugees as a result of events occurring in Europe.

109.     Accordingly, Article 1 B of the 1951 Convention states that:

"(1) For the purposes of this Convention, the words "events occurring before 1 January 1951" in Article 1, Section A, shall be understood to mean either

(a) "events occurring in Europe before 1 January 1951"; or

(b) "events occurring in Europe and elsewhere before 1 January 1951";

and each Contracting State shall make a declaration at the time of signature, ratification or accession, specifying which of these meanings it applies for the purposes of its obligations under this Convention.

(2) Any Contracting State which has adopted alternative (a) may at any time extend its obligations by adopting alternative (b) by means of a notification addressed to the Secretary-General of the United Nations."

110.     Of the States parties to the 1951 Convention, at the time of writing 9 still adhere to alternative (a), "events occurring in Europe".[14] While refugees from other parts of the world frequently obtain asylum in some of these countries, they are not normally accorded refugee status under the 1951 Convention.

### CHAPTER III – CESSATION CLAUSES

## A.     General

111.     The so-called "cessation clauses" (Article 1 C (1) to (6) of the 1951 Convention) spell out the conditions under which a refugee ceases to be a refugee. They are based on the consideration that international protection should not be granted where it is no longer necessary or justified.

112.     Once a person's status as a refugee has been determined, it is maintained unless he comes within the terms of one of the cessation clauses.[15] This strict approach towards the determination of refugee status results from the need to provide refugees with the assurance that their status will not be subject to constant review in the light of temporary changes – not of a fundamental character – in the situation prevailing in their country of origin.

113.     Article 1 C of the 1951 Convention provides that:

"This Convention shall cease to apply to any person falling under the terms of section A if:

(1) He has voluntarily re-availed himself of the protection of the country of his nationality; or

(2) Having lost his nationality, he has voluntarily re-acquired it; or

(3) He has acquired a new nationality, and enjoys the protection of the country of his new nationality; or

---

[14] See Annex IV.

[15] In some cases refugee status may continue, even though the reasons for such status have evidently ceased to exist. Cf sub-sections (5) and (6) (paragraphs 135 to 139 below).

(4) He has voluntarily re-established himself in the country which he left or outside which he remained owing to fear of persecution; or

(5) He can no longer, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist, continue to refuse to avail himself of the protection of the country of his nationality;

Provided that this paragraph shall not apply to a refugee falling under Section A (1) of this Article who is able to invoke compelling reasons arising out of previous persecution for refusing to avail himself of the protection of the country of nationality;

(6) Being a person who has no nationality he is, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist, able to return to the country of his former habitual residence;

Provided that this paragraph shall not apply to a refugee falling under section A (1) of this Article who is able to invoke compelling reasons arising out of previous persecution for refusing to return to the country of his former habitual residence."

114.    Of the six cessation clauses, the first four reflect a change in the situation of the refugee that has been brought about by himself, namely:

(1)     voluntary re-availment of national protection;

(2)     voluntary re-acquisition of nationality;

(3)     acquisition of a new nationality;

(4)     voluntary re-establishment in the country where persecution was feared.

115.    The last two cessation clauses, (5) and (6), are based on the consideration that international protection is no longer justified on account of changes in the country where persecution was feared, because the reasons for a person becoming a refugee have ceased to exist.

116.    The cessation clauses are negative in character and are exhaustively enumerated. They should therefore be interpreted restrictively, and no other reasons may be adduced by way of analogy to justify the withdrawal of refugee status. Needless to say, if a refugee, for whatever reasons, no longer wishes to be considered a refugee, there will be no call for continuing to grant him refugee status and international protection.

117.    Article 1 C does not deal with the cancellation of refugee status. Circumstances may, however, come to light that indicate that a person should never have been recognized as a refugee in the first place; e.g. if it subsequently appears that refugee status was obtained by a misrepresentation of material facts, or that the person concerned possesses another nationality, or that one of the exclusion clauses would have applied to him had all the relevant facts been known. In such cases, the decision by which he was determined to be a refugee will normally be cancelled.

# B.    Interpretation of terms

## (1) Voluntary re-availment of national protection

Article 1 C (1) of the 1951 Convention:

"He has voluntarily re-availed himself of the protection of the country of his nationality;"

118.    This cessation clause refers to a refugee possessing a nationality who remains outside the country of his nationality. (The situation of a refugee who has actually returned to the country of his nationality is governed by the fourth cessation clause, which speaks of a person having "re-established" himself in that country.) A refugee who has voluntarily re-availed himself of national

protection is no longer in need of international protection. He has demonstrated that he is no longer "unable or unwilling to avail himself of the protection of the country of his nationality".

119.    This cessation clause implies three requirements:

(a)     voluntariness: the refugee must act voluntarily;

(b)     intention: the refugee must intend by his action to re-avail himself of the protection of the country of his nationality;

(c)     re-availment: the refugee must actually obtain such protection.

120.    If the refugee does not act voluntarily, he will not cease to be a refugee. If he is instructed by an authority, e.g. of his country of residence, to perform against his will an act that could be interpreted as a re-availment of the protection of the country of his nationality, such as applying to his Consulate for a national passport, he will not cease to be a refugee merely because he obeys such an instruction. He may also be constrained, by circumstances beyond his control, to have recourse to a measure of protection from his country of nationality. He may, for instance, need to apply for a divorce in his home country because no other divorce may have the necessary international recognition. Such an act cannot be considered to be a "voluntary re-availment of protection" and will not deprive a person of refugee status.

121.    In determining whether refugee status is lost in these circumstances, a distinction should be drawn between actual re-availment of protection and occasional and incidental contacts with the national authorities. If a refugee applies for and obtains a national passport or its renewal, it will, in the absence of proof to the contrary, be presumed that he intends to avail himself of the protection of the country of his nationality. On the other hand, the acquisition of documents from the national authorities, for which non-nationals would likewise have to apply – such as a birth or marriage certificate – or similar services, cannot be regarded as a re-availment of protection.

122.    A refugee requesting protection from the authorities of the country of his nationality has only "re-availed" himself of that protection when his request has actually been granted. The most frequent case of "re-availment of protection" will be where the refugee wishes to return to his country of nationality. He will not cease to be a refugee merely by applying for repatriation. On the other hand, obtaining an entry permit or a national passport for the purposes of returning will, in the absence of proof to the contrary, be considered as terminating refugee status.[16] This does not, however, preclude assistance being given to the repatriant – also by UNHCR – in order to facilitate his return.

123.    A refugee may have voluntarily obtained a national passport, intending either to avail himself of the protection of his country of origin while staying outside that country, or to return to that country. As stated above, with the receipt of such a document he normally ceases to be a refugee. If he subsequently renounces either intention, his refugee status will need to be determined afresh. He will need to explain why he changed his mind, and to show that there has been no basic change in the conditions that originally made him a refugee.

124.    Obtaining a national passport or an extension of its validity may, under certain exceptional conditions, not involve termination of refugee status (see paragraph 120 above). This could for example be the case where the holder of a national passport is not permitted to return to the country of his nationality without specific permission.

125.    Where a refugee visits his former home country not with a national passport but, for example, with a travel document issued by his country of residence, he has been considered by certain States to have re-availed himself of the protection of his former home country and to have lost his refugee status under the present cessation clause. Cases of this kind should, however, be

---

[16] The above applies to a refugee who is still outside his country. It will be noted that the fourth cessation clause provides that any refugee will cease to be a refugee when he has voluntarily "re-established" himself in his country of nationality or former habitual residence.

DHSFF0163

judged on their individual merits. Visiting an old or sick parent will have a different bearing on the refugee's relation to his former home country than regular visits to that country spent on holidays or for the purpose of establishing business relations.

**(2) Voluntary re-acquisition of nationality**

Article 1 C (2) of the 1951 Convention:

"Having lost his nationality, he has voluntarily re-acquired it;"

126.    This clause is similar to the preceding one. It applies to cases where a refugee, having lost the nationality of the country in respect of which he was recognized as having well-founded fear of persecution, voluntarily re-acquires such nationality.

127.    While under the preceding clause (Article 1 C (1)) a person having a nationality ceases to be a refugee if he re-avails himself of the protection attaching to such nationality, under the present clause (Article 1 C (2)) he loses his refugee status by re-acquiring the nationality previously lost.[17]

128.    The re-acquisition of nationality must be voluntary. The granting of nationality by operation of law or by decree does not imply voluntary reacquisition, unless the nationality has been expressly or impliedly accepted. A person does not cease to be a refugee merely because he could have reacquired his former nationality by option, unless this option has actually been exercised. If such former nationality is granted by operation of law, subject to an option to reject, it will be regarded as a voluntary re-acquisition if the refugee, with full knowledge, has not exercised this option; unless he is able to invoke special reasons showing that it was not in fact his intention to re-acquire his former nationality.

**(3) Acquisition of a new nationality and protection**

Article 1 C (3) of the 1951 Convention:

"He has acquired a new nationality and enjoys the protection of the country of his new nationality;"

129.    As in the case of the re-acquisition of nationality, this third cessation clause derives from the principle that a person who enjoys national protection is not in need of international protection.

130.    The nationality that the refugee acquires is usually that of the country of his residence. A refugee living in one country may, however, in certain cases, acquire the nationality of another country. If he does so, his refugee status will also cease, provided that the new nationality also carries the protection of the country concerned. This requirement results from the phrase "and enjoys the protection of the country of his new nationality".

131.    If a person has ceased to be a refugee, having acquired a new nationality, and then claims well-founded fear in relation to the country of his new nationality, this creates a completely new situation and his status must be determined in relation to the country of his new nationality.

132.    Where refugee status has terminated through the acquisition of a new nationality, and such new nationality has been lost, depending on the circumstances of such loss, refugee status may be revived.

---

[17] In the majority of cases a refugee maintains the nationality of his former home country. Such nationality may be lost by individual or collective measures of deprivation of nationality. Loss of nationality (statelessness) is therefore not necessarily implicit in refugee status.

**(4) Voluntary re-establishment in the country where persecution was feared**

Article 1 C (4) of the 1951 Convention:

"He has voluntarily re-established himself in the country which he left or outside which he remained owing to fear of persecution;"

133.    This fourth cessation clause applies both to refugees who have a nationality and to stateless refugees. It relates to refugees who, having returned to their country of origin or previous residence, have not previously ceased to be refugees under the first or second cessation clauses while still in their country of refuge.

134.    The clause refers to "voluntary re-establishment". This is to be understood as return to the country of nationality or former habitual residence with a view to permanently residing there. A temporary visit by a refugee to his former home country, not with a national passport but, for example, with a travel document issued by his country of residence, does not constitute "re-establishment" and will not involve loss of refugee status under the present clause.[18]

**(5) Nationals whose reasons for becoming a refugee have ceased to exist**

Article 1 C (5) of the 1951 Convention:

"He can no longer, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist, continue to refuse to avail himself of the protection of the country of his nationality;

Provided that this paragraph shall not apply to a refugee falling under section A (1) of this Article who is able to invoke compelling reasons arising out of previous persecution for refusing to avail himself of the protection of the country of nationality;"

135.    Circumstances" refer to fundamental changes in the country, which can be assumed to remove the basis of the fear of persecution. A mere – possibly transitory – change in the facts surrounding the individual refugee's fear, which does not entail such major changes of circumstances, is not sufficient to make this clause applicable. A refugee's status should not in principle be subject to frequent review to the detriment of his sense of security, which international protection is intended to provide.

136.    The second paragraph of this clause contains an exception to the cessation provision contained in the first paragraph. It deals with the special situation where a person may have been subjected to very serious persecution in the past and will not therefore cease to be a refugee, even if fundamental changes have occurred in his country of origin. The reference to Article 1 A (1) indicates that the exception applies to "statutory refugees". At the time when the 1951 Convention was elaborated, these 'formed the majority of refugees. The exception, however, reflects a more general humanitarian principle, which could also be applied to refugees other than statutory refugees. It is frequently recognized that a person who – or whose family – has suffered under atrocious forms of persecution should not be expected to repatriate. Even though there may have been a change of regime in his country, this may not always produce a complete change in the attitude of the population, nor, in view of his past experiences, in the mind of the refugee.

**(6) Stateless persons whose reasons for becoming a refugee have ceased to exist**

Article 1 C (6) of the 1951 Convention:

"Being a person who has no nationality he is, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist, able to return to the country of his former habitual residence;

---

[18] See paragraph 125 above.

Provided that this paragraph shall not apply to a refugee falling under section A (1) of this Article who is able to invoke compelling reasons arising out of previous persecution for refusing to return to the country of his former habitual residence."

137.    This sixth and last cessation clause is parallel to the fifth cessation clause, which concerns persons who have a nationality. The present clause deals exclusively with stateless persons who are able to return to the country of their former habitual residence.

138.    "Circumstances" should be interpreted in the same way as under the fifth cessation clause.

139.    It should be stressed that, apart from the changed circumstances in his country of former habitual residence, the person concerned must be *able* to return there. This, in the case of a stateless person, may not always be possible.

### *CHAPTER IV – EXCLUSION CLAUSES*

## A.    General

140.    The 1951 Convention, in Sections D, E and F of Article 1, contains provisions whereby persons otherwise having the characteristics of refugees, as defined in Article 1, Section A, are excluded from refugee status. Such persons fall into three groups. The first group (Article 1 D) consists of persons already receiving United Nations protection or assistance; the second group (Article 1 E) deals with persons who are not considered to be in need of international protection; and the third group (Article 1 F) enumerates the categories of persons who are not considered to be deserving of international protection.

141.    Normally it will be during the process of determining a person's refugee status that the facts leading to exclusion under these clauses will emerge. It may, however, also happen that facts justifying exclusion will become known only after a person has been recognized as a refugee. In such cases, the exclusion clause will call for a cancellation of the decision previously taken.

## B.    Interpretation of terms

### (1) Persons already receiving United Nations protection or assistance

Article 1 D of the 1951 Convention:

"This Convention shall not apply to persons who are at present receiving from organs or agencies of the United Nations other than the United Nations High Commissioner for Refugees protection or assistance."

"When such protection or assistance has ceased for any reason, without the position of such persons being definitively settled in accordance with the relevant resolutions adopted by the General Assembly of the United Nations, these persons shall *ipso facto* be entitled to the benefits of this Convention."

142.    Exclusion under this clause applies to any person who is in receipt of protection or assistance from organs or agencies of the United Nations, other than the United Nations High Commissioner for Refugees. Such protection or assistance was previously given by the former United Nations Korean Reconstruction Agency (UNKRA) and is currently given by the United Nations Relief and Works Agency for Palestine Refugees In the Near East (UNRWA). There could be other similar situations in the future.

143.    With regard to refugees from Palestine, it will be noted that UNRWA operates only in certain areas of the Middle East, and it is only there that its protection or assistance are given. Thus, a refugee from Palestine who finds himself outside that area does not enjoy the assistance mentioned and may be considered for determination of his refugee status under the criteria of the 1951 Convention. It should normally be sufficient to establish that the circumstances which originally made him qualify for protection or assistance from UNRWA still persist and that he has

DHSFF0166

neither ceased to be a refugee under one of the cessation clauses nor is excluded from the application of the Convention under one of the exclusion clauses.

**(2) Persons not considered to be in need of international protection**

Article 1 E of the 1951 Convention:

"This Convention shall not apply to a person who is recognized by the competent authorities of the country in which he has taken residence as having the rights and obligations which are attached to the possession of the nationality of that country."

144.	This provision relates to persons who might otherwise qualify for refugee status and who have been received in a country where they have been granted most of the rights normally enjoyed by nationals, but not formal citizenship. (They are frequently referred to as "national refugees".) The country that has received them is frequently one where the population is of the same ethnic origin as themselves.[19]

145.	There is no precise definition of "rights and obligations" that would constitute a reason for exclusion under this clause. It may, however, be said that the exclusion operates if a person's status is largely assimilated to that of a national of the country. In particular he must, like a national, be fully protected against deportation or expulsion.

146.	The clause refers to a person who has "taken residence" in the country concerned. This implies continued residence and not a mere visit. A person who resides outside the country and does not enjoy the diplomatic protection of that country is not affected by the exclusion clause.

**(3) Persons considered not to be deserving of international protection**

Article 1 F of the 1951 Convention:

"The provisions of this Convention shall not apply to any person with respect to whom there are serious reasons for considering that:

(a) he has committed a crime against peace, a war crime, or a crime against humanity, as defined in the international instruments drawn up to make provision in respect of such crimes;

(b) he has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee;

(c) he has been guilty of acts contrary to the purposes and principles of the United Nations."

147.	The pre-war international instruments that defined various categories of refugees contained no provisions for the exclusion of criminals. It was immediately after the Second World War that for the first time special provisions were drawn up to exclude from the large group of then assisted refugees certain persons who were deemed unworthy of international protection.

148.	At the time when the Convention was drafted, the memory of the trials of major war criminals was still very much alive, and there was agreement on the part of States that war criminals should not be protected. There was also a desire on the part of States to deny admission to their territories of criminals who would present a danger to security and public order.

149.	The competence to decide whether any of these exclusion clauses are applicable is incumbent upon the Contracting State in whose territory the applicant seeks recognition of his refugee status. For these clauses to apply, it is sufficient to establish that there are "serious reasons for considering" that one of the acts described has been committed. Formal proof of previous penal prosecution is not required. Considering the serious consequences of exclusion

---

[19]	In elaborating this exclusion clause, the drafters of the Convention had principally in mind refugees of German extraction having arrived in the Federal Republic of Germany who were recognized as possessing the rights and obligations attaching to German nationality.

for the person concerned, however, the interpretation of these exclusion clauses must be restrictive.

**(a) War crimes, etc.**

"(a) he has committed a crime against peace, a war crime or a crime against humanity, as defined in the international instruments drawn up to make provision in respect of such crimes."

150.    In mentioning crimes against peace, war crimes or crimes against humanity, the Convention refers generally to "international instruments drawn up to make provision in respect of such crimes". There are a considerable number of such instruments dating from the end of the Second World War up to the present time. All of them contain definitions of what constitute "crimes against peace, war crimes and crimes against humanity". The most comprehensive definition will be found in the 1945 London Agreement and Charter of the International Military tribunal. The definitions contained in the above-mentioned London Agreement and a list of other pertinent instruments are given in Annexes V and VI.

**(b) Common crimes**

"(b) he has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee."

151.    The aim of this exclusion clause is to protect the community of a receiving country from the danger of admitting a refugee who has committed a serious common crime. It also seeks to render due justice to a refugee who has committed a common crime (or crimes) of a less serious nature or has committed a political offence.

152.    In determining whether an offence is "non-political" or is, on the contrary, a "political" crime, regard should be given in the first place to its nature and purpose i.e. whether it has been committed out of genuine political motives and not merely for personal reasons or gain. There should also be a close and direct causal link between the crime committed and its alleged political purpose and object. The political element of the offence should also outweigh its common-law character. This would not be the case if the acts committed are grossly out of proportion to the alleged objective. The political nature of the offence is also more difficult to accept if it involves acts of an atrocious nature.

153.    Only a crime committed or presumed to have been committed by an applicant "outside the country of refuge prior to his admission to that country as a refugee" is a ground for exclusion. The country outside would normally be the country of origin, but it could also be another country, except the country of refuge where the applicant seeks recognition of his refugee status.

154.    A refugee committing a serious crime in the country of refuge is subject to due process of law in that country. In extreme cases, Article 33 paragraph 2 of the Convention permits a refugee's expulsion or return to his former home country if, having been convicted by a final judgement of a "particularly serious" common crime, he constitutes a danger to the community of his country of refuge.

155.    What constitutes a "serious" non-political crime for the purposes of this exclusion clause is difficult to define, especially since the term "crime" has different connotations in different legal systems. in some countries the word "crime" denotes only offences of a serious character. In other countries it may comprise anything from petty larceny to murder. In the present context, however, a "serious" crime must be a capital crime or a very grave punishable act. Minor offences punishable by moderate sentences are not grounds for exclusion under Article 1 F (b) even if technically referred to as "crimes" in the penal law of the country concerned.

156.    In applying this exclusion clause, it is also necessary to strike a balance between the nature of the offence presumed to have been committed by the applicant and the degree of persecution feared. If a person has well-founded fear of very severe persecution, e.g. persecution endangering his life or freedom, a crime must be very grave in order to exclude him. If the persecution feared is less serious, it will be necessary to have regard to the nature of the crime or

DHSFF0168

crimes presumed to have been committed in order to establish whether the applicant is not in reality a fugitive from justice or whether his criminal character does not outweigh his character as a *bona fide* refugee.

157.    In evaluating the nature of the crime presumed to have been committed, all the relevant factors – including any mitigating circumstances – must be taken into account. It is also necessary to have regard to any aggravating circumstances as, for example, the fact that the applicant may already have a criminal record. The fact that an applicant convicted of a serious non-political crime has already served his sentence or has been granted a pardon or has benefited from an amnesty is also relevant. In the latter case, there is a presumption that the exclusion clause is no longer applicable, unless it can be shown that, despite the pardon or amnesty, the applicant's criminal character still predominates.

158.    Considerations similar to those mentioned in the preceding paragraphs will apply when a crime – in the widest sense – has been committed as a means of, or concomitant with, escape from the country where persecution was feared. Such crimes may range from the theft of a means of locomotion to endangering or taking the lives of innocent people. While for the purposes of the present exclusion clause it may be possible to over-look the fact that a refugee, not finding any other means of escape, may have crashed the border in a stolen car, decisions will be more difficult where he has hijacked an aircraft, i.e. forced its crew, under threat of arms or with actual violence, to change destination in order to bring him to a country of refuge.

159.    As regards hijacking, the question has arisen as to whether, if committed in order to escape from persecution, it constitutes a serious non-political crime within the meaning of the present exclusion clause. Governments have considered the unlawful seizure of aircraft on several occasions within the framework of the United Nations, and a number of international conventions have been adopted dealing with the subject. None of these instruments mentions refugees. However, one of the reports leading to the adoption of a resolution on the subject states that "the adoption of the draft Resolution cannot prejudice any international legal rights or duties of States under instruments relating to the status of refugees and stateless persons". Another report states that "the adoption of the draft Resolution cannot prejudice any international legal rights or duties of States with respect to asylum".[20]

160.    The various conventions adopted in this connexion[21] deal mainly with the manner in which the perpetrators of such acts have to be treated. They invariably give Contracting States the alternative of extraditing such persons or instituting penal proceedings for the act on their own territory, which implies the right to grant asylum.

161.    While there is thus a possibility of granting asylum, the gravity of the persecution of which the offender may have been in fear, and the extent to which such fear is well-founded, will have to be duly considered in determining his possible refugee status under the 1951 Convention. The question of the exclusion under Article 1 F (b) of an applicant who has committed an unlawful seizure of an aircraft will also have to be carefully examined in each individual case.

**(c) Acts contrary to the purposes and principles of the United Nations**

"(c) he has been guilty of acts contrary to the purposes and principles of the United Nations."

162.    It will be seen that this very generally-worded exclusion clause overlaps with the exclusion clause in Article 1 F (a); for it is evident that a crime against peace, a war crime or

---

[20] Reports of the Sixth Committee on General Assembly resolutions 2645 (XXV). United Nations document A/8716, and 2551 (XXIV), United Nations document A/7845.

[21] Convention on Offences and Certain Other Acts Committed on Board Aircraft, Tokyo, 14 September 1963. Convention for the Suppression of Unlawful Seizure of Aircraft, the Hague, 16 December 1970. Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation, Montreal, 23 September 1971.

a crime against humanity is also an act contrary to the purposes and principles of the United Nations. While Article 1 F (c) does not introduce any specific new element, it is intended to cover in a general way such acts against the purposes and principles of the United Nations that might not be fully covered by the two preceding exclusion clauses. Taken in conjunction with the latter, it has to be assumed, although this is not specifically stated, that the acts covered by the present clause must also be of a criminal nature.

163.    The purposes and principles of the United Nations are set out in the Preamble and Articles 1 and 2 of the Charter of the United Nations. They enumerate fundamental principles that should govern the conduct of their members in relation to each other and in relation to the international community as a whole. From this it could be inferred that an individual, in order to have committed an act contrary to these principles, must have been in a position of power in a member State and instrumental to his State's infringing these principles. However, there are hardly any precedents on record for the application of this clause, which, due to its very general character, should be applied with caution.

### CHAPTER V – SPECIAL CASES

## A.    War refugees

164.    Persons compelled to leave their country of origin as a result of international or national armed conflicts are not normally considered refugees under the 1951 Convention or 1967 Protocol.[22] They do, however, have the protection provided for in other international instruments, e.g. the Geneva Conventions of 1949 on the Protection of War Victims and the 1977 Protocol additional to the Geneva Conventions of 1949 relating to the protection of Victims of International Armed Conflicts.[23]

165.    However, foreign invasion or occupation of all or part of a country can result – and occasionally has resulted – in persecution for one or more of the reasons enumerated in the 1951 Convention. In such cases, refugee status will depend upon whether the applicant is able to show that he has a "well-founded fear of being persecuted" in the occupied territory and, in addition, upon whether or not he is able to avail himself of the protection of his government, or of a protecting power whose duty it is to safeguard the interests of his country during the armed conflict, and whether such protection can be considered to be effective.

166.    Protection may not be available if there are no diplomatic relations between the applicant's host country and his country of origin. If the applicant's government is itself in exile, the effectiveness of the protection that it is able to extend may be open to question. Thus, every case has to be judged on its merits, both in respect of well-founded fear of persecution and of the availability of effective protection on the part of the government of the country of origin.

## B.    Deserters and persons avoiding military service

167.    In countries where military service is compulsory, failure to perform this duty is frequently punishable by law. Moreover, whether military service is compulsory or not, desertion is invariably considered a criminal offence. The Penalties may vary from country to country, and are not normally regarded as persecution. Fear of prosecution and punishment for desertion or draft-evasion does not in itself constitute well-founded fear of persecution under the definition. Desertion or draft-evasion does not, on the other hand, exclude a person from being a refugee, and a person may be a refugee in addition to being a deserter or draft-evader.

---

[22]  In respect of Africa, however, see the definition in Article 1 (2) of the OAU Convention concerning the Specific Aspects of Refugee Problems in Africa, quoted in paragraph 22 above.

[23] See Annex VI, items (6) and (7).

DHSFF0170

168.     A person is clearly not a refugee if his only reason for desertion or draft-evasion is his dislike of military service or fear of combat. He may, however, be a refugee if his desertion or evasion of military service is concomitant with other relevant motives for leaving or remaining outside his country, or if he otherwise has reasons, within the meaning of the definition, to fear persecution.

169.     A deserter or draft-evader may also be considered a refugee if it can be shown that he would suffer disproportionately severe punishment for the military offence on account of his race, religion, nationality, membership of a particular social group or political opinion. The same would apply if it can be shown that he has well-founded fear of persecution on these grounds above and beyond the punishment for desertion.

170.     There are, however, also cases where the necessity to perform military service may be the sole ground for a claim to refugee status, i.e. when a person can show that the performance of military service would have required his participation in military action contrary to his genuine political, religious or moral convictions, or to valid reasons of conscience.

171.     Not every conviction, genuine though it may be, will constitute a sufficient reason for claiming refugee status after desertion or draft-evasion. It is not enough for a person to be in disagreement with his government regarding the political justification for a particular military action. Where, however, the type of military action, with which an individual does not wish to be associated, is condemned by the international community as contrary to basic rules of human conduct, punishment for desertion or draft-evasion could, in the light of all other requirements of the definition, in itself be regarded as persecution.

172.     Refusal to perform military service may also be based on religious convictions. If an applicant is able to show that his religious convictions are genuine, and that such convictions are not taken into account by the authorities of his country in requiring him to perform military service, he may be able to establish a claim to refugee status. Such a claim would, of course, be supported by any additional indications that the applicant or his family may have encountered difficulties due to their religious convictions.

173.     The question as to whether objection to performing military service for reasons of conscience can give rise to a valid claim to refugee status should also be considered in the light of more recent developments in this field. An increasing number of States have introduced legislation or administrative regulations whereby persons who can invoke genuine reasons of conscience are exempted from military service, either entirely or subject to their performing alternative (i.e. civilian) service. The introduction of such legislation or administrative regulations has also been the subject of recommendations by international agencies.[24] In the light of these developments, it would be open to Contracting States, to grant refugee status to persons who object to performing military service for genuine reasons of conscience.

174.     The genuineness of a person's political, religious or moral convictions, or of his reasons of conscience for objecting to performing military service, will of course need to be established by a thorough investigation of his personality and background. The fact that he may have manifested his views prior to being called to arms, or that he may already have encountered difficulties with the authorities because of his convictions, are relevant considerations. Whether he has been drafted into compulsory service or joined the army as a volunteer may also be indicative of the genuineness of his convictions.

---

[24] Cf Recommendation 816 (1977) on the Right of Conscientious Objection to Military Service, adopted at the Parliamentary Assembly of the Council of Europe at its Twenty-ninth Ordinary Session (5-13 October 1977).

DHSFF0171

## C.   Persons having resorted to force or committed acts of violence

175.    Applications for refugee status are frequently made by persons who have used force or committed acts of violence. Such conduct is frequently associated with, or claimed to be associated with, political activities or political opinions. They may be the result of individual initiatives, or may have been committed within the framework of organized groups. The latter may either be clandestine groupings or political cum military organizations that are officially recognized or whose activities are widely acknowledged.[25] Account should also be taken of the fact that the use of force is an aspect of the maintenance of law and order and may – by definition – be lawfully resorted to by the police and armed forces in the exercise of their functions.

176.    An application for refugee status by a person having (or presumed to have) used force, or to have committed acts of violence of whatever nature and within whatever context, must in the first place – like any other application – be examined from the standpoint of the inclusion clauses in the 1951 Convention (paragraphs 32-110 above).

177.    Where it has been determined that an applicant fulfils the inclusion criteria, the question may arise as to whether, in view of the acts involving the use of force or violence committed by him, he may not be covered by the terms of one or more of the exclusion clauses. These exclusion clauses, which figure in Article 1 F (a) to (c) of the 1951 Convention, have already been examined (paragraphs 147 to 163 above).

178.    The exclusion clause in Article 1 F (a) was originally intended to exclude from refugee status any person in respect of whom there were serious reasons for considering that he has "committed a crime against peace, a war crime, or a crime against humanity" in an official capacity. This exclusion clause is, however, also applicable to persons who have committed such crimes within the framework of various non-governmental groupings, whether officially recognized, clandestine or self-styled.

179.    The exclusion clause in Article 1 F *(b)*, which refers to "a serious non-political crime", is normally not relevant to the use of force or to acts of violence committed in an official capacity. The interpretation of this exclusion clause has already been discussed. The exclusion clause in Article 1 F *(c)* has also been considered. As previously indicated, because of its vague character, it should be applied with caution.

180.    It will also be recalled that, due to their nature and the serious consequences of their application to a person in fear of persecution, the exclusion clauses should be applied in a restrictive manner.

### *CHAPTER VI – THE PRINCIPLE OF FAMILY UNITY*

181.    Beginning with the Universal Declaration of Human Rights, which states that "the family is the natural and fundamental group unit of society and is entitled to protection by society and the State", most international instruments dealing with human rights contain similar provisions for the protection of the unit of a family.

182.    The Final Act of the Conference that adopted the 1951 Convention:

"Recommends Governments to take the necessary measures for the protection of the refugee's family, especially with a view to:

---

[25] A number of liberation movements, which often include an armed wing, have been officially recognized by the General Assembly of the United Nations. Other liberation movements have only been recognized by a limited number of governments. Others again have no official recognition.

(1)   Ensuring that the unity of the refugee's family is maintained particularly in cases where the head of the family has fulfilled the necessary conditions for admission to a particular country.

(2)   The protection of refugees who are minors, in particular unaccompanied children and girls, with special reference to guardianship and adoption."[26]

183.    The 1951 Convention does not incorporate the principle of family unity in the definition of the term refugee. The above-mentioned Recommendation in the Final Act of the Conference is, however, observed by the majority of States, whether or not parties to the 1951 Convention or to the 1967 Protocol.

184.    If the head of a family meets the criteria of the definition, his dependants are normally granted refugee status according to the principle of family unity. It is obvious, however, that formal refugee status should not be granted to a dependant if this is incompatible with his personal legal status. Thus, a dependant member of a refugee family may be a national of the country of asylum or of another country, and may enjoy that country's protection. To grant him refugee status in such circumstances would not be called for.

185.    As to which family members may benefit from the principle of family unity, the minimum requirement is the inclusion of the spouse and minor children. In practice, other dependants, such as aged parents of refugees, are normally considered if they are living in the same household. On the other hand, if the head of the family is not a refugee, there is nothing to prevent any one of his dependants, if they can invoke reasons on their own account, from applying for recognition as refugees under the 1951 Convention or the 1967 Protocol. In other words, the principle of family unity operates in favour of dependants, and not against them.

186.    The principle of the unity of the family does not only operate where all family members become refugees at the same time. It applies equally to cases where a family unit has been temporarily disrupted through the flight of one or more of its members.

187.    Where the unity of a refugee's family is destroyed by divorce, separation or death, dependants who have been granted refugee status on the basis of family unity will retain such refugee status unless they fall within the terms of a cessation clause; or if they do not have reasons other than those of personal convenience for wishing to retain refugee status; or if they themselves no longer wish to be considered as refugees.

188.    If the dependant of a refugee falls within the terms of one of the exclusion clauses, refugee status should be denied to him.

---

26 See Annex 1.

## PART TWO – Procedures for the Determination of Refugee Status

### A. GENERAL

189.    It has been seen that the 1951 Convention and the 1967 Protocol define who is a refugee for the purposes of these instruments. It is obvious that, to enable States parties to the Convention and to the Protocol to implement their provisions, refugees have to be identified. Such identification, i.e. the determination of refugee status, although mentioned in the 1951 Convention (cf. Article 9), is not specifically regulated. In particular, the Convention does not indicate what type of procedures are to be adopted for the determination of refugee status. It is therefore left to each Contracting State to establish the procedure that it considers most appropriate, having regard to its particular constitutional and administrative structure.

190.    It should be recalled that an applicant for refugee status is normally in a particularly vulnerable situation. He finds himself in an alien environment and may experience serious difficulties, technical and psychological, in submitting his case to the authorities of a foreign country, often in a language not his own. His application should therefore be examined within the framework of specially established procedures by qualified personnel having the necessary knowledge and experience, and an understanding of an applicant's particular difficulties and needs.

191.    Due to the fact that the matter is not specifically regulated by the 1951 Convention, procedures adopted by States parties to the 1951 Convention and to the 1967 Protocol vary considerably. In a number of countries, refugee status is determined under formal procedures specifically established for this purpose. In other countries, the question of refugee status is considered within the framework of general procedures for the admission of aliens. In yet other countries, refugee status is determined under informal arrangements, or *ad hoc* for specific purposes, such as the issuance of travel documents.

192.    In view of this situation and of the unlikelihood that all States bound by the 1951 Convention and the 1967 Protocol could establish identical procedures, the Executive Committee of the High Commissioner's Programme, at its twenty-eighth session in October 1977, recommended that procedures should satisfy certain basic requirements. These basic requirements, which reflect the special situation of the applicant for refugee status, to which reference has been made above, and which would ensure that the applicant is provided with certain essential guarantees, are the following:

(i)      The competent official (e.g., immigration officer or border police officer) to whom the applicant addresses himself at the border or in the territory of a Contracting State should have clear instructions for dealing with cases which might come within the purview of the relevant international instruments. He should be required to act in accordance with the principle of *non-refoulement* and to refer such cases to a higher authority.

(ii)     The applicant should receive the necessary guidance as to the procedure to be followed.

(iii)    There should be a clearly identified authority-wherever possible a single central authority-with responsibility for examining requests for refugee status and taking a decision in the first instance.

(iv)     The applicant should be given the necessary facilities, including the services of a competent interpreter, for submitting his case to the authorities concerned. Applicants should also be given the opportunity, of which they should be duly informed, to contact a representative of UNHCR.

(v)      If the applicant is recognized as a refugee, he should be informed accordingly and issued with documentation certifying his refugee status.

DHSFF0174

(vi)      If the applicant is not recognized, he should be given a reasonable time to appeal for a formal reconsideration of the decision, either to the same or to a different authority, whether administrative or judicial, according to the prevailing system.

(vii)     The applicant should be permitted to remain in the country pending a decision on his initial request by the competent authority referred to in paragraph (iii) above, unless it has been established by that authority that his request is clearly abusive. He should also be permitted to remain in the country while an appeal to a higher administrative authority or to the courts is pending.[27]

193.     The Executive Committee also expressed the hope that all States parties to the 1951 Convention and the 1967 Protocol that had not yet done so would take appropriate steps to establish such procedures in the near future and give favourable consideration to UNHCR participation in such procedures in appropriate form.

194.     Determination of refugee status, which is closely related to questions of asylum and admission, is of concern to the High Commissioner in the exercise of his function to provide international protection for refugees. In a number of countries, the Office of the High Commissioner participates in various forms, in procedures for the determination of refugee status. Such participation is based on Article 35 of the 1951 Convention and the corresponding Article 11 of the 1967 Protocol, which provide for co-operation by the Contracting States with the High Commissioner's Office.

### *B. ESTABLISHING THE FACTS*

# (1) Principles and methods

195.     The relevant facts of the individual case will have to be furnished in the first place by the applicant himself. It will then be up to the person charged with determining his status (the examiner) to assess the validity of any evidence and the credibility of the applicant's statements.

196.     It is a general legal principle that the burden of proof lies on the person submitting a claim. Often, however, an applicant may not be able to support his statements by documentary or other proof, and cases in which an applicant can provide evidence of all his statements will be the exception rather than the rule. In most cases a person fleeing from persecution will have arrived with the barest necessities and very frequently even without personal documents. Thus, while the burden of proof in principle rests on the applicant, the duty to ascertain and evaluate all the relevant facts is shared between the applicant and the examiner. Indeed, in some cases, it may be for the examiner to use all the means at his disposal to produce the necessary evidence in support of the application. Even such independent research may not, however, always be successful and there may also be statements that are not susceptible of proof. In such cases, if the applicant's account appears credible, he should, unless there are good reasons to the contrary, be given the benefit of the doubt.

197.     The requirement of evidence should thus not be too strictly applied in view of the difficulty of proof inherent in the special situation in which an applicant for refugee status finds himself. Allowance for such possible lack of evidence does not, however, mean that unsupported statements must necessarily be accepted as true if they are inconsistent with the general account put forward by the applicant.

198.     A person who, because of his experiences, was in fear of the authorities in his own country may still feel apprehensive vis-à-vis any authority. He may therefore be afraid to speak freely and give a full and accurate account of his case.

---

[27] *Official Records of the General Assembly, Thirty-second Session, Supplement No. 12* (A/32/12/Add.1), paragraph 53 (6) (e).

DHSFF0175

199.     While an initial interview should normally suffice to bring an applicant's story to light, it may be necessary for the examiner to clarify any apparent inconsistencies and to resolve any contradictions in a further interview, and to find an explanation for any misrepresentation or concealment of material facts. Untrue statements by themselves are not a reason for refusal of refugee status and it is the examiner's responsibility to evaluate such statements in the light of all the circumstances of the case.

200.     An examination in depth of the different methods of fact-finding is outside the scope of the present Handbook. It may be mentioned, however, that basic information is frequently given, in the first instance, by completing a standard questionnaire. Such basic information will normally not be sufficient to enable the examiner to reach a decision, and one or more personal interviews will be required. It will be necessary for the examiner to gain the confidence of the applicant in order to assist the latter in putting forward his case and in fully explaining his opinions and feelings. In creating such a climate of confidence it is, of course, of the utmost importance that the applicant's statements will be treated as confidential and that he be so informed.

201.     Very frequently the fact-finding process will not be complete until a wide range of circumstances has been ascertained. Taking isolated incidents out of context may be misleading. The cumulative effect of the applicant's experience must be taken into account. Where no single incident stands out above the others, sometimes a small incident may be "the last straw"; and although no single incident may be sufficient, all the incidents related by the applicant taken together, could make his fear "well-founded" (see paragraph 53 above).

202.     Since the examiner's conclusion on the facts of the case and his personal impression of the applicant will lead to a decision that affects human lives, he must apply the criteria in a spirit of justice and understanding and his judgement should not, of course, be influenced by the personal consideration that the applicant may be an "undeserving case".

## (2) Benefit of the doubt

203.     After the applicant has made a genuine effort to substantiate his story there may still be a lack of evidence for some of his statements. As explained above (paragraph 196), it is hardly possible for a refugee to "prove" every part of his case and, indeed, if this were a requirement the majority of refugees would not be recognized. It is therefore frequently necessary to give the applicant the benefit of the doubt.

204.     The benefit of the doubt should, however, only be given when all available evidence has been obtained and checked and when the examiner is satisfied as to the applicant's general credibility. The applicant's statements must be coherent and plausible, and must not run counter to generally known facts.

## (3) Summary

205.     The process of ascertaining and evaluating the facts can therefore be summarized as follows:

(a)     The *applicant* should:

(i)     Tell the truth and assist the examiner to the full in establishing the facts of his case.

(ii)     Make an effort to support his statements by any available evidence and give a satisfactory explanation for any lack of evidence. If necessary he must make an effort to procure additional evidence.

(iii)     Supply all pertinent information concerning himself and his past experience in as much detail as is necessary to enable the examiner to establish the relevant facts. He should be asked to give a coherent explanation of all the reasons invoked in support of his application for refugee status and he should answer any questions put to him.

(b) The *examiner* should:

(i)     Ensure that the applicant presents his case as fully as possible and with all available evidence.

(ii)    Assess the applicant's credibility and evaluate the evidence (if necessary giving the applicant the benefit of the doubt), in order to establish the objective and the subjective elements of the case.

(iii)   Relate these elements to the relevant criteria of the 1951 Convention, in order to arrive at a correct conclusion as to the applicant's refugee status.

### C. CASES GIVING RISE TO SPECIAL PROBLEMS IN ESTABLISHING THE FACTS

## (1) Mentally disturbed persons

206.    It has been seen that in determining refugee status the subjective element of fear and the objective element of its well-foundedness need to be established.

207.    It frequently happens that an examiner is confronted with an applicant having mental or emotional disturbances that impede a normal examination of his case. A mentally disturbed person may, however, be a refugee, and while his claim cannot therefore be disregarded, it will call for different techniques of examination.

208.    The examiner should, in such cases, whenever possible, obtain expert medical advice. The medical report should provide information on the nature and degree of mental illness and should assess the applicant's ability to fulfil the requirements normally expected of an applicant in presenting his case (see paragraph 205 *(a)* above). The conclusions of the medical report will determine the examiner's further approach.

209.    This approach has to vary according to the degree of the applicant's affliction and no rigid rules can be laid down. The nature and degree of the applicant's "fear" must also be taken into consideration, since some degree of mental disturbance is frequently found in persons who have been exposed to severe persecution. Where there are indications that the fear expressed by the applicant may not be based on actual experience or may be an exaggerated fear, it may be necessary, in arriving at a decision, to lay greater emphasis on the objective circumstances, rather than on the statements made by the applicant.

210.    It will, in any event, be necessary to lighten the burden of proof normally incumbent upon the applicant, and information that cannot easily be obtained from the applicant may have to be sought elsewhere, e.g. from friends, relatives and other persons closely acquainted with the applicant, or from his guardian, if one has been appointed. It may also be necessary to draw certain conclusions from the surrounding circumstances. If, for instance, the applicant belongs to and is in the company of a group of refugees, there is a presumption that he shares their fate and qualifies in the same manner as they do.

211.    In examining his application, therefore, it may not be possible to attach the same importance as is normally attached to the subjective element of "fear", which may be less reliable, and it may be necessary to place greater emphasis on the objective situation.

212.    In view of the above considerations, investigation into the refugee status of a mentally disturbed person will, as a rule, have to be more searching than in a "normal" case and will call for a close examination of the applicant's past history and background, using whatever outside sources of information may be available.

## (2) Unaccompanied minors

213.    There is no special provision in the 1951 Convention regarding the refugee status of persons under age. The same definition of a refugee applies to all individuals, regardless of their age. When it is necessary to determine the refugee status of a minor, problems may arise due to the difficulty of applying the criteria of "well-founded fear" in his case. If a minor is accompanied

by one (or both) of his parents, or another family member on whom he is dependent, who requests refugee status, the minor's own refugee status will be determined according to the principle of family unity (paragraphs 181 to 188 above).

214.    The question of whether an unaccompanied minor may qualify for refugee status must be determined in the first instance according to the degree of his mental development and maturity. In the case of children, it will generally be necessary to enrol the services of experts conversant with child mentality. A child – and for that matter, an adolescent – not being legally independent should, if appropriate, have a guardian appointed whose task it would be to promote a decision that will be in the minor's best interests. In the absence of parents or of a legally appointed guardian, it is for the authorities to ensure that the interests of an applicant for refugee status who is a minor are fully safeguarded.

215.    Where a minor is no longer a child but an adolescent, it will be easier to determine refugee status as in the case of an adult, although this again will depend upon the actual degree of the adolescent's maturity. It can be assumed that – in the absence of indications to the contrary – a person of 16 or over may be regarded as sufficiently mature to have a well-founded fear of persecution. Minors under 16 years of age may normally be assumed not to be sufficiently mature. They may have fear and a will of their own, but these may not have the same significance as in the case of an adult.

216.    It should, however, be stressed that these are only general guidelines and that a minor's mental maturity must normally be determined in the light of his personal, family and cultural background.

217.    Where the minor has not reached a sufficient degree of maturity to make it possible to establish well-founded fear in the same way as for an adult, it may be necessary to have greater regard to certain objective factors. Thus, if an unaccompanied minor finds himself in the company of a group of refugees, this may – depending on the circumstances – indicate that the minor is also a refugee.

218.    The circumstances of the parents and other family members, including their situation in the minor's country of origin, will have to be taken into account. If there is reason to believe that the parents wish their child to be outside the country of origin on grounds of well-founded fear of persecution, the child himself may be presumed to have such fear.

219.    If the will of the parents cannot be ascertained or if such will is in doubt or in conflict with the will of the child, then the examiner, in cooperation with the experts assisting him, will have to come to a decision as to the well-foundedness of the minor's fear on the basis of all the known circumstances, which may call for a liberal application of the benefit of the doubt.

## CONCLUSION

220.    In the present Handbook an attempt has been made to define certain guidelines that, in the experience of UNHCR, have proved useful in determining refugee status for the purposes of the 1951 Convention and the 1967 Protocol relating to the Status of Refugees. In so doing, particular attention has been paid to the definitions of the term "refugee" in these two instruments, and to various problems of interpretation arising out of these definitions. It has also been sought to show how these definitions may be applied in concrete cases and to focus attention on various procedural problems arising in regard to the determination of refugee status.

221.    The Office of the High Commissioner is fully aware of the shortcomings inherent in a Handbook of this nature, bearing in mind that it is not possible to encompass every situation in which a person may apply for refugee status. Such situations are manifold and depend upon the infinitely varied conditions prevailing in countries of origin and on the special personal factors relating to the individual applicant.

222.     The explanations given have shown that the determination of refugee status is by no means a mechanical and routine process. On the contrary, it calls for specialized knowledge, training and experience and – what is more important – an understanding of the particular situation of the applicant and of the human factors involved.

223.     Within the above limits it is hoped that the present Handbook may provide some guidance to those who in their daily work are called upon to determine refugee status.

**Annex I**

**EXCERPT FROM THE FINAL ACT OF THE UNITED NATIONS CONFERENCE OF PLENIPOTENTIARIES ON THE STATUS OF REFUGEES AND STATELESS PERSONS** [28]

**IV**

The Conference adopted unanimously the following recommendations:

**A.**

"THE CONFERENCE,

"*Considering* that the issue and recognition of travel documents is necessary to facilitate the movement of refugees, and in particular their resettlement,

"*Urges* Governments which are parties to the Inter-Governmental Agreement on Refugee Travel Documents signed in London 15 October 1946, or which recognize travel documents issued in accordance with the Agreement, to continue to issue or to recognize such travel documents, and to extend the issue of such documents to refugees as defined in article 1 of the Convention relating to the Status of Refugees or to recognize the travel documents so issued to such persons, until they shall have undertaken obligations under article 28 of the said Convention."

**B.**

"THE CONFERENCE,

"*Considering* that the unity of the family, the natural and fundamental group of society, is an essential right of the refugee, and that such unity is constantly threatened, and

"*Noting* with satisfaction that, according to the official commentary of the *ad hoc* Committee on Statelessness and Related Problems the rights granted to a refugee are extended to members of his family,

"*Recommends* Governments to take the necessary measure protection of the refugee's family, especially with a view to:

"(1)     Ensuring that the unity of the refugee's family is maintained particularly in cases where the head of the family has fulfilled the necessary conditions for admission to a particular country,

"(2)     The protection of refugees who are minors, in particular unaccompanied children and girls, with special reference to guardianship and adoption."

**C.**

"THE CONFERENCE,

"*Considering* that, in the moral, legal and material spheres, refugees need the help of suitable welfare services, especially that of appropriate non-governmental organizations,

"*Recommends* Governments and inter-governmental bodies to facilitate, encourage and sustain the efforts of properly qualified or organizations."

---

28 United Nations *Treaty Series*, vol. 189, p. 37

**D.**

"THE CONFERENCE,

"*Considering* that many persons still leave their country of origin for reasons of persecution and are entitled to special protection on account of their position,

"*Recommends* that Governments continue to receive refugees in their territories and that they act in concert in a true spirit of international co-operation in order that these refugees may find asylum and the possibility of resettlement."

**E.**

"THE CONFERENCE,

"*Expresses* the hope that the Convention relating to the Status of Refugees will have value as an example exceeding its contractual scope and that all nations will be guided by it in granting so far as possible to persons in their territory as refugees and who would not be covered by the terms of the Convention, the treatment for which it provides."

**Annex II**

**1951 CONVENTION RELATING TO THE STATUS OF REFUGEES** [29]

*PREAMBLE*

THE HIGH CONTRACTING PARTIES

*Considering* that the Charter of the United Nations and the Universal Declaration of Human Rights approved on 10 December 1948 by the General Assembly have affirmed the principle that human beings shall enjoy fundamental rights and freedoms without discrimination,

*Considering* that the United Nations has, on various occasions, manifested its profound concern for refugees and endeavored to assure refugees the widest possible exercise of these fundamental rights and freedoms,

*Considering* that it is desirable to revise and consolidate previous international agreements relating to the status of refugees and to extend the scope of and the protection accorded by such instruments by means of a new agreement,

*Considering* that the grant of asylum may place unduly heavy burdens on certain countries, and that a satisfactory solution of a problem of which the United Nations has recognized the international scope and nature the cannot therefore be achieved without international co-operation,

*Expressing* the wish that all States, recognizing the social and humanitarian nature of the problem of refugees, will do everything within their power to prevent this problem from becoming a cause of tension between States,

*Noting* that the United Nations High Commissioner for Refugees is charged with the task of supervising international conventions providing for the protection of Refugees, and recognizing that the effective co-ordination of measures taken to deal with this problem will depend upon the co-operation of States with the High Commissioner,

*Have agreed as follows:*

*CHAPTER I – GENERAL PROVISIONS*

# Article 1

# Definition of the term "Refugee"

A. For the purposes of the present Convention, the term "refugee" shall apply to any person who:

(1)      Has been considered a refugee under the Arrangements of 12 May 1926 and 30 June 1928 or under the Conventions of 28 October 1933 and 10 February 1938, the Protocol of 14 September 1939 or the Constitution of the International Refugee Organization;

Decisions of non-eligibility taken by the International Refugee Organization during the period of its activities shall not prevent the status of refugee being accorded to persons who fulfil the conditions of paragraph 2 of this section;

(2)      As a result of events occurring before 1 January 1951 and owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and

---

29 United Nations Treaty Series, vol. 189, p. 137.

being outside the country of his former habitual residence as a result of such events, is unable or, owing to such fear, is unwilling to return to it.

In the case of a person who has more than one nationality, the term "the country of his nationality" shall mean each of the countries of which he is a national, and a person shall not be deemed to be lacking the protection of the country of his nationality if, without any valid reason based on well-founded fear, he has not availed himself of the protection of one of the countries of which he is a national.

**B.** (1)    For the purposes of this Convention, the words "events occurring before 1 January 1951" in Article 1, Section A, shall be understood to mean either:

(a)    "events occurring in Europe before 1 January 1951" or

(b)    "events occurring in Europe or elsewhere before 1 January 1951"

and each Contracting State shall make a declaration at the time of signature, ratification or accession, specifying which of these meanings it applies for the purpose of its obligations under this Convention.

(2)    Any Contracting State which has adopted alternative *(a)* may at any time extend its obligations by adopting alternative *(b)* by means of a notification addressed to the Secretary-General of the United Nations.

**C.** This Convention shall cease to apply to any person falling under the terms of Section A if:

(1)    He has voluntarily re-availed himself of the protection of the country of his nationality; or

(2)    Having lost his nationality, he has voluntarily re-acquired it; or

(3)    He has acquired a new nationality, and enjoys the protection of the country of his new nationality; or

(4)    He has voluntarily re-established himself in the country which he left or outside which he remained owing to fear of persecution; or

(5)    He can no longer, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist, continue to refuse to avail himself of the protection of the country of his nationality;

Provided that this paragraph shall not apply to a refugee falling under section A (1) of this Article who is able to invoke compelling reasons arising out of previous persecution for refusing to avail himself of the protection of the country of nationality.

(6)    Being a person who has no nationality he is, because the circumstances in connexion with which he has been recognized as a refugee have ceased to exist, able to return to the country of his former habitual residence;

Provided that this paragraph shall not apply to a refugee falling under section A (1) of this Article who is able to invoke compelling reasons arising out of previous persecution for refusing to return to the country of his former habitual residence.

**D.** This Convention shall not apply to persons who are at present receiving from organs or agencies of the United Nations other than the United Nations High Commissioner for Refugees protection or assistance.

When such protection or assistance has ceased for any reason, without the position of such persons being definitively settled in accordance with the relevant resolutions adopted by the General Assembly of the United Nations, these persons shall *ipso facto* be entitled to the benefits of this Convention.

**E.** This Convention shall not apply to a person who is recognized by the competent authorities of the country in which he has taken residence as having the rights and obligations which are attached to the possession of the nationality of that country.

**F.** The provisions of this Convention shall not apply to any person with respect to whom there are serious reasons for considering that:

*(a)*        he has committed a crime against peace, a war crime, or a crime against humanity, as defined in the international instruments drawn up to make provision in respect of such crimes;

*(b)*        he has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee;

*(c)*        he has been guilty of acts contrary to the purposes and principles of the United Nations.

# Article 2

## General obligations

Every refugee has duties to the country in which he finds himself, which require in particular that he conform to its laws and regulations as well as to measures taken for the maintenance of public order.

# Article 3

## Non-Discrimination

The Contracting States shall apply the provisions of this Convention to refugees without discrimination as to race, religion or country of origin.

# Article 4

## Religion

The Contracting States shall accord to refugees within their territories treatment at least as favorable as that accorded to their nationals with respect to freedom to practice their religion and freedom as regards the religious education of their children.

# Article 5

## Rights granted apart from this Convention

Nothing in this Convention shall be deemed to impair any rights and benefits granted by a Contracting State to refugees apart from this Convention.

# Article 6

## The term "in the same circumstances"

For the purpose of this Convention, the term "in the same circumstances" implies that any requirements (including requirements as to length and conditions of sojourn or residence) which the particular individual would have to fulfil for the enjoyment of the right in question, if he were not a refugee, must be fulfilled by him, with the exception of requirements which by their nature a refugee is incapable of fulfilling.

## Article 7

## Exemption from reciprocity

1.      Except where this Convention contains more favorable provisions, a Contracting State shall accord to refugees the same treatment as is accorded to aliens generally.

2.      After a period of three years' residence, all refugees shall enjoy exemption from legislative reciprocity in the territory of the Contracting States.

3.      Each Contracting State shall continue to accord to refugees the rights and benefits to which they were already entitled, in the absence of reciprocity, at the date of entry into force of this Convention for that State.

4.      The Contracting States shall consider favorably the possibility of according to refugees, in the absence of reciprocity, rights and benefits beyond those to which they are entitled according to paragraphs 2 and 3, and to extending exemption from reciprocity to refugees who do not fulfil the conditions provided for in paragraphs 2 and 3.

5.      The provisions of paragraphs 2 and 3 apply both to the rights and benefits referred to in articles 13, 18, 19, 21 and 22 of this Convention and to rights and benefits for which this Convention does not provide.

## Article 8

## Exemption from exceptional measures

With regard to exceptional measures which may be taken against the person, property or interests of nationals of a foreign State, the Contracting States shall not apply such measures to a refugee who is formally a national of the said State solely on account of such nationality. Contracting States which, under their legislation, are prevented from applying the general principle expressed in this article, shall, in appropriate cases, grant exemptions in favor of such refugees.

## Article 9

## Provisional measures

Nothing in this Convention shall prevent a Contracting State, in time of war or other grave and exceptional circumstances, from taking provisionally measures which it considers to be essential to the national security in the case of a particular person, pending a determination by the Contracting State that person is in fact a refugee and that the continuance of such measures is necessary in his case in the interests of national security.

## Article 10

## Continuity of residence

1.      Where a refugee has been forcibly displaced during the Second World War and removed to the territory of a Contracting State, and is resident there, the period of such enforced sojourn shall be considered to have been lawful residence within that territory.

2.      Where a refugee has been forcibly displaced during the Second World War from the territory of a Contracting State and has, prior to the date of entry into force of this Convention, returned there for the purpose taking up residence, the period of residence before and after such enforced displacement shall be regarded as one uninterrupted period for any purposes for which uninterrupted residence is required.

## Article 11

## Refugee seamen

In the case of refugees regularly serving as crew members on board a ship flying the flag of a Contracting State, that state shall give sympathetic consideration to their establishment on its territory and the issue of travel documents to them on their temporary admissions to its territory particularly with a view to facilitating their establishment in another country.

*CHAPTER II – JURIDICAL STATUS*

## Article 12

## Personal status

1.      The personal status of a refugee shall be governed by the law of the country of his domicile or, if he has no domicile, by the law of the country of his residence.

2.      Rights previously acquired by a refugee and dependent on personal status, more particularly rights attaching to marriage, shall be respected by a Contracting State, subject to compliance, if this be necessary, with the formalities required by the law of that State, provided that the right in question is one which would have been recognized by the law of that State had he not become a refugee.

## Article 13

## Movable and immovable property

The Contracting States shall accord to a refugee treatment as favorable as possible and, in any event, not less favorable than that accorded to aliens generally in the same circumstances as regards the acquisition of movable and immovable property and other rights pertaining thereto, and to leases and other contracts relating to movable and immovable property.

## Article 14

## Artistic rights and industrial property

In respect of the protection of industrial property, such as inventions, designs or models, trade marks, trade names, and of rights in literary, artistic and scientific works, a refugee shall be accorded in the country in which he has his habitual residence the same protection as is accorded to nationals of that country. In the territory of any other Contracting State, he shall be accorded the same protection as is accorded in that territory to nationals of the country in which he has habitual residence.

## Article 15

## Right of association

As regards non-political and non-profit-making associations and trade unions the Contracting States shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country, in the same circumstances.

## Article 16

## Access to courts

1.      A refugee shall have free access to the courts of law on the territory of all Contracting States.

2.	A refugee shall enjoy in the Contracting State in which he has his habitual residence the same treatment as a national in matters pertaining to access to the Courts, including legal assistance and exemption from *cautio judicatum solvi*.

3.	A refugee shall be accorded in the matters referred to in paragraph 2 in countries other than that in which he has his habitual residence the treatment granted to a national of the country of his habitual residence.

### CHAPTER III – GAINFUL EMPLOYMENT

# Article 17

## Wage-earning employment

1.	The Contracting State shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to engage in wage-earning employment.

2.	In any case, restrictive measures imposed on aliens or the employment of aliens for the protection of the national labour market shall not be applied to a refugee who was already exempt from them at the date of entry into force of this Convention for the Contracting States concerned, or who fulfills one of the following conditions:

*(a)*	He has completed three years residence in the country;

*(b)*	He has a spouse possessing the nationality of the country of residence. A refugee may not invoke the benefits of this provision if he has abandoned his spouse;

*(c)*	He has one or more children possessing the nationality of the country of residence.

3.	The Contracting States shall give sympathetic consideration to assimilating the rights of all refugees with regard to wage-earning employment to those of nationals, and in particular to those refugees who have entered their territory pursuant to programmes of labour recruitment or under immigration schemes.

# Article 18

## Self-employment

The Contracting States shall accord to a refugee lawfully in their territory treatment as favorable as possible and, in any event, not less favorable than that accorded to aliens generally in the same circumstances, as regards the right to engage on his own account in agriculture, industry, handicrafts and commerce and to establish commercial and industrial companies.

# Article 19

## Liberal professions

1.	Each Contracting State shall accord to refugees lawfully staying in their territory who hold diplomas recognized by the competent authorities of that State, and who are desirous of practising a liberal profession, treatment as favorable as possible and, in any event, not less favorable than that accorded to aliens generally in the same circumstances.

2.	The Contracting States shall use their best endeavours consistently with their laws and constitutions to secure the settlement of such refugees in the territories, other than the metropolitan territory, for whose international relations they are responsible.

*CHAPTER IV – WELFARE*

# Article 20

# Rationing

Where a rationing system exists, which applies to the population at large and regulates the general distribution of products in short supply, refugees shall be accorded the same treatment as nationals.

# Article 21

# Housing

As regards housing, the Contracting States, in so far as the matter is regulated by laws or regulations or is subject to the control of public authorities, shall accord to refugees lawfully staying in their territory treatment as favorable as possible and, in any event, not less favorable than that accorded to aliens generally in the same circumstances.

# Article 22

# Public education

1.      The Contracting States shall accord to refugees the same treatment as is accorded to nationals with respect to elementary education.

2.      The Contracting States shall accord to refugees treatment as favorable as possible, and, in any event, not less favorable than that accorded to aliens generally in the same circumstances, with respect to education other than elementary education and, in particular, as regards access to studies, the recognition of foreign school certificates, diplomas and degrees, the remission of fees and charges and the award of scholarships.

# Article 23

# Public relief

The Contracting States shall accord to refugees lawfully staying in their territory the same treatment with respect to public relief and assistance as is accorded to their nationals.

# Article 24

# Labour legislation and social security

1.      The Contracting States shall accord to refugees lawfully staying in their territory the same treatment as is accorded to nationals in respect of the following matters:

*(a)*      In so far as such matters are governed by laws or regulations or are subject to the control of administrative authorities: remuneration, including family allowances where these form part of remuneration, hours of work, overtime arrangements, holidays with pay, restrictions on home work, minimum age of employment, apprenticeship and training, women's work and the work of young persons, and the enjoyment of the benefits of collective bargaining;

*(b)*      Social security (legal provisions in respect of employment injury, occupational diseases, maternity, sickness, disability, old age, death, unemployment, family responsibilities and any other contingency which, according to national laws or regulations, is covered by a social security scheme), subject to the following limitations:

(i)      There may be appropriate arrangements for the maintenance of acquired rights and rights in course of acquisition;

(ii)      National laws or regulations of the country of residence may prescribe special arrangements concerning benefits or portions of benefits which are payable wholly out of public funds, and concerning allowances paid to persons who do not fulfil the contribution conditions prescribed for the award of a normal pension.

2.      The right to compensation for the death of a refugee resulting from employment injury or from occupational disease shall not be affected by the fact that the residence of the beneficiary is outside the territory of the Contracting State.

3.      The Contracting States shall extend to refugees the benefits of agreements concluded between them, or which may be concluded between them in the future, concerning the maintenance of acquired rights and rights in the process of acquisition in regard to social security, subject only to the conditions which apply to nationals of the States signatory to the agreements in question.

4.      The Contracting States will give sympathetic consideration to extending to refugees so far as possible the benefits of similar agreements which may at any time be in force between such Contracting States and non-contracting States.

### CHAPTER V – ADMINISTRATIVE MEASURES

# Article 25

## Administrative assistance

1.      When the exercise of a right by a refugee would normally require the assistance of authorities of a foreign country to whom he cannot have recourse, the Contracting States in whose territory he is residing shall arrange that such assistance be afforded to him by their own authorities or by an international authority.

2.      The authority or authorities mentioned in paragraph 1 shall deliver or cause to be delivered under their supervision to refugees such documents or certifications as would normally be delivered to aliens by or through their national authorities.

3.      Documents or certifications so delivered shall stand in the stead of the official instruments delivered to aliens by or through their national authorities, and shall be given credence in the absence of proof to the contrary.

4.      Subject to such exceptional treatment as may be granted to indigent persons, fees may be charged for the services mentioned herein, but such fees shall be moderate and commensurate with those charged to nationals for similar services.

5.      The provisions of this article shall be without prejudice to articles 27 and 28.

# Article 26

## Freedom of movement

Each Contracting State shall accord to refugees lawfully in its territory the right to choose their place of residence and to move freely within its territory, subject to any regulations applicable to aliens generally in the same circumstances.

# Article 27

## Identity papers

The Contracting States shall issue identity papers to any refugee in their territory who does not possess a valid travel document.

## Article 28

## Travel documents

1.      The Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory unless compelling reasons of national security or public order otherwise require, and the provisions of the Schedule to this Convention shall apply with respect to such document. The Contracting States may issue such a travel document to any other refugee in their territory; they shall in particular give sympathetic consideration to the issue of such a travel document to refugees in their territory who are unable to obtain a travel document from the country of their lawful residence.

2.      Travel documents issued to refugees under previous international agreements by parties thereto shall be recognized and treated by the Contracting States in the same way as if they had been issued pursuant to this article.

## Article 29

## Fiscal charges

1.      The Contracting States shall not impose upon refugees duties, charges or taxes, of any description whatsoever, other or higher than those which are or may be levied on their nationals in similar situations.

2.      Nothing in the above paragraph shall prevent the application to refugees of the laws and regulations concerning charges in respect of the issue to aliens of administrative documents including identity papers.

## Article 30

## Transfer of assets

1.      A Contracting State shall, in conformity with its laws and regulations permit refugees to transfer assets which they have brought into its territory, to another country where they have been admitted for the purposes of resettlement.

2.      A Contracting State shall give sympathetic consideration to the application of refugees for permission to transfer assets wherever they may be and which are necessary for their resettlement in another country to which they have been admitted.

## Article 31

## Refugees unlawfully in the country of refuge

1.      The Contracting States shall not impose penalties, on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was threatened in the sense of Article 1, enter or are present in their territory without authorization, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence.

2.      The Contracting States shall not apply to the movements of such refugees restrictions other than those which are necessary and such restrictions shall only be applied until their status in the country is regularized or they obtain admission into another country. The Contracting States shall allow such refugees a reasonable period and all the necessary facilities to obtain admission into another country.

DHSFF0190

## Article 32

## Expulsion

1.      The Contracting States shall not expel a refugee lawfully in their territory save on grounds of national security or public order.

2.      The expulsion of such a refugee shall be only in pursuance of a decision reached in accordance with due process of law. Except where compelling reasons of national security otherwise require, the refugee shall be allowed to clear himself, and to appeal to and be represented for the purpose before competent authority or a person or persons specially designated by the competent authority.

3.      The Contracting States shall allow such a refugee a reasonable period within which to seek legal admission into another country. The Contracting States reserve the right to apply during that period such internal measures as they may deem necessary.

## Article 33

## Prohibition of expulsion or return ("refoulement")

1.      No Contracting State shall expel or return (*"refouler"*) a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

2.      The benefit of the present provision may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country.

## Article 34

## Naturalization

The Contracting States shall as far as possible facilitate the assimilation and naturalization of refugees. They shall in particular make every effort to expedite naturalization proceedings and to reduce as far as possible the charges and cost of such proceedings.

### CHAPTER VI – EXECUTORY AND TRANSITORY PROVISIONS

## Article 35

## Co-operation of the national authorities with the United Nations

1.      The Contracting States undertake to co-operate with the Office of the United Nations High Commissioner for Refugees, or any other agency of the United Nations which may succeed it, in the exercise of its functions, and shall in particular facilitate its duty of supervising the application of the provisions of this Convention.

2.      In order to enable the Office of the High Commissioner or any other agency of the United Nations which may succeed it, to make reports to the competent organs of the United Nations, the Contracting States undertake to provide them in the appropriate form with information and statistical data requested concerning:

(a)      the condition of refugees,

(b)      the implementation of this Convention, and

DHSFF0191

(c)      laws, regulations and decrees which are, or may hereafter be, in force relating to refugees.

## Article 36

## Information on national legislation

The Contracting States shall communicate to the Secretary-General of the United Nations the laws and regulations which they may adopt to ensure the application of this Convention.

## Article 37

## Relation to previous conventions

Without prejudice to article 28, Paragraph 2, of this Convention, this Convention replaces, as between parties to it, the Arrangements of 5 July 1922, 31 May 1924, 12 May 1926, 30 June 1928 and 30 July 1935, the Conventions of 28 October 1933 and 10 February 1938, the Protocol of 14 September 1939 and the Agreement of 15 October 1946.

### *CHAPTER VII – FINAL CLAUSES*

## Article 38

## Settlement of disputes

Any dispute between parties to this Convention relating to its interpretation or application, which cannot be settled by other means, shall be referred to the International Court of Justice at the request of any one of the parties to the dispute.

## Article 39

## Signature, ratification and accession

1.      This Convention shall be opened for signature at Geneva on 28 July 1951 shall thereafter be deposited with the Secretary-General of the United Nations. It shall be open for signature at the European office of the United Nations from 28 July to 31 August 1951 and shall be reopened for signature at the Headquarters of the United Nations from 17 September 1951 to 31 December 1952.

2.      This Convention shall be open for signature on behalf of all States members of the United Nations and also on behalf of any other State invited to attend the Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons or to which an invitation to sign will have been addressed by the General Assembly. It shall be ratified and the instruments of ratification shall be deposited with the Secretary-General of the United Nations.

3.      This Convention shall be open from 28 July 1951 for accession by the States referred to in paragraph 2 of this Article. Accession shall be effected by the deposit of an instrument of accession with the Secretary-General of the United Nations.

## Article 40

## Territorial application clause

1.      Any State may, at the time of signature, ratification or accession, declare that this Convention shall extend to all or any of the territories for the international relations of which it is responsible. Such a declaration shall take effect when the Convention enters into force for the States concerned.

2.      At any time thereafter any such extension shall be made by notification addressed to the Secretary-General of the United Nations and shall take effect as from the ninetieth day after the

day of receipt by the Secretary-General of the United Nations of this notification, or as from the date of entry into force of the Convention for the State concerned, whichever is the later.

3.      With respect to those territories to which this Convention is not extended at the time of signature, ratification or accession, each State concerned shall consider the possibility of taking the necessary steps in order to extend the application of this Convention to such territories, subject where necessary for constitutional reasons, to the consent of the governments of such territories.

## Article 41

### Federal clause

In the case of a Federal or non-unitary State, the following provisions shall apply:

*(a)*      With respect to those articles of this Convention that come within the legislative jurisdiction of the federal legislative authority, the obligations of the Federal Government shall to this extent be the same as those of Parties which are not Federal States,

*(b)*      With respect to those articles of this Convention that come within the legislative jurisdiction of constituent States, provinces or cantons which are not, under the constitutional system of the federation, bound to take legislative action, the Federal Government shall bring such articles with a favorable recommendation, to the notice of the appropriate authorities of States, provinces or cantons at the earliest possible moment.

*(c)*      A Federal State Party to this Convention shall, at the request of any other Contracting State transmitted through the Secretary-General of the United Nations, supply a statement of the law and practice of the Federation and its constituent units in regard to any particular provision of the Convention showing the extent to which effect has been given to that provision by legislative or other action.

## Article 42

### Reservations

1.      At the time of signature, ratification or accession, any State may make reservations to articles of the Convention other than to articles 1, 3, 4, 16 (1), 33, 36 to 46 inclusive.

2.      Any State making a reservation in accordance with paragraph 1 of this article may at any time withdraw the reservation by a communication to that effect addressed to the Secretary-General of the United Nations.

## Article 43

### Entry into force

1.      This Convention shall come into force on the ninetieth day following the day of deposit of the sixth instrument of ratification or accession.

2.      For each State ratifying or acceding to the Convention after the deposit of the sixth instrument of ratification or accession, the Convention shall enter into force on the ninetieth day following the day of deposit by such State of its instrument of ratification or accession.

## Article 44

### Denunciation

1.      Any Contracting State may denounce this Convention at any time by a notification addressed to the Secretary-General of the United Nations.

2.      Such denunciation shall take effect for the Contracting State concerned one year from the date upon which it is received by the Secretary-General of the United Nations.

3.      Any State which has made a declaration or notification under article 40 may, at any time thereafter, by a notification to the Secretary-General of the United Nations, declare that the Convention shall cease to extend to such territory one year after the date of receipt of the notification by the Secretary-General.

# Article 45

## Revision

1.      Any Contracting State may request revision of this Convention at any time by a notification addressed to the Secretary-General of the United Nations.

2.      The General Assembly of the United Nations shall recommend the steps, if any, to be taken in respect of such request.

# Article 46

## Notifications by the Secretary-General of the United Nations

The Secretary-General of the United Nations shall inform all Members of the United Nations and non-member States referred to in article 39:

*(a)*      of declarations and notifications in accordance with Section B of Article 1;

*(b)*      of signatures, ratifications and accessions in accordance with article 39;

*(c)*      of declarations and notifications in accordance with article 40;

*(d)*      of reservations and withdrawals in accordance with article 42;

*(e)*      of the date on which this Convention will come into force in accordance with article 43;

*(f)*      of denunciations and notifications in accordance with article 44;

*(g)*      of requests for revision in accordance with article 45.

*In faith whereof* the undersigned, duly authorized, have signed this Convention on behalf of their respective Governments,

*Done* at Geneva, this twenty-eighth day of July, one thousand nine hundred and fifty-one, in a single copy, of which the English and French texts are equally authentic and which shall remain deposited in the archives of the United Nations, and certified true copies of which shall be delivered to all Members of the United Nations and to the non-member States referred to in article 39.

### *SCHEDULE*

# Paragraph 1

1.      The travel document referred to in article 28 of this Convention shall be similar to the specimen annexed hereto.

2.      The document shall be made out in at least two languages, one of which shall be in English or French.

# Paragraph 2

Subject to the regulations obtaining in the country of issue, children may be included in the travel document of a parent or, in exceptional circumstances, of another adult refugee.

## Paragraph 3

The fees charged for issue of the document shall not exceed the lowest scale of charges for national passports.

## Paragraph 4

Save in special or exceptional cases, the document shall be made valid for the largest possible number of countries.

## Paragraph 5

The document shall have a validity of either one or two years, at the discretion of the issuing authority.

## Paragraph 6

1.      The renewal or extension of the validity of the document is a matter for the authority which issued it, so long as the holder has not established lawful residence in another territory and resides lawfully in the territory of the said authority. The issue of a new document is, under the same conditions, a matter for the authority which issued the former document.

2.      Diplomatic or consular authorities, specially authorized for the purpose, shall be empowered to extend, for a period not exceeding six months, the validity of travel documents issued by the Governments.

3.      The Contracting States shall give sympathetic consideration to renewing or extending the validity of travel documents or issuing new documents to refugees no longer lawfully resident in their territory who are unable to obtain a travel document from the country of their lawful residence.

## Paragraph 7

The Contracting States shall recognize the validity of the documents issued in accordance with the provisions of article 28 of this Convention.

## Paragraph 8

The competent authorities of the country to which the refugee desires to proceed shall, if they are prepared to admit him and if a visa is required, affix a visa on the document of which he is the holder.

## Paragraph 9

1.      The Contracting States undertake to issue transit visas to refugees who have obtained visas for a territory of final destination.

2.      The issue of such visas may be refused on grounds which would justify refusal of a visa to any alien.

## Paragraph 10

The fees for the issue of exit, entry or transit visas shall not exceed the lowest scale of charges for visas on foreign passports.

## Paragraph 11

When a refugee has lawfully taken up residence in the territory of another Contracting State, the responsibility for the issue of a new document, under the terms and conditions of article 28, shall be that of the competent authority of that territory, to which the refugee shall be entitled to apply.

## Paragraph 12

The authority issuing a new document shall withdraw the old document and shall return it to the country of issue, if it is stated in the document that it should be so returned; otherwise it shall withdraw and cancel the document.

## Paragraph 13

1.      Each Contracting State undertakes that the holder of a travel document issued by it in accordance with article 28 of this Convention shall be readmitted to its territory at any time during the period of its validity.

2.      Subject to the provisions of the preceding sub-paragraph, a Contracting State may require the holder of the document to comply with such formalities as may be prescribed in regard to exit from or return to its territory.

3.      The Contracting States reserve the right, in exceptional cases, or in cases where the refugee's stay is authorized for a specific period, when issuing the document, to limit the period during which the refugee may return to a period of not less than three months.

## Paragraph 14

Subject only to the terms of paragraph 13, the provisions of this Schedule in no way affect the laws and regulations governing the conditions of admission to, transit through, residence and establishment in, and departure from, the territories of the Contracting States.

## Paragraph 15

Neither the issue of the document nor the entries made thereon determine or affect the status of the holder, particularly as regards nationality.

## Paragraph 16

The issue of the document does not in any way entitle the holder to the protection of the diplomatic or consular authorities of the country of issue, and does not confer on these authorities a right of protection.

## ANNEX – Specimen Travel Document

[not reproduced here]

**Annex III**

## 1967 PROTOCOL RELATING TO THE STATUS OF REFUGEES [30]

*The States Parties* to the present Protocol,

*Considering* that the Convention relating to the Status of Refugees done at Geneva on 28 July 1951 (hereinafter referred to as the Convention) covers only those persons who have become refugees as a result of events occurring before 1 January 1951,

*Considering* that new refugee situations have arisen since the Convention was adopted and that the refugees concerned may therefore not fall within the scope of the Convention,

*Considering* that it is desirable that equal status should be enjoyed by all refugees covered by the definition in the Convention irrespective of the dateline 1 January 1951,

*Have agreed* as follows:

# Article I

# General provision

1.      The States Parties to the present Protocol undertake to apply articles 2 to 34 inclusive of the Convention to refugees as hereinafter defined.

2.      For the purpose of the present Protocol, the term "refugee" shall, except as regards the application of paragraph 3 of this article, mean any person within the definition of article 1 of the Convention as if the words "As a result of events occurring before 1 January 1951 and..." and the words "... as a result of such events", in article 1 A (2) were omitted.

3.      The present Protocol shall be applied by the States Parties hereto without any geographic limitation, save that existing declarations made by States already Parties to the Convention in accordance with article 1 B (1) (a) of the Convention, shall, unless extended under article 1 B (2) thereof, apply also under the present Protocol.

# Article II

# Co-operation of the national authorities with the United Nations

1.      The States Parties to the present Protocol undertake to co-operate with the Office of the United Nations High Commissioner for Refugees, or any other agency of the United Nations which may succeed it, in the exercise of its functions, and shall in particular facilitate its duty of supervising the application of the provisions of the present Protocol.

2.      In order to enable the Office of the High Commissioner, or any other agency of the United Nations which may succeed it, to make reports to the competent organs of the United Nations, the States Parties to the present Protocol undertake to provide them with the information and statistical data requested, in the appropriate form, concerning:

*(a)* The condition of refugees;

*(b)* The implementation of the present Protocol;

*(c)* Laws, regulations and decrees which are, or may hereafter be, in force relating to refugees.

─────────────────

30 United Nations, Treaty Series, vol 606, p. 267.

DHSFF0197

## Article III

## Information on national legislation

The States Parties to the present Protocol shall communicate to the Secretary-General of the United Nations the laws and regulations which they may adopt to ensure the application of the present Protocol.

## Article IV

## Settlement of disputes

Any dispute between States Parties to the present Protocol which relates to its interpretation or application and which cannot be settled by other means shall be referred to the International Court of Justice at the request of any one of the parties to the dispute.

## Article V

## Accession

The present Protocol shall be open for accession on behalf of all States Parties to the Convention and of any other State Member of the United Nations or member of any of the specialized agencies or to which an invitation to accede may have been addressed by the General Assembly of the United Nations. Accession shall be effected by the deposit of an instrument of accession with the Secretary-General of the United Nations.

## Article VI

## Federal clause

In the case of a Federal or non-unitary State, the following provisions shall apply:

*(a)*        With respect to those articles of the Convention to be applied in accordance with article I, paragraph 1, of the present Protocol that come within the legislative jurisdiction of the federal legislative authority, the obligations of the Federal Government shall to this extent be the same as those of States Parties which are not Federal States;

*(b)*        With respect to those articles of the Convention to be applied in accordance with article I, paragraph 1, of the present Protocol that come within the legislative jurisdiction of constituent States, provinces or cantons which are not, under the constitutional system of the federation, bound to take legislative action, the Federal Government shall bring such articles with a favourable recommendation to the notice of the appropriate authorities of States, provinces or cantons at the earliest possible moment;

*(c)*        A Federal State Party to the present Protocol shall, at the request of any other State Party hereto transmitted through the Secretary General of the United Nations, supply a statement of the law and practice of the Federation and its constituent units in regard to any particular provision of the Convention to be applied in accordance with article 1, paragraph 1, of the present Protocol, showing the extent to which effect has been given to that provision by legislative or other action.

## Article VII

## Reservations and Declarations

1.        At the time of accession, any State may make reservations in respect of article IV of the present Protocol and in respect of the application in accordance with article I of the present Protocol of any provisions of the Convention other than those contained in articles 1, 3, 4, 16 (1)

DHSFF0198

and 33 thereof, provided that in the case of a State Party to the Convention reservations made under this article shall not extend to refugees in respect of whom the Convention applies.

2.      Reservations made by States Parties to the Convention in accordance with article 42 thereof shall, unless withdrawn, be applicable in relation to their obligations under the present Protocol.

3.      Any State making a reservation in accordance with paragraph 1 of this article may at any time withdraw such reservation by a communication to that effect addressed to the Secretary-General of the United Nations.

4.      Declarations made under article 40, paragraphs 1 and 2, of the Convention by a State Party thereto which accedes to the present Protocol shall be deemed to apply in respect of the present Protocol, unless upon accession a notification to the contrary is addressed by the State Party concerned to the Secretary-General of the United Nations. The provisions of article 40, paragraphs 2 and 3, and of article 44, paragraph 3, of the Convention shall be deemed to apply *mutatis mutandis* to the present Protocol.

## Article VIII

## Entry into force

1.      The present Protocol shall come into force on the day of deposit of the sixth instrument of accession.

2.      For each State acceding to the Protocol after the deposit of the sixth instrument of accession, the Protocol shall come into force on the date of deposit by such State of its instrument of accession.

## Article IX

## Denunciation

1.      Any State Party hereto may denounce this Protocol at any time by a notification addressed to the Secretary-General of the United Nations.

2.      Such denunciation shall take effect for the State Party concerned one year from the date on which it is received by the Secretary-General of the United Nations.

## Article X

## Notifications by the Secretary-General of the United Nations

The Secretary-General of the United Nations shall inform the States referred to in article V above of the date of entry into force, accessions, reservations and withdrawals of reservations to and denunciations of the present Protocol, and of declarations and notifications relating hereto.

## Article XI

## Deposit in the Archives of the Secretariat of the United Nations

A copy of the present Protocol, of which the Chinese, English, French, Russian and Spanish texts are equally authentic, signed by the President of the General Assembly and by the Secretary-General of the United Nations, shall be deposited in the archives of the Secretariat of the United Nations. The Secretary-General will transmit certified copies thereof to all States Members of the United Nations and to the other States referred to in article V above.

**Annex IV**

**LIST OF STATES PARTIES**

CONVENTION RELATING TO THE STATUS OF REFUGEES OF 28 JULY 1951

(Entry into force: 22 April 1954)

PROTOCOL RELATING TO THE STATUS OF REFUGEES OF 31 JANUARY 1967

(Entry into force: 4 October 1967)

| | |
|---|---|
| States parties to the 1951 UN Convention: | 106 |
| States parties to the 1967 Protocol: | 107 |
| States parties to both the 1951 Convention and the 1967 Protocol: | 103 |
| States parties to either one both of these instruments: | 110 |

*I. AFRICA*

| | | |
|---|---|---|
| Algeria | Gabon | Niger |
| Angola | Gambia | Nigeria |
| Benin | Ghana | Rwanda |
| Botswana | Guinea | Sao Tome and Principe |
| Burkina Faso | Guinea Bissau | Senegal |
| Burundi | Ivory Coast | Seychelles |
| Cameroon | Kenya | Sierra Leone |
| Cape Verde (P) | Lesotho | Somalia |
| Central African | | |
| Republic | Liberia | Sudan |
| Chad | Madagascar (C)* | Swaziland (P) |
| Congo | Malawi | Togo |
| Djibouti | Mali | Tunisia |

| | | |
|---|---|---|
| Egypt | Mauritania | Uganda |
| Equatorial Guinea | Morocco | United Republic of Tanzania |
| Ethiopia | Mozambique | Zaire |
| Zambia | Zimbabwe | |

*II. AMERICAS*

| | | |
|---|---|---|
| Argentina | Dominican Republic | Panama |
| Belize | Ecuador | Paraguay |
| Bolivia | El Salvador | Peru |
| Brazil | Guatemala | Suriname |
| Canada | Haiti | United States of America (P) |
| Chile | Jamaica | Uruguay |
| Colombia | Nicaragua | Venezuela(P) |
| Costa Rica | | |

*III. ASIA*

| | | |
|---|---|---|
| China | Israel | Philippines |
| Iran (Islamic Republic of) | Japan | Yemen |

*IV. EUROPE*

| | | |
|---|---|---|
| Austria | Hungary* | Poland |
| Belgium | Iceland | Portugal |
| Cyprus | Ireland | Romania |
| Czecoslovakia | Italy | Spain |
| Denmark 2) | Liechtenstein | Sweden |
| Finland | Luxembourg | Switzerland |
| France 3) | Malta* | Turkey* |
| Germany, Federal Rep. of 4) | Monaco (C)* | United Kingdom 6) |

| | | |
|---|---|---|
| Greece | Netherlands 5) | Yugoslavia |
| Holy See | Norway | |

*V. OCEANIA*

| | | |
|---|---|---|
| Australia 1) | New Zealand | Samoa (C) |
| Fiji Papua | New Guinea | Tuvalu |

*) The five States marked with an asterisk: Hungary, Madagascar, Malta, Monaco and Turkey have made a declaration in accordance with Article I (B) I of the 1951 Convention to the effect that the words "events occurring before 1 January 1951" in Article 1, Section A, should be understood to mean "events occurring in Europe before 1 January 1951". All other States Parties apply the Convention without geographical limitation. The following two States have expressly maintained their declarations of geographical limitation with regard to the 1951 Convention upon acceding to the 1967 Protocol: Malta and Turkey. Madagascar and Monaco have not yet adhered to the 1967 Protocol.

"(C)": the three States marked with a "C" are Parties to the 1951 Convention only;

"(P)" the four States marked with a "P" are Parties to the 1967 Protocol only.

1 Australia exended application of the Convention to Norfolk Island.

2 Denmark declared that the Convention was also applicable to Greenland.

3 France declared that the Convention applied to all territories for the international relations of which France was responsible.

4 The Federal Republic of Germany made a separate declaration stating that the Convention and the Protocol also applied to Land Berlin.

5 The Netherlands extended application of the Protocol to Aruba.

6 The United Kingdom extended application of the Convention to the following territories for the conduct of whose international relations the Government of the United Kingdom is responsible:

Channel Islands, Falkland Islands (Malvinas), Isle of Man, St. Helena.

The United Kingdom declared that its accession to the Protocol did not apply to Jersey, but extended its application to Montserrat.

**Annex V**

## EXCERPT FROM THE CHARTER OF THE INTERNATIONAL MILITARY TRIBUNAL [31]

## Article 6

"The Tribunal established by the Agreement referred to in Article 1 hereof for the trial and punishment of the major war criminals of the European Axis countries shall have the power to try and punish persons who, acting in the interests of the European Axis countries, whether as individuals or as members of organisations, committed any of the following crimes.

"The following acts, or any of them, are crimes coming within the jurisdiction of the Tribunal for which there shall be individual responsibility:

*(a) Crimes against peace:* namely, planning, preparation, initiation or waging of a war of aggression, or a war in violation of international treaties, agreements or assurances, or participation in a common plan or conspiracy for the accomplishment of any of the foregoing;

*(b) War crimes:* namely, violations of the laws or customs of war. Such violations shall include, but not be limited to, murder, ill-treatment or deportation to slave labour or for any other purpose, of civilian population of or in occupied territory, murder or ill-treatment of prisoners of war or persons on the seas, killing of hostages, plunder of public or private property, wanton destruction of cities, towns or villages, or devastation not justified by military necessity;

*(c) Crimes against humanity:* namely, murder, extermination, enslavement, deportation and other inhumane acts committed against any civilian population, before or during the war; or persecutions on political, racial or religious grounds in execution of or in connection with any crime within the jurisdiction of the Tribunal, whether or not in violation of the domestic law of the country where perpetrated.

"Leaders, organisers, instigators and accomplices participating in the formulation or execution of a common plan or conspiracy to commit any of the foregoing crimes are responsible for all acts performed by any persons in execution of such plan."

---

[31] See *"The Charter and Judgment of the Nürnberg Tribunal: History and Analysis"* Appendix II – United Nations General Assembly-International Law Commission 1949 (A/CN.4/5 of 3 March 1949).

DHSFF0203

**Annex VI**

# INTERNATIONAL INSTRUMENTS RELATING TO ARTICLE 1 F(a) OF THE 1951 CONVENTION

The main international instruments which pertain to Article 1 F (a) of the 1951 Convention are as follows:

(1)    The London Agreement of 8 August 1945 and Charter of the International Military Tribunal;

(2)    Law No. 10 of the Control Council for Germany of 20 December 1945 for the Punishment of Persons Guilty of War Crimes, Crimes against Peace and Crimes against Humanity;

(3)    United Nations General Assembly Resolution 3 (1) of 13 February 1946 and 95 (1) of 11 December 1946 which confirm war crimes and crimes against humanity as they are defined in the Charter of the International Military Tribunal of 8 August 1945;

(4)    Convention on the Prevention and Punishment of the Crime of Genocide of 1948 (Article III); (entered into force 12 January 1951);

(5)    Convention of the Non-Applicability of Statutory Limitations of War Crimes and Crimes Against Humanity of 1968 (entered into force 11 November 1970);

(6)    Geneva Conventions for the protection of victims of war of August 12, 1949 (Convention for the protection of the wounded, and sick, Article 50; Convention for the protection of wounded, sick and shipwrecked, Article 51; Convention relative to the treatment of prisoners of war, Article 130; Convention relative to the protection of civilian persons, Article 147);

(7)    Additional Protocol to the Geneva Conventions of 12 August 1949 Relating to the Protection of Victims of International Armed Conflicts (Article 85 on the repression of breaches of this Protocol).



# Migration Governance Snapshot: Republic of Guatemala

## *August 2018*

In 2015, the International Organization for Migration (IOM) developed a Migration Governance Framework (MiGOF) to help countries define what "well-managed migration policy" might look like at the national level. The MiGOF was welcomed by IOM's Member States in the same year. The Migration Governance Indicators (MGI)[1] were developed to assist countries operationalize the MiGOF by using a standard set of approximately 90 indicators that could be applied across six key policy domains.

The MGI is a tool based on policy inputs, which offers insights on policy levers that countries can use to develop their migration governance. The MGI is not intended to function as a measurement of outcomes related to migration policies and institutions. Instead, it operates as an input-based benchmarking framework that offers insights on policy measures that countries can use to strengthen migration governance. The MGI is not meant to rank countries in the assessment of the comprehensiveness of their migration policies. The MGI aims to assist countries while advancing the conversation on migration governance by clarifying what "well-governed migration" might look like in the context of the Sustainable Development Goal Target 10.7, "Facilitate orderly, safe, regular and responsible migration and mobility of people, including through the implementation of planned and well-managed migration policies."

This country snapshot presents a summary of well-governed areas of the Republic of Guatemala's (hereafter referred to as Guatemala) migration governance structures, as well as the areas with potential for further development, as assessed by the MGI.

---

[1] The MGI initiative is a policy-benchmarking programme led by IOM and implemented with the support of the Economist Intelligence Unit. Funding is provided by IOM's Member States.

The opinions expressed in this report are those of the authors and do not necessarily reflect the views of IOM Member States or IOM. The designations employed and the presentation of material throughout the report do not imply the expression of any opinion whatsoever on the part of IOM concerning the legal status of any country, territory, city or area, or of its authorities, or concerning its frontiers or boundaries.

With research and analysis by



Y:\MPD\MGI Project(s)\Country profiles\Guatemala\20180923_ MGI Guatemala EN.docx

DHSFF0205

# Key findings

## 1. Adherence to international standards and the fulfilment of migrants' rights

### 1.1.  International conventions ratified

The table below follows a standard format and looks at the ratification of specific international conventions. The list of conventions covered is by no means exhaustive.

| Name of the convention | Ratification |
|---|---|
| Migration for Employment Convention (Revised), 1949 (No. 97) | Yes (1952) |
| Convention on the Status of Refugees, 1951 | Yes (1983) |
| Convention relating to the Status of Stateless Persons, 1954 | Yes (2000) |
| Convention on the Reduction of Statelessness, 1961 | Yes (2001) |
| Migrant Workers (Supplementary Provisions) Convention, 1975 (No. 143) | No |
| Convention on the Rights of the Child, 1989 | Yes (1990) |
| International Convention on the Protection of the Rights of All Migrant Workers and Members of Their Families, 1990 | Yes (2003) |

### 1.2.  Migration governance: Examples of well-developed areas

The Government of Guatemala gives priority to the rights of immigrants and has enacted legislation to ensure access to basic public services such as education, healthcare and security, on an equal footing with Guatemalan nationals.

In 2016, the Congress of the Republic of Guatemala adopted the Migration Code through Decree 44-2016, which took effect in May 2017 and is now being implemented. Article 2 of the Code guarantees access for immigrants to security, health services, education, employment and housing, among other things. Immigrants' rights are also enshrined in the Constitution. Under Article 71, for example, the State is required to provide and facilitate education for its citizens free of discrimination, while Article 100 guarantees the right to the services and benefits available from the Guatemalan Social Security Institute.

There are options for obtaining permanent residency and citizenship. A person with temporary resident status may obtain permanent residency after living in Guatemala and demonstrating to the immigration authorities that their situation is stable. To obtain citizenship, immigrants must first obtain "domiciled alien" status after two years of legal residence in Guatemala, or if they have Guatemalan children or parents, or are married to a Guatemalan national. Applicants from non-Central American countries must hold the "domiciled alien" status for five or more years in order to obtain citizenship. Spanish nationals are an exception to this, as they are treated in the same way as Central American citizens in virtue of a signed agreement. For persons from Central America (Belize, Costa Rica, El Salvador, Honduras and Nicaragua), a period of three years' residence in the country is required.

### 1.3.  Areas with potential for further development

Currently, only two types of residence permits allow access to the job market: employment may be sought only in the specific cases of being married to a Guatemalan national or having a Guatemalan child. Moreover, Article 13 of the Labour Code prohibits companies from employing more than 10 per cent of immigrants and from paying them more than 15 per cent of their respective total wage bills, subject to the provisions of any special laws in this regard.

2

DHSFF0206

In the case of the public sector, the National Civil Service Office (ONSEC) is the body that regulates hiring in centralized and decentralized entities, and under the law, immigrants are hired when there are no nationals with the requisite skills. There are no restrictions on autonomous and semi-autonomous entities. Self-employed workers must fulfil the requirements laid down by the Tax Administration Supervisory Authority (SAT), which are similar for nationals and immigrants.

The Migration Code contains the concept of family reunification, though cases are currently being handled on an ad hoc basis, in other words, on a case-by-case basis, except for investors, pensioners or people of independent means, whose permits of residence include their family members. Family members eligible for reunification are parents, spouses and children of less than 18 years old or unmarried children and persons below 25 years of age. There are no restrictions on family reunification based on certain personal characteristics (such as gender).

No pension portability agreements have been signed with other countries.

Under the Constitution, the right to vote in local elections is reserved for citizens of Guatemala. It is important for specific mechanisms for civil participation to exist so that immigrants can be included as active members of society.

## 2. Formulates policy using evidence and whole of government approach

### 2.1.     Migration governance: Examples of well-developed areas

Guatemala has domestic legislation regulating immigration and emigration. In 2016, the Congress of the Republic of Guatemala adopted the Migration Code, which addresses the rights and duties of migrants.

There are government bodies with different migration-related responsibilities. The Ministry of the Interior  is responsible for formulating the country's migration policy. The General Directorate of Migration (DGM) is a branch of the Ministry of the Interior and is specifically charged with implementing migration policy. The Government is implementing the new Migration Code, on the basis of which the National Migration Authority (AMN) was set up and tasked with formulating migration policy.

Guatemala has been striving for greater horizontal and vertical migration policy coherence. The National Migration Authority is expected to act as the principal interministerial coordination body. The AMN comprises the Office of the Vice-President of the Republic, the Guatemalan Migration Institute (now the DGM), the Guatemalan National Council for Attention to Migrants (CONAMIGUA) and the Ministries of Foreign Affairs, Social Development, Labour and Social Welfare and of the Interior.

CONAMIGUA is a body set up in 2007 through Decree 46-2007, comprising the Guatemalan State authorities responsible for monitoring and protecting the human rights and individual guarantees of Guatemalans living abroad. However, it remained inactive for about eight months prior to the start of 2018, for lack of authorities. CONAMIGUA has been re-activated and has begun operational interministerial coordination and now participates in technical sessions with AMN as well as other institutions. The new Migration Code establishes interinstitutional coordination bodies such as the AMN, which is tasked with formulating, creating and overseeing migration policy and migration-related security. Likewise, the Council for Attention and Protection created under the Migration Code is now meeting and coordinating the preparation and adoption of regulations.

There are currently other coordinating bodies in operation. For example, there is a coordinating body for matters relating to migrant children and adolescents pursuant to Government Decision 146-2014, and others

3

such as the Inter-Agency Commission against Trafficking in Persons (CIT) and the National Commission for Refugees (CONARE). This latter body is currently suspended now that the AMN has been set up.

There are institutions in Guatemala that assist nationals residing abroad (embassies, consulates, labour attachés, ministries/offices for diaspora issues). According to the Ministry of Foreign Affairs (MINEX), there are 41 embassies or consulates in countries around the world.

As regards data collection and the availability of information, the DGM web portal periodically publishes figures on the number of persons returning by air and land, breaking down adults, children and adolescents by gender. In addition, the 2002 census included five questions on migration. It is also confirmed that the 2018 census likewise includes a module on migration.

### 2.2.      Areas with potential for further development

The recent Migration Code has not been operationalized.

The country is now transitioning towards implementation of the measures laid out in the recent Migration Code, which is not yet operational, a fact that is impeding the determination of future actions. Once the transition process is complete, AMN will need to table a draft working agenda. Furthermore, the DGM will become the Guatemalan Migration Institute, a decentralized body that will be charged with ensuring respect for the human right to migrate and safeguarding it through the proper administration of migration law, as well as providing timely assistance and protection for immigrants in Guatemala and Guatemalan emigrants who need these services.

The MINEX has proposed fundamental measures such as expanding diplomatic and consular representation abroad, strengthening channels of communication through which to offer support for Guatemalans living abroad, including their associations and leaders. Nevertheless, there are still no formal programmes for working with Guatemalans in the diaspora.

Civil participation by Guatemalans abroad is limited. The electoral law was nevertheless amended in 2017 to allow for voting abroad and work is now progressing on the mechanisms to be used. The Supreme Electoral Tribunal issued Decree 274-2016 on the regulations governing voting abroad, but its implementation is still at the planning stage.

## 3. Engages with partners to address migration and related issues

### 31. Migration governance: Examples of well-developed areas

Guatemala participates in several Regional Consultative Processes on Migration (RCPs). Besides, the country is a member of the Regional Conference on Migration or Puebla Process (RCM) and also participates in the Central American Commission of Directors of Migration (OCAM). Guatemala is also a participant in the Global Forum on Migration and Development (GFMD), *inter alia*.

The Governments of Mexico and Guatemala have signed over 40 agreements and memorandums of understanding, a reflection of the rapid evolution of their relations over recent years and the commitment of both countries to strengthening cooperation such that it translates into greater development, prosperity and security, especially for those living in the border area. Furthermore, in May 2018 the Ministry of Labour signed an Agreement on Labour Cooperation with Mexico in order to strengthen ties of cooperation and foster information sharing between both countries.

The Government is working formally with the private sector and civil society in getting to grips with migration issues. It was announced in June 2017 that the Inter-American Development Bank (IDB), the Governments of

4

El Salvador, Guatemala and Honduras, as well as the private sector will invest US$750 million in energy, transport, water and tourism projects. The plan is to create economic and job opportunities in order to discourage migration towards the north of the continent. Meanwhile, the United Nations High Commissioner for Refugees (UNHCR) is undertaking institutional capacity building for the benefit of government officials responsible for refugee matters and is working with migration authorities to ensure compliance with the principles of international protection (IDB, 2017).

There are also initiatives such as the "GUATE TE INCLUYE" (Guatemala includes you) programme, which is an interinstitutional and intersectoral coordination initiative designed to ensure the participation of all stakeholders, thereby furthering social and job market inclusion for returning migrants. Participating in this initiative are private sector and civil society institutions as well as government bodies such as the MINEX, the Social Welfare Secretariat, the General Directorate of Migration, and the Ministry of Labour, among others.

Since 2005, Guatemala has been a party to the Convention on the creation of the single Central American visa for the free movement of foreign nationals between the Republics of El Salvador, Honduras, Guatemala and Nicaragua (CA4). The single visa permits free movement for foreign nationals on the territory of any of the Member States.

### 3.2.    Areas with potential for further development

Currently, there are agreements such as the CA4 on the free movement of aliens, as well as customs agreements in place between Honduras, Guatemala and El Salvador, but so far none has addressed the topic of labour mobility.

Although Guatemala is a member of the Executive Committee of the Comprehensive Regional Protection and Solutions Framework (MIRPS) and an Observing Member of the UNHCR Executive Committee, it does not form part of the governing body of the International Organization for Migration (IOM).

The country maintains regular interaction with Guatemalan communities abroad through the consular missions of the MINEX. This notwithstanding, there are no forums for formal collaboration with members of the diaspora and expatriate communities for devising migration programmes and implementing migration policy.

## 4. Advances the socioeconomic well-being of migrants and society

### 4.1.    Migration governance: Examples of well-developed areas

As a receiving country, Guatemala has drawn up regulations promoting ethical practices in the hiring of immigrants. In 2016 the Congress of the Republic of Guatemala approved the Migration Code, which guarantees that all persons present on the national territory will enjoy equal access to public employment services, pursuant to the Constitution of the Republic, the Migration Code and other applicable norms. Besides, the Migration Code lays down the minimum social rights and entitlements in terms of security and assets and properties for everyone, irrespective of migration status. The provisions of the Code are currently in transition, but reflect the country's determination to guarantee the rights of migrants.

In 2014 Mexico and Guatemala signed an agreement to create instruments to furnish quantitative and qualitative information on the characteristics of migrant workers, which would feed into the elaboration of active labour policies. As an offshoot of the agreement, a campaign was mounted to inform the Guatemalan population about working in southern Mexico and about their labour rights. Guatemala also signed an agreement with Belize aimed at establishing a general framework for implementing a seasonal workers programme.

5

Guatemala allows unrestricted and equal access to primary and secondary education for international students. Fees charged by national universities are different for Guatemalan and international students, however.

Guatemala has formally adopted accreditation criteria for the recognition of foreign qualifications (degrees and/or diplomas, skills and expertise). Article 87 of the Constitution states that the University of San Carlos of Guatemala is the only one entitled to approve the credentials of professionals who are graduates of foreign universities and to set the preliminary requirements that must be met to that end, as well as to recognize university-level titles and diplomas covered by international treaties.

Moreover, the National Policy on Decent Work 2017-2032 provides for Priority Action 2, National Migration for Development Programme, specific aim of focal point 1, "Job creation", and for Priority Action 9, Job skills certification programme, specific objective of focal point 2, "Promoting labour certification of people with on-the-job training and of returning migrants in the framework of the National Vocational Training System", *inter alia*.

In the case of the Directorate-General for Extracurricular Education (DIGEEX), when distance learning or virtual courses are involved, the place of study must be certified and the relevant documents must be apostilled. DIGEEX also recognizes education and training acquired in other countries, provided that verification is possible.

## 4.2.    Areas with potential for further development

Guatemala compiles information on the labour market broken down by migration status, but the data are not published online. On its official website, however, the MINEX does publish data on Guatemalan migrant workers abroad who register with that institution.

Demand for immigrant workers is not monitored in Guatemala, for example by means of lists of occupations facing human resource shortages. Likewise, Guatemala does not have different types of visas for attracting persons with specific professional skills nor has there been any national evaluation to gauge the effects of outmigration on the domestic labour market.

In Guatemala there are the National Policy for the Promotion and Integral Development of Women (PNPDIM) and the Equal Opportunity Plan 2008-2023 (PEO), being promoted by the Presidential Secretariat for Women (SEPREM), yet there are no specific measures to promote gender equality for immigrants on the job market.

A work permit must be obtained in Guatemala in order to engage in any kind of paid activity. International students holding residence permits for study purposes must apply for work permits. There are no provisions or regulations allowing or forbidding students to work during their studies. The only constraint for obtaining a work permit is that applicants must have a job offer to back up their application. No work permit is required, however, if a migrant worker is providing consulting or advisory services.

Although there is a substantial flow of remittances to Guatemala, there is no government scheme that actively encourages the sending of remittances. The Bank of Guatemala (BANGUAT) uses the IOM Migration and Remittances Survey to estimate the average cost of making remittances to Guatemala, as there is no official source of information. The country has a system for internally gauging aggregate remittance flows, which is fed with aggregate figures provided by private banks.

6

# 5. Effectively addresses the mobility dimensions of crises

### 5.1.  Migration governance: Examples of well-developed areas

The Government has an emergency plan for managing large movements of people in times of crisis. In 2017, the National Disaster Reduction Coordination Office (CONRED) issued the National Response Plan (PNR) which covers the entire resident population in Guatemala, irrespective of migration status.

The country has communication systems for receiving information regarding the evolution of a crisis, communicating the needs of the population and providing information on ways of accessing assistance. Public alerts are effected using a colour-coded system (from green to red) that is declared by CONRED, addressed to the population at large irrespective of migration status, and describe specific activities. Alerts are transmitted by radio, telephone, television and the Internet.

The Government has arrangements in place to assist Guatemalan nationals abroad in times of crisis (through consular assistance). For example, there is a call centre in Guatemala that offers assistance and provides information regarding consular protection for Guatemalan citizens living abroad. The registration of nationals residing abroad takes place on a voluntary basis. The number of Guatemalans abroad is estimated on the basis of consular actions as reported by the consular services.

The Ministry of Foreign Affairs has furthermore instructed its consular and diplomatic missions accredited abroad to draw up contingency plans to serve as action guidelines for the protection of the migrant Guatemalan population in crisis situations. There are currently 73 contingency plans.

### 5.2.  Areas with potential for further development

The Government has a disaster response strategy (the PNR), though it contains no provisions addressing migration and displacement issues. The standards for disaster reduction also do not specifically address the migrant population, but are generally intended to benefit everyone.

Guatemala has no strategies for dealing with migration flows triggered by the adverse effects of environmental degradation or climate change (planned resettlement programmes, for example), nor are there any reports published on climate change adaptation plans.

The national development policy "K'atun Nuestra Guatemala 2032" (K'atun 2032 National Development Plan) does not address measures relating to displacement (for example, provisions on refugees, internally displaced persons or the reintegration of migrants returning voluntarily or involuntarily).

# 6. Ensures that migration takes place in a safe, orderly and dignified manner

### 6.1.  Migration governance: Examples of well-developed areas

There is an entity in Guatemala specifically tasked with comprehensive border control and security. The Guatemalan Migration Institute is currently in transition from being a department of the Ministry of the Interior and is responsible for controlling, and for verifying and ensuring that nationals and immigrants are able to enter, remain on, as well as exit Guatemala territory. Besides, border control personnel receive specific and regular training.

The Guatemalan Government has a website operated by the DGM, which lays out residency and visa options in a clear and easily understandable manner.

7

Similarly, with IOM assistance, the Guatemalan Government has improved its systems for receiving returnees, whether adults, children or adolescents. For example, a facility has been set up at La Aurora International Airport to receive unaccompanied migrant children and adolescents as well as returning families and better streamline the assistance provided following their return. As pertains to reintegration, the Returned Migrants Entrepreneurship Programme helps returnees find employment.

The Secretariat against Sexual Violence, Exploitation and Trafficking of Persons (SVET) is Guatemala's steering, coordinating and advisory body in matters of prevention, attention, prosecution and punishment of the crimes of sexual violence, exploitation and human trafficking. In the framework of the Inter-Agency Commission against Trafficking in Persons (CIT), the SVET compiles statistical information regarding preventive action as well as the care and repatriation of victims of human trafficking. Besides, the SVET receives monthly statistics on human trafficking from the Office of the Public Prosecutor, the Judiciary, the National Civil Police and the Attorney General of the Nation. At the regional level, Guatemala forms part of the Regional Coalition against Human Trafficking, which comprises Belize, Costa Rica, the Dominican Republic, El Salvador, Guatemala, Honduras, Nicaragua, Mexico and Panama.

National statistical data on human trafficking is also shared in this regional technical forum pertaining to the aspects of prevention, attention, and repatriation of victims as well as the prosecution and punishment of this crime.

## 6.2.    Areas with potential for further development

The Government of Guatemala has improved its process of registering and providing immediate care for returnees both in reception centres and by creating training centres under the *Quédate* (Stay) programme being run by the Social Welfare Secretariat (SBS). These centres provide technical training for returning adolescents or those at risk of migrating, offering them tools and opportunities for becoming employable or self-employed in their departments of origin. Nevertheless, much remains to be done with respect to reintegration in the territories. This is crucial, as it empowers and protects returnees by giving them the tools and the assistance needed to become socially reintegrated in their country of origin.

Besides, there is no official programme or special government policy in Guatemala designed to attract people who have emigrated by encouraging them to return voluntarily. As things stand, this issue has so far had a very low profile on the Government's agenda.

8

## Key sources

Inter-American Development Bank (IDB)

   2017   The IDB Group is contributing US$750 million for key infrastructure projects in the Northern Triangle. Available from: https://www.iadb.org/es/noticias/comunicados-de-prensa/2017-06-14/triangulo-norte-en-iniciativa-de-infraestructura%2C11824.html

Congress of the Republic of Guatemala

   N.d.   Decree 114-97, Executive Branch Organic Law. Available from: http://www.wipo.int/edocs/lexdocs/laws/es/gt/gt009es.pdf

   2018   Ministerial Agreement 10-2018. Available from: https://goo.gl/tTebKL

   2016   Migration Code. Available from: www.acnur.org/fileadmin/scripts/doc.php?file=fileadmin/Documentos/BDL/2017/10978

   2016   Congress of the Republic of Guatemala, Political Constitution of the Republic of Guatemala. Available from: http://MGI.gob.gt/marco-legal/

   2009   Law against trafficking in persons 9-2009 Chapter VI. Available from: http://svet.gob.gt/leyes/ley-contra-la-violencia-sexual-explotaci%C3%B3n-y-trata-de-personas

   2005   Amendments to the National Migration Law, Decree 10-2005. Available from: https://goo.gl/rjDuwP

   2003   Decree 1441 Labour Code of Guatemala. Available from: http://biblioteca.oj.gob.gt/digitales/36036.pdf

   2003   Regulations on work permits for foreign nationals GOVERNMENT DECISION No. 528. Available from: https://goo.gl/XQ3dbA

   1998   Migration Law, No. 95-98. Available from: https://goo.gl/MR74cx

National Disaster Reduction Coordination Office

   2017   National Response Plan (PNR). Available from: https://conred.gob.gt/site/documentos/planes/Plan-Nacional-de-Respuesta.pdf

Government of Guatemala

   2016   CONRED, Standards for disaster reduction. Available from: https://conred.gob.gt/site/Normas-para-la-Reduccion-de-Desastres

   2016   Decree 274-2016 on Regulations governing voting abroad. Available from: http://www.tse.org.gt/images/Acuerdos2016/274-2016.pdf

   2016   Office of the Public Prosecutor, Gender Policy. Available from: https://www.mp.gob.gt/noticias/politica-de-genero/

   2014   National Development Policy – K'atun 2032. Available from: http://www.katunguatemala2032.com/

9

DHSFF0213

2008   National policy for the promotion and integral development of women (PNPDIM) and Equal opportunity plan 2008-2023 (PEO). Available from: https://goo.gl/uyYhSJ

International Organization for Migration (IOM)

2006   Derecho Internacional sobre Migración N°7 - Glosario sobre Migración. Available from: http://publications.iom.int/system/files/pdf/iml_7_sp.pdf

10

DHSFF0214



# Comprehensive Regional
# Protection and Solutions Framework

**MIRPS**



DHSFF0215

# Index



## Part 1 ...................................................... 1

MIRPS: Regional Context and Comprehensive
Approach............................................................................ 1.1

National Chapters of  MIRPS Countries.................... 1.2

Belize

Costa Rica

Guatemala

Honduras

Mexico

Panama

## Part 2 ........ .............................................2

Contributions from Cooperation Actors................. 2.1

Contributions from Regional and International
Organisations and from Regional
Networks................................................................. 2.2

DHSFF0216

**NOTICE / DISCLAIMER:**

The present MIRPS document is a transcript of the national chapters and comments to general chapters sent by the countries that are part of the MIRPS process, as well as the contributions of other countries, organizations, institutions and regional and international organizations at the close of Thursday 20 October 2017.

Following the celebration of the San Pedro Sula Conference on October 26, 2017, the content of the chapters or contributions could be modified and revised by the entities and States concerned in order to update content and / or modify the proposed action plans.

The most up-to-date version of the document will be available on the website www.mirps-hn.org

# PART 1



UNHCR / Tito Herrera

DHSFF0218

# 1.1. MIRPS: Regional Context and Comprehensive Approach



DHSFF0219

# Regional Context

A large scale movement of people has been registered in North and Central America; the reasons for their leaving are multiple and complex, including socioeconomic factors as well as violence and insecurity – mainly caused by organized crime –, forcing populations to move both inside and outside of the region. In recent years, a significant increase in the number of asylum seekers, refugees and other persons in need of international protection has been noted. All countries in the region have been affected – as countries of origin, transit, asylum and/or return; and sometimes all these at the same time – and that is why protection responses have been provided on both national and regional levels. This increase in forced displacement has led to the adoption of numerous commitments such as the 2014 Brazil Declaration and Plan of Action and the 2016 San José Action Statement in order to strengthen protection and encourage solutions for those affected, addressing the underlying causes through the promotion of a stable environment that guarantees safety, economic development and prosperity. This regional response requires collaboration from other stakeholders, along with support from the international community, to ensure the effectiveness of the responsibility sharing arrangements.



# The New York Declaration and the Global Compact on Refugees

In the New York Declaration on Refugees and Migrants, adopted in the High-level Plenary Meeting on Addressing Large Movements of Refugees and Migrants, held in the seventy-first session of the UN General Assembly in September 2016, the States reaffirmed the relevance of the international and regional protection systems; ratified their commitment to protecting persons who have been forced to flee from violence and persecution; and committed to supporting the countries of origin in addressing the underlying causes of displacement and re-establishing suitable conditions for the dignified and safe return of their citizens. They also recognised the need to develop a more equitable and predictable global approach to address large movements.

Annex I of the New York Declaration calls for the creation of a Comprehensive Refugee Response Framework (CRRF). The objective of the CRRF is to mobilise from the very beginning a wide range of relevant stakeholders including States, national and regional organisations, the United Nations system, international and regional financial institutions, the private sector, civil society and the affected populations.

This comprehensive response is focused on four priority areas: (i) improving reception and admission mechanisms; (ii) offering a timely response to the basic immediate needs of the population (at the humanitarian and protection levels); (iii) supporting host countries and communities; and (iv) expand opportunities for durable solutions.

The CRRF proposes the participation of multiple stakeholders through greater coordination and it recognises the important role that they could and should play in responding to a situation of displacement. Furthermore, it proposes closer collaboration with development agencies from the start. This approach is fully in line with the Sustainable Development Goals of the 2030 Agenda – with its commitment to leaving no-one behind – and with the shared responsibilities agreed upon in the World Humanitarian Summit 2016 and the national development programmes.

In the New York Declaration, the General Assembly of the United Nations invited the United Nations High Commissioner for Refugees to include a proposal for a Global Compact on Refugees in his annual report to the General Assembly in 2017, for consideration at its seventy-third session. This Global Compact will be based on the application of the CRRF in the different regions – including Central America and Mexico. As part of this process, the UNHCR will support the States in the realisation of broad consultations and practical initiatives for the implementation of the CRRF, to be carried out over 2017 and 2018.



UNHCR / Boris Heger

# Regional Cooperation and Solidarity Processes

En las Américas existe una larga tradición en cooperation in the Americas. In December 2014, the governments of Latin America and the Caribbean held a meeting in Brazil to celebrate the 30th anniversary of the 1984 Cartagena Declaration on Refugees. On that occasion, 28 countries and 3 territories from Latin America and the Caribbean adopted the Brazil Declaration and Plan of Action, establishing a broad set of operational priorities for the protection of refugees, asylum seekers, internally displaced persons and stateless persons in the Americas. There was also a specific chapter on "Solidarity with the Northern Triangle of Central America in Seeking and Implementing Durable Solutions."

Subsequently, in July 2016, Costa Rica hosted the High-Level Round Table – organised by the UNHCR and the General Secretariat of the Organisation of American States (OAS), with support from the Central American Integration System (SICA, by its acronym in Spanish) – with the aim of promoting new opportunities for strategic cooperation to address the needs for protection in Central America. The "San José Action Statement" establishes a series of commitments from the States and other relevant stakeholders to respond to the multiple dimensions of the situation, including prevention, addressing the structural causes, protection in the countries of origin and international protection for asylum seekers and refugees, from a perspective of solidarity and shared responsibility on a regional level.

The Brazil Declaration and Plan of Action and the San José Action Statement are considered important regional strategic frameworks for cooperation and shared responsibility in the promotion of regional solutions to the challenges of protection, which paved the way to the New York Declaration and the Global Compact.

DHSFF0222

There is a long tradition of regional cooperation in the Americas.

The Brazil Declaration and Plan of Action and the San José Action Statement paved the way to the New York Declaration and the Global Compact.



## MIRPS: visión and scope

In the New York Declaration, the States committed to applying this new comprehensive response framework and invited the United Nations High Commissioner for Refugees to engage with them and to consult with all relevant stakeholders with a view to evaluating the detailed practical application of the comprehensive refugee response framework. The objective would be to ease pressures on host countries, to enhance refugee self-reliance, to support the conditions in countries of origin and to expand access to third-country solutions.

By making use of their long tradition of regional cooperation in matters of protection, six countries of the region – **Belize**, **Costa Rica, Guatemala, Honduras, Mexico, Panama**– expressed before the High Commissioner their intention to work on a regional, practical and detailed application of the CRRF through the adoption and implementation of a "Comprehensive Regional Protection and Solutions Framework (MIRPS, by its acronym in Spanish).

The goal of the MIRPS is to make existing commitments operational and to promote new initiatives to address situations of displacement from a comprehensive and regional approach – linked with countries of origin, transit and destination – and involving a wide range of relevant stakeholders on a regional, national and international level.

In this respect, through the Declaration of San Pedro Sula, the countries agreed to take part in the Comprehensive Regional Protection and Solutions Framework (MIRPS), understood as a dynamic and collaborative process – as reflected in this practical, detailed and living document. They also committed to the adoption and implementation of their respective national chapters. Furthermore, participating countries confirmed their intention to work together to strengthen regional cooperation and shared responsibility mechanisms, with participation from all the relevant stakeholders.

As stated in Annex I of the New York Declaration, the MIRPS will be presented as a detailed practical application of the region in the development of the Global Compact on Refugees.

Therefore, in the spirit of the New York Declaration for Refugees and Migrants, the Comprehensive Regional Protection and Solutions Framework will have the following scope:

- ≠ **STRENGTHEN** the national and international protection systems in all MIRPS countries;
- ≠ **ENGAGE** development actors in the prevention, assistance and solutions of displacement;
- ≠ **STRENGTHEN** shared responsibility mechanisms between the stakeholders taking part in the MIRPS;
- ≠ **PRIORITISE** prevention, protection and solutions programmes for countries of the region in the bilateral and multilateral cooperation agenda;
- ≠ **ESTABLISH** spaces for coordination, monitoring and the exchange of good practices within the framework of the OAS and other regional forums; and
- ≠ **DOCUMENT** the lessons learned and good practices of this process and other previous processes of shared responsibility, in order to inform the construction process of the Global Compact



UNHCR / Tito Herrera

# Methodology and Consultation Processes

The MIRPS is a process led by the States and based on the regional dynamics and the existing commitments of each country, including those acquired in the Brazil Plan of Action and the San José Action Statement. Additionally, the MIRPS is based on the collective realisation that the region is facing a changing reality with shared elements, challenges and priorities.

On a national level, each country participating in the MIRPS developed a National Action Plan that identifies a series of specific and executable actions within the four pillars of the CRRF in the 2018 to 2020 period. These include an analysis of the scopes and challenges and they also identify the programmes, priority actions and the resources needed to:

≠ **Strengthen** the reception, protection and care systems,
≠ **Promote** prevention measures, and
≠ **Enhance** comprehensive and durable solutions.



## Methodological Phases in National Plans

**#1**
Participatory assessments with the affected popualtion to identify gaps and opportunities in terms of protection and solutions.

**#2**
Mapping of existing programmes and policies on prevention, protection and solutions in order to identify gaps and define priorities.

**#3**
Definition of strategic axes that include public policy proposals, programmes, actions and, in certain cases, necessary resources.

DHSFF0225

Government-led coordination mechanisms were established in these consultation processes which had ample participation from State institutions (those concerned with matters of protection and socio-economic insertion), civil society, the United Nations System (led by the Resident Coordinators), the private sector, as well as asylum seekers, refugees, displaced and/or deported persons in need of international protection.

Depending on the characteristics of each country, these plans focused on asylum seekers, refugees, internally displaced persons, deportees in need of protection and also the population affected by violence and insecurity.

The MIRPS is a living document and work will continue on the development of various strategic core ideas, on the definition of programmes and actions, and also on the quantification of needs and responses. In this respect, the San Pedro Sula Regional Conference will serve as a space for the exchange of good practices between the States and other relevant stakeholders, in order to complete and perfect the MIRPS over the course of 2017 and 2018.

In the spirit of encouraging wide participation from society and the international community, **specific annexes** with specific proposals from relevant stakeholders on a regional and international level will be developed.

*From April 2017, a series of national consultations for the MIRPS began in the countries involved: Belize, Costa Rica, Guatemala, Honduras, Mexico and Panama.*



# Towards a regional cooperation framework:
## Strategies and prioritized actions

In the MIRPS national consultation processes, a series of strategies and prioritized actions were identified that coincide in several national chapters.

These strategies and common actions fit into the 4 axes of the Annex I of the New York Declaration. Therefore, they can serve as a basis to develop complementary regional initiatives on protection and exchange mechanisms for good practices. They can also facilitate the support of bilateral and multilateral cooperation for regional projects on prevention, protection and solutions.

Below are some of the strategies and prioritized actions that are highlighted in several National Chapters:

## Axis 1
### Reception & Admission

Strengthen the capacity to identify and refer people in need of international protection in border areas

Provide individual documentation to asylum seekers and refugees

Support existing programs of identification and reference of returnees

Provide alternatives to the detention of asylum seekers, and ensure no penalty for irregular entry

## Axis 2
### Immediate and persistent needs

Provide humanitarian assistance and income generation projects for refugees and asylum seekers

Provide humanitarian assistance and reintegration projects for returnees in need of international protection

Provide humanitarian attention and legal guidance to people with protection needs in transit

### TRANSVERSAL

*Ensure population participation through assesments and consultations*

*Improve data collection according to age, gender, nationality and needs*

*Promote legal and institutional protection frameworks*

*Promote coordination forums between state institutions and other relevant actors*

*Strengthen protection systems for women, girls and other groups at risk*

*Quantify needs and assign budgets to attend affected population*

## Axis 3
### Support to host countries and communities

Promote policies and programs to support communities that receive asylum seekers and refugees

Strengthen the institutional response and coordination with local actors, civil society and the private sector in areas that receive refugees and asylum seekers

Prioritize communities affected by violence in national development plans

Promote institutional presence and protection and prevention mechanisms in communities affected by violence.

## Axis 4
### Expand opportunities for durable solutions

Promote specific public policies for refugees, returnees and displaced persons

Include refugee, returnee and dispalced populations in existing programs

Facilitate self-sufficiency projects for refugees, returnees and displaced persons

DHSFF0227

**TO HIGHLIGHT THE IMPORTANCE OF ENCOURAGING AMPLE PARTICIPATION FROM SOCIETY AND THE INTERNATIONAL COMMUNITY, SPECIFIC PROPOSALS WILL BE INCLUDED FROM RELEVANT STAKEHOLDERS ON A REGIONAL AND INTERNATIONAL LEVEL**

## BILATERAL COOPERATION

One of the objectives of the MIRPS is to strengthen South-South cooperation and international cooperation. As a result, proposals from the States and the relevant stakeholders that have and continue to manifest their commitment to increasing cooperation with the region will be included. This cooperation may reflect through financial commitments or technical support for one or more of the priority plans of MIRPS countries, whether this is on a national or a regional level. Said countries may also present specific programmes for the resettlement of persons in need of protection, as well as complementary forms of protection and solutions, such as humanitarian visas, the Protection Transfer Arrangement, assistance in family reunification and other means to promote orderly, safe and regular migration.

## REGIONAL AND INTERNATIONAL ORGANISATIONS

In order to strengthen this regional and comprehensive dynamic, various regional and international organisations have joined this process. They have developed multilateral proposals in support of the existing national plans as well as regional initiatives from the States and the civil society. These proposals include support programmes in prevention, protection, care and solutions, which must be implemented in the countries participating in the MIRPS.

## REGIONAL NETWORKS FOR PROTECTION AND ASSISTANCE

Similarly, invitations to participate in the process have been extended to relevant society stakeholders who operate within regional networks. These regional networks will present operational proposals in protection and care for refugees, asylum seekers, internally displaced persons and deportees in need of protection, as well as other affected populations. These proposals have regional coverage and will be implemented in countries of origin, transit, destination and return.

# 1.2 National Chapters of MIRPS Countries



UNHCR / Tito Herrera

DHSFF0229

# Belize





UNHCR / Daniele Volpe

DHSFF0230

# Introduction

Belize has a rich history of ensuring refugee protection and solutions for persons fleeing persecution. During the 1980s and 90s, Belize experienced a significant inflow of refugees from Central America due to civil wars ravaging the region. Although a young nation itself, Belize—with the support of the international community, most notably through the CIREFCA initiative[1]—managed to respond to the situation in a manner that provided comprehensive protection and solutions.

Refugees who believed it was safe to return home were able to do so voluntarily, while Belize incorporated integration options for those who decided to stay. Belize allowed refugees to naturalize—ensuring durable solutions and paving the way for these persons to contribute to Belize's economy and society. After ensuring this solution, Belize downsized its asylum processes at the end of the 1990s, while the national Refugees Act remained valid and one officer at the Immigration Department was tasked with receiving asylum applications.

When increasing levels of violence started to affect its neighboring countries of the north of Central America in the 2010s, Belize began to experience a new wave of persons seeking the safety of its borders. To better respond to the new arrivals, Belize reinitiated its Refugee Eligibility Committee in mid-2015, and reestablished the Refugees Department a year later. Both organs have engaged in significant capacity building exercises and have allowed Belize to illustrate its continuing commitment to providing refugee protection.

In this context, and illustrative of the country's desire to increase engagement in international cooperation on these critical issues, Belize participated in a number of international and regional forums related to refugee protection, including the Brazil Declaration and Plan of Action (2014) and the San Jose High-Level Roundtable (2016). Importantly, in the context of the San Jose Action Statement, Belize expanded further on the core statement regarding root causes, refugee protection, and regional cooperation, by committing specifically to:

- *Continue recognizing the historical and current humanitarian efforts offered to refugees of Central America in the provision of a safe haven from displacement due to insecurity and violence in their countries of origin;*
- *Strengthening, through cooperation and collaboration with UNHCR and other stakeholders, the Refugee Eligibility Committee for the Protection of Refugees and national officials in charge of reviewing asylum applications and ensuring the protection of refugees;*
- *Continue working with all stakeholders in order to address the protection needs of refugees in a collective manner from a regional approach;*
- *Strengthening efforts to build technical capacity and institutional strengthening at our main points of entry;*

[1] CIREFCA is the Spanish acronym for the International Conference on Central American Refugees, Returnees and Displaced Persons. This regional initiative was established to create and encourage durable solutions to the widespread forced displacement that occurred due to the civil wars in Central America in the 1980s.

DHSFF0231

≠ *Continue making efforts to implement an effective asylum system, including by participating in the Quality Assurance Initiative for refugee status determination;*

≠ *Fostering dialogue towards the formulation of coordinated efforts and mechanism, under the principle of responsibility-sharing, in regional and hemispheric forums.*[2]

The Government welcomed UNHCR's return to Belize with a permanent presence in 2016, and has appreciated the close cooperation and coordination, including technical, financial, and capacity building support.

Over the past two years, persons of concern have been engaged through consultation processes to better understand their experiences, and to map out the current services and activities that exist for persons of concern, as well as the gaps and needs that remain. Belize and its international partners have carried out formal and informal assessments in various refugee-hosting communities. The concerns and issues raised in these sessions have been communicated to the relevant authorities of the Government of Belize. Moreover, Belizean authorities (most notably the Refugees Department and Ministry of Human Development) have continued to engage in one-on-one case handling of persons of concern, which has provided the Government with additional insights into the issues of concern to asylum-seekers and refugees.

Within the context of the CRPSF, on October 10, 2017, Belize held a national consultation—hosted by the Ministry of Immigration, with the support of UNHCR. The consultation comprised approximately 25 persons representing various Government departments (Foreign Affairs, Education, Health, Police/Intelligence, Immigration, Labor, and Attorney General's Office), the Ombudsman, UNDP, the clergy, civil society, academia, and persons of concern.

The prioritization of the issues discussed in the consultation remains a work in progress. However, some of the issues which are agreed by all to be of concern, are described herein.

---

[2] *San Jose Action Statement*, of the High Level Round Table "Call to Action: Protection Needs in the Northern Triangle of Central America," *Accompanying Statements to the San Jose Action Statement*, p. 4, available at: http://www.refworld.org/docid/57a8a4854.html (listing Belize's particular commitments).

# Protection and Solutions: Overarching Gaps and Needs

Belize has a positive legislative framework that generally provides for the legal protection of refugees. Moreover, the Government has recently participated in and made commitments within international and regional forums to ensure even greater protections for persons of concern. Belize now welcomes the opportunity to complement the existing protections and gaps, as identified through the various consultations, through the CRPSF framework and international cooperation to take advantage of these opportunities to ensure full implementation of international human rights and refugee principles to guarantee protection and solutions for all persons of concern.

The stocktaking of Belize's current refugee protection scheme is a work in progress that will continue to be updated. Refugees generally have legal rights to access a panoply of social services that are offered to the population at large, including education and health. The reality of implementation is more complicated, however. Further sensitization of relevant authorities and mechanisms for ongoing collaboration on refugee concerns are needed to ensure full inclusion of persons of concern into social services, thus guaranteeing access to protection and solutions. Given this scenario, one priority action of the Government will be to ensure that future consultations are held and that ongoing comprehensive coordination mechanisms are created to ensure proper follow up and monitoring of these issues.

Belize has harnessed its regional "Multi Sectoral Development Framework" under the Agenda 2030, the MSDF, by including and mainstreaming a number of refugee and migration related activities in pursuit of various Sustainable Development Goals, which apply regardless of a person's migration status. In order to "leave nobody behind," Belize has notably committed to specific action under several Sustainable Development Goals,, as reflected in the recently adopted MSDF Country Implementation Plan for 2017. Further development and implementation of these plans will be ongoing

As a result of the robust discussions during the national consultation held on October 10, the multi-stakeholder group was able to determine a number of points of general agreement. While detailed gaps and needs are more fully discussed in the recommendations section, herein, the description of needs in all four pillars were cross-cutting, falling within these broad categories. The group determined that there is a need for:

≠ greater knowledge about persons of concern and their needs, including through carrying out a mapping or profiling process, and other data collection procedures that will provide better support for public policy creation and other protection and solution responses;

≠ wider sensitization, information-sharing, and capacity-building, including with persons of concern, Government

DHSFF0233

agencies, other stakeholders, and the general public;

≠ development of comprehensive multi-sectoral public policies on refugees (ensuring access to education, health, and other basic rights) and creating coordination mechanisms between relevant Ministries/Departments and UNHCR to ensure better cohesion and responsiveness to the needs of refugees; and

≠ greater engagement with other countries in the region, particularly other asylum countries, to share best practices on protection, facilitation of integration, protection-sensitive security protocols, responsibility-sharing, and other themes of relevance



UNHCR / Daniele Volpe

DHSER0234

# Protection and Solutions: Recommendations and Plan of Action

In addition to gaps acknowledgement and recommendations within each of the four pillar areas, the consultation identified several overarching issues and related recommendations/agreements that could be utilized to move forward in Belize's plan of action even while ongoing discussions continue.

**OVERARCHING RECOMMENDATIONS FOR PLAN OF ACTION:**

≠   Belize will work to complete stocktaking of existing programmes and activities to address protection and solutions needs, and will continue engaging in regular organized consultations with UN and civil society on refugee protection and solution issues.

≠   To continue this national dialogue, a next round of consultations will be held within the first quarter of 2018, to take stock and follow-up on the outcomes of the national consultation and to prepare a multi-annual National Action Plan for Protection and Solutions for refugees.

≠   Belize will engage with other CRPSF States to exchange information and discuss responsibility-sharing, best practices, and other opportunities for protection improvements in the areas outlined above;

≠   Belize will support protection-sensitive mapping and data collection opportunities, and the consider the public policy recommendations that arise from such efforts;

≠   Belize will consider joining the Quality Assurance Initiative (QAI) in order to promote strengthening of its asylum process, in line with the commitment made at the San Jose high-level roundtable in 2016; and

≠   Capacity building and public information of all stakeholders will be prioritized, to include all relevant authorities, persons of concern, and sensitization of the public at large.



UNHCR / Daniele Volpe

In addition to the overarching priorities identified through the national consultation process, additional protection gaps and general recommendations were identified in each of the four areas of the CRPSF pillars.

## PILLAR I: RECEPTION AND ADMISSION MEASURES

This pillar refers to the admission to territory and to asylum processes. Gaps have been identified in both areas, and solutions and needs were discussed to rectify these concerns. Some of the main points acknowledged include needs for:

≠ Further sensitization of and capacity building for Government authorities at all levels, with an initial prioritization of those who are the gatekeepers to accessing territory and asylum processes, respectively;

≠ Incorporation of protection-sensitive screening protocols that ensure the security of Belize while safeguarding the rights and protection of persons of concern;

≠ Provision of regular and comprehensive information to persons of concern about their rights and obligations, particularly in relation to admission to territory and asylum processes;

≠ Adoption of clear SOPs for referral pathways from the point of entry to territory throughout the asylum process, and for access to related rights; although potentially encompassing other Ministries/Departments, this would initially include Immigration, Police, Refugees Department, and Human Development authorities;

≠ Creation of a data collection and analysis system that includes regular transparent reporting on border admissions and rejections for persons claiming to have a fear of return; as well as data sharing by the Refugees Department on persons who applied for asylum, and those who were rejected from application due to administrative deadlines or other screening rationale; and

≠ Consideration of participation in the Quality Assurance Initiative (QAI), in line with the commitment made at the San Jose high-level roundtable in 2016.

## PILLAR II: SUPPORT FOR IMMEDIATE AND ONGOING NEEDS

Areas of concern in this pillar include issues relating to the immediate provision of social assistance to persons of concern, as well as allowing for access to livelihoods options to provide for immediate self-sustainability, and greater integration opportunities. Discussions in this area identified needs for:

≠ Closer collaboration with the international community and other donors to create development opportunities that will allow quicker and more robust opportunities for refugee integration;

≠ Ensuring closer coordination mechanisms between Government Ministries and Departments to ensure asylum-seekers can access all benefits to which they are entitled – including education, health, and other relevant social services.

## PILLAR III: SUPPORT FOR HOST COUNTRIES AND COMMUNITIES

This pillar incorporates issues such as burden-sharing among communities hosting persons of concern, as well as crime

prevention, and creating resilience of communities. Needs in this area included:

≠ Supporting the implementation of mapping and data collection opportunities to ensure that persons of concern and host communities are analyzed and their needs and opportunities are identified;
≠ Greater engagement in public information campaigns, providing accurate and holistic information, in order to sensitize the general population to the reality of refugees and their contributions/ needs in Belize;
≠ Ensuring that development planning fully incorporates the needs of these communities and persons of concern, including education, health, and other public services;



UNHCR / Daniele Volpe

## PILLAR IV: ENHANCED OPPORTUNITIES FOR DURABLE SOLUTIONS

The most relevant durable solution, at this time, would be local integration, given the lack of safety in the main countries of origin of the refugee population. Resettlement may also be a possibility in some situations of vulnerabilities or specific protection concerns. Needs identified in this area include:

≠ Supporting more comprehensive integration and contribution opportunities, including ensuring access to work authorization and livelihoods, such as education opportunities, language learning, and other skills training;
≠ Ideally within the context of the QAI, ensuring an even more fair and efficient refugee adjudication system so persons of concern receive legal certainty more quickly, and they can be fully supported on the path to integration;
≠ Greater engagement in communication with counterparts in the international community to secure options for resettlement for urgent protection or vulnerable cases, and consider additional responsibility-sharing in the future, including resettlement or other complementary pathways.

Belize is committed to continuing to support the CRPSF process and looks forward to the opportunity to engage further with its regional and international partners to respond to the needs inherent in full implementation of these important protection and solutions opportunities

# Costa Rica





UNHCR / Ricardo Ramírez Arriola

# Introduction

Costa Rica has a long history of respecting human rights and welcoming refugees. Upon adopting the New York Declaration, the Government of the Republic confirmed its commitment to solidarity with refugees and on June 1, 2017 it decided to develop a national chapter of the Comprehensive Refugee Response Framework, known locally as MINARE.

In a single document, MINARE brings together and unifies national policies concerning refugees; identifying gaps and proposing solutions for a comprehensive and more efficient response to the situation of refugees in Costa Rica. The effective implementation of MINARE constitutes a model of protection and integration for urban refugees in middle-income countries in accordance with international law and best practices.

Pursuant to Annex I of the New York Declaration, MINARE was developed through a process of national consultations with the most relevant stakeholders. To that effect, the Vice-President of the Republic formed the **MINARE Executive Committee**, an ad hoc work team composed of the heads of five ministries that are key in attending to the refugee population in Costa Rica: the Ministry of Foreign Affairs and Worship (MRREEyC), the Ministry of the Interior and Police (MGyP), The Ministry of Labour and Social Security (MTSS), the Ministry of Human Development and Social Inclusion (MDHIS), the Ministry of Planning and Economic Policy (MIDEPLAN), with participation from

the Resident Coordinator of the United Nations System (UNS) in Costa Rica, and with support from UNHCR as the Technical Secretariat.

The primary responsibility of the Executive Committee was to appoint, within their respective ministries, focal points who might drive the national consultation process. This second work team was the **MINARE Technical Team**, formed of officials with knowledge of the subject matter and with good judgement to propose actions to strengthen Costa Rica's asylum system.

The National Consultations took place in two phases: first, a series of thematic meetings of the Technical Team raised the relevant topics and captured the State's outlook as regards the challenges facing the national asylum system. The second phase involved two extended consultation workshops with the various sectors of society and its objective was the proposal of inter-agency agreements with concrete actions to be implemented between 2018 and 2020.

The relevant topics were determined based on an analysis of Costa Rica's progress in the implementation of its commitments on an international level, particularly the Ministerial Inter-governmental Event on Refugees and Stateless Persons held in Geneva in 2011, the adoption of the 2014 Brazil Declaration and Plan of Action, the San Jose Action Statement (2016), the Leaders' Summit on Refugees (2016) and the New York

Declaration (2016). Also taken into consideration were the reports from the UNHCR partner agencies in Costa Rica on recurrent cases and the preliminary data for the pilot "Survey for Refugees in Costa Rica" which had a sample group of 310 questionnaires.

The national consultation workshops took place on July 27 and August 10, 2017 in San Jose, with participation from representatives of 11 Ministries, 13 autonomous institutions of the State, 7 civil society organisations, 4 agencies from the United Nations System, 3 chambers of commerce, 2 national universities and a confessional group – making a total of 95 participants. The work was organised into

three thematic roundtables: (1) legal matters and protection, (2) social affairs and vulnerable persons, and (3) integration and livelihoods. Each roundtable was lead by the corresponding leader in coordination with the relevant focal point in the Technical Team

The result of the national consultation was an inventory of 64 agreements for concrete actions which shape MINARE 2018 – 2020. The Government of Costa Rica will implement these agreements through greater inter-institutional coordination. The international community is also expected to help through greater technical and financial cooperation.



*64 agreements for concrete actions which shape MINARE 2018-2020*

UNHCR / Andrés Loor

# Protection and Solutions: Overarching Gaps and Needs

**COMMITMENTS MADE BY COSTA RICA**

Consistent with its tradition of guaranteeing human rights, Costa Rica has honoured the commitments it assumed in the various International Forums on the protection of refugees and stateless persons.

Pursuant to the adoption of the Brazil Plan of Action in 2014, the Government of Costa Rica (GCR) has worked hard to maintain the highest standards of protection for refugees and to implement innovative solutions for their integration in Costa Rica. In terms of public policies, the National Council on Migration agreed[3] to incorporate the principles and guidelines of the Brazil Plan of Action (BPA) into the 2013-2023 Comprehensive Policy on Migration for Costa Rica. The implementation of the BPA was materialised through a series of Memoranda of Understanding and in the implementation of work plans with UNHCR, the private sector, civil society and academia.

Since 2014, Costa Rica has been part of the *Quality Assurance Initiative* (QAI) regional programme, which aims to improve eligibility procedures, strengthen the capacity and knowledge of eligibility bodies, and introduce efficient concepts of management and handling of procedures. In practice, four QAI evaluation exercises have taken place: three with the Refugee

Sub-process as the first instance, and a fourth with the Administrative Migration Tribunal (TAM, by its in acronym Spanish) as the second instance for appeal. Furthermore, *Country of Origin Information* (COI) visits have been made with officials of the first and second instances. In accordance with the caseload, trips were organized to El Salvador, Honduras and Colombia.

Within the framework of the Borders of Solidarity and Safety Programme, and with support from UNHCR and the IOM, the GCR established two Migrant in Transit Temporary Care Centres (CATEM, by their acronym in Spanish) to cover the basic needs of persons in mixed migration flows. CATEMs have become a solid alternative to administrative detention and safe spaces for immediate care and relevant referral to the governmental instances for persons in need of international protection.

In line with the *Local Integration Programme*, two UNHCR initiatives have been developed in coordination with the GCR, civil society and the private sector in order to promote refugee access to the labour market and to livelihood projects for those who live in poverty. The "*Living Integration*" Programme is a corporate social responsibility scheme that encourages training, mentoring and job-placement plans for refugees.

The second initiative, "*The Graduation Approach*" is a mechanism that seeks to contribute to the self-reliance of refugees in situations of extreme poverty and it does so through their participation in various components: psychosocial support, creation of networks, generation of savings, temporary economic subsidies, improvement of soft skills, design of an action plan for the generation of livelihoods, vocational training and seed capital for cases of self-employment, among others. This programme was included in the 2015-2018 National Development Plan, strengthening the sustainability of the refugee integration programmes.

A Legal Integration Programme aimed at facilitating changes in migration status was developed so that refugees could become temporary residents or obtain naturalisation through more agile and relevant procedures.

As part of the efforts made in the implementation of Chapter IV of the BPA

and in support of the regional efforts to create alternative responses to the main protection needs of persons originating from northern Central American countries, the GCR, UNHCR and IOM signed a Memorandum of Understanding to establish a *Protection Transfer Arrangement*, through which Costa Rica is used as a transit country for those who have suffered violence in northern Central America and who have been identified for resettlement in a third country.

In turn, through the *Chiriticos Project* in collaboration with the Civil Registry of Panama and the *Northern Border Project*, the GCR has addressed the risk of statelessness through a joint work plan between the Civil Registry of Costa Rica and UNHCR for addressing the birth sub-register of indigenous populations and transnational migrants born in Costa Rica of foreign parents. The implementation of these projects will allow Costa Rica to be declared free from the risk of statelessness in 2018.



UNHCR/ Markel Redondo

DHSFF0242

The following table contains a summary of the specific actions that were driven forward by Costa Rica in the implementation of the commitments made by the country in the various international forums and which serve as the basis for MINARE and the national chapter of MIRPS..

| STOCKTAKING EXERCISE | |
|---|---|
| **PILLAR 1 – Reception and Admission** | |
| **Commitment** | |
| ≠   *Brazil Plan of Action* | |
| **Supervisors** | General Directorate of Migration and Aliens (DGME, by its acronym in Spanish), MGyP. |
| **Existing Activity** | In December 2015, the National Council on Migration incorporated the principles of the Brazil Plan of Action (BPA) into the Comprehensive Policy on Migration for Costa Rica. |
| **Commitment** | |
| ≠   Inter-ministerial 2011<br>≠   PA Chap. 2 *Quality Assurance Initiative*<br>≠   San Jose Action Statement (SJAS) | |
| **Supervisors** | Refugee Sub-process (First Instance for recommendation of applications), Administrative Migration Tribunal (Second Instance for appeals), Restricted Visas and Refugee Commission (CVRR, by its acronym in Spanish), Ministry of the Interior and Police. |
| **Existing Activity** | Implementation of Phases I, II and III of the QAI with first instances (Refugee Sub-process) and Phase IV with second instances (TAM). Monthly meetings with the Coordination Team of the eligibility bodies in the Process for Refugee Status Determination (Refugee Sub-process and CVRR - first instance -, TAM, MGyP with UNHCR support).<br><br>At the time of creating this document, an agreement has been made for the Refugee Appeal Division of the Immigration Refugee Board of Canada to visit the TAM from October 16 to October 26, 2017, as a bilateral programme for mentoring, training and the exchange of best practices facilitated by UNHCR. |
| **Commitment** | |
| ≠   *Inter-ministerial 2011*<br>≠   *BPA Chap. 2*<br>≠   *SJAS*<br>≠   *Leader's Summit on Refugees (2016)* | |
| **Supervisors** | Refugee Sub-process, TAM, Ministry of the Interior and Police |

| Existing Activity | Project for the reduction and prevention of delays in first and second instances through the additional assignment of specialist staff, with technical and financial support from UNHCR. |
|---|---|
| **Commitment** | |
| ≠ *Inter-ministerial 2011*<br>≠ *BPA Chap. 2 Quality Assurance Initiative* | |
| **Supervisors** | Refugee Sub-process, TAM, Ministry of the Interior and Police |
| **Existing Activity** | Country of Origin Information: compilation of country of origin information provided by UNHCR for the purposes of supporting asylum applications. Visits to countries of origin for sensitization of adjudicators and for obtaining first-hand information about the protection and safety situation in said countries. Two visits were made to Colombia, two to Honduras and one to El Salvador, with adjudicators from the Refugee Sub-process, Refugee Commissioners and TAM Judges. All of this resulted in resolutions that are fairer and conform better to international protection standards, as well as a significant increase in recognition rates. |
| **Commitment** | |
| ≠ *Inter-ministerial 2011*<br>≠ *BPA Chap. 2*<br>≠ *QAI Programme*<br>≠ *SJAS* | |
| **Supervisors** | General Directorate of Migration and Aliens, National Council on Migration. |
| **Existing Activity** | Directive from the National Council on Migration so that all DGME employees include age, gender and diversity (AGD) and Sexual Orientation and Gender Identity (SOGI) perspectives in their daily work. |
| **Commitment** | |
| ≠ *Inter-ministerial 2011*<br>≠ *BPA Chap. 2*<br>≠ *SJAS*<br>≠ *Leader's Summit on Refugees (2016)* | |
| **Supervisors** | General Directorate of Migration and Aliens, HIAS |
| **Existing Activity** | The presence of two border control officials for the early identification of persons in need of international protection, the application of categorisation forms and the scheduling of interview appointments in the Refugee Sub-process. |
| **Commitment** | |
| ≠ *Inter-ministerial 2011*<br>≠ *BPA Chap. 6 Statelessness* | |

DHSFF0244

| | |
|---|---|
| | ≠   *San Jose Action Statement* |
| **Supervisors** | Civil Registry of Costa Rica, the Municipalities of Tarrazú, León Cortes and Dota – Electoral Tribunal of Panama.<br><br>Ministry of Foreign Affairs and Worship |
| **Existing Activity** | The Chiriticos Project and the Northern Borders Project: facilitating the late registration of births for indigenous populations and transnational migrants born in Costa Rica of foreign parents.<br><br>The Ministry of Foreign Affairs and Worship manages the administrative statelessness determination procedure. |

## PILLAR 2 – Immediate and ongoing needs

| | |
|---|---|
| **Compromiso** | |
| | ≠   *Inter-ministerial 2011*<br>≠   *BPA Chap. 2*<br>≠   *Borders of Solidarity*<br>≠   *SJAS* |
| **Supervisors** | DGME, National Institute for Women (INAMU, by its acronym in Spanish), Ministry of Health (MINSAL, by its acronym in Spanish), Municipality of La Cruz, IOM, Permanent Commission for the Protection and Assistance of Vulnerable Migrants (COPPAMI, by its acronym in Spanish). |
| **Existing Activity** | Continuous training for governmental border officials in human rights, international protection, international and national refugee law, gender-based violence prevention and response, HIV prevention, prevention and response to cases of the trafficking of undocumented migrants and human trafficking. |
| **Commitment** | |
| | ≠   *BPA Chap. 2*<br>≠   *Borders of Solidarity*<br>≠   *SJAS* |
| **Supervisors** | MGyP, DGME, Ministry of Health, National Commission of Emergencies (CNE, by its acronym in Spanish), Red Cross, IOM, UNHCR |
| **Existing Activity** | Establishment of two Migrant in Transit Temporary Care Centres (CATEMs) as an alternative to administrative detention in response to the increasing mixed migration flows. |
| **Commitment** | |
| | ≠   *Inter-ministerial 2011*<br>≠   *SJAS*<br>≠   *BPA Chap. 3.* |

| | |
|---|---|
| **Supervisors** | Joint Social Aid Institute (IMAS, by its acronym in Spanish), UNHCR, DGME |
| **Existing Activity** | Memorandum of Understanding between IMAS and UNHCR for the inclusion of Populations of Interest (PoI) in national poverty reduction programmes, giving them the same rights as nationals, with dedicated staff for PoI |

| Compromiso | |
|---|---|
| ≠ BPA Chap. 3 Local Integration<br>≠ SJAS | |
| **Supervisors** | Ministry of Labour and Social Security (MTSS) |
| **Existing Activity** | Presidential Executive Decree for the inclusion of refugees as beneficiaries of the Social Development and Family Allocations Fund (FODESAF, by its acronym in Spanish) of the MTSS (2016). |

| Commitment | |
|---|---|
| ≠ BPA Chap. 3 Local Integration<br>≠ SJAS | |
| **Supervisors** | Ministry of the Presidency<br><br>DGME |
| **Existing Activity** | Memorandum of Understanding with support from the Social Presidential Council (2016) to facilitate refugees' access to national social development programmes (2016) |

| Commitment | |
|---|---|
| ≠ BPA Chap. 4<br>≠ SJAS | |
| **Supervisors** | CENDEROS |
| **Existing Activity** | Establishment of two shelters for survivors of gender violence and members of LGBTI communities from countries of northern Central America. |

## PILLAR 4 – Enhance opportunities for durable solutions

| Commitment | |
|---|---|
| ≠ BPA Chap. 3<br>≠ SJAS | |
| **Supervisors** | Ministry of Public Education (MEP, by its acronym in Spanish) - UNHCR |
| **Existing Activity** | Memorandum of Understanding for access to primary and secondary education and the recognition of qualifications (2014) for refugees and asylum seekers. |

| Commitment | |
|---|---|
| ≠ BPA Chap. 3<br>≠ SJAS | |
| **Supervisors** | National Institute for Apprenticeships (INA, by its acronym in Spanish) - UNHCR |
| **Existing Activity** | Memorandum of Understanding for access to vocational training and the certification of skills (2015) for refugees and asylum seekers. |

| Commitment | |
|---|---|
| ≠ BPA Chap. 3<br>≠ SJAS | |
| **Supervisors** | National Council of Rectors (CONARE, by its in acronym Spanish) |
| **Existing Activity** | Memorandum of Understanding for the equalisation of university studies from countries of origin (2015) |

| Commitment | |
|---|---|
| ≠ Inter-ministerial 2011<br>≠ SJAS<br>≠ BPA Chap. 3 | |
| **Supervisors** | Costa Rica Chamber of Commerce, DGME, the Fundación Mujer and the Association of Consultants and International Advisors (ACAI, by its acronym in Spanish) |
| **Existing Activity** | The Living Integration programme: a corporate social responsibility scheme for the integration of PoI into the local labour market through job opportunities, skills certification, and training. |

| Commitment | |
|---|---|
| ≠ BPA Chap. 3 Local Integration | |
| **Supervisors** | Ministry of Labour and Social Security (MTSS) |
| **Existing Activity** | Memorandum of Understanding for the integration of refugees in national employment programmes and vocational training (2017) |

| Commitment | |
|---|---|
| ≠ BPA Chap. 3 Local Integration<br>≠ SJAS | |
| **Supervisors** | MEP, Supreme Court of Elections (TSE, by its acronym in Spanish), Jesuit Service for Migrants |
| **Existing Activity** | Legal Integration Programme: an agreement with the TSE for making requirements for naturalisation more flexible.<br><br>Protocol for providing naturalisation exams for refugees. |

| Commitment | |
|---|---|
| ≠ *BPA Chap. 3 Local Integration*<br>≠ *SJAS*<br>≠ *Leader's Summit on Refugees (2016)* | |
| **Supervisors** | DGME, Ministry of Culture and Youth, Ministry of the Presidency, Ministry of Economy, UNHCR |
| **Existing Activity** | Project to promote the intercultural integration of refugees and cohabitation spaces with host communities. Among others, the Integrarte Festival, mass media campaigns and trade fairs. |

**GAPS IDENTIFIED BY THE MINARE NATIONAL CONSULTATION PROCESS**

Costa Rica has been making significant efforts to provide protection and solutions to persons in need of international protection such as refugees, persons in mixed migration flows, persons at risk of statelessness and stateless persons. However, in some cases these efforts may prove to be insufficient in the face of the challenges the country is facing due to the continued increase in new applications and the complexity of the economic and social dynamics that affect refugee integration. Furthermore, the challenges arising from the fiscal deficit have resulted in a government hiring freeze policy, which in some cases may compromise the sustainability of the responses made by each of the corresponding ministerial departments. Within the framework of MINARE, the aim is to put together national level comprehensive responses the following identified gaps:

Within the **"Reception and admission measures"** pillar, protection gaps were identified in the following aspects: early identification of people in need of international protection; effective access to the refugee status determination process; effective access to documentation and alternative mechanisms of international protection.

In Costa Rica, many of the people who enter through the border crossing points do not know about the refugee protection system. It is therefore necessary to take steps to identify and immediately register refugee status applications at the border crossing points; and to identify persons in vulnerable situations so that the assistance protocols can be applied and referrals to the relevant governmental institutions can be coordinated. If this is not done, there is a risk that proper and timely protection will not be provided to those who are entitled to it and in turn, the State loses the opportunity to exercise the corresponding controls.

In terms of effective access to the refugee status determination process, the adjudication times do not fulfil the provisions of the General Migration and Aliens Act and international standards, due to the continuous increase in asylum applications in combination with the current hiring freeze. In turn, applicants do not have access to free legal assistance from the State for refugee status determination processes or for second instance appeals, potentially limiting their right to a defence.

Applicants receive a free provisional document in accordance with international standards; however, based on current regulations said document must be handed back at the moment of filing an application. In practice, if the person made their application at the border, the document is received later after at least three appearances and this means that the applicant may be undocumented for a period of one to four months. The provisional document has an identification number corresponding to the file number assigned by the Refugee Sub-process. However, the number of digits in that number is not the same as in the Foreign Immigrant Identification Document (DIMEX, by its acronym in Spanish), making it incompatible with the computer systems used by public and private institutions, particularly banking systems. As a result, applicants do not have immediate access to the social programmes and services offered by the State and to which they are entitled by virtue of their status.

The refugee identity document is not an equivalent of the documentation provided to nationals as it is not free. As of October 2017, the document costs 68 USD per person. The same charge is applied to the bi-annual renewal process of said document and this is in addition to being up-to-date on payments to the Costa Rican Social Security Fund (CCSS, by its acronym in Spanish). This charge and administrative requirement, obligatory for refugees in order to obtain the document, may represent an obstacle for economically vulnerable refugees, with large and single-parent families being particularly affected. Additionally, the travel document for refugees, with the requirements and standards established by the International Civil Aviation Organisation (ICAO) is costly and therefore actions need to be put into place to make issuing it sustainable for the General Directorate of Migration and Aliens (DGME).

There are cases of people in Costa Rica who, despite not fulfilling the eligibility requirements for being recognised as refugees (i.e. their persecution has no causal link to any of the reasons of the 1951 Convention), cannot return to their country of origin because there is a reasonable possibility of them being harmed in doing so. Currently, there is no complementary protection mechanism in Costa Rica to respond to this type of situation. The General Migration and Aliens Act only regulates one special migration category for humanitarian reasons based on Article 94 Subparagraph 12, the granting of which is at the discretion of the DGME.

DHSFF0249

In **"Support for immediate and ongoing needs":** Costa Rica has solid legislation, institutions and public services to care for nationals in vulnerable situations and recognises that being an asylum seeker or a refugee can worsen existing vulnerabilities or create new ones.



UNHCR/TitoHerrera

Within the framework of the national consultations, a need to take actions with the following populations of refugees and applicants was identified: children, women, single-parent families, teenage mothers, persons in situations of economic vulnerability and/or extreme poverty, survivors of gender-based violence, the LGBTI population and persons in need of special care such as the elderly, disabled persons and persons with problematic use of psychoactive substances.

Gaps were identified in the following areas specifically: identification of populations of interest in public institutions of the social sector for the application of the relevant care protocols and ensuring access to national social programmes for the aforementioned groups and populations.

For the sake of gathering information in order to create care protocols that reduce at-window rejection and improve effective access to national services for refugees and asylum seekers, the statistics collection variable of said populations needs to be included in the information files of all social care institutions.

According to the Migration Authority, 59% of refugees in Costa Rica are women. Up until now, the National Institute for Women (INAMU) has provided support in isolated cases. However, there is no strategy for comprehensive care for women seeking asylum or for female refugees which provides access to the entire range of INAMU programmes. Said strategy should include care protocols for women, particularly those who are the heads of single-parent families, teenage mothers, survivors of gender violence and women who are in Care Facilities due to conflict with the law. Additionally, the need to create protection and integration mechanisms for LGBTI populations in countries of northern Central America was identified.

In the case of those in a situation of socio-economic vulnerability from among the population of refugees and asylum seekers, the need to offer comprehensive care programmes that go beyond the temporary care offered by UNHCR through its partner organisations was identified. Said programmes should aim at addressing immediate needs and also at establishing the basis of early and sustainable integration. Similarly, access to national programmes needs to be guaranteed for refugees with special care needs, such as the elderly, disabled persons and persons with problematic use of psychoactive substances.

In the **"Development of opportunities to reach durable solutions"** pillar, gaps were identified in: access to the right to work, support for refugee entrepreneurship, socio-cultural integration programmes and access to decent housing.

With regard to accessing the right to work, applicants reported constant difficulties in the effective recognition of their identity document by potential employers and public officials at service windows. The lack of information about the validity and scope of the provisional document for those seeking refugee status who have a work permit, constitutes an actual barrier to effective access to decent work.

Many refugees in Costa Rica have to overcome various challenges to join the labour market. Unlike nationals, refugees very often have problems in certifying their skills, providing references from previous jobs, and they even face situations of discrimination and xenophobia. Furthermore, many refugees have gone through exclusion processes before arriving in the country and they do not have the necessary certificates to obtain jobs. Therefore, it has become necessary to promote training in vocational skills, the certification of previously acquired skills, the use of information and communication technology and labour mediation programmes.

The process of certifying higher education qualifications from countries of origin is complex and depends on a series of requirements which refugees very often find impossible to fulfil. The regular administrative channels used to obtain the necessary documents and to fulfil the requirements cannot always be used by refugees. Not addressing this situation in good time can result in a barrier to accessing their right to work and therefore limit their contribution to the Costa Rican social security system.

Some refugees in Costa Rica have the opportunity to undertake entrepreneurial projects. These projects need to be included in the support programmes of the Ministry of Economy, Industry and Commerce (MEIC, by its acronym in Spanish), with the aim of facilitating the incorporation of the companies, the commercialisation processes and the attainment of securities and guarantees for access to credit.

DHSFF0251

Access to decent and permanent housing is a fundamental pillar in integration processes. The Government of Costa Rica, through the Ministry of Housing and Human Settlement, recognises the need to develop affirmative actions which allow refugees to benefit from national housing programmes.

In the **"Support for host countries and communities"** pillar, Costa Rica makes a substantial contribution to the situation of refugees. MINARE summarises Costa Rica's efforts in favour of refugees and asylum seekers and sets out a series of actions which will improve the Costa Rican asylum system. However, the sustainability of these responses requires international support, solidarity and cooperation under the principle of shared responsibility. To that effect, there is a need to create a permanent monitoring, evaluation and fundraising mechanism that will ensure the sustainability of the implementation of the agreements within the MINARE framework.

During the national consultations, it was suggested that there is a need to use a methodology for the quantification of the State's contribution in response to the situation of refugees; one which puts Costa Rica's contributions into perspective based on the regional challenges, creating a baseline for the planning of future projects and guiding public policy decisions.



UNHCR / G. Menezes

# Protection and Solutions: Plan of Action

| PILLAR 1 – Reception and Admission | | | |
|---|---|---|---|
| **Prioritised Need** | | **Early identification of people in need of international protection** | |
| **Priority Action** | **Implementing parties** | **Schedule** | **Commitment (SJAS, BAP, others)** |
| Border presence: reinforce the existing agreement between the DGME and UNHCR, maintaining the current presence of liaison officers in the border migration points of Peñas Blancas, Los Chiles and Tablillas in the north and Paseo Canoas in the south, as well as extending said presence to at least one person in the ports of Golfito, Limón and Caldera and in both international airports. | DGME, Ministry of the Interior and Police, HIAS, UNHCR | 2018 | BPA Chap. 2<br><br>San Jose Action Statement |
| Regionalisation of the Refugee Sub-process: make progress in the regionalisation of the Refugee Sub-process in the offices of Upala, Liberia, Paso Canoas and Limón, with the objective of said offices being able to provide appointments for interviews, fix the signalling methods and handle the provision of documents. | DGME, Ministry of the Interior and Police | 2018, 2019, 2020 | BPA Chap. 2<br><br>Quality Assurance Initiative<br><br>San Jose Action Statement |
| Strengthening the CATEMs: guarantee the allocation of funds for the maintenance of the infrastructure, equipment and administration of the CATEMs as best regional practice for an alternative to administrative detention. | MGyP, DGME, MINSAL, CNE,<br><br>Red Cross, IOM, UNHCR | 2018, 2019, 2020 | BPA Chap. 2<br><br>Borders of<br><br>Solidarity SJAS |
| Free legal assistance for RSD: modify the Creation of Public Defence Act to create governmental structures guaranteeing free legal assistance and sponsorship to asylum seekers for procedures of Refugee Status Determination. | DGME, Unidad de Sub-refugio, TAM. | 2018,<br><br>2019,<br><br>2020 | BPA Chap. 2<br>San Jose Action Statement |
| **Prioritised Need** | | **Effective access to the refugee status determination procedure** | |
| **Priority Action** | **Implementing parties** | **Schedule** | **Commitment (SJAS, BAP, others)** |
| Project for preventing delay: increase the number of adjudicators specialising in refugees by at least six in each instance. | DGME, Sub-refuge Unit, TAM. | 2018, 2019, 2020 | BPA Chap. 2<br>San Jose Action Statement |
| Strengthening of the CVRR: reinforce the organic structure of the Restricted Visas and Refugee Commission (CVRR) through the designation of a full-time Specialist Legal Consultant for each Commissioner, employed by the respective Ministries, for the purposes of assisting in the review of files received through the Refugee Sub-process, and in the creation of draft resolutions of the CVRR. | DGME, MRREEyC, MTSS, Ministry of Security | 2018, 2019 | BPA Chap. 2<br>Quality Assurance Initiative<br><br>San Jose Action Statement |
| Modernisation of the TAM: establish the Administrative Migration Tribunal (TAM) as a body with two specialised sections: one to address refugees and another for | Ministry of the Interior and Police, TAM | 2018 | BPA Chap. 2<br><br>Quality |

| migration, with the subsequent legislative reforms. | | | Assurance Initiative |
|---|---|---|---|

| **Prioritised Need** | **Effective access to documentation** | | |
|---|---|---|---|
| **Priority Action** | **Implementing Parties** | **Schedule** | **Commitment (SJAS, BPA, others)** |
| Documentation for asylum seekers: provide the provisional identification document with DIMEX numbering and a temporary work permit at the moment of filing the seeking asylum. | Sub-Refugee Unit, DGME | 2018, 2019 | BPA Chap.2  Quality Assurance Initiative  San Jose Action Statement |
| Make documentation free for refugees: create a Technical Committee formed of the Ministry of the Presidency, the National Council for Migration and the General Directorate of Migration and Aliens for the purposes of guaranteeing that documentation is free for refugees and so that it is equal to that of nationals. | General Directorate of Migration and Aliens, Ministry of the Presidency, National Council on Migration | 2018, 2019, 2020 | Recommendation of the Committee of Economic Social and Cultural Rights Report V, Paragraphs 42 and 43 |

| **Prioritised Need** | **Supplementary mechanism for international protection** | | |
|---|---|---|---|
| **Priority Action** | **Implementing Parties** | **Schedule** | **Commitment (SJAS, BPA, others)** |
| Complementary protection mechanism: Establish a complementary protection mechanism for persons who do not fulfil the requirements to be recognised as refugees but who should not be returned to their country of origin as doing so would result in a reasonable risk of them suffering harm. | Presidency of the Republic, Ministry of Foreign Affairs, Ministry of the Interior and Police, DGME | 2018 | BPA Chap. 2 Borders of Solidarity and Security |

## PILLAR 2 – Immediate and ongoing needs

| **Prioritised Need** | **Access to solidarity services for refugees in extreme poverty and at risk of destitution** | | |
|---|---|---|---|
| **Priority Action** | **Implementing Parties** | **Schedule** | **Commitment (SJAS, BPA, others)** |
| Inclusion of the category of refugee in the information files of the social sector: the Ministry of Human Development and Social Inclusion will instruct institutions of the social sector and the National System of the Single Registry of State Beneficiaries (SINIRUBE, by its acronym in Spanish) to include the categories of Refugee and Person Seeking Refugee Status in their information files. | MDHIS/IMAS, PANI, CANAPAM, IAFA, CONAPDIS, INAMU, IMAS, DESAF | 2018, 2019 | BPA Chap. 3 San Jose Action Statement |
| Protocols for refugee care in the social sector: the Ministry of Human Development and Social Inclusion will provide technical support to all institutions of the Social Sector in the establishment of protocols which allow the standardisation of the assistance given to refugees and those seeking refugee status, and also the implementation of internal sensitization processes that guarantee the application of said protocols at all levels | MDHIS/IMAS, PANI, CANAPAM, IAFA, CONAPDIS, INAMU, IMAS, DESAF | 2018 | BPA Chap. 3 San Jose Action Statement |

in the institution.

| State programmes for the reduction of poverty: the Ministry of Human Development and Social Inclusion will instruct the National System of the Single Registry of State Beneficiaries (SINIRUBE) to include refugees and those seeking refugee status in the poverty reduction programmes of the Joint Social Aid Institute, giving them the same rights as nationals. | MDHIS/IMAS, UNHCR | 2018 | BPA Chap. 3 San Jose Action Statement |
|---|---|---|---|

| Prioritised Need | **Women, teenage mothers, survivors of gender-based violence and the LGBTI population** | | |
|---|---|---|---|
| Priority Action | Implementing Parties | Schedule | Commitment (SJAS, BPA, others) |
| Protocol for female refugee care: INAMU, along with the DGME, the National Board of Infancy (PANI, by its acronym in Spanish) and UNHCR, will develop a protocol for assisting women, teenage mothers and survivors of gender-based violence, enabling the coordination and articulation of the assistance given to cases of female refugees and asylum seekers in Costa Rica; including women who are in Care Facilities due to conflict with the law. | INAMU, DGME, PANI, Penitentiary System, UNHCR | 2018, 2019, 2020 | BPA Chap. 3  San Jose Action Statement |
| Project for the access of LGBTI populations to the labour market: the Ministry of Human Development and Social Inclusion, in coordination with the Diverse Chamber of Commerce of Costa Rica and with support from UNHCR, will develop a programme for the training and job placement of LGBTI refugees. | Ministry of Human Development and Social Inclusion, Diverse Chamber of Commerce | 2018, 2019, 2020 | BPA Chap. 3 Local Integration  San Jose Action Statement |

| Prioritised Need | **Children refugees or asylum seekers** | | |
|---|---|---|---|
| Priority Action | Implementing Parties | Schedule | Commitment (SJAS, BPA, others) |
| Protocol for the protection and care of refugee children: PANI, with support from UNHCR and DGME, will update the protection, care and reference protocol for refugee children, following the international standards. Said protocol must include actions for the protection of unaccompanied or separated children and children at risk of statelessness. | PANI, DGME, UNHCR | 2018 | BPA CHAP. 3 |
| Fund for DNA testing: PANI will develop a project for the creation of a fund to perform DNA testing of refugee families or asylum-seeking families when there is doubt over the filiation, in order to prevent trafficking and other types of activities harmful to children. | PANI, Supreme Court of Elections | 2018 – 2019 | BPA Chap. 3 |

| Prioritised Need | **Refugees and asylum seekers with special care needs (the elderly, disabled persons and persons with problematic use of psychoactive substances)** | | |
|---|---|---|---|
| Priority Action | Implementing parties | Schedule | Commitment (SJAS, BPA, others) |
| Protocol for elderly refugees: the Ministry of Human Development and Social Inclusion undertakes to manage, under the National Council for the Elderly (CONAPAM, by its in acronym Spanish), the development of a specialised care protocol for elderly refugees, providing access to public services and the right to healthcare. | Ministry of Human Development and Social Inclusion, CONAPAM | 2018, 2019 | BPA Chap. 3 |

DHSFF0255

| Protocol for assistance for refugees with problematic use of psychoactive substances: the IAFA will develop a care protocol for the refugee population in rehabilitation centres for persons with addictions which are under supervision from the Institute. | Institute for Alcoholism and Drug Dependency (IAFA, by its acronym in Spanish), MDHI | 2018, 2019 | BPA Chap. 3 |
|---|---|---|---|
| Adaptation of RSD Procedures for disabled persons: the National Council for Disabled Persons (CONAPDIS, by its acronym in Spanish) will advise the DGME in the development of a mechanism for assisting asylum seekers who have cognitive, physical or sensorial disabilities in the procedures for refugee status determination in order to guarantee due process. | CONAPDIS, DGME | 2018, 2019 | BPA Chap. 3 |

| Prioritised Need | Solidarity networks of and for refugees | | |
|---|---|---|---|
| Acción Prioritaria | Partes Ejecutoras | Cronograma | Compromiso (DASJ, PAB, otros) |
| Solidarity networks for refugees: the Ministry of Human Development and Social inclusion with collaboration from UNHCR will promote the participation of civil society in assisting refugees through research and professional practice initiatives with public and private universities. | Ministry of Development and Social Inclusion, Public and Private Universities, UNHCR | 2018, 2019, 202 | BPA Chap. 3 San Jose Action Statement |

## PILLAR 3 – Support for host countries and communities

| Prioritised Need | Information about State expenditure on matters of refugees | | |
|---|---|---|---|
| Priority Action | Implementing Parties | Schedule | Commitment (SJAS, BPA, others) |
| Methodology of quantifying the State contribution to refugees: the Ministry of Planning and National Policy (MIDEPLAN, by its acronym in Spanish) will develop a methodology for quantifying the amount the State spends on refugee matters, with technical support from the OEDC. | MIDEPLAN, OEDC, UNHCR | 2018, 2019, 2020 | BPA Chap. 3 |
| Prioritised Need | Mechanism enabling the sustainability of the implementation of MINARE agreements | | |
| Priority Action | Implementing Parties | Schedule | Commitment (SJAS, BPA, others) |
| Permanent MINARE team: the MINARE Technical Team will become a permanent monitoring, evaluation and fundraising mechanism that will ensure the sustainability of the implementation the framework. The team will be chaired by the Ministry of the Interior and Police and it will meet monthly. UNHCR will participate as the technical secretariat. | MGyP, MRREEyC, MTSS, IMAS, MIDEPLAN, DGME, UNHCR | 2018, 2019, 2020 | BPA Chap. 3 |

## PILLAR 4 – Enhance opportunities for durable solutions

| Prioritised Need | Refugee access to the right to work | | |
|---|---|---|---|
| **Priority Action** | **Implementing Parties** | **Schedule** | **Commitment (SJAS, BPA, others)** |
| The Digital Consultation of Work Permits Project: the DGME, in coordination with the Ministry of Labour and Social Security and with support from UNHCR, will create a digital consultation mechanism enabling refugees to certify the validity of their work permit with potential employers. | MTSS, DGME, UNHCR | 2018, 2019 | BPA Chap. 3  San Jose Action Statement |
| Labour mediation programme for refugees: the Ministry of Labour and Social Security will provide the PoI with effective access to labour mediation programmes such as www.buscoempleo.go.cr, the EMPLEATE Programme, Mi Primer Empleo and PRONAE 4x4; in addition to micro-business support programmes. The National Labour Inspectorate will take into consideration in its procedures the specific nature of refugees, with the objective of ensuring that their labour rights and the employer's obligations are recognised as equal to those of nationals.  Also, informative actions will be carried out on current legislation so as to improve the recognition of the identity documents of PoI and to reduce discrimination and xenophobia during recruitment and staff selection processes. | MTSS, DGME | 2018, 2019, 2020 | BPA Chap. 3  San Jose Action Statement |
| Project for making academic requirements more flexible: the INA will develop an alternative mechanism for checking the academic requirements and/or the equivalency of the technical skills of refugees who wish to enrol on vocational training courses. Additionally, it will carry out joint actions with the private sector for the promotion of internships and the certification of skills through dual training opportunities. | INA, Chamber of Commerce, Chamber of Industry, Diverse Chamber of Commerce | 2018, 2019, 2020 | BPA Chap. 3  San Jose Action Statement |
| **Prioritised Need** | **Recognition of studies from countries of origin** | | |
| **Priority Action** | **Implementing parties** | **Schedule** | **Commitment (SJAS, BPA, others)** |
| Project for the provision of alternative proof for the recognition of academic qualifications: CONARE will incorporate the Consular Section of the Ministry of Foreign Affairs and Worship into the understanding agreement with UNHCR for the provision of alternative proof or evidence in the formalisation of applications for the recognition and equalisation of refugees' academic and professional qualifications from countries of origin. | CONARE, Ministry of Foreign Affairs and Worship, UNHCR | 2018, 2019 | BPA Chap. 3  San Jose Action Statement |
| **Prioritised Need** | **Technological literacy** | | |
| **Priority Action** | **Implementing parties** | **Schedule** | **Commitment (SJAS, BPA, others)** |

| Technological Literacy Project: the Ministry of Culture and the IMAS will promote technological literacy to refugees through the "Digital Costa Rica" National Strategy (access to computers) and the literacy activities of the National system of Libraries (SINABI, by its acronym in Spanish). | Ministry of Culture and Youth, SINABI, IMAS | 2018, 2019, 2020 | BPA Chap. 3<br><br>San Jose Action Statement |
|---|---|---|---|
| **Prioritised Need** | **Encouragement of entrepreneurialism** | | |
| **Priority Action** | **Implementing parties** | **Schedule** | **Commitment (SJAS, BPA, others)** |
| Project for the encouragement of entrepreneurialism: the Ministry of Economy, Industry and Commerce will include business ventures lead by refugees in the Register of Entrepreneurs and will encourage their participation in entrepreneurial events and other activities organised by the Ministry to strengthen micro- and small enterprises. | MEIC, ACNUR | 2018, 2019, 2020 | BPA Chap. 3<br>Local Integration Programme<br><br>San Jose Action Statement |
| **Prioritised Need** | **Socio-cultural integration** | | |
| **Priority Action** | **Implementing parties** | **Schedule** | **Commitment (SJAS, BPA, others)** |
| Project for valuation of the population's contribution to the culture of host communities: the Ministry of Culture and Youth will strengthen information and training processes of the cultural advisors of local governments who are carrying out activities with the population of interest, with the objective of emphasising refugees' contribution to the cultural dynamic of host communities. | Ministry of Culture and Youth, local governments, UNHCR | 2018, 2019, 2020 | BPA Chap. 3<br>Local Integration Programme<br><br>San Jose Action Statement |
| SINEM Refugee Children Project: the National System of Musical Education (SINEM, by its acronym in Spanish) will give refugee children free access to musical education, including free access to musical instruments. | SINEM, ACNUR | 2018, 2019, 2020 | BPA Chap. 3 Local Integration Programme<br><br>San Jose Action Statement |
| **Prioritised Need** | **Access to decent housing** | | |
| **Priority Action** | **Implementing parties** | **Schedule** | **Commitment (SJAS, BPA, others)** |
| Project for access to dignified housing for refugees: the Ministry of Housing and Human Settlement will consult with the legal department on the possible modifications of Law 7052 and its Regulations, with the objective of guaranteeing refugees' access to housing programmes and subsidies. | Ministry of Housing and Human Settlement, UNHCR | 2018 | BPA Chap. 3 Local Integration Programme<br><br>San Jose Action Statement |

# Información más Detallada

If you require more detailed information about Costa Rica's national chapter, please visit the following website: http://www.mirps-hn.org

## "Next Steps"

With the objective of ensuring the execution of the agreements made by each of the competent ministries and institutions, the President of the Republic has decided that MINARE will be subject to agreements from the National Council on Migration and the Social Presidential Council; and it will be presented to the Cabinet. Additionally, the President of the Republic is considering its formalisation through an Executive Decree.

The Ministry of Foreign Affairs and Worship and the Ministry of Planning and Economic Policy will present the results of the MINARE national consultations to the diplomatic corps and representatives of the accredited

cooperation agencies in Costa Rica, with support from UNHCR. During this meeting, at least ten project profiles based on the agreements included in MINARE will be presented, with the objective of measuring the interest of the cooperating agencies and raising funds for the implementation of the first projects. Bilateral monitoring meetings will also be held.

The Vice-President of the Republic will participate in the Dialogue on Protection Challenges with the High Commissioner in December, which will focus this year on the *Comprehensive Refugee Response Framework*.

.



DHSFF0259



## Acronyms

| | |
|---|---|
| **AGD** | Age, Gender and Diversity |
| **BOCOS** | Branch Office Costa Rica |
| **BPA** | Brazil Plan of Action |
| **CATEM** | Migrant in Transit Temporary Care Centre |
| **CNE** | National Commission of Emergencies |
| **CNM** | National Council on Migration |
| **COI** | Country of Origin Information |
| **CONAPDIS** | National Council for Disabled Persons |
| **CONARE** | National Council of Rectors |
| **FODESAF** | Social Development and Family Allocations Fund |
| **GCR** | Government of Costa Rica |
| **IMAS** | Joint Social Aid Institute |
| **IOM** | International Organization for Migration |
| **MDHIS** | Ministry of Human Development and Social Inclusion |
| **MGyP** | Ministry of the Interior and Police |
| **MIDEPLAN** | Ministry of Planning and Economic Policy |
| **MINARE** | Framework for Protection and Solutions in Response to the Situation of Refugees in Costa Rica |
| **MINSAL** | Ministry of Health |
| **MRREEyC** | Ministry of Foreign Affairs and Worship |
| **MTSS** | Ministry of Labour and Social Security |
| **PoI** | Population of interest |
| **QAI** | Quality Assurance Initiative |
| **SOGI** | Sexual Orientation and Gender Identity |
| **TAM** | Administrative Migration Tribunal |
| **UNHCR** | United Nations High Commissioner for Refugees |
| **UNS** | United Nations System |

UNHCR / Tito Herrera

DHSFF0260

# Guatemala





UNHCR / Ricardo Ramírez Arriola

DHSFF0261

# Introduction

Since 1983, Guatemala has been a signatory of the main international treaties on human rights and the international protection of refugees – the 1951 Convention and the 1967 Protocol relating to the Status of Refugees. Guatemala adopted the 1984 Cartagena Declaration and, in 2014 on the 30th anniversary of said declaration, it adopted the Brazil Declaration and Plan of Action alongside 28 other Latin American countries. Guatemala also participated in the regional forums on international protection including the High Level Round Table discussing the "Call to Action: Protection Needs in the Northern Triangle of Central America," held in 2016 in San Jose, Costa Rica. In that same year, it adopted the New York Declaration for Refugees and Migrants, the first Annex of which is the "Comprehensive Regional Protection and Solutions Framework for the Americas" (MIRPS).

With the objective of designing its own chapter of the MIRPS and therefore contributing inputs to the development of the Global Compact on Refugees, Guatemala created an Executive Committee formed of the Ministry of Foreign Affairs, UNHCR, UNDP, OAS and the UN Resident Coordinator in Guatemala. The functions of the Committee consisted of approving the design of a methodology and the format of a matrix that would allow the development of a national operational plan for the actions required to provide a comprehensive response to refugees. The Committee will also review the progress of this process.

In May 2017, Guatemala officially started a series of rounds of national inter-sectoral consultations for adding information to the matrix. Six consultations took place in this regard.



ACNUR / Pablo Villagran

DHSFF0262

It is of the utmost importance to highlight the fact that in order to facilitate this work, the subject was approached from the framework of three national level collaborative groups that work on specific issues of migration: the National Commission for Refugees (CONARE, by its Spanish acronym), the Commission for the Comprehensive Care of Migrant Children and Adolescents, and the Committee of Labour Mobility..

The National Commission for Refugees is formed of the Ministry of Foreign Affairs, the Ministry of the Interior, the Ministry of Labour and Social Security and the General Directorate of Migration. The National Commission for Refugees is the body responsible for applying the provisions of the Convention and Protocol relating to the Status of Refugees, as well as any other regulations concerning the recognition, protection and care of refugees, and the rules and provisions contained in its regulations, in accordance with Governmental Agreement 383-2001.

The Commission for the Comprehensive Care of Migrant Children and Adolescents was created through Governmental Agreement 146-2014 and it is formed of the Ministry of the Interior, the Ministry of Foreign Affairs, the Ministry of Education, the Secretariat of Social Welfare of the First Lady, the Office of the Attorney General of the Nation and the Secretariat of Social Works of the First Lady. The objective of this Commission is to coordinate, evaluate, promote and monitor compliance with the strategic plans and the institutional or inter-agency programmes linked to migrant children and adolescents.

In turn, the so-called "Committee of Labour Mobility" is a collaborative body formed of the Ministry of Labour and Social Security and the Ministry of Foreign Affairs, and its purpose is to address matters relating to migrant workers abroad and their return to Guatemala.

In order for each of the aforementioned groups to progress in the consolidation of a comprehensive line of work, there was participation from civil society actors with whom strategic partnerships were formed to address specific matters.

Shown below is a table summarizing the objectives and participants of each of the six consultations that took place from May 2017:



UNHCR / Boris Heger

DHSFF0263

| First Consultation | Second Consultation | Third Consultation |
|---|---|---|
| **Participants:** CONARE | **Participants:** CONARE, the Committee of Labour Mobility and the Commission for the Comprehensive Care of Migrant Children and Adolescents. | **Participants:** CONARE, the Committee of Labour Mobility and the Commission for the Comprehensive Care of Migrant Children and Adolescents. |
| **Objectives:** Develop the Preparation Matrix for the Comprehensive Regional Protection and Solutions Framework (MIRPS) of Guatemala. | **Objectives:** Dissemination of the MIRPS Matrix of Guatemala and the methodology for filling it with data. | **Objectives:** Filling the Matrix with information that will help to consolidate National Inputs for MIRPS. |
| **Progress:** Formulation of the Matrix; Definition of Prioritised Subjects under the four pillars of MIRPS, based on the context of Guatemala. | **Progress:** Scheduling of meetings with the aforementioned Technical Roundtables and the dissemination of the methodology to be used to fill the Matrix. | **Progress:** Constant meetings with the aforementioned Technical Roundtables for filling the Matrix with information. |

| Fourth Consultation | Fifth Consultation | Sixth Consultation |
|---|---|---|
| **Participants:** CONARE, the Committee of Labour Mobility and the Commission for the Comprehensive Care of Migrant Children and Adolescents. | **Participants:** CONARE, the Committee of Labour Mobility and the Commission for the Comprehensive Care of Migrant Children and Adolescents. | **Participants:** CONARE, the Committee of Labour Mobility and the Commission for the Comprehensive Care of Migrant Children and Adolescents. |
| **Objectives:** Revision of the new MIRPS Matrix proposal, as provided by UNHCR, incorporating the recommendations of Ms. Reem Alsalem, Consultant of the UNHCR Bureau for the Americas on MIRPS and the Global Compact on Refugees, regarding the need to quantify resources and reformulate some of the prioritised activities. | **Objectives:** Presentation of the matrices created by the consultants hired by UNHCR on the headings in the Annual Operational Plans of the various national institutions that may contribute to the financing of MIRPS activities. | **Objectives:** Finalise the substantive information that each national institution has inserted in the matrix. |
| **Progress:** Dissemination of the new MIRPS Matrix with the aforementioned Technical Roundtables, to incorporate their observations and comments before approval. | **Progress:** Dissemination of the matrices created by the consultants hired by UNHCR to the planning officials at the institutions of the Roundtables. | **Progress:** Validation of the substantive part of the MIRPS matrix. |

# Protection and Solutions: Overarching Gaps and Needs

The protection, solutions, needs and gaps discussed within the framework of the country as a place of origin, transit, destination and return are developed around four pillars:

### Pillar 1, *Reception and Admission*

Referring to the measures that ensure the identification of persons in need of protection, as well as measures that protect the Guatemalan population and address the causes of risk.

### Pillar 4, *Solutions*

New proposals are needed to provide protection for the populations most at risk.

Shown below are the activities promoted by the Government of Guatemala to cover ratified commitments such as the 1951 Convention, its 1967 Protocol, the 1984 Cartagena Declaration, the 2014 Brazil Declaration and the 2016 San Jose Call to Action and other regional agreements and national legislations that are aligned with the international framework:



UNHCR/ Tito Herrera

DHSFF0265

## STOCKTAKING EXERCISE

### PILLAR 1 – Reception and Admission

| Commitment | |
|---|---|
| ≠  Cartagena 84<br>≠  Brazil Declaration | |
| **Supervisors** | CONARE |
| **Existing Activity** | Care for 786 asylum seekers from 41 different countries in the period between 2002 and 2017, with a recognition rate of between 97% and 100%. |
| **Commitment** | |
| ≠  Brazil Declaration<br>≠  Cartagena 84 | |
| **Supervisors** | CONARE |
| **Existing Activity** | Recognition of one case of a person from the LGBTI community. |
| **Commitment** | |
| ≠  Cartagena 84<br>≠  Brazil Declaration | |
| **Supervisors** | General Directorate of Migration (DGM, by its Spanish acronym) |
| **Existing Activity** | Policy of non-detention of persons in transit and asylum seekers, as provided for by Migration Act 95-98. |
| **Commitment** | |
| ≠  Brazil Declaration<br>≠  Cartagena 84 | |
| **Supervisors** | Commission for the Comprehensive Care of Migrant Children and Adolescents |
| **Existing Activity** | Teams specialising in the reception of Migrant Children and Adolescents (MCA) and family units in the centres in Tecún Umán, in the *Casa Nuestras Raíces* shelters and in the Guatemalan Air Force. |

### PILLAR 2 – Immediate and ongoing needs

| Commitment | |
|---|---|
| ≠  Cartagena 84<br>≠  Brazil Declaration | |
| **Supervisors** | DGM |
| **Existing Activity** | Issue of Refugee Documents to persons recognised as such, ensuring their right to identity |
| **Commitment** | |
| ≠  Cartagena 84 | |
| **Supervisors** | CONARE |
| **Existing Activity** | Support for the protection and the generation of livelihoods for refugees and asylum seekers, in coordination with UNHCR implementing partners in Guatemala – Pastoral Group of Human Mobility. |
| **Commitment** | |
| ≠  Brazil Declaration | |
| **Supervisors** | Ministry of Foreign Affairs (MINEX, by its Spanish acronym) |
| **Existing Activity** | Training the consular corps in assisting MCA |

DHSFF0266

| PILLAR 3 - Support for host countries and communities | |
| --- | --- |
| **Commitment** | |
| ≠   Brazil Declaration<br>≠   San Jose Call to Action | |
| **Supervisors** | MINEX |
| **Actividad Existente** | Request to UNHCR through the High Level Round Table "Call to Action: Protection Needs in the Northern Triangle of Central America." Support for the improvement of the Tecún Umán adult reception centre in the Department of San Marcos and the reception of unaccompanied MCA in the specialised centres in Quetzaltenango and Guatemala City. |
| **Commitment** | |
| ≠   Cartagena 84<br>≠   Brazil Declaration | |
| **Supervisors** | MINEX, Ministry of Labour (MINTRAB, by its Spanish acronym), Ministry of Education (MINEDUC, by its Spanish acronym) and others |
| **Actividad Existente** | Launching, on March 7, 2017 of the "*Guate te incluye*" programme, aimed at generating a national approach to the social and labour inclusion of the returned migrant population of Guatemala. |
| **Commitment** | |
| ≠   Brazil Declaration | |
| **Supervisors** | MINEX |
| **Actividad Existente** | Signing of a letter of understanding to strengthen the relationship between MINEX and UNHCR, including support for MINEX in the implementation of a "protection transfer arrangement" as an exceptional protection measure for persons who are at high risk, in order to provide a safe and legal alternative for accessing international protection. |
| PILLAR 4 – Enhance opportunities for durable solutions | |
| **Commitment** | |
| | |
| **Supervisors** | |
| **Actividad Existente** | Approval and coming into force of Decree 44-2016 of the Migration Code, whose Chapter V of which establishes the recognition of refugee status, political asylum and humanitarian assistance. Also, the creation of the new Institute of Migration. |

Despite the significant progress and the best practices recently put into use, gaps related to the following issues have been identified:

≠ Review the provisions established in the new Migration Code concerning compliance with the principle of non-refoulement and the principle of non-

penalisation for the irregular entry of asylum seekers and refugees.

≠ Strengthen inter-insitutional coordination by involving the judiciary in the detection, care, protection and monitoring of cases of unaccompanied children who wish to seek asylum.

# Protection and Solutions: Action Plan

Identify the main needs and the priority actions for each pillar, as identified in the national consultations.

Government commitments for the 2018-2020 period.

| PILLAR 1 – Reception and Admission | |
|---|---|
| *Prioritised Need* | *Identify persons in need of international protection* |
| **Priority Action** | **Institutions Responsible** |
| Strengthen the institutional capacity of the General Directorate of Migration/Guatemalan Institute of Migration, particularly in matters of care and protection. | DGM/IGM, National Migration Authority |
| Raise awareness and train migration delegates, the National Civil Police Force, the Army, Jurisdictional Bodies and security personnel at borders and airports in matters of international protection. | DGM/IGM, National Migration Authority, Care and Protection Council |
| Include in the curricula of training schools for authorities involved in matters of migration, topics concerning national protection systems for migrants, as provided by the Migration Code, the Comprehensive Protection of Migrant Children and Adolescents Act, the right of asylum and other international protection measures, in addition to regional level protection agreements. | DGM/IGM, Ministry of the Interior, Ministry of Defence, the Judiciary (OJ, by its Spanish acronym), The Office of the Attorney General of the Nation (PGN, by its Spanish acronym), Public Prosecutor (MP, by its Spanish acronym), Secretariat of Social Welfare (SBS, by its Spanish acronym), Secretariat of Social Works of the President's Wife (SOSEP, by its Spanish acronym), Human Rights Ombudsman (PDH, by its Spanish acronym), MINEDUC, MINEX, MINTRAB (other institutions may be added in any phase) |
| Draw up the regulations and update the current protocols in matters of care and protection in accordance with the Migration Code, ensuring that the processes include access to the application for asylum or other international protection measures such as the | DGM/IGM, Migration Authority, Care and Protection Council and other institutions |

| | |
|---|---|
| humanitarian visa and any other measures the State may adopt. | |
| Strengthen awareness raising and training processes for migration delegates at the border for the purpose of identifying persons in need of protection. | DGM/IGM, National Migration Authority |
| Create and disseminate informational materials regarding the access to asylum and other protection and assistance systems for migrants. | DGM/IGM, Ministry of the Interior, Ministry of Foreign Affairs, Ministry of Labour (CONARE), PDH, OJ, Municipalities and other institutions |
| *Prioritised Need* | *Identify specific protection needs based on age, gender and diversity* |
| **Priority Action** | **Institutions Responsible** |
| Strengthen Deportee Reception Centres for the (in situ) identification of Guatemalan returnees in need of protection whose rights have been violated in the deportation process. | DGM/IGM, MINEX, SOSEP (family groups), SBS (unaccompanied MCA), PGN |
| Train and raise awareness of officials working with migrant populations, for a comprehensive approach that takes into consideration the age, gender and diversity of persons, paying special attention to unaccompanied children and adolescents, women at risk, the LGBTI population, victims of human trafficking, elderly persons and disabled persons. | DGM/IGM, Ministry of the Interior, Ministry of Defence, the Judiciary, PGN, MP, SBS, SOSEP, MINTRAB, MINEX and other institutions |
| Strengthen the leading institutions in the protection of children and adolescents, especially in border areas. | PGN, SBS, SOSEP, OJ, DGM/IGM |
| *Prioritised Need* | *Guarantee safe transit* |
| **Priority Action** | **Institutions Responsible** |
| Develop the continuity of the persons in transit permit mechanism, as defined in the Migration Code regulations, with the objective of ensuring regular transit through the country. | DGM/IGM, National Migration Authority |
| Design, create and implement a mechanism for registering cases and reports of human rights violations committed against migrants in transit through Guatemalan territory. | Human rights, PGN, MP, the Judiciary, PNC, DGM/IGM |
| Create and/or improve suitable spaces with interview rooms guaranteeing the confidentiality of information shared by asylum seekers, as well as specialised and friendly spaces for children and adolescents. | DGM/IGM |
| Expand the teams of eligibility officials who process asylum applications in the General Directorate of Migration/Guatemalan Institute of Migration. | DGM/IGM |
| Initiate the process for creating a multi-disciplinary team for the care and protection of refuges and asylum seekers. | DGM/IGM |
| *Prioritised Need* | *Offer specialised, differentiated, safe and dignified reception conditions, with special attention to persons with specific needs* |
| **Priority Action** | **Institutions Responsible** |
| Formulate a diagnosis for the creation of decent, open shelters that are specialised for the population in need of international protection, involving specialised and | Care and Protection Council and other institutions |

| | |
|---|---|
| trained teams. | |
| Restructure the Temporary Family Placement Programme, for the assistance of children and adolescents in need of protection who have returned or are in transit. | SBS, National Adoptions Council, DGM/IGM, PGN |

| PILLAR 2 – Immediate and ongoing needs | |
|---|---|
| *Prioritised Need* | *Provide healthcare, education, social services and protection to children* |
| **Priority Action** | **Institutions Responsible** |
| Strengthen the Migrant Care Directorate at the Ministry of Public Health and Social Welfare. | Ministry of Public Health and Social Welfare |
| Negotiate and implement regional and international agreements for the recognition of academic qualifications, paying special attention to the specific needs and difficulties refugees face when presenting documentation from their countries of origin. | Ministry of Education, MINEX |
| Include in the Institutional Strategic Plans, Multi-Annual Plan and Annual Operational Plan, the provision of fundamental basic services for persons in need of international protection. | |
| Coordinate actions with local education authorities and institutions throughout the country for the inclusion and integration of MCA and youths into the national education system. These actions include awareness raising campaigns about the risks and consequences of migration routes, and the dissemination of the guide for bringing internal and external migration to the attention of the student population. Formulation and implementation of a road map for the provision of care to the Guatemalan migrant population in the process for the accreditation and certification of labour skills. Implementation and dissemination of Ministerial Agreement 696-2017 that mandates to "Validate the studies of Guatemalan deportees who will continue their training in the National Education System." | Ministry of Education |
| *Prioritised Need* | *Ensure close cooperation and encourage joint planning* |
| **Priority Action** | **Institutions Responsible** |
| Strengthen inter-agency and inter-sectoral coordination in order to increase the basic services options for asylum seekers and refugees. | All institutions |

| PILLAR 4 – Enhance opportunities for durable solutions | |
|---|---|
| *Prioritised Need* | *Encourage self-reliance in refugees through work opportunities* |
| **Priority Action** | **Institutions Responsible** |
| Propose the modification of the labour regulations so as to enable refugees and asylum seekers to access occupational training programmes. | Ministry of Labour and Social Security |
| Design awareness raising campaigns aimed at the business sector and public officials as regards the rights of refugees, especially in terms of the labour market and | Ministry of Education, National Migration Authority, Ministry of Labour and Social Security |

| | |
|---|---|
| access to services (information kiosks and job fairs). | |
| Strengthen information campaigns about labour rights and access to the labour market, aimed at the general public and including refugees and asylum seekers. | |
| Prioritise the processing and resolution of applications for work permits from refugees and asylum seekers. | |
| Facilitate access to Spanish language courses for asylum seekers and refugees. | |
| Through public-private partnerships, facilitate processes allowing asylum seekers and refuges to return to employment, using tools such as the National Employment Service. | |
| *Prioritised Need* | *Provide protection alternatives to persons at high risk and returnees with specific needs* |
| **Priority Action** | **Institutions Responsible** |
| Ensure the continuity of statistical studies and improve registration systems so as to learn about the profiles of returnees, refugees and asylum seekers, including their occupations, with a view to their safe reintegration and internal relocation, if necessary. | DGM/IGM, Ministry of Labour and Social Security |
| Create an inter-sectoral mechanism for the establishment of routes and implement the national strategy for the return to employment of Guatemalan migrant returnees with or without international protection needs. | Ministry of Labour and Social Security, Ministry of Foreign Affairs, General Directorate of Migration/Guatemalan Institute of Migration, Ministry of Education, Ministry of Economy, Ministry of the Interior, Technical Institute of Training and Productivity (INTECAP, by its Spanish acronym), the Business Sector |
| Create the Protection Transfer Arrangement for persons at high risk who need support for safe and regular access to asylum countries. | MINEX, UNHCR |

# More Detailed Information

If you require more detailed information about the Guatemala's national chapter, please send an email to the following focal point: digracom@minex.go.gt; dami@minex.gob.gt

# Next Steps

In order to determine the steps to take, two issues must be born in mind: firstly, that the consolidation of this operational plan will become an input for the construction of the Global Compact on Refugees in 2018; and also that it represents the systematisation of Guatemala's commitment to strengthening its refugee protection system and creating actions in their benefit.

In this regard, actions visible in the short and medium term that have already been identified consist of the verification of the budgets of each of the institutions.

With the national consultations process, Guatemala has concluded the substantive part of the MIRPS matrix and it is pending the integration of the information of the financial part. However, in light of the seventh MIRPS national consultation on October 18, 2017, the governmental institutions involved in elaborating the MIRPS matrix anticipated the need to add two columns to the financial part of the matrix: one referring to the Institutional Strategic Plan and another referring to the Annual Operational Plan. In virtue thereof, internal consultations within its institutions need to be carried out in order to fill in that information.

It is important to note that at this stage of the process the Financial and Planning Units of each of the institutions need to be involved.

Subsequently, it will be necessary to carry out a new national consultation for the discussion and integration of the information gathered by each of the institutions.

Another fundamental action anticipated for the realisation of this operational plan is based on its dissemination at all levels, with the objective of making asylum visible on a national level, setting it up for the fulfilment of all the designated actions and then monitoring them.



DHSFF0272



UNHCR / Tito Herrera

## ACRÓNIMOS

**CONARE**      Comisión Nacional para Refugiados
**MINGOB**      Ministerio de Gobernación
**MINEX**       Ministerio de  Relaciones Exteriores
**MINTRAB**     Ministerio de  Trabajo y Previsión Social
**DGM**         Dirección  General de Migración
**PMH**         Pastoral de Movilidad Humana
**MINEDUC**     Ministerio de Educación
**MIDES**       Ministerio de Desarrollo Social
**SBS**         Secretaría de Bienestar Social
**PGN**         Procuraduría General de la Nación
**SOSEP**       Secretaría de Obras Sociales de la Esposa del Presidente
**OEA**         Organización de Estados Americanos
**ACNUR**       Alto  Comisionado  de las Naciones Unidas para los Refugiados



UNHCR / Ricardo Ramirez Arriola

DHSFF0273

# Honduras





UNHCR / Ricardo Ramírez Arriola

DHSFF0274

# Introduction

In March 2017, the Government of Honduras notified the United Nations High Commissioner for Refugees (UNHCR) of its acceptance of the invitation to participate in the construction process of the CRRF. In doing so, Honduras became the first pilot CRRF country in America. This pioneering action reflects the State's commitment to comprehensively improve its protection systems from the roots, as a country of origin, providing a response to refugees and asylum seekers in Honduran territory; returned Honduran migrants in need of protection; Hondurans abroad; and internally displaced persons. The pilot CRRF process consisted of a series of national consultations aimed at a broad range of stakeholders and it served to consolidate existing response efforts and drive new forms of inter-insitutional collaboration and cooperation.

# The piloting of Honduras

After the dissemination of the New York Declaration and the CRRF to the State institutions, a technical team was formed of the following institutions to lead the national consultation process: the National Institute of Migration (INM, by its acronym in Spanish), the Ministry of Foreign Affairs and International Cooperation (SRECI, by its acronym in Spanish), the Ministry of Human Rights, Justice, the Interior and Decentralisation, the Ministry of General Coordination of the Government (SCGG, by its acronym in Spanish) and the Directorate of Children, Adolescents and Family (DINAF, by its acronym in Spanish).

With the support of UNHCR, the technical team planned activities in three phases: 1) consultations with the concerned population sectors for the identification of needs; 2) consultation with State institutions to prioritise needs, identify existing State responses and define a plan of action; and 3) consultation with civil society and international community actors for the identification of complementary actions.

In total, 338 people were consulted based on four profiles: 1) refugees and asylum seekers, 2) returnees in need of protection, 3) Hondurans abroad, and 4) internally displaced persons. Reports from the National Commission of Human Rights (CONADEH, by its acronym in Spanish) were used as a reference in order to define the consulted sectors, alongside the recommendations of the report of the UN Special Rapporteur on the Human Rights of Internally Displaced Persons on his 2015 mission to Honduras (CONADEH)[3] were used as a reference in order to define the consulted sectors, alongside the recommendations of the report of the UN Special Rapporteur on the Human Rights of Internally Displaced Persons on his

---

[3] Comisionado Nacional de los Derechos Humanos (CONADEH), *Boletín Estadístico sobre el Desplazamiento Forzado Interno: Identificación de* *Casos en los Registros de Quejas en Cinco Oficinas del CONADEH* (junio 2017).

2015 mission to Honduras. The groups defined as particularly at risk were: boys, girls and youths; women; traders; transport workers; educators; LGBTI persons; and farmers. The consultation methodology included interviews and focus groups from July 2017 in Tegucigalpa, San Pedro Sula, El Progreso and abroad.

In September 2017, a consultation was held with 23 State institutions and participation from 35 representatives to present the needs of the population identified in the consultations. The result was a mapping of the State response, prioritising the needs linked to their mandates and competencies. The third stage in the consultation process took place at the end of September and was aimed at civil society organisations in order to identify the priorities and potential complementarities of their social solutions.



UNHCR/ Ricardo Ramírez Arriola

# National achievements in compliance with international commitments

The regional processes for the protection of displaced persons, the population in transit in need of protection and refugees have boosted the strengthening of the national response. Based on the 2014 Brazil Plan of Action, Honduras managed to: 1) strengthen the asylum system with the creation in 2015 of the Internal Commission for the revision, analysis and resolution of applications presented to the National Institute of Migration (Asylum Commission); 2) establish guidelines for the identification, reception and referral of persons in need of protection in the process of reception of returned nationals; and 3) expand the initiatives and projects directed at the protection of internally displaced persons. Other efforts include regional cooperation initiatives with Colombia in matters of victim attention and land protection.

Within the framework of the San Jose Action Statement, the Government of Honduras committed to developing six concrete actions to reinforce the national response and since July 2016 it has made significant progress in this respect. In compliance with the first commitment regarding the establishment of an information system on internal displacement, 2017 saw the start of a process for updating the diagnostic on internal displacement, offering a more comprehensive vision of the problem in terms of causes, magnitude, profiles and impact on the population concerned. In turn, it will enable the identification of criteria for the creation of a displaced population registration system.

The second commitment refers to the adoption of a legal framework on internal displacement and therefore since 2016, a highly participative and constructive process has been developed with various governmental institutions, resulting in the formulation of the bill for a "Law for the Prevention, Care and Protection of Internally Displaced Persons" which is in the process of being presented before National Congress.

The third commitment refers to the establishment of a protection and assistance roadmap for persons who are displaced or at risk of being displaced, formulated under the leadership of the Inter-institutional Commission for the Protection of Persons Displaced by Violence (CIPPDV, by its acronym in Spanish) since 2016. The draft thereof, which is currently being finalised, proposes the design of a humanitarian assistance mechanism that focuses on people's needs and human rights and combines the current institutional services to care, protect and foster solutions.

The fourth commitment refers to the strengthening of the CIPPDV, as achieved through the planning and execution of actions aligned with international commitments and recommendations, along with the allocation of financial and technical resources for its operation. The national response capacity will be reinforced with the creation from January 1, 2018 of the Ministry of Human Rights. The Directorate will have

departments for the reception of cases and risk analysis; the implementation and monitoring of protection, prevention and protection measures; and for registration and information. This will complement the CIPPDV's efforts as an operational body for the implementation of response measures and mechanisms. Similarly, the promotion of awareness campaigns and political advocacy around internal displacement, as provided in the fifth commitment of the San Jose Action Statement, has been a fundamental element in the CIPPDV's work plan since 2016. This has been achieved through the establishment of spaces for dialogue and training with officials and civil servants of different State institutions, local governments and civil society. Lastly, and in line with the sixth commitment, the establishment of methodologies for allowing for a close relationship with displaced persons and communities was included as a priority action in 2017, appearing in the framework of the CRRF consultation activities.



UNHCR / Sebastian Rich

Although many activities have been adopted by national institutions pursuant to these commitments, it is worth highlighting some which are particularly important based on the four pillars of the CRRF, as shown in Table 1.

| STOCKTAKING EXERCISE | |
|---|---|
| **PILLAR 1 – Reception and Admission** | |
| *Refugees and asylum-seekers* | |
| **Supervisors** | National Institute of Migration |
| **Existing Activity** | ≠ Creation of the Department of Human Rights, which provides specialised care to refugees and asylum seekers.<br>≠ Creation of the Asylum Commission as a multi-sectoral space for case analysis and resolution.<br>≠ Creation of Care Centres for Irregular Migrants and a Medical Clinic for migrant care in order to provide humanitarian care and assistance.<br>≠ Promotion of refugee and asylum seeker participation processes through the Asylum Commission. |
| *Returnees in need of protection* | |
| **Commitment** | |
| ≠ Brazil Plan of Action | |
| **Supervisors** | Ministry of Foreign Affairs and International Cooperation; Directorate of Children, Adolescents and Family |
| **Existing Activity** | Establishment of differentiated mechanisms for the reception of children, families and adults who have returned by sea or air; and an identification, protection and referral procedure in the Care Centres for Returned Migrants in San Pedro Sula, La Lima and Omoa. |
| **PILLAR 2 – Immediate and ongoing needs** | |
| *Returnees in need of protection* | |
| **Supervisors** | Ministry of Foreign Affairs and International Cooperation |
| **Existing Activity** | ≠ Opening of Municipal Returnee Care Units in prioritised municipalities to facilitate effective reintegration on a local level.<br>≠ Already operational, the Consular and Migration Observatory of Honduras (CONMIGHO, by its acronym in Spanish) contributes to the decision-making process and the design of public policies on migration.<br>≠ Already operational and with extended coverage, the "ALHO VOZ" Call Centre provides an information and guidance service to Hondurans abroad.<br>≠ Already operational, the Care Centres for Returned Migrants are national response focal points through specialised care, identifying and referring persons in need of protection. |
| **Commitment** | |
| ≠ Brazil Plan of Action<br>≠ San Jose Action Statement | |
| **Supervisors** | Ministry of Foreign Affairs and International Cooperation |
| **Existing Activity** | Training and guidance programmes for returned migrants, leading to their access to the labour market through the Honduran Migrant Solidarity Fund. |
| *Hondurans abroad* | |
| **Supervisors** | Ministry of Foreign Affairs and International Cooperation |
| **Existing Activity** | ≠ Already operational, the Consular Centres for the Protection of |

DHSFF0279

| | |
|---|---|
| | Honduran Migrants in Houston (USA) and Mexico City (Mexico), with an approach based on respect for the Human Rights of our migrant population abroad, aiming at providing guidance and assistance to nationals seeking asylum.<br>≠ Implementation of the consulate capacity strengthening strategy for the protection of Hondurans abroad. |

| *Internally dispalced persons* | |
|---|---|
| **Commitment** | |
| ≠ Brazil Plan of Action<br>≠ San Jose Action Statement | |
| **Supervisors** | Ministry of Human Rights, Justice, the Interior and Decentralisation |
| **Existing Activity** | ≠ Finalisation of the bill for a law for the prevention, care and protection of internally displaced persons, which will be presented before National Congress.<br>≠ Allocation of financial resources for the implementation of the 2017 CIPPDV work plan. |
| **Commitment** | |
| ≠ San Jose Action Statement | |
| **Supervisors** | Ministry of Human Rights, Justice, the Interior and Decentralisation |
| **Existing Activity** | ≠ Allocation of financial resources for the implementation of the 2017 CIPPDV work plan. |
| **Commitment** | |
| ≠ San Jose Action Statement | |
| **Supervisors** | Ministry of Human Rights |
| **Existing Activity** | ≠ Creation of the Secretariat of State in the Office of Human Rights by way of Executive Decree PCM-055-2017 which will come into force on January 1, 2018.<br>≠ Creation of the Directorate for the Protection of Persons Internally Displaced by Violence within the structure of the new Secretariat of State in the Office of Human Rights. |
| **Commitment** | |
| ≠ San Jose Action Statement | |
| **Supervisors** | Inter-institutional Commission for the Protection of Persons Internally Displaced by Violence |
| **Existing Activity** | ≠ Design of a protection plan for displaced or at-risk persons, including returnees in need of protection. |
| **Commitment** | |
| ≠ Brazil Plan of Action | |
| **Supervisors** | Directorate of Children, Adolescents and Family |
| **Existing Activity** | ≠ Establishment of temporary protection homes or centres, as an alternative form of care for boys, girls and adolescents in vulnerable situations.<br>≠ Design and implementation of the Comprehensive System for Guaranteeing the Rights of Children and Adolescents of Honduras. |

## PILLAR 4 – Enhance opportunities for durable solutions

| *Refugees and asylum seekers* | |
|---|---|
| **Supervisors** | National Institute of Migration |
| **Existing Activity** | ≠ Finalisation of the Bill for a Law on Migration, harmonising national legislation with international standards in matters of refugees. |

# The Commitments of Honduras

Based on the measures adopted in compliance with international commitments, along with the information compiled in the population needs consultations, ongoing challenges were identified in each of the pillars. In **Pillar 1**, *Reception and admission*: reinforce the protection measures aimed at the prevention of displacement, differentiated by population sector or cause of risk. **Pillar 2**, *Immediate and ongoing needs*: combine the current national responses through a single mechanism focusing attention, care and protection in accordance with the programmes and services identified and quantified by the State, including measures to protect property and homes. **Pillar 3**, *Host community*: create a dissemination mechanism to sensitise and empower communities about the rights of displaced persons, in order to allow their integration. **Pillar 4**, *Durable solutions:* promote the active participation of displaced persons in the national protection framework consolidation processes as well as in programmes allowing them to progressively overcome their displacement.

The priorities of the Government of Honduras were implemented through a series of specific commitments, developed according to population sector and based on the CRRF pillars, as detailed below.

*Profilel 1: Refugees and asylum-seekers*

## PILLAR 1: RECEPTION AND ADMISSION

The procedure for applying for international protection in Honduras was strengthened after the creation of the Internal Commission for the Revision, Analysis and Resolution of Asylum Applications in May 2015. However, the consulted refugees and asylum seekers highlighted the need to provide more information and guidance about their rights and the procedure. In response to their needs, Honduras commits to **building INM and National Police capacities in the identification of persons in need of international protection.**

## PILLAR 2: IMMEDIATE AND ONGOING NEEDS

The INM provides humanitarian care and legal guidance to persons in transit in need of protection, as well as humanitarian care to asylum seekers. Honduras commits to **continuing to strengthen humanitarian care and legal guidance mechanisms.**

## PILLAR 3: HIST COMMUNITY

The refugee population expressed its difficulties in integrating into Honduran society, such as problems stemming from the lack of documentation facilitating access to the country's employment and education system. Although the INM issues refugee identity documents, there are difficulties in getting it recognised in some institutions, thus delaying access to rights. Honduras commits to **fostering a mechanism to guarantee the recognition of the refugee identity document and to strengthen the institutional response.**

## PILLAR 4: DURABLE SOLUTIONS

The INM ran a participative diagnosis which resulted in the identification of the needs of the refugee and asylum-seeking population,

ensuring that their experiences and needs are taken into consideration and addressed. Honduras commits to **including refugee interests in its institutional actions and to keep strengthening the capacities of its groups and organisations through the Asylum Commission.**

*Profile 2: Returnees in need of protection*

## PILLAR 1: RECEPTION AND ADMISSION

The Care Centres for Returned Migrants (CAMR, by their Spanish acronym), strengthened and created since the adoption of the Protection of Honduran Migrants and their Families Act, identify persons in need of protection and provide differentiated care in the reception of returnees through processes and facilities suited to the care of children and family units. Some of those identified as in need of protection explained that they left the country due to threats and risks to their lives. In cases where the risk remains upon their return to the country, assistance and support is required to protect their lives. Honduras commits to **improving the identification of returned migrants in need of protection so as to guarantee a comprehensive and inter-agency response.**

## PILLAR 2: IMMEDIATE AND ONGOING NEEDS

Currently, returned migrants receive support to cover their basic needs for shelter, food, clothing and basic healthcare services; these measures need to be sustained and strengthened. Honduras commits to **improving the care provided to returned migrants in need of protection so as to cover their needs for shelter, food and healthcare in the short and medium term.**

## PILLAR 3: HOST COMMUNITY

The Task Force for Migrant Children is the high-level inter-agency coordination authority that has fostered programmes and strengthened response in the attention, care and protection of migrants, involving local stakeholders. More coordination is required with local level stakeholders to guarantee a response consistent with the needs of the persons concerned. Honduras commits to **including this population in the prevention and protection mechanisms in the communities concerned.**

## PILLAR 4: DURABLE SOLUTIONS

The adoption of the Protection of Honduran Migrants and their Families Act enabled the development of self-reliance projects for returned migrants with protection needs. Additionally, access to employment and decent and suitable livelihoods has been facilitated through the Municipal Returnee Assistance Units (UMAR, by their acronym in Spanish). The persons consulted talked about the need to access employment and gain more opportunities for their reinsertion. Honduras commits to **promoting priority access to returned migrants in existing labour reintegration programmes..**

*Profile 3: Hondurans abroad*

## PILLAR 1: RECEPTION AND ADMISSION

The Consular Centre for the Protection of Honduran Migrants identifies Hondurans in need of protection abroad and in the process of being deported; it also provides monitoring

DHSFF0282

through referral to the corresponding authorities.

The need to have legal guidance and assistance for nationals seeking protection abroad was identified. Honduras commits to **strengthening the capacities of consular officials for the identification and referral of cases of persons in need of protection abroad.**

## PILLAR 2: IMMEDIATE AND PERSISTENT NEEDS

Access and refusal to protection systems is governed by the legislation of the destination country. Honduras commits to **strengthening its referral and legal advice mechanisms abroad.**

*Profile 4: Internally displaced persons and those at risk of displacement*

## PILLAR 1: RECEPTION AND ADMISSION

The creation of the Directorate for the Protection of Persons Internally Displaced by Violence provided an institutional focal point to respond to the internally displaced population. Honduras commits **to implementing a care and protection plan that facilitates the reception, care and referral of cases, and to strengthen the technical and financial capacities of the Directorate for the Protection of Persons Internally Displaced by Violence.**

## PILLAR 2: IMMEDIATE AND ONGOING NEEDS

The consultations highlighted the importance of strengthening the national response as regards:   1) improving State presence in communities at risk;

2) providing protection measures which address the collective impact of internal displacement and which take into consideration the specific needs of transport workers, traders, persons at risk of being deprived of their lands and homes, women and girls, lesbian, gay, bisexual, transgender and intersex (LGBTI) persons and returnees in need of protection; 3) adopting measures for safeguarding and protecting education centres against risks associated with organised crime and strengthening community and family support spaces; and 4) providing alternate means of transport and transfer mechanisms to other education centres aimed at educators. Honduras commits to **keep strengthening State presence in communities at risk, developing prevention and protection programmes that are differentiated by risk causes and profiles and that include prioritised access to documentation, and to keeping up-to-date information on displacement for an appropriate response.**

## PILLAR 3: HOST COMMUNITY

In the consultations, some people mentioned obstacles in their integration into host communities, referring to the stigmatization and discrimination associated with their status as displaced persons. The Government of Honduras commits to **developing a communication and awareness raising strategy on the rights of internally displaced persons in collaboration with local governments.**

DHSFF0283

## PILLAR 4: DURABLE SOLUTIONS

The consultations served to shed light on the impact of displacement in terms of its effect on the lives, safety, livelihoods and property of the persons concerned; their protection plays a fundamental role in the search for medium and long-term solutions. Honduras commits to **implementing a national protection system for internally displaced persons, to progressing in the adoption of a mechanism to register abandoned properties, to facilitating displaced persons' access to vocational training programmes and income generation initiatives, and to promoting spaces for dialogue and consultation with the displaced population..**



UNHCR/ Tito Herrera

| Priority Action | Implementing parties (Coordinating authority in **bold**) | Implementation Period |
|---|---|---|
| **Profile 1: Refugees and asylum seekers** | | |
| **Pillar 1: Reception and admission** | | |
| Carry out training processes for public migration officials at border points in order to strengthen international protection identification capacities. | **National Institute of Migration** | By the 2nd half of 2018 |
| Provide guidance materials in central institutional offices and border crossing points. | **National Institute of Migration** | By the 2nd half of 2018 |
| Create an identification protocol for persons in need of protection in Care Centres for Irregular Migrants (CAMI, by their Spanish acronym). | **National Institute of Migration** | By the 2nd half of 2018 |
| **Pillar 2: Immediate and ongoing needs** | | |
| Provide humanitarian aid and legal guidance in the CAMIs on a national level. | **National Institute of Migration** | By 2020 |
| Develop an awareness campaign for authorities and the private sector on the migration category of refugees and asylum seekers, and their rights. | **National Institute of Migration,** Asylum Commission | By 2020 |
| **Pillar 3: Host community** | | |
| Establish a dialogue with the Ministry of Labour and the Ministry of Education for the removal of obstacles in access to employment and education by refugees and asylum seekers. | **National Institute of Migration,** Ministry of Labour, Ministry of Education, Asylum Commission | By 2020 |
| **Pillar 4: Durable Solutions** | | |
| Foster initiatives for the participation of the Refugees Committee so as to incorporate their needs into the decision-making process through the Asylum Commission. | **National Institute of Migration** | By 2020 |
| **Profile 2: Returnees in need of protection** | | |
| **Pillar 1: Reception and admission** | | |
| Standardise the guidelines and specialise public officials in the identification of returned migrants in need of protection. | **Ministry of Foreign Affairs and International Cooperation** (SRECI), Directorate of Children, Adolescents and Family (DINAF) | By 2018 |
| Develop the case reception and referral mechanism in the Consular Protection Centres abroad to provide an effective, comprehensive and inter-agency response. | **Ministry of Foreign Affairs and International Cooperation** (SRECI) | By 2020 |
| **Pillar 2: Immediate and ongoing needs** | | |
| Increase the existing humanitarian assistance coverage in the reintegration process. | **Ministry of Foreign Affairs and International Cooperation** (SRECI) | By 2020 |

DHSFF0285

| Pillar 3: Host Community | | |
|---|---|---|
| Establish spaces for dialogue to include the population in the prevention and protection mechanisms. | **Ministry of Human Rights** | By 2019 |
| **Pillar 4: Durable Solutions** | | |
| Train consular representatives in international protection. | **Ministry of Foreign Affairs and International Cooperation (SRECI)** | By 2019 |
| **Profile 3: Hondurans abroad** | | |
| **Pillar 1: Reception and admission** | | |
| Train consular representatives in international protection. | **Ministry of Foreign Affairs and International Cooperation (SRECI)** | By 2019 |
| **Pillar 2: Immediate and ongoing needs** | | |
| Establish partnerships with free legal representatives abroad to provide effective assistance. | **Ministry of Foreign Affairs and International Cooperation (SRECI)** | By 2019 |
| Train officials to provide better assistance and guidance in consulates. | **Ministry of Foreign Affairs and International Cooperation (SRECI)** | By 2019 |
| **Profile 4: Internally displaced persons** | | |
| **Pillar 1: Reception and admission** | | |
| Organise awareness raising workshops for decision-makers to raise their awareness of internal displacement and the care and protection plan. | **Inter-institutional Commission for the Protection of Persons Internally Displaced by Violence** | By 2020 |
| Strengthen the technical and operational capacities of the Directorate for the Protection of Persons Internally Displaced by Violence. | **Ministry of Human Rights, Secretariat of General Coordination of the Government, Ministry of Finance**   Support: UNHCR | By 2018 |
| **Pillar 2: Immediate and ongoing needs** | | |
| Formulate a contingency plan for collective displacement caused by violence. | **Inter-institutional Commission for the Protection of Persons Internally Displaced by Violence** | By 2018 |
| Progress in the formulation and implementation of a prevention and protection strategy for schools. | **Ministry of Education** | By 2020 |
| Develop strategies aimed at preventing and addressing the specific risks of women and girls, transport workers, traders, persons at risk of losing their lands, returnees in need of protection, and lesbian, gay, bisexual, transgender and intersex (LGBTI) persons. | **Inter-institutional Commission for the Protection of Persons Internally Displaced by Violence, Ministry of Human Rights** | By 2020 |
| Implement a humanitarian assistance mechanism in coordination with the existing national response. | **Ministry of Human Rights,** Ministry of Development and Social Inclusion, Ministry of | By 2018 |

DHSFF0286

| | Labour, Ministry of Education, Ministry of Health, Ministry of Security, National Women's Institute, Directorate of Children, Adolescents and Family, National Institute of Vocational Training. | |
|---|---|---|
| Update the diagnostic study on internal displacement. | **Inter-institutional Commission for the Protection of Persons Internally Displaced by Violence, Ministry of Human Rights** | By 2018 |
| Establish an information mechanism about displacement, periodically generating data on displacement causes and trends, as well as on expulsion and arrival sites. | **Ministry of Human Rights**, Ministry of Foreign Affairs and International Cooperation; Ministry of Development and Social Inclusion, National Women's Institute, Directorate of Children, Adolescents and Family, National Commission of Human Rights | By 2018 |
| Promote measures that facilitate access to personal identification documents. | **Ministry of Human Rights, National Registry of Persons** | By 2020 |
| **Pillar 3: Host Community** | | |
| Develop an information and awareness raising campaign around the rights of internally displaced persons. | Inter-institutional Commission for the Protection of Persons Internally Displaced by Violence, Ministry of Human Rights | By 2019 |
| Design methodologies enabling a close relationship between internally displaced persons and communities, without increasing their level of risk. | Inter-institutional Commission for the Protection of Persons Internally Displaced by Violence, Ministry of Human Rights | By 2019 |
| **Pillar 4: Durable Solutions** | | |
| Promote spaces for dialogue between national institutions and groups of displaced persons and persons at risk. | **Inter-institutional Commission for the Protection of Persons Internally Displaced by Violence** | By 2020 |
| Create a confidential system for the registration of abandoned property and homes. | **Institute of Property, National Agrarian Institute** | By 2020 |
| Facilitate access to vocational training programmes and income generation initiatives. | **Inter-institutional Commission for the Protection of Persons Internally Displaced by Violence, Ministry of Human Rights,** Ministry of Development and Social Inclusion, Ministry of Labour, | By 2020 |

| | National Institute of Vocational Training. | |
|---|---|---|

# Siguientes Pasos

In order to assure the effective implementation of the national plan, the following measures need to be adopted:

1. Continue with the process of consultations with actors and entities of the international community and the private sector so as to be able to coordinate and identify complementarity possibilities.

2. Complete the mapping of the national response and determine the costs of the projects and programmes in order to identify the required social investment and sources of funding.



UNHCR / Tito Herrera

DHSFF0288



## ACRONYMS

| | |
|---|---|
| CAMR | Care Centres for the Returned Migrant |
| CIPPDV | Inter-institutional Commission for the Protection of Persons Displaced by Violence |
| CONADEH | National Commission of Human Rights |
| CRRF | Comprehensive Refugee Response Framework |
| DINAF | Directorate of Children, Adolescents and Family |
| INAM | National Women's Institute |
| INFOP | National Institute of Vocational Training |
| INM | National Institute of Migration |
| RNP | National Registry of Persons |
| SEDIS | Ministry of Development and Social Inclusion |
| SRECI | Ministry of Foreign Affairs and International Cooperation |
| UNHCR | United Nations High Commissioner for Refugees |



UNHCR / Rocardo Ramirez Arriola

# Mexico





DHSFF0290
ACNUR / Roland Schonbauer

# Introduction

On May 23, 2017, the Government of Mexico expressed its willingness to participate in the development of a Comprehensive Regional Protection and Solutions Framework (MIRPS), under the leadership of the Ministry of the Interior through the Mexican Commission for Refugee Assistance (COMAR, by its Spanish acronym), accompanied by the Ministry of Foreign Affairs (SRE, by its Spanish acronym).

In July and August 2017, local participatory consultations were held in six cities across Mexico, with participation from authorities of federal entities, civil society representatives, international organisations and members of academia. There was also a national consultation with representatives from the six cities, federal authorities and the legislature.

Each of the participatory consultations benefited from the assistance of members of civil society, international organisations, academia and government institutions; during the national consultation, the legislature was also represented.

## NATIONAL AND LOCAL CONSULTATIONS





UNHCR/ J. Morland

The methodology followed during the six local participatory consultations revolved around the four CRRF thematic pillars. The different stakeholders participated within the scope of their competencies, experience and knowledge:

Table 1: Reception and Admission
Table 2: Immediate and Ongoing Needs
Table 3: Support for Host Countries and Communities
Table 4: Durable Solutions

To foster dialogue enriched with proposals and the real identification of protection needs, each of the roundtables was given a list of discussion-guiding questions.

In the case of the national participatory consultation, the methodology followed had two slight variations in that it was a continuation of the table discussions but open questions were not posed to obtain specific inputs; rather, comments were proffered on the viability of the contributions made by the different stakeholders throughout the six local participatory consultations

As a result of the local participatory consultations and the national consultation, COMAR, supported by the Technical Secretariat, worked on a document for identifying protection gaps and recommendations, to serve as the basis of the Mexican chapter.

Said chapter evaluates the actions to be promoted and implemented, ideally within a period of 24 months.

For Mexico, the commitments emanating from the generation of MIRPS do not suppose the establishment of actions parallel to those marked out by previously assumed commitments on a national and regional level, but rather the practical integration of durable solutions. The intention is for MIRPS to specifically strengthen the commitments of the Brazil Declaration and Plan of Action.

# Map of Mexico and locations of COMAR offices

COMAR currently has a physical presence in four Mexican states, through two Federal Delegations in the states of Chiapas and Veracruz, one office in Mexico City and one representative in Tabasco. Shown below are the locations of said offices:



# General Statistics

## TOTAL APPLICATIONS IN MEXICO FOR INTERNATIONAL PROTECTION AND RECOGNITION OF REFUGEE STATUS AND COMPLEMENTARY PROTECTION, 2013 – AUGUST 31, 2017

Mexico faces increasing flows of persons, mainly from Central America, who may be in need of international protection. However, in the last two years there has been an increase in applicants from Venezuela, North Africa, Asia and the Latin American Caribbean.

Since 2013, the number of asylum seekers in Mexico has increased exponentially. There was a 678% increase in applications received in 2016 compared to 2013.

The recognition rate of the asylum seeking population is one of the highest in the Americas. In 2013, Mexico granted international protection to 37% of applicants, in 2014 it was granted to 39%, in 2015 to 46% and in 2016 protection was granted to 62%.

Between 2013 and August 31, 2017, Mexico granted international protection to 7,565 people, amongst whom 6,107 were refugees and 1,458 were beneficiaries of complementary protection.

The COMAR delegation in Chiapas is the office that receives the most applications for asylum, followed by the COMAR office in Mexico City, and the COMAR delegation in Vera Cruz is in third position.

### RECOGNITIONS AND COMPLEMENTARY PROTECTION

| Año | Solicitantes |
|-----|-----|
| 2013 | 1.296 |
| 2014 | 2.137 |
| 2015 | 3.424 |
| 2016 | 8.796 |
| 2017 | 9.651 |

*Cifras totales sin considerar abandonos ni desistimientos*



TOTAL APPLICATIONS FOR ASYLUM IN MEXICO,
ACCORDING TO PROCESSING OFFICE
January 2016 - August 31, 2017



# Protection and Solutions: Overarching Gaps and Needs

Stocktaking of the existing activities in 2017, based on the Mexico's International Protection commitments.

| STOCKTAKING EXERCISE | |
|---|---|
| **PILLAR 1 - Reception and Admission** | |
| **Commitment** | |
| ≠   Brazil Declaration and Plan of Action<br>≠   San Jose Action Statement | |
| **Supervisors** | COMAR |
| **Existing Activity** | In order to comply with the Brazil Action Plan objectives and to drive the commitments of the San Jose Action Statement, COMAR, in collaboration with UNHCR and civil organisations, has formed the Borders of Solidarity and Security Working Group, promoting information on the southern Mexican border about the right to seek asylum in secure conditions and with access to rights. |
| **Commitment** | |
| ≠   Commitments of the Leaders' Summit on Refugees: *Reinforce eligibility procedures based on international standards.*<br>≠   Brazil Plan of Action. | |
| **Supervisors** | COMAR / UNHCR |
| **Existing Activity** | Revision of the eligibility procedures through a Specific Cooperation Agreement between the Ministry of the Interior and UNHCR (Quality Assurance Initiative), enabling the identification of opportunities for strengthening the various stages of the refugee status determination procedure.<br>By August 2017, COMAR had addressed a total of 60 of the 97 UNHCR recommendations in matters of registering and interviewing applicants and issuing resolutions. |
| **Commitment** | |
| ≠   Commitments of the Leaders' Summit on Refugees: *Reinforce eligibility procedures, based on international standards.*<br>≠   Brazil Plan of Action. | |
| **Supervisors** | COMAR / UNHCR |
| **Existing Activity** | In August 2017, the Handbook for Determining the Recognition of Refugee Status in Mexico, the first of its type in Latin America, was completed, governing the performance of Protection Officials. |
| **Commitment** | |
| ≠   Commitments of the Leaders' Summit on Refugees: *Reinforce the presence of COMAR in places where the highest number of applications are registered.* | |
| **Supervisors** | COMAR / UNHCR |
| **Existing Activity** | From November 2016 and with support from UNHCR, 29 new positions were created to support the operations of the Mexican Commission for Refugee Assistance and 9 additional persons were recruited in 2017.<br>These recruitments have directly favoured the offices in Mexico City, the Chiapas Delegation, the Veracruz Delegation and the establishment of a Liaison Office in Tenosique, Tabasco |
| **Commitment** | |
| ≠   Commitments of the Leaders' Summit on Refugees: *Promote information campaigns to disseminate information about the right to seek refuge* | |

| Supervisors | COMAR / UNHCR. |
|---|---|
| Existing Activity | In collaboration with UNHCR, the Ministry of the Interior (SEGOB, by its Spanish acronym) has prepared dissemination information about the right to seek asylum, the determination procedure in Mexico and how to follow the permanent residence procedure. It also prepared a video explaining the various stages of the procedure, to be circulated in COMAR and UNHCR offices. |

| Commitment | |
|---|---|
| ≠   Leaders' Summit on Refugees: *Apply protocols identifying the need for international protection of unaccompanied Children and Adolescents.* | |

| Supervisors | INM / COMAR / National System for Integral Family Development (SNDIF, by its Spanish acronym) |
|---|---|
| Existing Activity | Through the INM, SEGOB has driven the training of 2,705 officials of the National Institute of Migration and the SNDIF as regards the Initial Evaluation Protocol for the Identification of Signs of International Protection Needs. |

| Commitment | |
|---|---|
| ≠   Brazil Plan of Action, San Jose Action Statement | |
| ≠   Commitments of the Leaders' Summit on Refugees | |

| Supervisors | COMAR / National System for the Comprehensive Protection of Children and Adolescents (SIPINNA, by its Spanish acronym) / UNHCR |
|---|---|
| Existing Activity | Strengthening the office of the Federal Attorney for the Protection of Children, through training strategies and technical support. |

## PILLAR 2 - Immediate and ongoing needs

| Commitment (Pillars 1 and 2) | |
|---|---|
| ≠   Commitments of the Leaders' Summit on Refugees: *Strengthen dialogue with the authorities in Central American countries and the United States and Canada.* | |

| Supervisors | COMAR / UNHCR |
|---|---|
| Existing Activity | COMAR has participated in joint missions with UNHCR to learn first-hand about the situation in the main countries of origin of asylum seekers. In 2017, missions took place in San Pedro Sula and Tegucigalpa in Honduras. Since 2015, authorities from Mexico, the United States and Canada, with the support of UNHCR, began a dialogue about international protection. The objective of the work sessions has been to address procedures in an attempt to identify actions that might strengthen refugee protection schemes. The last session was held in June 2017 in Montreal, Canada.<br>In July 2017, COMAR Officials attended a personalised training session on eligibility.<br>In September 2017, COMAR participated in the mission to Honduras to explain the refugee status determination procedure in Mexico. |

| Commitment (Pillars 1 and 2) | |
|---|---|
| ≠   Leaders' Summit on Refugees: *Promote alternatives to prevent the administrative detention of asylum seekers* | |

| Supervisors | INM / COMAR / UNHCR |
|---|---|
| Existing Activity | Since July of last year, 1,527 asylum seekers have benefited from alternative accommodation, a measure that is applied generally to all applicants, highlighting the effort made to avoid unaccompanied children and adolescents staying in administrative accommodation. |

| Commitment | |
|---|---|
| ≠   Brazil Declaration and Plan of Action | |
| ≠   San Jose Action Statement | |
| ≠   Commitments of the Leaders' Summit on Refugees | |

| Supervisors | COMAR |
|---|---|

DHSFF0297

| Existing Activity | Guidance and referral to social care programmes through the strengthening of the care and institutional liaison department. |
|---|---|

### PILLAR 3 - Support for host countries and communities

| Commitment | |
|---|---|
| ≠  Brazil Declaration and Plan of Action | |
| **Supervisors** | SEGOB |
| **Existing Activity** | The "Prosperous Border" component of the Southern Border Programme, including inter-agency coordination to provide humanitarian care and enhance security in border municipalities. Improvement of infrastructure and institutional strengthening. |

### PILLAR 4 - Enhance opportunities for durable solutions

| Commitment | |
|---|---|
| ≠  Leaders' Summit on Refugees: *Promote the socio-economic inclusion of those recognised as refugees.* | |
| **Supervisors** | COMAR / Migration Policy Unit (UPM, by its Spanish acronym) / UNHCR |
| **Existing Activity** | In June 2017, SEGOB and UNHCR announced the launch of the second Refugee Population Survey in Mexico, in an attempt to obtain a socio-economic and demographic diagnosis and therefore identify opportunities to help refugees and persons with complementary protection. |

# Main protection gaps and solutions identified

## PILLAR 1. RECEPTION AND ADMISSION

**Identified Protection Gaps (1)**

Strengthening access and rights protection mechanisms for asylum seekers

The growing number of asylum seekers in Mexico represents a series of constant challenges to institutional capacities. The respect of the fundamental principles of non-refoulement and non-penalisation for irregular entry have taken precedence among the actions fostered in the interest of safeguarding international protection principles to which Mexico has adhered through international treaties and national laws.

However, the need to continue strengthening inter-insitutional coordination mechanisms was identified with the intention of improving the conditions of access to the refugee status determination procedure.

Identified protection solutions:

1. Strengthen the permanent communication mechanism between the Mexican Commission for Refugee Assistance (COMAR) and the National Institute of Migration (INM) in migration stations and at places designated for the international transit of persons; as well as between the competent authorities in order to facilitate the identification and referral of persons in need of international protection.

2. Continue to increase the number of alternatives to administrative accommodation for asylum seekers, primarily for unaccompanied children and adolescents (CA), families, persons in a vulnerable situation, the elderly and

DHSFF0298

persons in need of medical and health care.

**Identified protection gaps (2)**

Promoting access to the country through places designated for the international transit of persons

The Law on Refugees, Complementary Protection and Political Asylum and the Migration Law recognise the right of all foreigners to seek asylum in Mexico, regardless of their migration status, as long as the irregular entry in the country does not constitute a crime.

Therefore, the ability to seek asylum by persons fleeing persecution should be prioritised when they enter the country through places designated for the international transit points of persons.

Identified protection solution:

3.  Increase the efficiency of the reception of asylum applications in places in the country designated for the international transit of persons.

**Identified protection gaps (3)**

Agile and efficient issuing of documentation concerning the refugee status determination procedure

It was deemed essential to reduce the time it takes to issue proof of procedure commencement, replacements and/or updates of validity, as well as documents proving the filing of a review appeal. The goal is to ensure that applicants have a valid document that entitles them to an INM condition of stay.

Identified protection solution:

4.  Strengthen coordination between COMAR and the INM to favour the agile issue of documentation concerning the

commencement of procedures before COMAR and the monitoring of the refugee status determination procedure.

**Identified protection gaps (4)**

Age, gender and diversity approach in the admission to the refugee status determination process

Protection and Political Asylum envisages institutional support for the asylum seekers who require it. This includes pregnant

women, children and adolescents (CA), the elderly, disabled persons, persons with chronic conditions and victims of torture or other cruel, inhuman or degrading treatment or punishment, victims of sexual abuse, gender violence or human trafficking; and any others who may be in a vulnerable situation.

COMAR has developed actions favouring the swift identification of international protection needs, as is the case of CA and those with specific vulnerabilities, through contact with the registration department. However, the protection responses based on the needs of the most vulnerable groups show opportunities for continual improvement. These include prioritised assistance for the reception of applications; swift procedural referral for medical or safety reasons; temporary transfer permits between federative entities in the event of emergencies; ensuring face-to-face interviews for children and adolescents, and gender-sensitive care for victims of sexual or gender violence.

Identified protection solutions:

5.  Strengthen actions for the early identification of specific needs that will activate differentiated protection mechanisms for especially vulnerable asylum seekers.



UNHCR / Christian Laverde

## PILLAR 2. IMMEDIATE AND ONGOIN NEEDS

### Identified protection gaps (5)
Care for asylum seekers

Regardless of their migration status, foreigners in Mexico have the right to receive healthcare services, education and access to justice.

The care given to asylum seekers should continue to ensure that the population concerned has the necessary means to access those services and the justice system.

### Identified protection solutions:

6. Inform registration staff in the *Seguro Popular* health coverage system of the right to access that service by asylum seekers and refugees.
7. Strengthen COMAR's referral capabilities in order to accelerate the issue in favour of asylum seekers of a condition of stay for humanitarian reasons
8. Strengthen access to healthcare and mental health services, particularly for victims of crime.
9. Inform healthcare staff of foreigners' rights to access this service, regardless of their migration status and of their registration with *Seguro Popular*.

### Identified protection gaps (6)
Processing of cases by COMAR in coordination with INM in the children, protection, health and justice systems

Given the increase in applications and the diversity of profiles, the need to increase the number of institutional liaison spaces was identified in order to offer differentiated care schemes.

### Identified protection solution:

10. Strengthening the coordination between COMAR and the INM must also include a permanent communication mechanism with the child protection, health and justice systems.

### Identified protection gaps (7)
Greater dissemination of the rights, obligations and needs of asylum seekers and refugees, and the powers of COMAR

Due to the growing number of asylum seekers, branches of the government, civil society organisations, the private sector, academia, asylum seekers and local populations in host and integration communities need to have information about asylum seekers and refugees in Mexico,

DHSFF0300

about their rights and obligations, and about the existence of a federal branch with the power to provide them with protection and care.

**Identified protection solutions:**

11. Development of an information campaign aimed at public institutions and officials to promote sensitive care for asylum seekers, refugees and complementary protection beneficiaries.
12. A clear and commonly accessible record of the national and local level programmes and services for asylum seekers.

**Identified protection gaps (8)**

Age, gender and diversity based care for asylum seekers and refugees

During the refugee status determination procedure, necessary measures must be taken to guarantee that asylum seekers who may be in a situation of vulnerability receive institutional care.

Therefore, the Mexican Government recognises the importance of having sufficient and appropriate administrative structure and human resources to address the needs of women, the elderly, victims of extreme or gender-based violence, children and adolescents and LGBTI persons.

**Identified protection solutions:**

13. Increase human, material and financial resources in order to provide mental healthcare for the treatment of victims of extreme, sexual or gender-based violence, trafficking or addictions at the places with the highest concentration of asylum seekers, refugees and complementary protection beneficiaries.
14. Prioritise the provision of basic needs and the integration of the elderly population in the inter-agency care coordination mechanisms.



UNHCR/ Tito Herrera

## PILLAR 3. SUPPORT FOR HOST COUNTRIES AND COMMUNITIES

**Identified protection gaps (9)**

Characterisation of asylum seekers in host communities and of refugees in integration communities

There is an opportunity to strengthen institutional and administrative capacities to better address the situation of refugees on a national and local level. Up-to-date information needs to be given on the social, economic and governmental spending impact that asylum seekers, refugees and beneficiaries of complementary protection have on first reception and integration communities.

Planning the budget and liaisons for the cooperation requires an analysis of the impact of local communities since their reception of groups of asylum seekers and refugees, considering both the needs of that population and the infrastructure (social and administrative) of the municipalities. The Mexican State understands the importance of impact studies with periodic evaluations in the generation and implementation of development projects that are sustainable in the medium and long term, and that avoid the loss of successive funding opportunities in the event that the results obtained are ineffective.

Identified protection solutions:

15. Impact studies aimed at discovering the characteristics of the population, immediate needs, location and capacities of local communities
16. A development funding programme in the framework of strengthening cities of solidarity and integration.

**Identified protection gaps (10)**

Local government through the creation and institutionalisation of spaces for dialogue in order to generate responses to the needs of local communities and refugees.

Considering the importance of the range of nationalities of refugees and asylum seekers, Mexico estimates that joint responses are required to promote self-reliance and socio-economic integration in host communities.

**Identified protection solution:**

17. In host communities, establish and institutionalise spaces for dialogue with the competent stakeholders, enabling the joint formulation and addressing of needs in terms of the social and economic integration of refugees and asylum seekers.



UNHCR / Tito Herrera

DHSFF0303

## PILLAR 4. DURABLE SOLUTIONS

**Identified protection gaps (11)**

Refugee integration in Mexico

Refugee integration in Mexico requires coordinated and inter-sectoral action as well as involvement from the private sector and civil society.

COMAR has prioritised the search for durable solutions through the integration of refugees and complementary protection beneficiaries into communities. Specifically, it aims to facilitate access to the goods and services offered in the country by public institutions. Furthermore, COMAR has made significant progress through cooperation with other government branches to promote and accelerate refugee integration in Mexico.

However, there are still challenges to refugee integration in all states of the republic.

Identified protection solution:

18. Strengthen spaces for dialogue with the private sector and society in an attempt to fortify the ability to identify areas of opportunity for government branches to work jointly in order to achieve the integration of the refugee population in Mexico.

**Identified protection gaps (12)**

Documentation issued to refugees and complementary beneficiaries in Mexico

Due to the existing misinformation about the rights and obligations of refugees and recipients of complementary protection about permanent residency in Mexico, all government and private sector stakeholders involved in the integration process need to be given more information on these matters.

Identified protection solutions:

19. Provide all authorities, officials and the private sector with information about the value of the permanent residency card as an official identification document and sole requirement of refugees and recipients of complementary protection, in terms of access to social welfare, private services and governmental development programmes.

# Protection and Solutions: Plan of Action

Based on the information gathered during the participatory consultations with the various stakeholders, this Plan of Action highlights the resulting actions with the purpose of favouring the attainment of the identified protection solutions.

| PILLAR 1 – Reception and Admission | | | |
|---|---|---|---|
| **Prioritised Need** | **Continue to increase the number of alternatives to administrative accommodation for asylum seekers, primarily unaccompanied children and adolescents (CA), families, persons in a vulnerable situation, the elderly and persons in need of medical and health care.** | | |
| **Priority Action** | **Implementing parties** | **Schedule** | **Commitment (SJAS, BAP, others)** |
| The Federal Attorney for the Protection of CA will formalise the alternate care legal entity that is being developed as an alternative to administrative accommodation for unaccompanied CA, therefore avoiding their stay in migration stations. | Federal Attorney for the Protection of CA (PFP, by its Spanish acronym) | 2018-2020 | San Jose Action Statement |
| Alongside UNHCR, INM and COMAR will look to enhance capacities for alternatives to administrative accommodation, particularly in the case of family groups. | INM/ COMAR / UNHCR | 2018-2020 | San Jose Action Statement |
| **Prioritised Need** | **Instrumentalise the reception of asylum applications at places in the country designated for the international transit of persons.** | | |
| **Priority Action** | **Implementing parties** | **Schedule** | **Commitment (SJAS, BAP, others)** |
| Replicate the federal coordination mechanisms on a state level among the authorities covering unaccompanied CA (COMAR, INM, SIPINNA), in a manner that favours the reception of CA applications at places designated for international transit, favouring the principle of family unity. | COMAR / INM / SIPINNA | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| **Prioritised Need** | **Strengthen coordination between COMAR and the INM to favour the agile issue of documentation concerning the commencement of procedures before COMAR and the monitoring of the refugee status determination procedure.** | | |
| **Priority Action** | **Implementing parties** | **Schedule** | **Commitment (SJAS, BAP, others)** |
| Increase COMAR presence in the Migration Stations with the highest number of asylum seekers. | INM / COMAR | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |

| | | | |
|---|---|---|---|
| Replicate on a state level the coordination existing between INM and COMAR on a federal level, with its operational features adapted to each regulatory framework, particularly in matters of CA protection and care. | INM / COMAR | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| **Prioritised Need** | **Strengthen actions for the early identification of specific needs for the activation of differentiated protection mechanisms for especially vulnerable asylum seekers.** | | |
| **Priority Action** | **Implementing parties** | **Schedule** | **Commitment (SJAS, BPA, others)** |
| Foster simple, permanent information campaigns in a language understandable to migrants, informing them of their rights and the possibility of seeking asylum or complementary protection. | COMAR / UPM / INM / UNHCR | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| Constant training and awareness raising programmes aimed at public officials who assist or work directly with the population concerned, in order to permanently ensure decent and respectful service that is closely linked to fully respecting their human rights. | COMAR / UPM | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| Evaluate the protocols for detecting the signs that international protection is needed by CA. Identify best practices in order to disseminate them and replicate them in border locations. This will continue the evaluation of their impact on the refugee population. | COMAR / UPM | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| Increase the CA PFP presence in states with the biggest refugee and migrant populations, particularly in border states. Additionally, generate coordination mechanisms for state and municipal attorneys' offices in order to standardise criteria of restitution plans and special protection measures between the PFP and state attorneys' offices. | SIPINNA / PFP | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| Coordinate the Law on Refugees, Complementary Protection and Political Asylum and the Migration Law with the General Law on the Rights of Children and Adolescents. | SIPINNA / UPM | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| Promote the "El Jaguar" information and awareness raising campaign which is run in the areas with the greatest transit and reception of asylum seekers and refugees. The objective is to provide clear and accurate information on the right to seek asylum and to promote the exercise of their rights. | COMAR / UNHCR | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| Sign Collaboration Platforms to increase affiliation to *Seguro Popular* by the National Commission of Healthcare Protection, by recognising COMAR-issued documents. | COMAR / Seguro Popular | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| Incorporate refugees and recipients of complementary protection into the scaled care mental health scheme. This involves a training process for officials who provide federal level healthcare services, promoting their awareness of the subject. | COMAR / Ministry of Health | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |

DHSFF0306

## PILLAR 2 - Immediate and ongoing needs

| Prioritised Need | Strengthening the coordination between COMAR and the INM must also include a permanent communication mechanism with the child protection, health and justice systems. | | |
|---|---|---|---|
| **Priority Action** | **Implementing parties** | **Schedule** | **Commitment (SJAS, BPA, others)** |
| Standardisation of the CA interview format, with the objective of avoiding interviews that victimise unaccompanied CA. | SIPINNA / COMAR | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| **Prioritised Need** | **Development of an information campaign aimed at public institutions and officials to promote sensitive care for asylum seekers, refugees and complementary protection beneficiaries.** | | |
| **Priority Action** | **Implementing parties** | **Schedule** | **Commitment (SJAS, BPA, others)** |
| Constant training and awareness raising programmes aimed at public officials who assist or work directly with the population concerned, in order to permanently ensure decent and respectful service that is closely linked to fully respecting their human rights. | COMAR / UPM | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| **Prioritised Need** | **A clear and commonly accessible record of the state and local level programmes and services for asylum seekers.** | | |
| **Priority Action** | **Implementing parties** | **Schedule** | **Commitment (SJAS, BPA, others)** |
| MIRPS institutions will share with COMAR and UNHCR materials describing the programmes and activities undertaken, so that they will be included in the record. | COMAR / UNHCR | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| **Prioritised Need** | **Increase human, material and financial resources in order to provide mental healthcare to treat victims of extreme, sexual or gender-based violence, trafficking or addictions at the places with the highest concentration of asylum seekers, refugees and complementary protection beneficiaries.** | | |
| **Priority Action** | **Implementing parties** | **Schedule** | **Commitment (SJAS, BPA, others)** |
| UNICEF will create and share support materials in CA-appropriate language, to be used during eligibility interviews, and it will also support COMAR and the Federal Attorney for the Protection of CA in the adaptation of the language used in the surveys for that population. | COMAR / UNICEF | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| Inclusion of the refugee population as a target group of the work strategy of the national community work and labour guidance network, which involves 200 organisations. It will also provide information spaces for the dissemination of refugee matters on TV UNAM and it will share its directory of shelters. | National Institute of Adult Education (INEA, by its Spanish acronym) /COMAR | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| Programmes for the strengthening of refugees' | INEA / | 2018-2020 | San Jose Action Statement, |

DHSFF0307

| vocational skills, in addition to training as "educational consultants" for staff in migrant shelters. | COMAR | | Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
|---|---|---|---|
| INEA will open the "Education without Borders" programme not just to returnees but also to refugees, seeing as it has modules on admission into the country. | INEA / COMAR | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |

| **Prioritised Need** | **Prioritise care covering the basic needs and integration of the elderly population in the inter-agency care coordination mechanisms.** | | |
|---|---|---|---|
| **Priority Action** | **Implementing parties** | **Priority Action** | **Implementing parties** |
| Inform state delegations of the possibility of issuing an INAPAM Card (National Institute of the Elderly discount card) to asylum seekers, refugees and complementary protection beneficiaries. | COMAR / INAPAM | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| Special protocol for refugee care so that the INAPAM card is issued upon presentation of the documentation issued by COMAR and INM. | INAPAM / COMAR | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |

## PILLAR 3 - Support for host countries and communities

| **Prioritised Need** | **Impact studies aimed at discovering the characteristics of the population, immediate needs, location and capacities of the local communities.** | | |
|---|---|---|---|
| **Priority Action** | **Implementing parties** | **Schedule** | **Commitment (SJAS, BPA, others)** |
| The Ministry of Population, Migration and Religious Matters – Ministry of the Interior (SPMAR-SEGOB, by its Spanish acronym) will share their generated statistical information with actors on all three governmental levels. The objective is to learn about the characteristics of the populations and to identify opportunities and the impact of their inclusion in various programmes and services. | COMAR / UPM | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| The National Council to Prevent Discrimination (CONAPRED, by its acronym in Spanish) will support COMAR in the realisation of a host communities diagnosis to bolster their target population reception capacities. | COMAR / CONAPRED | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| The UPM will promote synergies and effort-optimisation among governmental and academic institutions and civil society organisations, in order to generate studies and information linked to the design and evaluation of public policy caring for asylum seekers and recipients of complementary protection. | UPM | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| COMAR, in association with UPM, will drive the development of campaigns which disseminate and make visible the contributions of international protection beneficiaries in Mexico, | COMAR / UPM | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, |

| | | | |
|---|---|---|---|
| so as to prevent stereotypes and as a way to combat the xenophobia shown to foreigners. | | | Commitments of the Leaders' Summit on Refugees |
| Include refugees and recipients of complementary protection in the social mandate of institutions, in order to create relevant and sustainable development policies. | National Institute of Social Development (INDESOL, by its acronym in Spanish) / COMAR | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| Identify states and municipalities with the highest concentration of elderly asylum seekers, refugees and recipients of complementary protection, to promote their inclusion in the Clubs for the Elderly Programme, focusing on the entities where they are located. | INAPAM / COMAR | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| **Prioritised Need** | **In host communities, establish and institutionalise spaces for dialogue with the competent stakeholders, enabling joint collaboration and the addressing of needs in terms of the social and economic inclusion of refugees and asylum seekers.** | | |
| **Priority Action** | **Implementing parties** | **Priority Action** | **Implementing parties** |
| Establish coordination mechanisms in joint UPM/CONAPRED initiatives to include matters of refugee population inclusion in their campaigns and programmes. | UPM / CONAPRED | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| UNHCR will realise three projects a year, aimed at peaceful coexistence in the three main asylum seeker reception locations. | UNHCR / COMAR / Municipal Governments | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| Foster spaces for cultural exchange and learning in host communities, favouring the integration of refugees and foreigners. | COMAR / UPM / UNHCR | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| UNHCR is mobilising the population of asylum seekers and recognised refugees to support reconstruction efforts in the migration route areas affected by the earthquakes of September 2017. | UNHCR | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| UNDP is identifying opportunities for creating a finance programme for the development of border cities of solidarity and integration. | UNDP | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |

DHSFF0309

## PILLAR 4 - Enhance opportunities for durable solutions

| Prioritised Need | Strengthen spaces for dialogue with the private sector and civil society in an attempt to fortify the ability to identify areas of opportunity to work jointly with government branches in favour of the integration of the Mexican refugee population. | | |
|---|---|---|---|
| **Priority Action** | **Implementing parties** | **Schedule** | **Commitment (SJAS, BPA, others)** |
| Coordination of labour inclusion mechanisms aimed at asylum seekers, refugees and recipients of complementary protection who have a Unique Population Registry Code (CURP, by its acronym in Spanish). | Ministry of Labour and Social Welfare (STPS, by its acronym in Spanish) / COMAR | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| Creation of a guide or handbook and subsequent training in the National Employment System (SNE, by its acronym in Spanish) to facilitate access to services and benefits such as grants, training, internships and support for self-employment. | STPS / COMAR | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| Evaluation of programmes that facilitate refugee access to housing programmes. | National Housing Commission (CONAVI, by its acronym in Spanish) / COMAR | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| Revision of the rules of operation of housing programmes, adding a specific annex for refugees and complementary protection beneficiaries. | Ministry of Agrarian, Territorial and Urban Development (SEDATU, by its acronym in Spanish) / COMAR | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| **Prioritised Need** | Provide all authorities, officials and the private sector with information about the value of the permanent residency card as an official identification document and sole requirement of refugees and beneficiaries of complementary protection, in terms of access to social care and private services, and governmental development programmes. | | |
| **Priority Action** | **Implementing parties** | **Schedule** | **Commitment (SJAS, BPA, others)** |
| Promotion before the Executive Committee of the Association of Mexican Banks to raise banks' awareness of the situation of refugees and the importance of refugee access to financial services through the permanent residency card issued by the INM. | National Banking and Securities Commission (CNBV, by its acronym in Spanish) / COMAR / UNHCR | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of Action, Commitments of the Leaders' Summit on Refugees |
| Resume collaboration between the Ministry of Social Development (SEDESOL, by its acronym | COMAR / SEDESOL | 2018-2020 | San Jose Action Statement, Brazil Declaration and Plan of |

DHSFF0310

| in Spanish) and COMAR to go further in providing access to social programmes accessible by refugees in Mexico. | Action, Commitments of the Leaders' Summit on Refugees |
|---|---|

## Next Steps

Having set out its national chapter, Mexico eagerly awaits the Regional Framework document and how it will serve as an input for the Global Compact.

At the same time, a monitoring mechanism must be put into place to address the activities set out in the Plan of Action with the various stakeholders and with support from the relevant international agencies.



UNHCR / G. Menezes

DHSFF0311



## ACRONYMS

| | |
|---|---|
| **CA** | Children and adolescents |
| **CNBV** | National Banking and Securities Commission |
| **COMAR** | Mexican Commission for Refugee Assistance |
| **CONAPRED** | National Council to Prevent Discrimination |
| **CONAVI** | National Housing Commission |
| **DIF** | National System for Integral Family Development |
| **INAPAM** | National Institute of the Elderly |
| **INEA** | National Institute of Adult Education |
| **INM** | National Institute of Migration |
| **PFP** | Federal Attorney for the Protection of Children and Adolescents |
| **SEDATU** | Ministry of Agrarian, Territorial and Urban Development |
| **SEDESOL** | Ministry of Social Development |
| **SEGOB** | Ministry of the Interior |
| **SER** | Ministry of Foreign Affairs |
| **SIPINNA** | National System for the Comprehensive Protection of children and adolescents |
| **SNE** | National Employment System |
| **STPS** | Ministry of Labour and Social Security |
| **UPM** | Migration Policy Unit |

UNHCR/ Santiago Escobar Jaramillo

DHSFF0312

# Panamá





UNHCR / Tito Herrera

DHSFF0313

# Introduction

Panama confirmed its participation in the Comprehensive Regional Protection and Solutions Framework for Central America and Mexico (MIRPS) in July 2017. The Ministry of Government considered it key to implement comprehensive responses for refugees.

Panama as a host country, along with other countries of the region, committed through the 2014 Brazil Plan of Action5 and the 2016 San Jose Action Statement6 to improving international protection for asylum seekers and refugees fleeing their countries of origin. This commitment was ratified by Panama in the High Level Meeting on Refugees and Migrants of the General Assembly of the United Nations on September 19, 2016, which resulted in the adoption of the New York Declaration on Refugees and Migrants and the Comprehensive Refugee Response Framework - CRRF7.

Through this MIRPS exercise, Panama assumed leadership for defining a National Operational Plan, the design of which will include strategies, programmes and actions needed for the strengthening of protection and solutions for asylum-seekers and refugees on Panamanian territory..

In recent years, Panama has undergone changes in the dynamic of asylum applications, with an increase in the number of applications from persons and/or family units fleeing from violence in search of international protection, who come mainly from northern Central American countries, Colombia and Venezuela and choose Panama as their host country.

According to statistics from the National Office for the Attention of Refugees (ONPAR, by its acronym in Spanish), Panama recognised 2,474 refugees between 1990 and the first half of 2017.

The Panama chapter of the MIRPS process was developed through a national consultation process to take stock of the progress and achievements made in the face of previously assumed commitments (the Brazil Plan of Action, San Jose Action Statement, Ministry of Government – UNHCR Memorandum of Understanding). It also identifies the ongoing gaps in protection, priorities, resources and national capacities for a comprehensive response to asylum seekers and refugees. The national consultations involve national and governmental institutions, United Nations agencies, civil society organisations, the private sector and donors. Similarly, consultations were held with the population of concern in Panama (with a total of 12 focus groups and 113 persons of concern consulted in Panama City and Colón), to identify, from their perspective, progress, risks, protection needs and/or ongoing gaps in order to take their priorities and proposed solutions into consideration.

These will be the basis for the design of the response and improvement strategies in the National Operational Plan, which is still work in progress. Likewise, bilateral consultation roundtables were held during the process to complement the information and possible responses.

DHSFF0314

# Methodology

When working on its national plan and MIRPS chapter, Panama held a series of local consultations through thematic roundtables formed of governmental institutions, civil society and the United Nations and coordinated by the Ministry of Government and the Ministry of Foreign Affairs, with support from UNHCR.

In order to use a comprehensive approach during the consultation process, various entities were contacted (Panama City Council, Colón City Council, National Institute of Professional Training for Human Development [INADEH, by its acronym in Spanish], HIAS, Pastoral Group of Human Mobility, NRC, Red Cross, RET, Chamber of Commerce, United Nations System, and others still being registered) so as to include an institutional outlook and a mapping of the current situation of existing policies concerning the MIRPS pillars (which is now underway and/or being processed, along with the main gaps).

In this regard, it was deemed that two processes needed to be developed:

≠ A local consultation with the population of concern through a participatory diagnostic, with the support of a consultant.
≠ Institutional consultation roundtables (with national entities, agencies from the United Nations System and civil society organisations) on previously identified commitments and priorities.

Para la consulta con población, se utilizó la herramienta del ACNUR para realizar diagnósticos participativos, para lo cual se diseñaron preguntas orientadoras previas, con base en los ejes del MIRPS.

In the consultation with the population, a UNHCR tool was used for making participatory diagnostics. Guidance questions based on the CRRF pillars were designed for this.

In the consultations with entities, two roundtables were held to discuss the first three pillars, with participation from government entities (Ministry of Government – MINGOB, Ministry of Foreign Affairs – MINREX, Ministry of Labour – MITRADEL, Ministry of Education – MEDUCA, Ministry of Health – MINSA, Ministry of Security – MINSEG, Ministry of Social Development – MIDES, National Migration Service – SNM, National Border Service – SENAFRONT, National Secretariat for Children, Adolescents and Family – SENNIAF, Office of the Ombudsman, Electoral Tribunal, National Institute for Women – INAMU, Institute for Training and Development of Human Resources – IFARHU, [all acronyms from the Spanish]), civil society (Red Cross of Panama, Pastoral Group of Human Mobility, HIAS, RET, NRC) and United Nations agencies (UNICEF, UNDP, FAO, UNHCR).

The International Cooperation roundtable is also going to be developed, seeking complementary actions to integrate asylum seekers and refugees into society. Similarly, a

DHSFF0315

technical roundtable on shared responsibility will be established to identify Panama´s commitments with the countries of the region.

In terms of coordination, it is important to mention that an Executive Board has been formed consisting of:

≠   Ministry of Interior

≠   Ministry of Foreign Affairs

≠   UNHCR (with a specific duty as technical secretariat).

This Executive Board will have two levels: a technical level and a political level for the final approval and validation of Panama's operational plan and commitments.



UNHCR / María Jesús Vega

# Protection and Solutions: Overarching Gaps and Needs

Panama has made prior commitments in the San Jose Action Statement (SJAS), the Memorandum of Understanding (MoU) between the Ministry of Government and UNHCR, the recommendations of the various phases of the QAI Programme and the words that the President of the Republic of Panama, His Excellency Juan Carlos Varela, spoke before the General Assembly of the United Nations in September 2016. The following commitments for the MIRPS process should be highlighted from among those mentioned above:

≠   Continuing capacity building of state officials posted in border areas on the rights and profiles of the asylum seeking populations (SJAS 1).

≠   Developing a protocol for the assistance of girls, boys and adolescents in need of international protection, whether they are accompanied or not (SJAS 2).

≠   Ensuring the participation of girls, boys and adolescents in their refugee status determination procedures, guaranteeing that they will receive the necessary assistance (SJAS 3).

≠   Strengthening the capacity of state officials in charge of determining asylum applications and of the members of the National Commission for the Protection of Refugees (SJAS 4).

≠   Continuing working with UNHCR in the implementation of the Quality Assurance Initiative for refugee status determination, as Panama considers it fundamental that all asylum seekers should be able to access due process respecting their human rights (SJAS 5).

≠   Continuing strengthening technical capacities of the National Office for Refugee Assistance (ONPAR), the office in charge of processing asylum applications, and analyzing the mechanisms to ease the procedure, as far as possible. To this effect, Panama continues counting on the support of UNHCR (SJAS 6).

≠   Providing international protection to all those persons that fulfil the requirements established by the 1951 Convention as well as by the Panamanian Law established to that effect. Panama will continue adopting actions directed at strengthening its asylum system to ensure that its protection is effective (SJAS 7).

≠   Continuing working with the various state institutions, private enterprises and civil society in the campaign for the integration of refugees, which includes information around the realities they are facing in order not to be discriminated against and promoting access to livelihoods, public services and other aspects necessary to satisfy their needs, which is essential to obtain an adequate standard of living in Panama (SJAS 8).

≠   Developing public policies within the scope of its competencies and adapting existing ones so that they favour the inclusion, integration and durable solutions for the population of interest, in close coordination with Government Institutions whose mandates may favour the population of interest. This public policy will be focused on inclusion and Human Rights (MoU 1).

DHSFF0317

≠ Identify, establish and consolidate specific mechanisms enabling refugees and asylum seekers to access the country's public and social policies that facilitate their local integration (MoU 2).

≠ Access to banking services by refugees (MoU 3).

≠ Effective access to school and university education: MEDUCA protocol, validation of qualifications. Sensitisation within the education sector (schools and universities). Access by refugees and asylum seekers to vocational courses and training provided by governmental institutions (MoU 4).

≠ Initiate and formalise a Durable Solutions Process for Local Integration in Panama. Allow the refugee population to become gradually integrated into the culture of the country of asylum without prejudice to their own cultural traditions (MoU 5).

≠ Refugees have the same right to access public services as the local population. The interaction between refugees and the local community enables the former to participate in the social life of their new country, without fear of discrimination or hostility (MoU 6).

≠ Information campaigns to raise awareness about who refugees are and what their obligations and rights are (MoU 7).

≠ Recognition of the identification card as a valid document by government institutions and officials. Removal of the word "refugee" from identity documents (MoU 8).



UNHCR

Listed below are the actions that Panama has or is currently carrying out for the implementation of these commitments:

| STOCKTAKING EXERCISE | | |
|---|---|---|
| **Responsible Ministry/Office /National Partner** | **Existing Activity** | **Commitment** |
| **Pillar 1: Legal Matters and Protection** | | |
| *Access to the country and its RSD procedures (at the border) and prevention of refoulement* | | |
| MINGOB/ONPAR, SENAFRONT, SNM | Short training sessions on Effective Access to the Right of Asylum and Applicable National Legislation, reinforcing the application of non-penalisation for irregular entry. | Continue capacity building for state officials posted in border areas on the rights and profiles of the asylum-seeking and refugee populations (SJAS). |
| MINGOB/ONPAR, SENAFRONT, SNM | Provide SNM and SENAFRONT with informational material about the refugee status determination procedure. | |
| ONPAR | Sporadic ONPAR missions to border areas and presence of an ONPAR official in Guna Yala. | |
| OMBUDSMAN | Ombudsman presence in land border areas, creating the possibility of providing support in guiding refugees and local authorities in refugee law. | |
| SENNIAF, ONPAR | Draft Protocol on Assistance for Unaccompanied and/or Separated Children and Adolescents (CA) in need of protection, with SENNIAF. | Develop a protocol for the assistance of girls, boys and adolescents in need of international protection, whether they are accompanied or not (SJAS). |
| *Fair and efficient refugee status determination procedures* | | |
| UNHCR, MINGOB / ONPAR | Since 2012, UNHCR has been collaborating with MINGOB and ONPAR for the implementation of the QAI programme: the majority of the recommendations have been implemented, the quality of resolutions and analysis has been improved, and procedures have been adapted for persons with specific needs. | Continue working with UNHCR in the implementation of the Quality Assurance Initiative for refugee status determination, as Panama considers it fundamental that all asylum seekers should be able to access due process respecting their human rights (SJAS). |
| MINGOB/ONPAR, NATIONAL COMMISSION | Increase the number of National Commission for Refugee Protection meetings per year, in order to process more cases. | |
| MINGOB/ONPAR | Adaptation of the procedure: more child-friendly measures (adapted format of the sworn statement) and training officials in interviewing children. | Ensure the participation of girls, boys and adolescents in their refugee status determination procedures, guaranteeing that they will receive the necessary care (SJAS). |
| MINGOB/ONPAR | Make improvements in the motivation of resolutions and RSD analysis processes: composition, inclusion of information and structure. | Strengthen the capacity of state officials in charge of determining asylum applications and of the members of the National Commission for the Protection of Refugees (SJAS). |
| *Documentation for recognised refugees* | | |
| MINGOB/ONPAR, | Passing of Law No. 74 of October 15, | Develop public policies within the |

DHSFF0319

| | | |
|---|---|---|
| MITRADEL | 2013, establishing requirements so that refugees can apply for permanent residency. | scope of its competencies and adapting existing ones so that they favour the inclusion, integration and durable solutions for the population of interest, in close coordination with Government Institutions whose mandates may favour the population of interest. This public policy will be focused on inclusion and Human Rights (MoU). |
| *Regulation* | | |
| MINGOB/ONPAR | Current revision of Decree No. 23 of 1998. | |
| **Pillar 2: Access to Basic Needs** | | |
| *Access to basic services (healthcare, shelter, food, safety) and immediate responses* | | |
| NGO | Civil society organisations are providing Humanitarian Assistance through programmes or projects funded mainly by UNHCR or the Bureau of Population, Refugee and Migration at the US Department of State (PRM). | Refugees have the same right to access public services as the local population. The interaction between refugees and the local community enables the former to participate in the social life of their new country, without fear of discrimination or hostility (MoU). |
| PANAMA MUNICIPALITY | The Panama City Council has a Refugee Care Programme. It also provides a small amount of assistance (through an agreement) to the Hogar Luisa Comprehensive Accompaniment Centre of the Pastoral Group of Human Mobility (PMH, by its acronym in Spanish) as regards shelter (the only instance in the country for this population). | |
| NGO, MINSA | Civil society organisations, through advocacy in healthcare centres or hospitals, support the persons of interest in their access to the public or private healthcare system. When necessary they also provide support in the funding of medical and medicinal costs. | Identify, establish and consolidate specific mechanisms enabling refugees and asylum seekers to access the country's public and social policies that facilitate their local integration (MoU). |
| MINSA | It is worth highlighting the care provided at Santo Tomás Hospital: checkups, appointments, examinations and childbirth care, among other services, even waiving payments or accepting minimum agreements. | |
| INAMU | Within the Equal Opportunities for Women Policy, INAMU provides care for female refugees and asylum seekers. | |
| **Pillar 3: Local Integration and Livelihoods** | | |
| *Generation of income / livelihoods* | | |
| ONPAR/MINGOB, MITRADEL | Law 74 of 2013 establishes that refugees who gain permanent residency can obtain an indefinite work permit, reducing the risk of losing jobs due to delays caused by the annual renewal of work permits. | Develop public policies within the scope of its competencies and adapting existing ones so that they favour the inclusion, integration and durable solutions for the population of interest, in close coordination with Government Institutions whose mandates may favour the population of interest. This public policy will be focused on inclusion and Human Rights (SJAS). |

| SUPERINTENDENCE OF BANKS | The Superintendence of Banks, the body that governs the Panamanian banking system, issued a General Resolution to guide banks in providing access to bank accounts to refugees with permanent residency. | Access to banking services by refugees and asylum seekers (MoU). |
|---|---|---|
| *Education* | | |
| MEDUCA, ONPAR/MINGOB | Progress in the signing and implementation of MEDUCA Decree No. 1225 to reduce the processing time of the qualification validation and enrolment of CA asylum seekers arriving in Panama (progress is currently being made in the design of a Guide and Procedural Handbook for the nationwide implementation of the Decree). | Effective access to school and university education: MEDUCA protocol, validation of qualifications. Sensitisation within the education sector (schools and universities). Access by refugees and asylum seekers to vocational courses and training provided by governmental institutions (MoU). |
| INADEH | INADEH is admitting refugees (permanent residents) into its training programmes. | |
| *Socio-cultural integration* | | |
| MITRADEL | The identification document in work permits for recognised refugees no longer contains the word "refugee". | Removal of the word "refugee" from identity documents (MoU). |
| MINGOB/ONPAR, UNS, NGO | Sensitisation campaigns (schools) and commemorative acts (World Refugee Day - WRD) that influence public opinion. | Sensitisation campaigns to raise awareness about who refugees are and what their obligations and rights are (MoU). |

DHSFF0321

The following gaps were identified in the Panama Chapter of the MIRPS consultation exercise, including the conclusions of the work carried out with refugees and asylum seekers, organised by pillar and thematic area:

# PILLAR 1. LEGAL MATTERS AND PROTECTION

*Access to territory and to RSD procedures (at the border) and prevention of refoulement*

Among others, the gaps identified in this thematic area are: the limited presence of ONPAR in border areas and in Tocumen airport; the absence of Protocols on the Referral and Identification of Cases that guarantee access to ONPAR, SNM and SENAFRONT procedures that ensure the receiving authority's obligatory referral mandated in Decree No. 23/1998 and that guarantee an active role of the safety departments in the identification of persons in need of international protection; the high rotation of SNM and SENAFRONT staff at border crossing points, hindering the permanence of staff trained in the identification of persons in need of international protection, despite the efforts of ONPAR, SENAFRONT and SNM to organise training sessions on refugee law and international protection; and the lack of detailed statistical information on persons who were denied entry, categorised by nationality, age and gender (SNM).

*Fair and efficient refugee status determination procedures*

The following gaps were identified as priorities within this subject: the delaying of cases due to the level of applications exceeding ONPAR's capacity, leading to delays in registration/interviews and resolution processes; the physical limitations of the building that houses ONPAR, hindering the practical possibility of guaranteeing confidentiality during interviews, thus potentially distorting the interview results; practical difficulties in ensuring the right to legal representation of applicants in preventive detention shelters as well as in guaranteeing the availability of qualified interpreters if required; limited alternatives to the detention of asylum seekers in preventive detention shelters; Panama's documentation-related difficulties with asylum seekers (issue of documentation at the moment of filing the application and recognition of ONPAR-issued documents); the need for an agile and practical information management system, facilitating the production of statistics that would support the decisions made on various topics related to the protection of refugees and enable the automatic checking of the progress of the process, improving internal management and information to applicants; and the lack of an administrative appeal before a higher body in the event of resolutions of non-admittance, as well as the very short deadlines for the filing of appeals for cases of non-admission (they can only be sent for reconsideration and appeals cannot be made).

DHSFF0322

*Documentation of recognised refugees (temporary residency, permanent residency, naturalization and work permits)*

Identified among the gaps of this thematic area were, above all: the administrative difficulties related to the renewal process of various documents, sometimes putting people at risk due to missing the protection granted by said document during the process, the risk of being fined, or the need to provide documentation that is hard to attain for refugees; and the fact that naturalisation is not identified as the natural conclusion of integration as a durable solution, due to the high cost involved for refugees, thus making integration difficult in the host country.

*Regulation*

Lastly, the gaps identified in the first pillar include, for example: the inability of asylum seekers to access a temporary work permit, thus wasting human capital and the experience, training and expertise of asylum seekers and refugees in Panama; and the non-recognition of the broad definition of refugee (Cartagena Declaration) in current Executive Decree No. 23/1998, putting persons with a well-founded fear of generalised violence in their countries of origin at risk of losing their rights.

## PILLAR 2. ACCESS TO BASIC NEEDS

*Access to basic services (healthcare, shelter, food, safety) and immediate responses*

Within this Pillar, the identified prioritised gaps were as follows: the lack of national emergency food provision programmes (coupons, discounts, soup kitchens, etc.) for refugees and asylum seekers; the serious limitation in guaranteeing emergency shelter for asylum seekers and refugees (the only option is the Hogar Luisa Shelter of PMH); the inadequate access to psychological and psychiatric care for the persons concerned who may also have mental health issues due to the long refugee status determination process; the need for decent housing (the high cost of rent and the impossibility of regular work without the due permit means that asylum seekers live in overcrowded, insanitary and insecure homes); and the poor communications in the referral and care of women refugees and asylum seekers who have been victims of gender-based violence (GBV).

## PILLAR 3. SOCIO-CULTURAL INTEGRATION AND LIVELIHOODS

*Generation of income / livelihoods*

In pillar three, the gaps identified in the first thematic area include: the inability to access a work permit by asylum seekers who are not only in situations of economic and social risk but also suffering labour abuse and exploitation by their employers; the extreme difficulties of asylum seekers and refugees in the opening of bank accounts and in the recognition of their identification documents for banking procedures; difficulty in obtaining decent work with the same rights as nationals, due to the stigmatisation of the persons concerned; and limitations when accessing micro-credits due to documentation (asylum seekers) and requirements/costs (refugees).

*Education*

In terms of education, the main gaps are: the ignorance of Decree 1225 in some regional

DHSFF0323

MEDUCA offices, delaying the qualification validation and enrolment of CA asylum seekers (delays or possible overage); the need to develop the Decree 1225 Procedural Handbook, along with the proof of location, bringing the Decree into force nationwide; difficulties in accessing higher education due to the required documentation (proof of all prior studies); and the limited stay of CA refugees and asylum seekers in schools and other education centres, due to not having access to the Universal Grant, among other reasons.

*Socio-cultural integration*

As regards socio-cultural integration, the gaps identified were, among others: bullying and discrimination in schools by both teachers and students; in some cases, the failure to recognise their identification due to a lack of knowledge of their rights and identification documents; a lack of information about the rights and obligations of the refugee and asylum-seeking population, both in the general population and the institutions, and that might raise awareness on the situation of those persons; and a lack of spaces for consensus-building between refugees / asylum seekers and public institutions.



UNHCR/Tito Herrera

| Prioritised Need | Prioritised Action | Implementing parties (Coordinating agency in **bold**)[8] | Schedule | Commitment (SJAS, BPA, etc.) |
|---|---|---|---|---|
| **Pillar 1: Legal Matters and Protection** | | | | |
| *Access to the country and its RSD procedures (at the border) and prevention of refoulement* | | | | |
| Strengthen the training processes of public officials at the borders (especially those of SENAFRONT, National Air and Naval Service [SENAN, by its acronym in Spanish] and SNM) in refugee matters, in order to increase the identification and referral capacity of border officials in direct contact with migrants and persons in need of international protection (PNIP). | Formulate a training plan in various border institutions (SENAFRONT, SENAN, National Police, SNM) for the provision by ONPAR of training programmes to officials, with UNHCR support. | SENAFRONT, SENAN, NATIONAL POLICE, SNM, **ONPAR/MINGOB,** UNHCR | Before the year's end | SJAS 1 |
| Include, in the curriculum of the National Migration Service Academy, a module about International Law and Persons in Need of International Protection, so that graduated officials already know about the subject and can learn more depending on their job destination. Revise and update the subjects included in the SENAFRONT curriculum. | Establish a dialogue working group with the Academic Departments of SENAFRONT and SNM on the possible development of a programme subject about refugees within the curriculum of each institution. | SENAFRONT, SNM, **ONPAR/MINGOB,** UNHCR | During 2018 | SJAS 1 |
| Subscribe to action protocols for the due identification and referral of persons in need of international protection or who have expressed the desire to be recognised as refugees. This will be done between ONPAR and SNM to ensure the receiving authority's obligatory referral mandated in Decree No. 23/1998, and to guarantee an active role of the safety departments in the identification of persons in need of international protection. (Draft Protocol between SNM and ONPAR). | Revision of the previously drafted protocol (ONPAR - SNM) for its validation and possible signature. | SNM, **ONPAR,** UNHCR | During 2018 | SJAS 7 |
| Create a guide for the identification and referral of persons in need of international protection or who have expressed the desire to be recognised as refugees, based on the draft protocol between SENAFRONT and ONPAR, and ensure its widespread dissemination amongst staff. | Create a guide aimed at SENAFRONT staff, based on the draft protocol. | SENAFRONT, **ONPAR**/MIN GOB, UNHCR | During 2018 | SJAS 7 |
| Sign an Assistance Protocol for Unaccompanied and/or Separated CA in Need of Protection, between SENNIAF and ONPAR. | SENNIAF and ONPAR will validate and sign the Assistance Protocol for Unaccompanied and/or Separated CA in Need of Protection. | SENNIAF, **ONPAR** | Before the year's end (2017) | SJAS 2 |
| *Fair and efficient refugee status determination procedures* | | | | |
| Need to revise Executive Decree No. 23/1998, producing the modification and signature of a new Decree that includes new procedures such as: | Revision by ONPAR and MINGOB of the current Decree, based on international law and the needs identified for improving the | ONPAR, **MINGOB** | Before the year's end (2017) | MoU 1 |

DHSFF0325

| | | | | |
|---|---|---|---|---|
| reduce the status determination process time, increase the efficiency of the documentation process and expedite processes if the requirements are fulfilled (based on due process). | protection system, and its approval. | | | |
| Efficient registration system for the procedure: better data exchange in the database and an application that enables any public institution (i.e. security) device to check on the progress of a person's refugee status determination file, without the need to exchange information between institutions. | Work on the implementation of a new ONPAR database, enabling the more efficient management of files, improving the production of statistics, and enabling the simple checking of the progress of a person's refugee status determination application (QR technology). | **ONPAR,** United Nations System | Before the year's end (2017) | SJAS 6 |
| Overcome weaknesses in the documentation process: other institutions' failure to recognise ONPAR-issued documentation, the numbering of documents by ONPAR and SNM, etc. | Coordinate a technical roundtable formed of MINGOB/ONPAR and SNM, with technical support from UNHCR, to address various subjects in the jurisdiction of both institutions, particularly those linked to documentation (recognition of documents, standardisation and improvement of criteria/documents), as well as those related to asylum seekers' administrative detention, in order to prevent it through the implementation of alternative measures and the improvement of identification and verification tools. | ONPAR, **SNM,** UNHCR | November 2017 | SJAS 8 |
| Provide ONPAR with more human and financial resources so that it has sufficient capacity to respond to the growing number of applications. | Recruitment of more ONPAR staff in response to the growing number of applications and to avoid delays. | **MINGOB,** occasional support from UNHCR | During 2018 | SJAS 4, SJAS 6 |
| Guarantee a suitable space for the current volume of files and a private, confidential, safe and trustworthy setting for interviews. | Adapt ONPAR facilities so that they are suitable for covering the needs of the interview process and file archiving, maintaining the principle of confidentiality. | **MINGOB,** occasional support from UNHCR | Before the year's end (2017) | SJAS 6 |
| Ensure the regular holding of meetings of the National Commission for the Protection of Refugees: at least once a month in order to review as many files as possible per year. | Ensure that the reform of Decree No. 23/1998 modifies the frequency of Commission meetings, changing it to bi-monthly ordinary meetings with the option of additional extraordinary meetings.<br><br>Hold extraordinary Commission meetings until the reform of the Decree enables the holding of ordinary bi-monthly meetings. | MINGOB, ONPAR, **COMMISSION** | The holding of annual extraordinary meetings shall continue. | SJAS 4 |
| Seek free legal representation in various procedures for asylum seekers and refugees. | Subscribe to agreements with Universities (that teach Law degrees) or other types of entities that can provide free legal consultancy and representation to asylum seekers and refugees. | | | |

### Documentation for recognised refugees (temporary residency, permanent residency, naturalisation and work permits)

| | | | | |
|---|---|---|---|---|
| Reduction of the issue and renewal times of work permits so that people are not left unprotected when said | Dialogue with MITRADEL to analyse the possible reduction of the issue and renewal times of work | MITRADEL, **MINGOB** | Before the year's end | SJAS 8 MoU 2 |

DHSFF0326

| documents are not valid. | permits for refugees. | | | |
|---|---|---|---|---|
| *Regulation* | | | | |
| Drive the reform of Decree no. 23, incorporating priority pillars of the Brazil Plan of Action so that it can be signed sooner. | Decree 23 revision exercise, based on the foregoing. | **MINGOB,** ONPAR | During 2018 | SJAS 7 MoU 1 |
| Pursuant to adhesion to the 1954 Convention relating to the Status of Stateless Persons (in 2011), establish an internal procedure for the recognition of stateless persons in Panama. | Seek alternatives to work on a Decree that governs the procedure for recognising statelessness in Panama. | **MINREX,** MINGOB | During 2018 | SJAS 7 MoU 1 |
| **Pillar 2: Access to Basic Needs** | | | | |
| *Access to basic services (healthcare, shelter, food, safety) and immediate responses* | | | | |
| Learn about the real situation of refugees and asylum seekers in terms of their basic needs. | Development of socio-economic profiles and mapping of the population concerned (their places of residence, location, etc.) | MINGO B, ONPAR, UNHCR, NGOs | During 2018 | MoU 2 |
| Explore alternative emergency food programmes for the concerned population. | An approach, through a meeting with the National Secretariat for the Food and Nutritional Safety Plan (SEDAPAN, by its acronym in Spanish) (of MIDES) that explores the possible inclusion of the population concerned in food programmes. | MINGOB (ONPAR), MIDES (**SEDAPAN**), UNHCR | Before the year's end | SJAS 8 MoU 2 |
| | Advocacy through FAO for the inclusion of refugee matters in the Draft Law on the Right to Food. | **FAO,** MINGOB, UNHCR | During 2018 | |
| Create inter-agency coordination which provides a national outlook on the situation and alternative care of the population concerned, based on its needs. | Creation of an inter-agency roundtable on PNIP care: on a ministerial and municipal level (Panama City), with the creation of specific care programmes for the concerned population. | MINSEG, **MINGOB,** MINREX, MINSA, MEDUCA, MIVIOT, MIDES, MUNICIPA LITY OF PANAMA, UNHCR | During 2018 | SJAS 8 MoU 2 |
| Include the population concerned in mental health programmes due to their profiles of anxiety and post-traumatic stress. | Meeting with the Inter-sectoral Mental Health Network (MINSA, by it acronym in Spanish) for the possible and agile provision of mental healthcare to asylum seekers and refugees. | **MINSA,** MINGOB (ONPAR), UNHCR | Before the year's end | MoU 2 |
| Create identification and referral mechanisms for cases of GBV against female refugees and asylum seekers. | Meeting with INAMU to formulate a proposal on care for GBV victims (ONPAR – INAMU – UNHCR), for the creation of an identification and referral road map that will be disseminated and developed in the Protection in Panama Roundtable, in order to shed light on the mechanisms for the identification and referral of these cases. | MINGO B (ONPAR ), **INAMU,** UNHCR, NGO | During 2018 | MoU 2 |

DHSFF0327

| Pillar 3: Local Integration and Livelihoods | | | | |
|---|---|---|---|---|
| *Generation of income / livelihoods* | | | | |
| Search for income-generating alternatives that enable asylum seekers to produce food. | Meeting with the Ministry of Agriculture and Livestock Development (MIDA, by its acronym in Spanish) to explore the possibility of providing access to food production (for consumption and sale) programmes to asylum seekers and refugees. | **MIDA**, MINGOB (ONPAR), UNHCR, FAO | Before the year's end | MoU 2 |
| Awareness raising of private enterprises about the refugee population and the obstacles they face in the search for employment and family livelihoods. | Hold a roundtable with the private sector to analyse programmes for access to work and generation of income, and revise CSR programmes and/or partnerships with hotels and restaurants for the management of unused food. | MINGOB (**ONPAR**), UNHCR, PRIVATE SECTOR | During 2018 | SJAS 8 |
| Alternatives to bank micro-credits so that refugees and asylum seekers can obtain small loans to start-up their enterprises. | Hold meetings to analyse the possibility of including asylum seekers and refugees in the Small Grants Programme (SGP) of the UNDP. | UNDP, **MINGOB** (ONPAR) | Before the year's end | MoU 2 |
| *Education* | | | | |
| Provide Regional Education Directorates and education centres with more information about Decree 1225. | Meetings and workshops with the various national-level Regional Education Directorates for the presentation of Decree 1225. | **MEDUCA** | Before the year's end | MoU 4 |
| Develop the Guide, Procedural Handbook and proofs of location for the full, nationwide application of Decree 1225 in a uniform and standardised manner. | Development of a Guide to the Procedural Handbook, providing some initial, standardised guidelines for the implementation of the Decree. | **MEDUCA** | Before the year's end | MoU 4 |
| | Development of a Procedural Handbook based on the guidelines of the Ministry, as established in Decree 1225. | | For the start of 2018 | |
| | Creation of a Proofs of Location system by the Ministry, to be put into practice by the area supervisors of the Regional Directorates of Education. | | For the start of 2018 | |
| Explore effective and agile alternatives for access to higher education. | Re-establish contact with the Council of Rectors so as to present the possibility of improving access to higher education for asylum seekers and/or recognised refugees. | MINGOB (ONPAR), **COUNCIL OF RECTORS** | Before the year's end | MoU 4 |
| *Socio-cultural integration* | | | | |
| Sensitisation campaigns aimed at the general public, institutions, schools, the private sector, the media, etc. about non-discrimination and the specific measures needed by asylum seekers and refugees due to their condition. | Sensitisation workshops and actions aimed at schools, the private sector, the media, Government/Municipalities and the general public about non-discrimination and the specific protection measures needed by asylum seekers and refugees. | MINGOB, (**ONPAR**), UNHCR, NGOs | During 2018 | MoU 7 |
| Development of widely disseminated informational material about the specific protection condition of the | Design of informational material and its dissemination to specific target populations. | MINGOB (**ONPAR**), UNHCR. | During 2018 | MoU 7 |

DHSFF0328

| | | ONGs | | |
|---|---|---|---|---|
| refugee population. | | | | |
| Establishment of spaces for consensus building and participation between the population of interest and institutions, as well as feedback processes from the consultation process for this procedure. | Creation of ongoing spaces for consensus building with institutions. | MINGOB (**ONPAR**), **OMBSMAN,** REFUGEE AND ASYLUM SEEKER POPULATION | During 2018 | MoU 5 |
| | Information feedback to focus groups participating in the participatory diagnostic process (MIRPS process). | MINGOB (**ONPAR**), CONSULTED REFUGEES AND ASYLUM SEEKERS | Before the year's end | |

## More Detailed Information

≠  Matrix of Panama´s commitments expanded and complemented work plan stemming from bilateral and/or prioritised work meetings (in process).

≠  Results of the shared responsibility meeting (in process).

## Next Steps

≠  Plan resource mobilisation with key stakeholders, based on the actions identified as priorities.

≠  Hold a series of additional consultations on the items identified in the roundtables, such as the sub-group for documentation evaluation (Migration – ONPAR, technical support from UNHCR); and hold a Government – Private Sector meeting to analyse their engagement in local integration, social responsibility and employment programmes.

≠  Hold bilateral meetings with prioritised municipal councils, for the protection and care of refugees and asylum seekers, including Panama City, Colón, David and the Darién area. Similarly and throughout the rest of the process, examine the relevance of holding bilateral meetings with various entities (prioritised agencies) to continue establishing specific actions to include the target population in existing programmes in Panama.

≠  Organise, as a short term action within the process, the meeting/sub-committee on shared responsibility (Ministry of Foreign Affairs, ONPAR, Ministry of Government, UNHCR and the Resident Coordinator) to analyse Panama's possible actions/commitments with countries in the region, in matters of asylum and/or persons in need of protection.

≠  Once the results of this process have been validated, organise a meeting on international cooperation, with

participation from the Government of Panama, agencies from the United Nations System and other international organisations, in order to identify complementary and support actions for the implementation of Panama's operational plan for protection and solutions.



UNHCR / Tito Herrera

## ACRONYMS

| | |
|---|---|
| **CA** | Children and adolescents |
| **ED** | Executive Decree |
| **FAO** | Food and Agriculture Organisation of the United Nations |
| **GBV** | Gender Based Violence |
| **HIAS** | A global humanitarian organisation which protects refugees |
| **IFARHU** | Institute for Training and Development of Human Resources |
| **INADEH** | National Institute for Vocational Training and Human Development |
| **INAMU** | National Institute for Women |
| **MEDUCA** | Ministry of Education |
| **MIDA** | Ministry of Agriculture and Livestock Development |
| **MIDES** | Ministry of Social Development |
| **MINGOB** | Ministry of Government |
| **MINREX** | Ministry of Foreign Affairs |
| **MINSA** | Ministry of Health |
| **MINSEG** | Ministry of Security |
| **MITRADEL** | Ministry of Labour and Social Development |
| **NRC** | Norwegian Council for Refugees |
| **ONPAR** | National Office for the Attention of Refugees |
| **PGHM** | Pastoral Group of Human Mobility, Archdiocese of Panama |
| **PNIP** | Persons in Need of International Protection |
| **PRC** | Panamanian Red Cross |
| **PRM** | Bureau of Populations Refugees and Migrations of the US Department of State |
| **QR Technology** | Quick Response Code |
| **RET** | International social organisation which supports persons in need of international protection |
| **RSD** | Refugee Status Determination |
| **SEDAPAN** | National Secretariat for the Food and Nutritional Safety Plan |
| **SENAFRONT** | National Border Service |
| **SENAN** | National Naval Aviation Service |
| **SENNIAF** | National Secretariat of Children, Adolescents and Family |
| **SGP** | Small Grants Programme - UNDP |
| **SNM** | National Migration Service |
| **UNDP** | United Nations Development Programme |
| **UNHCR** | United Nations High Commissioner for Refugees |
| **UNICEF** | United Nations Children's Fund |
| **UNS** | United Nations System |
| **WRD** | World Refugee Day |

DHSFF033

UNHCR / Santiago Escobar Jaramillo

# PART 2



UNHCR / Mark Henley

DHSFF0332

## 2.1. Contributions from Cooperating Actors



DHSFF0333

UNHCR / Boris Heger

# Cooperating Actors

One of the objectives of the Comprehensive Regional Protection and Solutions Framework is to strengthen cooperation both on the level of regional actors and states, and also internationally. This cooperation is reflected in different ways, including financial contributions, technical assistance for direct support of MIRPS countries' implementation of their national plans or existing regional initiatives.

Cooperating states may offer resettlement programmes to those in need of international protection, along with other complementary forms of accessing countries, such as the concession of humanitarian visas, the Protection Transfer Arrangement, family reunification programmes and other pathways which promote regular, safe and orderly migration.



UNHCR / Helena Christensen



# ARGENTINA

## Pillar #4 Durable Solutions

| This pillar includes issues such as: local integration, resettlement and complementary pathways, as well as addressing root causes in countries of origin | |
| --- | --- |
| AREA OF SUPPORT | NEW COMMITMENT 2018-2020 |
| Financial or technical assistance to support local integration through access to self-reliance measures and the labour market. | Guarantee the same rights as nationals, without discrimination, to all refugees and residents in Argentina, including those who come from Central America through a temporary humanitarian admission programme. |
| Start private sponsorship programmes enabling communities or enterprises to sponsor Central American refugees. | Together with civil society, the private sector, local organisations and UNHCR, explore mechanisms for contributing to the protection of victims of forced displacement in Central America. Such mechanisms could be based on humanitarian admission programmes, with private sponsorship, and with the support from the Emerging Resettlement Countries Joint Support Mechanism (ERCM). |
| Start family reunification programmes for Central American refugees. | Guarantee the right to family reunification to all refugees and residents in Argentina, including those who come from Central America through a temporary humanitarian admission programme. |



UNHCR / Markel Redondo



# BRAZIL

Within this framework, we intend to contribute to MIRPS in the following areas:

| AREA OF SUPPORT | Existing commitment that can be continued in 2018 | New commitment within 2018-2020 timeframe |
|---|---|---|
| **PILLAR 4 – Durable solutions**<br>This pillar includes issues such as: local integration, resettlement and complementary pathways, as well as addressing root causes in countries of origin | | |
| Participation in the humanitarian evacuation programme for Central American persons at heightened risk, the Protection Transfer Arrangement (PTA), either as a destination country with resettlement spaces or as a transit country with spaces for refugees in transit per year. | In light of its commitment to create a state-funded resettlement programme for refugees from the NTCA, as made in the 2016 UN Summit on Refugees and Migrants, Brazil undertook to allocate public funds for the development and implementation of its first traditional resettlement programme from January 2018, through the PTA and in line with its commitments within the Brazil Plan of Action (2014-2024) and the 2016 San Jose Action Statement. | The Government of Brazil commits to holding a regional consultation meeting to consolidate the position of Latin America and the Caribbean in the context of negotiations on the Global Compact on Refugees that will be approved in 2018, as stipulated in the New York Declaration for Refugees and Migrants (A/RES/71/1). The regional event will also provide an opportunity to present the triennial UNHCR report on the implementation of the Brazil Plan of Action (BPA) that was adopted in the Cartagena +30 regional meeting held in Brasilia in 2014.<br><br>Event name:<br>Regional Meeting of Latin America and the Caribbean – Consultations for the Global Compact on Refugees.<br><br>Place:<br>Itamaraty Palace, San Tiago Dantas Room, Brasilia, Brazil..<br><br>Fechas:<br>February 19 and 20, 2018<br><br>Organisation:<br>Ministry of Foreign Affairs - United Nations Division / Alexandre de Gusmão Foundation (FUNAG, by its acronym in Portuguese), with support from UNHCR and the Ministry of Justice / National Committee for Refugees (CONARE, by its acronym in Portuguese).<br><br>Participants (estimated): |

DHSFF0336

| | | |
|---|---|---|
| | | Approximately 30 countries from Latin America and the Caribbean (two representatives per country), observers (civil society) and international organisations. |
| Start private sponsorship programmes enabling communities or enterprises to sponsor Central American refugees. | | The Government of Brazil has already started working with UNHCR to create the legal framework for the Brazil resettlement programme. The programme will not only involve private sponsorship but also government sponsorship or combined sponsorship.

In addition to this, Brazil intends to provide legal certainty to all those involved in the resettlement, including potential enterprises, NGOs, communities, civil society, the government and the refugees. |

DHSFF0337



# CANADA

Within this framework, we intend to contribute to the MIRPS in the following areas.

| AREA OF SUPPORT | Existing commitment that can be continued into 2018 | New commitment within 2018-2020 time frame |
|---|---|---|
| **Pillar #1---Reception and Admission**<br>*This pillar includes issues such as: identification of persons in need of international protection as refugees; documentation; registration; adequate, safe and dignified reception conditions; alternatives to detention; as well as an appropriate governance framework in countries of origin* | | |
| Financial or technical assistance to strengthen Refugee Status Determination processes | In 2014, Canada, the U.S. and Mexico, in partnership with UNHCR, created a *Joint Plan of Action on Promoting International Protection in North America.* Canada continues to work with the United States and UNHCR to support the Government of Mexico in strengthening its capacity to handle a growing volume of asylum claims.  The 2017-2018 Plan of Action was developed around four key themes: training; country of origin information; translation/interpretation; and case management.   $40,000 CAD in new funding was secured in October 2017 to advance this work, specifically to conduct a "needs analysis" study and assessment of off-the-shelf IT solutions to help manage the increased asylum caseload. | Building upon the *Joint Plan of Action on Promoting International Protection in North America,* Canada will continue to work, together with UNHCR and state partners, on efforts to strengthen asylum systems across the region. |
| Financial or technical assistance to strengthen border management capacity | Under its Anti-Crime Capacity Building Program (ACCBP), Canada is providing CAD $839,597 from 2016-2018 to the UN Office on Drugs and Crime (UNODC) to support regional coordination and capacity building for border security in Central America.<br><br>Under its Anti-Crime Capacity Building Program (ACCBP) Canada is providing CAD $405,000 from 2016-2018 to strengthen the capacity of Mexican immigration and law enforcement authorities to counter the growing phenomenon of migrant smuggling by sea along Mexico's borders. | |
| **Pillar #2---Meeting Basic Needs**<br>*This pillar includes issues such as: identification of needs, support for humanitarian response, joint planning between humanitarian and development actors* | | |
| Financial or technical assistance for humanitarian assistance to vulnerable asylum seekers and refugees | In 2017, Canada is providing $5.05 million in humanitarian assistance funding to the United Nations High Commissioner for Refugees (UNHCR), the International Committee of the Red Cross (ICRC), the United Nations Office for the Coordination of Humanitarian Affairs (OCHA), and the World Food Programme (WFP) in 2017 to support their operations in Central America and the Americas.  This funding is being provided in response to these organizations' | |

| | annual appeals for the region.  Activities will include general food and nutrition assistance, and other efforts to reach vulnerable affected people in Guatemala, Honduras, and Nicaragua. | |
|---|---|---|
| **Pillar #4---Durable Solutions** *This pillar includes issues such as:  local integration, resettlement and complementary pathways, as well as addressing root causes in countries of origin* | | |
| Financial or technical assistance to improve conditions to allow for the voluntary return of refugees and other displaced persons (development programmes that improve security and governance, as well as socio-economic conditions) | Canada, through Immigration Refugees and Citizenship Canada (IRCC) contributes CAD $15,000 annually to support the Regional Conference on Migration (RCM) /Puebla Process to assist with the voluntary return of regional migrants in particularly vulnerable situations. Canada through IRCC also provides USD $75,000/year to the RCM as our annual membership contribution.<br><br>Under its Peace and Stabilization Operations Program (PSOPs), Canada is providing CAD $461,075 from 2017-2019 to support youth violence prevention in El Salvador, and to address the root causes and grievances of youth at risk of perpetrating violence.<br><br>Under its Peace and Stabilization Operations Program (PSOPs), Canada is providing CAD $889,560 in Guatemala and Honduras from 2017-2021 to prevent criminality and violence in Guatemala and Honduras by addressing democratic inclusion and citizen security at the municipal level.<br><br>Canada is providing CAD $19.5 million in Honduras from 2016-2021 for the Canadian Support from Child Protection and Juvenile Justice Refom in Honduras ("PRONIÑEZ") project.  This project, implemented through a partnership led by UNICEF, aims to strengthen the capacity of the Honduran national child protection institute, DINAF, to develop an effective national framework that will better protect children and youth from violence, exploitation, abuse and discrimination. It will also enhance the protective environment of 870,000 boys, girls and adolescents in 35 municipalities of Honduras.<br><br>Canada is providing CAD $5 million from 2016-2018 in Honduras for the "Fight against corruption and impunity in Honduras (MACCIH)" project. Implemented by the OAS, this project focusses on: preventing and combating corruption; reforming the Honduran criminal justice system; reforming the political and electoral system; and public security. | Canada has a Call for Proposals process underway in order to select partners to implement projects under the planned CAD $12.75 million "Green and Inclusive Economic Growth for Indigenous Women and Youth" project in Guatemala. This project is expected to run from 2019-2024. |
| Financial or technical assistance for strengthening | Under its Anti-Crime Capacity Building Program (ACCBP), Canada is providing CAD $1.024 million in El Salvador from 2017-2019 to build a case management | |

| | | |
|---|---|---|
| institutional response for displaced victims of violence | tool for forced disappearances and torture cases related to organized crime in El Salvador.<br><br>Canada is providing CAD $18 million in Guatemala from 2008-2019 in support for the International Commission Against Impunity in Guatemala (CICIG). The CICIG seeks to help increase the rule of law in Guatemala, thereby reducing impunity and homicide rates. | |
| Participation in the humanitarian evacuation programme for Central American persons at heightened risk, the Protection Transfer Arrangement (PTA), either as a country of destination with X resettlement spaces or as a country of transit with X spaces for refugees in transit per year. | Canada, through Immigration Refugees and Citizenship Canada (IRCC), is piloting and evaluating the Protection Transfer Arrangement (PTA) to explore future options for the resettlement of refugees from the NCA region. | |
| Encourage the development of private sponsorship or community based resettlement programmes that may expand resettlement space for Central American refugees | Canada has an ongoing commitment to resettlement through Immigration Refugees and Citizenship Canada's Private Sponsorship of Refugees program. This program has led to the resettlement in Canada of 275,000 refugees since 1979.<br><br>Canada also is committed to expanding global refugee resettlement spaces, including in the Americas, through the Global Refugee Sponsorship Initiative (GRSI). Launched in Ottawa in December 2016, GRSI is led by the Government of Canada, UNHCR, the Open Society Foundations, the Radcliffe Foundation, and the University of Ottawa. GRSI aims to build on Canada's private sponsorship model to promote and support the development of new community-based sponsorship programs in other countries. | Canada has an ongoing commitment to resettlement through the Private Sponsorship of Refugees program.<br><br>Canada also has an ongoing commitment to expand global refugee resettlement spaces, including in the Americas, through the Global Refugee Sponsorship Initiative. |
| Start a family Reunification programmes for Central American refugees | Refugees and asylum claimants in Canada may include immediate non-accompanying family members on their application for status. Canada has programs for the family reunification of refugees, including the "One Year Window" for resettled refugees, and processing of dependents of refugees for asylum claimants.<br><br>Once refugees become permanent residents of Canada, they may sponsor other family members, such as spouses, partners, children, parents, and | |

| | grandparents, through Canada's normal immigration programs for family reunification. | |
|---|---|---|
| Financial or technical assistance to improve conditions for at-risk groups in countries of origin in order to address the drivers of and prevent irregular migration. | Canada is providing CAD $15.2 million from 2016-2020 in Guatemala, Honduras, El Salvador, Nicaragua, and Mexico for the "Prevention of irregular child migration in Central America" project.  Implemented through the Christian Children Fund of Canada (CCFC), the project will target the underlying root causes of violence, unemployment and lack of education in deprived urban and rural communities, leading to the dangerous migration of children out of the Americas region. | |

DHSFF0341



# COLOMBIA

## Pillar #4 Durable Solutions

| This pillar includes issues such as: local integration, resettlement and complementary pathways, as well as addressing root causes in countries of origin | |
| --- | --- |
| **AREA OF SUPPORT** | EXISTING COMMITMENT THAT CAN BE CONTINUED IN 2018 |
| Financial or technical assistance to improve conditions to allow for the voluntary return of refugees and other displaced persons (development programmes that improve security and governance, as well as socio-economic conditions). | Technical Assistance through the sharing of best practices in Colombia, in terms of: <br> ≠ Registration of victims abroad in the National Register of Victims. <br> ≠ Programmes for the dissemination of the Colombian governmental services for victims abroad. <br> ≠ Provision of individual administrative reparations for victims and refugees. <br> ≠ Coordination between the services of the Unit for Comprehensive Assistance and Reparation for Victims (UARIV, by its acronym in Spanish) and the "Colombia Unites Us" programme, designed to assist and unite Colombians abroad and to make them the subject of public policy and, among other things, to attend returning Colombians. <br> ≠ Possible coordination actions between UNHCR and UARIV for the provision of information about the state services for refugees in certain countries of interest. |
| Financial or technical assistance for strengthening institutional response for displaced victims of violence. | Technical Assistance through the sharing of best practices in Colombia, in terms of: <br> ≠ Progress in the implementation of the peace agreement between the FARC and the government of President Juan Manuel Santos, as a strategy of return, lands and the guarantee of the rights to truth (with the Truth Commission), justice, (with the Special Jurisdiction for Peace), reparation (through the reform processes of Law 1448) and non-repetition (with the surrender and handover of arms and the reincorporation of ex-combatants into society). <br> ≠ Progress in individual administrative reparation processes and a mechanism that includes the displaced population as part of the guarantee of reparation. <br> ≠ Progress in collaboration with local authorities (governments and councils) for the allocation of free housing for the displaced population, in coordination with the Ministry of Housing. <br> ≠ Partnerships with the international cooperation in legalisation processes of settlements with large displaced populations in urban areas, facilitating their local integration (the UNHCR legalisations programme, for example). |
| Financial or technical assistance to support local integration through access to self-reliance measures and the labour market. | Technical Assistance through the sharing of best practices in Colombia, in terms of: <br> ≠ Progress with local institutions and private businesses to create income-generation and employability actions, in coordination with national authorities. |



# SPAIN

The Spanish Cooperation (CE, by its acronym in Spanish) has a long-term commitment to Central America, both at a regional level and with each of the countries individually. A permanent aspect of its work has been humanitarian action, with priorities that have evolved alongside changes in the context. A current approach in Spain's humanitarian work is to mitigate the impact caused by Other Forms of Violence in the Northern Triangle of Central America. Furthermore and in terms of cooperation for development, Spain is analysing the possibility of starting a migration-based programme in the area, including this objective as a priority and potentially combining various actions. In these efforts, Spain is working closely with UNHCR, ICRC, EU and different national organisations and regional and international civil society organisations. Within this framework, we intend to start contributing to MIRPS in the following areas:

| Area of support | Existing commitment that can be continued in 2018 | New commitment 2018-2020 |
|---|---|---|
| **Pillar 1: Reception and admission**<br>*This pillar includes issues such as: identification of persons in need of international protection as refugees; documentation; registration; adequate, safe and dignified reception conditions; alternatives to detention; as well as an appropriate governance framework in countries of origin* | | |
| Financial or technical assistance to strengthen Refugee Status Determination processes. | Technical consultancy is being provided to persons in transit in Costa Rica. | This is a line that can be maintained, depending on the needs of the country. |
| Financial or technical assistance to improve reception conditions for asylum seekers and refugees. | In this objective, Mexico is being provided support for refugees from the Northern Triangle. | We expect to continue supporting this objective in the future, depending on the evolution of the situation, availability of resources, etc. |
| **Pillar 2: Meeting basic needs**<br>*This pillar includes issues such as: identification of needs, support for humanitarian response, joint planning between humanitarian and development actors.* | | |
| Financial or technical assistance to strengthen the safe spaces network that provides humanitarian care and comprehensive services (legal, psychosocial and for victims of sexual and gender-based violence) to refugees in transit. | Contributions are made to this objective through interventions that support child victims of violence (Guatemala). | We expect to begin an intervention based on persons forcibly displaced by other forms of violence in Honduras, especially in terms of access to basic services. |
| **PILLAR 3: Support for host countries and communities**<br>*This pillar includes issues such as: creation of protection and care networks, support of the international community* | | |
| Financial or technical assistance to strengthen the community response to displaced victims of violence. | Contributions are made to this objective through interventions that support child victims of violence (Guatemala). | We expect to continue supporting this objective in the future. |
| **Pillar 4: Durable solutions**<br>*This pillar includes issues such as: local integration, resettlement and complementary pathways, as well as addressing root causes in countries of origin* | | |
| Strengthen the institutional response to displaced victims of violence. | In this objective, Mexico is being provided support for refugees | This support will be increased in the future, both in Mexico and in |

| | from the Northern Triangle. | countries of the Northern Triangle. |
|---|---|---|
| Financial or technical assistance to support local integration through access to self-reliance measures and the labour market. | For number of years, a programme in Honduras has been focused on supporting social integration of young returnees and particularly in the fostering of employment. | This line shall be maintained. |

DHSFF0344



# SWITZERLAND

Switzerland's international cooperation efforts are aimed at reducing poverty and global risks, alleviating suffering and promoting peace and respect for human rights. Migration and protection are a part of the strategic priorities in the "Dispatch on Switzerland's International Cooperation 2017-2020". The Swiss Agency for Development and Cooperation (SDC) centres its humanitarian aid efforts on assisting the civil population most affected, particularly refugees and internally displaced persons, helping to satisfy their most basic needs.

In Central America, the SDC helps to find and implement solutions for persons at risk of forced displacement, refugees and stateless persons, with special focus on children and adolescents. It undertakes to extend this commitment even further in the near future through the following actions: deployment of Swiss experts (to United Nations partners), dialogue/promotion of policies and financial support (bilateral, multi-bi and core contributions). Currently, the SDC's strategic response in Central America is focused on ensuring that children in areas affected by other forms of violence have access to education.

Within this framework, we intend to contribute to MIRPS in the following areas:

| AREA OF SUPPORT | Existing commitment that can be continued in 2018 |
|---|---|
| **PILLAR 3 - Support for host countries and communities**<br>This pillar includes issues such as: the creation of protection and care networks, and support of the international community | |
| Financial or technical assistance to strengthen the community response to displaced victims of violence. | The Swiss Agency for Development and Cooperation is supporting the Norwegian Refugee Council in its efforts to promote access to education for young persons at risk in El Salvador and Honduras. |
| **PILLAR 4 – Durable solutions**<br>This pillar includes issues such as: local integration, resettlement and complementary pathways, as well as addressing root causes in countries of origin | |
| Financial or technical assistance to support local integration through access to livelihoods and the labour market. | The Swiss Agency for Development and Cooperation will soon deploy an expert in UNHCR operations in Mexico to support the agency's cash-based livelihood programme. |



## URUGUAY

### Pillar #4 Durable Solutions

| This pillar includes issues such as: local integration, resettlement and complementary pathways, as well as addressing root causes in countries of origin | | |
|---|---|---|
| AREA OF SUPPORT | EXISTING COMMITMENT THAT CAN BE CONTINUED IN 2018 | NEW COMMITMENT 2018-2020 |
| Financial or technical assistance to support local integration through access to self-reliance measures and the labour market. | Provision of free accommodation to 10 families / 50 persons for two years. | Facilitate access to social programmes on employment, education, health and accommodation for refugees, in the same conditions as nationals. |
| Participation in the humanitarian evacuation programme for Central American persons at heightened risk, the Protection Transfer Arrangement (PTA), either as a country of destination with resettlement spaces or as a country of transit with spaces for refugees in transit per year. | Receive 10 families / 50 persons as a resettlement country. | |
| Start a family reunification programme for Central American refugees. | Facilitate the family reunification of Central American families in Uruguay, with support from UNHCR. | Facilitate the family reunification of Central American families in Uruguay, with support from UNHCR. |



UNHCR / Santiago Escobar Jaramillo

## Spanish Committee for UNHCR (Spain with UNHCR) 

The Spanish Committee for UNHCR (Spain with UNHCR or ECA, by its acronym in Spanish) is a Spanish non-governmental organisation that has been working shoulder-to-shoulder with UNHCR since 1993 on sensitisation and fund-raising in support of UNHCR operations throughout the world. Declared as an organization 'Of Public Interest', the ECA team is proud to be the current main UNHCR National Association for fund-raising, with 450,000 members and donors, without whose help the needs of thousands of the most vulnerable refugees and displaced persons could not be fulfilled.

With its ample experience with the private sector, ECA believes that the challenge of working together, using a "multi-actor" approach, towards the Global Compact on Refugees and in support of the regional initiatives that are being developed is crucial, due to the record levels of forced displacement. For many years, ECA has supported UNHCR Latin American programmes that benefit refugees and internally displaced persons, through the private sector and decentralised cooperation, including the 2016 and 2017 operations in Central America. We rate the regional fostering of the MIRPS initiative very positively and therefore the Spanish Committee for UNHCR commits to keep making economic contributions in the region in 2018, through MIRPS.



UNHCR / Ricardo Ramirez Arriola

DHSEF03

## 2.2. Contributions from Regional and International Organisations and from Regional Networks



UNHCR

DHSPF0348

# The Organisation of American States



## Introduction

The Organisation of American States (OAS) brings together the 35 independent states of the Americas and constitutes the main governmental, political, legal and social forum in the hemisphere. In turn, the General Secretariat of the Organisation of American States (GS/OAS) is the central and permanent organ that exercises the mandates entrusted to it by the General Assembly, the Meeting of Consultation of Ministers of Foreign Affairs, the Permanent Council and the Inter-American Council for Comprehensive Development. Among its duties are the promotion of political dialogue and the establishment of cooperation relations.

Given the increase in migration flows in the Americas and the transcendence of the various political, economic, social and cultural aspects included in migration, these issues were incorporated into the political agenda of the Organisation in 2007 through a resolution of the General Assembly of the OAS. This was done for the purposes of analysing the challenges of human mobility and migration flows from a comprehensive perspective and in various entities of its structure, given their transversal nature.

Various dimensions of migration are incorporated into the work of the Secretariat for Access to Rights and Equity (SARE) of GS/OAS and its commitments include, through its Department of Social Inclusion (DSI), supporting the efforts of the Member States in the formulation, implementation and monitoring of public policies that enable

the focus on rights to be enacted, especially in the promotion and protection of the most vulnerable groups.

Along this line of work, one of its priorities is to address migration and displacement, including refugees and asylum seekers. Through SARE/DSI, the GS/OAS is lending support as General Secretariat in the work of the OAS Committee on Migration Issues (CAM, by its acronym in Spanish) and the Working Group of the Protocol of San Salvador. Furthermore, it is leading the *Continuous Reporting System on International Migration in the Americas* (SICREMI, by its acronym in Spanish), the region's sole information mechanism on migration flows to and from the Americas in intercensal periods, revealing general trends in migration movements. It also presents key information about regulatory frameworks, policies and programmes on international migration. The work of SICREMI is based on contributions from a Network of National Correspondents designated by OAS Member States.

Since 2007, the GS/OAS has promoted and facilitated dialogue, international cooperation and the search for solutions through a number of actions such as research and thematic forums on specific migration issues (extra-continental mixed migration flows, migrant trafficking, return migration, migration and gender, migrant workers, and refugees, among others); the development of information systems for reporting on the situation of international migration in the

Americas (immigration and emigration); diagnoses of gender-based migration information systems; the creation and implementation of projects such as the "Comprehensive Care Model for Women Victims of Violence in the Tijuana area, Mexico" and "Education of Migrant Children and Youth in the Americas: Current Situation and Challenges", among others.

As previously mentioned, in matters of the promotion and monitoring of regulatory frameworks in the hemisphere, the Department of Social Inclusion is the Technical Secretariat of the Working Group of the Protocol of San Salvador, committed to providing specific tools for monitoring and improving public policies on issues of economic, social and cultural rights. In this line, the Member States developed and approved the "Progress Indicators for Measuring Rights under the Protocol of San Salvador" document, including migration in their analyses[4].

In this last year, the OAS has worked together with the International Organization for Migration (IOM) and with the International Committee of the Red Cross (ICRC) on the creation of the "Irregular Migration Flows to the Americas from Africa, Asia and the Caribbean" regional report; with the World Food Programme (WFP) on the "Migration and Food Security in the Dry Corridor of the Northern Triangle of Central America" study; and with the Organisation for Economic Cooperation and Development (OECD on the "International Migration in the Americas: 2016" report.

Along these lines of work, the OAS General Secretariat has prioritised the addressing of

the phenomenon of forced migration since 2015, by establishing a line of cooperation with the Office of the United Nations High Commissioner for Refugees (UNHCR). In cooperation with UNHCR, the Central American Integration System (SICA, by its Spanish acronym) and the Government of Costa Rica, the GS/OAS organised the High Level Round Table titled "Call to Action: Protection Needs in the Northern Triangle of Central America", held in San Jose, Costa Rica on July 6 and 7, 2016. One of the main achievements of that Round Table was the approval of the "San Jose Action Statement" through which governments of the region and international agencies agreed on a joint work plan for the protection of refugees and migrants in the region.

The goal of the Comprehensive Regional Protection and Solutions Framework (MIRPS) is to make existing commitments operational and to promote new initiatives to address situations of displacement from a comprehensive and regional approach – linked with countries of origin, transit and destination – and involving a wide range of relevant stakeholders at a regional, national and international level. At the same time, it seeks to organise a comprehensive approach to address the identified needs of these populations in countries of origin, transit, return and destination, and it prioritises shared responsibility on the level of each region.

With its structure, its many years of work on multiple aspects linked to human mobility and the results obtained, the OAS is an organisation with unique characteristics for the support of the MIRPS process, particularly as a monitoring mechanism for

---

[4] For more information, visit:
http://www.oas.org/es/sadye/inclusion-social/protocolo-ssv/.

the agreements made and in order to build capacities for evidence-based decision-making.

Based on its comparative advantages and as a key political partner of UNHCR and of all the key stakeholders driving this agenda, the GS/OAS makes its political platform available to the Americas for: (a) promoting political dialogue in support of the implementation of MIRPS; (b) generating synergies and spaces for meetings between key stakeholders on specific issues; and (c) facilitating access to governmental authorities in charge of these issues, among other things. More specifically, the GS/OAS will prioritise its support for MIRPS around two lines of work: on the one hand, by contributing to existing efforts to advance the systematisation of information about the situation of refugees and asylum seekers in Member States; and on the other, by supporting regional solidarity and shared responsibility mechanisms, through its current political bodies.



UNHCR / Markel Redondo

## Main Needs

The increase in forced migration, particularly since 2014, has been a challenge for the states of the Americas, regardless of whether they are countries of migrant origin, transit or destination. By its very nature, migration involves more than one country, whether it is a country of origin, transit or destination, and therefore the challenges posed by the management of ever-increasing migration flows in the Americas and the world have never been and will never be resolved unilaterally. For that reason, the search for durable solutions must have a hemispherical approach that includes all of the Americas through regional dialogue focused on the shared responsibility of the states, and with collaborative efforts that must prioritise the protection, welfare and care of migrants.

The authorities of the countries in the region face difficulties in responding to these migration flows, in terms of the provision of protection and care and also in the application of their regulations on migration. The San Pedro Sula Declaration and its Comprehensive Regional Protection and Solutions Framework (MIRPS), shared by various states, is a specific response to the protection needs that forced migration demands.

A MIRPS monitoring mechanism is essential for decision-making and for its implementation by the states, enabling the visualisation not only of any progress made but also of any challenges that are still to be addressed. States have developed monitoring mechanisms for the different international regulatory instruments on global and regional levels (Protocol of San Salvador, Convention on the Rights of the Child, Belém do Pará Convention, etc.); these mechanisms have led to great progress in the implementation of the respective instruments.

Furthermore, upon recognising that the magnitude of the migration flows in the region recently reached historic levels, one of the main regional needs is also recognising the number of refugees involved in human mobility in the region. From there stems the understanding of the protection needs of those populations.

For a more precise definition of the phenomenon of human mobility in the Americas, it is essential to acknowledge the lack of information: from documenting the flows to revealing hidden migration routes, in addition to mapping the populations in a situation of vulnerability. Indeed, the available information on the vulnerabilities of persons in need of protection must be documented so as to provide a collaborative and more solid response.

Similarly, one of the main challenges is to build the capacities of governmental actors and representatives of civil society organisations, with the aim of generating strategic information and creating care protocols for the populations concerned as well, particularly women, children, disabled persons and others who require special care.

Gender and age considerations, in terms of risk and protection needs (differentiated problems), must be a central theme in the assessment of actions and solutions.

If it had the required resources, the GS/OAS could contribute to the following needs:

I. *A monitoring mechanism for the commitments made in MIRPS (stock taking meetings, sessions with the OAS political bodies, monitoring through a virtual OAS-UNHCR platform), supporting a participatory process with the states, UNHCR and other entities for the creation of instruments to measure the progress made and to detect unresolved challenges, thus contributing to guiding policies and programmes with the aim of analysing progress and trends in MIRPS compliance as regards the protection needs of victims of forced displacement.*

II. *Giving the national institutions in charge of documenting mixed flows of persons in their countries recommendations to improve their information systems for the formulation, implementation, monitoring and evaluation of policies/programmes for the protection of victims of forced displacement and returnees.*

III. *Enabling national institutions in charge of documenting the flows of persons in their country to share information about information-gathering systems on victims of forced displacement and returnees and about actions for their protection.*

IV. *Giving government agencies and civil society representatives new opportunities to share experiences and continue building their capacities for the design and implementation of care protocols for victims of forced displacement in situations of heightened vulnerability, such as women, children and disabled persons.*



UNHCR // Sebastian Rich

DHSP....03

# Plan of Action

With the purpose of institutionalising a monitoring mechanism to analyse the progress and trends in MIRPS implementation as regards the protection needs of victims of forced displacement, and to facilitate cooperation among States Parties, the following activities could be initiated:

1) Creation of general principles and ways of working in the MIRPS monitoring mechanism, in collaboration with the States Parties.
2) Design of MIRPS implementation-measuring instruments that could include information on: a) Regulations, b) Policies and Programmes, c) Qualitative and Quantitative Indicators. These activities will be carried out in the framework of a Technical Work Group (technical representatives) for monitoring the agreement, composed of experts from each of the participating countries, UNHCR, GS/OAS and other countries or entities that wish to support this technical process. In turn, the work carried out by the Technical Group would be approved by the States Parties through a group formed of the representatives of all those states and participants that have the authority and general responsibility to implement the mechanism (political representation).
3) Creation of an annual report with inputs generated by measurement and other relevant instruments.
4) An annual meeting of the Committee on Juridical and Political Affairs (CAJP, by its acronym in Spanish) of the OAS, presenting a MIRPS progress report.

With the purpose of contributing to the national institutions in charge of documenting the phenomena of mixed flows in their countries having the best information systems for the formulation, implementation, monitoring and evaluation of policies/programmes for the protection of victims of forced displacement, and sharing information about their experiences, the following tasks would be carried out:

1) Organisation of a Workshop (I) on information systems for documenting human mobility; dissemination of the Continuous Reporting System on International Migration in the Americas (SICREMI) as the base model for continuing the institutionalisation of information-gathering and to share experiences of current information systems.
2) Asesoría Técnica por país (que solicite) para hacer un diagnóstico de necesidades de los sistemas de información, y proponer mejoras.
3) Organisation of a Workshop (II) on the use of information systems for the formulation, implementation, monitoring and evaluation of public policies/programmes and to share the experiences of these policies.

To support work already in progress on building the capacities of governments and civil society, and to generate opportunities for sharing experiences of assisting populations in a situation of vulnerability, work will be carried out on:

DHSFF0354

1. Systemising/mapping the various protocols or models used for assisting victims of forced migration in situations of heightened vulnerability, such as women, children and disabled persons
2. Comparative analysis of protocols, focusing on best practices, worst practices, costs, differences, similarities, strengths and weaknesses in existing protocols.
3. Based on this analysis, a proposal for a guide, model or reference for assisting the populations concerned.
4. Validation of the protocol/model with strategic actors, publication and launch.

| Operational Plan Regional Consultations OAS 2018 - 2020 | | | |
|---|---|---|---|
| **Activity** | **Total Cost** | **OAS (In Kind)** | **Resources Required** |
| Management, supervision and monitoring | $ 763,317 | $ 397,022 | $ 366,295 |
| Reinforced information systems | $ 208,700 | $      - | $ 208,700 |
| Published protocol for assisting population in a situation of vulnerability | $ 112,160 | $      - | $ 112,160 |
| **Subtotal** | $1,084,177 | $ 397,022 | $ 687,155 |
| **ICR (13%)** | $ 89,330 | | $ 89,330 |
| | | | |
| **Total Project Cost** | **$1,173,508** | **$   397,022** | **$   776,485** |

# The Inter-American Commission on Human Rights (IACHR)



The Inter-American Commission on Human Rights (IACHR) is the main organ of the Organisation of American States (OAS) and is responsible for promoting the observance and defence of human rights in the Americas, serving as the advisory organ of the Organisation in these matters. The work of the IACHR rests on three main pillars: the individual petition system; the monitoring of the human rights situation in the Member States; and technical consultancy and cooperation with the states.

The IACHR Rapporteur on the Rights of Migrants has a mandate focused on respecting and guaranteeing the rights of migrants and their families, asylum seekers, refugees, stateless persons, victims of human trafficking, internally displaced persons and other vulnerable groups of persons in the context of human mobility (hereinafter persons in the context of human mobility). Its functions include:

≠ Fostering the promotion and protection of the human rights of people in the context of human mobility;

≠ A Acting on petitions, cases, amicable solutions, precautionary measures, requests for presentation of provisional measures before the Inter-American Court of Human Rights and disseminating Inter-American standards in these matters;

≠ Monitoring the human rights situation of people in the context of human mobility and making recommendations to the states as regards the violations of those rights;

≠ Contributing to prevent the violations of those rights;

≠ Providing technical assistance to political organs of the OAS, providing technical consultancy to member states and recommending the adoption of measures that contribute to the protection of the human rights of that population;

≠ Drawing up specialised reports and studies;

≠ Promoting human rights and the visibility of the human rights of people in the context of human mobility, in connection with other historic grounds for discrimination (sex, gender, race, ethnicity, deprivation of liberty, disability, age and poverty, among others).

The Rapporteur on Migrants has outlined four large areas of prioritised needs for the upcoming years in the promotion and protection of the rights of internally displaced persons, refugees, complementary protection beneficiaries and stateless persons:

## MONITORING IN CRISIS SITUATIONS

In recent years, various countries of the region have witnessed crisis situations that can occur as a consequence of the unforeseen or sudden large-scale displacement of persons moving in mixed migration flows.

The IACHR believes that, for the states in the region and for the greater protection of the rights of persons affected by humanitarian migration crisis situations, the creation of an impartial and independent mechanism for a rapid and effective response would be highly important. This would result in an Inter-Agency Rapid Response Group for Monitoring in Crisis Situations with internally displaced persons, refugees, complementary protection beneficiaries and stateless persons. The group could be formed of officials from bodies such as the IACHR Rapporteur on the Rights of Migrants, UNHCR and OHCHR, among others, as well as independent experts in the matter. The purpose of this group would be to change the late and ineffective responses of various national, inter-American and international bodies into a coordination that enables work to be carried out more appropriately and efficiently, guaranteeing responses that assume a human rights approach.

In view of the above, it is fundamental for the team that forms said group to be trained in advanced monitoring techniques, in order to ensure the greatest possible efficiency of the responses and technical assistance provided to the states.

## CREATION OF THEMATIC REPORTS

The Rapporteur on the Rights of Migrants has identified numerous, very different systems and procedures that provide international protection in the region, but very often fall below the minimum standards established in the regulations and standards developed by the Inter-American System. In this respect, the Rapporteur has identified that there is very little discussion about durable solutions in the region, specifically in terms of what occurs once persons are recognised as refugees and need to become integrated into their new country. Lastly, the Rapporteur has observed the worrying increase of detentions and deportations of persons to their countries of origin, even when they often require international protection. The return of those persons is usually carried out without any precise public policies focused on their reintegration in their countries of origin and on the protection and security which they sometimes need.

In this regard, the Rapporteur proposes the drawing up of the following reports for the purposes of establishing the state of matters, identifying protection gaps and best practices, developing standards, and formulating recommendations that might help the states of the region in the policies, laws and actions to be carried out in the following issues:

1) The situation of persons returned or deported to their countries, highlighting standards and best practices for assisting returnees and guaranteeing their rights; and

DHSFF0357

2) Local integration policies in destination countries, highlighting standards and best practices so as to guarantee access to rights and to make local integration a durable solution. This report will be drawn up as a continuation of the report on Guarantees of Due Process and Legal Protection in the Context of Refugee Status Determination Procedures, Complementary Protection and Statelessness, currently in preparation;

These last two lines of research, legal development and public policy development (the situation of returnees and integration policies) prioritise and draw attention to the importance of the states' shared responsibility in the face of the situation of human mobility in the region, and the importance of improving national systems for assisting the population that requires protection. Additionally, the creation of such reports will be focused on identifying best practices and concrete policies so as to better protect persons in the context of human mobility, with a view to supporting the creation and improvement of national protection plans, for example. The comparative research which drives the two reports will also shape an important factual information database to directly promote, with the states, the improvement of national systems and policies in the region.

Lastly, the drawing up of said reports will serve as the basis for discussion and involvement in regional spaces for action, such as the space developed by the *Comprehensive Regional Protection and Solutions Framework (MIRPS)*, and the initiatives fostered in the region in matters of shared responsibility.

## TRAINING AND DIALOGUE WITH STATE AUTHORITIES

The IACHR has noted that one of the biggest challenges in the region is the need for state official and authorities to know about the inter-American regulations and standards on human rights applicable to people in the context of human mobility. That is why the Rapporteur on the Rights of Migrants has prepared a Training Programme on IACHR Human Mobility Standards, addressing the human rights regulations and standards of migrants, refugees, stateless persons, victims of human trafficking, internally displaced persons and victims of forced expulsion. This programme includes a roadmap of the content of the workshop, a significant bibliography that should be studied and also interactive materials and presentations on all the topics addressed during the training and practical exercises. With the developments to be promoted by the special work group for cases (this being the fourth and next element of this proposal) and in the research and dissemination of the thematic reports, we hope to increase the impact of the training and dissemination of standards and best practices that the Rapporteur of the Rights of Migrants will impart.



UNHCR / Ricardo Ramirez Arriola

## ACCESS TO INTERNATIONAL JUSTICE AND DEVELOPMENT OF LEGAL STANDARDS

One of the greatest challenges for internally displaced persons, complementary protection beneficiaries and stateless persons in the region is related to their lack of access to justice and the obstacles they face in this regard. In this respect, the Inter-American Commission represents the entry point for individuals and states reporting human rights violations to present individual or inter-state petitions before the organs of regional system of human rights. The Inter-American System represents a real and very often the only opportunity to obtain justice and reparation for cases of human rights violations, and to develop legal standards which may impact the public policies and laws of the states in the region.

In order to be able to provide a better response to this challenge, the IACHR Rapporteur on the Rights of Migrants proposes the creation of a special work group for the processing of representative cases related to internally displaced persons, refugees, complementary protection beneficiaries and stateless persons. This group, formed of 2-3 additional team members will support the Petitions and Cases Department of the IACHR. These additional three persons could form a group that is completely integrated with the Registration, Admissibility, Merits and Court departments, potentially facilitating the advancement of cases through their processing before the IACHR and after they have been sent before the Inter-American Court of Human Rights. In turn, it would be very beneficial to replicate this type of initiative on the level of the Inter-American Court.

The group would focus on assessing petitions in the preliminary assessment stage and creating reports in the admissibility and merits stages and in their presentation before the Inter-American Court of Human Rights, guaranteeing specialist opinions in representative cases which may affect the development of new standards in matters of international protection and in terms of more structural changes or reforms. Similarly, the group would work on increasing the visibility and disseminating information about the new standards developed through innovative dissemination materials that are mainly focused on the elaboration of thematic factsheets with the development of jurisprudence and standards of the Inter-American System, on issues such as asylum, immigration detention, internal displacement and statelessness, among others. It will also work on the creation of a

more user-friendly electronic 'case-analyser' for seeking inter-American jurisprudence, materials on social media, and other matters.

The creation of more precise standards on the scope and contents of the rights recognised in inter-American and international instruments and the instruments of international law on refugees, stateless persons and internally displaced persons would provide fundamental support for the strengthening of states' capacities to comply with their obligations in matters of the human rights of internally displaced persons, refugees, complementary protection beneficiaries and stateless persons.



UNHCR / Sebastian Rich

DHSFF0360

# Plan of Action

| Prioritised Activity | Resources Required | | Project Schedule |
|---|---|---|---|
| **Need 1**: *Monitoring in crisis situations* | | | |
| Creation of a special mechanism for rapid response to migration crisis situations in the region, with a high capacity for on-site monitoring and responding to urgent situations within days. | Permanently available funds for on-site trips - $25,000 per year plus 13% ICR. Staff: IACHR Consultant - $75,862 | | From 2018 |
| **Need 2**: *Creation of thematic reports* | | | |
| Creation of a Report on the Situation of Persons Returned or Deported to their Countries, highlighting standards and best practices for assisting returnees and guaranteeing their rights. This would ideally include visits to countries in the region with large or growing populations of persons returned to their countries of origin. | Staff to create the report | $75,862.00 | 2018-2019 |
| | 3 trips to gather information | $5,400.00 | |
| | 2 consultations with experts to discuss the content of the report | $20,000.00 | |
| | Publication 100ag EN/ES | $13,000.00 | |
| | Translation 100p | $9,500.00 | |
| | Cover design | $1,500.00 | |
| | Social media campaign for the report | $5,000.00 | |
| | Micro-site | $10,000.00 | |
| | 2 EN/ES banners | $2,000.00 | |
| | Launch event | $10,000.00 | |
| | ICR | $26,583.00 | |
| | Total | $204,482.76 | |
| Local integration policies in destination countries, highlighting standards and best practices so as to guarantee access to rights and to make local integration a durable solution. This would ideally include visits to countries in the region with large or growing populations of migrants, such as Canada, USA, Mexico, Ecuador, Brazil and Chile or Argentina, so as to evaluate and highlight best practices in the matter. | Staff to create the report | $75,862.00 | 2019-2020 |
| | 3 trips to gather information | $5,400.00 | |
| | 2 consultations with experts to discuss the content of the report | $20,000.00 | |
| | Publication 100ag EN/ES | $13,000.00 | |
| | Translation 100p | $9,500.00 | |
| | Cover design | $1,500.00 | |
| | Social media campaign for report | $5,000.00 | |
| | Micro-site | $10,000.00 | |
| | 2 EN/ES banners | $2,000.00 | |
| | Launch event | $10,000.00 | |
| | ICR | $26,583.00 | |
| | Total | $204,482.76 | |
| **Need 3**: *Training for authorities and civil society* | | | |
| Training authorities on the created reports. Ideally, regarding the Report on Returnees: Mexico, Guatemala, El Salvador and Honduras. Ideally, regarding the Report on Integration: United States, Canada, Mexico, Argentina and Colombia. | Travel expenses - $12,000.00 per training course. One per year. Total $24,000 | | 2019-2020 |
| **Need 4**: *Access to Inter-American Justice* | | | |
| Formation of a special work group for the processing of representative cases in matters of human mobility, before the IACHR. | Ideally, 3 persons to work in the Registration, Admissibility and Merits Departments. Cost per person: $75,862 x 3 = $227,587 | | From 2018 |

DHSFF0361

# Inter-American Court of Human Rights

**Corte Interamericana de Derechos Humanos**
**Corte Interamericana de Direitos Humanos**
**Cour Interamericaine des Droits de l'homme**



The Inter-American Court of Human Rights is the "autonomous judicial institution" of the Organisation of the American States (OAS) and was formally established on September 3, 1979, when the American Convention on Human Rights came into force. Its main purpose is to apply and construe that treaty with binding authority. As the sole organ with regional-wide jurisdiction, the work of the Inter-American Court falls within the framework of the mandate delimited by the Convention, in accordance with which it exercises contentious competence, it has the power to issue provisional measures and it plays an advisory role.

In its contentious function, the Court determines, in the cases under its jurisdiction, whether a state that has accepted its jurisdiction has failed in its international obligations through a violation of a right recognised in the American Convention or in other applicable treaties of the Inter-American System and, if necessary, the Court will rule on the necessary measures to make reparations for the consequences of this violation of rights.

The power granted by the convention to order provisional protection measures addresses the objective of guaranteeing the rights of certain persons or groups of persons who are in a situation of extreme danger and urgency and when necessary to avoid irreparable damage. This mainly concerns the right to life or to personal integrity, and also, in certain matters, the right to freedom of movement[5].

In its advisory role, the Court responds to consultations made by OAS Member States or its organs about the construction of the American Convention or other treaties concerning the protection of human rights in the American states. Additionally, upon the request of an OAS Member State, the Court can issue an opinion on the compatibility between internal regulations and the instruments of the Inter-American System. To date, the Court has issued 22 advisory opinions, giving it the opportunity to make statements about issues concerning the protection of human rights in general and those of persons in need of international protection in particular.

Through its convention-mandated functions, the Inter-American Court has made authorised interpretation of the international regulations on human rights, setting and developing binding legal criteria on the protection of human rights for the region, within the framework of human mobility. Those standards are related to various rights recognised both in the American Declaration of the Rights and Duties of Man and in the American Convention on Human Rights, particularly the right to seek and receive/be granted asylum (Article XXVII and Article 22.7), non-refoulement (Article 22.8), personal liberty (Articles I and XXV and Article 7), the guarantees of due process and the right to justice (Article XVIII and Articles 8 and 22.6), the prohibition of collective expulsions (Article 9) and the right to

---

[5] Systematization of the resolutions of provisional measures issued by the Inter-American Court. Available in:

http://www.corteidh.or.cr/sitios/libros/todos/docs/Sistematizacion.pdf (in Spanish).

nationality (Article XIX and Article 20), among others.

The objective of this jurisprudence is to guide the actions of the states in matters of protecting the rights of asylum seekers, refugees, stateless persons and internally displaced persons, in such a way that the focus on human rights is integrated into the specific framework of international protection. The relevant standards in terms of the identification and protection of asylum seekers and refugees derive both from individual contentious cases (*Case of the Pacheco Tineo Family Vs. Bolivia*) and from advisory opinions (Advisory Opinion OC-21/14 on the *Rights and guarantees of children in the context of migration and/or in need of international protection*). Similarly, the standards regarding the right to nationality and the correlative obligation of the states to identify, prevent and reduce statelessness and to protect stateless persons were also developed during the exercise of its contentious functions (*Case of Ivcher Bronstein Vs. Peru, Case of the Girls Yean and Bosico* Vs. Dominican Republic, *Case of Gelman Vs. Uruguay*, and *Case of Expelled Dominicans and Haitians Vs. Dominican Republic*) and its advisory role (Advisory

Opinion OC-4/84 on the *Proposed Amendments of the Naturalization Provisions of the Constitution of Costa Rica* and Advisory Opinion OC-21/14 on the *Rights and guarantees of children in the context of migration and/or in need of international protection*).

Additionally, the standards regarding internal displacement and the protection of the persons affected by these matters have been addressed both in contentious jurisprudence (*Case of the Moiwana Community Vs. Suriname, Case of the Ituango Massacres Vs. Colombia, Case of the Mapiripán Massacre Vs. Colombia, Case of Chitay Nech et al. Vs. Guatemala, Case of the Río Negro Massacres Vs. Guatemala, Case of the Santo Domingo Massacre Vs. Colombia, Case of the Massacres of El Mozote and nearby places Vs. El Salvador, Case of the Afro-descendant communities displaced from the Cacarica River Basin (Operation Genesis) Vs. Columbia*, and *Case of Human Rights Defender et al. Vs. Guatemala*) and provisional measures (Matter of the *Kankuamo Indigenous People with regard to Colombia* and Matter of the Peace Community of *San José de Apartadó with regard to Colombia*)..



DHSFF0363

In regional forums, states have expressed their commitment and determination to implement the developed standards, leading to the General Assembly of the OAS stressing the importance of bearing in mind the content of Advisory Opinion OC-21/14 so that countries of the region adopt their respective regulatory frameworks in accordance with its provisions (Press Release e-427/14)[6].

Furthermore, the 2014 Brazil Declaration and Plan of Action[7] certifies the regional position of recognising and supporting the criteria developed by the Inter-American Court through its jurisprudence on the matter, in the following terms:

*We recognize* developments in the jurisprudence and doctrine of the Inter-American Court of Human Rights, in those countries in which they apply, regarding the content and scope of the right to seek and be granted asylum enshrined in the regional human rights instruments, their relationship to international refugee instruments, the *jus cogens* character of the principle of non-refoulement, including non-rejection at borders and indirect refoulement, and the integration of due process guarantees in refugee status determination procedures, so that they are fair and efficient.

THEY AGREED

To recognize that the deprivation of liberty of migrant children in an irregular situation, ordered solely for this reason, is arbitrary and that consequently we must make progress in adopting alternatives to detention, aimed at its prohibition, that promote their care and welfare with a view to their full protection in light of their particular vulnerabilities, taking into account Advisory Opinion 21/14 of the Inter-American Court of Human Rights, as appropriate.

The core aspects addressed by the Inter-American Court in jurisprudence are closely related to the objectives established in Annex I of the New York Declaration, referring to reception and admission and to support for immediate and ongoing needs. They particularly refer to: i) the mechanisms for identifying protection needs, bearing in mind the new contexts of displacement in the region; ii) access to fair and efficient procedures to determine international protection needs and particularly access to refugee status determination procedures and stateless person determination procedures, so that the due guarantees are provided; iii) the non-detention of children and adolescents based on their migration status or that of their parents; iv) non-refoulement, including non-rejection at the border; v) the need to progress in the recognition of forms of complementary protection; vi) the adaptation of procedures to the specific needs of children and adolescents.

---

[6] Available at:
oas.org/en/media_center/press_release.asp?scodigo=e-427/14

[7] Available at:
http://www.acnur.org/t3/fileadmin/Documentos/BDL/2014/9865.pdf

The effective implementation of those standards needs to be ensured at a regulatory level, along with the administrative and judicial practices of countries of the region.

Within the framework of the identified challenges and alongside the UNHCR's Regional Legal Unit, the Inter-American Court of Human Rights proposes to organise regional and national courses with the countries involved in the *Comprehensive Regional Protection and Solutions Framework (MIRPS)* to train all relevant state stakeholders in the international legal obligations that stem from the regional human rights instruments, as well as in the Inter-American Court's construction of said regulations when setting the aforementioned standards. This capacity building will address inter-American jurisprudence and international standards in matters of international protection and the rights of asylum seekers, refugees, stateless persons and internally displaced persons. It should cover the entire spectrum of state officials who may come into contact with persons in need of international protection, including those from migration and border services, administrative organs charged with determining refugee or stateless person status, the judiciary and ombudsperson offices, national offices for the protection of human rights, national institutions for women, comprehensive child protection mechanisms, etc.

Additionally, it is deemed important to also include civil society. Therefore, key institutions, actors and officials will be identified in each national context.

Given the delicate financial situation of the Inter-American Court of Human Rights, it does not have the resources to cover the aforementioned training activities, and therefore it will need to turn to donors to finance them. It is estimated that the regional course will cost 50,000 dollars, and it expects each training course in the countries participating in the *Comprehensive Regional Protection and Solutions Framework (MIRPS)* to cost 25,000 dollars. Therefore, considering that the proposal contemplates the realisation of training courses in Mexico, Guatemala, Honduras, El Salvador, Costa Rica, Panama and Belize, the estimated cost is 175,000 dollars. Additionally, the estimate needs to include a sum of 5,000 dollars to cover the academic planning and logistics of the courses. To sum up, the total cost of the proposed activities is 230,000 dollars.



# General Secretariat of the Central American Integration System



Collaborating on the shaping of a region of peace, freedom, democracy and development is the inspiration for the work of SICA. This commitment was assumed through the adoption of the Tegucigalpa Protocol in December 1991, when unfettered respect for human rights was committed to, as our guidance going forward.

The spirit of solidarity has been present in our security model since our origins and it feeds on a comprehensive outlook. The model firmly believes that strengthening the region is only possible if it works alongside civil society, in the search to overcome extreme poverty, to increase social justice and to promote sustainable development. It involves taking firm and decided steps throughout the region towards the eradication of violence and in the fight against corruption and the trafficking of drugs and arms. This unavoidable task cannot be done without the drive of a broad range of freedoms that ensure the full development of persons, nations and societies as a whole.

In 1995 and with this tenor, the *Framework Treaty on Democratic Security in Central America* ratified the construction of the *Central American Democratic Security Model.* The raison d'être of this model is the respect for, promotion of and protection of all human rights; and the solidarity and the security of all the peoples and governments of Central America. We are strongly committed to the prevention and joint settlement of common problems on this topic; to guaranteeing the conditions for the voluntary and peaceful return of refugees, displaced persons and stateless persons to their territories.

We are dedicated to their enjoyment of all of their rights and to improving their quality of life on equal footing with others, taking into consideration the domestic situation prevailing in each country. This forms part of the spirit found in Article 23 of the aforementioned treaty.

We understand the challenges in addressing the remaining regional challenges in the protection of the victims of violence. This is reflected in the Collaboration Agreement that SICA and UNHCR signed in April 2014, forging the path that we now walk on in the design of joint strategies that reduce the impact generated by the actions of transnational organised crime and other forms of violence.

We use our cooperation to address issues related to the protection of refugees, asylum seekers and other persons who may require regional and international protection. Our efforts are intertwined for the promotion of prevention policies whose overall results ensure institutional strengthening in all aspects.

Laying the foundations of the common roadmap in the region, we have reaffirmed our commitment to frank dialogue. We have examined trends in forced displacement in Mesoamerica, along with the national and international protection systems that address mixed movements. We have also examined the specific protection needs of boys, girls and adolescents. These efforts were crystallised in the Sub-regional Consultations in Mesoamerica, held with UNHCR in July 2014 in Managua (Nicaragua), on the occasion of the commemoration of the thirtieth anniversary of the Cartagena Declaration on Refugees. Thanks to the

DHSFF0366

determination of the SICA states, inputs from the sub-regions were identified for the Brazil Plan of Action that was adopted in Brasilia six months later, the progress of which is currently being evaluated. .



UNHCR / Jordan Hay

Their conviction has inspired partnerships between governments, the United Nations System, the Inter-American Development Bank, the Organisation of American States and the Central American Integration System; as well as with civil society, academia, the private sector, religious organisations, refugees and asylum seekers. This was the overwhelming call to action of the final declaration of the High Level Round Table held in San Jose (Costa Rica) in July 2016.

This effort corresponded to a joint commitment between UNHCR, OAS and the Costa Rican government, calling us to:

≠ "Recognise new forms of forced displacement."

≠ "Acknowledge an increase in the migration of unaccompanied children to the U.S., leading to a humanitarian crisis, due to the fragility of the human rights and child protection mechanisms."

≠ "Undertake regional workshops to train and raise awareness on forced displacement and protection frameworks, based on the cooperation agreement signed between SICA and UNHCR."

≠ "Promote regional policies on refugee protection as part of the discussions for

the adoption of a comprehensive migration policy for Central America."

≠ "Promote spaces for cooperation and exchange of good practices at regional and national level, including for the creation of an early warning system with emphasis on prevention of displacement and the establishment of an observatory on displacement."

As an integration mechanism and within the framework of our competencies, we promote the commitments of the San Jose Action Statement and the New York Declaration for Refugees and Migrants. Now is the time to take a qualitative leap towards the protection of persons stuck in the cycle of displacement, including the victims of violence and persecution in the SICA region. Today we celebrate the drive of the "Comprehensive Regional Protection and Solutions Framework." We are proud to play an active role in this historic milestone towards integration that is feeding the discussion for the Global Compact on Refugees.

We would like to take this opportunity to renew our efforts and to make contributions that build the capacities of the different governments so that they can assist the affected persons in coordination with international bodies.

These efforts are leading us to the consolidation of peace. We are heading towards democratic security, particularly as regards the victims of violence and the coordinated actions for the persecution of crime. Today we reaffirm that, with the concurrence and adoption of the decisions of the competent organs and institutions of SICA, we can build a region of opportunities. This is living integration.

# Secretariat of the Central American Socia Integration System (SISCA)



The Central American Integration System (SICA, by its acronym in Spanish) is currently formed of Belize, Guatemala, El Salvador, Honduras, Nicaragua, Costa Rica, Panama and the Dominican Republic and its main objective is to foster peace, freedom, democracy and development in the region. In 1995, as part of a new stage in the regional integration process that began with the creation of the Central American Integration System, the member states subscribed to the Central American Social Integration Treaty (TISCA, by its acronym in Spanish), as a legal instrument complementing the provisions of the Tegucigalpa Protocol (1991), through which they sought to position social matters as a central aspect of the work of integrationist efforts.

In recognition of the unique aspects of working on social matters in a regional integration framework, TISCA included the fundamental premise that human beings are the centre and fundamental subject of development. Furthermore, it seeks the substantive improvement of people's quality of life. Likewise, it establishes that states are committed to promoting greater opportunities and a better quality of life and work, under the inalienable principle of non-discrimination for reasons of nationality, race, ethnicity, age, illness, disability, religion, sex, ideology, marital or family status or any other types of social exclusion. With these objectives in mind, the Social Integration Council and the Secretariat of Central American Social Integration System (CIS and SISCA, by their acronyms in Spanish) were founded as fundamental parts of the regional institutions responsible for organising efforts in these matters. The function of CIS is to coordinate and drive the SICA Social Subsystem and it designated SISCA as the technical and administrative organ charged with implementing its mandates, with the capacity to make proposals and playing its role of a technical organ that drives the coordination of the inter-sectoral social policies between SICA Member States and integration authorities, establishing regional agendas to address common challenges in sustainable development in Central America and the Dominican Republic.

The Central American region and the Dominican Republic have improved a number of their social indicators since the 1990s, although some obstinate dynamics of exclusion and inequality still exist. This situation, far from discouraging regional efforts, should lead us to the realisation that now more than ever there is a need to increase the pace and make significant contributions to the achievement of the Sustainable Development Goals (SDG). In particular, the phenomena of migration and forced displacement in Central American societies present two fundamental challenges. One of these is the institutional weakness generated in part by the economic growth model adopted in the eighties, assuming the reduction of certain basic

DHSFF0369

functions performed by the states and the transfer of a sizable number of them to the private sector. On the other hand, the focus on social policies to the detriment of universal policies, alongside institutional fragmentation or dispersion, have hindered the response to the multi-dimensional needs and demands of the sectors with the most difficulties. These reductions generate social exclusion and instability and impact humanitarian issues and visible human rights, forming a barrier to the sustainable development of countries and generating high levels of forced displacement that need to be addressed.

It is worth mentioning that the Central American Observatory for Social Development of the Secretariat of Central American Social Integration System (OCADES/SISCA) has identified challenges and needs for the comprehensive management of international migration in Central America and the Dominican Republic. SISCA believes that the comprehensive addressing of the phenomenon of migration in SICA countries must be founded on a rights-based approach that simultaneously brings together the right to migrate and the right not to migrate, with the implementation of comprehensive public policies affecting both sides, thus avoiding the duplication of care systems

Also, the phenomenon of forced displacement in the region is closely linked to the presence of organised crime, as evidenced by the extortions, murders, forced recruitment, strategic control of territories, widespread fear within the population, the increase in indicators of violence and the weakening of state structures. Due to the actions of organised crime, both the victims

(those forcibly displaced) and the population at risk have suffered from a lack of effective social (in the case of internal forced displacement) and international (when there is forced displacement across of borders) protection mechanisms. Faced with this lack of protection, the population hides, flees and looks to join and blend in the population migrating north due to socio-economic reasons and on occasion, they do not apply directly for international protection as refugees for fear of repercussions from criminal organisations.

In this regard, the main challenge is in creating public policies and particularly local integration policies that contribute to in-transit and returned migrants, refugees and asylum seekers being able to integrate fully into the destination society and then, if they wish, to return voluntarily, safely and with dignity into their society of origin. Furthermore, there is also the challenge of implementing structural transformation policies so that persons can exercise their right not to migrate and obtain, in their place of origin, the same welfare and protection opportunities while efforts are focused on combating the structural determinants of "expulsion."

The strategic vision of the SICA Social Subsystem points to the need to reinforce the legitimate social inclusion mechanisms in both origin and destination countries, assuming that this capacity building requires structural transformations that must be made at a regional level, based on three lines of action: the management of knowledge for addressing common challenges; the organisation of permanent political and technical dialogue between institutions; and the mobilisation of resources. This will have a

national influence in the generation of inter-institutional, and inter-sectoral coordination tools for improved service, the encouragement of public-private partnerships, and the strengthening of technical-operational instruments for accountability and for the improvement of the services provided that have a direct effect on the promotion and protection of the fundamental rights of in-transit or returned migrants, refugees, and asylum seekers.



UNHCR / Markel Redondo

## Table of results and proposed activities for the SISCA-UNHCR Collaboration Agreement (2014-2020)

| **OBJECTIVE 1** |
|---|
| **Strengthening of the regional collaboration of the SICA Social Subsystem for the analysis and care of in-transit and returned migrants, refugees and asylum seekers, within the SDG framework** |

| Result 1 |
|---|
| SISCA will promote the implementation of comprehensive care actions for in-transit and returned migrants, refugees and asylum seekers, among the institutions of the SICA Social Subsystem and other institutions. |

| | |
|---|---|
| R1.A1: Hold high level inter-sectoral meetings of the SICA Social Subsystem. | With the aim of defining, positioning and endorsing the activities of the SISCA-UNHCR Collaboration Agreement (and other related efforts), approval must be obtained periodically from the highest institutional level of CIS (Central American Social Integration Council) and, when necessary, from the stakeholders linked with the activities being carried out and with the healthcare, education or cultural sectors, or any other institutions of the Social Subsystem.<br><br>For example, inter-sectoral coordination can be carried out within the framework of the Alliance of Secretariats and Authorities of the SICA Social Subsystem, favouring their strengthening and supporting compliance with the Sustainable Development Goals and other current mechanisms.<br><br>Also proposed are spaces for bilateral coordination between SISCA/UNHCR and other SICA and Social Subsystem regional institutions, on specific subjects of interest. |
| R1.A2: Hold institutional technical meetings. | The space for coordination in technical aspects will be tasked with composing, under the leadership of SISCA, the proposals that will be subsequently validated at a political level in order to guarantee a participatory process in the creation of a Social Subsystem regional agenda for the analysis and care of in-transit and returned migrants, refugees and asylum seekers.<br><br>Likewise, the proposal is for these technical spaces to be inter-sectoral and/or bilateral when the subjects of the proposals so require. In addition to coordination with SICA and Social Subsystem institutions, it is deemed strategic to organise work agendas between the General Directorates of Migration, the authorities responsible for the integration and protection of refugees and the Ministries of Social Development. |

| Result 2 |
|---|
| Strengthened institutional capacities for addressing, planning and evaluating interventions concerning in-transit and returned migrants, refugees and asylum seekers. |

| | |
|---|---|
| R2.A1: Design and execution of a regional plan for the capacity building of staff in Ministries of Social Development. | The aim of this activity is to make efforts to train persons working for the Ministries of Social Development, strengthening their capacities and knowledge.<br><br>These training activities or courses will be directed at operational staff deployed on site, based on their differentiated needs for knowledge about special care in crises, international legislation on the rights of migrants and asylum seekers, and mechanisms to avoid re-victimisation, among others.<br><br>Furthermore, the proposal also includes the organisation of regional courses to improve capacities in the design and evaluation of interventions aimed at the heads of Ministries of Social Development, where networks for the peer-based exchange of experience and information can be created. |
| R2.A2: Creation of more efficient organisational frameworks for the care of | To complement and enable the institutionalisation of the capacity building activities for persons working in Ministries of Social Development, work will be done in improving their organisational frameworks (action protocols, care processes, measurement of |

| | |
|---|---|
| in-transit and returned migrants, refugees and asylum seekers. | results, strategic planning, etc.) with the aim of providing better services to the target population group in the long term. |

| OBJECTIVE 2 |
|---|
| **Support the conceptualisation, design and implementation of a model for generating economies of scale in knowledge management.** |

| Result 3 |
|---|
| Strengthen OCADES so that it can further the analysis and exposure of migration and forced displacement in SICA countries. |

| | |
|---|---|
| R3.A1: Development and dissemination of research on the reality of migration and forced displacement in the region. | Within the framework of its institutional work as a tool for the generation of knowledge that develops learning and innovation dynamics to address key social challenges in Central America and the Dominican Republic, OCADES must have, in upcoming years, more technical and human resources to identify bottlenecks in the regional provision of services to in-transit and returned migrants, refugees and asylum seekers. |
| R3.A2: Generation of transnational social protection models in which migrants and forcibly displaced persons will be a target population. | The aim is to produce transnational social protection models as regional public assets, especially in transborder areas where, due to their interaction dynamics, it is necessary to generate specific response capacities for the dignified and safe mobility of migrants and displaced persons. |

| Result 4 |
|---|
| Institutionalise lessons learned and best practices through information management systems. |

| | |
|---|---|
| R4.A: Organisation of forums and events for the identification and dissemination of best practices. | Attending national and/or regional events can generate spaces for the exchange of regional best practices that can be extrapolated to other countries with the intention of improving existing care systems for in-transit and returned migrants, refugees and asylum seekers, and to not generate parallel systems.<br><br>Furthermore, they may also include other countries' experiences and ways of working that are relevant to the Central American migrant and refugee situation, Mexico for example. Also, these spaces for exchange serve to generate institutional synergies.<br><br>It is important to mention that in order to facilitate the institutionalisation of lessons learned, best practices must be addressed with the consideration that information on experiences needs to be gathered, lessons learned should be extracted, discoveries must be published and mechanisms for institutional innovation have to be found. |

| OBJECTIVE 3 |
|---|
| **Implementation of comprehensive public policies aimed at prioritised population groups.** |

| Result 5 |
|---|
| Support the comprehensive strategy of sustainable livelihoods to aid prioritised population groups in the region. |

| | |
|---|---|
| R5.A1: Drive support actions for the local integration of refugees, asylum seekers and persons in transit in selected countries. | Within the framework of this Collaboration Agreement, SISCA will work with UNHCR on the implementation of actions identified for the institutions and programmes, supporting or potentially supporting the development of sustainable livelihoods[8], and on the creation of economic opportunities for transit and/or host countries such as Guatemala, Panama, Costa Rica and Belize, and for returned persons.<br><br>This will contribute to the implementation of the Regional Plan of Action on Poverty and Social Protection and the Regional Inter-sectoral Agenda on Social Protection and Productive Inclusion. It will particularly improve the strengthening of national capacities for labour mediation, the fostering of employability, the development of productive |

---

[8] Sustainable livelihoods are understood as an approach that links poverty reduction strategies, the sustainability of interventions and empowerment processes. From the perspective of sustainable livelihoods, the right to work is the most important fundamental right, having direct consequences on refugees. Access to land, property and housing is also essential to sustainable livelihoods, as are other supporting rights such as access to healthcare and education. In this respect, families

| | |
|---|---|
| R5.A2: Drive support actions for returnees in need of protection, through the organisation of alternatives in the country of return, in selected countries. | enterprises, financial inclusion, and other productive inclusion initiatives, ensuring access for in-transit and returned migrants, refugees and asylum seekers. Furthermore, coordination mechanisms will be established for better documentation services for employment.<br><br>It is also worth mentioning that coordination and organisation actions will be fostered with projects and initiatives from other donor partners, in order to generate work synergies, to avoid the duplication of efforts and to increase the coverage of the care. |

---

and individuals at greatest risk who qualify for social care must be identified during the evaluation of needs and they must be supported with the ultimate aim, when applicable, of integrating them into national social security systems. Promotion and institutional capacity building must be used to improve refugees' access to the public and private services and institutions that can drive the development of sustainable livelihoods and self-reliance.

# Inter-American Development Bank



## Introduction/vision

The Inter-American Development Bank (IDB) is the main international financial institution dedicated to the support and funding of inclusive economic development in NCA countries. We work to improve the quality of life in Latin America and the Caribbean. We support institutional programmes to improve healthcare, education and infrastructure through the financial and technical support of countries that are working on reducing poverty and inequality. Our objective is to achieve development in a way that is sustainable and respectful of the environment. We therefore provide loans, grants and technical assistance, and we conduct extensive research on these matters. We maintain a strong commitment to achieving measurable results and the highest standards of increased integrity, transparency, and accountability.

The current focus areas of the Bank include three development challenges – social inclusion and equality; productivity and innovation; and economic integration – and three cross-cutting issues – gender equality; climate change and environmental sustainability; and institutional capacity and the rule of law.

In this context, the IDB is committed to supporting strategies and initiatives for the socio-economic reintegration of deportees through the generation of knowledge, regional technical assistance and the inclusion of this phenomenon in the preparation of its projects.

Furthermore, the IDB is committed to supporting the Alliance for Prosperity in the countries of the Northern Triangle. This regional approach seeks to generate opportunities through strategic projects and investments that improve the competitiveness of the region and its integration, closing gaps in the development of human capital, healthcare services and particularly care for pregnant women and infants; improving citizen security through violence prevention programmes; strengthening an independent judicial system capable of reducing impunity; and building institutional capacity, particularly: transparency in acquisition processes and the modernisation and technological advancement of tax and customs administrations.

# Priority Actions

≠   The IDB commits to keep working on individual and joint initiatives of NCA countries to overcome the challenge of insecurity, human trafficking and extortion, particularly initiatives that prioritise the fight against violence towards women and children.

≠   To do this, the IDB will continue supporting NCA countries in the strengthening of their institutions, the professionalization of their police departments and the strengthening of their public ministries.

≠   The IDB will also keep supporting NCA countries in urban development projects, including the restoration of urban areas at high risk of violence, through initiatives in education, healthcare, public spaces and housing.

≠   The IDB will continue to support NCA countries in initiatives for the socio-economic reintegration of deportees and displaced persons.

Additionally, the IDB intends to strengthen its partnership with UNHCR to explore and develop new initiatives on the prevention of displacement, the strengthening of protection systems and the promotion of solutions through:

≠   The hiring of staff for coordination between the entities.

≠   The development of studies, the gathering of data and the analysis of factors that drive migration and/or generate displacement.

≠   The identification of common work areas to strengthen the IDB projects on these matters in NCA countries.

≠   Cooperation in the design of a programme for the efficient management of migrants and refugees at border crossing points (Mexico, Costa Rica, Panama and the Dominican Republic).

≠   Management of the approval of regional technical cooperation so as to provide tools which guarantee an efficient and effective border management system in the Central American countries with the greatest flows of all types of migration, especially those of asylum seekers and stateless persons.

## JULIE T. KATZMAN WORDS AT THE G7 ON THIS REGARD.

*The Inter-American Development Bank*, at the request of the governments of Guatemala, Honduras and El Salvador, has supported the design and implementation of the *Plan of the Alliance for Prosperity in the Northern Triangle* to respond to the increasing flows of undocumented migrants (particularly unaccompanied children). This *Plan*, focused on growth and security, has been implemented along 4 strategic pillars: (i) fostering the productive sector to create economic opportunities; (ii) development of human capital; (iii) improving citizen security and access to justice; and (iv) strengthening institutions to increase public trust in the State. The Bank has provided technical and financial support, facilitated national and regional dialogues, and promoted coordination between different government agencies and private sector and civil society

representatives.[1] Furthermore, the IADB has been fostering the dialogue among all stakeholders at all levels, including other donors, UN agencies and NGOs. In addition, to promote South-South cooperation and share best practices, the Bank designed with the Northern Triangle Countries (NTCs) and México a "*Consular and Migration Cooperation Program*" which includes: comprehensive economic and social reintegration of returnees (including reception, inland transportation and reintegration assistance, job opportunities);[2] data collection and sharing, including data of deported migrants; prevention campaigns;[3] and legal instruments (such as the design and implementation of joint protocols). This *Program* is currently under consideration to be expanded with other countries' best practices in the region, such as Costa Rica's management of refugees and Ecuador's experience implementing returnees' economic and social reintegration programs.



ACNUR / Tito Herrera

---

[1] In this regard, the IADB Group has been promoting a dialogue with the NTC's private sector to curb migration through the generation of opportunities and employment. This includes the development of infrastructure funds, and an IADB Group Public-Private Facility (PPF) for project preparation and upstream work.

[2] México recently launched a program called "*Todos somos Mexicanos*" including fiscal incentives, education and health support for returnees; the NTCs have similar programs which could be further enhanced.

[3] The campaigns produced by US agencies like Customs and Border Protection (CBP) —*Dangers of the Journey* and *Know the Facts*— will be taken into account.

| PROJECT/TA TITLE | COUNTRY | AMOUNT | SECTOR(S) | OBJECTIVE(S) | SHORT DESCRIPTION | DATA, EVIDENCE PROJECT PREP. RES. LIMITATIONS |
|---|---|---|---|---|---|---|
| The IDB in the Northern Triangle | Regional: Northern Triangle countries (El Salvador, Guatemala and Honduras) | As of June 2017, <u>40 loan operations</u> are in execution, with an available balance of about <u>US$1.6 billion</u> for the public sector<br><br><u>81 non-reimbursable financing operations</u> for <u>US$29.3 million</u> approved between 2015 and June 2017 | Four strategic pillars:<br><br>Productive sector;<br>Human capital;<br>Citizen security and access to justice;<br>Institutions and transparency | To support the implementation of the Plan of the Alliance for the Prosperity of the Northern Triangle, endorsed by the governments of El Salvador, Guatemala and Honduras with the aim of achieving social inclusion, equality and promotion of productivity and innovation | <u>IDB support to the implementation of the Plan of the Alliance for Prosperity:</u><br><br>Provide technical and financial assistance in the implementation of the four strategic pillars<br><br>Facilitate national and regional dialogues<br><br>Promote coordination between different government agencies, private sector and civil society representatives | The IDB in the Northern Triangle document[4] |
| Consular and Migration Cooperation Program | Regional: Northern Triangle-Mexico | N/A - | Consular and migration multi-sectoral issues | To strengthen the capacities of public officials to promote effective management to assist returnees and improve the protection of rights and assistance to migrants. As well as promoting consulate coordination, establishing joint working agendas | <u>IDB designed with the Northern Triangle Countries and Mexico a "Consular and Migration Cooperation Program"</u> which includes:<br><br>Comprehensive economic and social reintegration of returnees, including reception, inland transportation and reintegration assistance, job opportunities;<br><br>Data collection and sharing, including data of deported migrants, regional information systems and prevention campaigns;<br><br>Legal instruments, such as the design and implementation of joint protocols; | |

---

[4] https://goo.gl/d7pHT9

| | | | | Knowledge exchange: this Program is currently under consideration to be expanded with the experiences of other countries in the region implementing economic and social reintegration programs for returnees. | |
|---|---|---|---|---|---|
| Knowledge products in the context of the Alliance for Prosperity and management of refugees: | Regional: | Approx. US$1.2 million | Knowledge generation and sharing | Add value to immigration data available in order to design and provide better solutions/proposals to address root causes of migration | To conduct a survey in the U.S. which aims to help understand the motivations of migration and characterize the migratory experience in general |
| Survey on migrants from El Salvador, Honduras and Guatemala living in certain metropolitan areas in the U.S. | Northern Triangle | | | | |
| Project on education policy responses. Phase I: Children raised by grandparents in the Northern Triangle | Northern Triangle | US$0.5 million | | To help officials in educational agencies promote the education attainment and achievement of children in skipped-generation households. | Assess the cost-effectiveness of support to skipped-generation households with social coping strategies (Group I) vis-à-vis social coping strategy support combined with parental training (Group II). The project will be evaluated through a Randomized Control Trial (RCT), contrasting any changes in learning of children in the treatment groups with children from a group of comparison households. |
| In design: Immigration and Refugee Border Management Program (Mexico, Costa Rica, Panama and Dominican Republic) | Mexico, Costa Rica, Panama and Dominican Republic | TBD – IN PREPARATION | | Support countries receiving increasing flows of migrants of all categories, particularly asylum seekers and the stateless with tools to ensure an efficient border management system | |

# The United Nations Development Group for Latin America and the Caribbean (UNDG LAC)



## Joint Initiative for the prevention, protection and addressing of violence

Northern Central American (NCA) countries have managed to consolidate democratic regimes with peaceful transitions. Furthermore, in the economic sphere, the three countries have managed to grow and stabilise their macro-economic accounts, expanding their range of products and services. Despite these advancements, the countries still present high levels of violence and insecurity.

There are various forms of violence in the sub-region, in addition to violence related to organised crime, and they affect all levels of society – individuals, families, the community, businesses and the state – with their impact being especially notable on women, children and adolescents.

From 2010 to 2016, 108,797 homicides were registered in the three countries, representing 8 out of every 10 homicides in Central America. In 2016 alone, 14,950 homicides took place and 2,448 of the victims were boys, girls or adolescents. Homicide is the most extreme manifestation of violence but other forms include extortion, robberies and attacks on property, gender-based crimes such as femicide, sexual crimes and domestic violence, a large proportion of which goes unpunished. All of the foregoing leads to, among other things, 43 out of every 100 people citing violence, insecurity and gangs as the main problems faced by their countries in 2016.

Forced displacement is another of the most evident consequences of this situation. According to statistics compiled by the United Nations and the governments of the region, forced displacement numbers are rising in the region. At the end of 2016, there were around 190,000 refugees and asylum seekers in Northern Central American (NCA) countries. This figure is ten times higher than five years ago. Likewise, there were 174,000 internally displaced persons in 20 municipalities in Honduras between 2004 and 2014.

Additionally, 217,000 nationals from El Salvador, Honduras and Guatemala were deported from the United States and Mexico in 2016. The migration from this sub-region is defined as "mixed" seeing as it is caused by three main, widely documented factors: the search for opportunities, family reunification and the high levels of violence in countries of origin.

UNDG LAC recognises the enormous efforts made by the countries in this region to deal with these challenges. However, there are still multiple difficulties in the provision of effective and comprehensive protection and an appropriate humanitarian response to the immediate consequences and long-term effects of violence that endanger the progress made by these countries.

Alongside the Resident Coordinators (RC) and the NCA country teams of the United Nations System (UNS), UNDG LAC is developing a new Joint Initiative within the protection priorities of the Secretary-General

DHSFF0380

of the United Nations, applying the "New Way of Working" agreed upon in the World Humanitarian Summit.

The main objective of this Joint Initiative is to reduce the levels of violence, prioritising actions for prevention, protection and care for persons affected by violence and those most vulnerable.

It also seeks to promote and support the implementation of comprehensive public policies that respond to the causes and effects of the multiple forms of violence present in the sub-region, on a basis of equity and with a focus on gender and human rights throughout the life cycle.

Faithful to our commitment to "Leave No-one Behind" and in accordance with the common framework of results established in the 2030 Agenda for Sustainable Development, we acknowledge the importance of a comprehensive approach by humanitarian and development agencies in the provision of a simultaneous response to the deep-rooted causes and challenges of violence, and to immediate protection needs.

In line with the current reform of the United Nations, we are seeking to overcome the fragmentation in efforts through more coordinated action that enables us to work together with the states of those countries, within a shared comprehensive vision. Eradicating the multiple forms of violence, with all their complexities, and avoiding reductionist views and strategies will require the combined efforts of all the sectors of the United Nations System and national and sub-national governments.

Along these lines, the Joint Initiative will generate a regular cooperative analysis of the context and trends in the sub-region, consolidating existing evidence and identifying the critical information gaps to be resolved. This will require gathering data and itemising it into groups such as age, ethnicity, gender, geographic region, poverty quintiles and other pertinent categories, in order to reach a holistic understanding of the dynamics of violence, so as to be able to respond effectively and correctly.

Lastly, the Joint Initiative recognises the importance of increasing the regional and global visibility of the unique aspects of this sub-regional context in order to foster a better understanding and to obtain support from various sectors, contributing to the search for sustainable solutions for the eradication of violence and full respect, protection and exercise of human rights, with a focus on equality.

As Regional Directors of the United Nations agencies in Guatemala, Honduras and El Salvador, UNDG LAC ensures that our Country Teams have access to all the technical capacity of the United Nations System, so as to be able to provide the support you need to eradicate violence in your countries and to achieve sustainable development in our region, leaving no-one behind.

# Resident Coordinators of the United Nations System in Honduras, Guatemala and El Salvador

Over the last 25 years, the population in Northern Central American countries has undergone a positive evolution in many aspects.  At the same time, the problem of violence still affects, to a lesser or greater extent, the full enjoyment of rights and the achievement of sustainable development for thousands of people in the three countries.

The comprehensive programming framework for the United Nations agencies working in the Northern Central American countries is the 2030 Agenda together with the SDG. Therefore, our outlook on population protection and the search for durable solutions is guided by this broad, multilateral, sustainable development framework that was adopted in 2015. This means that we address issues of protection and violence with comprehensive programmes and joint actions, ensuring that we leave no-one behind.

Different regional reports from the United Nations Development Programme (UNDP) and the Organisation of American States (OAS) on violence and public safety in Latin America and the Caribbean have shown that, in order to guarantee a sustainable reduction in violence in the Northern Central America countries, it is essential to implement multi-sectoral approaches in public safety policies.

The lessons learned in our cooperation in the three countries highlighted the need for a comprehensive approach to public safety so as to resolve the problems of violence in Central America. Prevention and the assistance and protection of the victims of violence need to be prioritised above all.

This requires rigorous planning based on available evidence and the ability to demonstrate tangible and verifiable results.

In order for the comprehensive approaches to have an impact, they need to continue over time so as to ensure the funding of the prevention, care and protection programmes and investment in institutional capacity building and coordination between state and non-state entities at a national and local level.

The impact of a comprehensive public safety policy depends on the capacity of the states to maintain political support, investment and the implementation of programmes and projects in the long term. In other words: the comprehensive approach needs to go beyond governmental administrations and become state policy.

To achieve sustainable changes, public safety comprehensive policies also need to be consistently implemented in the

DHSFF0382

countries, i.e. inside and alongside municipal authorities and communities.

As a result, the core of our cooperation has been and is still centred on support for the various initiatives that are fostered in the three countries and that are aimed at finding comprehensive security policies, focused on prevention and care and protection for the victims, combined with the encouragement of local development and citizen participation.

The UN country teams of Honduras, Guatemala and El Salvador currently cooperate with governments and societies by providing technical support and specific projects in areas such as:

*Expansion of care and protection services for persons internally displaced by violence.*

As institutional actions are deployed to re-establish the rights of victims of violence, they also address some of the recurring, deep-rooted causes in the cycles of violence and help to avoid re-victimisation.

Specifically, we support the improvement of facilities that receive victims of violence, ensuring confidentiality and specialised care for men, women and children.

*Driving economic and social opportunities for the reintegration of returnees*

The aim is to strengthen the capacity of the country to absorb returnees in an atmosphere of peace and solidarity. This ensures that they can contribute to the sustainable development of their respective countries.

This includes strengthening migrant assistance desks; the development of protocols that optimise their reception and reintegration; and the expansion of economic reintegration projects, with psychosocial care for returned migrants in situations of vulnerability and in need of protection.

It also includes the creation of micro-enterprises and the provision of seed capital in order to provide a durable solution for returnees in their communities.

*Advice and assistance to improve registration, processing and information analysis systems, along with inter-agency coordination*

Through various initiatives in these matters, we are trying to contribute to an increasingly bigger and better capacity in the generation of information and its analysis, so as to better understand the problem of violence in Northern Central American countries and therefore make decisions and design and implement public policies.

We also contribute to the creation of national registration systems of cases of victims of violence.

*Strengthening human rights protection mechanisms*

DHSFF0383

Solving the problem of violence in democratic societies poses a challenge in that it must be done within a framework of unconditional respect for human rights, both of the victims and the aggressors.

Being one of the foundational pillars of the UN, the defence and promotion of human rights is at the centre of our actions and therefore we are supporting the three nations in initiatives aimed at ensuring human rights.

This includes for example, strengthening the internal and external controls of public security forces, in view of their permanent exposure to violence and the other abhorrent forms it has taken on. The general objective of this cooperation is to guarantee that the various security agents involved in the prosecution of crime observe the rules that govern their actions, so as to ensure unconditional respect for the human rights of all the persons involved.

*Protection, prevention and reduction of gender-based violence against girls and women*

Sadly, the increase of violence affects certain sectors of the population more than others, namely those who have been historically subjected to more discrimination, marginalisation and abuse.

Women and girls are the population sectors that suffer the highest amount of violence stemming directly and indirectly from the actions of criminal groups, seeing as they are the objects not only of the violence perpetrated by said groups but also of the violence in their domestic environments, including their homes, schools, communities or work places

In this regard, we have supported initiatives that are aimed at both increasing the visibility of this particular problem and addressing it comprehensively as a priority; the adoption of legal frameworks; and the creation of institutional systems.

*Support for dialogue in the search for consensus and the concerted participation of different sectors of society and the various levels of government*

The challenge of violence, such as that faced by the countries and societies of northern Central America, can only be addressed with the participation of the various sectors of society.

We therefore support initiatives directed at gaining the participation of the different sectors of society and that of the various levels of government.

These spaces favour broad dialogue in search of consensus and the sum of the efforts made by the various sectors of society to resolve the problem of violence.

We put special emphasis on collaborating with local governments for the enactment of public policies

We are committed to expanding our cooperation in these areas. We are ready to adapt and focus our joint work as the United Nations System on the sub-

regional and national priorities that the governments participating in this conference deem important for the improvement of the protection of persons affected by violence, including refugees and displaced persons.

To be able to make this commitment effective and relevant, we have started to cooperate closely with the three Resident Coordinators and the UN country teams of Guatemala, Honduras and El Salvador.
In this work we are counting on the ample support of the Regional United Nations Development Group for Latin America and the Caribbean, through their Joint Initiative for the prevention, protection

and addressing of violence. We are also following the "New Way of Working" with development and humanitarian agencies working together, as was agreed in the World Humanitarian Summit.

Finally and based on our work and experiences in the countries with whom we cooperate, we would like to once more emphasise our conviction that public safety policies must prioritise prevention and protection; and that prevention and the protection of persons affected by violence is the way to create safe and prosperous countries and the path towards sustainable development.



UNHCR / Roland Schonbauer

# International Committee of the Red Cross



## Analysis of the problem

### 1. GENERAL PROBLEMS OF HUMANITARIAN CONCERN

According to public information, it is clear that despite the notable reduction in the number of deaths in Central America and the signs of improvement over this last year, the region still continues to register some of the highest global homicide rates, ranking among the most violent countries in the world. The most violent areas are characterised by high levels of extreme violence and large numbers of deaths, restriction of movement, displacement, chronic impunity, unofficial curfews/self-confinement, forced recruitment, insufficient reporting of crimes for fear of repercussions, kidnappings, few or no state institutions in areas under the influence of criminal groups (cartels or gangs), high levels of sexual violence and femicide, a lack of access to basic services, etc. The list of humanitarian consequences is long, forcing some of the most vulnerable to become internally displaced or migrate across borders so as to flee from the violence.

Public spaces are often abandoned and infrastructure is damaged, resulting in limited state services (particularly those providing healthcare and education). Generalised mistrust within communities has led to the tearing of the social fabric and to a lack of solidarity, leaving those affected to fend for themselves. Areas prone to violence are often stigmatised, increasing their marginalisation from society.

To escape chronic armed violence and its economic and social consequences, people continue to move throughout the region, either inside or outside their countries. The migration movement to the north has slowed down in recent months, in part due to the migration policies announced by the United States. Even if migration is not as continuous and systematic as internal displacement, many persons still decide to cross borders, given that they cannot find the necessary stability and safety in their own countries.



UNHCR / Sebastian Rich

## 2.  INTERNALLY DISPLACED PERSONS (IDPS)

Despite the absence of reliable and complete data, internal displacement is a reality in the majority of the countries affected by the high levels of violence in the region. Internal displacement as the consequence of armed violence takes on various forms. Mass displacements of entire communities or extended families occur in targeted areas, mainly caused by conflicts and persecution by the armed element in those communities. Smaller flows of families or individuals represent the majority of the current internal displacements: those fleeing from direct threats, extortion or attempts at recruitment. The displacement of persons who wish to remain in the country often continues to be secretive, so as to avoid being found again or due to general mistrust of the ability of the authorities to protect them. The internally displaced persons who turn to civil society actors in search of help have generally exhausted all other alternatives and ask for support as a last resort in their move abroad (to Mexico, the United States and more recently Costa Rica).

The needs of internally displaced persons to a greater extent stem from these patterns and are complicated by the weakness or absence of official government response mechanisms: the need for immediate safety and safe haven, access to healthcare services, support for mental health issues, economic income, legal advice, access to education and sensitisation on existing support and protection mechanisms. Networks of civil society organisations have responded to these needs by providing immediate relief to internally displaced persons through structures that temporarily guarantee safety, food and refuge until they complete their refugee status determination procedure and can move abroad. Moreover, the prevention of internal displacement has not been duly discussed or addressed by various states, mainly due to the lack of clarity on the phenomenon and the absence of state polices and concrete measures.

Despite the pressure being exerted by various stakeholders on the governments concerned with the recognition and addressing of internal displacement, Honduras is only country that officially recognised the issue in 2016, creating a commission charged with organising an inter-agency response in coordination with civil society and international organisations, including the ICRC and UNHCR. Even though the commission managed to produce a draft bill that hopes to recognise the status of internally displaced persons and respond to their needs, a specific institutional response has yet to be formulated and implemented. In Mexico, two states - Chiapas and Guerrero - have adopted a law for the protection and care of internally displaced persons, and other instruments refer to the problem of internal displacement, including the General Law on Victims.

## 3. MIGRATION AND RELATED HUMANITARIAN NEEDS[9]

Although there are multiple reasons for immigrating from Central America and Mexico to the United States (economic reasons or family reunification), the percentage of persons escaping from armed violence has increased in recent years. The migration flow towards the United States decreased substantially in the first months of 2017 compared to 2016, as did the deportations from Mexico in that period.

Despite the reduced flow, **the general risks for in-transit migrants continue to be the same**, seeing as people continue to migrate irregularly. To avoid being apprehended, migrants use isolated/alternative routes and therefore face greater risks: extreme climatic and geographic conditions, deficient sanitary conditions, hunger, dehydration, illness, physical trauma, endemic diseases, kidnapping, sexual violence, extortion and disappearance. According to the IOM, the number of persons who die whilst attempting to cross the border between the United States and Mexico has increased by 17%. The criminal groups present on the northern border of Mexico represent a greater risk to migrants (trafficking, kidnapping). Migrants also continue to fall from freight trains or they have automobile accidents and they suffer serious injuries or amputations as a consequence (by August of 2017, 74 migrants with serious injuries and amputations were treated by the ICRC). Additionally, migrants have limited possibilities in timely and needs-based access to healthcare.

Even though many migrants have been observed to own smartphones and use social media, many of them still lack the means to contact their families along the way. Many actors provide communication services but they cannot cover the needs of all migrants;

---

[9] Like the rest of the International Red Cross and Red Crescent Movement, the ICRC uses a deliberately broad description of "migrants" so as to include all those who abandon or flee from their homes in search of security or better prospects and may be in danger and need protection or humanitarian assistance. Migrants can be workers, students and/or foreigners deemed to be irregular by the public authorities. They can also be refugees, asylum seekers and/or stateless persons. We also attempt to guarantee that all migrants, including refugees and asylum seekers, receive the protection to which they are entitled by virtue of international and national law, but we approve of an inclusive description that reflects our operational practice and we would stress that all migrants are protected by various legal instruments.

theft, loss and confiscation of personal phones also contribute to the loss of family contact.

Within the region, **deportation/ repatriation processes** continue to be the main practice, along with systematic detention, the possible failure to respect the principle of non-refoulement, and the failure to inform migrants of asylum seeking procedures, their related rights and the status of their application. These processes are often used as a dissuasive policy in order to deter migrants from coming back (often accepting voluntary return and refusing to seek asylum). Additionally, migrants who have just been deported to their countries of origin often face limited access to social support and healthcare services, in addition to the safety issues.

Although the **reception mechanisms** for deported/returned migrants are considered to be satisfactory and have improved in recent years thanks to adapted infrastructures and processes, the practice of systematic deportation/repatriation continues to be the main concern, along with the reintegration of migrants into their country/community. The institutions responsible for supporting the repatriation processes of migrant children and their families have not been able to provide suitable assistance either.

The countries of the region have adopted specific laws in favour of the **rights of migrants**, particularly for vulnerable categories such as children. Even though these laws generally provide good legal frameworks for prevention and addressing the needs of migrants, they are neither exhaustive nor systematic. Even when significant advancements have been made in terms of respecting and processing the rights of migrants at a regional level, negative discourses about migrants are feeding a growing stigmatisation towards them, and various countries are labelling repatriated persons with a "criminal stamp," having a negative effect on their social reintegration process.

## 4.  DISAPPEARED MIGRANTS

Within the region, a significant and underestimated number of people have disappeared, either in transit or in destination countries (the IOM counted 400 dead migrants along the Mexico-United States border in 2016 and 175 in Central America, whilst admitting that these figures are incomplete). Migrants disappear in a variety of circumstances. For example, they disappear when they cannot establish contact with families, even though they may still be alive. Migrants disappear when they are detained with no access to means of communication, or when they or their families decide not to seek help to stay in contact, fearing that this may lead to deportation. Migrants also disappear when they perish during dangerous journeys by land (and more recently by sea), or even in the destination country.

Their remains may never be found and even if they are found, they may never be duly documented and identified. Kidnappings, human trafficking and encounters with criminal elements can also lead to their disappearance along the way.

For each disappeared migrant, there is a family that lives with uncertainty – not knowing whether their family member is alive or dead. Many families invest all their efforts

DHSFF0389

and money in trying to find information about their disappeared family member. The search itself can also cause significant suffering, especially if the families are actively following a number of trails simultaneously through the efforts of local stakeholders. Along with the emotional distress, the families of disappeared migrants face a series of additional practical difficulties: issues such as access to social services, the sale or management of property or inheritances, remarriage or the exercise of parental rights. This hinders their ability to resume their lives and to find their place in the community, all the while looking for answers about the fate of their disappeared family member. Ultimately, it also affects their dignity, adding a new dimension to the already heavy humanitarian toll of migration.

Various interested parties participate in national, bilateral and even regional initiatives that, to date, have not overcome the fragmentation and duplication of processes. Consulates continue to be key stakeholders in the crossroads between official searches (that are not trusted by the families) and search mechanisms lead by civil society. The increased participation of the United States border patrol in these processes has had a positive impact whilst simultaneously increasing the risks associated with the blurring of roles and the duplication of data. The Border Project includes a single transnational database of genetic profiles and ante-mortem data about families of disappeared persons (1,045 open cases for disappeared migrants in El Salvador, Honduras and Chiapas) and it is jointly managed by the Argentine Forensic Anthropology Team (EAAF, by its acronym in Spanish) and the authorities. This project continues to be a promising model that has yet to reach its full potential, due to its limited recognition by the federal systems of the United States and Mexico.



UNHCR / Sonia Aguilar

# Objectives of the ICRC

*For internally displaced persons, the ICRC will:*

Ensure that its operations and policies continue to be relevant to internal displacement, migration and their possible connection, following these general principles:

Adopt a **comprehensive approach** to the challenges of internal displacement and migration, where there is continuity between the two. The ICRC will focus on maximising the protection and care for both internally displaced persons and migrants, bearing in mind the negative effects accumulated by persons who are displaced more than once.

The ICRC will attempt to **influence the broadest debate on internal displacement and migration**, sensitising public opinion and governments on its specific concerns. The need for a greater focus on common and differentiated policies for the two groups of people will be emphasised. The ICRC will argue that internal displacement should be considered a critical humanitarian issue in its own right and that the specific situation of internally displaced persons should be recognised and addressed as a priority.

*For migrants in need of protection, the ICRC will:*

Ensure that its operations and polices continue to be relevant to migrants, their communities and the authorities responsible, following these general lines of action:

*To reduce the basic needs of migrants along the migration routes, the ICRC will:*

Support the efforts of National Society and civil society so as to provide an **immediate response to vulnerable migrants**, referring them to the appropriate structures, particularly those who are injured, victims of violence (treatment, remission, rehabilitation), separated families (Restoring Family Links services – RFL) and unaccompanied children (reintegration into communities of origin and respect for the rights of the child).

**Support public efforts** in the deployment of basic services for the reduction of the risks for migrants along transit routes.

Raise awareness of migrants on the risks along migration routes, through **awareness campaigns** (in countries of origin and transit).

*In matters of the detention of migrants, the ICRC wishes to:*

Remind authorities that **the detention of immigrants must only be used as a last resort** and that it must continue to be exceptional and limited, persuading them to develop alternatives to the detention of migrants, especially the most vulnerable groups;

Improve the **recognition of the problems and challenges related to the systematic detention** of migrants, when used as a way of regulating migration flows;

Improve the recognition of the negative effects of detention on migration, especially

DHSFF0391

for the **most vulnerable groups**, such as unaccompanied children, families, victims of sexual violence, victims of torture or human trafficking, persons with physical disability, the elderly and the LGBTI community.

Influence states in the development and application of sustainable models and, if necessary, **change regulations and practices** in order to favour a comprehensive approach to these groups, encouraging the development of alternatives to detention.

*For disappeared migrants, the ICRC is willing to support the states and interested parties to:*

**AVOID MIGRANTS DISAPPEARING:**

Recognise that migration policies and laws may have an impact on the risk of migrants disappearing and periodically revise them to reduce said risk, ensuring that they are adapted to international legal obligations.

Allow migrants and their families to establish, re-establish and maintain contact, if they wish, along migration routes, in destinations and even in detention places.

**FACILITATE THE SEARCH AND IDENTIFICATION OF DISAPPEARED MIGRANTS:**

Standardise the national and transnational gathering of data about disappeared migrants and their bodies; establishing clear channels for the compilation, access and sharing of data, with the sole humanitarian purpose of clarifying the destination and whereabouts of disappeared migrants; and informing their families, in accordance with internationally accepted standards on data protection and forensics.

Ensure that the remains of deceased migrants are treated with dignity, taking all the necessary measures to facilitate their immediate or future identification and their immediate repatriation as well.

**ADDRESS THE SPECIFIC NEEDS OF FAMILIES OF DISAPPEARED MIGRANTS:**

Support for the families of disappeared migrants throughout the search and identification process.

Guarantee that the families of disappeared migrants can exercise their rights and access existing services and other types of support to satisfy their specific needs, even clarifying the legal situation of those disappeared migrants.

DHSFF0392

# Human Rights Institutions




The Central American Council of Human Rights Ombudsmen and the National Human Rights Commission of Mexico:

Taking into account that the National Human Rights Institutions that form the Central American Council have similar mandates to prevent, defend, promote and safeguard respect for human rights, and to drive advocacy actions for their full effectiveness.

Recognising the adoption of institutional measures for the protection, prevention, defence and promotion of the exercise of human rights, along with the monitoring thereof, with the support and consensus of the Central American Council.

Considering that, historically, many inhabitants of the Northern Triangle of Central America have been displaced and have migrated, seeking to establish a life in another country due to multiple reasons, and that this situation has affected their enjoyment of their human rights, including the rights to physical integrity and non-discrimination.

Concerned that these effects are being currently worsened by people being forced to emigrate without the corresponding migration permits, without sufficient information about the mechanisms for protecting their rights, and without the necessary assistance from public and private institutions.

Taking into account that migration as a consequence of the failure of the states to fulfil their obligations to protect, respect and guarantee the right to human security,

places people in a situation of particular vulnerability.

Acknowledging the current need for the promotion of better responses in Central American countries and in Mexico as regards persons fleeing for fear of the violence, insecurity and poverty that forces them to migrate.

Building on the Brazil Declaration and Plan of Action and the commitments made in the San Jose Action Statement, as the basis for strengthening the protection of refugees and displaced persons in Central America, and for promoting durable solutions for displacement in the Northern Triangle of Central America.

Taking into account the New York Declaration for Refugees and Migrants and the need to promote a comprehensive and sustainable regional protection response for internally displaced persons, migrants, refugees and returnees.

Considering that this "Joint Strategy to Address the Reality of Migration, with protection actions in favour of displaced persons in transit, refugees and returnees," has support and assistance from the Office of the United Nations High Commissioner for Human Rights (OHCHR), the United Nations High Commissioner for Refugees (UNHCR), the International Organization for Migration (IOM), and any other institution within the framework of their priority strategies for Latin America.

In view of the foregoing, we hereby sign this Letter of Commitment for the coordination, creation and implementation of a "Joint Strategy to Address the Reality of Migration, with protection actions in favour of displaced persons in transit, refugees and returnees." This strategy must contain at least the following actions:

1. Carry out actions for the research, monitoring and verification of the reality of migration and its effects on human rights.

2. Evaluate the policies, programmes, regulations, institutional functions and allocated budgets in countries in the region to address the protection needs of migrants, displaced persons, returnees and refugees.

3. Issue statements, resolutions and reports on migration and the search for possible durable solutions or reparations for the prevention of human rights violations.

4. Recommend measures for the prevention of mass migration and also establish measures that address the human rights violations of migrants, returnees and refugees in countries of transit and destination.



UNHCR / Achilleas Zavallis

5. Implement awareness raising campaigns about protection mechanisms and the exercise of the human rights of migrants in countries of origin, transit and destination.

6. Carry out actions for the humanitarian, psychosocial and legal assistance of victims of human rights violations and their families in countries of origin, transit and destination, mainly persons in a situation of particular vulnerability and asylum seekers and refugees

7. Provide monitoring and measuring mechanisms for the results of the joint actions.

8. Any other actions that the undersigned institutions agree to carry out in accordance with the established considerations.



UNHCR / Ricardo Ramírez Arriola

# Latin American and Caribbean Eclesiastic Network of Migration, Displacement, Asylum and Human Trafficking - CLAMOR



## Introduction

1. Without a doubt, one of the most problematic realities of our continent is the situation of millions of brothers and sisters who are forced to flee from their countries and seek asylum in another nation, where they yearn to find an opportunity to live in dignity.

   Each refugee is much more than a statistic filling up the documents of official organs, they are human beings who must be respected and whose dignity and rights should be promoted.

2. The Catholic Church Organisations that assist and defend the lives of refugees are concerned to witness the harsh realities they face. This is a CLAMOR which must be heeded by both the states and societies of countries of expulsion, transit and reception.

We want to act within the four fundamental pillars, approaches or perspectives proposed by Pope Francis in the "20-Point Action Plan" presented by the Dicastery for Promoting Comprehensive Human Development:

- ≠ **WELCOMING:**
  We seek to multiply secure and legal routes for migration and asylum.
- ≠ **PROTECTING:**
  We want to strengthen the fight for the defence of the rights and dignity of migrants and refugees.
- ≠ **PROMOTING:**
  We commit to contributing to the fostering of the comprehensive human development of migrants and refugees.
- ≠ **INTEGRATING:**
  We seek greater participation from migrants and refugees, who make harmonious coexistence possible and enrich the local host, transit and asylum communities.

## WELCOMING

We aim to direct our internal efforts in pastoral action towards:

### The principle of non-refoulement:

3. It is important to respect the principle of non-refoulement, which entails the avoidance of collective and arbitrary expulsion of migrants and refugees. This intervention must be based on the humanitarian considerations of persons who flee due to violence in their countries, so that they are not abusively returned to a place considered a risk to their personal integrity.

4. As reiterated by the Jesuit Refugee Service:

"There are useful alternatives such as humanitarian visas that guarantee the protection of persons who do not formally fulfil the legal requirements to be considered refugees; family reunification visas (including siblings, grandparents and grandchildren); temporary visas for those fleeing conflicts in neighbouring countries; the creation of humanitarian corridors; and refugee relocation programmes in host communities, instead of concentrating them in settlements."

5.  In this regard, we propose:

Monitor and promote the guarantee of access to countries at borders, ports and airports, through the humanitarian networks of the Church.

Campaign for provisions concerning safeguards against collective or arbitrary expulsion to be reflected in laws and regulations on the issue.

Provide assistance and legal advice to victims forcibly displaced by violence so that they can access procedures and therefore avoid any arbitrary or collective expulsion.

Identify the profiles and protection needs of vulnerable persons or victims of violence (individual and paradigmatic case studies).

6.  Migration and security actors should have the capacity and political will to identify the profiles of vulnerable persons who are displaced by violence.

### Safe and voluntary relocation or resettlement:

Promote welcoming and solidarity in communities (acceptance and spirit of coexistence) with refugees, in safe and decent places.

Promote adaptation (of mechanisms, forms and accessibility) in terms of the multiplicity of legal channels with humanitarian criteria for safe and voluntary migration and relocation.

Promote or strengthen safe humanitarian corridors for refugees, through national and regional support networks, providing protection and assistance for safe referral.

Urge states of the region to respect the right to family reunification, especially that of boys, girls and adolescents with their fathers, mothers and other family members.

Promote alternative programmes to confinement and detention during the migration regularization and refugee status determination processes.

Fulfil the applicable commitments of the Brazil Plan of Action as regards matters of comprehensive, complementary and sustainable solutions that ensure the local

DHSFF0397

integration of solidarity relocations and labour mobility in favour of refugees.

**The value of security for everyone:**

Disseminate and promote an awareness and appropriation of the commitments made by the states of the region as regards the "Borders of Solidarity and Safety" programme of the Brazil Plan of Action.

Promote the involvement of parishes and church entities in border areas in the promotion of the Borders of Solidarity and Safety programmes.

Encourage states and governments in the region to implement "open borders of solidarity and safety for refugees" programmes, guaranteeing access to a border environment that provides vital services for their stay (safety, medical care, legal advice and information offices, in accordance with the provisions of the Brazil Plan of Action.)



UNHCR / Boris Heger

## PROTECTING

7. It is important for immigrants, asylum seekers and refugees to be able to benefit from the necessary protection from host countries in order to prevent situations that threaten their dignity, such as sexual exploitation, forced labour and human trafficking.

8. The refugee population must have full enjoyment of their rights, in equal conditions to the national population. Migrants and refugees face multiple obstacles, particularly legal vacuums, due to the lack of regulation and clear guidelines; many of them have legal difficulties when accessing basic goods and services (banks, schools, hospitals, work, housing etc.).

9. We assert the need to protect the family units of refugees, especially so that children and adolescents (CA) are not left unprotected.

**The right to be protected by one's country of origin.**

Strengthen and expand the Network of Service and Information and the Detection of Persons in Need of Protection of the Pastoral Group of Human Mobility, especially on migration routes.

Countries must guarantee the existence and implementation of permanent and reliable information and prevention programmes concerning the right to migrate or not migrate of their populations (for those leaving and those returning).

**The right to be protected by one's country of destination or arrival to prevent exploitation, forced labour and human trafficking.**

Assist refugees or asylum seekers in matters of labour rights and human dignity, enabling the reporting or prevention of actions against the right to decent and safe work, pursuant to laws and treaties in force.

Urge the national authorities responsible for the right to decent work (Human Rights Ombudsmen, Ministries of Labour, Labour Courts and others) to guarantee the access and protection of refugees' right to decent work in equal conditions and from the moment when they file for refugee status recognition, as part of their local integration

Encourage the states in the region to comply with the BPA commitments on refugees' access to justice.

**Asylum seekers and refugees should be allowed to make use of their abilities and skills for their own welfare.**

Develop dialogue and coordination processes with education entities, ensuring the continuity of studies of refugees in the country.

In partnership with the Sub-commission of the Educational Pastoral Group of the Episcopal Conference, promote strategies and actions that ensure the continuity of the studies of refugees.

Strengthen regional inter-agency cooperation through the Network, so as to locate, obtain and transfer the education certificates of migrants who need to continue their studies in the country.

Promote processes for the certification of skills and technical abilities of refugees, ensuring their local, social and labour integration.

Standardise admission and incorporation procedures in national education systems, for refugees who wish to continue their studies in the host country.

Urge public universities to waive higher education fees for refugees.

**Unaccompanied and separated children must be addressed in accordance with the International Convention on the Rights of the Child.**

Continue strengthening and participating in local and regional protection networks for children and adolescents (CA).

Make use of information made available through the Pastoral Group Network to disseminate it and advocate in state circles so that they take actions to benefit CA.

**All child migrants and asylum seekers should be protected**

Encourage states to guarantee the "Right to an Identity and non-separation from their mother" of all children when they are born, regardless of whether the father and/or mother has a personal identification document.

**The right to access social security, respecting to right to health and basic healthcare.**

Ensure the continuity of the monitoring and creation of shadow reports, UPRs created jointly with other similar institutions.

Promote the application of and compliance with the current applicable conventions, treaties, laws and regulations by states of the region.



UNHCR / Helene Caux

## PROMOCION

9. It is urgent to promote the comprehensive human development of migrants and refugees. We cannot be satisfied with measures that only provide welfare or humanitarian assistance in case of emergencies: these are necessary but must be accompanied by programmes and policies that enable comprehensive development "of the whole man and of every man" (Populorum Progressio 42)

10. We call on states to generate responsible and comprehensive public policies that promote the social inclusion of refugees so that they can practise their trades in host communities. It is therefore necessary to assume less restrictive policies that guarantee both equality and a broader possibility to exercise citizenship, and human promotion in host places.

11. Agile responses need to be generated for the recognition of migrant status, especially of those who require international protection, and the appropriate documentation that enables access to employment, housing, healthcare and education services. Similarly, it is paramount that this documentation is recognised and acknowledged by all governmental authorities and private institutions.

12. Similarly, the following cannot be delayed:

**The skills of migrants, asylum seekers and refugees.**

Encourage greater coordination and joint support with education ministries and with education entities or networks of the Church and the private sector, so as to guarantee access to learning or training programmes.

Promote the certification of vocational training and the validation of certifications or qualifications of all types and levels.

**Social and professional inclusión of migrants, asylum seekers and refugees within local communities.**

Promote the right to safe, informed and free asylum for all.

Monitor and follow up cases.

Ensure compliance with the commitments assumed by the states in matters of the right to local integration.

Adapt informational materials and resources to the local languages and contexts of the communities.

Influence authorities and businesses to make it possible for refugees to access employment, financial services and other types of services.

Demand that the states adapt informational resources to local languages and the cultural context of the region or community.

Promote programmes for coordination between states and the business sector in order to facilitate the employment of migrants, refugees and asylum seekers, along with their involvement in the generation of new enterprises.

**Family integrity and welfare should always be protected and promoted, independently of legal status.**

Provide comprehensive assistance (psychological, legal, human, spiritual and solidarity) for those who, due to forced displacement, have suffered family disintegration and require reunification.

Fortalecer los esfuerzos encaminados organizar, movilizar y acompañar la búsqueda de personas desaparecidas al huir de sus comunidades o países de origen y documentar casos.

Strengthen efforts aimed at organising, mobilising and supporting the search for persons who disappear when fleeing from their communities or countries of origin, and document the cases.

Encourage the states to implement registration, search, identification and/or repatriation systems for persons who disappear whilst fleeing from generalised violence.

Encourage the states of the region to implement permanent family reunification programmes, especially for children in order to avoid the trafficking of CA.

**Migrants, asylum seekers and refugees with special needs should be trated the same as citizens.**

From within care centres, promote programmes for the identification of the specific needs of disabled persons so as to implement responses that are adapted to their situation.

Enact policies that promote swift access to special education or vocational training, and policies that provide medical attention to unaccompanied or separated children and disabled adults.

**Increase funnding for international development and humanitarian aid aimed at countries that receive a significant influx of fleeing refugees and migrants so that needs of the recently arrived and resident populations can be satisfied**

Continue to provide care and protection services to victims of violence with an ecumenical approach that favours diversity of religion and belief.

Strengthen the spaces for inclusion and ecumenism within pastoral groups and other church authorities, ensuring that doors are open to everyone whose work is protecting life.

## INTEGRATION

13. We seek greater participation from migrants and refugees so as to enrich the local communities

14. One priority is to adopt a language that encourages solidarity and hospitality towards migrants, asylum seekers and refugees, avoiding seeing them as competition or as a threat in countries of transit and destination. The media ant political leaders play a fundamental role to transform this imaginary collective.

15. Spaces for sharing between those arriving and those welcoming must help to favour a cultural meeting point that leads to an understanding of the benefits of integration. This is a bi-directional process that may take time but must recognise and value the importance of multiculturalism that forms part of Latin America and the Caribbean. In virtue of this cultural richness, we can learn to coexist, benefitting from our differences and enjoying them.

16. Assumptions and discourses that continue to intrinsically stigmatise and criminalise migrants and refugees must be avoided. In contrast, there is a need to recognise the contributions that these populations make to the local economy, for example. Integration processes that involve mutual learning to share available resources are essential in this.

17. We propose to work more closely with the children born of foreigners in the host

country, so as to prevent various forms of violence from violating their fundamental rights and to contribute to a healthy process of healthy coexistence. "Integration is a fundamental component that can produce new life projects and promote the overcoming of the needs and vulnerabilities of migrants and refugees" (Jesuit Refugee Service. Proposals for the Global Compact on Migration. 2017).

**Promote integration as a bi-directional process that recognises and values the richness of both cultures.**

Recognise citizenship at birth (jus soli); giving nationality to all refugees without delay, independently of financial requirements or linguistic knowledge (at least for adults over 50).

**Promote a positive narrative of solidarity towards immigrants, asylum seekers and refugees.**

Promote programmes for the integration of refugees into local communities through pastoral groups.

Continue to document best practices in actions for solidarity and community integration in favour of refugees and asylum seekers.

Implement community-level and solidarity-based welcome and reception campaigns in favour of refugees and asylum seekers.

Fight to ensure that the states do not implement campaigns that foster terror, fear and the criminalisation or stereotyping of asylum seekers and refugees.

Promote campaigns that avoid a culture of xenophobia, discrimination or exclusion.

**Persons who are forced to flee from humanitarian crises and who are then evacuated or registeed in assisted repatriation programmes must be given the appropriate conditions for reintegration into their countries of origin.**

Promote protection and temporary care centres for refugees and displaced persons.

Implement promotion and solidarity campaigns for refugees and repatriated persons.

Encourage the states of the region to implement programmes for the safe and dignified relocation and reintegration of refugees and asylum seekers.

Encourage local authorities and governments to allocate funds to support the dignified relocation or resettlement of refugees and displaced persons.

# Conclusion

With these inputs, as created from the guide provided by the Migrants and Refugees Department of the Vatican Dicastery for Promoting Comprehensive Human Development, we wish to express some of the features and needs in our regional context.

C As can be seen, the document has four pillars and general lines and in each line we wished to provide two operational approaches: pastoral actions and advocacy actions for the countries of the region.

The Latin American and Caribbean Ecclesiastic Network of Migration, Displacement, Asylum and Human Trafficking – CLAMOR, is happy to join the spaces for dialogue, analysis, proposals and commitments that shed new light on the comprehensive and humane means of addressing and governing migration and forced displacement.



UNHCR / Boris Heger

# Regional Network of Civil Society Organisations for Migration



**REGIONAL CONSULTATION MEETING**
**SYSTEMATIZATION OF INPUTS ON THE GLOBAL COMPACTS**
**ON MIGRATION AND REFUGEES**
**GUATEMALA, OCTOBER 10 AND 11, 2017**

## Introduction

The Regional Network of Civil Society Organisations for Migration (RROCM, by its acronym in Spanish) is a space for networks of civil organisations and individuals from 11 countries in the region of Central America, the Caribbean and North America, with representatives from Canada, the United States, Mexico, Guatemala, Belize, El Salvador, Honduras, Nicaragua, Costa Rica, Panama and the Dominican Republic. RROCM was created in 1996 within the framework of the Regional Conference on Migration, in response to the need to organise a common front capable of dialogue with the countries of the region.

In September 2016, within the framework of the General Assembly of the United Nations, states agreed to move forward in a negotiation process for the approval of a Global Compact for Safe, Orderly and Regular Migration and a Global Compact on Refugees in 2018.

This negotiation process took place in the context of meetings for the discussion of specific aspects of migration and asylum at a global scale and for the analysis of regional features and situations. The global compact processes involved the acknowledgement of large gaps in the international legal system and in the structure of inter-governmental bodies in the co-dependency process between nations. The challenge for civil society organisations is how to reconcile this conflicting reality of co-dependency with the concept of national sovereignty.

The context of the global compacts is a valuable opportunity for civil society organisations and networks to discuss their advocacy and lobbying agenda based on the current challenges and the political, economic and social situation in the region.

Within this context, RRCOM organised national meetings in Canada, USA, Guatemala, Honduras, El Salvador, Nicaragua, Costa Rica, Panama and the Dominican Republic between September 25 and October 6, 2017, with the objective of formulating proposals on organising the regional contribution of civil society to the global compacts on migration and asylum.

DHSFF0405

These national meetings resulted in a Regional Civil Society Meeting held in Guatemala on October 10 and 11 with the objective of sharing the proposals discussed previously in the national meetings, using them as the basis for the collective formulation of arguments and proposals within the context of the global compacts. This meeting also contributed to strengthening relationships between civil society organisations that belong to different networks and groups whose work concerns migration and asylum in countries in North and Central America.

Through this process, RROCM and its regional civil society organisations garnered more knowledge and became more involved with the global compacts process, gaining the opportunity to define national, regional and global advocacy strategies related to the two compacts through the organisation of spaces for sharing and the strengthening of partnerships.

Based on a multi-dimensional and multi-sectoral view of the role of civil society as regards complying with the Global Compact on Refugees (New York Declaration) and the development and implementation of actions and responses, with an emphasis of the participation of "all of society", civil society intends to identify gaps and generate regional advocacy about the key dynamics associated with the comprehensive protection of refugees, asylum seekers, stateless persons and beneficiaries of other complementary forms of international protection. It will do this by promoting and facilitating compliance with the commitments assumed by the states in order to definitively focus on improving and anticipating the needs of refugees in the region.



UNHCR / Danilo Rivera

# Background

RROCM's view on the Global Compact on Refugees is that it should be focused on actual people, on persons in a situation of vulnerability and on those affected by forced displacement.

The individual consideration of a single person in an insecure situation tends to become lost when the focus of discussion is on the mass movement of vulnerable persons: boys, girls, adolescents and youths (especially when unaccompanied); women; the LGTBI community; native, indigenous and afro-descendant peoples; or any persons affected by gender, disability or old age.

The inter-determination between abuse and vulnerability should not be forgotten. People whose rights are not respected in their society of origin are forced to move away and they are then vulnerable to becoming refugees. What's more, the rights of refugees are not respected either and their vulnerability to violence, abuse, exploitation and human trafficking is compounded.

We have to acknowledge that the fight against xenophobia and racism must include an analysis of the causes of forced displacement and the way in which refugees are treated. This includes the legacy of colonialism and slavery. When a comprehensive approach to this problem is promoted, we should not forget the states' great responsibility in all of these ideological dynamics. In this respect, the principle of additionality should be applied to the search for safe and durable solutions for refugees, underlining the importance of their enjoyment of permanent status.

The creation of the Global Compact must reaffirm existing international commitments in matters of asylum. There should be a ratification of the fundamental principle of *non-refoulement* and the right to seek asylum, this being intrinsically linked with the right to enjoy a comprehensive migration status that allows refugees to achieve socio-economic integration.

Over and above the foregoing, the Global Compact should address the following problems:

a. The separation between migration and asylum does not coincide with the reality of mixed migration flows nor with the efforts of the states in the region, those of the inter-governmental bodies or those of the members of civil society involved in the issue.

b. The complexity of the thematic consultation process and the capacity of civil society organisations and states to participate in the multiple topics of discussion.

c. The absence of interest and commitment of many states in this process and the lack of protection for defenders of human rights.

d. The participation of civil society organisations is particularly difficult and has generated a process in which the large, traditional organisations take the lead in voicing positions and the spaces themselves, to the detriment of smaller organisations that have knowledge, experience and work directly with the subjects of the compacts.

e.  The non-participation of refugee communities in the formulation of actions and responses that have a fundamental impact on the future protection and building of those communities.



UNHCR / Santiago Escobar Jaramillo

# Contextualisation of the Refugee Compact

Many people are forced by violence and insecurity to flee their homes and undertake a journey that puts their lives in danger and infringes on their rights. Refugees, stateless persons and beneficiaries of other complementary forms of international protection continue to die whilst fleeing, families are separated, borders are closed, people are deprived of their freedom, they are discriminated against for belonging to certain ethnic groups and they are victims of the xenophobia that continues to rise in the region, in the same way that legal frameworks exclude the LGBTI population.

All this means that many people in the feel anxious, threatened and left behind.

The population in the Central American region faces growing forced displacement caused by increased social inequality, public insecurity, mistrust of the institutions that apply and oversee human rights, the influx of groups of organised criminals and drug traffickers, the preponderance of corruption, and the operational and administrative negligence in responses to the needs of victims of forced displacement. This situation affects a broad range of persons but has a more significant impact on the most vulnerable population groups such as boys, girls, adolescents and youths, women, disabled persons, the elderly and the LGBTI population. The phenomenon represents a social, political and economic challenge in the region, given that there is insufficient

capacity to handle a situation or crisis of growing magnitude.

Furthermore, the region is also facing situations of mass expulsions of indigenous persons, due to interests on land ownership and the exploitation of resources (mining, agricultural mega-projects and touristic projects, etc.), as well as the displacement associated with the effects of climate variability and change and the high vulnerability of many communities at risk from disasters.

Victims of forced displacement that flee their countries must then face the militarisation of borders, country admission restrictions and police detentions and deportations, increasing the risk of their falling into the hands of organised crime, criminal gangs and human trafficking networks. They also become easy victims of theft, assault, extortion and additional episodes of violence. Additionally, this population travels without any information about their rights that may assist them and how to access the refugee status determination procedures. In some cases, the solidarity of the wider population with migrants and refugees is criminalised and punished as a crime.

In view of this situation, there is a lingering lack of public policies and legal frameworks that effectively respond and contribute to the needs of victims of forced internal displacement, refugees, asylum seekers, stateless persons and those in need of international protection, given that there is no effective commitment that establishes political will through the availability of sufficient institutional capacities and budgetary and administrative resources that

enable the states to enact compliance with international commitments. Also, the displaced populations need to be categorised, the comprehensive care channels are insufficient and on occasion, the states are known to use institutional discretion in the application of international regulations.

Although progress has been made at a regional level in recent years, this has been insufficient compared to the social damage generated by factors associated with violence in the communities and cities of the region. The population has limited access to special and differential treatments in line with their problems and therefore a greater effort and a more precise and direct contribution are needed to reinforce trust in the states, these being the main guides and actors in decision-making in these matters.

Civil society plays an important role in the defence and protection of the rights of displaced persons, refugees, asylum seekers, stateless persons and those in need of international protection. It can provide support in the design and implementation of public policies that ensure compliance with the commitments the states made as regards protection. Moreover, it plays an important role in monitoring compliance with the commitments and obligations of the state in matters of international human rights law, international humanitarian law and international refugee law, and if necessary it should report their non-compliance

Although the MIRPS multi-sectoral and "all-of-society" approach incorporates, to a certain extent, organised civil society and other international cooperation actors in the

generation and implementation of the initiatives that provide a comprehensive protection response, the main organisational responsibility falls to the states. Civil society organisations believe that the states of the Although the MIRPS multi-sectoral and "all-of-society" approach incorporates, to a certain extent, organised civil society and other international cooperation actors in the generation and implementation of the initiatives that provide a comprehensive

protection response, the main organisational responsibility falls to the states. Civil society organisations believe that the states.

It is also clear that within the phenomenon of forced displacement, not all people are looking to leave their country of origin and it is therefore imperative that the adopted measures include relocation alternatives for those who exercise their right not to migrate.



UNHCR / Ricardo Ramírez Arriola

Civil society believes that the following points and views should be included in the Global Compact on Refugees:

a. The Global Compact on Refugees should be centred on refugees, asylum seekers and beneficiaries of other complementary forms of international protection, as well as on their human dignity.

b. The respect, guarantee and protection of the human rights of asylum seekers, refugees, stateless persons and beneficiaries of other complementary forms of international protection, regardless of their migration status.

c. Migration control should only be exercised by authorised officials who are duly trained to do this duty, which should in turn include a guarantee of non-refoulement and the identification of the population of interest, avoiding violations of human rights and of the international commitments subscribed by countries shielded by national security policies.

d. Countries of origin, transit, destination and return of refugees have a shared international responsibility based on international instruments. International cooperation is fundamental for building the capacities of these countries.

e. The eradication of racism, discrimination, exclusion and xenophobia is essential to the political, social and economic integration and inclusion of asylum seekers, refugees, stateless persons and beneficiaries of other forms of international protection. There is a need to address the problems of social injustice, discrimination and political matters in countries of origin. Linked with this is the need to cover the gaps in programmes aimed at providing information and awareness raising in host communities on how to facilitate integration so that they can understand and contribute to resolving the problem.

f. Asylum seekers, refugees, stateless persons and beneficiaries of other forms of international protection contribute to the societies of countries of origin, transit and destination. Refugees are agents of social, economic and cultural development. The right to participate must be ensured for organised communities of refugees, asylum seekers and their families.

g. Actions that respond to specific protection needs must be based on the recognition of the particular vulnerabilities of boys, girls, adolescents and youths; women; the elderly; indigenous peoples; afro-descendents; LGBTI; and disabled persons, based on the mainstreaming of their profiles

h. The definition of possibilities and mechanisms for the recognition of refugee status and other forms of international protection is essential. Punitive approaches towards migration flows are damaging, ineffective and a waste of resources. The status of 'irregular migrant' creates greater vulnerabilities and does not stop displacement.

i. The definitions of 'refugee' must be expanded to include the concepts expressed in the 1984 Cartagena Declaration, natural disasters, and climate change and development mega-projects.

j. Programmes for the reintegration of persons who were deported or who

voluntarily returned to their countries of origin must include the local population.



UNHCR / Edu Leon

## The RRCOM Regional Plan of Action as Contribution to the Comprehensive Regional Protection and Solutions Framework (MIRPS)

Assist in the strengthening of existing regional mechanisms and in development for the monitoring and follow-up of the commitments assumed by states through the MIRPS and Global Compact on Refugees processes.

Contribute to the construction and application of key indicator measurement systems that enable the measuring of the states' progress in the protection and inclusion of asylum seekers, refugees, stateless persons and beneficiaries of other forms of international protection in all spheres: political, social, economic and cultural.

Promote initiatives for the accountability of states in their implementation of the commitments assumed through the MIRPS and Global Compact on Refugees processes.

Support the joint initiative being worked on by UNHCR and the Organisation of American States (OAS), through its Committee on Juridical and Political Affairs, for the establishment of a follow up mechanism for states' commitments to strengthening comprehensive protection and solutions for refugees, asylum seekers, stateless persons and beneficiaries of other complementary forms of international protection.

## IN THE PILLAR ON RECEPTION AND ADMISSION

≠ Maintain and expand international networks with other organisations in order to share successful experiences in technical, legal and psychosocial advice for asylum seekers.

≠ Create protection mechanisms for to allow for victims of human rights violations to leave the country.

≠ Develop awareness raising and information campaigns on the risks of migration routes, in order to provide protection and asylum spaces.

≠ Share best practices in the creation of mechanisms to identify refugees and beneficiaries of other complementary forms of international protection at entry points into countries and when addressing mixed migration flows, so that specific protection needs are fulfilled.

≠ Generate information in countries of origin, contributing to the asylum seeking process (regional collaboration between civil society organisations).

≠ Promote the incorporation into legal practice of shorter lengths of time for refugee status determination procedures and other specialised procedures for especially vulnerable cases.

≠ Advocate for a monitoring system for compliance with state obligations, enshrining such monitoring in law.

≠ Guarantee due process for CA, particularly with regard to legal representation throughout the procedure.

## IN THE PILLAR ON SUPPORT FOR IMMEDIATE AND ONGOING NEEDS

≠ Share successful strategies that address humanitarian needs within the Comprehensive Regional Response Framework for asylum seekers, refugees, stateless persons and beneficiaries of other complementary forms of international protection.

≠ Promote regional proposals for strengthening national regulatory and referential frameworks for the protection of victims of forced displacement who exercise the right not to migrate.

≠ Create regional partnerships for humanitarian assistance for victims of displacement, through information sharing mechanisms on migration routes and on the profiles of persons with specific needs, etc.

≠ Strengthen networks of specialised care shelters and safe houses for persons in need of protection, generating information about safe migration routes at a regional level.

≠ Strengthen other existing regional networks for the protection of victims of forced internal displacement, asylum seekers, refugees, stateless persons and beneficiaries of other complementary forms of international protection.

≠ Develop and elaborate on bi-national and regional agreements for psychosocial care and support programmes for women, adolescent women, girls, indigenous women, afro-descendent women, pregnant women, afro-descendent women, pregnant women, mothers, adolescent mothers and transsexual women along migration routes. Furthermore, civil society must monitor

states' sensitive use of age and gender criteria when addressing refugee status determination procedures, ensuring that they are consistent with the relevant UNHCR guidelines.

≠ Generate a prevention and care strategy that includes taking responsibility for the allocation of a percentage of the GDP to humanitarian protection of the most vulnerable populations (asylum seekers, refugees, stateless persons and beneficiaries of other complementary forms of international protection), ensuring the inclusion of the population in decisions that concern them.

## IN THE PILLAR OF SUPPORT TO HOST COUNTRIES AND COMMUNITIES

≠ Support public policies that ensure compliance with national commitments in matters of protection, through strengthening planning in the comprehensive humanitarian response for the implementation of MIRPS, including the local communities in countries of transit and acknowledging the specific vulnerabilities of children and adolescents; youths; women; the elderly; indigenous peoples, afro-descendents; LGBTI; and disabled persons. This should include the establishment of actions that avoid discrimination and barriers in access to work for refugees, asylum seekers, stateless persons and beneficiaries of other complementary forms of international protection.

≠ Assist in the design and implementation of a Regional Roadmap for the comprehensive protection response for asylum seekers, refugees, stateless persons and beneficiaries of other complementary forms of international protection. This roadmap will guide key processes and determine the necessary resources, establishing a regional framework of minimum indicators that will facilitate civil society's monitoring of states' compliance with commitments and obligations in matters of international human rights law, international humanitarian law and international refugees law, and reporting their non-compliance if applicable.

≠ Encourage participation from organised communities of refugees, asylum seekers and their families in the planning and supporting of the implementation of the comprehensive response.

≠ Develop an information and regional awareness raising campaign regarding the rights of asylum seekers, refugees, stateless persons and beneficiaries of other complementary forms of international protection, highlighting them as agents of social, economic and cultural development in host countries.

## IN THE PILLAR OF DURABLE SOLUTIONS

≠ Share success stories about the local integration of refugees and advocacy in public policies.

≠ Drive bi-national and trans-national framework agreements that facilitate repatriation and resettlement through a humanitarian and durable solutions approach.

≠ Within the Regional Conference on Migration, drive the creation of an asylum network, promoting the formation of an ad hoc group on asylum in the upcoming San Pedro Sula meeting so that the

addressing of this matter is not just circumstantial.

≠ Foster the inclusion of asylum and migration affairs in spaces for political planning and management and for addressing the SDGs.

≠ Promote advocacy spaces for the formulation of an "Electoral Compact on Refugees" that promotes the appropriation of shared international responsibility through access to information, awareness raising and the generation of commitments from popular election candidates as part of the strengthening and sustainable solutions strategies. This point is a strategy to cover an anticipated gap, as in some cases it is not actually the states but rather the current governments who are subscribing the commitments of the New York Declaration, meaning that later on in upcoming electoral processes, these commitments have a high risk of not being understood or accepted.



UNHCR/ Ricardo Ramírez Arriola

# Risk, Emergency & Disaster Working Group for Latin America and the Caribbean (REDLAC)



---

## Introduction

1. In September 2016, the organisations of REDLAC celebrated the adoption by the General Assembly of the United Nations of the **New York Declaration for Refugees and Migrants**, as well as the invitation for the United Nations High Commissioner for Refugees to develop a proposal for a Global Compact on Refugees in his 2018 annual report to the General Assembly.

2. We thank the commitment of various countries of the region to this initiative that stems from the New York Declaration, to establishing a "Comprehensive Regional Protection and Solutions Framework" (MIRPS) that responds appropriately to the protection and humanitarian needs of the affected communities.

3. Assuming that the states are the main parties responsible for protecting human rights and for providing humanitarian responses, we urge them to make use of the region's long-standing tradition of protecting asylum seekers, refugees and displaced persons, leveraging the regional frameworks that cover them: from the 1984 Cartagena Declaration to the 2014 Brazil Plan of Action and the subsequent 2016 San Jose Action Statement.



UNHCR / Tito Herrera

# REDLAC's joint view of the situation and insecurity in the NCA

4. We are concerned about the worsening of the humanitarian and protection crisis that is affecting countries of origin as well as countries of transit and destination. Restrictive policies towards the rights of persons affected by violence – both confined communities and persons in a situation of human mobility – and so-called "mano dura" (firm hand) policies are aggravating the situation of the most vulnerable communities. We face big challenges: the response to the population's basic and immediate needs (humanitarian and protection) against extremely violent backdrops in which there is a systematic violation of human rights; the protection of children and the population affected by displacement; support for the victims of gender-based violence; and of course, the ability to contribute to durable solutions.

5. As a result of the humanitarian and regional protection crisis, men, women, youths, girls and boys run extreme risks to seek international protection, taking dangerous and clandestine routes due to a lack of better options. Many of them encounter locked doors and are deported, facing persecution and violence once more. Even though we acknowledge the importance of supporting governments in their work on security and the prevention of the deep-rooted causes of displacement, we believe that the states need to intensify their efforts and provide legal channels that guarantee safety through resettlement, family reunification and humanitarian visas; guarantee alternatives to detention; and respect of the right of "non-refoulement".

6. Through our work in the region, we are contributing to addressing the crisis by filling the gaps in protection and human assistance that the states can't reach. In this respect we are showing our will to contribute to durable and decent solutions for those affected by violence, forced displacement and the search for international protection. Similarly, we are reiterating our commitment to migrants.

7. Our activities span from the prevention of displacement and the provision of humanitarian assistance in countries of origin, transit and destination, to the addressing and promotion of access to basic rights such as healthcare, psychosocial care, education, shelter and legal assistance, among other things. Additionally, we support national social protection systems and assist different service suppliers – particularly for healthcare and education – whose protection is fundamental so that they can keep playing their part.

8. We believe it is necessary to respond to the gaps in protection – with the application of a differential and gender-sensitive approach –, seeking to reduce the deficits in responses by fostering an increase in the presence of humanitarian organisations in high-risk areas and promoting the capacity building of local institutions and affected communities.

9. It is vital that states develop protection mechanisms for deportees and families whose safety is at risk. Public policies must be used to also address the various causes of this type of displacement – violence, poverty, food insecurity, climate change – combining a humanitarian approach with a

DHSFF0417

focus on development. Public social protection programmes must incorporate aspects of food security and responses to emergencies, particularly those resulting situations of human mobility.

10. Due to the foregoing, we have high expectations that the states, who are inspiring us with their commitment to regional protection responses through the adoption and implementation of the Comprehensive Regional Protection and Solutions Framework (MIRPS), will make decisions that also persuade and involve other regional and national stakeholders, such as donors, the private sector and multilateral bodies, among others, to make MIRPS a reality.

## Joint Plan of Action

The REDLAC organisations hereby propose two lines of work which we believe are fundamental:

Develop a closer collaboration for coordination and information sharing with REDLAC agencies and other potentially interested actors, in order to:

 a. Produce a common reading of the violent situation and protection needs in NCA through the gathering, compilation and analysis of the information handled by the member organisations of REDLAC, so that the analysis of the impact of violence and the population's humanitarian needs can be improved.
 b. Create synergies in our efforts.

Drive joint actions aimed at making the humanitarian and protection needs of the vulnerable communities more visible, seeking to attract support from donors and other key actors.

Lastly, the REDLAC organisations wish to stress our belief that the practical application of the Comprehensive Refugee Response Framework (CRRF) offers Central America a unique opportunity to make the protection crisis in NCA more recognised and visible and to link this crisis to broader global discussions on the protection of victims of forced displacement. We hope that this translates into a greater and fairer response for those who are obliged to flee in order to safeguard their lives and physical integrity.

# Specialised Regional Group of Academics who Support the Comprehensive Regional Protection and Solutions Framework (Great MIRPS)

1. The *2016 New York Declaration on Refugees and Migrants* (Res. 71/1) ordered the Office of the United Nations High Commissioner for Refugees (UNHCR), in consultation with the states and other interested parties, to develop and implement a Global Compact for each situation of mass movement, including them in the annual report of the Commissioner to the General Assembly of the United Nations in 2018. The Global Compact on Refugees will be based on the best practices gathered in the implementation, in various countries and regions, of the Comprehensive Refugee Response Framework (CRRF) featured in Annex I of the New York Declaration.

2. In the Americas, given the uniqueness of its displacements and migrations, some states are formulating a CRRF for Central and North America called the Comprehensive Regional Protection and Solutions Framework (MIRPS). This will be adopted in the High Level Meeting held in Tegucigalpa, Honduras on October 26, 2017. MIRPS will include national plans of action prepared by governments and also regional plans of action developed by various stakeholders working on the issue at a regional level.

3. With the aim of involving members of academia and relevant experts in this process and to present a proposal that contributes to the development of MIRPS, on September 4 and 5, 2017, the Legal Support Network for Refugees in the Americas (RALRA, by its acronym in Spanish), alongside the Inter-American Institute for Human rights (IIHR) and UNHCR, invited 25 Central and North American experts to San Jose in Costa Rica to share their perspectives and experiences of matters of refugees and displaced persons in the regional context, and to develop initiatives and proposals that could be incorporated into MIRPS.

4. The participants agreed to form the Specialised Regional Group of Academics who support MIRPS (GREAT MIRPS, by its acronym in Spanish). The group will be coordinated as a sub-group of RALRA and it will be focused on MIRPS for Central and Northern America.

5. The working sub-group highlighted the unique situation arising in Central and North America, where Northern Central American (NCA) countries are experiencing socio-economic turbulence and high levels of violence that lead to multi-causal movements of persons throughout the region, including internally displaced persons, asylum seekers, refugees and migrants, as well as deported persons in need of protection.

6. Host countries are seeing an increasingly large number of asylum seekers and persons

DHSFF0419

in need of other forms of international protection and this generates pressures at a national and regional level. Countries of origin need to address the humanitarian consequences of violence by confronting the underlying causes, so as to create conditions that avoid forced displacement, protect those in vulnerable situations and favour eventual voluntary return. Addressing this complex situation requires a combination of humanitarian and security measures, socio-economic incentives and economic support.

7. With the purpose of contributing to this task, GREAT MIRPS commits to strengthening and developing the following activities related to the implementation of MIRPS, under the coordination of and with secretarial support from RALRA.

8. GREAT MIRPS recognises the lack of harmonised and comparative diagnoses that allow the displacement situation to be evaluated from a regional (NCA) perspective, and the information needed to propose possible responses. Therefore, the group recommends contributing to the following areas in 2018-2020:

*Develop comprehensive and multi-disciplinary studies on the situation in Central America and its impact on North America.*

i) Create a platform enabling the systematisation of existing studies and diagnoses on displacement in Central and North America;

ii) Disseminate the applicability of the relevant international regulatory instruments and frameworks and the study of the phenomenon of displacement through publications and comparative research, particularly:

≠ Develop a multi-disciplinary comparative study to understand the (multiple) causes and effects of forced displacement, bearing in mind the differences between the patterns and perpetrators of violence in the various areas of reference and the profiles of the victims, including differences due to gender and age in the analysis, in order to suggest appropriate protection measures.

≠ Study the categories and forms of forced internal displacement caused by organised crime and violence, establishing thresholds (humanitarian, socio-economic and other indicators) so as to determine when they qualify as such, for the purpose of linking them to guidelines that allow the provision of the appropriate protection and solution responses;

iii) Within GREAT MIRPS, create working sub-groups that specialise in the distinct aspects of forced migration with the aim of elaborating on the diagnoses of the situation so as to:

≠ improve the gathering of statistical information;
≠ document cases that illustrate the complexity of migration;
≠ guarantee the monitoring of situations of violence and the dynamics of displacement, as well as of situations of forced return that may violate the principle of non-refoulement. This will enable the

examination of trends and the suggestion of advocacy actions in public policies.

*In the pillar on recepción and admission in host and transit countries:*

i) Prepare a comparative study that analyses national and regional legal frameworks, and identifies possible protection responses (asylum, human rights, complementary protection) in transit and host countries;

ii) Through existing and future legal clinics and consultancies, strengthen the legal representation of asylum seekers and the legal advice that assures them better protection and better access to justice;

iii) Propose alternative models and options to detention;

iv) Use representative cases as precedents in national and regional courts so as to advance protection standards, fill gaps and correct human rights violations.

*In the pillar on support for immediate needs:*

i) Strengthen networks of legal clinics and consultancies that assist victims of violence displaced or at risk of displacement, including the channelling of psychosocial care to guarantee mental health;

ii) Promote a comparative study of the national protection system institutions,

their regulatory frameworks, their structures and existing programmes for assisting displaced persons, in order to propose standardised operational processes and training and advocacy pilot projects that are adapted to the situations causing displacement;

iii) Through a study, analyse alternative models to the current systems of shelters and safe houses in the region, so as to evaluate the possibility of creating other safe spaces and to propose different protection networks.

*In the pillar on support for host countries and communities:*

i) Create models and other options to strengthen community responses for the protection of forced displacement victims, stimulating support from the diaspora of nationals from NCA countries and the involvement of civil society stakeholders.

*In the pillar on durable solutions:*

i) Prepare a comparative study of complementary protection models, considering the possible applications and developing practical tools for alternative protection measures such as humanitarian visas or other measures for the legalisation of stays, along with family reunification in transit and host countries;

ii) Establish criteria and indicators to determine potential conditions of voluntary return for refugees, based on

legal, material and community security, and integration opportunities of returned persons into the productive, labour or educational fabric;

iii)   Develop school and university grant programmes for persons in need of international protection, with the aim of guaranteeing their stays in the host country and to provide them with higher education that increases their chances of local integration.



UNHCR / A. Zavallis

# Integrarse Network (Corporate Social Responsibility)



*The Central American Integration for Corporate Social Responsibility (INTEGRARSE) Network is a partnership of organisations promoting Corporate Social Responsibility and Sustainability in Central America and the Caribbean. It seeks to promote a permanent culture of Corporate Social Responsibility within the region's business community and contribute effectively to sustainable development and regional integration.*

*The organisations are:*

- ≠ *Costa Rica: AED (Entrepreneurial Association for Development)*
- ≠ *El Salvador: FUNDEMAS (Entrepreneurial Foundation for Social Action)*
- ≠ *Guatemala: CENTRARSE (Corporate Social Responsibility Action Centre in Guatemala)*
- ≠ *Honduras: FUNDAHRSE (Honduran Foundation for Corporate Social Responsibility)*
- ≠ *Nicaragua: uniRSE (Nicaraguan Union for Corporate Social Responsibility)*
- ≠ *Panama: Sumarse (Non-profit organisation whose main focus is CSR)*
- ≠ *Dominican Republic: ECORED (National Environmental Protection Support Network)*

*Among all these organisations, the INTEGRARSE Network brings together over 690 businesses of all sizes in the region: from small and medium enterprises to large, national and international corporations, in order to promote a business model based on the threefold generation of value: economic, social and environmental. To maximise their impact, all the relevant stakeholders of society need to be involved through multi-sectoral partnerships: businesses, civil society organisations, governments and international bodies.*

We know that in recent years the countries in our region have experienced high levels of violence and social and economic instability, thus becoming places of origin, transit, destination and return. The causes of this mobility are diverse and therefore the Integrarse Network recognises that the solutions must be addressed through multiple actors, including the private sector. This is why our network has undertaken programmes and initiatives on the matter with private sector participation.

In Guatemala in 2016 and 2017, through the CENTRARSE organisation, the "Diversity and Labour Inclusion" programme was brought about with support from the Avina and Cammina Foundations, with the purpose of increasing knowledge of the participating businesses on the matter, in addition to increasing their ability to identify persons with hidden skills, many of which go unnoticed and wasted due to prejudice. One example of this are repatriated persons who have experience and skills in certain jobs, meaning that business productivity could be increased and that returnees could be given more opportunities to apply for currently vacant jobs. As part of this programme, working roundtables took place on labour inclusion and mechanism implementation guides on how to design and implement inclusion policies in businesses.

In 2013 in Costa Rica, the Entrepreneurial Association for Development (AED, by its acronym in Spanish), alongside UNHCR, the General Directorate of Migration and Aliens (DGME), the Chamber of Commerce of Costa Rica, and the Association of

Consultants and International Advisors (ACAI) brought about the "Living Integration" Programme that promoted the insertion of refugees into the labour market and, through this, their integration into Costa Rican society

The programme provided a support framework for businesses to develop Corporate Social Responsibility (CSR) programmes that would favour the integration of refugees in Costa Rica. Under this programme, a Tool Box was published in 2015 with 4 modules to provide businesses with elements for the refugee labour integration process. It can be accessed through the www.acnur.org website (in Spanish).

In Honduras, the Honduran Foundation for Corporate Social Responsibility (FUNDAHRSE, by its acronym in Spanish) lobbied more than 100 businesses so that many of them participated in supporting the violence prevention programmes and employment and entrepreneurship programmes that are currently being developed in the country by friendly governments, international cooperation organisations and local NGOs, with the aim of joining the actions for the prevention of emigration and providing care to returnees and refugees.

Our commitment at the Integrarse Network is to continue supporting matters of returned migrants and refugees through relevant training, awareness raising and calls for action among the business sector. We will do this with an approach based on the principles of human rights and the objectives of the Sustainable Development Goals, through initiatives and programmes that support the solutions of the situation in our region.



UNHCR / Markel Redondo



# Comprehensive Regional Protection and Solutions Framework

**MIRPS**

For more information visit:

www.mirps-hn.org



UNHCR / Santiago Escobar Jaramillo

DHSFT04

 

OEA/Ser.L/V/II.

Doc. 208/17

31 December 2017

Original: Spanish

INTER-AMERICAN COMMISSION ON HUMAN RIGHTS

# Situation of Human Rights in Guatemala

2017

iachr.org

DHSFF0426

**OAS Cataloging-in-Publication Data**

Inter-American Commission on Human Rights

    Situation of Human Rights in Guatemala : Country report : Approved by the Inter-American Commission on Human Rights on December 31, 2017.

    v. ; cm. (OAS. Official records ; OEA/Ser.L/V/II)

    ISBN XXX-0-XXXX-XXXX-X

    1.    Human rights--Guatemala    2. Civil rights--Guatemala.    4. Rule of law--Guatemala.  I. Title.  II. Title: Sixth report on the human rights situation in Guatemala.  III. Series.

                                                        OEA/Ser.L/V/II.  Doc.208/17

.

DHSFF0427

# INTER-AMERICAN COMMISSION ON HUMAN RIGHTS

## Members

Francisco José Eguiguren Praeli

Margarette May Macaulay

Esmeralda Arosemena Bernal de Troitiño

José de Jesús Orozco Henríquez

Paulo Vannuchi

James L. Cavallaro

Luis Ernesto Vargas Silva

## Executive Secretary

Paulo Abrão

## Assistant Executive Secretary for Cases, Petitions, and Precautionary Measures

Elizabeth Abi-Mershed

## Assistant Executive Secretary for Monitoring, Promotion, and Technical Cooperation in Human Rights

María Claudia Pulido

DHSFF0428

Approved by the Inter-American Commission on Human Rights on December 31, 2017.

DHSFF0429

# TABLE OF CONTENTS

**EXECUTIVE SUMMARY**                                                                      **9**

**CHAPTER 1 | INTRODUCTION**                                                              **17**

*A. The Legacy of the Armed Conflict*                                                       25

*B. Poverty, Inequality, and Exclusion*                                                     26

**CHAPTER 2 | ADMINISTRATION OF JUSTICE**                                                 **37**

*A.   Access to justice and impunity*                                                       *37*

*B.   The requirements of independence and impartiality: The Public Prosecution
      Service and judicial reforms*                                                         *47*

*C.   Access to Justice for Different Groups*                                               *53*

    1.   Women                                                          53

    2.   Indigenous Peoples                                             58

    3.   Children and Adolescents                                       63

    4.   Lesbian, Gay, Bisexual, Trans and Intersex Persons (LGBTI)     66

    5.   People of African Descent                                      68

*D.   Transitional justice and reparations to victims of the internal armed conflict*       *69*

**CHAPTER 3 | SITUATION OF HUMAN RIGHTS DEFENDERS
                AND JUSTICE OPERATORS**                                                   **81**

*A.   Human Rights Defenders*                                                               *81*

    1.   Intimidation, Threats, Attacks and Murders                     83

    2.   Stigmatization and Smear Campaigns                              85

    3.   Criminalization                                                90

        a)   Measures Adopted by the State: Protection Mechanism   96

*B.   Justice Operators*                                                                    *101*

    1.   Acts Limiting or Hampering Performance of their Work           102

**CHAPTER 4 | INTERNALLY DISPLACED PERSONS, MIGRANTS,**
**ASYLUM-SEEKERS, REFUGEES, AND VICTIMS**
**OF HUMAN TRAFFICKING IN GUATEMALA**          **109**

A.   *Internal Displacement*                                                    *110*

B.   *Forced Evictions*                                                         *112*

C.   *International Migration: Migrants, Asylum-Seekers and Refugees*           *122*

D.   *Returned or Deported Migrants*                                            *126*

E.   *Human Trafficking*                                                        *127*


**CHAPTER 5 | SITUATION OF FREEDOM OF EXPRESSION**          **133**

A.   *Situation of journalists and attacks to freedom of expression*           *133*

    1.   Murders of Journalists and Reporters, and Impunity for these Crimes          135

    2.   Threats, Arrests, Harassment, and Attacks on Journalists and Media Outlets   140

    3.   Censorship                                                              144

    4.   Program for the Protection of Journalists and Media Workers             145

B.   *Situation of broadcasting*                                               *150*

    1.   Community Broadcasting                                                  150

    2.   Improper concentration of media ownership                              155

    3.   Government Advertising                                                  158

C.   *Excesive Use of Force at Social Protests*                                 *161*

D.   *Access to Public Information*                                             *168*


**CHAPTER 6 | CITIZEN SECURITY**          **173**

A.   *General Situation of Violence: Types, Areas of Highest Concentration,*
*Actors Involved*                                                              *173*

    1.   Homicides and other violent deaths                                      173

    2.   Other Types of Violence and Insecurity                                  176

    3.   State's Response                                                        178

B.   *Effects on Particular Groups and Effectiveness of State Policies*         *182*

    1.   Women                                                                   182

    2.   Children and Adolescents                                                185

3.   Indigenous Peoples                                                           189

4.   LGBTI Persons                                                                191

C.   *Death Penalty*                                                              *193*


**CHAPTER 7 | SITUATION OF PERSONS UNDER STATE CUSTODY**        **199**

A.   *Persons Deprived of Liberty*                                                *199*

1.   Overcrowding and excessive use of pre-trial detention          200

   a)   General considerations                                                   200

   b)   Major challenges to reducing pretrial detention                 202

   c)   Alternative measures to pretrial detention                        207

2.   Conditions of Detention                                                     210

3.   Acts of Violence Occurring at Prison Facilities                     213

4.   Depravation of Liberty at Police Stations and on Military Bases   214

5.   Imposition of Fines for Money Laundering Convictions          216

B.   *Adolescent Care and Detention Facilities*                               *217*

C.   *Persons with Disabilities at mental Health Institutions*             *229*

1.   General considerations                                                     229

2.   Conditions of Detention                                                     230

3.   Indefinite Institutionalization because of a Lack of Community Services   234


**CHAPTER 8 | CONCLUSIONS AND RECOMMENDATIONS**          **241**

A.   *General Recommendations*                                                *242*

B.   *Recommendations regarding administration of justice*             *242*

C.   *Recommendations regarding Transitional Justice and Reparation to Victims
     of the Internal Armed Conflict*                                            *243*

D.   *Recommendations regarding the Situation of Citizen Security*     *243*

E.   *Recommendations regarding Specific Segments of the Population*   *244*

# EXECUTIVE SUMMARY

DHSFF0433

# EXECUTIVE SUMMARY

1.  This report addresses the human rights situation of Guatemala, and provides recommendations aimed at assisting the State of Guatemala in strengthening its efforts to protect and guarantee human rights in the country.

2.  The Interamerican Commission on Human Rights (IACHR, Commission) conducted an on-site visit to Guatemala from July 31 to August 4, 2017, for the purpose of observing on the ground the human rights situation in the country. The Commission is grateful to President Jimmy Morales and his Government for the invitation to conduct his visit, and for all the logistical assistance provided in order to complete the visit satisfactorily.

3.  The IACHR has followed with special attention the situation of human rights in Guatemala since its early years of operation, particularly in response to the serious violations of human rights perpetrated during the internal armed conflict that took place between 1960 and 1996. The information received consistently by the Commission during the visit indicates that, fundamentally, more than twenty years after the signing of the Peace Accords, several of the reasons that generated the internal armed conflict persist: an economy based on the concentration of economic power in few hands persists, a weak State structure, with few resources due to scarce fiscal collection and high levels of corruption. Structural problems also persist, such as racial discrimination, social inequality, entrenched poverty and exclusion, and lack of access to justice, which constitute an obstacle to full respect for human rights in Guatemala. In addition, the IACHR received repeated information about the persistence of parallel power structures that prevent the fight against impunity, corruption and the consolidation of the rule of law.

4.  The socioeconomic situation in Guatemala is still characterized by poverty, racism, exclusion, violence and impunity. As an example, the extreme poverty rate is three times higher among the indigenous population than among the non-indigenous population. Guatemala has become the country most affected by chronic malnutrition in Latin America, and is one of the countries with the highest rates of chronic malnutrition worldwide. This dire situation is framed in a weak State structure, institutions with

DHSFF0434

insufficient resources, and a persistent problem of corruption and high levels of violence. The low levels of tax collection in Guatemala hinders the State's ability to provide basic public services and adopt public policies that guarantee the rights of the most resource-strapped sectors.

5. During the on site visit, the IACHR noted that the problem of impunity derives from the lack of capacity of the Guatemalan State to provide an adequate and efficient system of administration of justice, and an independent and impartial justice in cases from the past as well as the present. Historically marginalized sectors of the population, such as women, indigenous peoples and communities, children and adolescents, LGBTI persons and afrodescendants, among others, face particular obstacles that limit their effective access to justice.

6. In relation to the cases arising from the internal armed conflict, progress has been made in some cases, but they are limited compared to the number of human rights violations perpetrated during the conflict and the obligations of the State to protect the rights to truth, justice and reparation for the victims. During the visit, the Commission was informed of the abusive use of *amparo* proceedings as a delaying strategy in some criminal proceedings, requests for amnesty and prescription, as delaying tactics to protect the accused. Also, some justice operators who are aware of these matters are subject to constant threats, intimidation, and even criminal complaints levied against them.

7. The Commission notes that the Guatemalan State has made progress in the fight against impunity in recent years, thanks to the work of the International Commission against Impunity in Guatemala (CICIG), which together with the Public Prosecutor's Office has played a key role in the fight against corruption and impunity in the country. The contribution of CICIG has been significant, both in its research work and in support of training and promotion of legal reforms aimed at improving the efficiency of the administration of justice. These advances have come with reports, even from the highest levels of the State, on pressures directed to the CICIG Commissioner, Iván Velásquez, as well as Attorney General, Thelma Aldana. After the visit, events took place in the country that unleashed institutional instability. The IACHR highlights the declaration of *persona non grata* as to Iván Velásquez, issued by the President of Guatemala, as well as the order for his immediate expulsion from the country. On that occasion, the decision taken by the President was rendered null and void through an appeal granted by the Constitutional Court.

8. This serious situation led the IACHR to issue a resolution on human rights and the fight against corruption and impunity, wherein the Commission

DHSFF0435

reaffirmed the importance of the fight against corruption to combat impunity through a strengthened, independent and impartial system of justice; as well as the fundamental importance of the full exercise of the rights to freedom of expression and access to public information, and the rights to peaceful association and assembly, for the investigation and denunciation of corruption. The IACHR called for the independent exercise of the Public Powers in order to guarantee the Rule of Law and urged the State of Guatemala to take the necessary measures to ensure compliance with the order of the Constitutional Court and, consequently, allow Commissioner Velásquez to continue carrying out his duties with the required guarantees. The IACHR reiterates its recognition of the work of CICIG and the Public Prosecutor's Office regarding the measures and efforts to combat corruption and impunity in Guatemala over the past three years, a process in which society and international cooperation have played a fundamental role.

9.   The Commission also highlights the importance of the judicial reform, currently pending in the Guatemalan Congress, regarding the organization of the work of the Supreme Court of Justice the processes for the selection and appointment of judges and magistrates, among other topics. Various sectors of civil society, specialized organizations, academics, and even members of the Executive, Legislative and Judicial Branches have spoken in favor of this reform. However, as of the date of approval of this report, it was still not approved.

10.   In the framework of access to justice in relation to prior consultation, the IACHR recalls that it is the obligation of the State of Guatemala to abide by the standards of the Inter-American Commission and Court in matters of justice for indigenous peoples in general, and prior consultation in particular. The participation of indigenous peoples and communities in the processes, in accordance with their uses, customs and methods of participation, is fundamental to ensure that they achieve full access to justice in Guatemala. In a country where more than half of the population identifies as indigenous, the importance of complying with these standards becomes even more of a priority.

11.   During the visit, the IACHR verified the serious situation faced by human rights defenders in Guatemala. The Commission was informed of acts of violence and aggressions to which they are constantly subject, ranging from murders, threats, harassment, criminalization, arbitrary arrests and harassment. Another important cause of concern in the country is the stigmatization and defamation of human rights defenders, which undermines their public reputation and delegitimizes social justice work. The IACHR highlights the importance of preventing and punishing attacks

and intimidation against human rights defenders, in light of the valuable work they perform and given the multiplying impact that such attacks have on the protection of human rights in the country.

12. The IACHR received extensive information on the actions of forced evictions and the risk faced by a significant number of peasant and indigenous communities of being evicted by the Guatemalan State in the course of the execution of judicial orders. According to the information gathered during the visit, behind the execution of the evictions there are often interests of corporations and private companies that have various investment projects such as monocultures, mining, hydroelectric projects, oil, or tourism, among others. During recent years it has been observed how legal and illegal interests have forced the population to be displaced or to resist and defend their territories. The Commission was informed of the existence of the large number of eviction requests that exist, especially in the Petén department. The IACHR notes that evictions affect people who are most vulnerable and intensify inequality, social conflicts, segregation and the creation of ghettos. Forced evictions are often linked to the lack of legal certainty about the land, which is an essential element of the right to adequate housing.

13. In relation to violence and insecurity, the situation of women, children, indigenous peoples, afrodescendants, human rights defenders, LGBTI persons and journalists is of concern. Despite having had a slight decrease in the last ten years, the overall homicide rate in the country remains one of the highest in Latin America and the Caribbean. Most of the crimes are attributed to gangs, drug cartels and organized crime, which represent one of the most important security problems in the country. The IACHR hopes that with the installation of the Inter-Institutional Technical Board formed by the Public Prosecutor's Office, the INACIF, the PNC and other institutions that administer statistical information in the security and justice system, standardized figures will be generated on violent deaths and other crimes in the country to facilitate temporal, regional and disaggregated analysis of crime trends in Guatemala.

14. Regarding the situation of journalists, the IACHR observed that Guatemala is undergoing a context of violence, characterized by murders, threats and a discourse that seeks to stigmatize media and communicators committed to combating corruption and abuse of power. Accoring to the information received, especially in the interior of the country, journalists and social communicators are in a "high degree of vulnerability" to practice their profession. The IACHR highlights the announcement made by President Jimmy Morales during the on-site visit regarding a Program to Protect Journalists and Social Communicators, which would be approved shortly

DHSFF0437

and which is reportedly being worked on in consultation with journalists' organizations. Nonetheless, the Commission notes with concern that since the date of that announcement, there has been no tangible progress in the creation of said program.

15.   Regarding persons deprived of liberty, the Inter-American Commission observed that the Guatemalan prison system is mainly characterized by overcrowding, the excessive use of preventive detention, and the delay of justice. Furthermore, it is characterized by the deplorable conditions of detention, the high levels of violence, the lack of effective programs for social reintegration, corruption, and the absence of effective control of the authorities at the interior of the detention centers.

16.   The rights of children and adolescents in the country received special attention during 2017 after the tragedy in the *Virgen de la Asunción* Home, where 41 girls and adolescents died in State custody. This tragedy brought to light the insecure conditions of the homes where children are housed, as well as the deplorable situation of detention centers for children and adolescents in contact or conflict with the criminal justice system. The Commission visited some of these centers and verified these conditions. The IACHR notes that the serious situation of children and adolescents in Guatemala stems from the weakness and disarticulation among the institutions in charge of children's rights, as well as from the lack of a National Public Policy that focuses on *guaranteeing* the rights of children, girls and adolescents that is neither reductionist nor protectionist.

17.   In light of the human right situation observed, the Commission recommends the State, as immediate measures, to double down on its commitment to continue with the fight against impunity, violence, intolerance and corruption, through policies and programs of prevention and respect for human rights, as well as a strengthened, independent and impartial justice system. Similarly, the State must deepen its efforts to adopt laws, policies and programs in order to close the gap of persistent inequality and exclusion, so that all persons, particularly those who have been historically excluded, can exercise their human rights. The Commission expresses its willingness and disposition to contribute and collaborate with the State of Guatemala in the implementation of a human rights agenda aimed at guaranteeing and protecting the rights of all its inhabitants. In this context, the IACHR makes a series of recommendations to the State of Guatemala.

18.   This report is divided into eight chapters. The first contains the introduction to the report. Chapter Two analyzes the system of administration of justice in Guatemala. The third chapter addresses the

situation of human rights defenders and justice operators in the country. The fourth chapter addresses ....The fifth chapter looks at the situation of freedom of expression. Chapter Six deals with citizen security issues. Chapter Seven covers the situation of people in State custody. Chapter Eight contains the report's conclusions and recommendations. The Commission offers a series of recommendations intended to assist the Guatemalan State in its efforts to ensure human rights in the country.

DHSFF0439

# CHAPTER 1
# INTRODUCTION

DHSFF0440

DHSFF0441

# INTRODUCTION

19.   The Commission has monitored the human rights situation in Guatemala with particularly close attention since its inception, especially in response to the gross human rights violations perpetrated during the internal armed conflict. As a result, it has been the subject of the most on-site visits and country reports by the IACHR.

20.   After the armed conflict began in 1962, the Commission started receiving many communications denouncing alleged violations of fundamental individual rights. The Commission's monitoring of the situation during the early years of the conflict led to the publication in 1966 of its "Requests for Information Conveyed to the Government of Guatemala." The Commission's monitoring of the situation in the country continued both during and after the conflict with the publication of 9 special country reports [1] and 16 follow-up reports on the overall situation. [2] The Commission has made a total of 11 on-site visits to Guatemala since 1982, and has processed and published in its annual reports many reports on individual cases, among other activities. The most recent report, entitled *Situation of Human Rights in Guatemala*: *Diversity, Inequality and Exclusion*, was adopted by the IACHR on December 31, 2015, with a follow-up report published in 2016.

21.   On February 26, 2016, the State of Guatemala extended an invitation for the Commission to visit the country. In Guatemala City on March 14, 2016, Commissioners James Cavallaro and Enrique Gil Botero presented the IACHR report *Situation of Human Rights in Guatemala*: *Diversity, Inequality and Exclusion*. During that visit, the President of the Republic, Jimmy Morales, who took office on January 14, 2016, reiterated to the commissioners the invitation for the IACHR to visit Guatemala. Owing to the financial crisis afflicting the Commission, the IACHR had to postpone the visit.

22.   In its observations on the implementation of the recommendations of the IACHR in the 2015 country report, which were presented on October 10, 2016, the State of Guatemala renewed the invitation for the IACHR to visit

---

[1]   In 1981, 1983, 1985, 1993, 1994, 1996, 2001, 2003, and 2015.

[2]   Every year between 1983 and 1991, and in 1993, 1994, 1996, 1997, 2002, 2004, y 2016.

the country in the course of 2017, which was, in turn, reiterated in a communication dated January 13, 2017. On January 18, 2017, the IACHR accepted and advised the State of the proposed dates of the visit.

23. The IACHR visited the country from July 31 to August 4, 2017. The IACHR observed the situation of human rights in the country firsthand, giving attention to issues relating to justice, citizen security, inequality, discrimination, the legacy of the internal armed conflict, and freedom of expression. The Commission also received information on the situation of indigenous peoples, human rights defenders, and justice operators, as well as on persons deprived of their liberty and persons in other state institutions.

24. The delegation was led by the President of the IACHR, Francisco José Eguiguren Praeli; the First Vice President, Margarette May Macaulay; the Second Vice President, Esmeralda Arosemena de Troitiño; and Commissioners José de Jesús Orozco Henríquez, Paulo Vannuchi, James Cavallaro, and Luis Ernesto Vargas Silva. Other members of the delegation included the IACHR Executive Secretary, Paulo Abrão; the Special Rapporteur for Freedom of Expression, Edison Lanza; and specialists from the Executive Secretariat.

25. The Inter-American Commission had meetings with officials from all the three branches of government, representatives of civil society, human rights defenders, indigenous authorities, autonomous organs, international agencies, scholars, and journalists. The Commission also gathered testimony from victims of human rights violations and their family members. In the course the visit, the IACHR was able to visit various parts of the country without restrictions, including Alta Verapaz, Petén, and Huehuetenango. It also visited prisons and other facilities under state custody.  The IACHR visited the Aleluya Children's Home; the Male Juvenile Detention Center (CEJUPLIV "Etapa II") in San José Pinula; the Female Juvenile Detention Center (CEJUPLIM-"Gorriones"); the jails located in Basement 1 of the Courts of Justice; Santa Teresa Pretrial Detention Center for Women; the Women's Guidance Center (COF); Pavón Criminal Rehabilitation Unit; and Federico Mora National Mental Health Hospital. It also visited the Regional Command for Training in Peacekeeping Operations (CREOMPAZ) and the National Police Historical Archive.

26. The IACHR met with the the President of the Republic of Guatemala, Jimmy Morales Cabrera; the Minister of Foreign Affairs, Carlos Raul Morales Moscoso; the Minister of the Interior, Francisco Rivas Lara, and the Deputy Minister of the Interior, Ricardo Guzmán; the Minister of Defense, Williams Mansilla; the Deputy Minister of Public Health and Social Assistance, Adrián

Estuardo Chávez; the President of the Presidential Coordinating Commission for Executive Policy on Human Rights (COPREDEH), Víctor Hugo Godoy; the Secretary of Communication of the Office of the President, Alfredo Brito, and the Deputy Secretary of Communication, Luz Arminda Barrios; the Secretary for Social Welfare, Cándida Rabanales, and staff from that agency; Supreme Court Justices Delia Marina Dávila Salazar, María Eugenia Morales de Sierra, and Josué Felipe Baquiax Baquiax; the President of the Constitutional Court, José Francisco de Mata Vela; Constitutional Court Judges Dina Ochoa, Gloria Porras, María Consuelo Porras, María Cristina Fernández, Bonerge Mejía, Neftaly Aldana, Henry Comte, and José Mynor Par; the President of the Congress of the Republic, Óscar Chinchilla; the Second Vice-President, Eduardo Ramiro de Matta; the Third Vice-President of Congress, Marvin Orellana; the President of the congressional Human Rights Commission, Patricia Sandoval; Deputies Nineth Montenegro, Sandra Móran, Amílcar de Jesús Pop Ac, Boris España, Jaime José Regalado, and Oliverio García Rodas; the Attorney General of the Republic, Thelma Aldana Hernández; the Human Rights Prosecutor in the Public Prosecutor's Office, Hilda Pineda; the Human Rights Ombudsman, José Eduardo de León Duque; the Ombudsman-elect, Jordan Rodas, and Staff from the Office of the Human Rights Ombdusman; the Rapporteur for the National Mechanism for the Prevention of Torture, Silvia Villalta; the head of the Defender's Office for Indigenous Women, María Roselia Pop Cal, and staff from that agency; the Deputy Secretary for Peace, Hugo Rigoberto Casasola; the Deputy Secretary for Planning, Luis Ovando; the Interim Director of the Prison System, Mirna Fajardo; the Director of the General Archive of Central America, Anna Carla Ericastilla; the Executive Secretary of the PDH Commission on Access to Public Information, Violeta Mazariegos; the Superintendent of Telecommunications, José Raúl Solares Chiu, and staff from his agency; the Coordinator of the National Police Historical Archive, Gustavo Meoño; the Executive Director of the National Reparations Program, Rodolfo Martínez Mérida; prosecutors Rosa Lidia Navarro and Luis Daniel Ordoñez; Congressman Leocadio Juracán; and the Director of the Public Criminal Defense Institute (IDPP), Nydia Arévalo Flores Abril. The Commission also met with staff from the Ministry of the Environment and Natural Resources; the Ministry of Education; the Ministry of Energy and Mines; the Ministry of Public Health and Social Assistance; the Ministry of Labor; the Secretariat for Food and Nutritional Security of the Office of the President; the Presidential Secretariat for Women; the Secretariat against Sexual Violence, Exploitation, and Human Trafficking; the Executive Secretariat of the Commission against Drug Addiction and Illegal Drug Trafficking; the National Council of Protected Areas; the Presidential Commission against Discrimination and Racism; the National Commission on Children and Adolescents; the National Adoption Council; the Registry of Cadastral Information; the General Registry of

Property; and the Secretariat for Agrarian Affairs, as well as judges who enforce sentences for adolescent offenders. The Commission also met with prosecutors from the Unit for Crimes against Journalists in the Office of the Public Prosecutor.

27.   In its visits to departments of Guatemala, the IACHR met with the following authorities: the Governor of Alta Verapaz, Estela Ventura; the Governor of Huehuetenango, Ramiro Estuardo Varillas; the Mayor of Cobán, Koky Córdoba; the Mayor of San Andrés, Milton Méndez; the Municipal Corporation of Santa Eulalia; the District Prosecutor of Alta Verapaz, Lauro Oliver Ruiz; Iliana Alvarado, the head of COPREDEH for Huehuetenango; Miriam Judith Juárez, the head of COPREDEH for Petén; members of the Municipal Corporation of Santa Eulalia; and personnel from the Armed Forces of Guatemala, the National Civilian Police, and the National Council of Protected Areas.

28.   The IACHR also met with the following civil society organizations: 8Tijax, 12 Comunidades San Juan Sacatepéquez, A.B.J.P. Rabinal, AAICAVCAI Cobán, Abogados Moyoy, Acoguate, Aconapamy, Actenesta Social, ActionAid Guatemala, Actividad Central, ADICI, ADICAV, AFAIDEL, AFAMIDEG, AIN, Aj Tierra – Xbenil San Pedro, Aldea Chirrequim, Aldea Cocop, Aldeas Infantiles SOS, ANH Chisec de Alta Verapaz, APCU, Articulación de Mujeres, Articulación Nacional, Asamblea Nacional de las Abuelas Comadronas del Movimiento Nim Alaxik, Asocación MIRIAM, Asíes, Asociación Camilo Pacheco, Asociación Pro-Municipio Zona Reyna, Asociación Abogados Mayas, Asociación Achi, Asociación Ajkemab Rech K aslemal, Asociación de Comunidades Campesinas para el Desarrollo Integral del Municipio de La Libertad (ACCODIL), Asociación Centro de Análisis Forense y Ciencias Aplicadas (CAFCA), Asociación Awil Ricd, Asociación Ch'orti Nuevo Día, Asociación Cristiana de Guatemala, Asociación de Abogados Mayas, Asociación de Estudios de Investigación y Estudios Sociales (ASIES), Asociación de Generadores con Energía Renovable (AGER), Asociación Kumol, Asociación de Lambda, Asociación de Migrantes Desaparecidos, Asociación de Servicios Comunitarios de Salud (ASECSA), Asociación Familiares de Detenidos-Desaparecidos de Guatemala (FAMDEGUA), Asociación de Familias de Migrantes Desaparecidos, Asociación Fomento, Asociación Gente Positiva, Asociación Guatemalteca de Hipertensión Pulmonar, Asociación Guatemalteca de Pacientes con Enfermedades Autoinmunes Reumáticas (ARTRILUP), Asociación Iseri Ibagari, Asociación Ixmukane, Asociación K´amalb´e , Asociación Kumool lsnJncoTzal Quiché, Asociación La Alianza, Asociación MOLOJ, Asociación Mujeres Transformando el Mundo, Asociación Nuevo Día, Asociación Organización de Ayuda Solidaria contra la injusticia Social (OASIS), Asociación para el Desarrollo Integral de las Víctimas de la

Violencia en las Verapaces, Maya Achí (ADIVIMA), Asociación Héroes de Esperanza, Asociación Pop No'j, Asociación Pro-Municipios, Asociación PROCRECE, Asociación SOMOS, Asociación Vidas Paralelas, Asolación de Fomento para el Desarrollo Integral, Asociación Voces por la Justicia, ASOCDENEB, Azoder Cobán, Bancada Convergencia, Bufete de Derechos Humanos, Bufete jurídico de Derechos Humanos (BDH), Cahibón, Caschibal Instancia, Campaña Guatemala Sin Hambre, Camma Addarti, Campaña Libertad, Campaña Guatemala Sin Nombre, Carcha Aldexalital, Carchá AV, Cardina Chiseo SANK, Casa de la Cultura 4 de Noviembre, Casa del Migrante Ala, Catholic Relief Services, CCC Nuevo Día, CECOMS, CEIFA, Central General de Trabajadores de Guatemala (CGTG), CCP Arusa, Centro de Acción Legal, Ambiental y Social de Guatemala (CALAS), Centro de Análisis Forense y Ciencias Aplicadas (CAFCA), Centro de Capacitación Misional de Guatemala (MTC), Centro de Estudios de Guatemala (CEG), Centro Internacional para Investigaciones en Derechos Humanos (CIIDH), Centro para la Acción de la Responsabilidad Social en Guatemala (CENTRARSE), Centro para la Acción Legal en Derechos Humanos (CALDH), Centro para la Defensa de la Constitución, Centro por la Justicia y el Derecho Internacional (CEJIL), Chamil Chamelco Codevi, Chamelco A.V. SANK, CHILDFUND, Childfund Guatemala, Cheachamil, Chicoyguito CPT, Çhisee A.V., Chiquixhi Corchá, Chiol Saq.Be Cahbón, CHILDHOPE, Children's Fund, Chool SabeChikajbom, CICIDE, Cladem Enlace Guatemala, Cocahich, CODEMI, Colectivo 8 Tijax, CONSEDONC, Colectivo Artesana, Colectivo Independiente LGTBI, Colectivo Madreselva, Colectivo Vida Independiente, Colectivo de Educación, Colectivo Vida Independiente, Comisión de Verificación de Violaciones a Derechos Humanos de Laguna del Tigre y Sierra de Lacandón, Comisión de Derechos Humanos en Guatemala, Comisión Interamericana de los Derechos Humanos (CILDH), Comisión Nacional contra el Maltrato Infantil (CONACMI), Comisión por la Defensa de la Vida y la Naturaleza, Comité de Campesinos del Altiplano (CCDA), Comité de Familias Desaparecidas, Comité Coordinador de Asociaciones Agrícolas, Comerciales, Industriales y Financieras (CACIF), Comité de Desarrollo Campesino (CODECA), Comité de Familias Independientes DS, Comité de Migrantes Desaparecidos, Comité de Unidad Campesina (CUC), Comité Pro ciegos y sordos, Comunidad Chabán, Comunidad Cristiana Guerreros de Dios (CCGD), Comunidad de Población en Resistencia (CPR), Comunidad Indígena de Comunidades, Comunidad Judía Lev Tahor, Comunidades de Laguna del Tigre y Sierra de Lacandón, Comunidad Indígena la Campana, Comunidades Afectadas por TRECSA, Comunidades Petén, CONACMI, Concejo Mam, Confederación de Unidad Sindical de Guatemala (CUSG), Consejo del Pueblo Maya (CPO), Consejo Maya Achi, Consejo Nacional de Comadronas Mum Alaxik, Convergencia Nacional Maya Waqib' Kej, Convergencia por los Derechos Humanos, Cooperación Indígena para el Desarrollo Integral (COINDI), Coordinadora de Víctimas (CODEVI),

Coordinación de Acompañamiento Internacional en Guatemala (ACOGUATE), Coordinadora Central Campesina Chortí Nuevo Día, Coordinadora de Cooperativas y ONGs (CONGCOOP), Coordinadora Institucional de Promoción por los Derechos de la Niñez (CIPRODENI), Corporación Energía y Renovación, Delegación de Comunidades de Petén, CRS, Derechos Humanos El Rosario, DSU JUL, D.Disi, Educación para Todos (EPT), EDUCO Verde & Azul, El Prado Ixcan, El Recuerdo Ixcan, El Refugio de la Niñez, El Rosario Corcha, Equipo de Estudios Comunitarios y Acción Psicosocial (ECAP), ECAP Chimaltenango, ECAP Alta Verapaz, Coyombalam, Estor, Estrella Polar, Familia Nos Duelen 56, Famia Q'eqchí, Familiares de Detenidos Desaparecidos de Guatemala (FAMDEGUA), Fe y Alegría, Federación Guatemalteca de Escuelas Radiofónicas, Foro Nacional de la Mujer, Freedom Guatemala, Fundación de Antropología Forense de Guatemala (FAFG), Fundación Esperanza y Prosperidad (FUNDAESPRO), Fundación Guatemalteca para Niños con Sordoceguera Alex (FUNDAL), Fundación Guillermo Tonello, Fundación Justicia y Género, Fundación Marista, Fundación Myrna Mack, Fundación para el Desarrollo y Fortalecimiento de las organizaciones de base (FUNDEBASE), Fundación para la Justicia y el Estado Democrático de Derecho (FJEDD), Fundación Sobrevivientes, Fundación Tierra Madre, FUNDESA, Gente Positiva, Gremial de Transporte Extraurbano de Pasajeros (GRETEXPA), GRETEXPA, Grupo de Apoyo Mutuo (GAM), Grupo Guatemalteco de Mujeres (GGM), Grupo Interdisciplinario por los Derechos Sexuales y Reproductivos, Grupo Multidisciplinario para la Defensa de los Derechos Sexuales y Reformativos en Guatemala, Human Rights Defenders Project, Human Rights For Everyone, Humanistas Guatemala, Iglesia Luterana en Guatemala (ILGUA), Iglesia luterana Ilubua, Ixmukané, ILUGUA, IIHAA/USAC, Impunity Watch, Ingenieros Ixcan, Instancia Cobán, Instituto Centroamericano de Estudios Fiscales (ICEFI), Instituto de Colaboración y Educación Familiar (ICEF), INCIDEJOVEN, Instituto de Estudios Comparados en Ciencias Penales de Guatemala (ICCPG), Instancia Mujeres, Instituto de Investigaciones, Escuela de Historia USAC, Instituto de Protección Social, Instituto de Investigación y Proyección Social sobre Dinámicas Globales y Territoriales de la Universidad Rafael Landívar (IDGT - URL), Internews-Consultora, Ixmukare, Ixtzunun, JOC, Jóvenes contra la Violencia, Jóvenes por Guatemala, Asociación La Alianza (ALA), Jotaj, Las Minas, Ixcan, Comisión Internacional de Apostolado en Educación Jesuita, Comisión de Investigación, Fundación Guatemalteca para Niños con Sordoceguera Alex (FUNDAL), La Masa, La Niñez es Primero, Lambda, Ladvidud, Lotración El Poso, Ixcan, Mama Maquín Entre Ríos Petén, Mesa Nacional para las Migraciones en Guatemala MENAMIG, Mercedes I, Mercy Corps, Mesa de Transformación, Misioneros Scalabrinianos, Misioneros de San Carlos, Scalabrinianos, Monte Olivo CUC, Movimiento de Mujeres Indígenas Tzununija, Movimiento Nacional Comadronas Nim Alaxik, Movimiento

DHSFF0447

Nacional de Tejedoras, Movimiento Nacional de Víctimas, Muqb'ilha, MUNDIBAT, Municipalidades Indígena de Palín, MTC, Municipalidad de Sololá, Mujawil Qij, Mujeres de Afedes, Mujeres de Ate Oles, Mujeres Transformando el Mundo, Na'Ch'ooch, Nuevo Horizonte, Nuevo Paraíso Ixcan, Observatorio de Salud Sexual y Reproductiva (OSAR), Ocho Tajix, Oficina de Derechos Humanos del Arzobispado de Guatemala (ODHAG), ODAN, Organismo NALEB, Organizaciones Coban, Organización Líder y Pionera para las Mujeres Trans en Guatemala (OTRANS), Organización Maya Qeqchi, Organización Mujeres, Organización Negra Guatemalteca (ONEGUA), Organización para el Desarrollo Integral Sostenible para Oriente y Guatemala (ODISOG), Pan American Development Foundation (PADF), Parlamento Xinka, Pastoral de la Tierra, Dieciséis de San Marcos, Pastoral de Movilidad Humana de la Conferencia Episcopal de Guatemala (PMH-CEG), Para Todas y Todos de Guatemala, Pastoral de la Sierra San Marcos, Paz Joven Guatemala, Paz Para el Mundo, Peace Brigades International (PBI), Plan International Guatemala, PAMI, Planned Parenthood Global (PP Global), Plataforma contra la Impunidad, Plataforma de Organizaciones para Personas con Discapacidad, Plataforma Internacional contra la Impunidad, Pieza Clave, Pop Noj, Prensa Comunitaria, Programa de Atención, MENACI, Movilización e Incidencia por la Niñez y la Adolescencia (PAMI), Programa de Protección y Seguridad Infantil y Juvenil, Programa de Refugiados para Niños Menores Centroamericanos (CAM), Promoción y Desarrollos Hídricos (PDH), Proyecto Justicia, Equidad y Género, (USAID), Parulha CUC, Pastoral Ixalogica, Radio Xomilbe, Red de No Violencia contra Mujer, Región 18 Chircan, Renace, Radio Comunitaria Siwan Tinamit, Radio Única, Radio Snuq' Jolom Konob', Radios Comunitarias, Raxil Chinam San Pedro, Red Afroamericana XXI, Red de información Humanitaria para América Latina (TROCAIRE), Red de la No Violencia contra las Mujeres (REDNOVI), Red de Mujeres Afrodescendientes, Red de Organización de Víctimas Nacionales, Red Legal de Derechos Humanos, Red Nacional de la Diversidad sexual en Guatemala (REDNADS), Red Nacional de Víctimas, Red Niña Niño, Red No Violencia, REDVADS, Save the Children, San Cristobal, San Francisco Las Mercedes Ancestrales, Sank, Sindicatos Globales, Seguridad en Democracia en Guatemala (SEDEM), Seacte Coban, Sechaj A.V, Sechaj A.V SANK, Sechaj, Raxizilio Sank, Secretaria Cocode Aldea Rosario Ochimp, Setux Setzac, Sejax, Delegación Guatemala (ICM), Sobrevivencia Cultural, TRACAIRE, Tres Ríos, Ixcan, Tz'ununijal, UBAQ Garífuna, Tz'ununija´, UAUX BE, UCP Santa Cruz, UVOC, UDEFEGUA, Unidad de capacitación (UNICAP), Unión Sindical de Trabajadores de Guatemala (UNSITRAGUA), Universidad Rafael Landívar (URL), Vida Independiente, Vidas Paralelas Quetzaltenago, Waqib' Kij, World Vision Guatemala, World Vision International, Xalub'e Sepop, Xbenil Salrouneuto Werig, Yalicoq Chisec, Yuwa Chiodeh, ZAPP.

DHSFF0448

29.   The Commission also had meetings with the following international agencies: the representative of the Office of the United Nations High Commissioner for Human Rights (OHCHR) in Guatemala, Liliana Valiña, and OHCHR staff; and Iván Velásquez Gómez, a member of the International Commission against Impunity in Guatemala (CICIG). It also held meetings with the Coordinator of the International Organization for Migration (IOM) in Guatemala, José Diego Cárdenas, and IOM personnel; representatives of the United Nations Population Fund (UNFPA); the Deputy Representative of UNICEF in Guatemala, Mariko Kagoshima, and UNICEF personnel; and UNHCR representatives.

30.   In preparing this report, the IACHR systematized and analyzed information that it has received on the situation of human rights in Guatemala in recent years. The IACHR relied on information received before, during, and after the on-site visit, from investigations conducted *sua sponte*, from input produced by the various mechanisms through which the IACHR has followed the situation in the country, such as public hearings, thematic visits, requests for information under Article 41 of the American Convention on Human Rights, precautionary measures, journalists' reports, and decisions and recommendations of specialized international agencies, among other sources.

31.   On November 22, 2017, the IACHR submitted a copy of the preliminary draft of this report to the State according to its Rules of Procedure, and requested that it provide any comments. On December 22, 2017, the IACHR received the State's comments, which were incorporated, as deemed pertinent, into the final version approved by the Commission on December 31, 2017.[3] In its comments to the draft of this report, the State of Guatemala indicated that it provided observations "regarding the complete and very professional" draft report submitted by the IACHR.[4]

32.   The Commission is grateful to President Jimmy Morales and his government for the invitation to conduct this visit. The Commission also appreciates all the logistical support and assistance provided for the visit to be carried out in a satisfactory manner, especially by the Presidential Coordinating Commission for Executive Policy on Human Rights (COPREDEH). The Commission values the information provided by State authorities and their openness to engage in constructive dialogue with the IACHR. The Commission appreciates the efforts made by victims of human rights violations and their families and by groups, civil society

---

[3]   Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situtation in Guatemala," December 22, 2017.

[4]   Ibid.

DHSFF0449

organizations, and indigenous authorities to meet with the delegation and present their testimony, complaints, and communications.

## A.  *The Legacy of the Armed Conflict*

33.  The IACHR has monitored the human rights situation in Guatemala with particularly close attention since its inception, especially in response to the gross human rights violations perpetrated during the internal armed conflict that went on from 1960 to 1996. The conflict was notable for the systematic execution of people, massacres, forced disappearances, rapes, and scorched-earth operations designed to at least partially eliminate the Maya people. During the armed conflict, women suffered violence in a differentiated way, as rape was a widespread, massive, and systematic practice used by agents of the State as part of the counter-insurgency policy. According to the report of the Commission for Historical Clarification (CEH), *Guatemala: Memory of Silence*, multiple coinciding factors caused the internal armed conflict in Guatemala,[5] including structural impunity, the closing of political spaces, racism, the increasingly exclusionary and anti-democratic nature of institutions, as well as a reluctance to promote substantive reforms that could have reduced structural conflicts.[6]

34.  The CEH concluded in its report that throughout Guatemala's history, but particularly during the armed conflict "the violence was fundamentally directed by the State against the excluded, the poor and above all, the Mayan people, as well as against those who fought for justice and greater social equality."[7] The commission, for its part, has stated on several occasions that the dramatic exclusion and discrimination to which indigenous peoples, who account for more than half the population of Guatemala, were subjected became evident during the armed conflict, when 83% of the victims were Mayans, and against whom acts of genocide were performed. In its comments to the draft of this report, the State of Guatemala indicated that "it did not seek the elimination of the Mayan People" and that "both groups that fought in the internal war were indigenous"[8].

---

[5]  CEH, Memory of Silence, Volume I (in Spanish only), *Causas y orígenes del enfrentamiento armado interno*, p. 80

[6]  *Id.*, Volume V, Conclusions and Recommendations, p. 24.

[7]  CEH, Guatemala, Memory of Silence, Conclusions and of recommendations.

[8]  Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situation in Guatemala," December 22, 2017.

35.  With the signing of the Accord for a Firm and Lasting Peace in December 1996,[9] the government of then-president Álvaro Arzú and Guatemala National Revolutionary Unity (URNG) brought an end to 36 years of civil war. The Peace Accords were an opportunity for profound change in Guatemala. The succeeding administrations since the end of the armed conflict have made efforts to implement the accords. However, more than 20 years since signing of the Peace Accords the commitments adopted by the State in the areas of reparation, truth, justice, and non-repetition have not been fully met.[10]

36.  The information the IACHR received consistently during the visit indicates that more than 20 years after the Peace Accords were signed some of the fundamental reasons behind the internal armed conflict persist: an economy that is still based on the concentration of economic power in the hands of a few, and a weak State structure with few resources due to low tax collection and high levels of corruption. Guatemala still has structural problems such as racial discrimination, social inequality, deep poverty, exclusion, and lack of access to justice, which constitute obstacles to the full respect of human rights. The Commission has also repeatedly received information regarding the persistence of parallel power structures that hinder the fight against impunity and corruption and stand in the way of strengthening the rule of law.

## B.  Poverty, Inequality, and Exclusion[11]

37.  Guatemala is a country in Central America with an area of 108,809 km$^2$ and a population of around 16 million,[12] most of whom live in rural areas.[13] According to data from the most recent census, taken in 2002, 40% of the population identifies as indigenous; other sources say that 60% of the

---

9   The Accord for a Firm and Lasting Peace was signed and entered into force on December 29, 1996.

10  Information presented by the following civil society organizations with the request for a thematic hearing on "Reparation in Guatemala," October 10, 2016: Coordinadora de Víctimas de Alta Verapaz (CODEVI), Coordinadora de Víctimas de El Petén (COVIP), Asociación Campesina para el Desarrollo Nebajense (ASOCDENEB), Comunidades de Población en Resistencia (CPR-Sierra), Comunidades de Víctimas de Cotzal El Quiché, Centro de Análisis Forense y Ciencias Aplicadas (CAFCA).

11  In its comments to the draft of this report, the State of Guatemala stated: "we respect what [the Commission] has observed, but we suggest noting the change that is being generated for the benefit of the population."   Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situtation in Guatemala," December 22, 2017.

12  According to the census, in 2002 Guatemala's population numbered 15,073,375, 48.8% of whom were male and 51.2% female. INE, _Caracterización Estadística de la República de Guatemala_.

13  51.0% of the population resided in rural areas. INE, _Caracterización Estadística de la República de Guatemala_.

DHSFF0451

population falls under to that category.[14] It is a multiethnic, pluricultural, multilingual society in which indigenous Mayan, Xinka and Garífuna peoples and Ladinos coexist.[15] Guatemala's cultural diversity is evinced by the 25 different languages spoken in the country: Spanish and 24 indigenous languages.

38.   Its history has been scarred by colonialism, wars, subjugation, serfdom, and military dictatorships.[16] Poverty, racism, exclusion, violence, and impunity continue to feature large in the social and economic situation in Guatemala. This situation occurs in a framework of weak state apparatus with few resources as a result of a meager tax take, persistnet corruption, and high levels of violence. The Guatemalan state's low tax revenues hamper its ability to provide basic public services and ensure policies to guarantee the rights of the neediest sectors.[17] According to the Economic Commission for Latin America and the Caribbean (ECLAC), Guatemala's tax revenue, measured as a percentage of GDP, was the region's lowest from 1990 to 2013, managing only 13 percent compared to the regional average of 23 percent.[18] In 2016, the executive branch exempted delinquent taxpayers from paying more than 10 million quetzales (approximately US$1 .3 million) in fines and interests, a decision decried by a number of sectors of the population.[19]

39.   In the context of the Sustainable Development Goals, Guatemala remains one of the most unequal countries in the world in terms of health, education, and income distribution, which has the effect of reducing its human development index by 30 percent, according to the United Nations Development Programme.[20] Based on the National Living Standards Survey

[14]   OHCHR, Central America, *Diagnóstico sobre la Situación de los Derechos Humanos de los Pueblos Indígenas de América Central*, 2011, Vol. I, p. 190.

[15]   The *mestizo* or mixed-race hispanicized community that only speaks Spanish (Central America). Dictionary of the Spanish Royal Academy.The Maya group comprises 22 distinct sociolinguistic communities. Ministry of Education of Guatemala, *Un país con Diversidad Étnica, Cultural y Lingüística*

[16]   IACHR, Situation of Human Rights in Guatemala: *Diversity, Inequality and Exclusion*, OEA/Ser.L/V/II.Doc. 43/15, December 30, 2015, para. 30.

[17]   According to the Organisation for Economic Cooperation and Development, except for Venezuela, Guatemala was the country with the lowest average taxpayer from 1990 to 2010. OECD, Revenue Statistics in Latin America, 1990-2010. Available online: http://www.keepeek.com/oecd/media/taxation/revenue-statistics-in-latin-america-2012_9789264183889-en-fr#.WgZO5sanGUk.

[18]   ECLAC, Fiscal Panorama of Latin America and the Caribbean 2015: Policy space and dilemmas, March 2015 Se encuentra en: http://caribbean.cepal.org/content/fiscal-panorama-latin-america-and-caribbean-2015-policy-space-and-dilemmas

[19]   See newspaper article in La Prensa, *SAT llegó al a meta de recaudación influida por las intervenciones*, January 17, 2017. Available online: http://www.prensalibre.com/economia/economia/sat-llego-a-la-meta-de-cobranza-fiscal.

[20]   United Nations Development Programme in Guatemala, *Guatemala en breve*, 2017. Available online: http://www.gt.undp.org/content/guatemala/es/home/countryinfo/.

published in 2015 (the most recent version), 59.3 percent of Guatemalans live in poverty,[21] 23.4 percent of them in extreme poverty.[22] The national poverty rate grew 8 percentage points between 2006 and 2014,[23] in spite of GDP growth of 3.1 percent in 2016.[24]

40.   Nearly 4 out of 5 indigenous people live in poverty.[25] Extreme poverty is three times higher in the indigenous population than in the nonindigenous population.[26] Alta Verapaz and Sololá are the departments with the highest poverty rates—above 80 percent— followed by Totonicapán with 77.5 percent. The population in all three is mostly indigenous.[27] Poverty in rural areas is almost double that (1.8 times higher) of urban zones.[28] In light of these rates of poverty and extreme poverty, particularly in the indigenous population, the Commission has expressed concern at the State's failure to allocate sufficient resources to address this issue among indigenous children.[29]

41.   In this context, the situation of chronic malnutrition in children is alarming. Guatemala has become the country worst affected by chronic malnutrition in Latin America;[30] indeed, its situation in that regard is among the worst globally.[31] The food and nutrition insecurity situation reaches critical levels in rural areas, mainly affecting children under 5 years old, the school

---

[21]   In other words, they make less than 10,218 quetzales per year, aproximadamente US$1,400 at 2017 prices. Poverty is "a human condition characterized by the continuous or chronic deprivation of resources, capacity, options, security and the power necessary to enjoy an adequate standard of living and other civil, cultural, political and social rights." Extreme poverty is "a combination of scarcity of resources, lack of human development and social exclusion," where a prolonged lack of basic security affects several aspects of people's lives simultaneously, severely compromising their chances of exercising or regaining their rights in the foreseeable future. United Nations, Guiding Principles on Extreme Poverty and Human Rights , Special Rapporteur on extreme poverty and human rights, Magdalena Sepúlveda. Adopted by the Human Rights Council on September 27, 2012, par 2.

[22]   National Living Standards Survey (ENCOVI) 2014, National Statistics Institute. Available online: https://www.ine.gob.gt/sistema/uploads/2015/12/11/vjNVdb4IZswOj0ZtuivPIcaAXet8LZqZ.pdf.

[23]   Ibid.

[24]   United Nations Development Programme in Guatemala, *Guatemala en breve*, 2017. Available online: http://www.gt.undp.org/content/guatemala/es/home/countryinfo/. According to World Bank data, Guatemala's GDP grew 3.1 percent in 2016.

[25]   National Living Standards Survey (ENCOVI) 2014, National Statistics Institute.

[26]   *Id.*, pp. 49-58. Information from the organizations Campaña Guatemala Sin Hambre and IAN International (International Secretariat), August 25, 2017. In the IACHR archive.

[27]   National Living Standards Survey (ENCOVI) 2014, National Statistics Institute.

[28]   *Ibid*.

[29]   IACHR, Annual Report 2016, Chapter V. Available online: www.oas.org/en/iachr/docs/annual/2016/TOC.asp.

[30]   In its Human Development Report 2014, the UNDP ranks Guatemala 125th on the human development index. UNDP, IHuman Development Report 2014, Sustaining Human Progress: Reducing Vulnerabilities and Building Resilience, p. 175.

[31]   FANTA, The Cost of Essential Nutrition Interventions to Reduce Chronic Malnutrition in Guatemala, Executive Summary, 2015. Available online: http://www.fantaproject.org/sites/default/files/resources/Guatemala-Nutrition-Costing-Exec-Summ-Dec2015.pdf

DHSFF0453

population, and pregnant and nursing women, and worsens to an alarming degree in the indigenous population.[32] In context of high poverty and extreme poverty, 48 percent—that is, practically half—of Guatemalan children are chronically malnourished.[33] The highest rates of chronic malnutrition and food insecurity occur in rural areas, where the population is predominantly indigenous.[34] According to Information Provided by the United Nations Children's Fund (UNICEF), in Guatemala chronic malnutrition affects eight of every ten indigenous children (80%); it causes lower school retention rates, lower productivity, a propensity to contract diseases, and even a loss of I.Q., with irreversible effects throughout life.[35] The mortality rate from malnutrition is 9.1% nationwide and has trended downward (by 20.7%) since 2005.[36] The areas with the highest levels of chronic malnutrition and food insecurity are the Departments of Alta Verapaz and Baja Verapaz, as well as the municipalities in the Chortí area of the Department of Chiquimula, all of them with predominantly indigenous populations.[37] Given such challenges, the IACHR encourages the State of Guatemala's efforts to implement food distribution programs, particularly through the creation of the Presidential Commission to Reduce Chronic Malnutrition[38]. In its comments to the draft of this report, the State highlighted that as part of the Program for Food Assistance, between 2012 and June 2017 618,117 food rations were delivered in areas affected by natural disasters.[39]

---

[32]  Secretariat for Food and Nutrition Security, Strategic Plan for Food and Nutrition Security, p. 1. The Secretariat for Food and Nutrition Security reported a drop in levels of chronic and acute malnutrition in children under five years old between 1995 and 2015.

[33]  United Nations Development Programme in Guatemala, *Guatemala en breve*, 2017. Available online: http://www.gt.undp.org/content/guatemala/es/home/countryinfo/.

[34]  This occurs in the Departments of the Altiplano Nor-occidental, Alta Verapaz, and Baja Verapaz, and the municipalities in Chortí area of Chiquimula Department. Secretariat for Food and Nutrition Security.Strategic Plan for Food and Nutrition Security, p. 4.

[35]  Office of the Human Rights Ombudsman, *IX Informe del Procurador de los Derechos Humanos al Consejo Nacional de Seguridad Alimentaria y Nutricional. Análisis del Derecho a la Alimentación en el Marco de la Ley del SINASAN*, October 2016.  UNICEF-Guatemala.Panorama.

[36]  National Living Standards Survey (ENCOVI) 2014, National Statistics Institute.

[37]  *Ibid*.

[38]  In its comments to the draft of this report, the State also referenced the Family Agriculture Program for the Strengthening of the Rural Economy, within the Ministry of Agriculture, Cattle Raising and Food. It indicated that this Program constitutes the primary objective of the Agricultural Policy for 2016-2020, con contribute to the reduction in chronic malnutrition in children under two years of age. It also inciated that since 2016, it is strengthening the National Program for Feeding in Schools, which guarantees the rights to food and nutrition of students through food that is healthy, varied, safe and with cultural pertinence. Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situation in Guatemala," December 22, 2017.

[39]  Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situation in Guatemala," December 22, 2017.

DHSFF0454

42. In 2017, these levels of malnutrition caused the death of at least one girl beneficiary of court-ordered protection.[40] The Commission learned of the death from malnutrition of Mabelita Lucila Interiano Amador, an eight-year-old girl, on August 14, 2017, 10 days after its concluded the on-site visit.[41] In April and May 2013, the Judge of the Children's and Juvenile Offenders' Court of the Department of Zacapa ordered the Guatemalan State to protect the lives of three girls and two boys,[42] including Mabelita, who were suffering from chronic and acute malnutrition, as well as their immediate families. The Constitutional Court confirmed the judgments in 2017.[43] The judge found that there had been violations of her rights to life, health, education, food, and housing, recognized in Article 104 of the Child and Adolescent Comprehensive Protection Law. In his judgment, the judge ordered the Human Rights Ombudsman (PDH) to assist in the coordination of interinstitutional efforts in that regard.[44] The information received indicates that Mabelita weighed just 27 kilograms when she died. The Commission considers that, bearing in mind that Mabelita had been the beneficiary of a protection order since 2013, her death could have been avoided. The IACHR strongly urges the State to adopt immediate and effective concrete policies and mechanisms to safeguard the wellbeing of the other four children beneficiaries of the 2013 decisions, as well as to prevent the death from malnutrition of any more children in Guatemala.

43. As regards the right to education, according to the UNDP, the average length of schooling in the country is just 6.4 years, and a mere 4.8 years for indigenous children.[45] Indigenous girls attend school for only three years

---

[40]   According to the Secretariat for Food and Nutrition Security, 111 children died of malnutrition in the country in 2016. Newspaper article in La Prensa, *Niños desnutridos suman un millón*, December 3, 2016. Available online: http://www.prensalibre.com/guatemala/comunitario/nios-desnutridos-suman-un-millon.

[41]   Information from the organizations Campaña Guatemala Sin Hambre and IAN International (International Secretariat), August 25, 2017. In the IACHR archive. See also newspaper article in Prensa Libre, *Fallece Mabelita Interiano, niña que tenia medidas de protección*, August 14, 2017. Available online: http://www.prensalibre.com/guatemala/comunitario/fallece-mavelita-interiano-nia-que-tenia-medidas-de-proteccion.

[42]   Judgment No. 19003-2011-00641 Of. 1ª, Children's and Juvenile Offenders' Court of the Department of Zacapa in favor of the child Leonel Amador Garcia; Judgment No. 19003-2011-00637 Of. 1ª, Children's and Juvenile Offenders' Court of the Department of Zacapa in favor of the child Mayra Amador Raymundo; Judgment No. 19003-2011-00638 Of. 1ª, Children's and Juvenile Offenders' Court of the Department of Zacapa in favor of the children Dina Marilú and Mabelita Lucila Interiano Amador; Judgment No. 19003-2011-00639 Of. 1ª, Children's and Juvenile Offenders' Court of the Department of Zacapa in favor of the child Brayan René Espino Ramírez.

[43]   Judicial File No.19003-2011-0064l-Of. 1ª. Children's and Juvenile Offenders' Court of the Department of Zacapa, May 31, 2013. Confirmation of the Judgment by the Constitutional Court, Case File 4474-2014.

[44]   Information from the organizations Campaña Guatemala Sin Hambre and FIAN International (International Secretariat), August 25, 2017. In the IACHR archive.

[45]   Child Fund, Annual Report 2016. Available online: http://childfundannualguatemala.org/. United Nations Development Programme in Guatemala (UNDP) (2016), *Más allá del conflicto, luchas por el bienestar*. National Human Development Report 2015/2016, p. 81.

DHSFF0455

on average.[46] More than 1.8 million children and adolescents aged 10 to 19 are not in school.[47] According to available information, in 2015, 50 percent of boys and girls in Guatemala did not attend preprimary school;[48] in 2017, roughly 400,000 primary school-age boys and girls are not in the education system. Furthermore, more than 678,000 secondary school-age adolescents do not have access to secondary education.[49] According to the most recent data from Guatemala's National Statistics Institute, 20.8 percent of Guatemalans over the age of 14 years old are illiterate, while in the indigenous population illiteracy in that age group is 32.8 percent.[50] According to the UNDP, recent years have seen some progress in education, although Guatemala still faces crucial challenges. Among the advances there have been progressive increases in primary education enrollment; almost complete gender parity in education and an increase in youth literacy (from 76% to 91.9% between 1994 and 2011).[51] In its comments to the draft of this report, the State indicated that the National Committee of Literacy reported, as part of the process of achieving literacy in all persons over 15 years of age, a 4.31% decrease in the illiteracy rate between 2012 (16.62%) and 2016 (12.31%).[52]

44.    As regards land ownership, according to the Office of the United Nations High Commissioner for Human Rights (OHCHR), there are at present more than 1,440 disputes over land concerning overlaps, boundaries, regularizations, and land occupations, among other issues. Forcible evictions in this context continue to be a cause for concern. Farming accounts for 13.6 percent of GDP and 26.4 percent of total exports. According to the OHCHR and information received during the visit, a number of complaints have been made about the adverse impact of single-crop operations that continue to expand throughout the country. Such

---

[46]    UNICEF-Guatemala, Desnutrición.

[47]    Information provided by the State of Guatemala at the 154th regular session of the IACHR.

[48]    Human Rights Office of the Archdiocese of Guatemala (ODHAG), *Informe sobre los derechos de la niñez y adolescencia en Guatemala*, 2016.   Child Fund, Annual Report 2016.   Available online: http://childfundannualguatemala.org/.

[49]    Report on the overall situation of children, adolescents, and young people in Guatemala, in the framework of the on-site visit of the Inter-American Commission on Human Rights to Guatemala from July 31 to August 4, 2017, prepared by the national and international organizations El Refugio de la Niñez, Coordinadora Institucional de Promoción por los Derechos de la Niñez, CIPRODENI, Red Niña Niño, Asociación Civil Paz Joven Guatemala, World Vision, Save the Children, and Plan International Guatemala. In the IACHR archive.

[50]    National Living Standards Survey (ENCOVI) 2014, National Statistics Institute. Available online: https://www.ine.gob.gt/sistema/uploads/2015/12/11/vjNVdb4IZswOj0ZtuivPIcaAXet8LZqZ.pdf. Report on the overall situation of children, adolescents, and young people in Guatemala, in the framework of the on-site visit of the Inter-American Commission on Human Rights to Guatemala from July 31 to August 4, 2017, prepared by national and international organizations. In the IACHR archive.

[51]    UNDP-Guatemala, The Millennium Development Goals.

[52]    Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situation in Guatemala," December 22, 2017.

DHSFF0456

complaints concern, *inter alia*, alleged irregular land purchases, the impact of fumigation on crops in neighboring properties, and diversion of rivers.[53]

45. On the question of the right to water, according to information received, around three million Guatemalans lack access to safe drinking water, while some six million are without access to improved sanitation services.[54] According to the PDH, 20 percent of the country does not have access to improved water sources, and there is a gap of 24.7 percent between urban and rural areas.[55] Of people living in extreme poverty, 40 percent lack access to improved water sources.[56] Guatemala is the only country in Central America without a water law.[57] Information received also indicates that rural areas have serious problems of access to safe drinking water because of droughts, rivers being diverted, and water grabs by businesses, not to mention pollution and land grabs by corporations and megaprojects.[58] According to UNICEF, the global economic situation and the effects of climate change, especially droughts, disproportionately impact the economies and, in particular, the subsistence of indigenous families and of the poorest, with children the worst affected.[59]

46. With respect to the right to housing, civil society organizations say that 50% of the Guatemalan population lacks decent, adequate, and healthy housing.[60] In that regard, the State reported that it replaced the National Housing Fund of Guatemala (*Fondo Nacional de la Vivienda de Guatemala*—FODIGUA) with the National Fund for Housing (*Fondo Nacional para la Vivienda*—FOPAVI), which started functioning in 2013. One of its chief reforms has been the rise in the direct subsidy received by beneficiary families, from 15,000 quetzales (about US$1,900) to 35,000 quetzales (about US$4,600). The State added that since its establishment FOPAVI has

---

[53]    OHCHR, Meeting with civil society organizations in Alta Verapaz.

[54]    National Living Standards Survey (ENCOVI) 2014, National Statistics Institute. Available online: https://www.ine.gob.gt/sistema/uploads/2015/12/11/vjNVdb4IZswOj0ZtuivPIcaAXet8LZqZ.pdf.

[55]    Human Rights Ombudsman, press release, *Día Mundial del Agua*, March 22, 2017. Available online: https://www.pdh.org.gt/biblioteca/sala-de-prensa/category/16-comunicados.html?start=60.

[56]    Human Rights Ombudsman, press release, Día Mundial del Agua, March 22, 2017.

[57]    The PDH, for its parts, considers it "urgent to enact a law that prioritizes water for personal and domestic use, food production, and disease prevention, and that it should also recognize the principles of equality, equity, inclusion, access to information, social participation, accountability, and justice, as well as ensuring sustainability." Human Rights Ombudsman, press release, Día Mundial del Agua, March 22, 2017. See also, UNDP Guatemala, *Acceso al agua, indispensable para el bienestar*, March 22, 2017. Available online: http://www.gt.undp.org/content/guatemala/es/home/ourperspective/ourperspectivearticles/2017/03/22/acceso-al-agua-indispensable-para-el-bienestar.html.

[58]    Information received from civil society organizations, August 2017. In the IACHR archive.

[59]    IACHR, Situation of Human Rights in Guatemala: *Diversity, Inequality and Exclusion*, OEA/Ser.L/V/II.Doc. 43/15, December 30, 2015, para. 33.

[60]    Informe Alternativo al III Informe Periódico del Estado de Guatemala sobre la Aplicación del Pidesc, March 21, 2014, p. 75-76.

DHSFF0457

provided assistance to more than 26,000 families living in poverty or extreme poverty.[61]

47.   Regarding the right to work, according to information provided to the IACHR, difficulties persist with respect to access to jobs, with a result that informal employment is widespread, especially in the farming sector. Almost 70 percent of the labor force is informally employed, according to information from the Ministry of Labor.[62] According to the National Statistics Institute, in rural areas, 85 percent of the labor force is informally employed.[63] The Ministry reported that the informal employment rate fell by two percentage points between 2016 and 2017, from 69.8 percent to 67.8 percent, and that unemployment came down by 0.7 percent, thanks to labor fairs and employment kiosks held in the first half 2017.[64]

48.   As regards child labor, Guatemala has the highest child labor rate in the region. According to official data in the country, there are 850,000 children engaged in productive activities, 43 percent of whom are not in school.[65] The 2016 National Employment and Income Survey carried out by the National Statistics Institute indicates that 6.3 percent of all children aged 7 to 14 years old perform some kind of economic activity.[66]

49.   As regards the right to health, there is no universal health coverage system that provides access without discrimination to quality care services. The Commission received troubling information about the situation of people with HIV in Guatemala, who have to contend with constant supply shortages of antiretroviral drugs, failure to hire personnel at comprehensive care units,[67] and difficulties obtaining quality generic medicine.[68] In its comments to the draft of this report, the State indicated that in 2016 it established the Inclusive Health Model, which institutes

---

[61]   Report of the State of Guatemala regarding the "Draft General Report on Human Rights in Guatemala and the communication of August 14, 2015 of the IACHR," October 6, 2015.

[62]   Ministry of Labor, *Ferias del trabajo reducen tasa de desempleo e informalidad en Guatemala*, April 2017. Available online: http://www.mintrabajo.gob.gt/index.php/nota-principal/6085-ferias-del-trabajo-reducen-tasa-de-desempleo-e-informalidad-en-guatemala.html. See also newspaper article in La Prensa, *Empleo informal sube a 69.9 por ciento en 2016*, November 15, 2016. Available online: http://www.prensalibre.com/guatemala/politica/empleo-informal-sube-a-699-en-el-2016.

[63]   Newspaper article in La Prensa, *Empleo informal sube a 69.9 por ciento en 2016*, November 15, 2016.

[64]   Ministry of Labor, Ferias del trabajo reducen tasa de desempleo e informalidad en Guatemala, April 2017.

[65]   The organization *Programa Educativo del Niño, Niña y Adolescente Trabajador* (PENNAT) puts the number of children and adolescents in productive activities at 1 million and warns of underreporting in this area.

[66]   By sectors, most child workers are employed in farming (58.8 percent), followed by commerce, hospitality and catering (24 percent), and manufacturing (9.3 percent). El País, *La pobreza arrebata la niñez a un millón de menores trabajadores en Guatemala*, June 19, 2017.

[67]   The HIV Law (Decree 27-2000) requires the Ministry of Public Health and Social Assistance to provide health care services to people living with HIV/AIDS.

[68]   Information received from civil society organizations during the on-site visit from July 31 to August 4, 2017.

DHSFF0458

general guidelines for the geographic distribution in the territory, the organizational network, and development of healthcare services and strengthening of human resources. The State similarly pointed out that after the crisis in the availability of medication in national hospitals, by December 2016 it was able to incrase the availability of medication and surgical equipment to above 80% in 25 hospitals, 70% in 15 hospitals, and between 50% and 60% in 4 hospitals.[69]

50.   It is in this context of persistent poverty, inequality and exclusion, chronic malnutrition in children, and low levels of education, against a backdrop of insufficient government revenue to meet the most pressing needs of the population through policies and programs, that the Inter-American Commission analyzes the situation of human rights in Guatemala in this report.

---

[69]   Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situtation in Guatemala," December 22, 2017.

DHSFF0459

# CHAPTER 2
# ADMINISTRATION OF JUSTICE

DHSFF0461

# ADMINISTRATION OF JUSTICE

51.   Administration of justice is one of the main challenges facing the Guatemalan State, given its crosscutting effect on the enjoyment of all other human rights that the State is called on to protect. An efficient and effective justice administration is also critical for combating impunity.

52.   Through its various mechanisms, the Commission has received extensive information about the challenges that Guatemala faces in the area of administration of justice. They range from reparations to victims of the internal armed conflict and their next of kin to the fight against corruption and impunity in the present, as well as the high levels of violence that afflict the country. The Commission has also received information about efforts made to ensure full access to justice and has heard from the State about significant strides in that regard and about challenges that persist. This chapter provides a summary of those challenges and that progress as well as outlining the differentiated effect of lack of access to justice on different sectors of the population that require attention.

## A.   *Access to justice and impunity*

53.   Access to justice has long been a priority issue for the IACHR. The IACHR has seen the problems associated with impunity arising from the State's inability to provide an adequate and efficient justice administration system or independent and impartial justice[70]. According to the latest available information, the impunity rate for the crime of homicide in recent years has hovered between 99.1 percent and 98.4 percent[71].

54.   In that regard, most of the incidents that occurred during the armed conflict (1960 to 1996) have gone unpunished. The Commission noted in

---

[70]   IACHR, 2016 Annual Report, Chapter V, Follow-up of the Recommendations Issued by the IACHR in Its Country or Thematic Reports, Follow-Up on the Recommendations Formulated by the IACHR in *Report on the Situation of Human Rights in Guatemala: Diversity, Inequality and Exclusion.*

[71]   *Id.,* para. 96. CICIG defines impunity as the failure to report, investigation, arrest, try, find positive solutions for the victims and/or convict those responsible for crimes classified as such in Guatemalan law and focuses its report on the subject of judgments of conviction. CICIG, Press release 091,  Sistema de Medición de Impunidad en Guatemala [System to Measure Impunity in Guatemala], November 27, 2015.

DHSFF0462

its 2015 country report that the failure of justice to effectively respond to crimes perpetrated in Guatemala both in the past and the present tend to establish a situation of structural impunity.[72] According to the latest information from the Public Prosecution Service *(Ministerio Público)*, as of April 2017 there was a government backlog *(mora fiscal)* in around 617,640 criminal cases.[73]

55.     Indeed, impunity is one of the crosscutting problems affecting administration of justice and an obstacle for strengthening the rule of law in several States in the region, including Guatemala.[74] On many occasions, both the Inter-American Commission and Court have urged the State of Guatemala to adopt measures to remove the barriers that have created a situation of impunity.[75]

56.     In that regard, the Commission notes that in recent years the Guatemalan State has made progress in combating impunity, thanks to the efforts of the International Commission against Impunity in Guatemala (CICIG),[76] which,

---

[72]     IACHR, Situation of Human Rights in Guatemala: *Diversity, Inequality and Exclusion*, OEA/Ser.L/V/II.Doc. 43/15, December 30, 2015, para. 392.

[73]     Public Prosecution Service, Memoria de Labores 2016-2017 [Report on Activities 2016-2017], p. 43. Available online: https://www.mp.gob.gt/noticias/memoria-administracion-mayo-2016-2017/. According to the Public Prosecution Service the government backlog was reduced by 52 percent from 2014 to 2017. According to the same report, "government backlog is institutionally defined as the delay completing investigations and/or criminal prosecutions that should have been carried out in a specific case, within a reasonable time, which starts to be counted from the date on which the suspect is apprehended." *Ibid.*

[74]     IACHR, Second Report on the Situation of Human Rights in Peru (2000), Chapter II. See also IACHR, Third Report on the Situation of Human Rights in Paraguay, OEA/Ser./L/VII.110. Doc. 52, March 9, 2001, Chapter III.

[75]     I/A Court H.R., *Case of Human Rights Defender et al. v. Guatemala,* Preliminary Objections, Merits, Reparations and Costs, Judgment of August 28, 2014, Series C No. 283; *Case of Veliz Franco et al. v. Guatemala,* Preliminary Objections, Merits, Reparations and Costs, Judgment of May 19, 2014, Series C No. 277; *Case of García and family members v. Guatemala,* Merits, Reparations and Costs, Judgment of November 29, 2012, Series C No. *258; Case of Gudiel Álvarez et al. ("Diario Militar") v. Guatemala,* Merits, Reparations and Costs, Judgment of November 20, 2012, Series C No. 253; *Case of the Río Negro Massacres v. Guatemala,* Preliminary Objection, Merits, Reparations and Costs, Judgment of September 4, 2012, Series C No. 250; *Case of Chitay Nech et al. v. Guatemala,* Preliminary Objections, Merits, Reparations and Costs, Judgment of May 25, 2010, Series C No. 212; *Case of the "Las Dos Erres" Massacre v. Guatemala,* Preliminary Objection, Merits, Reparations and Costs, Judgment of November 24, 2009. Series C No. 211.

[76]     CICIG is an independent international organ that was set up in 2006 under an agreement between the United Nations and the Government of Guatemala to combat the impunity generated by illegal security groups and clandestine security organizations in the country that seriously undermine human rights. CICIG's mandate comprises a number of key objectives set down in its establishing agreement: determine the existence of illegal security groups and clandestine security organizations, their structure and possible relation to State entities or agents and other sectors that threaten civil and political rights in Guatemala; collaborate with the State in the dismantling of illegal security groups and clandestine security organizations and promote the investigation, criminal prosecution and punishment of those crimes committed by their members; recommend to the State the adoption of public policies for eradicating clandestine security organizations and illegal security groups and preventing their reemergence, including the legal and institutional reforms necessary to achieve this goal. Agreement between the United Nations and the State of Guatemala on the Establishment of an International Commission against Impunity in Guatemala (CICIG), December 12, 2006. The term of the CICIG has been extended until September 4, 2019.

DHSFF0463

together with the Public Prosecution Service, has played a key role in the fight against corruption and impunity in the country. The contribution of CICIG has been significant, both in terms of its investigative work and its support in the areas of training and promotion of legal reforms aimed at making the justice system more effective. Notable investigations and proceedings that can be cited as examples include the *La Línea* and State Co-option cases, as well as the case of the Mazatenango journalists Danilo López and Federico Salazar.[77] *La Línea*, one of the cases with the most far-reaching repercussions in the history of CICIG, involved a customs fraud and bribery network that operated at the very highest levels of the State and resulted in the resignation of the then-president, Otto Pérez Molina, and his vice president, Roxana Baldetti, both of whom are currently under criminal prosecution.[78]

57.  The cooperation between CICIG and the Public Prosecution Service has allowed the identification of justice operators suspected of belonging to corruption networks and organizations that generate impunity; identification and prosecution of members of criminal organizations responsible for the widespread murder of individuals who undermined or obstructed their criminal interests; dismantling to a large extent of criminal organizations that from within the State, such as the prison system and the police, engage in criminal conduct and terrorize defenseless populations, as well as helping to consolidate intricate networks of corruption in the State.[79]

58.  This progress in fight against corruption and impunity has come amid reports of pressure, even at the very highest levels of the State, against the head of CICIG, Iván Velásquez, and the Attorney General, Thelma Aldana. In that regard, both the IACHR and the Office of the High Commissioner for Human Rights have expressed their support for the work of CICIG and the

---

[77]  A criminal organization was identified that was planning murders and other attacks against journalists in the Department of Mazatenango. In 2016, in a bid to identify the masterminds behind that criminal organization, the case was transferred to the Office of the Special Prosecutor against Impunity, which, together with CICIG, is continuing the investigation.

[78]  Ninth Report of Activities of the International Commission against Impunity in Guatemala (CICIG), p. 13. Available online (in Spanish): http://www.cicig.org/uploads/img/2016/others/COM_087_20161124_INFORME_ANUAL_2016.pdf. Other high-profile cases instigated by CICIG include that of Judge Martha Sierra/Bufete de la Impunidad, concerning a bribery network linked to the investigation in the La Línea case; Judge Erick Santiago de León, relating to a bribery scheme involving the judge; a passport counterfeiters network; corruption in the prison system; fraud in the National Civil Police; Deputy Muadi, involving the granting of phantom jobs in the legislature; cases involving illicit acts against the mayors of the municipalities of La Antigua, Chinautla; as well as a series of investigations and preliminary proceedings involving illicit election campaign funding. *Ibid*.

[79]  *Id.*, pp. 10-21.

Public Prosecution Service.[80] The Commission considers that, as has already been stated, the independence of an agency like CICIG should be insulated from undue interference in order to preserve the democratic rule of law in Guatemala.[81]

59. The IACHR notes that following the visit, a number of events caused institutional instability in the country. On August 27, 2017, the President of the Republic, Jimmy Morales, declared Ivan Velasquez, the head of CICIG, persona non grata and ordered his immediate expulsion from the country.[82] The announcement came days after CICIG revealed a case of alleged corruption and suspected electoral finance irregularities that involved senior government officials, including the president.[83]

60. The Secretary-General of the United Nations issued a statement expressing shock at the decision of the president to expel Commissioner Velasquez from the country.[84] On August 29, 2017, the Constitutional Court of Guatemala granted the application for permanent relief (*amparo definitivo*) filed by the Human Rights Ombudsman on the half of Commissioner Iván Velásquez, nullifying the president's decision.[85] Days later, the Supreme Court of Justice of Guatemala admitted a request to begin impeachment proceedings against the President of the Republic. On September 11, 2017, the Congress of the Republic voted against stripping the President of his immunity, thus forestalling the possibility of investigating the corruption allegations made by CICIG. On September 21, the Congress re-examined the question of the impeachment of President Morales, and again voted not to lift his immunity.[86]

---

[80]   Statement by the spokesperson for the UN High Commissioner for Human Rights, Liz Throsell, "Support for CICIG and the Office of the Attorney General," August 25, 2070 25 de agosto de 2017.

[81]   IACHR, Resolution 1/17, Human Rights and the Fight against Impunity and Corruption, September 12, 2017. IACHR, Resolution 1/17, Human Rights and the Fight against Impunity and Corruption, September 12, 2017.

[82]   IACHR, Resolution 1/17, Human Rights and the Fight against Impunity and Corruption, September 12, 2017.

[83]   Ibid. In a separate video published later on August 27, 2017, the president said that "no domestic tribunal has the constitutional authority to interfere in the decisions of the president." The video was published on the Guatemalan Government's official YouTube page and can be viewed at https://www.youtube.com/watch?v=RQwJro8iZw0&feature=youtu.be.

[84]   United Nations, Statement attributable to the Spokesman for the Secretary-General on Guatemala, August 27, 2017. Available online: https://www.un.org/sg/en/content/sg/statement/2017-08-27/statement-attributable-spokesman-secretary-general-guatemala-scroll. On August 28, 2017, the International Commission of Jurists issued a press release in support of Commissioner Velasquez in which it said, among other things, that "President Morales decided to declare Commissioner Velasquez persona non grata to obstruct justice and create more impunity ..."

[85]   Constitutional Court, Case 4182-2017, August 29, 2017.

[86]   Newspaper article in Prensa Libre, *El Congreso vuelve a proteger a Jimmy Morales*, September 21, 2017. Available online: http://www.prensalibre.com/guatemala/politica/congreso-protege-por-segunda-vez-la-inmunidad-de-jimmy-morales.

DHSFF0465

61.   During this period of institutional and political instability the president dismissed the minister of foreign affairs. In addition, the ministers of the interior, health, public finance, and labor and social security,[87] as well as several vice ministers and the Chair of the Presidential Commission for Human Rights (COPREDEH) resigned.[88] According to widely available information, the president refused to accept the resignations of the ministers of the interior, public finance, and labor and social security.[89] As for the citizenry, there were mass public protests demonstrations against corruption and impunity, including a national strike on September 20, 2017.

62.   On August 29, the Commission decided to request the Guatemalan State to adopt precautionary measures on behalf of Judge Gloria Patricia Porras Escobar and her immediate family as it considered that she was in a situation of risk because of her work as a justice on the Constitutional Court in Guatemala.[90] Internally, a number of organizations presented motions for impeachment against the president for official disobedience, while another organization presented a motion for impeachment against the justices that granted the application for *amparo* (constitutional relief) in favor of Commissioner Velasquez.[91]

63.   This serious situation prompted the IACHR to adopt a resolution on human rights and the fight against impunity and corruption in which it stated that "[i]mpunity fosters and perpetuates acts of corruption. Therefore, the establishment of effective mechanisms to eradicate corruption is an urgent obligation in order to achieve effective access to an independent and impartial justice and to guarantee human rights." It also noted that "the consequences of corruption ... [affect] not only both the legitimacy of the governors and the rights of the persons governed, but also profoundly

---

[87]   In a joint press release, the ministers of labor and social security, the interior, and public finance said that their departure was due to the fact that the "opportunities for implementing [their] work programs have closed rapidly" as a result of the political crisis in the country. Newspaper article in Prensa Libre, *Renuncian ministros Francisco Rivas, Julio Héctor Estrada y Leticia Teleguario*, September 19, 2017. Available online: http://www.prensalibre.com/guatemala/politica/renuncian-ministros-de-finanzas-gobernacion-y-de-trabajo. The joint press release is available at https://twitter.com/julioHestrada/status/910293086781231105.

[88]   The minister of health resigned on August 27, 2017. The chair of COPREDEH quit on August 28. The ministers of the interior, public finance, and labor and social security stood down on September 19, 2017.

[89]   Prensa Libre, Jimmy Morales no acepta la renuncia de ministros de Gobernación, Trabajo y Finanzas, October 9, 2017.

[90]   IACHR, PM 431/17, Gloria Patricia Porras Escobar and Family, Guatemala, August 29, 2017. Available online (in Spanish): http://www.oas.org/es/cidh/decisiones/pdf/2017/34-17MC431-17-GU.pdf. See also para. 71, *infra*.

[91]   On August 29, 2017, Fundación Myrna Mack filed a motion for impeachment against President Jimmy Morales for the crime of disobedience. That same day, Fundación contra el Terrorismo filed a motion for impeachment against three justices of the Constitutional Court who voted in favor of the *amparo* application for Velásquez.

DHSFF0466

[affect] the national treasury, which is insufficient to meet the needs of citizens with regard to food, health, work, education, a dignified life, and justice." It also said that "corruption, impunity, organized crime, intolerance, political violence, and social exclusion of various sectors, present a serious danger of regression in the effectiveness of the rule of law and restrict the full enjoyment of the human rights that the American Convention recognizes for everyone. The consequences are particularly grave for the persons, groups and collectives historically excluded, in particular those who live in [poverty and] extreme poverty in the country."[92]

64. In its resolution, the IACHR reaffirmed the importance of the fight against corruption to combat impunity through a strengthened, independent and impartial judiciary; it also reaffirmed the fundamental importance of the full exercise of the rights to freedom of expression and access to public information, as well as the rights to association and peaceful assembly, for the investigation and denunciation of corruption. The IACHR called on the independent branches of government to act to guarantee the rule of law and urged the State of Guatemala to take the measures necessary to ensure compliance with the decision of the Constitutional Court and, consequently, to enable CICIG's head Commissioner, Iván Velásquez, to continue to perform his work with the requisite guarantees.[93]

65. As of the date of adoption of this report, new developments continued to emerge in Guatemala that call into doubt the fight against impunity and corruption that the State of Guatemala reaffirmed to the IACHR during the on-site visit. For example, on September 13, 2017, the Congress of Guatemala passed a series of reforms lessening the penalties for the crime of illicit finance, with the result that only the comptroller general of the party, not its general secretary, would be accountable, and allowing prison sentences of up to 10 years to be commuted.[94] The president was also said to have received a "bonus" of 50,000 quetzales per month from the Army (approximately US$6,800), which he claimed to have returned on September 14, 2017.[95] On September 14, the day after the Congress passed the reforms, the Constitutional court unanimously granted an application

---

[92]    IACHR, Resolution 1/17, <u>Human Rights and the Fight against Impunity and Corruption</u>, September 12, 2017.

[93]    *Ibid.*

[94]    See newspaper article in Prensa Libre, *Otras reformas buscan debilitar MP y justicia*, September 14, 2017. Available online: <u>http://www.prensalibre.com/guatemala/justicia/otras-reformas-buscan-debilitar-al-mp-y-justicia.</u>

[95]    Press report, Guatevisión, *Jimmy Morales "devolvió" los Q450 mil que le dio Ejército*, September 14, 2017. Available online: <u>http://www.guatevision.com/2017/09/14/jimmy-morales-devolvio-los-q450-mil-que-le-dio-el-ejercito/.</u>

for provisional constitutional relief to prevent them coming into force.[96] Once again, Guatemalans took to the streets to demonstrate against the reforms and express their support for the fight against corruption and impunity.[97]

66.  In this context, the Public Prosecution Service and CICIG filed an application for the impeachment of Álvaro Arzú Irigoyen, Mayor of Guatemala City and former president of the Republic for alleged embezzlement and illicit electoral financing. As of the date of adoption of this report, that proceeding was at the initial stage and the investigation was continuing. Days after these events, the Government revoked the visa of Iván Velásquez, supposedly because the application had not been submitted by the appropriate person, as on previous occasions.  On its social media accounts, the IACHR said that "the revocation of Iván Velásquez's visa is unwarranted and goes against Guatemala's commitments to international human rights bodies."  For his part, the United Nations spokesman said that they hoped that the Government would renew the visa because the Secretary-General considered the work of CICIG to be "extremely important."[98] According to CICIG, a new visa renewal application has been presented to the Guatemalan immigration authorities.

67.  On October 27, 2017, the Commission requested the State of Guatemala to adopt precautionary measures in favor of August Jordán Rodas Andrade, Human Rights Ombudsman, and his immediate family. The request alleged, among other things, that Mr. Rodas Andrade has worked alongside and has initiated legal actions in high-impact cases related to the fight against corruption and has been subjected to threates and harassment aimed at limiting his work, and has been made aware that some individuals are planning actions against him and his family[99]. The Commission requested the State of Guatemala to adopt the necessary measures to protect the life and personal integrity of Mr. Rodas Andrade and his immediate family, and to ensure thate he can carry out his work as Human Rights Ombudsman of Guatemala without being subjected to acts of intimidation, threats, and harassment.

[96]  Newspaper article in El Nuevo Herald, Guatemala, *Corte detiene reforma que favorece a políticos*, September 14, 2017. Available online: http://www.elnuevoherald.com/noticias/mundo/article173297241.html.

[97]  Newspaper article in Prensa Libre, *La otra perspectiva cívica del Paro Nacional que quizá no vio*, September 20, 2017. Available online: http://www.prensalibre.com/guatemala/politica/paro-nacional-el-color-de-la-manifestacion-del-20-de-septiembre.

[98]  Guatevisión, Video: ONU responde por visa revocada de Iván Velásquez, October 12, 2017.

[99]  IACHR, IACHR Grants Precautionary Measure for Human Rights Ombudsman of Guatemala, November 3, 2017.

68. In light of the recent events in Guatemala, the IACHR recalls first, that the fight against corruption and impunity, at all levels of government, is a fundamental component of that obligation, since preventing them is essential for proper administration of justice.[100] Moreover, "[e]ssential elements of representative democracy include, *inter alia*, respect for human rights and [...] access to and the exercise of power in accordance with the rule of law [...] and [t]ransparency in government activities, probity, responsible public administration on the part of governments, respect for social rights, and freedom of expression and of the press are essential components of the exercise of democracy."[101] Accordingly, the IACHR calls on the state of Guatemala to respect the independence of the different branches of government, including the judiciary, in order to encourage the fight against impunity and corruption at all levels of government and ensure the democratic rule of law.

69. The IACHR recalls that, in accordance with inter-American standards, in the region's democracies, including Guatemala's, there are systems of checks and balances in place by which the judiciary may consider the compatibility with the Constitution and international conventions of decisions or policies adopted by other branches of government.[102] Moreover, Guatemala ratified the International Covenant on Civil and Political Rights in 1992[103] and to the Optional Protocol thereto in 2000,[104] both of which instruments enshrine this international obligation for the State.

70. In its comments to the draft of this report, the State indicated that the Public Prosecutor's Unit Against Corruption includes 10 prosecutors' offices. In the first semester of 2017, this Unit filed more than 35 investigations before the Courts of Justice, which has resulted in important results in the fight against corruption. According to the State, the total number of judicial sanctions imposed between 2012 and 2017 is 247 (without specifying the crimes for which they were imposed).[105]

---

[100] IACHR, Report on Citizen Security and Human Rights, OEA/Ser.L/V/II. Doc. Doc. 57, December 31, 2009, para. 167.

[101] Inter-American Democratic Charter, Articles 3 and 4.

[102] I/A Court H.R., Case of Gudiel Álvarez et al. ("Diario Militar") v. Guatemala, Merits, Reparations and Costs, Judgment of November 20, 2012, para. 330.

[103] Status of signatures, ratifications, and accessions to the International Covenant on Civil and Political Rights: https://treaties.un.org/Pages/ViewDetails.aspx?src=TREATY&mtdsg_no=IV-4&chapter=4&clang=_en.

[104] Status of signatures, ratifications, and accessions to the Optional Protocol to the International Covenant on Civil and Political Rights: https://treaties.un.org/Pages/ViewDetails.aspx?src=TREATY&mtdsg_no=IV-5&chapter=4&clang=_en.

[105] Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situation in Guatemala," December 22, 2017.

DHSFF0469

71. The IACHR reiterates its recognition of the measures and efforts taken by the CICIG and the Public Prosecutor's Office to combat corruption and impunity in the last three years, a process in which civil society and international cooperation have played a fundamental role.[106]  In particular, the IACHR recognizes the crucial role of CICIG in the fight against corruption in Guatemala through the disbanding of criminal networks and organized crime structures together with the Public Prosecutor's Office, as well as the support it provides in the form of training and supporting legal reforms to improve the efficiency of the justice system, in keeping with its mandate.  Over the years, the investigations it has conducted revealed the alleged involvement of officials from all three branches of government and of other actors in the country in illicit acts of corruption, some of which are now the subject of criminal processes.[107]

72. In light of the results achieved, the IACHR welcomes the increase in budget to the Public Prosecution Service of which it was informed during the on-site visit and it encourages the State to provide similar support to other key institutions in the justice system, such as the National Institute of Forensic Sciences (INACF), whose work is essential in criminal proceedings. The Commission also recognizes the work done by the Presidential Commission on Human Rights (COPREDEH) to protect and promote human rights and hopes that that work will continue under the new leadership.[108] The IACHR urges the State to ensure that these institutions are able to carry out their work without interference, to continue to adopt measures to enable the Public Prosecution Service to continue coordinating actions and collaborating with the CICIG under the leadership of Ivan Velasquez, and that it allocate the necessary resources to that end.

73. Regarding the cases relating to the internal armed conflict, the State informed the Commission that, according to the Judicial Center for Information, Development and Statistics, eight judgments were issued that covered 17 identified victims.[109] During its on-site visit, the IACHR noted some recent progress in cases connected with gross violations that

---

[106]   The IACHR expressed that recognition in its country report, its follow-up on its recommendations, as well as its preliminary observations at the conclusion of the on-site visit. Press Release 114/17, IACHR Wraps up On-Site Visit to Guatemala, August 4, 2017.

[107]   IACHR, Resolution 1/17, Human Rights and the Fight against Impunity and Corruption, September 12, 2017.

[108]   The Commission learned that the former chair of COPREDEH, Víctor Hugo Godoy, resigned the position on August 28, 2017, amid the institutional crisis in the country. On September 22, 2017, Jorge Luis Borrayo became the new COPREDEH chair. COPREDEH, *Asume nuevo presidente de Comisión Presidencial de Derechos Humanos en Guatemala*, September 22, 2017. Available online: http://copredeh.gob.gt/4879-2/.

[109]   Information provided by the State, Note Ref. P-952-2017/VHG/LWC/nj, July 10, 2017, p. 4. Those judgments were issued in the following cases: Dos Erres (201 victims), Plan de Sánchez (256 victims), Pedro Arredondo (1 victim), Student Edgar Leonel Paredes (3 victims), Efraín Ríos Montt, Student Fernando García (1 victim), Embassy of Spain (41 victims), and Sepur Zarco (14 victims identificadas).

occurred during the internal armed conflict, including those of Molina Theissen [110] and the Regional Training Command for Peacekeeping Operations (CREOMPAZ),[111] where "Military Zone 21" operated during the time of the internal armed conflict, among others. The IACHR visited the CREOMPAZ facilities as well as the site where the Forensic Anthropology Foundation of Guatemala (FAFG) has exhumed at least 558 skeletons, making it the largest mass grave discovered to date in Latin America. In spite of the progress made in a number of cases, it pales in comparison with the number of violations perpetrated during the conflict and the State of Guatemala's obligations regarding the rights to truth, justice, and reparation for the victims, as is described later in this report.

74.    During its visit, the IACHR verified the existence of multiple persiting factors that contribute to impunity. For example, the Commission was informed about the abusive use of writs of amparo as a strategy to delay a number of criminal proceedings; amnesty requests; and the use of statutes of limitation as blocking tactics to protect the accused. The IACHR recalls that the State has an obligation to ensure that its apparatus provides prompt and effective justice to victims of human rights violations, carries out impartial investigations without delay, and punishes those found responsible.[112] Accordingly, the State should examine the factors that hinder access to prompt and effective justice and adopt appropriate corrective measures.

75.    The fight against impunity and corruption has permeated institutions in Guatemala since the era of the internal armed conflict. The Commission urges the State of Guatemala to make a political commitment to the fight against impunity and corruption by dismantling the parallel organizations and powers that persist in the country in order to achieve full observance of human rights in Guatemala. To that end, the State should allow the CICIG's head Commissioner, Iván Velasquez, to continue to work jointly with the Public Prosecution Service without interference and with the appropriate resources and the requisite guarantees.

---

[110]    IACHR, Presse Release 001, *IACHR Welcomes Arrest of Individuals Accused of Forced Disappearance and Crimes against Humanity in Guatemala,* January 13, 2015. Available online: http://www.oas.org/en/iachr/media_center/PReleases/2016/001.asp.

[111]    International Justice Monitor, CREOMPAZ Hearings Conclude; Tribunal to Determine if Case Goes to trial, June 7, 2016. Available online: https://www.ijmonitor.org/2016/06/creompaz-hearings-conclude-tribunal-to-determine-if-case-goes-to-trial/; NISGUA, *CREOMPAZ: Eleven retired military officers indicted on charges of crimes against humanity*, January 19, 2016. Available online: http://nisgua.org/creompaz-eleven-retired-military-officers-indicted-on-charges-of-crimes-against-humanity/.

[112]    IACHR, Situation of Human Rights in Mexico, OEA/Ser.L/V/II. Doc. 44/15, December 31, 2015, para. 184; I/A Court H.R., *González et al case ("Cotton Field") v. Mexico,* Preliminary Objection, Merits, Reparations and Costs, Judgment of November 16, 2009, Series C No. 205, para. 283.

## B.  The requirements of independence and impartiality: The Public Prosecution Service and judicial reforms

76.  The independence and impartiality of justice operators—prosecutors and judges—is a key element for combating impunity, as it allows them effectively to punish wrongdoers and, at the same time, ensure a fair trial for anyone subject to the State's exercise of its punitive power.[113] In that regard, the IACHR has been closely following selection processes for justice operators in Guatemala.[114]

77.  In its report *Guarantees for the Independence of Justice Operators*, the IACHR noted that in order to guarantee that independence and impartiality it is necessary to ensure an adequate and transparent process of election and appointment. The circumstances of their appointment should enable them to perform their work independently and impartially in the cases they adjudicate, bring, or defend, as well as establishing disciplinary procedures that offer the appropriate guarantees.[115]

78.  En Guatemala, nominating commissions are at the heart of the selection process for justice operators and other state officials.[116] The purpose of nominating commissions is to propose and submit lists of persons to be chosen and appointed by the President of the Republic or the Congress to occupy high-level State positions. [117] According to the Nominating Commission Law, the positions for which the Congress of the Republic or the President choose from a list of candidates proposed by a Nominations Committee include the justices of the Supreme Court of Justice, the Courts of Appeal, the Comptroller General, the Attorney General of the Republic

---

[113]   IACHR, *Guarantees for the Independence of Justice Operators: Towards Strengthening Access to Justice and the Rule of Law in the Americas*, OEA/Ser.L/V/II. Doc. 44, adopted on December 5, 2013.

[114]   IACHR, press release 41/14, <u>IACHR Urges Guatemala to Ensure Transparency and Meet Minimum Standards in the Appointment of Justice Operators</u>. Washington, D.C., April 21, 2014. Press release 108/14, <u>IACHR Reiterates its Concern about the Processes to Select and Appoint Judges to Guatemala's Appeals Court and Supreme Court</u>. Washington, D.C., September 29, 2014.

[115]   IACHR, *Guarantees for the Independence of Justice Operators: Towards Strengthening Access to Justice and the Rule of Law in the Americas*, OEA/Ser.L/V/II. Doc. 44, adopted on December 5, 2013, para. 34.

[116]   IACHR, Situation of Human Rights in Guatemala: *Diversity, Inequality and Exclusion*, OEA/Ser.L/V/II.Doc. 43/15, December 30, 2015, para. 372. IACHR, Hearing on the "Situation of Judicial Independence in Guatemala",  153rd regular session; IACHR, Hearing on the "Process for Appointing Justice Operators in Guatemala, 150th regular session. IACHR, 164th regular session.

[117]   The Nominations Committees are governed by the Political Constitution of the Republic of Guatemala and the Nominating Commissions Law (Legislative Decree No. 19-2009).  IACHR, *Situation of Human Rights in Guatemala: Diversity, Inequality and Exclusion*, OEA/Ser.L/V/II.Doc. 43/15, December 30, 2015, para. 372.

and Head of the Public Prosecution Service; and the Human Rights Ombudsman.[118]

79.   According to the Nominating Commissions Law, commissions are required to abide by the principles of transparency, professional excellence, objectivity, and disclosure.[119] The composition of commissions varies depending on the position in question. For example, the nominating commission lists of candidates for positions on the Supreme Court of Justice comprises 11 deans from the country's law schools, 11 representatives of the College of Lawyers and Notaries, 11 representatives of the appellate courts, and one representative of university rectors. The Commission presents a list of candidates from which the Congress of the Republic picks the justice.[120]

80.   The IACHR considers that, on paper, the selection process for justice operators seems good, pluralistic, and objective. However, for several years the IACHR has received information—enlarged during its visit—that suggests that the process has been abused and flawed in practice, mainly through political influence peddling over the composition of nominating commissions, as well as insufficient scrutiny of members' qualifications.[121] For example, the Commission received information suggesting that in the selection process potential candidates often require the tacit approval of certain high-ranking public officials and other actors that wield *de facto* power in the country. In what would be one of the most dramatic examples of the current system's flaws, the IACHR was informed of the creation of law schools without students for the sole purpose of placing an additional dean on the nominating commission.[122] The reiterated questions rasied are a reflection of the shortcomings in selection and appointment processes, which should respect and safeguard the principles of independence and autonomy of judges.[123]

---

[118]   Legislative Decree No. 19-2009, Nominating Commissions Law, Art. 1. Nominating commissions also put forward lists of candidates for the appointment of members of the Supreme Electoral Tribunal, the Director of the Public Criminal Defender Institute, the Superintendent of Tax Administration, the Superintendent of Banks, and others.

[119]   *Id.*, Art. 2.

[120]   *Ibid.*

[121]   IACHR, On-site visit to Guatemala, July 31 to August 4, 2017, meetings with civil society and other organizations.

[122]   *Id.*

[123]   The IACHR first expressed concern about the selection and appointment procedures for judges and other justice operators in Guatemala early in 2014. The IACHR underscored that the goal of any process to select and appoint justice operators must be to select candidates based on personal merit and professional qualifications, as well as on the particular and specific nature of the functions that they would perform. IACHR, Press release 41/14, IACHR Urges Guatemala to Ensure Transparency and Meet Minimum Standards in the Appointment of Justice Operators. Washington, D.C., April 21, 2014. To that end, it is essential to put

DHSFF0473

81. That is particularly important in light of information that in recent years six judges, including two Supreme Court (CSJ) justices have been convicted or prosecuted for such offenses as money laundering, illicit enrichment, acceptance of bribes, and breach of public duties.[124]

82. On March 7, 2016, the IACHR called on states in the region to strengthen judicial independence in their respective countries through appointment procedures that are in line with international standards. The IACHR pointed to risks in selection processes in several countries, including Guatemala, that could affect the independence of those selected. Such risks include: direct appointments by the executive branch, without the participation of another public body or without receiving observations from civil society actors or other interested parties with respect to the candidacies; a failure by the agencies responsible for designating judges to publish vacancy announcements and procedures; and lack of public access to information about the candidates so as to enable the effective participation of society, in compliance with the principle of civil society participation.[125]

83. Also in March 2016, the United Nations Special Rapporteur on the independence of judges and lawyers, Monica Pinto, warned that the selection process for the five members of the Constitutional Court and their alternates for the 2016-2021 term in Guatemala might not meet fundamental principles of transparency and objectivity. The Special Rapporteur rated as positive certain advances made in some stages of the selection process for justices of the Constitutional court. However, she expressed grave concern about the risk of politicization and undue interference that threaten them, especially as regards the process for the appointment of the justice and alternate that corresponds to the President of the Republic, given that no information had been shared about the selection procedures or the criteria used either before or during the process.[126]

---

in place objective predetermined criteria for assessing and grading candidates in order to minimize discretionary decisions on the part of individuals or bodies involved in the selection process. The State should also introduce safeguards to prevent selection processes being conducted on the basis of private or partisan interests that could erode the independence of the judiciary. IACHR, *Guarantees for the Independence of Justice Operators: Towards Strengthening Access to Justice and the Rule of Law in the Americas*, OEA/Ser.L/V/II. Doc. 44, adopted on December 5, 2013.

[124] Fundación Myrna Mack, *Convergencia por los Derechos Humanos. Alternative Report for the Third Cycle of the Universal Periodic Review*, March 29, 2017.

[125] IACHR, Press Release No. 030/16, <u>IACHR Calls on States in the Region to Strengthen Judicial Independence</u>, March 7, 2016.

[126] United Nations High Commissioner for Human Rights, Guatemala: *<u>"Me preocupa el proceso de elección de magistrados", advierte experta de la ONU</u>*, March 14, 2016.

84.    The IACHR will continue to monitor coming selection and appointment processes closely, in particular looking at whether candidates satisfy the merits of suitability, capacity, and honesty established in Article 113 of the Constitution of Guatemala,[127] as well as international standards in this regard.

85.    In this context, the Commission has also monitored the constitutional reform process in the area of justice, particularly laws that propose amendments to the Nominating Commissions Law, the Judicial Career Law, and the Organic Law of the Public Prosecution Service, among others. Broadly speaking the justice reforms are designed to separate the administrative and adjudicatory functions of the Supreme Court of Justice, recognize the indigenous jurisdiction, and reform selection processes for civil servants and justice operators. Among other aspects, the reforms aim to establish an objective points system for aspirants; adopt a score voting system in which each applicant grades candidates; set deadlines and establish rules on such things as technical assessment and interviews of candidates; incorporate mechanisms for assessing aspirants; correct a legal loophole with respect to the election procedure for members of the judicial career council who are not from the judiciary; and shield the disciplinary evaluation and punishment process from undue political influence.[128]

86.    The Commission was told that the reform process aimed at strengthening governance and administrative management in the judiciary was set in motion with the participation of broad sectors of Guatemalan society, the Public Prosecution Service, the Human Rights Ombudsman, civil society organizations, and international agencies specializing in such matters. In addition, a technical secretariat of experts was set up with the participation of the Office of the United Nations Resident Coordinator in Guatemala, OHCHR, and CICIG in the dialogue, results systematization, and content proposal stages.[129] Information received indicates that the President initially supported the reform.[130] However, the reform process that got underway in 2015 has stalled in the Congress and, according to

---

[127]    Political Constitution of the Republic of Guatemala, Art. 113 (Right to Apply for Public Employment or Office. Guatemalans have the right to apply for public employment or office and, in being so granted, to have only their capacity, suitability, and honesty taken into account.).

[128]    IACHR, On-site visit to Guatemala, July 31 to August 4, 2017, meetings with civil society and other organizations.

[129]    Ninth Report of Activities of the International Commission against Impunity in Guatemala (CICIG), p. 29. Available online (in Spanish): http://www.cicig.org/uploads/img/2016/others/COM_087_20161124_INFORME_ANUAL_2016.pdf.

[130]    Judicial Branch, *Presentan propuesta de reforma constitucional en materia de justicia*, October 6, 2016. Available online (in Spanish): http://www.oj.gob.gt/index.php/publicaciones-oj/419-presentan-propuesta-de-reforma-constitucional-en-materia-de-justicia.

DHSFF0475

Guatemalan civil society organizations, there is a lack of political will to move it forward.[131]

87.  The IACHR considers that this reform process presents an important opportunity for strengthening the independence of justice operators in Guatemala. The proposed reforms are especially important for ensuring noninterference in selection processes for justice operators who are critical for ensuring the continuity of efforts to combat corruption and impunity in the country, such as the Attorney General, the Comptroller General, and the members of the Supreme Court and Constitutional Court, who will be chosen in the first half of 2018.[132]

88.  The IACHR urges the State of Guatemala to push through the constitutional reform in the area of justice and enact it as soon as possible, while seeing to it that international standards in that regard are met. The Commission believes that the proposal to create a body in which the adjudicatory and administration functions of the Supreme Court of Justice are separate and which is independent from other branches of government could effectively better safeguard the independence of judges from pressures aimed at influencing or controlling their decisions. It also considers it important that the amendment of the Judicial Career Law be approved soon in order to completely and effectively integrate the operations of the Judicial Career Council. As to appointment and selection processes, as well as performance evaluation, the State should ensure that selection is based on merit and professional capacity and that the principle of non-discrimination and equal access to opportunities is observed.

89.  The Commission notes that in response to public demands to fight corruption and enhance judicial independence, the Congress adopted a number of amendments to laws, including the Organic Law of the Public Prosecution Service and the Judicial Career Law. According to the human rights ombudsman, one of the most important advances of the new provisions is the incorporation of guiding principles and the creation of the Judicial Career Council, whose functions will include convocation, appointment, performance evaluation, and the disciplinary regime for justices of the peace and lower court judges; the appointment of disciplinary boards and of the Director of the School of Legal Studies; approval of the policies and programs of the School of Legal Studies; and notification of the Congress of the expiration of the constitutional term of

---

[131]  IACHR, On-site visit to Guatemala, July 31 to August 4, 2017, meetings with civil society and other organizations.

[132]  The terms of office of the Attorney General and Head of the Public Prosecution Service and the Comptroller General end in 2018.

DHSFF0476

office of members of the Supreme Court and the Court of Appeals.[133] On June 29, 2016, the Public Prosecution Service, CICIG, and the Office of the High Commissioner for Human Rights welcomed the adoption by the Congress of Decree No. 32-2016 (Judicial Career Law), saying that it would help to strengthen and ensure judicial independence and impartiality consistent with international human rights standards. The Law is designed to ensure that the procedures for selection, promotion, transfer, and performance evaluation of judges is done based on objective and transparent criteria, merit and expertise, as well as establishing guarantees for due process in disciplinary proceedings.[134]

90.     CICIG and the office of the High Commissioner for Human Rights also welcomed the reform of the Organic Law of the Public Prosecution Service, saying that it would help strengthen the institutional framework of the Public Prosecution Service so that it could carry out its work independently and effectively, as the fight against impunity requires.[135]

91.     The importance of and need for these justice reforms is clear from the serious situation of risk that several justice operators face in Guatemala, which includes pressures, in particular on judges, from the highest levels of the State. (See section on the situation of human rights defenders and justice operators.)

92.     Another factor that weakens the independence of justice operators is their reduced budgets and poor working conditions. While the both the Public Criminal Defender Institute (IDPP) and the Attorney General of Guatemala recently reported a modest increase in their budgets, they also warned of their reduced ability to cover the country and their limited capacity to respond effectively to the large number of cases assigned to them.[136] In this regard, the Attorney General reported, for example, that her office only has a presence in 10 percent of the country, while the Public Defender Institute said that it has only about 300 lawyers to carry out its work nationwide. As

---

[133]   Human Rights Ombudsman of Guatemala, *Informe Anual Circunstanciado 2016*, p. 37.

[134]   United Nations, Public Prosecution Service of Guatemala, *MP, CICIG Y OACNUDH saludan aprobación de nueva ley de carrera judicial*, June 29, 2016.

[135]   The Office of the High Commissioner also welcomed the introduction in the Congress of Guatemala of the bill for the constitutional reform of the justice system. Office of the United Nations High Commissioner for Human Rights, Statement of the Spokesperson for the UN High Commissioner for Human Rights, Constitutional reform bill in Guatemala and threats to the Attorney General, October 7, 2016. The reform would be in line with what the High Commissioner has recommended to the State of Guatemala in different annual reports, since it would strengthen the institution and its investigations by developing a professional career system based on the principles of suitability, objectivity, transparency, and nondiscrimination, and by establishing objective criteria for the removal of the Attorney General, among other aspects. United Nations, CICIG Y OACNUDH saludan aprobación de reforma a ley orgánica del MP, February 23, 2016.

[136]   Meetings with the Public Criminal Defendant Institute during the on-site visit, July 31 to August 4, 2017.

DHSFF0477

regards the IDPP, the Commission was informed that it has 15 indigenous attorneys who cover 11 Mayan, Xinca and Garífuna languages.[137]

93.    In light of the situation, the IACHR reiterates that the State has an obligation to implement an efficient, impartial system for the administration of justice that functions with the appropriate swiftness to ensure full access to justice for everyone in Guatemala.[138]

## C.    *Access to Justice for Different Groups*

94.    During its visit, the IACHR noted that access to justice in Guatemala is differentiated. Historically sidelined sectors of the population face specific obstacles that hinder their effective access to justice. In the following section the Commission describes the main obstacles it has identified that prevent a number of groups from obtaining effective access to justice.

### 1.    Women

95.    With respect to access to justice for women, the Commission recognizes the efforts made to develop laws and institutions to provide protection and justice for women in general, and for indigenous women in particular, in terms of specialized justice.[139] The country has a number of laws, including the *Law to Prevent, Punish and Eradicate Intrafamily Violence* (1996),[140] the *Law against Femicide and Other Forms of Violence against Women* (2008),[141] the *Law against Sexual Violence, Exploitation, and Trafficking in Persons* (2009),[142] and the *Law on Immediate Search for Missing Women* (2016).[143] Guatemala has also developed state institutions for advancement and protection of women's rights, including the General

---

[137]    IACHR, Situation of Human Rights in Guatemala: Diversity, Inequality and Exclusion, OEA/Ser.L/V/II.Doc. 43/15, December 30, 2015, para. 409.

[138]    See, for example, I/A Court H.R., *Case of Molina Theissen v.* Guatemala, Supervision of compliance with judgment. Order of the Inter-American Court of Human Rights, November 16, 2009. I/A Court H.R., *Case of Bámaca Velásquez v. Guatemala*, Supervision of compliance with judgment. Order of the Inter-American Court of Human Rights, November 27, 2009.

[139]    UN Women, *Estudio de Caso de Guatemala: Avances y Retos de la Justicia Especializada*, 2015.

[140]    Congress of the Republic of Guatemala, Decree 97/1996: Law to Prevent, Punish and Eradicate Intrafamily Violence, 1996.

[141]    Congress of the Republic of Guatemala, Decree 22/2008, Law against Femicide and Other Forms of Violence against Women, 2008.

[142]    Congress of the Republic of Guatemala, Decree 9/20009, Law against Sexual Violence, Exploitation, and Trafficking in Persons, 2009.

[143]    Congress of the Republic of Guatemala, Decree 9/2016, Law on the Immediate Search for Missing Women, 2016.

DHSFF0478

Secretariat for Women (SEPREM), the National Coordinator for the Prevention of Intrafamilial Violence (CONAPREVI), and the Office of the Ombudsperson for Indigenous Women (DEMI). The creation of mechanisms such as the Prosecutor's Office for Women, the 24-hour Criminal Court of First Instance for Crimes of Femicide, or the Comprehensive Model to Address Violence against Women are also steps in the right direction in the specialization of the justice system and the prosecution of acts of violence against women.

96.    However, during its on-site visit the Commission was briefed about the shortage of resources and staff at most of these institutions, which weakens their capacity to act effectively. A case in point is the Office of the Ombudsperson for Indigenous Women (DEMI), which has the highly challenging mandate of covering all the country's different geolinguistic areas.[144] To carry out its mandate properly, the institution considers that it needs an annual budget of 43 million quetzales, whereas at present it is allocated only 16 million quetzales per year.[145] In its comments to the draf of this report, the State informed that DEMI's budget for 2017 was 19 million quetzals, and that this year it opened two additional regional offices, bringing the total number of offices in the country to 14.[146] Geolinguistic coverage is of the utmost importance for ensuring access to justice for indigenous women since, as the Commission has stated, although translation at hearings is guaranteed, there is a constant shortage of personnel who speak local languages fluently, as well as a lack of interpreters and translators for other procedures. This situation creates a mismatch between the alleged facts and the way in which the complaint is registered.[147]

97.    DEMI was created in the wake of the peace accords with the aim of advancing indigenous women's human rights. It represented an innovative

---

[144]    Between 2013 and 2017, the Office of the Ombudsperson for Indigenous Women has handled around 58,000 cases nationwide. However, at present the institution's only extends to 13 of the country's regions (in addition to its headquarters in Guatemala City) and it apparently does not have the resources to encompass every linguistic community in the country owing to budgetary constraints. For example, there are nine linguistic communities in Huehuetenango but only the Mam community is covered. By the same token, in Alta Verapaz, where there are high rates of violence, malnutrition, and poverty specifically affecting indigenous women, it only covers the Q'chi area and lacks the capacity to attend to the P'plchi area. Information received during the on-site visit of the IACHR from July 31 to August 4, 2017, at a meeting with institutions on indigenous women's rights held on August 3, 2017.

[145]    Communication from the Guatemalan State, Comments of the State of Guatemala on the Preliminary Observations of the IACHR on its on-site visit, August 29, 2017.

[146]    Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situtation in Guatemala," December 22, 2017.

[147]    Movimiento de Mujeres Indígenas, *Situación y Condición de las Mujeres y niñas indígenas en el acceso a la justicia en Guatemala.* Information received during the on-site visit of the IACHR from July 31 to August 4, 2017.

DHSFF0479

effort on the part of the Guatemalan State to provide comprehensive and specialized assistance to indigenous women who were victims of violence. However, the Commission has expressed concern at reverses in its institutional independence, given the change in the mechanism for appointing the Ombudsperson by Executive Decree 38-2013.[148] The information received suggests that this mechanism has suppressed the role of the Coordinating Board and the Advisory Council of proposing a shortlist of three candidates to the President of the Republic.[149] During its on-site visit, the Commission was informed that this situation has not been rectified, undermining the right of women to have a say in the choice of the Ombudsperson for Indigenous Women.[150] The Commission reminds the State of the importance of ensuring full participation for indigenous women in the process of selecting the head of DEMI. In its comments to the draft of this report, the State indicated that DEMI carried out 706 training modules related to womens' rights, in which it trained 52,372 people, including indigenous women and public servants and employees.[151] In addition, between 2012 and 2016 it provided assistance in a total of 1,937 cases related to violence against indigenous women, out of which 760 included legal representation in different types of violence-related cases. It also indicated that it provided social assistance in 308 cases and psychological services in 869 cases.[152]

98.   During its on-site visit, the Commission received consistent information about the obstacles that women—particularly indigenous women—face in obtaining effective access to justice, in spite of the institutional mechanisms developed in the country. For instance, on its visit to women in indigenous

---

[148]   IACHR, *Situation of Human Rights in Guatemala: Diversity, Inequality and Exclusion*, OEA/Ser.L/V/II.Doc. 43/15, 2015, para. 99.

[149]   Executive Decree 442-2007 granted DEMI an independent structure, including a coordination board in charge of choosing the Ombudsperson for Indigenous Women. For that purpose, there was a mechanism by which all indigenous women's organizations at the local and national level were publicly invited to propose to the President of the Republic three suitable candidates whom they considered appropriate in keeping with their worldview, principles, and values. The process afforded broad participation to indigenous women. However, the mechanism was modified by Executive Decree 38-2013, which eliminated the Coordination Board's function of selecting a shortlist of three candidates for the position of Ombudsperson for Indigenous Women, leaving the decision entirely up to the President of the Republic. Majawil Q'Ij Nuevo Amanecer, *"Violación al Derecho a la participación de las mujeres indígenas en la dirección de asuntos públicos por medio de representantes libremente elegidos y de tener acceso en condiciones de igualdad a las funciones públicas del Estado de Guatemala"*. Information received during the on-site visit of the IACHR from July 31 to August 4, 2017.

[150]   Majawil Q'Ij Nuevo Amanecer, "Violación al Derecho a la participación de las mujeres indígenas en la dirección de asuntos públicos por medio de representantes libremente elegidos y de tener acceso en condiciones de igualdad a las funciones públicas del Estado de Guatemala". Information received during the on-site visit of the IACHR from July 31 to August 4, 2017.

[151]   Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situation in Guatemala," December 22, 2017.

[152]   Ibid.

communities in Alta Verapaz the Commission was informed of acts of discrimination, lack of adequate assistance, and lack of coordination on the part of local authorities.[153] According to the information received, there is a practice of exclusion and centralization of justice services in the country that makes it difficult to lodge complaints, file lawsuits, and institute other judicial procedures. Indigenous women's human rights organizations told the Commission that there were not enough judicial offices in the country and that, because they were centrally situated at municipal and departmental seats, access to them was restricted by the large distances they had to travel which, in turn, made the process more costly for victim.[154]

99.  By the same token, systems of investigation and assistance reportedly do not take indigenous women's specific needs and traditions into consideration. Protection shelters, for example, lack the conditions to enable women and girls to wear traditional dress or to perform traditional community tasks, such as planting and fabric weaving.[155] In response to the situation, the Commission underscores the importance of having in place special assistance protocols tailored to the needs of indigenous girls and women that take their cultural background and traditions into account.

100.  The Commission was informed about the difficulties that Guatemalan women continue to encounter in accessing decision-making and representative positions in the country.[156] The information received indicates that there is a persistent absence of indigenous women in the majority of decision-making bodies. Indigenous organizations said that the prevalence of certain racist and male chauvinist stereotypes that reduce indigenous women's roles to domestic and rural settings hinders their participation and representation in policy and decision-making forums. In that regard, the Commission recalls that under the Inter-American Convention on the Prevention, Punishment, and Eradication of Violence against Women (Convention of Belém do Pará), the State has an obligation to ensure for women the right to have equal access to public service and to take part in the conduct of public affairs, including decision-making. In its comments to the draft of this report, the State informed that the Supreme Electoral Tribunal is currently devising a second group of reforms fo the

---

[153]  Information received during the on-site visit of the IACHR from July 31 to August 4, 2017, at a meeting with women from indigenous communities in Alta Verapaz during the visit to Cobán on August 1, 2017.

[154]  Situation of Q'eqchi', Poqomchí and Achí women in the north of the country. Information received during the on-site visit of the IACHR from July 31 to August 4, 2017.

[155]  Movimiento de Mujeres Indígenas, *Situación y Condición de las Mujeres y niñas indígenas en el acceso a la justicia en Guatemala.* Information received during the on-site visit of the IACHR from July 31 to August 4, 2017.

[156]  Information received during the on-site visit of the IACHR from July 31 to August 4, 2017, at a meeting with institutions on indigenous women's rights held on August 3, 2017.

DHSFF0481

Law of Elections and Political Parties, which will include gender parity and the alternation of indigenous peoples in the nominations to elected positions.[157] The State also indicated that out of the 158 representatives currently in Congress for the 2016-2020 legislative period, 25 are women, i.e., approximately 16%.[158]

101.  The IACHR also learned about the obstacles and difficulties indigenous women face in relation to the lack of judicial protection of their collective intellectual property in the law courts. Their traditional clothing and designs are a fundamental part of the identity and culture of indigenous peoples and communities. According to information provided to the Commission,[159] in recent years indigenous communities have seen their ancestral creations appropriated by persons alien to their communities without respect for their authorship, meaning, and traditions, or contributing to the development of the communities that create them. Computerized designs inspired by ancestral creations, reproduction of traditional garb, and industrialization of Mayan fabrics could be infringing their copyright and associated rights enshrined in the laws governing industrial property in Guatemala. According to information furnished to the Commission, women's communities that took their cases to court encountered large numbers of obstacles preventing their complaints from being given meaningful consideration without discrimination.[160]

102.  The IACHR has also received copious information on the effect of the femicide phenomenon on women and Guatemalan society, which is examined in the section of this report that deals with citizen security. Following the adoption of the Law against Femicide and Other Forms of Violence against Women in 2008, violence against women became the crime most reported to the Public Prosecution Service. The situation has overwhelmed the courts' capacity to settle complaints because there are still too few prosecution units to deal with the volume of cases. The Commission recognizes the efforts of the State to develop specific bodies, such as the Prosecutor's Office for Women (established in 2011) or the First Criminal Court of First Instance for Crimes of Femicide and Other Forms of Violence against Women and Sexual Violence, Exploitation, and Trafficking in Persons, which was created in 2012 and operates around-

---

[157]  Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situation in Guatemala," December 22, 2017.

158  *Ibid.*

[159]  Asociación Femenina para el Desarrollo de Santiago Sacatepéquez (AFEDE), *"Violación a los Derechos Culturales de Mujeres Indígenas y Violación al Principio e Igualdad y No Discriminación".* Information received during the on-site visit of the IACHR from July 31 to August 4, 2017.

[160]  Information received during the on-site visit of the IACHR from July 31 to August 4, 2017.

the-clock.[161] The Office of the Special Prosecutor for Femicide,[162] which has analysis, litigation, and evidence gathering units opened at the end of 2016. In spite of the efforts of the State in this regard, the number of convictions and acquittals in femicide cases are minimal relative to the number of complaints, and while the total number of judgments increased by 253 percent from 2012 to 2013, that rise still only accounts for judgments in 3 percent of complaints.[163] These figures reflect a high level of impunity in these cases. The Commission calls on the State to continue its efforts and to follow up on the implementation of the Law against Femicide, as well as establishing specialized courts and tribunals all over the country and ensuring the necessary budget appropriations to enable them to function.

## 2.    Indigenous Peoples

103.    The Commission has repeatedly said that indigenous peoples in Guatemala face the highest levels of social exclusion.[164] Their exclusion is visible in a variety of spheres, including access to justice. During the on-site visit, the Commission received information regarding the lack of access to justice for indigenous peoples in Guatemala and the persistence of linguistic, geographic, and cultural barriers in obtaining such access. For example, the IACHR was informed that some authorities make indigenous persons wait longer than non-indigenous persons. One indigenous person who met with the commission said: "When a Ladino person arrives and we were here before, they make us wait." In Alta Verapaz, a woman explained to the IACHR that "they have translators in the Public Prosecutor's Office, but they don't know Q'eqchi and they do not translate everything we say."[165] The IACHR has been reporting on the general situation of indigenous peoples in Guatemala since the 1990s. The fact that some of these barriers have not been overcome in over three decades reflects a structural failing, since those obstacles persist in spite of reiterated observations and recommendations. Information presented to the the United Nations Special Rapporteur on the rights of indigenous peoples indicate that only around

---

[161]    USAID, Guatemala's 24-Hour Courts: Changing the Way Women Access Justice, 2012.

[162]    Ministry of the Interior, *Inauguran Fiscalía de delitos contra el Femicidio*, November 23, 2016.

[163]    Impunity Watch, *¿Dónde está la justicia? El continuum de la violencia contra las mujeres*, 2015.

[164]    IACHR, *Situation of Human Rights in Guatemala: Diversity, Inequality and Exclusion*, OEA/Ser.L/V/II.Doc. 43/15, December 30, 2015, para. 70. *Fifth Report on the Situation of Human Rights in Guatemala (2001)*, Chapter XI. The Rights of Indigenous Peoples, Introduction, para. 4; and *Justice and Social Inclusion: The Challenges of Democracy in Guatemala* (2003), Chapter IV. The Situation of the Indigenous Peoples, A. Introduction, para. 210.

[165]    IACHR, On-site visit to Guatemala, July 31 to August 4, 2017, meetings with civil society organizations in Alta Verapaz.

DHSFF0483

10 percent of indigenous people have adequate and effective access to justice.

104. The IACHR received information from the State about training provided to officials in the judiciary and Public Prosecution Service on discrimination, the use of cultural and language experts, and the work of the Indigenous Peoples Unit of the Supreme Court of Justice to compile good practices in relation to discrimination-related judgments. In its observations to the draft of this report, the State further informed the Commission that the Public Defenders' Institute has provided representation in 6,602 cases in an indigenous language, as well as 547 cases "with cultural pertinence", regarding indigenous peoples.[166] The Commission values the efforts of the State in that regard and considers that they should continue in order to achieve their goal of eradicating discrimination.

105. The IACHR also learned that in the process of constitutional reform of justice, recognition of the indigenous jurisdiction prompted controversy and opposition from certain sectors of the population.[167] In response to that situation, the Commission heard that indigenous organizations and leaders adopted the position that if the issue of recognition of indigenous jurisdiction was preventing the constitutional reform from going through, indigenous organizations would withdraw that recognition from consideration in order to allow the Congress to pass the rest of the constitutional amendments.[168] This resulted in the continued exclusion of indigenous peoples in that regard, which affects their full access to justice in the country. In this regard, the IACHR reiterates that the rule of law in Guatemala can only be consolidated when these historically excluded sectors are granted an equal say in society and in decision-making, something that has yet to be accomplished.[169]

106. In relation to prior consultation as part of the issue of access to justice, the IACHR learned of the judgment handed down by the Constitutional Court in May 2017 ordering the Ministry of Energy and Mines (MEM) to conduct consultations with indigenous communities affected by two hydroelectric companies operating on the River Cahabón, in Alta Verapaz, in accordance

---

[166]   Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situtation in Guatemala," December 22, 2017, p. 27.

[167]   IACHR, On-site visit to Guatemala, July 31 to August 4, 2017, meetings with civil society and other organizations.

[168]   Ibid.

[169]   IACHR, *Situation of Human Rights in Guatemala: Diversity, Inequality and Exclusion*, OEA/Ser.L/V/II.Doc. 43/15, December 30, 2015, para. 104. IACHR, *Justice and Social Inclusion: The Challenges of Democracy in Guatemala* (2003), Chapter IV, pars. 234 and 434.

with International Labour Organization (ILO) Convention No. 169.[170] However, the Court allowed the companies to continue operating for the space of one year while the consultations are carried out and ordered the Congress to adopt legislation on issue of prior consultation.[171] In that connection, the IACHR recalls that, under inter-American standards on such matters, "the obligation to consult is the responsibility of the State; therefore the planning and executing of the consultation process is not an obligation that can be avoided by delegating it to a private company or to third parties, much less delegating it to the very company that is interested in exploiting the resources in the territory of the community that must be consulted."[172] Furthermore, as the Inter-American Court has stated, "the requirement of prior consultation means that this must take place *before* taking the measure or implementing the project that may affect the communities…."[173]

107.  In the course of its visit, the Commission was informed about the recent adoption of the "Operating Guidelines on Consultation of Indigenous Peoples."[174] The adoption of the guidelines was a controversial issue, since a number of indigenous organizations and elders opposed it, owing to the fact that, according to them, the guidelines echo certain precepts of ILO Convention No. 169 but not inter-American standards on the right of indigenous peoples to prior consultation.[175] A number of indigenous organizations and leaders told the Commission that the authorities that drafted the operating guidelines did not meet with other sectors of society and indigenous peoples in a bid to reach agreements or consensus; that those indigenous leaders did not endorse the regulation; that the operational guidelines on consultations prepared by the Ministry of Labor

---

[170]  Constitutional Court, Joined cases 90-2017, 91-2017, and 92-2017, Case of Oxec and Oxec II, May 26, 2017. In reference to Convention 169 on Indigenous and Tribal Peoples in Independent Countries, which Guatemala ratified in 1996.

[171]  *Id.*

[172]  I/A Court H.R., *Case of the Kichwa Indigenous People of Sarayaku v. Ecuador,* Merits and reparations, Judgment of June 27, 2012, Series C No. 245, para. 187. See also United Nations, *Report of the Special Rapporteur on the situation of the human rights and fundamental freedoms of indigenous peoples,* James Anaya, A/HRC/12/34, July 15, 2009, paras. 53 to 55.

[173]  I/A Court H.R., *Case of the Kichwa Indigenous People of Sarayaku v. Ecuador,* Merits and reparations, Judgment of June 27, 2012, Series C No. 245, para. 181 (emphasis added).

[174]  IACHR, On-site visit to Guatemala, July 31 to August 4, 2017, meetings with civil society and other organizations. Meeting with the Minister of Labor and Social Security, Aura Leticia Teleguario, and the Permanent Representative of Guatemala to the OAS, Ambassador Gabriel Aguilera, Washington, D.C., August 11, 2017.

[175]  IACHR, On-site visit to Guatemala, July 31 to August 4, 2017, meetings with indigenous organizations and elders. See also, government of the Republic of Guatemala, *Guía Operativa para la implementación de la consulta a pueblos indígenas* [Operating Guidelines on Consultation of Indigenous Peoples], pp. 3-7, which mentions ILO Conv will ention No. 169, rulings of the Constitutional Court, and the International Convention on the Elimination of all Forms of Racial Discrimination; however, it does not mention the binding decisions of the Inter-American Court of Human Rights as the "constitutional framework of rights, or as standards."

DHSFF0485

was "an imposition," since when ministry representatives visited some departments to consult on the guidelines, the guidelines were rejected, while some communities were not consulted.[176]

108. In that regard, the Commission highlights, that the State's obligation of free and informed prior consultation of indigenous and tribal peoples also relates to the adoption of legislative measures.[177] The Inter-American Court has stated: "In the case of consultation prior to the adoption of a legislative measure, the indigenous peoples must be consulted in advance during all stages of the process of producing the legislation, and these consultations must not be restricted to proposals."[178] By the same token, the IACHR considers that identifying the measure that is to be the subject of consultation is fundamental in the process of consultation and consent. Thus it should be endowed with the greatest possible guarantees, reducing discretion in the decision and applying, in non-restrictive terms, the concept of impairment or negative impact. This is regardless of the type of megaproject, extraction project, investment project or any other that affects ancestral peoples.[179]

109. During its visit, the Commission met with indigenous authorities of different peoples and regions of the country.[180] Some authorities said they consider prior consultation to be a strictly indigenous institution and, therefore, the indigenous peoples themselves should decide how to carry them out. They noted that some State authorities conceive of the prior consultation as a process to prevent or resolve social conflicts, and not as a true process to secure the consent of the consulted peoples and communities.[181] Also, they asserted that several different indigenous peoples of Guatemala have their own institutions, processes, mechanisms and timing in each individual group and community; and that a properly conducted process of prior consultation should take into account these characteristics and particularities.

---

[176]    Meeting with indigenous organizations and elders. Information submitted to the IACHR by several indigenous organizations on August 4, 2017.

[177]    I/A Court H.R., *Case of the Kichwa Indigenous People of Sarayaku v. Ecuador,* Merits and Reparations, Judgment of June 27, 2012, Series C No. 245, para. 181.

[178]    *Ibid.*

[179]    IACHR, Situation of Human Rights in Guatemala: *Diversity, Inequality and Exclusion*, OEA/Ser.L/V/II.Doc. 43/15, December 30, 2015, para. 495.

[180]    In Guatemala City, the IACHR met with indigenous authorities. In Alta Verapaz, the Commission met with indigenous women's organizations and with community-level indigenous peoples' rights defense organizations. In San Marcos, the Commission met with indigenous peoples' rights defenders.

[181]    IA Court of HR, Case of the Saramaka People v. Suriname. Preliminary Objections, Merits, Reparations and Costs. Judgment of November 28, 2007. Series C No. 172, para. 133 to 137. IA Court of HR, Case of the Saramaka People v. Suriname. Interpretation of Judgment of Preliminary Objections, Merits, Reparations and Costs. Judgment of August 12, 2008, Series C No. 185, para. 17.

110. On this topic, the Commission recalls that both the United Nations Declaration on the Rights of Indigenous Peoples and the Inter-American legal precedent conceive of the right to prior, free and informed consultation as a process emanating from the right to self-determination.[182] Therefore, implementation of the right to prior consultation must, above all, respect that right and make sure that it does not become a mere procedural formality that does not take into account the particular characteristics of the indigenous people or community involved. The Inter-American Court has repeatedly held that the right to consultation includes, as a fundamental element, the right of indigenous peoples to be consulted about, and to participate in, development of the process of consultation to which they are entitled.[183] The IACHR also recalls that prior consultation is not a tool to mitigate social conflict, but rather a procedure to provide for the right of self-determination, in relation to activities that are carried out on their ancestral lands and territories, or that have an impact on the natural resources that are found there.

111. In its observations to the draft of this report, the State of Guatemala noted that aftering unable to reach consensus on and approve an instrument to regulate consultation with indigenous peoples accoridngo the ILO Convention 169, in 2016 a specialized team was formed to collect necessary input from indigenous peoples to develop basic standards to carry out consultations.[184] By December 2016, six different linguistic

---

[182] IACHR, Indigenous peoples in voluntary isolation and initial contact in the Americas: recommendations for full respect for their human rights. OEA/Ser.L/V/II, Doc. 47/13, December 30, 2013, para. 21-22. The Commission previously wrote: "the right to self-determination is directly and profoundly related to the rights [of indigenous peoples] to their lands, territories and natural resources." Ibid. para. 22. IACHR, Indigenous and Tribal Peoples' Rights over their Ancestral Lands and Natural Resources.  Norms and Jurisprudence of the Inter-American Human Rights System. OEA/Ser.L/V/II, December 30, 2009, para. 165.  United Nations Declaration on the Rights of Indigenous Peoples, 61/295. A/61/L.67 and Add.1, September 13, 2007, Art. 3, "Indigenous peoples have to the right to self-determination. By virtue of that right they freely determine their political status and freely pursue their economic, social and cultural development." Also see IACHR, Pleadings before the Inter-American Court of Human Rights in the case of Yakye Axa v. Paraguay. Cited in: IA Court of HR, Case of the Yakye Axa Indigenous Community v. Paraguay. Judgment of June 17, 2005. Series C No. 125, para. 157(c). IA Court of HR, Case of the Xákmok Kásek Indigenous Community v. Paraguay. Merits, Reparations and Costs. Judgment of August 24, 2010, Series C No. 214, pars. 171-182. In the case of the Kichwa Indigenous People of Sarayaku v. Ecuador, the Inter-American Court wrote that "the right to cultural identity is a fundamental right – and one of collective nature – of the indigenous communities, which should be respected in a multicultural pluralistic and democratic society." IA Court of HR. Case of the Kichwa Indigenous People of Sarayaku v. Ecuador. Merits and reparations. Judgment of June 27, 2012. Series C No. 245, para. 217.

[183] IA Court of HR. Case of the Kichwa Indigenous People of Sarayaku v. Ecuador. Merits and Reparations. Judgment of June 27, 2012. Series C No. 245, para. 181. IA Court of HR, Case of the Saramaka People v. Suriname. Preliminary Objections, Merits, Reparations and Costs. Judgment of November 28, 2007. Series C No. 172, pars. 133 to 137. IA Court of HR, Case of the Saramaka People v. Suriname. Interpretation of Judgment of Preliminary Objections, Merits, Reparations and Costs. Judgment of August 12, 2008, Series C No. 185, para. 17.

[184] Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situation in Guatemala," December 22, 2017, p. 28.

DHSFF0487

communities had participated with this team, according to the State. Additionally, the State informed that the Ministry of Energy and Mines entered into an institutional agreement with the Executive Branch's Planning and Programming Secretariat (SEGEPLAN) to strengthen territorial management and provide prior and timely information in the territories where energy and mining projects exist.[185]

112. In summary, the IACHR stresses that it is the obligation of the State of Guatemala to adhere to the standards of the Inter-American Commission and the Court in the area of justice for indigenous peoples in general, and prior consultation in particular. Participation of indigenous peoples and communities in the processes, in accordance with their practices, customs and methods of participation, is fundamental in order to ensure that they achieve full access to justice in Guatemala. In a country where more than half of the population identifies itself as indigenous, compliance with said standards must be a priority.

## 3.    Children and Adolescents

113. Regarding access to justice for children and adolescents, the Commission received information that this group is facing the challenges of a justice system with limitations of a structural nature, in addition to barriers associated with their condition. According to the information received during the visit, rates of impunity for cases of physical and sexual violence and exploitation of children and adolescents surpasses 95%.[186] Based on public information, in the first half of 2016 there were 76 deaths of children and adolescents per month reported in the country.[187]

114. In order to address this situation and provide adequate assistance to this group, as of 2016, the State has been setting up Prosecutorial Branch Offices at hospitals to assist victims of sexual violence, mistreatment and crimes against the personal integrity of children and adolescents. [188] This measure could be instrumental in confronting impunity for crimes against children and in contributing to reduce the incidence thereof. Likewise, the Office of the Counsel General of the Nation (PGN) is mandated by law to play a fundamental role in the defense and protection of children and

---

[185]    Ibid.

[186]    IACHR, on-site visit to Guatemala, July 31 to August 4, 2017, meetings with civil society organizations and international agencies.

[187]    See, e.g., http://www.albedrio.org/htm/otrosdocs/comunicados/GAM-SituacionViolenciaNinezAdolescencia 2016.pdf.

[188]    Information provided by the State, Ref. P-859-2017/VHGM/LWC/nj, June 16, 2017, pg. 11. IACHR, on-site visit to Guatemala, July 31 to August 4, 2017, meetings with civil society and other organizations.

DHSFF0488

adolescents, whose rights have been violated, a task that, based on the information received, it has a difficult time fulfilling because of inadequate resources and coverage.

115.   The State reported to the IACHR that a Public Comprehensive Protection Policy and National Action Plan for Children and Adolescents in Guatemala has been pushed forward by the Secretariat of Social Welfare of the Office of the President of the Republic and the Social Movement for the Rights of Children and Youth, which was established in 2004.189 Despite said policy, institutional weakness in the areas of the State in charge of specialized justice for children is an impediment to the investigation and prosecution and, in cases that go to trial, to reaching a conviction for crimes committed against children and adolescents, as reflected in the rates of impunity.190 During its visit, the IACHR repeatedly heard that institutional weakness is also linked to the policy in force taking a protection-based approach as opposed to being a national public policy providing for full implementation of the rights of children and adolescents.

116.   In the framework of specialized justice for children and adolescents, we note the creation of the Sectional Office of the Prosecutor for crimes against children and adolescents in an attempt to strengthen the specialized approach for the protection of this group.191 Previously, the Office of the Prosecutor for Crimes against Women handled these cases. This new office must implement a model of comprehensive assistance, which must include services such as medical and psychological care and social work assistance. In this regard, civil society organizations specialized in the subject matter expressed their concern to the Commission over the lack of adequate resources for this Prosecutor's Office to function effectively.192 The IACHR deems it necessary for these institutions to have sufficient resources to be able to fulfill their mandate and improve the specialized system of justice for children.

117.   Additionally, the State noted that the Judiciary created the Trial Court for Children and Adolescents of the Metropolitan Area, which is tasked with

---

189   The State noted that this policy "unifies the priorities and approaches of the State in order to realize the rights of children and adolescents, promote greater coordination, organization, coherence and comprehensiveness in the actions undertaken by government institutions, non-governmental organizations and international cooperation, in order to promote in the context of execution and monitoring of the Public Policy and Plan of Action—at the national and municipal level—sustainability of actions to fulfill the human rights of children and adolescents." Information provided by the State. Ref. P-859-2017/VHGM/LWC/nj, June 16, 2017, pg. 11, and Annex 5.

190   IACHR, Violence, Children and Organized Crime, OEA/Ser.L/V/II. Doc. 40/15, November 11, 2015, para. 398.

191   IACHR, on-site visit to Guatemala, July 31 to August 4, 2017, meetings with civil society organizations and international agencies.

192   *Id*.

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 1237 of 1770

assisting the children and adolescents in the cases it hears, in which children and adolescents are being prosecuted.193 In the framework of specialized justice for children, in October 2016, the Oversight Court for Execution of Measures for Adolescents in Conflict with the Criminal Law of Guatemala City issued a ruling ordering several actions relating to the conditions of detention at four facilities for the deprivation of children and adolescents: Centro Juvenil de Privación de Libertad para Mujeres (CEJUPLIM-Gorriones), Centro Juvenil de Detención Provisional (CEJUDEP-Gaviotas), Centro Juvenil de Detención Provisional para Varones (CEJUDEP-Anexo), and Centro Juvenil de Privación de Libertad para Varones (CEJUPLIV-Etapa II). These actions fall under the purview of the Secretariat of Social Welfare, the Ministry of Education, the Secretariat for the Administration of Forfeited Assets, and the National Institute of Forensic Sciences. This ruling was upheld under an order of the Court of Appeals for Children and Adolescents.194

118.  On June 12, 2017, the IACHR asked the State to adopt precautionary measures on behalf of children and adolescents, who are housed at these four detention facilities, MC 161-17.195 The Commission requested the Guatemalan State to adopt the necessary measures to protect the lives and personal integrity of the adolescents of the four facilities, to take the necessary actions to improve their conditions of detention in keeping with international standards; to strengthen security at the four detention facilities; to adopt the necessary measures to have emergency plans in place to respond to potential risk factors identified in the ruling, should they materialize; to agree on the measures to be adopted with the beneficiaries and their representatives; and to report on the steps taken to investigate the alleged incidents and avoid the repetition thereof.196 The visits made to the children's and adolescents' detention facilities are explained in greater detail below.

119.  During its visit, the IACHR learned of significant concrete steps forward as a result of said ruling, particularly the demolition of the "dungeon" [calabozo] dormitories at the facility known as "Etapa II" ['Stage I'], as well as the installation of toilets in the adolescents' dormitories at the "Gorriones" facility, visited by the Commission.197 In contrast, the IACHR

---

193   Information provided by the State, Ref. P-859-2017/VHGM/LWC/nj, June 16, 2017, pg. 11.

194   Information received from the Oversight Court for Execution of Measures for Adolescents in Conflict with Criminal Law, August 2, 2017 (in the IACHR archive).

195   IACHR, MC 161-17, Centros Juveniles de Privación de Libertad, Guatemala, ['Juvenile Deprivation of Liberty Facilities, Guatemala'], June 12, 2017.

196   Id. The Resolution identified the following risk factors: deficient infrastructure, overcrowding and inadequate security measures.

197   Information received from the Oversight Court for Execution of Measures for Adolescents in Conflict with Criminal Law, August 2, 2017 (in the IACHR archive).

DHSFF0490

also learned about obstacles and delays in compliance with other items ordered in the ruling of the Oversight Court for Execution of Measures for Adolescents in Conflict with the Criminal Law, for which the partial justification was given that the team at the Secretariat of Social Welfare had recently been installed in their positions.198 The Commission notes that on August 9, 2017, the Secretary of Social Welfare was dismissed after only five months in office. In this sense, the IACHR expresses its concern that this recent turnover in the leadership and team might lead to additional delay in compliance with all the measures ordered by the Court back in October 2016.

120. As is mentioned hereunder, many of the problems standing in the way of children and adolescents in Guatemala from having full access to justice, stem from the lack of a national public policy ensuring full implementation of the rights of this group, as well as inadequate coordination between the institutions of the State in charge of this area. The 2004 Public Comprehensive Protection Policy and National Plan of Action for Children and Adolescents, which is based on a protection-focused approach rather than on full implementation of rights, has proven inadequate and ineffective. The Commission encourages the State to adopt and implement a national public policy for full implementation of the rights of children and adolescents as soon as possible.

## 4.    Lesbian, Gay, Bisexual, Trans and Intersex Persons (LGBTI)

121. LGBTI persons face major roadblocks to gain access to justice. The IACHR received information indicating that obstacles persist in Guatemala in terms of respect for and guarantee of due process rights in cases linked to acts of discrimination and violence based on the sexual orientation or gender identity of the victims.[199] In fact, according to the information provided, 85% of LGBTI victims of violence and discrimination filed a report for the assaults, and only 26% received a response from the authorities. [200]    Likewise, the Office of the United Nations High

---

[198] This turnover on the team of the Secretariat stemmed from the dismissal and subsequent indictment of the former heads, after a fire broke out at the residential care facility the Hogar Virgen de la Asunción on March 8, 2017, in which 41 little girls and adolescents burned to death. See Section VII.B, *infra*.

[199] Redlactrans, Violaciones a los Derechos Humanos de Mujeres Trans en Costa Rica, El Salvador, Guatemala, Honduras y Panamá, ['Violations of the Human Rights of Trans Women in Costa Rica, El Salvador, Guatemala, Honduras and Panama'], January 2016, para. 141, p. 37; Human Rights Committee, Final observations of the Human Rights Committee: Guatemala, CCPR/C/GTM/CO/3, April 19, 2012, para. 11.

[200] Redlactrans, Violaciones a los Derechos Humanos de Mujeres Trans en Costa Rica, El Salvador, Guatemala, Honduras y Panamá, ['Violations of the Human Rights of Trans Women in Costa Rica, El Salvador, Guatemala, Honduras and Panama'], January 2016, para. 141, p. 37.

DHSFF0491

Commissioner expressed his concern over the "persistent discrimination and violence against persons based on their sexual orientation and gender identity" in Guatemala.[201] In its comments to the draft of this report, the State of Guatemala noted that the Public Prosecutors' System for Information and Investigation Control (SICOMP) registered a total of 11 reports between 2011 and 2015, without specifying the crimes involved, and of those 4 were dismissed. Similarly, it indicated that between 2016 and 2017 the system registered 355 reports—again, without specifying the crimes—46 of which were dismissed or rejected. It also stated that the Human Rights Ombudsman has a Diversity Unit.[202]

122.   The State also informed that in November 2016, the Ministry of Public Health and Social Welfare launched an "Integral and Differentiated Healthcare Strategy for Trans Persons in Guatemala 2016-2030." It also pointed out that COPREDEH currently has a final draft of the Public Policy on this subject, and that in November 2017 a team of experts was established to follow-up on LGBTI matters, which is comprised of government institutions and civil society organizations.[203]

123.   The Commission received worrisome information from civil society about introduction of legislative bill in the Congress of the Republic, Law No. 5272, the content of which is about the "protection of life and family."[204] This bill, if approved, would prohibit teaching about gender and sexual diversity in schools; would reaffirm the institution of marriage as the exclusive right of persons of opposite sexes; and would do away with the criminal offense of discrimination, when it is directed at LGBTI persons.[205] On this issue, it came to the attention of the IACHR that evangelical movements were the main supporters of said legislative bill.[206]

---

[201]   United Nations Human Rights Council, Informe anual del Alto Comisionado de las Naciones Unidas para los Derechos Humanos sobre las actividades de su oficina en Guatemala A/HRC/34/4/Add.1, ['Annual Report of the United Nations High Commissioner for Human Rights on the activities of his Office in Guatemala'], January 11, 2017, para. 61, p. 18.

[202]   Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situation in Guatemala," December 22, 2017.

[203]   Ibid.

[204]   Congress of the Republic of Guatemala, Iniciativa que dispone aprobar Ley para la Protección de la Vida y la Familia, ['Legislative bill to approve the Law for the Protection of Life and Family'], July 24, 2017.

[205]   Otrans Reinas de la Noche, Pronunciamiento público, ['Public Statement'], April 28, 2017. Also see: Coalición de Organizaciones LGBTTTI de Incidencia en las Américas,  Red Latinoamericana y del Caribe de personas trans  (Redlactrans), Convención Interamericana de Derechos Sexuales y Derechos Reproductivos. ['Coalition of LGBTTTI Advocacy Organizations of the Americas, Latin American and Caribbean Network of Trans Persons (Redlactrans), Inter-American Convention on Sexual and Reproductive Rights'].

[206]   Congress of the Republic of Guatemala, Diputados reciben proyecto de ley de coordinadora evangélica nacional, ['Deputies receive legislative bill from the national evangelical coordinator'], February 17, 2017.

124. In view of these proposals, the Commission recalls that both the IACHR and the Inter-American Court have established that in accordance with Article 2 of the American Convention, the right to equal protection under the law and the principle of non-discrimination, mean that States are obligated to: (i) refrain from introducing into legal frameworks regulations that are discriminatory or that have discriminatory effects on certain groups of the population; (ii) eliminate discriminatory regulations; (iii) combat discriminatory practices; and (iv) establish norms and adopt the necessary measures to recognize and guarantee effective equality of all people under the law.[207] The IACHR calls upon the State of Guatemala to comply with these principles in considering the legislative proposals under review.

## 5.    People of African Descent

125. As for people of African descent, the Commission recognizes the efforts of the State in conducting activities in the context of the International Decade for People of African Descent.  However, despite the State's commitment to promote international and policy instruments in support of the rights of Afro-Guatemalans, challenges persist, particularly with regard to information collection and structural racism.

126. While the Commission recognizes the adoption of an ethnic approach to the 2017 national census, civil society organizations reported to the IACHR that the census scheduled to be carried out in 2017 takes into account the categories "Maya" and "Garifuna," but does not have a category encompassing Afro-Guatemalans that do not identify themselves as one of these two categories. Consequently, other Afro-Guatemalan groups, such as *criollos* or "*Afro-Mestizos*" would remain outside of the classification system.[208]

127. Based on information available to the Commission, the lack of visibility of Afro-Guatemalans, as a result of the scarce or non-existent information gathered by the State on persons self-identifying as such,[209] has led to Afro-Guatemalan people who are not Garifuna, not gaining full access to social programs and benefits targeted expressly to minority groups.[210] Civil

---

[207] IACHR, Violencia contra Personas Lesbianas, Gay, Bisexuales, Trans e Intersex en América, ['Violence against Lesbian, Gay, Bisexual, Trans and Intersex Persons in the Americas'], OEA/Ser.L/V/II. Rev.2.Doc. 36, approved on November 12, 2015, para. 423. IACHR, The Situation of People of African Descent in the Americas, 2011, para. 194.

[208] IACHR, on-site visit, July 31 to August 4, 2017. Meetings with civil society organizations.

[209] FADEP, Familia Desarrollo Población. Guatemala: INE anuncia censo de población para el 2017, ['Guatemala: INE Announces 2017 population census'], June 7, 2017.

[210] IACHR, on-site visit, July 31 to August 4, 2017. Meetings with civil society organizations.

DHSFF0493

society organizations that were present at the meetings with the IACHR in the context of the on-site visit, stated that Afro-Guatemalan persons, who are not Garifunas, have not had access to special policies related to education. In this regard, the Commission reiterates the recommendation of the UN CERD that a lack of complete, reliable and up-to-date statistical data on the demographic make-up of the country poses an obstacle to the development of inclusive public policies on topics of gender and racial discrimination, as well as a differentiated focus of the population in a particular situation of vulnerability.[211]

128. Lastly, the Commission underscores that the social and economic determinism, which shapes the racial profile of certain groups, reflects the persisting wide gap in the enjoyment of economic, social and cultural rights between Afro-Guatemalans in particular and other population groups.[212] This shows that the degree of structural and institutional discrimination creates *de facto* barriers for people of African descent to fully enjoy and exercise their human rights.

## D.   *Transitional justice and reparations to victims of the internal armed conflict*

129. The lack of access to justice in Guatemala is closely linked to the lack of reparation for human rights violations committed during the internal armed conflict. The Commission has previously noted the importance for Guatemala to deal with that historic debt to the victims of said violations and their next of kin, as enshrined in the Peace Accords.[213]

130. During the on-site visit, the Commission took note of recent progress it observed in cases linked to gross violations dating back to the internal armed conflict, such as the cases of CREOMPAZ, Molina Theissen, and Sepur Zarco,[214] among other ones. During the visit to the facilities of the Regional

---

[211]  CERD. Final observations on the 13th and 14th periodic reports of Guatemala. CERD/C/GTM/CO/14-15, June 12, 2015, p. 2.

[212]  Declaration of the First Congress of Afro-Guatemalan Women, July 22, 2017.

[213]  IACHR, Situation of Human Rights in Guatemala: Diversity, Inequality and Exclusion, OEA/Ser.L/V/II.Doc. 43/15, December 30, 2015, para. 422.

[214]  UN WOMEN, *Resolución histórica en Guatemala, una victoria contra la violencia sexual en los conflictos armados*, ['Historic resolution in Guatemala, a victory against sexual violence in armed conflicts'], March 3, 2016. It can be viewed at http://www.unwomen.org/es/news/stories/2016/3/guatemala-victory-against-sexual-violence-in-armed-conflict; UNDP, *Mujeres Maya Q'eqchí de Sepur Zarco marcan hito histórico contra la esclavitud sexual como acto de guerra*, ['Q'eqchí Mayan Women from Sepur Zarco set historical milestone against sexual slavery as act of war'], 2016. It can be viewed at http://www.gt.undp.org/content/guatemala/es/home/ourwork/crisispreventionandrecovery/successstories/Sepur_Zarco.html

DHSFF0494

Training Command for United Nations Peacekeeping Operations (CREOMPAZ), the IACHR was apprised that as of the present date, eight detained former military members were tried for acts committed from 1981 to 1984 at the former military base in the city of Coban, where bone remains have been located, from which 128 persons, who were victims of forced disappearance, have been successfully identified. [215] Notwithstanding this progress, some organizations raised the alert that there have been no forward steps in 2017, and that some alleged victims—and therefore, violations—have been excluded from the process of instituting trial proceedings.

131.    As for the case of the boy Marco Antonio Molina Theissen, allegedly disappeared by members of the Guatemalan Army in 1981,[216] the IACHR was informed that at a hearing held on July 25, 2017, Judge Víctor Hugo Herrera Ríos, of High Risk Case Court C, admitted evidence introduced by both parties, including testimony of witnesses, official documents and experts' reports, as well as the 2004 judgment of the Inter-American Court of Human Rights in the case of *Molina Theissen v. Guatemala*.[217] Following this hearing, the judge decided to certify the case to the oral trial stage, the starting date of which was left to the chief judge of High Risk Case Court C.[218]

132.    Much to its satisfaction, the Commission acknowledges the ruling of the Chamber of Appeals for High Risk cases upholding the landmark judgment of the Sepur Zarco case, relating to domestic and sexual violence committed by members of the armed services against Maya q'eqchi' women as an instrument of war and repression during the internal armed conflict.[219] In

---

[215]    International Justice Monitor, *CREOMPAZ Hearings Conclude; Tribunal to Determine if Case Goes to trial*, June 7, 2016. It can be viewed at https://www.ijmonitor.org/2016/06/creompaz-hearings-conclude-tribunal-to-determine-if-case-goes-to-trial/; NISGUA, *CREOMPAZ: Eleven retired military officers indicted on charges of crimes against humanity*, January 19, 2016. It can be viewed at http://nisgua.org/creompaz-eleven-retired-military-officers-indicted-on-charges-of-crimes-against-humanity/.

[216]    IACHR, Press Release 001, *CIDH saluda detención de imputados por delitos de desaparición forzada y lesa humanidad en Guatemala* ['IACHR Welcomes Arrest of Individuals Accused of Forced Disappearance and Crimes against Humanity in Guatemala'], January 13, 2016. It can be viewed at: http://www.oas.org/es/cidh/prensa/comunicados/2016/001.asp.

[217]    IA Court of HR, *Case of Molina Theissen v. Guatemala, Merits,* Judgment of May 4, 2004. Series C No. 106.

[218]    Centro de Medios Independientes, *El Caso Molina Theissen está listo para ir a juicio* ['Case of Molina Theissen is ready to go to trial'], August 6, 2017. It can be viewed at: https://cmiguate.org/el-caso-molina-theissen-esta-listo-para-ir-a-juicio/. International Justice Monitor, *Judge Sends Five High-Ranking Military Officers to Trial in Molina Theissen Case*, March 6, 2017. It can be found at: https://www.ijmonitor.org/2017/03/judge-sends-five-high-ranking-military-officers-to-trial-in-molina-theissen-case/.

[219]    Office of the Public Prosecutor, "Caso Sepur Zarco: sala de apelaciones confirma sentencia condenatoria obtenida por la Fiscalía de Derechos Humanos" ['Case of Sepur Zarco: appeals chamber upholds conviction obtained by the Prosecutor for Human Rights'], July 19, 2017. It can be viewed at:

DHSFF0495

1982, after the disappearance and destruction of homes and crops in the communities of the Valley of Polochic, a military outpost was installed in Sepur Zarco under the same name. As it appears in the case proceedings file, for at least six months, girls and women of the area were subjected to sexual violence and to sexual and domestic slavery.

133.  As a result of these crimes and a landmark conviction, on February 26, 2016, High Risk Case Court A convicted Coronel Steelmer Francisco Reyes Girón and former military commissioner Heriberto Valdéz Asij for crimes against the duties of humanity, sexual violence, humiliating and degrading treatment against the women, murder and forced disappearance and sentenced them to a prison term of 120 and 240 years respectively.[220] The Commission recognizes that the judgment of the Sepur Zarco case is emblematic because it was a final conviction under a charge of a criminal offense against the duties of humanity for sexual violence, and the first time in Guatemala that sexual slavery has been established as a war crime, and that the magnitude of use and control over the bodies of women during the conflict has been recognized. The IACHR calls on the State of Guatemala to take the necessary measures to enforce the judgment, especially as to implementation of the measures of reparation aimed at the dignifying and transforming the lives of the women victims.[221]

134.  The IACHR recognizes the efforts of the prosecutors and judges and other justice operators in achieving progress in this and other cases related to the internal armed conflict. Despite the positive side to this, most of the gross human rights violations committed during the internal armed conflict remain in impunity, and operators of justice who hear these matters are the targets of ongoing threats, intimidation and even criminal complaints brought against them.[222] The IACHR stresses that the State has the obligation to ensure conditions of independence and security so that justice operators are able to fulfill their duties in the struggle against impunity with respect to the human rights violations committed during the internal

---

https://www.mp.gob.gt/noticias/2017/07/19/caso-sepur-zarco-sala-de-apelaciones-confirma-sentencia-condenatoria-obtenida-por-la-fiscalia-de-derechos-humanos/.

[220]  UNAMG, Sepur Zarco, el camino de las mujeres hacia la justicia, ['Sepur Zarco, the women's path to justice'], 2016.

[221]  Mujeres Transformando el Mundo, Estudio de la Sentencia del Caso Sepur Zarco, ['Study of the Judgment of the Sepur Zarco case'] July 2017. Document submitted during the on-site visit of the IACHR, from July 31 to August 4, 2017, at a meeting with women from the indigenous communities of Alta Verapaz, visit to Cobán conducted on August 1, 2017.

[222]  Human Rights Ombudsman of Guatemala, Informe Anual Circunstanciado 2016, ['2016 Annual Status Report'], January 31, 2017, p.72; CEJIL, "Observaciones al Informe sobre la situación de derechos humanos en Guatemala" ['Observations to the Report on the Situation of Human Rights in Guatemala'], October 14, 2016; IACHR, Annual Report 2016, Capítulo V: Seguimiento de recomendaciones formuladas por la CIDH en sus informes de país o temáticos, ['Chapter V: Follow-up of recommendations made by the IACHR in its country or thematic reports'] para. 121.

DHSFF0496

armed conflict.  Civil society organizations also reported on increased assaults and harassment against human rights defenders who follow these cases.[223]  Furthermore, the IACHR received information about the risk that some of the cases currently under investigation will not be brought to trial, because of the recurring procedural stalling tactics mentioned earlier in the previous section of the instant report.[224]

135.  The Commission has also been closely monitoring the genocide case against José Mauricio Rodríguez Sánchez, the former chief of military intelligence and Efraín Ríos Montt, former head of State. In 2015, a civilian court found Mr. Ríos Montt incompetent to stand trial, and by decision of the Constitutional Court, the case was sent back to the early stages.[225] Additionally, it was reported to the IACHR that in May 2017, a complaint was brought for malfeasance in office against three justices of the Constitutional Court for unlawfully reinstating the case. The IACHR notes with concern the lack of progress in the Ixil genocide case, as well as in the case of the massacre of Las Dos Erres. The IACHR reminds the State of Guatemala of its obligation to investigate promptly, impartially and effectively all serious human rights violations committed in the past. It is the responsibility of the State to adopt the respective administrative or criminal measures in response to actions or omissions of State officials, who may contribute to the denial of justice and to impunity and hamper proceedings aimed at identifying and punishing those responsible.

136.  Furthermore, as for matters involving members of the armed forces, information was received from civil society organizations about difficulties in gaining access to information in the possession of the Ministry of Defense. The Commission received information as well regarding the failure of the Police to effectively execute the arrest warrants ordered by judges for several years, which subjects the victims to a situation of permanent vulnerability fearing they will be the targets of further attacks

---

[223]  By way of example, civil society organizations made reference to the arrest in January 2016 of 18 former members of the military forces, who in 1978 and 1989 were allegedly involved in committing gross human rights violations, including forced disappearances, extrajudicial executions, torture, violence and sexual violence. The persons standing accused include Edgar Ovalle, retired coronel and deputy until May 2017, and one of the founders of the political party in power FCN-Nación. Ovalle is currently a fugitive from justice and Interpol issued a Red Alert for his arrest, charged with forced disappearance and crimes against humanity relating to the bone remains discovered at CREOMPAZ. Interpol, Red Alert for Edgar Justino Ovalle Maldonado, June 18, 2017. It can be viewed at: https://www.interpol.int/es/notice/search/wanted/2017-16771.

[224]  See, by way of example, CEJIL, "Observaciones al Informe sobre la situación de derechos humanos en Guatemala" ['Observations to the Report on the Situation of Human Rights in Guatemala'], October 14, 2016, p. 7.

[225]  El Diario, "Ríos Montt declarado incapaz para afrontar un juicio por genocidio en Guatemala" ['Rios Montt found incompetent to stand trial for genocide in Guatemala'], November 16, 2016. It can be found at: http://www.eldiario.es/politica/Rios-Montt-declarado-genocidio-Guatemala_0_580943079.html.

DHSFF0497

by the perpetrators. Since 2009, the IACHR documented around 30 arrest warrants against persons charged with committing serious crimes during the internal armed conflict, none of which have been executed. The IACHR was informed that in one particular case, a defendant who received a monthly pension from the State, could not be successfully located to execute an arrest warrant against him.[226] In 2017, the Commission again received information that arrest warrants had still not been executed for the following individuals: Luis Enrique Mendoza García, charged in a case of genocide; 8 former commanders and intelligence officers of military zone 21; and 8 persons charged in the case of the massacre of Las Dos Erres, with arrest warrants issued back in 2000.[227]

137. During the on-site visit, the IACHR conducted an in-person visit to the facilities of the Archives of the National Civilian Police. The IACHR recognizes how important the Archives is for the reactivation and elucidation of some of the criminal cases for gross human rights violations connected to the internal armed conflict and that this repository of records greatly aids in the recovery of the historical memory. According to information it received, the Archive is solely dependent on international cooperation. The IACHR urges the State to allocate resources to the Archive and support this measure for memory, truth and justice.

### National Reparation Program

138. Regarding reparations for violations committed during the internal armed conflict, the IACHR was apprised once again about meager and delayed compliance with limited coverage by the Guatemalan State. The IACHR has held several public hearings on the National Reparation Program (PNR), created in 2003.[228] As the State acknowledged in the past before the IACHR, the total budget allocation of the PNR as set forth in the agreement creating it, emanating from the Peace Accords, has *never* actually been fulfilled. According to the information received, civil society organizations find that the PNR continues to be culturally inadequate and does not pay enough attention to the special situation of indigenous women, children and

---

[226]    IACHR, CIDH concluye visita de trabajo a Guatemala, 12 de junio de 2009. ['IACHR concludes working visit to Guatemala, June 12, 2009'].

[227]    Bufete Jurídico de Derechos Humanos, CALDH, Grupo de Apoyo Mutuo GAM, and FAMDEGUA, Report on the Situation of Memory, Truth and Justice, July 2017. In the archives of the Commission.

[228]    IACHR, 159th Session, Public Hearing "Right to full reparation for victims of the armed conflict in Guatemala," Panamá, December 6, 2016. IACHR, 156th Session, Public Hearing, "Human rights and transitional justice in Guatemala," October 22, 2015. IACHR, 153rd Session, Public Hearing "Access to justice and legacy of the internal armed conflict in Guatemala," October 28, 2014. IACHR, 150th Session, Public Hearing "National Reparation Program in Guatemala," March 25, 2014. IACHR, 144th Session, Public Hearing, "Situation of women victims of human rights violations during the internal armed conflict in Guatemala," March 27, 2012. IACHR, 138th Session, Public Hearing "Public policy on reparations in Guatemala," March 19, 2010.

DHSFF0498

adolescents. Consequently, this places the burden of trying to secure adequate reparation on the organizations supporting the victims.[229] Moreover, frequent staff turnover hampers continuity and delays cases. It was also reported to the IACHR that the victims continue to endeavor to push forward legislative bill 3551, drafted in 2006, which would give solidity and legal certainty to the PNR, but it has not been approved.[230]

139.  The most recent figures provided by the State indicate that as of 2015, there were 75,674 victims registered in the PNR, of which 38,263 have been economically compensated and around 20,000, compensated in material reparation projects, such as housing.[231]  The State acknowledged that reparation of the victims of the conflict is a pending matter in Guatemala and noted that in addition to the measures that it has begun to adopt in order to revive the Reparations Program in Guatemala, it shares the concern of the victims over prompt approval of draft Law 3551 and over the National Victims Register.[232]  In view of this situation, the budget cuts for the PNR in 2016 is of particular concern, as this effectively reduced the capacity for reparation measure execution. According to information the Commission received from civil society, citing as its source the narrative section of the PNR management report, as of the month of June 2017, in the first quarter of 2017, zero money was executed for direct reparation to the victims; and as of June 30, 2017, the reparations delivered totaled 740,000 quetzals in financial reparation (38 cases covered); and 868,000 quetzals in material restitution for the construction of 14 houses.[233] The IACHR urges the State to endow the PNR with sufficient resources to be able, for the first time since it was created, to have the budget allocation established in the accord creating it and, thus, provide the victims and their family members with the services for which the Register was created. In its comments to the draft of this report, the State indicated that in order to fully comply with the terms of the Peace Accords, it established the Political Agenda for Peace 2017-2026, which identifies institutional commitments. It also indicated that since 2017, the

---

[229] CEJIL, "Observaciones al Informe sobre la situación de derechos humanos en Guatemala" ['Observations to the Report on the Situation of Human Rights in Guatemala'], October 14, 2016.

[230] IACHR, Public Hearing "Right to full reparation for victims of the armed conflict in Guatemala," Panama, December 6, 2016; information submitted by civil society organizations to request a thematic hearing on "Reparation in Guatemala," October 10, 2016.

[231] Republic of Guatemala, Report of the State of Guatemala on draft Chapter V on follow-up to the recommendations of the IV Country Report of the IACHR: Diversity, Inequality and Exclusion (2015). Nota P-943a-2016/VHGM/MJOS/HM/af-wr, received on October 10, 2016, pg. 81. Information provided by the State, Ref. P-859-2017/VHGM/LWC/nj, June 16, 2017, Annex 21.

[232] IACHR, Public Hearing "Right to full reparation for the victims of the armed conflict in Guatemala," Panama, December 6, 2016.

[233] Status report on the situation of the Public Reparations Policy in Guatemala, submitted by 22 communities of Nebaj and Cotzal, Quiché, July 31, 2017. In the archives of the IACHR.

DHSFF0499

Commission on Sacred Sites has been incorporated into the Secretariat of Peace, in order to comply with the commitments related to the identity and rights of indigenous peoples.[234] The State also pointd out that the budged approved for CODISRA went from 5,985,751 quetzales in 2012 to 10,500,000 quetzales in 2017. Also, the State refered that this budget was approved as part of the Stategic Institutional Plan of 2017-2021. The objective of this Plan is to articulate public policies and national legislation in order to consolidate and strengthen the institutional development aimed at effectively complying with said policies.[235]

140.   As for the particular challenges faced by indigenous women,[236] even though Guatemalan courts have acknowledged that during said conflict, rape was a widespread, massive and systematic practice carried out by agents of the State as part of a counterinsurgent policy, the PNR lacks of a specific policy in place to provide adequate reparation to these victims.[237] In fact, the information available indicates that despite the breadth of rape cases, the PNR has no specific policy in place to meet the demands and specific petitions for the cases endured by the women during the internal armed conflict.[238] During the visit, the Commission received reports pertaining to the absence of clear procedures and requirements for women victims to have access to reparation. Moreover, the burden of proof rests on the victims, who encounter serious difficulties to document and prove their cases. Consequently, many of them remain outside the reparation mechanisms. [239] Additionally, several organizations reported to the Commission that, in response to women's demand for reparation in cases of rape, the PNR has stop taking cases because of the lack of budget.

---

[234]   Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situtation in Guatemala," December 22, 2017.

[235]   Ibid.

[236]   National Widows Coordinator of Guatemala (CONAVIGUA), Asociación Campesina de Desarrollo Nebajense (ASOCDENEB), Coordinadora de Víctimas de Alta Verapaz (CODEVI), Centro de Análisis Forense de Ciencias Aplicadas (CAFCA), Thematic hearing "Situation of women victims of human rights violations during the internal armed conflict in Guatemala," held during the 144th Session of the iACHR in Washington D.C., on March 27, 2012. CEJIL, Observations to the Report on the Situation of Human Rights in Guatemala, October 14, 2016.

[237]   Rape was used as an instrument of war and as a tool to generate terror and subdue the population. CICIG, Tribunal de Conciencia contra la Violencia Sexual hacia las Mujeres, ['Court of Conscience against sexual violence toward women'], Press release, March 5, 2010. The Commission for Historical Clarification (CEH) determined that sexual violence against women was a prevalent practice during the three decades of conflict and cautioned that sexual violence statistics have been underestimated: of the 42,275 human rights violations reported, only 2.38% are for sexual violence. Of the 1,465 cases reported, the CEH was only able to document 285 cases. UN WOMEN, Guatemala Country Background, 2017.

[238]   Network of Social and Victims' Organizations, Informe Auditoría social a la política de reparación del Estado de Guatemala, ['Social audit report on the reparation policy of the State of Guatemala'], January 2015, p. 35.

[239]   Information received during the IACHR's on-site visit, from July 31 to August 4, 2017. Information provided by the organization Estrella Polar of Guatemala at the public meeting held on July 31, 2017 in Guatemala City.

DHSFF0500

Countless testimonies of victims taken during the Commission's visit attest to the importance of taking into consideration the differential impact of the armed conflict on women, of including specific measures to consider displaced women, widowed women and orphans, and of establishing clear mechanisms to do justice and provide reparation in cases of rape.[240]

141. The State provided information on the PNR's 2015 Annual Report (*Memoria de Labores*), which describes five central components of reparation: (1) dignifying victims through actions of support for exhumations and measures of truth and memory; (2) cultural reparation; (3) psychosocial reparation and rehabilitation; and (4) material restitution of homes, lands, legal certainty of land in productive investment; and (5) economic reparation.[241] Additionally, the State acknowledged that one of the major challenges facing the PNR is "to complete the work teams at all regional offices with capable and suitable staff, especially in sensitive areas, such as, legal advisors, psychologists, community outreach intermediaries and technical production advisors."[242] The information received also indicates that some of the PNR Regional Offices were closed in 2016 and stopped assisting victims.[243]

142. Lastly, during its visit, the Commission gathered testimony on the many difficulties faced by the victims of the armed conflict to conduct an effective search for the disappeared. The IACHR recalls that since 2007, civil society has been pushing in the Congress of the Republic for approval of Law 35-90 to create the National Commission to Search for Victims of Forced Disappearance and other Forms of Disappearance, to endeavor to locate the whereabouts of more than 45,000 victims of forced disappearance and other forms of disappearance during the internal armed conflict.[244] The bill continues to languish ten years later. On this score, the State has the obligation to conduct serious, impartial, prompt and effective investigations of cases of alleged disappearances.[245] The Commission cautions the Guatemalan State about the need and urgency to conduct serious investigations and proceed to the search for disappeared persons

---

[240] *Id.*

[241] Information provided by the State, Ref. P-859-2017/VHGM/LWC/nj, June 16, 2017, Annex 21, pp. 9-16.

[242] *Id.*, Annex 21, p. 24.

[243] Status report on the situation of the Public Reparations Policy in Guatemala, submitted by 22 communities of Nebaj and Cotzal, Quiché, July 31, 2017. In archive of the IACHR.

[244] IACHR, *Situation of Human Rights in Guatemala: Diversity, Inequality and Exclusion,* OEA/Ser.L/V/II.Doc. 43/15, December 30, 2015, para. 127.

[245] I/A Court of HR, *Case of Bámaca Velásquez v. Guatemala.* Judgment of November 25, 2000, Merits. Series C No. 70, para. 212. IA Court of HR, *Case of Bámaca Velásquez v. Guatemala.* Resolution of January 27, 2009, pars. 28-30.

DHSFF0501

as a priority, in keeping with Inter-American standards on the subject matter.

143.  The IACHR has issued reiterated appeals to the Guatemalan State to make the PNR fully operational, endowing it with sufficient material and human resources to fulfill its mandate. In this occasion, the Commission expresses its concern over the failure to respond to these appeals.[246] The Commission will continue to monitor implementation of the PNR in every way and every form of reparation. The IACHR urges the State to meet its obligations in accordance with both the Peace Accords and domestic and international law, as well as to launch the National Commission to Search for Disappeared Persons.

---

[246] IACHR, Situation of Human Rights in Guatemala: Diversity, Inequality and Exclusion, OEA/Ser.L/V/II.Doc. 43/15, December 30, 2015, paras. 445-451.

DHSFF0503

CHAPTER 3

# SITUATION OF HUMAN RIGHTS DEFENDERS AND JUSTICE OPERATORS

DHSFF0504

DHSFF0505

# SITUATION OF HUMAN RIGHTS DEFENDERS AND JUSTICE OPERATORS

## A.   Human Rights Defenders

144.   The situation of human rights defenders in Guatemala has been a source of constant concern to the IACHR because of the acts of violence and attacks to which they are constantly exposed, which range from murders, to repeated threats, harassment, criminalization and bullying. In its 2015 Country Report, the IACHR voiced this concern, in particular, with respect to persons who defend the rights of indigenous peoples, to land ownership and a healthy environment, the rights of victims of the internal armed conflict and of workers. The IACHR also underscored the excessive and unjustified use of criminal law against human rights defenders, on allegedly unfounded charges, arbitrary arrests and the protracted use of pre-trial detention, in particular, with respect to indigenous leaders and authorities. Another important cause for concern in the country is the stigmatization and slander of human rights defenders, which undermines their reputation in society and takes legitimacy away from the social struggle.

145.   During its on-site visit, the Commission ascertained the situation described above. Attacks and murders have been on the rise in the country since 2016. The Unit for the Protection of Human Rights Defenders in Guatemala (UDEFEGUA) reported from January to June 2017 a total of 236 attacks on human rights defenders, which include processes of criminalization, acts of slander and defamation of character, arbitrary detention and filing of complaints with the courts. This figure is 89.73% of all attacks reported over all of 2016, which totaled 253.[247]

146.   In the first half of 2017 alone, UDEFEGUA reported that the number of assaults on persons who defend human rights linked to the defense of the environment, nature, natural resources and water, rose to 72, as compared

---

[247]   UDEFEGUA, Informe sobre Situación de Defensoras y Defensores de Derechos Humanos en Guatemala. Un Reflejo del Deterioro de los Derechos Humanos en el País. Enero a Junio de 2017, ['Report on the Situation of Human Rights Defenders in Guatemala. A Reflection on the Deterioration of Human Rights in the Country January to June 2017'], August 2017, p. 6.

to the total of 37 assaults targeting this group in all of 2016.[248] On June 30, 2017, a group of United Nations Rapporteurs, in conjunction with the IACHR, condemned the attacks and murders of environmental rights defenders in Guatemala and announced that they are the most at-risk defenders in the world, because of their efforts to defend territory and the environment from large scale projects, which threaten their right to a healthy environment.[249]

147. The Department of Guatemala posts the highest number of acts of violence in general, with 111 attacks reported from January to June 2017. Elsewhere, in the western high plains region (*Altiplano Occidental*), a total of 48 attacks on human rights defenders were reported. Likewise, in the northeast region (encompassing Alta and Baja Verapaz, Petén, Chiquimula, Jutiapa, Jalapa, Santa Rosa, Izabal, El Progreso and Zacapa), 74 attacks were reported. Within this region, Alta and Baja Verapaz, Izabal and Chiquimula would be the Departments with the highest levels of worsening violence against human rights defenders, particularly in terms of criminalization of human rights defense and murders.[250]

148. The IACHR received troubling reports about the northern extractive region, which encompasses the Departments of Alta Verapaz and Petén, the region with the heaviest concentration of extractive industry and projects, which include monoculture and bio-fuels, mining, a privatized model of protected areas, large scale hydroelectric dams, construction and extension of the Franja Transversal Norte highway, among other ones. Civil society organizations argued that these extractive industries and projects have entailed environmental destruction, unlawful dispossession of common property and of land owned by *campesinos*, communities and families. There are around 30 hydroelectric projects underway in the region, which have not fulfilled the requirement of a prior, free and informed consultation with the communities, according to the information received by the Commission.[251]

---

[248]    *Id.*, p. 8.

[249]    IACHR, Press Release No. 088/17, Expertos condenan ataques y asesinatos de defensoras y defensores del medioambiente en Guatemala, ['Experts condemn attacks and murders of defenders of the environment in Guatemala'], June 30, 2017.

[250]    UDEFEGUA, Informe sobre Situación de Defensoras y Defensores de Derechos Humanos en Guatemala. Un Reflejo del Deterioro de los Derechos Humanos en el País. Enero a Junio de 2017, ['Report on the Situation of Human Rights Defenders in Guatemala. A Reflection on the Deterioration of Human Rights in the Country January to June 2017'], August 2017, pp. 9-10.

[251]    Meeting with criminalized defenders in the Municipality of San Pablo, San Marcos, in the context of the on-site visit, in the City of Guatemala, on August 1, 2017; Civil Society, Situation of Human Rights in the Northern Region of Guatemala, August 1, 2017, p. 1.

DHSFF0507

149. On another note, according to the PDH, from 2016 to 2017, it continued to witness the discourse and action of smearing and discrediting the work of defenders, as well as some justice operators, especially district attorneys, improperly using criminal law to persecute and take human rights defenders into custody.[252] The IACHR notes with concern that the State has still not established a Public Policy for the Protection of Human Rights Defenders, in compliance with the judgment of the Inter-American Court of Human Rights in the case of *Human Rights Defender et al v. Guatemala* directing it to do so, as is explained hereunder.[253]

150. Greater detail is provided below of the types of acts of aggression faced by human rights defenders in Guatemala.

## 1.    Intimidation, Threats, Attacks and Murders

151. The IACHR is alarmed at the rise in murders of human rights defenders. According to information reported by UDEFEGUA, in 2016, a total of 14 murders were committed (4 women and 10 men), which represents an increase over the 12 murders recorded in 2015 and 7 in 2014.[254] For the

---

[252]  Human Rights Ombudsman, Contribution of the Human Rights Ombudsman Third Cycle for Guatemala Universal Periodic Review, March 2017, p. 3.

[253]  Ibid., pg. 3. See IA Court of HR. Caso Defensor de Derechos Humanos y otros Vs. Guatemala. Excepciones Preliminares, Fondo, Reparaciones y Costas. ['Case of Human Rights Defender et al v. Guatemala. Preliminary Objections, Merits, Reparations and Costs'], Judgment of August 28, 2014. Series C No. 283.

[254]  By way of example, on December 2, 2016, the IACHR condemned the murder of human rights defender Evelyn Zulma, trans leader and activist of the organization OTRANS Reinas de la Noche, who was the beneficiary of precautionary measures granted by the IACHR on February 3, 2006. According to reports, the body was found with all her teeth knocked out and her hair pulled out. The National Forensic Science Institute of Guatemala (INACIF) reported to the family that Evelyn Zulma Alegría Robles's throat was cut and based on the toxicological tests, she presented residue of high toxicity that were consistent with the administration of poison. IACHR, Press Release No. 181/16, CIDH repudia asesinato de defensora de derechos humanos de personas trans en Guatemala, ['IACHR repudiates murder of trans rights defender in Guatemala'], December 2, 2016; UDEFEGUA, Informe sobre situación de Defensoras y Defensores de Derechos Humanos, ['Report on the situation of human rights defenders'], January 2017, pg. 9. Separately, the OUNHCHR condemned several cases of murder of human rights defenders perpetrated in 2016, citing that in the past two years, murders of human rights defenders have been on the rise. For example, on March 18, 2016, it condemned the murder of human rights defender Walter Manfredo Méndez, President of Cooperativa La Lucha del municipio Las Cruces, Petén, and member of Frente Petenero contra las Represas. United Nations, UNESCO and the OUNHCHR condemn murders of journalist and human rights defender, March 18, 2016. The High Commissioner also spoke out about the case of Daniel Choc, murdered in June 2016 in the context of the San Juan Tres Rios of Alta Verapaz indigenous community's land claim, supported by the organization Comité de Campesinos del Altiplano (CCDA). United Nations, Informe del Alto Comisionado de las Naciones Unidas para los Derechos Humanos sobre las actividades de su Oficina en Guatemala 2016, ['Report of the United Nations High Commissioner for Human Rights on the activities of his Office in Guatemala 2016'], A/HRC/34/3/Add.1, January 11, 2017, para. 36. Likewise, it condemned the murder on June 19 of Brenda Marleni Estrada Tambito, legal counsel of the Unión Sindical de Trabajadores de Guatemala (UNSITRAGUA HISTÓRICA), who was dedicated to the strengthening of the exercise of the right to collective bargaining and to worker organization. United Nations High Commissioner for Human

first half of 2017 alone, UDEFEFUA reported 7 murders of human rights defenders, the same figure for all of 2014.[255]

152. Additionally, intimidation and threats continue to make up a significant number of the acts of aggression against human rights defenders. In 2016, UDEFEGUA verified a total of 54 incidents of intimidation stemming from human rights defense, and when added to the 48 incidents of threats (written, in-person, over the phone) they would account for 38.73%[256] of the total acts of aggression. In the first half of 2017, the organization recorded 51 incidents of defamation of character, 39 threats and 27 acts of intimidation.[257] By way of example, the IACHR received information that from July 1 to July 2, 2017, defender Rafael Maldonado received death threats over the social networks. These incidents were reported to the Crimes against Human Rights Activists Unit of the Office of the Human Rights Violation Prosecutor's Office (FIDH) of the Public Prosecutor's Office.[258] The IACHR expects said unit to take the necessary measures with regard to these threats on the life of Mr. Maldonado and on the exercise of human rights defense.

153. In addition to the smear and stigmatization campaigns that are explained in detail in the next paragraphs, the PDH has noted that another form of recurring intimidation is to take photographs and videos of persons and/or

---

Rights, OACNUDH rechaza recientes asesinatos de defensoras y defensores de derechos humanos, ['OUNHCHR rejects recent murders of human rights defenders'], June 21, 2016.

[255] On June 5, 2017, in the context of World Environment Day, the IACHR noted its concern over the murder of Sebastián Alonso Juan, defender of indigenous rights and of native territory of Yulchen, on January 17, 2017, while he was taking part in a protest rally against a hydroelectric dam project in Ixquisis, in the Department of Huehuetenango. IACHR, Press Release No. 072/17, CIDH urge a proteger a defensoras y defensores de la tierra y el medio ambiente, ['IACHR Issues Call for OAS States to Protect Defenders of the Land and Environment'], June 5, 2017. During the on-site visit to the hamlet of Ixquisis, the IACHR met with the family members of Sebastián Alonso Juan, who claimed that after being shot, workers of the hydroelectric project proceeded to beat him on one side of his face and neck when he was in the throes of death. Civil society organizations further contended that because of the blockade that workers and persons attached to the hydroelectric company PDHSA were maintaining in the major points of access to the village of Ixquisis, it took several hours to transfer Mr. Alonso Juan to provide him with medical assistance when he was wounded, and given the seriousness of his injuries, he passed away before he could be treated.

[255] During the meeting with the family members, they reported to the IACHR delegation that persons connected to the hydroelectric company disturbed the resting place where the remains of Sebastián Alonso Juan were buried and that the case was reported to the Unit for Crimes Committed against Activists of the Office of the Prosecutor for Human Rights and registered under Case File No. MP 001-2017-5897. Meeting with community leaders in Ixquisis, Department of Huehuetenango, in the context of the on-site visit, on August 2, 2017; UDEFEGUA, Informe sobre situación de Defensoras y Defensores de Derechos Humanos, ['Report on the situation of human rights defenders'], January 2017, p. 6.

[256] UDEFEGUA, Informe sobre situación de Defensoras y Defensores de Derechos Humanos, ['Report on the situation of human rights defenders'], January 2017, p. 8.

[257] Id., p. 7, table 3.

[258] FIDH, Guatemala: Campaña de estigmatización, difamación y amenazas de muerte contra personal de CALAS, ['Guatemala: Campaign of stigmatization, slander and death threats against CALAS staff'], July 7, 2017.

DHSFF0509

defenders without their consent. The defenders have reported that in many instances, the persons doing the photographing or taking the videos are linked to the extractive companies or are retired members of the military forces.[259]

## 2.    Stigmatization and Smear Campaigns

154.    The IACHR noticed the constant use of the social networks and other information media to disseminate stigmatizing and delegitimizing messages against defenders. For example, civil society organizations asserted that human rights defenders are branded as "professional troublemakers," "outlaws," "professional thugs," "failed fratricidal riffraff," "former terrorist organization left-wing NGOs" or claims are made that "human rights defense has become the exclusive business in this Central American country of the former guerrilla member/terrorists."[260] According to the organizations, this is pervasive language aimed at stigmatizing community leaders and human rights defenders.[261]

155.    The IACHR was also apprised of racist content, especially targeting representatives and leadership of indigenous communities and peoples, as well as homophobic content targeting organizations and individuals who defend the rights of sexual diversity, and sexist content targeting women human rights defenders.[262] According to the PDH, this takes place when there is opposition to diversion of rivers, pollution or reports of a lack of water, failures in electric service or complaints are filed for lack of access to public information.[263] The OUNHCHR has also voiced its concern over messages via social media resorting to aggressive and violent language, which could even be construed as incitement to hatred. It noted that some of these messages pose threats to the lives and safety of human rights defenders, and even columnists.[264]

---

[259]    Human Rights Ombudsman of Guatemala, Informe Anual Circunstanciado 2016, ['2016 Annual Status Report'], p. 198.

[260]    Amnesty International, Defendemos la tierra con nuestra sangre: personas defensoras de la tierra, el territorio y el medio ambiente en Honduras y Guatemala, ['Let us defend the land with our blood: defenders of land, territory and the environment in Honduras and Guatemala'], September 2016, p. 45.

[261]    Ibid.

[262]    IACHR, Observaciones Preliminares de la Visita in loco de la CIDH a Guatemala, ['Preliminary observations from the IACHR's on-site visit to Guatemala'], August 4, 2017.

[263]    Human Rights Ombudsman of Guatemala, Informe Anual Circunstanciado 2016, ['2016 Annual Status Report'], p. 197.

[264]    United Nations High Commissioner for Human Rights, OACNUDH rechaza mensajes que incitan a la violencia, ['OUNHCHR rejects messages that incite violence'], July 1, 2016.

DHSFF0510

156. Likewise, civil society organizations reported to the IACHR that over the past years, hate speech has been escalating, citing organizations such as Movimiento Reconciliación y Justicia, Libertad para los Veteranos de Guerra, o la Fundación contra el Terrorismo, which tend to denigrate individuals and organizations that seek justice for the victims. As a result of the intense campaign of stigmatization and criminalization unleashed in the different communications media and social networks, human rights defense organizations have filed several complaints with the PDH.[265]

157. By way of example, in the investigations into the CREOMPAZ military base, which gave rise to several arrests of members of the military for crimes of forced disappearance and crimes against humanity, the IACHR learned that in the context of the hearings conducted from January to June, 2016, complainants, prosecutors, expert witnesses and victims' organizations linked to the cases were the targets of threats, intimidation and surveillance. The organizations contended that since January 2017, hate speech has been spewed through postings on the web pages of the Fundación contra el Terrorismo and of Familiares y Amigos de Militares e hijas de Militares, with photographs of human rights defenders intended to denigrate the individuals and organizations supporting the quest for justice for the victims.[266] According to available information, these acts arose mainly in relation to the cases connected to CREOMPAZ, though not exclusively.

158. According to information received by the IACHR, on July 5, 2017, a protest rally took place in the central park of San Rafael Las Flores, in the Department of Santa Rosa, with the alleged participation of suppliers and workers of the San Rafael – El Escobal mining company, where they displayed stigmatizing messages against the organization Center for Environmental and Social Legal Action of Guatemala, known as CALAS for its Spanish language acronym (Centro de Acción Legal Ambiental y Social de Guatemala), accusing the organization of "creating conflict" and of "destroying development." In that context, the demonstrators were carrying banners with a photo of Yuri Melini Salguero, the Director of CALAS, during a recent working trip to Brussels, Belgium, organized by the World Organisation against Torture (OMCT). At the demonstrations, he was accused of traveling at the expense of the conflict. According to civil

---

[265] Most the complaints filed are related to print and digital postings disseminated by the Fundación contra el Terrorismo and its president, where charges are leveled against several human rights defenders as financiers of terrorism groups and fosterers of social conflict in the country, among other allegedly criminal or unlawful conduct. Information received in the context of the visit; UDEFEGUA, Report on transitional justice and human rights defenders, July 31, 2017, p. 2.

[266] Information received in the context of the visit; Civil society, Situation of human rights in the northern region of Guatemala, August 1, 2017, p. 17.

DHSFF0511

society organizations, the smear and stigmatization campaign against CALAS reached a fever pitch and seemed to be even further escalating as a result of the decision of the Supreme Court of Justice of Guatemala, on July 6, 2017, to order the temporary suspension of the license for exploration and exploitation of the San Rafael mining projects. This decision settled a petition for constitutional relief via *amparo* filed by CALAS in May 2017 against the Ministry of Energy and Mines (MEM), on the grounds that the Xinca indigenous peoples, who inhabit the municipalities affected by the project, were not consulted, as required under ILO Convention 169 and Inter-American legal precedent, and that the MEM discriminated against them in repeatedly denying their existence in the area where the mining project operates.[267]

159. Stigmatization and smear campaigns are nothing new to Guatemala. The Commission has been consistently monitoring this phenomenon in the country. In 2013, the PDH issued a resolution to bring charges against the president of the Fundación contra el Terrorismo [Foundation against Terrorism] for content the organization disseminated in several materials attacking the dignity of human rights defenders.[268] In this regard, the PDH concluded that that campaign was a coordinated strategy to spread a discourse of hatred, intended to degrade, intimidate, promote prejudice or incite violence against individuals on the basis of sex, age group, ethnic group, nationality, religion, sexual orientation, gender identity, opinion and political and ideological position, socioeconomic status, occupation, appearance or image.[269]

160. Furthermore, the IACHR notes with concern complaints regarding the involvement of private companies in processes and campaigns to stigmatize and delegitimize human rights defenders. On this score, civil

---

[267]  FIDH, Guatemala: Campaña de estigmatización, difamación y amenazas de muerte contra personal de CALAS, ['Guatemala: Campaign of stigmatization, smearing and death threats against CALAS staff'], July 7, 2017.

[268]  In particular, they were denigrated with several epithets that "denote disrespect and contempt, delegitimize the work of human rights defense, equating it to illegal, unlawful and harmful actions that the respondent calls "terrorism," and because its content urges and invokes hatred and intolerance, as opposed to a culture of respect for liberties and fundamental rights in order to achieve peace." Human Rights Ombudsman of Guatemala, Resolución REF. EXP. ORD. GUA. 8184-2012/DCP Acumulados: REF. EXP. ORD. GUA. 8926-2012/A REF. EXP. ORD. GUA. 2061-2013/DCP REF. EXP. ORD. GUA. 2433-2013/DCP REF. EXP. ORD. GUA. 3554-2013/DCP REF. EXP. ORD. GUA. 3632-2013/DCP, Resolution, December 27, 2013, p. 8 et seq.

[269]  The PDH recommended to the Ministry of the Interior to promote a mass outreach campaign on the importance of the work of human rights defenders, legislation protecting said work and the international obligations that the State of Guatemala is required to fulfill with respect to defenders. This resolution was finalized on January 19, 2016 after several appeals filed against it were denied. Human Rights Ombudsman of Guatemala, Resolución REF. EXP. ORD. GUA. 8184-2012/DCP Acumulados: REF. EXP. ORD. GUA. 8926-2012/A REF. EXP. ORD. GUA. 2061-2013/DCP REF. EXP. ORD. GUA. 2433-2013/DCP REF. EXP. ORD. GUA. 3554-2013/DCP REF. EXP. ORD. GUA. 3632-2013/DCP, December 27, 2013, pgs. 8 et seq. Prensa Libre, CC rechaza amparo de Méndez Ruiz contra la PDH, January 27, 2016.

society organizations claimed that some companies use corporate communications media and social networks to publicize the image of defenders with messages that discredit their leadership, smear them and injure their dignity. According to the organizations, the most frequently used names are "guerrilla," "terrorist," "hoodlum," "criminal," "swindler," among other ones.[270]

161. The IACHR notes that stigmatization and delegitimation have a differential impact on women human rights defenders, because of traditional gender relationships, which quite often intersect with the racial discrimination to which defenders of indigenous or African descent are subjected. Smears or defamation of character against women defenders has a differential status, because a significant number of these incidents hurt and undermine their gender condition.[271] In addition to the discrimination to which they are subjected because of their traditional role and gender stereotype conceptions that have been attributed to them, their situation is further compounded by performing a job, which entails great risk by virtue of the specific causes they advocate. The IACHR has received many petitions on violence affecting women in communities marked by an historical patriarchal conception, where they are subjected to degrading social stereotypes of their sexual life or they would be accused of undermining moral values or social institutions such as the family.[272]

162. By way of example, based on testimony reflected in the Amnesty International report *We are Defending the Land with Our Blood: Defenders of the Land, Territory and Environment in Honduras and Guatemala,* defender Lolita Chávez, member of the Kiché Peoples' Council (CPK) and beneficiary of precautionary measures granted by the IACHR,[273] contended that she was called "conflictive" and "troublemaker," names with roots in discriminatory views of women and indigenous people as being incapable of leading and who, instead of exercising their rights, act impulsively.[274] The case of the La Puya Peaceful Resistance, one of the most respected

---

270  IACHR, Metting in Santa Eulialia with civil society orgnizations; Situation of Human Rights in the Northern Region of Guatemala, August 1, 2017, pg. 3. Amnesty International, Defendemos la tierra con nuestra sangre: personas defensoras de la tierra, el territorio y el medio ambiente en Honduras y Guatemala, ['Let us defend the land with our blood: defenders of land, territory and the environment in Honduras and Guatemala'], September 2016, pp. 48-49.

271  UDEFEGUA, Informe sobre situación de Defensoras y Defensores de Derechos Humanos, ['Report on the situation of human rights defenders'], January 2017, p. 18.

272  IACHR, Segundo Informe sobre la Situación de las Defensoras y Defensores de Derechos Humanos en las Américas, ['Second Report on the Situation of Human Rights Defenders in the Americas'], OEA/Ser.L/V/II. Doc. 66 December 31, 2011, para. 283.

273  IACHR, Medida Cautelar 231-05, ['Precautionary Measure 231-05'], November 7, 2005.

274  Amnesty International, Defendemos la tierra con nuestra sangre: personas defensoras de la tierra, el territorio y el medio ambiente en Honduras y Guatemala, ['We Are Defending the Land with our Blood: Defenders of the Land, Territory and Environment in Honduras and Guatemala'], September 2016, p. 47.

leaders was stigmatized though rumors that she had received money from a mining company. This first drove her into isolation within the movement and then to make the decision to quit. Even though she left the movement, she continued to be the target of attacks against her and threats against her minor children, still referencing her role as a defender. In early 2016, the defender received death threats against her and her children when the case filed by the community was being heard in the High Courts of Guatemala, challenging the mining license for lack of prior consultation with the community. The defender was compelled to implement emergency protection strategies for her children as well as for her own safety. As a woman defender, she argued that her situation is doubly difficult and that "because of the threats, my husband just left and that was it, but I am not going to leave my children."[275]

163. The IACHR has learned of the use of this slanderous language by justice operators themselves. By way of example, in an interrogation conducted by an assistant prosecutor of the administrative crimes section, in the context of case proceeding MP001-2015-59084, the executive director of the Forensic Anthropology Foundation of Guatemala appeared to provide testimony about the proceedings brought against former President José Efraín Ríos Montt and José Mauricio Rodríguez. During his testimony, the director of said foundation was asked about the expert analysis conducted and whether he held any resentment, hatred or contempt toward the military profession and whether "you or your father have belonged to any terrorist, guerrilla group, rebel armed forces, revolutionary organization or left wing political party."[276]

164. The IACHR finds that stigmatizing statements against defenders can eventually undermine the right to personal integrity, the right to honor and dignity and the principle of the presumption of innocence. In this regard, the Commission has held that when authorities give statements or issue communiqués publically berating a defender for acts that have not been proven in a court of law, it is an assault on his or her dignity and honor, inasmuch as his or her work is delegitimized in the eyes of society, thereby affecting his or her human rights defense endeavors. Moreover, the Commission has noted that the repetition of stigmatizing statements can contribute to stoking a climate of hostility and intolerance by different segments of the population, possibly leading to adverse effects on the lives and personal integrity of the defender, by making him or her more vulnerable, because public officials or certain segments of society could

---

[275] *Id.*, p. 48.

[276] Ministry of Public Prosecution, Office of the Prosecutor for Administrative Crimes, (AUX) Auxiliaries, (AGS) Agency Five, (UL) Litigation Unit, Testimony MP001-2015-59084.

DHSFF0514

construe such statements as instructions, instigation, authorization or support, for the commission of acts against the defender's life, personal security, or violations of other rights.[277]

165. The IACHR finds that the State must provide defenders with an adequate remedy when they are the targets of stigmatizing statements that could affect their reputation, jeopardize their personal integrity, or give rise to or facilitate their criminalization.

### 3.    Criminalization

166. During its country visit, the Commission noted that human rights defenders are constantly at risk of retaliation for their work and face obstacles to doing their work, through the use of the criminal justice system against them. Information received by the IACHR points to improper use of criminal charges such as incitement to commit a crime or abduction or kidnapping, filing of judicial proceedings and protracted alternative measures to incarceration, groundless arrest warrants, arbitrary arrests and pretrial detention for the purpose of criminalizing their activities as human rights defenders. Civil society organizations also reported to the IACHR about the misuse of the criminal justice system in Guatemala by instituting criminal proceedings without any grounds as a way of intimidating and wearing down human rights defenders.

167. In fact, during its visit to Cobán in the Department of Alta Verapaz and to Ixquisis and Santa Eulalia in the Department of Huehuetenango, the IACHR noted with great concern that as a result of the situation of serious conflict stemming from different hydroelectric projects, defenders are subjected to protracted criminal proceedings, custody without bail, arbitrary detention and arrest warrants.[278] The Commission ascertained that leaders who defend indigenous peoples' rights, territory and the environment are especially at risk of criminalization.

168. At the public hearing "Denunciation of criminalization of human rights defenders who oppose hydroelectric projects in Guatemala," the participating organizations claimed, in addition to violent evictions, attacks, threats and constant harassment by the security agents of the hydroelectric companies, that there is a patterns of criminalization within

---

[277]    IACHR, Criminalización de la labor de las defensoras y los defensores de derechos humanos, ['Criminalization of the work of human rights defenders'], OEA/Ser.L/V/II, Doc. 49/15, December 31, 2015, paras. 84-85.

[278]    IACHR, Observaciones Preliminares de la Visita in loco de la CIDH a Guatemala, ['Preliminary observations to the IACHR's on-site visit to Guatemala'], August 4, 2017. Meeting with the organizations in Coban, Alta Verapaz, August 1, 2017, and meeting with organizations in Huehuetenango, August 2, 2017.

DHSFF0515

the Guatemalan court system and malicious litigation by agents of the office of the public prosecutor and attorneys of transnational corporations.

169.  Criminalization, as was mentioned above, is the most recurrent form of aggression against human rights defenders in Guatemala. According to the information cited, in the first half of 2017 alone, the total figure for 2016 has been surpassed, with a total of 106 cases reported. During this period, we can cite the arrests of the Guitz Pop brothers and Abelino Chub Caal, who has remained in prison since February 3, 2017, to stand as examples of the abuse of criminal law against human rights defenders.[279]

170.  In particular, the IACHR received a constant flow of information about inappropriate use of arrest or custody warrants, which remain in force and pending execution for several years and are reactivated at strategic times of mobilization and social protest.[280] This is frequently used against communities that occupy lands targeted for the development of megaprojects and exploitation of natural resources. In the northern region alone, 500 custody warrants were in force and have not been executed.[281] During its visit to Ixquisis and Santa Eulalia, Department of Huehuetenango, the IACHR witnessed this situation with great concern.[282] Likewise, the Commission was apprised that 204 custody orders have been issued against indigenous and community leaders of the Campesino Committee of the Altiplano in retaliation for the defense of the rights of their communities.

171.  During the on-site visit, the Commission received information about defenders living in constant fear as a consequence of criminal proceedings brought against them without any grounds. Particularly alarming is the information received by the Commission that most of the intimidation and threats are linked to economic groups with interests contrary to the causes

---

[279]  UDEFEGUA, Informe sobre Situación de Defensoras y Defensores de Derechos Humanos en Guatemala. Un Reflejo del Deterioro de los Derechos Humanos en el País. Enero a Junio de 2017, ['Report on the Situation of Human Rights Defenders in Guatemala. A Reflection on the Deterioration of Human Rights in the Country. January to June 2017'], August 2017, p. 7.

[280]  IACHR, Observaciones Preliminares de la Visita in loco de la CIDH a Guatemala, ['Preliminary observations from the IACHR's on-site visit to Guatemala'], August 4, 2017; Meeting with community leaders in Ixquisis, Department of Huehuetenango, in the context of the on-site visit, August 2, 2017.

[281]  Meeting with criminalized defenders in the Municipality of San Pablo, San Marcos, in the context of the on-site visit, Guatemala City, August 1, 2017; Civil Society, Situation of Human Rights in the Northern Region of Guatemala, August 1, 2017, pg. 2.

[282]  This custody orders are reportedly in force for several members of the communities without any basis or sufficient justification, without the affected individual even being properly informed of the crimes for which he or she is charged and without regard to what allegedly criminal acts he or she commited.  Meeting with community leaders in Ixquisis, Department of Huehuetenango, in the context of the on-site visit, August 2, 2017.

DHSFF0516

they defend, or to structures linked to the security forces that operated during the armed conflict.[283]

172.   Defenders describe that having a custody order in force against them is the equivalent to "psychological incarceration." In many instances, these warrants remain in force for months and even for years while they do not know whether or not said order will be executed or whether or not they will continue in force. Attorneys consulted by the organizations claim that in Guatemala it is common to be unable to gain access to information to know how many custody orders have been issued for a defender and, therefore, be able to fully exercise the right of defense. The issuing of many custody orders for several members of the same movement, also has a deterrent effect on the right of association, inasmuch as it prevents other persons from joining or continuing to engage in pro-human rights activities for fear of being arrested. The IACHR has previously warned that when arrest warrants are used in this way, it creates a deterrent effect on the activity of defense of human rights defenders because the defenders could stop performing their activities for fear of exposure to arrests.[284] Additionally, this practice tends to weaken and dismantle movements as they lose members, either because of their arrest, or because they must focus on their own defense, with resources which otherwise would have been used for the promotion of human rights.[285]

173.   During the meeting with defenders of the environment and territory in Santa Eulalia on August 2, 2017, a delegation of the IACHR received information about criminalized defenders for whom custody orders were issued for the commission of the crimes of attacks, coercion, threats, incitement to commit a crime, obstruction of criminal proceedings, abduction or kidnapping, and have been in force since April 3, 2015. The defenders claimed that they are being criminalized because they are leaders within their communities and were not even present at the scene of the crimes for which the company workers accused them. On this issue, they testified to the IACHR that criminalization against women "is not the same as the criminalization experienced by men, because we have to

---

[283]   IACHR, Observaciones Preliminares de la Visita in loco de la CIDH a Guatemala, ['Preliminary observations from the IACHR's on-site visit to Guatemala'], August 4, 2017.

[284]   IACHR, Informe sobre Criminalización de Defensoras y Defensores de Derechos Humanos, ['Report on Criminalization of Human Rights Defenders'], OEA/Ser.L/V/II. Doc. 49/15, December 31, 2015, para. 185.

[285]   Amnesty International, Defendemos la tierra con nuestra sangre: personas defensoras de la tierra, el territorio y el medio ambiente en Honduras y Guatemala, ['We Are Defending the Land with our Blood: Defenders of the Land, Territory and Environment in Honduras and Guatemala'], September 2016, p. 56.

DHSFF0517

concern ourselves as well with our children, with housework and the company's intimidation affects our way of life."[286]

174.  Furthermore, civil society organizations argued that the mere fact of belonging to a social movement or a human rights organization that works in favor of rights related to land or the right to territory or a healthy environment has been taken as an indicator of criminal liability. Far from proving any liability of the defenders for the acts, the authorities assume that being a member of a group or participation in a demonstration automatically makes defenders responsible for the acts for which they are accused.[287]  In addition to the fact that most conflicts over land are settled in criminal proceedings under charges of usurpation and aggravated usurpation, the civil society organizations claimed that the conflicts associated with indigenous territories and peasant's lands in Guatemala are also tied to corruption in land registration and structures engaged in the unlawful dispossession of lands.[288]

175.  The Commission also received information about the use of unjustified criminal charges for offenses such as "kidnapping" or "unlawful association," which do not allow for alternative measures to pretrial detention.  Additionally, the Commission received information about several cases of criminal complaints that have been dismissed for lack of merits or acquittals, after holding the defenders in custody for long periods of time based on these bogus charges.[289] By way of example, the IACHR received information about the criminal proceedings against seven indigenous authorities and community leaders of the Department of Huehuetenango, who unjustifiably remained in pretrial detention for 14 months charged with kidnapping, before the Guatemalan justice system acquitted five of them.[290] According to the annual report of the OUNHCHR, the defendants had remained in pre-trial detention for more than one year after many delays in their criminal proceedings, which were characterized by irregularities. After finding that there was not sufficient evidence, the judgment of acquittal noted that the criminal proceedings had been used to

---

[286]   Meeting with criminalized human rights defenders in Santa Eulalia in the context of the on-site visit, August 2, 2017.

[287]   Amnesty International, Defendemos la tierra con nuestra sangre: personas defensoras de la tierra, el territorio y el medio ambiente en Honduras y Guatemala, ['We Are Defending the Land with our Blood: Defenders of the Land, Territory and Environment in Honduras and Guatemala'], September 2016, p. 53.

[288]   Id., p. 21.

[289]   Lawyers without Borders, Study on the situation of gender-based violence in Guatemala and of women's access to justice, p.51.

[290]   Bufete Jurídico de Derechos Humanos and CALDH, Report on Criminalization of Social Demands, to the Inter-American Commission on Human Rights in Guatemala, July 2017. In the archives of the Commission.

"criminalize the actions carried out by the ancestral authorities [...] to defend their rights."[291]

176. During its country visit, the IACHR held a meeting with human rights defenders of the municipalities of San Pablo and Malacatán, both located in the Department of San Marcos, where it received reports on the criminalization of at least 14 human rights defenders who are opposed to a hydroelectric project, standing accused of the crimes of abduction, kidnapping and unlawful association, singling out the ancestral and community authorities for allegedly forming an organized crime structure.[292]

177. During the visit, the IACHR received information on the criminalization of a human rights defender and community leader from San Pablo, Fausto Sánchez Roblero. On December 10, 2014, the defender was arrested along with another three opponents to a hydroelectric project, which was reportedly built in an area without having conducted a prior, free and informed consultation with the communities, and stood charged with the crimes of kidnapping and unlawful association.[293] According to publically available information, on August 19, 2016, the trial court judges acquitted Mr. Sánchez for lack of evidence and contradictions in the testimony of the witnesses and, accordingly, ordered the release of the defender. However, the association Liga Pro Patria, which had been a private complainant in the proceedings, appealed the judgment of acquittal before the Chamber of Appeals for Criminal and Civil Matters. On February 9, 2017, the acquittal of the defender was upheld on the grounds that the decision was incoherent and, therefore, the judgment of acquittal issued by the trial court was upheld and the court was instructed to issue the respective release order. Defender Fausto Sánchez Roblero was deprived of liberty for approximately 2 years and 3 months prior to being acquitted of all charges. When he was released, the defender claimed that his case was about political persecution because he was against the building of a hydroelectric project.[294] Civil society organizations have contended that the case of human rights defender Fausto Sánchez stands as an example of the

---

[291] United Nations, Informe del Alto Comisionado de las Naciones Unidas sobre las actividades de su Oficina en Guatemala 2016, ['Report of the United Nations High Commission for Human Rights on the activities of his Office in Guatemala 2016'], A/HRC/34/3/Add.1, January 11, 2017, paras. 41-42.

[292] Meeting with criminalized human rights defenders in the Municipality of San Pablo, San Marcos, in the context of the on-site visit, in Guatemala City, August 1, 2017.

[293] Id.

[294] Meeting with criminalized human rights defenders in the Municipality of San Pablo, San Marcos, in the context of the on-site visit, in Guatemala City, August 1, 2017; Prensa Libre, Líder comunitario queda en libertad, ['Community Leader released'], March 15, 2017.

DHSFF0519

criminalization of community leaders who oppose the exploitation of natural resources.[295]

178.   In light of the situation of human rights defenders described in this section, the Commission recalls that under Inter-American legal precedent, when an arrest order is issued, it must provide a basis and reasons in order to avoid arbitrary detentions and ensure the right to a defense of the individual.[296] Additionally, the arresting agent must inform the person in simple language, free of technical legal terms, about the acts and the particular legal basis for the arrest.[297] The Commission recalls, as well, that every State of the region has the obligation to not use arrest warrants as a mechanism of punishment or retaliation against anyone, including in particular human rights defenders.

179.   In response, the State noted, among other things, that the on-site visit has been a starting point to achieve consensus, engage in talks and negotiations and to take the communities into account. It indicated that the recommendations issued by the IACHR after the on-site visit were received by COPREDEH and by the Office of the Foreign Ministry of Guatemala and are being considered for this sustainable dialogue with the communities and the companies. The Guatemalan State placed itself at their disposal for this permanent, sustainable dialogue and to carry out this type of negotiation. Lastly, it contended that it strictly enforces the law and the Convention in the sphere of investigation, which is the purview of the Office of the Public Prosecutor. It claimed that of the total number of complaints filed with the Unit for crimes against activists of the Office of the Prosecutor for Human Rights, a small percentage of the those filed by

---

[295]   Prensa Libre, Líder comunitario queda en  libertad, ['Community Leader released'], March 15, 2017.

[296]   IA Court of HR, Caso Defensor de Derechos Humanos y otros Vs. Guatemala. ['Case of Human Rights Defender et al v. Guatemala']. Preliminary objections, Merits, Reparations and Costs. Judgment of August 28, 2014. Series C No. 283, para. 263, which established that the State must implement, within a reasonable time, a public policy for the protection of human rights defenders, taking into account, at least the following requirements: a) the participation of human rights defenders, civil society organizations and experts in the formulation of standards for the regulation of a program for the protection of the group in question; b) the protection program should adopt a comprehensive and inter-institutional approach to this problem, based on the risk posed by each situation and adopt immediate measures to address complaints by defenders; c) the creation of a risk analysis model to adequately determine the risk and the protection needs of each defender or group; d) the creation of an information management system on the status of the prevention and protection of human rights defenders; e) the design of protection plans in response to specific risks faced by each defender and to the nature of his/her work; f) the promotion of a culture of legitimization and protection of the work of human rights defenders, and g) the provision of sufficient human and financial resources to respond to the real needs for protection of human rights defenders.

[297]   Ibid.

DHSFF0520

human rights defenders stem from acts of aggression by extractive companies.[298]

180. The Commission reiterates, as emphasized in its Report on Criminalization of Human Rights Defenders, that no defender may be subjected to a criminal proceeding indefinitely, inasmuch as such a situation would infringe on the guarantee of a reasonable time period. This guarantee, in addition to being a basic element for the right to a fair trial in accordance with the rules of due process, is particularly instrumental in preventing unwarranted criminal proceedings from hampering the work of human rights defenders.[299] Accordingly, States should take all necessary measures to prevent State investigations from leading to unjust or unfounded trial proceedings against people who legitimately demand respect for and protection of human rights.[300]

### a)    Measures Adopted by the State: Protection Mechanism

181. The State of Guatemala does not have in place, as of the date of approval of this report, a Public Policy for the Protection of Human Rights Defenders. Consequently, the State must coordinate different government agencies, whose obligation it is to grant protection to human rights defenders, with the participation of different civil society organizations and experts.[301] According to the information the IACHR received, despite the regulatory framework established to create the agencies in charge of human rights defender protection, no systematic or coordinated approach from these authorities is currently in place to address violence against these defenders.[302]

182. The IACHR notes that the State does have a process in place for the intake, analysis and granting of protection measures for human rights defenders within the National Civilian Police (PNC) through the Division of Protection of Individuals and Security of the Office of the Assistant Director General for Operations. According to the information provided by the State of Guatemala, through this Division, the PNC provides personalized or

---

[298]   IACHR. 164th Session. Hearing Denunciation of attacks on human rights defenders by extractive companies in Guatemala. September 7, 2017. Available for viewing at: https://www.youtube.com/watch?v=yuVmLG9gkmE&t=5s

[299]   CIDH, Informe sobre Criminalización de Defensoras y Defensores de Derechos Humanos, ['Report on Criminalization of Human Rights Defenders'], OEA/Ser.L/V/II. Doc. 49/15, December 31, 2015, para. 181.

[300]   Id., para. 182.

[301]   Human Rights Ombudsman of Guatemala, Contribution of the Human Rights Ombudsman Third Cycle for Guatemala Universal Periodic Review, March 2017, p. 3.

[302]   Amnesty International, América: situación de los mecanismos de protección para los defensores y defensoras de los derechos humanos, ['Americas: State Protection Mechanisms for Human Rights Defenders'], May 17, 2017, p. 5.

DHSFF0521

perimeter security to human rights defenders, whose risk has been ascertained through specific assessment to determine the security contingent required by the situation. Based on this information, beginning in 2016 at the Ministry of the Interior, the Protocol for the Implementation of Immediate and Preventive Security Measures has been in force to provide such measures for union workers, union leaders, officials, members, persons related to the defense of labor rights, as well as the physical spaces where they carry out their activities. Additionally, in its report to the IACHR, the State noted that in order to uphold the PNC's commitment to the protection of human rights defenders, representatives of the institution have been appointed to formulate a Public Policy for the Protection for Human Rights Defenders.[303]

183.  Notwithstanding, according to the claims of civil society organizations and the OUNHCHR, the Division for the Protection of Individuals and Security of the PNC is still not adequately documenting or monitoring the cases to assess ongoing risks and determine the effectiveness of the security measures. Additionally, the risk assessment processes do not always adequately take into account the culture and gender of the human rights defenders, or the social and general political context in which they perform their work.

184.  As to protection measures, civil society organizations expressed concern about the risk assessments of human rights defenders conducted by the Division for Individual Protection and Security of the PNC. This unit reportedly lacks a manual or unified criteria to aid in establishing what requirements need to be met in order to provide perimeter or personalized security. They also claimed that this division does not provide a copy of the risk assessment report to defenders, who thus remain in the dark about the reasoning behind the proposed security arrangement or any changes to it or decision to remove it altogether. In order to obtain this information, they must physically go to the Public Information Unit of the Ministry of the Interior. Based on the risk assessment reports that these organizations were able to obtain, they express concern about weak analytical content and very little fact-based grounds for conclusions as well as the failure to take into account the context in which the defenders do their work.[304]

185.  During its on-site visit, the IACHR held a meeting with the authorities of the Unit for Analysis of Patterns of Attacks on Human Rights Defenders of the

---

[303]  Government of the Republic of Guatemala, Ministry of the Interior, General Directorate of the National Civilian Police, Official Letter No. 1251-2017 Ref. DG/NARR/Juárez, Reg 4842, August 21, 2017, p. 8.

[304]  Fundación Myrna Mack, Convergencia para Derechos Humanos, Alternative Report for the Third Cycle of the Universal Periodic Review, Situation of Human Rights Defenders, Justice, Security and Combating Impunity in Guatemala, March 29, 2017, pars. 7-9.

Ministry of the Interior. At this meeting, the Commission was briefed about the mandate of said Unit, which entails analyzing, in context, patterns of attacks on human rights defenders, using a pre-established method, approved by the members of the Unit.[305]  According to the authority of the Ministry of the Interior representing the Unit, no pattern of attacks on human rights defenders has been verified.[306]

186.  In contrast, civil society organizations have contended that the Unit for the Analysis of Attacks on Human Rights Defenders in Guatemala has not been very effective and reiterated that the Unit has not taken adequate steps to protect defenders from the improper use of the justice system through unfounded criminal investigations that are used by the State itself, particularly against those who work to defend land, territory and the environment.[307] In fact, the organizations representing civil society in this framework became so unhappy with the way the Unit functions and its ineffectiveness that it decided to withdraw from it. In 2016, several years later, the civil society organizations resumed participation at the Unit for the Analysis of Attacks on Human Rights Defenders in Guatemala, because they felt that the new authorities in charge of this body would be more willing to change their approach to the protection of defenders.[308]

187.  Furthermore, the OUNHCHR voiced its concern that the Ministerial Decision issuing the mandate of the Unit has not been renewed since it lapsed in January 2017.[309]  This concern was also echoed by civil society organizations, which noted in addition that the Unit for Analysis does not have its own financial resources or staff, but must use whatever financial

---

[305] The 'unit' (*Intancia*) is a body made up of a representative of the Ministry of the Interior, who is the coordinator, one representative of the General Directorate of Civilian Intelligence (DIGICI), one representative of the Human Rights Unit of the Division of Criminal Investigation (DINC) of the National Civilian Police, one representative of the Public Prosecutor's Office, specifically from the Office of the Prosecutor for Human Rights Section, two representatives of national human rights organizations, and one representative of international human rights organizations.

[306] Meeting with authorities of the Unit for the Analysis of Patterns of Attacks on Human Rights Defenders of the Ministry of the Interior in the context of the IACHR's country visit, August 3, 2017.

[307] Amnesty International, América: situación de los mecanismos de protección para los defensores y defensoras de los derechos humanos, ['Americas: State Protection Mechanisms for Human Rights Defenders'], May 17, 2017, p. 5.

[308] Amnesty International, América: situación de los mecanismos de protección para los defensores y defensoras de los derechos humanos, ['Americas: State Protection Mechanisms for Human Rights Defenders'], May 17, 2017, pg. 5; United Nations, Informe del Alto Comisionado de las Naciones Unidas para los Derechos Humanos sobre las actividades de su Oficina en Guatemala 2016, [United Nations High Commissioner for Human Rights on the activities of its Office in Guatemala 2016'], A/HRC/34/3/Add.1, January 11, 2017, paras. 38-39.

[309] United Nations, Informe del Alto Comisionado de las Naciones Unidas para los Derechos Humanos sobre las actividades de su Oficina en Guatemala 2016, [United Nations High Commissioner for Human Rights on the activities of its Office in Guatemala 2016'], A/HRC/34/3/Add.1, January 11, 2017, paras. 37-38.

DHSFF0523

and human resources that are contributed by the public institutions making it up.[310]

188.  The Commission notes that even though the State has taken some initiatives, such as creating the Unit for Analysis of Attacks on Defenders and the Unit for Crimes against Human Rights Activists, these entities have not been properly strengthened or endowed with sufficient resources. The Unit for Analysis continues to operate on an unsure legal footing and the Unit for Crimes against Activists does not have the capacity to get to the bottom of crimes and effectively punish those responsible. The Commission further ascertained that the State still does not have adequate regulations and practices in place to ensure that defenders are not the targets of unwarranted criminal proceedings. The IACHR recalls the obligation of the State to investigate and punish violations of the rights of defenders in order to combat existing impunity and prevent the repetition thereof.[311]

189.  The IACHR notes the importance of creating a program or public policy for the comprehensive protection of human rights defenders, in keeping with the provisions of the judgment of the Inter-American Court in the case of *Human Rights Defender et al v. Guatemala.*[312] This concern has also been echoed by the European Parliament, which in a resolution expressed worry that the ongoing acts of violence and lack of security may have a negative effect on the full and free exercise of the activities of human rights defenders. Additionally, it recalled the need to develop a public policy for the protection of human rights defenders through a process of broad participation addressing the structural causes for the increased vulnerability of human rights defenders and asking the business community to support these efforts.[313]

190.  The Commission notes that in September 2016, COPREDEH began to develop a public policy on human rights defenders, which will be the subject to public consultation with civil society. If it is actually carried out, it would represent a step toward implementation of the judgment in the

---

[310]   Fundación Myrna Mack, Convergencia para Derechos Humanos, Alternative Report for the Third Cycle of the Universal Periodic Review, Situation of Human Rights Defenders, Justice, Security and Combating Impunity in Guatemala, March 29, 2017, p. 5.

[311]   CIDH, Observaciones Preliminares de la Visita in loco de la CIDH a Guatemala, ['Preliminary observations to the IACHR's on-site visit to Guatemala'] August 4, 2017.

[312]   IA Court of HR, *Caso Defensor de Derechos Humanos y otros Vs. Guatemala.* ['Case of Human Rights Defender et al v. Guatemala']. Preliminary objections, Merits, Reparations and Costs. Judgment of August 28, 2014. Series C No. 283, para. 263.

[313]   European Parliament, Resolución del Parlamento Europeo, de 16 de febrero de 2017, sobre Guatemala, en particular la situación de los defensores de los derechos humanos (2017/2565(RSP)), P8_TA(2017)0045, ['Resolution of the European Parliament, February 16, 2017, regarding Guatemala, in particular the situation of human rights defenders'], February 16, 2017, para. M.(2) and (4).

DHSFF0524

case of *Human Rights Defender et al v. Guatemala*. The IACHR also learned that the Public Prosecutor's Office is developing an internal policy for the investigation of crimes against human rights defenders, which could help to ensure that these cases are examined with a differential approach.[314]

191. The Commission recognizes the efforts of the State to institute in early 2018 a process to create the "Public Policy for the Protection of Human Rights Defenders," which has been supported by different State agencies and civil society organizations. As directed by the Inter-American Court of Human Rights, this policy must include implementation of a program of comprehensive protection for human rights defenders providing for special measures of adequate and effective protection, which are suitable to address the particular situation of risk faced by the individual and capable of producing the results for which they have been conceived.[315] This program should incorporate a model of analysis to be able to assess risk and the protection needs of each individual defender or group of defenders, including a gender perspective or a perspective of groups in situations of special vulnerability. Additionally, the State should make sure that authorities or third parties do not manipulate the punitive power of the State and its bodies of justice in order to harass human rights defenders and justice operators.[316]

192. The IACHR welcomes that the Office of the Attorney General is setting into motion the process of drafting a General Instruction manual to guide prosecutors in the investigation of attacks on defenders. The initiative, pushed forward by civil society groups, is currently under discussion. The adoption of this General Instruction could be a significant step toward addressing impunity in cases of attacks on human rights defenders. Additionally, according to civil society organizations, the Office of the Attorney General is reportedly working on draft guidelines to prevent criminalization and ensure that the criminal justice system is not used to attack or harass defenders. Adoption of these guidelines could represent a significant improvement in addressing the improper use of the justice

---

[314] United Nations, <u>Informe del Alto Comisionado de las Naciones Unidas para los Derechos Humanos sobre las actividades de su Oficina en Guatemala 2016,</u> ['Report of the United Nations High Commissioner for Human Rights regarding the activities of his Office in Guatemala 2016'], A/HRC/34/3/Add.1, January 11, 2017, paras. 38-39.

[315] IACHR, <u>Observaciones Preliminares de la Visita in loco de la CIDH a Guatemala,</u> ['Preliminary observations from the IACHR's on-site visit to Guatemala'], August 4, 2017. Also see IA Court of HR, <u>*Caso Defensor de Derechos Humanos y otros Vs. Guatemala*.</u> ['Case of Human Rights Defender et al v. Guatemala']. Preliminary objections, Merits, Reparations and Costs. Judgment of August 28, 2014. Series C No. 283, para. 263.

[316] IACHR, <u>Observaciones Preliminares de la Visita in loco de la CIDH a Guatemala,</u> ['Preliminary observations from the IACHR's on-site visit to Guatemala'], August 4, 2017. Also see IA Court of HR, <u>*Caso Defensor de Derechos Humanos y otros Vs. Guatemala*.</u> ['Case of Human Rights Defender et al v. Guatemala']. Preliminary Objections, Merits, Reparations and Costs. Judgment of August 28, 2014. Series C No. 283, para. 263.

DHSFF0525

system against them. In both instances, it is crucial for the authorities in charge of enforcing the General Instruction and the guidelines to be adequately trained to implement them effectively.[317]

193. Civil society organizations have expressed, nonetheless, their concern over the fact that as of the present date, the proposed General Instruction has still not been delivered to the Attorney General of the Ministry of Public Prosecution, whose job it is to approve and promote the implementation thereof nationwide. In the absence of this instruction manual, the capacity to conduct immediate, independent and systematic investigations of violations committed against human rights defenders is curtailed.[318]

194. The IACHR recalls that States should undertake, as a matter of public policy, the struggle against impunity for violations of the rights of human rights defenders, exhaustive and independent investigations into the attacks on this group, and punish their perpetrators, as a fundamental means of preventing such attacks from recurring.[319] The IACHR has urged States to set up specialized units within the police force and public prosecutor's office, armed with the necessary resources and training and protocols to enable them to act in coordination and with due diligence when investigating attacks on human rights defenders, while establishing hypothesis about the crimes and guidelines to steer the investigation, taking into account the interests that may have been harmed in retaliation for the activities conducted by the aggrieved human rights defender.[320]

## B.  *Justice Operators*

195. The Commission has repeatedly made the point that judges are the lead actors in ensuring judicial protection of human rights in a democratic State and the due process that must be observed when the State is able to impose a punishment. In a democratic system, judges act as a check on the acts of other branches of government and public servants in general to make sure their acts are consistent with conventions, the constitution and laws.

---

[317]    Amnesty International, América: situación de los mecanismos de protección para los defensores y defensoras de los derechos humanos, ['Americas: State Protection Mechanisms for Human Rights Defenders'], May 17, 2017, p. 6.

[318]    Fundación Myrna Mack, Convergencia para los Derechos Humanos, Alternative Report for the Third Cycle of the Universal Periodic Review, Situation of Human Rights Defenders, Justice, Security and Combating Impunity in Guatemala, March 29, 2017, para. 6.

[319]    IACHR, Segundo informe sobre la situación de las defensoras y los defensores de derechos humanos en las Américas, ['Second Report on the Situation of Human Rights Defenders in the Americas'], OEA/Ser.L/V/II. Doc. 66, December 31, 2011, para. 231.

[320]    *Id.*, para. 541(22).

Judges also administer justice in disputes between private parties where a person's rights might be at stake. For their part, prosecutors are essential to eliminating impunity in cases of human rights violations and providing an effective recourse to persons whose rights have been violated as a result of crimes committed against them. Additionally, public defenders play a critical role in ensuring that the State complies with its obligation to guarantee due process to any persons affected by the State's exercise of its punitive authority.[321]

### 1.    Acts Limiting or Hampering Performance of their Work

196.    At a meeting with operators of justice in the context of the country visit, the IACHR received information about the situation of accusations, defamation of character and attacks against judges and magistrates. At said meeting, the justice operators claimed they were targets of smear campaigns branding them as "communists," "lefties" or "guerrillas." They claimed they are the target of harassment through groundless motions to strip them of their immunity to stand regular trial (*prejuicios*), as well as of attacks and threats. Accordingly, they raised the need for retaliation to halt, as well as for improvement of administrative management procedures to ensure protection for justice operators, inasmuch as said attacks and threats are not addressed from a perspective that takes into account the pattern and nature thereof, but instead are treated as common crimes. They also emphasized the need to strengthen the agency protecting judges and magistrates and to conduct a thorough review or vetting process of the personnel assigned to the personal security system and produce action protocols for rapid-response protection of judges who come under threat.[322]

197.    Following its country visit in 2017, the International Commission of Jurists (ICJ) concluded that if high level officials who have sufficient protection are vulnerable to attacks and intimidation, then the situation is truly worrisome for justice operators who work on behalf of the affected communities in departments or municipalities removed from Guatemala City, where they are much more vulnerable to attacks. Recently, the judicial officer presiding over the Justice of the Peace Court for Civil and Criminal Matters in San Cristóbal Department of Alta Verapaz and an assistant

---

[321]    IACHR, ‚ Garantías para la independencia de las y los operadores de justicia : Hacia el fortalecimiento del acceso a la justicia y el estado de derecho en las Américas, ['Guarantees for the Independence of Justice Operators: Toward strengthening access to justice and the rule of law in the Americas'], OEA/Ser.L/V/II. Doc. 44 December 5, 2013, paras. 16-18.

[322]    Meeting with justice operators in the context of the country visit, August 2, 2017, Guatemala City.

prosecutor of the Public Prosecutor's Office were each attacked separately. Additionally, according to public information from the College of Attorneys, the President of the Bar Association of Jutiapa endured an armed assault and an attorney of the Department of Peten, and Saul Paaú Maaz was the target of threats, possibly linked to defense on behalf of communities affected by pollution of the La Pasion River. In this last case, Judge Karla Hernández was also reportedly threatened.[323]

198.   Furthermore, following its country visit, the ICJ noted that the case assignment system is very fragile and can be readily manipulated so that cases are assigned to a particular judge, who could act without independence or impartiality and foster through his or her rulings the impunity sought by the respective attorneys. By way of example, according to information that was provided to the ICJ, most of the cases that are brought by the Fundación contra el Terrorismo are assigned to Judge of the Seventh Criminal Court Adrián Rodríguez. In particular, the case assignment system of the high-risk courts has led to High Risk Tribunal A receiving few or no cases. This is at odds with the notion of crating a High Risk Tribunal D.  In its observations, the ICJ regretted that this practice is going on, as it can be construed as a mechanism to undermine the two women and one male judges sitting on said Tribunal.[324]

199.   The attempts to make progress in combatting impunity and corruption by justice operators, described in the chapter on access to justice[325] have brought in their wake attacks and threats against them. At meetings with both judges and prosecuting and defense attorneys, the Commission received reports of harassment, assaults and threats as instruments of control and intimidation in the performance of their duties, especially from those who are involved in high impact cases of corruption, serious human rights violations or case in which significant economic interests are at stake.

200.   Over the past years, the Commission has requested the Guatemalan State to adopt precautionary measures on behalf of Attorney General Thelma Aldana (MC 351-16);[326] magistrates Claudia Escobar (MC 433-14); Patricia

---

[323]   International Commission of Jurists (ICJ), Pronunciamiento de la Comisión Internacional de Juristas en ocasión de finalizar su visita a Guatemala, ['Statement of the International Commission of Jurists on the occasion of concluding its visit to Guatemala'] February 24, 2017, p. 5.

[324]   International Commission of Jurists (ICJ), Pronunciamiento de la Comisión Internacional de Juristas en ocasión de finalizar su visita a Guatemala, ['Statement of the International Commission of Jurists on the occasion of concluding its visit to Guatemala'] February 24, 2017, p. 6.

[325]   See Section III.B, on Requirements for independence and impartiality: Public Prosecutor's Office and reforms to the Judiciary.

[326]   IACHR, MC 497/16, Thelma Esperanza Aldana Hernández y familia, respecto de Guatemala, ['Thelma Esperanza Aldana Hernandez and family, with respect to Guatemala'], July 22, 2016.

DHSFF0528

Isabel Bustamante García, Pablo Xitumul de Paz, and Yassmín Barrios Aguilar (MC 125-13);[327] as well as judge Miguel Ángel Gálvez (MC 351-16);[328] and magistrate Gloria Patricia Porras Escobar (MC 431-17).[329] Following the visit, requests for precautionary measures were also received on behalf of members of the Office of the Human Rights Ombudsman, who completed their term in August 2017. The IACHR has followed up on these requests through the process of evaluation of Precautionary Measures, in accordance with its own Rules of Procedure, and urges the State to comply with all of the recommendations set forth within that framework.[330]

201. As was referenced above, on August 29, 2017, the IACHR requested the State of Guatemala to adopt the necessary measures to preserve the life and personal integrity of Magistrate Gloria Patricia Porras Escobar and next-of-kin, inasmuch as it finds that she faces a situation of risk stemming from her work as a Justice of the Constitutional Court in Guatemala.[331] The IACHR requested the State to ensure the necessary measures to ensure that Magistrate Porras Escobar is able to perform her duties as a justice of the Constitutional without being the target of acts of intimidation, threats and harassment; agree on the measures to be adopted together with the beneficiaries and their representatives; and report on the steps taken to investigate the alleged incidents that gave rise to the adoption of said precautionary measure and thus prevent them from happening again.[332]

202. The Commission also learned of hard-hitting stigmatization campaigns in the media and on social networks branding justice operators as "guerrilla members" or "detractors of development," together with other strategies of intimidation, including repeatedly subjecting operators to groundless disciplinary and/or criminal proceedings and threats through written messages and telephone calls.[333] During the hearing on "Denunciations of

---

[327] IACHR, MC 125/13, Iris Yassmín Barrios Aguilar y otros, respecto de Guatemala, [Iris Yassmin Barrios Aguilar et al, with respect to Guatemala'], June 28, 2013.

[328] IACHR, MC 351/16 and 366/16, Miguel Ángel Gálvez y familia, respecto de Guatemala, ['Miguel Angel Galvez and family, with respect to Guatemala'], August 21, 2016.

[329] IACHR, Resolution 34/17, Precautionary Measure No. 431-17, Gloria Patricia Porras Escobar y familia respecto de Guatemala, ['Gloria Patricia Porras Escobar and family with respect to Guatemala'], August 29, 2017.

[330] Rules of Procedure of the Inter-American Commission on Human Rights, Article 25.

[331] The request alleged that several hearings were held on the removal of immunity to stand trial against Justice Porras based on the performance of her duties, as well as that she had been the target of intimidation and harassment and surveillance on her and her husband. IACHR, MC 431/17, Gloria Patricia Porras Escobar and family, with respect to Guatemala, August 29, 2017. Resolution 34/17 it can be viewed at: http://www.oas.org/es/cidh/decisiones/pdf/2017/34-17MC431-17-GU.pdf

[332] IACHR, MC 431/17, Gloria Patricia Porras Escobar and family, with respect to Guatemala, August 29, 2017.

[333] IACHR, Observaciones Preliminares de la Visita in loco de la CIDH a Guatemala ['Preliminary observations from the IACHR's on-site visit to Guatemala'], August 4, 2017.

DHSFF0529

threats to judicial independence in Guatemala," held on September 7, 2017, during the 164th Special Session in Mexico City, Mexico, the IACHR heard directly from operator of justice Carmen Leonor Maldonado Cambra about an attempt on her life on February 9, 2017, where she was seriously wounded by gun shots.[334] According to the account of prosecutor Maldonado Cambra, the PDH had requested perimeter security on her behalf, but the National Civilian Police failed to provide it. The prosecutor decried that "power groups" with interests opposing human rights protection were behind the attempt.[335]

203.   According to information received by the IACHR in early 2017, during the criminal proceedings against her son and other defendants, former magistrate Blanca Stalling attempted to wield her influence over one of the judges of the sentencing court that was presiding over the case, Judge Carlos Ruano, member of the Guatemalan Association of Judges for Integrity (AGJI). Said judge reported the act to the Office of the Special Prosecutor against Impunity of the Attorney General's Office (FECI), the CICIG and the media, which prompted a hearing to remove her immunity before the commission of inquiry of the Congress of the Republic. Because of the imminent risk to the life of judge Ruano, in January 2017, he was compelled to leave the country temporarily. However, in its investigation, the Inquiry Commission itself requested information from the General Directorate of Migration about Judge Ruano, whereby the location where he was living as a security measure was made public, placing him at even greater risk, according to the organizations.[336]

204.   The Inter-American Court of Human Rights has held in its legal precedents that States must ensure that judicial officers, prosecutors, investigators and other justice officials have an adequate security and protection system that takes into account the circumstances of the cases under their jurisdiction and their places of work so that they may perform their duties with due diligence.[337] The IACHR reiterates that it is the duty of the State of Guatemala to protect its justice operators from attacks, acts of intimidation, threats and harassment, and to investigate those who violate their rights and effectively punish them. If States fail to guarantee the safety of their justice operators from every type of external and internal pressure, including reprisals directly aimed at attacking their person and family, the

---

[334]   IACHR, 164th Special Session, <u>Denuncias sobre amenazas a la independencia judicial en Guatemala</u>, ['Denunciations of threats to judicial independence in Guatemala'], September 7, 2017, Mexico City.

[335]   <i>Id</i>.

[336]   Impunity Watch, Report on threats and retaliation against tenured judges and magistrates of Guatemala, July 2017, p. 4.

[337]   IA Court of HR. <u>Caso de la Masacre de La Rochela Vs. Colombia</u>. ['Case of the Massacre of La Rochela v. Colombia']. Merits, Reparations and Costs. Judgment of May 11, 2007. Series C No. 163, para. 297.

DHSFF0530

exercise of judicial function may be gravely affected, access to justice impeded, and the rule of law weakened.[338]

205.   In 2011, the Guatemalan State established the Unit for Crimes against Justice Operators within the Office of the Prosecutor for Human Rights under the Public Prosecutor's Office. The IACHR received information indicating that this unit is underfunded and thus is unable to fulfill its mandate, and the staff is not properly trained.[339] Information was also received that justice operators have been subjected to pressure and attempts at improper interference in cases. In view of the context of pressure and intimidation to which justice operators are subjected in Guatemala, as reflected in the number of precautionary measures requested on their behalf, the Commission urges the State to strengthen the work of said Unit and recognize the importance of its functions to guarantee the right of access to justice as well as to due process of law.

206.   The Commission finds that to strengthen the institutional independence of the judicial branch and of the prosecution service and public defender service, they must be statutorily provided with stable and sufficient resources to enable them to perform their functions of protecting and ensuring the right of access to justice. Moreover, their budgets must be periodically reviewed with a view toward progressive increase. There must be a procedure in place to enable the entity concerned to participate in any change or modification of its budget and it must have assurances that it can execute and manage its own budget or that such authority will be vested in the respective organ of government.[340]

---

[338]   IACHR, Garantías para la independencia de las y los operadores de justicia. Hacia el fortalecimiento del acceso a la justicia y el estado de derecho en las Américas, ['Guarantees for the Independence of Justice Operators: Toward strengthening access to justice and the rule of law in the Americas'], OEA/Ser.L/V/II. Doc. 44 December 5, 2013, para. 147.

[339]   IACHR, Justicia e inclusión social: Los desafíos de la democracia en Guatemala, ['Justice and Social Inclusion: The Challenges of Democracy in Guatemala'], OEA/Ser.L/V/II.118. Doc. 5 rev. 1, December 29, 2003, Chapt. III, para. 201.

[340]   IACHR, Garantías para la independencia de las y los operadores de justicia. Hacia el fortalecimiento del acceso a la justicia y el estado de derecho en las Américas, ['Guarantees for the Independence of Justice Operators: Toward strengthening sccess to justice and the rule of law in the Americas'], OEA/Ser.L/V/II. Doc. 44 December 5, 2013, para. 55.

DHSFF0531

CHAPTER 4

# INTERNALLY DISPLACED PERSONS, MIGRANTS, ASYLUM-SEEKERS, REFUGEES, AND VICTIMS OF HUMAN TRAFFICKING IN GUATEMALA

DHSFF0532

DHSFF0533

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 1281 of 1770

Chapter 4:  Internally Displaced Persons, Migrants, Asylum-Seekers, Refugees,    | 109
and Victims of human Trafficking in Guatemala

# INTERNALLY DISPLACED PERSONS, MIGRANTS, ASYLUM-SEEKERS, REFUGEES, AND VICTIMS OF HUMAN TRAFFICKING IN GUATEMALA

207.  Guatemala is a country of origin, transit, destination and return of migrants. The prevailing trend in the country is migration to other countries. [341]   Throughout the visit, the IACHR received extensive information about how a variety of factors have compelled tens of thousands of people over the past years to flee their homes both internally within Guatemala, and to other countries of the region, contributing in this way to the crisis of displaced persons and refugees from the countries of the Northern Triangle of Central America.

208.  As was noted earlier in the report, the common thread running through the different forms of violence and displacement in Guatemala for decades has been concentrated ownership and use of land and natural resources by a limited segment of society. This has gone hand and hand with different forms of discrimination and racism, the main victims of which have been members of indigenous peoples, peasants farmers (*campesinos*), communities, persons in situation of poverty and other populations in situations of vulnerability. Regarding this issue, the Commission notes that the Agreement on the Identity and Rights of Indigenous Peoples and the Agreement on Socioeconomic Aspects of the Agrarian Situation gave rise to the Law of Registration of Cadastral Information, Article 91 of which sets forth the obligation of the Supreme Court of Justice to create Agrarian Tribunals and for a draft law to be introduced within the shortest length of time possible, regulating the substance and procedure for the application thereof and for which the appropriate budget would be allocated.[342] Notwithstanding, the IACHR was apprised of the lack of political will to comply with these commitments and, on the contrary, the Coordinating Committee of Agricultural, Commercial, Industrial and Financial Associations (CACIF) brought a suit challenging the constitutionality of this article. Consequently, the Supreme Court of Justice ordered the temporary

---

[341]    IOM, *Perfil Migratorio de Guatemala 2012*, [Migration Profile for Guatemala 2012, Spanish only], p. 22.

[342]    Ley del Registro de Información Catastral, ['Law of Registration of Cadastral Information'] Decree Number 41-2005, Article 91.

stay of the effect of the law, but left in force the obligation of the agrarian tribunals and the budget allocation to them.[343]

## A.    Internal Displacement

209. In the context of the visit, the IACHR received ample information about the different forms of forced internal displacement in Guatemala. According to estimates of the Internal Displacement Monitoring Centre (IDMC), as of 2016, there were 257,000 internally displaced persons.[344] Based on the information received, there are multiple causes for the phenomenon of internal displacement in Guatemala. The main factors leading to forced displacement in the country include extortion and threats, the presence of organized crime and drug trafficking activity, expansion of megaprojects and large scale business activities (such as monoculture of sugarcane and oil palm, extensive cattle ranching and expansion of grazing pastures, logging of fine wood, metal and non-metal mining, hydroelectric plants, archeological extraction, tourism), extreme poverty, social exclusion, different forms of violence such as intrafamily and gender violence,[345] as well as factors linked to climate change and natural disasters.[346] According to a diagnostic analysis on internal displacement written by Rafael Landívar University in 2016, this issue has been fueled by structural violence and the failure to fully implement the Peace Accords; the promotion of neoliberal policies; and the fragility of the State, which is under the influence of a military, political and economic elite, some of which is linked to illicit activities.[347]

210. During the visit, the IACHR received information about cases of displacement stemming from the acts of illegal actors, such as *maras* and gangs, criminal organizations and criminals acting on their own.[348] According to a study conducted by the Universidad Rafael Landívar, displaced persons fleeing these groups live mostly in the periphery of the metropolitan area of the capital city and move to nearby areas, which are

---

[343] Constitutional Court, <u>Expediente 2265-2006</u>, ['Case File 2265-2006], September 4, 2006.

[344] Internal Displacement Monitoring Centre, <u>Global Report on Internal Displacement</u>, *2017,* p.114.

[345] UNHCR International Centre for the Rights of Migrants, <u>Diagnóstico "Desplazamiento Forzado y Necesidades de Protección, generados por nuevas formas de Violencia y Criminalidad en Centroamérica"</u> [Study 'Forced Displacement and Protection Needs produced by new forms of Violence and Criminality in Central America'] May 2012, p. 11.

[346] Instituto de Investigación y Proyección sobre Dinámicas Globales y Territoriales de la Universidad Rafael Landívar, *Documento síntesis del Diagnóstico de desplazamiento interno en Guatemala (2010-2016)* ['Summary of Study on Internal Displacement in Guatemala 2010-2016'], (awaiting publication), p. 1.

[347] *Ibid.*

[348] *Ibid.*

DHSFF0535

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 1283 of 1770

Chapter 4:  Internally Displaced Persons, Migrants, Asylum-Seekers, Refugees,   | 111
and Victims of human Trafficking in Guatemala

slightly less dangerous.  Those displaced by violence lack any mechanism of protection or security for their own and their family's safety and live in constant fear and mistrust of authorities. In many instances, these people would rather not file complaints or reports with authorities and this situation leads to impunity.[349] Children and adolescents are at a higher risk of being victims of internal displacement, as well as of human trafficking for sexual or labor purposes or to be recruited by gangs and criminal organizations. The Commission also received information about cases of displacement caused by gender violence, as well as cases of displacement of the LGBTI population as a consequence of prevailing homophobic and lesbophobic attitudes.[350]

211.  By way of example, the delegation heard testimony from a displaced person who stated: "I left my community because I was extorted. I do not know perhaps some of my siblings went to the United States. I think that that is why they started to threaten my family for money. I had to leave my community and I have not been able to return and so unfortunately it is very sad to be far away from the family while being in our own country."[351]

212.  Another type of displacement is linked to the expansion of business activities, such as the cultivation of oil palm trees, sugarcane and the expansion of cattle grazing pastures, which has reduced food crop-growing areas.  As a result, many families and communities, mostly indigenous ones, have been displaced, and damage is also done to nature in the process.[352] This situation places these displaced persons at risk of malnutrition and disease.[353] Additionally, companies often resort to violence, material and physical harm in order to force the sale of plots of land. Similarly, mining companies and hydroelectric dam projects claim to carry out development projects, but this does not translate into formal jobs nor do they protect natural resources. These projects have divided communities and caused internal forced displacement in different parts of Guatemala, mostly in rural areas.[354]

213.  The last form of displacement observed by the Commission in the State of Guatemala is natural disaster-caused, such as heavy storms or hurricanes,

---

[349]  *Ibid.*

[350]  *Id.*, p. 2.

[351]  Testimony of displaced person to IACHR Rapporteur on the Rights of Migrants, August 1, 2017.

[352]  Instituto de Investigación y Proyección sobre Dinámicas Globales y Territoriales de la Universidad Rafael Landívar, *Documento síntesis del Diagnóstico de desplazamiento interno en Guatemala (2010-2016)* ['Summary of Study on Internal Displacement in Guatemala 2010-2016'] (awaiting publication), p. 3.

[353]  *Ibid.*

[354]  *Ibid.*

volcanic eruptions and earthquakes. This situation has been further exacerbated by climate change, as well as by deforestation, lack of control over real estate development and home building companies, a housing shortage and few prevention measures. Based on IDMC figures, in 2016 approximately 1,700 displacement events took place as a result of natural disasters.[355]  The people most affected in these displacements are those living in a situation of poverty and in marginalized areas. According to a study of the Universidad de Landívar, persons affected by this type of displacement only receive emergency assistance, even though they lose their property and endure emotional damages, are left homeless in precarious conditions and without any psychological support.[356]

214.  It can be surmised from the information in this section that the many forms of violence have forced a high number of Guatemalans to move to other parts of Guatemalan territory. The Commission notes that, as of the present date, the State has not produced any study or statistics regarding the profile and scope of internal displacement in Guatemala. Currently, most available statistics on this issue come mainly from qualitative and partial or indirect information produced by academic and research institutions and civil society organizations. Consequently, the IACHR urges the Guatemalan State to recognize the issue, perform a diagnostic assessment on it and collect data on the different types of internal displacement, as well as to develop and implement public policies aimed at preventing and dealing with the problem, including legislation based on the Guiding Principles on Internal Displacement, which must ensure the participation of displaced persons, the Office of the Human Rights Ombudsman and civil society organizations.  The Commission also calls on the State to appoint a lead institution to address this issue and implement the public policy that is developed on this subject matter, providing adequate budget resources for the effective implementation thereof.

## B.  Forced Evictions

215.  On its visit, the IACHR received a plethora of information on forced evictions and the risk faced by a high number of peasant farmer and indigenous communities of being evicted by the Guatemalan State as a result of the execution of court orders.[357] According to the information

---

[355]   Internal Displacement Monitoring Centre, _Global Report on Internal Displacement 2017_, p. 114.

[356]   Instituto de Investigación y Proyección sobre Dinámicas Globales y Territoriales de la Universidad Rafael Landívar, _Documento síntesis del Diagnóstico de desplazamiento interno en Guatemala (2010-2016)_ ['Summary of Study on Internal Displacement in Guatemala 2010-2016'] (awaiting publishing), p. 3.

[357]   See: International Commission of Jurists, _Acceso a la Justicia: El Caso de las Comunidades de los municipios de San Andrés y La Libertad, departamento del Petén Guatemala_, ['Access to Justice: _The Case of the_

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 1285 of 1770

Chapter 4:  Internally Displaced Persons, Migrants, Asylum-Seekers, Refugees,        | 113
and Victims of human Trafficking in Guatemala

collected during the visit, the vested interests of private corporations or companies are often behind the execution of the eviction orders and involve a variety of investment projects in monoculture farming, mining, hydroelectric dams, petroleum or tourism, *inter alia.* Over the past years, we have observed how legal and illegal interests have forced the population to move or resist and defend their territory. During the visit, the Commission learned that in the Department of El Petén alone at least 125 motions for eviction have been filed, in addition to evictions of the communities of Centro Uno, Nueva Esperanza and Laguna Larga. The IACHR notes that the evictions affect persons living in situations of greatest vulnerability and further compound inequality, social conflicts, segregation and the creation of ghettos.[358] Forced evictions are often linked to a lack of legal certainty about their land, which constitutes an essential ingredient of the right to adequate housing.[359]

216.    The IACHR received information about 37 multicultural communities, which have been in existence for 20 to 40 years and inhabit the "Laguna del Tigre National Park" and "La Sierra Lacandón National Park," both of which are part of the Maya Biosphere Reserve, a protected area of the Department of El Petén, consisting of several parks or natural reserves and holding the status of protected areas as of the time of entry into force of Decree 4-89, the Law of Projected Areas. Additionally, in 1990 the State approved the Law, which declared the Maya Biosphere Reserve as a Protected Area, and in 2004, Decree No. 16-2004 on the Emergency Law for the Defense, Restoration and Conservation of the Laguna del Tigre National Park.

217.    The individuals and communities inhabiting the Department of Petén arrived there at different points in time for different reasons. Based on the information received during the visit, groups of people and communities began to arrive in and created the Department of Petén, as a result of resettlements promoted by the Guatemalan State around the 1980s.  Other people live in the Department on their original territory because they belong to the Q'eqchí community; while others were displaced during the internal armed conflict and returned to their areas of origin with the signing of the Agreement on a Firm and Lasting Peace; and other people

---

*Communities of the Municipalities of San Andrés and La Libertad, Department of Petén* Guatemala'], November 15, 2012, p. 7.

[358]    Report of the Special Rapporteur on adequate housing, as component of the right to an adequate standard of living, *Principios Básicos y Directrices sobre los Desalojos y el Desplazamiento generados por el Desarrollo,* ['Basic Principles and Guidelines for Development-Based Evictions and Displacement'], para. 8.

[359]    *Id.,* para. 5

arrived in the Department after the State declared it a protected area.[360] One factor common to many of these people and communities is the lack of legal certainty regarding their land, even though they may be living in Petén for decades and 20 years have elapsed since the signing of the Peace Accords.[361]  Once the area was declared a natural protected area, many of these persons were regarded as "trespassers."[362] Notwithstanding, in cases such as the community of Laguna Larga, the State took several steps, which entailed recognition of the existence of that community through a 2006 endorsement enabling the community to receive elementary school teachers from the Ministry of Education and another endorsement enabling it to appoint an assistant mayor recognized by the Municipality of San Andrés. The IACHR was apprised of the processes of eviction, which were sealed and stemmed from 12 year old court cases, and were reportedly reopened in a short period of time as a result of alleged pressure from economic interests.

218.  In this context, the IACHR received information about a systematic and standing practice of Guatemalan authorities to bring community leaders before the Guatemalan justice system for allegedly committing the crime of "usurpation" or "aggravated usurpation" of protected areas, as well as "terrorism," "illegal assembly or demonstrations," as was noted in the section on the situation of human rights defenders.[363] On this note, the IACHR was provided information about the arrest of Don Jovel Tobar, a human rights defender from the community of La Mestiza, at the hands of members of the National Civilian Police, on March 28, 2017, for the alleged crime of usurpation of a protected area. According to reports from the members of his community and human rights defenders to the IACHR, the arrest of Mr. Tobar took place in response to his work as a representative of his community and, therefore, the criminal proceedings instituted against him allegedly amounts to a form of criminalization of social protest and of his human rights defense.[364] The IACHR learned that Mr. Jovel Tobar

---

[360]   International Commission of Jurists, *Pronunciamiento de la Comisión Internacional de Justicia (CIJ) en ocasión de finaliza la Misión de Alto Nivel al Departamento de Petén Guatemala*, ['Statement of the International Commission of Justice on the occasion of finalizing the High Level Mission to the Department of Peten, Guatemala'], August 9, 2012, p. 2.

[361]   International Commission of Jurists, *Acceso a la Justicia: El Caso de las Comunidades de los municipios de San Andrés y La Libertad, departamento del Petén Guatemala*, ['Access to Justice: the Case of the Communities of the Municipalities of San Andres and La Libertad, Department of Peten Guatemala'], November 15, 2012, p. 4.

[362]   International Commission of Jurists, *Pronunciamiento de la Comisión Internacional de Justicia (CIJ) en ocasión de finaliza la Misión de Alto Nivel al Departamento de Petén Guatemala*, ['Statement of the International Commission of Justice on the occasion of finalizing the High Level Mission to the Department of Peten, Guatemala'], August 9, 2012, p. 2.

[363]   *Id.*, p. 2.

[364]   International Commission of Jurists, La Comisión Internacional de Juristas hondamente preocupada por la detención arbitraria del defensor de derechos humanos Jovel Tobar en Guatemala, ['The International

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 1287 of 1770

Chapter 4:  Internally Displaced Persons, Migrants, Asylum-Seekers, Refugees,     | 115
and Victims of human Trafficking in Guatemala

was released from detention after the Commission's press release was issued reporting on the granting of precautionary measure 412-17 to the Community of Petén.

219. Likewise, it has also come to the attention of the IACHR that the Guatemalan State has charged communities inhabiting protected areas of being "drug trafficking collaborators." This situation is of special concern to the IACHR because generalizations of this kind were also used during the time of the internal armed conflict, when claims were made that all peasant farmers (*campesinos*) and indigenous people were guerrilla members or collaborated with the guerrilla forces, in an effort to stigmatize and criminalize these population groups.[365]

220. The IACHR learned of a pattern of human rights violations in the execution of evictions, including the violation of the right to consultation and the failure to provide advance notice, which is usually carried out in summary fashion and with violence by members of the National Civilian Police, the Army and the National Council of Protected Areas (CONAP), and involve burning and destruction of homes, food, animals, without any arrangement for return or relocation or any real chance for due process or access to justice. In light of this situation, 37 communities of Petén took actions aimed at engaging the State in direct talks through the *Alternative Proposal for the Comprehensive and Sustainable Development of the Communities Affected by the Declaration of the Protected Areas of Laguna del Tigre and Sierra Lacandon.*[366] Despite appearing open to dialogue at first, Guatemalan authorities closed the door on this possibility in 2017. On June 2, 2017, nearly 700 members of the community of San Andrés in Laguna Larga, Municipality of La Libertad in Petén, Guatemala, were forcibly displaced from their lands. The community decided to flee from location of their homes, yard animals and staple crops before the Guatemalan authorities executed the eviction order.

221. The eviction order operation was executed by 1500 members of the National Police, 300 members of the Army and officials of CONAP and the PDH. The IACHR delegation witnessed the presence in the area of heavily armed members of the Army and CONAP officials. The IACHR also

---

Commission of Jurists deeply concerned over the arbitrary detention of human rights defender Jovel Tobar in Guatemala'], July 18, 2017.

[365] International Commission of Jurists, <u>Acceso a la Justicia: El Caso de las Comunidades de los municipios de San Andrés y La Libertad</u>, <u>departamento del Petén Guatemala</u>, ['Access to Justice: The Case of the Communities of the Municipalities of San Andrés and La Libertad, Department of Peten Guatemala'], November 15, 2012, p. 18.

[366] Report: 37 Communities of Laguna del Tigre and Sierra de Lacandón National Park of Peten Guatemala, 2017, para. 3

DHSFF0540

confirmed that most of the houses had been destroyed or burned and that only the school, the church and a few houses remained intact. The community school was occupied by the military men who were guarding the area and one of the walls was marked as "Kaibil Battalion Military Outpost Laguna Larga." One house that was not destroyed was being used by CONAP officials. Crops were still seen around the houses, as well as backyard animals wandering freely between the houses and the ruins that remained of the community.

222. The affected individuals were displaced to the vicinity of *ejido* El Desengaño in the Municipality of Candelaria, State of Campeche, Mexico, which was also visited by the Commission on August 1, 2017. The IACHR delegation was received by a group of nearly 450 people, made up of slightly more than 100 children, 100 women, 200 men and 50 older adults. In the interviews, the community members identified themselves as a *campesina* community of indigenous extract. They reported that they had not been notified formally of the eviction, no reasonable alternatives to the eviction had been provided to them, no measures had been taken to minimize the adverse effects thereof and they were not allowed to take inventory of their properties either.[367]

223. They claimed that there were never notified that a public hearing or consultation was held in the context of the proceedings leading to the eviction order. They also reported that they had been negotiating for several years with different state offices to find a way to avoid the eviction. They contended as well that there were economic interests, such as Guatecarbon company, which was interested in cap and trade carbon emission credits. Many of the people interviewed stated that as a consequence of displacement, they had to incur expenses, which in many instances were as high as 1,000 quetzals. Regarding the stretch of border, they reported that they had no chance for any future economically sustainable livelihood there because they had no place to grow crops. They reported that the Presidential Commission for Dialogue of Guatemala had mentioned a possibility of alternative resettlement, but they believed it was not certain and they feared that the measure would take a long time and that the land to which they were resettled was not suitable for farming. The delegation took the testimony of a women originally from Laguna Larga, Petén, who testified as follows:

> "We are persons who have been living for 17 years in Laguna Larga and we are going through such a difficult time. What we

---

[367] IACHR, Observaciones Preliminares de la Visita in loco de la CIDH a Guatemala, ['Preliminary observations from the *in situ* visit of the IACHR to Guatemala'], August 4, 2017; IACHR, *Precautionary measure No. 412-17, Settlers evicted and displaced from the Community of Laguna Larga, Guatemala,* September 8, 2017.

DHSFF0541

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 1289 of 1770

Chapter 4:  Internally Displaced Persons, Migrants, Asylum-Seekers, Refugees,    | 117
and Victims of human Trafficking in Guatemala

are going through is very difficult. We have been abandoned now for almost two months in this place by our government and economic resources is the most impossible thing for us [to get] in order to continue to raise our children because this eviction was illegal, we believe it is because we were not called, we were not summoned to a meeting prior to the eviction (...). It is a blow, they hit us from behind and they knocked us down. (...) We ask to return to our place [of residence], this location is not suitable to be with our children, we are lacking everything, we are lacking economic resources, we are lacking everything we need to raise our children."[368]

224.   The Commission was able to ascertain the inhuman and degrading conditions in which the community was living with the lack of potable water, electricity, and basic sanitation services. Families were living in shacks (*champas*) with straw roofs and tents, fully exposed to the climate, animals and the elements. According to members of the community, most of the humanitarian assistance they have received has been provided by the Mexican State, as well as by Mexican civil society and organizations such as UNICEF and the Mexican Red Cross. The attending doctor at the medical center, which was set up for the community, reported to the Commission that the situation of the community is quite critical and that different illnesses are starting to appear. In particular, the doctor treating the community stressed that there was a considerable number of children with varying degrees of malnutrition and that 9 of them were suffering from severe cases.[369]

225.   The doctor also reported that there were 14 pregnant women, including 7 to 8 cases of highly risky pregnancy. The main diseases that are faced by the community pertain to skin, respiratory and diarrhea problems and one very serious case of a 2-year-old girl with a facial *staphylococcus* infection. Many of these diseases were the consequences of having to live exposed to the elements, in unsanitary conditions, without access to potable water, practices of poor hygiene, encountering difficulties to gain access to clean water and the use of communal latrines. With respect to older adults, the doctor reported that three patients have been diagnosed with enlarged prostate, which requires medical treatment. Because resources are scarce and the location is so inaccessible, priority has had to be given to those

---

[368]   Testimony of a lady belonging to Laguna Larga, Petén to the IACHR Rapporteur on the Rights of Migrants, August 1, 2017.

[369]   IACHR, Observaciones Preliminares de la Visita in loco de la CIDH a Guatemala, ['Preliminary observations from the *in situ* visit of the IACHR to Guatemala'], August 4, 2017; IACHR, *Precautionary measure No. 412-17, Settlers evicted and displaced from the Community of Laguna Larga, Guatemala,* September 8, 2017.

DHSFF0542

people who most need treatment and care. Community members reported that the closest points of medical and health services were the Health Center of El Desengaño and Candelaria Hospital in Mexico. They also stated that they do not have sufficient clothing and that women do not have supplies for their hygiene. They claimed that the food assistance was inadequate, and that it consisted of rations per family of mostly rice and corn.[370]

226. The IACHR confirmed that the community's main source of water was a lake that was located at the end of the camp of tents and shacks, but that the water it held was cloudy and polluted and, therefore, the community needed to dig a water well on the Guatemalan side of the border area. Because it is difficult and expensive to obtain clean water, the community members must go to the lake to wash their clothes and dishes. In the interviews, community members reported that the closest location to get potable water was the *ejido* El Desengaño in Mexico, which could be around 10 kilometers away and would take them nearly one hour to get there by motorcycle. Many of these people stated that they used the nearby lake as well to bathe.[371]

227. Community members reported being threatened and intimidated by members of the Army who were guarding the former community and have not allowed them to pick up the belongings they left behind or their crops, which are starting to spoil. The community members asked the Commission to intercede on their behalf before the Guatemalan State in order to allow them to return to the community where they had been living since the early 2000s and filed a request for a precautionary measure.[372]

228. In response, the IACHR granted precautionary measure 412-17, on the grounds that the persons evicted and displaced from Laguna Larga community are in a situation of gravity and urgency, because their rights to life and personal integrity are at risk of irreparable harm.[373] Based on the information provided by the petitioner, as well as on its own observations during the country visit, the IACHR asked the Guatemalan State to:[374] a) Adopt the necessary measures to protect the right to life and personal integrity of the beneficiaries, through measures aimed at improving, among

---

[370]   CIDH, Observaciones Preliminares de la Visita in loco de la CIDH a Guatemala, ['Preliminary observations from the *in situ* visit of the IACHR to Guatemala'], August 4, 2017; IACHR, *Precautionary measure No. 412-17, Settlers evicted and displaced from the Community of Laguna Larga, Guatemala,* September 8, 2017.

[371]   IACHR, Precautionary Measure No. 412-17, Settlers evicted and displaced from the Laguna Larga Community, Guatemala, September 8, 2017.

[372]   *Id.*

[373]   *Id.*

[374]   *Id.*

DHSFF0543

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 1291 of 1770

Chapter 4:  Internally Displaced Persons, Migrants, Asylum-Seekers, Refugees,   | 119
and Victims of human Trafficking in Guatemala

other aspects, sanitary and health conditions, especially of children, women and older adults. In particular, through measures to ensure, among other aspects: i. Access to adequate food in terms of nutrition and culturally appropriateness, as well as potable water for the displaced population, in keeping with a standard regarded as acceptable by international organizations such as the World Health Organization (WHO). Especially, adopt immediate measures to protect the lives and integrity of children suffering from malnutrition, and with the aim of preventing future cases; ii. Shelter in adequate conditions of habitability and sanitation as well as clothing that provides protection from heat, rain, wind and other threats to health, as well as conditions of safety; iii. Safe access to the area where they previously lived in order to collect the property, possessions and crops required for subsistence of the population; iv. Continuation of education and assistance services and basic care for children; v. Adequate medical treatment for pathologies, ailments and diseases of the beneficiary population in keeping with applicable international standards, including specialized medical treatment for those who are afflicted with chronic illness, as well as specialized women's health care, maternal health care, as well as for children and older adults in affordable and accessible conditions; b) Adopt the necessary measures to protect the right to life and personal integrity of the displaced population from potential acts of violence by third parties or agents of the State. At the same time, ensure protection of household items, property and crops left behind when members of the community were displaced; c) Adopt the measures necessary to continue in the appropriate dialogue and consultation with the evicted persons, in order to reach a lasting solution for the situation of the evicted and displaced persons; d) Arrange for the measures to be adopted together with the beneficiaries and their representatives; and e) Report on the steps taken in order to investigate the events that gave rise to the adoption of the instant precautionary measure and thus prevent them from happening again.[375]

229. The Guatemalan State reported to the IACHR on the actions that it is implementing in order to comply with the precautionary measure. These actions include authorization from Chamber B of the Multi-Judge Trial Court for Criminal Matters, Drug Activity and Crimes against the Environment of San Benito, department of Petén so that, in coordination with the other pertinent authorities, COPREDEH take the necessary steps to gather the harvest of the community as soon as possible; the decision to carry out a process of profiling families in order to be able to provide the necessary care, including the urgency of a temporary shelter; delivery of

---

[375]    *Id.*

food assistance for two months; setting up a medical care day and the delivery of 234 mosquito nets to 91 families in order to prevent insect-born diseases such as malaria; proposing to the community to grant them title to land located in the Municipality of Morales, department of Izabal, consisting of six *caballerías* (669 acres) of land with fertile soil and each family can be provided three *manzanas* of land for farming (3 hectares).[376]

230. Subsequently to the granting of the precautionary measure to the community of Laguna Larga, the IACHR received information on evictions of Maya Q´eqchí communities, which had been demanding legal recognition of their lands for several years.[377] In this regard, on October 30, 2017 approximately 80 families, made up of 429 individuals, including women, men, children belonging to the Chaab´ilch´o´ch of the municipality of Livingston,[378] department of Izabal, were evicted, and had previously been subjected to force displacement during the internal conflict.[379] The eviction was carried out by 1,141 members of the National Civilian Police.[380] Separately, on November 1, 2017, the community of La Cumbre Sacuxha, Tactic, department of Alta Vera Paz, which was made up of approximately 25 families[381] (120 persons), including 60 children, 6 infant children and 15 older adults, were evicted. The eviction was conducted with the participation of 182 National Civilian Police agents.[382] In the context of these events, an arrest warrant was reportedly issued for 6 individuals for the crime of aggravated usurpation. Lastly, on November 3, 15 families of

---

[376]   COPREDEH, Report of the State of Guatemala to the Illustrious Inter-American Commission on Human Rights. Precautionary Measures 412-17 benefiting Settlers evicted and displaced from the Community of Laguna Larga, Peten, Guatemala, October 18, 2017.

[377]   Open letter to the International Commission against Impunity in Guatemala (CICIG) and the Intern-American Commission on Human Rights (IACHR) in response to the humanitarian crisis and forced displacements caused by the Guatemalan State and Government in Chaab´ilch´o´ch, Livingston, Izabal; La Cumbre Sacuxha, Tactic, Alta Verapaz  and Chaqchila Trece Aguas Community, Senahu, Alta Verapaz, Guatemala, November 6, 2017.

[378]   Report requested by Chamber of Deputies member Locadio Juracan Salome of Bancada Convergencia, Memorandum October 31, 2017, COPREDEH, Izabal.

[379]   Open letter to the International Commission against Impunity in Guatemala (CICIG) and the Intern-American Commission on Human Rights (IACHR) in response to the humanitarian crisis and forced displacements caused by the Guatemalan State and Government in Chaab´ilch´o´ch, Livingston, Izabal; La Cumbre Sacuxha, Tactic, Alta Verapaz  and Chaqchila Trece Aguas Community, Senahu, Alta Verapaz, Guatemala, November 6, 2017.

[380]   Report requested by Chamber of Deputies member Locadio Juracan Salome of Bancada Convergencia, Memorandum October 31, 2017, COPREDEH, Izabal.

[381]   Report requested by Chamber of Deputies member Locadio Juracan Salome of Bancada Convergencia, Memorandum November 7, 2017, COPREDEH, Case of Finca Trece Aguas, Senahú, Alta Verapaz.

[382]   *Id.*

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 1293 of 1770

Chapter 4:  Internally Displaced Persons, Migrants, Asylum-Seekers, Refugees,        | 121
and Victims of human Trafficking in Guatemala

the Community of Chaqchila Trece Aguas, Senahu, Department of Alta Verapaz were evicted by 217 National Civilian Police agents.[383]

231. Based on available information, the IACHR notes with extreme concern that the evictions were carried out without conducting any prior consultation with the communities, with very little time in advance to remove their belongings, and using a disproportionate number of police agents to act by use of intimidation, humiliation, threats and aggression, particularly against some women.[384] Additionally, in the view of the Commission, it is of deep concern that houses were burn down by non State actors, though in the presence of the authorities, with them doing anything about it; as well as the lack of alternatives for relocation or lasting solutions for the displaced communities.[385] It is also worrying that during and after the eviction, the communities have not received support from the authorities, but have had to resort to neighbors or members of neighboring communities, specifically the Cotoxhá community in Finca Manzanitas, where there is dire need for food, healthcare, access to water and medical services, especially for children under 13 years of age and infant babies, who mostly present health and diarrhea problems.[386]

232. The IACHR notices that the practice of forced evictions has been implemented by the Guatemalan State over the past years and has been causing internal displacement. In accordance with human rights norms and standards, the IACHR deems it pertinent to explicitly note that evictions must only be carried out under strict observance of international human rights norms and standards and the principles of exceptionality, legality, proportionality and suitability, with the legitimate aim of promoting social wellbeing and ensuring solutions for the evicted population, which may involve restitution and return, resettlement to different land of better or equal quality and rehabilitation or fair compensation.[387] Likewise, should it

---

[383]   Report requested by Chamber of Deputies member Locadio Juracan Salome of Bancada Convergencia, Memorandum November 7, 2017, COPREDEH, Aldea la Cumbre Chamche.

[384]   Open letter to the International Commission against Impunity in Guatemala (CICIG) and the Intern-American Commission on Human Rights (IACHR) in response to the humanitarian crisis and forced displacements caused by the Guatemalan State and Government in Chaab´ilch´o´ch, Livingston, Izabal; La Cumbre Sacuxha, Tactic, Alta Verapaz  and Chaqchila Trece Aguas Community, Senahu, Alta Verapaz, Guatemala, November 6, 2017.

[385]   Id.

[386]   In this regard, see, Open letter to the International Commission against Impunity in Guatemala (CICIG) and the Intern-American Commission on Human Rights (IACHR) in response to the humanitarian crisis and forced displacements caused by the Guatemalan State and Government in Chaab´ilch´o´ch, Livingston, Izabal; La Cumbre Sacuxha, Tactic, Alta Verapaz  and Chaqchila Trece Aguas Community, Senahu, Alta Verapaz, Guatemala, November 6, 2017.

[387]   See: United Nations, Principios Básicos y Directrices sobre los Desalojos y el Desplazamiento generado por el Desarrollo, Anexo I del Informe del Relator Especial sobre una vivienda adecuada, como parte del derecho a un nivel de vida adecuado. ['Basic Principles and Guidelines for Development-Based Evictions and

DHSFF0546

be necessary to conduct an eviction, States must protect the dignity, lives and security of the evicted persons, ensuring at a minimum access to adequate food in terms of nutrition and culture, potable water and sanitation, lodging in adequately inhabitable conditions, as well as clothing that provides protection from inclement weather and other threats to health, access to medical services, means of subsistence, education and access to justice, as well as ensure access to humanitarian aid and independent monitoring. Additionally, safe access to commonly owned resources upon which they depended previously must be ensured, which includes the ability to collect their property, household items, crops and harvests.[388]

## C.   *International Migration: Migrants, Asylum-Seekers and Refugees*

233.   The Commission notes that according to the information it received, internal displacement tends to be the previous stage to international migration. It is estimated that one out of every ten Guatemalans live outside their country and that the majority of the people who migrate (97.4%), do so to the United States of America.[389] The trip is often made by paying around $5,000 USD to coyotes and generally covers three attempts. In many instances, people opt to go into debt and ask for loans to make the journey.[390] Very often, the migrants become the victims of different humans rights violations over the course of their trip, including kidnapping, sexual violence, extortions, robbery, disappearances and human trafficking.

234.   The IACHR observes that the number of individuals that have felt compelled to leave Guatemala and seek asylum in neighboring countries as a consequence of different forms of violence, has grown dramatically over the past years. Based on the figures of the United Nations High Commissioner for Refugees (UNHCR), from 2010 to 2016, asylum requests

---

Displacement, Annex I of the Report of the Special Rapporteur on adequate housing, as a component of the right to an adequate standard of living'] A/HRC/4/18, y Principios Rectores de los Desplazamientos Internos, ['Guiding Principles on Internal Displacement'] E/CN.4/1998/53/Add.2.

[388]   *Ibid*.

[389]   Bornschein, Dirk, Antecedentes: el caso de las migraciones en Guatemala, causas y cifras, ['Background: the case of migration in Guatemala, causes and figures'], March 24, 2017.

[390]   *Ibid*.

DHSFF0547

rose by 4,427.62% (See Graph 1).[391]  For the same period, the number of persons who were recognized as refugees increase by 121.06%.[392]

1.

Source: United Nations High Commissioner for Human Rights (UNHCR)
Reports Global Trends 2012 – 2016

235.  In transit through Guatemala, migrants are victims of many abuses, such as extortion, robbery and even disappearances, inasmuch as the Guatemalan State has seriously failed in its response to ensure these people and their family members access to justice and searches for missing and unidentified migrants. According to information provided by civil society organizations, migrants claim that it is harder to cross Central American borders and heavy emphasis on security serves to weaken the use of Regional Agreement on Procedure CA-4 for the Extension of the Single Central American Visa (CA-4).[393]

236.  In this regard, the delegation heard the testimony of a family member of one of the 72 persons massacred in Tamaulipas, Mexico, who claimed that: "We want to know what happened, we need for the Guatemalan government to ensure our rights as victims. As next of kin, we suffer many consequences and we need for the government to address our complaints, to not act deaf and turn a blind eye." "It is still frequent for authorities to refuse to take our complaints about disappearances occurring outside of

---

[391]    UNHCR, Global Trends (2012, 2013, 2014, 2015, 2016 and 2017).
[392]    *Ibid*.
[393]    Information provided by Scalabrini International Migration Network (SIMN) Missionaries of Saint Charles Scalabrinians.

DHSFF0548

Guatemalan territory, while the Mexican authorities do not facilitate the right to justice either because many times they refuse to bring a complaint and only make a simple record of appearance of the families.[394]"

237. Even though there have been policies aimed at providing access to transnational justice such as the Mexican Mechanism for Foreign Support for Search and Investigation, the IACHR deems it necessary for the State of Guatemala to accept joint responsibility so that this mechanism can adequately function. For this purpose, authorities must become involved in the coordination and collaboration with the Mechanism and make adequate, trained and permanent translators, interpreters and staffing available to advise the families and enable them to file and follow up on reports. Additionally, direct lines of communication with authorities of other countries must be ensured and plans for the protection of victims, complainants and witnesses must be drawn up.[395]

238. In this regard, the IACHR highlights the progress achieved with the entry into force of the new Migration Code, to which approximately 70 organizations and institutions from all spheres contributed.[396] The Code established the creation of the Guatemalan Migration Institute as an autonomous authority, which has incorporated a procedure for the care and assistance of the families of persons reported as disappeared as a result of migration, and includes the obligation to establish a search procedure, facilitation of conveyances, repatriation of bodies, prohibition of cremation and the facilitation of search mechanisms between States of transit, destination and origin of migrants, as well as special provisions for the search of unaccompanied migrant children and adolescents reported as disappeared or missing.[397]

239. Additionally, the Migration Code sets forth some important developments, such as recognition of the right to migrate,[398] the right to request recognition of refugee status[399] and the concept of diplomatic asylum.[400] The Code allows for the entry of foreigners for humanitarian reasons,

---

[394]   Testimony provided to the Rapporteur on the Rights of Migrants on his visit to Guatemala, July 31, 2017.

[395]   Foundation for Justice and Democratic Rule of Law and Community Studies and Psychosocial Action Team, Report addressed to the IACHR on the occasion of its country visit to Guatemala of July 31 to August 4, 2017, Disappeared migrants, a Guatemalan reality: Search, identification and access to justice for their families, p. 9.

[396]   Human Rights Ombudsman, Independent Report of the Human Rights Ombudsman of Guatemala to the Committee on the Protection of the Rights of All Migrant Workers and Members of their Families, p. 11.

[397]   Code of Migration, Chapter V: Procedure for assistance to the families of the persons reported as disappeared as a consequence of migration.

[398]   Code of Migration, Article 1.

[399]   *Id.*, Article 43.

[400]   *Id.*, Article 44.

DHSFF0549

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 1297 of 1770

Chapter 4:  Internally Displaced Persons, Migrants, Asylum-Seekers, Refugees,     | 125
and Victims of human Trafficking in Guatemala

including persons affected by natural disasters, medical emergencies, armed conflicts, cooperation with other States for medical purposes, aid and relief and for the repatriation of the remains of family members, who die in Guatemala.[401]

240. With respect to the right to not be returned (*non-refoulement*),[402] the Code only defines as the prohibition of returning a person who has been denied status of refugee or asylum, when there is a compelling reason to believe that his her life, physical integrity and liberty will be jeopardized, ensuring that the Office of the UNHCR has been apprised of the person's situation. This arrangement is of concern to the IACHR because it does not provide for the right of non-refoulement over the course of the entire proceeding for recognition of refugee status, nor for the prohibition of refusal of entry at the border, or for indirect return to home country (indirect *non-refoulement*). Additionally, Article 50 of the Code establishes the obligation to pay administrative costs incurred for persons who do not carry identification and travel documents or who have not fulfilled the administrative requirements for entry, in addition to providing that "they will returned to their country of provenance." The IACHR reminds the Guatemalan State that the obligation of *non-refoulement* is a peremptory norm of general international law, which means that no person may be expelled or returned to another country, whether or it is of origin, when his or her right to life or personal liberty is at risk of being violated for reasons of race, religion, nationality, membership in a particular social group or of political opinion.  Likewise, returning a refugee because of entry into Guatemalan territory without identification documents or for not fulfilling administrative entry requirements would be a clear infringement of Article 22.8 of the American Convention on Human Rights on *non-refoulement*.

241. The IACHR regards the enactment of the Migration Code in Guatemala, on May 8, 2017, as a first step to address migration from a human rights perspective. The State also informed, in its comments to the draft of this report, that between January and Decembe 2017 it housed 2,648 people in the Shelter of the General Directorate of Migration in Guatemala City. In addition, in December 2017 the State renewed 26 permits to remain in the country for appilcants under the Refugee Statute.[403] In this regard, the IACHR urges the Guatemalan State to overhaul the way in which the right of non-refoulement in Article 50 is established, in order to bring it in line with international and Inter-American human rights norms and standards.

---

[401]   *Id.*, Article 68.

[402]   *Id.*, Article 46.

[403]   Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situtation in Guatemala," December 22, 2017.

DHSFF0550

It is also essential to regulate the Migration Code and other statutes regarding persons in the context of human mobility, under the framework of a participatory process with civil society organizations and other relevant actors. Lastly, the IACHR urges the Guatemalan State to address and prevent the causes giving rise to forced migration of Guatemalans to other countries.

## D.    Returned or Deported Migrants

242.    The Inter-American Commission notes that Guatemala is also a important country for forced return of migrants, especially since the crack down in migration policies of Mexico and United States over the past years. The number of persons detained and deported by Mexican authorities has grown exponentially, especially after the Southern Border Plan came into effect in 2014. According to official statistics from Mexico's National Migration Institute (INM), fro 2014 to 2015 detentions of Guatemalans increased by 75.22%, while deportations grew by 92.95% (See Graph 2).[404] The IACHR finds that this situation raises significant challenges with regard to the reintegration of these people into society and the effective enjoyment of their rights in Guatemala. Even though the Guatemalan State has begun to adopt some measures to receive and reintegrate deported or returned persons, such as the recent opening of a lounge in the international airport of Guatemala City for migrant children,[405] and incorporating into the Migration Code the ability to request shelter and temporary care to stay overnight for 48 hours,[406] these efforts are still inadequate to address the current situation what's more the sharp increase in deportations and impacts this type of measures can have in the long term within Guatemalan society.

243.    In its comments to the draft of this report, the State submitted statistics of Guatemalan individuals deported from Mexico by land as of October 23, 2017. These figures show 25,167 people have been so deported, of whom 15,659 are adult males, 428 adult females, 215 accompanied boys, 175 accompanied girls, 156 unaccompanied boys, and 39 unaccompanied girls. The total figures reported reflect a derease compared to previous years, where the number of people deported reached 45,459 in 2016 and 61,635

---

[404]    National Migration Institute, *Boletines Estadísticos – Extranjeros presentados y devueltos,* ['Statistics Bulletin – Foreigners presented and returned'], 2012 – 2016.

[405]    Expansion, Guatemala opens a lounge in its airport to receive migrant children, May 31, 2017. Available at: http://expansion.mx/mundo/2017/05/31/guatemala-abre-sale-en-su-aeropuerto-para-recibir-a-ninos-inmigrantes

[406]    Code of Migration, Article 16.

DHSFF0551

Case 1:20-cv-00116-EGS    Document 85    Filed 03/27/20    Page 1299 of 1770

Chapter 4:  Internally Displaced Persons, Migrants, Asylum-Seekers, Refugees,        | 127
and Victims of human Trafficking in Guatemala

in 2015, as of October 31 of each year. Regarding Guatemalan people deported from the United States of America by air, figures for 2017 (as of October 4) show 22,477 people, compared to 28,464 in 2016 and 26,097 in 2015, as of October 31 of each year.[407]



Source: Secretariat of the Interior, National Migration Institute 2010 -2017
* Statistics available until July 2017

244.    The IACHR urges the State of Guatemala to continue to implement measures aimed at taking in and reintegrating returnees, especially to protect persons who first fled a situation of violence and run the risk of being persecuted or revictimized.

## E.    *Human Trafficking*

245.    Guatemala is also a country of origin, transit and destination of male and female adult and child and adolescent victims of trafficking for sexual or labor purposes.[408] Indigenous persons and children and adolescents tend to be the main victims of these crimes; children are usually exploited to beg on the streets and as roving vendors; moreover, criminal organizations tend to sexually exploit little girls and force young men in urban areas to sell or transport drugs or commit extortion.[409] According to the United Nations Office on Drugs and Crime (UNODC), crossborder trafficking in persons originating in Central America and the Caribbean accounts for

---

407    Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situtation in Guatemala," December 22, 2017.

408    Guatemala, Report of the State on Trafficking in Persons, 2016, 2017, p. 66.

409    Office to Monitor and Combat Trafficking in Persons, US Department of State, *2016 Trafficking in Persons Report*, Guatemala, 2016. Available at: https://www.state.gov/j/tip/rls/tiprpt/countries/2016/258775.htm

12% of the all human trafficking victims detected in North America, especially Mexico and the United States.[410]

246. In this regard, the Commission notes that through the Inter-Institutional Commission against Trafficking in persons, the Guatemalan State implemented training of 246 public officials in the first quarter of 2017.[411] In its comments to the draft of this report, the State indicated that the Secretariat against Sexual Violence, Exploitation and Human Trafficking (SVET) has trained 146,221 people on the prevention of crimes related to sexual violence, exploitation, human trafficking and LGBTI persons.[412] Additionally, 147 victims of human trafficking have been assisted, 113 of which are children and 13, adult males and females, while 138 of the victims were women or girls and 9 were boys and men.[413] Most of the victims were Guatemalan nationals, while there were 3 Hondurans, 3 Mexicans, 3 Salvadorans and 1 Venezuelan national.[414]



Source: Report of the Guatemalan State on Trafficking in Persons, 2016 and 2017.

247. In its comments to the draft of this report, the State stated that SVET has served 415 children and adolescents in its specialized termporary shelters. Additionally, in October 2015 the Public Prosecutor's Office approved the "Protocol regarding Assistance to Victims of Human Trafficking," the

---

410    UNODC, *Global Report on Trafficking in Persons 2016*, p. 93.

411    Guatemala, Report of the State on Trafficking in Persons 2016, 2017, p. 66.

412    Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situtation in Guatemala," December 22, 2017.

413    Guatemala, Report of the State on Trafficking in Persons 2016, 2017, pp. 70, 71.

414    *Id.*, p. 69.

DHSFF0553

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 1301 of 1770

Chapter 4:  Internally Displaced Persons, Migrants, Asylum-Seekers, Refugees,   | 129
and Victims of human Trafficking in Guatemala

"General Instruction regulating the Mechanisms of Serving, Coordinating and Intervention by the Public Prosecutor related to the Assistance to Victims and Strategic Criminal Prosecution of Human Trafficking Crimes." Also, the System for the Protection of Children and the Unit Against Child Pornography were created in May 2016, as pat of the Prosecutor's Office United on Human Trafficking.[415] As for the prosecution and punishment of the crime of trafficking in persons, the Guatemalan State received 168 complaints for the period of January to June 2017, obtaining over the same period 21 judgments, 17 of which were convictions and 4, acquittals.[416] Figures provided by the State in its comments to the draft of this report reflect that between 2012 and June 2017, there were a total of 1,771 reports, which included 3,338 people affected and resulted in a total of 82 convictions.[417] In this regard, the IACHR urges the Guatemalan State to continue its efforts to prevent and address the crime of human trafficking, especially, prosecuting the crime and providing assistance and care and full reparation to the victims thereof.

248.    The facts described in the instant chapter suggest that the situation of internal displacement, forced evictions, migration and return has grown worse over the past years in Guatemala, while the State has not taken adequate measures to properly address it over the migration continuum, either within the country or on route to other countries. Both internal and external displacement in Guatemala are caused by, *inter alia,* poverty, inequality, violence, forced evictions, domestic violence, megaprojects and natural disasters, which lead to Guatemalans having to leave their homes and places of origin as a mechanism of survival and protection.  Thus, it is essential for the approach to human mobility in the State of Guatemala to include addressing the root causes of the internal and external displacement, recognizing internal forced displacement in order to properly deal and eradicate it, addressing the return of displaced persons in order to ensure their protection and reintegration, as well as ensure human rights, including access to justice, the right to asylum and non-refoulement, for migrants on Guatemalan soil.

---

[415]   Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situtation in Guatemala," December 22, 2017.

[416]   Guatemala, Report of the State on Trafficking in Persons 2016, 2017, pp. 74 and 75.

[417]   Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situtation in Guatemala," December 22, 2017.

DHSFF0554

DHSFF0555

# CHAPTER 5
# SITUATION OF FREEDOM OF EXPRESSION

DHSFF0556

DHSFF0557

# SITUATION OF FREEDOM OF EXPRESSION

## A.   *Situation of journalists and attacks to freedom of expression*

249.   During the on-site visit conducted in 2017, the IACHR verified significant levels of violence against journalists in Guatemala, characterized by murders, threats, and speech that aims to stigmatize media outlets and journalists engaged in the fight against corruption and the abuse of power. According to reports, journalists and media workers are "highly vulnerable" to violence in the practice of their profession, especially in areas outside the nation's capital. These journalists, in addition to confronting the scourge of drug trafficking and organized crime, are also subject to attacks from some public servants allegedly linked to corrupt acts. [418] According to the information received, Quetzaltenango is one of the areas where the greatest number of attacks on journalists has been reported in recent years. [419]

250.   Article 35 of the 1985 Constitution of the Republic of Guatemala, amended in 1993, establishes that "The expression of thought through any means of dissemination, without censorship or prior permission, is free [...]." Notwithstanding this broad constitutional protection of the right to freedom of expression, the Commission has "constantly received information to the effect that the full exercise of that right has been obstructed by acts of intimidation against independent media and journalists."[420] Additionally, in recent years the IACHR has noted "with particular concern the attacks against [journalists] covering investigations into public administration, acts of corruption, and human rights."[421] During its on-site visit, the Commission verified that, in addition to attacks and stigmatization, there are persistent structural problems in Guatemala that

---

[418]   Prensa Libre. February 8, 2017. *PDH pide protección a periodistas*; República. February 6, 2017. *PDH pide implementar programa de protección a periodistas.*

[419]   Centro de Reportes Informativos sobre Guatemala (Cerigua). *Estado de la Situación de la Libertad de Expresión en Guatemala – Primer Trimestre 2017.* May 2, 2017

[420]   IACHR. *Situation of Human Rights in Guatemala: Diversity, Inequality and Exclusion.* OEA/Ser.L/V/II. Doc. 43/15. December 31, 2015. Para. 281.

[421]   *Ibid.*

prevent citizens from receiving information from a variety of sources, such as the high degree of concentration in the ownership and control of both free-to-air and subscription-based radio and television channels. There are also serious obstacles that keep the community media outlets of indigenous peoples from accessing the radio spectrum and the public resources needed to achieve sustainability.

251. The IACHR notes in particular the announcement made by President Jimmy Morales during the on-site visit, regarding the imminent approval of a Program for the Protection of Journalists and Media Workers, on which he is reportedly working in consultation with journalists' organizations. Nevertheless, the IACHR also notes with concern that there has been no tangible progress since that time toward the establishment of that program.

252. The IACHR and its Office of the Special Rapporteur for Freedom of Expression would like to underscore that journalism in Guatemala is currently playing a fundamental role in denouncing abuses of power and following up on investigations into cases of corruption. The IACHR observed that journalists and media workers continue to be, throughout Guatemala, the main source of information and debate concerning the serious human rights problems, institutional crisis, and corruption affecting the country. Nevertheless, a smear campaign against journalists and news media was evident on social media in 2017. According to Human Rights Ombudsman [*Procurador de los Derechos Humanos*] (PDH) Augusto Jordán Rodas Andrade, there is "an intent to disparage journalists in these times of so much uncertainty in Guatemala, which may jeopardize [its] fragile democracy." [422]

253. Principle 9 of the Declaration of Principles on Freedom of Expression of the IACHR establishes that: "The murder, kidnapping, intimidation of and/or threats to social communicators, as well as the material destruction of communications media violate the fundamental rights of individuals and strongly restrict freedom of expression. It is the duty of the state to prevent and investigate such occurrences, to punish their perpetrators and to ensure that victims receive due compensation."

254. Based on the Inter-American case law and doctrine, the IACHR and its Office of the Special Rapporteur remind the Guatemalan State, in relation to violence and attacks on journalists and media outlets, of the importance of meeting the three positive obligations that emanate from the rights to life,

---

[422] Prensa Libre. September 2, 2017. *PDH abre expediente para investigar campaña de desprestigio contra la prensa independiente*; Procurador de los Derechos Humanos (PDH). September 4, 2017. *PDH abre expediente por campaña para desacreditar a periodistas y medios de información*.

DHSFF0559

humane treatment, and freedom of expression, to wit: the obligation to prevent, the obligation to protect, and the obligation to criminally investigate, prosecute, and punish the perpetrators of these crimes. Violence against journalists must be combated through a comprehensive policy of prevention, protection, and the pursuit of justice. These obligations are mutually complementary in order for free, democratic, and robust speech to exist without restrictions. [423]

## 1.    Murders of Journalists and Reporters, and Impunity for these Crimes

255.   In 2016, and thus far in 2017, the Office of the Special Rapporteur for Freedom of Expression received information about the murder of 10 journalists in Guatemala. Eight journalists were reported to have been murdered in 2016; nevertheless, it has not been determined whether their murders were connected to the exercise of the right to freedom of expression. [424] According to the information available, the authorities opened investigations in those cases, but no answers have yet been provided with respect to the logical line of investigation into whether these crimes were connected to the work the victims were performing as journalists and media workers. [425] The Office of the Special Rapporteur has received information about two other cases in 2017, which it is monitoring in order to establish whether they are related to the victims' journalistic work. [426] In its comments to the draft of this report, the State indicated that between 2012 and June 2017, the Public Prosecutor's Office received 372 reports related to threats, violent attacks and murders of journalists, which lead to 17 judicial sentences: two acuittals and six convictions for

---

[423]   IACHR. Annual Report 2013. Annual Report of the Office of the Special Rapporteur for Freedom of Expression. Chapter III (Violence Against Journalists and Media Workers: Inter-American Standards and National Practices on Prevention, Protection and Prosecution of Perpetrators). OEA/Ser.L/V/II.149. Doc. 50. December 31, 2013, para. 31.

[424]   IACHR. Anual Report 2016. Annual Report of the Office of the Special Rapporteur for Freedom of Expression. Chapter II (Evaluation of the State of Freedom of Expression in the Hemisphere). OEA/Ser.L/V/II. Doc. 22/17, March 15, 2017, paras. 641-644.

[425]   Idem, para. 645.

[426]   Inter American Press Association (IAPA). January 25, 2017. La SIP condena asesinato de periodista en Guatemala; Prensa Libre. February 2, 2017. Unesco pide esclarecer asesinato de periodista en Zacapa; La Opción de Chihuahua. February 7, 2017. Asesinan en Guatemala a comunicadora Vilma Gabriela Barrios; Centro de Reportes Informativos sobre Guatemala (Cerigua). February 6, 2017. Joven locutora asesinada en Quetzaltenango; Centro de Reportes Informativos sobre Guatemala (Cerigua). July 8, 2017. CERIGUA condena el vil asesinato de comunicador en Petén; elPeriódico. July 12, 2017. Otro comunicador asesinado.

DHSFF0560

crimes against life, as well as one acquittal and eight convictions for other crimes.[427]

256. Journalist Manuel Salvador Villagrán, who worked with different local media outlets in the municipality of San Jorge, Department of Zacapa, was murdered on January 19, 2017. He was also reportedly the head of the Department of Public Relations of the Municipality of San Jorge. Sources revealed that the journalist was shot several times while riding his motorcycle. [428] According to publicly available information, significant progress has been made in the investigation of this crime.[429]

257. Also, on July 8, 2017, journalist and presenter Johnny Javier Guardado's body was found in the municipality of El Chal, Department of Petén. According to the information available, he had been stabbed.[430]

258. Additionally, according to the information gathered by the Office of the Special Rapporteur and received during the on-site visit, Guatemala continues to have high levels of impunity for crimes involving the murder of journalists. Given the slow pace of the investigations, in most cases the authorities reportedly have not been able to determine whether these crimes are related to the journalistic work of the victims. [431] According to Guatemalan freedom of expression organizations, that situation gives rise to self-censorship among journalists who do not know why they might be attacked.[432]

259. Despite this situation, the IACHR acknowledges the progress of the investigation into the murder of two journalists which shook the country in 2015. In January 2017, the International Commission against Impunity in Guatemala [*Comisión Internacional contra la Impunidad en Guatemala*] (CICIG) and the Public Ministry (MP) filed a request for a preliminary impeachment hearing against Representative Julio Antonio Juárez Ramírez for the March 10, 2015 death of journalists Danilo Efraín Zapón López and Federico Benjamín Salazar Gerónimo in Mazatenango, Suchitepéquez.

---

[427] Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situtation in Guatemala," December 22, 2017.

[428] Periodistas en Español. January 20, 2017. *Periodistas asesinados en Guatemala: Manuel Salvador Villagrán*; Radio ONU. February 3, 2017. *Condena por el asesinato del periodista Manuel Salvador Villagrán en Guatemala*; Notas Periodísticas. January 24, 2017. *Cámara Guatemalteca de Periodismo pide al MP pronta investigación de asesinato*.

[429] CNN en Español. May 4, 2017. *Once periodistas fueron asesinados en quince meses en Guatemala*.

[430] Centro de Reportes Informativos sobre Guatemala (Cerigua). July 8, 2017. *CERIGUA condena el vil asesinato de comunicador en Petén*; elPeriódico. July 12, 2017. *Otro comunicador asesinado*.

[431] Committee to Protect Journalists (CPJ). December 19, 2016. *Searching for answers in murder cases amid violence and corruption in Guatemala*.

[432] *Ibid.*

DHSFF0561

Ramírez is alleged to have been the mastermind of the murders, and reportedly viewed Zapón López as "a threat to the consolidation of his candidacy as district representative and a challenge to his power in the area." In January 2017, two individuals were reportedly arrested for their participation in the journalists' deaths. [433] Another four individuals were reportedly apprehended at an initial phase. [434] In February, the Guatemalan Supreme Court (CSJ) heard the request for a preliminary impeachment hearing against Representative Juárez Ramírez. [435] In November, the Investigative Judge [*Jueza Pesquisidora*]appointed by the Supreme Court of Justice [*Corte Suprema de Justicia*] (CJS) in the case against Representative Juárez Ramírez, would have recommended to the plenary of judges of the CSJ to withdraw the immunity of the parliamentarian to be investigated for the murder of the journalists.[436]

260.   In June 2017, it was learned that through its Office of the Special Prosecutor against Impunity [*Fiscalía Especial contra la Impunidad*], the Public Ministry was able to get High-Risk Court "B" [*Juzgado de Mayor Riesgo "B"*] to admit 81 items of evidence against the alleged murderers of Danilo López and Federico Salazar. It was also determined that the trial will be held in High-Risk Court "A" [*Tribunal "A" de Mayor Riesgo*].[437]

261.   Additionally, during the first half of 2017, through the actions of the Public Ministry's Unit for Crimes against Journalists [*Unidad de Delitos contra Periodistas*], two individuals were convicted of crimes committed against journalists during 2016. On May 30, Byron Eduardo Felipe Morales was sentenced to 40 years for the June 2016 murder of journalist Víctor Hugo Valdez Cardona. Similarly, on June 2, Rolando Antonio Jiménez Cruz was sentenced to 23 years for the September 4, 2016 death of journalist Felipe David Munguía Jiménez. The investigation is reportedly ongoing in an effort

---

[433]   International Commission against Impunity in Guatemala (CICIG). January 26, 2017. *Antejuicio contra diputado y capturas en caso asesinato de periodistas*; Prensa Libre. January 26, 2017. *Diputado Julio Juárez habría ordenado el asesinato de periodista Danilo López*; Ministerio Público (MP). February 1, 2017. *Sindicados en crimen de Periodistas son ligados a proceso penal*.

[434]   Ministerio Público (MP). February 1, 2017. *Sindicados en crimen de Periodistas son ligados a proceso penal*; International Commission against Impunity in Guatemala (CICIG). January 26, 2017. *Antejuicio contra diputado y capturas en caso asesinato de periodistas*.

[435]   Prensa Libre. February 9, 2017. *Empieza antejuicio contra diputado Julio Juárez Ramírez*; Guatevisión. February 8, 2017. *CSJ da trámite a antejuicio contra diputado de FCN Julio Juárez*.

[436]   Centro de Reportes Informativos sobre Guatemala (Cerigua). November 6, 2017. *Jueza Pesquisidora recomienda retirar inmunidad a diputado Juárez por asesinato de periodista*; CRN Noticias. November 7, 2017. *Juez recomienda retirar inmunidad al diputado Julio Juárez por asesinato de periodistas*; elPeriódico. November 6, 2017. *Recomiendan retirar inmunidad a diputado señalado por muerte de dos periodistas*; Soy502. No date. *Recomiendan quitar inmunidad a diputado de FCN implicado en asesinato*; Guatevisión. November 6, 2017. *Diputado de FCN contra las cuerdas: Recomiendan retirar inmunidad a Julio Juárez*.

[437]   Ministerio Público (MP). June 15, 2017. *Un total de 81 medios de prueba serán utilizados en juicio contra implicados en muerte de periodistas*.

to establish the identity of the masterminds of the crime against Jiménez. [438]

262. The IACHR received information about the May 2017 inauguration of a Prosecution Unit for Crimes against Journalists [*Unidad de Delitos contra Periodistas del Ministerio Público*] in Quetzaltenango. According to reports, the Prosecutor's Office in Quetzaltenango is composed of one prosecutor, three assistant prosecutors, one prosecution officer, and an administrative assistant. [439] This agency has territorial jurisdiction over the departments of Suchitepéquez, Retalhuleu, San Marcos, Huehuetenango, Totonicapán, Sololá, and Quetzaltenango. [440] In addition, according to information provided by the State, a division of the Unit for Crimes against Journalists that operates in Guatemala City was established in 2017, which includes: an agency that handles common crimes, made up of one prosecutor, 5 assistant prosecutors, and one prosecution officer; and another agency that investigates crimes against the person committed against journalists, comprised by one prosecutor, 4 assistant prosecutors, and one prosecution officer. A driver has also reportedly been assigned to provide assistance in investigative proceedings. [441] This staffing increase represents a strengthening of the Unit's human resources, which in 2015 had only five prosecutors to handle over 100 cases. [442] The State additionally reports that a general instruction from the Attorney General and Head of the Public Ministry that contains general guidelines for investigating cases in which the victims are human rights defenders (including journalists) is currently at the approval stage. [443]

---

[438]   Ministerio Público (MP). May 30, 2017. _Un hombre fue condenado a 40 años de prisión por muerte de periodista_; Centro de Reportes Informativos sobre Guatemala (Cerigua). May 30, 2017. _Asesino de periodista condenado a 40 años de prisión inconmutables_; Centro de Reportes Informativos sobre Guatemala (Cerigua). June 2, 2017. _MP logra nueva condena por crimen contra periodista_; Ministerio Público (MP). June 2, 2017. _Un hombre fue condenado a 23 años de prisión por muerte de periodista_;  El Nacional. June 2, 2017. _Guatemala: asesino de periodista recibe 23 años de cárcel_; Clases de Periodismo. June 3, 2017. _Guatemala: asesino de periodista recibe 23 años de cárcel_.

[439]   El Periódico. May 9, 2017. _Inauguran fiscalías en Quetzaltenango_; Centro de Reportes Informativos sobre Guatemala (Cerigua). May 9, 2017. _Thelma Aldana inauguró Agencia Fiscal de Delitos contra Periodistas en Quetzaltenango_.

[440]   República de Guatemala. Communication from the State of Guatemala regarding the request for information from the Office of the Special Rapporteur for Freedom of Expression of the IACHR. Ref. P-1021-2017/VHG/LWC/nj. July 24, 2017. Available at: Archive of the Office of the Special Rapporteur for Freedom of Expression.

[441]   _Ibid._

[442]   IACHR. Situation of Human Rights in Guatemala: Diversity, Inequality and Exclusion. OEA/Ser.L/V/II. Doc. 43/15. December 31, 2015, para. 295.

[443]   República de Guatemala. Communication from the State of Guatemala regarding the request for information from the Office of the Special Rapporteur for Freedom of Expression of the IACHR. Ref. P-1021-2017/VHG/LWC/nj. July 24, 2017. Available at: Archive of the Office of the Special Rapporteur for Freedom of Expression.

DHSFF0563

263. The IACHR notes in particular the efforts made by the Public Ministry to address the obligation to pursue full justice for murdered journalists, bearing in mind the specificities of these types of investigations. However, it also takes note of the delay in prosecuting the masterminds in some of these cases, due to the lack of coordination among the different state agencies with jurisdiction over the matter.

264. The IACHR has reiterated that the murder of journalists constitutes the most extreme form of censorship and States have a positive obligation to identify and punish the perpetrators of these crimes. For the Inter-American Commission, it is essential that the Guatemalan State investigate in a complete, effective, and impartial manner the murders of journalists and clarify their motives and judicially determine the relationship they may have with journalism and freedom of expression. The authorities should not rule out the exercise of journalism as a motive for murder and/or aggression before the investigation is completed. The omission of logical lines of investigation or the lack of diligence in collecting evidence in this regard can have serious repercussions on the development of the processes in stages of prosecution or trial.[444] Not having exhausted completely the logical lines of investigation affects, above all, that the intellectual authors cannot be identified.[445]

265. As established by the Special Rapporteur of the United Nations (UN) for the Protection and Promotion of the Right to Freedom of Opinion and Expression and the Office of the Special Rapporteur for Freedom of Expression of the Inter-American Commission on Human Rights of the Organization of the American States (OAS), the State "has the duty to ensure that journalists and media workers reporting on public demonstrations are not arrested, threatened, assaulted, or limited in any manner in their rights as a result of the practicing their profession. Their work material and tools must not be destroyed or confiscated by the authorities." Moreover, "the authorities must not stigmatize or stereotype demonstrators and their demands. They must refrain from making generalizations based on isolated events or the conduct of particular groups." [446]

---

[444] IACHR. Office of the Special Rapporteur for Freedom of Expression. Special Study on the Status of Investigations into the Murders of Journalists during the 1995-2005 Period for Reasons that may be Related to their Work in Journalism. OEA/Ser.L/V/II.131. Doc. 35, March 8, 2008, para. 116.

[445] Idem, Para. 125-126; IACHR. Office of the Special Rapporteur for Freedom of Expression. Impunity, self-censorship and armed internal conflict : an analysis of the state of freedom of expression in Colombia. OEA/Ser.L/V/II Doc.51. August 31, 2005. paras. 65-66.

[446] United Nations (UN) Special Rapporteur on the Protection and Promotion of the Right to Freedom of Opinion and Expression and Special Rapporteur for Freedom of Expression of the OAS Inter-American Commission on

DHSFF0564

## 2.    Threats, Arrests, Harassment, and Attacks on Journalists and Media Outlets

266. In its report entitled *Situation of Human Rights in Guatemala: Diversity, Inequality, and Exclusion*, the IACHR observed that, given their difficult working conditions, some journalists are said to have opted for self-censorship to protect themselves from attacks and threats. Between January and August of 2015, the Office of the Prosecutor for Crimes against Journalists [*Fiscalía de Delitos contra Periodistas*] received 81 complaints— a figure that surpassed the numbers recorded in each of the three previous years.[447]

267. More recently, during the on-site visit, journalists and organizations that defend freedom of expression reported to the IACHR a spike in threats and stigmatization on social media, assaults by law enforcement officers, and a climate of sharp social and political polarization that also permeates the practice of journalism, especially opinion journalism. According to press organizations, local politicians, members of the National Police, and organized crime are sources of intimidation in areas of the country outside the capital. Under the difficult working conditions, some journalists have reportedly continued to engage in self-censorship to protect themselves from attacks and threats. In 2017, between January and August, the Office of the Prosecutor for Crimes against Journalists reportedly received 53 complaints, 24 of which alleged threats.[448] Additionally, 170 complaints are reportedly at the initial criminal investigation phase in the common crimes unit, including the Department of Quetzaltenango, and 24 complaints are pending in the unit for crimes against the person. Some of the most notable cases of 2017 are detailed below.[449]

268. On March 1, photojournalist Alex Cruz and driver Ernesto Hidalgo, of the newspaper *elPeriódico*, were reportedly intercepted by two unknown men

---

Human Rights. September 13, 2013. *Joint declaration on violence against journalists and media workers in the context of protests*.

[447] IACHR. Situation of Human Rights in Guatemala: Diversity, Inequality and Exclusion. OEA/Ser.L/V/II. Doc. 43/15. December 31, 2015, para. 289.

[448] Information received during the on-site visit to Guatemala between July 30 and August 4, 2017. Data from the Unidad Fiscal de Delitos contra Periodistas. Available at: Archive of the Office of the Special Rapporteur for Freedom of Expression.

[449] República de Guatemala. Communication from the State of Guatemala regarding the request for information from the Office of the Special Rapporteur for Freedom of Expression of the IACHR. Ref. P-1021-2017/VHG/LWC/nj. July 24, 2017. Available at: Archive of the Office of the Special Rapporteur for Freedom of Expression.

DHSFF0565

who threatened them with firearms and confiscated their cell phones and photography equipment.[450]

269.  In June, it was learned that journalist Marielos Monzón, a columnist for *Prensa Libre,* filed a complaint with the Public Ministry's Prosecution Unit for Crimes against Journalists alleging that she had been subject to threats and intimidation. According to the information available, a list had reportedly been distributed in recent weeks to members of organized crime blaming her and other journalists for being responsible for the legal proceedings brought against individuals involved in drug trafficking crimes. This was reportedly not the first time the journalist had been accused of criminal activity—in 2011 she and 50 other individuals were accused of participating in various crimes during the internal armed conflict, although in fact she was just a child at the time. That complaint was dismissed by the Prosecutor's Office.[451]

270.  The same month, it was reported that Edgar Rubio Castañeda, an Infantry Colonel in the Guatemalan Army, had been interrogated by military authorities because of his book *Desde el cuartel, otra visión de Guatemala* ["From the Barracks: Another View of Guatemala"]. A Military Honor Board [*Junta de Honor Militar*], which was reportedly established specifically to question him about the publication of the aforementioned book, reportedly demanded that Rubio Castañeda present defense evidence. Additionally, the Board reportedly accused him of insubordination to the Army and of failing to conform to the institution, both of which are punishable under the Military Code.[452]

271.  In July, *Centro Pen* [PEN Center] Guatemala condemned the assaults committed against various reporters from *Prensa Libre* in the capital and Quetzaltenango, and from *Nuestro Diario*. According to the organization, reporters Rigoberto Escobar, Carlos Paredes, Edwin Pitán, Carlos Ventura, and Byron Bravo were assaulted by members of the security details of politicians and private electric power generation companies in outlying

---

[450]  Inter American Press Association (IAPA). Guatemala. March 27, 2017; elPeriódico. April 2, 2017. *La prensa de Guatemala recurre al silencio por miedo a políticos y criminales*; Cámara Guatemalteca de Periodismo. March 1, 2017. *Asaltan a fotoperiodista de Diario ElPeriódico*.

[451]  Cimacnoticias. June 28, 2017. *Guatemala: amenazas contra periodista Marielos Monzón*; Inter American Press Association (IAPA). July 6, 2017. *Guatemala: Denuncian amenaza e intimidación contra periodista*; Centro de Reportes Informativos sobre Guatemala (Cerigua). July 4, 2017. *Centro PEN Guatemala se solidariza con Marielos Monzón*; Centro Pen Guatemala. Press release, June 28, 2017. Available at: http://centropenguatemala.blogspot.com/; Guatevisión. June 26, 2017. *Lista en poder de narcos señala a una periodista*.

[452]  La Hora. May 23, 2017. *Junta de Honor cita a coronel por publicación del libro "Desde el cuartel"*; Prensa Comunitaria. May 31, 2017. *Ministro de la Defensa y Jefe del Estado Mayor podrían enfrentar denuncias formales por violar la Constitución*; elPeriódico. May 25, 2017. *Ejército exige a coronel que pruebe que la institución armada violó derechos humanos*.

areas of the country.[453] Similarly, on September 7, Rony Rolando Castillo, the *Nuestro Diario* correspondent for central-north Santa Rosa, was reportedly assaulted and had his photography equipment stolen by a group of tuk-tuk drivers while photographing a demonstration outside the Cuilapa National Hospital in Santa Rosa.[454]

272. As previously indicated, the sharp social and political polarization permeating the practice of journalism in Guatemala, threats, harassment, and the stigmatization of journalists, media workers and media outlets, among other things, were also reported. Some of the most notable cases from 2017 are detailed below.

273. On February 28, during a press conference, President Jimmy Morales reportedly blamed the media for spreading rumors of a coup d'état in Guatemala.[455] According to reports, the president himself was the one who raised the issue on February 16, when he alleged that he had heard "well-founded rumors" of a possible coup in Guatemala.[456]

274. According to the information available, on August 28, *Guatevisión* denounced the publication of a fake Facebook page, which acused the media outlet of being a "traitor to the nation," allegedly manipulating information, and placing the country in foreign hands. According to reports, that message was apparently replicated by accounts with few posts in their history, with few contacts, or contacts that were hidden or created within the past two or three years—which in turn attacked the channel on its own Facebook page, as well as in the comment sections of articles that had been shared. These events reportedly occurred in reaction to the channel's uninterrupted coverage the previous day of President Jimmy Morales's decision to declare Iván Velázquez *persona non grata*.[457]

275. Following the smear campaign that had been waged on social media against journalists and the news media, the Office of the Human Rights Ombudsman [*Procuraduría de Derechos Humanos*] (PDH) opened a file on September 2, as Ombudsman Augusto Jordán Rodas Andrade had indicated

---

[453]    Pen International. July 28, 2017. *PEN Guatemala denuncia las recientes agresiones en contra periodistas*.

[454]    Centro de Reportes Informativos sobre Guatemala (Cerigua). September 8, 2017. *Santa Rosa: Periodista fue agredido por "tuctuqueros"*; Pen International. September 13, 2017. *Pen Guatemala denounces attack against journalist*.

[455]    Prensa Libre. March 1, 2017. *Jimmy Morales se contradice*; Guatevisión. March 1, 2017. *[VÍDEO] Jimmy revela más detalles de supuesto golpe de Estado*; Inter American Press Association (IAPA). Guatemala. March 27, 2017.

[456]    HispanTV. February 17, 2017. *Presidente guatemalteco advierte de un golpe de Estado en el país*; República. February 16, 2017. *Jimmy Morales: "hay rumores de golpe de estado"*.

[457]    Prensa Libre. August 29, 2017. *Guatevisión denuncia bloqueo y campaña en su contra por recientes coberturas*; Aquítodito. August 30, 2017. *Denuncian ataque e insultos contra Guatevisión*.

DHSFF0567

that, "there is an intent to disparage journalists in these times of so much uncertainty in Guatemala, which may jeopardize our fragile democracy."[458]

276. On August 29, various media outlets complained of the restrictions placed on their coverage of the Regional Intelligence Conference in which President Jimmy Morales took part. According to the information available, a group of journalists was reportedly assaulted by members of the Secretariat of Administrative and Security Affairs [*Secretaría de Asuntos Administrativos y de Seguridad*] (SAAS). At the same event, SAAS staff reportedly tried to grab a camera that the reporters were using to film the incident. The President reportedly left without making any statements to the press.[459]

277. All types of threats, attacks, or harassment directed against journalists, media personnel, or media outlets themselves must be investigated by the justice system and the authorities should not proceed to discard the practice of journalism as the motive for criminal acts before an investigation is over. States have an obligation to take effective steps to prevent attacks against journalists and others exercising their right to freedom of expression and to combat impunity, specifically by vehemently condemning such attacks when they occur, through prompt and effective investigation, in order to duly punish perpetrators and make reparation to victims, as appropriate. States also have an obligation to provide protection to journalists and others exercising their right to freedom of expression, who run a grave risk of being attacked.[460]

278. Likewise, principle 9 of the Declaration of Principles on Freedom of Expression provides that "[t]he murder, kidnapping, intimidation of and/or threats to social communicators, as well as the material destruction of communications media violate the fundamental rights of individuals and strongly restrict freedom of expression. It is the duty of the state to prevent and investigate such occurrences, to punish their perpetrators and to ensure that victims receive due compensation."

---

[458] Prensa Libre. September 2, 2017. *PDH abre expediente para investigar campaña de desprestigio contra la prensa independiente*; Procurador de los Derechos Humanos (PDH). September 4, 2017. *PDH abre expediente por campaña para desacreditar a periodistas y medios de información*.

[459] Publinews. August 29, 2017. *Se registra altercado entre periodistas y SAAS en actividad donde participó Jimmy Morales*; Cámara Guatemalteca de Periodismo. August 29, 2017. *Periodistas denuncian agresiones de miembros de la SAAS*.

[460] The United Nations (UN) Special Rapporteur on Freedom of Opinion and Expression, the Organization for Security and Co-operation in Europe (OSCE) Representative on Freedom of the Media, the Organization of American States (OAS) Special Rapporteur on Freedom of Expression and the African Commission on Human and Peoples' Rights (ACHPR) Special Rapporteur on Freedom of Expression and Access to Information. May 4, 2015. *Joint declaration on freedom of expression and responses to conflict situations*.

### 3.    Censorship

279.    During 2017, the IACHR and the Office of the Special Rapporteur for Freedom of Expression also received information about alleged cases of censorship in Guatemala. In February, a group of journalists working for the newspaper *Contrapoder* complained that an article about Iván Velásquez, head of the International Commission against Impunity in Guatemala (CICIG), was censored. The article, entitled "*Emboscada contra Iván Velásquez*" ["Ambush of Iván Velásquez"] was supposedly withdrawn moments before the magazine went to press. [461] According to the information available, the reason given by the vice president of the publishing group for its withdrawal was a lack of "journalistic rigor."[462]

280.    According to reports, *Guatevisión's* signal was reportedly blocked in several departments of the country between 10:00 a.m. and 5:00 p.m., and 6:00 p.m. and 9:00 p.m. on August 27, while it was airing uninterrupted coverage of President Jimmy Morales's decision to declare Iván Velázquez, head of the International Commission against Corruption in Guatemala (CICIG), *persona non grata*. The blocking of *Guatevisión's* signal, which was allegedly done by cable companies tied to certain political groups, and had occurred during the broadcast of "news that affected [certain] interests. It happened to us in Petén, Retalhuleu, Quetzaltenango, and Sololá."[463]

281.    Article 13.2 of the American Convention explicitly states that the exercise of freedom of expression cannot be subject to prior censorship. Additionally, Principle 5 of the <u>Declaration of Principles on Freedom of Expression</u> establishes that, "Prior censorship, direct or indirect interference in or pressure exerted upon any expression, opinion or information transmitted through any means of oral, written, artistic, visual or electronic communication must be prohibited by law. Restrictions to the free circulation of ideas and opinions, as well as the arbitrary imposition of

---

[461]    Centro de Reportes Informativos sobre Guatemala (Cerigua). <u>Estado de la Situación de la Libertad de Expresión en Guatemala – Primer Trimestre 2017</u>. May 2, 2017; Iniciativa Mesoamericana de Mujeres Defensoras de Derechos Humanos. March 3, 2017. <u>#AlertaDefensoras GUATEMALA / Censuran artículo sobre la campaña de desprestigio que enfrenta el CICIG</u>; Pedrovisión Noticias. March 4, 2017. <u>LA NOTA CHAPINA: La historia de la nota censurada sobre Iván Velásquez en "Contrapoder</u>.

[462]    Centro de Reportes Informativos sobre Guatemala (Cerigua). <u>Estado de la Situación de la Libertad de Expresión en Guatemala – Primer Trimestre 2017</u>. May 2, 2017; Iniciativa Mesoamericana de Mujeres Defensoras de Derechos Humanos. March 3, 2017. <u>#AlertaDefensoras GUATEMALA / Censuran artículo sobre la campaña de desprestigio que enfrenta el CICIG</u>; Pedrovisión Noticias. March 4, 2017. <u>LA NOTA CHAPINA: La historia de la nota censurada sobre Iván Velásquez en "Contrapoder</u>.

[463]    Prensa Libre. August 29, 2017. <u>Guatevisión denuncia bloqueo y campaña en su contra por recientes coberturas</u>; Centro de Reportes Informativos sobre Guatemala (Cerigua). August 31, 2017. <u>APG denuncia que Guatevisión ha sido objeto de censura</u>.

DHSFF0569

information and the imposition of obstacles to the free flow of information violate the right to freedom of expression."

## 4.    Program for the Protection of Journalists and Media Workers

282.    In October 2012, during the Universal Periodic Review (UPR), Guatemala agreed to create a Program for the Protection of Journalists. That commitment was reiterated on November 28, 2013 by then-President of Guatemala, Otto Pérez Molina.[464] Nevertheless—nearly five years later— the implementation of such a program continues to be under discussion, despite the repeated recommendations of the IACHR, its Office of the Special Rapporteur, UNESCO, and OHCHR to move forward with its creation. In 2014, a High-Level Committee and a Technical Committee were established, consisting of the Presidential Commission coordinating the Executive's Policy on Human Rights [*Comisión Presidencial Coordinadora de la Política del Ejecutivo en Materia de Derechos Humanos*] (COPREDEH), the Ministry of the Interior [*Ministerio de Gobernación*], the Public Ministry, and the Social Communication Secretariat of the Presidency [*Secretaría de Comunicación Social de la Presidencia de la República*] (SCSPR). Their objective was to design and implement a program for the protection of journalists.[465]

283.    The following year, the government made progress on the design of the mechanism, in consultation with civil society and human rights organizations. Together, the High-Level Committee and the Technical Committee worked to design and implement the protection mechanism for journalists. This work was also supported by UNESCO and the Office of the High Commissioner for Human Rights (OHCHR). An initial document entitled "Preliminary Proposal - Program for the Protection of Journalists" was drafted, and the institutions that should make up the Program, their powers with respect to protection, and the mechanisms for coordination were identified. In this context, after being debated by journalists and defenders of the right to freedom of expression, a set of observations, recommendations, and comments was submitted to the Technical

---

[464]    The commitment was co-signed by the Vice President, the Minister of the Interior, the Chairman of the Comisión Presidencial Coordinadora de la Política del Ejecutivo en materia de Derechos Humanos (COPREDEH), with representatives of the Human Rights Ombudsman Institution, the Office of the Attorney General; and as witnesses of honor, the Resident Coordinator of the United Nations and the Representative of the United Nations Educational, Scientific and Cultural Organization – UNESCO.

[465]    IACHR. Annual Report 2014. <u>Annual Report of the Office of the Special Rapporteur for Freedom of Expression Chapter II: Evaluation of the State of Freedom of Expression in the Hemisphere</u>. OEA/Ser.L/V/II Doc. 13. March 9, 2015, paras. 557-560.

Committee, which were considered by the latter and focused on the conceptual design of the System to Protect the Practice of Journalism [*Sistema de Protección al Ejercicio Periodístico*] (SPEP).[466] Nevertheless, various journalists' associations claimed that they had little to no participation in preparing the proposal. Finally, in 2016, after the new government came to power, President Jimmy Morales's administration decided to suspend the process and begin a new process for establishing the mechanism.[467]

284. More recently, on different occasions in 2017, then-Human Rights Ombudsman Jorge de León Duque urged the government to implement the Program for the Protection of Journalists without delay. On February 7, the then-Human Rights Ombudsman expressed his concern over the vulnerable situation of the country's journalists, especially those who carry out their activities in areas outside Guatemala City, and urged the government to implement the program soon.[468]De León Duque reiterated that need on May 3, in a statement released for World Press Freedom Day.[469]

285. In February, the Press Alliance [*Alianza de Entidades de Prensa*] reportedly denounced the Guatemalan State for failing to keep its promise to adopt a Program for the Protection of Journalists. In the joint statement signed by the Association of Journalists of Guatemala (APG), the Guatemalan Chamber of Journalism [*Cámara Guatemalteca de Periodismo*] (CGP), the Guatemalan Chamber of Professional Broadcast Announcers [*Cámara de Locutores Profesionales de Guatemala*] (CLPG), and Guatemalan Sports Reporters [*Cronistas Deportivos Guatemaltecos*] (CDG), the Alliance condemned the Guatemalan government's apparent lack of will to fulfill its promises with respect to the Program.[470] On June 1, after Representative Sandra Morán announced her willingness to work on a legislative bill for

[466]   *Idem*, paras. 683-694.

[467]   IACHR. Anual Report 2016. Annual Report of the Office of the Special Rapporteur for Freedom of Expression. Chapter II (Evaluation of the State of Freedom of Expression in the Hemisphere). OEA/Ser.L/V/II. Doc. 22/17 March 15, 2017, para. 657.

[468]   Centro de Reportes Informativos sobre Guatemala (Cerigua). February 7, 2017. PDH insta al gobierno a la pronta implementación del Programa de Protección a Periodistas; Prensa Libre. February 8, 2017. PDH pide protección a periodistas; La Conexiónusa.com/EFE. February 7, 2017. Ombudsman pide a Guatemala implementar un plan de protección para periodistas.

[469]   Centro de Reportes Informativos sobre Guatemala (Cerigua). May 3, 2017. PDH reitera necesidad de establecer Programa de Protección a Periodistas; Procurador de los Derechos Humanos. May 3, 2017. Comunicado PDH – Día Mundial de la Libertad de Prensa. Available at: http://pdh.org.gt/biblioteca/sala-de-prensa/category/16-comunicados.html?start=10

[470]   Centro de Reportes Informativos sobre Guatemala (Cerigua). February 24, 2017. Alianza de Entidades de Prensa denuncia al Estado por incumplimiento de promesas; El Clarín. February 24, 2017. Alianza de Entidades de Prensa de Guatemala en comunicado conjunto denuncia incumplimiento del gobierno; Inter American Press Association (IAPA). Guatemala. March 27, 2017.

DHSFF0571

the protection of journalists, the Press Alliance reportedly dismissed the intent of some congressional representatives who support such a law, alleging that they did not enjoy public confidence and credibility, and that the intent of the initiative was not just to protect journalists but also to create opportunities and processes for regulation that would include a general media law.[471]

286. On May 2, Guatemalan Vice President Jafeth Cabrera and his communications team met with the Press Alliance to address the establishment of the Program for the Protection of Journalists, which reportedly has made no progress since July 2016. Jafeth Cabrera was said to have offered to look into the reasons for the alleged delay, and indicated that if the President would delegate the proposal to him, he would make the effort to move it forward.[472]

287. On this point, the IACHR took note of President Jimmy Morales's announcement during the on-site visit to the effect that the government was working on a Program for the Protection of Journalists and Media Workers in consultation with journalists' organizations, and that he would approve it as soon as possible.

288. During the on-site visit, the IACHR again heard complaints from various civil society organizations, including Cerigua and other collectives of the Press Alliance,[473] regarding the government's lack of political will to move forward with the creation, funding, and implementation of a protection mechanism, despite the long-standing assurances offered by the Executive Branch. The IACHR also received a letter signed by a number of active journalists demanding a public and participatory consultation in the process for the creation of the protection mechanism.[474]

---

[471] Notas Periodísticas. June 2, 2017. *Alianza de Entidades de Prensa refuta fingido proyecto de Ley a favor del gremio*; elPeriódico. June 2, 2017. *Entidades de Prensa rechazan propuesta de diputada*; Centro de Reportes Informativos sobre Guatemala (Cerigua). June 1, 2017. *Entidades de Prensa se oponen a intención de diputados de crear espacios de protección a periodistas*.

[472] Centro de Reportes Informativos sobre Guatemala (Cerigua). May 2, 2017. *Vicepresidente escucha propuesta de Programa de Protección a Periodistas*.

[473] Asociación de Periodistas de Guatemala (APG), Cámara Guatemalteca de Periodismo (CGP), Centro de Reportes Informáticos de Guatemala (Cerigua), Cámara de Locutores Profesionales de Guatemala, Cronistas Deportivos Guatemaltecos, Asociación de Periodistas Marquenses, Asociación de Prensa de Huehuetenango, Asociación de Periodistas Comunitarios de Verapaz (APCV). Asociación de Periodistas y Comunicadores Sociales de Alta Verapaz (APC-AV), Asociación de Periodistas de Jutiapa (APJ), Red de Comunicadores Sociales de Chiquimula (RCS), Asociación de Comunicadores de Santa Rosa, Asociación de Prensa Jalapaneca (Aprej), Asociación de Comunicadores "Omar Aguirre" Huehuetenango, Asociación de Periodistas y Comunicadores Sociales de Sololá, Asociación de Prensa Quetzalteca (APQ).

[474] Communication delivered to the Special Rapporteur for Freedom of Expression, Edison Lanza, by a group of journalists during the on-site visit to Guatemala. Available at: Archive of the Office of the Special Rapporteur for Freedom of Expression.

DHSFF0572

289.   The IACHR observes, according to information provided by the State, that the Ministry of the Interior, through the National Civil Police and its Personal Protection and Security Division [*División de Protección a Personas y Seguridad*], is responsible for providing security to human rights defenders, journalists, trade unionists, and others pursuant to Government Order 97-2009, which has been in force since April 3, 2009. According to the Guatemalan State, supplemental protection measures are provided through personal security, permanent security posts, and perimeter security. Additionally, the Presidential Commission coordinating the Executive's Policy on Human Rights [*Comisión Presidencial Coordinadora de la Política del Ejecutivo en Materia de Derechos Humanos*] (COPREDEH) published the "Protocol for the Protection of Journalists" [*Protocolo para Protección a Periodistas*], detailing a number of situations and rules that provide individuals who practice journalism with an overview of situations of risk. It also published the "Protection Manual for Journalists and Media Workers" [*Manual de protección para periodistas y comunicadores*], addressing national and international laws, permissible restrictions, and other material.[475]

290.   More recently, the Guatemalan news agency *Centro de Reportes Informativos sobre Guatemala* [Center for News Reports on Guatemala] (Cerigua), launched a campaign in Geneva with members of the diplomatic missions of different States in order to express their concern over the lack of progress on the establishment of the Program for the Protection of Journalists. The organization underscored that advances were made in the protection of the press, such as the establishment of the Body for the Analysis of Attacks on Human Rights Defenders [*Instancia de Análisis de Ataques contra Defensores de Derechos Humanos*], an entity coordinated by the Ministry of the Interior whose participants include the Public Ministry (MP), the Presidential Commission coordinating the Executive's Policy on Human Rights (COPREDEH), and the Office of the High Commissioner for Human Rights (OHCHR), as well as a variety of social actors, including the organization itself. Nevertheless, Cerigua indicated that the Ministry of the Interior had refused to approve the order that would enable the entity to continue operating. It further alleged that an advisor had needlessly blocked the approval of the government order to proceed with the creation

---

[475]   República de Guatemala. Brief from the State of Guatemala regarding the request for information prior to the on-site visit of the IACHR. Comisión Presidencial Coordinadora de la Política del Ejecutivo en materia de Derechos Humanos (COPREDEH). Ref. P-859-2017/VHGM/LWC/nj. June 16, 2017. Available at: Archive of the Office of the Special Rapporteur for Freedom of Expression.

DHSFF0573

of the Program for the Protection of Journalists, despite the existence of an order from the Office of the President.[476]

291.  In its comments to the draft of this report, the State of Guatemala stated that in November 2016 the President pushed for the creation of a Governmental Agreement that would create the Program for the Protection of Journalists and Social Communicators. According to the State, this program:

> "[W]ill be implemented in the office of Human Rights of the Minister of the Interior, who will define the legal procedures of the program, will establish its process within its jurisdiction, and will encompass any harm to the physical or psychological integrity, threat, harassment or intimidation against journalists and social communicators due to their profession. The Ministry of the Interior will issue the regulations for the specific activities of the program and will provide the necessary resources for its functioning. Currently, the Governmental Agreement that creates the program for the protection of journalists has been submitted to the consideration of various unionized sectors and journalists' organizations."[477]

292.  Based on the foregoing, the IACHR and its Office of the Special Rapporteur for Freedom of Expression remind the Guatemalan State some of the guidelines it has developed, and that should be taken into account in the design and operation of protection programs for journalists, among them: i) political commitment from the State, that must include an adequate legal framework, sufficient human resources, trained and prepared, capable of establishing trust with the persons who seek protection; with corresponding resources with a view to covering the costs of the personnel who work in the program and the specific expenses related to the protective measures provided; adopt rules clearly spelling out the authorities and responsibilities of the officials who will play a role in either implementing or monitoring the protection measures; ii) that it include the adequate identification of potential beneficiaries and an adequate recognition of the grounds on which a potential beneficiary can seek protection; iii) a proper risk assessment, considering the gender perspective, that enables the State to determine the best way to fulfill its obligation to protect, taking into account contextual and specific

---

[476]  Centro de Reportes Informativos sobre Guatemala (Cerigua). September 22, 2017. *Ileana Alamilla hace lobby en Ginebra por el Programa de Protección a Periodistas*.

[477]  Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situtation in Guatemala," December 22, 2017.

circumstances and providing for the active participation of the beneficiary; iv) the provision of suitable and effective protection measures that are tailored to both protect beneficiaries' life and integrity corresponding to journalists' needs and allow them to continue their professional activities; v) clear criteria and procedures for monitoring the effectiveness of the selected measures, and if the measures of protection are ineffective they will have to be adjusted to comport with the situation that the beneficiary is experiencing; vi) assess the risk in order to decide whether the measures of protection should be lifted with the beneficiaries' participation in order to get their view on the question of whether the measures should be lifted; and vii) material protective measures shall be linked to exhaustive and independent investigations by the pertinent authorities to prevent and reduce the sources of the risk.[478]

## B.    *Situation of broadcasting*

### 1.    Community Broadcasting

293.    During its on-site visit, the Inter-American Commission verified the lack of progress with regard to the obligation that the State assumed on multiple occasions to legally recognize the community broadcasting sector and effectively allocate permission for this sector to use frequencies. It additionally verified that, although Guatemala has no regulatory framework of policies for the incorporation of indigenous peoples into the broadcasting sector, it continued to persecute so-called "illegal" radio stations, which in some cases provide a service to the communities. While in some cases this persecution has been aimed at unauthorized commercial radio stations, in others it has also included the small radio stations of indigenous communities that broadcast in spite of the obstacles to accessing frequencies.

294.    In February 2016, the IACHR and its Office of the Special Rapporteur learned that the Guatemalan Congress was in the third phase of studying draft law 4087, the "Community Media Act" ["*Ley de Medios de Comunicación Comunitaria*"]. The bill, backed by civil society and the country's indigenous peoples, sought to guarantee "access to media for

---

[478]    IACHR. Annual Report 2013. Annual Report of the Office of the Special Rapporteur for Freedom of Expression. Chapter III (Violence Against Journalists and Media Workers: Inter-American Standards and National Practices on Prevention, Protection and Prosecution of Perpetrators). December 31, 2013, paras. 81-84; IACHR. Second Report on the Situation of Human Rights Defenders in the Americas. December 31, 2011, paras. 487-531.

indigenous communities and socially excluded minority sectors," promoting international standards. At the time, the Office of the Special Rapporteur stated that the legislative debate on the bill represented an extraordinary opportunity for the State to effectively comply with its international obligations in this area.[479] Nevertheless, the bill was defeated in an expedited procedure by the majority of a congressional Technical Committee, on the grounds that it lacked technical support and was an "untimely" and "unconstitutional" initiative.

295. More recently, during the on-site visit, the IACHR received with concern information about the application by analogy of the criminal offense of "frequency theft" ["*hurto de fluidos*"] and "theft" to community radio stations in order to bring criminal charges against them. The Guatemalan Association of Mayan Lawyers and Notaries reported that 46 community journalists have been convicted of this offense at this point.[480] In addition, César Gómez, a representative of the Community Radio Movement, reported that the State continues to harass these media outlets, and that at least 12 of them have been shut down in the past two years. He also reportedly stated that the Office of the Prosecutor for Crimes against Journalists and Trade Unionists stopped going after the community broadcasters once the situation was denounced before the IACHR; however, since then, the Office of the Prosecutor for Environmental Crimes [*Fiscalía de Delitos contra el Ambiente*] has reportedly been responsible for harassing these radios, despite the fact that the matter is not within its purview. Gómez further denounced that criminal proceedings were brought against community broadcasters without the administrative proceedings before the Superintendency of Telecommunications (SIT) first being exhausted, as required under the General Telecommunications Act [*Ley General de Telecomunicaciones*].[481]

296. According to the information available, various operations were carried out in the first half of the year to dismantle alleged "pirate radio stations"—the term used to refer to broadcasters that are not authorized to operate by the Superintendency of Telecommunications [*Superintendencia de Telecomunicaciones*] (SIT). According to information provided by the State, "Requests have been filed with the competent courts of Guatemala to

[479] IACHR. Anual Report 2016. Annual Report of the Office of the Special Rapporteur for Freedom of Expression. Chapter II (Evaluation of the State of Freedom of Expression in the Hemisphere). OEA/Ser.L/V/II. Doc. 22/17 March 15, 2017, para. 673.

[480] Communication by the Asociación de Abogados y Notarios Mayas de Guatemala. August 4, 2016 [sic]. Available at: Archive of the Office of the Special Rapporteur for Freedom of Expression.

[481] Centro de Reportes Informativos sobre Guatemala (Cerigua). July 5, 2017. *Las radios comunitarias en Guatemala, además de no ser reconocidas sufren persecución y criminalización*; Federación Guatemalteca de Escuelas Radiofónicas. July 11, 2017. *Sigue criminalización de la radio comunitaria*.

conduct 165 evidentiary searches and inspections of premises where investigations have yielded evidence of the unlawful use of radio frequencies. […] The seizure of the broadcasting equipment used as an instrument of the crime being prosecuted has also been requested." The State additionally indicated that, "Sixty-five convictions have been handed down to date, ordering the seizure of the broadcasting devices used in those unlawful activities."[482] Some of the most notable cases from 2017 are detailed below.

297. According to the information available, on February 15, authorities raided the radio station *La Jocosa* 104.7 FM,[483] and on February 22, in the municipality of Palencia, Guatemala, raids were carried out against 87.9 FM, *Promesa Stereo, Señal de Salvación*[484] and radio 104.7 MHz, resulting in the arrest of Eduardo Ortega Santos, who was subsequently charged with the offense of "theft." [485] Similarly, on March 8, in the municipality of Táctic, Department of Alta Verapaz, raids were conducted against stations using the frequencies 104.7 and 92.7, respectively.[486] The following day, a search was conducted at a property located in the municipality of Santa Lucía Cotzumalguapa associated with the frequency 95.9 FM.[487] Subsequently, on March 15, the Public Ministry (MP) announced the seizure of equipment used on three "illegal frequencies": radio station *Adoración Estéreo* in the municipality of Táctic, which operated on frequency 95.5 FM; radio station *Éxitos* in the municipality of Chamelco, which operated on frequency 104.3 FM, where Franklin Caz Caal was reportedly arrested and charged with "theft"; and finally, radio station *La Voz de Pocola* 105.5 FM, in the municipality of Pocola de Carchá.[488] On June 15, two raids were reportedly carried out in the municipalities of Patzicia and Patzún, Department of Chimaltenango, in connection with frequencies 91.9 and 107.9. José

[482]   República de Guatemala. Communication from the State of Guatemala regarding the request for information from the Office of the Special Rapporteur for Freedom of Expression of the IACHR. Ref. P-1021-2017/VHG/LWC/nj. July 24, 2017. Available at: Archive of the Office of the Special Rapporteur for Freedom of Expression.

[483]   Ministerio de Gobernación de Guatemala. February 15, 2017. *Localizan radio pirata en allanamiento*.

[484]   Ministerio de Gobernación de Guatemala. February 22, 2017. *Otra radio pirata desarticulada*.

[485]   Ministerio Público (MP). March 9, 2017. *Agencia que investiga delitos relacionados a frecuencias ilegales coordinó diligencia en Escuintla*.

[486]   Ministerio Público (MP). March 8, 2017. *MP coordina allanamientos por utilización de frecuencias ilegales en Alta Verapaz*.

[487]   Ministerio Público (MP). March 9, 2017. *Agencia que investiga delitos relacionados a frecuencias ilegales coordinó diligencia en Escuintla*.

[488]   CRN Noticias. March 15, 2017. *MP logra el cierre de tres radios que operaban de manera ilegal en Alta Verapaz*; Ministerio Público (MP). March 16, 2017. *Agencia de Delitos Cometidos por el Uso Ilegal de Frecuencia Radioeléctricas coordina allanamientos en Alta Verapaz*.

DHSFF0577

Lorenzo Choc Pérez was reportedly arrested and charged with theft in one of those raids.[489]

298.   On July 25, in the municipality of San Miguel Chicaj, Department of Baja Verapaz, staff from the Metropolitan District Prosecutor's Office and National Civil Police (PNC) officers carried out a raid on a radio station that was using frequency 107.5, which is reportedly assigned to *Radio TGW*, owned by the Guatemalan State. The operation reportedly resulted in the seizure of the equipment used to conduct the radio activity.  [490] Additionally, on August 31, in the municipality of Fray Bartolomé de las Casas, Department of Alta Verapaz, the Agency for Crimes Committed through the Unlawful Use of Radio Frequencies [*Agencia de Delitos Cometidos por el Uso Ilegal de Frecuencia Radioeléctricas*] reportedly seized the equipment used by frequency 92.5, including an amplifier, a CPU, an exciter, and various consoles. In the same incident, National Civil Police (PNC) officers reportedly arrested Santos Yaxcat Yat on suspicion of theft.[491]

299.   In spite of the situation described above, the IACHR took note of the fact that the community radio station *Snuq' Jolom Konob'* in Santa Eulalia—which it visited—reopened on December 2, 2016.[492] Previously, the Office of the Special Rapporteur had noted the harassment of the station, which was shut down by local authorities on January 20, 2015. There was an attempt to reopen it on March 19, 2016, but the attempt was blocked by the mayor and marred by violent incidents.[493] The IACHR takes particular note of the decision of the local authorities of Santa Eulalia in favor of the resumption of activities by *Snuq' Jolom Konob',* and of its journalists and media workers for their efforts to ensure that the population of Santa Eulalia has the means to access the right to freely seek, receive, and disseminate information and opinions.

---

[489]   Ministerio Público (MP). June 15, 2017. *Agencia que investiga delitos relacionados a frecuencias ilegales coordina diligencia en Chimaltenango.*

[490]   ChapinTV.com. July 25, 2017. *Realizan allanamiento en Baja Verapaz por radio pirata;* Ministerio Público (MP). July 26, 2017. *Baja Verapaz: Ministerio Público coordina allanamiento y secuestro de equipo en radio ilegal.*

[491]   Ministerio Público (MP). September 1, 2017. *MP incauta equipo utilizado en frecuencia ilegal en Alta Verapaz.*

[492]   Km 169 Prensa Comunitaria. November 30, 2016. *Después De Más De Un Año Censurada Por Fin La Radio Comunitaria Snuq' Jolom Konob'Logra Reabrirse;* Radio Comunitaria Snuq' Jolom Konob'/Facebook. December 2, 2016. *Celebración Reapertura de la comunitaria de Santa Eulalia.*

[493]   IACHR. Annual Report 2015. Annual Report of the Office of the Special Rapporteur for Freedom of Expression Chapter II (Evaluation of the State of Freedom of Expression in the Hemisphere) OEA/Ser.L/V/II. Doc.  48/15. December 31, 2015. Para. 716

300. Since 2000, the IACHR and its Office of the Special Rapporteur for Freedom of Expression have issued recommendations to the State of Guatemala in two aspects, namely: the need for a fairer and more inclusive legal framework for broadcasting and the decriminalization of broadcasting without a license.[494] The use of criminal law to punish violations to the broadcasting regime can be problematic in the light of the American Convention on Human Rights, and the establishment of criminal penalties for commercial or community broadcasting, which they may face due to the absence or misuse of the license, could constitute a disproportionate reaction.[495]Also, Article 13.2 of the American Convention on Human Rights holds that the exercise of the right to freedom of thought and expression "[s]hall not be subject to prior censorship but shall be subject to subsequent imposition of liability, which shall be expressly established by law to the extent necessary to ensure: a. respect for the rights or reputations of others; or b. the protection of national security, public order,

---

[494] IACHR. Office of the Special Rapporteur for Freedom of Expression. April 18, 2000. Press Release 24/00. Preliminary evaluation of freedom of expression in Guatemala; IACHR. Annual Report 2001. Annual Report of the Office of the Special Rapporteur for Freedom of Expression Chapter II (Evaluation of the State of Freedom of Expression in the Hemisphere). OEA/Ser./L/V/II.114. Doc. 5 rev. April 16, 2002, paras. 114-117; IACHR. Annual Report 2002. Annual Report of the Office of the Special Rapporteur for Freedom of Expression Chapter II (Evaluation of the State of Freedom of Expression in the Hemisphere). OEA/Ser.L/V/II.117. Doc. 1 rev. 1. March 7, 2003, para 139 – 141; IACHR. March 29, 2003. Press release of the Inter-American Commission on Human Rights 08-03; IACHR. Justice and Social Inclusion: The Challenges of Democracy in Guatemala. Chapter VII (The Situation of Freedom of Expression). OEA/Ser.L/V/II.118. Doc. 5 rev. 1. December 29, 2003, paras. 412 – 414; IACHR. Annual Report 2005. Annual Report of the Office of the Special Rapporteur for Freedom of Expression. Chapter II (Evaluation of the State of Freedom of Expression in the Hemisphere). OEA/Ser.L/V/II.124. Doc. 7. February 27, 2006, para. 91; IACHR. Annual Report 2007. Annual Report of the Office of the Special Rapporteur for Freedom of Expression. Chapter II (Evaluation of the State of Freedom of Expression in the Hemisphere). OEA/Ser.L/V/II.131 Doc. 34 rev. 1. March 8, 2008, para. 152; IACHR. Annual Report 2008. Annual Report of the Office of the Special Rapporteur for Freedom of Expression. Chapter II (Evaluation of the State of Freedom of Expression in the Hemisphere). OEA/Ser.L/V/II.134 Doc. 5 rev. 1. February 25, 2009, paras. 133 - 134; IACHR. Annual Report 2009. Annual Report of the Office of the Special Rapporteur for Freedom of Expression. Chapter II (Evaluation of the State of Freedom of Expression in the Hemisphere). OEA/Ser.L/V/II. Doc. 51. December 30, 2009, paras. 237 - 238; IACHR. Annual Report 2010. Annual Report of the Office of the Special Rapporteur for Freedom of Expression. Chapter II (Evaluation of the State of Freedom of Expression in the Hemisphere). OEA/Ser.L/V/II. Doc. 5. March 7, 2011, paras. 281 – 285; IACHR. Annual Report 2011. Annual Report of the Office of the Special Rapporteur for Freedom of Expression. Chapter II (Evaluation of the State of Freedom of Expression in the Hemisphere). OEA/Ser.L/V/II. Doc. 69. December 30, 2011, paras. 281 – 283; IACHR. Annual Report 2012. Annual Report of the Office of the Special Rapporteur for Freedom of Expression Chapter II (Evaluation of the State of Freedom of Expression in the Hemisphere). OEA/Ser.L/V/II.147. Doc. 1. March 5, 2013. paras. 275 – 281; IACHR. Annual Report 2013. Annual Report of the Office of the Special Rapporteur for Freedom of Expression. Chapter II (Evaluation of the State of Freedom of Expression in the Hemisphere). OEA/Ser.L/V/II.149. Doc. 50. December 31, 2013, para. 483; IACHR. Annual Report 2014. Annual Report of the Office of the Special Rapporteur for Freedom of Expression. Chapter II (Evaluation of the State of Freedom of Expression in the Hemisphere). OEA/Ser.L/V/II. Doc. 13. March 9, 2015, para. 577.

[495] IACHR. Annual Report 2013. Annual Report of the Office of the Special Rapporteur for Freedom of Expression. Chapter II (Evaluation of the State of Freedom of Expression in the Hemisphere).. OEA/Ser.L/V/II.149. Doc. 50. December 31, 2013, para. 129; IACHR. Annual Report 2011. Annual Report of the Office of the Special Rapporteur for Freedom of Expression. Chapter II (Evaluation of the State of Freedom of Expression in the Hemisphere). OEA/Ser.L/V/II. Doc. 69. December 30, 2011, para. 467.

DHSFF0579

or public health or morals." Additionally, the Inter-American case law has emphasized that the States have the obligation to "adopt affirmative measures (legislative, administrative, or of any other nature), under conditions of equality and non-discrimination, to reverse or change existing discriminatory situations that may compromise certain groups' effective enjoyment and exercise of the right to freedom of expression."[496]

## 2.    Improper concentration of media ownership

301.    During its on-site visit to Guatemala, the IACHR confirmed that the State has made no progress with respect to the excessive degree of concentration in the ownership and control of audiovisual media, especially free-to-air television. In December 2012, Decree 34-2012 entered into force, amending the General Telecommunications Act to extend by 20 years the titles to the usufructuary rights to the radio spectrum.[497] One of the main beneficiaries of the reform was Mexican businessman Ángel González, who holds rights to the frequencies and is the owner of four private VHF channels that broadcast in Guatemala. In addition, according to the report on Campaign Finance in Guatemala published by the International Commission against Impunity in Guatemala (CICIG) in July 2015, "There is probably no other case in the world where a single individual owns the four existing private VHF channels. But this has been possible in Guatemala, and Mr. Ángel González has no VH[F] competition." [498] According to various actors from both civil society and the State, the businessman is responsible for promoting an agenda tied to sectors that oppose institutional anti-corruption reforms and the investigation and punishment of serious human rights violations.

302.    According to the State, as far as the market and ownership in the country's communications sector are concerned, the Superintendency of Telecommunications [*Superintendencia de Telecomunicaciones*] (SIT) does not apply a specific allocation process to audiovisual media outlets, "the most usual process being the one established in Article 61 of the General Telecommunications Act, which provides for a public competition, under equal conditions, for all who wish to acquire [frequencies] in accordance with the law." It stated with respect to the announcement of public competitions and/or processes for the allocation of frequencies to the

---

[496]    IACHR. Annual Report 2009. Annual Report of the Office of the Special Rapporteur for Freedom of Expression. Chapter VI (Freedom of Expression and Broadcasting). OEA/Ser.L/V/II. Doc. 51. December 30, 2009, para. 11.

[497]    Congreso de la República de Guatemala. Decreto 34-2012. November 20, 2012.

[498]    International Commission against Impunity in Guatemala (CICIG). Financiamiento de la política en Guatemala. July 16, 2015.

community sector, "We must clarify that there are no community radio stations, and thus prevent any discretionary power with respect to the matter; all that exists is what is established in Article 61 of the General Telecommunications Act, which provides for a public competition, without limitation on the participation of any person or entity."[499] Even though the law prescribes public competitions for the adjudication of titles to the usufructuary rights to frequencies, competition by auction would do little to encourage the plurality and diversity of voices in Guatemala. That method is provided in Article 62 of the General Telecommunications Act, which establishes that "the Superintendency will determine the manner in which the public auction will be conducted. All offers must be submitted as a sealed bid, including a performance bond equivalent to the sum offered or any other form of guarantee that the Superintendency determines."[500] As the IACHR has stated, "auctions based solely on economic criteria or that grant concessions without equal opportunity to all sectors are not compatible with democracy and with the right to freedom of expression and information guaranteed in the American Convention on Human Rights and the Declaration of Principles on Freedom of Expression."[501]

303. Additionally, during the on-site visit, the IACHR was informed that the Government had begun a process for the implementation of free-to-air digital terrestrial television, reportedly involving important regulatory decisions. The State reported that the discussion of a Draft Government Order on the Implementation of Digital Television was currently underway, and was under analysis at the Ministry of Communications, Infrastructure, and Housing [*Ministerio de Comunicaciones, Infraestructura y Vivienda*]. It emphasized that the Superintendency of Telecommunications [*Superintendencia de Telecomunicaciones*] of Guatemala (SIT) was attempting to "create major opportunities for the application of Information and Communications Technology (ICT) and multimedia services, with the transition from analog to digital television broadcasting. It is also working to ensure that the digital dividend (freed-up spectrum)

---

[499] República de Guatemala. Superintendencia de Telecomunicaciones de Guatemala (SIT). OFI-SIT-DSI-1010-2017. August 17, 2017. Available at: Archive of the Office of the Special Rapporteur for Freedom of Expression.

[500] Congreso de la República de Guatemala. Ley General de Telecomunicaciones. Decree No. 94-96 reformed according to decree number 115-97 of the Congress of the Republic. Article 62. November 14, 1996.

[501] IACHR.   Annual Report 2009. Annual Report of the Office of the Special Rapporteur for Freedom of Expression. Chapter VI (Freedom of Expression and Broadcasting) OEA/Ser.L/V/II. Doc. 51. December 30, 2009. para. 65.

DHSFF0581

will allow for the introduction of mobile wireless broadband communications."[502]

304. In view of the above, the IACHR expresses its concern over the absence of a plan for organizing the spectrum and the allocation of frequencies to allow for the entrance of new operators. Guatemala should not pass up this historic opportunity to democratize its media system and promote greater media pluralism and diversity, bearing in mind the existence of a group that dominates television in the country—a group that, according to the recent criminal investigation conducted by CICIG and the MP, allegedly used its dominant position to illegally finance the campaign of former President Pérez Molina, having privileged access to funds earmarked for government advertising and influencing the State's decisions on broadcasting.

305. As indicated on previous occasions, the IACHR recalls that the concentration of the media in a few hands has a negative impact on democracy and freedom of expression, as expressly stated in principle 12 of the Declaration of Principles on Freedom of Expression of the IACHR "[m]onopolies or oligopolies in the ownership and control of the communication media must be subject to anti-trust laws, as they conspire against democracy by limiting the plurality and diversity which ensure the full exercise of people's right to information." Since its first statement on the issue, the Inter-American Court has ruled that the existence of any monopoly on the ownership or administration of the media, whatever the form it intends to adopt, is prohibited, and acknowledged that States must actively intervene to avoid concentration of ownership in the media sector.[503]

306. In this regard, the IACHR had indicated that, "If the media is controlled by a reduced number of individuals, or by only one individual, this situation would create a society in which a reduced number of individuals, or just one, would exert control over the information and, directly or indirectly, on the opinion received by the rest of the people. This lack of plurality in sources of information is a serious obstacle for the functioning of democracy. Democracy requires the confrontation of ideas, debate and discussion. When this debate does not exist, or is weakened by the lack of

---

[502]  República de Guatemala. Superintendencia de Telecomunicaciones de Guatemala (SIT). OFI-SIT-DSI-1010-2017. August 17, 2017. Available at: Archive of the Office of the Special Rapporteur for Freedom of Expression.

[503]  I/A Court H. R. Compulsory Membership in an Association Prescribed by Law for the Practice of Journalism (Arts. 13 and 29, American Convention On Human Rights). Advisory Opinion OC-5/85 of November 13, 1985. Serie A No. 5. Para. 33-34; IACHR.  Annual Report 2009. Annual Report of the Office of the Special Rapporteur for Freedom of Expression. Chapter VI (Freedom of Expression and Broadcasting). OEA/Ser.L/V/II. Doc. 51. December 30, 2009, para. 117.

sources of information, the main pillar for the functioning of democracy is harmed."[504]

307. The Office of the Special Rapporteur has also said that the States should take measures to ensure that all groups in society have access to opportunities to make their voices heard, both within their communities and in wider social debates, including through measures to promote media diversity, public service broadcasting and community media. The promotion of media and digital literacy and citizen journalism, including the capacity to make effective use of online communication tools, are also important. [505]

308. The future regulation on digital television "should aim to ensure that the new digital dividend makes optimal use of the spectrum to ensure the greatest plurality and diversity possible"[506] and become an opportunity to limit and reduce, or at least not increase, the undue concentration of existing media in the analogue environment by people, companies, or linked economic groups, either through ownership or control of the operation and programming of new television services.

### 3.    Government Advertising

309. The investigation conducted by Guatemala's Public Ministry and the International Commission against Impunity in Guatemala (CICIG), called "Co-optation of the State," revealed a corruption scheme set up to finance the election campaign of *Partido Patriota* that carried its leader Otto Pérez Molina to the Presidency and Roxana Baldetti to the Vice Presidency. The unlawful activities to obtain funds for *Partido Patriota* were reportedly conducted between 2008 and 2011, and remained in place during the party's administration (2012-2015). In a press release, the CICIG detailed that the "unlawful election campaign financing" was obtained through a network of corporations controlled by Baldetti that had no real business activity, since they were "instruments to channel the money secretly handed over by the representatives" of Radiotelevisión Guatemala S.A.

---

[504]   IACHR. <u>Justice and Social Inclusion: The Challenges of Democracy in Guatemala</u>. Chapter VII (The Situation of Freedom of Expression), para. 419.

[505]   The United Nations (UN) Special Rapporteur on Freedom of Opinion and Expression, the Organization for Security and Co-operation in Europe (OSCE) Representative on Freedom of the Media, the Organization of American States (OAS) Special Rapporteur on Freedom of Expression and the African Commission on Human and Peoples' Rights (ACHPR) Special Rapporteur on Freedom of Expression and Access to Information. May 4, 2015. <u>*Joint declaration on freedom of expression and responses to conflict situations.*</u>

[506]   IACHR. <u>Annual Report 2009. Annual Report of the Office of the Special Rapporteur for Freedom of Expression</u>. Chapter VI (Freedom of Expression and Broadcasting). OEA/Ser.L/V/II. Doc. 51. December 30, 2009, para. 80.

DHSFF0583

(*Canal 3*) and Televisiete S.A. (*Canal 7*), owned by Mexican businessman Ángel González.[507]

310. González's two companies, according to the documents seized during the investigation, contributed a total of 17,679,200 *quetzales* (approximately US$ 2,300,000 million) to *Partido Patriota* between 2008 and 2011. The CICIG concluded that, "this money was not reported to the Supreme Electoral Tribunal" as campaign contributions, and "was used to purchase the latest-model vehicles." The aforementioned television companies reportedly benefitted from million-dollar contracts for government advertising, beginning when Pérez Molina and Baldetti came to power. The investigation revealed that the value of the contracts entered into between 2012 and 2015 was in excess of 200,000,000 *quetzales* (approximately US$ 26,000,000 million), which means that the two companies received 69 per cent of all government television advertising purchased during that period.[508] González's wife, Alba Elvira Lorenzana, is the subject of an international arrest warrant for her alleged involvement in the unlawful financing of *Partido Patriota* in exchange for the million-dollar contracts for state advertising.[509] Former President Pérez Molina and former Vice President Baldetti resigned in 2015 amid various accusations of corruption, and both are being held in pretrial detention awaiting trial.

311. In connection with this group, in March 2017, the head of the Office of the Solicitor General [*Procuraduría General de la Nación*] (PGN), Anabella Morfín, filed a criminal complaint with the Public Ministry (MP) against the Superintendency of Telecommunications of Guatemala (SIT) for its alleged failure to turn over documents concerning the titles to the usufructuary

---

[507]  International Commission against Impunity in Guatemala (CICIG). June 2, 2016. *Comunicado de prensa 047. Caso Cooptación del Estado de Guatemala*; elPeriódico. July 25, 2016. *Ángel González: el encantador de presidente está molesto*; Observacom. July 28, 2016. *"El Fantasma" González rodeado por la Justicia: pedido de captura internacional para su esposa por caso "Cooptación del Estado" en Guatemala*; Proceso. June 6, 2016. *Magnate mexicano de medios es vinculado con red de corrupción en Guatemala*; Observacom. June 14, 2016. *Ángel González recibió US$ 27 millones de publicidad oficial tras financiar ilícitamente campaña presidencial de Otto Pérez Molina en Guatemala*.

[508]  International Commission against Impunity in Guatemala (CICIG). June 2, 2016. *Comunicado de prensa 047. Caso Cooptación del Estado de Guatemala*; elPeriódico. July 25, 2016. *Ángel González: el encantador de presidente está molesto*; Observacom. July 28, 2016. *"El Fantasma" González rodeado por la Justicia: pedido de captura internacional para su esposa por caso "Cooptación del Estado" en Guatemala*; Proceso. June 6, 2016. *Magnate mexicano de medios es vinculado con red de corrupción en Guatemala*; Observacom. June 14, 2016. *Ángel González recibió US$ 27 millones de publicidad oficial tras financiar ilícitamente campaña presidencial de Otto Pérez Molina en Guatemala*.

[509]  International Commission against Impunity in Guatemala (CICIG). June 2, 2016. *Comunicado de prensa 047. Caso Cooptación del Estado de Guatemala*; Prensa Libre. June 2, 2016. *Esposa de magnate de la TV y banqueros, con orden de captura*; Observacom. July 28, 2016. *"El Fantasma" González rodeado por la Justicia: pedido de captura internacional para su esposa por caso "Cooptación del Estado" en Guatemala*; Diario Extra. June 4, 2016. *Orden de captura por Interpol a esposa de dueño de Repretel*; Estrategia y Negocios. September 8, 2016. *Guatemala: Interpol emite alerta roja contra la esposa del magnate televisivo Ángel González*; Prensa Libre. September 9, 2016. *Interpol publica orden de captura de Alba Lorenzana*.

rights to television frequencies granted to the company Albavisión, owned by Mexican businessman Ángel González, requested of the SIT in 2016. The complaint was reportedly filed together with a report on the 85 frequencies said to be held by Ángel González's channels. According to the information available, the Solicitor General has indicated on a number of occasions that she was not given the complete documentation on those titles to usufructuary rights for purposes of verifying whether they were granted lawfully or unlawfully. For its part, the SIT reportedly replied that it had turned over all of the documents on record in the Telecommunications archives.[510]

312. In May, the Guatemalan Prosecutor's Office filed an indictment in the "Co-optation of the State" case, naming 46 individual defendants, including former President Pérez Molina.[511] The same month, based on testimony offered by Salvador González Álvarez, it was learned that, during the period she served as Vice President (2012-2015), Roxana Baldetti allegedly controlled 70 per cent of the *Corporación de Noticias* media group, which owned the newspapers *Siglo21* and *Al Día*, and used it to present information favorable to her and to the Government.[512]

313. During the on-site visit, the Communications Secretariat of the Presidency [*Secretaría de Comunicación de la Presidencia*] reported that it had ended the practice of using government advertising to reward media outlets for favorable coverage and punish critical media.

314. The Office of the Special Rapporteur recalls that Article 13.3 of the American Convention establishes that "[t]the right of expression may not be restricted by indirect methods or means, such as the abuse of government or private controls over newsprint, radio broadcasting frequencies, or equipment used in the dissemination of information, or by any other means tending to impede the communication and circulation of ideas and opinions." In this sense, also the Declaration of Principles on Freedom of Expression of the Inter-American Commission on Human Rights, in principle 13 indicates that "the exercise of power and the use of public funds by the State, the granting of customs duty privileges, the

---

[510] elPeriódico. February 8, 2017. *Denunciarán a la SIT por falta de información sobre usufructos*; La Hora. March 30, 2017. *PGN denunció a la SIT por contratos de la TV abierta*; elPeriódico. March 30, 2017. *PGN denuncia en MP a Superintendencia de Telecomunicaciones por negarle información de usufructos para TV abierta*; Guatevisión. March 30, 2017. *PGN denuncia a la SIT por proteger a monopolio de la TV*.

[511] Agencia EFE. March 7, 2017. *La Fiscalía de Guatemala presenta una acusación por el caso "Cooptación del Estado"*; Prensa Libre. March 7, 2017. *Tres acusados en caso Cooptación piden juicio abreviado*; Fundamedios. March 6, 2017. *Así consiguió el Fantasma González contratos con el Estado en Guatemala*.

[512] Centro de Investigación de Crimen Organizado. June 5, 2017. *Exvicepresidenta de Guatemala controlaba e influenciaba los medios de comunicación: Testigo*; Prensa Libre. June 1, 2017. *Fortuna de Roxana Baldetti surge de ocho empresas*.

DHSFF0585

arbitrary and discriminatory placement of official advertising and government loans; the concession of radio and television broadcast frequencies, among others, with the intent to put pressure on and punish or reward and provide privileges to social communicators and communications media because of the opinions they express threaten freedom of expression, and must be explicitly prohibited by law."

## C.    Excesive Use of Force at Social Protests

315.    According to the information gathered by the Office of the Special Rapporteur and received during the on-site visit, the interests and presence of corporations on traditional indigenous lands and territories has led to serious tensions and disputes in different regions of Guatemala, giving rise to social protest and—on occasion—triggering episodes of violence. There have been protests in some communities in view of the implementation of extractive projects, which have reportedly been repressed by the National Civil Police (PCN) and the army, as well as by private security personnel.

316.    In its visits to the cities of Ixquisis and Santa Eulalia, the IACHR received with concern information about the situation of violence and criminalization to which human rights defenders are reportedly exposed. Reports included allegations of the excessive use of force during social protests against hydroelectric projects in the region. In Ixquisis, in particular, the IACHR heard the testimony of relatives of Sebastián Alonso Juán, who was shot to death on January 17 during a peaceful protest outside the company *Proyectos de Desarrollo Hídrico S.A.*, in San Mateo Ixtatán. According to the information available, citizens from different communities of the Chuj and Q'anjob'al peoples were protesting against a hydroelectric project in Ixquisis, when armed individuals reportedly fired shots at them.[513]

317.    At the March 20 hearing it held on the criminalization of rights defenders who are opposed to hydroelectric projects in Guatemala, the Commission

---

[513]    Resumen Latino Americano. No date. *Guatemala: Un campesino asesinado por policías y paramilitares en una manifestación contra Hidroeléctrica*; Consejo de Pueblos Wuxhtaj. January 18, 2017. *Asesinan a Sebastien Alonso, líder opositor al proyecto hidroeléctrico Pojom 1*; Prensa Comunitaria. January 17, 2017. *Disparos Contra Manifestantes En Yichkisis En San Mateo Ixtatán*; European Parliament. February 16, 2017. *Human rights: Nicaragua, executions in Kuwait and Bahrain, and Guatemala*; International Federation for Human Rights (FIDH). February 7, 2017. *Guatemala: Asesinato de Sebastián Alonzo Juan y actos de intimidación y amenazas de muerte contra una caravana que buscaba verificar los hechos*; IACHR. February 7, 2017. *Press Release 011/017 IACHR Condemns Murders of Human Rights Defenders in the Region*; IACHR. June 5, 2017. *Press Release 072/17. IACHR issues call for OAS States to Protect Defenders of the Land and Environment*.

DHSFF0586

received information about violent evictions of the communities that opposed the operation of corporations in their territories, as well as attacks, threats, and constant harassment, particularly against female rights defenders. They alleged patterns of criminalization in the Guatemalan system through the statutory creation of criminal offenses to be used against them, as well as through malicious prosecution by prosecutors from the Public Ministry and lawyers from the transnational corporations. They condemned, among other things, the beforementioned murder of rights defender Sebastián Alonso Juán. At that same hearing, the Guatemalan State explained that it was seeking to gradually replace its current energy sources with renewable energy like hydroelectric power. It also stated that it was developing a National Plan on Business and Human Rights, which will include the monitoring and oversight of business activities, the protection of human rights, and measures of reparation.[514]

318. At the September 7, 2017 hearing about reports of attacks on human rights defenders by extractive corporations in Guatemala, the Commission received information about an alleged State policy of persecuting individuals who defend the environment, natural resources, water, and land and territory in general. The requesting organizations stated, among other things, that this was an "unwritten" policy, implemented through defamation cases, stigmatization, and criminalization, carried out principally by the National Civil Police (PCN), and by the Public Ministry in some cases. They also reported attacks by extractive industries against them and against communities. For its part, the State indicated, among other things, that the on-site visit was the starting point for reaching consensuses, dialogues, negotiations, and taking account of the communities. It indicated that the recommendations made by the IACHR after the on-site visit had been received by COPREDEH and the Guatemalan Foreign Ministry, and that they are being considered for this sustainable dialogue with the communities and the corporations. The Guatemalan State expressed its willingness to engage in ongoing, sustainable dialogue, and to conduct these types of negotiations. Finally, it stated that it strives to ensure strict compliance with the law, and the application of "conventionality control" with respect to the investigation that is incumbent upon the Public Ministry. It asserted that a very low percentage of the complaints lodged with the Human Rights Prosecutor's Unit for Crimes against Activists [*Unidad de delitos contra activistas de la Fiscalía de*

---

[514] IACHR. March 22, 2017. *Press Release 035A/17 Report on the 161st Session of the IACHR*; IACHR. 161st Period of Sessions, Public Hearing - Criminalization of human rights defenders who oppose hydroelectric projects in Guatemala. March 20, 2017. Available at: https://www.youtube.com/watch?v=3TW9U6ql-fA

*Derechos Humanos*] by human rights defenders stem from attacks by the extractive corporations.[515]

319.   According to publicly available information, on May 27, members of the Artisanal Fishermen's Guild [*Gremial de Pescadores Artesanales*] (GPA) of El Estor, Department of Izabal, reportedly blocked the route to Panzós, Alta Verapaz, in response to the authorities' refusal to establish a dialogue roundtable to address the alleged pollution of the El Estor Lake by the *Compañía Guatemalteca de Niquel* [Guatemalan Nickel Company] (GNC). In order to clear the way, National Civil Police (PNC) anti-riot forces reportedly fired ammunition, rubber bullets, and tear gas canisters at the demonstrators. Carlos Maaz Coc, a member of the Maya-Q'eqchi indigenous community, reportedly died in the incident after being shot, and at least four police officers were wounded. [516] The same day, the Ministry of the Interior reported the death of one individual, although that statement was subsequently denied.[517]

320.   On June 22, a group of residents of the municipality of Casillas, Department of Santa Rosa, reportedly blocked traffic heading toward the San Rafael Las Flores Mine. This was done to protest the mining company, which they held responsible for a number of tremors in the area that had caused cracks to form in residents' houses. According to the information available, riot control officers from the National Civil Police (PNC) arrived on the scene and launched tear gas to break up the protest. Eleven people were reportedly injured, including a four-month-old baby and a two-year-old who were sickened by a tear gas canister that was thrown at their house. Four individuals who allegedly used rocks to assault members of the PNC were also arrested.[518]

321.   On July 21, a group of residents protested by obstructing the highway leading to the municipality of Casillas, Department of Santa Rosa, reportedly blocking the passage of vehicles headed toward the El Escobal Mine in San Rafael Las Flores, which was guarded by the National Civil Police (PNC). According to the information available, the mine was not authorized to operate in light of a judgment by the Guatemalan Supreme

---

[515]   IACHR. 164 Period of Sessions. Public Hearing - Reports of attacks on human rights defenders by extractive companies in Guatemala. September 7, 2017. Available at: https://www.youtube.com/watch?v=yuVmLG9gkmE&t=5s.

[516]   Km 169 Prensa comunitaria. May 30, 2017. *El Estor: Pueblo Q'eqchi Enterró A Pescador Carlos Maaz, Asesinato Negado Por El Gobierno*; Front Line Defenders. May 31, 2017. *Carlos Maaz Coc Killed While Participating in Peaceful Demonstration*.

[517]   Ministerio de la Gobernación. May 27, 2017. *Urgente: Cuatro PNC heridos en bloqueo en El Estor Izabal*; Ministerio de la Gobernación. May 28, 2017. *PNC y autoridades se reúnen en Izabal*.

[518]   Prensa Libre. June 22, 2017. *Disturbios en Casillas dejan 11 intoxicados y cuatro capturados*; Info impacto/You tube. June 22, 2017. *Manifestantes agreden a la policía en Casillas*.

DHSFF0588

Court [*Corte Suprema de Justicia*] (CSJ) admitting a petition for a constitutional remedy [*amparo*] filed by the Center for Environmental, Social and Legal Action [*Centro de Acción Legal Ambiental y Social*] (Calas) and suspending the mine's license for extraction. [519] PNC Officers reportedly fired tear gas canisters to break up the protest, and at least four people were sickened as a result. [520]

322.  On August 24, the Guatemalan Education Workers Union [*Sindicato de Trabajadores y Trabajadoras por la Educación*] (STEG) held a number of protests around the country to demand better working conditions and salary increases. In the town of Atescatempa, Department of Jutiapa, at least two teachers were reportedly arrested. [521] The same day, in Ciudad Pedro de Alvarado, Department of Jutiapa, four other teachers were reportedly arrested for blocking the highway. Likewise, in Puerto Quetzal, Department of Escuintla, seven teachers were said to have been apprehended by the PNC while taking part in the demonstrations, although they were released after speaking with the authorities. According to the information available, la PNC used tear gas to disperse the crowd and no injuries were reported. [522]

323.  Guatemala also saw numerous social protests and demonstrations this year stemming from the country's political turmoil. This resulted, among other things, in President Jimmy Morales decision to declare Iván Velásquez, head of the International Commission against Impunity in Guatemala (CICIG) *persona non grata*, after he and the Office of the Attorney General accused President Morales of irregularities during the campaign that carried him to power in 2016. In view of this situation, on September 12 the IACHR issued a resolution on human rights, impunity, and corruption in Guatemala, urging the State to "fulfill [its] obligation to protect human rights defenders, whistleblowers, journalists, and media outlets, which face particular risk when they investigate and disseminate information on corruption," among other things. [523]

---

[519]   Prensa Libre. July 5, 2017. *CSJ suspende licencias de operación de minera San Rafael*; elPeriódico. July 6, 2017. *CSJ suspende licencias de explotación minera a empresa Minera San Rafael S.A.*.

[520]   Prensa Libre. July 21, 2017. *Enfrentamiento entre pobladores y PNC deja varios intoxicados*; Publinews. July 21, 2017. *Varias personas intoxicadas por gas lacrimógeno durante disturbios en Santa Rosa*.

[521]   Prensa Libre. August 24, 2017. *Disturbios, maestros detenidos y policías heridos en jornada de protestas*; El Orbe. August 27, 2017. *Caos en la Frontera Por Bloqueos y Protestas de Maestros en Guatemala*.

[522]   Prensa Libre. August 24, 2017. *Disturbios, maestros detenidos y policías heridos en jornada de protestas*; Guatevisión. August 24, 2017. *Capturan a maestros por bloquear carreteras*.

[523]   IACHR. September 12, 2017. *Press Release 140/17. IACHR Publishes Resolution on Human Rights and the Fight Against Impunity and Corruption*; IACHR. Resolution 1/17 Human Rights and the Fight against Impunity and Corruption. September 12, 2017.

DHSFF0589

324. On September 14, a group of individuals demonstrated in the *Plaza de la Constitución* in Guatemala City, across from the Congress of the Republic, to reject the amendments made to the Criminal Code by decrees 14-2017 and 15-2017 which, upon entering into force, would benefit politicians investigated for electoral crimes. They also demanded the resignation of the 107 members of congress who had voted for the amendments. There was a certain degree of tension between the demonstrators and the Military Police (PM) and officers from the Secretariat of Administrative and Security Affairs of the Presidency (SAAS) guarding the *Plaza de la Constitución*.[524] Consequently, President Jimmy Morales issued a statement rejecting "all acts and displays of violence," and indicated that he had instructed the country's security authorities to investigate who had been responsible for those acts.[525]

325. The following day, the protests outside the Legislative Palace continued, while members of the House of Representatives held an extraordinary session to review the amendments to the Criminal Code. The session resulted in the shelving of both decrees. The Military Police (PM) reportedly dispersed the protest with pepper spray.[526] One representative from the *FCN-Nación* party reportedly called the demonstrators "terrorists."[527] A video also shows that when the representatives exited a bus at the Legislative Palace, some of them hurled insults and made vulgar gestures at the demonstrators.[528]

326. On September 16, referring to the previous day's events, Human Rights Ombudsman Jordán Rodas allegedly stated that among the demonstrators it was known that there were infiltrators, not part of the social movement, who intended to leave a negative impression of the civic action. According

---

[524] Prensa Libre. September 14, 2017. *Ciudadanos protestan en la Plaza de la Constitución contra Morales y diputados*; 20 minutos. September 14, 2017. *Por protestas contra presidente, Guatemala suspende desfile patrio.*

[525] AGN. September 14, 2107. *Presidente Morales condena actos de violencia y atropello a celebración a la patria*; Guatevisión. September 14, 2017. *#URGENTE Jimmy Morales arremete contra manifestantes.*

[526] Guatevisión. September 16, 2017. *Festejos de independencia fueron marcados por manifestaciones anticorrupción*; Prensa Libre. September 16, 2017. *CC ordena garantizar los derechos de los manifestantes.*

[527] Prensa Libre. September 16, 2017. *El diputado Estuardo Galdámez calificó de terroristas a manifestantes*; Elsalvador.com. September 16, 2017. *Diputados guatemaltecos quedan encerrados siete horas en el Congreso.*

[528] Noticiero Guatevisión/You tube. September 16, 2017**.** *"Diputados dentro de buses insultan a los guatemaltecos con señas soeces"*; Guatevisión. September 16, 2017. *VIDEO: Diputados dentro de buses insultan a los guatemaltecos con señas soeces***.**

to him, among people trying to destabilize the demonstrations there were security staff of some congressmen.[529]

327. The same day, the Constitutional Court [*Corte de Constitucionalidad*](CC) admitted two petitions for constitutional remedies [*amparos*] filed by the Office of the Human Rights Ombudsman [*Procuraduría de los Derechos Humanos*] (PDH). In its decision, the CC held that the authorities "must allow the exercise of the rights to free movement, free expression of thought, assembly, and protest," and that the President must adhere to the decision, instructing the Ministry of the Interior and the National Civil Police (PNC) to comply with the decision and allow demonstrators to exercise their rights peacefully.[530] The same day, the Guatemalan government released a statement on Twitter indicating that it would comply with the decision.[531]

328. On September 24, at a public meeting attended by ranchers and agribusiness leaders, as well as President Jimmy Morales, the governor of the Department of Izabal reportedly stated in reference to the social protests that had taken place in the past month, that "We are not going to allow small minority groups that have no representation to demand [the President's] resignation," later adding that, "out of respect and loyalty to the Guatemalan people, we have to say no to those people that were demonstrating—they are not a big deal." Finally, he stated that "For five or ten thousand people to gather in the square, those people have [been paid], and that is why they can't claim to be speaking on behalf of honest and hardworking Guatemalans."[532]

329. The IACHR has reiterated that social protest is a fundamental tool for defending human rights and it is essential for expressing social and political criticism on the activities of the authorities. The Commission has stated that "in principle, criminalization per se of demonstrations in public thoroughfares is inadmissible when they are carried out in exercise of the rights to freedom of expression and to freedom of assembly"[533] and that

---

[529] Prensa Libre. September 16, 2017. *Jordán Rodas dice que la PNC hizo uso excesivo de la fuerza contra manifestantes*; Soy 502. September 16, 2017. *Guardias armados de algunos diputados estaban infiltrados en protestas*.

[530] Agencia EFE. September 16, 2017. *Constitucional ordena respetar los derechos de los manifestantes en Guatemala*. Prensa Libre. September 16, 2017. *CC ordena garantizar los derechos de los manifestantes*.

[531] "El presidente @jimmymoralesgt en atención a la resolución emitida hoy por la honorable Corte de Constitucionalidad (CC)". Official Twitter account of the Government of Guatemala @GuatemalaGob. September 16, 2017.

[532] Gobierno de Guatemala. September 24, 2017. *Presidente Jimmy Morales se reúne con representantes del sector ganadero del país*; Prensa Libre TV/ You tube. September 24, 2017. *Duras críticas contra protestas ciudadanas en apoyo a Jimmy Morales | Prensa Libre*.

[533] IACHR. Report on Citizen Security and Human Rights. OEA/Ser.L/V/II.Doc. 57. December 31, 2009, para. 197.

DHSFF0591

"the exercise of the right of assembly through social protest must not be subject to authorization on the part of the authorities or to excessive requirements that make such protests difficult to carry out."[534]

330. Also, the Joint Declaration on violence against journalists and media workers in the context of protests, adopted in 2013, establishes that the rights of assembly and freedom of expression "are fundamental, and guaranteeing them is a vital condition to the existence and proper functioning of a democratic society. A State may impose reasonable limitations on demonstrations for purposes of ensuring that they are conducted peacefully, or to disperse those that turn violent, provided that such limits are governed by the principles of legality, necessity, and proportionality. In addition, the breaking-up of a demonstration must be warranted by the duty to protect individuals, and authorities must use the measures that are safest and least harmful to the demonstrators. The use of force at public demonstrations must be an exception, used under strictly necessary circumstances consistent with internationally recognized principles."[535] Finally, the Inter-American Commission has found that any kind of arbitrary or abusive interference that affects the privacy of human rights defenders and their organizations is prohibited by the American Declaration and Convention.[536]

331. With respect to the use of force in contexts of social protest, the IACHR presented standards on the subject in its 2015 report on the Use of Force.[537] The IACHR indicated that "the imperative social interest of the right to participate in public demonstrations means that there is a general presumption in favor of its exercise." The IACHR affirmed that "the presumption in favor of the exercise of social protest implies that the States must act on the basis of the legality of the protests or public demonstrations and on the assumption that they do not constitute a threat to public order, even in the cases that are made without prior notice." Police action should have as its main objective the facilitation and not containment or confrontation with the demonstrators. Hence, police operations organized in the context of protests should be guided, as a general rule, to guarantee the exercise of this right and the protection of

---

[534] IACHR.  Second Report on the Situation of Human Rights Defenders in the Americas. OEA/Ser.L/V/II. Doc. 66. December 31, 2011, para. 139.

[535] United Nations (UN) Special Rapporteur on the Protection and Promotion of the Right to Freedom of Opinion and Expression and Special Rapporteur for Freedom of Expression of the OAS Inter-American Commission on Human Rights. September 13, 2013. Joint declaration on violence against journalists and media workers in the context of protests.

[536] IACHR.  Second Report on the Situation of Human Rights Defenders in the Americas. OEA/Ser.L/V/II. Doc. 66. December 31, 2011, para. 58.

[537] IACHR.  Annual Report 2015. Annual Report of the Office of the Special Rapporteur for Freedom of Expression. Chapter IV. (The Use of Force).

protesters and third parties present. In this sense, the Commission has considered that the mere deconcentration of a demonstration does not constitute, in itself, a legitimate end that justifies the use of force by the security forces. "When a demonstration or protest leads to situations of violence, it must be understood that the State was not able to guarantee the exercise of this right."

## D.    *Access to Public Information*

332.    The right to access to public information in Guatemala is provided in the Constitution of Guatemala, as well as in the ordinary law, through the Access to Public Information Act [*Ley de Acceso a la Información Pública*] (LAIP), Decree 57-2008, passed in 2008 by the Congress of the Republic, which further designates the Human Rights Ombudsman (PDH) as its regulating entity.[538]

333.    According to the PDH, progress was made in the implementation of the Access to Information Act in 2016, "to the extent that the number of Access to Information Units, Electronic Portals, Reports of Entities Subject to the Law, and public requests have all risen." Nevertheless, he indicated that certain challenges remain in view of the low levels of compliance, especially in areas outside the capital, in the municipal governments and development councils. At the central level, noncompliance is said to be notable among trusts, non-governmental entities that handle funds, and entities in the sports sector. He further asserted that there are structural challenges such as "the politicization, corruption, and social inequality of the country, which has hindered the exercise of the right in outlying areas, specifically in municipalities where citizens have considerable interest in how resources are managed, but procedures at times are not carried out correctly due to unfamiliarity with the law", affirmed the Human Rights Ombudsman[539]

334.    According to the information available, between 2012 and 2016 the PDH documented an exponential increase in the number of requests for access to public information submitted to the mechanisms established by the LAIP. This is reflected in the 21,944 requests received in 2012, compared to 63,830 in 2016. Nevertheless, in this context, the PDH identified two

---

[538]    Procurador de los Derechos Humanos (PDH). Informe Anual de la situación del derecho a la información pública 2016. No date. Available at: http://www.pdh.org.gt/biblioteca/category/90-informes-anuales.html

[539]    Procuraduría de Derechos Humanos (PDH). Informe Implementación Ley de Acceso a la Información Pública. Conclusiones del Informe Anual 2016. No date. Available at: Archive of the Office of the Special Rapporteur for Freedom of Expression.

DHSFF0593

related challenges: first, to compare figures on the gender of the persons requesting information, and second, to promote the use of the legally created mechanisms throughout the country to prevent the geographic concentration of requests in the Department of Guatemala.[540] In July 2017, the Public Ministry (MP) and the PDH reportedly signed an inter-institutional cooperation agreement. Its objective is to strengthen the LAIP through the creation of one agency under the responsibility of the MP that will hear and decide complaints alleging noncompliance with the law, and another that will provide guidance to complainants in those proceedings, under the direction of the PDH.[541] The new Human Rights Ombudsman, Jordán Rodas Andrade, reportedly confirmed that the agreement remains in effect.[542]

335. Principle 4 of the Declaration of Principles on Freedom of Expression states that "[a]ccess to information held by the state is a fundamental right of every individual. States have the obligation to guarantee the full exercise of this right. This principle allows only exceptional limitations that must be previously established by law in case of a real and imminent danger that threatens national security in democratic societies." Considering the principle of maximum disclosure, the law must guarantee the effective and broadest possible access to public information, and any exceptions must not become the general rule in practice. Also, the exceptions regime should be interpreted restrictively and all doubts should be resolved in favor of transparency and access.

---

[540] Procurador de los Derechos Humanos (PDH). Informe Anual de la situación del derecho a la información pública 2016. No date. Available at: http://www.pdh.org.gt/biblioteca/category/90-informes-anuales.html. Regarding gender, between 2014 and 2016, 39% of requests were made by women while 61% were made by men. In terms of geographical concentration, 85% of the requests made between 2016 and January 31, 2017 came from the department of Guatemala. On this matter, the PDH included among its challenges the need to empower the population of the rest of the country in order for them to know and demand their right to access public information. This is precisely because the PDH identified that in 2016, apart from the department of Guatemala, no other department reached 2% of requests for public information. In 2016, 45% of obligated individuals had not made any request.

[541] elPeriódico. July 21, 2017. *PDH y MP fortalecerán Ley de Acceso a la Información*; Emisoras Unidas. No date. *MP y PDH ratifican cooperación en el cumplimiento a la Ley de Acceso a la Información*; Ministerio Público (MP). July 20, 2017. *MP y PDH firman Convenio de Cooperación Interinstitucional para fortalecimiento de la Ley de Acceso a la Información Pública*.

[542] Ministerio Público (MP). August 21, 2017. *Fiscal General recibe visita del Procurador de los Derechos Humanos*; elPeriódico. August 21, 2017. *Presidente Morales y fiscal Aldana, los primeros contactados por el nuevo procurador Jordan Rodas Andrade*. In this regard, the Human Rights Ombudsman (Procurador de los Derechos Humanos) stated that the agreement should continue "because with more transparency in compliance with the Law of Access to Public Information, logically we are going to decrease corruption that is a scourge that hurts our society".

DHSFF0594

DHSFF0595

CHAPTER 6
# CITIZEN SECURITY

DHSFF0596

DHSFF0597

# CITIZEN SECURITY

## A.   *General Situation of Violence: Types, Areas of Highest Concentration, Actors Involved*

336.   The concept of citizen security is a situation in which persons are able to live free of the threats caused by violence and crime, and the State has the necessary means to guarantee and protect the human rights directly threatened by violence and crime.[543] In Guatemala, the high rates of violence and insecurity pose an obstacle to the full enjoyment of human rights.

337.   In the context of its monitoring duties, the Commission has been closely tracking levels of insecurity and violence in Guatemala. Even though there has been a slight decrease in the past ten years, the general homicide rate in the country continues to be one of the highest in Latin American and the Caribbean, one of the world's most violent regions.[544] Most crimes are attributed to the gangs (*maras*), the drug trafficking cartels and organized crime, which pose one of the most important security problems in the country, as is described in this section of the report.

### 1.     Homicides and other violent deaths

338.   As part of the drafting process of the instant report, the IACHR asked the State to provide official statistics on homicides occurring in Guatemala in 2016 and 2017, in order to set up a baseline for analysis of the situation of violence in the country. The State provided statistical data from the National Civilian Police (PNC), the Office of the Public Prosecutor, and the National Institute of Forensic Sciences of Guatemala (INACIF), and figures from each entity were not entirely consistent with each other. The figures of the PNC show that in 2016 there were 4,520 homicides in the country, 258 fewer than in 2015. Based on these figures, the homicide rate dropped from 29.5 to 27.3 for every 100,000 inhabitants.  It must be noted that the

---

[543]   IACHR, *Informe sobre seguridad ciudadana y derechos humanos (2009)*, [Report on Citizen Security and Human Rights (2009)'], OEA/Ser.L/V/II. Doc. 57, December 31, 2009, para. 221.

[544]   IACHR, Situation of Human Rights in Guatemala: Diversity, Inequality and Exclusion, OEA/Ser.L/V/II.Doc. 43/15, December 30, 2015, para. 117.

World Health Organization considers a rate above 100 homicides per 100,000 inhabitants to be an outbreak of violence. For 2017, the State reported that from January to May there were 1,498 homicides, as compared to 1,584 for the same period in 2016.[545] For its part, INACIF statistics reveal that in the first quarter of 2017, 2,641 autopsies for violent deaths were performed, averaging 4.1% less than for the same period in 2016.[546] Despite these figures continuing to be high and worrying—even reaching levels of an epidemic—the IACHR is pleased about the general downward trend in the indicators. At the same time, it notices with concern that in Guatemala City and other urban centers, homicides and violent deaths have risen in 2017.[547]

339.   As for the figures provided by the State, the IACHR notes that the PNC, the Office of the Public Prosecutor (MP), and the INACIF record homicides, "violent deaths," and "deaths from causes associated with criminal acts" based on apparently different criteria, thus making it difficult to compare available statistics. The PNC statistics refer to "homicides," but do not specify what definition is used.  The MP's figures of "violent deaths" include any ones that take place in the context of the following criminal offense: homicide, murder, femicide, extrajudicial execution, parricide, aggravated homicide, homicide in tumultuous feud, homicide committed in a state of violent emotion.[548] The INACIF, however, counts as deaths from "causes associated with criminal acts" those that are caused by firearm projectile wound, wounds caused by blade weapons, asphyxia by suspension, asphyxia by strangulation, asphyxia by suffocation, asphyxia from submersion, asphyxia by abdominal thoracic compression, corporal resection (decapitation and/or dismemberment).[549] The varying criteria lead to apparently disparate homicide figures.

340.   By way of example, the figures of the Office of the Public Prosecutor (MP) post 4,831 "violent deaths" in 2016,[550] while INACIF registered 5.459 autopsies performed in deaths from "causes associated with criminal acts" in the same period.[551] Likewise, the PNC recorded 1.498 homicides from January 1 to May 4, 2017, while the MP reflected 1,053 homicides in the

---

[545]   Information provided by the State, Ref. P-859-2017/VHGM/LWC/nj, June 16, 2017, pg. 23, Annex 14.

[546]   Ministry of the Interior, "Bajan homicidios en primer semestre de 2017" ['Homicides are down in the first half of 2017'], August 2, 2017. Can be viewed at:  http://mingob.gob.gt/bajan-homicidios-en-primer-semestre-de-2017/. According to the INACIF itself, in the first half of 2016, 2,754 autopsies for violent deaths were recorded.

[547]   Information provided by the State, Ref. P-859-2017/VHGM/LWC/nj, June 16, 2017, pg. 23, Annexes 14, 15.

[548]   *Id.*, Annex 13.

[549]   *Id.*, Annex 15(a) and 15(b).

[550]   *Id.*, Annex 13.

[551]   *Id.*, Annex 15(a) and 15(b).

DHSFF0599

same period of time.[552] For its part, INACIF posted 1,726 autopsies performed in deaths associated with criminal acts from January to the last day of April, 2017 (in addition to the 41 little girls at the Hogar Virgen de la Asunción on March 8[553]), while the Public Prosecutor recorded 1,382 violent deaths in the same period.[554] Based on the figures provided, it is not clear to the IACHR why the Public Prosecutor's Office would only record 1,382 "violent deaths" in this period when INACIF performed 1,726 autopsies in deaths associated with criminal acts (a discrepancy of 344 over a period of 4 months). Similarly, it is not clear how to account for the fact that in 2016, the MP has posted 4,831 violent deaths, while during that year INACIF performed 5,459 autopsies in deaths associated with alleged criminal acts (a discrepancy of 628 over one period of a year).[555]

341.  In response to the inconsistency in figures on homicides and violent deaths in Guatemala, the State explained that the PNC "collects information on deaths that take place in a context of a victim-criminal relationship, deaths from other causes are reflected in other statistics, and although the latter deaths may be violent deaths, they cannot be included in the homicide figure.  By that account, the INACIF records statistics on the number of autopsies performed and the Public Prosecutor's Office includes in its statistics the overall count of different deaths." [556]   Based on this explanation, the IACHR clarifies that the figures of the INACIF described in the previous paragraph account for autopsies performed in deaths from "causes associated with criminal acts," as opposed to autopsies performed in deaths from "causes associated with traffic accidents, common diseases and complications from them, intoxication and causes under review," which the INACIF breaks down in its statistics.[557] The lack of clarity and certainty in the statistics of the State's own institutions makes it difficult to analyze the phenomenon of violence and insecurity in the country.

342.  The State reported that the Ministry of the Interior has set up an Inter-Institutional Technical Group, made up of the Office of the Public Prosecutor, INACIF, PNC and other institutions that manage statistical information in the security and justice system. "The objective is to standardize the indicators of violence in the country in order to create a single statistic" in the country.[558] The IACHR hopes that with the creation of

---

[552]  *Id.*, Annexes 13 and 14.

[553]  *Id.*, Annex 15(a) and 15(b). Information also available on the INACIF website, at: http://www.inacif.gob.gt/index.php?option=com_content&view=article&id=96&Itemid=2.

[554]  Information provided by the State, Ref. P-859-2017/VHGM/LWC/nj, June 16, 2017, Annex 13.

[555]  *Id.*, Annex 13 and 15(a). INACIF figures can be found at: http://www.inacif.gob.gt/docs/estadisticas/anual/AnualM2016.pdf.

[556]  Information provided by the State, Ref. P-859-2017/VHGM/LWC/nj, August 29, 2017, Annex 14, p. 3.

[557]  INACIF website can be found at: http://www.inacif.gob.gt/index.php?option=com_content&view=article&id=96&Itemid=2.

[558]  Information provided by the State, Ref. P-859-2017/VHGM/LWC/nj, August 29, 2017, Annex 14, p. 3.

this group, standardized figures are generated regarding violent deaths and other crimes in the country to facilitate time-bound, region-based and disaggregated analysis of crime trends in Guatemala.

343. Approximately 80% of violent deaths in Guatemala are perpetrated with firearms and this figure has also decreased slightly. According to available data, 1,941 deaths by firearm were counted in the first half of 2017, which amounts to a 3% decrease as compared to the first half of 2016, when 2,000 deaths by firearms were recorded.[559] In earlier reports, the IACHR has attributed the high number of deaths by firearms to the loose control over firearm possession and carry, the lack of a policy to reduce the number of firearms and a national disarmament plan, and effective implementation thereof.

## 2.    Other Types of Violence and Insecurity

344. In addition to homicides, other types of violence, crime and insecurity have a bearing on the enjoyment of human rights in Guatemala. The IACHR has closely monitored the way private security forces function, a particularly critical issue in the area of security in the country.[560] On September 20, 2016, the General Directorate of Private Security Services (DIGESSP) approved Resolution No. 370-2016 on misapplication of the Law Regulating Private Security Services (Decree Number 52-2010), which grants operating licenses to provide private security services through private security agents, such as private escorts.[561] According to the General Directorate of Private Security Services, there are 181 private security firms currently in compliance or in the process of bringing themselves into compliance with the Law Regulating Private Security Services.[562] Nonetheless, 37% of the firms continue to be out of compliance with the law. During its country visit, the IACHR received information suggesting that, despite some measures adopted by the DIGESSP, challenges to State control over private security companies persist, in particular with regard to gun control, illegal arms trafficking and control over working conditions

---

[559] Ministry of the Interior, "Bajan homicidios en primer semestre de 2017" ['Homicides are down in the first half of 2017'], August 2, 2017. *Ibid.*

[560] IACHR, CIDH publica informe sobre la situación de derechos humanos en Guatemala, ['IACHR publishes report on the situation of human rights in Guatemala'], OEA/Ser.L/V/II. December 31, 2015, para. 136.

[561] Portal of the General Directorate of Private Security Services (DIGESSP). Resolución para escoltas privados, ['Resolution on private escorts'], September 21, 2016.

[562] According to the Dirección General de Servicios de Seguridad Privada, ['General Directorate of Private Security Services'], as of January 5, 2017 there are 119 licensed companies, 49 companies licensed under ministerial [prosecutor's office] authorization and 13 companies under government authorization.

DHSFF0601

of private security agents.[563] The case of activist and human rights defender Patricia Samayoa, who was allegedly killed by a private security guard, for example, was brought to the attention of the Commission.[564]

345.   In Guatemala, it has been common for "states of emergency (exception)" to be declared in response to public demonstrations, which for most part are organized by indigenous peoples and communities in defense of their territories and in opposition to projects carried out there.[565] In May 2017, the Legislative Branch of government upheld the declaration of a state of siege for the municipalities of Ixchiguán and Tajamulco, in the Department of San Marcos, under decree issued by the Executive Branch. Based on widely known public information, there has been a boundary dispute between these municipalities for more than 80 years, which escalated this year into armed confrontations.  According to press accounts, the reported presence of organized crime in the area has compounded the situation. The IACHR learned that the Office of the Human Rights Ombudsman has been monitoring the process.

346.   Additionally, lynching is another phenomenon fueling citizen insecurity in Guatemala, which has been closely watched by the IACHR for several years. Lynching is an act of crowd violence against one or more persons in order to dispense justice for themselves, regardless of whether or not the victim or victims die as a result. This social phenomenon has the particularity that the perpetrators are not habitual criminals nor do they act individually, but instead are ordinary citizens who join crowds of people and even entire communities to participate in lynching.[566] The victims are usually suspected of committing a crime. The victims are usually men, and are frequently tortured and beaten, mutilated, stoned to death or burned alive.[567]

347.   According to information provided by the PDH in 2017, the number of lynching in the past years has held relatively steady, ranging from around 30 deaths per year and one hundred injured, although a 2013 witnessed a sharp rise in deaths from this cause, with 53 lynchings reported in that year alone (that works out to an average of more than one person lynched per week).[568] The IACHR has noted above that lynching not only constitute

---

[563]   IACHR, Country visit to Guatemala, July 31 to August 4, 2017, meetings with civil society organizations, international agencies and others.

[564]   International Peace Brigades, Monthly Guatemala Information Packet, No. 164, May 2017, p. 2.

[565]   IACHR, CIDH publica informe sobre la situación de derechos humanos en Guatemala, ['IACHR publishes report on the situation of human rights in Guatemala'], OEA/Ser.L/V/II, December 31, 2015, para. 160.

[566]   IACHR, Report on the Situation of Human Rights in Guatemala: Diversity, Inequality and Exclusion, OEA/Ser.L/V/II.Doc. 43/15, December 30, 2015, para. 132.

[567]   *Id.*, para. 132-133.

[568]   Information provided by the Office of the Human Rights Ombudsman in the context of the country visit, July 31 to August 4, 2017.

a serious crime against the victim of the lynching, but are often also the cause and effect of impunity, because they are closely tied to a lack of public confidence in the State justice system, both in its duty to prevent crime and its duty to investigate, prosecute and punish those responsible for crimes.[569] Lynching is also emblematic of social conflict in some regions of the country, particularly regions with a heavy indigenous population where extraction projects are carried out on ancestral lands and territories. Some specialists also link the persistence of the phenomenon of lynching in Guatemala to the legacy of the internal armed conflict experienced by broad swaths of the population during that period, particularly in rural, mostly indigenous areas.[570]

348. The IACHR regrets that tangible progress has not been made to mitigate this issue, even though an appeal was issued by it to do so in its 2016 report.[571] The Commission reiterates its appeal and reminds the State that it is its duty to prevent crime and resolve conflicts or disputes, which trigger violence.[572]  Additionally, the State has the obligation to conduct an investigation from a culturally appropriate perspective, prosecute and, when applicable, punish those responsible for criminal acts and, thereby, address the phenomenon of lynching with a comprehensive approach and from a multicultural and prevention perspective.[573]

## 3.    State's Response

349. In response, the State reported to the IACHR on important initiatives in the area of citizen security. The State's concrete proposals to prevent crime include: (i) implementing the 2014-2034 National Violence and Crime Prevention, Citizen Security and Peaceful Coexistence Policy; (ii) developing early warning and monitoring mechanisms for social conflict; (iii) amending laws, regulations and rules in order to strengthen public ethics and judicial independence; (iv) establishing comprehensive and

---

[569]    IACHR, Report on the Situation of Human Rights in Guatemala: Diversity, Inequality and Exclusion, OEA/Ser.L/V/II.Doc. 43/15, December 30, 2015, para. 134.

[570]    Report of the Human Rights Ombudsman, PDH, on lynchings, 2017, citing United Nations Special Rapporteur on Extrajudicial Executions and the United Nations Mission in Guatemala, MINUGUA. In the archive of the Commission.

[571]    IACHR, Report on the Situation of Human Rights in Guatemala: Diversity, Inequality and Exclusion, OEA/Ser.L/V/II.Doc. 43/15, December 30, 2015, paras. 132-135.

[572]    *Id.*, para. 135.

[573]    As it noted in its report, in order to achieve it, "there must be a rapprochement between the State and the communities, and the Government must have a prevention policy, and the political will to enforce it.  There must also be collaboration with municipal authorities, traditional indigenous authorities, and the Human Rights Ombudsman's Office." IACHR, *Report on the Situation of Human Rights in Guatemala: Diversity, Inequality and Exclusion*, OEA/Ser.L/V/II.Doc. 43/15, December 30, 2015, para. 135.

coordinated mechanisms for victim assistance, paying special attention to victims belonging to particularly vulnerable groups; (v) conducting public information campaigns to promote a culture of peaceful social interaction and reducing sexism, racism and discrimination; (vi) promoting a culture of reporting acts of corruption; and (vii) designing urgent assistance mechanisms to prevent lynching.[574] The State also noted that it has 58 public policies in force, 10 of which include among their objectives violence and insecurity prevention and reduction.[575]

350. The Commission also received information on the creation, in October 2016, of a Prosecutor's Office Specialized in Children and Adolescents under the Office of the Public Prosecutor.[576] Implementation of said Prosecutor's Office took place in four stages, according to available information, it was first launched in Guatemala City and the metropolitan area, and was expanded to include the municipalities of Mixco, Villa Nueva, Quetzaltenango, Escuintla and Alta Verapaz.

351. As for measures to ensure that the PNC is in charge of internal security (domestic law enforcement), and has the capacity to do so in compliance with human rights, the State reported on some measures it adopted to strengthen the Police. These measures include increased budget for the PNC, adoption of the 2014-2034 National Violence and Crime Prevention, Citizen Security and Peaceful Coexistence Policy, as well as the National Action Plan cited above.[577] The State also reported that as of 2012, the PNC has taken steps to put the necessary human and material resources in place for it to operate properly, such as: prioritizing expenditures, streamlining resources; closing the gap between the allocated and executed budget; efforts to increase budget allocation; arrange for financial assistance for projects aimed at helping the PNC properly function with international

---

[574] Information provided by the State, Note P-943a-2016/VHGM/MJOS/HM/af-wr, received on October 10, 2016, p. 18.

[575] These policies include the 2008-2023 National Policy for the Promotion and Comprehensive Development of Women (Government Decision 302-2009), the Public Policy for Peaceful Coexistence and the Elimination of Racism and Racial Discrimination (Government Decision 143-2014), the Public Policy against Trafficking in Persons and Comprehensive Victim Protection la Política (Government Decision 306-2014), the Public Policy for the Comprehensive Protection of Children and Adolescents (Government Decision 281-2014), the 2012-2017 National Youth Policy (Government Decision 173-2012), the National Policy against Addictions and Illicit Drug Trafficking, the National Defense Policy, the National Security Policy and the National Prison Reform Policy. Republic of Guatemala, Report of the State of Guatemala in response to draft Chapter V on follow up to the recommendations of the IACHR IV Country Report: Diversity, Inequality and Exclusion (2015). Nota P-943a-2016/VHGM/MJOS/HM/af-wr, received on October 10, 2016, pg. 19. Republic of Guatemala, Report of the State of Guatemala in response to draft Chapter V on follow up to the recommendations of the IV IACHR Country Report: Diversity, Inequality and Exclusion (2015). Nota P-943a-2016/VHGM/MJOS/HM/af-wr, received on October 10, 2016, p. 18.

[576] See press article, Prensa Libre, Guatemala abre una fiscalía dedicada a menores ['Guatemala opens a prosecutor's office devoted to juveniles', October 26, 2016, at: http://www.prensalibre.com/guatemala/justicia/guatemala-abre-una-fiscalia-dedicada-a-menores.

[577] Government Decision No. 281-2014 of August 20, 2014.

cooperation agencies; among other steps. The State reported as well on the appointment of an Office of the Inspector General, as the body in charge of internal oversight of the PNC. Its powers include prevention, investigation and sanction actions.[578]

352. As was reported in the 2016 IACHR Report, one of the Guatemalan State's responses to violence and insecurity has been the participation of the armed forces in internal security tasks. In said report, the IACHR underscored the importance for the armed forces to be removed from internal security duties, because the Army and the police are substantively different institutions insofar as the purposes for which they were created and their training and preparation are concerned. Additionally, each entity is legally empowered to fulfill two entirely different duties under their respective jurisdictions.[579] The permanent presence of the Army in citizen security issues, besides, could be inconsistent with the Peace Accords, inasmuch as the accords set forth that citizen security is the sole province of the civilian police forces.[580] Subsequent to publication of the 2016 report, the State reported that in order to consolidate the Central American Democratic Security Model, it is currently executing the Plan to Strengthen the National Civilian Police and gradually remove the Guatemalan Army from Citizen Security tasks.[581] The IACHR welcomes this information.

353. The State proposed the withdrawal of the armed forces from internal security tasks in three phases. The first phase is redistribution and entails redirecting manpower to new priority locations as of January 1, 2017. This phase provides for the reassignment and relocation of the Army in thirty high violence high priority municipalities.[582] The second phase, reduction, currently underway as of the date of approval of this report, involves quantitative reduction of Army assets by 50% starting April1, 2017. Lastly, the third phase establishes the total withdrawal of Army assets from citizen security activities beginning on January 1, 2018, "leaving it open to the possibility of requesting support when necessary, pursuant to established protocols."[583] The State explained that it would continue to provide

---

[578] Information provided by the State, Nota Ref. P-859-2017/VHGM/LWC/nj, June 16, 2017.

[579] IACHR, Report on the Situation of Human Rights in Guatemala: Diversity, Inequality and Exclusion, OEA/Ser.L/V/II.Doc. 43/15, December 30, 2015, para. 153, 174, para. 178.

[580] *Id.*, para. 153. Submission of the PDH to the IACHR report on the Situation of Human Rights in Guatemala, September 2015.

[581] Information provided by the State, Ref. P-1261-2017/WHGM/LWC/nj, August 29, 2017, Annex 14, p. 7.

[582] *Ibid.* Communication of the State of Guatemala, Comments of the State of Guatemala on the "Draft: Chapter V Follow Up to Recommendations made by the IACHR in the Report on the Situation of Human Rights in Guatemala: Diversity, Inequality and Exclusion," January 23, 2017.

[583] Information provided by the State, Ref. P-1261-2017/WHGM/LWC/nj, August 29, 2017, Annex 14, p. 7.

DHSFF0605

security outside prison facilities and along the borders of the country.[584] The IACHR welcomes and encourages the efforts made and the commitments undertaken by the State in this regard, and it will closely monitor the process of withdrawal of the armed forces from these internal security tasks until it is completed, as scheduled for 2018.

354.   In the same vein, the State has also noted that it is strengthening the PNC in order to meet international standards and turn it into a highly professionalized police force, of a multicultural, multiethnic and multilingual nature, which is in tune with the country's true make-up, through the consequent vetting process with a view toward completely dispense with the presence of the armed forces in citizen security tasks.[585] The State reiterated that for the past 5 years, the Ministry of the Interior has been growing the ranks of the National Civilian Police force, and it expects the number to surpass 37,000 police members in 2017.[586]

355.   The IACHR welcomes the efforts made by the State in the area of citizen security, in particular, in dismantling criminal gangs. In May 2016, the Office of the Public Prosecutor and the National Civilian Police conducted a landmark operation against organized crime, which led to the apprehension of 72 alleged members of a ring of extortionists operating in the urban and extra urban transportation sectors, as well as to the seizure of scores of weapons, drugs and cash.[587] It was the largest operation ever reported by the MP and the PNC as of that time.[588] In similar operations against organized crime, authorities reported arresting more than 50 alleged criminals.[589] Likewise, in September 2017, the MP and the PNC reported another "mega operation" of enforcement against gangs and

---

[584]   Information provided by the State, Ref. P-1261-2017/WHGM/LWC/nj, August 29, 2017, Annex 14, p. 7; Communication of the State of Guatemala, Comments of the State of Guatemala on the "Draft: Chapter V Follow Up to Recommendations made by the IACHR in the Report on the Situation of Human Rights in Guatemala: Diversity, Inequality and Exclusion," January 23, 2017.

[585]   Republic of Guatemala, Report of the State of Guatemala on draft Chapter V regarding follow-up to the recommendations of the 4th Country Report of the IACHR: Diversity, Inequality and Exclusion (2015). Nota P-943a-2016/VHGM/MJOS/HM/af-wr, received on October 10, 2016, p. 52.

[586]   Communication of the State of Guatemala, Comments of the State of Guatemala on the "Draft: Chapter V Follow Up to Recommendations made by the IACHR in the Report on the Situation of Human Rights in Guatemala: Diversity, Inequality and Exclusion," January 23, 2017.

[587]   Press article, Siglo 21, *Histórico operativo en contra de extorsionistas* ['Historic operation against extortionists'], May 3, 2016. It can be found at: http://s21.gt/2016/05/03/historico-operativo-en-contra-extorsionistas/. Also see Ministry of the Interior, *Presuntos extorsionistas de la clica Solo para locos de la mara 18 capturados* ['Alleged extortionists of the Solo para locos clique of mara 18 captured'], April 26, 2017.  It can be viewed at: http://mingob.gob.gt/presuntos-extorsionistas-de-la-clica-solo-para-locos-de-la-mara-18-capturados/.

[588]   Press article, Siglo 21, *Histórico operativo en contra de extorsionistas* ['Historic operation against extortionists'], May 3, 2016. It can be found at: http://s21.gt/2016/05/03/historico-operativo-en-contra-extorsionistas/.

[589]   *Id*.

criminal groups in the business of extortion.[590] Mounted with officers of the abovementioned institutions, in addition to the Ministry of the Interior, the Judiciary and the Public Criminal Defense Institute, the operation netted 114 arrests of individuals charged in a case of the alleged crimes of murder, extortion, extortive obstruction of traffic and illicit association.[591]

356. Because of the high levels of violence Guatemala is experiencing, the Commission calls on the State to step up the efforts it announced, and to allocate sufficient resources to prevent, investigate and punish the acts of violence, in particular when the targets are specific segments of the population who are affected by violence in a differential manner, as is explained hereunder.

## B.    *Effects on Particular Groups and Effectiveness of State Policies*

### 1.    Women

357. The IACHR has repeatedly voiced its concern over the prevalence of violence against women in Guatemala and the general context of impunity for it.[592] During its visit, the Commission received reports about a disconnect between the efforts of the State institutions to protect women and the increase in violence against women in the country. As was noted by the Office of the UNHCHR, despite a slight decrease in the total number of violent deaths over the past two years, Guatemala continues to face serious problems of violence and organized crime, especially in the departments of Guatemala, Escuintla and Izabal, which have a differential effect on women.[593] In 2016, 4,327 cases of the crimes of femicide and other forms of violence against women were brought before the courts (an increase of 38% over 2015) and the courts specialized in crimes of femicide and other

---

[590]    Press article, PubliNews, *Más de 100 capturados en megaoperativo contra extorsiones* ['More than 100 arrested in megaoperation against extortionists'], September 11, 2017. View at: https://www.publinews.gt/gt/noticias/2017/09/11/megaoperativo-pnc-las-extorsiones-realizan-357-allanamientos.html.

[591]    *Ibid.* Also see, Office of Public Prosecutor, September 11, 2017, https://twitter.com/MPguatemala/status/907254387692765184. Ministry of the Interior, September 11, 2017, https://twitter.com/mingobguate/status/907227046044200960.

[592]    IACHR, *Situación de los derechos humanos en Guatemala: Diversidad, desigualdad y exclusión,* [Situation of human rights in Guatemala: Diversity, Inequality and Exclusion'], OEA/Ser.L/V/II.Doc. 43/15, 2015, para. 238.

[593]    Information received during IACHR country visit, from July 31 to August 4, 2017. Information submitted by the Office of the United Nations High Commissioner for Human Rights (UNHCHR) in Guatemala during the meeting held on July 29, 2017 in Guatemala City.

DHSFF0607

forms of violence against women issued 1,908 judgments in 2016, which represents a 29% increase over 2015.[594]

358. In its comment to the draft of this report, the State indicated that currently it has 35 Gender Units in the Executive Branch, and 340 Municipal Directorates for Women, in addition to the 60 municipal policies of security with equity that have been signed. Similarly, the Department of Protection of Womens' Rights within the Attorney General's Office receives and processes reports of intra-family violence since 2015. Regarding the Centers of Integral Support for Women Survivors of Violence (CAIMUS), the State informed that in October 2016 a formal meeting took place between the Ministry of the Interior, the Ministry of Public Finance and members of Congress, for the purpose of including a specific appropriation in the annual national budget to ensure the functioning of these centers, which the State considers would be beneficial for the Commission to visit at some point.[595]

359. The UN WOMEN country study asserts that impunity, stereotypes, discrimination, the prevalence of a machista culture and acceptance of violence lead to particular brutality against women in Guatemala.[596] According to the autopsies performed by the INACIF, from January to June 2016, 374 autopsies for violent deaths of women were counted, while in the same period of 2017, 431 have been conducted.[597] These figures confirm the rising trend of violent deaths of women, despite the decrease in violent deaths of men in the same period. Additionally, the Commission has obtained information about the prevalence of acts of asphyxiation and dismemberment, including decapitations, thus exhibiting particular viciousness against women's bodies.[598]

360. According to information obtained by the Commission, violence against women is the most reported crime in the country,[599] especially sexual violence, for which the troubling statistics are flat. Based on the data of the Secretariat against Sexual Violence, Exploitation and Trafficking in Persons (SVET), in 2015, the Office of the Public Prosecutor registered 7,845

---

[594] United Nations, Report of the United Nations High Commissioner for Human Rights on the activities of its Guatemala Office 2016, A/HRC/34/3/Add.1, 2017. In response to the Draft Report on the Situation of Human Rights in Guatemala, 2017.

[595] Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situation in Guatemala," December 22, 2017.

[596] UN Women, Guatemala Country Background, 2017.

[597] INACIF, Datos Consolidados Anuales y Mensuales – 'Consolidated Annual and Monthly Data, viewed on August 4, 2017.

[598] Human Rights Ombudsman, Submission of the Human Rights Ombudsman, Third Cycle of Universal Periodic Review Guatemala, March 2017.

[599] Guatemalan Women's Group (GGM), No Violence against Women Network (REDNOVI, Women's right to a violence free life in Guatemala as follow up to the hearing held at the 157th Regular Session of the IACHR, July 31, 2017. Information received during the IACHR country visit, from July 31 to August 4, 2017

DHSFF0608

complaints for crimes of sexual violence, while in 2016 7,949 complaints were recorded. For this past year, less than 1% of the cases have been disposed of with judgment.[600] According to information provided by the Human Rights Ombudsman, from 2008 to 2016, 90% of the victims of sexual violence were women, especially young girls, adolescents and young women.[601] In its comments to the draft of this report, the State indicated that figures of the Public Prosecutor's Office registered, beteen 2012 and June 2017, 71,504 women who were victims of sexual violence. In that same period, the State indicated that it conducted 263 trainings on issues related to violence against women, benefiting 4,532 peopl (2,589 women and 1,942 men).[602] The Commission reiterates its concern over the prevalence of sexual violence against women and calls on the State to step up its efforts to prevent, investigate and punish cases of sexual violence.

361. The Commission learned of the draft bill of law 5178,[603] introduced in the Congress of the Republic in 2016 in order to approve the *Law of the National Registry of Sexual Offenders and the Genetic Database.* The bill seeks to enhance the efficiency of security and justice agencies in identifying victimizers of these types of crimes, and effectively enforce the law. In its comments to the draft of this report, the State highlighted that this Law was approved on November 29, 2017,  which the IACHR salutes.[604]

362. The Commission has asserted that the end to the armed conflict has not meant the end to violence, especially for women, who do not realize their right to lead a violence-free life.[605]   The Commission has been noticing a scenario of violence in Guatemala, where most crime is attributed to violence perpetrated by criminal organizations, such as drug trafficking cartels and gangs or *maras.* In this context, women face a heightened situation of risk: the maras tend to be criminal structures dominated by

---

[600] Secretariat against Sexual Violence, Exploitation and Trafficking in Persons (SVET), Datos estadísticos [statistical data]– viewed on August 4, 2017.

[601] Human Rights Ombudsman, Annual Status Report, 2016. State's Response, comments on the Draft Report on the Situation of Human Rights in Guatemala, 2017. Human Rights Ombudsman, Statistics on sexual crimes from 2012 to 2017, May 2017. Information received during IACHR country visit, from July 31 to August 4, 2017.

[602] Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situation in Guatemala," December 22, 2017.

[603] Congress of the Republic, Iniciativa Que Dispone Aprobar Ley Del Registro Nacional De Agresores Sexuales Y Banco De Datos Genético, ['Legislative bill to approve the National Registry of Sexual Offenders and Genetic Database'] Iniciativa 5178-23, 2016.

[604] Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situtation in Guatemala," December 22, 2017.

[605] IACHR, *Situación de los derechos humanos en Guatemala: Diversidad, desigualdad y exclusión,* ['Situation of Human Rights in Guatemala: Diversity, Inequality and Exclusion'], OEA/Ser. L/V/II.Doc. 43/15, 2015, para. 114 and following.

DHSFF0609

males with a machista hierarchy, who engage in practices of extreme violence. It is difficult for women to rise above men to hold high positions in the hierarchy and, true to the stereotype, many women (mothers, sisters, female partners) are regarded as "property" of men and their gang.[606] Overpowering and harassing women is part of the control and confrontation strategy among gangs, which leaves women particularly vulnerable to acts of extortion, threats, sexual violence, torture and murder.[607]

363. In response to the Preliminary Observations of the IACHR, following its country visit,[608] the State reported to the Commission that in examining PNC-created registries of this crime phenomenon, an increase was noticed in the number of women victimizers (arrested or jailed) for different criminal acts, which could suggest that violence against women mostly stems from their involvement in criminal organizations.[609] In light of this situation, the Commission takes note of the intent of the State to promote and further actions to protect women in order to prevent them from being forced to join criminal groups or joining out of the sense of being the possession of the groups, and to adopt policies to prevent violence against women in general, regardless of who the perpetrators are.

## 2.    Children and Adolescents

364. The insecurity and violence currently dogging Guatemala, which is associated with the actions of organized crime and is aggravated by high levels of corruption and impunity, has negative repercussions on child protection. In addition to the alarming homicide numbers among children and adolescents, the IACHR has received information about the levels of crime affecting this population group and the link of this phenomenon to the situation of poverty, marginalization and lack of access to education in which many Guatemalan, particularly indigenous, children and adolescents are living.

---

[606]  YAGENOVA, SIMONA V, _La violencia contra las mujeres como problema de seguridad ciudadana y las políticas de seguridad. El caso de Guatemala, El Salvador, Honduras y Nicaragua_, ['Violence against women as a citizen security problem and security policies. The case of Guatemala, El Salvador, Honduras and Nicaragua'], European Union, Diakonia, FLACSO, 2013.

[607]  YAGENOVA, SIMONA V, _La violencia contra las mujeres como problema de seguridad ciudadana y las políticas de seguridad. El caso de Guatemala, El Salvador, Honduras y Nicaragua_, ['Violence against women as a citizen security problem and security policies. The case of Guatemala, El Salvador, Honduras and Nicaragua'], European Union, Diakonia, FLACSO, 2013.

[608]  IACHR, Press Release No. 114A/17, Observaciones Preliminares de la Visita in loco de la CIDH a Guatemala, ['Preliminary Observations to the IACHR's On-Site Visit to Guatemala'], August 4, 2017.

[609]  Institutional Statement of the National Civilian Police of Guatemala to the IACHR, Official Letter No. 1251-2017, Ref. DG/NARR/Juárez, Reg. 4842, August 21, 2017. Communication of the State of Guatemala, Observations of the State of Guatemala to the IACHR's preliminary observations regarding its On-site Visit, August 29, 2017.

365.  Homicides are the main cause of death among adolescents and young people from 15 to 24 years of age in Guatemala, for whom the homicide rate surpassed 55 for every 100,000 inhabitants in 2015 (the most recent year for which figures are available for this age group).[610] This has meant that much of the progress achieved in the area of survival during early childhood through public child protection policies falls by the wayside during adolescence.[611] Available information to the IACHR suggests that most homicides can be attributed to activities of the *maras*.

366.  Accordingly, the Commission notes that *maras* not only pose the most important security, but also human rights problem. The IACHR has noted that marginalization, social exclusion, poor quality education, violence in the home and poverty have led to the emergence and the expansion of criminal groups; children and adolescents join these groups because of a lack of education or job opportunities, or else in search of a feeling of belonging, recognition or protection. Additionally, many children and teenagers are recruited under deceit, pressure, threats, extortion and violence perpetrated by the *maras* themselves.[612] Even though there have been some isolated programs and initiatives to deal with this issue, available information shows that the lack of a comprehensive national public policy renders these programs ineffective, or they are discarded shortly after they get off the ground.

367.  The weaknesses cited earlier in information gathering and statistical data collection on violence and homicides in Guatemala also applies to the type of violence endured by children and adolescents. These weaknesses make it difficult to accurately identify victims and categorize homicides, in turn, making it hard to create effective public policies to address these issues.[613]

368.  Contrary to the trend in homicides and violent deaths, sexual crimes have been on the rise over the past eight years, according to medical examinations conducted by INACIF. Based on the figures of the Office of the Public Prosecutor, in 2015, there were 15,401 sexual offenses reported and

---

[610]  IACHR, *Situation of Human Rights in Guatemala:* Diversity, Inequality and Exclusion, CIDH, OEA/Ser.L/V/II.Doc. 43/15, December 30, 2015.

[611]  UNICEF, Hidden in Plain Sight: A statistical analysis of violence against children, 2014, pg. 38 and 40, para.59.

[612]  IACHR, *Violencia, niñez y crimen organizado*, ['Violence, Children and Organized Crime'], OEA/Ser.L/V/II. Doc. 40/15, November 11, 2015, para. 154 to 179.

[613]  By way of example, the Office of the Public Prosecutor reported that in 2013, 451 violent deaths of children took place, but in 60% of the cases, no information was recorded about the hypothesis of the crime or any other information that would aid in defining the victims' profile. No information was recorded either to make it possible to characterize the circumstances related to their deaths and thus help to design more effective public prevention and response policies and tailor them to protection needs, in addition to help to detect potential patterns of discrimination against particular social groups. Response to the questionnaire submitted by the State in preparation for the report *Violencia, niñez y crimen organizado*, [Children and Organized Crime], p. 6.

DHSFF0611

from January to October 2016 there were already 12,115 cases[614]  Among the cases reported during the first third of 2017, 37.8% was sexual assault, amounting to 990 rapes, against adolescents from 13 to 17 years of age; followed by 7 to 12 year old little boys and girls, with a total of 409 cases.[615] There were also 230 cases of sexual violence reported against children from 0 to 6 years of age, 169 of which documented that little girls as the victims.[616] Additionally, it was report that in 2016, 8% of the victims of sexual violence were from 0 to 6 years of age, 15% from 7 to 12 years of age, 36% from 13 to 17 years old, and 13% from 18 to 29 years of age.[617] These figures are for reported cases only and it is also estimated that there is a significant underreporting of cases, as victims often fail to report abuse.[618]

369.  On another note, from January 1 to May 31, 2017, the Office of the Public Prosecutor reported receiving 2,637 complaints for sexual violence against children and adolescents: 1,733 for rape, 661 for sexual assault, 193 for aggravated rape, 26 for sexual assault with special aggravating circumstances, and 24 for rape with special aggravating circumstances.[619] According to the INACIF, around 85% of the forensic examinations performed for reasons of sexual assault are present in cases where the alleged perpetrator is a family member or a person close to the family.[620] The Commission notes that there is also a discrepancy under this category between the figures of the Office of the Public Prosecutor and the INACIF.

370.  In its comments to the draft of this report, the State informed that in 2016 an agreement was entered into by the Ministry of Public Health and Social Welfare, the Public Prosecutors' Office, and the Secretariat against Sexual Violence, Exploitation and Human Trafficking (SVET) for the support in the provision of medication necessary in the assistance to victims of sexual violence. Between 2014 and 2017, SVET reported having provided medical assistance, psychological and social assistance, recreation, education or

---

[614]  Human Rights Ombudsman of Guatemala, Annual Status Report 2016, p. 33.

[615]  *Id*. Prensa Libre, Guatemala registra hasta 22 violaciones sexuales al día, ['Guatemala reports up to 22 rapes per day'], June 30, 2017.

[616]  Human Rights Ombudsman of Guatemala, Annual Status Report 2016.

[617]  Prensa Libre, Guatemala registra hasta 22 violaciones sexuales al día, ['Guatemala reports up to 22 rapes per day'], June 30, 2017.

[618]  Human Rights Ombudsman of Guatemala, Annual Status Report 2016. Additionally, the departments where the most victims were reported were: Guatemala (32%), Alta Verapaz, Escuintla and Quiché (5% each); Huehuetenango, Quetzaltenango, Petén and Suchitepéquez (4% each); Chimaltenango and San Marcos (3% each).

[619]  Report on the general situation of children and adolescents in Guatemala, in the context of the country visit of the Inter-American Commission on Human Rights to Guatemala from July 31 to August 4, 2017, National and international organizations. In the IACHR archives.

[620]  *Ibid*.

legal assistance to a total of 852 victims of sexual violence or sexual trafficking.[621]

371. As for child and teenage pregnancy, the Observatory on Sexual and Reproductive Health reported 18,279 pregnancies of girls aged 10 to 19 years old from January 1 to March 31, 2017.[622]  The available information to the IACHR indicates that girls and adolescents are twice as likely to die during pregnancy or while giving birth, and the babies born to an adolescent mother have a higher likelihood of dying in the first month of their lives as compared to babies born to adult mothers.[623] On August 17, 2017, the Congress of the Republic approved Decree 13-2017, amending the Civil Code to eliminate the exceptions allowing marriage of persons below 18 years of age, partly in response to the high rates of teenage pregnancy.[624] The Commission voices its concern over the high number of child and teenage pregnancies in Guatemala and, in addition to the amendment to the law urges the State to implement public policies on education and comprehensive care for children and adolescents, including age group appropriate sexual and reproductive education.

372. The Commission has also received reports to the effect that as part of the citizen security strategy, in Guatemala, armed members of the military at times teach classes in schools, including family planning.[625] This is reportedly a strategy used by the State to build ties of trust between the armed forces of the State and children and adolescents. During its visit to the department of Petén, the IACHR saw firsthand how members of the Army had occupied a school in the community of Laguna Larga, which they were apparently using to sleep overnight.[626] On this score, the State noted that "it is not the duty of the Guatemalan Army to occupy communities or schools."[627]

---

[621] Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situtation in Guatemala," December 22, 2017.

[622] *Ibid.*

[623] *Ibid.*

[624] Press article, Prensa Libre, Congreso prohíbe matrimonio de menores de edad sin excepciones ['Congress prohibits marriage of minors without exception'], August 17, 2017. Can be viewed at: http://www.prensalibre.com/guatemala/politica/congreso-prohibe-matrimonio-entre-menores-de-edad-sin-excepciones.

[625] Informe del Alto Comisionado de las Naciones Unidas para los Derechos Humanos sobre las actividades de sus Oficina en Guatemala 2014, ['Report of the United Nations High Commissioner for Human Rights on the activities of his Office in Guatemala 2014'], para. 41.

[626] IACHR, Press Release 114A/17 - Observaciones Preliminares de la Visita in Loco de la CIDH a Guatemala ['Preliminary Observations to the IACHR's On-Site Visit to Guatemala'], August 4, 2017.

[627] Communication of the Guatemalan State, Observations of the State of Guatemala to the *Preliminary Observations of the IACHR regarding its On-Site visit,* Annex 10, Communiqué of the Ministry of National Defense, August 29, 2017

DHSFF0613

373.  The IACHR has expressed that the trust of the civilian population in the Armed Forces must be build through other means and mechanisms, without infringing the right to education. The teaching of academic subject matter by personnel of the armed forces of the State is not consistent with the duty of the State to provide a quality education through specialized professionals in the education of children and adolescents.[628]

## 3.    Indigenous Peoples

374.  As for the situation of violence and citizen security in Guatemala and how it particularly affects indigenous peoples, the IACHR has been repeatedly contended that attacks in Guatemala are often targeted at traditional authorities, indigenous leaders, particularly those that are against projects on their ancestral lands and territories.[629] Over the past years, the IACHR has been receiving reports of increased violence, intimidation, murders, crackdowns on peaceful demonstrations, as well as criminal prosecution against indigenous leaders and authorities for their opposition to development and investment projects.

375.  The reports stresses that indigenous communities opposing megaprojects on their territories have confronted, among other aspects to: property destruction, robbery and theft and the burning of homes and crops; blocked roads or destroyed bridges; verbal threats and threats with blade weapons and firearms; gun shots in the air or on communities; complaints with local courts to obtain warrants for their arrest; direct physical assaults on communities, including on children; smear and stigmatization campaigns in the news media; and processes of criminalization of defenders of the human rights of indigenous peoples, among other things.[630]

376.  The violence faced by indigenous communities and peoples is also often linked to the agrarian conflict persisting in many areas of the country. The IACHR learned of the situation of the communities of Nueva Seamay and Nueva Sebax, in Senahú, Alta Verapaz. According to the information it received, the members of the communities of the Verapaz Union of Peasant Organizations (OVOC) have been the targets of assaults, death threats, and have even been attacked with firearms, with community member Dominga

---

[628]    IACHR, *Violencia, niñez y crimen organizado* ['Violence, Children and Organized Crime'], OEA/Ser.L/V/II. Doc. 40/15, November 11, 2015, para. 533.

[629]    IACHR, 2016 Annual Report, *Capítulo V: Seguimiento de recomendaciones formuladas por la CIDH en sus informes de país o temáticos* ['Chapter V: Follow-Up of Recommendations Issued by the IACHR in its Country or Thematic Reports'] para. 121.

[630]    Information received from civil society organizations and indigenous authorities during the country visit, July 31 to August 4, 2017.

Caal Col sustaining a bullet wound.[631] Their houses and farm plantings have reportedly been destroyed, and as of the present date those responsible for the destruction or the attack on Mrs. Caal Col have not be apprehended, based on available information. These attacks and violence have come about despite  the Secretariat of Agrarian Affairs (SAA) having set up a discussion forum, where the Ministry of the Interior, the municipal governments, the Land Fund (FONTIERRAS), the National Land Registry (National Cadastre), human rights organizations and the affected communities all have a seat as well. This forum, however, has not been effective at preventing these attacks, evictions and conflicts.[632]

377.   The violence faced by indigenous peoples is closely connected to the situation of discrimination and exclusion they experience.  This exclusion can be seen in spheres such as land ownership, access to basic services, working conditions, access to the formal economy, participation in decision-making and in the institutions of the State, representation in the media and public debate, and the lack of access to justice.[633] Despite specific provisions of the 1996 Peace Accords on the elimination of discrimination against indigenous peoples, more than 20 years after the signing, the IACHR continues to receive reports of the need for full compliance with the commitments, especially the *Agreement on Identity and the Rights of Indigenous Peoples.* Despite claims to the contrary, the Commission notes that, according to the Secretariat of Peace (SEPAZ), both that Agreement as well as the *Agreement on Socio-economic Aspects and the Agrarian Situation* are ones that present the "highest number of commitments pending compliance, which affects the socio-economic and culture issues of the country."[634]

378.   The IACHR also received reports of threats, harassment, intimidation and attempted cooptation against the members of the Central Campesina Ch'orti' Nuevo Día union, who are opposed to the operation of a hydroelectric company and an antimony mine in the municipality of Olopa, in the Department of Chiquimula.[635]  Reports were also received about assaults with machetes and threats against the lives of indigenous members of the Matasano community, as well as conflicts in the community

---

[631]   International Peace Brigades, Monthly Information Packet of Guatemala, No. 164, May 2017, p. 3.

[632]   International Peace Brigades, Monthly Information Packet of Guatemala, No. 164, May 2017, p. 3.

[633]   IACHR, *Justice and Social Inclusion: Challenges of Democracy in Guatemala (2003).* General Conclusions, para. 434; and UNHCHR. Report on the activities of his office in Guatemala. January 30, 2012. A/HRC/19/21/Add.1.

[634]   SEPAZ, Memoria de labores de 2012. Guatemala, 2012, pg. 9. Also see SEPAZ, Memoria de labores de 2016. Guatemala, 2016.

[635]   International Peace Brigades, Monthly Information Packet of Guatemala, No. 164, May 2017, p. 4.

DHSFF0615

of El Rodeo, also stemming from the presence of companies in the area and community opposition to it.

379. The IACHR notes that the common thread to the violence and insecurity afflicting the indigenous peoples and communities in rural areas of Guatemala is the presence of actors foreign to these communities, and the lack of a process of consultation in keeping with Inter-American standards. The IACHR stresses again the process of prior consultation must not be thought of merely as a tool to mitigate social conflict.  Notwithstanding, when it is properly conducted, it can have a collateral effect of lessening such conflicts.[636]

## 4.    LGBTI Persons

380. During its visit, the IACHR received information indicating that violence against LGBTI persons is a structural issue, as illustrated by persistent forms of discrimination and prejudice. In this regard, the Commission has become aware of the high incidence of violence against trans women, and of the high risk faced by human rights defenders of LGBTI rights. Additionally, the IACHR has received information regarding human rights matters linked to the right to health of trans persons, which warrant being addressed by the State, such as lack of medicine in hospitals for the treatment of HIV for who require it, and the absence of a public health care policy from a gender perspective.

381. On this topic, civil society has reported to the Commission that 85% of trans women, who are victims of violence and discrimination, are below 35 years of age, with 33% of the total number of victims from 18 to 24 years of age.[637] Additionally, based on accounts received by the Commission, trans women sex workers have been murdered by individuals, who use their services or at the hands of gangs and criminal groups.[638]

382. On related note, the IACHR has received worrying reports that indicate that defenders of the rights of LGBTI persons are subject to violence, threats and harassment because of the work they do.[639]  In this sense, the offices of

---

[636]   See Section III.C, para. 109, *supra*.

[637]   Redlactrans, *Violaciones a los Derechos Humanos de Mujeres Trans en Costa Rica, El Salvador, Guatemala, Honduras y Panamá* ['Violations of the Human Rights of Trans Women in Costa Rica, El Salvador, Guatemala, Honduras and Panama'], January 2016, para. 121, p. 33.

[638]   Redlactrans, *Violaciones a los Derechos Humanos de Mujeres Trans en Costa Rica,* El Salvador, Guatemala, Honduras y Panamá ['Violations of the Human Rights of Trans Women in Costa Rica, El Salvador, Guatemala, Honduras and Panama'], January 2016, pars. 132-134, p. 36

[639]   Redlactrans, *Violaciones a los Derechos Humanos de Mujeres Trans en Costa Rica, El Salvador, Guatemala, Honduras y Panamá* ['Violations of the Human Rights of Trans Women in Costa Rica, El Salvador, Guatemala, Honduras and Panama'], January 2016, para. 139, p. 38.

certain organizations have allegedly been attacked by unknown individuals.[640] On this score, the Commission cites the murder of the trans leader and activist Evelyn Zulm, who was a beneficiary of precautionary measures requested by the IACHR,[641] in November 2016. In this same period, the IACHR received reports of three other murders of trans women in Guatemala, which were characterized by alarming degrees of cruelty;[642] a view shared by the Human Rights Ombudsman of Guatemala and the Office of the United Nations High Commissioner for Human Rights. The two entities have voiced their concern over the evident "troubling trend of attacks on trans women."[643]

383. The Commission also learned about the serious situation that trans women confront in their access to health services because of the lack of HIV medications for hospitals in the public health network.[644] According to the information it received, this situation reportedly came about because of new directives from the Ministry of Health for the procurement of these drugs, which do not take into consideration the need to provide HIV treatment on a continual basis.[645] The IACHR was apprised as well during its on-site visit by civil society organizations on August 1, 2017 that the Ministry of Health was only purchasing medications once inventories are completely exhausted. This situation reportedly causes breaks in treatment for persons with HIV, particularly affecting trans women, who make up nearly 22% of the HIV positive population of the country.[646] Additionally with regard to the situation of trans persons, the IACHR heard accounts that in Guatemala there is no specific prison policy for the deprivation of liberty of trans persons.

384. Notwithstanding, the Commission recognizes the forward steps cited by the Office of the Human Rights Ombudsman of Guatemala, in his "2016 Annual Status Report" which, following the recommendations of the IACHR, conducted training sessions of National Civilian Police agents who "take

---

[640] Redlactrans, *Violaciones a los Derechos Humanos de Mujeres Trans en Costa Rica, El Salvador, Guatemala, Honduras y Panamá* ['Violations of the Human Rights of Trans Women in Costa Rica, El Salvador, Guatemala, Honduras and Panama'], January 2016, para. 141, p. 38.

[641] IACHR, MC 3-06 - Kevin Josué Alegría Robles y miembros de OASIS, Guatemala, February 3, 2006.

[642] IACHR, Comunicado de Prensa 181/2016, CIDH repudia asesinato de defensora de derechos humanos de personas trans en Guatemala. ['Press Release 181/2016, IACHR repudiates murder of defender of trans rights in Guatemala'], December 2, 2016.

[643] PDH and OUNHCHR Preocupan graves hechos de violencia contra mujeres trans. ['Concern over serious acts of violence against trans women'], December 8, 2016.

[644] El Periódico, Complicadas normas administrativas afectan a pacientes con VIH/sida ['Complicated administrative rules affect HIV/AIDS patients'], November 7, 2017.

[645] El Periódico, Más de 16 mil pacientes en riesgo por falta de medicamentos ['More than 16 thousand patients at risk because of lack of medications'], November 7, 2017.

[646] UNAIDS, Guatemala, in 2016.

DHSFF0617

complaints in order to shed light on and document the violence suffered by LGBTI persons."[647] The Office of the Ombudsman wrote that as a result of the oversight of the Office of Victim Care (OAV) of the National Civilian Police, it could be confirmed: "there are several deficiencies in recording violence suffered by LGBTI persons."[648] The Office of the Ombudsman noted in his report that a field was added for the identification of the complainant persons, "in addition to the name of the personal identification document (DPI), for the gender identification"[649] and that "the OAV agents must respect self-identification"[650] of the person bringing the complaint. Additionally, the Office of the Ombudsman reported to the IACHR that the Offices of Permanent Care of the Office of the Public Prosecutor and of Victim Care of the Office of the Ombudsman, carried out a supervisory check in order to make sure "to include the LGBTI field in complaint intake, so that violence against this population group is made visible."[651]

385.   The IACHR expresses its concern over the situation of violence and discrimination endured by LGBTI persons in Guatemala, as well as the lack of specific public policies to fully ensure the rights of these people. Nonetheless, the Commission does take note of the efforts of the bodies of justice in advancing the rights of LGBTI persons. The IACHR takes this opportunity to recall that the State of Guatemala is obligated to act with due diligence to prevent, investigate, punish and provide reparation for all types of violence committed against LGBTI persons. The Commission, accordingly, recommends the State of Guatemala to adopt the legislative and policy measures necessary to prevent violence, discrimination and prejudice against persons based on sexual orientation, identity and diverse gender expression, or whose bodies deviate from the male and female standard.

## C.   *Death Penalty*

386.   During its country visit, the IACHR noticed that a public debate was taking place about the high levels of insecurity in the country, particularly as a consequence of activities of the so-called *maras* or gangs. The debate has included, among other aspects, calls to resume application of the death

---

[647]   Human Rights Ombudsman of Guatemala, <u>Informe Anual Circunstanciado 2016</u>, ['2016 Annual Status Report'], January 31, 2017, p. 62.

[648]   *Ibid.*

[649]   *Ibid.*

[650]   *Ibid.*

[651]   *Ibid.*

penalty for crimes committed by members of the *maras*.[652] In light of the situation, the IACHR underscores the importance for the State of Guatemala to consider adopting as soon as possible Legislative Bill 5100 to abolish the death penalty, which is pending in Congress.

387. Guatemala is one of the few countries of the hemisphere where the death penalty is still provided for within the domestic legal framework.[653] The Guatemalan State ratified in 1978 the American Convention on Human Rights, Article 4 of which enshrines the right to life and Article 2 of which enshrines the obligation to adopt provisions of domestic law to give effect to that right. Guatemala has still not ratified the Protocol to the American Convention on Human Rights to Abolish the Death Penalty.

388. Capital punishment is provided for in the Guatemalan Criminal Code, the Law against Narcoactivity (Decree 48-92), and in Decree 100-96 that establishes the procedure for execution of the death penalty. The death penalty is in force in the country for the crimes of parricide, extrajudicial execution, abduction or kidnapping, forced disappearance, killing the President or Vice President. No legal mechanism is in place to regulate pardons. Article 18 of the Political Constitution of the Republic of Guatemala lists the instances in which said punishment may not be imposed, and also provides that the "Congress of the Republic may abolish the death penalty."[654] That is to say, in order to abolish the death penalty from the Guatemalan legal system, a simple amendment to the law is sufficient without the need for a constitutional amendment.

389. The Commission was informed of the legislative bill No. 5100, Law Abolishing the Death Penalty, which is currently pending in Congress. It also received information about the promotion of initiatives aimed resuming implementation of the death penalty, in particular, in response to the high levels of insecurity afflicting the country.[655]

---

[652] IACHR, On-Site Visit to Guatemala, July 31 to August 4, 2017, meetings with civil society organizations and others.

[653] In addition to Guatemala, the death penalty is still in force in Antigua and Barbuda, Bahamas, Barbados, Belize, Cuba, Dominica, United States, Granada, Guyana, Jamaica, Saint Kits and Neves, Santa Lucia, Saint Vicent and the Grenadines, and Trinidad and Tobago.

[654] The instances in which the death penalty may not be imposed are: "a. On the grounds of presumptions; b. On women; c. On persons older than 60 years of age; d. On convicts of political crimes and common crimes connected to political crimes; and e. On convicts whose extradition has been granted under that status."

[655] See, for example, Press article, "Guatemala analiza volver a aplicar la pena de muerte para combatir a las maras" ['Guatemala examines bringing back application of the death penalty to combat maras'], August 26, 2017. Can be viewed at: https://actualidad.rt.com/actualidad/248128-guatemala-analiza-volver-aplicar-pena-muerte.

DHSFF0619

390.  During its on-site visit, State officials reiterated to the Commission that the death penalty has not been applied in the country since 2000, and that there are no inmates on "death row," meaning sentenced to the death penalty and awaiting execution.[656] The IACHR welcomed this information, and noted that since the repeal of Decree 159, a void has opened up in the Guatemalan legal system on the subject of the death penalty, inasmuch as there is no State entity with the legal authority to hear and rule on pardons, petitions for clemency and commutation of sentences. In practice, this has functioned as a de facto moratorium. In February 2016, the Court of Constitutionality found the application of the death penalty for the crime of murder to be unconstitutional as established in Article 132 of the Guatemalan Criminal Code. The ruling did away with the element of dangerousness as grounds for a death sentence.

391.  The Commission views as positive that for 17 years the death penalty has not been imposed by judicial authorities and that for more than a decade commutation of death penalty sentence has been ordered for persons previously sentenced.  In response to recent calls to resume the application of the death penalty, the IACHR recalls that even though it is not used in practice, as long as the domestic law provides for its use, potential implementation of the death penalty lies dormant. As the Inter-American Court has held, even when the accused has not been executed, "the mere existence of [a rule that provides for the death penalty] is, *per se,* a violation" of the provision of the Convention to adopt laws in the domestic legal system to give effect to the right to life.[657]. In May 2016, in relation to compliance with judgment in the case of *Raxcacó v. Guatemala*, the Inter-American Court oversaw potential amendment to Article 132 of the Criminal Code on the crime of murder and the ability to impose the death penalty on the grounds of "dangerousness of the agent," as well as amendment to Article 201 of the Criminal Code which sets forth the elements and punishment of the crime of abduction or kidnapping, in such a way that different definitions and punishments are set forth for different forms of that criminal offense, and during the implementation of these amendments, to not apply the death penalty for that crime.[658] The Commission takes note and views positively that as a consequence of actions of both the Executive Branch and of the Judicial Branch, in keeping with the judgments of the Inter-American Court, more than 17 years have elapsed without the death penalty being imposed or executed in Guatemala. The Commission finds that, in practice, the State of Guatemala has taken steps forward toward abolishing the death penalty, which is

---

[656]    IACHR, On-site visit to Guatemala, July 31 to August 4, 2017, meetings with State officials.

[657]    IA Court of HR, *Case of Raxcacó Reyes v. Guatemala*, Judgment of September 15, 2005. Merits, Reparations and Costs. Series C, No. 133, para. 88.

[658]    IA Court of HR, 2016 Annual Report of the Inter-American Court of Human Rights, pg. 83.

consistent with the spirit of the American Convention on the subject matter.

392. Additionally, the IACHR acknowledges the ruling of the Constitutionality Court of October 24, 2017, declaring unconstitutional the application of the death penalty to the crimes of parricide, extrajudicial execution, abduction or kidnapping, forced disappearance, and killing the president or vice president. [659] The grounds for the Court's decision included the inconsistency between the application of the death penalty and international human rights treaties ratified by the Guatemalan State. In this regard, the Commission notes that while Article 18 of Guatemala's Constitution still provides for the death penalty, it may no longer be imposed in the country in light of Article 4.2 of the American Convention.[660] The IACHR welcomes this advancement toward abolition of the death penalty.[661]

393. Based on the foregoing, and taking into account the practice of almost two decades, and the findings of the IACHR in its Report *"The Death Penalty in the Inter-American Human Rights System: From Restrictions to Abolition"* with regard to the obligation of OAS member States to gradually eliminate the death penalty, the Commission recommends the State of Guatemala to adopt the necessary measures so that domestic law is brought into line with said practice and thus continue to move toward abolition of the death penalty. The IACHR reiterates the need to move forward in amending laws in the countries of the region, which still allow the death penalty, in order to totally abolish it from their legal systems or, otherwise, impose a moratorium on imposing it. In this vein, the Commission calls Guatemala to ratify the Protocol to the American Convention on Human Rights to Abolish the Death Penalty.[662]

---

[659] Case file 5986-2016, which found unconstitutional paragraphs of Articles 131, 132 Bis, 201, 201 Ter and 383 of the Criminal Code and of the Law against Narcoactivity. Press article, Agencia EFE, La Corte de Constitucionalidad de Guatemala anula la pena de muerte de cinco delitos ['Guatemala's Court of Constitutionality nullifies death penalty for five criminal offenses'], October 27, 2017. Can be viewed at: https://www.efe.com/efe/america/sociedad/la-corte-de-constitucionalidad-guatemala-anula-pena-muerte-cinco-delitos/20000013-3420629.

[660] American Convention on Human Rights, Article 4.2: "2. In countries that have not abolished the death penalty, it may be imposed only for the most serious crimes and pursuant to a final judgment rendered by a competent court and in accordance with a law establishing such punishment, enacted prior to the commission of the crime. The application of such punishment shall not be extended to crimes to which it does not presently apply."

[661] After the issuance of this ruling, the death penalty still exists in the Military Code (Decree 2014).

[662] Press Release 27/15, La CIDH celebra la aplicación de la pena de muerte en Suriname, ['IACHR Welcomes Abolition of the Death Penalty in Surinam'], March 12, 2015.

# CHAPTER 7
# SITUATION OF PERSONS UNDER STATE CUSTODY

DHSFF0622

DHSFF0623

# SITUATION OF PERSONS UNDER STATE CUSTODY

## A.   Persons Deprived of Liberty

394.   With regard to the situation of persons deprived of liberty in Guatemala, the Inter-American Commission notes that the Guatemalan prison system is characterized for the most part by overcrowding (22,464 persons held in facilities with a maximum capacity of 6,320), excessive use of pre-trial detention (50% of the total of the prison population), and a slow justice system. It is also characterized by deplorable conditions of detention, high levels of violence, a lack of effective social reintegration programs, corruption, authorities' failure to effectively control the inside of prison facilities.

395.   According to official figures, as of May 2017, a total of 22,464 persons were being held in detention at 21 prison/detention facilities currently in operation in the country.[663] Additionally, approximately 1,600 persons are regularly held in custody at police stations.[664] In particular, the IACHR learned that the total number of women deprived of liberty is 2,248, the equivalent of 10% of the total prison population.[665] This figure is of particular concern to the Commission, considering that the percentage of incarcerated women more than doubles the average of women deprived of liberty in the region.[666]

---

[663]   In particular, Guatemala has 22 prison facilities, but currently only 21 are in operation, because the Centro Penal del Progreso, Guastatoya, is not holding any people deprived of liberty. PDH-Guatemala. Information submitted to the IACHR on July 27, 2017, in the context of the on-site visit.

[664]   PDH, Guatemala, Information provided to the IACHR on July 25, 2017.

[665]   PDH-Guatemala. Information provided to the IACHR on July 25, 2017, in the context of country visit.

[666]   The specific percentage is 4.95%. This statistic is based on the latest available figures from the States of the Americas —which encompass from 2012 to 2017— except for Cuba, which does not have the respective statistics. Institute for Criminal Policy Research and Birkbeck University, World Prison Brief data. IACHR, _Informe sobre medidas dirigidas a reducir el uso de la prisión preventiva en las Américas_, ['Report on Measures Aimed at Reducing the Use of Pre-trial Detention in the Americas'], OEA/Ser.L/V/II.163. Doc. 105, July 3, 2017, para. 200.

## 1.     Overcrowding and excessive use of pre-trial detention

### b)     General considerations

396.   High rates of overcrowding pose one of the main concerns in connection with the prison system in Guatemala.[667] Available information shows that from 2010 to the present, the prison population in the country has nearly doubled.[668] In this regard, in order to address the situation of overcrowding, the IACHR notes that the Guatemalan State has made several efforts to reduce the number of persons deprived of liberty. These efforts include measures aimed at reducing pretrial detention in cases that warrant doing so, such as the use of alternative measures to incarceration, and the creation of the Democratic Crime Policy (Política Criminal Democrática) of the State of Guatemala by the Office of the Public Prosecutor (Ministerio Público or MP for its Spanish initials),[669] an initiative to use pretrial detention in keeping with its exceptional nature, and only in cases where risk of flight or potential hampering of the investigation is "provable." The State has also established programs such as the 'progressive regime' (gradual easing of confinement) and sentence reduction, which seek to facilitate social reintegration and enable persons deprived of liberty—through work, education and good conduct—to be conditionally released or to benefit from early release prior to completing their prison sentence.[670]   In its comments to the draft of this report, the

---

[667]   On this score, the OUNHCHR has spoken out about the "urgent need" to address structural problems of the Prison System, such as "chronic overcrowding." Annual Report of the OUNHCHR on the activities of its office in Guatemala, A/HRC/34/3/Add.1, January 11, 2017, para. 31.

[668]   In particular, in 2010, it was reported that 10,512 persons were deprived of liberty. PDH-Guatemala, Contribuciones del Procurador de los Derechos Humanos para la adopción, en el 54° período de sesiones del Comité contra la Tortura, de la lista de cuestiones previas a la presentación del séptimo informe periódico por parte del Estado de Guatemala, ['Contributions of the Human Rights Ombudsman for approval, at the 54th session of the Committee against Torture, of the list of questions prior to the submission of the 7th periodic report by the State of Guatemala'], February 5, 2015, para. 91. Also see, IACHR, Situación de derechos humanos en Guatemala, ['Situation of Human Rights in Guatemala'], OEA/Ser.L/V/II, Doc. 43/15, December 31, 2015, para. 354.

It must also be noted that the rate of deprivation of liberty per 100,000 inhabitants has notably increased year after year. For example, while in 2010 this rate was 84 persons deprived of liberty, in 2016, the rated increased to 127. PDH, Guatemala, Informe Anual Circunstanciado 2016, ['Annual Status Report'], p. 176.

[669]   This initiative, completed in 2016, designed in the context of the Democratic Crime Policy of Guatemala, involved the efforts of the three branches of government, and adopts "a comprehensive strategy to deal with violence and crime, through 4 strategic action prongs, which are: prevention, investigation, punishment and reintegration." State of Guatemala, Submission of the State of Guatemala in response to request for information prior to the on-site visit of the IACHR, Ref. P-859-2017/VHGM/LWC/nj, June 16, 2017, pars. 87-89, 92,93, and 95-97.

[670]   The progressive regime consists of several activities aimed at the social readaptation of convicted persons and is divided into four phases. The last phase is conditional release. For further information on how it works, see Ley del Régimen Penitenciario, ['Law of Prison Regime'], Decree No. 33-2006, Guatemala, in force as of September 2012, Articles 56 to 69.

DHSFF0625

State informed that it is currently working on the regulations to implement this Law.[671] Notwithstanding, the information provided indicates that the aforementioned measures have not been effective, and that the occupancy rate of prison facilities is at more than three times their maximum capacity.

397.    In view of the fact that overcrowding constitutes *per se* a violation of personal integrity, and that this situation seriously undermines the enjoyment of human rights by persons deprived of liberty,[672] the IACHR urges the State to adopt measures aimed at a more rational use of incarceration, such as the use of pretrial detention in keeping with standards on the subject matter; and the promotion, regulation and use of alternatives measures to the deprivation of liberty. The Guatemalan State must also take steps to efficiently implement existing initiatives which provide for the use of conditional release, which in addition to reduce the prison population, helps support persons deprived of liberty to become reintegrated into society. In particular, in order for programs such as sentence redemption and progressive release regime to efficiently work, the State must, among other things: a) implement comprehensive measures to prevent bureaucratization of processes and help to speed up and providing certainty to the processing of the progressive release regime and of motions for redemption of sentence; b) implement an automatized and unified system of registry and assessment of cases under these regimes, or cases that could be eligible for these benefits; c) ensure continuity of these programs, regardless of turnover of prison or government officials, and d) ensure that persons deprived of liberty have the legal assistance they require to gain access to the programs.

398.    As for the situation of pretrial detention, which poses one of the most serious problems faced by persons deprived of liberty in Guatemala, the IACHR notes that as of May 2017, 50.07% of the total prison population—that is, a total of 11,210 individuals—were being held in pretrial detention.[673] The fact that 50% of said population is under this regime

---

Redemption of the sentence is a measure based on "education and useful and/or productive work," which allows for redeeming punishments of deprivation of liberty. For further information on how it works, see Ley del Régimen Penitenciario, ['Law of Prison Regime'], Decree No. 33-2006, Guatemala, in force as of September 2012, 70 to 74.

[671]    Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situtation in Guatemala," December 22, 2017.

[672]    On this subject, the IACHR has held that overcrowding increases levels of violence between inmates; hampers access to basic services; contributes to the spread of diseases; creates deplorable conditions of sanitation and hygiene; in and of itself poses a risk factor for an emergency situation; restricts inmates access to productive activities and fosters corruption. IACHR, *Informe sobre el uso de la prisión preventiva en las Américas*, [Report on the Use of Pretrial Detention in the Americas], OEA/Ser.L/V/II., Doc. 46/13, December 30, 2013, para. 288.

[673]    Of the total number of persons in pretrial detention, 10,038 are males and 1,210, mujeres. PDH-Guatemala. Information submitted to the IACHR on July 27, 2017, in the context of the on-site visit. The PDH and the

clearly shows that it is not being used in keeping with the requirement for it to be exceptional in nature, and that it disproportionately affects persons who cannot afford to pay the monetary punishment of a fine. Excessive use of this measure is one of the most obvious signs of the failure of the justice administration system, and represents an unacceptable situation in a democratic society, which respects the right of every person to the presumption of innocence.[674] Accordingly, the Commission calls on the State to adopt the judicial, legislative, administrative and other types of measures required to correct the excessive use of pretrial detention, ensuring that this measure is of an exceptional nature and hews to the principles of legality, presumption of innocence, necessity and proportionality,[675] and making sure that the regulation thereof does not run counter to efforts to combat impunity in Guatemala.

### c)    Major challenges to reducing pretrial detention

399.    The IACHR had access to information suggesting that the major challenges faced by the Guatemalan State to reduce excessive use of pretrial detention, and consequently, high levels of prison overcrowding, include the following: a) crime policies proposing higher incarceration rates as a solution to citizen security; b) pressure from the media and public opinion to address citizen insecurity through deprivation of liberty; c) use of the mechanism of disciplinary control as a measure of pressure or punishment against judicial authorities who decide to use alternative measures to incarceration; d) inadequate public defense; e) lack of registries to monitor the length of judicial proceedings, and f) high incidence of hearing postponement.

400.    Firstly, crime policies proposing higher rates of incarceration as a solution to citizen insecurity translate into legislation that seeks to: a) favor the use of pretrial detention; b) limit the ability to use alternative measures to

---

OUNHCHR-Guatemala further report that the use of pretrial detention significantly varies from one department to another, with highest rates recorded in 2016: Santa Rosa (33%); Guatemala (37%); Jalapa (40%); Zacapa (42%), and Retalhuleu (50%). Said regime was used less frequently in these departments: San Marcos (9%), Alta Verapaz (15%) y Sololá (15%). OUNHCHR and PDH, "The use of pretrial detention in Guatemala: a human rights problem," 2016, para. 18.

[674]    IACHR, *Informe sobre medidas dirigidas a reducir el uso de la prisión preventiva en las Américas*, [Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas], OEA/Ser.L/V/II.163. Doc. 105, July 3, 2017, pars. 2 and 20, and *Informe sobre el Uso de la Prisión Preventiva en las Américas*, [Report on the Use of Pretrial Detention in the Americas], OEA/Ser.L/V/II., Doc. 46/13, 30 December 30, 2013, para. 317.

[675]    IACHR, *Informe sobre medidas dirigidas a reducir el uso de la prisión preventiva en las Américas*, [Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas], OEA/Ser.L/V/II.163. Doc. 105, July 3, 2017, para. 231. Recommendation A "General Measures Related to State Policy." For more information on specific measures to reduce the use of pretrial detention, see IACHR, Guía práctica para reducir la prisión preventiva, ['Practical Guide to Reducing Pretrial Detention'], OEA/Ser.L/V/II.163 Doc. 107, July 2017.

DHSFF0627

deprivation of liberty, and c) impose more requirements for release.[676] In this regard, amended Article 264 of the Code of Criminal Procedure makes it mandatory to impose pretrial detention with no ability to use alternative measures for certain crimes;[677] in addition to allowing for repeat offense as a criterion *per se* to automatically impose this regime.[678] In another statute, the Law against Femicide and other Forms of Violence against Women prohibits the use of alternatives to pretrial detention for any charge of femicide;[679] and the Law to Strengthen Criminal Prosecution, in addition to making pretrial detention automatic for certain crimes, prohibits the use of any prison benefits such as alternative measures for these same crimes.[680]

401. The IACHR notes that these legal provisions establish grounds for admissibility of pretrial detention that differ from the traditional or precautionary grounds and reflect a punitive or a perpetrator-focused approach to criminal law. In this regard, the IACHR reiterates that pretrial detention should be justified in each specific case and that legislation that provides for the use of non-custodial measures based on the type of offense, stands at odds with the governing principles of the use of pretrial detention.[681] Based on the foregoing, in no circumstance may the law provide that any type of offense is excluded from the regime established for ending pretrial detention, or provide for certain types of offense to receive a different treatment from others in relation to being free during the trial, without any basis in objective and legitimate criteria, other than meeting standards such as "social alarm," "social repercussion," "dangerousness."[682]

---

[676] PDH, Guatemala, <u>Informe Anual Circunstanciado 2016</u>, ['2016 Annual Status Report'] p. 44. Also see, Annual Report of the OUNHCHR on the activities of its office in Guatemala, A/HRC/34/3/Add.1, January 11, 2017, para. 31.

[677] In particular, Article 264 of the Code of Criminal Procedure establishes that no alternative measure [to incarceration] shall be granted for the following crimes: "homicide with malice of forethought, murder, parricide, aggravated rape, rape resulting in death, statutory rape [rape of a minor under 12 years of age], abduction or kidnapping in all of its forms, sabotage, aggravated robbery, possession or carrying of a firearm. Code of Criminal Procedure, <u>Decreto No. 6-2013 por el que se reforma el artículo 264</u>, ['Decree No. 6-2013 amending Article 264'], Guatemala, in force as of September 13, 2013, Article 264.

[678] Code of Criminal Procedure, <u>Decreto No. 6-2014 por el que se reforma el artículo 264</u>, ['Decree No. 6-2013 amending Article 264'], Guatemala, in force as of September 13, 2013, Article 264.

[679] <u>Ley contra el Feminicidio y otras Formas de Violencia contra la Mujer</u>, ['Law against Femicide and other Forms of Violence against Women'], Decree No. 22-2008, Guatemala, in force as of April 2008, Article 6.

[680] In particular, the Law to Strengthen Criminal Prosecution (*Ley de Fortalecimiento de la Persecución Penal*) (which amends the Law against Organized Crime) establishes that the "conditional suspension of criminal prosecution" shall not be granted for the crimes set forth in Article 25 of this last law, consisting of crimes against life; abduction and kidnapping; torture; serious or very serious specific bodily harm; crimes of rape and sexual abuse. <u>Ley de Fortalecimiento de la Persecución Penal</u>, ['Law to Strengthen Criminal Prosecution'], Decree No. 17-2009, Guatemala, in force as of May 2009, Article 3.

[681] IACHR, <u>*Informe sobre medidas dirigidas a reducir el uso de la prisión preventiva en las Américas*</u>, [Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas], OEA/Ser.L/V/II.163. Doc. 105, July 3, 2017, paras. 86 and 90.

[682] *Id.*, para. 231. Recommendation B "Eradicating Pretrial Detention as Anticipated Punishment."

On this issue, the IACHR determined in its recent jurisprudence that when a legal provision is in force allowing as sole grounds for pretrial detention preclusion from release during the case proceedings—and it is not determined based on an assessment of the evidence of risk of flight or hampering the case— the differential treatment leading to restriction of personal liberty is arbitrary and, therefore, a violation of the principle of equality and non-discrimination and of the right to personal liberty.[683]

402. Additionally, the IACHR views with concern that Guatemala has a 'tough-on-crime' or 'iron fist' crime policy in place when it comes to drugs,[684] in categorizing as "serious offenses' (felonies) all conduct relating to the use of drugs, which triggers automatic imposition of pretrial detention, and precludes defendants from benefitting from alternatives to incarceration.[685]  On this score, the Commission notes that the Law against Narcoactivity, in regarding as "serious" all offenses related to drugs, makes pretrial detention mandatory for the crimes of "drug trafficking" or only "possession for use."[686] By drawing no distinction between the treatments of crimes linked to drugs, Guatemalan law ignores the principles upon which the use pretrial detention is based, especially, the principle of proportionality.[687]  Accordingly, and taking into account the incompatibility of this legislation with international standards, the IACHR welcomes the

---

[683] IACHR, Report No.  53/16, Case 12.056. Merits. Gabriel Oscar Jenkins. Argentina. December 6, 2016, paras. 147-149.

[684] IACHR, _Informe sobre medidas dirigidas a reducir el uso de la prisión preventiva en las Américas_, [Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas], OEA/Ser.L/V/II.163. Doc. 105, July 3, 2017, para. 85.

[685] For a more detailed analysis about this type of policies region wide, see: IACHR, _Informe sobre medidas dirigidas a reducir el uso de la prisión preventiva en las Américas_, [Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas], OEA/Ser.L/V/II.163. Doc. 105, July 3, 2017, pars. 85 y 90. Also see: WOLA, IDPC, Dejusticia, CIM and OAS, _Mujeres, políticas de drogas, Una guía para la reforma de políticas en América Latina_, ['Women, Drug Policies and Incarceration: A Guide to Policy Reform in Latin America'] 2016, pgs. 20 and 22; IACHR, _Audiencia pública "Medidas para reducir la prisión preventiva en América_" ['Public Hearing "Measures to reduce pretrial detention in the Americas'], 157th regular session, April 5, 2016; Giacomello, Corina, _Documento Informativo "Propuestas de alternativas a la persecución penal y al encarcelamiento por delitos de drogas en América Latina"_, ['Informational document: Proposals for alternatives to criminal prosecution and incarceration for drug crimes in Latin America'], International Drug Policy Consortium June 2014. Also see Consorcio Internacional sobre Políticas de Drogas, _Las Cortes de Drogas. Los alcances y retos de una alternativa a la prisión preventiva_", ['Drug Courts. Suggestions and Challenges of alternatives to pretrial detention'], May 2012, pg. 2. For example, in the area of legislation, the National Code of Criminal Procedures of Mexico allows for the automatic use of pretrial detention for the crimes against health listed under Articles 194 and 195 of the Federal Criminal Code [section titled] 'About the production, possession, trafficking, proselytism and other acts in the area of drugs. _Código Nacional de Procedimientos Penales_, ['National Code of Criminal Procedures'], Mexico, published on March 5, 2014, in force as of June 18, 2016, Article 167.

[686] _Ley contra la Narcoactividad_, ['Law against Narcoactivity'], Guatemala, in effect as of October 1992, Article 61.

[687] IACHR, _Informe sobre medidas dirigidas a reducir el uso de la prisión preventiva en las Américas_, [Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas], OEA/Ser.L/V/II.163. Doc. 105, July 3, 2017, para. 90.

DHSFF0629

recent commitment made by the State with respect to the adoption of international criteria providing for "alternative measures to incarceration such as a strategy that allows for addressing the issue of drugs."[688]

403.   As for the lack of independence of justice operators, described in Chapter IV, Section B, this situation continues to be one of the major challenges to the use of alternatives to deprivation of liberty and, consequently, to a reduction in the incidence of prison overcrowding. This is because State policies, which propose more incarceration as a solution to the problems of citizen insecurity, often go hand in hand with a sharp media and political institutional message backed by public opinion, and even by the institutions of justice themselves. In this regard, the OUNHCHR and the PDH have noted that judicial officials receive very little encouragement or support from the institutions of justice to grant alternative measures, and that these decisions are more likely to be overturned than decisions imposing a custodial measure.[689] Furthermore, the National Mechanism Office for the Prevention of Torture reported to the IACHR that the major challenge for the use of non-custodial measures is precisely that, the fear of their decisions being attacked in this way, by both civil society and the media, as well as by the Supreme Court of Justice itself.[690] In response to this situation, the IACHR recommends the State to adopt the legislative, administrative and institutional measures necessary to ensure the highest degree possible of independence, autonomy and impartiality of judicial authorities, so that they are able to perform their duties free of any type of interference.[691]

404.   With respect to public defense in Guatemala, inadequate services continue to be one of the major causes of protracted pretrial detention. In particular, poor performance of public defenders is mostly rooted in the scant amount of resources allocated to pay them to fulfill their mandate and to remedy the problem of understaffing and cope with the heavy workload, which consequently befalls them. This keeps them from being able to effectively focus and properly follow up on the cases they take.[692]  Regarding this

---

[688]   State of Guatemala, Submission on preliminary observations to the on-site visit of the IACHR, Ref. P-1261-2017/VHGM/LWC/nj, August 29, 2017. Annex 3, Response of the Commission to Addiction and Illicit Drug Trafficking, August 17, 2017.

[689]   OUNHCHR and PDH, "Use of pretrial detention in Guatemala: A human rights problem,' 2016, para. 19.

[690]   National Mechanism Office of Prevention of Torture, Guatemala. Response to the consultation questionnaire for the Report on Measures aimed at Reducing the Use of Pretrial Detention in the Americas, submitted to the IACHR on May 16, 2016.

[691]   IACHR, _Informe sobre medidas dirigidas a reducir el uso de la prisión preventiva en las Américas_, [Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas], OEA/Ser.L/V/II.163. Doc. 105, July 3, 2017, para. 231 Recommendation D "Independence of Judicial Officers."

[692]   In this regard, IACHR, _Audiencia pública "Medidas para reducir la prisión preventiva en América"_ ['Public Hearing "Measure to reduce pretrial detention in the Americas'], 157th regular session, April 5, 2016. Information provided by the Institute of Comparative Studies in Penal Sciences of Guatemala (_ICCPG). Also_

DHSFF0630

institution, the IACHR recalls the recent legal precedents of the Inter-American Court to the effect that "the provision of free and public legal assistance helps […] to adequately make up for the procedural inequality in which persons who face the punitive power of the State find themselves in, as well as the situation of vulnerability of persons deprived of liberty."[693] Therefore, the Commission calls on the State of Guatemala to strengthen its public defender system, paying priority attention to the coverage and the quality of the service in order to provide from the time of apprehension by the police, a service aimed at timely and effective protection of the fundamental rights of the person charged with the crime.[694]

405. On another note, the lack of an automated and unified registration/record-keeping system of cases of persons deprived of liberty makes it virtually impossible to know when the deadline for holding someone in pretrial detention has lapsed leading to detainees awaiting judgment remaining in jail for inordinate lengths of time.[695] In view of the foregoing, the State should implement a judicial and prison information management system at every detention facility in the country, in order to provide updated information and easy access to case information and the legal status of persons deprived of liberty in the country. These information management systems should make it possible to process information in an organized and efficient way at every prison facility, and make all information available in centralized information management systems, to which prison administration officials can resort in order to obtain up-to-date data and reliable statistics.[696]

---

*see:* OUNHCHR and PDH, "La aplicación de la prisión preventiva en Guatemala: un problema de derechos humanos" ['The use of pretrial prevention in Guatemala: a human rights problem'], 2016, para. 67, and PDH, Guatemala, Informe Anual Circunstanciado 2016 ['2016 Annual Status Report'] pgs. 45 and 179, and Informe Anual Circunstanciado, Situación de los Derechos Humanos y Memoria de Labores 2015 ['2015 Annual Status Report, Situation of Human Rights and Record of Activities'], September 10, 2016, pg. 205.

[693]   IA Court of HR. *Case of Ruano Torres et al v. El Salvador.* Merits, Reparations and Costs. Judgment of October 5, 2015. Series C No. 303, para. 156.

[694]   IACHR, *Informe sobre medidas dirigidas a reducir el uso de la prisión preventiva en las Américas,* [Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas], OEA/Ser.L/V/II.163. Doc. 105, July 3, 2017, para. 231 Recommendation C "Public Defense." IACHR, *Informe sobre el Uso de la Prisión Preventiva en las Américas* ['Report on the use of pretrial detention in the Americas'], OEA/Ser.L/V/II., Doc. 46/13, December 30, 2013, para. 326. Recommendation E "Legal Defense." About most detailed standards in the area of public defense, see IA Court of HR. *Case of Ruano Torres et al v. El Salvador.* Merits, Reparations and Costs. Judgment of October 5, 2015. Series C No. 303.

[695]   PDH, Guatemala, Informe Anual Circunstanciado 2016, ['2016 Annual Status Report'] pgs. 45 and 176, and Informe Anual Circunstanciado, Situación de los Derechos Humanos y Memoria de Labores 2015, ['2015 Annual Status Report, Situation of Human Rights and Record of Activities'], September 10, 2016, pg. 205. With respect to the situation of pretrial detention, see OUNHCHR and PDH, ['The use of pretrial prevention in Guatemala: a human rights problem'], 2016, para. 66.

[696]   In this regard, IACHR, *Informe sobre los derechos humanos de las personas privadas de libertad en las Américas* ['Report on the human rights of persons deprived of liberty in the Americas'], OEA/Ser.L/V/II. Doc. 64, December 31, 2011, para. 158.

DHSFF0631

406.     Another cause of the extended length of pretrial detention is the high number of hearings that are suspended, as a consequence of a variety of factors such as parties' failure to appear; lack of means of transportation, not enough gasoline, insufficient prison guards and failures in the coordination between institutions in planning for hearings. This issue is one of the main complaints made to the Commission through numerous testimonies of persons deprived of liberty and from information provided by civil society. The OUNHCHR and the PDH have also spoken out about this situation.[697] On this score, the State of Guatemala reported that in order to streamline case proceedings and avoid hearing postponement, in 2017 the Judiciary entered into two interinstitutional cooperation agreements to implement the criminal matter notification system. One of the agreements is with the Office of the Public Prosecutor and the other one is with the Criminal Public Defense Institute.[698] For its part, the IACHR believes that one of the most effective measures that the State can adopt in order to overcome the difficulties that arise in transferring defendants to court hearings is to implement so-called "in-prison hearings," which are held on the prison premises and with the judicial officers going to the premises and conducting the particular proceeding.[699] In addition to making sure a higher number of cases are heard this way, by holding this type of hearing justice operators are also brought into direct contact with the actual prison conditions. This could help to make the judiciary more sensitive to how important it is to use alternative measures to the deprivation of liberty, particularly, to deal with the high incidence of overcrowding plaguing Guatemala's prisons.[700]

### d)      Alternative measures to pretrial detention

407.     Alternative measures are regulated under Article 264 of the Code of Criminal Procedure. This Code establishes that as long as the risk of flight or of obstruction of the proceeding to "ascertain the truth" can be reasonably avoided, the judicial authority may choose to any of the

---

[697]     In this regard, OUNHCHR and PDH, ['The use of pretrial prevention in Guatemala: a human rights problem'], 2016, para. 39.

[698] State of Guatemala, Submission on preliminary observations to the on-site visit of the IACHR, Ref. P-1261-2017/VHGM/LWC/nj, August 29, 2017.  Annex 13, Response of the Judiciary, August 18, 2017.

[699] For more information on implementation of hearings in jail facilities, see IACHR, *Informe sobre medidas dirigidas a reducir el uso de la prisión preventiva en las Américas* [Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas], OEA/Ser.L/V/II.163. Doc. 105, July 3, 2017, para. 231 Recommendation I "Measures Related to Speedy Process and Correcting the Procedural Delay", section 4. Also see: IACHR, *Guía práctica para reducir la prisión preventiva*, ['Practical guide to reduce pretrial detention'], OEA/Ser.L/V/II.163 Doc. 107, pp. 36 and 36.

[700]     IACHR, *Informe sobre medidas dirigidas a reducir el uso de la prisión preventiva en las Américas*, [Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas], OEA/Ser.L/V/II.163. Doc. 105, July 3, 2017, para. 175.

following measures: a) bail bond; b) house arrest; c) ban from departing a particular territory, or from going to certain gatherings or locations; d) placement in the custody or under the surveillance of a particular person or institution; e) periodic appearance before a court or designated authority, and f) prohibition of contact with certain individuals.[701]

408.   The IACHR notes that over the past years, the Guatemalan State has made several efforts mainly to apply two types of alternative measures: electronic monitoring devices; and restorative justice programs in criminal matters, focused on treatment of persons who commit minor drug-related offenses. As for electronic monitoring, the Law of Implementation of Control by Telematics (Telecommunications and Informatics) in Criminal Proceedings, in force as of December 2016, regulates the use of "telcom and computer (telematics) control over criminal cases [...] under the modality of permanent location of persons, through the use of electronic bracelets, anklets, armbands or of any electronic device with a global positioning system (GPS)."[702]  In response to the enactment of this law, and in order to develop the implementation of said devices, the Supreme Court of Justice issued Resolution 14-2017.[703]

409.   The IACHR was informed that the use of electronic monitoring devices poses serious challenges to persons who cannot afford to pay for them. In this regard, the Law of Implementation of Electronic Control establishes that the cost of the respective devices must be defrayed by the beneficiaries themselves, except at the discretion of the competent judge, after a socio-economic study has been conducted.[704]  On this score, the PDH has said that said provision amounts to a "limitation to persons deprived of liberty who, eligible for a non-custodial measure [...] are unable to secure it because they are unable to cover its cost."[705] In light of the foregoing, the IACHR recalls the obligation of States to take the necessary measures to make sure that the use of electronic monitoring devices conforms to the criteria of material equality, and does not pose a discriminatory measure to

---

[701]   Código Procesal Penal, [Code of Criminal Procedure], Decree No. 51-92, Guatemala, in force as of December 1993, Article 264.

[702]   Ley de Implementación del Control Telemático en el Proceso Penal (Decreto 49-2016) ['Law of Implementation of Telecommunication and Information Technology in Criminal Proceedings'], Guatemala, in force as of December 22, 2016, Article 7

[703]   State of Guatemala, Submission on preliminary observations to the on-site visit of the IACHR, Ref. P-1261-2017/VHGM/LWC/nj, August 29, 2017.  Annex 13, Response of the Judiciary, August 18, 2017.

[704]   Ley de Implementación del Control Telemático en el Proceso Penal (Decreto 49-2016), ['Law of Implementation of Telecommunication and Information Technology in Criminal Proceedings'], Guatemala, in force as of December 22, 2016, Article 7.

[705]   PDH, Guatemala, Informe Anual Circunstanciado 2016, ['2016 Annual Status Report'], p. 179.

DHSFF0633

the detriment of persons unable to afford said amounts of money.[706] Therefore, in the event the potential beneficiary's inability to afford the payment, another non-custodial measure must be used, or not charge for the use of the electronic device.[707]

410.  In respect to programs of restorative justice in criminal matters, the Regulation for the Control of Sentences issued within the Probationary Regime of Conditional Suspension of Sentence –approved by the Supreme Court of Justice in 2013[708]– provides for the ability of the defendant and the persons affected by the illicit conduct to participate in dispute resolution, through non-punitive measures which serve to redress the damage and mainstream the defendant back into society.[709]

411.  In the context of these cases, heavy drug users who commit crimes related to drug use cam be placed in treatment programs and, in such cases, the judicial authority has the power to remand the person to institutions, such as: a) specialized rehab facilities for addiction treatment; b) specialized institutions in psychological and psychiatric programs; c) job training providing institutions; and d) academic institutions.[710] On this score, the State reported that judicial officers of the Narcoactivity Courts have opted to remand persons who "are facing criminal proceedings for minor drug-related offenses" to the Treatment Center of the Executive Secretariat of the Commission against Addictions and Illicit Drug Trafficking (SECCATID), so that users can receive medical treatment and rehabilitation, and avoid being incarcerated.[711]

412.  In light of the main concerns voiced by the IACHR in the *Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas* with respect to drug treatment programs operating under judicial supervision in the region, the IACHR urges the Guatemalan State to take the necessary

---

[706]  IACHR, *Informe sobre el uso de la prisión preventiva en las Américas*, ['Report on the use of pretrial detention in the Americas'], para. 326. Recommendation B "Use of precautionary measures other than pretrial detention."

[707]  IACHR, *Informe sobre medidas dirigidas a reducir el uso de la prisión preventiva en las Américas*, [Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas], OEA/Ser.L/V/II.163. Doc. 105, July 3, 2017, para. 134.

[708]  Regulation for the Control of Impositions and Instructions Issued within the Probationary Regime of Conditional Suspension of Criminal Prosecution, approved under Resolution 4-2013 of the Supreme Court of Justice of Guatemala, published on August 6, 2013.

[709]  *Id.*, Article 4, section d).

[710]  *Id.*, Article 12;  IACHR, Hearing "Measures to reduce pretrial detention in the Americas," 157th regular session, April 5, 2016. Information provided by the *IECCPG (*Institute for Comparative Studies in Penal Sciences of Guatemala*).

[711]  State of Guatemala, Submission on preliminary observations to the on-site visit of the IACHR, Ref. P-1261-2017/VHGM/LWC/nj, August 29, 2017.  Annex 3, Response of the Commission on Addiction and Illicit Drug Trafficking. August 17, 2017.

measures to ensure implementation of a drug policy that pursues a public health rather than an enforcement and criminalizing approach.[712]  In this regard, as to the treatment of persons who have committed a minor crime as a consequence of drug use—as has been explained, are sent to the Treatment Center of SECCATID—the Guatemalan State should take the necessary measures to make sure that the persons, who will be placed in these programs are dependent or heavy drug users.  In this instance, the State must promote other alternatives to the deprivation of liberty, such as outpatient type treatment in order to avoid institutionalizing them and to be able to address this issue with a health and human rights approach.[713]

## 2.    Conditions of Detention

413.  The Commission is particularly concerned about the deplorable conditions of detention observed at Guatemalan prisons, which pose a risk to the lives and integrity of the persons deprived of liberty.  These conditions of detention are characterized by alarming levels of overcrowding; deficient infrastructure; failure to segregate inmates awaiting judgment and those serving sentences; lack of hygiene, and of toilets and designated locations to spend the night; and deficient medical care. Furthermore, throughout prison facilities, there is a prevalence of inadequate food service, both in terms of quantity and nutritional value, a lack of social reintegration programs and of a differential approach to treatment for persons belonging to groups in special at-risk situations.

414.  Firstly, the IACHR witnessed for itself with great concern the high degree of overcrowding at all detention facilities it visited, including three mini jailhouses or *carceletas* — commonly known as the 'chicken coups' or *gallineros*"— of the tower of the Courts of the judiciary (Torre de Tribunales del Organismo Judicial). The prison Unit *Granja Penal de Pavón*, built for a maximum capacity of 960 persons, houses triple that population (3,363 people). Moreover, the women's facility Centro de Orientación Femenina and the Santa Teresa prison hold prison populations five times larger than their maximum housing capacity: the Centro de Orientación Femenina, with a capacity of 125 women, houses 700; and Santa Teresa jailhouse, with a maximum capacity of 250, has a population of 1,257 women.[714] In its comments to the draft of this report, the State notified that

---

[712]   IACHR, *Informe sobre medidas dirigidas a reducir el uso de la prisión preventiva en las Américas*, [Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas], OEA/Ser.L/V/II.163. Doc. 105, July 3, 2017, pars. 148 to 151.

[713]   *Id.*, para. 153.

[714]   The data relating to where said facilities are currently housed was obtained during the IACHR's visit to the institution in the context of the country visit, August 1 and 2, 2017.

DHSFF0635

it is currently developing a list of people deprived of liberty to determine who may be eligible for a reduction of the sanction.[715]

415. Likewise, the IACHR expresses its concern over the deficient medical care characterizing prison facilities in Guatemala. This deficiency is evident in the lack of medical staff, medicine and equipment, the difficult access to general hospitals, and the lack of a comprehensive health program.[716] In particular, at the prison facilities it visited, the IACHR observed an almost total lack of medical staff for the prison population. For example, the prison Unit *Granja Pavón*, Santa Teresa jail and the women's prison Centro de Orientación Femenino only have one doctor on the premises from Monday to Friday, treating a total population at these facilities of approximately 5,320 people. For its part, the OHUNHCHR has noted with concern that there are only 8 doctors to treat the entire prison population of the country.[717] Furthermore, in many instances, the health facilities on the premises are not used for providing health care, but rather are used to house prisoners because of the high degree of overcrowding.[718]

416. In this same vein, the IACHR notes that the extreme overcrowding, the lack of hygiene and adequate ventilation pose a serious threat to the health of the inmates, because of increased risk of the spread of infectious disease caused by such conditions. This situation was observed by the IACHR particularly at the mini-jails of the Towers of the Courts, which were also extremely dirty, full of garbage, with a foul odor pervading the facilities and detainees in direct contact with the deplorable latrines. The detainees also ate their food in these same spaces and could remain there several days awaiting transfer to the respective prison facilities they were assigned to. In its comments to the draft of this report, the State indicated that regarding infrastructure, acess to healthcare and hygene, it is working on building two new units, with resources from the General Directorate of the Penitentiary System and with assistance from the Program to Support Security and Justice in Guatemala.[719]

417. The use of solitary confinement witnessed by the Commission at the three prison facilities it visited runs counter to international standards, inasmuch

---

[715] Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situation in Guatemala," December 22, 2017.

[716] For more information about medical care at prison facilities, see PDH, Guatemala, Informe Anual Circunstanciado 2016, ['2016 Annual Status Report], p. 210.

[717] Annual Report of the OUNHCHR on the activities of its office in Guatemala, A/HRC/34/3/Add.1, January 11, 2017, para. 31.

[718] PDH, Guatemala, Informe Anual Circunstanciado 2016, ['2016 Annual Status Report], p. 210.

[719] Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situation in Guatemala," December 22, 2017.

as this should only be used as a "security measure" to protect the integrity of detainees or as punishment for misconduct. The IACHR documented the situation of 45 individuals who were being held in 8 solitary confinement cells; 28 of them were men, and 17 were women. In general, the group and individual cells are characterized by extremely cramped space, unhygienic conditions, no natural light and very little artificial light, inadequate ventilation, and high temperatures. Persons held in solitary confinement had the right to one hour of exposure to the sun per week—and, in the best of circumstances, per day—and they were not permitted visits or any contact with family members.

418.   The protracted length of time that these exceptional regimes last is alarmingly worrisome to the IACHR.  Further fueling this concern is the fact that 31 of the 45 persons in solitary confinement, who were interviewed, claimed they have been held under this regime for more than one year. The IACHR saw solitary confinement cells on its visit and notes the deplorable conditions of one particular cell dubbed "Reflexión" ['Reflection'] at the women's prison Centro de Orientación Femenino. In said space, measuring a mere 1 meter by 2 meters, 5 women are housed, who in addition to the violations characterizing this type of regime, have no access to sunshine and are forced to sleep in a seated position. Two of these women have reportedly been held in these conditions for more than one year. Considering the frequency and extended periods of time for which this type of regime is used, the IACHR recalls that indefinite, unnecessary or prolonged application of the regime of solitary confinement constitutes torture or cruel, inhuman or degrading treatment.[720] Consequently, the IACHR urges the State to use the regime of solitary confinement as an exception, for as short a time as possible, and only as a last resort.[721] Additionally, it reiterates that solitary confinement orders should be

---

[720]   IACHR, Principios y Buenas Prácticas sobre la Protección de las Personas Privadas de Libertad en las Américas [Principles and Best Practices on the Protection of Persons Deprived of Liberty in the Americas'], OEA/Ser.L/V/II.131, Document approved by the Commission at its 131st Regular Session held from March 3 to 14, 2008, Principle XXII.3; and United Nations, Reglas Mínimas de las Naciones Unidas para el Tratamiento de los Reclusos (Reglas Nelson Mandela), ['United Nations Standard Minimum Rules for the Treatment of Prisoners (Nelson Mandela Rules)'], A/RES/70/175, Resolution approved by the General Assembly, December 17, 2015, Rule 43.

[721]   IACHR, Informe sobre los derechos humanos de las personas privadas de libertad en las Américas, ['Report on the human rights of persons deprived of liberty in the Americas'], December 31, 2011, para. 411; IACHR, Principios y Buenas Prácticas sobre la Protección de las Personas Privadas de Libertad en las Américas, [Principles and Best Practices on the Protection of Persons Deprived of Liberty in the Americas'], OEA/Ser.L/V/II.131, Document approved by the Commission at its 131st Regular Session held from March 3 to 14, 2008, Principle XXII.3; and United Nations, Reglas Mínimas de las Naciones Unidas para el Tratamiento de los Reclusos (Reglas Nelson Mandela), ['United Nations Standard Minimum Rules for the Treatment of Prisoners (Nelson Mandela Rules)'], A/RES/70/175, Resolution approved by the General Assembly, December 17, 2015, Rule 45.

DHSFF0637

authorized by a competent authority[722] and subjected to independent review.[723]

## 3.     Acts of Violence Occurring at Prison Facilities

419.  Over the past years, the IACHR has received information on the persistent high incidence of violence at prison facilities stemming from conflicts between rival groups of inmates and from a lack of effective control by authorities over what goes on inside these incarceration facilities. In particular, the IACHR notes that since 2015, there has been a notable increase in deaths from violent causes at prison facilities. On this score, the General Directorate of the Penitentiary System reports that in 2015 and 2016,  respectively, the number of violent deaths totaled 59[724] and 57;[725] while during the period of 2010 to 2014, a total of 23 violent deaths were reported.

420.  The IACHR expressed its concern over the acts of violence, which occurred on July 18, 2016, at the Pavón Prison Farm, which is located 17 kilometers outside of Guatemala City. In this regard, it noted that a riot broke out, as a consequence of a confrontation between rival groups, leaving 14 individuals dead and 10 people injured.[726] The IACHR has also spoken out about the acts of violence which took place from late 2015 to early 2016 at the Canada Prison Unit and Puerto Barrios prison, located in the province of Escuintla and in the Department of Izabal, respectively, where a total of 24 people lost their lives.[727]

---

[722]   IACHR, Principios y Buenas Prácticas sobre la Protección de las Personas Privadas de  Libertad en las Américas, [Principles and Best Practices on the Protection of Persons Deprived of Liberty in the Americas'], OEA/Ser/L/V/II.131, Document approved by the Commission at its 131st Regular Session held from March 3 to 14, 2008, Principle XXII.3.

[723]   United Nations, Reglas Mínimas de las Naciones Unidas para el Tratamiento de los Reclusos (Reglas Nelson Mandela), ['United Nations Standard Minimum Rules for the Treatment of  Prisoners (Nelson Mandela Rules)'], A/RES/70/175, Resolution approved by the General Assembly, December 17, 2015, Rule 45.

[724]   DGSP-113907-2016 REF/JURÍDICO/VCM/oa-cp/D.HUMANOS. Guatemala, November 24, 2016. Cited in PDH, Guatemala, Informe Anual Circunstanciado 2016, ['2016 Annual Status Report'], p. 182.

[725]   This number is for data from January to November 2016. PDH, Guatemala, Informe Anual Circunstanciado 2016, ['2016 Annual Status Report'], p. 182.

[726]   Among those who lost their lives in the incidents was Byron Lima, serving prison time for the murder of Bishop Juan Gerardi in 1998, and Johanna Birriel, a 24-year-old Argentine woman, who was visiting the prison facility. IACHR, Press Release 109/16-"CIDH condena violencia en cárcel de Guatemala". ['IACHR condemns violence in Guatemalan prison'], Washington DC, August 3, 2016.

[727]   IACHR, Press Release 1/16 - CIDH lamenta violencia en cárcel de Guatemala. ['IACHR regrets violence in Guatemalan Prison'], Washington, D.C., January 19, 2016, and IACHR, Press Release 144/15 - CIDH expresa preocupación por muertes violentas en cárcel de Guatemala ['IACHR expresses concern regarding violent deaths in Guatemalan Prison'], Washington DC, December 7, 2015. Additionally, the IACHR spoke out in its 2016 Annual Report about the Granja Penal Canadá prison riot. IACHR, Situación de derechos humanos en

421.   In this context, the Commission has voiced condemnation of this type of incident, and has urged the Guatemalan State to investigate and get to bottom of the circumstances in which it took place and, when possible, identify and punish those responsible.[728] The IACHR has also called on the State to take concrete measures, such as disarming inmates and gaining effective control inside prisons to prevent the entry of firearms and other illegal items; improve security inside prisons; and prevent the operation of criminal organizations that have a presence inside jails.[729]

## 4.   Depravation of Liberty at Police Stations and on Military Bases

422.   The use of police stations as permanent detention facilities and of military bases to house persons deprived of liberty indefinitely constitutes a special situation of concern to the IACHR. As to the National Civilian Police, it was brought to the attention of the Commission that police stations are used as permanent detention centers because of the current lack of space at prison facilities and the respective abuse of pretrial detention prevailing throughout the State. The PDH has been warning about this situation since 2014, and has recommended the prison system to implement the necessary measures to undertake the "protection of persons deprived of liberty at said stations."[730] In this regard, the IACHR reiterates that police stations facilities are not originally designed for the purpose of lodging persons deprived of liberty indefinitely, nor do they fulfill requirements for the long term housing of such persons.[731]

423.   With respect to the use of military bases, the "use of a space on the facilities of a military base or military unit" was first authorized under Ministry of the Interior Decision No. 126-2010, on June 18, 2010, "in order to transfer for their confinement those persons deprived of liberty whose lives or safety, for reasons of a situation of vulnerability and security, may be at risk." Under subsequent decisions of the Ministry of Interior, the following

---

*Guatemala* ['Situation of Human Rights in Guatemala'], OEA/Ser.L/V/II, Doc. 43/15, December 31, 2015, para. 363.

[728]   IACHR, *Situación de derechos humanos en Guatemala*, ['Situation of Human Rights in Guatemala'], OEA/Ser.L/V/II, Doc. 43/15, December 31, 2015, para. 362. Also see: IACHR, Press Release 106/16 - "CIDH condena violencia en cárcel de Guatemala", ['IACHR Condemns Violence in Guatemalan Prison']August 3, 2016.

[729]   IACHR, Press Release 106/16 - "CIDH condena violencia en cárcel de Guatemala" ['IACHR Condemns Violence in Guatemalan Prison'], August 3, 2016.

[730]   PDH, Guatemala, Informe Anual Circunstanciado 2016, ['2016 Annual Status Report'] p. 53.

[731]   IACHR, Press Release 151/16 - Relatoría sobre los Derechos de Personas Privadas de Libertad realiza visita a Argentina. ['Rapporteurship on the Rights of Persons Deprived of Liberty Visits Argentina'], Washington, D.C., October 19, 2016.

DHSFF0639

military premises have been used to house civilians deprived of their liberty: a) military headquarters "Matamoros," under Ministry Decision No. 129-2010, of June 24, 2010; b) space for women at the military headquarters "Matamoros", under Ministry Decision No. 484-2015, of August 24, 2015; c) expansion of the military headquarters "Matamoros" to 32 persons, under Ministerial Decision No. 263-2016, of June 13, 2016, and d) expansion of First Infantry Brigade Headquarters "Mariscal Zavala," to 135 persons in pre-trial detention, under Decision No. 557-2015, November 12, 2015.[732]

424. Regarding this situation, the CICIG has warned about the risks of operating jails on military bases, and has called on the State to close down these spaces.[733] On another front, the PDH has noted that detention at military facilities is worrisome, because "detainees should be located at detention facilities of a civilian nature;" an aspect that also runs counter to the provisions of the Guatemalan Constitution, which establishes that prison sentences must be served at "locations intended for such a purpose," which are characterized by being "of a civilian nature and with specialized personnel."[734] Moreover, the IACHR finds that prison administration should not be in the hands of the army or any other military institutions, except when they are under the control of civilian authority. Civilian public officials are suitable to perform duties of direct custody with respect to persons deprived of liberty, as well as to meet psychological, educational, labor and social reintegration needs."[735]

---

[732]   Previously, this military facility's maximum housing capacity was 16 persons.

[733]   Press article, Prensa Libre, "CICIG advierte sobre riesgo al funcionar cárceles en las instalaciones militares", ['International Commission against Impunity in Guatemala warns about the risk of operating jails at military facilities'], July 21, 2017.

[734]   Constitución Política de la República de Guatemala, ['Political Constitution of the Republic of Guatemala'], amended under Legislative Decision No. 18-93, November 17, 1993, article 19 b).

[735]   In this same vein, the European Prison Rules provide that prisons shall be under the responsibility of public authorities and will be segregated from military, police or judicial services; they also stipulate that one of the objectives of the duties of prison personnel is to facilitate the social reintegration of the persons deprived of liberty. Committee of Ministers of Europe, Recomendación Rec(2006)2 a los Estados miembros sobre las Reglas Penitenciarias Europeas, ['Recommendation Rec(2006)2 to the member State on the European Prison Rules'], adopted by the Committee of Ministers on January 11, 2006, Rules 71 and 72.3. Furthermore, according to the OUNHCHR, the administration of the prison system must be in "civilian hands" and not be part of the military structure. OUNHCHR, "Los Derechos Humanos y las Prisiones: Manual de capacitación en derechos humanos para funcionarios de prisiones", ['Human Rights and Prisons: Training manual on human rights for prison officials'], Professional training series Nº 11, New York and Geneva, 2004, p. 230.

The Principles and Best Practices on the Protection of Persons Deprived of Liberty in the Americas establish that prison officials must be civilians, and ensure that the employees making up the staff are preferably civilians. IACHR, Principios y Buenas Prácticas sobre la Protección de las Personas Privadas de Libertad en las Américas, ['Principles and Best Practices on the Protection of Persons Deprived of Liberty in the Americas'], approved by the IACHR under Resolution 1/08 at its 131st regular session, held from March 3 to 14, 2008, Principle XX "Personnel of places of deprivation of liberty."

DHSFF0640

### 5.    Imposition of Fines for Money Laundering Convictions

425.   Article 4 of the Law against the Laundering of Money and other Assets provides that the commission of the crime of laundering money or any other asset will be punished with an uncommutable prison term of 6 to 20 years, "plus a fine equal to the amount of the assets, instruments or proceeds of the subject crime."[736] Additionally, the Guatemalan Criminal Code provides that anyone who cannot afford to pay the fines imposed on them must pay off their fine by serving a sentence of deprivation of liberty equal to one day in prison for every 5 to 100 quetzals of fine.[737] During its country visit, the IACHR received repeated testimony from persons deprived of liberty, as well as information from prison authorities, indicating that hundreds of persons, who have served their prison sentence for the commission of this crime, are held in Guatemalan jails because they do not have the economic resources to pay the fines that were imposed on them.

426.   On this score, the IACHR was informed that the above-cited provision of law leads to low income persons sentenced to deprivation of liberty remaining in jail for life, or spending periods of time there that surpass three or even four times the length of time to which they had been sentenced to serve for their conviction.[738]  In response to this situation, in January 2017, the Public Criminal Defense Institute brought an unconstitutionality action before the Court of Constitutionality against Article 4 of the Law against Money Laundering. This action is based on the argument that the provision of the law in question provides for a double prison sentence for the same crime, because if a person is unable to pay the fine, he would continue to be deprived of liberty.[739] This line of argument has been supported by the PDH in his legal opinion of September 6, 2016.[740] The Commission will follow up on the outcome of this challenge to the constitutionality of the provision of the law.

427.   The IACHR notes that pursuant to the legal precedents of the Inter-American Court, the prohibition against torture and other cruel, inhuman

---

[736]   Ley contra el Lavado de Dinero y Otros Activos, ['Law against Money and other Asset Laundering'], Decree No. 67-2001, Guatemala, in force as of December 17, 2001, Article 4.

[737]   Criminal Code, Decreto No. 17-73, ['Decree No. 17-73'], Guatemala, in force as of September 15, 1973, Article 55.

[738]   PDH, Information provided to the IACHR at the meeting of August 2, 2017.

[739]   First Deputy Minister of the Interior, Information provided to the IACHR at the meeting of August 2, 2017; Letter of a person deprived of liberty, Pretrial Detention Center for Men of Zone 18, submitted through the National Mechanism Office on Prevention of Torture to the IACHR, July 28, 2017. Letter from persons deprived of liberty, Fraijanes, submitted through their legal representative to the IACHR, August 2, 2017.

[740]   PDH, Legal Opinion, September 6, 2016. Information submitted to the IACHR  on September 22, 2017.

DHSFF0641

and degrading punishments or treatment,[741] also entails the requirement of proportionality in "state punishments for the perpetration of offenses."[742] In not providing for other means to address the monetary obligation, the Law against Money Laundering and the Criminal Code, in conjunction, allow for a person convicted of money laundering to be deprived of his liberty indefinitely because he cannot afford to pay the fines based on the value of the assets, instruments or proceeds of the crime. Moreover, the miniscule amount of money subtracted from the debt of the fine in exchange for each day served in prison (ranging from .70¢ to $14 USD/day) further keeps persons deprived of liberty from successfully paying off their debt. The absence of explicit regulations of the time periods in these circumstances and the unpredictability render the deprivation of liberty arbitrary and amount to life imprisonment. Furthermore, said practice constitutes deprivation of liberty for debts, which is prohibited under Article 7.7 of the American Convention.

428.   Additionally, the IACHR notes that this legal provision is glaringly discriminatory because it has a differential effect on persons living in poverty or who do not have the economic wherewithal to pay the fine imposed. In view of the foregoing, the IACHR calls on the State to amend the Guatemalan law so that it can meet the following requirements: a) that the punishment for money laundering does not amount to *de facto* imposition of a double punishment of deprivation of liberty, even possibly leading to life imprisonment, and b) that it not continue to perpetuate the deprivation of liberty based on the mere material impediment that the persons have to address the fine imposed.

## B.   *Adolescent Care and Detention Facilities*

429.   Guatemala is an eminently young country. It has a population of more than 16 million inhabitants, around one half or 8,169,715 of which are children and adolescents from 0 to 19 years of age.[743] According to the National Adoption Council, it is estimated that more than 5,000 children are currently institutionalized in the country for different reasons ranging from abandonment, abuse (physical, sexual or other types), poverty, pregnancy, a disability, addiction, conflict or contact with criminal law, *inter alia.*[744]

---

[741]   IA Court of HR. *Case of Mendoza et al v. Argentina.* Preliminary Objections, Merits and Reparations. Judgment of May 14, 2013 Series C No. 260, para. 174.

[742]   *Ibid.*

[743]   National Institute of Statistics, INE. Rough figures for 2015, the most recent year for which these figures are available.

[744]   IACHR, *Situation of Human Rights in Guatemala: Diversity, Inequality and Exclusion,* OEA/Ser.L/V/II.Doc. 43/15, December 30, 2015, para. 271. Also see press article, La hora, 4.215 niños están institucionalizados,

According to available statistics, almost 40 children, on average, are orphaned in Guatemala each day.[745] In this context, this section of the instant report examines the situation of children under the custody of the State at shelters, orphanages and other residential care or detention facilities.

430.  The State of Guatemala does not have a National System for the Full Implementation of the Rights of Children and Adolescents (NSFIRCA), because the Comprehensive Child and Adolescent Protection Law (PINA Law, from the Spanish acronym) currently in force does not clearly establish any comprehensive protection system with a high-level interinstitutional coordinating body. Such a system for full implementation requires that comprehensive protection policies defining a set of actions be prescribed by the National Children's and Adolescents' Commission and the Municipal Children's and Adolescents' Commissions for children and adolescents to be able to ensure the full enjoyment of their rights and freedoms. In an attempt to create a National System for the Full Implementation of the Rights of Children and Adolescents, the National Children's and Adolescents' Commission was created to be the lead children's policy-making body. In practice, this National Commission fulfills its duty only to a limited extent, inasmuch as instead of coordinating a comprehensive public policy between the institutions involved, it only focuses on selected programs.

431.  In the absence of such a system, the Secretariat of Social Welfare (SBS) has taken on the role of the lead, as well as the implementing, agency for services at residential institutions and facilities housing adolescents in conflict or contact with the criminal justice system. Consequently, a public assistance-focused approach based on a paradigm of an irregular or aberrant situation is used, as opposed to an approach of full protection and implementation of rights. The Commission received information indicating that coordination between the SBS (which is directly under the Office of the President), the Ministry of Social Development, and other relevant government agencies involved in the full implementation of rights and protection of children is wholly inadequate.[746] The Ministry of Social Development is the lead agency for social services and national policy for the support of the most vulnerable segments of society and families living

---

¿quién vela por su bienestar? ['4,215 children are institutionalized, who watches over their wellbeing?'], November 23, 2016. It can be found at: http://lahora.gt/4-mil-215-ninos-ninas-estan-institucionalizados-quien-vela-bienestar/.

[745]  IACHR, *Situation of Human Rights in Guatemala: Diversity, Inequality and Exclusion,* OEA/Ser.L/V/II.Doc. 43/15, December 30, 2015, para. 271. UNODC, Homicide Statistics, 2013.

[746]  Information received during the country visit at meetings with civil society organizations specialized in the rights of children and adolescents, July 31 to August 4, 2017.

DHSFF0643

in a situation of poverty. However, these policies are not always coordinated with child protection and rights implementation policies, precisely because of the absence of an effective National System for the Full Implementation of Rights of Children and Adolescents.

432.  The information received shows that the lack of a comprehensive national policy for the full implementation of the rights of the child has given rise to a high rate of institutionalization of children and adolescents living in a situation of vulnerability, because no comprehensive family protection and rights violation prevention policies are in place.[747] In Guatemala, children and adolescents living in conditions of vulnerability—whether it is because of poverty, teen pregnancy, being victims of physical or sexual violence, disability, addictions or due to other causes—are generally placed in residential care institutions, usually large facilities, which have the capacity to house hundreds of boys and girls and operate under a closed-door regime with security mechanisms and details similar to those of prison facilities.  This is inconsistent with international and Inter-American human rights standards on the best interests of the child.[748]

433.  The information received by the IACHR on this score indicates that the model of large residential institutions is a structural problem in Guatemala. The Commission has written that "the objective of special measures of protection cannot be other than the protection of the child and the preservation and restoration of his/her rights," and that institutionalization and other protection measures "cannot be considered in their design or implementation, as a sanction on the parents in the exercise of their parental responsibilities; nor can they be considered as a corrective measure for those children who are deemed to have behavioral difficulties, or are labeled "rebels" or considered to have behavioral or social adaptation problems."[749] Therefore, the IACHR, the United Nations Committee on the Rights of the Child, UNICEF and the Office of the Human Rights Ombudsman of Guatemala have repeatedly requested the State to do away with this model of institutionalization, which stands in violation of the Convention on the Rights of the Child and international protection and alternative care standards.[750] In August 2016, the UN Committee on the Rights of Persons with Disabilities asked Guatemala to abolish "all placements at institutions for all children of all ages, with or without

---

[747]  Meeting with national and international children's rights protection organizations, August 2, 2017.

[748]  IACHR, the Right of Boys and Girls to a Family. Alternative care. Ending Institutionalization in the Americas, OEA/Ser.L/V/II. Doc. 54/13, October 17, 2013.

[749]  IACHR, the Right of Boys and Girls to a Family. Alternative care. Ending Institutionalization in the Americas, OEA/Ser.L/V/II. Doc. 54/13, October 17, 2013. para. 215.

[750]  IACHR, Situation of Human Rights in Guatemala: Diversity, Inequality and Exclusion, OEA/Ser.L/V/II.Doc. 43/15, December 30, 2015, paras. 271-275.

DHSFF0644

disability," because of the abuses that are committed in them. The Committee recommended the State to support the families and services adapted for these children and adolescents in the community sphere and linked to social, medical and other types of services as appropriate.[751] The Commission agrees with and endorses said request.

434.  The environment described above raises a variety of concerns because of the precarious conditions at this type of facility, in terms of sanitation, hygiene, security and overcrowding. These conditions are incompatible with the objective of child protection and care because at such facilities children and adolescents are isolated from society and because it deprives them of their right to live with their families and in their communities.[752] Available information shows that the number of care providers or other staff at these mega-institutions is often inadequate to cope with the high number of children and adolescents housed in them, or they lack qualified and trained staff to provide the support and assistance required by the children. In these settings, it is also commonplace to find that boys, girls and adolescents of differing profiles are not grouped together based on their ages and protection needs, thus fostering situations of abuse and violence.[753] Also, the IACHR received information about gross human rights violations of children in some facilities, such as: charges against facility staff or other inmates perpetrating physical, psychological and sexual violence, and of negligent treatment, deficient food service, lack of access to age-appropriate education and medical services, and baseless restrictions on contact with family members.[754] These conditions are typical of the problems found at the institutions where many children in Guatemala live and, therefore, the IACHR calls on the State again to take measures aimed at putting an end to the institutionalization of children and adolescents in the country.

435.  Furthermore, the State has not instituted comprehensive and effective socio-educational and rehabilitation programs for adolescents in conflict and contact with the criminal justice system. In Guatemala, there are around 1,087 adolescents deprived of liberty, based on SBS statistics.[755]

---

[751]  Also see, United Nations Committee on the Rights of Persons with Disabilities, General Comment #5, August 27, 2017, para. 37. It can be viewed at: http://www.ohchr.org/EN/HRBodies/Pages/GC.aspx.

[752]  See, for example, IACHR, Right of Boys and Girls to a Family. Alternative Care. Ending Institutionalization in the Americas. OEA/Ser.L/V/II., Doc. 54/ October 13, 2013, para. 32. IA Court of HR, Juridical Condition and Human Rights of the Child. Advisory Opinion OC-17/02, Series A No. 17, August 28, 2002.

[753]  IACHR, Information received during country visit, July 31 to August 4, 2017. Meetings with inmates and prison facility staff.

[754]  Id.

[755]  The SBS's figure is from 2016. Press story, *El 73 por ciento d elos jóvenes privados de libertad proviene del área metropolitan* ['73% of young people deprived of liberty come from the metropolitan area'], August 18, 2016. It can be viewed at: http://lahora.gt/73-ciento-los-jovenes-privados-libertad-provienen-del-area-

DHSFF0645

Facilities where adolescents are deprived of liberty operate under extremely precarious conditions of confinement, in terms of overcrowding, unhealthiness, insecurity and violence. This exposes the adolescents to further abuses and violations of their rights and does not help to prevent recidivism, further exacerbating the problem instead of providing opportunities for social integration. On June 12, 2017, as was mentioned earlier, the IACHR granted Precautionary Measure 161-17 (Resolution 17/2017) on "Juvenile Deprivation of Liberty Facilities with respect to Guatemala."[756]

436.   The Office of the Human Rights Ombudsman, who filed the request for PM 161-17, alleged a situation of risk to life and personal integrity of the adolescents deprived of liberty at four facilities as a consequence of several risk factors affecting them disproportionately. These sources of risk include precarious sanitation and infrastructure, and negligent health care. Also, high levels of violence are present, internal riots, abusive treatment and attacks on the facilities by individuals from outside the premises, and the fact that pregnant adolescents and adolescent mothers with their babies are housed at these facilities.[757]

437.   The acts of violence, riots and fires are periodic and endemic to how the system operates. During the country visit, the IACHR visited the two facilities Centro "Gaviotas" and Centro "Gorriones," where it was able to examine the conditions of imprisonment and ascertain for itself some of its concerns. Of particular concern to the IACHR was that at these facilities young people are held in the same spaces as people of other age groups, and consequently, there are currently 13 year-old boys held in the same spaces as 26 year-old men.[758]

438.   The Commission also visited the juvenile women's facility called the Centro Juvenil de Privación de Libertad para Mujeres (CEJUPLIM) "Gorriones," where girls, female adolescents and women in conflict and contact with the criminal justice system ranging from 13 to 22 years of age were being held,

---

metropolitana/. Also see, IACHR, *Violencia, niñez y crimen organizado*, ['Violence, Children and Organized Crime'], para. 440. State of Guatemala's response to the IACHR questionnaire.

[756]   These facilities are: (i) Centro Juvenil de Privación de Libertad para Varones II San José Pinula (CEJUPLIV II–"ETAPA II"); (ii) Centro Juvenil de Privación Provisional para Varones (CEJUDEP-"Gaviotas"); (iii) Centro Juvenil de Privación de Libertad para Varones Anexo II (CEJUPLIV–"Anexo"); and (iv) Centro Juvenil de Privación de Libertad para Mujeres (CEJUPLIM-"Gorriones").

[757]   IACHR, PM No. 161-17 (Resolution n° 17/2017), "Centros Juveniles de Privación de Libertad respecto de Guatemala" ['Juvenile deprivation of liberty facilities with respect to Guatemala'], June 12, 2017. Also see, *InsightCrime*, Miembros barrio 18 son arrestados tras varios ataques a la policía de Guatemala, ['Members of barrio 18 arrested after several attacks on Guatemalan police.'], March 22, 2017.

[758]   The facility houses young men that have reached adult age, because there are no "intermediate" facilities in Guatemala, adolescents convicted as juveniles serve their sentence at the same facility, even after reaching adult age.

some pregnant and some with children. The Commission takes note of the efforts mentioned by the management of the facility to improve conditions of confinement. However, during the visit to the facility, the Commission ascertained several different problems relating to the human rights of the imprisoned girls and adolescents.[759]

439. As for conditions of incarceration, the Commission noticed the absence of windows in the dormitories, the lack of ventilation in the common spaces, as well as some structures on the verge of collapse. The inadequate and precarious infrastructure has negative repercussions on the physical and mental health of the girls and adolescents, even placing their physical integrity at risk. The Commission also witnessed the widespread lack of hygiene such as plumbing problems in pipes, heavy humidity in the dormitories and inadequate washing and drying of clothing, which can have negative consequences on the physical health of the female inmates. Additionally, the Commission viewed with concern the presence of several men working at the female detention facility, including the Director's security guard, inasmuch as this is a setting where,  only the presence of women is allowed. In general, the Commission noted that the infrastructure of the facility is more typical of a penitentiary than a juvenile detention facility.[760]

440. With regard to the situation of women and adolescents with children who were pregnant or had children, the Commission visited the section that is designated for this population and noted the health status of the female inmates and their children. The testimonies received indicate the absence of proper food service, vitamin supplements and the lack of specialized medical care for the pregnant women, as well as the limited access to potable water.[761]

441. The IACHR also heard adolescent girls provide accounts of enduring mistreatment, as well as cruel, inhuman and degrading treatment, which could constitute torture. Several adolescents reported to the Commission the practice of humiliating shouting and insults, as well as the use of dousing their bodies and face with gas, having sustained beatings and have been forced to do squats (known as  "sapitos" or "rollitos") as a form of punishment. Likewise, information was received about abusive and disproportionate searches of female inmates, who are forced to strip off their clothing several times a day, and of their family members.[762] The

---

[759] Information received during the IACHR's on-site visit, from July 31 to August 4, 2017.
[760] Id.
[761] Id.
[762] Id.

DHSFF0647

Case 1:20-cv-00116-EGS   Document 85   Filed 03/27/20   Page 1395 of 1770

Commission reminds the State of the importance to ensure that persons, who met with the IACHR and provided information, including the little girls and female adolescent inmates and persons who work at the facility, are not subjected to retaliation by agents of the State.

442. The situation of the juvenile prison facilities are also adversely affected by the absence of a System for the Full Implementation of Rights of children and adolescents in Guatemala, as mentioned earlier in this report. At the time of approval of the instant report, the Commission had not received any information to indicate that there was a comprehensive child protection vision, strategies to promote respect of all rights of every child and adolescent, or effective coordination of policies, programs and services, and sufficient resources for them to function properly.

**The tragedy of the "Hogar Virgen de la Asunción"**

443. The facility formerly known as "Hogar Seguro Virgen de la Asunción" was a state-run residential facility for children and adolescent victims of violence, abandonment and child abuse located in San José Pinula, Department of Guatemala. In operation since 2010, the facility had a maximum capacity of 500 children and adolescents, but complaints had been filed for surpassing its capacity and overcrowding since it first opened.

444. To provide an idea of these complaints, according to the Human Rights Ombudsman's Office, since 2012, it received 37 reports of different types of violations of the right to personal integrity of children at that institution; and from May to October 2016, 43 adolescents ran away from the Hogar Virgen de la Asunción. On November 16, 2016, the media reported that 18 of the adolescents were located, while the whereabouts of the rest were still unknown. Additionally, on repeated occasions (2012, 2013 and 2014), the Office of the Human Rights Ombudsman issued recommendations to reduce the rate of overcrowding and ensure the personal integrity of the children at the care facility; though based on available information, the respective authority did not properly implement the recommendations.[763]

---

[763] With regard to the 55 girls who allegedly disappeared in September, October and November 2016 from facilities where they were living under State custody, the PDH has brought criminal complaints with the Office of the Public Prosecutor to investigate whether the disappearances may be related to human trafficking. The Secretariat of Social Welfare is coordinating a technical committee to address this issue. Informe anual del Alto Comisionado de las Naciones Unidas para los Derechos Humanos sobre las actividades de su oficina en Guatemala, ['Annual report of the United Nations High Commissioner for Human Rights on the activities of its office in Guatemala'], January 11, 2017, A/HRC/34/3/Add.1, para. 52.

DHSFF0648

445.   On March 8, 2017, there were 600 children and adolescents housed at the Hogar Virgen de la Asunción.[764] The information available indicates that, as a disciplinary measure, 55 girls were locked into a classroom smaller than 44 square meters. That night a fire broke out in the classroom where the girls were locked in, burning and suffocating 41 girls and adolescents to death, and leaving another 15 girls hospitalized because of burns and other injuries they sustained as a result of the fire.[765] According to the information received, police officials and security guards of the facility had the key to open the door where the girls were locked in, but it took nearly nine minutes before they opened it.[766]

446.   The Office of the Public Prosecutor opened a criminal investigation into the incidents against the public officials.[767] Available information shows that Secretary of Social Welfare Carlos Antonio Rodas Mejía, Assistant Secretary of Social Welfare and Child Care Anahí Keller Zabala, and the Director of the Hogar Seguro, Santos Torres Ramírez, were initially arrested. They were formally charged and proceedings were instituted for the crime of involuntary homicide (for the death of 41 girls), negligent bodily harm (to the detriment of the girls and adolescents who were seriously injured), abuse of authority, breach of duties and mistreatment of minors.[768] Subsequently, arrests were carried out on the Ombudsman for Children and Adolescents of the Office of the Council General of the Nation (PGN), Harold Flores; the head of the Office of the Defender of Children and Adolescents of the PDH, Gloria Castro; the Assistant Police Chief of the National Civilian Police (PNC), Luis Pérez Borja; the Assistant Inspector of the PNC, Eva Marina Marroquín, and the Chief of Special Protection against mistreatment in all of its forms of the Hogar Virgen de la Asunción, Brenda Chaman. Some civil society organizations voiced their disagreement with

---

[764]   According to information from the Office of the Counsel General of the Nation (Procuraduría General de la Nación), the five major causes for the institutionalization of these 600 children and adolescents was: violated right, 104 children and adolescents institutionalized (17.3%); abandonment, 101 (16.8%); mistreatment, 82 (13,7%); neglect, 59 (9.8%); and rebelliousness, 41 (6.8%). Some of the children confined there have been institutionalized simply because they have no family to belong to.

[765]   The information indicates that 55 girls were originally locked in, and one more went in later after she fell from the roof once the crisis broke out, and was put into the classroom, for a total of 56 girls.

[766]   Statement given by Prosecutor Edwin Marroquín at indictment hearing, on April 7, 2017. Press conference of the Office of the Public Prosecutor, June 12, 2017.

[767]   IACHR, see press releases, CIDH otorga medidas cautelares a Guatemala y lamenta muertes por incendio en el Hogar Seguro Virgen de la Asunción, ['IACHR Issues Precautionary Measures to Guatemala and Laments Deaths in Fire at Children's Residential Institution'], March 13, 2017 and Relatoría sobre los Derechos de la Niñez realiza visita a Guatemala, ['Rapporteur on the Rights of the Child Conducts Visit to Guatemala'], April 13, 2017.

[768]   Ministry of the Public Prosecutor, Caso Hogar Seguro: MP solicita enviar a juicio a exfuncionarios por cinco delitos ['Case of Hogar Seguro: Prosecutor's Office request bringing former public officials to trial for five crimes'], August 11, 2017. It can be viewed at: https://www.mp.gob.gt/noticias/2017/08/11/caso-hogar-seguro-mp-solicita-enviar-a-juicio-a-exfuncionarios-por-cinco-delitos/.

the fact that the defendants were charged with minor crimes, that intent was not included in the counts of the indictment, and that the case would not be approached from a human rights perspective in order to be able to charge the defendants with serious crimes, if applicable, such as torture.[769] The IACHR reiterates the importance that the investigation is carried out with due diligence and that the criminal offenses charged are commensurate with the seriousness of the crimes.[770]

447.   During the visit, the IACHR met with the representatives of some of the surviving girls, their families and the families of the girls who lost their lives in the fire. Some of the girls are being represented by different organizations in the country, and others, who do not have families to reunite with, are being represented by the Office of the Counsel General of the Nation (PGN), in keeping with its duty to represent minors who lack representation, pursuant to the Civil Code of Guatemala and Article 108 of the Law of Comprehensive Protection of Children and Adolescents (PINA Law).[771] Notwithstanding, the PGN is also tasked with the duty of representing and defending the interests of the State of Guatemala in every suit to which it is a party, in accordance with Article 252 of the Political Constitution of the Republic of Guatemala. Because the PGN is representing the girls who survived the fire in the case, wherein officials of the Executive branch, among others, are being prosecuted, such as the Assistant Inspector of the PNC and the former Secretary of Social Welfare, the representation of the girls by the PGN would amount to a conflict of interest. In view of this situation, the IACHR urges the Guatemalan State to take measures to resolve or avoid said conflict of interest and the effects thereof, and to especially take into consideration the best interests of the girls involved in the proceedings.

448.   The IACHR also learned of the motion for recusal filed by the Office of the Public Prosecutor and other civil complainants against Judge Carlos Guerra Jordán, chief judge of the Fourth Trial Court for Criminal Matters and presiding judge in the case, casting doubt on his ability to be impartial because he had allegedly issued an opinion on the case proceedings and the investigation, as well as citing other grounds. On August 25, 2017, Judge Guerra Jordán decided to recuse himself from the case because his ability

---

[769]   Information received during the on-site country visit, July 31 to August 4, 2017.

[770]   IACHR, Press Release No. 114A/17, Observaciones Preliminares de la Visita in loco de la CIDH a Guatemala, [Preliminary Observations to the IACHR's On-Site Visit to Guatemala], August 4, 2017.

[771]   Information provided by the Office of the Counsel General of the Nation in the context of the on-site visit, August 2, 2017. In the IACHR archives.

DHSFF0650

to be impartial was called into question.[772] All case proceedings were suspended until the Court of Appeals appointed a new judge to preside over the case. As of the date of approval of this report, the proceedings have not resumed. The IACHR stresses the importance for the State to fulfill its obligation to provide swift and effective justice, without delay for the victims and to be attentive to the resumption of the case with the alacrity that the seriousness of the case warrants, respecting at all times the right of due process of the accused, in keeping with the American Convention and Inter-American standards on the subject matter.[773]

449. The Commission was also informed that after the fire, 244 girls and adolescents were reintegrated with their core families; 272 were transferred to public or private residential care facilities; 5 were repatriated to Honduras or El Salvador; 10 left the system, apparently, because they had reached adult age; and as of May 31, 2017, 24 had not been located and alerts were issued for them under the "Alba-Keneth" system,[774] and two remained hospitalized in the United States.[775] The Commission understands that the situation of these children and adolescents has been in constant flux, because some of them have been moved from one facility to another; the whereabouts of some are unknown, one remains hospitalized for a disability. Some organizations also reported to the IACHR about the institutionalization of children with disabilities, who were previously housed in the residential care facility of the Hogar Virgen de la Asunción and at other public and private residential care facilities of different capacities, but all of which still follow the model of

---

[772] Press story, La hora, *Juez se excusa de seguir conociendo el Caso Hogar Seguro* ['Judge recuses himself from continuing to preside over the Hogar Seguro Case'], August 25, 2017. It can be viewed at: http://lahora.gt/juez-se-excusa-seguir-conociendo-caso-hogar-seguro/.

[773] American Convention on Human Rights, Pact of San Jose, Article 8. The Inter-American Court has written that three points must be taken into account in determining a reasonable time within which a trial must be conducted: (i) the complexity of the matter; (ii) the judicial activity of the interested party; and (iii) the behavior of the judicial authorities. IA Court of HR, *Case of Genie Lacayo v. Nicaragua, Merits, Reparations and Costs,* Series C, No. 30. Judgment of January 29, 1997.

[774] "The Alba-Keneth Alert System involves a series of coordinated actions between public institutions to help expedite and locate and protect children or adolescents, who have been taken or have gone missing and to assist in the recovery and provide shelter for them." Article 4, "Alba Keneth Alert System Law, Decree No. 28-2010, September 8, 2010. The Alba Keneth alert system is a rapid response system to disappearances or kidnappings of children. It was created after the disappearance of 8-year-old Alba Michelle España Días and of 4-year-old Keneth Alexis López Agustín, who were kidnapped and the search for them did not get under way immediately because of the lack of an adequate procedure. The system is designed to coordinate immediate actions by the National Civilian Police, the Office of the Public Prosecutor, the General Directorate of Migration, the Secetariat of Social Communication of the Office of the President, the Secretariat against Sexual Violence, Exploitation and Trafficking in Persons, the Ministry of Foreign Relations, and the Office of the General Counsel of the Nation (PGN); from 2012 to August 2017, the Operations Unit of the PGN has issued around 30,867 Alba-Keneth alerts, of which 23,521 were taken down because the child was successfully located, which works out to a 75% location rate.

[775] Information provided by the Office of the Counsel General of the Nation in the context of the on-site visit, August 2, 2017. In the IACHR archives.

---

DHSFF0651

institutionalization characterizing child and adolescent residential care facilities in Guatemala.[776] According to the PGN, its family reunification team has been closely following up on family reunification carried out through administrative proceedings and through hearings, with respect to 41% of the children and adolescents of the Hogar Virgen de la Asunción.[777] As for the children who were transferred to public residential care and private facilities, the PGN reported that it is working with said institutions to begin the process of family reintegration, and that the process will begin with the facilities that are not registered with National Adoption Council.[778] In its comments to the draft of this report, the State detailed the activities of support by State entities related to this incident, in coordination with the Ministry of Social Welfare (SBS). In particular,  the State informed that the Ministry of the Environment and Natural Resources provided training to adolescents who are in SBS homes, through a certification on environmental studies with an emphasis on climate change and ecological guardians; the Ministry of the Interior provided subsidies so that families who apply for the Program for Substitute or Temporary Families within the SBS may obtain the required background checks at no cost to them; the State is coordinating the training of personnel from the SBS and the National Council of Adoptions regarding legislation on protection for children with disabilities; and it is considering the creation of a registry of children and adolescents with thin protection system.[779]

450. The Commission reiterates its call for the Guatemalan State to prioritize reunification with family, in accordance with Inter-American and international standards on the rights of children and adolescents to live in a family and community setting, including the American Convention on Human Rights and the Convention on the Rights of the Child[780] and the Convention on the Rights of Persons with Disabilities.[781]

451. A common denominator that the IACHR has noticed is the failure of the institutions of the State to follow up and to provide comprehensive support to the families of the victims, in terms of psychological support, counseling, and care to those afflicted by post traumatic stress disorder and/or physical ailments. The Commission finds that this is mostly due to Guatemala's weak institutional framework with regard to the care of

---

[776] Information provided by *Disability Rights International*, October 8, 2017. In the IACHR archives.

[777] Information provided by the Office of the Counsel General of the Nation in the context of the on-site visit, August 2, 2017. In the IACHR archives.

[778] *Id.*

[779] Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situtation in Guatemala," December 22, 2017, p. 33.

[780] Guatemala acceded to the Convention on the Rights of the Child on June 6, 1990.

[781] Guatemala acceded to the Convention on the Rights of Persons with Disabilities on April 7, 2009.

children, inasmuch as State agencies do not have to capacity to ensure the full enjoyment of the human rights of children and adolescents, and that in this crisis, its lack of capacity has gotten worse. In the wake of the tragedy of Hogar Virgen de la Asunción, the institutional framework, which was already weak and uncoordinated, has shined a light on a veritable crisis and incapacity of the State to respond to the magnitude of the problems that the Guatemalan State is facing when it comes to ensuring the rights of children and adolescents.

452. The IACHR notes that one aspect that has hampered interinstitutional coordination with respect to the crisis of the Hogar Virgen de la Asunción, and protection of children in Guatemala in general, has been the constant turnover in the leadership at the relevant agencies. During the on-site visit, the IACHR met with then head of the Secretariat of Social Welfare Cándida Rabanales, who at the time mentioned her short tenure thus far in the position as one of the reasons why coordination between institutions had taken more time than anticipated. The organizations making up the child protection "cluster"—both state entities and civil society organizations—echoed this situation.[782] As such, the IACHR regrets that frequent turnover continues in directorships of these agencies, which stands in the way of them achieving the stability they need. The Commission learned of the recent appointment of Ana Patricia Contreras Mejía as Secretary of the SBS, on September 4, 2017, and calls on the State to pursue stability in the key institutions for the care of children, especially at a time of crisis, such as the one the country is going through.

453. As a result of the incidents of March 8, the draft legislation to create the National System for the Full Implementation of the Rights of Children and Adolescents was pushed forward more expeditiously and is before Congress at this time, but as of the date of approval of this report, it has not been enacted. Through the Commission's precautionary measures system, on March 12, 2017, the IACHR granted Precautionary Measure 985-16 seeking to protect the lives and integrity of the children and adolescents previously housed at the Hogar Virgen de la Asunción.[783] In this regard, the

---

[782] Information received during the on-site visit, July 31 to August 4, 2017.

[783] On March 30 and 31, along with members of the IACHR Secretariat, and the participation of a MESECVI expert, the Rapporteur on the Rights of the Child conducted a visit to Guatemala to follow-up on compliance with the Precautionary Measure. In Precautionary Measure No. 958/16, [Medida Cautelar No. 958/16], granted on March 12, 2017, the State of Guatemala was asked to take the necessary measures to protect the lives and safety of the children and adolescents, who are housed at the "Hogar Seguro Virgen de Asunción," including those who were seriously burned or otherwise affected physically or psychologically as a result of the fire; to ensure that the conditions in which the children and adolescents are living at the facility are brought into line with applicable international standards, while the State undertakes effective measures to promote reintegration with their family members, when possible and with the necessary family support; it should also identify alternatives for their care that serve to better protect them; prohibit any more children and adolescents from entering the "Hogar Seguro Virgen de la Asunción;" come to a

DHSFF0653

IACHR reiterates its concern  over the information it received regarding the lack of support and assistance to the families of the victims and survivors of the fire, as well as the search for the children and adolescents, who after being under the custody of the State, have still not been located. The State must take immediate steps to find the whereabouts of those children and adolescents and provide said services to the families.

454. In the Recommendations section, the IACHR makes concrete recommendations to the State of Guatemala with regard to child and adolescent detention facilities in general, as well as on follow-up to the case of the Hogar Virgen de la Asunción in particular. The Commission will closely monitor compliance with these recommendations by the State.

## C.   *Persons  with Disabilities at mental Health Institutions*

### 1.      General considerations

455. In August 2017, in the context of its on-site visit, the Commission visited the Federico Mora Hospital. On this score, the Commission reiterates that the prevailing situation at this hospital "reflects the lack of protection of persons with disabilities in Guatemala."[784]

456. The Federico Mora Hospital is the only long-termin public institution in Guatemala providing psychiatric care to the country's entire population of more than 15 million inhabitants, who are spread out among 22 different departments.[785] As of August 2017, the patient population at said institution was 334. The Federico Mora hospital offers acute and chronic treatment, in addition to functioning as a psychiatric hospital, it also operates as a detention facility for so-called "forensic patients," who are persons in pretrial detention or are serving sentences and, are ordered by the court to be admitted because they are deemed to have some mental illness.[786] Persons who are sent to the hospital as "protection measures"

---

consensus about the measures to be taken in conjunction with the beneficiaries and the requesting party; and report on the actions taken in order to investigate the alleged incidents that gave rise to the instant precautionary measure and thus avoid the repetition thereof.

[784]   IACHR, *Situación de derechos humanos en Guatemala*, ['Situation of Human Rights in Guatemala'], OEA/Ser.L/V/II, Doc. 43/15, December 31, 2015, para. 350.

[785]   National Statistics Institute, Características de la Población y de los Locales de Habitación Censados, 2002, pgs. 12 and 13.

[786]   According to request for precautionary measure MC 370-12, the three main categories of inpatients under security measures in terms of their mental health status, institutionalized at the Federico Mora Hospital are the following: (1) inpatients who were already convicted as criminally liable, and were transferred to the hospital to treat a mental illness; (2) persons who are being evaluated to determine whether or not they

imposed by the judicial authority, who are in situations such as living on the streets, are also considered "forensic patients."[787] These patients are currently guarded by penitentiary agents. Because of the different type in the hospital population, it is particularly complex to provide medical treatment and care to the patients.[788]

## 2.    Conditions of Detention

457.    Through a request for precautionary measures, filed in October 2012, the IACHR learned of several different violations, which jeopardize the lives and safety of the patients at Federico Mora Hospital.[789] One of the major allegations was that the regular hospital patients and those charged with criminal offenses shared the same space and, consequently, the former would endure abuse from the criminally charged patients and their guards.[790] For its part, the IACHR notes that at least 10 years prior to the filing of the request for precautionary measures, the PDH had already expressed its concern over the serious conditions prevailing at the aforementioned institution.[791] In light of this situation, on November 20, 2012, the IACHR granted precautionary measure MC-370-12 on behalf of 334 patients of the Federico Mora Hospital and asked the State of

---

[787]    have a mental illness or are competent to stand trial; and (3) persons with mental disability, who have committed a crime and have already been declared incompetent to stand trial." DRI and ODHAG, Solicitud de medidas cautelares a favor de las 334 personas con discapacidad mental internadas en el Hospital Federico Mora, ['Request for precautionary measures for 334 persons with mental disability confined at the Federico Mora Hospital'], October 2012, p.2.

[787]    Authorities of the Federico Mora Hospital. Information provided to the IACHR during the visit to the institution on August 2, 2017.

[788]    In its comments to the draft of this report, the State informed that the National Council for Attention to Persons with Disabilities has urged the creation of municipal offices for people with disabilities in 10 municipalities and 21 Department Commissions for People with Disabilities, in compliance with the National Policy on Disability. Communication from the State of Guatemala, "Submission of the State of Guatemala to Include in the Draft Report on the Human Rights Situtation in Guatemala," December 22, 2017.

[789]    In this regard, the IACHR was informed that patients faced the following violations: a) threats, harassment and acts of violence perpetrated by medical and guard staff, as well as by patients themselves; b) inhuman and degrading conditions; c) negligent medical care, which even led to the loss of life from diseases that are preventable and readily treated, such as pneumonia and diarrhea; d) use of protracted solitary confinement, and e) physical and sexual abuses, mainly of women and girls.

[790]    IACHR, Precautionary Measures, MC 370/12, Asunto de los 334 Pacientes del Hospital Federico Mora respecto a Guatemala, ['MC 370/12, Matter of 334 Patients of the Federico Mora Hospital with respect to Guatemala'], November 2012.

[791]    In this regard, see PDH, Guatemala, Recommendation EIO-GUA-106-2002/DR, "Diligencias Practicadas e Informes Recibidos" ['Investigative steps taken and reports received'], May 13, 2002; PDH, Office of the Human Rights Ombudsman of Persons with Disabilities, Report on the Monitoring of the National Mental Health Hospital, Guatemala, 2007, p. 5, and PDH, Recommendation REF.EXP.ORD.GUA "Resultados de la Investigación" ['Results of the investigation'], 2595–2009/DE, January 27, 2012.

DHSFF0655

Guatemala to adopt several measures to ensure the lives and personal integrity of the patients at the aforementioned hospital.[792]

458. The granting of this measure and subsequent public awareness about the situation in which these patients were living led to different international and national agencies expressing their own concern over the "alarming conditions" prevailing at the Institution. Thus, the UN Committee on the Rights of Persons with Disabilities (CRPD Committee), the OUNHCHR and the Committee against Torture (CAT), have all called upon the State of Guatemala to take the necessary measures to ensure and speed up the pace of implementation of the aforementioned precautionary measure.[793] This case has also attracted the attention of the national and international press and was heavily covered in 2014 by the BBC, which deemed the institution the "most dangerous hospital in the world."[794]

459. Five years after precautionary measure MC-370-12 was granted, the main changes noted by the Commission on its visit to the institution are: an improvement in infrastructure conditions as compared to the conditions reported at the time the precautionary measures were granted; and separation of hospital patients from those charged with criminal offenses. As to this last issue, the State has reported to the IACHR that said separation had made it possible to do without the presence of so many agents of the National Civilian Police—previously 140 agents—[795] and that

---

[792]  In particular, the ICDH requested Guatemala to take the following actions: a) provide adequate medical treatment to the patients, based on the particular pathologies of each individual; b) ensure segregation of children from adults, taking special measures in keeping with the principle of the best interests of the child; c) segregate patients in pretrial detention and serving sentence, who are under judicial order of deprivation of liberty, from the rest of the hospital patients, and that the custody of the latter group be provided by unarmed hospital staff; d) restrict the use of solitary confinement to the situations and under the conditions established in international standards on persons with mental disability, and e) adopt immediate measures of prevention so that all patients, particularly women and children, are not the targets of acts of physical, psychological and sexual violence by other patients, security agents or hospital employees. Additionally, the IACHR requested that agreement be reached with the beneficiaries and their representatives on the measures to be adopted, IACHR Precautionary Measures MC 370/12, Asunto de los 334 Pacientes del Hospital Federico Mora respecto a Guatemala,['MC 370/12, Matter of the 334 Patients of the Federico Mora Hospital with respect to Guatemala'], November 2012.

[793]  UN Committee on the Rights of Persons with Disabilities, Final observations on the initial report of Guatemala, CRPD/C/GTM/CO/1, September 30, 2016, para. 44; OUNHCHR -Guatemala, Press release, OACNUDH llama a garantizar los derechos humanos de pacientes del Hospital Federico Mora, ['OUNHCHR calls for ensuring the human rights of patients of the Federico Mora Hospital'], December 7, 2014; Committee against Torture (CAT), Observaciones Finales sobre los Informes Periódicos Quinto y Sexto de Guatemala, ['Final observations on the Fifth and Sixth periodical reports of Guatemala'], CAT/C/GTM/CO/5-6, June 24, 2013, para. 21.

[794]  BBC, "Inside the 'world's most dangerous' hospital", December 4, 2014.

[795]  State of Guatemala, Written submission of the State of Guatemala regarding the request for information prior to the on-site visit of the IACHR, Ref. P-859-2017/VHGM/LWC/nj, June 16, 2017, para. 102.

currently there are only 15 prison guards on-site.[796] Also, because the prison guards can only be posted in ward 4—the only location where criminally charged patients would be held—the State claimed that separation of the different categories of patients had also led to a "considerable" decrease in state agents abusing patients.

460. The IACHR notes that over the past years, there has been a notable increase in the budget allocated to the Federico Mora Hospital. In this vein, the State of Guatemala has reported that said budget has increased to 54 million quetzals (the equivalent of more than USD $7 million).[797] On this score, the IACHR has information reflecting that this increase has mainly been used for infrastructure changes in the hospital and has not been invested in creating community services to facilitate persons with mental disabilities to return to the community.

461. On another note, the requesting parties of precautionary measure MC 370-12 contend that despite the amount of resources invested, because the patients at Federico Mora are still facing similar rights violations to those reported in 2012,[798] their lives and integrity continue to be at risk. On this score, the IACHR notes the concern expressed by the CRPD Committee in its recent assessment of the Guatemalan State, in considering that the measures adopted by the State to ensure the rights of the patients, including the separation of patients under medical orders or those charged with criminal offenses, "have not been sufficient to protect the persons with disabilities."[799]

462. In particular, information has been made available to the IACHR indicating that the conditions of the hospital continue to be unsanitary and unhealthy, thus fostering infectious diseases and posing an immediate threat to the health and lives of the patients. With respect to the use of solitary confinement, the petitioners note that just as has been documented since 2012, the solitary confinement rooms continue to be used on a regular basis as punishment, when patients are aggressive, or when they are newly admitted and are in a "state of shock or resist their hospitalization."[800] In contrast, the State argues that the use of solitary confinement has been

---

[796] Authorities of the Federico Mora Hospital. Information provided to the IACHR, during the visit to the institution on August 2, 2017.

[797] State of Guatemala, Written submission of the State of Guatemala regarding the request for information prior to the on-site visit of the IACHR, Ref. P-859-2017/VHGM/LWC/nj, June 16, 2017, para. 100.

[798] Information provided in the context of the precautionary measure, submitted to the IACHR by the petitioners, on May 5, 2017.

[799] UN Committee on the Rights of Persons with Disabilities, Final observations to the initial report of Guatemala, CRPD/C/GTM/CO/1, September 30, 2016, para. 43.

[800] Information provided in the context of the precautionary measure, submitted to the IACHR by the petitioners, on May 5, 2017.

DHSFF0657

reduced, and that it is only used on an exceptional basis, under doctor's order and based on the respective protocol.[801]

463.  Additionally, with regard to the alleged abuses committed against the patients, the petitioners claim that patients continue to be subjected to torture and mistreatment.  In particular, they contend that violence and abuse are used by medical staff as a "tool of control," and it has an aggravated effect on overmedicated patients, who are unable to protect themselves.[802] Moreover, 5 years after the aforementioned precautionary measure was granted, and despite the different abuses committed against the patients, which were brought to the attention of the Commission, the State has only reported about the drafting of internal rules for the application of administrative and economic punishments to staff that departs from the care protocols.[803]  Furthermore, the IACHR has been informed that criminal charges were brought on September 22, 2016, against a male nurse who physically assaulted a patient. On this score, the IACHR notes that of the 12 cases of mistreatment of patients by hospital staff reported by the State in early 2017, which include physical abuse and negligent medical care, criminal proceedings were instituted in only one of them. The remaining cases were "brought to the attention of the disciplinary control agencies," and in one of them, a doctor who did not properly follow up on the traumatism stemming from the fall of a patient, was relieved of his duty.[804]

464.  Inasmuch as States play the role of guarantor of persons under their custody[805] and that persons with disabilities at psychiatric institutions are in a special at-risk situation of being subjected to torture and mistreatment,[806] it is the special duty of the Guatemalan State to investigate ex officio, and when appropriate, punish those responsible for any violation of the personal integrity of any institutionalized persons.[807] Moreover, under the assumption of the existence of an intrinsic imbalance of power

---

[801]  Information provided in the context of the precautionary measure, submitted to the IACHR by the State of Guatemala, on February 27, 2017.

[802]  Information provided in the context of the precautionary measure, submitted to the IACHR by the petitioners, on May 5, 2017.

[803]  State of Guatemala, Written submission of the State of Guatemala regarding the request for information prior to the IACHR's on-site visit, Ref. P-859-2017/VHGM/LWC/nj, June 16, 2017, para. 98.

[804]  Information provided in the context of the precautionary measure, submitted to the IACHR by the State of Guatemala, on February 27, 2017.

[805]  IACHR, Informe sobre los derechos humanos de las personas privadas de libertad en las Américas, ['Report on the Human Rights of Persons Deprived of Liberty in the Americas], December 31, 2011, para. 328.

[806]  IA Court of HR, *Case of Ximenes Lopes against Brazil*. Merits, Reparations and Costs. Judgment of July 4, 2006. Series C No. 149, para. 106.

[807]  In this regard, see Informe del Relator Especial sobre la tortura y otros tratos o penas crueles, inhumanos o degradantes, ['Report of the Special Rapporteur on Torture and other Cruel, Inhuman or Degrading Treatment or Punishment Juan E. Méndez, A/HRC/22/53, February 1, 2016. para. 85 c).

between these persons and the respective hospital authorities, the State is required to oversee and make sure that persons with disabilities at mental health facilities receive "a worthy, human and professional treatment," and they be protected against exploitation and abuse.[808] In particular, reflecting the promptings of the CRPD Committee in September 2016, the IACHR reiterates the obligation of the State of Guatemala to establish an independent mechanism to oversee the confinement of patients at Federico Mora in order to prevent and protect against acts of torture and mistreatment.[809]

### 3. Indefinite Institutionalization because of a Lack of Community Services

465. The right of persons with disabilities to independent living and to be included in the community, according to the CRPD Committee, means on the one hand that said persons are provided all the necessary means enabling them to exercise choice and control over their lives and make all decision concerning their lives.[810] On the other hand, this right is related to full and effective participation and inclusion of persons with disabilities in society, through the development of inclusive environments.[811] In and of itself, the protection of this right means that the lives of persons with disabilities take place outside residential institutions of all kinds.  It is not "just" about living in a particular building or setting, it is, first and foremost, about losing personal choice and autonomy as a result of the imposition of certain life and living arrangements.[812] When there is a lack of alternatives in the community, institutions segregate persons with disabilities from the community, because this becomes the only option for them to be able to receive the care and services they need. In this regard, the CRPD Committee has established that involuntary institutionalization on the basis of impairment, is often caused or increased by a lack of disability-specific support services, and leads to arbitrary deprivation of liberty.[813]

---

[808] IA Court of HR, *Case of Ximenes Lopes v. Brazil*. Merits, Reparations and Costs. Judgment of July 4, 2006. Series C No. 149, para. 107.

[809] UN Committee on the Rights of Persons with Disabilities, Final observations on the initial report of Guatemala, CRPD/C/GTM/CO/1, September 30, 2016, para. 43. In this regard, in its 2016 Annual Report, the PDH reiterated the concerns noted by the aforementioned Committee. PDH, Guatemala, Informe Anual Circunstanciado 2016, p. 251. ['Annual Status Report]

[810] UN Committee on the Rights of Persons with Disabilities, *General comment on article 19: Living independently and being included in the community*, CRPD/C/18/1, August 29, 2017, para. 16 a).

[811] *Id.*, para. 16 b) and 19.

[812] *Id.*, para. 16 c).

[813] *Id.*, para. 83; and Guidelines on article 14 of the Convention on the Rights of Persons with Disabilities: The right to liberty and security of persons with disabilities, adopted at the 4th Session, September 2015, para. 8.

DHSFF0659

Based on the foregoing, the IACHR finds that a lack of support and community services for persons with disabilities and their families creates incentive to institutionalize these persons and, consequently, violates their right to live in the community.

466. With respect to the establishment of community services, even though the State reports on implementation of a pilot project to establish a "halfway house" model,[814] it also recognizes patients are subjected to prolonged institutionalization because of an absence of support in the community.[815] Separately, the IACHR was advised by the Ministry of Public Health and Social Assistance that as of early 2017, it has been implementing an inclusive model of health care, from a human rights and social integration perspective,[816] which is based on the decentralization of medical treatment through health care promotion, at the primary care level.[817] In this context, said Ministry reported to the Commission about the revision of the protocols to allow and ensure that the patients of Federico Mora Hospital have contact with their family members and with the community, and about holding health care days for patients focused on eye care, dental care and nutrition.[818].

467. The IACHR welcomes actions aimed at improving the living conditions of the patients of the Federico Mora Hospital; however, it does not find that these conditions are adequate to protect their lives and integrity. In particular, the IACHR regrets that the measures adopted have not been focused on the creation of community-based services and that despite the notable increased hospital budget, these resources have not been used to create alternatives in the community. In this regard, the Commission notes the words of the CRPD Committee that investment of resources in institutions, instead of in developing possibilities for persons with disabilities to live independently in the community, leads to abandonment, dependence on family, institutionalization, isolation and segregation.[819]

---

[814] State of Guatemala, Written submission of the State of Guatemala regarding the request for information prior to the IACHR's on-site visit, Ref. P-859-2017/VHGM/LWC/nj, June 16, 2017, para. 103.

[815] Information provided in the context of the precautionary measure, submitted to the IACHR by the State of Guatemala, on February 27, 2017.

[816] State of Guatemala, Submission regarding the preliminary observations to the IACHR's on-site visit, Ref. P-1261-2017/VHGM/LWC/nj, August 29, 2017. Annex 5, Response of the Ministry of Public Health and Social Assistance, "Comments regarding the observations on the visit to the Federico Mora National Mental Health Hospital," August 18, 2017.

[817] Ministry of Public Health and Social Assistance. Information provided to the IACHR on August 2, 2017, at the meeting with health officials and during the visit to the institution.

[818] *Id*.

[819] UN Committee on the Rights of Persons with Disabilities, *General comment on article 19: Living independently and being included in the community*, CRPD/C/18/1, August 29, 2017, para. 1.

468.   In light of the foregoing, the main concern of the IACHR with respect to the situation of the patients of Federico Mora Hospital is the lack of community-based care programs to ensure living in the community. In this regard, as noted by the CRPD Committee, the lack of services designed to meet the needs of the patients of this institution in the community leads to their indefinite segregation.[820] This situation is particularly worrisome considering that most of them continue living at the institution because no support is available to them in the community. On this score, the IACHR notes that according to the evaluation conducted in 2013 by independent psychiatric and medical staff of the hospital itself, approximately 75% of the patients (without including those in conflict with the law), did not need to remain at the institutions "for psychiatric reasons," and could "easily" become integrated into the community, if there were outpatient services available to them.[821]

469.   Because of the lack of community-based options for the patients of the Federico Mora Hospital to receive the necessary services and treatment outside the institution, the IACHR recommends that the State guarantee community living for these persons, by creating and establishing community-based services. For this purpose, the Commission urges the State to adopt, among other ones, the following measures: a) expeditiously define a strategy for the de-institutionalization of persons with disabilities, with a timeline, sufficient resources and specific evaluation measures;[822] b) ensure the participation of persons with disabilities, directly and through the organizations representing them, in the design and implementation of said strategy,[823] and c) allocate sufficient resources for the development of support services.[824] In this regard, in accordance with the CRPD Committee, the Commission stresses that community-based support must be designed to help persons with disabilities to be included in the community and to avoid their isolation and segregation.[825]

---

[820]   UN Committee on the Rights of Persons with Disabilities, Final observations on the initial report of Guatemala, CRPD/C/GTM/CO/1, September 30, 2016, para. 54.

[821]   DRI, "Disability Rights International continues to pressure Guatemalan government to end human rights abuses at notorious psychiatric facility", March 15, 2013.

[822]   UN Committee on the Rights of Persons with Disabilities, Final observations on the initial report of Guatemala, CRPD/C/GTM/CO/1, September 30, 2016, para. 54. General comment on article 19: Living independently and being included in the community, CRPD/C/18/1, August 29, 2017, para. 98 g).

[823]   UN Committee on the Rights of Persons with Disabilities, *General comment on article 19: Living independently and being included in the community*, CRPD/C/18/1, August 29, 2017, para. 98 i).

[824]   UN Committee on the Rights of Persons with Disabilities, Final observations on the initial report of Guatemala, CRPD/C/GTM/CO/1, September 30, 2016, para. 54.

[825]   UN Committee on the Rights of Persons with Disabilities, *General comment on article 19: Living independently and being included in the community*, CRPD/C/18/1, August 29, 2017, para. 30.

DHSFF0661

470.   Lastly, as for the patients in conflict with the law, who as of August 2, 2017 numbered 46 individuals, the IACHR was informed that 90% of them should not even remain at the institution and, therefore, they too are subjected to arbitrary deprivation of liberty.[826] According to the psychiatric staff in charge of the treatment of this population of patients, this situation stems from the lack of review of judicial decisions to institutionalize, even though very often the medical expert opinions recommend outpatient treatment.[827] The State has also reported to the Commission that an "Interinstitutional Agreement" was signed for the Public Criminal Defense Institute to be able to request the release of a significant number of patients.[828] Furthermore, the IACHR learned of a State initiative to create a justice center with an expanded purview within the hospital itself, in order to review on an ongoing basis the security measures imposed on the patients in conflict with the law.[829]

---

[826]   Ministry of Public Health and Social Assistance. Information provided to the IACHR on August 2, 2017, at the meeting with health officials and during the visit to the institution. Additionally, this information was conveyed to the IACHR by the psychiatric staff itself in charge of treating the patients in conflict with the law, during its visit to the institution on August 2, 2017.

[827]   Psychiatric staff of the Federico Mora Hospital. Information provided to the IACHR during its visit to the institution on August 2, 2017.

[828]   IACHR, *Situación de derechos humanos en Guatemala*, [Situation of Human Rights in Guatemala], OEA/Ser.L/V/II, Doc. 43/15, December 31, 2015, para. 353. Information provided in the context of the precautionary measures and in the Observations of the State of Guatemala on the "Draft General Report on the Situation of Human Rights in Guatemala and on the IACHR's communication of August 14, 2015," October 6, 2015.

[829]   COPREDEH. Information provided to the IACHR, during its visit to the institution on August 2, 2017.

DHSFF0663

CHAPTER 8
# CONCLUSIONS AND RECOMMENDATIONS

DHSFF0664

DHSFF0665

# CONCLUSIONS AND RECOMMENDATIONS

471.   The human rights situation described in this report is rooted in the causes of the armed conflict, which persist to the present day. This causes include economic and social inequality, high levels of corruption, and a weak State response, partly as a consequence of the scarce tax revenue raised by the State to meet the most pressing needs through policies and programs. There continues to be structural problems, such as racial discrimination, social inequality, a widespread situation of poverty and exclusion, impunity and lack of access to justice, which stand as roadblocks to full respect for human rights in Guatemala. The IACHR has consistently received information about persisting parallel structures of power that hamper efforts to combat impunity, corruption and strengthen the rule of law.

472.   In this context, as immediate measures, it is essential for the State to redouble its commitment to continue with efforts undertaken to combat impunity, violence, intolerance and corruption, through prevention and pro-human rights policies and programs, as well as a strengthened, independent and impartial justice system. For this purpose, it is the obligation of the State to ensure the conditions for the CICIG and the Office of the Public Prosecutor to be able to efficiently perform their jobs, as well as approve a reform to the Constitution in the field of justice in keeping with the highest human rights standards.

473.   Additionally, the State must make further efforts to adopt laws, policies and programs to close the persistent inequality and exclusion gap, so that all persons, in particular, those historically excluded, are able to exercise their human rights. It includes ensuring sufficient budget to fund the areas of greatest concern described in the instant report.

474.   The Commission expresses its will and willingness to contribute and collaborate with the State of Guatemala in the implementation of a human rights agenda aimed at ensuring and protecting the rights of its inhabitants. In this context, the IACHR makes the following recommendations to the State of Guatemala:

## A.    General Recommendations

1.    Create, together with the IACHR, a Follow-Up Mechanism to the Recommendations of the instant report.

2.    Make sure that the CICIG, under the direction of its Commissioner, Iván Velásquez, is able to fulfill its mandate with the proper protections, without harassment, threats or undue interference, in accordance with the Agreement creating it.

3.    Endow COPREDEH and the Office of the Human Rights Ombudsman with sufficient human and budgetary resources to be able to fully comply with its mandate.

4.    Ratify the Inter-American Convention against All Forms of Discrimination and Intolerance, the Inter-American Convention against Racism, Racial Discrimination and Related Forms of Intolerance, the Inter-American Convention on Protecting the Rights of Older Persons and the Additional Protocol to the American Convention on Human Rights to Abolish the Death Penalty.

5.    Continue with efforts to eradicate extreme poverty and hunger, especially, to adopt emergency measures to eliminate the serious issue of child malnutrition, such as programs and policies to prevent maternal and infant mortality in the country.

6.    Adopt emergency measures to ensure the economic, social, cultural and environmental rights of the population, in particular, the persons living in a situation of major exclusion described in the instant report.

## B.    Recommendations regarding administration of justice

7.    Approve constitutional reform on justice as soon as possible while ensuring compliance with international standards on the subject matter, in order to strengthen the judicial career. For this purpose, it must be ensured that the processes of selection and appointment of the operators of justice are carried out in keeping with Inter-American standards, under merit and professional qualification-based criteria, free of any improper political interference.

8.    Examine the factors limiting expeditious and effective access to justice and take corrective measures. For example, ensure that the

DHSFF0667

*amparo* appeal mechanism and the application thereof in Guatemala meet Inter-American standards on the subject.

## C.   *Recommendations regarding Transitional Justice and Reparation to Victims of the Internal Armed Conflict*

9.   Approve Law 35-90 to create the National Commission to Search for Victims of Forced Disappearance and to push forward the search for missing persons in accordance with international standards on the subject matter.

10.   Approve Law 3551 to provide solidity and certainty to the National Reparations Program (PNR).

11.   Reinforce actions to combat impunity for human rights violations committed during the internal armed conflict, through prompt, thorough and impartial investigations, punish the perpetrators and masterminds and provide reparation to the victims.

12.   Earmark sufficient resources to the Archive of the National Civilian Police.

## D.   *Recommendations regarding the Situation of Citizen Security*

13.   Draft and implement public prevention policies, based on the root causes of violence and the high crime rates, in order to continue to bring these rates down substantially, and to ensure that Guatemalans live in a country free of violence.

14.   Continue with efforts to strengthen the PNC and withdraw the armed forces from duties of citizen security.

15.   Ensure the regulation and effective oversight of private security firms and their agents, registration and punishment of those who do not comply with requirements; as well as carry out strict gun control.

16.   Adopt specific measures to address the issue of lynching in the country.

## E.   Recommendations regarding Specific Segments of the Population

### Women

17.   Take decisive action to ensure for all women victims of violence and discrimination access to justice at all stages (complaint, investigation and trial proceedings) through accessible information in terms of language and culture, staff training, specialized legal assistance and through outreach services for victim assistance.

18.   Promote political participation of women and, in particular, indigenous and Afrodescendant women, in decision-making positions through the design and implementation of affirmative action measures.

19.   Include sexual crimes in all reparation and justice policies for victims of the armed conflict, especially with regard to implementation of the National Reparation Plan, and to take the necessary measures for the PNR to seriously address without discrimination complaints of sexual violence. These measures must include clarification of the criteria to gain access to justice and to the mechanisms of reparation, as well as the design of reparation measures that meet the specific needs of the women.

### Children and Adolescents

20.   With respect to the high rate of child institutionalization, implement measures to do away with institutionalization and review legislation, policies and practices to bring them into line with international standards, particularly, reinforcing social policies of support to families in order to help them to provide adequate care for their children, as well as social policies aimed at ensuring rights, such as health, education and nutrition, and taking into account the best interests of the child.

21.   Clearly regulate measures involving the removal of a child from his or her family for reasons of protection, on an exceptional basis and for the shortest length of time possible, and making it applicable only in limited circumstances provided for by the law, and stipulating that the decision must be subject to periodical review, in keeping with international standards.

DHSFF0669

22.    Adopt public policies and legislative measures to implement a true model of full implementation of all rights of all children and adolescents, which creates an adequate institutional framework to ensure their rights, with special emphasis on services for children at the local level, endowing the framework with sufficient human, material and economic resources.

23.    Put an end to the model of residential institutions for children and adolescents, inasmuch as it runs counter to international standards.

## Indigenous Peoples

24.    Prior to granting concessions, licenses or permits for the exploration or exploitation of natural resources that affect the ancestral lands or territories of indigenous peoples and communities, carry out a prior, free and informed consultation, with a view to obtain consent, in keeping with Inter-American standards on the subject, and taking into account the characteristics, practices and customs of the indigenous peoples and communities involved.

25.    With respect to concessions previously granted or in the process of implementation, establish a mechanism to be able to assess the need for a change in the terms thereof in order to preserve the physical and cultural survival of indigenous communities and peoples. Adopt the necessary measures to ensure that indigenous peoples and communities, who have suffered the effects of projects about which they had not been consulted, are able to gain access to mechanisms that enable them to mitigate the effects and receive adequate reparation, that is culturally appropriate.

26.    Adopt immediate measures to protect collective intellectual property of indigenous women with regard to apparel and designs that represent their traditional identity.

## Persons Deprived of Liberty

27.    Implement in practice a model of juvenile justice that regards deprivation of liberty as a measure of last resort and for the shortest length of time possible, and with a rehabilitative instead of a punitive approach.

28.    Adopt judicial, legislative, administrative and other types of measures required to correct the excessive use of pre-trial detention, ensuring that this measure is used as an exception and is bound by the

DHSFF0670

principles of legality, presumption of innocence, need and proportionality. In particular, the State must promote, regulate and apply alternative measures to pre-trial detention. Accordingly, it must repeal any legal provisions ordering compulsory use of pre-trial detention for the particular type of offense, and not establish further restrictions on procedural mechanisms and opportunities for release.

29. Strengthen public criminal defense systems, attaching priority to coverage and quality of service in order to provide, from the time of arrest, a service aimed at timely and effective protection of fundamental rights.

30. Implement judicial and prison information management systems at all detention facilities of the country, in order to provide up-to-date data and ready access on cases and the custody status of persons deprived of liberty in the country, and correct the lack of an automatized and unified system of registry of the proceedings of persons deprived of liberty.

31. Implement on-premise hearings at prison facilities in the presence of the judicial authorities in order to conduct particular proceedings to deal with the high rates of suspended court hearings and overcome difficulties in transferring persons inmates to courthouses.

32. Take the necessary steps to ensure that persons deprived of liberty are transferred to detention facilities meeting the minimum conditions compatible with the rights of persons deprived of liberty. This is inasmuch as police stations used as permanent detention facilities and military bases do not meet the minimum requirements for the detention to be compatible with international standards on the subject matter.

33. Change Guatemalan law against money laundering and the Criminal Code to meet the following requirements: a) that the punishment for money laundering does not amount to de facto imposition of a double sentence of deprivation of liberty, and b) that the law not continue to perpetuate the deprivation of liberty based on the mere material impediment that the persons have to cover the cost of the fine imposed.

## Persons with Disabilities

34. Investigate ex officio and, when appropriate, punish those responsible for any violation of the personal integrity of persons with

DHSFF0671

disabilities at psychiatric institutions. Establish an independent mechanism to oversee the institutionalization of patients at the Federico Mora Hospital in order to protect against acts of torture or mistreatment.

35. In light of the lack of community-based options for patients of the Federico Mora Hospital to receive the necessary services and treatment outside the institution, the IACH recommends the State to ensure the community life of these persons, by creating and establishing community-based services. For this purpose, the Commission urges the State to adopt, among other ones, the following measures: a) expeditiously define a strategy for the de-institutionalization of persons with disabilities, with a timeline, sufficient resources and specific evaluation measures; b) ensure the participation of persons with disabilities, directly and through the organizations representing them, in the design and implementation of said strategy, and c) allocate sufficient resources for the development of support services.

## Human rights Defenders

36. Approve and implement on an emergency basis a public protection policy for human rights defenders. This policy should include implementation of a comprehensive protection program, and incorporate a model of risk assessment to make it possible to determine the particular protection needs of each defender, using, for example, from a perspective of gender or of groups in an especially vulnerable situation.

37. Hold public hearings or interviews where citizens, civil society organizations and other interested parties are able to learn the selection criteria of operators of justice, as well as challenge candidates and express their concerns or their support, in order to strengthen the independence of the operators of justice holding the high-level positions in the judiciary, the office of the prosecutor and the public defender's office.

38. Adopt measures to ensure that operators of justice carry out their duties impartially and independently, respecting the principle of separation of powers and free of all threat or pressure. For this purpose, the State must strengthen the work of the Crimes against Operators of Justice Unit by recognizing the importance of its function in protecting the right of access to justice, as well as to due process.

DHSFF0672

39.   Ensure that the authorities or third parties do not manipulate the punitive power of the State and its organs of justice in order to harass human rights defenders and operators of justice.   Likewise, authorities should refrain from making statements or assertions that stigmatize or discredit human rights defenders, journalists, ancestral authorities or leaders, who suggest that the authorities are acting improperly or illegally, when they are simply doing their job as human rights defenders. In this regard, the Commission calls on the State to advance in the drafting of guidelines against criminalization by the Office of the Attorney General.

40.   Ensure that human rights defenders are not subjected to criminal proceedings for unnecessarily summary and protracted periods of time. Additionally, the State of Guatemala should cease using arrest warrants as mechanisms of punishment or retaliation against human rights defenders.

41.   Take measures to prevent the use of criminal charges against human rights defenders aimed at keeping them from doing their job. Operators of justice must consider, in response to the charges, whether or not the accused was acting in the capacity of a human rights defender, as well as the context of the facts, and in this way be able to identify whether the charges were used as a means of hampering their work as defenders. Likewise, the authorities in charge of the investigation of the crimes must make sure to gather the necessary evidence to determine whether there was unlawful conduct before they proceed to issue precautionary measures or formally open a case against the defenders.

42.   Establish specialized police and prosecutorial units with the necessary resources, training and specific investigation protocols in order to act in a coordinated fashion and respond with due diligence to the investigation of attacks on human rights defenders, establishing a hypothesis of the crimes and guidelines for the investigation thereof, taking into account vested interested that may have led to retaliation for the activities of the defender attacked. In this regard, the IACHR urges the State of Guatemala to adopt with urgency the General Instructions within the Office of the Public Prosecutor to guide prosecuting attorneys when investigating attacks on defenders.

DHSFF0673

## Internally Displaced persons, Migrants, Asylum Seekers, Refugees, and Victims of Trafficking in Persons

43. Adopt measures to prevent the causes of the forced migration of persons, as well as adopt measures of protection, humanitarian assistance and lasting solutions for internally displaced persons and ensure the right of migrants and persons with the need for international protection to leave the territory.

44. Adopt specific legislation at the federal and state level to address internal displacement in keeping with the Guiding Principles on Internal Displacement.

45. Amend Article 50 of the Code of Migration in keeping with human rights norms and standards in order to ensure that persons requiring international protection are never returned to a country where their life, safety and liberty are in jeopardy.

46. Regulate the Code of Migration and other norms relating to persons in the context of human mobility in keeping with the norms and standards of the Inter-American human rights system, in the framework of a participatory process with civil society organizations and other relevant stakeholders.

47. Ensure access to justice for migrants and their families, as well as implement measures to search for and identify missing migrants.

48. Implement effective measures to ensure the effective enjoyment of the human rights and reintegration of deported and returning persons.

49. Ensure that expansionist business and development activities are carried out in keeping with international human rights standards, analyzing legal aspects, potential social conflicts, environmental and social impacts, the right to consultation, the conduct of authorities and corruption, as well as their repercussions in the short and long term. The Guatemalan State must exercise adequate oversight of business activities in order to comply with its international obligations.

50. Ensure that evictions are conducted only in observance with human rights norms and standards and with the principles of exceptionality, legality, proportionality and suitability, in order to promote social wellbeing and by ensuring solutions for the evicted population, such

as restitution and return, resettlement and rehabilitation or fair compensation.

51.    Pursuant to the Peace Accords, promote the creation of an agrarian and environmental jurisdiction within the judicial apparatus through enactment by the Congress of the Republic of the respective law.

52.    Adopt measures to ensure the protection of the dignity, life and security of the evicted persons, by ensuring at a minimum access to food, potable water and sanitation, lodging, clothing, access to medical services, means of subsistence and access to justice, as well as ensure access to humanitarian assistance and independent monitoring.

## Afrodescendants

53.    Create institutions to formulate and develop policies for persons of African descent through a national action plan.

## LGBTI Persons

54.    Adopt the necessary measures to discourage intolerance and abolish any type of law that discriminates against persons based on their sexual orientation, gender identity or expression.

55.    Act with due diligence to prevent, investigate, punish and provide reparation for any type of violence committed against LGBTI persons.

56.    Adopt the necessary legislative measures and policies to prevent violence, discrimination and prejudice against persons because of their sexual orientation, diverse gender identity and expressions or whose bodies depart from male and female standards.

## Freedom of Expression

57.    Acknowledge, from the highest levels of government, the legitimacy and value of the work of journalists, and condemn attacks committed in retaliation for the exercise of freedom of expression.

58.    Investigate crimes committed against journalists completely, effectively, and impartially. Additionally, in cases involving the murder of journalists, establish the motive and judicially determine any possible connection to journalistic activity and freedom of

DHSFF0675

expression. The authorities should not rule out the practice of journalism as a motive for the attack and/or assault before the investigation is completed.

59.    With respect to the program for the protection of journalists and media workers—the creation of which was announced by the President of the Republic during the visit—ensure that its content is consistent with the international parameters, in broad and effective consultation with civil society organizations, journalists, and media workers.

60.    Take measures to guarantee the exercise of freedom of expression, plurality, and diversity in the digital transition process. Among other things, bring the license access, renewal, and revocation processes into line with the inter-American standards.

61.    Promote a pluralistic approach to information and multiple points of view by fostering the full enjoyment of freedom of thought and expression, access to the media, and diversity in media ownership and sources of information through, among other things, transparent licensing systems, and, as appropriate, effective regulations that prevent the improper concentration of media ownership.

62.    Adopt the legislative measures and public policies to recognize and ensure community media outlets' access to radio and television frequencies and licenses; in the meantime, abstain from criminally prosecuting community radio stations.

63.    Enact special, clear, and precise laws to regulate advertising at each level of government. Such provisions should clearly define government advertising and establish appropriate penalties for their violation. The Office of the Special Rapporteur reiterates that government advertising should never be allocated by the States to reward or punish media outlets for their editorial and news content.

64.    Ensure that its administrative laws and practices are compatible with the prohibition against the participation of the armed forces in public safety operations, in particular, the control of violence at social protests. Limit budget allocations to matters concerning national defense.

DHSFF0676



**FACTSHEET**

# Guatemala

April 2019

**102,340**
Refugees and asylum-seekers from Guatemala worldwide projected by end-2018, **1322%** higher than by end-2011.

**644**
Refugees and asylum-seekers in Guatemala by end-2018. **48%** are from El Salvador, **31%** from Nicaragua and **11%** from Honduras.

**110,600**
People on the move with possible protection needs transited through Guatemala during 2018. The National Safe Spaces Network assisted **41,000** of them in 2018.

**FUNDING (AS OF 30 APRIL 2019)**

## US$ 47 M

requested for the NCA situation



Funded
7%
**3.2 M**

Unfunded
93%
**43.8 M**

### Context

- Since 2013, UNHCR has been supporting and assisting the Guatemalan government in ensuring that persons in need of international protection have access to asylum procedures. In 2016, a field office in Petén (FOPET) was opened to enhance UNHCR's protection reach. Since April 2019, a semi-permanent presence has been established in Esquipulas.
- UNHCR has significantly scaled up its operational capacity in Guatemala to ensure protection and solutions response for the North of Central America (NCA) situation, in close collaboration with the national protection network.
- The vast majority (89%) of refugees and asylum-seekers reaching Guatemala are from Central America (El Salvador, Honduras and Nicaragua).

### UNHCR PRESENCE

**Staff:**
**12** National Staff
**9** International Staff

**Offices:**
**1** National Office located in Guatemala City
**1** Field Office in Petén
**1** Presence in Esquipulas



The boundaries and names shown and the designations used on this map do not imply official endorsement or acceptance by the United Nations

DHSFF0677[1]



## Working with Partners

- Guatemala is a country of origin, transit, return and asylum for refugees and migrants. Given the multi-causality of displacement in the NCA, and the increasing number of persons transiting through Guatemala to seek protection, ensuring a safe and dignified transit is a key priority for the operation.

- UNHCR works with 7 partners from civil society and faith-based organizations, which include specialized NGOs in child protection, sexual and gender base violence, human rights defenders and Lesbian, Gay, Bisexual, Transgender, Intersex (LGBTI) population. Seven partners comprise Guatemala's National Safe Spaces network (NSS), which operates through 10 shelters (including one exclusively for unaccompanied minors) and 16 protection and information points, strategically placed along the migration routes to provide information on asylum and humanitarian assistance. In 2018, UNHCR started working with Tierra Nueva NGO in the department of Huehuetenango and Quetzaltenango to strengthen protection and assistance response in Guatemala.

- Under the United Nations Country Team, UNHCR is part of two inter-agency groups: the UN Specialized Group on Migration and the Protection Cluster. The Specialized Group on Migration coordinates strategies on humanitarian assistance to persons in transit; asylum seekers, refugees and returnees; and legal framework on the implementation of the new Migration Code. The Protection Cluster is led by UNHCR and coordinates assistance to persons affected by the "Volcano of Fire" eruption in 2018, as well as those transiting through Guatemala as part of the large mixed movements of persons known as "Caravans".

## Main Activities

- Guatemala, as a member of the Comprehensive Regional Protection and Solutions Framework (MIRPS), is implementing its work plan for 2018-2020, which includes three main areas: (i) reception and admission; (ii) immediate and persistent needs; and (iii) enhance opportunities for durable solutions.

- In March 2019, UNHCR Guatemala conducted Participatory Assessments (PA) with refugees and asylum-seekers in Guatemala City, the Department of Petén, and with host communities in Petén. This was the first PA conducted in Guatemala since 2015, and the first one ever conducted with host communities.

- UNHCR Field Office Petén, in collaboration with partners, provided humanitarian assistance and protection services to approximately 21,000 persons, including refugees and migrants transiting in Petén and Izabal departments as part of the mixed population flows. Safe spaces capacity and field presence at key entry and transit hubs were reinforced through mobile teams and strengthening of the coordination with local institutions.

- To support and strengthen the asylum system in Guatemala, UNHCR provided the Guatemalan Migration Institute with a data-base to register asylum-seekers and refugees. This further contributes to enhance the collection and analysis of data which is now for the first time digitalized.

- To offer a protection alternatives to the traditional fast track return of unaccompanied children, UNHCR and partner Refugio de la Niñez (RdN) agreed with the Attorney's General Office (PGN) that unaccompanied children  in need of international protection will be sheltered by RdN for up to five days to allow PGN to conduct a Best Interest Determination Procedure and determine whether the child should seek asylum, be reunified with a family member in a third country, or be voluntarily repatriated.

- Community based protection in Izabal and Petén was boosted with implementation of quick impact projects (QIPs) empowering communities to better protect and assist refugees and migrants in transit and provide benefit to the hosts. UNHCR's support, provided consistently with the MIRPS and in coordination with State institutions, enhanced with infrastructural rehabilitation  three health facilities and the services they offer, two safe shelters respectively for SGBV survivors and unaccompanied and separated children, a migration border post, as well as constructed a pre-primary school in a border area, and provided sustainable solutions for access to safe water for more than 150.000 refugees, migrants and host communities.

- During large mixed movements of persons, UNCHR led the humanitarian response within the Protection Cluster. Between October 2018 and April 2019, the Protection Cluster assisted more than 30,000 persons crossing Guatemala with material assistance, information on asylum procedures, and access to services.

- As part of the Protection Transit Agreement programme, from January to April 2019, UNHCR Guatemala referred 38 cases/92 individuals at heightened risk to the Regional Office in Panama (ROPAN). During that timeframe, after clearance by ROPAN, 33 PTA case / 73 individuals were submitted for resettlement to the United States. Additionally, 4 cases/18 individuals were submitted for resettlement to Australia. In this same period, 20 cases/65 individuals were resettled.

- With regards to durable solutions, UNHCR developed a strategy to generate empathy from the private sector and promote the recognition of the documentation issued to refugees in order to facilitate local integration by improving their access to job opportunities. In addition, a local integration program was developed by UNHCR in Petén with government institutions to facilitate educational and job opportunities in the local tourism industry.

DHSFF06782



# Donors

In 2019, UNHCR operations in Central America received earmarked funding from the United States of America, Canada, the European Union, Spain, the UN Peacebuilding Fund, and various private donors.

**In 2019, UNHCR received unearmarked funding from:**

**Sweden** 90.4 million **|** **Norway** 44.5 million **|** **Netherlands** 37.5 million **|** **United Kingdom** 31.7 million **|** **Germany** 26.7 million **|** **Private donors Spain** 26.3 million **|** **Denmark** 24.4 million **|** **Switzerland** 15.1 million **|** **Private donors Republic of Korea** 10.4 million

**For more information:**

Rebeca Cenalmor-Rojas, Head of National Office UNHCR Guatemala, cenalmor@unhcr.org, Tel: +502 23162504; Pablo Villagrán, Public Information Assistant, villagra@unhcr.org, Tel: +502 23162500

For more information visit: Global CRRF Portal



**Submission by the United Nations High Commissioner for Refugees**

**For the Office of the High Commissioner for Human Rights' Compilation Report**

**Universal Periodic Review:** *3rd Cycle, 28th Session*

# GUATEMALA

## I.  BACKGROUND INFORMATION

Guatemala acceded to the *1951 Convention relating to the Status of Refugees* and its *1967 Protocol* in 1983 (hereinafter jointly referred to as the *1951 Convention*). Guatemala also acceded to the *1954 Convention relating to the Status of Stateless Persons* (the *1954 Convention*) in 2000 and to the *1961 Convention on the Reduction of Statelessness* (the *1961 Convention*) in 2001.

Guatemala is a signatory of the 2016 *San Jose Action Statement*,[1] in which it pledged to provide assistance to deportees, persons in transit and in need of international protection, particularly unaccompanied children. Its commitments also build on the *Brazil Declaration and Plan of Action* (*BDPA*),[2] which was signed in 2014 for the occasion of the 30th anniversary of the 1984 *Cartagena Declaration on Refugees* (the *Cartagena Declaration*).

Guatemala enacted regulations on asylum procedures in 2001[3] and gave the National Commission on Refugees (CONARE) the authority to decide on asylum claims. In addition, Guatemala applies the broader refugee definition in accordance with the *Cartagena Declaration*. In October 2016, Guatemala enacted a new *Migration Code* which, after promulgation but before taking legal effect, had its enforcement suspended by the Supreme Court. While a definitive decision on its implementation is not yet available, Guatemala is currently reviewing and preparing new asylum regulations, in accordance with the provisions of the new *Migration Code*, a process in which UNHCR is actively involved. In spite of having acceded to the Statelessness Conventions, Guatemala is yet to enact its national legal framework to allow for the protection of stateless persons and to prevent cases of statelessness amongst its population.

Guatemala is a country of origin, transit and return of asylum-seekers, victims of trafficking and migrants. Mexican authorities estimated that, in 2015, some 400,000 persons entered

---

[1] UN High Commissioner for Refugees (UNHCR), San Jose Action Statement, 7 July 2016, available at: http://www.refworld.org/docid/57a8a4854.html [accesseced 28 February 2017].

[2] *Brazil Declaration and Plan of Action: A Common Roadmap to Strengthen Protection and Promote Sustainable Solutions for Refugees, Displaced and Stateless Persons in Latin America and the Caribbean within a Framework of Cooperation and Solidarity*, 3 December 2014, available at: http://www.refworld.org/docid/5487065b4.html.

[3] Guatemala, *Acuerdo Gubernativo No. 383-2001 de 2001, Reglamento para la protección y determinación del estatuto de refugiado en el territorio del Estado de Guatemala*, 14 September 2001, available at: http://www.refworld.org/docid/3dbe65954.html [accessed 24 January 2017]; Guatemala, *Decreto No. 95-98 de 1998, Ley de Migración* [Guatemala], 26 November 1998, available at: http://www.refworld.org/docid/3dbe69e16.html [accessed 30 January 2017].

DHSFF0680

Mexico after crossing the borders from Guatemala. In a complex environment in which displacement takes multiple forms, UNHCR works primarily with the following population groups: refugees and asylum-seekers; persons in transit with international protection needs; and, returnees and deportees who are unable to return to their communities of origin due to persecution and violence.

According to information available to UNHCR, Guatemala hosts a refugee population of 239 persons of 7 different nationalities, with the majority being from El Salvador, Nicaragua and Honduras. In 2015, Guatemala registered 161 asylum claims and as of October  2016 a total of 133 asylum claims had been registered – which represents a 21 per cent increase in comparison with the same period in the previous year. While numbers of asylum claims in Guatemala remain low, civil society organizations continue to be approached by persons seeking advice on how to seek asylum in Mexico and in the United States of America due to fear of persecution in their countries of origin.

In 2016, there has been a 48 per cent increase in the number of asylum applications submitted by Guatemalans in North and Central American countries, in comparison to the same period in 2015. Nonetheless, Guatemalan nationals continue to be returned from Mexico and the United States of America. In 2015 alone, 106,488 Guatemalans were returned from the United States of America and México, among whom 14 per cent were children and adolescents. In 2016, approximately 95,000 Guatemalans were deported from North American countries (of which 20 per cent are female and 17 per cent are children). While there is no official data available on internal displacement in the country, a study on the extent of the phenomenon in Guatemala was commissioned by UNHCR to the University Rafael Landivar and is expected to shed light on the phenomenon in Guatemala, as well as to serve as a guide to UNHCR´s programming of protection interventions.

## II. ACHIEVEMENTS AND POSITIVE DEVELOPMENTS

### Positive developments linked to 2nd cycle UPR recommendations

**Linked to 2nd cycle UPR recommendation no. 99.37: "**Enhance the promotion and protection of women's rights, including addressing violence against women and femicide (Trinidad and Tobago)."[4]

In 2016, Guatemala took two major steps in terms of addressing violence against women. In February 2016, a historical trial (case *Sepur Zarco*[5]) convicted members of the military for crimes of sexual violence and for using rape as a weapon of war against indigenous women during the Guatemalan civil war. More recently, in November 2016, the Public Prosecutors Office established a new department specialized in femicide, to continue the investigations and prosecution of 947 cases.

---

[4] All recommendations made to Guatemala during its 2nd cycle UPR can be found in: "Report of the Working Group on the Universal Periodic Review of Guatemala" (31 December 2012), A/HRC/22/8, available at: http://ohchr.org/EN/HRBodies/UPR/Pages/GTSession14.aspx [accessed 28 February 2017].

[5] OHCHR Guatemala. *Guatemala: UN experts welcome judgment of two former military officials for crimes against humanity,* 1 March 2016, available at:
http://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=17118&LangID=E. *;* UN Women, *Guatemala Landmark ruling in Guatemala a victory against sexual violence in armed conflict,* 3 March 2016, available at: http://www.unwomen.org/en/news/stories/2016/3/guatemala-victory-against-sexual-violence-in-armed-conflict#sthash.otQ2EKqm.dpuf [accessed 28 February 2017].

DHSFF0681

### III.      KEY PROTECTION ISSUES, CHALLENGES AND RECOMMENDATIONS

**Challenges linked to outstanding 2nd cycle UPR recommendations**

**Issue 1: Protection mechanisms for women and children victims of violence**

**Linked to 2nd cycle UPR recommendations no. 99.16:** "Implement policies and programmes preventing violence against women and children (Switzerland)"; **no. 99.33:** "Devote adequate resources, in particular financial resources and personnel, to combating femicide and all forms of violence against women (Czech Republic);" **and no. 99.37:** "Enhance the promotion and protection of women's rights, including addressing violence against women and femicide (Trinidad and Tobago)."

A surging tide of violence sweeping across El Salvador, Guatemala, and Honduras – the Northen Triangle of Central America (NTCA) – has forced thousands of women, men, and children to leave their homes every month. With limited protection at home, women flee to protect themselves and their children from murder, extortion, and rape.

Research conducted by UNHCR[6] found that women from the NTCA face a startling degree of violence that has a devastating impact on their daily lives. Sixty-four per cent of the women interviewed described being the targets of direct threats and attacks by members of criminal armed groups as at least one of the primary reasons for their flight. For many of the women interviewed for this research, the increasing violence from criminal armed groups occurred alongside repeated physical and sexual violence at home. Women described life-threatening and degrading forms of domestic violence, including repeated rapes, sexual assaults, and violent physical abuse. In some instances, the harm became so intolerable that they had no choice but to flee with a potential or actual need for international protection. Likewise, additional research conducted by UNHCR[7] with children from NTCA countries and Mexico found that at least 58 per cent of the children interviewed were forcibly displaced because they suffered or faced harms that indicated a potential or actual need for international protection. Two overarching patterns of harm related to potential international protection needs emerged: violence by organized armed criminal actors and violence in the home.

As noted above, Guatemalan nationals continue to be returned from Mexico and the United States of America. Deportations from Mexico to Guatemala increased 188 per cent between 2010 and 2015. Many women and children are returned to their communities of origin, where the causes that initially forced some of them to leave are still present, mainly due to the absence of appropriate reception conditions and screening procedures in these countries.

Finally, the absence of mechanisms to register survivors of violence and displaced persons in Guatemala, coupled with limited alternatives to find protection and relocation in other areas of the country, leave survivors of violence perpetrated by organized criminal groups with few options but to seek international protection elsewhere.

---

[6] UNHCR, *Women on the Run: First-hand Accounts of Refugees Fleeing El Salvador, Guatemala, Honduras, and Mexico*, 26 October 2015, available at: http://www.refworld.org/docid/56307e2a4.html [accessed 28 February 2017].

[7] UNHCR, C*hildren on the Run: Unaccompanied Children Leaving Central America and Mexico and the need for International Protection*, 13 March 2014, available at: http://www.refworld.org/docid/532180c24.html [accessed 28 February 2017].

DHSFF0682

**Recommendations:**

UNHCR recommends that the Government of Guatemala:

a) Ensure that displaced women, families and children survivors of violence have access to protection mechanisms within Guatemala, and are able to access adequate legal and psychosocial counselling, as well as justice;

b) Ensure that women, children and families deported from Mexico and the United States of America are provided safety upon arrival, screened for any international protection needs, and that the best interests of the child principle is a central component of all responses; and

c) Improve reception facilities for both deportees and asylum-seekers, and enhance authorities' capacity, through increased staff, training and appropiate infrastructure to ensure the systematic identification of, and to provide protection and assistance for, children in need of international protection.

**Additional protection challenges**

**Issue 2: Protection of persons in need of international protection**

The increasing levels of violence in countries of the NTCA has unfolded into a humanitarian crisis in the region in recent years. Mixed migration flows of migrants, refugees and victims of trafficking (including large numbers of unaccompanied children) travelling southbound or northbound, including towards Mexico and the United States of America in search of protection and better life opportunities, shed light on concerning protection gaps yet to be addressed by Guatemala.

Despite serving as the main transit route for thousands of persons fleeing persecution in NTCA countries, along with other populations with specific needs, Guatemala is inadequately equipped to ensure a safe and dignified transit along its territory. Persons in transit report being victims of successive forms of extortion and violence, including sexual and gender-based violence (SGBV), at the hands of different actors, including government authorities, traffickers and smugglers. The alleged crimes are often committed along routes where Guatemalan security forces and military have established a strong presence, and criminal network and drug cartels are known to operate in parallel. Authorities lack adequate knowledge on the right to seek asylum and the government authorities mandated to protect victims and to provide follow up on the investigation and prosecution of such crimes against persons in transit (such as the Ombudsman Office, the General Attorney's Office and the Public Prosecutor's Office) do not have sufficient resources to intervene and respond.

There are no national reception mechanisms or transit centres for persons in need of international protection, and all humanitarian assistance and information on asylum procedures are being provided by civil society organizations – whose resources are already overstretched due to increasing numbers of persons fleeing and transiting through Guatemala. The lack of a governmental and multisectoral approach to the needs of migrants and refugees, coupled with the lack specialized units within key line ministries and authorities also hinders Guatemala´s response to the protection challenges and humanitarian needs of those groups.

As noted in the background a new *Migration Code* has been approved by the Congress and promulgated by the President, but implementation is on hold pending a judicial constitutional action filed at the Supreme Court in December 2016. As of March 2017, the Supreme Court

4

had not yet issued its final decision and the enforcement of the *Migration Code* remained suspended.

Despite the pending decisions, the *Migration Code* created a new Migration Authority, chaired by the Vice President and comprised of representatives from the following Ministries: Interior; Foreign Affairs; Labor; Social Development; as well as the Director of the new Migratory Institute and the Executive Director of the National Migration Council.

In addition, as the new *Migration Code* revokes the existing asylum legislation, if a new legal framework is not immediately enacted and approved this will leave clear gaps in relation to provisions on rights, duties and identity and travel documents of asylum-seekers and refugees as well provisions regarding refugee status determination (RSD) procedures. These gaps are expected to be filled by subsidiary regulations implementing the *Migration Code*. Delays in promulgating these regulations could mean that all asylum claims filed after the new *Migration Code* comes into force would not be processed for lack of a valid asylum mechanism. In this regard, priority should be given to  the expedited approval of new regulations, in accordance with the *Migration Code*, as well as a transitional plan with regard to the structure, resources and handover of activities to the new authority.

**Recommendations:**
UNHCR recommends that the Government of Guatemala:
   a)  Enact, without delay, regulations to implement the new Migration Code which, in line with international and regional instruments, ensure continuous access to RSD procedures;
   b)  Ensure that RSD procedures for persons who may be in need of international protection are fair and efficient, including by establishing protection-sensitive mechanisms and ensuring adequate training of the respective officials, particularly concerning accompanied and unaccompanied children;
   c)  Strengthen the Migration Authority's capacity, by allocating appropriate financial and technical resources for the implementation of a national policy on the protection of refugees, asylum-seekers and deportees in need of international protection;
   d)  Allocate adequate resources to strengthen the Ombudsman's  Office and the Public Prosecutor's Office so that these institutions are able to promote effective responses, conduct investigations and prosecute perpetrators of violence and extortion against persons in transit; and
   e)  Consider establishing specialized units within the Public Prosecutor's Office, General Attorney's Office and key line ministries, focused on the protection of refugees, asylum-seekers and persons in transit in Guatemala.

**Human Rights Liaison Unit**
**Division of International Protection**
**UNHCR**
**March 2017**

DHSFF0684

# ANNEX

**Excerpts of relevant Recommendations from the 2nd cycle Universal Periodic Review, Concluding Observations from UN Treaty Bodies and Recommendations of Special Procedures mandate holders**

# GUATEMALA

We would like to bring your attention to the following excerpts from the 2nd cycle UPR recommendations, and UN Treaty Monitoring Bodies' Concluding Observations relating to issues of interest and persons of concern to UNHCR with regards to Guatemala.

## I.    Universal Periodic Review (Second Cycle – 2012)

| Recommendation[8] | Recommending State/s | Position[9] |
|---|---|---|
| **Discrimination against minorities** | | |
| 99.9. Adopt a law specifically classifying the various manifestations of racial discrimination as punishable acts. | Bangladesh | Supported |
| **Violence against women and women's rights** | | |
| 99.16. Implement policies and programmes preventing violence against women and children; | Switzerland | Supported |
| 99.33. Devote adequate resources, in particular financial resources and personnel, to combating femicide and all forms of violence against women; | Czech Republic | Supported |
| 99.34. Consider allocating sufficient financial resources to effectively implement the Law against Femicide, in accordance with recommendations of CEDAW; | Honduras | Supported |
| 99.37. Enhance the promotion and protection of women's rights, including addressing violence against women and femicide; | Trinidad and Tobago | Supported |
| 99.40. Continue to strengthen its efforts to prevent sexual and gender-based violence by ensuring the provision of financial resources for the full implementation of the legal framework, including mandatory training with a gender perspective of all legal and law enforcement officials and health service personnel in order to ensure that they are able to respond effectively to all forms of violence against women. | Sweden | Supported |
| **Civil and political rights** | | |
| 99.52. Adopt further measures to ensure that any act of threat or reprisal against human rights defenders is effectively investigated, prosecuted and punished; | Czech Republic | Supported |

---

[8] All recommendations made to Guatemala during its 2nd cycle UPR can be found in: "Report of the Working Group on the Universal Periodic Review of Guatemala" (31 December 2012), A/HRC/22/8, available at: http://ohchr.org/EN/HRBodies/UPR/Pages/GTSession14.aspx.

[9] Guatemala's views and replies can be found in: *Addendum* (23 January 2013), A/HRC/22/8/Add.1, available at: http://ohchr.org/EN/HRBodies/UPR/Pages/GTSession14.aspx.

6

| 100.15. Implement effective protective measures as well as immediate, independent and systematic investigations of abuses perpetrated against human rights defenders. | Switzerland | Noted |
|---|---|---|
| **Trafficking in Persons** | | |
| 99.54. Continue increasing efforts countering the trafficking of persons including issuing an invitation to the Special Rapporteur on trafficking in persons, in particular women and children; | Belarus | Supported |
| 99.55. Take additional measures to eliminate criminal networks involved in the sale of children, including for the purposes of illegal adoption. | Belarus | Supported |

## II.    Treaty Bodies

### Committee on the Rights of Persons with Disabilities

Concluding Observations, (31 August 2016) CRPD/C/GTM/CO/1

13. El Comité toma nota con preocupación que las personas con discapacidad, especialmente los niños y niñas, las mujeres y pueblos indígenas, estén sometidos a graves formas de discriminación. Asimismo, al Comité le preocupa la falta de implementación efectiva de la Política Nacional de Discapacidad por todos os los ministerios ministerios e instituciones públicas concernidos. Además le preocupa la falta de consulta con las organizaciones representativas de las personas con discapacidad para asegurar la asignación de los recursos necesarios, así como la introducción de una agenda de aplicación y de mecanismos de seguimiento y evaluación.

**14. El Comité recomienda que el Estado parte asegure la implementación efectiva por todos los ministerios e instituciones públicas concernidos de su Política Nacional de Discapacidad, asignando los recursos necesarios, una agenda de aplicación y un mecanismo de seguimiento, en consulta con las organizaciones representativas de las personas con discapacidad. El Comité recomienda también que el Estado Parte incorpore la discapacidad transversalmente y asigne los recursos necesarios al Plan Nacional de Desarrollo -PND- Katún Nuestra Guatemala 2032, asegurando la participación de las personas con discapacidad en los Consejos de Desarrollo Urbano y Rural encargados de su seguimiento. Asimismo el Comité recomienda que se elabore una Política Nacional sobre la Eliminación de todas las Formas de Discriminación contra las Personas con Discapacidad en conformidad con la Convención.**

**Igualdad y no discriminación (art. 5)**
15. Al Comité le preocupa que las personas con discapacidad, -especialmente con discapacidad intelectual y psicosocial, niños y niñas, mujeres y pueblos indígenas-, se vean sometidas sistemáticamente a múltiples formas de discriminación, y que sus derechos humanos estén limitados o restringidos por la ley. También le preocupa que la legislación del Estado Parte no reconozca la discriminación múltiple e interseccional y la denegación de ajustes razonables como formas agravadas de discriminación hacia las personas con discapacidad.

**16. El Comité recomienda al Estado Parte a que revise toda su legislación y políticas en materia de igualdad y no discriminación con el fin de asegurar el pleno ejercicio de todos los derechos humanos de las personas con discapacidad en igualdad de condiciones con**

DHSFF0686

**las demás, y a que reconozca en la misma la discriminación múltiple e interseccional y la denegación de ajustes razonables como formas agravadas de discriminación hacia las personas con discapacidad.**

17. El Comité se encuentra preocupado por el reducido número de quejas, de registros y pronunciamientos sobre casos de discriminación por motivos de discapacidad, así como por la ausencia de difusión de los recursos legales disponibles para la lucha contra la discriminación entre las personas con discapacidad.

**18. El Comité recomienda al Estado parte asignar recursos a la Procuraduría de Derechos Humanos para asegurar el registro y pronunciamiento de los casos de discriminación de las personas con discapacidad, así como para difundir ampliamente y de forma accesible entre todas las personas con discapacidad los recursos legales disponibles para la lucha contra la discriminación, especialmente en instituciones donde se atienden a personas con discapacidad, en zonas rurales y en comunidades remotas. El Comité también alienta al Estado parte a realizar campañas contra la discriminación de personas con discapacidad dirigidas a la profesión legal, incluyendo los funcionarios del poder judicial y los abogados. Por último, el Comité recomienda que el Estado Parte se guíe por el artículo 5 de la Convención al implementar las metas 10.2 y 10.3 de los Objetivos de Desarrollo Sostenible.**

**Situaciones de riesgo y emergencias humanitarias (art. 11)**
29. Al Comité le preocupa que los planes de acción y la Política Nacional vinculados a la preparación y respuesta del Estado Parte ante situaciones de emergencia humanitaria y desastres naturales no contemple la atención a las necesidades de las personas con discapacidad.

**30. El Comité recomienda al Estado Parte que los planes de acción y la Política Nacional vinculados a la preparación y respuesta del país ante situaciones de emergencia humanitaria y desastres naturales sean inclusivos y accesibles para todas las personas con discapacidad, prestando especial atención a las que viven en zonas rurales y remotas. También recomienda incorporar la discapacidad en sus políticas y programas sobre cambio climático, tomando en cuenta los resultados del relativos a personas con discapacidad, el documento final de la cumbre sobre cambio climático y la carta sobre la inclusión de las personas con discapacidad en la acción humanitaria.**
**Protección contra la tortura y otros tratos o penas crueles, inhumanos o degradantes (art. 15)**

43. El Comité expresa su preocupación por que las acciones que se están llevando a cabo por el Estado Parte para implementar las Observaciones finales del Comité contra la Tortura (CAT/C/GTM/CO/5-6, 2013) en relación a los hospitales psiquiátricos, instituciones de internamiento de personas con discapacidad y centros penitenciarios para evitar el internamiento de personas condenadas por delitos y personas con discapacidad en el Estado Parte, y la aplicación de las medidas cautelares que la Comisión Interamericana de Derechos Humanos determinó con respecto al Hospital Nacional de Salud Mental Federico Mora en relación a las personas con discapacidad, no hayan sido suficientes para proteger a las personas con discapacidad, ni estén en consonancia con la Convención.

**44. El Comité recomienda al Estado Parte a implementar debidamente las Observaciones finales del Comité contra la Tortura (CAT/C/GTM/CO/5-6, 2013) y la aplicación de las**

8

medidas cautelares que la Comisión Interamericana de Derechos Humanos determinó con respecto al Hospital Nacional de Salud Mental Federico Mora, en conformidad con los principios y mandatos de la Convención y las presentes Observaciones Finales. Además, le recomienda el establecimiento de un mecanismo independiente que supervise los centros de internamiento de personas con discapacidad, incluidos los centros donde se encuentran niños y niñas con discapacidad, a fin de ofrecer prevención y protección contra actos que puedan considerarse como tortura y otros tratos y penas crueles, inhumanos o degradantes.

**Protección contra la explotación, la violencia y el abuso (art. 16)**
45. El Comité expresa su profunda preocupación porque muchas personas con discapacidad, -especialmente mujeres, niños y niñas-, son frecuentemente víctimas de explotación, violencia y abuso y que no existan medidas para su protección, recuperación y reparación de daños.  Le preocupa también que los casos de explotación, violencia y abuso cometidos contra estas personas, especialmente en el seno de la familia o en instituciones, no se investiguen debidamente y que, en consecuencia, los autores de tales hechos permanezcan en la impunidad.

**46. El Comité recomienda al Estado parte a redoblar esfuerzos y adoptar un marco de debida diligencia así como todas las medidas necesarias en su legislación y en sus políticas para prevenir y proteger a todas las personas con discapacidad de la explotación, la violencia y el abuso, así como para asegurar la debida recuperación de las víctimas en entornos adecuados para ellas.  Asimismo recomienda el suministro inclusivo y accesible de apoyo a las víctimas, así como la puesta en marcha de un mecanismo de denuncias y quejas y la formación de la policía, el poder judicial y los profesionales sociales y de salud. Además, el Comité le insta a investigar debidamente todos los casos de explotación, violencia y abuso cometidos contra personas con discapacidad, -fundamentalmente contra mujeres, niños y niñas- a fin de garantizar que sean detectados, investigados y, en su caso, juzgados.  Por último, el Comité solicita al Estado parte la recopilación periódica de datos y estadísticas sobre la situación de las personas con discapacidad ante la violencia, la explotación y el abuso, incluyendo información sobre la trata, el incesto y el femicidio.**

47. Al Comité le preocupa la ausencia de protocolos para llevar registro, control y supervisión de las condiciones en que operan orfanatos, hospitales, prisiones, asilos o cualquier centro público o privado donde vivan personas con discapacidad.

**48. El Comité recomienda al Estado Parte a establecer el mecanismo independiente de seguimiento de acuerdo con el artículo 16, párrafo 3 de la Convención, que registre, controle y supervise las condiciones en que operan instituciones donde vivan personas con discapacidad.**

**Protección de la integridad personal (art. 17)**
49. Preocupa al Comité que las personas con discapacidad, especialmente mujeres y niñas víctimas de abusos sexuales, incapacitadas legalmente y/o institucionalizadas, son objeto de esterilizaciones forzadas, abortos coercitivos y otras formas de tratamientos anticonceptivos no consentidos.

**50. El Comité recomienda que el Estado parte adopte todas las medidas posibles para asegurar la abolición de todas las prácticas de esterilizaciones forzadas y abortos coercitivos de mujeres y niñas con discapacidad, así como a que se garantice el**

9

consentimiento libre e informado de todas las personas con discapacidad para cualquier intervención o tratamiento médico.

**Libertad de desplazamiento y nacionalidad (art. 18)**

51. El Comité observa que las medidas que ha adoptado el Estado parte para promover la inscripción de niñas y niños en el Registro Civil aún no alcanzan la universalidad de niñas y niños con discapacidad y que muchos de ellos no tienen nombre.

**52. El Comité insta al Estado parte a asegurar la universalidad del registro de nacimiento inmediato de todos los niños y niñas con discapacidad y la provisión de un documento de identidad, así como a que asegure que el RENAP registre a todos los niños y niñas con discapacidad debidamente.**

**Derecho a vivir de forma independiente y a ser incluido en la comunidad (art. 19)**

53. El Comité muestra su preocupación por el alto número de niños y adultos con discapacidad detenidos en instituciones. El comité está particularmente preocupado por el caso de las personas detenidas en el Hospital Nacional de Salud Mental Federico Mora, quienes se encuentran segregados de manera indefinida. Además, expresa también su preocupación en relación con un gran número de niños y niñas que hoy se encuentran detenidos en instituciones, muchos de los cuales tienen una discapacidad. Asimismo el Comité nota con preocupación la falta de servicios diseñados para satisfacer sus necesidades en las comunidades locales a fin de que las **personas con discapacidad** puedan **vivir de forma independiente. Además al Comité le preocupa la falta de apoyo** a las familias de los niños y niñas con discapacidad para asegurar que puedan permanecer en el entorno familiar.

**54. El Comité recomienda al Estado Parte a:**

**a) Definir urgentemente una estrategia de desinstitucionalización para personas con discapacidad, con plazos, recursos suficientes y medidas de evaluación específicas;**

**b) Asignar recursos suficientes para el desarrollo de servicios de apoyo incluyendo la asistencia personal en las comunidades locales que permitan a todas las personas con discapacidad, independientemente de su discapacidad, el género o la edad, elegir libremente con quién, dónde y en qué modalidad de convivencia vivirán;**

**c) Proporcionar apoyo a las familias de niños y niñas con discapacidad para impedir la desintegración de la familia y su colocación en instituciones;**

**d) Abolir la colocación de niños y niñas de todas las edades bajo el cuidado de instituciones.**

**<u>Committee on the Economic, Social and Cultural Rights</u>**

<u>Concluding Observations, (20 February 2014),</u> CERD/C/DZA/CO/15-19

**No discriminación**

9. El Comité toma nota de la creación de la Defensoría de la Diversidad Sexual, sin embargo lamenta que persista discriminación contra personas por motivos de orientación sexual en el empleo, la vivienda y el acceso a la educación y la atención de la salud (art. 2).

**El Comité recomienda al Estado parte que adopte medidas, en particular de sensibilización, para garantizar que lesbianas, gais, bisexuales y transexuales (LGBT) no sean discriminados por su orientación sexual y su identidad de género.**

10

**Violencia basada en género**

10. El Comité toma nota de la creación de los juzgados y tribunales especializados de feminicidio y otras formas de violencia contra la mujer, sin embargo lamenta que todavía persiste el clima de impunidad y el temor de las víctimas en denunciar casos de violencia contra la mujer. El Comité reitera su preocupación por los altos índices de violencia contra la mujer en particular la violencia doméstica (E/C.12/1/Add.93, párr. 39) (arts. 2, 3 y 10).

**El Comité recomienda al Estado parte que siga sensibilizando a la población sobre el carácter penal de la violencia doméstica y que haga comparecer a los responsables ante la justicia. También recomienda al Estado parte que refuerce y amplíe los programas de asesoramiento jurídico, asignando los recursos necesarios a los juzgados y tribunales de feminicidio y otras formas de violencia contra la mujer.**

**Committee against Torture**

Concluding Observations, (21 June 2013), CAT/C/GTM/CO/5-6

**Aspectos positivos**

5. El Comité celebra las disposiciones adoptadas por el Estado parte para modificar su legislación en aspectos que guardan relación con la Convención, en particular las siguientes:

    e)    La adopción de la Ley contra la Violencia Sexual, Explotación y Trata de Personas, Decreto Legislativo Nº 9-2009.

**Investigación de los actos de tortura y otras graves violaciones a los derechos humanos cometidas durante el conflicto armado interno**

10. El Comité toma nota con interés de la información proporcionada por el Estado parte acerca de las investigaciones y condenas en relación con algunas de las causas relativas a las graves violaciones a los derechos humanos cometidas durante el conflicto armado interno. Sin embargo, continúa profundamente preocupado por la impunidad que existe respecto de la mayoría de las violaciones a los derechos humanos perpetradas durante este período que incluyen, según las conclusiones de la Comisión de Esclarecimiento Histórico (CEH), 626 masacres y un saldo de más de 200.000 personas muertas o desaparecidas. El Comité destaca que, según la CEH, más del 90% de las violaciones de los derechos humanos y hechos de violencia cometidos durante este período serían atribuibles al Estado y que más del 80% habrían sido cometidos contra la población indígena. El Comité enfatiza que la impunidad existente viola el derecho internacional de los derechos humanos, los Acuerdos de Paz y la normativa interna vigente. En particular, el Comité destaca la condena del ex Jefe de Estado, Efraín Ríos Montt, por genocidio y crímenes de lesa humanidad el 10 de mayo de 2013, pero no puede dejar de notar que el 20 de mayo de 2013 la misma fue anulada por la Corte Constitucional, según se señala, por razones procesales. Asimismo, al Comité le preocupa que durante el transcurso de dicho proceso hubo declaraciones, incluso de autoridades de alto nivel del Poder Ejecutivo, manifestando que en Guatemala no hubo genocidio, las que podrían tener como efecto influir en las determinaciones del Organismo Judicial. El Comité está preocupado también por la información que da cuenta de que el Ejército de Guatemala no coopera plenamente con las investigaciones. Además, inquietan al Comité los informes sobre ataques y amenazas contra las personas que participan en procedimientos penales, incluidos aquellos relativos a las investigaciones de violaciones a los derechos humanos (arts. 2, 12, 13, 14 y 16).

11

**El Comité reitera su anterior recomendación (párr. 15) según la cual el Estado parte debe aplicar plenamente la Ley de Reconciliación Nacional que, inter alia, deniega explícitamente la amnistía a los autores de los delitos de genocidio, tortura y desaparición forzada, así como de aquellos delitos que sean imprescriptibles o que no admitan la extinción de la responsabilidad penal, de conformidad con el derecho interno o los tratados internacionales ratificados por Guatemala. Asimismo, el Comité recomienda que el Estado parte:**

    **a)**    **Redoble sus esfuerzos con miras a asegurar que se investiguen las graves violaciones a los derechos humanos cometidas durante el conflicto armado interno, en particular las masacres y los actos de tortura y desaparición forzada, así como para llevar ante la justicia a los autores de esos actos, incluyendo la cadena de mando;**

    **b)**    **Asegure que las personas acusadas de tortura u otros actos equivalentes no se beneficien de un plazo de prescripción;**

    **c)**    **Garantice que todos los órganos involucrados en las investigaciones cuenten con los recursos humanos, técnicos y financieros necesarios para llevar a cabo sus funciones de una manera eficaz;**

    **d)**    **Asegure que todos los actores públicos colaboren plenamente y de manera expedita con las investigaciones;**

    **e)**    **Evite que agentes estatales realicen actos o declaraciones públicas que puedan tener el efecto de influir negativamente sobre la independencia del Organismo Judicial; y**

    **f)**    **Garantice la seguridad de las víctimas, testigos y de todas aquellas personas que participen en procedimientos penales y, en ese sentido, lo insta a que proporcione a los órganos encargados de brindar protección los recursos humanos y financieros necesarios para garantizar su funcionamiento eficaz.**

**Principales motivos de preocupación y recomendaciones**

**Definición y delito de tortura**

8. El Comité nota con preocupación que la tipificación del delito de tortura que figura en el Código Penal del Estado parte aun no ha sido ajustada a las disposiciones de la Convención a pesar de las anteriores recomendaciones del Comité y la resolución 18-22, de 17 de julio de 2012, de la Corte de Constitucionalidad. Al respecto, toma nota de la intención del Estado parte de adecuar su legislación tal como lo afirmara la delegación durante el diálogo con el Comité (arts. 1 y 4).

**El Comité reitera su anterior recomendación (CAT/C/GTM/CO/4, párr. 10) e insta al Estado parte a enmendar, con carácter prioritario, las disposiciones pertinentes del Código Penal, en particular los artículos 201 *bis* y 425, con miras a tipificar penalmente la tortura según se define en el artículo 1 de la Convención y considerarla delito punible de conformidad con el artículo 4, párrafo 2, de la Convención. El Comité recomienda además que el Estado parte garantice que los actos de tortura no queden sujetos a ningún régimen de prescripción.**

**Desapariciones forzadas cometidas durante el conflicto armado interno**

11. El Comité nota con preocupación que, no obstante los años transcurridos desde el final del conflicto armado interno, el destino y paradero de más de 40.000 personas que habrían sido víctimas de desaparición forzada durante ese período continúan desconocidos y, al respecto, lamenta que todavía no se haya establecido una comisión independiente para localizar a esas

DHSFF0691

personas. El Comité toma nota de la información brindada por la delegación acerca de que las iniciativas que en esa dirección se han presentado en el Congreso no tienen posibilidad de adoptarse y que se está negociando un nuevo texto (arts. 2, 12, 14 y 16).

**El Comité recomienda que el Estado parte establezca una comisión independiente para la búsqueda de las personas víctimas de desaparición forzada durante el conflicto armado interno, que se ajuste a los estándares internacionales de derechos humanos y posea facultades y recursos suficientes para llevar adelante sus funciones de manera efectiva. Asimismo, le recomienda que cree un registro nacional de personas desaparecidas para facilitar dicha búsqueda y que vele por que todas las personas involucradas en el proceso reciban apoyo adecuado.**

**Violencia contra la mujer**

13. Mientras valora las medidas legislativas y de otra índole adoptadas por el Estado parte para prevenir y sancionar la violencia contra la mujer, en particular la tipificación del delito de femicidio, el Comité nota con honda preocupación que, a pesar de su anterior recomendación (párr. 16), los niveles de violencia contra la mujer, incluidos asesinatos, continúan siendo elevados. En ese sentido, el Comité observa con profunda inquietud que, según el Instituto Nacional de Ciencias Forenses, se habrían registrado 709 muertes violentas de mujeres en 2012 y 200 entre enero y marzo de 2013. Asimismo, y si bien reconoce los avances en materia de investigación y persecución penal, el Comité también nota con preocupación el escaso número de condenas sobre delitos relativos a violencia contra las mujeres (arts. 1, 2, 12, 13, 14 y 16).

**El Comité  insta al Estado parte a:**

**a)    Redoblar sus esfuerzos para prevenir y combatir la violencia contra las mujeres, incluidos los asesinatos por motivos de género; garantizar la plena y efectiva aplicación de la legislación vigente en la materia; y asegurar la coordinación efectiva entre las distintas entidades que tienen un rol en el abordaje de la violencia contra las mujeres;**

**b)    Velar por que todos los actos de violencia contra las mujeres sean investigados sin demora, de manera eficaz e imparcial y porque los autores sean enjuiciados y sancionados de conformidad con la gravedad de sus actos;**

**c)    Garantizar que las víctimas obtengan una reparación adecuada, que incluya servicios de rehabilitación física y psicológica, y tengan acceso a albergues que las acojan y brinden apoyo que estén disponibles en todas las regiones del país; y**

**d)    Realizar amplias campañas de sensibilización dirigidas al público en general y extender y reforzar los programas de formación y capacitación existentes de modo de garantizar que todos los agentes de las fuerzas del orden, jueces, abogados y trabajadores sociales y de la salud estén preparados para responder de manera eficaz a todos los casos de violencia contra las mujeres.**

**Defensores de los derechos humanos**

14. El Comité  continúa preocupado porque, a pesar de las recomendaciones de numerosos mecanismos de supervisión de derechos humanos, el número de amenazas y ataques, incluidos asesinatos, contra defensores de derechos humanos, en particular los defensores de los derechos de los pueblos indígenas y aquellos que trabajan con cuestiones relativas al derecho a la tierra, los derechos laborales y el medio ambiente, sigue siendo muy elevado.  Al respecto, el Comité nota con preocupación la información que da cuenta de que, entre enero y octubre de 2012, se habrían registrado 15 asesinatos de defensores de derechos humanos. Le preocupan además los

DHSFF0692

informes sobre el limitado número de condenas relativas a crímenes cometidos contra defensores de derechos humanos. Asimismo, el Comité nota con preocupación las informaciones que dan cuenta de las campañas de desacreditación de sus actividades, incluso a través de los medios de comunicación, y del uso del sistema penal para perseguirles (arts. 2, 12, 13 y 16).

**El Comité exhorta al Estado parte a reconocer públicamente el papel esencial que desempeñan los defensores de derechos humanos ayudándolo a cumplir con sus obligaciones dimanantes de la Convención, a adoptar las medidas necesarias para facilitar su trabajo y, recordando su anterior recomendación (párr. 12), lo insta a:**

   a) **Redoblar sus esfuerzos para garantizar la eficaz protección, seguridad e integridad física de los defensores de derechos humanos frente a las amenazas y los ataques a los que podrían exponerles sus actividades;**

   b) **Asegurar la investigación pronta, exhaustiva y eficaz de todas las amenazas y ataques cometidos contra defensores de derechos humanos, y que los responsables sean enjuiciados y castigados con sanciones acordes con la gravedad de sus actos; y**

   c) **Garantizar la permanencia de la Instancia de Análisis de Ataques contra Defensores de Derechos Humanos.**

**Seguridad interior**

16. El Comité nota con preocupación que, no obstante sus recomendaciones anteriores y los esfuerzos realizados por el Estado parte para reforzarla, la Policía Nacional Civil (PNC) aún no cuenta con recursos suficientes para cumplir con sus funciones de manera eficaz. Preocupa también al Comité la información que da cuenta de que la presencia del Ejército en tareas de seguridad ciudadana se ha incrementado; que ha sido utilizado incluso en relación con conflictos sociales relacionados *inter alia* con reclamos de comunidades indígenas, y que en algunos casos su intervención ha culminado con personas privadas de su vida o con heridas. En ese sentido, el Comité deplora los acontecimientos que tuvieron lugar en octubre de 2012 en Totonicapán, en los que miembros del Ejército dispararon contra un grupo de manifestantes indígenas que habían cortado una carretera, matando a seis de ellos e hiriendo a más de 30, y espera que se avance en el esclarecimiento y enjuiciamiento de los responsables de estos hechos. El Comité toma nota de la afirmación de la delegación de que la cooperación del Ejército con la PNC continuará en tanto no se logre alcanzar el número de efectivos que ésta requiere. Asimismo, el Comité está preocupado por el creciente número de agentes de seguridad privada, que superaría al de la PNC (art. 2).

**El Comité:**

   a) **Reiterando su anterior recomendación (párr. 11), insta al Estado parte a redoblar sus esfuerzos con miras a reforzar la PNC a la mayor brevedad posible, en particular dotándola de recursos humanos y financieros adecuados, con miras a asegurar el pronto término de la intervención del Ejército en actividades relacionadas con la seguridad pública; y a garantizar que no subsistan disposiciones legales que autoricen al Ejército a intervenir en actividades netamente policiales y de prevención de la criminalidad común que corresponden únicamente a la PNC;**

   b) **Recomienda que el Estado parte asegure que todas las empresas de seguridad privada cumplan con el registro obligatorio establecido por la legislación vigente y que sus actividades estén sujetas a una adecuada supervisión y rendición de cuentas; y**

14

    **c)**    **Exhorta al Estado parte a garantizar que, en caso de que los servidores públicos o los miembros de las empresas privadas de seguridad cometan abusos o violaciones a los derechos humanos, los mismos sean investigados de una manera pronta, independiente y eficaz; los autores enjuiciados y sancionados con penas que se ajusten a la gravedad de sus actos; y las víctimas reciban una reparación adecuada que incluya los medios para su rehabilitación física y psicológica.**

**Condiciones de detención**

18. Al Comité le preocupan los informes sobre las malas condiciones existentes en los centros de privación de la libertad, incluidos los centros para mujeres, y, en particular, las elevadas tasas de hacinamiento que superarían el 200%. Asimismo, le preocupa las informaciones que describen situaciones de violencia entre reclusos y que dan cuenta de que grupos organizados de reclusos tendrían el control de numerosos centros de privación de la libertad y que, actuando con aquiescencia de las autoridades, obligarían a otros reclusos a realizar pagos para no hacerles daño o liberarlos de tareas, práctica conocida como "talacha", agrediendo a quienes no pueden realizar dichos pagos y, en algunos casos, provocándoles la muerte. Al respecto, el Comité observa con preocupación los fallecimientos de los Sres. Víctor Rojas y Efraín Pérez en 2012 debido a las golpizas que sufrieron por no poder pagar la "talacha". El Comité toma nota de la información brindada por la delegación según la cual se están adoptando medidas con miras a mejorar las condiciones de detención y encontrar una solución integral al problema del hacinamiento (arts. 2, 11 y 16).

**El Comité insta al Estado parte a que acelere y profundice sus esfuerzos para reducir el hacinamiento, en particular mediante la aplicación de disposiciones sustitutivas de la privación de libertad, en consonancia con las Reglas de Tokio. El Comité recomienda además que asegure que las condiciones en los centros penitenciarios sean compatibles con las Reglas mínimas para el tratamiento de los reclusos (Res. 663C (XXIV), de 31 de julio de 1957, y 2076 (LXII), de 13 de mayo de 1977, aprobadas por el Consejo Económico y Social, ECOSOC) y las Reglas de las Naciones Unidas para el tratamiento de las reclusas y medidas no privativas de libertad para las mujeres delincuentes (Reglas de Bangkok, Res. 65/229, de 21 de diciembre de 2010, aprobada por la Asamblea General). Asimismo, el Comité recomienda que el Estado parte asegure su autoridad y responsabilidad por el trato humano de las personas ingresadas en los centros de privación de la libertad e intensifique sus esfuerzos con miras a erradicar la práctica del control de esos centros por parte de grupos organizados de reclusos; asegure que se investiguen de forma exhaustiva e imparcial todos los casos de violencia cometidos en tales centros, incluidos torturas y malos tratos, y que los autores sean enjuiciados y, en caso de ser declarados culpables, sancionados de conformidad con la gravedad de sus actos; y vele por que las personas privadas de libertad tengan acceso a un mecanismo de denuncia independiente.**

**Comunidad de lesbianas, homosexuales, bisexuales y transexuales**

22. El Comité, mientras toma nota de la afirmación de la delegación del Estado parte de que se ha comenzado a abordar el tema, observa con inquietud los informes sobre actos de discriminación contra personas lesbianas, homosexuales, bisexuales y transexuales (arts. 2, 10, 12, 13 y 16).

**El Comité recomienda que el Estado parte adopte medidas efectivas para proteger a las personas lesbianas, homosexuales, bisexuales y transexuales contra los actos de discriminación y agresiones de que podrían ser objeto, y velar por que todos los casos de**

15

**violencia sean, sin demora y de manera efectiva e imparcial, objeto de investigación, enjuiciamiento y sanciones, y por que las víctimas obtengan una reparación adecuada. El Comité remite al Estado parte al apartado V, sobre protección de las personas y los grupos que resultan vulnerables a causa de la discriminación o la marginación, de su Observación General Nº 2 (2007), relativa a la aplicación del artículo 2 de la Convención.**

## Human Rights Committee

Concluding Observations (19 April 2012) CCPR/C/GTM/CO/3

### C. Principal subjects of concern and recommendations

10. The Committee is concerned at the continuing de facto exclusion of indigenous and Afro-descendent workers in all areas, including land ownership, access to basic services, labour conditions, access to the formal economy and justice, participation in decision-making forums and State institutions and representation in the media and in the public debate. The Committee regrets the lack of appropriate criminalization of acts of discrimination and xenophobia suffered by indigenous and Afro-descendent persons, as a result of which the crime of discrimination applies only to acts that impede or hinder the exercise of a legally constituted right (arts. 3, 26 and 27).

**The State party should continue its efforts to eradicate stereotypes and discrimination against indigenous and Afro-descendent persons by, inter alia, carrying out more education campaigns to promote tolerance and respect for diversity. The State party should adopt measures to promote equal opportunity and access to services through appropriate efforts to resolve existing inequalities. Lastly, the State party should amend article 202 bis of the Criminal Code to ensure the investigation of acts of racial discrimination, the prosecution and punishment of the perpetrators, and adequate compensation for the victims so that it is not necessary to establish that those acts impede or hinder the exercise of one or more rights in order to constitute an offence.**

11. The Committee is concerned at the discrimination and violence suffered by lesbian, gay, bisexual, transgender and intersex persons and rejects all violations of their human rights on the basis of their sexual orientation or gender identity (arts. 3, 6, 7 and 26).
**The State party should state clearly and officially that it does not tolerate any form of social stigmatization of homosexuality, bisexuality or transexuality, or harassment of or discrimination or violence against persons because of their sexual orientation or gender identity. The State party should ensure the investigation, prosecution and punishment of any act of discrimination or violence motivated by the victim's sexual orientation or gender identity.**

12. The Committee is concerned at the increase in levels of violence in the State party, mainly as a result of drug trafficking, the proliferation of firearms and growing social inequality. The Committee regrets the increase in repressive measures, which leads to further stigmatization and limitation of the exercise of civil rights. In that connection, the Committee is concerned at the frequency with which the State party has declared states of emergency under the Public Order Act, when they should be considered as an exceptional measure (arts. 4 and 6).

16

**The State party should adopt a comprehensive strategy that includes the prevention, control and appropriate punishment of violence, ensuring the full exercise of the rights of all persons as established in the Covenant. From that standpoint, the State party should promote preventive measures, focusing its security policies on the perspective of the human rights of the victims and the victimizers involved in criminal acts. It should also amend the 1965 Public Order Act so as to strictly limit the use of states of emergency, ensure systematic compliance with all the conditions set out in article 4 of the Covenant, and give priority to actions that have a greater impact on preventing violence.**

19. The Committee welcomes the State party's efforts to increase awareness of acts of sexual and gender-based violence, in particular femicide, domestic violence and trafficking in persons, and to prevent and punish them. However, the Committee is concerned at the persistence of very high levels of violence against women. The Committee is also concerned at the frequent inadequacy of the investigation mechanisms used by law enforcement officials and forensic doctors and the small number of treatment centres, which are the only support available to women survivors of violence (arts. 6, 7, 8, 14 and 26).

**The State party should continue its efforts to prevent sexual and gender-based violence and to encourage the victims to report such acts. The State party should ensure the inclusion of the issue of protection of women against violence in school curricula. It should also strengthen and institutionalize a training course with a gender perspective, which should be mandatory for all legal and law enforcement officials and health service personnel, in order to ensure that they are able to respond effectively to all forms of violence against women. Specific attention should be given to the collection of forensic evidence, treatment of victims, coordination between the authorities responsible for investigation, punishment and victim protection. In addition, the State party should ensure that all victims of sexual or gender-based violence have access to treatment centres or shelters.**

21. The Committee is concerned that, despite the years that have passed since the end of the armed conflict, thousands of families of disappeared persons still do not know the whereabouts of their loved ones. The Committee regrets that no national commission of inquiry has yet been established, as set out in draft act No. 3590, and that there is no single centralized registry of disappeared persons. However, the Committee takes note of the State party's commitment, during the public meeting on consideration of the report, to include the adoption of the aforementioned Act in the legislative agenda of Congress (arts. 6 and 14).

**In order to promote and facilitate the mechanisms for justice, truth and reparation for victims of forced disappearances committed during the armed conflict, the State party should adopt draft act No. 3590 on the establishment of a national commission to investigate the whereabouts of disappeared persons, provide it with the necessary human and material resources and establish a single centralized registry of disappeared persons.**

23. The Committee reiterates its concern at the fact that the State party has not yet brought the definition of the crime of torture in the Criminal Code into line with international standards. The Committee is also concerned that the police and the judiciary do not have reliable records of cases of torture (art. 7).

**The State party should review its legislation, in particular articles 201 bis and 425 of the Criminal Code, in order to define the crime of torture in accordance with international standards. The State party should ensure that any alleged act of torture or any instance**

DHSFF0696

of cruel, inhuman or degrading treatment is duly recorded, prosecuted and punished in a manner proportionate to its severity.

### III.   Special Procedures

**Report of the Special Rapporteur on the sale of children, child prostitution and child pornography**

Mission to Guatemala (21 January 2013) A/HRC/22/54/Add.1

**114. With regard to the legal framework, the Special Rapporteur recommends that the Government should continue its revision to prohibit, prevent and respond to all forms of sale and sexual exploitation of children, and ensure effective implementation through:**

    **[…]**

    **(a)   Harmonization of national legal (civil and penal) and regulatory frameworks, including on the minimum age of marriage, with ratified international instruments, accompanied by binding mechanisms;**

    **[…]**

    **(e)   Increased awareness-raising and adequate training of judges, prosecutors, lawyers, police officers, teachers, social workers and medical and other professionals, civil society organizations, families, communities and children themselves regarding the rights, needs and best interests of the child;**

**115. With regard to the institutional framework, the Government should conduct a mapping of all institutions, programmes and actors involved in child protection, with a view to:**

    **(a)   Identifying: (i) best practices, and capitalizing on them; (ii) overlaps, and gearing them towards complementary interactions; and (iii) inefficiencies and gaps, in order to overcome them;**

    **(b)   Re-defining clear roles and responsibilities of concerned actors, as children's rights duty bearers, based on: (i) personnel competencies and backgrounds; (ii) clear terms of references; and (iii) mechanisms of accountability by area of intervention;**

    **(c)   Assessing and, when applicable, redefining the capacity of key formal and informal structures to develop, administer, effectively monitor and implement their child protection responsibilities in coordination;**

    **(d)   Establishing effective intersectorial coordination mechanisms, at central and local levels.**

DHSFF0697



meeting, contact Mr. Wayne Lundy at (202) 372–1379 or by email at *Wayne.M.Lundy@uscg.mil* as soon as possible.

Dated: November 14, 2019.

**J.G. Lantz,**

*Director of Commercial Regulations and Standards, U.S. Coast Guard.*

[FR Doc. 2019–25144 Filed 11–19–19; 8:45 am]

**BILLING CODE P**

---

## DEPARTMENT OF HOMELAND SECURITY

**Agreement Between the Government of the United States of America and the Government of the Republic of Guatemala on Cooperation Regarding the Examination of Protection Claims**

**AGENCY:** Office of Strategy, Policy, and Plans, Department of Homeland Security.

**ACTION:** Notice of agreement.

---

**SUMMARY:** The Department of Homeland Security is publishing the Agreement between the Government of the United States of America and the Government of the Republic of Guatemala on Cooperation Regarding the Examination of Protection Claims.

The text of the Agreement is set out below.

**Valerie Boyd,**

*Assistant Secretary for International Affairs, Office of Strategy, Policy, and Plans, U.S. Department of Homeland Security.*

**BILLING CODE 9110–9M–P**

---

# AGREEMENT
# BETWEEN
# THE GOVERNMENT OF THE UNITED STATES OF AMERICA
# AND
# THE GOVERNMENT OF THE REPUBLIC OF GUATEMALA
# ON COOPERATION REGARDING THE EXAMINATION OF PROTECTION CLAIMS

THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE REPUBLIC OF GUATEMALA, hereinafter referred to individually as "Party" or collectively "the Parties".

CONSIDERING that Guatemala regulates its relations with other countries in accordance with international principles, rules and practices, with the purpose of contributing to the maintenance of peace and freedom, the respect and defense of human rights, and the strengthening of democratic processes and international institutions that guarantee the mutual and equitable benefit among the states. On the other hand, Guatemala will maintain relations of friendship, solidarity and cooperation with those states whose economic, social and cultural development is analogous to that of Guatemala, such as the right of people to migrate and their need for protection.

WHEREAS Guatemala currently incorporates a dynamic immigration law into its domestic legislation, which requires Guatemala to recognize the right of every person to emigrate or immigrate, thereby allowing any migrant to enter, remain, transit, leave and return to its territory in accordance with its domestic laws. Likewise, in situations not provided for by domestic legislation, the norm that most favors the migrant must be applied. As such, temporary shelter and care should be given to those who wish to enter Guatemala legally. For the above reasons it is necessary to promote cooperation agreements with other states that uphold the same values outlined in Guatemala's migration policy, which is regulated by the National Migration Authority.

CONSIDERING that Guatemala is a party to the 1951 Convention relating to the Status of Refugees, done at Geneva on July 28, 1951 (the "1951 Convention") and the Protocol Relating to the Status of Refugees, done at New York on January 31, 1967 (the "1967 Protocol"), to which the United States of America is a party and reaffirming the obligation of the Parties to provide protection to refugees who meet the requirements and who are physically in their respective territories, in accordance with their obligations under those instruments and subject to the respective laws, treaties, and declarations of the Parties.

RECOGNIZING, in particular, the obligation of the Parties to comply with the principle of non-refoulement, as outlined in the 1951 Convention and the 1967 Protocol, as well as the Convention against Torture and Other Treatment or Cruel, Inhuman or Degrading Penalties, signed in New York on December 10, 1984 (the "Convention against Torture"), subject to the Parties respective reservations, understandings, and declarations and reaffirming their respective obligations to promote and protect human rights and fundamental freedoms consistent with their international obligations;

RECOGNIZING and respecting the obligations of each Party in accordance with its domestic laws

**64096**   **Federal Register** / Vol. 84, No. 224 / Wednesday, November 20, 2019 / Notices

and policies, and international agreements and arrangements;

UNDERSCORING that the United States and Guatemala offer refugee protection systems that are consistent with their obligations under the 1951 Convention and/or the 1967 Protocols;

DETERMINED to maintain the status of refuge or equivalent temporary protection, as an essential measure of the protection of refugees or asylees, and at the same time wishing to prevent fraud in the refugee or asylum application process –an action that undermines its legitimate purpose– and determined to strengthen the integrity of the official process for requesting asylum or refugee status as well as public support for said processes;

AWARE that the distribution of responsibility for requests for protection must guarantee in practice, that people in need of protection be identified and that violations of the basic principle of non-refoulement be avoided; and, therefore, committed to safeguarding for each applicant the status of refuge or asylum that meets the required conditions, access to a full and fair procedure for the determination of their claim;

AGREE to the following:

### ARTICLE 1

For the purposes of this Agreement:

1.  "Request for Protection" refers to the request of a person of any nationality, to the government of one of the Parties to receive protection in accordance with their respective institutional obligations derived from the 1951 Convention, the 1967 Protocol or the Convention against Torture, and in accordance with the respective laws and policies of the Parties, enforcing compliance with said international obligations; as well as to receive any other type of equivalent temporary protection available under the migration law of the receiving party.

2.  "Protection Applicant" refers to any person who submits a request for protection in the territory of one of the Parties.

3.  "System to Determine Protection" refers to the set of policies, laws, administrative and judicial practices that the Government of each Party uses to make a decision on requests for protection.

4.  "Unaccompanied Minor" refers to an applicant for protection who has not reached the age of eighteen (18) and whose parent or legal guardian is not present or available to provide care and physical custody in the United States, or in Guatemala, where the unaccompanied minor is located.

5.  In the case of Guatemala immigration, law and migration policy refers to the rights of persons to enter, remain, transit and leave its territory in accordance with its domestic laws

DHSFF0699

and international agreements and arrangements, and immigration stay means the authorized period of time according to the immigration status granted to individuals.

## ARTICLE 2

This Agreement does not apply to applicants for protection who are citizens or nationals of Guatemala; or stateless individuals habitually residing in Guatemala.

## ARTICLE 3

1. To ensure that protection applicants transferred to Guatemala by the United States have access to a system to determine protection, Guatemala will not return or expel applicants for protection in Guatemala, unless the application is abandoned by the applicant or is formally rejected through an administrative decision.

2. During the transfer process, the persons subject to this Agreement will be the responsibility of the United States until the transfer process is completed.

## ARTICLE 4

1. The responsibility for determining and concluding requests for protection within its territory shall rest with the United States, when the United States establishes that that person:

   a. is an unaccompanied minor; or

   b. has arrived in the territory of the United States:

      i. with a validly-issued visa or other valid admission document, other than a transit visa, issued by the United States; or

      ii. without the United States requiring him to obtain a visa.

2. Notwithstanding paragraph 1 of this article, Guatemala will evaluate the request for protection on an individual basis, in accordance with what is established and authorized by the competent authority on immigration matters in its migration policies and laws and in its territory, of persons who meet the appropriate requirements under this Agreement and who arrive in the United States at a port of entry or between ports of entry, on or after the effective date of this Agreement. Guatemala will evaluate the request for protection, in keeping with the Initial Implementation Plan and the standard operating procedures referenced in Article 7.1 and 7.5.

3. The Parties shall apply this Agreement with respect to unaccompanied minors, in accordance with their respective domestic laws.

4.  The Parties shall have procedures in place to ensure that the transfers from the United States to Guatemala of the persons covered by this Agreement are compatible with their respective obligations, domestic and international laws, and migration policies.]

5.  The United States shall make the final decision that an individual qualifies for an exception under Articles 4 and 5 of this Agreement.

### ARTICLE 5

Notwithstanding any provision of this Agreement, any Party may, at its discretion, examine any request for protection that has been submitted to that Party when it decides that it is in the public interest to do so.

### ARTICLE 6

The Parties may:

1.  Exchange information when necessary for the effective implementation of this Agreement, subject to national laws and regulations. Such information will not be disclosed by the recipient country except in accordance with its national laws and regulations.

2.  The Parties may regularly exchange information regarding laws, regulations, and practices related to their respective systems to determine migration protection.

### ARTICLE 7

1.  The Parties shall develop standard operating procedures to assist in the implementation of this Agreement. These procedures shall incorporate provisions to notify Guatemala in advance of the transfer of any person pursuant to this Agreement. The United States will collaborate with Guatemala to identify the appropriate individuals to be transferred to Guatemala's territory.

2.  The operating procedures shall incorporate mechanisms to resolve disputes that respect the interpretation and implementation of the terms of this Agreement. Unforeseen cases that cannot be resolved through these mechanisms will be resolved through diplomatic channels.

3.  The United States plans to cooperate to strengthen the institutional capacities of Guatemala.

4.  The Parties agree to regularly evaluate this Agreement and its implementation to correct any deficiencies found. The evaluations will be carried out jointly by the Parties, the first within a maximum period of three (3) months from the date of entry into operation of the Agreement with following evaluations occurring by the same terms. The Parties may invite, by mutual agreement, other relevant organizations with specialized knowledge on the subject, to participate in the initial evaluation and/or cooperate for the implementation of this Agreement.

DHSFF0701

5. The Parties intend to complete an initial implementation plan, which will contain gradual steps, and address, among other things: (a) procedures necessary to effectuate the transfer of individuals under this agreement; (b) the volume or number of individuals to be transferred; and (c) institutional capacity requirements. The Parties plan to operationalize this Agreement upon the completion of a phased implementation plan.

## ARTICLE 8

1. This Agreement shall enter into force by means of an exchange of notes between the Parties indicating that each party has complied with the necessary domestic legal procedures for the Agreement to enter into force. For the term of two (2) years, renewable before its expiration with the exchange of diplomatic notes.

2. Any Party may terminate this Agreement by giving written notice to the other Party three (3) months in advance.

3. Any Party may, immediately after notifying the other Party in writing, suspend for an initial period of up to three (3) months the implementation of this Agreement. This suspension may be extended for additional periods of up to three (3) months, by means of written notification to the other Party. Any Party may, with the written consent of the other, suspend any part of this Agreement.

4. The Parties may in writing, by mutual agreement, make any modification or addition to this Agreement. These shall enter into force in accordance with the relevant legal procedures of each Party and the amendment or addition shall constitute an integral part of this Agreement.

5. Nothing in this Agreement shall be construed in such a way as to oblige the Parties to disburse or obligate funds.

IN FAITH WHEREOF, the undersigned, duly authorized by their respective governments, sign this Agreement.

SIGNED on the 26 day of July of the year 2019 in the English and Spanish languages, with both texts being authentic.

FOR THE GOVERNMENT OF THE UNITED STATES OF AMERICA:
Kevin K. McAleenan
Acting Secretary of Homeland Security

FOR THE GOVERNMENT OF THE REPUBLIC OF GUATEMALA:
Enrique A. Degenhart Asturias
Minister of Government

[FR Doc. 2019–25288 Filed 11–18–19; 4:15 pm]
BILLING CODE 9110–9M–C

---

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

[Docket No. FWS–HQ–IA–2019–0102; FXIA16710900000–201–FF09A30000]

### Foreign Endangered Species; Wild Bird Conservation Act; Receipt of Permit Applications

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Notice of receipt of permit applications; request for comments.

**SUMMARY:** We, the U.S. Fish and Wildlife Service, invite the public to comment on applications to conduct certain activities with foreign species that are listed as endangered under the Endangered Species Act (ESA). With some exceptions, the ESA prohibits activities with listed species unless Federal authorization is issued that allows such activities. The ESA also requires that we invite public comment before issuing permits for any activity otherwise prohibited by the ESA with respect to any endangered species. We also invite comment on an application for approval to conduct certain activities with a foreign bird species covered under the Wild Bird Conservation Act.

**DATES:** We must receive comments by December 20, 2019.

**ADDRESSES:**

*Obtaining Documents:* The applications, application supporting materials, and any comments and other materials that we receive will be available for public inspection at *http://www.regulations.gov* in Docket No. FWS–HQ–IA–2019–0102.

*Submitting Comments:* When submitting comments, please specify the name of the applicant and the permit number at the beginning of your comment. You may submit comments by one of the following methods:

• *Internet: http://www.regulations.gov.* Search for and submit comments on Docket No. FWS–HQ–IA–2019–0102.

• *U.S. mail or hand-delivery:* Public Comments Processing, Attn: Docket No. FWS–HQ–IA–2019–0102; U.S. Fish and

DHSFF0702



## Advisory Opinion on the Extraterritorial Application of *Non-Refoulement* Obligations under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol[*]

### Introduction

1.      In this advisory opinion, the Office of the United Nations High Commissioner for Refugees ("UNHCR") addresses the question of the extraterritorial application of the principle of *non-refoulement* under the 1951 Convention relating to the Status of Refugees[1] and its 1967 Protocol.[2]

2.      Part I of the opinion provides an overview of States' *non-refoulement* obligations with regard to refugees and asylum-seekers under international refugee and human rights law. Part II focuses more specifically on the extraterritorial application of these obligations and sets out UNHCR's position with regard to the territorial scope of States' *non-refoulement* obligations under the 1951 Convention and its 1967 Protocol.

3.      UNHCR has been charged by the United Nations General Assembly with the responsibility of providing international protection to refugees and other persons within its mandate and of seeking permanent solutions to the problem of refugees by assisting governments and private organizations.[3] As set forth in its Statute, UNHCR fulfils its international protection mandate by, *inter alia*, "[p]romoting the conclusion and ratification of international conventions for the protection of refugees, supervising their application and proposing amendments thereto."[4] UNHCR's supervisory responsibility under its Statute is mirrored in Article 35 of the 1951 Convention and Article II of the 1967 Protocol.

4.      The views of UNHCR are informed by over 50 years of experience supervising international refugee instruments. UNHCR is represented in 116 countries. It provides guidance in connection with the establishment and implementation of national procedures for refugee status determinations and also conducts such determinations under its own mandate. UNHCR's interpretation of the provisions of the 1951

---

[*]   This Opinion was prepared in response to a request for UNHCR's position on the extraterritorial application of the *non-refoulement* obligations under the 1951 Convention Relating to the Status of Refugees and its 1967 Protocol. The Office's views as set out in the Advisory Opinion are offered in a broad perspective, given the relevance of the legal questions involved to a variety of situations outside a State's national territory.

[1]   The 1951 Convention relating to the Status of Refugees, 189 U.N.T.S. 137, *entered into force* 22 April 1954 [hereinafter "1951 Convention"].

[2]   The 1967 Protocol relating to the Status of Refugees, 606 U.N.T.S. 267, *entered into force* 4 October 1967 [hereinafter "1967 Protocol"].

[3]   See: *Statute of the Office of the United Nations High Commissioner for Refugees*, G.A. Res. 428(V), Annex, U.N. Doc. A/1775, para. 1 (1950).

[4]   *Id.*, para. 8(a).

DHSFF0790



Convention and 1967 Protocol is considered an authoritative view which should be taken into account when deciding on questions of refugee law.

## I. NON-REFOULEMENT OBLIGATIONS UNDER INTERNATIONAL LAW

### A.      The Principle of *Non-Refoulement* Under International Refugee Law

### 1.      *Non-Refoulement* Obligations Under International Refugee Treaties

*(i)      The 1951 Convention Relating to the Status of Refugees and its 1967 Protocol*

5.      The principle of *non-refoulement* constitutes the cornerstone of international refugee protection. It is enshrined in Article 33 of the 1951 Convention, which is also binding on States Party to the 1967 Protocol.[5] Article 33(1) of the 1951 Convention provides:

> "No Contracting State shall expel or return ("*refouler*") a refugee in any manner whatsoever to the frontiers of territories where his [or her] life or freedom would be threatened on account of his [or her] race, religion, nationality, membership of a particular social group or political opinion."

6.      The protection against *refoulement* under Article 33(1) applies to any person who is a refugee under the terms of the 1951 Convention, that is, anyone who meets the requirements of the refugee definition contained in Article 1A(2) of the 1951 Convention (the "inclusion" criteria)[6] and does not come within the scope of one of its exclusion provisions.[7] Given that a person is a refugee within the meaning of the 1951 Convention as soon as he or she fulfills the criteria contained in the refugee definition, refugee status determination is declaratory in nature: a person does not become a refugee because of recognition, but is recognized because he or she is a refugee.[8] It follows that the principle of *non-refoulement* applies not only to recognized refugees, but also to

---

[5]   Article I(1) of the 1967 Protocol provides that the States Party to the Protocol undertake to apply Articles 2–34 of the 1951 Convention.

[6]   Under this provision, which is also incorporated into Article 1 of the 1967 Protocol, the term "refugee" shall apply to any person who "owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his [or her] nationality and is unable or, owing to such fear, unwilling to avail him [or her]self of the protection of that country; or who, not having a nationality and being outside the country of his [or her] habitual residence is unable or, owing to such fear, unwilling to return to it".

[7]   Exclusion from international refugee protection means denial of refugee status to persons who come within the scope of Article 1A(2) of the 1951 Convention, but who are not eligible for protection under the Convention because

-   they are receiving protection or assistance from a UN agency other than UNHCR (first paragraph of Article 1D of the 1951 Convention); or because

-   they are not in need of international protection because they have been recognized by the authorities of another country in which they have taken residence as having the rights and obligations attached to the possession of its nationality (Article 1E of the 1951 Convention); or because

-   they are deemed undeserving of international protection on the grounds that there are serious reasons for considering that they have committed certain serious crimes or heinous acts (Article 1F of the 1951 Convention).

[8]   See: UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status*, 1979, Reedited Geneva 1992, para. 28.



those who have not had their status formally declared.[9] The principle of *non-refoulement* is of particular relevance to asylum-seekers. As such persons may be refugees, it is an established principle of international refugee law that they should not be returned or expelled pending a final determination of their status.

7.      The prohibition of *refoulement* to a danger of persecution under international refugee law is applicable to any form of forcible removal, including deportation, expulsion, extradition, informal transfer or "renditions", and non-admission at the border in the circumstances described below. This is evident from the wording of Article 33(1) of the 1951 Convention, which refers to expulsion or return (*refoulement*) "in any manner whatsoever".[10] It applies not only in respect of return to the country of origin or, in the case of a stateless person, the country of former habitual residence, but also to any other place where a person has reason to fear threats to his or her life or freedom related to one or more of the grounds set out in the 1951 Convention, or from where he or she risks being sent to such a risk.[11]

8.      The principle of *non-refoulement* as provided for in Article 33(1) of the 1951 Convention does not, as such, entail a right of the individual to be granted asylum in a particular State.[12] It does mean, however, that where States are not prepared to grant asylum to persons who are seeking international protection on their territory, they must adopt a course that does not result in their removal, directly or indirectly, to a place where their lives or freedom would be in danger on account of their race, religion, nationality, membership of a particular social group or political opinion.[13] As a general rule, in order to give effect to their obligations under the 1951 Convention and/or 1967 Protocol, States will be required to grant individuals seeking international protection access to the territory and to fair and efficient asylum procedures.[14]

---

[9]    This has been reaffirmed by the Executive Committee of UNHCR, for example, in its Conclusion No. 6 (XXVIII) "*Non-refoulement*" (1977), para. (c) (reaffirming "the fundamental importance of the principle of *non-refoulement* … of persons who may be subjected to persecution if returned to their country of origin irrespective of whether or not they have been formally recognized as refugees."). The UNHCR Executive Committee is an intergovernmental group currently consisting of 70 Member States of the United Nations (including the United States) and the Holy See that advises the UNHCR in the exercise of its protection mandate. While its Conclusions are not formally binding on States, they are relevant to the interpretation and application of the international refugee protection regime. Conclusions of the Executive Committee constitute expressions of opinion which are broadly representative of the views of the international community. The specialized knowledge of the Committee and the fact that its conclusions are reached by consensus adds further weight. UNHCR Executive Committee Conclusions are available at http://www.unhcr.org/cgi-bin/texis/vtx/doclist?page=excom&id=3bb1cd174 (last visited on 26 October 2006).

[10]   The meaning of the terms "expel or return ("*refouler*")" in Article 33(1) is also discussed *infra* at Part II.A.

[11]   See: UNHCR, *Note on Non-Refoulement* (EC/SCP/2), 1977, para. 4. See also P. Weis, *The Refugee Convention, 1951: The Travaux Préparatoires Analysed with a Commentary by Dr. Paul Weis*, Cambridge University Press, Cambridge (1995), at p. 341.

[12]   See: P. Weis, *supra* footnote 11, at p. 342.

[13]   This could include, for example, removal to a safe third country or some other solution such as temporary protection or refuge under certain circumstances. *See* E. Lauterpacht and D. Bethlehem, "The scope and content of the principle of *non-refoulement: Opinion*", in E. Feller, V. Türk and F. Nicholson (eds.), *Refugee Protection in International Law: UNHCR's Global Consultations on International Protection*, Cambridge University Press, Cambridge (2003), para. 76.

[14]   The 1951 Convention and the 1967 Protocol define those to whom international protection is to be conferred and establish key principles such as non-penalisation of entry (Article 31) and *non-refoulement* (Article 33). However, they do not set out procedures for the determination of refugee status as such. Yet it is generally recognised that fair and efficient procedures are an essential element

 UNHCR

9.      The *non-refoulement* obligation under Article 33 of the 1951 Convention is binding on all organs of a State party to the 1951 Convention and/or the 1967 Protocol[15] as well as any other person or entity acting on its behalf.[16] As discussed in more detail in Part II below, the obligation under Article 33(1) of the 1951 Convention not to send a refugee or asylum-seeker to a country where he or she may be at risk of persecution is not subject to territorial restrictions; it applies wherever the State in question exercises jurisdiction.

10.     Exceptions to the principle of *non-refoulement* under the 1951 Convention are permitted only in the circumstances expressly provided for in Article 33(2), which stipulates that:

> "The benefit of [Article 33(1)] may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he [or she] is, or who, having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country."

The application of this provision requires an individualized determination by the country in which the refugee is that he or she comes within one of the two categories provided for under Article 33(2) of the 1951 Convention.[17]

11.     The provisions of Article 33(2) of the 1951 Convention do not affect the host State's *non-refoulement* obligations under international human rights law, which permit no exceptions. Thus, the host State would be barred from removing a refugee if this

---

in the full and inclusive application of the 1951 Convention outside the context of mass influx situations. *See* UNHCR, Asylum Processes (Fair and Efficient Asylum Procedures), EC/GC/01/12, 31 May 2001, paras. 4–5. See also Executive Committee, Conclusion No. 81 (XLVIII) *"General"* (1997), para. (h); Conclusion No. 82 (XLVIII), *"Safeguarding Asylum"* (1997), para. (d)(iii); Conclusion No. 85 (XLIX), *"International Protection"* (1998), para. (q); Conclusion No. 99 (LV), *"General Conclusion on International Protection"* (2004), para. (l).

[15]   See *supra* footnote 5.

[16]   Under applicable rules of international law, this applies to the acts, or omissions, of all organs, sub-divisions and persons exercising governmental authority in legislative, judicial or executive functions, and acting in that capacity in the particular instance, as well as to the conduct of organs placed at the disposal of a State by another State, even if they exceed their authority or contravene instructions. Pursuant to Articles 4–8 of the Articles of State Responsibility, the conduct of a person or group of persons shall be considered an act of a State under international law if the person or group of persons is in fact acting on the instructions of, or under the direction or control of, that State in carrying out the conduct (*Articles on State Responsibility*, Articles 4–8). The Articles of State Responsibility were adopted by the International Law Commission without a vote and with consensus on virtually all points. The Articles and their commentaries were subsequently referred to the General Assembly with the recommendation that the General Assembly initially take note of and annex the text of the articles in a resolution, reserving to a later session the question whether the articles should be embodied in a convention on State responsibility. *See* J. Crawford, *The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentary.* Cambridge University Press, UK: 2002. The General Assembly annexed the Articles on State Responsibility to its resolution 56/83 of 12 December 2001 on Responsibility of States for Internationally Wrongful Acts.

[17]   For a detailed discussion of the criteria which must be met for Article 33(2) of the 1951 Convention to apply, *see* E. Lauterpacht and D. Bethlehem, *supra* footnote 13, paras. 145–192. On the "danger to the security" exception, *see also "Factum of the Intervenor, UNHCR, Suresh v. the Minister of Citizenship and Immigration; the Attorney General of Canada, SCC No. 27790"* (hereinafter: "UNHCR, *Suresh Factum*"), in 14:1 International Journal of Refugee Law (2002).



would result in exposing him or her, for example, to a substantial risk of torture.[18] Similar considerations apply with regard to the prohibition of *refoulement* to other forms of irreparable harm.[19]

12.     Within the framework of the 1951 Convention/1967 Protocol, the principle of *non-refoulement* constitutes an essential and non-derogable component of international refugee protection. The central importance of the obligation not to return a refugee to a risk of persecution is reflected in Article 42(1) of the 1951 Convention and Article VII(1) of the 1967 Protocol, which list Article 33 as one of the provisions of the 1951 Convention to which no reservations are permitted. The fundamental and non-derogable character of the principle of *non-refoulement* has also been reaffirmed by the Executive Committee of UNHCR in numerous Conclusions since 1977.[20] Similarly, the General Assembly has called upon States "to respect the fundamental principle of *non-refoulement*, which is not subject to derogation."[21]

*(ii)     Other International Instruments*

13.     States' *non-refoulement* obligations with respect to refugees are also found in regional treaties, notably the 1969 OAU Convention Governing Specific Aspects of Refugee Problems in Africa[22] and the 1969 American Convention on Human Rights.[23]

---

[18]   See: UNHCR, *Suresh Factum*, *supra* footnote 17, paras. 18–50; E. Lauterpacht and D. Bethlehem, *supra* footnote 13, para. 159(ii), 166 and 179.

[19]   See the discussion of *non-refoulement* obligations under international human rights law *infra* at Part IB.

[20]   See, for example, Executive Committee, Conclusion No. 6 (XXVIII), *supra* footnote 9, para. (c) (reaffirming "the fundamental humanitarian principle of *non-refoulement* has found expression in various international instruments adopted at the universal and regional levels and is generally accepted by States." ); Conclusion No. 17 (XXXI) *"Problems of extradition affecting refugees"* (1980), at. para (b) (reaffirming "the fundamental character of the generally recognized principle of *non-refoulement.");* Conclusion No. 25 (XXXIII) *"General"* (1982), para. (b) (reaffirming "the importance of the basic principles of international protection and in particular the principle of *non-refoulement* which was progressively acquiring the character of a peremptory rule of international law."); Conclusion No. 65 (XLII) *"General"* (1981), para. (c) (emphasizing "the primary importance of *non-refoulement* and asylum as cardinal principles of refugee protection…"); Conclusion No. 68 (XLIII) *"General"* (1982), para. (f) (reaffirming "the primary importance of the principles of *non-refoulement* and asylum as basic to refugee protection); No. 79 (XLVIII) "*General*" (1996), para. (j) (reaffirming "the fundamental importance of the principle of *non-refoulement*); No. 81 (XLVIII), *supra* footnote 14, para. (i) (recognizing "the fundamental importance of the principle of *non-refoulement*"); No. 103 (LVI) *"Provision of International Protection Including Through Complementary Forms of Protection"* (2005), at (m) (calling upon States "to respect the fundamental principle of *non-refoulement*").

[21]   See, for example, A/RES/51/75, 12 February 1997, para. 3; A/RES/52/132, 12 December 1997, at preambular para. 12.

[22]   OAU Convention Governing Specific Aspects of Refugee Problems in Africa, 1969, 1001 U.N.T.S. 45, *entered into force* 20 June 1974 [hereinafter, "1969 OAU Convention"]. Article II(3) reads: "No person shall be subjected by a Member State to measures such as rejection at the frontier, return or expulsion, which would compel him to return to or remain in a territory where his life, physical integrity or liberty would be threatened for the reasons set out in Article I, paras. 1 and 2 *[concerning persecution for reasons of race, religion, nationality, membership of a particular social group or political opinion or who is compelled to leave his country of origin or place of habitual residence in order to seek refuge from external aggression, occupation, foreign domination or events seriously disturbing public order]*."

[23]   1969 American Convention on Human Rights "Pact of San José, Costa Rica", 1144 U.N.T.S. 123, *entered into force* 18 July 1978 [hereinafter, "ACHR"]. Article 22(8) reads: "In no case may an alien be deported or returned to a country, regardless of whether or not it is his country of origin, if in that



*Non-refoulement* provisions modelled on Article 33(1) of the 1951 Convention have also been incorporated into extradition treaties[24] as well as a number of anti-terrorism conventions both at the universal and regional level.[25] Moreover, the principle of *non-refoulement* has been re-affirmed in the 1984 Cartagena Declaration on Refugees[26] and other, important non-binding international texts, including, in particular, the Declaration on Territorial Asylum adopted by the United Nations General Assembly on 14 December 1967.[27]

---

country his right to life or personal freedom is in danger of being violated because of his race, nationality, religion, social status, or political opinions."

[24] In the context of extradition, these provisions are usually referred to as "discrimination clauses". *See*, for example, Article 3(2) of the 1957 European Convention on Extradition, ETS 024, 359 U.N.T.S. 273 *entered into force* 18 April 1960 ("[Extradition shall not be granted] if the requested Party has substantial grounds for believing that a request for extradition for an ordinary criminal offence has been made for the purpose of prosecuting or punishing a person on account of his race, religion, nationality or political opinion, or that that person's position may be prejudiced for any of these reasons."); Article 4(5) of the 1981 Inter-American Convention on Extradition, 20 I.L.M. 723 (1981), *entered into force* 28 March 1992 ("Extradition shall not be granted … when, from the circumstances of the case, it can be inferred that persecution for reasons of race, religion or nationality is involved, or that the position of the person sought may be prejudiced for any of these reasons.")

[25] See, for example, Article 9(1) of the 1979 International Convention against the Taking of Hostages, 1316 U.N.T.S. 205, *entered into force* 3 June 1983 ("A request for the extradition of an alleged offender, pursuant to this Convention, shall not be granted if the requested State Party has substantial grounds for believing: (a) that the request for extradition for an offence set forth in article 1 has been made for the purpose of prosecuting or punishing a person on account of his race, religion, nationality, ethnic origin or political opinion; or (b) that the person's position may be prejudiced: (i) for any of the reasons mentioned in subpara. (a) of this para. …"). *See also* Article 12 of the 1997 International Convention for the Suppression of Terrorist Bombings, 37 I.L.M. 249 (1998), *entered into force* 23 May 2001 ("Nothing in this Convention shall be interpreted as imposing an obligation to extradite or to afford mutual legal assistance, if the requested State Party has substantial grounds for believing that the request for extradition for offences set forth in article 2 or for mutual legal assistance with respect to such offences has been made for the purpose of prosecuting or punishing a person on account of that person's race, religion, nationality, ethnic origin or political opinion or that compliance with the request would cause prejudice to that person's position for any of these reasons."), and the almost identical provisions in Article 15 of the 1999 International Convention for the Suppression of the Financing of Terrorism, 39 I.L.M. 270 (2000), *entered into force* 10 April 2002; Article 5 of the 1977 European Convention on the Suppression of Terrorism, ETS 090, 1137 U.N.T.S. 93, *entered into force* 4 August 1978; Article 14 of the 2002 Inter-American Convention against Terrorism, 42 I.L.M. 19 (2003), *entered into force* 7 October 2003.

[26] Cartagena Declaration on Refugees, 22 November 1984, Annual Report of the Inter-American Commission on Human Rights, OAS Doc. OEA/Ser.L/V/II.66/doc.10, rev. 1, at 190-93 (1984-85) [hereinafter, "Cartagena Declaration"]. The Conclusion set out in section III(5) reads: "To reiterate the importance and meaning of the principle of *non-refoulement* (including the prohibition of rejection at the frontier) as a corner-stone of the international protection of refugees…" While not legally binding, the provisions of the Cartagena Declaration have been incorporated into the legislation of numerous States in Latin America.

[27] A/RES/2312 (XXII), 14 December 1967, at Article 3 ( "No person referred to in Article 1, para. 1, shall be subjected to measures such as rejection at the frontier or, if he has already entered the territory in which he seeks asylum, expulsion or compulsory return to any State where he may be subjected to persecution."). *See also* Resolution (67) 14 on Asylum to Persons in Danger of Persecution, adopted by the Committee of Ministers of the Council of Europe on 29 June 1967, para. 2 (recommending that Governments should "…ensure […] that no one shall be subjected to refusal of admission at the frontier, rejection, expulsion or any other measure which would have the result of compelling him to return to, or remain in, a territory where he would be in danger of persecution.").



**2.    *Non-Refoulement* of Refugees Under Customary International Law**

14.    Article 38(1)(b) of the Statute of the International Court of Justice lists "international custom, as evidence of a general practice accepted as law", as one of the sources of law which it applies when deciding disputes in accordance with international law.[28] For a rule to become part of customary international law, two elements are required: consistent State practice and *opinio juris*, that is, the understanding held by States that the practice at issue is obligatory due to the existence of a rule requiring it.[29]

15.    UNHCR is of the view that the prohibition of *refoulement* of refugees, as enshrined in Article 33 of the 1951 Convention and complemented by *non-refoulement* obligations under international human rights law, satisfies these criteria and constitutes a rule of customary international law.[30] As such, it is binding on all States, including those which have not yet become party to the 1951 Convention and/or its 1967 Protocol.[31] In this regard, UNHCR notes, *inter alia*, the practice of non-signatory States hosting large numbers of refugees, often in mass influx situations.[32] Moreover, exercising its supervisory function,[33] UNHCR has closely followed the practice of Governments in relation to the application of the principle of *non-refoulement*, both by States Party to the 1951 Convention and/or 1967 Protocol and by States which have not adhered to either instrument. In UNHCR's experience, States have overwhelmingly indicated that they accept the principle of *non-refoulement* as binding, as demonstrated, *inter alia*, in numerous instances where States have responded to UNHCR's representations by providing explanations or justifications of cases of actual or intended *refoulement*, thus implicitly confirming their acceptance of the principle.[34]

---

[28]    Article 38(1) of the Statute of the International Court of Justice, 59 Stat. 1031, 1060 (1945).

[29]    See: International Court of Justice, *North Sea Continental Shelf, Judgment,* 1969 ICJ Reports, page 3, para. 74. See also International Court of Justice, *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America)*, Jurisdiction and Admissibility, 1984 ICJ Reports, page 392, para. 77.

[30]    See: UNHCR, *The Principle of Non-Refoulement as a Norm of Customary International Law,* Response to the Questions posed to UNHCR by the Federal Constitutional Court of the Federal Republic of Germany in cases 2 BvR 1938/93, 2 BvR 1953/93, 2 BvR 1954/93 (available at: http://www.unhcr.org/home/RSDLEGAL/437b6db64.html, last accessed on 30 October 2006); UNHCR, *Note on the Principle of Non-Refoulement (EU Seminar on the Implementation of the 1995 EU Resolution on Minimum Guarantees for Asylum Procedures)*, 1 November 1997 (available at: http://www.unhcr.org/home/RSDLEGAL/438c6d972.html, last accessed on 30 October 2006). *See also* New Zealand Court of Appeal, *Zaoui v. Attorney General*, 30 September 2004, (No 2) [2005] 1 NZLR 690, para. 34 ("The prohibition on refoulement, contained in art 33.1 of the Refugee Convention, is generally thought to be part of customary international law, the (unwritten) rules of international law binding on all States, which arise when States follow certain practices generally and consistently out of a sense of legal obligation.") and para. 136 ("The Refugee Convention is designed to protect refugees from persecution and the non-refoulement obligation is central to this function. It is non-derogable in terms of art 42.1 and, as discussed above at para [34] has become part of customary international law."). *See also* E. Lauterpacht and D. Bethlehem, *supra* footnote 13, paras. 193–219; G. Goodwin-Gill, *The Refugee in International Law*, 2nd edition, Oxford University Press (1996), at pp. 167–171.

[31]    The prohibition of *refoulement* of refugees under customary international law also applies, with regard to non-European refugees, in States which are party to the 1951 Convention, but which maintain the geographical limitation provided for Article 1B(1) of the Convention.

[32]    This is the case, for example, in Bangladesh, India, Pakistan and Thailand.

[33]    Under Paragraph 8 of the Statute of UNHCR, Article 35 of the 1951 Convention and Article II of the 1967 Protocol (see also *supra* footnote 3).

[34]    As noted by the International Court of Justice in *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. U.S.)*, Merits, 1986 ICJ Reports, page 14, para. 186, "[i]n order to deduce the existence of customary rules, the Court deems it sufficient that the conduct of States should, in



16.     In a Declaration which was adopted at the Ministerial Meeting of States Parties of 12–13 December 2001 and subsequently endorsed by the General Assembly, the States party to the 1951 Convention and/or 1967 Protocol acknowledged "…the continuing relevance and resilience of this international regime of rights and principles, including at its core the principle of *non-refoulement*, whose applicability is embedded in customary international law."[35] At the regional level, the customary international law character of the principle of *non-refoulement* has also been re-affirmed in a Declaration adopted by Latin American States participating at a gathering to celebrate the twentieth anniversary of the 1984 Cartagena Declaration.[36]

## B.     *Non-Refoulement* Obligations Under International Human Rights Law

## 1.     International Human Rights Treaties

17.     *Non-refoulement* obligations complementing the obligations under the 1951 Convention, which preceded the major human rights treaties, have also been established under international human rights law. More specifically, States are bound not to transfer any individual to another country if this would result in exposing him or her to serious

---

general, be consistent which such rules, and that instances of State conduct inconsistent with a given rule should generally have been treated as breaches of that rule, not as indications of the recognition of a new rule. If a State acts in a way *prima facie* incompatible with a recognized rule, but defends its conduct by appealing to exceptions or justifications contained within the rule itself, then whether or not the State's conduct is in fact justifiable on that basis, the significance of that attitude is to confirm rather than to weaken the rule."

[35]  Declaration of States Parties to the 1951 Convention and/or its 1967 Protocol adopted at the Ministerial Meeting of States Parties of 12–13 December 2001, HCR/MMSP/2001/09, 16 January 2002 (available at:  http://www.unhcr.org/home/RSDLEGAL/3d60f5557.pdf, last accessed on 30 October 2006) at preambular para. 4. Earlier, the Executive Committee of UNHCR observed that "the principle of *non-refoulement* … was progressively acquiring the character of a *peremptory rule* of international law." *See* Executive Committee Conclusion No. 25 (XXXIII), *supra* footnote 20, para. (b). Pursuant to Article 53 of the 1969 Vienna Convention on the Law of Treaties, 1155 U.N.T.S. 331, *entered into force* 27 January 1980 [hereinafter: "1969 Vienna Convention"], peremptory norms of general international law, or *jus cogens*, are norms accepted and recognized by the international community of States as a whole as norms from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character. Article 64 of the 1969 Vienna Convention provides that peremptory norms of international law prevail over treaty provisions.

[36]  Mexico Declaration and Plan of Action to Strengthen the International Protection of Refugees in Latin America of 16 November 2004 (available at: http://www.unhcr.org/home/RSDLEGAL/424bf6914.pdf, last accessed on 30 October 2006), at preliminary para. 7 ("*Recognizing* the *jus cogens* nature of the principle of *non-refoulement*, including non-rejection at the border, the cornerstone of international refugee law, which is contained in the 1951 Convention relating to the Status of Refugees and its Protocol of 1967, and also set out in Article 22 (8) of the American Convention on Human Rights and Article 3 of the 1984 Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment, …"). *See also* Section III(5) of the 1984 Cartagena Declaration on Refugees, *supra* footnote 26 ("…[The] principle [of *non-refoulement*] is imperative in regard to refugees and in the present state of international law should be acknowledged and observed as a rule of *jus cogens*.").



human rights violations, notably arbitrary deprivation of life[37], or torture or other cruel, inhuman or degrading treatment or punishment.[38]

18.     An explicit *non-refoulement* provision is contained in Article 3 of the 1984 Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,[39] which prohibits the removal of a person to a country where there are substantial grounds for believing that he or she would be in danger of being subjected to torture.

19.     Obligations under the 1966 Covenant on Civil and Political Rights,[40] as interpreted by the Human Rights Committee, also encompass the obligation not to extradite, deport, expel or otherwise remove a person from their territory, where there are substantial grounds for believing that there is a real risk of irreparable harm, such as that contemplated by Articles 6 [right to life] and 7 [right to be free from torture or other cruel, inhuman or degrading treatment or punishment] of the Covenant, either in the country to which removal is to be effected or in any country to which the person may subsequently be removed.[41] The prohibition of *refoulement* to a risk of serious human rights violations, particularly torture and other forms of ill-treatment, is also firmly established under regional human rights treaties.[42]

---

[37]   The right to life is guaranteed under Article 6 of the ICCPR and, for example, Article 2 of the 1950 European Convention for the Protection of Human Rights and Fundamental Freedoms, ETS 005, 213 U.N.T.S. 222, *entered into force* 3 September 1953 [hereinafter: "ECHR"]; Article 4 ACHR; Article 4 of the African (Banjul) Charter on Human and People's Rights, 21 I.L.M. 58 (1982), *entered into force* 21 October 1986 [hereinafter: "Banjul Charter"].

[38]   The right to be free from torture is guaranteed under Article 1 of the 1984 Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and Article 2 of the 1985 Inter-American Convention to Prevent and Punish Torture, 25 I.L.M. 519 (1992), *entered into force* 28 February 1987. Article 16 of the Convention Against Torture prohibits other cruel, inhuman or degrading treatment or punishment. A prohibition of torture and other cruel, inhuman or degrading treatment or punishment is guaranteed under Article 7 of the ICCPR and provisions in regional human rights treaties, such as, for example, Article 3 of the ECHR; Article 5(2) of the ACHR; or Article 5 of the Banjul Charter.

[39]   The 1984 United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 1465 U.N.T.S. 85, *entered into force* 26 June 1987 [hereinafter: "Convention Against Torture"].

[40]   1966 International Covenant on Civil and Political Rights, 999 U.N.T.S. 171, *entered into force* 23 March 1976 [hereinafter: "ICCPR"].

[41]   With regard to the scope of the obligations under Article 7 of the ICCPR, *see* Human Rights Committee in its *General Comment No. 20: Article 7 (Prohibition of torture, or other cruel, inhuman or degrading treatment or punishment),* 10 March 1992, U.N. Doc. HRI/ GEN/1/Rev.7, para. 9 ("States parties must not expose individuals to the danger of torture or cruel, inhuman or degrading treatment or punishment upon return to another country by way of their extradition, expulsion or *refoulement")*; and *General Comment No. 31 on the Nature of the General Legal Obligation on States Parties to the Covenant*, U.N. Doc. CCPR/C/21/Rev.1/Add.13, 26 May 2004, para. 12. Similarly, in its *General Comment No. 6 (2005) on the Treatment of unaccompanied and separated children outside their country of origin*, U.N. Doc. CRC/GC/2005/6, 1 September 2005, the Committee on the Rights of the Child stated that States party to the Convention on the Rights of the Child "[…] shall not return a child to a country where there are substantial grounds for believing that there is a real risk of irreparable harm to the child, such as, but by no means limited to, those contemplated under articles 6 [right to life] and 37 [right to be free from torture or other cruel, inhuman or degrading treatment or punishment and right not to be arbitrarily deprived of liberty] of the Convention." (para. 27).

[42]   See, for example, the jurisprudence of the European Court of Human Rights, which has held that *non-refoulement* is an inherent obligation under Article 3 of the ECHR in cases where there is a real risk of exposure to torture, inhuman or degrading treatment or punishment, including, in particular, the Court's decisions in *Soering v. United Kingdom*, Application No. 14038/88, 7 July 1989 and subsequent cases, including *Cruz Varas v.* Sweden, Application No. 15567/89, 20 March 1991;



20.    The prohibition of *refoulement* to a country where the person concerned would face a real risk of irreparable harm such as violations of the right to life or the right to be free from torture or cruel, inhuman or degrading treatment or punishment extends to all persons who may be within a State's territory or subject to its jurisdiction, including asylum seekers and refugees,[43] and applies with regard to the country to which removal is to be effected or any other country to which the person may subsequently be removed.[44] It is non-derogable and applies in all circumstances,[45] including in the context of measures to combat terrorism[46] and during times of armed conflict.[47]

---

*Vilvarajah et al. v. United Kingdom*, Application No. 13163/87 et al., 30 October 1991; *Chahal v. United Kingdom*, Application No. 22414/93, 15 November 1996; *Ahmed v. Austria*, Application No. 25964/94, 17 December 1996; *TI v. United Kingdom*, Application No. 43844/98 (Admissibility), 7 March 2000. In the Americas, see, for example, Article 22(8) of the 1969 ACHR ("In no case may an alien be deported or returned to a country, regardless of whether or not it is his country of origin, if in that country his right to life or personal freedom is in danger of being violated because of his race, nationality, religion, social status, or political opinions.") or Article 13(4) of the 1985 Inter-American Convention to Prevent and Punish Torture ("Extradition shall not be granted nor shall the person sought be returned when there are grounds to believe that his life is in danger, that he will be subjected to torture or to cruel, inhuman or degrading treatment, or that he will be tried by special or ad hoc courts in the requesting State.").

[43] For States Party to the ICCPR, this has been made explicit by the Human Rights Committee in its *General Comment No. 31*, *supra* footnote 41, para. 10 ("… [T]he enjoyment of Covenant rights is not limited to citizens of States Parties but must also be available to all individuals, regardless of nationality or statelessness, such as asylum seekers, refugees, migrant workers and other persons, who may find themselves in the territory or subject to the jurisdiction of the State Party. …"). *See also infra* at Part II.B.

[44] See: Human Rights Committee, *General Comment No. 31*, *supra* footnote 41, para. 12. *See also supra* footnote 41.

[45] See, for example, Human Rights Committee, *General Comment No. 29 on States of Emergency (Article 4)*, U.N. Doc. CCPR/C/21/Rev.1/Add.11, 31 August 2001, para. 11; Human Rights Committee, *Concluding Observations/Comments* on Canada, U.N. Doc. CCPR/C/CAN/CO/5, 20 April 2006, para. 15; Committee Against Torture, *Gorki Ernesto Tapia Paez v. Sweden*, U.N. Doc. CAT/C/18/D/39/1996, 28 April 1997, para. 14.5. The absolute nature of the prohibition of *refoulement* to a risk of torture and other forms of ill-treatment under Article 3 of the ECHR has been affirmed by the European Court of Human Rights, for example, in *Chahal v. United Kingdom*, *supra* footnote 42.

[46] See, for example, Committee Against Torture, *Agiza v. Sweden*, U.N. Doc. CAT/C/34/D/233/2003, 20 May 2005; Human Rights Committee, *Alzery v. Sweden*, U.N. Doc. CCPR/C/88/D/1416/2005, 10 November 2006; Inter-American Commission on Human Rights, *Report on the Situation of Human Rights of Asylum-Seekers within the Canadian Refugee Determination System*, 28 February 2000, para. 154. *See also* United Nations Commission on Human Rights, Resolution 2005/80 of 21 April 2005 on Protection of human rights and fundamental freedoms while countering terrorism; Security Council resolutions 1456 (2003) of 20 January 2003, 1535 (2004) of 26 March 2004, 1624 (2004) of 14 September 2005, the Declaration on Measures to Eliminate International Terrorism (annex to General Assembly resolution 49/60 of 9 December 1994), the Declaration to Supplement the 1994 Declaration on Measures to Eliminate International Terrorism (annex to General Assembly resolution 51/210 of 17 December 1996), the 2005 World Summit Outcome (General Assembly resolution 60/1 of 16 September 2005) and the Plan of Action annexed to the United Nations Global Counter-Terrorism Strategy adopted by the General Assembly on 8 September 2006 (A/RES/60/288).

[47] International human rights law does not cease to apply in case of armed conflict, except where a State has derogated from its obligations in accordance with the relevant provisions of the applicable international human rights treaty (for example, Article 4 ICCPR). In determining what constitutes a violation of human rights, regard must be had to international humanitarian law, which operates as *lex specialis* to international human rights in law during a time of armed conflict. This has been confirmed, *inter alia*, by the International Court of Justice in its *Advisory Opinion on the Legality of the Threat or Use of Nuclear Weapons*, 8 July 1996, para. 25; and the judgement of 19 December 2005 in *Case concerning Armed Activities on the Territory of the Congo (Democratic Republic of the Congo v. Uganda)*, paras. 215–219. *See also*, for example, Concluding Observations of the Human Rights Committee, United States of America, U.N. Doc. CCPR/C/USA/CO/3/Rev.1, 18 December 2006, para. 10; Human Rights Committee, *General Comment No. 31*, *supra* footnote 41, para. 11; *see*



## 2.    Human Rights-Based *Non-Refoulement* Obligations Under Customary International Law

21.    The prohibition of torture is also part of customary international law, which has attained the rank of a peremptory norm of international law, or *jus cogens*.[48] It includes, as a fundamental and inherent component, the prohibition of *refoulement* to a risk of torture, and thus imposes an absolute ban on any form of forcible return to a danger of torture which is binding on all States, including those which have not become party to the relevant instruments. The prohibition of arbitrary deprivation of life, which also includes an inherent obligation not to send any person to a country where there is a real risk that he or she may be exposed to such treatment, also forms part of customary international law.[49] The prohibition of *refoulement* to a risk of cruel, inhuman or degrading treatment or punishment, as codified in universal as well as regional human rights treaties is in the process of becoming customary international law, at the very least at regional level.[50]

22.    Under the above-mentioned obligations, States have a duty to establish, prior to implementing any removal measure, that the person whom it intends to remove from their territory or jurisdiction would not be exposed to a danger of serious human rights violations such as those mentioned above. If such a risk exists, the State is precluded from forcibly removing the individual concerned.

## II. Extraterritorial Applicability of The Principle of *Non-Refoulement* Under the 1951 Convention and/or its 1967 Protocol

23.    The Sections of this Advisory Opinion which follow examine the territorial scope of Article 33(1) of the 1951 Convention in light of the criteria provided for under international law for the interpretation of treaties. In accordance with the relevant rules,

---

*also* Conclusions and recommendations of the Committee against Torture concerning the second report of the United States of America, U.N. Doc. CAT/C/USA/CO/2, 25 July 2006 para. 14.

[48]   See, for example, Human Rights Committee, *General Comment No. 29: Article 4: Derogations during a State of Emergency,* U.N. Doc. CCPR/C/21/Rev.1/Add.11, 31 August 2001, para. 11 ("The proclamation of certain provisions of the Covenant as being of a non-derogable nature, in article 4, para. 2, is to be seen partly as recognition of the peremptory nature of some fundamental rights ensured in treaty form in the Covenant (e.g., articles 6 and 7). "); *see also* the decisions of the International Criminal Tribunal for the former Yugoslavia (ICTY) in *Prosecutor v Delalic and Others*, Trial Chamber, Judgement of 16 November 1998, para. 454; *Prosecutor v. Furundzija*, Trial Chamber, Judgement of 10 December 1998, paras. 134–164; *Prosecutor v. Kunarac and Others*, Trial Chamber, Judgement of 22 February 2001, para. 466. *See also* the judgement of the House of Lords in *Pinochet Ugarte, re.* [1999] 2 All ER 97, paras. 108–109. *See also*, for example, *Filartiga v. Pena Irala,* 630 F.2d 876 (2d. Cir. 1980).

[49]   See Human Rights Committee, *General Comment No. 24: Issues relating to reservations made upon ratification or accession to the Covenant or the Optional Protocols thereto, or in relation to declarations under Article 41 of the Covenant*, U.N. Doc. CCPR/C/21/Rev.1/Add.6, 4 November 1994, para. 8 ("… [P]rovisions in the Covenant that represent customary international law (and *a fortiori* when they have the character of peremptory norms) may not be the subject of reservations. Accordingly, a State may not reserve the right to engage in … torture, to subject persons to cruel, inhuman or degrading treatment or punishment, to arbitrarily deprive persons of their lives …").

[50]   See, for example, the jurisprudence of the European Court of Human Rights referred to *supra* footnote 42; *see also* Article 19(2) of the European Charter of Fundamental Rights, [2000] OJ C364; and preambular para. 13 of the Council Framework Decision of 13 June 2002 on the European arrest warrant and the surrender procedures between Member States, 2002/584/JHA, adopted by the Council of the European Union.



as stated in the 1969 Vienna Convention on the Law of Treaties,[51] the meaning of a provision in an international treaty must be established by examining the ordinary meaning of the terms employed, in light of their context and the object and purpose of the treaty.[52] Subsequent practice of States in applying the treaty as well as relevant rules of international law must also be taken into consideration in interpreting a treaty.[53]

24.    For the reasons set out below, UNHCR is of the view that the purpose, intent and meaning of Article 33(1) of the 1951 Convention are unambiguous and establish an obligation not to return a refugee or asylum-seeker to a country where he or she would be risk of persecution or other serious harm, which applies wherever a State exercises jurisdiction, including at the frontier, on the high seas or on the territory of another State.[54]

## A.    Scope *Ratione Loci* of Article 33(1) of the 1951 Convention: Ordinary Meaning, Context, Object and Purpose of the 1951 Convention

25.    As noted above, the focus of the present inquiry is the territorial scope of the *non-refoulement* provision under Article 33(1) of the 1951 Convention. In keeping with the primary rule of treaty interpretation stated in Article 31(1) of the 1969 Vienna Convention, it is necessary, first, to examine the ordinary meaning of the terms of Article 33(1) of the 1951 Convention, taking into account their context as well as the object and purpose of the treaty of which it forms part.

26.    The obligation set out in Article 33(1) of the 1951 Convention is subject to a geographic restriction only with regard to the country where a refugee may not be sent to, not the place where he or she is sent from. The extraterritorial applicability of the *non-refoulement* obligation under Article 33(1) is clear from the text of the provision itself, which states a simple prohibition: "No Contracting State shall expel or return *("refouler")* a refugee in any manner whatsoever to the frontiers of territories where his [or her] life or freedom would be threatened…".

---

[51]    *Supra* footnote 35 [hereinafter, "1969 Vienna Convention"]. The 1969 Vienna Convention is generally regarded as expressing rules which constitute customary international law.

[52]    Article 31(1) of the 1969 Vienna Convention provides: "A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."

[53]    Article 31(3) of the 1969 Vienna Convention provides that, in interpreting a treaty: "… there shall be taken into account, together with the context, … (b) any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation; (c) any relevant rules of international law applicable in the relations between parties."

[54]    In a decision which addressed the applicability *inter alia* of Article 33(1) of the 1951 Convention to the return to Haiti of persons intercepted on the high seas by U.S. coast guard vessels, the United States Supreme Court determined that Article 33(1) of the 1951 Convention is applicable only to persons within the territory of the United States (*Sale, Acting Commissioner, Immigration and Naturalization Service, et al., Petitioners v. Haitian Centers Council, Inc., et. al.,* 509 U.S. 155 (1993)). For the reasons set out in this advisory opinion, UNHCR is of the view that the majority opinion of the Supreme Court in *Sale* does not accurately reflect the scope of Article 33(1) of the 1951 Convention. *See also* Inter-American Commission on Human Rights in *The Haitian Centre for Human Rights et al. v. United States*, *supra* footnote 42, para. 157 ("… The Commission shares the view advanced by the United Nations High Commissioner for Refugees in its <u>Amicus Curiae</u> brief in its argument before the Supreme Court, that Article 33 had no geographical limitations.").



27.     The ordinary meaning of "return" includes "to send back" or "to bring, send, or put back to a former or proper place".[55] The English translations of "*refouler*" "include words like 'repulse', 'repel', 'drive back'."[56] It is difficult to conceive that these words are limited to refugees who have already entered the territory of a Contracting State. The ordinary meaning of the terms "return" and "*refouler*" does not support an interpretation which would restrict its scope to conduct within the territory of the State concerned, nor is there any indication that these terms were understood by the drafters of the 1951 Convention to be limited in this way.[57]

28.     A contextual analysis of Article 33 of the 1951 Convention further supports the view that the scope *ratione loci* of the *non-refoulement* provision in Article 33(1) is not limited to a State's territory. The view has been advanced that Article 33(2) of the 1951 Convention, which permits exceptions to the principle of *non-refoulement* only with regard to a refugee who constitutes a danger to the security or the community of the country in which he is, implies that the scope of Article 33(1) is also limited to persons within the territory of the host country.[58] However, in UNHCR's opinion this view is contradicted by the clear wording of Article 33(1) and 33(2), respectively, which address different concerns,[59] as well as the fact that the territorial scope of a number of other provisions of the 1951 Convention is made explicit.[60] Thus, where the drafters of the 1951 Convention intended a particular clause of the 1951 Convention to apply only to

---

[55]  See: *Merriam-Webster Online Dictionary*, 10th edition, available at: http://www.m-w.com/cgi-bin/dictionary?book=Dictionary&va=return (last accessed on 15 October 2006).

[56]  This was also noted by the majority of the United States Supreme Court in *Sale, supra* footnote 54 (at 181) which, however, went on to state that "'return' means a defensive act of resistance or exclusion at a border rather than an act of transporting someone to a particular destination" (at 182), and that "… because the text of Article 33 cannot reasonably be read to say anything at all about a nation's actions toward aliens outside its own territory, it does not prohibit such actions." (at 183). As noted by Blackmun J in his dissenting opinion in *Sale, supra* footnote 54, "[t]he majority's puzzling progression ('*refouler*' means repel or drive back; therefore 'return' means only exclude at a border; therefore the treaty does not apply) hardly justifies a departure from the path of ordinary meaning. The text of Article 33(1) is clear, and whether the operative term is 'return' or '*refouler*', it prohibits the Government's actions." (at 192–193).

[57]  In support of its finding that Article 33(1) does not apply outside a State's territory, the majority of the United States Supreme Court in *Sale, supra* footnote 54, relied on statements by a number of delegates involved in the drafting of the 1951 Convention. However, these statements were expressions of concern related to a possible obligation to grant asylum to large numbers of arrivals in mass influx situations. In UNHCR's view, these portions of the negotiating history do not warrant the conclusion that the drafters of the 1951 Convention reached consensus about an implicit restriction of the territorial scope of the principle of *non-refoulement* as provided for in Article 33(1). *See also* UNHCR, *The Principle of Non-Refoulement as a Norm of Customary International Law, supra* footnote 30.

[58]  See: *Sale, supra* footnote 54, at 179–180.

[59]  See also the dissenting opinion of Blackmun J in *Sale, supra* footnote 54, at 194 ("Far from constituting 'an absurd anomaly […], the fact that a state is permitted to 'expel or return' a small class of refugees found within its territory but may not seize and return refugees who remain outside its frontiers expresses precisely the objectives and concerns of the Convention. Non return is the rule; the sole exception (neither applicable nor invoked here) is that a nation endangered by a refugee's very presence may 'expel or return' him to an unsafe country if it chooses. The tautological observation that only a refugee already in a country can pose a danger to the country 'in which he is' proves nothing.")

[60]  For example, Articles 2, 4 and 27 require simple presence of a refugee in the host country, while Articles 18, 26 and 32 require that he or she be "lawfully on the territory" of a Contracting State, and Articles 15, 17(1), 19, 21, 23, 24 and 28 apply to refugees who are "lawfully staying" in the country of refuge.



those within the territory of a State Party, they chose language which leaves no doubt as to their intention.

29.     Furthermore, any interpretation which construes the scope of Article 33(1) of the 1951 Convention as not extending to measures whereby a State, acting outside its territory, returns or otherwise transfers refugees to a country where they are at risk of persecution would be fundamentally inconsistent with the humanitarian object and purpose of the 1951 Convention and its 1967 Protocol. In this context, it is worth recalling the first two paragraphs of the Preamble to the 1951 Convention, which read:

"Considering that the Charter of the United Nations and the Universal Declaration of Human Rights approved on 10 December 1948 by the General Assembly have affirmed the principle that human beings shall enjoy fundamental rights and freedoms without discrimination,61

Considering that the United Nations has, on various occasions, manifested its profound concern for refugees and endeavoured to assure refugees the widest possible exercise of these fundamental rights and freedoms."

30.     A comprehensive review of the *travaux préparatoires*[62] confirms the overriding humanitarian object and purpose of the Convention and provides significant evidence that the *non-refoulement* provision in Article 33(1) was intended to prohibit any acts or omissions by a Contracting State which have the effect of returning a refugee to territories where he or she is likely to face persecution or danger to life or freedom. For example, when the 1951 Convention was in the course of preparation, the Secretary-General stated in a Memorandum dated 3 January 1950 to the *Ad Hoc* Committee on Statelessness and Related Problems that "turning a refugee back to the frontier of the country where his life or liberty is threatened… would be tantamount to delivering him into the hands of his persecutors."[63] During the discussions of the Committee, the representative of the United States vigorously argued that:

> "[w]hether it was a question of closing the frontier to a refugee who asked admittance, or of turning him back after he had crossed the frontier, or even expelling him after he had been admitted to residence in the territory, the problem was more or less the same. Whatever the case might be, whether or not

---

61   One of the fundamental rights enshrined in the Universal Declaration of Human Rights, General Assembly resolution 217A (III), U.N. Doc. A/810 at 71 (1948), is the right of everyone "to seek and enjoy in other countries asylum from persecution" under Article 14.

62   Pursuant to Article 32 of the 1969 Vienna Convention, *supra* footnote 35, recourse to the preparatory work of the treaty is a supplementary means of treaty interpretation is permitted only where the meaning of the treaty language is ambiguous or obscure; or where interpretation pursuant to the general rules set out in Article 31 of the 1969 Vienna Convention leads to a result which is manifestly absurd or unreasonable. It is a well-established principle that when the meaning of the treaty is clear from its text when viewed in light of its context, object and purpose, supplementary sources are unnecessary and inapplicable, and recourse to such sources is discouraged. *See*, for example, International Court of Justice, *Interpretation of the Treaty of Lausanne*, P.C.I.J., Ser. B, No. 12 (1925), at 22; The *Lotus Case*, P.C.I.J., Ser. A, No. 10 (1927), at 16; *Admission to the United Nations Case*, 1950 ICJ Reports 8. Thus, while UNHCR is of the view that recourse to the drafting history of Article 33(1) of the 1951 Convention is not necessary given the unambiguous wording of this provision, the *travaux préparatoires* are nevertheless of interest in clarifying the background, content and scope of Article 33(1).

63   *Ad Hoc* Committee on Statelessness and Related Problems, Status of Refugees and Stateless Persons – Memorandum by the Secretary General, U.N. Document E/AC.32/2, 3 January 1950, Comments on Article 24 of the preliminary draft, para. 3.



the refugee was in a regular position, he must not be turned back to a country where his life or freedom could be threatened."[64]

31.     The same representative of the United States proposed that the words "undertakes not to expel or return (*refouler*)" should replace the words "not turn back" in order to settle any doubts that *non-refoulement* applied to refugees whether or not they had been regularly admitted to residence,[65] an amendment that ultimately formed the basis for the "expel or return" final wording of Article 33 of the 1951 Convention. It is also worth noting that at one point the Chairman of the *Ad Hoc* Committee suspended the discussion, observing that it had indicated agreement on the principle that refugees fleeing from persecution on account of their race, religion, nationality or political opinion should not be pushed back into the arms of their persecutors.[66]

**B.      Extraterritorial Applicability of Article 33(1) of the 1951 Convention: Subsequent State Practice and Relevant Rules of International Law**

32.     Limiting the territorial scope of Article 33(1) of the 1951 Convention to conduct of a State within its national territory would also be at variance with subsequent State practice and relevant rules of international law applicable between the States party to the treaty in question. In accordance with Article 31(3) of the 1969 Vienna Convention,[67] these elements also need to be taken into account in interpreting a provision of an international treaty.

33.     Subsequent State practice is expressed, *inter alia*, through numerous Executive Committee Conclusions which attest to the overriding importance of the principle of *non-refoulement* irrespective of whether the refugee is in the national territory of the State concerned.[68] Subsequent State practice which is relevant to the interpretation of the *non-refoulement* obligation under the 1951 Convention and 1967 Protocol is also evidenced by other international refugee and human rights instruments drawn up since 1951, none of which places territorial restrictions on States' *non-refoulement* obligations.[69]

---

[64]   Statement of Mr. Henkin of the United States, U.N. Doc. E/AC.32/SR.20, Feb 1, 1950, paras. 54–55.

[65]   U.N. Doc. E/AC.32/SR.20, para. 56.

[66]   Statement of the Chairman, Mr. Chance of Canada, U.N. Doc. E/AC.32.SR.21, 2 February 1950, at page 7. The Chairman then invited the representatives of Belgium and the United States to confer with him to attempt the preparation of a suitable draft for later consideration.

[67]   *Supra* footnote 53.

[68]   See, for example, Executive Committee, Conclusion No. 6 (XXVIII), *supra* footnote 9, at para (c) (reaffirming "the fundamental importance of the observance of the principle of *non-refoulement* – both at the border and within the territory of a State …"); Conclusion No. 15 (XXX) *"Refugees without an Asylum Country"* (1979) paras. (b) and (c) (stating that "[a]ction whereby a refugee is obliged to return or is sent to a country where he has reason to fear persecution constitutes a grave violation of the principle of *non-refoulement*" and noting that "[i]t is the humanitarian obligation of all coastal States to allow vessels in distress to seek haven in their waters and to grant asylum, or at least temporary refuge, to persons on board wishing to seek asylum."); Conclusion No. 22 (XXXII) *"Protection of Asylum-Seekers in Situations of Large-Scale Influx"* (1981), at II.A.2. ("In all cases the fundamental principle of *non-refoulement* – including non-rejection at the frontier – must be scrupulously observed."); Conclusion No. 53 (XXXIX) *"Stowaway Asylum-Seekers"* (1988), para. (1) (providing *inter alia* that "[l]ike other asylum seekers, stowaway asylum-seekers must be protected against forcible return to their country of origin.").

[69]   These include, in particular, the 1969 OAU Convention (*supra* footnote 22); the 1969 ACHR (*supra* footnote 23); and the Convention Against Torture (*supra* footnote 39). See also the expressions of the principle of *non-refoulement* in non-binding texts such as, for example, the 1984 Cartagena



34.     In keeping with the above-mentioned rules of treaty interpretation, it is also necessary to have regard to developments in related areas of international law when interpreting the territorial scope of Article 33(1) of the 1951 Convention. International refugee law and international human rights law are complementary and mutually reinforcing legal regimes.[70] It follows that Article 33(1), which embodies the humanitarian essence of the 1951 Convention and safeguards fundamental rights of refugees, must be interpreted in a manner which is consistent with developments in international human rights law. An analysis of the scope *ratione loci* of States' *non-refoulement* obligations under international human rights law is particularly pertinent to the question of the extraterritorial applicability of the prohibition on returning a refugee to a danger of persecution under international refugee instruments.

35.     As discussed in more detail below, States are bound by their obligations not to return any person over whom they exercise jurisdiction to a risk of irreparable harm. In determining whether a State's human rights obligations with respect to a particular person are engaged, the decisive criterion is not whether that person is on the State's national territory, or within a territory which is *de jure* under the sovereign control of the State, but rather whether or not he or she is subject to that State's effective authority and control.

36.     In its General Comment No. 31 on the Nature of the General Legal Obligation Imposed on States Parties to the [ICCPR], the Human Rights Committee has stated that "States are required by Article 2(1) [of the ICCPR] to respect and to ensure the Covenant rights to all persons who may be within their territory and to all persons subject to their jurisdiction. This means that a State party must respect and ensure the rights laid down in the Covenant to anyone within the power or effective control of that State Party, even if not situated within the territory of the State Party."[71] The General Comment reaffirms consistent jurisprudence of the Human Rights Committee to the effect that States can "be held accountable for violations of rights under the ICCPR which its agents commit on the territory of another State, whether with the acquiescence of the Government of that State or in opposition to it"[72] and that in certain

---

Declaration (*supra* footnote 26); the 1967 Declaration of Territorial Asylum adopted by the General Assembly (*supra* footnote 27); and Resolution (67) 14 of the Committee of Ministers of the Council of Europe (*supra* footnote 27).

[70] The complementarity between *non-refoulement* obligations under international refugee and human rights law has been highlighted, for example, in the Mexico Declaration and Plan of Action to Strengthen the International Protection of Refugees in Latin America of 16 November 2004 (available at: http://www.unhcr.org/home/RSDLEGAL/424bf6914.pdf, last accessed on 30 October 2006). This Declaration was adopted by Latin American States participating at a gathering to celebrate the twentieth anniversary of the 1984 Cartagena Declaration. *See also* Executive Committee, Conclusion No. 79 (XLVII), *supra* footnote 20; No. 81(XLVII) "*General*" (1997); Conclusion No. 82 (XLVIII) "*Safeguarding Asylum*" (1997), which specifically refer to the prohibition of return to torture, as set forth in the Convention Against Torture, and Executive Committee Conclusion No. 95 (LIV) "*General Conclusion on International Protection*" (2003), para. (l) (noting the "complementary nature of international refugee and human rights law as well as the possible role of the United Nations human rights mechanisms in this area …").

[71] General Comment No. 31, *supra* footnote 41, para. 10.

[72] See the decisions of the Human Rights Committee in *Lopez Burgos v. Uruguay*, U.N. Doc. CCPR/C/13/D/52/1979, 29 July 1981, para. 12.3; and *Celiberti de Casariego v. Uruguay*, U.N. Doc. CCPR/C/13/D/56/1979, 29 July 1981, para. 10.3. In both decisions, the Human Rights Committee has also held that "it would be unconscionable to so interpret the responsibility under article 2 of the Covenant as to permit a State party to perpetrate violations of the Covenant on the territory of another State, which violations it could not perpetrate on its own territory." *See also* the decision of the



circumstances, "persons may fall under the subject-matter of a State Party [to the ICCPR] even when outside that State's territory."[73]

37.     The International Court of Justice has confirmed that the ICCPR is applicable in respect of acts done by a State in the exercise of its jurisdiction outside its own territory.[74] The Court observed that, "while the jurisdiction of States is primarily territorial, it may sometimes be exercised outside the national territory. Considering the object and purpose of the International Covenant on Civil and Political Rights, it would seem natural that, even when such is the case, States parties to the Covenant should be bound to comply with its provisions."[75]

38.     Similarly, the Committee against Torture has affirmed that the *non-refoulement* obligation contained in Article 3 of the Convention Against Torture applies in any territory under a State party's jurisdiction.[76] With regard to those provisions of the Convention Against Torture which "are expressed as applicable to 'territory under [the State party's] jurisdiction'", the Committee Against Torture reiterated "its previously expressed view that this includes all areas under the de facto effective control of the State party, by whichever military or civil authorities such control is exercised" and made it clear that these provisions "apply to, and are fully enjoyed, by all persons under the effective control of its authorities, of whichever type, wherever located in the world."[77]

39.     The extraterritorial applicability of human rights treaties is also firmly established at the regional level. The European Court of Human Rights has examined the concept of "jurisdiction" in a number of decisions and consistently held that the decisive criterion is not whether a person is within the territory of the State concerned, but whether or not, in respect of the conduct alleged, he or she is under the effective control

---

Human Rights Committee in *Pereira Montero v. Uruguay*, U.N. Doc. CCPR/C/18/D/106/1981, 31 March 1983, para. 5.

[73]  See, for example, Concluding Observations of the Human Rights Committee, United States of America, U.N. Doc. CCPR/C/79/Add.50, 3 October 1995, para. 284. In 2006, the Human Rights Committee also reaffirmed the applicability of the provisions of the ICCPR with reference to conduct of the United States at Guantánamo Bay. *See* Concluding Observations of the Human Rights Committee, United States of America, *supra* footnote 47, para. 10. See also Concluding Observations of the Human Rights Committee, Israel, U.N. Doc. CCPR/C/79/Add.93, 18 August 1998, para. 10 and U.N. Doc. CCPR/CO/78/ISR, 21 August 2003, para. 11.

[74]  See the Advisory Opinion of the International Court of Justice in *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory,* (2004) ICJ Gen. List No. 131, 9 July 2004, para. 111. See also the recent judgement of the International Court of Justice in *Case Concerning Armed Activities on the Territory of the Congo (DRC v. Uganda)*, (2005) ICJ Gen. List No. 116, 19 December 2005, para. 216.

[75]  *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*, *supra* footnote 74, para. 109.

[76]  See, for example, Committee Against Torture, Conclusions and recommendations of the Committee against Torture concerning the second report of the United States of America, *supra* footnote 47. Having requested the State Party's views on the extraterritorial applicability of Article 3 of the Convention against Torture in the context of Guantánamo Bay, the Committee expressed its concern ("…that the State party considers that the non-refoulement obligation, under article 3 of the Convention, does not extend to a person detained outside its territory. … The State party should apply the *non-refoulement* guarantee to all detainees in its custody, …, in order to comply with its obligations under article 3 of the Convention. …") (para. 20).

[77]  *Id*., para. 15. This applies, *inter alia*, to Article 16 of the Convention Against Torture, which prohibits acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture as defined in Article 1 of the Convention.



of, or is affected by those acting on behalf of, the State in question. Thus, in a decision in which it examined the circumstances in which the obligations under the European Convention apply extraterritorially, the European Court of Human Rights held that while, "from the standpoint of public international law, the jurisdictional competence of a state is primarily territorial",[78] it may extend extraterritorially if a State, "through the effective control of the relevant territory and its inhabitants abroad as a consequence of military occupation or through the consent, invitation or acquiescence of the government of that territory, exercises all or some of the public powers normally to be exercised by that government."[79] A situation in which a person is brought under the "effective control" of the authorities of a State if they are exercising their authority outside the State's territory may also give rise to the extraterritorial application of Convention obligations.[80]

40.     Also relevant in the present context is the judgement of the European Court of Human Rights in *Issa and Ors v. Turkey*, which confirmed that

> "a State may also be held accountable for violations of the Convention rights and freedoms of persons who are in the territory of another State but who are found to be under the former State's authority and control through its agents operating – whether lawfully or unlawfully – in the latter State […]. Accountability in such situations stems from the fact that Article 1 of the Convention cannot be interpreted so as to allow a State party to perpetrate violations of the Convention on the territory of another State, which it could not perpetrate on its own territory […]."[81]

41.     The Inter-American Commission on Human Rights held in its decision in *Coard et al. v. the United States* that "while the extraterritorial application of the American Declaration has not been placed at issue by the parties, the Commission finds it pertinent to note that, under certain circumstances, the exercise of its jurisdiction over acts with an extraterritorial locus will not only be consistent with, but required by the norms which pertain."[82]

---

[78]  *Bankovic et al. v. Belgium and 16 other contracting States (Admissibility)*, Application No. 52207/99, 12 December 2001, para. 59.

[79]  *Id.*, para. 71. See also *Loizidou v. Turkey (Preliminary Objections),* Application No. 15318/89, Judgement of 23 February 1995, Series A, No. 310, para. 62 ("In this respect the Court recalls that, although Article 1 (art. 1) sets limits on the reach of the Convention, the concept of 'jurisdiction' under this provision is not restricted to the national territory of the High Contracting Parties. […] [t]he responsibility of Contracting Parties can be involved because of acts of their authorities, whether performed within or outside national boundaries, which produce effects outside their own territory.").

[80]  *Öcalan v. Turkey (Preliminary Objections)*, Application No. 46221/99, Judgement of 12 March 2003, para. 93 (the former PKK leader had been arrested by Kenyan authorities and handed over to Turkish officials operating in Kenya). *See also Ilascu and Others v. Russia and Moldova*, Application No. 48787/99, Judgement of 8 July 2004, paras. 382-394 (finding that the complainants came within the "jurisdiction" of the Russian Federation, and that the responsibility of the Russian Federation for acts which occurred on the territory of Moldova was engaged by the conduct of its own soldiers there, as well as that of the Transdniestran authorities, on the basis of the support provided by Russia to the latter) on the basis of the actions of its own soldiers as well as their support to the Transdniestran authorities).

[81]  *Issa and Ors v. Turkey,* Application No. 3821/96, Judgement of 16 November 2004, para. 71, with references, *inter alia*, to decisions of the Human Rights Committee and the Inter-American Commission of Human Rights.

[82]  *Coard et al. v. the United States*, Case No. 10.951, Report No. 109/99, 29 September 1999, para. 37.

UNHCR

42.     In UNHCR's view, the reasoning adopted by courts and human rights treaty bodies in their authoritative interpretation of the relevant human rights provisions is relevant also to the prohibition of *refoulement* under international refugee law, given the similar nature of the obligations and the object and purpose of the treaties which form their legal basis.[83]

43.     Thus, an interpretation which would restrict the scope of application of Article 33(1) of the 1951 Convention to conduct within the territory of a State party to the 1951 Convention and/or its 1967 Protocol would not only be contrary to the terms of the provision as well as the object and purpose of the treaty under interpretation, but it would also be inconsistent with relevant rules of international human rights law. It is UNHCR's position, therefore, that a State is bound by its obligation under Article 33(1) of the 1951 Convention not to return refugees to a risk of persecution wherever it exercises effective jurisdiction. As with *non-refoulement* obligations under international human rights law, the decisive criterion is not whether such persons are on the State's territory, but rather, whether they come within the effective control and authority of that State.

UNHCR, Geneva
26 January 2007

---

[83]    As noted by the International Law Commission in its Report of the fifty-eighth session (1 May-9 June and 3 July-11 August 2006), U.N. Doc. A/61/10, at pp. 414–415, "Article 31(3)(c) [of the 1969 Vienna Convention, *supra* footnote 36] also requires the interpreter to consider other treaty-based rules so as to arrive at a consistent meaning. Such other rules are of particular relevance where parties to the treaty under interpretation are also parties to the other treaty, where the treaty rule has passed into or expresses customary international law or where they provide evidence of the common understanding of the parties as to the object and purpose of the treaty under interpretation or as to the meaning of a particular term."

 

# UNHCR Note on the Principle of Non-Refoulement

| Publisher | UN High Commissioner for Refugees (UNHCR) |
|---|---|
| Publication Date | November 1997 |
| Cite as | UN High Commissioner for Refugees (UNHCR), *UNHCR Note on the Principle of Non-Refoulement*, November 1997, available at: https://www.refworld.org/docid/438c6d972.html [accessed 5 February 2020] |
| Comments | Prepared for the EU Seminar on the Implementation of the 1995 EU Resolution on Minimum Guarantees for Asylum Procedures, which took place in Luxembourg on 4 and 5 November 1997. |

## A.  Introduction

The principle of **non-refoulement** is the cornerstone of asylum and of international refugee law. Following from the right to seek and to enjoy in other countries asylum from persecution, as set forth in Article 14 of the Universal Declaration of Human Rights, this principle reflects the commitment of the international community to ensure to all persons the enjoyment of human rights, including the rights to life, to freedom from torture or cruel, inhuman or degrading treatment or punishment, and to liberty and security of person. These and other rights are threatened when a refugee is returned to persecution or danger.

One may ask how a discussion of the principle of *non-refoulement* relates to the topic of this seminar, namely the implementation of the 1995 EU Resolution on Minimum Guarantees for Asylum Procedures. In fact, the observance of the principle of *non-refoulement* is intrinsically linked to the determination of refugee status.

Procedures or arrangements for identifying refugees should provide a guarantee against *refoulement,* by ensuring that persons who are entitled to protection do in fact receive it. Such procedures or arrangements are particularly important when a country receives both asylum-seekers and migratory movements. In UNHCR's view, respect for the principle of *non-refoulement* can therefore be most effectively ensured if claims to refugee status and asylum are determined substantively and expeditiously.

A closer examination of the text of the Resolution on Minimum Guarantees reveals several references to the principle of *non-refoulement*, reaffirming its importance, notably concerning fair and effective asylum procedures:

> Paragraph 1: "In particular, the procedures will comply fully with Article 1 of the 1951 Convention concerning the definition of a refugee, Article 33 relating to the principle of '*non-refoulement*' and Article 35 concerning cooperation with the Office of the United Nations High Commissioner for Refugees, including the facilitation of its duty of supervising the application of the Convention."

DHSFF0809

Paragraph 2: "*In order to ensure effectively the principle of 'non-refoulement', no expulsion measure will be carried out as long as no decision has been taken on the asylum application.*"

These broad commitments are, in UNHCR's view, not necessarily reflected in the substance of the Resolution. For example, paragraph 24 allows Member States to adopt special procedures for asylum applications at the border in order to determine, prior to access to the asylum procedure, whether the application is manifestly unfounded. No expulsion may be carried out in this period. In the case where an asylum application is manifestly unfounded, the asylum applicant may be refused entry. An appeal will not have a suspensive effect and the authorities may deport an asylum seeker.

The possibility for an asylum applicant to lodge an appeal with suspensive effect or its equivalent before a removal decision is implemented is an important principle that should guide all asylum procedures, especially summary procedures. This would minimise the risk of erroneous decisions, and, therefore, that of *non-refoulement*, without necessarily having an adverse effect on the length of accelerated procedures.

It should also be noted that the earlier Resolutions of 1992 on Manifestly Unfounded Applications for Asylum and on Host Third Countries are closely linked with the Resolution on Minimum Guarantees, since they elaborate in greater detail on concepts referred to in the Resolution on Minimum Guarantees. UNHCR has also raised various concerns in relation to both these Resolutions.

As for the Resolution on Manifestly Unfounded Applications, UNHCR's concerns relate to cases which, according to this resolution, are to be considered as manifestly unfounded, but which cannot appropriately be dealt with in accelerated procedures because of their inherently complex nature. This applies in particular when the possibility of an internal flight alternative is to be established, or when one of the exclusion clauses of the 1951 Convention (e.g. that relating to the commission of a common crime) is invoked by a Member State. Cases raising such issues can never, in our view, be regarded as manifestly unfounded.

Also, the Member States may, according to this resolution, consider asylum applications under accelerated procedures in case of deliberate deception or abuse of the asylum procedure. It is UNHCR's view, in line with Executive Committee Conclusion No. 58, that asylum applicants should cooperage with the authorities and not provide them with misleading information. Automatic recourse to accelerated procedures in all cases of this kind could lead to inequitable results and may, therefore, not be the most appropriate arrangement. The mere fact of having made false statements to the authorities does not in itself necessarily impair an asylum application and make it manifestly unfounded.

As can be seen, a combination of these standards of, on the one hand, the denial of suspensive effect in the appeal procedure, and on the other a widening of what constitutes a manifestly unfounded application increases the risk of genuine claims being rejected, and of applicants being deported before errors have been rectified, eventually resulting in *refoulement*.

With regard to the Resolution on Host Third Countries UNHCR attaches great importance to a proper assessment of the situation in the country concerned before an asylum applicant is sent there, which is appropriately reflected in this resolution. UNHCR strongly recommends that the agreement of the host third country be obtained before an asylum applicant is sent to that country in order to avoid the risk of so-called orbit cases and *refoulement*.

In brief, the above sets out why and to what extent the two subjects are closely inter-related. Ultimately, the basis of UNHCR's concerns are related to the danger of *refoulement*.

## B.  Legal basis of *non-refoulement*

*Non-refoulement* has been defined in a number of international refugee instruments, both at the universal and regional levels.

At the universal level the most important provision in this respect is Article 33 (1) of the 1951 Convention relating to the Status of Refugees, which states that:

> "No Contracting State shall expel or return ('*refouler*') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."

This provision constitutes one of the basic Articles of the 1951 Convention, to which no reservations are permitted. It is also an obligation under the 1967 Protocol by virtue of Article I (1) of that instrument. Unlike some provisions of the Convention, its application is not dependent on the lawful residence of a refugee in the territory of a Contracting State. As to the words *"where his life or freedom would be threatened",* it appears from the *travaux préparatoires* that they were not intended to lay down a stricter criterion than the *words "well-founded fear of persecution"* figuring in the definition of the term "*refugee*" in Article 1 A (2). The different wording was introduced for another reason, namely to make it clear that the principle of *non-refoulement* applies not only in respect of the country of origin but to any country where a person has reason to fear persecution.

Also at the universal level, mention should be made of Article 3 (1) of the UN Declaration on Territorial Asylum unanimously adopted by the General Assembly in 1967 [res. 2312 (XXII)].

> "No person referred to in Article 1, paragraph 1, shall be subjected to measures such as rejection at the frontier or, if he has already entered the territory in which he seeks asylum, expulsion or compulsory return to any State where he may be subjected to persecution."

At the <u>regional</u> level the OAU Convention Governing the Specific Aspects of Refugee Problems in Africa of 1969 gives expression in binding form to a number of important principles relating to asylum, including the principle of *non-refoulement*. According to Article II (3):

> "No person shall be subjected by a Member State to measures such as rejection at the frontier, return or expulsion, which would compel him to return to or remain in a territory where his life, physical integrity or liberty would be threatened for the reasons set out in Article I, paragraphs 1 and 2."

Again, Article 22 (8) of the American Human Rights Convention adopted in November 1969 provides that:

> "In no case may an alien be deported or returned to a country, regardless of whether or not it is his country of origin, if in that country his right to life or personal freedom is in danger of being violated because of his race, nationality, religion, social status or political opinions."

DHSFF0811

In the Resolution on Asylum to Persons in Danger of Persecution, adopted by the Committee of Ministers of the Council of Europe on 29 June 1967, it is recommended that member governments should be guided by the following principles:

> "1. They should act in a particularly liberal and humanitarian spirit in relation to persons who seek asylum on their territory.
>
> 2. They should, in the same spirit, ensure that no one shall be subjected to refusal of admission at the frontier, rejection, expulsion or any other measure which would have the result of compelling him to return to, or remain in, a territory where he would be in danger of persecution for reasons of race, religion, nationality, membership of a particular social group or political opinion."

Finally, Article III (3) of the Principles concerning the Treatment of Refugees adopted by the Asian-African Legal Consultative Committee at its Eighth Session in Bangkok in 1966, states that:

> "No one seeking asylum in accordance with these Principles should, except for overriding reasons of national security or safeguarding the populations, be subjected to measures such as rejection at the frontier, return or expulsion which would result in compelling him to return to or remain in a territory if there is a well-founded fear of persecution endangering his life, physical integrity or liberty in that territory."

In addition to statements in the above international instruments, the principle of *non-refoulement* has also found expression in the constitutions and/or ordinary legislation of a number of States.

Because of its wide acceptance, it is UNHCR's considered view, supported by jurisprudence and the work of jurists, that the principle of *non-refoulement* has become a norm of customary international law.[1] This view is based on a consistent State practice combined with a recognition on the part of States that the principle has a normative character. As outlined above, the principle has been incorporated in international treaties adopted at the universal and regional levels to which a large number of States have now become parties. Moreover, the principle has also been systematically reaffirmed in Conclusions of the Executive Committee and in resolutions adopted by the General Assembly, thus demonstrating international consensus in this respect and providing important guidelines for the interpretation of the aforementioned provisions.[2]

International human rights law provides additional forms of protection in this area. Article 3 of the 1984 UN Convention against Torture stipulates that no State Party shall expel, return ("*refouler*") or extradite a person to another State where there are substantial grounds for believing that he or she would be in danger of being subjected to torture.[3] Similarly, Art. 7 of the International Covenant on Civil and Political Rights has been interpreted as prohibiting the return of persons to places where torture or persecution is feared.[4] In the regional context, Article 3 of the European Convention for the Protection of Human Rights and Fundamental Freedoms has been interpreted by the European Court of Human Rights as implicitly prohibiting the return of anyone to a place where they would face a "real and substantiated" risk of ill-treatment in breach of the prohibition of torture or inhuman or degrading treatment or punishment.[5] While Art. 33 (2) of the 1951 Convention foresees exceptions to the principle of *non-refoulement*, international human rights law and most regional refugee instruments set forth an absolute prohibition, without exceptions of any sort.

DHSFF0812

## C. Beneficiaries

In the case of persons who have been formally recognised as refugees under the 1951 Convention and/or the 1967 Protocol, the observance of the principle of *non-refoulement* should not normally give rise to any difficulty.

In this connection, particular regard should be had to the fact that a determination of refugee status is only of a declaratory nature. The absence of formal recognition as a refugee does not preclude that the person concerned possesses refugee status and is therefore protected by the principle of *non-refoulement*.

In fact, respect for the principle of *non-refoulement* requires that asylum applicants be protected against return to a place where their life or freedom might be threatened until it has been reliably ascertained that such threats would not exist and that, therefore, they are not refugees. Every refugee is, initially, also an asylum applicant; therefore, to protect refugees, asylum applicants must be treated on the assumption that they may be refugees until their status has been determined. Without such a rule, the principle of *non-refoulement* would not provide effective protection for refugees, because applicants might be rejected at the frontier or otherwise returned to persecution on the grounds that their claim had not been established. That the principle of *non-refoulement* applies to refugees, irrespective of whether they have been formally recognised as such - that is, even before a decision can be made on an application for refugee status - has been specifically acknowledged by the UNHCR Executive Committee in its Conclusion No. 6 on *Non-Refoulement*. And indeed, where a special procedure for the determination of refugee status under the 1951 Convention and the 1967 Protocol exists, the applicant is almost invariably protected against *refoulement* pending a determination of his or her refugee status.

There are, however, a number of situations in which the observance of the principle of *non-refoulement* is called for, but where its application may give rise to difficulties. Thus the person concerned may find himself in a State which is not a party to the 1951 Convention or the 1967 Protocol, or which, although a party to these instruments, has not established a formal procedure for determining refugee status. The authorities of the country of asylum may have allowed the refugee to reside there with a normal residence permit or may simply have tolerated his or her presence and not have found it necessary formally to document his or her recognition as a refugee. In other cases, the person concerned may have omitted to make a formal request to be considered a refugee.

In situations of this kind it is essential that the principle of *non-refoulement* be scrupulously observed even though the person concerned has not - or has not yet - been formally documented as a refugee. Again, this flows from the fact that, first, the recognition of a person as a refugee, whether under UNHCR's mandate or under the 1951 Convention or the 1967 Protocol, is declaratory in nature, and, second, that the principle of *non-refoulement* is a norm of customary international law.

The need to provide international protection to persons fleeing armed conflict and civil strife, whether or not they come within the terms of the 1951 Convention definition, is generally accepted in practice by States as a humanitarian responsibility. The protection accorded in these countries to persons who are not deemed to be refugees under the 1951 Convention is normally granted as a humanitarian act, or as a duty under national law (including constitutional provisions). It should also be noted that many of these countries are parties to international instruments that could be invoked in certain circumstances against the return of some non-Convention refugees to a place where their lives, freedom or other fundamental rights would be in jeopardy, notably the 1984 Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment or the European Human

Rights Convention. Although these instruments may not provide protection against *refoulement*as broad as that provided in Africa by the OAU Refugee Convention, they give rise to international obligations towards some persons in need of international protection who would not come within the terms of the 1951 Convention.

This issue is also related to mass influxes and the concept of temporary protection. The concept of temporary protection has been defined as a means, in situations of large-scale influx and in view of the impracticality of conducting individual refugee status determination procedures, for providing protection to groups or categories of persons who are in need of international protection. It is primarily conceived as an emergency protection measure of short duration in response to large-scale influxes, guaranteeing admission to safety, protection from *non-refoulement* [6] and respect for an appropriate standard of treatment. While the practice of granting temporary refuge, or asylum, on a temporary basis to refugees has often been employed in situations of large-scale influx in various regions, UNHCR first formally recommended the granting of temporary protection to persons fleeing the conflict and human rights abuses in the former Yugoslavia.

The applicability of the *non-refoulement* principle to beneficiaries of temporary protection is explained by the fact that, among its beneficiaries, there are refugees in the sense of the 1951 Convention and also because they are asylum-seekers who have not had their claims determined. The EU proposal concerning temporary protection, submitted by the Commission, expressly recognises this linkage with the *non-refoulement* principle in its preamble.

In Latin America, the scope of the Cartagena Declaration closely resembles the OAU Refugee Convention, also with respect to the *non-refoulement* principle. This Declaration was adopted by a group of experts and representatives from Governments at a Colloquium held in Cartagena, Colombia, in November 1984. Building on the precedent provided by the OAU Convention and on the work of the Inter-American Commission on Human Rights, the Declaration recommends the use in the region of a *"definition or concept of refugee ... which, in addition to containing the elements of the 1951 Convention and the 1967 Protocol, includes among refugees persons who have fled their country because their lives, safety or freedom have been threatened by generalised violence, foreign aggression, internal conflicts, massive violation of human rights or other circumstances which have seriously disturbed public order."* Although the Declaration itself is not a binding legal instrument, it has repeatedly been endorsed by the Organisation of American States (OAS). The Cartagena Declaration has widely been accepted as the refugee protection basis in Latin America and has been incorporated into the national legislation of several Latin American States.

## D.  Measures of *refoulement*

Measures of *refoulement* are various and include expulsion/deportation orders against refugees, return of refugees to countries of origin or unsafe third countries, electrified fences to prevent entry, non-admission of stowaway asylum-seekers and push-offs of boat arrivals or interdictions on the high seas.

Whenever refugees - or asylum-seekers who may be refugees - are subjected, either directly or indirectly, to such measures of return, be it in the form of rejection, expulsion or otherwise, to territories where their life or freedom are threatened, the principle of *non-refoulement* has been violated.

Furthermore, having regard to the nature and purpose of the principle, it also applies to extradition. Indeed, the protection of a refugee cannot be regarded as complete unless he or she is also protected

DHSFF0814

against extradition to a country where he or she has reason to fear persecution. Insofar as their actual wording is concerned, statements of the principle of *non-refoulement* figuring in various international instruments are wide enough to cover extradition. This applies in particular as regards the wording of Article 33 (1) of the 1951 Convention. Most extradition conventions also foresee a safeguard against extradition to countries of persecution.[7]

## E.  Territorial application

Since the purpose of the principle of *non-refoulement* is to ensure that refugees are protected against forcible return to situations of danger it applies both within a State's territory and to rejection at its borders. It also applies outside the territory of States. In essence, it is applicable wherever States act.

It has been argued that the principle of *non-refoulement* is not binding on a State outside its own national territory, so that a Government may return refugees directly to persecution provided they have not yet reached or crossed its borders. This claim is clearly inconsistent with the purpose, and is contrary to the spirit, of the 1951 Convention and its 1967 Protocol, as well as of international refugee law generally. No such territorial limitation applies, for instance, to UNHCR's mandate to provide international protection to refugees. In fact, UNHCR's position on interdiction-at-sea is that this is inconsistent with the international refugee protection regime, especially since, among those leaving, there may be people who have concerns about their physical security and safety. There must be a possibility for these people to reach safety and have their protection needs assessed and met. Interdiction and compulsory return preclude this.

## F.  Exceptions to the principle of *non-refoulement*

While the principle of *non-refoulement* is basic, it is recognised that there may be certain legitimate exceptions to the principle.

Article 33 (2) of the 1951 Convention provides that the benefit of the *non-refoulement* principle may not be claimed by a refugee 'whom there are reasonable grounds for regarding as a danger to the security of the country ... or who, having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country'. This means in essence that refugees can exceptionally be returned on two grounds: (i) in case of threat to the national security of the host country; and (ii) in case their proven criminal nature and record constitute a danger to the community. The various elements of these extreme and exceptional circumstances need, however, to be interpreted.

With regard to the 'national security' exception (that is, having reasonable grounds for regarding the person as a danger to the security of the country), while the evaluation of the danger remains within the province of the national authorities, the term clearly implies a threat of a different kind than a threat to 'public order' or even to 'the community'. In 1977, the European Court of Justice ruled that there must be a genuine and sufficiently serious threat to the requirements of public policy affecting one of the fundamental interests of society (Reg. vs. Bouchereau, 2CMLR 800). It follows from state practice and the Convention *travaux* preparations that criminal offences without any specific national security implications are not to be deemed threats to national security, and that national security exceptions to *non-refoulement* are not appropriate in local or isolated threats to law and order.

With regard to the interpretation of the 'particularly serious crime'-exception, two basic elements must be kept in mind. First, as Article 33 (2) is an exception to a principle, it is to be interpreted and

DHSFF0815

implemented in a restrictive manner, as confirmed by Executive Committee Conclusion No. 7. Second, given the seriousness of an expulsion for the refugee, such a decision should involve a careful examination of the question of proportionality between the danger to the security of the community or the gravity of the crime, and the persecution feared. The application of this exception must be the ultima ratio (the last recourse) to deal with a case reasonably.

For Article 33 (2) to apply, therefore, it is generally agreed that the crime itself must be of a very grave nature. UNHCR has recommended that such measures should only be considered when one or several convictions are symptomatic of the basically criminal, incorrigible nature of the person and where other measures, such as detention, assigned residence or resettlement in another country are not practical to prevent him or her from endangering the community. Read in conjunction with Articles 31 and 32 of the 1951 Convention, a State should allow a refugee a reasonable period of time and all necessary facilities to obtain admission into another country, and initiate *refoulement* only when all efforts to obtain admission into another country have failed.

In conclusion, in view of the serious consequences to a refugee of being returned to a country where he or she is in danger of persecution, the exception provided for in Article 33 (2) should be applied with the greatest caution. It is necessary to take fully into account all the circumstances of the case and, where the refugee has been convicted of a serious criminal offence, any mitigating factors and the possibilities of rehabilitation and reintegration within society.

It should also be noted that such exceptions based on factors relating to the person concerned do not figure in other instruments, neither in the international refugee instruments nor in international human rights law. The 1969 OAU Convention, for example, does not provide for expulsion or *refoulement* of refugees under any circumstances. Instead, it calls on Member States to appeal to other Member States should they find difficulty in continuing to grant asylum.

## G. *Non-refoulement* and the safe third country concept

The following paragraphs set out some basic considerations in view of the importance of the safe third country concept in the context of the discussion of minimum guarantees for asylum procedures in relation to the principle of *non-refoulement*.

One of the problems that may arise in applying the safe third country concept to asylum-seekers is the difficulty of determining whether another country in which an asylum-seeker can reasonably be expected to request asylum, will, in fact, accept responsibility for examining his or her request and, if appropriate, granting asylum. UNHCR is aware of a number of instances where asylum-seekers have been refused admission and returned to a country through which they had passed, only to be summarily sent onwards from there, without an examination of their claim, either to their country of origin or to another, clearly unsafe country. Where asylum-seekers are returned to third countries, this needs to be implemented with due regard to the principle of *non-refoulement*. Without the prior consent and the co-operation of the country to which an asylum-seeker is returned, there is a grave risk that an asylum-seeker's claim may not receive a fair hearing there and that a refugee may be sent on, directly or indirectly, to persecution, in violation of the principle of *non-refoulement* and of Article 33 of the 1951 Convention.

In UNHCR's view, the proper application of the safe third country concept requires identifying a country that will actually accept responsibility for examining the asylum request and hence ensure that refugees and asylum-seekers receive 'somewhere' the protection they require.

If asylum-seekers are to be returned to a country where effective protection is conditional upon the determination of the asylum claim, then assured access to a refugee status determination procedure that is consistent with the 1951 Convention and 1967 Protocol is a prerequisite for such return. It is accordingly necessary to establish both that access to the refugee status determination procedure will be granted and that the procedure includes the necessary safeguards to ensure compliance with Article 33 of the 1951 Convention, including safeguards to ensure respect for the principle of *non-refoulement* in case the asylum-seeker is sent to yet another country on the grounds that protection and asylum could be obtained there.

## H.  Conclusion

The most essential component of refugee status and of asylum is protection against return to a country where a person has reason to fear persecution and danger. This protection has found expression in the principle of *non-refoulement*.

As States, particularly in the industrialised world, intensify and co-ordinate their efforts to curb irregular immigration, there is concern that the legal and administrative measures adopted, including measures to expedite asylum procedures and to shift the responsibility for considering asylum requests to other countries, may have the unintended result of placing refugees in situations that could ultimately lead to *refoulement* to their country of origin or other territories where their life or freedom would be threatened.

When it comes to the establishment and implementation of national procedures for the determination of refugee status, measures are therefore required to ensure that respect for the principle of *non-refoulement* remains the guiding principle and ultimate objective of any refugee protection regime.

Office of the United Nations High Commissioner for Refugees

November 1997

---

[1] UNHCR and its Executive Committee have even argued that the principle of *non-refoulement* is progressively acquiring the character of *ius cogens*; see Executive Committee Conclusion No. 25 para. (b); UN docs. A/AC.96/694 para 21.; A/AC.96/660 para. 17; A/AC.96/643 para. 15; A/AC.96/609/Rev.1 para. 5.

[2] See in particular Executive Committee Conclusion No. 6 on *Non-Refoulement*.

3] See for instance Communications No. 41/1996 (vs.Sweden) and No. 21/1995 (vs. Switzerland).

4] For more details see M. Nowak, UN Covenant on Civil and Political Rights: CCPR Commentary (1993), Article 7 para. 21.

5] The European Human Rights Convention does not foresee a right of entry or asylum. The interpretation of Article 3 can, however, be seen as a limit to the power of States to expel aliens. For further information see UNHCR, 'The European Convention on Human Rights and the Protection of Refugees, Asylum-Seekers and Displaced Persons', *European Series* 2 (1996), No. 3. As regards

recent jurisprudence, see *Ahmed vs. Austria* Judgement 71/1995/577/663 of 17 December 1996 and *Chahal vs. the United Kingdom* Judgement 70/1995/576/662 of 15 November 1996.

[6] See also Executive Committee Conclusion No. 22 para. II A 2: "*In all cases the fundamental principle of non-refoulement - including non-rejection at the frontier - must be scrupulously observed.*"

[7] See for instance Article 5 of the European Convention on the Suppression of Terrorism.

---

## Search Refworld

by keyword [Enter a word or phrase]

and / or country [All countries ▽]

[Clear] [Search]

---

[Advanced Search] | [Search Tips]

## Topics

- [Non-refoulement](#)
- [Refoulement](#)



**Legal Considerations regarding access to protection and a connection between the refugee and the third country in the context of return or transfer to safe third countries**

**Introduction**

1.      This paper aims to summarise UNHCR's position, reflecting international law and practice, on access to protection and rights in the context of transfer to 'first countries of asylum' and 'safe third countries'. It examines in particular the relevance of a connection between the refugee and the third country in the application of such concepts and the issue of access to and level of protection that needs to be guaranteed by the third country. The evolution of UNHCR's position and the documents in which it has been expressed are set out in the references.

2.      In line with general state practice and international law, ensuring refugee protection and access to human rights for individual refugees is the responsibility of the state where the refugees are, or which otherwise has jurisdiction over them. This reflects the primary responsibility for protection of the state in which a person arrives and seeks international protection. At the same time, refugees do not have an unfettered right to choose their 'asylum country'.[1] Their intentions, however, ought to be taken into account.[2] Refugees may be returned or transferred to a state where they had found, could have found or, pursuant to a formal agreement, can find international protection. The 1951 Convention relating to the Status of Refugees and its 1967 Protocol do not prohibit such return or transfer. According to relevant conclusions of UNHCR's Executive Committee, where refugees and asylum-seekers move in an irregular manner from a country where they have already found protection, they may be returned to that country.[3] Furthermore, according to relevant conclusions of UNHCR's Executive Committee, where it appears that a person, before requesting asylum, already has a connection or close links with another state, s/he may if it appears fair and reasonable be called upon first to request asylum from that state.[4]

**General considerations on applying the first country of asylum and safe third country concepts**

3.      The 'first country of asylum' concept is generally applied in cases where a person has already, in a previous state, found international protection that continues to be accessible and effective for the individual concerned. Application of the concept requires an individual assessment of whether the refugee will be readmitted to the 'first country of asylum', granted lawful stay[5] there, and be accorded standards of treatment commensurate with the 1951 Convention and its 1967 Protocol and international human rights standards, including – but not limited to – protection from *refoulement*.[6]

---

[1] UNHCR, *Guidance Note on bilateral and/or multilateral transfer arrangements of asylum-seekers*, May 2013, para. 3(i), http://www.refworld.org/docid/51af82794.html. UNHCR, *Summary Conclusions on the Concept of "Effective Protection" in the Context of Secondary Movements of Refugees and Asylum-Seekers (Lisbon Expert Roundtable, 9-10 December 2002)*, February 2003, para. 11, http://www.refworld.org/docid/3fe9981e4.html.
[2] *Ibid*. EXCOM Conclusion No. 15 (XXX) 1979, para. (h) (iii).
[3] EXCOM Conclusion No. 58 (XL) 1989, para. (f).
[4] EXCOM Conclusion No. 15 (XXX) 1979, para. (h) (iv).
[5] 'Lawful stay' means a permitted, regularized stay of some duration integral to the refugees' enjoyment of rights and necessary if a state is to implement its obligations under the 1951 Convention, see UNHCR, *"Lawfully Staying" - A Note on Interpretation*, 3 May 1988, paras. 11, 21 and 23, http://www.refworld.org/docid/42ad93304.html.
[6] EXCOM Conclusion No. 58 (XL) 1989, para. (f) and EXCOM Conclusion No. 85 (XLIX) 1998, para. (aa). UNHCR, *Summary Conclusions on the Concept of "Effective Protection" in the Context of Secondary Movements of Refugees and Asylum-Seekers (Lisbon Expert Roundtable, 9-10 December 2002)*, February 2003, para. 15, http://www.refworld.org/docid/3fe9981e4.html. UNHCR, *Global Consultations on International Protection/Third Track: Asylum Processes (Fair and Efficient Asylum Procedures)*, 31 May 2001, EC/GC/01/12, paras. 10 and 11, http://www.refworld.org/docid/3b36f2fca.html. UNHCR, *UNHCR Policy on Refugee Protection and Solutions in Urban*

DHSFF0819

4.      The 'safe third country concept' has been applied in cases where a person could have or can find protection in a third state either in relation to a specific individual case or pursuant to a formal bi- or multilateral agreement between states on the transfer of asylum-seekers.[7] Prior to transfer, it is important, keeping with relevant international law standards, individually to assess whether the third state will:

≠   (re)admit the person,

≠   grant the person access to a fair and efficient procedure for determination of refugee status and other international protection needs,

≠   permit the person to remain while a determination is made, and

≠   accord the person standards of treatment commensurate with the 1951 Convention and international human rights standards, including – but not limited to –  protection from *refoulement*.[8]

≠   Where she or he is determined to be a refugee, s/he should be recognized as such and be granted lawful stay.[9]

5.      In some circumstances, transfers or relocation of refugees or asylum-seekers under a bilateral or multilateral arrangement has been carried out in the absence of an individual assessment. This would require both the existence and availability of certain objective standards of protection in the third state, as well as firm undertakings by that country that those returned will have access to protection, assistance and solutions in line with the guarantees set out above in paragraph 4. Pre-transfer individual assessments, however, are nonetheless necessary for vulnerable groups, including unaccompanied and separated children, with the best interests of the child being given primary consideration.[10]

**Connection with the third country**

6.      According to relevant conclusions of UNHCR's Executive Committee, regard should be had to the concept that asylum should not be refused solely on the ground that it could be sought from another state. Where, however, it appears that a person, before requesting asylum, already has a connection or close links with another state, s/he may if it appears fair and reasonable be called upon first to request asylum from

---

*Areas*, September 2009, paras. 153 and 154, http://www.refworld.org/docid/4ab8e7f72.html. UNHCR, *Guidance Note on bilateral and/or multilateral transfer arrangements of asylum-seekers*, May 2013, para. 3(vi), http://www.refworld.org/docid/51af82794.html. UNHCR, *Considerations on the "Safe Third Country" Concept*, July 1996, http://www.refworld.org/docid/3ae6b3268.html.

[7] UNHCR, *Guidance Note on bilateral and/or multilateral transfer arrangements of asylum-seekers*, May 2013, para. 2, http://www.refworld.org/docid/51af82794.html.

[8] EXCOM Conclusion No. 85 (XLIX) 1998, para. (aa). UNHCR, *Summary Conclusions on the Concept of "Effective Protection" in the Context of Secondary Movements of Refugees and Asylum-Seekers (Lisbon Expert Roundtable, 9-10 December 2002)*, February 2003, para. 15, http://www.refworld.org/docid/3fe9981e4.html. UNHCR, *Global Consultations on International Protection/Third Track: Asylum Processes (Fair and Efficient Asylum Procedures)*, 31 May 2001, EC/GC/01/12, paras. 14 and 15, http://www.refworld.org/docid/3b36f2fca.html. UNHCR, *UNHCR Policy on Refugee Protection and Solutions in Urban Areas*, September 2009, paras. 153 and 154, http://www.refworld.org/docid/4ab8e7f72.html. UNHCR, *Guidance Note on bilateral and/or multilateral transfer arrangements of asylum-seekers*, May 2013, para. 3(vi), http://www.refworld.org/docid/51af82794.html. UNHCR, *Considerations on the "Safe Third Country" Concept*, July 1996, http://www.refworld.org/docid/3ae6b3268.html.

[9] UNHCR, *Summary Conclusions on the Concept of "Effective Protection" in the Context of Secondary Movements of Refugees and Asylum-Seekers (Lisbon Expert Roundtable, 9-10 December 2002)*, February 2003, para. 15, http://www.refworld.org/docid/3fe9981e4.html. UNHCR, *UNHCR Policy on Refugee Protection and Solutions in Urban Areas*, September 2009, para. 153, http://www.refworld.org/docid/4ab8e7f72.html. UNHCR, *Guidance Note on bilateral and/or multilateral transfer arrangements of asylum-seekers*, May 2013, para. 3(vi), http://www.refworld.org/docid/51af82794.html.

[10] See, e.g. Article 3 of the Convention on the Rights of the Child (2 September 1990) 1577 UNTS 3; UNHCR, *UNHCR Guidelines on Determining the Best Interests of the Child*, May 2008, http://www.refworld.org/docid/48480c342.html; and UN Committee on the Rights of the Child (CRC), *General comment No. 6 (2005): Treatment of Unaccompanied and Separated Children Outside their Country of Origin*, 1 September 2005, CRC/GC/2005/6, http://www.refworld.org/docid/42dd174b4.html.

DHSFF0820

that state.[11] Requiring a connection between the refugee or asylum-seeker and the third state is not mandatory under international law. The person may well be returned to a country through which s/he may have passed *en route*,[12] or the person may be transferred to a country to which s/he has never been but that has agreed, by way of a formal arrangement, to be responsible.[13] In follow up to relevant conclusions of UNHCR's Executive Committee, UNHCR though has consistently been advocating for a meaningful link or connection to exist that would make it reasonable and sustainable for a person to seek asylum in another state.[14] Taking into account the duration and nature of any sojourn, and connections based on family or other close ties[15] increases the viability of the return or transfer from the viewpoint of both the individual and the state. As such, it reduces the risk of irregular onward movement, prevents the creation of 'orbit' situations [16] and advances international cooperation and responsibility sharing. In this context, transfers to third countries should be aimed at enhancing burden- and responsibility-sharing and international/regional cooperation, and not be burden shifting. Transfers to third countries need to contribute to the enhancement of the overall protection space in the transferring state, the receiving state and/or the region as a whole.[17]

**Access to and level of protection in the third country**

7.       As a precondition to return or transfer of an asylum-seeker or refugee to another country, it is crucial to establish that s/he has access in that country to standards of treatment commensurate with the 1951 Convention, its 1967 Protocol and international human rights standards.[18] While protection from *refoulement* is at the centre of refugee protection principles, the standards of treatment to which refugees and asylum-seekers have a right under the 1951 Convention, its 1967 Protocol and international human rights law go beyond protection from *refoulement*.[19]

---

[11] EXCOM Conclusion No. 15 (XXX) 1979, para. (h) (iv).

[12] UNHCR, *Global Consultations on International Protection/Third Track: Asylum Processes (Fair and Efficient Asylum Procedures)*, 31 May 2001, EC/GC/01/12, paras. 12 and 16, http://www.refworld.org/docid/3b36f2fca.html.

[13] UNHCR, *Guidance Note on bilateral and/or multilateral transfer arrangements of asylum-seekers*, May 2013, para. 2, http://www.refworld.org/docid/51af82794.html.

[14]      UNHCR, *Considerations on the "Safe Third Country" Concept*, July 1996, http://www.refworld.org/docid/3ae6b3268.html. UNHCR, *Global Consultations on International Protection/Third Track: Asylum Processes (Fair and Efficient Asylum Procedures)*, 31 May 2001, EC/GC/01/12, para. 16 (final sentence), http://www.refworld.org/docid/3b36f2fca.html. UNHCR, *Summary Conclusions on the Concept of "Effective Protection" in the Context of Secondary Movements of Refugees and Asylum-Seekers (Lisbon Expert Roundtable, 9-10 December 2002)*, February 2003, para. 12, http://www.refworld.org/docid/3fe9981e4.html.

[15] UNHCR has identified such ties as including family relations; previously acquired rights in the state such as previous residence or long-term visits, and linguistic, cultural or other similar ties. See, for example: UNHCR, *Considerations on the "Safe Third Country" Concept*, July 1996, http://www.refworld.org/docid/3ae6b3268.html; UNHCR, *Improving Asylum Procedures: Comparative Analysis and Recommendations for Law and Practice - Detailed Research on Key Asylum Procedures Directive Provisions*, March 2010, p. 311, http://www.refworld.org/docid/4c63e52d2.html.

[16] EXCOM Conclusion No. 71 (XLIV) 1993, para. (k).

[17] UNHCR, *Guidance Note on bilateral and/or multilateral transfer arrangements of asylum-seekers*, May 2013, para. 3(iv), http://www.refworld.org/docid/51af82794.html.

[18] EXCOM Conclusion No. 87 (L) 1999, para. (l), According to which, asylum-seekers and refugees must be treatment in accordance with the highest possible standards of protection.

[19] EXCOM Conclusion No. 85 (XLIX) 1998, para. (aa), stressing that asylum-seekers who are returned to a third country will be treated in accordance with accepted international standards, will be protected from *refoulement*, and will be able to seek and enjoy asylum. UN General Assembly, *Note on International Protection*, 7 July 1999, A/AC.96/914, para. 19, http://www.refworld.org/docid/3ae68d98b.html, considering that no asylum-seeker should be returned to a third country for determination of the claim without sufficient guarantees, in each individual case: that the person will be readmitted to that country; will enjoy there effective protection against *refoulement*; will have the possibility to seek and enjoy asylum; and will be treated in accordance with accepted international standards. UNHCR, *Global Consultations on International Protection/Third Track: Asylum Processes (Fair and Efficient Asylum Procedures)*, 31 May 2001, EC/GC/01/12, para. 11, http://www.refworld.org/docid/3b36f2fca.html, indicating that securing "effective protection" requires the full and durable enjoyment of rights. UN High Commissioner for Refugees (UNHCR), *Guidance Note on bilateral and/or multilateral transfer arrangements of asylum-seekers*, May 2013, para. 3(vi), http://www.refworld.org/docid/51af82794.html. UNHCR, *The Concept of 'Protection Elsewhere'*, 7 IJRL 123 (1995), p. 125, in which UNHCR 'welcomes the fact that the definition of 'safe' now includes not only protection from *refoulement* but also the absence of 'other violations of fundamental human rights', in response to a Note submitted by the government of the United Kingdom to the Inter-Governmental Consultations on 'Sending Asylum Seekers to Safe Third Countries'.

DHSFF0821

8.      Refugees who have been so recognized and found protection in a third state need to have the opportunity to re-avail themselves of the protection previously afforded to them as refugees. Upon return, they need to be granted lawful stay in the country and as such entitled to the corresponding rights of the 1951 Convention, i.e. all rights applicable to refugees generally, including protection from *refoulement* and access to the legal right to pursue gainful employment in accordance with Articles 17, 18 and 19 of the 1951 Convention in order to enable the progressive achievement of self-reliance.[20]

9.      When it has not yet been determined by the third state whether the person seeking protection is a refugee or otherwise in need of international protection, upon return or transfer to the third country the person needs to be granted access to a fair and efficient asylum procedure and be authorized to remain in the country, until and unless a final negative determination of the asylum-seeker's claim to refugee protection is rendered. During this time the asylum-seeker is lawfully in the state.[21] Protective obligations under the 1951 Convention applicable to refugees generally, including protection from *refoulement*, to refugees present in the territory, and to refugees 'lawfully in' are relevant. This includes the requirement for the third state to provide asylum-seekers access to means of subsistence sufficient to maintain an adequate standard of living [22] and to undertake steps to enable the progressive achievement of self-reliance.[23] As such, although the enjoyment of the right to self-employment under Article 18 of the 1951 Convention may be delayed for a limited period of time, it cannot be denied over the long-term because of government delays in the asylum procedures.[24] Once it is determined the person is a refugee, s/he should be granted lawful stay and have access to the corresponding rights of the 1951 Convention as mentioned above in paragraph 8.

10.      Whether standards of treatment commensurate with the 1951 Convention, its 1967 Protocol and international human rights standards are available cannot be answered without looking at the state's international legal obligations, its domestic laws and the actual practice of implementation.[25] To ensure access to protection is effective and enduring, being a state party to the 1951 Convention and/or its 1967 Protocol and basic human rights instruments without any limitations is a critical indicator.[26] Access

---

[20] UNHCR, *Summary Conclusions on the Concept of "Effective Protection" in the Context of Secondary Movements of Refugees and Asylum-Seekers (Lisbon Expert Roundtable, 9-10 December 2002)*, February 2003, para. 15(g), http://www.refworld.org/docid/3fe9981e4.html.

[21] UNHCR, *Guidelines on the Applicable Criteria and Standards relating to the Detention of Asylum-Seekers and Alternatives to Detention*, 2012, para. 13, http://www.refworld.org/docid/503489533b8.html. UNHCR, *"Lawfully Staying" - A Note on Interpretation*, 3 May 1988, http://www.refworld.org/docid/42ad93304.html.

[22] Article 11, International Covenant on Economic, Social and Cultural Rights.

[23] UNHCR, *Improving Asylum Procedures: Comparative Analysis and Recommendations for Law and Practice - Detailed Research on Key Asylum Procedures Directive Provisions*, March 2010, p. 283, http://www.refworld.org/docid/4c63e52d2.html.

[24] (UNHCR), *Expert opinion of UNHCR on issues of the right to work for refugees and asylum-seekers in the case of [South African Somali Association vs Limpopo Department of Economic Development, Environment and Tourism] in the North Gauteng High Court, Pretoria, South Africa*, 14 March 2013, 12/HCR/RSA/ADM/594, http://www.refworld.org/docid/5215d0734.html.

[25] UNHCR, *Global Consultations on International Protection/Third Track: Asylum Processes (Fair and Efficient Asylum Procedures)*, 31 May 2001, EC/GC/01/12, para. 14, http://www.refworld.org/docid/3b36f2fca.html. UNHCR, *Improving Asylum Procedures: Comparative Analysis and Recommendations for Law and Practice - Detailed Research on Key Asylum Procedures Directive Provisions*, March 2010, p. 283, http://www.refworld.org/docid/4c63e52d2.html. UNHCR, *Summary Conclusions on the Concept of "Effective Protection" in the Context of Secondary Movements of Refugees and Asylum-Seekers (Lisbon Expert Roundtable, 9-10 December 2002)*, February 2003, para. 15 (e), http://www.refworld.org/docid/3fe9981e4.html. UNHCR, *Guidance Note on bilateral and/or multilateral transfer arrangements of asylum-seekers*, May 2013, para. 3(iii) and 3(viii), http://www.refworld.org/docid/51af82794.html. UNHCR, *Considerations on the "Safe Third Country" Concept*, July 1996, http://www.refworld.org/docid/3ae6b3268.html.

[26] UNHCR, *Summary Conclusions on the Concept of "Effective Protection" in the Context of Secondary Movements of Refugees and Asylum-Seekers (Lisbon Expert Roundtable, 9-10 December 2002)*, February 2003, para. 15(e), http://www.refworld.org/docid/3fe9981e4.html. It should be noted that the conclusion considers accession to and

to human rights standards and standards of treatment commensurate with the 1951 Convention and its 1967 Protocol may only be effectively and durably guaranteed when the state is obliged to provide such access under international treaty law, has adopted national laws to implement the relevant treaties and can rely on actual practice indicating consistent compliance by the state with its international legal obligations.

**UNHCR**
**April 2018**

---

compliance with the 1951 Convention and/or its 1967 Protocol to be essential, unless the destination country can demonstrate it has developed a practice akin to the 1951 Convention and/or its 1967 Protocol.

DHSFF0823

L 180/60    EN      Official Journal of the European Union      29.6.2013

# DIRECTIVES

## DIRECTIVE 2013/32/EU OF THE EUROPEAN PARLIAMENT AND OF THE COUNCIL

### of 26 June 2013

### on common procedures for granting and withdrawing international protection (recast)

THE EUROPEAN PARLIAMENT AND THE COUNCIL OF THE EUROPEAN UNION,

Having regard to the Treaty on the Functioning of the European Union, and in particular Article 78(2)(d) thereof,

Having regard to the proposal from the European Commission,

Having regard to the opinion of the European Economic and Social Committee (¹),

After consulting the Committee of the Regions,

Acting in accordance with the ordinary legislative procedure (²),

Whereas:

(1) A number of substantive changes are to be made to Council Directive 2005/85/EC of 1 December 2005 on minimum standards on procedures for granting and withdrawing refugee status (³). In the interest of clarity, that Directive should be recast.

(2) A common policy on asylum, including a Common European Asylum System, is a constituent part of the European Union's objective of establishing progressively an area of freedom, security and justice open to those who, forced by circumstances, legitimately seek protection in the Union. Such a policy should be governed by the principle of solidarity and fair sharing of responsibility, including its financial implications, between the Member States.

(3) The European Council, at its special meeting in Tampere on 15 and 16 October 1999, agreed to work towards establishing a Common European Asylum System, based on the full and inclusive application of the Geneva Convention Relating to the Status of Refugees of 28 July 1951, as amended by the New York Protocol of 31 January 1967 ('the Geneva Convention'), thus affirming the principle of *non-refoulement* and ensuring that nobody is sent back to persecution.

(4) The Tampere Conclusions provide that a Common European Asylum System should include, in the short term, common standards for fair and efficient asylum procedures in the Member States and, in the longer term, Union rules leading to a common asylum procedure in the Union.

(5) The first phase of a Common European Asylum System was achieved through the adoption of relevant legal instruments provided for in the Treaties, including Directive 2005/85/EC, which was a first measure on asylum procedures.

(6) The European Council, at its meeting of 4 November 2004, adopted The Hague Programme, which set the objectives to be implemented in the area of freedom, security and justice in the period 2005-10. In this respect, The Hague Programme invited the European Commission to conclude the evaluation of the first-phase legal instruments and to submit the second-phase instruments and measures to the European Parliament and to the Council. In accordance with The Hague Programme, the objective to be pursued for the creation of the Common European Asylum System is the establishment of a common asylum procedure and a uniform status valid throughout the Union.

(7) In the European Pact on Immigration and Asylum, adopted on 16 October 2008, the European Council noted that considerable disparities remained between one Member State and another concerning the grant of protection and called for new initiatives, including a proposal for establishing a single asylum procedure comprising common guarantees, to complete the establishment of a Common European Asylum System, provided for in The Hague Programme.

(¹) OJ C 24, 28.1.2012, p. 79.
(²) Position of the European Parliament of 6 April 2011 (OJ C 296 E, 2.10.2012, p. 184) and position of the Council at first reading of 6 June 2013 (not yet published in the Official Journal). Position of the European Parliament of 10 June 2013 (not yet published in the Official Journal).
(³) OJ L 326, 13.12.2005, p. 13.

(8) The European Council, at its meeting of 10-11 December 2009, adopted the Stockholm Programme which reiterated the commitment to the objective of establishing by 2012 a common area of protection and solidarity based on a common asylum procedure and a uniform status for those granted international protection based on high protection standards and fair and effective procedures. The Stockholm Programme affirmed that people in need of international protection must be ensured access to legally safe and efficient asylum procedures. In accordance with the Stockholm Programme, individuals should be offered the same level of treatment as regards procedural arrangements and status determination, regardless of the Member State in which their application for international protection is lodged. The objective is that similar cases should be treated alike and result in the same outcome.

(9) The resources of the European Refugee Fund and of the European Asylum Support Office (EASO) should be mobilised to provide adequate support to Member States' efforts in implementing the standards set in the second phase of the Common European Asylum System, in particular to those Member States which are faced with specific and disproportionate pressures on their asylum systems, due in particular to their geographical or demographic situation.

(10) When implementing this Directive, Member States should take into account relevant guidelines developed by EASO.

(11) In order to ensure a comprehensive and efficient assessment of the international protection needs of applicants within the meaning of Directive 2011/95/EU of the European Parliament and of the Council of 13 December 2011 on standards for the qualification of third-country nationals or stateless persons as beneficiaries of international protection, for a uniform status for refugees or for persons eligible for subsidiary protection, and for the content of the protection granted ($^1$), the Union framework on procedures for granting and withdrawing international protection should be based on the concept of a single procedure.

(12) The main objective of this Directive is to further develop the standards for procedures in Member States for granting and withdrawing international protection with a view to establishing a common asylum procedure in the Union.

(13) The approximation of rules on the procedures for granting and withdrawing international protection should help to limit the secondary movements of applicants for international protection between Member States, where such movements would be caused by

differences in legal frameworks, and to create equivalent conditions for the application of Directive 2011/95/EU in Member States.

(14) Member States should have the power to introduce or maintain more favourable provisions for third-country nationals or stateless persons who ask for international protection from a Member State, where such a request is understood to be on the grounds that the person concerned is in need of international protection within the meaning of Directive 2011/95/EU.

(15) With respect to the treatment of persons falling within the scope of this Directive, Member States are bound by obligations under instruments of international law to which they are party.

(16) It is essential that decisions on all applications for international protection be taken on the basis of the facts and, in the first instance, by authorities whose personnel has the appropriate knowledge or has received the necessary training in the field of international protection.

(17) In order to ensure that applications for international protection are examined and decisions thereon are taken objectively and impartially, it is necessary that professionals acting in the framework of the procedures provided for in this Directive perform their activities with due respect for the applicable deontological principles.

(18) It is in the interests of both Member States and applicants for international protection that a decision is made as soon as possible on applications for international protection, without prejudice to an adequate and complete examination being carried out.

(19) In order to shorten the overall duration of the procedure in certain cases, Member States should have the flexibility, in accordance with their national needs, to prioritise the examination of any application by examining it before other, previously made applications, without derogating from normally applicable procedural time limits, principles and guarantees.

(20) In well-defined circumstances where an application is likely to be unfounded or where there are serious national security or public order concerns, Member States should be able to accelerate the examination procedure, in particular by introducing shorter, but reasonable, time limits for certain procedural steps, without prejudice to an adequate and complete examination being carried out and to the applicant's effective access to basic principles and guarantees provided for in this Directive.

($^1$) OJ L 337, 20.12.2011, p. 9.

DHSFF0825

(21) As long as an applicant can show good cause, the lack of documents on entry or the use of forged documents should not *per se* entail an automatic recourse to border or accelerated procedures.

(22) It is also in the interests of both Member States and applicants to ensure a correct recognition of international protection needs already at first instance. To that end, applicants should be provided at first instance, free of charge, with legal and procedural information, taking into account their particular circumstances. The provision of such information should, inter alia, enable the applicants to better understand the procedure, thus helping them to comply with the relevant obligations. It would be disproportionate to require Member States to provide such information only through the services of qualified lawyers. Member States should therefore have the possibility to use the most appropriate means to provide such information, such as through non-governmental organisations or professionals from government authorities or specialised services of the State.

(23) In appeals procedures, subject to certain conditions, applicants should be granted free legal assistance and representation provided by persons competent to provide them under national law. Furthermore, at all stages of the procedure, applicants should have the right to consult, at their own cost, legal advisers or counsellors admitted or permitted as such under national law.

(24) The notion of public order may, inter alia, cover a conviction for having committed a serious crime.

(25) In the interests of a correct recognition of those persons in need of protection as refugees within the meaning of Article 1 of the Geneva Convention or as persons eligible for subsidiary protection, every applicant should have an effective access to procedures, the opportunity to cooperate and properly communicate with the competent authorities so as to present the relevant facts of his or her case and sufficient procedural guarantees to pursue his or her case throughout all stages of the procedure. Moreover, the procedure in which an application for international protection is examined should normally provide an applicant at least with: the right to stay pending a decision by the determining authority; access to the services of an interpreter for submitting his or her case if interviewed by the authorities; the opportunity to communicate with a representative of the United Nations High Commissioner for Refugees (UNHCR) and with organisations providing advice or counselling to applicants for international protection; the right to appropriate notification of a decision and of the reasons for that decision in fact and in law; the opportunity to consult a legal adviser

or other counsellor; the right to be informed of his or her legal position at decisive moments in the course of the procedure, in a language which he or she understands or is reasonably supposed to understand; and, in the case of a negative decision, the right to an effective remedy before a court or a tribunal.

(26) With a view to ensuring effective access to the examination procedure, officials who first come into contact with persons seeking international protection, in particular officials carrying out the surveillance of land or maritime borders or conducting border checks, should receive relevant information and necessary training on how to recognise and deal with applications for international protection, inter alia, taking due account of relevant guidelines developed by EASO. They should be able to provide third-country nationals or stateless persons who are present in the territory, including at the border, in the territorial waters or in the transit zones of the Member States, and who make an application for international protection, with relevant information as to where and how applications for international protection may be lodged. Where those persons are present in the territorial waters of a Member State, they should be disembarked on land and have their applications examined in accordance with this Directive.

(27) Given that third-country nationals and stateless persons who have expressed their wish to apply for international protection are applicants for international protection, they should comply with the obligations, and benefit from the rights, under this Directive and Directive 2013/33/EU of the European Parliament and of the Council of 26 June 2013 laying down standards for the reception of applicants for international protection (¹). To that end, Member States should register the fact that those persons are applicants for international protection as soon as possible.

(28) In order to facilitate access to the examination procedure at border crossing points and in detention facilities, information should be made available on the possibility to apply for international protection. Basic communication necessary to enable the competent authorities to understand if persons declare their wish to apply for international protection should be ensured through interpretation arrangements.

(29) Certain applicants may be in need of special procedural guarantees due, inter alia, to their age, gender, sexual orientation, gender identity, disability, serious illness, mental disorders or as a consequence of torture, rape or

_____
(¹) See page 96 of this Official Journal.

other serious forms of psychological, physical or sexual violence. Member States should endeavour to identify applicants in need of special procedural guarantees before a first instance decision is taken. Those applicants should be provided with adequate support, including sufficient time, in order to create the conditions necessary for their effective access to procedures and for presenting the elements needed to substantiate their application for international protection.

(30) Where adequate support cannot be provided to an applicant in need of special procedural guarantees in the framework of accelerated or border procedures, such an applicant should be exempted from those procedures. The need for special procedural guarantees of a nature that could prevent the application of accelerated or border procedures should also mean that the applicant is provided with additional guarantees in cases where his or her appeal does not have automatic suspensive effect, with a view to making the remedy effective in his or her particular circumstances.

(31) National measures dealing with identification and documentation of symptoms and signs of torture or other serious acts of physical or psychological violence, including acts of sexual violence, in procedures covered by this Directive may, inter alia, be based on the Manual on Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Istanbul Protocol).

(32) With a view to ensuring substantive equality between female and male applicants, examination procedures should be gender-sensitive. In particular, personal interviews should be organised in a way which makes it possible for both female and male applicants to speak about their past experiences in cases involving gender-based persecution. The complexity of gender-related claims should be properly taken into account in procedures based on the concept of safe third country, the concept of safe country of origin or the notion of subsequent applications.

(33) The best interests of the child should be a primary consideration of Member States when applying this Directive, in accordance with the Charter of Fundamental Rights of the European Union (the Charter) and the 1989 United Nations Convention on the Rights of the Child. In assessing the best interest of the child, Member States should in particular take due account of the minor's well-being and social development, including his or her background.

(34) Procedures for examining international protection needs should be such as to enable the competent authorities to conduct a rigorous examination of applications for international protection.

(35) When, in the framework of an application being processed, the applicant is searched, that search should be carried by a person of the same sex. This should be without prejudice to a search carried out, for security reasons, on the basis of national law.

(36) Where an applicant makes a subsequent application without presenting new evidence or arguments, it would be disproportionate to oblige Member States to carry out a new full examination procedure. In those cases, Member States should be able to dismiss an application as inadmissible in accordance with the *res judicata* principle.

(37) With respect to the involvement of the personnel of an authority other than the determining authority in conducting timely interviews on the substance of an application, the notion of 'timely' should be assessed against the time limits provided for in Article 31.

(38) Many applications for international protection are made at the border or in a transit zone of a Member State prior to a decision on the entry of the applicant. Member States should be able to provide for admissibility and/or substantive examination procedures which would make it possible for such applications to be decided upon at those locations in well-defined circumstances.

(39) In determining whether a situation of uncertainty prevails in the country of origin of an applicant, Member States should ensure that they obtain precise and up-to-date information from relevant sources such as EASO, UNHCR, the Council of Europe and other relevant international organisations. Member States should ensure that any postponement of conclusion of the procedure fully complies with their obligations under Directive 2011/95/EU and Article 41 of the Charter, without prejudice to the efficiency and fairness of the procedures under this Directive.

(40) A key consideration for the well-foundedness of an application for international protection is the safety of the applicant in his or her country of origin. Where a third country can be regarded as a safe country of origin, Member States should be able to designate it as safe and presume its safety for a particular applicant, unless he or she presents counter-indications.

DHSFF0827

(41) Given the level of harmonisation achieved on the qualification of third-country nationals and stateless persons as beneficiaries of international protection, common criteria should be established for designating third countries as safe countries of origin.

(42) The designation of a third country as a safe country of origin for the purposes of this Directive cannot establish an absolute guarantee of safety for nationals of that country. By its very nature, the assessment underlying the designation can only take into account the general civil, legal and political circumstances in that country and whether actors of persecution, torture or inhuman or degrading treatment or punishment are subject to sanction in practice when found liable in that country. For this reason, it is important that, where an applicant shows that there are valid reasons to consider the country not to be safe in his or her particular circumstances, the designation of the country as safe can no longer be considered relevant for him or her.

(43) Member States should examine all applications on the substance, i.e. assess whether the applicant in question qualifies for international protection in accordance with Directive 2011/95/EU, except where this Directive provides otherwise, in particular where it can reasonably be assumed that another country would do the examination or provide sufficient protection. In particular, Member States should not be obliged to assess the substance of an application for international protection where a first country of asylum has granted the applicant refugee status or otherwise sufficient protection and the applicant will be readmitted to that country.

(44) Member States should not be obliged to assess the substance of an application for international protection where the applicant, due to a sufficient connection to a third country as defined by national law, can reasonably be expected to seek protection in that third country, and there are grounds for considering that the applicant will be admitted or readmitted to that country. Member States should only proceed on that basis where that particular applicant would be safe in the third country concerned. In order to avoid secondary movements of applicants, common principles should be established for the consideration or designation by Member States of third countries as safe.

(45) Furthermore, with respect to certain European third countries, which observe particularly high human rights and refugee protection standards, Member States should be allowed to not carry out, or not to carry out full examination of, applications for international protection regarding applicants who enter their territory from such European third countries.

(46) Where Member States apply safe country concepts on a case-by-case basis or designate countries as safe by adopting lists to that effect, they should take into account, inter alia, the guidelines and operating manuals and the information on countries of origin and activities, including EASO Country of Origin Information report methodology, referred to in Regulation (EU) No 439/2010 of the European Parliament and of the Council of 19 May 2010 establishing a European Asylum Support Office (¹), as well as relevant UNHCR guidelines.

(47) In order to facilitate the regular exchange of information about the national application of the concepts of safe country of origin, safe third country and European safe third country as well as a regular review by the Commission of the use of those concepts by Member States, and to prepare for a potential further harmonisation in the future, Member States should notify or periodically inform the Commission about the third countries to which the concepts are applied. The Commission should regularly inform the European Parliament on the result of its reviews.

(48) In order to ensure the correct application of the safe country concepts based on up-to-date information, Member States should conduct regular reviews of the situation in those countries based on a range of sources of information, including in particular information from other Member States, EASO, UNHCR, the Council of Europe and other relevant international organisations. When Member States become aware of a significant change in the human rights situation in a country designated by them as safe, they should ensure that a review of that situation is conducted as soon as possible and, where necessary, review the designation of that country as safe.

(49) With respect to the withdrawal of refugee or subsidiary protection status, Member States should ensure that persons benefiting from international protection are duly informed of a possible reconsideration of their status and have the opportunity to submit their point of view before the authorities can take a reasoned decision to withdraw their status.

(50) It reflects a basic principle of Union law that the decisions taken on an application for international protection, the decisions concerning a refusal to reopen the examination of an application after its discontinuation, and the decisions on the withdrawal of refugee or subsidiary protection status are subject to an effective remedy before a court or tribunal.

(¹) OJ L 132, 29.5.2010, p. 11.

29.6.2013    EN    Official Journal of the European Union    L 180/65

(51) In accordance with Article 72 of the Treaty on the Functioning of the European Union (TFEU), this Directive does not affect the exercise of the responsibilities incumbent upon Member States with regard to the maintenance of law and order and the safeguarding of internal security.

(52) Directive 95/46/EC of the European Parliament and of the Council of 24 October 1995 on the protection of individuals with regard to the processing of personal data and on the free movement of such data (¹) governs the processing of personal data carried out in the Member States pursuant to this Directive.

(53) This Directive does not deal with procedures between Member States governed by Regulation (EU) No 604/2013 of the European Parliament and of the Council of 26 June 2013 establishing the criteria and mechanisms for determining the Member State responsible for examining an application for international protection lodged in one of the Member States by a third-country national or a stateless person (²).

(54) This Directive should apply to applicants to whom Regulation (EU) No 604/2013 applies, in addition and without prejudice to the provisions of that Regulation.

(55) The implementation of this Directive should be evaluated at regular intervals.

(56) Since the objective of this Directive, namely to establish common procedures for granting and withdrawing international protection, cannot be sufficiently achieved by the Member States and can therefore, by reason of the scale and effects of this Directive, be better achieved at Union level, the Union may adopt measures, in accordance with the principle of subsidiarity as set out in Article 5 of the Treaty on European Union (TEU). In accordance with the principle of proportionality, as set out in that Article, this Directive does not go beyond what is necessary in order to achieve that objective.

(57) In accordance with the Joint Political Declaration of Member States and the Commission on explanatory documents of 28 September 2011 (³), Member States have undertaken to accompany, in justified cases, the notification of their transposition measures with one or more documents explaining the relationship between the components of a directive and the corresponding parts of national transposition instruments. With regard to this Directive, the legislator considers the transmission of such documents to be justified.

(58) In accordance with Articles 1, 2 and Article 4a(1) of Protocol No 21 on the position of the United Kingdom and Ireland in respect of the Area of Freedom, Security and Justice, annexed to the TEU and the TFEU, and without prejudice to Article 4 of that Protocol, the United Kingdom and Ireland are not taking part in the adoption of this Directive and are not bound by it or subject to its application.

(59) In accordance with Articles 1 and 2 of Protocol No 22 on the position of Denmark, annexed to the TEU and to the TFEU, Denmark is not taking part in the adoption of this Directive and is not bound by it or subject to its application.

(60) This Directive respects the fundamental rights and observes the principles recognised by the Charter. In particular, this Directive seeks to ensure full respect for human dignity and to promote the application of Articles 1, 4, 18, 19, 21, 23, 24, and 47 of the Charter and has to be implemented accordingly.

(61) The obligation to transpose this Directive into national law should be confined to those provisions which represent a substantive change as compared with Directive 2005/85/EC. The obligation to transpose the provisions which are unchanged arises under that Directive.

(62) This Directive should be without prejudice to the obligations of the Member States relating to the time limit for transposition into national law of Directive 2005/85/EC set out in Annex II, Part B,

HAVE ADOPTED THIS DIRECTIVE:

CHAPTER I

GENERAL PROVISIONS

Article 1

Purpose

The purpose of this Directive is to establish common procedures for granting and withdrawing international protection pursuant to Directive 2011/95/EU.

Article 2

Definitions

For the purposes of this Directive:

(a) 'Geneva Convention' means the Convention of 28 July 1951 Relating to the Status of Refugees, as amended by the New York Protocol of 31 January 1967;

_____
(¹) OJ L 281, 23.11.1995, p. 31.
(²) See page 31 of this Official Journal.
(³) OJ C 369, 17.12.2011, p. 14.

DHSFF0829

(b) 'application for international protection' or 'application' means a request made by a third- country national or a stateless person for protection from a Member State, who can be understood to seek refugee status or subsidiary protection status, and who does not explicitly request another kind of protection outside the scope of Directive 2011/95/EU, that can be applied for separately;

(c) 'applicant' means a third-country national or stateless person who has made an application for international protection in respect of which a final decision has not yet been taken;

(d) 'applicant in need of special procedural guarantees' means an applicant whose ability to benefit from the rights and comply with the obligations provided for in this Directive is limited due to individual circumstances;

(e) 'final decision' means a decision on whether the third-country national or stateless person be granted refugee or subsidiary protection status by virtue of Directive 2011/95/EU and which is no longer subject to a remedy within the framework of Chapter V of this Directive, irrespective of whether such remedy has the effect of allowing applicants to remain in the Member States concerned pending its outcome;

(f) 'determining authority' means any quasi-judicial or administrative body in a Member State responsible for examining applications for international protection competent to take decisions at first instance in such cases;

(g) 'refugee' means a third-country national or a stateless person who fulfils the requirements of Article 2(d) of Directive 2011/95/EU;

(h) 'person eligible for subsidiary protection' means a third-country national or a stateless person who fulfils the requirements of Article 2(f) of Directive 2011/95/EU;

(i) 'international protection' means refugee status and subsidiary protection status as defined in points (j) and (k);

(j) 'refugee status' means the recognition by a Member State of a third-country national or a stateless person as a refugee;

(k) 'subsidiary protection status' means the recognition by a Member State of a third-country national or a stateless person as a person eligible for subsidiary protection;

(l) 'minor' means a third-country national or a stateless person below the age of 18 years;

(m) 'unaccompanied minor' means an unaccompanied minor as defined in Article 2(l) of Directive 2011/95/EU;

(n) 'representative' means a person or an organisation appointed by the competent bodies in order to assist and represent an unaccompanied minor in procedures provided for in this Directive with a view to ensuring the best interests of the child and exercising legal capacity for the minor where necessary. Where an organisation is appointed as a representative, it shall designate a person responsible for carrying out the duties of representative in respect of the unaccompanied minor, in accordance with this Directive;

(o) 'withdrawal of international protection' means the decision by a competent authority to revoke, end or refuse to renew the refugee or subsidiary protection status of a person in accordance with Directive 2011/95/EU;

(p) 'remain in the Member State' means to remain in the territory, including at the border or in transit zones, of the Member State in which the application for international protection has been made or is being examined;

(q) 'subsequent application' means a further application for international protection made after a final decision has been taken on a previous application, including cases where the applicant has explicitly withdrawn his or her application and cases where the determining authority has rejected an application following its implicit withdrawal in accordance with Article 28(1).

*Article 3*

**Scope**

1.   This Directive shall apply to all applications for international protection made in the territory, including at the border, in the territorial waters or in the transit zones of the Member States, and to the withdrawal of international protection.

2.   This Directive shall not apply to requests for diplomatic or territorial asylum submitted to representations of Member States.

3.   Member States may decide to apply this Directive in procedures for deciding on applications for any kind of protection falling outside of the scope of Directive 2011/95/EU.

DHSFF0830

*Article 4*

**Responsible authorities**

1.   Member States shall designate for all procedures a determining authority which will be responsible for an appropriate examination of applications in accordance with this Directive. Member States shall ensure that such authority is provided with appropriate means, including sufficient competent personnel, to carry out its tasks in accordance with this Directive.

2.   Member States may provide that an authority other than that referred to in paragraph 1 shall be responsible for the purposes of:

(a) processing cases pursuant to Regulation (EU) No 604/2013; and

(b) granting or refusing permission to enter in the framework of the procedure provided for in Article 43, subject to the conditions as set out therein and on the basis of the reasoned opinion of the determining authority.

3.   Member States shall ensure that the personnel of the determining authority referred to in paragraph 1 are properly trained. To that end, Member States shall provide for relevant training which shall include the elements listed in Article 6(4)(a) to (e) of Regulation (EU) No 439/2010. Member States shall also take into account the relevant training established and developed by the European Asylum Support Office (EASO). Persons interviewing applicants pursuant to this Directive shall also have acquired general knowledge of problems which could adversely affect the applicants' ability to be interviewed, such as indications that the applicant may have been tortured in the past.

4.   Where an authority is designated in accordance with paragraph 2, Member States shall ensure that the personnel of that authority have the appropriate knowledge or receive the necessary training to fulfil their obligations when implementing this Directive.

5.   Applications for international protection made in a Member State to the authorities of another Member State carrying out border or immigration controls there shall be dealt with by the Member State in whose territory the application is made.

*Article 5*

**More favourable provisions**

Member States may introduce or retain more favourable standards on procedures for granting and withdrawing international protection, insofar as those standards are compatible with this Directive.

CHAPTER II

BASIC PRINCIPLES AND GUARANTEES

*Article 6*

**Access to the procedure**

1.   When a person makes an application for international protection to an authority competent under national law for registering such applications, the registration shall take place no later than three working days after the application is made.

If the application for international protection is made to other authorities which are likely to receive such applications, but not competent for the registration under national law, Member States shall ensure that the registration shall take place no later than six working days after the application is made.

Member States shall ensure that those other authorities which are likely to receive applications for international protection such as the police, border guards, immigration authorities and personnel of detention facilities have the relevant information and that their personnel receive the necessary level of training which is appropriate to their tasks and responsibilities and instructions to inform applicants as to where and how applications for international protection may be lodged.

2.   Member States shall ensure that a person who has made an application for international protection has an effective opportunity to lodge it as soon as possible. Where the applicant does not lodge his or her application, Member States may apply Article 28 accordingly.

3.   Without prejudice to paragraph 2, Member States may require that applications for international protection be lodged in person and/or at a designated place.

4.   Notwithstanding paragraph 3, an application for international protection shall be deemed to have been lodged once a form submitted by the applicant or, where provided for in national law, an official report, has reached the competent authorities of the Member State concerned.

5.   Where simultaneous applications for international protection by a large number of third-country nationals or stateless persons make it very difficult in practice to respect the time limit laid down in paragraph 1, Member States may provide for that time limit to be extended to 10 working days.

*Article 7*

**Applications made on behalf of dependants or minors**

1.   Member States shall ensure that each adult with legal capacity has the right to make an application for international protection on his or her own behalf.

L 180/68   EN   Official Journal of the European Union   29.6.2013

2.   Member States may provide that an application may be made by an applicant on behalf of his or her dependants. In such cases, Member States shall ensure that dependent adults consent to the lodging of the application on their behalf, failing which they shall have an opportunity to make an application on their own behalf.

Consent shall be requested at the time the application is lodged or, at the latest, when the personal interview with the dependent adult is conducted. Before consent is requested, each dependent adult shall be informed in private of the relevant procedural consequences of the lodging of the application on his or her behalf and of his or her right to make a separate application for international protection.

3.   Member States shall ensure that a minor has the right to make an application for international protection either on his or her own behalf, if he or she has the legal capacity to act in procedures according to the law of the Member State concerned, or through his or her parents or other adult family members, or an adult responsible for him or her, whether by law or by the practice of the Member State concerned, or through a representative.

4.   Member States shall ensure that the appropriate bodies referred to in Article 10 of Directive 2008/115/EC of the European Parliament and of the Council of 16 December 2008 on common standards and procedures in Member States for returning illegally staying third-country nationals [1] have the right to lodge an application for international protection on behalf of an unaccompanied minor if, on the basis of an individual assessment of his or her personal situation, those bodies are of the opinion that the minor may have protection needs pursuant to Directive 2011/95/EU.

5.   Member States may determine in national legislation:

(a) the cases in which a minor can make an application on his or her own behalf;

(b) the cases in which the application of an unaccompanied minor has to be lodged by a representative as provided for in Article 25(1)(a);

(c) the cases in which the lodging of an application for international protection is deemed to constitute also the lodging of an application for international protection for any unmarried minor.

[1] OJ L 348, 24.12.2008, p. 98.

### Article 8

**Information and counselling in detention facilities and at border crossing points**

1.   Where there are indications that third-country nationals or stateless persons held in detention facilities or present at border crossing points, including transit zones, at external borders, may wish to make an application for international protection, Member States shall provide them with information on the possibility to do so. In those detention facilities and crossing points, Member States shall make arrangements for interpretation to the extent necessary to facilitate access to the asylum procedure.

2.   Member States shall ensure that organisations and persons providing advice and counselling to applicants have effective access to applicants present at border crossing points, including transit zones, at external borders. Member States may provide for rules covering the presence of such organisations and persons in those crossing points and in particular that access is subject to an agreement with the competent authorities of the Member States. Limits on such access may be imposed only where, by virtue of national law, they are objectively necessary for the security, public order or administrative management of the crossing points concerned, provided that access is not thereby severely restricted or rendered impossible.

### Article 9

**Right to remain in the Member State pending the examination of the application**

1.   Applicants shall be allowed to remain in the Member State, for the sole purpose of the procedure, until the determining authority has made a decision in accordance with the procedures at first instance set out in Chapter III. That right to remain shall not constitute an entitlement to a residence permit.

2.   Member States may make an exception only where a person makes a subsequent application referred to in Article 41 or where they will surrender or extradite, as appropriate, a person either to another Member State pursuant to obligations in accordance with a European arrest warrant [2] or otherwise, or to a third country or to international criminal courts or tribunals.

3.   A Member State may extradite an applicant to a third country pursuant to paragraph 2 only where the competent authorities are satisfied that an extradition decision will not result in direct or indirect *refoulement* in violation of the international and Union obligations of that Member State.

[2] Council Framework Decision 2002/584/JHA of 13 June 2002 on the European arrest warrant and the surrender procedures between Member States (OJ L 190, 18.7.2002, p. 1).

29.6.2013          EN          Official Journal of the European Union          L 180/69

*Article 10*

### Requirements for the examination of applications

1.   Member States shall ensure that applications for international protection are neither rejected nor excluded from examination on the sole ground that they have not been made as soon as possible.

2.   When examining applications for international protection, the determining authority shall first determine whether the applicants qualify as refugees and, if not, determine whether the applicants are eligible for subsidiary protection.

3.   Member States shall ensure that decisions by the determining authority on applications for international protection are taken after an appropriate examination. To that end, Member States shall ensure that:

(a) applications are examined and decisions are taken individually, objectively and impartially;

(b) precise and up-to-date information is obtained from various sources, such as EASO and UNHCR and relevant international human rights organisations, as to the general situation prevailing in the countries of origin of applicants and, where necessary, in countries through which they have transited, and that such information is made available to the personnel responsible for examining applications and taking decisions;

(c) the personnel examining applications and taking decisions know the relevant standards applicable in the field of asylum and refugee law;

(d) the personnel examining applications and taking decisions have the possibility to seek advice, whenever necessary, from experts on particular issues, such as medical, cultural, religious, child-related or gender issues.

4.   The authorities referred to in Chapter V shall, through the determining authority or the applicant or otherwise, have access to the general information referred to in paragraph 3(b), necessary for the fulfilment of their task.

5.   Member States shall provide for rules concerning the translation of documents relevant for the examination of applications.

*Article 11*

### Requirements for a decision by the determining authority

1.   Member States shall ensure that decisions on applications for international protection are given in writing.

2.   Member States shall also ensure that, where an application is rejected with regard to refugee status and/or subsidiary protection status, the reasons in fact and in law are stated in the decision and information on how to challenge a negative decision is given in writing.

Member States need not provide information on how to challenge a negative decision in writing in conjunction with a decision where the applicant has been provided with such information at an earlier stage either in writing or by electronic means accessible to the applicant.

3.   For the purposes of Article 7(2), and whenever the application is based on the same grounds, Member States may take a single decision, covering all dependants, unless to do so would lead to the disclosure of particular circumstances of an applicant which could jeopardise his or her interests, in particular in cases involving gender, sexual orientation, gender identity and/or age-based persecution. In such cases, a separate decision shall be issued to the person concerned.

*Article 12*

### Guarantees for applicants

1.   With respect to the procedures provided for in Chapter III, Member States shall ensure that all applicants enjoy the following guarantees:

(a) they shall be informed in a language which they understand or are reasonably supposed to understand of the procedure to be followed and of their rights and obligations during the procedure and the possible consequences of not complying with their obligations and not cooperating with the authorities. They shall be informed of the time-frame, the means at their disposal for fulfilling the obligation to submit the elements as referred to in Article 4 of Directive 2011/95/EU, as well as of the consequences of an explicit or implicit withdrawal of the application. That information shall be given in time to enable them to exercise the rights guaranteed in this Directive and to comply with the obligations described in Article 13;

(b) they shall receive the services of an interpreter for submitting their case to the competent authorities whenever necessary. Member States shall consider it necessary to provide those services at least when the applicant is to be interviewed as referred to in Articles 14 to 17 and 34 and appropriate communication cannot be ensured without such services. In that case and in other cases where the competent authorities call upon the applicant, those services shall be paid for out of public funds;

(c) they shall not be denied the opportunity to communicate with UNHCR or with any other organisation providing legal advice or other counselling to applicants in accordance with the law of the Member State concerned;

DHSFF0833

(d) they and, if applicable, their legal advisers or other coun-sellors in accordance with Article 23(1), shall have access to the information referred to in Article 10(3)(b) and to the information provided by the experts referred to in Article 10(3)(d), where the determining authority has taken that information into consideration for the purpose of taking a decision on their application;

(e) they shall be given notice in reasonable time of the decision by the determining authority on their application. If a legal adviser or other counsellor is legally representing the applicant, Member States may choose to give notice of the decision to him or her instead of to the applicant;

(f) they shall be informed of the result of the decision by the determining authority in a language that they understand or are reasonably supposed to understand when they are not assisted or represented by a legal adviser or other coun-sellor. The information provided shall include information on how to challenge a negative decision in accordance with the provisions of Article 11(2).

2.   With respect to the procedures provided for in Chapter V, Member States shall ensure that all applicants enjoy guarantees equivalent to the ones referred to in paragraph 1(b) to (e).

*Article 13*

**Obligations of the applicants**

1.   Member States shall impose upon applicants the obligation to cooperate with the competent authorities with a view to establishing their identity and other elements referred to in Article 4(2) of Directive 2011/95/EU. Member States may impose upon applicants other obligations to cooperate with the competent authorities insofar as such obligations are necessary for the processing of the application.

2.   In particular, Member States may provide that:

(a) applicants are required to report to the competent auth-orities or to appear before them in person, either without delay or at a specified time;

(b) applicants have to hand over documents in their possession relevant to the examination of the application, such as their passports;

(c) applicants are required to inform the competent authorities of their current place of residence or address and of any changes thereof as soon as possible. Member States may provide that the applicant shall have to accept any communication at the most recent place of residence or address which he or she indicated accordingly;

(d) the competent authorities may search the applicant and the items which he or she is carrying. Without prejudice to any search carried out for security reasons, a search of the applicant's person under this Directive shall be carried out by a person of the same sex with full respect for the prin-ciples of human dignity and of physical and psychological integrity;

(e) the competent authorities may take a photograph of the applicant; and

(f) the competent authorities may record the applicant's oral statements, provided he or she has previously been informed thereof.

*Article 14*

**Personal interview**

1.   Before a decision is taken by the determining authority, the applicant shall be given the opportunity of a personal interview on his or her application for international protection with a person competent under national law to conduct such an interview. Personal interviews on the substance of the appli-cation for international protection shall be conducted by the personnel of the determining authority. This subparagraph shall be without prejudice to Article 42(2)(b).

Where simultaneous applications for international protection by a large number of third-country nationals or stateless persons make it impossible in practice for the determining authority to conduct timely interviews on the substance of each application, Member States may provide that the personnel of another authority be temporarily involved in conducting such inter-views. In such cases, the personnel of that other authority shall receive in advance the relevant training which shall include the elements listed in Article 6(4)(a) to (e) of Regulation (EU) No 439/2010. Persons conducting personal interviews of applicants pursuant to this Directive shall also have acquired general knowledge of problems which could adversely affect an applicant's ability to be interviewed, such as indications that the applicant may have been tortured in the past.

Where a person has lodged an application for international protection on behalf of his or her dependants, each dependent adult shall be given the opportunity of a personal interview.

Member States may determine in national legislation the cases in which a minor shall be given the opportunity of a personal interview.

2.   The personal interview on the substance of the application may be omitted where:

29.6.2013    EN          Official Journal of the European Union          L 180/71

(a) the determining authority is able to take a positive decision with regard to refugee status on the basis of evidence available; or

(b) the determining authority is of the opinion that the applicant is unfit or unable to be interviewed owing to enduring circumstances beyond his or her control. When in doubt, the determining authority shall consult a medical professional to establish whether the condition that makes the applicant unfit or unable to be interviewed is of a temporary or enduring nature.

Where a personal interview is not conducted pursuant to point (b) or, where applicable, with the dependant, reasonable efforts shall be made to allow the applicant or the dependant to submit further information.

3. The absence of a personal interview in accordance with this Article shall not prevent the determining authority from taking a decision on an application for international protection.

4. The absence of a personal interview pursuant to paragraph 2(b) shall not adversely affect the decision of the determining authority.

5. Irrespective of Article 28(1), Member States, when deciding on an application for international protection, may take into account the fact that the applicant failed to appear for the personal interview, unless he or she had good reasons for the failure to appear.

### Article 15

#### Requirements for a personal interview

1. A personal interview shall normally take place without the presence of family members unless the determining authority considers it necessary for an appropriate examination to have other family members present.

2. A personal interview shall take place under conditions which ensure appropriate confidentiality.

3. Member States shall take appropriate steps to ensure that personal interviews are conducted under conditions which allow applicants to present the grounds for their applications in a comprehensive manner. To that end, Member States shall:

(a) ensure that the person who conducts the interview is competent to take account of the personal and general circumstances surrounding the application, including the applicant's cultural origin, gender, sexual orientation, gender identity or vulnerability;

(b) wherever possible, provide for the interview with the applicant to be conducted by a person of the same sex if the applicant so requests, unless the determining authority has reason to believe that such a request is based on grounds which are not related to difficulties on the part of the applicant to present the grounds of his or her application in a comprehensive manner;

(c) select an interpreter who is able to ensure appropriate communication between the applicant and the person who conducts the interview. The communication shall take place in the language preferred by the applicant unless there is another language which he or she understands and in which he or she is able to communicate clearly. Wherever possible, Member States shall provide an interpreter of the same sex if the applicant so requests, unless the determining authority has reasons to believe that such a request is based on grounds which are not related to difficulties on the part of the applicant to present the grounds of his or her application in a comprehensive manner;

(d) ensure that the person who conducts the interview on the substance of an application for international protection does not wear a military or law enforcement uniform;

(e) ensure that interviews with minors are conducted in a child-appropriate manner.

4. Member States may provide for rules concerning the presence of third parties at a personal interview.

### Article 16

#### Content of a personal interview

When conducting a personal interview on the substance of an application for international protection, the determining authority shall ensure that the applicant is given an adequate opportunity to present elements needed to substantiate the application in accordance with Article 4 of Directive 2011/95/EU as completely as possible. This shall include the opportunity to give an explanation regarding elements which may be missing and/or any inconsistencies or contradictions in the applicant's statements.

### Article 17

#### Report and recording of personal interviews

1. Member States shall ensure that either a thorough and factual report containing all substantive elements or a transcript is made of every personal interview.

2. Member States may provide for audio or audiovisual recording of the personal interview. Where such a recording is made, Member States shall ensure that the recording or a transcript thereof is available in connection with the applicant's file.

DHSFF0835

3.    Member States shall ensure that the applicant has the opportunity to make comments and/or provide clarification orally and/or in writing with regard to any mistranslations or misconceptions appearing in the report or in the transcript, at the end of the personal interview or within a specified time limit before the determining authority takes a decision. To that end, Member States shall ensure that the applicant is fully informed of the content of the report or of the substantive elements of the transcript, with the assistance of an interpreter if necessary. Member States shall then request the applicant to confirm that the content of the report or the transcript correctly reflects the interview.

When the personal interview is recorded in accordance with paragraph 2 and the recording is admissible as evidence in the appeals procedures referred to in Chapter V, Member States need not request the applicant to confirm that the content of the report or the transcript correctly reflects the interview. Without prejudice to Article 16, where Member States provide for both a transcript and a recording of the personal interview, Member States need not allow the applicant to make comments on and/or provide clarification of the transcript.

4.    Where an applicant refuses to confirm that the content of the report or the transcript correctly reflects the personal interview, the reasons for his or her refusal shall be entered in the applicant's file.

Such refusal shall not prevent the determining authority from taking a decision on the application.

5.    Applicants and their legal advisers or other counsellors, as defined in Article 23, shall have access to the report or the transcript and, where applicable, the recording, before the determining authority takes a decision.

Where Member States provide for both a transcript and a recording of the personal interview, Member States need not provide access to the recording in the procedures at first instance referred to in Chapter III. In such cases, they shall nevertheless provide access to the recording in the appeals procedures referred to in Chapter V.

Without prejudice to paragraph 3 of this Article, where the application is examined in accordance with Article 31(8), Member States may provide that access to the report or the transcript, and where applicable, the recording, is granted at the same time as the decision is made.

## Article 18

### Medical examination

1.    Where the determining authority deems it relevant for the assessment of an application for international protection in accordance with Article 4 of Directive 2011/95/EU, Member States shall, subject to the applicant's consent, arrange for a medical examination of the applicant concerning signs that might indicate past persecution or serious harm. Alternatively, Member States may provide that the applicant arranges for such a medical examination.

The medical examinations referred to in the first subparagraph shall be carried out by qualified medical professionals and the result thereof shall be submitted to the determining authority as soon as possible. Member States may designate the medical professionals who may carry out such medical examinations. An applicant's refusal to undergo such a medical examination shall not prevent the determining authority from taking a decision on the application for international protection.

Medical examinations carried out in accordance with this paragraph shall be paid for out of public funds.

2.    When no medical examination is carried out in accordance with paragraph 1, Member States shall inform applicants that they may, on their own initiative and at their own cost, arrange for a medical examination concerning signs that might indicate past persecution or serious harm.

3.    The results of the medical examinations referred to in paragraphs 1 and 2 shall be assessed by the determining authority along with the other elements of the application.

## Article 19

### Provision of legal and procedural information free of charge in procedures at first instance

1.    In the procedures at first instance provided for in Chapter III, Member States shall ensure that, on request, applicants are provided with legal and procedural information free of charge, including, at least, information on the procedure in the light of the applicant's particular circumstances. In the event of a negative decision on an application at first instance, Member States shall also, on request, provide applicants with information — in addition to that given in accordance with Article 11(2) and Article 12(1)(f) — in order to clarify the reasons for such decision and explain how it can be challenged.

2.    The provision of legal and procedural information free of charge shall be subject to the conditions laid down in Article 21.

### Article 20

**Free legal assistance and representation in appeals procedures**

1.   Member States shall ensure that free legal assistance and representation is granted on request in the appeals procedures provided for in Chapter V. It shall include, at least, the preparation of the required procedural documents and participation in the hearing before a court or tribunal of first instance on behalf of the applicant.

2.   Member States may also provide free legal assistance and/or representation in the procedures at first instance provided for in Chapter III. In such cases, Article 19 shall not apply.

3.   Member States may provide that free legal assistance and representation not be granted where the applicant's appeal is considered by a court or tribunal or other competent authority to have no tangible prospect of success.

Where a decision not to grant free legal assistance and representation pursuant to this paragraph is taken by an authority which is not a court or tribunal, Member States shall ensure that the applicant has the right to an effective remedy before a court or tribunal against that decision.

In the application of this paragraph, Member States shall ensure that legal assistance and representation is not arbitrarily restricted and that the applicant's effective access to justice is not hindered.

4.   Free legal assistance and representation shall be subject to the conditions laid down in Article 21.

### Article 21

**Conditions for the provision of legal and procedural information free of charge and free legal assistance and representation**

1.   Member States may provide that the legal and procedural information free of charge referred to in Article 19 is provided by non-governmental organisations, or by professionals from government authorities or from specialised services of the State.

The free legal assistance and representation referred to in Article 20 shall be provided by such persons as admitted or permitted under national law.

2.   Member States may provide that legal and procedural information free of charge referred to in Article 19 and free legal assistance and representation referred to in Article 20 are granted:

(a)   only to those who lack sufficient resources; and/or

(b)   only through the services provided by legal advisers or other counsellors specifically designated by national law to assist and represent applicants.

Member States may provide that the free legal assistance and representation referred to in Article 20 is granted only for appeals procedures in accordance with Chapter V before a court or tribunal of first instance and not for any further appeals or reviews provided for under national law, including rehearings or reviews of appeals.

Member States may also provide that the free legal assistance and representation referred to in Article 20 is not granted to applicants who are no longer present on their territory in application of Article 41(2)(c).

3.   Member States may lay down rules concerning the modalities for filing and processing requests for legal and procedural information free of charge under Article 19 and for free legal assistance and representation under Article 20.

4.   Member States may also:

(a)   impose monetary and/or time limits on the provision of legal and procedural information free of charge referred to in Article 19 and on the provision of free legal assistance and representation referred to in Article 20, provided that such limits do not arbitrarily restrict access to the provision of legal and procedural information and legal assistance and representation;

(b)   provide that, as regards fees and other costs, the treatment of applicants shall not be more favourable than the treatment generally accorded to their nationals in matters pertaining to legal assistance.

5.   Member States may demand to be reimbursed wholly or partially for any costs granted if and when the applicant's financial situation has improved considerably or if the decision to grant such costs was taken on the basis of false information supplied by the applicant.

### Article 22

**Right to legal assistance and representation at all stages of the procedure**

1.   Applicants shall be given the opportunity to consult, at their own cost, in an effective manner a legal adviser or other counsellor, admitted or permitted as such under national law, on matters relating to their applications for international protection, at all stages of the procedure, including following a negative decision.

DHSFF0837

2.    Member States may allow non-governmental organisations to provide legal assistance and/or representation to applicants in the procedures provided for in Chapter III and Chapter V in accordance with national law.

### Article 23

#### Scope of legal assistance and representation

1.    Member States shall ensure that a legal adviser or other counsellor admitted or permitted as such under national law, who assists or represents an applicant under the terms of national law, shall enjoy access to the information in the applicant's file upon the basis of which a decision is or will be made.

Member States may make an exception where disclosure of information or sources would jeopardise national security, the security of the organisations or person(s) providing the information or the security of the person(s) to whom the information relates or where the investigative interests relating to the examination of applications for international protection by the competent authorities of the Member States or the international relations of the Member States would be compromised. In such cases, Member States shall:

(a) make access to such information or sources available to the authorities referred to in Chapter V; and

(b) establish in national law procedures guaranteeing that the applicant's rights of defence are respected.

In respect of point (b), Member States may, in particular, grant access to such information or sources to a legal adviser or other counsellor who has undergone a security check, insofar as the information is relevant for examining the application or for taking a decision to withdraw international protection.

2.    Member States shall ensure that the legal adviser or other counsellor who assists or represents an applicant has access to closed areas, such as detention facilities and transit zones, for the purpose of consulting that applicant, in accordance with Article 10(4) and Article 18(2)(b) and (c) of Directive 2013/33/EU.

3.    Member States shall allow an applicant to bring to the personal interview a legal adviser or other counsellor admitted or permitted as such under national law.

Member States may stipulate that the legal adviser or other counsellor may only intervene at the end of the personal interview.

4.    Without prejudice to this Article or to Article 25(1)(b), Member States may provide rules covering the presence of legal advisers or other counsellors at all interviews in the procedure.

Member States may require the presence of the applicant at the personal interview, even if he or she is represented under the terms of national law by a legal adviser or counsellor, and may require the applicant to respond in person to the questions asked.

Without prejudice to Article 25(1)(b), the absence of a legal adviser or other counsellor shall not prevent the competent authority from conducting a personal interview with the applicant.

### Article 24

#### Applicants in need of special procedural guarantees

1.    Member States shall assess within a reasonable period of time after an application for international protection is made whether the applicant is an applicant in need of special procedural guarantees.

2.    The assessment referred to in paragraph 1 may be integrated into existing national procedures and/or into the assessment referred to in Article 22 of Directive 2013/33/EU and need not take the form of an administrative procedure.

3.    Member States shall ensure that where applicants have been identified as applicants in need of special procedural guarantees, they are provided with adequate support in order to allow them to benefit from the rights and comply with the obligations of this Directive throughout the duration of the asylum procedure.

Where such adequate support cannot be provided within the framework of the procedures referred to in Article 31(8) and Article 43, in particular where Member States consider that the applicant is in need of special procedural guarantees as a result of torture, rape or other serious forms of psychological, physical or sexual violence, Member States shall not apply, or shall cease to apply, Article 31(8) and Article 43. Where Member States apply Article 46(6) to applicants to whom Article 31(8) and Article 43 cannot be applied pursuant to this subparagraph, Member States shall provide at least the guarantees provided for in Article 46(7).

4.    Member States shall ensure that the need for special procedural guarantees is also addressed, in accordance with this Directive, where such a need becomes apparent at a later stage of the procedure, without necessarily restarting the procedure.

DHSFF0838

*Article 25*

**Guarantees for unaccompanied minors**

1. With respect to all procedures provided for in this Directive and without prejudice to the provisions of Articles 14 to 17, Member States shall:

(a) take measures as soon as possible to ensure that a representative represents and assists the unaccompanied minor to enable him or her to benefit from the rights and comply with the obligations provided for in this Directive. The unaccompanied minor shall be informed immediately of the appointment of a representative. The representative shall perform his or her duties in accordance with the principle of the best interests of the child and shall have the necessary expertise to that end. The person acting as representative shall be changed only when necessary. Organisations or individuals whose interests conflict or could potentially conflict with those of the unaccompanied minor shall not be eligible to become representatives. The representative may also be the representative referred to in Directive 2013/33/EU;

(b) ensure that the representative is given the opportunity to inform the unaccompanied minor about the meaning and possible consequences of the personal interview and, where appropriate, how to prepare himself or herself for the personal interview. Member States shall ensure that a representative and/or a legal adviser or other counsellor admitted or permitted as such under national law are present at that interview and have an opportunity to ask questions or make comments, within the framework set by the person who conducts the interview.

Member States may require the presence of the unaccompanied minor at the personal interview, even if the representative is present.

2. Member States may refrain from appointing a representative where the unaccompanied minor will in all likelihood reach the age of 18 before a decision at first instance is taken.

3. Member States shall ensure that:

(a) if an unaccompanied minor has a personal interview on his or her application for international protection as referred to in Articles 14 to 17 and 34, that interview is conducted by a person who has the necessary knowledge of the special needs of minors;

(b) an official with the necessary knowledge of the special needs of minors prepares the decision by the determining authority on the application of an unaccompanied minor.

4. Unaccompanied minors and their representatives shall be provided, free of charge, with legal and procedural information as referred to in Article 19 also in the procedures for the withdrawal of international protection provided for in Chapter IV.

5. Member States may use medical examinations to determine the age of unaccompanied minors within the framework of the examination of an application for international protection where, following general statements or other relevant indications, Member States have doubts concerning the applicant's age. If, thereafter, Member States are still in doubt concerning the applicant's age, they shall assume that the applicant is a minor.

Any medical examination shall be performed with full respect for the individual's dignity, shall be the least invasive examination and shall be carried out by qualified medical professionals allowing, to the extent possible, for a reliable result.

Where medical examinations are used, Member States shall ensure that:

(a) unaccompanied minors are informed prior to the examination of their application for international protection, and in a language that they understand or are reasonably supposed to understand, of the possibility that their age may be determined by medical examination. This shall include information on the method of examination and the possible consequences of the result of the medical examination for the examination of the application for international protection, as well as the consequences of refusal on the part of the unaccompanied minor to undergo the medical examination;

(b) unaccompanied minors and/or their representatives consent to a medical examination being carried out to determine the age of the minors concerned; and

(c) the decision to reject an application for international protection by an unaccompanied minor who refused to undergo a medical examination shall not be based solely on that refusal.

The fact that an unaccompanied minor has refused to undergo a medical examination shall not prevent the determining authority from taking a decision on the application for international protection.

6. The best interests of the child shall be a primary consideration for Member States when implementing this Directive.

Where Member States, in the course of the asylum procedure, identify a person as an unaccompanied minor, they may:

(a) apply or continue to apply Article 31(8) only if:

(i) the applicant comes from a country which satisfies the criteria to be considered a safe country of origin within the meaning of this Directive; or

DHSFF0839

(ii) the applicant has introduced a subsequent application for international protection that is not inadmissible in accordance with Article 40(5); or

(iii) the applicant may for serious reasons be considered a danger to the national security or public order of the Member State, or the applicant has been forcibly expelled for serious reasons of public security or public order under national law;

(b) apply or continue to apply Article 43, in accordance with Articles 8 to 11 of Directive 2013/33/EU, only if:

(i) the applicant comes from a country which satisfies the criteria to be considered a safe country of origin within the meaning of this Directive; or

(ii) the applicant has introduced a subsequent application; or

(iii) the applicant may for serious reasons be considered a danger to the national security or public order of the Member State, or the applicant has been forcibly expelled for serious reasons of public security or public order under national law; or

(iv) there are reasonable grounds to consider that a country which is not a Member State is a safe third country for the applicant, pursuant to Article 38; or

(v) the applicant has misled the authorities by presenting false documents; or

(vi) in bad faith, the applicant has destroyed or disposed of an identity or travel document that would have helped establish his or her identity or nationality.

Member States may apply points (v) and (vi) only in individual cases where there are serious grounds for considering that the applicant is attempting to conceal relevant elements which would likely lead to a negative decision and provided that the applicant has been given full opportunity, taking into account the special procedural needs of unaccompanied minors, to show good cause for the actions referred to in points (v) and (vi), including by consulting with his or her representative;

(c) consider the application to be inadmissible in accordance with Article 33(2)(c) if a country which is not a Member State is considered a safe third country for the applicant pursuant to Article 38, provided that to do so is in the minor's best interests;

(d) apply the procedure referred to in Article 20(3) where the minor's representative has legal qualifications in accordance with national law.

Without prejudice to Article 41, in applying Article 46(6) to unaccompanied minors, Member States shall provide at least the guarantees provided for in Article 46(7) in all cases.

*Article 26*

**Detention**

1. Member States shall not hold a person in detention for the sole reason that he or she is an applicant. The grounds for and conditions of detention and the guarantees available to detained applicants shall be in accordance with Directive 2013/33/EU.

2. Where an applicant is held in detention, Member States shall ensure that there is a possibility of speedy judicial review in accordance with Directive 2013/33/EU.

*Article 27*

**Procedure in the event of withdrawal of the application**

1. Insofar as Member States provide for the possibility of explicit withdrawal of the application under national law, when an applicant explicitly withdraws his or her application for international protection, Member States shall ensure that the determining authority takes a decision either to discontinue the examination or to reject the application.

2. Member States may also decide that the determining authority may decide to discontinue the examination without taking a decision. In that case, Member States shall ensure that the determining authority enters a notice in the applicant's file.

*Article 28*

**Procedure in the event of implicit withdrawal or abandonment of the application**

1. When there is reasonable cause to consider that an applicant has implicitly withdrawn or abandoned his or her application, Member States shall ensure that the determining authority takes a decision either to discontinue the examination or, provided that the determining authority considers the application to be unfounded on the basis of an adequate examination of its substance in line with Article 4 of Directive 2011/95/EU, to reject the application.

Member States may assume that the applicant has implicitly withdrawn or abandoned his or her application for international protection in particular when it is ascertained that:

(a) he or she has failed to respond to requests to provide information essential to his or her application in terms of Article 4 of Directive 2011/95/EU or has not appeared for a personal interview as provided for in Articles 14 to 17 of this Directive, unless the applicant demonstrates within a reasonable time that his or her failure was due to circumstances beyond his or her control;

(b) he or she has absconded or left without authorisation the place where he or she lived or was held, without contacting the competent authority within a reasonable time, or he or she has not within a reasonable time complied with reporting duties or other obligations to communicate, unless the applicant demonstrates that this was due to circumstances beyond his or her control.

For the purposes of implementing these provisions, Member States may lay down time limits or guidelines.

2.   Member States shall ensure that an applicant who reports again to the competent authority after a decision to discontinue as referred to in paragraph 1 of this Article is taken, is entitled to request that his or her case be reopened or to make a new application which shall not be subject to the procedure referred to in Articles 40 and 41.

Member States may provide for a time limit of at least nine months after which the applicant's case can no longer be reopened or the new application may be treated as a subsequent application and subject to the procedure referred to in Articles 40 and 41. Member States may provide that the applicant's case may be reopened only once.

Member States shall ensure that such a person is not removed contrary to the principle of *non-refoulement*.

Member States may allow the determining authority to resume the examination at the stage where it was discontinued.

3.   This Article shall be without prejudice to Regulation (EU) No 604/2013.

## Article 29

### The role of UNHCR

1.   Member States shall allow UNHCR:

(a) to have access to applicants, including those in detention, at the border and in the transit zones;

(b) to have access to information on individual applications for international protection, on the course of the procedure and on the decisions taken, provided that the applicant agrees thereto;

(c) to present its views, in the exercise of its supervisory responsibilities under Article 35 of the Geneva Convention, to any competent authorities regarding individual applications for international protection at any stage of the procedure.

2.   Paragraph 1 shall also apply to an organisation which is working in the territory of the Member State concerned on behalf of UNHCR pursuant to an agreement with that Member State.

## Article 30

### Collection of information on individual cases

For the purposes of examining individual cases, Member States shall not:

(a) disclose information regarding individual applications for international protection, or the fact that an application has been made, to the alleged actor(s) of persecution or serious harm;

(b) obtain any information from the alleged actor(s) of persecution or serious harm in a manner that would result in such actor(s) being directly informed of the fact that an application has been made by the applicant in question, and would jeopardise the physical integrity of the applicant or his or her dependants, or the liberty and security of his or her family members still living in the country of origin.

## CHAPTER III

### PROCEDURES AT FIRST INSTANCE

#### SECTION I

## Article 31

### Examination procedure

1.   Member States shall process applications for international protection in an examination procedure in accordance with the basic principles and guarantees of Chapter II.

2.   Member States shall ensure that the examination procedure is concluded as soon as possible, without prejudice to an adequate and complete examination.

3.   Member States shall ensure that the examination procedure is concluded within six months of the lodging of the application.

Where an application is subject to the procedure laid down in Regulation (EU) No 604/2013, the time limit of six months shall start to run from the moment the Member State responsible for its examination is determined in accordance with that Regulation, the applicant is on the territory of that Member State and has been taken in charge by the competent authority.

Member States may extend the time limit of six months set out in this paragraph for a period not exceeding a further nine months, where:

(a) complex issues of fact and/or law are involved;

(b) a large number of third-country nationals or stateless persons simultaneously apply for international protection, making it very difficult in practice to conclude the procedure within the six-month time limit;

(c) where the delay can clearly be attributed to the failure of the applicant to comply with his or her obligations under Article 13.

By way of exception, Member States may, in duly justified circumstances, exceed the time limits laid down in this paragraph by a maximum of three months where necessary in order to ensure an adequate and complete examination of the application for international protection.

4.    Without prejudice to Articles 13 and 18 of Directive 2011/95/EU, Member States may postpone concluding the examination procedure where the determining authority cannot reasonably be expected to decide within the time-limits laid down in paragraph 3 due to an uncertain situation in the country of origin which is expected to be temporary. In such a case, Member States shall:

(a) conduct reviews of the situation in that country of origin at least every six months;

(b) inform the applicants concerned within a reasonable time of the reasons for the postponement;

(c) inform the Commission within a reasonable time of the postponement of procedures for that country of origin.

5.    In any event, Member States shall conclude the examination procedure within a maximum time limit of 21 months from the lodging of the application.

6.    Member States shall ensure that, where a decision cannot be taken within six months, the applicant concerned shall:

(a) be informed of the delay; and

(b) receive, upon his or her request, information on the reasons for the delay and the time-frame within which the decision on his or her application is to be expected.

7.    Member States may prioritise an examination of an application for international protection in accordance with the basic principles and guarantees of Chapter II in particular:

(a) where the application is likely to be well-founded;

(b) where the applicant is vulnerable, within the meaning of Article 22 of Directive 2013/33/EU, or is in need of

special procedural guarantees, in particular unaccompanied minors.

8.    Member States may provide that an examination procedure in accordance with the basic principles and guarantees of Chapter II be accelerated and/or conducted at the border or in transit zones in accordance with Article 43 if:

(a) the applicant, in submitting his or her application and presenting the facts, has only raised issues that are not relevant to the examination of whether he or she qualifies as a beneficiary of international protection by virtue of Directive 2011/95/EU; or

(b) the applicant is from a safe country of origin within the meaning of this Directive; or

(c) the applicant has misled the authorities by presenting false information or documents or by withholding relevant information or documents with respect to his or her identity and/or nationality that could have had a negative impact on the decision; or

(d) it is likely that, in bad faith, the applicant has destroyed or disposed of an identity or travel document that would have helped establish his or her identity or nationality; or

(e) the applicant has made clearly inconsistent and contradictory, clearly false or obviously improbable representations which contradict sufficiently verified country-of-origin information, thus making his or her claim clearly unconvincing in relation to whether he or she qualifies as a beneficiary of international protection by virtue of Directive 2011/95/EU; or

(f) the applicant has introduced a subsequent application for international protection that is not inadmissible in accordance with Article 40(5); or

(g) the applicant is making an application merely in order to delay or frustrate the enforcement of an earlier or imminent decision which would result in his or her removal; or

(h) the applicant entered the territory of the Member State unlawfully or prolonged his or her stay unlawfully and, without good reason, has either not presented himself or herself to the authorities or not made an application for international protection as soon as possible, given the circumstances of his or her entry; or

DHSFF0842

(i) the applicant refuses to comply with an obligation to have his or her fingerprints taken in accordance with Regulation (EU) No 603/2013 of the European Parliament and of the Council of 26 June 2013 on the establishment of Eurodac for the comparison of fingerprints for the effective application of Regulation (EU) No 604/2013 establishing the criteria and mechanisms for determining the Member State responsible for examining an application for international protection lodged in one of the Member States by a third-country national or a stateless person and on requests for the comparison with Eurodac data by Member States' law enforcement authorities and Europol for law enforcement purposes (¹); or

(j) the applicant may, for serious reasons, be considered a danger to the national security or public order of the Member State, or the applicant has been forcibly expelled for serious reasons of public security or public order under national law.

9. Member States shall lay down time limits for the adoption of a decision in the procedure at first instance pursuant to paragraph 8. Those time limits shall be reasonable.

Without prejudice to paragraphs 3 to 5, Member States may exceed those time limits where necessary in order to ensure an adequate and complete examination of the application for international protection.

## Article 32

### Unfounded applications

1. Without prejudice to Article 27, Member States may only consider an application to be unfounded if the determining authority has established that the applicant does not qualify for international protection pursuant to Directive 2011/95/EU.

2. In cases of unfounded applications in which any of the circumstances listed in Article 31(8) apply, Member States may also consider an application to be manifestly unfounded, where it is defined as such in the national legislation.

## SECTION II

## Article 33

### Inadmissible applications

1. In addition to cases in which an application is not examined in accordance with Regulation (EU) No 604/2013, Member States are not required to examine whether the applicant qualifies for international protection in accordance with Directive 2011/95/EU where an application is considered inadmissible pursuant to this Article.

2. Member States may consider an application for international protection as inadmissible only if:

(a) another Member State has granted international protection;

(b) a country which is not a Member State is considered as a first country of asylum for the applicant, pursuant to Article 35;

(c) a country which is not a Member State is considered as a safe third country for the applicant, pursuant to Article 38;

(d) the application is a subsequent application, where no new elements or findings relating to the examination of whether the applicant qualifies as a beneficiary of international protection by virtue of Directive 2011/95/EU have arisen or have been presented by the applicant; or

(e) a dependant of the applicant lodges an application, after he or she has in accordance with Article 7(2) consented to have his or her case be part of an application lodged on his or her behalf, and there are no facts relating to the dependant's situation which justify a separate application.

## Article 34

### Special rules on an admissibility interview

1. Member States shall allow applicants to present their views with regard to the application of the grounds referred to in Article 33 in their particular circumstances before the determining authority decides on the admissibility of an application for international protection. To that end, Member States shall conduct a personal interview on the admissibility of the application. Member States may make an exception only in accordance with Article 42 in the case of a subsequent application.

This paragraph shall be without prejudice to Article 4(2)(a) of this Directive and to Article 5 of Regulation (EU) No 604/2013.

2. Member States may provide that the personnel of authorities other than the determining authority conduct the personal interview on the admissibility of the application for international protection. In such cases, Member States shall ensure that such personnel receive in advance the necessary basic training, in particular with respect to international human rights law, the Union asylum *acquis* and interview techniques.

## SECTION III

## Article 35

### The concept of first country of asylum

A country can be considered to be a first country of asylum for a particular applicant if:

(¹) See page 1 of this Official Journal.

(a) he or she has been recognised in that country as a refugee and he or she can still avail himself/herself of that protection; or

(b) he or she otherwise enjoys sufficient protection in that country, including benefiting from the principle of *non-refoulement*,

provided that he or she will be readmitted to that country.

In applying the concept of first country of asylum to the particular circumstances of an applicant, Member States may take into account Article 38(1). The applicant shall be allowed to challenge the application of the first country of asylum concept to his or her particular circumstances.

### Article 36

#### The concept of safe country of origin

1.   A third country designated as a safe country of origin in accordance with this Directive may, after an individual examination of the application, be considered as a safe country of origin for a particular applicant only if:

(a) he or she has the nationality of that country; or

(b) he or she is a stateless person and was formerly habitually resident in that country,

and he or she has not submitted any serious grounds for considering the country not to be a safe country of origin in his or her particular circumstances and in terms of his or her qualification as a beneficiary of international protection in accordance with Directive 2011/95/EU.

2.   Member States shall lay down in national legislation further rules and modalities for the application of the safe country of origin concept.

### Article 37

#### National designation of third countries as safe countries of origin

1.   Member States may retain or introduce legislation that allows, in accordance with Annex I, for the national designation of safe countries of origin for the purposes of examining applications for international protection.

2.   Member States shall regularly review the situation in third countries designated as safe countries of origin in accordance with this Article.

3.   The assessment of whether a country is a safe country of origin in accordance with this Article shall be based on a range of sources of information, including in particular information from other Member States, EASO, UNHCR, the Council of Europe and other relevant international organisations.

4.   Member States shall notify to the Commission the countries that are designated as safe countries of origin in accordance with this Article.

### Article 38

#### The concept of safe third country

1.   Member States may apply the safe third country concept only where the competent authorities are satisfied that a person seeking international protection will be treated in accordance with the following principles in the third country concerned:

(a) life and liberty are not threatened on account of race, religion, nationality, membership of a particular social group or political opinion;

(b) there is no risk of serious harm as defined in Directive 2011/95/EU;

(c) the principle of *non-refoulement* in accordance with the Geneva Convention is respected;

(d) the prohibition of removal, in violation of the right to freedom from torture and cruel, inhuman or degrading treatment as laid down in international law, is respected; and

(e) the possibility exists to request refugee status and, if found to be a refugee, to receive protection in accordance with the Geneva Convention.

2.   The application of the safe third country concept shall be subject to rules laid down in national law, including:

(a) rules requiring a connection between the applicant and the third country concerned on the basis of which it would be reasonable for that person to go to that country;

(b) rules on the methodology by which the competent authorities satisfy themselves that the safe third country concept may be applied to a particular country or to a particular applicant. Such methodology shall include case-by-case consideration of the safety of the country for a particular applicant and/or national designation of countries considered to be generally safe;

(c) rules in accordance with international law, allowing an individual examination of whether the third country concerned is safe for a particular applicant which, as a minimum, shall permit the applicant to challenge the application of the safe third country concept on the grounds that the third country is not safe in his or her particular circumstances. The applicant shall also be allowed to challenge the existence of a connection between him or her and the third country in accordance with point (a).

3.    When implementing a decision solely based on this Article, Member States shall:

(a) inform the applicant accordingly; and

(b) provide him or her with a document informing the authorities of the third country, in the language of that country, that the application has not been examined in substance.

4.    Where the third country does not permit the applicant to enter its territory, Member States shall ensure that access to a procedure is given in accordance with the basic principles and guarantees described in Chapter II.

5.    Member States shall inform the Commission periodically of the countries to which this concept is applied in accordance with the provisions of this Article.

### Article 39

**The concept of European safe third country**

1.    Member States may provide that no, or no full, examination of the application for international protection and of the safety of the applicant in his or her particular circumstances as described in Chapter II shall take place in cases where a competent authority has established, on the basis of the facts, that the applicant is seeking to enter or has entered illegally into its territory from a safe third country according to paragraph 2.

2.    A third country can only be considered as a safe third country for the purposes of paragraph 1 where:

(a) it has ratified and observes the provisions of the Geneva Convention without any geographical limitations;

(b) it has in place an asylum procedure prescribed by law; and

(c) it has ratified the European Convention for the Protection of Human Rights and Fundamental Freedoms and observes its provisions, including the standards relating to effective remedies.

3.    The applicant shall be allowed to challenge the application of the concept of European safe third country on the grounds that the third country concerned is not safe in his or her particular circumstances.

4.    The Member States concerned shall lay down in national law the modalities for implementing the provisions of paragraph 1 and the consequences of decisions pursuant to those provisions in accordance with the principle of *non-refoulement*, including providing for exceptions from the application of this Article for humanitarian or political reasons or for reasons of public international law.

5.    When implementing a decision solely based on this Article, the Member States concerned shall:

(a) inform the applicant accordingly; and

(b) provide him or her with a document informing the authorities of the third country, in the language of that country, that the application has not been examined in substance.

6.    Where the safe third country does not readmit the applicant, Member States shall ensure that access to a procedure is given in accordance with the basic principles and guarantees described in Chapter II.

7.    Member States shall inform the Commission periodically of the countries to which this concept is applied in accordance with this Article.

### Article 40

**Subsequent application**

1.    Where a person who has applied for international protection in a Member State makes further representations or a subsequent application in the same Member State, that Member State shall examine these further representations or the elements of the subsequent application in the framework of the examination of the previous application or in the framework of the examination of the decision under review or appeal, insofar as the competent authorities can take into account and consider all the elements underlying the further representations or subsequent application within this framework.

2.    For the purpose of taking a decision on the admissibility of an application for international protection pursuant to Article 33(2)(d), a subsequent application for international protection shall be subject first to a preliminary examination as to whether new elements or findings have arisen or have been presented by the applicant which relate to the examination of whether the applicant qualifies as a beneficiary of international protection by virtue of Directive 2011/95/EU.

3.    If the preliminary examination referred to in paragraph 2 concludes that new elements or findings have arisen or been presented by the applicant which significantly add to the likelihood of the applicant qualifying as a beneficiary of international protection by virtue of Directive 2011/95/EU, the application shall be further examined in conformity with Chapter II. Member States may also provide for other reasons for a subsequent application to be further examined.

4.    Member States may provide that the application will only be further examined if the applicant concerned was, through no fault of his or her own, incapable of asserting the situations set forth in paragraphs 2 and 3 of this Article in the previous procedure, in particular by exercising his or her right to an effective remedy pursuant to Article 46.

5.   When a subsequent application is not further examined pursuant to this Article, it shall be considered inadmissible, in accordance with Article 33(2)(d).

6.   The procedure referred to in this Article may also be applicable in the case of:

(a) a dependant who lodges an application after he or she has, in accordance with Article 7(2), consented to have his or her case be part of an application lodged on his or her behalf; and/or

(b) an unmarried minor who lodges an application after an application has been lodged on his or her behalf pursuant to Article 7(5)(c).

In those cases, the preliminary examination referred to in paragraph 2 will consist of examining whether there are facts relating to the dependant's or the unmarried minor's situation which justify a separate application.

7.   Where a person with regard to whom a transfer decision has to be enforced pursuant to Regulation (EU) No 604/2013 makes further representations or a subsequent application in the transferring Member State, those representations or subsequent applications shall be examined by the responsible Member State, as defined in that Regulation, in accordance with this Directive.

### Article 41

**Exceptions from the right to remain in case of subsequent applications**

1.   Member States may make an exception from the right to remain in the territory where a person:

(a) has lodged a first subsequent application, which is not further examined pursuant to Article 40(5), merely in order to delay or frustrate the enforcement of a decision which would result in his or her imminent removal from that Member State; or

(b) makes another subsequent application in the same Member State, following a final decision considering a first subsequent application inadmissible pursuant to Article 40(5) or after a final decision to reject that application as unfounded.

Member States may make such an exception only where the determining authority considers that a return decision will not lead to direct or indirect *refoulement* in violation of that Member State's international and Union obligations.

2.   In cases referred to in paragraph 1, Member States may also:

(a) derogate from the time limits normally applicable in accelerated procedures, in accordance with national law, when the examination procedure is accelerated in accordance with Article 31(8)(g);

(b) derogate from the time limits normally applicable to admissibility procedures provided for in Articles 33 and 34, in accordance with national law; and/or

(c) derogate from Article 46(8).

### Article 42

**Procedural rules**

1.   Member States shall ensure that applicants whose application is subject to a preliminary examination pursuant to Article 40 enjoy the guarantees provided for in Article 12(1).

2.   Member States may lay down in national law rules on the preliminary examination pursuant to Article 40. Those rules may, inter alia:

(a) oblige the applicant concerned to indicate facts and substantiate evidence which justify a new procedure;

(b) permit the preliminary examination to be conducted on the sole basis of written submissions without a personal interview, with the exception of the cases referred to in Article 40(6).

Those rules shall not render impossible the access of applicants to a new procedure or result in the effective annulment or severe curtailment of such access.

3.   Member States shall ensure that the applicant is informed in an appropriate manner of the outcome of the preliminary examination and, if the application is not to be further examined, of the reasons why and the possibilities for seeking an appeal or review of the decision.

### SECTION V

### Article 43

**Border procedures**

1.   Member States may provide for procedures, in accordance with the basic principles and guarantees of Chapter II, in order to decide at the border or transit zones of the Member State on:

(a) the admissibility of an application, pursuant to Article 33, made at such locations; and/or

29.6.2013          EN          Official Journal of the European Union          L 180/83

(b) the substance of an application in a procedure pursuant to Article 31(8).

2.    Member States shall ensure that a decision in the framework of the procedures provided for in paragraph 1 is taken within a reasonable time. When a decision has not been taken within four weeks, the applicant shall be granted entry to the territory of the Member State in order for his or her application to be processed in accordance with the other provisions of this Directive.

3.    In the event of arrivals involving a large number of third-country nationals or stateless persons lodging applications for international protection at the border or in a transit zone, which makes it impossible in practice to apply there the provisions of paragraph 1, those procedures may also be applied where and for as long as these third-country nationals or stateless persons are accommodated normally at locations in proximity to the border or transit zone.

CHAPTER IV

**PROCEDURES FOR THE WITHDRAWAL OF INTERNATIONAL PROTECTION**

*Article 44*

**Withdrawal of international protection**

Member States shall ensure that an examination to withdraw international protection from a particular person may commence when new elements or findings arise indicating that there are reasons to reconsider the validity of his or her international protection.

*Article 45*

**Procedural rules**

1.    Member States shall ensure that, where the competent authority is considering withdrawing international protection from a third-country national or stateless person in accordance with Article 14 or 19 of Directive 2011/95/EU, the person concerned enjoys the following guarantees:

(a) to be informed in writing that the competent authority is reconsidering his or her qualification as a beneficiary of international protection and the reasons for such a reconsideration; and

(b) to be given the opportunity to submit, in a personal interview in accordance with Article 12(1)(b) and Articles 14 to 17 or in a written statement, reasons as to why his or her international protection should not be withdrawn.

2.    In addition, Member States shall ensure that within the framework of the procedure set out in paragraph 1:

(a) the competent authority is able to obtain precise and up-to-date information from various sources, such as, where

appropriate, from EASO and UNHCR, as to the general situation prevailing in the countries of origin of the persons concerned; and

(b) where information on an individual case is collected for the purposes of reconsidering international protection, it is not obtained from the actor(s) of persecution or serious harm in a manner that would result in such actor(s) being directly informed of the fact that the person concerned is a beneficiary of international protection whose status is under reconsideration, or jeopardise the physical integrity of the person or his or her dependants, or the liberty and security of his or her family members still living in the country of origin.

3.    Member States shall ensure that the decision of the competent authority to withdraw international protection is given in writing. The reasons in fact and in law shall be stated in the decision and information on how to challenge the decision shall be given in writing.

4.    Once the competent authority has taken the decision to withdraw international protection, Article 20, Article 22, Article 23(1) and Article 29 are equally applicable.

5.    By way of derogation from paragraphs 1 to 4 of this Article, Member States may decide that international protection shall lapse by law where the beneficiary of international protection has unequivocally renounced his or her recognition as such. A Member State may also provide that international protection shall lapse by law where the beneficiary of international protection has become a national of that Member State.

CHAPTER V

**APPEALS PROCEDURES**

*Article 46*

**The right to an effective remedy**

1.    Member States shall ensure that applicants have the right to an effective remedy before a court or tribunal, against the following:

(a) a decision taken on their application for international protection, including a decision:

   (i) considering an application to be unfounded in relation to refugee status and/or subsidiary protection status;

   (ii) considering an application to be inadmissible pursuant to Article 33(2);

   (iii) taken at the border or in the transit zones of a Member State as described in Article 43(1);

(iv) not to conduct an examination pursuant to Article 39;

(b) a refusal to reopen the examination of an application after its discontinuation pursuant to Articles 27 and 28;

(c) a decision to withdraw international protection pursuant to Article 45.

2. Member States shall ensure that persons recognised by the determining authority as eligible for subsidiary protection have the right to an effective remedy pursuant to paragraph 1 against a decision considering an application unfounded in relation to refugee status.

Without prejudice to paragraph 1(c), where the subsidiary protection status granted by a Member State offers the same rights and benefits as those offered by the refugee status under Union and national law, that Member State may consider an appeal against a decision considering an application unfounded in relation to refugee status inadmissible on the grounds of insufficient interest on the part of the applicant in maintaining the proceedings.

3. In order to comply with paragraph 1, Member States shall ensure that an effective remedy provides for a full and *ex nunc* examination of both facts and points of law, including, where applicable, an examination of the international protection needs pursuant to Directive 2011/95/EU, at least in appeals procedures before a court or tribunal of first instance.

4. Member States shall provide for reasonable time limits and other necessary rules for the applicant to exercise his or her right to an effective remedy pursuant to paragraph 1. The time limits shall not render such exercise impossible or excessively difficult.

Member States may also provide for an *ex officio* review of decisions taken pursuant to Article 43.

5. Without prejudice to paragraph 6, Member States shall allow applicants to remain in the territory until the time limit within which to exercise their right to an effective remedy has expired and, when such a right has been exercised within the time limit, pending the outcome of the remedy.

6. In the case of a decision:

(a) considering an application to be manifestly unfounded in accordance with Article 32(2) or unfounded after examination in accordance with Article 31(8), except for cases where these decisions are based on the circumstances referred to in Article 31(8)(h);

(b) considering an application to be inadmissible pursuant to Article 33(2)(a), (b) or (d);

(c) rejecting the reopening of the applicant's case after it has been discontinued according to Article 28; or

(d) not to examine or not to examine fully the application pursuant to Article 39,

a court or tribunal shall have the power to rule whether or not the applicant may remain on the territory of the Member State, either upon the applicant's request or acting *ex officio*, if such a decision results in ending the applicant's right to remain in the Member State and where in such cases the right to remain in the Member State pending the outcome of the remedy is not provided for in national law.

7. Paragraph 6 shall only apply to procedures referred to in Article 43 provided that:

(a) the applicant has the necessary interpretation, legal assistance and at least one week to prepare the request and submit to the court or tribunal the arguments in favour of granting him or her the right to remain on the territory pending the outcome of the remedy; and

(b) in the framework of the examination of the request referred to in paragraph 6, the court or tribunal examines the negative decision of the determining authority in terms of fact and law.

If the conditions referred to in points (a) and (b) are not met, paragraph 5 shall apply.

8. Member States shall allow the applicant to remain in the territory pending the outcome of the procedure to rule whether or not the applicant may remain on the territory, laid down in paragraphs 6 and 7.

9. Paragraphs 5, 6 and 7 shall be without prejudice to Article 26 of Regulation (EU) No 604/2013.

10. Member States may lay down time limits for the court or tribunal pursuant to paragraph 1 to examine the decision of the determining authority.

11. Member States may also lay down in national legislation the conditions under which it can be assumed that an applicant has implicitly withdrawn or abandoned his or her remedy pursuant to paragraph 1, together with the rules on the procedure to be followed.

EN      Official Journal of the European Union

## CHAPTER VI

### GENERAL AND FINAL PROVISIONS

*Article 47*

**Challenge by public authorities**

This Directive does not affect the possibility for public authorities of challenging the administrative and/or judicial decisions as provided for in national legislation.

*Article 48*

**Confidentiality**

Member States shall ensure that authorities implementing this Directive are bound by the confidentiality principle as defined in national law, in relation to any information they obtain in the course of their work.

*Article 49*

**Cooperation**

Member States shall each appoint a national contact point and communicate its address to the Commission. The Commission shall communicate that information to the other Member States.

Member States shall, in liaison with the Commission, take all appropriate measures to establish direct cooperation and an exchange of information between the competent authorities.

When resorting to the measures referred to in Article 6(5), the second subparagraph of Article 14(1) and Article 31(3)(b), Member States shall inform the Commission as soon as the reasons for applying those exceptional measures have ceased to exist and at least on an annual basis. That information shall, where possible, include data on the percentage of the applications for which derogations were applied to the total number of applications processed during that period.

*Article 50*

**Report**

No later than 20 July 2017, the Commission shall report to the European Parliament and the Council on the application of this Directive in the Member States and shall propose any amendments that are necessary. Member States shall send to the Commission all the information that is appropriate for drawing up its report. After presenting the report, the Commission shall report to the European Parliament and the Council on the application of this Directive in the Member States at least every five years.

As part of the first report, the Commission shall also report, in particular, on the application of Article 17 and the various tools used in relation to the reporting of the personal interview.

*Article 51*

**Transposition**

1.    Member States shall bring into force the laws, regulations and administrative provisions necessary to comply with Articles 1 to 30, Article 31(1), (2) and (6) to (9), Articles 32 to 46, Articles 49 and 50 and Annex I by 20 July 2015 at the latest. They shall forthwith communicate the text of those measures to the Commission.

2.    Member States shall bring into force the laws, regulations and administrative provisions necessary to comply with Article 31(3), (4) and (5) by 20 July 2018. They shall forthwith communicate the text of those measures to the Commission.

3.    When Member States adopt the provisions referred to in paragraphs 1 and 2, they shall contain a reference to this Directive or be accompanied by such a reference on the occasion of their official publication. They shall also include a statement that references in existing laws, regulations and administrative provisions to the directive repealed by this Directive shall be construed as references to this Directive. Member States shall determine how such reference is to be made and how that statement is to be formulated.

4.    Member States shall communicate to the Commission the text of the main provisions of national law which they adopt in the field covered by this Directive.

*Article 52*

**Transitional provisions**

Member States shall apply the laws, regulations and administrative provisions referred to in Article 51(1) to applications for international protection lodged and to procedures for the withdrawal of international protection started after 20 July 2015 or an earlier date. Applications lodged before 20 July 2015 and procedures for the withdrawal of refugee status started before that date shall be governed by the laws, regulations and administrative provisions adopted pursuant to Directive 2005/85/EC.

Member States shall apply the laws, regulations and administrative provisions referred to in Article 51(2) to applications for international protection lodged after 20 July 2018 or an earlier date. Applications lodged before that date shall be governed by the laws, regulations and administrative provisions in accordance with Directive 2005/85/EC.

*Article 53*

**Repeal**

Directive 2005/85/EC is repealed for the Member States bound by this Directive with effect from 21 July 2015, without prejudice to the obligations of the Member States relating to the time limit for transposition into national law of the Directive set out in Annex II, Part B.

References to the repealed Directive shall be construed as references to this Directive and shall be read in accordance with the correlation table in Annex III.

*Article 54*

**Entry into force and application**

This Directive shall enter into force on the twentieth day following that of its publication in the *Official Journal of the European Union*.

Articles 47 and 48 shall apply from 21 July 2015.

*Article 55*

**Addressees**

This Directive is addressed to the Member States in accordance with the Treaties.

Done at Brussels, 26 June 2013.

<table>
<tr><td><em>For the European Parliament</em><br><em>The President</em><br>M. SCHULZ</td><td><em>For the Council</em><br><em>The President</em><br>A. SHATTER</td></tr>
</table>

―――――

DHSFF0850

*ANNEX I*

**Designation of safe countries of origin for the purposes of Article 37(1)**

A country is considered as a safe country of origin where, on the basis of the legal situation, the application of the law within a democratic system and the general political circumstances, it can be shown that there is generally and consistently no persecution as defined in Article 9 of Directive 2011/95/EU, no torture or inhuman or degrading treatment or punishment and no threat by reason of indiscriminate violence in situations of international or internal armed conflict.

In making this assessment, account shall be taken, inter alia, of the extent to which protection is provided against persecution or mistreatment by:

(a) the relevant laws and regulations of the country and the manner in which they are applied;

(b) observance of the rights and freedoms laid down in the European Convention for the Protection of Human Rights and Fundamental Freedoms and/or the International Covenant for Civil and Political Rights and/or the United Nations Convention against Torture, in particular the rights from which derogation cannot be made under Article 15(2) of the said European Convention;

(c) respect for the *non-refoulement* principle in accordance with the Geneva Convention;

(d) provision for a system of effective remedies against violations of those rights and freedoms.

———

*ANNEX II*

PART A

**Repealed Directive**

(referred to in Article 53)

Council Directive 2005/85/EC                    (OJ L 326, 13.12.2005, p. 13).

PART B

**Time limit for transposition into national law**

(referred to in Article 51)

| Directive | Time limits for transposition |
|-----------|-------------------------------|
| 2005/85/EC | First deadline: 1 December 2007<br>Second deadline: 1 December 2008 |

DHSFF0852

*ANNEX III*

**Correlation Table**

| Directive 2005/85/EC | This Directive |
|---|---|
| Article 1 | Article 1 |
| Article 2(a) to (c) | Article 2(a) to (c) |
| — | Article 2(d) |
| Article 2(d) to (f) | Article 2(e) to (g) |
| — | Article 2(h) and (i) |
| Article 2(g) | Article 2(j) |
| — | Article 2(k) and (l) |
| Article 2(h) to (k) | Article 2(m) to (p) |
| — | Article 2(q) |
| Article 3(1) and (2) | Article 3(1) and (2) |
| Article 3(3) | — |
| Article 3(4) | Article 3(3) |
| Article 4(1), first subparagraph | Article 4(1), first subparagraph |
| Article 4(1), second subparagraph | — |
| Article 4(2)(a) | Article 4(2)(a) |
| Article 4(2)(b) to (d) | — |
| Article 4(2)(e) | Article 4(2)(b) |
| Article 4(2)(f) | — |
| — | Article 4(3) |
| Article 4(3) | Article 4(4) |
| — | Article 4(5) |
| Article 5 | Article 5 |
| Article 6(1) | Article 6(1) |
| — | Article 6(2) to (4) |
| Article 6(2) and (3) | Article 7(1) and (2) |
| — | Article 7(3) |
| — | Article 7(4) |
| Article 6(4) | Article 7(5) |
| Article 6(5) | — |
| — | Article 8 |
| Article 7(1) and (2) | Article 9(1) and (2) |

| Directive 2005/85/EC | This Directive |
|---|---|
| — | Article 9(3) |
| Article 8(1) | Article 10(1) |
| — | Article 10(2) |
| Article 8(2)(a) to (c) | Article 10(3)(a) to (c) |
| — | Article 10(3)(d) |
| Article 8(3) and (4) | Article 10(4) and (5) |
| Article 9(1) | Article 11(1) |
| Article 9(2), first subparagraph | Article 11(2), first subparagraph |
| Article 9(2), second subparagraph | — |
| Article 9(2), third subparagraph | Article 11(2), second subparagraph |
| Article 9(3) | Article 11(3) |
| Article 10(1)(a) to (c) | Article 12(1)(a) to (c) |
| — | Article 12(1)(d) |
| Article 10(1)(d) and (e) | Article 12(1)(e) and (f) |
| Article 10(2) | Article 12(2) |
| Article 11 | Article 13 |
| Article 12(1), first subparagraph | Article 14(1), first subparagraph |
| Article 12(2), second subparagraph | — |
| — | Article 14(1), second and third subparagraph |
| Article 12(2), third subparagraph | Article 14(1), fourth subparagraph |
| Article 12(2)(a) | Article 14(2)(a) |
| Article 12(2)(b) | — |
| Article 12(2)(c) | — |
| Article 12(3), first subparagraph | Article 14(2)(b) |
| Article 12(3), second subparagraph | Article 14(2), second subparagraph |
| Article 12(4) to (6) | Article 14(3) to (5) |
| Article 13(1) and (2) | Article 15(1) and (2) |
| Article 13(3)(a) | Article 15(3)(a) |
| — | Article 15(3)(b) |
| Article 13(3)(b) | Article 15(3)(c) |
| — | Article 15(3)(d) |
| — | Article 15(3)(e) |
| Article 13(4) | Article 15(4) |

DHSFF0854

| Directive 2005/85/EC | This Directive |
|---|---|
| Article 13(5) | — |
| — | Article 16 |
| Article 14 | — |
| — | Article 17 |
| — | Article 18 |
| — | Article 19 |
| Article 15(1) | Article 22(1) |
| Article 15(2) | Article 20(1) |
| — | Article 20(2) to (4) |
| — | Article 21(1) |
| Article 15(3)(a) | — |
| Article 15(3)(b) and (c) | Article 21(2)(a) and (b) |
| Article 15(3)(d) | — |
| Article 15(3), second subparagraph | — |
| Article 15(4) to (6) | Article 21(3) to (5) |
| — | Article 22(2) |
| Article 16(1), first subparagraph | Article 23(1), first subparagraph |
| Article 16(1), second subparagraph, first sentence | Article 23(1), second subparagraph, introductory words |
| — | Article 23(1)(a) |
| Article 16(1), second subparagraph, second sentence | Article 23(1)(b) |
| Article 16(2), first sentence | Article 23(2) |
| Article 16(2), second sentence | — |
| — | Article 23(3) |
| Article 16(3) | Article 23(4), first subparagraph |
| Article 16(4), first subparagraph | — |
| Article 16(4), second and third subparagraphs | Article 23(4), second and third subparagraphs |
| — | Article 24 |
| Article 17(1) | Article 25(1) |
| Article 17(2)(a) | Article 25(2) |
| Article 17(2)(b) and (c) | — |
| Article 17(3) | — |
| Article 17(4) | Article 25(3) |
| — | Article 25(4) |
| Article 17(5) | Article 25(5) |

DHSFF0855

| Directive 2005/85/EC | This Directive |
|---|---|
| — | Article 25(6) |
| Article 17(6) | Article 25(7) |
| Article 18 | Article 26 |
| Article 19 | Article 27 |
| Article 20(1) and (2) | Article 28(1) and (2) |
| — | Article 28(3) |
| Article 21 | Article 29 |
| Article 22 | Article 30 |
| Article 23(1) | Article 31(1) |
| Article 23(2), first subparagraph | Article 31(2) |
| — | Article 31(3) |
| — | Article 31(4) and (5) |
| Article 23(2), second subparagraph | Article 31(6) |
| Article 23(3) | — |
| — | Article 31(7) |
| Article 23(4)(a) | Article 31(8)(a) |
| Article 23(4)(b) | — |
| Article 23(4)(c)(i) | Article 31(8)(b) |
| Article 23(4)(c)(ii) | — |
| Article 23(4)(d) | Article 31(8)(c) |
| Article 23(4)(e) | — |
| Article 23(4)(f) | Article 31(8)(d) |
| Article 23(4)(g) | Article 31(8)(e) |
| — | Article 31(8)(f) |
| Article 23(4)(h) and (i) | — |
| Article 23(4)(j) | Article 31(8)(g) |
| — | Article 31(8)(h) and (i) |
| Article 23(4)(k) and (l) | — |
| Article 23(4)(m) | Article 31(8)(j) |
| Article 23(4)(n) and (o) | — |
| — | Article 31(9) |
| Article 24 | — |
| Article 25 | Article 33 |
| Article 25(1) | Article 33(1) |

DHSFF0856

| Directive 2005/85/EC | This Directive |
|---|---|
| Article 25(2)(a) to (c) | Article 33(2)(a) to (c) |
| Article 25(2)(d) and (e) | — |
| Article 25(2)(f) and (g) | Article 33(2)(d) and (e) |
| — | Article 34 |
| Article 26 | Article 35 |
| Article 27(1)(a) | Article 38(1)(a) |
| — | Article 38(1)(b) |
| Article 27(1)(b) to (d) | Article 38(1)(c) to (e) |
| Article 27(2) to (5) | Article 38(2) to (5) |
| Article 28 | Article 32 |
| Article 29 | — |
| Article 30(1) | Article 37(1) |
| Article 30(2) to (4) | — |
| — | Article 37(2) |
| Article 30(5) and (6) | Article 37(3) and (4) |
| Article 31(1) | Article 36(1) |
| Article 31(2) | — |
| Article 31(3) | Article 36(2) |
| Article 32(1) | Article 40(1) |
| Article 32(2) | — |
| Article 32(3) | Article 40(2) |
| Article 32(4) | Article 40(3), first sentence |
| Article 32(5) | Article 40(3), second sentence |
| Article 32(6) | Article 40(4) |
| — | Article 40(5) |
| Article 32(7), first subparagraph | Article 40(6)(a) |
| — | Article 40(6)(b) |
| Article 32(7), second subparagraph | Article 40(6), second subparagraph |
| — | Article 40(7) |
| — | Article 41 |
| Article 33 | — |
| Article 34(1) and (2)(a) | Article 42(1) and (2)(a) |
| Article 34(2)(b) | — |
| Article 34(2)(c) | Article 42(2)(b) |

DHSFF0857

| Directive 2005/85/EC | This Directive |
|---|---|
| Article 34(3)(a) | Article 42(3) |
| Article 34(3)(b) | — |
| Article 35(1) | Article 43(1)(a) |
| — | Article 43(1)(b) |
| Article 35(2) and (3)(a) to (f) | — |
| Article 35(4) | Article 43(2) |
| Article 35(5) | Article 43(3) |
| Article 36(1) to (2)(c) | Article 39(1) to (2)(c) |
| Article 36(2)(d) | — |
| Article 36(3) | — |
| — | Article 39(3) |
| Article 36(4) to (6) | Article 39(4) to (6) |
| — | Article 39(7) |
| Article 36(7) | — |
| Article 37 | Article 44 |
| Article 38 | Article 45 |
| — | Article 46(1)(a)(i) |
| Article 39(1)(a)(i) and (ii) | Article 46(1)(a)(ii) and (iii) |
| Article 39(1)(a)(iii) | — |
| Article 39(1)(b) | Article 46(1)(b) |
| Article 39(1)(c) and (d) | — |
| Article 39(1)(e) | Article 46(1)(c) |
| — | Article 46(2) and (3) |
| Article 39(2) | Article 46(4), first subparagraph |
| — | Article 46(4), second and third subparagraphs |
| Article 39(3) | — |
| — | Article 46(5) to (9) |
| Article 39(4) | Article 46(10) |
| Article 39(5) | — |
| Article 39(6) | Article 41(11) |
| Article 40 | Article 47 |
| Article 41 | Article 48 |
| — | Article 49 |
| Article 42 | Article 50 |

DHSFF0858

| Directive 2005/85/EC | This Directive |
|---|---|
| Article 43, first subparagraph | Article 51(1) |
| — | Article 51(2) |
| Article 43, second and third subparagraphs | Article 51(3) and (4) |
| Article 44 | Article 52, first subparagraph |
| — | Article 52, second subparagraph |
| — | Article 53 |
| Article 45 | Article 54 |
| Article 46 | Article 55 |
| Annex I | — |
| Annex II | Annex I |
| Annex III | — |
| — | Annex II |
| — | Annex III |

DHSFF0859



Lisbon Expert Roundtable
9 and 10 December 2002

organised by the United Nations High Commissioner for Refugees
and the Migration Policy Institute
hosted by the Luso-American Foundation for Development

**Summary Conclusions on the Concept of "Effective Protection" in the Context of Secondary Movements of Refugees and Asylum-Seekers**

1. The December 2002 Lisbon expert roundtable reviewed the concept of "effective protection" in the context of secondary movements of asylum-seekers and refugees. The question of what constitutes effective protection in a third country usually arises in the implementation of what is commonly referred to as the concept of first country of asylum, "safety elsewhere" or the "safe" third country concept. The discussion was based on a background paper by Prof. Dr Stephen Legomsky, Washington University in St. Louis, United States, entitled "Returning Asylum-Seekers to Third Countries: The Requirements of Effective Protection". Participants included 30 experts from 18 countries, drawn from governments, NGOs, academia, the judiciary and the legal profession.

2. The roundtable is in direct follow-up of the "Agenda for Protection" (A/AC.96/965/Add.1 of 26 June 2002), which defines as one of its six goals "protecting refugees within broader migration movements". One of the activities foreseen to work towards this goal is: "Bearing in mind ExCom Conclusion No. 58 (XL) of 1989 on the Problem of Refugees and Asylum-Seekers Who Move in an Irregular Manner from a Country in which They had already Found Protection, UNHCR, in co-operation with relevant partners, to analyse the reasons for such movements, and propose strategies to address them in specific situations, predicated on a more precisely articulated understanding of what constitutes effective protection in countries of first asylum, and taking into account international solidarity and burden-sharing."

3. The objective of this roundtable was to identify the principles, grounded in law, around which policy parameters could be built to address issues concerning the secondary movement of asylum-seekers and refugees and which would have a practical value for decision- and policy-makers. The principles should be practical and holistic, that is, they should take account of physical, material and legal safety considerations.

4. The following Summary Conclusions do not represent the individual views of each participant or necessarily of UNHCR, but reflect broadly the understandings emerging from the discussion.

**Overall context**

5. The rationale behind examining "effective protection" in the context of the return of asylum-seekers and refugees to third countries is fourfold:
   ≠   to enhance international co-operation to share the burdens and responsibilities of admitting and hosting refugees;
   ≠   to strengthen protection capacities in host countries;
   ≠   to foster international solidarity and support for generating solutions;
   ≠   to address issues related to "irregular movement", including people smuggling, people trafficking, multiple applications and "orbit" cases.

DHSFF0881

6. The causes of secondary movements are manifold and include lack of durable solutions; limited capacity to host refugees and provide effective protection for protracted periods of time; as well as lack of access to legal migration opportunities. It was recommended that such causes required further careful study in relation to specific situations to provide a clearer understanding on which to build comprehensive strategies to reduce such movements.

7. Return to a third country of asylum is only one element in an interrelated comprehensive framework, aimed at reducing (the need for) secondary movement. Other elements of such an integrated framework were identified as including: addressing root causes of forced displacement; strengthening protection capacities in host countries; enabling access to durable solutions, including local integration and enhanced resettlement; concluding responsibility-sharing agreements; opening up more channels for regular entry in the context of resettlement, labour migration and, importantly, family reunification; as well as criminal law enforcement measures.

8. Operationalising international solidarity and international co-operation to share the burdens and responsibilities of hosting refugees is crucial to effecting the return of asylum-seekers and refugees to third countries under certain circumstances. Hosting large numbers of refugees is a major contribution by developing countries, which should be properly recognised when considering the removal of persons who could have sought protection there.

**Framework considerations**

9. While the 1951 Convention relating to the Status of Refugees and its 1967 Protocol constitute the core framework, other sources of rights and obligations in international law may be relevant for informing the appreciation of whether or not it is permissible to return an asylum-seeker or refugee to a third country. It is important not to exclude any source of law (treaty obligations, customary international obligations, interpretative guidance such as Executive Committee Conclusions) and to appreciate the specific circumstances of a case. An assessment of effective protection requires an individualised case-by-case examination.

10. From the point of view of identifying the elements of effective protection in the context of return to third countries, the distinction between the so-called "safe" third country and the country of first asylum concepts is not relevant.[1] The distinction is, however, relevant when it comes to an appreciation of the links between an asylum-seeker or refugee and the destination country, in which the person is now applying for asylum, or the third country, as well as for procedural issues in destination countries. In addition, readmission obligations are clearer in respect of countries that have already provided effective protection to an individual.

11. There is no obligation under international law for a person to seek international protection at the first effective opportunity. On the other hand, asylum-seekers and refugees do not have an unfettered right to choose the country that will determine their asylum claim in substance and provide asylum. Their intentions, however, ought to be taken into account.[2]

12. States could craft bi- or multilateral arrangements, consistent with international refugee and human rights law standards, according to which asylum-seekers would be encouraged and enabled to seek international protection at the first available opportunity. This could be done by agreeing to mechanisms and criteria to allocate responsibilities for the determination of asylum applications and the provision of effective protection. Such arrangements should take account of meaningful links, such as family connections and other close ties, between an asylum-seeker and a particular country. They should also include procedural safeguards, including for example, a notification to the receiving country that an asylum application has not been examined on its

---

[1] See, UNHCR, "Asylum Processes (Fair and Efficient Asylum Procedures)", EC/GC/01/12, 31 May 2001, paragraphs 10–18.
[2] Executive Committee Conclusion No. 15 (XXX) 1979, Refugees without an Asylum Country, paragraph (h) (iii).

DHSFF0882

merits. The effectiveness of such arrangements needs careful assessment and regular review both in terms of their operational efficiency and their resource implications.

13. Besides considerations of burden-sharing with countries hosting large numbers of refugees, several participants questioned the appropriateness, from a protection perspective, of returns outside the context of countries with equivalent asylum systems. In this regard, the wide disparity and poor levels of protection in many countries were noted.

14. Family and other links between a person seeking asylum and the destination country or the third State are important and should be given weight. The protection of the family as the natural and fundamental group unit of society is a widely recognised principle of human rights.

**Critical factors for the appreciation of "effective protection" in the context of return to third States**

15. The following elements, while not exhaustive, are critical factors for the appreciation of "effective protection" in the context of return to third countries:

a) The person has no well-founded fear of persecution in the third State on any of the 1951 Convention grounds.

b) There will be respect for fundamental human rights in the third State in accordance with applicable international standards, including but not limited to the following:

- ♠ there is no real risk that the person would be subjected to torture or to cruel, inhuman or degrading treatment or punishment in the third State;

- ♠ there is no real risk to the life of the person in the third State;

- ♠ there is no real risk that the person would be deprived of his or her liberty in the third State without due process.

c) There is no real risk that the person would be sent by the third State to another State in which he or she would not receive effective protection or would be at risk of being sent from there on to any other State where such protection would not be available.

d) While respecting data protection principles during the notification process, the third State has explicitly agreed to readmit the person as an asylum-seeker or, as the case may be, a refugee.

e) While accession to international refugee instruments and basic human rights instruments is a critical indicator, the actual practice of States and their compliance with these instruments is key to the assessment of the effectiveness of protection. Where the return of an asylum-seeker to a third State is involved, accession to and compliance with the 1951 Convention and/or 1967 Protocol are essential, unless the destination country can demonstrate that the third State has developed a practice akin to the 1951 Convention and/or its 1967 Protocol.

f) The third State grants the person access to fair and efficient procedures for the determination of refugee status, which includes — as the basis of recognition of refugee status — grounds that would be recognised in the destination country. In cases, however, where the third State provides prima facie recognition of refugee status, the examination must establish that the person can avail him- or herself of such recognition and the ensuing protection.

g) The person has access to means of subsistence sufficient to maintain an adequate standard of living. Following recognition as a refugee, steps are undertaken by the third State to

DHSFF0883

enable the progressive achievement of self-reliance, pending the realisation of durable solutions.

h)   The third State takes account of any special vulnerabilities of the person concerned and maintains the privacy interests of the person and his or her family.

i)   If the person is recognised as a refugee, effective protection will remain available until a durable solution can be found.


Department of International Protection
Office of the United Nations High Commissioner for Refugees (UNHCR)
February 2003

DHSFF0884



**UNHCR Statement on safe country concepts and
the right to an effective remedy in admissibility procedures**

*Issued in the context of the preliminary ruling reference to the Court of Justice of the European
Union in the case of LH v Bevándorlási és Menekültügyi Hivatal (C-564/18)*

## 1.    Introduction

1.    On 7 September 2018, the *Fővárosi Közigazgatási és Munkaügyi Bíróság* (Administrative
and Labour Court of Budapest) referred two questions to the Court of Justice of the European
Union (the 'Court'),[1] concerning the interpretation of Article 33 ('Inadmissible applications') of
the recast Asylum Procedures Directive ('APD'),[2] as well as Article 47 ('Right to an effective
remedy and to a fair trial') of the Charter of Fundamental Rights of the European Union ('the
Charter')[3] and Article 31 ('Examination procedure') APD, also in light of Articles 6 and 13 (Right
to a fair trial and to an effective remedy, respectively) of the European Convention on Human
Rights ('ECHR')[4].

2.    The referring court's request focuses first on the legality under EU law of a new provision
in Hungarian law providing for the inadmissibility of applications for international protection on
a safe third country ground and second, whether Hungary's system of judicial review, which
imposes a mandatory time line of eight days for review of such inadmissibility decisions, is in
line with the right to an effective remedy under EU law.

## 2.    UNHCR's interest and expertise in the matter

3.    UNHCR has been entrusted by the United Nations General Assembly with the mandate to
provide international protection to refugees and together with governments to seek solutions for
them.[5] UNHCR fulfils its mandate, *inter alia*, by supervising the application of international
conventions for the protection of refugees.[6] State parties to the *1951 Convention relating to the
Status of Refugees* and its *1967 Protocol*, (together, '1951 Convention') including all EU Member
States, are obliged to cooperate with UNHCR in the exercise of its mandate and to facilitate its
supervisory role.[7]

4.    UNHCR's supervisory responsibility is also provided for under EU law, both in primary
law and secondary legislation. Article 78(1) of the Treaty on the Functioning of the European
Union ('TFEU') stipulates that a common policy on asylum, subsidiary protection and temporary

---

[1] For the questions referred see: https://bit.ly/2mgFyzX.

[2] European Union: Council of the European Union, *Directive 2013/32/EU of the European Parliament and of the Council of 26
June 2013 on common procedures for granting and withdrawing international protection (recast)*, 29 June 2013, OJ L. 180/60 -
180/95; 29.6.2013, 2013/32/EU: https://www.refworld.org/docid/51d29b224.html.

[3] European Union, *Charter of Fundamental Rights of the European Union*, 7 December 2000, Official Journal of the European
Communities, 18 December 2000 (2000/C 364/01): https://bit.ly/2MgFXL3.

[4] Council of Europe, *European Convention for the Protection of Human Rights and Fundamental Freedoms, as amended by
Protocols Nos. 11 and 14*, 4 November 1950, ETS 5: https://www.refworld.org/docid/3ae6b3b04.html.

[5] UNGA, *Statute of the Office of the United Nations High Commissioner for Refugees*, 14 December 1950, A/RES/428(V), para.
1 ('UNHCR Statute'): http://www.unhcr.org/refworld/docid/3ae6b3628.html.

[6] UNHCR Statute, note 5 above, para. 8(a).

[7] Article 35 of the *1951 Convention relating to the Status of Refugees* ('1951 Convention') and Article II of the *1967 Protocol
Relating to the Status of Refugees* ('1967 Protocol'): https://www.unhcr.org/4ec262df9.pdf.

1

protection "must be in accordance with the [1951] Convention"[8] and Article 18 of the Charter states that "the right to asylum shall be guaranteed with due respect for the rules of the [1951] Convention." The recast Qualification Directive ('QD') states that consultations with UNHCR "may provide valuable guidance for Member States when determining refugee status."[9] Finally, the APD specifically refers to UNHCR's supervisory responsibility and obliges Member States to allow UNHCR to present its views regarding individual asylum applications "at any stage of the procedure."[10]

5.      EU law, as well as case-law of the Court, confirms that the 1951 Convention is the cornerstone of the international legal regime for the protection of refugees and that the EU asylum system must be based on the full and inclusive application of this convention.[11] EU legislation and the Court have accordingly considered that "documents from the United Nations High Commissioner for Refugees (UNHCR) are particularly relevant in the light of the role conferred on the UNHCR by the Geneva Convention."[12]

6.      Against this background, the present statement will first posit that legislation that foresees a mandatory rejection of claims based on safe third country concepts without applying the APD's strict safeguards is unlawful under international and EU law and second, that a mandatory judicial review time line of eight days, which does not, in practice, guarantee a court or tribunal's full and complete forward looking examination of the facts and points of law is inconsistent with the right to an effective remedy under international and EU law.

### 3.      UNHCR's observations on Hungarian practice

***Admissibility procedures based on the recently introduced inadmissibility ground***

7.      According to a new inadmissibility ground in Hungarian legislation, an application *shall* be considered inadmissible if an applicant has arrived through a third country where s/he is 'not exposed to persecution' or a risk of serious harm (first limb), *or* if 'sufficient protection' is available in this country (second limb).[13]

8.      The Hungarian provision combines elements of the two EU law concepts of safe third country (STC)[14] and first country of asylum (FCA).[15] However, it is missing essential elements

---

[8] European Union, *Consolidated version of the Treaty on the Functioning of the European Union*, 13 December 2007, 2008/C 115/01: https://www.refworld.org/docid/4b17a07e2.html
[9] Recital 22 European Union: Council of the European Union, *Directive 2011/95/EU of the European Parliament and of the Council of 13 December 2011 on standards for the qualification of third-country nationals or stateless persons as beneficiaries of international protection, for a uniform status for refugees or for persons eligible for subsidiary protection, and for the content of the protection granted (recast)*, 20 December 2011, OJ L. 337/9-337/26; 20.12.2011, 2011/95/EU: https://www.refworld.org/docid/4f197df02.html.
[10] Article 29 APD.
[11] Recitals 3, 4, 22, 23, and 24 QD, as well as Recital 3 APD. For CJEU cases, see *Alo and Osso* [GC], Joined Cases C-443/14 and C-444/14, 1 March 2016, para. 30, https://bit.ly/2kHSlLb; restated in *Bilali*, C-720/17, 23 May 2019, para. 54, https://bit.ly/2m7MdvY. See also *M and X, X* [GC], Joined Cases C-391/16, C-77/17 and C-78/17, 14 May 2019, paras. 80-83, https://bit.ly/2lSyhps and *Ahmed*, C-369/17, 13 September 2018, para. 37, https://bit.ly/2kdym6M. Where not otherwise indicated, case-law references refer to judgments of the CJEU.
[12] *Bilali*, see note 11 above, para. 57, restating *Halaf*, C-528/11, 30 May 2013, para. 44, https://bit.ly/2mfRphz. See also Recital 22 QD.
[13] Section 51(2)(f) of *Act LXXX of 2007 on Asylum* ('Hungarian Asylum Act') reads as follows: "An application shall be considered inadmissible if: the applicant arrived through a country where he/she is not exposed to persecution as provided for in Subsection (1) of Section 6 or to serious harm under Subsection (1) of Section 12, or in the country through which the applicant arrived to Hungary a sufficient level of protection is available."
[14] Article 38 APD, elements of which are reflected in the second limb of the Hungarian provision.
[15] Article 35 APD, elements of which are reflected in the second limb of the Hungarian provision.

DHSFF0916

of both concepts. When comparing the text of Article 38 APD (STC concept) with the Hungarian provision, the latter does not provide for the following requirements:

    (a) a pre-transfer assessment of the effectiveness of protection (Article 38(1) APD),

    (b) a connection to the third country (Article 38(2)(a) APD),

    (c) rules on the methodology by which a case-by-case consideration must be carried out (Article 38(2)(b) APD), and

    (d) granting access to the procedure where the third country does not admit the applicant (Article 38(4) APD).

9.    Similarly, when comparing the text of Article 35 APD (FCA concept) with the Hungarian provision, the latter does not provide for the following requirements:

    (a) the applicant must have been recognised as a refugee, or otherwise enjoy sufficient protection in this third country (Article 35 first paragraph (a) and (b) APD),

    (b) the applicant must be readmitted to the third country, or else Hungary must assess the claim in merits (Article 35 first paragraph, last sentence).

10.    In particular, since the Hungarian provision's two limbs, which do not fully transpose the APD, are phrased *as alternatives*: either (1) no persecution or serious harm *or* (2) 'sufficient' protection[16], a pre-transfer assessment of the level of protection available in the third country becomes optional under the first limb. Rather than a simple statement that there is no persecution or serious harm, what is required as a precondition to return or transfer, is a thorough assessment which ensures that the individual has access in that country to standards of treatment commensurate with the 1951 Convention and international human rights standards including but not limited to protection from *refoulement* (see also below para. 17).

11.    The Hungarian Immigration and Asylum Office ('IAO') has applied the new inadmissibility ground since mid-August 2018 and has so far declared the vast majority of new asylum applications in the transit zones[17] inadmissible. As a result, almost no applicant has had access to an in-merit assessment and consequently to international protection.[18] UNHCR further notes that the information included in the decision on third countries is not assessed in light of the individual circumstances of the applicant but related to the safety of the country in general.

12.    Since the new inadmissibility ground came into effect the IAO has applied it primarily against Serbia. UNHCR has observed that there is no reference in the decisions to the legal obligation under the Asylum Act requiring the IAO to satisfy itself that Serbia will actually readmit the individual concerned.[19] Since 15 September 2015, Serbia has not readmitted third country nationals under the readmission agreement with Hungary except those who hold valid travel/identity documents or are exempted from Serbian visa requirements.[20] The IAO has nonetheless ordered the expulsion of applicants to Serbia, in addition to imposing one year entry bans and the placement of Schengen-Information-System-alerts.

---

[16] For the wording of the provision, see above note 13.

[17] In September 2015, the Government of Hungary expedited legislation through Parliament and amended the Act on the State Border, to permit the establishment of 'transit zones' at any of Hungary's land borders that constitute an external Schengen border (which includes those with Serbia). The legislation provides these transit zones "shall function to temporarily accommodate individuals seeking refugee status or subsidiary protection…, [and] to conduct asylum and immigration procedures […]." On 15 September 2015, two transit zones on Hungary's border with Serbia became operational, one at Röszke, the other at Tompa. See UNHCR, *Hungary as a country of asylum. Observations on restrictive legal measures and subsequent practice implemented between July 2015 and March 2016*, ('UNHCR, Hungary as a country of asylum'), May 2016: https://www.refworld.org/docid/57319d514.html.

[18] Since July 2019, UNHCR observed that several new cases have undergone a first instance assessment on the merits.

[19] The Hungarian Asylum Act foresees this obligation with regard to the safe country of origin and safe third country provisions but omits this obligation from the newly introduced inadmissibility provision.

[20] UNHCR, Hungary as a country of asylum, para. 42.

3

13.     Following the formal refusal by the Serbian authorities to readmit applicants whose application has been declared inadmissible by Hungary, UNHCR has recently observed that the IAO subsequently amends the expulsion order by changing the destination country from Serbia to the applicants' country of origin. Consequently, many such applicants now face a substantial risk of either being returned to their country of origin or coerced[21] to re-enter Serbia irregularly, without access to a fair and efficient asylum procedure. Even though a *non-refoulement* assessment is included in relation to the country of origin of the applicant in the IAO decisions, UNHCR has observed that the analysis is limited to the general situation of rejected asylum-seekers who return to the countries of origin, rather than assessing the concrete, individual risk to the individual applicant as required by international and European standards as well as Hungarian law.

*Judicial review of inadmissibility decisions*

14.     Under Hungarian law, courts are bound to review inadmissibility decisions within a mandatory non-extendable eight-day time-limit. The judicial decision assessing the first instance decision cannot be further appealed.

15.     The majority of inadmissibility decisions in Hungary based on the new ground are being appealed. An appeal against the decision does not have automatic suspensive effect. While an applicant may request the suspension of the enforcement of the inadmissibility decision pending the appeal, UNHCR has observed that the IAO does not inform applicants of this possibility. Furthermore, the judgments of the administrative courts reviewing the inadmissibility decisions show that the inadmissibility ground is not consistently interpreted. While many judges equate the ground with the 'first country of asylum' concept under Article 35 first paragraph (b) APD, other judges interpret it as the 'safe third country' concept under Article 38 APD. In any case, the majority of judges consider the individual assessment of whether the applicant will be readmitted by the third country as a compulsory element of both concepts and have instructed the IAO to contact the Serbian authorities in order to gather information and statements to substantiate the actual readmission of the individual concerned. Furthermore, other judges have found that if Serbia does not readmit the applicant then the IAO has to conduct a full in-merit assessment of the asylum claim.

16.     According to Section 80/K (5) of the Hungarian Asylum Act during a 'crisis caused by mass immigration'[22] the court shall conduct personal interviews in the transit zone or through a telecommunications network.[23] However, UNHCR has observed that administrative courts do not hold a hearing with the participation of the applicant during the review of the inadmissibility decision.

**4.     UNHCR's position on admissibility procedures based on safe third country concepts**

---

[21] See UNHCR's press statement: *Hungary's coerced removal of Afghan families deeply shocking*, 08 May 2019: https://www.unhcr.org/news/press/2019/5/5cd3167a4/hungarys-coerced-removal-afghan-families-deeply-shocking.html.

[22] The Government first declared a crisis situation caused by mass immigration in September 2015 and has continually extended it since then. It is currently effective until 7 March 2020. See Government Decree No. 217/2019. (IX. 5.), available in Hungarian at: https://bit.ly/2kHZ5lZ.

[23] Section 80/K (5) of the Hungarian Asylum Act states that "the court seized shall conduct personal interviews in the transit zone. Personal interviews may be conducted through telecommunications network as well, if the judge conducts the personal interview from the court or from any other place outside the transit zone. In that case, direct connection shall be ensured by a device that is capable of simultaneous video and audio communication in real-time."

DHSFF0918

17.     As a precondition to return or transfer of an asylum-seeker or refugee to another country, it is crucial to establish that s/he will be (re)admitted and has access in that country to standards of treatment commensurate with the 1951 Convention and international human rights standards including but not limited to protection from *refoulement*.[24] This is reflected in both EU[25] and ECHR law.[26]

18.     To ensure that access to protection is effective and enduring, being a state party to the 1951 Convention and basic human rights instruments without any limitations is a critical indicator. Whether standards of treatment commensurate with the 1951 Convention and international human rights standards are available cannot be answered without looking at the state's international legal obligations, its domestic laws and the actual practice of implementation.[27] Access to protection may only be effectively and durably guaranteed when the state is obliged to provide such access under international treaty law, has adopted national laws to implement the relevant treaties and can rely on actual practice indicating consistent compliance by the state with its international legal obligations.[28]

19.     In accordance with the APD, Member States may apply the safe third country concept only where it is satisfied that the applicant will be treated in accordance with clear prescribed principles.[29] In UNHCR's view, following the above considerations, in the assessment of whether an applicant enjoys protection that is effective and enduring it is also critical that the applicant has access to means of subsistence sufficient to maintain an adequate standard of living; that steps are undertaken by the third state to enable the progressive achievement of self-reliance pending the realization of a durable solution; and that the third state takes account of any special vulnerabilities of the applicant and maintains the privacy interests of the person and his/her family.[30]

20.     As regards the existence of a connection between the applicant and the safe third country, UNHCR has consistently been advocating for a meaningful link or connection to exist that would make it reasonable and sustainable for a person to seek asylum in another state,[31] given that taking into account the duration and nature of any sojourn and connections based on family or other close ties increases the viability of the return or transfer from the viewpoint of both the individual and

---

[24] UNHCR, *Legal considerations regarding access to protection and a connection between the refugee and the third country in the context of return or transfer to safe third countries*, (Legal Considerations Regarding Access'), April 2018, para.7, https://www.refworld.org/docid/5acb33add.html. Also see Recital 3 QD, Recital 3 APD and *M and X, X*, para. 80, referring to the "full and inclusive application of the Geneva Convention."

[25] Article 38(1) APD requires that Member States apply the STC concept only where the competent authorities "are satisfied" that the applicant would, if recognised, "receive protection in accordance with the Geneva Convention" among other criteria. Regarding the FCA concept, an essential requirement is that the third state has already granted 'sufficient protection'. The CJEU further clarified the three requirements for applying the APD's FCA concept: a) *readmission* to the third country, b) *effectiveness* of protection in the third country, and c) *certainty* that the applicant will be able to stay in the third country under *dignified living* conditions *for as long as necessary*. See, *Alheto*, [GC], C-585/16, 25 July 2018, para. 140: https://bit.ly/2meBNuH.

[26] ECtHR, *F.G. v. Sweden* [GC], Application no. 43611/11, 23 March 2016, para. 117, https://www.refworld.org/pdfid/56fd485a4.pdf. The fact that a particular country is included on a list of safe countries, does not dispense a Contracting State from establishing that the person concerned will not be at risk of ill-treatment upon return. ECtHR, M.S.S. v. Belgium and Greece [GC], Application no. 30696/09, 21 January 2011, para. 354, 358-359: https://www.refworld.org/cases,ECHR,4d39bc7f2.html, ECtHR, Tarakhel v. Switzerland [GC], Application no. 29217/12, 4 November 2014, paras. 120-121: https://www.refworld.org/cases,ECHR,5458abfd4.html.

[27] The ECtHR stated that "the existence of domestic laws and accession to international treaties guaranteeing respect for fundamental rights in principle are not in themselves sufficient to ensure adequate protection against the risk of ill-treatment (…)." ECtHR, *Saadi v. The United Kingdom* [GC], Application no. 13229/03, 29 January 2008, para. 147: https://www.refworld.org/pdfid/47a074302.pdf.

[28] UNHCR, Legal Considerations Regarding Access, para. 10; *UNHCR Comments on the European Commission's Proposal for an Asylum Procedures Regulation*, April 2019, ('UNHCR APR Comments'), p. 40: https://www.refworld.org/docid/5cb597a27.html.

[29] APD, Article 38(1).

[30] UNHCR APR Comments, p. 40.

[31] UNHCR, Legal Considerations Regarding Access, para. 6.

DHSFF0919

the state. As such, it reduces the risk of irregular onward movement, prevents the creation of 'orbit' situations and advances international cooperation and responsibility sharing.

21.     In its recent observations on the Hungarian legislative amendments that form the subject of this case, UNHCR has further recalled that under EU law, Article 38(2)(a) APD specifically requires that the application of the safe third country concept shall be subject to rules laid down in national law, including rules requiring a connection between the applicant and the third country concerned on the basis of which it would be reasonable for that person to go to that country.[32] Further, in UNHCR's view, such a connection should be meaningful and should therefore not be based on the mere transit of the applicant through a particular country.[33] It should be noted that transfers to third countries should be aimed at enhancing burden and responsibility sharing and international/regional cooperation and not for the purpose of burden shifting. Transfers to third countries need to contribute to the enhancement of the overall protection space in the transferring state, the receiving state and/or the region as a whole.[34]

22.     As regards procedural safeguards, UNHCR notes that the current practice of the Hungarian government is at variance with the terms of the APD, which provides the following standards when considering an application on the basis of safe third country concepts:

(a) An *individualised assessment*, prior to transfer, of whether the third state will[35]
   i.   (re)admit the person,
   ii.  grant the person access to a fair and efficient asylum procedure,
   iii. permit the person to remain while a determination is made,
   iv.  accord the person effective protection (see criteria above), and
   v.   grant lawful stay where the person is determined to be a refugee.

(b) A *personal interview*, including the *right to interpretation*, on admissibility in accordance with Article 34(1) APD to allow the applicant to present his or her views on the existence of a connection between him or her and the third country and on the 'safety' of the third country in his or her particular circumstances. In other words, providing an *effective opportunity to rebut the presumption of safety* in the third country.

(c) The right to receive decisions that are properly reasoned, written, and in a language that the applicant understands,[36] in particular, *the right to be informed* of the decision to apply the safe country concept and provide him or her with a document informing the authorities of the third country in the language of that country, that the asylum application has not been examined in substance (Article 38(3) APD).

(d) The opportunity to consult in an effective manner a *legal adviser or other counsellor* (Article 22(1) APD).[37] Advisers/counsellors must have access to the applicant for the purpose of consultation, including in closed areas such as detention facilities (Article 23(2) APD). On appeal, the state must ensure free legal assistance and representation on the request of the applicant (Article 20(1) APD).

(e) The *right to an effective remedy* before a court or tribunal against the inadmissibility decision pursuant to Article 46 (1)(a)(ii) APD, with automatic suspensive effect (Article 46(5) APD).[38]

---

[32] *UNHCR Observations on the Legislative Amendments Adopted in Hungary in June & July 2018* ('UNHCR Observations on Hungary'), 6 November 2018, para 11: https://www.refworld.org/docid/5c6bd18a7.html.

[33] UNHCR, Legal considerations regarding access, UNHCR APR Comments, p. 43.

[34] UNHCR, Legal Considerations Regarding Access, para. 6.

[35] UNHCR Legal considerations regarding access, para. 4; UNHCR Observations on Hungary, para. 14.

[36] UNHCR, *UNHCR Discussion Paper Fair and Fast - Accelerated and Simplified Procedures in the European Union* ('UNHCR Fair and Fast'), 25 July 2018. p. 13: https://www.refworld.org/docid/5b589eef4.html.

[37] This opportunity should be provided at all stages of the procedure, including at first instance (Article 31(1) APD) or in border procedures (see Article 43(1) APD) when deciding on the admissibility of an application for international protection.

[38] UNHCR Observations on Hungary, see note 32 above, para. 14-18, and references cited.

DHSFF0920

**5.      UNHCR's position on judicial times lines and the right to an effective remedy**

23.      UNHCR considers that while efficient procedures are key, time lines may not be too short to the extent that they undermine the fairness and quality of the procedure.[39] While it is in the interest of all parties that quality decisions are taken as soon as possible, speed should not be a goal in itself and any time limit must be applied without prejudice to an adequate and complete examination.[40] States must guard against reducing or undermining procedural safeguards for applicants, or their ability to benefit from those safeguards in practice, and maintain sufficient flexibility in time frames should complicated issues arise.[41]

24.      Excessively short time frames for the examination of the claim *per definitio* result in a more cursory review of the relevant facts,[42] thereby potentially undermining the quality and scope of the review. With respect to a four-day time frame for the examination of an asylum claim by the French administrative authority, UNHCR considered that this time limit did not guarantee a rigorous and complete examination of protection needs.[43] The same concern that such a short time frame does not necessarily ensure the required assessment arises at the judicial review stage, in particular if the first instance authority does not conduct an adequate examination on its part. In UNHCR's view, short time lines "will only work […] if appropriate modalities are in place, and adequate resources allocated for case processing."[44]

25.      Where national law foresees time limits for the judiciary, these time limits need to be sufficient to allow the court to examine all individual circumstances of the particular case and to obtain and review all relevant evidence.[45] Where this is not possible within the set time limits, they need to be extendable to ensure the effectiveness of the remedy.[46] As is the case with insufficient time limits to lodge an application,[47] UNHCR is concerned that unduly short and inflexible time lines might affect the fairness of the procedure as guaranteed under EU[48] and ECHR law[49] and result in incomplete or hastily-reasoned decisions, which run the risk of being incorrect and may lead to instances of *refoulement*.[50]

26.      As the referring court notes in its reference, an eight-day time-limit to adjudicate an inadmissibility appeal is, in Hungarian practice, insufficient to guarantee the applicant's right to

---

[39] Excessively short time lines may affect the effectiveness of, for example, the right of information (Article 12(1)(a) APD), the right to a personal interview (Article 14 APD) or the right to legal assistance and representation (Articles 19-23 APD). When insufficient time is granted during the procedure to exercise these rights or to benefit from them, their effectiveness is undermined or negated. *UNHCR public statement in relation to Brahim Samba Diouf v. Ministre du Travail, de l'Emploi et de l'Immigration pending before the Court of Justice of the European Union* ('UNHCR Statement in *Diouf*'), 21 May 2010, para. 8: https://www.refworld.org/docid/4bf67fa12.html.

[40] See Recitals 18 and 20, as well as Articles 31(2), 31(3) last paragraph, 31(9) last paragraph APD.

[41] UNHCR, APR Comments, p. 31.

[42] UNHCR Statement in *Diouf*, note above, para. 8.

[43] UNHCR, *Observations actualisées du HCR devant la Cour européenne des droits de l'homme dans l'affaire I.M. c. France*, Requête no. 9152/09, 31 March 2011, para. 3.7: https://www.refworld.org/docid/4d9995d02.html.

[44] UNHCR, Fair and Fast, note 36 above, p. 10.

[45] CJEU, *Alheto*, paras 11-112.

[46] UNHCR APR Comments, pp. 5, 18.

[47] UNHCR, APR Comments, p. 18.

[48] See Article 47(1) of the Charter; CJEU, *Alheto*, para. 57; *XC and Others* [GC], C 234/17, 24 October 2018, para. 25: https://bit.ly/2md9Xil, as well as *K, B,* C 380/17, 7 November 2018, para. 56 and the case-law cited: https://bit.ly/2kHYSWd.

[49] ECtHR, *I.M. c. France*, para. 147.

[50] See also the case-law on this point, e.g. the CJEU's judgment in *Abdulla* requiring that the risk assessment "must, in all cases, be carried out with vigilance and care". *Abdulla* [GC], Joined Cases C-175/08, C-176/08, C-178/08 and C-179/08, 2 March 2010, para. 90: https://bit.ly/2lPMSSH. See also *Y, Z* [GC], Joined Cases C 71/11 and C 99/11, 5 September 2012, para. 77 ('vigilance and care […] based solely on a specific evaluation of the facts and circumstances'); *X, Y, Z,* Joined Cases C 199/12 to C 201/12, 7 November 2013, para. 73 ('vigilance and care […] based solely on a specific evaluation of the facts and circumstances'), *B and D* [GC], Joined Cases C 57/09 and C 101/09, para. 93 ('full investigation into all the circumstances of each individual case'), *Lounani* [GC], Case C 573/14, 31 January 2017, paras. 72, 78..

DHSFF0921

be heard. UNHCR is of the opinion that a personal interview is critical to guarantee the fairness of procedures and to ensure that decisions are based on complete information.[51] In line with EXCOM Conclusions,[52] UNHCR strongly recommends that all applicants should, in principle, be granted the opportunity for a personal interview, both at the admissibility and substantive stage.[53] This is also required for appeals where the court examines new facts or evidence, to guarantee the applicant's right to be heard.[54]

## 6.    Conclusion

27.    For all of the above reasons, UNHCR considers that both in law and in practice, Hungary's application of the new inadmissibility ground provided for in Section 51(2)(f), and the judicial review provision in Section 53(4) of the Hungarian Asylum Act, are at variance with international and EU law standards regarding the adoption of decisions based on safe country concepts and the judicial review of such decisions.[55]

UNHCR, September 2019

---

[51] UNHCR, APR Comments, p. 12.
[52] UNHCR, ExCom Conclusion No. 8 (XXVIII) of 1977 and 30 (XXXIV) of 1983.
[53] The only two narrow exceptions are foreseen in Article 14(2) APD (certain positive decisions, or where the applicant is unfit or unable to attend the interview). UNHCR APR Comments, p. 12.
[54] See CJEU, *Alheto,* note above, para. 130. See also *M.M.*, C-277/11, 22 November 2012, para. 85: https://bit.ly/2ma6MI9.
[55] UNHCR Observations on Hungary, para. 13. See also UNHCR, *Hungary as a country of asylum.*

DHSFF0922

The Department of State presents its compliments to the Ministry of Foreign Affairs and has the honor to refer to the Questions Regarding Access to Full and Fair Procedures, which support the Agreement Between the Government of the United States of America and the Government of the Republic of Guatemala on Cooperation Regarding the Examination of Protection Claims.

The Department of State, on behalf of the Department of Homeland Security and the Department of Justice, kindly requests the Ministry of Foreign Affairs coordinate with the relevant Guatemalan government ministries to provide answers to all questions with all expedience.  Answers to these questions will assist the United States in completing the necessary domestic procedures required to bring the agreement into force after signature by both sides.  We would like to notify the Ministry of Foreign Affairs that the Government of the United States may have additional questions for the Government of the Republic of Guatemala, so we would appreciate its assistance in answering any additional questions, if necessary.

The Department of State avails itself of this opportunity to renew to the Ministry of Foreign Affairs its assurances of its highest consideration.

**DIPLOMATIC NOTE**

Enclosure:

    Questions Regarding Access to Full and Fair Procedures

Department of State,

    Washington, July 26, 2019.

Questions Regarding Access to Full and Fair Procedures

**International Obligations and Standards**

- How does Guatemala implement its non-refoulement obligations under the Convention Against Torture and the Refugee Convention and Protocol in Guatemalan law?
- Does Guatemala apply any mandatory bars to such claims if the applicant is seeking protection from torture?
- Does Guatemala apply any mandatory bars to such claims if the applicant is seeking protection from persecution beyond those identified in the Refugee Convention and Protocol?
- Is Guatemala a party to other bilateral or multilateral agreements that require protections from persecution? Are these obligations incorporated into Guatemalan law?
- What Guatemalan laws protect individuals from persecution or torture from either state or non-state actors?
- Does Guatemala recognize refugee claims based on persecution by a non-state actor?

**Current Capacity**

- What is the number of asylum/ refugee cases filed in the last year?  How many were completed?  How many were granted?  How many were denied?
- What is the number of claims abandoned in the last year?  Do you record any reason given for abandonment of claims?
- How do you plan to address any current backlog of claims? How long do you estimate will be required to address any present backlog?

**Available Protections under Guatemalan Law**

- What is the difference between "asylum," "refugee status," "citizenship for CA4 nationals," and "temporary residence for CA4 nationals," including with respect to the rights/benefits they provide and the circumstances under which they can be terminated?
- How does Guatemala law provide for confidentiality in the refugee status determination (RSD) process?
- Are complementary and temporary forms of protection provided for in law and applied in practice?
- What is the process for seeking Guatemalan permanent residence?
  - What are the requirements for permanent resident status?
- What is the process for seeking Guatemalan citizenship?
  - What are the requirements for citizenship?
- Would you provide us with a written summary explaining both your current system for granting protection and the procedures that you use to reach determinations on an applicant's claims?  From the time a potential applicant first arrives in Guatemala, what are the procedural protections available to the applicant?

DHSFF1078

Questions Regarding Access to Full and Fair Procedures

## Reception Process

- What is the reception process for those seeking protection?  Who would run the reception process? How does an applicant present himself or herself to make a claim?
- How are individuals seeking protection informed about the process?
- In your current system, are there any special procedures available to interview members of vulnerable populations (e.g., family units, children, disabled, elderly, trauma victims) to ensure confidentiality?
- Does Guatemala provide for interpreter services for refugee status applicants?
- What happens if asylum seekers are unwilling or unable to get documentation of their identities from their embassies?

## Determination Process

- Are there written SOPs that regulate the processing of claims for protection?
- Does Guatemala have any documentation explaining its procedures for the processing of claims for protection?
- Does Guatemala provide any assistance to applicants in understanding the procedures for applying for protection?
- Does Guatemala have a deadline for filing protection applications?  If so, what are those rules and exceptions?
- What is the current interviewing process for those seeking protection in Guatemala?
- Who serves as the decision-maker adjudicating claims for protections in the first instance?
- Does each applicant enjoy identical procedural protections?
- Do applicants have access to legal counsel or NGO representatives during the status determination procedure?
  - o Are applicants referred to organizations providing legal aid services?
  - o Do attorneys or NGO representatives have access to their clients' files and other documentation relevant to the status determination procedure?
  - o Can attorneys or NGO representatives attend status determination interviews and make submissions?
- Does Guatemala affirmatively screen for protection concerns/fear of return, or must the individual express a fear before action is taken?
- How timely are the decisions to either grant or refuse such a claim for protection?
- How are applicants notified of the decision on their claim?
- Is there an appeal of denial of protection claims?  If there is an appeal process, does this stop any removal pending the appeal?
- Are all claims for protection treated equally, regardless of where the individual may have entered Guatemala or to whom they expressed their request for protection?
- Where are authorities capable of receiving and evaluating such a claim for protection located within Guatemala?
- Does Guatemalan law allow for derivative asylum/refugee status for immediate family members (e.g., spouse, children)?
- Is there a process regarding abandonment of claims?

2

Questions Regarding Access to Full and Fair Procedures

**Scope of Protections**

- Are individuals seeking protection from refoulement allowed to (1) work, (2) move freely within Guatemala, and (3) obtain travel authorization (e.g., refugee travel document) to depart and return? Are those authorizations valid until a decision has been made final
- Are individuals seeking protection or who have been granted protection provided with identity documents?
- Does Guatemalan law provide for a path to permanent residence or citizenship for individuals granted refugee status?

DHSFF1080

DHSFF1081

~~PRIVILEGED~~
~~ATTORNEY WORK PRODUCT~~
~~**DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT**~~


### Follow Up Questions

## International Obligations and Standards

≠   *How does Guatemala implement its nonrefoulement obligations under the Convention Against Torture and the Refugee Convention and Protocol in Guatemalan law?*

≠   Thank you very much for providing a response, but there are some points that remain unclear to us.  In your response, you wrote, "In accordance with what is established in Article 46 of Decree 44-2016 of the Migration Code of the Republic of Guatemala Congress, as long as there has been no abandonment or cessation regulated in Articles 17, 19 and 20 of the Status of Refugees Regulations and [Article] 184 of the Migration Code."  However, neither Article 46, nor Article 184, nor the governing regulations at 17, 19, or 20 directly mention prohibiting torture or how Guatemala upholds its obligations under the Convention Against Torture, the Protocol, and the Refugee Convention.  Can Guatemala please explain further how it implements its non-refoulment obligations?

≠   Can the Government of Guatemala provide us a better understanding of what role, if any, is UNHCR's role in preventing non-refoulement under Article 46?

≠   Is it accurate to state asylum-seekers who enter Guatemala illegally will not face criminal penalties, but they will have to pay fines and may also be removed, regardless of the merit of their claim?

≠   In your answer to this question, you reference Decree 40-2010.  May we obtain a copy?

≠   In responding to this question, you mention that no sanctions are taken against accusers who allege torture.  Are we right in interpreting your response here as meaning that no liable actions, either civil or criminal, will be taken against those who accuse any person, government office, or organization, over accusations of torture?

≠   In your response, you write the following is the protection mechanism against torture: "Confidentiality of the identity of individuals deprived of their liberty, and of particular individuals who provide information to the Office."  Can you please explain what you mean by this?  This answer seems to discuss only protecting the identity of those who are "deprived of liberty" or to provide the Office for Prevention of Torture information.  It is not clear to us how this mechanism involves Guatemala's non-refoulment obligations.

≠   In your response, you mention that the National Office of Prevention of Torture is independtly run.  Can you explain how this relates to Guatemala's non-refoulement obligations?

≠   As part of your response, you mention the existence of the National Office of Torture Prevention as being the operative body responsible for Guatemala meeting its non-refoulment obligations.  Is that correct?  Is the National Office of Torture Prevention in charge of reviewing Guatemalan domestic standards for the treatment and conditions for public and private detention/confinement centers inside Guatemala?  In other words, does the Office analyze whether an applicant is likely to be subjected to torture in their home country?  Or is the Office an internal Guatemalan oversight body?

1

~~PRIVILEGED~~
~~ATTORNEY WORK PRODUCT~~
~~**DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT**~~

≠ *Does Guatemala apply any mandatory bars to such claims if the applicant is seeking protection from torture?*

   ≠ We are still unclear about what, if any, mandatory bars exist if an applicant is seeking protection from torture.  For example, if an applicant has committed certain crimes, could the applicant be prohibited from seeking protection against torture?

   ≠ Your response is that "Guatemala only applies restrictions that are [included] in the agreement."  What agreement is Guatemala referring to here?

   ≠ Can Guatemala give a concrete list of these restrictions, as noted in your answer.

   ≠ To put the question a different way, are there any grounds to deny asylum or refugee status based on legal or policy reasons, even if the applicant otherwise qualifies for asylum?

   ≠ If an applicant for admission to Guatemala is otherwise barred from admission to Guatemala (i.e., would be denied entry on criminal grounds), would that applicant be allowed to seek some form of humanitarian protection anyways?

≠ *Does Guatemala apply any mandatory bars to such claims if the applicant is seeking protection from persecution beyond those identified in the Refugee Convention and Protocol?*

   ≠ Taken all together, is it fair to read Guatemala's response here to mean Guatemala can deny refugee status on the grounds of mandatory bars on three grounds:  1) those who committed certain serious crimes under international law (war crimes, crimes against humanity, etc…); 2) if refugee status has been previously terminated; 3) and if the applicant is currently being criminally prosecuted abroad for almost any type of crime, or is under an international arrest warrant.  Also, do any of these mandatory bars apply to those seeking protection from torture?

   ≠ Can Guatemala define what acts it considers contrary to the purposes and principles of the United Nations, such that it is a bar to refugee status in your country under Article 47 of the Migration Code?

   ≠ In your response, you refer to Article 66 of the Migration Code – the section called "Hinderances to Entry."  Does Article 66 require Guatemalan officials to deny admission to any applicant who is being currently prosecuted, without necessarily a conviction, for any crime?  Does this mean applicants for admission who seek asylum or refugee status who are being criminally prosecuted abroad may be denied entry to Guatemala, even if they may face torture in their home country?  Moreover, can Guatemala please confirm that normal crimes such as those against life, liberty, or property would entail almost any crime under the law?

   ≠ In your response, Guatemala refers to the "competent authority."  What authority might that be?

≠ *Is Guatemala a party to other bilateral or multilateral agreements that require protections from persecution? Are these obligations incorporated into Guatemalan law?*

2

DHSFF1083

~~PRIVILEGED~~
~~ATTORNEY WORK PRODUCT~~
~~**DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT**~~

≠   Does Guatemala's response mean that any treaty or convention ratified is self-executing, and, therefore, automatically becomes part of the state's domestic law?  Can Guatemala give the specific names of these bilateral and multilateral agreements that require protections from persecution, and point to where they, or their norms, are found in the Migration Code and/or regulations?

≠   *What Guatemalan laws protect individuals from persecution or torture from either state or non-state actors?*

≠   We are unclear as to how your response, "Agreements, once ratified, become a part of the internal legal system and are of mandatory compliance" relate to the specific laws existing in Guatemala that protect individuals from harm by either state or non-state actors.  Can Guatemala please name their exact domestic laws – or a treaty or some other international agreement that has entered into force domestically – that protect individuals from persecution or torture carried out by either a state or non-state actor.

**Current Capacity**

≠   *What is the number of claims abandoned in the last year?  Do you record any reason given for abandonment of claims?*

≠   Thank you for responding, but we need further clarity on the response, "There is a record of 32 applications that were abandoned in the last year, individuals who appeared to carry out the application, they went through the personal interview process, however, they did not re-appear for the renewal of their permanent status." Our original question referred to how many applicants abandoned their refugee status requests, but the answer appears to discuss how many aliens abandoned their permanent residency status.  Can Guatemala please clarify?

**Available Protections under Guatemalan Law**

≠   *What is the difference between "asylum," "refugee status," "citizenship for CA4 nationals," and "temporary residence for CA4 nationals," including with respect to the rights/benefits they provide and the circumstances under which they can be terminated?*

≠   Thank you for your response, but can Guatemala please provide more detail.  For example, can Guatemala explain what process or steps need to happen when these three-protected statuses are rescinded.  Based on the given response, it is not clear to us what the difference is between asylum and refugee status.  Can Guatemala further explain?

≠   *Are complementary and temporary forms of protection provided for in law and applied in practice?*

3

~~PRIVILEGED~~
~~ATTORNEY WORK PRODUCT~~
~~**DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT**~~

≠   Again, thank you for your response, but we have some additional questions.  Does Guatemala, in practice, have complementary and temporary forms of humanitarian protection irrespective of the fact that the laws exist in the Migration Code and corresponding regulations.  In other words, are these protection laws enforced in Guatemala?

≠   What is the referenced "competent body" here in establishing migration policies?

≠   *What is the process for seeking Guatemalan permanent residence?*
   o   *What are the requirements for permanent resident status?*

≠   We have read Article 78 of the Migration Code, but we are not sure we understand your answer or how obtaining permanent residency applies in practice.  Can you please explain how someone obtains permanent residency in Guatemala, the steps they need to take to obtain permanent residency, and any reason or reasons why someone would not be eligible for permanent residency?

≠   *What is the process for seeking Guatemalan citizenship?*
   o   *What are the requirements for citizenship?*

≠   We are eagerly waiting for a response to this question.  Also, what is the "competent entity" needed to answer this question?

≠   *Would you provide us with a written summary explaining both your current system for granting protection and the procedures that you use to reach determinations on an applicant's claims?  From the time a potential applicant first arrives in Guatemala, what are the procedural protections available to the applicant?*

≠   While we appreciate the direct language from the Migration Code, can we please obtain a written summary explaining your current system for granting protection.

≠   *What is the intake process for individuals seeking protection? Who will direct the intake process? How does an applicant report to [the corresponding authority] to present a claim?*

≠   Can Guatemala confirm that part of the response to this question is fairly read to mean it Guatemala does not currently have an intake process set up for an alien subject to a Cooperative Agreement?

≠   Can Guatemala give a more specific answer to the question of what the general intake process is like, with the understanding that there is not one currently in place specifically to handle aliens subject to the Cooperative Agreement?

## Reception Process

≠   *How are individuals seeking protection informed about the process?*

4

DHSFF1085

~~PRIVILEGED~~
~~ATTORNEY WORK PRODUCT~~
**~~DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT~~**

≠ Can the Government of Guatemala give a deeper explanation as to the guidance given to applicants by CONARE under Article 17 regarding the protection application process?

≠ Are guidance documents given out to every refugee status applicant?  If not, which applicants are given guidance documents, and which applicants are not?

≠ What information is provided in these guidance documents?

≠ In what language are these guidance documents provided?

≠ What type of application is being submitted under Article 17?

≠ And Does Guatemala mean that these intake procedures are now being established pursuant to the Cooperative Agreement?  If so, please describe what that intake procedure would be, how it would be established (e.g., by new regulations). and the time frame for establishment.

≠ *In your current system, are there any special procedures available to interview members of vulnerable populations (e.g., family units, children, disabled, elderly, trauma victims) to ensure confidentiality?*

≠ Thank you for your response, and we have some further follow-up questions.  Does Guatemala have special, or different, proceedings and/or interviews for refugee status applicants and interviews for children or other vulnerable groups?

≠ In your response, the Government of Guatemala refers to a manual and guidelines as containing norms guaranteed in Article 181.  May we obtain a copy of this manual and any corresponding guidelines?

≠ Does the manual and guidelines indicate any special procedures?  Or should we interpret your answer here as to mean Guatemala is currently developing procedures to protect vulnerable groups?  If so, please describe what that procedure would be, how it would be established (e.g., by new regulations), and the time frame for establishment.

≠ *Does Guatemala provide for interpreter services for refugee status applicants?*

≠ Does Guatemala have interpretive services beyond the Spanish and English languages?  If so, which ones?

≠ Also, what are the "institutional resources" referred to in the response?

≠ As for the interview, are applicants appraised of the right to contact a UNHCR representative during the asylum process?

What happens if the individuals applying for asylum are not available or cannot obtain identification documents at their respective embassies?

≠ If new procedures need to be established, please describe what that procedure would be, how it would be established (e.g., by new regulations), and the time frame for establishment.

DHSFF1086

PRIVILEGED
ATTORNEY WORK PRODUCT
**DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT**

## Determination Process

≠ *Are there written SOPs that regulate the processing of claims for protection?*

  ≠ We are not sure we understand your answer here.  Can Guatemala please explain what procedures are in place today for refugee status application processing, not what a new or different process may look like under the Cooperative Agreement.  Please also confirm whether a new procedure will need to be established and describe what that procedure would be, how it would be established (e.g., by new regulations). and the time frame for establishment.

≠ *Does Guatemala provide any assistance to applicants in understanding the procedures for applying for protection?*

  ≠ What rights are explained to applicants during this orientation session as referenced in your answer?  Is it provided in a written format, verbal format, or both?   If it is written format, what languages are used?

≠ *What is the current interviewing process for those seeking protection in Guatemala?*

  ≠ In your answer, you wrote "In connection with this agreement, these procedures must be established, being that this not a case foreseen in any existing procedures."  Does this mean that the Government of Guatemala intends to set up a different interview procedure for those processed under the Cooperative Agreement as compared to other refugee status applicants?  If so, please describe what that procedure would be, how it would be established (e.g., by new regulations). and the time frame for establishment.

  ≠ Beyond what is referred to in Article 17, what does the interview process entail?

≠ *Does each applicant enjoy identical procedural protections?*

  ≠ Can the Government of Guatemala more fully explain what different protections and procedures are granted to different applicants for different humanitarian protection programs or status?
  ≠ In your response, you mention Article 71 of the Migration Code.  Article 71 of the Migration Code guarantees some social services for humanitarian protection applicants; it does not appear to discuss the different rights, protections, and procedures in place for these different categories of applicants.  Can Guatemala help us understand how Article 71 relates to procedural protections?

≠ *Do applicants have access to legal counsel or NGO representatives during the status determination procedure?*
    o *Are applicants referred to organizations providing legal aid services?*

DHSFF1087

~~PRIVILEGED~~
~~ATTORNEY WORK PRODUCT~~
~~**DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT**~~

- o *Do attorneys or NGO representatives have access to their clients' files and other documentation relevant to the status determination procedure?*
- o *Can attorneys or NGO representatives attend status determination interviews and make submissions?*

≠ Is the Government of Guatemala saying in its response that that access to legal counsel or an NGO representative is not a right guaranteed to refugee status applicants during their interviews, but such a request may be taken on a case-by-case basis?

≠ *How timely are the decisions to either grant or refuse such a claim for protection?*

≠ We are not sure we understand this response to this question. Can the Government of Guatemala please explain how timely decisions are made to grant or deny a protection claim? In other words, on average, how long does it take to render a decision?

≠ *Is there an appeal of denial of protection claims? If there is an appeal process, does this stop any removal pending the appeal?*

≠ Can the Government of Guatemala please answer the second half of this question: during a pending appeal, will the alien be removed or be allowed to remain in Guatemala during the pendency of the appeal?

≠ *Does Guatemalan law allow grant asylum/refugee status to an applicant's close relatives (for example, a spouse or children)?*

≠ As a follow up question, can Guatemala give a list of the relatives that become, or may become, derivatives of the principal applicant's application? By our understanding, Article 26 of the regulatory code does not relate to what relatives can be beneficiaries or dependents; it discusses the procedure to extend a refugee status recognition in Guatemala.

**Scope of Protections**

≠ *Are individuals seeking protection or who have been granted protection provided with identity documents?*

≠ As a follow up question, are these documents recognized nationwide, and recognized by the public sector and private industry alike? For example, do banks or other financial institutions recognize these identity documents?

≠ *Does Guatemalan law provide for a path to permanent residence or citizenship for individuals granted refugee status?*

7

PRIVILEGED
ATTORNEY WORK PRODUCT
**DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT**

≠   Thank you for your response and reference to Article 84.  As a follow up question, what are these migratory policies, and may what obtain a copy of them?

≠    Who or what is the "competent authority" referenced in your response?

8

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

**September 16, 2019 Full and Fair Q&A Read Out/Summary**

*Questions Regarding Non-Refoulement*

≠   Guatemala is a signatory to the CAT.  Notwithstanding this, their Migration Code does not refer to any prohibition on returning, removing, or deporting individuals where there is a substantial ground for believing the individual would be in danger of being subjected to torture.  However, the CAT non-refoulement obligations are read into their laws, specifically at Article 71.  We further received assurances that no one with a viable claim of protection against torture would be returned to their home country, even if they had an extremely serious criminal conviction, such as murder.

≠   Guatemala has never had a claimant make a torture claim specifically; so far, they have only heard claims for asylum and refugee status protection.  They have no torture claim SOP.  Because they have never had this type of protection claim made in their country, protections specifically for torture are not in their regulations or in their code.  However, if they were to receive such an application, the application would be processed in the same manner as a refugee status applicant and given the same procedural protections.

≠   Guatemala assured us that, for a torture protection claim, there would be no applied criminal bars under Article 47 (criminal bars to refugee status applicants), nor any criminal bars denying admission under Article 66 (criminal grounds of inadmissible into Guatemala).  In other words, no criminal bars would be applied to torture protection applications.

≠   There are no policies currently in place that would be grounds to deny an applicant asylum, refugee status, or torture protection beyond those already in their laws.

≠   Taken together, Guatemala may deny refugee status on three grounds:  1) those who committed certain serious crimes under international law (war crimes, etc…); 2) those who had their refugee status previously terminated; 3) if the applicant is being criminally prosecuted abroad for virtually any kind of crime.

≠   The "acts and purposes" Guatemala considers contrary to the purposes and principles of the United Nations, such that it is a bar to refugee status under Article 47 of their code, are things founds in "the Human Rights Letter."  Things like committing persecution on account of racial discrimination or torture.  They could not remember what exact "Human Rights Letter" this was, but remembered it was written by the United Nations.

≠   Beyond the CAT, the Convention, and the Protocol, they could not remember if Guatemala was a signatory to any other conventions touching refugee protections, but

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

they confirmed that these treaties are self-executing, and do not need domestic implementation to become part of their law, which helps explain why their Migration Code and implementing regulations are silent re: CAT protections/non-refoulement.

≠   UNHCR's role regarding non-refoulment is advisory-only.

≠   Protection applicants who illegally enter Guatemala will face administrative fines and are subject to removal, but will not face criminal penalties.

≠   Those who accuse any person, government office, or government organization of torture will not face criminal or civil liable actions or penalties.  The confidentiality of any accuser is also protected by law.

≠   Guatemala confirmed the Office of Prevention of Torture is an internal, domestic Guatemalan oversight body charged with analyzing whether someone is likely to be, or has been, subjected to torture in places like prisons, confinement centers, etc.. in Guatemala.  The Office of Prevention of Torture is not involved with non-refoulement obligations or investigations regarding torture allegations over incidents occurring outside of Guatemala.

*Capacity*

≠   They clarified that 32 refugee status applications were abandoned last year, not 32 permanent residency status applications.

≠   A case, from the time an applicant makes a protection request, to its final resolution, takes an average of 1-2 years.

*Available Protections Under Guatemala Law*

≠   The basic difference between an asylum and refugee status application is:  asylum protection only involves persecution on account of political opinion.  Refugee status protection involves the four other protected grounds – racial discrimination, religious persecution, etc….

≠   Guatemala also confirmed that their protection laws do not just appear "on the books;" they actively grant protection and have a process in place to do so.

≠   Someone may be denied permanent residency if there are doubts about that individual's identification documents' legitimacy, the submission of documents or the request was not timely made, the documents submitted by the applicant are full of errors or inconsistencies, or if the applicant has a criminal record.  This criminal record may only involve an outstanding arrest warrant, or any kind of criminal conviction.  In general, and

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

based on the responses I received, the decision whether to grant or deny permanent residency appears discretionary, and is made on a case-by-case-basis.

*Reception/Determination Process*

≠ Oral, not written, guidance is given to every protection application (asylum and refugee status applicants) once they make a claim. Their oral guidance covers the procedures the applicant must follow, steps to take, protections available, information that the applicant gets a permit for 30 days, and what not to do while in Guatemala. They are also given an overview of the appellate process at this initial stage. This guidance is given to everyone.

≠ Written guidance is forthcoming/being developed.

≠ The right to contact a UNHCR representative is given orally at the first stage in the proceedings.

≠ The guidance is provided in a language the applicant understands; for now, it has been almost entirely Spanish, but they have interpreters available for other languages they can call on if needed, although it may take extra time to get one, especially for "African languages."

≠ Guatemala seemingly contradicted themselves as to whether ANM is becoming a "decentralized entity," but assured us that it would not impact asylum processing in any way, no matter how ANM is organized.

≠ The protection application interviews are normally in Spanish, but they will provide translators or interpreters for any language required. After substantial questioning on this, they recalled the difficulty they had in getting Arabic interpreters, but they were eventually able to work it out and obtain one. So far, they claim to have been successful in getting an interpreter for anyone who needs one, in any language needed. They have also expanded their budget for this, so they won't have the resource limitations they once had.

≠ Children are interviewed separately and apart from their family unit (if they are part of a larger family unit), and are also interviewed separately if they are unaccompanied. They have a UNHCR-funded special "child friendly" interview area that is currently being built, which they hope to be done at the beginning of the next fiscal year.

≠ In addition to children, they also interview LGBTQI claims separately from the main interview area due to their "special nature and vulnerability."

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

≠   A right to counsel is guaranteed in Article 12 of their constitution, and this right is applied to interviews on protection claims.  In practice, almost all NGO representatives in Guatemala are also lawyers, but this right to counsel only applies to actual counsel, not an NGO rep who is not also an attorney.

≠   If no identification document is provided by the applicant, or cannot be obtained by working with their embassy, Guatemalan officials will interview the applicant to ascertain their identity until they are satisfied, with the aim of detecting and preventing fraud.

≠   There are no written SOPs for processing protection claims.

≠   The interview procedure for those subject to the ACA will be the same as for any other protection applicant, with the exception that those processed under the ACA may be quicker to reduce possible fraud.

≠   An applicant will not be required to leave Guatemala during the pendency of any appeal on their protection claim(s).

≠   Derivative beneficiaries for successful protection applicants are "blood relatives," which Guatemala defines as parents, siblings, spouses, children.

*Scope of Protections*

≠   Guatemala confirmed that protection applicants are given identification documents, these documents are recognized nationwide, and are recognized by public and private institutions alike, including banks.

≠   The new Migration Authority Agreement came into effect in August 2019, but it did nothing to change identification document-issuing.  The Ministry of Foreign Affairs is still issuing documents.

≠   Although an answer referred to "migratory policies" of Guatemala in granting permanent residency or citizenship, Guatemala confirmed this was a mistake, and there are no such policies in place.  The applications go through the USCIS-equivalent in Guatemala.

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*



GOBIERNO DE LA REPÚBLICA DE
# GUATEMALA
MINISTERIO DE RELACIONES EXTERIORES

DEVIMIN 220-2019

## MEMORÁNDUM

**PARA:**    EMBAJADOR MANUEL ESPINA
EMBAJADA DE GUATEMALA EN LOS ESTADOS UNIDOS DE AMERICA

**CC:**    VIVIANA ARENAS
MINISTRO CONSEJERO DE LA EMBAJADA DE GUATEMALA EN LOS ESTADOS
UNIDOS DE AMERICA

**DE:**    EMBAJADOR PABLO GARCÍA SAENZ
VICEMINISTRO DE RELACIONES EXTERIORES

**ASUNTO:**    TRASLADO PREGUNTAS REFERENTES AL ACCESO DE PROCEDIMIENTOS
JUSTOS Y COMPLETOS DE APOYO AL ACUERDO DE COOPERACIÓN
RESPECTO AL EXAMEN DE SOLICITUDES DE PROTECCIÓN ENTRE EL
GOBIERNO DE GUATEMALA Y EL GOBIERNO DE LOS ESTADOS UNIDOS DE
AMÉRICA.

**FECHA:**    26 DE JULIO DE 2019

Tengo el agrado de dirigirme a usted en ocasión de hacer referencia al Memorándum No. 422-N2-2019 por medio del cual trasladó Nota Diplomática del Departamento de Estado dirigida a la señora Ministra de Relaciones Exteriores de la República de Guatemala en relación a las Preguntas referentes al Acceso de Procedimientos Justos y Completos de apoyo al Acuerdo de Cooperación Respecto al Examen de Solicitudes de Protección entre el Gobierno de Guatemala y el Gobierno de los Estados Unidos de América.

Al respecto, adjunto me permito remitir copia del oficio con referencia IGM-617-2019/CEMC-js remitida por el Licenciado Carlos Emilio Morales Cancino, Director General del Instituto Guatemalteco de Migración por medio del cual envió las respuestas a las preguntas enviadas, con el atento ruego de hacerlas llegar al Departamento de Estado.

Sin otro particular, aprovecho la oportunidad para reiterarle las muestras de mi distinguida consideración y estima.

www.minex.gob.gt

DHSFF1094



MINISTERIO DE GOBERNACIÓN
DIRECCIÓN GENERAL DE
MIGRACIÓN

Guatemala, 26 de julio de 2019
OFICIO-IGM-617-2019/CEMC-js

Señor Viceministro:

Respetuosamente me dirijo a usted en atención memo REFERENCIA: DEVIMIN 219-2019 mediante el cual hace del conocimiento del suscrito que el Departamento de Estado de Estados Unidos de América remitió una serie de preguntas referentes al Acceso de Procedimientos Completos y Justos de apoyo al Acuerdo de Cooperación Respecto al Examen de Solicitudes de Protección entre el Gobierno de los Estados Unidos de América y el Gobierno de la República de Guatemala, por lo que adjunta las preguntas competencia de esta institución a efecto sean respondidas y posteriormente trasladas al Ministerio de Relaciones Exteriores para ser enviadas por la vía diplomática al referido Departamento de Estado.

En atención a lo anterior, traslado las respuestas a las preguntas anteriormente relacionadas para lo que corresponda.

Sin otro particular, me suscribo de usted con muestras de consideración y respeto.

Atentamente.

Lic. *Carlos Emilio Morales Cancino*
*Director General*
*Instituto Guatemalteco de Migración*

Consta de veinticuatro (024) folios, inclusive.

Embajador
**PABLO GARCIA SAENZ**
Viceministro de Relaciones Exteriores
Ministerio de Relaciones Exteriores
Su Despacho.

6ta. Avenida 3-11 zona 4, Ciudad de Guatemala, Teléfono: 2411 2411, www.migracion.gob.gt

@migracionguate     *www.guatemala.gob.gt*

DHSFF1095

PRIVILEGED
ATTORNEY WORK PRODUCT
DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT

**Obligaciones y normas internacionales**

• ¿Cómo implementa Guatemala sus obligaciones de no devolución en virtud de la "Convención contra la Tortura y otros tratos o penas crueles, inhumanas o degradantes" y la "Convención sobre el Estatuto de los Refugiados" dentro del marco de su legislación?

De conformidad con lo establecido en el Artículo 46 del Decreto 44-2016 del Congreso de la República de Guatemala, Código de Migración, siempre y cuando no haya incurrido en abandono o cesación regulado en los artículos 17, 19 y 20 del Reglamento del Estatuto de Refugiado y el 184 del Código de Migración.

Respecto a la tortura se debe tomar en cuenta que los mecanismos y acuerdos respecto a la prevención de la misma se hacen por conducto de la oficina nacional de prevención contra la tortura, de conformidad con el decreto 40-2010 del congreso de la república de Guatemala; Respecto que protección da el Estado por medio de la oficina ya descrita en los mecanismos de prevención contra la tortura están el de:

1. La confidencialidad de la identidad de las personas privadas de libertad y de particulares que aporten información a la Oficina.
2. Que no se aplique, permita o tolere sanción o medida alguna contra las personas que integran la Oficina por el cumplimiento de sus funciones, ni contra ninguna persona u organización, por haber comunicado a la Oficina cualquier información, ya sea verdadera o falsa; ninguna de estas personas u organizaciones sufrirá perjuicios de ningún tipo por este motivo;
3. La independencia de la Oficina en la realización de sus planes y políticas económicas/financieras. Además, la presentación de su proyecto de presupuesto, de acuerdo a los procedimientos internos del Congreso de la República; y, d) Que la Oficina seleccione de forma independiente su propio personal, en base a los procedimientos, requisitos y criterios que se desarrollan en su reglamento

• ¿Guatemala aplica restricciones obligatorias a tales peticiones si el solicitante busca protección contra la tortura?

Guatemala solo aplica las restricciones que estén en el convenio.

• ¿Guatemala aplica restricciones obligatorias a tales peticiones si el solicitante busca protección contra la persecución más allá de las condiciones identificadas en la <<Convención sobre el Estatuto de los Refugiados>>?

1

~~PRIVILEGED~~
~~ATTORNEY WORK PRODUCT~~
**~~DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT~~**

Se resuelve de conformidad con lo regulado en el artículo 47 y 184 del Código de migración. Además, deberá observarse lo regulado en el artículo 59 y 66 si fuese procedente.

Asimismo, se debe observar lo dispuesto en las políticas migratorias emitidas por la autoridad Competente de conformidad con el artículo 114 del Código de Migración.

• ¿Guatemala es parte de otros acuerdos bilaterales o multilaterales que requieren la protección de personas contra la persecución? ¿Han sido incorporadas estas obligaciones a la legislación guatemalteca?

Al ser parte de un convenio las obligaciones Del mismo pasan a ser parte del ordenamiento jurídico

• ¿Qué leyes guatemaltecas protegen a los individuos de la persecución o la tortura llevada acabo por actores estatales o no estatales?

Los convenios al ser ratificados pasan a ser parte del ordenamiento jurídico interno siendo de observancia obligatoria

• ¿Reconoce Guatemala las peticiones de refugio basadas en la persecución de un actor no estatal?

Sí, Por motivos de raza, religión, nacionalidad, situación de país o pertenencia a determinado grupo social o persecuciones políticas se observa y aplica la igualdad.

**Capacidad actual**

• ¿Cuál es el número de casos de asilo/refugio presentados en el último año? ¿Cuántos fueron completados? ¿Cuántos fueron otorgados? ¿Cuántos fueron negados?

Se tienen 262 solicitudes del año 2018 y 218 solicitudes en lo que va del año 2019. Derivado de la entrada en vigencia del Acuerdo de Autoridad Migratoria Nacional 02-2019, que entró en vigencia en el mes de abril del año 2019 por medio del cual el 22 de mayo de 2019 se constituyó la CONARE que es el órgano competente para conocer y recomendar a la Autoridad Migratoria Nacional para que ésta resuelva.

• ¿Cuál es el número de peticiones abandonadas en el último año? ¿Registra usted alguna razón dada por el abandono de dichas peticiones?

En el último año se registran 32 solicitudes abandonadas, personas que se presentaron a realizar la solicitud, hicieron proceso de entrevista personal, sin embargo, no se presentaron más a renovar su estatus de permanencia

2

PRIVILEGED
ATTORNEY WORK PRODUCT
DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT

• ¿Cómo planean abordar cualquier atraso actual de peticiones? ¿Cuánto tiempo estimá que se requerirá para hacer frente a cualquier retraso actual?

La CONARE es la responsable de mitigar cualquier atraso referente a las solicitudes planteadas, la cual ya se ha reunido en varias sesiones para entregar los casos a la Autoridad Migratoria Nacional

## Protecciones disponibles bajo la ley guatemalteca

• ¿Cuál es la diferencia entre "asilo", "estado de refugiado", "ciudadanía para los ciudadanos de CA4" y "residencia temporal para los ciudadanos de CA4", incluso con respecto a los derechos/beneficios que son brindados y las circunstancias en las que se pueden rescindir?

1. Asilo en Guatemala es una figura de índole política sus efectos son regulados por el Ministerio de Relaciones Exteriores al día de hoy no se tiene conocimiento de casos concretos sobre dichas solicitudes.
2. Estatuto de Refugiado sus efectos son obtención de residencia temporal o permanente acceso a las dependencias del Estado. Los beneficios que pueden ser para el refugiado son el no pago de impuestos, acceso a las dependencias del Estado.
3. Ciudadanía es un reconocimiento por parte del Ministerio de Relaciones Exteriores el cual le otorga a una persona extranjera los mismos beneficios que un guatemalteco inclusive el documento personal de identificación del mismo color que un guatemalteco
4. Residencia temporal permanente o temporal es un estatus ordinario migratorio que se le da a una persona que ha llevado todos los requisitos que el reglamento respectivo manda para poder tener la residencia según su categoría los beneficios es la identificación por medio del registro nacional de las personas su beneficio varía en relación a una permanencia de índole legal por el plazo que su categoría lo regule de conformidad con el código de Migración

• ¿Cómo establece la ley guatemalteca la confidencialidad en el proceso de determinación de la condición de refugiado (RSD)?

Se establece como una garantía que el Estado cumple tal y como lo regula el Artículo 181. Confidencialidad. Se garantiza la confidencialidad de la solicitud, el trámite e información personal de la persona solicitante de reconocimiento de estatuto de refugiado, para evitar cualquier riesgo a la vida, integridad, libertad, o cualquier otro derecho de la persona solicitante.

DHSFF1098

PRIVILEGED
ATTORNEY WORK PRODUCT
DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT

• ¿Se aplican en la práctica las formas complementarias y temporales de protección previstas en la legislación?

El Estado reconocer el derecho migratorio en su totalidad siendo esto el ingreso, permanencia, tránsito y salida, el abrigo y protección temporal, además de otorgar los beneficios propios de la convención de 1951 en concordancia con las políticas migratorias establecidas por el órgano competente.

• ¿Cuál es el proceso para obtener la residencia permanente en Guatemala?

Encuadrar de acuerdo a los regulado al Código de Migración respecto al artículo 78 sobre Residentes permanentes. Son residentes permanentes las personas que además de cumplir con los otros requisitos legales, desean adquirir domicilio en el país, los cuales están establecidos en el reglamento correspondiente y que se encuentran dentro de los siguientes criterios:
   a) Han sido residentes temporales por un periodo igual o mayor de cinco años.
   b) Tener un año o más de haber contraído matrimonio o declarado la unión de hecho con persona guatemalteca.
   c) Los familiares, dentro de los grados de ley, de persona guatemalteca que tienen otra nacionalidad.
   d) Los nacidos en otros países de Centro América cuando han sido residentes temporales por un periodo de un año.
   e) Los rentistas o pensionados, que son las personas que han sido autorizadas para residir en el país y que cuentan con ingresos permanentes lícitos provenientes del extranjero.
Se entiende, como regla especial para el estatus de residente permanente rentista o pensionado, todos los beneficios y exoneraciones que sean regulados en el reglamento específico para estos casos, serán aplicables a las personas guatemaltecas de origen que se hayan naturalizado en otros países y que regresen pensionados o jubilados por gobiernos o entidades privadas

¿Cuáles son los requisitos para el estatus de residente permanente?

Ver anexo al presente cuestionario

¿Cuál es el proceso para obtener la ciudadanía guatemalteca? o ¿Cuáles son los requisitos para la ciudadanía?

La presente se remitirá al órgano competente.

• ¿Nos proporcionaría un resumen escrito que explique su sistema actual para otorgar protección y los procedimientos que utiliza para llegar a una determinación sobre el caso de una persona? Desde el momento en que una

4

~~PRIVILEGED~~
~~ATTORNEY WORK PRODUCT~~
~~DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT~~

persona llega por primera vez a Guatemala, ¿cuáles son las protecciones de procedimiento disponibles para esa persona?

R. (TORTURA) Respecto a la tortura se debe tomar en cuenta que los mecanismos y acuerdos respecto a la prevención de la misma se hacen por conducta de la oficina nacional de prevención contra la tortura, cuenta con las siguientes facultades La Oficina Nacional de Prevención de la Tortura tendrá el mandato de:

a) Examinar periódicamente el trato y las condiciones que reciben las personas privadas de libertad, en todos los lugares de detención o centros de privación de libertad, públicos o privados, con miras a fortalecer, si fuera necesario, su protección contra la tortura y otros tratos o penas crueles, inhumanos o degradantes.

b) Hacer recomendaciones y/o peticiones a las autoridades competentes, con el objeto de mejorar el trato y las condiciones de las personas privadas de su libertad y de prevenir la tortura y otros tratos o penas crueles, inhumanos o degradantes, tomando en consideración las normas pertinentes de derecho internacional de los derechos humanos.

c) Hacer recomendaciones y/o peticiones a las autoridades competentes, con el fin de asegurar la integridad, dignidad y una efectiva atención y reparación a las víctimas de tortura y otros tratos o penas crueles, inhumanos o degradantes, tomando en consideración las normas pertinentes de derecho nacional e internacional de los derechos humanos.

d) Hacer propuestas y observaciones acerca de la legislación vigente o de los proyectos de ley, así como de las normas de carácter administrativo en materia de prevención de tortura y otros tratos o penas crueles, inhumanos o degradantes.

e) Comunicar y/o denunciar a los órganos y autoridades competentes, la posible existencia de delitos u otras situaciones que requieran de investigación.

f) Comunicar a las autoridades competentes, el conocimiento que tengan sobre las debilidades en los sistemas de seguridad e infraestructura de los lugares de detención, para garantizar la vida e integridad de los detenidos, los trabajadores y las visitas, así como en general la finalidad del resguardo de la sociedad y evitar la comisión de delitos desde los mismos centros.

Respecto que protección da el Estado por medio de la oficina ya descrita en los mecanismos de prevención contra la tortura están el de:

4. La confidencialidad de la identidad de las personas privadas de libertad y de particulares que aporten información a la Oficina.

5. Que no se aplique, permita o tolere sanción o medida alguna contra las personas que integran la Oficina por el cumplimiento de sus funciones, ni contra ninguna persona u organización, por haber comunicado a la Oficina cualquier información, ya sea verdadera o falsa; ninguna de estas personas u organizaciones sufrirá perjuicios de ningún tipo por este motivo;

6. La independencia de la Oficina en la realización de sus planes y políticas económicas/financieras. Además, la presentación de su proyecto de

DHSFF1100

PRIVILEGED
ATTORNEY WORK PRODUCT
DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT

presupuesto, de acuerdo a los procedimientos internos del Congreso de la República; y, d) Que la Oficina seleccione de forma independiente su propio personal, en base a los procedimientos, requisitos y criterios que se desarrollan en su reglamento

RESPECTO AL REFUGIO **SEGÚN EL ARTÍCULO 17 DEL ACUERDO DE AUTORIDAD MIGRATORIA NACIONAL 02-2019 EL PROCEDIMIENTO ES EL SIGUIENTE:** La solicitud del Estatuto de Refugiado, se podrá formular personalmente por escrito o verbalmente ante el puesto de Control Migratorio o ante la Subdirección de Atención y Protección de Derechos Fundamentales de los Migrantes del Instituto, el procedimiento se realizará de la siguiente manera:

7. **De la Solicitud.** La solicitud se podrá realizar:

- Ante la Subdirección de Control Migratorio en los puestos de Control Migratorio del Instituto, el delegado recibirá la solicitud inicial de forma verbal o por escrito, trasladándola inmediatamente de forma escrita al personal de apoyo de la CONARE, ó;

- Ante la Subdirección de Atención y Protección de Derechos Fundamentales de los Migrantes del Instituto, se recibirá la solicitud inicial de forma verbal o escrita, trasladándola de forma escrita e inmediatamente al personal de apoyo de la CONARE.

Luego de recibida la solicitud, el personal de apoyo de la CONARE realizará lo siguiente:

a) Orientar al solicitante del Estatuto de Refugiado para que obtenga la información sobre el procedimiento Reglamentario para la obtención del Estatuto en mención.

b) Proceder a recibir la solicitud formal, deberá completar el formulario que la CONARE pondrá a su disposición, el cual deberá contener numeración correlativa, en el que el solicitante deberá exponer los motivos de la solicitud y la salida de su país de origen. El solicitante podrá acompañar a su solicitud el o los documentos de identificación personal que porte y demás medios de prueba que considere pertinentes para sustentar su solicitud.

c) Notificar a la Subdirección de Atención y Protección de Derechos Fundamentales de los Migrantes el estatus de permanencia provisional.

6

PRIVILEGED
ATTORNEY WORK PRODUCT
DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT

d) Notificar a la Subdirección de Extranjería sobre las solicitudes del Estatuto de Refugiado de niñas, niños y adolescentes, para el otorgamiento de la Residencia Temporal.

e) Fijar día y hora para la entrevista, la cual no podrá exceder de 15 días, contados a partir de presentado el formulario de solicitud formal.

Si el solicitante no se presentare a la entrevista personal en la fecha indicada, y transcurridos los treinta días de estatus de permanencia provisional, se notificará a las Subdirecciones competentes para los efectos correspondientes.

**8. Entrevista personal:**

El día y hora señalado para la entrevista, se dispondrá de un área específica para la realización de la entrevista a los solicitantes para la determinación del Estatuto de Refugiado, área debidamente equipada con video y audio para documentar las actuaciones que allí se realicen. Asimismo, en cada entrevista deberá estar presente un Psicólogo, quien emitirá un informe psicológico como resultado de la entrevista realizada, y si fuere necesario también con la intervención de un traductor o intérprete, quien firmará el documento resultante de la entrevista realizada. En el desarrollo de la entrevista se deberá cumplir con los siguientes aspectos:

8.1. Los solicitantes deberán ser atendidos individualmente por el personal de apoyo de la CONARE quien brindará un abordaje especializado, integral y diferenciado.

8.2. Las niñas, niños y adolescentes no acompañados o separados de sus familias, serán atendidos en áreas especiales por personal capacitado, atendiendo a sus necesidades específicas de protección de conformidad con la legislación nacional vigente con el acompañamiento de la Procuraduría General de la Nación a efecto de brindarles atención especial.

8.3. La entrevista deberá realizarse en idioma español, en caso el solicitante de refugio no lo hable, se le proporcionará la asistencia de un traductor o intérprete.

En caso de grupos familiares dichas entrevistas se harán de forma individualizada, las cuales se efectuarán dentro de un plazo que no podrá exceder de treinta días.

**9. Investigación del caso y emisión de recomendación, opinión o sugerencia:**

El personal de apoyo de la CONARE al momento de recibir la solicitud formal del Estatuto de Refugiado iniciará con la investigación del caso, utilizando los medios adecuados para que sea completado el expediente.

Al haber concluido la investigación del caso, la CONARE conocerá y analizará el expediente en la sesión más inmediata, para que posteriormente y en un plazo que no

7

PRIVILEGED
ATTORNEY WORK PRODUCT
**DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT**

exceda de 30 días, la CONARE recomiende, opine o sugiera a la AMN para efecto de que considere otorgar o denegar el Estatuto de Refugiado.

**10. Resolución de la Autoridad Migratoria Nacional y su notificación**:

Recibido el expediente con las recomendaciones, opiniones y sugerencias de la CONARE de conformidad con el Artículo 177 del Código de Migración, la AMN procederá a resolver la solicitud del Estatuto de Refugiado, otorgando o denegando el mismo.

En caso la resolución sea favorable, deberá ser notificada al solicitante por la CONARE. La persona Refugiada deberá continuar con el trámite que en derecho corresponda ante el Instituto.

R.2. Respecto a las protecciones que como Estado de Guatemala pueda dar esta la no devolución al país de origen, y los principio que engloba la convención de 1951 como lo es la confidencialidad del trámite.

## Proceso de recepción

• ¿Cuál es el proceso de recepción para aquellos que buscan protección? ¿Quién dirigiría el proceso de recepción? ¿Cómo se presenta un solicitante para presentar un reclamo?

De conformidad con el Código de Migración y al reglamento de Estatuto de Refugiado, así como de conformidad con las políticas migratorias que establezca la autoridad competente. **En el caso del presente convenio se deben diseñar por ser un caso no contemplado en ningún procedimiento actual.**

En caso de ser refugio se debe hacer como lo manda la convención y el reglamento respectivo siendo de la siguiente manera:

Quien dirige el proceso de recepción es la Dirección General de Migración

La solicitud se podrá realizar:

• Ante la Subdirección de Control Migratorio en los puestos de Control Migratorio del Institutio, ante la Subdirección de Atención y Protección de Derechos Fundamentales de los                    Migrantes                    del                    Instituto.

Luego de presentada la solicitud según sea el caso esta puede ser inicial o formal para continuar con el tramite de conformidad con el reglamento respectivo.

Una persona se puede presentar en cualquier puesto fronterizo y luego debe presentarse formalmente ante órgano competente.

8

DHSFF1103

PRIVILEGED
ATTORNEY WORK PRODUCT
DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT

**En el caso del presente convenio se deben diseñar por ser un caso no contemplado en ningún procedimiento actual.**

• ¿Cómo se les informa a las personas que buscan protección sobre el proceso?

De conformidad como lo establece el artículo 17 del reglamento de estatuto de refugiado

**En el caso del presente convenio se deben diseñar por ser un caso no contemplado en ningún procedimiento actual.**

• En su sistema actual, ¿existen procedimientos especiales para entrevistar a miembros de poblaciones vulnerables (por ejemplo, unidades familiares, niños, discapacitados, ancianos, víctimas de traumas) para garantizar la confidencialidad?

Sí, de conformidad con el artículo 181 se garantiza la confidencialidad. Y lo normado en el manual y directrices sobre procedimientos y criterios para garantizar la condición de refugiado.

**En el caso del presente convenio se deben diseñar por ser un caso no contemplado en ningún procedimiento actual.**

• ¿Guatemala le proporciona servicios de interpretación para solicitantes de estatus de refugiado?

De conformidad con lo regula el artículo 17 numeral 2 del reglamento de estatuto de refugiado
sub numeral 2.3 y las capacidades institucionales.

• ¿Qué sucede si los solicitantes de asilo no están dispuestos o no pueden obtener documentos de identidad en sus respectivas embajadas?

Se procede de conformidad con el artículo 65 del Código de Migración. No obstante, **En el caso del presente convenio se deben diseñar por ser un caso no contemplado en ningún procedimiento actual.**

## Proceso de determinación

• ¿Existen POE escritos que regulen el procesamiento de las peticiones para protección?

**En el caso del presente convenio se deben diseñar por ser un caso no contemplado en ningún procedimiento actual.**

DHSFF1104

~~PRIVILEGED~~
~~ATTORNEY WORK PRODUCT~~
~~DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT~~

- ¿Tiene Guatemala alguna documentación que explique sus procedimientos para el procesamiento de casos de protección?

R. el código de migración decreto 44-2016 y el Acuerdo de Autoridad Migratoria Nacional 02-2019. (refugio); respecto a la prevención de la tortura está el acuerdo 40-2010 del Congreso de la República de Guatemala.

- Guatemala brinda asistencia a las personas para comprender los procedimientos para solicitar protección

R. de conformidad con el acuerdo de autoridad migratoria nacional 02-2019 en el artículo 17 se da una inducción a los solicitantes de refugio con la finalidad de que comprendan los derechos que les asisten.

• ¿Guatemala tiene un plazo para presentar solicitudes de protección? Si es así, ¿cuáles son esas reglas y excepciones?

Plazo para presentar únicamente luego de realizada la solicitud formal. **En el caso del presente convenio se deben diseñar por ser un caso no contemplado en ningún procedimiento actual.**

• ¿Cuál es el proceso actual de entrevistas para aquellos que buscan protección en Guatemala?

Se realiza de conformidad con lo regulado en el artículo 17 del reglamento respectivo en el numeral 2. **En el caso del presente convenio se deben diseñar por ser un caso no contemplado en ningún procedimiento actual.**

- Quien sirve como que toma las decisiones para los casos de protección en primera instancia

R. de conformidad con el artículo 177 del Código de Migración es la Comisión Nacional para Refugiados (CONARE) quien debe emitir las recomendaciones, sugerencias y opiniones para que la AUTORIDAD MIGRATORIA NACIONAL sea quien toma la decisión final del otorgamiento del estatuto de refugio; (refugio)

R. respecto a la prevención de la tortura es la oficina Oficina Nacional de Prevención de la Tortura y otros Tratos o Penas Crueles, Inhumanos o Degradantes, en adelante la Oficina Nacional de Prevención, que cuenta con un órgano consultor.

- Cada solicitante disfruta de protecciones y procesos idénticos

DHSFF1105

~~PRIVILEGED~~
~~ATTORNEY WORK PRODUCT~~
~~DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT~~

R. no, según el caso detectado se puede dar una protección o proceso distinto tal y como lo regula el artículo 71 del Código de Migración.

• ¿Los solicitantes tienen acceso a abogados, asesores legales, o representantes de ONGs durante el procedimiento de determinación de sus peticiones?

Las solicitudes son personalísimas y violentaría el principio de confidencialidad. No obstante si así lo solicitan podrá evaluarse.

o ¿Se les provée a los solicitantes una lista de organizaciones que prestan servicios legales?

No.

o ¿Los abogados o representantes de las ONGs tienen acceso a los archivos de sus clientes y otra documentación relevante para el procedimiento de determinación de la petición?

No, por el principio de confidencialidad.

o ¿Pueden los abogados o representantes de ONG asistir a entrevistas de determinación de la petición y hacer presentaciones?

No.

• ¿Guatemala evalúa afirmativamente las peticiones de protección/afirmaciones de temor de retorno, o debe el individuo expresar un temor antes de que se tomen ciertas medidas?

Debe manifestarlo antes. Y ser sometido a la evaluación correspondiente.

• ¿Qué tan puntuales son las decisiones de otorgar o rechazar dicha petición de protección?

En virtud que la CONARE comenzó a conocer expedientes a partir del mes de mayo del año 2019 actualmente se está evaluando.

• ¿Cómo se notifica a los solicitantes de la decisión sobre su petición?

Por escrito y de forma personal.

• ¿Hay un proceso de apelación para peticiones de protección rechazadas? Si hay un

DHSFF1106

PRIVILEGED
ATTORNEY WORK PRODUCT
DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT

proceso de apelación, ¿esto detiene cualquier accion de remoción/deportación mientras se lleva a cabo el proceso de apelación?

Sí hay recurso de reposición regulado en el artículo 182 del Código de Migración.

• ¿Se tratan de manera equitativa a todas las peticiones de protección, independientemente de dónde haya ingresado la persona en Guatemala o a quiénes les presentaron su petición de protección?

Sí por el principio de Igualdad.

• ¿Dónde están ubicadas las autoridades responsables de recibir y evaluar peticiones de protección?

En cualquier punto fronterizo para la recepción. En la ciudad capital las oficinas De la CONARE y de la Autoridad Migratoria Nacional.

• ¿La ley guatemalteca permite el estatus de asilo/refugiado derivado para los familiares cercanos (por ejemplo, cónyuge, hijos) de un solicitante?

Sí previa evaluación del órgano competente de conformidad con el artículo 26 del reglamento respectivo.

• ¿Existe un proceso para abordar peticiones abandonadas?

Sí de conformidad con los artículos 17, 19 y 20 del reglamento respectivo.

**Alcance de las protecciones**

• ¿Se permite a las personas que buscan protección contra la devolución de (1) trabajar, (2) moverse libremente dentro de Guatemala y (3) obtener una autorización de viaje (por ejemplo, un documento de viaje de un refugiado) para salir y regresar? ¿Son válidas esas autorizaciones hasta que se haya tomado una decisión definitiva?

Sí de conformidad con el artículo 104 del Código de Migración.

• ¿Se les provée documentos de identidad a las personas que buscan protección o a las que se les ha otorgado protección?

En el caso de la protección del refugio Sí, de conformidad con el artículo 101 y 104 del Código de Migración.

DHSFF1107

~~PRIVILEGED~~
~~ATTORNEY WORK PRODUCT~~
~~DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT~~

• ¿La ley guatemalteca establece un camino hacia la residencia permanente o la ciudadanía para las personas con estatus de refugiado?

Si de conformidad con el artículo 84 del Código de Migración

Además de lo expuesto con anterioridad también se debe observar lo dispuesto en las políticas migratorias emitidas por la Autoridad competente por Guatemala.

## ANEXO

**RESIDENCIA PERMANENTE COMO RENTISTA O PENSIONADO**
*(Artículos 78 del Decreto No. 44-2016 del Congreso de la República de Guatemala Código de Migración)*
*(Artículos 22-24 y 29-39 del Acuerdo de Autoridad Migratoria Nacional 4-2019 "Reglamento de Residencias Guatemaltecas")*

**REQUISITOS**

**Presentar expediente en fólder color VERDE (RENTISTAS) / MORADO (PENSIONADOS), debidamente foliado para su ingreso sin tachones ni alteraciones.**

1. Pasaporte original, vigente y copia legalizada completa;
2. Certificación de validez y vigencia del pasaporte emitida por Embajada o Consulado de su país acreditado en Guatemala. Si en Guatemala no hubiere Embajada o Consulado deberá presentar certificación de nacimiento con apostilla o de conformidad con la Ley del Organismo Judicial, según corresponda;
3. Carencia de antecedentes penales y policiales válidos y vigentes, emitidos por la autoridad correspondiente en el o los países en los que ha tenido domicilio legal comprobable durante los últimos cinco años. En caso de que el país no emita ningún documento similar, deberá presentar negativa de la emisión de dichos documentos;
4. Certificación de movimiento migratorio;

13

DHSFF1108

PRIVILEGED
ATTORNEY WORK PRODUCT
DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT

5. Copia de la resolución que lo acredita como residente temporal, cuando corresponda;
6. Constancia de ingresos:
   a. Rentista: ingreso mensual individual mínimo de un mil doscientos cincuenta dólares de los Estados Unidos de América; y por cada dependiente un monto adicional de trescientos dólares de los Estados Unidos De América;
   b. Pensionado: ingreso mensual individual mínimo de un mil doscientos cincuenta dólares de los Estados Unidos de América; y por cada dependiente un monto adicional de trescientos dólares de los Estados Unidos De América.
7. Comprobante de pago.

Si el solicitante de residencia permanente es menor de edad o declarado en estado de interdicción, ambos padres en ejercicio de la patria potestad o quien ejerza la misma, deberán adjuntar los siguientes documentos:

   a. Certificación válida y vigente de nacimiento del menor de edad. En el caso de los declarados en estado de interdicción, se deberá adjuntar los documentos que acrediten dicha condición y la respectiva representación;
   b. Memorial de solicitud de ingreso de menores de edad o declarado en estado de interdicción, con firmas legalizadas de ambos padres o autorización expresa de conformidad con la ley. Cuando el menor de edad o el declarado en estado de interdicción sea acompañado por uno de los padres o por persona distinta, ésta deberá acreditar la representación que ejercita;
   c. Copia completa y legalizada del documento de identificación o pasaporte, según corresponda, de quien ejerza la patria potestad o la representación legal debidamente acreditada.

## OBSERVACIONES:

1. Las Actas de Legalización de documentos deben cumplir con lo establecido en el Art. 55 literal b) del Código de Notariado.

2. Si se presentan documentos donde el extranjero es conocido con varios nombres, debe adjuntar Testimonio de la Escritura Pública de Identificación de Persona. (*Art. 4 Código Civil*)

3. **DOCUMENTOS PROVENIENTES DEL EXTRANJERO.** Los documentos provenientes del extranjero deberán ser apostillados o legalizados de conformidad con la Ley del Organismo Judicial, según sea el caso. Dichos documentos al momento de su

DHSFF1109

PRIVILEGED
ATTORNEY WORK PRODUCT
DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT

presentación deben tener una fecha de emisión no mayor a seis meses, salvo que en el propio documento se establezca una vigencia distinta.

4. **REGISTRO DE RESIDENTES.** El extranjero residente deberá presentarse a la Subdirección de Extranjería para la captura de datos del registro de residentes, dentro de un plazo de treinta días contados a partir del día siguiente de la notificación que le otorga el estatus ordinario correspondiente; en caso contrario, incurrirá en registro extemporáneo de residentes y permanencia irregular, debiendo cumplir con las obligaciones impuestas en el tarifario de servicios migratorios u otra normativa que así lo regule.

5. **ARCHIVO DEL EXPEDIENTE POR FALTA DE INTERÉS.** El Instituto Guatemalteco de Migración procederá a archivar los expedientes en los que la persona extranjera deje de accionar por un plazo mayor a seis meses, siempre y cuando la Subdirección de Extranjería haya realizado los procedimientos administrativos internos correspondientes y los mismos hayan sido notificados. Al realizarse el archivo del expediente el extranjero incurrirá en multa por permanecer por más tiempo del que ha sido autorizado según lo establecido en el Código de Migración. Si la persona extranjera desea optar a un estatus ordinario, deberá cumplir con las disposiciones del Código de Migración y el presente reglamento previa cancelación de multa.

6. En caso que la renta percibida sea en moneda distinta al dólar de los Estados Unidos de América, se deberá adjuntar documento que acredite la conversión a esta moneda.

7. El arancel se cancela al ser notificada la Resolución que otorga el Estatus Migratorio solicitado.

**RESIDENCIA PERMANENTE PARA LOS NACIDOS EN OTROS PAÍSES DE CENTRO AMÉRICA CUANDO HAN SIDO RESIDENTES TEMPORALES POR UN PERÍODO DE UN AÑO**
*(Artículos 78 del Decreto No. 44-2016 del Congreso de la República de Guatemala Código de Migración)*
*(Artículos 22-24 y 28 del Acuerdo de Autoridad Migratoria Nacional 4-2019 "Reglamento de Residencias Guatemaltecas")*

**REQUISITOS**

DHSFF1110

~~PRIVILEGED~~
~~ATTORNEY WORK PRODUCT~~
~~DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT~~

**Presentar expediente en fólder color CELESTE, debidamente foliado para su ingreso sin tachones ni alteraciones.**

8. Pasaporte original, vigente y copia legalizada completa;
9. Certificación de validez y vigencia del pasaporte emitida por Embajada o Consulado de su país acreditado en Guatemala.  Si en Guatemala no hubiere Embajada o Consulado deberá presentar certificación de nacimiento con apostilla o de conformidad con la Ley del Organismo Judicial, según corresponda;
10. Carencia de antecedentes penales y policiales válidos y vigentes, emitidos por la autoridad correspondiente en el o los países en los que ha tenido domicilio legal comprobable durante los últimos cinco años. En caso de que el país no emita ningún documento similar, deberá presentar negativa de la emisión de dichos documentos;
11. Certificación de movimiento migratorio;
12. Certificación válida y vigente de nacimiento de la persona extranjera, donde se acredite que nació en un país centroamericano;
13. Acta notarial de declaración jurada de la actividad a la que se dedicará en el país;
14. Certificación de la resolución de residente temporal por el período mínimo de un año.
15. Comprobante de pago.

Si el solicitante de residencia permanente es menor de edad o declarado en estado de interdicción, ambos padres en ejercicio de la patria potestad o quien ejerza la misma, deberán adjuntar los siguientes documentos:

d. Certificación válida y vigente de nacimiento del menor de edad. En el caso de los declarados en estado de interdicción, se deberá adjuntar los documentos que acrediten dicha condición y la respectiva representación;
e. Memorial de solicitud de ingreso de menores de edad o declarado en estado de interdicción, con firmas legalizadas de ambos padres o autorización expresa de conformidad con la ley. Cuando el menor de edad o el declarado en estado de interdicción sea acompañado por uno de los padres o por persona distinta, ésta deberá acreditar la representación que ejercita;
f. Copia completa y legalizada del documento de identificación o pasaporte, según corresponda, de quien ejerza la patria potestad o la representación legal debidamente acreditada.

**OBSERVACIONES:**

DHSFF1111

~~PRIVILEGED~~
~~ATTORNEY WORK PRODUCT~~
~~DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT~~

8. Las Actas de Legalización de documentos deben cumplir con lo establecido en el Art. 55 literal b) del Código de Notariado.

9. Si se presentan documentos donde el extranjero es conocido con varios nombres, debe adjuntar Testimonio de la Escritura Pública de Identificación de Persona. (*Art. 4 Código Civil*)

10. **DOCUMENTOS PROVENIENTES DEL EXTRANJERO.** Los documentos provenientes del extranjero deberán ser apostillados o legalizados de conformidad con la Ley del Organismo Judicial, según sea el caso. Dichos documentos al momento de su presentación deben tener una fecha de emisión no mayor a seis meses, salvo que en el propio documento se establezca una vigencia distinta.

11. **REGISTRO DE RESIDENTES.** El extranjero residente deberá presentarse a la Subdirección de Extranjería para la captura de datos del registro de residentes, dentro de un plazo de treinta días contados a partir del día siguiente de la notificación que le otorga el estatus ordinario correspondiente; en caso contrario, incurrirá en registro extemporáneo de residentes y permanencia irregular, debiendo cumplir con las obligaciones impuestas en el tarifario de servicios migratorios u otra normativa que así lo regule.

12. **OBLIGACIÓN DE PRESENTAR PERMISO DE TRABAJO.** Toda persona extranjera que pretenda realizar una actividad remunerada en relación de dependencia dentro del territorio guatemalteco, una vez notificada la resolución de residencia respectiva, deberá presentar el permiso de trabajo emitido por el Ministerio de Trabajo y Previsión Social dentro de un plazo máximo de tres meses ante el Instituto Guatemalteco de Migración. El incumplimiento de este requisito será causal de revocación de la residencia otorgada.

13. **ARCHIVO DEL EXPEDIENTE POR FALTA DE INTERÉS.** El Instituto Guatemalteco de Migración procederá a archivar los expedientes en los que la persona extranjera deje de accionar por un plazo mayor a seis meses, siempre y cuando la Subdirección de Extranjería haya realizado los procedimientos administrativos internos correspondientes y los mismos hayan sido notificados. Al realizarse el archivo del expediente el extranjero incurrirá en multa por permanecer por más tiempo del que ha sido autorizado según lo establecido en el Código de Migración. Si la persona extranjera desea optar a un estatus ordinario, deberá cumplir con las disposiciones del Código de Migración y el presente reglamento previa cancelación de multa.

14. El arancel se cancela al ser notificada la Resolución que otorga el Estatus Migratorio solicitado.

DHSFF1112

PRIVILEGED
ATTORNEY WORK PRODUCT
DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT

**RESIDENCIA PERMANENTE PARA PERSONAS EXTRANJERAS QUE HAN SIDO RESIDENTES TEMPORALES POR UN PERIODO IGUAL O MAYOR DE CINCO AÑOS**
*(Artículos 78 del Decreto No. 44-2016 del Congreso de la República de Guatemala Código de Migración)*
*(Artículos 22-25 del Acuerdo de Autoridad Migratoria Nacional 4-2019 "Reglamento de Residencias Guatemaltecas")*

**REQUISITOS**

**Presentar expediente en fólder color ANARANJADO, debidamente foliado para su ingreso sin tachones ni alteraciones.**

16. Pasaporte original, vigente y copia legalizada completa;
17. Certificación de validez y vigencia del pasaporte emitida por Embajada o Consulado de su país acreditado en Guatemala. Si en Guatemala no hubiere Embajada o Consulado deberá presentar certificación de nacimiento con apostilla o de conformidad con la Ley del Organismo Judicial, según corresponda;
18. Carencia de antecedentes penales y policiales válidos y vigentes, emitidos por la autoridad correspondiente en el o los países en los que ha tenido domicilio legal comprobable durante los últimos cinco años. En caso de que el país no emita ningún documento similar, deberá presentar negativa de la emisión de dichos documentos;
19. Certificación de movimiento migratorio;
20. Copia de la resolución que lo acredita como residente temporal;
21. Acta notarial de declaración jurada de la actividad a la que se dedica en el país y documentos necesarios que acrediten dicho extremo;
22. Garante guatemalteco, presentando constancia de garante actualizada y acta notarial de declaración jurada de constitución de garante guatemalteco.
23. Comprobante de pago.

Si el solicitante de residencia permanente es menor de edad o declarado en estado de interdicción, ambos padres en ejercicio de la patria potestad o quien ejerza la misma, deberán adjuntar los siguientes documentos:

g. Certificación válida y vigente de nacimiento del menor de edad. En el caso de los declarados en estado de interdicción, se deberá adjuntar los documentos que acrediten dicha condición y la respectiva representación;
h. Memorial de solicitud de ingreso de menores de edad o declarado en estado de interdicción, con firmas legalizadas de ambos padres o autorización expresa de conformidad con la ley. Cuando el menor de edad o el declarado en estado de interdicción sea acompañado por uno de los padres o por persona distinta, ésta deberá acreditar la representación que ejercita;

DHSFF1113

PRIVILEGED
ATTORNEY WORK PRODUCT
DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT

 i. Copia completa y legalizada del documento de identificación o pasaporte, según corresponda, de quien ejerza la patria potestad o la representación legal debidamente acreditada.

## OBSERVACIONES:

**15.** Las Actas de Legalización de documentos deben cumplir con lo establecido en el Art. 55 literal b) del Código de Notariado.

**16.** Si se presentan documentos donde el extranjero es conocido con varios nombres, debe adjuntar Testimonio de la Escritura Pública de Identificación de Persona. (*Art. 4 Código Civil*)

**17. DOCUMENTOS PROVENIENTES DEL EXTRANJERO.** Los documentos provenientes del extranjero deberán ser apostillados o legalizados de conformidad con la Ley del Organismo Judicial, según sea el caso. Dichos documentos al momento de su presentación deben tener una fecha de emisión no mayor a seis meses, salvo que en el propio documento se establezca una vigencia distinta.

**18. REGISTRO DE RESIDENTES.** El extranjero residente deberá presentarse a la Subdirección de Extranjería para la captura de datos del registro de residentes, dentro de un plazo de treinta días contados a partir del día siguiente de la notificación que le otorga el estatus ordinario correspondiente; en caso contrario, incurrirá en registro extemporáneo de residentes y permanencia irregular, debiendo cumplir con las obligaciones impuestas en el tarifario de servicios migratorios u otra normativa que así lo regule.

**19. OBLIGACIÓN DE PRESENTAR PERMISO DE TRABAJO.** Toda persona extranjera que pretenda realizar una actividad remunerada en relación de dependencia dentro del territorio guatemalteco, una vez notificada la resolución de residencia respectiva, deberá presentar el permiso de trabajo emitido por el Ministerio de Trabajo y Previsión Social dentro de un plazo máximo de tres meses ante el Instituto Guatemalteco de Migración. El incumplimiento de este requisito será causal de revocación de la residencia otorgada.

**20. ARCHIVO DEL EXPEDIENTE POR FALTA DE INTERÉS.** El Instituto Guatemalteco de Migración procederá a archivar los expedientes en los que la persona extranjera deje de accionar por un plazo mayor a seis meses, siempre y cuando la Subdirección de Extranjería haya realizado los procedimientos administrativos internos

DHSFF1114

PRIVILEGED
ATTORNEY WORK PRODUCT
DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT

correspondientes y los mismos hayan sido notificados. Al realizarse el archivo del expediente el extranjero incurrirá en multa por permanecer por más tiempo del que ha sido autorizado según lo establecido en el Código de Migración. Si la persona extranjera desea optar a un estatus ordinario, deberá cumplir con las disposiciones del Código de Migración y el presente reglamento previa cancelación de multa.

21. El arancel se cancela al ser notificada la Resolución que otorga el Estatus Migratorio solicitado.

## RESIDENCIA PERMANENTE POR SER FAMILIAR, DENTRO DE LOS GRADOS DE LEY, DE PERSONA GUATEMALTECA
*(Artículos 78 del Decreto No. 44-2016 del Congreso de la República de Guatemala Código de Migración)*
*(Artículos 22-24 y 27 del Acuerdo de Autoridad Migratoria Nacional 4-2019 "Reglamento de Residencias Guatemaltecas")*

## REQUISITOS

**Presentar expediente en fólder color AMARILLO, debidamente foliado para su ingreso sin tachones ni alteraciones.**

24. Pasaporte original, vigente y copia legalizada completa;
25. Certificación de validez y vigencia del pasaporte emitida por Embajada o Consulado de su país acreditado en Guatemala. Si en Guatemala no hubiere Embajada o Consulado deberá presentar certificación de nacimiento con apostilla o de conformidad con la Ley del Organismo Judicial, según corresponda;
26. Carencia de antecedentes penales y policiales válidos y vigentes, emitidos por la autoridad correspondiente en el o los países en los que ha tenido domicilio legal comprobable durante los últimos cinco años. En caso de que el país no emita ningún documento similar, deberá presentar negativa de la emisión de dichos documentos;
27. Certificación de movimiento migratorio;
28. Copia de la resolución que lo acredita como residente temporal, cuando corresponda;
29. Certificación o certificaciones de nacimiento de los familiares del solicitante de residencia permanente, que evidencie la filiación con la persona guatemalteca;
30. Certificación de nacimiento de la persona extranjera.
31. Comprobante de pago.

DHSFF1115

PRIVILEGED
ATTORNEY WORK PRODUCT
DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT

Si el solicitante de residencia permanente es menor de edad o declarado en estado de interdicción, ambos padres en ejercicio de la patria potestad o quien ejerza la misma, deberán adjuntar los siguientes documentos:

j.  Certificación válida y vigente de nacimiento del menor de edad. En el caso de los declarados en estado de interdicción, se deberá adjuntar los documentos que acrediten dicha condición y la respectiva representación;

k.  Memorial de solicitud de ingreso de menores de edad o declarado en estado de interdicción, con firmas legalizadas de ambos padres o autorización expresa de conformidad con la ley. Cuando el menor de edad o el declarado en estado de interdicción sea acompañado por uno de los padres o por persona distinta, ésta deberá acreditar la representación que ejercita;

l.  Copia completa y legalizada del documento de identificación o pasaporte, según corresponda, de quien ejerza la patria potestad o la representación legal debidamente acreditada.

## OBSERVACIONES:

22. Las Actas de Legalización de documentos deben cumplir con lo establecido en el Art. 55 literal b) del Código de Notariado.

23. Si se presentan documentos donde el extranjero es conocido con varios nombres, debe adjuntar Testimonio de la Escritura Pública de Identificación de Persona. (*Art. 4 Código Civil*)

24. **DOCUMENTOS PROVENIENTES DEL EXTRANJERO.** Los documentos provenientes del extranjero deberán ser apostillados o legalizados de conformidad con la Ley del Organismo Judicial, según sea el caso. Dichos documentos al momento de su presentación deben tener una fecha de emisión no mayor a seis meses, salvo que en el propio documento se establezca una vigencia distinta.

25. **REGISTRO DE RESIDENTES.** El extranjero residente deberá presentarse a la Subdirección de Extranjería para la captura de datos del registro de residentes, dentro de un plazo de treinta días contados a partir del día siguiente de la notificación que le otorga el estatus ordinario correspondiente; en caso contrario, incurrirá en registro extemporáneo de residentes y permanencia irregular, debiendo cumplir con las obligaciones impuestas en el tarifario de servicios migratorios u otra normativa que así lo regule.

DHSFF1116

PRIVILEGED
ATTORNEY WORK PRODUCT
DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT

26. **ARCHIVO DEL EXPEDIENTE POR FALTA DE INTERÉS.** El Instituto Guatemalteco de Migración procederá a archivar los expedientes en los que la persona extranjera deje de accionar por un plazo mayor a seis meses, siempre y cuando la Subdirección de Extranjería haya realizado los procedimientos administrativos internos correspondientes y los mismos hayan sido notificados. Al realizarse el archivo del expediente el extranjero incurrirá en multa por permanecer por más tiempo del que ha sido autorizado según lo establecido en el Código de Migración. Si la persona extranjera desea optar a un estatus ordinario, deberá cumplir con las disposiciones del Código de Migración y el presente reglamento previa cancelación de multa.

27. El arancel se cancela al ser notificada la Resolución que otorga el Estatus Migratorio solicitado.

**RESIDENCIA PERMANENTE PARA PARA PERSONAS EXTRANJERAS QUE TIENEN UN AÑO O MÁS DE HABER CONTRAÍDO MATRIMONIO O DECLARADO LA UNIÓN DE HECHO CON PERSONA GUATEMALTECA**
*(Artículos 78 del Decreto No. 44-2016 del Congreso de la República de Guatemala Código de Migración)*
*(Artículos 22-24 y 26 del Acuerdo de Autoridad Migratoria Nacional 4-2019 "Reglamento de Residencias Guatemaltecas")*

**REQUISITOS**

**Presentar expediente en fólder color AZUL, debidamente foliado para su ingreso sin tachones ni alteraciones.**

32. Pasaporte original, vigente y copia legalizada completa;
33. Certificación de validez y vigencia del pasaporte emitida por Embajada o Consulado de su país acreditado en Guatemala. Si en Guatemala no hubiere Embajada o Consulado deberá presentar certificación de nacimiento con apostilla o de conformidad con la Ley del Organismo Judicial, según corresponda;
34. Carencia de antecedentes penales y policiales válidos y vigentes, emitidos por la autoridad correspondiente en el o los países en los que ha tenido domicilio legal comprobable durante los últimos cinco años. En caso de que el país no emita ningún documento similar, deberá presentar negativa de la emisión de dichos documentos;
35. Certificación de movimiento migratorio;
36. Copia de la resolución que lo acredita como residente temporal, cuando corresponda;
37. Certificación de matrimonio o de unión de hecho, emitida por el Registro Nacional de las Personas;

DHSFF1117

PRIVILEGED
ATTORNEY WORK PRODUCT
DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT

38. Certificación de nacimiento del cónyuge guatemalteco, emitida por el Registro Nacional de las Personas, con la anotación del matrimonio o unión de hecho respectivamente.

39. Comprobante de pago.

## OBSERVACIONES:

28. Las Actas de Legalización de documentos deben cumplir con lo establecido en el Art. 55 literal b) del Código de Notariado.

29. Si se presentan documentos donde el extranjero es conocido con varios nombres, debe adjuntar Testimonio de la Escritura Pública de Identificación de Persona. (*Art. 4 Código Civil*)

30. **DOCUMENTOS PROVENIENTES DEL EXTRANJERO.** Los documentos provenientes del extranjero deberán ser apostillados o legalizados de conformidad con la Ley del Organismo Judicial, según sea el caso. Dichos documentos al momento de su presentación deben tener una fecha de emisión no mayor a seis meses, salvo que en el propio documento se establezca una vigencia distinta.

31. **REGISTRO DE RESIDENTES.** El extranjero residente deberá presentarse a la Subdirección de Extranjería para la captura de datos del registro de residentes, dentro de un plazo de treinta días contados a partir del día siguiente de la notificación que le otorga el estatus ordinario correspondiente; en caso contrario, incurrirá en registro extemporáneo de residentes y permanencia irregular, debiendo cumplir con las obligaciones impuestas en el tarifario de servicios migratorios u otra normativa que así lo regule.

32. **ARCHIVO DEL EXPEDIENTE POR FALTA DE INTERÉS.** El Instituto Guatemalteco de Migración procederá a archivar los expedientes en los que la persona extranjera deje de accionar por un plazo mayor a seis meses, siempre y cuando la Subdirección de Extranjería haya realizado los procedimientos administrativos internos correspondientes y los mismos hayan sido notificados. Al realizarse el archivo del expediente el extranjero incurrirá en multa por permanecer por más tiempo del que ha sido autorizado según lo establecido en el Código de Migración. Si la persona extranjera desea optar a un estatus ordinario, deberá cumplir con las disposiciones del Código de Migración y el presente reglamento previa cancelación de multa.

33. El arancel se cancela al ser notificada la Resolución que otorga el Estatus Migratorio solicitado.

DHSFF1118

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

The United States and Guatemala, under the auspices of the U.S.-Guatemala Agreement for Cooperation in the Examination of Protection Claims ("Agreement"), aim to offer refugee protection systems consistent with our obligations under the 1951 Convention Relating to the Status of Refugees and the 1967 Protocol Relating to the Status of Refugees. Because of this, the United States maintains that any alien subject to the Agreement would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, as is required under U.S. domestic law.

Taking into account the above, the United States government has engaged the Government of Guatemala in an ongoing dialogue regarding your protection system. Based on the oral and written discussions between our two States, we have come to the following understandings about the Government of Guatemala's protection system:

## Understanding of Facts

*Non-Refoulement*

≠ Guatemala is a signatory to the United Nations Convention Against Torture (CAT). Notwithstanding this, the Guatemalan Migration Code does not directly refer to any prohibition on returning, removing, or deporting individuals where there is a substantial ground for believing the individual would be in danger of being subjected to torture. However, Guatemala interprets their domestic legal authority not to return individuals possibly subject to torture in their home country (CAT non-refoulement obligations) as deriving from Migration Code Article 71. Moreover, Article 3 of the Regulation of Procedure for Protection Determination and Recognition of the Refugee Status in the State of Guatemala also refers to non-refoulement for both those eligible for refugee status and for those with torture claims, by the language:

> The interpretation and application of dispositions established in the present Regulation, will be conducted in accordance with the principles of No Discrimination, Confidentiality, Family Reunification, of Humanitarian and Apolitical, in compliance with the rights and obligations established in the Political Constitution of the Republic of Guatemala, applicable to refugees and international arrangements which the State of Guatemala is part of.

≠ Guatemala has also assured the U.S. government that no one with a viable claim of protection against torture would be returned to their home country, even if they had an extremely serious criminal conviction, such as murder.

≠ Guatemala has never had a claimant make a torture claim specifically; so far, they have only heard claims for asylum and refugee status protection. They have no torture claim

DHSFF1119

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

standard operating procedures (SOP) at the present time.  Because the government of Guatemala has never had this type of protection claim made before, protections specifically for torture are not in their regulations or in their code.  However, if Guatemala were to receive such an application, the application would be processed in the same manner as a refugee status applicant and given the same procedural protections.

≠   For a torture protection claim, there would be no applied criminal bars under Article 47 (criminal bars to refugee status applicants), nor any criminal bars denying admission under Article 66 (criminal grounds of inadmissible into Guatemala).  For refugee status or asylum applications, there are also no outright bars, except those grounds laid out in Article 47, which, if present, will be considered on a case-by-case basis before granting the application.  Article 66 will not be applied to any kind of protection claim in Guatemala, and no criminal bars would be applied to torture protection applications.

≠   There are no policies currently in place that would be grounds to deny an applicant asylum, refugee status, or torture protection beyond those already in Guatemalan law.

≠   Taken together, Guatemala may deny refugee status on three grounds:  1) those who committed certain serious crimes under international law (war crimes, etc…); 2) those who had their refugee status previously terminated; 3) if the applicant is being criminally prosecuted abroad for almost any type of crime.

≠   The "acts and purposes" Guatemala considers contrary to the purposes and principles of the United Nations, such that they may warrant a denial of refugee status under Article 47 of their code, are all those acts of racial discrimination, torture, forced disappearances, people with disabilities, and the rights of women, children, migrants, minorities and indigenous people contained in the International Charter of Human Rights.

≠   Beyond the CAT, the Convention, and the Protocol, Guatemala is not a signatory to any other conventions touching refugee protections, but Guatemala confirmed that these treaties are self-executing, and do not need domestic implementation to become part of their law.

≠   UNHCR's role regarding non-refoulment is advisory-only.

≠   Protection applicants who illegally enter Guatemala will face administrative fines and are subject to removal, but they will not face criminal penalties.

≠   Those who accuse any person, government office, or government organization of torture will not face criminal or civil liable actions or penalties.  The confidentiality of any accuser is also protected by law.

≠   Guatemala confirmed the Office of Prevention of Torture is an internal, domestic Guatemalan oversight body charged with analyzing whether someone is likely to be, or has been, subjected to torture in places like prisons, confinement centers, etc... in

DHSFF1120

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

Guatemala.  The Office of Prevention of Torture is not involved with non-refoulement obligations or investigations regarding torture allegations over incidents occurring outside of Guatemala.

*Capacity*

≠   32 refugee status applications were abandoned last year.

≠   A case, from the time an applicant makes a protection request, to its final resolution, takes an average of 1-2 years.

≠   As of April 2019, there were 262 protection applications filed in 2018 and 218 protection applications filed in 2019 thus far.

*Available Protections Under Guatemala Law*

≠   Guatemala recognizes persecution by both state and non-state actors.

≠   The basic difference between an asylum and refugee status application is:  asylum protection only involves persecution on account of political opinion.  Refugee status protection involves the other protected grounds, such as racial discrimination.  More detailed information is provided below:

| | WHO DETERMINES | DESCRIPTION | LAW THAT REGULATES |
|---|---|---|---|
| **REFUGE** | National Immigration Authority | 1.     The request for Refugee Status can be conducted personally in writing or verbally at the Reception Center;  2.     Such request will be transferred immediately in writing to the support staff of CONARE;  3.     The individual shall appear at the offices occupied by the Office for International Migratory Relations (ORMI by its name in Spanish) in which he or she will ratify his or her initial request, which will be constituted as formal request and he or she will receive through CONARE a permit for | Migration Code |

DHSFF1121

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

permanence of 30 days established in the Rules of Procedure for Protection, Determination of Refugee Status.

4.      A day and time are set for the personal interview, if the applicant does not appear the request can be declared abandoned.

5.      If he or she shows up for the interview, the applicant will attach to the request documents that substantiate the well-founded fear or any other situation which deserves the awarding of refugee status.

6.      Once the investigation process of CONARE support staff has concluded, the results are sent to the said Commission so that they issue the corresponding Technical Opinion.

7.      With the Technical Opinion issued by CONARE, the refugee status applicant's file is elevated to the National Immigration Authority.

8.      The National Immigration Authority issues Resolution whether granting or denying the Refugee Status in the territory of Guatemala.

9.      Notifying the applicant of the issued resolution by the competent authority

DHSFF1122

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

| | | granting or denying the request. | |
|---|---|---|---|
| | | 10.   In case of refusal of Statute the interested party may file an appeal for reconsideration in accordance with regulations in the law. | |
| | | 11.   The appeal shall be known by the National Immigration Authority who rules on the appeal. | |
| **ASYLUM** | Ministry of Foreign Affairs | The Directorate of Bilateral Relations is the one in charge of providing follow up to the Asylum request and the Minister of Foreign Affairs is the officer in charge of resolving said situation. | Governmental Agreement 415-2003 |
| **NATIONALITY** | Ministry of Foreign Affairs | 1.   The applicant shall be registered as alien domiciled. This quality presupposes that the applicant must be the holder of a permanent resident visa, issued by the General Directorate of Migration. 2.   The applicant must have the quality of Alien Domiciled for at least five years prior to the submission of the application, and not have been absent of the national territory within that time-frame for more than six consecutive months or periods that added together result in one year or more. 3.   The interested party must be of legal age and the proceeding is personal. The petitioner may not be represented by a third party and only persons of sound mind and body may make a request. | Governmental Agreement 415-2003 |

5

DHSFF1123

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

| RESIDENCE FOR CA-4 NATIONALS | Sub-directorate of Immigration, Guatemalan Migration Institute | Permanent residence for people of the CA 4, it takes less time to acquire a permanent residence than temporary residence. | Article 74 and 78 of the Migration Code. |
| --- | --- | --- | --- |
| | | Art.78 (a-e) of MC Art. 22 onwards of the Residence Regulations | |
| | | 1. Download form according to PR modality to be requested 2. Fill the form and attach requirements in accordance with Residence Regulations 3. Appear before the SI to deliver the file personally 4. The file is analyzed by a process analyst who determines if the requirements are met (issues resolution that approves) or not (prior) so that it is rectified, unless is un-rectifiable and then what corresponds is to deny it. 5. Approved the file, the individual personally appears to be notified and to conduct the registration interview.  The fee must be paid according to the tariff. 6. The notified resolution and residence sheet are delivered. 7 go to RENAP and register as alien domiciled. | |

≠   Guatemala also confirmed that their protection laws exist not just on paper, but they actively grant protection and have a process in place to do so.

≠   The process in place to obtain refugee status is:

1.   The request for Refugee Status can be conducted personally in writing or verbally at the Reception Center;

2.   Such request will be transferred immediately in writing to the support staff of CONARE;

DHSFF1124

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

3.   The individual shall appear at the offices occupied by the Office for International Migratory Relations (ORMI by its name in Spanish) in which he or she will ratify his or her initial request, which will be constituted as formal request, and he or she will receive through CONARE a permit for permanence of 30 days established in the Rules of Procedure for Protection, Determination of Refugee Status.

4.   A day and time are set for the personal interview.  If the applicant does not appear, the request can be declared abandoned.

5.   If the applicant appears at the interview, the applicant will attach to the request documents that substantiate the well-founded fear, or any other situation which deserves the awarding of refugee status.

6.   Once the investigation process of CONARE support staff has concluded, the results are sent to the said Commission, so that they issue the corresponding Technical Opinion.

7.   With the Technical Opinion issued by CONARE, the refugee status applicant's file is elevated to the National Immigration Authority.

8.   The National Immigration Authority issues a resolution on whether to grant or deny Refugee Status in the territory of Guatemala.

9.   The applicant is notified of the decision reached in the case.

10.   In case of a denial, the party may file an appeal for reconsideration in accordance with regulations in the law.

11.   The appeal shall be known by the National Immigration Authority who rules on the appeal.

≠   Under Article 78 of the Migration Code, to obtain permanent residency in Guatemala, an applicant must show one of the following:

a) Has been temporary residents for a period equal to five or more years.
b) Has been married for more than one year or declared a domestic partnership with a Guatemalan citizen.
c) Is a family member, within a certain legal degree, of a Guatemalan citizen who has another nationality.
d) Those born in other Central American countries where they have been temporary residents for a period of one year.
e) Persons with private income or retirees who have been authorized to reside in the country and who have legal permanent incomes originating from abroad.

7

DHSFF1125

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

≠   An applicant in Guatemala may be denied permanent residency if there are doubts about that individual's identification documents' legitimacy, the untimely submission of documents or if the request was not timely made, if the documents submitted by the applicant are full of errors or inconsistencies, or if the applicant has a criminal record.  This criminal record may involve an outstanding arrest warrant or any kind of criminal conviction.  The decision whether to grant or deny permanent residency is discretionary and is made on a case-by-case-basis.

≠   To obtain citizenship in Guatemala, an applicant must:

1.  The applicant shall be registered as alien domiciled. This presupposes that the applicant must be the holder of a permanent resident visa, issued by the General Directorate of Migration.

2.  The applicant must have been an alien domiciled for at least five years prior to the submission of the application, and not have been absent of the national territory within that time-frame for more than six consecutive months or periods that added together result in one year or more.

3.  The applicant must be of legal age.  The petitioner may not be represented by a third party, and only persons of sound mind and body may make a request.

*Reception/Determination Process*

≠   A refugee status application must be filed in person, in writing or verbally, before a Migration Checkpoint or before the Sub-directorate of Care and Protection of Migrant's Fundamental Rights in the Institute.  The process shall be carried out in the following manner:

A)  Before the Sub-directorate of Migration Control at the Checkpoints of the Institute, the delegate will receive the initial application in a verbal or written manner, and the official will immediately transfer the application in a written manner to the support personnel from CONARE, or;

B)  Before the Sub-directorate of Care and Protection of Migrant's Basic Rights in the Institute, the initial application will be received in a verbal or written manner, and will be transferred in the written form to CONARE's support personnel.

≠   After the protection application has been received, the support personnel in CONARE shall carry out the following:

1.  Guide the refugee status applicant so that he/she can obtain information about the procedures.

DHSFF1126

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

2. Receive the formal application.  The applicant shall complete the form that CONARE provides, which should have sequential numbering, in which the applicant shall explain the reasons for the application, and the departure of the country of origin. The applicant can add personal identification documents that he/she has to the application, and any other evidence that he/she might consider pertinent to support the application.

3. Notify the Sub-directorate of Care and Protection of Migrant's Basic Rights of the applicant's Temporary Residency Status.

4. Notify the Migration Sub-directorate whether the applicant has children or adolescents, for the purpose granting of temporary residency.

5. Set up the day and the time for the interview, which shall not exceed 15 days, counted from the date on which the formal application was filed.

≠ In Guatemala, oral guidance is given to every protection applicant once they make a claim.  The oral guidance covers the procedures the applicant must follow, what steps to take, the protections available, information that the applicant obtains a permit for 30 days, and what an applicant may not to do while in Guatemala.  The applicant is also given an overview of the appellate process at this initial stage.  This guidance is given to everyone.

≠ Written guidance that will be given to applicants is forthcoming/being developed in Guatemala.

≠ The right to contact a UNHCR representative is given orally at the first stage in the proceedings.

≠ The guidance is provided in a language the applicant understands; for now, the guidance has been almost entirely Spanish, but Guatemala can and has obtained interpreters available for other languages if needed, although it may take extra time to get one, especially for languages like Arabic.   Presently, interpreters in German, English, French, Italian, Russian, Chinese, Mandarin are readily available, along with other indigenous languages common throughout Central America.

≠ On the day and at the time scheduled for the interview, a specific area will be available to conduct the interview with the applicants to determine whether the applicant qualifies for refugee status. This area will be duly equipped with video and audio recording devices to document the proceedings conducted.  Furthermore, a psychologist must be present at each interview in order to prepare a psychological report as a result of the interview taken.  If necessary, there will be a translator or interpreter, who will sign the document resulting from the interview conducted.

≠ While conducting the interview, the interviewer must comply with the following regulatory conditions:

DHSFF1127

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

1. The applicants must be seen individually by the CONARE support personnel, who will use a specialized, comprehensive, and individualized approach.
2. Children and adolescents who are unaccompanied or separated from their families will be attended to in specialized areas by qualified personnel, who will see to their specific needs for protection, in accordance with the current national legislation, and the interviewer will work with the Attorney General's office to ensure specialized attention.
3. The interview must be conducted in the Spanish language. If the applicant or refugee does not speak Spanish, he or she will be assisted by a translator or interpreter.
4. With regard to family groups, each family member is interviewed individually within a time period not to exceed thirty days.

≠ As mentioned above, the protection application interviews are normally in Spanish, but Guatemala will provide translators or interpreters for any language required, although obtaining some translators in languages like Arabic may take extra time.  Thus far, Guatemala has been successful in getting an interpreter for anyone who needs one, in any language needed.  Interpreter and translation services has also been given an expanded budget.

≠ As mentioned above, children are interviewed separately and apart from their family unit (if they are part of a larger family unit), and children are also interviewed separately if they are unaccompanied.  Guatemala has a UNHCR-funded special "child friendly" interview area that is currently being built, which they hope to be done at the beginning of the next fiscal year.

≠ In addition to children, Guatemala also interviews LGBTQ claims separately from the main interview area due to their special nature and particular vulnerability.

≠ Upon receiving the formal application for refugee status, the CONARE support personnel will initiate the investigation of the case, using appropriate methods to bring the case file to completion.

≠ A right to counsel is guaranteed in Article 12 of the Guatemalan constitution, and this right is applied to interviews on protection claims.  In practice, almost all NGO representatives in Guatemala are also lawyers, but this right to counsel only applies to actual legal counsel.

≠ If no identification document is provided by the applicant, or cannot be obtained by working with their embassy, Guatemalan officials will interview the applicant to ascertain their identity until they are satisfied, with the aim of detecting and preventing fraud.

DHSFF1128

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

≠ The interview procedure for those subject to the ACA will be the same as for any other protection applicant, with the exception that those processed under the ACA may be quicker to reduce possible fraud.

≠ An applicant will not be required to leave Guatemala during the pendency of any appeal on their protection claim(s).

≠ Derivative beneficiaries for successful protection applicants are "blood relatives," which Guatemala defines as parents, siblings, spouses, and children.

*Scope of Protections*

≠ Guatemala confirmed that protection applicants are given identification documents, these documents are recognized nationwide, and these documents are recognized by public and private institutions alike, including banks.

≠ Under Article 104 of the Migration Code, protection applicants are allowed to (1) work, (2) move around freely within Guatemala, and (3) obtain travel authorization (for example, a refugee travel document) to leave and return.  These authorization documents are valid until a definitive decision is made.

≠ The new Migration Authority Agreement came into effect in August 2019, but it did nothing to change identification document-issuing.  The Ministry of Foreign Affairs is still issuing identification documents.

## ATTACHMENT

## PERMANENT RESIDENCE AS A PERSON WITH PRIVATE INCOME OR RETIREE

*(Articles 78 of Decree No. 44-2017 issued by the Congress of the Republic of Guatemala [regarding the] Migration Code)*
*(Articles 22-24 and 29-39 of Migratory Authority Agreement [No.] 4-2019, "Regulations regarding Residency in Guatemala")*

## REQUIREMENTS

**Present your file in a GREEN folder (INVESTORS)/PURPLE [folder] (RETIREES), duly paginated, with no deletions or alterations.**

1. Original, current passport with a complete notarized copy;
2. Certification of passport validity and currency, issued by your country's Embassy or Consulate, accredited in Guatemala. If your country does not have an Embassy or Consulate, you must present a certification of birth with an apostille, pursuant to the Law of the Judicial Branch, as applicable;

DHSFF1129

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

3. Valid, up to date proof of clean criminal and police records issued by the appropriate authority in the country or countries in which he or she has had legal, verifiable residence during the last five years. In the event that the country does not issue any similar document, he or she must present the letter of refusal to issue said documents;
4. Certification of migratory movement;
5. Copy of a resolution accrediting your status as a temporary resident, when applicable;
6. Proof of income:
   a. Person with private income: Minimum individual monthly income of one thousand two hundred fifty United States dollars; and for each dependent, an additional sum of three hundred United States dollars.
   b. Retiree: Minimum individual monthly income of one thousand two hundred fifty United States dollars; and for each dependent, an additional sum of three hundred United States dollars.
7. Proof of payment.

If the applicant for permanent residence is a minor, or has been declared legally incompetent, both parents, assuming they have custody of the minor, or whoever is authorized to exercise the same, must attach the following documents:

   a. Valid and current certification of the minor's birth. In the case of individuals declared legally incompetent, the documents accrediting said condition, as well as the corresponding guardianship, must be attached;
   b. Record of application to claim the minor or legally incapacitated individual as a dependent, with legalized signatures of both parents, or express legal authorization. When the minor or incapacitated individual is accompanied by one of the parents or another person, this person must accredit his or her guardianship;
   c. Complete and legalized copy of identification document or passport, as the case may be, of the guardian or the individual lawfully granted power of attorney.

**NOTES:**

1. The document legalization certificates must comply with the provisions of Art. 55 section b) of the Notary Code.

2. If there are documents in which the foreigner is known by multiple names, you must attach an Official Record of the Public Instrument [certifying] an Individual's Identity. *(Art. 4 of the Civil Code)*

3. **DOCUMENTS ORIGINATING ABROAD.** Documents originating abroad should be apostilled or authenticated in accordance with the Judiciary Law, according to the case. Such documents when submitted must have an issue date not exceeding six months, except when a different validity date is established in the same document.

DHSFF1130

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

4.  **REGISTRATION OF RESIDENTS**.  The alien resident must appear at the Sub-directorate for Alien   Affairs within thirty days starting from the day after notification of the appropriate regular status was issued so that information may be entered in the register of residents; otherwise, he or she will incur in an extemporaneous registration of residence and illegal status and must comply with the obligations imposed in the fee chart of immigration services or other standard that regulates it.

5.  **FILE ARCHIVED DUE TO LACK OF INTEREST**.  The Guatemalan Immigration Institute shall archive files in which the alien ceased to take action for more than six months, always and whenever the Sub-directorate of Alien Affairs has performed the appropriate internal administrative proceedings and notification has been made thereof.  Upon archiving the file, the alien will incur a fine for remaining longer than authorized according to what is established in the Immigration Code. If the alien wishes to select regular status, he or she must comply with the provisions of the Immigration Code and the present regulation, after having paid the corresponding fine.

6.  In the event that the amount received is in currency other than the U.S. dollar, a document must be attached that establishes the conversion to this currency.

7.  The fee is canceled upon notification of the Resolution granting the Immigration Status requested.

**PERMANENT RESIDENCE FOR THOSE WHO WERE BORN IN OTHER CENTRAL AMERICAN COUNTRIES WHEN THEY HAVE BEEN TEMPORARY RESIDENTS FOR A ONE YEAR PERIOD**
*(Article 78 of Decree No. 44-2016 of the Republic of Guatemala Congress Immigration Code)*
*(Articles 22-24 and 28 of the "Guatemalan Residency Regulation" 4-2019 National Immigration Authority Agreement)*

**REQUIREMENTS**

**Present the file in a LIGHT BLUE folder, duly paginated for entry without stray markings or alterations.**

1.  Original valid passport and full authenticated copy;
2.  Certification of validity for passport issued by an Embassy or Consulate established in Guatemala. If there is no Embassy or Consulate in Guatemala, he or she must present a birth certificate with apostille or in accordance with Judiciary Law, as appropriate;
3.  Valid, up to date proof of clean criminal and police records issued by the appropriate authority in the country or countries in which he or she has had legal,

DHSFF1131

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

verifiable residence during the last five years.  In the event that the country does not issue any similar document, he or she must present the letter of refusal to issue said documents;

4. Certificate of immigration activity;

5. Alien's valid, up to date birth certificate which establishes that he or she was born in a Central American country;

6. Notarized sworn statement regarding the activity he or she will pursue in the country;

7. Certification of the resolution for temporary residence for a minimum period of one year.

8. Proof of payment.

If the person requesting permanent residence is a minor or has been declared incapacitated, both parents in exercise of their parental authority or the person who exercises same must attach the following documents:

a. Valid, up to date birth certificate for the minor.  In the case of those who are incapacitated, documents establishing said condition and the corresponding representation must be attached.

b. Entry request brief for minors or incapacitated person, with authenticated signatures by both parents or express permission in accordance with the law.  When the minor or incapacitated person is accompanied by one of the parents or by another person, he or she must establish the representation that he or she exercises;

c. Full, authenticated copy of identification document or passport, as appropriate, of the person who exercises parental authority or duly established legal representation.

**NOTES:**

1. Certificates of Authentication for documents must comply with the provisions in Art. 55, section b) of the Notary Code.

2. If documents are submitted in which the alien is known by several names, he or she must attach a Certified Copy of Identification of Person. (*Art. 4, Civil Code*)

3. **DOCUMENTS ORIGINATING ABROAD**.  Documents originating abroad should be notarized or authenticated in accordance with the Judiciary Law, according to the case.  Such documents when submitted must have an issue date not exceeding six months, except when a different validity date is established in the same document.

4. **REGISTRATION OF RESIDENTS**.  The alien resident must appear at the Subdirectorate for Alien Affairs within thirty days starting from the day after notification of the appropriate regular status was issued so that information may be entered in the register of residents; otherwise, he or she will incur in an extemporaneous registration of residence and illegal status and must comply with the obligations imposed in the fee chart of immigration services or other standard that regulates it.

DHSFF1132

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

5. **OBLIGATION TO PRESENT WORK PERMIT.**  Every alien who intends to perform remunerative activity for an organization within Guatemalan territory must present a work permit issued by the Ministry of Labor and Social Security at the Guatemalan Immigration Institution within no more than three months once he or she has been notified of the decision regarding his or her respective residence status. Non-compliance with this requirement will constitute grounds for revoking the residence granted.

6. **FILE ARCHIVED DUE TO LACK OF INTEREST**.  The Guatemalan Immigration Institute shall archive files in which the alien ceased to take action for more than six month, always and whenever the Subdirectorate of Alien Affairs has performed the appropriate internal administrative proceedings and notification has been made thereof.  Upon archiving the file, the alien will incur in a fine for remaining longer than authorized according to the provisions in the Immigration Code.  If the alien wishes to select regular status, he or she must comply with the rulings of the Immigration Code and the present regulation, after having paid for the fine.

7. The fee is canceled upon notification of the Resolution granting the Immigration Status requested.



DHSFF1133

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

## PERMANENT RESIDENCE FOR ALIENS WHO HAVE BEEN TEMPORARY RESIDENTS FOR A PERIOD EQUAL OR GREATER TO FIVE YEARS

*(Article 78 of Decree No. 44-2016 of the Republic of Guatemala Congress Immigration Code)*
*(Articles 22-25 of the "Guatemalan Residency Regulation" 4-2019 National Immigration Authority Agreement)*

## REQUIREMENTS

**Present the file in an ORANGE folder, duly paginated for entry without stray markings or alterations.**

1. Original valid passport and full authenticated copy;
2. Certification of validity for passport issued by an Embassy or Consulate established in Guatemala.  If there is no Embassy or Consulate in Guatemala, he or she must present a birth certificate with apostille or in accordance with Judiciary Law, as appropriate;
3. Valid, up to date proof of clean criminal and police records issued by the appropriate authority in the country or countries in which he or she has had legal, verifiable residence during the last five years. In the event that the country does not issue any similar document, he or she must present the letter of refusal to issue said documents;
4. Certificate of immigration activity;
5. Alien's valid, up to date birth certificate, which establishes that he or she was born in a Central American country;
6. Notarized sworn statement regarding the activity he or she will pursue in the country;
7. Certification of the resolution for temporary residence for a minimum period of one year.
8. Proof of payment.

If the person requesting permanent residence is a minor or has been declared incapacitated, both parents in exercise of their parental authority or the person who exercises same must attach the following documents:

a. Valid, up to date birth certificate for the minor. In the case of those who are incapacitated, documents establishing said condition and the corresponding representation must be attached.
b. Entry request brief for minors or incapacitated person, with authenticated signatures by both parents or express permission in accordance with the law. When the minor or incapacitated person is accompanied by one of the parents or by another person, he or she must establish the representation that he or she exercises;

DHSFF1134

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

    c.  Full, authenticated copy of identification document or passport, as appropriate, of the person who exercises parental authority or duly established legal representation.

**NOTES:**

1. Certificates of Authentication for documents must comply with the ruling in Art. 55, letter b) of the Notary Code.
2. If documents are submitted in which the alien is known by several names, he or she must attach a Certified Copy of Identification of Person. (*Art. 4, Civil Code*)
3. **DOCUMENTS ORIGINATING ABROAD**. Documents originating abroad should be notarized or authenticated in accordance with the Judiciary Law, according to the case. Such documents when submitted must have an issue date not exceeding six months, except when a different validity date is established in the same document.
4. **REGISTRATION OF RESIDENTS**. The alien resident must appear at the Subdirectorate for Alien Affairs within thirty days starting from the day after notification of the appropriate regular status was issued, so that the information may be entered in the register of residents; otherwise, he or she will incur in an extemporaneous registration of residence and illegal status and must comply with the obligations imposed in the fee chart of immigration services or other standard that regulates it.
5. **OBLIGATION TO PRESENT WORK PERMIT**. Every alien who intends to perform remunerative activity for an organization within Guatemalan territory must present a work permit issued by the Ministry of Labor and Social Security at the Guatemalan Immigration Institution within no more than three months once he or she has been notified of the decision regarding his or her respective residence status. Non-compliance with this requirement will constitute grounds for revoking the residence granted.
6. **FILE ARCHIVED DUE TO LACK OF INTEREST**. The Guatemalan Immigration Institute shall archive files in which the alien ceased to take action for more than six months, always and whenever the Subdirectorate of Alien Affairs has performed the appropriate internal administrative proceedings and notification has been made thereof. Upon archiving the file, the alien will incur in a fine for remaining longer than authorized according to the provisions in the Immigration Code. If the alien wishes to select regular status, he or she must comply with the provisions of the Immigration Code and the present regulation, after having paid the fine.
7. The fee is canceled upon notification of the Resolution granting the Immigration Status requested.

**PERMANENT RESIDENCE BASED ON FAMILY RELATIONSHIP, WITHIN LEGAL TERMS, WITH A GUATEMALAN**

DHSFF1135

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

*(Article 78 of Decree No. 44-2016 of the Republic of Guatemala Congress Immigration Code)*
*(Articles 22-24 and 27 of the "Guatemalan Residency Regulation" 4-2019 National Immigration Authority Agreement )*

**REQUIREMENTS**
**Present the file in a YELLOW folder, duly paginated for entry without stray markings or alterations.**

1. Original valid passport and full authenticated copy;
2. Certification of validity for passport issued by an Embassy or Consulate established in Guatemala. If there is no Embassy or Consulate in Guatemala, he or she must present a birth certificate with apostille or in accordance with Judiciary Law, as appropriate;
3. Valid, up to date proof of clean criminal and police records issued by the appropriate authority in the country or countries in which he or she has had legal, verifiable residence during the last five years.  In the event that the country does not issue any similar document, he or she must present the letter of refusal to issue said documents;
4. Certificate of immigration activity;
5. Copy of resolution establishing him or her as a temporary resident, as appropriate;
6. Birth certificate(s) for family members of person requesting permanent residence that proves his or her ties with the Guatemalan person;
7. Alien's birth certificate.
8. Proof of payment.

If the person requesting permanent residence is a minor or has been declared incapacitated, both parents in exercise of their parental authority or the person who exercises same must attach the following documents:

a. Valid, up to date birth certificate for the minor.  In the case of those who are incapacitated, documents establishing said condition and the corresponding representation must be attached.
b. Entry request brief for minors or incapacitated person, with authenticated signatures by both parents or express permission in accordance with the law. When the minor or incapacitated person is accompanied by one of the parents or by another person, he or she must establish the representation that he or she exercises;
c. Full, authenticated copy of identification document or passport, as appropriate, of the person who exercises parental authority or duly established legal representation.

**NOTES:**

DHSFF1136

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

1. Certificates of Authentication for documents must comply with the ruling in Art. 55, letter b) of the Notary Code.
2. If documents are submitted in which the alien is known by several names, he or she must attach a Certified Copy of Identification of Person. (*Art. 4, Civil Code*)
3. **DOCUMENTS ORIGINATING ABROAD**. Documents originating abroad should be notarized or authenticated in accordance with the Judiciary Law, according to the case. Such documents when submitted must have an issue date not exceeding six months, except when a different validity date is established in the same document.
4. **REGISTRATION OF RESIDENTS**.  The alien resident must appear at the Subdirectorate for Alien Affairs within thirty days starting from the day after notification of the appropriate regular status was issued, so that information may be entered in the register of residents; otherwise, he or she will incur in an extemporaneous registration of residence and illegal status and must comply with the obligations imposed in the fee chart of immigration services or other standard that regulates it.
5. **FILE ARCHIVED DUE TO LACK OF INTEREST**. The Guatemalan Immigration Institute shall archive files in which the alien ceased to take action for more than six months, always and whenever the Subdirectorate of Alien Affairs has performed the appropriate internal administrative proceedings and notification has been made thereof. Upon archiving the file, the alien will incur in a fine for remaining longer than authorized according to the provisions in the Immigration Code. If the alien wishes to select regular status, he or she must comply with the provisions of the Immigration Code and the present regulation, after having paid the fine.
6. The fee is canceled upon notification of the Resolution granting the Immigration Status requested.


**PERMANENT RESIDENCE FOR ALIENS WHO HAVE BEEN MARRIED FOR A YEAR OR MORE OR ARE IN A DOMESTIC PARTNERSHIP WITH A GUATEMALAN PERSON**
*(Article 78 of Decree No. 44-2016 of the Republic of Guatemala Congress Immigration Code)*
*(Articles 22-24 and 26 of the "Guatemalan Residency Regulation" 4-2019 National Immigration Authority Agreement)*


**REQUIREMENTS**

**Present the file in a BLUE folder, duly paginated for entry without stray markings or alterations.**

1. Original valid passport and full authenticated copy;
2. Certification of validity for passport issued by an Embassy or Consulate established in Guatemala. If there is no Embassy or Consulate in Guatemala, he or she must

DHSFF1137

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

present a birth certificate with apostille or in accordance with Judiciary Law, as appropriate;

3.  Valid, up to date proof of clean criminal and police records issued by the appropriate authority in the country or countries in which he or she has had legal, verifiable residence during the last five years. In the event that the country does not issue any similar document, he or she must present the letter of refusal to issue said documents;

4.  Certificate of immigration activity;

5.  Copy of resolution establishing him or her as a temporary resident, as appropriate;

6.  Marriage certificate or certificate of domestic partnership, issued by the National Register of Persons;

7.  Birth certificate for Guatemalan spouse, issued by the National Register of Persons, with annotation of the corresponding marriage or domestic partnership;

8.  Proof of payment.


**NOTES:**

1.  Certificates of Authentication for documents must comply with the ruling in Art. 55, section b) of the Notary Code.

2.  If documents are submitted in which the alien is known by several names, he or she must attach a Certified Copy of Identification of Person. (*Art. 4, Civil Code*)

3.  **DOCUMENTS ORIGINATING ABROAD**.  Documents originating abroad should be notarized or authenticated in accordance with the Judiciary Law, according to the case. Such documents when submitted must have an issue date not exceeding six months, except when a different validity date is established in the same document.

4.  **REGISTRATION OF RESIDENTS**.  The alien resident must appear at the Subdirectorate for Alien Affairs within thirty days starting from the day after notification of the appropriate regular status was issued, so that the information may be entered in the register of residents; otherwise, he or she will incur in an extemporaneous registration of residence and illegal status and must comply with the obligations imposed in the fee chart of immigration services or other standard that regulates it.

5.  **FILE ARCHIVED DUE TO LACK OF INTEREST**. The Guatemalan Immigration Institute shall archive files in which the alien ceased to take action for more than six months, always and whenever the Subdirectorate of Alien Affairs has performed the appropriate internal administrative proceedings and notification has been made thereof. Upon archiving the file, the alien will incur in a fine for remaining longer than authorized according to the ruling in the Immigration Code. If the alien wishes to select regular status, he or she must comply with the provisions of the Immigration Code and the present regulation, after having paid the fine.

DHSFF1138

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

6.  The fee is canceled upon notification of the Resolution granting the Immigration Status requested.

Please confirm by signature below that our understandings fairly reflect your protection system.

_____

Title:

For the Government of Guatemala

21

DHSFF1139



[GOVERNMENT OF THE REPUBLIC OF
GUATEMALA
MINISTRY OF FOREIGN AFFAIRS]

DEVIMIN 220-2019

**MEMORANDUM**

**TO:**     AMBASSADOR MANUEL ESPINA
            EMBASSY OF GUATEMALA IN THE UNITED STATES OF AMERICA

**CC:**     VIVIANA ARENAS
            ADVISING MINISTER OF THE GUATEMALAN EMBASSY IN THE UNITED STATES OF AMERICA

**FROM:**   AMBASSADOR PABLO GARCÍA SAENZ
            DEPUTY MINISTER OF FOREIGN AFFAIRS        [Signature]
                                                     [Round stamp reading:
                                                      Ministry of Foreign Relations, C.A]
**SUBJECT:** TRANSFER OF QUESTIONS REGARDING ACCESS TO JUST AND COMPLETE PROCESSES IN
            SUPPORT OF THE COOPERATION AGREEMENT CONCERNING THE REVIEW OF PROTECTION
            REQUESTS BETWEEN THE GOVERNMENT OF GUATEMALA AND THE
                    GOVERNMENT OF THE UNITED STATES OF AMERICA

**DATE:**   JULY 26, 2019

---

I am writing to you regarding Memorandum No. 422-N2-2019, whereby a Diplomatic Note from the State Department was sent to the Minister of Foreign Affairs of the Republic of Guatemala, regarding questions about access to just and complete processes in support of the cooperation agreement concerning the review of protection requests between the government of Guatemala and the government of the United States of America.

To that effect, I am attaching a copy of official notice with reference IGM-617-2019/CEMC-js, issued by Mr. Carlos Emilio Morales Cancino, General Director of the Guatemalan Migration Institute, in response to your questions. Please refer this official notice to the State Department.

Sincerely,

2 av. 4-17 zona 10, ciudad de Guatemala • Código Postal 01010 • Telephone (502) 2410-0000

www.minex.gob.gt





[GOVERNMENT OF THE REPUBLIC OF
GUATEMALA
MINISTRY OF THE INTERIOR
GENERAL DIRECTORATE OF MIGRATION]

Guatemala, July 16, 2019
OFFICIAL NOTICE-IGM-617-2019/CEMC-js

Mr. Deputy Minister:

    I am hereby writing to you in regards to memorandum REFERENCE: DEVIMIN 219-2019, whereby which you inform the undersigned that the State Department of the United States of America, sent a series of questions related to access to just and complete processes in support of the cooperation agreement concerning the review of protection requests between the government of Guatemala and the government of the United States of America, reason for which we have attached the competency questions of this institution, so that they can be answered and subsequently transferred to the Ministry of Foreign Affairs to be sent via diplomatic means to the abovementioned State Department.

    Pursuant to the foregoing, I am sending the responses to the abovementioned questions for the uses and purposes therein contained.

Sincerely,

[Signature] _____

[Stamp: Carlos Emilio Morales Cancino
General Director
Guatemalan Migration Institute



[GUATEMALAN MIGRATION INSTITUTE
GUATEMALA, C.A.]

Consists of (24) pages, inclusive

Ambassador
**PABLO GARCIA SAENZ**
Deputy Minister of Foreign Affairs
Ministry of Foreign Affairs
Hand Delivered.

**6ta. Avenida 3-11 zona 4, Ciudad de Guatemala, Telephone: 2411 2411, www.migración.gob.gt**



@migracionguate    www.guatemala.gob.gt

DHSFF1141

PRIVILEGED
ATTORNEY WORK PRODUCT
**DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT**

**Obligations and international regulations**

**• How does Guatemala implement its non-refoulement obligations by virtue of the "Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment," and the "Convention Relating to the Status of Refugees," within its legislative framework?**

In accordance with what is established in Article 46 of Decree 44-2016 of the Migration Code of the Republic of Guatemala Congress, as long as there has been no abandonment or cessation regulated in Articles 17, 19 and 20 of the Status of Refugees Regulations and [Article] 184 of the Migration Code.

In regards to torture, it should be taken into account that the mechanisims and agreements related to the prevention of the same are carried out via the National Office of Torture Prevention, in accordance with Decree 40-2010 of the Republic of Guatemala Congress; in respect to the type of protection that the State grants through the aforementioned office, the mechanisms of protection against torture are the following:

    **1.** Confidentiality of the identity of individuals deprived of their liberty, and of particular individuals who provide information to the Office.

    **2.** That sanctions or measures shall not be enforced against individuals who are part of the Office in compliance of their duties, or against any organization or individual who provides any type of information to the Office, even if the information is true or false, none of these organizations or individuals shall suffer damages of any kind for this reason.

    **3.** The autonomy of the Office in the fulfillment of its plans and economic/financial policies. In addition, the presentation of its budget plan, in accordance with the internal procedures of the Congress of the Republic; and, d) That the Office can independently select its own personnel based on the procedures, requirements and criteria developed in its rules of procedure.

**• Does Guatemala apply mandatory restrictions to such petitions if the applicant is seeking protection against torture?**

Guatemala only applies restrictions that are [included] in the agreement.

**• Does Guatemala apply mandatory restrictions to such petitions if the applicant is seeking protection against persecution beyond the conditions which are identified in the <<Convention Relating to the Status of Refugees>>?**

1

DHSFF1142

~~PRIVILEGED~~
~~ATTORNEY WORK PRODUCT~~
**~~DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT~~**

It is determined, in accordance with the provisions in Article 47 and 184 of the Migration Code. In addition, the provisions in Article 59 and 66, shall be analyzed if deemed applicable.

Likewise, the provisions in migration policies issued by the competent authority shall be analyzed in accordance with Article 114 of the Migration Code.

**• Is Guatemala part of the any other bilateral or multilateral agreements which require the protection of persons against persecution? Have these obligations been incorporated into Guatemalan legislation?**

As part of an agreement, the obligations of the same become part of the legal system.

**• Which Guatemalan laws protect persons from persecution or torture carried out by state and non-state actors?**

Agreements, once ratified, become a part of the internal legal system and are of mandatory compliance.

**• Does Guatemala recognize ayslum petitions based on the persecution of a non-state actor?**

Yes, equality is observed and applied for reasons of race, religion, nationality, country's situation or membership in a particular group or political persecutions.


**Current Capacity**

**• What is the number of asylum/refugee cases filed in the last year? How many cases were completed? How many cases were granted? How many cases were denied?**

There are 262 applications from 2018 and 218 applications for this year of 2019 thus far, as a result of the efective date of the National  Migration Authority Agreement 02-2019, effective on April of 2019, via which CONARE was constituted on May 22, 2019, which is a competent entity that will identify and recommend [matters] for the National Migration Authority to decide on.


**• What is the number of petitions that were abandoned in the last year? Can you identify any reasons given for the abandonment of said petitions?**

There is a record of 32 applications that were abandoned in the last year, individuals who appeared to carry out the application, they went through the personal interview process, however, they did not re-appear for the renewal of their permanent status.

DHSFF1143

PRIVILEGED
ATTORNEY WORK PRODUCT
**DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT**

• **How do you plan to address any current delay of petitions? How much time do you estimate will be required to confront any current delay?**

CONARE is responsible of alleviating any delays related to filed applications. [CONARE] has met on several sessions in order to deliver the cases to the National Migration Authority.

**Available protections under Guatemalan law**

• **What is the difference between "asylum," "refugee status," "citizenship for CA4 individuals" and "temporary residence for CA4 individuals," including the rights/benefits that are granted and the circumstances under which they could be rescinded?**

**1.** Asylum in Guatemala is a figure of political nature, its effects are regulated by the Ministry of Foreign Affairs, there is no knowledge of concrete cases of said applications to this date.

**2.** The effects of the refugee status are those of obtaining a temporary or permanent residence [which] grants access to state agencies. The benefits for refugees are those of non-payment of taxes and access to state agencies.

**3.** Citizenship is a recognition by the Ministry of Foreign Affairs which grants a foreigner the same benefits that a Guatemalan citizen [has], including a personal identification document in the same color of those of Guatemalan citizens.

**4.** Temporary or permanent residency is a regular migratory status, which is granted to an individual who has complied with all of the requirements of the respective regulations, in order to obtain the residency depending on his/her category. The benefits are the identification through the National Demographic Registry; benefits vary in relation to a residency of legal nature for the period authorized by its category in accordance with the Migration Code.

• **How does the Guatemalan law establish confidentiality in the process of refugee status (RSD)?**

A guarantee that the State has to comply with the provisions of Article 181 is established. Confidentiality. Confidentiality of the application, paperwork and personal information of the individual requesting the recognition of refugee status is guaranteed in order to avoid any risks against life, integrity, liberty or any other rights of the applicant.

3

~~PRIVILEGED~~
~~ATTORNEY WORK PRODUCT~~
**~~DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT~~**

**• Are the complementary and temporary forms of protection foreseen in the legislation implemented into practice?**

The State recognizes immigration law as a whole, that is, the entry, residency, transit and departure, temporary shelter and protection, as well as the granting of the benefits of the convention of 1951 in accordance with the migration policies established by the competent entity.

**• What is the process [followed] to obtain permanent residency in Guatemala?**

Conform in accordance with the regulations of the Migration Code in respect to Article 78 regarding permanent residents. Permanent residents are the individuals, who not only comply with other legal requirements, but who want to be domiciled in the country, who are established in the corresponding regulation, and that fall within the following criterion:

a) Have been temporary residents for a period equal to five or more years.

b) Have been married for more than one year or declared a domestic partnership with a Guatemalan citizen.

c) Family members, within legal degrees, of a Guatemalan citizen who has another nationality.

d) Those born in other Central American countries, when they have been temporary residents for a period of one year.

e) Persons with private income or retirees who have been authorized to reside in the country and who have legal permanent incomes originating from abroad.

It is understood that as a special regulation for permanent resident status for persons with private income or retirees, all of the benefits and exemptions that are regulated in the specific regulations for these cases, will be applicable to Guatemalan citizens who have been naturalized in other countries, and who have returned having retired from the government or private entities.

**What are the requirements for permanent residence status?**

See the document annexed to this questionnaire

**What is the process to obtain Guatemalan citizenship or what are the requirements for citizenship?**

This answer will be sent to the competent entity.

**• Can you provide a written summary that explains your current system of granting protection and the procedures used to reach a determination on an individual's case? From the moment an individual**

4

PRIVILEGED
ATTORNEY WORK PRODUCT
DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT

**arrives in Guatemala for the first time, what are the procedural safeguards available to this individual?**

A. (TORTURE) In regards to torture, it should be taken into account that the mechanisims and agreements related to the prevention of the same are carried out via the National Office of Torture Prevention. The National Office of Torture Prevention has the following duties, it shall have the mandate to:

a) Periodically review the treatment and conditions that the individuals deprived of liberty receive in all of the private or public detention centers or areas of confinement, with the purpose of reinforcing their protection against torture and other cruel, inhuman or degrading treatement or punishment, if deemed neccesary.

b) Send recommendations and/or requests to competent authorities with the purpose of improving the treatment and conditions of individuals deprived of liberty, and prevent the torture and other cruel, inhuman or degrading treatment or punishment, taking into consideration the pertinent regulations of International Law of Human Rights.

c) Send recommendations and/or requests to the competent authorities with the purpose of assuring the integrity, dignity and  effective care and rehabilitation of victims of torture and other cruel, inhuman or degrading treatment or punishment, taking into consideration the pertinent regulations of International Law of Human Rights.

e) Report and/or denounce to competent agencies and authorities the probable existence of crimes and other situations that require an investigation.

f) Report to competent authorities, any knowledge that they have on weaknesses in the security and infrastructure system of  detention centers, in order to guarantee the life and integrity of the detainees, workers and visitors, as well as the purpose of safeguarding society in general, and avoid the commission of crimes in those centers.

In regards to the protection that the State provides through the abovementioned office in prevention mechanisms against torture, we can find:

4. Confidentiality of the identity of individuals deprived of  their liberty and of particular individuals who provide information to the Office.

5. The non-enforcement of sanctions or measures against individuals who are part of the Office in compliance of their duties, or against any organization or individual who provides information to the Office, even if the information is true or false, none of these organizations or individuals shall suffer damages of any kind for this reason.

6. The autonomy of the Office in the fullfillment of its plans and economic/financial policies. In addition, the presentation of its budget

5

PRIVILEGED
ATTORNEY WORK PRODUCT
DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT

plan, in accordance with the internal procedures of the Congress of the Republic; and, d) That the Office independently selects its own personnel based on the procedures, requirements and criteria which are developed in its rules of procedure.

IN REGARDS TO ASYLUM **IN ACCORDANCE WITH ARTICLE 17 OF THE NATIONAL MIGRATION AUTHORITY AGREEMENT 02-2019, THE PROCESS IS AS FOLLOWS:** The application for Refugee Status, can be filed personally, in writing or verbally, before a Migration Checkpoint or before the Sub-directorate of Care and Protection of Migrant's Fundamental Rights in the Institute, the process shall be carried out in the following manner:

7. **Regarding the application.** The request shall be carried out:

≠ Before the Sub-directorate of Migration Control at the Checkpoints of the Institute, the delegate will receive the initial application in a verbal or written manner, [and] he/she will immediately transfer the application in a written manner to the support personnel from CONARE, or;

≠ before the Sub-directorate of Care and Protection of Migrant's Basic Rights in the Institute, the initial application will be received in a verbal or written manner, and will be transferred in the written form to CONARE's support personnel.

After the application has been received the support personnel in CONARE shall carry out the following:

a) Guide the Refugee Status applicant so that he/she can obtain information about the regulatory procedure in order to obtain the abovementioned status.

b) Proceed to receive the formal application, [the applicant] shall complete the form that CONARE provides, which should have sequential numbering, in which the applicant shall explain the reasons for the application, and the departure of the country of origin. The applicant can add personal identification documents that he/she has to the application, and any other evidence that he/she might consider pertinent to support the application.

c) Notify the Sub-directorate of Care and Protection of Migrant's Basic Rights, of the Temporary Residency Status.

DHSFF1147

PRIVILEGED
ATTORNEY WORK PRODUCT
**DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT**

d) Notify the Migration Sub-directorate of the Refugee Status applications of children and adolescents, for the granting of temporary residency.

e) Set up the day and the time for the interview, which shall not exceed 15 days, counted from the date on which the formal application was filed.

If the applicant does not appear at the interview in person at the scheduled date, and having elapsed the thirty days of temporary residence status, the competent sub-directorates will be notified for all legal and pertinent purposes.

### 8. Personal interview:

On the day and at the time scheduled for the interview, a specific area will be available to conduct the interview with the applicants to determine [whether or not they are eligible for] Refugee Status. This area will be duly equipped with video and audio [recording devices] to document the proceedings conducted. Furthermore, a psychologist must be present at each interview in order to prepare a psychological report as a result of the interview taken, and if necessary, there will be a translator or interpreter, who will sign the document resulting from the interview conducted. While conducting the interview, [the interviewer] must comply with the following [regulatory] components:

8.1 The applicants must be seen individually by the CONARE support personnel, who will [operate by using] a specialized, comprehensive and individualized approach.

8.2 Children and adolescents who are unaccompanied or separated from their families will be attended to in specialized areas by qualified personnel, who will see to their specific needs for protection, in accordance with the current national legislation, [working] with the Attorney General's office to ensure specialized attention.

8.3 The interview must be conducted in the Spanish language. If the applicant or refugee does not speak it, he or she will be assisted by a translator or interpreter.

With regard to family groups, the interviews must be conducted individually within a time period not to exceed thirty days.

### 9. Investigation of the case and the issuance of a recommendation, opinion or suggestion:

Upon receiving the formal application for Refugee Status, the CONARE support personnel will initiate the investigation of the case, using the appropriate methods to bring the case file to completion.

Once the investigation of the case has concluded, CONARE will familiarize itself with the case file and analyze it as quickly as possible, so that subsequently, within a period not to

DHSFF1148

PRIVILEGED
ATTORNEY WORK PRODUCT
**DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT**

exceed 30 days, CONARE can issue a recommendation, opinion or suggestion to the AMN in order to consider granting or denying Refugee Status.

**10. Resolution issued by the National Migration Authority and notification regarding the same:**

Having received the case file with the recommendations, opinions and suggestions issued by CONARE, in accordance with Article 177 of the Migration Code, the AMN will proceed to issue a resolution regarding [the application for] Refugee Status, granting or denying the same.

In the case of a favorable resolution, the applicant must be notified by CONARE. The Refugee must continue with the corresponding legal procedure with the Institute.

R.2. Regarding the [categories of] protection that the Guatemalan Government can provide, these include non-refoulement, as well as [those based on] the principles encompassed by the 1951 convention, such as the confidentiality of all procedures.

**Intake process**

≠   What is the intake process for individuals seeking protection? Who will direct the intake process? How does an applicant report to [the corresponding authority] to present a claim?

In accordance with the Migration Code and Refugee Status Regulations, as well as in accordance with the migratory policies established by a competent authority.  **In connection with this agreement, these procedures must be established, being that this is not a case foreseen in any existing procedures.**

Actions taken in regards to refugees must be in accordance with the convention and the corresponding regulation, in the following manner:

**The General Directorate of Migration will direct the intake process**

The application can be submitted:

≠   To the Institute's Sub-directorate of Migratory Control, at the Institute's Migratory Control Checkpoints, and to the Institute's Sub-directorate of Assistance and Protection of Fundamental Migrant Rights.

Once the application is submitted, depending on the situation, it may be initial or formal, and the procedure can continue in accordance with the corresponding regulations.

An individual can appear at any border patrol checkpoint, and must then formally report to this competent entity.

8

PRIVILEGED
~~ATTORNEY WORK PRODUCT~~
**~~DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT~~**

**In connection with this agreement, these must be established, being that this is not a case foreseen in any existing procedures.**

≠   How are the individuals seeking protection within the process informed?

Pursuant to the provisions of article 17 of the refugee status regulations.

**In connection with this agreement, these procedures must be established, being that this is not a case foreseen in any existing procedures.**

≠   Are there specific proceedings in the current system for interviewing members of vulnerable populations (for example: family units, children, disabled individuals, elderly individuals, trauma victims) that would guarantee confidentiality?

Yes, confidentiality is guaranteed pursuant to article 181, as well as the norms contained in the manual and guidelines regarding proceedings and criteria for guaranteeing refugee status.

**In connection with this agreement, these procedures must be established, being that this is not a case foreseen in any existing procedures.**

≠   Does Guatemala provide interpretation services for individuals seeking refugee status?

Pursuant to the regulations of article 17 section 2 of the refugee status regulation, sub-section 2.3, and institutional resources.

≠   What happens if the individuals applying for asylum are not available or cannot obtain identification documents at their respective embassies?

Procedures are conducted pursuant to article 65 of the Migration Code. However, **in connection with this agreement, these procedures must be established, being that this is not a case foreseen in any existing procedures.**

**Determination process**

≠   Are there written SOPs [Standard Operating Procedures] that regulate the processing of petitions for protection?

**In connection with this agreement, these procedures must be established, being that this is not a case foreseen in any existing procedures.**

9

PRIVILEGED
ATTORNEY WORK PRODUCT
**DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT**

≠   Does Guatemala have any documentation that explains its procedures for the processing of protection cases?

Answer: The Migration Code, decree 44-2016, as well as Agreement 02-2019, established by the National Migration Authority. (Refugee [status]); Regarding the prevention of torture, there is agreement 40-2010 of the Congress of the Republic of Guatemala.

≠   Does Guatemala help people understand the proceedings for requesting protection?

Answer: Pursuant to Article 17 of the agreement established by the national migration authority, 02-2019, the applicants [can attend] an orientation session to [help them] understand their rights.

≠   Does Guatemala have a deadline for submitting applications for protection? If so, what are the rules and exceptions?

The time period for submitting [application] only [begins] after the formal application is filed. **In connection with this agreement, these procedures must be established, being that this is not a case foreseen in any existing procedures.**

≠   What is the current interview process for individuals seeking protection in Guatemala?

[This] is conducted pursuant to the regulations in article 17 of the corresponding regulation in section 2. **In connection with this agreement, these procedures must be established, being that this is not a case foreseen in any existing procedures.**

≠   Who takes on the role of making the decisions at the initial stage in cases [involving requests for] protection?

Answer: Pursuant to article 177 of the Code of Migration, the National Commission for Refugees (CONARE) is the entity that must issue the recommendations, suggestions and opinions to [assist] the NATIONAL MIGRATION AUTHORTY [with] making the final decision to grant refugee status; (refugee)

Answer: Regarding the prevention of torture, the National Office for the Prevention of Torture and other Cruel, Inhumane or Degrading Treatment or Penalties, hereinafter referred to as the National Office of Prevention, which includes a consultation department.

≠   Does each applicant have the right to identical protections and procedures?

10

DHSFF1151

PRIVILEGED
ATTORNEY WORK PRODUCT
**DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT**

Answer: No, different [categories of] protection can be granted and procedures can be conducted one a case-by-case basis, pursuant to article 71 of the Code of Migration.

≠   Do the applicants have access to attorneys, legal counsel, or representatives from NGOs during the proceedings involving the determination of [the status] of their applications?

The applications are very personal and [answering this question] would violate the principle of confidentiality. However, if they request [the above, this request] can be evaluated.

≠   Are the applicants provided with a list of organizations that provide legal services?

No.

≠   Do attorneys or NGO representative have access to their clients' files and other documentation relevant to determining [the status] of the application?

No, due to the confidentiality principle.

≠   Does Guatemala positively assess applications for protection/affirmations regarding fear of returning [to one's country], or does the individual have to express a fear before certain measures are taken?

[The individual] must express it [to begin with] and submit to the corresponding evaluation.

≠   How timely are the decisions to grant or deny the aforementioned applications for protection?

Being that CONARE started [handling] cases in the month of May of 2019, they are currently being evaluated.

≠   How are applicants notified of the decision regarding their application?

In writing and in person.

≠   Is there an appeal process for applications for protection that are denied? If there is an

11

PRIVILEGED
ATTORNEY WORK PRODUCT
**DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT**

appeal process, does this pause any removal/deportation proceedings that may be in progress while the appeal process is conducted?

Yes, there is an option to appeal, pursuant to article 182 of the Code of Migration.

≠   Are all the applications for protection treated equally, independently of where the individuals came from before entering Guatemala, or who submitted the application for protection?

Yes, due to the principle of equality.

≠   What is the location of the authorities responsible for receiving and evaluating applications for protection?

[They can be located] at any border patrol checkpoint [used] for intake. In the capital, [they are located] at the offices of CONARE and the National Migration Authority.

≠   Does Guatemalan law grant asylum/refugee status to an applicant's close relatives (for example, a spouse or children)?

Yes, pending evaluation by a competent authority, pursuant to article 26 of the corresponding regulation.

≠   Is there an intake process for abandoned applications?

Yes, pursuant to articles 17, 19 and 20 of the corresponding regulation.

**Access to protection**

≠   Are people who are seeking protection from [having to return to their home country] permitted to (1) work, (1) move around freely within Guatemala and (3) obtain travel authorization (for example, a refugee travel document) to leave and return? Are these authorization documents valid until a definitive decision is made?

Yes, pursuant to article 104 of the Migration Code.

≠   Are people seeking protection, or those who have been granted protection, provided with identification documents?

In the case of [the category of] protection being refugee [status] – yes, pursuant to articles 101 and 104 of the Migration Code.

12

PRIVILEGED
ATTORNEY WORK PRODUCT
**DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT**

≠   Does Guatemalan law establish a path to permanent residence or citizenship for people with refugee status?

Yes, pursuant to article 84 of the Code of Migration

**In addition to the aforementioned, one should also consider the dispositions of the migratory policies issued by the competent Authority for Guatemala.**

**ATTACHMENT**

**PERMANENT RESIDENCE AS A PERSON WITH PRIVATE INCOME OR RETIREE**
*(Articles 78 of Decree No. 44-2017 issued by the Congress of the Republic of Guatemala [regarding the] Migration Code)*
*(Articles 22-24 and 29-39 of Migratory Authority Agreement [No.] 4-2019, "Regulations regarding Residency in Guatemala")*

**REQUIREMENTS**

**Present your file in a GREEN folder (INVESTORS)/PURPLE [folder] (RETIREES), duly paginated, with no deletions or alterations.**

1. Original, current passport with a complete notarized copy;
2. Certification of passport validity and currency, issued by your country's Embassy or Consulate, accredited in Guatemala. If [your country does not have] an Embassy or Consulate, you must present a certification of birth with an apostille, pursuant to the Law of the Judicial Branch, as applicable;
3. Valid, up to date proof of clean criminal and police records issued by the appropriate authority in the country or countries in which he or she has had legal, verifiable residence during the last five years.  In the event that the country does not issue any similar document, he or she must present the letter of refusal to issue said documents;
4. Certification of migratory movement;

13

DHSFF1154

PRIVILEGED
ATTORNEY WORK PRODUCT
**DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT**

5.  Copy of a resolution accrediting [your status] as a temporary resident, when applicable;
6.  Proof of income:
    a.  Person with private income: Minimum individual monthly income of one thousand two hundred fifty United States dollars; and for each dependent, an additional sum of three hundred United States dollars.
    b.  Retiree: Minimum individual monthly income of one thousand two hundred fifty United States dollars; and for each dependent, an additional sum of three hundred United States dollars.

7.  Proof of payment.

If the applicant for permanent residence is a minor, or has been declared legally incompetent, both parents, [assuming] they have custody [of the minor], or whoever is authorized to exercise the same, must attach the following documents:

a.  Valid and current certification of the minor's birth. In the case of individuals declared legally incompetent, the documents accrediting said condition, as well as the corresponding guardianship, must be attached;
b.  Record of [application to claim] the minor or legally incapacitated individual [as a dependent], with legalized signatures of both parents, or express legal authorization. When the minor or incapacitated individual is accompanied by one of the parents or another person, this [person] must accredit his or her guardianship;
c.  Complete and legalized copy of identification document or passport, as the case may be, of the guardian or the individual lawfully granted power of attorney.

**NOTES:**

**1.**  The document legalization certificates must comply with the provisions of Art. 55 section b) of the Notary Code.

**2.**  If there are documents in which the foreigner is known by multiple names, you must attach an Official Record of the Public Instrument [certifying] an Individual's Identity. *(Art. 4 of the Civil Code)*

**3.**  <u>**DOCUMENTS ORIGINATING ABROAD**</u>.  Documents originating abroad should be apostilled or authenticated in accordance with the Judiciary Law, according to the case. Such documents when

14

~~PRIVILEGED~~
~~ATTORNEY WORK PRODUCT~~
~~DELIBERATIVE PROCESS/PREDECISIONAL/DRAFT~~

submitted must have an issue date not exceeding six months, except when a different validity date is established in the same document.

**4. <u>REGISTRATION OF RESIDENTS</u>**.  The alien resident must appear at the Subdirectorate for Alien Affairs within thirty days starting from the day after notification of the appropriate regular status was issued so that information may be entered in the register of residents; otherwise, he or she will incur in an extemporaneous registration of residence and illegal status and must comply with the obligations imposed in the fee chart of immigration services or other standard that regulates it.

**5.   <u>FILE ARCHIVED DUE TO LACK OF INTEREST</u>**.  The Guatemalan Immigration Institute shall archive files in which the alien ceased to take action for more than six months, always and whenever the Subdirectorate of Alien Affairs has performed the appropriate internal administrative proceedings and notification has been made thereof.  Upon archiving the file, the alien will incur a fine for remaining longer than authorized according to what is established in the Immigration Code. If the alien wishes to select regular status, he or she must comply with the provisions of the Immigration Code and the present regulation, after having paid the corresponding fine.

**6.**   In the event that the amount received is in currency other than the U.S. dollar, a document must be attached that establishes the conversion to this currency.

**7.**   The fee is canceled upon notification of the Resolution granting the Immigration Status requested.

**PERMANENT RESIDENCE FOR THOSE WHO WERE BORN IN OTHER CENTRAL AMERICAN COUNTRIES WHEN THEY HAVE BEEN TEMPORARY RESIDENTS FOR A ONE YEAR PERIOD**

*(Article 78 of Decree No. 44-2016 of the Republic of Guatemala Congress Immigration Code)*
*(Articles 22-24 and 28 of the "Guatemalan Residency Regulation" 4-2019 National Immigration Authority Agreement)*

**REQUIREMENTS**

15

DHSFF1156

~~PRIVILEGED~~
~~ATTORNEY WORK PRODUCT~~
~~**DELIBERATIVE PROCESS/PREDECISIONAL DRAFT**~~

**Present the file in a LIGHT BLUE folder, duly paginated for entry without stray markings or alterations.**

8.  Original valid passport and full authenticated copy;
9.  Certification of validity for passport issued by an Embassy or Consulate established in Guatemala. If there is no Embassy or Consulate in Guatemala, he or she must present a birth certificate with apostille or in accordance with Judiciary Law, as appropriate;
10. Valid, up to date proof of clean criminal and police records issued by the appropriate authority in the country or countries in which he or she has had legal, verifiable residence during the last five years.  In the event that the country does not issue any similar document, he or she must present the letter of refusal to issue said documents;
11. Certificate of immigration activity;
12. Alien's valid, up to date birth certificate which establishes that he or she was born in a Central American country;
13. Notarized sworn statement regarding the activity he or she will pursue in the country;
14. Certification of the resolution for temporary residence for a minimum period of one year.
15. Proof of payment.

If the person requesting permanent residence is a minor or has been declared incapacitated, both parents in exercise of their parental authority or the person who exercises same must attach the following documents:

d.  Valid, up to date birth certificate for the minor.  In the case of those who are incapacitated, documents establishing said condition and the corresponding representation must be attached.
e.  Entry request brief for minors or incapacitated person, with authenticated signatures by both parents or express permission in accordance with the law. When the minor or incapacitated person is accompanied by one of the parents or by another person, he or she must establish the representation that he or she exercises;
f.  Full, authenticated copy of identification document or passport, as appropriate, of the person who exercises parental authority or duly established legal representation.

**NOTES:**

16

PRIVILEGED
ATTORNEY WORK PRODUCT
**DELIBERATIVE PROCESS/PREDECISIONAL DRAFT**

8.      Certificates of Authentication for documents must comply with the provisions in Art. 55, section b) of the Notary Code.

9.      If documents are submitted in which the alien is known by several names, he or she must attach a Certified Copy of Identification of Person. (*Art. 4, Civil Code*)

10.     **DOCUMENTS ORIGINATING ABROAD**.  Documents originating abroad should be notarized or authenticated in accordance with the Judiciary Law, according to the case.  Such documents when submitted must have an issue date not exceeding six months, except when a different validity date is established in the same document.

11.     **REGISTRATION OF RESIDENTS**.  The alien resident must appear at the Subdirectorate for Alien Affairs within thirty days starting from the day after notification of the appropriate regular status was issued so that information may be entered in the register of residents; otherwise, he or she will incur in an extemporaneous registration of residence and illegal status and must comply with the obligations imposed in the fee chart of immigration services or other standard that regulates it.

12.     **OBLIGATION TO PRESENT WORK PERMIT.**  Every alien who intends to perform remunerative activity for an organization within Guatemalan territory must present a work permit issued by the Ministry of Labor and Social Security at the Guatemalan Immigration Institution within no more than three months once he or she has been notified of the decision regarding his or her respective residence status. Non-compliance with this requirement will constitute grounds for revoking the residence granted.

13.     **FILE ARCHIVED DUE TO LACK OF INTEREST**.  The Guatemalan Immigration Institute shall archive files in which the alien ceased to take action for more than six month, always and whenever the Subdirectorate of Alien Affairs has performed the appropriate internal administrative proceedings and notification has been made thereof.  Upon archiving the file, the alien will incur in a fine for remaining longer than authorized according to the provisions in the Immigration Code. If the alien wishes to select regular status, he or she must comply with the rulings of the Immigration Code and the present regulation, after having paid for the fine.

14.     The fee is canceled upon notification of the Resolution granting the Immigration Status requested.

17

DHSFF1158

PRIVILEGED
ATTORNEY WORK PRODUCT
DELIBERATIVE PROCESS/PREDECISIONAL DRAFT

**PERMANENT RESIDENCE FOR ALIENS WHO HAVE BEEN TEMPORARY RESIDENTS FOR A PERIOD EQUAL OR GREATER TO FIVE YEARS**
*(Article 78 of Decree No. 44-2016 of the Republic of Guatemala Congress Immigration Code)*
*(Articles 22-25 of the "Guatemalan Residency Regulation" 4-2019 National Immigration Authority Agreement)*

**REQUIREMENTS**

**Present the file in an ORANGE folder, duly paginated for entry without stray markings or alterations.**

16. Original valid passport and full authenticated copy;
17. Certification of validity for passport issued by an Embassy or Consulate established in Guatemala. If there is no Embassy or Consulate in Guatemala, he or she must present a birth certificate with apostille or in accordance with Judiciary Law, as appropriate;
18. Valid, up to date proof of clean criminal and police records issued by the appropriate authority in the country or countries in which he or she has had legal, verifiable residence during the last five years. In the event that the country does not issue any similar document, he or she must present the letter of refusal to issue said documents;
19. Certificate of immigration activity;
20. Alien's valid, up to date birth certificate, which establishes that he or she was born in a Central American country;
21. Notarized sworn statement regarding the activity he or she will pursue in the country;
22. Certification of the resolution for temporary residence for a minimum period of one year.
23. Proof of payment.

If the person requesting permanent residence is a minor or has been declared incapacitated, both parents in exercise of their parental authority or the person who exercises same must attach the following documents:

g. Valid, up to date birth certificate for the minor. In the case of those who are incapacitated, documents establishing said condition and the corresponding representation must be attached.
h. Entry request brief for minors or incapacitated person, with authenticated signatures by both parents or express permission in accordance with the law. When the minor or incapacitated person is accompanied by one of the parents or by another person, he or she must establish the representation that he or she exercises;

18

DHSFF1159

PRIVILEGED
ATTORNEY WORK PRODUCT
**DELIBERATIVE PROCESS/PREDECISIONAL DRAFT**

i.   Full, authenticated copy of identification document or passport, as appropriate, of the person who exercises parental authority or duly established legal representation.

**NOTES:**

15.   Certificates of Authentication for documents must comply with the ruling in Art. 55, letter b) of the Notary Code.

16.   If documents are submitted in which the alien is known by several names, he or she must attach a Certified Copy of Idntification of Person. (*Art. 4, Civil Code*)

17.   **DOCUMENTS ORIGINATING ABROAD**.  Documents originating abroad should be notarized or authenticated in accordance with the Judiciary Law, according to the case. Such documents when submitted must have an issue date not exceeding six months, except when a different validity date is established in the same document.

18.   **REGISTRATION OF RESIDENTS**.   The alien resident must appear at the Subdirectorate for Alien Affairs within thirty days starting from the day after notification of the appropriate regular status was issued, so that the information may be entered in the register of residents; otherwise, he or she will incur in an extemporaneous registration of residence and illegal status and must comply with the obligations imposed in the fee chart of immigration services or other standard that regulates it.

19.   **OBLIGATION TO PRESENT WORK PERMIT.**  Every alien who intends to perform remunerative activity for an organization within Guatemalan territory must present a work permit issued by the Ministry of Labor and Social Security at the Guatemalan Immigration Institution within no more than three months once he or she has been notified of the decision regarding his or her respective residence status. Non-compliance with this requirement will constitute grounds for revoking the residence granted.

20.   **FILE ARCHIVED DUE TO LACK OF INTEREST**. The Guatemalan Immigration Institute shall archive files in which the alien ceased to take action for more than six months, always and whenever the Subdirectorate of Alien Affairs has performed the appropriate internal administrative

DHSFF1160

PRIVILEGED

ATTORNEY WORK PRODUCT

**DELIBERATIVE PROCESS/PREDECISIONAL DRAFT**

proceedings and notification has been made thereof. Upon archiving the file, the alien will incur in a fine for remaining longer than authorized according to the provisions in the Immigration Code. If the alien wishes to select regular status, he or she must comply with the provisions of the Immigration Code and the present regulation, after having paid the fine.

**21.** The fee is canceled upon notification of the Resolution granting the Immigration Status requested.

## PERMANENT RESIDENCE BASED ON FAMILY RELATIONSHIP, WITHIN LEGAL TERMS, WITH A GUATEMALAN
*(Article 78 of Decree No. 44-2016 of the Republic of Guatemala Congress Immigration Code)*
*(Articles 22-24 and 27 of the "Guatemalan Residency Regulation" 4-2019 National Immigration Authority Agreement )*

## REQUIREMENTS
**Present the file in a YELLOW folder, duly paginated for entry without stray markings or alterations.**

24. Original valid passport and full authenticated copy;
25. Certification of validity for passport issued by an Embassy or Consulate established in Guatemala. If there is no Embassy or Consulate in Guatemala, he or she must present a birth certificate with apostille or in accordance with Judiciary Law, as appropriate;
26. Valid, up to date proof of clean criminal and police records issued by the appropriate authority in the country or countries in which he or she has had legal, verifiable residence during the last five years. In the event that the country does not issue any similar document, he or she must present the letter of refusal to issue said documents;
27. Certificate of immigration activity;
28. Copy of resolution establishing him or her as a temporary resident, as appropriate;
29. Birth certificate(s) for family members of person requesting permanent residence that proves his or her ties with the Guatemalan person;
30. Alien's birth certificate.
31. Proof of payment.

DHSFF1161

PRIVILEGED
ATTORNEY WORK PRODUCT
**DELIBERATIVE PROCESS/PREDECISIONAL DRAFT**

If the person requesting permanent residence is a minor or has been declared incapacitated, both parents in exercise of their parental authority or the person who exercises same must attach the following documents:

> j.      Valid, up to date birth certificate for the minor.  In the case of those who are incapacitated, documents establishing said condition and the corresponding representation must be attached.
>
> k.      Entry request brief for minors or incapacitated person, with authenticated signatures by both parents or express permission in accordance with the law. When the minor or incapacitated person is accompanied by one of the parents or by another person, he or she must establish the representation that he or she exercises;
>
> l.      Full, authenticated copy of identification document or passport, as appropriate, of the person who exercises parental authority or duly established legal representation.

**NOTES:**

**22.**   Certificates of Authentication for documents must comply with the ruling in Art. 55, letter b) of the Notary Code.

**23.**   If documents are submitted in which the alien is known by several names, he or she must attach a Certified Copy of Identification of Person. (*Art. 4, Civil Code*)

**24.**   **DOCUMENTS ORIGINATING ABROAD**. Documents originating abroad should be notarized or authenticated in accordance with the Judiciary Law, according to the case. Such documents when submitted must have an issue date not exceeding six months, except when a different validity date is established in the same document.

**25.**   **REGISTRATION OF RESIDENTS**.   The alien resident must appear at the Subdirectorate for Alien Affairs within thirty days starting from the day after notification of the appropriate regular status was issued, so that information may be entered in the register of residents; otherwise, he or she will incur in an extemporaneous registration of residence and illegal status and must comply with the obligations imposed in the fee chart of immigration services or other standard that regulates it.

21

DHSFF1162

PRIVILEGED
ATTORNEY WORK PRODUCT
**DELIBERATIVE PROCESS/PREDECISIONAL DRAFT**

26.    **FILE ARCHIVED DUE TO LACK OF INTEREST**. The Guatemalan Immigration Institute shall archive files in which the alien ceased to take action for more than six months, always and whenever the Subdirectorate of Alien Affairs has performed the appropriate internal administrative proceedings and notification has been made thereof. Upon archiving the file, the alien will incur in a fine for remaining longer than authorized according to the provisions in the Immigration Code. If the alien wishes to select regular status, he or she must comply with the provisions of the Immigration Code and the present regulation, after having paid the fine.

27.    The fee is canceled upon notification of the Resolution granting the Immigration Status requested.

**PERMANENT RESIDENCE FOR ALIENS WHO HAVE BEEN MARRIED FOR A YEAR OR MORE OR ARE IN A DOMESTIC PARTNERSHIP WITH A GUATEMALAN PERSON**
*(Article 78 of Decree No. 44-2016 of the Republic of Guatemala Congress Immigration Code)*
*(Articles 22-24 and 26 of the "Guatemalan Residency Regulation" 4-2019 National Immigration Authority Agreement)*

**REQUIREMENTS**

**Present the file in a BLUE folder, duly paginated for entry without stray markings or alterations.**

32.    Original valid passport and full authenticated copy;
33.    Certification of validity for passport issued by an Embassy or Consulate established in Guatemala. If there is no Embassy or Consulate in Guatemala, he or she must present a birth certificate with apostille or in accordance with Judiciary Law, as appropriate;
34.    Valid, up to date proof of clean criminal and police records issued by the appropriate authority in the country or countries in which he or she has had legal, verifiable residence during the last five years. In the event that the country does not issue any similar document, he or she must present the letter of refusal to issue said documents;
35.    Certificate of immigration activity;
36.    Copy of resolution establishing him or her as a temporary resident, as appropriate;
37.    Marriage certificate or certificate of domestic partnership, issued by the National Register of Persons;

22

PRIVILEGED
ATTORNEY WORK PRODUCT
**DELIBERATIVE PROCESS/PREDECISIONAL DRAFT**

38. Birth certificate for Guatemalan spouse, issued by the National Register of Persons, with annotation of the corresponding marriage or domestic partnership.
39. Proof of payment.


**NOTES:**


**28.** Certificates of Authentication for documents must comply with the ruling in Art. 55, section b) of the Notary Code.

**29.** If documents are submitted in which the alien is known by several names, he or she must attach a Certified Copy of Identification of Person. (*Art. 4, Civil Code*)

**30.** **DOCUMENTS ORIGINATING ABROAD**.  Documents originating abroad should be notarized or authenticated in accordance with the Judiciary Law, according to the case. Such documents when submitted must have an issue date not exceeding six months, except when a different validity date is established in the same document.

**31.** **REGISTRATION OF RESIDENTS**.   The alien resident must appear at the Subdirectorate for Alien Affairs within thirty days starting from the day after notification of the appropriate regular status was issued, so that the information may be entered in the register of residents; otherwise, he or she will incur in an extemporaneous registration of residence and illegal status and must comply with the obligations imposed in the fee chart of immigration services or other standard that regulates it.

**32.** **FILE ARCHIVED DUE TO LACK OF INTEREST**. The Guatemalan Immigration Institute shall archive files in which the alien ceased to take action for more than six months, always and whenever the Subdirectorate of Alien Affairs has performed the appropriate internal administrative proceedings and notification has been made thereof. Upon archiving the file, the alien will incur in a fine for remaining longer than authorized according to the ruling in the Immigration Code.  If the alien wishes to select regular status, he or she must comply with the provisions of the Immigration Code and the present regulation, after having paid the fine.

**33.** The fee is canceled upon notification of the Resolution granting the Immigration Status requested.

DHSFF1164

SENSITIVE BUT UNCLASSIFIED
PRIVILEGED & CONFIDENTIAL

## Questions for Post about Guatemala's Asylum System

**Eligibility to Apply for Asylum:**
- ≠ Where can asylum seekers apply for relief (e.g. ports of entry)?
- ≠ Is there a deadline or fee to apply?
- ≠ Are asylum seekers protected from return while their application is pending?

**Access to Information/Assistance:**
- ≠ What kind of information does Guatemala provide to asylum seekers regarding the process to apply for asylum or equivalent protection?
- ≠ Are asylum seekers permitted access to an interpreter (if necessary), other explanatory assistance, and/or counsel during the application process?
- ≠ Please describe any accommodations provided for unaccompanied children or persons with disabilities.

**Refugee Status Determination Procedures:**
- ≠ Who bears the burden of proof, and what is the relevant evidentiary standard?
- ≠ Are there any limitations on the types of evidence that the asylum seeker can introduce?
- ≠ Does Guatemalan law incorporate the definition of "refugee" from Article 1 of the Refugee Convention?
- ≠ Does Guatemala exclude asylum seekers from protection on any basis other than those provided for in Articles 1 and 33(2) of the Refugee Convention?
- ≠ Does Guatemalan law protect individuals from return to torture? If so, does Guatemala law incorporate the standard from Article 3 of the Convention Against Torture?
- ≠ Who is responsible for making the final determination about asylum?

**Appeal Rights:**
- ≠ If a claim is denied, is the applicant informed of the grounds of the decision in writing?
- ≠ Is there a mechanism to appeal asylum determinations?

**Nature of Protection Granted:**
- ≠ What rights/benefits are provided to foreign nationals who are granted asylum or equivalent protection under Guatemalan law?

**Capacity of ANE and CONARE:**
- ≠ How many asylum claims does Guatemala currently adjudicate per year?
- ≠ With appropriate assistance, how many asylum claims could Guatemala reasonably be expected to adjudicate per year?
- ≠ Do asylum decision-makers receive training, including about non-refoulement obligations, and are there safeguards against corruption?

**UNHCR's Views:**
- ≠ Why has UNHCR assessed that Guatemala's Migration Code does not provide sufficient safeguards against refoulement?

DHSFF1165

| | |
|---|---|
| **From:** | Sinclair-Smith, Suzanne |
| **To:** | Teichman, Sabrina |
| **Cc:** | Boyd, Valerie; McCament, James; Wright, Charles E; Plumer, Morgan; Salcedo, Viviana; Cloe, David; Mizelle, Chad; Kelliher, Brian; Mazzochi, Sarah; Baroukh, Nader |
| **Subject:** | RE: Question: Guatemala Asylum |
| **Date:** | Thursday, July 25, 2019 11:49:12 AM |

Hi Sabrina,

I just spoke with Rebeca Cenalmor-Rejas, head of the Guatemala office of UNHCR. She said the majority of the denial recommendations were due to CONARE's finding that applicants had other legal options to remain in Guatemala, namely, the could avail themselves of lawful presence because they are from CA-4 countries. However, she pointed out that the process is very costly, and persons lawfully present in Guatemala solely due to their CA-4 nationality are not protected against refoulement. Rebeca mentioned that one-year temporary residence permits cost $200, five-year permits cost $500, and permanent residence permits cost $1000. These administrative fees do not include the cost to applicants to obtain documents and legal assistance. These costs make such CA-4-based residence beyond the means of most protection applicants.

Rebeca said that two or three cases were recommended for denial due to lack of credibility, but she questions the basis for this. She noted that in some cases, the Oficina de Relaciones Migratorias Internacionales (ORMI), which handles asylum adjudications, recommended approving cases, while CONARE subsequently recommended denying those cases based on lack of credibility. Also, despite CONARE's recent recommendations on asylum cases, the Autoridad Migratoria Nacional (AMN) has not issued final decisions.

I hope this information is useful to you,

Suzanne

**Suzanne Sinclair-Smith**
**USCIS Field Office Director, Guatemala and Belize**
**Tel:** ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Central Time Zone**

---

**From:** Teichman, Sabrina ▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Thursday, July 25, 2019 8:12 AM
**To:** Sinclair-Smith, Suzanne ▮▮▮▮▮▮▮▮▮▮
**Cc:** Boyd, Valerie ▮▮▮▮▮▮▮▮▮▮; McCament, James ▮▮▮▮▮▮▮▮▮▮▮▮▮;
Wright, Charles E ▮▮▮▮▮▮▮▮▮▮; Plumer, Morgan
▮▮▮▮▮▮▮▮▮▮▮▮; Salcedo, Viviana ▮▮▮▮▮▮▮▮▮▮▮▮; Cloe, David
▮▮▮▮▮▮▮▮▮▮; Mizelle, Chad ▮▮▮▮▮▮▮▮▮▮▮; Kelliher, Brian
▮▮▮▮▮▮▮▮▮▮; Mazzochi, Sarah ▮▮▮▮▮▮▮▮▮▮; Baroukh, Nader
▮▮▮▮▮▮▮▮▮▮

DHSFF1166

**Subject:** RE: Question: Guatemala Asylum

Hi Suzanne – Would be helpful if we could get an update this morning on the cases denied – specifically why they were denied (or rejected according to UNHCR). Thank you!

Sabrina H. Teichman
Office: ███████████
Mobile: ███████████

**From:** Sinclair-Smith, Suzanne ██████████████████████████
**Sent:** Tuesday, July 16, 2019 3:26 PM
**To:** Teichman, Sabrina ████████████████
**Cc:** Boyd, Valerie ████████████████; McCament, James ███████████████████████;
Wright, Charles E ████████████████████; Plumer, Morgan
████████████████████; Salcedo, Viviana ██████████████████; Cloe, David
████████████████; Mizelle, Chad █████████████████; Kelliher, Brian
████████████████; Mazzochi, Sarah █████████████████; Baroukh, Nader
████████████████
**Subject:** RE: Question: Guatemala Asylum

Sabrina,

Here's a correction to the information UNHCR provided this morning:

On 6/26/19, CONARE recommended approving five cases, denying two, and leaving two pending for the following meeting.  At the meeting on 7/11/19, CONARE recommended denying five, approving one, and leaving one pending for additional information.  When the UNHCR wrote "reject" a case, they meant "deny" it.

Regards,
Suzanne

**From:** Sinclair-Smith, Suzanne
**Sent:** Tuesday, July 16, 2019 8:55 AM
**To:** Teichman, Sabrina ████████████████
**Cc:** Boyd, Valerie ████████████████; McCament, James ███████████████████████;
Wright, Charles E ████████████████████; Plumer, Morgan
████████████████████; Salcedo, Viviana ██████████████████; Cloe, David
████████████████; Mizelle, Chad █████████████████; Kelliher, Brian
████████████████; Mazzochi, Sarah ████████████████; 'Baroukh, Nader'
████████████████
**Subject:** RE: Question: Guatemala Asylum

Sabrina,

Here's the update from UNHCR regarding the asylum backlog in Guatemala:

CONARE met on June 26th and July 11th.

- On June 26th: 9 cases were analyzed, out of which CONARE recommended four for approval, one to be rejected, and one was left pending for the next meeting. (I'm checking with UNHCR to confirm that the remaining three were recommended for denial.)
- On July 11th: 7 cases were analyzed, out of which CONARE 5 were recommended rejecting five, approving one, and leaving one pending to obtain additional information.

The denials were recommended for different reasons, including lack of credibility, failure to meet the 1951 Refugee Criteria or because they were not considered strong enough and the applicants had other means of obtaining immigration status in Guatemala.

Please feel free to contact me if you have additional questions.

Suzanne

Suzanne Sinclair-Smith
USCIS Field Office Director, Guatemala and Belize
Tel: ███████████
███████████████████
Central Time Zone

---

**From:** Baroukh, Nader ███████████████
**Sent:** Friday, July 12, 2019 1:41 PM
**To:** Teichman, Sabrina ███████████████; Sinclair-Smith, Suzanne ███████████████
███
**Cc:** Boyd, Valerie ███████████████; McCament, James ███████████████;
Wright, Charles E ███████████████; Plumer, Morgan
███████████████; Salcedo, Viviana ███████████████; Cloe, David
███████████████; Mizelle, Chad ███████████████; Kelliher, Brian
███████████████; Mazzochi, Sarah ███████████████
**Subject:** RE: Question: Guatemala Asylum

Adding Brian and Sarah on my team.

Nader Baroukh
Associate General Counsel, Immigration
Department of Homeland Security, Office of the General Counsel
Office: ███████████
Cell: ███████████
email: ███████████
This communication, along with any attachments, is covered by federal and state law governing

electronic communications and may contain legally privileged information. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, use or copying of this message is strictly prohibited. If you have received this in error, please reply immediately to the sender.

---

**From:** Teichman, Sabrina ███████████
**Sent:** Friday, July 12, 2019 2:54 PM
**To:** Sinclair-Smith, Suzanne ███████████████
**Cc:** Boyd, Valerie ██████████████; McCament, James ████████████████;
Wright, Charles E ██████████████████; Plumer, Morgan
████████████████; Salcedo, Viviana █████████████; Cloe, David
████████████████; Mizelle, Chad ████████████; Baroukh, Nader
████████████
**Subject:** RE: Question: Guatemala Asylum

Excellent, thank you Suzanne.  Appreciate any update you can provide today.

Sabrina H. Teichman
Office: █████████
Mobile: █████████

---

**From:** Sinclair-Smith, Suzanne ████████████████
**Sent:** Friday, July 12, 2019 12:33 PM
**To:** Teichman, Sabrina ███████████
**Cc:** Boyd, Valerie ██████████████; McCament, James ████████████████;
Wright, Charles E ██████████████████; Plumer, Morgan
████████████████; Salcedo, Viviana █████████████; Cloe, David
████████████████; Mizelle, Chad ████████████; Baroukh, Nader
████████████
**Subject:** RE: Question: Guatemala Asylum

Hi Sabrina,

I'll check that and will get back to you ASAP.

Cheers,
Suzanne


Suzanne Sinclair-Smith
USCIS Field Office Director, Guatemala and Belize
Tel: ██████████
███████████████████
Central Time Zone

**From:** Teichman, Sabrina ████████████████████
**Sent:** Friday, July 12, 2019 10:31 AM
**To:** Sinclair-Smith, Suzanne ████████████████
**Cc:** Boyd, Valerie ████████████████ ; McCament, James ████████████████ ;
Wright, Charles E ████████████████ ; Plumer, Morgan
████████████████ ; Salcedo, Viviana ████████████████ ; Cloe, David
████████████████ ; Mizelle, Chad ████████████████ ; Baroukh, Nader
████████████████
**Subject:** RE: Question: Guatemala Asylum

Hi Suzanne -  Is there an update you can share on CONARE's June 26th meeting (how many cases did
they review?) or any subsequent meetings in July or the group of any additional pending cases they
have adjudicated to get through the backlog?

Thank you!
Sabrina

Sabrina H. Teichman
Office: ████████████
Mobile: ████████████

---

**From:** Sinclair-Smith, Suzanne ████████████████
**Sent:** Tuesday, June 25, 2019 1:10 PM
**To:** Teichman, Sabrina ████████████████
**Cc:** Boyd, Valerie ████████████████ ; McCament, James ████████████████ ;
Wright, Charles E ████████████████ ; Plumer, Morgan
████████████████ ; Salcedo, Viviana ████████████████ ; Cloe, David
████████████████
**Subject:** RE: Question: Guatemala Asylum

Sabrina,

Giovanni said CONARE recommended rejecting the case due to Salvadoran/Canadian dual
nationality.  Also, I'm confirming that CONARE's next meeting is tomorrow, June 26.

Suzanne

---

**From:** Teichman, Sabrina ████████████████████
**Sent:** Tuesday, June 25, 2019 9:31 AM
**To:** Sinclair-Smith, Suzanne ████████████████
**Cc:** Boyd, Valerie ████████████████ ; McCament, James ████████████████ ;
Wright, Charles E ████████████████ ; Plumer, Morgan
████████████████ ; Salcedo, Viviana ████████████████ ; Cloe, David
████████████████
**Subject:** Re: Question: Guatemala Asylum

Thanks Suzanne, very helpful.  Can you also find out from Giovanni why the case of (4 persons) was rejected?

Sabrina H. Teichman
Office: █████████
Mobile: █████████

**From:** Sinclair-Smith, Suzanne
**Sent:** Tuesday, June 25, 2019 11:22:54 AM
**To:** Teichman, Sabrina
**Cc:** Boyd, Valerie; McCament, James; Wright, Charles E; Plumer, Morgan; Salcedo, Viviana; Cloe, David
**Subject:** RE: Question: Guatemala Asylum

Good morning Sabrina,

I'm very happy to report that CONARE recently reconvened to make recommendations on several asylum cases, per Giovanni Bassu (contrary to what the Dep. Dir. of the IGM told me).  Giovanni said the Vice President intends to get through the pending cases by the end of the year.  Giovanni provided the following information this morning:

> On June 9, the newly formed CONARE (National Commission for Refugees) held its first meeting, during which it analyzed six asylum applications.  CONARE recommended rejecting one case (4 persons) and approving four cases (13 persons).  CONARE left one case (3 persons) pending to be analysed in the next meeting.  These recommendations will now be sent to the National Migratory Authority (NMA), who under the Migration Code, has the responsibility for final approval. It is expected that the NMA will conduct this determination in the coming weeks.

> The CONARE will hold its second meeting on June 16 (I think Giovanni meant June 26), during which they expect to analyse 9 asylum applications. The CONARE is expected to hold a total of three more meetings by the end of July 2019, and to analyze an average number of 8-9 cases per meeting.

> Giovanni noted that the Vice President told UNHCR in a meeting that the current administration is committed to clear the backlog of pending asylum-cases by the end of this year.

Giovanni mentioned that he'll be arriving in Guatemala this afternoon for another meeting, and he would be happy to meet with the Acting Secretary to explain the above points and other aspects of the asylum system further.

It's heartening to see some progress on this.

Suzanne

Suzanne Sinclair-Smith
USCIS Field Office Director, Guatemala and Belize
Tel: ███████████
████████████████████████
Central Time Zone

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

The United States and Guatemala, under the auspices of the U.S.-Guatemala Agreement for Cooperation in the Examination of Protection Claims ("Agreement"), aim to offer applicants to refugee protection systems consistent with our obligations under the 1951 Convention Relating to the Status of Refugees and the 1967 Protocol Relating to the Status of Refugees.  Because of this, ~~the United States maintains~~both countries maintain that any alien subject to the Agreement would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, as is required under ~~U.S. domestic law~~applicable legislation.

Taking into account the above, the United States government has engaged the Government of Guatemala in an ongoing dialogue regarding your protection system.  ~~Based on the oral and written discussions between our two States, we have come to the following understandings about the Government of Guatemala's protection system:~~

**~~Understanding of Facts~~**

*Non-Refoulement*

≠ Guatemala is a signatory to the United Nations Convention Against Torture (CAT).  Notwithstanding this, the Guatemalan Migration Code does not directly refer to any prohibition on returning, removing, or deporting individuals where there is a substantial ground for believing the individual would be in danger of being subjected to torture.  ~~However, Guatemala interprets their domestic legal authority not to return individuals possibly subject to torture in their home country (CAT non-refoulement obligations)~~ as deriving from Migration Code Article 71.  Moreover, Article 3 of the Regulation of Procedure for Protection Determination and Recognition of the Refugee Status in the State of Guatemala also refers to non-refoulement for both those eligible for refugee status and for those with torture claims, by the language:

> The interpretation and application of dispositions established in the present Regulation, will be conducted in accordance with the principles of No Discrimination, Confidentiality, Family Reunification, of Humanitarian and Apolitical, in compliance with the rights and obligations established in the Political Constitution of the Republic of Guatemala, applicable to refugees and international arrangements which the State of Guatemala is part of.

~~≠ Guatemala has also assured the U.S. government that no one with a viable claim of protection against torture would be returned to their home country, even if they had an extremely serious criminal conviction, such as murder.~~

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

DHSFF1203

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

- Guatemala has never had a claimant make a torture claim specifically; so far, they have only heard claims for asylum and refugee status protection.  They have no torture claim standard operating procedures (SOP) at the present time.  Because the government of Guatemala has never had this type of protection claim made before, protections specifically for torture are not in their regulations or in their code.  However, if Guatemala were to receive such an application, the application would be processed in the same manner as a refugee status applicant and given the same procedural protections.

- For a torture protection claim, there would be no applied criminal bars under Article 47 (criminal bars to refugee status applicants), nor any criminal bars denying admission under Article 66 (criminal grounds of inadmissible into Guatemala).  For refugee status or asylum applications, there are also no outright bars, except those grounds laid out in Article 47, which, if present, will be considered on a case-by-case basis before granting the application.  Article 66 will not be applied to any kind of protection claim in Guatemala, and no criminal bars would be applied to torture protection applications.

- There are no policies currently in place that would be grounds to deny an applicant asylum, refugee status, or torture protection beyond those already in Guatemalan law.

- Taken together, Guatemala may deny refugee status on three grounds:  1) those who committed certain serious crimes under international law (war crimes, etc…); 2) those who had their refugee status previously terminated; 3) if the applicant is being criminally prosecuted abroad for almost any type of crime.

- The "acts and purposes" Guatemala considers contrary to the purposes and principles of the United Nations, such that they may warrant a denial of refugee status under Article 47 of their code, are all those acts of racial discrimination, torture, forced disappearances, people with disabilities, and the rights of women, children, migrants, minorities and indigenous people contained in the International Charter of Human Rights.

- Beyond the CAT, the Convention, and the Protocol, Guatemala is not a signatory to any other conventions touching refugee protections, but Guatemala confirmed that these treaties are self-executing, and do not need domestic implementation to become part of their law.

2. Due to the absence of specific cases of requests for protection against torture and their lack of regulation in the Migration Code, refugee status will apply.

3. Guatemala will only apply the restrictions contained in the conventions and internal laws to requests for protection.

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

4. There are currently no migration policies that serve as a basis for denying an applicant a request for protection (Asylum, Refugee Status or Protection Against Torture) beyond those already established in Guatemalan law.

5. Guatemala does not grant protection measures to applicants for refugee status when any of the following assumptions occur: a) That they have committed a crime against peace, a war crime or a crime against humanity, as defined in the international instruments developed to address and prevent such crimes; b) That they have committed a particularly serious crime outside the country of refuge, before being admitted to it as a refugee or when the application has been submitted to escape the justice of another country; c) That he has been guilty of acts contrary to the purposes and principles of the United Nations, embodied in international treaties and conventions.

6. Acts of racial discrimination, torture, enforced disappearances, acts against persons with disabilities, and acts contrary to the rights of women, children, migrants, minorities and indigenous people contained in the Universal Declaration of Human Rights are those "acts and purposes "that are considered under the 1951 Convention and Article 47 of the Migration Code as "contrary to the purposes and principles of the United Nations in such a way as to justify the refusal of refugee status."

7. Guatemala is currently a signatory to the Convention Against Torture, the 1951 Convention on the Status of Refugees and the 1967 Protocol regarding the Status of Refugees.

≠   UNHCR's role to the State of Guatemala regarding non-refoulment is advisory-only.

≠   Protection applicants who illegally enter Guatemala will face administrative fines and are subject to removal, but they will not face criminal penalties.

≠   ~~Those who accuse any person, government office, or government organization of torture will not face criminal or civil liable actions or penalties. The confidentiality of any accuser is also protected by law.~~

≠   Guatemala confirmed the Office of Prevention of Torture is an internal, domestic Guatemalan oversight body charged with making recommendations to state entities when a person has been subject to cruel, inhumane, or degrading treatment. ~~analyzing whether someone is likely to be, or has been, subjected to torture in places like prisons, confinement centers, etc... in Guatemala. The Office of Prevention of Torture is not involved with non-refoulement obligations or investigations regarding torture allegations over incidents occurring outside of Guatemala.~~

*Capacity*

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

≠   1. The Guatemalan Institute of Migration filed 262 protection applications in 2018 and 284 in 2019 to date.

2. The information on the capacity for protection requests from Guatemala was improved after the entry into force of the regulation for the determination and granting of refugee status that was approved in March of this year.

3. A case, from the time an applicant makes a protection request, to its final resolution, takes an average of 1-2 years. Today, this process is faster thanks to the entry into force of the respective regulation.

≠   32 refugee status applications were abandoned last year.

≠   ~~A case, from the time an applicant makes a protection request, to its final resolution, takes an average of 1-2 years.~~

≠   ~~As of April 2019, there were 262 protection applications filed in 2018 and 218 protection applications filed in 2019 thus far.~~

*Available Protections Under Guatemala Law*

≠   Guatemala recognizes requests for protection that cite torture and/or persecution perpetrated by both state and non-state actors.

≠   The basic difference between an asylum and a refugee status application is:  asylum protection only involves persecution on account of political opinion and is made at a Guatemalan embassy or consulate overseas.  Claims for ~~Rr~~efugee status protection involves the other reasons and must be filed in Guatemala.

≠   ~~protected grounds, such as racial discrimination.~~  More detailed information on the administrative procedures in the applicable requests for refuge is provided below:

| | WHO DETERMINES | DESCRIPTION | LAW THAT REGULATES |
|---|---|---|---|
| **REFUGE** | National Immigration Authority | 1.   The request for Refuge Status can be conducted personally in writing or verbally at the Reception Center; | Migration Code |

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

2.      Such request will be transferred immediately in writing to the support staff of CONARE;

3.      The individual shall appear at the offices occupied by the Office for International Migratory Relations (ORMI by its name in Spanish) in which he or she will ratify his or her initial request, which will be constituted as formal request and he or she will receive through CONARE a permit for permanence of 30 days established in the Rules of Procedure for Protection, Determination of Refugee Status.

4.      A day and time are set for the personal interview, if the applicant does not appear the request can be declared abandoned.

5.      If he or she shows up for the interview, the applicant will attach to the request documents that substantiate the well-founded fear or any other situation which deserves the awarding of refugee status.

6.      Once the investigation process of CONARE support staff has concluded, the results are sent to the said Commission so that they

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

| | | | |
|---|---|---|---|
| | | issue the corresponding Technical Opinion. | |
| | | 7. With the Technical Opinion issued by CONARE, the refugee status applicant's file is elevated to the National Immigration Authority. | |
| | | 8. The National Immigration Authority issues Resolution whether granting or denying the Refugee Status in the territory of Guatemala. | |
| | | 9. The applicant will be nNotifiedying the applicant of the issued resolution by the competent authority, either granting or denying the request. | |
| | | 10. In case of refusal of Statute the interested party may file an appeal for reconsideration in accordance with regulations in the law. | |
| | | 11. The appeal shall be known by the National Immigration Authority who rules on the appeal. | |
| **ASYLUM** | Ministry of Foreign Affairs | The Directorate of Bilateral Relations is the one in charge of providing follow up to the Asylum request and the Minister of Foreign Affairs is the officer in charge of resolving said situation.<br><br>Political asylum can be requested outside of | Governmental Agreement 415-2003 |

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

| | | Guatemala while refuge can be requested inside Guatemala. | |
|---|---|---|---|
| **NATIONALITY** | Ministry of Foreign Affairs | 1.      The applicant shall be registered as alien domiciled. This quality presupposes that the applicant must be the holder of a permanent resident visa, issued by the General Directorate of Migration.<br>2.      The applicant must have the quality of Alien Domiciled for at least five years prior to the submission of the application, and not have been absent of the national territory within that time frame for more than six consecutive months or periods that added together result in one year or more.<br>3.      The interested party must be of legal age and the proceeding is personal.  The petitioner may not be represented by a third party and only persons of sound mind and body may make a request. | Governmental Agreement 415-2003 |
| **RESIDENCE FOR CA-4 NATIONALS** | Sub-directorate of Immigration, Guatemalan Migration Institute | Permanent residence for people of the CA-4, it takes less time to acquire a permanent residence than temporary residence.<br><br>Art.78 (a-e) of MC Art. 22 onwards of the Residence Regulations<br><br>1. Download form according to PR modality to be requested<br>2. Fill the form and attach requirements in accordance with Residence Regulations<br>3. Appear before the SI to deliver the file personally | Article 74 and 78 of the Migration Code. |

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

~~4. The file is analyzed by a process analyst who determines if the requirements are met (issues resolution that approves) or not (prior) so that it is rectified, unless is un-rectifiable and then what corresponds is to deny it.~~
~~5. Approved the file, the individual personally appears to be notified and to conduct the registration interview.  The fee must be paid according to the tariff.~~
~~6. The notified resolution and residence sheet are delivered.~~
~~7 go to RENAP and register as alien domiciled.~~

4. Guatemala receives requests for protection verbally and in writing in accordance with the provisions of article 17 of the Rules of Procedure for the Protection, Determination and Recognition of the Refugee Statute in the State of Guatemala.

~~≠   Guatemala also confirmed that their protection laws exist not just on paper, but they actively grant protection and have a process in place to do so.~~

~~≠   The process in place to obtain refugee status is:~~

~~1.      The request for Refugee Status can be conducted personally in writing or verbally at the Reception Center;~~

~~2.      Such request will be transferred immediately in writing to the support staff of CONARE;~~

~~3.~~
~~4.      The individual shall appear at the offices occupied by the Office for International Migratory Relations (ORMI by its name in Spanish) in which he or she will ratify his or her initial request, which will be constituted as formal request, and he or she will receive through CONARE a permit for permanence of 30 days established in the Rules of Procedure for Protection, Determination of Refugee Status.~~

~~5.~~
~~6.      A day and time are set for the personal interview.  If the applicant does not appear, the request can be declared abandoned.~~

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

7. If the applicant appears at the interview, the applicant will attach to the request documents that substantiate the well-founded fear, or any other situation which deserves the awarding of refugee status.

8. Once the investigation process of CONARE support staff has concluded, the results are sent to the said Commission, so that they issue the corresponding Technical Opinion.

9. With the Technical Opinion issued by CONARE, the refugee status applicant's file is elevated to the National Immigration Authority.

10. The National Immigration Authority issues a resolution on whether to grant or deny Refugee Status in the territory of Guatemala.

11. The applicant is notified of the decision reached in the case.

12. In case of a denial, the party may file an appeal for reconsideration in accordance with regulations in the law.

13. The appeal shall be known by the National Immigration Authority who rules on the appeal.

≠ Under Article 78 of the Migration Code, to obtain permanent residency in Guatemala, an applicant must show one of the following:

a) Has been temporary residents for a period equal to five or more years.
b) Has been married for more than one year or declared a domestic partnership with a Guatemalan citizen.
c) Is a family member, within a certain legal degree, of a Guatemalan citizen who has another nationality.
d) Those born in other Central American countries where they have been temporary residents for a period of one year.
e) Persons with private income or retirees who have been authorized to reside in the country and who have legal permanent incomes originating from abroad.

≠ An applicant in Guatemala may be denied permanent residency if there are doubts about that individual's identification documents' legitimacy, the untimely submission of documents or if the request was not timely made, if the documents submitted by the applicant are full of errors or inconsistencies, or if the applicant has a criminal record. This criminal record may involve an outstanding arrest warrant or any kind of

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

DHSFF1211

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

criminal conviction.  The decision whether to grant or deny permanent residency is discretionary and is made on a case-by-case basis.

≠ To obtain citizenship in Guatemala, an applicant must:

1. The applicant shall be registered as alien domiciled. This presupposes that the applicant must be the holder of a permanent resident visa, issued by the General Directorate of Migration.

2. The applicant must have been an alien domiciled for at least five years prior to the submission of the application, and not have been absent of the national territory within that time-frame for more than six consecutive months or periods that added together result in one year or more.

3. The applicant must be of legal age.  The petitioner may not be represented by a third party, and only persons of sound mind and body may make a request.

*Reception/Determination Process*

*This section expands on the reception procedures in the procedure for the granting of refuge, as previously described in paragraph C numeral 3 of this document being the following*

≠ A refugee status application must be filed in person, in writing or verbally, before a Migration Checkpoint or before the Sub-directorate of Care and Protection of Migrant's Fundamental Rights or at the reception center in the Institute.  The process shall be carried out in the following manner:

A) Before the Sub-directorate of Migration Control at the Checkpoints of the Institute, the delegate will receive the initial application in a verbal or written manner, and the official will immediately transfer the application in a written manner to the support personnel from CONARE, or;

B) Before the Sub-directorate of Care and Protection of Migrant's Basic Rights in the Institute. T, the initial application will be received in a verbal or written manner, and will be transferred in the written form to CONARE's support personnel.

B)C)                                        At the Reception Center, upon entering the country.

≠ After the protection application has been received, the support personnel in CONARE shall carry out the following:

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

1. Guide the refugee status applicant so that he/she can obtain information about the procedures.
2. Receive the formal application.  The applicant shall complete the form that CONARE provides, which should have sequential numbering, in which the applicant shall explain the reasons for the application, and the departure of the country of origin. The applicant can add personal identification documents that he/she has to the application, and any other evidence that he/she might consider pertinent to support the application.
3. Notify the Sub-directorate of Care and Protection of Migrant's Basic Rights of the applciant's Temporary Residency Status.
4. Notify the Migration Sub-directorate whether the applicant has children or adolescents, for the purpose of granting ~~of~~ temporary residency.
5. Set up the day and the time for the interview, which shall not exceed 15 days, counted from the date on which the formal application was filed.

≠  In Guatemala, oral guidance is given to every protection applicant once they make a claim.  The oral guidance covers the procedures the applicant must follow, what steps to take, the protections available, information that the applicant obtains a permit for 30 days, and what an applicant may not to do while in Guatemala.  The applicant is also given an overview of the appellate process at this initial stage.  This guidance is given to everyone.

≠  ~~Written guidance that will be given to applicants is forthcoming/being developed in Guatemala.~~

≠  ~~The right to contact a UNHCR representative is given orally at the first stage in the proceedings.~~

≠  The guidance is provided in a language the applicant understands; for now, the guidance has been almost entirely Spanish, ~~but Guatemala can and has obtained interpreters available for other languages if needed, although it may take extra time to get one, especially for languages like Arabic.   Presently, interpreters in German, English, French, Italian, Russian, Chinese, Mandarin are readily available, along with other indigenous languages common throughout Central America.~~and as outlined in the migration policies.

≠  Applicants will be verbally notified in the initial stages of proceedings, of their right to contact a UNHCR representative.

≠  On the day and at the time scheduled for the interview, a specific area will be available to conduct the interview with the applicants to determine whether the applicant qualifies for refugee status. This area will be duly equipped with video and audio recording devices to document the proceedings conducted.  Furthermore, a psychologist must be present at

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

each interview in order to prepare a psychological report as a result of the interview taken.  If necessary, there will be a translator or interpreter, who will sign the document resulting from the interview conducted.

≠   While conducting the interview, the interviewer must comply with the following regulatory conditions:

1. The applicants must be seen individually by the CONARE support personnel, who will use a specialized, comprehensive, and individualized approach.
2. Children and adolescents who are unaccompanied or separated from their families will be attended to in specialized areas by qualified personnel, who will see to their specific needs for protection, in accordance with the current national legislation, and the interviewer will work with the Attorney General's office to ensure specialized attention.
3. The interview must be conducted in the Spanish language. If the applicant or refugee does not speak Spanish, he or she will be assisted by a translator or interpreter.
4. With regard to family groups, each family member is interviewed individually within a time period not to exceed thirty days.

≠   As mentioned above, the protection application interviews are normally in Spanish, but Guatemala will provide translators or interpreters for any language required, although it must be in accordance with the "Agreement" and migratory policies. At the present moment, it is not necessary. obtaining some translators in languages like Arabic may take extra time.  Thus far, Guatemala has been successful in getting an interpreter for anyone who needs one, in any language needed.  Interpreter and translation services has also been given an expanded budget.

≠   As mentioned above, children are interviewed separately and apart from their family unit (if they are part of a larger family unit), and children are also interviewed separately if they are unaccompanied.  Guatemala has a UNHCR-funded special "child friendly" interview area (for unaccompanied children, this currently does not apply, as stated in the "Agreement."). that is currently being built, which they hope to be done at the beginning of the next fiscal year.

≠   In addition to children, Guatemala also interviews LGBTQ claims separately from the main interview area due to their special nature and particular vulnerability.

≠   Upon receiving the formal application for refugee status, the CONARE support personnel will initiate the investigation of the case, using appropriate methods to bring the case file to completion.

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

≠   A right to counsel is guaranteed in Article 12 of the Guatemalan constitution, and this right is applied to interviews on protection claims. ~~In practice, almost all NGO representatives in Guatemala are also lawyers, but this right to counsel only applies to actual legal counsel.~~

≠   If no identification document is provided by the applicant, or cannot be obtained by working with their embassy, Guatemalan officials will interview the applicant to ascertain their identity until they are satisfied, with the aim of detecting and preventing fraud.

≠   The interview procedure for those subject to the ACA will be the same as for any other protection applicant, with the exception that those processed under the ACA may be quicker to reduce possible fraud.

≠   An applicant will not be required to leave Guatemala during the pendency of any appeal on their protection claim(s).

≠   Derivative beneficiaries for successful protection applicants are "blood relatives," which Guatemala defines as parents, siblings, spouses, and children.

*Scope of Protections*

1. At the beginning of their process, applicants for protection in Guatemala are granted a special identification document which they can use to identify themselves before the authorities and that recognizes their stay in Guatemala as being legal. Then, when Refugee Statute is granted, an identification document will be issued to them which they can use to carry out activities of in their daily life such as education or work.

2. In accordance with Article 101, subsection b) of the Migration Code, protection applicants are allowed to: 1) work, 2) move freely within Guatemala, and 3) obtain travel permits (for example, a document for refugee travel) to leave and return. These authorization documents are valid until a final decision is made. The rights described above can be made in effect at the time the identification document is granted after the second interview.

≠   ~~Guatemala confirmed that protection applicants are given identification documents, these documents are recognized nationwide, and these documents are recognized by public and private institutions alike, including banks.~~

≠   ~~Under Article 104 of the Migration Code, protection applicants are allowed to (1) work, (2) move around freely within Guatemala, and (3) obtain travel authorization (for example, a refugee travel document) to leave and return. These authorization documents are valid until a definitive decision is made.~~

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

DHSFF1215

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

≠ The new Migration Authority Agreement came into effect in August 2019, but it did nothing to change identification document issuing. The Ministry of Foreign Affairs is still issuing identification documents.

## ATTACHMENT

## PERMANENT RESIDENCE AS A PERSON WITH PRIVATE INCOME OR RETIREE
*(Articles 78 of Decree No. 44-2017 issued by the Congress of the Republic of Guatemala [regarding the] Migration Code)*
*(Articles 22-24 and 29-39 of Migratory Authority Agreement [No.] 4-2019, "Regulations regarding Residency in Guatemala")*

## REQUIREMENTS

**Present your file in a GREEN folder (INVESTORS)/PURPLE [folder] (RETIREES), duly paginated, with no deletions or alterations.**

1. Original, current passport with a complete notarized copy;
2. Certification of passport validity and currency, issued by your country's Embassy or Consulate, accredited in Guatemala. If your country does not have an Embassy or Consulate, you must present a certification of birth with an apostille, pursuant to the Law of the Judicial Branch, as applicable;
3. Valid, up to date proof of clean criminal and police records issued by the appropriate authority in the country or countries in which he or she has had legal, verifiable residence during the last five years. In the event that the country does not issue any similar document, he or she must present the letter of refusal to issue said documents;
4. Certification of migratory movement;
5. Copy of a resolution accrediting your status as a temporary resident, when applicable;
6. Proof of income:
   a. Person with private income: Minimum individual monthly income of one thousand two hundred fifty United States dollars; and for each dependent, an additional sum of three hundred United States dollars.
   b. Retiree: Minimum individual monthly income of one thousand two hundred fifty United States dollars; and for each dependent, an additional sum of three hundred United States dollars.
7. Proof of payment.

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

If the applicant for permanent residence is a minor, or has been declared legally incompetent, both parents, assuming they have custody of the minor, or whoever is authorized to exercise the same, must attach the following documents:

a. Valid and current certification of the minor's birth. In the case of individuals declared legally incompetent, the documents accrediting said condition, as well as the corresponding guardianship, must be attached;

b. Record of application to claim the minor or legally incapacitated individual as a dependent, with legalized signatures of both parents, or express legal authorization. When the minor or incapacitated individual is accompanied by one of the parents or another person, this person must accredit his or her guardianship;

c. Complete and legalized copy of identification document or passport, as the case may be, of the guardian or the individual lawfully granted power of attorney.

**NOTES:**

1. The document legalization certificates must comply with the provisions of Art. 55 section b) of the Notary Code.

2. If there are documents in which the foreigner is known by multiple names, you must attach an Official Record of the Public Instrument [certifying] an Individual's Identity. *(Art. 4 of the Civil Code)*

3. **DOCUMENTS ORIGINATING ABROAD**. Documents originating abroad should be apostilled or authenticated in accordance with the Judiciary Law, according to the case. Such documents when submitted must have an issue date not exceeding six months, except when a different validity date is established in the same document.

4. **REGISTRATION OF RESIDENTS**. The alien resident must appear at the Sub-directorate for Alien Affairs within thirty days starting from the day after notification of the appropriate regular status was issued so that information may be entered in the register of residents; otherwise, he or she will incur in an extemporaneous registration of residence and illegal status and must comply with the obligations imposed in the fee chart of immigration services or other standard that regulates it.

5. **FILE ARCHIVED DUE TO LACK OF INTEREST**. The Guatemalan Immigration Institute shall archive files in which the alien ceased to take action for more than six months, always and whenever the Sub-directorate of Alien Affairs has performed the appropriate internal administrative proceedings and notification has been made thereof. Upon archiving the file, the alien will incur a fine for remaining longer than authorized according to what is established in the Immigration Code. If the alien wishes to select regular status, he or she must

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

DHSFF1217

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

comply with the provisions of the Immigration Code and the present regulation, after having paid the corresponding fine.

6.   In the event that the amount received is in currency other than the U.S. dollar, a document must be attached that establishes the conversion to this currency.

7.   The fee is canceled upon notification of the Resolution granting the Immigration Status requested.


**PERMANENT RESIDENCE FOR THOSE WHO WERE BORN IN OTHER CENTRAL AMERICAN COUNTRIES WHEN THEY HAVE BEEN TEMPORARY RESIDENTS FOR A ONE YEAR PERIOD**
*(Article 78 of Decree No. 44-2016 of the Republic of Guatemala Congress Immigration Code)*
*(Articles 22-24 and 28 of the "Guatemalan Residency Regulation" 4-2019 National Immigration Authority Agreement)*

**REQUIREMENTS**

**Present the file in a LIGHT BLUE folder, duly paginated for entry without stray markings or alterations.**

1.   Original valid passport and full authenticated copy;
2.   Certification of validity for passport issued by an Embassy or Consulate established in Guatemala. If there is no Embassy or Consulate in Guatemala, he or she must present a birth certificate with apostille or in accordance with Judiciary Law, as appropriate;
3.   Valid, up to date proof of clean criminal and police records issued by the appropriate authority in the country or countries in which he or she has had legal, verifiable residence during the last five years. In the event that the country does not issue any similar document, he or she must present the letter of refusal to issue said documents;
4.   Certificate of immigration activity;
5.   Alien's valid, up to date birth certificate which establishes that he or she was born in a Central American country;
6.   Notarized sworn statement regarding the activity he or she will pursue in the country;
7.   Certification of the resolution for temporary residence for a minimum period of one year.
8.   Proof of payment.

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

If the person requesting permanent residence is a minor or has been declared incapacitated, both parents in exercise of their parental authority or the person who exercises same must attach the following documents:

a. Valid, up to date birth certificate for the minor. In the case of those who are incapacitated, documents establishing said condition and the corresponding representation must be attached.

b. Entry request brief for minors or incapacitated person, with authenticated signatures by both parents or express permission in accordance with the law. When the minor or incapacitated person is accompanied by one of the parents or by another person, he or she must establish the representation that he or she exercises;

c. Full, authenticated copy of identification document or passport, as appropriate, of the person who exercises parental authority or duly established legal representation.

**NOTES:**

1. Certificates of Authentication for documents must comply with the provisions in Art. 55, section b) of the Notary Code.

2. If documents are submitted in which the alien is known by several names, he or she must attach a Certified Copy of Identification of Person. (*Art. 4, Civil Code*)

3. **DOCUMENTS ORIGINATING ABROAD.** Documents originating abroad should be notarized or authenticated in accordance with the Judiciary Law, according to the case. Such documents when submitted must have an issue date not exceeding six months, except when a different validity date is established in the same document.

4. **REGISTRATION OF RESIDENTS.** The alien resident must appear at the Subdirectorate for Alien Affairs within thirty days starting from the day after notification of the appropriate regular status was issued so that information may be entered in the register of residents; otherwise, he or she will incur in an extemporaneous registration of residence and illegal status and must comply with the obligations imposed in the fee chart of immigration services or other standard that regulates it.

5. **OBLIGATION TO PRESENT WORK PERMIT.** Every alien who intends to perform remunerative activity for an organization within Guatemalan territory must present a work permit issued by the Ministry of Labor and Social Security at the Guatemalan Immigration Institution within no more than three months once he or she has been notified of the decision regarding his or her respective residence status. Non-compliance with this requirement will constitute grounds for revoking the residence granted.

6. **FILE ARCHIVED DUE TO LACK OF INTEREST.** The Guatemalan Immigration Institute shall archive files in which the alien ceased to take action for more than six month, always and whenever the Subdirectorate of Alien Affairs has performed the appropriate

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

DHSFF1219

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

internal administrative proceedings and notification has been made thereof. Upon archiving the file, the alien will incur in a fine for remaining longer than authorized according to the provisions in the Immigration Code. If the alien wishes to select regular status, he or she must comply with the rulings of the Immigration Code and the present regulation, after having paid for the fine.

7. The fee is canceled upon notification of the Resolution granting the Immigration Status requested.



*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

## PERMANENT RESIDENCE FOR ALIENS WHO HAVE BEEN TEMPORARY RESIDENTS FOR A PERIOD EQUAL OR GREATER TO FIVE YEARS

*(Article 78 of Decree No. 44-2016 of the Republic of Guatemala Congress Immigration Code)*
*(Articles 22-25 of the "Guatemalan Residency Regulation" 4-2019 National Immigration Authority Agreement)*

### REQUIREMENTS

**Present the file in an ORANGE folder, duly paginated for entry without stray markings or alterations.**

Original valid passport and full authenticated copy;
Certification of validity for passport issued by an Embassy or Consulate established in Guatemala.  If there is no Embassy or Consulate in Guatemala, he or she must present a birth certificate with apostille or in accordance with Judiciary Law, as appropriate;
Valid, up to date proof of clean criminal and police records issued by the appropriate authority in the country or countries in which he or she has had legal, verifiable residence during the last five years. In the event that the country does not issue any similar document, he or she must present the letter of refusal to issue said documents;
Certificate of immigration activity;
Alien's valid, up to date birth certificate, which establishes that he or she was born in a Central American country;
Notarized sworn statement regarding the activity he or she will pursue in the country;
Certification of the resolution for temporary residence for a minimum period of one year.
Proof of payment.

If the person requesting permanent residence is a minor or has been declared incapacitated, both parents in exercise of their parental authority or the person who exercises same must attach the following documents:

Valid, up to date birth certificate for the minor. In the case of those who are incapacitated, documents establishing said condition and the corresponding representation must be attached.
Entry request brief for minors or incapacitated person, with authenticated signatures by both parents or express permission in accordance with the law.  When the minor or incapacitated person is accompanied by one of the parents or by another person, he or she must establish the representation that he or she exercises;
Full, authenticated copy of identification document or passport, as appropriate, of the person who exercises parental authority or duly established legal representation.

### NOTES:

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

DHSFF1221

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

Certificates of Authentication for documents must comply with the ruling in Art. 55, letter b) of the Notary Code.

If documents are submitted in which the alien is known by several names, he or she must attach a Certified Copy of Identification of Person. (*Art. 4, Civil Code*)

**DOCUMENTS ORIGINATING ABROAD**. Documents originating abroad should be notarized or authenticated in accordance with the Judiciary Law, according to the case. Such documents when submitted must have an issue date not exceeding six months, except when a different validity date is established in the same document.

**REGISTRATION OF RESIDENTS**. The alien resident must appear at the Subdirectorate for Alien Affairs within thirty days starting from the day after notification of the appropriate regular status was issued, so that the information may be entered in the register of residents; otherwise, he or she will incur in an extemporaneous registration of residence and illegal status and must comply with the obligations imposed in the fee chart of immigration services or other standard that regulates it.

**OBLIGATION TO PRESENT WORK PERMIT**. Every alien who intends to perform remunerative activity for an organization within Guatemalan territory must present a work permit issued by the Ministry of Labor and Social Security at the Guatemalan Immigration Institution within no more than three months once he or she has been notified of the decision regarding his or her respective residence status. Non-compliance with this requirement will constitute grounds for revoking the residence granted.

**FILE ARCHIVED DUE TO LACK OF INTEREST**. The Guatemalan Immigration Institute shall archive files in which the alien ceased to take action for more than six months, always and whenever the Subdirectorate of Alien Affairs has performed the appropriate internal administrative proceedings and notification has been made thereof. Upon archiving the file, the alien will incur in a fine for remaining longer than authorized according to the provisions in the Immigration Code. If the alien wishes to select regular status, he or she must comply with the provisions of the Immigration Code and the present regulation, after having paid the fine. The fee is canceled upon notification of the Resolution granting the Immigration Status requested.

**PERMANENT RESIDENCE BASED ON FAMILY RELATIONSHIP, WITHIN LEGAL TERMS, WITH A GUATEMALAN**
*(Article 78 of Decree No. 44-2016 of the Republic of Guatemala Congress Immigration Code)*
*(Articles 22-24 and 27 of the "Guatemalan Residency Regulation" 4-2019 National Immigration Authority Agreement )*

**REQUIREMENTS**
**Present the file in a YELLOW folder, duly paginated for entry without stray markings or alterations.**

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

Original valid passport and full authenticated copy;
Certification of validity for passport issued by an Embassy or Consulate established in Guatemala. If there is no Embassy or Consulate in Guatemala, he or she must present a birth certificate with apostille or in accordance with Judiciary Law, as appropriate;
Valid, up to date proof of clean criminal and police records issued by the appropriate authority in the country or countries in which he or she has had legal, verifiable residence during the last five years.  In the event that the country does not issue any similar document, he or she must present the letter of refusal to issue said documents;
Certificate of immigration activity;
Copy of resolution establishing him or her as a temporary resident, as appropriate;
Birth certificate(s) for family members of person requesting permanent residence that proves his or her ties with the Guatemalan person;
Alien's birth certificate.
Proof of payment.

If the person requesting permanent residence is a minor or has been declared incapacitated, both parents in exercise of their parental authority or the person who exercises same must attach the following documents:

Valid, up to date birth certificate for the minor.  In the case of those who are incapacitated, documents establishing said condition and the corresponding representation must be attached.  Entry request brief for minors or incapacitated person, with authenticated signatures by both parents or express permission in accordance with the law.  When the minor or incapacitated person is accompanied by one of the parents or by another person, he or she must establish the representation that he or she exercises;
Full, authenticated copy of identification document or passport, as appropriate, of the person who exercises parental authority or duly established legal representation.

**NOTES:**

Certificates of Authentication for documents must comply with the ruling in Art. 55, letter b) of the Notary Code.
If documents are submitted in which the alien is known by several names, he or she must attach a Certified Copy of Identification of Person. (*Art. 4, Civil Code*)
**DOCUMENTS ORIGINATING ABROAD**. Documents originating abroad should be notarized or authenticated in accordance with the Judiciary Law, according to the case. Such documents when submitted must have an issue date not exceeding six months, except when a different validity date is established in the same document.
**REGISTRATION OF RESIDENTS**.  The alien resident must appear at the Subdirectorate for Alien Affairs within thirty days starting from the day after notification of the appropriate regular status was issued, so that information may be entered in the register of residents; otherwise, he or

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

she will incur in an extemporaneous registration of residence and illegal status and must comply with the obligations imposed in the fee chart of immigration services or other standard that regulates it.

**FILE ARCHIVED DUE TO LACK OF INTEREST.** The Guatemalan Immigration Institute shall archive files in which the alien ceased to take action for more than six months, always and whenever the Subdirectorate of Alien Affairs has performed the appropriate internal administrative proceedings and notification has been made thereof. Upon archiving the file, the alien will incur in a fine for remaining longer than authorized according to the provisions in the Immigration Code. If the alien wishes to select regular status, he or she must comply with the provisions of the Immigration Code and the present regulation, after having paid the fine. The fee is canceled upon notification of the Resolution granting the Immigration Status requested.

**PERMANENT RESIDENCE FOR ALIENS WHO HAVE BEEN MARRIED FOR A YEAR OR MORE OR ARE IN A DOMESTIC PARTNERSHIP WITH A GUATEMALAN PERSON**
*(Article 78 of Decree No. 44-2016 of the Republic of Guatemala Congress Immigration Code)*
*(Articles 22-24 and 26 of the "Guatemalan Residency Regulation" 4-2019 National Immigration Authority Agreement)*

**REQUIREMENTS**

**Present the file in a BLUE folder, duly paginated for entry without stray markings or alterations.**

Original valid passport and full authenticated copy;
Certification of validity for passport issued by an Embassy or Consulate established in Guatemala. If there is no Embassy or Consulate in Guatemala, he or she must present a birth certificate with apostille or in accordance with Judiciary Law, as appropriate;
Valid, up to date proof of clean criminal and police records issued by the appropriate authority in the country or countries in which he or she has had legal, verifiable residence during the last five years. In the event that the country does not issue any similar document, he or she must present the letter of refusal to issue said documents;
Certificate of immigration activity;
Copy of resolution establishing him or her as a temporary resident, as appropriate;
Marriage certificate or certificate of domestic partnership, issued by the National Register of Persons;
Birth certificate for Guatemalan spouse, issued by the National Register of Persons, with annotation of the corresponding marriage or domestic partnership;
Proof of payment.

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

DHSFF1224

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

**NOTES:**

Certificates of Authentication for documents must comply with the ruling in Art. 55, section b) of the Notary Code.

If documents are submitted in which the alien is known by several names, he or she must attach a Certified Copy of Identification of Person. (*Art. 4, Civil Code*)

**DOCUMENTS ORIGINATING ABROAD**.  Documents originating abroad should be notarized or authenticated in accordance with the Judiciary Law, according to the case. Such documents when submitted must have an issue date not exceeding six months, except when a different validity date is established in the same document.

**REGISTRATION OF RESIDENTS**.  The alien resident must appear at the Subdirectorate for Alien Affairs within thirty days starting from the day after notification of the appropriate regular status was issued, so that the information may be entered in the register of residents; otherwise, he or she will incur in an extemporaneous registration of residence and illegal status and must comply with the obligations imposed in the fee chart of immigration services or other standard that regulates it.

**FILE ARCHIVED DUE TO LACK OF INTEREST**. The Guatemalan Immigration Institute shall archive files in which the alien ceased to take action for more than six months, always and whenever the Subdirectorate of Alien Affairs has performed the appropriate internal administrative proceedings and notification has been made thereof. Upon archiving the file, the alien will incur in a fine for remaining longer than authorized according to the ruling in the Immigration Code.  If the alien wishes to select regular status, he or she must comply with the provisions of the Immigration Code and the present regulation, after having paid the fine. The fee is canceled upon notification of the Resolution granting the Immigration Status requested.

Please confirm at your earliest convenience that our understandings fairly reflect your protection system.

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

DHSFF1225

*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*



*Privileged Material*
*Attorney-Client Communication / Attorney Work Product*
*Deliberative & Predecisional*
*For Official Use Only (FOUO)*

## UNCLASSIFIED
SBU



| | |
|---|---|
| **MRN:** | 19 GUATEMALA 536 |
| **Date/DTG:** | Jun 12, 2019 / 121741Z JUN 19 |
| **From:** | AMEMBASSY GUATEMALA |
| **Action:** | WASHDC, SECSTATE *ROUTINE* |
| **E.O.:** | 13526 |
| **TAGS:** | PREL, PREF, PHUM, SMIG, KCOM, GT |
| **Captions:** | SENSITIVE |
| **Reference:** | 19 STATE 61360 |
| **Subject:** | Assessment of the Guatemalan Asylum System |

1.  (U) Post provides the following responses to the request in Ref A for information on the Guatemalan Asylum System.  The Director for the Guatemalan Institute for Migration, the United Nations High Commissioner for Refugees (UNHCR) Regional Representative and local UNHCR Protection Officer provided information for the responses.

**(SBU) Eligibility to Apply for Asylum in Guatemala:**

- Where can asylum seekers apply for relief in Guatemala?

  Asylum seekers can apply at the Guatemalan Institute for Migration (IGM) office in Guatemala City, and at any land, sea, or air port of entry.

- Is there a deadline or fee to apply?

  No, there is no deadline or fee.  Though it is not codified, IGM told Post that the National Police (PNC) are trained to bring anyone that wants to claim asylum to the IGM offices.

- Are asylum seekers protected from return while their application is pending?

  Yes, while asylum seekers wait for adjudication, they receive temporary permanent residency (Article 17 subparagraph (c) of the Rules of Procedure for Refugee Status).

**(SBU) Access to Information and Assistance:**

- What kind of information does the Guatemalan government provide to asylum seekers regarding the process to apply for asylum or equivalent protection?

IGM said applicants receive information about legal status and how and when to appear for an interview at IGM. "After the border agent or IGM official accepts a verbal or oral request for asylum, they immediately transmit it in writing to CONARE's IGM support staff. After IGM support staff receive the written request, they provide guidance to the asylum applicant on the application procedures. CONARE's IGM support staff give the applicant the application form and schedules an appointment for a personal interview regarding their claim," (Migration Authority Agreement, Title II, Chapter II, Article 17).

According to IGM, at ports of entry, the border agent provides basic information regarding the asylum process to the asylum seeker. Post cannot confirm the consistency or quality of the information officials provide. If the applicant applies at IGM in Guatemala City, case officers who focus specifically on asylum cases handle the case.

- Are asylum seekers permitted access to an interpreter (if necessary), other explanatory assistance, and/or counsel during the application process?

  Yes, but IGM said it currently has only English-language interpretation services available. Most applicants are from Spanish-speaking countries. However, IGM also receives a number of applications from the Middle East. It would like to expand its interpretation services to include Arabic.

- What kind of accommodations are provided to unaccompanied children or persons with disabilities?

  The Secretariat for Social Welfare provides shelter for unaccompanied children, while IGM works with the Solicitor General's Office to make a determination on the children's asylum applications, usually denying asylum and returning children to their home countries. There are no special protections for persons with disability under the law. IGM told Post it prioritizes cases for the elderly and others with special considerations.

- Do asylum seekers in Guatemala have access to social services or the right to work while they wait for asylum claims to be adjudicated?

  Asylum seekers are granted work permits according to Article 8 of the Rules of Procedure for Refugee Status, and Articles 6, 48, 53, 84 and 101 of the Migration Code. Asylum seekers receive a provisional permit that gives them access to health services and primary and secondary education. However, employment in the formal sector in Guatemala can be hard to find, as is the case for the general Guatemalan population. Claimants receive medical insurance through their employer, and without insurance, medical attention is limited to emergencies only.

  According to UNHCR, despite legal entitlement, documentation issued to refugees lacks recognition by many public and private institutions, including banks. The new Migration Authority Agreement, which comes into effect in August, recognizes the role of the Guatemalan National Registry of Persons (RENAP) in issuing documents to

asylum seekers.  Having identification documents issued by RENAP should improve their recognition.

**(SBU) Refugee Status Determination Procedures:**

- Who bears the burden of proof?  What is the relevant evidentiary standard?

  The Rules of Procedure for Refugee Status do not specifically address who bears responsibility for burden of proof.  CONARE consists of working-level technical representatives from the Ministries of Government, Labor and Social Development, Foreign Affairs, and a representative of the IGM director.  CONARE's primary function is to make a technical recommendation to the National Migration Authority (AMN) to approve or deny a case, based on its assessment of whether the case meets burden of proof.

  The representatives in CONARE remain on the payrolls of their respective ministries.  According to UNHCR, CONARE has a principal participant and stand-in from each institution.  Currently none of these people is dedicated to the council full-time and asylum is only one of their many portfolios.

  CONARE has met three to four times to draft recommendations on asylum cases since March 2019, when the Rules of Procedure for Refugee Status came into effect.  It has made about 30 determinations: 20 recommending asylum and five to ten recommending refusal.  UNHCR told Post historically Guatemala approves 90-95% of asylum claims.  Although council members have UNHCR training on legitimacy guidelines, UNHCR said the council probably made determinations on the first 30 cases based on "gut decision" and would need more training in evidentiary standards.  CONARE has invited UNHCR to attend meetings this month to observe its process.

  Before CONARE makes recommendations, investigators on IGM's payroll and seconded to CONARE collect information to verify the veracity of the claim.  Investigators will ask the applicant to obtain proof of citizenship from his or her respective consulate in Guatemala if the claimant has no valid ID.  Investigators will then verify the residence of the claimant with country officials and the level of threat in that area.  Investigators run an INTERPOL background check on the claimant and seek to obtain police records from the country of origin, if available.  The investigators provide information to CONARE to help corroborate or disprove the applicant's claim as well as highlight cases of blatant criminality or terrorism.  CONARE can ask investigators to gather more information before making a recommendation for approval or denial of the case.

- Are there any limitations on the types of evidence that the asylum seeker can introduce?

  No.

- Does Guatemalan law incorporate the definition of "refugee" from Article 1 of the

Refugee Convention?

The Migration Authority Agreement, Title I, Article 4 lays out three different profiles for who may request asylum in Guatemala. The first definition mirrors the convention definition of an asylee.

- Does the Government of Guatemala exclude asylum seekers from protection on any basis other than those provided for in Articles 1 and 33(2) of the Refugee Convention?

  No.

- Does Guatemalan law protect individuals from return to torture? If so, does Guatemalan law incorporate the standard from Article 3 of the Convention Against Torture?

  The Migration Code does not clearly state a prohibition against returning individuals who may face torture. However, IGM said Guatemala considers the Convention Against Torture and all other conventions in its asylum processing. UNHCR confirmed that Guatemala follows all conventions in practice. According to IGM, Guatemalan law cannot run against these conventions without full declaration of intent to abandon the convention and subsequent congressional approval.

- Who is responsible for making the final determination about asylum?

  The National Migration Authority (AMN) makes the final decision on asylum cases and ultimately grants asylum. CONARE, as a technical body, assesses the evidence and makes a recommendation to AMN, as the political body, to approve or deny an asylum claim. AMN is composed of seven governmental institutions: four ministries, the Guatemalan Institute for Migration (IGM), the Council for Guatemalan Migrants, and the Office of the Vice-President as the head. Like CONARE, AMN has a principal participant and stand-in from each institution, none of whom is full-time dedicated to asylum determinations.

  AMN has not met since the March 2019 Rules of Procedure for Refugee Status came into effect, and therefore has not reviewed CONARE's recommendations on 30 asylum cases. Until AMN reviews CONARE's recommendations and makes a decision to approve or deny these cases, they remain pending. It is unclear whether CONARE will present a single recommendation for each case or each board member will submit individual recommendations to his or her agency counterpart on the AMN. UNHCR is encouraging the Guatemalan government to streamline this process as much as possible.

**(SBU) Appeal Rights:**

- If a claim is denied, is the applicant informed of the grounds of the decision in writing?

  Yes, CONARE is responsible for notifying the applicant of the final decision to approve

or deny a claim after AMN makes its final determination.  There is no requirement in the law that CONARE provide a justification for a denial.

- Is there a mechanism to appeal asylum determinations?

  Yes.  Asylum seekers have ten days to appeal the denial to the AMN, through a legal action called *recurso de reposicion*.  The AMN must uphold, overturn, or modify the decision within five days.  Although the Migration Code does not clearly set out the option, asylum seekers could also file a petition for *amparo*, a legal remedy that challenges the constitutionality of the denial and acts as a stay.

**(SBU) Nature of Protection Granted:**

- What rights or benefits are provided to foreign nationals who are granted asylum or equivalent protection under Guatemalan law?

  Asylees have the right to a national identification card in order to access education, health services, and work permits.  They receive a separate legal status as an asylee, after which they can apply for permanent residency under certain circumstances.

**(SBU) Capacity of the National Migration Authority (AMN) and the National Refugee Commission (CONARE):**

- How many asylum claims does the Government of Guatemala adjudicate per year?

  IGM handles approximately 100-150 asylum cases per year that proceed past the initial interview.  IGM currently has over 400 pending asylum cases.  IGM and CONARE were unable to work on cases for over a year while the Rules of Procedure for Refugee Status were being drafted.  As of March 2019, there was a backlog of 210 cases.  Though CONARE has been able to make about 30 recommendations since March, the AMN has not reached a decision on these cases.  IGM and CONARE have created a plan to work through the backlog by the end of the calendar year.  CONARE will meet biweekly instead of monthly over the next few months to make recommendations on the backlogged cases.  Historically, Guatemala has had capacity to process about 100-150 cases per year.

- With increased assistance, how many asylum claims could Guatemala reasonably be expected to adjudicate per year?

  The Office of International Migration Relations (ORMI), a specialized unit within the IGM, handles asylum claims.  ORMI has three caseworkers, three investigators seconded to CONARE, and one supervisor to complete asylum casework.  IGM said ORMI staffing was sufficient to complete the current average of 100-150 cases yearly, after completing the 210 cases in backlog.  IGM said it could complete investigations within 30 days and send cases to CONARE within 3-4 months without a backlog.

Under the new Migration Authority Agreement, the entire National Migration Authority (AMN), including IGM, is moving out of the Ministry of Government in August to become a "decentralized entity." UNHCR explained that ORMI would disappear, and responsibility for asylum processing would fall under a new Sub-Department for International Migration Relations. According to IGM and UNHCR, the new budget is still in negotiation, but IGM believes funding and resources would increase for asylum processing under this new entity. IGM continues to ask for technical assistance to hire psychologists and interpreters and update databases.

- Do asylum decision-makers receive training, including about non-refoulement obligations, and are there safeguards against corruption?

According to UNHCR, no cases of refoulement have been reported in Guatemala. According to IGM, all border officers receive training on initial processing of asylum claims including non-refoulement obligations. IGM told Post that border officers must submit all claims to IGM, but also said border officers were trained to decide if the claimant's initial reason for asylum was valid to begin a case. IGM was unable to clarify the level of oversight over the officer's initial decision at ports of entry.

**(SBU) UNHCR:**

- Why has UNHCR assessed that Guatemala's Migration Code does not provide sufficient safeguards against refoulement?

UNCHR said that, while on the whole, the Migration Code is a positive step, some provisions may not be fully compatible with the principles of non-refoulement and non-penalization for irregular entry. Specifically, Article 46 leaves some ambiguity with respect to UNHCR's role in preventing refoulement. Article 50 states that asylum seekers will not face criminal charges due to irregular entry, however they will have to pay administrative fines and may also be deported from Guatemala.

- Does the Government of Guatemala have a Memorandum of Understanding with UNHCR that outlines the government's cooperation with UNHCR on issues including technical assistance on and monitoring of refugee protection, access to refugees and asylum seekers in detention, and provision of basic services and assistance to refugees and asylum seekers? If so, please share a copy.

Currently UNHCR operates in Guatemala under the general UNDP framework and does not have a headquarters agreement with the Government of Guatemala. In December 2015, UNHCR and the Ministry of Foreign Affairs signed a MoU that includes various commitments to strengthen the asylum system in Guatemala. However, it expired in December 2017. UNHCR has proposed an extension of that MoU or a formal engagement with the Government, which has not materialized thus far. Following a meeting between the UNHCR Regional Representative and the Vice President last month, UNCHR has formally offered to sign a MoU with the AMN to strengthen their asylum capacity, to which it has not yet received a reply.

**(SBU) Other Factors for Consideration**

- Ratification of Safe Third Country Agreement in Guatemala

Post reached out to a former Solicitor General and a former Foreign Minister to determine if the Guatemalan congress would need to ratify a Safe Third Country Agreement. Both stated that they believe congressional ratification is necessary since the Guatemalan state would assume responsibility for individuals requesting asylum as well as the fact that it would be assuming a series of responsibilities to their countries of origin. In addition, article 171 of the Guatemalan constitution requires congressional ratification of international agreements that "affect the existing laws where this Constitution may require the same majority of votes"; that create a financial obligation for the state that is either equal to one percent of the budget or an indeterminate amount; or that result in the state submitting itself to international jurisdiction or an international judicial decision.

- Crime Statistics and Security

Guatemala's homicide rate in 2018 was about 22 per 100,000 inhabitants. In 2018, the police reported approximately 3,881 homicides, 4,246 aggravated assaults, and over 2,500 missing persons. Despite the slight downward trend, Guatemala remains among the most dangerous countries in the world, according to several security providers. Endemic poverty, an abundance of weapons, a legacy of societal violence, and the presence of organized criminal gangs Barrio 18 (18th Street) and Mara Salvatrucha (MS13) all contribute to the violent crime. Guatemala's high murder rate appears driven by narco-trafficking activity, gang-related violence, a heavily armed population, and police/judicial system unable to hold many criminals accountable.

Extortion is extremely common and effects all sectors of society with public bus and taxi drivers being the easiest and most common victims. However, small businesses, the U.S. private sector, as well as local national employees of the U.S. Embassy were all frequent targets in 2018. The gangs also target schoolchildren, street vendors, and private citizens. Although in recent years the number of reported extortions increased, most incidents are still unreported. Gang members usually punish non-compliant victims with violent assault or murder, and their family members are also victimized as punishment.

According to official government crime statistics, sexual assault numbers slightly decreased from 551 in 2017 to 527 in 2018. The Embassy believes, however, that the actual numbers of sexual assaults are far greater; cultural stigmas and sporadic police presence in rural areas cause significant underreporting. (Guatemala 2019 Crime and Safety Report. OSAC. https://www.osac.gov/Content/Report/5f31517e-62bb-4f2c-8956-15f4aeaab930)

| Signature: | Arreaga |
|---|---|

| **Drafted By:** | GUATEMALA:Nameth, Mary E (Guatemala) |
|---|---|
| **Cleared By:** | WHA:Jordan, J. Brice (Guatemala) |
| | POL-ECON:Flatt, Shawn E (Guatemala) |
| | Sinclair-Smith, Suzanne |
| | DHS/ICE:Gonzalez, Jessie D (Guatemala) |

|  | INL:Guevara, Hugo A (Guatemala) |
|---|---|
|  | USAID:Rajaraman, Anupama S (Guatemala) |
| **Approved By:** | EXEC:Hodge, David (Guatemala) |
| **Released By:** | GUATEMALA:Nameth, Mary E (Guatemala) |

| **Dissemination Rule:** | Archive Copy |
|---|---|

<u>**UNCLASSIFIED**</u>
SBU

DHSFF1234

[Type here]

U.S. Department of State
Office of Language Services
Translating Division



LS No. 2020-0109472
Spanish/English
ALK/GPG

**Translation**

**Ministry of Foreign Relations**
**Republic of Guatemala, Central America**

DEVIMIN-290-2019

The Ministry of Foreign Relations of the Republic of Guatemala presents its compliments to the Embassy of the United States of America and transmits herewith a presentation to provide an understanding of how the refugee system works in Guatemala.

The attached presentation provides information, which was approved and forwarded by the Ministry of Government, on the correct operation of the refugee system in Guatemala. At the same time, this Ministry would like to take this opportunity to reiterate the fact that in Guatemala refugee status and asylum are two different forms of protection.

[Complimentary close]

Guatemala, October 8, 2019

[Signature]

[Ministry stamp]

Embassy of the United States of America,
    Guatemala City.

SBU – DELIBERATIVE PROCESS

DHSFF1235

[Not a USG classification:] Confidential
Attorney-Client Communication /Attorney Work Product
Deliberative and Predecisional
For Official Use Only

The United States and Guatemala, pursuant to the AGREEMENT BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE REPUBLIC OF GUATEMALA REGARDING THE EXAMINATION OF PROTECTION APPLICATIONS ("the Agreement"), intend to offer applicants for protection systems of protection consistent with the obligations provided for under, respectively, the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees. As a result, the two countries maintain that any foreign national who is subject to the Agreement would have access to a full and fair procedure in the investigation of a protection application under applicable legislation.

In view of the foregoing, the Government of the United States of America has initiated a dialogue with the Government of Guatemala, which is currently in progress, regarding the latter's system of protection. This dialogue has resulted in establishment of the following information:

A. *Non-Refoulement*

1. Guatemala is a signatory to the United Nations Convention Against Torture (CAT); however, the Guatemalan Migration Code contains no direct reference to any prohibition on the return, expulsion, or deportation of individuals when there are substantial grounds to believe that a given individual would be at risk of being tortured. This situation is covered under Article 71 of the Code. Article 3 of the Rules of Procedure for Protection, Determination, and Recognition of Refugee Status in Guatemala [*Reglamento del procedimiento para la protección, determinación y reconocimiento del estatuto de refugiado en el Estado de Guatemala*] also makes reference to non-refoulement for those individuals eligible for refugee status. It provides that:

> "The provisions set forth in these Rules shall be interpreted and applied in accordance with the principles of non-discrimination, confidentiality, and family reunification, and on a humanitarian and apolitical basis, consistent with the rights and obligations applicable to refugees under the Constitution of the Republic of Guatemala and international agreements to which Guatemala is party."

2. Because there are currently no specific cases in which protection is being sought on the grounds of torture and because no provision is made in this regard in the Migration Code, refugee status shall apply to torture cases.

3. Guatemala shall apply only those protection application restrictions that are contained in conventions and domestic laws.

4. At present, no migration policies, beyond those already established under Guatemalan law, are used as grounds to deny an applicant's protection (asylum, refugee status, or protection from torture) application.

5. Guatemala does not grant protection measures to refugee status applicants in any of the following circumstances: (a) The individual has committed a crime against peace, a war crime,

DHSFF1236

[Not a USG classification:] Confidential
Attorney-Client Communication /Attorney Work Product
Deliberative and Predecisional
For Official Use Only

or a crime against humanity, as defined in the international instruments drafted for the adoption of provisions on such crimes; (b) The individual committed a particularly serious crime in a place other than the country of refuge before being admitted to that country as a refugee or before the time that his/her application was submitted for the purpose of evading justice in another country; (c) The individual is guilty of acts contrary to the purposes and principles of the United Nations  as embodied in treaties and international agreements.

6.   Acts of racial discrimination, torture, forced disappearance, acts against persons with disabilities, and acts contrary to the rights of women, children, migrants, minorities, and indigenous people, as contained in the Universal Declaration of Human Rights, are those "acts and purposes" that are considered, under the 1951 Convention and Article 47 of the Migration Code, to be so contrary to the purposes and principles of the United Nations that they warrant denial of refugee status.

7.   Guatemala is currently a signatory to the Convention Against Torture and to the 1951 Convention relating to Refugee Status and its 1967 Protocol.

8.   UNHCR involvement with respect to non-refoulement is of an advisory nature with regard to the Guatemalan State.

9.   Those protection applicants who enter Guatemala as irregular entrants shall face administrative fines and be subject to expulsion or deportation but shall not face criminal penalties.

10.  Guatemala has a National Office for the Prevention of Torture, the function of which is to make recommendations, as applicable, to State entities when a person is the object of cruel and inhuman or degrading treatment.

B.   *Protection Application Processing Capacity*

1.   Two hundred sixty-two protection applications were submitted to the Guatemalan Migration Institute in 2018, and two hundred eighty-four have been submitted so far in 2019.

2.   Guatemala's protection application capacity information [*sic*—inclusion of the word "*información*" here may be a typographical error] improved after the rules for the determination and granting of refugee status [*reglamento para la determinación otorgamiento del estatuto de refugiado*], adopted in March 2019, took effect.

3.   The processing of protection applications has been taking an average of one to two years from the time the applicant submits his/her protection application to the time a decision on the application is made, but since the above-mentioned rules took effect, this process has become faster.

4.   Thirty-two refugee status applications were abandoned in 2018.

DHSFF1237

[Not a USG classification:] Confidential
Attorney-Client Communication /Attorney Work Product
Deliberative and Predecisional
For Official Use Only

C. *Protection available under Guatemalan law*

1.  In applications alleging torture, Guatemala recognizes persecution perpetrated abroad by both State and non-State actors.

2.  The difference between asylum applications and refugee status applications is basically that asylum protection requires political persecution and is processed in a Guatemalan consulate or embassy abroad whereas refugee status protection requires other grounds and is processed inside Guatemala.

3.  Additional information on the administrative procedures regarding protection measures is given below:

| | WHO MAKES DETERMINATION | DESCRIPTION | LAW GOVERNING THIS |
|---|---|---|---|
| **REFUGEE** | National Migration Authority | 1. An application for refugee status may be made in person, either orally or in writing, at the Reception Center;<br><br>2. The application shall be immediately forwarded, in writing, to the support personnel of the National Commission for Refugees (CONARE) [*Comisión Nacional para Refugiados*];<br><br>3. The individual shall appear at the Office of International Migration Affairs (ORMI), where he/she shall confirm his/her initial application. This shall then constitute an official application and he/she will receive, through CONARE, a 30-day residence permit, as established in the rules for protection and determination of refugee status [*Reglamento para la* | Migration Code |

DHSFF1238

[Not a USG classification:] Confidential
Attorney-Client Communication /Attorney Work Product
Deliberative and Predecisional
For Official Use Only

| | | | |
|---|---|---|---|
| | | *Protección y Determinación del Estatuto de Refugiado*]. | |
| | | 4. A date and time for a personal interview is established. If the applicant fails to appear, the application may be declared abandoned. | |
| | | 5. If the applicant appears for the interview, he or she shall append documents corroborating the well-founded fear, or proving any other situation that warrants the grant of refugee status, to the application. | |
| | | 6. Once the investigation process conducted by CONARE support personnel is completed, the results are sent to the CONARE expert committee so that it can issue the appropriate Expert Opinion. | |
| | | 7. Once the CONARE expert committee issues its Expert Opinion, the applicant's refugee status file is sent to the National Migration Authority. | |

DHSFF1239

[Not a USG classification:] Confidential
Attorney-Client Communication /Attorney Work Product
Deliberative and Predecisional
For Official Use Only

| | | | |
|---|---|---|---|
| | | 8. The National Migration Authority issues a decision on the grant or denial of refugee status in Guatemalan territory. | |
| | | 9. The applicant is notified of the decision issued by the competent authority granting or denying the application. | |
| | | 10. In the event of denial of status, the party concerned may file a petition for reconsideration in accordance with law. | |
| | | 11. Notice of the petition for reconsideration shall be served on the National Migration Authority, which rules on such petitions. | |
| **ASYLUM** | Ministry of Foreign Relations | The Bilateral Relations Directorate is responsible for processing asylum applications, and the Minister of Foreign Relations is the official responsible for issuing a decision on such applications.<br><br>Political asylum is requested outside Guatemalan territory, and refugee status is requested inside Guatemalan territory. | Government Order No. 415-2003 |

DHSFF1240

[Not a USG classification:] Confidential
Attorney-Client Communication /Attorney Work Product
Deliberative and Predecisional
For Official Use Only

4.  Guatemala receives protection applications both orally and in writing as established in Article 17 of the Rules of Procedure for Protection, Determination, and Recognition of Refugee Status in Guatemala [*Reglamento del Procedimiento para la Protección, Determinación y Reconocimiento del Estatuto de Refugiado en el Estado de Guatemala*].

*D.  Reception/Determination Process*

This section develops and expands on the reception procedure, which is a component of the procedure for the grant of refugee status described above in C(3) of this document.

1.  All applications for refugee status shall be delivered in person, either orally or in writing, to a migration checkpoint, to the Unit for the Protection of the Fundamental Rights and Care of Migrants [*Subdirección de Atención y Protección de Derechos*], or to the Institute's Reception Center. This process shall be carried out as follows:

(A) At the Migration Control Unit [*Subdirección de Control Migratorio*] located at one of the Institute's checkpoints, the agent shall take receipt of the spoken or written initial application and shall immediately forward that application, in writing, to CONARE support personnel, or;

(B) At the Institute's Unit for the Protection of the Fundamental Rights and Care of Migrants, receipt of the initial application shall be taken orally or in writing and shall be forwarded in writing to CONARE support personnel;

(C) [Receipt of the application shall be taken] at the Reception Center upon entry into Guatemala.

2.  After receiving the protection application, CONARE support personnel shall take the following actions:

a.  Provide guidance to the refugee status applicant so that he/she can obtain information about procedures;

b.  Take receipt of the official application. The applicant shall fill out the form provided by CONARE, which must be sequentially numbered. On that form the applicant shall explain the grounds for the application and why he/she left his/her country of origin. The applicant may append to the application any personal identification documents that he/she has brought with him/her, as well as any other proof he/she deems pertinent as grounds for his/her application;

c.  Notify the Unit for the Protection of the Fundamental Rights and Care of Migrants [*Subdirección de Atención y Protección de Derechos*] about the applicant's temporary residence status;

DHSFF1241

[Not a USG classification:] Confidential
Attorney-Client Communication /Attorney Work Product
Deliberative and Predecisional
For Official Use Only

d.   Notify the Migration Unit [*Subdirección de Migración*] if the applicant has children or adolescents, for purposes of providing temporary residence.

e.   Establish a date and time for the interview, which must take place within a period not to exceed 15 days from the date of the receipt of the official application.

3.   In Guatemala, each protection applicant receives spoken guidance once he or she submits an application. Spoken guidance covers the procedures to be followed by the applicant, what steps to take, available protections, information relating to the fact that the applicant is being given a 30-day permit, and what he/she may not do while in Guatemala. The applicant also receives a summary of the appeals (petition for reconsideration) process during this initial stage. This guidance is given to all protection applicants.

4.   The guidance is offered in Spanish or in a language the applicant understands and in accordance with migration policy.

5.   In the initial stage of the proceedings, the applicant is advised, orally, of his/her right to contact a UNHCR representative.

6.   On the date and at the time established for the interview, a specific area shall be made available for interviewing applicants in order to determine whether each applicant meets the requirements for obtaining refugee status. This area shall be properly equipped with audio- and video-recorders to document the interview. In addition, a psychologist shall be present at each interview to draft a psychological report based on the interview. If necessary, a translator or interpreter shall be present and shall sign the document issued as a result of the interview.

7.   While conducting the interview, the interviewer shall comply with the following regulatory requirements:

a.   Applicants shall be interviewed one by one by CONARE support personnel, who shall use a specialized, comprehensive, and individualized approach;

b.   Unaccompanied children and adolescents or children and adolescents who have been separated from their families shall be served in specialized areas by qualified personnel who shall attend to their specific protection needs in accordance with current Guatemalan law, and the interviewer shall work with the Office of the Attorney General of Guatemala [*oficina de la Procuraduría General de la Nación*] to ensure specialized attention to this category of migrants. (This provision does not apply to persons processed under the terms of the Agreement.);

c.   The interview shall be conducted in Spanish. If the applicant or refugee does not speak Spanish, he/she shall be assisted by a translator or interpreter;

DHSFF1242

[Not a USG classification:] Confidential
Attorney-Client Communication /Attorney Work Product
Deliberative and Predecisional
For Official Use Only

d.  With respect to family groups, each family member shall be interviewed individually within a period not to exceed 30 days.

8.  As indicated earlier, protection application interviews are generally conducted in Spanish, but Guatemala shall provide translators or interpreters for any language; under the Agreement and migration policies, however, this is not necessary.

9.  As indicated earlier, children are interviewed separately and apart from their family unit (if they are part of a more extended family unit). If a child is unaccompanied, he/she shall also be interviewed separately. Guatemala has a special "child-friendly" interview area. (Under the Agreement, this provision does not apply to unaccompanied children.)

10. Once an official refugee status application is received, CONARE support personnel shall open an investigation into the case, using appropriate methods to bring that investigation to completion.

11. The right to a defense is guaranteed under Article 12 of the Guatemalan Constitution and this right applies to protection application interviews.

12. If the applicant fails to present an identification document or if such a document cannot be obtained through the services of the embassy of the applicant's country, Guatemalan agents shall interview the applicant to verify his/her identity to their satisfaction for the purpose of detecting and preventing fraud.

13. The interview process for those persons subject to the Agreement shall be the same as the process for other protection applicants, except that potential fraud can be more efficiently minimized for those individuals processed under the Agreement.

14. Applicants shall not be required to leave Guatemala while any appeal relating to their protection application(s) is pending.

15. The derivative beneficiaries of approved protection applications are parents, siblings, spouses, and sons and daughters.

*E.  Scope of Protection*

1.  When protection applicants in Guatemala start their paperwork, they are provided with a special identification document to use for identifying themselves to the authorities. This document also identifies them as persons entitled to remain legally in Guatemalan territory. Later, when refugee status is granted, they are provided with an identification document to use for activities of daily life, such as education or work activities.

2.  In accordance with Article 101(b) of the Migration Code, protection applicants are permitted to: (1) work, (2) move freely within Guatemala; and (3) obtain travel authorizations (for example, a

DHSFF1243

[Not a USG classification:] Confidential
Attorney-Client Communication /Attorney Work Product
Deliberative and Predecisional
For Official Use Only

refugee travel document) to leave and return to the country. These authorizing documents are valid until a final decision is made. The rights described above can take effect as soon as the identification document is issued after the second interview.



DHSFF1244

| | |
|---|---|
| **From:** | Kosinski, Doc |
| **To:** | A- ATAM-C |
| **Cc:** | Car enter, Dylan |
| **Subject:** | Assessment o the Guatemalan Asylum System |
| **Date:** | Wednesday, June 12, 2019 4: 4:11 PM |

## UNCLASSIFIED
SBU

| | |
|---|---|
| MRN: | 19 GUATE ALA |
| Date/DTG: | un 12 2019 / 121741 UN 19 |
| From: | A E ASS GUATE ALA |
| Action: | AS D SE STATE *ROUTINE* |
| E.O.: | 1 2 |
| TAGS: | P EL P E P U S G K O GT |
| Captions: | SENS T E |
| Reference: | 19 STATE 1 0 |
| Subject: | Assessment of the Guatemalan As lum S stem |

1.  (U) Post provides the following responses to the request in Ref A for information on the Guatemalan Asylum System.  The Director for the Guatemalan Institute for Migration, the United Nations High Commissioner for Refugees (UNHCR) Regional Representative and local UNHCR Protection Officer provided information for the responses.

**(SBU) Eligibility to Apply for Asylum in Guatemala:**

- Where can asylum seekers apply for relief in Guatemala?

  Asylum seekers can apply at the Guatemalan Institute for Migration (IGM) office in Guatemala City, and at any land, sea, or air port of entry.

- Is there a deadline or fee to apply?

  No, there is no deadline or fee.  Though it is not codified, IGM told Post that the National Police (PNC) are trained to bring anyone that wants to claim asylum to the IGM offices.

- Are asylum seekers protected from return while their application is pending?

  Yes, while asylum seekers wait for adjudication, they receive temporary permanent residency (Article 17 subparagraph (c) of the Rules of Procedure for Refugee Status).

**(SBU) Access to Information and Assistance:**

- What kind of information does the Guatemalan government provide to asylum seekers regarding the process to apply for asylum or equivalent protection?

    IGM said applicants receive information about legal status and how and when to appear for an interview at IGM.  "After the border agent or IGM official accepts a verbal or oral request for asylum, they immediately transmit it in writing to CONARE's IGM support staff.  After IGM support staff receive the written request, they provide guidance to the asylum applicant on the application procedures.  CONARE's IGM support staff give the applicant the application form and schedules an appointment for a personal interview regarding their claim," (Migration Authority Agreement, Title II, Chapter II, Article 17).

    According to IGM, at ports of entry, the border agent provides basic information regarding the asylum process to the asylum seeker.  Post cannot confirm the consistency or quality of the information officials provide.  If the applicant applies at IGM in Guatemala City, case officers who focus specifically on asylum cases handle the case.

- Are asylum seekers permitted access to an interpreter (if necessary), other explanatory assistance, and/or counsel during the application process?

    Yes, but IGM said it currently has only English-language interpretation services available.  Most applicants are from Spanish-speaking countries.  However, IGM also receives a number of applications from the Middle East.  It would like to expand its interpretation services to include Arabic.

- What kind of accommodations are provided to unaccompanied children or persons with disabilities?

    The Secretariat for Social Welfare provides shelter for unaccompanied children, while IGM works with the Solicitor General's Office to make a determination on the children's asylum applications, usually denying asylum and returning children to their home countries.  There are no special protections for persons with disability under the law.  IGM told Post it prioritizes cases for the elderly and others with special considerations.

- Do asylum seekers in Guatemala have access to social services or the right to work while they wait for asylum claims to be adjudicated?

    Asylum seekers are granted work permits according to Article 8 of the Rules of Procedure for Refugee Status, and Articles 6, 48, 53, 84 and 101 of the Migration Code.  Asylum seekers receive a provisional permit that gives them access to health services and primary and secondary education.  However, employment in the formal sector in Guatemala can be hard to find, as is the case for the general Guatemalan population.  Claimants receive medical insurance through their employer, and without insurance, medical attention is limited to emergencies only.

    According to UNHCR, despite legal entitlement, documentation issued to refugees lacks recognition by many public and private institutions, including banks.  The new

Migration Authority Agreement, which comes into effect in August, recognizes the role of the Guatemalan National Registry of Persons (RENAP) in issuing documents to asylum seekers.  Having identification documents issued by RENAP should improve their recognition.

**(SBU) Refugee Status Determination Procedures:**

- Who bears the burden of proof?  What is the relevant evidentiary standard?

  The Rules of Procedure for Refugee Status do not specifically address who bears responsibility for burden of proof.  CONARE consists of working-level technical representatives from the Ministries of Government, Labor and Social Development, Foreign Affairs, and a representative of the IGM director.  CONARE's primary function is to make a technical recommendation to the National Migration Authority (AMN) to approve or deny a case, based on its assessment of whether the case meets burden of proof.

  The representatives in CONARE remain on the payrolls of their respective ministries.  According to UNHCR, CONARE has a principal participant and stand-in from each institution.  Currently none of these people is dedicated to the council full-time and asylum is only one of their many portfolios.

  CONARE has met three to four times to draft recommendations on asylum cases since March 2019, when the Rules of Procedure for Refugee Status came into effect.  It has made about 30 determinations: 20 recommending asylum and five to ten recommending refusal.  UNHCR told Post historically Guatemala approves 90-95% of asylum claims.  Although council members have UNHCR training on legitimacy guidelines, UNHCR said the council probably made determinations on the first 30 cases based on "gut decision" and would need more training in evidentiary standards.  CONARE has invited UNHCR to attend meetings this month to observe its process.

  Before CONARE makes recommendations, investigators on IGM's payroll and seconded to CONARE collect information to verify the veracity of the claim.  Investigators will ask the applicant to obtain proof of citizenship from his or her respective consulate in Guatemala if the claimant has no valid ID.  Investigators will then verify the residence of the claimant with country officials and the level of threat in that area.  Investigators run an INTERPOL background check on the claimant and seek to obtain police records from the country of origin, if available.  The investigators provide information to CONARE to help corroborate or disprove the applicant's claim as well as highlight cases of blatant criminality or terrorism.  CONARE can ask investigators to gather more information before making a recommendation for approval or denial of the case.

- Are there any limitations on the types of evidence that the asylum seeker can introduce?

  No.

- Does Guatemalan law incorporate the definition of "refugee" from Article 1 of the Refugee Convention?

The Migration Authority Agreement, Title I, Article 4 lays out three different profiles for who may request asylum in Guatemala. The first definition mirrors the convention definition of an asylee.

- Does the Government of Guatemala exclude asylum seekers from protection on any basis other than those provided for in Articles 1 and 33(2) of the Refugee Convention?

  No.

- Does Guatemalan law protect individuals from return to torture? If so, does Guatemalan law incorporate the standard from Article 3 of the Convention Against Torture?

  The Migration Code does not clearly state a prohibition against returning individuals who may face torture. However, IGM said Guatemala considers the Convention Against Torture and all other conventions in its asylum processing. UNHCR confirmed that Guatemala follows all conventions in practice. According to IGM, Guatemalan law cannot run against these conventions without full declaration of intent to abandon the convention and subsequent congressional approval.

- Who is responsible for making the final determination about asylum?

  The National Migration Authority (AMN) makes the final decision on asylum cases and ultimately grants asylum. CONARE, as a technical body, assesses the evidence and makes a recommendation to AMN, as the political body, to approve or deny an asylum claim. AMN is composed of seven governmental institutions: four ministries, the Guatemalan Institute for Migration (IGM), the Council for Guatemalan Migrants, and the Office of the Vice-President as the head. Like CONARE, AMN has a principal participant and stand-in from each institution, none of whom is full-time dedicated to asylum determinations.

  AMN has not met since the March 2019 Rules of Procedure for Refugee Status came into effect, and therefore has not reviewed CONARE's recommendations on 30 asylum cases. Until AMN reviews CONARE's recommendations and makes a decision to approve or deny these cases, they remain pending. It is unclear whether CONARE will present a single recommendation for each case or each board member will submit individual recommendations to his or her agency counterpart on the AMN. UNHCR is encouraging the Guatemalan government to streamline this process as much as possible.

**(SBU) Appeal Rights:**

- If a claim is denied, is the applicant informed of the grounds of the decision in writing?

  Yes, CONARE is responsible for notifying the applicant of the final decision to approve or deny a claim after AMN makes its final determination. There is no

requirement in the law that CONARE provide a justification for a denial.

- Is there a mechanism to appeal asylum determinations?

  Yes.  Asylum seekers have ten days to appeal the denial to the AMN, through a legal action called *recurso de reposicion*.  The AMN must uphold, overturn, or modify the decision within five days.  Although the Migration Code does not clearly set out the option, asylum seekers could also file a petition for *amparo*, a legal remedy that challenges the constitutionality of the denial and acts as a stay.

**(SBU) Nature of Protection Granted:**

- What rights or benefits are provided to foreign nationals who are granted asylum or equivalent protection under Guatemalan law?

  Asylees have the right to a national identification card in order to access education, health services, and work permits.  They receive a separate legal status as an asylee, after which they can apply for permanent residency under certain circumstances.

**(SBU) Capacity of the National Migration Authority (AMN) and the National Refugee Commission (CONARE):**

- How many asylum claims does the Government of Guatemala adjudicate per year?

  IGM handles approximately 100-150 asylum cases per year that proceed past the initial interview.  IGM currently has over 400 pending asylum cases.  IGM and CONARE were unable to work on cases for over a year while the Rules of Procedure for Refugee Status were being drafted.  As of March 2019, there was a backlog of 210 cases.  Though CONARE has been able to make about 30 recommendations since March, the AMN has not reached a decision on these cases.  IGM and CONARE have created a plan to work through the backlog by the end of the calendar year.  CONARE will meet biweekly instead of monthly over the next few months to make recommendations on the backlogged cases.  Historically, Guatemala has had capacity to process about 100-150 cases per year.

- With increased assistance, how many asylum claims could Guatemala reasonably be expected to adjudicate per year?

  The Office of International Migration Relations (ORMI), a specialized unit within the IGM, handles asylum claims.  ORMI has three caseworkers, three investigators seconded to CONARE, and one supervisor to complete asylum casework.  IGM said ORMI staffing was sufficient to complete the current average of 100-150 cases yearly, after completing the 210 cases in backlog.  IGM said it could complete investigations within 30 days and send cases to CONARE within 3-4 months without a backlog.

  Under the new Migration Authority Agreement, the entire National Migration Authority (AMN), including IGM, is moving out of the Ministry of Government in August to become a "decentralized entity."  UNHCR explained that ORMI would

disappear, and responsibility for asylum processing would fall under a new Sub-Department for International Migration Relations. According to IGM and UNHCR, the new budget is still in negotiation, but IGM believes funding and resources would increase for asylum processing under this new entity. IGM continues to ask for technical assistance to hire psychologists and interpreters and update databases.

- Do asylum decision-makers receive training, including about non-refoulement obligations, and are there safeguards against corruption?

  According to UNHCR, no cases of refoulement have been reported in Guatemala. According to IGM, all border officers receive training on initial processing of asylum claims including non-refoulement obligations. IGM told Post that border officers must submit all claims to IGM, but also said border officers were trained to decide if the claimant's initial reason for asylum was valid to begin a case. IGM was unable to clarify the level of oversight over the officer's initial decision at ports of entry.

## (SBU) UNHCR:

- Why has UNHCR assessed that Guatemala's Migration Code does not provide sufficient safeguards against refoulement?

  UNCHR said that, while on the whole, the Migration Code is a positive step, some provisions may not be fully compatible with the principles of non-refoulement and non-penalization for irregular entry. Specifically, Article 46 leaves some ambiguity with respect to UNHCR's role in preventing refoulement. Article 50 states that asylum seekers will not face criminal charges due to irregular entry, however they will have to pay administrative fines and may also be deported from Guatemala.

- Does the Government of Guatemala have a Memorandum of Understanding with UNHCR that outlines the government's cooperation with UNHCR on issues including technical assistance on and monitoring of refugee protection, access to refugees and asylum seekers in detention, and provision of basic services and assistance to refugees and asylum seekers? If so, please share a copy.

  Currently UNHCR operates in Guatemala under the general UNDP framework and does not have a headquarters agreement with the Government of Guatemala. In December 2015, UNHCR and the Ministry of Foreign Affairs signed a MoU that includes various commitments to strengthen the asylum system in Guatemala. However, it expired in December 2017. UNHCR has proposed an extension of that MoU or a formal engagement with the Government, which has not materialized thus far. Following a meeting between the UNHCR Regional Representative and the Vice President last month, UNCHR has formally offered to sign a MoU with the AMN to strengthen their asylum capacity, to which it has not yet received a reply.

## (SBU) Other Factors for Consideration

- Ratification of Safe Third Country Agreement in Guatemala

Post reached out to a former Solicitor General and a former Foreign Minister to determine

if the Guatemalan congress would need to ratify a Safe Third Country Agreement.  Both stated that they believe congressional ratification is necessary since the Guatemalan state would assume responsibility for individuals requesting asylum as well as the fact that it would be assuming a series of responsibilities to their countries of origin.  In addition, article 171 of the Guatemalan constitution requires congressional ratification of international agreements that "affect the existing laws where this Constitution may require the same majority of votes";  that create a financial obligation for the state that is either equal to one percent of the budget or an indeterminate amount; or that result in the state submitting itself to international jurisdiction or an international judicial decision.

- Crime Statistics and Security

Guatemala's homicide rate in 2018 was about 22 per 100,000 inhabitants.  In 2018, the police reported approximately 3,881 homicides, 4,246 aggravated assaults, and over 2,500 missing persons. Despite the slight downward trend, Guatemala remains among the most dangerous countries in the world, according to several security providers. Endemic poverty, an abundance of weapons, a legacy of societal violence, and the presence of organized criminal gangs Barrio 18 (18th Street) and Mara Salvatrucha (MS13) all contribute to the violent crime. Guatemala's high murder rate appears driven by narco-trafficking activity, gang-related violence, a heavily armed population, and police/judicial system unable to hold many criminals accountable.

Extortion is extremely common and effects all sectors of society with public bus and taxi drivers being the easiest and most common victims.  However, small businesses, the U.S. private sector, as well as local national employees of the U.S. Embassy were all frequent targets in 2018. The gangs also target schoolchildren, street vendors, and private citizens. Although in recent years the number of reported extortions increased, most incidents are still unreported. Gang members usually punish non-compliant victims with violent assault or murder, and their family members are also victimized as punishment.

According to official government crime statistics, sexual assault numbers slightly decreased from 551 in 2017 to 527 in 2018. The Embassy believes, however, that the actual numbers of sexual assaults are far greater; cultural stigmas and sporadic police presence in rural areas cause significant underreporting. (Guatemala 2019 Crime and Safety Report. OSAC. https://www.osac.gov/Content/Report/5f31517e-62bb-4f2c-8956-15f4aeaab930)

| Signature: | Arreaga |
| --- | --- |

| Drafted By: | GUATE  ALA Nameth   ar E  Guatemala |
| --- | --- |
| Cleared By: | A  or an  .  rice  Guatemala |
| | POL-E  ON  latt Sha  n E  Guatemala |
| | Sinclair-Smith  Su  anne |
| | D  S/  E Gon ale   essie D  Guatemala |
| | NL Guevara    ugo A  Guatemala |
| | USA D   a araman  Anupama S  Guatemala |
| Approved By: | E  E    o ge Davi   Guatemala |
| Released By: | GUATE  ALA Nameth   ar  E  Guatemala |

| Dissemination Rule: | or  ar e   op |
| --- | --- |

UNCLASSIFIED
SBU

**Official - SBU**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Salcedo, Viviana |
| **To:** | Mazzochi, Sarah |
| **Subject:** | d: Asylum sta  ing in NCA countries |
| **Date:** | riday,   ctober 4, 2019 2:21:11 PM |

Here you go!


Get Outlook for iOS

---

**From:** Katie Tobin ███████████

**Sent:** Tuesday, October 1, 2019 11:01 AM

**To:** Salcedo, Viviana

**Subject:** Asylum staffing in NCA countries


Hi Viviana,

I thought this info may be of interest to you too, especially with your meeting with USCIS today…


Cheers,

Katie

---

**From:** Giovanni Bassu ███████████

**Sent:** Monday, September 30, 2019 3:38 PM

**To:** Coine, Glenn ███████████

**Cc:** Samuelson, Andrea L ███████████; Chiara Cardoletti-Carroll ███████████;
Katie Tobin ███████████

**Subject:** RE: URGENT PRM request for information


Dear Glenn

This is what we know, although the question of budget is not easy for us to check.

- Guatemala:
  - Currently, the Office of International Migration Relations has a team of 7 full-time employees. Before the month of February there were only 4, the 3 additional people have been integrated in the last few months. The CONARE has 4 officials (one of them from the National Migration Institute (IGM)). The Migration Authority is composed of 9 institutions in total, 4 of which are attending the CONARE meetings .

We do not have information on the National Migration Authority or the National Refugee Commission annual budgets

- El Salvador:
    - CODER does not have its own budget, nor does it have staff dedicated exclusively to tasks of the organization. They are employees of the Ministry of Foreign Affairs whose duties include those related to the CODER

- Honduras:
    - The National Migration Institute, Human Rights Management has a team of 12 employees (amongst which 3 people are eligibility officers, and 1 staff is dedicated to collecting COI).
    - The Commission for the Analysis, Revision, and Dictum on the Status of Refugees is composed of 3 members of the Ministry of Justice, Governance and Decentralization and 3 members of the INM. Additionally, 2 eligibility officers assist the human rights manager in the presentation of cases during the commission.
    - We do not have information on their annual budgets

Best

Giovani

DHSFF1254

## Guatemalan Immigration Law and Current Capacity

### Guatemalan Legal Authorities on Immigration

1. The Migration Code, Decree 44-2016
2. Articles of Decree 95-98 of the Congress of the Republic.  Law of Migration.
3. National immigration authority agreement No. 2-2019
4. National immigration authority agreement No. 3-2019
5. National immigration authority agreement No. 4-2019
6. Government agreement No 83-2017
7. Convention on the Creation of a Single Central American Visa for the Free Movement of Foreigners (C-4 Agreement)
8. Regional Manual on Migration Practices of the Single Central American CA-4 Visa and its Annexes
9. Agreement on Regional Practices for CA-4 and for the Extension of the Single Central American CA-4 Visa July 2005
10. Border Agreement 5-2017 GUA-HON

### Guatemalan Operational Authorities

- ≠ **Guatemala Institute of Migration:** The Guatemala Institute of Migration is tasked with adjudicating all immigration benefits and entry/exit. The departments/sections are the following:
  - o Migration Control Department: controls all requirements and documentation to enter/leave Guatemala including collecting fees
  - o Passports
  - o Consular Affairs
  - o Permanent Status/Naturalization
  - o Asylum
- ≠ **División de Puertos, Aeropuertos y Puestos Fronterizos (DIPAFRONT)**: Border enforcement
- ≠ **Policia Nacional Civil (PNC):** Immigration enforcement inland.
  - o Please note Guatemala has no immigration enforcement body inside the country. Furthermore, the PNC is not well versed on Guatemala immigration laws.

### CA-4 Agreement: The CA-4 agreement categorizes foreign nationals in three categories. These three categories set the requirement to enter Guatemala:

- ≠ Category A:
  - o No visa required
  - o Must have passport or proper ID (not a birth certificate)
  - o Children need passport
  - o Must enter through port of entry
  - o Applies to all CA-4 countries, 81 countries, 4 International Organizations, 14 Cat B diplomat passports
- ≠ Category B:
  - o Need Guatemala visa
  - o Category B visa can be obtained from a C-4 consulate
  - o Applies to 74 countries

- ≠ Category C:
    - o Need Guatemala visa
    - o Category C visa also needs approval from Institute of Migration in GUA
    - o Applies to 41 countries, 2 entities

## Grounds to Deny Admission (Article 66)
- ≠ Threat to Public Order and Security
- ≠ International Criminal Court indictment or conviction
- ≠ Ongoing criminal prosecution for inflicting death, injury, or property damage
- ≠ Wants or warrants

## Immigration Enforcement
- ≠ **Inland:**
    - o Due to a lack of inland immigration enforcement body, GIM relies heavily on PNC and the army who are able to operate inside Guatemala. PNC and the army do not enforce immigration laws instead they refer individuals to GIM.
    - o For Category A (mostly Central American) migrants who violate immigration laws by entering Guatemala irregularly, the government of Guatemala allows the opportunity to remedy their "unlawful" status by "regularizing" their status. The migrants are given 10 days to register and gain a status in Guatemala. According to the immigration code the penalties are the following: fees of 200 Quetzales for no international travel document, 15 Quetzales per day for overstays, and 500 Quetzales for engaging in activities outside of their approved status.
        - ▪ Please note we have not confirmed to what degree the penalties are enforced.
    - o In addition to the above fees the GIM can also request voluntary departure.
    - o Category B and C: Migrants need a Guatemala visa therefore, they do not have the ability to "remedy" their status and can be expelled.
        - ▪ Please note a few challenges to expulsion are country of last presence refuses to admit the migrants, migrant has no funds to pay for return travel, appeal process and any children are not expelled but sent to social services.
        - ▪ Please note the Migration Code does not apply to children.
- ≠ **Border security**
    - o Border Enforcement is primarily focused on drug trafficking, human trafficking and smuggling therefore, DIPAFRONT is not well versed in immigration laws.
    - o DIPAFRONT mostly carries out custom and criminal enforcement at the border but not immigration control.
- ≠ When migrants are apprehended or claim fear at the border and need to be transported to Guatemala City, PNC transports them to town by turning them over to the next official.
- ≠ There are no detention centers or migration stations at the borders with the capacity to temporarily hold migrants, nor is there any food provided in these locations.
- ≠ There is no GIM presence on the border.

**Shelters**

- ≠ There is only one operational shelter in Guatemala that has 35 beds but the capacity to house 100 migrants using mattresses.
- ≠ One floor is a female dorm and the other a male dorm.
- ≠ No UACs are allowed at the shelter, and there is only one room for FAMUs. There is no Special Housing Unit or specified area for LGBT migrants.
- ≠ Medical and psychological evaluations are conducted on site.

**Biometrics**

- ≠ All fingerprints are currently captured manually, which prevents GIM or any other authority from tracking recidivists.
- ≠ GIM believes a biometrics system could be deployed within 4-6 months once it is funded. Ideally, there would be 30 control points and 30 mobile teams.
- ≠ Priority checkpoints include: Agua Caliente and El Corinto with Honduras; San Cristobal with El Salvador; and Naranjo, Bethel and Tecun Uman with Mexico.
- ≠ Agua Caliente could serve as a processing hub. GIM is searching for a facility that could serves as an open-door reception center/shelter where migrants are only held for up to 72 hours. At least 30 staff members would be needed to run this facility.
- ≠ GIM would like to set up an alert system with Honduras and El Salvador agencies to share information on all migrants who are deported or denied immigration benefits.
- ≠ GIM was fingerprinting caravan members with mobile devices but could not keep track of who had already been fingerprinted.

**Asylum Processing (called Refugee Status in Guatemala)**

- ≠ GIM claimed that all GIM, PNC, DIPAFRONT, etc. operators understand the procedures for when a migrant claims fear.
- ≠ When a migrant claims fear, the operators know that any other processing they are completing must stop, and the migrant must be transported to Guatemala City to file an asylum claim.
- ≠ Asylum applications are generally processed in 30-45 days. However, there is a 450 case backlog because there was an 8-month period where no cases were adjudicated while the agency changed over.
- ≠ The *comisión técnica* is made up of four protection officers who interview cases in Guatemala City. Then, each case must be reviewed and unanimously concurred upon by a 7-member *autoridad migratoria nacional* called CONARE that includes the Ministers (or their Vice Minister designees) of Government, Labor, Social Development, and the Vice President, among others. The Director of Migration is a member of the panel, but does not have a vote. CONARE meets twice a month.
- ≠ During the adjudications period, the asylum applicants must check in with GIM every 30 days. If they miss a check-in, they are considered to have abandoned their claims.
- ≠ Migrants granted asylum are automatically given permanent residency, and then can apply for citizenship after maintaining permanent residency for five years.
- ≠ As permanent residents, asylees have access to services and employment, but it is not affirmatively provided to them.
- ≠ Asylum seekers currently do not stay in the GIM shelter.

≠   GIM is only responsible for transportation related to deportation. However, it has an
agreement with IOM to transport asylum seekers from the border.

Meeting with Guatemala Instituto de Migracion
May 30, 2019
All cites refer to Codigo de Migracion Decree 44-2016

≠   Met with Director Carlos Emilio Morales and Deputy Director Ruben Desiderio Aguilar.

≠   GIM is its own agency as of this year. GIM broke away from MOG and no longer depends on the central government. They are currently in a transition phase therefore some of their functions are still under MOG. The Director explained he is eager to make the complete transition.

≠   It is important to note that Guatemalan laws and their leadership stressed that their laws do not restrict migration but that they see migration as a right. However, they want assistance in enforcing their laws and being able to control the migrant flows especially of people who are criminals or engaging in human trafficking.

≠   GIM functions are the following:
    o   Control Migratorio (controls all requirements and documentation to enter/leave Guatemala including collecting fees)—led by GIM
    o   Passports—led by GIM
    o   Consular Affairs—led by GIM
    o   Permanent Status/Naturalization—led by GIM
    o   Asylum—led by GIM
    o   Customs—led by SAT
    o   Border security—led by DIPAFRONT (División de Puertos, Aeropuertos y Puestos Fronterizos)
    o   Immigration enforcement inland—led by PNC and Army. Guatemala has no immigration enforcement body inside the country.

≠   Along with their immigration code, Guatemala also has bilateral agreements on immigration with Honduras and El Salvador. Honduras is Acuerdeos Puesto Fronterizo Integrado and Protocolo Habilitente and with El Salvador Paso Agil.

≠   Immigration Enforcement-Inland
    o   Due to no inland immigration enforcement body, GIM relies heavily on PNC and the army who are able to operate inside Guatemala. PNC and the army do not enforce immigration laws instead they refer individuals to GIM. GIM only has one location to "register" migrants which is in Guatemala City. Migrants are told to register but no action is physically taken by PNC or the army to ensure migrants "register." Furthermore, any immigration violation usually is enforced if a crime is committed first since unlawful status only requires a "registration" to regularize their status. If migrant found to have entered unlawfully they are given 10 days to register and gain a status in Guatemala. There are penalties.
    o   GIM requested assistance in creating more locations where migrants could "register." They don't have any locations besides Guatemala City.
    o   Sanctions are available as an enforcement tool: fees of 200 Quetzales for no international travel document, 15 Quetzales per day for overstays, engaging in activities outside of approved status—500 Quetzales. In addition to the above fees the GIM can also request voluntary departure.

≠   Border security—border

1

- o   DIPAFRONT—an arm of the PNC heads border security.
  - ▪   Note: DIPAFRONT AND PNC are not well versed in immigration law under the GIM. DIPAFRONT mostly carries out custom and criminal enforcement at the border but not immigration control. They are currently under the MOG. It is important to note that although GIM oversees immigration control they do not have an enforcement arm under them instead it is under MOG. Detention is authorized to be carried out by PNC. See Articulo 168: Detencion pg. 53.
- o   GIM does not have any operational manuals.
- o   No detention capabilities—have a shelter that holds 200 migrants.
  - ▪   Note: They have a 48-hour hold time afterwards the migrants must be released. The 48 hold time is for administrative time for GIM.
    Law is clear that unaccompanied children should be held in different facilities as well as traveling families must be kept together. Unaccompanied children cannot be refused entry to the country and deportation is limited to exceptional cases. –See Capitulo II "Derechos y Condiciones Especiales" pg. 4
- o   Requirements for Guatemalans to leave Guatemala are listed in Capitulo II "Obligaciones y Prohibicones de las Personas Migrantes."
- o   Guatemala refers to deportation as "Expulsion." Due to limited detention capabilities, their expulsion numbers are low and in practice only happens if a migrant is already serving time for a crime.
- o   Inadmissibility: public order and security, crimes under the International Criminal Court, crimes against life, liberty and property, and international arrest warrant. See Capitulo III Ingreso de Personas Extranjereas a Guatemala Articulo 66.
- o   Leaving Guatemala via air, sea or land without passengers going through immigration control is a fine of 10,000 USD for the driver.
- o   Central Americans can enter as tourists up to 90 days.
  - ▪   Note: Central Americans must still meet the tourist requirements.
- ≠   Refugee/Asylum
  - o   Clarification in term. Refugee means all protected grounds (not political). Asylum is only political asylum.
  - o   Requires UNHCR communication/awareness. See Capitulo V "Derechos al Reconocimiento del Estatuto de Refugiado, Asilo Politico y la Asistencia Humanitaria" PG. 13.
- ≠   Travel documents: at this time they do not have a process to request travel documents.
- ≠   CA-4: Director said that the CA-4 between the four countries is in their constitution. That it was never ratified but that it has been incorporated in the additional manuals afterwards.
  - o   Note: I asked him to please send me all documents related to the CA-4.

Director said that the following would assist them:
- ▪   Removal process with a 5 and 10 year bar.
- ▪   Assistance in creating regulations.
- ▪   Transportation for deportation since commercial flights are too expensive
- ▪   Immigration databases
- ▪   GIM offices closer to the borders.

DHSFF1260

**From:**     Arreaga, uis E_Guatemala
**To:**       McCament, James; Koontz, Bryan K; Quam, illary C; _odge, David_Guatemala_; Rodriguez, ugo_; Sigmon, Eric B; _ooke, Kathleen_; San ord, Christina; _Connell, Carol; Jackson, Nancy_; Wol , Chad; Gountanis, John; Bro_n, Katherine; Boyd, Valerie; Teichman, Sabrina; Cloe, David; Salcedo, Viviana; _rzecho_ski, Je_rey; _o ez, Allison; Dolan, Ed ard; Maher, Jose h; _ishman, George; Baroukh, Nader; Kelliher, Brian; Mazzochi, Sarah; Tomney, Christo her; Barker, Tony; _e is, liver M; _outh, Marta C; _ersten, Thomas E; Kambo , eera K; Guatemala Desk; Mattler, Michael J; ohara_d; String, Marik A; Mizelle, Chad; Philli_s, Sha_n; Gene_amilton; Mayers, Dyani_CTR
**Subject:**  Re: M A Res onse to ACA  nderstanding o  acts
**Date:**            riday,  ctober 11, 2019  :  :  PM
 **ttac me t :**    image00 g

---

James, I just received a text from Minister Degenhart which he said was a follow up of a conversation he has been having with DHS related to the understanding of facts.  I assume you know what he is talking about and where it fits in the document.  Here is the text:

"Any foreign individual inside Guatemalan territory who claims persecution on account of political opinion, is entitled to apply for refugee status."

Get Outlook for iOS

---

DHSFF1261

*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528



**Homeland Security**

MEMORANDUM FROM THE SECRETARY

SUBJECT:    Whether Guatemala's Refugee Protection Laws and Procedures Satisfy the "Access to a Full and Fair Procedure" Requirements of Section 208(a)(2)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a)(2)(A).

After careful consideration, I find that Guatemala's refugee protection laws and procedures satisfy the requirements of Immigration and Nationality Act ("INA" or "the Act"), Section 208(a)(2)(A). This decision was made after a careful review of the available information found in the Guatemalan Migration Code, their implementing regulations, an active dialogue between our two States, information provided by the Department of State, information provided by the United Nations High Commissioner for Refugees (UNHCR), and information from other sources.

As the Department of Homeland Security has long recognized, the perfect harmonization of a foreign country's asylum laws and procedures to the laws and procedures in the United States "is not a prerequisite to entering into responsibility-sharing arrangements."[1]

Guatemala has satisfied the INA Section 208(a)(2)(A) requirement because it has in place a sufficient protection system with accompanying procedures and laws. Applicants for protection in Guatemala have a meaningful opportunity to make a protection claim, receive a hearing and adjudication regarding that claim, and safely remain in Guatemala until their protection claim is resolved.

Additionally, the phrase "full and fair procedure" presumes that the third country have in place a process that comports with basic notions of procedural fairness. The Guatemalan system meets these basic requirements. In Guatemala, an interpreter is available for the applicant during the interview, oral guidance is given to the applicant at the initial stages of the proceedings on how to present a claim along with information on rights, protections, and privileges, and an appeal process is provided. The applicant may also remain in Guatemala during the appeals process. Guatemalan law has adopted and maintains laws against *refoulement* of refugees that are in accord with its *non-refoulement* obligations described in Article 33 of the 1951 Convention Relating to the Status of Refugees 1951 and the 1967 Protocol Relating to the Status of Refugees, at a minimum.

---

[1] 69 Fed. Reg. 10,620-01, 10,620 (Mar. 8, 2004).

**Subject**: Whether Guatemala's Refugee Protection Laws and Procedures Satisfy the "Access to a Full and Fair Procedure" Requirements of Section 208(a)(2)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a)(2)(A).
Page 2

Additionally, non-binding UNHCR guidance provides another official's view in the context of safe third country considerations. The UNHCR Handbook is not definitive, but it indicates that a variety of procedures may be appropriate.[2]

I need not conclude that all of these UNHCR Handbook guidelines must be met for a country to provide "full and fair" procedures. Notwithstanding this, the Guatemalan system appears to satisfy each of them based on the available information. For example, it appears Guatemala has a competent immigration authority that has clear instruction for addressing initial asylum applicants, including referral to an adjudicative body. As for Guatemala's compliance with its *non-refoulement* obligations, Article 46 of the Migration Code generally establishes what those *non-refoulement* duties and obligations are, and they appear to meet or exceed the standards of Article 33 of the 1951 Refugee Convention and the 1967 Protocol. For example, Guatemalan law requires that, should asylum or refugee status be denied, an applicant will not be return to "his or her country when there is a credible reason to fear serious dangers to his or her life, physical integrity, and freedom."[3] Guatemalan Migration Code Article 12 also guarantees all migrants are not to be subject to "any form of violence," including torture, cruel, or degrading treatment. Guatemalan law further provides that asylum applicants will receive guidance during their application process, and it has a robust protection system in place under its laws, including the availability of psychologist during the refugee interview.[4] It also appears that a refugee applicant and refugee status grantee in Guatemala are informed of this decision and issued certifying documentation. Guatemala provides applicants the right to appeal an adverse decision on protection applications, which they must do within 10 days of notification of the decision. Applicants are also allowed to stay in Guatemalan during the pendency an appeal.

Therefore, and based on the information provided, I find that the Guatemalan refugee protection system satisfies the "access to a full and fair procedure" requirements of INA § 208(a)(2)(A).

Kevin K. McAleenan
Acting Secretary of Homeland Security

OCT 1 6 2019
Date

---

[2] *See* UNHCR, Handbook on Procedures and Criteria for Determining Refugee Status ("UNHCR Handbook") ¶ 189 (Jan. 1992 ed.). Notably, the UNHCR Handbook's most recent reissuance was in February 2019. However, the substance between the 2019 version of the UNHCR Handbook and the 1992 UNHCR Handbook remains unchanged.

[3] Migration Code, Congressional Decree, No. 44–2016, art. 46 (2016) (Guat.).

[4] *See* Regulations on the Procedure for the Protection, Determination, and Recognition of Refugee States in the State of Guatemala, Order No. 2-2019, at art. 17 (2019); *see also* Migration Code art. 180.

## Possible Removal to Guatemala in Accordance with the
## U.S.-Guatemala Asylum Cooperation Agreement
### Initial Processing Information

- You have been inspected and determined not to be admissible to the United States. You are subject to removal proceedings as described in the documents provided to you for the removal process. Nothing in this tear sheet changes that removal process.
- You have been identified as an alien who is potentially amenable to removal to Guatemala for consideration of your asylum or other protection claim(s) in accordance with the Agreement Between the Government of the United States and the Government of Guatemala on Cooperation Regarding the Examination of Protection Claims ("Asylum Cooperation Agreement") and section 208(a)(2)(A) of the Immigration and Nationality Act (8 U.S.C. § 1158(a)(2)(A)).
- You will be referred for an interview with a U.S. asylum officer, so a determination can be made whether you meet any exceptions to the Asylum Cooperation Agreement or section 208(a)(2)(A) of the Act.
    - Over the next day, you may consult with a person or persons of your choosing prior to the interview by telephone.
    - This interview will take place over the phone or may be in person at this location.
    - You may qualify for an exception to the Asylum Cooperation Agreement or section 208(a)(2)(A) if: (1) you are an unaccompanied minor; (2) you have arrived with a validly issued visa or other valid admission document, other than a transit visa issued by the United States; or you are not required to obtain a visa to the United States; or (3) it is determined in the agency's discretion that it is in the public interest for the United States to allow you to seek asylum in the United States.
- No Established Exceptions to the Asylum Cooperation Agreement or Section 208(a)(2)(A): If you are NOT determined to meet an exception to the Asylum Cooperation Agreement or section 208(a)(2)(A), you may be removed to Guatemala pursuant to the Agreement. If you are determined to not meet an exception to the Agreement or section 208(a)(2)(A), you may not apply for asylum or other protection in the United States, but you will have access to a full and fair procedure for pursuing asylum or equivalent temporary protection in Guatemala.
- Established an Exception to the Asylum Cooperation Agreement or Section 208(a)(2)(A): If you are determined to meet an exception to the Asylum Cooperation Agreement or Section 208(a)(2)(A), you will be permitted to seek protection (including, if applicable, asylum) in the United States consistent with the standard process. You will receive more information after your interview.
- You may express a fear of being removed to Guatemala or a fear of persecution or torture in Guatemala. If you express a fear of removal to Guatemala, you will be afforded the appropriate process.
- If you have such a fear, please inform the immigration officer who provided you this form or any other immigration officer, or please ask to speak to a supervisor.

# Lesson Plan Overview

| | |
|---|---|
| **Course** | Refugee, Asylum and International Operations Directorate Officer Training Asylum Division Officer Training Course |
| **Lesson** | ***Safe Third Country Threshold Screening*** |
| **Rev. Date** | May 9, 2013 |
| **Lesson Description** | The purpose of this lesson is to explain how to determine whether an alien seeking entry into the US from Canada at a land border is eligible for an exception to the Safe Third Country Agreement between the US and Canada, which would allow him/her to seek asylum in the United States. |
| **Terminal Performance Objective** | The Asylum Officer will be able to correctly determine whether the applicant in a "threshold screening" has established eligibility for an exception to the Safe Third Country Agreement. |
| **Enabling Performance Objectives** | 1. Identify who is subject to the Safe Third Country Agreement. (OK4)(AIL4)(ACRR10) |
| | 2. Identify the exceptions to the Safe Third Country Agreement.(AIL4) |
| | 3. Identify the function of the threshold screening.(AIL4) |
| | 4. Identify the standard of proof required to establish eligibility for an exception to the Safe Third Country Agreement.(AIL4) |
| | 5. Distinguish between the processes for Land Border Port-of-Entry cases versus Removals from Canada In-Transit through the US.(OK6)(OK7) |
| | 6. Identify family relationships that may prompt eligibility for an exception. |
| | 7. Identify the types of lawful immigration status a qualifying family member must have to prompt eligibility for an exception.(AIL4) |
| | 8. Identify when an asylum claim is pending and whether it may provide a basis for an exception.(AIL4)(OK4) |
| | 9. Identify exceptions based on citizenship or statelessness with last habitual residence in Canada.(AIL4)(OK4) |
| | 10. Identify process and potential bases for a public interest exception.(AIL4) |
| **Instructional Methods** | Lecture, practical exercises |
| **Student Materials/ References** | INA Section 208(a)(2)(A), 235(b)(1)(B)-(F); 8 C.F.R. § 208.30; *Agreement for the Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries*; *Procedural Issues Associated* |

*with Implementing the Agreement for the Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries*: *Statement of Principles*

Forms: **Form I-860**: Notice and Order of Expedited Removal; **Form I-867-A&B**:  Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act;  Safe Third Country Agreement Threshold Screening Adjudication Worksheet; **Form M-444C**:  Information about Threshold Screening Interview

**Method of Evaluation**     Written test

**Background Reading**     Joseph E. Langlois, Director, Asylum Division, US Citizenship and Immigration Service.  *APSS SAFE Screen Guidance*, Memorandum to All Asylum Officer Personnel (Washington, DC: June 5, 2006) 9 pp.


## CRITICAL TASKS


Knowledge of U.S. case law that impacts RAIO (3)

Knowledge of the Asylum Division mission, values, and goals. (3)

Knowledge of how the Asylum Division contributes to the mission and goals of RAIO, USCIS, and DHS. (3)

Skill in identifying information required to establish eligibility. (4)

Knowledge of the Asylum Division jurisdictional authority. (4)

Knowledge of forms required for exclusion/removal. (4)

Knowledge of Safe Third Country Agreement's impact on asylum. (4)

Skill in organizing case and research materials (4)

Skill in analyzing complex issues to identify appropriate responses or decisions. (5)

Skill in applying legal, policy, and procedural guidance (e.g., statutes, precedent decisions, case law) to information and evidence. (5)

Knowledge of Custom and Border Protection (CBP) functions and responsibilities, as they relate to RAIO (2)

# TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................................................4

II.   BACKGROUND.....................................................................................................................4

III.  FUNCTION OF THRESHOLD SCREENING....................................................................5

IV.   STANDARD OF PROOF IN THRESHOLD SCREENING ...............................................6

V.    EXCEPTIONS APPLICABLE AT U.S.-CANADA LAND BORDER PORTS OF ENTRY ...............................6
    A.   Citizen or habitual resident of Canada...........................................................................8
    B.   Family member in lawful status .....................................................................................8
    C.   Family Member 18 years of age or over who has a pending asylum application ...................12
    D.   Unaccompanied Minors.................................................................................................14
    E.   Individuals with a validly-issued U.S. visa, or Visa Waiver nationals required to have a visa in Canada...........................................................................14
    F.   USCIS Director or designee determines it is in the Public Interest to allow the individual to seek asylum in the U.S...........................................15

VI.   EXCEPTIONS APPLICABLE TO INDIVIDUALS BEING REMOVED BY THE GOVERNMENT OF CANADA IN-TRANSIT THROUGH THE UNITED STATES.....................15

VII.  SUMMARY ............................................................................................................................16
    A.   Function of the threshold screening ..............................................................................16
    B.   Standard of proof in threshold screening ......................................................................16
    C.   Exceptions applicable at U.S.-Canada land border ports of entry ......................................16
    D.   Exceptions applicable to individuals being removed by the Government of canada in-transit through the united states ...........................17

**Presentation**                                                                 **References**

## I.    INTRODUCTION

The purpose of this lesson is to explain how to determine whether an alien is eligible for an exception to the bar on applying for asylum when the alien would be subject to removal to Canada by operation of the *Agreement Between the Government of the United States and the Government of Canada For Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries* ("Safe Third Country Agreement" or "Agreement").

## II.    BACKGROUND

Section 208(a)(1) of the Immigration and Nationality Act ("Act") permits any alien who is physically present in or who arrives at the United States to apply for asylum; however, section 208(a)(2)(A) of the Act specifically states that paragraph (1) shall not apply where, "pursuant to a bilateral or multilateral agreement, the alien may be removed to a country where the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General [now deemed to be the Secretary of Homeland Security under the Homeland Security Act] finds that it is in the public interest for the alien to receive asylum in the United States."

On December 5th, 2002, the governments of the United States and Canada signed the Agreement Between the Government of the United States and the Government of Canada For Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries. The Agreement allocates responsibility between the United States and Canada whereby one country or the other (but not both) will assume responsibility for processing the claims of certain asylum seekers who are traveling from Canada into the United States or from the United States into Canada.

Under the Agreement, U.S. and Canada have agreed that the "country of last presence" is obligated to accept the return of an asylum seeker from the "receiving country" under certain circumstances. Specifically, aliens who request protection from the "receiving country," either at a U.S.-Canada land border port-of-entry or while being deported through the "receiving country" by the government of the "country of last presence," may generally be returned to the "country of last presence." The "country of last presence" will then

A more detailed discussion of the background underlying the Agreement may be found in the Supplementary Information discussion that accompanied publication of the Proposed Rule to implement the Agreement, published on March 8, 2004. 69 Fed. Reg. 10620.

consider the alien's protection request under its legal system.

The general obligation of the "country of last presence" to accept the return of asylum seekers making protection claims was largely tempered by principles underlying the U.S. position while negotiating the Agreement: (1) to the extent practicable, the Agreement should not act to separate families; (2) the Agreement must guarantee that persons subject to it would have their protection claims adjudicated in one of the two countries; and (3) it would be applied only in circumstances where it is indisputable that the alien arrived directly from the other country.  Reflecting these principles, the Agreement allows asylum seekers to join certain relatives already in the "receiving country." It also clearly stipulates that an asylum seeker subject to its terms must have his or her protection claim adjudicated in either Canada or the United States. And, the Agreement limits its application to two situations where aliens have come directly from the other country: those arriving at land border ports-of-entry and those transiting from the "country of last presence" through the "receiving country" during the course of deportation.

In addition to these limits on the Agreement's applicability, the Agreement also contains several exceptions allowing asylum seekers to pursue their protection claims in the "receiving country." These exceptions are discussed in detail below.

Finally, it is important to note that, because the Agreement is applicable only to aliens who may be treated as "applicants for admission" under INA § 235(a), the expedited removal process of § 235(b) has been selected as the principal implementation vehicle for the Agreement. The DHS regulations implementing the Agreement create within the expedited removal process a new mechanism for making determinations about how the Agreement applies to asylum seekers. This new mechanism is called the "threshold screening interview."  For cases where the Agreement applies, the "threshold screening interview" will precede (and, in some cases, preempt) the INA § 235(b)(1)(B) credible fear interview process with which asylum officers are familiar.

Immigration judges will conduct a similar analysis in those cases where DHS does not apply the expedited removal process to an alien subject to the Agreement and instead places the alien in removal proceedings under INA § 240.  8 CFR 1240.11(g)

## III.  FUNCTION OF THRESHOLD SCREENING

The function of the threshold screening process is to determine whether an alien is subject to the Agreement, and, if so, whether the alien will be permitted to remain in the U.S. to pursue his or her protection claims based on the alien's qualification for one of the Agreement's exceptions.

It is important to keep in mind that, while both the U.S. and Canada boast generous and effective protection regimes, in some individual cases, an applicant may have compelling reasons for not seeking protection in one nation, in favor of the other. Asylum officers are trained to make factual and legal determinations in the context of protection claims, so they are well-suited to the task of the threshold screening.

## IV.   STANDARD OF PROOF IN THRESHOLD SCREENING

The threshold screening is a fact-based determination, and is subject to a *preponderance of the evidence* standard of proof. Threshold screening interviews are conducted in Q&A format to create a sworn statement that is read back to the asylum seeker to ensure a complete and accurate record for supervisory and Headquarters Asylum (HQASM) review. There is no other review of the threshold screening determination.

**8 CFR 208.30**(e)(6)(ii)

Asylum officers will use all available evidence, including the individual's testimony, affidavits and other documentation, as well as available records and databases, to determine whether an exception to the Agreement applies in each alien's case. Credible testimony alone may be sufficient to establish that an exception applies, if there is a satisfactory explanation of why corroborative documentation is not reasonably available. In assessing whether evidence is reasonably available, asylum officers should be sensitive to the fact that asylum seekers fleeing persecution may often not have documents establishing eligibility for one of the Agreement's exceptions at the time they seek to enter the United States from Canada; however, they should also consider the length of time the asylum seeker spent in Canada, and whether one could reasonably be expected to have obtained documentation while in Canada. Also, computer systems and government database records, though helpful in verifying certain family relationships and questions concerning immigration status, may not be conclusive. Asylum officers conducting threshold screening interviews should rely upon their training and experience in evaluating credibility of testimony when there is little or no documentation in support of that testimony.

Excerpt from Supplementary Information to the Proposed Rule - "What Type of Evidence Will Satisfy USCIS When Determining Whether an Individual Meets One of the Exceptions in the Agreement?" **69 FR 10623**

## V.   EXCEPTIONS APPLICABLE AT U.S.-CANADA LAND BORDER PORTS OF ENTRY

Aliens who request asylum, withholding of removal, or protection under the Convention Against Torture at a U.S. port-of-entry located

**8 CFR 208.30**(e)(6)(iii)

on the shared U.S.-Canada land border will be ineligible to pursue their claims in the U.S. unless they qualify for one of the Agreement's exceptions. An alien qualifies for an exception to the Agreement under these circumstances if he or she:

a.) Is a citizen of Canada or, not having a country of nationality, is a habitual resident of Canada;

b.) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who has been granted asylum, refugee, or other lawful status in the United States, provided, however, that this exception shall not apply to an alien whose relative maintains only nonimmigrant visitor status, as defined in section 101(a)(15)(B) of the Act, or whose relative maintains only visitor status based on admission to the United States pursuant to the Visa Waiver Program;

c.) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who is at least 18 years of age and has an asylum application pending before U.S. Citizenship and Immigration Services, the Executive Office for Immigration Review, or on appeal in federal court in the United States;

d.) Is unmarried, under 18 years of age, and does not have a parent or legal guardian in either Canada or the United States;

e.) Arrived in the United States with a validly issued visa or other valid admission document, other than for transit, issued by the United States to the alien, or, being required to hold a visa to enter Canada, was not required to obtain a visa to enter the United States; or

f.) The Director of USCIS, or the Director's designee, determines, in the exercise of unreviewable discretion, that it is in the public interest to allow the alien to pursue a claim for asylum, withholding of removal, or protection under the Convention Against Torture, in the United States.

### A.   Citizen or habitual resident of Canada

Applications made by individuals claiming to be citizens of Canada must be referred to HQASM prior to a determination. A passport may generally be considered presumptive proof of citizenship.

Aliens claiming citizenship in multiple countries may be admitted under this exception if they establish Canadian citizenship by a preponderance of the evidence.

Stateless individuals who last resided in Canada must establish both statelessness and habitual residence in Canada.

The UN has defined "stateless person" as "a person who is not considered as a national by any State under the operation of its law." The INA defines "national" as a person owing permanent allegiance to a State. Both definitions should be considered when determining whether an individual is stateless. Even if the applicant believes he or she owes allegiance to a State, if the State does not consider the applicant to be a national of that State, the applicant should be considered stateless. Asylum Officers may wish to research State nationality laws to help identify statelessness.

Whether the applicant maintained a habitual residence in Canada is a question of fact that should be assessed based on the applicant's testimony and any documentation that establishes that the applicant, in fact, resided in Canada. Asylum Pre-Screening Officers (APSOs) should elicit specific information establishing place of residence and duration to determine whether the applicant habitually resided in Canada.

### B.   Family member in lawful status

1.   Qualifying family members with lawful immigration status in the United States, other than visitor (B-1, B-2, or visa waiver program), may serve as anchor relatives upon whom the applicant may base his/her request for exception to return under the Safe Third Agreement.

Proof of relationship may be based on specific documentary evidence (such as a birth certificate establishing a parent-child relationship), or, on the credible testimony of the applicant alone.

Additional supporting evidence could include a sworn

Agreement, art. 2

8 CFR 208.30(e)(6)(iii)(A)

Convention Relating to the Status of Stateless Persons, opened for signature Sept. 28, 1954, art. 1(1), 360 U.N.T.S. 117 (entered into force June 6, 1960)

INA § 101(a)(21)

Agreement, art. 4, ¶ 2(a)

8 CFR 208.30(e)(6)(iii)(B)

statement executed by the anchor relative, or by the anchor relative's representative (not necessarily a legal representative) if the anchor relative is incapable of executing a sworn statement.  Sworn statements by anchor relatives should identify the anchor by full name, date of birth, and alien registration number (if the anchor is not a US citizen).  APSOs may wish to contact anchor relatives by telephone to confirm or supplement information provided in the statement.

To facilitate submission of documents by the anchor relative, the applicant should be afforded access to telecommunications equipment to contact the anchor, and to receive communication from the anchor.

The applicant's credible testimony alone may also be sufficient to establish a qualifying relationship, if obtaining documentary evidence is unreasonable.  The testimony must establish that it is more likely than not that the relationship exists.  To establish a relationship through credible testimony alone, the APSO should elicit information relating to the anchor relative's basic biographic information, such as birth date, age, place of residence, length of time in the U.S., or other information that confirms familiarity with the relative.

*Matter of Dass,* 20 I&N Dec. 120 (BIA 1989); *Matter of S-M-J,* 21 I&N Dec. 722 (BIA 1997); *Matter of Y-B-,* 21 I&N Dec. 1136 (BIA 1998) *Matter of B-B-,* Int. Dec. 3367 (BIA 1998)

The following family members may serve as anchor relatives:

a.   The applicant's spouse, as defined in INA § 101(a)(35).  The relationship must be based on a non-polygamous marriage valid under the laws of the place where the marriage was performed, and does not include unions precluded by U.S. law or regulations.  Proof of a spousal relationship could include a marriage certificate or a sworn statement from the spouse.

69 Fed. Reg. 69480

Matter of H-, 9 I&N Dec. 640, 641 (BIA 1962)

Defense of Marriage Act, Public Law 104-199, section 3, 110 Stat. 2419 (1996).

b.   Son, meaning the male offspring of the applicant, including those born either in or out of wedlock, step-sons, and those adopted prior to the age of 18.  Proof of a parent-son relationship could include a birth certificate or adoption decree showing the applicant's name as one of the son's parents, or a sworn statement by the son (if he is 18 or over) or by the son's representative (if the son is under 18).

The terms, "son" and "daughter," as they are used in the Agreement, are equivalent to the "child" definition of INA § 101(b), with the exception that 101(b)(1)'s requirement that the "son" or "daughter" be "an unmarried person under twenty-one years of age" does not apply to analysis under

the Agreement's exceptions.

c.   Daughter, meaning the female offspring of the applicant, including those born either in or out of wedlock, step-daughters, and those adopted prior to the age of 18.  Proof of a parent-daughter relationship could include a birth certificate or adoption decree showing the applicant's name as one of the daughter's parents, or a sworn statement by the daughter (if she is 18 or over) or by the daughter's representative (if she is under 18).

*Id.*

d.   Parent, meaning the father or mother of the applicant, either through birth or adoption prior to the age of 18, or a step-father or step-mother, meaning a person married to the father or mother of the applicant prior to the applicant's eighteenth birthday.  Proof of parental relationship could include a birth certificate or adoption decree showing the applicant as the child of the named parent, or a sworn statement by the parent.

INA Section 101(b)(2)

e.   Legal guardian, meaning a person currently vested with legal custody of the applicant or vested with legal authority to act on behalf of the applicant, provided that the applicant is unmarried and under age 18.  Proof of guardianship could include a court-issued guardianship order or sworn statement by the guardian.

8 CFR 208.30(e)(6)(iv)

f.   Sibling, meaning the brother or sister of the applicant, as a result of having the same mother or father through birth or adoption prior to the age of 18.  This term also includes a step-sibling, meaning a person with a parent married to a parent of the applicant.  Proof of sibling relationship could include birth certificates or adoption decrees for both the sibling and the applicant showing shared parentage, or a sworn statement by the sibling (if 18 or over), parent, or representative, or any combination of the above.

g.   Grandparent, meaning the parent of the applicant's parent, as the term "parent" is defined above.  Proof of grandparent relationship to the applicant could include birth certificates or adoption decrees of the applicant's parent and the applicant, or by sworn

statement from the grandparent or the applicant's parent, or their representative, or any combination of the above.

h.   Grandchild, meaning the son or daughter of the applicant's son or daughter as the terms "son" and "daughter" are defined above.  Proof of grandchild relationship could include birth certificates or adoption decrees for the grandchild and the grandchild's parent (applicant's son or daughter), sworn statements from the grandchild (if 18 or over) or his/her parents or representative, or any combination of the above.

i.   Aunt or uncle, meaning the sibling of the applicant's parent, or the spouse of an applicant's parent's sibling, as the terms "sibling," "parent," and "spouse" are defined above.  Proof of relationship to an aunt or uncle could include birth certificates or adoption decrees showing common parentage of the aunt and the applicant's parent, or marriage certificate showing union with the applicant's parent's sibling, or sworn testimony from the aunt or uncle (if 18 or over), or his or her sibling, parent, or representative, or any combination of the above.

j.   Niece, meaning the daughter of the applicant's sibling, as the terms "daughter" and "sibling" are defined above.  Proof of aunt/uncle relationship to a niece could include birth certificates or adoption decrees of the applicant, the niece's parent (applicant's sibling), and the niece, sworn statements from the niece (if 18 or over), her parents, or her representative, or any combination of the above.

k.   Nephew, meaning the son of the applicant's sibling, as the terms "son" and "sibling" are defined above. Proof of aunt/uncle relationship to a nephew could include birth certificates or adoption decrees of the applicant, the nephew's parent (applicant's sibling), and the nephew, sworn statements from the nephew (if 18 or over), his parents, or his representative, or any combination of the above.

2.   In-law relationships are not considered qualifying family members.

3.   For purposes of this exception, there is no age restriction on the anchor family member in lawful immigration status.

4.   Lawful immigration status for the purpose of exception to the Safe Third Agreement does not include family members in non-immigrant status under INA 101(a)(15)(B) or pursuant to the Visa Waiver Program. Proof of lawful immigrant status could include verification through DHS or EOIR databases, copies of documents that form the basis for such status (e.g. a U.S. birth certificate for citizenship based on birth in the U.S.; Court Order granting withholding of removal, etc.). Examples of eligible anchor status would include the following:

> The VWP is outlined in INA § 217 and implemented at 8 CFR part 217.

   a.   U.S. Citizens
   b.   U.S. Lawful Permanent Residents (LPRs), including conditional LPRs
   c.   Asylees
   d.   Refugees
   e.   Aliens granted Temporary Protected Status
   f.   Aliens granted withholding of removal
   g.   Aliens with valid student and employment-related non-immigrant visas

## C.   Family Member 18 years of age or over who has a pending asylum application

> Agreement, art. 4, ¶ 2(b)
>
> **8 CFR 208.30(e)(6)(iii)(C)**

1.   This exception includes qualifying family members as defined in B.1.a-l, above.

2.   Unlike the previous category, this exception places an age restriction on the anchor family member.

   The anchor family member must be 18 or over, according to information contained in the asylum application, on the date of the threshold screening determination.  This age restriction applies to all family members in this category, including spouses.

3.  A "family member" should be regarded as having an asylum application pending where he or she is a principal applicant or is included as a derivative beneficiary on an I-589 filed by another alien, or is in the U.S. and is the beneficiary of a pending Refugee/Asylee Relative Petition (Form I-730).

    a.  Pending applications include the following:

        *(i)*  Applications awaiting interview;

        *(ii)*  Applications that have been; interviewed, but are awaiting decision;

        *(iii)*  Applications in which a Notice of Intent to Deny has been issued, but which have not been denied;

        *(iv)*  Applications that have been referred to an IJ and are pending before EOIR;

        *(v)*  Applications that have been denied, but have an appeal pending with the BIA;

        *(vi)*  Applications that have been denied but have a Petition for Review pending with a U.S. Court of Appeals.

> HQASM can be contacted to help determine if a family member's asylum application is pending review by a U.S. Court of Appeals.

    b.  The following application will not be considered "pending:"

        *(i)*  Applications that have been administratively closed;

        *(ii)*  Applications that have been dismissed;

        *(iii)*  Applications that have been terminated;

        *(iv)*  Applications that have been withdrawn.

    c.  The application must be pending on the date of threshold screening determination.

    d.  Proof of filing of I-589 must be confirmed by RAPS and/or EOIR databases, or by proof of receipt (either through communication received from DHS or DOJ, or proof of docketing before a federal court).

    e.  No assessment of the quality of the pending asylum application is required.

        *(i)*  Neither the asylum filing bars of INA § 208(a)(2) or the eligibility bars of § 208(b)(2)(A) are relevant to the threshold screening determination.

        *(ii)*  Likelihood of approval is not relevant to the threshold screening determination.

**D.   Unaccompanied Minors**

For purposes of the Agreement, "unaccompanied minors" are

1.   Unmarried and under age 18 (age may be established through valid identity documents, dental and/or wrist bone examination, which is a process usually coordinated by the Public Health Service, or other evidence that established that it is more like than not that the alien is under age 18); and

2.   Have no parent or legal guardian in either the United States or Canada.

Under CBP practices, unaccompanied juvenile aliens are generally not subject to Expedited Removal. As such, most aliens who might qualify for the agreement's "unaccompanied minor" exception will not undergo threshold screening interviews by asylum officers.  Immigration judges, in removal proceedings under INA § 240, will determine whether unaccompanied minors are excepted from the Agreement by applying the Agreement's definition of "unaccompanied minor," which differs from that customarily used by CBP officers.

**E.   Individuals with a validly-issued U.S. visa, or Visa Waiver nationals required to have a visa in Canada**

An applicant for admission at a U.S.-Canada land border port of entry may be denied admission by CBP and referred to an asylum officer for a threshold screening interview, even though he or she has a passport that contains a U.S.-issued visa.  Aliens referred in this fashion may include those presenting currently genuine (not counterfeit) non-immigrant U.S. visa indicating an intention to apply for asylum, and determined by CBP to be an intending immigrant during the inspection process.  Aliens found to possess genuine visas will meet an exception to the Agreement, even if they are an intending immigrant, and the officer will continue with consideration of the credible fear claim.

An example of validly issued, genuine visas, for purposes of this exception is a non-immigrant visa that was properly issued by a designated State Department official to an individual using a properly-issued passport, but the individual was found ineligible for admission into the U.S. because CBP determined the alien to be an intending immigrant.

Agreement, art. 4, ¶ 2(c)

**8 CFR 208.30(e)(6)(iii)(D)**

**8 CFR 1208.4(a)(6); 1240.11(g)(1)**

**69 Fed. Reg. 10623; 10630; 69483**

Agreement, art. 4, ¶ 2(d); art. 5

**8 CFR 208.30(e)(6)(iii)(E)**

Examples of visas that will not be considered validly issued for purposes of this exception to the Agreement are, obviously, counterfeit visas not issued by the U.S. Government. Additionally, visas in passports that were obtained through identity fraud and visas in photo-subbed passports will not be considered validly issued. However, where an alien has made a material misrepresentation to a consular officer for purposes of concealing his or her intent in order to apply for asylum in the U.S., a visa issued by the State Department in reliance on such a misrepresentation may still be regarded as validly-issued.

Aliens from countries participating in the U.S. Visa Waiver Program who are not exempt from Canadian visa requirements also qualify for an exception to the Agreement. However, at this time, all nationals of each U.S. VWP participating country are also visa exempt for Canadian purposes. Thus, this exception will not presently apply to any asylum seekers. VWP applicants who indicate an intention to apply for asylum will be referred to an asylum officer, who will conduct a threshold screening interview to determine the applicability of other Agreement exceptions.

> A list of U.S. VWP participating countries and visa exempt Canadian nationalities may be found, respectively, at http://www.cic.gc.ca/english/visit/visas.asp (scroll down to "Visitor Visa Exemptions")

**F.   USCIS Director or designee determines it is in the Public Interest to allow the individual to seek asylum in the U.S.**

> Agreement, art. 6
>
> **8 CFR 208.30(e)(6)(iii)(F)**

For purposes of the public interest exception to the Agreement, an APSO will conduct the threshold screening interview and may recommend such a determination, but the final decision on affirmative public interest findings is made by the USCIS director or his/her designee.

Each public interest exception should be evaluated on an individualized, case-by-case basis, applying a "totality of the circumstances" analysis.

> **69 FR 69483-84**

## VI.   EXCEPTIONS APPLICABLE TO INDIVIDUALS BEING REMOVED BY THE GOVERNMENT OF CANADA IN-TRANSIT THROUGH THE UNITED STATES

Parole status granted to an alien for the purpose of allowing him or her to transit through the U.S. during the course of removal by the Canadian government will be revoked upon the alien's indication of intention to seek asylum. The applicant will then be immediately referred for a threshold screening interview. For threshold screening of in-transit referrals, the only exceptions to the Agreement are the following:

- Is a citizen of Canada or, not having a country of nationality, is a habitual resident of Canada; or

  Described in greater detail at Section V.(A) above.

- The Director of USCIS, or the Director's designee, determines, in the exercise of unreviewable discretion, that it is in the public interest to allow the alien to pursue a claim for asylum, withholding of removal, or protection under the Convention Against Torture, in the United States

  Described in greater detail at Section V.(F) above.

## VII. SUMMARY

### A.    Function of the threshold screening

The function of the threshold screening process is to determine whether an alien is subject to the Agreement, and, if so, whether s/he will be permitted to remain in the U.S. to pursue his or her protection claims based on the alien's qualification for one of the Agreement's exceptions.

### B.    Standard of proof in threshold screening

The threshold screening is a fact-based determination, and is subject to a *preponderance of the evidence* standard of proof.

### C.    Exceptions applicable at U.S.-Canada land border ports of entry

Aliens who request asylum, withholding of removal, or protection under the Convention Against Torture at a U.S. port-of-entry located on the shared U.S.-Canada land border will be ineligible to pursue their claims in the U.S. unless they qualify for one of the Agreement's exceptions.

An alien qualifies for an exception to the Agreement under these circumstances if he or she:

a.    Is a citizen of Canada or, not having a country of nationality, is a habitual resident of Canada;

b.    Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who has been granted asylum, refugee, or other lawful status in the United States, provided, however, that this exception shall not apply to an alien whose relative maintains only

nonimmigrant visitor status, as defined in section 101(a)(15)(B) of the Act, or whose relative maintains only visitor status based on admission to the United States pursuant to the Visa Waiver Program;

c.   Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who is at least 18 years of age and has an asylum application pending before U.S. Citizenship and Immigration Services, the Executive Office for Immigration Review, or on appeal in federal court in the United States;

d.   Is unmarried, under 18 years of age, and does not have a parent or legal guardian in either Canada or the United States;

e.   Arrived in the United States with a validly issued visa or other valid admission document, other than for transit, issued by the United States to the alien, or, being required to hold a visa to enter Canada, was not required to obtain a visa to enter the United States; or

f.   The Director of USCIS, or the Director's designee, determines, in the exercise of unreviewable discretion, that it is in the public interest to allow the alien to pursue a claim for asylum, withholding of removal, or protection under the Convention Against Torture, in the United States.

**D.   Exceptions applicable to individuals being removed by the Government of Canada in-transit through the United States**

For threshold screening of in-transit referrals, the only exceptions to the Agreement are the following:

a.)   Is a citizen of Canada or, not having a country of nationality, is a habitual resident of Canada; or

b.)   The Director of USCIS, or the Director's designee, determines, in the exercise of unreviewable discretion, that it is in the public interest to allow the alien to pursue a claim for asylum, withholding of removal, or protection under the Convention Against Torture, in the United States.



# US – Guatemala Asylum Cooperation Agreement (ACA) Threshold Screening

## Guidance for Asylum Officers and Asylum Office Staff

11/19/2019



USCIS00278



U.S. Citizenship
and Immigration
Services

2

# Roadmap

- Background/Legal Framework

- Overview of the Agreement

- Threshold Screening Process

- Exceptions to the Agreement

- Eliciting Evidence to Support Exception

- Review Process

- Post-Decision and Service

USCIS00279

FOUO



# Background/Legal Framework

- ACA – On July 26, 2019, the U.S. and Guatemala entered into an agreement, the Asylum Cooperation Agreement (ACA), "Agreement between the Government of the United States of America and the Government of the Republic of Guatemala on Cooperation Regarding the Examination of Protection Claims."

- Under 208(a)(2)(A) of the INA, an alien who may be removed, pursuant to a bilateral or multilateral agreement, to a country where the alien's life or freedom would not be threated and which has a full and fair process for determining a claim to asylum or equivalent protection is not eligible to apply for asylum in the U.S.

- Language added at 8 CFR § 208.30(e)(7)

3

FOUO



U.S. Citizenship
and Immigration
Services

# Overview of the ACA

- Prohibits certain asylum seekers from pursuing a request for protection in the U.S. and allows the U.S. to remove them to Guatemala to seek protection.

- Applies to individuals who are subject to expedited removal, regardless of whether the individual arrives at a POE, and who express a fear of persecution or torture, a fear of return, or an intention to apply for asylum.

- Certain populations are exempt from the Agreement.

- Individuals who establish during an interview with an AO that they are more likely than not to be persecuted or tortured in Guatemala are exempt from the Agreement.

- Implementing regulations apply only prospectively to aliens who enter or arrive in the United States on or after Tuesday, November 19.

- Exceptions may apply

- Affirmative asylum cases are NOT subject to the Agreement.

FOUO

USCIS00281

4



# Interview Procedures

- ## Most relevant CF interview procedures in 208.30(d) apply:

  - Officer may reschedule if the individual is unable to participate effectively in the interview due to illness, fatigue, or other impediments

  - Individual is <u>not</u> entitled to a consultant

  - Asylum Division will provide interpreter as needed

  - AO must create a summary of material facts as stated by the individual and at the end of the interview the AO must review the summary with the alien and give him or her an opportunity to correct errors

FOUO

USCIS00282



# Threshold Screening Process

- CBP processes individual for ER and generates I-213, I-860, I-867 Parts A&B.

- CBP makes an initial determination whether the individual is amenable to ACA

- CBP provides Tear Sheet with information about the threshold screening (similar to M-621)

- CBP refers the case to Asylum. Asylum receives I-213, I-860, I-867 Parts A&B, and Tear Sheet

6

USCIS00283

FOUO



U.S. Citizenship
and Immigration
Services

# Tear Sheet

- Explains:

  - The individual is potentially amenable to removal to Guatemala under section 208(a)(2) pursuant to the "Agreement between the Government of the United States and the Government of the Republic of Guatemala on Cooperation in the Examination of Protection Claims." They will be referred to an asylum officer for an assessment on whether they meet an exception to the US – Guatemala ACA.

  - Interview will take place over the phone or in person.

  - If the aliens do not meet an exception to the ACA they may not apply for asylum or other protection in the U.S. and will be removed to Guatemala where they may apply for asylum or protection.

  - Aliens may express a fear of removal to Guatemala or a fear of persecution or torture in Guatemala. If they express a fear of removal to Guatemala they will be afforded the appropriate process.

7

USCIS00284



U.S. Citizenship
and Immigration
Services

8

# Threshold Screening Process Cont.

- Asylum office receives I-860, I-867 A&B, I-213, and copy of Tear Sheet

- Case entry into Global

- The individual's accompanying spouse and qualifying children (immediately family members) are processed together

- AO interviews to: 1) verify Asylum Division-relevant aspects of CBP amenable population determination, 2) validate CBP's determination of exceptions, 3) determine if public interest exception applies

- If individual affirmatively expresses a fear of removal to Guatemala, the AO will screen him or her to determine if the individual is more likely than not to be persecuted or tortured in Guatemala

- AO must create a summary of material facts as stated by the individual, review the summary with the individual, and provide him or her with an opportunity to correct any errors

USCIS00285

FOUO

U.S. Citizenship
and Immigration
Services

# Standard of Proof

- The individual must show by preponderance of the evidence that he or she qualifies for an exception under the terms of the Agreement.

- If the individual affirmatively expresses a fear of removal to Guatemala, he or she must show it is more likely than not that he or she will be persecuted on account of a protected ground or tortured in Guatemala.

USCIS00286



# ACA Amenable Population and Exceptions

- AOs conduct a threshold screening to determine amenable population, meaning the individual:
  1) Is not a Citizen or national of Guatemala
  2) Is a national of Honduras or El Salvador
  3) Claims a fear of return to their home country
  4) Arrived or entered the U.S. on or after the effective date of the ACA IFR
  5) Has not been admitted to the U.S.
  6) Has not been returned to the U.S. from Canada under the STCA
  7) Not stateless and habitually residing in Guatemala
  8) Has not been convicted of a felony in the U.S. or any crime in Guatemala.
- AOs determine if the alien meets a public interest/discretionary exception
- Other exceptions or limits on amenability could be applicable based on agreement with Guatemala

USCIS00287

FOUO



U.S. Citizenship
and Immigration
Services

# Exception 1: Unaccompanied Alien Child

- UACs are not subject to INA § 208(a)(2)(A) and should not be referred to USCIS for ACA Threshold Screening

- UACs are unmarried, under 18 years of age, and do not have a parent or legal guardian in the United States (as defined in 8 CFR 208.30(6)(iii)(D))

11

USCIS00288

12

# Exception 2: Validly issued visa or no visa required

■ The individual demonstrates:

1. He or she arrived in the U.S. with a validly issued visa or other valid admission document, other than for transit.

   • Validly issued = genuine and issued by the U.S. government. Individual's admission to using false identity may affect determination of "genuineness." A finding of immigrant intent does <u>not</u> mean the visa was not validly issued.

2. He or she was not required to obtain a travel document – citizens or nationals of Visa Waiver Program (VWP) countries

USCIS00289

FOUO



U.S. Citizenship
and Immigration
Services

# Exception 3: Public Interest

- The Director of USCIS or his or her designee determines, in the exercise of unreviewable discretion, that it is in the public interest to allow the individual to pursue a claim for asylum, withholding of removal, or protection under the Convention Against Torture, in the U.S.

- Public interest is undefined in U.S. regulations and agreement

- AO must elicit relevant testimony and evidence

- Complete "Decision Memorandum: Review of Public Interest Exception Determination"

- HQASM concurrence required

FOUO

USCIS00290



# Post Interview Processing

- Document interview and exceptions in Global

- Complete Worksheet and Notice if no fear of Guatemala affirmatively claimed

- Supervisor must review determination

USCIS00291

# Fear of Removal to Guatemala

- If individual affirmatively expresses a fear of removal to Guatemala, AOs assess fear of removal to Guatemala

- Burden is on individual to establish credibility and meet standard of proof

- More likely than not standard – standard is higher than well-founded fear but lower than "beyond a reasonable doubt"

- More likely than not standard also used in MPP assessments

- [This standard provides for protection] "only if the alien's life or freedom 'would' be threatened in the country to which he would be deported; it does not require withholding if the alien 'might' or 'could' be subject to persecution." *INS v. Stevic*, 467 U.S. 407, 422 (1984)

15

FOUO

USCIS00292



# Relevant Case Law - Nexus

**We primarily see cases in the 5th and 9th Circuits – <u>QA Case Law ECN</u>**

- 9th circuit: "a reason"

    1. *Barajas-Romero*, 846 F.3d 351 (9th Cir. 2017)

    2. *Parussimova v. Mukasey*, 555 F.3d 734 (9th Cir. 2009) (compares "one central reason" to "at least in part," which is similar to "a reason")

- All other circuits: "one central reason"

USCIS00293

FOUO



# Credibility

- In conducting the interview, the asylum officer should take into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer.

USCIS00294

FOUO



# Persecution Claims

- Alien's testimony, if credible, may be sufficient for the individual to meet his or her burden of proof

- Nexus to one of the five grounds is required

- Government Actor OR Government Unable/Unwilling to Control Private Actor

- If past persecution established, presumption would not apply, but past persecution would be considered strong evidence of likelihood of future persecution

- Internal Relocation – if individual has not established past, burden is on individual to establish unless persecutor is government or government-sponsored

- May not make a positive assessment solely on past persecution or other serious harm

USCIS00295

FOUO



# Convention Against Torture (CAT)

- Assessment that there is no basis for statutory withholding does not necessarily mean the individual is ineligible for CAT protection

- AO must make separate CAT assessment if withholding of removal based on persecution is not established

- Evidence to Consider

  1. Past Torture
  2. Internal Relocation
  3. Gross, Flagrant, Mass Human Rights Violations
  4. Other Relevant Information

- Standard is more likely than not

- No presumption of future torture if past torture established

- No nexus to a protected ground required

USCIS00296

FOUO



# Country Conditions Resources

See the RAIO Research Unit's Guatemala Resource Guide at

**https://ecn.uscis.dhs.gov/team/raio/Research/RU_Resources/SitePages/Resources%20-%20Guatemala.aspx.**

FOUO

USCIS00297



# Post-Interview and Service

- Document Guatemala fear interview in Global

- AO prepares Worksheet and Assessment Notice

- SAO reviews Worksheet and Assessment Notice

- HQ reviews public interest exception cases

- CBP receives:

  - Guatemala ACA Threshold Screening Worksheet

  - Guatemala ACA Threshold Screening Assessment Notice

- CBP will serve the Guatemala ACA Assessment Notice to the individual

- No IJ review of Threshold Screening, including fear of removal to Guatemala

USCIS00298

FOUO



# Next Steps

- Individual receives Threshold Screening Assessment Notice indicating:

  1. Individual is not subject to removal to Guatemala and will be screened for credible fear.

  2. Individual is subject to removal to Guatemala under the U.S. – Guatemala Asylum Cooperation Agreement for consideration of his or her asylum or other protection claim(s).

  ➢ Individual may withdraw or dissolve his or her request for asylum or protection from return to his or her country and be removed to his or her country under an ER order.

22

USCIS00299



23

# Questions?

FOUO

**Whitney, Ronald W**

| | |
|---|---|
| **From:** | Caudill-Mirillo, Ashley B <Ashley.Caudill-Mirillo@uscis.dhs.gov> |
| **Sent:** | Thursday, November 21, 2019 4:18 PM |
| **To:** | RAIO - Asylum Field Office Staff; RAIO - Asylum Field Office Managers; RAIO - Asylum HQ; RefugeeAffairsTDY |
| **Cc:** | RAIO - Asylum HQ Leadership; RAIO - Executive Leadership |
| **Subject:** | RE: FOR INTERNAL USE ONLY--Implementation of the Guatemala ACA UPDATED |
| **Attachments:** | Guatemala ACA Threshold Assessment Worksheet 2019-11-21.docx; Guatemala ACA Fear Assessment Worksheet 2019-11-21.docx; ACA Flowchart 11.21.19.pdf |

<u>**FOR INTERNAL USE ONLY**</u>

Dear Colleagues,

I am sending this message as a follow up to the guidance we provided previously.  We are updating our guidance and the three documents attached as follows:

1. The language below provides more detailed guidance on the processing of requests for Dissolution/Withdrawal;
2. The ACA Threshold Worksheet has been edited to remove language in the paragraph the officer reads to the individual that is more properly included in the fear in the  ACA Threshold Addendum Worksheet (Fear Worksheet);
3. The formatting of the dissolution section was changed on both worksheets; and
4. The flowchart was amended to reflect the scenario when an individual asserts no fear claim and the dissolution box was updated to be consistent with the guidance as described below

All other guidance and forms remain unchanged and are in effect.  Please continue to raise any questions through your chain of command.

Best,
Ashley

----

The United States and Guatemala entered into an Asylum Cooperative Agreement (ACA), formally "Agreement between the Government of the United States and the Government of the Republic of Guatemala on Cooperation in the Examination of Protection Claims" on July 26, 2019.  The Guatemala ACA affects an asylum seeker's ability to request asylum in the United States.  Regulatory language was added at 8 CFR § 208.30(e)(7), which took effect on November 19, 2019 and applies to aliens who arrive in or enter the United States on or after that date.  This regulatory language can be found on the Federal Register here: https://www.federalregister.gov/documents/2019/11/19/2019-25137/implementing-bilateral-and-multilateral-asylum-cooperative-agreements-under-the-immigration-and.

<u>Background</u>

Section 208(a)(2)(A) of the Immigration and Nationality Act (INA) prohibits certain aliens from applying for asylum in the U.S., if the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country where the alien's life or freedom would not be threatened on account of a  protected ground and where the alien would have access to a full

1

and fair procedure for determining a claim to asylum or similar protection.  The Guatemala ACA is such an agreement, as it allows the U.S. to remove certain aliens to Guatemala to seek protection there.  The Acting Secretary of Homeland Security and the Attorney General have determined that aliens returned pursuant to the Guatemala ACA would have access to a full and fair procedure for determining their claims for protection.  The Agreement applies to nationals of Honduras and El Salvador who are subject to expedited removal and who express a fear of persecution or torture, a fear of return, or an intention to apply for asylum in the United States. Certain populations, including Guatemalan nationals, unaccompanied alien children, and individuals who establish during an interview with an asylum officer (AO) that they are more likely than not to be persecuted or tortured in Guatemala, are exempt from return under the Agreement. The implementing regulations apply prospectively to aliens who enter or arrive in the United States on or after November 19, 2019.

USCIS will conduct a threshold screening to:
1) Verify certain aspects of CBP's amenable population determination;
2) Validate CBP's determination of exceptions;
3) Determine if a public interest exception applies; and
4) If an individual affirmatively expresses a fear of removal to Guatemala, the AO will screen the individual to determine if the individual is more likely than not to be persecuted on account of a protected ground or tortured in Guatemala.

<u>Overview of Process</u>

*Intake and Interview Preparation*:

Asylum seekers amenable to the agreement will be referred to an AO for a threshold screening determination.  To initiate this referral, a CBP officer will prepare and transmit the following documents to USCIS:

- Form I-213
- Form I-860
- Form I-867 Parts A&B
- Tear Sheet with information about the ACA threshold screening interview.

*Interview and Adjudication*:

ACA screening interviews must be conducted separate and apart from the general public. The purpose of the interview is to verify certain aspects of CBP's amenability determination, validate CBP's determination of exceptions, and determine if a public interest exception applies. Additionally, if the individual affirmatively expresses a fear of removal to Guatemala, screen him or her to determine if it is more likely than not that the individual will be persecuted on account of a protected ground or tortured in Guatemala.

Here are some important things to remember about the Guatemala ACA screening interview:

- The AO must confirm that the individual received the Tear Sheet and understood its contents.
- The individual is not entitled to a consultation period before the screening interview, and is not entitled to a consultant.
- If the AO determines the individual is unable to participate effectively in the interview because of illness, fatigue, or other impediments the office may reschedule the interview.
- The Asylum Division will provide an interpreter as needed.
- The AO must create a summary of the material facts as stated by the individual. At the end of the interview, the AO must review the summary with the individual and give him or her an opportunity to correct errors.

In Phase I of implementation of the Agreement, family units with children under 18 will not be subject to the Agreement. However, if family units with children under 18 become subject to subsequent phases of implementation,

USCIS00314

the individual's accompanying spouse and qualifying children (immediate family members) should be processed together with the alien. No separate worksheet is required.

After completing the interview and analyzing the facts, AOs should complete the Guatemala ACA Threshold Screening Worksheet, the Guatemala ACA Threshold Screening Worksheet Addendum/Fear Assessment (if applicable), and Guatemala ACA Threshold Assessment Notice.  These documents should be saved as PDFs, electronically signed, and e-mailed to a supervisory asylum officer for review. Supervisory review is required in all cases.  When the supervisor concurs in the decision, he or she should also sign the document electronically. Guidance on electronically signing PDFs is available here: https://helpx.adobe.com/acrobat/11/using/signing-pdfs.html.

If it appears that the individual may be eligible for a public interest exception, the SAO must send the worksheet to HQASM for review and concurrence.

*Recording the Case and Decision in the Global Case Management System:*

Asylum Office staff must create a case record in the Global system, as well as take appropriate steps to record each case outcome.  Staff must follow the attached Global Instructions Guidance for all Guatemala ACA cases.

*Dissolution/Withdrawal:*

An individual may withdraw or dissolve his or her request for asylum or protection from return to his or her country and be removed to his or her country under an ER order.  Asylum officers should complete the ACA Threshold Screening and ACA Fear worksheets (if applicable) and address withdrawal only after the alien has been determined to be amenable to the ACA (including not establishing any exceptions) and, if the applicant affirmatively raises a fear of removal to Guatemala, is found not to have a fear of removal to Guatemala.  So even if the alien raises the issue of withdrawal before the officer has completed the threshold screening, the officer should complete the the threshold screening (and if applicable, the fear screening) and address the withdrawal at the end.

If the individual does not affirmatively express a fear of Guatemala but wishes to withdraw the request for protection, the officer need only complete the ACA Threshold Screening Worksheet.

The Notice should be completed in both situations.  Also, update Global, as appropriate.

*Service*:

Asylum Office staff will provide the ACA Threshold Screening Worksheet and Assessment Notice to CBP and/or ICE to include in the A-file. DHS staff will provide a copy of the ACA Threshold Screening Assessment Notice to the alien.

CBP and/or ICE will take the appropriate next steps depending on the outcome of the threshold screening. In the event that an individual establishes an exception and/or establishes a likelihood of persecution or torture in Guatemala, USCIS must arrange for the M-444 to be provided and orientation to occur by USCIS, CBP or ICE depending on local policy, prior to the subsequent credible fear interview.  The individual must be provided the opportunity to consult with a person of their choosing following orientation and all existing credible fear guidance must be followed.

*HQ Notification*:

All ACA worksheets must be submitted to HQASM for awareness. Additionally, when it appears that the individual may be eligible for a public interest exception, the SAO must send the worksheet to HQASM for review and concurrence.

**FOR INTERAL USE ONLY**

USCIS00315

Thanks,
Ashley

Ashley Caudill-Mirillo
Deputy Chief
Asylum Division
Refugee, Asylum, and International Operations
U.S. Citizenship and Immigration Services

---

**From:** Caudill-Mirillo, Ashley B <Ashley.Caudill-Mirillo@uscis.dhs.gov>
**Sent:** Tuesday, November 19, 2019 7:58 PM
**To:** RAIO - Asylum Field Office Staff <RAIO-Test@uscis.dhs.gov>; RAIO - Asylum Field Office Managers <RAIO-AsylumFieldOfficeManagers@uscis.dhs.gov>; RAIO - Asylum HQ <RAIO-Asylum@uscis.dhs.gov>; RefugeeAffairsTDY <refugeeaffairstdy@uscis.dhs.gov>
**Cc:** RAIO - Asylum HQ Leadership <RAIO-AsylumHQLeadership@uscis.dhs.gov>; RAIO - Executive Leadership <RAIO-ExecutiveLeadership@uscis.dhs.gov>
**Subject:** RE: FOR INTERNAL USE ONLY--Implementation of the Guatemala ACA

**<u>FOR INTERNAL USE ONLY</u>**

Dear Asylum Staff,

As noted in the message from Associate Director Higgins, the United States and Guatemala entered into an Asylum Cooperative Agreement (ACA), formally "Agreement between the Government of the United States and the Government of the Republic of Guatemala on Cooperation in the Examination of Protection Claims" on July 26, 2019.  The Guatemala ACA affects an asylum seeker's ability to request asylum in the United States.  Regulatory language was added at 8 CFR § 208.30(e)(7), which took effect on November 19, 2019 and applies to aliens who arrive in or enter the United States on or after that date.  This regulatory language can be found on the Federal Register here: https://www.federalregister.gov/documents/2019/11/19/2019-25137/implementing-bilateral-and-multilateral-asylum-cooperative-agreements-under-the-immigration-and.

<u>Background</u>

Section 208(a)(2)(A) of the Immigration and Nationality Act (INA) prohibits certain aliens from applying for asylum in the U.S., if the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country where the alien's life or freedom would not be threatened on account of a  protected ground and where the alien would have access to a full and fair procedure for determining a claim to asylum or similar protection.  The Guatemala ACA is such an agreement, as it allows the U.S. to remove certain aliens to Guatemala to seek protection there.  The Acting Secretary of Homeland Security and the Attorney General have determined that aliens returned pursuant to the Guatemala ACA would have access to a full and fair procedure for determining their claims for protection.  The Agreement applies to nationals of Honduras and El Salvador who are subject to expedited removal and who express a fear of persecution or torture, a fear of return, or an intention to apply for asylum in the United States. Certain populations, including Guatemalan nationals, unaccompanied alien children, and individuals who establish during an interview with an asylum officer (AO) that they are more likely than not to be persecuted or tortured in Guatemala, are exempt from return under the Agreement. The implementing regulations apply prospectively to aliens who enter or arrive in the United States on or after November 19, 2019.

USCIS will conduct a threshold screening to:
1) Verify certain aspects of CBP's amenable population determination;
2) Validate CBP's determination of exceptions;
3) Determine if a public interest exception applies; and

USCIS00316

4)  If an individual affirmatively expresses a fear of removal to Guatemala, the AO will screen the individual to determine if the individual is more likely than not to be persecuted on account of a protected ground or tortured in Guatemala.

Overview of Process

*Intake and Interview Preparation*:

Asylum seekers amenable to the agreement will be referred to an AO for a threshold screening determination.  To initiate this referral, a CBP officer will prepare and transmit the following documents to USCIS:

-   Form I-213
-   Form I-860
-   Form I-867 Parts A&B
-   Tear Sheet with information about the ACA threshold screening interview.

*Interview and Adjudication*:

ACA screening interviews must be conducted separate and apart from the general public. The purpose of the interview is to verify certain aspects of CBP's amenability determination, validate CBP's determination of exceptions, and determine if a public interest exception applies. Additionally, if the individual affirmatively expresses a fear of removal to Guatemala, screen him or her to determine if it is more likely than not that the individual will be persecuted on account of a protected ground or tortured in Guatemala.

Here are some important things to remember about the Guatemala ACA screening interview:

-   The AO must confirm that the individual received the Tear Sheet and understood its contents.
-   The individual is not entitled to a consultation period before the screening interview, and is not entitled to a consultant.
-   If the AO determines the individual is unable to participate effectively in the interview because of illness, fatigue, or other impediments the office may reschedule the interview.
-   The Asylum Division will provide an interpreter as needed.
-   The AO must create a summary of the material facts as stated by the individual. At the end of the interview, the AO must review the summary with the individual and give him or her an opportunity to correct errors.

In Phase I of implementation of the Agreement, family units with children under 18 will not be subject to the Agreement. However, if family units with children under 18 become subject to subsequent phases of implementation, the individual's accompanying spouse and qualifying children (immediate family members) should be processed together with the alien. No separate worksheet is required.

After completing the interview and analyzing the facts, AOs should complete the Guatemala ACA Threshold Screening Worksheet, the Guatemala ACA Threshold Screening Worksheet Addendum/Fear Assessment (as appropriate), and Guatemala ACA Threshold Assessment Notice.  These documents should be saved as PDFs, electronically signed, and e-mailed to a supervisory asylum officer for review. Supervisory review is required in all cases.  When the supervisor concurs in the decision, he or she should also sign the document electronically. Guidance on electronically signing PDFs is available here: https://helpx.adobe.com/acrobat/11/using/signing-pdfs.html.

If it appears that the individual may be eligible for a public interest exception, the SAO must send the worksheet to HQASM for review and concurrence.

*Recording the Case and Decision in the Global Case Management System:*

USCIS00317

Asylum Office staff must create a case record in the Global system, as well as take appropriate steps to record each case outcome.  Staff must follow the attached Global Instructions Guidance for all Guatemala ACA cases.

*Service***:**

Asylum Office staff will provide the ACA Threshold Screening Worksheet and Assessment Notice to CBP and/or ICE to include in the A-file. DHS staff will provide a copy of the ACA Threshold Screening Assessment Notice to the alien.

CBP and/or ICE will take the appropriate next steps depending on the outcome of the threshold screening. In the event that an individual establishes an exception and/or establishes a likelihood of persecution or torture in Guatemala, USCIS must arrange for the M-444 to be provided and orientation to occur by USCIS, CBP or ICE depending on local policy, prior to the subsequent credible fear interview.  The individual must be provided the opportunity to consult with a person of their choosing following orientation and all existing credible fear guidance must be followed.

*HQ Notification*:

All ACA worksheets must be submitted to HQASM for awareness. Additionally, when it appears that the individual may be eligible for a public interest exception, the SAO must send the worksheet to HQASM for review and concurrence.

<u>Next Steps</u>

The Asylum Division must take immediate steps to train all staff on the Guatemala ACA within one week of the Agreement's effective date.  No officers or supervisors can be assigned to this caseload until they have received this training.

Employees should direct any questions pertaining to the Guatemala ACA through their chain of command.

As always, we are incredibly proud of our workforce and remain inspired by your dedication and hard work.

Sincerely,
Ashley

Ashley Caudill-Mirillo
Deputy Chief
Asylum Division
Refugee, Asylum, and International Operations
U.S. Citizenship and Immigration Services

**<u>FOR INTERNAL USE ONLY</u>**

---

**From:** Kim, Ted H <Ted.H.Kim@uscis.dhs.gov>
**Sent:** Tuesday, November 19, 2019 6:19 PM
**To:** RAIO - ALL1 <RAIO-ALL@uscis.dhs.gov>
**Subject:** FOR INTERNAL USE ONLY--Implementation of the Guatemala ACA

**<u>FOR INTERNAL USE ONLY</u>**

Dear Colleagues,

On July 26, 2019, the U.S. and Guatemala entered into an agreement, the Asylum Cooperative Agreement (Guatemala ACA), formally "Agreement between the Government of the United States and the Government of the Republic of Guatemala on Cooperation in the Examination of Protection Claims." The Guatemala ACA affects an asylum seeker's

USCIS00318

ability to request asylum in the United States. Regulatory language was added at 8 CFR § 208.30(e)(7), which took effect on November 19, 2019 and applies to aliens who arrive in or enter the United States on or after that date.  The regulation can be found here: https://www.federalregister.gov/documents/2019/11/19/2019-25137/implementing-bilateral-and-multilateral-asylum-cooperative-agreements-under-the-immigration-and.

Section 208(a)(2)(A) of the Immigration and Nationality Act (INA) prohibits certain aliens from applying for asylum in the U.S. if they may be removed to a third country pursuant to an agreement such as the Guatemala ACA. The Agreement applies to nationals of Honduras and El Salvador who are subject to expedited removal and who express a fear of persecution or torture, a fear of return, or an intention to apply for asylum in the United States. Certain populations, including Guatemalan nationals, unaccompanied alien children, and individuals who establish during an interview with an asylum officer (AO) that they are more likely than not to be persecuted or tortured in Guatemala, are exempt from the Agreement. The Agreement applies prospectively to aliens who enter or arrive in the United States on or after November 19, 2019.

In this process, asylum seekers amenable to the agreement will be referred to an asylum officer for a threshold screening determination.  USCIS will then conduct a threshold screening to:
1) Verify certain aspects of CBP's amenable population determination;
2) Validate CBP's determination of exceptions;
3) Determine if a public interest exception applies; and
4) If an individual affirmatively expresses a fear of removal to Guatemala, the AO will screen the individual to determine if the individual is more likely than not to be persecuted on account of a protected ground or tortured in Guatemala.

The Asylum Division has already provided training and guidance to a group of officers to support today's implementation.  Additional guidance, forms, and training materials will be provided by the Asylum Division.  All officers will receive training on the Guatemala ACA prior to being assigned this caseload.  Any questions or concerns should be directed to your chain of command. Thank you to our asylum colleagues and to the whole RAIO workforce for your continued hard work and dedication to the mission.

Sincerely,
Ted Kim
Deputy Associate Director
Refugee, Asylum and International Operations
USCIS, DHS

USCIS00319



# US – Guatemala Asylum Cooperation Agreement (ACA) Threshold Screening

## Guidance for Asylum Officers and Asylum Office Staff

01/04/2020

USCIS00348



# Roadmap

- Background/Legal Framework
- Overview of the Agreement
- Threshold Screening Process
- Exceptions to the Agreement
- Eliciting Evidence to Support Exception
- Review Process
- Post-Decision and Service

USCIS00349

FOUO

2



# Background/Legal Framework

- ACA – On July 26, 2019, the U.S. and Guatemala entered into an agreement, the Asylum Cooperation Agreement (ACA), "Agreement between the Government of the United States of America and the Government of the Republic of Guatemala on Cooperation Regarding the Examination of Protection Claims."

- Under 208(a)(2)(A) of the INA, an alien who may be removed, pursuant to a bilateral or multilateral agreement, to a country where the alien's life or freedom would not be threated and which has a full and fair process for determining a claim to asylum or equivalent protection is not eligible to apply for asylum in the U.S.

  - Language added at 8 CFR § 208.30(e)(7)

3

FOUO

USCIS00350



U.S. Citizenship and Immigration Services

# Overview of the ACA

- Prohibits certain asylum seekers from pursuing a request for protection in the U.S. and allows the U.S. to remove them to Guatemala to seek protection.

- Applies to individuals who are subject to expedited removal, regardless of whether the individual arrives at a POE, and who express a fear of persecution or torture, a fear of return, or an intention to apply for asylum.

- Certain populations are exempt from the Agreement.

- Individuals who establish during an interview with an AO that they are more likely than not to be persecuted or tortured in Guatemala are exempt from the Agreement.

- Applies only prospectively to aliens who enter or arrive in the United States on or after November 19, 2019.

- Exceptions may apply.

- Affirmative asylum cases are NOT subject to the Agreement.

USCIS00351

FOUO

4



# Interview Procedures

- **Most relevant CF interview procedures in 208.30(d) apply:**

  - Officer may reschedule if the individual is unable to participate effectively in the interview due to illness, fatigue, or other impediments

  - Individual is <u>not</u> entitled to a consultant

  - Asylum Division will provide interpreter as needed

  - AO must create a summary of material facts as stated by the individual and at the end of the interview the AO must review the summary with the alien and give him or her an opportunity to correct errors

5

FOUO

USCIS00352



U.S. Citizenship
and Immigration
Services

# Threshold Screening Process

- CBP processes individual for ER and generates I-213, I-860, I-867 Parts A&B

- CBP makes an initial determination whether the individual is amenable to ACA

- CBP provides Tear Sheet with information about the threshold screening (similar to M-621)

- CBP refers the case to Asylum. Asylum receives I-213, I-860, I-867 Parts A&B, and Tear Sheet

USCIS00353

6

FOUO

# Tear Sheet

- Explains:

  - The individual is potentially amenable to removal to Guatemala under section 208(a)(2) pursuant to the "Agreement between the Government of the United States and the Government of the Republic of Guatemala on Cooperation in the Examination of Protection Claims." They will be referred to an asylum officer for an assessment on whether they meet an exception to the US – Guatemala ACA.

  - Interview will take place over the phone or in person.

  - If the aliens do not meet an exception to the ACA they may not apply for asylum or other protection in the U.S. and will be removed to Guatemala where they may apply for refugee status or other form of protection.

  - Aliens may express a fear of removal to Guatemala or a fear of persecution or torture in Guatemala. If they express a fear of removal to Guatemala they will be afforded the appropriate process.

USCIS00354

7



U.S. Citizenship and Immigration Services

# Threshold Screening Process Cont.

- Asylum office receives I-860, I-867 A&B, I-213, and copy of Tear Sheet

- Case entry into Global

- The individual's accompanying spouse and qualifying children (immediately family members) are processed together

- Asylum Officer role: 1) review CBP documentation to verify CBP's amenable population; 2) review CBP documentation to validate CBP's determination of exceptions, 3) interviews to determine if public interest exception applies

- If individual <u>affirmatively expresses</u> a fear of removal to Guatemala, the AO will interview him or her to determine if the individual is more likely than not to be persecuted or tortured in Guatemala

- AO must create a summary of material facts as stated by the individual, review the summary with the individual, and provide him or her with an opportunity to correct any errors

USCIS00355

FOUO

8

U.S. Citizenship
and Immigration
Services

# Standard of Proof

- The individual must show by preponderance of the evidence that he or she qualifies for an exception under the terms of the Agreement.

- If the individual affirmatively expresses a fear of removal to Guatemala, he or she must show it is more likely than not that he or she will be persecuted on account of a protected ground or tortured in Guatemala.

USCIS00356



## ACA Amenable Population

■ AOs review CBP documentation to verify that alien is part of the amenable population, meaning the individual:

1) Is a citizen or national of an amenable country;
2) Is not a citizen or national of Guatemala;
3) Claims a fear of return to their home country;
4) Arrived or entered the U.S. on or after November 19, 2019;
5) Has not been admitted to the U.S.;
6) Has not been returned to the U.S. from Canada under the STCA;
7) Not stateless and habitually residing in Guatemala;
8) Has not been convicted of a felony in the U.S. or any crime in Guatemala.

10

FOUO

USCIS00357



# ACA Exceptions

- AOs review CBP documentation to see if any exception to the ACA is noted or warranted. These exceptions are:
    1. UAC;
    2. Alien arrived with a validly issued visa;
    3. Alien was not required to obtain a visa.

- AOs determine if the alien meets a public interest / discretionary exception.

- Other exceptions or limits on amenability could be applicable based on agreement with Guatemala.

- Note that we are not screening for ABC class members and/or NACARA eligibility.

11

USCIS00358

FOUO



# Exception 1: Unaccompanied Alien Child

- UACs are not subject to INA § 208(a)(2)(A) and should not be referred to USCIS for ACA Threshold Screening

- UACs are unmarried, under 18 years of age, and do not have a parent or legal guardian in the United States (as defined in 6 U.S.C. § 279(g)(2))

12

FOUO

USCIS00359

# Exception 2: Validly issued visa or no visa required

■ The individual demonstrates:

1. He or she arrived in the U.S. with a validly issued visa or other valid admission document, other than for transit.

   • Validly issued = genuine and issued by the U.S. government. Individual's admission to using false identity may affect determination of "genuineness." A finding of immigrant intent does not mean the visa was not validly issued.

2. He or she was not required to obtain a travel document – citizens or nationals of Visa Waiver Program (VWP) countries

13

FOUO

USCIS00360



14

# Exception 3: Public Interest

- The Director of USCIS or his or her designee determines, in the exercise of unreviewable discretion, that it is in the public interest to allow the individual to pursue a claim for asylum, withholding of removal, or protection under the Convention Against Torture, in the U.S.

- Public interest is undefined in U.S. regulations and agreement

- AO must elicit relevant testimony and evidence

- Complete "Decision Memorandum: Review of Public Interest Exception Determination"

- HQASM concurrence required

USCIS00361

FOUO

15

# Fear of Removal to Guatemala

- If individual affirmatively expresses a fear of removal to Guatemala, AOs assess fear of removal to Guatemala

- Burden is on individual to establish credibility and meet standard of proof

- More likely than not standard – standard is higher than "well-founded fear" but lower than "beyond a reasonable doubt"

- More likely than not standard also used in MPP assessments

- [This standard provides for protection] "only if the alien's life or freedom 'would' be threatened in the country to which he would be deported; it does not require withholding if the alien 'might' or 'could' be subject to persecution." *INS v. Stevic*, 467 U.S. 407, 422 (1984)

USCIS00362

FOUO



# Affirmative Expression of Fear



- If the alien affirmatively states a fear of removal to Guatemala, the AO will determine whether the alien has demonstrated that it is more likely than not that he or she would be persecuted on account of a protected ground or tortured in Guatemala.

  - By definition, the affirmative expression of fear by the alien should be <u>unprompted</u>. Therefore, the AO should not actively probe or question whether the alien has a fear of removal to Guatemala.

  - If, however, the alien without prompting affirmatively expresses a fear of removal to Guatemala, the AO must elicit additional testimony to make a fear determination.

USCIS00363



# Relevant Case Law - Nexus

**We primarily see cases in the 5th and 9th Circuits – <u>QA Case Law ECN</u>**

- Apply circuit court law based on location where alien is detained

- 9th circuit: "a reason"

  1. *Barajas-Romero*, 846 F.3d 351 (9th Cir. 2017)

  2. *Parussimova v. Mukasey*, 555 F.3d 734 (9th Cir. 2009) (compares "one central reason" to "at least in part," which is similar to "a reason")

- All other circuits: "one central reason"

17

FOUO

USCIS00364



# Credibility

- In conducting the interview, the asylum officer should take into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer.

- If testimony is elicited from the alien regarding the location where he or she will reside, then the AO also needs to explore internal relocation.

18

FOUO

USCIS00365

# Persecution Claims

- Alien's testimony, if credible, may be sufficient for the individual to meet his or her burden of proof

- Nexus to one of the five grounds is required

- Government Actor OR Government Unable/Unwilling to Control Private Actor

- If past persecution established, presumption would not apply, but past persecution would be considered strong evidence of likelihood of future persecution on the basis of the same claim

- Internal Relocation – if individual has not established past, burden is on individual to establish unless persecutor is government or government-sponsored

- May not make a positive assessment solely on past persecution or other serious harm

- A positive assessment means the alien can establish it is more likely than not that they will face persecution on account of a protected ground

USCIS00366

FOUO

19



U.S. Citizenship
and Immigration
Services

# Convention Against Torture (CAT)

- Assessment that there is no basis for statutory withholding does not necessarily mean the individual is ineligible for CAT protection

- AO must make separate CAT assessment if withholding of removal based on persecution is not established

- Evidence to Consider

  1. Past Torture

  2. Internal Relocation

  3. Gross, Flagrant, Mass Human Rights Violations

  4. Other Relevant Information

- Standard is more likely than not

- No presumption of future torture if past torture established

- No nexus to a protected ground required

20

USCIS00367

FOUO



# Country Conditions Resources

See the RAIO Research Unit's Guatemala Resource Guide at:

https:/ecn.uscis.dhs.gov/team/raio/Research/RU_Resources/SitePages/Resources%20-%20Guatemala.aspx

USCIS00368



# Post-Interview and Service

- Document Guatemala fear interview in Global

- AO prepares Worksheet and Assessment Notice

- SAO reviews Worksheet and Assessment Notice

- HQ reviews public interest exception cases

- CBP receives:
  - Guatemala ACA Threshold Screening Worksheet
  - Guatemala ACA Threshold Screening Assessment Notice

- CBP will serve the Guatemala ACA Assessment Notice to the individual

- No IJ review of Threshold Screening, including fear of removal to Guatemala

USCIS00369

FOUO

23

# Withdrawal/Dissolution

- An individual may affirmatively withdraw or dissolve the request for asylum or protection from return to his or her country and be removed to his or her country under an ER order.

- AOs should complete the ACA Threshold Screening and ACA Fear worksheets (if applicable) and address withdrawal only after determining the individual is amenable to the ACA (including not establishing any exceptions) and, if he or she affirmatively raises a fear of removal to Guatemala, is found not to have a fear of removal to Guatemala.

- Even if the individual raises withdrawal before the AO has completed the threshold screening, the AO should complete the threshold screening (and if applicable, the fear interview) and address withdrawal at the end.

- If the individual does not affirmatively express a fear of Guatemala but wishes to withdraw the request for protection, the AO need only complete the ACA Threshold Screening Worksheet.

- The Notice should be completed in both situations. Also, update Global, as appropriate.

USCIS00370

# Next Steps

- Individual receives Threshold Screening Assessment Notice indicating:

    1. Individual is not subject to removal to Guatemala and will be screened for credible fear.

    2. Individual is subject to removal to Guatemala under the U.S. – Guatemala Asylum Cooperation Agreement for consideration of his or her asylum or other protection claim(s).

    ⟐ Individual may affirmatively request to withdraw or dissolve his or her request for asylum or protection from return to his or her country and be removed to his or her country under an ER order.

USCIS00371

FOUO



25

# Questions?

FOUO

USCIS00372

**ACA – Guatemala**
**Guidance and Procedures**
**January 4, 2020**
FOUO

The United States and Guatemala entered into an Asylum Cooperative Agreement (ACA), formally "Agreement between the Government of the United States and the Government of the Republic of Guatemala on Cooperation in the Examination of Protection Claims" on July 26, 2019.  The Guatemala ACA affects an asylum seeker's ability to request asylum in the United States.  Regulatory language was added at 8 CFR § 208.30(e)(7), which took effect on November 19, 2019 and applies to aliens who arrive in or enter the United States on or after that date.  This regulatory language can be found on the Federal Register here: https://www.federalregister.gov/documents/2019/11/19/2019-25137/implementing-bilateral-and-multilateral-asylum-cooperative-agreements-under-the-immigration-and.

Background

Section 208(a)(2)(A) of the Immigration and Nationality Act (INA) prohibits certain aliens from applying for asylum in the U.S., if the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country where the alien's life or freedom would not be threatened on account of a  protected ground and where the alien would have access to a full and fair procedure for determining a claim to asylum or similar protection.  The U.S.-Guatemala ACA is such an agreement, as it allows the U.S. to remove certain aliens to Guatemala to seek protection there.  The Acting Secretary of Homeland Security and the Attorney General have determined that aliens returned pursuant to the U.S.-Guatemala ACA would have access to a full and fair procedure for determining their claims for protection.  The Agreement applies to nationals of amenable countries who are subject to expedited removal and who express a fear of persecution or torture, a fear of return, or an intention to apply for asylum in the United States. Certain populations, including Guatemalan nationals, unaccompanied alien children, and individuals who establish during an interview with an asylum officer (AO) that they are more likely than not to be persecuted or tortured in Guatemala, are exempt from return under the Agreement. The implementing regulations apply prospectively to aliens who enter or arrive in the United States on or after November 19, 2019.

USCIS will conduct a threshold screening to:
1) Verify certain aspects of CBP's amenable population determination;
2) Validate CBP's determination of exceptions;
3) Determine if a public interest exception applies; and
4) If an individual affirmatively expresses a fear of removal to Guatemala, the AO will screen the individual to determine if the individual is more likely than not to be persecuted on account of a protected ground or tortured in Guatemala.

Overview of Process

*Intake and Interview Preparation*:

USCIS00373

**ACA – Guatemala**
**Guidance and Procedures**
**January 4, 2020**
FOUO

Asylum seekers amenable to the agreement will be referred to an AO for a threshold screening determination.  To initiate this referral, a CBP officer will prepare and transmit the following documents to USCIS:

- Form I-213
- Form I-860
- Form I-867 Parts A&B
- Tear Sheet with information about the ACA threshold screening interview.

*Interview and Adjudication*:

ACA screening interviews must be conducted separate and apart from the general public. The purpose of the interview is to verify certain aspects of CBP's amenability determination, validate CBP's determination of exceptions, and determine if a public interest exception applies. Additionally, if the individual affirmatively expresses a fear of removal to Guatemala, interview him or her to determine if it is more likely than not that the individual will be persecuted on account of a protected ground or tortured in Guatemala.

Here are some important things to remember about the Guatemala ACA screening interview:

- The AO must confirm that the individual received the Tear Sheet and understood its contents.
- The individual is not entitled to a consultation period before the screening interview, and is not entitled to a consultant.
- If the AO determines the individual is unable to participate effectively in the interview because of illness, fatigue, or other impediments the office may reschedule the interview.
- The Asylum Division will provide an interpreter as needed.
- If the individual affirmatively states a fear of removal to Guatemala, the AO will determine whether the individual has demonstrated that it is more likely than not that he or she would be persecuted on account of a protected ground or tortured in Guatemala.
    o By definition, the affirmative expression of fear by the individual should be **unprompted**. Therefore, the AO should not actively probe or question whether the individual has a fear of removal to Guatemala.
    o If, however, the individual **without prompting** affirmatively expresses a fear of removal to Guatemala, the AO must elicit additional testimony to make a fear determination.

USCIS00374

- For example, if the individual says he or she "cannot" "will not" or "does not want to" go to Guatemala, the AO must explore why.
- The AO must create a summary of the material facts as stated by the individual. At the end of the interview, the AO must review the summary with the individual and give him or her an opportunity to correct errors.

As of December 10, 2019, family units with children under 18 may be subject to the Agreement. The individual's accompanying spouse and qualifying children (immediate family members) should be processed together. No separate worksheet is required.

For all family members, USCIS must verify certain aspects of CBP's amenable population determination and validate CBP's determination of exceptions. USCIS must also determine if a public interest exception applies. Then, if an officer determines any immediate family member qualifies for an exception under the terms of the Agreement, that family member becomes the main applicant on the Threshold Assessment Worksheet and the Assessment Notice. The accompanying immediate family members should be included in the family section. The assessment and analysis should be for the family member who qualifies for an exception. If the analysis is the same for other immediate family members, officers should note that in the additional information section.

Similarly, if applicable, if an officer determines an immediate family member is more likely than not to face persecution on account of a protected ground or tortured in Guatemala, that family member becomes the main applicant on the Guatemala ACA Threshold Screening Worksheet Addendum/Fear Assessment and the Assessment Notice. The accompanying immediate family members should be included in the family section. The assessment and analysis should be for the family member who establishes a fear of removal to Guatemala. If the analysis is the same for other immediate family members, officers should note that in the additional information section.

When an officer determines no family member qualifies for an exception, and, if applicable, no family member is more likely than not to face persecution on a protected ground or torture, the officer must fully develop the record for all family members. A parent is the main applicant on the Threshold Assessment Worksheet, the Guatemala ACA Threshold Screening Worksheet Addendum/Fear Assessment (as appropriate), and Assessment Notice. If any accompanying family member's analysis is different from that of the parent, the officer copies, pastes, and completes the analysis section for that accompanying family member.

After completing the interview and analyzing the facts, AOs should complete the Guatemala ACA Threshold Screening Worksheet, the Guatemala ACA Threshold Screening Worksheet Addendum/Fear Assessment (as appropriate), and Guatemala ACA Threshold Assessment

USCIS00375

**ACA – Guatemala**
**Guidance and Procedures**
**January 4, 2020**
FOUO

Notice.  These documents should be saved as PDFs, electronically signed, and e-mailed to a supervisory asylum officer for review. Supervisory review is required in all cases.  When the supervisor concurs in the decision, he or she should also sign the document electronically. Guidance on electronically signing PDFs is available here: https://helpx.adobe.com/acrobat/11/using/signing-pdfs.html.

If it appears that the individual may be eligible for a public interest exception, the SAO must send the worksheet to HQASM for review and concurrence.

*Recording the Case and Decision in the Global Case Management System:*

Asylum Office staff must create a case record in the Global system, as well as take appropriate steps to record each case outcome.  Staff must follow the attached Global Instructions Guidance for all Guatemala ACA cases.

*Dissolution/Withdrawal:*

An individual may <u>affirmatively request</u> to withdraw or dissolve the request for asylum or protection from return to his or her country and be removed to his or her country under an ER order.

- AOs should complete the ACA Threshold Screening and ACA Fear worksheets (if applicable) and address withdrawal only after determining the individual is amenable to the ACA (including not establishing any exceptions) and, if he or she affirmatively raises a fear of removal to Guatemala, is found not to have a fear of removal to Guatemala.
- Even if the individual raises withdrawal before the AO has completed the threshold screening, the AO should complete the threshold screening (and if applicable, the fear screening) and address withdrawal at the end.
- If the individual does not affirmatively express a fear of Guatemala but wishes to withdraw the request for protection, the AO need only complete the ACA Threshold Screening Worksheet.
- The Notice should be completed in both situations. Also, update Global, as appropriate.

*Service***:**

Asylum Office staff will provide the ACA Threshold Screening Worksheet and Assessment Notice to CBP and/or ICE to include in the A-file. DHS staff will provide a copy of the ACA Threshold Screening Assessment Notice to the alien.

USCIS00376

**ACA – Guatemala**
**Guidance and Procedures**
**January 4, 2020**
FOUO

CBP and/or ICE will take the appropriate next steps depending on the outcome of the threshold screening. In the event that an individual establishes an exception and/or establishes a likelihood of persecution or torture in Guatemala, USCIS must arrange for the M-444 to be provided and orientation to occur by USCIS, CBP or ICE depending on local policy, prior to the subsequent credible fear interview.  The individual must be provided the opportunity to consult with a person of their choosing following orientation and all existing credible fear guidance must be followed.

*HQ Notification*:

All ACA worksheets must be submitted to HQASM for awareness at asylum-aca@uscis.dhs.gov. Additionally, when it appears that the individual may be eligible for a public interest exception, the SAO must send the worksheet to HQASM for review and concurrence.

USCIS00377

**Global Case Management System**

At intake, Asylum Office staff must create a case record in the Global system. Please follow the Global guidance in the following tables and paragraphs. Each individual in a family unit must have a threshold screening record in Global and a fear assessment (if appropriate).

**Threshold Screenings – ACA (Guatemala):**

| Entry Tab Data Fields: | |
|---|---|
| Case Type | APSO CF |
| Fear Type | ACA 3rd Country – Expedited Removal |
| 3rd – Screening Interview Date | Date of Threshold Screening Interview |
| 3rd – Decision Date | Date of Threshold Decision |
| 3rd – Outcome | Choices: No Exception; No Exception – Dissolved; Exception – Public Interest; Exception – Validly Issued Visa; Exception – No Visa Required |
| 3rd – Service Date | Date when the case is provided to CBP and/or ICE after supervisory review |
| Case Control Office | Office with jurisdiction over the individual's location |
| Clock-in Date | Date that the case was referred to the Asylum Office regardless of time |
| Detention Facility Code (indicates when USCIS encountered the individual) | Location of individual at the time of the interview |
| Date of Entry | Latest arrival or entry date to the US |
| Port of Entry | Enter the corresponding Port of Entry or "UNK – Unknown" when apprehended between official Ports of Entry |
| Date of Apprehension | Initial apprehension date when the individual was encountered by CBP |
| Special Group | Guatemala |

NOTE: Follow all other instructions for entering case data on the Entry Tab of Global.

Not Part of Amenable Population: If it is determined that the individual is not part of the amenable population, do not enter data into the following fields: 3rd – Screening Interview Date, 3rd – Decision Date, 3rd – Outcome, or 3rd – Service Date.  On the Adjudication tab, close the case using the reason "Other" and make a note.

Dissolutions: If an individual affirmatively wishes to dissolve his or her request for protection in the United States during or at the conclusion of the Threshold Screening interview, users should select "No Exception – Dissolved" as the 3rd – Outcome on the Entry tab. Users must also close the case as dissolved. Asylum officers should not conduct or document an ACA Fear interview.

Adjudication Tab Data Fields:
Users should "Case Close" the case. This will complete the case.

| Case Close Data Fields: | |
|---|---|
| Close Date | Date when the case is provided to CBP and/or ICE after supervisory review |
| Close Reason | Other |
| Notes | If applicable, indicate whether the individual will receive a Credible Fear determination or an analysis of Fear of Removal to Guatemala. |

FOR INTERNAL USE ONLY – Rev. 1.4.2020

USCIS00378

Exception Established: If an exception is established, users should create a new entry in Global using the Fear Type of Expedited Removal and follow the instructions for capturing a Credible Fear determination. Under the Decision Details card for the Credible Fear determination, users should indicate in the Decision Notes section that a prior ACA Guatemala exception was found.  This will indicate from where this credible fear referral initiated.

**ACA Fear Assessment (Fear of Removal to Guatemala):**

| Entry Tab Data Fields: | |
|---|---|
| Case Type | APSO RF |
| Fear Type | Asylum Cooperative Agreement |
| Case Control Office | Office with jurisdiction over the individual's location |
| Clock-in Date | Date that the case was referred to the Asylum Office regardless of time |
| Detention Facility Code (indicates when USCIS encountered the individual) | Location of individual at the time of the interview |
| Date of Entry | Latest arrival or entry date to the US |
| Port of Entry | Enter the corresponding Port of Entry or "UNK – Unknown" when apprehended between official Ports of Entry |
| Date of Apprehension | Initial apprehension date when the individual was encountered by CBP |
| Special Group | Guatemala |

Enter the service date when the case is returned to CBP and/or ICE after supervisory review.

Follow all other instructions for entering case data and actions in Global.

Fear Established: If fear is established, users should create a new entry in Global using the Fear Type of Expedited Removal and follow the instructions for capturing a Credible Fear determination.  Under the Decision Details card for the Credible Fear determination, users should indicate in the Decision Notes section that a prior ACA Fear Assessment (Fear of Removal to Guatemala) was made.  This will indicate from where this credible fear referral initiated.

Dissolutions: If an individual affirmatively wishes to dissolve his or her request for protection in the United States during or at the conclusion of the ACA Fear interview, users should close the fear case as dissolved. Users should not update the threshold case.

USCIS00379

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 27, 2020, I electronically filed the foregoing appendix with the Clerk of the Court for the United States Court of for the District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.


By: */s/ Brian C. Ward*
     BRIAN C. WARD
     Senior Litigation Counsel
     United States Department of Justice