**~~IN~~IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| U.T.*<br>c/o National Immigrant Justice Center<br>~~224 S. Michigan Ave~~111 W. Jackson Blvd., Suite ~~600~~800<br>Chicago, IL 60604; | ) |
| | ) |
| E.R.*<br>c/o National Immigrant Justice Center<br>~~224 S. Michigan Ave~~111 W. Jackson Blvd., Suite ~~600~~800<br>Chicago, IL 60604; | ) No. 1:20-cv——————116 (EGS)<br><br>) **AMENDED COMPLAINT** |
| H.R.* and her minor son, J.R.* (by and through his mother),<br>c/o National Immigrant Justice Center<br>~~224 S. Michigan Ave~~111 W. Jackson Blvd., Suite ~~600~~800<br>Chicago, IL 60604; | ) |
| M.H.* and her minor daughter, H.D.* (by and through her mother),<br>c/o National Immigrant Justice Center<br>~~224 S. Michigan Ave~~111 W. Jackson Blvd., Suite ~~600~~800<br>Chicago, IL 60604; | ) |
| J.C.*<br>c/o National Immigrant Justice Center<br>111 W. Jackson Blvd., Suite 800<br>Chicago, IL 60604; | ) |
| A.S.*<br>c/o National Immigrant Justice Center<br>111 W. Jackson Blvd., Suite 800<br>Chicago, IL 60604; | ) |
| D.G.*<br>c/o National Immigrant Justice Center<br>111 W. Jackson Blvd., Suite 800<br>Chicago, IL 60604 ; | ) |
| Y.A.* | ) |

c/o National Immigrant Justice Center )
111 W. Jackson Blvd., Suite 800 )
Chicago, IL 60604; )
)
Tahirih Justice Center )
6402 Arlington Blvd., Suite 300 )
Falls Church, VA 22042; )
)
Las Americas Immigrant Advocacy Center )
1500 East Yandell Drive )
El Paso, TX 79902; )
)
*Plaintiffs*, )
)
v. )
)
WILLIAM BARRPAMELA BONDI, Attorney )
General of the United States, in hisher official )
capacity, )
950 Pennsylvania Avenue, NW )
Washington, DC 20530; )
)
U.S. DEPARTMENT OF JUSTICE, )
950 Pennsylvania Avenue, NW )
Washington, DC 20530; )
)
JAMES MCHENRY, SIRCE OWEN, Acting Director )
of the Executive Office for Immigration Review, in )
hisher official capacity, )
5107 Leesburg Pike )
Falls Church, VA 22041; )
)
EXECUTIVE OFFICE OF IMMIGRATION )
REVIEW, )
5107 Leesburg Pike )
Falls Church, VA 22041; )
)
CHAD F. WOLF, ActingKRISTI NOEM, Secretary )
of the Department of Homeland Security, in hisher )
official capacity, )
245 Murray Lane, SW )
Washington, DC 20528; )
)
U.S. DEPARTMENT OF HOMELAND SECURITY, )
245 Murray Lane, SW )
Washington, DC 20528; )
)
KENNETH T. CUCCINELLI, ActingJOSEPH )

EDLOW, Director of U.S. Citizenship and               )
Immigration Services, in his official capacity,        )
245 Murray Lane, SW                                    )
Washington, DC 20528;                                  )
5900 Capital Gateway Dr., Mail Stop 2120               )
Camp Springs, MD 20588;                                )
                                                       )
U.S. CITIZENSHIP AND IMMIGRATION                       )
SERVICES,                                              )
20 Massachusetts Ave NW,                               )
Washington, DC 20529;                                  )
                                                       )
MARK MORGAN, Acting 5900 Capital Gateway Dr.,          )
Mail Stop 2120                                         )
Camp Springs, MD 20588;                                )
                                                       )
RODNEY SCOTT, Commissioner of U.S. Customs             )
and Border Protection, in his official capacity,       )
1300 Pennsylvania Ave, NW                              )
Washington, DC 20229;                                  )
                                                       )
U.S. CUSTOMS AND BORDER PROTECTION,                    )
1300 Pennsylvania Ave, NW                              )
Washington, DC 20229;                                  )
                                                       )
MATTHEW ALBENCE TODD LYONS, Acting                     )
Director of Immigration and Customs Enforcement,       )
in his official capacity,                              )
500 12th Street, SW                                    )
Washington, DC 20536;                                  )
                                                       )
U.S. IMMIGRATION AND CUSTOMS                           )
ENFORCEMENT,                                           )
500 12th Street, SW                                    )
Washington, DC 20536;                                  )
                                                       )
                    *Defendants.*                      )
                                                       )
                                                       )
                                                       )
                                                       )
                                                       )
                                                       )
                                                       )
                                                       )
                                                       )

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)



)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

(Violation of Refugee Act, Immigration and Nationality Act, Administrative Procedure Act, Foreign Affairs Reform and Restructuring Act of 1998, and Suspension Clause)

---

[*] Plaintiffs proceeding under a pseudonym are indicated with an asterisk.

# INTRODUCTION

This suit challenges the government's interim final rule ("Rule") and associated policies that purport to implement the "safe third country" provision in the asylum statute.  That statutory provision allows the government to enter into international agreements for the purpose of removing asylum seekers from the United States to third countries that can hear their asylum claims, effectively outsourcing the United States's asylum process.  Understandably, Congress allowed that extreme step only where the third country is "safe" and provides a "full and fair" asylum process—such that people will have a meaningful opportunity to pursue asylum—and only when noncitizens would not face persecution or torture in the third country.  8 U.S.C. TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

JURISDICTION AND VENUE ........................................................................................... 6

PARTIES ............................................................................................................................. 6

BACKGROUND .................................................................................................................. 13

I.     Federal Law Provides Several Forms of Protection for Individuals Fleeing Persecution and Torture ........................................................................................... 13

       Asylum ........................................................................................................................ 13

       Withholding of Removal and Protection Under the Convention Against Torture ........... 14

II.    Given the Importance of Preventing *Refoulement*, Congress and Agencies Created Numerous Procedural Safeguards in Removal Proceedings ....................... 16

III.   The Safe Third Country Provision, 8 U.S.C. § 1158(a)(2)(A), Sets Out a Narrow Exception to the Right to Apply for Asylum. ............................................ 18

       The Safe Third Country Agreement with Canada ...................................................... 19

       Recent Agreements With Northern Triangle Countries ............................................. 20

IV.    The Interim Final Rule Creates a Procedural Framework That Is Inconsistent With the Safeguards Required in Removal Proceedings ...................... 21

       The Rule Makes Onerous New Changes to Regular Removal Proceedings ............... 21

       The Rule Creates New Expedited Removal Procedures that Lack the Safeguards of the Statutory Credible Fear Interview Process ....................................................... 22

       USCIS Guidance Concerning the Guatemala ACA Further Increases the Burden on Asylum Seekers ..................................................................................................... 24

V.     The Government Is Removing Asylum Seekers to Guatemala, and Is Poised to Begin Removals to Honduras, Without the Required Determinations that Their Asylum Systems Provide Access to Full and Fair Procedures. ....................... 26

VI.    The Current ACA Countries—Guatemala, Honduras, and El Salvador—Are Extremely Dangerous and Unfit for Asylum Seekers. ............................................. 27

       Guatemala Is Not Safe for Asylum Seekers and Lacks a Full and Fair Asylum System ........................................................................................................................ 28

i

El Salvador and Honduras Are Also Not Safe for Asylum Seekers and Lack Functioning Asylum Systems ...................................................................................... 31

It Is Dangerous to Shuffle Asylum Seekers Between Northern Triangle Countries ........ 33

VII.   The ACA Rule Is Inconsistent with International Law Regarding Safe Third Country Agreements ........................................................................................... 33

VIII.   The Guatemala ACA Program Is Rapidly Expanding ........................................ 35

IX.   Guatemala Has Proven Totally Unprepared to Receive Asylum Seekers Under Its ACA .................................................................................................. 37

X.   The ACA Rule and USCIS Guidance Cause Serious, Irreparable Harms to Plaintiffs ..................................................................................................... 39

CLAIMS FOR RELIEF ........................................................................................ 42

PRAYER FOR RELIEF ........................................................................................ 48

**~~INTRODUCTION~~**

~~1.      The United States has a longstanding commitment to protect people fleeing persecution.  Congress has guaranteed that noncitizens who arrive or are physically present in the United States may apply for asylum, subject to three narrow exceptions.  One of those exceptions is that noncitizens may be denied the opportunity to apply for asylum in the United States and instead be removed to seek protection elsewhere pursuant to a "safe third country" agreement. That exception only applies if strict statutory requirements are met, including that the asylum seeker would have a full and fair opportunity to seek asylum in the "safe third country" and would not face persecution or torture there.~~

1.      For years, our only safe third country agreement was with Canada, a § 1158(a)(2)(A).  The Department of Homeland Security ("DHS") and Department of Justice ("DOJ") call these third country agreements "asylum cooperative agreements" ("ACAs").

2.      Prior to 2019, the U.S. had only one third country asylum agreement, with Canada.  When the Rule was first issued in November 2019, ACAs were in place with Guatemala, Honduras, and El Salvador, all of which were violent, refugee-producing countries without functional asylum systems.  The first Trump administration used the Rule to remove nearly 1,000 non-Guatemalan asylum seekers to Guatemala between November 2019 and March 2020, when implementation ceased due to the COVID-19 pandemic.  In February 2021, the Court placed this case in abeyance at the parties' request while the Biden administration reported that it was reviewing whether to rescind the Rule and the other challenged policies.  That administration ultimately terminated the three ACAs signed in 2019 but never rescinded the Rule.

3.      The second Trump administration is now using the Rule and the related agency actions challenged here to launch an aggressive push to deport asylum seekers to far-flung countries without adequate asylum systems.  And in recent months, the government has signed a series of new ACAs with nations that the U.S. State Department itself reports are unsafe, present serious human rights concerns, and/or have weak or corrupt asylum systems.  To date, these nations include at least Guatemala, Honduras, Paraguay, and Uganda; and an ACA with Ecuador is reportedly imminent, if it has not yet been signed.

4.      The original Plaintiffs—six noncitizens unlawfully removed under the Rule and two organizations that serve asylum seekers—first filed this suit on January 15, 2020.  They sought to vacate the Rule, its implementing guidance, and the government's categorical designations that Guatemala, Honduras, and El Salvador have "full and fair" asylum systems within the meaning of the safe third country provision.  Those Plaintiffs are now joined by four additional individual asylum seekers, and they amend their complaint to challenge the Rule and the government's other unlawful actions to implement the current ACAs.

2.      The Rule violates the safe nation with a robust asylum system.  Then, last summer, the United States signed three new "asylum cooperative agreements" ("ACAs") with Guatemala, Honduras, and El Salvador—extremely dangerous, refugee-producing countries with asylum systems that are skeletal at best.

3.      On November 19, 2019, the government issued an Interim Final Rule titled "Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act" (the "Rule").  The Rule establishes procedures for the removal of asylum seekers to Guatemala, Honduras, and El Salvador, and to any other countries with which the United States signs future ACAs.  The Rule's aim is to permit the "distributionthird

2

country provision of ~~hundreds of thousands of asylum claims" to other countries~~the asylum

statute~~.  84 Fed. Reg. at 63,994.~~

~~4.      On November 20, the government issued written guidance implementing its ACA
with Guatemala and began removing non-Guatemalan asylum seekers there.~~

        5.      This ~~lawsuit challenges the Rule, as well as agency guidance implementing the~~

~~Guatemala ACA (the "USCIS Guidance"), which unlawfully slam our nation's doors on people~~

~~fleeing horrific violence~~ and other ~~forms of persecution by denying them the right to apply for~~

~~asylum in the United States and shipping them to dangerous countries where there is virtually no~~

~~chance they will find refuge.  Indeed, the Rule has already put the Individual Plaintiffs in this~~

~~case, and others like them, in harm's way by removing them to Guatemala and forcing them to~~

~~decide between remaining there, where they fear for their lives, and returning to the countries~~

~~from which they fled persecution.~~

        ~~6.      The Rule and the USCIS Guidance allow for the removal of vulnerable asylum~~

~~seekers to a *different* dangerous country from that which they fled, even one where they have~~

~~never set foot.  For example, under the Rule and Guatemala ACA, the United States could deport~~

~~an Afghan or Mexican asylum seeker to Guatemala.  Moreover, the Rule and the USCIS~~

~~Guidance provide for their removal without adequate measures to ensure that they will be safe~~

~~and have access to asylum or other protection from persecution.~~

        ~~7.      The nations that have signed ACAs so far—Guatemala, El Salvador, and~~

~~Honduras—are impoverished, unstable, and among the most dangerous places in the world.~~

~~Known collectively as Central America's Northern Triangle, they have extremely high murder~~

~~rates, rampant gender-based violence, and virtually no ability to receive asylum seekers.  Indeed,~~

~~all three countries *generate* large numbers of refugees due to epidemic levels of violence and~~

instability typically seen in war zones. In 2017 and 2018, the Northern Triangle countries were three of the top four countries of origin for individuals *granted* asylum in the United States.

8.      The government's willingness to sign ACAs with these countries illustrates that its true goal is not to promote burden sharing while ensuring the safety of refugees. Rather, the Rule and ACAs simply turn away asylum seekers and pass the buck to other countries, regardless of what happens to the individuals. As one asylum officer said, "This agreement [with Guatemala] feels like a pretext to get rid of as many asylum claims as possible."[1]

9.      Because of the Rule, vulnerable asylum seekers are shut out of the United States and left to seek protection in countries with barely functioning asylum systems that cannot adequately protect them. And if the receiving country rejects an individual's claim, that individual likely cannot get another chance at asylum in the United States. The result is a deadly game of musical chairs that leaves many desperate asylum seekers without a safe haven, in violation of U.S. and international law.

10.      The only escape valve from this trap is for an asylum seeker to demonstrate that they are more likely than not to face persecution or torture in *every one* of the possible receiving countries that the government designates. Yet under the Rule, an asylum seeker will only get the opportunity to demonstrate this likelihood of harm if they volunteer, without ever being asked, that they are afraid of being sent to one or more of those countries. And even if an asylum seeker does affirmatively express such a fear, they must then demonstrate their likelihood of persecution or torture during a rushed interview almost immediately after a harrowing journey to the United States; without time to prepare, research, or compile documentation; without talking

---

[1] Hamed Aleaziz, *Asylum Officers Were Told of Killings and Violence in Guatemala. They Were Ordered to Send People There Anyway.*, BuzzFeed News (Nov. 21, 2019), https://tinyurl.com/Buzzfeed-GuatemalaGuidance.

to a lawyer or being represented by one during the interview; and without review of the decision by an immigration judge.

11.    Moreover, although called a "threshold screening interview," 84 Fed. statutes, is Reg. at 64,008, the Rule applies the more-likely-than-not standard, which is higher than even the ultimate burden to win asylum and is otherwise reserved for decisions on claims for "withholding of removal"—a more limited form of protection against persecution—made after a full evidentiary removal hearing before an immigration judge with the rights to counsel, to present and cross-examine witnesses, and to both administrative and judicial review. The Rule's bare bones procedures, by contrast, are woefully inadequate to ensure that those who risk persecution, torture, or death in receiving countries will not be erroneously removed to danger there.

12.    The Rule and USCIS Guidance cast aside our asylum laws, which reflect Congress's carefully considered balance between effectuating our broad, historic commitment to protecting refugees fleeing persecution and torture—a commitment with origins in the 1951 United Nations Convention Relating to the Status of Refugees—and ensuring fairness and efficiency in the asylum process. First, it violates the Immigration and Nationality Act's ("INA") safe third country provision, 8 U.S.C. § 1158(a)(2)(A), which requires an individualized likelihood-of-persecution determination in *every* case prior to removal to a third country. Second, the Rule violates the withholding of removal statute, 8 U.S.C. § 1231(b)(3), and the Foreign Affairs Reform and Restructuring Act of 1998, which bar the removal of individuals to countries where their lives or freedom would be threatened on account of a protected ground or where they would be tortured, and their implementing regulations. And third, the Rule violates the expedited removal statute, 8 U.S.C. § 1225(b), by denying access to a credible fear interview,

~~and by depriving asylum seekers of numerous procedural safeguards that Congress created as prerequisites to the imposition of an expedited removal order in their cases.~~

~~13.     Additionally, the Rule and USCIS Guidance violate § 1158(a)(2)(A)'s requirement that any receiving nation must be equipped to provide asylum seekers "access to full and fair procedures for determining [their] claim[s] to asylum."  The Rule prohibits case-by-case consideration of this requirement and instead calls for a categorical designation that a country meets this standard with respect to all asylum seekers *before* ACA removals to that country begin.  But ACA removals to Guatemala are well underway and are set to begin to Honduras, and no such designations for those countries have been issued publicly.  In the absence of any lawful categorical designation, the lack of individualized consideration of this statutory requirement violates the statute.  And to the extent that some secret, categorical designations have been made, they have failed to account for the dire security situations and failing asylum systems in the receiving countries, as required by statute.  At the very least, any designation that fails to adequately consider these highly relevant factors would be~~ arbitrary and capricious<u>, and was issued</u> in violation <u>of the procedural requirements</u> of the Administrative Procedure Act ("APA").  ~~With the government refusing to even address these essential statutory requirements, there are no limits on where it might send asylum seekers.  Indeed, the government is already using the Rule to remove gay men—like the lead Plaintiff in this case—to Guatemala, a country that persecutes LGBT persons, as the U.S. State Department has recognized.~~

~~14.     The Rule is also~~<u>DHS and DOJ guidance documents ("Guidance") issued to implement both the Rule and the new agreements are likewise unlawful.  And DHS and DOJ's categorical designations that ACA countries have "full and fair" asylum systems ("Designations") are contrary to law and</u> arbitrary and capricious ~~in violation of the APA~~

because it inexplicably fails to include even the most basic safeguards to ensure that individuals are not returned to countries where they face persecution, and departs without acknowledgment or explanation from the procedures otherwise used by the government to protect against removal to persecution or torture.

15.    In addition, the agencies issued the Rule without prior notice and opportunity for public comment, and effective immediately, in violation of the APA's procedural requirements.

16.    Finally, the Rule subjects individuals to expedited removal to third countries without the constitutionally required level of federal court review of an expedited removal order, and so violates the Suspension Clause.

17.5.    In short, the Rule recklessly subverts our legal framework for *accepting* refugees into a machinery for casting them off into circumstances as perilous as those they fled. .

**JURISDICTION AND VENUE**

18.6.    This case arises under the APA, 5 U.S.C. § 701, *et seq.*; the the Immigration and Nationality Act ("INA,"), 8 U.S.C. § 1101, *et seq.*, and its implementing regulations; and the Foreign Affairs Reform and Restructuring Act of 1998. ("FARRA"), Pub. L. No. 10-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231);). and the United States Constitutionits implementing regulations.  This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and under 8 U.S.C. § 1252(e)(3).

19.7.    Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States and officers of the United States acting in their official capacity and reside in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District.  Venue is furtheralso appropriate under 8 U.S.C. § 1252(e)(3)(A).

7

**PARTIES**

**Original Individual Plaintiffs**

~~20.~~8.   The Original Individual Plaintiffs are noncitizens who came to the United States

to seek asylum and were unlawfully removed to Guatemala pursuant to the Rule~~, the USCIS~~

~~Guidance, and the Guatemala ACA.² The~~ during the first Trump administration~~Organizational~~

~~Plaintiffs are organizations that serve asylum seekers~~.

~~21.~~        Plaintiff U.T. is a gay man from El Salvador~~. When U.T. was a young child, a~~

~~male relative sexually abused him. As he grew up, he struggled to come to terms with his sexual~~

~~orientation due to his family's and his country's homophobic views. U.T. moved within El~~

~~Salvador looking for a place where he could be open about his sexual orientation, but he never~~

~~found a place where he was safe. He~~ who fled ~~El Salvador~~that country in 2019 after ~~an MS-13~~a

gang member solicited him for sex and threatened him. ~~When U.T. finally came out to his~~

~~parents, they disowned him; his mother said she would rather be dead than have a gay son. Now,~~

~~U.T.~~He fears ~~that~~ he will be ~~attacked or~~ killed ~~for~~because of his sexual orientation if he tries to

live openly in El Salvador as a gay man ~~in El Salvador~~.

9.        there.   U.T. ~~travelled~~traveled through Guatemala en route to the United States

and, while there, was subjected to homophobic slurs on the street.

~~22.~~10.   When ~~he~~U.T. entered the United States~~,~~ in December 2019, DHS border officials

told him that because of the Guatemala ACA, he would be removed to Guatemala. When U.T.

told ~~the~~an officer that he did not want to go to Guatemala because it is not safe for gay people

---

² ~~The Individual Plaintiffs are seeking leave to proceed under their initials in this case, and have~~
~~filed a separate motion under seal as to that issue, with declarations setting forth the details~~
~~provided here. They are referred to in this complaint using their initials, but their true names~~
~~have been provided in conjunction with the motion to proceed under pseudonym.~~

there, the officer said he would have an interview to explain.  In that interview, which lasted less

than an hour, U.T. tried to explain his fear of removal to Guatemala.  Not long after this

interview, U.T. was removed to Guatemala, where he was given just 72 hours to decide whether

to pursue asylum in Guatemalathere.  U.T. decided to try to apply for asylum in Guatemala, but

because that country is also unsafe for gay people, Guatemalan officials advised him to go to

Mexico, where they said he could apply for asylum.  U.T. is in Mexico for now, but he remains

uncertain how or where to find safety.After travelling back to Mexico at the advice of

Guatemalan officials, U.T. eventually returned to the United States through the agreement of the

Parties and is now pursuing an application for asylum in the United States.

23.11.  Plaintiff E.R. fled his native Honduras after members of the MS-13 gang

repeatedly attacked him and threatened his life.  Gang members came to E.R.'s workplace and

told him that he could either sell drugs for the gang, become the gang's mechanic, or pay an

extortion payment.  When he explained that he was not the owner of the business and he had no

ability to decide to pay, the gang members attacked him.  The first time, they hit him over the

head with a bat.  On another occasion, they stabbed him multiple times with a broken bottle.

Each of these incidents caused significant injury and required hospitalization.  E.R. knew that he

could not go to the local police to report these problems because the police in his community

work with the gang, and reporting them would only make things worse.

24.12.  E.R. fled Honduras and was detained when he entered the United States. Border

in 2019.  DHS border officials told him that because of the 2019 Guatemala ACA, he would be

removed to Guatemala.  E.R., however, said that he was afraid of going to Guatemala.  E.R.

knew that the MS-13 could locate him there.  He also insisted that he had evidence to support his

claim for asylum, but DHS officials told him that he did not need to present that evidence and

instead asked him only about Guatemala.  E.R. was removed to Guatemala in December 2019, about 10 days after he entered.  Once in Guatemala, E.R. was given just 72 hours to decide whether to apply for asylum ~~in Guatemala~~there.  E.R. did not believe that he would be safe in Guatemala because the MS-13 ~~can~~could reach him there.  He also felt pressure to leave the shelter where he stayed temporarily and did not have any support in Guatemala to help protect him.  ~~He is now in hiding in Honduras temporarily, but believes he is not safe there either.  E.R. remains uncertain how or where to find safety~~E.R. eventually returned to the United States through the agreement of the Parties and is now pursuing an application for asylum in the United States.

25.13.  Plaintiff H.R. is a Salvadoran woman who was forced to flee ~~her country~~El Salvador after the MS-13 gang killed two of her siblings and began threatening her teenage daughter.  H.R. and her family reported her siblings' murders to the police.  After the police failed to investigate the murders, H.R. and her family began seeking answers on their own.  The gang threatened H.R. and her family with death and told them to stop investigating.  H.R. and her children attempted to relocate within El Salvador, but they did not feel safe.  H.R. fled El Salvador with her two children after the MS-13 attempted to force her teenage daughter into a relationship with a gang member.

26.14.  H.R. and her children traveled through Guatemala, where they stood out as migrants.  Police demanded their documents, and extorted money from them ~~upon learning that~~because they were migrants.  Feeling unsafe in Guatemala, ~~they~~the family continued on to Mexico.  In Mexico, H.R. became separated from her teenage daughter ~~in Mexico,~~, who entered the United States alone and ~~her daughter is now in~~was taken to a migrant shelter for children ~~in the United States~~and subsequently released.  H.R. and her son J.R. crossed the border into the

United States on December 24, 2019.  An asylum officer interviewed H.R. and told her that because of the 2019 Guatemala ACA, she would be removed to either Guatemala or El Salvador. H.R. explained her fear of ~~return~~removal to both Guatemala and El Salvador ~~and Guatemala~~ and attempted to present evidence to the officer, but she and her son were removed to Guatemala on January 6, 2020.  After being removed to Guatemala, H.R. was given just 72 hours to decide whether to apply for asylum ~~in Guatemala~~there.  H.R. had no resources or ability to protect herself and her child in Guatemala, and she was anxious to get documents from El Salvador to secure her daughter's release from detention in the United States.  ~~So, she~~She therefore returned to El Salvador temporarily~~, where she fears for her and her son's lives.~~.  H.R. ~~remains uncertain how or where she and her child can find safety~~eventually returned to the United States through the agreement of the Parties and is now pursuing an application for asylum in the United States.

27.15.  Plaintiff J.R. is the minor son of Plaintiff H.R.  He traveled to the United States with H.R., intending to seek asylum with her, and he was removed to Guatemala with H.R.  J.R. eventually returned to the United States through the agreement of the Parties and is now pursuing an application for asylum in the United States.

28.16.  Plaintiff M.H. is a woman from Honduras who fled to the United States with her minor daughter, H.D.  Both M.H.'s common-law husband and her sister-in-law worked in the transportation business in Honduras and were forced to pay extortions to local gangs in order to work.  They were murdered one year apart from one another.  In May 2019, M.H. was threatened by a man who owned and operated taxis in the same city where her husband and sister-in-law had worked and who had detailed information about her, her daughter, and the murders of her husband and sister-in-law.  In November 2019, when M.H. paid a brief visit to Guatemala, she received an alarming text message from an unknown person ~~letting her know~~stating that the

person knew ~~she~~that M.H. was away from her home but was nevertheless close by.  Fearing for her and her daughter's safety, M.H. ~~and H.D.~~ fled to the United States with her daughter.

~~29.~~17.  M.H. and her daughter entered the United States in December 2019, presented themselves to immigration officials, and requested asylum.  ~~Officials~~DHS officials told M.H. that because of a new policy, she and her daughter would be removed to Guatemala.  M.H. explained that she had been threatened while in Guatemala, and she asked for an opportunity to obtain a lawyer and present evidence that she had brought with her.  Officials refused to allow her time to obtain a lawyer, denied her an opportunity to present evidence in connection with her claims, and removed her to Guatemala.  ~~There~~In Guatemala, M.R. learned that she had just 72 hours to decide whether to stay in Guatemala and apply for asylum there or return to Honduras. Feeling that she had no means to remain safe or support herself in Guatemala, M.H. ~~and her daughter~~ returned temporarily to Honduras~~.~~ with her daughter.  M.H. ~~remains uncertain how or where she and~~eventually returned to the United States with her daughter ~~can find safety~~through the agreement of the Parties and is now pursuing an application for asylum in the United States.

~~30.~~18.  Plaintiff H.D. is the minor child of Plaintiff M.H.  She traveled to the United States with her mother, intending to seek asylum with her.  Both were removed from the United States to Guatemala under the ~~ACA~~Rule.  H.D. eventually returned to the United States through the agreement of the Parties and is now pursuing an application for asylum in the United States.

**New Individual Plaintiffs**

19.  The New Individual Plaintiffs are four noncitizens who have applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT") in regular removal proceedings in immigration court in the United States and whose applications

Defendants have sought to pretermit based on invocation of one or more ACAs pursuant to the Rule, Guidance, and Designations challenged here.

20.    Plaintiff J.C. is a gay man from Guatemala who faced threats of physical harm from community and family members when he disclosed his sexual orientation.  He was also fired from his job because he is gay.  He fears that he will face more of the same harm or worse if he is removed to Guatemala and tries to live openly there.  J.C. entered the United States in 2024 and applied for asylum, withholding of removal, and CAT protection later that year.  He was scheduled for an immigration court hearing on those applications, but on August 8, 2025, the government moved to pretermit his applications so that he could be removed to Honduras under an ACA pursuant to the Rule, Guidance, and Designations.  That motion remains pending, but J.C. also fears removal to Honduras.  As in Guatemala, gay people face serious harm in Honduras.  He also fears that people who have targeted him in the past in Guatemala will easily reach him in neighboring Honduras.

21.    Plaintiff A.S. fled political repression and the threat of arrest in Bolivia because of his participation in protests.  He entered the United Sates in April 2022 and applied for asylum affirmatively in early 2023.  Once in the United States, A.S. also reunited with a childhood friend whom he eventually married.  In July 2025, A.S. was scheduled for interviews in New York on his asylum case and on an application to adjust his status to permanent residency that his wife had filed on his behalf.  But those interviews did not happen.  The adjustment of status interview was cancelled; A.S. was placed in expedited removal proceedings; and his asylum interview was converted into a credible fear interview.  He established a credible fear of being removed to Bolivia at a credible fear interview.  After the credible fear interview, A.S. was detained and transferred to Louisiana for regular removal proceedings.  On August 8, 2025, DHS moved to

pretermit A.S.'s application for asylum, withholding of removal, and CAT protection, arguing that he should be removed to Honduras under an ACA pursuant to the Rule, Guidance, and Designations.  On August 20, 2025, the immigration judge granted DHS's motion.  A.S. is currently detained, and he fears that he will be removed to Honduras.

22.    Plaintiff D.G. fled Nicaragua after he was persecuted for participating in student political activity against the country's authoritarian ruling regime.  He traveled through Honduras on route to the United States, and there he was robbed by a group dressed in military clothing.  That group kidnapped some of the people D.G. was traveling with and threatened to harm and rape those who were kidnapped if a ransom was not paid.  D.G. entered the United States in January 2022 and filed applications for asylum, withholding of removal, and CAT protection later that year.  D.G. had a final hearing on his applications where an immigration judge took testimony about his fear of being removed to Nicaragua.  The hearing was then continued, and before the continued hearing, DHS filed a motion to pretermit the applications so that D.G. could be removed to Honduras under an ACA pursuant to the Rule, Guidance, and Designations.  In its motion, DHS stated that D.G. had not expressed a fear of being removed to Honduras, even though that motion was the first time Defendants had raised any possibility of removal to Honduras.  D.G.'s case was continued, and he now fears that he will be removed to Honduras.  In Honduras he fears violence stemming from his status as a Nicaraguan migrant, and he likewise fears that Honduras will immediately deport him to or otherwise require him to return to neighboring Nicaragua.

23.    Plaintiff Y.A. fled her native Somalia after her stepmother subjected her to female genital mutilation and forced marriage to a much older man.  Before the marriage could occur, members of Y.A.'s fiancé's clan kidnapped her, and her fiancé tried to rape her.  Y.A. fled

14

Somalia for Kenya and South Africa but was unable to find safety in either country.  As a result, she fled to the United States and briefly traveled through Honduras on the way.  Y.A. entered the United States in October 2024, was detained by DHS, and applied for asylum, withholding of removal, and CAT protection.  On September 4, 2025, which was supposed to be Y.A.'s final hearing date before an immigration judge, the immigration judge *sua sponte* ordered pretermission of her applications and ordered her removed to Honduras or, in the alternative, to Uganda based on the ACAs with those countries and pursuant to the Rule, Guidance, and Designations.  Y.A. fears that if she is removed to Honduras, she will being targeted for harm as a black, Muslim woman who does not speak Spanish.  Y.A. fears that if she is removed to Uganda, she will be discovered by the family she fled in Somalia; forced to marry her attempted rapist; or otherwise subjected to gender related violence.

**Organizational Plaintiffs**

31.24.  Plaintiff Las Americas Immigrant Advocacy Center ("Las Americas") is a nonprofit legal services organization based in El Paso, Texas, dedicated to serving the legal needs of low-income immigrants, including asylum seekers.  An essential part of Las Americas' mission is to providecore activities include providing immigration counseling and legal services to asylum seekers who are detained by the federal governmentDHS in the El Paso area and subjected to expedited removal.  This work includes assisting asylum seekers to prepare for their credible fear interviews with asylum officers, representing them during those credible fear interviews, and representing them throughout the process of obtaining immigration judge review of negative credible fear determinations.  Las Americas also regularly represents detained asylum seekers in other settings, such as in connection with bond and parole requests, and in regular removal proceedings in immigration court.

32.25.  Plaintiff Tahirih Justice Center ("Tahirih") is a nonprofit and non-partisan organization that provides free legal immigration services to ~~survivors of gender-based violence. Tahirih's mission is to provide free holistic services to~~ immigrant women and girls fleeing gender-based violence such as rape, domestic violence, female genital mutilation~~/cutting~~, forced marriage, and human trafficking, and who seek legal immigration status ~~under U.S. law.  Tahirih offers.~~  Tahirih's core activities include offering legal representation and social services for ~~individuals~~noncitizens who seek protection, including asylum, in their immigration proceedings. Tahirih operates from five offices across the country, ~~which are located~~ in Falls Church, Virginia; Baltimore, Maryland; Atlanta, Georgia; Houston, Texas; and San Bruno, California.

**Defendants**

33.26.  Defendant ~~William Barr~~Pamela Bondi is the Attorney General of the United States.  ~~He~~She is sued in ~~his~~her official capacity. ~~In that capacity, he issued the Rule challenged in this suit.~~  The Attorney General is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and is empowered to grant asylum ~~or other relief.~~, withholding of removal, and CAT protection.  A predecessor of Defendant Bondi's, Attorney General William Barr, issued the Rule challenged in this suit on behalf of DOJ and issued the original 2019 DOJ Designations as to Guatemala, Honduras, and El Salvador.  Defendant Bondi has issued the new DOJ Designations in connection with ACAs signed by the current administration.

34.27.  Defendant ~~U.S. Department of Justice ("DOJ")~~ is a cabinet-level department of the United States federal government.  DOJ or its sub-agencies have issued challenged Guidance implementing the Rule.

35.28.  Defendant ~~James McHenry~~Sirce Owen is the Acting Director of the Executive Office for Immigration Review ("EOIR").  ~~He~~She is sued in ~~his~~her official capacity.

36.29.  Defendant EOIR is the sub-agency of DOJ that, through its immigration judges, conducts regular removal proceedings and provides limited review of negative credible fear determinations in expedited removal proceedings.  EOIR has issued challenged Guidance implementing the Rule.

37.    Defendant Chad F. WolfKristi Noem is the Acting Secretary of Homeland Security.  HeShe is sued in hisher official capacity.  In that capacity, he issued the Rule challenged in this suit.  He directsDefendant Noem oversees each of the component agencies within the Department of Homeland Security.DHS.  In hisher official capacity, Defendant WolfNoem is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, and is empowered to grant asylum and other immigration benefits.

30.    Defendant U.S. Department A predecessor of Homeland Security ("DHS")Defendant Noem's, former purported Acting DHS Secretary Chad Wolf, first issued the Rule challenged in this suit on behalf of DHS.  Defendant Noem issued an intended ratification of the Rule on behalf of DHS on August 20, 2025.  Wolf and former purported Acting DHS Secretary Kevin McAleenan issued the DHS Designations issued after the signing of the 2019 Guatemala, Honduras, and El Salvador ACAs.  Defendant Noem has issued the new DHS Designations in connection with ACAs signed by the current administration.

38.31.  Defendant DHS is a cabinet-level department of the United States federal government.  Its components include U.S. Citizenship and Immigration Services ("USCIS"), Customs and Border Protection ("CBP"), and Immigration and Customs Enforcement ("ICE").  DHS and its components have issued challenged Guidance implementing the Rule.

39.32.  Defendant Kenneth T. CuccinelliJoseph Edlow is the Acting Director of USCIS. He is sued in his official capacity.

40.33.  Defendant USCIS is the sub-agency of DHS that, through its asylum officers, conducts interviews adjudicates the applications of individualsnoncitizens who apply for asylum. USCIS issued guidance on implementing the U.S.-Guatemala ACA. affirmatively and conducts credible fear screening interviews in expedited removal proceedings.  Pursuant to the Rule and USCIS Guidance, USCIS asylum officers conduct "threshold screening interviews" to determine whether noncitizens can be removed to a receivingan ACA signatory country.

41.34.  Defendant Mark A. MorganRodney Scott is the Acting Commissioner of CBP. He is sued in his official capacity.

42.35.  Defendant CBP is the sub-agency of DHS that is responsible for the initial processing and detention of noncitizens who are apprehended near the U.S. border or who present themselves at ports of entry.  CBP makes the initial determination whether an individual in expedited removal is "amenable" to removal pursuant to an ACA and, if so, refers the individual to USCIS for a "threshold screening interview."

43.36.  Defendant Matthew T. AlbenceTodd Lyons is the Acting Director of ICE.  He is sued in his official capacity.

44.37.  Defendant ICE is the sub-agency of DHS that is responsible for carrying out removal orders and overseeing immigration detention.

**BACKGROUND**

~~Federal Law Provides Several Forms of Protection~~FACTS

**I.    Protections for ~~Individuals~~People Fleeing Persecution and Torture~~.~~**

~~45.~~38.  Federal law provides three primary forms of protection for individuals fleeing persecution and torture: asylum under 8 U.S.C. § 1158; withholding of removal under 8 U.S.C. § 1231(b)(3); and protection under the Convention Against Torture ("CAT"), *see* 8 C.F.R. § 1208.16-18.

~~Asylum~~

~~46.~~39.  Asylum affords protection to individuals who have a "well-founded fear of persecution" on account of ~~one or more of five protected grounds:~~ race, religion, nationality, political opinion, or membership in a particular social group.  8 U.S.C. § 1101(a)(42)(A).  ~~A "well-founded fear of persecution" is defined as~~The Supreme Court has recognized that a ten percent chance of persecution can give rise to a well-founded fear of persecution.  *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430, 440 (1987).  Past persecution gives rise to a presumption of a well-founded fear of future persecution and thus of asylum eligibility.

~~47.~~40.  Subject to several narrow exceptions, including the safe third country exception at issue here, Congress has mandated that "[a]ny ~~alien~~[noncitizen] who is physically present in the United States or who arrives in the United States . . . , irrespective of such ~~alien's~~[noncitizen's] status, may apply for asylum ~~in accordance with this section or, where applicable, [8 U.S.C. §] 1225(b).".~~"  8 U.S.C. § 1158(a)(1).

~~48.~~41.  There are three principal ways to seek asylum.  First, a noncitizen not in removal proceedings may file an "affirmative" application ~~to~~with USCIS~~,~~ and complete an interview with an asylum officer.  8 C.F.R. §§ 208.2(a), 208.9.  Second, a noncitizen in regular removal proceedings~~,~~ under 8 U.S.C. § 1229a~~,~~ may submit a "defensive" asylum application to the

immigration judge as a form of relief from removal~~.~~.  8 C.F.R. § 208.2(b).  Third, a noncitizen who has been placed in "expedited removal"~~—a truncated removal process that may be applied to certain noncitizens who arrive at the border or enter without inspection,~~ proceedings under 8 U.S.C. § 1225(b)(1~~—~~ ) may ~~also~~ raise an asylum claim. ~~The noncitizen may do so~~ by expressing fear of removal and undergoing a "credible fear" interview with an asylum officer to screen for asylum eligibility.  8 U.S.C. § 1225(b~~By statute, the asylum officer must apply a low threshold screening standard, not the ultimate asylum standard.  Any noncitizen who satisfies that low bar must be referred to regular removal proceedings, where they can apply for asylum.~~)(1).

~~**Withholding of Removal and Protection Under the Convention Against Torture**~~

~~49.~~42.  Like asylum, withholding of removal protects individuals facing persecution ~~on account of a protected ground.~~.  The withholding provision, 8 U.S.C. § 1231(b)(3), bars the government from "remov[ing] ~~an alien~~[a noncitizen] to a country if . . . the ~~alien's~~[noncitizen's] life or freedom would be threatened in that country because of ~~the alien's . . .~~ race, religion, nationality, membership in a particular social group, or political opinion."  ~~Whereas winning asylum requires showing a ten percent chance of persecution, being granted withholding requires showing that persecution is more likely than not—a much higher bar.  *INS v. Stevic*, 467 U.S. 407, 429-30 (1984).~~ The withholding statute bars removal to *any* country ~~as to which this showing is made~~where a noncitizen can show they would more likely than not be persecuted, not just ~~an individual's home~~the noncitizen's country ~~. Just as~~ of origin.  As with asylum, a showing of past persecution creates presumptive eligibility for relief.

~~50.    A noncitizen in regular removal proceedings—even one who is ineligible for asylum—may apply for withholding of removal before an immigration judge.~~

51.    A noncitizen who expresses a fear of removal during expedited removal is screened for withholding eligibility by an asylum officer who applies a low threshold screening standard.

52.43.  Immigration regulationsRegulations implementing the Convention Against Torture ("CAT") likewise prohibit the removal of a noncitizen to any country where "it is more likely than not that he or she would be tortured."  8 C.F.R. § 208.16(c)(2).

53.    The withholding of removal statute and the CAT regulations also implement international treaty obligations not to send noncitizens to countries where they face persecution or torture, known as *non-refoulement* obligations.  The Supreme Court has held, *see Stevic*, 467 U.S. at 421, 426 n.20, that the withholding statute addresses the requirement in Article 33 of the 1951 United Nations Refugee Convention, incorporated into its 1967 Protocol to which the United States is a signatory, that no signatory "expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."  *INS v. Aguirre-Aguirre*, 526 U.S. 415, 427 (1999).  The CAT regulations address the requirement in Article 3 of the CAT that "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture."

54.44.   These prohibitions on *refoulement* encompass both direct *refoulement*—sending asylum seekers directly to countries where they face persecution or torture—; and indirect *refoulement*—sending asylum seekers to countries that then send them onward to persecution or torture.

~~55.~~45.  An asylum officer cannot decide claims for withholding of removal and CAT protection.  Only an immigration judge can make these ultimate determinations of whether a noncitizen's removal to a given country is prohibited by our *non-refoulement* obligations ~~under the Refugee Convention and the CAT.  8 C.F.R. § 1208.16(a), (c)(4).~~.

**~~II.    Given the Importance of Preventing *Refoulement*, Congress and Agencies Created Numerous Procedural~~ Safeguards to Prevent *Refoulement* in Regular and Expedited Removal Proceedings~~.~~**

~~56.    The Rule challenged here denies noncitizens subject to an ACA the opportunity to apply for asylum, withholding of removal, and CAT protection.  As explained further below, it does so by creating new procedures that apply to individuals in expedited removal proceedings, where it imposes an extra-statutory process outside of the mandated credible fear interview framework, and to individuals in regular removal proceedings.  Those procedures depart drastically from the safeguards that Congress and federal agencies have long required to ensure that bona fide asylum seekers are not removed to persecution or torture.~~

46.    ~~Generally, noncitizens~~Both expedited and regular removal proceedings contain safeguards designed to prevent *refoulement*.  In regular removal proceedings, noncitizens have the right to counsel, to present evidence, to cross-examine witnesses, and to administrative appeal and judicial review.

~~57.    ~~Noncitizens subjected to expedited removal ~~are~~proceedings who do not fear removal can be ordered removed by an immigration officer "without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i).  But Congress crafted an exception for individuals who express fear of removal.

~~58.~~47.  To determine if that exception applies, immigration officers must affirmatively ask noncitizens whether they have "any fear or concern about being returned to [their] home

country or being removed from the United States." DHS Form I-867AB; 8 C.F.R.

§ 235.3(b)(2)(i) (requiring immigration officers to use Form I-867AB).  A noncitizen who

expresses such a fear is entitled to a "credible fear" interview.  8 U.S.C. § 1225(b)(1)(B).

59.    At the credible fear interview, the asylum officer must affirmatively "elicit all

relevant and useful information bearing on whether the applicant has a credible fear of

persecution or torture."  8 C.F.R. § 208.30(d).

60.    Because the credible fear interview is a threshold screening device, noncitizens

need not satisfy the ultimate standards for asylum, withholding of removal, or CAT protection.

Instead, they need only show a "significant possibility" that they could establish eligibility in a

full removal hearing.  See 8 U.S.C. § 1225(b)(1)(B)(v); 8 C.F.R. § 208.30 (e)(2)-(3).  Because

asylum requires a showing of a one in ten chance of persecution, it follows that a "significant

possibility" of eligibility for asylum is just a fraction of that.  The standard is also met by

demonstrating past persecution.

61.48.  The reason for applying a lower standard at this threshold screening stage is

straightforward.  Asylum, withholding, and CAT claims are highly fact-specific and take

significant time, resources, and expertise to develop, and often require expert testimony and

extensive evidence about country conditions.  They also often involve complex legal questions.

But credible fear interviews occur while individuals are detained, within days of their arrival, and

often when they are still traumatized from the dangers they fled and their journeys to the United

States.  It is impossible to present fully developed protection claims in this context.  Thus,

Congress created a low threshold at the credible fear stage to ensure that potentially valid

protection claims could be developed properly before an immigration judge, so that bona fide

asylum seekers would not be summarily removed.  Congress intended the expedited removal

23

statute to balance efficiency with a "second, equally important goal: ensuring that individuals with valid asylum claims are not returned to countries where they could face persecution." *Grace v. Barr*, 965 F. 3d 883, 890 (D.C. Cir. 2020).

62.49.  If the asylum officer finds a "significant possibility" that the individual "could establish eligibility for asylum," the individual is placed in regular removal proceedings, where they will have the opportunity to develop a full record supporting their protection claims before an immigration judge.

63.    In addition to expedited removal, there are two other statutory summary removal processes to which certain noncitizens may be subjected: administrative removal of non-permanent residents convicted of aggravated felonies, and reinstatement of removal of certain previously removed noncitizens who return to the United States without authorization.  8 U.S.C. §§ 1228(b), 1231(a)(5).  Although noncitizens subject to these proceedings are not permitted to apply for asylum, if they express a fear of persecution or torture, they are screened for potential entitlement to withholding of removal and CAT protection.  As in credible fear interviews, the ultimate standard for entitlement to withholding of removal and CAT protection—more likely than not—is *not* applied in these screenings.  The threshold screening standard for these summary removal processes is called "reasonable fear," which can be satisfied either by demonstrating past persecution or by meeting the lower standard for a grant of asylum, which is a ten percent chance of future persecution or torture.  Reasonable fear interviews provide similar basic procedural safeguards to credible fear interviews, including the right to consult with and be represented by counsel and immigration judge review.  *See* 8 C.F.R. §§ 208.31(e), (g).  A noncitizen who passes this screening can present their withholding and CAT claims before an immigration judge.

64.    In regular removal proceedings, noncitizens have the right to counsel, to present evidence, to cross-examine witnesses, and to administrative and judicial review.

### III.    The Safe Third Country Provision, 8 U.S.C. § 1158(a)(2)(A), Sets Out a Narrow Exception to the Right to Apply for Asylum.)

65.    Congress created the safe third country provision at 8 U.S.C. § 1158(a)(2)(A) as one of three narrow exceptions to the right to seek asylum.  (The two other exceptions affect individuals who fail to apply within one year of their arrival, 8 U.S.C. § 1158(a)(2)(B), and those who had a previous application denied, *id.* § 1158(a)(2)(C), and are not at issue in this case). Under the safe third country provision, an individual may not apply for asylum "if the Attorney General determines that the alien[noncitizen] may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's[noncitizen]'s nationality or, in the case of an aliena [noncitizen] having no nationality, the country of the alien's[noncitizen]'s last habitual residence) in which the alien's[noncitizen]'s life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien[noncitizen] would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General finds that it is in the public interest for the alien[noncitizen] to receive asylum in the United States."

66.50.  The safe third country provision may not be applied to unaccompanied children. 8 U.S.C. § 1158(a)(2)(E).

### The Safe Third Country Agreement with Canada

67.51.  Congress enacted the safe third country provision in 1996 in light of negotiations initiated by Canada, which had long sought such an agreement with the United States. has long been a global leader in refugee protection.

68.     Canada is a global leader in refugee protection.  In 2001, the year before our safe third country agreement with Canada was signed, it processed more than 44,000 asylum applications.[3]  Between 2000 and 2019, Canada processed more than 28,000 applications per year on average.[4]

69.     Canada re-initiated negotiations on a safe third country agreement in 2001.  That process included public meetings with U.S. government officials and the Office of the U.N. High Commissioner for Refugees ("UNHCR"), publication of the draft agreement, and a hearing on the issue before the House Immigration Subcommittee.

70.     During the negotiations, the State Department looked to the European Union's Dublin Regulation governing the transfer of asylum seekers, which revealed "how tremendously complex, and potentially problematic, it is to implement these types of arrangements for bona fide refugees."[5]

71.52.  The United States first signed the safe third country agreement with Canada on December 5, 2002.  Subject to several exceptions—including a generous family unification exception—In its present form, that agreement provides that an asylum seeker who arrives at a land port of entry oncross the U.S.-Canada border may be removed back to the other country to apply for asylum.  The agreement first entered into force on December 29, 2004, one month after the United States issued procedural regulations adopted pursuant to regular notice-and-comment procedures.

[3] Statistics Canada, Just the Facts: Asylum Claimants (May 17, 2019), https://www150.statcan.gc.ca/n1/pub/89-28-0001/2018001/article/00013-eng.htm.
[4] Id.; Government of Canada, Asylum Claims by Year – 2019 (last modified Dec. 18, 2019), https://tinyurl.com/CanadaAsylumClaims2000-2019.
[5] U.S. & Canada Safe Third Country Agreement: Hearing Before the H. Subcomm. on Immigr., Border Security, and Claims, 107th Cong. 17 (Oct. 16, 2002) (statement of Deputy Assistant Secretary of State Kelly Ryan).

**~~Recent Agreements With Northern Triangle Countries~~The 2019 ACAs with Guatemala, El Salvador, and Honduras**

~~72.~~ For more than sixteen years after signing the agreement with Canada, the United States did not enter into any other safe third country agreement.  However, ~~between June and September~~in 2019~~,~~ the U.S. government signed three new "~~asylum cooperative~~ agreements" ("that it referred to as ACAs") with Guatemala, El Salvador, and Honduras~~.~~

~~73.~~53.  ~~The context of these ACAs contrasts sharply with~~ in order to remove asylum seekers to those countries pursuant to the ~~U.S.-Canada~~ safe third country ~~agreement~~provision.  Unlike Canada, which is a stable democracy that accepts large numbers of asylum seekers and has low levels of violence, Guatemala, El Salvador, and Honduras ~~have~~in 2019 all had epidemic levels of violence ~~and *produce*~~, produced large numbers of asylum seekers ~~fleeing to the United States and other countries, as discussed below.~~, and lacked functional asylum systems.

54.    The 2019 Guatemala ACA was signed on July 26, 2019, and published in the Federal Register on November 20, 2019.  84 Fed. Reg. ~~Interim Final~~64095.

55.    Although the Rule states that ACAs entered pursuant to the safe third country provision "will be published in the Federal Register," 84 Fed. Reg. ~~Creates~~at 63997, the 2019 ACAs with Honduras and El Salvador were not published at the time.  They were eventually published by the State Department, which indicated that the 2019 El Salvador ACA was signed on September 20, 2020 and entered into force on December 10, 2020;[6] and that the 2019 Honduras ACA was signed on September 25, 2019 and entered into force on March 25, 2020.[7]

---

[6] U.S. State Dep't, Treaties & Other Int'l Acts Series 20-1210, Agreement Between the United States of America and El Salvador, https://www.state.gov/wp-content/uploads/2021/02/20-1210-El-Salvador-Asylum-Cooperative-Agreement.pdf.
[7] U.S. State Dep't, Treaties & Other Int'l Acts Series 20-325, Agreement Between the United States of America and Honduras, https://www.state.gov/wp-content/uploads/2020/06/20-325-Honduras-Migration-and-Refugees.pdf.

The government has since confirmed that the 2019 ACAs "with El Salvador and Honduras were never implemented."[8]

**IV.    The Rule Imposes a Procedural Framework ~~That Is~~ Inconsistent With the Required Safeguards ~~Required in Removal Proceedings.~~**

~~74.~~56.  On November 19, 2019, ~~Defendant~~former Attorney General Barr and ~~Defendant~~former purported Acting DHS Secretary ~~of Homeland Security~~ Wolf promulgated the Rule~~, "Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act."~~ challenged here.  84 Fed. Reg. 63,994.  The Rule creates a ~~procedural~~ framework for removals under ~~the Guatemala, Honduras, and El Salvador agreements and any future ACAs~~ so-called ACAs—excluding the Canada agreement, which remains governed by separate regulations—by instituting new procedures that apply to ~~individuals~~noncitizens in regular and expedited removal proceedings.

~~75.~~57.  Defendants issued the Rule without following the APA requirements of notice and comment rulemaking followed by a 30-day implementation period.  *See* 5 U.S.C. § 553(b)(B), (d).  Instead, they asserted the good cause and foreign affairs exceptions to these requirements.  *See* ~~5 U.S.C.~~*id.* § 553(a)(1), (b)(B), (d)(3).

~~**The Rule Makes Onerous New Changes to Regular Removal Proceedings**~~

~~76.    The Rule amends DOJ regulations governing *regular* removal proceedings by authorizing immigration judges to order asylum seekers removed to ACA countries before hearing the merits of their asylum, withholding, and CAT claims as to their home countries.  As to any ACA countries to which removal is proposed, the immigration judge would have to determine whether it is more likely than not that the applicant would be persecuted or tortured~~

---

[8] U.S. State Dep't, Press Release, Suspending and Terminating the Asylum Cooperative Agreements with the Governments El Salvador, Guatemala, and Honduras, Feb. 6, 2021, https://perma.cc/BLB4-AVRD.

~~there.  Thus, to avoid being ordered removed, an applicant would have to present evidence and satisfy the more-likely-than-not standard as to *every* possible ACA country.~~

58.    ~~By~~Under the Rule, an asylum applicant who is subject to an ACA can generally avoid removal only by showing that it is more likely than not that they will be persecuted in the proposed ACA country of removal.  However, in both expedited removal proceedings and regular removal proceedings, the Rule and Guidance do not adequately ensure that asylum seekers will have the opportunity to express fears of removal to ACA countries or that they will have the opportunity to make the required showings of likelihood of persecution or torture.

~~77.~~    When used in expedited removal, the process of requiring noncitizens to demonstrate their ultimate eligibility for withholding of removal or CAT protection ~~as to *every* ACA-signatory country to which the government argues they can be removed, *before* they have a chance present their asylum claims on the merits, the Rule imposes severe new substantive and practical burdens on asylum seekers and the attorneys and legal services organizations who represent them.~~

~~78.    Additionally, while the safe third country provision confers on immigration judges in regular removal proceedings the authority to apply a broad "public interest" exception in cases where that provision could otherwise bar asylum, *see* 8 U.S.C. § 1158(a)(2)(A), the Rule constrains that power, and asserts that immigration judges may apply that exception only with the permission of DHS attorneys.~~

**~~The Rule Creates New Expedited Removal Procedures that Lack the Safeguards of the Statutory Credible Fear Interview Process~~**

59.    ~~For individuals in *expedited* removal, the Rule~~to third countries during initial interviews strips away essential procedural safeguards that Congress created to protect asylum seekers from *refoulement* to countries where they may be persecuted or tortured.  ~~If~~

79.60.  First, if the government deems an asylum seeker in expedited removal proceedings potentially removable under an ACA, the asylum seeker is diverted away from the normal credible fear process into a new process created by the Rule.  Instead of receiving a credible fear interview, in which asylum officers must affirmatively ask noncitizens whether they fear harm in the receiving country, the Rule provides that the asylum seeker "shall be provided written notice that if he or she fears removal to the prospective receiving country because of the likelihood of persecution on account of a protected ground or torture in that country . . . the alien[noncitizen] should affirmatively state to the officer such a fear of removal."  84 Fed. Reg. at 64,009.  The Rule does not explain when such notice will be provided, who shall provide it, whether it must be in the noncitizen's language, or how notice is to be given if the noncitizen is illiterate.  Unlike in the credible fear regulations, there is no requirement under the Rule that the officer affirmatively ask noncitizens whether they fear harm in the receiving country.

61.    If the noncitizen does not affirmatively state a fear of removal to an ACA country, there is no assessment of whether they are at risk of persecution or torture in that country ever happens.  If.

80.62.  Second, if the noncitizen does express such a fear, an asylum officer will assess their risk of persecution or torture in the ACA country in what the Rule calls a "threshold screening interview."  84 Fed. Reg. at 64,008-64,009.

81.63.  In that interview, the Rule provides that the officer will "determine whether it is more likely than not that the alien[noncitizen] would be persecuted on account of a protected ground or tortured in that country," 84 Fed. Reg. at 64,009—which is the *ultimate* standard for receiving withholding or CAT relief in a full removal hearing before an immigration judge, not the lower screening standard used in credible fear or reasonable fear interviews., in which

30

noncitizens must show only a possibility of ultimately establishing eligibility after a full hearing. Only if the noncitizen meets that ultimate standard as to every ACA country to which they are susceptible to removal, *see id.*, will the noncitizen then receive a normal credible fear interview regarding their fear of removal to their home country.

64.    It is often impossible for asylum seekers to make this showing while detained and within days of being placed into an expedited removal process.  That is because an asylum seeker who may have spent little or no time in the third country would have to explain why they feared being returned there.  Doing so might require substantial country conditions evidence, an explanation of the relationship between that country and the applicant's country of origin, or details as to why the same form of harm that the person fled in their home country is likely in the third country too.  For instance, an applicant like U.T. or J.C.—both of whom are gay men— would have to provide substantial country conditions evidence to show why the harm they experienced on account of their sexual orientation in one country would persist in another.

82.65.  Thus, a noncitizen subject to an ACA will receive a credible fear interview—and have the chance of developing and presenting her asylum claims to an immigration judge—only if they both affirmatively express a fear of removal to the ACA country and manage to satisfy the ultimate standard for withholding of removal or CAT relief by showing that they are more likely than not to be persecuted or tortured in the ACA country.

83.66.  Unlike in credible fear interviews, moreover, the noncitizen subjected to an ACA interview must make this much greater evidentiary showing without any opportunity to consult with or be represented by counsel.

84.    The absence of an opportunity to consult with or be represented by counsel also contrasts sharply with expedited removal pursuant to the U.S.-Canada Safe Third Country

Agreement.  Regulations implementing that agreement—which applies only to individuals who present at a port of entry along the northern border—permit consultation with and representation by counsel in connection with the screening interviews in which asylum officers determine whether to apply that agreement.  8 C.F.R. § 208.30(d)(4); 65 Fed. Reg. 76,121, 76,129 (Dec. 6, 2000) (final rule).

85.67.  If, after the ACA interview, the asylum officer determines that the noncitizen does not meet the ultimate more-likely-than-not standard, the noncitizen cannot apply for asylum, withholding of removal, or CAT protection in the United States, and is subject to immediate removal to the ACA country once a supervisory asylum officer signs off on the decision.

68.    TheThat asylum officer's determination that a noncitizen is barred from applying for asylum and may be removed to a thirdthe ACA country under an ACA is final.  The, because the Rule forbids an immigration judge from reviewing that determination.  Thus, the asylum officer renders a conclusive determination that the noncitizen'sreview.

86.69.  The Rule also provides for its application in regular removal complies withproceedings in immigration court by immigration judges and DHS attorneys. The Rule amended DOJ regulations governing regular removal proceedings by authorizing immigration judges to order asylum seekers removed to ACA countries before hearing the merits of their asylum, withholding, and CAT statutesclaims as to their countries of origin.

70.    TheHowever, the Rule prohibits immigration judges from exercising the broad "public interest" exception conferred on immigration judges by the safe third country provision.  See 8 U.S.C. § 1158(a)(2)(A).  The Rule instead provides that only DHS may exercise that discretionary authority.

87.71.  In both expedited and regular removal proceedings, often the only way for a noncitizen subject to an ACA to avoid removal to the ACA country is to abandon their asylum claim and accept a removal order to their ~~home~~ country of origin—which, of course, is the country from which they are seeking asylum in the first place.

**USCIS Guidance Concerning the Guatemala ACA Further Increases the Burden on Asylum Seekers**

**The 2019 Designations**

72.     The Rule's preamble states that "[p]rior to implementation of an ACA, the Attorney General and the Secretary of Homeland Security" will "make a categorical determination whether a country to which [noncitizens] would be removed under such an agreement provides 'access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection.'"  84 Fed. Reg. at 63997 (quoting 8 U.S.C. § 1158(a)(2)(A)). These categorical determinations are referred to herein as "Designations."

73.     In 2019, the former Attorney General and former purported Acting DHS Secretary and issued Designations concluding that Guatemala has a full and fair asylum system.

74.     On October 16, 2019, former purported Acting DHS Secretary Kevin McAleenan signed a memorandum with the subject line: "Whether Guatemala's Refugee Protection Laws and Procedures Satisfy the 'Access to a Full and Fair Procedure' Requirements of Section 208(a)(2)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a)(2)(A)."  The memorandum concluded that Guatemala meets the statutory requirement of providing a full and fair asylum system.  Among other defects, the memorandum contained no discussion of the actual functioning or capacity of Guatemala's asylum system or the country's ability to safely accommodate asylum seekers.  Former Attorney General Barr signed an equivalent memorandum with the same subject line on November 7, 2019.

75.     On information and belief, the former Attorney General and former purported Acting DHS Secretaries also issued similar memoranda in 2019 or 2020 concerning Honduras and El Salvador.  To date, Defendants have not produced those memoranda or otherwise made them public.

**2019 Agency Guidance**

76.     On November 19, 2019, the same day the Rule was published in the Federal Register, Defendant USCIS distributed written guidance for asylum officers on conducting ACA threshold screening interviews ~~concerning the Guatemala ACA.~~ in expedited removal proceedings.

~~88.~~     That 2019 USCIS ~~Guidance~~guidance provided ~~the background and legal framework for the agreement and its implementation and an explanation of the threshold screening process, exceptions to the agreement, how to elicit evidence to support an exception, the process for reviewing an asylum officer's decision about the applicability of an ACA, and what happens after the interview with an asylum officer.~~

~~89.     The USCIS Guidance sets forth details about the procedures Defendants apply to remove non-Guatemalan asylum seekers to Guatemala under the ACA.~~

~~90.     First,~~that CBP officers ~~processing individuals at the border~~were to make the initial determination as to whether a noncitizen falls under an ACA.  ~~To be removed under the Guatemala ACA, the noncitizen initially had to be a national of Honduras or El Salvador and must not have been convicted of a felony in the United States or any crime in Guatemala.  (The list of amenable nationalities can be modified; Defendants have publicly stated that no nationalities are exempt.  *See infra* ¶ 136.).~~

91.77.  CBP officers were then givesto give the noncitizen a "Tear Sheet" stating, inter alia, that they could be removed to Guatemala, that they willwould be referred to an asylum officer over the phone or in person to determine whether they meet an exception to the 2019 Guatemala ACA, and that they "may express a fear of removal to Guatemala or a fear of persecution or torture in Guatemala."

92.78.  Additionally, theThe 2019 USCIS Guidance providesguidance also provided that in these ACA interviews—unlike in credible fear interviews or in withholding of removal adjudications in regular removal proceedings, or in threshold evaluations of potential withholding eligibility in credible fear and reasonable fear interviews—demonstrating past persecution in Guatemala does *not* create a presumption of future persecution.  Instead, such a showing willwould just count as "strong evidence" of the likelihood of future persecution. TheUnder the 2019 USCIS guidance, the asylum officer *cannot*was not permitted to determine that a noncitizen is more likely than not to face persecution based solely on past persecution.

93.    Along with the USCIS Guidance, asylum officers have been provided training materials that describe pervasive violence committed with impunity in Guatemala.[9]

79.    On January 10, 2020, Also on November 19, 2019, Defendant EOIR distributed guidance to immigration judges titled "Guidelines Regarding New Regulations Providing For Implementation Of Asylum Cooperative Agreements."  That guidance stated in part that a noncitizen subject to an ACA is not eligible for asylum, withholding of removal, or CAT protection "unless the immigration judge determines" that the ACA "does not preclude the [noncitizen] from applying for asylum in the United States," that the noncitizen "qualifies for an

---

[9] Hamed Aleaziz, *A Controversial Plan To Deport Mexican Asylum-Seekers To Guatemala Has Been Paused*, BuzzFeed News (Jan. 8, 2020), https://www.buzzfeednews.com/article/hamedaleaziz/mexican-asylum-seekers-guatemala-plan-paused.

exception to the relevant" ACA; or that the noncitizen "has demonstrated that it is more likely than not that he or she would be persecuted on account of a protected ground or tortured in the third country."

80.    The 2019 EOIR guidance further stated that "[i]mmigration judges should not review, consider, or decide any issues pertaining to any discretionary determination on whether [a noncitizen] who is subject to an ACA should be permitted to pursue asylum in the United States"; and that a noncitizen "who is otherwise barred from applying for asylum pursuant to an ACA may nonetheless file an asylum application with the immigration court if DHS files a written notice stating that DHS has decided in the public interest that the [noncitizen] may pursue an application for asylum or withholding of removal in the United States."

**The First Trump Administration's Implementation of the Rule**

81.    On November 20, 2019, Defendants began applying the Rule and the 2019 Guatemala ACA to asylum seekers in expedited removal proceedings.

94.    When those ~~Defendants~~ announced that they had finalized the implementing agreement for the ACA with Honduras. The details of that agreement and any guidance to asylum officers regarding application of the ACA with Honduras have not yet been made public.

~~V.    **The Government Is Removing Asylum Seekers to Guatemala, and Is Poised to Begin Removals to Honduras, Without the Required Determinations that Their Asylum Systems Provide Access to Full and Fair Procedures.**~~

~~95.    The safe third country statute prohibits the government from removing an asylum seeker to a third country without first determining that the country will provide the asylum seeker with a full and fair procedure for seeking asylum. 8 U.S.C. § 1158(a)(2)(A).~~

~~96.    Neither the Rule nor the USCIS Guidance permits asylum officers to consider this statutory requirement on a case-by-case basis.~~

97.    Instead, the Rule states: "Prior to implementation of an ACA, the Attorney General and the Secretary of Homeland Security . . . will evaluate and make a categorical determination whether a country to which aliens would be removed under such an agreement provides 'access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection.'" 84 Fed. Reg. at 63,997 (quoting 8 U.S.C. § 1158(a)(2)(A)).

98.    However, the government has not publicly issued any such categorical designation concerning Guatemala or any other country.

99.    If the government has made, but not disclosed, a categorical decision that Guatemala provides access to "full and fair" asylum procedures, that designation did not and cannot have adequately considered the security situation in Guatemala, the impact of that insecurity on refugees' ability to remain and seek protection in Guatemala, or the actual functioning of Guatemala's brand new, very limited, and failing asylum system.

100.    The administration has never adequately evaluated Guatemala's capacity, in terms of infrastructure or personnel, to accept and process asylum seekers before beginning to remove asylum seekers there.[10]

101.    The government also has not issued any categorical "full and fair" designation concerning Honduras or El Salvador, despite its announcement that it plans to begin removals to Honduras under that ACA imminently.

---

[10] Nicole Narea, *Trump's Agreements in Central America Are Dismantling the Asylum System as We Know It*, Vox (Nov. 20, 2019), https://www.vox.com/2019/9/26/20870768/trump-agreement-honduras-guatemala-el-salvador-explained.

VI.    The Current ACA Countries—Guatemala, Honduras, and El Salvador—Are
       Extremely Dangerous and Unfit for Asylum Seekers.

102.    El Salvador, Guatemala, and Honduras are experiencing epidemic levels of

violence comparable to those typically seen in war zones.

103.    Violence against women, children, and members of the LGBT community by

armed criminal groups has escalated dramatically in the Northern Triangle countries, and those

governments have been unable or unwilling to provide effective protection.

104.    Consequently, large numbers of asylum seekers are fleeing life-threatening

situations in El Salvador, Guatemala, and Honduras,[11] and thousands have been granted asylum

in the United States.  Between fiscal years 2015 and 2017, the United States granted asylum to

19,649 people from El Salvador, Guatemala, and Honduras.[12]

**Guatemala Is Not Safe for Asylum Seekers and Lacks a Full and Fair Asylum System**

105.    For most asylum seekers, seeking protection in Guatemala is not an option.  The

country lacks a full and fair asylum processing system, and is often even more dangerous for

migrants than it is for Guatemalans, who have fled the country in large numbers.

106.    Guatemala had the twenty-sixth-highest homicide rate in the world in 2017, and

the seventh-highest for females.[13]  The U.S. State Department warns that "[v]iolent crime, such

as armed robbery and murder, is common."[14]  "Gang activity, such as extortion, violent street

crime, and narcotics trafficking, is widespread," began, the U.S. and Guatemalan police often

---

[11] *See, e.g.*, Dep't of Homeland Sec'y, Office of Immigration Statistics, Annual Flow Report,
Refugees and Asylees: 2017 7-8, Mar. 2019,
https://www.dhs.gov/sites/default/files/publications/Refugees_Asylees_2017.pdf.
[12] *Id.*, Tbl. 7.
[13] U.N. Office on Drugs and Crime, Int'l Homicide Statistics Database,
https://tinyurl.com/UNHomicideDatabase.
[14] U.S. State Dep't, Guatemala Travel Advisory, Feb. 28, 2019,
https://tinyurl.com/GuatemalaTravelAdvisory.

"lack the resources to respond effectively to serious criminal incidents."[15] Accordingly, the State

Department advises Americans to "[e]xercise increased caution in Guatemala due to crime," and

to "reconsider travel" to six of Guatemala's twenty-two departments where approximately 40%

of Guatemala's population lives, including where Guatemala City is located, due to high levels

of murder and other violent crime.[16]

107.    The State Department's Overseas Security Advisory Council reports that

"Guatemala remains among the most dangerous countries in the world" and has an "alarmingly

high murder rate" that "appears driven by narco-trafficking activity, gang-related violence, a

heavily armed population, and police/judicial system unable to hold many criminals

accountable."[17]

108.    Some of Guatemala's most serious human rights issues identified by the U.S.

State Department in 2018 were "widespread corruption; trafficking in persons; crimes involving

violence or threats thereof targeting lesbian, gay, bisexual, transgender, and intersex (LGBTI)

persons, persons with disabilities, and members of other minority groups; and use of forced or

compulsory or child labor."[18] The high incidence of rape and other forms of physical and sexual

violence against women is a serious problem.[19]

109.    Guatemala's gangs "include former members of the military, intelligence agencies

and active members of the police," who are "often complicit" in organized crime.[20] "Corruption

---

[15] *Id.*

[16] *Id.*

[17] U.S. State Dep't, Overseas Security Advisory Council, Guatemala 2019 Crime & Safety Report, Feb. 28, 2019, https://tinyurl.com/OSACGuatemala.

[18] U.S. State Dep't, Guatemala 2018 Human Rights Report 1, https://www.state.gov/wp-content/uploads/2019/03/GUATEMALA-2018.pdf.

[19] *Id.* at 16-17.

[20] InSight Crime, Guatemala Profile (Nov. 29, 2017), https://www.insightcrime.org/guatemala-organized-crime-news/guatemala/.

and inadequate investigations ma[ke] prosecution difficult," and "officials frequently engage[] in corrupt practices with impunity."[21] Guatemalan "[p]olice ha[ve] minimal training or capacity to investigate sexual crimes or assist survivors of such crimes, and the government [does] not enforce the law [criminalizing rape] effectively."[22] LGBT persons face unchecked "societal discrimination . . . in access to education, health care, employment, and housing," violent attacks including acts of so-called "corrective rape," and frequent abuse by police.[23]

110.    Guatemala is also very poor, hindering its ability to support and provide a full and fair process to asylum seekers and making it difficult for asylum seekers to survive there during the pendency of their proceedings and beyond. Its per capita gross domestic product was an estimated $8,200 in 2017, "roughly half the average for Latin America and the Caribbean."[24] More than half of the population is below the national poverty line, and 23% live in extreme poverty. Nearly half of Guatemala's children under age five are chronically malnourished, one of the highest malnutrition rates in the world.

111.    Guatemala's asylum system is also brand new and barely functioning. Its new migration code was approved in 2016 and the implementing regulations pertaining to asylum were issued in early 2019. Before the official creation of this new system, Guatemala accepted just 370 asylum seekers in 15 years, including individual family members.

112.    Last year, the U.S. State Department found that while Guatemalan "laws provide for the granting of asylum or refugee status, and the government has established a system for providing protection to refugees," UNHCR has "reported that identification and referral

---

[21] U.S. State Dep't, Guatemala 2018 Human Rights Report 1, 14, https://www.state.gov/wp-content/uploads/2019/03/GUATEMALA-2018.pdf.
[22] *Id.* at 16.
[23] *Id.* at 21-22.
[24] CIA World Factbook, Guatemala (Dec. 4, 2019), https://www.cia.gov/library/publications/the-world-factbook/geos/gt.html.

25

mechanisms for potential asylum seekers were inadequate."[25]  "Both migration and police authorities lacked adequate training concerning the rules for establishing refugee status."[26]

113.    According to UNHCR, only 466 people applied for refugee status in Guatemala between January 2018 and July 2019.[27]  Even with this small number of applications, more than ninety percent had not yet been decided by August 2019.[28]

114.    There are very few officials working on the asylum process in Guatemala, and staff usually are not familiar with the rights of refugees and asylum seekers.  There are significant limits on where asylum seekers can submit applications and attend interviews, and there are frequent check-in requirements.  Asylum applicants are also not permitted to be represented by attorneys during their interviews.  The system lacks adequate infrastructure, and does not have capacity to provide competent translation or interpretation services for non-Spanish speaking asylum seekers.  Moreover, Guatemala has failed to implement a system for asylum applicants to access basic social services such as shelter and education.

115.    UNHCR has warned that Guatemala does not have the capacity to significantly expand its asylum program.

116.    On June 18, 2019, less than six weeks before the signing of the Guatemala ACA, Guatemala's foreign minister acknowledged that Guatemala does not have adequate resources to receive asylum seekers.[29]

---

[25] U.S. State Dep't, Guatemala 2018 Human Rights Report 13, https://www.state.gov/wp-content/uploads/2019/03/GUATEMALA-2018.pdf.
[26] *Id.*
[27] David C. Adams, *Guatemala's "Embryonic" Asylum System Lacks Capacity to Serve as Safe U.S. Partner, Experts Say*, Univision News (Aug. 2, 2019), https://tinyurl.com/tb55o7t.
[28] *Id.*
[29] Sofia Menchu, *Guatemala Says It Has Not Pledged to Accept U.S.-Bound Asylum Seekers*, Reuters (June 18, 2019), https://tinyurl.com/tzca5v5.

**El Salvador and Honduras Are Also Not Safe for Asylum Seekers and Lack Functioning Asylum Systems**

117.    The other impoverished countries with which the United States has signed ACAs are even more violent than Guatemala.  El Salvador had the highest homicide rate in the world in 2017, and Honduras had the fifth highest.[30]  Both countries suffer from epidemic levels of gang violence, rape and other violence against women and LGBT individuals, attacks on members of ethnic minorities, ineffective policing, and entrenched corruption at all levels of government and law enforcement.[31]

118.    Neither El Salvador nor Honduras has a functioning asylum system capable of processing an influx of asylum applicants removed from the United States.  On December 15, 2019, three months *after* the signing of the U.S.-El Salvador ACA, El Salvador's president admitted that his country does not "have asylum capacities" and is not safe enough to properly serve as a safe third country.[32]

119.    Between 2008 and mid-2019, Honduras's immigration agency received fewer than 300 asylum applications and recognized only 50 people as refugees.[33]  The country received just nine asylum applications in 2016.[34]  That year, a U.N. monitor reported that Honduran

---

[30] U.N. Office on Drugs and Crime, Int'l Homicide Statistics Database, https://tinyurl.com/UNHomicideDatabase.

[31] *See, e.g.*, U.S. State Dep't, El Salvador 2018 Human Rights Report 1, 16, Mar. 2019, https://www.state.gov/wp-content/uploads/2019/03/EL-SALVADOR-2018.pdf; U.S. State Dep't, Honduras 2018 Human Rights Report 1, 14, Mar. 2019, https://www.state.gov/wp-content/uploads/2019/03/HONDURAS-2018.pdf.

[32] Sharyn Alfoni, *"Our Whole Economy is in Shatters": El Salvador's President Nayib Bukele on the Problems His Country is Facing*, CBS News (Dec. 15, 2019), https://tinyurl.com/ElSalvadorProblems.

[33] Yael Schacher, Senior U.S. Advocate, Refugees International, *Letter to USCIS Asylum Div. Chief Andrew Davidson & EOIR Ass't Dir. Lauren Alder Reid Re: Request for Comments* (Dec. 23, 2019), https://tinyurl.com/LetterToUSCISRequestComments.

[34] Global Detention Project, *Honduras Immigration Detention: Quick Facts* https://www.globaldetentionproject.org/countries/americas/honduras.

"immigration and asylum policies and practices fail to live up to international standards required for those fleeing violence or persecution."[35]  In 2017, UNHCR reported that the nation had yet to "develop[] [or] implement[] . . . guidelines for the identification of persons with protection needs in order to guarantee effective access to asylum procedures."[36]

**It Is Dangerous to Shuffle Asylum Seekers Between Northern Triangle Countries**

120.    In addition to the profound dangers and institutional deficiencies that make each Northern Triangle country unsuitable to serve as a safe third country for asylum seekers, there are grave risks in removing asylum seekers from one of these countries to another.

121.    Much of the epidemic violence that has caused individuals to flee El Salvador, Guatemala, and Honduras is carried out by gangs, such as the MS-13 and Mara 18, that are transnational and have tens of thousands of members throughout the Northern Triangle.[37]

122.    Additionally, El Salvador, Guatemala, and Honduras—along with Nicaragua—form the "Central America-4 Free Mobility Agreement," a regional free movement accord that permits unchecked land travel between the four countries, without visas or passports.  This freedom of movement between the Northern Triangle countries—which have a combined area smaller than Michigan—makes it easy for a gang or other motivated persecutor to pursue a victim anywhere within the region.  As such, there is little practical difference between removing an asylum seeker from any one of these countries to another, rather than back to her home country.

---

[35] U.N. Human Rights Council, *Report of the Special Rapporteur on the Human Rights of Internally Displaced Persons on his Mission to Honduras*, Apr. 2016, https://tinyurl.com/UNHCR-Honduras.

[36] UNHCR, Honduras Factsheet 2, Mar. 2017, https://tinyurl.com/UNHCRHondurasFactsheet.

[37] ICE, Combating Gangs, Dec. 11, 2019, https://www.ice.gov/features/gangs.

VII.    The ACA Rule Is Inconsistent with International Law Regarding Safe Third Country Agreements.

123.    The Rule suggests that the United States' efforts to formulate ACAs with other countries are consistent with the practice of other countries regarding burden sharing for refugee protection and with the views of UNHCR.  This is incorrect.

124.    Consistent with its prior guidance, UNHCR publicly stated that the Rule constitutes "an approach at variance with international law that could result in the transfer of highly vulnerable individuals to countries where they may face life-threatening dangers."[38]

125.    UNHCR guidance on safe-third-country-type transfer agreements affirms that the "primary responsibility to provide protection rests with the State where asylum is sought."[39] UNHCR also advises that such agreements are not permissible as a means for a country to "divest itself of responsibility" for asylum seekers.[40]  Asylum should not be refused "solely on the ground that it could be sought from another State," and an asylum seeker should not be required "to seek asylum in a country with which he has not established any relevant links."[41]

126.    Before removing an asylum seeker to a third country, UNHCR advises that it is incumbent on the sending country "individually to assess whether the third state will: (re)admit the person, grant the person access to a fair and efficient procedure for determination of refugee status and other international protection needs, permit the person to remain while a determination

[38] UNCHR, Statement on New U.S. Asylum Policy, Nov. 19, 2019, https://www.unhcr.org/en-us/news/press/2019/11/5dd426824/ statement-on-new-us-asylum-policy.html.
[39] UNHCR, Guidance Note on Bilateral and/or Multilateral Transfer Arrangements of Asylum-Seekers ¶ 1, May 2013, https://www.refworld.org/pdfid/51af82794.pdf; *accord* UNHCR, Legal Considerations Regarding Access to Protection and a Connection Between the Refugee and the Third Country in the Context of Return or Transfer to Safe Third Countries ¶ 2, Apr. 2018, https://www.refworld.org/pdfid/5acb33ad4.pdf.
[40] UNHCR, Guidance Note on Bilateral and/or Multilateral Transfer Arrangements of Asylum-Seekers ¶ 6, May 2013, https://www.refworld.org/pdfid/51af82794.pdf.
[41] UNHCR, Note on Asylum ¶ 11, Aug. 30, 1979, https://tinyurl.com/UNHCRNoteOnAsylum1979.

is made, and accord the person standards of treatment commensurate with the 1951 Convention and international human rights standards, including—but not limited to—protection from *refoulement.*"[42]

127.    For a transferring state to determine whether such requisite "standards are available" in a proposed safe third country, the transferring state must assess not just the receiving state's "international legal obligations," but also "its domestic laws and the actual practice of implementation" to ensure that the state's "actual practice indicat[es] consistent compliance with its international legal obligations."[43]

128.    In addition to meeting baseline *non-refoulement* obligations, the receiving country must be able to provide "effective protection," which includes the requirement that "there is no real risk to the life of the person in the third State," whether or not on account of a protected ground.[44]

129.    UNHCR has also made clear that "[t]he burden of proof does not lie with the asylum-seeker (to establish that the third country is unsafe), but rather with the country which wishes to remove the asylum-seeker from its territory (to establish that the third country is safe)."[45]

---

[42] UNHCR, Legal Considerations Regarding Access to Protection and a Connection Between the Refugee and the Third Country in the Context of Return or Transfer to Safe Third Countries ¶ 4, Apr. 2018, https://www.refworld.org/pdfid/5acb33ad4.pdf.
[43] *Id.* ¶ 10.
[44] UNHCR, Summary Conclusions on the Concept of "Effective Protection" in the Context of Secondary Movements of Refugees and Asylum-Seekers, Feb. 2003, https://www.refworld.org/docid/3fe9981e4.html.
[45] UNHCR, Observations on the European Commission's Proposal for a Council Directive on Minimum Standards on Procedures for Granting and Withdrawing Refugee Status ¶ 36, July 2001, https://www.refworld.org/docid/3e0e3f374.html.

45

130.    The European Union has recognized similar requirements for transfers under its Dublin Regulation.[46]

**VIII.    The Guatemala ACA Program Is Rapidly Expanding.**

131.    On November 20, 2019, Defendants began imposing ACA procedures on asylum seekers apprehended and placed in expedited removal in the El Paso Border Patrol Sector, which spans west Texas and all of New Mexico.  Initially, Defendants applied the new ACA procedures only to adult male Honduran and Salvadoran asylum seekers.  However, Defendants have quickly expanded the geographic scope of the Guatemala ACA's application and the types of individuals subject to it.  The program is now being carried out across at least two sectors, and men, women, and children, including families, are being removed.

132.    On November 21, Defendants removed a non-Guatemalan asylum seeker to Guatemala.  That individual, a young Honduran man, later stated that he had to sign a piece of paper that he did not understand, and was not informed that he was being removed to Guatemala until he was being taken to the plane that would deport him.[47]

133.    Between November 21 and December 20, Defendants removed approximately 40 Honduran and Salvadoran asylum seekers to Guatemala.  This group included single men, young women, and families.

134.    During that same period, approximately 20 more asylum seekers were pressured into withdrawing their asylum applications and accepting removal to their countries of origin when confronted with the threat of deportation to Guatemala.

---

[46] *M.S.S. v. Belgium & Greece*, 2011-I Eur. Ct. H.R. 255; Joined Cases C-411/10 & C-493/10, *N.S. v. Sec'y of State for the Home Dep't*, 2011 E.C.R. I-13905.

[47] Sofia Menchu, *Honduran Migrant Sent Back Under New U.S. Deal Resigned to Fate for Now*, Reuters (Nov. 22, 2019), https://tinyurl.com/HonduranMigrant.

135.    On or around December 9, Defendants expanded the program's geographic reach and began applying the Guatemala ACA to Honduran and Salvadoran asylum seekers in the Rio Grande Valley in southern Texas.

136.    On December 19, Defendant Cucinelli stated that "all populations" of asylum seekers are being considered for removal to Guatemala, "including Mexican nationals." Mexico's Ministry of Foreign Affairs estimates that if Mexican asylum seekers are subjected to the ACA, approximately 900 could be removed to Guatemala within a month.[48] Other U.S. officials stated that the government is also specifically considering removing Ecuadorian asylum seekers to Guatemala, as well as asylum seekers from the non-Spanish-speaking countries of Brazil and Haiti.[49]

137.    In the early days of January 2020, while much of the Guatemalan government and civil society was closed, Defendants increased removals.  As of January 13, 2020, approximately 140 individuals had been removed to Guatemala under the Rule.[50]

138.    Removals to Honduras appear to be imminent.  On January 10, Defendants announced that they were prepared to move forward with implementation of the Honduras ACA.

IX.    **Guatemala Has Proven Totally Unprepared to Receive Asylum Seekers Under Its ACA.**

139.    When ACA removals to Guatemala began on November 21, the Guatemalan government governments had not yet developed any coherent plan to ensure that asylum seekers deported under the agreement would be able to access asylum procedures.

---

[48] Julio-Cesar Chavez & Lizbeth Diaz, *"Into the Lion's Den": Mexican Asylum Seekers Fear Deportation to Guatemala*, Reuters (Jan. 7, 2020), https://tinyurl.com/tlbca4n.

[49] Michelle Hackman & Juan Montes, *Guatemala Is Set to Finalize Deal with U.S. to Accept Mexican Asylum Seekers*, Wall St. J. (Dec. 20, 2019), https://www.wsj.com/articles/guatemala-is-set-to-finalize-deal-with-u-s-to-accept-mexican-asylum-seekers-11576872424.

[50] Kevin Sieff, *The U.S. Is Putting Asylum Seekers on Planes to Guatemala—Often Without Telling Them They're Going There* (Jan. 13, 2020), https://tinyurl.com/tzptctx.

140.82.        On November 18, 2019, a briefing prepared for ~~Defendant~~former purported Acting DHS Secretary Wolf stated: "There is uncertainty as to who will provide orientation services for migrants as well as who will provide shelter, food, transportation, and other care."

141.    ~~At present, those~~Non-Guatemalan nationals who were removed to Guatemala ~~are being provided short-term accommodations by nonprofit shelters in~~pursuant to the Rule and the 2019 Guatemala ~~City—one of the most dangerous places in the country—which are not designed to accommodate this population.  The Guatemalan government has not put in place a plan for long-term housing of asylum seekers and officials have publicly stated that the government is not devoting any government resources to receiving asylum seekers.~~

142.    ~~Upon their arrival in Guatemala, asylum seekers removed under the~~ ACA ~~are granted~~were given preliminary authorization to stay in the country for just 72 hours.

143.83.        Within those 72 hours, ~~ACA deportees must~~ they had to decide whether to return to their ~~home~~ countries of origin or remain in Guatemala and attempt to apply for asylum there.  However, many ~~individuals have~~people had not received adequate information or instructions about the process of applying for asylum in Guatemala to allow them to make an informed decision just days after their disorienting deportation to an unexpected country.

144.    ~~And asylum seekers~~Those removed to Guatemala ~~face~~also faced significant pressure to return to their countries of origin.  ~~They frequently lack stable shelter and resources in Guatemala and face well-known dangers similar to those they fled in their home countries.  In fact, one woman removed to Guatemala reported that she came upon a crime scene with a dead body just blocks from the migrant shelter where she was staying temporarily. They also must~~

assess the unlikely prospects for protection from either Guatemala's untested asylum system or its notoriously corrupt, ineffectual police.

145.    The United States has also provided substantial funds to support efforts in Guatemala to offer ACA deportees transportation back to their home countries.  This offer of free transportation intensifies the pressure that these individuals already face to return to their countries of origin.

146.84.        This the removed noncitizens transportation back to their countries of origin, which intensified the pressure for them to do so.  And the shelter infrastructure in Guatemala that existed for people removed under the Rule authorized only very brief stays.  And Guatemala did not provide access to guidance or support for the legal and social service needs that would be necessary if individuals actually wanted to remain in the country and seek protection.  The result was indirect *refoulement* of asylum seekers is, which was reportedly just the "result the Trump administration intended."[51]

85.    On March 17, 2020, the Guatemalan government suspended removals under its 2019 ACA due to concerns surrounding the spread of COVID-19 and the country's capacity to receive asylum seekers.  Removals under the 2019 Guatemala ACA never ultimately resumed.

86.    Between November 2019 and March 2020, Defendants removed approximately 945 non-Guatemalan asylum seekers to Guatemala under the Rule, including single women and parents with young children.  In October 2020, the Office of the United Nations High Commissioner for Refugees ("UNHCR") informed congressional staff that less than 2 percent of those asylum seekers were actively pursuing asylum claims in Guatemala and that none of them

---

[51] Jason Hopkins, *Trump's Latest Asylum Deal is Working Just as the Administration Intended*, Daily Caller (Dec. 13, 2019), https://dailycaller.com/2019/12/13/all-asylum-seekers-returning-to-home-country/.

had yet been granted asylum in Guatemala.[52]  Additionally, during the four months the 2019 Guatemala ACA was being implemented, Defendants coerced many other asylum seekers into withdrawing their requests for protection and accepting removal to their countries of origin when faced with the prospect of being deported to Guatemala.

87.    Likely also due to the COVID-19 pandemic, the 2019 ACAs with Honduras and El Salvador were never implemented under the first Trump administration.

**The Biden Administration Terminated the 2019 ACAs But Failed to Rescind the Rule**

88.    On February 2, 2021, former President Biden directed the Attorney General and DHS Secretary to "promptly review and determine whether to rescind the interim final rule" at issue in this case "as well as any agency memoranda or guidance issued in reliance on that rule." Executive Order 14010, 86 Fed. Reg. 8267, 8270.  That executive order further directed the Secretary of State to "promptly consider whether to notify the governments of" Guatemala, Honduras, and El Salvador that "the United States intends to suspend and terminate" the 2019 ACAs with those countries.  *Id.* ~~The ACA Rule and USCIS Guidance Cause Serious, Irreparable~~

89.    On February 6, 2021, the State Department announced that "the United States ha[d] suspended and initiated the process to terminate the Asylum Cooperative Agreements with the Governments of El Salvador, Guatemala, and Honduras."[53]  The termination of the 2019 ACAs was "effective after the notice period stipulated in each of the Agreements."[54]  The notice

---

[52] Democratic Staff Report for the Senate Committee on Foreign Relations, Cruelty, Coercion, and Legal Contortions: The Trump Administration's Unsafe Asylum Cooperative Agreements 23, Jan. 18, 2021, https://perma.cc/48UW-JH68.

[53] U.S. State Dep't, Press Release, Suspending and Terminating the Asylum Cooperative Agreements with the Governments El Salvador, Guatemala, and Honduras, Feb. 6, 2021, https://perma.cc/BLB4-AVRD.

[54] *Id.*

periods for the 2019 ACAs were three and six months.  Therefore, all three 2019 agreements terminated by August 2021.

90.     However, the government has not announced publicly or represented in this litigation that it has rescinded the 2019 Designations concerning Honduras, Guatemala, and El Salvador or that it has rescinded the 2019 agency guidance documents.

**New ACAs Signed by the Second Trump Administration**

91.     Since June 2025, the United States government has signed a series of new ACAs with countries that the State Department itself has acknowledged are unsafe, commit serious human rights violations, and/or have weak or corrupt asylum systems.  On information and belief, Defendants are actively working to sign further ACAs with inappropriate third countries.

92.     On June 13, 2025, the United States signed a new ACA with Guatemala, which was published on July 15, 2025.  90 Fed. Reg. 31670.  The agreement provides for the "transfer of nationals of Central American countries to Guatemala" and does not set forth any limitation on the number of non-Guatemalan nationals who can be removed to Guatemala pursuant to the agreement.  *Id.* at 31675.

93.     The State Department reports that "Guatemala remains dangerous" and that "[e]ndemic poverty, an abundance of weapons, a legacy of societal conflict, and the presence of organized criminal gangs" in the country "all contribute to violent crime."[55]  The State Department therefore warns that people should "[r]econsider travel to Guatemala due to crime"

---

[55] U.S. State Dep't, Overseas Security Advisory Council, Guatemala 2019 Crime & Safety Report, May 15, 2025, https://www.osac.gov/Country/Guatemala/Content/Detail/Report/2013f384-296b-4394-bfcb-1c9c40b9c7df.

and it prohibits U.S. government personnel and their families from traveling to multiple areas of the country that "are controlled by drug gangs."[56]

94.    The State Department has acknowledged that although Guatemalan law "provides for the granting of asylum or refugee status," "[t]here [are] gaps and shortcomings in the procedures for implementing the legal framework."[57]  In particular, each application must go through "an interministerial process, whose complexity contribute[s] to major delays on final case decisions and an increased backlog."[58]  Among other additional defects, Guatemala's "[i]dentification and referral mechanisms for potential asylum seekers [are] inadequate, and requirements to travel to Guatemala City for the initial asylum interview limited access."[59]

95.    On June 25, 2025, the United States signed a new ACA with Honduras ("2025 Honduras ACA"), which was published on July 8, 2025.  90 Fed. Reg. 30076.  The agreement does not set forth any limitation on the number of people or the nationalities of asylum seekers the United States may remove to Honduras.

96.    The State Department reports that Honduras has epidemic levels of gang violence, rape and sexual violence, and other violence against women and lesbian, gay, bisexual, transgender, queer, or intersex ("LGBTQI+") people; "serious restrictions on freedom of expression"; ineffective policing and entrenched corruption; and state violence including torture and extra-judicial killings.[60]  The State Department also warns people to "[r]econsider travel to

---

[56] U.S. State Dep't, Guatemala Travel Advisory, Dec. 30, 2024, https://perma.cc/PGF7-FF5Q.
[57] U.S. State Dep't, 2023 Country Reports on Human Rights Practices: Guatemala, Apr. 22, 2024, https://perma.cc/Y2V6-XTGR.
[58] *Id.*
[59] *Id.*
[60] U.S. State Dep't, 2023 Country Reports on Human Rights Practices: Honduras, Apr. 22, 2024, https://perma.cc/W6N6-LQSL.

Honduras due to crime" and that "[v]iolent crime, such as homicide, armed robbery, and kidnapping, remains common."[61]

97.    The State Department has acknowledged that Honduras has only "a nascent system to provide legal protection to refugees" and that migrants and "asylum seekers with pending cases were vulnerable to abuse and sexual exploitation by criminal organizations."[62] The State Department reports that "[w]omen, children, and [LGBTQI+]" asylum seekers are "especially vulnerable to abuse."[63]

98.    On August, 14, 2025, the United States announced that it had signed a "safe third country agreement" with Paraguay, which has not yet been published.[64]  The State Department press release announcing the signing states that the "agreement provides asylum seekers currently in the United States the opportunity to pursue their protection claims in Paraguay."[65]

99.    Among other human rights concerns, the State Department reports that security forces of Paraguay's long-entrenched ruling party continue to engage in torture, that there are "serious restrictions on freedom of expression" and "serious government corruption," and that the country remains plagued by "extensive gender-based violence."[66]  Paraguay granted asylum to just 85 people in 2024.[67]

---

[61] U.S. State Department, Honduras Travel Advisory, Dec. 10, 2024, https://perma.cc/8XTL-X2GV.
[62] U.S. State Dep't, 2023 Country Reports on Human Rights Practices: Honduras, Apr. 22, 2024, https://perma.cc/W6N6-LQSL.
[63] Id.
[64] U.S. State Dep't, Press Release, Signing of a Safe Third Country Agreement with Paraguay, Aug. 14, 2025, https://perma.cc/X88Q-C6W7.
[65] Id.
[66] U.S. State Dep't, 2023 Country Reports on Human Rights Practices: Paraguay, Apr. 22, 2024, https://perma.cc/7PQQ-CFEJ.
[67] UNHCR, Refugee Data Finder: Paraguay, https://www.unhcr.org/refugee-statistics/download/?v2url=d816ed.

100.     The United States signed an ACA with Uganda on July 29, 2025, which was published on September 3, 2025.  90 Fed. Reg. 42597.  The agreement contains no limitation on the number of people or the nationalities of asylum seekers who can be removed to Uganda under the agreement.  *Id.*

101.     In 2023, the State Department warned that Uganda had taken aim "at the human rights of all Ugandans, enacting draconian anti-LGBTQI+ legislation, including the death penalty for 'serial offenders.'"[68]  The State Department reported that Uganda's "Anti-Homosexuality Act" also imposes "life imprisonment for 'homosexuality.'"[69]

102.     The U.S. government has acknowledged that other forms of repression in Uganda include "serious restrictions on freedom of expression and media freedom," "substantial interference with the freedom of peaceful assembly and freedom of association," the arrest and detention of "political prisoners," "torture," and "extrajudicial killings."[70]  There is also "extensive gender-based violence" and violence against LGBTQI+ people.[71]  The State Department recently reported further "negative developments in the human rights situation in Uganda" last year.[72]  In 2024, the United States removed Uganda from the African Growth and Opportunity Act trade arrangement due to its government's "gross violations of internationally recognized human rights."[73]  The State Department also stresses that "[v]iolent crime is a real

---

[68] U.S. State Dep't, 2023 Country Reports on Human Rights Practices: Preface, Apr. 22, 2024, https://perma.cc/9DMF-DSWG.

[69] U.S. State Dep't, 2023 Country Reports on Human Rights Practices: Uganda, Apr. 22, 2024, https://perma.cc/9TG5-TUJG.

[70] *Id.*

[71] *Id.*

[72] U.S. State Dep't, 2024 Country Reports on Human Rights Practices: Uganda, Aug. 12, 2025, https://perma.cc/A6DP-NSSC.

[73] U.S. Trade Representative, 2024 Biennial Report on the Implementation of the African Growth & Opportunity Act 19 (June 2024) https://perma.cc/RJ9Z-JLDC.

danger in Uganda" and warns people to "[r]econsider travel to Uganda due to crime, terrorism, and laws targeting persons on the basis of sexual orientation."[74]

103.    The State Department has acknowledged that while Uganda has a committee for making refugee eligibility determinations, the body is already backlogged with existing claims from refugees fleeing other African countries.[75]  In addition, Ugandan "[o]fficials frequently engage[] in corrupt practices with impunity" and some "government officials demanded bribes from refugees to process or issue paperwork."[76]

104.    On September 4, 2025, the Secretary of State met with government officials in Ecuador and "a senior State Department official" reported that "the United States and Ecuador are in the final stages of establishing" a "safe third country agreement" "that would allow the US to send asylum seekers to the country."[77]  That agreement has not yet been published.

105.    Ecuador has suffered from an explosion of violence by warring drug cartels in recent years.  The State Department reports that in January 2024, the country's president "decreed a state of emergency" due to "escalating violence from local and transnational organized crime groups."[78]  Yet the State Department reports that violence and kidnappings "by criminal groups increased" last year, alongside arbitrary arrests, killings, and "serious restrictions on freedom of expression" by the government.[79]  The State Department cautions that travel to Ecuador is dangerous because "[v]iolent crime, such as murder, assault, kidnapping, and armed

---

[74] U.S. State Dep't, Uganda Travel Advisory, Apr. 23, 2025, https://perma.cc/3W8D-L4FA.
[75] U.S. State Dep't, 2023 Country Reports on Human Rights Practices: Uganda, Apr. 22, 2024, https://perma.cc/9TG5-TUJG.
[76] U.S. State Dep't, 2023 Country Reports on Human Rights Practices: Uganda, Apr. 22, 2024, https://perma.cc/9TG5-TUJG.
[77] CNN, *US working with Ecuador on Agreement to Send Asylum Seekers to the Country* (Sept. 4, 2025), https://perma.cc/XV5H-CTDJ.
[78] U.S. State Dep't, 2024 Country Reports on Human Rights Practices: Ecuador, Aug. 12, 2025, https://perma.cc/J9E2-WFEY.
[79] *Id.*

robbery, is prevalent and widespread."[80]   On August 28, 2025, just one week before the
Secretary of State met with officials in Ecuador to discuss finalizing an ACA, the State
Department's Overseas Security Advisory Council reported that "[d]espite an increased outcry
from the Ecuadorean population and authorities' focus on curbing crime, Ecuador continues to
experience high rates of mass shootings, bombings, extortion, and kidnapping."[81]   The State
Department has also acknowledged that criminal groups in Ecuador target migrants and refugees
for violence, recruitment into forced labor, and sex trafficking, and that "women, children, and
[LGBTQI+] individuals" are in particular danger.[82]

**The Current Administration's Implementation of the Rule**

106.    On August 20, 2025, Defendant Noem issued an intended ratification of the Rule,
which was originally issued in November 2019 on behalf of DHS by former purported Acting
DHS Secretary Wolf, who had been found to be serving unlawfully.  The intended ratification
was published in the Federal Register on September 2, 2025.  90 Fed. Reg. 42309, 42310.

107.    On information and belief, Defendants have issued Designations categorically
finding that each country with which the United States has signed an ACA has a "full and fair"
asylum process.  Defendants have not made any new of the new Designations public.

108.    On information and belief, Defendants have issued new agency guidance
documents to DHS and DOJ personnel—including CBP and USCIS officers, the ICE attorneys
who prosecute regular removal proceedings, and immigration judges—that, together with the
guidance documents previously issued in 2019, provide for the implementation of the Rule and

---

[80] U.S. State Dep't, Ecuador Travel Advisory, Apr. 15, 2024, https://perma.cc/6ZAY-2P5N.
[81] U.S. State Dep't Overseas Security Advisory Council, Violent Crime Surge in Ecuador, Aug. 28, 2025, https://www.osac.gov/.
[82] U.S. State Dep't, 2023 Country Reports on Human Rights Practices: Ecuador, Apr. 22, 2024, https://perma.cc/NA8P-E854.

Designations in expedited removal proceedings and regular removal proceedings (collectively "Guidance").

109.    On information and belief, Defendants are implementing or will imminently implement the new ACAs in expedited removal proceedings pursuant to the Rule, Guidance, and Designations, much as they did in late 2019.  As before, Defendants' application of the Rule, Guidance, and Designations in expedited removal proceedings deprive noncitizens of credible fear screenings and result in their unlawful summary removal to dangerous or repressive nations that are ill-equipped to receive and screen asylum seekers.

110.    This time, however, Defendants are also implementing the Rule, Guidance, and Designations in regular removal proceedings as well.  Since at least July 2025, ICE attorneys have been filing motions in immigration court to pretermit noncitizens' applications for asylum, withholding of removal, and CAT protection based on the new ACAs.  In their motions, ICE attorneys argue that noncitizens need not be given any opportunity to express fear of removal to the ACA country, even though the possibility of removal to that third country is being raised for first time.  Defendants are also attempting to coerce noncitizens in regular removal proceedings to withdraw their applications for protection and accept removal to their countries of origin in order to avoid removal to the ACA third countries.

111.    On information and belief, the Guidance authorizes and/or directs immigration judges to pretermit applications for asylum, withholding of removal, and CAT protection as to the original proposed country of removal without permitting the noncitizen to seek withholding of removal or CAT protection with respect to the ACA country.

112.    On information and belief, the Guidance also authorizes and/or directs immigration judges to *sua sponte* order pretermission of applications for asylum, withholding of removal, and CAT protection for removal to a third country pursuant to an ACA.

113.    On information and belief, the Guidance authorizes and/or directs Defendants to foreclose noncitizens from the opportunity to seek withholding of removal and CAT protection either to the applicants' home country or to the proposed ACA country or countries of removal, even though the asylum statute's safe third country provision does not provide an exception from withholding of removal or CAT protection.

## CLASS ACTION ALLEGATIONS

114.    The New Individual Plaintiffs—J.C., A.S., D.G., and Y.A.—bring this action under Federal Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of themselves and a class of all other persons similarly situated.  (The Original Individual Plaintiffs do not assert class action claims).

115.    The New Individual Plaintiffs seek to represent the following Proposed Class: All noncitizens in removal proceedings under 8 U.S.C. § 1229a whom Defendants seek to bar from seeking asylum, withholding of removal, or CAT protection based on application of the Rule, Guidance, or Designations.

116.    The proposed class satisfies the requirements of Rule 23(a)(1) because the class is so numerous that joinder of all members is impracticable.  On information and belief, Defendants have already sought to pretermit the protection applications of at least dozens of asylum seekers in multiple immigration courts across the country based on the Rule, Guidance, and Designations.  The proposed class also includes numerous noncitizens against whom Defendants

will seek to apply the Rule, Guidance, and Designations in regular removal proceedings in the future.

117.    The class meets the commonality requirements of Rule 23(a)(2).  The members of the class are subject to a common practice: invocation of the Rule, Guidance, and Designations as a basis to bar them from seeking asylum, withholding of removal, and CAT protection.  The suit also raises questions of law common to members of the proposed class, including whether the Rule, Guidance, and Designations violate the asylum statute, 8 U.S.C. § 1158; whether the Rule, Guidance, and Designations are arbitrary and capricious; and whether the Rule was issued in violation of the APA's procedural requirements.

118.    The proposed class meets the typicality requirements of Rule 23(a)(3), because the claims of the representative New Individual Plaintiffs are typical of the claims of the proposed class.  Each proposed class member, including the proposed class representatives, has experienced or faces the same principal injury (pretermission of their claims for asylum, withholding of removal, and CAT protection), based on the same government practice (application of the Rule, Guidance, and Designations), which is unlawful as to the entire class because it violates the immigration laws and the APA.

119.    The proposed class meets the adequacy requirements of Rule 23(a)(4). The representative New Individual Plaintiffs seek the same relief as the other members of the class—among other things, an order declaring the Designations and the relevant provisions of the Rule and Guidance unlawful, vacatur of the challenged policies, and an injunction preventing their enforcement.  In defending their rights, the New Individual Plaintiffs will defend the rights of all proposed class members fairly and adequately.

120.    The proposed class is represented by experienced attorneys from the American Civil Liberties Union Foundation Immigrants' Rights Project, the National Immigrant Justice Center, the Center for Gender and Refugee Studies, Human Rights First, and the American Civil Liberties Foundation of the District of Columbia.  Proposed Class Counsel have extensive experience litigating class action lawsuits and other complex systemic cases in federal court on behalf of noncitizens.

121.    The proposed class also satisfies Rule 23(b)(2).  Defendants have acted and will act on grounds generally applicable to the class by seeking to pretermit their applications for asylum, withholding of removal, and CAT protection pursuant to the Rule, Guidance, and Designations.  Injunctive and declaratory relief is therefore appropriate with respect to the class as a whole.

### HARMS TO PLAINTIFFS

**X.    The Original Individual Plaintiffs were previously unlawfully denied the opportunity to seek asylum, withholding of removal, and CAT protection in the United States pursuant to the Rule, Guidance, and Designations, and were removed to Guatemala, where they feared for their safety and were unable to seek protection. They then spent more than a year in hiding, either in their home countries or in Mexico before they were able to return to the United States pursuant to an agreement with Defendants. The Original Individual Plaintiffs are currently again seeking asylum and other protection in the United States but fear that they will once again be wrongfully denied protection and removed to dangerous or repressive third countries under the Rule and the current Guidance and Designations.HARMS TO PLAINTIFFS.**

147.    Absent declaratory and injunctive relief, Plaintiffs will be severely and irreparably harmed by the Rule and USCIS Guidance.  The Individual Plaintiffs will be severely limited in their ability to access protection from persecution and torture, as they have been prevented from applying for asylum or any other form of protection in the United States and removed to a

~~country where they face grave dangers and serious barriers to obtaining protection.  They cannot~~
~~live safely either in Guatemala or in their home countries.~~

122.    They cannot live safely or find protection in either the ACA countries or their countries of origin.

123.    The New Individual Plaintiffs face harm due to the Rule, Guidance, and Designations, which subject these Plaintiffs to denial of their applications for asylum, withholding of removal, and CAT protection and to removal to third countries that are unsafe and that lack full and fair asylum systems.  The New Individual Plaintiffs cannot live safely or find protection in either the ACA countries or their countries of origin.  Two of the New Individual Plaintiffs, Y.A. and A.S., have already received pretermission orders that directed their removal to Honduras as a third country—and, in Y.A.'s case, alternatively to Uganda—without being afforded any opportunity to express fear of being removed to those third countries. The other two, D.G. and J.C., fear the same outcome.

124.    Removal to Honduras poses a particular danger for each of the New Individual Plaintiffs.  For example, J.C. and D.G. are from neighboring Guatemala and Nicaragua and fear being forcibly deported or returned to their home countries by Honduras.  For D.G., this fear is particularly acute given that Honduras has recently restricted its reception of Nicaraguan refugees.  And for J.C., who fears harm based on his sexual orientation, the treatment he faces in Honduras is likely to be just as bad as in his native Guatemala.  Y.A. is an African, single, Muslim woman who does not speak Spanish and fears that she will be singled out for violence in Honduras based on all of those traits.  A.S. fears that if he is removed to Honduras, he will in turn be returned to Bolivia and persecuted there, as happened to a friend who fled Boliva for another Latin American country to try to seek protection.

125.     Plaintiff Las ~~Americas is a nonprofit legal services organization dedicated to serving low-income immigrants, including asylum seekers.  A core component of Las~~ Americas' ~~mission is to provide immigration counseling and legal services to~~core work includes representing asylum seekers and noncitizens detained by ~~DHS in~~ the ~~El Paso area and subjected to~~U.S. government in both expedited removal proceedings.~~ ~~ under 8 U.S.C. § 1225(b) and regular removal proceedings under 8 U.S.C. § 1229a.  In regular removal proceedings, Las ~~Americas' goal in that work is to ensure that as many~~Americas represents detained people seeking asylum ~~seekers as possible have a fair chance~~, withholding of ~~passing their credible fear screenings so that they will have~~removal, and protection under the ~~opportunity to present their asylum claims on the merits in full~~CAT, among other forms of relief from removal.  In expedited removal proceedings.~~  Normally~~, Las Americas ~~is able~~provides consultation and legal representation to ~~fulfill this part of its mission by counseling and/or representing detained~~ asylum seekers ~~in preparation for~~throughout the credible fear ~~interviews, representing individuals during those interviews, and, when necessary,~~interview process, including assistance in seeking immigration judge review of negative credible fear determinations.~~ ~~ by asylum officers.

~~148.~~126.     By removing asylum seekers without ~~any~~ credible fear ~~interview~~interviews and without any opportunity to consult with or be represented by counsel, the Rule ~~and USCIS,~~ Guidance ~~frustrate~~, and Designations will interfere with Las Americas' ~~mission~~core activities of providing legal services to detained asylum seekers subjected to expedited removal proceedings.  ~~By~~And by depriving asylum seekers of credible fear interviews and thereby preventing detained asylum seekers from ~~making it through~~reaching regular removal proceedings in immigration court, the ~~credible fear process, these ACA~~challenged policies will also ~~negatively impact~~directly interfere with Las Americas' ability to represent individuals in

connection with parole and bond requests, and in full removal proceedings. those regular removal proceedings.  The Rule, Guidance, and Designations will also impair and interfere with Las Americas' ability to carry out its core work of representing asylum seekers in regular removal proceedings by requiring it to respond to DHS motions to pretermit asylum applications, or preparing to respond to immigration judges' *sua sponte* pretermission decisions, and seeking to establish that clients would more likely than not be persecuted or tortured in third countries.

149.   The Rule and USCIS, Guidance , and Designations will also require Las Americas to expend significant resources to attempt to address this interference with its work in both expedited and regular removal proceedings.  For example, in expedited removal proceedings, Las Americas will have to expend additional time and resources interviewing noncitizens about potential eligibility for the frustrationvarious ACAs and potential fears of their mission. Additionally, these policies jeopardize funding streams contingent on removal to the organization's work representing individuals during thevarious ACA countries in order to prepare them for "threshold screening interviews" under the Rule, in addition to the normal credible fear process.

150.   Plaintiff Tahirih Justice Center is a nonprofit and non-partisan organization that provides free legal immigration services, including asylum services, to survivors of gender-based violence.  Tahirih's mission is to provide free holistic services to immigrant women and girls fleeing violence such as rape, domestic violence, female genital mutilation/cutting, forced marriage, and human trafficking,interviews.  And Las Americas' attorneys will need to expend considerable time and who seek legal immigration status under U.S. law.  Tahirih offers legal representation and social services for individuals who seek protection, including asylum, in their immigration proceedings.

151.    Asylum accounts for approximately 40% of Tahirih's immigration services. Tahirih's asylum clients come from all over the globe, and under~~resources trying to prepare noncitizens to prepare~~ the ~~terms of the Rule, the vast majority of those clients would be categorically ineligible~~much higher, ultimate more-like-than-not standards for ~~asylum,~~ withholding of removal~~, and CAT relief in the United States. Even as currently applied to nationals of El Salvador and Honduras, the Rule will severely compromise Tahirih's asylum work. In 2018, 21.4% of Tahirih's clients were from Honduras and 18.6% were from El Salvador. Another 8.4% of Tahirih's asylum clients came from Guatemala in 2018. These individuals would be subject to removal to Honduras or El Salvador once the agreements with those countries are operational.~~

152.    The Rule and USCIS Guidance frustrate Tahirih's mission of providing legal services to protect women and girls fleeing violence. For example, the Rule prevents Tahirih's primary client-base from ever having the chance to apply for asylum or other forms of protection. The Rule's more-likely-than-not and CAT protection as to ACA countries in those interviews, rather than the normal, much lower credible fear screening standard~~is so high, and the procedures established by the Rule so bare bones and inadequate, that very few gender-based violence survivors will pass the "screening" interview. Most gender-based violence survivors from Honduras and El Salvador thus will be removed before Tahirih ever has the chance to represent or otherwise serve them in their immigration proceedings.~~

127.    ~~The provisions of the Rule concerning~~. In regular removal proceedings~~will also frustrate Tahirih's mission and force it~~, Las Americas will have to ~~divert~~expend additional ~~staff~~ time and ~~other~~ resources.~~In particular, Tahirih~~ responding to motions to pretermit applications for protection premised on application of the Rule, Guidance, and Designations.

153.128.        Las Americas will also have to significantly increase the resources it expends on each asylum client, because clientswho will have to be prepared to prove before an immigration judgejudges that they are more likely than not to be persecuted or tortured in every country with which the United States has signed an ACA.  Satisfying that more-likely-than-not standard is a resource-intensive process, because staff attorneys must conduct additional interviews with clients and gather detailed expert evidence and testimony about country conditions. Prior to the Rule, Tahirih generally had to prepare clients only to meet the lower asylum standard and only as to their country of origin.  Attempting to satisfy the more-likely-than-not standard as to any number of different countries will be incredibly burdensome in terms of staff time and organizational resources, and will limit the number of clients TahirihLas Americas is able to serve.

154.    The Rule will also affect Tahirih's funding.  Tahirih receives certain funding that can be used to provide immigration services only in specified geographic locations within the United States.  Because the Rule prevents Tahirih's client base from entering the country to seek asylum or other forms of protection, Tahirih will be unable to use existing funding to provide the asylum services it has previously provided under such geographically-limited grants.

129.    TheePlaintiff Tahirih's core work includes providing legal representation to survivors of domestic violence, sexual assault, and other forms of gender-based violence from all over the globe who are seeking asylum, withholding of removal, and CAT protection in regular removal proceedings in immigration court under 8 U.S.C. § 1229a.  The Rule, Guidance, and Designations will interfere with Tahirih's core work of representing its clients in pursuing applications for asylum, withholding, and CAT protection.

130.   The Rule, Guidance, and Designations also require Tahirih to expend resources and divert additional staff time and other resources to attempt to address this interference with its core activities.  For example, in regular removal proceedings, Tahirih will likely have to expend additional time and resources preparing to respond to motions to pretermit applications for protection, or preparing to respond to an immigration judge's *sua sponte* pretermission, premised on application of the Rule, Guidance, and Designations.

131.   Tahirih will also have to significantly increase the resources it expends on each asylum client, who will likely have to be prepared to prove that they are more likely than not to be persecuted or tortured in every country with which the United States has signed an ACA. Satisfying that more-likely-than-not standard is a resource-intensive process, at least in part, because attorneys must conduct additional interviews with clients and gather detailed expert evidence and testimony about country conditions. Attempting to satisfy the more-likely-than-not standard as to any number of different countries will be burdensome in terms of staff time and organizational resources and could limit the number of clients Tahirih is able to serve.

132.   In addition, Tahirih attorneys will need to expend considerable time and resources trying to prepare current clients who might be deemed subject to expedited removal.

~~155.~~133.   Finally, the Rule's immediate promulgation denied Tahirih and Las Americas the opportunity to comment on the Rule before it ~~into effect, and denied them the ability to prepare for its serious and harmful impacts~~went into effect.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**(Challenge to the Designations)**
**(Violation of the Safe Third Country Statute, 8 U.S.C. § 1158(a)(2)(A),**
**and the APA, 5 U.S.C. § 706(2)(A))**

134.    The asylum statute's safe third country provision requires that before the government may remove an asylum seeker to a "safe third country" pursuant to an international agreement, it must first determine that the third country is "safe" and would provide the asylum seeker "access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection."  8 U.S.C. § 1158(a)(2)(A).

135.    The statute therefore requires Defendants to assess not just whether potential receiving countries have adopted laws, regulations, and policies providing for asylum or equivalent protection but whether receiving countries, in reality, are safe and have procedures and operations in place to effectively provide for asylum or equivalent protection.

136.    The Designations do not account for whether those countries are, in reality, safe and capable of providing full and fair access to protection, as required by the statute.

137.    The Designations therefore violate 8 U.S.C. § 1158(a)(2)(A) and are contrary to law under the APA, 5 U.S.C. § 706(2)(A).

**SECOND CLAIM FOR RELIEF**
**(Challenge to the Rule and Guidance)**
**(Violation of the Safe Third Country Statute, 8 U.S.C. § 1158(a)(2)(A),**
**and the APA, 5 U.S.C. § 706(2)(A))**

~~156.~~138.      The ~~INA's~~asylum statute's safe third country provision ~~forbids~~prohibits the government from removing an ~~individual~~asylum seeker to a third country pursuant to a bilateral or multilateral agreement unless it first "determines that . . . the ~~alien's~~[noncitizen]'s life or freedom would not be threatened on account of" a protected ground.  8 U.S.C. § 1158(a)(2)(A).  It thus requires that the government make a likelihood-of-persecution

67

determination in every case prior to removing an ~~individual~~asylum seeker under ~~a § 1158(a)(2)(A)~~such an agreement.

~~157.~~139.    In expedited removal proceedings, the Rule and ~~USCIS~~ Guidance do not ~~require~~provide for such a determination in every case.  Instead, they require a likelihood-of-persecution assessment only if the individual affirmatively informs an asylum officer that they have a fear of removal to the relevant third country.

140.    ~~Section 1158(a)(2)(A)~~In regular removal proceedings, the Rule and Guidance likewise do not ensure the required determination in every case.  They instead allow immigration judges to pretermit applications for asylum, withholding of removal, and CAT protection and order noncitizens removed to ACA countries without ensuring that noncitizens have the opportunity to (1) raise fears as to any proposed ACA country of removal and (2) have hearings to determine whether they may be persecuted in the proposed countries.

141.    The Rule and Guidance therefore violate 8 U.S.C. § 1158(a)(2)(A) and are contrary to law under the APA, 5 U.S.C. § 706(2)(A).

**THIRD CLAIM FOR RELIEF**
**(Challenge to the Rule and Guidance)**
**(Violation of the Safe Third Country Statute, 8 U.S.C. § 1158(a)(2)(A),**
**and the APA, 5 U.S.C. § 706(2)(A))**

~~158.~~142.    The safe third country provision also requires that before the government may remove an asylum seeker to a "safe third country" pursuant to a bilateral agreement, it must first determine that the third country would provide the asylum seeker "access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection."  8 U.S.C. § 1158(a)(2)(A).

143.    ~~The Rule and USCIS Guidance~~ The statute therefore requires Defendants to assess whether the proposed country of removal is in fact able to provide a full and fair asylum

68

process to particular asylum applicants based on their specific immutable characteristics.  This requires, for ~~the expedited removal of asylum seekers without any case-by-case determination~~example, an assessment that the receiving country ~~will~~ provides a full and fair asylum process for LGBTQI+ people and people of an applicants' racial or ethnic background.

144.    The Rule and Guidance instead provide ~~those asylum seekers with access to full and fair asylum procedures.  The Rule states~~ that ~~a designation~~ Designations concerning this statutory requirement will be made ~~addressing this requirement~~ strictly on a categorical basis~~, but no such categorical designation has been issued as to any of the current~~.  The Rule and Guidance do not provide for asylum officers or immigration judges to consider whether any individual asylum seeker would lack access to a full and fair asylum process in an ACA ~~countries.  Nor has any such designation, or the basis for it, been communicated to Plaintiffs or to the public.  To the extent any such designation has been made, it does not account for whether those countries are, in reality, capable of providing full and fair~~ country, even if the individual has specific grounds to believe that they, in particular, would not have access to a full or fair process in that country.

145.    The Rule and Guidance therefore violate 8 U.S.C. § 1158(a)(2)(A) and are contrary to law under the APA, 5 U.S.C. § 706(2)(A).

**FOURTH CLAIM FOR RELIEF**
~~protection, as required by~~ **(Challenge to the Rule and Guidance)**
**(Violation of the Safe Third Country Statute, 8 U.S.C. § 1158(a)(2)(A),**
~~159.~~    **and** the ~~statute.~~**APA, 5 U.S.C. § 706(2)(A))**

146.    The safe third country provision ~~also confers on immigration judges the authority to apply the provision's public interest~~ contains an exception ~~in~~ applicable if "the Attorney General finds that it is in the public interest for the [noncitizen] to receive asylum in the United States."  8 U.S.C. § 1158(a)(2)(A).  With respect to regular removal proceedings~~,~~ ~~in~~

immigration court, the term "the Attorney General" as used in the statute refers to immigration judges.

160.147.    The Rule and Guidance erroneously providesprovide that immigration judges lack this independent authority and may insteadthat only apply that exception withDHS can make the permission of DHS counselpublic interest determination.

161.    For these reasons and others, theThe Rule and USCIS Guidance therefore violate 8 U.S.C. § 1158(a)(2)(A).

162.148.    As a result, the Rule and USCIS Guidance) and are contrary to law.  See under the APA, 5 U.S.C. § 706(2)(A).

### FIFTH CLAIM FOR RELIEF
SECOND CLAIM FOR RELIEF
(Challenge to the Rule and Guidance)
**(Violation of the Withholding of Removal Statute, 8 U.S.C. § 1231(b)(3), and Implementing Regulations;its implementing regulations; FARRA, codified at 8 U.S.C. § 1231 note, and its implementing regulations; and the Foreign Affairs Reform and Restructuring Act of 1998, § 2242, 112 Stat. 2681-822, 105th Cong. 2d Sess. (1998), and Implementing Regulations;APA, 5 U.S.C. § 706(2)(A)) and the APA, 5 U.S.C. § 706(2)(A))**

149.    The INA's withholding of removal provision, 8 U.S.C. § 1231(b)(3), and Section 2242(a) of FARRA implement the United States' *non-refoulement* treaty obligations with respect to persecution and torture.

163.150.    The withholding of removal provision bars removal of an individuala noncitizen to a country where it is more likely than not that they would face persecution. 8 U.S.C. § 1231(b)(3).

164.151.    Section 2242(a) of the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") bars removal of an individuala noncitizen to a country where it is more likely

than not that they would be ~~subjected to torture.~~  *~~See also~~*tortured.  8 U.S.C. § 1231 note; *see* 8

C.F.R. §§ 208.16(c)(2), 1208.16(c)(2).

165.152.       Longstanding regulations implement these statutory provisions and the

obligation not to ~~send~~remove an individual to persecution or torture.  For instance, only an

immigration judge can determine whether an individual faces such a risk of persecution or

torture and is entitled to withholding of removal or CAT protection after full removal

proceedings in immigration court.  8 C.F.R. § 208.16(a), (c)(4); *id.* § 1208.16(a), (c)(4).  And

past persecution creates a rebuttable presumption of eligibility for withholding of removal.  *See* 8

C.F.R. §§ 208.16(b)(1)(i), 1208.16(b)(1)(i).

153.    The Rule and ~~USCIS~~ Guidance are inconsistent with, and seek to bypass, these

~~and other~~ statutory and regulatory ~~provisions.  Among other things, for individuals in~~

requirements.

154.    In expedited removal~~, they~~ proceedings, the Rule and Guidance require asylum

officers, not immigration judges, to make the ultimate withholding ~~determination, i.e., whether~~

~~an individual is more likely than not to be persecuted in a third country,~~and CAT determinations

and deny the opportunity for immigration judge review.  ~~They~~

155.    In regular removal proceedings, the Rule and Guidance allow immigration judges

to pretermit applications for withholding of removal and CAT protection as to the originally

proposed countries of removal and then to order removal to third countries, without ensuring that

noncitizens have the opportunity to raise fears of persecution or torture in those countries and

receive hearings on withholding of removal and CAT protection.

166.156.    The Guidance also provideprovides that, in determining whether an individual is more likely than not to be persecuted in the receiving country, past persecution shall not establish a presumption of future persecution.

167.    Because the Rule and USCIS Guidance abandon the statutory and regulatory safeguards set out in statutory provisions and regulations designed to ensure thethese critical protectionprotections against *nonrefoulement* to persecution and torture, the Rule and USCIS Guidance violate 8 U.S.C. § 1231(b)(3), the) and FARRA, and their implementing regulations.

168.157.    As a result, the Rule and USCIS Guidance , and are therefore contrary to law.  *See* under the APA, 5 U.S.C. § 706(2)(A).

### SIXTH CLAIM FOR RELIEF
### ~~THIRD CLAIM FOR RELIEF~~
### (Challenge to the Rule and Guidance)
### (Violation of the Credible Fear Statute, 8 U.S.C. § 1225(b)(1), and Implementing Regulations))

169.158.    Under the INA, ifa noncitizen placed in expedited removal proceedings indicates to an immigration officer either amust be asked if they fear of persecution removal or an intentionwish to apply forseek asylum, and if the noncitizen answers affirmatively, they must be referred to an asylum officer for a credible fear interview, after which the asylum officer must determine whether the noncitizen has a credible fear of persecution.  8 U.S.C. § 1225(b)(1)(A)(ii), (B).  "'[C]redible fear of persecution' means that there is a applying the low "significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum."" screening standard.  8 U.S.C. § 1225(b)(1).  *Id.* § 1225(b)(1)(B)(v).

159.    A noncitizen "who is eligible for such interview may consult with a person or persons of the ~~alien's~~[noncitizen]'s choosing prior to the interview or any review thereof," 8 U.S.C. § 1225(b)(1)(B)(iv), and that "person . . . may be present at the interview and may be permitted . . . to present a statement at the end of the interview," 8 C.F.R. § 208.30(d)(4).

~~170.~~160.    Following the credible fear interview, "if the officer determines that ~~an alien~~[a noncitizen] does not have a credible fear of persecution," the noncitizen is entitled to "request . . . prompt review by an immigration judge of [that] determination." 8 U.S.C. § 1225(b)(1)(B)(iii)(I), (III).

~~171.~~161.    This credible fear interview process, with its attendant safeguards, is the only mechanism in expedited removal proceedings by which the government may remove an individual who has expressed a fear of persecution or intention to apply for asylum. Only removal proceedings "specified in" the INA may supplant regular removal ~~proceeding~~proceedings before an immigration judge. 8 U.S.C. § 1229a(a)(3).

~~172.~~162.    ~~While~~If applied in expedited removal proceedings, the safe third country provision ~~creates a bar that may be applied to asylum seekers, if applied in expedited removal, it~~ must be ~~done~~applied through the statutory credible fear interview process, with its attendant procedural safeguards. Nothing in the safe third country provision purports to create an alternate expedited removal mechanism.

~~173.~~163.    Because the Rule and ~~USCIS~~ Guidance provide for the expedited removal of asylum seekers without application of the low credible fear screening standard, right to consultation with and representation by counsel, and immigration judge review, ~~and~~ the ~~other required safeguards, it violates~~Rule and Guidance violate 8 U.S.C. § 1225(b)(1~~.~~) and are contrary to law under the APA, 5 U.S.C. § 706(2)(A).

**SEVENTH CLAIM FOR RELIEF**

174.    ~~As a result,~~ **(Challenge to** ~~and USCIS,~~ **the Rule** ~~Guidance are contrary to law.  *See* 5 U.S.C. § 706(2)(A).~~**, and Designations)**

**FOURTH CLAIM FOR RELIEF**

**(Violation of the APA, Arbitrary and Capricious—Failure to Acknowledge Departures)**

~~175.    An agency violates the APA where it fails to acknowledge, or cannot show "good reasons" for, departing from prior policy.  Several of the procedures set out in the Rule and USCIS Guidance are unacknowledged or unjustified departures from prior agency policies regarding screening for claims of protection from removal because of the risk of persecution or torture.  Several are also unjustified departures from the procedures set out in the regulations implementing the U.S.-Canada Safe Third Country Agreement.~~

~~176.    The Rule and USCIS Guidance are arbitrary and capricious.  *See* 5 U.S.C. § 706(2)(A).~~

~~**FIFTH CLAIM FOR RELIEF**~~

**(Violation of the APA, Arbitrary and Capricious)**

~~177.~~164.        The APA requires reasoned and reasonable policy-making.

~~178.    Defendants have adopted procedures so ill-suited to achieving their *non-refoulement* obligation as to render the~~ The Rule ~~and USCIS,~~ Guidance~~.~~, and Designations are arbitrary and capricious~~.~~

~~179.~~165.        ~~To the extent they have made such non-public categorical designations, Defendants' designations~~ in violation of ~~Guatemala, Honduras, and El Salvador as providing asylum seekers access to full and fair procedures for determining protection claims are also arbitrary and capricious.  *See*~~the APA, 5 U.S.C. § 706(2)(A).

~~180.~~166.        Among other reasons, ~~any such designations~~the Rule, Guidance, and Designations are arbitrary and capricious because Defendants adopted procedures unreasonably ill-suited to complying with their *non-refoulement* obligations; made unacknowledged,

inadequately explained, and unjustified departures from prior agency policies and procedures; failed to articulate reasoned explanations for their decisions; considered factors that Congress did not intend to be considered; entirely failed to consider important aspects of the problem; and offered explanations that run counter to the evidence before the agencies.

~~SIXTH CLAIM FOR RELIEF~~

**EIGHTH CLAIM FOR RELIEF**

**(Challenge to the Rule)**

**(Violation of the APA, Notice And Comment, and 30-Day Grace Period)**

~~181.~~167.     The APA requires notice and opportunity for comment prior to the promulgation of regulations.  5 U.S.C. §§ 553(b), (c).  Defendants failed to provide notice and an opportunity to comment prior to the Rule's effective date.

~~182.~~168.     The APA requires that a regulation be published "no less than 30 days before its effective date."  5 U.S.C. § 553(d).  Defendants failed to comply with this requirement with respect to the Rule.

~~183.~~169.     Defendants have not articulated reasons sufficient to show good cause why these requirements are inapplicable, nor is the foreign affairs exception applicable.

~~SEVENTH CLAIM FOR RELIEF~~

~~(Violation of the Suspension Clause, Art. 1, § 9, cl. 2, of the U.S. Constitution)~~

~~184.     Article 1, § 9, cl. 2 of the United States Constitution provides that the "Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."~~

~~185.     The Rule subjects individuals to expedited removal to third countries without the constitutionally required level of federal court review of an expedited removal order.~~

~~186.     Depriving individuals of the right to seek judicial review of an expedited removal order violates the Suspension Clause.~~

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for the following relief:

a.   An order certifying the proposed class, appointing the New Individual Plaintiffs as class representatives, and appointing Plaintiffs' counsel as class counsel;

a.b. A declaration pursuant to 28 U.S.C. § 2201 that the Rule and USCIS, Guidance, and Designations are contrary to law, in excess of statutory authority, and/or arbitrary and capricious, and/or unconstitutional;

b.c. Vacatur of the Rule and USCIS, Guidance, and Designations;

c.d. An injunction prohibiting Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from implementing or enforcing the Rule and USCIS, Guidance, and Designations;

d.   An order vacating the removal orders issued to each of theFor any New Individual Plaintiffs;

e.   For any Individual PlaintiffsPlaintiff who have beenis removed priorto a third country pursuant to the Court's OrderRule, Guidance, or Designations, an order paroling thoserequiring Defendants to (1) physically return each removed New Individual Plaintiff to the United States and (2) parole each removed New Individual PlaintiffsPlaintiff into the United States for the duration of their removal proceedings so that they mayor otherwise permit them to apply for asylum, withholding of removal, and/or CAT protection in the United States; ;

f.   An order awarding Plaintiffs costs of suit, and reasonable attorneys' fees and expenses pursuant to any applicable law;

g.   Such other and further relief as the Court deems equitable, just, and proper.

Dated: ~~January 15, 2020~~ September 8, 2025                    Respectfully submitted,

_____

~~Katrina Eiland*~~

~~Julie Veroff*~~Keren Zwick

~~Morgan Russell*~~

~~Adrienne Harrold*~~

~~American Civil Liberties Union Foundation~~

~~Immigrants' Rights Project~~

~~39 Drumm Street~~

~~San Francisco, CA 94111~~

~~(415) 343-0770~~

~~Arthur B. Spitzer~~ (D.D.C. Bar~~.~~ No.

~~235960~~IL0055)

Mary Georgevitch**

Gerardo Romo**

Mark Fleming*

Charles G. Roth*

National Immigrant Justice Center

111 W. Jackson Blvd., Suite 800

Chicago, IL 60604

(312) 660-1370

~~Scott~~

~~Michelman~~kzwick@immigrantjustice.org

mgeorgevich@immigrantjustice.org

gromo@immigrantjustice.org

mfleming@immigrantjustice.org

croth@immigrantjustice.org

Melissa Crow (D.C. Bar No.

~~1006945~~453487)

~~American Civil Liberties Union Foundation~~

~~of the District of Columbia~~

~~Keren Zwick (D.D.C. Bar. No. IL0055)~~

~~Gianna Borroto*~~

~~Ruben Loyo*~~

s/ Lee Gelernt          .

Lee Gelernt*

~~Mark Fleming*~~

~~Charles G. Roth*~~

~~National Immigrant Justice Center~~

~~224 S. Michigan Avenue, Suite 600~~

~~Chicago, IL 60604~~

~~(312) 660-1370~~

Omar Jadwat*

~~Lee Gelernt*~~

Natalie Behr**

Grace Choi**

American Civil Liberties Union Foundation,

Immigrants' Rights Project

125 Broad Street, 18th Floor

New York, NY 10004

(212) 549-2660

lgelernt@aclu.org

ojadwat@aclu.org

irp_nbehr@aclu.org

gchoi@aclu.org

Morgan Russell*

Stephen B. Kang**

American Civil Liberties Union Foundation

Immigrants' Rights Project

425 California Street, Suite 700

915 15th Center for Gender & Refugee
Studies
1121 14th Street, NW, 2nd floorSuite 200
Washington, D.C.DC 20005
(202) 457-0800355-4471
crowmelissa@uclawsf.edu

Blaine Bookey*
Annie Daher*
Sayoni Maitra*
Karen Musalo*
Peter Habib**
Center for Gender & Refugee Studies
200 McAllister St.
San Francisco, CA 94102
(415) 565-4877

bookeybl@uclawsf.edu
musalok@uclawsf.edu
habibpeter@uclawsf.edu

Anwen Hughes**
Inyoung Hwang**
Human Rights First
121 W. 36th St., PMB 520
New York, NY 10004
(202) 547-5692
hughesa@humanrightsfirst.org
hwangs@humanrightsfirst.org

San Francisco, CA 94104
(415) 343-0770
mrussell@aclu.org
skang@aclu.org

Arthur B. Spitzer
Hardy Vieux (D.C. Bar No. 474762235960)
Patricia StottlemyerScott Michelman (D.C.
Bar No. 8882525361006945)
Human Rights First
805 15thAmerican Civil Liberties Union
Foundation of the District of Columbia
529 14th Street, N.W., NW, Suite 900722
Washington, D.C. 200520045
(202) 547-5692457-0800

aspitzer@acludc.org
smichelman@acludc.org

*Attorneys for Plaintiffs*
\*Motion for Appearing pro hac vice or pro
bono
** Application for admission pro hac vice or
pro bono appearance forthcoming