## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| U.T.*<br>c/o National Immigrant Justice Center<br>111 W. Jackson Blvd., Suite 800<br>Chicago, IL 60604;<br><br>E.R.*<br>c/o National Immigrant Justice Center<br>111 W. Jackson Blvd., Suite 800<br>Chicago, IL 60604;<br><br>H.R.* and her minor son, J.R.* (by and through his mother),<br>c/o National Immigrant Justice Center<br>111 W. Jackson Blvd., Suite 800<br>Chicago, IL 60604;<br><br>M.H.* and her minor daughter, H.D.* (by and through her mother),<br>c/o National Immigrant Justice Center<br>111 W. Jackson Blvd., Suite 800<br>Chicago, IL 60604;<br><br>J.C.*<br>c/o National Immigrant Justice Center<br>111 W. Jackson Blvd., Suite 800<br>Chicago, IL 60604;<br><br>A.S.*<br>c/o National Immigrant Justice Center<br>111 W. Jackson Blvd., Suite 800<br>Chicago, IL 60604;<br><br>Y.A.*<br>c/o National Immigrant Justice Center<br>111 W. Jackson Blvd., Suite 800<br>Chicago, IL 60604;<br><br>E.M.*<br>c/o National Immigrant Justice Center<br>111 W. Jackson Blvd., Suite 800<br>Chicago, IL 60604; | No. 1:20-cv-116 (EGS)<br><br>**SECOND AMENDED COMPLAINT** |

L.H.* and her minor child Y.V.* (by and through )
L.H.) )
c/o National Immigrant Justice Center )
111 W. Jackson Blvd., Suite 800 )
Chicago, IL 60604; )
)
D.M.*, I.B.*, and their minor children A.M.*, M.S.*, )
and M.A.* (by and through D.M.*) )
c/o National Immigrant Justice Center )
111 W. Jackson Blvd., Suite 800 )
Chicago, IL 60604; )
)
L.T.*, and his children, A.T.* and A.J.* (A.J., a )
minor, by and through L.T.) )
c/o National Immigrant Justice Center )
111 W. Jackson Blvd., Suite 800 )
Chicago, IL 60604; )
)
N.S.* and her minor child D.D.* (by and through )
N.S.) )
c/o National Immigrant Justice Center )
111 W. Jackson Blvd., Suite 800 )
Chicago, IL 60604; )
)
N.V.* )
c/o National Immigrant Justice Center )
111 W. Jackson Blvd., Suite 800 )
Chicago, IL 60604; )
)
M.O.* )
c/o National Immigrant Justice Center )
111 W. Jackson Blvd., Suite 800 )
Chicago, IL 60604; )
)
S.M.* and her minor child J.M.* (by and through )
S.M.) )
c/o National Immigrant Justice Center )
111 W. Jackson Blvd., Suite 800 )
Chicago, IL 60604; )
)
J.D.* )
c/o National Immigrant Justice Center )
111 W. Jackson Blvd., Suite 800 )
Chicago, IL 60604; )
)
)

Tahirih Justice Center )
6402 Arlington Blvd., Suite 300 )
Falls Church, VA 22042; )
 )
Las Americas Immigrant Advocacy Center )
1500 East Yandell Drive )
El Paso, TX 79902; )
 )
*Plaintiffs*, )
 )
v. )
 )
PAMELA BONDI, Attorney General of the United )
States, in her official capacity, )
950 Pennsylvania Avenue, NW )
Washington, DC 20530; )
 )
U.S. DEPARTMENT OF JUSTICE, )
950 Pennsylvania Avenue, NW )
Washington, DC 20530; )
 )
DAREN MARGOLIN, Acting Director of the )
Executive Office for Immigration Review, in his )
official capacity, )
5107 Leesburg Pike )
Falls Church, VA 22041; )
 )
EXECUTIVE OFFICE OF IMMIGRATION )
REVIEW, )
5107 Leesburg Pike )
Falls Church, VA 22041; )
 )
KRISTI NOEM, Secretary of the Department of )
Homeland Security, in her official capacity, )
245 Murray Lane, SW )
Washington, DC 20528; )
 )
U.S. DEPARTMENT OF HOMELAND SECURITY, )
245 Murray Lane, SW )
Washington, DC 20528; )
 )
JOSEPH EDLOW, Director of U.S. Citizenship and )
Immigration Services, in his official capacity, )
5900 Capital Gateway Dr., Mail Stop 2120 )
Camp Springs, MD 20588; )

U.S. CITIZENSHIP AND IMMIGRATION )
SERVICES, )
5900 Capital Gateway Dr., Mail Stop 2120 )
Camp Springs, MD 20588; )
)
RODNEY SCOTT, Commissioner of U.S. Customs )
and Border Protection, in his official capacity, )
1300 Pennsylvania Ave, NW )
Washington, DC 20229; )
)
U.S. CUSTOMS AND BORDER PROTECTION, )
1300 Pennsylvania Ave, NW )
Washington, DC 20229; )
)
TODD LYONS, Senior Official Performing the )
Duties of the Director of Immigration and Customs )
Enforcement, in his official capacity, )
500 12th Street, SW )
Washington, DC 20536; )
)
U.S. IMMIGRATION AND CUSTOMS )
ENFORCEMENT, )
500 12th Street, SW )
Washington, DC 20536; )
)
                    *Defendants.* )
)

* Plaintiffs proceeding under a pseudonym are indicated with an asterisk.

## INTRODUCTION

1.       This suit challenges the government's interim final rule ("Rule") and associated

policies that purport to implement the "safe third country" provision in the asylum statute.  That

statutory provision allows the government to enter into international agreements for the purpose

of removing asylum seekers from the United States to third countries that can hear their asylum

claims, effectively outsourcing the United States's asylum process.  Understandably, Congress

allowed that extreme step only where the third country is "safe" and provides a "full and fair"

asylum process—such that people will have a meaningful opportunity to pursue asylum—and

only when noncitizens would not face persecution or torture in the third country.  8 U.S.C.

§ 1158(a)(2)(A).  The Department of Homeland Security ("DHS") and Department of Justice

("DOJ") call these third country agreements "asylum cooperative agreements" ("ACAs").

2.       Prior to 2019, the U.S. had only one third country asylum agreement, with

Canada.  When the Rule was first issued in November 2019, ACAs were in place with

Guatemala, Honduras, and El Salvador, all of which were refugee-producing countries plagued

by acute levels of violence and with only nascent, dysfunctional asylum systems.  The first

Trump administration used the Rule to remove nearly 1,000 non-Guatemalan asylum seekers to

Guatemala between November 2019 and March 2020, when implementation ceased due to the

COVID-19 pandemic.  In February 2021, the Court placed this case in abeyance at the parties'

request while the Biden administration reported that it was reviewing whether to rescind the Rule

and the other challenged policies.  That administration ultimately terminated the three ACAs

signed in 2019 but never rescinded the Rule.

3.       The second Trump administration is now aggressively using the Rule and the

related agency actions challenged here to deny asylum seekers' protection applications and

deport them to nations that the U.S. State Department itself has reported are unsafe, present serious human rights concerns, and/or have weak or corrupt asylum systems.  To date, the administration has entered into new ACAs with at least Guatemala, Honduras, Paraguay, Uganda, Ecuador, and Belize.  On information and belief, an ACA with Liberia has also been concluded but has not yet been published or publicly acknowledged.

4.      The original Plaintiffs—six noncitizens unlawfully removed under the Rule and two organizations that serve asylum seekers—first filed this suit on January 15, 2020.  They sought to vacate the Rule, its implementing guidance, and the government's categorical designations that Guatemala, Honduras, and El Salvador have "full and fair" asylum systems within the meaning of the safe third country provision.  Four Individual Plaintiffs joined the suit in the First Amended Complaint docketed on October 15, 2025, ECF No. 166; one of those, D.G., has since voluntarily dismissed his claims, ECF No. 172.  Those Plaintiffs are now joined by 18 additional individual asylum seekers, and they amend their complaint to challenge the Rule and the government's other unlawful agency actions to implement the current ACAs, including all agency Guidance documents and country-specific Designations.

5.      The Rule violates the safe third country provision of the asylum statute and other immigration statutes, is arbitrary and capricious, and was issued in violation of the procedural requirements of the Administrative Procedure Act ("APA").  DHS and DOJ guidance documents ("Guidance") issued to implement the Rule and the ACAs are likewise unlawful.  And DHS and DOJ's categorical designations that ACA countries have "full and fair" asylum systems ("Designations") are contrary to law and arbitrary and capricious.

## JURISDICTION AND VENUE

6.      This case arises under the APA, 5 U.S.C. § 701, *et seq.*; the Immigration and

Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.*, and its implementing regulations; and the

Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 10-277, div. G,

Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231), and

its implementing regulations.  This Court has subject matter jurisdiction under 28 U.S.C. § 1331

and under 8 U.S.C. § 1252(e)(3).

7.      Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of

the United States and officers of the United States acting in their official capacity and reside in

this District, and a substantial part of the events or omissions giving rise to the claim occurred in

this District.  Venue is also appropriate under 8 U.S.C. § 1252(e)(3)(A).

## PARTIES

### Original Individual Plaintiffs

8.      The Original Individual Plaintiffs are noncitizens who came to the United States

to seek asylum and were unlawfully removed to Guatemala pursuant to the Rule during the first

Trump administration.

9.      Plaintiff U.T. is a gay man from El Salvador who fled that country in 2019 after a

gang member solicited him for sex and threatened him.  He fears he will be killed because of his

sexual orientation if he tries to live openly in El Salvador as a gay man there.  U.T. traveled

through Guatemala en route to the United States and, while there, was subjected to homophobic

slurs on the street.

10.     When U.T. entered the United States in December 2019, DHS border officials

told him that because of the Guatemala ACA, he would be removed to Guatemala.  When U.T.

told an officer that he did not want to go to Guatemala because it is not safe for gay people there, the officer said he would have an interview to explain. In that interview, which lasted less than an hour, U.T. tried to explain his fear of removal to Guatemala. Not long after this interview, U.T. was removed to Guatemala, where he was given just 72 hours to decide whether to pursue asylum there. U.T. decided to try to apply for asylum in Guatemala, but because that country is also unsafe for gay people, Guatemalan officials advised him to go to Mexico, where they said he could apply for asylum. After travelling back to Mexico at the advice of Guatemalan officials, U.T. eventually returned to the United States through the agreement of the Parties and is now pursuing an application for asylum in the United States.

11.     Plaintiff E.R. fled his native Honduras after members of the MS-13 gang repeatedly attacked him and threatened his life. Gang members came to E.R.'s workplace and told him that he could either sell drugs for the gang, become the gang's mechanic, or pay an extortion payment. When he explained that he was not the owner of the business and he had no ability to decide to pay, the gang members attacked him. The first time, they hit him over the head with a bat. On another occasion, they stabbed him multiple times with a broken bottle. Each of these incidents caused significant injury and required hospitalization. E.R. knew that he could not go to the local police to report these problems because the police in his community work with the gang and reporting them would only make things worse.

12.     E.R. fled Honduras and was detained when he entered the United States in 2019. DHS border officials told him that because of the 2019 Guatemala ACA, he would be removed to Guatemala. E.R., however, said that he was afraid of going to Guatemala. E.R. knew that the MS-13 could locate him there. He also insisted that he had evidence to support his claim for asylum, but DHS officials told him that he did not need to present that evidence and instead

4

asked him only about Guatemala.  E.R. was removed to Guatemala in December 2019, about 10 days after he entered.  Once in Guatemala, E.R. was given just 72 hours to decide whether to apply for asylum there.  E.R. did not believe that he would be safe in Guatemala because the MS-13 could reach him there.  He also felt pressure to leave the shelter where he stayed temporarily and did not have any support in Guatemala to help protect him.  E.R. eventually returned to the United States through the agreement of the Parties and is now pursuing an application for asylum in the United States.

13.    Plaintiff H.R. is a Salvadoran woman who was forced to flee El Salvador after the MS-13 gang killed two of her siblings and began threatening her teenage daughter.  H.R. and her family reported her siblings' murders to the police.  After the police failed to investigate the murders, H.R. and her family began seeking answers on their own.  The gang threatened H.R. and her family with death and told them to stop investigating.  H.R. and her children attempted to relocate within El Salvador, but they did not feel safe.  H.R. fled El Salvador with her two children after the MS-13 attempted to force her teenage daughter into a relationship with a gang member.

14.    H.R. and her children traveled through Guatemala, where they stood out as migrants.  Police demanded their documents, and extorted money from them because they were migrants.  Feeling unsafe in Guatemala, the family continued on to Mexico.  In Mexico, H.R. became separated from her teenage daughter, who entered the United States alone and was taken to a migrant shelter for children and subsequently released.  H.R. and her son J.R. crossed the border into the United States on December 24, 2019.  An asylum officer interviewed H.R. and told her that because of the 2019 Guatemala ACA, she would be removed to either Guatemala or El Salvador.  H.R. explained her fear of removal to both Guatemala and El Salvador and

attempted to present evidence to the officer, but she and her son were removed to Guatemala on January 6, 2020.  After being removed to Guatemala, H.R. was given just 72 hours to decide whether to apply for asylum there.  H.R. had no resources or ability to protect herself and her child in Guatemala, and she was anxious to get documents from El Salvador to secure her daughter's release from detention in the United States.  She therefore returned to El Salvador temporarily.  H.R. eventually returned to the United States through the agreement of the Parties and is now pursuing an application for asylum in the United States.

15.     Plaintiff J.R. is the minor son of Plaintiff H.R.  He traveled to the United States with H.R., intending to seek asylum with her, and he was removed to Guatemala with H.R.  J.R. eventually returned to the United States through the agreement of the Parties and is now pursuing an application for asylum in the United States.

16.     Plaintiff M.H. is a woman from Honduras who fled to the United States with her minor daughter, H.D.  Both M.H.'s common-law husband and her sister-in-law worked in the transportation business in Honduras and were forced to pay extortions to local gangs in order to work.  They were murdered one year apart from one another.  In May 2019, M.H. was threatened by a man who owned and operated taxis in the same city where her husband and sister-in-law had worked and who had detailed information about her, her daughter, and the murders of her husband and sister-in-law.  In November 2019, when M.H. paid a brief visit to Guatemala, she received an alarming text message from an unknown person stating that the person knew that M.H. was away from her home but was nevertheless close by.  Fearing for her and her daughter's safety, M.H. fled to the United States with her daughter.

17.     M.H. and her daughter entered the United States in December 2019, presented themselves to immigration officials, and requested asylum.  DHS officials told M.H. that because

of a new policy, she and her daughter would be removed to Guatemala.  M.H. explained that she had been threatened while in Guatemala, and she asked for an opportunity to obtain a lawyer and present evidence that she had brought with her.  Officials refused to allow her time to obtain a lawyer, denied her an opportunity to present evidence in connection with her claims, and removed her to Guatemala.  In Guatemala, M.R. learned that she had just 72 hours to decide whether to stay in Guatemala and apply for asylum there or return to Honduras.  Feeling that she had no means to remain safe or support herself in Guatemala, M.H. returned temporarily to Honduras with her daughter.  M.H. eventually returned to the United States with her daughter through the agreement of the Parties and is now pursuing an application for asylum in the United States.

18.    Plaintiff H.D. is the minor child of Plaintiff M.H.  She traveled to the United States with her mother, intending to seek asylum with her.  Both were removed from the United States to Guatemala under the Rule.  H.D. eventually returned to the United States through the agreement of the Parties and is now pursuing an application for asylum in the United States.

**Section 240 Individual Plaintiffs**

19.    The Section 240 Individual Plaintiffs are 21 individual noncitizens—three added in the First Amended Complaint and 18 added here—who have applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT") in regular removal proceedings in immigration court under 8 U.S.C. § 1229a ("Section 240" removal proceedings) whose applications Defendants have sought to pretermit based on invocation of one or more ACAs pursuant to the Rule, Guidance, and Designations challenged here.

20.    Plaintiff J.C. is a gay man from Guatemala who faced threats of physical harm from community and family members when he disclosed his sexual orientation.  He was also

fired from his job because he is gay.  He fears that he will face more of the same harm or worse if he is removed to Guatemala and tries to live openly there.  J.C. entered the United States in 2024 and applied for asylum, withholding of removal, and CAT protection later that year.  He was scheduled for an immigration court hearing on those applications, but on August 8, 2025, the government moved to pretermit his applications so that he could be removed to Honduras under an ACA pursuant to the Rule, Guidance, and Designations.  That motion remains pending, but J.C. also fears removal to Honduras.  As in Guatemala, gay people face serious harm in Honduras.  He also fears that people who have targeted him in the past in Guatemala will easily reach him in neighboring Honduras.

21.    Plaintiff A.S. fled political repression and the threat of arrest in Bolivia because of his participation in protests.  He entered the United Sates in April 2022 and applied for asylum affirmatively in early 2023.  Once in the United States, A.S. also reunited with a childhood friend whom he eventually married.  In July 2025, A.S. was scheduled for interviews in New York on his asylum case and on an application to adjust his status to permanent residency that his wife had filed on his behalf.  But those interviews did not happen.  The adjustment of status interview was cancelled; A.S. was placed in expedited removal proceedings; and his asylum interview was converted into a credible fear interview, where he established a credible fear of being removed to Bolivia.  After the credible fear interview, A.S. was detained and transferred to Louisiana for Section 240 removal proceedings.  On August 8, 2025, DHS moved to pretermit A.S.'s application for asylum, withholding of removal, and CAT protection, arguing that he should be removed to Honduras under an ACA pursuant to the Rule, Guidance, and Designations.  On August 20, 2025, the immigration judge granted DHS's motion and scheduled A.S. for a hearing on his fear of being removed to Honduras.  On October 22, 2025, the immigration judge ordered

A.S. removed to Honduras, and A.S. filed a timely administrative appeal of that decision. A.S. is currently detained, and he fears that he will be removed to Honduras.

22.     Plaintiff Y.A. fled her native Somalia after her stepmother subjected her to female genital mutilation and forced marriage to a much older man. Before the marriage could occur, members of Y.A.'s fiancé's clan kidnapped her, and her fiancé tried to rape her. Y.A. fled Somalia for Kenya and South Africa but was unable to find safety in either country. As a result, she fled to the United States and briefly traveled through Honduras on the way. Y.A. entered the United States in October 2024, was detained by DHS, and applied for asylum, withholding of removal, and CAT protection. On September 4, 2025, which was supposed to be Y.A.'s final hearing date before an immigration judge, the immigration judge *sua sponte* ordered pretermission of her applications and ordered her removed to Honduras or, in the alternative, to Uganda based on the ACAs with those countries and pursuant to the Rule, Guidance, and Designations. Y.A. is currently detained, and her administrative appeal of the immigration judge's decision is pending. Y.A. fears that if she is removed to Honduras, she will be targeted for harm as a black, Muslim woman who does not speak Spanish. Y.A. fears that if she is removed to Uganda, she will be discovered by the family she fled in Somalia; forced to marry her attempted rapist; or otherwise subjected to gender related violence. After Y.A.'s pretermission order to Honduras or Uganda, Uganda announced that it would not consider asylum claims from Somali nationals.

23.     Plaintiff E.M. is a bisexual man from Ecuador who faced abuse, threats, extortion, harassment, and other mistreatment because of his sexual orientation. He attempted to move to different parts of Ecuador, but the violence followed him. He fears that he will face more of the same harm or worse if he is removed to Ecuador and tries to live openly there. E.M. entered the

9

United States in 2024 and applied for asylum, withholding of removal, and CAT protection later that year.  He was arrested while attending his immigration court hearing in August 2025 and has been detained since.  DHS filed a motion to pretermit the applications so that E.M. could be removed to Honduras under an ACA pursuant to the Rule, Guidance, and Designations.  E.M. never received a copy of the motion, and when he went to his immigration court hearing, he was told that the immigration judge had granted the government's motion and ordered him deported to Honduras the day before.  E.M. fears that he would face similar or worse harm in Honduras than he faced in Ecuador.  As in Ecuador, bisexual people face serious harm in Honduras.

24.    Plaintiff L.H. fled Peru in 2021 with her minor son Y.V. after she experienced years of domestic violence by her ex-partner.  His abuse was motivated not only by L.H.'s gender but also by her status as an Indigenous Quechua woman, and it included kidnapping, stalking, and assault with a knife.  The police failed to protect L.H. despite numerous reports.  This abuse also continued a pattern of gender-based violence that began when L.H was a child.  L.H. and Y.V. fled to the United States in May 2021.  They settled in California, where they now live, and submitted a timely asylum application.  At L.H.'s immigration court hearing in November 2025, DHS filed a motion to pretermit her applications for relief so that L.H. and Y.V. could be removed to Honduras under an ACA pursuant to the Rule, Guidance, and Designations.  L.H.'s case has been continued but she fears that she and Y.V. will be deported to Honduras.  In Honduras, L.H. fears the same sort of gender- and race-based violence that she endured in Peru.  She also fears that she will be targeted as a single mother lacking in male protection.

25.    Plaintiff Y.V. is the minor child of Plaintiff L.H.  Y.V. is a derivative beneficiary on L.H.'s application for asylum.

26.     Plaintiff D.M. was born in the former Soviet Union in what is now Kyrgyzstan. He is a citizen of Russia, and he and his family, I.B., A.M., M.S., and M.A., fled Russia after experiencing violence and threats of false imprisonment based on their ethnic identity and because of their Muslim faith.  D.M. and his family fled to the United States in March 2023 and applied for asylum later that year.  In October 2025, D.M. had a hearing on the merits of his asylum application before the immigration court in Los Angeles.  The hearing was not completed in the time allotted, so the immigration judge continued it to December 2025.  But on December 12, 2025, days before the continued hearing, DHS moved to pretermit D.M.'s application so that he could be removed to Uganda under an ACA pursuant to the Rule, Guidance, and Designations.  The immigration judge continued the case to January 26, 2025.  D.M. fears removal to Uganda because he fears that Russian agents will be able to find him there and because of the harm that Muslims face in the country.  He also fears that he will be particularly targeted because he will stand out ethnically, racially, and linguistically.

27.     Plaintiff I.B. is the wife of Plaintiff D.M.  Plaintiffs A.M., M.S., and M.A. are their minor children.  I.B., A.M., M.S, and M.A. are derivative beneficiaries on D.M.'s application for asylum.

28.     Plaintiff L.T., a bisexual man and former politician, fled Venezuela with his two children, A.T. and A.J., because L.T. feared persecution because of his political views, his sexuality, and his same-sex relationship with his now-husband.  L.T. was seriously beaten as a child by caregivers for "acting gay" and nearly committed suicide as a teenager due to that mistreatment.  L.T. and his children entered the United States in May 2023 and filed for asylum within one year of entering.  After arriving in the United States, L.T. was diagnosed with HIV, and his fear of returning to Venezuela grew upon learning of his diagnosis.  The family had a

final hearing on the merits of their asylum application on December 11, 2025. DHS filed a motion to pretermit on the eve of that hearing, arguing that L.T. and his children could be deported to Uganda under an ACA pursuant to the Rule, Guidance, and Designations. The immigration judge denied the motion as untimely, and, on December 15, 2025, granted asylum to the family. DHS reserved appeal and indicated an intention to challenge both the denial of the motion to pretermit and the asylum grant. L.T. fears that he will face arrest and be imprisoned or worse in Uganda, because of his sexual orientation and same-sex marriage.

29.    Plaintiffs A.T. and A.J. are the children of Plaintiff L.T. They are derivative beneficiaries on L.T.'s application for asylum. A.J. is a minor; A.T. is 18 years old.

30.    Plaintiff N.S. and her minor daughter D.D. fled Guatemala in 2022, after a local gang member attempted to rape D.D. N.S. reported this incident to the police, but the gang's targeting only intensified. The attacker and his associates threatened to kill them and even told N.S., who was pregnant at the time, that they would cut her stomach to kill her unborn child. N.S. and D.D. also fled Guatemala to escape domestic violence that N.S. endured by two ex-partners—a man involved in a gang and D.D.'s father, who was verbally, physically, and sexually abusive. N.S. and D.D. traveled through Mexico to the United States and filed a timely asylum application. At a hearing on November 13, 2025, DHS filed a motion to pretermit the application so that N.S. and D.D. could be removed to Honduras under an ACA pursuant to the Rule, Guidance, and Designations. The judge continued scheduled a hearing on this motion for January 2026. N.S. and D.D. fear persecution in Honduras by gangs like those that persecuted them in Guatemala. They also fear that the people who targeted them in Guatemala will find them in neighboring Honduras.

31.    Plaintiff D.D. is the minor child of Plaintiff N.S.  D.D. is a derivative beneficiary on N.S.'s application for asylum.

32.    Plaintiff N.V. is a gay, HIV-positive man from Honduras who was sexually assaulted by a Honduran national police officer and assaulted by others associated with the Honduran government.  He fled Honduras after he was attacked and left unconscious outside a courthouse where he had a formal complaint regarding the threats and abuse.  He fears that he will face more of the same harm or worse if he is removed to Guatemala.  N.V. entered the United States in 2025 and applied for asylum later that year.  The government moved to pretermit his applications so that he could be removed to Guatemala under an ACA pursuant to the Rule, Guidance, and Designations.  On November 20, 2025, the immigration judge granted DHS's motion.  N.V. now fears that he would face similar or more harm in Guatemala as he faced in Honduras as a gay, HIV positive man.  Indeed, when he previously lived in Guatemala, he was attacked for being gay and the police failed to protect him and instead arrested him alongside the attacker.  He also fears that people who have targeted him in the past in Honduras will easily reach him in neighboring Guatemala.

33.    Plaintiff M.O. is from Nicaragua.  In 2018, he attended widespread protests against the government and shared updates from these demonstrations on social media.  Because of this activism, police targeted M.O.: they followed him, harassed him, intimidated him, and came to his house to threaten him.  M.O. feared that this intimidation would lead to false criminal accusations due to his political beliefs, so he fled the country in 2021, entered the United States in 2022, and applied for asylum.  When he went to an interview for his asylum case in October 2025, DHS detained him.  Then, the day before his hearing in immigration court, DHS moved to pretermit M.O.'s asylum application, arguing that he can removed to Honduras

under an ACA pursuant to the Rule, Guidance, and Designations. The immigration judge scheduled a hearing on that issue, but before that hearing, DHS filed another motion arguing M.O. could also be removed to Ecuador or Guatemala under those ACAs. At the hearing, the judge ordered M.O. removed to Ecuador pursuant to that ACA, without an opportunity to testify as to his fear of removal there. M.O. fears being returned to Ecuador because the Nicaraguan government has a record of persecuting political dissidents throughout Latin America. He also fears persecution in Ecuador because violent gangs have significant control there.

34.     Plaintiff S.M., a member of the minority Garifuna Afro-Indigenous community, and her minor son, J.M., fled their native Honduras after facing abuse and threats by the father of J.M., who has ties to a powerful cartel. S.M. has also faced race- and gender-based violence her entire life in Honduras. S.M. fears that she and her child will face more of the same harm or worse if they are removed to Honduras. S.M. and J.M. entered the United States in 2024 and applied for asylum, withholding of removal, and CAT protection later that year. They had their final immigration hearing on December 8, 2025, where the government moved for the first time to pretermit their applications so that they could be removed to Guatemala under an ACA pursuant to the Rule, Guidance, and Designations. The immigration judge indicated that he would grant DHS's motion and provide a written decision, without giving S.M. an opportunity to provide a written response. S.M. fears fears that her persecutor will easily reach her and her son if she is removed to neighboring Guatemala. As a single Garifuna woman, she also fears more of the same race- and gender-based violence that she experienced in Honduras.

35.     Plaintiff J.M. is the minor child of Plaintiff S.M. J.M. is a derivative beneficiary on S.M.'s application for asylum.

36.     Plaintiff J.D. is a gay, HIV-positive man from Guatemala, where he experienced severe physical violence due to his sexual orientation.  He has been physically assaulted on numerous occasions, and the police have routinely failed to protect him or follow up on his reports.  Instead, the police told J.D. that if he were to stop being gay, he would not be attacked.  J.D. also endured discrimination at his job and was filed because of his HIV-positive diagnosis, they fired him.  J.D. fled to the United States in December 2023 and timely filed an asylum application.  In July 2025, DHS detained J.D. at an immigration court hearing in New York. In October 2025, the day before J.D. was scheduled for another hearing, DHS moved to pretermit his asylum application on the basis that he is ineligible for asylum because he can be removed to Honduras under an ACA pursuant to the Rule, Guidance, and Designations.  The immigration judge granted the motion and ordered J.D. removed to Honduras, without any testimony.  J.D. moved to reconsider, and the case is currently scheduled for a hearing on December 22, 2025.  J.D. fears the same kind of persecution in Honduras that he faced in Guatemala based on his sexual orientation and HIV-positive status.

**Organizational Plaintiffs**

37.     Plaintiff Las Americas Immigrant Advocacy Center ("Las Americas") is a nonprofit legal services organization based in El Paso, Texas, dedicated to serving the legal needs of low-income immigrants, including asylum seekers.  Las Americas' core activities include providing immigration counseling and legal services to asylum seekers detained by DHS in the El Paso area.  This work includes assisting asylum seekers to prepare for their credible fear interviews with asylum officers, representing them during those credible fear interviews, and representing them throughout the process of obtaining immigration judge review of negative

credible fear determinations.  Las Americas also regularly represents detained asylum seekers in Section 240 removal proceedings in immigration court.

38.    Plaintiff Tahirih Justice Center ("Tahirih") is a nonprofit and non-partisan organization that provides free legal immigration services to immigrant women and girls fleeing gender-based violence such as rape, domestic violence, female genital mutilation, forced marriage, and human trafficking, and who seek legal immigration status.  Tahirih's core activities include offering legal representation and social services for noncitizens who seek protection, including asylum, in their immigration proceedings.  Tahirih operates from five offices across the country, in Falls Church, Virginia; Baltimore, Maryland; Atlanta, Georgia; Houston, Texas; and San Bruno, California.

**<u>Defendants</u>**

39.    Defendant Pamela Bondi is the Attorney General of the United States.  She is sued in her official capacity.  The Attorney General is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and is empowered to grant asylum, withholding of removal, and CAT protection.  A predecessor of Defendant Bondi's, Attorney General William Barr, issued the Rule challenged in this suit on behalf of DOJ and issued the original 2019 DOJ Designations as to Guatemala, Honduras, and El Salvador.  Defendant Bondi has issued the new DOJ Designations in connection with ACAs signed by the current administration.

40.    Defendant DOJ is a cabinet-level department of the United States federal government.  DOJ or its sub-agencies have issued challenged Guidance implementing the Rule.

41.    Defendant Daren Margolin is the Acting Director of the Executive Office for Immigration Review ("EOIR").  He is sued in his official capacity.

42.    Defendant EOIR is the sub-agency of DOJ that, through its immigration judges, conducts Section 240 removal proceedings and provides limited review of negative credible fear determinations in expedited removal proceedings.  EOIR has issued challenged Guidance implementing the Rule.

43.    Defendant Kristi Noem is the Secretary of Homeland Security.  She is sued in her official capacity.  Defendant Noem oversees each of the component agencies of DHS.  In her official capacity, Defendant Noem is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and is empowered to grant asylum and other immigration benefits. A predecessor of Defendant Noem's, former purported Acting DHS Secretary Chad Wolf, first issued the Rule challenged in this suit on behalf of DHS.  Defendant Noem issued an intended ratification of the Rule on behalf of DHS on August 20, 2025.  Wolf and former purported Acting DHS Secretary Kevin McAleenan issued the DHS Designations issued after the signing of the 2019 Guatemala, Honduras, and El Salvador ACAs.  Defendant Noem has issued the new DHS Designations in connection with ACAs signed by the current administration.

44.    Defendant DHS is a cabinet-level department of the United States federal government.  Its components include U.S. Citizenship and Immigration Services ("USCIS"), Customs and Border Protection ("CBP"), and Immigration and Customs Enforcement ("ICE"). DHS and its components have issued challenged Guidance implementing the Rule.

45.    Defendant Joseph Edlow is the Acting Director of USCIS.  He is sued in his official capacity.

46.    Defendant USCIS is the sub-agency of DHS that, through its asylum officers, adjudicates the applications of noncitizens who apply for asylum affirmatively and conducts credible fear screening interviews in expedited removal proceedings.  Pursuant to the Rule and

Guidance, USCIS asylum officers conduct "threshold screening interviews" to determine

whether noncitizens can be removed to an ACA signatory country.

47.     Defendant Rodney Scott is the Commissioner of CBP.  He is sued in his official

capacity.

48.     Defendant CBP is the sub-agency of DHS that is responsible for the initial

processing and detention of noncitizens who are apprehended near the U.S. border or who

present themselves at ports of entry.  CBP makes the initial determination whether an individual

in expedited removal is "amenable" to removal pursuant to an ACA and, if so, refers the

individual to USCIS for a "threshold screening interview."

49.     Defendant Todd Lyons is the Senior Official Performing the Duties of the

Director of ICE. He is sued in his official capacity.

50.     Defendant ICE is the sub-agency of DHS that is responsible for carrying out

removal orders and overseeing immigration detention.

## FACTS

### Protections for People Fleeing Persecution and Torture

51.     Federal law provides three primary forms of protection for individuals fleeing

persecution and torture: asylum under 8 U.S.C. § 1158; withholding of removal under 8 U.S.C.

§ 1231(b)(3); and protection under the CAT, *see* 8 C.F.R. § 1208.16-18.

52.     Asylum affords protection to individuals who have suffered persecution or have a

"well-founded fear" of persecution on account of race, religion, nationality, political opinion, or

membership in a particular social group.  8 U.S.C. § 1101(a)(42)(A).  The Supreme Court has

recognized that a ten percent chance of persecution can give rise to a well-founded fear of

persecution.  *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430, 440 (1987).  Past persecution gives

rise to a presumption of a well-founded fear of future persecution and thus of asylum eligibility.

53.     Subject to several narrow exceptions, including the safe third country exception at

issue here, Congress has mandated that "[a]ny [noncitizen] who is physically present in the

United States or who arrives in the United States . . . , irrespective of such [noncitizen's] status,

may apply for asylum."  8 U.S.C. § 1158(a)(1).

54.     There are three principal ways to seek asylum.  First, a noncitizen not in removal

proceedings may file an "affirmative" application with USCIS and complete an interview with

an asylum officer.  8 C.F.R. §§ 208.2(a), 208.9.  Second, a noncitizen in Section 240 removal

proceedings in immigration court under 8 U.S.C. § 1229a may submit a "defensive" asylum

application to the immigration judge as a form of relief from removal.  8 C.F.R. § 1208.2(b).

Third, a noncitizen who has been placed in expedited removal proceedings under 8 U.S.C.

§ 1225(b)(1) may raise an asylum claim by expressing fear of removal and undergoing a credible

fear interview with an asylum officer to screen for asylum eligibility.  8 U.S.C. § 1225(b)(1).

55.     Like asylum, withholding of removal protects individuals facing persecution.  The

withholding provision, 8 U.S.C. § 1231(b)(3), bars the government from "remov[ing] [a

noncitizen] to a country if . . . the [noncitizen's] life or freedom would be threatened in that

country because of . . . race, religion, nationality, membership in a particular social group, or

political opinion."  The withholding statute bars removal to *any* country where a noncitizen can

show they would more likely than not be persecuted, not just the noncitizen's country of

nationality.  As with asylum, a showing of past persecution creates presumptive eligibility for

relief.

56.     Regulations implementing the CAT likewise prohibit the removal of a noncitizen to any country where "it is more likely than not that he or she would be tortured."  8 C.F.R. § 1208.16(c)(2).

57.     The withholding of removal statute and the CAT regulations implement international treaty obligations not to send noncitizens to countries where they face persecution or torture, known as *non-refoulement* obligations.  The Supreme Court has held that the withholding statute addresses the requirement in Article 33 of the 1951 United Nations Refugee Convention, incorporated into its 1967 Protocol to which the United States is a signatory, that no signatory "expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."  *INS v. Aguirre-Aguirre*, 526 U.S. 415, 427 (1999).  The CAT regulations address the requirement in Article 3 of the CAT that "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture."  These prohibitions on *refoulement* encompass both direct *refoulement*— sending asylum seekers directly to countries where they face persecution or torture; and indirect *refoulement*—sending asylum seekers to countries that then send them onward to persecution or torture.

58.     An asylum officer cannot decide claims for withholding of removal and CAT protection.  Only an immigration judge can make these ultimate determinations of whether a noncitizen's removal to a given country is prohibited by our *non-refoulement* obligations.

**Safeguards to Prevent *Refoulement* in Section 240 and Expedited Removal Proceedings**

59.     Both Section 240 proceedings and expedited removal proceedings contain safeguards designed to prevent *refoulement*.   In Section 240 removal proceedings, noncitizens have the right to counsel, to present evidence, to cross-examine witnesses, and to administrative appeal and judicial review.

60.     Noncitizens subjected to expedited removal proceedings who do not fear removal can be ordered removed by an immigration officer "without further hearing or review."  8 U.S.C. § 1225(b)(1)(A)(i).  But Congress crafted an exception for individuals who express fear of removal.  To determine if that exception applies, immigration officers must affirmatively ask noncitizens whether they have "any fear or concern about being returned to [their] home country or being removed from the United States."  DHS Form I-867AB; 8 C.F.R. § 235.3(b)(2)(i) (requiring immigration officers to use Form I-867AB).  A noncitizen who expresses such a fear is entitled to a credible fear interview.  8 U.S.C. § 1225(b)(1)(B).

61.     At the credible fear interview, the asylum officer must affirmatively "elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture."  8 C.F.R. § 208.30(d).  Because the credible fear interview is a threshold screening device, noncitizens need not satisfy the ultimate standards for asylum, withholding of removal, or CAT protection.  Instead, they need only show a "significant possibility" that they could establish eligibility in a full removal hearing.  8 U.S.C. § 1225(b)(1)(B)(v); 8 C.F.R. § 208.30 (e)(2)-(3).  Congress created a low threshold at the credible fear stage to ensure that potentially valid protection claims could be developed properly before an immigration judge, so that bona fide asylum seekers would not be summarily removed.  Congress intended the expedited removal statute to balance efficiency with a "second, equally important goal: ensuring

that individuals with valid asylum claims are not returned to countries where they could face persecution." *Grace v. Barr*, 965 F. 3d 883, 890 (D.C. Cir. 2020).

62.    If the asylum officer finds a "significant possibility" that the individual "could establish eligibility for asylum," the individual is placed in Section 240 removal proceedings, where they will have the opportunity to develop a full record supporting their protection claims before an immigration judge.

**The Safe Third Country Provision, 8 U.S.C. § 1158(a)(2)(A)**

63.    Congress created the safe third country provision at 8 U.S.C. § 1158(a)(2)(A) as one of three narrow exceptions to the right to seek asylum.  Under the safe third country provision, an individual may not apply for asylum "if the Attorney General determines that the [noncitizen] may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the [noncitizen]'s nationality or, in the case of a [noncitizen] having no nationality, the country of the [noncitizen]'s last habitual residence) in which the [noncitizen]'s life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the [noncitizen] would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General finds that it is in the public interest for the [noncitizen] to receive asylum in the United States."  The safe third country provision may not be applied to unaccompanied children.  8 U.S.C. § 1158(a)(2)(E).

**The Safe Third Country Agreement with Canada**

64.    Congress enacted the safe third country provision in 1996 in light of negotiations initiated by Canada, which has long been a global leader in refugee protection.

65.    The United States first signed the safe third country agreement with Canada on December 5, 2002.  In its present form, that agreement provides that an asylum seeker who presents at or crosses the U.S.-Canada border may be removed back to the other country to apply for asylum.  The agreement first entered into force on December 29, 2004, one month after the United States issued procedural regulations pursuant to regular notice-and-comment procedures.

**The 2019 ACAs with Guatemala, El Salvador, and Honduras**

66.    For more than sixteen years after signing the agreement with Canada, the United States did not enter into any other safe third country agreement.  However, in 2019 the U.S. government signed three agreements that it referred to as ACAs with Guatemala, El Salvador, and Honduras in order to remove asylum seekers to those countries pursuant to the safe third country provision.  Unlike Canada, which is a stable democracy that accepts large numbers of asylum seekers and has low levels of violence, Guatemala, El Salvador, and Honduras in 2019 all had epidemic levels of violence, produced large numbers of asylum seekers, and lacked functional asylum systems.

67.    The 2019 Guatemala ACA was signed on July 26, 2019, and published in the Federal Register on November 20, 2019.  84 Fed. Reg. 64095.

68.    Although the Rule states that ACAs entered pursuant to the safe third country provision "will be published in the Federal Register," 84 Fed. Reg. at 63997, the 2019 ACAs with Honduras and El Salvador were not published at the time.  They were eventually published by the State Department, which indicated that the 2019 El Salvador ACA was signed on September 20, 2020 and entered into force on December 10, 2020;[1] and that the 2019 Honduras

---

[1] U.S. State Dep't, Treaties & Other Int'l Acts Series 20-1210, Agreement Between the United States of America and El Salvador, https://www.state.gov/wp-content/uploads/2021/02/20-1210-El-Salvador-Asylum-Cooperative-Agreement.pdf.

ACA was signed on September 25, 2019 and entered into force on March 25, 2020.[2]  The

government has since confirmed that the 2019 ACAs "with El Salvador and Honduras were

never implemented."[3]

**The Rule Imposes a Procedural Framework Inconsistent With the Required Safeguards**

69.     On November 19, 2019, former Attorney General Barr and former purported

Acting DHS Secretary Wolf promulgated the Rule challenged here.  84 Fed. Reg. 63,994.  The

Rule creates a framework for removals under so-called ACAs—excluding the Canada

agreement, which remains governed by separate regulations—by instituting new procedures that

apply to noncitizens in Section 240 proceedings and expedited removal proceedings.

70.     Defendants issued the Rule without following the APA requirements of notice

and comment rulemaking followed by a 30-day implementation period.  *See* 5 U.S.C.

§ 553(b)(B), (d).  Instead, they asserted the good cause and foreign affairs exceptions to these

requirements.  *See id.* § 553(a)(1), (b)(B), (d)(3).

71.     Under the Rule, an asylum applicant who is subject to an ACA can generally

avoid removal only by showing that it is more likely than not that they will be persecuted in the

proposed ACA country of removal.  However, in both expedited removal proceedings and

Section 240 removal proceedings, the Rule and Guidance do not adequately ensure that asylum

seekers will have the opportunity to express fears of removal to ACA countries or that they will

have the opportunity to make the required showings of likelihood of persecution or torture.

---

[2] U.S. State Dep't, Treaties & Other Int'l Acts Series 20-325, Agreement Between the United
States of America and Honduras, https://www.state.gov/wp-content/uploads/2020/06/20-325-
Honduras-Migration-and-Refugees.pdf.
[3] U.S. State Dep't, Press Release, Suspending and Terminating the Asylum Cooperative
Agreements with the Governments El Salvador, Guatemala, and Honduras, Feb. 6, 2021,
https://perma.cc/BLB4-AVRD.

72.     When used in expedited removal, the process of requiring noncitizens to demonstrate their ultimate eligibility for withholding of removal or CAT protection to third countries during initial interviews strips away essential procedural safeguards that Congress created to protect asylum seekers from *refoulement* to countries where they may be persecuted or tortured.

73.     First, if the government deems an asylum seeker in expedited removal proceedings potentially removable under an ACA, the asylum seeker is diverted away from the normal credible fear process into a new process created by the Rule.  Instead of receiving a credible fear interview, in which asylum officers must affirmatively ask noncitizens whether they fear harm in the receiving country, the Rule provides that the asylum seeker "shall be provided written notice that if he or she fears removal to the prospective receiving country because of the likelihood of persecution on account of a protected ground or torture in that country . . . the [noncitizen] should affirmatively state to the officer such a fear of removal."  84 Fed. Reg. at 64,009.  The Rule does not explain when such notice will be provided, who shall provide it, whether it must be in the noncitizen's language, or how notice is to be given if the noncitizen is illiterate.

74.     If the noncitizen does not affirmatively state a fear of removal to an ACA country, there is no assessment of whether they are at risk of persecution or torture in that country.

75.     Second, if the noncitizen does express such a fear, an asylum officer will assess their risk of persecution or torture in the ACA country in what the Rule calls a "threshold screening interview."  84 Fed. Reg. at 64,008-64,009.

76.     In that interview, the Rule provides that the officer will "determine whether it is more likely than not that the [noncitizen] would be persecuted on account of a protected ground

or tortured in that country," 84 Fed. Reg. at 64,009—which is the *ultimate* standard for receiving withholding or CAT relief in a full removal hearing before an immigration judge, not the lower screening standard used in credible fear or reasonable fear interviews, in which noncitizens must show only a possibility of ultimately establishing eligibility after a full hearing. Only if the noncitizen meets that ultimate standard as to every ACA country to which they are susceptible to removal, *see id.*, will the noncitizen then receive a normal credible fear interview regarding their fear of removal to their home country.

77. It is often impossible for asylum seekers to make this showing while detained and within days of being placed into an expedited removal process. That is because an asylum seeker who may have spent little or no time in the third country would have to explain why they feared being returned there. Doing so might require substantial country conditions evidence, an explanation of the relationship between that country and the applicant's country of origin, or details as to why the same form of harm that the person fled in their home country is likely in the third country, too. For instance, an applicant like U.T. or J.C.—both of whom are gay men— would have to marshal evidence of country conditions or other evidence to show why the harm they experienced on account of their sexual orientation in one country would persist in another. This is a particular challenge where the third country is one where asylum seekers have never set foot and in which they have no personal experience.

78. Thus, noncitizens subject to an ACA will receive a credible fear interview—and have the chance of developing and presenting her asylum, withholding of removal, and CAT claims in immigration court—only if they both affirmatively express a fear of removal to the ACA country and manage to satisfy the ultimate standard for withholding of removal or CAT

26

protection by showing that they are more likely than not to be persecuted or tortured in the ACA country.

79.    Unlike in credible fear interviews, moreover, the noncitizen subjected to an ACA interview must make this much greater evidentiary showing without any opportunity to consult with or be represented by counsel.

80.    If, after the ACA interview, the asylum officer determines that the noncitizen does not meet the ultimate more-likely-than-not standard, the noncitizen cannot apply for asylum, withholding of removal, or CAT protection in the United States, and is subject to immediate removal to the ACA country once a supervisory asylum officer signs off on the decision.

81.    That asylum officer's determination that a noncitizen is barred from applying for asylum and may be removed to the ACA country under an ACA is final, because the Rule forbids immigration judge review.

82.    The Rule also provides for its application in Section 240 removal proceedings in immigration court by immigration judges and DHS attorneys. The Rule amended DOJ regulations governing Section 240 removal proceedings by authorizing immigration judges to order asylum seekers removed to ACA countries before hearing the merits of their asylum, withholding, and CAT claims as to their countries of origin.

83.    However, the Rule prohibits immigration judges from exercising the broad "public interest" exception conferred on immigration judges by the safe third country provision. *See* 8 U.S.C. § 1158(a)(2)(A).  The Rule instead provides that only DHS may exercise that discretionary authority.

84.    In both expedited and Section 240 removal proceedings, often the only way for a noncitizen subject to an ACA to avoid removal to the ACA country is to abandon their asylum

claim and accept a removal order to their country of origin—which, of course, is the country from which they are seeking asylum in the first place.

**The 2019 Designations**

85.     The Rule's preamble states that "[p]rior to implementation of an ACA, the Attorney General and the Secretary of Homeland Security" will "make a categorical determination whether a country to which [noncitizens] would be removed under such an agreement provides 'access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection.'" 84 Fed. Reg. at 63997 (quoting 8 U.S.C. § 1158(a)(2)(A)). These categorical determinations are referred to herein as "Designations."

86.     In 2019, the former Attorney General and former purported Acting DHS Secretary and issued Designations concluding that Guatemala has a full and fair asylum system.

87.     On October 16, 2019, former purported Acting DHS Secretary Kevin McAleenan signed a memorandum with the subject line: "Whether Guatemala's Refugee Protection Laws and Procedures Satisfy the 'Access to a Full and Fair Procedure' Requirements of Section 208(a)(2)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a)(2)(A)." The memorandum concluded that Guatemala meets the statutory requirement of providing a full and fair asylum system. Among other defects, the memorandum contained no discussion of the actual functioning or capacity of Guatemala's asylum system or the country's ability to safely accommodate asylum seekers. Former Attorney General Barr signed an equivalent memorandum with the same subject line on November 7, 2019.

88.     On information and belief, the former Attorney General and former purported Acting DHS Secretaries also issued similar memoranda in 2019 or 2020 concerning Honduras

and El Salvador.  To date, Defendants have not produced those memoranda or otherwise made them public.

**2019 Agency Guidance**

89.    On November 19, 2019, the same day the Rule was published in the Federal Register, Defendant USCIS distributed written guidance for asylum officers on conducting ACA threshold screening interviews in expedited removal proceedings.

90.    That 2019 USCIS guidance provided that CBP officers were to make the initial determination as to whether a noncitizen falls under an ACA.  CBP officers were then to give the noncitizen a "Tear Sheet" stating, inter alia, that they could be removed to Guatemala, that they would be referred to an asylum officer to determine whether they meet an exception to the 2019 Guatemala ACA, and that they "may express a fear of removal to Guatemala or a fear of persecution or torture in Guatemala."

91.    The 2019 USCIS guidance also provided that in these ACA interviews—unlike in credible fear interviews or in withholding of removal adjudications in Section 240 removal proceedings—demonstrating past persecution in Guatemala does *not* create a presumption of future persecution.  Instead, such a showing would just count as "strong evidence" of the likelihood of future persecution.  Under the 2019 USCIS guidance, the asylum officer was not permitted to determine that a noncitizen is more likely than not to face persecution based solely on past persecution.

92.    Also on November 19, 2019, Defendant EOIR distributed guidance to immigration judges titled "Guidelines Regarding New Regulations Providing For Implementation Of Asylum Cooperative Agreements."  That guidance stated in part that a noncitizen subject to an ACA is not eligible for asylum, withholding of removal, or CAT

protection "unless the immigration judge determines" that the ACA "does not preclude the [noncitizen] from applying for asylum in the United States," that the noncitizen "qualifies for an exception to the relevant" ACA; or that the noncitizen "has demonstrated that it is more likely than not that he or she would be persecuted on account of a protected ground or tortured in the third country."

93.    The 2019 EOIR guidance further stated that "[i]mmigration judges should not review, consider, or decide any issues pertaining to any discretionary determination on whether [a noncitizen] who is subject to an ACA should be permitted to pursue asylum in the United States"; and that a noncitizen "who is otherwise barred from applying for asylum pursuant to an ACA may nonetheless file an asylum application with the immigration court if DHS files a written notice stating that DHS has decided in the public interest that the [noncitizen] may pursue an application for asylum or withholding of removal in the United States."

**The First Trump Administration's Implementation of the Rule**

94.    On November 20, 2019, Defendants began applying the Rule and the 2019 Guatemala ACA to asylum seekers in expedited removal proceedings.

95.    When those removals began, the U.S. and Guatemalan governments had not yet developed any plan to ensure that asylum seekers deported under the agreement would be able to access asylum procedures.  On November 18, 2019, a briefing prepared for former purported Acting DHS Secretary Wolf stated: "There is uncertainty as to who will provide orientation services for migrants as well as who will provide shelter, food, transportation, and other care."

96.    Non-Guatemalan nationals who were removed to Guatemala pursuant to the Rule and the 2019 Guatemala ACA were given preliminary authorization to stay in the country for just 72 hours.  Within those 72 hours, they had to decide whether to return to their countries of

origin or remain in Guatemala and attempt to apply for asylum there.  However, many people
had not received adequate information or instructions about the process of applying for asylum in
Guatemala to allow them to make an informed decision just days after their disorienting
deportation to an unexpected country.

97.    Those removed to Guatemala also faced significant pressure to return to their
countries of origin.  The United States provided substantial funds to support efforts in Guatemala
to offer the removed noncitizens transportation back to their countries of origin, which
intensified the pressure for them to do so.  And the shelter infrastructure in Guatemala that
existed for people removed under the Rule authorized only very brief stays.  Moreover,
Guatemala did not provide access to guidance or support for the legal and social service needs
that would be necessary if individuals actually wanted to remain in the country and seek
protection.  The result was indirect *refoulement* of asylum seekers, which was reportedly just the
"result the Trump administration intended."[4]

98.    On March 17, 2020, the Guatemalan government suspended removals under its
2019 ACA due to concerns surrounding the spread of COVID-19 and the country's capacity to
receive asylum seekers.  Removals under the 2019 Guatemala ACA never ultimately resumed.

99.    Between November 2019 and March 2020, Defendants removed approximately
945 non-Guatemalan asylum seekers to Guatemala under the Rule, including single women and
parents with young children.  In October 2020, the Office of the United Nations High
Commissioner for Refugees ("UNHCR") informed congressional staff that less than 2 percent of
those asylum seekers were actively pursuing asylum claims in Guatemala and that none of them

---

[4] Jason Hopkins, *Trump's Latest Asylum Deal is Working Just as the Administration Intended*,
Daily Caller (Dec. 13, 2019), https://dailycaller.com/2019/12/13/all-asylum-seekers-returning-to-
home-country/.

had yet been granted asylum in Guatemala.[5]  Additionally, during the four months the 2019 Guatemala ACA was being implemented, Defendants coerced many other asylum seekers into withdrawing their requests for protection and accepting removal to their countries of origin when faced with the prospect of being deported to Guatemala.

100.     Likely also due to the COVID-19 pandemic, the 2019 ACAs with Honduras and El Salvador were never implemented under the first Trump administration.

**The Biden Administration Terminated the 2019 ACAs But Failed to Rescind the Rule**

101.     On February 2, 2021, former President Biden directed the Attorney General and DHS Secretary to "promptly review and determine whether to rescind the interim final rule" at issue in this case "as well as any agency memoranda or guidance issued in reliance on that rule." Executive Order 14010, 86 Fed. Reg. 8267, 8270.  That executive order further directed the Secretary of State to "promptly consider whether to notify the governments of" Guatemala, Honduras, and El Salvador that "the United States intends to suspend and terminate" the 2019 ACAs with those countries.  *Id.*

102.     On February 6, 2021, the State Department announced that "the United States ha[d] suspended and initiated the process to terminate the Asylum Cooperative Agreements with the Governments of El Salvador, Guatemala, and Honduras."[6]  The termination of the 2019 ACAs was "effective after the notice period stipulated in each of the Agreements."[7]  The notice

---

[5] Democratic Staff Report for the Senate Committee on Foreign Relations, Cruelty, Coercion, and Legal Contortions: The Trump Administration's Unsafe Asylum Cooperative Agreements 23, Jan. 18, 2021, https://perma.cc/48UW-JH68.
[6] U.S. State Dep't, Press Release, Suspending and Terminating the Asylum Cooperative Agreements with the Governments El Salvador, Guatemala, and Honduras, Feb. 6, 2021, https://perma.cc/BLB4-AVRD.
[7] *Id.*

periods for the 2019 ACAs were three and six months.  Therefore, all three 2019 agreements

terminated by August 2021.

103.    However, the government has not announced publicly or represented in this

litigation that it has rescinded the 2019 Designations concerning Honduras, Guatemala, and El

Salvador or that it has rescinded the 2019 agency guidance documents.

**New ACAs Signed by the Second Trump Administration**

104.    Since June 2025, the United States government has signed a series of new ACAs

with countries that the State Department itself has acknowledged are unsafe, commit serious

human rights violations, and/or have weak or corrupt asylum systems.  On information and

belief, Defendants are actively working to sign further ACAs with inappropriate third countries.

ACAs signed by the current administration to date include the following.

105.    On June 13, 2025, the United States signed a new ACA with Guatemala, which

was published on July 15, 2025.  90 Fed. Reg. 31670.  The agreement provides for the "transfer

of nationals of Central American countries to Guatemala" and does not set forth any limitation

on the number of non-Guatemalan nationals who can be removed to Guatemala pursuant to the

agreement.  *Id.* at 31675.

106.    The State Department reports that "Guatemala remains dangerous" and that

"[e]ndemic poverty, an abundance of weapons, a legacy of societal conflict, and the presence of

organized criminal gangs" in the country "all contribute to violent crime."[8]  The State

Department therefore warns that people should "[r]econsider travel to Guatemala due to crime"

---

[8] U.S. State Dep't, Overseas Security Advisory Council, Guatemala 2019 Crime & Safety
Report, May 15, 2025,
https://www.osac.gov/Country/Guatemala/Content/Detail/Report/2013f384-296b-4394-bfcb-
1c9c40b9c7df.

and it prohibits U.S. government personnel and their families from traveling to multiple areas of the country that "are controlled by drug gangs."[9]

107.    The State Department has acknowledged that although Guatemalan law "provides for the granting of asylum or refugee status," "[t]here [are] gaps and shortcomings in the procedures for implementing the legal framework."[10]   In particular, each application must go through "an interministerial process, whose complexity contribute[s] to major delays on final case decisions and an increased backlog."[11]   Among other additional defects, Guatemala's "[i]dentification and referral mechanisms for potential asylum seekers [are] inadequate, and requirements to travel to Guatemala City for the initial asylum interview limited access."[12]

108.    On June 25, 2025, the United States signed a new ACA with Honduras ("2025 Honduras ACA"), which was published on July 8, 2025.  90 Fed. Reg. 30076.  The agreement does not set forth any limitation on the number of people or the nationalities of asylum seekers the United States may remove to Honduras.

109.    The State Department reports that Honduras has epidemic levels of gang violence, rape and sexual violence, and other violence against women and lesbian, gay, bisexual, transgender, queer, or intersex ("LGBTQI+") people; "serious restrictions on freedom of expression"; ineffective policing and entrenched corruption; and state violence including torture and extra-judicial killings.[13]   The State Department also warns people to "[r]econsider travel to

---

[9] U.S. State Dep't, Guatemala Travel Advisory, Dec. 30, 2024, https://perma.cc/PGF7-FF5Q.
[10] U.S. State Dep't, 2023 Country Reports on Human Rights Practices: Guatemala, Apr. 22, 2024, https://perma.cc/Y2V6-XTGR.
[11] *Id.*
[12] *Id.*
[13] U.S. State Dep't, 2023 Country Reports on Human Rights Practices: Honduras, Apr. 22, 2024, https://perma.cc/W6N6-LQSL.

Honduras due to crime" and that "[v]iolent crime, such as homicide, armed robbery, and kidnapping, remains common."[14]

110.    The State Department has acknowledged that Honduras has only "a nascent system to provide legal protection to refugees" and that migrants and "asylum seekers with pending cases were vulnerable to abuse and sexual exploitation by criminal organizations."[15] The State Department reports that "[w]omen, children, and [LGBTQI+]" asylum seekers are "especially vulnerable to abuse."[16]

111.    On August, 14, 2025, the United States announced that it had signed a "safe third country agreement" with Paraguay.[17]  The agreement was posted online on December 19, 2025, for publication in the Federal Register on December 23, 2025.[18]

112.    Among other human rights concerns, the State Department reports that security forces of Paraguay's long-entrenched ruling party continue to engage in torture, that there are "serious restrictions on freedom of expression" and "serious government corruption," and that the country remains plagued by "extensive gender-based violence."[19]  According to UNHCR data, Paraguay granted asylum to just 85 people in 2024.[20]

---

[14] U.S. State Department, Honduras Travel Advisory, Dec. 10, 2024, https://perma.cc/8XTL-X2GV.
[15] U.S. State Dep't, 2023 Country Reports on Human Rights Practices: Honduras, Apr. 22, 2024, https://perma.cc/W6N6-LQSL.
[16] *Id.*
[17] U.S. State Dep't, Press Release, Signing of a Safe Third Country Agreement with Paraguay, Aug. 14, 2025, https://perma.cc/X88Q-C6W7.
[18] U.S. Dep't of Homeland Security, Agreement Between the U.S. Department of Homeland Security and and the U.S. Department of State and the Paraguayan National Commission for Stateless Persons and Refugees, https://perma.cc/9JUB-QTKB.
[19] U.S. State Dep't, 2023 Country Reports on Human Rights Practices: Paraguay, Apr. 22, 2024, https://perma.cc/7PQQ-CFEJ.
[20] UNHCR, Refugee Data Finder: Paraguay, https://www.unhcr.org/refugee-statistics/download/?v2url=d816ed.

113.     The United States signed an ACA with Uganda on July 29, 2025, and it was published on September 3, 2025.  90 Fed. Reg. 42597.  The text of the published agreement contains no limitation on the number of people or the nationalities of asylum seekers who can be removed to Uganda under the agreement.  *Id.*

114.     In 2023, the State Department warned that Uganda had taken aim "at the human rights of all Ugandans, enacting draconian anti-LGBTQI+ legislation, including the death penalty for 'serial offenders.'"[21]  The State Department reported that Uganda's "Anti-Homosexuality Act" also imposes "life imprisonment for 'homosexuality.'"[22]

115.     The U.S. government has acknowledged that other forms of repression in Uganda include "serious restrictions on freedom of expression and media freedom," "substantial interference with the freedom of peaceful assembly and freedom of association," the arrest and detention of "political prisoners," "torture," and "extrajudicial killings."[23]  There is also "extensive gender-based violence" and violence against LGBTQI+ people.[24]  The State Department recently reported further "negative developments in the human rights situation in Uganda" last year.[25]  In 2024, the United States removed Uganda from the African Growth and Opportunity Act trade arrangement due to its government's "gross violations of internationally recognized human rights."[26]  The State Department also stresses that "[v]iolent crime is a real

---

[21] U.S. State Dep't, 2023 Country Reports on Human Rights Practices: Preface, Apr. 22, 2024, https://perma.cc/9DMF-DSWG.
[22] U.S. State Dep't, 2023 Country Reports on Human Rights Practices: Uganda, Apr. 22, 2024, https://perma.cc/9TG5-TUJG.
[23] *Id.*
[24] *Id.*
[25] U.S. State Dep't, 2024 Country Reports on Human Rights Practices: Uganda, Aug. 12, 2025, https://perma.cc/A6DP-NSSC.
[26] U.S. Trade Representative, 2024 Biennial Report on the Implementation of the African Growth & Opportunity Act 19 (June 2024) https://perma.cc/RJ9Z-JLDC.

danger in Uganda" and warns people to "[r]econsider travel to Uganda due to crime, terrorism, and laws targeting persons on the basis of sexual orientation."[27]

116.    The State Department has acknowledged that while Uganda has a committee for making refugee eligibility determinations, the body is already backlogged with existing claims from refugees fleeing other African countries.[28]  In addition, Ugandan "[o]fficials frequently engage[] in corrupt practices with impunity" and some "government officials demanded bribes from refugees to process or issue paperwork."[29]

117.    The Ugandan government recently announced that it has stopped granting asylum and refugee status "to new arrivals from countries not experiencing war," "especially those coming from Eritrea, Ethiopia, and Somalia."[30]

118.    The United States completed an ACA with Ecuador on July 23, 2025, and that agreement was published on November 17, 2025.  90 Fed. Reg. 51376.

119.    Ecuador has suffered from an explosion of violence by warring drug cartels in recent years.  The State Department reports that in January 2024, the country's president "decreed a state of emergency" due to "escalating violence from local and transnational organized crime groups."[31]  Yet the State Department reports that violence and kidnappings "by criminal groups increased" last year, alongside arbitrary arrests, killings, and "serious restrictions on freedom of expression" by the government.[32]  The State Department cautions that travel to

---

[27] U.S. State Dep't, Uganda Travel Advisory, Apr. 23, 2025, https://perma.cc/3W8D-L4FA.
[28] U.S. State Dep't, 2023 Country Reports on Human Rights Practices: Uganda, Apr. 22, 2024, https://perma.cc/9TG5-TUJG.
[29] U.S. State Dep't, 2023 Country Reports on Human Rights Practices: Uganda, Apr. 22, 2024, https://perma.cc/9TG5-TUJG.
[30] The Guardian, Uganda Stops Granting Refugee Status for Eritreans, Somalis and Ethiopians (Dec. 4, 2025), https://perma.cc/FW6Y-8M2G.
[31] U.S. State Dep't, 2024 Country Reports on Human Rights Practices: Ecuador, Aug. 12, 2025, https://perma.cc/J9E2-WFEY.
[32] *Id.*

Ecuador is dangerous because "[v]iolent crime, such as murder, assault, kidnapping, and armed robbery, is prevalent and widespread."[33]   On August 28, 2025, just one week before the Secretary of State met with officials in Ecuador to discuss finalizing an ACA, the State Department's Overseas Security Advisory Council reported that "[d]espite an increased outcry from the Ecuadorean population and authorities' focus on curbing crime, Ecuador continues to experience high rates of mass shootings, bombings, extortion, and kidnapping."[34]   The State Department has also acknowledged that criminal groups in Ecuador target migrants and refugees for violence, recruitment into forced labor, and sex trafficking, and that "women, children, and [LGBTQI+] individuals" are in particular danger.[35]

120.    On October 20, 2025, the United States signed an ACA with Belize.[36]   That agreement has not yet been published.

121.    The State Department warns that "[v]iolent crime—such as sexual assault, home invasions, armed robberies, and murder—are common [in Belize] even during the day and in tourist areas" and that "[l]ocal police lack the resources and training to respond effectively to serious crimes."[37]   The State Department has also reported that Belize engages in the "refoulement of refugees to [countries] where they would face serious harms."[38]   According to the State Department, other "[s]ignificant human rights issues" in the country include "arbitrary or unlawful killings; inhuman and degrading treatment by security officers; arbitrary arrest or

---

[33] U.S. State Dep't, Ecuador Travel Advisory, Apr. 15, 2024, https://perma.cc/6ZAY-2P5N.
[34] U.S. State Dep't Overseas Security Advisory Council, Violent Crime Surge in Ecuador, Aug. 28, 2025, https://www.osac.gov/.
[35] U.S. State Dep't, 2023 Country Reports on Human Rights Practices: Ecuador, Apr. 22, 2024, https://perma.cc/NA8P-E854.
[36] Government of Belize, Ministry of Foreign Affairs & Foreign Trade, Belize Signs Safe Third Country Agreement With United States (Oct. 20, 2025), https://perma.cc/B829-QNKQ.
[37] U.S. State Dep't, Belize Travel Advisory, Dec. 30, 2024, https://perma.cc/9ECZ-B7AH.
[38] U.S. State Dep't, 2023 Country Reports on Human Rights Practices: Belize, Apr. 22, 2024, https://perma.cc/XRT5-LW2F.

detention; . . . and extensive gender-based violence."[39]  According to UNHCR data, Belize has granted asylum or similar protection to fewer than 50 people annually on average in recent years.[40]

122.    On information and belief, the United States has also entered into an ACA with Liberia that has not yet been published.

123.    The State Department warns that "[v]iolent crime, such as armed robbery [is] common in urban areas" of Liberia, that "[l]ocal police lack the resources to respond effectively to serious crimes," and that travel beyond the capital is unsafe outside of daylight hours.[41]  The State Department has reported that significant human rights issues in Liberia include extrajudicial killings and torture by government actors, "serious restrictions on freedom of expression," "serious government corruption," "extensive gender-based violence," the enforcement of "laws criminalizing consensual same-sex conduct between adults," and violence against LGBTQI+ people.[42] The State Department further reported that Liberia's government failed to "take credible steps to identify and punish officials who may have committed human rights abuses."[43]  According to UNHCR data, Liberia has granted asylum or similar protection to fewer than 25 people per year on average in recent years.[44]

---

[39] *Id.*
[40] UNHCR, Refugee Data Finder: Belize, https://www.unhcr.org/refugee-statistics/download/?v2url=14b683.
[41] U.S. State Department, Liberia Travel Advisory (Dec. 11, 2025), https://perma.cc/5825-GX5P.
[42] U.S. State Dep't, 2023 Country Reports on Human Rights Practices: Liberia, Apr. 22, 2024, https://perma.cc/586K-57KM.
[43] *Id.*
[44] UNHCR, Refugee Data Finder: Liberia, https://www.unhcr.org/refugee-statistics/download?v2url=911c97.

**The Current Administration's Implementation of the Rule**

124.    On August 20, 2025, Defendant Noem issued an intended ratification of the Rule, which was originally issued in November 2019 on behalf of DHS by former purported Acting DHS Secretary Wolf, who had been found to be serving unlawfully.  The intended ratification was published in the Federal Register on September 2, 2025.  90 Fed. Reg. 42309, 42310.

125.    On information and belief, Defendants have issued Designations categorically finding that each country with which the United States has signed an ACA has a "full and fair" asylum process.  Defendants have not published any of the Designations.  Plaintiffs challenge all Designations that have been issued concerning any country—whether or not an ACA with that country has been made public and therefore including but not limited to the ACA countries identified herein.

126.    On information and belief, Defendants have issued new agency guidance documents to DHS and DOJ personnel—including CBP, ICE, and USCIS officers, the ICE attorneys who prosecute Section 204 removal proceedings, and immigration judges—that, together with the guidance documents previously issued in 2019, provide for the implementation of the Rule and Designations in expedited removal proceedings and Section 240 removal proceedings (collectively "Guidance").

127.    On information and belief, Defendants are implementing or will imminently implement the new ACAs in expedited removal proceedings pursuant to the Rule, Guidance, and Designations, much as they did in late 2019.  As before, Defendants' application of the Rule, Guidance, and Designations in expedited removal proceedings deprive noncitizens of credible fear screenings and result in their unlawful summary removal to dangerous or repressive nations that are ill-equipped to receive and screen asylum seekers.

128.    This time, however, Defendants are implementing the Rule, Guidance, and Designations in Section 240 removal proceedings and this has been the focus of this administration's implementation of the challenged policies to date.  Since at least July 2025, ICE attorneys have been making oral and/or written motions in immigration courts, including in the cases of noncitizens who arrived in the United States several years ago, asking immigration judges to pretermit noncitizens' applications for asylum, withholding of removal, and CAT protection and order the noncitizens removed to countries with which ACAs have been signed.  Such motions are referred to hereafter as "ACA pretermission motions."  In these oral or written ACA pretermission motions, ICE attorneys argue that noncitizens need not be given any opportunity to express fear of removal to the ACA country, even though the possibility of removal to that third country is being raised for first time—often in open court at the time of the removal hearing.  On information and belief, these actions are being undertaken pursuant to agency Guidance challenged here.

129.    Defendants' effort to pretermit noncitizens' protection claims and secure orders of removal to ACA countries pursuant to the Rule, Guidance, and Designations has expanded massively in recent months.  At first, Defendants appeared to focus on making ACA pretermission motions in particular immigration courts.  In recent months, however, Defendants have aggressively expanded the practice to immigration courts across the United States and have made at least hundreds of ACA pretermission motions.  On information and belief, this practice and its aggressive expansion in immigration courts across the country has been undertaken pursuant to the Guidance.

130.    On information and belief, the Guidance directs ICE attorneys to make ACA pretermission motions in broad categories of cases involving applications for asylum,

41

withholding of removal, and/or CAT protection.  On information and belief, this includes directives that ICE attorneys bring those motions in virtually all such cases, seeking the removal of many more noncitizens with protection claims to ACA countries than those countries could reasonably be expected to receive—even assuming that the countries were actually safe and had full and fair asylum procedures.

131.    Defendants are also attempting to coerce noncitizens into withdrawing their applications for protection and accept removal to their countries of origin in order to avoid removal to the ACA third countries.  On information and belief, these actions are also undertaken pursuant to the Guidance.

132.    On information and belief, the Guidance authorizes and/or directs immigration judges to pretermit applications for asylum, withholding of removal, and CAT protection as to the original proposed country of removal without permitting the noncitizen to seek withholding of removal or CAT protection with respect to the ACA country.

133.    On information and belief, the Guidance also authorizes and/or directs immigration judges to *sua sponte* order pretermission of applications for asylum, withholding of removal, and CAT protection and to order removal to third countries pursuant to ACAs, as happened to Plaintiff Y.A.

134.    On information and belief, the Guidance authorizes and/or directs Defendants to foreclose noncitizens from the opportunity to seek withholding of removal and CAT protection either to the applicants' home country or to the proposed ACA country or countries of removal, even though the asylum statute's safe third country provision does not provide an exception from withholding of removal or CAT protection.

## CLASS ACTION ALLEGATIONS

135.    The Section 240 Individual Plaintiffs—J.C., A.S., Y.A., E.M., L.H., Y.V., D.M., I.B., A.M., M.S., M.A., L.T., A.T., A.J., N.S., D.D., N.V., M.O., S.M., J.M, and J.D.—bring this action under Federal Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of themselves and a class of all other persons similarly situated.  (The Original Individual Plaintiffs do not assert class action claims).

136.    The Section 240 Individual Plaintiffs seek to represent the following Proposed Class: All noncitizens whom Defendants have sought or will seek to bar from asylum, withholding of removal, or CAT protection in removal proceedings under 8 U.S.C. § 1229a on the basis that they can be removed to a third country under an Asylum Cooperative Agreement pursuant to the Rule, Guidance, or Designations.

137.    The proposed class satisfies the requirements of Rule 23(a)(1) because the class is so numerous that joinder of all members is impracticable.  On information and belief, Defendants have already sought to pretermit the protection applications of at least hundreds of asylum seekers in multiple immigration courts across the country based on the Rule, Guidance, and Designations.  The proposed class also includes numerous noncitizens against whom Defendants will seek to apply the Rule, Guidance, and Designations in Section 240 removal proceedings in the future.

138.    The class meets the commonality requirements of Rule 23(a)(2).  The members of the class are subject to a common practice: invocation of the Rule, Guidance, and Designations as a basis to bar them from seeking asylum, withholding of removal, and CAT protection.  The suit also raises questions of law common to members of the proposed class, including whether the Rule, Guidance, and Designations violate the asylum statute, 8 U.S.C. § 1158; whether the

Rule, Guidance, and Designations are arbitrary and capricious; and whether the Rule was issued in violation of the APA's procedural requirements.

139.    The proposed class meets the typicality requirements of Rule 23(a)(3), because the claims of the representative Section 240 Individual Plaintiffs are typical of the claims of the proposed class.  Each proposed class member, including the proposed class representatives, has experienced or faces the same principal injury (pretermission of their claims for asylum, withholding of removal, and CAT protection), based on the same government practice (application of the Rule, Guidance, and Designations), which is unlawful as to the entire class because it violates the immigration laws and the APA.

140.    The proposed class meets the adequacy requirements of Rule 23(a)(4).  The representative Section 240 Individual Plaintiffs seek the same relief as the other members of the class—among other things, an order declaring the Designations and the relevant provisions of the Rule and Guidance unlawful, vacatur of the challenged policies, and an injunction preventing their enforcement.  In defending their rights, the Section 240 Individual Plaintiffs will defend the rights of all proposed class members fairly and adequately.

141.    The proposed class is represented by experienced attorneys from the American Civil Liberties Union Foundation Immigrants' Rights Project, the National Immigrant Justice Center, the Center for Gender and Refugee Studies, Human Rights First, and the American Civil Liberties Foundation of the District of Columbia.  Proposed Class Counsel have extensive experience litigating class action lawsuits and other complex systemic cases in federal court on behalf of noncitizens.

142.    The proposed class also satisfies Rule 23(b)(2).  Defendants have acted and will act on grounds generally applicable to the class by seeking to pretermit their applications for

asylum, withholding of removal, and CAT protection pursuant to the Rule, Guidance, and Designations.  Injunctive and declaratory relief is therefore appropriate with respect to the class as a whole.

### HARMS TO PLAINTIFFS

143.    The Original Individual Plaintiffs were previously unlawfully denied the opportunity to seek asylum, withholding of removal, and CAT protection in the United States pursuant to the Rule, Guidance, and Designations, and were removed to Guatemala, where they feared for their safety and were unable to seek protection.  They then spent more than a year in hiding, either in their home countries or in Mexico before they were able to return to the United States pursuant to an agreement with Defendants. The Original Individual Plaintiffs are currently again seeking asylum and other protection in the United States but fear that they will once again be wrongfully denied protection and removed to dangerous or repressive third countries under the Rule and the current Guidance and Designations.  They cannot live safely or find protection in either the ACA countries or their countries of origin.

144.    The Section 240 Individual Plaintiffs face harm due to the Rule, Guidance, and Designations, which subject these Plaintiffs to denial of their applications for asylum, withholding of removal, and CAT protection and to removal to third countries that are unsafe and that lack full and fair asylum systems.  The Section 240 Individual Plaintiffs cannot live safely or find protection in either the ACA countries or their countries of origin.  Five of the Section 240 Individual Plaintiffs, Y.A., A.S., E.M., N.V., and M.O., have already received pretermission orders that directed their removal to third countries.  Some plaintiffs, like Y.A., E.M. and L.T., did not receive sufficient advance notice that Defendants would seek to pretermit their claims and remove them to third countries.  Indeed, E.M., Y.A., and A.S., had no

opportunity to raise fears of being removed to the third countries.  In other cases, Section 240 Individual Plaintiffs were deprived of sufficient opportunities to present evidence concerning their fears of removal to third countries.  For example, M.O. had filed a full evidentiary response to DHS's motion concerning Honduras when DHS proposed pretermission based on two additional ACA countries.  The immigration judge ordered M.O. removed to Ecuador without the opportunity to provide evidence in support of his fear of removal there.  The other Section 240 Individual Plaintiffs fear similar harms.

145.    Removal to ACA countries poses serious dangers for all of the Section 240 Individual Plaintiffs.  For example, L.T. is a gay man married to another man, and Defendants seek to remove him to Uganda where he could face prosecution and imprisonment or the death penalty because of his sexual orientation.  L.H., an Indigenous woman who has been subjected to violence in Peru, fears removal to Honduras, where attitudes toward Indigenous women are similar.  The 240 Individual Plaintiff fear that, if they are removed to third countries under the challenged policies, those countries will in turn forcibly deport or return them to their countries of origin.   For Y.A., this fear is particularly acute, as Uganda has recently restricted access to asylum and refugee protections for Somali people.  And as an African, single, Muslim woman who does not speak Spanish, Y.A. fears that she will be singled out for violence in Honduras based on all of those traits.  Meanwhile, J.C., E.M., N.V., L.T., and J.D. fear harm based on their sexual orientation, and the treatment they would face in the third countries to which Defendants seek send is likely to be just as bad or worse than in the countries they fled.  A.S. fears that if he is removed to Honduras, he will in turn be returned to Bolivia and persecuted there, as happened to a friend who fled Bolivia and sought protection in another Latin American country  D.M. is a Russian Uzbek Muslim who fears persecution on account of his religion in both Russia and the

third country of Uganda.  D.M., M.O., N.S., N.V., S.M., and J.D. fear that their persecutors will reach them in the third countries as well.

146.    Plaintiff Las Americas' core work includes representing asylum seekers and noncitizens detained by the U.S. government in both expedited removal proceedings under 8 U.S.C. § 1225(b) and Section 240 removal proceedings under 8 U.S.C. § 1229a.  In Section 240 removal proceedings, Las Americas represents detained people seeking asylum, withholding of removal, and protection under the CAT, among other forms of relief from removal.  In expedited removal proceedings, Las Americas provides consultation and legal representation to asylum seekers throughout the credible fear interview process, including assistance in seeking immigration judge review of negative credible fear determinations by asylum officers.  Las Americas' core work also includes offering opinion letters with case-specific analysis, advice or guidance, and information to detained people in both expedited removal proceedings and Section 240 removal proceedings after consultations are completed by staff members.

147.    Through its consultations, Las Americas' staff has become aware that DHS attorneys are making oral and written motions to pretermit asylum, withholding of removal, and CAT applications based on ACAs across the three immigration courts that Las Americas serves.

148.    By removing asylum seekers without credible fear interviews and without any opportunity to consult with or be represented by counsel, the Rule, Guidance, and Designations will interfere with Las Americas' core activities of providing legal services to detained asylum seekers subjected to expedited removal proceedings.  And by depriving asylum seekers of credible fear interviews and thereby preventing detained asylum seekers from reaching Section 240 removal proceedings in immigration court, the challenged policies will also directly interfere with Las Americas' ability to represent individuals in those Section 240 removal proceedings.

The Rule, Guidance, and Designations will also impair and interfere with Las Americas' ability to carry out its core work of representing asylum seekers in Section 240 removal proceedings by requiring it to respond to DHS motions to pretermit asylum applications, or preparing to respond to immigration judges' *sua sponte* pretermission decisions, and seeking to establish that clients would more likely than not be persecuted or tortured in third countries.

149.    The Rule, Guidance, and Designations also interfere with Las Americas' consultation and opinion letter services by severely limiting the time available to complete case-specific opinion letters.  Through these services, Las Americas has observed that the Rule, Guidance, and Designations create a fast-moving process where there is hardly any advance notice to detained people who may be awaiting Las Americas' analysis, advice or guidance, and information about their cases via opinion letters.

150.    The Rule, Guidance, and Designations will also require Las Americas to expend resources to attempt to address this interference with its work in both expedited and Section 240 removal proceedings.  For example, in expedited removal proceedings, Las Americas will have to expend additional time and resources interviewing noncitizens about potential eligibility for the various ACAs and potential fears of removal to the various ACA countries in order to prepare them for "threshold screening interviews" under the Rule, in addition to the normal credible fear interviews.  And Las Americas' attorneys will need to expend considerable time and resources trying to prepare noncitizens to meet the much higher, ultimate more-like-than-not standards for withholding of removal and CAT protection as to ACA countries in those interviews, rather than the normal, much lower credible fear screening standard.  In Section 240 removal proceedings, Las Americas will have to expend additional time and resources responding to motions to pretermit applications for protection premised on application of the

Rule, Guidance, and Designations. Las Americas will also have to expend additional time and resources in connection with its consultation and opinion letter services to fully analyze potential applicability of the challenged policies and then inform and advise detained people who undergo consultations and may be subject to the Rule, Guidance, and Designations. For example, at times this will involve an analysis of conditions in various ACA countries against the more-likely-than-not-standard in relation to the facts of any given case.

151.    Las Americas will also have to significantly increase the resources it expends on each asylum client, who will have to be prepared to prove before immigration judges that they are more likely than not to be persecuted or tortured in every country with which the United States has signed an ACA. Satisfying that more-likely-than-not standard is a resource-intensive process because attorneys must conduct additional interviews with clients and gather detailed expert evidence and testimony about country conditions. Attempting to satisfy the more-likely-than-not standard as to any number of different countries will be incredibly burdensome in terms of staff time and organizational resources and will limit the number of clients Las Americas is able to serve.

152.    Plaintiff Tahirih's core work includes providing legal representation to survivors of domestic violence, sexual assault, and other forms of gender-based violence from all over the globe who are seeking asylum, withholding of removal, and CAT protection in Section 240 removal proceedings in immigration court under 8 U.S.C. § 1229a. The Rule, Guidance, and Designations will interfere with Tahirih's core work of representing its clients in pursuing applications for asylum, withholding, and CAT protection.

153.    DHS attorneys have already made written and oral motions to pretermit asylum, withholding of removal, and CAT applications for Tahirih clients in immigration court, where

DHS attorneys have making such motions based on the challenged Rule, Guidance, and Designations in nearly all cases concerning such applications.

154.    The Rule, Guidance, and Designations also require Tahirih to expend resources and divert additional staff time and other resources to attempt to address this interference with its core activities.  For example, in Section 240 removal proceedings, Tahirih must expend additional time and resources preparing to respond to motions to pretermit applications for protection, or preparing to respond to an immigration judge's *sua sponte* pretermission, premised on application of the Rule, Guidance, and Designations.

155.    Tahirih will also have to significantly increase the resources it expends on each asylum client, who will likely have to be prepared to prove that they are more likely than not to be persecuted or tortured in every country with which the United States has signed an ACA. Satisfying that more-likely-than-not standard is a resource-intensive process, at least in part, because attorneys must conduct additional interviews with clients and gather detailed expert evidence and testimony about country conditions. Attempting to satisfy the more-likely-than-not standard as to any number of different countries will be burdensome in terms of staff time and organizational resources and could limit the number of clients Tahirih is able to serve.

156.    This work is already underway, as the Rule, Guidance, and Designations have required Tahirih's staff to respond to these motions.  DHS makes some of these motions in writing and springs others on Tahirih's clients orally at the beginning of the individual merits hearings on their clients' asylum cases, despite DHS never having raised the issue previously. Tahirih's attorneys must prepare strategies and draft plans concerning how to respond to motions to pretermit protection applications based on the policies; draft responsive pleadings to be ready to file to oppose pretermission of applications on this basis; discuss these issues with clients who

are already at high risk of retraumatization; and prepare supporting evidentiary submissions including extensive collections of country conditions evidence concerning the various countries with which ACAs have been signed or reportedly signed.

157.    In addition, Tahirih attorneys will need to expend considerable time and resources trying to prepare current clients who might be deemed subject to expedited removal.

158.    Finally, the Rule's immediate promulgation denied Tahirih and Las Americas the opportunity to comment on the Rule before it went into effect.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**(Challenge to the Designations)**
**(Violation of the Safe Third Country Statute, 8 U.S.C. § 1158(a)(2)(A),**
**and the APA, 5 U.S.C. § 706(2)(A))**

159.    The asylum statute's safe third country provision requires that before the government may remove an asylum seeker to a "safe third country" pursuant to an international agreement, it must first determine that the third country is "safe" and would provide the asylum seeker "access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection."  8 U.S.C. § 1158(a)(2)(A).

160.    The statute therefore requires Defendants to assess not just whether potential receiving countries have adopted laws, regulations, and policies providing for asylum or equivalent protection but whether receiving countries, in reality, are safe and have procedures and operations in place to effectively provide for asylum or equivalent protection, as well as the actual number of asylum seekers to whom the countries could realistically provide such truly full and fair procedures.

161.    The Designations fail to account for whether those countries are, in reality, safe and capable of providing full and fair access to protection or the actual number of people to whom the countries could realistically provide such full and fair procedures.

162.    The Designations therefore violate 8 U.S.C. § 1158(a)(2)(A) and are contrary to law under the APA, 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF
### (Challenge to the Rule and Guidance)
### (Violation of the Safe Third Country Statute, 8 U.S.C. § 1158(a)(2)(A), and the APA, 5 U.S.C. § 706(2)(A))

163.    The asylum statute's safe third country provision prohibits the government from removing an asylum seeker to a third country pursuant to a bilateral or multilateral agreement unless it first "determines that . . . the [noncitizen]'s life or freedom would not be threatened on account of" a protected ground in the third country.  8 U.S.C. § 1158(a)(2)(A).  It thus requires that the government make a likelihood-of-persecution determination in every case prior to removing an asylum seeker under such an agreement.

164.    In expedited removal proceedings, the Rule and Guidance do not provide for such a determination in every case.  Instead, they require a likelihood-of-persecution assessment only if the individual affirmatively informs an asylum officer that they have a fear of removal to the relevant third country.

165.    In Section 240 removal proceedings, the Rule and Guidance likewise do not ensure the required determination in every case.  They instead direct ICE attorneys to seek pretermission and allow immigration judges to pretermit applications for asylum, withholding of removal, and CAT protection and order noncitizens removed to ACA countries without ensuring that noncitizens have adequate notice and the opportunity to raise fears as to any proposed ACA

country of removal and have hearings to determine whether they may be persecuted in the proposed countries.

166.    The Rule and Guidance therefore violate 8 U.S.C. § 1158(a)(2)(A) and are contrary to law under the APA, 5 U.S.C. § 706(2)(A).

### THIRD CLAIM FOR RELIEF
**(Challenge to the Rule and Guidance)**
**(Violation of the Safe Third Country Statute, 8 U.S.C. § 1158(a)(2)(A),**
**and the APA, 5 U.S.C. § 706(2)(A))**

167.    The safe third country provision also requires that before the government may remove an asylum seeker to a "safe third country" pursuant to a bilateral agreement, it must first determine that the third country would provide the asylum seeker "access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection."  8 U.S.C. § 1158(a)(2)(A).

168.    The statute therefore requires Defendants to assess whether the proposed country of removal is in fact able to provide a full and fair asylum process to particular asylum applicants based on their specific characteristics.  This requires, for example, an assessment that the receiving country provides a full and fair asylum process for LGBTQI+ people and people of an applicant's racial or ethnic background.

169.    The Rule and Guidance instead provide that Designations concerning this statutory requirement will be made strictly on a categorical basis.  The Rule and Guidance do not provide for asylum officers or immigration judges to consider whether any individual asylum seeker would lack access to a full and fair asylum process in an ACA country, even if the individual has specific grounds to believe that they, in particular, would not have access to a full or fair process in that country.

170.    The Rule and Guidance therefore violate 8 U.S.C. § 1158(a)(2)(A) and are

contrary to law under the APA, 5 U.S.C. § 706(2)(A).

## FOURTH CLAIM FOR RELIEF
### (Challenge to the Rule and Guidance)
### (Violation of the Safe Third Country Statute, 8 U.S.C. § 1158(a)(2)(A), and the APA, 5 U.S.C. § 706(2)(A))

171.    The safe third country provision contains an exception applicable if "the Attorney

General finds that it is in the public interest for the [noncitizen] to receive asylum in the United

States."  8 U.S.C. § 1158(a)(2)(A).  With respect to Section 240 removal proceedings in

immigration court, the term "the Attorney General" as used in the statute encompasses DOJ

immigration judges.

172.    The Rule and Guidance erroneously provide that immigration judges lack this

authority and that only DHS can make the public interest determination.

173.    The Rule and Guidance therefore violate 8 U.S.C. § 1158(a)(2)(A) and are

contrary to law under the APA, 5 U.S.C. § 706(2)(A).

## FIFTH CLAIM FOR RELIEF
### (Challenge to the Rule and Guidance)
### (Violation of 8 U.S.C. § 1231(b)(3), and its implementing regulations; FARRA, codified at 8 U.S.C. § 1231 note, and its implementing regulations; and the APA, 5 U.S.C. § 706(2)(A))

174.    The INA's withholding of removal provision, 8 U.S.C. § 1231(b)(3), and Section

2242(a) of FARRA implement the United States' *non-refoulement* treaty obligations with respect

to persecution and torture.

175.    The withholding of removal provision bars removal of a noncitizen to a country

where it is more likely than not that they would face persecution.  8 U.S.C. § 1231(b)(3).

176.    FARRA bars removal of a noncitizen to a country where it is more likely than not

that they would be tortured.  8 U.S.C. § 1231 note; *see* 8 C.F.R. §§ 208.16(c)(2), 1208.16(c)(2).

177.    Longstanding regulations implement these statutory provisions and the obligation not to remove an individual to persecution or torture.  For instance, the determination whether an individual faces a risk of persecution or torture and is entitled to withholding of removal or CAT protection can be made only by an immigration judge, and only  after full removal proceedings in immigration court.  8 C.F.R. § 208.16(a), (c)(4); *id.* § 1208.16(a), (c)(4).  And past persecution creates a rebuttable presumption of eligibility for withholding of removal.  *See* 8 C.F.R. §§ 208.16(b)(1)(i), 1208.16(b)(1)(i).

178.    The Rule and Guidance are inconsistent with, and seek to bypass, these statutory and regulatory requirements.

179.    In expedited removal proceedings, the Rule and Guidance require asylum officers, not immigration judges, to make the ultimate withholding and CAT determinations and deny the opportunity for immigration judge review.

180.    In Section 240 removal proceedings, the Rule and Guidance allow immigration judges to pretermit applications for withholding of removal and CAT protection as to the originally proposed countries of removal and then to order removal to third countries, without ensuring that noncitizens have the opportunity to raise fears of persecution or torture in those countries and receive hearings on withholding of removal and CAT protection.

181.    The Guidance also provides that, in determining whether an individual is more likely than not to be persecuted in the receiving country, past persecution shall not establish a presumption of future persecution.

182.    Because the Rule and Guidance abandon the statutory and regulatory safeguards designed to ensure these critical protections against *nonrefoulement* to persecution and torture,

the Rule and Guidance violate 8 U.S.C. § 1231(b)(3) and FARRA, and their implementing

regulations, and are therefore contrary to law under the APA, 5 U.S.C. § 706(2)(A).

### SIXTH CLAIM FOR RELIEF
**(By Section 240 Individual Plaintiffs and Proposed Class Only)**
**(Challenge to the Rule and Guidance)**
**(Violation of the Due Process Clause of the Fifth Amendment, 8 U.S.C. § 1229a, 8 C.F.R.**
**Part 1240, and the APA, 5 U.S.C. § 706(2)(A)-(B))**

183.    The Rule and Guidance fail to ensure adequate notice and opportunity to be heard

prior to the denial of applications for asylum, withholding of removal, and CAT protection.

184.    The Rule and Guidance therefore violate the Due Process Clause of the Fifth

Amendment to the U.S. Constitution and statutory and regulatory due process protections in 8

U.S.C. § 1229a and 8 C.F.R. Part 1240.

### SEVENTH CLAIM FOR RELIEF
**(Challenge to the Rule and Guidance)**
**(Violation of the Credible Fear Statute, 8 U.S.C. § 1225(b)(1))**

185.    Under the INA, a noncitizen placed in expedited removal proceedings must be

asked if they fear removal or wish to seek asylum and if the noncitizen answers affirmatively,

they must be referred to an asylum officer for a credible fear interview applying the low

"significant possibility" screening standard.  8 U.S.C. § 1225(b)(1).

186.    A noncitizen "who is eligible for such interview may consult with a person or

persons of the [noncitizen]'s choosing prior to the interview or any review thereof," 8 U.S.C.

§ 1225(b)(1)(B)(iv), and that "person . . . may be present at the interview and may be permitted

. . . to present a statement at the end of the interview," 8 C.F.R. § 208.30(d)(4).

187.    Following the credible fear interview, "if the officer determines that [a noncitizen]

does not have a credible fear of persecution," the noncitizen is entitled to "request . . . prompt

review by an immigration judge of [that] determination."  8 U.S.C. § 1225(b)(1)(B)(iii)(I), (III).

188.     This credible fear interview process, with its attendant safeguards, is the only

mechanism in expedited removal proceedings by which the government may remove an

individual who has expressed a fear of persecution or intention to apply for asylum.  Only

removal proceedings "specified in" the INA may supplant Section 240 removal proceedings

before an immigration judge.  8 U.S.C. § 1229a(a)(3).

189.     If applied in expedited removal proceedings, the safe third country provision must

be applied through the statutory credible fear interview process, with its attendant procedural

safeguards.  Nothing in the safe third country provision purports to create an alternate expedited

removal mechanism.

190.     Because the Rule and Guidance provide for the expedited removal of asylum

seekers without application of the low credible fear screening standard, right to consultation with

and representation by counsel, and immigration judge review, the Rule and Guidance violate 8

U.S.C. § 1225(b)(1) and are contrary to law under the APA, 5 U.S.C. § 706(2)(A).

## EIGHTH CLAIM FOR RELIEF
### (Challenge to the Rule, Guidance, and Designations)
### (Violation of the APA, Arbitrary and Capricious)

191.     The APA requires reasoned and reasonable policy-making.

192.     The Rule, Guidance, and Designations are arbitrary and capricious in violation of

the APA, 5 U.S.C. § 706(2)(A).

193.     Among other reasons, the Rule, Guidance, and Designations are arbitrary and

capricious because Defendants adopted procedures unreasonably ill-suited to complying with

their *non-refoulement* obligations; made unacknowledged, inadequately explained, and

unjustified departures from prior agency policies and procedures; failed to articulate reasoned

explanations for their decisions; considered factors that Congress did not intend to be considered;

failed to consider and account for third countries' actual safety, third countries' actual ability to provide full and fair protection procedures, or the number of people to which third countries can actually provide such procedures; entirely failed to consider other important aspects of the problem; and offered explanations that run counter to the evidence before the agencies.

### NINTH CLAIM FOR RELIEF
### (Challenge to the Rule)
### (Violation of the APA, Notice And Comment and 30-Day Grace Period)

194.    The APA requires notice and opportunity for comment prior to the promulgation of regulations.  5 U.S.C. §§ 553(b), (c).  Defendants failed to provide notice and an opportunity to comment prior to the Rule's effective date.

195.    The APA requires that a regulation be published "no less than 30 days before its effective date."  5 U.S.C. § 553(d).  Defendants failed to comply with this requirement with respect to the Rule.

196.    Defendants have not articulated reasons sufficient to show good cause why these requirements are inapplicable, nor is the foreign affairs exception applicable.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for the following relief:

a.   An order certifying the proposed class, appointing the Section 240 Individual Plaintiffs as class representatives, and appointing Plaintiffs' counsel as class counsel;

b.   A declaration pursuant to 28 U.S.C. § 2201 that the Rule, Guidance, and Designations are contrary to law, in excess of statutory authority, and/or arbitrary and capricious;

c.   Vacatur of the Rule, Guidance, and Designations;

d.  An injunction prohibiting Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from implementing or enforcing the Rule, Guidance, and Designations;

e.  For any Section 240 Individual Plaintiff who is removed to a third country pursuant to the Rule, Guidance, or Designations, an order requiring Defendants to (1) physically return each removed Section 240 Individual Plaintiff to the United States and (2) parole each removed Section 240 Individual Plaintiff into the United States or otherwise permit them to apply for asylum, withholding of removal, and/or CAT protection;

f.  An order awarding Plaintiffs' costs of suit, and reasonable attorneys' fees and expenses pursuant to any applicable law;

g.  Such other and further relief as the Court deems equitable, just, and proper.

Dated: December 19, 2025                              Respectfully submitted,

Keren Zwick (D.D.C. Bar. No. IL0055)          s/ Lee Gelernt
Mary Georgevich**                             Lee Gelernt*
Gerardo Romo*                                 Omar Jadwat*
Mark Fleming*                                 Natalie Behr**
Charles G. Roth*                              American Civil Liberties Union Foundation,
National Immigrant Justice Center             Immigrants' Rights Project
111 W. Jackson Blvd., Suite 800               125 Broad Street, 18th Floor
Chicago, IL 60604                             New York, NY 10004
(312) 660-1370                                (212) 549-2660
kzwick@immigrantjustice.org                   lgelernt@aclu.org
mgeorgevich@immigrantjustice.org              ojadwat@aclu.org
gromo@immigrantjustice.org                    irp_nbehr@aclu.org
mfleming@immigrantjustice.org
croth@immigrantjustice.org
                                              Morgan Russell*
                                              American Civil Liberties Union Foundation
Melissa Crow (D.C. Bar No. 453487)            Immigrants' Rights Project
Center for Gender & Refugee Studies           425 California Street, Suite 700
1901 Pennsylvania Avenue, NW                  San Francisco, CA 94104
Suite 900, PMB 228                            (415) 343-0770

Washington, DC 20006
(202) 355-4471
crowmelissa@uclawsf.edu

Blaine Bookey**
Peter Habib**
Center for Gender & Refugee Studies
200 McAllister St.
San Francisco, CA 94102
(415) 565-4877
bookeybl@uclawsf.edu
habibpeter@uclawsf.edu

Anwen Hughes**
Inyoung Hwang**
Human Rights First
121 W. 36th St., PMB 520
New York, NY 10018
(212) 845-5244 02) 547-5692
hughesa@humanrightsfirst.org
hwangs@humanrightsfirst.org

mrussell@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation of
the District of Columbia
529 14th Street NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

*Attorneys for Plaintiffs*
*\* Appearing pro hac vice or pro bono*
*\*\* Application for admission pro hac vice or
pro bono appearance forthcoming*